```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION

 3                 CASE NUMBER 16-20893-CR-MORENO

 4
   UNITED STATES OF AMERICA,
 5
                  Plaintiff,                    Courtroom 13-3
 6
      vs.                                       Miami, Florida
 7
   MONTY RAY GROW,                              January 23, 2018
 8
                  Defendant.
 9   ================================================================
10             EXCERPT OF JURY TRIAL PROCEEDINGS
        TESTIMONY OF JENNIFER KLEIN and LISA KLITZ
11        BEFORE THE HONORABLE FEDERICO A. MORENO
                  UNITED STATES DISTRICT JUDGE
12   ================================================================
13   APPEARANCES:

14   FOR THE GOVERNMENT:      KEVIN J. LARSEN, AUSA
                              JON M. JUENGER, AUSA
15                            United States Attorney's Office
                              Economic Crimes Section
16                            United States Attorney's Office
                              99 Northeast Fourth Street
17                            Miami, Florida 33132
                                             305-961-9356
18                                      Fax: 305-530-6168
                                    kevin.larsen@usdoj.gov
19                                    jon.juenger@usdoj.gov
20   FOR THE DEFENDANT:       DANIEL L. RASHBAUM, ESQ.
                              JEFFREY D. MARCUS, ESQ.
21                            Marcus Neiman & Rashbaum, LLP
                              2 South Biscayne Boulevard
22                            Suite 1750
                              Miami, Florida 33131
23                                             305-400-4261
                                        Fax: 866-780-8355
24                                 drashbaum@mnrlawfirm.com
                                    jmarcus@mnrlawfirm.com
25
```

1         **KATHRYN A. MEYERS, ESQ.**
          Law Office of Kathryn A. Meyers PLLC
2         201 South Biscayne Boulevard
          Suite 1750
3         Miami, Florida 33131
                305-400-4266
4            kate@kmeyerslaw.com

5  **REPORTED BY:**    **GILDA PASTOR-HERNANDEZ, RPR, FPR**
          Official United States Court Reporter
6         Wilkie D. Ferguson Jr. US Courthouse
          400 North Miami Avenue - Suite 13-3
7         Miami, Florida  33128    305.523.5118
          gphofficialreporter@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS

Page

Jennifer Klein ............................................... 5

    Direct Examination by Mr. Larsen ....................... 5

      Cross-Examination by Mr. Marcus ...................... 18

Lisa Klitz ................................................. 40

    Direct Examination by Mr. Juenger ...................... 40

      Cross-Examination by Mr. Marcus ...................... 60

Reporter's Certificate ..................................... 67

## EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Government's Exhibit Numbers 1, 67, 170 ............. 5 | | | | 2 |
| Government's Exhibit Numbers 170-A through 170-D ............................................ 11 | | | | 9 |
| Government's Exhibit Number 171 ................... 30 | | | | 3 |
| Government's Exhibit Numbers 3, 4, 4-B, 4-C, 4-D, 5, 6, 7, 8, 9, 11, 159 through 169 ........... 41 | | | | 19 |

```
 1                        *      *      *

 2          (The following proceedings were held at 3:33 p.m.:)

 3                THE COURT:  Next witness.

 4                MR. LARSEN:  Your Honor, the United States calls

 5   Special Agent Jennifer Klein.

 6                THE COURT:  All right.  Raise your right hand.

 7                JENNIFER KLEIN, GOVERNMENT'S WITNESS, SWORN.

 8                THE COURT:  Tell us your name once you get seated.

 9                THE WITNESS:  My name is Jennifer, J-e-n-n-i-f-e-r;

10   last name is Klein, K-l-e-i-n.

11                THE COURT:  Where do you work?

12                THE WITNESS:  I'm a special agent with the Defense

13   Criminal Investigative Service.

14                THE COURT:  Go ahead.

15                MR. LARSEN:  Your Honor, before I get started with the

16   examination, I have spoken with counsel for defense, without

17   objection the Government is moving in Government's Exhibits 1,

18   67 --

19                THE COURT:  Hold on, hold on.  167.

20                MR. LARSEN:  1, 67 and 170.

21                THE COURT:  167, right?

22                MR. LARSEN:  No.

23                THE COURT:  You said 1, 67.  What else?

24                MR. LARSEN:  170.

25                THE COURT:  Okay.  Without objection they will be
```

1    admitted.

2        (Government's Exhibit Numbers 1, 67, 170 were received in

3    evidence.)

4                        DIRECT EXAMINATION

5    BY MR. LARSEN:

6    Q.   Good afternoon, Special Agent Klein.  Where are you

7    currently employed?

8    A.   I am currently employed with the Defense Criminal

9    Investigative Service, assigned to the Fort Lauderdale, Florida

10   office.

11   Q.   And how long have you been employed with the Defense

12   Criminal Investigative Service?

13   A.   Approximately 15 years.

14   Q.   What are the types, just generally, types of cases that

15   you're assigned to investigate?

16   A.   The Defense Criminal Investigative Service is specifically

17   assigned to protecting the American war fighters, the U.S.

18   military men and women, and the critical infrastructure that is

19   part of the Department of Defense.

20           We investigate a slew of different areas to include

21   procurement fraud, healthcare fraud, terrorism related crimes,

22   economic crimes, computer crimes, bribery, extortion, things of

23   the like.

24   Q.   What is your educational background?

25   A.   I have a Bachelor and Master's Degree in criminal justice.

1  Q.  And when did you graduate?

2  A.  Approximately 1999.

3  Q.  With your Bachelor's degree?

4  A.  No, about 1998, and then about a year later with the

5  Master's.

6  Q.  Okay.  Now, were you assigned as part of your duties to

7  investigate a case involving the defendant, Mr. Monty Grow?

8  A.  Yes.

9  Q.  And what was the scope of the assignment that you received

10  for this case?

11  A.  I was assigned to review claims data that was obtained

12  through certified Tricare claims database system from PCA, and

13  then from there, extract certain beneficiaries that were under

14  Mr. Grow and the patient recruiters that were under Mr. Grow and

15  their patients, and create a separate spreadsheet.

16  Q.  You testified that you analyzed claims data.  What

17  specifically related to that claims data did you look at?  Did

18  you look at all the claims?  Did you look at a subset of the

19  claims?

20  A.  Based on the documents, e-mails, and other investigative

21  materials that we had during the course of the investigation,

22  there were certain names that were specifically assigned under

23  Mr. Grow.  For example, there's an email, there's -- I'm sorry.

24  There was an email specifically from Mr. Grow to Ms. Delgado, I

25  believe around the time frame April 2015, with specific

1   attachments with it and under those attachments were beneficiary

2   names.

3   Q.  So with respect to the claims data, what specifically were

4   you looking at with respect to Mr. Grow?

5   A.  With respect to Mr. Grow, I was tasked with sorting and

6   filtering out specific beneficiary names.  For example, if under

7   Mr. Grow there was a beneficiary named John Smith, I would look

8   at the master claims data that was under PCA and then filtered

9   out and specifically pick John Smith, with his respective

10  biographical information, to pertain to that specific John

11  Smith.

12  Q.  Okay.  Ms. Klein, I previously -- or a moment ago you

13  mentioned an email related to someone named Ms. Delgado.  I'm

14  going to show you what's been admitted as Government's Exhibit

15  67, and we're going to just put it on the screen here.

16          MR. LARSEN:  Your Honor, could we switch over to the

17  computer?

18          THE COURT:  I don't know.  Can you?

19          MR. LARSEN:  May I?

20          THE COURT:  You may.  Permission granted.

21          MR. LARSEN:  I just need someone --

22          THE COURT:  When you say may --

23          MR. LARSEN:  May I, Your Honor?  Ms. Christie is -- I

24  could come over there and try, but I don't know how.

25          THE COURT:  As excited as she would be about being here

1    with you all, she also has to do a lot of work for me inside my

2    office.

3           Can you help us, Gilda?

4    BY MR. LARSEN:

5    Q.   Okay.  Ms. Klein, I'm showing you what's been admitted as

6    Government's Exhibit 67.  What is this document that's on the

7    screen?

8    A.   This is a document that I was explaining before from

9    Mr. Grow to Mary Delgado at her Yahoo account and attached to

10   the email are a few attachments, and on those attachments are

11   beneficiary names respective to his customers' clients.

12   Q.   So just showing you Page 2 of the exhibit, could you just

13   describe for the jury what this is and what you did with it?

14   A.   Okay.  So I went line-by-line and I tried to, again, go to

15   the master claims data, which is PCA's claims data, and

16   literally look up Aaron Gernon.  If I found Aaron Gernon, I

17   added him -- I segregated his claims information to a separate

18   spreadsheet.  The same thing with all the other representatives

19   listed on there.  You know, I tried to be as consistent and as

20   accurate as possible.

21   Q.   What were you aiming to do by reviewing this list with

22   respect to the defendant?

23   A.   To accurately reflect all of the patients that Mr. Grow was

24   providing for PCA, for PCA to then in turn bill Tricare and be

25   paid for those respective claims.

