UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-CR-20893-FAM(s)

UNITED STATES OF AMERICA,

vs.

MONTY RAY GROW,

        Defendant.
_____/

**DEFENDANT MONTY RAY GROW'S OBJECTIONS
TO PRSENTENCE INVESTIGATION REPORT**

    Defendant Monty Ray Grow, by and through undersigned counsel, hereby files his objections to the Presentence Investigation Report ("PSI") dated March 12, 2018 (DE 170), and states as follows:[1]

**I.**    **Objections to Offense Level Computation**

    *A.*   *Analysis Under U.S.S.G. § 2B1.1 (PSI ¶¶ 42, 54-67 & 107-108)*

    The PSI rests on a series of assumptions to reach a total offense level 36, namely: (1) that in returning a guilty verdict on Count 1, the jury found beyond a reasonable doubt that Mr. Grow conspired to commit both health care fraud, which carries a maximum term of imprisonment of 10 years, and wire fraud, which carries a maximum term of 20 years; (2) that under U.S.S.G. § 2B1.1, which applies to both Counts 1 and 5, the loss amount is $19 million; (3) that under the grouping rules, § 2B1.1 determines the combined offense level because it produces the highest adjusted level; (4) that a 3-level increase is warranted because the loss to a health care program exceeds $7

---

[1] Mr. Grow maintains his innocence, and therefore objects to each and every paragraph contained in the PSI on that basis. We recognize, however, that the jury returned a guilty verdict against Mr. Grow and that as a result, this Court is required to make certain findings in anticipation of sentencing. We therefore make specific objections only to those paragraphs that we believe are contrary to the evidence or contrary to law.

million; (5) that a 2-level increase is warranted for sophisticated means; and (6) that under § 3B1.1(a), Mr. Grow's offense level should be increased by 4 levels for role. Each of these assumptions is flawed.

As a preliminary matter, contrary to the PSI, it is highly unlikely that the jury found Mr. Grow guilty of conspiracy to commit both health care fraud and wire fraud. Despite Mr. Grow's request (DE 97), the jury was not presented with, and therefore did not return, a special verdict as to Count 1, and the general verdict said nothing about which of the two offenses formed the object of the conspiracy. But given that trial was singularly focused on the health care charge, that the jury returned a guilty verdict on Count 5 charging substantive health care fraud, and that the Court did not instruct the jury on wire fraud in any meaningful way, the only reasonable conclusion is that the jury intended to convict Mr. Grow of the health care fraud object.[2]

Health care fraud, the PSI correctly notes, is governed by U.S.S.G. § 2B1.1. But because health care fraud has a statutory maximum term of 10 years, the base offense level is 6, not 7. In addition, the PSI improperly ascribes a $19 million loss amount and resulting 20-level increase to Mr. Grow when there is no basis to do so. Aside from a single claim for $7,014 that forms the basis of Count 5 (which we dispute), there is no evidence that any of the claims submitted by PCA to Tricare were medically unnecessary or otherwise false. (PSI ¶ 40). While the jury found that

---

[2] Should the Court rule otherwise and determine that Mr. Grow is guilty of conspiracy to commit wire fraud, the applicable guideline would be § 2B4.1, not § 2B1.1. Although the guidelines direct users to § 2B1.1 for violations of the wire fraud statute, § 2B1.1 includes a cross reference provision, which states that where a defendant is convicted under a "general fraud statute" such as 18 U.S.C. § 1343, § 2B1.1 will not apply if the defendant's conduct is "more aptly covered by another guideline." U.S.S.G. § 2B1.1(c)(3), comment. (n.16). Among the examples cited by the commentary is the state employee convicted under 18 U.S.C. § 1341 for using the mails to offer bribes to influence the award of a state contract. While the employee could be sentenced under § 2B1.1, such a case, the commentary concludes, would be more aptly covered by § 2C1.1, which applies to the offering of bribes and to honest services fraud. *Id.* Here, application of the cross reference provision leads to a similar result. To the extent Mr. Grow was even convicted of conspiracy to commit wire fraud (which we dispute), the conduct at issue – his purported receipt of kickbacks – is covered by U.S.S.G. § 2B4.1. (PSI ¶ 54). Accordingly, § 2B4.1 should apply. *See* Point IB, *infra*.

