```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
 3                  CASE NUMBER 16-20893-CR-MORENO
 4
     UNITED STATES OF AMERICA,
 5
                 Plaintiff,              Courtroom 13-3
 6
       vs.                               Miami, Florida
 7
     MONTY RAY GROW,                     January 23, 2018
 8
                 Defendant.
 9
10                  JURY TRIAL PROCEEDINGS
         BEFORE THE HONORABLE FEDERICO A. MORENO
11               UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     FOR THE GOVERNMENT:      KEVIN J. LARSEN, AUSA
14                            JON M. JUENGER, AUSA
                              United States Attorney's Office
15                            Economic Crimes Section
                              United States Attorney's Office
16                            99 Northeast Fourth Street
                              Miami, Florida 33132
17                                              305-961-9356
                                           Fax: 305-530-6168
18                                      kevin.larsen@usdoj.gov
                                        jon.juenger@usdoj.gov
19
     FOR THE DEFENDANT:       DANIEL L. RASHBAUM, ESQ.
20                            JEFFREY E. MARCUS, ESQ.
                              Marcus Neiman & Rashbaum, LLP
21                            2 South Biscayne Boulevard
                              Suite 1750
22                            Miami, Florida 33131
                                                305-400-4261
23                                         Fax: 866-780-8355
                                        drashbaum@mnrlawfirm.com
24                                      jmarcus@mnrlawfirm.com
25
```

1                  **KATHRYN A. MEYERS, ESQ.**
                  Law Office of Kathryn A. Meyers PLLC
2                  2 South Biscayne Boulevard
                  Suite 1750
3                  Miami, Florida 33131
                                305-400-4266
4                       kate@kmeyerslaw.com

5   **REPORTED BY:**         **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                  Official United States Court Reporter
6                  Wilkie D. Ferguson Jr. US Courthouse
                  400 North Miami Avenue - Suite 13-3
7                  Miami, Florida  33128    305.523.5118
                  gphofficialreporter@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Page

Ginger Lay ................................... 6

    Cross-Examination by Mr. Marcus ........................ 6

    Redirect Examination by Mr. Larsen .................... 81

    Recross-Examination by Mr. Marcus ..................... 91

Philip Snodgrass ......................................... 93

    Direct Examination by Mr. Juenger ..................... 93

    Cross-Examination by Mr. Rashbaum .................... 99

    Redirect Examination by Mr. Juenger ................. 102

Blair Von Letkemann ..................................... 103

    Direct Examination by Mr. Larsen ..................... 103

    Cross-Examination by Ms. Meyers ..................... 108

    Redirect Examination by Mr. Larsen .................. 112

James Featherston ....................................... 114

    Direct Examination by Mr. Juenger .................... 114

    Cross-Examination by Ms. Meyers ..................... 121

    Redirect Examination by Mr. Juenger ................. 127

Jennifer Klein .......................................... 129

    Direct Examination by Mr. Larsen ..................... 129

    Cross-Examination by Mr. Marcus ..................... 143

Lisa Klitz .............................................. 164

    Direct Examination by Mr. Juenger .................... 164

    Cross-Examination by Mr. Marcus ..................... 185

Reporter's Certificate .................................. 225

```
 1                            EXHIBITS

 2

 3   Exhibits                    Marked for           Received
                               Identification       in Evidence
 4
     Description                  Page    Line     Page    Line
 5
     Defendant's Exhibit Number 202-J ................... 20        25
 6
     Defendant's Exhibit Number 206 ..................... 32        10
 7
     Defendant's Exhibit Number 204 ..................... 38        21
 8
     Defendant's Exhibit Number 202-K ................... 40        14
 9
     Defendant's Exhibit Number 205 ..................... 42        14
10
     Defendant's Exhibit Number 207 ..................... 46         3
11
     Defendant's Exhibit Number 202-A ................... 49         5
12
     Defendant's Exhibit Number 202-I ................... 88         1
13
     Government's Exhibit Numbers 1, 67, 170 .......... 129         20
14
     Government's Exhibit Numbers 170-A through
15   170-D .......................................... 136           2

16   Government's Exhibit Number 171 .................. 154         21

17   Government's Exhibit Numbers 3, 4, 4-B, 4-C,
     4-D, 5, 6, 7, 8, 9, 11, 159 through 169 .......... 166        12
18

19

20

21

22

23

24

25
```

Jury Trial

1          (The following proceedings were held at 11:58 a.m. outside

2     the presence of the jury:)

3          THE COURT:  I am so sorry, folks.  This turned into a

4     mess, but I take full responsibility for it.  I won't even blame

5     the courtroom deputy.

6          THE COURTROOM DEPUTY:  Thank you.

7          THE COURT:  It's my fault.  Okay.  We're ready for the

8     continuation of the cross?

9          MR. MARCUS:  Yes, Your Honor.

10         THE COURT:  Where is the witness?  Let's go.  The

11    jurors were here on time.  I'll take full blame.  It won't be

12    your fault.

13         MR. MARCUS:  How do you want me to handle the

14    defendant's exhibits we've discussed?

15         THE COURT:  How long do you have on cross?

16         MR. MARCUS:  I'm going to try to keep it to an hour,

17    but if I have to go document by document, refreshing

18    recollection, it could take a little longer.  It depends on what

19    the witness says obviously.

20         THE COURT:  That's what you said it would take, an

21    hour, an hour and a half.  You've done an hour.  So another hour

22    would be reasonable.  I agree.  More than that would probably

23    not be reasonable but all right.

24         Ready.

25         MR. MARCUS:  Yes, thank you.

Lay - Cross

```
 1              THE COURT:  Okay.  Bring in the jurors.
 2       (The jury entered the courtroom at 12:00 p.m.)
 3              THE COURT:  Thank you, folks.  Please be seated.  I
 4   know you've been waiting.
 5              We had to add more things unrelated to this case
 6   because some lawyers in some of my other cases had to appear
 7   before other judges.  So what happened this morning -- please be
 8   seated -- is we added probably through my fault too many cases,
 9   and it took longer than 10:15.
10              That's why we're here, and these lawyers and parties
11   were waiting just as patiently as you were for it.  So I don't
12   want you to hold it against them, all right?  Because they were
13   waiting while I was trying to get through seven or eight cases.
14   All right?
15              Thank you.  Cross-examination.  You may continue,
16   Mr. Marcus.
17              MR. MARCUS:  Thank you, Your Honor.
18                         CROSS-EXAMINATION
19                           (Continuation)
20   BY MR. MARCUS:
21   Q.  Good afternoon, Ms. Lay.
22   A.  Good afternoon.
23   Q.  I want to focus on the patient survey program we were
24   discussing yesterday and just recap a little bit.
25              Do you recall your testimony yesterday was that you
```

Lay - Cross

1  started the patient survey program in February of 2015?  Do you

2  recall that?

3  A.  Yes.  There was an initial survey done.  The patient survey

4  was actually -- there was an initial survey done, yes.

5  Q.  That was when you started, in around February of 2015?

6  A.  January or February, yes.

7  Q.  Now January?

8  A.  No, I stated January, February.

9  Q.  Okay.  And that was the first time you ever had anything to

10  do with the survey?

11  A.  Yes.

12  Q.  Of any kind involving patients?

13  A.  Yes.

14  Q.  And your testimony was that you sent the Consent Form that

15  you had put together so that lawyers at the pharmacy at PCA

16  could review it, right?

17  A.  I sent it to Monty and he sent it to the pharmacy and he

18  said that some counsel from PCA looked at it, said that there

19  were changes that needed to be made, and once those changes were

20  made, it would be okay.

21  Q.  He asked you for the survey, didn't he, in February?

22  A.  I sent him the Consent Form.

23  Q.  Did you send it on your own or did he ask you, wondering

24  what you were doing?

25  A.  We discussed the survey idea.

Lay - Cross

8

1   Q.   Right.   And your testimony yesterday was that Mr. Grow told

2   you to keep paying the patients even though the program was

3   terminated in early March of 2015?

4   A.   Yes.   When I asked him what am I supposed to do with all

5   these people, he said keep paying them because we don't want any

6   problems.

7   Q.   Right.   Okay.   So Mr. Lloyd, who we talked about yesterday,

8   is your business partner, correct?

9   A.   Yes.

10  Q.   And you provided text messages to the Government, did you

11  not, as part of your cooperation?

12  A.   Yes.

13  Q.   Okay.   And you exchanged text messages with Mr. Lloyd in

14  November of 2014, did you not?

15  A.   Yes.

16  Q.   And do you recall Mr. Lloyd telling you in November of 2014,

17  that he wanted to have all the telemarketers start a survey on

18  Tuesday?

19          MR. LARSEN:   Objection.

20          THE COURT:   Did you say something?

21          MR. LARSEN:   Objection, it's hearsay, Your Honor.

22          THE COURT:   Pardon?

23          MR. LARSEN:   Objection, hearsay, out-of-court

24  statement.

25          THE COURT:   Whose statement?

Lay - Cross

1          MR. LARSEN:  Mr. Lloyd's statement, out-of-court

2   statement.  He's reading, also, from a document not in evidence.

3          THE COURT:  Okay.  Do we have this witness' statement

4   in that --

5          MR. MARCUS:  Yes, yes.

6          THE COURT:  Then ask her about her own statement in

7   response to someone else.

8          I allow cross-examination, as every judge would, of

9   statements made by a witness outside when her credibility is

10  being attacked in case it's a prior inconsistent statement, for

11  example.  That comes in and in the law we say not as substantive

12  evidence, but to impeach.

13         Impeachment has nothing to do with presidents, whether

14  it's Nixon, Clinton or anyone else, but it has to do with --

15  it's a word that the law uses to attack the credibility of

16  someone.  So you can attack the credibility of someone and

17  challenge her testimony by a prior statement that she has made.

18         Now, most people make statements to other human beings,

19  so the issue is a statement out of court is generally hearsay.

20  So the other human being with whom she's talking, that statement

21  would normally not come in because that person is not a witness.

22  However, it can come in to provide context.  No?

23         Let's say a statement out of court was, yes.  Well, the

24  "yes" wouldn't mean anything unless you had the question asked

25  by someone else.

1          I don't know if I confused you or if I gave you a

2    course in evidence, which takes a whole semester, and we can

3    still disagree, but I think you understand.

4          Hearsay is a statement out of court.  The reason we

5    don't let it in is because it's unfair because it doesn't get

6    cross-examined.  There are all kinds of exceptions; if it's

7    against a party, if it's an admission it comes in because

8    generally we believe, and the courts, that people don't say

9    anything that is generally against one's interests.  We allow

10   statements against a party.  So Mr. Grow's statements come in

11   because the law allows that.

12         Here the statement that's being questioned about is, I

13   assume, a prior inconsistent statement.

14         Am I right?

15         MR. MARCUS:  Yes, Your Honor.

16         THE COURT:  So there's a Rule 613 that allows that,

17   613(b), so I will allow that, but I want you to understand

18   whatever anybody else said is just to provide context.  Okay?

19   All right.

20         MR. MARCUS:  Your Honor, may I approach with Defense

21   Exhibits 202-G, N and F to the witness?

22         THE COURT:  Sure, sure.  You've given them to the

23   prosecutor yesterday at the end of the day.

24   BY MR. MARCUS:

25   Q.  Ms. Lay, let me first direct your attention to 202-G.  On

Lay - Cross

1   the first page, do you see the Bates numbers at the bottom?

2   A.   Yes

3   Q.   Do you see GL?

4   A.   Yes.

5   Q.   Okay.  Those are the Bates numbers you used when you

6   produced documents to the Government in this case?

7   A.   Yes.

8   Q.   And Mr. Lloyd, his cell phone was 601-917-4793; is that

9   correct?

10  A.   Yes.

11  Q.   Looking at the first page, does that refresh your

12  recollection as to whether --

13          THE COURT:  Well, are you refreshing her recollection

14  or are you impeaching, which of the two, so I know what

15  pigeonhole I'm looking for?  You can do either one, but I just

16  want to know ahead of time so my -- I'm not as smart as you all

17  are, so I've got to think ahead.

18          MR. MARCUS:  I may do both.  I'm trying to give her an

19  opportunity --

20          THE COURT:  You're trying to do both.  Well, you have

21  to give her an opportunity even if you want to impeach her.

22          MR. MARCUS:  That's right.

23          THE COURT:  But you can ask her, is that your

24  statement, her statement, but if you want to refresh her

25  recollection, fine.

Lay - Cross

BY MR. MARCUS:

Q.  Did you use telemarketers in November of 2014 to do a survey?

A.  To do a Patient Data Form, yes.

Q.  A Patient Data Form?

A.  Yes.

Q.  But in the communication, it was described as a survey, right?

A.  Yes.

Q.  Okay.  And what's the difference between -- well, we saw the Consent Form, and as part of the patient survey program that you put together for PCA, patients receive forms, do they not?

A.  This is not that -- this is not the survey with patients that I was doing with Monty.

Q.  No, I understand.  This is a different survey, isn't it?

A.  No, it's not.  This was a telemarketing to generate leads for private insurance.

Q.  Involving patients with the survey program?

A.  They were not being compensated, this is just a questionnaire to see if the patient qualified to get the compounding medication for private insurance.

Q.  Okay.  But in your communications you described it.  You used the word "survey" to describe the program.  You agree with that?

A.  Yes.

1   Q.   Okay.  Can you look at 202-N, the first page of that as

2   well, and just directing your attention, 662-420-2170, that's

3   your cell phone?

4   A.   Yes.

5   Q.   Okay.  And do you know a gentleman named David who has the

6   number 207-205-1752?

7   A.   I don't recall this gentleman.

8   Q.   Okay.

9            MR. LARSEN:  Your Honor, objection.  We don't have --

10            THE COURT:  You have objection to what?

11            MR. LARSEN:  Well, I don't know what document is being

12   referred to.  I don't have that.

13            MR. MARCUS:  I gave it to you.

14            MR. LARSEN:  I have through M --

15            THE COURT:  Well, if you guys want to whisper to each

16   other, you're entitled to do that, but then whisper because the

17   court reporter is straining to see if she should take it down.

18   So she's not going to take your conversations.

19            You certainly had enough time while I was doing other

20   things for you all to do this, I would think.  What's the issue

21   here?

22            MR. MARCUS:  They lost the copy we gave to them.

23            MR. LARSEN:  I don't have a copy.

24            THE COURT:  Do you have an extra one?

25            MR. LARSEN:  Your Honor, the issue is, there were some

Lay - Cross

14

1  copies that were not provided to us yesterday and there were

2  some that were, so we're just to --

3          THE COURT:  You know, the best way to do it is tell me

4  what the number is of the exhibit.  Wouldn't that be the best

5  way of doing it?  That way I know.  You had mentioned two

6  letters of Exhibit 202, I believe, right?  What were the two

7  letters?

8          MR. MARCUS:  We added 202-N as in Nancy.

9          THE COURT:  Oh, you added from yesterday.  Well, that's

10 what causes problems, see.

11         MR. MARCUS:  And we provided it to them.

12         THE COURT:  No, but I'm not going to let you do that.

13 That's why we do things the night before.  You can't just keep

14 adding.  I mean, maybe you're entitled to it, but then we have

15 to talk about it before, that's all.  So you can talk about

16 202-A all the way to M.  Do that, if you want to, before we go

17 to something that has not been provided, that's all.

18 BY MR. MARCUS:

19 Q.  Ms. Lay, in the summer of 2014, were you running a survey

20 involving patients?

21 A.  No, sir.

22 Q.  Let me refer you now to Exhibit 202-F.

23 A.  All right.

24 Q.  Directing your attention to the second page, as part of your

25 survey program you set up assessment portals, did you not?

Lay - Cross

1  A.  This was doing private insurance when I was working for Eric

2  Santos.

3  Q.  I understand.  It was before you were working with Mr. Grow.

4  A.  Yes.

5  Q.  But it was a survey program, wasn't it?

6  A.  It was a telemarketing program to generate leads for

7  patients who had private insurance to see if they qualified for

8  it.

9  Q.  Right.  You set up an assessment portal where patient forms

10  would be sent, correct?

11  A.  Eric Santos had a portal that had information in it that the

12  rep was supposed to put in the portal.

13  Q.  And you were paying reps per survey, were you not?

14  A.  I was paying them per person that got the compounding.

15  Q.  Right.  And just directing your attention to Pages 473 and

16  474.

17  A.  Yes.

18  Q.  You use the word "survey," do you not, to describe the

19  program?

20  A.  It was a questionnaire Patient Data Form that had questions

21  on it.

22  Q.  But yesterday when I asked you about survey programs, you

23  said you had never done a survey program until the one you

24  started for PCA in February of 2015; isn't that right?

25  A.  It was a Patient Data Form that the rep completed that asks

Lay - Cross

1    questions.

2    Q.   The survey program that you set up in this case, you used an

3    email, did you not, called assessmentsurvey@medrxsales.com?

4    A.   Could you please tell me what date you're looking at?

5    Q.   Sure.

6         MR. MARCUS:  May I approach, Your Honor?

7         THE COURT:  Sure.  You have permanent permission to

8    approach.

9         MR. MARCUS:  Your Honor, I'm showing the witness what's

10   been marked as Defense Exhibit 202-J.

11   BY MR. MARCUS:

12   Q.   Do you see at the bottom the Bates number GL-001092?

13   A.   Yes.

14   Q.   That's the number you used to produce documents to the

15   Government?

16   A.   Yes.

17   Q.   And do you recognize the assessment survey email address

18   that's at the top of this email?

19   A.   Yes, and it was dated in January, correct?

20   Q.   And that's an assessmentsurvey@medrxsales.com, right?

21   A.   Yes.

22   Q.   You controlled it, that was your website, right?

23   A.   It was an email address.

24   Q.   That was your email address.

25        MR. MARCUS:  Your Honor, I'd offer Exhibit 202-J into

Lay - Cross

1    evidence at this time.

2         THE COURT:  What say the Government?

3         MR. LARSEN:  Your Honor, it's an out-of-court

4    statement, it's an email, it's hearsay, Your Honor.

5         THE COURT:  What's the response?

6         MR. MARCUS:  Well, she has authenticated it, Your

7    Honor, and it's dated January 12, which is earlier than the time

8    period that she discussed.

9         THE COURT:  Whose statement are we talking about?

10        MR. MARCUS:  Well, she just testified that this

11   comes -- it's her statement because it comes from --

12        THE COURT:  That's what the answer is, that's what I

13   want to know.  See, I like to focus on the things.  I know what

14   she has testified.  I want you to tell me whose statement are we

15   talking about, and you're talking about the witness' statement.

16        So is it an inconsistent statement or not under Rule

17   613(b), or what is it?

18        MR. MARCUS:  It's a --

19        THE COURT:  Are you introducing it as substantive

20   evidence or as extrinsic evidence of impeachment?  What is it?

21        MR. MARCUS:  It is a prior inconsistent statement, Your

22   Honor.

23        THE COURT:  A prior inconsistent statement, and you

24   certainly may inquire.

25        And why should it be excluded according to the

1    Government?

2         MR. LARSEN:  Your Honor, this is not an inconsistent

3    statement.  I don't believe the defense -- the witness stated it

4    was January email, there's a January date.  I just don't know

5    where the inconsistency is at this point, Your Honor.

6         THE COURT:  Did the witness unequivocally admit making

7    the statement, Mr. Marcus?

8         MR. MARCUS:  Yesterday, she was unequivocal that this

9    program started --

10        THE COURT:  No, no, this statement, that she made the

11   statement, did she unequivocally say, yeah, I made that

12   statement, but it means something else?  Did she do that today,

13   now, with that statement?

14        MR. MARCUS:  No, Your Honor.

15        THE COURT:  She did not admit it.  She did not admit

16   that she made that statement?

17        MR. MARCUS:  I just started asking her about it.

18        THE COURT:  Okay.  Why don't you tell her -- put down

19   what her statement is and ask her, did you make that statement?

20   How about if we do it that way?

21        MR. MARCUS:  Okay.

22        THE COURT:  See, that way I decide whether the

23   statement may be proved by extrinsic evidence even though the

24   witness unequivocally admits having made it, because there is a

25   dispute among the courts about that and that's why I want to

Lay - Cross

1    focus on that.

2    BY MR. MARCUS:

3    Q.  On January 12, 2015, did you email a patient named Rebecca

4    Dickensauge congratulating her about being accepted into the Med

5    RX Sales assessment product model?

6    A.  I sent --

7              THE COURT:  Yes or no, did you do that or say that?

8              THE WITNESS:  I didn't email that, my assistant emailed

9    that.

10             THE COURT:  Okay.

11   BY MR. MARCUS:

12   Q.  Did you direct the email to be sent?

13   A.  Yes.

14   Q.  This was done on your authority?

15   A.  Yes.

16             THE COURT:  So what's the dispute, from the Government?

17             MR. LARSEN:  Well, Your Honor, on direct --

18             THE COURT:  No, no, what's the dispute with the

19   statement?

20             MR. LARSEN:  There is no inconsistent statement.

21   There's no prior inconsistent statement.

22             THE COURT:  Maybe.  So how does it hurt you?

23             MR. LARSEN:  Well, he can ask.  He asked the question.

24   She's answered the question.  I don't know that we need to

25   impeach the witness when there's no inconsistent statement.

1          THE COURT:  You may be right, so it doesn't hurt you or

2    your witness, right?

3          MR. LARSEN:  Right.

4          THE COURT:  Right?

5          MR. LARSEN:  I agree, Your Honor.

6          THE COURT:  So it doesn't really matter except maybe to

7    teach me more about the rules of evidence, which I may find

8    interesting, but the jurors probably don't care.  So what I'm

9    going to do is, I'm going to admit it, and I will do that with

10   all these statements as long as she acknowledges that it's her

11   statement.  We were having a little bit of an issue there with

12   who sends it.  I am going to allow it.

13         Whether it's an inconsistent statement or not, the jury

14   will decide whether it means anything, but they might as well

15   hear it.  And whether I force the defense to put it on in the

16   event that the defense wants to put on a case, as the defense

17   has indicated that it wants, so that's why I can say that, it

18   doesn't really matter.  So we might as well save time.

19         Go ahead.  Have her acknowledge it, and if it is, I'm

20   going to admit it with that cautionary instruction.  All right?

21         MR. MARCUS:  Thank you, Your Honor.

22         THE COURT:  Done.  With this and all the other ones --

23         MR. MARCUS:  Thank you.

24         THE COURT:  -- that have been already identified.

25      (Defendant's Exhibit Number 202-J was received in evidence.)

Lay - Cross

1   BY MR. MARCUS:

2   Q.   So, Ms. Lay, this is an example of letters that were sent to

3   patients once they were entered into your assessment survey

4   program; is that correct?

5   A.   This was an initial survey which they were not compensated

6   for.

7   Q.   Right.  And this one was sent on January 12th, correct?

8   A.   Yes.

9   Q.   And the subject line says Med RX Assessment Program.  Do you

10  see that?

11  A.   Yes.

12  Q.   And Med RX is your company?

13  A.   Yes.

14  Q.   And this email tells the patient that she will be

15  compensated from your company, Med RX Sales, LLC, correct?

16  A.   Further in the document it states that the initial survey

17  she would not be compensated for.

18  Q.   Right.  But it lists for pain and scar and vitamin, the

19  three products that you were entrusted to market.  Compensation,

20  do you see that?

21  A.   Yes.

22  Q.   Later on you changed the compensation.  You started paying

23  patients even more, did you not?

24  A.   No, that totals a thousand dollars.

25  Q.   Okay.  And you see the email address, that's the assessment

Lay - Cross

1   survey, right?  That's the email address we were talking about

2   that you controlled?

3   A.   Yes, that my assistant sent the emails from.

4   Q.   As part of this, patients had to fill out forms with patient

5   data, right, and information?

6   A.   They were asked to answer questions with regard to how they

7   were before they started using the product.

8   Q.   Right.  And the words "assessment survey" are yours, are

9   they not?

10  A.   Yes.  I actually got the information from a website that I

11  found online and created the survey from their information.

12  Q.   And this information and Consent Form language, this is part

13  of what you found online and modified for your own purposes?  Do

14  you see that?

15  A.   I'm reading it.  Yes.

16  Q.   You did not tell the pharmacy about this program, did you,

17  in January?

18  A.   No.  I talked to my business partners and some of the reps

19  about the program before I talked to Monty about it.

20  Q.   You talked to your team, the people who worked with you?

21  A.   Yes, and we sent out a few initial surveys to Tricare

22  beneficiaries, but they knew they would not get paid, and we let

23  them know that they could possibly get paid on further surveys.

24          So before I started paying people, I didn't know if it

25  was right, so I reached out to someone who had experience in the

Lay - Cross

1   health care industry and asked them to work with me on doing the

2   Consent Form, and then I paid them $500, sent the Consent Form

3   they worked with me, on to Monty, he sent it to the pharmacy.

4   The pharmacy told him to tell me to make certain revisions to

5   it.  He sent me the revised copy and after that, people were

6   getting paid.

7   Q.   Right.  And this is Exhibit 17-A which is already in

8   evidence.  This is a brochure that you testified that you

9   created, correct?

10  A.   Yes.

11  Q.   And again, from your company, Med RX Sales, LLC?

12  A.   Yes.

13  Q.   And this time you're offering -- well, you're offering $1500

14  a month to the patients?

15  A.   It was changed.

16  Q.   And again, there is no date on this document, correct?

17  A.   No.

18  Q.   And there's no email with this document ever from you to

19  Mr. Grow that exist, correct?

20  A.   No, not that I recall, no.

21  Q.   Okay.  You never sent it to him?

22  A.   No, not that I recall, no.

23  Q.   Now, this is Government's Exhibit 134.  This is February

24  20th?

25  A.   Yes.

Lay - Cross

1   Q.   Right.   Obviously, you're not copied on this, right?

2   A.   No.

3   Q.   Right.   But attached is the Consent Form that you prepared

4   that you were giving the patients as part of your program?

5   A.   There's actually another Consent Form prior to this.   This

6   one has the changes that Monty advised me that the pharmacy told

7   him that needed to be made.   There's another form prior to this.

8   Q.   The truth is that Mr. Grow found out about your program

9   because the patients started to complain to the pharmacy that

10  they weren't getting paid around this date in February; isn't

11  that correct?

12  A.   I had a conversation with Monty Grow at the end of

13  January/February about the survey.   This is dated February the

14  20th.   There's a previous Consent Form that does not have the

15  changes that is made on this Consent Form.

16  Q.   Okay.   And that Consent Form that you claim you made changes

17  to, did you ever email it to Mr. Grow so he could look at it?

18  A.   Yes, I did.   That's the one he sent to Patient Care of

19  America because that Consent Form doesn't even mention Patient

20  Care of America.

21  Q.   Well, are you talking about this attached form?   This is the

22  attachment to 134, but this is February 20th.

23  A.   Yes, but this is not -- Patient Care of America's name is

24  not even mentioned in the form that I sent to Monty Grow.   They

25  told him to tell me to make changes to the form.   This is the

Lay - Cross

1   revised form that they said to make the changes to.  Patient

2   Care of America was never mentioned in the original form that I

3   send to Monty Grow.

4   Q.   Okay.  Ms. Lay, you produced emails to the Government as

5   part of your cooperation, correct?

6   A.   My attorneys did, yes.

7   Q.   You gave your emails to your attorneys, right?

8   A.   The attorneys took my cell phone, my laptops, and everything

9   I had during that time and they had someone pull the documents

10  off and submit it, all the documentation, to the Government.

11  Q.   Okay.  Yes or no, Ms. Lay, did the Government ask you for

12  all of your relevant documents that pertain to this case?

13  A.   My attorney pulled that information off and gave it to the

14  Government.

15  Q.   Okay.  Are you saying now in court that there is a missing

16  email from you to Mr. Grow with a patient form, Consent Form, in

17  January that you never gave to the Government?

18  A.   Whatever the attorneys were able to -- the person was able

19  to pull off my computer, that's all I can go by.

20  Q.   Well, you have an email address, right?

21  A.   There is a form that was sent to Monty Grow prior to this

22  form.

23  Q.   Ms. Lay, let's just look for a second at what's in evidence

24  as Government's Exhibit 133.  Just direct your attention to this

25  portion.  This email address, glay@medrxsales.com, that's your

Lay - Cross

1  email, correct?

2  A.  Yes.

3  Q.  And you obviously have access to your email, do you not?

4  A.  I wasn't able to get into that email address from my

5  computer at the time that I gave it to my attorneys.

6  Q.  Were you asked by the Government to pull all emails in your

7  possession that related to Mr. Grow in this case?

8  A.  The person who pulled the information off my computers was

9  not able to get into this email address to get that information.

10 Q.  But were you able to produce other documents to the

11 Government?

12 A.  Yes.

13 Q.  Okay.  And your text messages, while we're just talking on

14 the subject of production, isn't it an amazing coincidence that

15 once February 2015 rolls around, that you have no more text

16 messages between you and Mr. Grow?

17 A.  I got another phone.

18 Q.  But you were able to produce your old text messages from

19 2014?

20 A.  I only gave them the devices I had during that time.  We

21 were talking almost three years ago.

22 Q.  Did you have an iPhone?

23 A.  I had an iPhone, yes.

24 Q.  And you produced text messages from the cloud, did you not?

25 A.  I didn't even know what the cloud was.

Lay - Cross

1    Q.   Okay.

2    A.   The gentleman who pulled off the information, he pulled that

3    information that my attorneys asked to pull it off.

4    Q.   Well, February 2015 is when the patient survey program comes

5    to light both to Mr. Grow and PCA, correct?

6    A.   The discussions that I discussed with Mr. Grow about --

7    Q.   Right.  That time period would be very important, after

8    February 2015, to this case.  Do you agree?

9    A.   Yes, but I didn't have that phone.

10   Q.   Okay.  Well, let's just look at this document while we have

11   it up.  This is an email that you sent to Mr. Grow on March 4th

12   of 2015.  Do you see that?

13   A.   Yes.

14   Q.   "Program discontinued," do you see that?

15   A.   Yes.

16   Q.   And that was because Mr. Grow and the pharmacy told you on

17   March 3rd that the program needed to stop immediately; isn't

18   that right?

19   A.   Yes, it is.

20   Q.   Okay.  And you tell Mr. Grow not only have you discontinued

21   the program effective immediately, but the patients are going to

22   be converted to a non-paid product evaluation.  Do you see that?

23   A.   Yes.

24   Q.   Non-paid, right?

25   A.   Monty Grow knew I was paying the patients when we had the

Lay - Cross

1   initial conversation at the end of January, first of February.

2   Q.  So when you wrote this, you're saying that was just a lie,

3   that's not true?

4   A.  This is stating that the program had ended and that the

5       patients would not be getting paid, anyone who was -- I'm

6       saying, "I will be sending everyone a list of their patients

7       from the portal.  Also, I have informed them that those who

8       have already enrolled will need to be converted by April the

9       30th, 2015.  These individual patients will receive an email

10      April 1st letting them know the program will be terminated.

11      Please advise the pharmacy of this.  Also, let the pharmacy

12      know, if possible, if the patient calls in regard to the

13      program, they need to contact their representative and we

14      will handle the rest."

15  Q.  Did you send out emails to patients by April 1st telling

16  them that the program was terminated?

17  A.  Yes.

18  Q.  You did.  And here you're asking the pharmacy for the

19  patient to contact you, so you can handle the situation, right?

20  A.  Monty called me that day --

21  Q.  It's a yes or no question.

22  A.  Repeat the question.

23  Q.  Directing your attention to the last sentence of this email,

24  you are asking or telling Mr. Grow to have the pharmacy tell

25  patients that are in this program to contact your sales reps and

1   that you will, quote, "handle the rest;" isn't that right?

2   A.   "We will handle the rest," yes.

3   Q.   Okay.  You were nervous at this point, in March of 2015,

4   because both Mr. Grow and the pharmacy were discovering that you

5   were running this unauthorized patient survey program?

6   A.   Monty Grow already knew about the survey.

7   Q.   Okay.

8   A.   He's the one that told me that the pharmacy told me to make

9   the changes.  Once the changes were made, to move forward.  That

10   was at the end of January, first of February.  He calls me March

11   3rd saying that someone from PCA talked to their lawyers, the

12   lawyers said some expletives, and said that the survey was in

13   the gray area and to stop it.  That's why the email was sent to

14   him to let him know that the survey was terminated.

15   Q.   Okay.

16          MR. MARCUS:  Your Honor, may I approach with Defense

17   Exhibit 206?

18          THE COURT:  You have permanent permission to approach

19   the witness.

20          MR. MARCUS:  Thank you.

21          THE COURT:  You're welcome.

22   BY MR. MARCUS:

23   Q.   Ms. Lay, that is a text message on March 3rd from you to

24   Mr. Grow, is it not?

25   A.   My name is on it, yes.  I don't see a telephone number.

Lay - Cross

1  Q.  Okay.  Do you not recognize -- you don't believe that's a

2  text message you sent to Mr. Grow?

3  A.  I'm just saying I don't see my telephone number.  It says

4  Ginger.

5  Q.  Right.  You see the contact Ginger?

6  A.  Yes.

7  Q.  Which is your first name?

8  A.  Yes.

9  Q.  And you see the content of the text message, do you not?

10 A.  Yes.

11 Q.  And it talks on March 3rd about discontinuing, you were

12 going to discontinue the program immediately, correct?

13 A.  Yes.

14 Q.  Which is consistent with the other documents we've seen in

15 the case, correct?

16 A.  Yes.

17 Q.  The next morning, on March 4th -- you sent this email to

18 Mr. Grow on March 4th, very early in the morning, right, at 7:33

19 a.m.?

20 A.  Yes.

21 Q.  On March 4th, you also sent a text message to Mr. Grow,

22 right?  You were nervous, you said, did you see my email, call

23 me if you can, right?  No response?

24 A.  March 3rd I told him I was terminating the program effective

25 immediately.

Lay - Cross

1  Q.  And on March 4th you were asking him to call you, right, and

2  your text is several minutes after this March 4th email that you

3  sent him, right, where you're asking, did you see the email?

4  A.  The text is 8:49 and the email is 7:33.

5           MR. MARCUS:  Can I see it one second?

6  BY MR. MARCUS:

7  Q.  Sorry.  You were you saying that email was sent at 8:49 a.m.

8  -- that text, correct?

9  A.  Yes.

10 Q.  About an hour after you sent this email?

11 A.  I'm asking him, did he receive my email.

12 Q.  Right.  You are telling him the program was discontinued,

13 correct?

14 A.  Yes.

15 Q.  Now, let me ask you a question, because right after that you

16 sent him another text where you blame the problem with the

17 patient survey program on other sales reps that work for you,

18 correct?

19 A.  The sales reps was giving misinformation.

20 Q.  You tell Mr. Grow that you're going to find out, right,

21 you're going to get to the bottom of this.  You told him that,

22 right?  And you tell him in this text that other sales reps --

23 there's a group of sales reps responsible for this, and you're

24 not going to bring them over to the pharmacy to be employees

25 because of this?

1   A.   I don't really -- this was in regard to the program.

2   Q.   Do you recognize those are your own statements, do you not?

3   A.   Yes.

4        MR. MARCUS:  Your Honor, at this time I would offer 206

5   into evidence.

6        THE COURT:  Any objection?

7        MR. LARSEN:  No objection.

8        THE COURT:  It will be admitted.

9        MR. MARCUS:  Thank you.

10       (Defendant's Exhibit Number 206 was received in evidence.)

11  BY MR. MARCUS:

12  Q.   So the first text is consistent with being told that the

13  pharmacy -- that you must terminate this program effective

14  immediately, correct?

15  A.   Monty Grow told me someone at PCA legal looked at the survey

16  idea, said it was a gray area, said that it needed to be

17  terminated.  He reached out to me on March the 3rd letting me

18  know what they said, some explicatives [sic] that the survey was

19  in a gray area and that it needed to be terminated.

20  Q.   None of that is in writing, correct?

21  A.   There is a conversation me and Monty Grow had on the phone.

22  Q.   Right, right.  It's a conversation, that's your testimony,

23  but it's not memorialized in any writing, correct?

24  A.   It was a conversation.  He called me up on the phone --

25  Q.   I understand.

Lay - Cross

1   A.   -- just like I talked to him at the end of January,

2   beginning of February about the survey and sent him the Consent

3   Form and which he sent to PCA, and told me that someone at PCA

4   told me to make certain changes to the Consent Form, it would be

5   okay.  That was end of January, first of February.

6   Q.   When you send these two texts back to back, that's because

7   you're nervous that the pharmacy is going to let you go, you're

8   not going to be able to do work for them because of this patient

9   survey program you were doing without authorization; isn't that

10  right?

11  A.   No, I was not nervous.

12  Q.   Okay.  Well let me ask you this:  If Mr. Grow knew about

13  your program every step of the way, then why would you be

14  telling him that there's a group causing these problems, and you

15  reference an Employment Agreement with the pharmacy?  You're

16  talking about your sales reps, right?

17  A.   The sales reps was given misinformation.

18  Q.   You were blaming the existence of the survey program on your

19  sales reps, weren't you?

20  A.   The sales reps was given misinformation.

21  Q.   If Mr. Grow knew about your program the whole time and

22  approved it, why in the world would you be blaming the program

23  on sales reps?

24  A.   He knew about the program.  Like I stated before, I spoke

25  with Mr. Grow the end of January, the first of February via a

Lay - Cross

1    phone call in regard to the survey.  He calls me March the 3rd

2    and states that someone at PCA called him, stated some

3    explicatives [sic] and said that the survey was in a gray area

4    and that it needed to be terminated.

5    Q.  By the way, this Exhibit 206, this text message, that was

6    not produced by you to the Government, was it?

7    A.  No, it wasn't.

8    Q.  Okay.  You did produce some bank records, however, to the

9    Government, did you not?

10   A.  Yes, I did.

11         MR. MARCUS:  I'm approaching with what I've marked as

12   Defense Exhibit 202-K.

13   BY MR. MARCUS:

14   Q.  These are bank records that you produced to the Government.

15   Do you see that?

16   A.  Yes.

17   Q.  And you testified yesterday that you kept paying patients

18   one time once the program was terminated because you had a

19   discussion with Mr. Grow and you guys didn't want any problems.

20   Do you recall that?

21   A.  Yes.

22   Q.  The truth was you were paying patients all throughout

23   February and into June of 2015; isn't that the right answer?

24   A.  The patients that were paid in this time were enrolled, were

25   already in the survey program and was due to be paid one time.

Lay - Cross

1  Q.  And you were paying patients anywhere from $750 to a

2  thousand dollars, right?

3  A.  It dropped from a thousand to 750 because the metabolic

4  vitamin -- the pharmacy was no longer offering the metabolic

5  vitamin.

6  Q.  Okay.  But your company, Med RX Sales, was responsible, you

7  made all these payments yourself?

8  A.  Yes.

9  Q.  Right, yesterday, when we were talking about the

10 telemedicine consults that caused $100 up-front, Mr. Grow paid

11 for those consults, right?  Remember that testimony?

12 A.  Yes.

13 Q.  Okay.  And you talked about not having money and financial

14 circumstances.  Do you recall that?

15 A.  Yes.

16 Q.  But with this patient survey program, you, yourself, your

17 company made every single payment to patients, correct?

18 A.  Yes.

19 Q.  Thousands and thousands of dollars?

20 A.  Yes.

21 Q.  You never asked Mr. Grow to pay for these, did you?

22 A.  I had already earned some money.

23 Q.  That's not my question.  Did you ever ask Mr. Grow to

24 re-compensate you for the cost of running this patient survey

25 program?

Lay - Cross

1  A.  No.

2  Q.  Okay.  And just directing your attention to the page marked

3  1042 --

4  A.  Yes.

5  Q.  -- do you see the transaction with Mr. Marshall, Frederick

6  Marshall?

7  A.  Yes.

8  Q.  He's receiving a payment, correct?

9  A.  Yes.

10  Q.  That was in June of 2015?

11  A.  Yes.

12  Q.  If you turn to Page 1046, it's just a few pages past that,

13  and if you look at May 2015, do you see Mr. Marshall's name

14  again?

15  A.  The 22nd?

16  Q.  May 20th of 2015.

17  A.  Yes.

18  Q.  He got another $750, didn't he?

19  A.  Yes.

20  Q.  And there were a number of patients that got paid more than

21  once, once this program was supposedly terminated?

22  A.  The email that was sent out to the patients let them know

23  that they were going to continue to receive payments past a

24  certain date.

25  Q.  You sent an email to patients telling them they were going

Lay - Cross

1    to keep getting paid?

2    A.  That the survey -- the program had terminated, anybody

3    enrolled in the program will continue to get payment after

4    stopping at a certain date.

5    Q.  And did you produce that email to the Government?

6    A.  Sir, I gave them my computer.

7    Q.  Okay.

8    A.  That would have been in the Med RX Sales email address,

9    which I wouldn't have had access to.

10   Q.  Yesterday, when we were talking about this, you were very

11   clear that the patients would only receive one extra payment

12   once you terminated the program.  That was your testimony

13   yesterday.

14   A.  Those who were already enrolled would receive one extra

15   payment, yes.

16        MR. MARCUS:  May I approach, Your Honor, with Defense

17   Exhibit 204?

18   BY MR. MARCUS:

19   Q.  Do you see the header, Ms. Lay?

20   A.  Yes.

21   Q.  That's an email you sent to Mr. Grow; is it not?

22   A.  Yes.

23   Q.  And that's in March, in the beginning of March, when this

24   program was being terminated.  Do you see that?

25   A.  Yes.  It's not mentioning anything about the program being

Lay - Cross

1  terminated.

2  Q.  No.  You see the date?  Can you read the date?

3  A.  Yes.

4  Q.  That's when the program was being terminated.  Do you see

5  that?  Do you see the date, March 4, 2015?

6  A.  Yes.

7  Q.  And you're telling Mr. Grow, are you not, that these

8  patients are going to be switched, converted, cancelled out of

9  the program?

10  A.  This is not what this email is saying.

11  Q.  Well, I know it's not --

12       MR. MARCUS:  Your Honor, I'm going to offer this

13  exhibit at this time into evidence under 613(b).

14       THE COURT:  Is it 204?

15       MR. MARCUS:  Yes, 204.

16       THE COURT:  Any objection?

17       MR. LARSEN:  One moment, Your Honor.  No objection,

18  Your Honor.

19       THE COURT:  It will be admitted.

20       MR. MARCUS:  Thank you, Your Honor.

21     (Defendant's Exhibit Number 204 was received in evidence.)

22  BY MR. MARCUS:

23  Q.  This is the morning of March 4th.  Do you see the time?

24  A.  Yes.

25  Q.  It is the same morning that you sent this email that we were

Lay - Cross

1  just talking about, do you see that, where you're terminating

2  the program?

3  A.  Yes.

4  Q.  And you're telling, in this email, Mr. Grow at least that

5  patients will receive an email or a letter telling them that the

6  program has been stopped.  Do you see that?

7  A.  Yes.

8  Q.  And here 1st Care -- that's your reference to the pharmacy?

9  A.  1st Care is the telemedicine company.

10 Q.  Right.  You're telling them not to process orders, correct?

11 A.  Yes, but it's not going into detail about anything else.

12 Q.  Well, why would you be stopping orders the same day that

13 you're terminating the patient survey program?

14 A.  Can you please put the --

15 Q.  Sure.

16 A.  It's saying do not process, they're currently uploaded in

17 the following states.  I don't even know what states it was.

18 That email is not ...

19 Q.  You had to convert these patients to a non-paid program,

20 right, couldn't pay them anymore?  That's what you were telling

21 Mr. Grow in this email?

22 A.  Yes.

23 Q.  But you kept paying them all through June?

24 A.  Like I stated, the email that went to the patients stated

25 that they would continue to get paid until a certain date.

Lay - Cross

1   Q.   And you paid them a lot more than one time, did you not?

2   A.   The patients would be paid until a certain date.

3   Q.   Well, in your letter you talked about that date, the program

4   ending that month, didn't you?

5   A.   Yes, the program ended.  Anybody enrolled in the survey by a

6   certain date, before the certain date ended, would continue to

7   be paid till a certain date and there will be final payments

8   made.

9          MR. MARCUS:  At this time, Your Honor, I would offer

10  202-K into evidence.

11         THE COURT:  Any objection?

12         MR. LARSEN:  No objection, Your Honor.

13         THE COURT:  It will be admitted.

14     (Defendant's Exhibit Number 202-K was received in evidence.)

15  BY MR. MARCUS:

16  Q.   This was your Med RX Sales bank account, correct?

17  A.   Yes.

18  Q.   And this is June of 2015?

19  A.   Yes.  And during this time also my son had passed away so I

20  can't --

21  Q.   I'm very sorry to hear that, but I just --

22  A.   I understand.  I'm just saying I was in a different state of

23  mind.

24  Q.   Okay.  But these are patients, correct, that are still being

25  paid under the survey program as late as June of 2015?

Lay - Cross

1    A.   They were told they would be paid till a certain date.

2    Q.   And what date was that?

3    A.   Anybody that submitted their stuff by the end of March,

4    final payments will go out no later than June the 15th, I do

5    believe, either May the 15th or June the 15th.  When my son

6    passed away in May, I didn't think nothing else of it because I

7    had to bury a child.

8    Q.   Which again I'm very sorry about.  But let me ask you this:

9    Mr. Marshall, he's still getting paid in June, right?  Not just

10   one time, you paid him in May as well, didn't you?

11   A.   He got paid twice.

12   Q.   Right.  He got paid twice.

13   A.   One was on the 20th and one was June the 1st.

14   Q.   Kimberly Smith, she was paid more than once as well, wasn't

15   she?  She was paid in May and in June.

16   A.   When was she was paid in May?  May the 20th and June the

17   1st, just like Mr. Marshall.

18   Q.   Right.  Mr. Marshall was paid in May and so is Ms. Smith.

19        And by the way, these are all payments to patients all

20   throughout May on this page; isn't that right?

21   A.   Yes.

22   Q.   And on this page as well, correct?

23   A.   These were the final people that were getting paid.  Some of

24   them had already been -- they knew they were going to paid one

25   last time.  Not all of these people have been paid twice.

Lay - Cross

1  Q.  Right.  You paid patients more than $40,000 in May, right?

2  A.  Yes.

3  Q.  But you told Mr. Grow and the pharmacy that the program had

4  ended several months before; isn't that right?

5  A.  The program was ended.  There would be no more -- we never

6  said that there would be no more payments.  That was never --

7  the program, as far as enrolling new people, we would never -- I

8  wouldn't enroll new people into the program.

9       MR. MARCUS:  Your Honor, we are offering Defense

10  Exhibit 205 into evidence.

11       THE COURT:  Any objection?

12       MR. LARSEN:  No objection, Your Honor.

13       THE COURT:  It will be admitted.

14    (Defendant's Exhibit Number 205 was received in evidence.)

15  BY MR. MARCUS:

16  Q.  This is a text message that you sent Mr. Grow on April 29th,

17  correct?

18  A.  Yes.

19  Q.  And in it you tell him that your program ended in March and

20  you're wondering, right, if you can pay the patients still,

21  correct?

22  A.  Yes, because he told me to keep paying them when I had that

23  conversation with him the first of March when the program ended,

24  and he said keep paying them because we don't want any problems.

25  Q.  Right.  But his response to you on April 29th is, "I

Lay - Cross

1    wouldn't be paying anyone," right?

2  A.  Yes.

3  Q.  As we just saw, you kept paying patients through June of

4  2015.

5  A.  Could you go back up to the top of that text message,

6  please?

7  Q.  Sure.  By the way, this is a text message you did not

8  produce to the Government, correct?

9  A.  Correct.

10  Q.  But you produced hundreds of text messages and pages to the

11  Government in this case, did you not?

12  A.  Yes.  My attorneys did, yes.

13  Q.  Okay.  But not this one?

14  A.  I didn't -- I had a different phone.  I didn't have that

15  phone.

16  Q.  You were making a lot of money, right, through your sales

17  commissions by paying patients through your survey program?

18  A.  I was making money as well as Monty was making money.

19  Q.  If Mr. Grow had given you permission earlier to keep paying

20  patients under your program, why are you asking him on April

21  29th if you can be paying patients?

22  A.  Because he told me in March to continue paying patients, so

23     I am asking him, there are situations where it says "March

24     31st but those who were due first refill in April would

25     receive one assessment compensation.  Those on the list I

1          sent you are due compensation, but it won't be until May

2          when the new guidelines are in place.  Can I pay them or

3          not?"

4                And according to this text message, I sent him some

5    type of list.

6    Q.   That's not my question.  My question is, if you already had

7    authorization to keep running and paying patients under the

8    program in March, as you've testified previously, why, on April

9    29th, are you asking for permission to continue?

10   A.   The program had ended.  We weren't enrolling any new people.

11   I'm asking it because, number one, it's going to, I assume, put

12   more money in our pocket, but also the changes with the

13   pharmacy, the formulators were changing, we were going to a W-2

14   employee.

15   Q.   Well, you were concerned, right, that if the pharmacy found

16   out you were still running the survey program all this time,

17   even after you had discontinued it supposedly, they might not

18   have allowed you to be a W-2 employee?

19   A.   I wasn't running the survey, we weren't enrolling any new

20   people into the survey.

21   Q.   Well, you were continuing to pay people thousands of

22   dollars?

23   A.   We weren't enrolling new people.  They received the email

24   saying that the program had terminated immediately and that they

25   would be receiving additional compensation up to a certain date.

Lay - Cross

1   The program was terminated.

2   Q.  Well --

3   A.  We weren't enrolling new people.

4   Q.  But you were continuing to pay people for many months?

5   A.  Yes.

6   Q.  And you were doing that because you didn't want the patients

7   to complain to the pharmacy about your program; isn't that

8   right, the existence of it?

9   A.  The pharmacy already knew about the program that ended

10  January, the first of February, when Monty -- I sent Monty the

11  Consent Form, he sends it to the pharmacy, the pharmacy told me

12  to make certain changes to the Consent Form.  Monty told me of

13  the changes, made those changes.  Monty calls me March stating

14  that someone from the pharmacy called him, their legal said some

15  expletives, said that the survey was in a gray area.

16  Q.  Right.  That's a document that has not -- we have not seen

17  that document, correct?

18  A.  It was a phone conversation.

19  Q.  Oh, it was a phone conversation, but earlier you referenced

20  an email, right, with a patient form that you --

21  A.  There's an original Patient Consent Form that does not have

22  the changes that I sent to Monty.

23       MR. MARCUS:  Approaching the witness with Defense

24  Exhibit 207.  At this time I would offer it into evidence.

25       THE COURT:  Any objection?

Lay - Cross

1      MR. LARSEN:  No objection.

2      THE COURT:  It will be admitted.

3      (Defendant's Exhibit Number 207 was received in evidence.)

4  BY MR. MARCUS:

5  Q.  Again, that's an email from your assessment survey email

6  address from your company, correct?

7  A.  Yes.

8  Q.  Do you recognize the name Blair Von Letkemann?

9  A.  It could have been a beneficiary or a rep I had.

10 Q.  Okay.  Well, your email is about your assessment survey

11 program, isn't it?

12 A.  Apparently Ms. -- what was the name?  Blair was already

13 included because that person was apparently in the program in

14 March, before March 31st.

15 Q.  You see the date.  That's April 13th?

16 A.  Yes.

17 Q.  Okay.  That's well after you were supposedly sending out

18 emails to patients telling them the program was terminated?

19 A.  Just because the email date is April the 13th does not mean

20 that Mrs. Blair did not get into the deadline before March 31st.

21 Q.  Well, let's just look at the document.  You're

22 congratulating the patient on completing the first 30 days.  Do

23 you see that?

24 A.  Yes.

25 Q.  And you're enclosing the paid compensation assessment to the

Lay - Cross

1  patient.  Do you see that?

2  A.  Yes, and the first 30 days would have been March the 13th

3  Q.  And you're asking the patient to keep completing surveys and

4  send you surveys by April 25, 2015.  Do you see that?

5  A.  It says, survey must be completed by April 25th.  Where does

6  it say for them to continue doing surveys?

7  Q.  You're asking this patient to fill out more surveys, right?

8  "Please be as honest as possible.  Surveys must be completed

9  by April 25th."

10 A.  It's telling that she needs to have that survey done by

11 April 25th, because there was no payments coming out.

12 Q.  Where in this document does it tell the patient they're not

13 getting payments?

14 A.  This document doesn't tell the patient that they're going to

15 continue getting payments.  It tells them that the survey must

16 be completed by April 25, 2015.  It does not state that they

17 will continue getting payments.

18 Q.  You're congratulating the patient and asking them to

19 continue in the program.  You agree with that?

20 A.  Sir, this document is not implying that they will continue

21 in the program.  It's a congratulatory email that was sent out

22 to everyone else, any of the individuals that was doing the

23 survey.

24 Q.  Right.  And you are asking them to complete surveys and send

25 in consent forms.  It's right here.

Lay - Cross

1    A.  To complete a survey and do the Consent Form.

2    Q.  Right.  Well after the program supposedly was stopped by

3    you?

4    A.  This was 30 days -- Ms. Blair could have done her product in

5    March.  I cannot speak to the date of April 13th.

6    Q.  And this is an email that you did not produce to the

7    Government.  It does not contain the GL Bates numbers that you

8    use.  Do you see that?

9    A.  Yes.

10   Q.  Now, when you first met Mr. Grow, you held yourself out as

11   someone who was experienced in marketing, didn't you?

12   A.  Sales, yes, I had a sales background.

13   Q.  Right.  You were part of a compounding pharmacy networking

14   group.  That's where you got in touch with Mr. Kimble, right --

15   A.  Yes.

16   Q.  -- through LinkedIn, as you testified?

17   A.  Yes.

18   Q.  And you represented yourself to the world as someone

19   experienced in sales and marketing in this area.

20   A.  Yes.

21   Q.  Now, yesterday, on direct with Mr. Larsen I believe he asked

22   how far you got in school and you said you had dropped out of

23   high school, but you got your GED.

24   A.  Yes.

25           MR. MARCUS:  Approaching with Defense Exhibit 202-A,

Lay - Cross

1    and seek to offer it into evidence at this time?

2              THE COURT:  Any objection?

3              MR. LARSEN:  No objection.

4              THE COURT:  It will be admitted.

5         (Defendant's Exhibit Number 202-A was received in evidence.)

6    BY MR. MARCUS:

7    Q.  This was a resumé that you were using at the time, in 2014,

8    correct?

9    A.  Yes.

10   Q.  And under your objective section you're telling people that

11   you have vast experience in customer service, collections,

12   recruiting and outside sales.

13   A.  Yes.

14   Q.  But yesterday you testified that you didn't have any

15   marketing experience on direct, didn't you?

16   A.  I said I had sales experience.  Direct [sic] asked me did I

17   have any experience in finance, business negotiation, and that

18   sort of thing.

19   Q.  On your resumé you talked about running Med RX, Inc.

20   starting in April of 2014.  Do you see that?

21   A.  Yes.

22   Q.  And that you were in charge of recruiting, hiring, and

23   training pharmaceutical sales associates.

24   A.  April 14th, I was -- during that time I was working with

25   BioMediTech like towards the end of April, and I was doing

Lay - Cross

1  business as Med RX and I was an independent contractor with

2  them.

3  Q.   Right.  When you met Mr. Grow you held yourself out as

4  someone savvy in sales and marketing, with experience?

5  A.   In sales, I've sold various products.

6  Q.   And marketing and you talked about pharmaceutical

7  experience, didn't you?

8  A.   I talked -- I don't recall talking about pharmaceutical

9  experience.  Could you please --

10  Q.   And the truth is that Mr. Grow was interested in building a

11  sales network and that's why he brought you in, to run a sales

12  group of your creation, right?

13  A.   Not that I recall, no.

14  Q.   Are you aware that Mr. Grow had many other sales reps that

15  worked for him totally independent of your network?

16  A.   No.

17  Q.   Okay.  Are you aware that no other sales group ran a patient

18  survey program under Mr. Grow and PCA other than yours?

19  A.   No, but Monty Grow did know about the patient survey.

20  Q.   I understand your testimony.

21         Under your education you represent that you graduated

22  college from the University of Memphis with a major in marketing

23  and advertising.

24  A.   That doesn't say I graduated college.  It just says what my

25  major was and I only completed one semester.

Lay - Cross

1  Q.  Okay.  Well, you list 1998, and you list a major.  You said

2  you dropped out of -- does your resumé reflect that you dropped

3  out of college?

4  A.  No.  I didn't put in there I dropped out of college, but I

5  only did one semester in 1998.

6  Q.  Okay.  But yesterday, when you were asked about your

7  education and how far you went in school, you mentioned dropping

8  out of high school and getting a GED.  You mentioned nothing

9  about college.

10  A.  They said what was the most -- the last highest level of

11  education.  That was a GED.  That was my GED.  I don't have a

12  college degree.

13  Q.  Okay.  And you think that this listing for education with

14  the University of Memphis with a date of 1998 accurately

15  portrays that you attended a semester of college?

16  A.  It doesn't -- I attended a semester of college.  I was

17  married with two kids.  I only did one semester.

18  Q.  Okay.  That is not reflected on your resumé.

19  A.  I didn't put on there that I dropped out of college.

20  Q.  You negotiated a pretty good deal for yourself and your

21  sales network, right, with Mr. Grow and PCA?  You were going to

22  receive 40 percent of the marketing commissions, correct?

23  A.  I didn't negotiate that.  Monty Grow told me that's what he

24  would pay me.

25  Q.  He just decided out of the goodness of his heart to just

Lay - Cross

1    give you 40 percent?

2    A.   The agreement dated 10/27 is 40 percent.  I didn't ask Monty

3    how much to get paid.  He said he would pay me 40 percent.

4    Q.   So you don't think it was a negotiation?

5    A.   No, he told me he would pay me 40 percent.

6    Q.   And are you aware that other sales reps in the PCA force

7    made a lot less than 40 percent?

8    A.   I don't know.  I can't speak about them.

9    Q.   Right.  But he was hiring you based on your experience, at

10   least as you represented, to build a sales network to promote

11   these three products that the pharmacy had available.  Do you

12   recall that?

13   A.   He hired me to market the compounding products, yes.

14   Q.   Right.  The ones that the pharmacy provided, right, that

15   they had on formula that insurance would pay for?

16   A.   Yes.

17   Q.   There's nothing wrong with marketing products that insurance

18   would cover.  Do you agree with that?

19   A.   I don't see anything wrong with that.

20   Q.   Would it make sense to market products that insurance would

21   not cover for patients?

22   A.   I mean, some insurance companies cover things, sometimes

23   they don't.

24   Q.   I'm going to put on Government's Exhibit 120.

25            You saw a lot of these in your direct testimony, these

1  Patient Profile sheets?

2  A.   Yes.

3  Q.   These are Patient Information Sheets that get sent to the

4  physician with information that would relate to whether a

5  patient might qualify for a prescription.  Do you agree with

6  that?

7  A.   Yes.

8  Q.   Just like when you fill out an intake form when you go to

9  see a physician in person, right, you give background, sometimes

10 you give your patient history?

11 A.   Yes.

12 Q.   Okay.  You were asked about pre-checking these forms.  Do

13 you remember that testimony?

14 A.   Yes.

15 Q.   P-01 and s-01 [sic], do you see that?

16 A.   Yes.

17 Q.   And you talked about also 360 grams and refills, right?

18 A.   Yes.

19 Q.   And you said this was done for reimbursement, the 360 gram

20 quantity, do you recall that, because it was the highest

21 reimbursement?

22 A.   That's what Monty told me, yes.

23 Q.   Right.  Now, these medications, they were monthly supplies

24 that you were providing, right?  These were being prescribed by

25 physicians in monthly doses?

1  A.  Yes.

2  Q.  30-day supplies?

3  A.  Yes.

4  Q.  Okay.  Do you see in the directions column, do you see how

5  one gram equals one pump?

6  A.  Yes.

7  Q.  And that a patient may need up to three pumps a day?

8  A.  Yes.

9  Q.  Well, three pumps at a time, sorry, to the affected area

10  three to four times daily?

11  A.  Yes.

12  Q.  Would you agree that if you had to do three pumps four times

13  a day that would be 12 pumps in a day?

14  A.  Yes.

15  Q.  And that would be 12 grams a day?

16  A.  Yes.

17  Q.  And over 30 days, that would equal 360 grams?

18  A.  Yes.

19  Q.  So these were monthly supplies.  There's nothing sinister

20  about a monthly supply, is there?

21  A.  No.

22  Q.  And providing information to a physician on the formulas

23  that are available that a pharmacy can fill, there's nothing

24  sinister about that, is there?

25  A.  Could you repeat the question?

Lay - Cross

1   Q.  There's nothing sinister about letting the physician know
2   what formulas are actually available that could actually be
3   filled by the pharmacy and given to a patient.  Do you agree
4   with that?
5   A.  Please ask the question one more time, please.
6   Q.  Let me go back up so it's -- in your direct you talked about
7   how picking out p-01 and sc-01 was done simply for
8   reimbursement.  Do you recall that?
9   A.  That's what Monty told me, yes.
10  Q.  Right.  You never talked to the pharmacy or a physician
11  about that, did you?
12  A.  No.
13  Q.  So you have no independent knowledge of whether that's true?
14  A.  No.
15  Q.  You would agree that if these were the formulas available
16  for those products, there would be nothing wrong in providing
17  that information to a physician so that the prescription, if a
18  patient deserved it, would be accurate and filled in a timely
19  fashion?
20  A.  But there were other prescriptions that a different one was
21  checked, and there were emails stated to change it to sc-01.
22  Q.  Right.  But you don't know whether these other formulas, for
23  example, were available to be filled by the pharmacy on this
24  date in question, do you?
25  A.  I was only going by what Monty told me to do and how to

Lay - Cross

1   follow the guideline.

2   Q.   Okay.  Well, let me show you a document, Government's

3   Exhibit 54, that you were shown yesterday.  Now, you are not on

4   this document.

5           Mr. O'Hara, he runs a telemedicine company, right?

6   A.   Yes.

7   Q.   And you see at the bottom where sc-02 is being marked

8   instead of sc-01?

9   A.   Yes.

10  Q.   And the telemedicine company is wondering, can we take off

11  that formula so it's not confusing to the physicians who are

12  doing the consult.  Do you see that?

13  A.   Yes.

14  Q.   That would make sense, for example, if that formula wasn't

15  available at the time because that would just delay the patient

16  getting their prescription?

17  A.   So why would Monty tell me to always use sc-01 and Pain-01?

18  Q.   Right.  But again, you don't know if that was because that

19  was what was available?

20  A.   This was during -- when I first got it started with him in

21  December.

22  Q.   Right.  But you agree that it's possible that the reason he

23  told you about those two formulas was because those were the

24  ones that the pharmacy was actually able to fill?

25  A.   Monty told me about those formulas because he told me how

1   much they paid on insurance.

2   Q.  Okay.  And you think the other formulas did not pay a lot

3   through insurance?

4   A.  I don't know.

5   Q.  You don't know.

6   A.  I only can go by what he told me they paid on insurance.

7   Q.  Okay.  You wouldn't agree that all of these medications are

8   expensive?

9   A.  I know sc-01, the pain -- sc-01 and Pain-01 was, yes.

10  Q.  Okay.  So you believe that the other formulas were much

11  cheaper?

12  A.  I don't know.  I'm just only going by what Monty told me to

13  do according to the example he sent me and according to the

14  email where he said always choose sc-01 and Pain-01.  He never

15  gave an option to choose any other formulary.

16  Q.  Now, your patients, right, when they would fill out intake

17  forms, they would give them to your sales reps, correct?

18  A.  The sales reps would do the intake form.  No, I would do the

19  intake form.  I'm sorry.

20  Q.  You would do the intake form?

21  A.  Yes.

22  Q.  You would be responsible for the intake form and then you

23  would send it to the telemedicine company, correct?

24  A.  Yes.

25  Q.  Mr. Grow did not receive those forms directly, did he?

Lay - Cross

1   A.  Mr. Grow sent me those forms and he advised me on how to

2   complete them.  In all the forms, it's stated do p-01, 360

3   grams, 6 refills for pain, and sc-01, 360, refills for scar, and

4   a metabolic vitamin.  There was never any other option.  It was

5   never left blank.  It never gave anybody a choice to make,

6   whether they would choose.  He said what was supposed to be

7   written in there.

8   Q.  Right.  He sent you blank forms and then you would fill them

9   out.  You were the one who had contact, you and your

10  salespeople, with the patients directly, correct?

11  A.  He sent me a guide to go by on how to fill out the blank

12  forms that he sent me, the preprinted forms that he sent me.

13  Q.  A guide, he sent that to you in an email?

14  A.  Yes, the one that states John Doe anytime, how to write

15  about the scar, the recommended suggestions, and then with House

16  Calls, check out p-01, sc-01, and metabolic vitamin.  And in

17  cases where sc-01 wasn't checked, there was a conversation that

18  sc-01 needed to be checked.

19  Q.  But Mr. Grow did not have direct contact with the patients

20  in your network, that was your responsibility?

21  A.  I'm only going by what he told me to fill out on the form.

22  Q.  Well, yesterday you talked about how patients didn't need

23  these medications, right?

24  A.  Yes.

25  Q.  You don't know that for a fact, do you?

Lay - Cross

1   A.   The patients, they said they didn't need them.  They didn't

2   need the medication.

3   Q.   When you talked to some patients they told you that?

4   A.   No, I didn't talk to the patients.

5   Q.   Okay.  So how do you know that if the patient didn't tell

6   you?  Because you didn't talk to the physician, we established

7   that, right?  You never talked to the physician?

8   A.   Right.

9   Q.   You never talked to the telemedicine company?

10  A.   Right.

11  Q.   And if you didn't talk to the patient, how would you know if

12  a prescription written by one of those physicians for a patient

13  was necessary or not?

14  A.   Because the patient was -- after -- in January they were

15  getting the prescription because of the survey, so they didn't

16  need it.

17  Q.   You're assuming because you were paying them money in your

18  survey program that they didn't want or need the prescription,

19  right?

20  A.   Yes.

21  Q.   Right.  And you would agree that if the pharmacy and

22  Mr. Grow didn't know about your program, they might assume that

23  these patients did, in fact, need it, like many other patients

24  that were receiving prescriptions from other sales reps?

25  A.   Mr. Grow and the pharmacy knew about the survey.

1  Q.  That's your testimony.  It's based on conversations,

2  correct, that are not reflected in text messages or in emails.

3  Would you agree with that?

4  A.  But there were many conversations me and Mr. Grow had.

5  Q.  I understand that that's your testimony today.

6  A.  Yes.

7  Q.  Right.  But there's no way to corroborate those phone

8  conversations?

9  A.  Not everything is discussed through text messages and

10  emails.  Some things are discussed through phone conversations.

11  Q.  Right.  You never wrote to Mr. Grow, for example, that

12  patients did not need or want these products, did you?

13  A.  That was never even a question.  It was never discussed.

14  Q.  And the reason you didn't discuss it, just like you wouldn't

15  discuss your survey program, because if Mr. Grow and the

16  pharmacy knew about it, they would have shut it done immediately

17  like they tried to do in March; isn't that correct?

18  A.  I'm going to state again, at the end of January, the

19  beginning of February, I had a conversation with Mr. Grow about

20  the survey, sent him the Consent Form.  He sent it to Patient

21  Care of America.  Someone at Patient Care of America looked at

22  it, told him to make the following changes.  He told me the

23  changes, sent the form back to me.  He called me March 3rd, said

24  some lawyers at PCA looked at the survey, said it was a gray

25  area, said some expletives and that it needed to stop.

Lay - Cross

1  Q.  Okay.  In the spring of 2015, you became an employee, a W-2

2  employee, during the transition for PCA pharmacy, correct?

3  A.  In May.

4  Q.  Right, in May.  And you received more than half a million

5  dollars in commissions from PCA after you joined as a W-2.

6  A.  These were all refills.

7  Q.  Okay.  You received half a million dollars in compensation

8  through commissions?

9  A.  Yes.

10  Q.  If PCA knew you were running an illegal program months

11  before that and didn't stop even when they told him, you

12  wouldn't have been paid all that money, right?

13  A.  PCA and Monty knew about the survey.

14  Q.  You were concerned in the spring of 2015, you did not want

15  the pharmacy to know what you were doing because you wanted to

16  keep earning very high sales commissions.  True?

17  A.  Monty and the pharmacy knew about the survey.

18  Q.  The truth is, you said yesterday that you became concerned

19  about your behavior in marketing once you saw the money that you

20  were receiving in commissions in January of 2015.  Do you recall

21  that?

22  A.  Yes, it sounded too good to be true.

23  Q.  Right.  But the truth is, before that, when you were working

24  in December and you were acting as a real marketer and marketing

25  to patients, all that was legal; isn't that true?

Lay - Cross

1  A.   It wasn't legal then apparently.

2  Q.   Well, you thought it was legal.   I'm asking what you

3  thought.   You thought it was legal?

4  A.   I can't assume what I thought then because I was working

5  with Monty, and I just got started with Monty at the first of

6  December.

7  Q.   Right.   And in December you did not think you were doing

8  anything illegal, did you?

9  A.   He just told me I was finding Tricare patients.

10  Q.   Right.   And the Government has told you that you've done

11  something illegal now?

12  A.   I've done something illegal.

13  Q.   Well, you ran a patient survey program, right?   That was

14  your problem?

15  A.   I did something illegal because I received payments from

16  Monty.

17  Q.   So you're saying earning a sales commissions as a marketing

18  rep is illegal?

19  A.   I was told it's illegal because it was paid -- it was paid

20  from the Government.

21  Q.   You were told when?

22  A.   When Monty reached out to me in June of 2016, saying that

23  the Feds had showed up at his house.

24  Q.   Okay.   So now you're talking about 2016?

25  A.   Yes, because I didn't even know anything about him being

Lay - Cross

1  indicted until then.

2  Q.  Okay.  You gave a detailed statement to the prosecutors and

3  the agents in this case on September 15th of 2017?

4  A.  Okay.

5  Q.  Right?

6  A.  Can you please read the statement?  I can't --

7  Q.  Well, I'm asking you:  Did you meet with them?  You've met

8  with them many times, have you not?

9  A.  Yes, I have.

10 Q.  Okay.  And they asked you a lot of questions, right, they

11 wanted to find out what you knew?

12 A.  Yes.

13 Q.  And they talked to you about this case, right, and being a

14 witness against Mr. Grow?

15 A.  They talked to me about my case.

16 Q.  Right.  And when you met with them, did you tell them about

17 June 2016, this supposed statement by Mr. Grow that you're just

18 bringing up now?

19 A.  Yes, they know about that.

20 Q.  They do?

21 A.  I told them that he called me June the 9th, 2016, saying

22 that the Feds had showed up at his house, Patient Care of

23 America had been raided, they came and got his cars, seized the

24 money out of his bank account.

25 Q.  Okay.  All those may be true, but how does that prove that

1   someone did something illegal?  You're saying because he was

2   arrested, that means that he did something illegal?

3   A.   I don't think you get arrested if you haven't done anything

4   illegal.

5   Q.   Oh, so you think just because someone has been charged with

6   something, he automatically is guilty.  That's what you're

7   saying?

8   A.   I feel like if you've been arrested, you've done something

9   illegal.

10  Q.   So you feel that you've done something illegal because the

11  Government told you you did something illegal and charged you

12  with something illegal?

13  A.   All I'm stating is I did something illegal.

14  Q.   And running the survey program and paying the patients, that

15  was illegal, right?

16  A.   As I am going to state, I can't speak to that.

17  Q.   Okay.  But when you were doing sales and marketing in 2014

18  for products and being paid on a commission basis, you did not

19  think you were doing something illegal at the time; isn't that

20  right?

21  A.   That was private insurance.

22  Q.   Okay.  When you started marketing these Tricare products you

23  felt the same way?

24  A.   I didn't ask any questions.  Like I said, when I got my

25  first check the first of January, I was like, this is

1  interesting, it's too good to be true, but the money was good so

2  I continued.

3  Q.  Okay.  Do you know who sets the reimbursement rates for

4  these prescriptions?

5  A.  No.

6  Q.  Would it surprise you that it's the Tricare program itself

7  which sets the reimbursement rate?

8  A.  I wouldn't know.  I don't know how they --

9  Q.  But you've done sales for a long time in your life, haven't

10 you?

11 A.  I've done sales, yes.

12 Q.  And you make money on a commission basis?

13 A.  Yes.

14 Q.  And being paid as an employee, being paid as a salesperson

15 on a commission basis is not illegal; isn't that right?

16 A.  Why did the pharmacy change us to a W-2 employee?

17 Q.  Okay.  Do you understand -- well, let me ask you this:  You

18 were charged with fraud crimes in this case.

19 A.  Yes.

20 Q.  Do you understand that you had to have a specific intent,

21 you had to intend to violate the law to be guilty of that

22 charge?

23 A.  Yes.

24 Q.  So, if you were technically not in compliance with some rule

25 about employee compensation, that would not prove that you had a

1   criminal intent.  Do you agree with that?

2   A.   Could you please rephrase the question?

3   Q.   If you didn't comply with a regulation that related to W-2

4   compensation by mistake, you didn't know, in that situation you

5   would not have had intent to violate the law.  Do you agree with

6   that?

7   A.   I can't speak to that.

8   Q.   For yourself?

9   A.   No, because we were working for several months before we

10  became W-2.  Why we didn't become W-2 from the start?

11  Q.   Are you aware that attorneys for the pharmacy made a

12  decision about transitioning employees from a 1099 status to W-2

13  status?

14          MR. LARSEN:  Objection, Your Honor, foundation.

15          THE COURT:  Okay.  How does she know?  That's what he

16  means by foundation.

17          MR. MARCUS:  I am saying -- I'm asking if she's aware.

18          THE COURT:  I understand, and how is that admissible,

19  what she knows about that?  How does that help you in this

20  particular case in the cross-examination of the witness?

21          MR. MARCUS:  It goes to her state of mind, Your Honor,

22  at the time.  She was one of these people transitioned.

23          THE COURT:  Why is her state of mind at issue?  She's

24  not a defendant defending herself.  Her state of mind is not at

25  issue.  It's her testimony that's at issue.

Lay - Cross

1          MR. MARCUS:  No, I understand, but she's testifying

2   about why she thought she did something illegal.

3          THE COURT:  I don't even think that was admissible

4   anyway, but there was no objection to it.

5          Is your argument that she testified credibly and

6   truthfully or that she did not, and that she's guilty or that

7   she's innocent?  What is your position, if any, on this witness?

8          MR. MARCUS:  Well, I don't think she's testified

9   credibly, no, Your Honor.

10          THE COURT:  Oh, I figured that.  Then you're entitled

11   to cross-examine.  So the next issue is:  Is her guilt an issue

12   or not for you as the cross-examining lawyer?

13          MR. MARCUS:  Well, I am trying to understand the --

14          THE COURT:  No, no, I've got a question.  Is her guilt

15   an issue or not?

16          MR. MARCUS:  Her state of mind as to why she pled

17   guilty is, I think, relevant.

18          THE COURT:  Why did you plead guilty?

19          THE WITNESS:  Because I committed a crime.

20          THE COURT:  Next question.

21   BY MR. MARCUS:

22   Q.   The truth is, Ms. Lay, after you were charged this summer,

23   in August, with the Indictment we talked a little bit about

24   yesterday, you were charged with a lot of crimes, were you not?

25   A.   Yes.

Lay - Cross

1  Q.  And you were facing a lot of time, do you agree with that,

2  jail time, potential jail time?

3  A.  Yes.

4  Q.  And you're under a lot of pressure.  You were able to work

5  out a plea deal to plead guilty to one count of what you were

6  charged with.  Do you agree with that?

7  A.  Yes.

8  Q.  And as we said, you can get no more than 10 years in jail

9  and your guideline range is at 63 months at the low end.  Do you

10 agree?

11 A.  Yes.

12 Q.  And you're hoping that by doing all this cooperation and

13 providing documents and testifying here that the Government, in

14 their discretion, will file a motion on your behalf to reduce

15 your sentence at your sentencing?

16 A.  If they choose to.

17 Q.  Right.  It's up to them, it's their choice?

18 A.  Yes.

19 Q.  Right.  And your testimony has to be consistent with their

20 theory of prosecution; isn't that right?

21 A.  Yes.

22 Q.  Because if you said something different, such as Mr. Grow

23 was unaware of the patient survey program, that would be a big

24 problem for their case, wouldn't it?

25 A.  Monty did know about the survey.

Lay - Cross

1    Q.  But that's not my question.  If he didn't know about the

2    program and you testified to that fact, that would be a problem

3    for their case, would it not?

4    A.  Yes, but that's not what I testified to.

5    Q.  I understand that.  Because you are hoping that they will

6    file that motion for you to reduce your sentence; isn't that

7    right?

8    A.  No, that's their choice.

9    Q.  And you have a lot invested in the choice that they

10   ultimately make?

11   A.  I'm telling about my story of how this whole scheme

12   unfolded.

13   Q.  Right.  With no text messages or emails, despite all the

14   documents you produced to the Government, that corroborate this

15   key point.  Do you agree with that?

16   A.  So I could not have a phone conversation with Mr. Grow?

17   Q.  Well, you can make up anything, sure.  You said it was your

18   story.

19   A.  I spoke with Mr. Grow several times.  We have had several

20   conversations on the phone.

21          MR. MARCUS:  No further questions, Your Honor.

22          THE COURT:  All right.  How long is your redirect?  I'm

23   not limiting you -- at least not yet -- I'm merely inquiring.

24          MR. LARSEN:  Your Honor, I have a few categories

25   that --

1          THE COURT:  I just want to know how long.

2          MR. LARSEN:  Maybe 30 minutes.

3          THE COURT:  How long?

4          MR. LARSEN:  30 minutes, 20 minutes.

5          THE COURT:  I don't know.  You keep shooting different

6    things.  I heard --

7          MR. LARSEN:  I think at the outside 30 minutes.

8          THE COURT:  Oh, my goodness gracious.  You know what,

9    I'm going to give you -- you can eat if you want.  I'm going to

10   give the jurors lunch time, and for you to narrow it down.  The

11   hardest thing is always to make something long into something

12   short, you know.  Do you remember the old saying, I didn't have

13   time to make a short letter, email, or whatever.  You're going

14   to make it short and ask the best questions first because half

15   an hour will be way too long.

16         Redirect, despite its name, is not direct all over

17   again.  Right?

18         MR. LARSEN:  Absolutely, you're right, Your Honor.

19         THE COURT:  And I'm going to give you time to narrow it

20   down.

21         Don't talk about the case.  Don't read anything about

22   the case.  Did anybody read anything or hear anything on the

23   news, on the radio, on the television?  Okay.  You've got to be

24   truthful.  And remember, the lawyers and parties and witnesses

25   aren't going to talk to you.  Don't hold it against them.

1          We'll see you at 2:15.  Is that all right or do you

2     want a whole hour?  It will probably end up being a whole hour

3     anyway, right?  Do you want me to make it a whole hour to make

4     it easy or not?

5          MS. BEREZIN:  Sounds good.

6          THE COURT:  All right.  Today we will leave little

7     earlier, around 5:00, 5:10, something like that.  Okay.  Is that

8     good?

9          MR. MERIDA:  Yes.

10          MR. BODDEN:  Yes.

11          THE COURT:  Look at that.  All right.  Don't talk about

12    the case.

13        (The jury retired from the courtroom at 1:37 p.m.)

14          THE COURT:  Go ahead and have a seat because you've got

15    to wait the five minutes.

16          There are two things that I want to discuss with you.

17          First of all, let me take the last thing first.  On

18    your cross-examination, that's why I asked you -- I normally

19    don't do that -- what the theory is, because most

20    cross-examinations of cooperating witnesses who admit guilt is

21    obviously to show that they -- I need that closed -- to show

22    that they're saying something in order to get a reward, but here

23    you also mixed it up, and I understand why, because your client

24    is a codefendant, to imply that she didn't do anything wrong.

25          Am I right?  It's kind of weird.

1          MR. MARCUS:  Well, on part.

2          THE COURT:  It's kind of weird, but that's the reason

3    why it's difficult to figure it out, right?  Because you're

4    trying to get her state of mind, her intent, which I understand

5    that's your theory of defense, as your co-counsel did say in

6    opening statement.

7          But those questions -- I mean, are you trying to move

8    to vacate her plea or anything like that to show she has no

9    intent?  So that's the reason.  I am just explaining why I

10   interfered by asking the question.  I understood the impeaching

11   part because that's easy for me to understand.  I didn't

12   understand the legal basis of asking questions about her state

13   of mind because her state of mind at the time she pled guilty is

14   not at issue, unless you're arguing that she's not guilty, which

15   you're entitled to argue if that's what you want, but then it

16   seems like you're doing both, which is kind of unusual to say

17   the least.  That doesn't mean it's wrong, but that's the reason.

18         I'm explaining why I interfered by asking a question.

19   I don't usually do that, but I said, where are we going since

20   there was an objection.  Well, I just want to know why she's

21   pleading guilty.  She felt coerced it almost seemed like.  And I

22   said, why did you plead guilty?  And she answered the question,

23   but you can argue that she's not guilty, that she felt like

24   lying in order to protect herself.  You can do that if you want.

25   I'm not barring you from presenting that, but I'm just noting as

1    an explanation for what I did.  Okay.

2            You can leave.  Come back at -- ma'am, come back at

3    2:20.  I always ask people to come back five minutes before the

4    jurors.  Okay.  Don't talk about your case with anyone except

5    your own lawyer.  All right?

6        (Witness, Ginger Lay, retired from the courtroom.)

7            THE COURT:  Now, on the issue of -- frankly, we spent

8    already too much time, but I wanted to let you know why it's

9    been a difficult issue, it probably doesn't matter, and that is

10   the admissibility of the emails, right, of the statements of

11   Ms. Lay, Ginger Lay, the witness, and whether her prior

12   statements should be admitted.  The problem that I have, of

13   course, is all the cases that talk about Rule 613(b) and the old

14   common law and all of that.

15           I've admitted it.  I kind of finally kind of persuaded

16   the Government to say what difference does it make, but I wanted

17   to make sure that you all understood, especially what the

18   defendant wants, whether you want a limiting instruction or not.

19           There's a case called Feliciano, Judge Martin wrote it,

20   I think I have it, but I remember reading it.  It talks about

21   the requirement of a limiting instruction.  United States of

22   America versus Feliciano, 761 F.3d 1202, Eleventh Circuit, 2014,

23   and that says what I've mentioned repeatedly, that ordinarily a

24   prior inconsistent statement is admissible only for the purpose

25   of impeaching, attacking the credibility.

1           If you look at that case, what Judge Martin writes, and

2    she was joined by -- it doesn't matter, but I just thought --

3    well, it doesn't matter.  It's an Eleventh Circuit case.  She

4    adds that she found no plain error because no one objected, and

5    that's the reason I'm going through it, to the admission of

6    those statements.

7           It was the Government that was bringing in the

8        statements.  Here, of course, we have the defendant bringing

9        in the statements so it makes it different.  But she writes,

10           "Although it may be best for District Courts to

11        routinely issue an instruction limiting the use of a prior

12        inconsistent statement admitted under Rule 613(b) to

13        impeachment, the District Court's failure to do so here did

14        not constitute plain error that affected Mr. Feliciano's

15        substantial rights."

16           I always try a case thinking there's going to be other

17   proceedings and appeals, sometimes even post conviction motions

18   under 2255, and I probably spend too much time doing that now,

19   but it saves me time later on.  If the defendant is acquitted,

20   the Government cannot appeal.  If the defendant is convicted,

21   though, the Government could cross-appeal whatever the defendant

22   appeals and then we would have 2255.

23           The problem, of course, with some of these statements,

24   the Government points out, well, they're really not

25   inconsistent, so that's why I say, well, then it doesn't really

1   hurt you.  It clutters the record a little bit, it takes time,

2   but it's safer to do that, especially when you're preventing a

3   defendant from raising an issue with what is probably certainly

4   the most important Government witness, I suspect, though I do

5   not know.

6           But the law says we have to give a limiting instruction

7   if it's for impeachment purposes, but sometimes some of these

8   things are also admissible perhaps as substantive evidence.

9   I've always been a believer that giving limited instructions and

10  admitting something as substantive evidence and for impeachment

11  doesn't really make any difference for a jury.  They hear it all

12  and they decide everything together.  But the Rules of Evidence

13  and the Court of Appeals make a point of making a distinction

14  and that's the reason -- I want to follow the law to see whether

15  something is admissible.  But I have to consider the degree of

16  inconsistency, I have to consider whether it's relevant or it's

17  a collateral matter.  I have to consider the extent of

18  admissibility.  A lot of the cases talk about whether the person

19  admits it or not and all of that.

20          I don't want to say it's nonsense, but there are issues

21  that have left the courtroom totally empty.  This courtroom was

22  full and now it's empty and it's part of this.  That's the

23  reason I'm having these issues, but as long as both sides agree

24  it should come in, then there's no issue on appeal, but I wanted

25  to let you know.

1              But should I give a limiting instruction on how these

2    exhibits that were added on should be considered?  What is the

3    Government's position, since it's being offered by your

4    opponent?  And then I'll ask the defendant's position.  What is

5    the Government's position?  Should I give a limiting instruction

6    on these exhibits that have come in to say that they're only

7    coming in as -- and I've already told the jurors a little bit of

8    the difference between one or the other.  Should I or not?

9              MR. JUENGER:  That's what I going to say, Your Honor,

10   you essentially already did give the limiting instruction.

11             THE COURT:  I did.  I always like to be cautious.

12             MR. JUENGER:  I think we'll have to see through the

13   course of trial until we get to the end, this issue could come

14   up again.  If we have more of these, then I think --

15             THE COURT:  You won't have more of these.  She's done

16   testifying.

17             MR. JUENGER:  No, with other witnesses.

18             THE COURT:  Oh, you're going to have other witnesses'

19   e-mails, too?  We'll cross that bridge when we come to it, but

20   this is the most important one.

21             So do you want me to give a limiting instruction or

22   not?

23             MR. JUENGER:  At the end of trial?

24             THE COURT:  No, right now.

25             MR. JUENGER:  I thought you did give it.

1          THE COURT:  I did.

2          MR. JUENGER:  So I don't think you need to give another

3    one at this point.

4          THE COURT:  You don't want to.

5          All right.  What say the defendant?

6          MR. RASHBAUM:  I hate to agree with the Government, but

7    I do.  Just to make it easier on you, Judge, you should know a

8    lot of these documents will come in through Mr. Grow, so I don't

9    think a limiting instruction is necessary.

10          THE COURT:  Do you want one?

11          MR. RASHBAUM:  I want a lot of things, but I don't

12    think we need it.

13          THE COURT:  Well, that's not what I asked.

14          MR. RASHBAUM:  I don't want one, no.

15          THE COURT:  You don't want one.  The record will

16    reflect that, despite the Court of Appeals saying that District

17    Courts should give limiting instructions, the only reason I'm

18    not doing it is not because I do not know, or not because I do

19    not want to follow and don't agree, but because neither side

20    wants me to, and I will agree with you all.  All right.

21          MR. JUENGER:  But, Your Honor, if I may, I will say

22    that, depending on how trial goes, it may --

23          THE COURT:  Oh, we'll cross that bridge when we come to

24    it.

25          MR. JUENGER:  Indeed.  It may make sense at the

1   instruction phase to remind them --

2           THE COURT:  When is that going to be?

3           MR. JUENGER:  That's going to be awhile.

4           THE COURT:  When?

5           MR. JUENGER:  I hope it will be early next week.

6           THE COURT:  It will be early next week, so be prepared

7   for it.  Okay.  So we'll discuss that at charge conference, but

8   just know.

9           All right.  So see you at 2:20.

10          Who is your next witness?  Because that way they can

11  prepare during the short lunch.

12          MR. JUENGER:  Mr. Snodgrass.

13          THE COURT:  Okay.  And who else after that?

14          MR. JUENGER:  And then Mr. Von Letkemann and then

15  Mr. Featherston, and they should all be fairly quick witnesses.

16          MR. RASHBAUM:  These will be really fast, Your Honor.

17  So who's the fourth witness?

18          THE COURT:  So who's the fourth witness?

19          MR. JUENGER:  We have two, Klein and --

20          THE COURT:  Klein and who else?

21          MR. JUENGER:  Klein and Klitz, Lisa Klitz.  I think

22  that's how we'll go.

23          MR. MARCUS:  Your financial analyst?

24          MR. JUENGER:  Yeah.

25          MR. MARCUS:  She was down the Witness List.

```
 1            THE COURT:  Now you know.

 2            MR. MARCUS:  I don't have my materials for her.

 3            THE COURT:  You don't bring all of your materials?  Oh,

 4   my goodness.  Bring --

 5            MR. MARCUS:  She's witness number --

 6            THE COURT:  Well, that's why I gave you that room, so

 7   tell them to bring them over.  Bring all your materials.  You

 8   can use that room outside.  You should bring all of your

 9   materials.  Okay?

10            We're not going to quit at 3:30 because you don't have

11   your materials.  We are not going to do that, are we?  No.

12            MR. MARCUS:  No, but we asked yesterday.  That's why we

13   asked.

14            MR. RASHBAUM:  Judge, this is why we make a request

15   and, again, we will reiterate for the record that we be given

16   notice of who the next four or five witnesses are.

17            THE COURT:  When you say for the record, can you tell

18   me what rule of evidence, statute or law requires that?

19            MR. RASHBAUM:  I can, Your Honor.  I can.  We have to

20   be effective lawyers for our client.  So I want to make sure

21   that if a 2255 comes along, I don't have to testify and say I

22   was not prepared to cross-examine a witness because I didn't

23   know she was coming.

24            THE COURT:  You know how you resolve that?  You

25   prepare.  You've been in this case for a long time.  You're not
```

1    even entitled to the list of witnesses.

2          If a Court of Appeals wants to say that I have to force

3    the Government to tell you that, let them say it.  Until now,

4    they haven't done that.  I have done that, but don't talk about

5    2255's and setting it up intentionally.  Don't do that because

6    that's not right.  There's no rule or law that requires it.

7    It's the right thing to do, and we're going to do it.

8          MR. RASHBAUM:  Great.

9          THE COURT:  And you're going to prepare.  Don't tell me

10   you haven't brought the materials to court.  Bring the materials

11   for all witnesses.  They could say we rest based on the

12   stipulations and Ginger Lay.  Frankly, I think they could do

13   that, I really do, with the admission of exhibits.  They won't

14   do that because prosecutors are not confident enough.  They

15   always think they should bring in more witnesses than not.

16   Right?  That's why they won't do that, so I'm not going to force

17   them, but they could do that.  They're going to bring them in,

18   but you should be ready for all of them.

19         MR. RASHBAUM:  All we can do is make a request, Your

20   Honor, which I'm glad that you've granted.

21         THE COURT:  Now, you've got it.  Now you've got five

22   witnesses, so bring your stuff.  All right?

23         MR. LARSEN:  Thank you, Judge.

24         THE COURT SECURITY OFFICER:  All rise.

25       (There was a luncheon recess taken at 1:52 p.m.)

1                          AFTERNOON SESSION

2        (The following proceedings were held at 2:30 p.m. outside

3    the presence of the jury:)

4              THE COURT:  Okay.  Bring in the jurors, please.

5              MR. JUENGER:  Should we bring the witness in?

6              THE COURT:  Sure, of course.  Is the witness out there?

7              MR. JUENGER:  I think she is in the bathroom.

8              THE COURT:  Okay.

9              THE COURT SECURITY OFFICER:  All rise for the jury.

10       (The jury entered the courtroom at 2:31 p.m.)

11             THE COURT:  Go ahead and sit down.  We'll wait.  No

12   problem.  Have we got everybody?  Now we do.  Super.

13             All the jurors are present, defendant, defense counsel,

14   and Government counsel.

15             Redirect, Mr. Larsen.

16                       REDIRECT EXAMINATION

17   BY MR. LARSEN:

18   Q.  Ms. Lay, on cross-examination you heard Mr. Marcus argue to

19   you that Monty Grow told you, said it a few times, that he

20   cleared the marketing arrangement that he had with the pharmacy,

21   that it was fine.

22             Do you know for a fact that Mr. Grow ever actually

23   spoke to someone and cleared the marketing arrangement that you

24   had or the Consent Form that was fine?

25   A.  No.

Lay - Redirect

1  Q.  Do you know for a fact if he spoke to anybody at the

2  pharmacy with respect to their law firms or legal counsel to

3  clear what you and he were doing was fine?

4  A.  He said that someone at their -- like I said, he said

5  someone he spoke with at PCA, some of their legal people.

6  Q.  Did he ever put you in touch with the lawyer to verify that?

7  A.  No.

8  Q.  Did he ever offer to put you in touch with their directors,

9  the pharmacists?

10  A.  No.

11  Q.  Did he ever send you a text message or an email contact with

12  someone at PCA to verify that everything was on the up and up?

13  A.  No.

14  Q.  Did he schedule a meeting with you?  Did he bring you over

15  to the pharmacy to meet with any of the folks there?

16  A.  No.

17  Q.  Okay.  Mr. Marcus also asked you on cross-examination,

18  stated that there's -- a few times he said this -- there's

19  nothing wrong with receiving commissions if you work for a

20  pharmaceutical company, and you agreed, correct?

21  A.  Yes.

22  Q.  Now, would you agree, though, that there's nothing wrong

23  with receiving commissions when those commissions are rooted or

24  come from prescriptions that relate to paying patients to order

25  the products or to fill out surveys?

Lay - Redirect

1   A.   Yes, that is wrong.

2   Q.   I'm sorry?

3   A.   Repeat the question.   I'm sorry.

4   Q.   Would you agree that there's nothing wrong with paying

5   commissions or receiving commissions that are related to

6   patients that are paid for?

7   A.   There's something wrong with that.

8   Q.   How about, is there anything wrong with getting commissions

9   for sales that were generated by a phony survey?

10   A.   There's something wrong with that.

11   Q.   How about the prescriptions?   Specifically, is there

12   anything wrong with getting paid commissions for sales that are

13   made by prescriptions that are preselected before the doctor

14   sees them or changed after the doctor signs them?

15   A.   Yes, there's something wrong with that.

16   Q.   What about prescriptions where you're told to always pick

17   the same three products?   Is there something wrong with

18   receiving commissions in that scenario?

19   A.   Yes, there's something wrong with that.

20   Q.   How about is there anything wrong with finding a scar on a

21   patient because you're told -- and selecting the scar-01 cream

22   because you're told by your co-conspirator that everybody has a

23   scar and it's okay to find a scar on every patient?   Is there

24   anything wrong with getting commissions for those types of

25   patients?

Lay - Redirect

1   A.   Yes, it is.

2   Q.   Now, Mr. Marcus questioned you on cross about the

3   possibility that his instructions to use -- you heard a couple

4   of times the instructions to use the p-01, the sc-01, the pain

5   cream and the scar cream, was related to what was available,

6   what was in stock, what the pharmacy had available to dispense.

7   Do you remember that?

8   A.   Yes.

9   Q.   Now, do you remember in Government's Exhibit Number 100 --

10          MR. LARSEN:   Could you put that up?

11          MR. JUENGER:   Go to the ELMO.

12  BY MR. LARSEN:

13  Q.   I can just hold it up, Government's Exhibit 100.   You

14  testified on it and it's been admitted.

15          Mr. Grow states, "Ginger, here is a sample for a pain,

16     a scar, and the vitamin.   Always use p-01 for pain and sc-01

17     for scar."

18          Do you remember that?

19  A.   Yes.

20  Q.   I think you said that on cross, that Mr. Grow did say

21  "always."   On the prescriptions that you got, was there ever

22  anything from Mr. Grow that said always use p-01 for pain and

23  sc-01 for scar if it's available?

24  A.   No.

25  Q.   It was always?

Lay - Redirect

1   A.   Always.

2   Q.   Was there ever anything -- on Page 3 of the prescription,

3   the jury has seen it and we've talked about it at length, you'll

4   see p-01, general pain, inflammation; p-02, neuropathic chronic

5   pain; p-03, neuropathic, these choices that could be made.

6   A.   Could you repeat the question?

7              MR. LARSEN:   Your Honor, may I just approach the ELMO?

8              THE COURT:   Sure, of course.   Is it on?

9   BY MR. LARSEN:

10  Q.   Ms. Lay, I'm showing you again what's Government's Exhibit

11  100, and we just talked about Mr. Grow's statement of always

12  using these products.   What is this page?

13  A.   That is explaining what each product is.

14  Q.   And does it say anywhere on this page that p-02 is not

15  available, or p-03 is not available, or p-04 is not available,

16  or these other products.

17  A.   It doesn't say that.

18  Q.   If they weren't available, why would they be on this

19  document?

20  A.   I don't know.

21  Q.   Okay.   Did Mr. Grow ever send you an email that said --

22  after this document that said, hey, p-01 is the only thing

23  that's available, use this because of availability issues?

24  A.   No, he did not.

25  Q.   I think I'll just stay over because I have a couple of

1    documents.

2         Mr. Marcus asked you about the Consent Form.  Do you

3    remember that on direct or on cross-examination, Ms. Lay?

4    A.  Yes.

5    Q.  And there was a line of questioning about changes to the

6    Consent Form that had come from Patient Care America, or PCA.

7    He showed you this document, Government's Exhibit 134.

8    A.  Yes.

9    Q.  And you stated on cross that there was another version of a

10   document that did not have the changes in it.  Do you remember

11   that?

12   A.  Yes.

13   Q.  I'm going to show you I believe what's --

14        MR. LARSEN:  Can I confirm with the Court that 202-I

15   has been admitted before I put it on the ELMO?

16        THE COURT:  Government's 202 or defendant's?

17        MR. LARSEN:  Defendant's.

18        MR. MARCUS:  It wasn't offered.

19        THE COURT:  You don't want 202-I?

20        MR. MARCUS:  We didn't offer it through the witness,

21   no.

22        THE COURT:  So what do you want to do with it?

23        MR. MARCUS:  I don't mind it coming in, Your Honor.

24        THE COURT:  No, no.  Those are words that we always

25   use, but when we're in court, I kind of want the words I'm used

Lay - Redirect

1    to hearing because I'm not as sophisticated as you all are.  So

2    the Government wants to use Defendant's Exhibit 202-I.  So I've

3    got that.

4            Does the defendant object to his own defense exhibit

5    being used by the Government and being admitted; yes or no?  It

6    doesn't matter to me.  You decide.  I rule.  You decide what

7    your position is, and I'll tell you what my ruling is.

8            MR. MARCUS:  If I could have two questions of recross

9    just on that document, I have no objection.

10           THE COURT:  I don't know because I can't make a

11   ruling -- we are not selling vegetables here on the market in

12   the Middle Ages where we do that.  I just want to know

13   whether -- you marked it, you gave it to them, maybe it came

14   even from the Government in the first place.  I don't know.

15           But I just want to know whether you have an objection

16   and then I'll hear what the Government's position is and then

17   I'll make an evidentiary ruling, hopefully without the need of a

18   Fordham Law Review article.  I even read a Law Review article on

19   the inconsistent statements.  So I don't want to do that.

20           So what's your position?  Time to fish or cut bait on

21   that.  I don't care.

22           MR. MARCUS:  I don't object, Your Honor.

23           THE COURT:  You don't object.  It will be admitted.

24   Done.

25           MR. LARSEN:  Thank you, Your Honor.

1    (Defendant's Exhibit Number 202-I was received in evidence.)

2    BY MR. LARSEN:

3    Q.  I'm going to briefly put Government's Exhibit 134 back on

4    the ELMO.

5        THE COURT:  You're going to do it briefly, really?

6        MR. LARSEN:  Briefly, Your Honor.

7        THE COURT:  Okay.  Let's find out what that means.

8    BY MR. LARSEN:

9    Q.  I'm going to show you here at the bottom, there's language

10       here, "Your participation in this product assessment and use

11       of the product therein does not create a contractual

12       relationship with you as the consumer and Patient Care of

13       America."

14   A.  Yes.

15   Q.  Do you recall how the name, the words, Patient Care of

16   America, got into this document, 134?

17   A.  Those were the changes that Monty told me someone at PCA

18   told him that I needed to make to the form.

19   Q.  And on Page 2 again there's reference here, "Compensation is

20       not paid from the Government, Patient Care of America,

21       formerly known as Patient First."

22           Now I'm going to show you what's now admitted as

23   Government's Exhibit -- excuse me, Defense Exhibit 202-I.  Do

24   you see any reference to Patient Care of America on the front

25   page?

Lay - Redirect

1   A.   No.

2   Q.   And how about on Page 2, any reference to Patient Care of

3   America?

4   A.   No.

5   Q.   Why is that?

6   A.   Because this is the original form that was sent to --

7   Consent Form that was sent to Monty that he sent to the

8   pharmacy.

9   Q.   Is that what you were referring to on cross-examination in

10  response to Mr. Marcus' questions on the patient -- on the

11  Consent Form?

12  A.   Yes.

13  Q.   Mr. Marcus also spent some time going over your bank

14  records.  Do you remember that?

15  A.   Yes.

16  Q.   And he showed you some payments to an individual in June of

17  2016, and there was a couple of references to, you know, one

18  payment or two payments.  You stated that they could be paid one

19  more time.  What did you mean by that?

20  A.   When the survey had ended, that anybody that was in the

21  survey with no new patients would be paid one more time.

22  Q.   Okay.  And in June of 2015, Mr. Marcus made a point to point

23  out to you that there were a few payments in June of 2016.  I'm

24  going to show you the page that he asked you about on cross,

25  June of 2015, just one-third of a page.

Lay - Redirect

1        What about payments that were made in May of 2015, were

2   there more of them, and in April?

3   A.   There were more in May than June.

4   Q.   So you see there's almost a full page here in May, actually

5   two pages, going on to the third page, and then April of 2015,

6   there's a full page, it's Page 2, Page 3, going on to four

7   pages.  Why is there a difference in the number of payments in

8   June versus May versus April?

9   A.   Because the people in June were the end of the individuals

10  that were due to be paid for their participation in the earlier

11  assessment that has ended.

12  Q.   Mr. Marcus talked to you about the March 4, 2015 email where

13  you had terminated the program, and you sent them that email

14  telling them that the program terminated.

15        After March 4th, did Monty tell you you're fired?

16  A.   No.

17  Q.   Did he tell you to pay the hundreds of thousands of dollars

18  of commissions he paid you back?

19  A.   No.

20  Q.   Did he keep doing business with you?

21  A.   Yes.

22  Q.   Did he discuss further business, new business with you?

23  A.   Yes.

24  Q.   Mr. Marcus also stated on cross that Mr. Grow hired you to

25  promote PCA's products.  Did Mr. Grow ever train you on how to

Lay - Recross

1  promote PCA's products?

2  A.  No.

3  Q.  What did he tell you to do?

4  A.  Find Tricare beneficiaries and sign them up for the

5  compounding creams.

6        MR. LARSEN:  Nothing further, Your Honor.

7        THE COURT:  Thank you.

8        MR. MARCUS:  Your Honor, can I just ask two questions

9  on that new document.

10        THE COURT:  All right.  You can.

11        MR. MARCUS:  Thank you.

12        THE COURT:  You can.  Discretionary recross allowed on

13  Defendant's Exhibit 202-I.

14                    RECROSS-EXAMINATION

15  BY MR. MARCUS:

16  Q.  So, Ms. Lay, you just testified that this was the original

17  template Consent Form that you had sent to Mr. Grow and PCA for

18  their lawyers to look at and send you back changes?

19  A.  Yes.

20  Q.  And you produced this document, correct?  It has your Bates

21  number, GL?

22  A.  Yes.

23  Q.  You agree if you would have sent this document to

24  Mr. Grow -- you're talking about sending it to him by email,

25  right?

Lay - Recross

1   A.   Yes.

2   Q.   Okay.  But you don't have an email with this form sent to

3   either Mr. Grow or anyone at PCA, correct?

4   A.   As I stated before --

5   Q.   It's a yes or no question.

6   A.   I don't have an email, no.

7          MR. MARCUS:  Okay.  Nothing further, Your Honor.

8          THE COURT:  All right.  Thank you, ma'am.  You're

9   excused.  Have a good day.

10     (The witness was excused.)

11         THE COURT:  What say the Government?

12         MR. JUENGER:  The United States would call Philip

13  Snodgrass as its next witness.

14         THE COURT:  Okay.  Raise your right hand, please, sir.

15       PHILIP SNODGRASS, GOVERNMENT'S WITNESS, SWORN.

16         THE COURT:  Okay.  Have a seat, tell us your name, and

17  spell your last name for us, if you don't mind.

18         THE WITNESS:  My name is Philip Snodgrass.  Last name

19  S-n-o-d-g-r-a-s-s.

20         THE COURT:  Thank you, sir.

21         MR. JUENGER:  May I inquire, Your Honor?

22         THE COURT:  Of course.

23         MR. JUENGER:  Make yourself comfortable up there,

24  Mr. Snodgrass.

25         THE COURT:  Well, as comfortable as a witness box is,

1  right?

2                    DIRECT EXAMINATION

3  BY MR. JUENGER:

4  Q.  Mr. Snodgrass, please tell us where you live.  Just the city

5  and state.

6  A.  Ocean Springs, Mississippi.

7  Q.  And how old are you, sir?

8  A.  I am 68.

9  Q.  Have you ever served in the military?

10  A.  Yes, sir, 27 years.

11  Q.  Which branch?

12  A.  Army.

13  Q.  Army.  And when was that, more or less?

14  A.  Couldn't hear you.

15  Q.  I'm sorry.  When was that, more or less?  You said 27 years.

16  A.  From '68 to about '96.

17  Q.  And are you retired from the military?

18  A.  Yes, sir.

19  Q.  And do you currently have health insurance?

20  A.  Yes, sir.  It's Medicare and Tricare For Life.

21  Q.  And did you have Tricare back in the time period of 2014 and

22  2015?

23  A.  Yes.

24  Q.  There in Mississippi where you live, do you have a doctor?

25  A.  Yes.

Snodgrass - Direct

1  Q.  And did you have a doctor back in 2014 and 2015?

2  A.  Same doctor.

3  Q.  And was there a time when you were approached by a person or

4  contacted by a person about ordering any kinds of drugs?

5  A.  Yes, there was.

6  Q.  And who was that?  Do you recall who that was?

7  A.  I don't recall the name.

8  Q.  Was it a man or was it a woman?

9  A.  It was a man.

10  Q.  And describe for us how that happened, the substance of the

11  call.

12  A.  I was approached by an individual that asked me to take part

13  in a trial for a new kind of pain cream and was told that during

14  the trial I would be given $100 a month, and at the time it

15  sounded like a pretty good deal.

16  Q.  Okay.  And now, you used the words you were approached by.

17  Was this --

18  A.  On the phone.

19  Q.  On the phone?

20  A.  Yeah.

21  Q.  And was it only a pain cream or were there other products?

22  A.  No, there was a scar cream and some vitamins as well.

23  Q.  And were you going to be compensated for taking those as

24  well?

25  A.  It was just the one price.

Snodgrass - Direct

1  Q.   Okay.  And did the offer of compensation, did that affect

2  your decision to order those drugs?

3  A.   Well, yeah.

4  Q.   Okay.  And did you agree to order the drugs?

5  A.   Yes, I did.

6  Q.   And at the time that you were solicited on the telephone,

7  were you in the market for or were you looking for a pain cream,

8  a scar cream, a multivitamin?

9  A.   Not specifically, no.

10 Q.   And were you taking any pain medications?

11 A.   No, I wasn't.

12 Q.   Were you taking any scar remedies?

13 A.   No.

14 Q.   Did you go to your doctor there in Mississippi to get the

15 prescription?

16 A.   I'm sorry?

17 Q.   Did you go to your doctor in Mississippi to get a

18 prescription for those things?

19 A.   No, I was called by a doctor.

20 Q.   And do you recall the doctor's name?

21 A.   No, I don't.

22 Q.   Do you recall whether it was a man or a woman doctor?

23 A.   It was a woman.

24 Q.   And what did they ask?  Can you just describe that doctor

25 call?

Snodgrass - Direct

1   A.   They explained that I was going to be in a trial and they

2   asked if I had scars and what kind of pain I was experiencing

3   and if I was at the time taking any vitamins.

4   Q.   Okay.  Did they ask you about what kind of scar you had?

5   A.   I'm sorry?

6   Q.   Did they ask what kind of scar, what type of scar; a burn

7   versus a cut?

8   A.   No, just asked generically scars.

9   Q.   Okay.  Did they ask about other drugs you might be taking

10  for pain or vitamins?

11  A.   I don't recall that they did.

12  Q.   Did they talk about what the ingredients were in these

13  drugs?

14  A.   No, not at all.

15  Q.   Did they ask you about what allergies you might have?

16  A.   I don't recall them asking that, either.

17  Q.   Did they give you a telephone number so that you could call

18  the doctor back if you had a problem with the drugs?

19  A.   I had it in my phone, but they didn't give me a number.

20  Q.   Did they schedule an appointment for you to follow up and

21  check on how you were doing?

22  A.   Not that I recall.

23  Q.   Now, during this initial call, were you told how much those

24  drugs were going to cost Tricare?

25  A.   No.

Snodgrass - Direct

1    Q.   If you had known at that time that those drugs would cost

2    somewhere around $25,000 a month, would you have agreed to order

3    those drugs?

4    A.   Absolutely not.

5    Q.   And in that initial call, were you told about a copayment

6    for ordering those drugs?

7    A.   No.

8    Q.   Now, did you eventually get those drugs in the mail?

9    A.   I did.

10   Q.   And was there a copayment that came with it?

11   A.   Yes, there was.

12   Q.   And were you expecting a copay?

13   A.   I was not.

14   Q.   What did you do then?

15   A.   I called the pharmacy, and they told me they would get back

16   to me.

17   Q.   And did someone get back to you?

18   A.   They did.

19   Q.   Well, let me back up.  You called the pharmacy.  Did you

20   complain about having that copay?

21   A.   Absolutely.

22   Q.   And they said they would get back to you?

23   A.   They acted like they didn't even know there was a trial

24   going on, to be honest with you.

25   Q.   Okay.  And did someone get back to you about that?

Snodgrass - Direct

98

1  A.  Yes.  I think it was the person that initially contacted me.

2  Q.  Okay.  And what happened in that call?

3  A.  Said I wouldn't have to pay the copayment.

4  Q.  Okay.  And you said that you had received these drugs in the

5  mail, correct?

6  A.  Correct.

7  Q.  Did you fill out the survey?

8  A.  I probably did.  I can't really recall.  It's been too long.

9  Q.  Do you remember at all what was the task, like what were you

10 supposed to fill out?  Did you meet with someone in person for

11 part of this survey?

12 A.  I never met with anyone in person.

13 Q.  Was it a paper you filled out or a computer program?

14 A.  Paper.

15 Q.  How many pages?

16 A.  Probably three.

17 Q.  And how long did it take you to fill out?

18 A.  Maybe five minutes.

19 Q.  And were you ultimately paid as promised for these drugs?

20 A.  Never got a dime.

21 Q.  All right.  Mr. Snodgrass, do you know a man by the name of

22 Monty Grow?

23 A.  The name doesn't ring a bell.

24 Q.  Do you have any idea why Monty Grow would receive thousands

25 of dollars for you ordering those drugs?

Snodgrass - Cross

1    A.   No.

2              MR. JUENGER:   That's all I have, Your Honor.

3              THE COURT:   Cross-examination.

4              MR. RASHBAUM:   Thank you, Your Honor.   Very briefly.

5                        CROSS-EXAMINATION

6    BY MR. RASHBAUM:

7    Q.   Good afternoon, Mr. Snodgrass.

8    A.   How are you doing?

9    Q.   Sorry, I'm a bit challenged.

10             Mr. Snodgrass, my name is Dan Rashbaum.   I represent

11   Monty Grow.   We've never met before, right?

12   A.   No.

13   Q.   Okay.   Let me ask you, when you did this survey, were you

14   suffering from pain?

15   A.   I have arthritis.

16   Q.   Where is your arthritis?

17   A.   Knees, elbows.

18   Q.   Okay.   Your joints, right?   Is that fair to say?

19   A.   You're going to have to speak up.

20   Q.   Your joints; is that fair to say?

21   A.   Yeah.

22   Q.   And did you also suffer from migraines?

23   A.   No.

24   Q.   Now, let me ask you, you said that the name Monty Grow

25   doesn't ring a bell.

Snodgrass - Cross

1    A.  Correct.

2    Q.  And you've never emailed with Monty Grow, correct?

3    A.  I don't believe that I did, but it has been a long time.

4    Q.  And those surveys that you completed, you have no reason to

5    believe those surveys were in any way connected to Monty Grow,

6    do you?

7    A.  I have no idea on that.

8    Q.  Where do you live?

9    A.  Ocean Springs, Mississippi.

10   Q.  In Mississippi.  Not in Florida, correct?

11   A.  Correct.

12   Q.  Now, you said that before you got the medicine, you did

13   speak to a doctor on the phone?

14   A.  Yes.

15   Q.  Okay.  And what kind of questions did the doctor ask you?

16   A.  Briefly what kind of pain I was suffering and whether I had

17   scars and if I was taking any vitamins.

18   Q.  And did you tell the doctor that you did have some scars?

19   A.  Yeah.

20   Q.  And did you also tell the doctor that you did suffer from

21   some pain in those joints?

22   A.  Yes.

23   Q.  Okay.  And after telling the doctor on the phone that you

24   suffered from those pains and that you had those scars, the

25   doctor gave you a prescription; is that fair to say?

Snodgrass - Cross

101

1   A.   Yes.

2   Q.   Now, you said at some point in time the pharmacy called you

3   about a copay.  Did I get that right?

4   A.   The copay was in the billing on the initial package of drugs

5   that I received.

6   Q.   Okay.  I'm sorry.  So you got the copay in the mail?

7   A.   Right.

8   Q.   And you were upset about that because you didn't think you

9   were going to have to pay a copay; fair to say?

10  A.   That's correct.

11  Q.   So you called the pharmacy and you complained?

12  A.   Yes.

13  Q.   And if I heard your testimony right, the pharmacy called you

14  back and said you don't have to pay that copay?

15  A.   I don't believe it was the pharmacy that called me back.  I

16  think it was the gentleman that initially contacted me.

17  Q.   Okay.  And that gentleman was not Monty Grow, correct?

18  A.   The name doesn't ring a bell.

19  Q.   Okay.  Now, when that gentleman contacted you and told you,

20  you don't have to pay this copay --

21  A.   Right.

22  Q.   -- did you think there was anything wrong about getting the

23  medicine and not paying the copay?

24  A.   No.

25  Q.   You thought it was fine, right?

```
 1   A.  It was supposed to be a trial.

 2          MR. RASHBAUM:  May I have one moment, Your Honor?

 3          THE COURT:  Sure.

 4          MR. RASHBAUM:  Nothing further, Your Honor.

 5          THE COURT:  Redirect, if any.

 6                    REDIRECT EXAMINATION

 7   BY MR. JUENGER:

 8   Q.  Mr. Snodgrass, in other circumstances, besides this mail

 9   order thing, do you get copays for some of the things you order

10   or services you receive?

11   A.  Do I have to pay copays?

12   Q.  Do you get a copay for some of those things?

13   A.  Yes.

14   Q.  And do you pay your copays when you're asked to?

15   A.  Of course.

16          MR. JUENGER:  That's all I have, Your Honor.

17          THE COURT:  Thank you, sir.  You're excused.

18          THE WITNESS:  Thank you.

19          THE COURT:  And thank you for serving your country in

20   the Army.  I think both sides would appreciate that.  That's why

21   I say it.

22      (The witness was excused.)

23          THE COURT:  Next witness.

24          MR. LARSEN:  Your Honor, the United States calls Blair

25   Von Letkemann.
```

Von Letkemann - Direct

1          THE COURT:  Raise your right hand, please.

2       BLAIR VON LETKEMANN, GOVERNMENT'S WITNESS, SWORN.

3          THE COURT:  Okay.  Have a seat, tell us your name, and

4  spell your last name for us.

5          THE WITNESS:  Say again, sir?

6          THE COURT:  State your name and spell it.

7          THE WITNESS:  Blair Von Letkemann.  B-l-a-i-r, V-o-n,

8  space, L-e-t-k-e-m-a-n-n.

9          THE COURT:  Okay.  And the L is capitalized, too,

10  right?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Okay.  Thank you.

13                        DIRECT EXAMINATION

14  BY MR. LARSEN:

15  Q.  Good afternoon, Mr. Von Letkemann.  Am I saying your name

16  correctly, sir?

17  A.  Yes, sir.

18  Q.  Okay.  Mr. Von Letkemann, where do you live?  City and state

19  only.

20  A.  Morrisville, North Carolina.

21  Q.  Do you know why you were called to testify in court here

22  today?

23  A.  Yes, sir, for the most part.

24  Q.  Why is that?

25  A.  I participated in a drug trial when I was still active duty,

Von Letkemann - Direct

104

1  and from what I know of it, it was not completely on the

2  up-and-up.  It was a scam.

3  Q.  And this scam you're talking about, what did it involve?

4  A.  From what I know of it, I tried a pain cream and a scar

5  cream.

6  Q.  Did you have health insurance at the time?

7  A.  Yes, sir, I had Tricare.

8  Q.  What is Tricare?

9  A.  Tricare is the health insurance for the military.

10  Q.  And at the time you had -- you do have Tricare now?

11  A.  No, I do not now.

12  Q.  Why not?

13  A.  Just out of the Marine Corps, I have had civilian insurance

14  since.

15  Q.  Okay.  So at the time -- you were active duty in 2015?

16  A.  Yes.

17  Q.  From what time frame were you enlisted in the Armed Forces?

18  A.  2011 to 2015.

19  Q.  And which branch did you serve in?

20  A.  Marine Corps.

21  Q.  What was your job in the marines?

22  A.  I was a radio operator and a combat marksmanship coach.

23  Q.  What was your rank?

24  A.  E4 corporal.

25  Q.  And in early 2015, where were you stationed?

Von Letkemann - Direct

1   A.   Camp Pendleton, California.

2   Q.   Are you presently going to school or do you have a college

3   education?

4   A.   I am currently in school.

5   Q.   What are you studying?

6   A.   It's a technical school.  I'm going to UTI for the

7   automotive industry.

8   Q.   Okay.  Now, do you recall being solicited -- I think you

9   talked about this briefly a moment ago -- to order compounded

10  medications by mail back in 2015?

11  A.   Yes.

12  Q.   How did that start?

13  A.   I had a junior marine approach me.  He knew that I was

14  having some financial issues with my wife just moving in and he

15  brought up that he was being paid for trying out a pain cream

16  and it seemed like a decently easy way to make a little bit

17  extra money.

18  Q.   What did he tell you about what you could make?

19  A.   He told me that he was bringing in roughly between 3 and

20  500, I believe, a month for filling out a survey, for testing

21  out a cream and filling in a survey.

22  Q.   Did you agree to try it out?

23  A.   Yes, I did.

24  Q.   What did you do?  What was the first step you took to get

25  started?

Von Letkemann - Direct

1  A.  I went online to a website that I was given by the marine

2  and set it up online.

3  Q.  What happened after that?

4  A.  I was contacted by email and sent in personal information

5  and Tricare information.

6  Q.  Personal Tricare information?  What kind of information

7  would you have been sending in?

8  A.  Name, Social Security number, current address, active

9  military duty status.

10  Q.  So after you provided this information online, what was the

11  next thing you remember happening?

12  A.  Waited a couple of weeks and received a shipment to my home.

13  Q.  Describe the shipment, if you can remember.

14  A.  Cardboard box with, I believe, either three or six tubes of

15  the cream.  I believe it was six.

16  Q.  And was it a big tube, small tubes?

17  A.  Pretty large tubes.  They were about 10 to 12 inches tall

18  and about two inches in diameter.

19  Q.  Do you know how much of a period of time that particular

20  product was for?

21  A.  I believe 30 days.

22  Q.  Was that, in your estimation, about the -- excuse me --

23  about the right amount for 30 days, if you remember?

24  A.  It seemed like a lot more than you would need for 30 days.

25  Q.  Now, at the time you got these products in the mail, were

Von Letkemann - Direct

107

1   you under the care of a doctor for any chronic pain or scarring?

2   A.   I was going through physical therapy for a knee injury.

3   Q.   Physical therapy.  Were you seeing a doctor for chronic

4   pain, aside from physical therapy?

5   A.   No.

6   Q.   Were you addicted to pain medications, opioids?

7   A.   No.

8   Q.   What were you taking for pain at the time?

9   A.   Motrin.

10  Q.   Did you have a need for these pain and scar medications?

11  A.   I wouldn't really say a need, no.

12  Q.   Well, why did you agree to sign up to receive these meds?

13  A.   It was an easy way to make a little bit of extra money and

14  if it worked, it worked.  If it didn't, it didn't.

15  Q.   Did you try the medications?

16  A.   I did.

17  Q.   Would you say they worked?

18  A.   The pain medication, no, not really.  And the scar

19  medication I thought was working, but it really didn't work any

20  better than lotion.

21  Q.   Lotion?

22  A.   Yeah.

23  Q.   What kind of lotion?

24  A.   Just standard lotion.

25  Q.   Like Vaseline Intensive Care?

Von Letkemann - Cross

1  A.  Yes.

2  Q.  So what happened after -- well, let me back up.  Do you

3  recall speaking to a doctor or the pharmacy prior to receiving

4  this shipment?

5  A.  I do not recall it, no.

6  Q.  So after you received the shipment in the mail, what's the

7  next thing you can remember happening?

8  A.  About 30 days later, I received a survey, sent in the

9  survey.  And a couple of weeks after that, I received payment.

10 Q.  Do you remember about when this -- when you ordered the

11 medications in 2015?

12 A.  I believe I ordered them in March; March/April time period.

13 Q.  And the survey came, would it have been after you received

14 the medications?

15 A.  Yes.

16 Q.  Do you know how much Tricare paid for the medications that

17 you ordered?

18 A.  No, not exactly.

19 Q.  If you knew that Tricare paid more than 20 or $25,000 for

20 these medications, would you have agreed to order them?

21 A.  No.

22        MR. LARSEN:  Nothing further, Your Honor.

23        THE COURT:  Cross-examination.

24                  CROSS-EXAMINATION

25 BY MS. MEYERS:

Von Letkemann - Cross

1  Q.  Good afternoon, Mr. Von Letkemann.  My name is Kate Meyers

2  and I represent Monty Grow.

3          We've never spoken before; is that correct?

4  A.  No, we have not.

5  Q.  We've never met before?

6  A.  No.

7  Q.  It's fair to say before now, you had no idea who I was,

8  correct?

9  A.  Correct.

10  Q.  All right.  You testified a moment ago that you spoke with a

11  junior marine officer who approached you and said that he had

12  ordered pain cream, correct?

13  A.  A junior marine enlisted.

14  Q.  Pardon me.  Pardon me.  Junior marine enlisted.  And that he

15  had ordered pain cream, correct?

16  A.  Correct.

17  Q.  That's all he said, just pain, correct?

18  A.  Pain, scarring and a vitamin cream.

19  Q.  Well, you testified a moment ago that it was just pain

20  cream.

21  A.  It was pain and scarring cream.

22  Q.  Did you ever speak to Monty Grow about --

23  A.  No, I did not.

24  Q.  Were you ever contacted by email by Monty Grow?

25  A.  No.

Von Letkemann - Cross

1  Q.  Were you ever contacted by text by Monty Grow?

2  A.  No.

3  Q.  Were you ever contacted by phone with Monty Grow?

4  A.  No.

5  Q.  Do you recall speaking with Ginger Lay about the products?

6  A.  No.  I have an email, but I don't recall speaking with

7  anybody.

8  Q.  You do recall receiving an email from Ms. Lay?

9  A.  Yes.

10  Q.  Okay.

11       MS. MEYERS:  Your Honor, may I approach and use the

12  ELMO?

13       THE COURT:  With what?

14       MS. MEYERS:  Government's Exhibit 2 -- excuse me.

15  Defense Exhibit 207, which is in evidence.

16       THE COURT:  All right.  You may.

17       MS. MEYERS:  Thank you, Judge.

18  BY MS. MEYERS:

19  Q.  Mr. Von Letkemann, is this the email you recall receiving

20  from Ms. Lay?

21  A.  Yes, I believe so.

22  Q.  And you see the email address at the top is MedRx Assessment

23  Survey?  You see that?

24  A.  Yes.

25  Q.  And can you tell me the date of this document?

Von Letkemann - Cross

1  A.  April 13, 2015.

2  Q.  And do you see in the first paragraph, do you see the

3  language, surveys must be completed by?

4  A.  Yes.

5  Q.  And what date is that, sir?

6  A.  April 25th.

7  Q.  Did you ever receive payment for your participation in the

8  surveys, Mr. Von Letkemann?

9  A.  Yes, I did.

10 Q.  Do you recall when that payment was?

11 A.  I do not.

12      MS. MEYERS:  Your Honor, may I approach and use the

13 ELMO again with -- excuse me -- Defense Exhibit 202-K, which is

14 in evidence?

15      THE COURT:  All right.  You may.

16 BY MS. MEYERS:

17 Q.  Mr. Von Letkemann, do you see the date in which you were

18 paid on this document?

19 A.  Yes, I do.

20 Q.  And what date was that?

21 A.  April 22, 2015.

22 Q.  At the risk of stating the obvious, April is after March,

23 Mr. Von Letkemann?

24 A.  Yes, it is.

25 Q.  Okay.  If someone had testified that the surveys that you

1  participated in ended in March, that would be a false statement,

2  correct?

3  A.  Yes, I believe so.

4  Q.  Okay.

5          MS. MEYERS:  Okay.  I have nothing further, Your Honor.

6          THE COURT:  Redirect.

7                          REDIRECT EXAMINATION

8  BY MR. LARSEN:

9  Q.  Just briefly, Mr. Von Letkemann.  You testified on direct

10  and you were asked on cross about when you ordered these

11  products.  Ms. Meyers showed you a document dated mid-April

12  2015.

13          Do you recall whether it was before or after this email

14  that you received or that you had ordered these products?

15  A.  I believe it would have to be before, but I do not recall.

16  Q.  Okay.  You testified on direct, you thought it was some time

17  in March of 2015; is that correct?

18  A.  Correct.

19  Q.  Is that to the best of your recollection when you ordered

20  these products?

21  A.  Yes, it is.

22  Q.  And I believe you testified on direct that you had some

23  initial -- you made some initial email contact for the survey.

24  The first email contact, would that have been before March when

25  you received the products?

Von Letkemann - Redirect

113

1    A.   Yes.

2    Q.   Okay.  So could it have been in February?

3    A.   It could have, yes.

4            MR. LARSEN:  Okay.  Thank you.

5            Nothing further.

6            THE COURT:  Thank you, sir.  You're excused.  And thank

7    you for serving your country as a marine.

8            THE WITNESS:  Yes, sir.

9        (The witness was excused.)

10           THE COURT:  Next witness.

11           MR. JUENGER:  United States would call James

12   Featherston as its next witness.

13           THE COURT:  Okay.  Raise your right hand, please, sir.

14        JAMES FEATHERSTON, GOVERNMENT'S WITNESS, SWORN.

15           THE COURT:  Have a seat and tell us your name, please.

16           THE WITNESS:  James William Featherston.

17           THE COURT:  Thank you.  Featherston with an N at the

18   end, right?

19           THE WITNESS:  That's correct.

20           THE COURT:  Okay.  Thank you.

21           MR. JUENGER:  Do people sometimes say it with an E?

22           THE COURT:  That's why I said with an N.  You're right.

23           MR. JUENGER:  I was just asking, do sometimes people

24   pronounce it like it would have an E at the end?

25           THE WITNESS:  That's right.

Featherston - Direct

114

                    DIRECT EXAMINATION

1

2    BY MR. JUENGER:

3    Q.  Sir, can you please tell us where you live, what city and

4    state?

5    A.  Long Beach, Mississippi.

6    Q.  And how old are you?

7    A.  45.

8    Q.  And have you ever served in the military?

9    A.  Yes, sir.

10   Q.  What branch and when?

11   A.  United States Navy, 1992 to 2013.

12   Q.  So you're retired?

13   A.  Yes, sir.

14   Q.  And what do you do now?

15   A.  I work for an engineering consultant company.

16   Q.  And back in the 2014, 2015 time period, what kind of

17   insurance did you have, health insurance?

18   A.  Tricare.

19   Q.  And do you have a regular doctor that you see in

20   Mississippi?

21   A.  I have a team at the VA.

22   Q.  Okay.  And did you have that same VA team back in the 2014,

23   2015 time period?

24   A.  Yes, sir.

25   Q.  And does Tricare pay for those doctor visits for you?

1  A.  Yes.

2  Q.  Was there a time when you were contacted or otherwise

3  communicated with someone about ordering some drugs over the

4  phone?

5  A.  Yes.

6  Q.  And can you tell us how that happened; who did you speak to

7  and what was the conversation about?

8  A.  It was a woman.  I don't recall the name, but it was a woman

9  that called and asked if I, you know, served in the military, if

10  I had any ailments that were caused by my service, and if I

11  would benefit from using something that might help.

12  Q.  And what kinds of products were they offering that might

13  help you?

14  A.  I was offered a scar cream.  I was offered muscle cream and

15  then some vitamins.

16  Q.  And you say muscle cream.  What do you mean by that?  Can

17  you be a little more specific?  What kind of ailment?

18  A.  For muscle pain.

19  Q.  All right.  And were you offered any sort of incentive to

20  agree to order these products?

21  A.  I was offered money to try out the product.

22  Q.  And how much money?

23  A.  I don't know the -- I don't remember the exact amount of the

24  payment, but it was somewhere around $1,000 on the first payment

25  and then some monthly installments after that.

1  Q.  Okay.  And at the time that you were solicited about these

2  drugs, were you in the market for or otherwise looking for a

3  pain cream, a scar cream or any other kinds of --

4  A.  No, sir.

5  Q.  Were you taking prescription pain medication at the time?

6  A.  I wasn't taking any prescription pain medicine.  Just

7  over-the-counter Motrin.

8  Q.  Okay.  And were you using any scar treatments?

9  A.  No, sir.

10  Q.  And did you agree to order these products?

11  A.  Yes.

12  Q.  And did the offer of whatever it was, $1,000, did that

13  motivate you to order these products?

14  A.  Absolutely.

15  Q.  And so did you order them?

16  A.  I did.

17  Q.  And were you told up-front how much Tricare was going to be

18  paying for these products?

19  A.  Negative.

20  Q.  If you had been told that these products would cost Tricare

21  somewhere in the neighborhood of $25,000, would you have agreed

22  to order those products?

23  A.  Absolutely not.

24  Q.  Were you told whether or not there would be a copayment

25  along with these products?

Featherston - Direct

117

1   A.   I don't recall that.

2   Q.   You don't recall?  And did you go to your own doctors there

3   at the VA to get a prescription for these drugs?

4   A.   No, sir.

5   Q.   Why not?

6   A.   I wasn't told to do that.

7   Q.   Well, what were you told to do?

8   A.   I was told that I'd have a follow-up phone call.

9   Q.   Okay.  And did you get that follow-up phone call?

10  A.   I did.

11  Q.   And tell us about that.  Who called you and what did they

12  ask about?

13  A.   I don't recall the name, but it was a gentleman that called,

14  and he went over a lot of the same questions that the lady did,

15  kind of like he was just confirming all the information that I

16  had already given.

17  Q.   Okay.  And was this person a doctor?  Did they purport to be

18  a doctor?

19  A.   I don't remember him saying he was a doctor.

20  Q.   All right.  And did you speak with anyone else about this

21  program besides the woman who originally called you and the man

22  who followed up?

23  A.   No.

24  Q.   And tell us a little bit then about that call from the man

25  who called you the second time.

Featherston - Direct

118

1  A.  Again, he was asking me, you know, about my service ailments

2  and, you know, if those products would help, and then verified

3  my information --

4  Q.  And did you tell the person --

5  A.  -- and said the products would be coming in the mail.

6  Q.  Forgive me for talking over you.

7       Did you tell the person that you wanted these drugs?

8  A.  No, I didn't tell him I wanted them.  I just told him -- I

9  just answered his questions, basically.

10  Q.  Okay.  And did you ultimately receive the drugs?

11  A.  I did.

12  Q.  And did you ultimately receive the payments?

13  A.  I did.

14  Q.  And did you take this survey in order to sort of complete

15  your side of the bargain?

16  A.  Yes, sir.  It was a monthly survey.  Once I completed it and

17  sent it back, then it would continue me for another month.

18  Q.  And tell us about the survey.  Was it online or was it

19  paper?

20  A.  It was a paper and it just asked basic questions about the

21  products and how I felt, you know, their use was on my

22  particular situation.

23  Q.  Okay.  And how long did it take to fill that out?

24  A.  Five minutes.

25  Q.  And you got $1,000 for doing it?

1  A.  The first month.

2  Q.  Have you ever had a job where you made $1,000 an hour

3  before?

4  A.  I wish.

5  Q.  Now, was there a time when you called the pharmacy that had

6  sent these drugs to you?

7  A.  Yes.

8  Q.  And what was that call about?

9  A.  I called a number that I was given.  I don't remember how I

10  got it, but I was given a number if I had questions, and it

11  ended up being the pharmacy that was sending me the products.

12  And I was asking about the payment because it had been the 30

13  days and I hadn't gotten a payment yet, and they told me that

14  that wasn't the place to call; that they would, you know, let

15  the people know that I was calling concerning the payment.

16  Q.  Okay.  Did the pharmacy seem surprised about you calling

17  about money?

18  A.  They did.  Yes, they did.  They told me that I shouldn't be

19  calling them.

20  Q.  Just that you shouldn't be calling them?

21  A.  Right.

22  Q.  You should be calling someone else?

23  A.  Right.

24  Q.  And did the pharmacy follow up with you again about this

25  issue?

1  A.  No.

2  Q.  And how many months did you receive these products?

3  A.  I believe I did it about three months before they said that

4  the program was canceled.

5  Q.  And do you remember which three months you would have

6  ordered those?  It was awhile ago, but if you remember.

7  A.  I don't.

8  Q.  Okay.  And what did you do with the money that you received?

9  A.  Paid bills.  Probably spent it on food.

10  Q.  Did a time come when you stopped receiving the drugs?

11  A.  Yes.

12  Q.  And why did that happen?

13  A.  They said the program ended.

14  Q.  Who said the program ended?

15  A.  The same lady that I had talked to the first time.

16  Q.  And did she telephone you or email you or how did you find

17  out?

18  A.  It was a phone call.

19  Q.  All right.  Let me ask you, Mr. Featherston, do you know a

20  man by the name of Monty Grow?

21  A.  No, sir.

22  Q.  Do you have any idea why Monty Grow should have received

23  thousands of dollars for your drug orders?

24  A.  No, sir.

25  Q.  Did Monty Grow ever call you and see how you were doing?

Featherston - Cross

1   A.  No, sir.

2   Q.  Did he ever ask about the survey?

3   A.  No, sir, nothing.

4         MR. JUENGER:  That's all I have, Your Honor.

5         Thank you, sir.

6         THE COURT:  Cross-examination.

7                    CROSS-EXAMINATION

8   BY MS. MEYERS:

9   Q.  Good afternoon, Mr. Featherston.

10  A.  Good afternoon.

11  Q.  My name is Kate Meyers and I represent Monty Grow.  We've

12  never spoken before or met before; is that correct?

13  A.  No, ma'am.

14  Q.  You testified on direct, Mr. Featherston, that a woman

15  contacted you about the pain medication; is that correct?

16  A.  Yes, ma'am.

17  Q.  Do you recall when that was, sir?

18  A.  I do not.

19  Q.  You do not.

20        MS. MEYERS:  Your Honor, may I approach the witness and

21  use the ELMO to publish Government's Exhibit 17-B which is in

22  evidence?

23        THE COURT:  Sure.

24        MS. MEYERS:  Thank you, Your Honor.

25        THE COURT:  I'm sorry, I couldn't hear what you said.

1          MS. MEYERS:  I am providing the witness with a copy,

2    Your Honor.

3          THE COURT:  I've got to hear everything.

4    BY MS. MEYERS:

5    Q.  So again, Mr. Featherston, you testified that a woman

6    contacted you about the prescription, but you did not recall the

7    date; is that correct?

8    A.  Yes, ma'am.

9    Q.  I am showing you what's been admitted into evidence as

10   Government's Exhibit 15 -- excuse me, 17-B.

11         Can you please look at the highlighted date at the

12   bottom?  Can you read that date, sir?  It's a little difficult,

13   but can you do your best?

14   A.  The highlighted date?

15   Q.  Correct, at the bottom -- excuse me.  If you look on the

16   screen.

17   A.  Oh, on the screen.

18   Q.  I apologize.

19   A.  I can't make that out.

20   Q.  Does it appear to be January, some date in --

21         MR. JUENGER:  Objection, Your Honor.

22         THE COURT:  Grounds?

23         MR. JUENGER:  Foundation.  He just testified he can't

24   see it.

25         MS. MEYERS:  It's cross-examination, Your Honor.

1          THE COURT:  Hold on.  Let's hold on.  Now, you're

2    asking about a particular exhibit?

3          MS. MEYERS:  Correct, Your Honor.

4          THE COURT:  That has been admitted?

5          MS. MEYERS:  Correct, Your Honor.

6          THE COURT:  Whose exhibit is it?

7          MS. MEYERS:  The Government's, Your Honor.

8          THE COURT:  All right.  Now, see, I always ask these

9    questions because you all are just throwing curves at me.

10          The Government is objecting to something that's in the

11    Government's exhibit?

12          MR. JUENGER:  No, Your Honor.  I'm objecting to the

13    question based on the lack of foundation from the witness'

14    previous answer about being able to read this.  That's all.

15          THE COURT:  Okay.  Ask the question again.

16          MS. MEYERS:  May I ask it differently, Your Honor?

17          THE COURT:  Well, even better.  Then I don't even have

18    to rule on it.

19          MS. MEYERS:  I will do that, Judge.  I will do it

20    differently.

21          THE COURT:  Sure.

22    BY MS. MEYERS:

23    Q.  Does the date on this document appear to be January 3, 2015?

24    A.  I can't make it out.  I can make out '15 and that's it.

25    Q.  Well, do you see in the second part of the document, between

1   the two slashes, do you see a single digit?

2   A.  I believe so.

3   Q.  There doesn't appear to be a one or a two before that single

4   digit, does it?

5   A.  Before that single, before the second one?

6   Q.  Correct.

7   A.  It looks like a letter.

8   Q.  Okay.  So would it not suggest to you, Mr. Featherston, that

9   this prescription was written in early January 2015?

10  A.  I'm sorry?

11  Q.  Does this document, does the date that I highlighted,

12  suggest to you that the date of this prescription was early

13  January 2015?

14  A.  It doesn't look like that.  I don't know.  It doesn't look

15  like it to me.  I can't make it out.  I can make out the '15.

16  Q.  Well, if I were to represent to you, Mr. Featherston --

17           THE COURT:  Oh, no, you're not going to represent to

18  him anything.  The exhibit is there.

19           MS. MEYERS:  Okay.

20           THE COURT:  Any other questions?

21           And the jurors are looking at it just like I am, just

22  like the witness.  All right.  Let's go.

23           MS. MEYERS:  Court's indulgence, Your Honor.  I

24  apologize.

25  BY MS. MEYERS:

Featherston - Cross

125

Q.  So the telephone call that you would have received from a
woman would have been before this prescription was written,
correct, sir?

A.  I would assume so.

Q.  So if someone were to say, were to testify --

THE COURT:  Oh, you know what?  You asked that before
and there was no objection, but I don't allow -- the second
time, I have to interfere.  I don't allow a witness to opine on
another witness' testimony.

MS. MEYERS:  Okay, Your Honor.

THE COURT:  Because it's not permissible.  It's done
all the time, but it's not permissible.

MS. MEYERS:  I'll withdraw it, Your Honor.

THE COURT:  No problem.  And, of course, argue that in
closing argument.

MS. MEYERS:  Thank you, Your Honor.

THE COURT:  That's what argument is all about.

MS. MEYERS:  Thank you, Your Honor.

BY MS. MEYERS:

Q.  So you would have agreed to participate in a survey before
the date of this prescription; is that correct?

A.  I don't know the date of that prescription.

Q.  Understood, sir.  But you testified that you got the
prescription because you had agreed to participate in a survey;
is that correct?

Featherston - Cross

126

1   A.  That's correct.

2   Q.  So the prescription would not have been written until after

3   you had already agreed to participate in a survey, correct?

4   A.  I would assume that.

5   Q.  Okay.  You were asked this on direct, but I just want to

6   confirm.  You never spoke with Monty Grow about any survey?

7   A.  No, ma'am.

8   Q.  You never received an email or a text message from Monty

9   Grow about a survey?

10  A.  No, ma'am.

11  Q.  You didn't send any survey to Monty Grow?

12  A.  No, ma'am.

13  Q.  Do you recall where you sent the survey, sir?

14  A.  I do not.

15  Q.  Was it an email address provided on the survey itself, do

16  you recall?

17  A.  I do not recall.

18  Q.  You were not paid by Monty Grow for your participation in

19  the survey, were you?

20  A.  Not to my knowledge.

21  Q.  Do you recall when you were paid for your participation in

22  the survey?

23  A.  I don't remember exactly when it happened, ma'am.

24          MS. MEYERS:  May I approach, Your Honor, and use the

25  ELMO again for Defendant's Exhibit 202-K which is in evidence?

1              THE COURT:  All right.

2              MS. MEYERS:  Thank you, Your Honor.

3    BY MS. MEYERS:

4    Q.  Mr. Featherston, this document reflects that you were paid

5    in April, correct, sir?

6    A.  Say that again.

7    Q.  According to this document that is in front of you, Defense

8    Exhibit 202-K, you were paid in April of 2015; is that correct,

9    sir?

10   A.  That's correct.

11   Q.  And you were paid $750 by a company called MedRx Sales; is

12   that correct, sir?

13   A.  Yes, ma'am.

14   Q.  And do you know what MedRx Sales is, sir?

15   A.  I do not.

16   Q.  Do you have any reason or do you know whether it is in any

17   way connected to Monty Grow?

18   A.  I do not.

19             MS. MEYERS:  I have nothing further, Your Honor.

20             THE COURT:  Any redirect?

21                       REDIRECT EXAMINATION

22   BY MR. JUENGER:

23   Q.  Mr. Featherston, you testified a few minutes ago that the

24   first person who contacted you about these creams was a woman,

25   correct?

Featherston - Redirect

128

1   A.  Yes, sir.

2   Q.  And that person told you that a doctor would call you?

3   A.  Yes, sir.

4   Q.  And I believe you said the person who called you after that,

5   presumably, the doctor, was a man; is that correct?

6   A.  Yes, sir.

7   Q.  Did that man say that their name was Pamela Svendsen?

8   A.  I don't recall that.

9   Q.  I want to show you the same document that defense just

10  showed you.  It's Government's Exhibit 17-B.  Can you read the

11  name of the --

12  A.  I can see Pamela --

13  Q.  -- prescribing physician?

14  A.  I could see Pamela and then I can make out MD at the end.

15  Q.  Did you talk to a Pamela Svendsen who called you to give you

16  a consultation?

17  A.  Not to my knowledge.

18          MR. JUENGER:  That's all I have, Your Honor.

19          THE COURT:  Thank you, sir.  Have a good day, a safe

20  trip back.  Thank you for serving in the Navy.

21          Next witness.

22          MR. LARSEN:  Your Honor, the United States calls

23  Special Agent Jennifer Klein.

24          THE COURT:  All right.  Raise your right hand.

25          JENNIFER KLEIN, GOVERNMENT'S WITNESS, SWORN.

Klein - Direct

1        THE COURT:  Tell us your name once you get seated.

2        THE WITNESS:  My name is Jennifer, J-e-n-n-i-f-e-r;

3   last name is Klein, K-l-e-i-n.

4        THE COURT:  Where do you work?

5        THE WITNESS:  I'm a special agent with the Defense

6   Criminal Investigative Service.

7        THE COURT:  Go ahead.

8        MR. LARSEN:  Your Honor, before I get started with the

9   examination, I have spoken with counsel for defense, without

10  objection the Government is moving in Government's Exhibits 1,

11  67 --

12       THE COURT:  Hold on, hold on.  167.

13       MR. LARSEN:  1, 67 and 170.

14       THE COURT:  167, right?

15       MR. LARSEN:  No.

16       THE COURT:  You said 1, 67.  What else?

17       MR. LARSEN:  170.

18       THE COURT:  Okay.  Without objection they will be

19  admitted.

20     (Government's Exhibit Numbers 1, 67, 170 were received in

21  evidence.)

22                   DIRECT EXAMINATION

23  BY MR. LARSEN:

24  Q.  Good afternoon, Special Agent Klein.  Where are you

25  currently employed?

Klein - Direct

130

A.   I am currently employed with the Defense Criminal

Investigative Service, assigned to the Fort Lauderdale, Florida

office.

Q.   And how long have you been employed with the Defense

Criminal Investigative Service?

A.   Approximately 15 years.

Q.   What are the types, just generally, types of cases that

you're assigned to investigate?

A.   The Defense Criminal Investigative Service is specifically

assigned to protecting the American war fighters, the U.S.

military men and women, and the critical infrastructure that is

part of the Department of Defense.

         We investigate a slew of different areas to include

procurement fraud, health care fraud, terrorism related crimes,

economic crimes, computer crimes, bribery, extortion, things of

the like.

Q.   What is your educational background?

A.   I have a Bachelor and Master's Degree in criminal justice.

Q.   And when did you graduate?

A.   Approximately 1999.

Q.   With your Bachelor's degree?

A.   No, about 1998, and then about a year later with the

Master's.

Q.   Okay.  Now, were you assigned as part of your duties to

investigate a case involving the defendant, Mr. Monty Grow?

1  A.  Yes.

2  Q.  And what was the scope of the assignment that you received

3  for this case?

4  A.  I was assigned to review claims data that was obtained

5  through certified Tricare claims database system from PCA, and

6  then from there, extract certain beneficiaries that were under

7  Mr. Grow and the patient recruiters that were under Mr. Grow and

8  their patients, and create a separate spreadsheet.

9  Q.  You testified that you analyzed claims data.  What

10  specifically related to that claims data did you look at?  Did

11  you look at all the claims?  Did you look at a subset of the

12  claims?

13  A.  Based on the documents, e-mails, and other investigative

14  materials that we had during the course of the investigation,

15  there were certain names that were specifically assigned under

16  Mr. Grow.  For example, there's an email, there's -- I'm sorry.

17  There was an email specifically from Mr. Grow to Ms. Delgado, I

18  believe around the time frame April 2015, with specific

19  attachments with it and under those attachments were beneficiary

20  names.

21  Q.  So with respect to the claims data, what specifically were

22  you looking at with respect to Mr. Grow?

23  A.  With respect to Mr. Grow, I was tasked with sorting and

24  filtering out specific beneficiary names.  For example, if under

25  Mr. Grow there was a beneficiary named John Smith, I would look

1  at the master claims data that was under PCA and then filtered

2  out and specifically pick John Smith, with his respective

3  biographical information, to pertain to that specific John

4  Smith.

5  Q.  Okay.  Ms. Klein, I previously -- or a moment ago you

6  mentioned an email related to someone named Ms. Delgado.  I'm

7  going to show you what's been admitted as Government's Exhibit

8  67, and we're going to just put it on the screen here.

9          MR. LARSEN:  Your Honor, could we switch over to the

10  computer?

11          THE COURT:  I don't know.  Can you?

12          MR. LARSEN:  May I?

13          THE COURT:  You may.  Permission granted.

14          MR. LARSEN:  I just need someone --

15          THE COURT:  When you say may --

16          MR. LARSEN:  May I, Your Honor?  Ms. Christie is -- I

17  could come over there and try, but I don't know how.

18          THE COURT:  As excited as she would be about being here

19  with you all, she also has to do a lot of work for me inside my

20  office.

21          Can you help us, Gilda?

22  BY MR. LARSEN:

23  Q.  Okay.  Ms. Klein, I'm showing you what's been admitted as

24  Government's Exhibit 67.  What is this document that's on the

25  screen?

Klein - Direct

1    A.   This is a document that I was explaining before from

2    Mr. Grow to Mary Delgado at her Yahoo account and attached to

3    the email are a few attachments, and on those attachments are

4    beneficiary names respective to his customers' clients.

5    Q.   So just showing you Page 2 of the exhibit, could you just

6    describe for the jury what this is and what you did with it?

7    A.   Okay.  So I went line-by-line and I tried to, again, go to

8    the master claims data, which is PCA's claims data, and

9    literally look up Aaron Gernon.  If I found Aaron Gernon, I

10   added him -- I segregated his claims information to a separate

11   spreadsheet.  The same thing with all the other representatives

12   listed on there.  You know, I tried to be as consistent and as

13   accurate as possible.

14   Q.   What were you aiming to do by reviewing this list with

15   respect to the defendant?

16   A.   To accurately reflect all of the patients that Mr. Grow was

17   providing for PCA, for PCA to then in turn bill Tricare and be

18   paid for those respective claims.

19   Q.   So what was the next thing that you did after reviewing this

20   document, the claims data?  What, if anything, did you do next?

21   A.   Okay.  There were instances with his patient recruiters

22   where there would be -- again, I'll utilize the example of John

23   Smith.  You'd have John Smith on this document listed for

24   Mr. Grow, and then you would have John Smith listed under one of

25   his recruiters.  It would pertain to the same claims data, so

Klein - Direct

134

1    essentially I removed duplicates because obviously you just

2    wanted to count it for the one time.

3    Q.   Okay.  I'm going to show you what's been admitted as

4    Government Exhibit 1-7-0; 170.  Do you recognize the document

5    that's on the screen?

6    A.   Yes.

7    Q.   What is it?

8    A.   This is the segregated claims data from the PCA into the

9    Monty Grow spreadsheet of beneficiaries.

10   Q.   Okay.  On the bottom right-hand corner it says page 1 of

11   128, so are pages 2 through 128 substantially the same in terms

12   of the data, the columns that are on these documents?

13   A.   Correct.

14   Q.   So in a nutshell, what is this document?  For the jury,

15   describe it.

16   A.   This document, just to kind of break it down for the jury a

17   little bit, it will obviously -- some of it is self-explanatory,

18   but it will provide the beneficiary's name.  The fill date is in

19   respect to the date that the prescription was filled.

20          So in this case, the part that's highlighted would be

21   for Mr. John Adams, so the fill date would have been 4-14-2015.

22   The adjudicated date is essentially the date that the claim was

23   paid for by the insurance company based on the benefits coverage

24   requirements that they have.

25          Then the copayment amount if it applied to that

Klein - Direct

135

1    respective beneficiary.  The billed amount is what essentially

2    was billed to Tricare.  The paid amount is what Tricare

3    essentially paid from that billed amount.  The prescriber is the

4    physician who, you know, is under that respective prescription,

5    and obviously the pharmacy is DCRX, but it's also known as PCA.

6    Q.  So the names that are in the bene name column, where do

7    those names come from?

8    A.  That came from the PCA claims data.

9    Q.  But where did you get it?  Where did you get those names

10   from with respect to Mr. Grow?

11   A.  I extracted the claims data information from the claims that

12   were submitted and paid for by Tricare.  Everything is housed

13   under Tricare through a company called Express Scripts,

14   Incorporated.

15   Q.  I apologize.  I probably asked a bad question.  These names,

16   Adams, John; Gabriella, Addie; did they come from another

17   exhibit you testified to?

18   A.  Yes, I apologize.  Yes.

19   Q.  Where did you get the names that are in the bene name

20   column?

21   A.  From the email that I just spoke of from Mr. Grow to

22   Ms. Delgado for the time frame of April 2015.

23          MR. LARSEN:  Your Honor, the Government is now offering

24   without objection Exhibits 170-A through D.

25          THE COURT:  All right.  It will be admitted -- they

Klein - Direct

136

1  will be admitted.

2      (Government's Exhibit Numbers 170-A through 170-D were

3  received in evidence.)

4  BY MR. LARSEN:

5  Q.  Could we go to the last page of Exhibit 170.  Okay.

6      Ms. Klein, can you explain what's on this last page,

7  especially the numbers that are in red?

8  A.  Based on the email, as I articulated before, that Mr. Grow

9  had submitted to Ms. Delgado and the attachments that pertain to

10  that, the total for all the beneficiaries identified, and I

11  identified approximately 676 beneficiaries and about 4,449

12  claims, this is the overall total to that.

13      So for copayment amount, the total came out to $37,545

14  for all the beneficiaries.  It went from, obviously, zero

15  copayment to $20 copayment, everybody was different.  And the

16  billed amount was in total that was submitted to Tricare was

17  48,000 -- I'm sorry, $48,320,259.38, and the total paid amount

18  was $39,408,499.02.

19  Q.  I'm sorry.  Did you say there were -- how many

20  individual, specific individual beneficiaries did you identify?

21  A.  Based on the documents that I reviewed, I was able to

22  identify, removing duplicates, approximately 676.

23  Q.  676 individual people?

24  A.  Individual beneficiaries, correct.

25  Q.  And how many individual claims?

1    A.    Approximately 4,449.

2    Q.    And what was the date range that comprised these claims that

3    you just testified about?

4    A.    Based on the email that I utilized, the date range that I

5    had was on or about November 2014 to August of 2015.

6    Q.    Okay.  I'm going to show you what's been admitted as

7    Government's Exhibit 170-A.  Can you explain for the jury what

8    this document is?

9    A.    This document is based on information that I reviewed and

10   based on the document that was provided through the email of the

11   percentage amounts as well, this is essentially a branch of --

12   for example, the Rambaran family, you have Rosalinda who

13   recruited, if you will, or had under her Rasheed, Latonya,

14   Tricosa and Tashawn; as well as under Rashaan, then Rashaan in

15   turn recruits Dryvaan.  I apologize if I am butchering the

16   names.

17   Q.    With respect to Rosalinda Rambaran, based on your analysis

18   of the Tricare claims data, was Ms. Rambaran a Tricare

19   beneficiary?

20   A.    Yes.

21   Q.    How about Rasheed Rambaran?

22   A.    Yes.

23   Q.    How about Rashaan Rambaran?

24   A.    Yes.

25   Q.    How about Dryvaan Rambaran?

Klein - Direct

138

1    A.   Yes.

2    Q.   What about the others?

3    A.   Yes.

4    Q.   Everybody on this screen was a Tricare beneficiary?

5    A.   That I could locate, yes.

6    Q.   Let's now look at Government's Exhibit 170-B.  I'm sorry,

7    hold on.  No, Page 2 of Government's Exhibit 170-A.

8         Can you explain for the jury what this document is?

9    A.   I took from Mr. Grow's spreadsheet of those individuals that

10   I previously identified in the previous exhibit and essentially

11   is this sum total of the billed, paid, the number of claims, the

12   specific doctor that was under those prescriptions, and the date

13   range that this applies to.

14        On the bottom you will see the specific ingredients for

15   these prescriptions and the number of times those ingredients

16   were used for each individual.

17   Q.   So when you say Rambaran family, what assumption did you

18   make in calling this the Rambaran family?

19   A.   When you see, for example, the sponsor ID number, it's

20   actually when you have a Tricare member, just like myself, I'm

21   the primary -- you know, I have my own insurance, I am the

22   primary, so any of my family members would be under me, same

23   thing with Tricare.  So the sponsor ID is that, it is one

24   individual, but it's the coverage for the family.

25        Then for the specific ingredients, for example, for the

1    first column, for the pain, when I looked at the claims data,

2    you would see for Dryvaan, for his respective claims, you would

3    see the number of times each one of these ingredients were

4    utilized.

5         So, for example, Dryvaan would be -- there was

6    prescriptions where on two occasions I would see it was under

7    pain, scar, you know, so forth, you know, et cetera.

8    Q.   Okay.  Can we briefly look at Page 3?  Now, what are you

9    stating in this document?

10   A.   Based on interviews that were conducted as well as the

11   documents that were submitted by Mr. Grow, it shows that

12   Mrs. Rambaran had recruited the following individuals and it's

13   outlined.  The slight difference is Rosalinda Rambaran did

14   recruit Rashaan Rambaran, but then he in turn recruited Dryvaan

15   Rambaran.

16   Q.   Okay.  What data, if any, did you look at in creating this

17   that came from Mr. Grow's documents?

18   A.   I looked at the claims data to see whether or not claims

19   were submitted for these respective individuals, which they

20   were, as well as reviewing interview reports.

21        MR. LARSEN:  Okay.  Could I get 170-B?

22   BY MR. LARSEN:

23   Q.   What is 170-B?

24   A.   This is another example.  As I did with the Rambaran family,

25   I did it the same way for the Bing family as a general outline.

1            So you have, you know, Joy Bing, who then recruited the

2  other individuals; Colette Bing, Vidal Bing, Oliver Thomas,

3  Nichole Powell and Rosalinda Rambaran, who obviously you had

4  seen from the previous exhibit.  Rosalinda in turn then

5  recruited her family members, so it kind of extends.

6  Q.  So Joy Bing is a Tricare beneficiary?

7  A.  Yes.

8  Q.  And how about Colette Bing and Vidal Bing?

9  A.  Yes.

10  Q.  Oliver Thomas and Nichole Powell?

11  A.  Yes.

12  Q.  So everyone on this document is also a Tricare beneficiary?

13  A.  Correct.

14  Q.  If we could look at Page 2 of the exhibit.  So Page 2 shows

15  a similar amount of data as you did for the Rambaran family.

16  Can you just briefly describe what you did here?

17  A.  Okay.  As in the previous exhibit, the same thing with the

18  Bing family where you have the sponsor ID number for that

19  respective family.  The total billed for the Bing family is

20  outlined, as well as the total paid, as well as the total number

21  of claims that were submitted for those respective individuals,

22  as well as the prescriber and the date range that this applies

23  to.  On the bottom of you have, again, the specific ingredients

24  that were used and identified through the claims data was

25  reviewed.

Klein - Direct

1  Q.  So the total paid amount here, the $337,999, whose claim is

2  that specifically related to?

3  A.  To the Bing family.

4  Q.  Joy Bing, Vidal Bing, and Colette Bing?

5  A.  Correct.

6  Q.  If we could look at Government's Exhibit 170-C.  Who's the

7  Powell family?

8  A.  The Powell family is another example to the previous Bing

9  family and Rambaran family.  Nichole Powell who had been

10  recruited by someone else, who then -- she is a Tricare

11  beneficiary who then recruited Joy Bing, Glenn Powell and Aisha

12  Owmby.

13  Q.  And everyone on this, Nichole Powell, Glenn Powell, and we

14  just talked about Joy Bing, and Aisha Owmby, is everybody on

15  this document a Tricare beneficiary?

16  A.  Yes.

17  Q.  If you look at Page 2, it says for the Powell family -- and

18  the Powell family, according to the document, is it Glenn Powell

19  and Nichole Powell?

20  A.  Yes.

21  Q.  Okay.  So the total amount paid for claims related to the

22  Powell family is what?

23  A.  Total billed is $373,816.36; total paid is $318,347.79 in

24  relation to 28 claims.

25  Q.  Finally, if we could look at Government's Exhibit 170-D.

Klein - Direct

1  Who is Philip Snodgrass?

2  A.  He is another Tricare beneficiary.

3  Q.  What did you do to create this document in 170-D?

4  A.  I segregated his claims data from Mr. Grow's spreadsheet and

5  identified a total of four claims and, you know, summarized the

6  total billed and the total paid, you know, the prescriber, as

7  well as the date range and the ingredients that were used to

8  make the prescription.

9  Q.  So a total of four claims and the total amount paid was the

10  second figure, the $26,336.81?

11  A.  Yes.

12        MR. LARSEN:  One moment, Your Honor.

13  BY MR. LARSEN:

14  Q.  On Government's Exhibit 67, you testified about the patient

15  list of Mr. Grow's and you said there were several other

16  attachments.  Could you just briefly describe what these other

17  attachments that you looked at were and what you used them for?

18  A.  The first attachment, which we saw a sub attachment to, is a

19  listing of beneficiaries that he had in alphabetical order with

20  names next to it and numbers next to it, which is like

21  percentages.  That's the first attachment.

22        The second one is outlining beneficiaries that he

23  brought into the company.  For example, it says Monty Grow,

24  2.21, 3.7.  When you open that attachment, it's showing February

25  21st to March 7th.

Klein - Cross

1    Q.   Okay.

2    A.   And the next one is Monty Grow, 3.8 through 3.21.  Again, it

3    reflects the date range of patients he brought in for March 8th

4    through March 21st, so on and so forth.  The next attachment,

5    Monty Grow, 3.22 through 4.4.  It's March 22nd through April

6    4th; and the last one that he has attached is Monty Grow, 4.5

7    through 4.18, which is April 5th through April 18th.

8             MR. LARSEN:  Thank you.  Nothing further, Your Honor.

9             THE COURT:  Cross-examination.

10                          CROSS-EXAMINATION

11   BY MR. MARCUS:

12   Q.   Good afternoon, Special Agent Klein.

13   A.   Good afternoon.

14   Q.   I want to start with some questions about the Tricare data

15   and Tricare itself.  Tricare is essentially a very large health

16   insurance program, right --

17   A.   Yes.

18   Q.   -- that provides benefits to military families and people in

19   the military?

20   A.   Yes.

21   Q.   One of the largest health care programs in the country,

22   right?

23   A.   Yes.

24   Q.   And as an insurance program, it reimburses for claims that

25   providers make to it.  Do you agree with that?

Klein - Cross

```
 1   A.  Yes.

 2   Q.  But you have to become a provider in order to submit a bill

 3   to Tricare for a claim.  Do you agree with that?

 4   A.  Yes.

 5   Q.  So for example, physicians can be providers, right?

 6   A.  Yes.

 7   Q.  Hospitals?

 8   A.  Yes.

 9   Q.  And pharmacies?

10   A.  Yes.

11   Q.  Mr. Grow is not a Tricare provider, is he?

12   A.  Not to my knowledge.

13   Q.  Right.  So just so it's clear to the jury --

14            MR. MARCUS:  Could you guys show the last email with

15   Mr. Grow's report on the computer?

16   BY MR. MARCUS:

17   Q.  Ms. Delgado worked with Mr. Grow, right?

18            MR. LARSEN:  Objection, foundation.

19            MR. MARCUS:  Well --

20            THE COURT:  Grounds.

21            MR. LARSEN:  Objection, foundation, Your Honor.

22            THE COURT:  Okay.  Does she know that?

23            Do you know that?

24            THE WITNESS:  I do not, Your Honor.

25            THE COURT:  Then that takes care of it.
```

Klein - Cross

1  BY MR. MARCUS:

2  Q.  Okay.  But you were part of the investigative team for this

3  case, were you not?

4  A.  Yes, but I came in very, very late on in the investigation.

5  Q.  Okay.

6  A.  Literally like less than two months ago.

7  Q.  Less than two months?

8  A.  Correct.

9  Q.  Okay.  So when do you think you started on the

10  investigation?

11  A.  November, late November I would say.  October-November time

12  frame, but fully vested, because we have so many cases, I would

13  say the past two months.

14  Q.  Okay.  So when you're talking about documents with Mr. Grow,

15  you're not talking about any documents submitted to Tricare, are

16  you?

17  A.  For these attachments?

18  Q.  Yes.

19  A.  No.  That I am aware of, those attachments were not

20  submitted to Tricare directly.

21  Q.  Are you aware of a single document that Mr. Grow ever sent

22  to Tricare?

23  A.  Him directly?  No.

24  Q.  Yes, him directly.

25  A.  No.  The answer is no, that I'm aware of.

Klein - Cross

146

1   Q.   And are you aware of any claim that was ever submitted by

2   Mr. Grow directly to Tricare?

3   A.   No.

4   Q.   So Exhibit 170 is a compilation of claims that were

5   submitted to Tricare for reimbursement; is that right?

6   A.   Correct.  That was submitted by PCA to Tricare for

7   reimbursement.

8   Q.   Right.  PCA is the pharmacy and they were a Tricare

9   provider.

10  A.   Correct.

11  Q.   Okay.  And so just so it's -- so all of this data that you

12  looked at relate to claims that the pharmacy submitted directly

13  to Tricare on behalf of prescription medications that it

14  provided to beneficiaries?

15  A.   It was submitted by PCA, but those names were obtained

16  through that email from Monty Grow to Ms. Delgado.

17  Q.   Well, I understand.  The email is separate.  There's an

18  email with Mr. Grow and Ms. Delgado that has an attachment that

19  lists some of the same patients, right, and some information

20  that you discussed on direct.

21  A.   Yes.

22  Q.   Right.  But the actual claims submissions that are sent to

23  Tricare, the billing, the claims reimbursement, none of that

24  came from Mr. Grow?

25  A.   For the physical claim, for example, for one of the

1    attachments that is not physically listed on Exhibit 67, it

2    lists the -- I believe it was the prescription number.  So, for

3    example, John Smith had specific numbers assigned to him and

4    then I would cross reference it with the master claims data from

5    PCA so that it fully aligned.  It's not just John Smith, it

6    fully aligned with specific claims that were then in turn

7    submitted by PCA that were billed and paid for by Tricare.

8    Q.   Okay.  I understand you were looking -- my question is

9    focused on -- we're just talking about the submission of claims.

10   Okay?

11   A.   Okay.

12   Q.   I mean, I could put them all here, but this is 128 pages and

13   this is just a summary of some of the claims, right, these are

14   beneficiaries, and you went through on direct and explained the

15   categories, right?

16   A.   Yes, sir.

17   Q.   Okay.  For all of the claims in this entire document, all of

18   them were submitted by PCA to Tricare, correct?

19   A.   Correct, but they were submitted by Mr. Grow to Ms. Delgado

20   who -- okay.  I'm sorry.

21   Q.   Because I don't want it to be confusing.  So we talked about

22   Tricare is an insurance program, correct?

23   A.   Yes, sir.

24   Q.   In order to send a claim to Tricare, you have to be a

25   provider.  Do you agree with that?

Klein - Cross

1  A.  Yes.

2  Q.  You actually have to sign a provider agreement, it's

3  essentially a contract.  You agree with that?

4  A.  Yes.

5  Q.  And you get a number and that allows you to submit claims

6  for reimbursement for medical services you provide?

7  A.  Yes.

8  Q.  Okay.  Pharmacies, for example, have a provider number?

9  A.  Correct.

10  Q.  PCA had a provider number?

11  A.  Correct.

12  Q.  And all of the patient data you looked at in this case

13  related to prescriptions that PCA filled for Tricare

14  beneficiaries?

15  A.  Correct.

16  Q.  And for that reimbursement claim -- for the claims that were

17  submitted, you went through and you showed the amounts per

18  claim.  Every single claim that was submitted to Tricare came

19  from PCA.  Do you agree with that?

20  A.  For the billed and paid amount, it was done by PCA and paid

21  for by Tricare to that company, yes.

22  Q.  Right.  They're the ones lawfully that submit the claim

23  because they are the actual medical provider, in this case the

24  prescription drug provider.  Do you agree with that?

25  A.  Yes.

Klein - Cross

149

1   Q.   Okay.  And in fact, Tricare hires a pharmacy benefit manager

2   to administer Tricare and look at all of these claims that are

3   submitted to it.  It's a company called Express Scripts.  Have

4   you heard of that name?

5   A.   Yes.

6   Q.   We sometimes call them PBM for short, but it's prescription

7   benefit manager, correct?

8   A.   Correct, yes.

9   Q.   And Express Scripts provides those services to Tricare on a

10  contract basis?

11  A.   Yes.

12  Q.   And in fact, Express Scripts acts as a PBM for private

13  insurances like Aetna or Humana, for example?

14  A.   Yes.

15  Q.   And they're paid to do that?

16  A.   Nothing is free, yes.

17  Q.   Nothing is free.  And they screen these claims, do they not?

18           MR. LARSEN:  Objection, foundation.

19           THE COURT:  How does she know that?

20           How do you know that, who screens?

21           THE WITNESS:  I do not, Your Honor.

22           THE COURT:  Okay.  I'll sustain the objection.

23  BY MR. MARCUS:

24  Q.   Well, you were talking about the claim submission process.

25  So you're not familiar through your work as to the Tricare

1  reimbursement process?

2  A.  A very general understanding, but the intricate details of

3  how that process works, no.

4  Q.  Okay.  Well, in the data you looked at there were

5  prescriptions, right, from a medical doctor for every single

6  claim?

7  A.  Correct.

8  Q.  Right.  And the reason for that --

9  A.  If I can clarify.  Based on the ones that I saw, I saw

10  prescriber.

11  Q.  You saw prescriber, just like, for example, this column,

12  right, prescriber?

13  A.  Yes, correct.

14  Q.  Right.  And that denotes a physician that can lawfully

15  prescribe prescription medications?

16          MR. LARSEN:  Objection, foundation.

17          THE COURT:  Does she know that?  How does she know

18  that?

19          Do you know that?

20          THE WITNESS:  I do not know, Your Honor.

21          THE COURT:  Okay.  Sustained.

22  BY MR. MARCUS:

23  Q.  Well, did you put together this chart?

24  A.  Yes, I did, sir.

25  Q.  So every document -- you looked at claims to put this

Klein - Cross

151

1  together, right?

2  A.  I reviewed the claims based on the specific documentation,

3  that email with those respective attachments that I explained

4  before, to compare it with that master claims data, yes.

5  Q.  Right.  And for each claim you saw a prescriber, correct?

6  A.  I believe that for every one, I did see a prescriber.  I

7  mean, there was literally -- there are, as I said before, 4,449

8  claims.  If you don't mind, I would like to look at, you know,

9  the 128 pages just to verify that every single line item had a

10 prescriber, but I believe that it did, but I don't want to say

11 for certain.

12 Q.  Okay.  But to your memory, based on the work you did, you

13 recall seeing prescriptions and prescriber information for the

14 claims?

15 A.  Yes, correct.

16 Q.  And that last page that Mr. Larsen showed you which broke

17 down the billing amount -- which I think was around $48 million

18 or so?

19 A.  Yes.

20 Q.  And then the paid amount was 39 million.  You saw that?

21 A.  Yes.

22 Q.  So Tricare or Express Scripts as the PBM, denied some

23 claims?

24          MR. LARSEN:  Objection, foundation.

25          THE COURT:  Do you know that?

1          THE WITNESS:  I do not.

2          THE COURT:  Okay.

3    BY MR. MARCUS:

4    Q.  You do not know the difference between a claim that is

5    billed and a claim that is paid?

6    A.  A general understanding, but the intricate details behind

7    it, no.

8    Q.  When you put together --

9          MR. MARCUS:  Could you just bring up that last page?  I

10   don't think -- it's not physically attached to 170.

11         THE COURT:  It's not going to go on unless someone is

12   there.  So if you're going to do that -- I can't just have

13   someone sitting there just waiting for that.

14         Now it's on.

15   BY MR. MARCUS:

16   Q.  You prepared that page?

17   A.  The summation page, yes.

18   Q.  So you prepared billed amount and paid amount, but you don't

19   know what they mean?

20   A.  The billed amount is the amount that the company submitted,

21   you know, for the claim, for each respective claim, and that's

22   the ultimate total.  The paid amount is what the insurance

23   physically paid.

24   Q.  And you would agree that insurance in this case, Tricare,

25   paid about 9 million less than was billed?

Klein - Cross

153

 1  A.  I don't have a calculator.  I'll take your word for it.

 2  Q.  Okay.  Well, the amounts speak for themselves on the screen,

 3  correct?

 4  A.  Yes.

 5  Q.  And the paid amount is less than the billed amount?

 6  A.  Yes.

 7          MR. MARCUS:  Your Honor, I apologize.  Can I indulge to

 8  switch back to the ELMO?  I promise I won't do it again.  Thank

 9  you.

10          THE COURT:  Don't make a promise you aren't able to

11  keep.

12  BY MR. MARCUS:

13  Q.  Agent Klein, on direct you testified that the fill date is

14  the date that the prescription is filled, correct?

15  A.  Correct.  That's my understanding of how it worked.

16  Q.  Right.  So --

17          THE COURT:  Where did you get that information?

18          THE WITNESS:  Through reviewing claims data, speaking

19  with representatives from the defense health agency, you know,

20  through Tricare.

21          THE COURT:  But how would you get the fill date?

22          THE WITNESS:  Through the claims data itself.

23          THE COURT:  And it said fill date?

24          THE WITNESS:  Correct.  Yes, Your Honor.

25          THE COURT:  Someone had put fill date on it?

Klein - Cross

154

1              THE WITNESS:  Yes.  When we received the claims data

2   information, it has all of those headers for us.

3              THE COURT:  Okay.  Go ahead.

4   BY MR. MARCUS:

5   Q.  Okay.  So for Mr. Featherston, I'll just highlight it so you

6   can see it on the screen, there's a fill date of January 9th of

7   2015.  Do you see that?

8   A.  Yes.

9   Q.  And this next column is adjudication date.  Do you see that?

10  A.  Yes.

11  Q.  That's when the claim is adjudicated by Tricare?

12  A.  Yes.

13  Q.  And it's the same date, January 9th?

14  A.  Yes.

15  Q.  And this is when Tricare decides if the claim submitted, in

16  this case by PCA, the pharmacy, is appropriate to be reimbursed?

17  A.  Yes.

18              MR. MARCUS:  Without objection, Your Honor, I'm going

19  to offer into evidence Government's Exhibit 171.

20              THE COURT:  All right.  Admitted.

21     (Government's Exhibit Number 171 was received in evidence.)

22  BY MR. MARCUS:

23  Q.  And again, just for the first Tricare beneficiary, this is a

24  gentleman named Philip Snodgrass.  Do you see that?

25  A.  Yes, sir.

Klein - Cross

155

1   Q.  Could you just tell us what the fill date is?

2   A.  December 29, 2014.

3   Q.  Thank you.  And the prescription number?

4   A.  105565.

5   Q.  And just to state the obvious, you would agree that December

6   comes before January or February on the calendar?

7   A.  Yes.

8   Q.  Of 2014.  So, for example, December 29, 2014 comes before

9   January 28, 2015?

10  A.  Correct.

11  Q.  It's an earlier date.  Thank you.

12          THE COURT:  Redirect.

13          MR. MARCUS:  Oh, no --

14          THE COURT:  Oh, when you say "thank you," I thought you

15  were at the end.

16          MR. MARCUS:  I'm getting there.  I'm getting there.

17          THE COURT:  You don't have to thank her for each one.

18  When I hear "thank you," I'll know you're finished.

19          MR. MARCUS:  Understood.

20  BY MR. MARCUS:

21  Q.  So when you were compiling the data for these various

22  claims, you saw that a lot of these prescriptions, drugs, cost

23  thousands of dollars.  Is that fair to say?

24  A.  Yes.

25  Q.  And that reimbursement price is something set by Tricare and

1    Express Scripts for prescriptions?

2              MR. LARSEN:  Objection, foundation.

3              THE COURT:  How do you know that?  Do you?

4              THE WITNESS:  I do not know, Your Honor.

5              THE COURT:  Then I'll sustain the objection.

6    BY MR. MARCUS

7    Q.  You know that all these claims were processed and approved

8    by Tricare?

9    A.  I don't know what was truly processed and paid.  I only have

10   the certified claims data from Tricare, which I believe was

11   Exhibit Number 1, so I'm taking for face value that that is the

12   accurate information.

13   Q.  Right.  And it shows claims by date, it shows prescribers,

14   correct?

15   A.  Yes.

16   Q.  It shows the amounts that are claimed, the amounts billed,

17   and the amounts paid?

18   A.  Yes.

19   Q.  And an adjudication date?

20   A.  Yes.

21   Q.  Okay.  Now, have you ever seen like an Explanation of

22   Benefits?  Have you ever like stayed in a hospital, for example,

23   and seen an Explanation of Benefits for a hospital stay?

24   A.  Yes, I have.

25   Q.  Okay.  And fair to say that items that are billed to you

1  while you stay in the hospital can be very expensive?

2  A.  Yes.

3  Q.  Have you, yourself, seen prescription medications, the

4  sticker price for some of these medications on an Explanation of

5  Benefits?

6  A.  That I can recall off the top of my head, no.

7  Q.  But from your own personal experience you've seen medical

8  services that are billed that are on the sticker price very

9  high?

10  A.  For example, for prescriptions for me personally, I go to

11  CVS, so it will be $10, it will be $25.  You know what I mean?

12  I don't see an exuberant amount that I don't have to personally

13  pay, and I don't see it on the benefits.

14  Q.  Right.  Because you have health insurance and your health

15  insurance has a certain rate and a benefit in terms of

16  reimbursement, it's contractual?

17          MR. LARSEN:  Objection, relevance.

18          THE COURT:  Overruled on that basis.

19  BY MR. MARCUS:

20  Q.  And if you stayed in a hospital, if you had surgery for

21  example, and you were given Motrin, do you think you would be

22  paying the same price on that Explanation of Benefits for your

23  hospital stay as you would if you were just buying Motrin over

24  the counter at like at a CVS?

25  A.  I don't know honestly.

Klein - Cross

 1   Q.   Would it surprise you if it was a lot more?

 2            MR. LARSEN:   Objection, foundation, asked and answered.

 3            THE COURT:   Well, probably true, but is there really

 4   any disagreement that that occurs from time to time?  You're too

 5   young to have health --

 6            MR. LARSEN:   I don't think there's a disagreement.

 7   It's just we're going way beyond the scope.

 8            THE COURT:   So it doesn't matter.  All right.  So I'll

 9   overrule the objection.

10   BY MR. MARCUS:

11   Q.   Agent Klein, also you said you joined the investigation, you

12   participated as part of the investigation in this case.

13   A.   Correct, sir.

14            THE COURT:   But you're not going to ask her to tell you

15   what she found in the investigation, are you?  Because that

16   would be hearsay, she would hear things, read things.

17            MR. MARCUS:   I am not going to ask her that.

18            THE COURT:   Oh, I just want to make sure because that

19   happens a lot, usually from the other side.  All right.

20   BY MR. MARCUS:

21   Q.   You attended an interview with a witness named Deanna

22   Dutting, D-u-t-t-i-n-g, correct?

23   A.   I don't think so, no.

24            THE COURT:   You're going to ask her about someone

25   else's statement to her?

1              MR. MARCUS:  I wasn't going to ask what the statement

2  was.

3              THE COURT:  Are you going to ask her if she interviewed

4  her?

5              MR. MARCUS:  Yes.

6  BY MR. MARCUS:

7  Q.  You've reviewed interview reports in this case?

8  A.  Yes, but I was not part of an interview with Ms. Dutting.

9              THE COURT:  You've been there two months, right, on

10  this case?

11             THE WITNESS:  Correct, yes, Your Honor.

12  BY MR. MARCUS:

13  Q.  Are you aware that --

14             THE COURT:  I've got to interrupt.  When you say "are

15  you aware," we are aware of things when we read things, right,

16  like reports?  We're aware of things when we see things, and

17  we're aware of things when we hear things.  If we hear things,

18  we have hearsay and the jurors already are now graduates based

19  on the hearsay rule.

20             There's no see-say rule, so she can testify about what

21  she saw, and if she used it to compute her summary of charts of

22  what was paid and what was asked, she can testify about that.

23  But I don't know if she can testify about what she was aware of

24  from looking at reports.

25             Do you think she's able to testify about that?

Klein - Cross

1          MR. MARCUS:  I'll phrase it in a better way.

2          THE COURT:  Do you think she can do that?

3          MR. MARCUS:  No, I wasn't asking --

4          THE COURT:  All right, as long as we agree.  I agree

5   with you because I wouldn't want to let then the prosecutor asks

6   those on redirect and then we've got all kinds of things.

7   BY MR. MARCUS:

8   Q.  Let me ask it this way:  As part of the investigative team,

9   have you listened to recorded conversations from anyone in this

10  case?

11  A.  No, I have not.

12  Q.  You have not seen any?

13  A.  Seen any recorded conversations?

14  Q.  Well, have you seen any CDs or media of recorded

15  conversations physically?

16  A.  No, sir.

17  Q.  Okay.  I'll move on.

18          THE COURT:  How much longer do you have of this summary

19  witness?

20          MR. MARCUS:  Very short, Your Honor.

21          THE COURT:  I don't know what that means, but I'll

22  accept it.

23          MR. MARCUS:  Less than five minutes.

24          THE COURT:  That is short.  I'll take it.

25          MR. MARCUS:  Okay.

Klein - Cross

1   BY MR. MARCUS:

2   Q.  So Mr. Grow's hotmail account was subpoenaed by law

3   enforcement as part of this investigation?

4           MR. LARSEN:  Objection, foundation.

5           THE COURT:  Sustained.  Did you do anything with that?

6           THE WITNESS:  No, Your Honor, I did not.

7           THE COURT:  Sustained.

8   BY MR. MARCUS:

9   Q.  Okay.  Let me show what's already in evidence as Exhibit 70.

10  Do you agree that in the "from" line, this is an email sent by

11  Mr. Grow?

12  A.  Yes, sir.

13  Q.  Okay.  And are you familiar with Bates numbers?

14  A.  Yes, I am, sir.

15  Q.  They're numbers when you produce documents to denote the

16  source of the production?

17  A.  Yes.

18  Q.  And the production here is, the number is -- in the bottom

19  right-hand corner it is MG 116986?

20  A.  Yes, sir.

21  Q.  Okay.  Let me show you another document that's in evidence.

22  That is Government's Exhibit 142.

23          Can you see that this is an email from Monty Grow's

24  hotmail account?  See that?

25  A.  Yes, sir.

Klein - Cross

162

1   Q.  Okay.  This Bates range, though -- that's PCAX.  Do you see

2   that?

3   A.  Yes, sir.

4           MR. LARSEN:  Objection, foundation.

5           THE COURT:  Well, all she's doing is saying that's what

6   it says, so I'll overrule the objection.

7           Do any other jurors not know how to read?  You all know

8   how to read?  Okay.  No problem.

9   BY MR. MARCUS:

10  Q.  PCA is short for Patient Care of America, the pharmacy,

11  right?

12  A.  My understanding is yes.

13  Q.  Okay.  Let me just show you one last document, this is also

14  in evidence, this is Defense Exhibit 202-I.  It's titled

15  Participant Information and Consent Form.

16          Do you see that?

17  A.  Yes, sir.

18  Q.  And you would agree that this Bates number is not either MG

19  or PCA?

20  A.  Based on the number shown, no, it is not.

21  Q.  The letters there are GL?

22  A.  Yes, sir.

23  Q.  And just so it's clear, I'll show you the pages and just

24  stop me -- it's a three-page document.  You would agree there's

25  no email attached to this document?

1    A.   That I see you flipping through?  No, sir.

2          THE COURT:  No, there's no email attached.

3          THE WITNESS:  No, there's no email attached.  Sorry.

4    BY MR. MARCUS:

5    Q.   Agent Klein, on the charts that you made for the different

6    families that showed their claims that were submitted to

7    Tricare -- do you recall those charts?

8    A.   Yes, sir.

9    Q.   -- you used the word "recruit" a lot.  That's your term.

10   A.   That's based on reports that I have read.

11   Q.   Not based on your knowledge, personal knowledge?

12   A.   Personal knowledge as far as the investigation and what I've

13   read?  I'm sorry.

14   Q.   You didn't talk to any of those people personally?

15   A.   For those family members, I did not, sir, no.

16   Q.   So you don't know -- when you use that term "recruit,"

17   that's not based on any direct hand knowledge of the facts?

18   A.   Based on those investigative reports that I read --

19   Q.   I'm not asking you --

20   A.   I'm sorry.  If I spoke to the individuals?  No.  To answer

21   your question, no, correct.

22   Q.   Okay.  Sales representatives can market products in this

23   country; that's not a crime, is it?

24          MR. LARSEN:  Objection, foundation.

25          THE COURT:  You're going to ask her what's a crime or

1    not?

2           MR. MARCUS:  I'll withdraw that.

3           THE COURT:  Okay.

4           MR. MARCUS:  Thank you, Your Honor.

5           THE COURT:  Any redirect?  That's not direct all over

6    again, just redirect?

7           MR. LARSEN:  No redirect, your Honor.

8           THE COURT:  Thank you.  You're excused.

9        (The witness was excused.)

10          THE COURT:  Who is your next witness?

11          MR. JUENGER:  Lisa Klitz, Your Honor.

12          THE COURT:  All right.  Are you all okay?  You're

13   troopers.  Do you need a bathroom break?  You're all okay?

14   Excellent.

15          Right over here, please.  Raise your right hand.

16          LISA KLITZ, GOVERNMENT'S WITNESS, SWORN.

17          THE COURT:  Get comfortable.  Get as comfortable as you

18   can and tell us your name, please.

19          THE WITNESS:  My name is Lisa Klitz, K-l-i-t-z.

20          THE COURT:  Thank you very much.  Go ahead.

21                         DIRECT EXAMINATION

22   BY MR. JUENGER:

23   Q.  Good afternoon, Ms. Klitz.  Can you please tell us where you

24   live, city and state?

25   A.  Coral Springs, Florida.

Klitz - Direct

165

1   Q.   What do you do for a living?

2   A.   I'm a senior financial investigator for Renzulli &

3   Associates.

4   Q.   And for the benefit of our court reporter can you spell

5   Renzulli, please?

6   A.   R-e-n-z-u-l-l-i.

7   Q.   And what kind of company is Renzulli & Associates?

8   A.   They are a Government contractor.

9   Q.   What kind of services do they provide?

10  A.   They provide financial analysis services to the Department

11  of Defense.

12  Q.   And can you briefly describe your education and experience

13  as a financial investigator?

14  A.   I have a four-year Bachelor's Degree in business

15  administration, with a major in accounting.   I was employed by

16  the Internal Revenue Service, Criminal Investigation Division

17  for approximately 27 years, 24 years as an agent and three years

18  as a supervisor.

19  Q.   And what type of cases did you work on generally?

20  A.   Fraud cases; mortgage fraud, health care fraud, public

21  corruption, tax fraud, all financial investigations.

22  Q.   And are you familiar with an investigation of a pharmacy

23  called Patient Care America?

24  A.   I am.

25  Q.   And were you asked to do some analysis of the bank records

1   related to that investigation?

2   A.  I was.

3   Q.  And so I want to show you some documents.

4          MR. JUENGER:  Your Honor, if I may, without objection

5   from the defense, I have a number of documents I would like to

6   introduce.

7          THE COURT:  Okay.  You've got to tell me what they are.

8          MR. JUENGER:  They are Government's 3, 4, 4-B, 4-C,

9   4-D, 11, and 159 through 169 inclusive, and Government's 5, 6,

10  7, 8, 9.

11         THE COURT:  Without objection, they will be admitted.

12     (Government's Exhibit Numbers 3, 4, 4-B, 4-C, 4-D, 5, 6, 7,

13  8, 9, 11, 159 through 169, were received in evidence.)

14  BY MR. JUENGER:

15  Q.  Ms. Klitz, I'm showing you -- I'm just going to hold them up

16  for you, what's marked as Government's Exhibit 3 and

17  Government's Exhibit 4.  Do you recognize these?

18  A.  I do.

19  Q.  And can you tell us what's on Government's Exhibit 3?  It's

20  a CD.

21  A.  Bank accounts belonging to PCA or DCRX.

22  Q.  And as far as Government's Exhibit 4, can you tell us what's

23  on Government's Exhibit 4?

24  A.  Bank accounts belonging to MGTEN Marketing Group and Monty

25  Grow.

1  Q.  And how many accounts total are on Government's Exhibit 4?

2  A.  At least the two MGTEN Marketing Group accounts at Bank of

3  America and the Monty Grow personal account at Bank of America.

4  Q.  And have you reviewed all of those bank records on

5  Government's Exhibit 4?

6  A.  I have.

7  Q.  And did you prepare summaries today, or prior to today, of

8  those bank records on Government's Exhibit 4?

9  A.  I did.

10  Q.  Now, before we take a look at those summaries, I want to

11  talk about the two MGTEN corporate accounts that you just

12  mentioned.

13        Who's the signatory on both of those accounts?

14  A.  Monty Grow.

15  Q.  And I'm going to show you, if you can see on the ELMO, this

16  is Government's Exhibit 4-B, and can you tell the jury what this

17  is?

18  A.  This is the signature card for the account opening, the

19  account number ending 4176 at Bank of America, the name MGTEN

20  Marketing Group, Inc.

21  Q.  If you look at the bottom of that first page, who's the

22  signatory on this account?

23  A.  Monty Ray Grow.

24  Q.  And I'm now going to show you Government's Exhibit 4-C, and

25  can you tell us what this is?

1   A.   The same type of form, the signature card when the account

2   was opened for MGTEN Marketing Group, Inc., account ending in

3   4397 at Bank of America.

4   Q.   And according to the bank records for both of those accounts

5   we looked at, 4-B and 4-C, does anyone else have any interest in

6   any of those accounts other than Monty Grow?

7   A.   No.

8   Q.   Is anyone else besides Mr. Grow authorized to conduct any

9   transactions from those accounts?

10  A.   No.

11  Q.   And does your review of the records suggest in any way that

12  anyone other than Mr. Grow conducted transactions out of either

13  one of those accounts?

14  A.   No.

15  Q.   All right.  I want to show you Government's Exhibit 11, and

16  can you tell the jury what Government's 11 is?

17  A.   The records from the State of Florida, Secretary of State

18  when the corporation was organized, or in this instance,

19  dissolved.

20  Q.   And what company are we talking about?

21  A.   MGTEN Marketing Group, Inc.

22  Q.   And based upon your review of these records -- and I'm

23  flipping through several pages so the jury can just see the

24  documents -- who is the person who holds the interest in MGTEN

25  Marketing Group?

Klitz - Direct

1    A.   Monty Grow.

2    Q.   And the incorporator?

3    A.   The incorporator?

4    Q.   Who is the incorporator?

5    A.   Monty Grow and Frederick Mills.

6    Q.   And throughout the existence of that company, who was the

7    president, director, and so forth?

8    A.   Monty Grow.

9    Q.   And do the corporate records listed in Government's 11 match

10   up with the information in those two bank signature opening

11   cards?

12   A.   They do.

13   Q.   All right.  I want to show you now what's been admitted as

14   Government's Exhibit 4-D, and can you tell the jury what this

15   is?

16   A.   That is, again, a signature card, but this is for the

17   personal account at Bank of America for Monty Grow, account

18   number ending in 6597.

19   Q.   And who is the signatory on this account?

20   A.   Monty Grow.

21   Q.   And according to these bank records, does anyone else have

22   any interest in this account?

23   A.   No.

24   Q.   Is anyone else besides Mr. Grow authorized to conduct any

25   transactions from this account?

Klitz - Direct

170

1    A.   No.

2    Q.   And does your review of the records suggest in any way that

3    anyone other than Mr. Grow conducted transactions out of this

4    account?

5    A.   No.

6    Q.   Okay.  Now, if we can turn to the summaries, and I'm going

7    to start with -- well, in general terms describe for the jury

8    what you were asked to do, what types of summaries you made and

9    what the purposes were.

10   A.   I reviewed the statements and backup items that we received

11   from Bank of America for the three different accounts, the two

12   corporate accounts and the personal account.  I traced the funds

13   into those accounts and the funds out of those accounts and then

14   prepared summaries to illustrate that flow of funds.

15   Q.   And the jury should now be able to see Government's Exhibit

16   159.

17           Is this an exhibit you created?

18   A.   Correct, it is.

19   Q.   And if you would -- well, let's start with, what is the date

20   range on your analysis here?

21   A.   Approximately October 2014 through June of 2016.

22   Q.   And if you could maybe start in the top left and describe

23   for us the transactions that you traced through these bank

24   records.  What is the icon in the top left where I'm indicating

25   here?

A.   In the top left corner the icon is used to illustrate the funds coming from the Patient Care America account at Chase Bank, account ending in 6983, that were issued to Monty Grow and his corporate entity MGTEN.  So you'll see in the top line from the 6983 account, moving over to the right, to the MGTEN Bank of America account ending in 4397, there were distributions by Patient Care America to MGTEN of $19,582,503.

Q.   And how about going down from the PCA icon, what does that represent?

A.   Right.  Then there were also payments made directly to Monty Grow by Patient Care America totaling $1,183,590.

Q.   And how were these transactions conducted?  If they weren't all the same, maybe indicate the division between them, but were they checks, wires, some other form of transaction?

A.   They are almost exclusively all electronic transfers.  There was one check that was issued into the personal 6597 account by DCRX, but the remainder of the payments were made electronically to the two accounts.

Q.   And the account that I'm indicating in the center left, Monty Grow account BOA 6597, who controls that account?

A.   Monty Grow.

Q.   And the account in the top right, MGTEN BOA 4397, who controls that account?

A.   Monty Grow.

Q.   And then if we can continue on, from the MGTEN BOA account

Klitz - Direct

1   4397, I'd like you to explain where the money flows from there,

2   but I want to start with the question:  When the time of your

3   analysis began, how much money was in that account?

4   A.   There was about 10,000 -- just a little over $10,000 in the

5   4397 account when these transfers began.

6   Q.   And when was that date more or less?

7   A.   October 2014.

8   Q.   And so tell us where that $19,582,503 ends up.

9   A.   There were transfers from the 4397 account, the MGTEN Bank

10  of America 4397 account, to the other MGTEN Bank of America

11  account ending in 4176 of 19,201,371.  There were also transfers

12  totaling 1,057,000 from the MGTEN Bank of America 4397 account

13  to the Monty Grow personal account at Bank of America ending in

14  6597.

15  Q.   Okay.  And I want to make an observation and ask for your

16  comment.  Where I'm indicating 19,200,000 was transferred from

17  account 4397 to account 4176, 19.2 million, and then another 1

18  million and change was transferred to the personal account,

19  correct?

20  A.   Correct.

21  Q.   If you add those two figures together, 19 million and 1

22  million, it exceeds the 19 million that was transferred from

23  PCA, correct?

24  A.   Correct.

25  Q.   And so can you explain the difference there?

Klitz - Direct

1   A.  Yes.  There were additional deposits into the 4397 account.

2   There were approximately $424,000 in deposits made that were

3   described on the statement as counter credits.  I was actually

4   on the phone with the bank just as I walked in, and to date --

5   Q.  Let me stop you.  You just described 400,000 in counter

6   credits.  What is a counter credit and were there any examples

7   of what that was within the bank records you actually reviewed?

8   A.  There was one other deposit described as a counter credit

9   that I did receive the backup for, and it was the one check that

10  DCRX cut to Monty Grow and it was deposited.  And counter credit

11  simply means it's a deposit that was made inside the bank facing

12  a teller.

13  Q.  Okay.  So that's $400,000.  What's the remaining unaccounted

14  for amount?

15  A.  There was a little over $200,000 in deposits from a company

16  by the name of InforMD.  I'm not exactly sure how you say it.

17  It's I-n-f-o-r-m-d, LLC.

18  Q.  And that accounts for how much?

19  A.  A little over 200,000.

20  Q.  How were those InforMD, LLC payments made?  Was it one lump

21  sum, were they spread out?  Can you describe those?

22  A.  They were electronic transfers as well.  The 200,000 relates

23  to the time period that was relevant to my analysis, October

24  2014 through -- I think they ended in July of 2015.  There were

25  additional transfers made prior to my time frame.  I think the

Klitz - Direct

174

1  very first one was in June of 2014, and they occurred

2  approximately monthly, a couple, 3, 2, $1,000 monthly.

3  Q.  And so just to sum that up, it was about 200,000 spread out

4  over what time period?

5  A.  The 200,000 was from October of 2014 to July of 2015.

6  Q.  Okay.  And now if I can direct your attention back to the

7  Monty Grow personal account, Bank of America 6597, that

8  received -- correct me if I'm wrong -- about 10 and a half

9  million; is that correct?

10 A.  No, a little bit more than that.  It received from three

11 sources.  It received 1.1 million from the PCA account, it

12 received a little over a million from the MGTEN Bank of America

13 4397 account, and then it received about 9.4 million from the

14 MGTEN 4176 account.

15 Q.  That's why you do this and not me.  What's the total then

16 that was sent into that account?

17 A.  Just over 11 -- like about 11.5 million, 11.6, right around

18 there.

19 Q.  And then below that account you see these outward arrows to

20 the blue squares.  What do those represent?

21 A.  Financial transactions out of the 6597 account.

22 Q.  And do these total up the entire expenditures out of this

23 account?

24 A.  No.

25 Q.  And what are these then?

1    A.   Primarily asset purchases.

2    Q.   And did you do summaries of those asset purchase

3    transactions?

4    A.   I did.

5    Q.   And we notice that this box here I'm pointing at says U.S.

6    Treasury.   That can't possibly be an asset purchase, is it?

7    A.   No.   People don't generally refer to those as asset

8    purchases.

9    Q.   What is it?

10   A.   Payment of taxes.

11   Q.   And then if I can direct your attention back to the

12   right-hand side, this is the MGTEN corporate account, Bank of

13   America 4176, correct?

14   A.   Correct.

15   Q.   And it received a total of 19,200,000?

16   A.   Correct.

17   Q.   And then this shows 19.3 million went to the personal

18   account?

19   A.   Correct.

20   Q.   And then what are these other two transactions below it?

21   A.   The first one, the 90,478, is the purchase of a Range Rover

22   from Land Rover of Naples titled in the name of MGTEN Marketing,

23   and the other one is a payment made to sales reps and

24   beneficiaries and those payments total $8,748,971.

25   Q.   And for each of these -- well, for the Land Rover of Naples

Klitz - Direct

1  transaction, did you do a summary of that transaction?

2  A.  Yes, reviewed the file and traced the funds from the bank

3  account to the company.

4  Q.  And we'll look at that in just a moment.  Here you also

5  have, as you just described, the $8.7 million to sales reps and

6  benes.  Did you do a summary of that as well?

7  A.  I did.

8  Q.  Let's then turn to Government's Exhibit 160.  Ms. Klitz, is

9  this a summary that you created, Government's 160?

10  A.  It is.

11  Q.  What does this show?

12  A.  This shows now the 8.8 million that came out of the MGTEN

13  4176 account and the different categories of payments that were

14  made either to sales reps or to beneficiaries and/or sales reps.

15  Q.  And in order to calculate those, did you, in effect, create

16  other summaries of each of these transactions?

17  A.  Yes.

18  Q.  Can you describe what you did?

19  A.  I went through the bank account and analyzed all the

20  payments out, sorted them by entity, created a master list and

21  then summarized after the determination was made by the case

22  agent as to what the nature of the entity or individual was.

23  Q.  Okay.  And let's start with looking at the summary of this

24  transaction, and I'll show you Government's Exhibit 162.  Tell

25  the jury what this document is.

1   A.   That's the listing of names of the individuals or entities,

2   because there are some entities, not just individuals in there,

3   and the total of payments made to each one of them because most

4   of them received multiple payments.

5   Q.   And is it fair to say that you looked into this bank account

6   for MGTEN sales and you actually located all of these

7   transactions --

8   A.   Yes.

9   Q.   -- to these individuals or entities?

10  A.   Yes, they came out of the MGTEN 4176 account.

11  Q.   What was the total figure when you summed up all of those

12  payments?

13  A.   $7,605,584.

14  Q.   And that is reflected -- if we go back to Government's 160,

15  that's how you calculated the total payments to sales reps?

16  A.   Correct.

17  Q.   Did you create a similar document for the payments to what

18  we have listed here as bene, sales reps on the right-hand side

19  of that?

20  A.   Yes.

21  Q.   Now, I'm going to show you Government's 162, and tell the

22  jury what this is.

23  A.   This is the same type of listing.  It's an alphabetical

24  summary of the payments made to entities or individuals that

25  were identified by the case agent as either beneficiaries and/or

1   sales reps, and the total paid to each one of them out of the

2   4176 account.

3   Q.  And so you went through those bank records and confirmed

4   that these transactions were in there?

5   A.  I did.

6   Q.  And what's the sum total -- this is obviously a much longer

7   list, it's three pages.  Do you know how many of the individuals

8   are in here?

9   A.  No, not off the top of my head, sorry.

10  Q.  But what is the total on Page 3?

11  A.  $1,123,577.

12  Q.  And now I'm showing you what has been admitted as

13  Government's Exhibit 163.  Can you describe for the jury what

14  this summary is?

15  A.  These are the payments, not all of them, but some of the

16  payments made by PCA to either the MGTEN Marketing 4397 account

17  or the Monty Grow 6597 account.

18  Q.  And so I'm going to go back and show kind of the original,

19  Government's 159, which is your large outline, correct?

20  A.  Correct.

21  Q.  And point to the jury which -- no, don't point to the jury.

22  I will point to the jury and you confirm.  What you just talked

23  about was the summary of some of the transactions from PCA Chase

24  6983 over to MGTEN BOA 4397, correct?

25  A.  Correct.  That's the first grouping on the page underneath.

1  Q.  And then the second grouping at the bottom of that chart are

2  the transactions that go from PCA Chase 6983 down to Monty

3  Grow's personal account?

4  A.  Correct.

5  Q.  Let's then go back to Government's Exhibit 163, and did you

6  confirm in the bank records that all of these transactions took

7  place on all of these dates?

8  A.  I did.

9  Q.  It lists on the far left count numbers, from the top, Count

10  11, 12, 13, and so on down to Count 33.  Can you tell us what

11  those are?

12  A.  They correspond to the counts in the Superseding Indictment.

13  Q.  And so for Count 12 in the Superseding Indictment it

14  lists --

15  A.  10.  Count 10.

16  Q.  Forgive me.  Thank you.  For Count 10 in the Superseding

17  Indictment, it lists a payment of 85,946, correct?

18  A.  Correct.

19  Q.  And you actually located that transaction on that date

20  inside the bank records?

21  A.  I did.

22  Q.  And did you do that for all of the various transactions in

23  there?

24  A.  I did.

25  Q.  And all of these transactions that are listed in

1    Government's Exhibit 163, are those the sum total of all

2    transactions to him?

3    A.  No.

4    Q.  Just the ones linked to the counts?

5    A.  Correct.

6    Q.  Okay.  I'm now going to show you Government's 164.  Can you

7    tell the jury what this summary is?

8    A.  This is just the listing of the counts as they're titled on

9    the left side and their payments made out of the 4176 account to

10   beneficiaries on the dates listed for the amounts paid.  Those

11   are individual amounts, they're not totals.

12   Q.  And so where in the Superseding Indictment each count lists

13   a transaction on a particular date and a particular total, did

14   you locate these transactions within Monty Grow or MGTEN bank

15   records?

16   A.  Yes, they were all transfers, and right on the statement it

17   will say, transfer of funds, and it lists the account name, the

18   holder of the account, and the date and the amount.

19   Q.  And do these represent all of the transactions that are

20   reflected in the MGTEN or Mr. Grow's personal account to

21   beneficiaries or sales reps?

22   A.  No.

23   Q.  Just the ones listed in the counts?

24   A.  Correct.

25   Q.  And now I want to show you, Ms. Klitz, a summary document.

Klitz - Direct

181

1  Did you create this?

2  A.  Yes.

3  Q.  And this is listed Government's Exhibit 45.

4  A.  165.

5  Q.  165.  Thank you.  And can you describe for the jury the

6  information that's in here and where this information came from?

7  A.  These images relate to Count 45 of the Indictment, which was

8  the purchase of a 2014 Porsche from Kessler Auto Group.  There

9  was a withdrawal from Monty Grow's personal account at Bank of

10  America and a cashier's check was issued to Kessler Auto Group

11  in the amount of $105,544.94 and then those are pictures of that

12  vehicle.

13  Q.  And I want to show you what's been admitted as Government's

14  Exhibit 8.  Have you seen this document before?

15  A.  I have.

16  Q.  And what is it?

17  A.  Those are the transaction documents from Kessler Auto Group

18  in regard to the purchase of that Porsche by Monty Grow.

19  Q.  On Page 2 of Government's Exhibit 8, which are the Kessler

20  Auto Group documents, do you recognize this check?

21  A.  Yes.  That's the same check that's used in the illustration,

22  the same check I received from Bank of America -- image of the

23  check.

24  Q.  And that's related to which count of the Indictment?

25  A.  Count 45.

Klitz - Direct

182

1   Q.   And now I want to show you another summary exhibit.  Did you

2   create this, Government's Exhibit 166?

3   A.   Yes.

4   Q.   And what is this?

5   A.   These are images that relate to the transaction for the

6   purchase of the Range Rover from Land Rover of Naples.

7   Q.   And did you locate that transaction within that bank

8   account?

9   A.   I did.  This was through the MGTEN Marketing Group account,

10  account ending in 4176.

11  Q.   And I want to show you what has been admitted as

12  Government's Exhibit 7.  Do you recognize these documents?

13  A.   Yes, those are the sales records received from Land Rover of

14  Naples for that purchase.

15  Q.   And does it reflect the purchase of the vehicle that's

16  listed in the check?

17  A.   It does.

18  Q.   And moving on to Government's Exhibit 167, is this another

19  summary that you created from the financial records?

20  A.   Yes.

21  Q.   And what does this summary document reflect?

22  A.   This summarizes transfers made from the Monty Grow personal

23  account ending in 6597 at Bank of America to an Ameritrade

24  account in Monty Grow's name totaling $3 million.

25  Q.   And at the bottom of this exhibit it lists Count 47.  Count

1  47, what's the total amount of the transfer reflected in that

2  alleged money laundering count?

3  A.  250,000.

4  Q.  Right above Count 47 there's a -- I don't know, some sort of

5  transaction.  Can you describe what that is and where it comes

6  from?

7  A.  That was just lifted directly from the bank statement for

8  account ending in 6597 for the transaction on that date.

9  Q.  And now I'm showing you Government's Exhibit 168.  Do you

10  recognize this document?

11  A.  Yes.  That's an exhibit that I prepared with images

12  documenting the purchase of a piece of property at 5803 Mariner

13  Street in Tampa, Florida.

14  Q.  And Ms. Klitz, it's getting late, but I want to show you

15  Government's Exhibit 5.  Do you recognize this?

16  A.  I reviewed 3 and 4.

17  Q.  Well, let me go back to Government's Exhibit 167 and show

18  you Government's 5.  Do you recognize that?

19  A.  No.

20  Q.  If you don't, you don't.

21  A.  No.

22  Q.  Okay.  Then continuing back to 167.

23  A.  168.

24  Q.  168.  Can you tell us again what this exhibit reflects?

25  A.  It's the page of the bank statement for Monty Grow's account

Klitz - Direct

184

1  ending in 6597 at Bank of America, reflecting the transfer of

2  funds from the account to DHI Title in the amount of -- I

3  believe off the top of my head it was 1.548 million.  I can't

4  really read the print, but it's on the summary schedule from

5  before.

6  Q.  And I also did want to show you what's been admitted as

7  Government's Exhibit 6.  Do you recognize these documents?

8  A.  Yes, those are the documents received from DHI Title

9  regarding that transaction.

10  Q.  And what exactly are these documents and what do they

11  reflect?

12  A.  The closing documents for that property.

13  Q.  And what was the total reflected in those closing documents?

14  A.  1,548,000 and some odd dollars.

15  Q.  And I think lastly, I want to show you what has been

16  admitted at Government's Exhibit 169.  Do you recognize this

17  document?

18  A.  Yes.

19  Q.  Go ahead.

20  A.  It's an exhibit we prepared with images documenting the

21  purchase of two jet skis from Barney's.

22  Q.  And what is the total of that transaction?

23  A.  $24,521.36 from the Monty Grow 6597 account at Bank of

24  America.

25  Q.  And then I want to show you Government's Exhibit 9.  Do you

1  recognize these documents?

2  A.  Yes.  Those are the records of the purchase of those two jet

3  skis.

4  Q.  And those records confirm this transaction for these jet

5  skis; is that correct?

6  A.  Yes.

7  Q.  And is this the transaction that's reflected in Count 49, an

8  alleged money laundering transaction?

9  A.  Correct.

10         MR. JUENGER:  I finished before 5:00, Your Honor.

11         THE COURT:  All right.  Cross-examination.

12                    CROSS-EXAMINATION

13  BY MR. MARCUS:

14  Q.  Good afternoon.

15  A.  Good afternoon.

16  Q.  So let me just start with Government's Exhibit 159.  You

17  were asked to look at a variety of records in this case and make

18  some charts?

19  A.  Correct.

20  Q.  Okay.  And you looked at some records for Mr. Grow's

21  marketing company, MGTEN Marketing Group, right?

22  A.  Correct.

23  Q.  And that was a group that was registered with the State of

24  Florida, publicly incorporated in Mr. Grow's name, correct?

25  A.  Correct.

Klitz - Cross

186

1  Q.   And Mr. Grow had bank accounts with Bank of America in his

2  name, right?

3  A.   Correct.

4  Q.   And as you testified earlier, there were no other

5  signatories or other names on either of these companies or the

6  bank accounts?

7  A.   Correct.

8  Q.   And one of the things you were asked to look at by the

9  Government was the amount of money that PCA paid Mr. Grow's

10 company.  Do you see that?

11 A.   To Mr. Grow and to his company, yes.

12 Q.   Yes, we'll talk about that in a minute, but you're right.

13        So this figure is what goes to the corporate account,

14 correct?

15 A.   Correct.

16 Q.   And this figure goes to his personal account?

17 A.   Correct.

18 Q.   And do you recall that this figure, these amounts of money,

19 this came later --

20 A.   Correct.

21 Q.   -- do you recall that, towards the end?

22 A.   Correct, yes.

23 Q.   Right.  Did you see evidence of W-2 payments to Mr. Grow?

24 A.   What do you mean by W-2 payments?

25 Q.   Well, did you look?  Did you pull -- for example, you talked

1  about the U.S. Treasury and his tax payments.

2  A.  Right.

3  Q.  Did you do any analysis of W-2 payments versus 1099?

4  A.  I'm not sure what your question is, but the payments that

5  were made directly to Mr. Grow were different than the payments

6  that were made to his company.  The payments made to him were

7  through a Paychex company, I believe, and there was withholding

8  on those payments.  The amount that's listed is the net amount,

9  not the gross amount.  If you add the taxes, it's a little over

10  2 million.

11  Q.  Correct.  These were payments you said that came towards --

12  they were later?

13  A.  They were May and June.  The above payments were from

14  October 2014 to April of 2015.

15  Q.  Right.  So May, June of 2015.  So consistent with becoming

16  an employee?

17  A.  I don't know why they changed, I just know they changed.

18  Q.  Right.  But you saw evidence of PCA withholding tax and you

19  saw that they were using Paychex to make direct deposit payments

20  to Mr. Grow?

21  A.  Correct.

22  Q.  You're aware that Paychex is a company that pays employees

23  for lots of other companies?

24  A.  I know they handle payroll.

25  Q.  They handle payroll.  Very good.  Thank you.

Klitz - Cross

1        Okay.  And so this U.S. Treasury amount of tax, you

2   didn't actually look at Mr. Grow's tax records, did you?

3   A.  I did not.

4   Q.  So he could have paid even more tax that year than this

5   figure of $4,184,830?

6   A.  Oh, I know certainly he did because that only reflects the

7   payments he made himself out of the Bank of America 6597

8   account.  It does not include the amount that was withheld from

9   the Paychex checks.

10  Q.  You were not asked to put that on this chart by the

11  Government?

12  A.  Because he didn't pay it.  It didn't come out of his

13  account.

14  Q.  You were just looking --

15  A.  This just reflects -- right, this just reflects in and out

16  of his account.

17  Q.  Okay.  Thank you.

18        THE COURT:  Redirect.

19        MR. MARCUS:  Oh, I'm sorry.  It's a bad habit.

20        THE COURT:  So you know I'm paying attention.

21        MR. MARCUS:  I know you are.

22  BY MR. MARCUS:

23  Q.  And again, this is a chart, 163, Government's Exhibit 163.

24  You were just looking essentially for the movement of money from

25  one account to another, right?

Klitz - Cross

1  A.  Correct.

2  Q.  And so, for example, you have no factual knowledge about the

3  agreement between PCA and Mr. Grow that underlies these

4  payments?

5  A.  No, I don't.

6  Q.  You never looked at Employment Agreements or anything like

7  that?

8  A.  No.

9  Q.  Thank you.

10       But I do want to ask about, to make sure I'm clear,

11  this figure, sales reps and beneficiaries.  You said that the

12  case agents, they told you to use that term to describe these

13  payments?

14  A.  Correct.

15  Q.  I just want to show this.  So these are not terms that you

16  came up with yourself based on any knowledge of the case or any

17  facts?

18  A.  No.

19  Q.  Okay.  And this is 161, which is titled MGTEN Sales Reps?

20  A.  Correct.

21  Q.  And as you said, it's a listing of payments to what you were

22  told were sales representatives, correct?

23  A.  Correct.

24  Q.  All from his company?

25  A.  Yes.

Klitz - Cross

190

1   Q.   And I could put up chart 159, Exhibit 159, but most of the

2   payments of your breakdown were to people designated as sales

3   reps by the Government?

4   A.   Correct, of the 8.8 million.

5   Q.   I'll just put it up.  That's 7.6 million to the sales reps

6   as described to the Government to you, and the total again is a

7   little under 8.8 million?

8   A.   Correct.

9   Q.   Right.  Okay.  And again, just so it's clear, this term

10  beneficiary/sales reps, that's a term that you got from the

11  Government as well?

12  A.   Correct.

13  Q.   And so, for example, you don't know what these payments were

14  for?

15  A.   No.

16  Q.   And you don't know if all of these people were acting as

17  sales reps and being paid commissions when they received these

18  monies?

19  A.   I just know that they were paid those monies out of the 4176

20  MGTEN account.

21  Q.   Right.  The corporate account?

22  A.   Correct.

23  Q.   And you said most of the payments were electronic?

24  A.   All of these payments were electronic.

25  Q.   Were wired.

1    A.   Yes.

2    Q.   Okay.   And then you were asked by the Government to look at

3    certain purchases or expenses, certain purchases that came out

4    of that corporate account?

5    A.   Correct, financial transactions.

6    Q.   Financial transactions?

7    A.   Correct.

8    Q.   When you looked at the account, were you asked by the

9    Government to compute business expenses for MGTEN Marketing

10   Group?

11   A.   No.

12   Q.   Okay.   And sitting here today, you don't have a number

13   that -- you don't have a calculation for business expenses that

14   MGTEN Marketing paid to other third parties?

15   A.   No.

16         MR. MARCUS:   Okay.   Nothing further.

17         THE COURT:   Redirect.

18         MR. JUENGER:   No redirect, Your Honor.

19         THE COURT:   Thank you, Ms. Klitz.   You're excused.

20   Have a good day.

21         THE WITNESS:   Thank you.

22      (The witness was excused.)

23         THE COURT:   All right.   I told you I would send you

24   home early today.   Look how sunny it is there.   So watch out.

25   You should use sunscreen when you leave with that sun.   Look at

that.  So powerful.

        So don't talk about the case.  Don't read anything
about the case.  Don't discuss it with your loved ones.  And
tomorrow morning if you can be here at 9:00, I've cleared up the
day, unless someone has added things.  I don't think so.  So I'm
all yours.

        Two things are going to happen tomorrow, though.  We
have to move -- we will start here in the morning, and you'll
always be in the jury room.  My courtroom, because I've got this
big courtroom, sometimes when guests come, I have to give it up,
and there's what we call the Multidistrict Panel.  They come
every January.  They're pretty smart.  They come in January to
Miami and they sit here and it's a good group of people that
handle big civil cases and they send them around the country.
Sometimes they send them right to the same courtroom where they
decide to send them.

        But in any event, they need to set up in the afternoon
with the chairs and all of that.  So after lunch, we will go --
Judge Graham was nice enough, right next door, to lend me his
assigned courtroom, and that's where you'll be.  But you just
don't worry about that.  You'll be in the jury room and then I'm
going to take you over there or someone will take you over there
through my hallway tomorrow afternoon and the following day and
then Friday we'll be back here.  All right?

        And I think the case is moving.  The lawyers are

1    cooperating very well.  So I think it looks promising, but I'm

2    going to chat with them to see if I'm just an optimist or not.

3              Okay.  Have a good afternoon.  We'll see you tomorrow

4    morning at 9:00.

5              THE COURT SECURITY OFFICER:  All rise.

6        (The jury retired from the courtroom at 5:13 p.m.)

7              THE COURT:  Let me hear that door.  I've got to hear

8    the door.

9              There we go.  Okay.

10             All right.  Have a seat.  Thank you.

11             Yeah, we've got to close the door so they don't hear

12   what we're saying.  Thank you.

13             THE COURT SECURITY OFFICER:  They were going in and --

14             THE COURT:  I know, but you have to close the door so

15   they don't hear our questions.

16             No problem.  Thank you.

17             Witnesses for tomorrow?

18             You're moving faster than you thought, no?

19             MR. LARSEN:  We are, Your Honor.  We are.

20             THE COURT:  See, I told you I would help you.

21             MR. LARSEN:  We are, and we are doing our best to

22   shuffle out-of-town witnesses, get them here.

23             Robin Halliburton, she will be available tomorrow.

24             THE COURT:  Okay.

25             MR. LARSEN:  I have just been told that Amanda Donnelly

Jury Trial

1   is also here in town.  So she will be available.

2              THE COURT:  Great.

3              MR. LARSEN:  Nichole Powell is here.  She will be

4   available.

5              THE COURT:  How long are they going to be?

6              MR. LARSEN:  Ms. Halliburton may be up to an hour.  The

7   others are very short.

8              THE COURT:  What did she do?

9              MR. LARSEN:  I'm sorry?

10             THE COURT:  What did she do?

11             MR. LARSEN:  She's a co-conspirator, Your Honor.

12             MR. MARCUS:  Well --

13             MR. LARSEN:  Well, she pled guilty.

14             MR. RASHBAUM:  Her cross will be very quick, Your

15  Honor.

16             THE COURT:  Really?

17             MR. RASHBAUM:  Yeah.

18             THE COURT:  All right.

19             MR. RASHBAUM:  If she tells the truth.

20             THE COURT:  All right.

21             MR. RASHBAUM:  I expect she will.

22             THE COURT:  All right.

23             MR. LARSEN:  Amanda Donnelly will be quick.  I would

24  say --

25             THE COURT:  What is she going to say?

1          MR. LARSEN:  She's a beneficiary, Your Honor.

2          THE COURT:  All right.  Who else?

3          MR. LARSEN:  Nichole Powell is a sales rep/beneficiary.

4          THE COURT:  All right.

5          MR. LARSEN:  Your Honor, I don't know if I have

6     Rosalinda Rambaran in town.  I am going to check today.

7          THE COURT:  Well, you've got to get people.  Who else

8     do you have?

9          MR. LARSEN:  I know that everyone is being transported

10    here as we speak.  I just don't know if she's here today or

11    tomorrow.

12         Dr. Bansal, he's local and I intend to move him up if

13    we need to.

14         THE COURT:  Oh, you're going to need to.  So far that

15    takes us till lunchtime, if not before.  So you need a lot more.

16         MR. LARSEN:  I don't know about Ralph Louis.

17         THE COURT:  If you don't know, you'd better --

18         MR. LARSEN:  We're trying to get Laurene Long here

19    tomorrow.

20         If Rosalinda Rambaran is here, then her son Rashaan

21    Rambaran will also be here.

22         THE COURT:  Hold on.  Hold on a second.

23         And what are they going to say?

24         MR. LARSEN:  Those are beneficiaries, Your Honor.

25         THE COURT:  Okay.  You need more than that.

1           MR. LARSEN:  They'll be fairly quick.

2           THE COURT:  You need more than that.

3           Laurene Long, same thing?  Laurene Long.

4           MR. LARSEN:  Laurene Long, short beneficiary.

5           THE COURT:  Okay.  You need --

6           MR. LARSEN:  No, I'm sorry.  No, I'm sorry.

7           THE COURT:  You still have time tomorrow.  You really

8  do.

9           MR. LARSEN:  And possibly Ralph Louis.

10           MR. JUENGER:  He'll be longer, Your Honor.

11           MR. LARSEN:  He will be a longer direct.

12           THE COURT:  Why?

13           MR. JUENGER:  Your Honor, he worked inside the

14  pharmacy.  You can give you soup to nuts on how the whole thing

15  ran.

16           THE COURT:  Okay.  Is he a co-conspirator, in your

17  view?

18           MR. JUENGER:  No.

19           THE COURT:  All right.  I don't know.  I think you

20  still are going to have some time left.  I really do and we're

21  not going to quit at five tomorrow.  So have people ready.  Have

22  people ready.

23           MR. JUENGER:  We will, Your Honor.  One witness, she's

24  in the military.  Her husband is in the military.  She was

25  transferred to Germany.  We're going to have to move her flight

1    up and there are a few that are just --

2         THE COURT:  Why do you need to bring someone from

3    Germany?

4         MR. JUENGER:  Because we listed her in the Indictment

5    and I mean, look --

6         THE COURT:  How many counts?  I mean, I forgot.  What

7    did you say, there were 50 what?  How many counts?

8         MR. JUENGER:  I take your point, Your Honor.  And if --

9         THE COURT:  Well, how many?  I forgot.  52?

10        MR. JUENGER:  I think there's 51 counts total.

11        THE COURT:  51 counts.  Sorry.

12        MR. MARCUS:  43 against Mr. Grow.

13        THE COURT:  Okay.  Thank you.  43.  So you're concerned

14   about that one count and a woman from Germany that you are going

15   to ship for thousands of dollars.  All right.  Well, it's your

16   decision.

17        MR. JUENGER:  We'll deal with it when it comes, Your

18   Honor.

19        THE COURT:  You make the decision.  But if she's not

20   here -- Okay.  I don't want you to filibuster when you call a

21   witness, because then I'll interrupt, but I think you're going

22   to rest Thursday morning.

23        Are you going to call this doctor, Dr. Simone?

24        MR. JUENGER:  No.  We had talked about a stipulation.

25   If they're still willing to stipulate, then we don't need

1   Dr. Simone.

2           THE COURT:  What say the defendant?

3           MR. MARCUS:  Well, we agreed to the part that he would

4   need to testify about.

5           THE COURT:  You've got to stand up if you're going to

6   talk to me.

7           MR. MARCUS:  I'm sorry, Your Honor.

8           THE COURT:  So the court reporter hears you.

9           MR. MARCUS:  There is a stipulation drafted as to

10  flurbiprofen, which is an ingredient that is in --

11          THE COURT:  You had mentioned that before.

12          MR. MARCUS:  Yes.

13          THE COURT:  But there was a second part.

14          MR. JUENGER:  Well, there were three parts, Your Honor.

15  The first was Tricare is a health care benefit program.  I

16  thought we had an agreement on that one to avoid a Tricare

17  witness.

18          MR. MARCUS:  Not an issue.

19          MR. JUENGER:  Secondly, that flurbiprofen requires a

20  prescription.  I thought we had a --

21          THE COURT:  You agree with that?

22          MR. MARCUS:  Not an issue.

23          THE COURT:  Done.

24          MR. JUENGER:  The only other issue we were going to

25  take care of is part of instructions because they didn't want to

 1   agree on the Tricare regulations as to copayments and I had

 2   drafted something in, I think, late --

 3            THE COURT:  But what does the doctor have to do with

 4   that?

 5            MR. JUENGER:  No, no, we don't need the doctor.  If --

 6            THE COURT:  So Dr. Simone is out?

 7            MR. JUENGER:  Correct.

 8            THE COURT:  All right.  How about Dr. Bansal?

 9            MR. JUENGER:  We're going to try and get him tomorrow

10   because he's local.

11            THE COURT:  What's he going to say?

12            MR. JUENGER:  He worked for one of these telemedicine

13   companies.

14            THE COURT:  For which one?

15            MR. JUENGER:  Which one?

16            THE COURT:  What does he have to do with the case?

17            MR. JUENGER:  He works for 1st Care MD, which you have

18   seen emails about how that operated.  He was on the receiving

19   end of those.  He dealt with some of the calls.  He was --

20            THE COURT:  What did he do?

21            MR. JUENGER:  He was criticized.  Well, he refused to

22   sign on some of these.

23            THE COURT:  Because he thought it was fraudulent?

24            MR. JUENGER:  He thought these people didn't need it.

25   And that's --

1          THE COURT:  Some of the people who have testified?

2    Which people?

3          MR. JUENGER:  Just scripts in general, Your Honor,

4    because --

5          THE COURT:  I'm sorry?

6          MR. JUENGER:  Scripts in general.  As you've heard, the

7    way that it worked was the doctor would never have any face to

8    face.  They would just get sent a script, call the patient, and

9    he would determine that patients did not need this or he would

10   give only one refill or 240 grams.

11         THE COURT:  Did he do that?

12         MR. JUENGER:  Yes.

13         THE COURT:  Okay.  So he's going to talk about

14   something he did specifically?

15         MR. JUENGER:  Correct.

16         THE COURT:  All right.

17         MR. MARCUS:  But, Your Honor, just on this point, he

18   did one consult for one patient out of --

19         THE COURT:  All right.  Did he do it for more?

20         MR. JUENGER:  He was given more, but he didn't do them,

21   and we have emails from Mr. Grow criticizing him because he

22   won't give what Mr. Grow is paying for.

23         THE COURT:  Okay.  So you want to ask Mr. Grow that,

24   since defense counsel has announced he is going to testify?

25         MR. JUENGER:  We will want to talk about that.

1          THE COURT:  And then you are going to have this doctor

2    for rebuttal, depending on what he says.  That's the way you're

3    going to do it, except for the one patient.  You want to talk

4    about one patient, you can do it.  So he will be short?

5          MR. JUENGER:  He will be short.

6          THE COURT:  And he's local, so you bring him in for

7    tomorrow.

8          MR. JUENGER:  Sure.

9          THE COURT:  And we'll work as late as he wants.

10         Doctors usually want to come in in the afternoon, but I

11   don't know about these doctors.

12         Is he a surgeon, too?  He is not, right?

13         MR. JUENGER:  I don't believe so.

14         THE COURT:  I didn't think so.  Okay.

15         So for the next day, who do you have?  All these other

16   people, are you going to call?  Cichowicz?

17         MR. LARSEN:  Yes, Your Honor.

18         THE COURT:  Who's she, a beneficiary?

19         MR. LARSEN:  She's a beneficiary tied to an account in

20   the Indictment.

21         THE COURT:  All right.  Jonelle Coronado.

22         MR. LARSEN:  Same thing, Your Honor.

23         THE COURT:  Michael Ewton.

24         MR. LARSEN:  Same thing.  These will be fast.  These

25   will be fast witnesses.

1           THE COURT:  I know.  Armando Lozada?

2           MR. JUENGER:  Mr. Lozada worked inside PCA, similar to

3    Mr. Louis.  He can tell you everything you ever wanted to know

4    about compounding but, more to the point, he can testify as to

5    the --

6           THE COURT:  But what's he going to say about

7    compounding?

8           MR. JUENGER:  Well, he's going to explain what it is.

9    I think we all know by now.

10          THE COURT:  What is it?

11          MR. JUENGER:  It's the mixing of ingredients based on a

12    doctor's order to create prescription drugs.

13          THE COURT:  Is there any dispute as to that?

14          MR. MARCUS:  I don't know if this witness is --

15          THE COURT:  You've got to stand up.

16          MR. MARCUS:  I'm sorry.  Not as to the general term of

17    compounding.  These are medications that are compounded by the

18    pharmacy.

19          THE COURT:  You've all talked about it already in front

20    of the jury.

21          MR. JUENGER:  Correct.  And he worked at the pharmacy

22    and he ordered the supplies, specifically the Ethoxy Gold that I

23    mentioned in opening statement, and he can explain that regular

24    ethoxy comes in a big jug and costs dollars, whereas Mr. Grow

25    sold an exclusive product that was just the repackaged regular

1   ethoxy that cost $50,000 and then it caused Tricare to bill

2   millions of dollars.  He will say, it's the same thing.  It was

3   highly inconvenient to use, but under instructions from Mr. Grow

4   and from others at the pharmacy, they were instructed to do that

5   for no other purpose than to increase reimbursements.

6           THE COURT:  All right.  I don't know about others in

7   the pharmacy, because I don't know who you're talking about,

8   right?  So I don't know who that is.

9           MR. JUENGER:  Fair enough.

10          THE COURT:  But if it's Mr. Grow -- if he says that

11  Mr. Grow told him to do that, he's entitled to testify as to

12  that, and he will be cross-examined.

13          MR. JUENGER:  Yes.

14          THE COURT:  So he will be awhile.

15          MR. MARCUS:  Right, but he's not an expert on ethoxy.

16  So I'm going to want a foundation laid before he opines on

17  whether something or why things are packaged in a certain way or

18  what those ingredients -- what their purpose is for compounding.

19          THE COURT:  Well, what is your client going to say what

20  the purpose is?  Does he know?

21          MR. RASHBAUM:  Yeah.

22          THE COURT:  Okay.  And what is it?

23          MR. RASHBAUM:  He is going to say that he sold it to

24  the pharmacy and that it was done for binding.

25          THE COURT:  Okay.

1        MR. RASHBAUM:  I don't think there's any dispute on

2   that.  We could stipulate to that.

3        THE COURT:  See what you can stipulate on Lozada, if

4   you can, then we'll see what he testifies to.  But it's got to

5   be limited to what he did in this case.  We are not trying --

6        MR. JUENGER:  Correct.

7        THE COURT:  -- anyone dealing in these compound creams.

8   We're just not doing that.

9        MR. JUENGER:  Correct.

10       THE COURT:  It's a fraud case, right?

11       MR. JUENGER:  It is.

12       THE COURT:  All right.  Now, Sven Bjerke?

13       MR. JUENGER:  Bjerke.

14       THE COURT:  Bjerke.

15       MR. LARSEN:  Yes.  Co-conspirator, sales rep,

16   previously pled guilty.

17       THE COURT:  Okay.  Well, you'd better bring in more

18   people tomorrow because then these others will take long,

19   because I think you will rest Thursday.  So plan on that.

20       Josie Brundige.

21       MR. LARSEN:  Beneficiary.

22       THE COURT:  Okay.  That's short.  I think you're going

23   to rest Thursday.  So that's what you should plan.

24       In view of that, I will give you, probably tomorrow by

25   the end of the day, the jury instructions that I preliminarily

1    intend to give.  So that should help you.

2         I saw that the Government wants to give a deliberate

3    ignorance instruction.  They want me to give a deliberate

4    ignorance instruction, and I'm very hesitant to do that because

5    I assume based on the opening statement that you're saying that

6    the defendant knew that what he was doing was fraudulent.  Am I

7    right or did I misunderstand the opening?

8         MR. JUENGER:  That's correct, Your Honor.  The only

9    reason we included that was sort of as a prophylactic based on

10   what Mr. Grow may say and --

11        THE COURT:  But you see --

12        MR. JUENGER:  -- it's highly fact-dependent

13   instructions.

14        THE COURT:  But if that's your theory, you have -- let

15   me see if you agree with this:  Well, I'll tell you instead of

16   sandbagging you.

17        In United States versus Rivera, 944 F.2d 1563, Eleventh

18       Circuit 1991, "We caution the district courts against

19       instructing juries on deliberate ignorance when the evidence

20       only points to either actual knowledge or no knowledge on

21       the part of the defendant.  A deliberate ignorance

22       instruction is appropriate only when there's evidence in the

23       record showing the defendant purposely contrived to avoid

24       learning the truth."

25        So be aware of that.  Obviously, we have to wait to see

1    what it's like, but it's the alternative to actual knowledge.

2    So it's not a prophylactic.  It's one or the other.  That's what

3    Rivera said.

4         You know, they affirm convictions even when given in

5    cases when we have hidden cocaine in compartments and even in

6    mortgage frauds, it was given, and you have cases going all over

7    the place and the Court of Appeals eventually say, harmless

8    error.  I don't like to do error either way.  So be aware of

9    that.  So don't count on that.

10        MR. JUENGER:  Yes, Your Honor.  I only meant

11   prophylactic in the sense that we wanted to make the Court aware

12   of it and that we weren't sandbagging to pull that out later.

13        THE COURT:  All right.  I like it.

14        Pinkerton.  Oh, Pinkerton instruction.  If I were to

15   give a Pinkerton instruction -- you know, Pinkerton, of course,

16   the Supreme Court way back in 1946 concluded that a defendant

17   may be convicted of a substantive offense based on the act of

18   the co-conspirators.

19        It seems to me that in this particular case, according

20   to the Government, he's the man, right?  He's more important

21   than any of the co-conspirators; would you agree?

22        MR. JUENGER:  Absolutely.  But Pinkerton makes him

23   responsible for the conduct of other people he's conspiring with

24   if he has reasonable belief that they are committing crimes.

25        THE COURT:  Sure.  Of course.  It has to be reasonably

1    foreseeable.  But if he's the main guy and he's guilty of that,

2    why confuse a jury with an instruction on Pinkerton?  Okay?

3              MR. JUENGER:  Yes.

4              THE COURT:  So I don't think I will do that.  And, you

5    know, it's an instruction -- you'll see a lot of cases, one of

6    them in United States versus Alvarez, an old case, because I

7    tried it in front of Judge King, the Court of Appeals -- jeez,

8    it may have been the Fifth Circuit.  I don't remember.  But they

9    expanded the breadth of Pinkerton to include, reasonably

10   foreseeable, but originally unintended substantive crimes,

11   embracing crimes occurring as a result of an act, unintended

12   turn of events.

13             It was a murder.  They were drug dealers.  An agent was

14   killed.  A big case in the early 80's, and they said, drug

15   dealers, you're responsible for the murder.

16             This is a different type of case.  So I don't think --

17   I mean, it was done reluctantly by the judge and by the Court of

18   Appeals, but that's totally different from here.  So I don't

19   like to give instructions -- it's not final.  Alvarez, by the

20   way, was 755 F.2d 830, Eleventh Circuit 1985.  So it wasn't The

21   Fifth Circuit.  But be aware of that.  I probably will not give

22   that instruction.

23             I tell you this now so it helps you.  It's not a final

24   thing, but it makes the charge conference easy.  I'll give you

25   the jury instructions.

1          Anything I exclude, you can then provide it.  Anything

2     I include that you want to delete for the aiding and abetting

3     section, for example, I make sure I tell the jurors it does not

4     include the conspiracy counts.  I think that's 1 and 9, aiding

5     and abetting.  I think it's confusing to give aiding and

6     abetting, but I'll give it because you all charge it as a

7     Section 2.

8          Now, the defense also wanted a bunch of instructions

9     that they give in Massachusetts and in the First Circuit and all

10    that stuff.

11         MR. MARCUS:  On Anti-Kickback Statute cases, yes.

12         THE COURT:  Pardon?

13         MR. MARCUS:  Yes.  We did cite some First Circuit

14    cases, Your Honor.

15         THE COURT:  I know, I know, but, you know, you forgot

16    the other "one" to make it the Eleventh.  So to just to let you

17    know, I don't give a missing witness instruction.  That's from

18    the First Circuit.  The number of witnesses called is not

19    controlling.  That you gave a sample of and that's covered.

20    This instruction about not here to decide or opine on policy,

21    you can argue that.  You cite the McKenzie case.

22         Intent is the issue.  It was presented in the opening

23    statement.  You're going to get an intent instruction and you

24    can argue.  Now, you wanted a good faith.  The Government

25    proposed two good faith instructions, one advice of counsel.  Is

Jury Trial

209

1    that going to be part of this or not?

2              MR. RASHBAUM:  Advice of counsel, no.  Good faith, yes.

3              THE COURT:  All right.  Because both of them were

4    proposed by the Government, I'll give a good faith instruction,

5    assuming that the defense is going to be consistent with the

6    opening statement.  So that should narrow down what we do at the

7    charge conference, which I think we are going to do it on

8    Friday.  You should have all your witnesses ready for Thursday

9    afternoon.

10             MR. RASHBAUM:  So, Judge --

11             THE COURT:  So do not say, hey, I need to talk to my

12   client.  I need to talk and all of that.  You won't finish, but

13   I think you're going to finish on Friday.

14             MR. RASHBAUM:  Judge, here's our dilemma:  Maybe you

15   can help us.  So we have cut down our -- based on what's

16   happened in the two days now, we have cut our list down

17   dramatically --

18             THE COURT:  Great.

19             MR. RASHBAUM:  -- which is good news.

20             THE COURT:  Well, it's up to you.  I'm not suggesting

21   you should.

22             MR. RASHBAUM:  No, no, I know you're not.  But the

23   thing is, they're going to be calling the bulk of their

24   witnesses in the next two days.

25             THE COURT:  That's right.

1          MR. RASHBAUM:  We have several witnesses that are out

2     of town.

3          THE COURT:  Well, you'd better call them and tell them

4     to come in for Friday morning.

5          MR. RASHBAUM:  Well, Judge, that's our dilemma, right?

6     I mean, look, I'm just being ---

7          THE COURT:  I told you it was going to be faster than

8     you all thought.  And it's a lot slower than I expected because

9     of my own doing with all the other -- if I didn't have all the

10    hearings.  But now it's really going to move fast because I

11    don't have anything but you tomorrow.

12         MR. RASHBAUM:  Judge, all I can say is some witnesses

13    we're not going to be able to get in here.

14         THE COURT:  Why?  Why do you wait?  Is this a 2016

15    case?

16         MR. RASHBAUM:  It's not a question of them not being --

17    they are in San Diego and they are in the military.  So we knew

18    what --

19         THE COURT:  Then why didn't you get them here before?

20         MR. RASHBAUM:  Judge, with the Witness List that they

21    provided of 20 witnesses, there was no indication that any of

22    these witnesses would be available on our side this week.  Okay?

23    And look, I still --

24         THE COURT:  Why didn't you tell me, Judge, I can't be

25    ready until next week?  I would have said, you'd better be ready

1  this week because you are going to -- well, then you put your

2  client on.

3           MR. RASHBAUM:  Judge, what we'll do is we'll fill the

4  time.  We will call witnesses.  I mean, I will call 15

5  witnesses.

6           THE COURT:  You can do that if you want.

7           MR. RASHBAUM:  That's what we'll do then.  I mean,

8  look, what I can tell you is --

9           THE COURT:  Or you'll call your client.

10          MR. RASHBAUM:  Judge, my client is going to --

11          THE COURT:  But I'm not going to stop and waste half a

12  day or a day.  It's just not fair to these jurors.

13          MR. RASHBAUM:  Judge, with all due respect, my client

14  will --

15          THE COURT:  Whenever a lawyer says, "with all due

16  respect," it means he's getting annoyed.  So skip that.

17          MR. RASHBAUM:  My client will testify when we decide he

18  testifies.

19          THE COURT:  Well, you do that, but you will call a

20  witness.

21          MR. RASHBAUM:  That's fine.  Then we will probably have

22  10 to 15 witnesses, Your Honor.

23          THE COURT:  Then have them here one after another --

24          MR. RASHBAUM:  Okay.  Thank you, Your Honor.

25          THE COURT:  -- if that's what you want.  It's up to

1    you.  I don't tell you how many witnesses to call, but I'm going

2    to ask who they are and what they're going to say.

3              MR. RASHBAUM:  I'll tell who they are now, if you want.

4              THE COURT:  All right.  Let's go through it.

5              MR. RASHBAUM:  Judge, I will let you know that my

6    client will be on the stand for awhile.

7              THE COURT:  I understand.  That's why if you have time,

8    that's when he should, but that's up to you.  Normally you want

9    to do it at the end, which is fine, but then you've got to be

10   ready for it.  That's why we can try a lot of cases.  That's the

11   reason.

12             Let me look at your list.  Let's see.

13             Okay.  Who are you going to call?

14             MR. RASHBAUM:  Possibly Tom Buschemi.

15             THE COURT:  What number is Tom Buschemi?

16             MR. RASHBAUM:  Number 4.

17             THE COURT:  And he's going to say what?

18             MR. RASHBAUM:  He's from the pharmacy.

19             THE COURT:  But what's he going to say?

20             MR. RASHBAUM:  I'm not going to say, Your Honor, in

21   court, but I'll be happy to tell you in camera.  I'm not going

22   to say it in front of the Government.

23             THE COURT:  No, I don't do anything in camera.  I asked

24   the Government what he's going to say.

25             Well, then if I think it's irrelevant and then I will

 1    say he's excused and I'll strike his testimony in front of the

 2    jury.  You want me to do that?

 3              MR. RASHBAUM:  If you feel there's a need for that,

 4    then you will have to do that, right?

 5              THE COURT:  Well, I'm going to ask you to tell me what

 6    he's going to say.

 7              MR. RASHBAUM:  And I'm happy to do that, but not in

 8    front of the Government.

 9              THE COURT:  All right.  Well, then I won't let him

10    testify.  Next.

11              MR. RASHBAUM:  Okay.  I don't think there's going to be

12    an issue with the text messages.  We's talk to the Government,

13    so I don't think Carter Conrad will need to be called.

14              THE COURT:  All right.  Just tell me who you're going

15    to call, not who you're not.

16              MR. RASHBAUM:  David Corcoran is an attorney with PCA.

17              THE COURT:  I thought advice of counsel was not an

18    issue.

19              MR. RASHBAUM:  He did not give Mr. Grow advice of

20    counsel.  So --

21              THE COURT:  What is he going to say?

22              MR. RASHBAUM:  I'm not going to say in front of the

23    Government.

24              THE COURT:  Well, if you don't tell me ahead of time

25    what an attorney is going to say in a particular case, I'm not

1    going to bother the jury and have you call a witness in front of

2    the jury to bring in inadmissible evidence.

3               MR. RASHBAUM:  He's a fact witness.

4               THE COURT:  I'm not going to do that.

5               MR. RASHBAUM:  He's a fact witness.  He's not a witness

6    on the law.  He's a fact witness.  He's a fact witness in this

7    case.

8               THE COURT:  And what did he do?  How do I know he's a

9    fact witness?

10              MR. RASHBAUM:  As an officer of the Court, I'm telling

11   you he's a fact witness in this case that the Government has

12   interviewed.  So they know some of the things he'll say.

13              THE COURT:  Does the Government know what he's going to

14   say?

15              You've got to stand up.

16              MR. JUENGER:  Yes, Your Honor.  He was an attorney that

17   lived in Boston and he did some work for PCA and he knows

18   generally about some of these issues.

19              THE COURT:  What do you mean, some of these issues?

20              MR. JUENGER:  Well, relating to --

21              THE COURT:  I don't let people testify about what they

22   think happens, not even an agent who investigates.  I let people

23   testify in a trial about what they did and what they saw.

24              So just like a pharmacist who says, this is how it's

25   done, this is how we do it, probably won't be allowed to

1  testify.  By the same token, another worker at the pharmacy --

2  unless he's going to tell me, this is what these individuals who

3  have testified said and it's in contradiction to what they've

4  said, or based upon what Mr. Grow did or did not do.  That's how

5  we are going to try cases.

6          We don't just have people say, hey, we hear about this

7  thing happening, and it must have been a scam or something.

8  See, one witness already testified to that without any

9  objection.  He said, well, I thought it was a scam.  I wouldn't

10  let a person like that testify.  It didn't matter at that time

11  and no one objected.  It's a strategic decision made by the

12  lawyers regarding that, but I'm not going to allow it.  That's

13  why I need to find out what people are going to say.

14          MR. JUENGER:  Yes, Your Honor.  And with respect to --

15          THE COURT:  Are you going to have character witnesses?

16          MR. RASHBAUM:  No, no character witnesses.

17          THE COURT:  All right.

18          MR. RASHBAUM:  Judge, you may have heard testimony

19  today regarding that they thought that the movement to W-2

20  employees -- Ms. Lay testified about that, about the movement

21  from 1099 to W-2.  He will shed some light on that.

22          THE COURT:  And that's what this case is about?

23          MR. RASHBAUM:  It's partly about that, Judge.  It's

24  about Mr. Grow's intent.

25          THE COURT:  All right.  It is about that.

1          MR. RASHBAUM:  And the jury should be able to see all

2     the evidence in this case, Your Honor.

3          THE COURT:  All right.  Okay.  Who else?

4          MR. RASHBAUM:  Sal Davila.

5          THE COURT:  He's a marketer.

6          MR. RASHBAUM:  Correct.

7          THE COURT:  What did he market?

8          MR. RASHBAUM:  I'm sorry, Your Honor?

9          THE COURT:  What did he market?

10          MR. RASHBAUM:  These products, Your Honor, that we've

11     been listening about for two days.

12          THE COURT:  All right.

13          MR. LARSEN:  Your Honor, this would be the subject of

14     our motion in limine.  I believe what the defense is trying to

15     do is put instances of irrelevant but prior good conduct to

16     show, as they said in their opening, that our evidence in this

17     case are outliers.  So I don't think it's relevant and I don't

18     think they should be allowed to call instances of good conduct

19     that's not charged in the Indictment.

20          THE COURT:  Is good conduct by the defendant, I take

21     it?

22          MR. RASHBAUM:  We're charged in a conspiracy, Your

23     Honor.  We're allowed to show that their outliers are not the

24     conspiracy, that there may have been some bad eggs who worked

25     for Mr. Grow, but that that was not what the case was about.

1   That was not what his marketing was about.

2          I know they only want to show the bad examples, but

3   they charged us in a conspiracy.  If they want to just charge us

4   with the substantive counts, they might have a good point, but

5   we're charged in two conspiracy counts.

6          THE COURT:  Now, I notice that in your proposed

7   instructions, you wanted to put all of the three objects of a

8   conspiracy for Count 9; is that right?

9          MR. RASHBAUM:  Mr. Marcus has to address that.

10         THE COURT:  Okay.  Right?

11         MR. MARCUS:  Yes.

12         THE COURT:  Or someone did.

13         MR. MARCUS:  We're probably going to need a Special

14  Verdict Form, I would think.

15         THE COURT:  Well, that's what you want, right?  And the

16  Government says what?

17         See, you all aren't looking ahead, but I'm looking

18  ahead because we have got to get this thing done.

19         All right.  If I give that instruction -- and I'll put

20  it in my proposed suggested instructions, because it's easier

21  for me to delete than to add, but I think it's appropriate

22  because that's kind of what some of the arguments have been.

23  The jury would probably have to find which object of the

24  conspiracy, because even the Government's proposed instruction

25  says, you must all agree on the crime, on the object of the

1    conspiracy.  In order to do that, we might as well tell them the

2    three.  So I'll probably do -- not all, everything, but I'll

3    separate it.  You'll see how it is, so you'll be ready for it.

4         Now, prior good acts.  Are prior good acts admissible?

5    I don't know.

6         MR. MARCUS:  These aren't prior good acts, Your Honor.

7    This is conduct, business practices within the charged

8    conspiracy.  It's the same business practices at issue.  They

9    pick out --

10        THE COURT:  Involving the same substances?

11        MR. MARCUS:  Same substances.

12        THE COURT:  Same dates?

13        MR. RASHBAUM:  Same telemed company, same pharmacy.

14        MR. MARCUS:  Yes.

15        THE COURT:  Same defendant?

16        MR. RASHBAUM:  Same defendant, same everything.

17        MR. JUENGER:  Your Honor, we don't list Sal Davila as a

18   co-conspirator.

19        THE COURT:  Okay.  They agree with you.  They don't

20   think it's a conspiracy in the first place.

21        MR. JUENGER:  Right.  And our records show he was paid

22   41,000 out of the $20 million.

23        THE COURT:  Okay.  And then you can argue that.  I'm

24   going to allow that.  You know what -- it's safer, it's fair,

25   and it's probably the right thing to do, and it's probably

1  legally required, though I could probably go either way.  I'm

2  not going to gamble.  But what that means is you can -- I mean,

3  it's very easy.  We went through this once before.  You could

4  have a health care fraud thing and give good treatment to some

5  patients and you can have a 100 percent false health care fraud

6  clinic.  This is a little different, but you can do that.

7           You know, sometimes people commit crimes and at the

8  same time do good things, and if they're related to the case,

9  then your cross-examination can either be attack the witness or

10 you can say, no questions.  No problem.  I mean, then leave it

11 at that, and let the jury decide whether that makes any

12 difference or not.

13          So who else?

14          MR. RASHBAUM:  Theirrien Davis will testify.  He's a

15 sergeant.  He's the one who's coming from San Diego, so we have

16 to work that out.

17          THE COURT:  What is he going to say?

18          MR. RASHBAUM:  He was a marketer for Mr. Grow.

19          THE COURT:  Now, all of these individuals, have they

20 been investigated or --

21          MR. RASHBAUM:  Actually, Mr. Davis was court-martialed.

22          THE COURT:  For this?

23          MR. RASHBAUM:  Yes, and he was acquitted.

24          THE COURT:  All right.  So he's not going to invoke his

25 Fifth Amendment.  He's got a lawyer and all of that stuff?

1          MR. RASHBAUM:  Jeopardy is attached.  He can't be

2     charged.

3          THE COURT:  If you are court-martialed, you cannot be

4     charged in Federal court.

5          MR. RASHBAUM:  No, jeopardy is attached.  I didn't know

6     that before this case, Your Honor.

7          THE COURT:  I didn't know that.  I learn something in

8     every case.

9          MR. RASHBAUM:  That's at least what I'm told by his

10    lawyer.

11         THE COURT:  All right.  Who else?

12         MR. RASHBAUM:  Judge, there is --

13         THE COURT:  Now, there's not going to be any testimony

14    about the fact that he was found not guilty in another case?

15         MR. RASHBAUM:  I don't plan on asking him any of that.

16    If the Government asks the wrong question, they may get the

17    wrong answer.

18         THE COURT:  You tell him he can't talk about that.

19         MR. RASHBAUM:  Okay.

20         THE COURT:  All right.  So no questions about that.  We

21    don't talk about what happened in another case with anybody,

22    whether there's jeopardy attached or not.

23         Who else?

24         MR. RASHBAUM:  Judge, there's Kim Day and Mary Jo

25    Giles.  We expect to call --

1          THE COURT:  They are pharmacists or workers in the

2  pharmacy?

3          MR. RASHBAUM:  We are going to try to only call one of

4  them.

5          THE COURT:  All right.  They are from here?

6          MR. RASHBAUM:  Yes.

7          THE COURT:  Okay.  Just have them ready.  You can call

8  whoever you want, but just have them ready.

9          MR. RASHBAUM:  Now, Joe Dimond and Esan Forde, we

10  haven't heard about their part of the case yet, same with Amy

11  Fouche.  I don't know whether we'll call them until I see what

12  their witnesses say.  So, I mean, I can't tell you.

13          THE COURT:  All right.  I just want to discuss this

14  with you to help you prepare.  That's all.

15          MR. RASHBAUM:  Luis Green.

16          THE COURT:  All right.  We have enough.  That should

17  take us --

18          MR. RASHBAUM:  Okay.

19          THE COURT:  If you call all those people, that should

20  take us probably until Friday afternoon.

21          MR. RASHBAUM:  Judge, here is what I'm trying to say to

22  you.

23          THE COURT:  You want to quit early --

24          MR. RASHBAUM:  No.  Here is what I'm trying to say to

25  you.

1          THE COURT:  -- or filibuster.  One of the two.

2          MR. RASHBAUM:  Here is what I'm trying to say.

3          THE COURT:  Federal judges don't like filibusters.

4          MR. RASHBAUM:  I can only ask.  Here's what I'm saying

5   to you.  We are confident that our case is going to be over --

6   provided we get the case on Thursday, we are confident that our

7   case will be over on Monday.

8          THE COURT:  Well, I don't know if the Government is

9   going to have any rebuttal.

10         MR. RASHBAUM:  Well, I can only talk about our case.

11         THE COURT:  Okay.

12         MR. RASHBAUM:  Okay.  We are confident our case will be

13  over on Monday.  That is our confidence.  But we are going to

14  want Mr. Grow to testify last, and so if I have to call

15  witnesses in to fill that in, I'm going to have to do that.

16  That's what I'm saying to Your Honor.

17         THE COURT:  But then you are going to have to have

18  them.

19         MR. RASHBAUM:  I'll get them here, Your Honor.

20         THE COURT:  Then you're going to have to have them,

21  because if we move fast, I'm not just going to break.

22         MR. RASHBAUM:  But if I have to call more witnesses,

23  I'm not sure that the case will be over on Monday.  That's all

24  I'm saying.

25         THE COURT:  I mean, you do what you think is the best

1    thing for your client.

2              MR. RASHBAUM:  I understand.

3              THE COURT:  I don't tell you not to call witnesses, nor

4    do I tell you to call witnesses, especially for the defense.

5    All I'm telling you is we're not just going to quit.  All right?

6              Anything else?

7              MR. MARCUS:  Just on Friday, just when we talk to

8    witnesses, you had said earlier that you thought we were going

9    to start at 10:15 on Friday.  Is that still --

10             THE COURT:  Probably, yes, yes.  But that's why

11   tomorrow and Thursday are great days.

12             MR. MARCUS:  So Thursday you don't have calendar in the

13   afternoon?

14             THE COURT:  Well, not yet.  We're going to go straight

15   through.  That's why I think the Government will rest and the

16   defense will begin.

17             MR. RASHBAUM:  And so, Judge, just so we're straight,

18   we should have our witnesses ready when?

19             THE COURT:  Whenever the Government rests.

20             MR. RASHBAUM:  Okay.  But for all I know, they could

21   rest tonight.

22             THE COURT:  And that would be wonderful for me, but I

23   don't think they're going to do that.  They don't even think

24   they're going to rest Thursday morning, right?

25             MR. JUENGER:  I would love to.  I just --

1          THE COURT:  And then you should have witnesses Thursday

2    afternoon.  How's that?  If we quit early, I'll let you have a

3    reasonable lunch hour.  It's only fair.  So start with your

4    witnesses Thursday afternoon and then Friday, see what happens.

5    Okay?  But we have to keep doing it.

6          MR. MARCUS:  Just the last thing, Your Honor, because

7    there's no Pattern on the Anti-Kickback Act.

8          THE COURT:  Oh, I'm going to give you what I think and

9    then you can -- what I'll do is I'm going to give you the jury

10   instructions and then you can make two copies or I'll give you

11   two copies and you can write over one of them, change it, do

12   what you think is right, both of you.  You don't have to agree.

13   And then we'll have a charge conference, probably on Friday

14   afternoon, so you'll know.  Okay?

15         MR. MARCUS:  Thank you.

16         THE COURT:  It will be done.

17         Anything else I can help you with?  Bring all your

18   exhibits.  Keep them in that office, right out here.  Give them

19   the key.

20         And you have a key to that room, you can lock it up

21   there.

22         All right.  Anything else?

23         MR. LARSEN:  9 a.m.?

24         THE COURT:  And I didn't see a Proposed Verdict Form,

25   if you want a Special Verdict Form, but you should probably file

1    one the way you want it, and I'll look at it.  Did you file one?

2          MR. MARCUS:  Not yet.  We just were waiting to see what

3    the -- just for the structure because both conspiracies are

4    multi-object, but we'll put something together and file it.

5          THE COURT:  Okay.  Put it the way you want it and I can

6    always delete things.  It's easier for me to delete than to add,

7    and then that way you're protected.  And I say, no, I won't, or

8    you'll say it's withdrawn.  It makes things easier and faster.

9          All righty.  Thank you, folks.

10          MR. RASHBAUM:  Have a nice evening.

11          THE COURT:  Have a nice afternoon.  It's not the

12    evening yet.  See, the sun is still there.

13        (The trial adjourned at 5:50 p.m.)

14

15              C E R T I F I C A T E

16        I hereby certify that the foregoing is an accurate

17    transcription of proceedings in the above-entitled matter.

18

19    ____09-10-18_____    _____
            DATE                 GILDA PASTOR-HERNANDEZ, RPR, FPR
20                               Official United States Court Reporter
                                 Wilkie D. Ferguson Jr. U.S. Courthouse
21                               400 North Miami Avenue, Suite 13-3
                                 Miami, Florida  33128    305.523.5118
22                               gphofficialreporter@gmail.com

23

24

25

**A**

**Aaron** 133:9,9
**abetting** 208:2,5,6
**able** 25:18,18 26:4,9,10,18 33:8
56:24 68:4 123:14 136:21
153:10 159:25 170:15 210:13
216:1
**about** 8:7 9:6 10:12 14:15,15
15:22 17:9,15,15 18:17,20,25
19:4 20:7 22:1,16,19,19 24:8
24:13,21 27:6 29:6 30:11
31:10 33:2,12,16,21,24 35:9
35:13 37:10,25 39:1,11 40:3
41:8 45:7,9 46:10 49:19 50:6
50:8,19 51:6,9 52:8 53:12,17
54:20,24 55:1,6,11 56:23,25
58:15,22 59:22,25 60:16,19
61:13,17,19 62:24,25 63:13
63:15,16,19 65:25 66:12,19
67:2,23 68:25 69:1,11 70:21
70:21 71:11 72:12 73:4,13,20
75:18 80:4 83:8,11,16,20 84:2
85:3,11 86:2,5 89:2,24 90:1
90:12 91:24 93:16 94:4 96:4,9
96:12,15 97:5,20,25 101:3,8
101:22 104:3 105:9,18 106:17
106:18,22,23 108:8,10 109:22
110:5 112:10 115:3,7 116:1
117:11,12,20,24 118:1,18,20
119:8,12,16,17,2,4 120:3
121:2,15 122:6 123:2,14
125:17 126:6,9 127:24 130:22
130:22 132:18 136:11 137:5,3
137:21,23,25 138:2 140:8
141:14 142:14 143:14 145:14
145:15 147:9,21 149:24
152:25 158:24 159:20,22,23
159:25 167:11 168:20 171:8
172:4 174:3,8,13,17 178:23
186:12 187:1 189:2,10 192:2
192:3,21 195:16 197:14,24
198:4 199:8,18 200:13,25
201:4,11 202:4,6,19 203:6,7
208:20 214:18,21,2,3 215:6,20
215:20,22,23,24,2 5 216:11,25
217:1 220:14,18,20,2 1 221:10
222:10
**above** 183:4 187:13
**above-entitled** 225:17
**Absolutely** 70:18 97:4,21 116:14
116:23 206:22
**accept** 160:22
**accepted** 19:4
**access** 26:3 37:9
**according** 17:25 44:4 57:13,13
127:7 141:18 168:4 169:21
206:19
**account** 40:16 63:24 133:2 161:2
161:24 167:3,18,19,22 168:1
168:2 169:17,17,19,22,25
170:4,12 171:2,3,5,6,16,19,20
171:20,22,23,25 172:3,5,9,10
172:11,12,13,17,17,18 173:1
174:7,11,13,14,16,19,21,23
175:12,18 176:3,13,19 177:5
177:10 178:2,16,17 179:3
180:9,17,18,2,0 181:9 182:8,9
182:10,23,24 183:8,25 184:2
184:23 186:13,16 188:8,13,16
188:25 190:20,21 191:4,8
201:19
**accounting** 165:15
**accounts** 166:21,24 167:1,2,11
167:13 168:4,6,9,13 170:11
170:12,13,1 3 171:18 173:18
186:1,6
**accurate** 55:18 133:13 156:12
225:16
**accurately** 51:14 133:16

**acknowledge** 20:19
**acknowledges** 20:10
**acquitted** 74:19 219:23
**act** 206:17 207:11 224:7
**acted** 97:23
**acting** 61:24 190:16
**active** 103:25 104:15 106:8
**acts** 149:12 218:4,4,6
**actual** 146:22 148:23 205:20
206:1
**actually** 7:4 22:10 24:5 55:2,2
56:24 81:22 90:4 138:20
148:2 173:3,7 177:6 179:19
188:2 219:21
**Adams** 134:21 135:16
**add** 6:5 172:21 187:9 217:21
225:6
**added** 6:8 14:8,9 76:2 133:10
192:5
**addicted** 107:6
**Addie** 135:16
**adding** 14:14
**additional** 44:25 173:1,25
**address** 16:17,23,2,4 21:25 22:1
25:20,25 26:4,9 37:8 46:6
106:8 110:22 126:15 217:9
**adds** 74:4
**adjourned** 225:13
**adjudicated** 134:22 154:11
**adjudication** 154:9 156:19
**administer** 149:2
**administration** 165:15
**admissibility** 73:10 75:18
**admissible** 66:18 67:3 73:24
75:8,15 218:4
**admission** 10:7 74:5 80:13
**admit** 18:6,15,15 20:9,20 71:20
**admits** 18:24 75:19
**admitted** 32:8 38:19 40:13 42:13
46:2 49:4 73:12,15 74:12
84:14 86:15 87:5,23 88:22
122:9 123:4 129:19 132:7,23
134:3 135:25 136:1 137:6
154:20 166:11 169:13 178:12
181:13 182:11 184:6,16
**admitting** 75:10
**advertising** 50:23
**advice** 208:25 209:2 213:17,19
**advise** 28:11
**advised** 24:6 58:1
**Aetna** 149:13
**affect** 95:1
**affected** 54:9 74:14
**affirm** 206:4
**after** 23:5 27:7 31:2,10,15 37:3
44:17 46:17 48:2 59:14 61:5
67:22 78:13 83:14 85:22
90:15 100:23 106:3,10 108:2
108:6,9,13 111:22 112:13
115:25 126:2 128:4 133:19
176:21 192:18 211:23
**afternoon** 6:21,22 81:1 99:7
103:15 109:1 121:9,10 129:24
143:12,13 164:23 185:14,15
192:17,23 193:3 201:10 209:9
221:20 223:13 224:2,4,14
225:11
**again** 23:11,16 36:14 41:8 46:5
56:18 60:18 70:17 76:14
79:15 85:10 88:19 103:5
111:13 118:1 119:24 122:5
123:15 126:25 127:6 133:7,22
140:23 143:2 153:8 154:23
164:6 169:16 183:24 188:23
190:6,9
**against** 6:12 10:7,9,10 63:14
70:25 197:12 205:18
**agency** 153:19
**agent** 128:23 129:5,24 143:12

153:13 158:11 163:5 165:17
176:22 177:25 207:13 214:22
**agents** 63:3 189:12
**Ages** 87:12
**ago** 26:21 105:9 109:10,19 120:6
127:23 132:5 145:6
**agree** 5:22 12:23 20:5 27:8 47:19
52:18 53:5 54:12 55:3,15
56:22 57:7 59:21 60:3 66:1,5
68:1,6,10 69:15 75:23 77:6,19
77:20 82:22 83:4 91:23 95:4
105:22 107:12 115:20 116:10
143:25 144:3 147:25 148:3,19
148:24 152:24 155:5 160:4,4
161:10 162:18,24 198:7,18
199:1 205:15 206:21 217:25
218:19 224:12
**agreed** 82:20 97:2 108:20
116:21 125:20,24 126:3 198:3
**agreement** 33:15 52:2 148:2
189:3 198:16
**Agreements** 189:6
**ahead** 11:16,17 20:19 71:14
81:11 129:7 154:3 164:20
184:19 213:24 217:17,18
**aiding** 208:2,4,5
**ailment** 115:17
**ailments** 115:10 118:1
**aiming** 133:14
**Aisha** 141:11,14
**aligned** 147:5,6
**alleged** 183:2 185:8
**allergies** 96:15
**allow** 9:8 10:9,17 20:12 125:7,8
215:12 218:24
**allowed** 44:18 91:12 214:25
216:18,23
**allows** 10:11,16 148:5
**almost** 26:21 72:21 90:4 171:15
**along** 79:21 116:25
**alphabetical** 142:19 177:23
**already** 24:24 23:7 28:8 29:6
34:25 35:22 37:14 41:24 44:6
45:9 46:12 73:8 76:7,10
117:16 126:3 159:18 161:9
202:19 215:8
**alternative** 206:1
**Although** 74:10
**Alvarez** 207:6,19
**always** 56:17 57:14 70:11 73:3
74:16 75:9 76:11 80:15 83:16
84:16,21,22,2 5 85:1,11 86:24
123:8 192:9 225:6
**Amanda** 193:25 194:23
**amazing** 26:14
**Amendment** 219:25
**America** 1:4 24:19,20 25:2
60:21,21 63:23 73:22 86:6
88:13,16,20,2 4 89:3 162:10
165:23 167:3,3,19 168:3
169:17 170:11 171:2,6,7,11
172:10,10,12,1 3 174:7,12
175:13 181:10,22 182:23
184:1,24 186:1 188:7
**American** 130:10
**America's** 24:23
**Ameritrade** 182:23
**among** 18:25
**amount** 106:23 115:23 134:25
135:1,2,3 136:13,16,17
140:15 141:1,21 142:9 148:20
151:17,20 152:18,18,20,20,22
153:5,5 157:12 173:14 180:18
181:11 183:1 184:2 186:9
187:8,8,9 188:1,8
**amounts** 137:11 148:17 153:2
156:16,16,17 180:10,11
186:18
**Amy** 221:10

**analysis** 137:17 165:10,25
170:20 172:3 173:23 187:3
**analyst** 78:23
**analyzed** 131:9 176:19
**and/or** 176:14 177:25
**announced** 200:24
**annoyed** 211:16
**another** 5:21 24:5,7 26:17 31:16
36:18 77:2 86:9 118:17 125:9
135:16 139:24 141:8 142:2
161:21 172:17 182:1,18
188:25 211:23 215:1 220:14
220:21
**answer** 17:12 22:6 34:23 123:14
145:25 163:20 220:17
**answered** 19:24 72:22 118:9
158:2
**Anti-Kickback** 208:11 224:7
**anybody** 10:18 37:2 40:5 41:3
58:5 70:22 82:1 89:20 110:7
220:21
**anymore** 39:20
**anyone** 9:14 28:5 43:1 73:4 92:3
98:12 117:20 160:9 168:5,8
168:12 169:21,24 170:3 204:7
**anything** 7:9 9:24 10:9 20:14
37:25 39:11 52:19 62:8,25
64:3 69:17 70:21,22,22 71:24
72:8 83:8,12,20,2 4 84:22 85:2
101:22 124:18 133:20 161:5
189:6 192:2 208:1,1 210:11
212:23 223:6 224:17,22
**anytime** 58:14
**anyway** 67:4 71:3
**anywhere** 35:1 85:14
**apologize** 122:18 124:24 135:15
135:18 137:15 153:7
**apparently** 46:12,13 62:1
**appeal** 74:20 75:24
**appeals** 74:17,22 75:13 77:16
80:2 206:7 207:7,18
**appear** 6:6 122:20 123:23 124:3
**APPEARANCES** 1:12
**applied** 134:25
**applies** 138:13 140:22
**appointment** 96:20
**appreciate** 102:20
**approach** 10:20 16:6,8 29:16,18
37:16 85:7 105:13 110:11
111:12 121:20 126:24
**approached** 94:3,12,16 109:11
**approaching** 34:11 45:23 48:25
**appropriate** 154:16 205:22
217:21
**approved** 33:22 156:7
**approximately** 130:6,20 136:11
136:22 137:1 165:17 170:21
173:2 174:2
**April** 28:8,10,15 42:16,25 43:20
43:24 44:8 46:15,19 47:4,5,9
47:11,16 48:5 49:20,24,25
90:2,5,8 111:1,6,21,22 127:5
127:8 131:18 135:22 143:5,7
143:7 187:14
**area** 29:13 32:16,19 34:3 45:15
48:19 54:9 60:25
**areas** 130:13
**argue** 72:15,23 81:18 125:14
208:21,24 218:23
**arguing** 72:14
**argument** 67:5 125:15,17
**arguments** 217:22
**Armando** 202:1
**Armed** 104:17
**Army** 93:12,13 102:20
**around** 7:5 24:10 26:15 71:7
97:2 115:24 131:18 151:17
174:17 192:14
**arrangement** 81:20,23

**arrested** 64:2,3,8
**arrows** 174:19
**arthritis** 99:15,16
**article** 87:18,18
**articulated** 136:8
**aside** 107:4
**asked** 7:21 8:4 9:24 15:22 19:23 22:6 23:1 26:6 27:3 35:21 48:21 49:16 51:6 53:12 63:10 71:18 77:13 79:12,13 82:17 86:2 89:24 94:12 96:2,8 102:14 112:10 115:9 118:20 125:6 126:5 135:15 158:2 159:22 165:25 170:8 185:17 186:8 188:10 191:2,8 212:23
**asking** 18:17 28:18,24 31:1,3,11 43:20,23 44:9,11 47:3,7,18,24 62:2 63:7 66:17 72:10,12,18 96:16 113:23 118:1 119:12 123:2 160:3 163:19 220:15
**asks** 15:25 160:5 220:16
**assessment** 14:25 15:9 16:17 19:5 21:3,9,25 22:8 43:25 46:5,10,25 88:10 90:11 110:22
**assessmentsurvey@medrxsal...** 16:3,20
**asset** 175:1,2,6,7
**assigned** 130:2,8,10,24 131:4,15 147:3 192:20
**assignment** 131:2
**assistant** 19:8 22:3
**associates** 49:23 165:3,7
**assume** 10:13 44:11 59:22 62:4 125:4 126:4 205:5
**assuming** 59:17 209:5
**assumption** 138:17
**attached** 24:3,21 133:2 143:6 152:10 162:25 163:2,3 220:1 220:5,22
**attachment** 24:22 142:18,18,21 142:24 143:4 146:18
**attachments** 131:19,19 133:3,3 136:9 142:16,17 145:17,19 147:1 151:3
**attack** 9:15,16 219:9
**attacked** 9:10
**attacking** 73:25
**attended** 51:15,16 158:21
**attention** 10:25 13:2 14:24 15:15 25:24 28:23 36:2 174:6 175:11 188:20
**attorney** 25:13 213:16,25 214:16
**attorneys** 25:6,7,8,18 26:5 27:3 43:12 66:11
**Attorney's** 1:14,15
**August** 67:23 137:5
**AUSA** 1:13,14
**authenticated** 17:6
**authority** 19:14
**authorization** 33:9 44:7
**authorized** 168:8 169:24
**Auto** 181:8,10,17,20
**automatically** 64:6
**automotive** 105:7
**availability** 85:23
**available** 52:11 54:23 55:2,15,23 56:15,19 84:5,6,23 85:15,15 85:15,18,23 193:23 194:1,4 210:22
**Avenue** 2:6 225:21
**avoid** 198:16 205:23
**aware** 50:14,17 52:6 66:11,17 145:19,21,25 146:1 159:13,15 159:15,16,17,23 187:22 205:25 206:8,11 207:21
**away** 40:19 41:6
**awhile** 78:3 120:6 203:14 212:6
**a.m** 5:1 30:19 31:7 224:23

**B**
**Bachelor** 130:18
**Bachelor's** 130:21 165:14
**back** 33:6,6 43:5 55:6 60:23 73:2 73:2,3 88:3 90:18 91:18 93:21 94:1 96:18 97:15,17,19,22,25 101:14,15 105:10 108:2 114:16,22 118:17 128:20 153:8 174:6 175:11 177:14 178:18 179:5 183:17,22 192:24 206:16
**background** 48:12 53:9 130:17
**backup** 170:10 173:9
**bad** 135:15 188:19 216:24 217:2
**bait** 87:20
**bank** 34:8,14 40:16 63:24 89:13 165:25 166:21,24 167:2,3,4,8 167:19 168:3,4 169:10,17,21 170:11,23 171:3,5 172:9,10 172:12,13 173:4,7,11 174:7 174:12 175:12 176:2,19 177:5 178:3 179:6,20 180:14 181:9 181:22 182:7,23 183:7,25 184:1,23 186:1,1,6 188:7
**Bansal** 195:12 199:8
**bargain** 118:15
**Barney's** 184:21
**barring** 72:25
**based** 52:9 60:1 80:11 123:13 131:13 134:23 136:8,21 137:4 137:9,10,17 139:10 150:9 151:2,12 159:18 162:20 163:10,11,17,1 8 168:22 189:16 202:11 205:5,9 206:17 209:15 215:4
**basic** 118:20
**basically** 118:9
**basis** 64:18 65:12,15 72:12 149:10 157:18
**Bates** 11:1,5 16:12 48:7 91:20 161:13 162:1,18
**bathroom** 81:7 164:13
**Beach** 114:5
**became** 61:1,18 66:10
**become** 66:10 144:2
**becoming** 187:15
**before** 1:6 7:14 13,15,16 15:3 22:7,19,24 33:24 40:6 42:4 46:14,20 61:11,23 66:9 73:3 83:13 86:15 92:4 99:11 100:12 109:3,5,7 112:13,15 112:24 119:3 120:3 121:12,12 124:3,5,5 125:2,6,20 129:8 133:1 136:8 151:4,7 155:6,8 167:10 181:14 184:5 185:10 195:15 198:11 203:16 210:19 219:3 220:6
**began** 172:3,5
**begin** 223:16
**beginning** 33:2 37:23 60:19
**behalf** 68:14 146:13
**behavior** 61:19
**behind** 152:6
**being** 9:10,20 10:12 12:19 13:11 19:4 32:12 37:24,25 38:4 40:24 53:24 56:7 62:25 63:13 64:18 65:14,14 71:2 76:3 87:5 87:5 105:8,15 119:11 123:14 132:18 190:17 195:9 210:6,16
**beings** 9:18
**belief** 206:24
**believe** 10:8 14:6 18:3 30:1 41:5 48:21 57:10 86:13 100:3,5 101:15 105:20 106:14,15,21 108:12 110:21 112:5,12,22 120:3 124:2 128:4 131:18 147:2 151:6,10 156:10 184:3 187:7 201:13 216:14
**believer** 75:9

**bell** 98:23 99:25 101:18
**belonging** 166:21,24
**below** 174:19 175:20
**bene** 135:6,19 177:18
**beneficiaries** 22:22 91:4 131:6 134:9 136:10,11,14,20,24 142:19,22 146:14 147:14 148:14 175:24 176:14 177:25 180:10,21 189:11 195:24
**beneficiary** 46:9 131:19,24,25 133:4 135:1 137:19 138:4 140:6,12 141:11,15 142:2 154:23 195:1 196:4 201:18,19 204:21
**beneficiary's** 134:18
**beneficiary/sales** 190:10
**benefit** 115:11 149:1,7 157:15 165:4 198:15
**benefits** 134:23 143:18 156:22 156:23 157:5,13,22
**benes** 176:6
**BEREZIN** 71:5
**besides** 102:8 117:21 168:8 169:24
**best** 14:3,4 70:14 74:10 112:19 122:13 193:21 222:25
**better** 107:20 123:17 160:1 195:17 204:17 210:3,25
**between** 12:10 26:16 76:8 105:19 123:25 152:4 171:13 189:3
**beyond** 158:7
**big** 68:23 106:16 192:10,14 202:24 207:14
**bill** 133:17 144:2 203:1
**billed** 135:1,2,3 136:16 138:11 140:19 141:23 142:6 147:7 148:20 152:5,18,20,25 153:5 156:16,25 157:8
**billing** 101:4 146:23 151:17
**bills** 120:9
**binding** 203:24
**Bing** 139:25 140:1,2,2,6,8,8,18 140:19 141:3,4,4,4,8,11,14
**biographical** 132:3
**BioMediTech** 49:25
**Biscayne** 1:21 2:2
**bit** 6:24 20:11 67:23 75:1 76:7 99:9 105:16 107:13 117:24 134:17 174:10
**Bjerke** 204:12,13,14
**Blair** 3:11 46:8,12,20 48:4 102:24 103:2,7
**blame** 5:4,11 31:16
**blaming** 33:18,22
**blank** 58:5,8,11
**blue** 174:20
**BOA** 171:20,22,2,5 178:24
**BODDEN** 71:10
**Boston** 214:17
**both** 11:18,20 27:5 29:4 72:16 75:23 102:20 167:13 168:4 209:3 224:12 225:3
**bother** 214:1
**bottom** 11:1 16:12 31:21 56:7 88:9 122:12,15 134:10 138:14 140:23 161:18 167:21 179:1 182:25
**Boulevard** 1:21 2:2
**box** 92:25 106:14 175:5
**branch** 93:11 104:19 114:10 137:11
**breadth** 207:9
**break** 134:16 164:13 222:21
**breakdown** 190:2
**bribery** 130:15
**bridge** 76:19 77:23
**briefly** 88:3,5,6 99:4 100:16 105:9 112:9 139:8 140:16

**bell** 142:16 165:12
**bring** 6:1 31:24 79:3,4,7,7,8 80:10,15,17,2,2 81:4,5 82:14 152:9 197:2 201:6 204:17 214:2 224:17
**bringing** 63:18 74:7,8 105:19
**brochure** 23:8
**broke** 151:16
**brought** 50:11 80:10 105:15 142:23 143:3
**Brundige** 204:20
**build** 52:10
**building** 50:10
**bulk** 209:23
**bunch** 208:8
**burn** 96:6
**bury** 41:7
**Buschemi** 212:14,15
**business** 8:8 22:18 49:17 50:1 90:20,22,22 165:14 191:9,13 218:7,8
**butchering** 137:15
**buying** 157:23
**B-l-a-i-r** 103:7

**C**
**C** 225:15,15
**calculate** 176:15
**calculated** 177:15
**calculation** 191:13
**calculator** 153:1
**calendar** 155:6 223:12
**California** 105:1
**call** 30:22 31:1 34:1 92:12 94:11 95:25 96:17,23 97:5 98:2 113:11 117:8,9,24 119:8,14 120:18,25 125:1 128:2 149:6 192:11 197:20,23 200:8 201:16 210:3 211:4,4,9,19 212:1,13 213:15 214:1 216:18 220:25 221:3,7,11,19 222:14 222:22 223:3,4
**called** 16:3 28:20 32:24 34:2 45:14 60:23 63:21 73:19 95:19 97:15,19 101:2,11,13 101:15 103:21 115:9 117:11 117:13,21,25 119:5,9 127:11 128:4,15 135:13 149:3 165:23 208:18 213:13
**calling** 119:15,16,19,20,22 138:18 209:23
**calls** 28:12 29:10 34:1 45:13 58:16 102:24 128:22 199:19
**came** 63:23 87:13 97:10 108:13 135:8 136:13 139:17 145:4 146:24 148:18 176:12 177:10 181:6 186:19 187:11 189:16 191:3
**camera** 212:21,23
**Camp** 105:1
**canceled** 120:4
**cancelled** 38:8
**capitalized** 103:9
**card** 167:18 168:1 169:16
**Cardboard** 106:14
**cards** 169:11
**care** 20:8 23:1 24:18,20,23 25:2 39:8,9 60:21,21 63:22 86:6 87:21 88:12,15,20,24 89:2 107:1,25 130:14 143:21 144:25 162:10 165:20,23 171:2,7,11 198:15,25,25 199:17 219:4,5
**Carolina** 103:20
**cars** 63:23
**Carter** 213:13
**case** 1:3 6:5 9:10 11:6 16:2 20:16 25:12 26:7 27:8 30:15 43:11 63:3,13,15 65:18 66:20 68:24

69:3 70:21,22 71:12 73:4,19
74:1,3,16 79:25 130:25 131:3
134:20 145:3 148:12,23
152:24 154:16 158:12 159:7
159:10 160:10 176:21 177:25
185:17 189:12,16 192:2,3,25
199:16 204:5,10 206:19 207:6
207:14,16 208:21 210:15
213:25 214:7,11 215:22 216:2
216:17,25 219:8 220:6,8,14
220:21 221:10 222:5,6,7,10
222:12,23
**cases** 6:6,8,13 58:17 73:13 75:18
130:7 145:12 165:19,20
192:14 206:5,6 207:5 208:11
208:14 212:10 215:5
**cashier's** 181:10
**categories** 69:24 147:15 176:13
**caused** 35:10 115:10 203:1
**causes** 14:10
**causing** 33:14
**caution** 205:18
**cautionary** 20:20
**cautious** 76:11
**CD** 166:20
**CDs** 160:14
**cell** 11:8 13:3 25:8
**center** 171:19
**certain** 4:33 33:4 36:24 37:4
39:25 40:2,6,6,7 41:1 44:25
45:12 131:6,15 151:11 157:15
191:3,3 203:17
**certainly** 13:19 17:24 75:3 188:6
**Certificate** 3:25
**certified** 131:5 156:10
**certify** 225:16
**cetera** 139:7
**chairs** 192:18
**challenge** 9:17
**challenged** 99:9
**change** 55:21 65:16 172:18
224:11
**changed** 21:22 23:15 83:14
187:17,17
**changes** 7:19,19 24:6,15,16,25
25:1 29:9,9 33:4 44:12 45:12
45:13,13,22 60:22,23 86:5,10
88:17 91:18
**changing** 44:13
**character** 215:15,16
**charge** 49:22 65:22 78:7 207:24
208:6 209:7 217:3 224:13
**charged** 64:5,11 65:18 67:22,24
68:6 216:19,22 217:3,5 218:7
220:2,4
**chart** 150:23 179:1 188:10,23
190:1
**charts** 159:21 163:5,7 185:18
**Chase** 171:2 178:23 179:2
**chat** 193:2
**cheaper** 57:11
**check** 58:16 64:25 96:21 171:16
173:9 181:10,20,21,22,23
182:16 195:6
**checked** 55:21 58:17,18
**checks** 171:14 188:9
**child** 41:7
**choice** 58:5 68:17 69:8,9
**choices** 85:5
**choose** 57:14,15 58:6 68:16
**Christie** 132:16
**chronic** 85:4 107:1,3
**Cichowicz** 201:16
**Circuit** 73:22 74:3 205:18 207:8
207:20,21 208:9,13,18
**circumstances** 35:14 102:8
**cite** 208:13,21
**city** 93:4 103:18 114:3 164:24
**civil** 192:14

**civilian** 104:13
**claim** 24:16 134:22 141:1 144:3
146:1,25 147:24 148:16,18,18
148:22 149:24 150:6 151:5
152:4,5,21,2,1 154:11,15
**claimed** 156:16
**claims** 131:4,5,9,10,11,12,21
132:1 133:8,8,10,18,20,25
134:8 135:8,11,1,1 136:12,25
137:2,18 138:11 139:1,2,18
139:18 140:21,24 141:21,24
142:4,5,9 143:24 144:6,14,22
146:23 147:4,6,9,13,17 148:5
148:16 149:2,17 150:25 151:2
151:4,8,14,2,3 153:18,22
154:1 155:22 156:7,10,13
163:6
**clarify** 150:9
**clear** 37:11 82:3 144:13 162:23
189:10 190:9
**cleared** 81:20,23 192:4
**client** 71:23 79:20 203:19 209:12
211:2,9,10,13,1 7 212:6 223:1
**clients** 133:4
**clinic** 219:6
**Clinton** 9:14
**close** 193:11,14
**closed** 71:21
**closing** 125:15 184:12,13
**cloud** 26:24,25
**clutters** 75:1
**coach** 104:22
**cocaine** 206:5
**codefendant** 71:24
**coerced** 72:21
**coincidence** 26:14
**Colette** 140:2,8 141:4
**collateral** 75:17
**collections** 49:11
**college** 50:22,24 51:3,4,9,12,15
51:16,19 105:2
**column** 54:4 135:6,20 139:1
150:11 154:9
**columns** 134:12
**combat** 104:22
**come** 9:21,22 10:10 73:2,2,3
75:24 76:6,13,19 77:8,23
82:24 86:6 120:10 132:17
135:7,16 188:12 192:10,11,12
201:10 210:4
**comes** 9:11 10:7 17:11,11 27:4
79:21 155:6,8 183:5 197:17
202:24
**comfortable** 92:23,25 164:17,17
**coming** 47:11 76:7 79:23 86:23
118:5 171:2 219:15
**comment** 172:16
**commission** 64:18 65:12,15
**commissions** 43:17 51:22 61:5,8
61:16,20 62:17 82:19,23,23
83:5,5,8,12,18,2,4 90:18
190:17
**commit** 219:7
**committed** 67:19
**committing** 206:24
**common** 73:14
**communicated** 115:3
**communication** 12:7
**communications** 12:22
**companies** 52:22 186:5 187:23
199:13
**company** 21:12,15 23:11 35:6
35:17 39:9 46:6 56:5,10 57:23
59:9 82:20 114:15 127:11
134:23 135:13 142:23 148:21
149:3 152:20 165:7 168:20
169:6 173:15 176:3 185:21
186:10,11 187:6,7,22 189:24
218:13

**compare** 151:4
**compartments** 206:5
**compensated** 12:19 21:5,15,17
94:23
**compensation** 21:19,22 43:25
44:1,25 46:25 61:7 65:25 66:4
88:19 95:1
**compilation** 146:4
**compiling** 155:21
**complain** 24:9 45:7 97:20
**complained** 101:11
**complete** 47:24 48:1 58:2 118:14
**completed** 15:25 47:5,8,16 50:25
100:4 111:3 118:16
**completely** 104:1
**completing** 46:22 47:3
**compliance** 65:24
**comply** 66:3
**compound** 204:7
**compounded** 105:9 202:17
**compounding** 12:21 15:14 48:13
52:13 91:5 202:4,7,17 203:18
**comprised** 137:2
**compute** 159:21 191:9
**computer** 25:19 26:5 37:6 98:13
130:15 132:10 144:15
**computers** 26:8
**concerned** 44:15 61:14,18
197:13
**concerning** 119:15
**concluded** 206:16
**conduct** 168:8 169:24 206:23
216:15,18,20 218:7
**conducted** 139:10 168:12 170:3
171:12
**conference** 78:7 207:24 209:7
224:13
**confidence** 222:13
**confident** 80:14 222:5,6,12
**confirm** 86:14 126:6 178:22
179:6 185:4
**confirmed** 178:3
**confirming** 117:15
**confuse** 207:2
**confused** 10:1
**confusing** 56:11 147:21 208:5
**congratulating** 19:4 46:22 47:18
**congratulatory** 47:21
**connected** 100:5 127:17
**Conrad** 213:13
**consent** 7:14,22 12:11 22:12
23:2,2 24:3,5,14,15,16,19
25:16 33:2,4 45:11,12,21
47:25 48:1 60:20 81:24 86:2,6
89:7,11 91:17 162:15
**consider** 75:15,16,17
**considered** 76:2
**consistent** 30:14 32:12 68:19
133:12 187:15 209:5
**conspiracies** 225:3
**conspiracy** 208:4 216:22,24
217:3,5,8,2,4 218:1,8,20
**conspiring** 206:23
**constitute** 74:14
**consult** 56:12 200:18
**consultant** 114:15
**consultation** 128:16
**consults** 35:10,11
**consumer** 88:12
**contact** 28:13,19,2,5 30:5 58:9,19
82:11 112:23,24
**contacted** 94:4 98:1 101:16,19
106:4 109:24 110:1,3 115:2
121:15 122:6 127:24
**contain** 48:7
**content** 30:9
**CONTENTS** 3:1
**context** 9:22 10:18
**continuation** 5:8 6:19

**continue** 6:15 36:23 37:3 39:25
40:6 43:22 44:9 47:6,15,17,19
47:20 118:17 171:25
**continued** 65:2
**continuing** 44:21 45:4 183:22
**contract** 148:3 149:10
**contractor** 50:1 165:8
**contractual** 88:11 157:16
**contradiction** 215:3
**contrived** 205:23
**controlled** 16:22 22:2
**controlling** 208:19
**controls** 171:20,23
**conversation** 24:12 28:1 32:21
32:22,24 42:23 45:18,19
58:17 60:19 69:16 115:7
**conversations** 13:18 60:1,4,8,10
69:20 160:9,13,15
**convert** 39:19
**converted** 27:22 28:8 38:8
**convicted** 74:20 206:17
**conviction** 74:17
**convictions** 206:4
**cooperating** 71:20 193:1
**cooperation** 8:11 25:5 68:12
**copay** 97:12,20 101:3,4,6,9,14
101:20,23 102:12
**copayment** 97:5,10 98:3 116:24
134:25 136:13,15,15
**copayments** 199:1
**copays** 102:9,11,14
**copied** 24:1
**copies** 14:1 224:10,11
**copy** 13:22,23 23:5 122:1
**Coral** 164:25
**Corcoran** 213:16
**corner** 134:10 161:19 171:1
**Coronado** 201:21
**corporal** 104:24
**corporate** 167:1 169:9 170:12
171:4 175:12 186:13 190:21
191:4
**corporation** 168:18
**Corps** 104:13,20
**correct** 8:8 11:9 15:10 16:19
21:4,7,15 23:9,16,19 24:11
25:5 26:1 27:5 30:12,15 31:8
31:13,18 32:14,20,23 35:17
36:8 39:10 40:16,24 41:22
42:17,21 43:8,9 45:17 46:6
49:8 51:22 57:17,23 58:10
60:2,17 61:2 82:20 91:20 92:3
98:5,6 100:1,2,10,11 101:10
101:17 109:3,8,9,12,15,16,17
112:2,17,18 113:19 121:12,15
122:7,15 123:3,5 124:6 125:3
125:21,25 126:1,3 127:5,8,10
127:12,25 128:5 134:13
136:24 140:13 141:5 145:8
146:6,10 147:18,19,22 148:9
148:11,15 149:7,8 150:7,13
151:5,15 153:3,14,15,24
155:10 156:14 158:13,22
159:11 163:21 170:18 172:19
172:20,23,24 174:8,9 175:13
175:14,16,19 177:16 178:19
178:20,24,25 179:4,17,18
180:5,24 185:5,9,19,22,24,25
186:3,7,14,15,17,20,2,2 187:11
187:21 189:1,14,20,22,23
190:4,8,12,22 191:5,7 199:7
200:15 202:21 204:6,9 205:8
216:6
**correctly** 103:16
**correspond** 179:12
**corroborate** 60:7 69:14
**corruption** 165:21
**cost** 35:24 96:24 97:1 116:20
155:22 203:1

costs 202:24
counsel 7:18 81:13,14 82:2
  129:9 200:24 208:25 209:2
  213:17,20
count 68:5 134:2 179:9,9,10,13
  179:15,16 180:12 181:7,24,25
  182:25,25 183:2,4 185:7
  197:14 206:9 217:8
counter 157:24 173:3,5,6,8,10
country 102:19 113:7 143:21
  163:23 192:14
counts 179:12 180:4,8,23 197:6
  197:7,10,11 208:4 217:4,5
couple 84:3 85:25 89:17 106:12
  108:9 174:2
course 10:2 73:13 74:8,23 76:13
  81:6 85:8 92:22 102:15
  125:14 131:14 206:15,25
court 1:1 2:5 5:3,7,10,15,2 0 6:1
  6:3 8:20,22,25 9:3,6,19,23
  10:4,16,22 11:13,20,23 13:10
  13:15,17,24 14:3,9,12 16:7
  17:2,5,9,12,19,2 3 18:6,10,15
  18:18,22 19:7,10,16,18,22
  20:1,4,6,22,2 4 25:15 29:18,21
  32:6,8 38:14,16,19 40:11,13
  42:11,13 45:25 46:2 49:2,4
  66:15,18,23 67:3,10,14,18,20
  69:22 70:1,3,5,8,19 71:6,11
  71:14 72:2 73:7 75:13 76:11
  76:15,18,24 77:1,4,10,13,15
  77:16,23 78:2,4,6,13,18,20
  79:1,3,6,17,24 80:2,9,10,21
  80:24 81:4,6,8,9,11 85:8
  86:14,16,19,22,24,2 5 87:10,23
  88:5,7 91:7,10,12 92:8,11,14
  92:16,20,22,2 5 99:3 102:3,5
  102:17,19,23 103:1,3,6,9,12
  103:21 108:23 110:13,16
  111:15 112:6 113:6,10,13,15
  113:17,20,22 121:6,23,25
  122:3,22 123:1,4,6,8,15,17,21
  124:17,20 125:6,11,14,17
  127:1,20 128:19,24 129:1,4,7
  129:12,14,16,1 8 132:11,13,15
  132:18 135:25 143:9 144:20
  144:22,25 149:19,22 150:17
  150:21 151:25 152:2,11
  153:10,17,21,23,2 5 154:3,20
  155:12,14,1 7 156:3,5 157:18
  158:3,8,14,18,2 4 159:3,9,14
  160:2,4,18,21,2 4 161:5,7
  162:5 163:2,25 164:3,5,8,10
  164:12,17,20 165:4 166:7,11
  185:11 188:18,20 191:17,19
  191:23 193:5,7,13,14,20,24
  194:2,5,8,10,16,18,20,22,25
  195:2,4,7,14,17,22,2 5 196:2,5
  196:7,12,16,19 197:2,6,9,11
  197:13,19 198:2,5,8,8,11,13
  198:21,23 199:3,6,8,11,14,16
  199:20,23 200:1,5,11,13,16,19
  200:23 201:1,6,9,14,18,21,23
  202:1,6,10,13,15,1 9 203:6,10
  203:14,19,22,2 5 204:3,7,10,12
  204:14,17,22 205:11,14 206:7
  206:11,13,16,2 5 207:4,7,17
  208:12,15 209:3,11,18,20,25
  210:3,7,14,19,2 4 211:6,9,11
  211:15,19,23,25 212:4,7,15,17
  212:19,21,23 213:5,9,14,17,21
  213:24 214:4,8,10,13,19,21
  215:15,17,22,2 5 216:3,5,7,9
  216:12,20 217:6,10,12,15
  218:10,12,15,19,2 3 219:17,19
  219:22,24 220:3,4,7,11,13,18
  220:20 221:1,5,7,13,16,19,23
  222:1,3,8,11,17,20,2 5 223:3
  223:10,14,19,2 2 224:1,8,16,24

225:5,11,20
Courthouse 2:6 225:20
courtroom 1:5 5:5,6 6:2 71:13
  73:6 75:21,21 81:10 192:9,10
  192:15,20 193:6
courts 10:8 18:25 74:10 77:17
  205:18
Court's 74:13 124:23
court-martialed 219:21 220:3
cover 52:18,21,22
coverage 134:23 138:24
covered 208:19
co-conspirator 83:22 194:11
  196:16 204:15 218:18
co-conspirators 206:18,21
co-counsel 72:5
cream 83:21 84:5,5 94:13,21,22
  95:7,8 104:4,5 105:15,21
  106:15 109:12,15,18,20,21
  115:14,14,16 116:3,3
creams 91:5 127:24 204:7
create 88:11 131:8 142:3 176:15
  177:17 181:1 182:2 202:12
created 22:11 23:9 170:17 176:9
  176:20 182:19
creating 139:16
creation 50:12
credibility 9:9,15,16 73:25
credibly 67:5,9
credit 173:6,8,10
credits 173:3,6
crime 67:19 163:23,25 217:25
crimes 1:15 65:18 67:24 130:14
  130:15,15 206:24 207:10,11
  219:7
criminal 66:1 129:6 130:1,5,9,18
  165:16
critical 130:11
criticized 199:21
criticizing 200:21
cross 5:8,15 76:19 77:23 84:2,20
  86:9 89:24 90:24 112:10
  147:4 194:14
cross-appeal 74:21
cross-examination 3:4,9,13,17
  3:21,24 6:15,18 9:8 66:20
  71:18 81:18 82:17 86:3 89:9
  99:3,5 108:23,24 121:6,7
  122:25 143:9,10 185:11,12
  219:9
cross-examinations 71:20
cross-examine 67:11 79:22
cross-examined 10:6 203:12
cross-examining 67:12
current 106:8
currently 39:16 93:19 105:4
  129:25 130:1
curves 123:9
customer 49:11
customers 133:4
cut 87:20 96:7 173:10 209:15,16
CVS 157:11,24

**D**

D 2:6 135:24 225:20
daily 54:10
Dan 99:10
DANIEL 1:19
data 12:4,5 15:20,25 22:5 131:4
  131:9,10,2 1 132:1 133:8,8,20
  133:25 134:8,12 135:8,11
  137:18 139:1,16,18 140:15,24
  142:4 143:14 146:11 147:4
  148:12 150:4 151:4 153:18,22
  154:1 155:21 156:10
database 131:5
date 16:4 18:4 23:16 24:10
  36:24 37:4 38:2,2,5 39:25
  40:2,3,6,6,7 41:1,2 44:25

46:15,19 48:5 51:14 55:24
  110:25 111:5,17,20 122:7,11
  122:12,14,20 123:23 124:11
  124:12 125:21,22 134:18,19
  134:21,22,2 2 137:23 138:12
  140:22 142:7 143:3 153:13,14
  153:21,23,2 5 154:6,9,13
  155:1,11 156:13,19 170:19
  172:6 173:4 179:19 180:13,18
  183:8 225:19
dated 16:19 17:7 24:13 52:2
  112:11
dates 179:7 180:10 218:12
David 13:5 213:16
Davila 214:4 218:17
Davis 219:14,21
day 10:23 28:20 39:12 54:7,13
  54:13,15 92:9 128:19 191:20
  192:5,23 201:15 204:25
  211:12,12 220:24
days 46:22 47:2 48:4 54:17
  106:21,23,24 108:8 119:13
  209:16,24 216:11 223:11
DCRX 135:5 166:21 171:17
  173:10
deadline 46:20
deal 51:20 68:5 94:15 197:17
dealers 207:13,15
dealing 204:7
dealt 199:19
Deanna 158:21
December 56:21 61:24 62:6,7
  155:2,5,8
decently 105:16
decide 18:22 20:14 75:12 87:6,6
  192:16 208:20 211:17 219:11
decided 51:25
decides 154:15
decision 66:12 95:2 197:16,19
  215:11
defendant 1:8,19 66:24 73:18
  74:8,19,20,2 1 75:3 77:5 81:13
  87:4 130:25 133:15 198:2
  205:6,21,23 206:16 216:20
  218:15,16
defendant's 4:5,6,7,8,9,10,11,12
  5:14 20:25 32:10 38:20 41:4
  42:14 46:3 49:5 76:4 86:16,17
  87:2 88:1 91:13 126:25
defending 66:24
defense 10:20 16:10 18:3 20:15
  20:16,16 29:16 34:12 37:16
  42:9 45:23 48:25 72:5 81:13
  87:4 88:23 110:15 111:13
  127:7 128:9 129:5,9 130:1,4,9
  130:12 153:19 162:14 165:11
  166:5 200:24 208:8 209:5
  216:14 223:4,16
degree 51:12 75:15 130:18,21
  165:14
delay 56:15
delete 208:2 217:21 225:6,6
Delgado 131:17 132:6 133:2
  135:22 136:9 144:17 146:16
  146:18 147:19
deliberate 205:2,3,19,21
denied 151:22
denote 161:15
denotes 150:14
Department 130:12 165:10
depending 77:22 201:2
depends 5:18
deposit 173:8,11 187:19
deposited 173:10
deposits 173:1,2,15
deputy 5:5,6
describe 12:23 15:18 94:10
  95:24 106:13 133:6 134:15
  140:16 142:16 165:12 170:7

170:22 173:21 176:18 178:13
  181:5 183:5 189:12
described 12:7,22 173:3,5,8
  176:5 190:6
Description 4:4
deserved 55:18
designated 190:2
despite 69:13 70:16 77:16
detail 39:11
detailed 63:2
details 150:2 152:6
determination 176:21
determine 200:9
devices 26:20
DHI 184:2,8
diameter 106:18
Dickensauge 19:4
Diego 210:17 219:15
difference 12:10 73:16 75:11
  76:8 90:7 139:13 152:4
  172:25 219:12
different 12:15 40:22 43:14
  55:20 68:22 70:5 74:3 130:13
  136:15 163:5 170:11 176:13
  187:5 207:16,18 219:6
differently 123:16,20
difficult 72:3 73:9 122:12
digit 124:1,4
dilemma 209:14 210:5
dime 98:20
Dimond 221:9
direct 3:8,12,16,20,2 3 10:25
  19:12,17 25:24 48:21 49:15
  49:16 52:25 55:6 58:19 70:16
  86:3 93:2 103:13 112:9,16,22
  114:1 121:14 126:5 129:22
  146:20 147:14 153:13 163:17
  164:5,21 174:6 175:11 187:19
  196:11
directing 13:2 14:24 15:15 28:23
  36:2
directions 54:4
directly 57:25 58:10 145:20,23
  145:24 146:2,12 171:10 183:7
  187:5
director 169:7
directors 82:3
disagree 10:3
disagreement 158:4,6
discontinue 30:12
discontinued 27:14,20 31:12
  44:17
discontinuing 30:11
discovering 29:4
discretion 68:14
Discretionary 91:12
discuss 60:14,15 71:16 78:7
  90:22 192:3 221:13
discussed 5:14 7:25 17:8 27:6
  60:9,10,13 146:20
discussing 6:24
discussion 34:19
discussions 27:6
dispense 84:6
dispute 18:25 19:16,18 202:13
  204:1
dissolved 168:19
distinction 75:13
distributions 171:6
district 1:1,1,11 74:10,13 77:16
  205:18
division 1:2 165:16 171:13
doctor 83:13,14 93:24 94:1,2
  95:14,17,19,22,2 4 96:18
  100:13,15,18,20,23,2 5 107:1,3
  108:3 114:19,25 117:17,18,19
  128:2,5 138:12 150:5 197:23
  199:3,5 200:7 201:1
doctors 117:2 201:10,11

**doctor's** 95:20 202:12
**document** 5:17,17 9:2 13:11
21:16 23:16,18 27:10 45:16
45:17 46:21 47:12,14,20 56:2
56:4 85:19,22 86:7,10 87:9
88:16 91:9,20,23 110:25
111:18 112:11 123:23,25
124:11 127:4,7 128:9 132:24
133:1,20,23 134:4,14,16
137:8,9,10 138:8 139:9
140:12 141:15,18 142:3
145:21 147:17 150:25 161:21
162:13,24,2 5 176:25 177:17
180:25 181:14 182:21 183:10
184:17
**documentation** 25:10 151:2
**documenting** 183:12 184:20
**documents** 11:6 16:14 25:9,12
26:10 30:14 68:13 69:14 77:8
86:1 131:13 134:12 136:21
139:11,17 145:14,15 161:15
166:3,5 168:24 181:17,20
182:12 184:7,8,10,12,13
185:1
**Doe** 58:14
**doing** 7:24 12:14 13:19 14:5
15:1 23:1 33:9 45:6 47:6,22
49:25 56:12 61:15 62:7 64:17
64:19 68:12 72:16 74:18
77:18 82:3 90:20 96:21 99:8
118:25 120:25 162:5 193:21
204:8 205:6 210:9 224:5
**dollars** 21:24 35:2,19 44:22 61:5
61:7 90:17 98:25 120:23
155:23 184:14 197:15 202:24
203:2
**done** 5:21 7:3,4 15:23 19:14
20:22 47:10 48:4 53:19 55:7
60:16 62:10,12 64:3,8,10 65:9
65:11 76:15 80:4,4 87:24
125:11 148:20 198:23 203:24
207:17 214:25 217:18 224:16
**Donnelly** 193:25 194:23
**door** 192:19 193:7,8,11,14
**doses** 53:25
**down** 13:17 18:18 70:10,20
78:25 81:11 134:16 151:17
171:8 179:2,10 209:6,15,16
**Dr** 195:12 197:23 198:1 199:6,8
**drafted** 198:9 199:2
**dramatically** 209:17
**drashbaum@mnrlawfirm.com**
1:23
**dropped** 35:3 48:22 51:2,2,4,19
**dropping** 51:7
**drug** 103:25 120:23 148:24
207:13,14
**drugs** 94:4 95:2,4 96:9,13,18,24
97:1,3,6,8 98:4,19,25 101:4
115:3 116:2 117:3 118:7,10
119:6 120:10 155:22 202:12
**Dryvaan** 137:15,25 139:2,5,14
**due** 34:25 43:24 44:1 90:10
211:13,15
**duplicates** 134:1 136:22
**during** 25:9 26:20 40:19 49:24
56:20 61:2 78:11 94:13 96:23
131:14
**duties** 130:24
**Dutting** 158:22 159:8
**duty** 103:25 104:15 106:9
**D-u-t-t-i-n-g** 158:22

**E**

**E** 1:20 113:21,24 225:15,15
**each** 13:15 85:13 138:16 139:3
151:5 152:21 155:17 175:25
176:16 177:3 178:1 180:12
**earlier** 17:7 43:19 45:19 71:7

**90:10 155:11 186:4 223:8**
**early** 8:3 30:18 78:5,6 104:25
124:9,12 191:24 207:14
221:23 224:2
**earned** 35:22
**earning** 61:16 62:17
**easier** 77:7 217:20 225:6,8
**easy** 71:4 72:11 105:16 107:13
207:24 219:3
**eat** 70:9
**economic** 1:15 130:15
**education** 50:21 51:7,11,13
105:3 165:12
**educational** 130:17
**effect** 176:15
**effective** 27:21 30:24 32:13
79:20
**eggs** 216:24
**eight** 6:13
**either** 11:15 41:5 92:3 96:16
106:14 162:18 168:12 176:14
177:25 178:16 186:5 205:20
206:8 219:1,9
**elbows** 99:17
**electronic** 171:15 173:22 190:23
190:24
**electronically** 171:17
**Eleventh** 73:22 74:3 205:17
207:20 208:16
**ELMO** 84:11 85:7 86:15 88:4
110:12 111:13 121:21 126:25
153:8 167:15
**else's** 158:25
**email** 16:3,17,18,23,24 4 17:4 18:4
19:3,8,12 21:14,25 22:1 23:18
24:17 25:16,20,2 5 26:1,3,4,9
27:11 28:9,23 29:13 30:17,22
31:2,3,4,7,10,1 1 36:22,25
37:5,8,21 38:10,25 39:4,5,18
39:21,24 44:23 45:20 46:5,5
46:10,19 47:21 48:6 57:14
58:13 70:13 82:11 85:21
90:12,13 91:24 92:2,6 106:4
109:24 110:6,8,19,22 112:13
112:23,24 120:16 126:8,15
131:16,17 132:6 133:3 135:21
136:8 137:4,10 144:14 146:16
146:17,18 151:3 161:10,23
162:25 163:2,3
**emailed** 19:8 100:2
**emails** 22:3 25:4,7 26:6 28:15
46:18 55:21 60:2,10 69:13
73:10 199:18 200:21
**embracing** 207:11
**employed** 129:25 130:1,4 165:15
**employee** 44:14,18 61:1,2 65:14
65:16,25 187:16
**employees** 31:24 66:12 187:22
215:20
**Employment** 33:15 189:6
**empty** 75:21,22
**enclosing** 46:25
**end** 20:23 24:12 28:1 29:10 33:1
33:5,25 41:3 49:25 60:18 68:9
71:2 76:13,23 90:9 118:11,24
128:14 155:15 186:21 199:19
204:25 212:9
**ended** 28:4 40:5,6 42:4,5,19,23
44:10 45:9 89:20 90:11 112:1
119:11 120:13,14 173:24
**ending** 40:4 167:19 168:2
169:18 171:3,6 172:11,13
182:10,23 183:8 184:1
**ends** 172:8
**enforcement** 161:3
**engineering** 114:15
**enlisted** 104:17 109:13,14
**enough** 13:19 80:14 192:19
203:9 221:16

**enroll** 42:8
**enrolled** 28:8 34:24 37:3,14 40:5
**enrolling** 42:7 44:10,19,23 45:3
**entered** 6:2 21:3 81:10
**entire** 147:17 174:22
**entities** 177:1,2,9,24
**entitled** 13:16 14:14 67:10 72:15
80:1 203:11
**entity** 171:4 176:20,22
**entrusted** 21:19
**equal** 54:17
**equals** 54:5
**Eric** 15:1,11
**error** 74:4,14 206:8,8
**Esan** 222:7
**especially** 73:17 75:2 136:7
223:4
**ESQ** 1:19,20 2:1
**essentially** 76:10 134:1,22 135:1
135:3 137:11 138:10 143:15
148:3 188:24
**established** 59:6
**estimation** 106:22
**et** 139:7
**ethoxy** 202:22,24 203:1,15
**evaluation** 47:22
**even** 5:4 8:2 11:21 18:23 21:23
24:19,24 26:25 39:17 44:17
60:13 61:11 62:25 67:3 74:17
80:1 87:14,18 97:23 123:17
123:17 188:4 206:4,5 214:22
217:24 223:23
**evening** 225:10,12
**event** 20:16 192:17
**events** 207:12
**eventually** 97:8 206:7
**ever** 7:9 23:18 24:17 35:23 81:22
82:6,8,11 84:21 85:2,21 90:25
93:9 109:22,24 110:1,3 111:7
114:8 119:2 120:25 121:2
145:21 146:1 156:21,22 202:3
**every** 9:8 33:13 35:17 83:23
148:18 150:5,25 151:6,9
192:12 220:8
**everybody** 81:12 83:22 136:15
138:4 141:14
**everyone** 28:6 47:22 140:12
141:13 195:9
**everything** 25:8 60:9 75:12
82:12 122:3 135:12 202:3
218:2,16
**evidence** 4:3 9:2,12 10:2 17:1,20
17:20 18:23 20:7,25 23:8
25:23 32:5,10 38:13,21 40:10
40:14 42:10,14 45:24 46:3
49:1,5 75:8,10,12 79:18 88:1
110:15 111:14 121:22 122:9
126:25 129:21 136:3 154:19
154:21 161:9,21 162:14
166:13 186:23 187:18 205:19
205:22 214:2 216:2,16
**evidentiary** 87:17
**Ewton** 201:23
**exact** 115:23
**exactly** 108:18 126:23 173:16
184:10
**examination** 3:5,8,10,12,14,16
3:18,20,23 81:16 93:2 102:6
103:13 112:7 114:1 127:21
129:9,22 164:21
**example** 9:11 21:2 55:23 56:14
57:13 60:11 131:16,24 133:22
137:12 138:19,25 139:5,24
141:8 142:23 144:5 146:25
147:3 148:8 149:13 150:11
155:8 156:22 157:10,21
186:25 189:2 190:13 208:3
**examples** 173:6 217:2
**exceeds** 172:22

**Excellent** 164:14
**except** 20:6 73:4 201:3
**exceptions** 10:6
**exchanged** 8:13
**excited** 132:18
**exclude** 208:1
**excluded** 17:25
**exclusive** 202:25
**exclusively** 171:15
**excuse** 88:23 106:22 110:14
111:13 122:10,15
**excused** 92:9,10 102:17,22 113:6
113:9 164:8,9 191:19,22
213:1
**exhibit** 4:5,6,7,8,9,10,11,12,13
4:14,16,17 14:4,6,22 16:10,25
20:25 23:7,23 25:24 29:17
32:10 34:5,12 37:17 38:13,21
40:14 42:10,14 45:24 46:3
48:25 49:5 52:24 56:3 84:9,13
85:10 86:7 87:2,4 88:1,3,23
88:23 91:13 110:14,15 111:13
121:21 122:10 123:6,21,1
124:18 126:25 127:8 128:10
129:20 132:7,24 133:5 134:4
135:17 136:2,5 137:7 138:6,7
138:10 140:4,14,17 141:6,25
142:14 146:4 147:1 154:19,21
156:11 161:9,22 162:14
166:12,16,17,19,22,2 3 167:1,5
167:8,16,24 168:15 169:14
170:15,17 176:8,24 178:13
179:5 180:1 181:3,14,19
182:1,2,12,18,2 5 183:9,11,15
183:17,24 184:7,16,20,25
185:16 188:23 190:1
**exhibits** 4:1,3 5:14 10:21 76:2,6
80:13 129:10 135:24 224:18
**exist** 23:19
**existence** 33:18 45:8 169:6
**expanded** 207:9
**expect** 194:21 220:25
**expected** 210:8
**expecting** 97:12
**expenditures** 174:22
**expenses** 191:3,9,13
**expensive** 57:8 157:1
**experience** 22:25 49:11,15,16,17
50:4,7,9 52:9 157:7 165:12
**experienced** 48:11,19
**experiencing** 96:2
**expert** 203:15
**explain** 136:6 137:7 138:8 172:1
172:25 202:8,23
**explained** 96:1 147:14 151:3
**explaining** 72:9,18 85:13 133:1
**explanation** 73:1 156:21,23
157:4,22
**expletives** 29:12 45:15 60:25
**explicatives** 32:18 34:3
**Express** 135:13 149:3,9,12
151:22 156:1
**extends** 140:5
**extent** 75:17
**extortion** 130:15
**extra** 13:24 37:11,14 105:17
107:13
**extract** 131:6
**extracted** 135:11
**extrinsic** 17:20 18:23
**exuberant** 157:12
**e-mails** 76:19 131:13
**E4** 104:24

**F**

**F** 10:21 225:15
**face** 156:11 200:7,8
**facing** 68:1 173:11
**fact** 58:25 59:23 69:2 81:22 82:1

149:1,12 214:3,5,6,6,9,11
220:14
**facts** 163:17 189:17
**factual** 189:2
**fact-dependent** 205:12
**failure** 74:13
**fair** 99:18,20 100:25 101:9 109:7
155:23 156:25 177:5 203:9
211:12 218:24 224:3
**fairly** 78:15 196:1
**faith** 208:24,25 209:2,4
**false** 112:1 219:5
**familiar** 149:25 161:13 165:22
**families** 143:18 163:6
**family** 137:12 138:17,18,22,24
139:24,25 140:5,15,18,19,19
141:3,7,8,9,9,17,18,2,2 163:15
**far** 42:7 48:22 51:7 163:12
166:22 179:9 195:14
**fashion** 55:19
**fast** 78:16 201:24,25 210:10
222:21
**faster** 193:18 210:7 225:8
**fault** 5:7,12 6:8
**Fax** 1:17,23
**Feathergon** 3:15 78:15 113:12
113:14,16,1 7 120:19 121:9,14
122:5 124:8,16 127:4,23
154:5
**February** 7:1,5,6,8,2 1 15:24
23:23 24:10,13,2,2 26:15 27:4
27:8 28:1 29:10 33:2,5,25
34:23 45:10 60:19 113:2
142:24 155:6
**Federal** 220:4 222:3
**FEDERICO** 1:10
**Feds** 62:23 63:22
**feel** 64:8,10 213:3
**Feliciano** 73:19,22
**Feliciano's** 74:14
**felt** 64:23 72:21,23 118:21
**Ferguson** 2:6 225:20
**few** 22:21 36:12 69:24 81:19
82:18 89:23 127:23 133:3
197:1
**Fifth** 207:8,21 219:25
**fighters** 130:10
**figure** 72:3 142:10 177:11
186:13,16,1 8 188:5 189:11
**figured** 67:10
**figures** 172:21
**file** 68:14 69:6 176:2 224:25
225:1,4
**filibuster** 197:20 222:1
**filibusters** 222:3
**fill** 22:4 47:7 53:8 54:23 56:24
57:16 58:8,11,21 82:25 98:7
98:10,17 118:23 134:18,21
153:13,21,23,2 5 154:6 155:1
211:3 222:15
**filled** 55:3,18,23 98:13 134:19
148:13 153:14
**filling** 105:20,21
**filtered** 132:1
**filtering** 131:24
**final** 40:7 41:4,23 207:19,23
**finally** 73:15 141:25
**finance** 49:17
**financial** 35:13 78:23 105:14
165:2,10,13,2 1 174:21 182:19
191:5,6
**find** 20:7 31:20 63:11 83:23 88:7
91:4 120:16 215:13 217:23
**finding** 62:9 83:20
**fine** 11:25 81:21,24 82:3 101:25
211:21 212:9
**finish** 209:12,13
**finished** 155:18 185:10
**fired** 90:15

**firms** 82:2
**first** 7:9 10:25 11:1,11 13:1 28:1
29:10 30:7 32:12 33:5,25
42:23 43:24 45:10 46:22 47:2
48:10 56:20 62:5 64:25,25
70:14 71:17,17 87:14 88:21
105:24 111:2 112:24 115:24
119:1 120:15 127:24 139:1
142:18,21 154:23 167:21
174:1 175:21 178:25 198:15
208:9,13,18 218:20
**fish** 87:20
**five** 71:15 73:3 79:16 80:21
98:18 118:24 160:23 196:21
**flight** 196:25
**flipping** 163:1 168:23
**Florida** 1:1,6,16,22 2:3,7 100:10
130:2 164:25 168:17 183:13
185:24 225:21
**flow** 170:14
**flows** 172:1
**flurbiprofen** 198:10,19
**focus** 6:23 17:13 19:1
**focused** 147:9
**folks** 5:3 6:3 82:15 225:9
**follow** 56:1 75:14 77:19 96:20
119:24
**followed** 117:22
**following** 5:1 39:17 60:22 81:2
139:12 192:23
**follow-up** 117:8,9
**food** 120:9
**force** 20:11 52:6 80:2,16
**Forces** 104:17
**Forde** 221:9
**Fordham** 87:18
**foregoing** 225:16
**foreseeable** 207:1,10
**Forgive** 118:6 179:16
**forgot** 197:6,9 208:15
**form** 7:14,22 12:4,5,11 15:20,25
22:12 23:2,2 24:3,5,7,14,15
24:16,19,21,24,2 5 25:1,2,16
25:16,21,22 33:3,4 45:11,12
45:20,21 48:1 53:8 57:18,19
57:20,22 58:21 60:20,23
81:24 86:2,6 88:18 89:6,7,11
91:17 92:2 162:15 168:1
171:14 217:14 224:24,25
**formerly** 88:21
**forms** 12:12 15:9 22:4 47:25
53:12 57:17,25 58:1,2,8,12,12
**formula** 52:15 56:11,14
**formulary** 57:15
**formulas** 54:22 55:2,15,22 56:23
56:25 57:2,10
**formulators** 44:13
**Fort** 130:2
**forth** 139:7 143:4 169:7
**forward** 29:9
**Fouche** 221:11
**found** 22:11,13 24:8 44:15 74:4
133:9 158:15 220:14
**foundation** 66:14,16 122:23
123:13 144:18,21 149:18
150:16 151:24 156:2 158:2
161:4 162:4 163:24 203:16
**four** 54:10,12 79:16 90:6 142:5,9
**fourth** 1:16 78:17,18
**four-year** 165:14
**FPR** 2:5 225:19
**frame** 104:17 131:18 135:22
145:12 173:25
**frankly** 73:7 80:12
**fraud** 65:18 130:14,14 165:20
165:20,20,2 1 204:10 219:4,5
**frauds** 206:6
**fraudulent** 199:23 205:6
**Frederick** 36:5 169:5

**free** 149:16,17
**Friday** 192:24 209:8,13 210:4
221:20 223:7,9 224:4,13
**from** 7:18 9:2 14:9 17:11 19:16
21:15 22:3,10,11 23:11,18
25:16 26:4,18,24 28:7 29:11
29:23 35:1,3 45:14 46:5,6
50:22 59:24 61:5 62:15,20
66:10,12 71:13 72:25 73:16
75:3 82:24 84:22 86:6 87:14
88:20 93:16,17 99:14,22
100:20,24 104:1,4,17 107:4
110:8,20 115:11 117:24
123:13 125:1 126:8 131:5,6
131:17 133:1 134:8 135:3,7,8
135:10,11,16,21,2 1 136:14
138:9 139:17 140:4 142:4
146:16,24 147:4 148:19 150:5
153:19 156:10 157:7 158:4,19
159:24 160:9 161:10,23 166:5
168:9,17 169:25 170:17 171:2
171:4,8,25 172:1,9,12,16,22
173:15 174:5,10,11,12,13
175:22 176:2 178:23 179:2,9
181:6,8,9,17,2 2 182:6,13,19
182:22 183:6,7 184:2,4,8,21
184:23 187:13 188:8,24
189:24 190:10 193:6 197:2,14
200:21 203:3,4 207:18 208:17
212:18 215:21 219:15 221:5
**front** 88:24 127:7 202:19 207:7
212:22 213:1,8,22 214:1
**full** 5:4,11 75:22 90:4,6
**fully** 145:12 147:5,6
**funds** 170:12,13,14 171:2 176:2
180:17 184:2
**further** 21:16 22:23 69:21 90:22
91:6 92:7 102:4 108:22 112:5
113:5 127:19 143:8 191:16
**F.2d** 205:17 207:20
**F.3d** 73:22

**G**

**Gabriella** 135:16
**gamble** 219:2
**gave** 10:1 13:13,22 25:7,13,17
26:5,20 37:6 57:15 58:5 63:2
79:6 87:13 100:25 208:19
**GED** 48:23 51:8,11,11
**general** 85:4 139:25 150:2 152:6
170:7 200:3,6 202:16
**generally** 9:19 10:8,9 130:7
165:19 175:7 214:18
**generate** 12:16 15:6
**generated** 83:9
**generically** 96:8
**gentleman** 13:5,7 27:2 101:16
101:17,19 117:13 154:24
**Germany** 196:25 197:3,14
**Gernon** 133:9,9
**getting** 23:6 24:10 28:5 37:1
41:9,23 47:13,15,17 51:8
56:16 59:15 83:8,12,24
101:22 155:16,16 183:14
211:16
**Gilda** 2:5 132:21 225:19
**Giles** 220:25
**Ginger** 3:3 30:4,5 73:6,11 80:12
84:15 110:5
**give** 11:18,21 52:1 53:9,10 57:17
70:9,10,19 75:6 76:1,5,10,21
76:25 77:2,17 96:17,19
128:15 192:10 196:14 200:10
200:22 204:24 205:1,2,3
206:15 207:19,21,24 208:5,6
208:9,17 209:4 213:19 217:19
219:4 224:8,9,10,18
**given** 10:22 33:17,20 43:19 55:3
79:15 94:14 106:1 117:16

119:9,10 157:21 200:20 206:4
206:6
**giving** 24:4 31:19 75:9
**GL** 11:3 48:7 91:21 162:21
**glad** 80:20
**glay@medrxsales.com** 25:25
**Glenn** 141:11,13,18
**GL-001092** 16:12
**go** 5:10,17 14:16 20:19 25:19
33:7 41:4 43:5 53:8 55:6 57:6
58:11 71:14 78:22 81:11
84:11 95:14,17 117:2 124:22
129:7 133:7 136:5 152:11
154:3 157:10 164:20 177:14
178:18 179:2,5 183:17 184:19
192:18 193:9 212:4 219:1
223:14
**goes** 66:21 77:22 186:13,16
**going** 5:16 13:18 14:12 20:9,9,12
20:20 27:21 30:12 31:20,21
31:24 33:7,8 36:23,25 38:8,12
39:11 41:24 44:11,13 47:14
51:21 52:24 55:25 57:12
58:21 60:18 64:16 70:9,9,13
70:19,25 72:19 74:5,16 76:9
76:18 78:2,3 79:10,11 80:7,9
80:16,17 86:13 88:3,5,9,22
89:13,24 90:5,6 94:23 96:1,24
97:24 99:19 101:9 105:2,6
107:2 116:17 124:17 132:7,8
134:3 137:6 152:11,12 154:18
158:7,14,17,24 159:1,3
163:25 166:15 167:15,24
170:6 171:8 177:21 178:18
180:6 192:7,22 193:2,13
194:5,25 195:6,14,23 196:20
196:21,25 197:14,21,23 198:5
198:24 199:9,11 200:13,24
201:1,3,16 202:6,8 203:16,19
203:23 204:22 206:6 208:23
209:1,5,7,13,23 210:7,10,13
211:1,10,11 212:1,2,13,17,19
212:20,21,24 213:5,6,11,14,21
213:22,25 214:1,4,13 215:2,5
215:12,13,15 217:13 218:24
219:2,17,24 220:13 221:3
222:5,9,13,15,17,20,2 1 223:5
223:8,14,23,2 4 224:8,9
**Gold** 202:22
**good** 6:21,22 51:20 61:22 65:1,1
71:5,8 92:9 94:15 99:7 103:15
109:1 121:9,10 128:19 129:24
143:12,13 164:23 185:14,15
187:25 191:20 192:13 193:3
208:24,25 209:2,4,19 216:15
216:18,20 217:4 218:4,4,6
219:4,8
**goodness** 51:25 70:8 79:4
**gotten** 119:13
**Government** 1:13 8:10 11:6
16:15 17:2 18:1 19:16 25:4,10
25:11,14,17 26:6,11 34:6,9,14
37:5 43:8,11 48:7 62:10,20
64:11 68:13 69:14 73:16 74:7
74:20,21,24 75:4 77:6 80:3
81:14 87:2,5,14 88:20 92:11
123:10 129:10 134:4 135:23
165:8 186:9 188:11 190:3,6
190:11 191:2,9 205:2 206:20
208:24 209:4 212:22,24 213:8
213:12,23 214:11,13 217:16
220:16 222:8 223:15,19
**Government's** 4:13,14,16,17
23:23 25:24 52:24 56:2 76:3,5
84:9,13 85:10 86:7,16 87:16
88:3,23 92:15 103:2 110:14
113:14 121:21 122:10 123:7
123:11 128:10,25 129:10,20
132:7,24 136:2 137:7 138:6,7

141:6,25 142:14 154:19,21
161:22 164:16 166:8,9,12,16
166:17,19,22,23 167:1,5,8,16
167:24 168:15,16 169:9,14
170:15 176:8,9,24 177:14,21
178:13,19 179:5 180:1,6
181:3,13,19 182:2,12,18
183:9,15,17,18 184:7,16,25
185:16 188:23 217:24
gphofficialreporter@gmail.com
2:7 225:22
gracious 70:8
graduate 130:19
graduated 50:21,24
graduates 159:18
Graham 192:19
gram 53:19 54:5
grams 53:17 54:15,17 58:3
200:10
granted 80:20 132:13
gray 29:13 32:16,19 34:3 45:15
60:24
great 80:8 194:2 209:18 223:11
Green 221:15
gross 187:9
Grounds 122:22 144:20
group 31:23 33:14 48:14 50:12
50:17 166:24 167:2,20 168:2
168:21,25 181:8,10,17,20
182:9 185:21,23 191:10
192:13
grouping 178:25 179:1
Grow 1:7 8:1 15:3 23:19 24:8,12
24:17,24 25:3,16,21 26:7,16
27:5,6,11,16,20,2 5 28:24 29:4
29:6,24 30:2,18,21 31:20
32:15,21 33:12,21,25 34:19
35:10,21,23 37:21 38:7 39:4
39:21 42:3,16 43:19 48:10
50:3,10,14,18,1 9 51:21,23
57:25 58:1,19 59:22,25 60:4
60:11,15,19 63:14,17 68:22
69:16,19 77:8 81:19,22 84:15
84:20,22 85:21 90:24,25
91:17,24 92:3 98:22,24 99:11
99:24 100:2,5 101:17 109:2
109:22,24 110:1,3 120:20,22
120:25 121:11 126:6,9,11,18
127:17 130:25 131:7,7,16,17
131:22,23,25 133:2,16,24
134:9 135:10,21 136:8 139:11
142:23 143:2,5,6 144:11,17
145:14,21 146:2,16,18,24
147:19 161:11 166:25 167:3
167:14,23 168:6,8,12 169:1,5
169:8,17,20,2 4 170:3 171:3
171:11,20,21,2 4 172:13
173:10 174:7 178:17 180:14
181:18 182:22 184:23 186:1
186:11,23 187:5,20 189:3
197:12 200:21,22,23 202:24
203:3,10,1 1 205:10 213:19
215:4 216:25 219:18 222:14
Grow's 10:10 85:11 138:9
139:17 142:4,15 144:15 161:2
161:23 179:3 180:20 181:9
182:24 183:25 185:20,24
186:9 188:2 215:24
guests 192:10
guide 58:11,13
guideline 56:1 68:9
guidelines 44:2
guilt 67:11,14 71:20
guilty 64:6 65:21 67:6,17,18
68:5 72:13,14,21,22,23
194:13 204:16 207:1 220:14
guy 207:1
guys 13:15 34:19 144:14

**H**
habit 188:19
half 5:21 61:4,7 70:14 174:8
211:11
Halliburton 193:23 194:6
hallway 192:23
hand 92:14 103:1 113:13 128:24
163:17 164:15
handle 5:13 28:14,19 29:1,2
187:24,25 192:14
happen 120:12 192:7
happened 6:7 94:10 98:2 106:3
108:2 115:6 126:23 209:16
220:21
happening 106:11 108:7 215:7
happens 158:19 214:22 224:4
happy 212:21 213:7
hardest 70:11
harmless 206:7
hate 77:6
having 18:24 20:11 35:13 75:23
97:20 105:14
head 157:6 178:9 184:3
header 37:19
headers 154:2
health 23:1 93:19 104:6,9
114:17 130:14 143:15,21
153:19 157:14,14 158:5
165:20 198:15 219:4,5
hear 20:15 40:21 70:22 75:11
87:16 93:14 121:25 122:3
155:18 158:16 159:17,17
193:7,7,11,1 5 215:6
heard 70:6 81:18 84:3 101:13
149:4 200:6 215:18 221:10
hearing 87:1
hearings 210:10
hears 198:8
hearsay 8:21,23 9:19 10:4 17:4
158:16 159:18,19
heart 51:25
held 5:1 48:10 50:3 81:2
help 46:15 71:15,11,13 118:2
132:21 193:20 205:1 209:15
221:14 224:17
helps 207:23
her 9:6,6,9,17 11:13,18,21,21,23
11:24,24 17:11 18:17,18,19
18:19 19:4 20:10,19 48:4
66:21,23,24,2 5 67:11,14,16
72:4,4,8,12,1 3 73:11 79:2
133:2 137:13 140:5 155:17
158:14,17,24,2 5 159:3,4,21
163:25 194:14 195:20 196:24
196:25 197:4
herself 66:24 72:24
hesitant 205:4
hey 85:22 209:11 215:6
he'll 196:10 214:12
hidden 206:5
high 48:23 51:8 61:16 157:9
highest 51:10 53:20
highlight 154:5
highlighted 122:11,14 124:11
134:20
highly 203:3 205:12
him 7:22 8:4 23:4,21 24:7,25
29:14,14 30:24 31:1,3,11,12
31:16,21,22 33:1,2,14 34:2
41:10 42:19,23 43:20,23 44:4
45:14 50:15 56:20 60:20,22
61:11 62:25 88:18 91:24
117:19 118:8,8 124:18 133:10
145:23,24 147:3 180:2 187:6
195:12 199:9 200:21 201:6
203:11 206:22 213:9 220:15
220:18
himself 188:7
hired 52:13 90:24

hires 149:1
hiring 49:22 52:9
history 53:10
hold 6:12 70:25 84:13 123:1,1
129:12,12 138:7 166:15
195:22,22
holder 180:18
holds 168:24
home 106:12 191:24
honest 47:8 97:24
honestly 155:7
Honor 5:9 6:17 8:21 10:15,20
13:9,25 16:6,9,25 17:3,4,7,22
18:2,5,14 19:17 20:5,21 29:16
32:4 37:16 38:12,17,18,20
40:9,12 42:9,12 66:14,21 67:9
69:21,24 70:18 76:9 77:21
78:16 79:19 80:20 85:7 86:23
87:22,25 88:6 91:6,8 92:7,21
99:2,4 102:2,4,16,24 108:22
110:11 111:12 112:5 121:4,20
121:24 122:2,21,25 123:3,5,7
123:12,16 124:23 125:10,13
125:16,18 126:24 127:2,19
128:18,22 129:8 132:9,16
135:23 142:12 143:8 144:21
144:24 149:21 150:20 153:7
153:24 154:18 156:4 159:11
160:20 161:6 164:4,7,11
166:4 185:10 191:18 193:19
194:11,15 195:1,5,24 196:10
196:13,23 197:8,18 198:7,14
200:3,17 201:17,22 205:8
206:10 208:14 211:22,24
212:20 214:16 215:14 216:2,8
216:10,13,23 218:6,17 220:6
222:16,19 224:6
HONORABLE 1:10
hope 78:5
hopefully 87:17
hoping 68:12 69:5
hospital 156:22,23 157:1,20,23
Hospitals 144:7
hotmail 161:2,24
hour 5:16,21,21,21,2 1 31:10
70:15 71:2,2,3 119:2 194:6
224:3
house 58:15 62:23 63:22
housed 135:12
How's 224:2
human 9:18,20
Humana 149:13
hundreds 43:10 90:17
hurt 19:22 20:1 75:1
husband 196:24

**I**
icon 170:24 171:1,8
ID 138:19,23 140:18
idea 7:25 32:16 98:24 100:7
109:7 120:22
Identification 4:3
identified 20:24 136:10,11
138:10 140:24 142:5 177:25
identify 136:20,22
ignorance 205:3,4,19,21
illegal 61:10 62:8,11,12,15,18,19
64:1,2,4,9,10,11,12,13,15,19
65:15 67:2
illustrate 170:14 171:1
illustration 181:21
image 181:22
images 181:7 182:5 183:11
184:20
immediately 27:17,21 30:12,25
32:14 44:24 60:16
impeach 9:12 11:21 19:25
impeaching 11:14 72:10 73:25
impeachment 9:13 17:20 74:13

75:7,10
imply 71:24
implying 47:20
important 27:7 75:4 76:20
206:20
inadmissible 214:2
Inc 49:19 167:20 168:2,21
incentive 115:19
inches 106:17,18
include 130:13 188:8 207:9
208:2,4
included 46:13 205:9
inclusive 166:9
inconsistency 18:5 75:16
inconsistent 9:10 10:13 17:16,21
17:23 18:2 19:20,21,25 20:13
73:24 74:12,25 87:19
inconvenient 203:3
incorporated 135:14 185:24
incorporator 169:2,3,4
increase 203:5
Indeed 77:25
independent 50:1,15 55:13
indicate 171:13
indicated 20:17
indicating 170:24 171:19 172:16
indication 210:21
indicted 63:1
Indictment 67:23 179:12,13,17
180:12 181:7,24 197:4 201:20
216:19
individual 28:9 89:16 94:12
136:20,20,23,24,2 5 138:16,24
176:22 180:11
individuals 47:22 90:9 138:9
139:12,19 140:2,21 163:20
177:1,2,9,2 4 178:7 215:2
219:19
indulge 153:7
indulgence 124:23
industry 23:1 105:7
inflammation 85:4
information 15:11 22:5,10,11,12
25:13 26:8,9 27:2,3 53:3,4
54:22 55:17 106:4,5,6,6,10
117:15 118:3 132:3 133:10
135:11 137:9 146:19 151:13
153:17 154:2 156:12 162:15
169:10 181:6,6
InforMD 173:16,20
informed 28:7
infrastructure 130:11
ingredient 198:10
ingredients 96:12 138:14,15,25
139:3 140:23 142:7 202:11
203:18
initial 7:3,4 21:5,16 22:21 28:1
96:23 97:5 101:4 112:23,23
initially 98:1 101:16
injury 107:2
innocent 67:7
inquire 17:24 92:21
inquiring 69:23
inside 132:19 173:11 179:20
196:13 202:2
installments 115:25
instance 168:18
instances 133:21 216:15,18
instead 56:8 205:15
instructed 203:4
instructing 205:19
instruction 20:20 73:18,21
74:11 75:6 76:1,5,10,21 77:9
78:1 205:3,4,22 206:14,15
207:2,5,22 208:17,20,23
209:4 217:19,24
instructions 75:9 77:17 84:3,4
198:25 203:3 204:25 205:13
207:19,25 208:8,25 217:7,20

**224**:10
**insurance** 12:17,21 15:1,7 52:15
   52:17,20,22 57:1,3,6 64:21
   93:19 104:6,9,13 114:17,17
   134:23 138:21 143:16,24
   147:22 152:22,24 157:14,15
**insurances** 149:13
**intake** 53:8 57:16,18,19,20,22
**intend** 65:21 195:12 205:1
**Intensive** 107:25
**intent** 65:20 66:1,5 72:4,9
   208:22,23 215:24
**intentionally** 80:5
**interest** 168:5,24 169:22
**interested** 50:10
**interesting** 20:8 65:1
**interests** 10:9
**interfere** 125:8
**interfered** 72:10,18
**Internal** 165:16
**interrupt** 159:14 197:21
**interview** 139:20 158:21 159:7,8
**interviewed** 159:3 214:12
**interviews** 139:10
**intricate** 150:2 152:6
**introduce** 166:6
**introducing** 17:19
**invested** 69:9
**investigate** 130:8,13,25
**investigated** 219:20
**investigates** 214:22
**investigation** 131:14 145:4,10
   158:11,12,1 5 161:3 163:12
   165:16,22 166:1
**investigations** 165:21
**investigative** 129:6 130:2,5,9
   131:13 145:2 160:8 163:18
**investigator** 165:2,13
**invoke** 219:24
**involve** 104:3
**involving** 7:12 12:18 14:20
   130:25 218:10
**iPhone** 26:22,23
**irrelevant** 212:25 216:15
**issue** 9:19 13:20,25 20:11 66:23
   66:25,25 67:11,11,15 72:14
   73:7,9 74:11 75:3,24 76:13
   119:25 198:18,22,24 208:22
   213:12,18 218:8
**issued** 171:3,16 181:10
**issues** 75:20,23 85:23 105:14
   214:18,19
**item** 151:9
**items** 156:25 170:10
**I-n-f-o-r-m-d** 173:17

---

**J**

**J** 1:13
**jail** 68:2,2,8
**James** 3:15 113:11,14,16
**January** 1:7 7:6,7,8 16:19 17:7
   18:4,4 19:3 21:7 22:17 25:17
   28:1 29:10 33:1,5,25 45:10
   59:14 60:18 61:20 64:25
   122:20 123:23 124:9,13 154:6
   154:13 155:6,9 192:12,12
**January/February** 24:13
**jeez** 207:7
**JEFFREY** 1:20
**Jennifer** 3:19 128:23,25 129:2
**jeopardy** 220:1,5,22
**jet** 184:21 185:2,4
**jmarcus@mnrlawfirm.com**
   1:24
**Jo** 220:24
**job** 104:21 119:2
**Joe** 221:9
**John** 58:14 131:25 132:2,3
   133:22,23,24 134:21 135:16

147:3,5
**joined** 61:5 74:2 158:11
**joints** 99:18,20 100:21
**JON** 1:14
**Jonelle** 201:21
**jon.juenger@usdoj.gov** 1:18
**Josie** 204:20
**Joy** 140:1,6 141:4,11,14
**Jr** 2:6 225:20
**judge** 1:11 9:8 73:19 74:1 77:7
   79:14 80:23 110:17 123:19
   192:19 207:7,17 209:10,14
   210:5,12,20,24 211:3,10,13
   212:5 215:18,23 220:12,24
   221:21 223:17
**judges** 6:7 222:3
**Juenger** 1:14 3:8,10,16,18,23
   76:9,12,17,23,2 5 77:2,21,25
   78:3,5,12,14,19,21,24 81:5,7
   84:11 92:12,21,23 93:3 99:2
   102:7,16 113:11,21,23 114:2
   121:4 122:21,23 123:12
   127:22 128:18 164:11,22
   166:4,8,14 185:10 191:18
   196:10,13,18,23 197:4,8,10,17
   197:24 198:14,19,24 199:5,7
   199:9,12,15,17,21,2 4 200:3,6
   200:12,15,20,2 5 201:5,8,13
   202:2,8,11,2 1 203:9,13 204:6
   204:9,11,13 205:8,12 206:10
   206:22 207:3 214:16,20
   215:14 218:17,21 223:25
**jug** 202:24
**July** 173:24 174:5
**June** 34:23 36:10 39:23 40:18,25
   41:4,5,9,13,15,1 6 43:3 62:22
   63:17,21 89:16,22,23,25 90:3
   90:8,9 170:21 174:1 187:13
   187:15
**junior** 105:13 109:11,13,14
**juries** 205:19
**jurors** 5:11 6:1 20:8 70:10 73:4
   76:7 81:4,13 124:21 159:18
   162:7 208:3 211:12
**jury** 1:10 5:2 6:2 20:13 71:13
   75:11 81:3,9,10 85:3 133:6
   134:14,16 137:7 138:8 144:13
   167:16 168:16 169:23 169:14
   170:7,15 176:25 177:22
   178:13,21,21,2 2 180:7 181:5
   192:9,21 193:6 202:20 204:25
   207:2,2,5 213:2 214:1,2 216:1
   217:23 219:11 224:9
**just** 6:11,24 10:18 11:15 12:19
   13:2 14:2,13 15:15 17:10 18:4
   18:17 25:23,24 26:13 27:10
   28:2 30:3 33:1 36:2,12 39:1
   40:21,22 41:9,17 43:3 46:19
   46:21 50:24 51:25,25 53:8
   56:15 57:12 60:14 62:5,9
   63:17 64:5 70:1 72:9,20,25
   74:2 77:7 78:8 84:13 85:7,11
   85:25 87:9,12,15 89:25 91:8
   91:16 93:4 94:25 95:24 96:8
   104:13 105:14 107:24 109:17
   109:19 112:9 113:23 116:6
   117:15 118:8,9,20 119:20
   122:23 123:9 124:21,21 126:5
   128:9 130:7 132:8,14 133:5,5
   134:1,16 135:21 137:3 138:20
   140:16 141:14 142:16 144:13
   146:11 147:5,9,13 150:11
   151:9 152:9,12,13 154:5,23
   155:1,5 157:23 158:7,18
   162:13,23,23 164:6 166:15
   167:11 168:23 172:4 173:4,5
   174:3,17 176:4,5 177:2
   178:22 180:4,8,23 183:7
   185:16 187:17 188:14,15,15

188:24 189:15 190:5,9,19
   192:20 193:2,2,5 195:10 197:1
   200:3,8,1 7 202:25 204:8
   208:16 210:6 211:12 213:14
   214:24 215:6 217:3 221:7,8
   221:13 222:21 223:5,7,7,17
   223:25 224:6 225:2,3
**justice** 130:18
**J-e-n-n-i-f-e-r** 129:2

---

**K**

**Kate** 109:1 121:11
**kate@kmeyerslaw.com** 2:4
**Kathryn** 2:1,1
**keep** 5:16 8:2,5 14:13 37:1 42:22
   42:24 43:19 44:7 47:3 61:16
   70:5 90:20 153:11 224:5,18
**kept** 34:17 39:23 43:3
**Kessler** 181:8,10,17,19
**KEVIN** 1:13
**kevin.larsen@usdoj.gov** 1:18
**key** 69:15 224:19,20
**kids** 51:17
**killed** 207:14
**Kim** 220:24
**Kimberly** 41:14
**Kimble** 48:14
**kind** 7:12 71:25 72:2,16 73:15
   73:15 86:25 94:13 96:2,4,6
   100:15,16 106:6 107:23
   114:16 115:17 117:15 134:16
   140:5 165:7,9 178:18 217:22
**kinds** 10:6 94:4 115:12 116:3
   160:6
**King** 207:7
**Klein** 3:19 78:19,20,21 128:23
   128:25 129:3,24 132:5,23
   136:6 143:12 153:13 158:11
   163:5
**Klitz** 3:22 78:21,21 164:11,16,19
   164:23 166:15 176:8 180:25
   183:14 191:19
**knee** 107:2
**Knees** 99:17
**knew** 22:22 27:25 29:6 33:12,21
   33:24 41:24 45:9 59:25 60:16
   61:10,13,17 63:11 105:13
   108:19 205:6 210:17
**know** 6:4 10:1 11:14,16 13:5,11
   14:3,5 17:13,13 18:4 19:24
   22:23,24 26:25 28:10,12
   29:14 32:18 36:22 38:11
   39:17 50:19 52:8 55:1,22
   56:18 57:4,5,9,12 58:25 59:5
   59:11,22 61:15 62:5,19 63:19
   65:3,8,8 66:4,15 68:25 69:1
   70:1,5,8,12 72:20 73:2 75:5
   75:25 77:7,18 78:8 79:1,23,24
   81:22 82:1 85:20 87:10,12,14
   87:15 89:17 97:23 98:21
   103:21 104:1,4 106:19 108:16
   115:9,23 118:1,2,21 119:14
   119:15 120:19 124:14 125:6
   125:22 127:14,16 132:11,17
   133:12 135:14 138:21 139:7,7
   140:1 142:5,6 144:22,23
   149:19,20 150:17,17,19,20
   151:8,25 152:4,19,21 153:19
   155:18 156:3,4,7,9 157:11,25
   159:23 160:21 162:7,7 163:16
   178:7 183:4 187:17,17,24
   188:6,20,21 190:13,16,19
   193:14 195:5,9,10,16,17
   196:19 201:11 202:1,3,9,14
   203:6,7,8,20 206:4,15 207:5
   208:15,15,15,1 7 209:22 212:5
   214:8,12,13 217:25 221:15
   219:7 220:5,7 221:11 222:8
   223:20 224:14

**knowledge** 55:13 126:20 128:17
   144:12 163:11,11,12,17 189:2
   189:16 205:20,20 206:1
**known** 88:21 97:1 135:5
**knows** 66:19 214:17
**K-l-e-i-n** 129:3
**K-l-i-t-z** 164:19

---

**L**

**L** 1:19 103:9
**lack** 123:13
**lady** 117:14 120:15
**laid** 203:16
**Land** 175:22,25 182:6,13
**language** 22:12 88:9 111:3
**laptops** 25:8
**large** 106:17 143:15 178:19
**largest** 143:21
**Larsen** 1:13 3:5,12,14,20 8:19
   8:21,23 9:1 13:9,11,14,23,25
   17:3 18:2 19:17,20,21,23 20:5
   32:7 38:17 40:12 42:12 46:1
   48:21 49:3 66:14 69:24 70:2,4
   70:7,18 80:23 81:15,17 84:10
   84:12 85:7,9 86:14,17 87:25
   88:2,6,8 91:6 102:24 103:14
   108:22 112:8 113:4 128:22
   129:8,13,15,17,2 3 132:9,12,14
   132:16,22 135:23 136:4
   139:21,22 142:12,13 143:8
   144:18,21 149:18 150:16
   151:16,24 156:2 157:17 158:2
   158:6 161:4 162:4 163:24
   164:7 193:19,21,2 5 194:3,6,9
   194:11,13,23 195:1,3,5,9,16
   195:18,24 196:1,4,6,9,11
   201:17,19,22,2 4 204:15,21
   216:13 224:23
**last** 28:23 41:25 51:10 71:17
   92:17,18 103:4 129:3 136:5,6
   143:6 144:14 151:16 152:9
   162:13 222:14 224:6
**lastly** 184:15
**late** 40:25 145:4,11 183:14 199:2
   201:9
**later** 21:22 41:4 74:19 108:8
   130:22 186:19 187:12 206:12
**Latonya** 137:13
**Lauderdale** 130:2
**laundering** 183:2 185:8
**Laurene** 195:18 196:3,3,4
**law** 2:1 9:11,15 10:11 65:21 66:5
   73:14 75:6,14 79:18 80:6 82:2
   87:18,18 161:2 214:6
**lawfully** 148:22 150:14
**lawyer** 67:12 73:5 82:6 211:15
   219:25 220:10
**lawyers** 6:6,10 7:15 29:11,12
   60:24 70:24 79:20 91:18
   192:25 215:12
**Lay** 3:3 6:21 10:25 14:19 21:2
   25:4,11,23 29:23 37:19 67:22
   73:6,11,11 80:12 81:18 85:10
   86:3 91:16 110:5,8,20 215:20
**leads** 12:16 15:6
**learn** 220:7
**learning** 205:24
**least** 39:4 52:10 69:23 72:17
   167:2 220:9
**leave** 71:6 73:2 191:25 219:10
**left** 58:5 75:21 170:22,24 171:1
   171:19 179:9 180:9 196:20
**legal** 32:15 45:14 61:25 62:1,2,3
   72:12 82:2,5
**legally** 219:1
**lend** 192:19
**length** 85:3
**less** 52:7 93:13,15 145:6,7
   152:25 153:5 160:23 172:6

let 10:5,25 14:12,22 22:22 28:11
29:14 31:15 33:7,12 36:22
41:8 55:6 56:2 65:17 71:17
73:8 75:25 80:3 97:19 99:13
99:24 108:2 119:14 120:19
160:5,8 161:9,21 162:13
173:5 183:17 185:16 193:7
205:14 208:16 212:5,12 213:9
214:21,22 215:10 219:11
224:2
Letkemann 3:11 46:8 78:14
102:25 103:2,7,15,18 109:1
110:19 111:8,17,23 112:9
letter 39:5 40:3 70:13 124:7
letters 14:6,7 21:2 162:21
letting 28:10 32:17 55:1
let's 5:10 9:23 25:23 27:10 46:21
88:7 123:1 124:22 138:6
170:19 176:8,23 179:5 212:4
212:12
level 51:10
lie 28:2
life 65:9 93:20
lifted 183:7
light 27:5 215:21
like 17:13 33:1,24 39:24 41:17
49:25 53:8 59:23 60:14,17
64:8,24,25 71:7 72:8,16,21,23
76:11 82:4 94:15 97:23 98:9
105:16 106:24 107:25 113:24
117:15 124:7,14,15,21,22
130:16 138:20 142:20 145:6
149:13 150:11 151:8 156:21
156:22 157:24 159:16 166:5
172:1 174:17 189:6 206:1,8
206:13 207:19 214:24 215:10
223:3
limine 216:14
limited 75:9 204:5
limiting 69:23 73:18,21 74:11
75:6 76:1,5,10,2 1 77:9,17
line 4:4,4 21:9 86:5 151:9 161:10
171:4
line-by-line 133:7
linked 180:4
LinkedIn 48:16
Lisa 3:22 78:21 164:11,16,19
list 28:6 43:25 44:5 51:1,1 78:25
80:1 133:14 142:15 176:20
178:7 209:16 210:20 212:12
218:17
listed 133:12,23,24 147:1 169:9
177:18 179:25 180:10,23
181:3 182:16 187:8 197:4
listened 160:9
listening 216:11
listing 51:13 142:19 177:1,23
180:8 189:21
lists 21:18 146:19 147:2 179:9
179:14,17 180:12,17 182:25
literally 133:9 145:6 151:7
little 5:18 6:24 20:11 67:23 71:6
75:1 76:7 105:16 107:13
115:17 117:24 122:12 134:17
172:4 173:15,19 174:10,12
187:9 190:7 219:6
live 93:4,24 100:8 103:18 114:3
164:24
lived 214:17
living 165:1
LLC 21:15 23:11 173:17,20
Lloyd 8:7,13,16 11:8
Lloyd's 9:1
LLP 1:20
local 195:12 199:10 201:6
locate 138:5 180:14 182:7
located 176:17 179:19
lock 224:20
long 5:15 20:10 65:9 69:22 70:1

70:3,11,15 75:23 79:25 98:8
98:17 100:3 114:5 118:23
130:4 160:4 194:5 195:18
196:3,3,4 204:18
longer 5:18 6:9 35:4 108:17
178:6 196:10,11
look 13:1 24:17 25:23 27:10
36:13 46:21 71:11 74:1 91:18
122:11,15 124:14,14 131:10
131:11,11,25 133:9 138:6
139:8,16 140:14 141:6,17,25
149:2 151:8 167:10,21 176:4
185:17 186:8,25 188:2 191:2
191:24,25 197:5 210:6,23
211:8 212:12 225:1
looked 7:18 32:15 60:21,24
139:1,18 142:17 146:12
148:12 150:4,25 168:5 177:5
185:20 189:6 191:8
looking 11:11,15 16:4 95:7
116:2 124:21 131:22 147:8
159:24 176:23 188:14,24
217:17,17
looks 124:7 193:1
lost 13:22
lot 40:1 43:16 52:7,25 57:2
63:10 67:24 68:1,4 69:9 75:18
77:8,11 106:24 117:14 132:19
155:22 158:1,19 163:9 195:15
207:5 210:8 212:10
lotion 107:20,21,23,24
lots 187:23
Louis 195:16 196:9 202:3
love 223:25
loved 192:3
low 68:9
Lozada 202:1,2 204:3
Luis 221:15
lump 173:20
lunch 70:10 78:11 192:18 224:3
luncheon 80:25
lunchtime 195:15
lying 72:24
L-e-t-k-e-m-a-n-n 103:8

# M

M 1:14 13:14 14:16
made 7:19,20 9:9,17 18:10,11,16
18:24 24:7,15,16 29:9 35:7,17
40:8 45:13 52:7 66:11 83:13
85:5 89:22 90:1 112:23 119:2
163:5 170:8 171:10,17 173:2
173:11,20,2 5 175:23 176:14
176:21 177:3,24 178:16 180:9
182:22 187:5,6,6 188:7
215:11
mail 97:8 98:5 101:6 102:8
105:10 106:25 108:6 118:5
main 20:7:1
major 50:22,25 51:1 165:15
make 9:18 18:19 23:4 24:25 25:1
29:8 33:4 45:12 52:20 56:14
58:5 60:22 65:12 69:10,17
70:11,13,14 71:3,3 73:16,17
75:11,13 77:7,25 79:14,20
80:19 87:10,17 88:18 92:23
105:16,18 107:13 122:19
123:24,24 124:15,15 128:14
138:18 142:8 143:25 153:10
158:18 172:15 185:17 187:19
189:10 197:19 206:11 208:3
208:16 224:10
makes 74:9 206:22 207:24
219:11 225:8
making 18:6 43:16,18,18 75:13
man 94:8,9 95:22 98:21 117:21
117:24 120:20 128:5,7 206:20
manager 149:1,7
many 6:8 45:4 50:14 59:23 60:4

63:8 98:15 120:2 136:19,25
145:12 167:1 178:7 197:6,7,9
212:1
March 8:3 27:11,17 29:3,10,23
30:11,17,18,21,2 4 31:1,2
32:17 34:1 37:23,23 38:5,23
41:3 42:19,23 43:22,23 44:8
45:13 46:14,14,20 47:2 48:5
60:17,23 90:12,1,5 108:12
111:22 112:1,17,24 142:25
143:3,4,5
March/April 108:12
Marcus 1:20,20 3:4,6,21,24 5:9
5:13,16,25 6:16,17,20 9:5
10:15,20,24 11:18,22 12:1
13:13,22 14:8,11,18 16:6,9,11
16:25 17:6,10,18,21 18:7,8,14
18:17,21 19:2,11 20:21,23
21:1 29:16,20,22 31:5,6 32:4
32:9,11 34:11,13 37:16,18
38:12,15,20,2 2 40:9,15 42:9
42:15 45:23 46:4 48:25 49:6
66:17,21 67:1,8,13,16,21
69:21 72:1 78:23,25 79:2,5,12
81:18 82:17 84:2 86:2,18,20
86:23 87:8,22 89:10,13,22
90:12,24 91:8,11,15 92:7
143:11 144:14,16,19 145:1
149:23 150:22 152:3,9,15
153:7,12 154:4,18,22 155:13
155:16,19,20 156:6 157:19
158:10,17,20 159:1,5,6,12
160:1,3,7,20,23,2 5 161:1,8
162:9 163:4 164:2,4 185:13
188:19,21,22 191:16 194:12
197:12 198:3,7,9,12,18,22
200:17 202:14,16 203:15
208:11,13 217:9,11,13 218:6
218:11,14 223:7,12 224:6,15
225:2
marine 104:13,20 105:13 106:1
109:11,13,14 113:7
Mariner 183:17
marines 104:21
marked 4:3 16:10 34:11 36:2
56:7 87:13 166:16
market 21:19 52:13,20 87:11
95:7 116:2 163:22 216:7,9
marketer 61:24 216:5 219:18
marketing 48:11,19 49:15 50:4
50:6,22 51:22 52:17 61:19,24
62:17 64:17,22 81:20,23
166:24 167:2,20 168:2,21,25
175:22 178:16 182:9 185:21
185:21 191:9,14 217:1
marksmanship 104:22
married 51:17
Marshall 36:5,6 41:9,17,18
Marshall's 36:13
Martin 73:19 74:1
Mary 133:22 220:24
Massachusetts 208:9
master 132:1 133:8 147:4 151:4
176:20
Master's 130:18,23
match 169:9
materials 79:2,3,7,9,11 80:10,10
131:14
matter 20:6,18 73:9 74:2,3
75:17 87:6 158:8 215:10
225:17
may 6:15 10:20 11:18 16:6
17:24 18:23 20:1,7 29:16
36:13,16 37:16 41:5,6,10,15
41:16,16,18,20 42:1 44:1 54:7
61:3,4 63:25 74:10 77:21,22
77:25 85:7 90:1,3,4,8 92:21
102:2 110:11,16 111:12,15
121:20 123:16 126:24 132:12

132:13,15,16 166:4 187:13,15
194:6 205:10 206:17 207:8
215:18 216:24 220:16
maybe 14:14 19:22 20:6 70:2
87:13 98:18 170:22 171:13
209:14
ma'am 73:2 92:8 121:13,16
122:8 126:7,10,12,23 127:13
McKenzie 208:21
MD 128:14 199:17
mean 9:24 14:14 46:19 52:22
72:7,17 89:19 115:16 147:12
151:7 152:19 157:11 186:24
197:5,6 207:17 210:6 211:4,7
214:19 219:2,10 221:12
222:25
means 18:12 20:14 64:2 66:16
88:7 160:21 173:11 211:16
219:2
meant 206:10
Med 19:4 21:9,12,15 23:11 35:6
37:8 40:16 49:19 50:1
media 160:14
medical 148:6,23 150:5 157:7
Medicare 93:20
medication 12:21 59:2 107:18
107:19 116:5 121:15
medications 53:23 57:7 58:23
95:10 105:10 107:6,10,15
108:11,14,16,2 0 146:13
150:15 157:3,4 202:17
medicine 100:12 101:23 116:6
MedRx 110:22 127:11,14
meds 107:12
meet 63:7 82:15 98:10
meeting 82:14
member 138:20
members 138:22 140:5 163:15
memorialized 32:23
memory 151:12
Memphis 50:22 51:14
men 130:11
mention 24:19
mentioned 14:5 24:24 25:2 51:7
51:8 73:23 132:6 167:12
198:11 202:23
mentioning 37:25
merely 69:23
MERIDA 71:9
mess 5:4
message 29:23 30:2,9,21 34:5
42:16 43:5,7 44:4 82:11 126:8
messages 8:10,13 26:13,16,18,24
43:10 60:2,9 69:13 213:12
met 48:10 50:3 63:7,16 98:12
99:11 109:5 121:12
metabolic 35:3,4 58:4,16
Meyers 2:1,1 3:13,17 108:25
109:1 110:11,14,17,18 111:12
111:16 112:5,11 121:8,11,20
121:24 122:1,4,25 123:3,5,7
123:16,19,22 124:19,23,25
125:10,13,16,18,1 9 126:24
127:2,3,19
MG 161:19 162:18
MGTEN 166:24 167:2,11,19
168:2,21,24 171:4,5,7,22,25
172:9,10,12 174:12,14 175:12
175:22 176:12 177:6,10
178:16,24 180:14,20 182:9
185:21 189:19 190:20 191:9
191:14
Miami 1:2,6,16,22 2:3,6,7
192:13 225:21,21
Michael 201:23
Middle 87:12
mid-April 112:11
might 20:14,18 44:17 53:5 59:22
96:9,15 115:11,12 217:4

218:1
migraines 99:22
military 93:9,17 104:9 106:9
114:8 115:9 130:11 143:18,19
196:24,24 210:17
million 61:4,7 151:17,20 152:25
172:17,18,21,22,2 174:9,11
174:12,13,1 7 175:1 7 176:5,12
182:24 184:3 187:10 190:4,5
190:7 218:22
millions 203:2
Mills 169:5
mind 40:23 66:21,23,24 67:16
72:4,13,13 86:23 92:17 151:8
minute 186:12
minutes 31:2 70:2,4,4,7 71:15
73:3 98:18 118:24 127:23
160:23
misinformation 31:19 33:17,20
missing 25:15 208:17
Mississippi 93:6,24 95:14,17
100:9,10 114:5,20
mistake 66:4
misunderstand 205:7
mixed 71:23
mixing 202:11
model 19:5
modified 22:13
moment 38:17 102:2 105:9
109:10,19 132:5 142:12 176:4
Monday 222:7,13,23
money 35:13,22 43:16,18,18
44:12 59:17 61:12,19 63:24
65:1,12 105:17 107:13 115:21
115:22 119:17 120:8 172:1,3
183:2 185:8 186:9,18 188:24
monies 190:18,19
month 23:14 40:4 94:14 97:2
105:20 118:17 119:1
monthly 53:23,25 54:19,20
115:25 118:16 174:2,2
months 42:4 45:4 61:10 66:9
68:9 120:2,3,5 145:6,7,13
159:9
Monty 1:7 7:17 12:14 22:19
23:3 24:6,12,24 25:3,21 27:25
28:20 29:6 32:15,21 43:18
45:10,10,12,13,2 2 50:19
51:23 52:2 53:22 55:9,25
56:17,25 57:12 61:13,17 62:5
62:5,16,22 68:25 81:19 88:17
89:7 90:15 98:22,24 99:11,24
100:2,5 101:17 109:2,22,24
110:1,3 120:20,22,25 121:11
126:6,8,11,18 127:17 130:25
134:9 142:23 143:2,5,6
146:16 161:23 166:24 167:3
167:14,23 168:6 169:1,5,8,17
169:20 171:3,10,20,21,24
172:13 173:10 174:7 178:17
179:2 180:14 181:9,18 182:22
182:24 183:25 184:23
more 5:22 6:5 20:7 21:23 26:15
36:20 40:1 41:14 42:1,5,6
44:12 47:7 55:5 61:4 68:8
76:14,15 80:15 89:19,21 90:2
90:3 93:13,15 106:24 108:19
115:17 158:1 172:6 174:10
188:4 195:15,25 196:2 200:19
200:20 202:4 204:17 206:20
222:22
MORENO 1:10
morning 6:7 30:17,18 38:23,25
192:4,8 193:4 197:22 210:4
223:24
Morrisville 103:20
mortgage 165:20 206:6
most 9:18 51:10 71:19 75:4
76:20 103:23 177:3 190:1,23

motion 68:14 69:6 216:14
motions 74:17
motivate 116:13
Motrin 107:9 116:7 157:21,23
move 29:9 72:7 160:17 192:8
195:12 196:25 210:10 222:21
movement 188:24 215:19,20
moving 105:14 129:10 171:5
182:18 192:25 193:18
much 52:3 57:1,10 73:8 74:18
96:23 106:19 108:16 115:22
116:17 160:18 164:20 172:3
173:18 178:6
Multidistrict 192:11
multiple 177:4
multivitamin 95:8
multi-object 225:4
murder 207:13,15
muscle 115:14,16,18
must 32:13 47:5,8,1 5 111:3
215:7 217:25
myself 138:20

N

N 10:21 113:17,22
name 24:23 29:25 30:7 36:13
46:8,12 70:16 88:15 92:16,17
92:18,18 94:7 95:20 98:21,23
99:10,24 101:18 103:3,4,6,15
106:8 109:1 113:15 115:8
117:13 120:20 121:11 128:7
128:11 129:1,2,3 134:18
135:6,19 149:4 164:18,19
167:19 173:16 175:22 180:17
182:24 185:24 186:2
named 13:5 19:3 131:25 132:6
154:24 158:21
names 131:15,20,24 133:4 135:6
135:7,9,15,19 137:16 142:20
146:15 177:1 186:5
Nancy 14:8
Naples 175:22,25 182:6,14
narrow 70:10,19 209:6
nature 176:22
Navy 114:11 128:20
necessary 59:13 77:9
need 19:24 28:8,13 54:7 58:22
59:1,2,16,18,2 3 60:12 71:21
77:2,12 87:17 106:24 107:10
107:11 132:14 164:13 192:17
195:13,14,15,2 5 196:2,5
197:2,2,5 198:4 199:5,24
200:9 209:11,12 213:3,13
215:13 217:13
needed 7:19 24:7 27:17 32:16,19
34:4 58:18 60:25 88:18
needs 47:10
Negative 116:19
negotiate 51:23
negotiated 51:20
negotiation 49:17 52:4
neighborhood 116:21
Neiman 1:20
neither 77:19
nervous 29:3 30:22 33:7,11
net 187:8
network 50:11,15 51:21 52:10
58:20
networking 48:13
neuropathic 85:4,5
never 15:23 23:21 25:2,17 35:21
42:5,6,7 55:10 57:14 58:4,5,5
59:7,9 60:11,13,1 3 98:12,20
99:11 100:2 109:3,5 121:12
126:6,8 189:6 200:7
new 42:7,8 44:2,10,19,2 3 45:3
89:21 90:22 91:9 94:13
news 70:23 209:19
next 30:17 67:11,20 78:5,6,10

79:16 92:13 102:23 106:11
108:7 113:10,12 128:21
133:19,20 142:20,20 143:2,4
154:9 164:10 192:19 201:15
209:24 210:25 213:10
nice 192:19 225:10,11
Nichole 140:3,10 141:9,13,19
194:3 195:3
night 14:13
Nixon 9:14
none 32:20 146:23
nonsense 75:20
non-paid 27:22,24 39:19
normally 9:21 71:18 212:8
North 2:6 103:20 225:21
Northeast 1:16
nothing 9:13 41:6 51:8 52:17
54:19,23 55:1,16 82:19,22
83:4 91:6 92:7 102:4 108:22
112:5 113:5 121:3 127:19
143:8 149:16,17 191:16
notice 79:16 175:5 217:6
noting 72:25
November 8:14,16 12:2 137:5
145:11,11
number 1:3 4:5,6,7,8,9,10,11,12
4:16 13:6 14:4 16:12,14 20:25
29:25 30:3 32:10 36:20 38:21
40:14 42:14 44:11 46:3 49:5
79:5 84:9 88:1 90:7 91:21
96:17,19 106:8 119:9,10
138:11,15,19 139:3 140:18,20
147:2 148:5,8,10 154:21
155:3 156:11 161:18 162:18
162:20 166:5 167:19 169:18
191:12 208:18 212:15,16
numbers 4:13,14,17 11:1,5 48:7
129:20 136:2,7 142:20 147:3
146:11 147:8,10,11,17,20
148:8 149:1,22 150:4,21
151:12 152:2 153:2 154:3,5
156:21,25 160:17,25 161:9,13
161:21 162:1,8,13 163:22
164:3,12,13 166:7 170:6
172:15 173:13 174:6 176:23
180:6 183:22 185:20 188:1,17
189:19 190:9 191:2,12,16
193:3,9,24 195:25 196:5,16
197:13,20 200:13,23 201:14
203:22,25 204:17,22 207:2
210:22 211:24 212:13 213:11
216:3 217:10 218:19,23
220:19 221:7,18 222:11,12
223:20 224:5,14 225:5
old 26:18 70:12 73:13 93:7
114:6 207:6
Oliver 140:2,10
once 7:19 21:3 26:15 29:9 34:18
36:21,21 37:12 41:14 61:19
118:16 129:1 219:3
one 11:15 13:24 15:23 21:7 24:6
24:18 29:8 31:5 34:18,25
37:11,14 38:17 40:1 41:10,13
41:13,24 43:13,25 44:11
50:25 51:5,17 54:5,5 55:5,20
58:9,14 59:12 66:22 68:5 74:4
76:8,20 77:3,10,14,15 89:17
89:18,21 94:25 102:2 124:3,5
133:24 134:2 138:23 139:3
142:12,22 143:2,6,21 146:25
151:6 155:17 162:13 168:13
171:16 173:8,9,20 174:1
175:21,23 177:3 178:1 186:8
188:25 196:23 197:14 198:16
199:12,14,15 200:10,18,18
201:3,4 206:2 207:5 208:16
208:25 211:23 215:8,11
219:15 221:3 222:1 224:11
225:1,1

115:21
offering 23:13,13 35:4 42:9
115:12 135:23
office 1:14,15 2:1 130:3 132:20
224:18
officer 80:24 81:9 109:11 193:5
193:13 214:10
Official 2:5 225:20
Oh 14:9 45:19 64:5 67:10 70:8
76:18 77:23 79:3 122:17
124:17 125:6 155:13,14
158:18 188:6,19 195:14
206:14 224:8
okay 5:7 6:1 7:9,20 8:7,13 9:3
10:18 11:5 12:10,22 13:1,5,8
18:18,21 19:10 21:25 23:21
24:16 25:4,11,15 26:13 27:1
27:10,20 29:3,7,15 30:1 33:5
33:12 34:8 35:6,13 36:2 37:7
40:24 43:13 46:10,17 50:17
51:1,6,13,18 53:12 54:4 56:2
57:2,7,10 59:5 61:1,7 62:24
63:2,4,10,2 5 64:17,22 65:3,17
66:15 70:23 71:7 73:1,4 78:7
78:13 79:9 81:4,8 82:17 83:23
85:21 88:7 89:22 92:2,7,14,16
94:16 95:1,4 96:4,9 97:25
98:2,4 99:13,18 100:15,23
101:6,17,19 103:3,9,12,18
104:15 105:8 110:10 111:25
112:4,5,16 113:2,4,13,20
114:22 116:1,8 117:9,17
118:10,23 119:16 120:8
123:15 124:8,19 125:10 126:5
129:18 130:24 132:5,23 133:7
133:21 134:3,10 136:5 137:6
139:8,16,21 140:17 141:21
143:1 144:22 145:2,5,9,14
146:11 147:8,10,11,17,20
148:8 149:1,22 150:4,21
151:12 152:2 153:2 154:3,5
156:21,25 160:17,25 161:9,13
161:21 162:1,8,13 163:22
164:3,12,13 166:7 170:6
172:15 173:13 174:6 176:23
180:6 183:22 185:20 188:1,17
189:19 190:9 191:2,12,16
193:3,9,24 195:25 196:5,16
197:13,20 200:13,23 201:14
203:22,25 204:17,22 207:2
210:22 211:24 212:13 213:11
216:3 217:10 218:19,23
220:19 221:7,18 222:11,12
223:20 224:5,14 225:5

ones 20:22 52:14 56:24 148:22
  150:9 180:4,23 192:3
one's 10:9
one-third 89:25
online 22:11,13 106:1,2,10
  118:18
only 26:20 27:20 37:11 50:25
  51:5,17 55:25 57:6,12 58:21
  73:24 76:6 77:17 85:22 94:21
  103:19 156:9 188:6 198:24
  200:10 205:8,20,22 206:10
  217:2 221:3 222:4,10 224:3
open 142:24
opened 168:2
opening 72:6 167:18 169:10
  202:23 205:5,7 208:22 209:6
  216:16
operated 199:18
operator 104:22
opine 125:8 208:20
opines 203:16
opioids 107:6
opponent 76:4
opportunity 11:19,21
optimist 193:2
option 57:15 58:4
order 71:22 72:24 82:24 95:2,4
  97:2 102:9,9 105:9 108:20
  115:20 116:10,13,15,22
  118:14 142:19 144:2 147:24
  176:15 202:12 218:1
ordered 108:10,12,17 109:12,15
  112:10,14,19 120:6 202:22
ordering 94:4 97:6 98:25 115:3
orders 39:10,12 120:23
ordinarily 73:23
organized 168:18
original 25:2 45:21 89:6 91:16
  178:18
originally 117:21 207:10
other 6:6,7 9:18,20 13:16,19
  20:22 26:10 30:14 31:17,22
  50:14,17,18 52:6 55:20,22
  57:2,10,15 58:4 59:23,24
  74:16 76:8,17,18 85:16 94:21
  96:9 102:8 116:3 124:20
  131:13 133:11 140:2 142:15
  142:16 158:19 162:7 168:6,12
  170:3 171:14 172:10 173:8
  175:20,23 176:16 186:4,5
  187:23 191:14 198:24 201:15
  203:5 206:2,23 208:16 210:9
others 138:2 194:7 203:4,6
  204:18
otherwise 115:2 116:2
out 9:19,23 10:4 22:4,21,25 24:8
  28:15 31:20 32:17 36:22 38:8
  41:4 44:16 46:17 47:7,11,21
  48:10,22 50:3 51:2,3,4,8,19
  51:25 53:8 55:7 57:16 58:9,11
  58:16,21 62:22 63:11,24 68:5
  72:3 74:24 81:6 82:25 88:7
  89:23 98:7,10,13,17 104:13
  105:15,20,21,22 115:21
  118:23 120:17 122:19 123:24
  123:24 124:15,15 128:14
  131:24 132:2 136:13 168:12
  170:3,13 173:21 174:3,21,22
  176:12,20 177:10 178:1 180:9
  188:7,12,15 190:19 191:3,24
  199:6 200:18 206:12 210:1
  215:13 218:9,22 219:16
  224:18
outliers 216:17,23
outline 139:25 178:19
outlined 139:13 140:20
outlining 142:22
outside 5:1 9:9 49:12 70:7 79:8
  81:2

outward 174:19
out-of-court 8:23 9:1 17:3
out-of-town 193:22
over 31:24 54:17 70:16 79:7
  82:14 85:25 89:13 115:3
  117:14 118:6 132:9,17 157:23
  164:5,15 171:5 172:4 173:15
  173:19 174:4,12,17 178:24
  187:9 192:22,22 206:6 222:5
  222:7,13,23 224:11
overall 136:12
overrule 158:9 162:6
Overruled 157:18
over-the-counter 116:7
Owmby 141:12,14
own 7:23 9:6 22:13 32:2 73:5
  87:4 117:2 138:21 157:7
  210:9
O'Hara 56:5

P

package 101:4
packaged 203:17
page 3:2 4:4,4 11:1,11 13:1
  14:24 36:2,12 41:20,22 85:2
  85:12,14 88:19,25 89:2,24,25
  90:4,5,6,6,6 133:5 134:10
  136:5,6 138:7 139:8 140:14
  140:14 141:17 151:16 152:9
  152:16,17 167:21 178:10,25
  181:19 183:25
pages 15:15 36:12 43:10 90:5,7
  98:15 134:11 147:12 151:9
  162:23 168:23 178:7
paid 22:22,23 23:2,6 24:10 28:5
  34:24,25 35:10 36:20 37:1
  39:25 40:1,2,7,2,5 41:1,9,10
  41:11,12,14,15,16,18,23,24,25
  42:1 46:25 52:3 57:1,6 61:12
  62:19,19 64:18 65:14,14 83:6
  83:12 88:20 89:18,21 90:10
  90:18 98:19 105:15 108:16,19
  111:18 120:9 126:18,21 127:4
  127:8,11 133:18 134:23 135:2
  135:3,12 136:17 138:11
  140:20 141:1,21,23 142:6,9
  147:7 148:20,20 149:15
  151:20 152:5,18,22,23,25
  153:5 156:9,17 159:22 178:1
  180:10 186:9 188:4 190:17,19
  191:14 218:21
pain 21:18 57:9 58:3 84:4,15,16
  84:22 85:4,5 94:13,21 95:7,10
  96:2,10 99:14 100:16,21
  104:4 105:15 107:1,4,6,8,10
  107:18 109:12,15,17,18,19,21
  115:18 116:3,5,6 121:15
  139:1,7
pains 100:24
Pain-01 56:17 57:9,14
Pamela 128:7,12,14,15
Panel 192:11
paper 98:13,14 118:19,20
paragraph 111:2
Pardon 8:22 109:14,14 208:12
part 8:11 12:11 14:24 22:4,12
  24:4 25:5 48:13 72:1,11 75:22
  94:12 98:11 103:23 123:25
  130:12,24 134:20 145:2
  158:12 159:8 160:8 161:3
  198:3,13,25 205:21 209:1
  221:10
Participant 162:15
participate 125:20,24 126:3
participated 103:25 112:1
  158:12
participation 88:10 90:10 111:7
  126:18,21
particular 66:20 106:19 118:22

123:2 180:13,13 206:19
  213:25
parties 6:10 70:24 191:14
partly 215:23
partner 8:8
partners 22:18
parts 198:14
party 10:7,10
passed 40:19 41:6
past 36:12,23 145:13
PASTOR-HERNANDEZ 2:5
  225:19
patient 6:23 7:1,3 12:4,5,11,20
  5:9,20,25 19:3 21:14 22:4
  24:18,19,23 25:1,16 27:4
  28:12,19 29:5 31:17 33:8
  35:16,24 39:13 45:20,21
  46:22 47:1,3,7,12,14,18 50:17
  50:19 53:1,3,5,10 54:7 55:3
  55:18 56:15 59:5,11,12,14
  60:20,21 62:13 63:22 68:23
  83:21,23 86:6 88:12,15,20,21
  88:24 89:2,10 131:7 133:21
  142:14 148:12 162:10 165:23
  171:2,7,11 200:8,18 201:3,4
patiently 6:11
patients 7:12 8:2 12:12,13,18
  14:20 15:7 21:3,23 22:4 23:14
  24:4,9 27:21,25 28:5,6,9,15
  28:25 34:17,22,24 35:1,17
  36:20,22,25 37:11 38:8 39:5
  39:19,24 40:2,24 41:19 42:1
  42:20 43:3,17,20,21,24 44:7
  45:6 46:18 52:21 57:16 58:10
  58:19,22 59:1,3,4,23,23 60:12
  61:25 62:9 64:14 82:24 83:6
  83:25 89:21 131:8 133:16
  143:3 146:19 200:9 219:5
Pattern 224:7
pay 35:21 39:20 42:20 44:2,21
  45:4 51:24 52:3,5,15 57:2
  90:17 98:3 101:9,14,20
  102:11,14 114:25 157:13
  188:12
Paychex 187:7,19,22 188:9
paying 8:2,5 15:13,14 21:22
  22:24 27:25 34:17,22 35:1
  39:23 42:22,24 43:1,3,17,19
  43:21,22 44:7 59:17 64:14
  82:24 83:4 101:23 116:18
  157:22 188:20 200:22
payment 35:17 36:8 37:3,11,15
  89:18 108:9 111:7,10 115:24
  115:24 119:12,13,15 175:10
  175:23 179:17
payments 35:7 36:23 40:7 41:4
  41:19 42:6 47:11,13,15,17
  62:15 89:16,18,23 90:1,7
  118:12 171:10,17 173:20
  175:24 176:13,20 177:3,4,12
  177:15,17,24 178:15,16 180:9
  186:23,24 187:1,3,4,5,6,8,11
  187:13,19 188:7 189:4,13,21
  190:2,13,23,24
payroll 187:24,25
pays 187:22
PBM  149:6,12 151:22
PCA 7:15,18 12:12 15:24 27:5
  29:11 32:15 33:3,3 34:2 50:18
  51:21 52:6 60:24 61:2,5,10,13
  82:5,12 86:6 88:17 91:17 92:3
  131:5 132:1 133:17,17 134:8
  135:5,8 146:6,8,15 147:5,7,18
  148:10,13,19,2,0 154:16
  162:10,19 166:21 171:8
  172:23 174:11 178:16,23
  179:2 186:9 187:18 189:3
  202:2 213:16 214:17
PCAX 162:1

PCA's 90:25 91:1 133:8
Pendleton 105:1
people 8:5 9:18 10:8 22:20,24
  23:5 41:23,25 42:7,8 44:10,20
  44:21,23 45:3,4 49:10 66:22
  73:3 82:5 90:9 113:21,23
  119:15 136:23 143:18 163:14
  175:7 190:2,16 192:13 195:7
  196:21,22 199:24 200:1,2
  201:16 204:18 206:23 214:21
  214:22 215:6,13 219:7 221:19
per 15:13,14 148:17
percent 51:22 52:1,2,3,5,7 219:5
percentage 137:11
percentages 142:21
perhaps 75:8
period 17:8 27:7 93:21 106:19
  108:12 114:16,23 173:23
  174:4
permanent 16:7 29:18
permissible 125:11,12
permission 16:7 29:18 43:19
  44:9 132:13
person 9:21 15:14 25:18 26:8
  46:13 53:9 75:18 94:3,4 98:1
  98:10,12 117:17 118:4,7
  127:24 128:2,4 168:24 215:10
personal 106:4,6 157:7 163:11
  163:12 167:3 169:17 170:12
  171:16 172:13,18 174:7
  175:17 179:3 180:20 181:9
  182:22 186:16
personally 157:10,12 163:14
persuaded 73:15
pertain 25:12 132:3 133:25
  136:9
pharmaceutical 49:23 50:6,8
  82:20
pharmacies 144:9 148:8
pharmacist 214:24
pharmacists 82:9 221:1
pharmacy 7:15,17 22:16 23:3,4
  24:6,9 27:16 28:11,11,18,24
  29:4,8 31:24 32:13 33:7,15
  35:4 39:8 42:3 44:13,15 45:7
  45:9,11,11,14 48:13 52:11,14
  54:23 55:3,10,23 56:24 59:21
  59:25 60:16 61:2,15,17 65:16
  66:11 81:20 82:2,15 84:6 89:8
  97:15,19 101:2,11,13,15
  108:3 119:5,11,16,24 135:5
  146:8,12 149:1 154:16 162:10
  165:22 196:14 202:18,21
  203:4,7,24 212:18 215:1
  218:13 221:2
phase 78:1
Philip 3:7 92:12,15,18 142:1
  154:24
phone 11:8 13:3 25:8 26:17 27:9
  32:21,24 34:1 43:14,15 45:18
  45:19 60:7,10 69:16,20 94:18
  94:19 96:19 100:13,23 110:3
  115:4 117:8,9 120:18 173:4
phony 83:9
phrase 160:1
physical 107:2,3,4 146:25
physically 147:1 152:10,23
  160:15
physician 53:4,9 54:22 55:1,10
  55:17 59:6,7 128:13 135:4
  150:14
physicians 53:25 56:11 59:12
  144:5
pick 83:16 132:2 218:9
picking 55:7
pictures 181:11
piece 181:3
pigeonhole 11:15
Pinkerton 206:14,14,15,15,22

207:2,9
**place** 44:2 87:14 119:14 179:7
206:7 218:20
**plain** 74:4,14
**Plaintiff** 1:5
**plan** 204:19,23 220:15
**plea** 68:5 72:8
**plead** 67:18 68:5 72:22
**pleading** 72:21
**please** 6:3,7 16:4 28:11 39:14
43:6 47:8 50:9 55:5,5 63:6
66:2 81:4 92:14 93:4 103:1
113:13,15 114:3 122:11
164:15,18,23 165:5
**pled** 67:16 72:13 194:13 204:16
**PLLC** 2:1
**pocket** 44:12
**point** 18:5 29:3 69:15 75:13 77:3
89:22,22 101:2 178:21,22
197:8 200:17 202:4 217:4
**pointing** 175:5
**points** 74:24 205:20
**policy** 208:20
**Porsche** 181:8,18
**portal** 15:9,11,12 28:7
**portals** 14:25
**portion** 25:25
**portrays** 51:15
**position** 67:7 76:3,4,5 87:7,16
87:20
**possession** 26:7
**possibility** 84:3
**possible** 28:12 47:8 56:22
133:13
**possibly** 22:23 175:6 196:9
212:14
**post** 74:17
**potential** 68:2
**Powell** 140:3,10 141:7,8,9,11,13
141:13,17,18,18,19,2,2 194:3
195:3
**powerful** 192:1
**practices** 218:7,8
**preliminarily** 204:25
**prepare** 78:11 79:25 80:9 167:7
221:14
**prepared** 24:3 78:6 79:22
152:16,18 170:14 183:11
184:20
**preprinted** 58:12
**prescribe** 150:15
**prescribed** 53:24
**prescriber** 135:3 140:22 142:6
150:10,11,12 151:5,6,10,13
**prescribers** 156:13
**prescribing** 128:13
**prescription** 53:5 55:17 56:16
59:12,15,18 85:2 95:15,18
100:25 116:5,6 117:3 122:6
124:9,12 125:2,21,22,24
126:2 134:19 135:4 142:8
146:13 147:2 148:24 149:6
150:15 153:14 155:3 157:3
198:20 202:12
**prescriptions** 55:20 59:24 65:4
82:24 83:11,13,16 84:21
138:12,15 139:6 148:13 150:5
151:13 155:22 156:1 157:10
**preselected** 83:13
**presence** 5:2 81:3
**present** 81:13
**presented** 208:22
**presenting** 72:25
**presently** 105:2
**president** 169:7
**presidents** 9:13
**pressure** 68:4
**presumably** 128:5
**pretty** 51:20 94:15 106:17

192:12
**preventing** 75:2
**previous** 24:14 123:14 138:10
140:4,17 141:8
**previously** 44:8 132:5 138:10
204:16
**pre-checking** 53:12
**price** 94:25 155:25 157:4,8,22
**Primarily** 75:1
**primary** 138:21,22
**print** 184:4
**prior** 9:10,17 10:13 17:21,23
19:21 24:5,7 25:21 73:11,24
74:11 108:3 167:7 173:25
216:15 218:4,4,6
**private** 12:17,21 15:1,7 64:21
149:12
**probably** 5:22 6:8 20:8 71:2
73:9 74:18 75:3 98:8,16 120:9
135:15 158:3 204:24 207:21
211:21 214:25 217:13,23
218:2,25,25 219:1 221:20
223:10 224:13,25
**problem** 31:16 62:14 68:24 69:2
73:12 74:23 81:12 96:18
125:14 162:8 193:16 219:10
**problems** 8:6 14:10 33:14 34:19
42:24
**proceedings** 1:10 5:1 74:17 81:2
225:17
**process** 39:10,16 149:24 150:1,3
**processed** 156:7,9
**procurement** 130:14
**produce** 16:14 26:10,18 34:8
37:5 43:8 48:6 161:15
**produced** 11:6 25:4 26:24 34:6
34:14 43:10 69:14 91:20
**product** 19:5 52:7 27:22 48:4
85:13 88:10,11 106:20 115:21
202:25
**production** 26:14 161:16,18
**products** 21:19 50:5 52:11,13,17
52:20 55:16 60:12 64:18,22
82:25 83:17 85:12,16 90:25
91:1 94:21 106:25 110:5
112:11,14,20,2 5 115:12,20
116:10,13,18,20,22,2 5 118:2,5
118:21 119:11 120:2 163:22
216:10
**Profile** 53:1
**program** 6:23 7:1 8:2 12:11,18
12:23 14:25 15:5,6,19,23 16:2
18:9 21:4,9 22:16,19 24:4,8
27:4,14,17,21 28:4,10,13,16
28:25 29:5 30:12,24 31:12,17
32:1,13 33:9,13,18,21,22,24
34:18,25 35:16,25 36:21 37:2
37:3,12,24,25 38:4,9 39:2,6
39:13,19 40:3,5,25 42:3,5,7,8
42:19,23 43:17,20 44:8,10,16
44:24 45:1,7,9 46:11,13,18
47:19,21 48:2 50:18 59:18,22
60:15 61:10 62:13 64:14 65:6
68:23 69:2 90:13,14 98:13
117:21 120:4,13,14 143:16,24
147:22 198:15
**programs** 12:22 143:21
**promise** 153:8,10
**promised** 98:19
**promising** 193:1
**promote** 52:10 90:25 91:1
**pronounce** 113:24
**property** 183:12 184:12
**prophylactic** 205:9 206:2,11
**proposed** 208:25 209:4 217:6,20
217:24 224:24
**prosecution** 68:20
**prosecutor** 10:23 160:5
**prosecutors** 63:2 80:14

**protect** 72:24
**protected** 225:7
**protecting** 130:10
**prove** 63:25 65:25
**proved** 18:23
**provide** 9:22 10:18 134:18 148:6
165:9,10 208:1
**provided** 8:10 14:1,11,17 52:14
106:10 126:15 137:10 146:14
210:21 222:6
**provider** 144:2,11 146:9 147:25
148:2,8,10,23,24
**providers** 143:25 144:5
**provides** 143:18 149:9
**providing** 53:24 54:22 55:16
68:13 122:1 133:17
**public** 165:20
**publicly** 185:24
**publish** 121:21
**pull** 25:9,19 26:6 27:3 186:25
206:12
**pulled** 25:13 26:8 27:2,2
**pump** 54:5
**pumps** 54:7,9,12,13
**purchase** 175:2,6,21 181:8,18
182:6,14,15 183:12 184:21
185:2
**purchases** 175:1,8 191:3,3
**purport** 117:17
**purpose** 73:24 203:5,18,20
**purposely** 205:23
**purposes** 22:13 75:7 170:9
**put** 7:15 12:12 15:12 18:18
20:15,16 39:14 44:11 51:4,19
52:24 82:6,8 84:10 86:15 88:3
132:8 147:12 150:23,25 152:8
153:25 188:10 190:1,5 211:1
216:15 217:7,19 225:4,5
**p-01** 53:15 55:7 58:2,16 84:4,16
84:22 85:4,22
**p-02** 85:4,14
**p-03** 85:5,15
**p-04** 85:15
**p.m** 6:2 71:13 80:25 81:2,10
193:6 225:13

**Q**
**qualified** 12:20 15:7
**qualify** 53:5
**quantity** 53:20
**question** 9:24 19:23,24 28:21,22
31:15 35:23 44:6,6 54:25 55:5
55:24 60:13 66:2 67:14,20
69:1 72:10,18,22 83:3 85:6
92:5 123:13,15 135:15 147:8
163:21 172:2 187:4 210:16
220:16
**questioned** 10:12 84:2
**questioning** 86:5
**questionnaire** 12:20 15:20
**questions** 15:20 16:1 22:6 63:10
64:24 69:21 70:14 72:7,12
87:8 89:10 91:8 100:15
117:14 118:9,20 119:10 123:9
124:20 143:14 193:15 219:10
220:20
**quick** 78:15 194:14,23 196:1
**quit** 79:10 196:21 221:23 225:5
224:2
**quote** 29:1

**R**
**R** 225:15
**radio** 70:23 104:22
**raided** 63:23
**Raise** 92:14 103:1 113:13 128:24
164:15
**raising** 75:3
**Ralph** 195:16 196:9

**Rambaran** 137:12,17,18,21,23
137:25 138:17,18 139:12,13
139:14,15,24 140:3,15 141:9
195:6,20,21
**ran** 50:17 62:13 196:15
**range** 68:9 137:2,4 138:13
140:22 142:7 143:3 162:1
170:20 175:21 182:6
**rank** 104:23
**Rashaan** 137:14,14,23 139:14
195:20
**Rashbaum** 1:19,20 3:9 77:6,11
77:14 78:16 79:14,19 80:8,19
99:4,6,10 102:2,4 194:14,17
194:19,21 203:21,23 204:1
209:2,10,14,19,2 2 210:1,5,12
210:16,20 211:3,7,10,13,17,21
211:24 212:3,5,14,16,18,20
213:3,7,11,16,19,2 2 214:3,5
214:10 215:16,18,2 3 216:1,4
216:6,8,10,22 217:9 218:13
218:16 219:14,18,21,23 220:1
220:5,9,12,15,19,2 4 221:3,6,9
221:15,18,21,2 4 222:2,4,10,12
222:19,22 223:2,17,20 225:10
**Rasheed** 137:13,21
**rate** 65:7 157:15
**rates** 65:3
**Ray** 1:7 167:23
**reached** 22:25 32:17 62:22
**read** 38:2 63:6 70:21,22 87:18
122:12 123:14 128:10 158:16
159:15 162:7,8 163:10,13,18
184:4 192:2
**reading** 9:2 22:15 73:20
**ready** 5:7,24 80:18 196:21,22
209:8 210:25,25 212:10 218:3
221:7,8 223:18
**real** 61:24
**really** 20:6,18 32:1 74:24,25
75:11 78:16 80:13 88:5 98:8
107:11,18,19 158:3 184:4
194:16 196:7,20 210:10
**reason** 10:4 56:22 60:14 72:2,9
72:17 74:5 75:14,23 77:17
100:4 127:16 150:8 205:9
212:11
**reasonable** 5:22,23 206:24 224:3
**reasonably** 206:25 207:9
**Rebecca** 19:3
**rebuttal** 201:2 222:9
**recall** 6:25 7:2 8:16 13:7 23:20
23:22 34:20 35:14 50:8,13
52:12 53:20 55:8 61:20 88:15
94:6,7 95:20,22 96:11,16,22
98:8 105:8 108:3,5 110:5,6,8
110:19 111:10 112:13,15
115:8 117:1,2,13 121:17
122:6 126:13,16,17,21 128:8
151:13 157:6 163:7 186:18,21
**recap** 6:24
**receive** 12:12 28:9 31:11 36:23
37:11,14 39:5 43:25 51:22
57:25 98:24 102:10 107:12
111:7 118:10,12 120:2 173:9
**received** 4:3 20:25 32:10 38:21
40:14 42:14 44:23 46:3 49:5
61:4,7 62:15 88:1 98:4 101:5
106:12 108:6,8,9,13 112:14
112:25 120:8,22 125:1 126:8
129:20 131:2 136:3 154:1,21
166:13 170:10 174:8,10,11,12
174:13 175:15 177:4 181:22
182:13 184:8 190:17
**receiving** 36:8 44:25 59:24
61:20 82:19,23 83:5,18 108:3
110:8,19 120:10 199:18
**recess** 80:25
**recognize** 16:17 30:1 32:2 46:8

134:4 166:17 181:20 182:12
183:10,15,18 184:7,16 185:1
recollection 5:18 11:12,13,25
112:19
recommended 58:15
record 75:1 77:15 79:15,17
205:23
recorded 160:9,13,14
records 34:8,14 89:14 165:25
167:4,8 168:4,11,17,22 169:9
169:21 170:2,24 173:7 178:3
179:6,20 180:15 182:13,19
185:2,4,17,20 188:2 218:21
recross 87:8 91:12
Recross-Examination 3:6 91:14
recruit 139:14 163:9,16
recruited 137:13 139:12,14
140:1,5 141:10,11
recruiters 131:7 133:21,25
recruiting 49:12,22
recruits 137:15
red 136:7
redirect 3:5,10,14,18 69:22
70:16 81:15,16 102:5,6 112:6
112:7 127:20,21 155:12 160:6
164:5,6,7 188:18 191:17,18
reduce 68:14 69:6
refer 14:22 175:7
reference 33:15 39:8 88:19,24
89:2 147:4
referenced 45:19
references 89:17
referred 13:12
referring 89:9
refill 43:24 200:10
refills 53:17 58:3,3 61:6
reflect 51:2 77:16 133:16 182:15
182:21 184:11
reflected 51:18 60:2 177:14
180:20 183:1 184:13 185:7
reflecting 184:1
reflects 127:4 143:3 183:24
188:6,15,15
refresh 11:11,24
refreshing 5:17 11:13
refused 199:21
regard 22:6 28:12 32:1 34:1
181:18
regarding 184:9 215:12,19
registered 185:23
regular 114:19 202:23,25
regulation 66:3
regulations 199:1
reimbursed 154:16
reimbursement 53:19,21 55:8
65:3,7 146:5,7,23 148:6,16
150:1 155:25 157:16
reimbursements 203:5
reimburses 143:24
reiterate 79:15
relate 53:4 82:24 146:12 181:7
182:5
related 26:7 66:3 83:5 84:5
130:14 131:10 132:6 141:2,21
148:13 166:1 181:24 219:8
relates 173:22
relating 214:20
relation 141:24
relationship 88:12
relevance 157:17
relevant 25:12 67:17 75:16
173:23 216:17
reluctantly 207:17
remainder 171:17
remaining 173:13
remedies 95:12
remember 35:11 53:13 70:12,24
73:20 84:7,9,18 86:3,10 89:14
98:9 106:11,13,23 108:7,10

115:23 117:19 119:9 120:5,6
126:23 207:8
remind 78:1
removed 134:1
removing 136:22
Renzulli 165:2,5,7
rep 15:12,25 46:9 62:18 204:15
repackaged 202:25
repeat 28:22 54:25 83:3 85:6
repeatedly 73:23
rephrase 66:2
report 144:15
REPORTED 2:5
reporter 2:5 13:17 165:4 198:8
225:20
Reporter's 3:25
reports 139:20 159:7,16,24
163:10,18
represent 50:21 99:10 109:2
121:11 124:16,17 171:9
174:20 180:19
representative 28:13
representatives 133:11 153:19
163:22 189:22
represented 48:18 52:10
reps 15:13 22:18 28:25 31:17,19
31:22,23 33:16,17,19,20,23
50:14 52:6 57:17,18 59:24
175:23 176:5,14,14 177:15,18
178:1 180:21 189:11,19 190:3
190:5,10,17
rep/beneficiary 195:3
request 79:14 80:19
required 219:1
requirement 73:21
requirements 134:24
requires 79:18 80:6 198:19
resolve 79:24
respect 82:2 131:21,22,23
133:15 134:19 135:10 137:17
211:13,16 215:14
respective 132:2 133:4,18 135:1
135:4 139:2,19 140:19,21
151:3 152:21
response 9:7 17:5 30:23 42:25
89:10
responsibility 5:4 58:20
responsible 31:23 35:6 57:22
206:23 207:15
rest 28:14 29:1,2 80:11 197:22
204:19,23 223:15,21,24
rests 223:19
result 207:11
resumé 49:7,19 51:2,18
retired 71:13 73:6 93:17 114:12
193:6
Revenue 165:16
review 7:16 87:18,18 131:4
168:11,22 170:2
reviewed 136:21 137:9 140:25
151:2 159:7 167:4 170:10
173:7 176:2 183:16
reviewing 133:14,19 139:20
153:18
revised 23:5 25:1
revisions 23:4
reward 71:22
re-compensate 35:24
right 5:23 6:12,14 7:16 8:1,7
10:14,19 11:22 12:8 14:6,23
15:9,15,24 16:20,22 20:1,2,3
20:4,20 21:7,18 22:1,5,8,25
23:7 24:1,1,3 25:7,20 27:7,18
27:24 28:19 29:1 30:5,18,22
30:23 31:1,3,12,15,20,22
32:22,23 33:10,16 34:23 35:2
35:9,11 39:10,20 41:9,12,18
41:20 42:1,1,4,20,25 43:1,16
44:15 45:8,16,20 47:7,24,25

48:2,13,14 50:3,12 51:21 52:9
52:14,14 53:9,17,23,24 55:10
55:22 56:5,18,22 57:16 58:8
58:23 59:7,8,10,19,21 60:7,11
61:4,12,23 62:7,10,13 63:5,10
63:13,16 64:15,25 65:15
68:17,19,20 69:7,13,22 70:17
70:18 71:1,3,6,11,25 72:3
73:5,10 76:24 77:5,20 78:9
80:6,7,16,2,2 91:10,25 92:8,14
93:1 98:21 99:11,18 101:3,7
101:13,21,25 103:1,10 106:23
109:10 110:16 111:15 113:13
113:18,22,25 115:19 117:20
119:21,23 120:19 123:8
124:22 127:1 128:24,24
129:14 135:25 143:16,22
144:5,13,17 146:5,8,19,22
147:13,15 148:22 150:5,8,12
150:14 151:1,5 153:16 154:20
156:13 157:14 158:8,19 159:9
159:15 160:4 162:11 164:12
164:15,15 168:15 169:13
171:5,10,22 174:17 180:16
183:4 185:11,21 186:2,12,23
187:2,15,18 188:15,25 190:9
190:21 191:23 192:15,19,24
193:10 194:18,20,22 195:2,4
196:19 197:15 199:8 200:16
200:19 201:12,21 203:6,8,15
204:10,12 205:7 206:13,20
209:3,25 210:5 212:4 213:4,9
213:14 215:17,25 216:3,12
217:8,10,15,19 218:21,25
219:24 220:11,20 221:5,13,16
223:5,24 224:12,18,22
rights 74:15
righty 225:9
right-hand 134:10 161:19
175:12 177:18
ring 98:23 99:25 101:18
rise 80:24 81:9 193:5
risk 111:22
Rivera 205:17 206:3
Robin 193:23
rolls 26:15
room 79:6,8 192:9,21 224:20
rooted 82:23
Rosalinda 137:12,17 139:13
140:3,4 195:6,20
roughly 105:19
routinely 74:11
Rover 175:21,22,2,5 182:6,6,13
RPR 2:5 225:19
rule 10:16 17:16 65:24 73:13
74:12 79:18 80:6 87:6 123:18
159:19,20
rules 20:7 75:12
ruling 87:7,11,17
run 50:11
running 14:19 29:5 35:24 44:7
44:16,19 49:19 61:10 64:14
runs 56:5
RX 19:5 21:9,12,15 23:11 35:6
37:8 40:16 49:19 50:1
R-e-n-z-u-l-l-i 165:6

_____

S

_____

safe 218:19
safer 75:2 218:24
Sal 216:4 218:17
sales 19:5 21:15 23:11 28:25
31:17,19,22,2,3 33:16,17,19,20
33:23 35:6 37:8 40:16 43:16
48:12,12,19 49:22 50:1,5,4
50:5,11,11,14,1 7 51:21 52:6
52:10 57:17,18 59:24 61:16
62:17 64:17 65:9,11 83:9,12
127:11,14 163:22 175:23

176:5,14,14 177:6,15,18
178:1 180:21 182:13 189:11
189:19,22 190:2,5,17 195:3
204:15
salespeople 58:10
salesperson 65:14
same 38:25 39:12 64:23 83:17
94:2 114:22 117:14 120:15
128:9 133:11,25 134:11
138:22 139:25 140:17 146:19
154:13 157:22 168:1 171:13
177:23 181:21,22 192:15
196:3 201:22,24 203:2 215:1
218:8,10,11,12,13,13,15,16,16
219:8 221:10
sample 84:15 208:19
San 210:17 219:15
sandbagging 205:16 206:12
Santos 15:2,11
save 20:18
saves 74:19
savvy 50:4
saw 12:10 43:3 52:25 61:19
142:18 150:9,9,11 151:5,20
155:22 159:21 187:18,19
205:2 214:23
saying 25:15 28:2,6 29:11 30:3
31:7 38:10 39:16 40:22 44:24
62:17,22 63:21 64:1,7 66:17
70:12 71:22 77:16 103:15
117:19 162:5 193:12 205:5
222:4,16,24
says 5:19 21:9 30:3 43:23 47:5
50:24 73:23 75:6 134:10
141:17 142:23 162:6 175:5
201:2 203:10 211:15 214:24
217:16,25
scam 104:2,3 215:7,9
scar 21:18 58:3,15 83:20,23,23
84:5,16,17,23 94:22 95:8,12
96:4,6,6 104:4 107:10,18
115:14 116:3,8 139:7
scarring 107:1 109:18,21
scars 96:2,8 100:17,18,24
scar-01 83:21
scenario 83:18
schedule 82:14 96:20 184:4
scheme 69:11
school 48:22,23 51:7,8 105:2,4,6
scope 131:2 158:7
screen 122:16,17 132:8,25 134:5
138:4 149:17 153:2 154:6
screens 149:20
script 200:8
scripts 135:13 149:3,9,12 151:22
156:1 200:3,6
sc-01 55:7,21 56:8,17 57:9,9,14
58:3,16,17,18 84:4,16,23
sc-02 56:7
seat 71:14 92:16 103:3 113:15
193:10
seated 6:3,8 129:1
second 14:24 25:23 31:5 117:25
123:25 124:5 125:7 142:10,22
179:1 195:22 198:13
Secondly 198:19
Secretary 168:17
section 1:15 49:10 208:3,7
Security 80:24 81:19 106:8 193:5
193:13
see 11:1,3 12:20 13:17 14:10
15:7 16:12 17:13 18:22 21:10
21:20,25 22:14 27:12,14,22
29:25 30:3,5,9,22 31:3,5
34:15 36:5,13 37:19,24 38:2,4
38:5,23 39:1,6 46:15,23 47:1
47:4 48:8 49:20 52:19 53:9,15
54:4,4 56:7,12 71:1 75:14
76:12 78:9 85:4 88:24 90:4

110:22,23 111:2,2,17 114:19
120:25 122:24 123:8,25 124:1
128:12,14 138:14,19 139:2,3
139:6,18 151:6 154:6,7,9,24
157:12,13 159:16 161:23,24
162:1,16 163:1 167:15 168:23
170:15 171:4 174:19 186:10
186:23 193:2,3,20 204:3,4
205:11,15,25 207:5 212:12
215:8 216:1 217:17 218:3
221:11 224:4,24 225:2,12
**seeing** 107:3 151:13
**seek** 49:1
**seem** 119:16
**seemed** 72:21 105:16 106:24
**seems** 72:16 206:19
**seen** 30:14 45:16 85:3 140:4
156:21,23 157:3,7 160:12,13
160:14 181:14 199:18
**sees** 83:14
**see-say** 159:20
**segregated** 133:10 134:8 142:4
**seized** 63:23
**selecting** 83:21
**self-explanatory** 134:17
**selling** 87:11
**semester** 10:2 50:25 51:5,15,16
51:17
**send** 7:23 25:3 28:15 33:6 47:4
47:24 57:23 82:11 85:21
91:18 126:11 147:24 191:23
192:14,15,16
**sending** 28:6 46:17 91:24 106:7
119:11
**sends** 20:12 45:11
**senior** 165:2
**sense** 52:20 56:14 77:25 206:11
**sent** 7:14,17,17,22 15:10 19:6,12
21:2,7 22:3,21 23:2,3,5,21
24:18,24 25:21 27:11 29:13
30:2,17,21 31:3,7,10,16 33:2
33:3 36:22,25 37:21 38:25
42:16 44:1,4 45:10,22 47:21
53:3 57:13 58:1,8,11,12,12,13
60:20,20,23 89:6,7,7 90:13
91:17,23 92:2 106:4 108:8
111:7 119:6 126:13 145:21
146:22 161:10 174:16 200:8
**sentence** 28:23 68:15 69:6
**sentencing** 68:15
**separate** 131:8 133:10 146:17
218:3
**September** 63:3
**sergeant** 219:15
**serve** 104:19
**served** 93:9 114:8 115:9
**service** 49:11 115:10 118:1
129:6 130:2,5,9 165:16
**services** 102:10 148:6 149:9
157:8 165:9,10
**serving** 102:19 113:7 128:20
**SESSION** 81:1
**set** 14:25 15:9 16:2 106:2 155:25
192:17
**sets** 65:3,7
**setting** 80:5
**seven** 6:13
**several** 31:2 42:4 66:9 69:19,19
142:15 168:23 210:1
**shed** 215:21
**sheets** 53:1,3
**ship** 197:15
**shipment** 106:12,13 108:4,6
**shooting** 70:5
**short** 70:12,13,14 78:11 149:6
160:20,24 162:10 194:7 196:4
201:4,5 204:22
**show** 56:2 71:21,21 72:8 86:13
88:9,22 89:24 128:9 132:7

134:3 137:6 144:14 161:9,21
162:13,23 166:3 167:15,24
168:15 169:13 176:11,24
177:21 178:18 180:6,25
181:13 182:1,11 183:14,17
184:6,15,25 189:15 216:16,23
217:2 218:21
**showed** 62:23 63:22 86:7 89:16
112:11 128:10 148:17 151:16
163:6
**showing** 16:9 85:10 122:9
132:23 133:5 142:24 166:15
178:12 183:9 205:23
**shown** 56:3 162:20
**shows** 139:11 140:14 156:13,13
156:16 175:17 176:12
**shuffle** 193:22
**shut** 60:16
**sic** 32:18 34:3 49:16 53:15
**side** 77:19 118:15 158:19 175:12
177:18 180:9 210:22
**sides** 75:23 102:20
**sign** 91:4 107:12 148:2 199:22
**signatories** 186:5
**signatory** 167:13,22 169:19
**signature** 167:18 168:1 169:10
169:16
**signs** 83:14
**similar** 140:15 177:17 202:2
**Simone** 197:23 198:1 199:6
**simply** 55:7 173:11
**since** 72:19 76:3 104:14 200:24
**single** 35:17 124:1,3,5 145:21
148:18 150:5 151:9
**sinister** 54:19,24 55:1
**sir** 14:21 37:6 47:20 92:14,20
93:7,10,18,20 102:17 103:5
103:11,16,17,23 104:7 111:5
113:6,8,13 114:3,9,13,24
116:4,9 117:4 118:16 120:21
120:24 121:1,3,5,17 122:12
125:3,23 126:13 127:5,9,12
127:14 128:1,3,6,19 147:16
147:23 150:24 154:25 158:13
160:16 161:12,14,20,2,5 162:3
162:17,22 163:1,8,15
**sit** 81:11 192:13
**sitting** 152:13 191:12
**situation** 28:19 66:4 118:22
**situations** 43:23
**six** 106:14,15
**skip** 211:16
**skis** 184:21 185:3,5
**slashes** 124:1
**slew** 130:13
**slight** 139:13
**slower** 210:8
**small** 106:16
**smart** 11:16 192:12
**Smith** 41:14,18 131:25 132:2,4
133:23,23,24 147:3,5
**Snodgrass** 3:7 78:12 92:13,15
92:18,24 93:4 98:21 99:7,10
102:8 142:1 154:24
**Social** 106:8
**sold** 50:5 202:25 203:23
**solicited** 95:6 105:8 116:1
**some** 6:6,6,7:18 13:25 14:2
22:18 29:12 32:18 34:2,8
35:22 41:23 44:4 45:14 52:22
59:3 60:10,24,8 65:24 74:23
75:7 82:5 89:13,16 94:22
100:18,21 101:2 102:9,12
105:14 112:16,22,23 115:3,15
115:25 122:20 134:17 143:14
146:19,19 147:13 151:22
157:4 165:25 166:3 171:14
177:2 178:15,23 183:4 184:14
185:18,20 196:20 199:19,22

200:1 208:13 210:12 214:12
214:17,18,19 215:21 216:24
217:22 219:4
**someone** 9:7,16,16,2 5 22:25
25:9 29:11 32:15 33:3 34:2
45:14 48:11,18 50:4 60:21
64:1,5 81:23 82:4,5,12 88:17
97:17,25 98:10 111:25 115:3
119:22 125:5 132:6,14 141:10
152:11,13 153:25 158:24
192:5,22 197:2 217:12
**something** 8:20 14:17 18:12
62:11,12,15 64:1,2,6,8 10,11
64:12,13,19 67:2 68:22 70:11
70:11 71:7,22 75:10,15 83:7
83:10,15,17,19 115:11 123:10
155:25 199:2 200:14 203:17
215:7 220:7 225:4
**sometimes** 52:22 53:9 74:17
75:7 113:21,23 149:6 192:10
192:15 219:7
**somewhere** 97:2 115:24 116:21
**son** 40:19 41:5 195:20
**sophisticated** 87:1
**sorry** 5:3 31:7 40:21 41:8 54:9
57:19 83:2,3 93:15 95:16 96:5
99:9 101:6 121:25 124:10
131:16 136:17,19 138:6
147:20 163:3,13,20 178:9
188:19 194:9 196:6,6 197:11
198:7 200:5 202:16 216:8
**sort** 49:18 115:19 118:14 183:4
205:9
**sorted** 176:20
**sorting** 131:23
**sounded** 61:22 94:15
**Sounds** 71:5
**soup** 196:14
**source** 161:16
**sources** 174:11
**South** 1:21 2:2
**space** 103:8
**speak** 48:5 52:8 64:16 66:7
99:19 100:13 109:22 115:6
117:20 153:2 195:10
**speaking** 108:3 110:5,6 153:8
**special** 128:23 129:5,24 143:12
217:13 224:25
**specific** 65:20 115:17 131:18,24
132:3 136:20 138:12,14,25
140:23 147:3,6 151:2
**specifically** 83:11 95:9 130:9
131:10,15,17,2 1 132:2 141:2
200:14 202:22
**spell** 92:17 103:4,6 165:4
**spend** 74:18
**spent** 73:7 89:13 120:9
**spoke** 33:24 69:19 81:23 82:1,5
109:10 126:15 163:20
**spoken** 109:3 121:12 129:9
**sponsor** 138:19,23 140:18
**spread** 173:21 174:3
**spreadsheet** 131:8 133:11 134:9
138:9 142:4
**spring** 61:1,14
**Springs** 93:6 100:9 164:25
**squares** 174:20
**stand** 198:5 202:15 212:6 214:15
**standard** 107:24
**start** 8:17 66:10 105:12 143:14
170:7,19,22 172:2 176:23
185:16 192:8 223:9 224:3
**started** 7:1,5 15:24 18:9,17
21:22 22:7,24 24:9 56:20 62:5
64:22 105:25 129:8 145:9
**starting** 49:20
**state** 40:22 47:16 60:18 64:16
66:21,23,24 67:16 72:4,12,13

93:5 103:6,18 114:4 155:5
164:24 168:17,17 185:23
**stated** 7:8 18:3 33:24 34:2 39:24
39:24 55:21 58:2 82:18 86:9
89:18 90:24 92:4
**statement** 8:24,25 9:1,2,3,6,10
9:17,19,20,23 10:4,12,13
11:24,24 17:4,9,11,14,15,16
17:21,23 18:3,7,10,11,12,13
18:16,19,19,23 19:19,20,21,25
20:11,13 63:2,6,17 72:6 73:24
74:12 85:11 112:1 158:25
159:1 173:3 180:16 183:7,25
202:23 205:5 208:23 209:6
**statements** 9:9,18 10:10,10
20:10 32:2 73:10,12 74:6,8,9
74:23 87:19 170:10
**states** 1:1,4,11,14,1 5 2:5 21:16
34:2 39:17,17 58:14 73:21
84:15 92:12 102:24 113:11
114:11 128:22 205:17 207:6
225:20
**stating** 28:4 45:13 64:13 111:22
139:9
**stationed** 104:25
**status** 66:12,13 106:9
**statute** 79:18 208:11
**stay** 85:25 156:23 157:1,23
**stayed** 156:22 157:20
**step** 33:13 105:24
**sticker** 157:4,8
**still** 10:3 40:24 41:9 42:20 44:16
103:25 196:7,20 197:25
210:23 223:9 225:12
**stipulate** 197:25 204:2,3
**stipulation** 197:24 198:9
**stipulations** 80:12
**stock** 84:6
**stop** 27:17 29:13 60:25 61:11
162:24 173:5 211:11
**stopped** 39:6 48:2 120:10
**stopping** 37:4 39:12
**story** 69:11,18
**straight** 223:14,17
**straining** 13:17
**strategic** 215:11
**Street** 1:16 183:13
**strike** 213:1
**structure** 225:3
**studying** 105:5
**stuff** 41:3 80:22 208:10 219:25
**sub** 142:18
**subject** 21:9 26:14 216:13
**submission** 147:9 149:24
**submissions** 146:22
**submit** 25:10 144:2 148:5,22
**submitted** 41:3 135:12 136:9,16
139:11,19 140:21 145:15,20
146:1,5,6,12,1 5 147:7,18,19
148:17,18 149:3 152:20
154:15 163:6
**subpoenaed** 161:2
**subset** 131:11
**substance** 94:10
**substances** 218:10,11
**substantial** 74:15
**substantially** 134:11
**substantive** 9:11 17:19 75:8,10
206:17 207:10 217:4
**suffer** 99:22 100:20
**suffered** 100:24
**suffering** 99:14 100:16
**suggest** 124:8,12 168:11 170:2
**suggested** 217:20
**suggesting** 209:20
**suggestions** 58:15
**Suite** 1:21 2:2,6 225:21
**sum** 138:11 173:21 174:3 178:6
180:1

**summaries** 167:7,10 170:6,8,14
175:2 176:16
**summarized** 142:5 176:21
**summarizes** 182:22
**summary** 147:13 159:21 160:18
176:1,6,9,23 177:24 178:14
178:23 180:7,25 182:1,19,21
184:4
**summation** 152:17
**summed** 177:11
**summer** 14:19 67:22
**sun** 191:25 225:12
**sunny** 191:24
**sunscreen** 191:25
**Super** 81:12
**Superseding** 179:12,13,16
180:12
**supervisor** 165:18
**supplies** 53:23 54:2,19 202:22
**supply** 54:20
**supposed** 8:4 15:12 58:6 63:17
98:10 102:1
**supposedly** 36:21 44:17 46:17
48:2
**Supreme** 206:16
**sure** 10:22,22 16:5,7 39:15 43:7
69:17 73:17 79:20 81:6 85:8
102:3 121:23 123:21 158:18
173:16 187:4 189:10 201:8
206:25 208:3 222:23
**surgeon** 201:12
**surgery** 157:20
**surprise** 65:6 158:1
**surprised** 119:16
**survey** 6:23 7:1,3,3,4,10,21,25
8:17 12:3,7,11,13,15,18,23
14:19,25 15:5,13,18,22,23
16:2,17 21:3,5,16 22:1,8,11
24:13 27:4 29:5,6,12,14 31:17
32:15,18 33:2,9,18 34:1,3,25
35:16,24 37:2 39:13 40:5,25
43:17 44:16,19,20 45:15 46:5
46:10 47:5,10,15,23 48:1
50:18,19 59:15,18,25 60:15
60:20,24 61:13,17 62:13
64:14 68:23,25 83:9 89:20,21
98:7,11 99:13 105:20,21
108:8,9,13 110:23 112:23
118:14,16,18 121:2 125:20,24
126:3,6,9,11,13,15,19,22
**surveys** 22:21,23 47:3,4,6,7,8,24
82:25 100:4,5 111:3,8,25
**suspect** 75:4
**sustain** 149:22 156:5
**Sustained** 150:21 161:5,7
**Sven** 204:12
**Svendsen** 128:7,15
**switch** 132:9 153:8
**switched** 38:8
**SWORN** 92:15 103:2 113:14
128:25 164:16
**system** 131:5
**S-n-o-d-g-r-a-s-s** 92:19
**s-01** 53:15

---

**T**

**T** 225:15,15
**TABLE** 3:1
**take** 5:4,11,18,20 13:17,18 56:10
71:17 94:12 98:17 118:14,23
153:1 160:24 167:10 192:22
192:22 197:8 198:25 204:18
216:20 221:17,20
**taken** 80:25
**takes** 10:2 75:1 144:25 195:15
**taking** 94:23 95:10,12 96:3,9
100:17 107:8 116:5,6 156:11
**talk** 14:15,15 59:4,6,11 70:21,25
71:11 73:4,13 75:18 80:4

**96:12 128:15 163:14 167:11**
186:12 192:2 198:6 200:13,25
201:3 209:11,12 213:12
220:18,21 222:10 223:7
**talked** 8:7 22:18,19,20 29:11
33:1 35:13 40:3 49:19 50:6,8
53:17 55:6,10 58:22 59:3,7,9
63:13,15 67:23 85:3,11 90:12
105:9 120:15 141:14 147:21
178:22 186:25 197:24 202:19
**talking** 9:20 17:9,15,15 22:1
24:21 26:13,21 33:16 35:9
37:10 39:1 50:8 62:24 91:24
104:3 118:6 145:14,15 147:9
149:24 168:20 203:7
**talks** 30:11 73:20
**tall** 106:17
**Tampa** 183:13
**Tashawn** 137:14
**task** 98:9
**tasked** 131:23
**tax** 165:21 187:1,18 188:1,2,4
**taxes** 175:10 187:9
**teach** 20:7
**team** 22:20 114:21,22 145:2
160:8
**technical** 105:6
**technically** 65:24
**telemarketers** 8:17 12:2
**telemarketing** 12:16 15:6
**telemed** 218:13
**telemedicine** 35:10 39:9 56:5,10
57:23 59:9 199:12
**telephone** 29:25 30:3 95:6 96:17
120:16 125:1
**television** 70:23
**tell** 14:3 16:4 17:14 18:18 22:16
23:4 24:25 27:20 28:24 31:20
31:22 42:19 47:12,14 56:17
59:5 63:16 79:7,17 80:3,9
87:7 90:15,17 91:3 92:16 93:4
100:18,20 103:3 105:18
110:25 113:15 114:3 115:6
117:11,24 118:4,7,8,18 129:1
155:1 158:14 164:18,23 166:7
166:19,22 167:16,25 168:16
169:14 172:8 176:24 177:21
179:10 180:7 183:24 202:3
205:15 207:23 208:3 210:3,24
211:8 212:1,3,21 213:5,14,24
215:2 218:1 220:18 221:12
223:3,4
**teller** 173:12
**telling** 8:16 28:15,24 31:12
33:14 36:25 38:7 39:4,5,10,20
46:18 47:10 49:10 69:11
90:14 100:23 214:10 223:5
**tells** 21:14 47:15 194:19
**template** 91:17
**term** 163:9,16 189:12 190:9,10
202:16
**terminate** 32:13
**terminated** 8:3 28:10,16 29:14
32:17,19 34:4,18 36:21 37:2
37:12,24 38:1,4 44:24 45:1
46:18 90:13,14
**terminating** 30:24 39:1,13
**terms** 134:11 157:15 170:7
189:15
**terrorism** 130:14
**testified** 17:10,14 23:8 34:17
44:8 48:16 49:4 67:5,8 69:2
69:4 84:14 91:16 109:10,19
111:25 112:9,16,22 121:14
122:5,23 125:23 127:23 131:9
135:17 137:3 142:14 153:13
186:4 200:1 215:3,8,20
**testifies** 204:4 211:18
**testify** 79:21 103:21 125:5

**159:20,22,23,2 5 198:4 200:24**
202:4 203:11 211:17 213:10
214:21,23 215:1,10 219:14
222:14
**testifying** 67:1 68:13 76:16
**testimony** 6:25 7:14 8:1 9:17
32:22 35:11 37:12 50:20
52:25 53:13 60:1,5 66:25
68:19 101:13 125:9 213:1
215:18 220:13
**testing** 105:20
**text** 8:10,13 26:13,15,18,24
29:23 30:2,2,9,21 31:2,4,8,16
31:22 32:12 34:5 42:16 43:5,7
43:10 44:4 60:2,9 69:13 82:11
110:1 126:8 213:12
**texts** 33:6
**thank** 5:6,25 6:3,15,17 20:21,23
29:20 32:9 38:20 80:23 87:25
91:7,11 92:8,20 99:4 102:17
102:18,19 103:12 110:17
113:4,6,6,17,20 121:5,24
125:16,18 127:2 128:19,20
143:8 153:8 155:3,11,14,17
155:18 164:4,8,20 179:16
181:5 187:25 188:17 189:9
191:19,21 193:10,12,16
197:13 211:24 224:15 225:9
**their** 22:11 28:6,13 29:11 41:3
45:14 56:16 68:14,17,19,24
69:3,8 82:2,4,5,8 90:10 91:18
118:21 128:7 131:8 163:6
180:9 203:18 209:23 216:16
216:23 221:10,12
**Theirrien** 219:14
**themselves** 153:2
**theory** 68:20 71:19 72:5 205:14
**therapy** 107:2,3,4
**thing** 49:18 70:11 71:17 80:7
85:22 102:9 106:11 108:7
133:11,19 138:23 140:17
196:3,14 201:22,24 203:2
207:24 209:23 215:7 217:18
218:25 219:4 223:1 224:6
**things** 6:5 13:20 14:13 17:13
77:11 95:18 102:9,12 133:15
158:16,16 159:15,15,16,16,17
159:17,17 160:6 186:8 192:5
192:7 203:17 214:12 219:8
**think** 10:3 11:17 13:20 41:6
51:13 52:4 57:2 62:7 64:3,5
64:19 67:3,8,17 70:7 73:20
76:12,14 77:2,9,12 78:21
80:12,15 81:7 84:20 85:25
98:1 101:8,16,22 102:20
105:8 145:9 151:17 152:10
157:21 158:6,23 159:25 160:2
173:24,25 184:15 192:5,25
193:1 196:19 197:10,12,16,25
201:14 202:9 204:1,19,22
207:4,16 208:4,5 209:7,13
212:25 213:11,13 214:22
216:17,18 217:14,21 218:20
222:25 223:15,23,3 224:8,12
**thinking** 74:16
**third** 90:5 191:14
**Thomas** 140:2,10
**though** 8:2 18:23 74:21 75:4
82:22 162:1 192:7 219:1
**thought** 62:2,3,3,4 67:2 74:2
76:25 101:25 107:19 112:16
155:14 193:18 198:16,20
199:23,24 210:8 213:17 215:9
215:19 223:8
**thousand** 21:24 35:2,3
**thousands** 35:19,19 44:21 90:17
98:24 120:23 155:23 197:15

**three** 21:19 26:21 52:11 54:7,9
54:10,12 83:17 98:16 106:14
120:3,5 165:17 170:11 174:10
178:7 198:14 217:7 218:2
**three-page** 162:24
**through** 4:14,17 6:8,13 13:14
39:23 43:3,16,17 48:16 57:3
60:9,10 61:8 74:5 76:12 77:8
86:20 107:2 131:5 134:11
135:13,24 136:2 137:10
140:24 143:2,4,5,5,7 146:16
147:14 148:17 149:25 153:18
153:20,22 163:1 166:9,13
168:23 170:21,23 173:24
176:19 178:3 182:9 187:7
192:23 212:4 219:3 223:15
**throughout** 34:22 41:20 169:6
**throwing** 123:9
**Thursday** 197:22 204:19,23
209:8 222:6 223:11,12,24
224:1,4
**tied** 201:19
**till** 40:7 41:1 195:15
**time** 5:11 7:9 11:16 13:19 17:1,7
20:18 23:13 25:9 26:5,20 27:7
32:4 33:21 34:18,24,25 38:13
38:23 40:1,9,19 41:10,25
44:16 45:24 49:1,7,24 54:9
55:5 56:15 64:19 65:9 66:22
68:1,2,2 70:10,13,19 72:13
73:8 74:18,19 75:1 79:25
87:20 89:13,19,21 93:21 94:3
94:14 95:6 96:3 97:1 100:3
101:2 104:6,10,15,17 106:19
106:25 107:8 108:12 112:16
114:16,23 115:2 116:1,5
117:25 119:5 120:10,15 125:8
125:12 131:18 134:2 135:22
145:11 158:4,4 172:2 173:23
173:25 174:4 196:7,20 211:4
212:7 213:24 215:10 219:8
**timely** 55:18
**times** 54:10,12 63:8 69:19 81:19
82:18 84:4 138:15 139:3
**Title** 184:2,8
**titled** 162:14 175:22 180:8
189:19
**today** 18:12 60:5 71:6 103:22
167:7,7 191:12,24 195:6,10
215:19
**together** 7:15 12:12 75:12
150:23 151:1 152:8 172:21
225:4
**token** 215:1
**told** 8:1 23:4 24:6,25 27:16 29:8
29:8 30:24 31:21 32:12,15
33:3,4 41:1 42:3,22 43:22
45:11,12 51:23 52:5 53:22
55:9,25 56:23,25,25 57:6,12
58:21 59:3 60:22,22 61:11
62:9,10,19,21 63:21 64:11
76:7 81:19 83:16,21,22 88:17
88:18 94:13 96:23 97:5,15
101:19 105:19 116:17,20,24
117:6,7,8 118:8 119:13,18
128:2 189:12,22 191:23
193:20,25 203:11 210:7 220:9
**Tom** 212:14,15
**tomorrow** 192:4,7,23 193:3,17
193:23 195:11,19 196:7,21
199:9 201:7 204:18,24 210:11
223:11
**tonight** 223:21
**top** 16:18 43:5 110:22 157:6
170:22,24 171:1,4,22 178:9
179:9 184:3
**total** 136:10,12,13,16,1 7 138:11
140:19,20,20 141:1,21,23,23
142:5,6,6,9,9 152:22 167:1

174:15,22 175:15,24 177:3,11
177:15 178:1,6,10 180:1,13
183:1 184:13,22 190:6 197:10
**totaling** 171:11 172:12 182:24
**totally** 50:15 75:21 207:18
**totals** 21:24 180:11
**touch** 48:14 82:6,8
**towards** 49:25 186:21 187:11
**town** 194:1 195:6 210:2
**traced** 170:12,23 176:2
**train** 90:25
**training** 49:23
**transaction** 36:5 171:14 176:1,1
176:24 179:19 180:13 181:17
182:5,7 183:5,8 184:9,22
185:4,7,8
**transactions** 168:9,12 169:25
170:3,23 171:12 174:21 175:3
175:20 176:16 177:7 178:4,23
179:2,6,22,25 180:2,14,19
191:5,6
**transcription** 225:17
**transfer** 180:17 183:1 184:1
**transferred** 172:16,18,22 196:25
**transfers** 171:15 172:5,9,11
173:22,25 180:16 182:22
**transition** 61:2
**transitioned** 66:22
**transitioning** 66:12
**transported** 195:9
**Treasury** 175:6 187:1 188:1
**treatment** 219:4
**treatments** 116:8
**trial** 1:10 76:13,23 77:22 94:13
94:14 96:1 97:23 102:1
103:25 214:23 225:13
**Tricare** 22:21 62:9 64:22 65:6
91:4 93:20,21 96:24 104:7,8,9
104:10 106:5,6 108:16,19
114:18,25 116:17,20 131:5
133:17 135:2,2,12,13 136:16
137:18,18 138:4,20,23 140:6
140:12 141:10,15 142:2
143:14,15,1,5 144:3,11 145:15
145:20,22 146:2,5,6,8,13,23
147:7,18,22,24 148:13,18,21
149:1,2,9,25 151:22 152:24
153:20 154:11,15,23 155:25
156:8,10 163:7 198:15,16
199:1 203:1
**Tricosa** 137:14
**tried** 60:17 104:4 133:7,12 207:7
**trip** 128:20
**troopers** 164:13
**true** 28:3 55:13 61:16,22,25
63:25 65:1 158:3
**truly** 156:9
**truth** 24:8 34:22 50:10 61:18,23
67:22 194:19 205:24
**truthful** 70:24
**truthfully** 67:6
**try** 5:16 74:16 105:22 107:15
115:21 132:17 199:9 212:10
215:5 221:3
**trying** 6:13 11:18,20 67:13 72:4
72:7 105:1,5 195:18 204:5
216:14 221:21,24 222:2
**tube** 106:16
**tubes** 106:14,16,17
**Tuesday** 8:18
**turn** 36:12 133:17 137:15
139:14 140:4 147:6 170:6
176:8 207:12
**turned** 5:3
**twice** 41:11,12,25
**two** 11:14 14:5,6 33:6 51:17
56:23 71:16 78:19 87:8 89:18
90:5 91:8 106:18 124:1,3
139:6 145:6,7,1,3 159:9 167:2

167:11 169:10 170:11 171:18
172:21 175:20 184:21 185:2
192:7 208:25 209:16,24
216:11 217:5 222:1 224:10,11
**type** 44:5 96:6 165:19 168:1
177:23 207:16
**types** 83:24 130:7,7 170:8

### U

**ultimate** 152:22
**ultimately** 69:10 98:19 118:10
118:12
**unaccounted** 173:13
**unauthorized** 29:5
**unaware** 68:23
**under** 17:16 38:13 40:25 43:20
44:7 49:10 50:18,21 68:4
74:12,18 107:1 131:6,7,15,19
131:24 132:1 133:24 135:4,13
137:13,14 138:12,22 139:6
190:7 203:3
**underlies** 189:3
**underneath** 178:25
**understand** 10:3,17 12:15 15:3
32:25 40:22 50:20 60:5 65:17
65:20 66:18 67:1,13 69:5
71:23 72:4,11,12 146:17
147:8 212:7 223:2
**understanding** 150:2 152:6
153:15 162:12
**understood** 72:10 73:17 125:23
155:19
**unequivocal** 18:8
**unequivocally** 18:6,11,24
**unfair** 10:15
**unfolded** 69:12
**unintended** 207:10,11
**United** 1:1,4,11,14,1 5 2:5 73:21
92:12 102:24 113:11 114:11
128:22 205:17 207:6 225:20
**University** 50:25 51:14
**unless** 9:24 72:14 152:11 192:5
215:2
**unrelated** 6:5
**until** 15:23 39:25 40:2 44:1 63:1
76:13 80:3 126:2 210:25
221:11,20
**unusual** 72:16
**uploaded** 39:16
**upset** 101:8
**up-and-up** 104:2
**up-front** 35:10 116:17
**use** 12:2 15:18 48:8 56:17 74:11
79:8 84:3,4,16,2,2 85:23 86:25
87:2 88:10 110:1,1 111:12
118:21 121:21 126:24 163:16
189:12 191:25 203:3
**used** 11:5 12:23 16:2,1,4 86:25
87:5 94:16 138:16 140:24
142:7,17 159:21 163:9 171:1
181:21
**uses** 9:15
**using** 22:7 49:7 85:12 115:11
116:8 187:19
**usually** 72:19 158:19 201:10
**UTI** 105:6
**utilize** 133:22
**utilized** 137:4 139:4
**U.S** 130:10 175:5 187:1 188:1
225:20

### V

**VA** 114:21,22 117:3
**vacate** 72:8
**value** 156:11
**variety** 185:17
**various** 50:5 155:21 179:22
**Vaseline** 107:25
**vast** 49:11

**vegetables** 87:11
**vehicle** 181:12 182:15
**Verdict** 217:14 224:24,25
**verified** 118:2
**verify** 82:6,12 151:9
**version** 86:9
**versus** 73:22 90:8,8 96:7 187:3
205:17 207:6
**very** 27:7 30:18 37:10 40:21
41:8 61:16 99:4 143:15 145:4
145:4 150:2 157:1,8 160:20
164:20 174:1 187:25 193:1
194:7,14 205:4 219:3
**vested** 145:12
**via** 33:25
**Vidal** 140:2,8 141:4
**view** 196:17 204:24
**violate** 65:21 66:5
**visits** 114:25
**vitamin** 21:18 35:4,5 58:4,16
84:16 109:18
**vitamins** 94:22 96:3,10 100:17
115:15
**Von** 3:11 46:8 78:14 102:25
103:2,7,15,18 109:1 110:19
111:8,17,23 112:9
**vs** 1:6
**V-o-n** 103:7

### W

**wait** 71:15 81:11 205:25 210:14
**Waited** 106:12
**waiting** 6:4,11,13 152:13 225:2
**walked** 173:4
**want** 5:13 6:12,23 8:5 10:17
11:16,21,24 13:15 14:16
17:13,14 18:25 34:19 42:24
45:6 59:18 60:12 61:14 70:1,9
71:2,3,16 72:15,20,24 73:18
75:14,20 76:21 77:4,10,11,14
77:15,19 79:20 86:19,22,25
87:12,15,19 126:5 128:9
143:14 147:21 151:10 158:18
160:5 166:3 167:10 168:15
169:13 172:2,15 180:25
181:13 182:1,11 183:14 184:6
184:15,25 189:10 1,15 197:20
198:25 200:23,25 201:3,10
203:16 205:3 208:2 211:6,25
212:3,8 213:2 217:2,3,15
221:8,13,23 222:14 224:25
225:1,5
**wanted** 8:17 61:15 63:11 73:8
73:16 75:24 118:7,8 134:2
202:3 206:11 208:8,24 217:7
**wants** 20:16,17 73:18 77:20 80:2
87:2 201:9 205:2
**war** 130:10
**wasn't** 15:5 26:4 34:7 41:14
44:19 56:14 58:17 62:1 86:18
95:11 116:6 117:6 119:14
159:1 160:3 207:20
**waste** 211:11
**watch** 191:24
**way** 14:3,5,5,1 6 18:20,22 33:13
34:5 41:19 43:7 60:7 64:23
70:15 78:10 100:5 105:16
107:13 127:17 139:25 158:7
160:1,8 168:1,1 170:2 200:7
201:2 203:17 206:8,16 207:20
219:1 225:1,5,7
**website** 16:22 22:10 106:1
**week** 78:5,6 210:22,25 211:1
**weeks** 106:12 108:9
**weird** 71:25 72:2
**welcome** 29:21
**well** 9:23 11:13,20 12:10 13:2,11
13:15 14:9 17:6,10 19:17,23
20:14,18 23:13 24:21 25:20

27:4,10 33:12 38:11 39:12
40:3 41:10,14,22 43:18 44:15
44:21 45:2 46:10,17,21 48:2
51:1 54:9 56:2 58:22 62:2,13
63:7 65:17 67:8,13 69:17 72:1
72:20 74:3,24,2,5 77:13 79:6
92:25 94:22,24 95:3 97:19
107:12 108:2 109:19 117:7
123:17,2,5 124:16 137:11,14
139:10,20 140:20,20,22 142:7
144:19 146:17 149:24 150:4
150:23 153:2 158:3 160:14
162:5 170:7,19 173:22 175:25
176:6 183:17 186:25 190:11
193:1 194:12,13 195:7 197:9
197:15 198:3,14 199:21 202:8
203:19 204:17 205:15 209:20
210:3,5 211:1,19 212:25
213:5,9,24 214:20 215:9
217:15 218:1 222:8,10 223:14
**went** 39:24 51:7 106:1 117:14
133:7 136:14 147:14 148:17
175:17 176:19 178:3 219:3
**were** 5:1,1,1 6:11,11,12,23 7:19
7:19,24 12:19 13:25 14:1,1,2
14:6,19 15:3,13,13 20:11 21:2
21:3,5,19 22:1,6,7 23:5 24:4
25:18 26:6,10,18,2,1 29:3,4,5
29:9 30:11,22 31:1,7 33:9,18
34:22,24,24,24 35:1,9 36:20
36:23,25 37:10,10,14 38:25
39:20 41:1,23,23,24 43:16,24
44:13,13,15,16,2,1 45:4,6
46:17 48:13 49:7,22 51:6,21
53:12,23,24,24 54:19 55:15
55:20,21,23 56:3,23 57:10
58:9 59:14,17,24 60:4 61:6,10
61:14,15,20,23,24 62:7,21
64:17,19 65:18,24 66:9 67:22
67:24,24 68:1,4,5 76:2 81:2
82:3 83:9 88:17 89:9,23 90:1
90:1,3,9,10 94:3,16,21,23
95:6,7,7,10,1,2 96:12,21,23,24
97:5,12 98:9,19 99:13 100:5
101:8,9 103:21 104:15,17,25
106:17,25 107:3,6,8 109:24
110:1,3 111:17 112:10 115:2
115:10,12,19 116:1,2,5,8,17
116:24 117:7 120:25 124:16
125:5,5 126:5,18,19,21 127:4
127:8,11 129:20 130:24 131:6
131:7,15,15,19,2 1 133:14,21
135:12 136:2,19 138:16 139:3
139:10,11,19,20 140:21,24
142:7,15,17 145:2,3,19 146:4
146:8,15 147:6,7,8,18,19
148:16 149:24 150:4 155:15
155:21 156:7 157:21,23 163:6
165:25 166:13 170:8,9 171:3
171:6,10,12,13,1 7 172:9,11
173:1,2,2,6,20,21,22,24
176:13 177:25 178:4 180:16
185:17 186:4,8 187:5,5,6,6,11
187:12,13,13,19 188:10,14,24
189:21,22 190:2,13,16,19,23
190:24,25 191:2,8 193:13
197:7 198:14,24 203:4 206:14
207:13 209:3 223:8 225:2
**weren't** 24:10 33:19 44:10,19,23
45:3 85:18 171:12 206:12
**we'll** 71:1 76:12,19 77:23 78:7
78:22 81:11 176:4 186:12
192:24 193:3 197:17 201:9
204:4 211:3,3,7 221:11
224:13 225:4
**we're** 5:7 6:10 14:2 26:13 79:10
80:7 86:25 132:8 147:9 158:7
159:16,17 193:12 195:18
196:20,25 199:9 204:8 210:13

216:22,23 217:5,13 223:5,14
223:17
**We's** 213:12
**we've** 5:14 30:14 85:3 99:11
109:3,5 121:11 160:6 193:11
216:10
**while** 6:13 13:19 26:13 27:10
157:1
**whisper** 13:15,16
**whole** 10:2 33:21 69:11 71:2,2,3
196:14
**wife** 105:14
**Wilkie** 2:6 225:20
**William** 113:16
**willing** 197:25
**wired** 190:25
**wires** 171:14
**wish** 119:4
**withdraw** 125:13 164:2
**withdrawal** 181:9
**withdrawn** 225:8
**withheld** 188:8
**withholding** 187:7,18
**witness** 5:10,19 9:3,9,21 10:21
16:9 17:15 18:3,6,24 19:8,25
20:2 29:19 45:23 63:14 66:20
67:7,19 73:6,11 75:4 78:10,17
78:18,25 79:5,22 81:5,6 86:20
92:10,13,15,18,2 5 102:18,22
102:23 103:2,5,7,11 113:8,9
113:10,12,14,16,19,2 5 121:20
122:1 123:13 124:22 125:8,9
128:21,25 129:2,5 144:24
149:21 150:20 152:1 153:18
153:22,24 154:1 156:4 158:21
159:11 160:19 161:6 163:3
164:9,10,16,1 9 191:21,22
196:23 197:21 198:17 202:14
208:17 210:20 211:20 214:1,3
214:5,5,6,6,9,1 1 215:8 219:9
**witnesses** 70:24 71:20 76:17,18
78:15 79:16 80:1,11,15,22
193:17,22 201:25 208:18
209:8,24 210:1,12,21,22
211:4,5,22 212:1 215:15,16
221:12 222:15,22 223:3,4,8
223:18 224:1,4
**woman** 94:8 95:22,23 115:8,8
117:21 121:14 122:5 125:2
127:24 197:14
**women** 130:11
**wonderful** 223:22
**wondering** 7:23 42:20 56:10
**word** 9:15 12:23 15:18 153:1
163:9
**words** 22:8 86:24,25 88:15
94:16
**work** 23:1 31:17 33:8 68:4 82:19
107:19 114:15 129:4 132:19
149:25 151:12 165:19 201:9
214:17 219:16
**worked** 22:20 23:3 50:15 107:14
107:14,17 144:17 153:15
196:13 199:12 200:7 202:2,21
216:24
**worker** 215:1
**workers** 221:1
**working** 15:1,3 49:24 61:23 62:4
66:9 107:19
**works** 150:3 199:17
**world** 33:22 48:18
**worry** 192:21
**wouldn't** 9:24 14:4 37:9 42:8
43:1 57:7 60:14 61:12 65:8
68:24 98:3 107:11 160:5
215:9
**write** 58:14 224:11
**writes** 74:1,9
**writing** 32:20,23

written 58:7 59:12 124:9 125:2
126:2
**wrong** 52:17,19 55:16 71:24
72:17 82:19,22 83:1,4,7,8,10
83:12,15,17,19,20,2 4 101:22
174:8 220:16,17
**wrote** 28:2 60:11 73:19
**W-2** 44:13,18 61:1,5 65:16 66:3
66:10,10,12 186:23,24 187:3
215:19,21

**Y**

**Yahoo** 133:2
**yeah** 18:11 78:24 94:20 95:3
99:21 100:19 107:22 193:11
194:17 203:21
**year** 130:22 188:4
**years** 26:21 68:8 93:10,15 130:6
165:17,17,17
**yesterday** 6:24,25 8:1,7 10:23
14:1,9 15:22 18:8 34:17 35:9
37:10,13 48:21 49:14 51:6
56:3 58:22 61:18 67:24 79:12
**young** 158:5

**Z**

**zero** 136:14

**$**

**$1,000** 115:24 116:12 118:25
119:2 174:2
**$1,123,577** 178:11
**$1,183,590** 171:11
**$10** 157:11
**$10,000** 172:4
**$100** 35:10 94:14
**$105,544.94** 181:11
**$1500** 23:13
**$19,582,503** 171:7 172:8
**$20** 136:15 218:22
**$200,000** 173:15
**$24,521.36** 184:23
**$25** 157:11
**$25,000** 97:2 108:19 116:21
**$26,336.81** 142:10
**$3** 182:24
**$318,347.79** 141:23
**$337,999** 141:1
**$37,545** 136:13
**$373,816.36** 141:23
**$39,408,499.02** 136:18
**$4,184,830** 188:5
**$40,000** 42:1
**$400,000** 173:13
**$424,000** 173:2
**$48** 151:17
**$48,320,259.38** 136:17
**$50,000** 203:1
**$500** 23:2
**$7,605,584** 177:13
**$750** 35:1 36:18 127:11
**$8,748,971** 175:24
**$8.7** 176:5

**1**

**1** 4:12,13 129:10,13,16,20
134:10 156:11 172:17,21
208:4
**1st** 28:10,15 39:8,9 41:13,17
199:17
**1,057,000** 172:12
**1,548,000** 184:14
**1-7-0** 134:4
**1.1** 174:11
**1.548** 184:3
**1:37** 71:13
**1:52** 80:25
**10** 4:6 68:8 106:17 174:8 179:15

179:15,16 211:22
**10,000** 172:4
**10/27** 52:2
**10:15** 6:9 223:9
**100** 84:9,13 85:11 219:5
**102** 3:10
**103** 3:11,12
**1042** 36:3
**1046** 36:12
**105565** 155:4
**108** 3:13
**1099** 66:12 187:3 215:21
**11** 4:17 166:9,13 168:15,16
169:9 174:17 179:10
**11.5** 174:17
**11.6** 174:17
**11:58** 5:1
**112** 3:14
**113** 3:15,16
**116986** 161:19
**12** 4:17 17:7 19:3 54:13,15
106:17 179:10,13
**12th** 21:7
**1200** 6:2
**120** 52:24
**1202** 73:22
**121** 3:17
**127** 3:18
**128** 134:11,11 147:12 151:9
**129** 3:19,20 4:13
**13** 111:1 179:10
**13th** 46:15,19 47:2 48:5
**13-3** 1:5 2:6 225:21
**133** 25:24
**134** 23:23 24:22 86:7 88:3,16
**136** 4:15
**14** 4:8,9
**14th** 49:24
**142** 161:22
**143** 3:21
**15** 122:10 123:24 124:15 130:6
211:4,22
**15th** 41:4,5,5 63:3
**154** 4:16
**1563** 205:17
**159** 4:17 166:9,13 170:16 178:19
185:16 190:1,1
**16-20893-CR-MORENO** 1:3
**160** 176:8,9 177:21
**161** 189:19
**162** 176:24 177:21
**163** 178:13 179:5 180:1 188:23
188:23
**164** 3:22,23 180:6
**165** 181:4,5
**166** 4:17 182:2
**167** 129:12,14 182:18 183:17,22
**168** 183:9,23,24
**169** 4:17 166:9,13 184:16
**17-A** 23:7
**17-B** 121:21 122:10 128:10
**170** 4:13 129:13,17,20 134:4
136:5 146:4 152:10
**170-A** 4:14 135:24 136:2 137:7
138:7
**170-B** 138:6 139:21,23
**170-C** 141:6
**170-D** 4:15 136:2 141:25 142:3
**171** 4:16 154:19,21
**1750** 1:21 2:2
**18th** 143:7
**185** 3:24
**19** 172:21,22
**19,200,000** 172:16 175:15
**19,201,371** 172:11
**19.2** 172:17
**19.3** 175:17
**1946** 206:16
**1985** 207:20

**1991** 205:18
**1992** 114:11
**1998** 51:1,5,14 130:22
**1999** 130:20

**2**

**2** 1:21 2:2 4:15 88:19 89:2 90:6
110:14 133:5 134:11 138:7
140:14,14 141:17 174:2
181:19 187:10 208:7
**2.21** 142:24
**2:15** 71:1
**2:20** 73:3 78:9
**2:30** 81:2
**2:31** 81:10
**20** 4:5,13 70:4 108:19 210:21
**20th** 23:24 24:14,22 36:16 41:13
41:16
**200,000** 173:19,22 174:3,5
**2011** 104:18
**2013** 114:11
**2014** 8:14,16 12:2 14:19 26:19
49:7,20 64:17 73:22 93:21
94:1 114:16,22 137:5 155:2,8
155:8 170:21 172:7 173:24
174:1,5 181:8 187:14
**2015** 7:1,5 8:3 15:24 19:3 26:15
27:4,8,12 28:9 29:3 34:23
36:10,13,16 38:5 40:18,25
43:4 47:4,16 61:1,14,20 89:22
89:25 90:1,5,12 93:22 94:1
104:15,18,25 105:10 108:11
111:1,21 112:12,17 114:16,23
123:23 124:9,13 127:8 131:18
135:22 137:5 154:7 155:9
173:24 174:5 187:14,15
**2016** 62:22,24 63:17,21 89:17,23
170:21 210:14
**2017** 63:3
**2018** 1:7
**202** 14:6 86:16
**202-A** 4:11 14:16 48:25 49:5
**202-F** 14:22
**202-G** 10:21,25
**202-I** 4:12 86:14,19 87:2 88:1,23
91:13 162:14
**202-J** 4:5 16:10,25 20:25
**202-K** 4:8 34:12 40:10,14
111:13 126:25 127:8
**202-N** 13:1 14:8
**204** 4:7 37:17 38:14,15,21
**205** 4:9 42:10,14
**206** 4:6 29:17 32:4,10 34:5
**207** 4:10 45:24 46:3 110:15
**207-205-1752** 13:6
**21** 4:7,16
**21st** 142:25 143:4
**22** 111:21
**22nd** 36:15 143:5
**225** 3:25
**2255** 74:18,22 79:21
**2255's** 80:5
**23** 1:7
**24** 165:17
**240** 200:10
**25** 4:5 47:4,16
**25th** 47:5,9,11 111:6
**250,000** 183:3
**27** 93:10,15 165:17
**28** 141:24 155:9
**29** 155:2,8
**29th** 42:16,25 43:21 44:9

**3**

**3** 4:10,17 85:2 90:6 105:19
123:23 139:8 166:8,12,16,19
174:2 178:10 183:16
**3rd** 27:17 29:11,23 30:11,24
32:17 34:1 60:23

**3.21** 143:2
**3.22** 143:5
**3.7** 142:24
**3.8** 143:2
**3:30** 79:10
**30** 46:22 47:2 48:4 54:17 70:2,4
    70:7 106:21,23,24 108:8
    119:12
**30th** 28:9
**30-day** 54:2
**305-400-4261** 1:22
**305-400-4266** 2:3
**305-530-6168** 1:17
**305-961-9356** 1:17
**305.523.5118** 2:7 225:21
**31st** 43:24 46:14,20
**32** 4:6
**33** 179:10
**33128** 2:7 225:21
**33131** 1:22 2:3
**33132** 1:16
**360** 53:17,19 54:17 58:2,3
**38** 4:7
**39** 151:20

---

**4**

**4** 4:17 38:5 90:12 166:8,12,17,22
    166:23 167:1,5,8 183:16
    212:16
**4th** 27:11 30:17,18,2 1 31:1,2
    38:23 90:15 143:6
**4,449** 136:11 137:1 151:7
**4-B** 4:17 166:8,12 167:16 168:5
**4-C** 4:17 166:8,12 167:24 168:5
**4-D** 4:17 166:9,12 169:14
**4-14-2015** 134:21
**4.18** 143:7
**4.4** 143:5
**4.5** 143:6
**40** 4:8 51:22 52:1,2,3,5,7
**400** 2:6 225:21
**400,000** 173:5
**41,000** 218:22
**4176** 167:19 172:11,17 174:14
    175:13 176:13 177:10 178:2
    180:9 182:10 190:19
**42** 4:9
**43** 197:12,13
**4397** 168:3 171:6,22 172:1,5,9
    172:10,12,1 7 173:1 174:13
    178:16,24
**45** 114:7 181:3,7,25
**46** 4:10
**47** 182:25 183:1,4
**473** 15:15
**474** 15:16
**48,000** 136:17
**49** 4:11 185:7

---

**5**

**5** 4:11,17 166:9,12 183:15,18
**5th** 143:7
**5:00** 71:7 185:10
**5:10** 71:7
**5:13** 193:6
**5:50** 225:13
**50** 197:7
**500** 105:20
**51** 197:10,11
**52** 197:9
**54** 56:3
**5803** 183:12

---

**6**

**6** 3:3,4 4:17 58:3 166:9,12 184:7
**601-917-4793** 11:8
**613** 10:16
**613(b)** 10:17 17:17 38:13 73:13

74:12
**63** 68:9
**6597** 169:18 171:16,20 172:14
    174:7,2 1 178:17 182:23 183:8
    184:1,23 188:7
**662-420-2170** 13:2
**67** 4:13 129:11,13,16,2 0 132:8
    132:24 142:14 147:1
**676** 136:11,22,23
**68** 93:8,16
**6983** 171:3,5 178:24 179:2

---

**7**

**7** 4:17 166:10,12 182:12
**7th** 142:25
**7.6** 190:5
**7:33** 30:18 31:4
**70** 161:9
**750** 35:3
**755** 207:20
**761** 73:22

---

**8**

**8** 4:17 166:10,13 181:14,19
**8th** 143:3
**8.8** 176:12 190:4,7
**8:49** 31:4,7
**80's** 207:14
**81** 3:5
**830** 207:20
**85,946** 179:17
**866-780-8355** 1:23
**88** 4:12

---

**9**

**9** 4:17 152:25 166:10,13 184:25
    208:4 217:8 224:23
**9th** 63:21 154:6,13
**9.4** 174:13
**9:00** 192:4 193:4
**90,478** 175:21
**91** 3:6
**93** 3:7,8
**944** 205:17
**96** 93:16
**99** 1:16 3:9