```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
 3                  CASE NUMBER 16-20893-CR-MORENO
 4
     UNITED STATES OF AMERICA,
 5
                Plaintiff,                    Courtroom 13-3
 6
        vs.                                   Miami, Florida
 7
     MONTY RAY GROW,                          January 24, 2018
 8
                Defendant.
 9
10                     JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE FEDERICO A. MORENO
11               UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     FOR THE GOVERNMENT:      KEVIN J. LARSEN, AUSA
14                           JON M. JUENGER, AUSA
                             United States Attorney's Office
15                           Economic Crimes Section
                             United States Attorney's Office
16                           99 Northeast Fourth Street
                             Miami, Florida 33132
17                                              305-961-9356
                                           Fax: 305-530-6168
18                                       kevin.larsen@usdoj.gov
                                         jon.juenger@usdoj.gov
19
     FOR THE DEFENDANT:       DANIEL L. RASHBAUM, ESQ.
20                           JEFFREY E. MARCUS, ESQ.
                             Marcus Neiman & Rashbaum, LLP
21                           2 South Biscayne Boulevard
                             Suite 1750
22                           Miami, Florida 33131
                                                305-400-4261
23                                         Fax: 866-780-8355
                                        drashbaum@mnrlawfirm.com
24                                      jmarcus@mnrlawfirm.com
25
```

1                                    **KATHRYN A. MEYERS, ESQ.**
                                     Law Office of Kathryn A. Meyers PLLC
2                                    2 South Biscayne Boulevard
                                     Suite 1750
3                                    Miami, Florida 33131
                                                          305-400-4266
4                                                    kate@kmeyerslaw.com

5    **REPORTED BY:**                **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                                     Official United States Court Reporter
6                                    Wilkie D. Ferguson Jr. US Courthouse
                                     400 North Miami Avenue - Suite 13-3
7                                    Miami, Florida  33128    305.523.5118
                                     gphofficialreporter@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Page

Robin Halliburton .......................................... 28

    Direct Examination by Mr. Larsen ....................... 28

     Cross-Examination by Mr. Rashbaum ..................... 66

     Redirect Examination by Mr. Larsen ................... 98

Nichole Powell ............................................ 103

    Direct Examination by Mr. Juenger ..................... 103

     Cross-Examination by Mr. Rashbaum ..................... 121

     Redirect Examination by Mr. Juenger .................. 142

Amanda Donnelly ........................................... 146

    Direct Examination by Mr. Larsen ...................... 146

     Cross-Examination by Mr. Rashbaum ..................... 158

Ankush Bansal ............................................. 165

    Direct Examination by Mr. Larsen ...................... 165

     Cross-Examination by Mr. Marcus ...................... 204

     Redirect Examination by Mr. Larsen .................. 212

Laurene Long .............................................. 213

    Direct Examination by Mr. Juenger ..................... 213

     Cross-Examination by Mr. Rashbaum ..................... 216

     Redirect Examination by Mr. Juenger .................. 217

Rosalinda Rambaran ........................................ 219

    Direct Examination by Mr. Larsen ...................... 219

1         Cross-Examination by Ms. Meyers ....................... 245

2            Redirect Examination by Mr. Larsen ................... 249

3    Rashaan Rambaran ......................................... 250

4       Direct Examination by Mr. Larsen ...................... 250

5         Cross-Examination by Ms. Meyers ..................... 257

6            Redirect Examination by Mr. Larsen ................. 261

7    Jill Cichowicz ........................................... 262

8       Direct Examination by Mr. Larsen ...................... 262

9         Cross-Examination by Mr. Rashbaum ................... 270

10           Redirect Examination by Mr. Larsen ................. 283

11   Reporter's Certificate ................................... 333

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **EXHIBITS**

2
     Exhibits                    Marked for          Received
3                              Identification       in Evidence

4    Description                  Page    Line      Page    Line

5
     Government's Exhibits Numbers 34, 40, 41, 42,
6    44, 52, 62 ........................................ 11         2

7    Defendant's Exhibit Number 15 ..................... 72        6

8    Defendant's Exhibit Number 5 ..................... 76        19

9    Government's Exhibit Number 61 .................... 122       20

10   Government's Exhibit Number 47 .................... 169        6

11   Government's Exhibit Number 49 .................... 169       15

12   Government's Exhibit Number 58 .................... 169       23

13   Government's Exhibit Number 64 .................... 170        1

14   Government's Exhibit Number 110 .................. 170        8

15   Government's Exhibit Number 92 .................... 170       12

16   Government's Exhibit Number 112 .................. 170       16

17   Government's Exhibit Number 55 .................... 170       20

18   Government's Exhibit Number 2 .................... 178       22

19   Government's Exhibit Number 32 .................... 186        9

20   Government's Exhibit Number 174 .................. 189        1

21   Government's Exhibit Number 172 .................. 189       21

22   Defendant's Exhibit Number 199 .................. 271       15

23   Defendant's Exhibit Number 43 .................... 276        3

24   Defendant's Exhibit Number 33 .................... 279        2

25   Government's Exhibit Number 31 .................... 287       25

```
 1  Government's Exhibit Number 33 .................... 288      5

 2  Government's Exhibit Number 35 .................... 288      9

 3  Government's Exhibit Number 69 .................... 288     14

 4  Government's Exhibit Number 71 .................... 288     18

 5  Government's Exhibit Number 74 .................... 288     24

 6  Government's Exhibit Number 76 .................... 289      3

 7  Government's Exhibit Number 79 .................... 289      7

 8  Government's Exhibit Number 88 .................... 289     15

 9  Government's Exhibit Number 95 .................... 289     20

10  Government's Exhibit Number 98 .................... 289     24

11  Government's Exhibit Number 124 ................... 290      3

12  Government's Exhibit Number 125 ................... 290      7

13  Government's Exhibit Number 127 ................... 290     11

14  Government's Exhibit Number 128 ................... 292     10

15  Government's Exhibit Number 136 ................... 292     16

16  Government's Exhibit Number 141 ................... 292     21

17  Government's Exhibit Number 146 ................... 293      5

18  Government's Exhibit Number 147 ................... 293      8

19  Government's Exhibit Number 148 ................... 293     11

20  Government's Exhibit Number 149 ................... 293     15

21  Government's Exhibit Number 150 ................... 293     18

22  Government's Exhibit Number 151 ................... 293     22

23  Government's Exhibit Number 152 ................... 294      1

24  Government's Exhibit Number 153 ................... 294      5

25  Government's Exhibit Number 137 ................... 295     10
```

7

```
 1  Government's Exhibit Number 135 ................... 295    16

 2  Government's Exhibit Number 77 .................... 295    21

 3  Government's Exhibit Number 145 ................... 296     2

 4  Government's Exhibit Number 72 .................... 326     2

 5  Government's Exhibit Number 78 .................... 326     7

 6  Government's Exhibit Number 85 .................... 326    12

 7  Government's Exhibit Number 97 .................... 326    16

 8  Government's Exhibit Number 143 .................. 326    20
```

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

 1      (The following proceedings were held at 9:04 a.m. outside

 2   the presence of the jury:)

 3           THE COURT:  Defendant is present, defense counsel,

 4   Government counsel.

 5           Your next witness is?

 6           MR. LARSEN:  Good morning, Your Honor.  Robin

 7   Halliburton is our next witness.

 8           THE COURT:  Any exhibits with that witness?

 9           MR. LARSEN:  Yes, we have --

10           THE COURT:  Let's go through that.  We're missing six

11   or five jurors.

12           MR. LARSEN:  Okay.  Government's ...

13           THE COURT:  Government's what?

14           MR. LARSEN:  Government's Exhibit 62.

15           THE COURT:  Any objection?

16           MR. RASHBAUM:  No objection, Your Honor.

17           THE COURT:  Okay.

18           MR. LARSEN:  42.

19           THE COURT:  Hold on.  All right.  What else?

20           MR. LARSEN:  42, Your Honor.

21           THE COURT:  42.

22           MR. RASHBAUM:  No objection assuming she can -- It's an

23   email from Monty Grow to another individual, assuming she knows

24   something about it.

25           MR. LARSEN:  She does.  She does.

1          THE COURT:  What do you mean assuming?  Who knows

2    something?

3          MR. RASHBAUM:  Well, neither Monty Grow are [sic] going

4    to be on the stand or that other individual.  So I don't know

5    what she has to do --

6          THE COURT:  What did you just say?

7          MR. RASHBAUM:  Halliburton --

8          THE COURT:  No, no.  What did you just say before that?

9    Neither Monty Grow nor Chris O'Hara are going to be on the stand

10   when they put this in now.

11         THE COURT:  But I thought you told me from the very

12   beginning that Monty Grow will --

13         MR. RASHBAUM:  Oh, he will be and they can certainly

14   ask Mr. Grow about it.  I just don't know that she has any

15   foundation to know anything about this email.  She is not on it.

16         THE COURT:  So you think it's a fabricated email.

17         MR. RASHBAUM:  No, no.  Let me be --

18         THE COURT:  Whose statement is it?

19         MR. RASHBAUM:  It's our client's statement.

20         THE COURT:  Then it comes in automatically.

21         MR. RASHBAUM:  Absolutely, but I might object to her

22   talking about it since she's not on it.

23         THE COURT:  We don't know that yet.  I'm just going to

24   go through the exhibits.  An exhibit is different from

25   testimony.

1          MR. RASHBAUM:  Fair enough.  No objection to the actual

2    document.

3          THE COURT:  That's all we're doing.

4          MR. RASHBAUM:  Gotcha.

5          THE COURT:  You know, the rest of you can sit down

6    unless you're addressing the court.  When you talk, you get up.

7    When you don't talk, you sit down.  That's the way it's been for

8    40 some years, probably before, but that's all I can talk about.

9          All right.  Next number.

10          MR. LARSEN:  44, Your Honor, Government's Exhibit.

11          THE COURT:  What say the defense?

12          MR. RASHBAUM:  It's good, Your Honor.

13          THE COURT:  No objection.

14          MR. LARSEN:  Government's Exhibit 34, Your Honor.

15          THE COURT:  34.

16          MR. RASHBAUM:  No objection.

17          THE COURT:  It will be admitted.

18          MR. LARSEN:  Government's Exhibit 41.

19          MR. RASHBAUM:  No objection.

20          THE COURT:  It will be admitted.

21          MR. LARSEN:  Government's Exhibit 40.

22          MR. RASHBAUM:  No objection.

23          THE COURT:  It will be admitted.

24          MR. LARSEN:  And Government's Exhibit 52.

25          MR. RASHBAUM:  No objection.

1          THE COURT:  It will be admitted.

2      (Government's Exhibits Numbers 34, 40, 41, 42, 44, 52, 62

3  were received in evidence.)

4          MR. LARSEN:  That's it for the Government for this

5  witness, Your Honor.

6          THE COURT:  Who's your next witness?

7          MR. JUENGER:  Nichole Powell.

8          THE COURT:  And what exhibits are you going to use with

9  that witness?

10          MR. JUENGER:  Zero exhibits.

11          THE COURT:  Wonderful.  You guys have conspire with the

12  jurors to delay the case to get what you want, an easy paced

13  trial.

14          MR. RASHBAUM:  I didn't hear you.

15          THE COURT:  You have conspired with the jurors to slow

16  down the trial.  I am kidding for the record.

17          MS. MEYERS:  We understood.

18          THE COURT:  I know you understand, but who knows who

19  reads the record.

20          This is way premature, but since I've got some time,

21  whenever all of the evidence is in by the Government and since

22  the defense says it's going to have a defense, including the

23  defendant's testimony -- if he still wants to do that, it's up

24  to him -- I send the jurors to deliberate.  I think they're

25  going to take awhile because it's a lot of stuff to go through

1    and a difficult case probably, but if it's not guilty, that

2    takes care of it.  If it's guilty, we're going right to the

3    forfeiture proceeding.  Okay?

4           Why am I telling you that now?  So you'll know.

5    Government, you have to be prepared.  So unless there's a

6    stipulation -- which I know is difficult to think about, but

7    freedom is more important to most people than money.  Why I'm

8    telling you this now this week is so that next week you don't

9    say, oh, Judge, we need more time:  We're bringing in witnesses

10   from San Diego, we're innocent owners, which has nothing to do

11   with this defendant; or the Government says, well, we need more

12   witnesses, we didn't present enough for the forfeiture.

13          Whatever you're going to do, you've got to be ready.  I

14   know it's difficult.  You don't have to think about it now, but

15   you have to be ready.  It won't be till next week, because I

16   don't want to tell the jurors in the event -- and I'm not

17   suggesting they would convict the defendant, but you've got to

18   be ready.  That's all I'm saying.  Okay?

19      (There was a brief discussion off the record.)

20          THE COURT:  I should have scheduled pleas and

21   sentencings and all that stuff.

22          THE COURT:  Yes, sir.

23          MR. LARSEN:  I wanted to apprise the Court.

24          THE COURT:  Use the microphone.  I can hear you fine,

25   folks.  I don't like to give you a hard time, but the court

1   reporter likes to take every word.  She's proud of her work, and

2   you never know, there may be an appeal.  You certainly want an

3   appeal, right?  You do, because see, in order for there to be an

4   appeal, you have to win the case.

5          MR. LARSEN:  Right.

6          THE COURT:  If not, there's no appeal.  So you do want

7   an appeal as odd as it sounds.  Okay.  So you want a record.

8          MR. LARSEN:  Yes, Your Honor.

9          This is a scheduling issue.  Monday morning I am

10  scheduled before I believe it's Judge Gayles for a sentencing of

11  a co-defendant or -- excuse me -- a co-conspirator in this case.

12         THE COURT:  A co-conspirator in this case --

13         MR. LARSEN:  Yes.

14         THE COURT:  -- who's not going to be a witness.

15         MR. LARSEN:  No, Your Honor.

16         THE COURT:  Okay.  What time is that?

17         MR. LARSEN:  I believe it's scheduled for 10 a.m.

18         THE COURT:  10 a.m.

19         MR. LARSEN:  I belive so, but my co-counsel will be

20  here.  I just wanted to apprise the Court that --

21         THE COURT:  Oh, you won't be here.

22         MR. LARSEN:  Well --

23         THE COURT:  You don't have to be here.  I don't choose

24  who is here.

25         MR. LARSEN:  Okay.

Jury Trial

```
 1              THE COURT:  I'm not suggesting that if I did, you
 2   wouldn't be here.
 3              MR. LARSEN:  Okay.  Okay.  Just letting the Court know.
 4              THE COURT:  No problem, but I'll accommodate your
 5   schedules.
 6              If he does it early in the morning, it would be great.
 7   Don't you think?  He does it at 10:00.
 8              MR. LARSEN:  I spoke with co-counsel or defense counsel
 9   last night late.  I will reach out to him.
10              THE COURT:  Why don't you talk Jermaine?  He's very
11   accommodating.  He's a great courtroom deputy --
12              MR. LARSEN:  Will do.
13              THE COURT:  -- and see if you can do it early in the
14   morning.
15              MR. LARSEN:  Will do.
16              THE COURT:  I mean, I don't care but --
17              MR. LARSEN:  Will do.
18              THE COURT:  Because I think that's easier.  If you give
19   people enough time and if he has other -- I'll tell what.  Let's
20   find out what he has.  Mr. Marcus, you needed Tuesday before
21   Judge Cooke, right?
22              MR. MARCUS:  It's tomorrow, Your Honor, at 10.
23              THE COURT:  Oh, it's tomorrow.  Okay.  All right.  It's
24   tomorrow.  It's Wednesday.  I thought it was Tuesday but okay.
25              It's tomorrow.  Tomorrow is Thursday.  So I thought it
```

1   was next week.  So it's tomorrow at what time?

2          MR. MARCUS:  It's at 10 in the morning, Your Honor.

3          THE COURT:  Okay.  All right.  Let's see.

4          What do we do with these jurors?  See, we make them

5   wait.  Now they make us wait.  It's jurors' revenge.  Can't

6   blame them.  We make them wait, why shouldn't they make us wait.

7   See, I'm going to tell them that it's probably better if we

8   started at 8 or 8:30 -- they would miss some of the traffic --

9   than if they came at 9:00.  I really believe that.  It's been my

10  experience.  You either come late or come early.  You miss the 9

11  to 5 traffic.  You all can do that, right?

12         MR. RASHBAUM:  Are you asking us our preference?

13         THE COURT:  No, notice how I ask the question, "You all

14     can do that."

15         MR. RASHBAUM:  I just wanted to make sure I heard

16  right.

17         THE COURT:  Your preference is to start to work from 10

18  to 4 like a banker used to.

19         MR. MARCUS:  On Thursday I have to drive a carpool, but

20  I could be here by 8:30.

21         THE COURT:  You drive a carpool.

22         MR. MARCUS:  I drive my son to school with my older

23  son.

24         THE COURT:  What time do you drop him off?

25         MR. MARCUS:  About 7:30.

1          THE COURT:  Broward or where?

2          MR. MARCUS:  It's in Coconut Grove.

3          THE COURT:  Okay.

4          MR. MARCUS:  I could not be here by 8:00.

5          THE COURT:  I know.  I would never make you come in at

6    8.  I'm like a salesman 8:30.

7          MR. MARCUS:  Okay.  That's fine.

8          THE COURT:  See, those are the problems with the longer

9    trials.  The longer the case is the more problems we have.

10         MR. RASHBAUM:  Judge, may I just step out?

11         THE COURT:  Sure.

12         MR. RASHBAUM:  Thank you, Your Honor.

13      (Daniel Rashbaum, Esq. retired from the courtroom.)

14         THE COURT:  When is your sentencing did you say before

15   Judge Gayles, this Friday?

16         MR. LARSEN:  Your Honor, I believe it's Monday at 10

17   a.m.

18         THE COURT:  Next Monday.

19         MR. LARSEN:  Yes.

20         THE COURT:  Okay.  Thank you.

21         Yuri Lahara (phonetic) or Michael Shane Matthews.

22         MR. LARSEN:  Michael Shane Matthews.

23         THE COURT:  It's at 9:30.  Is it complicated?

24         MR. LARSEN:  I don't think so.  It shouldn't be

25   contested.  The parties are in agreement on the sentencing

1    recommendation.

2         (Daniel Rashbaum, Esq. entered the courtroom.)

3              THE COURT:  All right.  Four, we're down to four.

4              THE COURT SECURITY OFFICER:  Yes, sir.

5              THE COURT:  We'll start playing the 8 Little Indians

6    song.  Is that what it was?  We're now down to 4.

7              Well, you know, the beauty of it is, you all being very

8    smart, selected four alternates.

9              MR. RASHBAUM:  That was your doing, Judge.

10             THE COURT:  But with your consent.  So what do you want

11   to do?  You've got 12 jurors.

12             What say the Government?

13             MR. LARSEN:  The Government would like to wait, give

14   the jurors a few more minutes to arrive.

15             THE COURT:  What say the defense?

16             MR. RASHBAUM:  Judge, we would prefer to wait as well.

17             THE COURT:  I know.  I knew you would say that.

18             THE COURT SECURITY OFFICER:  Two.

19             THE COURT:  Two.  We're down to two.  What say the

20   Government?

21             MR. LARSEN:  Same thing, Your Honor.  We'd like to give

22   the jurors --

23             THE COURT:  What say the defense?

24             MR. RASHBAUM:  We would like to wait, Your Honor.

25             THE COURT:  Okay.  We're good at that.

1          See, I got you all to agree on things.  That's why I do

2    it.  I knew you would say that.

3          How long do you think we should wait?

4          MR. LARSEN:  15 minutes, Your Honor.

5          THE COURT:  We did.

6          MR. LARSEN:  Another 15 minutes.

7          THE COURT:  Another 15 minutes.  Half an hour, okay.

8          How long does the defense think we should wait?

9          MR. RASHBAUM:  As long as Your Honor wants.

10         THE COURT:  And then that means right now.

11         MR. RASHBAUM:  Judge, we think we should wait until all

12   the jurors get here.

13         THE COURT:  No matter what?  2:00 in the afternoon?

14         MR. RASHBAUM:  No, within reason.

15         THE COURT:  What is that?

16         MR. RASHBAUM:  45 minutes.

17         THE COURT:  45 minutes.

18         MR. RASHBAUM:  I'm a salesman, too.

19         THE COURT:  45 minutes.

20         See, if I go back in there, I'll be 45 minutes late

21   with all the stuff I have to do.

22         Well, you want to take your mid-morning break, Gilda,

23   now?

24         All right.  We'll see you.

25         THE COURT SECURITY OFFICER:  All rise.

1        (There was a brief recess.)

2              THE COURT:  All right.  Let's see.

3              Defendant is present, defense counsel, Government

4    counsel.

5              Two issues regarding the jurors:  You can sit down,

6    folks.

7              Delphine Glover told my courtroom deputy a couple of

8    things, and we will bring her out.  She's got a swollen ankle

9    and she wanted to know the phone number to call next week,

10   because she doesn't think she'll be able to come next week and

11   she also added -- I always tell you in case I hear anything,

12   because it's fair for you to know.  She also added whether the

13   judge was going to be here today.

14             MR. RASHBAUM:  Whether the judge was going to be here

15   today?

16             THE COURT:  That's what she said.  I infer from that

17   that I confused her or them when I said we're going to switch

18   courtrooms in the afternoon because of the multidistrict panel.

19   You chose them and you had peremptory challenges left I think at

20   least at the beginning.

21             Anyway, so she's got a swollen ankle and she says she's

22   okay but it's hurting, but she's already anticipating -- today

23   is Wednesday, right -- that next week it will hurt so much.  So

24   that's one issue that we have, and then we're still missing one

25   juror.

1          It was Jefnie Jean, is that right --

2          THE COURTROOM DEPUTY:  Yes.

3          THE COURT:  -- who was an hour late yesterday.  Of

4   course, he was late yesterday and I was busy, so it didn't make

5   any difference.  So he probably figured even though I told them

6   I didn't have anything, we've got the half an hour that you all

7   wanted but you wanted 45 minutes, but I figure the 15 minutes we

8   could use.  You can tell me what you thought about Delphine

9   Glover's ankle.

10          MR. RASHBAUM:  Who was the other juror, Judge.  I'm

11  sorry.  I didn't hear you.

12          THE COURT:  The third juror, Jefnie Jean.  Jean, you

13  know, sometimes they want to use the French name, sometimes they

14  want to use the English name.

15          MR. LARSEN:  Your Honor, with respect to the first

16  juror --

17          THE COURT:  I don't know who the first juror is.

18          MR. LARSEN:  Delphine --

19          THE COURT:  -- Glover, the ankle one.

20          MR. LARSEN:  The Government doesn't have an objection

21  to moving or I guess excusing that juror and taking an alternate

22  in her place.

23          THE COURT:  What say the defendant?

24          MR. RASHBAUM:  Judge, we could give her some pain

25  cream.  I'm just kidding.  We can excuse her.

1          THE COURT:  All right.  And what do you want to do

2   about Mr. Jean?

3          MR. LARSEN:  Your Honor, we would like to wait and I

4   only say this Your Honor --

5          THE COURT:  No problem.  We called.  He was on the bus.

6          MR. LARSEN:  There is some possible -- I don't know if

7   they're housekeeping issues, but I would --

8          THE COURT:  Fillers.  Yeah, I figured after my sermon

9   yesterday, both of you would join up in fillers to make sure

10  we're here next week --

11         MR. LARSEN:  No, Your Honor.

12         THE COURT:  -- so you would get billable hours.  I

13  don't think any of you is charging by the hours but I don't

14  know.  Times have changed but let's see.

15         So you want to wait for Mr. Jean?

16         MR. LARSEN:  Well, I want to raise an issue with the

17  Court and maybe in the meantime she shows up.

18         THE COURT:  It's a man.

19         MR. LARSEN:  Excuse me.  He shows up.

20         11:00 last night, I don't know if the Court is aware,

21  there were a number of defense exhibits added to the Exhibit

22  List.  We got them late last night.

23         THE COURT:  You know, my courtroom deputy told me, but

24  I didn't see it, but she said she put it in my stack.  I know it

25  shocks you guys that I do other things.

1           THE COURTROOM DEPUTY:  I'll print out another one.

2           THE COURT:  And how many exhibits did you add, defense?

3           MR. MARCUS:  I believe five, Your Honor, all document

4    that the Government produced to us.

5           THE COURT:  My goodness.  This is like a miracle.

6           MR. LARSEN:  It's a composite that contains several

7    separate documents, Your Honor.

8           THE COURT:  And you've got the document.

9           MR. LARSEN:  This morning.

10          THE COURT:  What do you want to do?

11          MR. LARSEN:  Are you asking me, Your Honor?

12          THE COURT:  You're the one who's bringing it up.

13          They want to introduce them.  I don't have to ask them,

14   right?  That's what you want to do?

15          MR. MARCUS:  We may want to introduce them, yes, with

16   some witnesses, sure.  That's why we added them.

17          THE COURT:  Well, I assume so.  That's why I didn't ask

18   you, but I can never tell.  Sometimes parties object to their

19   own exhibits, sometimes the other sides moves it in.  It just

20   keeps me sharp.

21          MR. LARSEN:  Your Honor --

22          THE COURT:  What do you want me to do?

23          MR. LARSEN:  I think some of these aren't going to come

24   in.  I think they're hearsay.  For example, all of these emails

25   from Matthew Smith that don't have anything to do with Monty

1  Grow, I've been told yet again that Mr. Smith --

2        THE COURT:  Give me a second.  I've got an emergency

3  call.  Hold on a second.

4    (There was a brief recess.)

5        THE COURT:  Okay.  We're back.

6        With these exhibits, you have the exhibits.  You can

7  look at them.  Whether they're admissible or not, why don't we

8  wait.  Are they going to be used with the next two or three

9  witnesses, defense?

10       MR. RASHBAUM:  They're not going to be used with the

11  next two witnesses.  I don't know who the third witness is.

12       THE COURT:  We went through the witnesses yesterday,

13  remember?

14       MR. RASHBAUM:  But I don't know the order.  They're not

15  going to be used with the next two.

16       I know that Nichole Powell and Halliburton are

17  testifying.  I don't know who's after that.

18       THE COURT:  Well, you do.  He went through the list

19  yesterday.

20       MR. RASHBAUM:  I have no idea who the third witness is

21  today.

22       MR. LARSEN:  I intend calling Robin Halliburton, then

23  we're going to call Nichole Powell, then Amanda Donnelly.

24       THE COURT:  Are any of those exhibits going to be --

25       MR. RASHBAUM:  No, no.

Jury Trial

1          MR. MARCUS:  No.

2          THE COURT:  Okay.  So we can deal with that later I

3   think.  There's no point talking about things that may not come

4   up, but if you have them, you have the list.  You know what they

5   want.  So you can prepare for it.

6          It is now 40 minutes after the hour.  So the clock will

7   tick for the five minutes.

8          Could you bring -- do we have a court security officer?

9          THE COURTROOM DEPUTY:  I'm here.

10          THE COURT:  No, you're not the court security officer.

11          THE COURTROOM DEPUTY:  They're waiting for the juror

12   outside.

13          THE COURT:  They're waiting.

14          Can you bring Ms. Glover?  Is she okay?

15          THE COURTROOM DEPUTY:  Yeah, she fine.

16          THE COURT:  I've got that cane that they give me -- the

17   Irish, what is it called? -- in case she needs.  Ladle I think

18   it's called.

19      (Juror Delphine Glover entered the courtroom.)

20          THE COURT:  Ms. Glover take the first seat over here,

21   so I can see you.  How are you doing?  It hurts?

22          MS. GLOVER:  Yeah, it hurts.

23          THE COURT:  You want to be excused?

24          MS. GLOVER:  Yeah, I could be excused if you don't

25   mind.

1        THE COURT:  All right.  We are going to excuse you.

2        MS. GLOVER:  Okay.  Thank you.

3        THE COURT:  Do you know how to get back to wherever?

4        MS. GLOVER:  Yes.

5        THE COURT:  Don't walk too much.

6        MS. GLOVER:  Okay.

7        THE COURT:  All right.  You're excused.  Say good-bye

8   to everybody, and hope you feel better.

9        Thank you very much.

10    (Juror Delphine Glover retired from the courtroom.)

11       THE COURT:  All right.  Okay.  What do you want to do

12  with the other juror, Government?

13       MR. LARSEN:  Has he called in, Your Honor, and given a

14  further update?  Is he on his way?

15       THE COURT:  Yeah, he says he's on the bus.

16       MR. LARSEN:  Do we know approximately how long it will

17  be?

18       THE COURT:  When was the last time you took a bus in

19  Miami?

20       MR. LARSEN:  It's been a while.

21    (There was a brief discussion off the record.)

22       THE COURT:  He just got here?

23       THE COURT SECURITY OFFICER:  He got off the bus.

24       THE COURT:  How do you know he just got off the bus?

25       THE COURT SECURITY OFFICER:  She told me he got off the

1  bus about five minutes ago.

2          THE COURT:  Okay.  The issue is --

3          THE COURT SECURITY OFFICER:  How fast he gets here.

4          THE COURT:  -- where did he get off the bus.  Okay.

5  You want to wait.

6          MR. RASHBAUM:  We're okay excusing him, Your Honor.

7          MR. LARSEN:  We'd like to wait.

8          THE COURT:  Of course.

9          MR. LARSEN:  He's in route.  He's off the bus.  He went

10 through all the trouble to get here.

11         THE COURT:  All right.

12         MR. LARSEN:  We'd like to wait.

13         THE COURT:  Okay.  We'll wait.  It's one of those days,

14 usually happens on the third day of trial.  It really does.

15         We have no issues with the first two witnesses, right?

16         MR. LARSEN:  Not that I'm aware of, Your Honor.

17         MR. RASHBAUM:  I don't know what they're going to say,

18 but I don't think so.

19         MR. LARSEN:  As far as being here, they're here, ready

20 to go.

21         THE COURT:  Okay.  They're outside, right?

22         MR. LARSEN:  The first witness is sitting outside, yes,

23 for sure, and the second witness is in another room.

24         THE COURT:  So why don't you bring in the first

25 witness?  We might as well have the witness here.

1        MR. LARSEN:  Okay.

2        THE COURT:  I don't want to go back there or I won't

3   come back.

4        Good morning.  Just have a seat.  I'll swear you in in

5   front of the jury.

6        It's like a dentist office.  We bring you from one room

7   to the another, okay, but it won't be as bad I don't think.

8        THE COURT SECURITY OFFICER:  The last juror is here.

9        THE COURT:  Bring them in, please.

10       THE COURT SECURITY OFFICER:  All rise for the jury.

11    (The jury entered to the courtroom at 9:48 a.m.)

12       THE COURT:  Good morning.

13       THE JURY:  Good morning.

14       THE COURT:  You can all sit down or whatever is

15   comfortable for people to get through, whatever you think.

16       Okay.  We've got everybody.  I think all the jurors are

17   present.  Thank you.

18       Ms. Glover had an ankle problem.  I don't know if she

19   told you about it, but it was swollen, so with the agreement of

20   all parties, we let her go so she can get treatment or whatever.

21   So she could concentrate on that.

22       The next witness by the Government is?

23       MR. LARSEN:  Good morning, Your Honor.

24       The Government calls Robin Halliburton.

25       THE COURT:  Raise your right hand.

1      ROBIN HALLIBURTON, GOVERNMENT'S WITNESS, SWORN.

2           THE COURT:  Have a seat.  Speak right into that

3  microphone and tell us your name, please.

4           THE WITNESS:  Robin Halliburton.

5           THE COURT:  Two L's or one L?

6           THE WITNESS:  One L -- or two L's.

7           THE COURT:  Okay.  All right.  Thank you.

8           And Robin with an I or a Y?

9           THE WITNESS:  With an I.

10          THE COURT:  All right.  Thank you.

11          MR. LARSEN:  Your Honor, I plan to use the computer.  I

12  don't know if it's cued up this morning.  We had plenty of

13  time --

14          MR. LARSEN:  Okay.

15          THE COURT:  -- to cue it up, don't you think?  Let's

16  cue it up, but that's one thing we could have done in 45 minutes

17  I think while I'm sitting here.

18          MR. LARSEN:  Fair enough, Your Honor.

19          THE COURT:  Do you want to put it on, Gilda?

20                    DIRECT EXAMINATION

21  BY MR. LARSEN:

22  Q.  Good morning, Ms. Halliburton.  Where do you live?  City and

23  state only, please.

24  A.  Ponte Vedra, Florida.

25  Q.  How far did you go in school?

1   A.   I graduated from Louisiana State University.

2   Q.   With what type of degree?

3   A.   A Bachelor of Arts.

4   Q.   Do you know why you were called to testify in court here

5   today, Ms. Halliburton?

6   A.   Yes, because I was charged with conspiracy to receive

7   kickback and to tell my information about the case.

8   Q.   You were charged with a conspiracy.  Who, if anyone, did you

9   conspire with?

10   A.   Monty Grow.

11   Q.   And what did this conspiracy with Monty Grow involve?

12   A.   Recruiting Tricare patients.

13   Q.   Do you know what Tricare is?

14   A.   Tricare is the military insurance that pays for active

15   military, their families, and veterans.  It's funded by the

16   Government.

17   Q.   Ms. Halliburton, please briefly describe the role you played

18   in this conspiracy with Mr. Grow.

19   A.   I was a patient recruiter, recruiting Tricare patients to

20   get the pain, scar and vitamin, and got paid for it.

21   Q.   Now, you said you were charged.  Did you plead guilty to

22   these charges?

23   A.   I pled guilty.

24   Q.   And did you plead guilty because you are, in fact, guilty?

25   A.   I am.

1  Q.  Were these criminal charges related specifically to a

2  conspiracy with the defendant?

3  A.  Yes.

4  Q.  Did you enter into a written Plea Agreement with the United

5  States Government?

6  A.  Yes.

7  Q.  So are you now a convicted felon?

8  A.  I am.

9  Q.  Have you been sentenced yet?

10  A.  I have.

11  Q.  What was your sentence?

12  A.  I was sentenced to five years of Federal probation, home

13  confinement, $10,000 fine, 1200 hours of community service, and

14  pay back restitution.

15          THE COURT:  Who was the judge?

16          THE WITNESS:  Judge Huck.

17  BY MR. LARSEN:

18  Q.  What do you understand your Plea Agreement requires you to

19  do?

20  A.  To cooperate with the Government and be truthful.

21  Q.  And have you been cooperating with the Government?

22  A.  I've been cooperating with the Government since the day that

23  Agent King and Agent Hill has come to my house in July of 2016.

24  Q.  Just briefly describe what type of cooperation you've been

25  giving.

A.   I welcomed the two agents into my house, gave them --

answered all the questions that they had and provided all the

emails, text messages that I had, and FedEx'd them to them, as

well as drive myself down to Miami and proffer with Mr. Larsen

and Agent King and answer any questions that they've had from

that point on.

Q.   Okay.  Ms. Halliburton, are you testifying, at least in

part, in court today because you hope to gain some sort of

additional reduction of the sentence that Judge Huck imposed on

you?

A.   I am.

Q.   And who do you understand will make that decision as far as

any potential reduction in your sentence?

A.   Only Judge Huck.

Q.   Are you familiar with the Federal crime of perjury?

A.   I am.

Q.   Do you know what could happen to you if you testified

falsely under oath?

A.   Yes, I could go to Federal prison.

Q.   I am going to ask you about your professional experience.

Do you have any professional experience in the area of health

care?

A.   Yes, I am a trained pharmaceutical sales rep.

Q.   How long have you been a pharmaceutical sales rep?

A.   Three years.

1    Q.   Where have you worked in the health care field?

2    A.   I worked for Publicis Touchpoint Solutions and Vertical

3    Pharmaceutical.

4    Q.   What did you do at Publicis Solutions?

5    A.   At Publicis I was a customer service sales rep that brought

6    marketing information to providers on Lunesta and Omnaris and

7    Zetonna.   Lunesta is a sleep medicine, Zetonna and Omnaris are

8    both allergy medicines.   I did not speak clinically on the

9    medicines, but I did just bring them marketing information and

10   then, after that, I rolled into an AstraZeneca contract that I

11   stayed on from January to June, and then I started as a true

12   sales rep in June of 2015.

13   Q.   Was this all with Publicis?

14   A.   The second -- it was all under Publicis, but because I was

15   contract rep, I worked as an agent of Sunovion Pharmaceutical

16   the first nine months, and then we rolled -- I ways still a

17   contract rep for Publicis Touchpoint Solutions and rolled into

18   an AstraZeneca contract, and then I left Publicis Touchpoint

19   Solutions and became a full-time sales rep for Vertical

20   Pharmaceuticals.

21   Q.   Are you still with Vertical?

22   A.   No, I got fired.

23   Q.   Why did you get fired?

24   A.   Because of the Federal charges that I pled guilty to.

25   Q.   Just describe for the jury what your day-to-day duties were

1   as a pharmaceutical sales rep.  When I say pharmaceutical sales

2   rep, I mean selling or in the marketing of pharmaceutical

3   products.

4   A.   My day-to-day duties are bringing marketing information to

5   the providers to give them the clinical knowledge, as well as

6   the marketing information and side-effects, contraindications,

7   and the pros and cons of why my drug would be best, and to give

8   them the clinical information to make a judgment when they

9   happen to see a patient that could benefit from the meds that I

10  am repping.

11  Q.   You've used the word "providers."  What is a provider?

12  A.   A doctor, a nurse practitioner, anyone who has the

13  capability of writing a prescription.

14  Q.   Now, how do you know what to say about the products that you

15  market to providers?

16  A.   We have intense training.

17  Q.   What kind of training did you get, or do you get?

18  A.   We get training on just straight sales techniques, as well

19  as clinical information about the drugs, medical information on

20  what -- how the drug works, as well as compliance training for

21  the laws and rules governing the pharmaceutical industry.

22  Q.   What about with respect to supervisors, do supervisors have

23  input on what you say in the clinical setting?

24  A.   Supervisors don't, but the overall company does.  There's

25  strict guidelines in pharmaceuticals of what you can and can't

1  say and what you can and can't do, but I did have a direct

2  supervisor, manager, district manager, that did monthly

3  ride-alongs with me to make sure that I was doing my job

4  properly.

5  Q.  Okay.  What is a ride-along?

6  A.  A ride-along is the district manager would meet with me, sit

7  in the car with me, and go on my daily route with me, meeting

8  with providers and attending educational lunches that I would

9  provide to the offices.

10 Q.  Would you receive feedback from the district manager about

11 things you said to providers, things that you did in the field?

12 A.  Yes, I got field training reports after each field ride.

13 Q.  How was your compensation structured as a marketer for a

14 pharmaceutical company?

15 A.  I got a base salary, as well as I had a sales quota that I

16 had to meet, and I got paid commission on the percentage that I

17 made to quota on the scripts that were written.

18 Q.  Now, earlier I think you mentioned something about

19 compliance, health care compliance as part of training.  Did you

20 receive training as a pharmaceutical sales rep on areas related

21 to health care fraud, waste and abuse?

22 A.  Yes.

23 Q.  What kind of training did you receive in that area?

24 A.  We got trained on the anti-kickback law, the Stark law and

25 HIPAA laws, as well as the Pharmaceutical Code of Conduct.

Halliburton - Direct

35

Q.  Did you receive training on the Anti-Kickback Statute at
every company you worked at in the pharmaceutical area?

A.  Every company that I worked at.

Q.  Earlier, you mentioned lunches, visits in the filed.  Are
things as simple as lunches, is that something that is governed
by your training in health care compliance?

A.  Yes, it's strictly governed.  I mean each company accepts
different guidelines that they have to adhere to, and they set
the limit per head of how much you can spend.  $25 was the limit
that you can spent per head while you're in there, and it also
has to go along with an education discussion.  I'm not just
providing lunch and having a visiting session.  I provide a
clinical discussion at each lunch.

Q.  Based on the training you received on the Anti-Kickback
Statute, what do you understand the Anti-Kickback Statute to be
about?

A.  The Anti-Kickback Statute is that you can't pay patients,
doctors, indirectly or directly --

            MR. RASHBAUM:  Objection, Your Honor.

            THE COURT:  Grounds.

            MR. RASHBAUM:  She's not a lawyer.

            THE COURT:  I know, but she pled guilty to it, so
that's why I allow it.

            Are you going to ask her about her plea?

            MR. RASHBAUM:  Maybe.

1          THE COURT:  Then I'll let her say what she thinks she

2   pled guilty to.

3          Okay.  Go ahead.

4          THE WITNESS:  That you can't pay patients, directly or

5   indirectly, especially with patients that have both Medicare,

6   Medicaid or Tricare that are paid through the Federal

7   Government.

8   BY MR. LARSEN:

9   Q.  And are you referring to the information you received in

10  training?  That was the question I asked.  Were you trained on

11  that?

12  A.  Yes.

13  Q.  And why can't you pay people to go -- why can't you pay

14  patients?  Why can't you pay patients?

15  A.  Because patients are to go to the doctor when they need

16  things, not when they are paid to go to -- paid for reasoning to

17  go see the doctor.  Patients go to the doctor's office when they

18  are in need of something, and paying them or paying the doctor

19  gives them undue influence than just getting the medical advice

20  that they need.

21  Q.  You mentioned earlier the term "patient recruiter."  I

22  believe you said you were a patient recruiter for Mr. Grow.

23  What's a patient recruiter?

24  A.  A patient recruiter was -- I was specifically targeting

25  Tricare beneficiaries to get the pain, scar and vitamins that we

1  were getting and I got paid for each patient that I brought to

2  Mr. Grow.

3  Q.  You said you were recruiting Tricare beneficiaries.  Were

4  you told to recruit any other type of patient other than

5  Tricare?

6  A.  I was not, only Tricare beneficiaries because they were the

7  only ones that were paying out at that time.

8  Q.  And you stated just a moment ago that you were paid for

9  every Tricare patient.  What did you receive from Mr. Grow or

10  anyone related to every Tricare patient that you referred to the

11  defendant?

12  A.  I got paid 7 percent of -- I got paid 7 percent of the

13  adjudicated cost or adjudicated payment from Tricare.

14  Q.  What do you mean by "adjudicated payment"?

15  A.  It means that a script was written and filled at the

16  pharmacy and actually paid from the Federal Government to the

17  pharmacy, and from that payment, I got 7 percent.

18  Q.  Okay.  Now what products, if any, did you sign patients up

19  for Mr. Grow?

20  A.  I signed them up for compounding scar cream, compounding

21  pain cream, and some kind of vitamin.

22  Q.  How did you know which products to market to Tricare

23  patients that you recruited for Mr. Grow?

24  A.  Monty Grow and Shane Matthews are the ones who gave me the

25  information.

1  Q.  Who's Shane Matthews?

2  A.  Shane Matthews is an acquaintance that I had met through my

3  son's football -- youth football.  He was the local high school

4  football coach in the feeder program of my child's Pop Warner

5  team.

6  Q.  Do you know if Mr. Matthews had any relationship with

7  Mr. Grow?

8  A.  Shane Matthews and Monty Grow both played football at the

9  University of Florida together.

10  Q.  Now, did Mr. Grow ever train you on what to say about the

11  pain, the scar, and the vitamin products that you just talked

12  about?

13  A.  Yes.

14  Q.  What did he tell you to do?

15  A.  He told me to find Tricare beneficiaries that have insurance

16  and let them know, you know, about the pain cream and the scar

17  cream.  I didn't have any information about the vitamins other

18  than filling out an intake form for each of the patients and

19  then getting their Tricare information and sending it back to

20  Mr. Grow.

21  Q.  Earlier, you talked about the type of product training you

22  received at Vertical and Publicis.  Did you receive training

23  from Mr. Grow on the pain cream, the vitamin cream -- excuse

24  me -- the pain cream, the scar cream and vitamin products

25  similar to what you received at the pharma companies you were

1   working for?

2   A.   No, sir.

3   Q.   What, if anything, did Mr. Grow tell you to do or say when

4   recruiting patients for him?

5   A.   He just told me that I needed to get them to fill out the

6   intake form, mail it back to him, let them know that it is free

7   for all Tricare patients, and that if they happen to get a

8   copay, tell them not to worry about it, that it will never go

9   into collections.

10  Q.   Okay.  We'll talk about that in a moment.  I want to show

11  you Government's Exhibit 41.  It's been admitted.

12          And while we're pulling up the document, so after you

13  identified a patient with Tricare, what was the first step that

14  you were instructed by Mr. Grow to take when you found and

15  identified a person with Tricare insurance?

16  A.   To get them to fill out the Tricare beneficiary intake form.

17  Q.   Can you just describe what the Tricare beneficiary intake

18  form looked like?

19  A.   It was name, address, information.  They asked for their DoD

20  or Tricare number, which was their Social Security number in

21  most cases, or their spouse's Social Security number.  It asked

22  where their pain was, where their scar was, and a yes and no

23  question if they wanted vitamins.

24  Q.   I'm showing you Page 2 of Government's Exhibit 41.  You'll

25  see it says Tricare Patient Intake Form.  Is this the form that

1   you're talking about?

2   A.   This is the form that I'm talking about.  The way that I got

3   it from Mr. Grow, it had his email up at the top, where I just

4   switched it so that the patients that I recruited would come to

5   me before I would send them to Mr. Grow.  So I changed the email

6   address up at the top from Monty Grow's compounding email

7   address to the lsurobin32.

8   Q.   Okay.  And what was the most important -- you see a few

9   lines here, there's name, date of birth, we'll follow along

10  here, but what's the most important piece of information that

11  Mr. Grow told you you needed to get on every single Tricare

12  intake form?

13  A.   To make sure that they gave me their Tricare beneficiary

14  number.

15  Q.   And that is highlighted in the middle of the screen, Tricare

16  Member ID Benefits Number?

17  A.   Yes

18  Q.   Now, at the bottom, you'll see there's references to

19  location of scar, location of pain, and metabolic vitamin.  Were

20  these on the form that you received from Mr. Grow?

21  A.   They weren't prefilled, it was blank that said location of

22  scar, location of pain, and the patient filled those in, and the

23  metabolic vitamin, they were supposed to circle yes or no.

24  Q.   Could we go back to Page 1.

25       So a minute ago, you said that you changed Mr. Grow's

1  email on the Patient Intake Form to yours and that you then

2  would forward it on.  The front page here is an email from you

3  to Mr. Grow on February 2, 2015.

4        Is this what you're talking about, the next step you

5  would do as far as sending some email from Robin Halliburton to

6  Monty Grow?  What are you doing in this email?

7  A.  In this email I was forwarding the intake form to Monty

8  Grow, and the original intake form that I sent in, did not have

9  the vitamin marked yes or no and he sent me an email asking me

10  if the patient, Tara, there wanted the vitamin, and I then

11  reached out to Tara and asked her if she wanted it and then

12  returned it.  This is the email me returning it back to Monty

13  saying that she did say yes to the vitamin.

14  Q.  Okay.  So the original intake form did not have the vitamin

15  marked, and Mr. Grow asked you to confirm with the patient about

16  the vitamin?

17  A.  Yes.  When I asked Tara about it, she thought it was a yes

18  or no question, do you take vitamins, and she just left it

19  blank.  So I then reached out to her and asked her if she wanted

20  to purchase or to get the multivitamin and she said yes.

21  Q.  And that's why you say, "say yes to the vitamin!" and you

22  put an exclamation point?

23  A.  Yes.

24  Q.  Do you know if the products that you were instructed to

25  market for Mr. Grow, the pain cream, the scar cream, the

1    vitamin, were these prescription products?  Did they require a

2    prescription, do you know?

3    A.   Yes, they were all prescription products that required a

4    doctor's prescription.

5    Q.   Now, you stated that the second step was to email this form

6    when it was completed to Mr. Grow; is that right?

7    A.   Yes.

8    Q.   Talking about doctors, while we're talking about doctors,

9    did the patients that you recruited for Mr. Grow see their own

10   primary care doctors related to these products?

11   A.   No, they didn't.  They received a telephone call from a

12   doctor asking them the questions.  I wasn't a part of that.  I

13   just was told that a doctor was going to give them a call and

14   then the pharmacy was going to give them a call.  So they did

15   not physically see a doctor.  They just got a phone call.

16   Q.   What if a patient didn't answer the call from the doctor or

17   from the pharmacy, did that ever come up with discussions with

18   you and Mr. Grow?

19   A.   That came up a couple of times, hey -- via text, hey, make

20   sure that, you know, patient X answers the phone call.  The

21   pharmacy, the doctor has tried to call several times.  The area

22   code -- we all don't answer the call sometimes from an area

23   code, but to remind them that they're getting a call from a

24   doctor and they're getting a call from the pharmacy, so make

25   sure that they answer the call.

Halliburton - Direct

43

1  Q.  What, if anything, would happen if a patient didn't answer

2  the call?  Did you have discussions with Mr. Grow about that?

3  A.  Well, if they didn't answer the call, then we wouldn't get

4  the script, and then we wouldn't get paid.

5  Q.  Okay.  What about, do you know if the patients -- I'm asking

6  about patients you personally recruited for Mr. Grow.  Did they

7  always get a call from a doctor?

8  A.  They did not always get a call from a doctor.  I reached out

9  to my patients that I recruited and asked them if they've gotten

10 a call from the doctor or the pharmacy.  Some would tell me that

11 they did receive a phone call from the doctor, some say that

12 they just got the cream sent to them in the mail.

13 Q.  Okay.  So in some instances, even if a doctor wasn't called,

14 the product arrived?

15 A.  Yes.

16 Q.  Okay.  Would you have gotten paid on that?

17 A.  I got paid on everything that was adjudicated from the

18 pharmacy.  I wasn't aware of what products got adjudicated or

19 what the prescription was actually written for.

20 Q.  If you got paid, then, do you know if Mr. Grow got paid?

21 A.  If I got paid, Monty got paid as well as Shane Matthews got

22 paid.

23 Q.  I'm going to ask you about a particular person named Becky

24 Lawson.  Do you know who that is?

25 A.  Yes.

1   Q.   Who is Becky Lawson?

2   A.   Becky Lawson is one of my friends that I worked out with at

3   my gym whose husband was in the military that had Tricare, and

4   she was one of my patients that for the first time did not want

5   to fill out their DoD or Tricare number on the intake form.

6   Q.   Did you have a discussion with Mr. Grow about that issue?

7   A.   I did.   I sent Mr. Grow an email asking him what I'm

8   supposed to do if a patient does not want to give me their

9   Tricare beneficiary ID.

10  Q.   What did Mr. Grow say?

11  A.   He told me that it's fine if they don't want to give it to

12  me, but they're going to have to give it to the pharmacy because

13  I paid the doctor $150 prior to going to the pharmacy, and if

14  the patient won't give the pharmacy their ID, then I'm going to

15  deduct the $150 from your pay.

16  Q.   I'm going to show you now what has been admitted as

17  Government's Exhibit 52, Ms. Halliburton.   Do you recognize this

18  email?

19  A.   Yes.

20  Q.   What are you discussing with Mr. Grow in this email?   Let's

21  focus your attention in on the area that's been highlighted.

22  You just testified about $150 being deducted from your

23  commission.   Is this related to patient Becky Lawson?

24  A.   Yes.

25  Q.   I'd like to focus your attention in on the paragraph in the

1    middle of the page starting with "Yes, active military can

2    benefit here.  They are the primary candidate."

3         What was Mr. Grow telling you here?

4  A.  As a pharmaceutical rep, I knew that there were different

5  levels of Tricare so some different -- some prime, some active

6  military -- sometimes active military Tricare patients aren't

7  eligible for some certain kinds of drugs because they have to

8  get it on the base that they are attached to.  So my question to

9  him was, can active military receive the compounding scar cream,

10 and his response was, yes, active military are the exact people

11 that we want to gather.

12 Q.  Okay.  I think you said earlier that at the time you joined

13 the scheme with Mr. Grow, you had a job, you had a day job, if

14 you will.

15 A.  I did.

16 Q.  Where were you working?

17 A.  I was working with Vertical Pharmaceutical.

18 Q.  And you mentioned Shane Matthews as the individual who was

19 working with Mr. Grow; is that right?

20 A.  Yes.

21 Q.  What, if anything, did Mr. Matthews tell you about the

22 opportunity with Mr. Grow?

23 A.  He told me that it was quick, easy, fast money.  You don't

24 have to do a lot.  Originally, because I was a pharmaceutical

25 rep, he wanted me to, you know, gather patients in my offices

1   and I said no, I really -- I have a job.  I'm not allowed to

2   have a second job and I kind of just blew Mr. Matthews off for a

3   while and I then started receiving text messages from Shane as

4   he was receiving payments from the Tricare beneficiaries that he

5   recruited, that he was receiving payments from Monty, snapshots

6   of the bank deposits.  It started out at $4,000, $10,000, then

7   $14,000 kind of got my attention and I put my thinking cap on

8   and said, I might know a couple of Tricare patients.  I only

9   know a couple, so I'm going to go ahead and gather them.

10  Q.   So you changed your mind?

11  A.   I changed my mind and then Shane arranged a three-way

12  telephone call with Mr. Grow and Shane and myself.

13  Q.   What was discussed on this call with Mr. Matthews and

14  Mr. Grow?

15  A.   It was discussed that it's really easy, all you have to do

16  is gather Tricare beneficiaries, have them fill out a form, a

17  doctor is going to give them a call, then the pharmacy is going

18  to give them a call, it's no cost to any of the Tricare

19  beneficiaries.  And even if they do get a bill, then just tell

20  them not to worry about it because it will never go into

21  collections.

22  Q.   I'm going to show you what's been admitted as Government's

23  Exhibit 62.  It's an email from Monty Grow to you on December

24  10, 2014.

25          In the email you ask him a question:  "Am I doing it

1     all right?"

2          What were you asking here?

3  A.  This was my first patient right after I got it -- right

4  after I received the very first intake form, got her to fill it

5  out, mailed it, she emailed it back to me, I emailed it to him.

6  And at this point, this is when I was just reconfirming that I

7  did everything right, as well as, our initial talk really was

8  very vague about how much I got paid and how I would know how I

9  would get paid, so I started asking a little bit more questions

10 because now my contact went from Shane Matthews to me directly

11 talking to Mr. Grow.

12 Q.  Mr. Grow says, "Yes, you are good to go."  Then he follows

13     it up by telling you again "You are off to a great start.

14     Keep up the good work."

15          At the top Mr. Grow tells you it goes 3 levels and that

16 you get 7 percent on anyone you personally refer, 5 percent on

17 anyone they refer, and 3 percent on the next level.

18          And then the next statement he says "To put it into

19     perspective, if your two" -- two what?

20          What does he mean by that "two"?

21 A.  My two Tricare beneficiaries that I've recruited, patients.

22 Q.  So your first two patients.

23          "If your two go through as expected, your 7 percent

24     will be approximately $4,000 every month that they get their

25     script filled."  And then he goes on to say, "If each of

Halliburton - Direct

1      those two go get two people like you did, you would have

2      four on your second level.  That would be an additional

3      $2800 a month."

4          So is the second level the 5 percent?

5  A.  Yes.

6  Q.  And then he follows it up with, "If you do the math, it can

7      add up really fast, especially going one more level."

8          And then he talks about he tracks through a web-based

9  portal linked directly to the pharmacy and that he sees

10 everything in realtime as it's billed.  Do you know why he's

11 telling you this?

12 A.  I asked the question of how will I know if a patient has got

13 the scar and pain cream.  I wanted to kind of keep track that I

14 was getting paid properly and that the patients that I was

15 recruiting were actually getting the meds and mainly really just

16 to kind of keep up with how much I was making.

17 Q.  Did Mr. Grow ever give you access to the information on what

18 was getting paid for your patients?

19 A.  No.  He told me that I could just text him and ask him if I

20 had any problems with any of my patients.

21 Q.  Okay.  What did you think when you got this explanation

22 about for two patients, you could make $4,000 a month, and then

23 if they got two more patients, so we're talking close to $7,000

24 a month?  What did you think?

25 A.  Well, I mean, honestly, I thought it was too good to be true

1  and that I was running out of people that I personally knew for

2  my first line at the 7 percent, that maybe if I ask some of

3  those patients, that I could just start earning the 5 percent

4  and not really have to do very much and make a lot of money.

5  Q.  Did you know at the time, back in December 2014, when you

6  got paid 7 percent on every person that had Tricare insurance

7  that you referred to Mr. Grow, that that was illegal?

8  A.  I'm sorry?

9  Q.  Did you know it was wrong, did you know getting paid 7

10 percent on every patient that had Tricare that you referred to

11 Mr. Grow that you were doing something wrong?

12 A.  Yes.

13 Q.  Why did you do it?

14 A.  Out of greed.

15 Q.  Do you know if Mr. Grow also knew that paying you money for

16 finding patients for him with Tricare insurance was wrong, was a

17 crime?

18         MR. RASHBAUM:  Objection, Your Honor.

19         THE COURT:  Sustained to the way the question was

20 asked, do you know, but you can talk about what he said.

21         Did he say anything about that?

22         THE WITNESS:  I asked him at the beginning, you know,

23 that I was worried about my real job and tried to make sure

24 that, you know, everything was --

25         THE COURT:  And what did he say, if anything?

1          THE WITNESS:  He said that other pharmaceutical reps

2    were also doing it.

3          MR. LARSEN:  Let me rephrase my question.

4    BY MR. LARSEN:

5    Q.  Did Mr. Grow hold himself out as someone knowledgeable in

6    the area of health care?

7    A.  Yes.

8          MR. RASHBAUM:  Objection, Your Honor.

9          THE COURT:  Grounds.

10          MR. RASHBAUM:  Hold himself out?  If he wants to ask

11   about specific --

12          THE COURT:  Overruled on those grounds.  I heard the

13   question, but if you don't tell me a legal basis, I can't

14   sustain it.  But you have to tell us what he said, if he said

15   anything that you remember, instead of a conclusion.  What did

16   he say, if anything?

17          THE WITNESS:  I knew --

18          THE COURT:  No, no.  I'm sorry, my mic probably went

19   off.  What did he say about his knowledge of health care?

20          THE WITNESS:  I mean, that he also --

21          THE COURT:  Not I mean.  What did he say, if anything,

22   if you remember?

23          THE WITNESS:  He told me that he was a rep.

24   BY MR. LARSEN:

25   Q.  Okay.  What did he tell you?

1   A.   That he worked in the medical field also.

2   Q.   Did you have a LinkedIn page?

3   A.   I did.

4   Q.   Were you LinkedIn with Mr. Grow?

5   A.   I'm not sure if I was actually linked in with him, but I did

6   check out his LinkedIn page.

7   Q.   And what was on Mr. Grow's LinkedIn page that you saw?

8   A.   That he, indeed, had worked at many medical device

9   companies.

10  Q.   What is a medical device company?  How does that compare to

11  a pharmaceutical company?

12  A.   They have the same strict codes and laws that they have to

13  adhere to.  Instead of influencing doctors on the medicines that

14  they are doing, the device reps influence them on the medical

15  devices, the screws, the pins, the stints that --

16       MR. RASHBAUM:  Objection, Your Honor, and move to

17  strike.  Improper opinion.

18       THE COURT:  Because?  It's improper because of what?

19       MR. RASHBAUM:  There is no basis for her opinion on

20  this.  She's not testifying as to what he said.

21       THE COURT:  Are you telling me what he said, or what

22  are you saying?

23       Look at me.  I'm asking the question now, not the

24  prosecutor.

25       THE WITNESS:  He told me that he was -- you know, he

1    worked in medical device.

2            THE COURT:  Okay.  Could you read back her answer,

3    please?

4            MR. LARSEN:  Could I have my question?

5            THE COURT:  No, I'm sorry, the court reporter.

6        (The answer referred to was read by the reporter.)

7            THE COURT:  Did he say that?

8            THE WITNESS:  Did he say that?  No.

9            THE COURT:  Okay.  Next question.

10           MR. RASHBAUM:  Move to strike, Your Honor.

11           THE COURT:  Motion granted.  Just tell us what he said,

12   not any conclusions.  The lawyers will make the arguments.

13   BY MR. LARSEN:

14   Q.  I'm going to ask you a little bit more about the issue of

15   copays.  You talked about this beginning conversation you had

16   with Mr. Grow when you decided to join the scheme, and you

17   stated that Mr. Grow told you what to do when patients complain

18   about copays.

19           What was your understanding as to why Mr. Grow gave you

20   the instructions that you've already testified to about the

21   copays?

22   A.  That the medicine that we were offering to these patients

23   were free to Tricare beneficiaries.

24   Q.  Okay.  And if a patient were to complain about having to pay

25   a copay, what instructions did you receive from Mr. Grow?

1    A.   To instruct the patient that they can just throw the bill

2    away, that the pharmacy will never collect on the copay.

3    Q.   And did you have an understanding, based on your

4    conversations with Mr. Grow, as to why that's an important

5    instruction that he gave you?

6    A.   Because all medicine -- every drug has a copay.

7    Q.   What would happen if a patient didn't want to pay a copay?

8         MR. RASHBAUM:   Judge, objection.   Again, if it's what

9    Mr. Grow said, that's fine, but --

10        THE COURT:   How would she know the answer to that?

11        MR. LARSEN:   Well, I'm inquiring what --

12        THE COURT:   I heard the question.   How would she know

13   that?

14        MR. LARSEN:   If she had a conversation with Mr. Grow.

15        THE COURT:   Then ask her that.   You can say anything

16   that Mr. Grow told you.   What you can't do is make the jump.

17   All right?

18        THE WITNESS:   Yes.

19   BY MR. LARSEN:

20   Q.   You stated Mr. Grow told you they could ignore the copay?

21   A.   Yes, sir.

22   Q.   Why could they ignore the copay?   Did he tell you why they

23   could ignore the copay?

24   A.   Because the pharmacy was never going to collect on it.

25   Q.   Did you have an incident with any of your patients where a

Halliburton - Direct

54

1   patient had an issue or complained about a copay?

2   A.   Yes.

3   Q.   Who was that?

4   A.   I had several.  One of them was Amanda Donnelly and one was

5   Becky Lawson and one was Amanda Schwartzlender.

6   Q.   Who is a Amanda Donnelly?

7   A.   Amanda Donnelly is one of the patients that one of my

8   recruiters recruited from the gym that we all worked at.

9   Q.   What was the issue with Amanda Donnelly's copay?

10  A.   Amanda Donnelly received a bill in the mail from Patient

11  Care America stating that she owed X amount of money and I let

12  her know that I'll look into it and find out, but don't worry

13  about it, they're never going to send you into collections.  You

14  shouldn't have gotten a bill.

15  Q.   So the answer you gave to Ms. Donnelly, was that the

16  instruction given by Mr. Grow?

17  A.   Yes.

18  Q.   Did that quash the issue or did it develop further?

19  A.   No, she received several bills in the mail and I felt bad

20  and just told her to send me the bill and I paid the copay.

21  Q.   How did you pay the copay?

22  A.   Through my personal check.

23  Q.   Where did you write the check?

24  A.   I wrote the check to Patient Care America.

25  Q.   So it was personal check in your name to the pharmacy?

1    A.   Correct, with a copy of the bill that Amanda Donnelly

2    received.

3    Q.   Who is Warren Karr?

4    A.   Warren Karr was one of my girlfriend's boyfriends at the

5    time who was a Navy nurse.

6    Q.   What, if anything, happened with Mr. Karr?  How do you know

7    him?

8    A.   I know him through his now wife.

9    Q.   What kind of relationship did you have with Mr. Karr?

10   A.   I had no relationship other than meeting him originally and

11   figuring out that he had Tricare and trying to recruit him as

12   one of my patients.

13   Q.   Did you ultimately recruit him as one of your patients?

14   A.   I ultimately recruited him as one of my patients.

15   Q.   Did Mr. Karr refer anyone to you after you recruited him?

16   A.   Yes, Warren then became a patient recruiter himself.

17   Q.   And who specifically did Mr. Karr refer to you?

18   A.   Warren referred some of his family members as well as some

19   of his buddies from San Diego.

20   Q.   Who is Madison Karr?

21   A.   Madison Karr is his daughter.

22            MR. LARSEN:  Can you put up Government's Exhibit 72.

23            MR. RASHBAUM:  I'm sorry, what number?

24            MR. LARSEN:  72.

25            MR. RASHBAUM:  Thank you.

1        MR. LARSEN:  I'm sorry, I have a bad number here.  Take

2   that down.

3        THE COURT:  Are you introducing 72?

4        MR. JUENGER:  No.

5        THE COURT:  While we were waiting for a juror this

6   morning, I admitted Government's Exhibits 34, 40, 41, 42, 44, 52

7   and 62.

8        Any other exhibits?

9        MR. LARSEN:  No, Your Honor.

10        THE COURT:  All right.

11  BY MR. LARSEN:

12  Q.  Ms. Halliburton, who is Adrianne Paul?

13  A.  Adrianne Paul was one of the trainers at my gym who was a

14  wife of an Army person who had Tricare.

15  Q.  Was Adrianne Paul -- what did you do with Adrianne Paul?

16  A.  Adrianne Paul was one of the patients that I recruited on my

17  first line at first.

18  Q.  So was Ms. Paul a Tricare beneficiary?

19  A.  She was.

20  Q.  Why did you target Adrianne Paul?

21  A.  Because she had Tricare.

22  Q.  Who did Ms. Paul refer to you?

23  A.  Ms. Paul decided that her husband wanted to get the vitamins

24  and scar cream and pain cream, as well as become a patient

25  recruiter himself.

1  Q.  So did Mr. Paul also sign up?

2  A.  Yes.

3  Q.  Okay.  Now, I asked you a moment ago about Madison Karr.

4  Did Madison Karr sign up to receive the pain cream, scar cream

5  products that you were recruiting for Mr. Grow?

6  A.  Madison Karr was Warren's patient.  I just was the middle

7  person that collected Warren's patients that he recruited that I

8  then forwarded to Mr. Grow.

9  Q.  And in the Indictment one of the allegations is that in

10 February of 2015, you emailed Mr. Grow a Patient Intake Form for

11 referring Tricare beneficiary M.K.  Is that Madison Karr?

12 A.  Yes.

13 Q.  Now, I want to focus your attention in on a text

14 conversation that you had with Mr. Grow.  Do you recall an

15 incident where you texted Mr. Grow about paying a physician

16 assistant to refer patients to you and him?

17 A.  Yes.

18 Q.  What do you remember about that?

19 A.  It was later in the process of gathering patients.  I was

20 out of Tricare beneficiaries that I could recruit, and knowing

21 that the offices that I called on had lots of compounding

22 pharmacies' prescription pads in the offices.  So I was trying

23 to, in the height of my greed, extend out my potential earnings

24 and thinking outside the box and asked a simple question to

25 Mr. Grow, hey, do we have prescription pads for the pharmacies

1   that we have and in return maybe we can pay a physician

2   assistant that I know.

3   Q.   And what, if anything, did Mr. Grow say in response to you?

4   A.   He sent me back a response that was very politically correct

5   that said that, no, we can't pay patient or physician

6   assistants, that's against the Anti-Kickback Statute.

7   Q.   Is there a difference in your mind, based on your

8   experience, between paying a physician assistant a kickback to

9   refer his patients to you and paying the patient directly?

10          MR. RASHBAUM:   Objection, Your Honor.

11          THE COURT:   Overruled.   I'll allow her to what she

12   thinks about what she did.

13   BY MR. LARSEN:

14   Q.   In your mind, is there a difference between paying a

15   physician assistant to refer patients to you and paying a

16   patient to actually sign up to receive the products?

17   A.   No, they're both wrong.

18   Q.   Let's talk about the paying of the patients.   Why is the

19   scheme that you participated in with paying the patients, you

20   and Mr. Grow, wrong?

21   A.   Because that's a kickback.

22   Q.   You talked about earlier Warren Karr and Warren Karr

23   referred his family members and his buddies and then you talked

24   about Adrianne Paul and Ms. Paul referring her husband.   All of

25   those referrals, can you describe in your mind why that's wrong,

1  family members, friends?

2  A.  It's indirectly getting paid a kickback for the patients and

3  of your family members.  You're getting -- I'm getting a

4  kickback, you're getting a kickback, Monty is getting a

5  kickback.  We all are getting paid on patients that recruited

6  into Tricare, which is all wrong.

7  Q.  Did there come a time in the scope of the time you were

8  involved in the scheme with Mr. Grow when you were told that you

9  needed to become a W-2 employee of the pharmacy?

10  A.  Yes.

11  Q.  Who told you this?

12  A.  Monty.

13  Q.  What reason did Mr. Grow give you?

14  A.  That there was a -- that Tricare had caught on, that they

15  weren't paying as much of the adjudicated rate and that if I

16  wanted to get my last commission check, which I had normally

17  gotten directly from him through the MGTEN payment, I then had

18  to become a W-2 employee of PCA and they FedEx'd me a package to

19  become an employee, to technically make me a bone fide employee

20  of the pharmacy.

21  Q.  When you say a bona fide employee, what do you mean?

22  A.  A bona fide employee, meaning that I'm a W-2, that they're

23  going to take Social Security taxes out, that I had to take a

24  drug test, fill out an application form and a drug test.

25  Q.  You said technically make me a W-2 employee.  Why did you

1    use the word "technically" in front of make me a W-2?

2    A.  Because I really wasn't going to be doing anything for

3    Patient Care America.  All I wanted -- all I was doing was

4    filling out the paperwork to receive my last commission check

5    that I had earned from Monty.

6    Q.  Well, let's talk about that.  Did you receive a package from

7    PCA?

8    A.  I did receive a package.

9    Q.  What was in it?

10   A.  It was a form to go to one of the labs to get a drug

11   screening, an application, papers about HIPAA requirements and a

12   bunch of other, you know, on boarding papers from the HR

13   Department.  I had no interest in becoming a W-2 employee.  I

14   was going to forfeit my last commission check.

15   Q.  How much was that last commission check, do you know?

16   A.  I didn't know at the time.  I was just going to forfeit it.

17   Q.  Did you later learn how much it was?

18   A.  Later, probably around June, July, I started receiving phone

19   calls from Patient Care America telling me that I had a paycheck

20   there.  I ignored the phone calls several times and then they

21   got me on the phone and I was in the process of moving, so I

22   just decided that I'd ask how much is my commission check for

23   and they said that it was $17,000, and I said, what do I need to

24   do to get it.

25   Q.  What did you need to do to get it?

1  A.  They then emailed me some forms that were similar to the

2  original forms that I got, but I just had to fill out the forms

3  and email them back.

4  Q.  What kind of forms?

5  A.  It was an application form, a HIPAA like acknowledgment

6  form, and my resumé.

7  Q.  Okay.  And did you receive those payments from PCA?

8  A.  I did.  Approximately a week later, I received two checks

9  separately from a company.  On the check it just said Diabetes

10 Care something or other.

11 Q.  Those checks, what were they for, do you know?

12 A.  They were my last commission checks that were due

13 technically from Monty Grow.

14 Q.  Before he told you about the --

15 A.  Before he told us that he -- he was adamant on the

16 conference call that he was no longer paying out commissions,

17 and that if we didn't fill out the form and become an employee

18 of PCA, then we would not get our last commission check.

19 Q.  And how much money did those two checks comprise?  How much

20 was it?

21 A.  Approximately $17,000 net.

22 Q.  Now, the Indictment alleges -- it's overt act 19, it states

23 that in June of 2015, you cashed two checks, a check number

24 10070 and 10071, in the approximate amount of $9,853, 10071.

25 Did you do that, cash those checks?

Halliburton - Direct

1   A.   I did.

2   Q.   Okay.   How much money did you earn from start to finish in

3   this scheme?

4   A.   Net, I made -- Monty paid me about $45,000 directly into my

5   checking account and then I received those two bills or two

6   paychecks that net 17,000, for a total of about $64,000.

7   Q.   And what did you do with that $64,000 from, say, start to

8   finish?   What did you do with it?

9   A.   From start to finish, I let it sit in the bank.   I never

10  really thought that -- I always that it might go away at

11  sometime.

12  Q.   Why?

13  A.   I just always thought that there was something wrong with

14  the money that I got, which I am glad that I saved it because I

15  ended having to pay the Government back at the end.

16  Q.   Did you pay all of the money that you received back?

17  A.   I paid all the money back that I made, including all the

18  money that I paid in taxes, as well as the $10,000 fine.

19  Q.   Okay.   Just give me one second and I'll wrap up.

20       Earlier, you told us that the Anti-Kickback Statute

21  forbids paying patients and paying doctors, correct?

22  A.   Yes.

23       MR. RASHBAUM:   Objection, Your Honor.

24       THE COURT:   Grounds.

25       MR. RASHBAUM:   Again, it's not what Monty Grow said.

1    It goes to her expertise.  I don't think she has the expertise.

2            THE COURT:  What is the evidentiary rule?

3            MR. RASHBAUM:  Speculation and opinion.

4            THE COURT:  What she told --

5            MR. RASHBAUM:  Opinion testimony and expert testimony.

6            THE COURT:  Read back the question.  I must have

7    misunderstood it because I thought the question was what she

8    said.  Let's find out.  That's what I heard, but I could be

9    mistaken.

10       (The question referred to was read by the reporter.)

11           THE COURT:  Okay, you can stop.

12           So the objection to the question, "earlier you told us"

13   is what?

14           MR. RASHBAUM:  You sustained the objection earlier when

15   she told that.

16           THE COURT:  On what basis?

17           MR. RASHBAUM:  On the basis that it wasn't something

18   that Monty Grow said, it was on the basis of her knowledge

19   outside of the case.  You sustained that objection.

20           THE COURT:  Read the whole question again.

21       (The question referred to was read by the reporter.)

22           THE COURT:  All right.  Where are we going with that?

23           MR. LARSEN:  This is what she pled guilty to, Your

24   Honor.  This is her knowledge.  I'm asking about her knowledge.

25           THE COURT:  Her knowledge.  She hasn't talked about

1    that already?

2              MR. LARSEN:  She has.

3              THE COURT:  So why do you need to ask it again?

4              MR. LARSEN:  I'm just redirecting to a specific point

5    in her testimony, Your Honor, that's it.

6              THE COURT:  But why would you do that on direct?

7              MR. LARSEN:  Because I have a follow-up question on

8    that issue.

9              THE COURT:  Then ask the follow-up question.

10   BY MR. LARSEN:

11   Q.  Ms. Halliburton, you weren't a patient or a doctor, were

12   you, during the scope of this conspiracy?

13   A.  No, I was a patient recruiter.

14   Q.  And you got paid as part of your role in the conspiracy for

15   referring prescriptions, correct?

16   A.  Yes.

17             THE COURT:  That's probably a leading question,

18   correct, isn't it?  Isn't it?

19             MR. LARSEN:  I'll rephrase, Your Honor.

20             THE COURT:  Isn't it?

21             MR. LARSEN:  Yes, Your Honor.

22             THE COURT:  Then don't ask it again.  Wrap it up.

23             You know, the only time I allow a leading question in

24   direct is when it's the last question, so now you're warned.  As

25   soon as I hear a leading question, I'll say "thank you."

1   BY MR. LARSEN:

2   Q.   Based on your understanding of law, does the Anti-Kickback

3   Statute forbid what you did?

4           MR. RASHBAUM:   Objection, Your Honor.

5           THE COURT:   Well, this is the issue, right?   I'm going

6   tell the jurors what the law is.   I allowed the witness to say

7   that what she did was wrong because she pled guilty and I'm sure

8   Judge Huck went through questions and answers with her because

9   he is very thorough, but I don't see the purpose of asking that.

10  I'm going to tell the jurors what the law is.   They have to

11  follow it.   Is the law that in your view?

12          MR. LARSEN:   Yes, Your Honor.

13          THE COURT:   Then, if it's true and I agree, the jurors

14  will know that.   It doesn't matter what the witness said.   The

15  only reason I allowed that is because I expect on

16  cross-examination she's going to be asked about her guilty plea

17  because every cooperator -- and I told you before, and if I

18  didn't tell you before, I will tell you at the end of the trial,

19  that people can cooperate, and there were some questions on jury

20  selection.   I remember there were specific questions asked of

21  Mr. Jean, if I remember correctly, during the jury selection

22  about cooperators.

23          So it's permissible under the rules of any court for

24  cooperators to testify, that's permissible, but I'm going to

25  give you an instruction that you should consider that more

1  carefully, which makes sense because they're entering into a

2  bargain with the Government and that's why I will allow

3  cross-examination.

4          So she has pled guilty.  She'll be cross-examined on

5  that, but her view of the law is really not as important.  It's

6  only limited to what she pled guilty to, but not what the law

7  is, assuming there's a conflict.  If there's a conflict between

8  the lawyers as to what the law says, I'm going to decide that,

9  not her or you or the defense lawyer, but I'll do it with your

10  help.  Okay?

11          MR. LARSEN:  Thank you, Your Honor.

12          THE COURT:  How much longer do you think you have with

13  this witness?

14          MR. LARSEN:  I'm done.

15          THE COURT:  You're done?

16          MR. LARSEN:  Yes.

17          THE COURT:  You can ask one more question if you want.

18          MR. LARSEN:  I'm good.  Thank you, Your Honor.

19          THE COURT:  Cross-examination.

20          MR. RASHBAUM:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MR. RASHBAUM:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  My name is Dan Rashbaum, I represent Monty Grow.

1         We've never spoken before, right, other than just

2  saying hello in the hallway, correct?

3  A.   Correct.

4  Q.   Let me ask you, how many times have you met with the

5  Government?

6  A.   I have met with the Government a total of about five times.

7  Q.   In the last two days, how many times have you met with the

8  Government, how many hours?

9  A.   A total of three hours.

10 Q.   Tuesday night did you meet with the Government?

11 A.   I did.

12 Q.   And what time did you meet with the Government on Tuesday

13 night?

14 A.   On Tuesday night I drove in from Jacksonville and I believe

15 you guys were in court and I met with them for about an hour and

16 a half.

17 Q.   And they weren't very happy with what you were telling them

18 on Tuesday night, were they?

19 A.   I mean, they were asking questions in a way that I didn't

20 understand.

21 Q.   Let me break it down.  They were asking you questions

22 Tuesday night, right?

23 A.   They were.

24 Q.   And you were answering those questions, right?

25 A.   Yes.

1   Q.  And for instance, they were asking you questions like back

2   in 2014, did you think you were doing anything wrong?  They

3   asked you that question, right?

4   A.  Yes.

5   Q.  And you answered, no, back then I didn't think I was doing

6   anything wrong, I thought this was like Mary Kay.  Isn't that

7   what you told them?

8   A.  No.

9   Q.  Tell me what you told them on Tuesday night when they asked

10  you the question, did you think you were doing anything wrong

11  when you were working with Mr. Grow.

12  A.  I always knew what I was doing was wrong.

13  Q.  So Tuesday night, what were they unhappy about?  What were

14  you misunderstanding and what were they unhappy with when you

15  were talking to them?

16  A.  They were -- I was getting confused with them asking me

17  indirectly and directly, the definition of that in the sense of

18  paying, getting -- the patients that I recruited, getting paid

19  on their own family member, the definition of directly and

20  indirectly.

21  Q.  And you were getting confused on what a kickback was, right?

22  A.  No.

23  Q.  They weren't upset with you because you were telling them,

24  at the time I didn't know I was giving a kickback?

25  A.  No.

1  Q.   Okay.  You met with them Tuesday night and they were a

2  little bit upset.  Is that fair to say?

3  A.   My lawyer just wanted me --

4  Q.   I don't want to hear what your lawyer told you because

5  that's not my business, but did it come to your attention that

6  they were upset with your testimony?

7           THE COURT:  It's her right if she wishes to say what

8  her lawyer said, because it's her privilege, not yours.

9           MR. RASHBAUM:  Fair enough.

10          THE COURT:  So it's up to her.  Do you want to say what

11  your lawyer said?  It's up to you.

12          THE WITNESS:  My lawyers were -- just brought it to my

13  attention that they thought that I was confused, but I have

14  always stated from day one that I knew that it was wrong.

15  BY MR. RASHBAUM:

16  Q.   And you were confused on Tuesday night and so the Government

17  decided to bring you back after talking to your lawyer, they

18  decided to bring you back on Wednesday night and prep you again

19  for today.  Is that fair to say?

20  A.   Yes.  Well, I felt like if I sat here all day long waiting

21  for my turn, that I wanted to make sure that I was prepped

22  again.

23  Q.   So you asked to meet with the Government last night or they

24  asked to meet with you?

25  A.   They asked me to stay.

1   Q.   Who requested the meeting last night, Wednesday night, after

2   the Government was upset with you on Tuesday night?  Who

3   requested that meeting?  Was it you who requested the meeting or

4   the Government lawyers who requested that meeting?

5              THE COURT:  Hold on a second.

6              MR. LARSEN:  Objection, Your Honor, mischaracterizes

7   the testimony.

8              THE COURT:  I overrule that objection all the time,

9   just so you know, because it's up to the jury to decide what the

10  testimony was.  Did you say Wednesday night?

11             MR. RASHBAUM:  I'm sorry, every day is the same for me.

12             THE COURT:  I know, but it isn't.

13             MR. RASHBAUM:  I apologize.

14             THE COURT:  That's why I am interrupting.

15             MR. RASHBAUM:  Thank you, Your Honor.  Today is

16  Wednesday.

17             THE COURT:  Today is Wednesday and we will be here

18  probably Wednesday night it seems like.

19             MR. RASHBAUM:  Let me back up.

20  BY MR. RASHBAUM:

21  Q.   The Government met with you on Monday night and you

22  testified there was some -- they were upset with what you were

23  telling them, you were confused.  Then you met with them again

24  Tuesday night, last night.

25             My question to you is:  Who asked to meet with you

Halliburton - Cross

1   Tuesday night?  Was that your request or was that the

2   Government's request to meet with you Tuesday night?

3   A.   The Government's request.

4   Q.   Okay.  Now, the Government showed you a lot of documents and

5   they asked you about a text message.  Do you recall them asking

6   you about a text message?

7   A.   Yes.

8   Q.   They didn't show you that text message, right?  They didn't

9   show that to the jury, right?

10  A.   No.

11  Q.   Okay.  And remember you said in the text message Monty Grow

12  was being very politically correct?  That was your testimony,

13  right?

14  A.   Yes.

15  Q.   And was that one of the things that you discussed with the

16  Government last night when you met with them, that you were

17  going to testify that he was being politically correct?

18  A.   No.

19  Q.   Well, why don't we just show the jury the document.

20           MR. RASHBAUM:  If I could have the ELMO?

21           THE COURT:  Does it have an exhibit number?

22           MR. RASHBAUM:  It does.  It's in evidence, Your Honor,

23  as Defendant's Exhibit 15.  Actually, I'm not sure it's in

24  evidence.

25           THE COURT:  Well, then don't show it yet.

1        MR. RASHBAUM:  Let me check.

2        Judge, I would offer Defendant's Exhibit 15.

3        THE COURT:  What say the Government?

4        MR. LARSEN:  No objection, Your Honor.

5        THE COURT:  It will be admitted.

6     (Defendant's Exhibit Number 15 was received in evidence.)

7        MR. RASHBAUM:  I'm really bad with this thing, but let

8  me see if I can figure it out.

9  BY MR. RASHBAUM:

10 Q.  Do you see this is a text message from you to Shane?  Do you

11 see that?

12 A.  Yes.

13 Q.  Okay.  Let me make sure I can read it.  You say -- and this

14 is May 10, 2015?

15 A.  Yes.

16 Q.  You say, "I have a friend who is a PA and can prescribe or

17     refer patients that can benefit from the pain cream."

18        Do you see that?

19 A.  Yes.

20 Q.  Can you tell the jury what a PA is?

21 A.  A physician assistant.

22 Q.  And that's kind of like a doctor, right?

23 A.  Yes.

24 Q.  "Neither I nor he can have our name associated with being an

25     employee of the pharmacy while currently holding our jobs."

1           What were you telling Mr. Grow and Shane in that

2   sentence?

3   A.   That if we wanted to enhance what we were doing, that I

4   could not get paid as a pharmacy employee because I was an

5   employee of Vertical Pharmaceutical and the physician could not

6   get paid from a pharmacy that he was referring medicine to.

7   Q.   And so if you were going to do that, both you and the

8   doctor -- I'm just going to call it a doctor, the physician

9   assistant -- you and the doctor would have to be hidden,

10  correct?

11  A.   Correct.

12  Q.   "Talking with Shane, he said we could do it through him."

13          You are saying there we can hide the doctor and we can

14  hide me and we can pay the doctor through Shane.  Is that what

15  you're saying there?

16  A.   Yes.

17  Q.   Then you say, "Do you think this is something we could do?"

18          Again you are asking Mr. Grow's advice, whether you can

19  hide the doctor, hide yourself and pay the doctor for patients

20  through Shane.  Is that accurate?

21  A.   Yes.

22  Q.   And then you say, "do you have script pads that can be used

23      to be faxed to the pharmacy?"

24          Do you see that?

25  A.   Yes.

1  Q.  What you're saying is, if that's okay, can you give me some

2  script pads, so I can give it to the doctor, the doctor can get

3  patients, right?

4  A.  Yes.

5  Q.  And then, once the doctor gets the patients, we're going to

6  pay the doctor and pay me, but pay them through Shane, we're

7  going to hide everything.  That's what you're saying?

8  A.  These were all just questions.

9  Q.  They're questions.  If Mr. Grow agrees to that, that was

10  going to be what you were going to do.  You're asking can we do

11  this?

12  A.  I was asking, to enhance the scheme, to go in a different

13  direction.  The PA had no awareness of it.  It was me at the

14  height of my greed trying to figure out how I could extend it

15  out.

16         These were questions that I just was asking because I

17  saw it on a daily basis of reps coming in with doctors with

18  script pads and everything else.  So this was all just asking

19  questions, but I knew from the get-go that I didn't want to be a

20  part of it, and I know that because a doctor cannot get paid to

21  write scripts, that he could not be in it and he was not asked

22  in any way about this.  It was me thinking outside the box to

23  enhance my money.

24  Q.  We're going to get what you knew and what you don't know.

25  Believe me, we're going to get there.  But I want to get to

1    Mr. Grow's politically correct answer, okay?

2          So his politically correct answer is "PAs" -- again,

3       that's the doctor, right? -- "Doctors cannot be paid to

4       write prescriptions.  That is an illegal kickback."

5          Isn't that what Mr. Grow says to this thinking

6    out-of-box plan of yours?

7    A.  Yes, but I didn't understand why a PA that I personally knew

8    couldn't get kickback, because I already knew that Mr. Grow was

9    paying a telemedicine doctor $150.

10   Q.  I understand that.  So let me ask you, is there another text

11   message after where you say to Mr. Grow, I don't get it, Monty,

12   we are already paying patients, why can't we also pay this

13   doctor?  Isn't it the same thing as what we're doing?  Why

14   didn't you say that to him?

15   A.  Because I already knew that we were paying a telemedicine

16   doctor $150 in the email that he sent me that he was going to

17   deduct $150 from my patient, Becky Lawson.

18   Q.  That telemedicine doctor that Mr. Grow's program was paying,

19   you knew they were getting paid for consults, right, they

20   weren't getting paid for prescriptions?

21   A.  They were getting -- I mean, a patient goes to the doctor, a

22   doctor does not call a patient.  If a patient wants to get a

23   prescription, then they would go actually to this PA, doctor,

24   and ask for the script, and I was asking him if he found the

25   actual patient that would benefit from the cream, if we could

1    pay him.  But the telemedicine in what we were doing, we were

2    bringing patients to the doctors.

3    Q.  Let me ask -- I think I must have been inarticulate.

4            You understand that the telemedicine company was

5    getting paid to do a consult.  Just yes or no?

6    A.  Yes.

7    Q.  You understood that the telemedicine company, unlike your

8    description here, were not getting paid to write prescriptions?

9    A.  They were getting paid to write prescriptions.

10   Q.  Oh, really?  So the telemedicine company always wrote the

11   prescriptions, they never declined prescriptions?

12   A.  I don't know what they said.

13   Q.  Oh, you don't.  Okay.  Let me show you another exhibit.  I'm

14   showing you what's marked as Defendant's Exhibit 5.

15           MR. RASHBAUM:  I'd like to move it in evidence.

16           THE COURT:  Any objection?

17           MR. LARSEN:  No objection.

18           THE COURT:  It will be admitted.

19      (Defendant's Exhibit Number 5 was received in evidence.)

20   BY MR. RASHBAUM:

21   Q.  This is a text message between you, Shane and Monty Grow on

22       February 28, 2015, and in this text message you say, "Josh

23       wants to know if Sanchez can get resubmitted."

24           Who's Josh?

25   A.  Josh is one of the military patients that I recruited.

1  Q.  And Sanchez, I take it, is a patient of Josh's?

2  A.  Josh or Sanchez is one of the patients that he recruited.

3  Q.  He was the one who got rejected.  Who did he get rejected

4  by?

5  A.  By the pharmacy, I believe.

6  Q.  Are you sure he didn't get rejected by the telemedicine

7  company, by the doctor?

8        MR. LARSEN:  Objection, asked and answered.

9        THE COURT:  Overruled.

10        THE WITNESS:  I don't know.

11  BY MR. RASHBAUM:

12  Q.  So you don't know whether he was rejected by the doctor or

13  by the pharmacy?

14  A.  I don't recall.

15  Q.  Do you see what Mr. Grow's response is, "I don't think so.

16      I don't think he can be resubmitted"?

17  A.  Yes.

18  Q.  Does that refresh your memory a little bit that the

19  telemedicine company and the doctors didn't always give these

20  patients prescriptions?

21  A.  They always didn't always call --

22        MR. RASHBAUM:  Judge, sometimes it's a yes or no

23  question.

24  BY MR. RASHBAUM:

25  Q.  Yes or no, does it refresh your memory that some of your

1  reps and patients were declined by the doctors?

2  A.  Yes.

3  Q.  Okay.  And when they were declined by the doctors, the

4  telemedicine company still got paid, correct?

5  A.  I don't know.

6  Q.  Well, let me ask you this:  Do you remember that document

7  that Mr. Larsen showed you?  I think it's Government's Exhibit

8  52 and I'll put it up here just for you to look at it.  And this

9  is where you are saying to Mr. Grow, if I understand, you were

10 saying to him that some of the patients didn't want to give

11 information like their Social Security number.  Do you recall

12 that?

13 A.  I do.

14 Q.  And Mr. Grow was saying, look, if they want the medicine,

15 they have to give their information.  Is that a fair way to

16 characterize this?

17 A.  Yes.

18 Q.  And he says to you, "I pay the doctors, the telemedicine

19     company, for the consult."  Do you see that?  "And if they

20     are not going to give the information, I'm going to deduct

21     that consult pay out of your commissions."

22         Do you see that?

23 A.  Yes.

24 Q.  Does that give you some idea that the telemedicine company

25 was being paid no matter whether they wrote a prescription or

Halliburton - Cross

1    not?

2    A.  Yeah.  Well --

3    Q.  Yes or no?

4    A.  They were getting paid, yes.

5    Q.  So just to recap, here in Defendant's Exhibit 15 Mr. Grow is

6    politically correct and says, "we cannot pay doctors to write

7    prescriptions."

8          That's accurate, correct?

9    A.  Correct.

10   Q.  And here in Defendant's Exhibit 5, there's a patient who

11   gets rejected either by the pharmacy, you think, or the doctor,

12   and you want that patient to be resubmitted and Mr. Grow says

13   that, no, I'm not going to resubmit.  That's accurate, correct?

14   A.  He says he doesn't think so.

15   Q.  Do you know, was this patient ever resubmitted?

16   A.  I don't know.

17   Q.  You have no reason to believe they were, do you?

18   A.  That they weren't?

19   Q.  You have no reason to believe that they were resubmitted, do

20   you?

21   A.  I don't know.

22   Q.  And here it's clear that the telemedicine company was

23   getting paid for consults, not for prescriptions?

24   A.  Right.

25   Q.  Different than this example where you want -- you're

1    thinking out of the box and you want to pay the doctors directly

2    for prescriptions?

3    A.   I wanted to pay the doctor for patients that they were

4    actually seeing versus me bringing the patient to the

5    telemedicine doctor.

6    Q.   Oh, I see.  So you thought the difference was or that the

7    point of this was that the PA was actually going to see a

8    patient?

9    A.   Yes.

10   Q.   Oh, so that's what you were asking Mr. Grow.  You weren't

11   asking him -- I thought we went over this.  You weren't asking

12   him whether you could pay the doctor directly for the

13   prescription?

14   A.   No, I was asking him if we could pay the doctor for the

15   patients that he was physically seeing.

16   Q.   Oh, really?  Because what it says here is, "I have a friend

17       who is a PA and can prescribe or refer patients."

18           Prescribe means write a prescription, right?

19   A.   Yes.

20   Q.   Oh, so it's not just seeing, right, it's actually writing

21   the prescription.  Is that fair?

22   A.   Right.

23   Q.   Now, you testified earlier that you knew this to be wrong

24   from the beginning and that Monty Grow knew this to be wrong

25   from the beginning, right?

1  A.  Yes.

2  Q.  If you knew it to be wrong from the beginning,

3  Ms. Halliburton, and if my client, Monty Grow, knew it to be

4  wrong from the beginning, why would you write a text message to

5  him in May of 2015, asking him if you could do an illegal

6  kickback?  Why would you need to ask him if you guys already had

7  conspired together and agreed that what you were doing was

8  wrong?  Why would you need his permission?

9  A.  I didn't need his permission.  I needed to turn the scheme

10  from bringing patients to doctors to now patients that were

11  physically seeing doctors, if I could get them on board, so that

12  we could further make more money off of patients that were

13  already going to a pain clinic that would benefit from the

14  medicine, that we could then pay him instead of the telemedicine

15  person.

16  Q.  Let me shift gears a little bit.  I want to take you back to

17  2014, 2015.  When you signed up as a marketer for Mr. Grow -- by

18  the way, you keep using the word patient recruiter.  Is that a

19  word that the Government has told you about?

20  A.  Yes.

21  Q.  That's not your word, right?

22  A.  That's what I was doing.

23  Q.  Let me ask a more precise question.  Before you met with the

24  Government, had you ever used the word in your life "patient

25  recruiter"?

1    A.   No, because I was marketing.

2    Q.   Right.  You used the word marketer, right?  That's what

3    you've been your entire career, a marketer?

4    A.   Correct.

5    Q.   Now, before you became a marketer -- I'm going to use your

6    word, not the Government's word.  Before you became a marketer

7    for Mr. Grow, he sent you some information about the products,

8    right?

9    A.   He did.

10   Q.   He told you what the pain cream was, the scar cream was, and

11   the vitamin was, right?

12   A.   He just told me that it was compounded information and

13   forwarded me sheets, like one sheeters, kind of like marketing

14   material about the ingredients of the compounding medicine, but

15   compounded medicine is individualized.

16   Q.   And when he forwarded you that information with the

17   information on the products, he also gave you a 1099 form.  Is

18   that fair to say?

19   A.   That is.

20   Q.   And the 1099 form is a tax form, right?

21   A.   Yes.

22   Q.   So he told you when you become a marketer for me, you're

23   going to have to pay your own taxes?

24   A.   Yes.

25   Q.   That was the first thing he did.  He didn't say to you,  we

1  have to hide this from the Government.  He said you have to fill

2  out your 1099 when you get money, commissions from being a

3  marketer, you've got to fill out this 1099.  That's fair to say,

4  correct?

5  A.  As well as my routing number for my check.

6  Q.  Fair enough.  And he also took information so that he could

7  give you direct deposits for the commissions that you would be

8  making?

9  A.  Yes.

10  Q.  And he told you, I think you testified, that you should seek

11  out Tricare patients, right?

12  A.  Yes.

13  Q.  Let me ask you:  In your career, I think you said you sold

14  some products in the past, some medical products?

15  A.  Yes.

16  Q.  What medical products have you sold?

17  A.  I sold Lunesta, which is for sleep, and I sold -- well, I

18  just brought marketing information on Lunesta, and I sold two

19  pain meds, Lorzone, which is a non-drowsy muscle relaxer, and

20  ConZip, which was an extended release Tramadol.

21  Q.  All right.  I'm going to try to do this with the sleep one.

22  You marketed some medicine that was for people who had trouble

23  sleeping?

24  A.  Correct.

25  Q.  Would you market that medicine to insomniacs?

1    A.   No.

2    Q.   Do you know what an insomniac is?

3    A.   Yes.

4    Q.   What is an insomniac?

5    A.   Someone who has difficulty sleeping.

6    Q.   So an insomniac is someone who has difficulty sleeping,

7    right?

8    A.   I was not trained clinically on Lunesta.  I was a

9    marketing -- I was a customer service rep for -- a contract

10   person for Publicis representing Lunesta, who only brought

11   marketing information to the offices.  I did not know clinical

12   information about Lunesta.

13   Q.   Fair enough.  Let me ask a more precise question.  I'm

14   trying to make a point, but I'm having a hard time doing it.

15   Let me try this more precisely.

16          When you market products, do you generally market

17   products to the people who need those products?

18   A.   No, I market them to the doctors to find patients that need

19   the products.

20   Q.   Okay, fair enough.  But if you're marketing a heart pill,

21   are you marketing that to a cardiologist, a heart doctor --

22   A.   Yes.

23   Q.   -- or are you marketing that to an orthopedist?

24   A.   I marketing it to the doctor who would write it.

25   Q.   And similarly, when you were marketing in this case, you

1  were aware that the only insurance that was paying for these

2  products for the patients was Tricare, right?

3  A.  Yes.

4  Q.  So it wouldn't make sense for you to market to the people

5  who had Medicare, or Medicaid, or private insurance, right?

6  A.  Right, they were no longer paying.

7  Q.  So it would be marketing to someone who didn't qualify for

8  the product.  That's fair to say, right?

9  A.  But you don't market drugs to patients, you market drugs to

10  doctors to write it.

11  Q.  But in this case, you were marketing to patients; fair

12  enough?

13  A.  I was recruiting patients to get the medicine.

14  Q.  Let's just stick with not what you believe the law to be.

15  A.  It's not.

16  Q.  Let's just stick with the facts of this case.

17        In this case, you were marketing to patients and

18  marketers who were marketing to patients.  Fair enough?

19  A.  I was marketing -- I was recruiting patients that had

20  Tricare.

21  Q.  The reason why you were recruiting patients who had Tricare

22  was because Tricare was the only insurance that was paying for

23  the product.

24  A.  Yes.  Well, paying the highest payout.

25  Q.  Okay.  I thought you just testified that you knew that

1  private insurances were not paying for these pain creams and

2  scar creams and vitamins.  Didn't you know that?

3  A.  They all did at one point.

4  Q.  Okay.  But when you came in on this in February of 2015, you

5  were aware that Medicare, Medicaid, private insurance companies

6  were no longer paying for pain creams, scar creams and vitamins

7  like the creams you were marketing here.  You knew that?

8  A.  No, they were paying at a lower rate, but not as much.

9  Q.  Oh, really?  When were they paying at this lower rate?

10  A.  At the time that we started.  In my initial conversation,

11  those patients are eligible for it if they wanted it, but they

12  weren't paying it out and we were targeting the highest payout.

13  Q.  You're aware that in the summer of 2014, private insurances,

14  Medicare, Medicaid were no longer paying anything for these

15  products?

16          MR. LARSEN:  Foundation.

17          MR. RASHBAUM:  I'm just asking if she was aware.

18          THE COURT:  Well, she can say yes or no, but I'm going

19  to overrule the objection.  Go ahead.

20          THE WITNESS:  Yes.

21  BY MR. RASHBAUM:

22  Q.  Okay.  So when these messages are happening and when your

23  commissions are happening in 2015, those insurances aren't

24  paying for the products anymore, correct?

25  A.  They are if -- I mean, if the doctor really wanted to get

1    the medicine.

2    Q.   I'm sorry.  I'm a patient, I have Medicare, I go to a doctor

3    for pain cream.  You are aware that in early 2015, it's what you

4    just testified to --

5    A.   Right.

6    Q.   -- that in early 2015, Medicare is not going to reimburse me

7    for that pain cream?

8    A.   Any drug can go through different processes to get a

9    medicine that a doctor medically necessary -- necessary that

10   they need.  So, yes, a patient can always get the med.  It might

11   not -- they might have to come out of pocket for it or the

12   doctor has to fight to get the tier level of the cream, but a

13   patient can always get a prescription.

14   Q.   Isn't it a lot easier to market to the people who have the

15   insurance that are actually covering the product?

16   A.   Absolutely.

17   Q.   And your time is valuable as a marketer, right?

18   A.   Yes.

19   Q.   You work on a commission basis, correct?

20   A.   Yes.

21   Q.   Doesn't it make sense, rather than to find the one or two

22   people who might go through the hoops of trying to get it paid

23   in some way, to go to Tricare recipients who you knew Tricare

24   would cover the product for?

25   A.   But as a trained pharmaceutical rep, I knew that you -- I

1    never speak to patients.  I only speak to doctors.

2    Q.  I'm just asking a yes or no question.

3         Doesn't it make sense for you, as a marketer whose time

4    is valuable, who wants to make money, whether you're greedy or

5    not, as you've testified to four times today, doesn't it make

6    sense to you to market to a group of people whose insurance is

7    covering that product?

8    A.  No, because that is what I am trained.  It's against the

9    anti-kickback to target patients that have Tricare, Medicare or

10   any Government paid information.  I market to doctors, not to

11   patients.

12   Q.  Oh, so you think it's always illegal to market to patients?

13   A.  As a pharmaceutical rep.

14   Q.  Who told you that?

15   A.  In my training.

16   Q.  Where did you get training that it was always illegal to

17   market to patients?

18   A.  From Publicis Touchpoint Solutions, through Sunovion

19   training while I was there, as well as AstraZeneca, as well as

20   Vertical Pharmaceutical.  It's all stated there --

21   Q.  Let me ask you a question.

22   A.  -- that you're marketing to doctors.

23   Q.  Because that's what those companies do, right, they market

24   to doctors?

25   A.  Doctors.

1   Q.   Do you ever watch TV?

2   A.   I do.

3   Q.   Have you ever seen a Viagra commercial on TV?

4   A.   Yes.

5   Q.   Are they marketing to doctors or are they marketing to

6   patients?

7   A.   They are marketing to patients to go see their doctor to ask

8   for it.

9   Q.   Okay.  So let me ask you this question:  You don't think

10   it's illegal to market to patients, correct?

11   A.   I don't think it's illegal.

12   Q.   It seems like your qualm is you think telemedicine is

13   illegal.  Is that what you think?

14   A.   No, telemedicine is legal in the state of Florida.

15   Q.   So let me just stop you there.  So you agree that there are

16   instances where it's legal to market to patients; yes or no?

17   A.   No.

18   Q.   So the commercials on TV about Viagra, those companies are

19   all committing crimes because they're illegally marketing to

20   patients?

21         MR. LARSEN:  Foundation, Your Honor.

22         THE COURT:  Overruled.  Go ahead, you can answer it the

23   way you want.  Go ahead.

24         THE WITNESS:  No, it's not illegal to advertise your

25   medicine, but you are not targeting a specific group.

BY MR. RASHBAUM:

Q.   You don't think that those Viagra commercials are targeting a specific group?

A.   They are informing the public about the medicine in case you happen to have the issues that need Viagra.

Q.   Let me ask you a question.  Do you like sports?

A.   I do.

Q.   What sport do you like?

A.   College football.

Q.   Do you ever notice that during those college football games those Viagra commercials come on a lot more?

A.   Absolutely.

Q.   Why do you think that is?

A.   Because there's a lot of people that are watching college sports that could benefit from the knowledge of Viagra.

Q.   Who do you think those people are, women or men?

A.   Men.

Q.   Right.  So don't you have think those Viagra commercials are targeting a particular group?

A.   Well, actually, a wife or husband could request Viagra.

Q.   Oh, I get it.  I'll move on.  I think I made my point.

          THE COURT:  You should.  How much longer do you think you have?

          MR. RASHBAUM:  Not that much longer, Your Honor, maybe 10, 15 minutes.

1          THE COURT:  All right.  That seems fair.

2   BY MR. RASHBAUM:

3   Q.  Let's talk about the patients that you recruited.  Those

4   patients, did you bribe them?

5   A.  No.

6   Q.  Did they actually need the product?

7   A.  Some of them, yes, or they could benefit from them.

8   Q.  Fair enough.  But when you went to them, you asked them

9   first could this be of use to you, correct?

10  A.  Yes.

11  Q.  And they told you, I've got problems with my joints, I've

12  got problems with my knees, correct?

13  A.  Yes.

14  Q.  It wasn't a situation where you said to them, get this

15  medicine, we'll all make money even though you don't need it?

16  A.  Right.

17  Q.  That didn't happen?

18  A.  That did not happen.

19  Q.  And for the most part, those patients, many of them were

20  friends of yours, correct?

21  A.  Correct.

22  Q.  Can you give some names of some of the people that were

23  friends of yours that you recruited?

24  A.  I recruited Tisha Ogden, Amanda Schwartzlender, Warren Karr,

25  Becky Lawson.

Halliburton - Cross

1  Q.  That's enough.  It's not a memory check.  My memory is

2  terrible.

3       I'm showing you what the Government showed you, which

4  is Government's Exhibit 41.

5       Do you recall them showing you this document?

6  A.  Yes.

7  Q.  And it's the intake form, correct, that you would fill out?

8  A.  Yes.

9  Q.  When you filled out that intake form, did Mr. Grow tell

10 you -- Mr. Grow didn't fill out the intake form for you,

11 correct?

12 A.  No, he provided it to me.

13 Q.  He provided you a blank intake form, right?

14 A.  He provided me a blank intake form where at the top, where

15 my email address is, his -- it was like com -- I don't remember

16 what the exact email address was, but it was to go directly to

17 him and I just played middle person so that I could keep track

18 because my initial contact with him was I will never know who

19 got it or not.  So I just kind of kept my own spreadsheet and

20 asked my recruiters and patients to forward it back to me before

21 I sent it to Monty.

22 Q.  And Mr. Grow didn't have direct contact with the patients,

23 right, you were kind of like the middle person?

24 A.  Correct.

25 Q.  And so when you filled out this form, like location of scar

1   and location of pain, you filled that out truthfully, right?

2   A.  I didn't fill it out.  I just forwarded the blank form to my

3   patients and they would send it back to me.  Some patients, if

4   they handwrote it and took a picture of it, I would retype it

5   and put it in typed out and then forward it to Mr. Grow.

6   Q.  But you assumed that when they filled it out, for instance,

7   like this individual, Jerry Donnelly, you assumed that he

8   actually did have sports scars, right?

9   A.  I didn't ask questions.

10  Q.  Right, but you had no reason to believe he didn't, right?

11  A.  I didn't, no.

12  Q.  In other words, you didn't tell them make up stuff?

13  A.  I did not.

14  Q.  Okay.  And in this form I think you said they didn't circle

15  the box.  Boy oh boy, my vision is getting worse or something

16  bad happened.  Okay.  You didn't circle the box -- They didn't

17  circle the box -- I'm sorry -- yes or no for metabolic vitamin,

18  right?

19  A.  Right.

20  Q.  And you testified that when they didn't circle the box,

21  Monty Grow got in contact with you and said do they need the

22  vitamins or not?

23  A.  Correct.

24  Q.  So Mr. Grow didn't automatically just check a box saying the

25  patient needed vitamins, right?

1   A.   No.

2   Q.   He got back to you and he said, can you follow-up with the

3   marketer, with the patient, to see if they need the vitamins,

4   right?

5   A.   Yes.

6   Q.   And sure enough, you got back to him and you said they need

7   the vitamins?

8   A.   Yes.

9   Q.   So in this instance, and in no instance that you ever know

10  of, did Mr. Grow actually fill out something falsely, check a

11  box saying -- it would have been easier for him to just check

12  the box saying vitamins, correct?

13  A.   Correct.

14  Q.   Instead, he called you and made you confirm that the patient

15  needed the vitamins, right?

16  A.   That the patient requested it, yes.

17  Q.   Okay.  And the Government showed you Government's Exhibit

18  62, right, and you see at the top, it lays out how you're going

19  to be compensated, and that was how you were compensated, right?

20  A.   Yes.

21  Q.   There was nothing hidden about your compensation?

22  A.   Other than I didn't know what the 7 percent, 5 percent

23  actually was coming from.

24  Q.   I asked an articulate question.  My fault.

25          Mr. Grow didn't say I can't talk to you about

1   compensation online because what we're doing is illegal.  He

2   said, I'll write you an email about the compensation?

3   A.   Right.

4   Q.   All out in the open?

5   A.   All out in the open except I was unaware of what the cost of

6   the medicine was, but I already knew that Tricare decides on

7   what the cost they pay out is.

8   Q.   And for this patient here, Tisha, you say she is super

9   excited.  Do you see that?

10  A.   Yes.

11  Q.   Do you recall what she was super excited about?  Was it

12  because she was in pain and thought that these creams could help

13  her?

14  A.   She actually had just had a tummy tuck.

15  Q.   So she was excited because she was kind of embarrassed about

16  her scars, right?

17  A.   Yes.

18  Q.   Now, by the way, the Government went through your long

19  history in the pharmaceutical world.  Do you recall that?

20  A.   Yes.

21  Q.   And you pled guilty -- do you remember when you pled guilty

22  in this case?

23  A.   I pled guilty in November of 2016.

24  Q.   And as a result of your guilty plea and your cooperation

25  with the Government, they cut you a deal, correct?

1    A.   I signed a Plea Agreement.

2    Q.   And under that Plea Agreement, you were sentenced to home

3    confinement, probation for five years?

4    A.   Yes.

5    Q.   And you understood that if you didn't cooperate and didn't

6    plead guilty, you could be charged like in our case with 20 year

7    counts, correct?

8    A.   Yes.

9    Q.   You knew you could be facing decades in jail?

10   A.   Yes.

11   Q.   And that was part of the reason why you decided to plead

12   guilty and cooperate, right?

13   A.   Yes.

14   Q.   Now, the Government put some conditions on your probation,

15   right?  Let me be more specific.  You are currently wearing an

16   ankle monitor?

17   A.   Yes.

18   Q.   Because you're confined to your house?

19   A.   Correct.

20   Q.   And I'm guessing you do drug testing?

21   A.   I do.

22   Q.   Where are you currently working?

23   A.   I am currently working for Salix Pharmaceuticals.

24   Q.   Oh, wait a minute.  You are currently marketing

25   pharmaceuticals?

Halliburton - Cross

97

1  A.  I am.

2  Q.  The Government didn't think it was important enough to put a

3  prerequisite that you couldn't be in the pharmaceutical industry

4  marketing drugs after you pled guilty in this case?

5  A.  I did not bring my work into it.  I was recruiting patients

6  outside of my work.

7  Q.  You're not in violation of your probation, right?

8  A.  No.

9  Q.  I mean, you are allowed to work in the pharmaceutical

10  industry, right?

11  A.  Yes.

12  Q.  So after this entire case where you've testified for the

13  last hour and a half, hour and 45 minutes, that you knew from

14  the beginning what you were doing was wrong, selling these drugs

15  to patients, getting kickbacks in the pharmaceutical world,

16  where you knew it was wrong, the Government still allows you to

17  work in the pharmaceutical world, right?

18  A.  Yes.

19  Q.  And as a result of your cooperation, you're not facing the

20  decades in prison, but have five years' probation with some home

21  confinement, correct?

22  A.  Correct.

23           MR. RASHBAUM:  May I have one moment, Your Honor?

24           THE COURT:  Sure.

25  BY MR. RASHBAUM:

1   Q.  By the way, on that current job that you're in right now in

2   the pharmaceutical world, marketing pharmaceuticals, are you a

3   1099 employee?

4   A.  No, I'm a W-2 employee.

5   Q.  Were you a 1099 employee before?

6   A.  Of Monty Grow.

7   Q.  Were you ever a 1099 employee of that?

8   A.  No.

9          MR. RASHBAUM:  Okay, I have no further questions, Your

10  Honor.

11         THE COURT:  Redirect.

12                      REDIRECT EXAMINATION

13  BY MR. LARSEN:

14  Q.  Ms. Halliburton, at the beginning of Mr. Rashbaum's

15  cross-examination he went into lengths to talk about the

16  allegation that I was upset with you when you met with us Monday

17  and Tuesday and he even said Wednesday, but today is Wednesday.

18         Did I ever seem upset with you at all the times we met?

19  A.  No.

20  Q.  Did I tell you what to say on the stand?

21  A.  Never.

22  Q.  Now, you were questioned about your criminal charges at

23  length, and you testified on direct about it as well.

24         You pled guilty to conspiracy to receive health care

25  kickbacks, right?

Halliburton - Redirect

1  A.   Yes.

2  Q.   Did you plead guilty to conspiracy to pay health care

3  kickbacks?

4  A.   No, just to receive.

5  Q.   Did you pay anybody kickbacks?

6  A.   I paid nobody kickbacks.

7  Q.   Did you pay doctors?

8  A.   I paid nobody.

9  Q.   Patients?  Did you receive -- the crime you committed was

10 receiving kickbacks from Monty Grow?

11 A.   Correct.

12 Q.   Mr. Rashbaum showed you a text message about -- I think the

13 name of the patient might have been Sanchez, one rejection.

14 Were patient rejections a common thing during the course of the

15 scheme you participated in with Mr. Grow?

16 A.   There were a couple.

17 Q.   A couple?

18 A.   Yes.

19 Q.   Was it the norm?

20 A.   No.

21 Q.   Was it rare?

22 A.   It was rare.

23 Q.   Mr. Rashbaum changed, he said that there was a reference to

24 patient recruiter and he wanted to call you instead of a patient

25 recruiter, he said that was something you heard for the first

Halliburton - Redirect

100

 1  time from the Government, he wanted to use the word "marketer."

 2  Okay.  So he labeled you a marketer.

 3          Were you committing crimes when you were being paid by

 4  Mr. Grow to market to Tricare representatives?

 5  A.  I was --

 6  Q.  When you were being paid.

 7  A.  I was being paid to recruit Tricare patients.

 8  Q.  And you agreed that you were a patient recruiter?

 9  A.  I was a patient recruiter.

10  Q.  Does it matter if you call yourself a patient recruiter or a

11  marketer?

12  A.  No, I was bringing Tricare patients to Monty.

13  Q.  Okay.  Now, talking about marketing, there was a bunch of

14  discussion about Viagra and football.  Does Viagra pay patients?

15  A.  No.

16  Q.  Does Viagra target insurance companies?

17  A.  No, no.

18  Q.  Does Viagra market to only one insurance company --

19  A.  No.

20  Q.  -- do you know?

21          When you were recruiting, as you just said, these

22  Tricare beneficiaries, were you advertising the pain, the scar

23  and the vitamin products to them like a Viagra commercial?

24  A.  I did provide the marketing material that Monty and Shane

25  provided to me and handed it to them, but these were compounding

1  medicines that were supposed to be individualized by the doctor.

2  Q.  Do you remember where these marketing materials came from?

3  A.  I received them from Monty and Shane after that initial

4  phone call, but at the bottom it said InforMed or InfoMed,

5  something like that.

6  Q.  InforMD?

7  A.  I guess.

8  Q.  Was it PCA?

9  A.  It was not.

10  Q.  You testified that you brought in Warren Karr and Adrianne

11  Paul.  Did you tell them when they signed up that there was an

12  opportunity for them to make money?

13  A.  Not at first.

14  Q.  Did you ever tell them?

15  A.  I did.

16  Q.  So there was discussions about making money.  Mr. Rashbaum

17  asked you about that.

18      Did you tell your friends that in addition to buying or

19  ordering this, you could make money?

20  A.  Yes.

21  Q.  Did Mr. Grow ever tell you he was selling ingredients to the

22  pharmacy?

23  A.  No.

24  Q.  Now, at the end of Mr. Rashbaum's cross, he talked about the

25  fact that you're still working in a pharmaceutical company.  Who

Halliburton - Redirect

102

1    imposed your sentence?  Did I impose your sentence?  Did the

2    Government impose your sentence?

3    A.  Judge Huck.

4    Q.  So was it Judge Huck that imposed the sentence on you?

5    A.  Yes.

6    Q.  What about the terms of your probation, was that something

7    the Government imposed on you?

8    A.  No, Judge Huck.

9    Q.  Do you understand that the terms of your probation, if you

10   mess up, Judge Huck -- what could Judge Huck do to you?

11   A.  Judge Huck could put me in Federal prison.

12   Q.  And Mr. Rashbaum made a big deal about the money and the

13   crimes you committed.

14        Did you make $20 million in this scheme?

15   A.  No.

16   Q.  How much did you make?

17   A.  I made $64,000 that I paid all of it back, including the

18   taxes that I paid.

19   Q.  So not 20 million, you made $64,000, start to finish?

20   A.  64,000.

21        MR. LARSEN:  Nothing further.

22        THE COURT:  Thank you, you're excused.  Have a safe

23   trip back up to North Florida.

24     (The witness was excused.)

25        THE COURT:  Your next witness is?

Powell - Direct

 1            MR. JUENGER:  Nichole Powell.

 2            THE COURT:  Raise your right hand, please.

 3            NICHOLE POWELL, GOVERNMENT'S WITNESS, SWORN.

 4            THE COURT:  Where are you going?

 5            MR. RASHBAUM:  I am just getting the --

 6            THE COURT:  Not now, later, either before or after, but

 7  not during.

 8            Tell us your name, please.

 9            THE WITNESS:  Nichole Powell.

10            THE COURT:  All right.

11                      DIRECT EXAMINATION

12  BY MR. JUENGER:

13  Q.  Ms. Powell, where do you live, city and state?

14  A.  Jacksonville, Florida.

15  Q.  And how old are you?

16  A.  46.

17  Q.  And how far did you go in school?

18  A.  Four years of college.

19  Q.  Did you finish?

20  A.  No, I did not.

21  Q.  You did not.  What did you study?

22  A.  History.

23  Q.  And what do you currently do for a living?

24  A.  I'm a real estate agent and a high school cheer coach.

25  Q.  How long have you been a Realtor?

Powell - Direct

104

1   A.   For four years.

2   Q.   Do you have a family?

3   A.   I do.

4   Q.   Can you tell us who's in your family, their names,

5   relationship?

6   A.   My husband, Glenn.  I have a set of twin daughters, Imani

7   and Iyanna.  I have another daughter, Soumaya, she is our middle

8   child, another daughter, Anisi, and my son Gyasi.

9   Q.   Can you spell their names for the court reporter, please.

10  A.   Yes.  Imani, I-m-a-n-i; Iyanna, I-y-a-n-n-a; Soumaya,

11  S-o-u-m-a-y-a; Anisi, A-n-i-s-i; and Gyasi, G-y-a-s-i, all last

12  name Powell.

13  Q.   And Ms. Powell, what does your husband do, or what did he do

14  for his career?

15  A.   He's right now, currently, a retired Naval officer.  He was

16  an officer in the Navy, and now he is a contractor for the

17  military.

18  Q.   How many years did he serve?

19  A.   22.

20  Q.   And do you currently have health insurance?

21  A.   We do.

22  Q.   What type of health insurance?

23  A.   Tricare Prime.

24  Q.   Tricare Prime?

25  A.   Um-hmm.

Powell - Direct

1  Q.  And did you have that health insurance with Tricare back in

2  the years 2014 and 2015?

3  A.  Yes.

4  Q.  And Ms. Powell, do you know a man by the name of Monty Grow?

5  A.  Yes.

6  Q.  Did you ever meet Monty Grow?

7  A.  Not face to face.

8  Q.  How would you communicate with Mr. Grow?

9  A.  We communicated via text and email.

10  Q.  Any phone calls?

11  A.  Yes.  Oh, and phone calls, yes.

12  Q.  And how did you come to know Mr. Grow?

13  A.  A friend of mine named Stacey Hanaman, she introduced me to

14  him through our pharmaceutical business that we did.

15  Q.  Okay.  And when was that, more or less, when did that start?

16  A.  October of 2014.

17  Q.  And how soon after your friend told you about this -- you

18  call it a pharmaceutical --

19  A.  Business.

20  Q.  -- business.  How soon after that, did you have your first

21  communication with Mr. Grow?

22  A.  It was probably about three to four days after I talked to

23  Stacey about it.

24  Q.  Okay.  And once you started speaking to Mr. Grow, I want to

25  ask, did your friend tell you anything different from what

Powell - Direct

106

1  Mr. Grow was telling you?

2  A.  No.

3  Q.  Then let's just talk about what Mr. Grow told you.  Please

4  describe for us what this pharmaceutical business was about.

5  A.  Basically, getting other people to get products; pain cream,

6  scar cream and vitamins.

7  Q.  And was there something in it for you?

8  A.  I would get paid off of it, yes.

9  Q.  And what was the compensation structure for a person like

10  yourself who would get involved in this?

11  A.  I would get -- I couldn't get paid off of my own

12  prescriptions, but I would get paid off of the people who I

13  signed up.  I would get 7 percent off of them, 5 percent from

14  the next person they signed up, and then 3 percent from two

15  people down from them.

16  Q.  And the percentage being a percentage of what?

17  A.  Of the amount that the prescription cost on our Explanation

18  of Benefits.  So the total cost of the prescription.

19  Q.  Okay.  And what were the drugs that were being offered?

20  A.  A scar cream, pain cream and vitamins.

21  Q.  And you said that you couldn't get paid for your own,

22  correct?

23  A.  Correct.

24  Q.  But could you become a rep without ordering products?

25  A.  Well, at the beginning I didn't think you could.  I

Powell - Direct

1   assumed -- not assumed, I signed up knowing that I needed to

2   basically get the products, so I got the products and then I

3   signed my husband up.

4   Q.  And were you told whether you actually needed the drugs to

5   sign up, or could you just sign up because you wanted them?

6   A.  No, I just signed up.  I didn't need the drugs.

7   Q.  Well, but I'm concerned to know, did Mr. Grow say anything

8   to you about whether or not you needed them before you ordered

9   them or whether you could just sign up because you could make

10  more money?

11  A.  No, our conversation about starting was basically it was a

12  way to make money, and I needed to order the scar cream and the

13  pain cream in order to do the business.

14  Q.  And were there discussions with Mr. Grow about how doctors

15  would factor into this pharmaceutical business?

16  A.  Well, the scripts would be given by a doctor and then the

17  pharmacy would give us a call.

18  Q.  Okay.  Well, did he tell you that you would receive calls

19  from these people?

20  A.  That we would receive a phone call from the pharmacy.

21  Q.  Did he tell you you will receive a call from the doctor?

22          MR. RASHBAUM:  Objection, Your Honor, leading.

23          THE COURT:  You're right, but I'm going to overrule it,

24  but you're right.  Go ahead, you can answer.

25          THE WITNESS:  Okay.  No, he said that we would receive

1    a phone call from the pharmacy.  The doctors -- I received a

2    phone call from the doctor probably three months into the

3    process, but I didn't receive a phone call from a doctor

4    immediately.

5    BY MR. JUENGER:

6    Q.  But again, I'm trying to ask you what Mr. Grow told you

7    about that process.

8    A.  In reference to the doctor, he said that I might -- well, I

9    would get a phone call from the pharmacy.  There was a doctor

10   that had to do the prescription, but I wouldn't necessarily get

11   a phone call from the doctor.

12   Q.  Okay.  So you might get a call from the doctor or you might

13   not?

14   A.  Or might not.

15   Q.  And in your case, did you get a call from the doctor?

16   A.  I didn't get a phone call for three months.  I think in

17   January is when I got a call.

18   Q.  So I want to make sure it's clear.  Did you receive some of

19   these drugs that we're talking about before you spoke to a

20   doctor?

21   A.  Yes.

22   Q.  And how many months before you spoke to a doctor did you

23   receive these drugs?

24   A.  Two -- November, December, and then January, so three

25   months.

Powell - Direct

109

1  Q.  Okay.  And you said that Mr. Grow told you you will get a

2  call from the pharmacy.  Did that happen?

3  A.  Yes.

4  Q.  Tell us about that call.

5  A.  Well, they called and they asked for myself, one, they asked

6  for my specifics as far as my birth date and my insurance

7  information, and then I told them I wanted six prescriptions.

8  They told me they could only give me three immediately, and

9  then, that was that.

10 Q.  So you told the pharmacy how many prescriptions you wanted?

11 A.  Yes.  When I talked to Mr. Grow he told us -- he told me

12 that basically I needed to make sure I got the six

13 prescriptions, they probably would not give me the six

14 initially, and then that they would give us the three and I got

15 three.

16 Q.  Okay.  And when you spoke to the pharmacy -- because they

17 called, correct?  And you have to say yes or no.

18 A.  Yes, they called me.

19 Q.  It's difficult for the court reporter.

20         Did the subject of copayments come up?

21 A.  Yes.

22 Q.  And tell us about that.

23 A.  Well, Mr. Grow, he said that we would get a copay and that

24 the copay, I did or did not have to pay it.  Basically I didn't

25 have to pay it because they were going to send the prescriptions

Powell - Direct

1  anyway, so I didn't pay the copay a month.  I don't even

2  remember the amount of months that went by.

3         Once they did call me for the copay and I told them

4  that I wasn't -- Well, I didn't tell them that I was going to

5  pay it.  They asked for the credit card number over the phone.

6  I told them to mail me the bill, which is what Monty told me to

7  tell them, basically, mail me the bill and I never had to pay

8  for it.  And I did not send in -- I never paid for it.

9  Q.  So for the entire time, for the entire duration of you

10 getting the products from the pharmacy, you never paid a copay?

11 A.  I didn't pay a copay, no.

12 Q.  How about your husband?

13 A.  Glenn paid a copay.

14 Q.  Why did Glenn pay a copayment?

15 A.  Glenn pays our bills and he pays them on time, basically,

16 and when they called him for his prescription, they told him

17 that he needed to pay a copay.  He gave them the credit card

18 number over the phone.

19 Q.  So your husband was signed up as well?

20 A.  Yes, I signed Glenn up.

21 Q.  Did you get paid a percentage of your husband's scripts?

22 A.  He was my first person, so I got 7 percent of his

23 prescriptions.

24 Q.  And who signed or who paid you that money?

25 A.  Who paid me the money for the prescriptions?

Powell - Direct

111

1   Q.   Yeah, for your husband.

2   A.   It came from Monty Grow.

3   Q.   And did your husband speak to a doctor before he received

4   his drugs?

5   A.   No.

6   Q.   And when is the first time that he received a phone call

7   from a doctor?

8   A.   It was the same day that I received mine, in January, we

9   were -- do you want to know why or how I know?

10   Q.   Yeah.  Where were you?  How do you know that?

11   A.   We were -- he retired in 2015, and we were on our way to his

12   retirement, to the hotel, to get hotels for our guests from out

13   of town.  They called -- the doctor called me and then probably

14   about two minutes after I got off the phone is when the doctor

15   called him.

16   Q.   Okay.  And tell us about that doctor call.  How long was it?

17   A.   Probably about five minutes, if that.  In fact, she was in

18   an airport, she said that she was in between planes, and she

19   called just to get the information.

20   Q.   Did the doctor ask about the types of scars you had?

21   A.   No.

22   Q.   Did the doctor ask about the location, the frequency, the

23   duration of your pain?

24   A.   No.

25   Q.   Did the doctor ask about any allergies you had?

Powell - Direct

112

1   A.   No.

2   Q.   Did the doctor ask or did the doctor tell you about any of

3   the ingredients in all of these products?

4   A.   No, she didn't.  She did ask me about any medications that I

5   took, and I told her I took high blood pressure medication.

6   Q.   And did this doctor provide you a contact number so you

7   could call them back in case of a problem, an emergency, a bad

8   reaction?

9   A.   No.

10  Q.   Did the doctor set up a follow-up call?

11  A.   No, she didn't.

12  Q.   Did the doctor ask you about refills?

13  A.   She did ask about refills and I told her I wanted six.  She

14  gave me three refills.

15  Q.   But you never even tried the drugs, right?

16  A.   Well, at that point I had, when the doctor called me, yes.

17  Q.   Okay.  And whose products had you tried since you hadn't had

18  them yet?  Oh, no, forgive me.  Forgive me.  I misspoke.

19       You had the products before you ever spoke to a doctor.

20  A.   Yes.

21  Q.   So when you did speak to the doctor, you had already

22  received the products?

23  A.   Yes.

24  Q.   My bad.  Sorry.

25       So did the drugs come?

Powell - Direct

113

A.   Yes, they came.

Q.   And describe the quantities that you received of these drugs.

A.   I received three tubes of the scar cream, a bottle of the vitamins, and then three tubes of the pain cream.

Q.   What was the amount of time for those drugs, was that a --

A.   30-day supply.

Q.   30-day supply.  And did you use them?

A.   I used the pain cream because I burned myself with a curling iron right after I got them, so I used the scar cream, but the pain cream I never used and the vitamins I didn't use.

Q.   What did you do with the creams that you never used?

A.   They sat in my linen closet.

Q.   What about your husband's products?

A.   He didn't use his.

Q.   Now, you said you hardly used them, but the scar cream that you did use, I want to ask, was that worth $17,000 a month to you?

A.   Not 17,000, no.

Q.   Would you have paid $17,000 for that if it came out of your pocket?

A.   No.

Q.   Would you have paid a $60 copay if you had to?

A.   No.

Q.   Now, you talked about signing other people up and you

Powell - Direct

114

1  mentioned your husband, Glenn, so far.  Did you sign anyone else

2  up?

3  A.   Yes, I signed Rebecca Brown -- three people, well, in

4  addition to my husband; Rebecca Brown, Joy Bing and Aisha Owmby.

5  Q.   And did you have any experience in pharmaceutical sales when

6  you became a rep for Mr. Grow?

7  A.   No, I didn't.

8  Q.   Did any of your friends have pharmaceutical sales --

9  A.   No.  Aisha might have, but I'm not sure, but I know Joy

10  didn't, Rebecca didn't, and my husband didn't, but my husband

11  didn't get anybody.

12  Q.   And these people that you signed up, the three people you

13  mentioned, were they friends or were they strangers?

14  A.   They were friends.

15  Q.   And did you sign up anybody that wasn't a friend --

16  A.   No.

17  Q.   -- or a family member?

18  A.   No.

19  Q.   And what did you tell your friends about the program since

20  you brought them into it?

21  A.   Basically, I told them what Monty told me; was the best way

22  to make money.  Let them know that it's a product they could

23  get.  They all had to have Tricare.  I had Tricare.  They could

24  get the products, they needed to get all three of the products,

25  and it was an easy way to make money.

1  Q.  Well, why did they need to get all three products?

2  A.  That's the best way that we were able to maximize our money

3  that we made, by getting all three products.  Getting one would

4  only give us a third of the amount of money that we would make.

5  Q.  Did you tell your sales reps that they didn't need to pay

6  copays?

7  A.  Yes, I did.

8  Q.  Why did you tell them that?

9  A.  Because I wasn't paying mine and it was said that we didn't

10  need to pay them.  So that was the first thing I told them.  You

11  will get a copay, don't worry about paying them.  Monty said

12  that we don't have to pay them.  The bill will come and you

13  don't have to send it out to them.

14  Q.  And in fact, you didn't have to pay them, did you?

15  A.  No.

16  Q.  Now, the people that you signed up, do you know, at least

17  roughly, how many people they signed up?

18  A.  I don't.  I don't because it was so far removed from me at

19  that point, I didn't know the numbers.  I knew they signed up

20  quite a few people, at least a couple of them did, but I don't

21  know the exact amount.

22  Q.  And in all, how much money did you get paid from Mr. Grow

23  for referring people and then for the people they referred?

24  A.  $54,000.

25  Q.  And was there a time when you were told that this program

Powell - Direct

116

1  was ending?

2  A.  Yes.  We were told in April, I think April of 2015 is when

3  we were told.  We got an email.  I received an email from Monty

4  saying, Nichole, can you send this email out?  Share this email

5  with everybody that you signed up, letting them know that, due

6  to pharmacy regulations, that the program was going to end.

7  Q.  Due to pharmacy regulations?

8  A.  Yes.

9  Q.  And did a time come when you learned that now, in fact, the

10  program is not ending?

11  A.  Well, we received another email.  I think it was an email or

12  a text, I'm not sure which one, that we were going to have a

13  conference call; and on that conference call, we were told that

14  the program was back and that we were going to now become

15  employees of the pharmacy, and we basically would receive a

16  packet in the mail telling us what we needed to do with the

17  offer letter.  And then once we got that, then we would be able

18  to resume the program.

19  Q.  And when was this, more or less?

20  A.  It was about two weeks after, maybe in the beginning of May,

21  sometime in May.

22  Q.  Okay.  So the middle of April, the program was ending; the

23  beginning of May, it's back on and you have to become an

24  employee?

25  A.  Yes.

Powell - Direct

117

1   Q.   And did you ever get interviewed by anyone from PCA?

2   A.   No.

3   Q.   But you did receive a packet?

4   A.   I received a packet.

5   Q.   What was in the packet?

6   A.   It was an offer letter, it was an application and there was

7   a form to go to a Lab Corp, or somewhere similar to that, to

8   give urine.

9   Q.   So if I heard you correctly, you said you received an offer

10  letter and an application?

11  A.   Yes.

12  Q.   So is it fair to say you had an offer to work at PCA before

13  you filled out an application?

14  A.   Yes.

15  Q.   Have you ever had a job where you had an offer before you

16  filled out an application?

17  A.   No, but I was already working doing the same thing, so we

18  were transferring over, leaving what we were doing and then

19  making it, I guess -- I don't know -- where they were giving us

20  a W-2 and taking taxes.

21  Q.   Okay.  You said that Mr. Grow -- your arrangement with him

22  previously was that he would pay you 7 percent, 5 percent, 3

23  percent of whatever Tricare paid; is that correct?

24  A.   Yes.

25  Q.   And did that change at all after you became employed with

Powell - Direct

1  PCA?

2  A.  No, it didn't.

3  Q.  And did you have any issues with getting paid, though?

4  A.  The first month I did.  As I talked to my people who had

5  signed up, Rebecca, she told me how much she had gotten and just

6  calculating how much we were getting before, the amounts weren't

7  the same.

8       So I called, along with Joy Bing, we called the lady

9  there at the pharmacy to ask them -- to tell them, hey,

10  something is wrong with our pay, something is not right.  And

11  she told us that there was nothing she could do about it, we

12  needed to contact our representative through the pharmacy, and I

13  asked her who would that be and she said it was Monty.  So I

14  reached out to Monty and told him that there was a difference in

15  pay that I should have gotten and what the pharmacy paid me.

16  Q.  So you were now employed by PCA, correct?

17  A.  Yes.

18  Q.  They sent you the check?

19  A.  Yes.

20  Q.  But when there was a problem with the amount, they sent you

21  to Mr. Grow?

22  A.  Yes.

23       THE COURT:  Do you have any other questions?

24       MR. JUENGER:  No.

25       THE COURT:  What's my rule?  You don't have any more

1    questions, you're finished, right?

2              MR. JUENGER:  No, I have just a few more questions.

3              THE COURT:  Did you just ask three leading questions?

4              MR. JUENGER:  I did, all in one, making it compound.

5              THE COURT:  No -- well, yeah, but remember my rule?

6    You ask a leading question, that means you're finished.  Do you

7    want the court reporter to read it back or do you agree that

8    they're leading.

9              MR. JUENGER:  To embarrass me, yes, Your Honor.

10             THE COURT:  You do?

11             MR. JUENGER:  No, I won't put her through that.

12             THE COURT:  You're leading if she says yes.  If you

13   start a question with "so," that's probably what you're doing.

14   You'll get a chance.

15             I may start deducting the time from the closing

16   argument when you do that, but let's finish it up.

17             MR. JUENGER:  Yes, sir.

18   BY MR. JUENGER:

19   Q.  Ms. Powell, did you ever get any training from PCA?

20   A.  No, I didn't.

21   Q.  Did anything change about the way you were working with

22   Mr. Grow after you started working for PCA?

23   A.  No, nothing changed.

24   Q.  Did PCA ever give you an email account?

25   A.  No.

Powell - Direct

1  Q.  A cell phone?

2  A.  No.

3  Q.  A business card?

4  A.  No.

5  Q.  Marketing materials?

6  A.  No.

7  Q.  Were you ever really, in your own mind, an employee of PCA?

8  A.  No.

9  Q.  How long did you work -- and I'm using air quotes for the

10  record -- or were you an employee of PCA?

11  A.  For two months.

12  Q.  And what happened to bring that all to an end?

13  A.  We received another email stating that the compound pharmacy

14  program was no longer going to work because the amount that the

15  pharmacies were paying or not the pharmacy, the amount that the

16  companies were paying for the drugs was going down, and it

17  wasn't going to be worth doing the business anymore.

18  Q.  Did the email say that last part?

19  A.  Yes.

20  Q.  And did you talk to Mr. Grow about that?

21  A.  I did.

22  Q.  And did you have any other contact with Mr. Grow after the

23  program ended?

24  A.  I did, I called him to -- I don't remember exactly what I

25  said, but I expressed to him that I was sad that the program was

1  over because making money like that, that quick, was really good

2  for me and my family and wanted to know if he knew if it was

3  going to come back or not.

4  Q.  What did he say?

5  A.  No.

6        MR. JUENGER:  Thank you, Your Honor.  That's all I

7  have.

8        THE COURT:  Cross-examination.

9        MR. RASHBAUM:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. RASHBAUM:

12  Q.  Hi, Ms. Powell.

13  A.  Hi, how are you doing?

14  Q.  Good afternoon.  My name is Dan Rashbaum.  I represent Monty

15  Grow.  We've never met before, right?

16  A.  No.

17  Q.  I want to make sure that I'm clear on this.  When you

18  started, you started as a patient, correct?

19  A.  No.

20  Q.  Well, let me ask you:  First you received products before

21  you recruited anyone.  Is that fair to say?

22  A.  No, no.

23  Q.  So when you started in this program, immediately you started

24  recruiting people or did you try the product first?

25  A.  I ordered the product and I didn't try the product.  My

Powell - Cross

122

```
 1    recruiting people came from me getting paid.  I didn't try it.

 2    I told my friends -- once I got paid for getting these products

 3    for myself, then I let them know, and I remember like the day I

 4    was in my real estate training, my deposit came through.  I

 5    called Becky and said, Becky, this is real, you need to sign up.

 6    Q.  So you think you got paid for your own medicine?

 7    A.  Not for mine, my husband's medicine.

 8    Q.  Okay.  I am just trying to get a -- I've never met with you

 9    before, so I'm just trying to get a chronology.

10          First you ordered the product, correct, for yourself?

11    A.  I ordered it for my myself and my husband.

12    Q.  Okay.  I want to show you --

13          MR. RASHBAUM:  I would like to put in evidence

14    Government's Exhibit 61.

15          THE COURT:  I assume there's no objection.

16          MR. JUENGER:  I just want to see it.

17          THE COURT:  Is there?

18          MR. JUENGER:  No objection, Your Honor.

19          THE COURT:  It will be admitted.

20      (Government's Exhibit Number 61 was received in evidence.)

21          MR. RASHBAUM:  May I approach, Your Honor?

22          THE COURT:  Of course.

23    BY MR. RASHBAUM:

24    Q.  This is a Government's exhibit that they didn't show you

25    during the direct, Government's Exhibit 61.
```

Powell - Cross

1           You said you got scar cream, right?

2     A.   Yes.

3     Q.   And do you remember they asked you all those questions about

4     would you pay this amount of money for the cream, do you

5     remember that, and you said, I really wouldn't pay that much for

6     it?

7     A.   Yes.

8     Q.   Do you see this email?  And this is an email to Monty Grow,

9     right?  You emailed with him occasionally; is that fair to say?

10    A.   I did, yes.

11    Q.   In this you say, "Good morning.  I hope you had a Merry

12         Christmas.  Glenn and I signed up for refills."

13              Glenn is your husband, correct?

14    A.   Yes, sir.

15    Q.   "I just received mine today.  Do we get paid for those?  For

16         your information, I am loving the scar cream.  I had a burn

17         scar on my chest and it is almost gone after a month of use.

18         Hopefully, I will get you new orders before the weekend is

19         over.  Thanks for your help."  And you see Monty Grow

20         responds and says, "That's awesome."

21              I take it "that's awesome" you took to refer to the

22    fact that the scar creams were working for you?

23    A.   This was in December, though.  Yes.

24    Q.   And then he tells you that the commissions are being paid on

25    the refills for December and January.  You see that, right?

1    A.   Yes.

2    Q.   So at least with the scar cream, you used it for at least a

3    month, right?

4    A.   It wasn't a full month really.  I used it for about three

5    weeks.  I signed up in November.  That email was written

6    December 27th, and that's what I mentioned earlier when I was

7    asked in reference to the burn that I had on my chest.  I burned

8    myself with a curling iron.  So I didn't use it the month of

9    November when I got it.  December, when I got it, I said, hey, I

10   have this scar, let me use the scar cream, and that's when I

11   sent him that message.  That's why I said I loved it because I

12   had a burn from my curling iron, used it, and it went away.

13   Q.   Good.  I'm glad it worked.

14        Showing you what's in evidence as Government's Exhibit

15   41, and this is a Patient Intake Form.  Okay?  It's not one that

16   you did.  Okay?

17   A.   Okay.

18   Q.   Do you recall filling out these Patient Intake Forms or

19   receiving Patient Intake Forms from the patients that you

20   recruited?

21   A.   No, I sent my stuff via email.

22   Q.   So explain to the jury the process.  When you got a patient,

23   how did you get their information?

24   A.   Well, they weren't patients.  I don't call them patients,

25   they were my friends, and I basically told them I will need your

1    name, your Social Security number, your information and your

2    check account.

3    Q.   And so when you got that information, you would send it to

4    Monty Grow?

5    A.   I emailed it him.

6    Q.   And it would also describe if they needed -- did any of

7    these people need creams for themselves?  Let me ask you:  Did

8    any of them have ailments like joint issues or --

9    A.   No.

10   Q.   So you never filled out anything where it said what their

11   pains were or anything like that?

12   A.   I had them -- I told them, tell me what pain cream or what

13   items you needed, and that's what they did.

14   Q.   On the top of that intake form, you'll see it says, "Let the

15        patient know that they will need to take a call from the

16        doctor and then the pharmacy."

17           Do you see that?

18   A.   Where are we looking?

19   Q.   I've highlighted it.

20   A.   Oh, up there.  Okay.  Yes.

21   Q.   Do you recall that being on the intake forms that you

22   circulated?

23   A.   I didn't circulate any intake forms.  My people were my

24   three friends and my husband.  I basically got their

25   information, what items they needed, and I emailed it to Monty.

Powell - Cross

126

1  Q.  And you don't remember that on every intake form it had that

2  disclaimer?

3  A.  I didn't give any intake forms so -- at least I don't

4  remember giving one.

5  Q.  Now, you never paid anyone, right, to get a product, did

6  you?  You never bribed anyone, right?

7  A.  No.

8  Q.  And when Mr. Grow signed you up, he gave you a 1099 form

9  right away?  It's a long time.  You may not remember.

10 A.  I don't remember filling out the form.  I remember sending

11 him my information.  I don't remember filling out a form.

12 Q.  Let me ask it this way because it is a long time ago:  Did

13 you pay taxes on the money that you made?

14 A.  No.  I paid my -- once we became employees of the pharmacy,

15 that's when they took out the taxes.  The money that I did

16 before I became an employee of the pharmacy, right now we're

17 paying that back to the Government.

18 Q.  But do you recall that when Mr. Grow signed you up

19 initially, he not only gave you information about the product,

20 but he also gave you or he asked you for what your direct

21 deposit would be, so he could pay you?  Do you recall that?

22 A.  Yes.

23 Q.  And in that communication he also sent you a 1099 form so

24 that you would pay your taxes.  Do you recall that?

25 A.  I don't recall it, but I didn't pay taxes on it, but I was a

1   1099 employee.  I knew that, yes.

2   Q.   And you knew that because presumably Mr. Grow sent you a

3   1099 form, correct?

4   A.   Okay.  He must have or I just sent him my information.

5   Q.   Now, you met with the Government, correct, many times?

6   A.   a couple -- yeah, I did.

7   Q.   Do you recall meeting with them in February of 2016, a long

8   time ago?

9   A.   Last year.

10  Q.   And you agree that's closer to the events than today, right?

11  Your memory might have been a little bit better then, right?

12  A.   Yes.  Well, I remember.  It's just that I have to go back

13  and think.

14  Q.   Believe me I know.  I have a bad memory.

15        But in February of 2016, do you recall telling the

16  Government that you received a telephone call from a telephone

17  number with a 954 area code from an individual named Dr. Sarah

18  Garcia who inquired about your medical history?  Do you recall

19  telling the Government that?

20  A.   That's the doctor, yes, Dr. Garcia, that called me.

21  Q.   And you told them that you then got the scar cream after you

22  received that call.  Do you recall telling them that?

23  A.   Yes, that's around January, yes.

24  Q.   And that you believed it was effective?

25  A.   Yes.

Powell - Cross

1    Q.   And do you recall meeting with the Government in April of

2    2017?

3    A.   Yes.

4    Q.   And do you recall telling the Government that Grow told you

5    that you would receive a copay bill?

6    A.   Yes.

7    Q.   And that you told the Government that you paid the copay

8    bills to the pharmacy?

9    A.   No, I didn't pay any of my -- my husband did, yes.

10   Q.   And do you recall telling the Government in April that while

11   you were never examined by the doctor who prescribed the

12   medication, you did speak to a doctor, you couldn't remember

13   whether it was a him or her, on the phone?  Do you recall

14   telling them that?

15   A.   Yes, that was Dr. Garcia.

16   Q.   And do you recall telling the Government that you also

17   recall getting a call from the pharmacy to confirm your address

18   and to confirm where to send the products to --

19   A.   Yes.

20   Q.   -- and to confirm that you wanted the products?

21   A.   From the pharmacy, yes.

22   Q.   Now, at some point early on --

23              THE COURT:  How much longer do you think you have?

24              MR. RASHBAUM:  Maybe five minutes, Your Honor.

25              THE COURT:  Okay.  If you've got more than that, we're

 1   going to recess.

 2             MR. RASHBAUM:  Okay.  I'll try to be very quick, Your

 3   Honor.

 4   BY MR. RASHBAUM:

 5   Q.  At some point early on, did you ask Mr. Grow whether this

 6   was legitimate?

 7   A.  I did.

 8   Q.  And he told you it was, correct?

 9   A.  Yes.

10   Q.  Have you ever heard of Mary Kay?

11   A.  Yes.

12   Q.  Did you think that this was kind of like a Mary Kay or an

13   Amway, where it was multilevel marketing, you bring people in

14   and you get commissions for the people you bring in and

15   commissions for the people that they brought in?

16   A.  I didn't think it was like Mary Kay because it was -- Mary

17   Kay, if I signed up, I signed up and ordered a packet.  This one

18   I didn't have to use the products to sign up, so I didn't equate

19   the two to be the same or similar.

20   Q.  Let me ask you a more direct question.  When you were doing

21   this, you didn't think you were doing anything wrong, right?

22   A.  I did think I was doing something wrong.

23   Q.  You did?

24   A.  Deep down inside I did.

25   Q.  What's that?  I'm sorry.

1  A.  Deep down inside I felt like I was doing something wrong

2  every time I got paid.

3  Q.  Yeah, but you kept on doing it?

4  A.  Yeah.

5  Q.  What did you think you were doing wrong?

6  A.  Honestly, I thought I was -- with my husband being in the

7  military and with our insurance, that we were getting paid for

8  getting products that my husband's job, the Government, you

9  know, the military was paying for.

10  Q.  But you needed -- like the scar cream you talked about, you

11  needed it?

12  A.  I didn't need it.  That scar came after I used my curling

13  iron and I scarred myself here.

14  Q.  You had a scar, right?

15  A.  Yes.

16  Q.  And you used the product on the scar, correct?

17  A.  I used one of the three vials that I got in one month, but I

18  never used the rest.

19  Q.  And it worked?

20  A.  Yes.

21  Q.  Now, you talked a little bit about the onboarding -- well,

22  let me ask you this question:  After the program shut down -- I

23  know you testified that you thought you were doing something

24  wrong, but after the program shut down and you didn't talk to

25  Monty Grow anymore, he was no longer working with you, did you

1   try to work with another individual named Leland Smith on a

2   similar program?

3   A.   I received an email from Leland and I think I shared that

4   with Monty, that he had sent an email out to that big old group

5   of people that he sent out, saying that he was going to start

6   the program up again and it was going to get going that way.

7          MR. RASHBAUM:  Judge, I might actually need another 5

8   to 10 minutes, I want to let you know.  It's up to you whether

9   you want me to continue.

10          THE COURT:  When your five minutes is over, I told you

11   we would recess.  That's what we're going to do.

12          MR. RASHBAUM:  Okay.  I just wanted to let you know.

13   BY MR. RASHBAUM:

14   Q.   So you never worked with Leland Smith?

15   A.   I didn't work with Leland, no.

16   Q.   Did you correspond with him about the possibility of working

17   with him?

18   A.   I did correspond with Leland about that.

19   Q.   So after you worked with Mr. Grow on a program that you knew

20   deep down in your heart was wrong and Mr. Grow closed that

21   program down, you reached out to another person doing the exact

22   same thing to see if you could work with them as well.  Just yes

23   or no?

24   A.   Yes.

25          THE COURT:  Why did you do that?

Powell - Cross

1           THE WITNESS:  Because I didn't know.  What he asked,

2    deep down inside, I felt like it was wrong.  It wasn't confirmed

3    that we were doing anything wrong at that point when I reached

4    out to him.  He said that he had found -- in that email that he

5    sent out to the people that were on that conference call, he

6    said that he had found a way to do this program in a better way

7    than what we were doing it before with Monty, and I said, okay,

8    if it's a possibility and we can get it done properly, then I

9    wanted to know more information about it.

10   BY MR. RASHBAUM:

11   Q.  Ms. Powell, isn't it true that you didn't think you were

12   doing anything wrong until the Government told you you were

13   doing something wrong?

14   A.  I didn't know exactly, yes, that's true.

15   Q.  Because the truth is, I could tell from your demeanor,

16   you're not someone who would knowingly commit a crime?

17   A.  No, I hope not.

18   Q.  And so when you were working for Mr. Grow, you didn't think

19   you were committing a Federal crime; is that true?

20   A.  Yes.

21   Q.  Now, we talked about the onboarding.  I call it onboarding,

22   but your switch from a 1099 to a W-2, and I think you said, and

23   I just want to make sure that I got it right and that the jury

24   heard it, that at one point Monty Grow called you in the spring

25   of 2015 or emailed, and he said the program is terminated,

1    meaning we're no longer doing this.

2    A.  He sent an email out.

3         THE COURT:  All right.  We're going to recess, like I

4    said.  Ladies and gentlemen, I'm going to give you a long lunch

5    hour today because we're going to move you from one courtroom to

6    another, like I mentioned yesterday.  Unfortunately, we have to

7    do that, but you just go back to the same jury room.

8         You can sit down, ma'am.  You'll wait outside.  At

9    2:00, you have to be there at 2:00, outside of this courtroom

10   and then someone will walk you into the other courtroom.  Okay?

11   Don't talk about your testimony with anyone.

12      (The witness retires from the courtroom.)

13        THE COURT:  So you all come back to the same jury room

14   and then Shirley is going to walk you into Judge Graham's

15   courtroom.  Okay?  Don't talk about the case, don't google.  You

16   know all of that.  Take your notebooks, leave them in the jury

17   room and that way you can take them.

18        We have to clean all this up.

19        THE COURTROOM DEPUTY:  Yes.

20      (The jury retired from the courtroom at 12:16 p.m.)

21        THE COURT:  All right.  You can all be seated.

22   Remember my five-minute rule.  Let me hear that door.  I need

23   the door closed.  Thank you.  I need the door closed.  Thank

24   you.  Thanks.

25        Have a seat, wait five minutes, and I would suggest you

1  all go into Judge Graham's room at a quarter of 2:00 in case

2  you're going to use any equipment, you should familiarize

3  yourself with the equipment and take all your stuff.  We will be

4  there this afternoon and tomorrow while the multidistrict panel

5  is here.  Okay?

6      How long is your redirect?

7      MR. JUENGER:  Five minutes, if that.

8      THE COURT:  Who's your next witness?

9      MR. JUENGER:  Amanda Donnelly.

10     THE COURT:  Are you are going to have exhibits with the

11 videos, the monitors, the ELMO, the computer?

12     MR. LARSEN:  I don't think with Amanda Donnelly, but

13 the next witness, likely, yes.

14     THE COURT:  So straighten it out so that we can go

15 straight through.  Anything else?

16     MR. RASHBAUM:  Who is the next witness?

17   (There was a brief discussion off the record.)

18     THE COURT:  All right.  We will see you at 2:00 next

19 door.  Thank you.

20     THE COURT SECURITY OFFICER:  All rise.

21     MR. RASHBAUM:  We probably should clean up now, right?

22     THE COURT:  Oh, yeah, I would.  Take everything out.

23   (A luncheon recess was taken at 12:18 p.m.)

24                    AFTERNOON SESSION

25   (The following proceedings were held at 2:25 p.m. outside

1    the presence of the jury:)

2          THE COURT:  All right.  Defendant is present, defense

3    counsel, Government counsel.  I understand that you wanted to

4    see me before the jurors come in.

5          Go ahead and bring them, Shirley.

6          THE COURTROOM DEPUTY:  The jurors?  Okay.

7          THE COURT:  What happened?  You can all sit down unless

8    you're addressing the Court.

9          MR. RASHBAUM:  Judge --

10         THE COURT:  Yes, sir, I'm listening.

11         MR. RASHBAUM:  -- I just wanted you to know my son came

12   down with -- he's five.  He came down with the flu yesterday.

13         THE COURT:  Sorry to hear that.

14         MR. RASHBAUM:  I got a text from my wife about maybe 45

15   minutes ago that he's having trouble breathing and his fever

16   spiked.  So she rushed him to the doctors in Hollywood.  They're

17   seeing the doctor now.

18         THE COURT:  You live in Broward?

19         MR. RASHBAUM:  Yeah.  She said he doesn't seem in

20   jeopardy right now but --

21         THE COURT:  What do you want to do?

22         MR. RASHBAUM:  No, I can continue, Your Honor.  I just

23   wanted --

24         THE COURT:  You're sure?

25         MR. RASHBAUM:  I don't know what's going happen in the

1    next 45 minutes obviously.  I'm hoping everything is fine and we

2    do what we do, but I wanted to let the Court know.

3              THE COURT:  Okay.  All right.

4         (There was a brief discussion off the record.)

5              MR. MARCUS:  Your Honor, there's also one issue with a

6    witness that's coming at some point, Ralph Louis.

7              THE COURT:  Is he the next witness?

8              MR. LARSEN:  No.

9              THE COURT:  Is he --

10             MR. JUENGER:  No, Your Honor, he is not the next

11   witness.

12             THE COURT:  Is he the second or third?

13             MR. JUENGER:  No, we may have five or six beneficiary

14   witnesses that will go before him.

15             THE COURT:  So we've got time.

16             MR. MARCUS:  Okay.

17             MR. JUENGER:  Should we bring the witness in?

18             THE COURT:  Okay.  Let's bring in the witness.

19             THE COURTROOM DEPUTY:  We have all the jurors, Judge.

20             THE COURT:  Okay.  Bring them in.  You can bring them

21   in.  Sorry.

22             THE COURT SECURITY OFFICER:  Rise for the jury, please.

23        (The jury entered the courtroom.)

24             THE COURT:  You know what, don't forget, let's do it

25   right to left because it's going to be the easiest thing.  So

1   Ms. Vettaparambil, she is way over there.  I think that's the

2   easiest thing.  Do you remember the numbers?  Number 1.  Of

3   course Number 1.

4           THE COURTROOM DEPUTY:  She might be the one that left

5   this morning.

6           THE COURT:  No, she is not.  She is in the bathroom,

7   that's why.

8           Mr. James Jones, take the second seat over there.

9   Jefnie Jean take next seat.  Angelica Berezin, Kelly Ann Padron,

10  Diego Hurtado, Leisy Meneses, okay, in the first row.  Does that

11  make sense?  It's easier.  I know it's a little confusing.  And

12  then Garcia, right, Berny Garcia, Pedro Bodden.  We excused

13  Ms. Glover so you can leave that empty to help me remember.

14  German Merida, Gerald Jones, Leah Brooks, Jansel Febres Cotto,

15  Dineiska Rodriguez and Laura Oropesa.

16          Does that make sense?  We've got everybody?  That way

17  we kind of have the same order as opposed to the opposite.

18  Okay?  It makes it easier for me.

19          Thank you, folks, for your patience as we move from one

20  courtroom to another.  I apologize for the slight delay.

21          Ms. Powell, you're still under oath of course.  All

22  right.  And the final cross-examination, Mr. Rashbaum.

23          MR. RASHBAUM:  Thank you, Your Honor.

24  BY MR. RASHBAUM:

25  Q.  Ms. Powell, when we stopped I think -- I'll just take you a

Powell - Cross

1   little bit back.  At some point in 2015, the spring of 2015, you

2   learned that the program was going to be stopped, right?

3   A.  Yes.

4   Q.  Okay.  Monty Grow sent out an email informing you that it

5   was going to be stopped, correct?

6   A.  Yes.

7   Q.  And then shortly thereafter, do you recall that there was a

8   sales call?

9   A.  Yes, a conference call.

10  Q.  And I take it there were a lot of participants on that

11  conference call, correct?

12  A.  Yes.

13  Q.  And during that conference call Mr. Grow informed everyone

14  that the program was going to be restarted, correct?

15  A.  Yes.

16  Q.  And he informed everyone that because of some legal

17  requirements, that you were all going to have to switch from

18  becoming 1099 employees to W-2 employees, correct?

19  A.  Yes.

20  Q.  And that the W-2 employment would be directly with PCA, the

21  pharmacy?

22  A.  That we would be employed by the pharmacy, yes.

23  Q.  And Mr. Grow said that pretty much everything would stay the

24  same, but that your employment would be directly with the

25  pharmacy, not with him; is that correct?

Powell - Cross

139

1   A.   That we would be employed by the pharmacy, yes.

2   Q.   Okay.  And he told you that one of the things that would

3   change would be that instead of receiving payments from MGTEN or

4   Monty Grow, you would now be receiving payments from the

5   pharmacy, correct?

6   A.   Correct.

7   Q.   And he told you that your taxes would be taken out directly

8   from the pharmacy because you were now going to be a W-2

9   employee from the pharmacy, right?

10  A.   Yes.

11  Q.   And there was an opportunity during that call for you all to

12  ask questions, right?

13  A.   Yes.

14  Q.   And in fact, some of the representatives, some of the

15  marketers did ask questions, right?

16  A.   Yes.

17  Q.   And some of them asked questions regarding why this was

18  happening, right?

19  A.   Yes.

20  Q.   And Mr. Grow responded that the lawyers at PCA had

21  determined that in order to be fully compliant with the law, you

22  needed to be switched over as W-2 employees rather than 1099

23  employees, correct?

24  A.   Well, I don't remember that.  Honestly, I don't remember

25  what he said on that call outside of we were going to be

Powell - Cross

140

1   employees of the pharmacy.  So the way you worded that, I don't

2   know.

3   Q.  Fair enough.  I know it was awhile ago.

4   A.  Yeah.

5   Q.  Now, you did fill out a W-2 form, and you did switch over to

6   a W-2 employee, correct?

7   A.  Yes.

8   Q.  And once you switched over, there was an onboarding process

9   by the pharmacy, right?

10  A.  What do you mean by onboarding?

11  Q.  Let me be more specific.  They sent you like a packet,

12  correct?

13  A.  Yes.

14  Q.  And they made you take a drug test?

15  A.  Yes.

16  Q.  Okay.  And you filled out your information so that they

17  could pay you and also so that they could deduct your taxes?

18  A.  Yes.

19  Q.  And they gave you at least some information about the

20  pharmacy, I take it, you know, maybe not the location, but some

21  information about what PCA was?

22  A.  I don't remember that being in there.  I know there was an

23  offer letter, there was an application in there, and the form to

24  get the urine sample from us.

25  Q.  Okay.  But your payments remained the same and it was still

1  the 7, 5, 3 percent structure, correct?

2  A.  Yes.

3  Q.  Okay.  And you knew that Monty Grow was also going to become

4  a W-2 employee of the pharmacy, right?

5  A.  I didn't know that.

6  Q.  Well, did you know that he was going to become your manager

7  at the pharmacy?  He was still going to go through your

8  commissions and make sure that you were paid the accurate amount

9  with the pharmacy.  Did you know that?

10  A.  Yes.

11  Q.  Okay.  Ms. Powell, when you were marketing I know you had

12  several conversations with Monty Grow usually through email,

13  right?  You usually --

14  A.  Email or text.

15  Q.  Email or text.  And when you were marketing and trying to

16  find other marketers, did you ever use surveys?

17  A.  No.

18  Q.  You don't even know what that is, right?

19  A.  I didn't, uh-uh.

20  Q.  And Mr. Grow never talked to you about using surveys to pay

21  marketers or pay patients, right?

22  A.  No, not a survey, no.

23  Q.  That never came up in any of the numerous communications

24  between you and Mr. Grow, right?

25  A.  No, but I didn't market really.  I had four people I signed

Powell - Redirect

1  up and I didn't sign anybody else up outside of that.  I wasn't

2  actively looking for people.  I signed those four people up and

3  that's as much as I wanted to do.

4  Q.  And with those four people you didn't use anything like

5  surveys, right?

6  A.  No.

7  Q.  And in no conversation with Mr. Grow did he ever talk to you

8  about a survey program, right?

9  A.  No.

10 Q.  And you never heard of an individual name Ginger Lay, right?

11 A.  No.

12         MR. RASHBAUM:  May I have one moment, Your Honor?

13         THE COURT:  Sure.

14         MR. RASHBAUM:  Nothing further, Your Honor.

15         THE COURT:  Redirect.

16                    REDIRECT EXAMINATION

17 BY MR. JUENGER:

18 Q.  Ms. Powell, during Mr. Rashbaum's cross, he asked you

19 whether you had ever bribed anyone to join Mr. Grow's drug

20 program.  Do you recall that?

21 A.  Yes.

22 Q.  And your answer was that you didn't bribe anyone, correct?

23 A.  Correct.

24 Q.  And why not?

25 A.  Because I didn't have to bribe them.  I basically told them

Powell - Redirect

1  what I did and what we were going to do as far as making money

2  through getting the products and that was it.  They were pretty

3  much sold once I told them how much money I made.

4  Q.   Okay.  And remind me if you told us before, how much did you

5  make?

6  A.   About 50 -- it was 54.  The exact number was -- it was a

7  little over 54, almost $55,000.

8  Q.   And what was the time period, roughly, that you got that

9  money?

10  A.   December of 2014 through May of 2015.

11  Q.   So six months or so?

12  A.   Yes.

13  Q.   Was that a lot of money for your family?

14  A.   Yes.

15  Q.   And what did you do with it?

16  A.   We put some money in the bank, paid off some bills, college

17  students, paid some tuitions and one private school tuition.

18  Q.   And another point Mr. Rashbaum asked you about on

19  cross-examination was whether or not you thought what you had

20  done was wrong.  Do you remember that?

21  A.   Yes.

22  Q.   And I believe you said, but correct me if I'm wrong, that

23  you knew deep down there was something wrong with it, but you

24  just didn't know if it was illegal.  Is that fair?

25  A.   That's fair to say.

Powell - Redirect

144

1   Q.   And then let me follow-up with that and ask:  Did you have

2   any training or expertise or education in the pharmaceutical

3   sales or marketing world?

4   A.   No, I didn't.

5   Q.   Did you create this program that we've been talking about

6   for the last hours?

7   A.   No, I didn't.

8   Q.   Did you decide how it worked?

9   A.   No.

10  Q.   Did you have a deal with the pharmacy to split the profits?

11  A.   No.

12  Q.   Did you know that Mr. Grow sold ingredients to the pharmacy?

13  Have you ever heard about that before?

14  A.   No.

15  Q.   Did you know that Mr. Grow paid for the consults and the

16  scripts that were generated?

17  A.   No.

18  Q.   Did you know that Mr. Grow was paid $20 million from the

19  pharmacy for all of this activity we have been discussing?

20  A.   No.

21  Q.   If you had known any of these things, would that have left

22  you with a more favorable or a less favorable view of Mr. Grow's

23  drug program?

24          MR. RASHBAUM:  Objection, Your Honor.

25          THE COURT:  Grounds.

1          MR. RASHBAUM:  Speculation.

2          THE COURT:  Response.

3          MR. JUENGER:  Your Honor --

4          THE COURT:  You've asked that before or you all have

5     asked that before, but what does that have to do --

6          MR. JUENGER:  On cross he asked what her opinion of the

7     program was and I'm just trying to establish, as I did through

8     the previous questions, what she didn't know about the program.

9     If she had known --

10         THE COURT:  I didn't know that you had asked, what did

11    you not know about the program?  I missed that question.  What

12    did you not know about the program?

13         THE WITNESS:  How much money Mr. Grow made and the

14    fact, with those questions that he asked in reference to the

15    paying the pharmacy for the drugs.

16         THE COURT:  All right.  Next question.  But whether she

17    would have done it or not, it is somewhat speculative, though

18    it's been asked before of others without objection.

19    BY MR. JUENGER:

20    Q.  Ms. Powell, of the people that you signed up or any of the

21    people that they signed up that you knew about, did any of them

22    ever get rejected by the doctor?

23    A.  Not that I know of, no.

24         MR. JUENGER:  Okay.  That's all I have, Your Honor.

25         THE COURT:  Okay.  Thank you.  Sorry you had to come

Donnelly - Direct

 1    back afterwards.  I apologize for that.  It's my fault.

 2              THE WITNESS:  It's okay.

 3         (The witness was excused.)

 4              THE COURT:  Next witness.

 5              MR. RASHBAUM:  The United States calls Amanda Donnelly.

 6              THE COURT:  Raise your right hand, if you don't mind.

 7          AMANDA DONNELLY, GOVERNMENT'S WITNESS, SWORN.

 8              THE COURT:  Okay.  Have a seat.  Tell us your name.

 9    Spell your last name.  Look at the jurors.

10              THE WITNESS:  My name is Amanda Donnelly, A-m-a-n-d-a,

11    D-o-n-n-e-l-l-y.

12              THE COURT:  Thank you.

13                         DIRECT EXAMINATION

14    BY MR. LARSEN:

15    Q.  Good afternoon, Ms. Donnelly.  Could you tell the jury where

16    you live, just city and state only?

17    A.  I lived in St. Augustine, Florida.  Currently we reside in

18    the eastern panhandle of West Virginia, outside of D.C.

19    Q.  Do you know why you were called to testify in court here

20    today?

21    A.  Yes.

22    Q.  Why is that?

23    A.  I'm a fact witness.

24    Q.  And what are the facts you're here to testify about?

25    A.  That I was to not have been paying a copay as I was told.

Donnelly - Direct

147

Q.   Okay.  Let me ask:  Do you know what the Tricare program is?

A.   Yes.

Q.   Are you a Tricare beneficiary?

A.   Yes.

Q.   And how is it that you are a Tricare beneficiary?

A.   My husband is in the military.  He was active duty when this
was occurring, and he is now in the Reserves.

Q.   Where were you and your husband stationed in 2015?

A.   He was stationed in Jacksonville, we lived in St. Augustine.

Q.   And what branch of service did your husband serve in?

A.   The Coast Guard.

Q.   What is your present occupation, Ms. Donnelly?

A.   I am a registered nurse.

Q.   Have you ever heard of a pharmacy named Patient Care
America?

A.   Yes.

Q.   How did you first hear about Patient Care America?

A.   That is the pharmacy that was listed on the statements that
I received in the mail.

Q.   What statements are you referring to?

A.   The statements showing that I owed the copay.

Q.   Okay.  So a statement, a billing statement?

A.   A billing statement, correct.

Q.   You heard of a person named Robin Halliburton?

A.   Yes.

Donnelly - Direct

1   Q.   Who is Robin Halliburton?

2   A.   That is the lady who I contacted in regard to the creams.

3   Q.   What do you mean, the creams?

4   A.   The scar cream and pain cream.

5   Q.   Tell us what you know about the creams.  When did you first

6   hear about these creams?

7   A.   So I had a baby in June 2014, and seven months postpartum I

8   started at a gym in St. Augustine and the gym owner -- I

9   suffered from sciatica pain in my back, and three weeks into the

10  gym, I started having recurring pain in my sciatic nerve and so

11  this program was 13 weeks long.  It was very vigorous in the

12  gym.  So the owner of the gym is best friends with Robin and so

13  she told me I should just get in contact with Robin because

14  Robin was -- she had a connection, since I was a Tricare member

15  that I should get in contact with her.

16  Q.   Did you get in contact with Ms. Halliburton?

17  A.   I did via email.

18  Q.   And what, if anything, did you and Ms. Halliburton discuss?

19  A.   She told me that -- she had a form for me to fill out and

20  told me very specifically that I was to accept a phone call from

21  a pharmacy in which I was to tell them I needed to auto fill,

22  and a phone call from a doctor, that it should be very quick.  I

23  can ask any questions that I would have, in which my question

24  was, I was breast feeding, so I wasn't sure if it was safe.  And

25  as a nurse, I knew what questions to ask.

Donnelly - Direct

149

1      And then we talked about my husband as well was to sign

2  up, fill out the form as well individually.  So I filled out the

3  form and emailed it back to her, and my husband did the same and

4  emailed that back to her as well.

5  Q.  Did you have any conversations the first time or any

6  follow-up conversations with Ms. Halliburton about what she was

7  doing with respect to Tricare beneficiaries?

8  A.  Yes.  So there were two incidents, one email.  I had emailed

9  her to ask her -- Sara had led on -- again, that's the gym

10  owner, her friend.  Sara had led on that she was in a contest

11  and so my other occupation is, I have a direct sales business,

12  and so I'm all about supporting other businesses.  And so Sara

13  had led on that she was in a contest, Robin was in a contest,

14  and Robin had told me that she needed as many Tricare members as

15  she could.  So being in the military, I reached out via Facebook

16  and -- to back up, Robin had said she needed as many as she

17  could Tricare members.  So without question I told her I would

18  reach out.

19      I went to Facebook and just put a post, hey, I have a

20  friend, she has a great program going on if you're a Tricare

21  member to get a pain cream in which I was going to use on my

22  back.  And three days past and Robin had emailed me and told me

23  to remove that post because it gets funny between Tricare and

24  Government.

25  Q.  Did you take the post down?

Donnelly - Direct

150

A.  I did.  I immediately removed it and she said thanks, that she appreciated me helping her.

Q.  Okay.  Now, after you took the post down -- let me ask this: Have you heard of the defendant, Mr. Monty Grow?

A.  I have heard the name.  I do not know him.

Q.  Well, in what way have you heard his name?

THE COURT:  Well, hold on a second.  I mean, doesn't that kind of open a can of worms?

MR. LARSEN:  I agree.  Poor question, Your Honor

THE COURT:  We tell the jurors not to read the paper and all that.

MR. LARSEN:  Fair point, Your Honor.

BY MR. LARSEN:

Q.  When you say you've heard the name --

THE COURT:  You don't know him, right?

BY MR. LARSEN:

Q.  -- do you know him?

THE COURT:  Did you ever talk to him?

THE WITNESS:  No.

THE COURT:  Okay.  Next question, if any.

BY MR. LARSEN:

Q.  Did you ever agree to be a sales representative for any of these products?

A.  No.  I didn't even know that was -- not that I would have, but I didn't know that was an option.  I had no idea what I was

Donnelly - Direct

151

1  doing.

2  Q.   Okay.   Now, what did you did in order to order the products?

3  A.   So she emailed a form to me, it was very generic.   It just

4  said my name, date of birth, Social, my information for

5  Tricare --

6           THE COURT:   This is Ms. Halliburton, or who is this?

7  Who is "she"?

8           THE WITNESS:   For my form.

9           THE COURT:   Pardon?

10           THE WITNESS:   This is what I wrote on my form.

11           THE COURT:   This is what you what?

12           THE WITNESS:   Wrote down on my form when she emailed me

13  the form.

14           THE COURT:   Who is "she"?

15           THE WITNESS:   The Robin, I'm sorry.

16           THE COURT:   That is what I meant.   Robin, Halliburton

17  is her last name.

18           THE WITNESS:   Correct, yes.

19           THE COURT:   So she's now telling us what

20  Ms. Halliburton said; is that right?

21           THE WITNESS:   I am saying --

22           THE COURT:   No, we have to do a little --

23           THE WITNESS:   No, sure.   Go ahead.   Sorry.

24           THE COURT:   Give me a few minutes.   We'll figure it

25  out.

Donnelly - Direct

1          MR. LARSEN:  No, Your Honor.  My question was --

2          THE COURT:  She just said, she said to do this.  That's

3    why I asked who the "she" is, and it's Ms. Halliburton.

4          MR. LARSEN:  Your Honor, my question was what did she

5    do next.

6          THE COURT:  Who is "she"?

7          MR. LARSEN:  What did the witness do next.

8          THE COURT:  Okay.  What did you do?  You can't tell

9    us --

10         THE WITNESS:  Oh, me, not she.

11         THE COURT:  -- most of the time what someone else said,

12   Sometimes you can, but not most of the time.  Okay?

13         THE WITNESS:  Okay.  So what I did do next,

14   specifically after what?

15   BY MR. LARSEN:

16   Q.  You were discussing the form.  What did you do with respect

17   to the form?

18   A.  Got you.  So I filled out the form, emailed it back to her.

19   Q.  Okay.

20   A.  I then waited for the call from the pharmacy and from the

21   doctor.

22   Q.  And did you receive a call from someone purporting to be

23   either from the pharmacy or the doctor?

24   A.  I did.

25   Q.  And what do you remember about that?

Donnelly - Direct

1          THE COURT:  Is that admissible?

2          MR. LARSEN:  It's not offered for the truth, just to

3    talk whether she received a call from the pharmacy or the

4    doctor.

5          MR. RASHBAUM:  I'm okay with it, Your Honor.

6          THE COURT:  I know you are, but that is because -- it

7    opens up all kinds of cross-examination questions.  But, you

8    know, Judge Graham, just like I do, has this rule of evidence,

9    and now that I'm in his courtroom, I think I should probably

10   abide by it perhaps more than I normally do in his honor, since

11   he let me have his courtroom.

12          I don't see how that comes in.  Do you?  I could be

13   wrong.  You want her to tell me what someone at the pharmacy

14   said to her.  Who is the person in the pharmacy?

15          MR. LARSEN:  I can -- I am asking about the doctor, did

16   you receive a call from a doctor.

17          THE COURT:  Okay.  And why is that not hearsay?  You

18   said it's not coming in for the truth.  I know we don't have the

19   sign here that says, "We who labor here seek only truth,"

20   because we seek other things, and I know what you mean by that,

21   but then how does it come in?  Is her state of mind at issue?

22   Is she charged with anything?

23          MR. LARSEN:  I think it is, Your Honor.

24          THE COURT:  Oh, she's charged with something?

25          MR. LARSEN:  No, no, Your Honor.

1        THE COURT:  Then why is her state of mind at issue?  It

2   really isn't, is it?  Is it?  What is sauce for the goose is

3   sauce for the gander, too.  That means same thing for the other

4   side.

5        MR. LARSEN:  Okay.

6        THE COURT:  Sometimes "Brevity is the soul of wit,"

7   that's what Shakespeare wrote.  Sometimes.

8   BY MR. LARSEN:

9   Q.  You received a call.

10  A.  Yes.

11       THE COURT:  You can't tell us what he said or she said.

12  So next question, if there is one.  I don't know.  It's a hint.

13  BY MR. LARSEN:

14  Q.  Did you say anything to the person on the phone?

15  A.  Yep.

16  Q.  What did you tell the person on the phone?

17       THE COURT:  Okay.  Almost every lawyer thinks that's

18  not hearsay, but it is hearsay because it's a statement out of

19  court.  That's the definition of hearsay.  It could mean it

20  sometimes comes in, it comes in as a prior inconsistent

21  statement, but we spent so much time on that.  Remember, we

22  spent some evening on that.  But it's really -- you're not

23  impeaching your own witness so you can do that.  So what she

24  says doesn't matter, it's what she did, which I think you've

25  already covered it because a lot of things you are asking is

1    what she didn't do, right?

2            MR. LARSEN:  Yes, Judge.

3            THE COURT:  That shouldn't take long.

4    BY MR. LARSEN:

5    Q.  How long did this call last?

6            THE COURT:  Okay.  My hints are --

7            THE WITNESS:  As a nurse, I would have thought that it

8    would have lasted a little bit longer for an examination.

9            MR. RASHBAUM:  Your Honor, move to strike.

10           THE COURT:  Move to strike the answer on the length of

11   a phone call, and the reason is?

12           MR. RASHBAUM:  She's giving her expertise as a nurse.

13   I don't know her expertise as a nurse.

14           THE COURT:  Well, okay, I mean that may be true, but I

15   think just about everybody can decide how long of a phone call

16   it is.  We may have different opinions on the length of a phone

17   call, like we have on length of witnesses, direct and

18   cross-examination.

19           So on that basis, I'll overrule the objection.  She

20   answered it anyway.

21           Anything else?

22   BY MR. LARSEN:

23   Q.  Earlier you mentioned the issue of a copay, you received a

24   bill for a copay.  Did you ever pay that copay?

25   A.  No.

Donnelly - Direct

156

1   Q.   Why not?

2   A.   I was told not to and I was told that I would not have a

3   copay.

4   Q.   Who told you that?

5   A.   Robin.

6   Q.   Do you know if that copay --

7        THE COURT:  How is that admissible?  See, I understand

8   why you want to bring it.  Isn't it hearsay?  It's a consistent

9   statement, you can bring in consistent statements.  I'll let you

10  bring it in based upon the consistent, but no more.

11       MR. LARSEN:  Okay.

12       THE COURT:  Because the prior witness' testimony was

13  challenged, so under that basis, I will allow that.

14  BY MR. LARSEN:

15  Q.   Did the products eventually come in the mail?

16  A.   Yes.

17  Q.   Could you describe just generally what you got in the mail?

18  A.   I received -- our original form was for pain cream, then we

19  were asked if we wanted to do scar cream, no cost, and then

20  there were vitamins that she asked if my husband wanted to try.

21       THE COURT:  Don't tell me what anybody said.  The

22  question was:  What did you get and what did it look like?

23       THE WITNESS:  Well, all three of those, we received all

24  three of those products.

25       THE COURT:  Thank you.  Next question.

Donnelly - Direct

1  BY MR. LARSEN:

2  Q.  Did you receive any -- along with the shipment, any

3  instructions on how to use the product?

4  A.  No.

5  Q.  How much of the products did you receive, volume?

6  A.  Too many to count.

7  Q.  What do you mean by too many to count?

8  A.  I mean, the bottles were probably about that size, I would

9  say, I mean, and the lid was probably that thick probably, and

10  we received four at a time probably every two weeks for myself

11  and my husband.

12  Q.  Did you have any idea what these products were costing the

13  insurance company?

14  A.  No.

15  Q.  One last question:  If you had to pay a copay for these

16  products, would you have ordered them?

17  A.  No.

18  Q.  Why not?

19  A.  There's other options I feel like probably with sciatic pain

20  for why I first sought out doing it.  If it's free, why not try

21  it.

22          THE COURT:  Cross-examination, if any.

23          MR. LARSEN:  Thank you.

24          MR. RASHBAUM:  Thank you, Your Honor.

25          THE COURT:  In the scope of direct.

Donnelly - Cross

158

 1            MR. RASHBAUM:  Yes, Your Honor.

 2                         CROSS-EXAMINATION

 3  BY MR. RASHBAUM:

 4  Q.  Good afternoon.

 5  A.  Hi.

 6  Q.  My name a Dan Rashbaum.  I represent Monty Grow.

 7           Very briefly, you're a registered nurse, right?

 8  A.  Correct.

 9  Q.  Before you got these products, you had pain?

10  A.  Correct.

11  Q.  And you spoke to Ms. Halliburton about that pain, correct?

12           THE COURT:  Well, that's hearsay.

13           MR. RASHBAUM:  I'm not asking --

14           THE COURT:  That's why I said what's sauce for the

15  goose is sauce for the gander.

16           MR. RASHBAUM:  I'll rephrase.

17  BY MR. RASHBAUM:

18  Q.  You received the products because you thought they could

19  help you, right?

20  A.  Yeah.

21  Q.  Now, you said that you put an ad on Facebook?

22  A.  Yes.

23  Q.  And Ms. Halliburton asked you to take that ad down?

24           MR. LARSEN:  Objection, hearsay.

25           MR. RASHBAUM:  It came in in direct.

Donnelly - Cross

1    THE COURT:  I know because I didn't make my own

2 objection, which I usually sustain my objections, but it's

3 unfair.  Didn't it come out?  It came out, which is why the

4 cross is longer now, see?  I should have sustained my own

5 objection.

6         So based upon that, I have no choice but to allow cross

7 on that statement.

8 BY MR. RASHBAUM:

9 Q.  So Ms. Halliburton asked you to take it down, correct?

10 A.  Yes.

11 Q.  Because it was inappropriate?  She thought it was wrong to

12 put that on Facebook?

13 A.  I suppose.

14 Q.  She wanted you --

15 A.  She didn't elaborate.  She just asked me to take it down.

16 Q.  How well do you know Ms. Halliburton?

17 A.  I don't.

18 Q.  But when she asked you to take it down, for whatever reason,

19 you did so, right?

20 A.  Correct.

21 Q.  Now, you received this medication, correct?

22 A.  Correct.

23 Q.  But you never became a marketer at all, right?

24 A.  No.

25 Q.  And you never received any payment at all, right?

Donnelly - Cross

160

1  A.  Correct.

2  Q.  And so you knew you could get the medication without having

3  to do anything?

4  A.  Correct.

5  Q.  There was no you can only get the medication if you become a

6  marketer, right?

7  A.  Right.

8  Q.  The copay -- do you remember how much the copay was for?

9  A.  $60.

10  Q.  $20 for each product?

11  A.  No.

12  Q.  It was $60 for each product?

13  A.  It was itemized on the form, on the statement, and it said

14  $60, $60, but there was question.  That's why I questioned Robin

15  because I wasn't sure if that was just me or me and my husband.

16  I didn't know.  So maybe it was.  I don't know.  There was never

17  clarification.

18  Q.  Do you know what the total copay was?

19  A.  I received multiple.

20  Q.  Well, okay.

21  A.  I don't know.

22  Q.  Per shipment?  You got three products?

23  A.  I was never told.  It would just be months later I would

24  receive a statement.

25  Q.  And you don't remember what the bill was for, right?

Donnelly - Cross

1   A.   $60 every time.

2   Q.   Right.  So your bill was for $60?

3   A.   Um-hum.

4   Q.   And you got pain cream, scar cream and a vitamin, right?

5   A.   I did not get the vitamin.

6   Q.   All right.  So you got pain cream and scar cream?

7   A.   Correct.

8   Q.   And your husband got what?

9   A.   All three.

10   Q.   Okay.  And there was a $60 copay for each of you, or a $60

11   copay for one of you?

12   A.   I don't know.  I never had clarification.  I don't know

13   that.

14   Q.   And Ms. Halliburton paid that copay, correct?

15   A.   She did.

16   Q.   And you know it was Ms. Halliburton that paid that copay?

17   A.   Correct.

18   Q.   Now, you said that you received medications every two weeks.

19   Are you sure about that?

20   A.   I'm positive.

21   Q.   So if I told you that you received medications on February

22   23rd, and not again until March 25th, that would be more than

23   two weeks, right?

24   A.   We moved, so there was a delay in two shipments and the

25   statement.

Donnelly - Cross

162

1   Q.   And if I told you the third time you got medications was on

2   May 1st, that would be more than two weeks also, correct?

3   A.   We moved out.  I don't even know that I received May.  I

4   don't know.

5   Q.   Well, if I told you that in total you received medications

6   three times, does that sound right to you?

7   A.   No.

8   Q.   You think you received medications more than three times?

9   A.   I do.

10  Q.   Okay.  If I told you that records show that you and your

11  husband -- records that are in evidence in this case -- show

12  that you and your husband received medications only three times

13  and that those three dates were February 23rd, March 25th, and

14  May 1st, those records would be inaccurate in your mind,

15  correct?

16  A.   Yes.

17  Q.   The records that are Government exhibits in this case,

18  correct?

19  A.   Correct.

20            MR. RASHBAUM:   One moment, Your Honor.

21  BY MR. RASHBAUM:

22  Q.   Let me make sure I understand something.  So you moved in

23  this period of time?

24  A.   Yes.

25  Q.   So a lot of your mail got forwarded, too, right?

Donnelly - Cross

163

A.   Some did not.   We had it held.

Q.   So did all your mail come at the same time?

A.   No.

Q.   So in other words, if you got a bill in January and February and March, you might not have gotten it all till like April, right, at the same time?

A.   No, that's not true.   We have moved 10 years -- 10 times in 11 years and it's not that easy.

Q.   Well, is it possible that all these products got forwarded to you at the same time because they were sent to your old address and then you moved and that's why they came all within a period of two weeks?

A.   No, because we didn't receive any of that medication at our new location.

Q.   Oh, you didn't.

A.   We did not.

Q.   So you got all your medication at your old location?

A.   For whatever we received, yes.

Q.   And when did you move from the old location to the new location?

A.   Let me think about this.

Q.   I know it's a long time ago.

A.   We were in extended stay in April, actually before Easter, so March-ish until June, and then we moved again in July and we moved again in September.

Donnelly - Cross

164

1  Q.  So on February 23, 2015, March, 25, 2015, and May 1, 2015,

2  were you living at the same place?

3  A.  No

4  Q.  You were living in different places?

5  A.  Correct.

6  Q.  Okay.

7          MR. RASHBAUM:  I have no further questions, Your Honor.

8          THE COURT:  Redirect.

9          MR. LARSEN:  None, Your Honor.

10          THE COURT:  Thank you, Ms. Donnelly.  You're excused.

11  Have a good day.

12          THE WITNESS:  Thank you.

13     (The witness was excused.)

14          THE COURT:  Next witness.

15          MR. LARSEN:  The United States calls Dr. Ankush Bansal.

16          THE COURT:  Raise your right hand, please, sir.

17    ANKUSH KUMAR BANSAL, M.D., GOVERNMENT'S WITNESS, SWORN.

18          THE COURT:  Have a seat and tell us your name, please.

19          THE WITNESS:  Ankush Kumar Bansal.

20          THE COURT:  Can you spell it for us, please?

21          THE WITNESS:  I'm sorry?

22          THE COURT:  Can you spell it for us, please?

23          THE WITNESS:  Oh, sure.  A-n-k-u-s-h, K-u-m-a-r,

24  B-a-n-s-a-l.

25          THE COURT:  Thank you, sir.

Bansal - Direct

165

1        MR. LARSEN:  Your Honor, the Government is moving

2   Exhibits 47, 49, 58, 64, 110, 92, 112, 55 and 93 into evidence.

3        THE COURT:  Any objection?

4        MR. MARCUS:  I'd like to see them, Your Honor.  I

5   haven't been shown --

6        THE COURT:  But you've seen them before, right?

7        MR. MARCUS:  Some of them, yes.

8        THE COURT:  No, all of them.  They are part of the

9   Government's Exhibit List that we discussed last week.  This is

10  kind of like the dead time that remember we talked about last

11  week.

12        MR. LARSEN:  I could start.  I can certainly start.

13        THE COURT:  I hate dead time.

14        MR. LARSEN:  I won't show any documents until we get --

15        THE COURT:  Until we get --

16        MR. LARSEN:  -- an answer from --

17        THE COURT:  No, you can do it the old-fashioned way,

18  but that's why I wanted to do it easier.

19                    DIRECT EXAMINATION

20  BY MR. LARSEN:

21  Q.  Dr. Bansal, where do you live, city and state only, please?

22  A.  West Palm Beach, Florida.

23  Q.  And what type of doctor are you?

24  A.  Internal --

25        THE COURT:  A good one, I'm sure, right?  Go ahead.

Bansal - Direct

1           What type of doctor are you?

2           THE WITNESS:  Internal medicine and hospitalist.

3           THE COURT:  Does that matter for this case?

4           MR. LARSEN:  Just introducing to the jury.

5           THE COURT:  I know.

6  BY MR. LARSEN:

7  Q.  How long have you been a physician?

8  A.  10 years.

9  Q.  Can you please summarize your current practice?

10          THE COURT:  Why do we need to do that?

11          MR. MARCUS:  I won't object to that, Your Honor.

12  BY MR. LARSEN:

13  Q.  As part of your practice, do you engage in telemedicine

14  practice?

15  A.  Yes, I do.

16  Q.  And just briefly describe what telemedicine is for the jury.

17          MR. MARCUS:  Objection, 701.  He's a fact witness on

18  one patient.

19          THE COURT:  Okay.  Well, let me see how we do this

20  here.

21          Did you all have your coffee yet?  Why don't you have

22  your coffee?  Take them into Judge Graham's jury room.  Okay?

23  It's just easier to do it that way.

24          Don't talk about the case.  You can leave your

25  notebooks there.  No one is going to look at them.

1     (The jury retired from the courtroom.)

2       THE COURT: He has a door there, too. Let me hear that

3 door. There we go. I think I heard it.

4       MS. MEYERS: Excuse me, Your Honor, may I step out for

5 one moment? I just need to step out for one moment.

6       THE COURT: You all don't need permission. As long as

7 there's one lawyer, you can all step out.

8       MS. MEYERS: Thank you, Your Honor.

9       THE COURT: All I need is one lawyer for each side,

10 that's all, you decide who it is.

11       Okay. We talked about him as being the next witness

12 before? Did we do that?

13       MR. LARSEN: Yes.

14       THE COURT: We did? Okay.

15       MR. MARCUS: Well, we talked about him yesterday. We

16 did have a discussion that he might testify today.

17       THE COURT: So you knew what the exhibits were. How

18 can you say, I've never seen these exhibits?

19       MR. MARCUS: Well, Your Honor, in fairness, they handed

20 me 25 exhibits when he's supposed to testify on one patient, and

21 there's about four exhibits that relate to him.

22       THE COURT: Okay. But you know about the exhibits.

23 You say, I haven't seen them. You can't say that.

24       MR. LARSEN: Your Honor, actually I think almost all of

25 them are already admitted in evidence. So I didn't know that at

1  the time, but now that I look at them, they've all -- they're

2  all statements of Mr. Grow and I believe Ms. Lay testified at

3  length about a bunch of them.

4          THE COURT:  Hold on a second.  Hold on a second.  You

5  put out some numbers about exhibits that have been admitted

6  already.

7          MR. LARSEN:  Yes.

8          THE COURT:  Because you have duplicates.

9          MR. LARSEN:  49 --

10         THE COURT:  Hold on.  Hold on.  Hold on.  Because you

11 have duplicates or what's the reason?

12         MR. LARSEN:  Your Honor, 49 has not been admitted, but

13 we did --

14         THE COURT:  The first one was 47.

15         MR. LARSEN:  Yes, 47.

16         THE COURT:  Do you keep a list like I do?  47 has not

17 been admitted according to my list.

18         MR. LARSEN:  No.  Your Honor, we discussed it at the

19 pretrial status and we agreed that this was a statement of the

20 defendant and would be --

21         THE COURT:  I don't remember that, but it hasn't been

22 admitted, so we have to do it on the record, admitted.

23         MR. LARSEN:  Sure.

24         THE COURT:  So 47 has not been admitted and it's an

25 email between Mr. Grow and who?

1          MR. LARSEN:  Christopher O'Hara.

2          THE COURT:  Okay.  And the objection is what?

3          MR. MARCUS:  Your Honor, I don't object to this

4  document.

5          THE COURT:  So it will be admitted.

6      (Government's Exhibit Number 47 was received in evidence.)

7          THE COURT:  See, these are the things I like to do on

8  nonjury time, but I'm not as successful in convincing you all of

9  that.  49.

10         MR. LARSEN:  Your Honor, 49 is --

11         THE COURT:  It's an email from Monty Grow.  Why is that

12 inadmissible according to the defense?

13         MR. MARCUS:  I don't object to 49 or 64.

14         THE COURT:  Admitted.

15     (Government's Exhibit Number 49 was received in evidence.)

16         THE COURT:  See.  All right.  58, email between Monty

17 Grow and someone else.

18         MR. LARSEN:  58, Your Honor --

19         THE COURT:  I'm asking the defense.  I am looking at

20 your chart, that's what it says.  Any objection?

21         MR. MARCUS:  Not to 58, no.

22         THE COURT:  Then it will be admitted.

23     (Government's Exhibit Number 58 was received in evidence.)

24         THE COURT:  64, email between Monty Grow and someone

25 else.  It will be admitted.

1        (Government's Exhibit Number 64 was received in evidence.)

2            THE COURT:  110.  The defense case will be next week,

3    so you guys win.  110.

4            MR. LARSEN:  Email from Monty Grow.

5            THE COURT:  Yeah.  Any objection?

6            MR. MARCUS:  No, Your Honor.

7            THE COURT:  It will be admitted.

8        (Government's Exhibit Number 110 was received in evidence.)

9            THE COURT:  92.

10           MR. MARCUS:  No objection.

11           THE COURT:  It will be admitted.

12       (Government's Exhibit Number 92 was received in evidence.)

13           THE COURT:  112.

14           MR. MARCUS:  No objection.

15           THE COURT:  It will be admitted.

16       (Government's Exhibit Number 112 was received in evidence.)

17           THE COURT:  55.

18           MR. MARCUS:  No objection.

19           THE COURT:  It will be admitted.

20       (Government's Exhibit Number 55 was received in evidence.)

21           THE COURT:  93 had been previously admitted.  Any other

22   ones with the doctor by the Government?

23           MR. LARSEN:  I believe you covered them all, Your

24   Honor.

25           THE COURT:  It's up to you.  You keep tabs of this

1  though, right?

2          MR. LARSEN:  I had 47 --

3          THE COURT:  Yeah, yeah, yeah, the ones I went through.

4          MR. LARSEN:  Right.

5          THE COURT:  Okay.  Now, what's the doctor going to

6  testify about?

7          MR. LARSEN:  He's going to testify about his employment

8  at one of the two telemedicine companies that other witnesses

9  have testified.  It's 1st Care MD.  He will testify about a

10 prescription that he signed and will be asked questions about

11 why he agreed or disagreed on that particular prescription.

12         My preliminary questions were just set up to describe

13 telemedicine, not to go into expert territory.

14         THE COURT:  No, no, I wasn't going to sustain that.

15 But he's not on trial, right?

16         MR. LARSEN:  No.

17         THE COURT:  So that's why he doesn't get to tell us how

18 many children he has, how long he has practiced medicine, unless

19 on cross-examination he's challenged on those things, and then

20 it may be on redirect, because we've got to get to the bottom

21 line on all these things.  Is he going to testify about anyone's

22 statements?

23         MR. LARSEN:  He is going to testify -- he is going to

24 testify about the defendant's statements.

25         THE COURT:  Okay.  Well, those are admissible.  Anybody

1  else's?

2        MR. LARSEN:  No.

3        MR. MARCUS:  Did he talk --

4        THE COURT:  Hold on.  You'll get a chance to cross,

5  right?

6        Okay.  So now, I'm not suggesting that there are no

7  exceptions to the hearsay rule like maybe someone's statements,

8  sometimes it's in furtherance of the conspiracy.  I don't know.

9  But if no one suggests that, I'm not going to be making the

10 objections, the responses, and the rulings.  I probably do too

11 much of that already, and I don't like to do that.  But the

12 reason I do it is we've got to keep the trial focused and both

13 sides in this case, not necessarily in every criminal case, but

14 in this case both sides want to expand the scope of the case and

15 that's why I'm going to be tougher on the rules of evidence, but

16 maybe some statements.

17        If someone is part of a conspiracy and you say to me

18 we've got evidence that Ms. So-and-so is a co-conspirator, then

19 her statements, if they're made in furtherance of the

20 conspiracy, would be admissible.  But if they're not statements

21 in furtherance of the conspiracy, they're not admissible even if

22 she testified before, unless it's an inconsistent statement, or

23 a consistent statement, or give me another pigeonhole, but

24 that's how I have to function.  All right?

25        I don't just say have at it, everybody talk about

1    everything you want.  Maybe I would do that if it was a one or

2    two-day trial and you wanted to do that, but since you wanted to

3    make it longer than two weeks -- and you know it's not going to

4    be longer than two weeks, but it's not going to be one week as I

5    hoped, which is fine, I can live with that, and so can the

6    jurors, but that's why.

7            I don't like to interrupt, but I'm going to do that if

8    it's not moving fast, and the witnesses don't want to hang

9    around either on direct or cross.  The longer the direct is, the

10   longer the cross has to be not because of length, but because of

11   the scope.

12           Who is the next witness after this so we don't do this?

13   I've admitted all the exhibits and we had to excuse the jurors.

14           MR. MARCUS:  Your Honor, I do have some concerns about

15   this witness' testimony, the scope of his testimony.

16           THE COURT:  Okay.  Like what?

17           MR. MARCUS:  He's not been noticed as an expert.

18           THE COURT:  Pardon?

19           MR. MARCUS:  There was no expert notice for Dr. Bansal.

20   He's here as a fact witness.  He can talk about the one

21   prescription as a fact witness, but to back door and try to

22   elicit his medical opinions on telemedicine or prescription

23   medicine in general --

24           THE COURT:  Is he going to do that?

25           MR. LARSEN:  No.  Your Honor, I'm going to be asking

1    him about a prescription that --

2           THE COURT:  The one prescription?

3           MR. LARSEN:  Yes.

4           THE COURT:  That he did over the video.

5           MR. LARSEN:  I'm sorry, Your Honor?

6           THE COURT:  Over the phone or over the video, is that

7    how it's done?

8           MR. LARSEN:  Yes, a telemedicine prescription that he

9    signed, and I am going to ask him about some of the defendant's

10   statements, some of which refer to him.

11          THE COURT:  All right.

12          MR. MARCUS:  Statements to him?

13          MR. LARSEN:  Statements that discuss him, yes.

14          MR. MARCUS:  So he's going to show him a document

15   that --

16          THE COURT:  That's already been admitted.

17          MR. MARCUS:  Okay.

18          THE COURT:  That is against a party opponent.

19          MR. MARCUS:  Right, but why would you ask a fact

20   witness an opinion about a statement that's in an email?

21          THE COURT:  I don't know.  What are you going to ask

22   him about the statement?

23          MR. LARSEN:  The defendant calls him a terrible doctor

24   and he is going to react to that, why he's being called a

25   terrible doctor.

1          MR. MARCUS:  Well, he doesn't actually.

2          MR. LARSEN:  He says he's terrible because he doesn't

3    write the scripts that Monty Grow wants him to write.

4          MR. MARCUS:  What exhibit are you referring to?

5          MR. LARSEN:  I am referring to exhibit --

6          THE COURT:  So you are going to argue to the jury what?

7          MR. LARSEN:  I'm sorry, Your Honor?

8          THE COURT:  I'm sorry, this must not be as strong as

9    mine.  I don't know.

10         You're going to argue to the jury that his testimony

11   means what?  See, everybody who comes in to testify has to be

12   linked to some argument that you're making to the jury or some

13   element that you have to prove.  So you're going to say, ladies

14   and gentlemen of the jury, you saw Dr. Bansal and he said this.

15   "This" means -- fill in the blank.  Means what?

16         MR. LARSEN:  This means, Your Honor, the defense --

17         THE COURT:  No, no.

18         MR. LARSEN:  This means --

19         THE COURT:  The jury is there.  You say remember

20   Dr. Bansal said A, B, C.  That means what?

21         MR. LARSEN:  It means that the doctor's prescriptions

22   or prescribing decisions were later undermined by the marketers,

23   and you've heard there was testimony during this trial about --

24   for example, yesterday there was testimony about why 360 grams

25   is the appropriate selection.  You will hear from the doctor

1  that he did not prescribe that and why he feels he should not

2  have prescribed that and he did not give refills.

3            THE COURT:  In his one case or in what case?

4            MR. LARSEN:  In the case -- yes, in the prescription,

5  and the statement by the defendant is directly related to

6  Dr. Bansal's prescribing.

7            THE COURT:  What is the statement?

8            MR. MARCUS:  I'll put it up on the board, Your Honor.

9            THE COURT:  That's okay.  You can read it.

10           MR. MARCUS:  Well --

11           THE COURT:  Read it.  What does it say?  See, if you

12  put it on the board I can see it, but the court reporter can't

13  hear it and thus, in case there's an appeal, that's what

14  happens.

15           MR. MARCUS:  Okay.  He asks --

16           THE COURT:  Who is "he"?

17           MR. MARCUS:  Mr. Grow is emailing with --

18           THE COURT:  Well, the Government is proposing it.  I'm

19  going to have them -- what does he say?

20           MR. LARSEN:  Mr. Grow says --

21           THE COURT:  Quote, say quote.

22           MR. LARSEN:  He says, "You don't use a Dr. Bansal in

23     New York, do you?  He's terrible."  Mr. Speir, who is the

24     owner of one of the two telemedicine companies that we've

25     heard all about, says, "No, I've heard of him, but not one

1      of our docs.  Is he just slow?"  Mr. Grow says, "And he

2      doesn't write half the time and gives zero refills."

3              THE COURT:  Okay.

4              MR. MARCUS:  Well, this is not a doctor in New York,

5  Your Honor.

6              THE COURT:  But those are your client's statements.

7              MR. MARCUS:  About a doctor in New York.

8              MR. LARSEN:  He will say he is the doctor.

9              THE COURT:  Where are you from?

10              THE WITNESS:  Florida, but I am licensed in New York as

11  well.

12              THE COURT:  Okay.  Then you can.  See, that would have

13  been a good question as opposed to his specialty because it is

14  actually relevant, and you'll be able to ask him that.  See,

15  that makes sense, whether it's an internist or psychiatrist,

16  whatever it is, or dermatologist I guess, maybe.  I don't know.

17  They're all good practices.  All right.

18              Now, I'm going to let him ask those questions and then

19  you can cross-examine him and that's what we'll do, but we're

20  not having a medical malpractice case because no one is being

21  charged with medical malpractice, but once you call him, I've

22  got to let them.

23              So who's the next witness?

24              MR. JUENGER:  Laurene Long.

25              THE COURT:  What is she going to say?

1          MR. JUENGER:  She was a co-owner of a durable medical

2   equipment company with Mr. Grow and all I am really offering her

3   for is that her and Mr. Grow signed a Medicare -- it's like the

4   regular Medicare case, Your Honor, they signed the enrollment

5   form in which she and Mr. Grow certified that they would abide

6   by whatever rules were applied, including the Anti-Kickback

7   Statute.  That's it.

8          THE COURT:  And that proves what?

9          MR. JUENGER:  Well, it proves that he has acknowledged

10  in the past that he knew --

11         THE COURT:  Do you have a document with that?

12         MR. JUENGER:  Excuse me?

13         THE COURT:  Do you have a document with that?

14         MR. JUENGER:  Yes.

15         THE COURT:  And what is that exhibit number?

16         MR. JUENGER:  That's Government's Exhibit 2.

17         THE COURT:  That has been admitted already?

18         MR. JUENGER:  It has not.

19         THE COURT:  Okay.  And you have an objection to it?

20         MR. RASHBAUM:  No, Your Honor.

21         THE COURT:  Okay.  It will be admitted.

22     (Government's Exhibit Number 2 was received in evidence.)

23         THE COURT:  So she's going to say, yeah, we signed that

24  together.

25         MR. JUENGER:  Yes, and she would say, if I asked about

1  their business practices, where do they get their patients from,

2  she'll say hospitals, doctors referrals, and she will certainly

3  say they didn't pay for anyone, they didn't pay doctors for

4  scripts.

5          THE COURT:  So you're going to bring in other people

6  who are not committing, according to the Government, fraud.

7          MR. JUENGER:  It's a separate company.

8          THE COURT:  I know we're kind of number one, but

9  hopefully there are a lot of doctors, nurses, even durable

10  medical individuals who do not commit fraud.  How does that help

11  you?

12          MR. JUENGER:  It all goes to Mr. Grow's knowledge and

13  as the Court --

14          THE COURT:  I think the exhibit is admissible, and she

15  can say we both signed that together, but what else was she

16  going to say?

17          MR. JUENGER:  Well, they were in business practice

18  together as Medicare providers for a five-year period and

19  throughout that time, even though their business was failing,

20  they never thought to pay patients, pay doctors, pay home health

21  agencies.

22          THE COURT:  So you want to bring in Mr. Grow's prior

23  good acts in another business.

24          MR. JUENGER:  Well, I want to bring in the fact --

25          THE COURT:  That's what it is, right?

Jury Trial

180

1          MR. JUENGER:  Well --

2          THE COURT:  That he knew that he couldn't violate the

3     law and he didn't violate the law in another business.

4          MR. JUENGER:  That's how they will argue it, Your

5     Honor.

6          THE COURT:  Well, that's what you're saying, too, and

7     the defense is saying, no, no, no, no, what?  You want to

8     exclude the prior good acts, that he didn't commit bad acts.

9          MR. RASHBAUM:  Honestly, I have no idea what she is

10    going to say.  I will tell you that the business they were in

11    was completely different.

12         THE COURT:  Well, I figured that.

13         MR. RASHBAUM:  But I can't exclude anything because I

14    don't know what the woman is going to say.  I'm as blind as you

15    are.

16         THE COURT:  Well, he just told you what the woman was

17    going to say.

18         MR. RASHBAUM:  If she's just going to say that, that

19    he's a good citizen, I'm all for it.

20         THE COURT:  She's going to say that he signed this and

21    he didn't pay any kickbacks.  That's what the Government wants

22    to bring in.

23         MR. JUENGER:  Sure, which has a tendency to prove a

24    central fact in the case which is that he knew the rules, and in

25    the past he abided by the rules.

1           THE COURT:  The defense has said that the defendant is

2     going to take the stand.  Are you going to ask the defendant

3     that?

4           MR. JUENGER:  Ask him what?

5           THE COURT:  Whether he knew about the rules.

6           MR. JUENGER:  I will.

7           THE COURT:  Of course.  And if he says no, will you

8     impeach him with this exhibit?

9           MR. JUENGER:  It certainly would tend to impeach him

10    with it.

11          THE COURT:  And you're able to do that, and if he

12    denies signing that document, you can bring in that witness on

13    rebuttal, but you don't need her.

14          MR. JUENGER:  But she is here today and next week she

15    will be back in North Florida and we have no guarantee that he

16    is going to testify.  I know we keep saying it, but I don't want

17    to have to --

18          THE COURT:  You know, he told the jury.  If you do

19    that, we'll accommodate her for rebuttal if we really need it,

20    if he doesn't take the stand, because it's only fair.  But he's

21    entitled not to take the stand or to change his mind.  His

22    lawyer doesn't dictate that.  But you don't need her.  You only

23    need her for the exhibit.

24          MR. JUENGER:  Well, that's part of it.

25          THE COURT:  That's the only part of it.  What's the

1   other --

2          MR. JUENGER:  Well, I think there are a few other

3   relevant questions.

4          THE COURT:  Like what?  That's why I'm asking.

5          MR. JUENGER:  Well, that, in fact, it was him that

6   signed it, that they had this business that lasted for a

7   five-year period, that it wasn't successful and that they could

8   have paid patients.

9          THE COURT:  They could have cheated and violated the

10  law, but they didn't.

11         MR. JUENGER:  Correct.

12         THE COURT:  And the defense has an objection to the

13  Government bringing up --

14         MR. JUENGER:  Okay.

15         THE COURT:  Hold on.  The defense has an objection -- I

16  know you all like switching seats, and maybe that's what is

17  confusing you in a different courtroom.  The defense wants to

18  keep out the fact that the defendant did not violate the

19  kickback statute in another business.  Am I right?

20         MR. RASHBAUM:  No, I'm all for them asking that as long

21  as it's limited to that.

22         THE COURT:  Well, the other side of the coin is he knew

23  that it was against the law.

24         MR. RASHBAUM:  I don't have objection to them putting

25  in the document.  I don't have objection to them asking about

her signing the document, and I don't have an objection to them

saying Mr. Grow was a good citizen with her and didn't violate

the law.  I'm fine with all three of those things.

THE COURT:  So if she says that, you're not going to

cross-examine her.

MR. RASHBAUM:  Oh, no, I didn't say that.

THE COURT:  Well, then we're not going to call her.

You're not going to call her because the exhibit is in.

Are you denying that he signed that?

MR. RASHBAUM:  I don't know.  They'll get to ask him.

I mean, I'm not making any statement whether he signed --

THE COURT:  Will you stipulate that that's his

signature?

MR. RASHBAUM:  Can I see the document?

THE COURT:  Yeah, of course.  It probably takes longer

to do that than to bring in the witness.

MR. RASHBAUM:  One moment, Your Honor.

THE COURT:  Sure.

(There was a brief discussion off the record.)

THE COURT:  All right.  You can bring in the witness

for those questions only:  Do you know Mr. Grow, what business

were you in with him, look at this exhibit that I've admitted.

Show her.  Is that him?  Yes, we signed it.  There will be no,

"no, we didn't get any kickbacks."  You don't bring in a

witness --

1          MR. JUENGER:  No problem, Your Honor.

2          THE COURT:  -- to say he didn't commit the crime.  It's

3     like calling someone, did he ever commit a burglary with you in

4     a burglary case?  No.  That doesn't mean that he didn't commit

5     this burglary.  It doesn't mean that he did.  It doesn't mean

6     anything.

7          The fact that the rules are there and he read it,

8     that's relevant.  I'll allow you to do that.  So that should be

9     relatively short because the cross will be limited to that,

10    which is not being disputed anyway.  So usually if things are

11    not disputed, there's not much cross, but I'm not limiting

12    arbitrarily the cross.

13         Next witness.  See, that way we don't have sidebars.

14         MR. LARSEN:  Your Honor, Rosalinda Rambaran will be the

15    next witness.

16         THE COURT:  Who is she?

17         MR. LARSEN:  She is being --

18         THE COURT:  We have to use the mic.  Remember?  We're

19    not used to this courtroom and I'm happy.

20         MR. LARSEN:  Rosalinda Rambaran.

21         THE COURT:  Hold on, I've got to look her name up.

22    Okay.  Rambaran, R-a-m-b-a-r-a-n.  And she is what?

23         MR. LARSEN:  She is a Tricare beneficiary.

24         THE COURT:  Okay.

25         MR. LARSEN:  And her son as well, very short testimony.

1    THE COURT:  All right.  And then, exhibits with them or

2  not?

3    MR. LARSEN:  I think just maybe one exhibit.

4    THE COURT:  Find out what it is so we don't have --

5    MR. LARSEN:  I'm going to use 67, which has already

6  been admitted.

7    THE COURT:  If it's already been admitted, you can do

8  it.  All right.  And then who?

9    MR. LARSEN:  The only one that hasn't been admitted I

10  believe, Your Honor, that I intend to use with her is Exhibit

11  32.

12    THE COURT:  Hold on, let me find it.  Thank you.

13    MR. LARSEN:  32.

14    THE COURT:  32, email between Monty Grow and Rosa

15  Rambaran.  Since you have initials, I assume that's what it is,

16  right.

17    MR. LARSEN:  Yes, that's it, Your Honor.

18    THE COURT:  Any objection?

19    MS. MEYERS:  I don't have an objection -- well, Your

20  Honor, Exhibit 67 is --

21    THE COURT:  No, no, I'm sorry.  My accent gets to me in

22  the afternoon.

23    THE COURT:  32 is the exhibit we're talking about.  Any

24  objection to 32?

25    MS. MEYERS:  Can show me a copy?

1    THE COURT:  See, that's why I don't want to do it in

2  front of the jury.  Two things jurors hate the most are sidebars

3  and legal objections.  And what's the other one?  Voir dire.

4    MR. MARCUS:  Judge, is it okay if Mr. Grow just runs to

5  the restroom while we're talking about witnesses?

6    THE COURT:  No.

7    MS. MEYERS:  No objection to 32, Your Honor.

8    THE COURT:  32 is admitted.

9    (Government's Exhibit Number 32 was received in evidence.)

10    THE COURT:  What other?

11    MR. LARSEN:  The other one is 174.

12    THE COURT:  174.  Everything we do in court is a

13  critical stage.  We're in the middle of a jury trial.  I could

14  not have the defendant, of all people, leave and then have a

15  2255 saying I did that.  No, no.

16    What number is it?

17    MR. LARSEN:  174.

18    THE COURT:  174, an employee personnel file on this

19  witness.  The whole file?

20    MR. LARSEN:  Actually, I think that's on the following

21  witness.  Just the one page, it's an employment application,

22  it's part of the file.

23    THE COURT:  By Rambaran.

24    MR. LARSEN:  Rashaan Rambaran, the second witness.

25    THE COURT:  The son.

1          MR. LARSEN:  Yes.

2          THE COURT:  See, when you use initials we don't know

3  which R.R. it is, right?  You've got to say something else.  So

4  174 is the son's one-page personnel file to show what?

5          MR. LARSEN:  To show where he was working when he was

6  hired by the pharmacy, on his employment application to the

7  pharmacy.  It's his employment application to PCA.

8          THE COURT:  Because that proves what?

9          MR. LARSEN:  It proves that this whole hiring thing was

10  a sham.

11          THE COURT:  The hiring is the fraud in this case.

12          MR. LARSEN:  It's part of the alleged fraud.  It's part

13  of the scheme, yes, it is, the charged scheme.

14          THE COURT:  That he was hired to commit a fraud.

15          MR. LARSEN:  No, no, that these sales reps were hired

16  to cover-up the illegal conduct as W-2 employees.

17          THE COURT:  And he is going to say that, that he was

18  hired for that purpose?

19          MR. LARSEN:  No, he's going to say what -- he's going

20  to say what he was doing at the time.  The jury can draw

21  whatever conclusion they want.  I'm really only going to show

22  him the document for two minutes and ask him a couple of

23  questions about it.

24          THE COURT:  Like what, were you an employee?  And he is

25  going to say yes.

Jury Trial

```
 1              MR. LARSEN:  Did you get hired?

 2              THE COURT:  And he's going to say yes?

 3              MR. LARSEN:  Yes.  I was going to ask him about what

 4   training he got, if any.

 5              THE COURT:  And he's going to say very little.

 6              MR. LARSEN:  Probably, something along those lines.

 7              THE COURT:  And then, that shows what?

 8              MR. LARSEN:  Well, Your Honor, it shows that when this

 9   pharmacy was hiring en masse these people, it was a sham.

10              THE COURT:  Okay.  And the pharmacy was owned by whom?

11              MR. LARSEN:  It was owned by several entities and

12   Mr. Grow was conspiring with the pharmacy.  It's part of the

13   charged scheme.

14              THE COURT:  So you want to make sure the pharmacy is

15   convicted in this case.  I missed that.

16              MR. LARSEN:  No, Your Honor.

17              THE COURT:  All right.

18              MS. MEYERS:  Your Honor, all it calls for, in my

19   understanding of what the Government wants to --

20              THE COURT:  Do you have an objection to 174?

21              MS. MEYERS:  I don't have an objection to

22   admissibility, Your Honor, but the page --

23              THE COURT:  Then it will be admitted and then you can

24   cross.

25              MS. MEYERS:  Okay.
```

1       (Government's Exhibit Number 174 was received in evidence.)

2           THE COURT:  If that's what you want to do, that's what

3  you do.  It's the afternoon.  Any other exhibits?

4           MR. LARSEN:  The last one, Your Honor, is Exhibit 172,

5  it's a box full of medication.

6           THE COURT:  A box full of medication?

7           MR. LARSEN:  It's just a box that this particular

8  witness turned over to the Government.

9           THE COURT:  Which witness?

10          MR. LARSEN:  The Rambaran witnesses.

11          THE COURT:  The son.

12          MR. LARSEN:  The son and the mother, they live

13 together.

14          THE COURT:  Okay.  You have the box?

15          MR. LARSEN:  We do.

16          THE COURT:  So the jurors can see the medicine.

17          MR. LARSEN:  Just so the jurors can actually see --

18          THE COURT:  Any objection?

19          MS. MEYERS:  No, Your Honor.

20          THE COURT:  Okay.  It will be admitted.

21      (Government's Exhibit Number 172 was received in evidence.)

22          THE COURT:  That's it?

23          MR. LARSEN:  That's it for those two witnesses, Your

24 Honor.

25          THE COURT:  They will be short.

 1          MR. LARSEN:  They will be.

 2          THE COURT:  Next witness.

 3          MR. LARSEN:  Your Honor, we have witnesses.  I need to

 4   confer with my agent, who is not here, who is actually

 5   physically here.  We're kind of shuffling them in and out.  We

 6   do intend to call them until the Court is done with business

 7   today.

 8          THE COURT:  Okay.  Or until you finish resting,

 9   whichever comes first.

10          MR. LARSEN:  We think that will be tomorrow.

11          THE COURT:  Yeah, I know.

12          MR. JUENGER:  It will be by noon.

13          MR. LARSEN:  Yeah, we expect it by lunchtime.

14          MR. RASHBAUM:  By lunchtime?  I didn't hear.

15          MR. LARSEN:  We expect that we will be resting.

16          THE COURT:  All right.  Go to the bathroom and come

17   back.

18          MR. RASHBAUM:  Judge --

19          THE COURT:  You don't want to go to the bathroom.

20          MR. RASHBAUM:  I do, but can we just have a two-second

21   sidebar to update you on the other issue?

22          THE COURT:  On your son?

23          MR. RASHBAUM:  Yeah.

24          THE COURT:  What is the issue?  You can go ahead and

25   tell me.

1      MR. RASHBAUM:  He's okay now, so we're good for today.

2  Tonight may be interesting, but we will see.

3      THE COURT:  I'm sure he'll be fine.

4      MR. RASHBAUM:  Okay.  I just wanted to let the Court

5  know.

6      THE COURT:  Thank you.  Go to the bathroom and come

7  back.

8      MR. RASHBAUM:  Thank you, Your Honor.

9      THE COURT:  When I say go to the bathroom, it's not an

10  order; it's a suggestion based upon what you all have said

11  before.  We're taught to hold it at judicial college.

12      (There was a brief recess.)

13      THE COURT:  Everybody is here?

14      MR. LARSEN:  Yes.

15      THE COURT:  All right.  Bring in the jurors.

16      THE COURT SECURITY OFFICER:  All rise for the jury.

17      (The jury entered the courtroom.)

18      THE COURT:  Thank you, folks.  I think we have

19  everybody, right?

20      All right.  Go ahead.  I've admitted without objection

21  Exhibits 47, 49, 58, 64, 110, 92, 112, 55 and 93.

22      All right.  Go ahead.

23      MR. LARSEN:  Thank you.

24  BY MR. LARSEN:

25  Q.  Dr. Bansal, before the break we were talking about your

Bansal - Direct

192

1   occupation.  Where do you hold licenses?

2   A.   19 states, Florida --

3   Q.   How about if I just ask you about a couple?

4   A.   Sure.

5   Q.   Are you licensed in -- you said Florida.  Are you licensed

6   in New York?

7   A.   Yes.

8   Q.   Okay.  Do you recall a specific telemedicine company by the

9   name of 1st Care MD?

10  A.   Yes.

11  Q.   How do you recall that?

12  A.   I worked for them.

13  Q.   When did you work for them?

14  A.   I think it was 2014 to '15.

15  Q.   Who at 1st Care do you recall dealing with?

16  A.   It was an individual named Wayne Moore.

17  Q.   Do you know an individual or familiar with the name Chris

18  O'Hara?

19  A.   I've seen the name, but that's all.

20  Q.   Okay.  I am going to show you what's been marked as -- or,

21  excuse me -- what's been admitted as Government's Exhibit 49.

22  I'll put it on the ELMO.  Dr. Bansal, do you recognize this

23  document?  I realize it's blurry.  I trying my best to focus.

24          Do you recognize this document?

25  A.   My monitor is not working.

Bansal - Direct

193

1    MR. LARSEN:  May I approach the witness with the

2  exhibit?

3    THE COURT:  Of course.  That's the way we used to do it

4  for years.

5    THE WITNESS:  What was the question again?

6  BY MR. LARSEN:

7  Q.  Do you recognize this document?

8  A.  Yes, I do.

9  Q.  What is it?

10  A.  It is a prescription I wrote for a patient.

11  Q.  What is the name of the patient?

12  A.  Manda Martini.

13  Q.  When was this prescription written?

14  A.  11-24-14.

15  Q.  Was this written at a time you were working at 1st Care MD?

16  A.  Yes.

17  Q.  What type of medications are you prescribing on this

18  prescription?

19  A.  I'm prescribing a medicine for scar/post-op pain.

20  Q.  What type of medication is it?

21  A.  It's a transdermal, so it's a topical medicine.  It's used

22  to treat pain as well as scars.

23  Q.  Okay.  And do you see there are several boxes here to check

24  under this sc-01?

25  A.  Yes.

Bansal - Direct

194

1   Q.   Now, there's a listing of formulations.  May I just take

2   this?

3   A.   Sure.

4   Q.   There's a listing of formulations -- next to sc-01 and

5   there's one called fluticasone, 1 percent.  And then

6   levocetirizine --

7   A.   Yes.

8   Q.   -- 2 percent, prilocaine 3 percent, and then it looks like

9   pentoxifylline.

10        THE COURT:  Maybe he should say it.

11  BY MR. LARSEN:

12  Q.   And then the last.  What are those?

13  A.   So the fluticasone is a non-steroidal anti-inflammatory drug

14  somewhat similar to Ibuprofen, Advil, Motrin, those type of

15  medicines.  The second one, the levocetirizine, I believe it's

16  used for dermal reactions.  The prilocaine is an anesthetic.

17  The pentoxifylline is also used for vascular type issues in the

18  skin, basically to reduce a reaction.  And the gabapentin, which

19  is the last medicine, is what's called a neuropathic medicine,

20  and what that does is treat pain caused specifically by nerve

21  irritation.

22  Q.   The list of those medications that you just discussed, what

23  type of ingredients are those?  Are they active, nonactive?

24  A.   They are active ingredients.

25  Q.   Okay.  So when you are prescribing, for example, this

Bansal - Direct

195

 1   formulation, is it that you're approving the active ingredients

 2   that are next to the box you checked?

 3   A.   That's correct.

 4   Q.   You said it was a topical, like a cream.  What about the

 5   ingredients that go into binding, like the binding agents, are

 6   those active ingredients?

 7   A.   No, those are inactive ingredients.

 8   Q.   With respect to the inactive ingredients, does your

 9   prescription in any way dictate what inactive ingredients should

10   be used with that patient and prescription?

11   A.   No.

12   Q.   Who or what makes that decision?

13   A.   It's the pharmacist who creates that formula.

14   Q.   For the inactive?

15   A.   Correct.

16   Q.   Okay.  Thank you.

17         Now, I'd like to show you -- you prescribed the sc-01

18   formulation, and there's a box under quantity, 30-day.  It says

19   240 grams and then refills, none.

20         Can you tell the jury why you prescribed 240 grams of

21   this particular formulation?

22   A.   Sure.  So this is a new medicine for this patient, so the

23   goal whenever you prescribe a medicine is to see if it's

24   effective for the patient, so I would generally, for these type

25   of medicines, order a mid-range quantity so that if the patient

1   is not getting any benefit, that they are not wasting extra

2   medicine for something that's not working for them.

3        Similarly, I don't write refills for a couple of

4   reasons; one, because we want to see if it's effective.  So if

5   they're written for refills, I don't want them to keep on

6   getting refills if it's not working or they're having a reaction

7   or allergy or something to that effect.  And then the second

8   reason is they need to follow-up to make sure that it actually

9   is working and they're not getting any kind of safety reaction,

10  for example, an allergy or causing other side effects.  So they

11  need to follow-up with a doctor and this kind of makes the

12  patient follow-up with the doctor to make sure it's working and

13  that it's safe.

14  Q.  Okay.  I'm going to show you the first page, it's a Patient

15  Info/Profile, and at the bottom it says suggested/requested

16  products, quantities, and you'll see here it says, sc-01 for

17  scar, and then it says 360 grams, six refills, and below that,

18  general wellness metabolic supplement.

19        Did you prescribe a metabolic supplement for this

20  patient?

21  A.  No, I didn't.

22  Q.  Why didn't you?

23  A.  Because it's basically a vitamin and my feeling on that is

24  they can go to Publix or Whole Foods or CVS and get pretty much

25  the same thing.

1  Q.  Okay.  Now I'm going to show you -- I'm going to take

2  another try at this.  I'm going to show what's been admitted as

3  Government's Exhibit 47.  It's an email from Monty Grow and you

4  mentioned earlier you heard the name Christopher O'Hara

5  associated with 1st Care MD?

6  A.  Correct.

7  Q.  And this is dated the same day, November 24, 2014 and it

8      says, script, and Mr. Grow says, "Got this email, but don't

9      understand.  After your first doctor would not write a

10     script for scar, I had my other telemed network go to work

11     on it.  They had Dr. Bansal do a consult and he wrote the

12     sc-03 and gave no refills.  I then asked you to have another

13     consult done, and lo and behold, it's Dr. Bansal again and

14     he wrote sc-03 after I recommended sc-03 specifically."  And

15     then he follows it up with "sc-02 and sc-03 are not

16     available.  Dr. Bansal also does not write refills.  Do you

17     have another doctor in New York to consult this patient, or

18     do I need to pursue other avenues?"  Thanks, Monty."

19         What is your reaction to this, to his statements about

20  you here?

21         MR. MARCUS:  Objection, Your Honor.

22         THE COURT:  Grounds.

23         MR. MARCUS:  Calls for an opinion and speculative, his

24  reaction to an email.

25         THE COURT:  Does the email mention him?

Bansal - Direct

1      MR. MARCUS:  Yeah, but he's not part of the

2  conversation.  He doesn't know the back and forth.

3      THE COURT:  You can cross-examine him on it, but I'll

4  overrule it.  Go ahead.

5      THE WITNESS:  So when I first saw that email, basically

6  he wanted a specific medicine and he wants to go to another

7  doctor which, from my standpoint, that's fine if he wants to go

8  to another doctor, but that was my recommendation based on my

9  medical expertise.

10  BY MR. LARSEN:

11  Q.  I am going to show you Government's Exhibit 64, it's been

12  admitted, an email from Monty Grow to Larry Speir.  Do you know

13  Larry Speir?

14  A.  No, I don't.

15  Q.  Okay.  I see a reference here again on Wednesday, this is

16      about a few weeks later, December 17, 2014, Monty Grow

17      wrote, "You don't use a Dr. Bansal in New York, do you?

18      He's terrible."  And the response by Mr. Speir is, "Nope.  I

19      have heard of him but not one of our docs.  Is he just

20      slow?"  Mr. Grow says, "And he doesn't write half the time

21      and gives zero refills."

22      What is your reaction to Mr. Grow characterizing you as

23  terrible and his explanation for why you're terrible, at least

24  according to the document, is that you don't write half the time

25  and give zero refills?  What do you think "write half the time"

1   means?  Do you know?

2            MR. MARCUS:  Objection.

3            THE COURT:  I'll sustain the objection now.  I allowed

4   it at first, but now I'll sustain it.  I allowed it at first to

5   give context to the admissibility of the document which was

6   admitted without objection.  His reaction is really not of

7   moment.

8            MR. LARSEN:  Okay.

9            THE COURT:  Whether he is a good doctor or not -- yes,

10  you have a question.

11           MR. MERIDA:  We can't see.

12           THE COURT:  You can't see it?  The monitors are not

13  showing?  But in any event -- do you have extra copies?  Give

14  the original to the first juror and she'll pass it around.

15           MR. LARSEN:  They're on now?  I will show it again.

16           THE COURT:  Any other questions?

17           MR. LARSEN:  Briefly, Your Honor.

18           THE COURT:  Go ahead.

19  BY MR. LARSEN:

20  Q.  When I asked you a moment ago, Dr. Bansal, about the

21  prescription for Ms. Martini --

22  A.  Yes.

23  Q.  And I am talking specifically about the exhibit --

24           THE COURT:  No, just ask the question.  You don't have

25  to give a preamble.

1    BY MR. LARSEN:

2    Q.  Do you recall the discussion in the exhibit about the

3    availability of the products, that sc-02 and sc-03 were not

4    available?

5    A.  Okay.

6    Q.  Were you ever told that these formulations that were on the

7    prescription pad were unavailable?

8    A.  No.

9    Q.  I'm going to show you Exhibit 110, which has been admitted

10   without objection.  It's a couple of weeks later.

11          Mr. Grow states to Christopher O'Hara with respect to

12      the subject scripts, "Chris, I hope all is well.  Just

13      wanted to send you a quick note.  I received three scripts

14      back today from two different doctors and neither one of

15      them wrote for 360 grams.  This is a tremendous difference

16      in reimbursement.  Is there a way we can fix this?  I hope

17      you have a safe and Happy New Year."

18          Do you, based on your practice, have a problem with

19   marketers receiving prescriptions after they leave your hand?

20          MR. MARCUS:  Objection, Your Honor.

21          THE COURT:  Grounds.

22          MR. MARCUS:  Well, scope, again opinion.  He is not

23   here again --

24          THE COURT:  You don't have to say "again" just because

25   I'm thinking about it.

Bansal - Direct

201

 1          MR. LARSEN:  I can ask about --

 2          THE COURT:  About whether he has a problem as a doctor

 3   with some marketer saying something.  Could you ask that

 4   question of a nondoctor?

 5          MR. LARSEN:  I'm asking --

 6          THE COURT:  I'm sorry, the mic, I know it goes off and

 7   on all the time.

 8          Could you ask that question of a nondoctor?

 9          MR. LARSEN:  Well, it's a fact specific question to

10   what he did.

11          THE COURT:  I'm sorry.  Would you ask that question of

12   a nondoctor?  You wouldn't, right?

13          MR. LARSEN:  These facts, no, I wouldn't

14          THE COURT:  Of course not.  So he's going to give you

15   an opinion of what he thinks is the right thing to do.

16          MR. LARSEN:  Not an expert opinion, Your Honor.

17          THE COURT:  I didn't say an expert.  I said an opinion

18   on what is the right thing to do.

19          MR. LARSEN:  I'll withdraw the question, Your Honor.

20          THE COURT:  All right.

21          MR. LARSEN:  I just have one question, one final

22   question.

23   BY MR. LARSEN:

24   Q.  Dr. Bansal, did you know at any time that marketers were

25   receiving prescriptions after they left your hands?

Bansal - Direct

```
 1                MR. MARCUS:  Objection, Your Honor.

 2                THE COURT:  Grounds.

 3                MR. MARCUS:  Foundation, same objection.

 4                THE COURT:  How would he know that?  What was the

 5    question?

 6                MR. LARSEN:  I asked if he knew it.  The answer is

 7    either yes or no.

 8                THE COURT:  Okay.  And if he knew --

 9                MR. MARCUS:  He is asserting facts --

10                THE COURT:  Hold on a second.  If he knew what?

11                MR. LARSEN:  Whether the prescriptions after they left

12    the doctor's hands --

13                THE COURT:  How many prescriptions are we talking

14    about?

15                MR. LARSEN:  We're talking about Manda Martini's

16    prescription.

17                THE COURT:  That's one prescription.  You used the word

18    "S," so that's what confuses me, I'm sorry.  Whether that

19    prescription -- what happened to it?

20                MR. LARSEN:  As the witness testified, Your Honor, the

21    script, there was discussion with Mr. Grow and Mr. O'Hara --

22                THE COURT:  We are talking about this witness.

23                MR. LARSEN:  Right.

24                THE COURT:  You're asking him what about this sole

25    prescription?  What are you asking him?
```

1           MR. LARSEN:  Did he know that the prescription, after

2    he signed the prescription, that it went to Monty Grow?

3           THE COURT:  I'll overrule the objection.  Did you know

4    that?

5           THE WITNESS:  No.

6           THE COURT:  All right.

7           MR. LARSEN:  Thank you, Your Honor.

8           THE COURT:  All right.  Cross-examination, if any.

9           Let me straighten one thing out.  Remember when they

10   called the doctor -- and I always say that about every

11   professional, and based upon some of the defense here, when he

12   wanted to know the specialty and I said I'm sure he's a good

13   doctor, and I didn't mean for you all to think that I favor one

14   witness or another.  I don't get involved in that.  I just

15   wanted the prosecutor to move along, not with the expertise and

16   all of that, but get down to the bottom line of what he

17   testified about which had to do with the one prescription.  So

18   you probably don't remember me saying that, but I said that.  I

19   don't want you to think that I -- since apparently there's an

20   issue of who's good and who's not, I express no opinion because

21   I have no opinion.  Sometimes I do have an opinion and I still

22   don't express it, but here I have no opinion.

23          I just wanted -- it was a saying, like a good police

24   officer or a good witness and that type of thing, just for the

25   case to move along, but I thought it would be right for me to

1   straighten that out in case anybody misunderstood it.

2          Go ahead, Mr. Marcus.

3          MR. MARCUS:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. MARCUS:

6   Q.  Good afternoon, Dr. Bansal.

7   A.  Good afternoon.

8   Q.  You said on direct examination you thought you worked for

9   this telemedicine company for about a year, between 2014 and

10  2015?

11  A.  Yes.

12  Q.  Okay.  Would it surprise you if on your resumé you actually

13  worked for this company into 2016?

14  A.  That is when I sent my resignation letter, but the last time

15  I did prescriptions was in mid 2015.

16  Q.  Okay.  And you were asked questions about one prescription

17  for one patient on direct examination, Ms. Martini.  Do you

18  recall that?

19  A.  Yes.

20  Q.  And you were explaining your medical decision-making, your

21  individual medical decision-making, correct?

22  A.  Yes.

23  Q.  You're not here to second-guess the prescriptions that were

24  written by dozens of other physicians you've never met, are you?

25  A.  No.

Bansal - Cross

1   Q.   For example, you don't know a Dr. Sara Garcia who wrote

2   prescriptions for patients involved in this case?

3   A.   No.

4   Q.   Now, let's talk -- I'm just going to come over here so I can

5   show the documents were you asked about.

6         You did a telemedicine consult related to Ms. Martini

7   in November of 2014.  Do you recall that?

8   A.   Yes.  That's the date on the document, yes.

9   Q.   Yes.  And you were paid by the telemedicine company a fee

10  for your time for that consult?

11  A.   That's correct.

12  Q.   Okay.  Do you recall how much they paid you?

13  A.   I don't know.  It would be a guess.

14  Q.   You were not paid to write a prescription, were you?

15  A.   That's right, I was not paid to write a prescription.

16  Q.   You were paid for your consult time regardless of the

17  decision you made, whether you wrote a prescription or did not

18  write a prescription?

19  A.   That's correct.

20  Q.   Okay.  Now, let me show you Exhibit 47 which you were shown.

21  This is on November 24th, and obviously, you are not on this

22  email.  This is an email between two other people, correct?

23         THE COURT:  This is a particular exhibit?

24         MR. MARCUS:  This is Government's Exhibit 47, yes.

25         THE COURT:  Okay, thank you.

Bansal - Cross

206

1    MR. MARCUS:  It was just shown.

2    THE COURT:  I know.  I just wanted to make sure.

3    Thanks.

4    BY MR. MARCUS:

5    Q.  And you said you've never spoken to Mr. Grow yourself,

6    correct?

7    A.  Not that I ever recall.

8    Q.  Right.  You've never had any communications with Mr. Grow?

9    A.  No.

10   Q.  And you said you recognize Mr. O'Hara's name, but you've

11   never spoken with him or met him as well?

12   A.  Correct.

13   Q.  Okay.  Do you know if Mr. O'Hara had a management position

14   for the telemedicine company you were doing a consult for?

15   A.  I think he was the head or executive of the company.

16   Q.  Okay.  And have you ever had conversations with any of the

17   pharmacists at a pharmacy called Patient Care of America?

18   A.  Not that I ever recall.

19   Q.  Sometimes they use the acronym PCA.  Do you know that?  Have

20   you talked to anyone at PCA?

21   A.  Not that I recall.

22   Q.  Okay.  So you were shown this email by Mr. Larsen and you

23   were asked about whether -- let me know if you can see it, I'll

24   just highlight it with my finger -- whether two scar cream

25   formulas, you see sc-02 and sc-03, whether they were available

Bansal - Cross

207

1   or not.

2           Do you see that in the email, that reference?

3   A.  Yes.  What was the beginning of your question again?

4   Q.  You have no personal knowledge as to whether those two

5   formulas were or were not available on November 24th at PCA

6   pharmacy, do you?

7   A.  That's correct, I do not.

8   Q.  Okay.  You have no reason to doubt the statement is true?

9   A.  No.

10  Q.  And we will go actually to the next day.  This is again

11  Government's Exhibit 49.

12          Can you see the words next to the attachment?

13  A.  Yes.

14  Q.  Does that say "Manda Martini scar revised?"

15  A.  Yes.

16  Q.  Okay.  And the email says that the doctor, meaning you, who

17  originally wrote the prescription for sc-03 has now revised it

18  to sc-01.  Do you see that?

19  A.  Yes.

20  Q.  I think on direct you said you don't have a memory as to

21  which formulas were available on any particular day in 2014?

22  A.  That's correct.

23  Q.  Okay.  Now, let's just walk through the attachments to the

24  documents, focus on those.

25          So this was the profile sheet sent to you to give you

Bansal - Cross

1  information about the patient prior to your consultation?

2  A.  That's correct.

3  Q.  And in the comment section, this is a patient who had a

4  stomach surgery and had multiple scars?

5  A.  Yes, that's what it says.

6  Q.  Right.  And she also wanted metabolic vitamin, right?

7  A.  Yes.

8  Q.  And you talked about how in your individual opinion, you

9  didn't write a vitamin prescription because you think there are

10 over-the-counter vitamins that are equally efficacious for the

11 patient, correct?

12 A.  Correct.

13 Q.  And you had a phone consultation with Ms. Martini.  Do you

14 remember the particulars of the consultation?

15 A.  I don't remember the particulars, but I had a consult.

16 Q.  Okay.  You would always have a consultation, right?

17 A.  That's correct.

18 Q.  And I want to just focus, this is dated November 24th.  Let

19 me just -- I know this is hard to read.  And that's your

20 signature, right?

21 A.  Yes.

22 Q.  Now, this is the revised prescription and so let me blow

23 this up so everyone can see this.  Do you see here that you've

24 now checked sc-01?

25 A.  Yes.

Bansal - Cross

1   Q.   So you made a change from sc-03 to sc-01?

2   A.   Correct.

3   Q.   And you made a decision that sc-01, that formula, would be

4   efficacious for this patient based on your consultation?

5   A.   Yes.

6   Q.   And it's entirely consistent with your revision of this

7   prescription that sc-03, the formula you had chosen originally,

8   was not available to be filled by the pharmacy?

9   A.   Say that once more.

10  Q.   Well, you've made a change from sc-03 and now you've changed

11  the prescription to sc-01.

12  A.   Yes.

13  Q.   Okay.   In your judgment, both of those formulas would be

14  equally good for this patient.   You agree with that?

15  A.   Correct.

16  Q.   And there was some reason why you switched from 3 to 1.   You

17  agree with that?

18  A.   Yes.

19  Q.   And I assume -- let me ask you just directly.   Your decision

20  would not have been because sc-01 might carry a higher

21  reimbursement rate from an insurance company.   Was that the

22  reason you made the change?

23  A.   No.

24  Q.   It was a medical reason, right?

25  A.   Correct.

Bansal - Cross

1   Q.   Now, if sc-03 wasn't available to be filled, would that be a

2   good reason to switch to sc-01 for this patient?

3   A.   Yes, in this particular case.

4   Q.   Right.  And compounding pharmacies, right, they make

5   formulas?  You talked about some of the ingredients on direct,

6   did you not?

7   A.   Yes.

8   Q.   Okay.  And so if certain active ingredients might not be

9   available or a certain formula wasn't being compounded by a

10  pharmacy and a formula could not be filled, you might be asked

11  to consider another formula for a patient, correct?

12  A.   Yes.

13  Q.   Okay.  By the way, on this revised prescription that you

14  signed the next day, can you just look at the metabolic vitamin

15  section and tell me did anyone check a vitamin here?

16  A.   No.

17  Q.   No one changed your prescription?

18  A.   On the vitamin.

19  Q.   You made a judgment that the vitamin in this case, right,

20  you didn't think it appropriate and you kept to your medical

21  decision for this patient?

22  A.   That's correct.

23  Q.   Let me just ask you this, Dr. Bansal.  You were shown some

24  emails that didn't involve you.  You have no factual knowledge

25  of when patients call Mr. Grow and what their communications

Bansal - Redirect

1    are, do you?

2    A.   No, I don't.

3    Q.   And you don't have any knowledge of communications between

4    patients and the pharmacy, for example?

5    A.   No.

6    Q.   Right.  You never talked to anyone at PCA?

7    A.   Correct.

8    Q.   You just know that on -- in Ms. Martini's case, you did a

9    phone consultation with her and you made a medical judgment that

10   had nothing to do with whether anyone offered you any sort of

11   kickback or inducement, right?

12   A.   Correct.

13   Q.   Let me ask you:  How long do you think you talked to

14   Ms. Martini on the phone when you did your consultation?

15   A.   I couldn't say.  Usually they were between five and seven

16   minutes.

17   Q.   Okay.  And that was enough time, based on the information

18   you had from the form and talking to the patient, to make a

19   decision as to whether prescriptions would be warranted for her,

20   correct?

21   A.   Correct.

22           MR. MARCUS:  Nothing further, Your Honor.

23           THE COURT:  Redirect.

24           MR. LARSEN:  Yes, briefly, Your Honor.

25                     REDIRECT EXAMINATION

Bansal - Redirect

212

1   BY MR. LARSEN:

2   Q.  Dr. Bansal, you have been testifying about this prescription

3   for Ms. Martini.  I just want to ask you a follow-up question

4   here.

5           Now, you testified that you did approve a prescription

6   for sc-01, and that you did approve a prescription for 240 grams

7   and no refills; is that right?

8   A.  Yes.

9   Q.  And, as Mr. Marcus just asked, you did not approve a

10  prescription for a vitamin or for a pain cream; is that right?

11  A.  Correct.

12  Q.  So if the billing data indicated that this particular

13  patient was billed -- or that Tricare was billed for a pain

14  cream, a vitamin, and anything more than 240 grams and zero

15  refills, you would not have authorized a dispensement of any of

16  those formulations, would you?

17          MR. MARCUS:  Objection, Your Honor.

18          THE COURT:  Grounds.

19          MR. MARCUS:  Again, it's a hypothetical without

20  foundation.  It's not based on his factual knowledge.

21          THE COURT:  Overruled based on the cross.  Go ahead.

22          THE WITNESS:  That's correct.

23          MR. LARSEN:  Thank you.

24          THE COURT:  Thank you, Doctor.  Have a good day.

25          THE WITNESS:  Thank you.

1            THE COURT:  Next witness is?

2            MR. JUENGER:  Laurene Long.

3            THE COURT:  Raise your right hand, please.

4        LAURENE ANN LONG, GOVERNMENT'S WITNESS, SWORN.

5            THE COURT:  Have a seat, please, and tell us your name.

6            THE WITNESS:  My name is Laurene Ann Long.

7            THE COURT:  Thank you.  How do you spell your first

8    name?

9            THE WITNESS:  L-a-u-r-e-n-e.

10           THE COURT:  Thank you.

11                     DIRECT EXAMINATION

12   BY MR. JUENGER:

13   Q.  Ms. Long, where do you live?

14   A.  In Inverness, Florida.

15           THE COURT:  Can you speak a little louder into that mic

16   so the jurors --

17           THE WITNESS:  Inverness, Florida.

18           THE COURT:  Thank you very much.

19   BY MR. JUENGER:

20   Q.  And where is that, more or less, in Florida?

21   A.  North central.

22   Q.  And were you a co-owner of a company that was started up

23   back in 2004?

24   A.  Yes.

25   Q.  What was the name of that company?

Long - Direct

1   A.   Community Oxygen and Medical.

2   Q.   And did you have a co-owner?

3   A.   Yes.

4   Q.   Who was that co-owner?

5   A.   Monty Grow.

6   Q.   And do you see Mr. Grow here today?

7   A.   Yes.

8   Q.   And was Community Oxygen and Medical a Federal health care

9   provider?

10   A.   Yes.

11   Q.   And I'm holding up for you a document.

12          MR. JUENGER:  Your Honor, I'm going to move in as

13   Government's Exhibit 2.

14          THE COURT:  Oh, I think I admitted it already without

15   objection.

16   BY MR. JUENGER:

17   Q.   I'm showing you what has been admitted as Government's

18   Exhibit 2.  Do you recognize this document?

19          THE COURT:  It's probably too far away for her, don't

20   you think?

21   BY MR. JUENGER:

22   Q.   Do you recognize it?

23   A.   Yes.

24   Q.   I showed you this a few minutes ago, didn't I?

25   A.   Right, yes.

1   Q.   And you were able to leaf through it?

2   A.   Right.

3   Q.   What is this document?

4   A.   It's our application for our Federal -- our Medicare

5   provider number.

6   Q.   Okay.  And did you look at this document to see who had

7   signed it?

8   A.   Yes.

9   Q.   And who signed it?

10   A.   I signed it and Monty appeared to sign it.

11   Q.   Did it look like his signature?

12   A.   It looked like it.

13   Q.   Do you have any reason to doubt that he signed this form?

14        MR. RASHBAUM:  We'll stipulate it's his signature, Your

15   Honor.

16        THE COURT:  All right.

17   BY MR. JUENGER:

18   Q.   And how long were you in business with Mr. Grow?

19   A.   I think it was about four years.

20   Q.   Okay.

21        MR. JUENGER:  That's all I have, Your Honor.

22        THE COURT:  Cross-examination.

23        MR. RASHBAUM:  Very briefly, Your Honor.

24        THE COURT:  Oh, why do lawyers always say that?  You

25   notice that, both sides, they say it all the time.  I don't tell

Long - Cross

```
 1  you very briefly because I know it isn't.

 2           MR. RASHBAUM:  May I approach, Your Honor?

 3           THE COURT:  With what?

 4           MR. RASHBAUM:  A document.

 5           THE COURT:  With that document, sure.  The ELMO isn't

 6  working?

 7           MR. RASHBAUM:  It's easier this way.

 8           THE COURT:  Okay.

 9                        CROSS-EXAMINATION

10  BY MR. RASHBAUM:

11  Q.  This document that they're showing you, it's 39 pages?

12  A.  That's what it says.

13  Q.  Okay.  And did you read every single -- well, let me ask you

14  this:  Do you remember signing this document?

15  A.  No.

16  Q.  It wasn't a big moment in your life, right?

17  A.  No.

18  Q.  And have you rented a car before?

19  A.  Yes.

20  Q.  They give you a whole load of documents --

21           MR. JUENGER:  Objection as to relevance, Your Honor,

22  driving in a car.

23           THE COURT:  Say that again.

24           MR. RASHBAUM:  Are you asking me?

25           THE COURT:  Yes.
```

1            MR. RASHBAUM:  I asked if she has ever rented a car

2    before.

3            THE COURT:  Okay.  I'm going to sustain the objection

4    to renting a car.  You can, of course, argue that if you want in

5    closing argument.

6            MR. RASHBAUM:  Sure.

7    BY MR. RASHBAUM:

8    Q.  So you don't remember signing this, right?

9    A.  No.

10   Q.  Somewhere in the middle of this document, do you recall it

11   talks about making sure you're in compliance with the health

12   care laws?  Do you recall that?

13   A.  Not really.

14   Q.  You don't remember.  When you signed this document, did you

15   go and look a tutorial on the health care laws?

16   A.  No.

17   Q.  Did you get any training on the health care laws to make

18   sure that what you were signing here was okay?

19   A.  No.

20            MR. RASHBAUM:  No further questions, Your Honor.

21            THE COURT:  Redirect.

22                     REDIRECT EXAMINATION

23   BY MR. JUENGER:

24   Q.  Ms. Long, this form has a sworn certification statement on

25   it.  Do you understand that?

Long - Redirect

218

1   A.   Yes.

2   Q.   And it says:  "I agree to abide by the Medicare laws,

3        regulations and program instructions applicable to durable

4        medical equipment suppliers."

5             That was your company, correct?

6   A.   Yes.

7   Q.   Durable medical equipment?

8   A.   Yes.

9   Q.   It says:  "I understand that payment of a claim by Medicare

10       is conditioned upon the claim and the underlying

11       transactions complying with such laws, regulations, and

12       program instructions, including but not limited to the

13       Federal Anti-Kickback Statute."

14            Right?

15  A.   Yes.

16  Q.   And when you signed that, you agreed to abide by those

17  rules, correct?

18  A.   Yes.

19  Q.   And do you agree with me that you cannot abide by rules if

20  you don't understand them?

21  A.   Yes.

22            MR. JUENGER:  That's all I have, Your Honor.

23            THE COURT:  Thank you, ma'am.  You're excused.  Have a

24  good day.

25       (The witness was excused.)

Rosalinda Rambaran - Direct

219

```
 1              THE COURT:  Next witness.

 2              MR. LARSEN:  The Government calls Rosalinda Rambaran.

 3              THE COURT:  Raise your hand if you don't mind.

 4          ROSALINDA RAMBARAN, GOVERNMENT'S WITNESS, SWORN.

 5              THE COURT:  As soon as you sit down and you get close

 6    to the microphone, tell us your name.

 7              THE WITNESS:  My name is Rosalinda Rambaran.

 8              THE COURT:  R-a-m-b-a-r-a-n?

 9              THE WITNESS:  Yes.

10              THE COURT:  Thank you.

11                       DIRECT EXAMINATION

12    BY MR. LARSEN

13    Q.  Good afternoon, Ms. Rambaran.

14    A.  Good afternoon.

15    Q.  Where do you live, city and state only?

16    A.  Houston, Texas.

17    Q.  Do you know why you were called to testify in court here

18    today?

19    A.  Yes.

20    Q.  Why is that?

21    A.  Testify on my dealings with Monty Grow and the products that

22    we were selling, or we were, I guess, selling; the creams.

23    Q.  Okay.  And do you know what Tricare program is,

24    Ms. Rambaran?

25    A.  Yes.
```

Rosalinda Rambaran - Direct

1  Q.  What is it?

2  A.  It's for military based care, health care.

3  Q.  Are you a Tricare beneficiary?

4  A.  Yes.

5  Q.  And how is it that you are a Tricare beneficiary?

6  A.  My husband is a retired Navy.

7  Q.  So your husband is retired, no longer active duty?

8  A.  Correct.

9  Q.  Where were you --

10        THE COURT:  That's what retired means.

11  BY MR. LARSEN:

12  Q.  Where were you stationed with your husband in 2015?

13  A.  In Jacksonville, Florida.

14  Q.  Are you acquainted with a person named Monty Grow?

15  A.  Yes.

16  Q.  And how do you know Mr. Grow?

17  A.  He was the founder of what I assume is the company that

18  sells the products.

19  Q.  Who did you meet him through?

20  A.  Joy Bing was the person who introduced me to the products

21  and told me about --

22        MS. MEYERS:  Objection, Your Honor, hearsay.

23        THE COURT:  Who are we talking about?  Who is the "he"?

24        MS. MEYERS:  It's the woman --

25        THE COURT:  No, I'm not asking you, I assume.  I'm

Rosalinda Rambaran - Direct

221

 1  asking the proponent of the evidence.  I'm sorry, I should

 2  probably use names.  Mr. Larsen.

 3          MR. LARSEN:  The witness gave the name Joy Bing.

 4          THE COURT:  No, no, I'm sorry.  Who?

 5          MR. LARSEN:  A co-conspirator.

 6          THE COURT:  Who?

 7          MR. LARSEN:  Joy Bing is the name.

 8          THE COURT:  Okay.  So you're introducing it under what

 9  rule, 801(d)(2)(E)?

10          MR. LARSEN:  Statement of co-conspirator.  I actually

11  was just asking the name.

12          THE COURT:  Okay.  And what's the objection then?

13          MS. MEYERS:  Your Honor, they've never alleged her to

14  be a co-conspirator, and I'd like them to lay a foundation.

15  There's no foundation.

16          MR. LARSEN:  I just asked the name that she was

17  introduced.

18          MS. MEYERS:  Well, Your Honor, the witness was about to

19  testify about what Ms. Bing said.

20          THE COURT:  Are you going to ask her what he said?

21  It's a man, right, or no?

22          MS. MEYERS:  It's a woman.

23          MR. LARSEN:  It's a woman.

24          THE COURT:  What's her name again?

25          MR. LARSEN:  Her name is Joy Bing, B-i-n-g.

1          THE COURT:  Okay.  Don't I have to making findings

2    under Bourjaily, the Supreme Court decision?  When should I make

3    those findings, in front of the jury or outside of the jury's

4    presence?  How do you see it done?

5          MR. LARSEN:  I see it outside of the jury's --

6          THE COURT:  See, I know the answers to most of my

7    questions.  And they have already had their coffee break, that's

8    the problem.

9          Do you need to get into that right now?

10          MR. LARSEN:  Yes.

11          THE COURT:  Okay.  Then, that means it's not a bad job,

12   doesn't pay much as jurors, but you get a lot of breaks.  Okay.

13   We'll bring you back.  I have to do it this way.  Those are the

14   rules.  All right.

15          THE COURT SECURITY OFFICER:  All rise for the jury.

16          THE COURT:  Is there stuff in Judge Graham's jury room?

17   You have coffee and soda there, Shirley?  I shouldn't have even

18   asked.  I apologize, Mrs. Christie.  I apologize.  I should have

19   known.  My fault.

20     (The jury retired from the courtroom.)

21          THE COURT:  Let me hear that door.  That's a different

22   door.  That one.  Okay.

23          Have a seat unless you're addressing the Court.

24          I sure wish I knew these things before hand, right,

25   because you saw those jurors' faces?  They hate sidebars, this

1    is kind of like a sidebar, but I have to make findings,

2    otherwise, you've got an issue on appeal.  So it better be a big

3    enough issue, right?  You don't want to try this case again,

4    assuming you win.  I'm not suggesting you will.

5            So you've got to tell me who this person is and how is

6    she a co-conspirator and then what the statement is and then how

7    is it in furtherance of the conspiracy.

8            MR. LARSEN:  Your Honor --

9            THE COURT:  Right?

10           MR. LARSEN:  Yes, yes.

11           THE COURT:  Don't you have to do that?

12           MR. LARSEN:  The witness --

13           THE COURT:  Who the person?

14           MR. LARSEN:  The person is Joy Bing.  She is also

15   identified in the Indictment, not a charged conspirator.  She's

16   referenced in overt acts of the Indictment under the manner and

17   means and I believe under the 371 conspiracy, overt acts.

18           THE COURT:  Do you know which overt act?

19           MR. LARSEN:  Yes, Your Honor.  She is referenced in

20   overt act 12 of the Indictment on Page 14.

21           THE COURT:  Hold on.  Give me a chance to get there.

22   Thanks.  Oh, by initials.  See, I was looking for a name.

23           MR. LARSEN:  And also overt act 5, Your Honor.

24           THE COURT:  Okay.  12 and 5.  12 is on February 23,

25   2015, Monty Ray Grow paid a kickback in the approximate amount

1  $1,750 to Tricare beneficiary JB, and you are telling me that's

2  Joy Bing, in exchange for her husband's order of compounded

3  medication for Company 1.

4      And overt number 5 says, "on January 7, 2015 --" that's

5  the one you want me to read?

6      MR. LARSEN:  Yes, Your Honor.

7      THE COURT:  "-- a co-conspirator caused Prescription

8      Number 105809 for Tricare beneficiary VB who was recruited

9      by an individual that was paid a kickback by Monty Ray Grow

10     in exchange for referring VB to Company 1 to be ratified by

11     a doctor located in Miami-Dade County."

12     MR. LARSEN:  Yes, Your Honor.  VB is --

13     THE COURT:  VB is who?

14     MR. LARSEN:  VB is -- well, he is Joy Bing's husband,

15 Vidal Bing.

16     THE COURT:  Okay.  So is he a co-conspirator, too?

17     MR. LARSEN:  Yes.

18     THE COURT:  So the husband and wife, who are

19 beneficiaries, in a way, are co conspirators.

20     MR. LARSEN:  Joy Bing was also --

21     THE COURT:  Is every beneficiary a co-conspirator?

22     MR. LARSEN:  I'm sorry, Your Honor?

23     THE COURT:  There is something wrong with this mic.  Is

24 every beneficiary a co-conspirator?

25     MR. LARSEN:  Every beneficiary that got paid or that

1  recruited others.  I don't know that every beneficiary is a

2  co-conspirator, but the testimony would be that this beneficiary

3  received payment for referring that beneficiary.

4          THE COURT:  See, now even if I understood what you have

5  just said, if it ever went up on appeal -- she writes down

6  everything we say, including the dumb things that I may say, but

7  we don't know who we're talking about so we can use names.

8          All right.  So Ms. Rambaran is going to say that Joy

9  Bing did what?

10         MR. LARSEN:  That she referred Ms. Rambaran into the

11 program and received a kickback from Monty Grow related to

12 Ms. Rambaran's prescription.

13         THE COURT:  Who received a kickback?

14         MR. LARSEN:  Joy Bing.

15         THE COURT:  And how do we know that she received a

16 kickback?

17         MR. LARSEN:  Well, she will testify to that.  They

18 talked about it.

19         THE COURT:  Rosalinda Rambaran is going to talk about a

20 statement by Joy Bing.

21         MR. LARSEN:  Well, it's also in a document that's

22 been -- I believe has already been admitted into evidence.

23         THE COURT:  You've got to tell me what it is.

24         MR. LARSEN:  It's in the bank records and in an email

25 with Monty Grow.

1          THE COURT:  You've got to give me a number.

2          MR. LARSEN:  Exhibit 32, for example, Your Honor.

3          THE COURT:  Okay.  Let's look at 32.  See, in the old

4  days they would do a James hearing and it would take forever.

5  We don't have to do that anymore.

6          The email between Monty Grow and this witness or who?

7  No.

8          MR. LARSEN:  Excuse me, I'm sorry, Your Honor.

9          THE COURT:  See, we have got to get it together.  I

10  just make your appellate division's job easier.  You're mad now,

11  but you'll be happy later.

12          MR. LARSEN:  Your Honor, Joy Bing was also referenced

13  repeatedly --

14          THE COURT:  No, no what exhibit?  No exhibit?  Let's

15  keep focused on the numbers.  I know I'm a pain, but it makes it

16  easier later on for both sides, it really does.

17          MR. JUENGER:  It's 170-A, Your Honor.

18          THE COURT:  Oh, that that's a big difference.  170-A.

19          MR. LARSEN:  It was admitted yesterday.  Page --

20          THE COURT:  Hold on.  I'll get it.

21          MR. LARSEN:  I'm sorry, 170-B, Your Honor.  I

22  apologize.

23          THE COURT:  170-B, the summary exhibit regarding

24  prescriptions to the beneficiaries under the same initials, JB.

25          MR. LARSEN:  Yes, the Bing family.

 1          THE COURT:  Okay.  So that means that there's no

 2  question she was a beneficiary, right?

 3          MR. LARSEN:  Correct, Your Honor.

 4          THE COURT:  And there's no question in your mind, based

 5  on the evidence, that who got a kickback or a referral fee?

 6          MR. LARSEN:  That this witness received -- I'm sorry,

 7  that Ms. Bing received -- the document itself identifies

 8  Ms. Rosalinda Rambaran as being recruited by Joy Bing, and it

 9  actually says it on Page 3 of the exhibit, Joy Bing recruited

10  Rosalinda Rambaran.

11          THE COURT:  Okay.  By the way, I suspect, not that I

12  want more witnesses, but I suspect that Joy Bing is not a

13  witness.

14          MR. LARSEN:  No, Your Honor.

15          THE COURT:  No, she is not?

16          MR. LARSEN:  She's not a witness.

17          THE COURT:  And the reason she's not is?

18          MR. LARSEN:  Your Honor, we have so many -- there are

19  so many beneficiaries we could call, you know.  We could have

20  called a lot more.  I mean, the allegation is that we

21  cherry-picked, but in reality, Your Honor, we picked the best

22  representatives from the overall amount we could.

23          THE COURT:  I just want to know.  Now, did Joy Bing

24  receive money?

25          MR. LARSEN:  Yes.

1          THE COURT:  This witness did not receive money?

2          MR. LARSEN:  She did also receive money.

3          THE COURT:  She received money.  So why doesn't she

4    just talk about the money that she received?  Because you

5    wouldn't want to call every beneficiary who received money.  I

6    think you're wise.

7          MR. LARSEN:  No, Your Honor, it's for context as far as

8    how did she learn about this scheme.

9          THE COURT:  I know but, see, the problem is how someone

10   learns about a scheme -- it would be wonderful if we could try

11   cases like that, it really would, and maybe it would still be

12   fair, I don't know, But if you call an agent and he says this is

13   the result of my testimony, then the defense challenge the

14   agent.  But if she says what someone else said, it's usually

15   hearsay.

16         In order for me to find that a beneficiary is indeed a

17   co-conspirator, I've got to know more about it.  You do

18   recognize that some of them weren't even charged.  In fact, most

19   of them weren't even charged, right?  That doesn't mean they're

20   not co-conspirators, but in my practice as a judge, they're

21   usually -- I don't want to say bad guys, but there's no doubt

22   that they were participants in the conspiracy.

23         There have been cases where on a statement that's

24   admitted even by a co-conspirator, there's reversal.  See, I

25   know the difference between things that could cause a reversal

1    and things that could not.  This is probably not key to your

2    case.  So a Court of Appeals perhaps, I don't know, might say,

3    well, it didn't make any difference, harmless error, but I don't

4    know that yet.

5            So the question is, how crucial is it to you to gamble?

6    Prosecutors are gamblers all the time in front of me, and I feel

7    like one of those temperance people to follow the rules.  I

8    really do.  I'm a pain and you'll complain and you have because

9    you've been before me.

10           MR. LARSEN:  I'm not going to be a gambler.  I will

11   say that --

12           THE COURT:  So you're not going to ask her the

13   question.

14           MR. LARSEN:  I'm just going to add to the record, Your

15   Honor, that Exhibit 172 also identifies -- excuse me, 162 --

16           THE COURT:  Hold on.  Let me look at it.  We haven't

17   talked about that one?  Summary payments.  So she got a payment.

18   So you've got evidence that Joy Bing received how much money?

19           MR. LARSEN:  She received about $26,000.

20           THE COURT:  Okay.  That's good.  For doing what?

21           MR. LARSEN:  For recruiting Tricare patients.

22           THE COURT:  How do you know that it's for recruiting

23   Tricare patients?

24           MR. LARSEN:  Because she's been interviewed and --

25           THE COURT:  I know, but she hasn't been interviewed by

1   me, see.

2          MR. LARSEN:  I understand.  Your Honor --

3          THE COURT:  That's the problem.  There's got to be

4   some -- it doesn't have to be foolproof, it's the preponderance

5   of the evidence, even her own statement can be used.  You know

6   all of that with Bourjaily.  I can consider everything, but it's

7   got to be done beforehand.

8          MR. LARSEN:  Your Honor, I am not going to be a

9   gambler.  I am fine with the witness identifying the name of the

10  person, and then I can ask her what she did.

11         THE COURT:  What who did?

12         MR. LARSEN:  What the witness did.

13         THE COURT:  That you can always do, because you know

14  why?  She's going to be cross-examined, so there's never any

15  issue.  Whenever someone gets cross-examined, there is never any

16  issue.

17         MR. LARSEN:  It isn't a crucial point to our case, Your

18  Honor, that Joy Bing was a co-conspirator.  We believe she was.

19  We believe this is an admissible statement under the rules for

20  co-conspirators.

21         THE COURT:  The reason you didn't charge her is because

22  you don't charge the little people.

23         MR. LARSEN:  Your Honor, we didn't want to have a month

24  or two-month long trial.

25         THE COURT:  You wouldn't even with her but --

 1          MR. LARSEN:  Or others that are like her.  So every

 2   case is different.

 3          THE COURT:  All right.  And I'm not suggesting you

 4   should.  Based on the testimony I've heard of some witnesses,

 5   it's probably not worth it, but I still have to have enough and

 6   right now it doesn't seem like it's enough for me.  I'd not

 7   confident.  It probably is not error.

 8          MR. LARSEN:  Okay.  I appreciate the Court's comment.

 9          THE COURT:  I don't even like to gamble when I play

10   golf.  I don't even like to do that.  I would lose anyway.  All

11   right.

12          Now, are we going to have any other issues with this

13   witness?  It's not going to be a long witness, right?

14          MR. LARSEN:  No, it won't, Your Honor.

15          THE COURT:  And the cross, who's going to do it?  It's

16   not going to be a long cross, right?

17          MR. MEYERS:  No, Your Honor.

18          THE COURT:  I'm sorry.  I didn't look at you.

19          MS. MEYERS:  Mr. Rashbaum was distracting me.  I

20   apologize, Your Honor.

21          THE COURT:  So who's your next witness?

22          MR. LARSEN:  Rashaan Rambaran.

23          THE COURT:  We don't have any issues?  See, I'm kind of

24   fishing for issues outside of the presence of the jury now so we

25   can consolidate those issues.

Jury Trial

232

```
 1              MR. LARSEN:  The same issue.  I can --

 2              THE COURT:  Whose statement is --

 3              MR. LARSEN:  It would be an in-court statement.

 4              THE COURT:  The son.  Whose statement?

 5              MR. LARSEN:  Well, Your Honor, it would be

 6   Ms. Rambaran's statement today in court.  She will tell --

 7              THE COURT:  But you have her saying it.  You want her

 8   son to say what her mother said.

 9              MR. LARSEN:  No, I won't elicit that.

10              THE COURT:  So what statement is the son going to talk

11   about?

12              MR. LARSEN:  He's going to explain how he came into the

13   scheme.

14              THE COURT:  Okay.  So that means he's going to talk

15   about someone telling him something.

16              MR. LARSEN:  I won't elicit that.

17              THE COURT:  Then what's he going to say?

18              MR. LARSEN:  He's going to say he joined the scheme and

19   why he did it.

20              THE COURT:  He joined the scheme and he did it for the

21   money.

22              MR. LARSEN:  Yes.

23              THE COURT:  All right.  And he knew what he was doing.

24              MR. LARSEN:  Yes.

25              THE COURT:  All right.  He is not going attribute any
```

1    statements to anybody?

2         MR. LARSEN:  I will not try attribute any statement.  I

3    will simply fashion my questions to what he did.

4         THE COURT:  But he's going to be a normal person.

5    Normal people do not consider the hearsay rules, they just

6    don't.  I know it surprises you, but they don't say 803.  They

7    just don't do that.

8         MR. LARSEN:  Right.

9         THE COURT:  So we've got to make sure we don't have a

10   sidebar and objection because if we do, I'll sustain it.

11         MR. LARSEN:  Okay.

12         THE COURT:  And after him?

13         It's actually lighter than it is in this courtroom, so

14   you know, it's got the curtains and I don't even know how to

15   open them here.  And it's also facing the east side where the

16   sun rises, so it's a lot nicer on the west side, it's sunny.  I

17   don't want you to think it's that late.

18         MR. LARSEN:  I can have another witness available after

19   Mr. Rashaan Rambaran.  I can have Jill Cichowicz available.

20         THE COURT:  Who's out there, right?

21         MR. LARSEN:  I believe so, Your Honor.

22         THE COURT:  Okay.  All right.  We don't have any issues

23   with that witness?

24         MR. LARSEN:  No, no.  We have been trying to follow

25   Your Honor's orders and keep everybody here and keep this thing

Jury Trial

234

1   moving along for you.

2          THE COURT:  Okay.  So we'll keep going.  Ready for the

3   jury?

4          MR. LARSEN:  Yes.

5          THE COURT:  Bring them in, please.

6          THE COURT SECURITY OFFICER:  Rise for the jury.

7       (The jury entered the courtroom.)

8          THE COURT:  We've got everybody.  Thank you, folks, I

9   appreciate it.  Sorry about that.

10          You know, most of the time in the courtrooms.  And you

11  probably have seen it even on TV, we have what we call sidebars

12  where I give you the back and then everybody whispers into it,

13  and in the courtroom that I use, we don't have a noisemaker.  I

14  think this courtroom does and I hate noisemakers.  I made sure

15  almost 28 years ago that -- I said, I don't want a noisemaker.

16  What they do in all the Federal courthouses is whenever they

17  have a sidebar, so you don't hear what we're saying, they have a

18  noisemaker where you hear static and I thought that's too

19  annoying to you all.  So that's why I walk you or the court

20  security officer walks you into the jury room.

21          But the important thing about all of that is, first,

22  you wouldn't be hearing the noise, but in my courtroom you don't

23  even hear it.  I have to make sometimes rulings on the law.

24  Frankly, most of the time what we're talking about is how long

25  are you going to be, who's your next witness, give each other

1    the exhibits, and things that just move along the case; and all

2    the lawyers in this case have been very cooperative, with little

3    suggestions from my part, I'll confess, but they've been very

4    cooperative and they've gotten along.  So it's not wasted time.

5    So you're really not missing anything.

6            But you are judges of the facts.  You will decide what

7    facts you believe or do not believe.  I'm just the judge of the

8    law.  So I've got to keep the rules and sometimes people, good

9    lawyers disagree with the ref's call, but the ref's call -- we

10   don't really have video review immediately, so that doesn't

11   happen, so they have to live with my decision, but I didn't want

12   you to think that we are keeping anything away from you or not.

13   It's really just to move the case along so it's no big deal.

14   All right?  And I think we have moved the case along.  Right?

15           MR. LARSEN:  Yes, yes.

16           THE COURT:  Let's keep moving.

17           MR. LARSEN:  Okay.

18           THE COURT:  And it's not -- the other thing I told the

19   lawyers, that's the east side, that's why it looks darker and

20   later than it really is.  If you were on the west side that sun

21   would be shining and blinding the witnesses.  So we still have

22   plenty of time to work.  Okay?  You want to avoid that 5:00 rush

23   hour which is even worse than the 9:00 rush hour.  All right.

24   So we're going to work a little later today unless someone has a

25   deep objection.  Hearing none, let's go.  Okay.

1  BY MR. LARSEN:

2  Q.  Ms. Rambaran, before the break I asked you just the name,

3  the name only of how you learned --

4        THE COURT:  How you got involved in this.  Who was it?

5        THE WITNESS:  Yeah, Joy Bing.

6        THE COURT:  Thank you.

7  BY MR. LARSEN:

8  Q.  Did you decide at that point, or at some point thereafter,

9  to participate in a scheme with a person named Monty Grow?

10  A.  Yes.  I didn't know it was a scheme at the time, but yes.

11  Q.  Okay.  What was the first step that you took to meet or to

12  communicate with Monty Grow, with the defendant?

13  A.  I emailed an introduction of myself and that I would like to

14  participate.

15  Q.  What was it that you told him you would like to participate

16  in?

17  A.  I don't recall exactly what the email consisted of other

18  than an introduction and that I was wanting to join his staff

19  for selling the products to my knowledge.

20  Q.  Okay.  Selling what?

21  A.  It was creams, scar cream and pain cream.

22  Q.  Anything else?

23  A.  Not that I recall.

24  Q.  Now, what did, if anything, did the defendant tell you about

25  the specific products that he hoped that you would agree to --

1  you said sell.  Sell to whom?

2  A.  I don't know what you really -- if you would really call it

3  selling.  I don't know what other term to use other than signing

4  up people to use the cream.

5  Q.  What kind of people?

6  A.  There was a criteria, they had to be military or Tricare

7  based as far as health care goes.

8  Q.  Okay.  Tricare beneficiaries?

9  A.  Yes.

10  Q.  And did Mr. Grow, the defendant, tell you anything about the

11  products that he was selling, the pain cream or the scar cream?

12  A.  No.  I don't remember any interaction between me and him.

13  Q.  At that time that you had your first -- in the interaction,

14  did you communicate with Mr. Grow?

15  A.  Yeah, email was about the only way and I don't remember

16  there being more than that introduction and him saying welcome,

17  basically.

18  Q.  Okay.  Let's talk about these products; a pain cream, a scar

19  cream.  Did you agree to order them for yourself?

20  A.  Yes.

21  Q.  Okay.  At the time that you agreed to order, what did you

22  order for yourself?

23  A.  The pain cream and the scar cream.

24  Q.  Did you order a vitamin cream as well or a vitamin?

25  A.  I think there was a vitamin as well.  I don't recall that,

1    but I do remember there was some vitamin "talking."  I don't

2    remember even seeing the vitamin myself.

3             MR. LARSEN:  Your Honor, may I approach the witness

4    with Exhibit 172?

5             THE COURT:  That has been admitted already, right?

6             MR. LARSEN:  Yes.

7             THE COURT:  Yes, you may.

8    BY MR. LARSEN:

9    Q.  Ms. Rambaran, I'm going to show you what's been admitted as

10   Exhibit 172.  What is all of this?

11   A.  Seeing the vitamins, I do recall seeing those before.  These

12   are all the products that I turned over to the agent that came

13   to my house initially.

14   Q.  Okay.

15   A.  Scar cream, pain cream and the vitamins.

16   Q.  Okay.  And there are names on these products.  Rashaan

17   Rambaran, who is that?

18   A.  My son.

19   Q.  And your first name is Rosalinda?

20   A.  Yes.

21   Q.  How about Rasheed Rambaran?

22   A.  My husband.

23   Q.  Is this the entirety of everything that you received in the

24   mail?

25   A.  It's not all of it, but my son, Dryvaan, also had product in

1    there.  I am not sure if he has any bottles in there.

2    Q.  You have provided these?

3    A.  This is the stuff I've turned over to you.

4    Q.  Since these were yours, are they used?  Did you use them?

5    A.  Not every bottle was used.  There was one or two that were

6    open and used by whoever the prescription was written to.  They

7    weren't used a lot.  There was probably a couple of squirts out

8    of each one that we would have used.

9    Q.  I see on the top where it's marked, pain and P.  Who did

10   that, do you know?  This is your name, Rosalinda Rambaran.

11   Where it says "pain"?

12   A.  Yeah, I marked the tops that were different than that one.

13   I am not sure if I marked that one or one of my children may

14   have.

15   Q.  Why would you mark the tops?

16   A.  Because when I had them in the box, there were so many of

17   them, I didn't know which one was what and I wanted to identify

18   which ones were scar and which ones were pain.

19   Q.  Did you do that for your benefit or someone else's?

20   A.  My own, just so I would know which ones were which.

21   Q.  Did these products come with detailed instruction how to use

22   them?

23   A.  I don't remember the way they were packaged.  I can't speak

24   on that.  I don't remember.

25   Q.  Did you know how to use them?

240

1    A.  Well, other than that they're creams to put on the scars or

2    where you feel pain, that's the only instruction I would have

3    thought of.

4    Q.  Did you ever receive any training from the defendant about

5    how to use these or sell these products?

6    A.  No.

7    Q.  Okay.  At the time that you and Mr. Grow, the defendant, had

8    this initial email, were you under the care of a doctor for any

9    chronic pain condition?

10   A.  No.

11   Q.  What about for any problems with scarring?

12   A.  No.

13   Q.  Were you addicted to opioid pain medications?

14   A.  No.

15   Q.  What, if anything, did the defendant tell you about whether

16   you need to see a doctor to get these medications?

17   A.  I'm not sure how the information was given to me that a

18   pharmacist would contact me and a doctor would also contact me,

19   and it was like two separate calls.

20   Q.  Okay.  A telephone call?

21   A.  Yes.

22   Q.  Do you remember the length of the telephone call?

23   A.  I don't.  Approximately 10 minutes.

24   Q.  Okay.  With the pharmacy or with the doctor?

25   A.  With the pharmacy.

1   Q.  How about with the doctor, just the length?

2   A.  With the doctor, maybe three minutes.

3   Q.  Okay.  Now, what, if anything, did the defendant tell you

4   about opportunities to make money through the sale of these

5   products?

6   A.  He didn't speak to me about that.  That was actually when

7   Joy --

8           MS. MEYERS:  Objection, Your Honor, hearsay.

9           THE COURT:  Whose statements are you trying to

10  introduce?

11          MR. LARSEN:  I'm asking the defendant's statements

12  only.

13          THE COURT:  What she said to whom?

14          MR. LARSEN:  What the defendant may have said to her,

15  that was my question.

16          THE COURT:  Okay.  Did Mr. Grow say anything to you?

17          THE WITNESS:  No.

18          THE COURT:  All right.

19  BY MR. LARSEN:

20  Q.  Did you, after having a conversation with Mr. Grow, agree to

21  order these products?

22          MS. MEYERS:  Objection, Your Honor, misstates the

23  testimony.

24          THE COURT:  Overruled on that basis.  You can answer.

25          THE WITNESS:  Yes.

1  BY MR. LARSEN:

2  Q.  Ms. Rambaran, you said that your husband's name was Rasheed;

3  is that right?

4  A.  Yes.

5  Q.  His name is on some of those bottles.  Did your husband

6  agree to signed up for this medication?

7  A.  Yes.

8  Q.  Okay.  Did you tell your husband why you wanted him to sign

9  up for these medications?

10  A.  Yes.

11          MS. MEYERS:  Objection, hearsay, Your Honor.

12          THE COURT:  Overruled.

13  BY MR. LARSEN:

14  Q.  What did you tell your husband?

15          THE COURT:  Oh, I overruled it.  It's not invitation to

16  keep going.  All right.

17          MR. LARSEN:  Okay.  I'll rephrase the question.

18          THE COURT:  Or stop asking it altogether.

19  BY MR. LARSEN:

20  Q.  Why did you sign your husband up for the medications?

21  A.  It was just a way that I could make some money.

22  Q.  How were you making money through your husband's order of

23  medications?

24  A.  For the medications that you see that he ordered, I would

25  get paid.

1  Q.  Okay.  How much did you make on the items that your husband

2  ordered through his -- was it his Tricare insurance?

3  A.  Yes.

4  Q.  How much did you make for one specific -- I guess one order?

5  A.  I believe the number was 1700.

6  Q.  Okay.  Was that one time or --

7  A.  It was a recurring monthly, I believe.

8  Q.  And I believe you testified also that your son's name -- you

9  have two children, right?

10  A.  Yes.

11  Q.  Rashaan and Dryvaan?

12  A.  Yes.

13  Q.  Did either of your children sign up to receive these

14  medications through Mr. Grow?

15  A.  Yes, both of them did.

16  Q.  Okay.  And did you receive payments for either of your

17  children in exchange for their signing up for the medications

18  from the defendant?

19  A.  Yes.  Rashaan had signed up and I received the payments for

20  him.

21  Q.  Okay.  Do you remember any discussions with Mr. Grow, email

22  discussions, about having one or more of your sons call in to

23  the pharmacy or answer a doctor's call?  Do you remember

24  anything about that?

25  A.  No.

1 Q. Did you ever have any conversations with the defendant about

2 what could happen if you didn't take a call from the pharmacy or

3 the doctor?

4 A. Actually, I recall an email that was stating something about

5 -- I don't remember the specifics of the email, but I remember

6 there was content of that nature in there.

7 Q. What do you remember about it? I know you don't remember

8 everything.

9 A. That he -- I think it was Dryvaan that needed to answer a

10 call from a pharmacy in order to get the product, or within a

11 certain amount of days or time, they would not make the payment.

12 Q. To who?

13 A. To me.

14 Q. Do you and your husband share the same bank account?

15 A. Yes.

16 Q. Do you recall about how much you got paid on your husband's

17 and your one son's prescriptions?

18 A. You mean in total?

19 Q. Yeah. Do you have an estimation?

20 A. I remember the number being like 16,000 total.

21 Q. And was this money that you received from -- for example,

22 for your husband's prescriptions, was this money that both you

23 and your husband used together?

24 A. Yes.

25 Q. What did you do with that money together?

Rosalinda Rambaran - Cross

245

```
 1   A.  We paid bills.
 2          MR. LARSEN:  May I approach, Your Honor, the witness?
 3          THE COURT:  Sure.
 4   BY MR. LARSEN:
 5   Q.  I'm going to show you one, it says pain and it's for
 6   Rosalinda Rambaran, and on the label you'll see here it says
 7   Sara, MG, Garcia.  Do you know anything about what MG might
 8   mean?
 9   A.  No, I don't.
10   Q.  What was the reason that you ordered all, you and your
11   family, but you specifically ordered all of these products?
12   A.  It was just to make money.  I was between jobs and needed
13   money to pay bills.
14   Q.  Okay.
15          MR. LARSEN:  No further questions, Your Honor.
16          THE COURT:  All right.  Cross-examination.
17          MS. MEYERS:  Thank you, Your Honor.
18                       CROSS-EXAMINATION
19   BY MS. MEYERS:
20   Q.  Now I can see you.  Good afternoon, Ms. Rambaran.  My name
21   is Kate Meyers and I represent Monty Grow.  We've never met
22   before, correct?
23   A.  Yes.
24   Q.  We've never spoken before; is that also correct?
25   A.  Correct.
```

Rosalinda Rambaran - Cross

1   Q.  Ms. Rambaran, you ordered, between you and your family

2   members, 33 separate medications; isn't that correct?

3   A.  Yes.

4   Q.  Okay.  So the medicines that are laid out before you, which

5   is Government's Exhibit 172, that's not one shipment of

6   medication, is it?

7   A.  No.

8   Q.  It's more likely that it's closer to the 33; isn't that

9   correct?

10  A.  Yeah.  I don't know.  I haven't counted, but I assume.

11  Q.  Well, you said that you only used one or two bottles and

12  discarded those one or two bottles.  So those bottles would

13  represent 33 separate prescriptions?  Certainly, if not 33, far

14  closer to 33 than 1; isn't that correct?

15  A.  Yes.

16  Q.  Do you recall filling out a Tricare Intake Form,

17  Ms. Rambaran, before you ordered the prescriptions?

18  A.  Yes.

19  Q.  And on that form, isn't it true that you listed having had a

20  hysterectomy?

21  A.  Yes.

22  Q.  And you, therefore, had a scar on your stomach; isn't that

23  correct?

24  A.  No.

25  Q.  You don't have a scar on your abdomen from your

Rosalinda Rambaran - Cross

1  hysterectomy?

2  A.  No, it was vaginal.

3  Q.  Do you have a scar on your leg?

4  A.  Yes.

5  Q.  Do you recall indicating on your Tricare form that you have

6  any pain?

7  A.  Yes.

8  Q.  And where was that pain?

9  A.  Knees, joints.

10  Q.  Knees and joints?

11  A.  Yeah.  Maybe back as well.

12  Q.  And your back?

13  A.  (Witness nodding)

14  Q.  You testified on direct that you didn't use much of the

15  product?

16  A.  Correct.

17  Q.  You didn't tell Mr. Grow that, did you?

18  A.  No.

19  Q.  You testified that your son, Dryvaan, was told in an email

20  that he needed to answer the call from the pharmacy or he

21  wouldn't get a prescription; isn't that correct?

22  A.  Correct.

23  Q.  And you testified that you, in fact, had discussions with

24  both the pharmacy and with a telemedicine doctor before you got

25  your prescriptions, correct?

Rosalinda Rambaran - Cross

1  A.  Yes.

2  Q.  And just to clarify, because I think there's some confusion

3  in terms of your testimony, you didn't speak with Mr. Grow about

4  marketing these products, did you?

5  A.  No.

6  Q.  Do you recall if your husband, Rasheed, prepared a Tricare

7  intake form?

8  A.  Yes.

9  Q.  And do you recall whether he indicated that he had any pain

10  or scarring on that form?

11  A.  I don't know.

12  Q.  You don't know.

13          The amount of money that you received, that was

14  commission for your husband's prescription, correct?

15  A.  And my son, Rashaan.

16  Q.  And your son, I apologize.  It was not for your

17  prescription; isn't that right?

18  A.  Correct.

19  Q.  And for your work as a marketer on behalf of Mr. Grow's

20  company, MGTEN, do you recall that you received a 1099 form so

21  that you could file it with your taxes?

22  A.  Yes.

23  Q.  And did that 1099 accurately reflect all of the income that

24  you earned as a marketer for MGTEN?

25  A.  To my knowledge, yes.

1  Q.  Okay.

2           MS. MEYERS:  Court's indulgence, Your Honor.

3           THE COURT:  All right.  Thank you, Ms. Meyers.

4  Redirect.

5           MS. MEYERS:  Your Honor, I had asked for the Court's

6  indulgence, but I have nothing further.

7           THE COURT:  Oh, I thought you were done.

8           MS. MEYERS:  I am done, Your Honor.

9           THE COURT:  All right.  Redirect, if any.

10          MR. LARSEN:  Two questions, Your Honor.

11                      REDIRECT EXAMINATION

12  BY MR. LARSEN:

13  Q.  First, Ms. Rambaran, on cross-examination Ms. Meyers asked

14  you about if your son didn't take the call, you wouldn't get the

15  prescription.  My recollection on direct, you said you wouldn't

16  get paid; is that correct?

17  A.  That's correct.

18  Q.  Now, Ms. Meyers also asked you asked you about marketing.

19  Did you have any training, or have you had any formal training

20  in sales or marketing?

21  A.  No.

22  Q.  Did Mr. Grow instruct you at all on how you should sell

23  these products?

24  A.  No.

25  Q.  Did he give you any materials that you should give to other

Rashaan Rambaran - Direct

1   people about how to sell these products?

2   A.  No.  There was an intake form that you had to have filled

3   out, and as far as I know, that was the only marketing that you

4   had to do, was tell people about the intake form that were

5   Tricare beneficiaries.

6           MR. LARSEN:  Okay.  Thank you.  Nothing further.

7           THE COURT:  Thank you, you're excused.  Have a good

8   day.

9       (The witness was excused.)

10          THE COURT:  The next witness is?

11          MR. LARSEN:  Dryvaan Rambaran.  I'm sorry, excuse me,

12  Rashaan Rambaran.  I apologize.

13          THE COURT:  Raise your right hand, please, sir.

14          RASHAAN RAMBARAN, GOVERNMENT'S WITNESS, SWORN.

15          THE COURT:  Have a seat and tell us your name.

16          THE WITNESS:  My name is Rashaan Rambaran.

17          THE COURT:  Thank you.

18                          DIRECT EXAMINATION

19  BY MR. LARSEN:

20  Q.  Good afternoon, Mr. Rambaran.  Where do you live, city and

21  state only?

22  A.  Houston, Texas.

23  Q.  How old are you?

24  A.  21.

25  Q.  What do you do for a living?

1  A.  I work at Sam's.

2  Q.  What kind of business is that?

3  A.  I cook rotisserie chickens.

4  Q.  Okay.  Are you familiar with the Tricare program?

5  A.  Yes, I am.

6  Q.  What is Tricare?

7  A.  It is insurance from the military.

8  Q.  How do you know that?

9  A.  My dad was in the military and I've been to the hospital a

10  couple of times.

11  Q.  Do you have Tricare insurance now?

12  A.  I don't believe I do.

13  Q.  Okay.  Have you ever heard of the defendant, Mr. Monty Grow?

14  A.  Yes, I have.

15  Q.  How do you know him?

16  A.  I know he was who --

17          THE COURT:  Have you ever met him?

18          THE WITNESS:  I've never met him in person, no.

19          THE COURT:  Have you ever talked to him?

20          THE WITNESS:  I haven't directly one-on-one talked to

21  him, but I believe there was a conference call --

22          THE COURT:  No, no, no.  Have you ever talked to him?

23  Have you ever heard him say anything?

24          THE WITNESS:  Yes.

25  BY MR. LARSEN:

Rashaan Rambaran - Direct

252

1   Q.   Have you ever had an email conversation with Mr. Grow?

2   A.   I don't really remember but --

3   Q.   Okay.  Let me ask you:  Did you at some point in time in

4   2015, sign up to be a sales representative for the defendant?

5   A.   Yes.

6   Q.   And what were you going to be a sales representative to do?

7   What were you going to do?

8   A.   I was going to sign up people with Tricare to receive a

9   product.

10  Q.   Did you at the same time sign up as a beneficiary to receive

11  product yourself?

12  A.   I did.

13  Q.   Okay.  And why did you sign up to receive the product

14  yourself?

15  A.   To help my family get some money.

16  Q.   Okay.  And what do you mean by that, help your family get

17  money?

18  A.   I mean, well, my mother wanted to sign me up, so I told her,

19  yeah, go ahead, you know, it's extra money in your pocket which

20  means extra money for the house.

21  Q.   Okay.  And did you, in turn, sign anybody up in your family?

22  A.   Yes, my older brother.

23  Q.   What's your older brother's name.

24  A.   Dryvaan.

25  Q.   Do you see the products that are lined out in front of you

1    on the ledge there?

2    A.   Yes, sir.

3    Q.   Are these some of the products that you received in the

4    mail?

5    A.   Yes, sir.

6    Q.   What did you order?  Which products did you order from the

7    defendant?

8    A.   I believe it was a pain cream, a scar cream and vitamins, I

9    think.  I'm not entirely sure.

10   Q.   Okay.  When you ordered them, were you under the care of a

11   doctor for pain problems?

12   A.   No.

13   Q.   Did you have problems with scarring?

14   A.   A little bit.

15   Q.   Okay.  Were you under the care of a doctor for that?

16   A.   No, sir.

17   Q.   If you did have pain, what would you take for it?

18   A.   An Advil.

19   Q.   Okay.  Is that all you needed for your pain?

20   A.   Yes.

21   Q.   Okay.  Did Mr. Grow, the defendant, after you agreed to

22   become a sales rep for him, did he ever train you about how to

23   sell these products that you see laid out on the ledge in front

24   of you?

25   A.   No.

1  Q.  Did he give you any training about the efficacy or how

2  effective or how they work, how these products work?

3  A.  No.

4  Q.  Did he tell you how to market these products?

5  A.  No.

6  Q.  Okay.  Did there come a time -- excuse me, let me back up.

7       I believe you said you heard a conference call.  Was

8  the defendant on that call?

9  A.  I believe he was, but it was a lot of voices on that call.

10  I don't know who was who.

11  Q.  What do you remember about that call?

12  A.  Honestly, I just remember there was a lot of different

13  voices in my ear.  I did not stay on the call long.  I called,

14  said my name, shortly thereafter hung up the phone.

15  Q.  Did you learn that you had to do something based on that

16  call?

17  A.  No.

18  Q.  Okay.  Was there a point in time when you learned that you

19  had to become an employee of a pharmacy named Patient Care

20  America?

21  A.  I don't know what the name of whatever it was, but there was

22  a time where we switched over from what we normally did, signing

23  people up, to now you have to do these online things to switch,

24  I guess it was companies.

25  Q.  Okay.  I'm going to show you what's been admitted as

Rashaan Rambaran - Direct

255

1  Government's Exhibit 174.  I am just going do put it here.  Do

2  you recognize this document, Mr. Rambaran?

3  A.  Yes.

4  Q.  Is this your name?

5  A.  Yes, sir.

6  Q.  And is this your signature?

7  A.  Yes, sir.

8  Q.  It's May 1, 2015, it says Application for Employment.  I

9  don't know if you can see up here lightly, but it says Patient

10 Care America?

11 A.  Yes.

12 Q.  Did you apply for a job with Patient Care America?

13 A.  Yes.

14 Q.  Why did you fill out this application?

15 A.  To get hired.

16 Q.  Okay.  Let's look at the section on employment, your

17 employment history.  It looks like you had a job here in

18 November of 2014 to March of 2015, it was a part-time job at

19 Cici's Pizza?

20 A.  Yes.

21 Q.  And you were cook?

22 A.  Yes.

23 Q.  And you described your responsibilities as "to make sure the

24     buffet is always fresh."

25 A.  Yes.

Rashaan Rambaran - Direct

256

1   Q.  And you left because of a bad work environment.

2         Did you receive any type of training on marketing?  Did

3   you have any experience in marketing when you applied for this

4   job to PCA in May of 2015?

5   A.  No.  I did a little door-to-door, like asking people if they

6   needed their windshield replaced, but I don't know if it's

7   really marketing it.

8   Q.  Did you get hired?

9   A.  Yes.

10  Q.  From the pharmacy?

11  A.  Yes.

12  Q.  Okay.  Did you have a job interview?

13  A.  No.

14  Q.  Did the pharmacy ever train you in how to market the pain

15  creams, the scar creams, the vitamins?

16  A.  No.

17  Q.  Did they ever tell you how their products worked?

18  A.  No.

19  Q.  When I say "they," did you understand that Mr. Grow, the

20  defendant, was still involved with the pharmacy after you became

21  an employee?

22  A.  I mean, I had a hunch he was, yes.

23  Q.  Now, who did you recruit?  Who did you recruit as a sales

24  rep for Monty Grow?

25  A.  I don't think I recruited anybody.

Rashaan Rambaran - Cross

257

1  Q.  Anybody at all?

2  A.  At all.

3  Q.  You said earlier your older brother.

4  A.  Yes.  Oh, I signed him up.

5  Q.  Did you sign anybody else up?

6  A.  No.

7  Q.  How much did you get paid for your brother's orders?

8  A.  I think $1200.

9  Q.  Is that everything you received?

10  A.  Yes.

11  Q.  Okay.

12         MR. LARSEN:  That's all, Your Honor.

13         THE COURT:  Cross-examination.

14                    CROSS-EXAMINATION

15  BY MS. MEYERS:

16  Q.  Good morning, Mr. Rambaran.  My name is Kate Meyers and I

17  represent Monty Grow.  When you signed up to get a prescription,

18  you filled out an intake form; isn't that correct?

19  A.  Yes.

20  Q.  And you indicated earlier on direct testimony that you had

21  issues with scarring; isn't that correct?

22  A.  Yes.

23  Q.  Did you put that issue on your intake form?

24  A.  I'm sure I did.

25  Q.  Okay.  Do you recall whether you also put on your intake

1  form that you had issues with pain in your wrist?

2  A.  Yes.

3  Q.  You did.  And after you submitted the intake form you spoke

4  with the pharmacy?

5  A.  Yes, I did.

6  Q.  Before you got the medication?

7  A.  Yes.

8  Q.  You told them that you still wanted the medication?

9  A.  Yes.

10  Q.  And you spoke with a doctor?

11  A.  I believe so.

12  Q.  Okay.  You weren't paid for your own prescription, were you?

13  A.  No, I was not.

14  Q.  And the doctor agreed -- after speaking with you, the doctor

15  wrote you a prescription, correct?

16  A.  Yes.

17  Q.  Okay.  You talked about that you were paid for referring

18  your brother; is that correct?

19  A.  Yes.

20  Q.  Monty Grow's company, MGTEN, sent you a 1099; isn't that

21  correct?

22  A.  Yes.

23  Q.  So that you could pay your taxes on the money that you

24  earned?

25  A.  No.

Rashaan Rambaran - Cross

259

1  Q.  What is a 1099 for, do you know?

2  A.  I honestly do not.

3  Q.  I'll move on.  I'll move on.  You applied for a position

4  with PCA, correct --

5  A.  Yes.

6  Q.  -- that's the pharmacy?

7       That was Government's Exhibit 174 that the Government

8  just showed you a few moments ago?

9  A.  Yes.

10  Q.  So you filled out an application?

11  A.  Yes.

12  Q.  Did you have a drug test?

13  A.  I do not remember.

14  Q.  You don't recall.  Do you recall whether you filled out a

15  W-2 to work for the pharmacy?

16  A.  Yes.

17  Q.  You did.  And that, again, is so that any taxes that you

18  would owe would be with withheld from your paycheck from PCA,

19  correct?

20  A.  Yes.

21  Q.  You also mentioned --

22       THE COURT:  I'm sorry, I didn't hear the answer.  I

23  apologize.  Did you --

24       MS. MEYERS:  I didn't either, Your Honor.

25       THE WITNESS:  Yes.

Rashaan Rambaran - Cross

1          THE COURT:  Okay.  Thanks.

2   BY MS. MEYERS:

3   Q.  You testified on direct that you went through training at

4   PCA -- excuse me -- online training; isn't that correct?

5   A.  Yes.

6   Q.  And the online training was on subjects like HIPAA, correct?

7   A.  I'm not entirely sure, but it's possible.

8          MS. MEYERS:  I'll place on the ELMO, Your Honor,

9   Government's Exhibit 174, which is admitted into evidence.

10  BY MS. MEYERS:

11  Q.  Is this your signature, Mr. Rambaran?

12  A.  Yes.

13  Q.  Okay.  And this indicates that you went through something

14  called PSE Track Training; isn't that correct?

15  A.  Yes.

16  Q.  The next page, 5-11-2015, again is that your signature?

17  A.  Yes.

18  Q.  And this that indicates that you went through something call

19  IMMU Track Training; is that correct?

20  A.  Yes.

21  Q.  Again, training on 5-11-2015, this indicates you went to

22  OSHA Track Training; is that correct?

23  A.  Yes.

24  Q.  Again, is that your signature?

25  A.  Yes.

1  Q.  5-11-15, it indicates that you went through Quality

2  Assurance Training.  Is that your signature?

3  A.  Yes.

4  Q.  5-6-15, this indicates you went through Medicare Fraud and

5  Waste and Abuse Training; is that correct?

6  A.  Yes.

7  Q.  Is that your signature?

8  A.  Yes, ma'am.

9  Q.  The date is cut off, but I think it says 5-6-2015, it

10  indicates you went through HIPAA training; is that correct?

11  A.  Yes.

12  Q.  Is that your signature?

13  A.  Yes.

14  Q.  I can't read the date, it's cut off, but this indicates that

15  sometime in May, I believe, of 2015, you went through Blood

16  Borne Pathogen Training; isn't that correct?

17  A.  Yes.

18  Q.  And that's your signature, correct?

19  A.  Yes.

20          MS. MEYERS:  Your Honor, I have nothing further.

21          THE COURT:  Redirect.

22                    REDIRECT EXAMINATION

23  BY MR. LARSEN:

24  Q.  Mr. Rambaran, all this training that Ms. Meyers just asked

25  you about, do you know what that training was about?  What's

Cichowicz - Direct

1  HIPAA Training, do you know?

2  A.  No, I do not.

3  Q.  Info [sic] Track Training?

4  A.  I do not know.

5          MR. LARSEN:  Okay.  Thank you.

6          Nothing further.

7          THE COURT:  Thank you, sir, you're excused.  Have a

8  good day, safe trip back to Houston.

9      (The witness was excused.)

10         THE COURT:  Next witness.

11         MR. LARSEN:  The United States calls Jill Cichowicz.

12         THE COURT:  Raise your right hand, please.

13         JILL CICHOWICZ, GOVERNMENT'S WITNESS, SWORN.

14         THE COURT:  Have a seat, please.  Tell us your name

15  when you get comfortable.

16         THE WITNESS:  My name is Jill Marie Cichowicz.

17         THE COURT:  C-i-c-h-o-w-i-c-z, right?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Thanks.

20                    DIRECT EXAMINATION

21  BY MR. LARSEN:

22  Q.  Good afternoon, Ms. Cichowicz.  Where do you live, city and

23  state only, please?

24  A.  Richmond, Virginia.

25  Q.  And do you know why you are testifying in court here today?

Cichowicz - Direct

263

1  A.  I was subpoenaed to come to the trial for Tricare with Monty

2  Grow.

3  Q.  Who is Monty Grow, do you know?

4  A.  I have only spoken to him a few times.  I don't know him

5  personally, no.

6  Q.  How do you know Mr. Grow?

7  A.  I was introduced to him from a neighbor in New York when I

8  was approached about getting some vitamins and creams.

9  Q.  Are you a Tricare beneficiary?

10  A.  I am.

11  Q.  Are you active duty or --

12  A.  No, I am a dependent.  My husband is now retired.  He was

13  active duty at the time.

14  Q.  And where were you stationed in early 2015?

15  A.  Fort Drum, New York.

16  Q.  Now, you stated that you, at some point, became acquainted

17  with the defendant, Mr. Grow, and what was the reason that you

18  became acquainted?  What did you speak to him about with respect

19  to -- what did you speak to him about?

20  A.  Well, my neighbor in New York was an acquaintance and she

21  had him call me regarding some vitamins that I was inquiring

22  about that she said would work great and he called me to ask me

23  about them and I went with it.

24  Q.  Okay.  So let's talk about that call with the defendant.

25  What kinds of products did the defendant talk to you about?

Cichowicz - Direct

1  A.  He mentioned a vitamin and some compound creams particularly

2  for pain and for scars.

3  Q.  Do you see these items in front of you?

4  A.  Yes.

5  Q.  Do those look familiar to you?

6  A.  Absolutely.

7  Q.  How do they look familiar to you?

8  A.  These compound creams are the ones that I received and the

9  vitamins are the ones that I received.

10  Q.  Okay.  And what did the defendant tell you about these

11  specific products?

12  A.  He just mentioned that the creams would help with pain and

13  scars and the vitamins, how great they were, and everybody could

14  use vitamins, you know.

15  Q.  Okay.  Well, did he talk to you about whether you would need

16  to see a doctor to get these creams and vitamins?

17  A.  No.

18  Q.  Did he say whether you would need to or don't need to?

19  A.  He said that a doctor's office would be contacting me, I

20  would speak with a nurse, and they would fill it for me.

21  Q.  At the time that you and Mr. Grow spoke and you said you

22  went with it --

23  A.  Yes.

24  Q.  -- were you under the care of a doctor for any chronic pain

25  conditions or scars?

Cichowicz - Direct

1  A.  No.

2  Q.  Were you using any prescription medications for pains or

3  scars?

4  A.  No.

5  Q.  What would you take if you did have pain?

6  A.  Motrin.

7  Q.  What did Mr. Grow, if anything, say about the opportunity to

8  make money through the use of his products?

9  A.  That I would receive a commission based on my prescription

10  and that -- he asked me if my husband had any of these issues,

11  that we could get him a prescription as well, which I told him

12  he would go on post for since he was an active duty soldier.

13  Q.  What does that mean, to go "on post for"?

14  A.  Oh, he would go to a pharmacy at Fort Drum where soldiers

15  get their prescriptions filled by their doctors

16  Q.  Okay.  So did you tell him no then?

17  A.  I said no.

18  Q.  Okay.  Did Mr. Grow persist with respect to anything with

19  respect to your husband?

20  A.  Not really.  Once I said no, no, it ended.

21  Q.  Now, I thought I heard you say that the defendant told you

22  you could make money on your own prescriptions; is that right?

23  A.  Yes, commission on the prescription.

24  Q.  And did you, in fact, get paid for ordering your own

25  prescriptions?

Cichowicz - Direct

1  A.  I did.

2  Q.  What did you get paid for doing?

3  A.  How much?

4  Q.  Or for doing, what did you get paid for doing?

5  A.  Nothing, I got paid to do nothing.

6  Q.  What do you mean by nothing?

7  A.  I thought there was a job opportunity there, but I filled

8  the prescription and not too much later I saw money in my

9  checking account.

10  Q.  You had done nothing other than filling your own

11  prescription?

12  A.  Right.

13  Q.  Let me ask you, you had a conversation with Mr. Grow.  Did

14  you have an impression of him on the conversation?  Did he come

15  across in any way to you as far as -- what was your impression

16  of Mr. Grow?

17  A.  He was very nice.  He was very nice.  He was charismatic.

18  He answered every question I had.  Anything I was concerned

19  about, he answered and it was a very nice conversation.

20  Q.  So how did you place these orders for your own products?

21  A.  So after we spoke, I received a call from a nurse at a

22  doctor's office.  She asked me questions.  I do, in fact, have

23  some scars and some pain issues that I did use the creams for,

24  and I did actually use the vitamins.  I did use everything.

25  Q.  Okay.  And then, what happened after you received the

Cichowicz - Direct

1  products?

2  A.  After I received the products, they were delivered to my

3  front door, I got the checking -- the money in my checking

4  account and there was, I think, three refills on the

5  prescriptions and we went based on that.

6  Q.  Let's talk about that first payment.  You said you received

7  a payment into your account.  How much did you get?

8  A.  I think that one was 1500.

9  Q.  For your first order?

10  A.  I believe.

11  Q.  What did you think when you got $1500 in your account for

12  ordering medications?

13  A.  I will say I think the red flag probably went up right away,

14  like I thought maybe I was going to be doing a job or something

15  was to come in order to get paid, and at that point I had done

16  nothing.

17  Q.  What, if anything, did you do after that first payment?

18  What happened?

19  A.  Nothing.

20  Q.  And you said that the refill -- you mentioned refills.

21  A.  Right.

22  Q.  So when would the next refill come?

23  A.  I want to say maybe monthly.  I don't really recall exactly.

24  Q.  And what would happen, would you get paid again after a

25  refill?

Cichowicz - Direct

268

1    A.   Yes.

2    Q.   And you see these products here on the ledge in front of

3    you.  Could you describe what quantity the products came in?

4    A.   I usually got three of these big white creams and that big

5    thing of vitamins.

6    Q.   It would be for one month?

7    A.   Yes.

8    Q.   Would you go through all of that in one month?

9    A.   No.

10   Q.   Was it possible to go through it all in one month?

11   A.   I don't think so.

12   Q.   Did you ever recruit or refer any friends or family to

13   purchase any of the products that Mr. Grow, the defendant, was

14   selling you?

15   A.   I did not.

16   Q.   Not your husband?

17   A.   No.

18   Q.   Friends, family?

19   A.   No.

20   Q.   Did there come a time when -- did your husband know that you

21   were doing this?

22   A.   No.

23   Q.   Did he find out?

24   A.   Yes.

25   Q.   Without telling us anything that your husband may have said,

Cichowicz - Direct

269

what happened when your husband found out about your involvement
with this?

A.  He was surprised that I could have gotten involved.  I'm a
pretty smart woman, good head on my shoulders, you know, just --
I think I was more embarrassed, and I felt stupid that I could
have fallen trap to this.

Q.  Okay.  Did you continue with this after speaking with your
husband?

A.  Honestly, it stopped shortly after it started.  You know, it
was ending so-to-speak.  So it was only a few months in and
that's kind of where the red flags were starting to coming up
and I was questioning it anyways and it ended, so ...

Q.  Do you recall a time where the defendant told you that you
would have to become an employee of the pharmacy?

A.  Yes.

Q.  What do you remember about that conversation?

A.  He said something about the regulations had changed, that I
would now be employed through the pharmacy, and I was sent to go
get a urine sample and some certifications and that I would now
be employed through the pharmacy.

Q.  And did you fill out the paperwork and --

A.  I did.

Q.  -- send it off?

A.  I even spoke to someone supposedly at HR regarding this.

Q.  Okay.  Did you ever go to the pharmacy?

1  A.  I did not.

2  Q.  Did you ever have a job interview?

3  A.  No.

4  Q.  Did you ever get trained by anyone at the pharmacy about how

5  to sell their products or how their products worked?

6  A.  No.

7  Q.  Did Mr. Grow ever tell you how to sell the products or how

8  the products worked?

9  A.  No.

10  Q.  You already stated that you never sold the products to

11  anyone but yourself?

12  A.  Right.

13          MR. LARSEN:  Nothing further, Your Honor.

14          THE COURT:  Cross-examination.

15          MR. RASHBAUM:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. RASHBAUM:

18  Q.  Good afternoon.

19  A.  Hi.

20  Q.  My name is Dan Rashbaum.  I represent Monty Grow.

21          I think you said the way that you first became involved

22  in this is you had some pain and a neighbor said that there were

23  some products that could help you she thought?

24  A.  Well, it first started off, my two neighbors, who were two

25  girlfriends of mine, wanted to tell me about some vitamins that

1    they started and they're both rather attractive women and I

2    said, well, we all could use that, and then they said, it's not

3    only this, we also have this pain and scar cream that works

4    really well should you require it.

5    Q.   And who were those two neighbors?

6    A.   Amanda Martini and Amy Fouche.

7    Q.   Okay.  And shortly after hearing that from them, you

8    contacted Mr. Grow?

9    A.   I believe he called me.

10   Q.   Let me see if I can --

11         MR. RASHBAUM:   Judge, I'd like to put into evidence

12   Defendant's Exhibit 199.

13         MR. LARSEN:   No objection, Your Honor.

14         THE COURT:   It will be admitted.

15    (Defendant's Exhibit Number 199 was received in evidence.)

16   BY MR. RASHBAUM:

17   Q.   By the way, what is your maiden name?

18   A.   Zebrowski.

19   Q.   Okay.  I didn't want to butcher it so -- is this an email

20   between you and Mr. Grow?

21   A.   Yes.

22   Q.   Can you see it okay?

23   A.   Yes.

24   Q.   Okay.  And in the email Mr. Grow says, "It was good talking

25        with you today."

Cichowicz - Cross

1  A.  Yes.

2  Q.  "Here is the info for you to review.  I have attached the

3      Tricare Patient Intake Form along with a W-9."

4          Do you see that?

5  A.  Yes.

6  Q.  So in this Mr. Grow -- and we will go to it -- attaches this

7      Tricare intake form, and this is for you to fill out for

8  your product, correct?

9  A.  Correct.

10  Q.  And you filled it out accurately, I assume, when you filled

11  it out?

12  A.  Yes.

13  Q.  You told Mr. Grow of your scars and of your pains?

14  A.  Yes.

15  Q.  Okay.  And you noticed in the front it said, "Let the

16      patient know that they will need to take a call from the

17      doctor and the pharmacy."

18          You see it says that there, right?

19  A.  Correct.

20  Q.  And behind that Mr. Grow attached a W-9 to be filled out,

21  correct?

22  A.  Yes.

23  Q.  And he then asked you to send him the W-9 along with your

24  banking information, correct?

25  A.  Yes.

Cichowicz - Cross

273

```
1   Q.   And you already knew by this point in time that you wanted
2   to try those products, right --
3   A.   Yes.
4   Q.   -- provided that a doctor would prescribe them to you?
5   A.   Correct.
6   Q.   That's correct, right?
7   A.   Um-hum.
8   Q.   You knew that you needed to get a doctor's prescription in
9   order to get the products, right?
10  A.   Um-hum.
11  Q.   I'm sorry, just for the court reporter --
12  A.   Yes.
13  Q.   -- it has to be yes or no.
14  A.   Sorry, yes.
15  Q.   Great.  But Mr. Grow also attached -- along with the W-9 and
16  the intake form, he attached information about the products.  Do
17  you see that?  I'll just turn pages.
18  A.   Okay.  I don't know if --
19  Q.   You know what?  Let me turn them and then I'll give you a
20  copy.
21  A.   Okay.  It's just I don't think I've seen this before.
22  Q.   It was attached to this email.  They were all attached in
23  one email.  I'll let you see it so that you don't have to take
24  my word for it.
25  A.   Sure.
```

1   Q.  Take your time, just look at that.  I'll let you have a

2   chance to look through it.

3   A.  I don't recall it, but if you say so --

4   Q.  Well, do you see to the email --

5   A.  I knew there was an attachment, but to this length, I

6   don't remember getting all of this to be honest with you, but

7   it's been awhile.

8   Q.  Of course.  My memory is very bad as well.  But if you look

9   at the email, you'll see there are a bunch of attachments.

10  A.  Right.

11  Q.  And one of them says IMD Solutions, metabolic well, InforMD

12  compound formula, pain management, pdf.  Do you see that?

13  A.  Right, yes.

14  Q.  And you see attached is InforMD compound.  You have no

15  reason to believe these are not the attachments, correct?

16  A.  Yeah.  I don't recall.  I'm sorry.

17  Q.  And again, when Mr. Grow sent this to you, he wasn't trying

18  to convince you to buy products, right?  You had already decided

19  that if a doctor would give you a prescription, you wanted those

20  products because you had those pains and scars, right?

21  A.  Right.

22  Q.  So he was sending this to you because he thought you were

23  going to be marketing to other people possibly; is that correct?

24          MR. LARSEN:  Objection, speculation.

25          MR. RASHBAUM:  I am just asking if she knew.

1          THE COURT:  If she knew what?

2          MR. RASHBAUM:  That the reason that she was being sent

3   these marketing materials along with a W-9 was because Mr. Grow

4   thought she was going to be marketing to others.

5          THE COURT:  Do you know that or you don't know?

6          THE WITNESS:  He did tell me that if other people had

7   gotten the prescription, I would make a commission off that.

8   BY MR. RASHBAUM:

9   Q.  And that email is from January of 2015.  Do you see that?

10  A.  Yes.

11  Q.  I want to fast-forward a little bit because it's getting

12  late.

13         THE COURT:  How much longer do you think you're going

14  to go for?

15         MR. RASHBAUM:  I want to be less than, you know, 10

16  minutes or so.

17         THE COURT:  Oh, we'll take that.

18         MR. RASHBAUM:  I'm going to try my best.

19         THE COURT:  Succeed.

20         MR. RASHBAUM:  Defendant's Exhibit 43.

21         MR. LARSEN:  No objection.

22         MR. RASHBAUM:  Okay.

23         THE COURT:  You're introducing that?

24         MR. RASHBAUM:  Yes, Your Honor.

25         THE COURT:  Any objection?

1          MR. LARSEN:  None.  No, Your Honor.

2          THE COURT:  It will be admitted.

3      (Defendant's Exhibit Number 43 was received in evidence.)

4  BY MR. RASHBAUM:

5  Q.  So in April of 2019, I think you alluded to the fact --

6          THE COURT:  April of two thousand and what?

7          MR. RASHBAUM:  Did I say '19?

8          THE COURT:  You did because, see, probably you think

9  it's going to take that long.  You probably meant '15, no?

10          MR. RASHBAUM:  I did.  I apologize, Your Honor.

11          THE COURT:  It does seem like three years, doesn't it?

12  Go ahead.

13  BY MR. RASHBAUM:

14  Q.  In April of 2015, you see that you have an email exchange

15  with Mr. Grow.  Do you see that?

16  A.  Yes.

17  Q.  Okay.  And I want to bring you to the front of the email,

18  which is April 8, 2015.

19          You say, "Hey there.  I'm loving my vitamins and

20      realize I only got two refills with the prescription.  What

21      do I need to do in order to get more?  I've seen a huge

22      difference since taking them."

23          Do you see that?

24  A.  Yes.

25  Q.  And I know we talked about how big these vials are, right,

Cichowicz - Cross

277

1   but the vitamins were working, right?

2   A.  Yes.

3   Q.  You liked the product?

4   A.  I believe so.  It's been awhile.

5   Q.  And you wanted to figure out -- at some point you must have

6   run out because you wanted to figure out how can I get more of

7   them, right?

8   A.  Yes.

9   Q.  And that had nothing to do with money or anything like that,

10  it had to do with the product was working, right?

11  A.  Yes.

12  Q.  And Mr. Grow said, "Jill, I'm in the process of getting a

13      new prescription for you.  Tricare made us change the

14      formula a little, so a new script is needed.  Hopefully it

15      will happen soon."

16          Do you see that?

17  A.  Yes.

18  Q.  And again, Mr. Grow didn't tell you he could write a

19  prescription out, right, he said the prescription has to come

20  from a doctor, correct?

21  A.  Yes.

22  Q.  And then you respond to Mr. Grow, "Quick question.  I still

23      have one more refill on my current prescription.  Will I be

24      able to fill that?"

25          Again you are seeking to get more of this product

Cichowicz - Cross

1  because you're short on it?

2  A.  Yes.

3  Q.  So even though -- let me see how big this is.  I mean, they

4  are big, but as big as they are, you had run out?

5  A.  The vitamins, yes, not the cream.

6  Q.  Sorry.

7  A.  Yeah, the vitamins.

8  Q.  You had run out?

9  A.  Yes.

10 Q.  And then Mr. Grow says to you on April 19, 2015, "Jill, no

11     submission sent in April will be processed.  Please see

12     below and pass along to any representatives you are

13     associated with."

14         Did that give you an indication that Mr. Grow thought

15 that you had been marketing to other people, that you were a

16 representative to those people?

17 A.  I don't know.

18 Q.  When you got this email, what did you think he was saying

19 when he said pass along to any representatives you are

20 associated with?

21 A.  I'm not really sure, to be honest.

22 Q.  Fair enough.

23         MR. RASHBAUM:  I'd like to put in Defendant's Exhibit

24 33.

25         MR. LARSEN:  No objection, Your Honor.

Cichowicz - Cross

279

1           THE COURT:  It will be admitted.

2       (Defendant's Exhibit Number 33 was received in evidence.)

3   BY MR. RASHBAUM:

4   Q.  You said at some point in time there was a change where you

5   went from being a 1099 to a W-2 and being directly employed by

6   the pharmacy?

7   A.  Yes.

8   Q.  And on April 28th, you wrote to Mr. Grow, and this is

9       Defendant's Exhibit 33; "Morning, Monty.  I have a few

10      questions/concerns regarding the changes in compounding.

11      The last email you sent said it would officially stop due to

12      regulations, but now I've been informed that we have to send

13      new information to you.  I'm not sure what the new job title

14      is and how all this works.  Would you mind explaining a

15      little more.  I'm not getting adequate information.  Thank

16      you in advance!"

17          By the way, every time that you contacted Mr. Grow by

18  email, did he always respond to you?

19  A.  I don't recall.  Not immediately but --

20  Q.  Did you ever remember him being not responsive?

21  A.  A few times, yes.

22  Q.  Okay.  But ultimately, he would answer you?

23  A.  From what I can recall, yes.

24  Q.  Okay.  This email was at 9:27 a.m. on April 28th, and at

25      9:42 a.m. on April 28th, he responded and he said, "Jill, in

1    order to receive commissions on sales that involve a Federal

2    payer such as" -- it's actually "such ad Tricare," I think

3    it's a typo -- "you must be an employee of the entity that

4    is billing.  In this case it's the pharmacy.  Everything

5    else in the process remains the same, but the pharmacy has

6    to be your employer and they make all payments to you twice

7    monthly.  In order to start I need your full name, address,

8    email address, and phone number.  The pharmacy will FedEx

9    you an employee packet."

10         Do you see that?

11   A.  Yes.

12   Q.  And ultimately, you provided that information to Mr. Grow,

13   correct?

14   A.  Yes.

15   Q.  And the pharmacy then gave you that employee packet, right?

16   A.  Yes.

17   Q.  Okay.  And you respond on that same day, "Okay.  That makes

18       sense.  And the vitamins will be compounded differently to

19       be less expensive?"

20         So you were asking him is it going to be less money,

21   correct, for the vitamins?

22   A.  As far as commission or as far as --

23   Q.  No, just as far as cost.

24   A.  -- to me?  Yes.

25   Q.  By the way, did you pay copays for the vitamins?

1   A.   I don't recall.  I believe that I did, but I cannot say yes

2   or no.

3   Q.   Okay.  And then Mr. Grow responded regarding your question

4        about being less expensive, "No, we have no control over

5        costs.  The pharmacy has formulas that benefit the patients

6        and get reimbursed whatever the insurance carriers agree to

7        pay."

8           Do you see that?

9   A.   Yes.

10  Q.   And so you understood that Mr. Grow was telling you here

11  it's up to the insurance company what they pay for

12  reimbursement, I don' know what the reimbursement will be.  Did

13  you understand that's what he was saying?

14  A.   Yes.

15  Q.   And that answered your questions, correct?

16  A.   Yes.

17  Q.   So going back to your medicine that you got, you do recall

18  getting a call from someone, a nurse or doctor, on the phone who

19  went through your medical history?

20  A.   Yes.

21  Q.   And determined that you qualified or that they should

22  prescribe you the vitamins and the creams?

23  A.   She was a nurse.

24  Q.   You said you took Motrin for some of this stuff before?

25  A.   Yes.

Cichowicz - Cross

1  Q.  Did the Motrin work as well?

2  A.  Yes.

3  Q.  It did?

4  A.  Yeah.

5  Q.  Did you take other vitamins before this stuff that you took

6  here?

7  A.  No.

8  Q.  But you liked the vitamins, right?

9  A.  I did.

10  Q.  Okay.  And you also received a call from the pharmacy before

11  you got the product, too, to confirm that you wanted the product

12  and to confirm your address?

13  A.  Yes.

14  Q.  Okay.  Now, you got paid how much money as a result of this?

15  A.  You mean total?

16  Q.  Yes.

17  A.  I believe between 5 and 6,000.

18  Q.  Okay.  And you got the medication not because you were

19  getting paid any money, right?

20  A.  I wanted to try it out.

21  Q.  And you continued -- when you wrote Mr. Grow about your

22  running out of vitamins, that had nothing to do with getting

23  payments, right, because the vitamins were working, you wanted

24  more of the product?

25  A.  I wanted the vitamins, yes.

1        MR. RASHBAUM:  One moment, Your Honor.  No further

2   questions, Your Honor.

3        THE COURT:  Redirect.

4                     REDIRECT EXAMINATION

5   BY MR. LARSEN:

6   Q.  Ms. Cichowicz, did you ever have a single rep under you?

7   Did you ever have anyone that you referred the product to?

8   A.  No.

9   Q.  Did you ever refer a single patient to the defendant?

10  A.  I did not.

11  Q.  Did you ever tell the defendant that you were going to refer

12  a single patient to him?

13  A.  No.

14  Q.  Now, Mr. Rashbaum asked you about these vitamins and you

15  said you liked them.  Would you pay $5,000 out of pocket for

16  those?

17  A.  Absolutely not, no.

18        MR. LARSEN:  Okay.  Thank you.

19        Nothing further.

20        THE COURT:  Thank you, you're excused.  Have a good

21  day, safe trip back.

22     (The witness was excused.)

23        THE COURT:  Ladies and gentlemen, I'm going to send you

24  home for the afternoon.  Tomorrow morning I want you to come in

25  for 9:30.  Some of you try to get here around 8:30, so we can

1    start around 9:30, or 8:45.  You know how traffic is, you know

2    how the Metrorail is, I-95, US-1, the buses.  By now you know

3    how it is.  Because if one of you cannot make it, we have to

4    wait, all right, which is fine because you've waited for us, so

5    it's only fair that we wait for you, but all it means is it just

6    takes longer.  That's all.  But I think the case is moving.  We

7    are probably going to have case in your hands, in my opinion,

8    around Tuesday of next week.  You'll have the case in your hands

9    and then you take as long as you want.  There's never a maximum

10   amount of time or minimum amount of time.  That's up to you.

11   Okay?

12           Don't talk about the case.  Don't google about the

13   case.

14           Mrs. Christie is going to show you how to get back to

15   your original room, and that's where you go because it's hard to

16   get through here.  Take your notebooks to that room and just

17   leave them there, because when all of you are present, we'll

18   bring you in through the back corridor.  Okay?

19           Thank you very much.  Have a good afternoon.

20      (The jury retired from the courtroom at 5:50 p.m.)

21           THE COURT:  Let me hear that door.

22           THE COURT SECURITY OFFICER:  Yes, sir.

23           THE COURT:  Thanks.

24           Okay.  You know what I'm going to ask.  You don't know.

25   Who is your next witness?

 1          MR. LARSEN:  Your Honor, we have four witnesses until

 2  we rest.

 3          THE COURT:  Okay.  Who are they?

 4          MR. JUENGER:  They are Sven Bjerke.

 5          THE COURT:  Okay.

 6          MR. JUENGER:  And Josie Brundige.

 7          THE COURT:  All right.

 8          MR. JUENGER:  And Ralph Louis and Armando Lozada.  And

 9  there's still one witness who is on our list, but she will be in

10  the air coming from Germany.

11          THE COURT:  You're bringing someone all way from

12  Germany?

13          MR. JUENGER:  I know.

14          THE COURT:  Who is that?

15          MR. JUENGER:  Her name is Jill Coronado.

16          THE COURT:  Oh, my goodness.

17          MR. JUENGER:  Jonelle, forgive me.

18          THE COURT:  Jonelle Coronado.  And she was going to say

19  what all the way from Germany?

20          MR. JUENGER:  Like the beneficiaries, Your Honor --

21          THE COURT:  Oh, my goodness.

22          MR. JUENGER:  -- she was going to say whatever she was

23  going to say.

24          THE COURT:  Holy Toledo.  You know why that happens?

25  Because it's taxpayers' money.  If it was your own pocket, you

1    wouldn't do that.

2              MR. JUENGER:  That's a fact, Your Honor.

3              THE COURT:  But that's okay, that's what happens.

4              MR. JUENGER:  Like this last witness, she was paid for

5    her own script, she never recruited anybody, and that's a

6    separate type of charge so it is an important witness.

7              THE COURT:  I know.  You told me it is an important

8    witness for each of the 49 counts, right?

9              MR. JUENGER:  No, not for each, of course.

10             THE COURT:  Just for one of them.  Okay.  But that's

11   all right.  You call whoever you want whenever you want, as long

12   as it's done on time.

13             All right.  So that means, as I mentioned to the

14   defense -- so that means you're going to rest in the morning.

15   Or do we have any issues with any of these witnesses?  They're

16   all beneficiaries?

17             MR. JUENGER:  No, Mr. Lozada and Mr. Louis were both

18   pharmacy employees, so they worked in PCA and they had direct

19   contact over the entire course of this scheme with Mr. Grow.

20             THE COURT:  Okay.

21             MR. JUENGER:  I will try my best to limit them to their

22   interactions and communications and so I will --

23             THE COURT:  With whom?

24             MR. JUENGER:  With Mr. Grow.

25             THE COURT:  Yeah, that's who's on trial, remember?  No

```
 1   pharmacy is on trial, right, that I missed.

 2           MR. JUENGER:  Sure.

 3           THE COURT:  What's the problem?

 4           MR. MARCUS:  There are issues with both witnesses, Your

 5   Honor.

 6           THE COURT:  Who's going to be first?  You don't know

 7   yet?

 8           MR. JUENGER:  I don't know yet.  I am going to work on

 9   my outlines and try and streamline them and I'd like to do the

10   quicker one first, but I just don't know who that will be yet.

11           THE COURT:  What are the exhibits that you want to

12   introduce?

13           MR. JUENGER:  There are a lot of exhibits.

14           THE COURT:  We might as well do it today instead of

15   tomorrow, don't you think?

16           MR. JUENGER:  We can.

17           THE COURT:  Do not leave for tomorrow what you can do

18   today.  Have you ever heard of that?  I'm a firm believer in

19   that.

20           MR. JUENGER:  I am, too.

21           THE COURT:  Give me a number.

22           MR. JUENGER:  Sure.  It's 31, 33.

23           THE COURT:  Okay.  Hold on.  We're going to do it one

24   at a time.  Any objection to 31?  It will be admitted.

25       (Government's Exhibit Number 31 was received in evidence.)
```

Jury Trial

288

1           THE COURT:  Next.  Next.

2           MR. JUENGER:  31, 33.

3           THE COURT:  33.  Any objection to the email by

4   Mr. Grow?  It will be admitted.

5       (Government's Exhibit Number 33 was received in evidence.)

6           MR. JUENGER:  35.

7           THE COURT:  Any objection to the email by Mr. Grow?  It

8   will be admitted.

9       (Government's Exhibit Number 35 was received in evidence.)

10          MR. JUENGER:  69.

11          THE COURT:  Any objection to the email by Mr. Grow?

12          MR. MARCUS:  No.

13          THE COURT:  It will be admitted.

14      (Government's Exhibit Number 69 was received in evidence.)

15          MR. JUENGER:  71.

16          THE COURT:  Email by Mr. Grow, any objection?  It will

17  be admitted.

18      (Government's Exhibit Number 71 was received in evidence.)

19          MR. JUENGER:  74.

20          THE COURT:  Email between Monty Grow and MS on March

21  29, 2015.  '15, emphasis added.  Any objection?

22          MR. MARCUS:  No.

23          THE COURT:  It will be admitted.

24      (Government's Exhibit Number 74 was received in evidence.)

25          MR. JUENGER:  76.

1        THE COURT:  Another email.  Any objection?  It will be

2   admitted.

3       (Government's Exhibit Number 76 was received in evidence.)

4        MR. JUENGER:  79.

5        THE COURT:  Email, February 15, 2015, by Mr. Grow.  It

6   will be admitted.

7       (Government's Exhibit Number 79 was received in evidence.)

8        MR. JUENGER:  88.

9        THE COURT:  Email between Monty Grow and an individual

10  whose initials are AC.

11       MR. MARCUS:  No objection.

12       THE COURT:  88, is that what you said?

13       MR. JUENGER:  Yes, sir.

14       THE COURT:  It will be admitted.

15      (Government's Exhibit Number 88 was received in evidence.)

16       MR. JUENGER:  95.

17       THE COURT:  Any objection?

18       MR. MARCUS:  No.

19       THE COURT:  All right.  It will be admitted.

20      (Government's Exhibit Number 95 was received in evidence.)

21       THE COURT:  Anything else?

22       MR. JUENGER:  98.

23       THE COURT:  Any objection?  It will be admitted.

24      (Government's Exhibit Number 98 was received in evidence.)

25       MR. JUENGER:  124.

1             MR. MARCUS:  No.

2             THE COURT:  It will be admitted.

3        (Government's Exhibit Number 124 was received in evidence.)

4             MR. JUENGER:  125.

5             MR. MARCUS:  No objection.

6             THE COURT:  It will be admitted.

7        (Government's Exhibit Number 125 was received in evidence.)

8             THE COURT:  What else?

9             MR. JUENGER:  127.

10            MR. MARCUS:  No objection.

11       (Government's Exhibit Number 127 was received in evidence.)

12            MR. JUENGER:  128.

13            THE COURT:  It will be admitted.

14            MR. MARCUS:  Well, this wasn't --

15            THE COURT:  128.  April 6, 2015 email between Monty

16  Grow and CO, and attachments Patient Care America.  What is the

17  objection?

18            MR. MARCUS:  My notes were that you reserved on this.

19  Let me just take a look.

20            THE COURT:  I think I reserved on 121, but I could be

21  wrong, which is an email between Monty Grow and MS and an

22  attachment spreadsheet, but I don't know.  I could be wrong, but

23  now it's 128.

24            MR. MARCUS:  Right.  So, you know, the issue with this,

25  Your Honor, is -- so the first email string is from Mr. Grow,

1    he's sending it to Mr. O'Hara.  No objection to that part.  But

2    there are other pieces of this string that Mr. Grow is not

3    copied on, doesn't make any statement.

4         THE COURT:  By whom?

5         MR. MARCUS:  They're internal communications with the

6    pharmacy.

7         THE COURT:  Okay.  Why should that go in?

8         MR. JUENGER:  Well, Your Honor, I mean, he has them so

9    this email --

10        THE COURT:  Who has them?

11        MR. JUENGER:  Monty Grow has them.

12        THE COURT:  How do we know?

13        MR. JUENGER:  When Monty Grow sends this email to Chris

14   O'Hara with his own statements, it includes everything that's

15   below it so necessarily --

16        THE COURT:  Does the email show that those were

17   attachments sent by Mr. Grow, Mr. Marcus?

18        MR. MARCUS:  The email string is forwarded from

19   Mr. Smith, who is an executive at the pharmacy, to Mr. Grow

20   without comment.

21        THE COURT:  Does he forward it himself?  What does

22   Mr. Grow do?

23        MR. MARCUS:  It's sent to him.  So he gets an email

24   string to him and then he has a communication with Mr. O'Hara at

25   the telemed company about this issue.

Jury Trial

292

1          THE COURT:  And includes the attachments to someone

2   else?

3          MR. JUENGER:  Correct.

4          MR. MARCUS:  Yes.

5          THE COURT:  Well, you could dispute whether you read

6   that or not or whether you sent it, but it goes to the weight of

7   the evidence, not its admissibility, unless there's something

8   there that's outrageous or totally unrelated to this case.  Not

9   being told any of that, I'll admit it.

10      (Government's Exhibit Number 128 was received in evidence.)

11          THE COURT:  Is that it?

12          MR. JUENGER:  136.

13          THE COURT:  136.  Any problems with that?

14          MR. MARCUS:  No objection, Your Honor.

15          THE COURT:  It will be admitted.

16      (Government's Exhibit Number 136 was received in evidence.)

17          MR. JUENGER:  141.

18          THE COURT:  Any problems with that?

19          MR. MARCUS:  No.

20          THE COURT:  It will be admitted.

21      (Government's Exhibit Number 141 was received in evidence.)

22          MR. JUENGER:  144.

23          MR. MARCUS:  No objection.

24          THE COURT:  I already admitted that one, but I'll

25   readmit it.

1          MR. JUENGER:  At least you're consistent.  146.

2          THE COURT:  Any objection to that one?

3          MR. MARCUS:  No, Your Honor.

4          THE COURT:  It will be admitted.

5     (Government's Exhibit Number 146 was received in evidence.)

6          MR. JUENGER:  147.

7          THE COURT:  Without objection, admitted.

8     (Government's Exhibit Number 147 was received in evidence.)

9          MR. JUENGER:  148.

10          THE COURT:  Without objection, admitted.

11     (Government's Exhibit Number 148 was received in evidence.)

12          MR. JUENGER:  149.

13          MR. MARCUS:  No objection.

14          THE COURT:  It will be admitted.

15     (Government's Exhibit Number 149 was received in evidence.)

16          MR. JUENGER:  150.

17          MR. MARCUS:  No objection.

18     (Government's Exhibit Number 150 was received in evidence.)

19          MR. JUENGER:  151.

20          MR. MARCUS:  No objection.

21          THE COURT:  In without objection.

22     (Government's Exhibit Number 151 was received in evidence.)

23          MR. JUENGER:  152.

24          MR. MARCUS:  No objection.

25          THE COURT:  In without objection.

Jury Trial

294

1          (Government's Exhibit Number 152 was received in evidence.)

2              MR. JUENGER:  153.

3              MR. MARCUS:  No objection.

4              THE COURT:  In without objection.

5          (Government's Exhibit Number 153 was received in evidence.)

6              MR. JUENGER:  And 158.

7              MR. MARCUS:  Let me just look at this.  I don't think

8    Mr. Grow is on this email.

9              THE COURT:  Go ahead.  Look at it.  Take your time.

10             MR. MARCUS:  So, Your Honor, this is an internal email

11   string at the pharmacy.  They talk about Mr. Grow.  He doesn't

12   make any statements.  He's not a party to the email.

13             THE COURT:  All right.

14             MR. MARCUS:  So it's hearsay.

15             THE COURT:  How is that admissible?  Who's MS?

16             MR. JUENGER:  I'll withdraw that one, Your Honor.

17             THE COURT:  Withdrawn?

18             MR. JUENGER:  Yes.

19             THE COURT:  Okay, not in.  Anything else from the

20   Government.

21             MR. JUENGER:  Not for this witness, but for one of the

22   other witnesses.

23             THE COURT:  Tell me what they are.  Might as well find

24   out.  It's better to get bad news early than late.

25             MR. LARSEN:  Your Honor, Government's Exhibit 137.

1          THE COURT:  137.  Any objection?  Email between Monty

2     Grow and Sven Bjerke, who's going to testify.

3          MR. LARSEN:  Sven Bjerke.

4          THE COURT:  Pardon?

5          MR. LARSEN:  Sven Bjerke.

6          THE COURT:  You said it better, but I said it away from

7     the microphone.  Sven Bjerke.

8          MR. RASHBAUM:  No objection.

9          THE COURT:  It will be admitted.

10        (Government's Exhibit Number 137 was received in evidence.)

11        MR. LARSEN:  Government's Exhibit 135.

12        THE COURT:  Same type of email between those two

13    individuals.

14        MR. RASHBAUM:  No objection.

15        THE COURT:  Without objection, it will go in.

16        (Government's Exhibit Number 135 was received in evidence.)

17        MR. LARSEN:  And Government's Exhibit 77.

18        THE COURT:  77.

19        MR. RASHBAUM:  No objection.

20        THE COURT:  It will come in.

21        (Government's Exhibit Number 77 was received in evidence.)

22        MR. LARSEN:  145.  I don't know if that one has been

23    admitted.

24        THE COURT:  145.  Any objection?

25        MR. RASHBAUM:  No objection.

1          THE COURT:  It will be come in.

2      (Government's Exhibit Number 145 was received in evidence.)

3          THE COURT:  Are you going to have witnesses talk about

4   each one of these?

5          MR. JUENGER:  No, Your Honor.

6          THE COURT:  All right.

7          MR. JUENGER:  But they are sort of related to these

8   witnesses, and we may use a few of them.  They are mostly

9   Mr. Grow's statements, we'll use them in closing.

10         THE COURT:  Okay.  What else?

11         MR. LARSEN:  I think that's it, Your Honor.

12         THE COURT:  All right.

13         MR. MARCUS:  Your Honor, we have an issue with

14   Mr. Louis and Mr. Lozada I just want to raise.

15         THE COURT:  Go ahead.

16         MR. MARCUS:  So Mr. Louis is a former pharmacy tech who

17   was fired by PCA in 2015.  Today we got a 302 from him from

18   March of 2011.  It's a lot of Giglio.  I mean, he admits to

19   essentially violating pharmacy DEA regulations and dispensing

20   medications and Oxycontin.

21         THE COURT:  So you're happy, you'll have

22   cross-examination.

23         MR. MARCUS:  Well, I am raising it because -- I mean, I

24   don't want to surprise you during cross-examination.  So we

25   haven't had a chance --

1    THE COURT:  The only thing that would surprise me in

2    cross-examination is if any of you would be brief.  That would

3    be the only thing that would surprise me.  So you're right, I

4    don't think you are going to surprise me.

5    MR. MARCUS:  I will explore it.  Obviously, I can't

6    investigate it.  I mean, this should have been turned over a

7    long time ago.

8    THE COURT:  So what do you want me to do?

9    MR. MARCUS:  I mean, I would exclude the witness

10   honestly.  I don't want to delay the trial.

11   THE COURT:  Well, when you have the friends that I have

12   to get appointed a Federal judge and have even more friends to

13   get confirmed by a Democratic Senate and appointed by a

14   Republican president, then you can make that ruling, but now

15   you're going to have to give me a reason since you would have to

16   convince me.

17   MR. MARCUS:  Well, we have no ability to investigate

18   the allegations.

19   THE COURT:  You've never heard of Ralph Louis?

20   MR. MARCUS:  We just got it.  This is the first --

21   yeah, we haven't heard of him --

22   THE COURT:  I'm sorry.  You've never heard of him?

23   Ralph Louis is a fellow you've never heard of.

24   MR. MARCUS:  He was added to the Witness List.

25   THE COURT:  No, the question is:  Have you heard?

Jury Trial

298

1          MR. MARCUS:  Yes, I have before today.

2          THE COURT:  When was the first time you heard about

3   Ralph Louis?

4          MR. MARCUS:  He is on some of the emails as a PCA

5   employee, so yes.

6          THE COURT:  So months ago.

7          MR. MARCUS:  Yes.

8          THE COURT:  If not maybe over a year ago you probably

9   heard about Ralph Louis.  All right.  So now you have matters

10  that help you in cross-examination that you can use.

11         MR. MARCUS:  Okay.  He wasn't charged with this so

12  there's no --

13         THE COURT:  So you can cross-examine him about that.

14         MR. MARCUS:  But if he lies --

15         THE COURT:  We're interrupting each other.

16         So you can ask him about that.  What do you want to do?

17  What do you want me to do, prevent you from cross-examining him?

18  No, I won't.  Cross-examine him.

19         MR. MARCUS:  Okay.  If I confront him with just what I

20  have in the 302 and he lies on the stand, I have no ability --

21  all I have is this information.

22         THE COURT:  And that information that you have in your

23  hands is what kind of a report done by what agency?

24         MR. MARCUS:  It's an FBI 302.

25         THE COURT:  And you don't think it's a good thing to

 1   impeach someone with an FBI investigation.  You think that's not

 2   good enough?  You would rather --

 3             MR. MARCUS:  I would --

 4             THE COURT:  Let me finish.  You would rather hire your

 5   own investigator whom you will pay in order to find out the same

 6   thing as opposed to a Government FBI agent that would give you

 7   more credibility in the cross-examination.  That's what you want

 8   to do.

 9             MR. MARCUS:  Well, these agents --

10             THE COURT:  You really think that's better?

11             MR. RASHBAUM:  Yes.

12             THE COURT:  Well, I've got to have only one person

13   talk.  So whoever wants to talk has to talk.  The other person

14   cannot be talking.

15             MR. MARCUS:  So, Your Honor, the first issue is --

16             THE COURT:  No, no, you want to have -- what do you

17   want to do?  You have an FBI report.

18             MR. MARCUS:  Without an agent, so I don't have an agent

19   to call.

20             THE COURT:  You don't need an agent, you've got the

21   report and I'm going to let you use it, which most judges

22   wouldn't let you do an FBI report.  They may even tell you it's

23   not Jencks.

24             MR. MARCUS:  So I confront him, let's say he denies it.

25   Normally I would call the agent --

1          THE COURT:  Why would you call the agent?  You would

2    have the FBI report and I'll let you introduce it.

3          MR. MARCUS:  Okay.

4          THE COURT:  What's the harm?  Look at that.  Save you

5    money, time and gave you cross-examination with the imprimatur

6    of the FBI agent.  Go complain to the Eleventh Circuit.  The

7    Government may say, oh, my goodness, he went too far, is what

8    the prosecutors would do.  So what's the harm?

9          See, you come up with a problem, I come up with a

10   solution.  There's never a problem.

11         It's going to be tough, if you lose, to find error.

12   I'll tell you that much.  We're fast, we're efficient.

13         MR. MARCUS:  Your Honor --

14         THE COURT:  What do you want to do?

15         MR. MARCUS:  If I can put the report in, the 302,

16   that's fine.

17         THE COURT:  Didn't I say that?  Why would I say

18   something that I don't believe in?  You can put it in if he

19   denies it.  If he admits it, you don't need extrinsic evidence.

20   Remember we went through all of that.  We went through all of

21   that.  Read that Fordham Law Review, google it.  It will help

22   you.

23         MR. JUENGER:  Your Honor, may I?

24         THE COURT:  Well, okay.  What else?

25         MR. JUENGER:  I just wanted to say that I just received

1    the report last night so I turn it over as soon as I had it.

2           THE COURT:  I know, but see, all that does is you're

3    the Government, it's not personal, you are the whole United

4    States Government.

5           MR. JUENGER:  I know.

6           THE COURT:  So they're going to say remember that

7    Alaska senator and we want to create all of these issues and I

8    don't like issues.

9           MR. JUENGER:  I don't like issues either, Your Honor.

10          THE COURT:  We won't have issues.

11          MR. JUENGER:  But the allegation was it should have

12   been turned over a long time ago.  I only spoke to Mr. Louis two

13   weeks ago.  No one on the team had spoken to him since then or

14   before then.  So he is sort of a late witness, but everybody has

15   known that he's worked at the pharmacy, the emails are there.  I

16   dug in the emails and thought I want to talk to this guy and now

17   he is a witness.

18          THE COURT:  All right.  Anything by the defense?

19          MR. MARCUS:  Well, I mean, that's not how the Giglio

20   obligations work obviously.

21          THE COURT:  What do you want to do and what is it that

22   you want?  Lawyers make motions, judges make rulings.  That's

23   how we do it.  We don't just chat about it.

24          MR. MARCUS:  Right.  So I move to exclude him.

25          THE COURT:  Denied.  Why would I exclude someone?

1  That's so drastic.  What would you do if you had know about it

2  two weeks ago?

3          MR. MARCUS:  We would have had our investigators --

4          THE COURT:  Wonderful.  We'll give you an opportunity.

5  I vacate the ruling allowing you to use the FBI report and what

6  we will do is, you will not use Mr. Louis.  You can use him on

7  rebuttal next week and you can also bring in the FBI agent next

8  week.  Done.  No problem.

9          MR. JUENGER:  I like that, Your Honor.  I like that.

10          THE COURT:  Resolved.  And you can hire your own

11  investigator.  Today is Wednesday, so have him work on it on

12  Monday.  I will not -- You've made the strategic decision after

13  consulting with your co-counsel and your client that rather than

14  having the FBI report to challenge the witness, you prefer

15  having your own private investigator, and thus Mr. Louis will

16  only testify in rebuttal in the event that the defendant

17  testifies.  Resolved.  Okay.

18          Any other issue?  Any other issue?  Hearing nothing

19  else, so Louis --

20          MR. MARCUS:  There is an issue, Your Honor.

21          THE COURT:  Louis will be in rebuttal, so you tell him

22  not to worry about it because it will be next week.

23          What's the other issue?  What's the issue with Lozada?

24          MR. MARCUS:  So here's the issue, Your Honor.

25          THE COURT:  With Lozada.

 1          MR. MARCUS:  It relates to his testimony.

 2          THE COURT:  Lozada.

 3          MR. MARCUS:  Mr. Lozada.  It also relates to something

 4  that Dr. Bansal said that slipped it.

 5          THE COURT:  Who?

 6          MR. MARCUS:  Dr. Bansal.

 7          THE COURT:  That's over.  He testified.  Any objection

 8  you had should have made there.  It's done.  In fact, we have

 9  had several witnesses since then, so we don't look back.

10          MR. MARCUS:  I know.

11          THE COURT:  Lozada.

12          MR. MARCUS:  Lozada is going to talk about some of

13  the --

14          THE COURT:  What is Armando Lozada going to say?

15          MR. JUENGER:  He was a pharmacy technician.  He worked

16  in the pharmacy, in the lab part, so he actually made these

17  drugs and he will testify that one of the ingredients that was

18  used on most all of the creams and certainly all of Mr. Grow's

19  creams was something that they called in the pharmacy and

20  Mr. Grow called Ethoxy Gold, which is the thousand dollar

21  version of the pennies' worth of legitimate ethoxy.

22          THE COURT:  He doesn't know Mr. Grow.

23          MR. JUENGER:  He's spoken to him.  He's emailed with

24  him.  He would order the drugs from him personally.  I have

25  emails where he asked Mr. Grow when is the shipment of Ethoxy

1    Gold coming.

2         So he will explain not only that he had these

3    interactions, but that he knows from the billing, which he's

4    also familiar with, that it would increase the reimbursement by

5    1800, $2400 for every single script which was all waste.

6         THE COURT:  And he benefited from that, too?

7         MR. JUENGER:  He worked in the pharmacy.  I think he --

8    I don't remember if he was hourly or salaried.

9         THE COURT:  So he didn't benefit by each product that

10   is sold.

11        MR. JUENGER:  No, he did not.

12        THE COURT:  All right.  And what's the issue?

13        MR. MARCUS:  Here's the issue, Your Honor:  We have a

14   pharmacology expert who is a professor at the University of

15   Arizona, and before trial I supplied them with what his opinion

16   would be about all of these ingredients in these formulas, both

17   active and inactive, and how they are beneficial and

18   efficacious.  I raised it.  Then, obviously we had the issues

19   with the experts.

20        THE COURT:  What issues did you have, the experts I

21   excluded or others?

22        MR. MARCUS:  No, no, you excluded their experts.

23        THE COURT:  At your request.

24        MR. MARCUS:  Right.  And I told them before trial.

25   They said that they were not going to contest the efficacy of

1   the formulas in the medications.  I said if you're going to make

2   it an issue, I'm going to have Dr. Ronaldson come in and testify

3   about these ingredients, including ethoxy.

4          Today we had a little taste of it because Dr. Bansal,

5   if you recall, was asked and then quickly talked about active

6   and then the inactive ingredients.  So they are now going to

7   make an issue about the efficacy of ethoxy, which is one of the

8   ingredients.  If that's true and it's going to be allowed, I

9   mean, I want to fly in Dr. Ronaldson to testify in our case on

10  this issue.

11         THE COURT:  All right.

12         MR. JUENGER:  Not the efficacy, the cost.  That's what

13  we are going to be --

14         THE COURT:  So he's not going to talk about the

15  efficacy.

16         MR. JUENGER:  No.  He's going to say that ethoxy is a

17  perfectly good ingredient to use and you can buy it cheap, it

18  costs pennies, and you use it and you get reimbursed a few

19  dollars.

20         MR. MARCUS:  Well, in his 302, he says there's no

21  purpose to using the ethoxy.  He basically says it's a waste.

22         THE COURT:  He is not going to say that in direct.

23         MR. JUENGER:  No.

24         THE COURT:  You want to ask him that in cross?

25         MR. MARCUS:  I don't, but if --

1          THE COURT:  I didn't think so.  So if he doesn't say it

2    on direct, you have no issue.  You kind of like it.  Maybe you

3    will surprise me and say, no questions, but I don't know.  You

4    decide what to do.

5          MR. MARCUS:  I'm just concerned about the scope of

6    direct and there will be inferences drawn about the -- I mean,

7    we already saw in opening a little bit of it, that there's going

8    to be an inference that this is not necessary.

9          THE COURT:  Are you going to say that?

10         MR. JUENGER:  I'm going to say --

11         THE COURT:  No, no, it's not a hard question.  This is

12   not an LSAT question, a trick question.  Are you going to say

13   that?

14         MR. JUENGER:  Say what?

15         THE COURT:  What he just said, that this is

16   ineffective, that it doesn't work, that it's all bull.

17         MR. JUENGER:  No.

18         THE COURT:  You would say it elegantly, but are you

19   going to say anything like that?

20         MR. JUENGER:  No.  I'm going to say using the same

21   product that cost $2,000 when it should cost pennies, that is a

22   waste.

23         THE COURT:  All right.

24         MR. JUENGER:  I don't need him to say that.  He doesn't

25   have to draw the conclusion.  He's just going to give the

1    underlying facts, and the jury, I hope, can draw the conclusion.

2            THE COURT:  Well, the jury only draws conclusions if

3    you argue it to them.

4            MR. JUENGER:  Well, then that's when we will argue it.

5            THE COURT:  You won't argue that it's ineffective.

6            MR. LARSEN:  I will not argue that it's ineffective.

7            THE COURT:  There you go.  You have the Government

8    saying that.  What more do you want?

9            MR. MARCUS:  What's the knowledge --

10           THE COURT:  No, no.  If you all want to chat, I'll let

11   you go have a drink and talk all you want.  You want me to do

12   something, I'll do something.  You probably have a better chance

13   of convincing me, though you've convinced your opponent, so

14   maybe not.

15           MR. MARCUS:  That's fine.  My question was just on the

16   cost issue -- I mean, obviously he's not an expert.  I don't

17   know what his basis for knowledge is to talk about Tricare

18   reimbursement.  Again, we're --

19           THE COURT:  How does he know that, that it's more, that

20   you can make 1800, $2400?  Who told him that?

21           MR. JUENGER:  I think he has access to the billing at

22   the pharmacy, and even if he doesn't, Mr. Ralph Louis does.  He

23   is the lead --

24           THE COURT:  Ralph Louis comes in rebuttal.

25           MR. JUENGER:  Okay.

Jury Trial

308

1          THE COURT:  I tell you what, bring Lozada in rebuttal,

2  too.  There you go, and it depends what happens.  No problem.

3  That resolves all issues.

4          MR. RASHBAUM:  Judge, the problem with that --

5          THE COURT:  You want Lozada in the Government's

6  case-in-chief.

7          MR. RASHBAUM:  I want both of them in the Government's

8  case-in-chief given that choice.

9          THE COURT:  Well, hold on a second.  You're asking for

10  something and then you get it and so you don't want it.

11          MR. RASHBAUM:  No, Judge.

12          THE COURT:  You can't have your cake and eat it, too.

13          MR. RASHBAUM:  Judge, that wasn't the option you gave

14  us because what you're doing now is you are depriving -- Well,

15  I'm not going to say that.

16          Let me just say this:  Judge, if we're given the choice

17  of Monty Grow not being able to testify --

18          THE COURT:  Oh, you're never given that choice.

19          MR. RASHBAUM:  Let me finish, please, Your Honor.

20          THE COURT:  You're never given that choice.

21          MR. RASHBAUM:  The problem is Mr. Grow is going to take

22  the stand --

23          THE COURT:  You said that at the beginning.

24          MR. RASHBAUM:  I did.  He's still going to take the

25  stand.

1          THE COURT:  It's up to him.

2          MR. RASHBAUM:  But the problem is, with what's been

3    done now, we're not going to hear from Mr. Louis, we're not

4    going to hear from Mr. Lozada.  I don't know if I'm going to ask

5    Mr. Grow one question about Mr. Louis or Mr. Lozada.  And then

6    they're going to come in in redirect and talk about something

7    completely different.

8          THE COURT:  Not redirect, rebuttal.

9          MR. RASHBAUM:  Rebuttal, and Mr. Grow is not going to

10   have any ability to answer that.  So what we would ask, Your

11   Honor --

12         THE COURT:  Number one, number one, I don't know if

13   they're going to be able to say that because it may be enough

14   with the cross-examination.  The only reason we are discussing

15   that is because you all for the defense are saying, we want time

16   to examine Mr. Louis.  I don't think you really need it because

17   I have given you the choice --

18         MR. RASHBAUM:  We think --

19         THE COURT:  -- of the FBI -- don't interrupt.  See, the

20   reason I say don't interrupt is so my words flow and then your

21   words flow.

22         MR. RASHBAUM:  You're right.

23         THE COURT:  Then if I am wrong, some law clerk for the

24   Court of Appeals will say, look at that, it flows.  If not, it

25   doesn't flow and it makes it harder.  So if I'm making a

1    mistake, at least it will be in more or less full sentences.

2         I gave you all the option.  When someone complains

3    about something, you move to exclude.  It's not enough to

4    exclude a witness because you have an opportunity to do

5    something about it, get your own investigator, and you can get

6    an investigator between now and next week.  It's no big deal.

7         But in my opinion, more importantly, the FBI agent is

8    much better, and his report is much better because he can't even

9    color the testimony.  I do that intentionally to say you got the

10   best of both worlds, no appellate issue, and even better

11   cross-examination, because you don't have anybody who says,

12   well, no, I didn't think that, but I thought that, and this is

13   what I meant by that.  But if you want someone, then I'll force

14   the Government to delay.

15        They want to bring in the witness in the case-in-chief.

16   The defense wants to exclude a witness.  Excluding a witness

17   would be a drastic remedy, a drastic remedy for someone like

18   that.  So as far as Ralph Louis, that's the solution.  You do

19   have to sometimes select.  It's like moving for a mistrial and

20   hope, like 99 percent of the lawyers, that the judge denies it.

21   What I do when you move for a mistrial is, you really want one,

22   grant it, manifest necessity, let's start again, because it was

23   something that you thought was important enough to grant a

24   mistrial.

25        We do not do things at trial just for the record or for

1    the Court of Appeals.  If something is unfair, the time to

2    resolve it is now, not later, because later, frankly, most

3    things are harmless error.  I don't want to make any error.  Is

4    it difficult to decide strategy?  Absolutely.

5          You had the difficult decision of deciding whether you

6    were going to tell the jury that your client was testifying.  It

7    was an unusual thing.  You're a smart lawyer, you discussed it

8    with two others lawyers and with your client and you decided to

9    do that and it's a gamble, but it's not necessarily a bad

10   strategy because that way, the jurors are always anticipating.

11         In fact, I think, if I didn't say it, I certainly meant

12   it, it's probably the most important part of the trial, which is

13   why I think that direct and that cross-examination is probably

14   the case, but there's a lot of corroboration, the emails and all

15   of that.  I'm going to give you time to present that, and I'm

16   going to give the Government time to cross-examine that.

17         So I think a lot of the things the Government does are

18   a little bit superfluous and unnecessary, but I can't just

19   exclude them.  I think some of the things the defendants do

20   through their lawyers is also superfluous and unnecessary, but I

21   am more reluctant to do that because of strategic decisions, but

22   I'm not forcing you to do anything, but you can't have it both

23   ways.

24         So you talk with your client and tell me what you want

25   me to tell the Government about Ralph Louis and Armando Lozada.

1    Talk and speak with one voice.  We cannot speak with three

2    voices.  One, whoever is going to speak.

3              Ms. Meyers.

4              MS. MEYERS:  This is my voice, Your Honor, and I'm the

5    one voice.

6              THE COURT:  You're the voice for all three.

7              MS. MEYERS:  I am the voice for all three, you are

8    correct, Your Honor.

9              I am overruling my colleagues.  I have consulted with

10   Mr. Grow.  We would like Mr. Louis to be called in the

11   Government's case-in-chief, not on rebuttal, and we would like

12   an opportunity to present the FBI 302 and put it into evidence

13   as Your Honor initially suggested.

14             THE COURT:  All right.  So bring him in.  You don't

15   want to bring him in now.

16             MR. JUENGER:  No, no, no, I'm definitely going to bring

17   him in.

18             THE COURT:  I mean, this is crazy.  I feel like I'm in

19   Disney World.

20             MR. JUENGER:  Your Honor, I'm definitely bringing him

21   in.

22             THE COURT:  All right.

23             MR. JUENGER:  I just wanted to let the Court know,

24   you've heard that there's this 302, and I just want the Court to

25   know what it is.  It is a 302 from seven years ago when he

1    worked at a completely unrelated pharmacy that was being

2    investigated and he gave an interview statement.  That's all it

3    is.

4              THE COURT:  And if he admits to what he said, that is

5    all it is, and no one is going to cross-examine him once he

6    makes the admission.

7              MR. JUENGER:  That's all.

8              THE COURT:  And that's good pretrial work.  If you

9    pre-try him it takes care of the cross.  Sometimes people don't

10   admit or they get confused, so that will take care of it.

11             MS. MEYERS:  That's fine, Your Honor.

12             THE COURT:  I mean, we don't argue about things that

13   are not in dispute, only about things that are in dispute.

14             Okay.  Armando Lozada is only going to testify about

15   cost.  So he's not going to get into what's in the product,

16   right?

17             MR. JUENGER:  He is going to -- well --

18             THE COURT:  See, I ask specific questions, and no one

19   ever says yes or no.

20             MR. JUENGER:  Because cost sounds like he is just going

21   to say how much it cost and then sit down.

22             THE COURT:  Yeah.

23             MR. JUENGER:  There has to be context.

24             THE COURT:  I know that would be shocking.

25             MR. JUENGER:  The thing is, he has to -- he's going to

1  talk about the fact that he puts together these compounds based

2  on the formulas that come in, and as I think it was alluded to,

3  they have to use base ingredients, wetting agents to mix things

4  together.

5          THE COURT:  Is that a good thing or a bad thing, to do

6  that?

7          MR. JUENGER:  No, no, that's just how you normally do

8  it and he will say --

9          THE COURT:  Okay.  So how does that help you prove

10  fraud?

11          MR. JUENGER:  Because he will say the ethoxydiglycol is

12  an ingredient that costs pennies and you use it.  You buy it and

13  you use it for pennies and you get dollars reimbursement.

14          THE COURT:  Kind of like the spaghetti in fancy Italian

15  restaurants, right?

16          MR. JUENGER:  Yeah.

17          THE COURT:  Okay.

18          MR. JUENGER:  And then he will say Mr. Grow sold

19  something called "Ethoxy Gold."

20          THE COURT:  And he knows that from Mr. Grow himself.

21          MR. JUENGER:  Yes and he would order it and I have

22  emails where he's asking Mr. Grow where is the Ethoxy Gold.  And

23  the witness will explain ethoxy is ethoxy.  You can call it

24  Ethoxy Gold, the only difference is that it costs a lot more and

25  it reimburses way more.

1        THE COURT:  It costs more to the patient or Medicare or

2   Tricare.

3        MR. JUENGER:  To the insurance, correct.

4        MR. MARCUS:  So the problem, Your Honor --

5        THE COURT:  You disagree with that.

6        MR. MARCUS:  Yeah, of course.  This is an expert

7   opinion.

8        THE COURT:  How much does it cost?

9        MR. MARCUS:  No, the cost I'm not -- Tricare, whatever

10  the two products cost, they cost.  That's not the issue.

11       THE COURT:  So there's no dispute.

12       MR. MARCUS:  The dispute is he's going to say that the

13  two things are equivalent, that there's no difference, and you

14  can use one product that costs pennies and another that's very

15  expensive.  He is not an expert, he's never been noticed, and

16  under 701, there's no --

17       THE COURT:  I didn't hear that part.

18       MR. MARCUS:  He's giving an opinion on --

19       THE COURT:  I didn't hear that part.  He is going to

20  say that the product that he uses is cheap and you can sell it

21  for a lot more and that's where the terminology "gold" is.  In

22  other words, that the profit range is high because whoever pays

23  decides to pay that much.  All right.

24       MR. MARCUS:  I mean --

25       THE COURT:  Right?  Isn't that what he's going to say?

1    He's not going to say it like that because no one ever speaks in

2    plain English when they're called by either side.  Is that what

3    he's going to say?

4          MR. JUENGER:  He's going to say that he makes these

5    things, so he's only going to say I get ethoxy that costs

6    pennies and it's cheap --

7          THE COURT:  How does he know it costs pennies and it's

8    cheap?

9          MR. JUENGER:  Because he orders it and he'll say we use

10   it and it works perfectly fine in these --

11         THE COURT:  How does he know that you sell it at 1800,

12   $2400.

13         MR. JUENGER:  Because there's an email between him and

14   Mr. Grow where it's called the AWP on the product, average

15   wholesale price, is very high, and therefore, it reimburses for

16   a lot more.

17         THE COURT:  The email says that?

18         MR. JUENGER:  It does.

19         THE COURT:  All right.

20         MR. JUENGER:  And he will testify to it.

21         THE COURT:  And whose email is it?

22         MR. JUENGER:  It's e-mails between him and Mr. Grow.

23         THE COURT:  Okay.  Why can't he testify about that?

24         MR. MARCUS:  Well, what my expert would say is --

25         THE COURT:  No, no, forget about your expert.  You want

1   to bring in your expert, bring in your expert.  It's up to you.

2   Did I exclude your expert?

3           MR. MARCUS:  You did say we didn't need to have experts

4   in the case based on the representations --

5           THE COURT:  I excluded the Government's expert, right?

6           MR. MARCUS:  Right.  And we had a pharmacology expert

7   and because of the representations that there wasn't going to be

8   challenges to the ingredients and the efficacy of the

9   formulas --

10          THE COURT:  And there are no challenges.

11          MR. MARCUS:  Well --

12          THE COURT:  I'll tell you what, you say it in front of

13  the jury.  There will be a stipulation saying we're not

14  challenging the efficacy of that.  Can you do that?

15          MR. JUENGER:  I think so.

16          THE COURT:  There you go.  Put it in writing.

17          MR. JUENGER:  In opening as well, I said this is not

18  about --

19          THE COURT:  Well, that's been awhile, so put it in

20  writing.  That takes care of it.  It's up to you.

21          MR. MARCUS:  I'll draft a stipulation.  Thank you.

22          THE COURT:  Draft one that's in English, not in

23  appellate English or trial English.  There's dispute as to this,

24  that's what a stipulation is.  That takes care of it.

25          He's entitled to say I buy it cheaply and I sell it for

1  a lot more to the insurance companies, to the Government company

2  that pays for it, because there's no dispute, according to the

3  opening statement made, that your client made $20 million,

4  right?

5      MR. MARCUS:  His company received $20 million, yes.

6      THE COURT:  I'm sorry.  The company received $20

7  million and he paid a lot of taxes and he made a lot of money.

8  So obviously, there's no dispute that money was made, right?

9      MR. MARCUS:  And he's not going to say anything about

10  the size, the formula --

11      MR. JUENGER:  No, he is going to say, that's how it

12  came.  When he gets it from Mr. Grow --

13      THE COURT:  What does that prove?

14      MR. JUENGER:  No, he's just going to say the only

15  difference between the regular ethoxy that costs pennies and the

16  ethoxy that he gets from Mr. Grow is that it's repackaged into

17  smaller units, but it costs way more and it reimburses way more.

18      THE COURT:  It costs who more?

19      MR. JUENGER:  It costs the pharmacy more to buy it and

20  then it reimburses, I mean, thousands of dollars more from

21  Tricare.

22      THE COURT:  And he does it for Mr. Grow, too?

23      MR. JUENGER:  Yes.

24      THE COURT:  Then, how much does it cost when he gets it

25  from Mr. Grow?

1          MR. JUENGER:  The pharmacy buys it for $20,000 for

2     4,000 individual millimeter units.

3          THE COURT:  And the reason the pharmacy does that is so

4     that it gets reimbursed at the higher rate.

5          MR. JUENGER:  Exactly.

6          THE COURT:  All right.  And he knows that.

7          MR. JUENGER:  He knows that.

8          THE COURT:  All right.  And what's wrong with that

9     testimony?

10         MR. MARCUS:  I don't want an opinion about the sizing

11    because he has no expertise to come into court and talk about

12    whether receiving ethoxy from a manufacturer in one millimeter

13    vials versus larger vials is the same from a therapeutic or a

14    pharmaceutical or a pharmacological perspective and that's

15    essentially what they're trying to sneak in.  I don't care if he

16    wants to come in and say, we buy this product, we got it in this

17    size, this is what it cost.

18         THE COURT:  Is your contention that there's a

19    difference between the two products?

20         MR. MARCUS:  It's just like any drug, yeah, of course.

21         THE COURT:  I mean, I don't know.  I don't know.

22         MR. MARCUS:  Yeah, the formulations -- these go to like

23    the absorption of the other active ingredients.

24         THE COURT:  So one is better than the other.

25         MR. MARCUS:  There are different agents, yeah, and

1   there are different substances out there that are for purchase,

2   yes.

3           THE COURT:  If you want to bring it up, bring in your

4   expert.  I'm not excluding your expert.  You want to bring him

5   up, bring him up.  I mean, I'm not excluding him.  If you all

6   can't stipulate to something, bring both of them and let them

7   testify, if that's what you want.

8           That's not how the jurors are going to make a decision,

9   but I'm not going to exclude something that I think is somewhat

10  irrelevant because that's not what I do.  It's not my case, I'm

11  just assigned to it.  I don't care who wins, I really don't.  So

12  bring in your expert.  All right.  Fly him in.  Where is he

13  coming from?

14          MR. MARCUS:  Arizona.

15          THE COURT:  They have great flights from Arizona, it's

16  a beautiful state.

17          MR. MARCUS:  It's Wednesday night.  I understand.

18          THE COURT:  I know.  But, you know what, the beauty is,

19  that in Arizona it's what?

20          MS. MEYERS:  It's the afternoon.

21          MR. MARCUS:  It's 4:30 right now in Arizona.

22          THE COURT:  Is it 4:30?  It's not a three-hour

23  difference in Arizona?

24          MR. LARSEN:  It's two.

25          MR. MARCUS:  Oh, you're right.  It's only --

1          MR. LARSEN:  I am an Arizonian and so I can speak to

2     the time.

3          THE COURT:  It's only two hours.  All right.  So there

4     you go, 4:30, you can catch him and say take a flight, let's go,

5     and be here.  All righty.

6          MR. RASHBAUM:  Judge, just for scheduling purposes, I

7     want to make sure that we're good tomorrow and we're not causing

8     any problems.

9          THE COURT:  We were just concerned about your son, but

10    you've got able counsel there and we hope everything is okay.

11         MR. RASHBAUM:  I think he's -- look, hopefully he'll be

12    good.  But for scheduling, Judge, I think the Government

13    indicated that they will be done in the morning.  So is that --

14         THE COURT:  Not with all these witnesses, you won't.

15         MR. JUENGER:  Right.  It probably won't be before noon.

16         THE COURT:  It all depends on the cross.

17         MR. JUENGER:  Tomorrow.

18         THE COURT:  Especially if you are going to call Louis

19    and Lozada and then you are going to cross him and all of that.

20    So, you know, if you can't, you can't.  What can I do?

21         MR. RASHBAUM:  Judge, I have a request.  I'm not the

22    judge, but I have a request.

23         Based on what happened today, I can tell you that our

24    witnesses will be very limited.  Okay.  We did fly in about --

25    we brought in tonight seven or eight witnesses I think, or in

Jury Trial

1    the morning, but I think a lot of those, assuming there's no

2    surprises tomorrow, we will not be calling.

3              THE COURT:  You flew them in.

4              MR. RASHBAUM:  Yeah, but I didn't know what these

5    people were going to say today.

6              THE COURT:  All right.

7              MR. RASHBAUM:  But, Judge, what we request --

8              THE COURT:  From as far away as what?

9              MR. RASHBAUM:  What's that?

10             THE COURT:  From as far away as what?

11             MR. RASHBAUM:  San Diego, Your Honor.

12             THE COURT:  That's farther than Arizona.  I knew you

13   could do it.  Great.

14             MR. RASHBAUM:  What we would request, Your Honor, and

15   we are confident that this case will be to the jury -- again, I

16   can't speak to the rebuttal case -- but we are confident this

17   case will be to the jury on Monday or Tuesday.

18             THE COURT:  I think you're right.

19             MR. RASHBAUM:  Judge, what we would request is we would

20   request, when they're done with their case tomorrow, that we do

21   the charging conference then.

22             THE COURT:  Oh, the charge conference will take a

23   couple of minutes, I am telling you because --

24             MR. RASHBAUM:  Either way.

25             THE COURT:  We are going to have that done tomorrow,

1    Shirley?

2              THE COURTROOM DEPUTY:  Yes.

3              THE COURT:  Tomorrow -- I gave you a long lunch hour

4    today.  Tomorrow I'll give you the jury instructions and what

5    you're going to do -- remember I said that before.  You're going

6    to look at them, you're going to correct any typos I may have

7    made, any mistakes, and you can write right on it, and I'll give

8    you two copies.  You can do that and whatever is missing, boom,

9    you do just those instructions.  That way that's preserved.  And

10   then we'll have a charge conference and it shouldn't take so

11   long.  Either I do it or I don't.  So that takes nothing.  In my

12   courtroom that takes nothing, I'm telling you.

13             MR. RASHBAUM:  Okay.  I'm sorry.

14             THE COURT:  So what else?

15             MR. RASHBAUM:  All we're requesting is that the

16   Government be given time --

17             THE COURT:  You didn't mean to say that.  You said that

18   the Government be given time.

19             MR. RASHBAUM:  I've said "2019."  I have said "the

20   Government."  Clearly, my mind is not perfect today.

21             THE COURT:  Yes, it is.  You have done an excellent job

22   and rendered effective assistance of counsel.

23             MR. RASHBAUM:  Thank you, Your Honor.

24             We would request as a defense that we be allowed to

25   have a little bit of time and that we start our case Friday

1   morning.

2          THE COURT:  Oh, no, I can't do that.  I can't do that

3   because I don't know what's going to happen.  Tomorrow I have a

4   full day for you all.  I've got a full day for you all and so

5   you've got to have somebody.

6          MR. RASHBAUM:  We would request then, Your Honor, that

7   we be able to call our three or four fact witnesses tomorrow.

8          THE COURT:  We'll see what happens.  That's probably

9   it.

10          MR. RASHBAUM:  Okay.  But that Mr. Grow's testimony

11   begin on Friday morning.

12          THE COURT:  Oh, I'm not forcing you when Mr. Grow is

13   going to be called.  I would never do that.  You decide.  I know

14   you want to call him last, and that's fine with me.  You can

15   call him Friday.  Call him whenever you want, but you have to

16   have witnesses.

17          MR. RASHBAUM:  No, no, I just worried that if we're

18   done with our witness at -- I don't know when they're going to

19   finish, but I'm worried we're done with our witnesses at 3:00

20   tomorrow and our request, so we can talk to Mr. Grow --

21          THE COURT:  Oh, you've talked to Mr. Grow.

22          MR. RASHBAUM:  But, Judge, we're seeing witnesses and

23   hearing what they're saying and, look, I was surprised today.  I

24   thought today was going to be a lot worse for us.

25          THE COURT:  Welcome to Federal court.

1          MR. RASHBAUM:  I know.  We are just making the request,

2     Your Honor.  We would request we be given time to talk to him

3     and that he start his testimony on Friday morning.

4          THE COURT:  We'll play it by ear.  I assume he's going

5     to be on the stand for a long time, right?

6          MR. RASHBAUM:  I wouldn't assume that, Your Honor.  I

7     am going to -- I move pretty quickly.

8          THE COURT:  We'll see.

9          MR. JUENGER:  Your Honor --

10         THE COURT:  Are we just filling the time for like

11    billable hours?  Are you getting overtime?

12         THE COURT SECURITY OFFICER:  Yes.

13         THE COURT:  There's a happy man.  I think he's the only

14    one.  The Court security officer is being identified.

15         MR. JUENGER:  Your Honor, Ms. Lam just pointed out to

16    me that we didn't go over exhibits for Mr. Lozada and there are

17    six exhibits.

18         THE COURT:  Wonderful.

19         MR. JUENGER:  I don't know if there are any objections.

20    I can give you the numbers.

21         THE COURT:  I'm so excited about it.  Give me the

22    numbers.

23         MR. JUENGER:  72.

24         THE COURT:  72.  Any objection to Mr. Grow's email?

25         MR. MARCUS:  No, Your Honor.

1          THE COURT:  It will be admitted.

2       (Government's Exhibit Number 72 was received in evidence.)

3          MR. JUENGER:  78.

4          THE COURT:  Any objection to Mr. Grow's mail?

5          MR. MARCUS:  No.

6          THE COURT:  It will be admitted.

7       (Government's Exhibit Number 78 was received in evidence.)

8          MR. JUENGER:  85.

9          THE COURT:  Any objection to Mr. Grow's email?

10         MR. MARCUS:  No.

11         THE COURT:  It will be admitted.

12      (Government's Exhibit Number 85 was received in evidence.)

13         MR. JUENGER:  97.

14         THE COURT:  Any objection to that email by Mr. Grow?

15         MR. MARCUS:  No.

16      (Government's Exhibit Number 97 was received in evidence.)

17         MR. JUENGER:  143.

18         THE COURT:  Any objection to that email by Mr. Grow?

19         MR. MARCUS:  No.

20      (Government's Exhibit Number 143 was received in evidence.)

21         MR. JUENGER:  Lastly, 155.

22         THE COURT:  Any objection to that -- oh, it's an email

23   between two other individuals.  What say the defense?

24         MR. MARCUS:  Do we have 155?  Hold on.

25         THE COURT:  Go ahead.  Look at it.  Take your time.

1        MR. RASHBAUM:  Judge, do you mind if I stretch a

2   little?

3        THE COURT:  You do what you want.  As long as I only

4   have one lawyer, that's all I need, and that's all your client

5   says he wants.

6      (There was a brief discussion off the record.)

7        THE COURT:  Yes, sir.

8        MR. MARCUS:  We do object.  Again Mr. --

9        THE COURT:  Sustained.

10       MR. MARCUS:  -- Grow is not on this email.

11       THE COURT:  Sustained.

12       MR. JUENGER:  Your Honor, he --

13       THE COURT:  Sustained.  I'm not going to let you have

14   an email between two individuals who are not here.  Who is MS?

15       MR. JUENGER:  Even if they are co-conspirator

16   statements, Your Honor, in furtherance of the conspiracy?

17       THE COURT:  You're going to have to tell me who MS is.

18       MR. JUENGER:  Sure.  MS is Matt Smith, who is the head

19   of the nonsterile compounding at the pharmacy.

20       THE COURT:  Where is he?

21       MR. JUENGER:  Where is he?

22       THE COURT:  Yeah.

23       MR. JUENGER:  He is somewhere.  I don't know.  He's not

24   going to be a witness.

25       THE COURT:  Why not?

1        MR. JUENGER:  I understand from his lawyer that he
2   would take The Fifth if called to testify.
3        THE COURT:  All right.  And MJG.
4        MR. JUENGER:  MJG was a pharmacist who worked within
5   Patient Care America and the subject of the emails is --
6        THE COURT:  And is he a co-conspirator, the pharmacist?
7        MR. JUENGER:  I think I wouldn't necessarily constitute
8   that person as a co-conspirator.
9        THE COURT:  So MS is a co-conspirator.  When did he
10  enter into the conspiracy?
11       MR. JUENGER:  I believe it would be July of 2014 and
12  continuing up through the end of the charged period.
13       THE COURT:  And what did he say back then?
14       MR. JUENGER:  Well, in this --
15       THE COURT:  No, when he joined the conspiracy.
16       MR. JUENGER:  Oh.
17       THE COURT:  What's the evidence of him being in a
18  conspiracy?
19       MR. JUENGER:  Well, he's the one who signs the
20  contract, and ultimately brings Mr. Grow into allegiance with
21  the pharmacy offering him 50 percent of all the profits from
22  these drugs.  And then around that July time period is when
23  Mr. Grow and Mr. Smith start talking about how Mr. Grow can sell
24  ingredients in order to increase the reimbursements and there
25  are several emails.  This is one of them where --

1          THE COURT:  So how come he hasn't been indicted, you

2    don't have sufficient evidence to prove probable cause?

3          MR. JUENGER:  No, I wish I were indicting him today

4    but --

5          THE COURT:  Are you going to indict him in the --

6          MR. JUENGER:  I believe he will be indicted, Your

7    Honor.

8          THE COURT:  He will be indicted?

9          MR. JUENGER:  I believe he will.

10         THE COURT:  Well, then he's not going to testify, is

11   he?

12         MR. MARCUS:  He actually has exculpatory testimony, but

13   he been chilled because he's been told he's a target.  If they

14   immunized him, I would be happy to have him come into court and

15   testify.

16         MR. RASHBAUM:  Judge, he's not going to testify.  He's

17   not going to testify.

18         THE COURT:  Who is his lawyer?

19         MR. RASHBAUM:  Ryan Stumphauser.

20         THE COURT:  Okay.  Well --

21         MR. MARCUS:  Again, Your Honor --

22         THE COURT:  I'm going to sustain the objection.

23         MR. JUENGER:  But, Your Honor, I would add Mr. Grow is

24   on this email.

25         THE COURT:  I know.

 1          MR. JUENGER:  He is emailing throughout this.  He's

 2    just not on the last email where Mr. Smith says order it.

 3          THE COURT:  You know what, whenever he testifies, if he

 4    elects to testify, you ask him about a conversation --

 5          MR. JUENGER:  I will.

 6          THE COURT:  -- then we'll see what he says about MS,

 7    right?

 8          MR. JUENGER:  Fair enough, yes.

 9          THE COURT:  And see what happens.  And then, even if

10    you don't admit the exhibit, maybe you'll be able to question

11    him on it.  I don't know, but now the defense lawyers know to

12    prepare him about that, but I'm going to sustain the objection.

13          I don't feel comfortable enough to admit it.  You know,

14    the fact that you're telling me he's going to be indicted and

15    he's got a lawyer and he's going to invoke The Fifth is not

16    enough for a judge to make a finding under the Supreme Court

17    decision of Bourjaily, at least for this judge.

18          Okay.  That's it?

19          MR. JUENGER:  No, one last thing.  I tried to --

20          THE COURT:  Just tell me what you want.

21          MR. JUENGER:  Yes.  I turned over the criminal history

22    report, the NCIC report for Mr. Louis and it shows he has a

23    dismissed a case, a nol-pros, and an adjudication withheld from

24    12 years ago.

25          THE COURT:  Of what?

 1              MR. JUENGER:  Of --

 2              MR. MARCUS:  Theft.

 3              MR. JUENGER:  It was a theft.  He was working at Macy's

 4    and --

 5              MR. MARCUS:  Credit card theft.

 6              THE COURT:  Hold on, hold on, hold on.

 7              MR. MARCUS:  I'm sorry.

 8              THE COURT:  You guys get too excited.  The court

 9    reporter is going to call in sick tomorrow, you watch.  That's

10    what she's going to do.  You don't want that, she's the

11    greatest.

12              What are they, theft?  What else?

13              MR. JUENGER:  Well, the others were dropped.

14              THE COURT:  Crimes of dishonesty I take it.

15              MR. MARCUS:  Yes.

16              THE COURT:  But they're not convictions.

17              MR. JUENGER:  They're not convictions.

18              THE COURT:  So what do we do?  What does the rule say,

19    those darn rules of evidence?

20              MR. JUENGER:  It says convictions.

21              THE COURT:  What does it say?  You can't impeach him,

22    right?

23              MR. MARCUS:  Well, when he takes the stand, if it goes

24    to his honesty, I can ask about the bad acts.

25              THE COURT:  Okay.  And that's what you all have to

Jury Trial

1    research.  You looked at Rule 608.

2            MR. JUENGER:  609.

3            THE COURT:  609 is the easy one, but you've got to look

4    up specific bad conduct.

5            MR. JUENGER:  Okay.

6            THE COURT:  608 I think it is.

7            MR. MARCUS:  It's 608(b), Your Honor.

8            THE COURT:  There you go.  I don't have my books here,

9    so I have to go by memory.  608(b).

10           So what happens is, most judges, most of the time when

11   you have a bad guy testifying, we let the cross-examiner talk

12   about prior bad acts that are not convictions.  Sometimes I do,

13   sometimes I don't.  It depends on the circumstances, but we have

14   to be clear.  But he's not going to be your first witness, is

15   he?

16           MR. JUENGER:  No.

17           THE COURT:  Then we have time to discuss that.  I'm

18   sure you'll want a break to delay when the defense case starts

19   anyway, so that's when we'll do it.  Okay.  Anything else?

20           MR. JUENGER:  No, that's it.

21           THE COURT:  Okay.  Have a good evening.  Today we can

22   say it honestly in court.

23           THE COURT SECURITY OFFICER:  All rise.

24           THE COURT:  9:30 tomorrow and Friday, as I told you,

25   10:15.  Okay?

1        MR. LARSEN:  Good night, Your Honor.

2        MR. RASHBAUM:  Good night, Your Honor.

3        MR. MARCUS:  Thank you.

4        MR. RASHBAUM:  Thank you, Your Honor, for my son.

5        THE COURT:  If you want a break, go see him.  Go see

6   him.  He is home?

7        MR. RASHBAUM:  He's home.

8        THE COURT:  Okay.  That's a good sign.

9        (The trial adjourned at 6:45 p.m.)

10

11                    C E R T I F I C A T E

12        I hereby certify that the foregoing is an accurate

13   transcription of proceedings in the above-entitled matter.

14

15   ___09-10-18_____      _____
          DATE               GILDA PASTOR-HERNANDEZ, RPR, FPR
16                           Official United States Court Reporter
                             Wilkie D. Ferguson Jr. U.S. Courthouse
17                           400 North Miami Avenue, Suite 13-3
                             Miami, Florida  33128    305.523.5118
18                           gphofficialreporter@gmail.com

19

20

21

22

23

24

25

**A**

**abdomen** 246:25
**abide** 153:10 178:5 218:2,16,19
**abided** 180:25
**ability** 297:17 298:20 309:10
**able** 19:10 115:2 116:17 177:14
181:11 215:1 277:24 308:17
309:13 321:10 324:7 330:10
**about** 8:24 9:14,15,22 10:8 12:6
12:14 15:25 20:8 21:2 24:3
26:1 27:19 29:7 31:20 33:14
33:19,22 34:10,18 35:16,24
38:10,12,16,17,2 1 39:8,10
40:1,2 41:4,15,17 42:8,8 43:2
43:5,6,23 44:6,22 45:21 46:20
47:8 48:8,22 49:20,21,23
50:11,19 52:14,15,18,20,24
54:1,13 57:3,15,18 58:12,18
58:22,24 60:6,11 61:14 62:4,6
63:24,25 65:16,22 67:6,15
68:13 71:5,6 74:22 81:19 82:7
82:14 84:12 89:18 90:4 91:3
94:21,25 95:2,11,15 98:15,22
98:23 99:12 100:13,14 101:16
101:17,24 102:6,12 105:17,22
105:23 106:3,4 107:8,11,14
108:7,19 109:4,22 110:12
111:14,16,17,20,22,2 5 112:2,4
112:12,13 113:14,25 114:19
115:11 116:20 118:11 119:21
120:20 123:3 124:4 126:19
127:18 130:10,21 131:16,18
132:9,21 133:11,15 135:14
140:19,21 141:20 142:8 143:6
143:18 144:5,13 145:8,11,12
145:21 146:24 147:17 148:5,6
149:1,6,12 152:25 153:15
155:15 157:8 158:11 161:19
163:21 165:10 166:24 167:11
167:15,21,22 168:3,5 171:6,7
171:9,10,21,2 4 172:25 173:14
173:20 174:1,9,20,22 175:23
175:24 176:25 177:7 178:25
181:5 182:25 185:23 186:5
187:23 188:3 191:25 192:3,3
195:4 197:19 198:16 199:20
199:23 200:2,25 201:1,2
202:14,15,22,2 4 203:10,17
204:9,16 205:5 206:23 208:1
208:8 210:5 212:2 215:19
217:11 220:21,23 221:18,19
225:7,18,19 228:4,8,10,17
229:17,19 232:11,15 234:9,21
234:24 236:24 237:10,15,18
238:21 240:4,11,15 241:1,4,6
243:22,24 244:1,4,7,16 245:7
248:3 249:14,18 250:1,4
253:22 254:1,11 258:17
261:25,25 263:8,18,19,22,23
263:24,25 264:10,15 265:7
266:19 267:6 269:1,16,17
270:4,25 273:16 276:25 281:4
282:21 283:14 284:12,12
291:25 294:11 296:3 298:2,9
298:13,16 301:23 302:1,22
303:12 304:16 305:3,5,7,14
306:5,6 307:17 309:5,6 310:3
310:5 311:25 313:12,13,14
314:1 316:23,25 317:18 318:9
319:10,11 321:9,24 325:21
328:23 330:4,6,12 331:24
332:12
**above-entitled** 333:13
**Absolutely** 9:21 87:16 90:12
264:6 283:17 311:4
**absorption** 319:23
**abuse** 34:21 261:5
**AC** 289:10
**accent** 185:21

**accept** 148:20
**accepts** 35:7
**access** 48:17 307:21
**accommodate** 14:4 181:19
**accommodating** 14:11
**according** 168:17 169:12 179:6
198:24 318:2
**account** 62:5 119:24 125:2
244:14 266:9 267:4,7,11
**accurate** 73:20 79:8,13 141:8
333:12
**accurately** 248:23 272:10
**acknowledged** 178:9
**acknowledgment** 61:5
**acquaintance** 38:2 263:20
**acquainted** 220:14 263:16,18
**acronym** 206:19
**across** 266:15
**act** 61:22 223:18,20,23
**active** 29:14 45:1,5,6,9,10 147:6
194:23,24 195:1,6 210:8
220:7 263:11,13 265:12
304:17 305:5 319:23
**actively** 142:2
**activity** 144:19
**acts** 179:23 180:8,8 223:16,17
331:24 332:12
**actual** 10:1 75:25
**actually** 37:16 43:19 48:15 51:5
58:16 71:23 75:23 80:4,7,20
87:15 90:20 91:6 93:8 94:10
94:23 95:14 107:4 131:7
163:23 167:24 175:1 177:14
186:20 189:17 190:4 196:8
204:12 207:10 221:10 227:9
233:13 241:6 244:4 266:24
280:2 303:16 329:12
**ad** 158:21,23 280:2
**adamant** 61:15
**add** 22:2 48:7 229:14 329:23
**added** 19:11,12 21:21 22:16
288:21 297:24
**addicted** 240:13
**addition** 101:18 114:4
**additional** 31:48:2
**address** 39:19 40:6,7 92:15,16
128:17 163:11 280:7,8 282:12
**addressing** 10:6 135:8 222:23
**adequate** 279:15
**adhere** 35:8 51:13
**adjourned** 333:9
**adjudicated** 37:13,13,1 4 43:17
43:18 59:15
**adjudication** 330:23
**admissibility** 188:22 199:5
292:7
**admissible** 23:7 153:1 156:7
171:25 172:20,21 179:14
230:19 294:15
**admission** 313:6
**admit** 292:9 313:10 330:10,13
**admits** 296:18 300:19 313:4
**admitted** 10:17,20,23 11:1 39:11
44:16 46:22 56:6 72:5 76:18
122:19 167:25 168:5,12,17,22
168:22,24 169:5,14,22,25
170:7,11,15,19,2 1 173:13
174:16 178:17,2 1 183:22
185:6,7,9 186:8 188:23
189:20 191:20 192:21 197:2
198:12 199:6 200:9 214:14,17
225:22 226:19 228:24 238:5,9
254:25 260:7 271:14 276:2
279:1 287:24 288:4,8,13,17
288:23 289:2,6,14,19,23
290:2,6,13 292:15,20,24
293:4,7,10,1 4 295:9,23 326:1
326:6,11
**Adrianne** 56:12,13,15,16,20

58:24 101:10
**advance** 279:16
**advertise** 89:24
**advertising** 100:22
**advice** 36:19 73:18
**Advil** 194:14 253:18
**after** 21:8 23:17 24:6 32:10
34:12 39:12 47:3,4 55:15
69:17 70:1 75:11 97:4,12
101:3 103:6 105:17,20,22
111:14 113:10 116:20 117:25
119:22 120:22 123:17 127:21
130:12,22,2 4 131:19 150:3
152:14 173:12 197:9,14
200:19 201:25 202:11 203:1
233:12,18 241:20 253:21
256:20 258:3,14 266:21,25
267:2,17,24 269:7,9 271:7
302:12
**afternoon** 18:13 19:18 121:14
134:4,24 146:15 158:4 185:22
189:3 204:6,7 219:13,14
245:20 250:20 262:22 270:18
283:24 284:19 320:20
**afterwards** 146:1
**again** 23:1 47:13 53:8 62:25
63:20 64:3,22 69:18,22 70:23
73:18 75:2 108:6 131:6 149:9
161:22 163:24,25 193:5
197:13 198:15 199:15 200:22
200:23,24 207:3,10 212:19
216:23 221:24 223:3 259:17
260:16,21,2 4 267:24 274:17
277:18,25 307:18 310:22
322:15 327:8 329:21
**against** 58:6 88:8 174:18 182:23
**agencies** 179:21
**agency** 298:23
**agent** 30:23,23 31:5 32:15
254:3 190:4 228:12,14
238:12 299:6,18,18,20,25
300:1,6 302:7 310:7
**agents** 31:1 195:5 299:9 314:3
319:25
**ago** 26:1 37:8 40:25 57:3 126:12
127:8 135:15 140:3 163:22
199:20 214:24 234:15 259:8
297:7 298:6,8 301:12,13
302:2 312:25 330:24
**agree** 18:1 65:13 89:15 119:7
127:10 150:9,22 209:14,17
218:2,19 236:25 237:19
241:20 242:6 281:6
**agreed** 81:7 100:8 168:19
171:11 218:16 237:21 253:21
258:14
**agreement** 16:25 27:19 30:4,18
96:1,2
**agrees** 74:9
**ahead** 36:3 46:9 86:19 89:22,23
107:24 135:5 151:23 165:25
190:24 191:20,22 198:4
199:18 204:2 212:21 252:19
276:12 294:9 296:15 326:25
**ailments** 125:8
**air** 120:9 285:10
**airport** 111:18
**Aisha** 114:4,9
**Alaska** 301:7
**allegation** 98:16 227:20 301:11
**allegations** 57:9 297:18
**alleged** 187:12 221:13
**alleges** 61:22
**allegiance** 328:20
**allergies** 111:25
**allergy** 32:8 196:7,10
**allow** 35:23 58:11 64:23 66:2
156:13 159:6 184:8
**allowed** 46:1 65:6,15 97:9 199:3

199:4 305:8 323:24
**allowing** 302:5
**allows** 97:16
**alluded** 276:5 314:2
**almost** 123:17 143:7 154:17
167:24 234:15
**along** 35:11 40:9 118:8 157:2
188:6 203:15,25 234:1 235:1
235:4,13,1 4 272:3,23 273:15
275:3 278:12,19
**already** 19:22 52:20 64:1 75:8
75:12,15 81:6,13 95:6 112:21
117:17 154:25 167:25 168:6
172:11 174:16 178:17 185:5,7
214:14 222:7 225:22 238:5
270:10 273:1 274:18 292:24
306:7
**alternate** 20:21
**alternates** 17:8
**altogether** 242:18
**always** 19:11 43:7,8 62:10,13
68:12 69:14 76:10 77:19,21
77:21 87:10,13 88:12,16
203:10 208:16 215:24 230:13
255:24 279:18 311:10
**Amanda** 3:13 23:23 54:4,5,6,7,9
54:10 55:1 91:24 134:9,12
146:5,7,10 271:6
**America** 1:4 54:11,24 60:3,19
147:15,17 206:17 254:20
255:10,12 290:16 328:5
**amount** 54:11 61:24 106:17
110:2 113:6 115:4,21 118:20
120:14,15 123:4 141:8 223:25
227:22 244:11 248:13 284:10
284:10
**amounts** 118:6
**Amway** 129:13
**Amy** 271:6
**anesthetic** 194:16
**Angelica** 137:9
**Anisi** 104:8,11
**ankle** 19:8,21 20:9,19 27:18
96:16
**Ankush** 3:16 164:15,17,19
**Ann** 137:9 213:4,6
**annoying** 234:19
**another** 8:23 18:6,7 22:1 26:23
27:7 75:10 76:13 104:7,8
116:11 120:13 131:1,7,21
133:6 137:20 143:18 172:23
179:23 180:3 182:19 197:2,12
197:17 198:6,8 203:14 210:11
233:18 289:1 315:14
**answer** 31:5 42:16,22,25 43:1,3
52:2,6 53:10 54:15 75:1,2
89:22 107:24 142:22 155:10
165:16 202:6 241:24 243:23
244:9 247:20 259:22 279:22
309:10
**answered** 31:2 68:5 77:8 155:20
266:18,19 281:15
**answering** 67:24
**answers** 42:20 65:8 222:6
**anticipating** 19:22 311:10
**anti-inflammatory** 194:13
**anti-kickback** 34:24 35:1,1,16
35:17 58:6 62:20 65:2 88:9
178:6 218:13
**anybody** 99:5 114:11,15 142:1
156:21 171:25 204:1 233:1
252:21 256:25 257:1,5 286:5
310:11
**anymore** 86:24 120:17 130:25
226:5
**anyone** 29:8 33:12 37:10 47:16
47:17 55:15 114:1 117:1
121:21 126:5,6 133:11 142:19
142:22 179:3 206:20 210:15

211:6,10 270:4,11 283:7
anyone's 171:21
anything 9:15 19:11 20:6 22:25
    39:3 43:1 45:21 49:21,25
    50:15,16,2 1 53:15 55:6 58:3
    60:2 68:2,6,10 86:14 105:25
    107:7 119:21 125:10,11
    129:21 132:3,12 134:15 142:4
    148:18 153:22 154:14 155:21
    160:3 180:13 184:6 212:14
    235:5,12 236:22,24 237:10
    240:15 241:3,16 243:24 245:7
    251:23 265:7,18 266:18
    267:17 268:25 277:9 289:21
    294:19 301:18 306:19 311:22
    318:9 332:19
anyway 19:21 110:1 155:20
    184:10 231:10 332:19
anyways 269:12
apologize 70:13 137:20 146:1
    222:18,18 226:22 231:20
    248:16 250:12 259:23 276:10
apparently 203:19
appeal 13:2,3,4,6,7 176:13 223:2
    225:5
Appeals 229:2 309:24 311:1
APPEARANCES 1:12
appeared 215:10
appellate 226:10 310:10 317:23
applicable 218:3
application 59:24 60:11 61:5
    117:6,10,13,1 6 140:23 186:21
    187:6,7 215:4 255:8,14
    259:10
applied 178:6 256:3 259:3
apply 255:12
appointed 297:12,13
appreciate 231:8 234:9
appreciated 150:2
apprise 12:23 13:20
approach 122:21 193:1 216:2
    238:3 245:2
approached 263:8
appropriate 175:25 210:20
approve 212:5,6,9
approving 195:1
approximate 61:24 223:25
approximately 25:16 47:24 61:8
    61:21 240:23
April 116:2,2,22 128:1,10 163:5
    163:23 276:5,6,14,18 278:10
    278:11 279:8,24,25 290:15
arbitrarily 184:12
area 31:21 34:23 35:2 42:21,22
    44:21 50:6 127:17
areas 34:20
argue 175:6,10 180:4 217:4
    307:3,4,5,6 313:12
argument 119:16 175:12 217:5
arguments 52:12
Arizona 304:15 320:14,15,19,21
    320:23 322:12
Arizonian 321:1
Armando 285:8 303:14 311:25
    313:14
Army 56:14
around 60:18 127:23 173:9
    199:14 283:25 284:1,8 328:22
arranged 46:11
arrangement 117:21
arrive 17:14
arrived 43:14
articulate 94:24
Arts 29:3
asked 36:10 39:19,21 41:11,15
    41:17,19 43:9 48:12 49:20,22
    57:3,24 65:16,20 68:3,9 69:23
    69:24,25 70:25 71:5 74:21
    77:8 91:8 92:20 94:24 101:17

109:5,5 110:5 118:13 123:3
    124:7 126:20 132:1 139:17
    142:18 143:18 145:4,5,6,10
    145:14,18 152:3 156:19,20
    158:23 159:9,15,18 171:10
    178:25 197:12 199:20 202:6
    204:16 205:5 206:23 210:10
    212:9 217:1 221:16 222:18
    236:2 249:5,13,18,18 261:24
    265:10 266:22 272:23 283:14
    303:25 305:5
asking 15:12 22:11 41:9 42:12
    43:5 44:7 47:2,9 51:23 63:24
    65:9 67:19,21 68:1,16 71:5
    73:18 74:10,12,16,18 75:24
    80:10,11,11,1 4 81:5 86:17
    88:2 153:15 154:25 158:13
    169:19 173:25 182:4,20,25
    201:5 202:24,25 216:24
    220:25 221:1,11 241:11
    242:18 256:5 274:25 280:20
    308:9 314:22
asks 176:15
asserting 202:9
assigned 320:11
assistance 323:22
assistant 57:16 58:2,8,15 72:21
    73:9
assistants 58:6
associated 72:24 197:5 278:13
    278:20
assume 22:17 122:15 185:15
    209:19 220:17,2 5 246:10
    272:10 325:4,6
assumed 93:6,7 107:1,1
assuming 8:22,23 9:1 66:7 223:4
    322:1
Assurance 261:2
AstraZeneca 32:10,18 88:19
attached 45:8 272:2,20 273:15
    273:16,22,22 274:14
attaches 272:6
attachment 207:12 274:5 290:22
attachments 207:23 274:9,15
    290:16 291:17 292:1
attending 34:8
attention 44:21,25 46:7 57:13
    69:5,13
Attorney's 1:14,15
attractive 271:1
attribute 232:25 233:2
Augustine 146:17 147:9 148:8
AUSA 1:13,14
authorized 212:15
auto 148:21
automatically 9:20 93:24
availability 200:3
available 197:16 200:4 206:25
    207:5,21 209:8 210:1,9
    233:18,19
Avenue 2:6 333:17
avenues 197:16
average 316:14
avoid 235:22
aware 21:20 26:16 43:18 85:1
    86:5,13,17 87:3
awareness 74:13
away 53:2 62:10 124:12 126:9
    214:19 235:12 267:13 295:6
    322:8,10
awesome 123:20,21
awhile 11:25 140:3 274:7 277:4
    317:19
AWP 316:14
A-m-a-n-d-a 146:10
A-n-i-s-i 104:11
A-n-k-u-s-h 164:23
a.m 8:1 13:17,18 16:17 27:11
    279:24,25

**B**

B 175:20
baby 148:7
Bachelor 29:3
back 27:7 54:19 56:1 72:7 93:16
    30:14 38:19 39:6 40:24 41:12
    47:5 49:5 52:2 58:4 61:3
    62:15,16,17 63:6 68:1,5 69:17
    69:18 70:19 81:16 92:20 93:3
    94:2,6 102:17,23 105:1 112:7
    116:14,23 119:7 121:3 126:17
    127:12 133:7,13 138:1 146:1
    148:9 149:3,4,16,22 152:18
    173:21 181:15 190:17 191:7
    198:2 200:14 213:23 222:13
    234:12 247:11,12 254:6 262:8
    281:17 283:21 284:14,18
    303:9 328:13
bad 27:7 54:19 56:1 72:7 93:16
    112:7,24 127:14 180:8 222:11
    228:21 256:1 274:8 294:24
    311:9 314:5 331:24 332:4,11
    332:12
bank 46:6 62:9 143:16 225:24
    244:14
banker 15:18
banking 272:24
Bansal 3:16 164:15,17,19
    165:21 173:19 175:14,20
    176:22 191:25 192:22 197:11
    197:13,16 198:17 199:20
    201:24 204:6 210:23 212:2
    303:4,6 305:4
Bansal's 176:6
bargain 62:2
base 34:15 45:8 314:3
based 35:14 53:3 58:7 65:2
    156:10 159:6 191:10 198:8
    200:18 203:11 209:4 211:17
    212:20,21 220:2 227:4 231:4
    237:7 254:15 265:9 267:5
    314:1 317:4 321:23
basically 106:5 107:2,11 109:12
    109:24 110:7,15 114:21
    116:15 124:25 125:24 142:25
    194:18 196:23 198:5 237:17
    305:21
basis 50:13 51:19 63:16,17,18
    74:17 87:19 155:19 156:13
    241:24 307:17
bathroom 137:6 190:16,19
    191:6,9
Beach 165:22
beautiful 320:16
beauty 17:7 320:18
became 32:19 55:16 82:5,6
    114:6 117:25 126:14,16
    159:23 256:20 263:16,18
    270:21
Becky 43:23 44:1,2,23 54:5
    75:17 91:25 122:5,5
become 56:24 59:9,18,19 61:17
    82:22 106:24 116:14,23 141:3
    141:6 160:5 253:22 254:19
    269:14
becoming 60:13 138:18
before 9:19 10:8 10:8 13:10 14:20
    16:14 40:5 61:14,15 65:17,18
    67:1 81:23 82:5,6 92:20 98:5
    103:6 107:8 108:19,22 111:3
    112:19 117:12,15 118:6
    121:15,20 122:9 123:18
    126:16 132:7 135:4 136:14
    143:4 144:13 145:4,5,18
    158:9 163:23 165:6 167:12
    172:22 191:11,25 216:18
    217:2 222:24 229:9 236:2
    238:11 245:22,24 246:4,17
    247:24 258:6 273:21 281:24

282:5,10 298:1 301:14 304:15
    304:24 321:15 323:5
beforehand 230:7
begin 324:11
beginning 9:12 19:20 49:22
    52:15 80:24,25 81:2,4 97:14
    98:14 106:25 116:20,23 207:3
    308:23
behalf 248:19
behind 272:20
behold 197:13
being 17:7 26:19 44:22 71:12,17
    72:24 78:25 83:2 100:3,6,7
    106:16,19 123:24 125:21
    130:6 140:22 149:15 167:11
    174:24 177:20 184:10,17
    210:9 227:8 237:16 244:20
    275:2 279:5,5,20 281:4 292:9
    308:17 313:1 325:14 328:7
believe 13:10,17 15:9 16:16 22:3
    36:22 67:14 74:25 77:5 79:17
    79:19 85:14 93:10 127:14
    143:22 168:2 170:23 185:10
    194:15 223:17 225:22 230:18
    230:19 233:21 235:7,7 243:5
    243:7,8 251:12,21 253:8
    254:7,9 258:11 261:15 267:10
    271:9 274:15 277:4 281:1
    282:17 300:18 328:11 329:6,9
believed 127:24
believer 287:18
belive 13:19
below 196:17 278:12 291:15
beneficial 304:17
beneficiaries 36:25 37:3,6 38:15
    46:4,16,19 47:21 52:23 57:20
    100:22 149:7 224:19 226:24
    227:19 237:8 250:5 285:20
    286:16
beneficiary 39:16,17 40:13 44:9
    56:18 57:11 136:13 147:3,5
    184:23 220:3,5 224:1,8,21,24
    224:25 225:1,2,3 227:2 228:5
    228:16 252:10 263:9
benefit 33:9 45:2 72:17 75:25
    81:13 90:15 91:7 196:1
    239:19 281:5 304:9
benefited 304:6
Benefits 40:16 106:18
Berezin 137:9
Berny 137:12
best 33:7 114:21 115:2 148:12
    192:23 227:21 275:18 286:21
    310:10
better 15:7 25:8 127:11 132:6
    223:2 294:24 295:6 299:10
    307:12 310:8,8,10 319:24
between 58:8,14 66:7 76:21
    111:18 141:24 149:23 168:25
    169:16,24 185:14 204:9
    205:22 211:3,15 226:6 228:5
    237:12 245:12 246:1 271:20
    282:17 288:20 289:9 290:15
    290:21 295:1,12 310:6 316:13
    316:22 318:15 319:19 326:23
    327:14
big 102:12 131:4 216:16 223:2
    226:18 235:13 268:4,4 276:25
    278:3,4,4 310:6
bill 46:19 53:1 54:10,14,20 55:1
    110:6,7 115:12 128:5 155:24
    160:25 161:2 163:4
billable 21:12 325:11
billed 48:10 212:13,13
billing 147:22,23 212:12 280:4
    304:3 307:21
bills 54:19 62:5 110:15 128:8
    143:16 245:1,13
binding 195:5,5

**Bing** 114:4 118:8 220:20 221:3,7
221:19,25 223:14 224:2,15,20
225:9,14,20 226:12,25 227:7
227:8,9,12,2 3 229:18 230:18
236:5
**Bing's** 224:14
**birth** 40:9 109:6 151:4
**Biscayne** 1:21 2:2
**bit** 47:9 52:14 69:2 77:18 81:16
127:11 130:21 138:1 155:8
253:14 275:11 306:7 311:18
323:25
**Bjerke** 285:4 295:2,3,5,7
**blame** 15:6
**blank** 40:21 41:19 92:13,14 93:2
175:15
**blew** 46:2
**blind** 180:14
**blinding** 235:21
**blood** 112:5 261:15
**blow** 208:22
**blurry** 192:23
**board** 81:11 176:8,12
**boarding** 60:12
**Bodden** 137:12
**bona** 59:21,22
**bone** 59:19
**books** 332:8
**boom** 323:8
**Borne** 261:16
**both** 21:9 32:8 36:5 38:8 58:17
73:7 172:12,14 179:15 209:13
215:25 226:16 243:15 244:22
247:24 271:1 286:17 287:4
304:16 308:7 310:10 311:22
320:6
**bottle** 113:4 239:5
**bottles** 157:8 239:1 242:5 246:11
246:12,12
**bottom** 40:18 101:4 171:20
196:15 203:16
**Boulevard** 1:21 2:2
**Bourjaily** 222:2 230:6 330:17
**box** 57:24 74:22 80:1 93:15,16
93:17,20,24 94:11,12 189:5,6
189:7,14 195:2,18 239:16
**boxes** 193:23
**boy** 93:15,15
**boyfriends** 55:4
**branch** 147:10
**break** 18:22 67:21 191:25 222:7
236:2 332:18 333:5
**breaks** 222:12
**breast** 148:24
**breathing** 135:15
**Brevity** 154:6
**bribe** 91:4 142:22,25
**bribed** 126:6 142:19
**brief** 12:19 19:1 23:4 25:21
134:17 136:4 183:19 191:12
297:2 327:6
**briefly** 29:17 30:24 158:7 166:16
199:17 211:24 215:23 216:1
**bring** 19:8 24:8,14 26:24 27:6,9
32:9 69:17,18 97:5 120:12
129:13,14 135:5 136:17,18,20
136:20 156:8,9,10 179:5,22
179:24 180:22 181:12 183:16
183:20,24 191:15 222:13
234:5 276:17 284:18 302:7
308:1 310:15 312:14,15,16
317:1,1 320:3,3,4,5,6,12
**bringing** 12:9 22:12 33:4 76:2
80:4 81:10 100:12 182:13
285:11 312:20
**brings** 328:20
**Brooks** 137:14
**brother** 252:22 257:3 258:18
**brother's** 252:23 257:7

**brought** 32:5 37:1 69:12 83:18
84:10 101:10 114:20 129:15
321:25
**Broward** 16:1 135:18
**Brown** 114:3,4
**Brundige** 285:6
**buddies** 55:19 58:23
**buffet** 255:24
**bull** 306:16
**bunch** 60:12 100:13 168:3 274:9
**burglary** 184:3,4,5
**burn** 123:16 124:7,12
**burned** 113:9 124:7
**bus** 21:5 25:15,18,23,2 4 26:1,4,9
**buses** 284:7
**business** 69:5 105:14,19,20
106:4 107:13,15 120:3,17
149:11 179:1,17,19,23 180:3
180:10 182:6,19 183:21 190:6
215:18 251:2
**businesses** 149:12
**busy** 20:4
**butcher** 271:19
**buy** 274:18 305:17 314:12
317:25 318:19 319:16
**buying** 101:18
**buys** 319:1
**B-a-n-s-a-l** 164:24
**B-i-n-g** 221:25

### C

**C** 175:20 333:11,11
**cake** 308:12
**calculating** 118:6
**call** 19:2 23:23 42:11,13,14,15
42:16,20,21,22,23,24,2 5 43:2
43:3,7,8,10,1 1 46:12,13,17,18
61:16 73:8 75:22 77:21 99:24
100:10 101:4 105:18 107:17
107:20,21 108:1,2,3,9,11,12
108:15,16,1 7 109:2,4 110:3
111:6,16 112:7,10 116:13,13
124:24 125:15 127:16,22
128:17 132:5,21 138:8,9,11
138:13 139:11,25 148:20,22
152:20,22 153:3,16 154:9
155:5,11,15,1 7 177:21 183:7
183:8 190:6 210:25 227:19
228:5,12 234:11 235:9,9
237:2 240:20,22 243:22,23
244:2,10 247:20 249:14
251:21 254:7,8,9,11,13,16
260:18 263:21,24 266:21
272:16 281:18 282:10 286:11
299:19,25 300:1 314:23
321:18 324:7,14,15,15 331:9
**called** 21:5 24:17,18 25:13 29:4
43:13 57:21 94:14 109:5,17
109:18 110:16 111:13,13,15
111:19 112:16 118:8,8 120:24
122:5 127:20 132:24 146:19
174:24 194:5,19 203:10
206:17 219:17 227:20 254:13
260:14 263:22 271:9 303:19
303:20 312:10 314:19 316:2
316:14 324:13 328:2
**calling** 23:22 184:3 322:2
**calls** 27:24 60:19,20 105:10,11
107:18 146:5 164:15 174:23
188:18 197:23 219:2 240:19
262:11
**came** 15:9 42:19 86:4 101:2
111:2 113:1,20 122:1,4
130:12 135:11,12 141:23
158:25 159:3 161:1 232:12
238:12 268:3 318:12
**candidate** 45:2
**cane** 24:16
**cap** 46:7

**capability** 33:13
**car** 34:7 216:18,22 217:1,4
**card** 110:5,17 120:3 331:5
**cardiologist** 84:21
**care** 12:2 14:16 31:22 32:1 34:19
34:21 35:6 42:10 50:6,19
54:11,24 60:3,9 61:10 98:24
99:2 147:14,17 171:9 192:9
192:15 193:15 197:5 206:17
214:8 217:12,15,17 220:2,2
237:7 240:8 253:10,15 254:19
255:10,12 264:24 290:16
313:9,10 317:20,24 319:15
320:11 328:5
**career** 82:3 83:13 104:14
**carefully** 66:1
**carpool** 15:19,21
**carriers** 281:6
**carry** 209:20
**case** 1:3 11:12 12:1 13:4,11,12
16:9 19:11 24:17 29:7 63:19
84:25 85:11,16,1 7 90:4 95:22
96:6 97:4,12 108:15 112:7
133:15 134:1 162:11,17 166:3
166:24 170:2 172:13,13,14,14
176:3,3,4,1 3 177:20 178:4
180:24 184:4 187:11 188:15
203:25 204:1 205:2 210:3,19
211:8 223:3 229:2 230:17
231:2 235:1,2,13,14 280:4
284:6,7,8,12,1 3 292:8 305:9
311:14 317:4 320:10 322:15
322:16,17,20 323:25 330:23
332:18
**cases** 39:21 228:11,23
**case-in-chief** 308:6,8 310:15
312:11
**cash** 61:25
**cashed** 61:23
**catch** 321:4
**caught** 59:14
**cause** 228:25 329:2
**caused** 194:20 224:7
**causing** 196:10 321:7
**cell** 120:1
**central** 180:24 213:21
**certain** 4:5 7 210:8,9 244:11
**certainly** 9:13 13:2 165:12 179:2
181:9 246:13 303:18 311:11
**Certificate** 4:11
**certification** 217:24
**certifications** 269:19
**certified** 178:5
**certify** 333:12
**challenge** 228:13 302:14
**challenged** 156:13 171:19
**challenges** 19:19 317:8,10
**challenging** 317:14
**chance** 119:4 172:4 223:21
274:2 296:25 307:12
**change** 117:25 119:21 139:3
181:21 209:1,10,22 277:13
279:4
**changed** 21:14 40:5,25 46:10,11
99:23 119:23 209:10 210:17
269:17
**changes** 279:10
**characterize** 78:16
**characterizing** 198:22
**charge** 230:21,22 286:6 322:22
323:10
**charged** 29:6,8,21 96:6 153:22
153:24 177:21 187:13 188:13
223:15 228:18,19 298:11
322:8
**charges** 29:22 30:1 32:24 98:22
**charging** 21:13 322:21
**charismatic** 266:17
**chart** 169:20

**chat** 301:23 307:10
**cheap** 305:17 315:20 316:6,8
**cheaply** 317:25
**cheated** 182:9
**check** 51:6 54:22,23,24,2 5 59:16
60:4,14,15,22 61:9,18,23 72:1
83:5 92:1 93:24 94:10,11
118:18 125:2 193:23 210:15
**checked** 195:2 208:14
**checking** 62:5 266:9 267:3,3
**checks** 61:8,11,12,19,23,25
**cheer** 103:24
**cherry-picked** 227:21
**chest** 123:17 124:7
**chickens** 251:3
**child** 104:8
**children** 171:18 239:13 243:9,13
243:17
**child's** 38:4
**chilled** 329:13
**choice** 159:6 308:8,16,18,20
309:17
**choose** 13:23
**chose** 19:19
**chosen** 209:7
**Chris** 9:9 192:17 200:12 291:13
**Christie** 222:18 284:14
**Christmas** 123:12
**Christopher** 169:1 197:4 200:11
**chronic** 240:9 264:24
**chronology** 122:9
**Cichowicz** 4:7 233:19 262:11,13
262:16,22 283:6
**Cici's** 255:19
**circle** 40:23 93:14,16,17,20
**Circuit** 300:6
**circulate** 125:23
**circulated** 125:22
**circumstances** 332:13
**citizen** 180:19 183:2
**city** 28:22 103:13 146:16 165:21
219:15 250:20 262:22
**claim** 218:9,10
**clarification** 160:17 161:12
**clarify** 248:2
**clean** 133:18 134:21
**clear** 79:22 108:18 121:17
332:14
**Clearly** 323:20
**clerk** 309:23
**client** 81:3 302:13 311:6,8,24
318:3 327:4
**client's** 9:19 177:6
**clinic** 81:13
**clinical** 33:5,8,19,2 3 35:13 84:11
**clinically** 32:8 84:8
**clock** 24:6
**close** 48:23 219:5
**closed** 131:20 133:23,23
**closer** 127:10 246:8,14
**closet** 113:13
**closing** 119:15 217:5 296:9
**co** 224:19 290:16
**coach** 38:4 103:24
**Coast** 147:11
**Coconut** 16:2
**code** 34:25 42:22,23 127:17
**codes** 51:12
**coffee** 166:21,22 222:7,17
**coin** 182:22
**colleagues** 312:9
**collect** 53:2,24
**collected** 57:7
**collections** 39:9 46:21 54:13
**college** 90:9,10,14 103:18 143:16
191:11
**color** 310:9
**com** 92:15
**come** 15:10,10 16:5 19:10 22:23

24:3 27:3 30:23 40:4 42:17
59:7 69:5 87:11 90:11 105:12
109:20 112:25 115:12 116:9
121:3 133:13 135:4 145:25
153:21 156:15 159:3 163:2
190:16 191:6 205:4 239:21
254:6 263:1 266:14 267:15,22
268:20 277:19 283:24 295:20
296:1 300:9,9 305:2 309:6
314:2 319:11,16 329:1,14
**comes** 9:20 153:12 154:20,20
175:11 190:9 307:24
**comfortable** 27:15 262:15
330:13
**coming** 74:17 94:23 136:6
153:18 269:11 285:10 304:1
320:13
**comment** 208:3 231:8 291:20
**commercial** 89:3 100:23
**commercials** 89:18 90:2,11,18
**commission** 34:16 44:23 59:16
60:4,14,15,2 2 61:12,18 87:19
248:14 265:9,23 275:7 280:22
**commissions** 61:16 78:21 83:2,7
86:23 123:24 129:14,15 141:8
280:1
**commit** 132:16 179:10 180:8
184:2,3,4 187:14
**committed** 99:9 102:13
**committing** 89:19 100:3 132:19
179:6
**common** 99:14
**communicate** 105:8 236:12
237:14
**communicated** 105:9
**communication** 105:21 126:23
291:24
**communications** 141:23 206:8
210:25 211:3 286:22 291:5
**community** 30:13 214:1,8
**companies** 38:25 51:9 86:5
88:23 89:18 100:16 120:16
171:8 176:24 254:24 318:1
**company** 33:24 34:14 35:2,3,7
51:10,11 61:9 76:4,7,10 77:7
77:19 78:4,19,24 79:22
100:18 101:25 157:13 178:2
179:7 192:8 204:9,13 205:9
206:14,15 209:21 213:22,25
218:5 220:17 224:3,10 248:20
258:20 281:11 291:25 318:1,5
318:6
**compare** 51:10
**compensated** 94:19,19
**compensation** 34:13 94:21 95:1
95:2 106:9
**complain** 52:17,24 229:8 300:6
**complained** 54:1
**complains** 310:2
**completed** 42:6
**completely** 180:11 309:7 313:1
**compliance** 33:20 34:19,19 35:6
217:11
**compliant** 139:21
**complicated** 16:23
**complying** 218:11
**composite** 22:6
**compound** 119:4 120:13 264:1,8
274:12,14
**compounded** 82:12,15 210:9
224:2 280:18
**compounding** 37:20,20 40:6
45:9 57:21 82:14 100:25
210:4 279:10 327:19
**compounds** 314:1
**comprise** 61:19
**computer** 28:11 134:11
**concentrate** 27:21
**concerned** 107:7 266:18 306:5

321:9
**concerns** 173:14
**conclusion** 50:15 187:21 306:25
307:1
**conclusions** 52:12 307:2
**condition** 240:9
**conditioned** 218:10
**conditions** 96:14 264:25
**conduct** 34:25 187:16 318:4
**confer** 190:4
**conference** 61:16 116:13,13
132:5 138:9,11,1 3 251:21
254:7 322:21,22 323:10
**confess** 235:3
**confident** 231:7 322:15,16
**confined** 96:18
**confinement** 30:13 96:3 97:21
**confirm** 41:15 94:14 128:17,18
128:20 282:11,12
**confirmed** 132:2 297:13
**conflict** 66:7,7
**confront** 298:19 299:24
**confused** 19:17 68:16,21 69:13
69:16 70:23 313:10
**confuses** 202:18
**confusing** 137:11 182:17
**confusion** 248:2
**connection** 148:14
**cons** 33:7
**consent** 17:10
**consider** 65:25 210:11 230:6
233:5
**consisted** 236:17
**consistent** 156:8,9,10 172:23
209:6 293:1
**consolidate** 231:25
**conspiracy** 29:6,8,11,1 8 30:2
64:12,14 98:24 99:2 172:8,17
172:20,21 223:7,17 228:22
327:16 328:10,15,18
**conspirator** 223:15
**conspirators** 224:19
**conspire** 11:11 29:9
**conspired** 11:15 81:7
**conspiring** 188:12
**constitute** 328:7
**consult** 76:5 78:19,21 197:11,13
197:17 205:6,10,16 206:14
208:15
**consultation** 208:1,13,14,16
209:4 211:9,14
**consulted** 312:9
**consulting** 302:13
**consults** 75:19 79:23 144:15
**contact** 47:10 92:18,22 93:21
112:6 118:12 120:22 148:13
148:15,16 240:18,18 286:19
**contacted** 148:2 271:8 279:17
**contacting** 264:19
**contains** 22:6
**content** 244:6
**contention** 319:18
**CONTENTS** 3:1
**contest** 149:10,13,1 3 304:25
**contested** 16:25
**context** 199:5 228:7 313:23
**continue** 131:9 135:22 269:7
**continued** 282:21
**continuing** 328:12
**contract** 32:10,15,17,1 8 84:9
328:20
**contractor** 104:16
**contraindications** 33:6
**control** 281:4
**conversation** 52:15 53:14 57:14
86:10 107:11 142:7 198:2
241:20 252:1 266:13,14,19
269:16 330:4
**conversations** 53:4 141:12 149:5

149:6 206:16 244:1
**convict** 12:17
**convicted** 30:7 188:15
**convictions** 331:16,17,20 332:12
**convince** 274:18 297:16
**convinced** 307:13
**convincing** 169:8 307:13
**ConZip** 83:20
**cook** 251:3 255:21
**Cooke** 14:21
**cooperate** 30:20 65:19 96:5,12
**cooperating** 30:21,22
**cooperation** 30:24 95:24 97:19
**cooperative** 235:2,4
**cooperator** 65:17
**cooperators** 65:22,24
**copay** 39:8 52:25 53:2,6,7,20,22
52:23 54:1,9,20,2 1 109:23,24
110:1,3,10,11,13,1 7 113:23
115:11 128:5,7 146:25 147:21
155:23,24,2 4 156:3,6 157:15
160:8,8,8,1 8 161:10,11,14,16
**copayment** 110:14
**copayments** 109:20
**copays** 52:15,18,2 1 115:6
280:25
**copied** 291:3
**copies** 199:13 323:8
**copy** 55:1 185:25 273:20
**Coronado** 285:15,18
**Corp** 117:7
**correct** 55:1 58:4 62:21 64:15,18
67:2,3 71:12,1 7 73:10,11 75:1
75:2 78:4 79:6,8,9,13 82:4
83:4,24 86:24 87:19 89:10
91:9,12,20,2 1 92:7,11,24
93:23 94:12,1 3 95:25 96:7,19
97:21,22 99:11 106:22,23
109:17 117:23 118:16 121:18
122:10 123:13 127:3,5 129:8
130:16 138:5,11,14,18,25
139:5,6,23 140:6,12 141:1
142:22,23 143:22 147:23
151:18 158:8,10,1 1 159:9,20
159:21,22 160:1,4 161:7,14
161:17 162:2,15,18,19 164:5
182:11 195:3,15 197:6 204:21
205:11,19,22 206:6,12 207:7
207:22 208:2,11,12,17 209:2
209:15,25 210:11,22 211:7,12
211:20,21 212:11,22 218:5,17
220:8 227:3 245:22,24,25
246:2,9,14,23 247:16,21,22,25
248:14,18 249:16,17 257:18
257:21 258:15,18,21 259:4,19
260:4,6,14,19,2 2 261:5,10,16
261:18 272:8,9,19,21,24
273:5,6 274:15,23 277:20
280:13,21 281:15 292:3 312:8
315:3 323:6
**correctly** 65:21 117:9
**correspond** 131:16,18
**corridor** 284:18
**corroboration** 311:14
**cost** 37:13 46:18 95:5,7 106:17
106:18 156:19 280:23 305:12
306:21,21 307:16 313:15,20
313:21 315:8,9,10,1 0 318:24
319:17
**costing** 157:12
**costs** 281:5 305:18 314:12,24
315:1,14 316:5,7 318:15,17
318:18 319:2 3 289:2,6,9,11
**Cotto** 137:14
**counsel** 8:3,4 14:8 19:3,4 135:3
135:3 321:10 323:22
**count** 157:6,7
**counted** 246:10
**counts** 96:7 286:8

**County** 224:11
**couple** 19:7 42:19 46:8,9 99:16
99:17 115:20 127:6 187:22
192:3 196:3 200:10 239:7
251:10 322:23
**course** 20:4 26:8 99:14 122:22
137:3,21 181:7 183:15 193:3
201:14 217:4 274:8 286:9,19
315:6 319:20
**court** 1:1 2:5 8:3,8,10,13,15,17
8:19,21 9:1,6,8,11,16,18,20
9:23 10:3,5,6,11,13,15,17,20
10:23 11:1,6,8,11,15,1 8 12:20
12:22,23,24,2 5 13:6,12,14,16
13:18,20,21,23 14:1,3,4,10,13
14:16,18,23 15:3,13,17,21,24
16:1,3,5,8,11,14,18,20,23
17:3,4,5,10,15,17,18,19,23,25
18:5,7,10,13,15,17,19,2 5 19:2
19:16 20:3,12,17,19,2 3 21:1,5
21:8,12,17,18,20,2 3 22:2,5,8
22:10,12,17,2 2 23:2,5,12,18
23:24 24:2,8,10,10,13,16,20
24:23 25:1,3,5,7,11,15,18,22
25:23,24,25 26:2,3,4,8,11,13
26:21,24 27:2,8,9,10,12,14,25
28:2,5,7,10,15,1 9 29:4 30:15
31:8 35:20,22 36:1 49:19,25
50:9,12,18,21 51:18,21 52:2,5
52:5,7,9,1 1 53:10,12,15 56:3
56:5,10 58:11 62:24 63:2,4,6
63:11,16,20,22,2 5 64:3,6,9,17
64:20,22 65:5,13,23 66:12,15
66:17,19 67:15 69:7,10 70:5,8
70:12,14,1 7 71:21,25 72:3,5
76:16,18 77:9 86:18 89:22
90:22 91:1 97:24 98:11
102:22,25 103:2,4,6,10 104:9
107:23 109:19 118:23,25
119:3,5,7,10,1 2 121:8 122:15
122:17,19,22 128:23,25
131:10,25 133:3,13,21 134:8
134:10,14,18,20,2 2 135:23
135:10,13,18,21,2 4 136:2,3,7
136:9,12,15,18,20,22,24 137:6
142:13,15 144:25 145:2,4,10
145:16,25 146:4,6,8,12,19
150:7,10,15,18,2 0 151:6,9,11
151:14,16,19,22,2 4 152:2,6,8
152:11 153:1,6,17,2 4 154:1,6
154:11,17,19 155:3,6,10,14
156:7,12,21,2 5 157:22,25
158:12,14 159:1 164:8,10,14
164:16,18,20,22,2 5 165:3,6,8
165:13,15,17,2 5 166:3,5,10,19
167:2,6,9,14,17,2 2 168:4,8,10
168:14,16,21,2 4 169:2,5,7,11
169:14,16,19,22,2 4 170:2,5,7
170:9,11,13,15,17,19,21,25
171:3,5,14,17,2 5 172:4
173:16,18,24 174:2,4,6,11,16
174:18,21 175:6,8,17,19
176:3,7,9,11,12,16,18,21
177:3,6,9,12,2 5 178:8,11,13
178:15,17,19,21,2 3 179:5,8,13
179:14,22,2 5 180:2,6,12,16,20
181:1,5,7,11,18,2 5 182:4,9,12
182:15,22 183:4,7,12,15,18,20
184:2,16,18,21,2 4 185:1,4,7
185:12,14,18,21,2 3 186:1,6,8
186:10,12,12,18,23,2 5 187:2,8
187:11,14,17,2 4 188:2,5,7,10
188:14,17,20,2 3 189:2,6,9,11
189:14,16,18,20,22,2 5 190:2,6
190:8,11,16,19,22,2 4 191:3,4
191:6,9,13,15,16,1 8 193:3
194:10 197:22,25 198:3 199:3
199:9,12,16,18,2 4 200:21,24
201:2,6,11,14,17,2 0 202:2,4,8

202:10,13,17,22,2 4 203:3,6,8
205:23,25 206:2 211:23
212:18,21,24 213:1,3,5,7,10
213:15,18 214:14,19 215:16
215:22,24 216:3,5,8,23,25
217:3,21 218:23 219:1,3,5,8
219:10,17 220:10,23,25 221:4
221:6,8,12,20,2 4 222:1,2,6,11
222:15,16,21,23 223:9,11,13
223:18,21,24 224:7,13,16,18
224:21,23 225:4,13,15,19,23
226:1,3,9,14,18,20,2 3 227:1,4
227:11,15,17,2 3 228:1,3,9
229:2,12,16,20,22,2 5 230:3,11
230:13,21,25 231:3,9,15,18,21
231:23 232:2,4,6,7,10,14,17
232:20,23,25 233:4,9,12,20,22
234:2,5,6,8,19 235:16,18
236:4,6 238:5,7 241:9,13,16
241:18,24 242:12,15,18 245:3
245:16 249:3,7,9 250:7,10,13
250:15,17 251:17,19,22
257:13 259:22 260:1 261:21
262:7,10,12,14,17,19,25
270:14 271:14 273:11 275:1,5
275:13,17,19,23,2 5 276:2,6,8
276:19 279:1 283:3,20,23
284:21,22,2 3 285:3,5,7,11,14
285:16,18,21,24 286:3,7,10,20
286:23,25 287:3,6,11,14,17,21
287:23 288:1,3,7,11,13,16,20
288:23 289:1,5,9,12,14,17,19
289:21,23 290:2,6,8,13,15,20
291:4,7,10,12,16,2 1 292:1,5
292:11,13,15,18,20,2 4 293:2,4
293:7,10,14,21,2 5 294:4,9,13
294:15,17,19,23 295:1,4,6,9
295:12,15,18,20,2 4 296:1,3,6
296:10,12,15,2 1 297:1,8,11,19
297:22,25 298:2,6,8,13,15,22
298:25 299:4,10,12,16,20
300:1,4,14,17,2 4 301:2,6,10
301:18,21,25 302:4,10,21,25
303:2,5,7,11,14,2 2 304:6,9,12
304:20,23 305:11,14,22,24
306:1,9,11,15,18,2 3 307:2,5,7
307:10,19,24 308:1,5,9,12,18
308:20,23 309:1,8,12,19,23,24
311:1 312:6,14,18,22,23,24
313:4,8,12,18,22,2 4 314:5,9
314:14,17,20 315:1,5,8,11,17
315:19,25 316:7,11,17,19,21
316:23,25 317:5,10,12,16,19
317:22 318:6,13,18,22,24
319:3,6,8,11,18,21,2 4 320:3
320:15,18,22 321:3,9,14,16,18
322:3,6,8,10,12,18,22,25
323:3,14,17,2 1 324:2,8,12,21
324:25,25 325:4,8,10,12,13,14
325:18,21,24 326:1,4,6,9,11
326:14,18,22,2 5 327:3,7,9,11
327:13,17,20,22,2 5 328:3,6,9
328:13,15,17 329:1,5,8,10,14
329:18,20,22,5 330:3,6,9,16
330:20,23 331:6,8,14,16,18
331:21,25 332:3,6,8,17,21,22
332:23,24 333:5,8,16
**Courthouse** 2:6 333:16
**courthouses** 234:16
**courtroom** 1:5 14:11 16:13 17:2
19:7 20:2 21:23 22:1 24:9,11
24:15,19 25:10 27:11 133:5,9
133:10,12,15,19,2 0 135:6
136:19,23 137:4,20 153:9,11
167:1 182:17 184:19 191:17
222:20 233:13 234:7,13,14,22
284:20 323:2,12
**courtrooms** 19:18 234:10
**Court's** 231:8 249:2,5

**cover** 87:24
**covered** 154:25 170:23
**covering** 87:15 88:7
**cover-up** 187:16
**co-conspirator** 13:11,12 72:18
221:5,10,14 223:6 224:7,16
224:21,24 225:2 228:17,24
230:18 327:15 328:6,8,9
**co-conspirators** 228:20 230:20
**co-counsel** 13:19 14:8 302:13
**co-defendant** 13:11
**co-owner** 178:1 213:22 214:2,4
**crazy** 312:18
**cream** 20:25 37:20,21 38:16,17
38:23,23,24,24 41:25,25
43:12 45:9 48:13 56:24,24
57:4,4 72:17 75:25 82:10,10
87:3,7,12 106:5,6,20,20
107:12,13 113:4,5,9,10,11,16
123:1,4,16 124:2,10 125:12
127:21 130:10 148:4,4 149:21
156:18,19 161:4,4,6,6 195:4
206:24 212:10,14 236:21,21
237:4,11,11,18,19,23,23,24
238:15,15 253:8,8 271:3
278:5
**creams** 86:1,2,6,6,7 95:12
113:12 123:22 125:7 148:2,3
148:5,6 219:22 236:21 240:1
256:15,15 263:8 264:1,8,12
264:16 266:23 268:4 281:22
303:18,19
**create** 144:5 301:7
**creates** 195:13
**credibility** 299:7
**credit** 110:5,17 331:5
**crime** 31:15 49:17 99:9 132:16
132:19 184:2
**crimes** 1:15 89:19 100:3 102:13
331:14
**criminal** 30:1 98:22 172:13
330:21
**criteria** 237:6
**critical** 186:13
**cross** 101:24 142:18 145:6 159:4
159:6 172:4 173:9,10 184:9
184:11,12 188:24 212:21
231:15,16 305:24 313:9
321:16,19
**cross-examination** 3:7,11,15,18
3:22 4:1,5,9 65:16 66:3,19,21
98:15 121:8,10 137:22 143:19
153:7 155:18 157:22 158:2
171:19 203:8 204:4 215:22
216:9 245:16,18 249:13
257:13,14 270:14,16 296:22
296:24 297:2 298:10 299:7
300:5 309:14 310:11 311:13
**cross-examine** 177:19 183:5
198:3 298:13,18 311:16 313:5
**cross-examined** 66:4 230:14,15
**cross-examiner** 332:11
**cross-examining** 298:17
**crucial** 229:5 230:17
**cue** 28:15,16
**cued** 28:12
**curling** 113:9 124:8,12 130:12
**current** 98:1 166:9 277:23
**currently** 72:25 96:15,22,23,24
103:23 104:15,20 146:17
**curtains** 233:14
**customer** 32:5 84:9
**cut** 95:25 261:9,14
**CVS** 196:24
**C-i-c-h-o-w-i-c-z** 262:17

**D**

**D** 2:6 333:16
**dad** 251:9

**daily** 34:7 74:17
**Dan** 66:25 121:14 158:6 270:20
**Daniel** 1:19 16:13 17:2
**darker** 235:19
**darn** 331:19
**data** 212:12
**date** 40:9 109:6 151:4 205:8
261:9,14 333:15
**dated** 197:7 208:18
**dates** 162:13
**daughter** 55:21 104:7,8
**daughters** 104:6
**day** 26:14 30:22 45:13 69:14,20
70:11 111:8 122:3 164:11
197:7 207:10,21 210:14
212:24 218:24 250:8 262:8
280:17 283:21 324:4,4
**days** 26:13 67:7 105:22 149:22
226:4 244:11
**day-to-day** 32:25 33:4
**DEA** 296:19
**dead** 165:10,13
**deal** 24:2 95:25 102:12 144:10
235:13 310:6
**dealing** 192:15
**dealings** 219:21
**decades** 96:9 97:20
**December** 46:23 49:5 108:24
123:23,25 124:6,9 143:10
198:16
**decide** 66:8 70:9 144:8 155:15
167:10 235:6 236:8 306:4
311:4 324:13
**decided** 52:16 56:23 60:22 69:17
69:18 96:11 274:18 311:8
**decides** 95:6 315:23
**deciding** 311:5
**decision** 31:12 195:12 205:17
209:3,19 210:21 211:19 222:2
235:11 302:12 311:5 320:8
330:17
**decisions** 175:22 311:21
**decision-making** 204:20,21
**declined** 76:11 78:1,3
**deduct** 44:15 75:17 78:20
140:17
**deducted** 44:22
**deducting** 119:15
**deep** 129:24 130:1 131:20 132:2
143:23 235:25
**defendant** 1:8,19 8:3 12:11,17
19:3 20:23 30:2 37:11 135:2
150:4 168:20 174:23 176:5
181:1,2 182:18 186:14 236:12
236:24 237:10 240:4,7,15
241:3,14 243:18 244:1 251:13
252:4 253:7,21 254:8 256:20
263:17,24,2 5 264:10 265:21
268:13 269:13 283:9,11
302:16
**defendants** 311:19
**defendant's** 5:7,8,22,23,24
11:23 71:23 72:2,6 76:14,19
79:5,10 171:24 174:9 241:11
271:12,1,5 275:20 276:3
278:23 279:2,9
**defense** 8:3 10:11 11:22,22 14:8
17:15,23 18:8 19:3 21:21 22:2
23:9 66:9 135:2 169:12,19
170:2 175:16 180:7 181:1
182:12,15,17 203:11 228:13
286:14 301:18 309:15 310:16
323:24 326:23 330:11 332:18
**definitely** 312:16,20
**definition** 68:17,19 154:19
**degree** 29:2
**delay** 11:12 137:20 161:24
297:10 310:14 332:18
**deliberate** 11:24

**delivered** 267:2
**Delphine** 19:7 20:8,18 24:19
25:10
**demeanor** 132:15
**Democratic** 297:13
**Denied** 301:25
**denies** 181:12 299:24 300:19
310:20
**dentist** 27:6
**denying** 183:9
**Department** 60:13
**dependent** 263:12
**depends** 308:2 321:16 332:13
**deposit** 122:4 126:21
**deposits** 46:6 83:7
**depriving** 308:14
**deputy** 14:11 19:7 20:2 21:23
22:1 24:9,11,15 133:19 135:6
136:19 137:4 323:2
**dermal** 194:16
**dermatologist** 177:16
**describe** 29:17 30:24 32:25
39:17 58:25 106:4 113:2
125:6 156:17 166:16 171:12
268:3
**described** 255:23
**description** 5:4 76:8
**detailed** 239:21
**determined** 139:21 281:21
**develop** 54:18
**device** 51:8,10,14 52:1
**devices** 51:15
**Diabetes** 61:9
**dictate** 181:22 195:9
**Diego** 12:10 55:19 137:10
322:11
**difference** 20:5 58:7,14 80:6
118:14 200:15 226:18 228:25
229:3 276:22 314:24 315:13
318:15 319:19 320:23
**different** 9:24 35:8 45:4,5 74:12
79:25 87:8 105:25 155:16
164:4 180:11 182:17 200:14
222:21 231:2 239:12 254:12
309:7 319:25 320:1
**differently** 280:18
**difficult** 12:1,6,14 109:19 311:4
311:5
**difficulty** 84:5,6
**Dineiska** 137:15
**dire** 186:3
**direct** 3:6,10,14,17,21,2 5 4:4,8
28:20 34:1 64:6,24 83:7 92:22
98:23 103:11 122:25 126:20
129:20 146:13 149:11 155:17
157:25 158:25 165:19 173:9,9
204:8,17 207:20 210:5 213:11
219:11 247:14 249:15 250:18
257:20 260:3 262:20 286:18
305:22 306:2,6 311:13
**direction** 74:13
**directly** 35:18 36:4 47:10 48:9
58:9 59:17 62:4 68:17,19 80:1
80:12 92:16 138:20,24 139:7
176:5 209:19 251:20 279:5
**disagree** 235:9 315:5
**disagreed** 171:11
**discarded** 246:12
**disclaimer** 126:2
**discuss** 148:18 174:13 332:17
**discussed** 46:13,15 71:15 165:9
168:18 194:22 311:7
**discussing** 44:20 144:19 176:16
309:14
**discussion** 12:19 25:21 35:11,13
44:6 100:14 134:17 136:4
167:16 183:19 200:2 202:21
327:6
**discussions** 42:17 43:2 101:16

107:14 243:21,22 247:23
**dishonesty** 331:14
**dismissed** 330:23
**Disney** 312:19
**dispensement** 212:15
**dispensing** 296:19
**dispute** 292:5 313:13,13 315:11
315:12 317:23 318:2,8
**disputed** 184:10,11
**distracting** 231:19
**district** 1:1,1,11 34:2,6,10
**DIVISION** 1:2
**division's** 226:10
**docs** 177:1 198:19
**doctor** 33:12 36:15,17,18 42:12
42:13,15,16,21,2 4 43:7,8,10
43:11,13 44:13 46:17 64:11
72:22 73:8,8,9,13,14,19,19
74:2,2,5,6,2 0 75:3,9,13,16,18
75:21,22,2 3 77:7,12 79:11
80:3,5,12,1 4 84:21,24 86:25
87:2,9,12 89:7 101:1 107:16
107:21 108:2,3,8,9,11,12,15
108:20,2 2 111:3,7,13,14,16,20
111:22,25 112:2,2,6,10,12,16
112:19,21 125:16 127:20
128:11,12 135:17 145:22
148:22 152:21,23 153:4,15,16
165:23 166:1 170:22 171:5
174:23,25 175:25 177:4,7,8
196:11,12 197:9,17 198:7,8
199:9 201:2 203:10,13 207:16
212:24 224:11 240:8,16,18,24
241:1,2 244:3 247:24 253:11
253:15 258:10,14,14 264:16
264:24 272:17 273:4 274:19
277:20 281:18
**doctors** 35:18 42:8,8,10 51:13
62:21 74:17 75:3 76:2 77:19
78:1,3,18 79:6 80:1 81:10,11
84:18 85:10 88:1,10,22,24,25
89:5 99:7 107:14 108:1
135:16 179:2,3,9,20 200:14
265:15
**doctor's** 36:17 42:4 175:21
202:12 243:23 264:19 266:22
273:8
**document** 10:2 22:3,8 39:12
71:19 78:6 92:5 169:4 174:14
178:11,13 181:12 182:25
183:1,14 187:22 192:23,24
193:7 198:24 199:5 205:8
214:11,18 215:3,6 216:4,5,11
216:14 217:10,14 225:21
227:7 255:2
**documents** 22:7 71:4 165:14
205:5 207:24 216:20
**DoD** 39:19 44:5
**doing** 10:3 17:9 24:21 34:3 41:6
46:25 49:11 50:2 51:14 60:2,3
68:2,5,10,12 73:3 75:13 76:1
81:7,22 84:14 95:1 97:14
117:17,18 119:13 120:17
121:13 129:20,21,22 130:1,3
130:5,23 131:21 132:3,7,12
132:13 133:1 149:7 151:1
157:20 187:20 206:14 229:20
232:23 266:2,4,4 267:14
268:21 308:14
**dollar** 303:20
**dollars** 305:19 314:13 318:20
**don** 281:12
**done** 28:16 66:14,15 132:8
143:20 145:17 174:7 190:6
197:13 222:4 230:7 249:7,8
266:10 267:15 286:12 298:23
302:8 303:8 309:3 321:13
322:20,25 323:21 324:18,19
**Donnelly** 3:13 23:23 54:4,6,7,10

54:15 55:1 93:7 134:9,12
146:5,7,10,1 5 147:12 164:10
**Donnelly's** 54:9
**door** 133:22,23,2 3 134:19 167:2
167:3 173:21 222:21,22 267:3
284:21
**door-to-door** 256:5
**doubt** 207:8 215:13 228:21
**down** 10:5,7 11:16 17:3,6,19
19:5 27:14 31:4 56:2 67:21
106:15 120:16 129:24 130:1
130:22,24 131:20,21 132:2
133:8 135:7,12,1 2 143:23
149:25 150:3 151:12 158:23
159:9,15,18 203:16 219:5
225:5 313:21
**dozens** 204:24
**Dr** 127:17,20 128:15 164:15
165:21 173:19 175:14,20
176:6,22 191:25 192:22
197:11,13,16 198:17 199:20
201:24 204:6 205:1 210:23
212:2 303:4,6 305:2,4,9
**draft** 317:21,22
**drashbaum@mnrlawfirm.com**
1:23
**drastic** 302:1 310:17,17
**draw** 187:20 306:25 307:1
**drawn** 306:6
**draws** 307:2
**drink** 307:11
**drive** 15:19,21,22 31:4
**driving** 216:22
**drop** 15:24
**dropped** 331:13
**drove** 67:14
**drug** 33:7,20 53:6 59:24,24
60:10 87:8 96:20 140:14
142:19 144:23 194:13 259:12
319:20
**drugs** 33:19 45:7 85:9,9 97:4,14
106:19 107:4,6 108:19,23
111:4 112:15,25 113:3,6
120:16 145:15 303:17,24
328:22
**Drum** 263:15 265:14
**Dryvaan** 238:25 243:11 244:9
247:19 250:11 252:24
**due** 61:12 116:5,7 279:11
**dug** 301:16
**dumb** 225:6
**duplicates** 168:8,11
**durable** 178:1 179:9 218:3,7
**duration** 110:9 111:23
**during** 64:12 65:21 90:10 99:14
103:7 122:25 138:13 139:11
142:18 175:23 296:24
**duties** 32:25 33:4
**duty** 147:6 220:7 263:11,13
265:12
**D-o-n-n-e-l-l-y** 146:11
**D.C** 146:18

**E**

**E** 1:20 333:11,11
**each** 34:12 35:7,13 37:1 38:18
47:25 160:10,12 161:10 167:9
234:25 239:8 286:8,9 296:4
298:15 304:9
**ear** 254:13 325:4
**earlier** 34:18 35:4 36:21 38:21
45:12 58:22 62:20 63:12,14
80:23 124:6 155:23 197:4
257:3,20
**early** 14:6,13 15:10 87:3,6
128:22 129:5 263:14 294:24
**earn** 62:2
**earned** 60:5 248:24 258:24
**earning** 49:3

**earnings** 57:23
**easier** 14:18 87:14 94:11 137:11
137:18 165:18 166:23 216:7
226:10,16
**easiest** 136:25 137:2
**east** 233:15 235:19
**Easter** 91:23
**eastern** 146:18
**easy** 11:12 45:23 46:15 114:25
163:8 332:3
**eat** 308:12
**Economic** 1:15
**education** 35:11 144:2
**educational** 34:8
**effect** 196:7
**effective** 127:24 195:24 196:4
254:2 323:22
**effects** 196:10
**efficacious** 208:10 209:4 304:18
**efficacy** 254:1 304:25 305:7,12
305:15 317:8,14
**efficient** 300:12
**eight** 321:25
**either** 15:10 79:11 103:6 152:23
173:9 202:7 243:13,16 259:24
301:9 316:2 322:24 323:11
**elaborate** 159:15
**elects** 330:4
**elegantly** 306:18
**element** 175:13
**Eleventh** 300:6
**elicit** 173:22 232:9,16
**eligible** 45:7 86:11
**ELMO** 71:20 134:11 192:22
216:5 260:8
**else's** 172:1 239:19
**email** 8:23 9:15,16 40:3,5,6 41:1
41:2,5,6,7,9,12 42:5 44:7,18
44:20 46:23,25 61:3 75:16
92:15,16 95:2 105:9 116:3,3,4
116:4,11,11 119:24 120:13,18
123:8,8 124:5,21 131:3,4
132:4 133:2 138:4 141:12,14
141:15 148:17 149:8 168:25
169:11,16,24 170:4 174:20
185:14 197:3,8,24,25 198:5
198:12 205:22,22 206:22
207:2,16 225:24 226:6 236:17
237:15 240:8 243:21 244:4,5
247:19 252:1 271:19,24
273:22,23 274:4,9 275:9
276:14,17 278:18 279:11,18
279:24 280:8 288:3,7,11,16
288:20 289:1,5,9 290:15,21
290:25 291:9,13,16,18,23
294:8,10,12 295:1,12 316:13
316:17,21 325:24 326:9,14,18
326:22 327:10,14 329:24
330:2
**emailed** 47:5,5 57:10 61:1 123:9
125:5,25 132:25 149:3,4,8,22
151:3,12 152:18 236:13
303:23
**emailing** 176:17 330:1
**emails** 22:24 31:3 210:24 298:4
301:15,16 303:25 311:14
314:22 328:5,25
**embarrass** 119:9
**embarrassed** 95:15 269:5
**emergency** 22:2 112:7
**emphasis** 288:21
**employed** 117:25 118:16 138:22
139:1 269:18,20 279:5
**employee** 59:9,18,19,19,21,22
59:25 60:13 61:17 72:25 73:4
73:5 98:3,4,5,7 116:24 120:7
120:10 126:16 127:1 139:19
140:6 141:4 186:18 187:24
254:19 256:21 269:14 280:3,9

280:15 298:5
**employees** 116:15 126:14 138:18
138:18 139:22,23 140:1
187:16 286:18
**employer** 280:6
**employment** 138:20,24 171:7
186:21 187:6,7 255:8,16,17
**empty** 137:13
**en** 188:9
**end** 62:15 65:18 101:24 116:6
120:12 328:12
**ended** 62:15 120:23 265:20
269:12
**ending** 116:1,10,22 269:10
**engage** 166:13
**English** 20:14 316:2 317:22,23
317:23
**enhance** 73:3 74:12,23
**enough** 10:1 12:12 14:19 28:18
69:9 83:6 84:13,20 85:12,18
91:8 92:1 94:6 97:2 140:3
211:17 223:3 231:5,6 278:22
299:2 309:13 310:3,23 330:8
330:13,16
**enrollment** 178:4
**enter** 30:4 328:10
**entered** 17:2 24:19 27:11 136:23
191:17 234:7
**entering** 66:1
**entire** 82:3 97:12 110:9,9 286:19
**entirely** 209:6 253:9 260:7
**entirety** 238:23
**entities** 188:11
**entitled** 181:21 317:25
**entity** 280:3
**environment** 256:1
**equally** 208:10 209:14
**equate** 129:18
**equipment** 134:2,3 178:2 218:4
218:7
**equivalent** 315:13
**error** 229:3 231:7 300:11 311:3
311:3
**especially** 36:5 48:7 321:18
**Esq** 1:19,20 2:1 16:13 17:2
**essentially** 296:19 319:15
**establish** 145:7
**estate** 103:24 122:4
**estimation** 244:19
**ethoxy** 303:20,21,2 5 305:3,7,16
305:21 314:19,22,23,23,24
316:5 318:15,16 319:12
**ethoxydiglycol** 314:11
**even** 20:5 43:13 46:19 91:15
98:17 110:1 112:15 141:18
150:24 162:3 172:21 179:9,19
222:17 225:4 228:18,19,24
230:5,25 231:9,10 233:14
234:11,23 235:23 238:2
269:24 278:3 297:12 299:22
307:22 310:8,10 327:15 330:9
**evening** 154:22 332:21
**event** 12:16 199:13 302:16
**events** 127:10
**eventually** 156:15
**ever** 38:10 42:17 48:17 79:15
81:24 89:1,3 90:10 94:9 98:7
98:18 101:14,21 105:6 112:19
117:1,15 119:19,24 120:7
129:10 141:16 142:7,19
144:13 145:22 147:14 150:18
150:22 155:24 184:3 200:6
206:7,16,18 217:1 225:5
240:4 244:1 251:13,17,19,22
251:23 252:1 253:22 256:14
256:17 268:12 269:25 270:2,4
270:7 279:20 283:6,7,9,11
287:18 313:19 316:1
**every** 13:1 35:2,3 37:9,10 40:11

47:24 49:6,10 53:6 65:17
70:11 126:1 130:2 154:17
157:10 161:1,18 172:13
203:10 216:13 224:21,24,25
225:1 228:5 231:1 239:5
266:18 279:17 304:5
**everybody** 25:8 27:16 116:5
137:16 155:15 172:25 175:11
191:13,19 233:25 234:8,12
264:13 301:14
**everyone** 138:13,16 208:23
**everything** 43:17 47:7 48:10
49:24 74:7,18 134:22 136:1
138:23 173:1 186:12 225:6
230:6 238:23 244:8 257:9
266:24 280:4 291:14 321:10
**evidence** 5:3 11:3,21 71:22,24
72:6 76:15,19 122:13,20
124:14 153:8 162:11 165:2
167:25 169:6,15,23 170:1,8
170:12,16,20 172:15,18
178:22 186:9 189:1,21 221:1
225:22 227:5 229:18 230:5
260:9 271:11,15 276:3 279:2
287:25 288:5,9,14,18,24
289:3,7,15,20,24 290:3,7,11
292:7,10,16,21 293:5,8,11,15
293:18,22 294:1,5 295:10,16
295:21 296:2 300:19 312:12
326:2,7,12,16,2 0 328:17
329:2 331:19
**evidentiary** 63:2
**exact** 45:10 92:16 115:21 131:21
143:6
**exactly** 120:24 132:14 236:17
267:23 319:5
**examination** 3:6,8,10,12,14,17
3:19,21,23,2 5 4:2,4,6,8,10
28:20 98:12 103:11 142:16
146:13 155:8 165:19 204:8,17
211:25 213:11 217:22 219:11
249:11 250:18 261:22 262:20
283:4
**examine** 309:16
**examined** 128:11
**example** 22:24 79:25 175:24
194:25 196:10 205:1 211:4
226:2 244:21
**excellent** 323:21
**except** 95:5
**exceptions** 172:7
**exchange** 224:2,10 243:17
276:14
**excited** 95:9,11,15 325:21 331:8
**exclamation** 41:22
**exclude** 180:8,13 297:9 301:24
301:25 310:3,4,16 311:19
317:2 320:9
**excluded** 304:21,22 317:5
**excluding** 310:16 320:4,5
**exculpatory** 329:12
**excuse** 13:11 20:25 21:19 25:1
38:23 167:4 173:13 178:12
192:21 226:8 229:15 250:11
254:6 260:4
**excused** 24:23,24 25:7 102:22,24
137:12 146:3 164:10,13
218:23,25 250:7,9 262:7,9
283:20,22
**excusing** 20:21 26:6
**executive** 206:15 291:19
**exhibit** 5:7,8,9,10,11,12,13,14
5:15,16,17,18,19,20,21,22,23
5:24,25 6:1,2,3,4,5,6,7,8,9,10
6:11,12,13,14,15,16,17,18,19
6:20,21,22,23,24,2 5 7:1,2,3,4
7:5,6,7,8 8:14 9:4 10:14
10:18,21,24 21:21 39:11,24
44:17 46:23 55:22 71:21,23

72:2,6 76:13,14,1 9 78:7 79:5
79:10 92:4 94:17 122:14,20
122:24,25 124:14 165:9 169:6
169:15,23 170:1,8,12,16,20
175:4,5 178:15,22 179:14
181:8,23 183:8,22 185:3,10
185:20,23 186:9 189:1,4,21
192:21 193:2 197:3 198:11
199:23 200:2,9 205:20,23,24
207:11 214:13,18 226:2,14,14
226:23 227:9 229:15 238:4,10
246:5 255:1 259:7 260:9
271:12,15 275:20 276:3
278:23 279:2,9 287:25 288:5
288:9,14,18,24 289:3 292:10,16
289:24 290:3,7,11 292:10,16
292:21 293:5,8,11,15,18,22
294:1,5,2 5 295:10,11,16,17,21
296:2 326:2,7,12,16,20
330:10
**exhibits** 5:1,2,5 8:8 9:24 11:2,8
11:10 21:21 22:2,19 23:6,6,24
56:6,8 134:10 162:17 165:2
167:17,18,20,21,2 2 168:5
173:13 185:1 189:3 191:21
235:1 287:11,13 325:16,17
**expand** 172:14
**expect** 65:15 190:13,15
**expected** 47:23
**expensive** 280:19 281:4 315:15
**experience** 15:10 31:20,21 58:8
114:5 256:3
**expert** 63:5 171:13 173:17,19
201:16,17 304:14 307:16
315:6,15 316:24,25 317:1,1,2
317:5,6 320:4,4,12
**expertise** 63:1,1 144:2 155:12,13
198:9 203:15 319:11
**experts** 304:19,20,2 2 317:3
**explain** 124:22 232:12 304:2
314:23
**explaining** 204:20 279:14
**explanation** 48:21 106:17
198:23
**explore** 297:5
**express** 203:20,22
**expressed** 120:25
**extend** 57:23 74:14
**extended** 83:20 163:23
**extra** 196:1 199:13 252:19,20
**extrinsic** 300:19
**e-mails** 316:22

---

**F**

**F** 333:11
**fabricated** 9:16
**face** 105:7,7
**Facebook** 149:15,19 158:21
159:12
**faces** 222:25
**facing** 96:9 97:19 233:15
**fact** 29:24 101:25 111:17 115:14
116:9 123:22 139:14 145:16
146:23 166:17 173:20,21
174:19 179:24 180:24 182:5
182:18 184:7 201:9 228:18
247:23 265:24 266:22 276:5
286:2 303:8 311:11 314:1
324:7 330:14
**factor** 107:15
**facts** 85:16 146:24 201:13 202:9
235:6,7 307:1
**factual** 210:24 212:20
**failing** 179:19
**fair** 10:1 19:12 28:18 69:2,9,19
78:15 80:21 82:18 83:3,6
84:13,20 85:8,11,18 91:1,8
117:12 121:21 123:9 140:3
143:24,25 150:12 181:20

228:12 278:22 284:5 330:8
**fairness** 167:19
**fallen** 269:6
**falsely** 31:18 94:10
**familiar** 31:15 192:17 251:4
264:5,7 304:4
**familiarize** 134:2
**families** 29:15
**family** 55:18 58:23 59:1,3 68:19
104:2,4 114:17 121:2 143:13
226:25 245:11 246:1 252:15
252:16,21 268:12,18
**fancy** 314:14
**far** 26:19 28:25 31:12 41:5
103:17 109:6 114:1 115:18
143:1 214:19 228:7 237:7
246:13 250:3 266:15 280:22
280:22,23 300:7 310:18 322:8
322:10
**farther** 322:12
**fashion** 233:3
**fast** 26:3 45:23 48:7 173:8
302:12
**fast-forward** 275:11
**fault** 94:24 146:1 222:19
**favor** 203:13
**favorable** 144:22,22
**Fax** 1:17,23
**faxed** 73:23
**FBI** 298:24 299:1,6,17,2,2 300:2
300:6 302:5,7,14 309:19
310:7 312:12
**Febres** 137:14
**February** 41:3 57:10 76:22 86:4
127:7,15 161:21 162:13 163:4
164:1 223:24 289:5
**Federal** 30:12 31:15,19 32:24
36:6 37:16 102:11 132:19
214:8 215:4 218:13 234:16
280:1 297:12 324:25
**FEDERICO** 1:10
**FedEx** 280:8
**FedEx'd** 31:3 59:18
**fee** 205:9 227:5
**feedback** 34:10
**feeder** 38:4
**feeding** 148:24
**feel** 25:8 157:19 229:6 240:2
312:18 330:13
**feeling** 196:23
**feels** 176:1
**fellow** 297:23
**felon** 30:7
**felt** 54:19 69:20 130:1 132:2
269:5
**Ferguson** 2:6 333:16
**fever** 135:15
**few** 17:14 40:8 115:20 119:2
151:24 182:2 198:16 214:24
259:8 263:4 269:10 279:9,21
296:8 305:18
**fide** 59:19,21,22
**field** 32:1 34:11,12,12 51:1
**Fifth** 328:2 330:15
**fight** 87:12
**figure** 20:7 72:8 74:14 151:24
269:5
**figured** 20:5 21:8 180:12
**figuring** 55:11
**file** 186:18,19,22 187:4 248:21
**filed** 35:4
**fill** 39:5,16 44:5 46:16 47:4
59:24 61:2,17 83:1,3 92:7,10
93:2 94:10 140:5 148:19,21
149:2 155:15 255:14 264:20
269:21 272:7 277:24
**filled** 37:15 40:22 47:25 92:9,25
93:1,6 117:13,16 125:10
140:16 149:2 152:18 209:8

210:1,10 250:2 257:18 259:10
259:14 265:15 266:7 272:10
272:10,20
**fillers** 21:8,9
**filling** 38:18 60:4 124:18 126:10
126:11 246:16 266:10 325:10
**final** 137:22 201:21
**find** 14:20 38:15 54:12 63:8
84:18 87:21 141:16 185:4,12
228:16 268:23 294:23 299:5
300:11
**finding** 49:16 330:16
**findings** 222:1,3 223:1
**fine** 12:24 16:7 24:15 30:13
44:11 53:9 62:18 136:1 173:5
183:3 191:3 198:7 230:9
284:4 300:16 307:15 313:11
316:10 324:14
**finger** 206:24
**finish** 62:2,8,9 102:19 103:19
119:16 190:8 299:4 308:19
324:19
**finished** 119:1,6
**fired** 32:22,23 296:17
**firm** 287:18
**first** 20:15,17 24:20 26:15,22,24
32:16 39:13 44:4 47:3,4,22
49:2 56:17,17 82:25 91:9
99:25 101:13 105:20 110:22
111:6 115:10 118:4 121:20,24
122:10 137:10 147:17 148:5
149:5 157:20 168:14 190:9
196:14 197:9 198:5 199:4,4
199:14 213:7 234:21 236:11
237:13 238:19 249:13 267:6,9
267:17 270:21,24 287:6,10
290:25 297:20 298:2 299:15
332:14
**fishing** 231:24
**five** 8:11 22:3 24:7 26:1 30:12
67:6 96:3 97:20 111:17
128:24 131:10 133:25 134:7
135:12 136:13 211:15
**five-minute** 133:22
**five-year** 179:18 182:7
**fix** 200:16
**flag** 267:13
**flags** 269:11
**flew** 322:3
**flight** 321:4
**flights** 320:15
**Florida** 1:1,6,16,22 2:3,7 28:24
38:9 89:14 102:23 103:14
146:17 165:22 177:10 181:15
192:2,5 213:14,17,20 220:13
333:17
**flow** 309:20,21,25
**flows** 309:24
**flu** 135:12
**fluticasone** 194:5,13
**fly** 305:9 320:12 321:24
**focus** 44:21,25 57:13 192:23
207:24 208:18
**focused** 172:12 226:15
**folks** 12:25 19:6 137:19 191:18
234:8
**follow** 40:9 65:11 229:7 233:24
**following** 8:1 134:25 186:20
**follows** 47:12 48:6 197:15
**follow-up** 64:7,9 94:2 112:10
144:1 149:6 196:8,11,12
212:3
**Foods** 196:24
**foolproof** 230:4
**football** 38:3,3,4,8 90:9,10
100:14
**forbid** 65:3
**forbids** 62:21
**force** 310:13

**forcing** 311:22 324:12
**Fordham** 300:21
**foregoing** 333:12
**forever** 226:4
**forfeit** 60:14,16
**forfeiture** 12:3,12
**forget** 136:24 316:25
**forgive** 112:18,18 285:17
**form** 38:18 39:6,16,18,25,25
40:2,12,20 41:1,7,8,14 42:5
44:5 46:16 47:4 57:10 59:24
60:10 61:5,6,17 82:17,20,20
92:7,9,10,13,14,2 5 93:2,14
117:7 124:15 125:14 126:1,8
126:10,11,2 3 127:3 140:5,23
148:19 149:2,3 151:3,8,10,12
151:13 152:16,17,18 156:18
160:13 178:5 211:18 215:13
217:24 246:16,19 247:5 248:7
248:10,20 250:2,4 257:18,23
258:1,3 272:3,7 273:16
**formal** 249:19
**former** 296:16
**forms** 61:1,2,2,4 124:18,19
125:21,23 126:3
**formula** 195:13 209:3,7 210:9
210:10,11 274:12 277:14
318:10
**formulas** 206:25 207:5,21
209:13 210:5 281:5 304:16
305:1 314:2 317:9
**formulation** 195:1,18,21
**formulations** 194:1,4 200:6
212:16 319:22
**Fort** 263:15 265:14
**forth** 198:2
**forward** 41:2 92:20 93:5 291:21
**forwarded** 57:8 82:13,16 93:2
162:25 163:9 291:18
**forwarding** 41:7
**Fouche** 271:6
**found** 39:14 75:24 132:4,6 269:1
**foundation** 9:15 86:16 89:21
202:3 212:20 221:14,15
**founder** 220:17
**four** 17:3,3,8 48:2 88:5 103:18
104:1 105:22 141:25 142:2,4
157:10 167:21 215:19 285:1
324:7
**Fourth** 1:16
**FPR** 2:5 333:15
**frankly** 234:24 311:2
**fraud** 34:21 179:6,10 187:11,12
187:14 261:4 314:10
**free** 39:6 52:23 157:20
**freedom** 12:7
**French** 20:13
**frequency** 111:22
**fresh** 255:24
**Friday** 16:15 323:25 324:11,15
325:3 332:24
**friend** 72:16 80:16 105:13,17,25
114:15 149:10,20
**friends** 44:2 59:1 91:20,23
101:18 114:8,13,14,19 122:2
124:25 125:24 148:12 268:12
268:18 297:11,12
**from** 8:23 9:11,24 12:10 15:17
16:13 19:16 22:25 25:10 27:6
29:1 31:5 32:11 33:9 34:10
37:9,13,16,17 38:23 40:3,6,20
41:2,5 42:11,16,17,22,23,24
43:7,8,10,11,17 44:15,22 46:3
46:4,5,23 47:10 52:25 54:8,10
55:19 59:17 60:5,6,12,19 61:7
61:9,13 62:2,7,9 67:14 69:14
72:10,17 73:6 74:19 75:17,25
80:24,25 81:2,4,10,13 83:1,2
88:18 90:15 91:7 94:23 97:13

99:10 100:1 101:2,3 105:25
106:13,14,15 107:19,20,21
108:1,2,3,9,11,12,1 5 109:2
110:10 111:2,7,12 115:18,22
116:3 117:1 119:15,19 122:1
124:12,19 125:15 127:16,17
128:17,21 131:3 132:15,22
133:5,12,20 135:14 137:19
138:17 139:3,4,8,9 140:24
144:18 148:9,20,22 152:20,20
152:22,23 153:3,16 163:19
165:16 167:1 169:11 170:4
175:25 177:9 179:1 197:3
198:7,12 200:14 209:1,10,16
209:21 211:18 222:20 225:11
227:22 235:3,12 240:4 243:18
244:2,10,21 246:25 247:20
251:7 253:6 254:22 256:10
259:18,18 263:7 266:21 271:7
272:16 275:9 277:20 279:5,23
281:18 282:10 284:20 285:10
285:11,19 290:25 291:18
294:19 295:6 296:17,17
298:17 303:24 304:3,6 309:3
309:4 312:25 314:20 318:12
318:16,20,2 5 319:12,13
320:13,15 322:8,10 328:1,21
330:23
**front** 27:5 41:2 60:1 186:2 222:3
229:6 252:25 253:23 264:3
267:3 268:2 272:15 276:17
317:12
**full** 124:4 189:5,6 280:7 310:1
324:4,4
**fully** 139:21
**full-time** 32:19
**function** 172:24
**funded** 29:15
**funny** 149:23
**further** 25:14 54:18 81:12 98:9
102:21 142:14 164:7 211:22
217:20 245:15 249:6 250:6
261:20 262:6 270:13 283:1,19
327:16
**furtherance** 172:8,19,21 223:7
327:16

---

**G**

**gabapentin** 194:18
**gain** 31:8
**gamble** 229:5 231:9 311:9
**gambler** 229:10 230:9
**gamblers** 229:6
**games** 90:10
**gander** 154:3 158:15
**Garcia** 127:18,20 128:15 137:12
137:12 205:1 245:7
**gather** 45:11,25 46:9,16
**gathering** 57:19
**gave** 31:1 37:24 40:13 52:19
53:5 54:15 82:17 110:17
112:14 126:8,19,20 140:19
197:12 221:3 280:15 300:5
308:13 310:2 323:2 323:3
**Gayles** 13:10 16:15
**gears** 81:14
**general** 173:23 196:18
**generally** 84:16 156:17 195:24
**generated** 144:16
**generic** 151:3
**gentlemen** 133:4 175:14 283:23
**Gerald** 137:14
**German** 137:14
**Germany** 285:10,12,19
**gets** 26:3 74:5 79:11 149:23
185:21 230:15 291:23 318:12
318:16,24 319:4
**getting** 36:19 37:1 38:19 42:23
42:24 48:14,15,18 49:9 59:2,3
59:3,4,4,5 68:16,18,18,21

75:19,20,21 76:5,8,9 79:4,23
93:15 97:15 103:5 106:5
110:10 115:3,3 118:3,6 122:1
122:2 128:17 130:7,8 143:2
196:1,6,9 263:8 274:6 275:11
277:12 279:15 281:18 282:19
282:22 325:11
**get-go** 74:19
**Giglio** 296:18 301:19
**Gilda** 2:5 18:22 28:19 333:15
**Ginger** 142:10
**girlfriends** 270:25
**girlfriend's** 55:4
**give** 12:25 14:18 17:13,21 20:24
23:2 24:16 33:5,7 42:13,14
44:8,11,12,14 46:17,18 48:17
59:13 62:19 65:25 74:1,2
77:19 78:10,15,20,24 83:7
91:22 107:17 109:8,13,14
115:4 117:8 119:24 126:3
133:4 151:24 172:23 176:2
198:25 199:5,13,2 5 201:14
207:25 216:20 223:21 226:1
234:12,2 5 249:25,25 254:1
273:19 274:19 278:14 287:21
297:15 299:6 302:4 306:25
311:15,16 323:4,7 325:20,21
**given** 25:13 54:16 107:16 240:17
308:8,16,18,2 0 309:17 323:16
323:18 325:2
**gives** 36:19 177:2 198:2
**giving** 30:25 68:24 117:19 126:4
155:12 315:18
**glad** 62:14 124:13
**Glenn** 64:6 110:13,14,15,20
114:1 123:12,13
**Glover** 19:7 20:19 24:14,19,20
24:22,24 25:2,4,6,10 27:18
137:13
**Glover's** 20:9
**go** 8:10 9:24 11:25 18:20 26:20
27:2,20 28:25 31:19 34:7
35:11 36:3,13,15,16,17,17
39:8 40:24 46:9,20 47:12,23
48:1 60:10 62:10 74:12 75:23
86:19 87:2,8,22,23 89:7,22,23
92:16 103:17 107:24 117:7
127:12 133:7 134:1,14 135:5
136:14 141:7 151:23 165:25
167:3 171:13 190:16,19,24
191:6,9,20,22 195:5 196:24
197:10 198:4,6,7 199:18
204:2 207:10 212:21 217:15
235:25 252:19 265:12,13,14
268:8,10 269:18:25 272:6
275:14 276:12 284:15 291:7
294:9 295:15 296:15 300:6
307:7,11 308:2 317:16 319:22
321:4,4 325:16 326:25 332:8
332:9 333:5,5
**goal** 195:23
**goes** 47:15,25 63:1 75:21 179:12
201:6 237:7 292:6 331:23
**going** 9:3,9,23 11:8,22,25 12:2
12:13 13:14 15:7 19:13,14,17
22:23 23:8,10,15,23,24 25:1
26:17 31:20 35:24 42:13,14
43:23 44:12,13,14,1 6 46:9,17
46:17,22 48:7 52:14 53:24
54:13 59:23 60:2,14,16 63:22
65:5,10,16,24 66:8 71:17 73:7
73:8 74:5,7,10,10,24,2 5 75:16
78:20,20 79:13 80:7 81:13
82:5,23 83:21 86:18 87:6
94:18 103:4 107:23 109:25
110:4 116:6,12,14 120:14,16
120:17 121:3 129:1 131:5,6,6
131:11 133:3,4,5,14 134:2,10
135:25 136:25 138:2,5,14,17

139:8,25 141:3,6,7 143:1
149:20,21 166:25 171:5,7,14
171:21,23,23 172:9,15 173:3
173:4,7,24,2 5 174:9,14,21,24
175:6,10,13 176:19 177:18,25
178:23 179:5,16 180:10,14,17
180:18,20 181:2,2,16 183:4,7
183:8 185:5 187:17,19,19,21
187:25 188:2,3,5 192:20
196:14 197:1,1,2 198:11
200:9 201:14 205:4 214:12
217:3 221:20 225:8,19 229:10
229:12,14 230:8,14 231:12,13
231:15,16 232:10,12,14,17,18
232:25 233:4 234:2,25 235:24
238:9 242:16 245:5 252:6,7,8
254:25 255:1 267:14 274:23
275:4,13,18 276:9 280:20
281:17 283:11,23 284:7,14,24
285:18,22,23 286:14 287:6,8
287:23 295:2 296:3 297:4,15
299:21 300:1 301:6 303:12
303:14 304:25 305:1,2,6,8,13
305:14,16,22 306:7,9,10,12,19
306:20,25 308:15,21,24 309:3
309:4,4,6,9,13 311:6,15,16
312:2,16 313:5,14,15,17,20,25
315:12,19,25 316:1,3,4,5
317:7 318:9,11,14 320:8,9
321:18,19 322:5,25 323:5,5,6
324:3,13,18,24 325:4,7
327:13,17,24 329:5,10,16,17
329:22 330:12,14,1 5 331:9,10
332:14
**gold** 303:20 304:1 314:19,22,24
315:21
**golf** 231:10
**gone** 123:17
**good** 8:6 10:12 17:25 27:4,12,13
27:23 28:22 47:12,14 48:25
66:18,23,24 121:1,1,4 123:11
124:13 146:15 158:4 164:11
165:25 177:13,17 179:23
180:8,19 183:2 191:1 199:9
203:12,20,23,2 4 204:6,7
209:14 210:2 212:24 218:24
219:13,14 229:20 235:8
245:20 250:7,20 257:16 262:8
262:22 269:4 270:18 271:24
283:20 284:19 298:25 299:2
305:17 313:8 314:5 321:7,12
332:21 333:1,2,8
**goodness** 22:5 285:16,21 300:7
**good-bye** 25:7
**google** 133:15 284:12 300:21
**goose** 154:2 158:15
**Gotcha** 10:4
**gotten** 43:9,16 54:14 59:17
118:5,15 163:5 235:4 269:3
275:7
**governed** 35:5,7
**governing** 33:21
**Government** 1:13 8:4 11:4,21
12:5,11 17:12,13,20 19:3
20:20 22:4 25:12 27:22,24
29:16 30:5,20,21,22 36:7
37:16 62:15 66:2 67:5,6,8,10
67:12 69:16,23 70:2,4,21 71:4
71:16 72:3 81:19,24 83:1
88:10 92:3 94:17 95:18,25
96:14 97:2,16 100:1 112:9,12
126:17 127:5,16,19 128:1,4,7
128:10,16 130:8 132:12 135:3
149:24 162:17 165:1 170:22
176:18 179:6 180:21 182:13
188:19 189:8 219:2 259:7
294:20 299:6 302:10 303:4
307:7 310:14 311:16,17,25
318:1 321:12 323:16,18,20

**Government's** 5:5,9,10,11,12,13
5:14,15,16,17,18,19,20,21,25
6:1,2,3,4,5,6,7,8,9,10,11,12
6:13,14,15,16,17,18,19,20,21
6:22,23,24,25 7:1,2,3,4,5,6,7
7:8 8:12,13,14 10:10,14,18,21
10:24 11:2 28:1 39:11,24
44:17 46:22 55:22 56:6 71:2,3
78:7 82:6 92:4 94:17 103:3
122:14,20,24,25 124:14 146:7
164:17 165:9 169:6,15,23
170:1,8,12,16,2,0 178:16,22
186:9 189:1,21 192:21 197:3
198:11 205:24 207:11 213:4
214:13,17 219:4 246:5 250:14
255:1 259:7 260:9 262:13
287:25 288:5,9,14,18,24
289:3,7,15,20,2,4 290:3,7,11
292:10,16,2,1 293:5,8,11,15,18
293:22 294:1,5,2,5 295:10,11
295:16,17,2,1 296:2 308:5,7
312:11 317:5 326:2,7,12,16
326:22

gphofficialreporter@gmail.com
2:7 333:18
**graduated** 29:1
**Graham** 153:8
**Graham's** 133:14 134:1 166:22
222:16
**grams** 175:24 195:19,20 196:17
200:15 212:6,14
**grant** 310:22,23
**granted** 52:11
**great** 14:6,11 47:13 149:20
263:22 264:13 273:15 320:15
322:13
**greatest** 331:11
**greed** 49:14 57:23 74:14
**greedy** 88:4
**grounds** 35:20 50:9,12 62:24
144:25 197:22 200:21 202:2
212:18
**group** 88:6 89:25 90:3,19 131:4
**Grove** 16:2
**Grow** 1:7 8:23 9:3,9,12,14 23:1
29:10,11,18 36:22 37:2,9,19
37:23,24 38:7,8,10,20,23 39:3
39:14 40:3,5,11,2,0 41:3,6,8
41:15,25 42:6,9,18 43:2,6,20
44:6,7,10,20 45:3,13,19,22
46:12,14,23 47:11,12,15
48:17 49:7,11,15 50:5 51:4
52:16,17,19,2,5 53:4,9,14,16
53:20 54:16 57:5,8,10,14,15
57:25 58:3,20 59:8,13 61:13
62:25 63:18 66:25 68:11
71:11 73:1 74:9 75:5,8,11
76:21 78:9,14 79:5,12 80:10
80:24 81:3,17 82:7 92:9,10,22
93:5,21,24 94:10,25 98:6
99:10,15 100:4 101:21 105:4
105:6,8,12,21,2,4 106:1,3
107:7,14 108:6 109:1,11,23
111:2 114:6 115:22 117:21
118:21 119:22 120:20,22
121:15 123:8,19 125:4 126:8
126:18 127:2 128:4 129:5
130:25 131:19,20 132:18,24
138:4,13,23 139:4,20 141:3
141:12,20,2,4 142:7 144:12,15
144:18 145:13 150:4 158:6
168:2,25 169:11,17,24 170:4
175:3 176:17,20 177:1 178:2
178:3,5 183:2,21 185:14
186:4 188:12 197:3,8 198:12
198:16,20,2,2 200:11 202:21
203:2 206:5,8 210:25 214:5,6
215:18 219:21 220:14,16
223:25 224:9 225:11,25 226:6

236:9,12 237:10,14 240:7
241:16,20 243:14,21 245:21
247:17 248:3 249:22 251:13
252:1 253:21 256:19,24
257:17 263:2,3,6,17 264:21
265:7,18 266:13,16 268:13
270:7,20 271:8,20,24 272:6
272:13,20 273:15 274:17
275:3 276:15 277:12,18,22
278:10,14 279:8,17 280:12
281:3,10 282:21 286:19,24
288:4,7,11,16,2,0 289:5,9
290:16,21,2,5 291:2,11,13,17
291:19,22 294:8,11 295:2
303:20,22,2,5 308:17,21 309:5
309:9 312:10 314:18,20,22
316:14,22 318:12,16,22,25
324:12,20,2,1 326:14,18
327:10 328:20,23,23 329:23
**Grow's** 40:6,25 51:7 73:18 75:1
75:18 77:15 142:19 144:22
179:12,22 248:19 258:20
296:9 303:18 324:10 325:24
326:4,9
**guarantee** 181:15
**Guard** 147:11
**guess** 20:21 101:7 117:19 177:16
205:13 219:22 243:4 254:24
**guessing** 96:20
**guests** 111:12
**guidelines** 32:25 35:8
**guilty** 12:1,2 29:21,23,24,24
32:24 35:22 36:2 63:23 65:7
65:16 66:4,6 95:21,21,23,24
96:6,12 97:4 98:24 99:2
**guy** 301:16 332:11
**guys** 11:11 21:25 67:15 81:6
170:3 228:21 331:8
**Gyasi** 104:8,11
**gym** 44:3 54:8 56:13 148:8,8,10
148:12,12 149:8
**G-y-a-s-i** 104:11

**H**

**half** 18:7 20:6 67:16 97:13 177:2
198:20,24,25
**Halliburton** 3:5 8:7 9:7 23:16,22
27:24 28:1,4,22 29:5,17 31:7
41:5 44:17 56:12 64:11 81:3
98:14 147:24 148:1,16,18
149:6 151:6,16,2,0 152:3
158:11,23 159:9,16 161:14,16
**hallway** 67:2
**Hanaman** 105:13
**hand** 27:25 103:2 146:6 164:16
200:19 213:3 219:3 222:24
250:13 262:12
**handed** 100:25 167:19
**hands** 201:25 202:12 284:7,8
298:23
**handwrote** 93:4
**hang** 173:8
**happen** 11:7 33:9 39:7 43:1
53:7 90:5 91:17,18 109:2
135:25 235:11 244:2 267:24
277:15 324:3
**happened** 55:6 93:16 120:12
135:7 202:19 266:25 267:18
269:1 321:23
**happening** 86:22,23 139:18
**happens** 26:14 176:14 285:24
286:3 308:2 324:8 330:9
332:10
**happy** 67:17 184:19 200:17
226:11 296:21 325:13 329:14
**hard** 12:25 84:14 208:19 284:15
306:11
**harder** 309:25
**hardly** 113:16

**harm** 300:4,8
**harmless** 229:3 311:3
**hate** 165:13 186:2 222:25 234:14
**having** 35:12 52:24 62:15 84:14
135:15 148:10 160:2 177:20
196:6 241:20 243:22 246:19
302:14,15
**head** 35:9,10 206:15 269:4
327:18
**health** 31:21 32:1 34:19,21 35:6
50:6,19 98:24 99:2 104:20,22
105:1 179:20 214:8 217:11,15
217:17 220:2 237:7
**hear** 11:14 12:24 19:11 20:11
64:25 69:4 133:22 135:13
147:17 148:6 167:2 175:25
176:13 190:14 222:21 234:17
234:18,23 259:22 284:21
309:3,4 315:17,19
**heard** 15:15 50:12 53:12 63:8
99:25 117:9 129:10 132:24
142:10 144:13 147:14,24
150:4,5,6,14 167:3 175:23
176:25,25 197:4 198:19 231:4
251:13,23 254:7 265:21
287:18 297:19,21,22,23,25
298:2,9 312:24
**hearing** 226:4 234:22 235:25
271:7 302:18 324:23
**hearsay** 22:24 153:17 154:18,18
154:19 156:8 158:12,24 172:7
220:22 228:15 233:5 241:8
242:11 294:14
**heart** 84:20,21 131:20
**height** 57:23 74:14
**held** 8:1 134:25 163:1
**hello** 67:2
**help** 66:10 95:12 123:19 137:13
158:19 179:10 252:15,16
264:12 270:23 298:10 300:21
314:9
**helping** 150:2
**her** 9:21 13:1 19:8,17 20:22,24
20:25 27:20 35:24,24 36:1
41:11,19,19 47:4 51:19 52:2
53:15 54:12,20 56:23 58:11
58:24 63:1,18,24,24,25 64:5
65:8,16 66:5,9 69:7,8,8,10
95:13,16 112:5,13 118:13
119:11 128:13 145:6 148:15
149:3,4,9,9,10,17 150:2
151:17 152:18 153:13,14,21
154:1 155:12,13 172:19 178:2
178:3 181:13,19,22,23 183:1
183:2,5,7,8,2,3 184:21,25
185:10 211:9,19 214:19
221:13,20,24,2,5 224:2 229:12
230:5,10,21,2,5 231:1 232:7,7
232:8 241:14 252:18 285:15
286:5
**hey** 42:19,19 57:25 118:9 124:9
149:19 276:19
**he'll** 191:3 316:9 321:11
**Hi** 121:12,13 158:5 270:19
**hidden** 73:9 94:21
**hide** 73:13,14,19,1 9 74:7 83:1
**high** 38:3 103:24 112:5 315:22
316:15
**higher** 209:20 319:4
**highest** 85:24 86:12
**highlight** 206:24
**highlighted** 40:15 44:21 125:19
**Hill** 30:23
**him** 11:24 14:9 15:24 26:6 39:4
39:6 44:7 45:9 46:25 47:5
48:19,19 49:16,22 51:5 55:7,8
55:10,11,13,14,1 5 57:16
59:17 73:12 75:14,24 76:1
78:10 80:11,12,14 81:5,5,6,14

92:17,18 94:6,11 105:14
110:16,16 111:15 117:21
118:14 120:24,25 123:9
124:11 125:5 126:11 127:4
128:13 131:16,17 132:4
135:16 136:14 138:25 150:5
150:15,17,18 167:11,15,21
174:1,9,10,12,13,14,22,23
175:3 176:25 177:14,18,19,21
181:4,8,9 182:5 183:10,22,23
187:22,22 188:3 197:25 198:3
198:19 202:24,25 206:11,11
220:19 232:15 233:12 236:15
237:12,16 242:8 243:20
251:15,17,18,19,21,22,23
253:22 257:4 263:4,4,7,18,19
263:21 265:11,11,16 266:14
272:23 279:20 280:20 283:12
291:23,24 296:17 297:21,22
298:13,16,17,18,1 9 299:24
301:13,24 302:6,11,21 303:23
303:24,24 305:24 306:24
307:20 309:1 312:14,15,17,20
313:5,9 316:13,22 320:4,5,5
320:12 321:4,19 324:14,15,15
325:2 328:17,21 329:3,5,14
329:14 330:4,11,12 331:21
333:5,6
**himself** 50:5,10 55:16 56:25
291:21 314:20
**hint** 154:12
**hints** 155:6
**HIPAA** 34:25 60:11 61:5 260:6
261:10 262:1
**hire** 299:4 302:10
**hired** 187:6,14,15,18 188:1
255:15 256:8
**hiring** 187:9,11 188:9
**history** 95:19 103:22 127:18
255:17 281:19 330:21
**hold** 8:19 23:3 50:5,10 70:5
150:7 168:4,4,10,10,10 172:4
182:15 184:21 185:12 191:11
192:1 202:10 223:21 226:20
229:16 287:23 308:9 326:24
331:6,6,6
**holding** 72:25 214:11
**Hollywood** 135:16
**Holy** 285:24
**home** 30:12 96:2 97:20 179:20
283:24 333:6,7
**honest** 274:6 278:21
**honestly** 48:25 130:6 139:24
180:9 254:12 259:2 269:9
297:10 332:22
**honesty** 331:24
**honor** 8:6,16,20 10:10,12,14
11:5 13:8,15 14:22 15:2 16:12
16:16 17:21,24 18:4,9 20:15
21:3,4,11 22:3,7,11,21 25:13
26:6,16 27:23 28:11,18 35:19
49:18 50:8 51:16 52:10 56:9
58:10 62:23 63:24 64:5,19,21
65:4,12 66:11,18,20 70:6,15
71:22 72:4 89:21 90:24 97:23
98:10 107:22 119:9 121:6,9
122:18,21 128:24 129:3
135:22 136:5,10 137:23
142:12,14 144:24 145:3,24
150:9,12 152:1,4 153:5,10,23
153:25 155:9 157:24 158:1
162:20 164:7,9 165:1,4
166:11 167:4,8,19,24 168:12
168:18 169:3,10,18 170:6,24
173:14,25 174:5 175:7,16
176:8 177:5 178:4,20 180:5
183:17 184:1,14 185:10,17,20
186:7 188:8,16,18,22 189:4
189:19,24 190:3 191:8 197:21

199:17 200:20 201:16,19
202:1,20 203:7 204:3 211:22
211:24 212:17 214:12 215:15
215:21,23 216:2,21 217:20
218:22 220:22 221:13,18
223:8,19,23 224:6,12,22
226:2,8,12,17,2 1 227:3,14,18
227:21 228:7 229:15 230:2,8
230:18,23 231:14,17,20 232:5
233:21 238:3 241:8,22 242:11
245:2,15,17 249:2,5,8,10
257:12 259:24 260:8 261:20
270:13,15 271:13 275:24
276:1,10 278:25 283:1,2
285:1,20 286:2 287:5 290:25
291:8 292:14 293:3 294:10,16
294:25 296:5,11,13 299:15
300:13,23 301:9 302:9,20,24
304:13 308:19 309:11 312:4,8
312:13,20 313:11 315:4
322:11,14 323:23 324:6 325:2
325:6,9,15,2 5 327:12,16
329:7,21,23 332:7 333:1,2,4
**HONORABLE** 1:10
**Honor's** 233:25
**hoops** 87:22
**hope** 25:8 31:8 123:11 132:17
200:12,16 307:1 310:20
321:10
**hoped** 173:5 236:25
**hopefully** 123:18 179:9 277:14
321:11
**hoping** 136:1
**hospital** 251:9
**hospitalist** 166:2
**hospitals** 179:2
**hotel** 111:12
**hotels** 111:12
**hour** 18:7 20:3,6 24:6 67:15
97:13,13 133:5 235:23,23
323:3
**hourly** 304:8
**hours** 21:12,13 30:13 67:8,9
144:6 321:3 325:11
**house** 30:23 31:1 96:18 238:13
252:20
**housekeeping** 21:7
**Houston** 219:16 250:22 262:8
**HR** 60:12 269:24
**Huck** 30:16 31:9,14 65:8 102:3,4
102:8,10,10,11
**huge** 276:21
**hunch** 256:22
**hung** 254:14
**hurt** 19:23
**Hurtado** 137:10
**hurting** 19:22
**hurts** 24:21,22
**husband** 44:3 56:23 58:24 90:20
104:6,13 107:3 110:12,19
111:1,3 114:1,4,10,10 122:11
123:13 125:24 128:9 130:6
147:6,8,10 149:1,3 156:20
157:11 160:15 161:8 162:11
162:12 220:6,7,12 224:14,18
238:22 242:5,8,14,20 243:1
244:14,23 248:6 263:12
265:10,19 268:16,20,25 269:1
269:8
**husband's** 110:21 113:14 122:7
130:8 224:2 242:2,22 244:16
244:22 248:14
**hypothetical** 212:19
**hysterectomy** 246:20 247:1

---

**I**

**Ibuprofen** 194:14
**ID** 40:16 44:9,14
**idea** 23:20 78:24 150:25 157:12

180:9
**Identification** 5:3
**identified** 39:13,15 223:15
325:14
**identifies** 227:7 229:15
**identify** 239:17
**identifying** 230:9
**ignore** 53:20,22,23
**ignored** 60:20
**illegal** 49:7 75:4 81:5 88:12,16
89:10,11,13,2 4 95:1 143:24
187:16
**illegally** 89:19
**Imani** 104:6,10
**IMD** 274:11
**immediately** 108:4 109:8 121:23
150:1 235:10 279:19
**IMMU** 260:19
**immunized** 329:14
**impeach** 181:8,9 299:1 331:21
**impeaching** 154:23
**important** 12:7 40:8,10 53:4
66:5 97:2 234:21 286:6,7
310:23 311:12
**importantly** 310:7
**impose** 102:1,2
**imposed** 39:7 102:1,4,7
**impression** 266:14,15
**imprimatur** 300:5
**improper** 51:17,18
**inaccurate** 162:14
**inactive** 195:7,8,9,14 304:17
305:6
**inadmissible** 169:12
**inappropriate** 159:11
**inarticulate** 76:3
**incident** 53:25 57:15
**incidents** 149:8
**includes** 291:14 292:1
**including** 11:22 62:17 102:17
178:6 218:12 225:6 305:3
**income** 248:23
**inconsistent** 154:20 172:22
**increase** 304:4 328:24
**indeed** 51:8 228:16
**Indians** 17:5
**indicated** 212:12 248:9 257:20
321:13
**indicates** 260:13,18,21 261:1,4
261:10,14
**indicating** 247:5
**indication** 278:14
**indict** 329:5
**indicted** 329:1,6,8 330:14
**indicting** 329:3
**Indictment** 57:9 61:22 223:15
223:16,20
**indirectly** 35:18 36:5 59:2 68:17
68:20
**individual** 8:23 9:4 45:18 93:7
127:17 131:1 142:10 192:16
192:17 204:21 208:8 224:9
289:9 319:2
**individualized** 82:15 101:1
**individually** 149:2
**individuals** 179:10 295:13
326:23 327:14
**inducement** 211:11
**indulgence** 249:2,6
**industry** 33:21 97:3,10
**ineffective** 306:16 307:5,6
**infer** 19:16
**inference** 306:8
**inferences** 306:6
**influence** 36:19 51:14
**influencing** 51:13
**info** 262:3 272:2
**InfoMed** 101:4
**information** 29:7 32:6,9 33:4,6,8

33:19,19 36:9 37:25 38:17,19
39:19 40:10 48:17 78:11,15
78:20 82:7,12,16,17 83:6,18
84:11,12 88:10 109:7 111:19
123:16 124:23 125:1,3,25
126:11,19 127:4 132:9 140:16
140:19,21 151:4 208:17 217:11
240:17 272:24 273:16 279:13
279:15 280:12 298:21,22
**InforMD** 101:6 274:11,14
**informed** 101:4 138:13,16
279:12
**informing** 90:4 138:4
**Info/Profile** 196:15
**ingredient** 305:17 314:12
**ingredients** 82:14 101:21 112:3
144:12 194:23,24 195:1,5,6,7
195:8,9 210:5,8 303:17
304:16 305:3,6,8 314:3 317:8
319:23 328:24
**initial** 47:7 86:10 92:18 101:3
240:8
**initially** 109:14 126:19 238:13
312:13
**initials** 185:15 187:2 223:22
226:24 289:10
**innocent** 12:10
**input** 33:23
**inquired** 127:18
**inquiring** 53:11 263:21
**inside** 129:24 130:1 132:2
**insomniac** 84:2,4,6
**insomniacs** 83:25
**instance** 68:1 93:6 94:9,9
**instances** 43:13 89:16
**instead** 50:15 51:13 81:14 94:14
99:24 139:3 287:14
**instruct** 53:1 249:22
**instructed** 39:14 41:24
**instruction** 53:5 54:16 65:25
239:21 240:2
**instructions** 52:20,25 157:3
218:3,12 323:4,9
**insurance** 29:14 38:15 39:15
49:6,16 85:1,5,22 86:5 87:15
88:6 100:16,18 104:20,22
105:1 109:6 130:7 157:13
209:21 243:2 251:7,11 281:6
281:11 315:3 318:1
**insurances** 86:1,13,23
**intake** 38:18 39:6,16,17,25
40:12 41:1,7,8,14 44:5 47:4
57:10 92:7,9,10,13,14 124:15
124:18,19 125:14,21,23 126:1
126:3 246:16 248:7 250:2,4
257:18,23,25 258:3 272:3,7
273:16
**intend** 23:22 185:10 190:6
**intense** 33:16
**intentionally** 310:9
**interaction** 237:12,13
**interactions** 286:22 304:3
**interest** 60:13
**interesting** 191:2
**internal** 165:24 166:2 291:5
294:10
**internist** 177:15
**interrupt** 173:7 309:19,20
**interrupting** 70:14 298:15
**interview** 256:12 270:2 313:2
**interviewed** 11:7 229:24,25
**introduce** 22:13,15 241:10
287:12 300:2
**introduced** 105:13 220:20
221:17 263:7
**introducing** 56:3 166:4 221:8
275:23
**introduction** 236:13,18 237:16
**Inverness** 213:14,17

**investigate** 297:6,17
**investigated** 313:2
**investigation** 299:1
**investigator** 299:5 302:11,15
310:5,6
**investigators** 302:3
**invitation** 242:15
**invoke** 330:15
**involve** 29:11 210:24 280:1
**involved** 59:8 106:10 203:14
205:2 236:4 256:20 269:3
270:21
**involvement** 269:1
**in-court** 232:3
**Irish** 24:17
**iron** 113:10 124:8,12 130:13
**irrelevant** 320:10
**irritation** 194:21
**issue** 13:9 19:24 21:16 26:2 44:6
52:14 54:1,9,18 64:8 65:5
136:5 153:21 154:1 155:23
190:21,24 203:20 223:2,3
230:15,16 232:1 257:23
290:24 291:25 296:13 299:15
302:18,18,20,23,23,4 304:12
304:13 305:2,7,10 306:2
307:16 310:10 315:10
**issues** 19:5 21:7 26:15 90:5
118:3 125:8 194:17 231:12,23
231:24,25 233:22 257:21
258:1 265:10 266:23 286:15
287:4 301:7,8,9,10 304:18,20
308:3
**Italian** 314:14
**itemized** 160:13
**items** 125:13,25 243:1 264:3
**Iyanna** 104:7,10
**I-m-a-n-i** 104:10
**I-y-a-n-n-a** 104:10
**I-95** 284:2

---

**J**

**J** 1:13
**Jacksonville** 67:14 103:14 147:9
220:13
**jail** 96:9
**James** 137:8 226:4
**Jansel** 137:14
**January** 1:7 32:11 108:17,24
111:8 123:25 127:23 163:4
224:4 275:9
**JB** 224:1 226:24
**Jean** 20:1,12,12 21:2,15 65:21
137:9
**JEFFREY** 1:20
**Jefnie** 20:1,12 137:9
**Jencks** 299:23
**jeopardy** 135:20
**Jermaine** 14:10
**Jerry** 93:7
**Jill** 4:7 233:19 262:11,13,16
277:12 278:10 279:25 285:15
jmarcus@mnrlawfirm.com
1:24
**job** 34:3 45:13,13 46:1,2 49:23
98:1 117:15 130:8 222:11
226:10 255:12,17,18 256:4,12
266:7 267:14 270:2 279:13
323:21
**jobs** 72:25 245:12
**join** 21:9 52:16 142:19 236:18
**joined** 45:12 232:18,20 328:15
**joint** 125:8
**joints** 91:11 247:9,10
**JON** 1:14
**Jonelle** 285:17,18
**Jones** 137:8,14
jon.juenger@usdoj.gov 1:18
**Josh** 76:22,24,25 77:2

Josh's 77:1
Josie 285:6
Joy 114:4,9 118:8 220:20 221:3
221:7,25 223:14 224:2,14,20
225:8,14,20 226:12 227:8,9
227:12,23 229:18 230:18
236:5 241:7
Jr 2:6 333:16
judge 1:11 12:9 13:10 14:21
16:10,15 17:9,16 18:11 19:13
19:14 20:10,24 30:15,16 31:9
31:14 53:8 65:8 72:2 77:22
102:3,4,8,10,10,1 1 131:7
133:14 134:1 135:9 136:19
153:8 155:2 166:22 186:4
190:18 222:16 228:20 235:7
271:11 297:12 308:4,11,13,16
310:20 321:6,12,21,22 322:7
322:19 324:22 327:1 329:16
330:16,17
judges 235:6 299:21 301:22
332:10
judgment 33:8 209:13 210:19
211:9
judicial 191:11
Juenger 1:14 3:10,12,21,2 3 11:7
11:10 56:4 103:1,12 108:5
118:24 119:2,4,9,11,17,18
121:6 122:16,18 134:7,9
136:10,13,1 7 142:17 145:3,6
145:19,24 177:24 178:1,9,12
178:14,16,18,2 5 179:7,12,17
179:24 180:1,4,23 181:4,6,9
181:14,24 182:2,5,11,14
184:1 190:12 213:2,12,19
214:12,16,2 1 215:17,21
216:21 217:23 218:22 226:17
285:4,6,8,13,15,17,20,22
286:2,4,9,17,21,2 4 287:2,8,13
287:16,20,2 2 288:2,6,10,15,19
288:25 289:4,8,13,16,22,25
290:4,9,12 291:8,11,13 292:3
292:12,17,22 293:1,6,9,12,16
293:19,23 294:2,6,16,18,21
296:5,7 300:23,25 301:5,9,11
302:9 303:15,23 304:7,11
305:12,16,2 3 306:10,14,17,20
306:24 307:4,21,25 312:16,20
312:23 313:7,17,20,23,25
314:7,11,16,18,2 1 315:3
316:4,9,13,18,20,2 2 317:15,17
318:11,14,19,2 3 319:1,5,7
321:15,17 325:9,15,19,23
326:3,8,13,17,2 1 327:12,15,18
327:21,23 328:1,4,7,11,14,16
328:19 329:3,6,9,23 330:1,5,8
330:19,21 331:1,3,13,17,20
332:2,5,16,20
July 30:23 60:18 163:24 328:11
328:22
jump 53:16
June 32:11,12 60:18 61:23 148:7
163:24
juror 19:25 20:10,12,16,17,21
24:11,19 25:10,12 27:8 56:5
199:14
jurors 8:11 11:12,15,24 12:16
15:4,5 17:11,14,22 18:12 19:5
27:16 65:6,10,13 135:4,6
136:19 146:9 150:10 173:6,13
186:2 189:16,17 191:15
213:16 222:12,25 311:10
320:8
jury 1:10 8:2 27:5,10,11,13
32:25 65:19,21 70:9 71:9,19
72:20 124:22 132:23 133:7,13
133:16,20 135:1 136:22,23
146:15 166:4,16,22 167:1
175:6,10,12,14,1 9 181:18

186:2,13 187:20 191:16,17
195:20 222:3,15,16,20 231:24
234:3,6,7,20 284:20 307:1,2
311:6 317:13 322:15,17 323:4
jury's 222:3,5
just 9:6,8,14,23 13:20 14:3
15:15 16:10 20:25 22:19
25:22,24 27:4 30:24 32:9,25
33:18 35:11 36:19 37:8 38:11
39:5,17 40:3 41:18 42:13,15
43:12 44:22 46:2,19 47:6
48:15,19 49:3 52:11 53:1
54:20 57:6 60:16,22 61:2,9
62:13,19 64:4 67:1 69:3,12
70:9 71:19 73:8 74:8,16,18
76:5 78:8 79:5 80:20 82:12
83:18 85:14,16,2 5 86:17 87:4
88:2 89:15 92:17,19 93:2,24
94:11 95:14 99:4 100:21
103:5 106:3 107:5,6,9 111:19
118:5 119:2,3 122:8 9,16
123:15 127:4,12 131:12,22
132:23 133:7 135:11,12
137:25 143:24 145:7 146:16
147:8 149:14 151:3 152:2
153:2,8 155:15 156:17 159:15
160:15,23 166:4,16,23 167:5
171:12 172:25 177:1 180:16
180:18 185:3 186:4,21 189:7
189:17 190:20 191:4 192:3
194:1,22 198:19 199:24
200:12,24 201:21 203:14,23
203:24 205:4 206:1,2,24
207:23 208:18,19 209:19
210:14,23 211:8 212:3,9
221:11,16 225:5 226:10
227:23 228:4 229:14 233:5,7
235:1,7,13 236:2 239:20
241:1 242:21 245:12 248:2
246:12 255:1 259:8 261:24
264:12 269:4 273:11,17,21
274:1,25 280:23 284:5,16
286:10 287:10 290:19 294:7
296:14 297:20 298:19 300:25
300:25 301:23 306:5,15,25
307:15 308:16 310:25 311:18
312:23,24 313:20 314:7
318:14 319:20 320:11 321:6,9
323:9 324:17 325:1,10,15
330:2,20

K

Karr 55:3,4,6,9 15,17,20,21
57:3,4,6,1 1 58:22,22 91:24
101:10
Kate 245:21 257:16
kate@ kmeyerslaw.com 2:4
Kathryn 2:1,1
Kay 68:6 129:10,12,16 17
keep 47:14 48:13,16 81:18 92:17
168:16 170:25 172:12 181:16
182:18 196:5 226:15 233:25
233:25 234:2 235:8,16 242:16
keeping 235:12
keeps 22:20
Kelly 137:9
kept 92:19 130:3 210:20
KEVIN 1:13
kevin.larsen@usdoj.gov 1:18
key 229:1
kickback 29:7 58:8,21 59:2,4,4,5
68:21,24 75:4,8 81:6 182:19
211:11 223:25 224:9 225:11
225:13,16 227:5
kickbacks 97:15 98:25 99:3,5,6
99:10 180:21 183:24
kidding 11:16 20:25
kind 33:17 34:23 37:21 46:2,7
48:13,16 55:9 61:4 72:22

82:13 92:19,23 95:15 129:12
137:17 150:8 165:10 179:8
190:5 196:9,1 1 223:1 231:23
237:5 251:2 269:11 298:23
306:2 314:14
kinds 45:7 153:7 263:25
King 30:23 31:5
knees 91:12 247:9,10
knew 17:17 18:2 45:4 49:1,15
50:17 68:12 69:14 74:19,24
75:7,8,15,1 9 80:23,24 81:2,3
85:25 86:7 87:23,25 95:6 96:9
97:13,16 115:19 121:2 127:1
127:2 131:19 141:3 143:23
145:21 148:25 160:2 167:17
178:10 180:2,24 181:5 182:22
202:6,8,10 222:24 232:23
273:1,8 274:5,25 275:1
322:12
know 9:4,14,15,23 10:5 11:18
12:4,6,14 13:2 14:3 16:5 17:7
17:17 19:9,12 20:13,17 21:6
21:14,20,23,2 4 23:11,14,16,17
24:4 25:3,16,24 26:17 27:18
28:12 29:4,11 33:7 33:14
35:22 37:22 38:6,16,16 39:6
41:24 42:2,20 43:5,20,24
45:25 46:8,9 47:8 48:10,12
49:5,9,9,15,20,22,2 4 51:25
53:10,12 54:12 55:6,8 58:2
60:12,15,16 61:11 64:23
65:14 68:24 70:9,12 74:20,24
76:12,23 77:10,12 78:5 79:15
79:16,21 84:2,11 86:2 92:18
94:9,22 100:20 105:4,12
107:7 111:9,9,10 114:9,22
115:16,19,21 116:5 117:19
121:2 122:3 125:15 127:14
130:9,23 131:8,12 132:1,9,14
133:16 135:11,25 136:2,24
137:11 140:2,3,20,22 141:5,6
141:9,11,18 143:24 144:12,15
144:18 145:8,10,11,12,23
146:19 147:1 148:5 150:5,15
150:17,24,25 153:6,8,18,20
154:12 155:13 156:6 159:1,16
160:16,16,18,2 1 161:12,12,16
162:3,4 163:22 166:5 167:22
167:25 172:8 173:3 174:21
175:9 177:16 179:8 180:14
181:16,18 182:16 183:10,21
187:2 190:11 191:5 192:17
198:2,12 199:1 201:6,24
202:4 203:1,3,12 205:1,13
206:2,13,19,23 208:19 211:8
216:1 219:17,23 220:16 222:6
223:18 225:1,7,15 226:15
227:19,23 228:9,12,17,25
229:2,4,22,25 230:5,13 233:6
233:14,14 234:10 236:10
237:2,3 239:10,17,20,25
244:7 245:7 246:10 248:11,12
250:3 251:8,15,16 252:19
254:10,21 255:9 256:6 259:1
261:25 262:1,4,25 263:3,4,6
264:14 268:20 269:4,9 272:16
273:18,19 275:5,5,15 276:25
278:17 281:12 284:1,1,2,24
284:24 285:13,24 286:7 287:6
287:8,10 290:22,24 291:12
295:22 301:2,5 302:1 303:10
303:22 306:3 307:17,19 309:4
309:12 312:23,25 313:24
316:7,11 319:21,21 320:18,18
321:20 322:4 324:3,13,18
325:1,19 327:23 329:25 330:3
330:11,11,13
knowing 57:20 107:1
knowingly 132:16

knowledge 33:5 50:19 63:18,24
63:24,25 90:15 179:12 207:4
210:24 211:3 212:20 236:19
248:25 307:9,17
knowledgeable 50:5
known 144:21 145:9 222:19
301:15
knows 8:23 9:1 11:18 304:3
314:20 319:6,7
Kumar 164:17,19
K-u-m-a-r 164:23

L

L 1:19 28:5,6
lab 117:7 303:16
label 245:6
labeled 100:2
labor 153:19
labs 60:10
ladies 133:4 175:13 283:23
Ladle 24:17
lady 118:8 148:2
Lahara 16:21
laid 246:4 253:23
Lam 325:15
larger 319:13
Larry 198:12,13
Larsen 1:13 3:6,8,14,17,19,25
4:2,4,6,8,10 8:6,9,12,14,18,20
8:25 10:10,14,18,21,24 11:4
12:23 13:5,8,13,15,17,19,22
13:25 14:3,8,12,15,17 16:16
16:19,22,24 17:13,21 18:4,6
20:15,18,20 21:3,6,11,16,19
22:6,9,11,21,2 3 23:22 25:13
25:16,20 26:7,9,12,16,19,22
27:1,23 28:11,14,18,2 1 30:17
31:4 36:8 50:3,4,24 52:4,13
53:11,14,19 55:22,24 56:1,9
56:11 58:13 63:23 64:2,4,7,10
64:19,21 65:1,12 66:11,14,16
66:18 70:6 72:4 76:17 77:8
78:7 86:16 89:21 98:13
102:21 134:12 136:8 146:14
150:9,12,13,16,2 1 152:1,4,7
152:15 153:2,15,23,25 154:5
154:8,13 155:2,4,22 156:11
156:14 157:1,23 158:24 164:9
164:15 165:1,12,14,16,20
166:4,6,12 167:13,24 168:7,9
168:12,15,18,2 3 169:1,10,18
170:4,23 171:2,4,7,16,23
172:2 173:25 174:3,5,8,13,23
175:2,5,7,16,18,2 1 176:4,20
176:22 177:8 184:14,17,20,23
184:25 185:3,5,9,13,17
186:11,17,20,2 4 187:1,6,9,12
187:15,19 188:1,3,6,8,11,16
189:4,7,10,12,15,17,2 3 190:1
190:3,10,13,1 5 191:14,23,24
193:1,6 194:11 198:10 199:8
199:15,17,19 200:1 201:1,5,9
201:13,16,19,21,2 3 202:6,11
202:15,20,23 203:1,7 206:22
211:24 212:1,23 219:2,12
220:11 221:2,3,5,7,10,16,23
222:2,25 225:10 223:8 10,12
223:14,19,23 224:6,12,14,17
224:20,22,2,5 225:10,14,17,21
225:24 226:2,8,12,19,21,25
227:3,5,6,14,16,18,2 5 228:2,7
229:10,14,19,21,2 4 230:2,8,12
230:17,23 231:1,8,14,22
232:1,3,5,9,12,16,18,22,24
233:2,8,11,18,21,2 4 234:4
235:15,17 236:1,7 238:3,6,8
241:11,14,19 242:1,13,17,19
245:2,4,15 249:10,12 250:6
250:11,19 251:25 257:12

261:23 262:5,11,21 270:13
271:13 274:24 275:21 276:1
278:25 283:5,18 285:1 294:25
295:3,5,11,17,2,2 296:11
307:6 320:24 321:1 333:1
**last** 14:9 21:20,22 25:18 27:8
59:16 60:4,14,15 61:12,18
64:24 67:7 69:23 70:1,24
71:16 97:13 104:11 120:18
127:9 144:6 146:9 151:17
155:5 157:15 165:9,10 189:4
194:12,19 204:14 279:11
286:4 301:1 324:14 330:2,19
**lasted** 155:8 182:6
**Lastly** 326:21
**late** 14:9 15:10 18:20 20:3,4
21:22 233:17 275:12 294:24
301:14
**later** 24:2 57:19 60:17,18 61:8
103:6 160:23 175:22 198:16
200:10 226:11,16 235:20,24
266:8 311:2,2
**Laura** 137:15
**Laurene** 3:20 177:24 213:2,4,6
**law** 2:1 34:24,24 65:2,6,10,11
66:5,6,8 85:14 139:21 180:3,3
182:10,23 183:3 234:23 235:8
300:21 309:23
**laws** 33:21 34:25 51:12 217:12
217:15,17 218:2,11
**Lawson** 43:24 44:1,2,23 54:5
75:17 91:25
**lawyer** 35:21 66:9 69:3,4,8,11
69:17 154:17 167:7,9 181:22
311:7 327:4 328:1 329:18
330:15
**lawyers** 52:12 66:8 69:12 70:4
139:20 215:24 235:2,9,19
301:22 310:20 311:8,20
330:11
**lay** 142:10 168:2 221:14
**lays** 94:18
**lead** 307:23
**leading** 64:17,23,25 107:22
119:3,6,8,12
**leaf** 215:1
**Leah** 137:14
**learn** 60:17 228:8 254:15
**learned** 116:9 138:2 236:3
254:18
**learns** 228:10
**least** 19:20 31:7 115:16,20 124:2
124:2 126:3 140:19 198:23
293:1 310:1 330:17
**leave** 133:16 137:13 166:24
186:14 200:19 284:17 287:17
**leaving** 117:18
**led** 149:9,10,13
**ledge** 253:1,23 268:2
**left** 19:19 32:18 41:18 136:25
137:4 144:21 201:25 202:11
256:1
**leg** 247:3
**legal** 50:13 89:14,16 138:16
186:3
**legitimate** 129:6 303:21
**Leisy** 137:10
**Leland** 131:1,3,14,15,18
**length** 98:23 155:10,16,17 168:3
173:10 240:22 241:1 274:5
**lengths** 98:15
**less** 105:15 116:19 144:22
213:20 275:15 280:19,20
281:4 310:1
**let** 9:17 27:20 36:1 38:16 39:6
50:3 54:11 62:9 67:4,21 70:19
72:1,7,13 75:10 76:3,13 78:6
81:16,23 83:13 84:13,15
88:21 89:9,15 90:6 96:15

114:22 121:20 122:3 124:10
125:7,14 126:12 129:20
130:22 131:8,12 133:22 136:2
140:11 144:1 147:1 150:3
153:11 156:9 162:22 163:21
166:19 167:2 177:18,22
185:12 191:4 203:9 205:20
206:23 208:18,22 209:19
210:23 211:13 216:13 222:21
229:16 252:3 254:6 266:13
271:10 272:15 273:19,23
274:1 278:3 284:21 290:19
294:7 299:4,21,22 300:2
307:10 308:16,19 312:23
320:6 327:13 332:11
**letter** 116:17 117:6,10 140:23
204:14
**letting** 14:3 116:5
**let's** 8:10 14:19 15:3 19:2 21:14
28:15 44:20 58:18 60:6 63:8
85:14,16 91:3 106:3 119:16
136:18,24 205:4 207:23 226:3
226:14 235:16,2,5 237:18
255:16 263:24 267:6 299:24
310:22 321:4
**level** 47:17 48:2,4,7 87:12
**levels** 45:5 47:15
**levocetirizine** 194:6,15
**licensed** 177:10 192:5,5
**licenses** 192:1
**lid** 157:9
**lies** 298:14,20
**life** 81:24 216:16
**lighter** 233:13
**lightly** 255:9
**like** 12:25 15:18 16:6 17:13,21
17:24 21:3 22:5 26:7,12 27:6
39:18 44:25 48:1 51:6 58:1,6
69:20 70:18 72:22 76:15
78:11 82:13,13 86:7 89:12
90:6,8 92:15,23,2,5 93:7 96:6
100:23 101:5 106:9 121:1
122:3,13 125:8,11 129:12,16
130:1,10 132:2 133:3,6
140:11 142:4 153:8 155:17
156:22 157:19 163:5 165:4,10
168:16 169:7 172:7,11 173:7
173:16 178:3 182:4,16 184:3
187:24 194:8 195:4,5,17
203:23 215:11,12 221:14
223:1 228:11 229:7 231:1,6,9
231:10 236:13,15 240:19
244:20 255:17 256:5 260:6
267:14 271:11 276:11 277:9
278:23 285:20 286:4 287:9
301:8,9 302:9,9 306:2,19
310:17,19,20 312:10,11,18
313:20 314:14 316:1 319:20
319:22 325:10
**liked** 277:3 282:8 283:15
**likely** 134:13 246:8
**likes** 13:1
**limit** 35:9,9 286:21
**limited** 66:6 182:21 184:9
218:12 321:24
**limiting** 184:11
**line** 5:4,4 49:2 56:17 171:21
203:16
**lined** 252:25
**linen** 113:13
**lines** 40:9 188:6
**linked** 48:9 51:5 175:12
**LinkedIn** 51:2,4,6,7
**list** 21:22 23:18 24:4 165:9
168:16,1,7 194:22 285:9
297:24
**listed** 147:18 246:19
**listening** 135:10
**listing** 194:1,4

**little** 17:5 47:9 52:14 69:2 77:18
81:16 127:11 130:21 137:11
138:1 143:7 151:22 155:8
188:5 213:15 230:22 235:2,24
253:14 256:5 275:11 277:14
279:15 305:4 306:7 311:18
323:25 327:2
**live** 28:22 103:13 135:18 146:16
165:21 173:5 189:12 213:13
219:15 235:11 250:20 262:22
**lived** 146:17 147:9
**living** 103:23 164:2,4 250:25
**LLP** 1:20
**lo** 197:13
**load** 216:20
**local** 38:3
**located** 224:11
**location** 40:19,19,21,2,2 92:25
93:1 111:22 140:20 163:14,17
163:19,20
**long** 3:20 18:3,8,9 25:16 31:24
69:20 95:18 103:25 111:16
120:9 126:9,12 127:7 133:4
134:6 148:11 155:3,5,15
163:22 166:7 167:6 171:18
177:24 182:20 211:13 213:2,4
213:6,13 215:18 217:24
230:24 231:13,16 234:24
254:13 276:9 284:9 286:11
297:7 301:12 323:3,11 325:5
327:3
**longer** 16:8,9 61:16 66:12 85:6
86:6,14 90:22,24 120:14
128:23 130:25 133:1 155:8
159:4 173:3,4,9,10 183:15
220:7 275:13 284:6
**look** 23:7 51:23 54:12 78:8,14
146:9 156:22 166:25 168:1
183:22 184:21 210:14 215:6
215:11 217:15 226:3 229:16
231:18 255:16 264:5,7 274:1
274:2,8 290:19 294:7,9 300:4
303:9 309:24 321:11 323:6
324:23 326:25 332:3
**looked** 39:18 215:12 332:1
**looking** 125:18 142:2 169:19
322:23
**looks** 194:8 235:19 255:17
**Lorzone** 83:19
**lose** 231:10 300:11
**lot** 11:25 45:24 49:4 71:4 87:14
90:11,14 138:10 143:13
154:25 162:25 179:9 222:12
227:20 233:16 239:7 254:9,12
287:13 296:18 311:14,17
314:24 315:21 316:16 318:1,7
318:7 322:1 324:24
**lots** 57:21
**louder** 213:15
**Louis** 63:16 285:8 286:17
296:14,16 297:19,23 298:3,9
301:12 302:6,15,19,21 307:22
307:24 309:3,5,16 310:18
311:25 312:10 321:18 330:22
**Louisiana** 29:1
**loved** 24:11
**loving** 123:16 276:19
**lower** 86:8,9
**Lozada** 285:8 286:17 296:14
302:23,25 303:2,3,11,12,14
308:1,5 309:4,5 311:25
313:14 321:19 325:16
**LSAT** 306:12
**lsurobin32** 40:7
**lunch** 35:12,13 133:4 323:3
**luncheon** 134:23
**lunches** 34:8 35:4,5
**lunchtime** 190:13,14
**Lunesta** 32:6,7 83:17,18 84:8,10

84:12
**L's** 28:5,6
**L-a-u-r-e-n-e** 213:9

**M**

**M** 1:14
**Macy's** 331:3
**mad** 226:10
**made** 34:17 62:4,17 90:21 94:14
102:12,17,19 115:3 126:13
140:14 143:3 145:13 172:19
205:17 209:1,3,10,22 210:19
211:9 234:14 277:13 302:12
303:8,16 318:3,3,7,8 323:7
**Madison** 55:20,21 57:3,4,6,11
**maiden** 271:17
**mail** 39:6 43:12 54:10,19 110:6
110:7 116:16 147:19 156:15
156:17 162:25 163:2 238:24
253:4 326:4
**mailed** 47:5
**mainly** 48:15
**make** 15:4,5,6,6,15 16:5 20:4
21:9 31:12 33:8 34:3 40:13
42:19,24 48:22 49:4,23 52:12
53:16 59:19,25 60:1 69:21
72:13 81:12 84:14 85:4 87:21
88:3,4,5 91:15 93:12 101:12
101:19 102:14,16 107:9,12
108:18 109:12 114:22,25
115:4 121:17 132:23 137:11
137:16 141:8 143:5 159:1
162:22 173:3 188:14 196:8,12
206:2 210:4 211:18 217:17
222:2 223:1 226:10 229:3
233:9 234:23 241:4 242:21
243:1,4 244:11 245:12 255:23
265:8,22 275:7 280:6 284:3
291:3 294:12 297:14 301:22
301:22 305:1,7 307:20 311:3
320:8 321:7 330:16
**makes** 66:1 137:18 177:15
195:12 196:11 226:15 280:17
309:25 313:6 316:4
**making** 48:16 83:8 101:16
117:19 119:4 121:1 143:1
172:9 175:12 183:11 217:11
222:1 242:22 309:25 325:1
**malpractice** 177:20,21
**man** 21:18 105:4 221:21 325:13
**management** 206:13 274:12
**manager** 34:2,2,6,10 141:6
**Manda** 193:12 202:15 207:14
**manifest** 310:22
**manner** 223:16
**manufacturer** 319:12
**many** 22:2 51:8 67:4,7,8 91:19
104:18 108:22 109:10 115:17
127:5 149:14,16 157:6,7
171:18 202:13 227:18,19
239:16
**March** 161:22 162:13 163:5
164:1 255:18 288:20 296:18
**March-ish** 163:24
**Marcus** 1:20,20 3:18 14:20,22
15:2,19,22,25 16:2,4,7 22:3
22:15 24:1 136:5,16 165:4,7
166:11,17 167:15,19 169:3,13
169:21 170:6,10,14,18 172:3
173:14,17,19 174:12,14,17,19
175:1,4 176:8,10,15,17 177:4
177:7 186:4 197:21,23 198:1
199:2 200:20,22 202:1,3,9
204:2,3,5 205:24 206:1,4
211:22 212:9,17,19 287:4
288:12,22 289:11,18 290:1,5
290:10,14,18,2,4 291:5,17,18
291:23 292:4,14,19,23 293:3
293:13,17,20,2,4 294:3,7,10,14

296:13,16,2 3 297:5,9,17,20,24
298:1,4,7,11,14,19,2 4 299:3,9
299:15,18,2 4 300:3,13,15
301:19,24 302:3,20,24 303:1
303:3,6,10,1 2 304:13,22,24
305:20,25 306:5 307:9,15
315:4,6,9,12,18,2 4 316:24
317:3,6,11,2 1 318:5,9 319:10
319:20,22,5 320:14,17,21,25
325:25 326:5,10,15,19,24
327:8,10 329:12,21 331:2,5,7
331:15,23 332:7 333:3
**Marie** 262:16
**mark** 239:15
**marked** 5:2 41:9,15 76:14
192:20 239:9,12,13
**market** 33:15 37:22 41:25 83:25
84:16,16,1 8 85:4,9,9 87:14
88:6,10,12,17,2 3 89:10,16
100:4,18 141:25 254:4 256:14
**marketed** 83:22
**marketer** 34:13 81:17 82:2,3,5,6
82:22 83:3 87:17 88:3 94:3
100:1,2,1 1 159:23 160:6
201:3 248:19,24
**marketers** 85:18 139:15 141:16
141:21 175:22 200:19 201:24
**marketing** 32:6,9 33:2,4,6 82:1
82:13 83:18 84:9,11,20,21,23
84:24,25 85:7,11,17,18,19
86:7 88:22 89:5,5,7,19 96:24
97:4 98:2 100:13,24 101:2
120:5 129:13 141:11,15 144:3
248:4 249:18,20 250:3 256:2
256:3,7 274:23 275:3,4
278:15
**Martini** 193:12 199:21 204:17
205:6 207:14 208:13 211:14
212:3 271:6
**Martini's** 202:15 211:8
**Mary** 68:6 129:10,12,16,16
**masse** 188:9
**material** 82:14 100:24
**materials** 101:2 120:5 249:25
275:3
**math** 48:6
**Matt** 327:18
**matter** 18:13 65:14 78:25
100:10 154:24 166:3 333:13
**matters** 298:9
**Matthew** 22:25
**Matthews** 16:21,22 37:24 38:1,2
38:6,8 43:21 45:18,21 46:2,13
47:10
**maximize** 115:2
**maximum** 284:9
**may** 13:2 16:10 22:15 24:3
72:14 81:5 97:23 116:20,21
116:23 119:15 122:21 126:9
136:13 142:12 143:10 155:14
155:16 162:2,3,14 164:1
167:4 171:20 191:2 193:1
194:1 216:2 225:6 238:3,7
239:13 241:14 245:2 255:8
256:4 261:15 268:25 296:8
299:22 300:7,23 309:13 323:6
**maybe** 21:17 35:25 49:2 58:1
90:24 116:20 128:24 135:14
140:20 160:16 172:7,16 173:1
177:16 182:16 185:3 194:10
228:11 241:2 247:11 267:14
267:23 298:8 306:2 307:14
330:10
**ma'am** 133:8 218:23 261:8
**MD** 171:9 192:9 193:15 197:5
**mean** 9:1 14:16 33:2 35:7 37:14
47:20 48:25 50:20,21 59:21
67:19 75:21 86:25 97:9
100:10 148:3 150:7 153:20

154:19 155:14 157:7,8,9
183:11 184:4,5,5 203:13
227:20 228:19 244:18 245:8
252:16,18 256:22 265:13
266:6 278:3 282:15 291:8
296:18,23 297:6,9 301:19
305:9 306:6 307:16 312:18
313:12 315:24 318:20 319:21
320:5 323:17
**meaning** 59:22 133:1 207:16
**means** 18:10 37:15 80:18 119:6
154:3 175:11,15,15,16,18,20
175:21 199:1 220:10 222:11
223:17 227:1 232:14 252:20
284:5 286:13,14
**meant** 151:16 276:9 310:13
311:11
**med** 87:10
**Medicaid** 36:6 85:5 86:5,14
**medical** 33:19 36:19 51:1,8,10
51:14 52:1 83:14,16 127:18
173:22 177:20,21 178:1
179:10 198:9 204:20,21
209:24 210:20 211:9 214:1,8
218:4,7 281:19
**medically** 87:9
**Medicare** 36:5 85:5 86:5,14 87:2
87:6 88:9 178:3,4 179:18
215:4 218:2,9 246:14 315:1
**medication** 112:5 128:12 159:21
160:2,5 163:13,17 189:5,6
193:20 224:3 242:6 246:6
258:6,8 282:18
**medications** 112:4 161:18,21
162:1,5,8,12 193:17 194:22
240:13,16 242:9,20,23,24
243:14,17 246:2 265:3 267:12
296:20 305:1
**medicine** 32:7 52:22 53:6 73:6
78:14 81:14 82:14,15 83:22
83:25 85:13 87:1,9 89:25 90:4
91:15 95:6 122:6,7 166:2
171:18 173:23 189:16 193:19
193:21 194:19,19 195:22,23
196:2 198:6 281:17
**medicines** 32:8,9 51:13 101:1
194:15 195:25 246:4
**meds** 33:9 48:15 83:19
**meet** 34:6,16 67:10,12 69:23,24
70:25 71:2 105:6 220:19
236:11
**meeting** 34:7 55:10 70:1,3,3,4
127:7 128:1
**member** 40:16 68:19 114:17
148:14 149:21
**members** 55:18 58:23 59:1,3
149:14,17 246:2
**memory** 77:18,25 92:1,1 127:11
127:14 207:20 274:8 332:9
**men** 90:16,17
**Meneses** 137:10
**mention** 197:25
**mentioned** 34:18 35:4 36:21
45:18 114:1,13 124:6 133:6
155:23 197:4 259:21 264:1,12
267:20 286:13
**Merida** 137:14 199:11
**Merry** 123:11
**mess** 102:10
**message** 71:5,6,8,1 1 72:10 75:11
76:21,22 81:4 99:12 124:11
**messages** 31:3 46:3 86:22
**met** 38:2 67:4,6,7,15 69:1 70:21
70:23 71:16 81:23 98:16,18
121:15 122:8 127:5 204:24
206:11 245:21 251:17,18
**metabolic** 40:19,23 93:17
196:18,19 208:6 210:14
274:11

**Metrorail** 284:2
**Meyers** 2:1,1 4:1,5 11:17 167:4
167:8 185:19,25 186:7 188:18
188:21,25 189:19 220:22,24
221:13,18,22 231:17,19 241:8
241:22 242:11 245:17,19,21
249:2,3,5,8,13,1 8 257:15,16
259:24 260:2,8,10 261:20,24
312:3,4,7 313:11 320:20
**MG** 245:7,7
**MGTEN** 59:17 139:3 248:20,24
258:20
**Miami** 1:2,6,16,22 2:3,6,7 25:19
31:4 333:17,17
**Miami-Dade** 224:11
**mic** 50:18 184:18 201:6 213:15
224:23
**Michael** 16:21,22
**microphone** 12:24 28:3 219:6
295:7
**mid** 204:15
**middle** 40:15 45:1 57:6 92:17,23
104:7 116:22 186:13 217:10
**mid-morning** 18:22
**mid-range** 195:25
**might** 9:21 26:25 46:8 62:10
87:10,11,22 99:13 108:8,12
108:12,14 114:9 127:11 131:7
137:4 163:5 167:16 209:20
210:8,10 229:2 245:7 287:14
294:23
**military** 29:14,15 44:3 45:1,6,6
45:9,10 76:25 104:17 130:7,9
147:6 149:15 220:2 237:6
251:7,9
**millimeter** 319:2,12
**million** 102:14,19 144:18 318:3
318:5,7
**mind** 24:25 46:10,11 58:7,14,25
120:7 146:6 153:21 154:1
162:14 181:21 219:3 227:4
279:14 323:20 327:1
**mine** 105:13 111:8 115:9 122:7
123:15 175:9 270:25
**minimum** 284:10
**minute** 40:25 96:24
**minutes** 17:14 18:4,6,7,16,17,19
18:20 20:7,7 24:6,7 26:1
28:16 90:25 97:13 111:14,17
128:24 131:8,10 133:25 134:7
135:15 136:1 151:24 187:22
211:16 214:24 240:23 241:2
275:16 322:23
**miracle** 22:5
**mischaracterizes** 70:6
**miss** 15:8,10
**missed** 145:11 188:15 287:1
**missing** 8:10 19:24 235:5 323:8
**misspoke** 112:18
**misstates** 241:22
**mistake** 30:11
**mistaken** 63:9
**mistakes** 323:7
**mistrial** 310:19,21,24
**misunderstanding** 68:14
**misunderstood** 63:7 204:1
**mix** 314:3
**MJG** 328:3,4
**moment** 37:8 39:10 57:3 97:23
142:12 162:20 167:5,5 183:17
199:7,20 216:16 283:1
**moments** 259:8
**Monday** 13:9 16:16,18 70:21
98:16 302:12 322:17
**money** 12:7 45:23 49:4,15 54:11
61:19 62:2,14,16,17,1 8 74:23
81:12 83:2 88:4 91:15 102:12
101:16,19 102:12 107:10,12
110:24,25 114:22,25 115:2,4

115:22 121:1 123:4 126:13,15
143:1,3,9,13,1 6 145:13
227:24 228:1,2,3,4,5 229:18
232:21 241:4 242:21,22
244:21,22,2 5 245:12,13
248:13 252:15,17,19,20
258:23 265:8,22 266:8 267:3
277:9 280:20 282:14,19
285:25 300:5 318:7,8
**monitor** 96:16 192:25
**monitors** 134:11 199:12
**month** 47:24 48:3,22,24 110:1
113:17 118:4 123:17 124:3,4
124:8 130:17 230:23 268:6,8
268:10
**monthly** 34:2 243:7 267:23
280:7
**months** 32:16 108:2,16,22,25
110:2 120:11 143:11 148:7
160:23 269:10 298:6
**Monty** 1:7 8:23 9:3,9,12 22:25
29:10,11 37:24 38:8 40:6 41:6
41:7,12 43:21 46:5,23 59:4,12
60:5 61:13 62:4,25 63:18
66:25 71:11 75:11 76:21
80:24 81:3 92:21 93:21 98:6
99:10 100:12,24 101:3 105:4
105:6 110:6 111:2 114:21
115:11 116:3 118:13,14
121:14 123:8,19 125:4,25
130:25 131:4 132:7,24 138:4
139:4 141:3,12 150:4 158:6
169:11,16,24 170:4 175:3
185:14 197:3,18 198:12,16
203:2 214:5 215:10 219:21
220:14 223:25 224:9 225:11
225:25 226:6 236:9,12 245:21
251:13 256:24 257:17 258:20
263:1,3 270:20 279:9 288:20
289:9 290:15,21 291:11,13
295:1 308:17
**Moore** 192:16
**more** 12:7,9,11 16:9 17:14 47:9
48:7,23 52:14 65:25 66:17
81:12,23 84:13,15 90:11
96:15 105:15 107:10 116:19
118:25 119:2 128:25 129:20
132:9 140:11 144:22 153:10
156:10 161:22 162:2,8 209:9
212:14 213:20 227:12,20
228:17 237:16 243:22 246:8
269:5 276:21 277:6,23,25
279:15 282:24 297:12 299:7
307:8,19 310:1,7 311:21
314:24,25 315:1,21 316:16
318:1,17,17,18,19,20
**MORENO** 1:10
**morning** 8:6 13:9 14:6,14 15:2
22:9 27:4,12,13,2 3 28:12,22
56:6 66:23,24 123:11 137:5
257:16 279:9 283:24 286:14
321:13 322:1 324:1,11 325:3
**most** 12:7 39:21 40:8,10 91:19
152:11,12 186:2 222:6 228:18
234:10,24 299:21 303:18
311:2,12 332:10,10
**mostly** 296:8
**mother** 189:12 232:8 252:18
**Motion** 52:11
**motions** 301:22
**Motrin** 194:14 265:6 281:24
282:1
**move** 51:16 52:10 76:15 90:21
133:5 137:19 155:9,10 163:19
203:15,25 214:12 235:1,13
259:3,3 301:24 310:3,21
325:7
**moved** 161:24 162:3,22 163:7,11
163:24,25 235:14

moves 22:19
moving 20:21 60:21 165:1 173:8
  234:1 235:16 284:6 310:19
much 19:23 25:5,9 35:9 47:8
  48:16 49:4 59:15 60:15,17,22
  61:19,19 62:2 66:12 86:8
  90:22,24 102:16 115:22 118:5
  118:6 123:5 128:23 138:23
  142:3 143:3,3,4 145:13
  154:21 157:5 160:8 172:11
  184:11 196:24 205:12 213:18
  222:12 229:18 243:1,4 244:16
  247:14 257:7 266:3,8 267:7
  275:13 282:14 284:19 300:12
  310:8,8 313:21 315:8,23
  318:24
multidistrict 19:18 134:4
multilevel 129:13
multiple 160:19 208:4
multivitamin 41:20
muscle 83:19
must 63:6 76:3 127:4 175:8
  277:5 280:3
myself 31:4 46:12 109:5 113:9
  122:3,11 124:8 130:13 157:10
  236:13 238:2
M.D 164:17
M.K 57:11

N

name 20:13,14 28:3 39:19 40:9
  54:25 66:25 72:24 99:13
  103:8 104:12 105:4 121:14
  125:1 142:10 146:8,9,10
  150:5,6,14 151:4,17 158:6
  164:18 184:21 192:9,17,19
  193:11 197:4 206:10 213:5,6
  213:8,25 219:6,7 221:3,7,11
  221:16,24,2 5 223:22 230:9
  236:2,3 238:19 239:10 242:2
  242:5 243:8 245:20 250:15,16
  252:23 254:14,21 255:4
  257:16 262:14,16 270:20
  271:17 280:7 285:15
named 43:23 105:13 127:17
  131:1 147:14,24 192:16
  220:14 236:9 254:19
names 91:22 104:4,9 221:2
  225:7 238:16
nature 244:6
Naval 104:15
Navy 55:5 104:16 220:6
NCIC 330:22
necessarily 108:10 172:13
  291:15 311:9 328:7
necessary 87:9,9 306:8
necessity 310:22
need 12:9,11 36:15,18,20 60:23
  60:25 64:3 81:6,8,9 84:17,18
  87:10 90:5 91:6,15 93:21 94:3
  94:6 107:6 115:1,5,10 122:5
  124:25 125:7,15 130:12 131:7
  133:22,23 166:10 167:5,6,9
  181:13,19,22,23 190:3 196:8
  196:11 197:18 222:9 240:16
  264:15,18,18 272:16 276:21
  280:7 299:20 300:19 306:24
  309:16 317:3 327:4
needed 14:20 39:5 40:11 59:9
  81:9 93:25 94:15 107:1,4,8,12
  109:12 110:17 114:24 116:16
  118:12 125:6,13,25 130:10,11
  139:22 148:21 149:14,16
  244:9 245:12 247:20 253:19
  256:6 273:8 277:14
needs 24:17
neighbor 263:7,20 270:22
neighbors 270:24 271:5
Neiman 1:20

neither 9:3,9 72:24 200:14
nerve 148:10 194:20
net 61:21 62:4,6
network 197:10
neuropathic 194:19
never 13:2 16:5 22:18 39:8
  46:20 53:2,24 54:13 62:9 67:1
  76:11 88:1 92:18 98:21 110:7
  110:8,10 112:15 113:11,12
  121:15 122:18 125:10 126:5,6
  128:11 130:18 131:14 141:20
  141:23 142:10 159:23,25
  160:16,23 161:12 167:18
  179:20 204:24 206:5,8,11
  211:6 221:13 230:14,15
  245:21,24 251:18 270:10
  284:9 286:5 297:19,22,23
  300:10 308:18,20 315:15
  324:13
new 123:18 163:14,19 176:23
  177:4,7,10 192:6 195:22
  197:17 198:17 200:17 263:7
  263:15,20 277:13,14 279:13
  279:13
news 294:24
next 8:5,7 10:9 11:6 12:8,15
  15:1 16:18 19:9,10,23 21:10
  23:8,11,15 27:22 41:4 47:17
  47:18 52:9 102:25 106:14
  134:8,13,16,1 8 136:1,7,10
  137:9 145:16 146:4 150:20
  152:5,7,13 154:12 156:25
  164:14 167:11 170:2 173:12
  177:23 181:14 184:13,15
  190:2 194:4 195:2 207:10,12
  210:14 213:1 219:1 231:21
  234:25 250:10 260:16 262:10
  267:22 284:8,25 288:1,1
  302:7,7,22 310:6
nice 266:17,17,19
nicer 233:16
Nichole 3:9 11:7 23:16,23 103:1
  103:3,9 116:4
night 14:9 21:20,22 67:10,13,14
  67:18,22 68:9,13 69:1,16,18
  69:23 70:1,1,2,10,18,21,24,24
  71:1,2,16 301:1 320:17 333:1
  333:2
nine 32:16
nobody 99:6,8
nodding 247:13
noise 234:22
noisemaker 234:13,15,18
noisemakers 234:14
nol-pros 330:23
nonactive 194:23
nondoctor 201:4,8,12
none 164:9 195:19 235:25 276:1
nonjury 169:8
nonsterile 327:19
non-drowsy 83:19
non-steroidal 194:13
noon 190:12 321:15
Nope 198:18
norm 99:19
normal 233:4,5
normally 59:16 153:10 254:22
  299:25 314:7
North 2:6 102:23 181:15 213:21
  333:17
Northeast 1:16
note 200:13
notebooks 133:16 166:25 284:16
notes 290:18
nothing 12:10 94:21 102:21
  118:11 119:23 142:14 211:10
  211:22 249:6 250:6 261:20
  262:6 266:5,5,6,10 267:16,19
  270:13 277:9 282:22 283:19

302:18 323:11,12
notice 15:13 90:10 173:19
  215:25
noticed 173:17 272:15 315:15
November 95:23 108:24 124:5,9
  197:7 205:7,21 207:5 208:18
  255:18
number 1:3 5:7,8,9,10,11,12,13
  5:14,15,16,17,18,19,20,21,22
  5:23,24,25 6:1,2,3,4,5,6,7,8,9
  6:10,11,12,13,14,15,16,17,18
  6:19,20,21,22,23,24,2 5 7:1,2
  7:3,4,5,6,7,8 10:9 19:9 21:21
  39:20,20,21 40:14,16 44:5
  55:23 56:1 61:23 71:21 72:6
  76:19 78:11 83:5 110:5,18
  112:6 122:20 125:1 127:17
  137:2,3 143:16 169:6,15,23
  170:1,8,12,16,2 0 178:15,22
  179:8 186:9,16 189:1,21
  215:5 224:4,8 226:1 243:5
  244:20 271:15 276:3 279:2
  280:8 287:21,25 288:5,9,14
  288:18,24 289:3,7,15,20,24
  290:3,7,11 292:10,16,21
  293:5,8,11,15,18,2 2 294:1,5
  295:10,16,21 296:2 309:12,12
  326:2,7,12,16,20
numbers 5:5 11:2 115:19 137:2
  168:5 226:15 325:20,22
numerous 141:23
nurse 33:12 55:5 147:13 148:25
  155:7,12,13 158:7 264:20
  266:21 281:18,23
nurses 179:9

O

oath 31:18 137:21
object 9:21 22:18 166:11 169:3
  169:13 327:8
objection 8:15,16,22 10:1,13,16
  10:19,22,2,5 20:20 35:19
  49:18 50:8 51:16 53:8 58:10
  62:23 63:12,14,19 65:4 70:6,8
  72:4 76:16,17 77:8 86:19
  107:22 122:15,18 144:24
  145:18 155:19 158:24 159:2,5
  165:3 166:17 169:2,20 170:5
  170:10,14,18 178:19 182:12
  182:15,24,25 183:1 185:18,19
  185:24 186:7 188:20,21
  189:18 191:20 197:21 199:2,3
  199:6 200:10,20 202:1,3
  203:3 212:17 214:15 216:21
  217:3 220:22 221:12 233:10
  235:25 241:8,22 242:11
  271:13 274:24 275:21,25
  278:25 287:24 288:3,7,11,16
  288:21 289:1,11,17,23 290:5
  290:10,17 291:1 292:14,23
  293:2,7,10,13,17,20,21,24,25
  294:3,4 295:1,8,14,15,19,24
  295:25 303:7 325:24 326:4,9
  326:14,18,22 329:22 330:12
objections 159:2 172:10 186:3
  325:19
obligations 301:20
obviously 136:1 205:21 297:5
  301:20 304:18 307:16 318:8
occasionally 123:9
occupation 147:12 149:11 192:1
occurring 147:7
October 105:16
odd 13:7
off 12:19 15:24 25:21,23,24,25
  26:4,9 46:2 47:13 50:19 81:12
  106:8,11,12,13 111:14 134:17
  136:4 143:16 183:19 201:6
  261:9,14 269:23 270:24 275:7

327:6
offer 72:2 116:17 117:6,9,12,15
  140:23
offered 106:19 153:2 211:10
offering 52:22 178:2 328:21
office 1:14,15 2:1 27:6 36:17
  264:19 266:22
officer 17:4,18 18:25 24:8,10
  25:23,25 26:3 27:8,10 104:15
  104:16 134:20 136:22 191:16
  203:24 222:15 234:6,20
  284:22 325:12,14 332:23
offices 34:9 45:25 57:21,22
  84:11
Official 2:5 333:16
officially 279:11
Ogden 91:24
oh 9:13 12:19 13:21 14:23 76:10
  76:13 80:6,10,16,20 86:9
  88:12 90:21 93:15 96:24
  105:11 112:18 125:20 134:22
  152:10 153:24 163:15 164:23
  183:6 214:14 215:24 223:22
  226:18 242:15 249:7 257:4
  265:14 275:17 285:16,21
  300:7 308:18 320:25 322:22
  324:2,12,2 1 326:22 328:16
okay 8:12,17 12:3,18 13:7,16,25
  14:3,3,23,24 15:3 16:3,7,20
  17:25 18:7 19:22 23:5 24:2,14
  25:2,6,11 26:2,4,6,13,21 27:1
  27:7,16 28:7,14 31:7 34:5
  36:3 37:18 39:10 40:8 41:14
  43:5,13,16 45:12 48:21 50:25
  52:2,9,24 57:3 61:7 62:2,19
  63:11 66:10 69:1 71:4,11
  72:13 74:1 75:1 76:13 78:3
  84:20 85:25 86:4,22 89:9
  93:14,16 94:17 98:9 100:2,13
  105:15,24 106:19 107:18,25
  108:12 109:1,6 111:16
  112:17 116:22 117:21 122:8
  122:12 124:15,16,17 125:20
  127:4 128:25 129:2 131:12
  132:7 133:10,15 134:5 135:6
  136:3,16,18,20 137:10,18
  138:4 139:2 140:16,25 141:3
  141:11 143:4 145:24,25 146:2
  146:8 147:1,22 150:3,20
  151:2 152:8,12,13,19 153:5
  153:17 154:5,17 155:6,14
  156:11 160:20 161:10 162:10
  164:6 166:19,22 167:11,14,22
  169:2 171:5,25 172:6 173:16
  174:17 176:9,15 177:3,12
  178:19,21 182:14 184:22,24
  186:4 188:10,25 189:14,20
  190:8 191:1,4 192:8,20
  193:23 194:25 195:16 196:14
  197:1 198:15 199:8 200:5
  202:8 204:12,16 205:12,20,25
  206:13,16,22 207:8,16,23
  208:16 209:13 210:8,13
  211:17 215:6,20 216:8,13
  217:3,18 219:23 221:8,12
  222:1,11,12,2,2 223:24 224:16
  226:3 227:1,11 229:20 231:8
  232:14 233:11,22 234:2
  235:17,22,2 5 236:11,20 237:8
  237:18,21 238:14,16 240:7,20
  240:24 241:3,16 242:8,17
  243:1,6,16,21 245:14 246:4
  249:1 250:6 251:4,13 252:3
  252:13,16,2 1 253:10,15,19,21
  254:6,18,2 5 255:16 256:12
  257:11,2 5 258:12,17 260:1,13
  262:5 263:24 264:10,15
  265:16,18 266:25 269:7,25
  271:7,19,22,2 4 272:15 273:18

273:21 275:22 276:17 279:22
279:24 280:17,17 281:3
282:10,14,1 8 283:18 284:11
284:18,24 285:3,5 286:3,10
286:20 287:23 291:7 294:19
296:10 298:11,19 300:3,24
302:17 307:25 313:14 314:9
314:17 316:23 321:10,24
323:13 324:10 329:20 330:18
331:25 332:5,19,21,25 333:8
**old** 103:15 131:4 163:10,17,19
226:3 250:23
**older** 15:22 252:22,23 257:3
**old-fashioned** 165:17
**Omnaris** 32:6,7
**onboarding** 130:21 132:21,21
140:8,10
**once** 74:5 105:24 110:3 116:17
122:2 126:14 140:8 143:3
177:21 209:9 265:20 313:5
**one** 19:24,24 20:19 22:1,12
26:13 27:6 28:5,6,1 6 44:2,4
48:7 54:4,4,5,7,7 55:4,12,13
55:14 56:13,1 6 57:9 60:10
62:19 66:17 69:14 71:15
76:25 77:2,3 82:13 83:21 86:3
87:21 97:23 99:13 100:18
109:5 115:3 116:12 119:4
124:15 126:4 129:17 130:17
130:17 132:24 133:5 136:5
137:4,19 139:2 142:12 143:17
149:8 154:12 157:15 161:11
162:20 165:25 166:18,25
167:5,5,7,9,20 168:14 171:8
172:9 173:1,4,20 174:2 176:3
176:24,25 177:20 179:8
183:17 185:3,9 186:3,11,21
189:4 194:5,15 196:4 198:19
200:14 201:21,21 202:17
203:9,13,17 204:16,17 210:17
222:22 224:5 229:7,17 239:5
239:8,12,13,13,1 7 243:4,4,6
243:22 244:17 245:5 246:5,11
246:12 267:8 268:6,8,10
273:23 274:11 277:23 283:1
284:3 285:9 286:10 287:10,23
292:24 293:2 294:16,21
295:22 296:4 299:12 301:13
303:17 305:7 309:5,12,12
310:21 312:1,2,5 313:5,18
315:14 316:1 317:22 319:12
319:24 325:14 327:4 328:19
328:25 330:19 332:3
**ones** 37:7,24 170:22 171:3
239:18,18,20 264:8,9
**one-on-one** 251:20
**one-page** 187:4
**online** 95:1 254:23 260:4,6
**only** 21:4 28:23 31:14 37:6,7
46:8 64:23 65:15 66:6 84:10
85:1,22 88:1 100:18 109:8
115:4 126:19 146:16 153:19
160:5 162:12 165:21 181:20
181:22,25 183:21 185:9
187:21 219:15 236:3 237:15
240:2 241:12 246:11 250:3,21
262:23 263:4 269:10 271:3
276:20 284:5 297:1,3 299:12
301:12 302:16 304:2 307:2
309:14 313:13,14 314:24
316:5 318:14 320:25 321:3
325:13 327:3
**open** 54:25 150:8 233:15 239:6
**opening** 306:7 317:17 318:3
**opens** 153:7
**opinion** 51:17,19 63:3,5 145:6
174:20 197:23 200:22 201:15
201:16,17 203:20,21,21,22
200:8 284:7 304:15 310:7

315:7,18 319:10
**opinions** 155:16 173:22
**opioid** 240:13
**opponent** 174:18 307:13
**opportunities** 241:4
**opportunity** 45:22 101:12
139:11 265:7 266:7 302:4
310:4 312:12
**opposed** 137:17 177:13 299:6
**opposite** 137:17
**option** 150:25 308:13 310:2
**options** 157:19
**order** 13:3 23:14 107:12,13
137:17 139:21 151:2,2 191:10
195:25 224:2 228:16 237:19
237:21,22,24 241:21 242:22
243:4 244:10 253:6,6 267:9
267:15 273:9 276:21 280:1,7
299:5 303:24 314:21 328:24
330:2
**ordered** 107:8 121:25 122:10,11
129:17 157:16 242:24 243:2
245:10,11 246:1,17 253:10
**ordering** 101:19 106:24 265:24
267:12
**orders** 123:18 233:25 257:7
266:20 316:9
**original** 41:8,14 61:2 156:18
199:14 284:15
**originally** 45:24 55:10 207:17
209:7
**Oropesa** 137:15
**orthopedist** 84:23
**OSHA** 260:22
**other** 9:4 14:19 20:10 21:25
22:19 25:12 37:4,4 38:17 50:1
55:10 56:8 60:12 61:10 67:1
93:12 94:22 106:5 113:25
118:23 120:22 133:10 141:16
149:11,12 153:20 154:3
157:19 163:4 170:21 171:8
179:5 182:1,2,22 186:3,10,11
189:3 190:21 196:10 197:10
197:18 199:16 204:24 205:22
231:12 234:25 235:18 236:17
237:3,3 240:1 249:25 266:10
274:23 275:6 278:12 285:25
291:2 294:22 298:15 299:13
302:18,18,23 315:22 319:23
319:24 326:23
**others** 145:18 225:1 231:1 275:4
304:21 311:8 331:13
**otherwise** 23:12
**out** 14:9,20 16:10 19:8 22:1 37:7
38:18 39:5,16 41:11,19 43:8
44:2,5 46:6,16 47:5 49:1,14
50:5,10 51:6 54:12 55:11
57:20,23 59:23,24 60:4 61:2
61:16,17 63:8 72:8 74:14,15
78:21 80:1 83:2,3,11 86:12
87:11 92:7,9,10,2 5 93:1,2,5,6
94:10,18 95:4,5,7 111:12
113:20 115:13 116:4 117:13
117:16 118:14 124:18 125:10
126:10,11,1 5 131:4,5,21
132:4,5 133:2 134:14,22
138:4 139:7 140:5,16 148:19
149:2,2,15,1 8 151:25 152:18
154:18 157:20 159:3,3 162:3
167:4,5,7 168:5 182:18 185:4
190:5 203:9 204:1 233:10
239:7 246:4,16 250:3 252:25
253:23 255:14 257:18 259:10
259:14 268:23 269:1,21 272:7
272:10,11,20 277:5,6,6,19
278:4,8 282:20,22 283:15
294:24 299:5 320:1 325:15
**outlines** 287:9
**outrageous** 292:8

**outside** 8:1 24:12 26:21,22 57:24
63:19 74:22 97:6 133:8,9
134:25 139:25 142:1 146:18
222:3,5 231:24
**out-of-box** 75:6
**over** 24:20 80:11 110:5,18
117:18 121:1 123:19 131:10
137:1,8 139:22 140:5,8 143:7
174:4,6,6 189:8 205:4 238:12
239:3 254:22 281:4 286:19
297:6 298:8 301:1,12 303:7
325:16 330:21
**overall** 33:24 227:22
**overrule** 70:8 86:19 107:23
155:19 198:4 203:3
**overruled** 50:12 58:11 77:9
89:22 212:21 241:24 242:12
242:15
**overruling** 312:9
**overt** 61:22 223:16,17,18,20,23
224:4
**overtime** 325:11
**over-the-counter** 208:10
**owe** 259:18
**owed** 54:11 147:21
**Owmby** 114:4
**own** 22:19 42:9 68:19 82:23
92:19 106:11,21 120:7 122:6
154:23 159:1,4 230:5 239:20
258:12 265:22,24 266:10,20
285:25 286:5 291:14 299:5
302:10,15 310:5
**owned** 188:10,11
**owner** 148:8,12 149:10 176:24
**owners** 12:10
**Oxycontin** 296:20
**Oxygen** 214:1,8
**O'Hara** 9:9 169:1 192:18 197:4
200:11 202:21 206:13 291:1
291:14,24
**O'Hara's** 206:10

**P**

**P** 239:9
**PA** 72:16,20 74:13 75:7,23 80:7
80:17
**paced** 11:12
**package** 59:18 60:6,8
**packaged** 239:23
**packet** 116:16 117:3,4,5 129:17
140:11 280:9,15
**pad** 200:7
**Padron** 19:7
**pads** 57:22,25 73:22 74:2,18
**page** 3:2 5:4,4 39:24 40:24 41:2
45:1 51:2,6,7 186:21 188:22
196:14 223:20 226:19 227:9
260:16
**pages** 216:11 273:17
**paid** 29:20 34:16 36:6,16,16
37:1,8,12,12,1 6 43:4,16,17,20
43:20,21,21,2 2 44:13 47:8,9
48:14,18 49:6,9 54:20 59:2,5
62:4,17,18 64:14 68:18 73:4,6
74:20 75:3,19,20 76:5,8,9
78:4,25 79:4,23 87:22 88:10
99:6,8 100:3,6,7 102:17,18
106:8,11,12,2 1 110:8,10,13,21
110:24,25 113:20,23 115:22
117:23 118:3,15 122:1,2,6
123:15,24 126:5,14 128:7
130:2,7 141:8 143:16,17
144:15,18 161:14,16 182:8
205:9,12,14,15,1 6 223:25
224:9,25 242:25 244:16 245:1
249:16 257:7 258:12,17
265:24 266:2,4,5 267:15,24
282:14,19 286:4 318:7
**pain** 20:24 29:20 36:25 37:21

38:11,16,23,2 4 39:22 40:19
40:22 41:25 48:13 56:24 57:4
72:17 81:13 82:10 83:19 86:1
86:6 87:3,7 93:1 95:12 100:22
106:5,20 107:13 111:23 113:5
113:9,11 125:12 148:4,9,10
149:21 156:18 157:19 158:9
158:11 161:4,6 193:19,22
194:20 212:10,13 226:15
229:8 236:21 237:11,18,23
238:15 239:9,11,1 8 240:2,9
240:13 245:5 247:6,8 248:9
253:8,11,17,1 9 256:14 258:1
264:2,12,24 265:5 266:23
270:22 271:3 274:12
**pains** 125:11 265:2 272:13
274:20
**Palm** 165:22
**panel** 19:18 134:4
**panhandle** 146:18
**paper** 150:10
**papers** 60:11,12
**paperwork** 60:4 269:21
**paragraph** 44:25
**Pardon** 151:9 173:18 295:4
**part** 31:8 34:19 42:12 64:14
74:20 91:19 96:11 120:18
165:8 166:13 172:17 181:24
181:25 186:22 187:12,12
188:12 198:1 235:3 291:1
303:16 311:12 315:17,19
**participants** 138:10 228:22
**participate** 236:9,14,15
**participated** 58:19 99:15
**particular** 43:23 90:19 171:11
189:7 195:21 205:23 207:21
210:3 212:12
**particularly** 264:1
**particulars** 208:14,15
**parties** 16:25 22:18 27:20
**party** 174:18 294:12
**part-time** 255:18
**PAs** 75:2
**pass** 199:14 278:12,19
**past** 83:14 149:22 178:10 180:25
**PASTOR-HERNANDEZ** 2:5
333:15
**Pathogen** 261:16
**patience** 137:19
**patient** 29:19 33:9 36:21,22,23
36:24 37:1,4,9,10 39:13,25
40:22 41:1,10,15 42:16,20
43:1 44:8,14,23 47:3 48:12
49:10 52:24 53:1,7 54:1,10,24
55:16 56:24 57:6,10 58:5,9,16
60:3,19 64:11,13 75:17,21,22
75:22,25 77:1 79:10,12,15
80:4,8 81:18,24 87:2,10,13
93:25 94:3,14,16 95:8 99:13
99:14,24,24 100:8,9,10
121:18 124:15,18,19,22
125:15 147:14,17 166:18
167:20 193:10,11 195:10,22
195:24,25 196:12,14,20
197:17 204:17 206:17 208:1,3
208:11 209:4,14 210:2,11,21
211:18 212:13 254:19 255:9
255:12 272:3,16 283:9,12
290:16 315:1 328:5
**patients** 29:12,19 35:17 36:4,5
36:14,14,15,1 7 37:18,23
38:18 39:4,7 40:4 42:9 43:5,6
43:9 44:4 45:6,25 46:8 47:21
47:22 48:14,18,20,22,23 49:3
49:16 52:17,22 53:25 54:7
55:12,13,14 56:16 57:7,16,19
58:9,19,19 59:2,5,6,21 62:21
68:18 72:17 73:19 74:3,5
75:12 76:2,25 77:2,20 78:1,10

80:3,15,17 81:10,10,12 83:11
84:18 85:2,9,11,13,17,18,19
85:21 86:11 88:1,9,11,12,17
89:6,7,10,16,20 91:3,4,19
92:20,22 93:3,3 97:5,15 99:9
100:7,12,14 124:19,24,24
141:21 179:1,20 182:8 205:2
210:25 211:4 229:21,23 281:5
**Paul** 56:12,13,15,15,16,18,20,22
56:23 57:1 58:24,24 101:11
**pay** 30:14 35:17 36:4,13,13,14
44:15 52:24 53:7 54:21 58:1,5
62:15,16 73:14,19 74:6,6,6
75:12 76:1 78:18,21 79:6 80:1
80:3,12,14 81:14 82:23 95:7
99:2,5,7 100:14 109:24,25
110:1,5,7,11,14,17 115:5,10
115:12,14 117:22 118:10,15
123:4,5 126:13,21,24,25
128:9 140:17 141:20,21
155:24 157:15 179:3,3,20,20
179:20 180:21 222:12 245:13
258:23 280:25 281:7,11
283:15 299:5 315:23
**paycheck** 60:19 259:18
**paychecks** 62:6
**payer** 280:2
**paying** 36:18,18 37:7 49:15
57:15 58:8,9,16,17,18,19
59:15 61:16 62:21,21 68:18
75:9,12,15,18 85:1,6,22,24
86:1,6,8,9,12,14,24 115:9,11
120:15,16 126:17 130:9
145:15 146:25
**payment** 37:13,14,17 59:17
159:25 218:9 225:3 229:17
244:11 267:6,7,17
**payments** 46:4,5 61:7 139:3,4
140:25 229:17 243:16,19
280:6 282:23
**payout** 85:24 86:12
**pays** 29:14 110:15,15 315:22
318:2
**PCA** 59:18 60:7 61:7,18 101:8
117:1,12 118:1,16 119:19,22
119:24 120:7,10 138:20
139:20 140:21 187:7 206:19
206:20 207:5 211:6 256:4
259:4,18 260:4 286:18 296:17
298:4
**pdf** 274:12
**Pedro** 137:12
**pennies** 303:21 305:18 306:21
314:12,13 315:14 316:6,7
318:15
**pentoxifylline** 194:9,17
**people** 12:7 14:19 27:15 36:13
45:10 48:1 49:1 65:19 83:22
84:17 85:4 87:14,22 88:6
90:14,16 91:22 106:5,12,15
107:19 113:25 114:3,12,12
115:16,17,20,23,3 118:4
121:24 122:1 125:7,23 129:13
129:14,15 131:5 132:5 141:25
142:2,2,4 145:20,21 179:5
186:14 188:9 205:22 229:7
230:22 233:5 235:8 237:4,5
250:1,4 252:8 254:23 256:5
274:23 275:6 278:15,16 313:9
322:5
**per** 35:9,10 160:22
**percent** 37:12,12,17 47:16,16,17
47:23 48:4 49:2,3,6,10 94:22
94:22 106:13,13,14 110:22
117:22,22,23 141:1 194:5,8,8
310:20 328:21
**percentage** 34:16 106:16,16
110:21
**peremptory** 19:19

**perfect** 323:20
**perfectly** 305:17 316:10
**perhaps** 153:10 229:2
**period** 143:8 162:23 163:12
179:18 182:7 328:12,22
**perjury** 31:15
**permissible** 65:23,24
**permission** 81:8,9 167:6
**persist** 265:18
**person** 39:15 43:23 49:6 56:14
57:7 81:15 84:10 92:17,23
106:9,14 110:22 131:21
147:24 153:14 154:14,16
220:14,20 223:5,13,14 230:10
233:4 236:9 251:18 299:12,13
328:8
**personal** 54:22,25 207:4 301:3
**personally** 43:6 47:16 49:1 75:7
263:5 303:24
**personnel** 186:18 187:4
**perspective** 47:19 319:14
**pharma** 38:25
**pharmaceutical** 31:23,24 32:3
32:15 33:1,1,2,21 34:14,20,25
35:2 45:4,17,24 50:1 51:11
73:5 87:25 88:13,20 95:19
97:3,9,15,17 98:2 101:25
105:14,18 106:4 107:15 114:5
114:8 144:2 319:14
**pharmaceuticals** 32:20 33:25
96:23,25 98:2
**pharmacies** 57:22,25 120:15
210:4
**pharmacist** 195:13 240:18 328:4
328:6
**pharmacists** 206:17
**pharmacological** 319:14
**pharmacology** 304:14 317:6
**pharmacy** 37:16,17 42:14,17,21
42:24 43:10,18 44:12,13,14
46:17 48:9 53:2,24 54:25 59:9
59:20 72:25 73:4,6,23 77:5,13
79:11 101:22 107:17,20 108:1
108:9 109:2,10,16 110:10
116:6,7,15 118:9,12,15
120:13,15 125:16 126:14,16
128:8,17,21 138:21,22,25
139:1,5,8,9 140:1,9,20 141:4
141:7,9 144:10,12,19 145:15
147:14,18 148:21 152:20,23
153:3,13,14 187:6,7 188:9,10
188:12,14 206:17 207:6 209:8
210:10 211:4 240:24,25
243:23 244:2,10 247:20,24
254:19 256:10,14,20 258:4
259:6,15 265:14 269:14,18,20
269:25 270:4 272:17 279:6
280:4,5,8,15 281:5 282:10
286:18 287:1 291:6,19 294:11
296:16,19 301:15 303:15,16
303:19 304:7 307:22 313:1
318:19 319:1,3 327:19 328:21
**phone** 19:9 42:15,20 43:11
60:18,20,21 101:4 105:10,11
107:20 108:1,2,3,9,11,16
110:5,18 111:6,14 120:1
128:13 148:20,22 154:14,16
155:11,15,16 174:6 208:13
211:9,14 254:14 280:8 281:18
**phonetic** 16:21
**physically** 42:15 80:15 81:11
190:5
**physician** 57:15 58:1,5,8,15
72:21 73:5,8 166:7
**physicians** 204:24
**picked** 227:21
**picture** 93:4
**piece** 40:10
**pieces** 291:2

**pigeonhole** 172:23
**pill** 84:20
**pins** 51:15
**Pizza** 255:19
**place** 20:22 164:2 260:8 266:20
**places** 164:4
**plain** 316:2
**Plaintiff** 1:5
**plan** 28:11 75:6
**planes** 111:18
**play** 23:9 325:4
**played** 29:17 38:8 92:17
**playing** 17:5
**plea** 30:4,18 35:24 65:16 95:24
96:1,2
**plead** 29:21,24 96:6,11 99:2
**pleas** 12:20
**please** 27:9 28:3,23 29:17 52:3
103:2,8 104:9 106:3 136:22
164:16,18,20,2,2 165:21 166:9
213:3,5 234:5 250:13 262:12
262:14,23 278:11 308:19
**pled** 29:23 32:24 35:22 36:2
63:23 65:7 66:4,6 95:21,21,23
97:4 98:24
**plenty** 28:12 235:22
**PLLC** 2:1
**pocket** 87:11 113:21 252:19
283:15 285:25
**point** 24:3 31:6 41:22 47:6 64:4
80:7 84:14 86:3 90:21 112:16
115:19 128:22 129:5 132:3,24
136:6 138:1 143:18 150:12
230:17 236:8,8 252:3 254:18
263:16 267:15 273:1 277:5
279:4
**pointed** 325:15
**police** 203:23
**politically** 58:4 71:12,17 75:1,2
79:6
**Ponte** 28:24
**Poor** 150:9
**Pop** 38:4
**portal** 48:9
**position** 206:13 259:3
**positive** 161:20
**possibility** 131:16 132:8
**possible** 21:6 163:9 260:7
268:10
**possibly** 274:23
**post** 149:19,23,25 150:3 265:12
265:13
**postpartum** 148:7
**potential** 31:13 57:23
**Powell** 3:9 11:7 23:16,23 103:1
103:3,9,13 104:12,13 105:4
119:19 121:12 132:11 137:21
137:25 141:11 142:18 145:20
**practice** 166:9,13,14 179:17
200:18 228:20
**practiced** 171:18
**practices** 177:17 179:1
**practitioner** 33:12
**preamble** 199:25
**precise** 81:23 84:13
**precisely** 84:15
**prefer** 17:16 302:14
**preference** 15:12,17
**prefilled** 40:21
**preliminary** 171:12
**premature** 11:20
**prep** 69:18
**prepare** 24:5 330:12
**prepared** 12:5 248:6
**preponderance** 230:4
**prepped** 69:21
**prerequisite** 97:3
**prescribe** 72:16 80:17,18 176:1
195:23 196:19 273:4 281:22

**prescribed** 128:11 176:2 195:17
195:20
**prescribing** 175:22 176:6 193:17
193:19 194:25
**prescription** 33:13 42:1,2,3,4
43:19 57:22,25 75:23 78:25
80:13,18,21 87:13 106:17,18
108:10 110:16 171:10,11
173:21,22 174:1,2,8 176:4
193:10,13,18 195:9,10 199:21
200:7 202:16,17,19,25 203:1
203:2,17 204:16 205:14,15,17
205:18 207:17 208:9,22 209:7
209:11 210:13,17 212:2,5,6
212:10 224:7 225:12 229:16
247:21 248:14,17 249:15
257:17 258:12,15 265:2,9,11
265:23 266:8,11 273:8 274:19
275:7 276:20 277:13,19,23
**prescriptions** 64:15 75:4,20 76:8
76:9,11,11 77:20 79:7,23 80:2
106:12 109:7,10,13,25 110:23
110:25 175:21 200:19 201:25
202:11,13 204:15,23 205:2
211:19 226:24 244:17,22
246:13,17 247:25 265:15,22
265:25 267:5
**presence** 8:2 135:1 222:4 231:24
**present** 8:3 12:12 19:3 27:17
135:2 147:12 284:17 311:15
312:12
**preserved** 323:9
**president** 297:14
**pressure** 112:5
**presumably** 127:2
**pretrial** 168:19 313:8
**pretty** 138:23 143:2 196:24
269:4 325:7
**prevent** 298:17
**previous** 145:8
**previously** 117:22 170:21
**pre-try** 313:9
**price** 316:15
**prilocaine** 194:8,16
**primary** 42:10 45:2
**prime** 45:5 104:23,24
**print** 22:1
**prior** 44:13 154:20 156:12
179:22 180:8 208:1 332:12
**prison** 31:19 97:20 102:11
**private** 85:5 86:1,5,13 143:17
302:15
**privilege** 69:8
**probable** 329:2
**probably** 10:8 12:1 15:7 20:5
50:18 60:18 64:17 70:18
105:22 108:2 109:13 111:13
111:17 119:13 134:21 153:9
157:8,9,9,10,19 172:10
183:15 188:6 203:18 214:19
221:2 229:1 231:5,7 234:11
239:7 267:13 276:8,9 284:7
298:8 307:12 311:12,13
321:15 324:8
**probation** 30:12 96:3,14 97:7,20
102:6,9
**problem** 14:4 21:5 27:18 112:7
118:20 184:1 200:18 201:2
222:8 228:9 230:3 287:3
300:9,10 302:8 308:2,4,21
309:2 315:4
**problems** 16:8,9 48:20 91:11,12
240:11 253:11,13 292:13,18
321:8
**proceeding** 12:3
**proceedings** 1:10 8:1 134:25
333:13
**process** 57:19 60:21 108:3,7
124:22 140:8 277:12 280:5

processed 278:11
processes 87:8
produced 22:4
product 38:21 43:14 85:8,23
    87:15,24 88:7 91:6 114:22
    121:24,25,2,5 122:10 126:5,19
    130:16 157:3 160:10,12
    238:25 244:10 247:15 252:9
    252:11,13 272:8 277:3,10,25
    282:11,11,2,4 283:7 304:9
    306:21 313:15 315:14,20
    316:14 319:16
products 33:3,14 37:18,22 38:11
    38:24 41:24 42:1,3,10 43:18
    57:5 58:16 82:7,17 83:14,14
    83:16 84:16,17,17,19 85:2
    86:15,24 100:23 106:5,24
    107:2,2 110:10 112:3,17,19
    112:22 113:14 114:24,24
    115:1,3 121:20 122:2 128:18
    128:20 129:18 130:8 143:2
    150:23 151:2 156:15,24 157:5
    157:12,16 158:9,18 160:22
    163:9 196:16 200:3 219:21
    220:18,20 236:19,25 237:11
    237:18 238:12,16 239:21
    240:5 241:5,21 245:11 248:4
    249:23 250:1 252:25 253:3,6
    253:23 254:2,4 256:17 263:25
    264:11 265:8 266:20 267:1,2
    268:2,3,13 270:5,5,7,8,10,23
    273:2,9,16 274:18,20 315:10
    319:19
professional 31:20,21 203:11
professor 304:14
proffer 31:4
profile 207:25
profit 315:22
profits 144:10 328:21
program 38:4 75:18 114:19
    115:25 116:6,10,14,18,22
    120:14,23,2,5 121:23 130:22
    130:24 131:2,6,19,21 132:6
    132:25 138:2,14 142:8,20
    144:5,23 145:7,8,11,12 147:1
    148:11 149:20 218:3,12
    219:23 225:11 251:4
properly 34:4 48:14 132:8
proponent 221:1
proposing 176:18
pros 33:7
prosecutor 51:24 203:15
prosecutors 229:6 300:8
proud 13:1
prove 175:13 180:23 314:9
    318:13 329:2
proves 178:8,9 187:8,9
provide 34:9 35:12 100:24 112:6
provided 31:2 92:12,13,14
    100:25 239:2 273:4 280:12
provider 33:11 214:9 215:5
providers 32:6 33:5,11,15 34:8
    34:11 179:18
providing 35:12
PSE 260:14
psychiatrist 177:15
public 90:4
Publicis 32:2,4,5,13,14,17,18
    38:22 84:10 88:18
Publix 196:24
pulling 39:12
purchase 41:20 268:13 320:1
purporting 152:22
purpose 65:9 187:18 305:21
purposes 321:6
pursue 197:18
put 9:10 21:24 28:19 41:22 46:7
    47:18 55:22 78:8 93:5 96:14
    97:2 102:11 119:11 122:13

143:16 149:19 158:21 159:12
168:5 176:8,12 192:22 240:1
255:1 257:23,25 271:11
278:23 300:15,18 312:12
317:16,19
puts 314:1
putting 182:24
p.m 133:20 134:23,25 284:20
    333:9

                    Q
qualified 281:21
qualify 85:7
Quality 261:1
qualm 89:12
quantities 113:2 196:16
quantity 195:18,25 268:3
quarter 134:1
quash 54:18
question 15:13 36:10 39:23
    41:18 45:8 46:25 48:12 49:19
    50:3,13 51:23 52:4,9 53:12
    57:24 63:6,7,10,12,20,21 64:7
    64:9,17,23,24,2,5 66:17 68:3
    68:10 70:25 77:23 81:23
    84:13 88:2,21 89:9 90:6 94:24
    119:6,13 129:20 130:22
    145:11,16 148:23 149:17
    150:9,20 152:1,4 154:12
    156:22,25 157:15 160:14
    177:13 193:5 199:10,24 201:4
    201:8,9,11,19,21,2,2 202:5
    207:3 212:3 227:2,4 229:5,13
    241:15 242:17 266:18 277:22
    281:3 297:25 306:11,12,12
    307:15 309:5 330:10
questioned 98:22 160:14
questioning 269:12
questions 31:2,5 42:12 47:9 65:8
    65:19,20 67:19,21,24 68:1
    74:8,9,16,19 93:9 98:9 118:23
    119:1,2,3 123:3 139:12,15,17
    145:8,14 148:23,25 153:7
    164:7 171:10,12 177:18 182:3
    183:21 187:23 199:16 204:16
    217:20 222:7 233:3 245:15
    249:10 266:22 281:15 283:2
    306:3 313:18
questions/concerns 279:10
quick 45:23 121:1 129:2 148:22
    200:13 277:22
quicker 287:10
quickly 305:5 325:7
quite 115:20
quota 34:15,17
quote 176:21,21
quotes 120:9

                    R
R 333:11
raise 21:16 27:25 103:2 146:6
    164:16 213:3 219:3 250:13
    262:12 296:14
raised 304:18
raising 296:23
Ralph 136:6 285:8 297:19,23
    298:3,9 307:22,24 310:18
    311:25
Rambaran 3:24 4:3 184:14,20
    184:22 185:15 186:23,24
    189:10 219:2,4,7,13,24 225:8
    225:10,19 227:8,10 231:22
    233:19 236:2 238:9,17,21
    239:10 242:2 245:6,20 246:1
    246:17 249:13 250:11,12,14
    250:16,20 255:2 257:16
    260:11 261:24
Rambaran's 225:12 232:6
range 315:22

rare 99:21,22
Rashaan 4:3 186:24 231:22
    233:19 238:16 243:11,19
    248:15 250:12,14,16
Rashbaum 1:19,20 3:7,11,15,22
    4:9 8:16,22 9:3,7,13,17,19,21
    10:1,4,12,16,19,22,2,5 11:14
    15:12,15 16:10,12,13 17:2,9
    17:16,24 18:9,11,14,16,18
    19:14 20:10,2,4 23:10,14,20
    23:25 26:6,17 35:19,21,25
    49:18 50:8,10 51:16,19 52:10
    53:8 55:23,25 58:10 62:23,25
    63:3,5,14,17 65:4 66:20,22,25
    69:9,15 70:11,13,15,19,20
    71:20,22 72:1,7,9 76:15,20
    77:11,22,2,4 86:17,21 90:1,24
    91:2 97:23,25 98:9 99:12,23
    101:16 102:12 103:5 107:22
    121:9,11,14 122:13,21,23
    128:24 129:2,4 131:7,12,13
    132:10 134:16,21 135:9,11,14
    135:19,22,2,5 137:22,23,24
    142:12,14 143:18 144:24
    145:1 146:5 153:5 155:9,12
    157:24 158:1,3,6,13,16,17,25
    159:8 162:20,21 164:7 178:20
    180:9,13,18 182:20,24 183:6
    183:10,14,17 190:14,18,20,23
    191:1,4,8 215:14,23 216:2,4,7
    216:10,24 217:1,6,7,20
    231:19 270:15,17,20 271:11
    271:16 274:25 275:2,8,15,18
    275:20,22,2,4 276:4,7,10,13
    278:23 279:3 283:1,14 295:8
    295:14,19,2,5 299:11 308:4,7
    308:11,13,19,21,2,4 309:2,9,18
    309:22 321:6,11,21 322:4,7,9
    322:11,14,19,2,4 323:13,15,19
    323:23 324:6,10,17,22 325:1
    325:6 327:1 329:16,19 333:2
    333:4,7
Rashbaum's 98:14 101:24
    142:18
Rasheed 238:21 242:2 248:6
rate 59:15 86:8,9 209:21 319:4
rather 87:21 139:22 271:1 299:2
    299:4 302:13
ratified 224:10
Ray 1:7 223:25 224:9
reach 14:9 149:18
reached 41:11,19 43:8 118:14
    131:21 132:3 149:15
react 174:24
reaction 112:8 194:18 196:6,9
    197:19,24 198:22 199:6
reactions 194:16
read 52:2,6 63:6,10,20,2,1 72:13
    119:7 150:10 176:9,11 184:7
    208:19 216:13 224:5 261:14
    292:5 300:21
readmit 292:25
reads 11:19
ready 12:13,15,18 26:19 234:2
real 49:23 103:24 122:4,5
reality 227:21
realize 192:23 276:20
really 15:9 26:14 46:1,15 47:7
    48:7,15 49:4 60:2 62:10 66:5
    72:7 76:10 80:16 86:9,25
    120:7 121:1 123:5 124:4
    141:25 154:2,22 178:2 181:19
    187:21 199:6 217:13 226:16
    228:11 229:8 235:5,10,13,20
    237:2,2 252:2 256:7 265:20
    267:23 271:4 278:21 299:10
    309:16 310:21 320:11
realtime 48:10
Realtor 103:25

reason 18:14 59:13 65:15 79:17
    79:19 85:21 93:10 96:11
    155:11 159:18 168:11 172:12
    196:8 207:8 209:16,22,24
    210:2 215:13 227:17 230:21
    245:10 263:17 274:15 275:2
    297:15 309:14,20 319:3
reasoning 36:16
reasons 196:4
Rebecca 114:3,4,10 118:5
rebuttal 181:13,19 302:7,16,21
    307:24 308:1 309:8,9 312:11
    322:16
recall 57:14 71:5 77:14 78:11
    92:5 95:11,19 124:18 125:21
    126:18,21,24,2,5 127:7,15,18
    127:22 128:1,4,10,13,16,17
    138:7 142:20 192:8,11,15
    200:2 204:18 205:7,12 206:7
    206:18,21 217:10,12 236:17
    236:23 237:25 238:11 244:4
    244:16 246:16 247:5 248:6,9
    248:20 257:25 259:14,14
    267:23 269:13 274:3,16
    279:19,23 281:1,17 305:5
recap 79:5
receive 29:6 34:10,20,23 35:1
    37:9 38:22 43:11 45:9 52:25
    57:4 58:16 60:4,6,8 61:7
    98:24 99:4,9 107:18,20,21,25
    108:3,18,23 116:15 117:3
    128:5 152:22 153:16 157:2,5
    160:24 163:13 227:24 228:1,2
    240:4 243:13,16 252:8,10,13
    256:2 265:9 280:1
received 5:2 11:3 35:14 36:9
    38:22,25 40:20 42:11 47:4
    54:10,19 55:2 61:8 62:5,16
    72:6 76:19 101:3 108:1 111:3
    111:6,8 112:22 113:2,4 116:3
    116:11 117:4,9 120:13 121:20
    122:20 123:15 127:16,22
    131:3 147:19 153:3 154:9
    155:23 156:18,23 157:10
    158:18 159:21,25 160:19
    161:18,21 162:3,5,8,12
    163:18 169:6,15,23 170:1,8
    170:12,16,20 178:22 186:9
    189:1,21 200:13 225:3,11,13
    225:15 227:6,7 228:3,4,5
    229:18,19 238:23 243:19
    244:21 248:13,20 253:3 257:9
    264:8,9 266:21,25 267:2,6
    271:15 276:3 279:2 282:10
    287:25 288:5,9,14,18,24
    289:3,7,15,20,2,4 290:3,7,11
    292:10,16,21 293:5,8,11,15,18
    293:22 294:1,5 295:10,16,21
    296:2 300:25 318:5,6 326:2,7
    326:12,16,20
receiving 46:3,4,5 60:18 99:10
    124:19 139:3,4 200:19 201:25
    319:12
recess 19:1 23:4 129:1 131:11
    133:3 134:23 191:12
recipients 87:23
recognize 44:17 192:22,24 193:7
    206:10 214:18,22 228:18
    255:2
recollection 249:15
recommendation 17:1 198:8
recommended 197:14
reconfirming 47:6
record 11:16,19 12:19 13:7
    25:21 120:10 134:17 136:4
    168:22 183:19 229:14 310:25
    327:6
records 162:10,11,14,1 7 225:24
recruit 37:4 55:11,13 57:20

100:7 256:23,23 268:12
**recruited** 37:23 40:4 42:9 43:6,9
  46:5 47:21 54:8 55:14,15
  56:16 57:7 59:5 68:18 76:25
  77:2 91:3,23,24 121:21
  124:20 224:8 225:1 227:8,9
  256:25 286:5
**recruiter** 29:19 36:21,22,23,24
  55:16 56:25 64:13 81:18,25
  99:24,25 100:8,9,10
**recruiters** 54:8 92:20
**recruiting** 29:12,19 37:3 39:4
  48:15 57:5 85:13,19,21 97:5
  100:21 121:24 122:1 229:21
  229:22
**recurring** 148:10 243:7
**red** 267:13 269:11
**redirect** 3:8,12,19,23 4:2,6,10
  98:11,12 134:6 142:15,16
  164:8 171:20 211:23,25
  217:21,22 249:4,9,11 261:21
  261:22 283:3,4 309:6,8
**redirecting** 64:4
**reduce** 194:18
**reduction** 31:9,13
**refer** 47:16,17 55:15,17 56:22
  57:16 58:9,15 72:17 80:17
  123:21 174:10 268:12 283:9
  283:11
**reference** 99:23 108:8 124:7
  145:14 198:15 207:2
**referenced** 223:16,19 226:12
**references** 40:18
**referral** 227:5
**referrals** 58:25 179:2
**referred** 37:10 49:7,10 52:6
  55:18 58:23 63:10,21 115:23
  225:10 283:7
**referring** 36:9 57:11 58:24
  64:15 73:6 115:23 147:20
  175:4,5 224:10 225:3 258:17
**refill** 267:20,22,2,5 277:23
**refills** 112:12,13,14 123:12,25
  176:2 177:2 195:19 196:3,5,6
  196:17 197:12,16 198:21,25
  212:7,15 267:4,20 276:20
**reflect** 248:23
**refresh** 77:18,25
**ref's** 235:9,9
**regard** 148:2
**regarding** 19:5 139:17 226:23
  263:21 269:24 279:10 281:3
**regardless** 205:16
**registered** 147:13 158:7
**regular** 178:4 318:15
**regulations** 116:6,7 218:3,11
  269:17 279:12 296:19
**reimburse** 87:6
**reimbursed** 281:6 305:18 319:4
**reimbursement** 200:16 209:21
  281:12,12 304:4 307:18
  314:13
**reimbursements** 328:24
**reimburses** 314:25 316:15
  318:17,20
**rejected** 77:3,3,6,12 79:11
  145:22
**rejection** 99:13
**rejections** 99:14
**relate** 167:21
**related** 30:1 34:20 37:10 42:10
  44:23 176:5 205:6 225:11
  296:7
**relates** 303:1,3
**relationship** 38:6 55:9,10 104:5
**relatively** 184:9
**relaxer** 83:19
**release** 83:20
**relevance** 216:21

**relevant** 177:14 182:3 184:8
**reluctant** 311:21
**remained** 140:25
**remains** 280:5
**remedy** 310:17,17
**remember** 23:13 50:15,22 57:18
  65:20,21 71:11 78:6 92:15
  95:21 101:2 110:2 119:5
  120:24 122:3 123:3,5 126:1,4
  126:9,10,10,1 1 127:12 128:12
  133:22 137:2,13 139:24,24
  140:22 143:20 152:25 154:21
  160:8,25 165:10 168:21
  175:19 184:18 203:9,18
  208:14,15 216:14 217:8,14
  237:12,1 5 238:1,2 239:23,24
  240:22 243:21,23 244:5,5,7,7
  244:20 252:2 254:11,12
  259:13 269:16 274:6 279:20
  286:25 300:20 301:6 304:8
  323:5
**remind** 42:23 143:4
**remove** 149:23
**removed** 115:18 150:1
**rendered** 323:22
**rented** 216:18 217:1
**renting** 217:4
**rep** 31:23,24 32:5,12,15,17,19
  33:1,2 34:20 45:4,25 50:23
  84:9 87:25 88:13 106:24
  114:6 253:22 256:24 283:6
**repackaged** 318:16
**repeatedly** 226:13
**rephrase** 50:3 64:19 158:16
  242:17
**replaced** 256:6
**report** 298:23 299:17,21,22
  300:2,15 301:1 302:5,14
  310:8 330:22,22
**REPORTED** 2:5
**reporter** 2:5 13:1 52:5,6 63:10
  63:21 104:9 109:19 119:7
  176:12 273:11 331:9 333:16
**Reporter's** 4:11
**reports** 34:12
**repping** 33:10
**represent** 66:25 121:14 158:6
  245:21 246:13 257:17 270:20
**representations** 317:4,7
**representative** 118:12 150:22
  252:4,6 278:16
**representatives** 100:4 139:14
  227:22 278:12,19
**representing** 84:10
**reps** 50:1 51:14 74:17 78:1
  115:5 187:15
**Republican** 297:14
**request** 71:1,2,3 90:20 304:23
  321:21,22 322:7,14,19,20
  323:24 324:6,20 325:1,2
**requested** 70:1,3,3,4 94:16
**requesting** 323:15
**require** 42:1 271:4
**required** 42:3
**requirements** 60:11 138:17
**requires** 30:18
**research** 332:1
**reserved** 290:18,20
**Reserves** 147:7
**reside** 146:17
**resignation** 204:14
**resolve** 311:2
**Resolved** 302:10,17
**resolves** 308:3
**respect** 20:15 33:22 149:7
  152:16 195:8 200:11 263:18
  265:18,19
**respond** 277:22 279:18 280:17
**responded** 139:20 279:25 281:3

**responds** 123:20
**response** 45:10 58:3,4 77:15
  145:2 198:18
**responses** 172:10
**responsibilities** 255:23
**responsive** 279:20
**rest** 10:5 130:18 285:2 286:14
**restarted** 138:14
**restaurants** 314:15
**resting** 190:8,15
**restitution** 30:14
**restroom** 186:5
**resubmit** 79:13
**resubmitted** 76:23 77:16 79:12
  79:15,19
**result** 95:24 97:19 228:13
  282:14
**resume** 116:18
**resumé** 61:6 204:12
**retired** 16:13 25:10 104:15
  111:11 133:20 167:1 220:6,7
  220:10 222:20 263:12 284:20
**retirement** 111:12
**retires** 133:12
**return** 58:1
**returned** 41:12
**returning** 41:12
**retype** 93:4
**revenge** 15:5
**reversal** 228:24,25
**review** 235:10 272:2 300:21
**revised** 207:14,17 208:22 210:13
**revision** 209:6
**Richmond** 262:24
**ride** 34:12
**ride-along** 34:5,6
**ride-alongs** 34:3
**right** 8:19 10:9 12:2 13:3,5
  14:21,23 15:3,11,16 17:3
  18:10,24 19:2,23 20:1 21:1
  22:14 25:1,7,11 26:11,15,21
  27:25 28:2,7,10 42:6 45:19
  47:1,3,3,7 53:17 56:10 63:22
  65:5 67:1,22,24 68:3,21 69:7
  71:8,9,13 72:22 74:3 75:3,19
  79:24 80:18,20,22,25 81:21
  82:2,2,8,11,2 0 83:11,21 84:7
  85:2,5,6,8 87:5,17 88:23
  90:18 91:1,16 92:13,23 93:18
  93:10,10,18,19,2 5 94:4,15,18
  94:19 95:3,16 96:12,15 97:7
  97:10,17 98:1,25 103:2,10
  104:15 107:23,24 112:15
  113:10 118:10 119:1 121:15
  123:1,9,25 124:3 126:5,6,9,16
  127:10,11 129:21 130:14
  132:23 133:3,21 134:18,21
  135:2,20 136:3,25 137:12,22
  138:2 139:9,12,15,18 140:9
  141:4,13,18,21,2 4 142:5,8,10
  145:16 146:6 150:15 151:20
  155:1 158:7,19 159:19,23,25
  160:6,7,25 161:2,4,6,23 162:6
  162:25 163:6 164:16 165:6,25
  169:16 171:1,4,1 5 172:5,24
  174:11,19 177:17 179:25
  182:19 183:20 185:1,8,16
  187:3 188:17 190:16 191:15
  191:19,20,22 201:12,15,18,20
  202:23 203:6,8,2 5 205:15
  206:8 208:6,6,16,20 209:24
  210:4,4,19 211:6,11 212:7,10
  213:3 214:25 215:2,16 216:16
  217:8 218:14 221:21 222:9,14
  222:24 223:3,9 225:8 227:2
  228:19 231:3,6,11,13,16
  232:23,25 233:8 234:25 235:14
  235:14,23 238:5 241:18 242:3
  242:16 243:9 245:16 248:17

  249:3,9 250:13 262:12,17
  265:22 266:12 267:13,21
  270:12 272:18 273:2,6,9
  274:10,13,18,20,2 1 276:25
  277:1,7,10,19 280:15 282:8
  282:19,23 284:4 285:7 286:8
  286:11,13 287:1 289:19
  290:24 294:13 296:6,12 297:3
  298:9 301:18,24 304:12,24
  305:11 306:23 309:22 312:14
  312:22 313:16 314:15 315:23
  315:25 316:19 317:5,6 318:4
  318:8 319:6,8 320:12,21,25
  321:3,15 322:6,18 323:7
  325:5 328:3 330:7 331:22
**righty** 321:5
**rise** 18:25 27:10 134:20 136:22
  191:16 222:15 234:6 332:23
**rises** 233:16
**Robin** 3:5 8:6 23:22 27:24 28:1
  28:4,8 41:5 147:24 148:1,12
  148:13,14 149:13,14,16,22
  151:15,16 156:5 160:14
**Rodriguez** 137:15
**role** 29:17 64:14
**rolled** 32:10,16,17
**Ronaldson** 305:2,9
**room** 26:23 27:6 133:7,13,17
  134:1 166:22 222:16 234:20
  284:15,16
**Rosa** 185:14
**Rosalinda** 3:24 184:14,20 219:2
  219:4,7 225:19 227:8,10
  238:19 239:10 245:6
**rotisserie** 251:3
**roughly** 115:17 143:8
**route** 26:9 34:7
**routing** 83:5
**row** 137:10
**RPR** 2:5 333:15
**rule** 63:2 118:25 119:5 133:22
  153:8 172:7 221:9 331:18
  332:1
**rules** 33:21 65:23 172:15 178:6
  180:24,25 181:5 184:7 218:17
  218:19 222:14 229:7 230:19
  233:5 235:8 331:19
**ruling** 297:14 302:5
**rulings** 172:10 234:23 301:22
**run** 277:6 278:4,8
**running** 49:1 282:22
**runs** 186:4
**rush** 235:22,23
**rushed** 135:16
**Ryan** 329:19
**R-a-m-b-a-r-a-n** 184:22 219:8
**R.R** 187:3

## S

**S** 202:18
**sad** 120:25
**safe** 102:22 148:24 196:13
  200:17 262:8 283:21
**safety** 196:9
**salaried** 304:8
**salary** 34:15
**sale** 241:4
**sales** 31:23,24 32:5,12,19 33:1,1
  33:18 34:15,20 114:5,8 115:5
  138:8 144:3 149:11 150:22
  187:15 249:20 252:4,6 253:22
  256:23 280:1
**salesman** 16:6 18:18
**Salix** 96:23
**same** 17:21 51:12 70:11 75:13
  111:8 117:17 118:7 129:19
  131:22 133:7,13 137:17
  138:24 140:25 149:3 154:3
  163:2,6,10 164:2 196:25

197:7 202:3 226:24 232:1
244:14 252:10 280:5,17
295:12 299:5 306:20 319:13
**sample** 140:24 269:19
**Sam's** 251:1
**San** 12:10 55:19 322:11
**Sanchez** 76:23 77:1,2 99:13
**Sara** 149:9,10,12 205:1 245:7
**Sarah** 127:17
**sat** 69:20 113:13
**sauce** 154:2,3 158:14,15
**Save** 300:4
**saved** 62:14
**saw** 51:7 74:17 175:14 198:5
222:25 266:8 306:7
**saying** 12:18 41:13 51:22 67:2
73:13,15 74:1,7 78:9,10,14
93:24 94:11,12 116:4 131:5
151:21 180:6,7 181:16 183:2
186:15 201:3 203:18,23 232:7
234:17 237:16 278:18 281:13
307:8 309:15 317:13 324:23
**says** 11:22 12:11 19:21 25:15
39:25 47:12,18 66:8 75:5
78:18 79:6,12,14 80:16
119:12 123:20 125:14 153:19
154:24 169:20 175:2 176:20
176:22,25 177:1 181:7 183:4
195:18 196:15,16,17 197:8,8
198:20 207:16 208:5 216:12
218:2,9 224:4 227:9 228:12
228:14 239:11 245:5,6 255:8
255:9 261:9 271:24 272:18
274:11 278:10 305:20,21
310:11 313:19 316:17 327:5
330:2,6 331:20
**scar** 29:20 36:25 37:20 38:11,16
38:24 39:22 40:19,22 41:25
45:9 48:13 56:24 57:4 82:10
86:2,6 92:25 100:22 106:6,20
107:12 113:4,10,16 123:1,16
123:17,22 124:2,10,10 127:21
130:10,12,14,16 148:4 156:19
161:4,6 196:17 197:10 206:24
207:14 236:21 237:11,18,23
238:15 239:18 246:22,25
247:3 253:8 256:15 271:3
**scarred** 130:13
**scarring** 240:11 248:10 253:13
257:21
**scars** 93:8 95:16 111:20 193:22
208:4 240:1 264:2,13,25
265:3 266:23 272:13 274:20
**scar/post-op** 193:19
**scheduled** 12:20 13:10,17
**schedules** 14:5
**scheduling** 13:9 321:6,12
**scheme** 45:13 52:16 58:19 59:8
62:3 74:12 81:9 99:15 102:14
187:13,13 188:13 228:8,10
232:13,18,20 236:9,10 286:19
**school** 15:22 28:25 38:3 103:17
103:24 143:17
**Schwartzlender** 54:5 91:24
**sciatic** 148:10 157:19
**sciatica** 148:9
**scope** 59:7 64:12 157:25 172:14
173:11,15 200:22 306:5
**screen** 40:15
**screening** 60:11
**screws** 51:15
**script** 37:15 43:4 47:25 73:22
74:2,18 75:24 197:8,10
202:21 277:14 286:5 304:5
**scripts** 34:17 74:21 107:16
110:21 144:16 175:3 179:4
200:12,13
**sc-01** 193:24 194:4 195:17
196:16 207:18 208:24 209:1,3

209:11,20 210:2 212:6
**sc-02** 197:15 200:3 206:25
**sc-03** 197:12,14,14,1 5 200:3
206:25 207:17 209:1,7,10
210:1
**seat** 24:20 27:4 28:2 133:25
137:8,9 146:8 164:18 213:5
222:23 250:15 262:14
**seated** 133:21
**seats** 182:16
**second** 23:2,3 26:23 32:14 42:5
46:2 48:2,4 62:19 70:5 136:12
137:8 150:7 168:4,4 186:24
194:15 196:7 202:10 308:9
**second-guess** 204:23
**section** 1:15 208:3 210:15
255:16
**security** 17:4,18 18:25 24:8,10
25:23,25 26:3 27:8,10 39:20
39:21 59:23 78:11 125:1
134:20 136:22 191:16 222:15
234:6,20 284:22 325:12,14
332:23
**see** 13:3 14:13 15:3,4,7 16:8 18:1
18:20,24 19:2 21:14,24 24:21
33:9 36:17 39:25 40:8,18 42:9
42:15 65:9 72:8,10,11,18
73:24 77:15 78:19,22 80:6,7
89:7 94:3,18 95:9 122:16
123:8,19,25 125:14,17 131:22
134:18 135:4 153:12 156:7
159:4 165:4 166:19 169:7,16
175:11 176:11,12 177:12,14
183:14 184:13 186:1 187:2
189:16,17 191:2 193:23
195:23 196:4,16 198:15
199:11,12 206:23,25 207:12
207:18 208:23,23 214:6 215:6
222:4,5,6 223:22 225:4 226:3
226:9 228:9,24 230:1 231:23
239:9 240:16 242:24 245:6,20
252:25 253:23 255:9 264:3,16
268:2 271:10,22 272:4,18
273:17,23 274:4,9,12,14
275:9 276:8,14,15,23 277:16
278:3,11 280:10 281:8 300:9
301:2 309:19 313:18 324:8
325:8 330:6,9 333:5,5
**seeing** 80:4,15,20 81:11 135:17
238:2,11,1 1 324:22
**seek** 83:10 153:19,20
**seeking** 277:25
**seem** 98:18 135:19 231:6 276:11
**seems** 70:18 89:12 91:1
**seen** 89:3 165:6 167:18,23
192:19 234:11 273:21 276:21
**sees** 48:9
**select** 310:19
**selected** 17:8
**selection** 65:20,21 175:25
**sell** 237:1,1 240:5 249:22 250:1
253:23 270:5,7 315:20 316:11
317:25 328:23
**selling** 33:2 97:14 101:21 219:22
219:22 236:19,20 237:3,11
268:14
**sells** 220:18
**Senate** 297:13
**senator** 301:7
**send** 11:24 40:5 54:13,20 93:3
109:25 110:8 115:13 116:4
125:3 128:18 200:13 269:23
272:23 279:12 283:23
**sending** 38:19 41:5 126:10
274:22 291:1
**sends** 291:13
**sense** 66:1 68:17 85:4 87:21 88:3
88:6 137:11,16 177:15 280:18
**sent** 41:8,9 43:12 44:7 58:4

75:16 82:7 92:21 118:18,20
124:11,21 126:23 127:2,4
131:4,5 132:5 133:2 138:4
140:11 163:10 204:14 207:25
258:20 269:18 274:17 275:2
278:11 279:11 291:17,23
292:6
**sentence** 30:11 31:9,13 73:2
102:1,1,2,4
**sentenced** 30:9,12 96:2
**sentences** 310:1
**sentencing** 1:10 16:14,25
**sentencings** 12:5
**separate** 22:7 179:7 240:19
246:2,13 286:6
**separately** 61:9
**September** 163:25
**sermon** 21:8
**serve** 104:18 147:10
**service** 30:13 32:5 84:9 147:10
**session** 35:12 134:24
**set** 35:8 104:6 112:10 171:12
**setting** 33:23
**seven** 148:7 211:15 312:25
321:25
**several** 22:6 42:21 54:4,19 60:20
141:12 188:11 193:23 303:9
328:25
**Shakespeare** 154:7
**sham** 187:10 188:9
**Shane** 16:21,22 37:24 38:1,2,8
43:21 45:18 46:3,11,12 47:10
72:10 73:1,12,14,20 74:6
76:21 100:24 101:3
**share** 116:4 244:14
**shared** 131:3
**sharp** 22:20
**sheet** 207:25
**sheeters** 82:13
**sheets** 82:13
**she'll** 19:10 66:4 179:2 199:14
**shift** 81:16
**shining** 235:21
**shipment** 157:2 160:22 246:5
303:25
**shipments** 161:24
**Shirley** 133:14 135:5 222:17
323:1
**shocking** 313:24
**shocks** 21:25
**short** 184:9,25 189:25 278:1
**shortly** 138:7 254:14 269:9
271:7
**shoulders** 269:4
**show** 39:10 44:16 46:22 71:8,9
71:19,25 76:13 122:12,24
162:10,1 1 165:14 174:14
183:23 185:25 187:4,5,21
192:20 195:17 196:14 197:1,2
198:11 199:15 200:9 205:5,20
238:9 245:5 254:25 284:14
291:16
**showed** 71:4 78:7 92:3 94:17
99:12 214:24 259:8
**showing** 39:24 76:14 92:3,5
124:14 147:21 199:13 214:17
216:11
**shown** 165:5 205:20 206:1,22
210:22
**shows** 21:17,19 188:7,8 330:22
**shuffling** 190:5
**shut** 130:22,24
**sic** 9:3 262:3
**sick** 331:9
**side** 154:4 167:9 182:22 196:10
233:15,16 235:19,20 316:2
**sidebar** 190:21 223:1 233:10
234:17
**sidebars** 184:13 186:2 222:25

234:11
**sides** 22:19 172:13,14 215:25
226:16
**side-effects** 33:6
**sign** 37:18 57:1,4 58:16 107:5,5
107:9 114:1,15 122:5 129:18
142:1 149:1 153:19 215:10
242:8,20 243:13 252:4,8,10
252:13,18,21 257:5 333:8
**signature** 183:13 208:20 215:11
215:14 255:6 260:11,16,24
261:2,7,12,18
**signed** 37:20 81:17 96:1 101:11
106:13,14 107:1,3,6 110:19
110:20,24 114:3,12 115:16,17
115:19 116:5 118:5 123:12
124:5 126:8,18 129:17,17
141:25 142:2 145:20,21
171:10 174:9 178:3,4,23
179:15 180:20 182:6 183:9,11
183:23 203:2 210:14 215:7,9
215:10,13 217:14 218:16
242:6 243:19 257:4,17
**signing** 113:25 181:12 183:1
216:14 217:8,18 237:3 243:17
254:22
**signs** 328:19
**similar** 38:25 61:1 117:7 129:19
131:2 194:14
**similarly** 84:25 196:3
**simple** 35:5 57:24
**simply** 233:3
**since** 9:22 11:20,21 30:22
112:17 114:19 148:14 153:10
173:2 185:15 203:19 239:4
265:12 276:22 297:15 301:13
303:9
**single** 40:11 216:13 283:6,9,12
304:5
**sir** 12:22 17:4 39:2 53:21 119:17
123:14 135:10 164:16,25
250:13 253:2,5,16 255:5,7
262:7,18 284:22 289:13 327:2
**sit** 10:5,7 19:5 27:14 34:6 62:9
133:8 135:7 219:5 313:21
**sitting** 26:22 28:17
**situation** 91:14
**six** 8:10 109:7,12,13 112:13
136:13 143:11 196:17 325:17
**size** 157:8 318:10 319:17
**sizing** 319:10
**skin** 194:18
**sleep** 32:7 83:17,21
**sleeping** 83:23 84:5,6
**slight** 137:20
**slipped** 303:4
**slow** 11:15 177:1 198:20
**smaller** 318:17
**smart** 17:8 269:4 311:7
291:19 327:18 328:23 330:2
**snapshots** 46:5
**sneak** 319:15
**Social** 39:20,21 59:23 78:11
125:1 151:4
**soda** 222:17
**sold** 83:13,16,17,17,1 8 143:3
144:12 270:10 304:10 314:18
**soldier** 265:12
**soldiers** 265:14
**sole** 202:24
**solution** 300:10 310:18
**Solutions** 32:2,4,17,19 88:18
274:11
**some** 10:8 11:20 15:8 20:24 21:6
22:16,23 31:8 37:21 41:5
43:10,11,13 45:5,5,5,7 49:2
55:18,18 61:1 65:19 70:22
74:1 77:25 78:10,24 82:7

83:14,14,22 87:23 91:7,22,22
93:3 96:14 97:20 108:18
128:22 129:5 136:6 138:1,16
139:14,14,17 140:19,20
143:16,16,17 154:22 163:1
165:7 168:5 172:16 173:14
174:9,10 175:12,12 201:3
203:11 209:16 210:5,23
228:18 230:4 231:4 236:8
238:1 242:5,21 248:2 252:3
252:15 253:3 263:8,16,21
264:1 266:23,23 269:19
270:22,23,5 277:5 279:4
281:24 283:25 298:4 303:12
309:23 311:19
**somebody** 324:5
**someone** 50:5 84:5,6 85:7
132:16 133:10 152:11,22
153:13 169:17,24 172:17
184:3 228:9,14 230:15 232:15
235:24 239:19 269:24 281:18
285:11 292:1 299:1 301:25
310:2,13,17
**someone's** 172:7
**something** 8:24 9:2 34:18 35:5
36:18 49:11 61:10 62:13
63:17 73:17 93:15 94:10
99:25 101:5 102:6 106:7
118:10,10 129:22 130:1,23
132:13 143:23 153:24 162:22
187:3 188:6 196:2,7 201:3
224:23 232:15 244:4 254:15
260:13,18 267:14 269:17
292:7 300:18 303:3,19 307:12
307:12 308:10 309:6 310:3,5
310:23 311:1 314:19 320:6,9
**sometime** 62:11 116:21 261:15
**sometimes** 20:13,13 22:18,19
42:22 45:6 77:22 152:12
154:6,7,20 172:8 203:21
206:19 234:23 235:8 310:19
313:9 332:12,13
**somewhat** 145:17 194:14 320:9
**somewhere** 117:7 217:10 327:23
**son** 15:22,23 104:8 135:11
184:25 186:25 189:11,12
190:22 232:4,8,10 238:18,25
247:19 248:15,16 249:14
321:9 333:4
**song** 17:6
**sons** 243:22
**son's** 38:3 187:4 243:8 244:17
**soon** 64:25 105:17,20 219:5
277:15 301:1
**sorry** 20:11 49:8 50:18 52:5
55:23 56:1 70:11 87:2 93:17
112:24 129:25 135:13 136:21
145:25 151:15,23 164:21
174:5 175:7,8 185:21 201:6
201:11 202:18 221:1,4 224:22
226:8,21 227:6 231:18 234:9
250:11 259:22 273:11,14
274:16 278:6 297:22 318:6
323:13 331:7
**sort** 31:8 211:10 296:7 301:14
**sought** 157:20
**soul** 154:6
**Soumaya** 104:7,10
**sound** 162:6
**sounds** 13:7 313:20
**South** 1:21 2:2
**SOUTHERN** 1:1
**So-and-so** 172:18
**so-to-speak** 269:10
**spaghetti** 314:14
**speak** 28:2 32:18 88:1,1 111:3
112:21 128:12 213:15 239:23
241:6 248:3 263:18,19 264:20
312:1,1,2 321:1 322:16

**speaking** 105:24 258:14 269:7
**speaks** 316:1
**specialty** 177:13 203:12
**specific** 50:11 64:4 65:20 89:25
90:3 96:15 140:11 192:8
198:6 201:9 236:25 243:4
264:11 313:18 332:4
**specifically** 30:1 36:24 55:17
148:20 152:14 194:20 197:14
199:23 245:11
**specifics** 109:6 244:5
**speculation** 63:3 145:1 274:24
**speculative** 145:17 197:23
**Speir** 176:23 198:12,13,18
**spell** 109:4 146:9 164:20,22
213:7
**spend** 35:9
**spent** 35:10 154:21,22
**spiked** 135:16
**split** 144:10
**spoke** 14:8 108:19,22 109:16
112:19 158:11 258:3,10
264:21 266:21 269:24 301:12
**spoken** 67:1 206:5,11 245:24
263:4 301:13 303:23
**sport** 90:8
**sports** 90:6,11
**spouse's** 39:21
**spreadsheet** 92:19 290:22
**spring** 132:24 138:1
**squirts** 239:7
**St** 146:17 147:9 148:8
**Stacey** 105:13,23
**stack** 21:24
**staff** 236:18
**stage** 186:13
**stand** 9:4,9 98:20 181:2,20,21
298:20 308:22,25 325:5
331:23
**standpoint** 198:7
**Stark** 34:24
**start** 15:17 17:5 47:13 49:3 62:2
62:7,9 102:19 105:15 119:13
119:15 131:5 165:12,12 280:7
284:1 310:22 323:25 325:3
328:23
**started** 15:8 32:11 46:3,6 47:9
60:18 86:10 105:24 119:22
121:18,18,23,23 148:8,10
213:22 269:9 270:24 271:1
**starting** 45:1 107:11 269:11
**starts** 332:18
**state** 28:23 29:1 89:14 103:13
146:16 153:21 154:1 165:21
219:15 250:21 262:23 320:16
**stated** 37:8 42:5 52:17 53:20
69:14 88:20 263:16 270:10
**statement** 9:18,19 47:18 147:22
147:22,23 154:18,21 156:9
159:7 160:13,24 161:25
168:19 172:22,23 174:20,22
176:5,7 183:11 207:8 217:24
221:10 223:6 225:20 228:23
230:5,19 232:2,3,4,6,10 233:2
291:3 313:2 318:3
**statements** 147:18,20,2 1 156:9
168:2 171:22,24 172:7,16,19
172:20 174:10,12,13 177:6
197:19 233:1 241:9,11 291:14
294:12 296:9 327:16
**states** 1:1,4,11,14,1 5 2:5 30:5
61:22 146:5 164:15 192:2
200:11 262:11 301:4 333:16
**static** 234:18
**stating** 54:11 120:13 244:4
**stationed** 147:8,9 220:12 263:14
**status** 168:19
**statute** 35:1,15,15,1 7 58:6 62:20
65:3 178:7 182:19 218:13

**stay** 69:25 138:23 163:23 254:13
**stayed** 32:11
**step** 16:10 39:13 41:4 42:5 167:4
167:5,7 236:11
**stick** 85:14,16
**still** 11:23 19:24 32:16,21 78:4
97:16 101:25 137:21 140:25
141:7 203:21 228:11 231:5
235:21 256:20 258:8 277:22
285:9 308:24
**stints** 51:15
**stipulate** 183:12 215:14 320:6
**stipulation** 12:6 317:13,21,24
**stomach** 208:4 246:22
**stop** 63:11 89:15 242:18 279:11
**stopped** 137:25 138:2,5 269:9
**straight** 33:18 134:15
**straighten** 134:14 203:9 204:1
**strangers** 114:13
**strategic** 302:12 311:21
**strategy** 311:4,10
**streamline** 287:9
**Street** 1:16
**stretch** 327:1
**strict** 33:25 51:12
**strictly** 35:7
**strike** 51:17 52:10 155:9,10
**string** 290:25 291:2,18,24
294:11
**strong** 175:8
**structure** 106:9 141:1
**structured** 34:13
**students** 143:17
**study** 103:21
**stuff** 11:25 12:21 18:21 93:12
124:21 134:3 222:16 239:3
281:24 282:5
**Stumphauser** 329:19
**stupid** 269:5
**subject** 109:20 200:12 328:5
**subjects** 260:6
**submission** 278:11
**submitted** 258:3
**subpoenaed** 263:1
**substances** 320:1
**Succeed** 275:19
**successful** 169:8 182:7
**suffered** 148:9
**sufficient** 329:2
**suggest** 133:25
**suggested** 312:13
**suggested/requested** 196:15
**suggesting** 12:17 14:1 172:6
223:4 231:3
**suggestion** 191:10
**suggestions** 235:3
**suggests** 172:9
**Suite** 1:21 2:2,6 333:17
**summarize** 166:9
**summary** 226:23 229:17
**summer** 86:13
**sun** 233:16 235:20
**sunny** 233:16
**Sunovion** 32:15 88:18
**super** 95:8,11
**superfluous** 311:18,20
**supervisor** 34:2
**supervisors** 33:22,22,24
**supplement** 196:18,19
**supplied** 304:15
**suppliers** 218:4
**supply** 113:7,8
**supporting** 149:12
**suppose** 159:13
**supposed** 40:23 44:8 101:1
167:20
**supposedly** 269:24
**Supreme** 222:2 330:16
**sure** 15:15 16:11 21:9 22:16

26:23 34:3 40:13 42:20,25
49:23 51:5 65:7 69:21 71:23
72:13 77:6 94:6 97:24 108:18
109:12 114:9 116:12 121:17
132:23 135:24 141:8 142:13
148:24 151:23 160:15 161:19
162:22 164:23 165:25 168:23
180:23 183:18 188:14 191:3
192:4 194:3 195:22 196:8,12
203:12 206:2 216:5 217:6,11
217:18 222:24 233:9 234:14
239:1,13 240:17 245:3 253:9
255:23 257:24 260:7 273:25
278:21 279:13 287:2,22 321:7
327:18 332:18
**surgery** 208:4
**surprise** 204:12 296:24 297:1,3
297:4 306:3
**surprised** 269:3 324:23
**surprises** 233:6 322:2
**survey** 141:22 142:8
**surveys** 141:16,20 142:5
**suspect** 227:11,12
**sustain** 50:14 159:2 171:14
199:3,4 217:3 233:10 329:22
330:12
**sustained** 49:19 63:14,19 159:4
327:9,11,13
**Sven** 285:4 295:2,3,5,7
**swear** 27:4
**switch** 19:17 132:22 138:17
140:5 210:2 254:23
**switched** 40:4 139:22 140:8
209:16 254:22
**switching** 182:16
**swollen** 19:8,21 27:19
**sworn** 28:1 103:3 146:7 164:17
213:4 217:24 219:4 250:14
254:21
**S-o-u-m-a-y-a** 104:11

---

| T |
|---|
| **T** 333:11,11 |

**TABLE** 3:1
**tabs** 170:25
**take** 11:25 13:1 18:22 24:20
39:14 41:18 56:1 59:23,23
77:1 81:16 123:21 125:15
133:16,17 134:3,22 137:8,9
137:25 138:10 140:14,20
149:25 155:3 158:23 159:9,15
159:18 166:22 181:2,20,21
194:1 197:1 226:4 244:2
249:14 253:17 265:5 272:16
273:23 274:1 275:17 276:9
282:5 284:9,16 290:19 294:9
308:21,24 313:10 321:4
322:22 323:10 326:25 328:2
331:14
**taken** 134:23 139:7
**takes** 12:2 183:15 284:6 313:9
317:20,24 323:11,12 331:23
**taking** 20:21 117:20 276:22
**talk** 10:6,7,8 14:10 39:10 47:7
49:20 58:18 60:6 91:3 94:25
98:15 106:3 120:20 130:24
133:11,15 142:7 150:18 153:3
166:24 172:3,25 173:20 205:4
225:19 228:4 232:10,14
237:18 263:24,25 264:15
267:6 284:12 294:11 296:3
299:13,13,13 301:16 303:12
305:14 307:11,17 309:6
311:24 312:1 314:1 319:11
324:20 325:2 332:11
**talked** 38:11,21 52:15 58:22,23
63:25 101:24 105:22 109:11
113:25 118:4 130:10,21
132:21 141:20 149:1 165:10

167:11,15 206:20 208:8 210:5
211:6,13 225:18 229:17
251:19,20,22 258:17 276:25
305:5 324:21
**talking** 9:22 24:3 40:1,2 41:4
42:8,8 47:11 48:23 68:15
69:17 73:12 100:13 108:19
144:5 185:23 186:5 191:25
199:23 202:13,15,22 211:18
220:23 225:7 234:24 238:1
271:24 299:14 328:23
**talks** 48:8 217:11
**Tara** 41:10,11,17
**target** 56:20 88:9 100:16 329:13
**targeting** 36:24 86:12 89:25
90:2,19
**taste** 305:4
**taught** 191:11
**tax** 82:20
**taxes** 59:23 62:18 82:23 102:18
117:20 126:13,15,24,25 139:7
140:17 248:21 258:23 259:17
318:7
**taxpayers** 285:25
**team** 38:5 301:13
**tech** 296:16
**technically** 59:19,25 60:1 61:13
**technician** 303:15
**techniques** 33:18
**telemed** 197:10 291:25
**telemedicine** 75:9,15,18 76:1,4,7
76:10 77:6,19 78:4,18,24
79:22 80:5 81:14 89:12,14
166:13,16 171:8,13 173:22
174:8 176:24 192:8 204:9
205:6,9 206:14 247:24
**telephone** 42:11 46:12 127:16,16
240:20,22
**tell** 12:16 14:19 15:7 19:11 20:8
22:18 28:3 29:7 38:14 39:3,8
43:10 45:21 46:19 50:13,14
50:25 52:11 53:22 65:6,10,18
65:18 68:9 72:20 92:9 93:12
98:20 101:11,14,18,21 103:8
104:4 105:25 107:18,21 109:4
109:22 110:4,7 111:16 112:2
114:19 115:5,8 118:9 125:12
132:15 146:8,15 148:5,21
150:10 152:8 153:13 154:11
154:16 156:21 164:18 171:17
180:10 190:25 195:20 210:15
213:5 215:25 219:6 223:5
225:23 232:6 236:24 237:10
240:15 241:3 242:8,14 247:17
250:4,15 254:6 256:17 262:14
264:10 265:16 270:7,25 275:6
277:18 283:11 294:23 299:22
300:12 302:21 308:1 311:6,24
311:25 317:12 321:23 327:17
330:20
**telling** 12:4,8 45:3 47:13 48:11
51:21 60:19 67:17 68:23
70:23 73:1 106:1 116:16
127:15,19,22 128:4,10,14,16
151:19 224:1 232:15 268:25
281:10 322:23 323:12 330:14
**tells** 47:15 123:24
**temperance** 229:7
**tend** 181:9
**tendency** 180:23
**term** 36:21 237:3
**terminated** 132:25
**terminology** 315:21
**terms** 102:6,9 248:3
**terrible** 92:2 174:23,25 175:2
176:23 198:18,23,23
**territory** 171:13
**test** 59:24,24 140:14 259:12
**testified** 31:17 44:22 52:20

70:22 80:23 83:10 85:25 87:4
88:5 93:20 97:12 98:23
101:10 130:23 168:2 171:9
172:22 202:20 203:17 212:5
243:8 247:14,19,23 260:3
303:7
**testifies** 302:17 330:3
**testify** 29:4 65:24 71:17 146:19
146:24 167:16,20 171:6,7,9
171:21,23,24 175:11 181:16
219:17,21 221:19 225:17
295:2 302:16 303:17 305:2,9
308:17 313:14 316:20,23
320:7 328:2 329:10,15,16,17
330:4
**testifying** 23:17 31:7 51:20
212:2 262:25 311:6 332:11
**testimony** 9:25 11:23 63:5,5
64:5 69:6 70:7,10 71:12
133:11 156:12 173:15,15
175:10,23,4 184:25 225:2
228:13 231:4 241:23 248:3
257:20 303:1 310:9 319:9
324:10 325:3 329:12
**testing** 96:20
**Texas** 219:16 250:22
**text** 31:3 42:19 46:3 48:19 57:13
71:5,6,8,11 72:10 75:10 76:21
76:22 81:4 99:12 105:9
116:12 135:14 141:14,15
**texted** 57:15
**thank** 16:12,20 25:2,9 27:17
28:7,10 55:25 64:25 66:15,18
66:20 70:15 102:22 121:6,9
133:23,23 134:19 137:19,23
145:25 146:12 156:25 157:23
157:24 164:10,12,25 167:8
185:12 191:6,8,18,23 195:16
203:7 204:3 205:25 212:23,24
212:25 213:7,10,18 218:23
219:10 234:8 236:6 245:17
249:3 250:6,7,17 262:5,7
270:15 279:15 283:18,20
284:19 317:21 323:23 333:3,4
**thanks** 123:19 133:24 150:1
197:18 206:3 223:22 260:1
262:19 284:23
**theft** 331:2,3,5,12
**their** 22:18 29:15 38:19 39:19,20
39:21,22,22 40:13 42:9 44:5,8
44:14 47:24 68:19 78:11,15
89:7 104:4,9 124:23 125:10
125:24 179:1,1,19 210:25
222:7 243:17 256:6,17 265:15
265:15 270:5,5 286:21 304:22
311:20 322:20
**themselves** 125:7
**therapeutic** 319:13
**thick** 157:9
**thing** 17:21 28:16 72:7 75:13
82:25 99:14 115:10 117:17
131:22 136:25 137:2 154:3
187:9 196:25 201:15,18 203:9
203:24 233:25 234:21 235:18
268:5 297:1,3 298:25 299:6
311:7 313:25 314:5,5 330:19
**things** 18:1 19:8 21:25 24:3
34:11,11 35:5 36:16 71:15
139:2 144:21 153:20 154:25
169:7 171:19,21 183:3 184:10
186:2 222:24 225:6 228:25
229:1 235:1 254:23 310:25
311:3,11,19 313:12,13 314:3
315:13 316:5
**think** 9:16 11:24 12:6,14 14:7,18
16:24 18:3,8,11 19:10,19
21:13 22:23,24 24:3,17 26:18
27:7,15,16 28:15,17 34:18
45:12 48:21,24 63:1 66:12

68:2,5,10 73:17 76:3 77:15,16
78:7 79:11,14 83:10,13 88:12
89:9,11,12,13 90:2,13,16,18
90:21,22 93:14 97:2 99:12
106:25 108:16 116:2,11 122:6
127:13 128:23 129:12,16,21
129:22 130:5 131:3 132:11,18
132:22 134:12 137:1,25 153:9
153:23 154:24 155:15 162:8
163:21 167:3,24 179:14 182:2
185:3 186:20 190:10 191:18
192:14 198:25 203:13,19
206:15 207:20 208:9 210:20
211:13 214:14,20 215:19
228:6 233:17 234:14 235:12
235:14 237:25 244:9 248:2
253:9 256:25 257:8 261:9
267:4,8,11,13 268:11 269:5
270:21 273:21 275:13 276:5,8
278:18 280:2 284:6 287:15
290:20 294:7 296:11 297:4
298:25 299:1,10 304:7 306:1
307:21 309:16,18 310:12
311:11,13,17,19 314:2 317:15
320:9 321:11,12,25 322:1,18
325:13 328:7 332:6
**thinking** 46:7 57:24 74:22 75:5
80:1 200:25
**thinks** 36:1 58:12 154:17 201:15
**third** 20:12 23:11,20 26:14
115:4 136:12 152:1
**thorough** 65:9
**though** 20:5 91:15 118:3 123:23
145:17 171:1 179:19 278:3
307:13
**thought** 9:11 14:24,25 20:8
41:17 48:25 62:10,13 63:7
68:6 69:13 80:6,11 85:25
95:12 130:6,23 143:19 155:7
158:18 159:11 179:20 203:25
204:8 234:18 240:3 249:7
265:21 266:7 267:14 270:23
274:22 275:4 278:14 301:16
310:12,23 324:24
**thousand** 276:6 303:20
**thousands** 318:20
**three** 23:8 31:25 67:9 105:22
108:2,16,24 109:8,14,15
112:14 113:4,5 114:3,12,24
115:1,3 119:3 124:4 125:24
130:17 148:9 149:22 156:23
156:24 160:22 161:9 162:6,8
162:12,13 183:3 200:13 241:2
267:4 268:4 276:11 312:1,6,7
324:7
**three-hour** 320:22
**three-way** 46:11
**through** 8:10 9:24 11:25 23:12
23:18 26:10 27:15 36:6 38:2
47:23 48:8 54:22 55:8 59:17
65:8 73:12,14,20 74:6 87:8,22
88:18 95:18 105:14 118:12
119:11 122:4 134:15 141:7,12
143:2,10 145:7 171:3 207:23
215:1 220:19 241:4 242:22
243:2,14 260:3,13,18 261:1,4
261:10,15 265:8 268:8,10
269:18,20 274:2 281:19
328:12
**throughout** 179:19 330:1
**throw** 53:1
**Thursday** 14:25 15:19
**tick** 24:7
**tier** 87:12
**till** 12:15 163:5
**time** 11:20 12:9,25 13:16 14:19
15:1,24 25:18 28:13 37:7 44:4
45:12 49:5 55:5 59:7,7 60:16

64:23 67:12 68:24 70:8 84:14
86:10 87:17 88:3 100:1 110:9
110:15 111:6 113:6 115:25
116:9 119:15 126:9,12 127:8
130:2 136:15 143:8 149:5
152:11,12 154:21 157:10
161:1 162:1,23 163:2,6,10,22
165:10,13 168:1 169:8 177:2
179:19 187:20 193:15 198:20
198:24,25 201:7,24 204:14
205:10,16 211:17 215:25
229:6 234:10,24 235:4,22
236:10 237:13,21 240:7 243:6
244:11 252:3,10 254:6,18,22
263:13 264:21 268:20 269:13
273:1 274:1 279:4,17 284:10
284:10 286:12 287:24 294:9
297:7 298:2 300:5 301:12
309:15 311:1,15,16 321:2
323:16,18,25 325:2,5,10
326:25 328:22 332:10,17
**times** 21:14 42:19,21 60:20 67:4
67:6,7 88:5 98:18 127:5 162:6
162:8,12 163:7 251:10 263:4
279:21
**Tisha** 91:24 95:8
**title** 279:13
**today** 19:13,15,22 23:21 29:5
31:8 69:19 70:15,17 88:5
98:17 123:15 127:10 133:5
146:20 167:16 181:14 190:7
191:1 200:14 214:6 219:18
232:6 235:24 262:25 271:25
287:14,18 296:17 298:1
302:11 305:4 321:23 322:5
323:4,20 324:23,24 329:3
332:21
**together** 38:9 81:7 178:24
179:15,18 189:13 226:9
244:23,25 314:1,4
**told** 9:11 19:7 20:5 21:23 23:1
25:25 27:19 37:4 38:15 39:5
40:11 42:13 44:11 45:23
48:19 50:23 51:25 52:17
53:16,20 54:20 59:8,11 61:14
61:15 62:20 63:4,12,15 65:17
68:7,9 69:4 81:19 82:10,12,22
83:10 88:14 91:11 105:17
106:3 107:4 108:6 109:1,7,8
109:10,11,11 110:3,6,6,16
112:5,13 114:21,21 115:10,25
116:2,3,13 118:5,11,14 122:2
124:25 125:12 127:21 128:4,7
129:8 131:10 132:12 139:2,7
142:25 143:3,4 146:25 148:13
148:19,20 149:14,17,22 156:2
156:2,4 160:23 161:21 162:1
162:5,10 180:16 181:18 200:6
220:21 235:18 236:15 247:19
252:18 258:8 265:11,21
269:13 272:13 286:7 292:9
304:24 307:20 329:13 332:24
**Toledo** 285:24
**tomorrow** 14:22,23,24,25,25
15:1 134:4 190:10 283:24
287:15,17 321:7,17 322:2,20
322:25 323:3,4 324:3,7,20
331:9 332:24
**tonight** 191:2 321:25
**top** 40:3,6 47:15 92:14 94:18
125:14 239:9
**topical** 193:21 195:4
**tops** 239:12,15
**total** 62:6 67:6,9 106:18 160:18
162:5 244:18,20 282:15
**totally** 292:8
**Touchpoint** 32:2,17,18 88:18
**tough** 300:11
**tougher** 172:15

town 111:13
track 48:13 92:17 260:14,19,22
    262:3
tracks 48:8
traffic 15:8,11 284:1
train 38:10 253:22 256:14
trained 31:23 34:24 36:10 84:8
    87:25 88:8 270:4
trainers 56:13
training 33:16,17,18,2 0 34:12
    34:19,20,23 35:1,6,14 36:10
    38:21,22 88:15,16,19 119:19
    122:4 144:2 188:4 217:17
    240:4 249:19,19 254:1 256:2
    260:3,4,6,14,19,21,2 2 261:2,5
    261:10,16,24,2 5 262:1,3
Tramadol 83:20
transactions 218:11
transcription 333:13
transdermal 193:21
transferring 117:18
trap 269:6
treat 193:22 194:20
treatment 27:20
tremendous 200:15
trial 1:10 11:13,16 26:14 65:18
    171:15 172:12 173:2 175:23
    186:13 230:24 263:1 286:25
    287:1 297:10 304:15,24
    310:25 311:12 317:23 333:9
trials 16:9
Tricare 29:12,13,14,1 9 36:6,25
    37:3,5,6,9,10,13,2 2 38:15,19
    39:7,13,15,16,17,20,2 5 40:11
    40:13,15 44:3,5,9 45:5,6 46:4
    46:8,16,18 47:21 49:6,10,16
    52:23 55:11 56:14,18,21
    57:11,20 59:6,14 83:11 85:2
    85:20,21,22 87:23,23 88:9
    95:6 100:4,7,12,22 104:23,24
    105:1 114:23,23 117:23 147:1
    147:3,5 148:14 149:7,14,17
    149:20,23 151:5 184:23
    212:13 219:23 220:3,5 224:1
    224:8 229:21,23 237:6,8
    243:2 246:16 247:5 248:6
    250:5 251:4,6,11 252:8 263:1
    263:9 272:3,7 277:13 280:2
    307:17 315:2,9 318:21
trick 306:12
tried 42:21 49:23 112:15,17
    330:19
trip 102:23 262:8 283:21
trouble 26:10 83:22 135:15
true 32:11 48:25 65:13 132:11
    132:14,19 155:14 163:7 207:8
    246:19 305:8
truth 132:15 153:2,18,19
truthful 30:20
truthfully 93:1
try 83:21 84:15 121:24,25 122:1
    129:2 131:1 156:20 157:20
    173:21 197:2 223:3 228:10
    233:2 273:2 275:18 282:20
    283:25 286:21 287:9
trying 55:11 57:22 74:14 84:14
    87:22 108:6 122:8,9 141:15
    145:7 192:23 233:24 241:9
    274:17 319:15
tubes 113:4,5
tuck 95:14
Tuesday 14:20,24 67:10,12,14
    67:18,22 68:9,13 69:1,16 70:2
    70:24 71:1,2 98:17 284:8
    322:17
tuition 143:17
tuitions 143:17
tummy 95:14
turn 69:21 81:9 252:21 273:17

273:19 301:1
turned 189:8 238:12 239:3
    297:6 301:12 330:21
tutorial 217:15
TV 89:1,3,18 234:11
twice 280:6
twin 104:6
two 17:18,19,19 19:5 23:8,11,15
    26:15 28:5,6 31:1 47:19,19,20
    47:21,22,23 48:1,1,22,23 61:8
    61:19,23 62:5,5 67:7 83:18
    87:21 106:14 108:24 111:14
    116:20 120:11 129:19 149:8
    157:10 161:18,23,24 162:2
    163:12 171:8 173:3,4 176:24
    186:2 187:22 189:23 200:14
    205:22 206:24 207:4 239:5
    240:19 243:9 246:11,12
    249:10 270:24,24 271:5 276:6
    276:20 295:12 301:12 302:2
    311:8 315:10,13 319:19
    320:24 321:3 323:8 326:23
    327:14
two-day 173:2
two-month 230:24
two-second 190:20
type 29:2 30:24 37:4 38:21
    104:22 165:23 166:1 193:17
    193:20 194:14,17 195:24
    203:24 256:2 286:6 295:12
typed 93:5
types 111:20
typo 280:3
typos 323:6

U

uh-uh 141:19
ultimately 55:13,14 279:22
    280:12 328:20
Um-hmm 104:25
Um-hum 161:3 273:7,10
unavailable 200:7
unaware 95:5
under 31:18 32:14 65:23 96:2
    137:21 156:13 193:24 195:18
    221:8 222:2 223:16,17 226:24
    230:19 240:8 253:10,15
    264:24 283:6 315:16 330:16
underlying 218:10 307:1
undermined 175:22
understand 11:18 30:18 31:12
    35:15 67:20 75:7,10 76:4 78:9
    102:9 135:3 156:7 162:22
    197:9 217:25 218:9,20 230:2
    256:19 281:13 320:17 328:1
understanding 52:19 53:3 65:2
    188:19
understood 11:17 76:7 96:5
    225:4 281:10
undue 36:19
unfair 159:3 311:1
Unfortunately 133:6
unhappy 68:13,14
United 1:1,4,11,14,1 5 2:5 30:4
    146:5 164:15 262:11 301:3
    333:16
units 31:17 319:2
University 29:1 38:9 304:14
unless 10:6 12:5 135:7 171:18
    172:22 222:23 235:24 292:7
unlike 76:7
unnecessary 311:18,20
unrelated 292:8 313:1
until 18:11 132:12 161:22
    163:24 165:14,15 190:6,8
    285:1
unusual 311:7
update 25:14 190:21
upset 68:23 69:2,6 70:2,22 98:16

98:18
urine 117:8 140:24 269:19
use 11:8 12:24 20:8,13,14 28:11
    60:1 82:5 91:9 100:1 113:8,11
    113:15,17 123:17 124:8,10
    129:18 134:2 141:16 142:4
    149:21 157:3 176:22 184:18
    185:5,10 187:2 198:17 206:19
    221:2 225:7 234:13 237:3,4
    239:4,21,25 240:5 247:14
    264:14 265:8 266:25 269:24
    271:2 296:8,9 298:10 299:21
    302:5,6,6 305:17,18 314:3,12
    314:13 315:14 316:9
used 15:18 23:8,10,15 33:11
    73:22 81:24 82:2 113:9,10,11
    113:12,16 124:2,4,12 130:12
    130:16,17,18 184:19 193:3,21
    194:16,17 195:10 202:17
    230:5 239:4,5,6,7,8 244:23
    246:11 303:18
uses 315:20
using 81:18 120:9 141:20 265:2
    305:21 306:20
usually 26:14 141:12,13 159:2
    184:10 211:15 228:14,21
    268:4
US-1 284:2
U.S 333:16

V

vacate 302:5
vaginal 247:2
vague 47:8
valuable 87:17 88:4
vascular 194:17
VB 224:8,10,12,13,14
Vedra 28:24
version 303:21
versus 80:4 319:13
Vertical 32:2,19,21 38:22 45:17
    73:5 88:20
very 9:11 14:10 17:7 25:9 47:4,8
    49:4 58:4 65:9 67:17 71:12
    129:2 148:11,20,22 151:3
    158:7 184:25 188:5 213:18
    215:23 216:1 235:2,3 266:17
    266:17,19 274:8 284:19
    315:14 316:15 321:24
veterans 29:15
Vettaparambil 137:1
via 42:19 105:9 124:21 148:17
    149:15
Viagra 89:3,3,18 90:2,5,11,15,18
    90:20 100:14,14,16,23 269:3
vials 130:17 276:25 319:13,13
Vidal 224:15
video 174:4,6 235:10
videos 134:11
view 65:11 66:5 144:22
vigorous 148:11
violate 180:2,3 182:18 183:2
violated 182:9
violating 296:19
violation 97:7
Virginia 146:18 262:24
vision 93:15
visiting 35:12
visits 35:4
vitamin 29:20 37:21 38:11,23,24
    40:19,23 41:9,10,13,14,16,21
    42:1 82:11 93:17 100:23
    161:4,5 196:23 208:6,9
    210:14,15,18,1 9 212:10,14
    237:24,24,25 238:1,2 264:1
vitamins 36:25 38:17 39:23
    41:18 56:23 86:2,6 93:22,25
    94:3,7,12,15 106:6,20 113:5
    113:11 156:20 208:10 238:11

238:15 253:8 256:15 263:8,21
    264:9,13,14,1 6 266:24 268:5
    270:25 276:19 277:1 278:5,7
    280:18,21,2 5 281:22 282:5,8
    282:22,23,2 5 283:14
voice 312:1,4,5,6,7
voices 254:9,13 312:2
Voir 186:3
volume 157:5
vs 1:6

W

wait 15:5,5,6,6 17:13,16,24 18:3
    18:8,11 21:3,15 23:8 26:5,7
    26:12,13 96:24 133:8,25
    284:4,5
waited 152:20 284:4
waiting 24:11,13 56:5 69:20
walk 25:5 133:10,14 207:23
    234:19
walks 234:20
want 11:12 12:16 13:2,6,7 17:10
    18:22 20:13,14 21:1,15,16
    22:10,13,14,15,2 2 24:5,23
    25:11 26:5 27:2 28:19 39:10
    44:4,8,1 1 45:11 53:7 57:13
    66:17 69:4,10 74:19,25 78:10
    78:14 79:12,25 80:1 81:16
    89:23 105:24 108:18 111:9
    113:17 119:7 121:17 122:12
    122:16 131:8,9 132:23 135:21
    153:13 156:8 172:14 173:1,8
    179:22,24 180:7 181:16 186:1
    187:21 188:14 189:2 190:19
    196:4,5 203:19 208:18 212:3
    217:4 223:3 224:5 227:12,23
    228:5,21 230:23 232:7 233:17
    234:15 235:11,22 267:23
    271:19 275:11,15 276:17
    283:24 284:9 286:11,11
    287:11 296:14,24 297:8,10
    298:16,17 299:7,16,17 300:14
    301:7,16,21,22 305:9,24
    307:8,10,11,1 1 308:5,7,10
    309:15 310:13,15,21 311:3,24
    312:15,24 316:25 319:10
    320:3,4,7 321:7 324:14,15
    327:3 330:20 331:10 332:18
    333:5
wanted 12:23 13:20 15:15 19:9
    20:7,7 39:23 41:10,11,19
    45:25 48:13 56:23 59:16 60:3
    69:3,21 73:3 80:3 86:11,25
    99:24 100:1 107:5 109:7,10
    112:13 121:2 128:20 131:12
    132:9 135:3,11,23 136:2
    142:3 156:19,20 159:14
    165:18 173:2,2 191:4 198:6
    200:13 203:12,15,23 206:2
    208:6 239:17 242:8 252:18
    258:8 270:25 273:1 274:19
    277:5,6 282:11,20,23,25
    300:25 312:23
wanting 236:18
wants 11:23 18:19 50:10 75:22
    76:23 88:4 175:3 180:21
    182:17 188:19 198:6,7 299:13
    310:16 319:16 327:5
warned 64:24
Warner 38:4
warranted 211:19
Warren 55:3,4,16,18 58:22,22
    91:24 101:10
Warren's 57:6,7
wasn't 42:12 43:13,18 60:2
    63:17 91:14 110:4 114:15
    115:9 120:17 124:4 132:2
    142:1 148:24 160:15 171:14
    182:7 210:1,9 216:16 274:17

290:14 298:11 308:13 317:7
waste 34:21 261:5 304:5 305:21
306:22
wasted 235:4
wasting 196:1
watch 89:1 331:9
watching 90:14
way 10:7 11:20 25:14 40:2 49:19
67:19 74:22 78:15 81:18
87:23 89:23 95:18 98:1
107:12 111:11 114:21,25
115:2 119:21 126:12 131:6
132:6,6 133:17 137:1,16
140:1 150:6 165:17 166:23
184:13 193:3 195:9 200:16
210:13 216:7 222:13 224:19
227:11 237:15 239:23 242:21
266:15 270:21 271:17 279:17
280:25 285:11,19 311:10
314:25 318:17,17 322:24
323:9
Wayne 192:16
ways 32:16 311:23
wearing 96:15
web-based 48:8
Wednesday 14:24 19:23 69:18
70:1,10,16,17,1 8 98:17,17
198:15 302:11 320:17
week 12:8,8,15 15:1 19:9,10,23
21:10 61:8 165:9,11 170:2
173:4 181:14 284:8 302:7,8
302:22 310:6
weekend 123:18
weeks 116:20 124:5 148:9,11
157:10 161:18,23 162:2
163:12 173:3,4 198:16 200:10
301:13 302:2
weight 292:6
welcome 237:16 324:25
welcomed 31:1
well 9:3 12:11 13:22 17:7,16
18:22 21:16 22:17 23:18
26:25 31:4 33:5,18,20 34:15
34:25 43:3,21 47:7 48:25
53:11 55:18 56:24 60:6 62:18
65:5 69:20 71:19,25 78:6 79:2
83:5,17 85:24 86:18 88:19,19
90:20 98:23 106:25 107:7,16
107:18 108:8 109:5,23 110:4
110:19 112:16 114:3 115:1
116:11 119:5 121:20 124:24
127:12 130:21 131:22 139:24
141:6 149:1,2,4 150:6,7
155:14 156:23 158:12 159:16
160:20 162:5 163:9 166:19
167:15,19 171:25 175:1
176:10,18 177:4,11 178:9
179:17,24 180:1,6,12,16
181:24 182:2,5,22 183:7
184:25 185:19 188:8 193:22
200:12,22 201:9 206:11
209:10 216:13 221:18 224:14
225:17,21 229:3 232:5 237:24
237:25 240:1 246:11 247:11
252:18 263:20 264:15 265:11
270:24 271:2,4 274:4,8,11
282:1 287:14 290:14 291:8
292:5 294:23 296:23 297:11
297:17 299:9,12 300:24
301:19 305:20 307:2,4 308:9
308:14 310:12 313:17 316:24
317:11,17,19 328:14,19
329:10,20 331:13,23
wellness 196:18
went 23:12,18 26:9 47:10 50:18
65:8 80:11 91:8 95:18 98:15
110:2 124:12 149:19 171:3
203:2 225:5 260:3,13,18,21
261:1,4,10,1 5 263:23 264:22

267:5,13 279:5 281:19 300:7
300:20,20
were 8:1 11:3 21:21 29:4,8,21
30:1 32:25 34:17 36:10,22
37:1,3,3,6,7,8 38:25 39:14
40:19,23 41:24 42:1,3 45:4,16
47:2 48:15 49:11 50:2 51:4
52:22,23,24 56:5 57:5 59:7,8
61:1,11,12,1 2 64:11 65:19,20
67:15,17,18,19,21,23,2 4 68:1
68:2,10,11,13,13,14,15,16,21
68:23 69:1,6,12,16 70:22,22
70:23 71:16 73:1,3,7 74:8,10
74:16 75:15,19,2 1 76:1,1,8,9
78:1,3,9 79:4,17,19 80:3,10
81:7,10,12 84:25 85:1,6,11,17
85:18,21 86:1,5,6,7,8,9,12,14
91:19,22 92:23 94:19 96:2
97:14 98:5,7,22 99:14,16
100:3,3,6,8,21,22,2 5 101:1
106:19,19 107:4,14 109:25
111:9,10,11,1 1 114:13,13,14
115:2,25 116:2,3,12,13,14
117:18,18,19 118:6,16 119:21
120:7,10,15,1 6 123:22 124:25
125:11,23 128:11 129:20,21
130:5,7,23 132:3,5,7,11,12,18
132:19 134:25 138:10,17
139:8,25 141:8,11,1 5 143:1,2
144:16 146:19 147:8 149:8
152:16 156:19,20 157:8,12
162:13 163:10,23 164:2,4
167:17 171:12 175:22 178:6
179:17 180:10 183:22 187:15
187:24 191:25 193:15 200:3,6
200:6,7 201:24 204:16,20,23
205:5,9,14,14,16,2 0 206:14,22
206:23,25 207:5,5,21 210:23
211:15 213:22 215:1,18
217:18 219:17,22,2 2 220:9,12
228:22 235:20 239:4,5,12,16
239:18,18,20,2 3 240:8,13
242:22 249:7 250:4 252:6,7
253:10,15 255:21 258:12,17
263:14 264:13,24 265:2 267:2
268:21 269:11 270:22,24
271:5 273:22 274:22 277:1
278:15 280:20 282:18,23
283:11 286:17 290:18 291:16
304:25 311:6 321:9 322:5
329:3 331:13
weren't 40:21 59:15 64:11 67:17
68:23 75:20 79:18 80:10,11
86:12 118:6 124:24 228:18,19
239:7 258:12
west 146:18 165:22 233:16
235:20
wetting 314:3
we'll 17:5 18:24 26:13 39:10
40:9 91:15 151:24 177:19
181:19 215:14 222:13 234:2
275:17 284:17 296:9 302:4
323:10 324:8 325:4,8 330:6
332:19
we're 8:10 10:3 12:2,9,10 17:3,6
17:19,25 19:17,24 21:10 23:5
23:23 26:6 39:12 42:8 48:23
74:5,6,24,25 75:13 95:1
108:19 126:16 128:25 131:11
133:1,3,5 177:19 179:8 183:7
184:18 185:23 186:5,13 190:5
191:1,11 202:15 225:7 234:17
234:24 235:24 287:23 298:15
300:12,12 307:18 308:16
309:3,3 317:13 321:7,7
323:15 324:17,19,22
we've 20:6 27:16 67:11 121:15
125:16 137:16 144:5 171:20
172:12,18 176:24 233:9 234:8

245:21,24
whichever 190:9
while 25:20 28:17 35:10 39:12
42:8 46:3 56:5 72:25 88:19
128:10 134:4 186:5
whispers 234:12
white 268:4
whole 63:20 186:19 187:9
196:24 216:20 301:3
wholesale 316:15
wife 55:8 56:14 90:20 135:14
224:18
Wilkie 2:6 333:16
win 13:4 170:3 223:4
windshield 256:6
wins 320:11
wise 228:6
wish 222:24 329:3
wishes 69:7
wit 154:6
withdraw 201:19 294:16
Withdrawn 294:17
withheld 259:18 330:23
witness 8:5,7,8 11:5,6,9 13:14
23:11,20 26:22,23,25,25
27:22 28:1,4,6,9 30:16 36:4
49:22 50:1,17,20,23 52:5
52:8 53:18 65:6,14 66:13
69:12 77:10 86:20 89:24
102:24,25 103:3,9 107:25
132:1 133:12 134:8,13,16
136:6,7,11,17,1 8 145:13
146:2,3,4,7,10,2 3 150:19
151:8,10,12,15,18,21,2 3 152:7
152:10,13 154:23 155:7
156:12,23 164:12,13,14,17,19
164:21,23 166:2,17 167:11
173:12,15,20,2 1 174:20
177:10,23 181:12 183:6,10
183:25 184:13,15 186:19,21
186:24 189:8,9 190:2 193:1,5
198:5 202:20,22 203:5,14,24
212:22,25 213:1,4,6,9,17
218:25 219:1,4,7,9 221:3,18
223:12 226:6 227:6,13,16
228:1 230:9,12 231:13,13,21
233:18,23 234:25 236:5 238:3
241:17,25 245:2 247:13 250:9
250:10,14,1 6 251:18,20,24
259:25 262:9,10,13,16,18
275:6 283:22 284:25 285:9
286:4,6,8 294:21 297:9,24
301:14,17 302:14 310:4,15,16
310:16 314:23 324:18 327:24
332:14
witnesses 12:9,12 22:16 23:9,11
23:12 26:15 136:14 155:17
171:8 173:8 186:5 189:10,23
190:3 227:12 231:4 235:21
285:1 286:15 287:4 294:22
296:3,8 303:9 321:14,24,25
324:7,16,19,22
woman 180:14,16 220:24 221:22
221:23 269:4
women 90:16 271:1
wonderful 11:11 228:10 302:4
325:18
word 13:1 33:11 60:1 81:18,19
81:21,24 82:2,6,6 100:1
202:17 273:24
worded 140:1
words 93:12 163:4 207:12
309:20,21 315:22
work 13:1 15:17 47:14 87:19
97:5,6,9,17 117:12 120:19,14
131:1,15,22 137:23 197:10
235:22,24 248:19 251:1 254:2
254:2 256:1 259:15 263:22
282:1 287:8 301:20 302:11

306:16 313:8
worked 32:1,2,15 35:2,3 44:2
51:1,8 52:1 54:8 124:13
130:19 131:14,19 144:8
192:12 204:8,13 256:17 270:5
270:8 286:18 301:15 303:15
304:7 313:1 328:4
working 39:1 45:16,17,19 68:11
96:22,23 101:25 117:17
119:21,22 123:22 130:25
131:16 132:18 187:5 192:25
193:15 196:2,6,9,12 216:6
277:1,10 282:23 331:3
works 33:20 271:3 279:14
316:10
world 95:19 97:15,17 98:2 144:3
312:19
worlds 310:10
worms 150:8
worried 49:23 324:17,19
worry 39:8 46:20 54:12 115:11
302:22
worse 93:15 235:23 324:24
worth 113:17 120:17 231:5
303:21
wouldn't 14:2 43:3,4 85:4
108:10 123:5 201:12,13 228:5
230:25 234:22 247:21 249:14
249:15 286:1 299:22 325:6
328:7
wrap 62:19 64:22
wrist 258:1
write 54:23 74:21 75:4 76:8,9
79:6 80:18 81:4 84:24 85:10
95:2 175:3,3 177:2 196:3
197:9,16 198:20,24,25 205:14
205:15,18 208:9 277:18 323:7
writes 225:5
writing 33:13 80:20 317:16,20
written 30:4 34:17 37:15 43:19
124:5 193:13,15 196:5 204:24
239:6
wrong 49:9,11,1 6 58:17,20,25
59:6 62:13 65:7 68:2,6,10,12
69:14 80:23,24 81:2,4,8 97:14
97:16 118:10 129:21,22 130:1
130:5,24 131:20 132:2,3,12
132:13 143:20,22,23 153:13
159:11 224:23 290:21,22
309:23 319:8
wrote 54:24 76:10 78:25 151:10
151:12 154:7 193:10 197:11
197:14 198:17 200:15 205:1
205:17 207:17 258:15 279:8
282:21
W-2 59:9,18,22,2 5 60:1,13 98:4
117:20 132:22 138:18,20
139:8,22 140:5,6 141:4
187:16 259:15 279:5
W-9 272:3,20,23 273:15 275:3

---

X

X 42:20 54:11

---

Y

Y 28:8
yeah 21:8 24:15,22,24 25:15
79:2 111:1,10 119:5 127:6
130:3,4 134:22 135:19 140:4
158:20 170:5 171:3,3,3
178:23 183:15 190:11,13,23
198:1 236:5 237:15 239:12
244:19 246:10 247:11 252:19
274:16 278:7 282:4 286:25
297:21 313:22 314:16 315:6
319:20,22,25 322:4 327:22
year 66:2 127:9 200:17 204:9
298:8
years 10:8 30:12 31:25 96:3

97:20 103:18 104:1,18 105:2
163:7,8 166:8 193:4 215:19
234:15 276:11 312:25 330:24
**Yep** 154:15
**yesterday** 20:3,4 21:9 23:12,19
133:6 135:12 167:15 175:24
226:19
**York** 176:23 177:4,7,10 192:6
197:17 198:17 263:7,15,20
**youth** 38:3
**Yuri** 16:21

---
**Z**
---
**Zebrowski** 271:18
**zero** 11:10 177:2 198:21,25
212:14
**Zetonna** 32:7,7

---
**$**
---
**$1,750** 224:1
**$10,000** 30:13 46:6 62:18
**$1200** 257:8
**$14,000** 46:7
**$150** 44:13,15,22 75:9,16,17
**$1500** 267:11
**$17,000** 60:23 61:21 113:17,20
**$2,000** 306:21
**$20** 102:14 144:18 160:10 318:3
318:5,6
**$20,000** 319:1
**$2400** 304:5 307:20 316:12
**$25** 35:9
**$26,000** 229:19
**$2800** 48:3
**$4,000** 46:6 47:24 48:22
**$45,000** 62:4
**$5,000** 283:15
**$54,000** 115:24
**$55,000** 143:7
**$60** 113:23 160:9,12,14,4 161:1
161:2,10,10
**$64,000** 62:6,7 102:17,19
**$7,000** 48:23
**$9,853** 61:24

---
**1**
---
**1** 5:13,20 6:23 40:24 137:2,3
164:1 194:5 209:16 224:3,10
246:14 255:8
**1st** 162:2,14 171:9 192:9,15
193:15 197:5
**10** 6:14,25 13:17,18 14:22 15:2
15:17 16:16 46:24 72:14
90:25 131:8 163:7,7 166:8
240:23 275:15
**10:00** 14:7
**10:15** 332:25
**10070** 61:24
**10071** 61:24,24
**103** 3:9,10
**105809** 224:8
**1099** 82:17,20 83:2,3 98:3,5,7
126:8,23 127:1,3 132:22
138:18 139:22 248:20,23
258:20 259:1 279:5
**11** 5:6 6:13,19 163:8
**11-24-14** 193:14
**11:00** 21:20
**110** 5:14 165:2 170:2,3,8 191:21
200:9
**112** 5:16 165:2 170:13,16 191:21
**12** 5:15 7:6 17:11 223:20,24,24
330:24
**12:16** 133:20
**12:18** 134:23
**1200** 30:13
**121** 3:11 290:20
**122** 5:9

---
**2**
---
**2** 1:21 2:2 5:6,18,24 7:3,4 39:24
41:3 178:16,22 194:8 214:13
214:18
**2:00** 18:13 133:9,9 134:1,18
**2:25** 134:25
**20** 5:9,17 6:9 7:8 96:6 102:19
**2004** 213:23
**2011** 296:18
**2014** 46:24 49:5 68:2 81:17
86:13 105:2,16 143:10 148:7
192:14 197:7 198:16 204:9
205:7 207:21 255:18 328:11
**2015** 32:12 41:3 57:10 61:23
72:14 76:22 81:5,17 86:4,23
87:3,6 105:2 111:11 116:2
132:25 138:1,1 143:10 147:8
164:1,1,1 204:10,15 220:12
223:25 224:4 252:4 255:8,18
256:4 261:15 263:14 279:5
276:14,18 278:10 288:21
289:5 290:15 296:17
**2016** 30:23 95:23 127:7,15
204:13

---
**3**
---
**3** 5:23 6:6,11 47:15,17 106:14
117:22 141:1 194:8 209:16
227:9
**3:00** 324:19
**30-day** 113:7,8 195:18
**302** 296:17 298:20,24 300:15
305:20 312:12,24,25
**305-400-4261** 1:22
**305-400-4266** 2:3
**305-530-6168** 1:17
**305-961-9356** 1:17
**305.523.5118** 2:7 333:17
**31** 5:25 287:22,24,2 5 288:2
**32** 5:19 185:11,13,14,23,24
186:7,8,9 226:2,3
**326** 7:4,5,6,7,8
**33** 5:24 6:1 246:2,8,13,13,14
278:24 279:2,9 287:22 288:2
288:3,5
**33128** 2:7 333:17
**33131** 1:22 2:3
**33132** 1:16
**333** 4:11
**34** 5:5 10:14,15 11:2 56:6
**35** 6:2 288:6,9
**360** 175:24 196:17 200:15
**371** 223:17
**39** 216:11

---
**4**
---
**4** 15:18 17:6
**4,000** 319:2
**4:30** 320:21,22 321:4
**40** 5:5 10:8,21 11:2 24:6 56:6

---
**2017** 128:2
**2018** 1:7
**2019** 276:5 323:19
**204** 3:18
**21** 5:21 6:16 7:2 250:24
**212** 3:19
**213** 3:20,21
**216** 3:22
**217** 3:23
**219** 3:24,25
**22** 5:18 6:22 104:19
**2255** 186:15
**23** 5:12 164:1 223:24
**23rd** 161:22 162:13
**24** 1:7 6:5,10 197:7
**24th** 205:21 207:5 208:18
**240** 195:19,20 212:6,14
**245** 4:1
**24** 4:2
**25** 5:25 164:1 167:20
**25th** 161:22 162:13
**250** 4:3
**257** 4:5
**261** 4:6
**262** 4:7,8
**27th** 124:6
**270** 4:9
**271** 5:22
**276** 5:23
**279** 5:24
**28** 3:5,6 76:22 234:15
**28th** 279:8,24,25
**283** 4:10
**287** 5:25
**288** 6:1,2,3,4,5
**289** 6:6,7,8,9,10
**29** 288:21
**290** 6:11,12,13
**292** 6:14,15,16
**293** 6:17,18,19,20,21,22
**294** 6:23,24
**295** 6:25 7:1,2
**296** 7:3

---
**5**
---
**5** 5:8 6:1,17,24 15:11 47:16 48:4
49:3 76:14,19 79:10 94:22
106:13 117:22 131:7 141:1
223:23,24 224:4 282:17
**5-11-15** 261:1
**5-11-2015** 260:16,21
**5-6-15** 261:4
**5-6-2015** 261:9
**5:00** 235:22
**5:50** 284:20
**50** 143:6 328:21
**52** 5:6 10:24 11:2 44:17 56:6
78:8
**54** 143:6,7
**55** 5:17 165:2 170:17,20 191:21
**58** 5:12 165:2 169:16,18,21,23
191:21

---
**6**
---
**6** 5:7,10 290:15
**6,000** 282:17
**6:45** 333:9
**608** 332:1,6
**608(b)** 332:7,9
**609** 332:2,3
**61** 5:9 122:14,20,25
**62** 5:6 8:14 11:2 46:23 56:7
94:18
**64** 5:13 165:2 169:13,24 170:1
191:21 198:11
**64,000** 102:20
**66** 3:7
**67** 185:5,20
**69** 6:3 288:10,14

---
**7**
---
**7** 6:7,12 7:5 37:12,12,1 7 47:16
47:23 49:2,6,9 94:22 106:13
110:22 117:22 141:1 224:4
**7:30** 15:25
**701** 166:17 315:16
**71** 6:4 288:15,18
**72** 5:7 7:4 55:22,24 56:3 325:23
325:24 326:2
**74** 6:5 288:19,24
**76** 5:8 6:6 288:25 289:3
**77** 7:2 295:17,18,21
**78** 7:5 326:3,7
**79** 6:7 289:4,7

---
**8**
---
**8** 5:14 6:18 15:8 16:6 17:5
276:18
**8:00** 16:4
**8:30** 15:8,20 16:6 283:25
**8:45** 284:1
**801(d)(d)(E)** 221:9
**803** 233:6
**85** 7:6 326:8,12
**866-780-8355** 1:23
**88** 6:8 289:8,12,15

---
**124** 6:11 289:25 290:3
**125** 6:12 290:4,7
**127** 6:13 290:9,11
**128** 6:14 290:12,15,23 292:10
**13** 148:11
**13-3** 1:5 2:6 333:17
**135** 7:1 295:11,16
**136** 6:15 292:12,13,16
**137** 6:25 294:25 295:1,10
**14** 6:3 223:20
**141** 6:16 292:17,21
**142** 3:12
**143** 7:8 326:17,20
**144** 292:22
**145** 7:3 295:22,24 296:2
**146** 3:13,14 6:17 293:1,5
**147** 6:18 293:6,8
**148** 6:19 293:9,11
**149** 6:20 293:12,15
**15** 5:7,11,22 6:8,20 18:4,6,7 20:7
71:23 72:2,6 79:5 90:25
192:14 276:9 288:21 289:5
**150** 6:21 293:16,18
**1500** 267:8
**151** 6:22 293:19,22
**152** 6:23 293:23 294:1
**153** 6:24 294:2,5
**155** 326:21,24
**158** 3:15 294:6
**16** 5:16 6:15 7:1,7
**16,000** 244:20
**16-20893-CR-MORENO** 1:3
**162** 229:15
**165** 3:16,17
**169** 5:10,11,12
**17** 198:16
**17,000** 62:6 113:19
**170** 5:13,14,15,16,17
**170-A** 226:17,18
**170-B** 226:21,23
**1700** 243:5
**172** 5:21 189:4,21 229:15 238:4
238:10 246:5
**174** 5:20 186:11,12,17,18 187:4
188:20 189:1 255:1 259:7
260:9
**1750** 1:21 2:2
**178** 5:18
**18** 6:4,21
**1800** 304:5 307:20 316:11
**186** 5:19
**189** 5:20,21
**19** 5:8 61:22 192:2 276:7 278:10
**199** 5:22 271:12,15

---
**400** 2:6 333:17
**41** 5:5 10:18 11:2 39:11,24 56:6
92:4 124:15
**42** 5:5 8:18,20,2 1 11:2 56:6
**43** 5:23 275:20 276:3
**44** 5:6 10:10 11:2 56:6
**45** 18:16,17,19,20 20:7 28:16
97:13 135:14 136:1
**46** 103:16
**47** 5:10 165:2 168:14,15,16,24
169:6 171:2 191:21 197:3
205:20,24
**49** 5:11 165:2 168:9,12 169:9,10
169:13,15 191:21 192:21
207:11 286:8

**9**

**9** 5:19 6:2 15:10
**9:00** 15:9 235:23
**9:04** 8:1
**9:27** 279:24
**9:30** 16:23 283:25 284:1 332:24
**9:42** 279:25
**9:48** 27:11
**92** 5:15 165:2 170:9,12 191:21
**93** 165:2 170:21 191:21
**95** 6:9 289:16,20
**954** 127:17
**97** 7:7 326:13,16
**98** 3:8 6:10 289:22,24
**99** 1:16 310:20