1  Q.  So what was the next thing that you did after reviewing this
2  document, the claims data?  What, if anything, did you do next?
3  A.  Okay.  There were instances with his patient recruiters
4  where there would be -- again, I'll utilize the example of John
5  Smith.  You'd have John Smith on this document listed for
6  Mr. Grow, and then you would have John Smith listed under one of
7  his recruiters.  It would pertain to the same claims data, so
8  essentially I removed duplicates because obviously you just
9  wanted to count it for the one time.
10  Q.  Okay.  I'm going to show you what's been admitted as
11  Government Exhibit 1-7-0; 170.  Do you recognize the document
12  that's on the screen?
13  A.  Yes.
14  Q.  What is it?
15  A.  This is the segregated claims data from the PCA into the
16  Monty Grow spreadsheet of beneficiaries.
17  Q.  Okay.  On the bottom right-hand corner it says page 1 of
18  128, so are pages 2 through 128 substantially the same in terms
19  of the data, the columns that are on these documents?
20  A.  Correct.
21  Q.  So in a nutshell, what is this document?  For the jury,
22  describe it.
23  A.  This document, just to kind of break it down for the jury a
24  little bit, it will obviously -- some of it is self-explanatory,
25  but it will provide the beneficiary's name.  The fill date is in

Klein - Direct

1    respect to the date that the prescription was filled.

2          So in this case, the part that's highlighted would be

3    for Mr. John Adams, so the fill date would have been 4-14-2015.

4    The adjudicated date is essentially the date that the claim was

5    paid for by the insurance company based on the benefits coverage

6    requirements that they have.

7          Then the copayment amount if it applied to that

8    respective beneficiary.  The billed amount is what essentially

9    was billed to Tricare.  The paid amount is what Tricare

10   essentially paid from that billed amount.  The prescriber is the

11   physician who, you know, is under that respective prescription,

12   and obviously the pharmacy is DCRX, but it's also known as PCA.

13   Q.  So the names that are in the bene name column, where do

14   those names come from?

15   A.  That came from the PCA claims data.

16   Q.  But where did you get it?  Where did you get those names

17   from with respect to Mr. Grow?

18   A.  I extracted the claims data information from the claims that

19   were submitted and paid for by Tricare.  Everything is housed

20   under Tricare through a company called Express Scripts,

21   Incorporated.

22   Q.  I apologize.  I probably asked a bad question.  These names,

23   Adams, John; Gabriella, Addie; did they come from another

24   exhibit you testified to?

25   A.  Yes, I apologize.  Yes.

1  Q.  Where did you get the names that are in the bene name

2  column?

3  A.  From the email that I just spoke of from Mr. Grow to

4  Ms. Delgado for the time frame of April 2015.

5       MR. LARSEN:  Your Honor, the Government is now offering

6  without objection Exhibits 170-A through D.

7       THE COURT:  All right.  It will be admitted -- they

8  will be admitted.

9     (Government's Exhibit Numbers 170-A through 170-D were

10 received in evidence.)

11 BY MR. LARSEN:

12 Q.  Could we go to the last page of Exhibit 170.  Okay.

13      Ms. Klein, can you explain what's on this last page,

14 especially the numbers that are in red?

15 A.  Based on the email, as I articulated before, that Mr. Grow

16 had submitted to Ms. Delgado and the attachments that pertain to

17 that, the total for all the beneficiaries identified, and I

18 identified approximately 676 beneficiaries and about 4,449

19 claims, this is the overall total to that.

20      So for copayment amount, the total came out to $37,545

21 for all the beneficiaries.  It went from, obviously, zero

22 copayment to $20 copayment, everybody was different.  And the

23 billed amount was in total that was submitted to Tricare was

24 48,000 -- I'm sorry, $48,320,259.38, and the total paid amount

25 was $39,408,499.02.

1  Q.   I'm sorry.  Did you say there were -- how many

2  individual, specific individual beneficiaries did you identify?

3  A.   Based on the documents that I reviewed, I was able to

4  identify, removing duplicates, approximately 676.

5  Q.   676 individual people?

6  A.   Individual beneficiaries, correct.

7  Q.   And how many individual claims?

8  A.   Approximately 4,449.

9  Q.   And what was the date range that comprised these claims that

10  you just testified about?

11  A.   Based on the email that I utilized, the date range that I

12  had was on or about November 2014 to August of 2015.

13  Q.   Okay.  I'm going to show you what's been admitted as

14  Government's Exhibit 170-A.  Can you explain for the jury what

15  this document is?

16  A.   This document is based on information that I reviewed and

17  based on the document that was provided through the email of the

18  percentage amounts as well, this is essentially a branch of --

19  for example, the Rambaran family, you have Rosalinda who

20  recruited, if you will, or had under her Rasheed, Latonya,

21  Tricosa and Tashawn; as well as under Rashaan, then Rashaan in

22  turn recruits Dryvaan.  I apologize if I am butchering the

23  names.

24  Q.   With respect to Rosalinda Rambaran, based on your analysis

25  of the Tricare claims data, was Ms. Rambaran a Tricare

1  beneficiary?

2  A.   Yes.

3  Q.   How about Rasheed Rambaran?

4  A.   Yes.

5  Q.   How about Rashaan Rambaran?

6  A.   Yes.

7  Q.   How about Dryvaan Rambaran?

8  A.   Yes.

9  Q.   What about the others?

10  A.   Yes.

11  Q.   Everybody on this screen was a Tricare beneficiary?

12  A.   That I could locate, yes.

13  Q.   Let's now look at Government's Exhibit 170-B.  I'm sorry,

14  hold on.  No, Page 2 of Government's Exhibit 170-A.

15       Can you explain for the jury what this document is?

16  A.   I took from Mr. Grow's spreadsheet of those individuals that

17  I previously identified in the previous exhibit and essentially

18  is this sum total of the billed, paid, the number of claims, the

19  specific doctor that was under those prescriptions, and the date

20  range that this applies to.

21       On the bottom you will see the specific ingredients for

22  these prescriptions and the number of times those ingredients

23  were used for each individual.

24  Q.   So when you say Rambaran family, what assumption did you

25  make in calling this the Rambaran family?

1  A.   When you see, for example, the sponsor ID number, it's

2  actually when you have a Tricare member, just like myself, I'm

3  the primary -- you know, I have my own insurance, I am the

4  primary, so any of my family members would be under me, same

5  thing with Tricare.  So the sponsor ID is that, it is one

6  individual, but it's the coverage for the family.

7        Then for the specific ingredients, for example, for the

8  first column, for the pain, when I looked at the claims data,

9  you would see for Dryvaan, for his respective claims, you would

10 see the number of times each one of these ingredients were

11 utilized.

12       So, for example, Dryvaan would be -- there was

13 prescriptions where on two occasions I would see it was under

14 pain, scar, you know, so forth, you know, et cetera.

15 Q.   Okay.  Can we briefly look at Page 3?  Now, what are you

16 stating in this document?

17 A.   Based on interviews that were conducted as well as the

18 documents that were submitted by Mr. Grow, it shows that

19 Mrs. Rambaran had recruited the following individuals and it's

20 outlined.  The slight difference is Rosalinda Rambaran did

21 recruit Rashaan Rambaran, but then he in turn recruited Dryvaan

22 Rambaran.

23 Q.   Okay.  What data, if any, did you look at in creating this

24 that came from Mr. Grow's documents?

25 A.   I looked at the claims data to see whether or not claims

1    were submitted for these respective individuals, which they

2    were, as well as reviewing interview reports.

3              MR. LARSEN:  Okay.  Could I get 170-B?

4    BY MR. LARSEN:

5    Q.  What is 170-B?

6    A.  This is another example.  As I did with the Rambaran family,

7    I did it the same way for the Bing family as a general outline.

8              So you have, you know, Joy Bing, who then recruited the

9    other individuals; Colette Bing, Vidal Bing, Oliver Thomas,

10   Nichole Powell and Rosalinda Rambaran, who obviously you had

11   seen from the previous exhibit.  Rosalinda in turn then

12   recruited her family members, so it kind of extends.

13   Q.  So Joy Bing is a Tricare beneficiary?

14   A.  Yes.

15   Q.  And how about Colette Bing and Vidal Bing?

16   A.  Yes.

17   Q.  Oliver Thomas and Nichole Powell?

18   A.  Yes.

19   Q.  So everyone on this document is also a Tricare beneficiary?

20   A.  Correct.

21   Q.  If we could look at Page 2 of the exhibit.  So Page 2 shows

22   a similar amount of data as you did for the Rambaran family.

23   Can you just briefly describe what you did here?

24   A.  Okay.  As in the previous exhibit, the same thing with the

25   Bing family where you have the sponsor ID number for that

1  respective family.  The total billed for the Bing family is

2  outlined, as well as the total paid, as well as the total number

3  of claims that were submitted for those respective individuals,

4  as well as the prescriber and the date range that this applies

5  to.  On the bottom of you have, again, the specific ingredients

6  that were used and identified through the claims data was

7  reviewed.

8  Q.  So the total paid amount here, the $337,999, whose claim is

9  that specifically related to?

10 A.  To the Bing family.

11 Q.  Joy Bing, Vidal Bing, and Colette Bing?

12 A.  Correct.

13 Q.  If we could look at Government's Exhibit 170-C.  Who's the

14 Powell family?

15 A.  The Powell family is another example to the previous Bing

16 family and Rambaran family.  Nichole Powell who had been

17 recruited by someone else, who then -- she is a Tricare

18 beneficiary who then recruited Joy Bing, Glenn Powell and Aisha

19 Owmby.

20 Q.  And everyone on this, Nichole Powell, Glenn Powell, and we

21 just talked about Joy Bing, and Aisha Owmby, is everybody on

22 this document a Tricare beneficiary?

23 A.  Yes.

24 Q.  If you look at Page 2, it says for the Powell family -- and

25 the Powell family, according to the document, is it Glenn Powell

Klein - Direct

1  and Nichole Powell?

2  A.   Yes.

3  Q.   Okay.  So the total amount paid for claims related to the

4  Powell family is what?

5  A.   Total billed is $373,816.36; total paid is $318,347.79 in

6  relation to 28 claims.