Mr. Grow received kickbacks in connection with PCA's Tricare claims, the Court of Appeals has held that a party's receipt of kickbacks "is not sufficient to establish a loss" under § 2B1.1. *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (concluding that absent evidence that claims are medically unnecessary, the fact that kickbacks are paid and received does not establish a loss to Medicare); *cf. United States v. Guerra*, 307 F. App'x 283, 285 (11th Cir. 2009) (noting, in a subsequent appeal by one of the *Medina* defendants, that the trial court interpreted *Medina* to mean that even in the face of kickbacks, "there is no [health care fraud] loss in the absence of . . . illegitimate prescriptions").

With no evidence of lack of medical necessity to support any loss beyond at most $7,014, the PSI, at the Government's urging, instead points to the $19 million that Mr. Grow received in purported kickbacks and equates that figure with loss. (PSI ¶¶ 40-41). Setting aside that the kickback number is not $19 million but $18,856,744, that figure cannot be used to determine loss for purposes of § 2B1.1 because it reflects not loss, but the improper benefit that the jury believed was conferred upon Mr. Grow. Put differently, the $18,856,744 figure is not loss, but gain to Mr. Grow in the form of kickbacks. While the guidelines "permit the use of the defendant's gain as a substitute figure," they do so "only if there is a loss [that] reasonably cannot be determined." *United States v. Bradley*, 644 F.3d 1213, 1289 (11th Cir. 2011) (*quoting* § 2B1.1, comment. (n.2(B))). If a loss can be determined, as is the case here, a court cannot sentence a defendant based on gain. Accordingly, the PSI's reliance on kickbacks to prove loss is impermissible.

With a loss amount of at most $7,014, Mr. Grow's offense level should only be increased by 2 levels, not 20. And with that loss figure, the 3-level, federal health-care program increase proposed by the PSI pursuant under § 2B1.1(b)(7) no longer applies.

3

Equally unwarranted is the proposed 2-level increase based on sophisticated means. Notwithstanding the PSI's characterization of the conspiracy as "sophisticated" (PSI ¶ 42), the term "sophisticated means" refers only to "especially complex or especially intricate conduct pertaining to the execution or concealment of an offense." § 2B1.1, comment. (n.9(B)). Typically, sophisticated means includes conduct "such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* None of that is present here – no false billings to Tricare, no fraudulent prescriptions, no false invoices to conceal the payment of commissions, no fictional shell companies, no hiding assets, no illicit cash payments and no overseas accounts.

At worst, the evidence in this case shows that Mr. Grow, as a sales representative for PCA, recruited by word of mouth other sales representatives and patients whom, he was told, were interested in securing prescription topical creams and vitamins to treat their various symptoms and conditions. Those patients were then referred to telemedicine doctors who would decide, in the exercise of their independent medical judgment, whether to write the prescriptions. If a prescription was written (which did not universally occur), PCA would submit the claim to Tricare. Ultimately, Mr. Grow received commissions from PCA, between 40 and 50 percent of which went to his representatives whom he paid based on a simplistic excel spreadsheet that he created and maintained. Mr. Grow not only paid nearly $5 million in taxes on behalf of himself and his company, but he issued 1099s to ensure that the sales representatives paid tax on their earnings as well. Under these facts, a 2-level increase for sophisticated means is not appropriate.

Nor should the Court impose any increase on the basis of role, let alone the 4-level increase proposed by the PSI under U.S.S.G. § 3B1.1(a). (PSI ¶ 42). No other co-conspirator in this or any of the related cases has been assessed a role enhancement, and no one from PCA has even been

charged as a co-conspirator. Ginger Lay masterminded and ran the survey program, recruited scores of patients and marketers, and received payments totaling $6.3 million (a full one-third of the gross amount Mr. Grow received from PCA), yet she received no role increase. (PSI ¶ 43). Nor did Deanna Dutting or Paul Robinson who, after collectively earning hundreds of thousands of dollars from PCA through Mr. Grow, proceeded to sever ties with Mr. Grow and establish their own marketing companies through which they earned hundreds of thousands more marketing to patients for the benefit of an unrelated pharmacy. (PSI ¶¶ 35-36). Halliburton, Matthews, Bjerke, Bowman and Bear also saw no role increase even though they recruited dozens of patients and sales representatives. (PSI ¶¶ 35-36). There is no principled reason why Mr. Grow should receive a four-level increase when no other person received any role enhancement at all.