7  Q.   Finally, if we could look at Government's Exhibit 170-D.

8  Who is Philip Snodgrass?

9  A.   He is another Tricare beneficiary.

10  Q.   What did you do to create this document in 170-D?

11  A.   I segregated his claims data from Mr. Grow's spreadsheet and

12  identified a total of four claims and, you know, summarized the

13  total billed and the total paid, you know, the prescriber, as

14  well as the date range and the ingredients that were used to

15  make the prescription.

16  Q.   So a total of four claims and the total amount paid was the

17  second figure, the $26,336.81?

18  A.   Yes.

19       MR. LARSEN:  One moment, Your Honor.

20  BY MR. LARSEN:

21  Q.   On Government's Exhibit 67, you testified about the patient

22  list of Mr. Grow's and you said there were several other

23  attachments.  Could you just briefly describe what these other

24  attachments that you looked at were and what you used them for?

25  A.   The first attachment, which we saw a sub attachment to, is a

1    listing of beneficiaries that he had in alphabetical order with

2    names next to it and numbers next to it, which is like

3    percentages.  That's the first attachment.

4          The second one is outlining beneficiaries that he

5    brought into the company.  For example, it says Monty Grow,

6    2.21, 3.7.  When you open that attachment, it's showing February

7    21st to March 7th.

8    Q.   Okay.

9    A.   And the next one is Monty Grow, 3.8 through 3.21.  Again, it

10   reflects the date range of patients he brought in for March 8th

11   through March 21st, so on and so forth.  The next attachment,

12   Monty Grow, 3.22 through 4.4.  It's March 22nd through April

13   4th; and the last one that he has attached is Monty Grow, 4.5

14   through 4.18, which is April 5th through April 18th.

15         MR. LARSEN:  Thank you.  Nothing further, Your Honor.

16         THE COURT:  Cross-examination.

17                        CROSS-EXAMINATION

18   BY MR. MARCUS:

19   Q.   Good afternoon, Special Agent Klein.

20   A.   Good afternoon.

21   Q.   I want to start with some questions about the Tricare data

22   and Tricare itself.  Tricare is essentially a very large health

23   insurance program, right --

24   A.   Yes.

25   Q.   -- that provides benefits to military families and people in

1    the military?

2    A.   Yes.

3    Q.   One of the largest healthcare programs in the country,

4    right?

5    A.   Yes.

6    Q.   And as an insurance program, it reimburses for claims that

7    providers make to it.  Do you agree with that?

8    A.   Yes.

9    Q.   But you have to become a provider in order to submit a bill

10   to Tricare for a claim.  Do you agree with that?

11   A.   Yes.

12   Q.   So for example, physicians can be providers, right?

13   A.   Yes.

14   Q.   Hospitals?

15   A.   Yes.

16   Q.   And pharmacies?

17   A.   Yes.

18   Q.   Mr. Grow is not a Tricare provider, is he?

19   A.   Not to my knowledge.

20   Q.   Right.  So just so it's clear to the jury --

21             MR. MARCUS:  Could you guys show the last email with

22   Mr. Grow's report on the computer?

23   BY MR. MARCUS:

24   Q.   Ms. Delgado worked with Mr. Grow, right?

25             MR. LARSEN:  Objection, foundation.

1    MR. MARCUS:  Well --

2    THE COURT:  Grounds.

3    MR. LARSEN:  Objection, foundation, Your Honor.

4    THE COURT:  Okay.  Does she know that?

5    Do you know that?

6    THE WITNESS:  I do not, Your Honor.

7    THE COURT:  Then that takes care of it.

8 BY MR. MARCUS:

9 Q.  Okay.  But you were part of the investigative team for this

10 case, were you not?

11 A.  Yes, but I came in very, very late on in the investigation.

12 Q.  Okay.

13 A.  Literally like less than two months ago.

14 Q.  Less than two months?

15 A.  Correct.

16 Q.  Okay.  So when do you think you started on the

17 investigation?

18 A.  November, late November I would say.  October-November time

19 frame, but fully vested, because we have so many cases, I would

20 say the past two months.

21 Q.  Okay.  So when you're talking about documents with Mr. Grow,

22 you're not talking about any documents submitted to Tricare, are

23 you?

24 A.  For these attachments?

25 Q.  Yes.

1    A.   No.   That I am aware of, those attachments were not

2    submitted to Tricare directly.

3    Q.   Are you aware of a single document that Mr. Grow ever sent

4    to Tricare?

5    A.   Him directly?   No.

6    Q.   Yes, him directly.

7    A.   No.   The answer is no, that I'm aware of.

8    Q.   And are you aware of any claim that was ever submitted by

9    Mr. Grow directly to Tricare?

10   A.   No.

11   Q.   So Exhibit 170 is a compilation of claims that were

12   submitted to Tricare for reimbursement; is that right?

13   A.   Correct.   That was submitted by PCA to Tricare for

14   reimbursement.

15   Q.   Right.   PCA is the pharmacy and they were a Tricare

16   provider.

17   A.   Correct.

18   Q.   Okay.   And so just so it's -- so all of this data that you

19   looked at relate to claims that the pharmacy submitted directly

20   to Tricare on behalf of prescription medications that it

21   provided to beneficiaries?

22   A.   It was submitted by PCA, but those names were obtained

23   through that email from Monty Grow to Ms. Delgado.

24   Q.   Well, I understand.   The email is separate.   There's an

25   email with Mr. Grow and Ms. Delgado that has an attachment that

1    lists some of the same patients, right, and some information

2    that you discussed on direct.

3    A.   Yes.

4    Q.   Right.  But the actual claims submissions that are sent to

5    Tricare, the billing, the claims reimbursement, none of that

6    came from Mr. Grow?

7    A.   For the physical claim, for example, for one of the

8    attachments that is not physically listed on Exhibit 67, it

9    lists the -- I believe it was the prescription number.  So, for

10   example, John Smith had specific numbers assigned to him and

11   then I would cross reference it with the master claims data from

12   PCA so that it fully aligned.  It's not just John Smith, it

13   fully aligned with specific claims that were then in turn

14   submitted by PCA that were billed and paid for by Tricare.

15   Q.   Okay.  I understand you were looking -- my question is

16   focused on -- we're just talking about the submission of claims.

17   Okay?

18   A.   Okay.

19   Q.   I mean, I could put them all here, but this is 128 pages and

20   this is just a summary of some of the claims, right, these are

21   beneficiaries, and you went through on direct and explained the

22   categories, right?

23   A.   Yes, sir.

24   Q.   Okay.  For all of the claims in this entire document, all of

25   them were submitted by PCA to Tricare, correct?

Klein - Cross

1    A.   Correct, but they were submitted by Mr. Grow to Ms. Delgado

2    who -- okay.  I'm sorry.

3    Q.   Because I don't want it to be confusing.  So we talked about

4    Tricare is an insurance program, correct?

5    A.   Yes, sir.

6    Q.   In order to send a claim to Tricare, you have to be a

7    provider.  Do you agree with that?

8    A.   Yes.

9    Q.   You actually have to sign a provider agreement, it's

10   essentially a contract.  You agree with that?

11   A.   Yes.

12   Q.   And you get a number and that allows you to submit claims

13   for reimbursement for medical services you provide?

14   A.   Yes.

15   Q.   Okay.  Pharmacies, for example, have a provider number?

16   A.   Correct.

17   Q.   PCA had a provider number?

18   A.   Correct.

19   Q.   And all of the patient data you looked at in this case

20   related to prescriptions that PCA filled for Tricare

21   beneficiaries?

22   A.   Correct.

23   Q.   And for that reimbursement claim -- for the claims that were

24   submitted, you went through and you showed the amounts per

25   claim.  Every single claim that was submitted to Tricare came

1    from PCA.  Do you agree with that?

2    A.  For the billed and paid amount, it was done by PCA and paid

3    for by Tricare to that company, yes.

4    Q.  Right.  They're the ones lawfully that submit the claim

5    because they are the actual medical provider, in this case the

6    prescription drug provider.  Do you agree with that?

7    A.  Yes.

8    Q.  Okay.  And in fact, Tricare hires a pharmacy benefit manager

9    to administer Tricare and look at all of these claims that are

10   submitted to it.  It's a company called Express Scripts.  Have

11   you heard of that name?

12   A.  Yes.

13   Q.  We sometimes call them PBM for short, but it's prescription

14   benefit manager, correct?

15   A.  Correct, yes.

16   Q.  And Express Scripts provides those services to Tricare on a

17   contract basis?

18   A.  Yes.

19   Q.  And in fact, Express Scripts acts as a PBM for private

20   insurances like Aetna or Humana, for example?

21   A.  Yes.

22   Q.  And they're paid to do that?

23   A.  Nothing is free, yes.

24   Q.  Nothing is free.  And they screen these claims, do they not?

25          MR. LARSEN:  Objection, foundation.

Klein - Cross

1        THE COURT:  How does she know that?

2        How do you know that, who screens?

3        THE WITNESS:  I do not, Your Honor.

4        THE COURT:  Okay.  I'll sustain the objection.

5   BY MR. MARCUS:

6   Q.  Well, you were talking about the claim submission process.

7   So you're not familiar through your work as to the Tricare

8   reimbursement process?

9   A.  A very general understanding, but the intricate details of

10  how that process works, no.

11  Q.  Okay.  Well, in the data you looked at there were

12  prescriptions, right, from a medical doctor for every single

13  claim?

14  A.  Correct.

15  Q.  Right.  And the reason for that --

16  A.  If I can clarify.  Based on the ones that I saw, I saw

17  prescriber.