To the extent there was health care fraud, it was realized through the operations of PCA, which was solely responsible for submitting claims to Tricare. Mr. Grow did not supervise any physicians and had no role in claims submission on behalf of the pharmacy. As to the receipt of kickbacks, Mr. Grow was merely one of a number of sales representatives hired by PCA to recruit patients and other marketers on PCA's behalf. He did not supervise or manage anyone in connection with his receipt of kickbacks. And he was paid no different from how he was paid as a W-2 employee of PCA for which he was acquitted. While Mr. Grow also was convicted of conspiring to pay kickbacks, he was acquitted of all substantive counts, putting into question what conduct that conspiracy object actually covered. Accordingly, Mr. Grow's offense level should not be increased for role.[3]

---

[3] For these reasons, if the Court is inclined to impose a role enhancement, that enhancement should be no more than 3 levels.

Applying the analysis set forth above, Mr. Grow's offense level under Counts 1 and 5 is not level 36 as the PSI suggests, but level 8, which is calculated as follows:

| | |
|---|---|
| Base Offense Level: | 6 |
| Loss: | +2 |
| **Adjusted Offense Level:** | **8** |

B. *Analysis Under U.S.S.G. § 2B4.1*

The PSI relies exclusively on § 2B1.1 in determining Mr. Grow's offense level. Section 2B1.1, however, does not drive Mr. Grow's sentence. As set forth in Mr. Grow's Motion for Judgment of Acquittal (DE 165), given the evidence presented in this case, Counts 1 and 5 cannot stand under the logic of the Court of Appeals' decision in *United States v. Medina*, *supra*. But even if Counts 1 and 5 survive, this is, at bottom, a kickback case. U.S.S.G. § 2B4.1, which applies the kickback counts, is therefore the most analogous guideline.[4] Under § 2B4.1, having been convicted of receiving kickbacks totaling $18,856,744, Mr. Grow's adjusted offense level is as follows:

| | |
|---|---|
| Base Offense Level: | 8 |
| Value of the Bribe: | +20 |
| **Adjusted Offense Level:** | **28 (78-97 months)[5]** |

---

[4] Notably, every defendant in the related cases save for Matthews, who was allowed to plead to a single misbranding charge, was sentenced under § 2B4.1.

[5] Mr. Grow also was convicted of purchasing a single cashier's check in the amount of $105,545. U.S.S.G. § 2S1.1, which applies to money laundering offenses, garners a lower offense level than § 2B4.1. Accordingly, we will not address money laundering in the context of these objections. We reserve the right to do so, however, at the Court's request or should the Government address money laundering in its objections to the PSI or at sentencing.

## II.     Miscellaneous Objections

**Page 1, Count 1 and Paragraph 113:** In the absence of a special verdict on Count 1, Mr. Grow wishes to clarify that because he was convicted of conspiracy to commit health care fraud (as opposed to conspiracy to commit wire fraud),[6] the applicable penalty ranges from 0 to 10 years, not 0 to 20 years' imprisonment.  Further, with a health care loss of $7,014, Mr. Grow's maximum fine under Count 1 is $250,000.

**Page 1, Count 9 and Paragraph 113:** Mr. Grow wishes to clarify that because he was convicted of receiving kickbacks totaling $18,856,744, his alternative maximum fine under Count 9 is $37,731,488, not $38 million.

**Paragraph 1:** Mr. Grow wishes to clarify that in addition to the Counts identified in the last sentence of this paragraph, he was also acquitted of Count 30, 31 and 32.

**Paragraph 5:** Mr. Grow wishes to clarify that Deanna Dutting, Paul Robinson and Raymond Bear were charged by Indictment in Case No. 16-20910-Scola (DE 1).  Each then proceeded to waive indictment and plead guilty to an Information charging them with conspiracy to receive health care kickbacks.