18  Q.  You saw prescriber, just like, for example, this column,

19  right, prescriber?

20  A.  Yes, correct.

21  Q.  Right.  And that denotes a physician that can lawfully

22  prescribe prescription medications?

23        MR. LARSEN:  Objection, foundation.

24        THE COURT:  Does she know that?  How does she know

25  that?

1          Do you know that?

2          THE WITNESS:  I do not know, Your Honor.

3          THE COURT:  Okay.  Sustained.

4   BY MR. MARCUS:

5   Q.  Well, did you put together this chart?

6   A.  Yes, I did, sir.

7   Q.  So every document -- you looked at claims to put this

8   together, right?

9   A.  I reviewed the claims based on the specific documentation,

10  that email with those respective attachments that I explained

11  before, to compare it with that master claims data, yes.

12  Q.  Right.  And for each claim you saw a prescriber, correct?

13  A.  I believe that for every one, I did see a prescriber.  I

14  mean, there was literally -- there are, as I said before, 4,449

15  claims.  If you don't mind, I would like to look at, you know,

16  the 128 pages just to verify that every single line item had a

17  prescriber, but I believe that it did, but I don't want to say

18  for certain.

19  Q.  Okay.  But to your memory, based on the work you did, you

20  recall seeing prescriptions and prescriber information for the

21  claims?

22  A.  Yes, correct.

23  Q.  And that last page that Mr. Larsen showed you which broke

24  down the billing amount -- which I think was around $48 million

25  or so?

1    A.   Yes.

2    Q.   And then the paid amount was 39 million.   You saw that?

3    A.   Yes.

4    Q.   So Tricare or Express Scripts as the PBM, denied some

5    claims?

6              MR. LARSEN:   Objection, foundation.

7              THE COURT:   Do you know that?

8              THE WITNESS:   I do not.

9              THE COURT:   Okay.

10   BY MR. MARCUS:

11   Q.   You do not know the difference between a claim that is

12   billed and a claim that is paid?

13   A.   A general understanding, but the intricate details behind

14   it, no.

15   Q.   When you put together --

16             MR. MARCUS:   Could you just bring up that last page?   I

17   don't think -- it's not physically attached to 170.

18             THE COURT:   It's not going to go on unless someone is

19   there.   So if you're going to do that -- I can't just have

20   someone sitting there just waiting for that.

21             Now it's on.

22   BY MR. MARCUS:

23   Q.   You prepared that page?

24   A.   The summation page, yes.

25   Q.   So you prepared billed amount and paid amount, but you don't

1  know what they mean?

2  A.  The billed amount is the amount that the company submitted,

3  you know, for the claim, for each respective claim, and that's

4  the ultimate total.  The paid amount is what the insurance

5  physically paid.

6  Q.  And you would agree that insurance in this case, Tricare,

7  paid about 9 million less than was billed?

8  A.  I don't have a calculator.  I'll take your word for it.

9  Q.  Okay.  Well, the amounts speak for themselves on the screen,

10  correct?

11  A.  Yes.

12  Q.  And the paid amount is less than the billed amount?

13  A.  Yes.

14         MR. MARCUS:  Your Honor, I apologize.  Can I indulge to

15  switch back to the ELMO?  I promise I won't do it again.  Thank

16  you.

17         THE COURT:  Don't make a promise you aren't able to

18  keep.

19  BY MR. MARCUS:

20  Q.  Agent Klein, on direct you testified that the fill date is

21  the date that the prescription is filled, correct?

22  A.  Correct.  That's my understanding of how it worked.

23  Q.  Right.  So --

24         THE COURT:  Where did you get that information?

25         THE WITNESS:  Through reviewing claims data, speaking

1   with representatives from the defense health agency, you know,

2   through Tricare.

3              THE COURT:  But how would you get the fill date?

4              THE WITNESS:  Through the claims data itself.

5              THE COURT:  And it said fill date?

6              THE WITNESS:  Correct.  Yes, Your Honor.

7              THE COURT:  Someone had put fill date on it?

8              THE WITNESS:  Yes.  When we received the claims data

9   information, it has all of those headers for us.

10             THE COURT:  Okay.  Go ahead.

11  BY MR. MARCUS:

12  Q.  Okay.  So for Mr. Featherston, I'll just highlight it so you

13  can see it on the screen, there's a fill date of January 9th of

14  2015.  Do you see that?

15  A.  Yes.

16  Q.  And this next column is adjudication date.  Do you see that?

17  A.  Yes.

18  Q.  That's when the claim is adjudicated by Tricare?

19  A.  Yes.

20  Q.  And it's the same date, January 9th?

21  A.  Yes.

22  Q.  And this is when Tricare decides if the claim submitted, in

23  this case by PCA, the pharmacy, is appropriate to be reimbursed?

24  A.  Yes.

25             MR. MARCUS:  Without objection, Your Honor, I'm going

1    to offer into evidence Government's Exhibit 171.

2           THE COURT:  All right.  Admitted.

3        (Government's Exhibit Number 171 was received in evidence.)

4    BY MR. MARCUS:

5    Q.  And again, just for the first Tricare beneficiary, this is a

6    gentleman named Philip Snodgrass.  Do you see that?

7    A.  Yes, sir.

8    Q.  Could you just tell us what the fill date is?

9    A.  December 29, 2014.

10   Q.  Thank you.  And the prescription number?

11   A.  105565.

12   Q.  And just to state the obvious, you would agree that December

13   comes before January or February on the calendar?

14   A.  Yes.

15   Q.  Of 2014.  So, for example, December 29, 2014 comes before

16   January 28, 2015?

17   A.  Correct.

18   Q.  It's an earlier date.  Thank you.

19          THE COURT:  Redirect.

20          MR. MARCUS:  Oh, no --

21          THE COURT:  Oh, when you say "thank you," I thought you

22   were at the end.

23          MR. MARCUS:  I'm getting there.  I'm getting there.

24          THE COURT:  You don't have to thank her for each one.

25   When I hear "thank you," I'll know you're finished.

Klein - Cross

1          MR. MARCUS:  Understood.

2    BY MR. MARCUS:

3    Q.  So when you were compiling the data for these various

4    claims, you saw that a lot of these prescriptions, drugs, cost

5    thousands of dollars.  Is that fair to say?

6    A.  Yes.

7    Q.  And that reimbursement price is something set by Tricare and

8    Express Scripts for prescriptions?

9          MR. LARSEN:  Objection, foundation.

10          THE COURT:  How do you know that?  Do you?

11          THE WITNESS:  I do not know, Your Honor.

12          THE COURT:  Then I'll sustain the objection.

13   BY MR. MARCUS

14   Q.  You know that all these claims were processed and approved

15   by Tricare?

16   A.  I don't know what was truly processed and paid.  I only have

17   the certified claims data from Tricare, which I believe was

18   Exhibit Number 1, so I'm taking for face value that that is the

19   accurate information.

20   Q.  Right.  And it shows claims by date, it shows prescribers,

21   correct?

22   A.  Yes.

23   Q.  It shows the amounts that are claimed, the amounts billed,

24   and the amounts paid?

25   A.  Yes.

1   Q.   And an adjudication date?

2   A.   Yes.

3   Q.   Okay.  Now, have you ever seen like an Explanation of

4   Benefits?  Have you ever like stayed in a hospital, for example,

5   and seen an Explanation of Benefits for a hospital stay?

6   A.   Yes, I have.

7   Q.   Okay.  And fair to say that items that are billed to you

8   while you stay in the hospital can be very expensive?

9   A.   Yes.

10  Q.   Have you, yourself, seen prescription medications, the

11  sticker price for some of these medications on an Explanation of

12  Benefits?

13  A.   That I can recall off the top of my head, no.

14  Q.   But from your own personal experience you've seen medical

15  services that are billed that are on the sticker price very

16  high?

17  A.   For example, for prescriptions for me personally, I go to

18  CVS, so it will be $10, it will be $25.  You know what I mean?

19  I don't see an exuberant amount that I don't have to personally

20  pay, and I don't see it on the benefits.

21  Q.   Right.  Because you have health insurance and your health

22  insurance has a certain rate and a benefit in terms of

23  reimbursement, it's contractual?

24           MR. LARSEN:  Objection, relevance.

25           THE COURT:  Overruled on that basis.

1  BY MR. MARCUS:

2  Q.  And if you stayed in a hospital, if you had surgery for

3  example, and you were given Motrin, do you think you would be

4  paying the same price on that Explanation of Benefits for your

5  hospital stay as you would if you were just buying Motrin over

6  the counter at like at a CVS?

7  A.  I don't know honestly.

8  Q.  Would it surprise you if it was a lot more?

9        MR. LARSEN:  Objection, foundation, asked and answered.

10        THE COURT:  Well, probably true, but is there really

11  any disagreement that that occurs from time to time?  You're too

12  young to have health --

13        MR. LARSEN:  I don't think there's a disagreement.

14  It's just we're going way beyond the scope.

15        THE COURT:  So it doesn't matter.  All right.  So I'll

16  overrule the objection.

17  BY MR. MARCUS:

18  Q.  Agent Klein, also you said you joined the investigation, you

19  participated as part of the investigation in this case.

20  A.  Correct, sir.

21        THE COURT:  But you're not going to ask her to tell you

22  what she found in the investigation, are you?  Because that

23  would be hearsay, she would hear things, read things.

24        MR. MARCUS:  I am not going to ask her that.

25        THE COURT:  Oh, I just want to make sure because that

Klein - Cross

1    happens a lot, usually from the other side.  All right.