**Paragraph 7:** Mr. Grow wishes to clarify that Sven Bjerke pleaded guilty to the Information on December 5, 2017.

**Paragraph 11:** Mr. Grow objects to this paragraph because it fails to reflect that under the Anti-Kickback Statute, a person may only be held criminally liable if he acts knowingly and willfully.

**Paragraph 12:** Mr. Grow objects to this paragraph because there is no evidence that Mr. Grow knowingly conspired with any so-called "others" referenced in this paragraph.  Nor was

---

[6] *See* Point IA, *supra*.

there evidence presented at trial that Mr. Grow conspired with Paul Robinson, Deanna Dutting, Raymond Bear, Shane Matthews or Michael Bowman. While each may have made certain representations in connection with their respective pleas, we have not been afforded an opportunity to test those claims because none of them testified at trial. In addition, Deanna Dutting and Paul Robinson severed all ties with Mr. Grow in late-March 2015. For that reason alone, it is not correct to say that Mr. Grow conspired with either Dutting or Robinson through June 2015. Finally, Mr. Grow objects to this paragraph to the extent it claims that Mr. Grow paid kickbacks through June 2015. The evidence proves that Mr. Grow and many of his sales representatives became W-2 employees of PCA in May 2015, and thereafter were paid directly by the pharmacy. The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 16:** Mr. Grow objects to this paragraph to the extent it states that Bowman "paid individuals" to refer Tricare beneficiaries to MG TEN. There is no evidence that Bowman paid others to refer Tricare beneficiaries to Mr. Grow's company, nor is there evidence that Mr. Grow was ever aware of such payments. Further, no evidence was presented at trial concerning Bowman's formation of MB-Ten or his role in the conspiracy. While we understand that Bowman made certain representation in connection with his plea, we were not afforded an opportunity to test those claims because he did not testify at trial.

**Paragraph 17:** Mr. Grow objects to this paragraph on several grounds. As an initial matter, there is no evidence that Mr. Grow offered or paid kickbacks to any Tricare beneficiaries as an incentive to induce them to order compounded medications. Mr. Grow made a handful of payments to patients who ultimately chose not to become sales representatives. But as the jury

clearly found, those payments (out of thousands of payments intended for more than 125 different sales representatives) were the result of inadvertent accounting error, not attempts to induce patients to order compounded medications. (DE 115 ¶ 9(b)).

Instead, it was Ginger Lay who paid patients pursuant to a survey program that she alone created and managed. The evidence shows that Lay drafted the survey; that she transmitted it from her corporate email address to patients whom she recruited independent of Mr. Grow; that she instructed the patients to return the completed survey forms to a company of which she was the sole owner; and that she paid those patients from her corporate bank account – all without Mr. Grow's knowledge, participation or assent. Of the three survey participants who testified at trial, not one testified that he had ever heard of Mr. Grow, had ever spoken with Mr. Grow or had received any payments from Mr. Grow. While Lay claims that Mr. Grow knew about the survey program and agreed that patients could be paid, contemporaneous documents prove otherwise. *See* DX 205 (text from Mr. Grow to Lay that reads: "I wouldn't be paying anyone"); *see also* DX 202I (survey flier created on Lay's personal computer); DX 202J (survey sent from Lay's company, Med RX Sales); DX 202K (bank statements for Med RX Sales reflecting payments to patients).

Nor is there any evidence that Mr. Grow induced Tricare beneficiaries to receive compounded medications by waiving Tricare copayments. The uncontroverted evidence is that an executive at Patient Care America ("PCA") – a company with outside counsel and a separate compliance department – told Mr. Grow that he could lawfully pay the co-payments on behalf of Tricare beneficiaries. Mr. Grow therefore had no reason to believe that it was improper for him to do so.

Similarly, there is no evidence that Mr. Grow induced even a single Tricare beneficiary to receive medications "without regard to any legitimate medical need for the drug," as paragraph 17

9

claims. With one exception, no patient testified that he or she ever received a prescription that was medically unnecessary. The lone exception, Josie Brundige, was clear that she never once spoke with Mr. Grow, and certainly never told him that she had no need for the scar cream. Brundige aside, every patient who testified reported that they had a medical need for the prescription. Many also said that the medications helped alleviate their symptoms. And not one testified that Mr. Grow was told or otherwise knew that patients were receiving prescriptions absent medical need. Similarly, the only physician called to testify, Dr. Ankush Bansal, testified that he never once wrote a prescription that he did not believe was medically appropriate.