2    BY MR. MARCUS:

3    Q.  You attended an interview with a witness named Deanna

4    Dutting, D-u-t-t-i-n-g, correct?

5    A.  I don't think so, no.

6         THE COURT:  You're going to ask her about someone

7    else's statement to her?

8         MR. MARCUS:  I wasn't going to ask what the statement

9    was.

10        THE COURT:  Are you going to ask her if she interviewed

11   her?

12        MR. MARCUS:  Yes.

13   BY MR. MARCUS:

14   Q.  You've reviewed interview reports in this case?

15   A.  Yes, but I was not part of an interview with Ms. Dutting.

16        THE COURT:  You've been there two months, right, on

17   this case?

18        THE WITNESS:  Correct, yes, Your Honor.

19   BY MR. MARCUS:

20   Q.  Are you aware that --

21        THE COURT:  I've got to interrupt.  When you say "are

22   you aware," we are aware of things when we read things, right,

23   like reports?  We're aware of things when we see things, and

24   we're aware of things when we hear things.  If we hear things,

25   we have hearsay and the jurors already are now graduates based

1   on the hearsay rule.

2         There's no see-say rule, so she can testify about what

3   she saw, and if she used it to compute her summary of charts of

4   what was paid and what was asked, she can testify about that.

5   But I don't know if she can testify about what she was aware of

6   from looking at reports.

7         Do you think she's able to testify about that?

8         MR. MARCUS:  I'll phrase it in a better way.

9         THE COURT:  Do you think she can do that?

10        MR. MARCUS:  No, I wasn't asking --

11        THE COURT:  All right, as long as we agree.  I agree

12  with you because I wouldn't want to let then the prosecutor asks

13  those on redirect and then we've got all kinds of things.

14  BY MR. MARCUS:

15  Q.  Let me ask it this way:  As part of the investigative team,

16  have you listened to recorded conversations from anyone in this

17  case?

18  A.  No, I have not.

19  Q.  You have not seen any?

20  A.  Seen any recorded conversations?

21  Q.  Well, have you seen any CDs or media of recorded

22  conversations physically?

23  A.  No, sir.

24  Q.  Okay.  I'll move on.

25        THE COURT:  How much longer do you have of this summary

1   witness?

2           MR. MARCUS:  Very short, Your Honor.

3           THE COURT:  I don't know what that means, but I'll

4   accept it.

5           MR. MARCUS:  Less than five minutes.

6           THE COURT:  That is short.  I'll take it.

7           MR. MARCUS:  Okay.

8   BY MR. MARCUS:

9   Q.  So Mr. Grow's hotmail account was subpoenaed by law

10  enforcement as part of this investigation?

11          MR. LARSEN:  Objection, foundation.

12          THE COURT:  Sustained.  Did you do anything with that?

13          THE WITNESS:  No, Your Honor, I did not.

14          THE COURT:  Sustained.

15  BY MR. MARCUS:

16  Q.  Okay.  Let me show what's already in evidence as Exhibit 70.

17  Do you agree that in the "from" line, this is an email sent by

18  Mr. Grow?

19  A.  Yes, sir.

20  Q.  Okay.  And are you familiar with Bates numbers?

21  A.  Yes, I am, sir.

22  Q.  They're numbers when you produce documents to denote the

23  source of the production?

24  A.  Yes.

25  Q.  And the production here is, the number is -- in the bottom

1    right-hand corner it is MG 116986?

2    A.  Yes, sir.

3    Q.  Okay.  Let me show you another document that's in evidence.

4    That is Government's Exhibit 142.

5            Can you see that this is an email from Monty Grow's

6    hotmail account?  See that?

7    A.  Yes, sir.

8    Q.  Okay.  This Bates range, though -- that's PCAX.  Do you see

9    that?

10   A.  Yes, sir.

11           MR. LARSEN:  Objection, foundation.

12           THE COURT:  Well, all she's doing is saying that's what

13   it says, so I'll overrule the objection.

14           Do any other jurors not know how to read?  You all know

15   how to read?  Okay.  No problem.

16   BY MR. MARCUS:

17   Q.  PCA is short for Patient Care of America, the pharmacy,

18   right?

19   A.  My understanding is yes.

20   Q.  Okay.  Let me just show you one last document, this is also

21   in evidence, this is Defense Exhibit 202-I.  It's titled

22   Participant Information and Consent Form.

23           Do you see that?

24   A.  Yes, sir.

25   Q.  And you would agree that this Bates number is not either MG

Klein - Cross

38

1    or PCA?

2    A.  Based on the number shown, no, it is not.

3    Q.  The letters there are GL?

4    A.  Yes, sir.

5    Q.  And just so it's clear, I'll show you the pages and just

6    stop me -- it's a three-page document.  You would agree there's

7    no email attached to this document?

8    A.  That I see you flipping through?  No, sir.

9            THE COURT:  No, there's no email attached.

10           THE WITNESS:  No, there's no email attached.  Sorry.

11   BY MR. MARCUS:

12   Q.  Agent Klein, on the charts that you made for the different

13   families that showed their claims that were submitted to

14   Tricare -- do you recall those charts?

15   A.  Yes, sir.

16   Q.  -- you used the word "recruit" a lot.  That's your term.

17   A.  That's based on reports that I have read.

18   Q.  Not based on your knowledge, personal knowledge?

19   A.  Personal knowledge as far as the investigation and what I've

20   read?  I'm sorry.

21   Q.  You didn't talk to any of those people personally?

22   A.  For those family members, I did not, sir, no.

23   Q.  So you don't know -- when you use that term "recruit,"

24   that's not based on any direct hand knowledge of the facts?

25   A.  Based on those investigative reports that I read --

1    Q.   I'm not asking you --

2    A.   I'm sorry.  If I spoke to the individuals?  No.  To answer

3    your question, no, correct.

4    Q.   Okay.  Sales representatives can market products in this

5    country; that's not a crime, is it?

6              MR. LARSEN:  Objection, foundation.

7              THE COURT:  You're going to ask her what's a crime or

8    not?

9              MR. MARCUS:  I'll withdraw that.

10             THE COURT:  Okay.

11             MR. MARCUS:  Thank you, Your Honor.

12             THE COURT:  Any redirect?  That's not direct all over

13   again, just redirect?

14             MR. LARSEN:  No redirect, your Honor.

15             THE COURT:  Thank you.  You're excused.

16        (The witness was excused.)

17             THE COURT:  Who is your next witness?

18             MR. JUENGER:  Lisa Klitz, Your Honor.

19             THE COURT:  All right.  Are you all okay?  You're

20   troopers.  Do you need a bathroom break?  You're all okay?

21   Excellent.

22             Right over here, please.  Raise your right hand.

23             LISA KLITZ, GOVERNMENT'S WITNESS, SWORN.

24             THE COURT:  Get comfortable.  Get as comfortable as you

25   can and tell us your name, please.

Klitz - Direct

1          THE WITNESS:  My name is Lisa Klitz, K-l-i-t-z.

2          THE COURT:  Thank you very much.  Go ahead.

3                      DIRECT EXAMINATION

4    BY MR. JUENGER:

5    Q.   Good afternoon, Ms. Klitz.  Can you please tell us where you

6    live, city and state?

7    A.   Coral Springs, Florida.

8    Q.   What do you do for a living?

9    A.   I'm a senior financial investigator for Renzulli &

10   Associates.

11   Q.   And for the benefit of our court reporter can you spell

12   Renzulli, please?

13   A.   R-e-n-z-u-l-l-i.

14   Q.   And what kind of company is Renzulli & Associates?

15   A.   They are a Government contractor.

16   Q.   What kind of services do they provide?

17   A.   They provide financial analysis services to the Department

18   of Defense.

19   Q.   And can you briefly describe your education and experience

20   as a financial investigator?

21   A.   I have a four-year Bachelor's Degree in business

22   administration, with a major in accounting.  I was employed by

23   the Internal Revenue Service, Criminal Investigation Division

24   for approximately 27 years, 24 years as an agent and three years

25   as a supervisor.

1  Q.  And what type of cases did you work on generally?

2  A.  Fraud cases; mortgage fraud, healthcare fraud, public

3  corruption, tax fraud, all financial investigations.

4  Q.  And are you familiar with an investigation of a pharmacy

5  called Patient Care America?

6  A.  I am.

7  Q.  And were you asked to do some analysis of the bank records

8  related to that investigation?

9  A.  I was.

10  Q.  And so I want to show you some documents.

11        MR. JUENGER:  Your Honor, if I may, without objection

12  from the defense, I have a number of documents I would like to

13  introduce.

14        THE COURT:  Okay.  You've got to tell me what they are.

15        MR. JUENGER:  They are Government's 3, 4, 4-B, 4-C,

16  4-D, 11, and 159 through 169 inclusive, and Government's 5, 6,

17  7, 8, 9.

18        THE COURT:  Without objection, they will be admitted.

19     (Government's Exhibit Numbers 3, 4, 4-B, 4-C, 4-D, 5, 6, 7,

20  8, 9, 11, 159 through 169, were received in evidence.)

21  BY MR. JUENGER:

22  Q.  Ms. Klitz, I'm showing you -- I'm just going to hold them up

23  for you, what's marked as Government's Exhibit 3 and

24  Government's Exhibit 4.  Do you recognize these?

25  A.  I do.

Klitz - Direct

1  Q.   And can you tell us what's on Government's Exhibit 3?  It's

2  a CD.

3  A.   Bank accounts belonging to PCA or DCRX.

4  Q.   And as far as Government's Exhibit 4, can you tell us what's

5  on Government's Exhibit 4?