Finally, Mr. Grow objects to this paragraph to the extent it claims that Mr. Grow paid kickbacks to Lay through June 2015. The evidence proves that Mr. Grow and many of his sales representatives became W-2 employees of PCA in May 2015, and thereafter were paid directly by the pharmacy. The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 18:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Bowman's role in the conspiracy. While Bowman may have made certain representations in the context of his plea, we were not afforded an opportunity to test those claims because he did not testify at trial. Further, Mr. Grow objects to this paragraph to the extent it claims that Mr. Grow paid kickbacks through June 2015. The evidence proves that Mr. Grow and many of his sales representatives became W-2 employees of PCA in May 2015, and thereafter were paid directly by the pharmacy. The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 20:** Mr. Grow objects to this paragraph because it is inaccurate. Although the Marketing Agreement between Mr. Grow and Ginger Lay was dated October 2014, Lay testified that she did not begin working with Mr. Grow until late December 2014 or early January 2015. Further, as set forth above, there is no credible evidence that Mr. Grow was aware of or participated in Ginger Lay's patient-survey program, or that he had any role in creating or disseminating the flyer discussed in this paragraph.

**Paragraph 21:** Mr. Grow objects to this paragraph because is inaccurate. While Mr. Grow once provided Lay with a completed intake form as a sample, at no time did he suggest that Lay should use that sample form and apply it to all patients. Nor did he suggest that Lay pre-select specific medications without regard to a patient's medical need. Further, Mr. Grow always understood that regardless of any recommendation made on a particular intake form, no medications would be given unless prescribed by a licensed telemedicine physician who, in the exercise of his or her independent medical judgment, determined after consulting with the patient that the prescription was medically necessary. There is no evidence that a physical examination of each patient was required.

**Paragraph 22:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Bowman's role in the conspiracy. While Bowman may have made certain claims in the context of his plea, we were not afforded an opportunity to test those claims because he did not testify at trial.

**Paragraphs 23 through 28:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Mathews' role in the conspiracy. While Matthews may have made certain claims in the context of his plea, we were not afforded an opportunity to test those claims because he did not testify at trial. That aside, Mr. Grow objects to paragraph 26 to the extent it claims that Mr.

Grow told Matthews that Tricare beneficiaries could receive commissions for their own prescriptions.  Mr. Grow testified (and the jury, through its acquittal, agreed) that he never made any such statement, and that to the extent that a small number of patients (less than 5 out of nearly 600) were paid for their own prescriptions, it was the result of inadvertent error.  In addition, Mr. Grow objects to paragraph 27 to the extent it asserts that Mr. Grow agreed to pay Matthews $100 per physician consultation.  As the evidence reflects, Mr. Grow paid telemedicine companies, not Matthews, $100 for each consultation by a physician.  Mr. Grow further objects to this paragraph because it states incorrectly that physical examinations are "prerequisite[s] to the dispensing of all drugs," and that any prescriptions written pursuant to a telemedicine consult are therefore invalid.  Neither is accurate, as Dr. Bansal testified and as the Government ultimately conceded.

**Paragraph 30:**   Mr. Grow objects to this paragraph to the extent it suggests that payments made by PCA to its sales representatives after the W-2 conversion were illegal kickbacks.  The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 31:**   Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Dutting's role in the conspiracy.  While Dutting may have made certain claims in the context of her plea, we were not afforded an opportunity to test those claims because she did not testify at trial.

**Paragraph 32:**  Mr. Grow objects to this paragraph because, as set forth above, there is no credible evidence that Mr. Grow was aware of or participated in Lay's survey program.  Nor is there credible evidence that Mr. Grow was aware of, authorized or made any payments to survey participants, and in fact there is direct evidence to the contrary.