6  A.   Bank accounts belonging to MGTEN Marketing Group and Monty

7  Grow.

8  Q.   And how many accounts total are on Government's Exhibit 4?

9  A.   At least the two MGTEN Marketing Group accounts at Bank of

10  America and the Monty Grow personal account at Bank of America.

11  Q.   And have you reviewed all of those bank records on

12  Government's Exhibit 4?

13  A.   I have.

14  Q.   And did you prepare summaries today, or prior to today, of

15  those bank records on Government's Exhibit 4?

16  A.   I did.

17  Q.   Now, before we take a look at those summaries, I want to

18  talk about the two MGTEN corporate accounts that you just

19  mentioned.

20       Who's the signatory on both of those accounts?

21  A.   Monty Grow.

22  Q.   And I'm going to show you, if you can see on the ELMO, this

23  is Government's Exhibit 4-B, and can you tell the jury what this

24  is?

25  A.   This is the signature card for the account opening, the

Klitz - Direct

43

1  account number ending 4176 at Bank of America, the name MGTEN

2  Marketing Group, Inc.

3  Q.   If you look at the bottom of that first page, who's the

4  signatory on this account?

5  A.   Monty Ray Grow.

6  Q.   And I'm now going to show you Government's Exhibit 4-C, and

7  can you tell us what this is?

8  A.   The same type of form, the signature card when the account

9  was opened for MGTEN Marketing Group, Inc., account ending in

10  4397 at Bank of America.

11  Q.   And according to the bank records for both of those accounts

12  we looked at, 4-B and 4-C, does anyone else have any interest in

13  any of those accounts other than Monty Grow?

14  A.   No.

15  Q.   Is anyone else besides Mr. Grow authorized to conduct any

16  transactions from those accounts?

17  A.   No.

18  Q.   And does your review of the records suggest in any way that

19  anyone other than Mr. Grow conducted transactions out of either

20  one of those accounts?

21  A.   No.

22  Q.   All right.  I want to show you Government's Exhibit 11, and

23  can you tell the jury what Government's 11 is?

24  A.   The records from the State of Florida, Secretary of State

25  when the corporation was organized, or in this instance,

Klitz - Direct

44

1    dissolved.

2    Q.   And what company are we talking about?

3    A.   MGTEN Marketing Group, Inc.

4    Q.   And based upon your review of these records -- and I'm

5    flipping through several pages so the jury can just see the

6    documents -- who is the person who holds the interest in MGTEN

7    Marketing Group?

8    A.   Monty Grow.

9    Q.   And the incorporator?

10   A.   The incorporator?

11   Q.   Who is the incorporator?

12   A.   Monty Grow and Frederick Mills.

13   Q.   And throughout the existence of that company, who was the

14   president, director, and so forth?

15   A.   Monty Grow.

16   Q.   And do the corporate records listed in Government's 11 match

17   up with the information in those two bank signature opening

18   cards?

19   A.   They do.

20   Q.   All right.  I want to show you now what's been admitted as

21   Government's Exhibit 4-D, and can you tell the jury what this

22   is?

23   A.   That is, again, a signature card, but this is for the

24   personal account at Bank of America for Monty Grow, account

25   number ending in 6597.

Klitz - Direct

1   Q.   And who is the signatory on this account?

2   A.   Monty Grow.

3   Q.   And according to these bank records, does anyone else have

4   any interest in this account?

5   A.   No.

6   Q.   Is anyone else besides Mr. Grow authorized to conduct any

7   transactions from this account?

8   A.   No.

9   Q.   And does your review of the records suggest in any way that

10  anyone other than Mr. Grow conducted transactions out of this

11  account?

12  A.   No.

13  Q.   Okay.  Now, if we can turn to the summaries, and I'm going

14  to start with -- well, in general terms describe for the jury

15  what you were asked to do, what types of summaries you made and

16  what the purposes were.

17  A.   I reviewed the statements and backup items that we received

18  from Bank of America for the three different accounts, the two

19  corporate accounts and the personal account.  I traced the funds

20  into those accounts and the funds out of those accounts and then

21  prepared summaries to illustrate that flow of funds.

22  Q.   And the jury should now be able to see Government's Exhibit

23  159.

24       Is this an exhibit you created?

25  A.   Correct, it is.

1  Q.  And if you would -- well, let's start with, what is the date

2  range on your analysis here?

3  A.  Approximately October 2014 through June of 2016.

4  Q.  And if you could maybe start in the top left and describe

5  for us the transactions that you traced through these bank

6  records.  What is the icon in the top left where I'm indicating

7  here?

8  A.  In the top left corner the icon is used to illustrate the

9  funds coming from the Patient Care America account at Chase

10 Bank, account ending in 6983, that were issued to Monty Grow and

11 his corporate entity MGTEN.  So you'll see in the top line from

12 the 6983 account, moving over to the right, to the MGTEN Bank of

13 America account ending in 4397, there were distributions by

14 Patient Care America to MGTEN of $19,582,503.

15 Q.  And how about going down from the PCA icon, what does that

16 represent?

17 A.  Right.  Then there were also payments made directly to Monty

18 Grow by Patient Care America totaling $1,183,590.

19 Q.  And how were these transactions conducted?  If they weren't

20 all the same, maybe indicate the division between them, but were

21 they checks, wires, some other form of transaction?

22 A.  They are almost exclusively all electronic transfers.  There

23 was one check that was issued into the personal 6597 account by

24 DCRX, but the remainder of the payments were made electronically

25 to the two accounts.

Klitz - Direct

1  Q.   And the account that I'm indicating in the center left,

2  Monty Grow account BOA 6597, who controls that account?

3  A.   Monty Grow.

4  Q.   And the account in the top right, MGTEN BOA 4397, who

5  controls that account?

6  A.   Monty Grow.

7  Q.   And then if we can continue on, from the MGTEN BOA account

8  4397, I'd like you to explain where the money flows from there,

9  but I want to start with the question:  When the time of your

10  analysis began, how much money was in that account?

11  A.   There was about 10,000 -- just a little over $10,000 in the

12  4397 account when these transfers began.

13  Q.   And when was that date more or less?

14  A.   October 2014.

15  Q.   And so tell us where that $19,582,503 ends up.

16  A.   There were transfers from the 4397 account, the MGTEN Bank

17  of America 4397 account, to the other MGTEN Bank of America

18  account ending in 4176 of 19,201,371.  There were also transfers

19  totaling 1,057,000 from the MGTEN Bank of America 4397 account

20  to the Monty Grow personal account at Bank of America ending in

21  6597.

22  Q.   Okay.  And I want to make an observation and ask for your

23  comment.  Where I'm indicating 19,200,000 was transferred from

24  account 4397 to account 4176, 19.2 million, and then another 1

25  million and change was transferred to the personal account,

1  correct?

2  A.  Correct.

3  Q.  If you add those two figures together, 19 million and 1

4  million, it exceeds the 19 million that was transferred from

5  PCA, correct?

6  A.  Correct.

7  Q.  And so can you explain the difference there?

8  A.  Yes.  There were additional deposits into the 4397 account.

9  There were approximately $424,000 in deposits made that were

10 described on the statement as counter credits.  I was actually

11 on the phone with the bank just as I walked in, and to date --

12 Q.  Let me stop you.  You just described 400,000 in counter

13 credits.  What is a counter credit and were there any examples

14 of what that was within the bank records you actually reviewed?

15 A.  There was one other deposit described as a counter credit

16 that I did receive the backup for, and it was the one check that

17 DCRX cut to Monty Grow and it was deposited.  And counter credit

18 simply means it's a deposit that was made inside the bank facing

19 a teller.

20 Q.  Okay.  So that's $400,000.  What's the remaining unaccounted

21 for amount?

22 A.  There was a little over $200,000 in deposits from a company

23 by the name of InforMD.  I'm not exactly sure how you say it.

24 It's I-n-f-o-r-m-d, LLC.

25 Q.  And that accounts for how much?

1   A.   A little over 200,000.

2   Q.   How were those InforMD, LLC payments made?  Was it one lump

3   sum, were they spread out?  Can you describe those?

4   A.   They were electronic transfers as well.  The 200,000 relates

5   to the time period that was relevant to my analysis, October

6   2014 through -- I think they ended in July of 2015.  There were

7   additional transfers made prior to my time frame.  I think the

8   very first one was in June of 2014, and they occurred

9   approximately monthly, a couple, 3, 2, $1,000 monthly.

10  Q.   And so just to sum that up, it was about 200,000 spread out

11  over what time period?

12  A.   The 200,000 was from October of 2014 to July of 2015.

13  Q.   Okay.  And now if I can direct your attention back to the

14  Monty Grow personal account, Bank of America 6597, that

15  received -- correct me if I'm wrong -- about 10 and a half

16  million; is that correct?

17  A.   No, a little bit more than that.  It received from three

18  sources.  It received 1.1 million from the PCA account, it

19  received a little over a million from the MGTEN Bank of America

20  4397 account, and then it received about 9.4 million from the

21  MGTEN 4176 account.

22  Q.   That's why you do this and not me.  What's the total then

23  that was sent into that account?

24  A.   Just over 11 -- like about 11.5 million, 11.6, right around

25  there.

Klitz - Direct

50

1  Q.  And then below that account you see these outward arrows to

2  the blue squares.  What do those represent?

3  A.  Financial transactions out of the 6597 account.

4  Q.  And do these total up the entire expenditures out of this

5  account?

6  A.  No.

7  Q.  And what are these then?

8  A.  Primarily asset purchases.

9  Q.  And did you do summaries of those asset purchase

10 transactions?