12

**Paragraph 34:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Robinson's or Dutting's roles in the conspiracy. While Robinson and Dutting may have made certain claims in the context of their respective pleas, we were not afforded an opportunity to test those claims because neither testified at trial.

**Paragraph 35:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Robinson's role in the conspiracy. While Robinson may have made certain claims in the context of his plea, we were not afforded an opportunity to test those claims because he did not testify at trial. Further, in late-March 2015, Robinson severed all ties with Mr. Grow and began marketing compounded medications for the person identified as Individual 3 and the pharmacy identified as Company 2, neither of which has any relationship to Mr. Grow.

**Paragraph 36:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Dutting's role in the conspiracy. While Dutting may have made certain claims in the context of her plea, we were not afforded an opportunity to test those claims because she did not testify at trial. Further, in late-March 2015, Dutting severed all ties with Mr. Grow and began marketing compounded medications the person identified as Individual 3 and the pharmacy identified as Company 2, neither of which has any relationship to Mr. Grow.

**Paragraph 37:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Bear's role in the conspiracy. While Bear may have made certain claims in the context of his plea, we were not afforded an opportunity to test those claims because he did not testify at trial. Mr. Grow further objects to this paragraph to the extent it suggests that payments made by PCA to its sales representatives after the W-2 conversion were illegal kickbacks. The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became

13

W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 38:** Mr. Grow objects to this paragraph to the extent it suggests that payments made by PCA to its sales representatives after the W-2 conversion were illegal kickbacks. Mr. Grow further objects to this paragraph to the extent it suggests that payments made by PCA to its sales representatives after the W-2 conversion were illegal kickbacks. The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 39:** Mr. Grow wishes to clarify that no evidence was admitted at trial concerning Bowman's role in the conspiracy. While Bowman may have made certain claims in the context of his plea, we were not afforded an opportunity to test those claims because he did not testify at trial. Mr. Grow further objects to this paragraph to the extent it suggests that payments made by PCA to its sales representatives after the W-2 conversion were illegal kickbacks. The evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 40:** Mr. Grow objects to this paragraph to the extent it seeks to hold him responsible for claims paid by Tricare to, or any improper benefits conferred upon, Company 2. As set forth elsewhere in the PSI (PSI ¶¶ 35-36), Dutting and Robinson recruited Tricare beneficiaries for Individual 3 and Company 2 after severing ties with Mr. Grow.

**Paragraph 41:** Mr. Grow objects to this paragraph to the extent it seeks to hold him responsible for a loss amount of $19 million. For purposes of U.S.S.G. § 2B1.1, the "loss amount"

is at most $7,014, the amount of the claim at issue in Count 5.[7]  Separately, Mr. Grow was convicted of receiving kickbacks totaling $18,856,744, not $19 million.

**Paragraph 42:**  The question of role aside (*supra*, Point IA), Mr. Grow objects to this paragraph because it is inaccurate on several fronts.  First, while Robinson, Dutting, Bear, and Bowman made certain claims in the context of their respective pleas, we were not afforded an opportunity to test those claims because he did not testify at trial.  Beyond that, there is no evidence that Mr. Grow made a single payment, kickback or otherwise, to Paul Robinson.  Nor is there evidence that Mr. Grow made payments to any "others unknown to the" Government, as this paragraph suggests.

Second, there is no evidence that Mr. Grow made even a single payment in order to recruit patients "for the purpose[] of submitting false and fraudulent claims" to Tricare.  As stated above, every patient but one testified that they had a medical need for their prescriptions, with many testifying that medications helped alleviate their symptoms.  And not one person testified that Mr. Grow was told or otherwise knew that patients were receiving prescriptions absent medical need.  Nor was there even a shred of evidence that Mr. Grow was involved in PCA's Tricare claims submission process, let alone that he was aware of or involved with the submission of false claims.

Third, while Mr. Grow was convicted of receiving $18,856,744 (not $19 million) in kickbacks, the loss amount for purposes of U.S.S.G. § 2B1.1 is at most $7,014.

And finally, fourth, while Mr. Grow did, in fact, purchase a Porsche with funds he received from PCA, that fact bears no relevance to the question of Mr. Grow's role in the offense.