11 A.  I did.

12 Q.  And we notice that this box here I'm pointing at says U.S.

13 Treasury.  That can't possibly be an asset purchase, is it?

14 A.  No.  People don't generally refer to those as asset

15 purchases.

16 Q.  What is it?

17 A.  Payment of taxes.

18 Q.  And then if I can direct your attention back to the

19 right-hand side, this is the MGTEN corporate account, Bank of

20 America 4176, correct?

21 A.  Correct.

22 Q.  And it received a total of 19,200,000?

23 A.  Correct.

24 Q.  And then this shows 19.3 million went to the personal

25 account?

1   A.   Correct.

2   Q.   And then what are these other two transactions below it?

3   A.   The first one, the 90,478, is the purchase of a Range Rover

4   from Land Rover of Naples titled in the name of MGTEN Marketing,

5   and the other one is a payment made to sales reps and

6   beneficiaries and those payments total $8,748,971.

7   Q.   And for each of these -- well, for the Land Rover of Naples

8   transaction, did you do a summary of that transaction?

9   A.   Yes, reviewed the file and traced the funds from the bank

10  account to the company.

11  Q.   And we'll look at that in just a moment.  Here you also

12  have, as you just described, the $8.7 million to sales reps and

13  benes.  Did you do a summary of that as well?

14  A.   I did.

15  Q.   Let's then turn to Government's Exhibit 160.  Ms. Klitz, is

16  this a summary that you created, Government's 160?

17  A.   It is.

18  Q.   What does this show?

19  A.   This shows now the 8.8 million that came out of the MGTEN

20  4176 account and the different categories of payments that were

21  made either to sales reps or to beneficiaries and/or sales reps.

22  Q.   And in order to calculate those, did you, in effect, create

23  other summaries of each of these transactions?

24  A.   Yes.

25  Q.   Can you describe what you did?

1  A.   I went through the bank account and analyzed all the

2  payments out, sorted them by entity, created a master list and

3  then summarized after the determination was made by the case

4  agent as to what the nature of the entity or individual was.

5  Q.   Okay.  And let's start with looking at the summary of this

6  transaction, and I'll show you Government's Exhibit 162.  Tell

7  the jury what this document is.

8  A.   That's the listing of names of the individuals or entities,

9  because there are some entities, not just individuals in there,

10  and the total of payments made to each one of them because most

11  of them received multiple payments.

12  Q.   And is it fair to say that you looked into this bank account

13  for MGTEN sales and you actually located all of these

14  transactions --

15  A.   Yes.

16  Q.   -- to these individuals or entities?

17  A.   Yes, they came out of the MGTEN 4176 account.

18  Q.   What was the total figure when you summed up all of those

19  payments?

20  A.   $7,605,584.

21  Q.   And that is reflected -- if we go back to Government's 160,

22  that's how you calculated the total payments to sales reps?

23  A.   Correct.

24  Q.   Did you create a similar document for the payments to what

25  we have listed here as bene, sales reps on the right-hand side

Klitz - Direct

1  of that?

2  A.   Yes.

3  Q.   Now, I'm going to show you Government's 162, and tell the

4  jury what this is.

5  A.   This is the same type of listing.  It's an alphabetical

6  summary of the payments made to entities or individuals that

7  were identified by the case agent as either beneficiaries and/or

8  sales reps, and the total paid to each one of them out of the

9  4176 account.

10  Q.   And so you went through those bank records and confirmed

11  that these transactions were in there?

12  A.   I did.

13  Q.   And what's the sum total -- this is obviously a much longer

14  list, it's three pages.  Do you know how many of the individuals

15  are in here?

16  A.   No, not off the top of my head, sorry.

17  Q.   But what is the total on Page 3?

18  A.   $1,123,577.

19  Q.   And now I'm showing you what has been admitted as

20  Government's Exhibit 163.  Can you describe for the jury what

21  this summary is?

22  A.   These are the payments, not all of them, but some of the

23  payments made by PCA to either the MGTEN Marketing 4397 account

24  or the Monty Grow 6597 account.

25  Q.   And so I'm going to go back and show kind of the original,

Klitz - Direct

1   Government's 159, which is your large outline, correct?

2   A.   Correct.

3   Q.   And point to the jury which -- no, don't point to the jury.

4   I will point to the jury and you confirm.  What you just talked

5   about was the summary of some of the transactions from PCA Chase

6   6983 over to MGTEN BOA 4397, correct?

7   A.   Correct.  That's the first grouping on the page underneath.

8   Q.   And then the second grouping at the bottom of that chart are

9   the transactions that go from PCA Chase 6983 down to Monty

10  Grow's personal account?

11  A.   Correct.

12  Q.   Let's then go back to Government's Exhibit 163, and did you

13  confirm in the bank records that all of these transactions took

14  place on all of these dates?

15  A.   I did.

16  Q.   It lists on the far left count numbers, from the top, Count

17  11, 12, 13, and so on down to Count 33.  Can you tell us what

18  those are?

19  A.   They correspond to the counts in the Superseding Indictment.

20  Q.   And so for Count 12 in the Superseding Indictment it

21  lists --

22  A.   10.  Count 10.

23  Q.   Forgive me.  Thank you.  For Count 10 in the Superseding

24  Indictment, it lists a payment of 85,946, correct?

25  A.   Correct.

Klitz - Direct

1  Q.  And you actually located that transaction on that date

2  inside the bank records?

3  A.  I did.

4  Q.  And did you do that for all of the various transactions in

5  there?

6  A.  I did.

7  Q.  And all of these transactions that are listed in

8  Government's Exhibit 163, are those the sum total of all

9  transactions to him?

10  A.  No.

11  Q.  Just the ones linked to the counts?

12  A.  Correct.

13  Q.  Okay.  I'm now going to show you Government's 164.  Can you

14  tell the jury what this summary is?

15  A.  This is just the listing of the counts as they're titled on

16  the left side and their payments made out of the 4176 account to

17  beneficiaries on the dates listed for the amounts paid.  Those

18  are individual amounts, they're not totals.

19  Q.  And so where in the Superseding Indictment each count lists

20  a transaction on a particular date and a particular total, did

21  you locate these transactions within Monty Grow or MGTEN bank

22  records?

23  A.  Yes, they were all transfers, and right on the statement it

24  will say, transfer of funds, and it lists the account name, the

25  holder of the account, and the date and the amount.

1  Q.  And do these represent all of the transactions that are

2  reflected in the MGTEN or Mr. Grow's personal account to

3  beneficiaries or sales reps?

4  A.  No.

5  Q.  Just the ones listed in the counts?

6  A.  Correct.

7  Q.  And now I want to show you, Ms. Klitz, a summary document.

8  Did you create this?

9  A.  Yes.

10 Q.  And this is listed Government's Exhibit 45.

11 A.  165.

12 Q.  165.  Thank you.  And can you describe for the jury the

13 information that's in here and where this information came from?

14 A.  These images relate to Count 45 of the Indictment, which was

15 the purchase of a 2014 Porsche from Kessler Auto Group.  There

16 was a withdrawal from Monty Grow's personal account at Bank of

17 America and a cashier's check was issued to Kessler Auto Group

18 in the amount of $105,544.94 and then those are pictures of that

19 vehicle.

20 Q.  And I want to show you what's been admitted as Government's

21 Exhibit 8.  Have you seen this document before?

22 A.  I have.

23 Q.  And what is it?

24 A.  Those are the transaction documents from Kessler Auto Group

25 in regard to the purchase of that Porsche by Monty Grow.

1  Q.  On Page 2 of Government's Exhibit 8, which are the Kessler
2  Auto Group documents, do you recognize this check?
3  A.  Yes.  That's the same check that's used in the illustration,
4  the same check I received from Bank of America -- image of the
5  check.
6  Q.  And that's related to which count of the Indictment?
7  A.  Count 45.
8  Q.  And now I want to show you another summary exhibit.  Did you
9  create this, Government's Exhibit 166?
10 A.  Yes.
11 Q.  And what is this?
12 A.  These are images that relate to the transaction for the
13 purchase of the Range Rover from Land Rover of Naples.
14 Q.  And did you locate that transaction within that bank
15 account?
16 A.  I did.  This was through the MGTEN Marketing Group account,
17 account ending in 4176.
18 Q.  And I want to show you what has been admitted as
19 Government's Exhibit 7.  Do you recognize these documents?
20 A.  Yes, those are the sales records received from Land Rover of
21 Naples for that purchase.
22 Q.  And does it reflect the purchase of the vehicle that's
23 listed in the check?
24 A.  It does.
25 Q.  And moving on to Government's Exhibit 167, is this another

1  summary that you created from the financial records?

2  A.  Yes.

3  Q.  And what does this summary document reflect?

4  A.  This summarizes transfers made from the Monty Grow personal

5  account ending in 6597 at Bank of America to an Ameritrade

6  account in Monty Grow's name totaling $3 million.

7  Q.  And at the bottom of this exhibit it lists Count 47.  Count

8  47, what's the total amount of the transfer reflected in that

9  alleged money laundering count?

10  A.  250,000.

11  Q.  Right above Count 47 there's a -- I don't know, some sort of

12  transaction.  Can you describe what that is and where it comes

13  from?

14  A.  That was just lifted directly from the bank statement for

15  account ending in 6597 for the transaction on that date.

16  Q.  And now I'm showing you Government's Exhibit 168.  Do you

17  recognize this document?