---

[7]  *See* Point IA, *supra.*

**Paragraph 43:**  Mr. Grow objects to this paragraph to the extent it suggests that (1) Mr. Grow directed Company 1 to submit false claims to Tricare, or (2) that any false claims were, in fact, submitted to Tricare.  As noted above, there is no evidence to support either allegation.

**Paragraphs 44 through 49:**  In response to these paragraphs, Mr. Grow wishes to clarify that no evidence was admitted at trial concerning the roles played by Robinson, Dutting, Bear, Matthews or Bowman in the conspiracy.  While all four may have made certain claims in the context of their respective pleas, we were not afforded an opportunity to test those claims because they did not testify at trial.

In addition, in response to Paragraph 44, Mr. Grow wishes to clarify that the total kickback figures listed as having been paid to Robinson and Dutting consist of (in the case of Robinson) or include (in the case of Dutting) monies each received from Company 2 in connection with a separate conspiracy unrelated to Mr. Grow.  Similarly, Mr. Grow objects to the kickback figures listed in paragraphs 45 through 49 to the extent they include payments not from Mr. Grow, but from PCA after the W-2 conversion process was complete.  As noted above, the evidence proves, and the jury found, that all payments made by PCA to its representatives once they became W-2 employees of the pharmacy fell within the Anti-Kickback Statute's statutory safe harbor, and therefore did not constitute kickbacks.

**Paragraph 100:**  Mr. Grow wishes to clarify that both the 2014 Porsche and 2014 Range Rover have been seized by the Government.

**Paragraph 105:**  Mr. Grow wishes to clarify that he is a 49 percent owner of MG 10 Land, LLC, which (unlike MG TEN) is not involved in this case.

**Paragraph 118:**  Mr. Grow objects to the PSI's conclusion that there are no factors that would warrant a variance.  Mr. Grow intends to submit a separate sentencing memorandum in

16

advance of sentencing that will address, among other things, the sentencing factors under 18 U.S.C. § 3553(a) and Mr. Grow's entitlement to a downward variance.

### III. <u>Objections to Calculation of Mandatory Restitution (PSI ¶¶ 50-51 & 116-117)</u>

The PSI recommends that the Court impose mandatory restitution of $19 million. Again, however, given that Mr. Grow was convicted of receiving kickbacks totaling $18,856,744, his restitution should be $18,856,744, not $19 million. Further, consistent with the Judgments of Conviction entered in the related cases, Mr. Grow submits that his restitution should be made joint and several with the following: Deanna Dutting up to $264,263 (Case No. 16-20910-Cr-Scola, DE 59); Paul Robinson up to $177,575 (*id.*, DE 69); Raymond Bear up to $43,705 (*id.*, DE 72); Robin Halliburton up to $67,732 (Case No. 16-20846-Cr-Huck, DE 37); Sven Bjerke up to $114,378 (Case No. 17-60264-Cr-Cohn, DE 20); and Bowman up to $135,024 (Case No. 17-60248-Cr-Gayles, DE 31).[8]

Respectfully submitted,

/s/ Jeffrey E. Marcus
Jeffrey E. Marcus
MARCUS NEIMAN & RASHBAUM LLP
2 South Biscayne Boulevard, Suite 1750
Miami, Florida 33131
Tel: (305) 400-4260
Jeffrey E. Marcus
Fla. Bar No. 310890
jmarcus@mnrlawfirm.com
Daniel L. Rashbaum
Fla. Bar No. 75084
Drashbaum@mnrlawfirm.com

/s/ Kathryn A. Meyers
Kathryn A. Meyers
Fla. Bar No. 0711152
kate@kmeyerslaw.com

---

[8] Although Mr. Matthews admitted to receiving $439,765 over the course of the conspiracy, he was not ordered to pay restitution.

17

>LAW OFFICE OF KATHRYN A. MEYERS PLLC
>2 South Biscayne Boulevard, Suite 1750
>Miami, Florida 33131
>Tel: (305) 400-4266
>
>*Counsel for Defendant Monty Ray Grow*

### **CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2018, a true and correct copy of the foregoing was served via CM/ECF on all counsel of record.

>/s/ Jeffrey E. Marcus
>JEFFREY E. MARCUS