18  A.  Yes.  That's an exhibit that I prepared with images

19  documenting the purchase of a piece of property at 5803 Mariner

20  Street in Tampa, Florida.

21  Q.  And Ms. Klitz, it's getting late, but I want to show you

22  Government's Exhibit 5.  Do you recognize this?

23  A.  I reviewed 3 and 4.

24  Q.  Well, let me go back to Government's Exhibit 167 and show

25  you Government's 5.  Do you recognize that?

1  A.   No.

2  Q.   If you don't, you don't.

3  A.   No.

4  Q.   Okay.   Then continuing back to 167.

5  A.   168.

6  Q.   168.   Can you tell us again what this exhibit reflects?

7  A.   It's the page of the bank statement for Monty Grow's account

8  ending in 6597 at Bank of America, reflecting the transfer of

9  funds from the account to DHI Title in the amount of -- I

10  believe off the top of my head it was 1.548 million.   I can't

11  really read the print, but it's on the summary schedule from

12  before.

13  Q.   And I also did want to show you what's been admitted as

14  Government's Exhibit 6.   Do you recognize these documents?

15  A.   Yes, those are the documents received from DHI Title

16  regarding that transaction.

17  Q.   And what exactly are these documents and what do they

18  reflect?

19  A.   The closing documents for that property.

20  Q.   And what was the total reflected in those closing documents?

21  A.   1,548,000 and some odd dollars.

22  Q.   And I think lastly, I want to show you what has been

23  admitted at Government's Exhibit 169.   Do you recognize this

24  document?

25  A.   Yes.

1  Q.  Go ahead.

2  A.  It's an exhibit we prepared with images documenting the

3  purchase of two jet skis from Barney's.

4  Q.  And what is the total of that transaction?

5  A.  $24,521.36 from the Monty Grow 6597 account at Bank of

6  America.

7  Q.  And then I want to show you Government's Exhibit 9.  Do you

8  recognize these documents?

9  A.  Yes.  Those are the records of the purchase of those two jet

10  skis.

11  Q.  And those records confirm this transaction for these jet

12  skis; is that correct?

13  A.  Yes.

14  Q.  And is this the transaction that's reflected in Count 49, an

15  alleged money laundering transaction?

16  A.  Correct.

17          MR. JUENGER:  I finished before 5:00, Your Honor.

18          THE COURT:  All right.  Cross-examination.

19                      CROSS-EXAMINATION

20  BY MR. MARCUS:

21  Q.  Good afternoon.

22  A.  Good afternoon.

23  Q.  So let me just start with Government's Exhibit 159.  You

24  were asked to look at a variety of records in this case and make

25  some charts?

1   A.   Correct.

2   Q.   Okay.  And you looked at some records for Mr. Grow's

3   marketing company, MGTEN Marketing Group, right?

4   A.   Correct.

5   Q.   And that was a group that was registered with the State of

6   Florida, publicly incorporated in Mr. Grow's name, correct?

7   A.   Correct.

8   Q.   And Mr. Grow had bank accounts with Bank of America in his

9   name, right?

10  A.   Correct.

11  Q.   And as you testified earlier, there were no other

12  signatories or other names on either of these companies or the

13  bank accounts?

14  A.   Correct.

15  Q.   And one of the things you were asked to look at by the

16  Government was the amount of money that PCA paid Mr. Grow's

17  company.  Do you see that?

18  A.   To Mr. Grow and to his company, yes.

19  Q.   Yes, we'll talk about that in a minute, but you're right.

20       So this figure is what goes to the corporate account,

21  correct?

22  A.   Correct.

23  Q.   And this figure goes to his personal account?

24  A.   Correct.

25  Q.   And do you recall that this figure, these amounts of money,

1   this came later --

2   A.   Correct.

3   Q.   -- do you recall that, towards the end?

4   A.   Correct, yes.

5   Q.   Right.  Did you see evidence of W-2 payments to Mr. Grow?

6   A.   What do you mean by W-2 payments?

7   Q.   Well, did you look?  Did you pull -- for example, you talked

8   about the U.S. Treasury and his tax payments.

9   A.   Right.

10  Q.   Did you do any analysis of W-2 payments versus 1099?

11  A.   I'm not sure what your question is, but the payments that

12  were made directly to Mr. Grow were different than the payments

13  that were made to his company.  The payments made to him were

14  through a Paychex company, I believe, and there was withholding

15  on those payments.  The amount that's listed is the net amount,

16  not the gross amount.  If you add the taxes, it's a little over

17  2 million.

18  Q.   Correct.  These were payments you said that came towards --

19  they were later?

20  A.   They were May and June.  The above payments were from

21  October 2014 to April of 2015.

22  Q.   Right.  So May, June of 2015.  So consistent with becoming

23  an employee?

24  A.   I don't know why they changed, I just know they changed.

25  Q.   Right.  But you saw evidence of PCA withholding tax and you

1  saw that they were using Paychex to make direct deposit payments

2  to Mr. Grow?

3  A.  Correct.

4  Q.  You're aware that Paychex is a company that pays employees

5  for lots of other companies?

6  A.  I know they handle payroll.

7  Q.  They handle payroll.  Very good.  Thank you.

8       Okay.  And so this U.S. Treasury amount of tax, you

9  didn't actually look at Mr. Grow's tax records, did you?

10 A.  I did not.

11 Q.  So he could have paid even more tax that year than this

12 figure of $4,184,830?

13 A.  Oh, I know certainly he did because that only reflects the

14 payments he made himself out of the Bank of America 6597

15 account.  It does not include the amount that was withheld from

16 the Paychex checks.

17 Q.  You were not asked to put that on this chart by the

18 Government?

19 A.  Because he didn't pay it.  It didn't come out of his

20 account.

21 Q.  You were just looking --

22 A.  This just reflects -- right, this just reflects in and out

23 of his account.

24 Q.  Okay.  Thank you.

25       THE COURT:  Redirect.

```
 1           MR. MARCUS:  Oh, I'm sorry.  It's a bad habit.
 2           THE COURT:  So you know I'm paying attention.
 3           MR. MARCUS:  I know you are.
 4   BY MR. MARCUS:
 5   Q.  And again, this is a chart, 163, Government's Exhibit 163.
 6   You were just looking essentially for the movement of money from
 7   one account to another, right?
 8   A.  Correct.
 9   Q.  And so, for example, you have no factual knowledge about the
10   agreement between PCA and Mr. Grow that underlies these
11   payments?
12   A.  No, I don't.
13   Q.  You never looked at employment agreements or anything like
14   that?
15   A.  No.
16   Q.  Thank you.
17           But I do want to ask about, to make sure I'm clear,
18   this figure, sales reps and beneficiaries.  You said that the
19   case agents, they told you to use that term to describe these
20   payments?
21   A.  Correct.
22   Q.  I just want to show this.  So these are not terms that you
23   came up with yourself based on any knowledge of the case or any
24   facts?
25   A.  No.
```

1   Q.   Okay.  And this is 161, which is titled MGTEN Sales Reps?

2   A.   Correct.

3   Q.   And as you said, it's a listing of payments to what you were

4   told were sales representatives, correct?

5   A.   Correct.

6   Q.   All from his company?

7   A.   Yes.

8   Q.   And I could put up chart 159, Exhibit 159, but most of the

9   payments of your breakdown were to people designated as sales

10  reps by the Government?

11  A.   Correct, of the 8.8 million.

12  Q.   I'll just put it up.  That's 7.6 million to the sales reps

13  as described to the Government to you, and the total again is a

14  little under 8.8 million?

15  A.   Correct.

16  Q.   Right.  Okay.  And again, just so it's clear, this term

17  beneficiary/sales reps, that's a term that you got from the

18  Government as well?

19  A.   Correct.

20  Q.   And so, for example, you don't know what these payments were

21  for?

22  A.   No.

23  Q.   And you don't know if all of these people were acting as

24  sales reps and being paid commissions when they received these

25  monies?

66

1  A.  I just know that they were paid those monies out of the 4176

2  MGTEN account.

3  Q.  Right.  The corporate account?

4  A.  Correct.

5  Q.  And you said most of the payments were electronic?

6  A.  All of these payments were electronic.

7  Q.  Were wired.

8  A.  Yes.

9  Q.  Okay.  And then you were asked by the Government to look at

10  certain purchases or expenses, certain purchases that came out

11  of that corporate account?

12  A.  Correct, financial transactions.

13  Q.  Financial transactions?

14  A.  Correct.

15  Q.  When you looked at the account, were you asked by the

16  Government to compute business expenses for MGTEN Marketing

17  Group?

18  A.  No.

19  Q.  Okay.  And sitting here today, you don't have a number

20  that -- you don't have a calculation for business expenses that

21  MGTEN Marketing paid to other third parties?

22  A.  No.

23          MR. MARCUS:  Okay.  Nothing further.

24          THE COURT:  Redirect.

25          MR. JUENGER:  No redirect, Your Honor.

1           THE COURT:  Thank you, Ms. Klitz.  You're excused.

2    Have a good day.

3           THE WITNESS:  Thank you.

4      (The witness was excused and the testimony concluded at 5:10

5    p.m.)

6

7                C E R T I F I C A T E

8           I hereby certify that the foregoing is an accurate

9    transcription of proceedings in the above-entitled matter.

10

11   __03-26-18_____      _____
          DATE                GILDA PASTOR-HERNANDEZ, RPR, FPR
12                            Official United States Court Reporter
                              Wilkie D. Ferguson Jr. U.S. Courthouse
13                            400 North Miami Avenue, Suite  3-3
                              Miami, Florida  33128    305.523.5118
14                            gphofficialreporter@gmail.com

15

16

17

18

19

20

21

22

23

24

25