```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
3                   CASE NUMBER 16-20893-CR-MORENO
4
   UNITED STATES OF AMERICA,
5
                   Plaintiff,              Courtroom 13-3
6
     vs.                                   Miami, Florida
7
   MONTY RAY GROW,                         January 25, 2018
8
                   Defendant.
9
10                     JURY TRIAL PROCEEDINGS
           BEFORE THE HONORABLE FEDERICO A. MORENO
11               UNITED STATES DISTRICT JUDGE
12
   APPEARANCES:
13
   FOR THE GOVERNMENT:      KEVIN J. LARSEN, AUSA
14                          JON M. JUENGER, AUSA
                            United States Attorney's Office
15                          Economic Crimes Section
                            United States Attorney's Office
16                          99 Northeast Fourth Street
                            Miami, Florida 33132
17                                              305-961-9356
                                          Fax: 305-530-6168
18                                        kevin.larsen@usdoj.gov
                                          jon.juenger@usdoj.gov
19
   FOR THE DEFENDANT:       DANIEL L. RASHBAUM, ESQ.
20                          JEFFREY E. MARCUS, ESQ.
                            Marcus Neiman & Rashbaum, LLP
21                          2 South Biscayne Boulevard
                            Suite 1750
22                          Miami, Florida 33131
                                                305-400-4261
23                                        Fax: 866-780-8355
                                          drashbaum@mnrlawfirm.com
24                                        jmarcus@mnrlawfirm.com
25
```

1                               **KATHRYN A. MEYERS, ESQ.**
                              Law Office of Kathryn A. Meyers PLLC

2                               2 South Biscayne Boulevard
                              Suite 1750

3                               Miami, Florida 33131
                                           305-400-4266

4                                       kate@kmeyerslaw.com

5 **REPORTED BY:**              **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                            Official United States Court Reporter

6                               Wilkie D. Ferguson Jr. US Courthouse
                              400 North Miami Avenue - Suite 13-3

7                               Miami, Florida  33128    305.523.5118
                              gphofficialreporter@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

                                                                  Page
Josie Brundige .............................................. 11

    Direct Examination by Mr. Juenger ...................... 11

        Cross-Examination by Mr. Rashbaum ..................... 13

Sven Bjerke ................................................. 15

    Direct Examination by Mr. Larsen ...................... 15

        Cross-Examination by Mr. Rashbaum ..................... 31

        Redirect Examination by Mr. Larsen ................... 45

Armando Lozada .............................................. 48

    Direct Examination by Mr. Juenger ...................... 48

        Cross-Examination by Mr. Marcus ...................... 75

        Redirect Examination by Mr. Juenger .................. 99

Michael Ewton ............................................... 113

    Direct Examination by Mr. Larsen ...................... 113

        Cross-Examination by Mr. Rashbaum ..................... 120

        Redirect Examination by Mr. Larsen ................... 123

David Corcoran .............................................. 169

Direct Examination (Outside the Presence of the Jury)
by Mr. Marcus ............................................... 169

Cross-Examination (Outside the presence of the Jury)
by Mr. Juenger .............................................. 180

David Corcoran .............................................. 187

    Direct Examination by Mr. Marcus ...................... 187

        Cross-Examination by Mr. Juenger ..................... 204

        Redirect Examination by Mr. Marcus .................. 224

1  Luis Green  ............................................... 230

2       Direct Examination by Mr. Rashbaum ..................... 230

3         Cross-Examination by Mr. Larsen ...................... 237

4         Redirect Examination by Mr. Rashbaum ................. 245

5  Salvador Davila ......................................... 246

6       Direct Examination by Mr. Larsen ...................... 246

7         Cross-Examination by Mr. Larsen ...................... 250

8  Monty Ray Grow .......................................... 254

9       Direct Examination by Mr. Rashbaum ..................... 254

10  Reporter's Certificate .................................. 281

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBITS

| Exhibits<br>Description | Marked for<br>Identification | | Received<br>in Evidence | |
|---|---|---|---|---|
| | Page | Line | Page | Line |
| Defendant's Exhibit Number 17 ...................... 32 | | | | 22 |
| Defendant's Exhibit Number 211 ..................... 81 | | | | 9 |
| Defendant's Exhibit Number 58 ...................... 84 | | | | 25 |
| Defendant's Exhibit Number 53 ...................... 88 | | | | 16 |
| Government's Exhibit Number 100 ................... 127 | | | | 24 |
| Government's Exhibit Numbers 124 and 125 .......... 128 | | | | 19 |
| Defendant's Exhibit Numbers 19, 36, 47, 105,<br>171 .............................................. 165 | | | | 21 |
| Defendant's Exhibit Number 120 .................... 234 | | | | 12 |
| Defendant's Exhibit Number 201 .................... 264 | | | | 13 |

```
 1          (The following proceedings were held at 9:32 a.m.:)

 2          THE COURT:  Good morning.  The defendant is present,

 3   defense counsel, Government counsel.

 4          Mr. Rashbaum, how is your son?

 5          MR. RASHBAUM:  Judge, thanks for asking.  He has no

 6   fever this morning so -- my wife is a stellar mom.  I'm lucky.

 7          THE COURT:  All right.  I gave you all a few minutes

 8   ago, about 5, 10 minutes ago, proposed jury instructions so you

 9   can look at them.  No need to talk about it now, but it was

10   something for you.

11          This morning we got a call from our Ms. Brooks.  She

12   was the 13th juror who became the 12th juror after we excused

13   Ms. Glover who had the swelling in her ankle.  And Ms. Brooks

14   was going to the doctor, to the hospital, she's got stomach

15   pain.  The doctor had told her she couldn't work and I guess she

16   forgot to tell us that.  In any event, she is either at the

17   doctor or at the hospital right now and left a number, and

18   that's Leah Michelle Brooks.

19          So obviously, we shouldn't make her come because I'm

20   not going to have the marshals get someone from the hospital.

21   She has stomach pains, and it looked like it was serious, at

22   least from what she says.

23          What say the defense?

24          MR. RASHBAUM:  Excuse her, Your Honor.

25          THE COURT:  What say the Government?
```

1           MR. LARSEN:  Excuse the juror, Your Honor.

2           THE COURT:  Okay.  See, now we are down to two

3    alternates.  That's why we chose alternates, see.  And that's

4    why it's important for trials to move quickly for both sides.

5    All right?  That's what happens.  Okay.  They are being moved

6    from one jury room to the other.

7           So you've got your witness?

8           MR. LARSEN:  Yes, Judge, we do.

9           THE COURT:  All right.  Ready to go?

10          MR. LARSEN:  Yes, we are.

11          MR. JUENGER:  Should we bring the witness in now, Your

12   Honor, just to be ready to go?

13          THE COURT:  Yes, you might as well bring him in.

14   Something has happened.

15          Right over here on my left, your right.  Okay?  You can

16   sit down, get comfortable.  The jury will be coming in.  Right

17   in there.  It's hard to see.  Right there, our left.  Go ahead

18   and have a seat, get comfortable.  We'll swear you in in a

19   minute.

20          And this witness is?

21          MR. JUENGER:  Josie Brundige, Your Honor.

22          THE COURT:  And she came from where?

23          MR. JUENGER:  Jacksonville.

24          THE COURT:  Okay.  Did you drive?

25          THE WITNESS:  No, sir, I fly.

```
 1              THE COURT:  All right.  I wonder what's going on.
 2    Bring them in.
 3              THE COURTROOM DEPUTY:  They are in there.
 4              THE COURT:  Bring them in.  Thank you.  Well, I didn't
 5    know.
 6              THE COURTROOM DEPUTY:  I was coming to tell you.
 7              THE COURT SECURITY OFFICER:  All rise for the jury,
 8    please.
 9              One second, Your Honor, one is in the restroom.
10              THE COURT:  No, but bring them in.  Bring them in, and
11    the last one comes in.  They all don't have to come in together
12    as a team.  Just start bringing them in.  We don't wait.
13         (The jurors entered the courtroom at 9:38 a.m.)
14              THE COURT:  Good morning, everybody.
15              THE JURY:  Good morning.
16              THE COURT:  Have a seat and relax.
17         (The remaining juror entered the courtroom 9:39 a.m..)
18              THE COURT:  Please be seated.
19              The defendant is present, defense counsel and
20    Government counsel.
21              Ms. Brooks, Leah Michelle Brooks, became ill, she had
22    to go to the doctor, I'm sure she'll be all right, with stomach
23    pains.  So we have excused her, just in case you wondered why
24    she was not here.
25              And then I want to apologize in particular to
```

1    Mr. Jones, James Lee Jones, because when I said get here for

2    9:30, I also said for some of you 8:30, because I didn't want to

3    zero in on anybody.  So Mr. Jones thought it was 8:30 and he was

4    here before 8:00 because I saw him and the others.  So I'll make

5    it up to you somehow.  I don't know how, but I'll make it up to

6    you.  If not, you'll get your reward in the next world.  Right?

7    I don't know.  Somehow or other that will work, but I want you

8    to know I appreciate the fact and it was my fault.

9            I also don't tell you too much in advance when we start

10   the next day because then it can be confusing, but I might as

11   well tell you that tomorrow morning, because of other matters

12   that I have in the court, is 10:15.  Okay?  So 10:15 tomorrow.

13           Yes, sir.  Mr. Jean.

14           MR. JEAN:  I have a doctor's appointment.

15           THE COURT:  You have a doctor's appointment.  Did you

16   tell me about that?

17           MR. JEAN:  Yeah.

18           THE COURT:  You did?

19           MR. JEAN:  Yeah.

20           THE COURT:  You did, huh?  Okay.  What time was it?

21           MR. JEAN:  At 9:00.

22           THE COURT:  At 9:00.  And how long do you think it's

23   going to take?

24           MR. JEAN:  About an hour.

25           THE COURT:  Pardon?

Brundige - Direct

1           MR. JEAN:  About an hour.

2           THE COURT:  Half an hour, you said?

3           MR. JEAN:  About an hour.

4           THE COURT:  All right.  Well, go to the doctor, we'll

5    figure it out.  Okay?

6           I forgot to write it down, okay, but no problem.  And

7    then, what we'll do is we will start at 10:30.  All right?

8    There's no point making everybody come in at 10:15.

9           How far is the way doctor?  How far away is the doctor?

10   How far?  What part of town is the doctor in where you are

11   going?

12          MR. JEAN:  Right by my house.

13          THE COURT:  But I don't remember where your house is

14   so -- what city?

15          MR. JEAN:  Miami Shores.

16          THE COURT:  Miami Shores.  Okay.  All righty.

17          Your next witness is?

18          MR. JUENGER:  Josie Brundige.

19          THE COURT:  Would you mind raising your right hand.

20          JOSIE BRUNDIGE, GOVERNMENT'S WITNESS, SWORN.

21          THE COURT:  Lower your hand and tell us your name.

22          THE WITNESS:  My name is Josie Brundige, spelled

23   J-o-s-i-e, B, as in boy, r-u-n-d-i-g-e.

24          THE COURT:  All right.  Go ahead.

25                     DIRECT EXAMINATION

Brundige - Direct

1    BY MR. JUENGER:

2    Q.  Ms. Brundige, where do you live, what city and state?

3    A.  I live in Jacksonville, Florida.

4    Q.  And do you have health insurance?

5    A.  Yes, sir.

6    Q.  What type of health insurance?

7    A.  Tricare.

8    Q.  And was there a time in the past when you were offered to

9    order some drugs through the mail?

10   A.  Yes, sir.  It was shown to me by a friend.

11   Q.  And just tell me the name of the friend, please.

12   A.  Her name is Eleanor Alley.

13   Q.  Eleanor Alley?

14   A.  Yes.

15   Q.  And what were the drugs that you offered?

16   A.  She just told me would you like to try a pain, something

17   pain medication.  It's a kind of cream.

18   Q.  And did you have pain?

19   A.  The pain, yeah, because I work in health care and then I

20   walk around a lot and so I tried it.

21   Q.  And did you agree to order it?

22   A.  I kind of like told her, okay, I will try it, and then she

23   gave me a piece of paper.

24   Q.  And were there other drugs that you agreed to try?

25   A.  She didn't mention that.  She just said just the pain cream.

Brundige - Direct

12

```
 1  Q.  And were you offered any money if you ordered any drugs?

 2  A.  She just said like if you order this, you're going to get

 3  some money.

 4          MR. RASHBAUM:  Objection, Your Honor, hearsay.

 5          THE COURT:  Sustained.  You can't tell us what she

 6  said.

 7          MR. JUENGER:  It was an offer, Your Honor, but --

 8          THE COURT:  Pardon?  I'm sorry?

 9          MR. JUENGER:  It was an offer.  It's not offered for

10  the truth.  That's ironic but --

11          THE COURT:  Are you seeking the truth here?

12          MR. JUENGER:  I am not.

13          THE COURT:  You are not seeking the truth in this case?

14          MR. JUENGER:  No.

15          THE COURT:  You don't really want to say that, do you?

16          MR. JUENGER:  Well --

17          THE COURT:  I'm sustaining the objection.

18          MR. JUENGER:  Fair enough, Your Honor.

19          THE COURT:  Let's not talk lawyer-talk.  Just call the

20  witness for whatever you think is important, not to argue with

21  the Court about the rules of evidence.

22  BY MR. JUENGER:

23  Q.  Ms. Brundige, did you ever hear from a doctor about those

24  drugs?

25  A.  No, never.
```

Brundige - Cross

13

1   Q.   And did the drugs come?

2   A.   I never heard from -- I mean none of them.

3   Q.   You never received any drugs?

4   A.   I mean, drugs, yeah, it was delivered, yes.

5   Q.   And what drugs were delivered?

6   A.   When I open it, it was pain cream and there's a vitamin and

7   there is a scar cream also.

8   Q.   Do you have any scars?

9   A.   No, sir, I don't have any scar.

10  Q.   And did you receive some money after the drugs came?

11  A.   Yes.   Right after a month of that when we received it.

12          MR. JUENGER:   That is all I have, Your Honor.

13          THE COURT:   Cross-examination.

14          MR. RASHBAUM:   Very briefly.

15          THE COURT:   It should be.

16                      CROSS-EXAMINATION

17  BY MR. RASHBAUM:

18  Q.   My name is Dan Rashbaum.   I represent Monty Grow.   Good

19  morning.

20  A.   Good morning.

21  Q.   Did you ever meet Mr. Grow, Monty Grow?

22  A.   No.

23  Q.   Did you ever talk to Monty Grow about your pains or anything

24  like that?

25  A.   No, sir.

Brundige - Cross

14

```
1  Q.  Have you ever talked to Monty Grow in your whole entire
2  life?
3  A.  No.
4  Q.  And that form that you gave detailing the pain in your back
5  and whether you wanted scar cream or didn't want scar cream, did
6  you give that to Monty Grow?
7  A.  Yes.
8  Q.  You gave --
9  A.  I'm sorry.
10 Q.  Let me rephrase.
11      Have you ever given anything to Monty Grow or spoken to
12 Monty Grow?
13 A.  I never met him and I never spoke to him.
14 Q.  Okay.  And you've never given him anything either, correct?
15 A.  Correct.
16      MR. RASHBAUM:  No further questions, Your Honor.
17      THE COURT:  Redirect.
18      MR. JUENGER:  No redirect, Your Honor.
19      THE COURT:  Thank you, Ms. Brundige, you're excused.
20 Have a safe trip back to Jacksonville.  Next witness.  You can
21 go the same way you came.
22    (The witness was excused.)
23      MR. LARSEN:  Your Honor, the --
24      THE COURT:  Who is it?
25      MR. LARSEN:  Your Honor, the Government called Sven
```

 1 Bjerke.

 2          THE COURT:  All right.

 3          Raise your right hand, please, sir.

 4           SVEN BJERKE, GOVERNMENT'S WITNESS, SWORN.

 5          THE COURT:  Have a seat, tell us your name, and spell

 6 both first and last name.  All right?

 7          THE WITNESS:  My name be Sven Bjerke, S-v-e-n,

 8 B-j-e-r-k-e.

 9          THE COURT:  Thank you, sir.

10                    DIRECT EXAMINATION

11 BY MR. LARSEN:

12 Q.  Good morning, Mr. Bjerke.

13 A.  Good morning.

14 Q.  Where do you live, city and state only, please?

15 A.  Jacksonville, Florida.

16 Q.  Do you know why you were called to testify here in court

17 today, Mr. Bjerke?

18 A.  Yes, sir.

19 Q.  Why were you called to testify?

20 A.  To speak in front of a jury about my business with Monty

21 Grow.

22 Q.  And how did you first meet Mr. Grow?

23 A.  Through a friend of mine named Ryan Long.

24 Q.  And who is Ryan Long?

25 A.  Monty's friend.

Bjerke - Direct

1   Q.   Do you know how Mr. Long and Mr. Grow know each other?

2   A.   I believe childhood buddies.

3   Q.   Now, what did you specifically do -- what were your business

4   dealings?   In a brief way describe your business dealings with

5   Mr. Grow.

6   A.   I got paid to recruit patients that had Tricare.

7   Q.   By -- you got paid by whom?

8   A.   By Monty.

9   Q.   Did you plead guilty to charges associated with this

10  business arrangement you had with the defendant?

11  A.   I did plead guilty.

12  Q.   What did you plead guilty to?

13  A.   To receiving kickbacks.

14  Q.   What type of charge did you plead guilty to, do you know?

15  A.   Conspiracy.

16  Q.   Conspiracy to receive kickbacks?

17  A.   To receive kickbacks, sorry.

18  Q.   And did you plead guilty because you are, in fact, guilty,

19  Mr. Bjerke?

20  A.   Yes, sir.

21  Q.   And have you met Mr. Grow personally before?

22  A.   I have met Monty once.

23  Q.   Do you see Mr. Grow in the courtroom today?

24  A.   Yes, sir, he's sitting over there.

25  Q.   Did you, in connection with the charges, enter into a

Bjerke - Direct

1   written Plea Agreement with the United States Government?

2   A.   Yes, I did.

3   Q.   Have you been sentenced yet in connection with the conduct

4   that you pled guilty to?

5   A.   I have not.

6   Q.   Now, what do you understand that your Plea Agreement

7   requires you to do?

8   A.   Just to cooperate.

9   Q.   What do you understand cooperate to mean?

10  A.   I submitted documents and had an interview with the U.S.

11  attorneys.

12  Q.   And what else do you understand your Plea Agreement requires

13  you to do?

14  A.   Just to tell the truth.

15  Q.   And have you been cooperating with the Government prior to

16  today?

17  A.   Yes, sir.

18  Q.   Now, are you testifying today in court, at least in part,

19  because you're hoping to get some further reduction of your

20  ultimate sentence?

21  A.   Sure.

22  Q.   Has the Government asked for a reduction in your sentence at

23  this point?

24  A.   No.

25  Q.   Who do you understand will make that decision if any request

Bjerke - Direct

1  is ultimately made to reduce your sentence?

2  A.  The judge would be the final decision on that.

3  Q.  Do you know what perjury is, Mr. Bjerke?

4  A.  Yes.

5  Q.  What is it?

6  A.  Lying on the witness stand.

7  Q.  And what do you believe could happen to you if you lied on

8  the witness stand today?

9  A.  Jail time.

10  Q.  Now, earlier you mentioned Ryan Long as the individual who

11  introduced you to the defendant.  Why were you introduced to the

12  defendant?

13  A.  Just for a business opportunity, to become a pharmaceutical

14  rep and make money.

15  Q.  And what was this opportunity, this pharmaceutical rep?  Was

16  there a company name?

17  A.  It was InforMD Solutions.

18  Q.  What was InforMD Solutions?

19  A.  A pharmaceutical rep company.

20  Q.  Did you sign a contract with Mr. Grow for InforMD Solutions?

21  A.  Yes, I did.

22  Q.  Do you know where InforMD Solutions was located?

23  A.  Based in Louisiana.

24  Q.  I'm going to show you what has been admitted in evidence as

25  Government's Exhibit 137.  Sven Bjerke, this is you, right --

Bjerke - Direct

1    A.  Yes, sir.

2    Q.  -- and Mr. Grow?

3          I'm showing you the document that's attached to this

4    email.  It says Independent Sales Agreement and your name?

5    A.  Yes, sir.

6    Q.  On the last page, is this your signature?

7    A.  It is.

8    Q.  And you see Monty Grow, President.  Do you know what MGTEN

9    Marketing Group, Inc. is?

10   A.  Yes, that's Monty's company.

11   Q.  And this agreement was to be an independent sales agent for

12   Mr. Grow?

13   A.  Yes, sir.

14   Q.  What did you understand you were going to be doing for

15   Mr. Grow with this pharmacy in Louisiana?

16   A.  Well, as a pharmaceutical rep, I guess you had to have a

17   relationship with a doctor or doctors and to get them to use

18   your script pad that had their information on it.

19   Q.  Now, what time frame was this when you started working with

20   Mr. Grow, the defendant, at the Louisiana or for the Louisiana

21   pharmacy?

22   A.  I would say mid to late 2014.

23   Q.  So in mid 2014, did you have any other job at the time?

24   A.  At the time I did, I worked in a warehouse.

25   Q.  Did you have any pharmaceutical background or marketing

1  experience?

2  A.  I did not.

3  Q.  Tell the jury how you started with InforMD in Louisiana?

4  Was it physically in Louisiana where you were living?

5  A.  No, I was living in Jacksonville.

6  Q.  How did you get started with Mr. Grow and InforMD?

7  A.  Well, as soon as I received the kit, almost like a welcome

8  kit from InforMD, they just send you this big kit that had --

9  what is this -- intake sheets, prescription forms, and different

10 literature telling their services and what kind of products they

11 had.  And you were to, you know, have a relationship with

12 doctors so that they would use your specific script pads when

13 they prescribed stuff to patients.

14 Q.  Your specific script pads, what do you mean by that?

15 A.  Well, on the script pads, they would have identifying

16 numbers or letters that you would get paid for if they were able

17 to fill the prescriptions.

18 Q.  And who did you understand you were to be marketing these

19 InforMD products to?

20 A.  Tricare.

21 Q.  At InforMD?

22 A.  At InforMD, yeah.

23 Q.  Where would you go to try and persuade someone for InforMD,

24 I'm talking about in Louisiana?  Where were you supposed to

25 market the products to?

1   A.   To military.

2   Q.   At InforMD?

3   A.   Oh, no, not at InforMD.   InforMD was just a doctor's office.

4   Q.   Okay.

5   A.   You would have to have a relationship with doctors and

6   then --

7   Q.   I'm going to ask you about the military in a moment.   Tell

8   the jury -- we're talking about July of 2014, the summer of

9   2014.   What was the business arrangement with the defendant and

10  InforMD?   What were you told to do?

11  A.   Just to have a relationship with doctors and get the

12  literature into their office, so that they could prescribe the

13  products.

14  Q.   How were you supposed to do that?

15  A.   By meeting with doctors and maybe taking them out to lunch

16  or something and having a relationship with them.

17  Q.   Did you know any doctors or had any relationships with

18  doctors?

19  A.   I did not, no.

20  Q.   Did Mr. Grow train you at all on these products from

21  InforMD?

22  A.   No.

23  Q.   Did he train you about how to market the products?

24  A.   No.

25  Q.   Did he train you about what they were supposed to be used

Bjerke - Direct

1  for?  Again, I'm talking about the InforMD products.

2  A.  No, not at all.

3  Q.  How were you supposed to make money in this arrangement with

4  the defendant at InforMD?

5  A.  Well, at InforMD, if the doctors used the script pads, you

6  would get a commission.

7  Q.  Did you make any money at all through InforMD?

8  A.  I made about 400 bucks.

9  Q.  And what was that $400 related to?

10  A.  I got -- actually got my mom to go in and take the script

11  pad to her doctor and they were able to fill it.

12  Q.  Okay.  So your mom took a script to her primary care doctor?

13  A.  Correct.

14  Q.  And you made how much money?

15  A.  400 bucks.

16  Q.  Is that all you made through your relationship with the

17  defendant and InforMD?

18  A.  For InforMD, yes.

19  Q.  Was the money that you were supposed to make at InforMD, was

20  it a commission or a percentage?

21  A.  Yes.

22  Q.  If you made money through any patient at InforMD, do you

23  know whether Mr. Grow would also make money?

24  A.  Yes.

25  Q.  Okay.  Now, did you ever pay doctors while you were working

Bjerke - Direct

23

1   for InforMD?

2   A.   Never.

3   Q.   Did you actually ever make it into a face-to-face meeting

4   with a doctor?

5   A.   Never made it that far.

6   Q.   Did you ever pay a patient to try these products or to take

7   a prescription in?

8   A.   I did not.

9   Q.   Aside from your mother, who you just testified to, did you

10  directly market to any patient while you were working with

11  InforMD?

12  A.   No.

13  Q.   Now, did there come a time when the way you were marketing

14  the products at InforMD changed?  Did there come a time when the

15  business arrangement changed?

16  A.   With InforMD?

17  Q.   With InforMD or thereafter.  I'm talking about after the

18  summer of 2014, was there ever a change?

19  A.   Yeah, there was a change at some point.

20  Q.   Can you tell the jury about that change?

21  A.   Well, it went from having relationships with doctors to now

22  being able to use something called telemed which is -- I guess

23  which is a doctor, I am not quite sure what it is, but a doctor.

24  You would turn the intake sheet and then a doctor would call the

25  patient.

Bjerke - Direct

1  Q.   And how did you learn about that?  How did you know that?

2  A.   Through turning in the sheets to Monty Grow.

3  Q.   So the defendant told you about this change in the

4  arrangement?

5  A.   Sure.

6  Q.   Okay.  Do you know where these telemed doctors came from?

7  A.   I have no idea.

8  Q.   Did the defendant tell you anything about relationships he

9  had with the telemed doctors?

10  A.   No.

11  Q.   So with this change, the change we are talking about with

12  the use of the telemed doctors, did you get any different

13  instructions about how you were supposed to market these

14  products?

15  A.   Sure.  Now you could just market directly to a patient that

16  had Tricare and then just get the sheet filled out with the

17  information and email it to Grow and to tell them that they

18  would expect a phone call from a doctor.

19  Q.   I want to just go back to InforMD for just a second.  Were

20  you told by the defendant to target Tricare beneficiaries back

21  at InforMD?

22  A.   Not specifically, no.

23  Q.   So this was something new --

24  A.   Correct.

25  Q.   -- targeting the Tricare?

Bjerke - Direct

1  A.  Sure.

2  Q.  So what type of direction, if any, did you get from the

3  defendant about the products that you should sign up patients

4  for?

5  A.  It was just three things; it was scar cream, multivitamin,

6  and pain cream.

7  Q.  Were there any directions with respect to how much or

8  refills?

9  A.  There was a thing on the sheet that you could check off to

10  get auto refills, so that was a pushing point.

11  Q.  What do you mean, a pushing point?

12  A.  You wanted auto refills, so you could get more money.

13  Q.  And who told you that?

14  A.  Mr. Grow.

15  Q.  Why were you told to target Tricare patients for these

16  products?

17  A.  Well, they were the only ones that were paying, the only

18  company that was paying out for these products.

19  Q.  Did the defendant tell you to find any other type of patient

20  for these products?

21  A.  No.

22  Q.  Did you receive any instruction from the defendant about

23  what to tell patients about what the cost of these drugs, what

24  the cost out of pocket to the patient would be?

25  A.  Yes.  There would be no cost to them aside from a copay.

Bjerke - Direct

26

1   Q.   Did you ever receive any instruction from Mr. Grow about

2   copays?

3   A.   Sure.

4   Q.   What did he tell you?

5   A.   That they wouldn't collect a copay if they didn't want to

6   pay for it.

7   Q.   Who is "they" when you say they wouldn't collect?

8   A.   I guess Tricare or --

9   Q.   Okay.  So there would be no copay collected if the patient

10  didn't want it.  I want to make sure I understand your

11  question -- your answer.  Excuse me.

12       MR. RASHBAUM:  Objection, Your Honor, leading.  He

13  asked and answered.

14       THE COURT:  Sustained.

15  BY MR. LARSEN:

16  Q.   Any other instructions with respect to copay that you got

17  from the defendant?

18  A.   No.

19  Q.   Why would you tell a patient that didn't want to pay a copay

20  that they could ignore it?

21  A.   Just as, I guess, a selling point maybe to get them involved

22  as perhaps a rep.

23  Q.   Would there be any impact to you as a sales rep if a patient

24  didn't have to pay a copay?

25  A.   Yeah, they might lean towards getting the products if they

Bjerke - Direct

1    didn't have to pay anything out of their own pocket.

2    Q.  Have you ever the heard the name of a person named Josie

3    Brundige?

4    A.  Sure.

5    Q.  Who is she?

6    A.  She's a friend of my aunt.

7    Q.  Let me show you Government's Exhibit 77.  It's been

8    admitted.  It's an email from you to Mr. Grow dated January 24,

9    2015.  It says, "Tricare Patient Intake Form."

10          Is this the intake form that you were testifying about

11   earlier to fill out?

12   A.  Yes, sir.

13   Q.  And what instructions were you given by Mr. Grow with

14   respect to how to fill this out?

15   A.  Just to fill it out, get it filled out and email it to him.

16   Q.  Okay.  And this email address up here, is this the email

17   address that you would sometimes use --

18   A.  Sure.

19   Q.  -- or in this case, this email address,

20   montygrow@hotmail.com?

21   A.  Correct.

22   Q.  And here you say, "Attached is a new Patient Intake Form."

23   And you mentioned Eleanor Alley?

24   A.  Yes, that's my aunt.

25   Q.  Now, did you fill out this Patient Intake Form?

Bjerke - Direct

1  A.  I did.

2  Q.  And I want to focus in on -- let's see.  There's the name

3  Josie Brundige, her Tricare benefits number; surgeries, none.

4  It says location of scar, and here it says zero, still wants the

5  scar cream.  Did you write that?

6  A.  I did.

7  Q.  Did it seem odd to you to be writing down zero, but still

8  wants the scar cream?

9  A.  Sure.

10  Q.  Why would that be odd?

11  A.  'Cause I guess she doesn't need the scar cream and she still

12  wanted it.

13  Q.  And it says location of pain, knee; and metabolic vitamin,

14  yes.

15       So you emailed this to Mr. Grow on January 24th?

16  A.  Yes.

17  Q.  Do you know what happened to the intake form that we were

18  just discussing after you emailed it to the defendant?

19  A.  I do not.

20  Q.  How did you get paid for patients that you referred to the

21  defendant?

22  A.  I would get a direct deposit monthly.

23  Q.  And how much money did you get from the defendant?

24  during the course of this arrangement you've been talking about

25  this morning?

Bjerke - Direct

1  A.  Somewhere around 80 grand.

2  Q.  What did you get the 80 grand -- what did you do for that

3  money?

4  A.  Just recruited Tricare patients, that's it.

5  Q.  And how many?  Was it a lot, a little?

6  A.  My first tier wasn't very many, maybe a few, but then you

7  had reps underneath you that were way more active than I was,

8  that I was drawing income from as well.

9  Q.  So was it a period of months, or how long were you involved

10 with Mr. Grow?

11 A.  I would say months, maybe not quite a year, six months.  I

12 can't really remember.

13 Q.  You said you were working in a warehouse before you got

14 involved with the defendant?

15 A.  Yes, sir.

16 Q.  Was that a full-time job?

17 A.  It was.

18 Q.  So 40 hours a week?

19 A.  Sure.

20 Q.  And what kind of work were you doing there?

21 A.  Just shipping and receiving.

22 Q.  How much money did you earn at that job in a year?

23 A.  About 42 grand.

24 Q.  Okay.  Now, did there come a time when you learned that you

25 had to become an employee of a pharmacy called PCA?

Bjerke - Direct

1  A.   I remember that, yes.

2  Q.   What do you remember about that?

3  A.   Just that we were switching over to be employees of the

4  pharmacy, not quite sure why, just had to fill out paperwork.

5  Q.   And who told you you had to do that?

6  A.   Monty.

7  Q.   Did you do the paperwork?

8  A.   Sure.

9  Q.   Did you ever work for this pharmacy?

10 A.   I mean, I didn't do any work for the pharmacy, no.

11 Q.   Did you ever do any more active recruiting of Tricare

12 beneficiaries after you became or filled out this paperwork for

13 the pharmacy?

14 A.   I did not.

15 Q.   How much money, if any, did you receive in payment from the

16 pharmacy?

17 A.   Somewhere around 32 grand.

18 Q.   Okay.  So about $80,000 came directly from the defendant and

19 then another $30,000 from the pharmacy?

20 A.   Yes, sir.

21 Q.   Did you ever get any training from the pharmacy on the

22 products --

23 A.   No.

24 Q.   -- about how to sell them --

25 A.   No.

1    Q.   -- whether they worked or not or how they worked?

2    A.   Nothing.

3    Q.   Did you incorporate a company named S. Bjerke, LLC?

4    A.   Yes, I did.

5    Q.   Why did you do that?

6    A.   I was just told by Grow that that's just something I needed

7    to do in order to get paid.

8    Q.   Was this company -- did this company do anything, S. Bjerke,

9    LLC?

10   A.   It didn't really do anything, no.

11   Q.   Did it do any business?

12   A.   No, it didn't do any business, it just received money.

13   Q.   Okay.

14        MR. LARSEN:   Nothing further, Your Honor.

15        THE COURT:   Cross-examination.

16        MR. RASHBAUM:   Thank you, Your Honor.

17        THE COURT:   You're welcome.

18                     CROSS-EXAMINATION

19   BY MR. RASHBAUM:

20   Q.   How do you say your last name?  I'm sorry.

21   A.   Bjerke.

22   Q.   Good morning, Mr. Bjerke.

23   A.   Good morning.

24   Q.   If I mess up your name, I'm sorry.

25   A.   No worries.

Bjerke - Cross

1    Q.  My name is Dan Rashbaum.  I represent Monty Grow.

2         I want to just unpack a couple of things to make sure

3    the jury is not confused.  When you first met Monty Grow and

4    started working with him, it was at a company called InforMD,

5    right.

6    A.  Yes, sir.

7    Q.  Okay.  And InforMD was a very large company?

8    A.  Correct.

9    Q.  And when you were signed up to work at InforMD, Mr. Grow was

10   your contact at InforMD, correct?

11   A.  Sure.

12   Q.  Now, when you started with InforMD, the first thing that

13   InforMD did was they sent you some literature, right, on the

14   company and the products they were selling.

15   A.  Correct.

16   Q.  Let me just --

17        MR. RASHBAUM:  Judge, I'm offering or admitting

18   Defendant's Exhibit 17 with no objection.

19        MR. LARSEN:  No objection.

20        THE COURT:  All right.  With no objection, it will be

21   admitted.

22      (Defendant's Exhibit Number 17 was received in evidence.)

23   BY MR. LARSEN:

24   Q.  The literature looked something like this, correct?

25   A.  Yes, sir.

Bjerke - Cross

1  Q.  Okay.  And InforMD also immediately sent you a 1099, right,

2  so you could do your taxes?

3  A.  Yes, sir.

4  Q.  And InforMD, this large company, immediately sent you

5  information so that you could tell them where they could wire

6  money to for your commissions, right?

7  A.  Yes.

8  Q.  And you were paid at InforMD on a commissions basis, right?

9  A.  Yes.

10 Q.  I don't know the exact numbers, but it was a tiering system,

11 right?

12 A.  It was a tier, I believe, yes.

13 Q.  Something like 7 percent, 5 percent, 3 percent?

14 A.  Sure.  It sounds about right.

15 Q.  And InforMD had you also filled out some other paperwork

16 that companies would normally have you fill out before you start

17 working for them, right?

18 A.  I can't remember.

19 Q.  Okay.  But they had you fill out the 1099, they gave you

20 that information, and they asked for your direct deposit,

21 correct?

22 A.  Yes

23 Q.  Your bank account information?

24 A.  Sure.

25 Q.  And then when you got your commissions at InforMD, your

Bjerke - Cross

1   payments didn't come directly from Mr. Grow, they came directly

2   from InforMD.  Is that fair to say?

3   A.  Okay.  That's fair, yes.

4   Q.  And InforMD did not market to patients.  That's also fair to

5   say, correct?

6   A.  Right.

7   Q.  The deal at InforMD was, you would go to, hopefully,

8   doctors' offices.

9   A.  Correct.

10  Q.  But there was a problem with that.  It was difficult, right?

11  A.  For me, yes.

12  Q.  And it was difficult because the doctors already had

13  relationships with other salespeople?

14  A.  Sure.

15  Q.  And other salespeople were taking the doctors out to ball

16  games, right?

17  A.  Sure.

18  Q.  And they were friends with the doctors.

19          MR. LARSEN:  Objection, foundation.

20          THE COURT:  Is this a question?

21          MR. RASHBAUM:  Yes.

22          THE COURT:  What is the question?

23  BY MR. RASHBAUM:

24  Q.  You were having trouble because the doctors were already

25  inundated with their friends and people who had relationships

1    with them, right?

2            THE COURT:  Why don't you break it up, say did you have

3    problems.

4    BY MR. RASHBAUM:

5    Q.  The doctors had friends that already had relationships with

6    them, right?

7            THE COURT:  If you know.

8            MR. RASHBAUM:  If you know.

9            THE COURT:  If you don't know, say I don't know.

10           THE WITNESS:  Sure.

11   BY MR. RASHBAUM:

12   Q.  And Monty Grow and you had a rule because InforMD had a

13   rule, we don't pay doctors for prescriptions.

14   A.  Correct.

15   Q.  Because you knew paying doctors for prescriptions would be a

16   kickback, right?

17   A.  Correct.

18   Q.  And you knew you couldn't do that because Monty Grow and you

19   discussed that and said we don't pay doctors for prescriptions.

20   A.  Right.

21   Q.  And so at some point in time, Mr. Grow leaves InforMD,

22   correct?

23   A.  Yes.

24   Q.  By the way, just backing up a little bit, and again, you got

25   introduced to Mr. Grow through Ryan Long, correct?

1    A.   Correct.

2    Q.   And Ryan Long was also one of these marketers at InforMD?

3    A.   Yes.  He was actually my sponsor.

4    Q.   Okay.  So on my chart before he would be in your downstream.

5    A.   Sure.

6    Q.   Anything you brought in, he would get a percentage of as

7    well?

8    A.   Correct.

9    Q.   So at some point in late 2014, early 2015, you learned that

10   Mr. Grow is leaving InforMD, correct?

11   A.   Yes.

12   Q.   And that he's going to open up his own company?

13   A.   Correct.

14   Q.   And you learn through Mr. Long that there's an opportunity

15   for you and him, Mr. Long, to move with Mr. Grow to his new

16   company, correct?

17   A.   Correct.

18   Q.   And the whole part of this new company is you no longer are

19   going to run into that roadblock because you won't pay doctors

20   because that would be a kickback, you're going to market

21   directly to patients, correct?

22   A.   Correct.

23   Q.   And when you market directly to those patients, you're going

24   to market to patients who have Tricare?

25   A.   Yes.

Bjerke - Cross

1   Q.  And the reason why you're going to market directly to

2   patients who have Tricare is because Tricare was the only game

3   in town that was paying for these compound pharmaceutical

4   products, right?

5   A.  Yes.

6   Q.  So it wouldn't make sense to market it to Medicare

7   patient's, right, because they wouldn't pay for the product,

8   correct?

9   A.  Correct.

10  Q.  And when Mr. Grow signed you on to his new company, MGTEN,

11  what's the first thing he gives you?  He gives you these same

12  marketing materials, correct?

13  A.  Sure.

14  Q.  And he gives you the 1099, right?

15  A.  Correct.

16  Q.  And you're tiered situation, the 7 percent, 5 percent, 3

17  percent, that remained the same as well, correct?

18  A.  Yes.

19  Q.  He basically takes -- he copies the entire InforMD structure

20  and brings it to this new company, right?

21  A.  Yes.

22  Q.  The only thing that changes is you're not dealing with

23  doctors, you're dealing directly with patients, right?

24  A.  Correct.

25  Q.  And the way it works at this new company -- and I'm showing

Bjerke - Cross

1  you as an example Government's Exhibit 77, which the Government

2  just showed you and put into evidence -- is it starts with you

3  or someone in your downstream finding a Tricare patient who

4  needs one of the medications, correct?

5  A.   Sure.

6  Q.   Mr. Grow never told you, just go find people who don't need

7  the product, right?

8  A.   Right.  No, he never said that.

9  Q.   So you go and you find people who need it and you then take

10  their basic information, correct?

11  A.   Yes.

12  Q.   And the information you take is real information, right?

13  You don't make this stuff up, correct?

14  A.   Correct.

15  Q.   And on the intake form it always says, as you could see

16  here, let the patient know that they will take a call from the

17  doctor and then the pharmacy.  So when you get these patients,

18  you let them know that they're going to get a call on the phone

19  from a doctor, right?

20  A.   Yeah.

21  Q.   And that they should tell him what's wrong with them and

22  maybe the doctor will prescribe the medication, correct?

23  A.   Correct.

24  Q.   And once the patient fills out this intake form, you or the

25  people in the downstream would send that information to

1   Mr. Grow, correct?

2   A.   Yes.

3   Q.   And Mr. Grow wouldn't have any contact directly with the

4   patient, correct?

5   A.   I'm not sure.

6   Q.   Fair enough.  A lot of times you didn't have contact with

7   the patient, right?

8   A.   Correct.

9   Q.   Because it would be one of your downstream marketers who met

10  a patient, who filled out an intake form, and you would get

11  credit in the commission line --

12  A.   That's correct.

13  Q.   -- but you don't know who the patient is, right?

14  A.   That's correct.

15  Q.   And so you would just assume the patient is putting the

16  truth on the form, correct?

17  A.   Yes.

18  Q.   You don't think you should be held responsible if someone

19  who you never met put something wrong on a form, do you?

20  A.   No.

21  Q.   Now, I want to talk about Ms. Brundige.  So on

22  Ms. Brundige's form, it says location of scar, zero, still wants

23  the scar cream.  Do you see that?

24  A.   I do see that.

25  Q.   You didn't lie on the form and say she had a scar on her

Bjerke - Cross

1    left shoulder?

2    A.   Correct.

3    Q.   You wrote the truth, which is Ms. Brundige says she doesn't

4    have a scar, but she wants scar cream, correct?

5    A.   Yes.

6    Q.   And you sent that to Mr. Grow.  And are you aware --

7              THE COURT:  I'm sorry, I don't know if he answered.

8              MR. RASHBAUM:  Oh, I'm sorry.

9              THE WITNESS:  Yes, yes.

10             THE COURT:  Speak real loudly into the microphone.

11   Thank you.

12   BY MR. RASHBAUM:

13   Q.   Are you aware that after saying that to Mr. Grow --

14             THE COURT:  Well, "are you aware," whenever you all say

15   "are you aware," I interrupt.  I don't know what that means.

16             MR. RASHBAUM:  I'll rephrase.  Good point.  May I have

17   one moment, Your Honor?

18             THE COURT:  Sure.

19   BY MR. RASHBAUM:

20   Q.   After sending this form to Mr. Grow, it's true that Mr. Long

21   reached out to you --

22             MR. LARSEN:  Object, Your Honor, foundation.

23             THE COURT:  Okay.

24             MR. RASHBAUM:  I'm finding out if he knows.

25             THE COURT:  I'm sorry?

Bjerke - Cross

1          MR. LARSEN:  Foundation and hearsay, Your Honor.

2          THE COURT:  All right.  And what is the response on

3    Long's statements, if any?

4          MR. RASHBAUM:  I'm not asking what Mr. Long said.  I'm

5    asking if Mr. Long reached out to him about this patient.

6          THE COURT:  Well, how would he know if there's no

7    substance to it?

8          MR. RASHBAUM:  There is substance, the substance is --

9          THE COURT:  I know and that's the problem.  The

10   substance would be hearsay unless it meets one of the

11   exceptions.  I mean, it may meet an exception, I don't know, but

12   I don't know.

13         MR. RASHBAUM:  One moment, Your Honor.

14         I'm laying a foundation for his actions and it goes to

15   Mr. Grow's state of mind.

16         THE COURT:  But he can't testify as to Mr. Grow's state

17   of mind.

18         MR. RASHBAUM:  I'm not asking what Mr. Grow's state of

19   mind is.

20         THE COURT:  So what's your next question?

21   BY MR. RASHBAUM:

22   Q.  Did Mr. Long ever reach out to you --

23         THE COURT:  I'm going to sustain the objection.  The

24   way people reach out I suspect in 99 percent of the

25   circumstances, I do not know about the one percent, is by

1    talking, which means Long's words would be admitted.  Maybe they

2    are admissible, maybe they are not, but you're going to have to

3    convince me how Long's words are admissible.

4              Is Long a witness according to the Government?

5              MR. LARSEN:  He's not a witness, Your Honor.

6              THE COURT:  You've got how many witnesses left, three

7    or four?

8              MR. LARSEN:  Four.

9              THE COURT:  I did that intentionally so you all would

10   know that, though it doesn't have anything to do with my

11   decision, but the jurors are happy to hear that.

12             I'm not going to let you get into Long's words unless

13   you convince me that they're admissible.

14             MR. RASHBAUM:  I'll try this way, and if not, I'll move

15   on.

16             THE COURT:  No, give me the legal argument.  How are

17   Long's words admissible?

18             MR. RASHBAUM:  I am not asking about Long's words.

19             THE COURT:  All right.

20   BY MR. RASHBAUM:

21   Q.  Were you ever contacted by Mr. Long, without telling me

22   anything about what he said --

23             THE COURT:  No.  When someone contacts you they say,

24   hey, listen, guy, did you hear about this?  We don't know what's

25   going to happen because I suspect that Mr. Bjerke is not as

```
 1   familiar with the rules of evidence as you are, though I'm not
 2   sure now.  I don't know, but we'll see.
 3           MR. RASHBAUM:  Judge, it's coming in for the impact on
 4   the listener.
 5           THE COURT:  But that's not relevant, the impact on this
 6   listener.
 7           MR. RASHBAUM:  For his actions, what he did after --
 8           THE COURT:  You could ask him what he did afterwards.
 9   BY MR. RASHBAUM:
10   Q.  After Mr. Long contacted you, what did you do?
11           THE COURT:  If he did.
12           MR. RASHBAUM:  I'm trying to ask him if he contacted
13   him.
14           THE COURT:  I know, but that's what you can't get into.
15   You can ask him what he did.  Do you have a date?
16           MR. RASHBAUM:  Yeah.
17           THE COURT:  What did you do after this particular date?
18   You can ask that.  You can't get through the back door what you
19   cannot get in through the front door of the same house.
20   BY MR. RASHBAUM:
21   Q.  January 24, 2015, this intake form is sent from you to Monty
22   Grow.  Do you see that?
23   A.  Yes.
24   Q.  After that date, yes or no, you received a phone call from
25   Mr. Long?
```

Bjerke - Cross

1           MR. LARSEN:  Objection, hearsay.

2           THE COURT:  It is hearsay.  Or if not, it would be

3    irrelevant because it doesn't prove anything.

4           MR. RASHBAUM:  I want to show what he did after he got

5    that phone call.

6           THE COURT:  I don't know if he got a phone call or not.

7    You can say what did you do about this case after that date.

8           MR. RASHBAUM:  Did you ever have any other --

9           THE COURT:  What did you do after that date regarding

10   this case?

11          THE WITNESS:  I don't remember.

12          THE COURT:  Next question.  Move on.

13          MR. RASHBAUM:  I'll move on, Your Honor.

14          THE COURT:  You will.  I just said it.

15   BY MR. RASHBAUM:

16   Q.  Mr. Grow was explicit with you, correct, that it was also

17   illegal to pay patients for prescriptions, right?

18   A.  Sure.

19   Q.  So just so we're clear, Mr. Grow was specific with you at

20   InforMD that it was illegal to pay doctors, right?

21   A.  Correct.

22   Q.  And when he opened up his own company, he was explicit with

23   you that it was illegal to pay patients, correct?

24   A.  Yes.

25          MR. RASHBAUM:  One moment, Your Honor.  No further

1  questions, Your Honor.

2          THE COURT:  Redirect.

3          MR. LARSEN:  Thank you.

4                  REDIRECT EXAMINATION

5  BY MR. LARSEN:

6  Q.  Mr. Bjerke, Mr. Rashbaum asked you about this document, and

7  you said on cross that this is the document, these

8  materials, Mr. Grow asked you to use these with the patients --

9  A.  Yes.

10 Q.  -- for a company called InforMD Solutions.  Were you working

11 for InforMD Solutions in the fall -- well, let's say early 2015,

12 January of 2015, when we were talking about that prescription?

13 A.  No, I was not.

14 Q.  So if you were using InforMD -- were you ever using these

15 documents with any patient?

16 A.  I was not.

17 Q.  Now, on direct you talked about your mom.  What was your

18 mom's name?

19          MR. RASHBAUM:  Objection, Your Honor, outside the scope

20 of cross.  I didn't ask one question about mom.

21          THE COURT:  Did you ask him on direct about the mother?

22          MR. LARSEN:  I asked him about --

23          THE COURT:  No, I just want -- you know how you all

24 say, just say yes or no.

25          MR. LARSEN:  Yes, Your Honor.

Bjerke - Redirect

```
 1              THE COURT:  You did.  So why go through it again?

 2              MR. LARSEN:  Well, it's going to lead into my question

 3    that is within the scope of the direct and the cross.

 4              THE COURT:  Well, then why don't you skip that part and

 5    go right to it.

 6    BY MR. LARSEN:

 7    Q.   Let me show you Government's Exhibit 77.  Mr. Rashbaum

 8    focused your attention, on let the patient know they will need

 9    to take a call from the doctor and then the pharmacy.  Was that

10    what you were doing at InforMD, having telemedicine?

11    A.   No.

12    Q.   That's different than what you were doing at InforMD, isn't

13    it?

14    A.   Yes.

15    Q.   It's a big difference, isn't it?

16    A.   It's different.

17    Q.   You said on cross, in response to Mr. Rashbaum's question --

18    he said that the defendant told you to find people who needed

19    these products, and is that the instruction you received, to

20    find people who need it, or did you receive other instruction?

21    A.   To find patients that needed or desired.

22    Q.   Was that the most important instruction?

23              MR. RASHBAUM:  Objection, Your Honor, leading.

24              THE WITNESS:  Also the --

25              THE COURT:  Overruled.
```

Lozada - Direct

1    THE WITNESS:  Also be a part of the sales team.

2  BY MR. LARSEN:

3  Q.  What was the most important instruction Mr. Grow gave you

4  about patients to find?

5    MR. RASHBAUM:  Asked and answered.

6    THE WITNESS:  Tricare.

7    THE COURT:  Overruled.  I'm sorry, I didn't hear.

8    THE WITNESS:  That they had to have Tricare.

9  BY MR. LARSEN:

10  Q.  Was that the most important thing?

11  A.  Sure.

12  Q.  Did you know anything about the telemedicine doctors being

13  paid by the defendant?  Did you know that?

14  A.  I did not.

15    MR. LARSEN:  Nothing further, Your Honor.

16    THE COURT:  Thank you, sir, you're excused.  Have a

17  good day.

18    (The witness was excused.)

19    THE COURT:  Your next we witness is?

20    MR. JUENGER:  Armando Lozada.

21    THE COURT:  Raise your right hand.

22    ARMANDO LOZADA, GOVERNMENT'S WITNESS, SWORN.

23    THE COURT:  Okay.  Have a seat, get comfortable, and

24  speak real loudly into that microphone in front of you.

25    DIRECT EXAMINATION

1   BY MR. JUENGER:

2   Q.   Sir, can you tell us your name and spell it for the court

3   reporter?

4   A.   My name an Armando Lozada, A-r-m-a-n-d-o, L-o-z-a-d-a.

5   Q.   And where do you live, city and state?

6   A.   I live in Austin, Texas.

7   Q.   And how long have you lived in Austin, Texas?

8   A.   I've lived in Austin, Texas for approximately two months.

9   Q.   Where did you live before that?

10  A.   In Broward County.

11  Q.   And how old are you?

12  A.   I am 28 years old.

13  Q.   And what do you do for a living?

14  A.   I am a pharmacy technician.

15  Q.   And are you licensed as a pharmacy technician?

16  A.   Absolutely.

17  Q.   And how long have you been a licensed pharmacy technician?

18  A.   For about nine years.

19  Q.   And without going into great detail, tell us what it

20  is, what a pharmacy technician is, what do you do for your job?

21  A.   We are technicians.  We are licensed under pharmacists to

22  dispense medications, compound medications, which is specific

23  different medications that are prescribed for different

24  patients.

25  Q.   Did you ever work as a pharmacy technician for a company

1  called Patient Care America?

2  A.  I did.

3  Q.  When was that, more or less?

4  A.  Towards the end of 2014, like December of 2014, till about

5  July of 2015.

6  Q.  And what kind of pharmacy was Patient Care America?

7  A.  Patient Care America was a compounding pharmacy.

8  Q.  And what is compounding just in layman's terms?  We don't

9  need a history lesson.

10  A.  Basically a specialty medication that is specially made for

11  each patient from a prescription from a doctor that is not

12  commercially available.

13       THE COURT:  Let me interrupt.  Mr. Jones, do you need a

14  break?

15       MR. J. JONES:  Yes, yes.

16       THE COURT:  You do?  Okay.  Why don't we take a

17  10-minute break.  Stay in this jury room.  You can leave your

18  notebooks there, and then we will bring you back.

19       You know what I'm going to say, don't talk about the

20  case.

21    (The jury retired from the courtroom at 10:33 a.m.)

22       THE COURT:  Let me hear that door.

23       Okay.  You have to take a break, too.  I think, since

24  he was here before 8:00, he probably drank a lot of coffee.

25       MR. JUENGER:  Your Honor, may the witness take a

1    bathroom break, if necessary?

2          THE COURT:  Everybody can take a bathroom break if you

3    want.  You do what you want.

4          If you want stretch outside of the courtroom, not

5    outside of the courthouse, you may.

6      (There was a brief recess.)

7          THE COURT:  Now you know why I don't like taking a

8    break.

9          The Chief Judge wanted to talk to me and it took longer

10   than he thought, but it was very productive.  I apologize.

11         Ready?  Set?

12         MR. JUENGER:  Yes, Your Honor.

13         THE COURT:  Go bring in the jurors.

14         THE COURT SECURITY OFFICER:  All rise for the jury,

15   please.

16     (The jury entered the courtroom at 11:14 a.m.)

17         THE COURT:  All right.  Thank you, folks, please be

18   seated.

19         You know what happens is, we took a recess, and we will

20   take a recess whenever you all want, okay, because nature calls

21   and you've got to go.  But then I go in there and I had a

22   meeting with another judge, the Chief Judge, so I have to show

23   up and it takes a little longer, but I don't want you to think

24   that the lawyers were delaying anything.  They were waiting, I

25   assume just as patiently.  I know they were waiting because I

1    wasn't here.  I was across the hall.

2         It had nothing to do with the case so you don't have to

3    worry about that, and they are moving the case, both sides.  All

4    right.

5         MR. JUENGER:  Thank you, Your Honor.

6    BY MR. JUENGER:

7    Q.  Mr. Lozada, I think the last question I asked you before we

8    broke was what is compounding, and I think you were in the

9    middle of your answer.  So if you could answer that question.

10   What is compounding in simplest terms?

11   A.  Compounding is basically when you basically make a

12   medication, it's a specialized medication that is made for a

13   patient with a prescription from a doctor.

14   Q.  Okay.  And did you or, to your knowledge, did anyone else at

15   PCA ever design drug formulas from scratch?

16   A.  Yes, pharmacists do design formulas.

17   Q.  Okay.  If you could reach out in front of you, I have placed

18   before you what's been admitted as Government's Exhibit 143.  Do

19   you see that?

20   A.  Yes.

21   Q.  And if you could please turn to the last page of that, and

22   I'm putting it on the ELMO.  I want to focus your attention in

23   on the middle.  What is this?  What is the document on the last

24   page there?

25   A.  Transdermal Formulations.

1   Q.   And it's up on the screen as well, you can look at either

2   one, but the document as a whole is what?

3   A.   It's a prescription.

4   Q.   And does that seem familiar to you?

5   A.   Yes, it does.

6   Q.   And so let me -- before I start asking questions, let me

7   zoom in a little bit to the part that says Pain Management

8   Transdermal Formulations.  Do you see that?

9   A.   Yes, I do.

10        MR. JUENGER:  For the jurors who are looking, can you

11   all see that well enough?

12        THE JURY:  Yes.

13        MR. JUENGER:  Okay.

14   BY MR. JUENGER:

15   Q.   And so I want to ask you, Mr. Lozada, about the first

16   formulation that has a box checked.  Do you see that?

17   A.   Yes.

18   Q.   It says p-01 Transdermal?

19   A.   Yes.

20   Q.   And what's the list that comes after it moving from left to

21   right on the prescription?

22   A.   Loperamide, flurbiprofen, cyclobenzaprine, and baclofen and

23   DMSO.

24   Q.   But what are those?

25   A.   Those are all active ingredients --

1          MR. MARCUS:  Objection, Your Honor.

2          THE COURT:  Grounds.

3          MR. MARCUS:  Calls for an opinion under 701.

4          THE COURT:  Well, the reason he cannot give it is

5    because he is only a pharmacy --

6          MR. MARCUS:  Technician.

7          THE COURT:  -- technician.

8          MR. MARCUS:  Yes.

9          THE COURT:  He doesn't know anything about pharmacy in

10   your view, that's the argument?

11         MR. MARCUS:  He is not here as an expert in

12   pharmacology.

13         THE COURT:  And the response.

14         MR. JUENGER:  He's not an expert, Your Honor.  He's

15   here to just tell us about what he did.  He's identified this as

16   a prescription.  He is a pharmacy technician.  I can ask more

17   questions about how familiar he is, what he would do with this.

18   That's where I'm going.

19         THE COURT:  You know, what happens is we have opinions

20   that people can give as lay individuals and we have opinions

21   that experts can give, and then we have lot of people who are in

22   between, a law enforcement agent who may know more things than

23   others without having a Ph.D. in particular subject matters.  We

24   discussed a little bit of this before, but I think I'm going to

25   give the Government a little bit of leeway, limited, and then

1    you can cross-examine him on it.

2         I'll overrule the objection, but that's not an

3    invitation to open the door because then he is going to come in

4    with two Cadillacs and we can be here for as long as he wants.

5         MR. JUENGER:  I'm endeavoring to move us along.

6         THE COURT:  So one more question and then skip to the

7    eventual response that you're seeking, which I think has to do

8    not with the type of compound, but with some other matter,

9    right?  You know what I'm talking about?

10        MR. JUENGER:  I do, Your Honor.

11   BY MR. JUENGER:

12   Q.   So, Mr. Lozada, this formulation, you read them all off and

13   I was simply asking what are those, and you were answering, and

14   if you could give us the answer about what those are?

15   A.   Those are active ingredients.

16   Q.   Okay.  So those are active ingredients to be able to create

17   that drug?

18   A.   Correct.

19   Q.   And is that the sum total of all of the ingredients that

20   would go into that particular drug when you make the final

21   product?

22   A.   There are other ingredients that are involved in all of

23   these formulations.

24   Q.   And what are some of those other ingredients?  Just focus in

25   on p-01.

A.   The other ingredients, there would be a base, a base cream,
and there would also be more of a wetting agent.

THE COURT:  How do you know that?

THE WITNESS:  It's a compounded medication, you have to
have -- it has to be -- you have to have a wetting agent in
order to blend the formulation.  All of these are actual
powders.

THE COURT:  How do you know that?  How do you know that
you have to have that?

THE WITNESS:  Because I'm a compounding technician.

THE COURT:  And how did you become one?

THE WITNESS:  I've gone through schooling and
certification.  I'm actually certified by the PTCB board of the
United States as a pharmacy technician as well.

THE COURT:  What is the PTC Board?

THE WITNESS:  It's a national certification for the
pharmacy technicians.

THE COURT:  What do the initials stand for?

THE WITNESS:  Pharmacy Tech Certification Board.

THE COURT:  How long did you have to be trained in
medicine in order to pass that, to be certified?

THE WITNESS:  You have to take 500 hours of --
basically 500 hours of pharmacy technician training and also
pass the State Boards.

THE COURT:  And you did all of that?

1          THE WITNESS:  Yes, I did.

2          THE COURT:  All right.  Go ahead.

3    BY MR. JUENGER:

4    Q.  Mr. Lozada, how many times, when you were working at Patient

5    Care America, did you make that p-01 formula?

6    A.  Numerous times.

7    Q.  You literally made that cream?

8    A.  Yes.

9    Q.  And so in addition to these --

10         THE COURT:  As soon as you say "so" -- I am going to

11   leave you alone, but as soon as you say "so," it looks like it's

12   going to be a leading question.  I could be wrong, but it looked

13   like it, sounded like it.

14         MR. JUENGER:  And now I've forgotten his answer.

15   BY MR. JUENGER

16   Q.  How many times would you have made this drug?

17   A.  Numerous times.

18   Q.  Well, how many?  Give me --

19   A.  A lot.

20   Q.  -- a numerical ballpark?

21   A.  I'd say a hundred times, if not more.

22   Q.  Okay.  And you were mentioning that there are additional

23   ingredients, I think you said a wetting agent and a base

24   ingredient?

25   A.  Correct.

1        THE COURT:  See, if the answer is "correct," you know

2    what I'm going to say.  What am I going to say?

3        MR. JUENGER:  You're going to say it's a leading

4    question.

5        THE COURT:  Who, what, where, when; what other

6    material, what else did you do, what else goes in it, what does

7    it mean.  And I will leave you alone.

8    BY MR. JUENGER:

9    Q.  What were the additional ingredients for p-01?

10   A.  There's ethoxydiglycol and there's also a base.

11   Q.  And I want to direct your attention to the top of this, the

12   top right of this prescription and ask you:  Do you know where

13   this prescription came from?

14   A.  Yes.

15   Q.  Where?

16   A.  Monty Grow's -- it was Monty Grow's -- it was a doctor from

17   Monty Grow.

18   Q.  And how do you know that?

19   A.  Because the initials up at the top right-hand corner.

20   Q.  And is there something else in the top right-hand corner?

21   A.  No.  No.

22   Q.  Can you look on the screen?

23       THE COURT:  This is an exhibit that has been admitted?

24       MR. JUENGER:  Yes, 143.

25       THE COURT:  The jurors, all still know how to read?

1    Everybody knows how to read.

2          Next question.  You can always use it in closing

3    argument.

4          MR. JUENGER:  Yes, Your Honor.

5    BY MR. JUENGER:

6    Q.  And now, what was your job title at PCA?

7    A.  I was lead pharmacy technician.

8    Q.  What were your responsibilities as lead pharmacy technician?

9    A.  Basically, to lead the group of technicians more in the lab,

10   laboratory, compounding medications, ordering medications,

11   ordering different ingredients.

12   Q.  Okay.  And I want to ask you about ordering an ingredient.

13   Did you order ethoxydiglycol?

14   A.  Yes, I did.

15   Q.  And where did you order the ethoxydiglycol from?

16   A.  Monty Grow.

17   Q.  Well, was there another place that you ordered?

18   A.  Yes, Medisca.

19   Q.  And what is Medisca and how do you spell it?

20   A.  M-e-d-i-s-c-a.  Medisca is a chemical wholesaler for

21   pharmaceuticals.

22   Q.  And when you purchased ethoxydiglycol from Medisca how much

23   did PCA pay for it?

24   A.  It could be probably about a hundred dollars probably for a

25   four-liter jar of ethoxy.

1  Q.  And we all know math, but four liters is how many

2  milliliters?

3  A.  4,000 MLs.

4  Q.  So 4,000 MLs for $100, and we can divide and figure out what

5  it is per milliliter.

6          Now, do you know how much the Medisca ethoxydiglycol

7  reimbursed from Tricare for prescriptions like the ones we were

8  just talking about?

9  A.  How much per ML?

10  Q.  Yes.

11  A.  I would say probably about -- between 10 to 15 cents a

12  milliliter.

13  Q.  A milliliter, okay.  And now I want to ask you about

14  something you said earlier.  Are you familiar with the term

15  "Ethoxy Gold"?

16  A.  Yes, I am.

17  Q.  What is Ethoxy Gold?

18          MR. MARCUS:  Objection, Your Honor, calls for hearsay.

19          THE COURT:  How would you know the answer to that?  Is

20  that something you learned in your training?

21          THE WITNESS:  The answer to?

22          THE COURT:  To the word Ethoxy Gold.

23          THE WITNESS:  No.

24          THE COURT:  Is it someone told you what Ethoxy Gold

25  was?

Jury Trial

1              THE WITNESS:  Yes.

2              THE COURT:  Who was the person who told you?

3              THE WITNESS:  It was the pharmacy, it's not --

4              THE COURT:  Is there a human being who told you what

5    Ethoxy Gold --

6              MR. MARCUS:  It's hearsay.

7              THE WITNESS:  Matt Smith.

8              THE COURT:  I'm sorry?

9              THE WITNESS:  Matt Smith.

10             THE COURT:  I'll sustain the objection to what Matt

11   Smith said.

12   BY MR. JUENGER:

13   Q.  Did you order Ethoxy Gold?

14   A.  Yes.

15   Q.  And who did you order Ethoxy Gold from?

16   A.  Monty.

17   Q.  Monty who?

18   A.  Monty Grow.

19   Q.  I want to show you now what has been admitted as

20   Government's Exhibit 72, and I'm going to hand a copy of

21   Government's Exhibit 72 to the witness.

22             And Mr. Lozada, can you tell us what, if you know,

23   Government's Exhibit 72 is?

24   A.  It's an email.

25   Q.  And what's happening?

Jury Trial

61

1    A.   It's an email from myself to Monty Grow in regard to a

2    shipment of an order of Ethoxy Gold.

3    Q.   And does this indicate how much the Ethoxy Gold costs for

4    PCA to purchase?

5    A.   Correct.

6    Q.   And what is that amount?

7    A.   $12.50 per ML.

8    Q.   And are you aware --

9         THE COURT:  Whenever you say "are you aware," you know

10   I'm going to interrupt you.

11   BY MR. JUENGER:

12   Q.   Do you know how much Ethoxy Gold reimbursed from Tricare in

13   the types of formulas that we looked at on the prescription?

14   A.   Per ML?

15   Q.   Per ML if you know.

16        THE COURT:  Before you tell us how much, how do you

17   know?

18        THE WITNESS:  It's a prescription that's billed.  Every

19   NDC is billed separately.

20        THE COURT:  How do you know, by looking at something?

21        THE WITNESS:  By billing it and you see a

22   reimbursement.

23        THE COURT:  And you've seen the reimbursements and

24   you've seen the bills or --

25        THE WITNESS:  Correct.

1          THE COURT:  -- you do the billing?  You do billing?

2          THE WITNESS:  I have done the billing.

3          THE COURT:  All right.  Go ahead.  You can answer.

4    BY MR. JUENGER:

5    Q.  And so the amount per ML?

6    A.  Roughly, I'd say between 55 to $60 per ML.

7          THE COURT:  ML is milliliters?

8          THE WITNESS:  Milliliters.

9    BY MR. JUENGER:

10   Q.  And in one of those creams that we looked at, p-01, how many

11   milliliters of ethoxy or Ethoxy Gold would be required to do a

12   360 gram cream?

13   A.  20 percent.

14   Q.  20 percent of what?

15   A.  20 percent of the 360 grams.

16   Q.  And so based on that, can you give us an idea of how much

17   Tricare would reimburse for the Ethoxy Gold in a 360 gram cream?

18   A.  It could be a couple thousand dollars or a few thousand

19   dollars.

20   Q.  Was there any difference between ethoxy from Medisca and

21   Ethoxy Gold from Monty Grow?

22          MR. MARCUS:  Objection, Your Honor.

23          THE COURT:  Grounds.

24          MR. MARCUS:  Calls for an opinion.

25          THE COURT:  How would you know that, whether there's

1    any difference or whether they are the same?

2             THE WITNESS:  There's --

3             THE COURT:  How do you know?  Before you tell me, how

4    would you know?

5             THE WITNESS:  There's a Material Safety Data Sheet,

6    there's a sheet that comes with the medication -- or the

7    ingredient itself.

8             THE COURT:  And it tells you whether they're the same

9    or different?

10            THE WITNESS:  Yes.

11            THE COURT:  And who prepares that?

12            THE WITNESS:  The wholesaler, basically, the

13   manufacturer.

14            THE WITNESS:  And you have that, Government?

15            MR. JUENGER:  We have some, yes.

16            THE COURT:  Then you're going to introduce that and

17   I'll sustain the objection.

18   BY MR. JUENGER:

19   Q.  Well, did you use these products on a day-to-day basis?

20   A.  The ethoxy?

21   Q.  Yes.

22   A.  Yes.

23   Q.  When you used it, was there any material difference between

24   ethoxy and Ethoxy Gold?

25            MR. MARCUS:  Same objection.

1        THE COURT:  When you say you used it, you used them for
2  yourself?
3        THE WITNESS:  No.
4        THE COURT:  I didn't think so.  So same thing.
5        MR. JUENGER:  Let me rephrase.
6        THE COURT:  I sustained it before.  I should sustain it
7  now because nothing has changed.  He knows what it's like by
8  looking at two pieces of paper that say either they are
9  different or the same, right?
10        MR. JUENGER:  No, Your Honor.
11        THE COURT:  Did I miss that?
12        MR. JUENGER:  No, I didn't miss that.
13        THE COURT:  No, did I miss that?
14        MR. JUENGER:  No, you did not miss that.
15        THE COURT:  If you have the two pieces of paper that
16  say they're different or they're the same, we'll talk about it
17  at that time.
18  BY MR. JUENGER:
19  Q.  Mr. Lozada, did you actually put these drugs together with
20  your own hands?
21  A.  Absolutely.
22  Q.  And was there any difference when you used one ingredient
23  versus the other?
24  A.  No, there's not.
25        MR. MARCUS:  I object to the question.  It's

1  misleading.

2        THE COURT:  Then you'll straighten it out in

3  cross-examination, right?  That's what part of cross is.  So

4  I'll overrule it on that basis.

5  BY MR. JUENGER:

6  Q.  And Mr. Lozada, other than the price and the reimbursement,

7  was there any difference in how the product arrived at PCA once

8  it was ordered?

9  A.  What do you mean by that exactly?

10  Q.  In terms of the quantities that it was purchased in and the

11  containers it came in.

12  A.  Yes.  The Ethoxy Gold was actually shipped to us in 1 ML

13  bottles.

14        THE COURT:  What bottles?  I'm sorry.

15        THE WITNESS:  1 ML, 1 milliliter bottles.  And the one

16  from Medisca, which is regular ethoxydiglycol, would be shipped

17  to us in a 4,000 ML bottle.

18  BY MR. JUENGER:

19  Q.  And as a pharmacy technician using these products, was it

20  more or less convenient to use the larger quantity or the

21  smaller quantity?

22  A.  It was more convenient to use the larger quantity vial

23  instead of the 1 ML vials.

24  Q.  What steps did PCA take to actually employ using the 1

25  milliliter units?

1          MR. MARCUS:  Objection, calls for hearsay.

2          THE COURT:  What steps did you take, if any?  Did you

3   do anything?

4          THE WITNESS:  We had to --

5          THE COURT:  No, no.  "We."  Only two people speak "we,"

6   the Queen of England and the Pope.  You're neither.  So you've

7   got to say "I" if you did something.  Okay?

8          THE WITNESS:  I had to open 1 ML vials in order to make

9   a cream.

10  BY MR. JUENGER:

11  Q.   And so for one cream how many vials would you have to open?

12  A.   It could be -- depending on the quantity of the cream that

13  was made, because they were also made in batches, it could be

14  thousands of bottles that needed to be opened.

15  Q.   Did that take more time than using the larger 4,000

16  milliliter container?

17  A.   Absolutely.

18  Q.   Did you see other people opening the 1 milliliter vials?

19  A.   Absolutely.

20  Q.   Did a time come when PCA stopped using ethoxydiglycol -- or

21  I'm sorry -- Ethoxy Gold?

22  A.   Yes.

23  Q.   And why did PCA stop using it?

24          MR. MARCUS:  Objection, calls for hearsay.

25          THE COURT:  I don't know.  You can answer if there --

```
 1    did there come a time when you stopped using it?

 2              THE WITNESS:  Correct.

 3              THE COURT:  You personally?

 4              THE WITNESS:  Yes.

 5              MR. MARCUS:  The question was why, Your Honor.

 6              THE COURT:  I know.  Why did you stop, you personally?

 7              THE WITNESS:  I stopped using it because it was no

 8    longer covered.  It was covered at a 12 cent ratio compared to

 9    what it was covered before.

10    BY MR. JUENGER:

11    Q.  When you say "it," what do you mean?

12    A.  I mean the ethoxydiglycol, the Ethoxy Gold.

13    Q.  Just so the record is clear --

14              THE COURT:  Everything on the record is clear.

15              MR. JUENGER:  Okay.

16              THE COURT:  You can ask the question if you want.

17    BY MR. JUENGER:

18    Q.  Did Mr. Grow sell PCA other ingredients besides the Ethoxy

19    Gold?

20    A.  Yes.

21    Q.  And just name some of those.

22    A.  Stera Base.

23    Q.  And did Stera Base have equivalence in the same way that

24    Ethoxy Gold had equivalent to the Medisca ethoxydiglycol?

25              MR. MARCUS:  Objection, again, calls for an opinion.
```

1    He's asking him to opine as to what's equivalent.

2              THE COURT:  Okay.  Isn't that what we already went

3    through once, or not, or is this a different question?

4              MR. JUENGER:  It's a different ingredient, Your Honor.

5              THE COURT:  Different ingredient and the ruling should

6    be the same.  No?

7    BY MR. JUENGER:

8    Q.  Mr. Lozada, besides selling ingredients, did Grow have any

9    other relationship with Patient Care America?

10   A.  He was also a marketer.

11   Q.  And what does that mean?

12   A.  A sales rep.

13   Q.  And what did he do as a sales rep?

14   A.  He worked with doctors and sent in prescriptions for

15   patients.

16   Q.  And we looked at one of the prescriptions earlier, correct?

17   A.  Correct.

18   Q.  And did Mr. Grow's prescriptions focus on particular

19   insurance?

20   A.  Yes.

21   Q.  And what was that insurance?

22   A.  Tricare.

23   Q.  And how did Mr. Grow's scripts end up at PCA?

24             MR. MARCUS:  Objection to the term "Mr. Grow's

25   scripts," lack of foundation.

1          THE COURT:  Can you rephrase the question?

2          MR. JUENGER:  I can.

3    BY MR. JUENGER:

4    Q.  I am going to go back and show you again.  If you look on

5    the screen, Mr. Lozada, there's a prescription.  Do you see

6    that?

7    A.  Yes.

8    Q.  Whose prescription is that?

9    A.  Monty Grow's.

10   Q.  And can you tell from looking at the prescription how it

11   arrived --

12   A.  Yes.

13   Q.  -- at Patient Care America?

14   A.  Yes.

15   Q.  And how did it arrive?

16   A.  Via fax.

17   Q.  Did you ever see anyone at PCA whiting out information on

18   prescriptions from Mr. Grow?

19   A.  Yes.

20   Q.  What was being whited out?

21   A.  Mr. Grow's fax number.

22   Q.  And who instructed that to be done?

23   A.  Matt Smith.

24   Q.  And who is Matt Smith?

25   A.  The vice president of operations at Patient Care America.

Jury Trial

1    Q.   And I want to show you the cover sheet, the top page, if I

2    can find it, for Government's 143.  Do you have that,

3    Mr. Lozada?

4    A.   Yes.

5    Q.   And you don't have to read this because we can all read, but

6    what is Mr. Smith instructing -- this is to you, correct?

7    A.   This is.

8    Q.   And what is he instructing?

9    A.   Instructing that the fax numbers from Mr. Grow on Ginger

10   Lay's prescriptions are blacked out or whited out before being

11   scanned into PK software.

12   Q.   What is PK software.

13   A.   It's the software that we used to bill and input all of the

14   prescriptions that we receive from the doctors.

15   Q.   I want to show you now what has been admitted as

16   Government's Exhibit 85.  And Mr. Lozada, if you would start at

17   the bottom of Government's Exhibit 85, and you don't need to

18   read it, but who is this email to, from and to?

19   A.   It's from myself, Armando Lozada, to Monty Grow.

20   Q.   And what are you describing to Mr. Grow in this email?

21   A.   That I received the same prescription three to four times.

22   Q.   And did Mr. Grow respond to you?

23   A.   Yes, he did.

24   Q.   And I'll read bits of what he said and I want to ask you

25   some questions about it.

Jury Trial

1        He writes, "I understand your frustration and will try

2    my best to make sure that the prescriptions are filled out

3    correctly the first time.  If you notice, most of the time

4    the reasons they are sent multiple times is because they are

5    filled out wrong or the grams aren't check off or no refills

6    or signature."

7        I want to ask you:  Is that consistent with the

8    problems that you were identifying in this email?

9    A.  Meaning what exactly?

10   Q.  Meaning that in the beginning email you said you were

11   receiving scripts three or four times.

12   A.  Correct.

13   Q.  Why was that a problem for you?

14   A.  It was a problem just because when I receive a prescription

15   it goes to be processed.

16        Once I receive it again, it takes a lot of time to --

17   you know, you've got to hand it over to another technician or

18   whoever goes to bill it to find out that it's actually a

19   duplicate prescription.

20   Q.  Were they true duplicates?

21   A.  At times there were true duplicates.

22   Q.  Okay.  In your email to Mr. Grow you wrote that "it's time

23   consuming having to go through all these faxes and compare

24   to what was received prior that day."

25        So was it just duplicates that was your concern?

1    A.   No.

2    Q.   And what was the other concern?

3    A.   Basically, making sure everything was sent over correctly

4    the first time.

5    Q.   And who decides if something is correct the first time?

6    A.   It's a completed prescription, a completed prescription

7    needs to have, for example, a doctor's signature, a quantity

8    written from the physician as well.  And some of these

9    prescriptions would come over without some of that information.

10   Q.   Okay.  And at the end of Mr. Grow's response to you, he

11        says, "That's why I used to have them sent to me directly

12        before you would ever see them to make sure they were done

13        correctly by the time they got to you.  Unfortunately, I was

14        told to change that process."

15             So who were the scripts coming from as indicated in

16   this email from Mr. Grow?

17   A.   The doctor's office.

18   Q.   But he says, "I used to have them sent to me directly before

19        you would ever see them."

20   A.   Correct.

21   Q.   And so again, who did the scripts come from?

22   A.   From Mr. Grow.

23   Q.   Okay.  Mr. Lozada, was there ever an issue with

24   prescriptions from Mr. Grow with regard to any of the

25   ingredients in the vitamins?

1    A.   Ever an issue?  Can you elaborate on that a little bit?

2    Q.   Sure.  I'll show you again Government's Exhibit 143, the

3    last page.  Can you see where it says "metabolic supplement"?

4    A.   Yes, sir.

5    Q.   And the box is checked and it lists a number of ingredients,

6    including Resveratrol?

7    A.   Correct.

8    Q.   And again, was there ever a time when there were issues with

9    this formulation?

10   A.   Yes, there was.

11   Q.   And what is the problem?

12   A.   That the Resveratrol no longer covered.

13   Q.   So why was that a problem?

14   A.   The prescriptions -- we could not process the prescriptions

15   or bill them through an insurance because the Resveratrol was

16   actually not covered and it's on an actual prescription.

17   Q.   And so was the prescription valid anymore?  Could you bill

18   for it?

19   A.   Not -- no, not this exact prescription if it included

20   Resveratrol.

21   Q.   And do you know if PCA billed for it without Resveratrol

22   even though the prescription had Resveratrol --

23             MR. MARCUS:  Objection, Your Honor.

24   Q.   -- if you know?

25             THE COURT:  Grounds.

1          MR. MARCUS:  Calls for hearsay.

2          THE COURT:  How would you know?  Did you do any of that

3  billing?

4          THE WITNESS:  Yes, yes, sir.

5          THE COURT:  I will overrule the objection as long as

6  it's something that you did.

7  BY MR. JUENGER:

8  Q.  And so the question was:  Did you, working at PCA, bill for

9  prescriptions that had Resveratrol, bill as though the

10  prescription did not have Resveratrol?

11  A.  Yes.

12  Q.  And was that proper?

13  A.  No.

14  Q.  And what efforts were made to correct that problem?

15  A.  There was a Therapeutic Alternative Form that a doctor would

16  sign off on.

17  Q.  And what is that?  What does that mean?

18  A.  A therapeutic alternative would be basically the doctor

19  giving consent to the pharmacy or the pharmacist to go ahead and

20  either remove an ingredient or change it with another ingredient

21  in the same family.

22  Q.  With regard to this therapeutic alternative, did you ever

23  reach out to the doctors about obtaining a Therapeutic

24  Alternative Form?

25  A.  I did not.

1   Q.  Do you know, if you know, did anyone from PCA do so?

2   A.  The pharmacists are supposed to do that.

3   Q.  The pharmacists are supposed to do that.  Do you know if any

4   PCA pharmacist did reach out to the applicable doctors?

5   A.  To my knowledge, for Monty's account, we could not contact

6   physicians.

7   Q.  And why was that?

8   A.  It was what I was told.

9   Q.  Who told you that?

10          MR. MARCUS:  Your Honor, move to strike.  Again, it's

11  hearsay.

12          THE COURT:  Okay.  If you would have objected before, I

13  would have sustained the objection.  All right.  It's stricken.

14  You cannot tell us what other people said unless there's some

15  exception.

16          MR. JUENGER:  That's all I have then for this witness,

17  Your Honor.

18          THE COURT:  Cross-examination.

19                      CROSS-EXAMINATION

20  BY MR. MARCUS:

21  Q.  Good morning, Mr. Lozada.

22  A.  Good morning.

23  Q.  Let's work backwards.  You were just asked some questions

24  about therapeutic alternatives.  Do you recall that?

25  A.  Yes.

Lozada - Cross

1    Q.   Now, you were also shown a sheet that listed certain

2    formulas for certain prescription medications.  Do you recall

3    that as well?

4    A.   Yes.

5    Q.   And those formulations have different ingredients in them;

6    is that correct?

7    A.   Yes.

8    Q.   And you worked for PCA, which is a pharmacy, right?

9    A.   Correct.

10   Q.   And the pharmacy has contractual relationships with

11   insurance companies, correct?

12   A.   Yes.

13   Q.   And you bill those insurance companies, correct?

14   A.   Yes.

15   Q.   And they make their own rules for reimbursement.  Do you

16   agree with that?

17   A.   Yes.

18   Q.   And they make decisions sometimes about which ingredients

19   they'll reimburse for and which ones they won't?

20   A.   Yes.

21   Q.   And so you were asked about -- just ask about Resveratrol,

22   right, that's an ingredient that was in the wellness vitamin

23   formula?

24   A.   Yes.

25   Q.   And Tricare made a decision not to cover that particular

1  ingredient?

2  A.   Correct.

3  Q.   And with prescription medications, that's something that is

4  not uncommon, is it?

5  A.   It depends on the compound.

6  Q.   Right.  How about even noncompounded medications, right?  I

7  mean, insurance companies make decisions on reimbursement?

8          MR. JUENGER:  Objection as to relevance, Your Honor.

9          THE COURT:  Overruled.  Go ahead, you can answer.

10  BY MR. MARCUS:

11  Q.   Did you need me to repeat the question?

12  A.   Yes.

13  Q.   For compounding and noncompounding medications the insurance

14  company makes decisions about what it's going to reimburse for,

15  correct?

16  A.   Yes.

17  Q.   And if they make a decision that they're not going to cover

18  an ingredient, the pharmacy then has to --

19          MR. JUENGER:  Your Honor, objection, foundation as to

20  who they are and what their decisions are.  I don't think this

21  witness has said anything about that.

22          THE COURT:  Overruled.  Once you call him as a witness,

23  I am going to let him cross-examine him.  Go ahead.

24  BY MR. MARCUS:

25  Q.   You said yourself that you're involved in submitting billing

1    and reimbursement to insurance companies, correct?

2    A.   Correct.

3    Q.   And if they don't cover a prescription the pharmacy doesn't

4    get paid; is that right?

5    A.   Correct.

6    Q.   And if that happens, then patients are in a situation where

7    they have to make a decision if they're going to pay for

8    something out of pocket, right, completely on their own, or not

9    get that particular medication; is that correct?

10   A.   Repeat that question again.

11   Q.   If insurance doesn't cover a prescription because it has an

12   ingredient that it's not reimbursing for, then that cost has to

13   be passed on to someone, doesn't it?

14   A.   No.

15   Q.   No?  Well, so if they don't reimburse for the prescription,

16   who's going to pay for the medication?

17   A.   Either the patient can pay cash or it has to be changed.

18   Q.   Right.  So either the patient has to pay the sticker price,

19   let's say, right, on a medication or the pharmacy can change the

20   ingredients to something that would be covered, correct?

21   A.   The doctor has to change the ingredient.

22   Q.   Oh, I know.  We'll get to that.  Right.  So the doctor

23   always is the one that makes a decision on a prescription,

24   right?

25   A.   Correct.

1  Q.  And they're also the ones that make decisions on if an

2  alternative ingredient could be substituted into a formula,

3  correct, on a prescription?  Do you agree with that?

4  A.  Repeat that.

5  Q.  You mentioned the Therapeutic Alternative Form.

6  A.  Correct.

7  Q.  And the point of that, right, is that those forms get sent

8  to the physician to see if there's an alternative ingredient

9  that can be changed for the ingredient that's not covered

10  anymore by insurance?

11  A.  Correct.

12  Q.  Right.  And the whole idea is to see if they'll consent and

13  agree that that's an appropriate substitute?

14  A.  Correct.

15  Q.  You agree that there's nothing wrong with making an

16  appropriate substitute if a doctor makes that decision?

17  A.  Correct.

18  Q.  Right.  And so you were asked about Resveratrol.  That was

19  an issue -- do you recall when that came up?  Was that in the

20  spring of 2015?

21  A.  Yes.

22  Q.  Right.  And you said Tricare stopped covering that.

23  A.  Correct.

24  Q.  Now, Mr. Juenger characterized those prescriptions as

25  Mr. Grow's prescriptions.  Do you remember those questions?

A.  Yes.

Q.  In fact, those prescriptions are written by a physician;
isn't that true?

A.  Yes.

Q.  And Mr. Grow was a marketer, correct?

A.  Yes.

Q.  And PCA had many different marketing groups, did it not, for
the compounded medications?

A.  Yes.

Q.  At the same time, in 2015?

A.  Yes.

Q.  Three, four, five, six other groups?

A.  Yes.

Q.  And were all of these groups marketing prescriptions that
involved reimbursement to Tricare?

A.  Not all of them.

Q.  Some of them were, weren't they?

A.  Yes.

Q.  Okay.  So did you have other formulas for vitamins that
involved Resveratrol as an ingredient?

A.  Not that I can recall.

Q.  And so when that came up, something had to be done, right?
There was a decision to make, right, about what to do now that
Resveratrol is no longer being covered by insurance?

A.  Correct.

1   Q.   And you were asked whether or not doctors filled out
2   Therapeutic Alternative Forms.  Do you recall that?
3   A.   Yes.
4            MR. MARCUS:  Your Honor, at this time I would move into
5   evidence Defense Exhibit 211.
6            THE COURT:  Any objection from the Government?
7            MR. JUENGER:  No objection, Your Honor.
8            THE COURT:  It will be admitted.
9        (Defendant's Exhibit Number 211 was received in evidence.)
10           MR. MARCUS:  I just want to hand the witness a copy,
11  Your Honor, and I'll put it up on the screen.
12  BY MR. MARCUS:
13  Q.   Do you see the date of this email, March 27, 2015?
14  A.   Yes.
15  Q.   And do you know a Mr. Louis at PCA, who used to work at PCA?
16  A.   Yes.
17  Q.   And this is talking about a consent to change formula that
18  Dr. Cullen has approved?
19  A.   Yes.
20  Q.   Okay.  Let's just take a look.  Let's see if I can focus
21  that.
22           So earlier on direct when you were talking about
23  Therapeutic Alternative Forms, this is a Letter of Authorization
24  from a physician, right?
25  A.   Yes.

Lozada - Cross

1  Q.   And this is a physician agreeing to make a change in the

2  compounding formula?

3  A.   Yes.

4  Q.   This was a document that Mr. Grow was sending to your

5  pharmacy in the spring of 2015?

6  A.   Yes.

7  Q.   Can you see the date of the signature, March 20th?

8  A.   Yes.

9  Q.   And again, this is the same form signed by a different

10 physician, correct?

11 A.   Yes.

12 Q.   So that's how the process is supposed to work when you want

13 to substitute an ingredient; you agree with that?

14 A.   The process is supposed to work -- you're supposed to

15 actually hear from the physician themselves.  The pharmacy is

16 actually supposed to reach out to the physician.

17 Q.   Okay.  Well, let's just put it back up and see.  There's

18 information on this form, as you see, on the Letter of

19 Authorization?

20 A.   Yes.

21 Q.   This physician is giving their address and phone number.  Do

22 you see that?

23 A.   Yes.

24 Q.   So your pharmacy could call that physician if it wanted to

25 and needed to, couldn't it?

1    A.   Yes.

2    Q.   And there's a DEA number.  Now, you weren't in charge of

3    calling physicians yourself, correct?

4    A.   No.

5    Q.   That wasn't your job?

6    A.   No.

7    Q.   I'll just show another page, but certainly, as this document

8    indicates, your pharmacy certainly would have had all the phone

9    numbers and information to call these physicians, right, about

10   this change of authorization?

11   A.   Yes.

12   Q.   And that information was coming, attached to this email.  Do

13   you see that?

14   A.   Yes.

15   Q.   In your job you had pharmacists, correct, that supervised

16   you?

17   A.   Yes.

18   Q.   Was Kim Day one of those pharmacists?

19   A.   Yes, she was.

20   Q.   Mary Jo Giles?

21   A.   Yes, she was.

22   Q.   They would have been in charge of supervising the process of

23   talking to physicians as needed?

24   A.   Yes.

25   Q.   Now, I want to go back to the fax number and the white-out

Lozada - Cross

1    issue you were asked some questions about.  Do you recall that?

2    A.   Yes.

3    Q.   Let's do it this way:  You were shown Exhibit 143, which is

4    dated January 23rd, and there is some discussion about fax

5    numbers.  Do you see that?

6    A.   Yes.

7    Q.   Now, Mr. Juenger asked you if prescriptions were being

8    whited out.  Do you recall that?

9    A.   Yes.

10   Q.   In this email, the only thing that's being whited out is a

11   fax number, correct?

12   A.   A fax number was being whited out.  Prescriptions were not

13   whited out.

14   Q.   Right.  Fax number was, right?

15   A.   Yes.

16   Q.   Okay.  Not the prescriptions.  Let's talk about the fax

17   number.

18            MR. MARCUS:  And at this time, Your Honor, I would move

19   into evidence Defense Exhibit 58.

20            THE COURT:  Any objection?

21            MR. JUENGER:  Can I see it?

22            THE COURT:  Any objection?

23            MR. JUENGER:  No objection, Your Honor.

24            THE COURT:  It will be admitted.

25       (Defendant's Exhibit Number 58 was received in evidence.)

1   BY MR. MARCUS:

2   Q.   Now, you mentioned that prescriptions should be faxed to the

3   pharmacy directly.  Do you recall that?

4   A.   Yes.

5   Q.   And there's medical privacy issues, right, raised by HIPAA,

6   laws like that?

7   A.   Yes.

8   Q.   And that's one of the reasons you want to have the direct

9   transmission, correct?

10   A.   Yes.

11   Q.   Okay.  Let me show you this.  This is an email from two days

12   before the last exhibit.  This is Defense Exhibit 58.

13          Do you see that this is an email from Monty Grow to

14   Matt Smith?

15   A.   Yes

16   Q.   And you identified Matt Smith on direct, he was an executive

17   at PCA.

18   A.   Yes.

19   Q.   He was in charge of all the operations of the pharmacy?

20   A.   Yes.

21   Q.   And you see that it actually has the same heading of

22   Government's Exhibit 43.  It's talking about this efax issue,

23   correct?

24   A.   Yes.

25   Q.   Mr. Smith is telling Mr. Grow that there's a HIPAA concern,

Lozada - Cross

1  right?  There's brokering concerns when a prescription does not

2  come directly from the doctor.  Do you recall that?

3  A.  Yes.

4  Q.  This is on January 21st?

5  A.  Okay.

6  Q.  And the pharmacy then made a change, didn't it?

7  A.  Meaning what?

8  Q.  Well, the pharmacy changed the fax numbers so that

9  prescriptions could go directly to the pharmacy?

10  A.  No.

11  Q.  When you say no, do you know that or are you guessing?

12  A.  I'm not aware of any fax number change.

13  Q.  Well, you don't know if there was an efax set up that would

14  go directly to the pharmacy?

15  A.  That I wasn't a part of.

16  Q.  Okay.  So you really have no idea why this fax number was

17  being changed and having to be whited out, right?

18  A.  The fax number was being whited out because it was showing

19  that it was coming from Monty Grow instead of a physician's

20  office.

21  Q.  Right.  And you don't know if that fax number was changed so

22  that now there was a fax number coming directly to the pharmacy

23  for the prescriptions that Mr. Grow's group were marketing to

24  physicians?

25  A.  It was.

1   Q.  So there was a direct fax line to your --

2   A.  There's an efax, that's how we received the prescriptions.

3   Q.  Right.  And let me be more precise.

4        You don't know if there was a change in January of 2015

5   to the fax procedure so that now there would be an efax that

6   would come directly to the pharmacy?

7   A.  Well, they all come directly to the pharmacy.  I'm a little

8   confused.

9   Q.  You don't know if there was a change so that the

10  prescriptions that were coming from telemedicine companies would

11  now come directly to the pharmacy?

12  A.  I'm not aware of that.

13  Q.  You're not aware.  Right.  You were just shown a document.

14  You're not aware of whether that change in fax number policy is

15  the basis for why Mr. Grow's fax number would then become whited

16  out?

17        MR. JUENGER:  I think it's asked and answered now, Your

18  Honor.

19        THE COURT:  I don't know.  People say objection and

20  then I listen to it.

21        MR. JUENGER:  Objection.

22        THE COURT:  Overruled, though probably true, that it is

23  asked and answered.

24  BY MR. MARCUS:

25  Q.  Was that something you were responsible for, receiving faxes

Lozada - Cross

1   from physicians?

2   A.   Yeah.   As you can see on the fax form, there's a few people

3   that are actually cc'd on all the faxes that were incoming.

4   Q.   Right.   But the particulars of what was happening with fax

5   procedures in January of 2015, that was not something you have a

6   memory of, do you?

7   A.   No.

8   Q.   But what is clear is that prescription information was not

9   being whited out.   You agree with that?

10  A.   Prescription information was not whited out, fax number was.

11          MR. MARCUS:   At this time I'd like to move into

12  evidence Defense Exhibit 53.

13          THE COURT:   Any objection?

14          MR. JUENGER:   No objection, Your Honor.

15          THE COURT:   It will be admitted.

16      (Defendant's Exhibit Number 53 was received in evidence.)

17  BY MR. MARCUS:

18  Q.   Mr. Lozada, you were asked some questions about Government's

19  Exhibit 85, right?

20  A.   Yes.

21  Q.   And this was about how you were receiving different

22  prescriptions and trying to make sure that you were getting the

23  correct prescription with the right information?

24  A.   Correct.

25  Q.   And the truth is Mr. Grow was involved in facilitating

Lozada - Cross

1   sometimes when prescriptions would come in incorrectly with

2   something missing, whether it be quantity or a signature.

3   You're aware of that?

4   A.  If it was his account, we would have to go through him.

5   Q.  Right.

6   A.  Yes.

7   Q.  So this would be kind of troubleshooting, wouldn't it, to

8   try to make sure that you, the pharmacy, would ultimately get

9   the right information so it could fill a valid prescription and

10  provide that to a patient.  So this is just --

11          THE COURT:  Was that a question?

12          MR. MARCUS:  Yes, it was.

13          THE COURT:  Was there an answer?

14          THE WITNESS:  Yes.

15          THE COURT:  Next question.

16  BY MR. MARCUS:

17  Q.  So let me show you Defense Exhibit 53.  So on January 29th,

18  you're emailing other employees within PCA, right?  Do you see

19  that?

20  A.  Yes.

21  Q.  And again, this is about you've received a prescription on a

22  patient where the image is very small.  Do you see that?

23  A.  Yes.

24  Q.  And you can't exactly make out the physician information?

25  A.  Correct.

Lozada - Cross

1   Q.   And so you want Mr. Grow and his group, his company to

2   resend a clearer copy?

3   A.   Correct.

4   Q.   And then that information is forwarded to Mr. Grow?

5   A.   Correct.

6   Q.   With the hope and idea that then he will interact with, for

7   example, a telemedicine company and make sure that the

8   physician's information gets to you and is correct?

9   A.   Yes.

10  Q.   And he's involved in that process?

11  A.   Yes.

12  Q.   And ultimately, it's the pharmacy, their responsibility to

13  check and make sure with physicians that the information is

14  correct?

15  A.   Meaning?  Can you rephrase that for me?

16  Q.   So like in this example, when you get a prescription that

17  like, for example, you can't read, you're going to follow-up on

18  that, right?  You're going to ask for, in this case, a clearer

19  copy?

20  A.   Yes.

21  Q.   And if you got a prescription that didn't check off a

22  requirement box, you would follow up on that as well; would you

23  not?

24  A.   Yes.

25  Q.   With the idea of going back to getting the correct

Lozada - Cross

1   information?

2   A.   Yes.

3   Q.   So that when you ultimately fill your prescriptions at the

4   pharmacy, it's done based on the orders of the physician?

5   A.   Yes.

6   Q.   Okay.  And that's a process that ultimately the pharmacy is

7   overseeing, correct?

8   A.   Yes.

9   Q.   Let's talk about Ethoxy Gold and ethoxy.  You were asked

10   some questions about compounded medication, and one of the

11   things you said is that some of these ingredients and

12   formulations are powder.  Do you recall that?

13   A.   Yes.

14   Q.   And ethoxy is actually a shorthand for a longer chemical

15   name, isn't it?

16   A.   It's ethoxydiglycol.

17   Q.   Ethoxydiglycol.  And in your testimony you described that as

18   a wetting agent?

19   A.   Correct.

20   Q.   Right.  It's liquid, right, it's a solvent?

21   A.   Yes.

22   Q.   And its purpose is to take the other ingredients, correct,

23   and help deliver them to the site of treatment.  Do you agree

24   with that?

25   A.   It helps the powders blend.  The powders blend into the base

1  of the cream as well.

2  Q.  Right.  And so for example, let's take a topical pain cream.

3  You talked about the formulations, right?  You were asked about

4  pain cream?

5  A.  Yes.

6  Q.  Now, your pharmacy was compounding a lot of topical pain

7  creams, correct?

8  A.  Yes.

9  Q.  Not just for Mr. Grow's group, but for many other marketing

10  groups, correct?

11  A.  Yes.

12  Q.  And the topical pain cream treats at the site of local pain

13  or injury.  Do you agree with that?

14  A.  Yes.

15  Q.  So when I take a Motrin, for example, a tablet, I'm

16  ingesting that, right?  I am swallowing that, right?

17  A.  Yes.

18  Q.  And that has to be metabolized and spread throughout my

19  bloodstream.  Do you agree with that?

20  A.  Yes.

21  Q.  It's not localized, it doesn't go directly to the site of

22  pain?

23  A.  Yes.

24  Q.  But a topical cream can be applied directly to where you

25  have pain?

Lozada - Cross

1  A.  Yes.

2  Q.  For example your back or your knee?

3  A.  Yes.

4  Q.  It has to be absorbed by the skin to be effective.  Do you

5  agree with that?

6  A.  Yes.

7  Q.  And these agents, for example ethoxydiglycol, is very

8  important in aiding the absorption of the pain cream?

9  A.  Yes.

10  Q.  And that's why it's a necessary ingredient in this overall

11  formula?

12  A.  Correct.

13  Q.  Okay.  Now, you were asked about purchasing ethoxydiglycol,

14  ordering it on behalf of the pharmacy.

15  A.  Yes.

16  Q.  You mentioned that you sometimes would order it from

17  Medisca?

18  A.  Yes.

19  Q.  Right.  And Mr. Grow also provided it, correct, his company,

20  he sold that to the pharmacy?

21  A.  Yes, Ethoxy Gold.

22  Q.  Okay.  Well, we'll talk about that in a second.  Let me ask

23  you this since you bring it up.

24       If we look at the invoices that you billed to Tricare,

25  are we going to see the words Ethoxy Gold?

Lozada - Cross

1   A.   No.

2   Q.   We're going to see ethoxydiglycol?

3   A.   Yes.

4   Q.   If we see the invoices from PCA on purchasing, are we going

5   to see the words Ethoxy Gold?

6   A.   No.

7   Q.   Mr. Grow was selling ethoxydiglycol to your pharmacy?

8   A.   Yes.

9   Q.   And you talked a lot about the milliliters.  You are

10  essentially talking about purchasing ethoxydiglycol in different

11  sizes?

12  A.   Yes.

13  Q.   Right?  And you talked about larger sizes versus smaller

14  sizes?

15  A.   Yes.

16  Q.   Now, ethoxydiglycol we talked about was a necessary

17  ingredient for compounding.  You agreed with that?

18  A.   Yes.

19  Q.   Would you consider yourself an expert in purchasing

20  ethoxydiglycol?

21  A.   An expert?  I wouldn't consider myself an expert, but I do

22  order ethoxydiglycol.

23  Q.   Right.  But for example, you worked from 2014, you said,

24  through 2015?

25  A.   Yes.

Lozada - Cross

1    Q.   Okay.  In that period of time how many different

2    manufacturers did you talk to about the availability of

3    ethoxydiglycol?

4    A.   Not very many.

5    Q.   Okay.  Do you know whether ethoxydiglycol was available at

6    other places when PCA purchased it from Mr. Grow's company?

7    A.   Yes, it was.

8    Q.   Yeah?

9    A.   Yes, it was.

10   Q.   You mentioned Medisca?

11   A.   Yes.

12   Q.   Okay.  And you know the term law of supply and demand?

13   A.   Yes.

14   Q.   Are you aware that in this time period ethoxydiglycol became

15   very difficult to obtain nationally?

16   A.   Not really.

17   Q.   How much did you purchase?

18   A.   Thousands of MLs at a time.

19   Q.   Yeah.  And do you recall the dates you purchased from

20   Medisca?

21   A.   I do not recall the dates.

22   Q.   I mean, there should be invoices, shouldn't there, that

23   would show those purchases from your company, from PCA?

24   A.   Yes.

25   Q.   Okay.  So you purchased it at times from Medisca.  You

Lozada - Cross

1   testified to that?

2   A.   Yes.

3   Q.   But you can't remember the dates?

4   A.   No.

5   Q.   And so sitting here today you can't testify as to whether it

6   was available in this general window of time, on which days it

7   was available?

8   A.   I don't recall it ever not being available.

9   Q.   Okay.  But you don't know when it was, do you?

10  A.   It was the beginning of the year, the beginning of 2015.

11  Q.   Right.  Ingredients can be become scarce in the

12  pharmaceutical market.

13  A.   Yes.

14  Q.   There are times when certain ingredients are hard to

15  purchase, they're just not available for whatever reason?

16  A.   Yes.

17  Q.   If less of it is made, right, in a particular year and

18  demand increases, there's less supply to go around.  You would

19  agree with that?

20  A.   Yes.

21  Q.   In this period of time compounding medications increased

22  quite a bit, didn't they?

23  A.   Yes.

24  Q.   There were a lot of other pharmacies other than PCA trying

25  to buy ethoxydiglycol?

Lozada - Cross

1    A.   Yes.

2    Q.   And you never dealt directly with Mr. Grow, you didn't have

3    conversations with him about the availability, did you?

4    A.   With who?

5    Q.   Mr. Grow.

6    A.   Availability meaning?

7    Q.   Well, let me ask you:  Do you know how many pharmacies

8    Mr. Grow sold ethoxydiglycol to?

9    A.   No.

10   Q.   Now, you testified that his marketing company did marketing

11   for PCA.  Do you recall that?

12   A.   Yes.

13   Q.   But sitting here today, you're not aware, you don't know

14   that Mr. Grow also sold ethoxydiglycol to other pharmacies for

15   which he did zero marketing?

16   A.   I'm not aware of that.

17   Q.   Right.  You just know that you purchased ethoxy on the

18   directions of your company, right?

19   A.   Yes.

20   Q.   And you talked about the reimbursement for it and that's

21   something that is set by Tricare in this case, right?

22   A.   Yes.

23   Q.   And if it was included in products to private insurance,

24   those private insurance companies would decide on the price of

25   reimbursement?

1   A.   Yes.

2   Q.   Now, you were asked was there a time, on direct, where your

3   company stopped doing these compounding medications.  Do you

4   recall that?

5   A.   Yes.

6   Q.   When you stopped having a need for ethoxydiglycol?

7   A.   Yes.

8   Q.   That wasn't until what, the summer of 2015?

9   A.   I think it was maybe before the summer of 2015.

10  Q.   It was after April 2015, wasn't it?

11  A.   It was when Tricare no longer was covering.

12  Q.   Right.  When Tricare stopped paying for certain ingredients,

13  right?

14  A.   Yes.

15  Q.   And let me ask you:  PCA is a pharmacy for profit, right,

16  it's a company?

17  A.   It's a company, yes.

18  Q.   And companies aren't in the business of making products that

19  they're not going to get paid on.  Do you agree with that?

20  A.   Yes.

21  Q.   And the pharmacy gets paid for its prescriptions largely

22  from insurance.  Do you agree with that?

23  A.   Yes.

24  Q.   It's the reimbursement?

25  A.   Yes.

1  Q.  And so when an insurance program makes a decision not to

2  cover something, your pharmacy has to make alternative plans.

3  Do you agree with that?

4  A.  Yes.

5  Q.  And whether that's substituting an ingredient like

6  Resveratrol, right, sometimes you have to look for an

7  alternative?

8  A.  Yes.

9  Q.  Or sometimes, if a product is not covered at all, you'll

10  stop making it?

11  A.  Yes.

12  Q.  These were expensive medications.  You agree with that?

13  A.  Yes.

14  Q.  Prescription drugs in general are expensive?

15  A.  Yes.

16  Q.  And for most Americans the cost of paying for a prescription

17  drug 100 percent that's not covered by insurance, would be very

18  exorbitant.  Do you agree with that?

19  A.  Yes.

20          MR. MARCUS:  No further question, Your Honor.

21          THE COURT:  Redirect.

22                      REDIRECT EXAMINATION

23  BY MR. JUENGER:

24  Q.  Mr. Lozada --

25  A.  Yes.

Lozada - Redirect

1  Q.  -- during the time that you were purchasing drug ingredients

2  for PCA --

3  A.  Yes.

4  Q.  -- did you ever have a time when you wanted to buy

5  ethoxydiglycol -- and I'm going to use the word the cheap stuff

6  -- did you ever have a problem where you couldn't buy it?

7  A.  No.  In fact, we had a bunch of regular product from Medisca

8  in stock as well.

9  Q.  Okay.  So did PCA ever have to buy Ethoxy Gold out of

10  necessity?

11  A.  No.

12  Q.  Now, Mr. Marcus was talking about if insurance won't pay,

13  then a patient would have to pay out of pocket, correct?

14  A.  Yes.

15  Q.  Do you know what the cash price out of pocket for one of

16  these cream pain medications was?

17  A.  It's pretty high.  I can't give you an exact dollar amount,

18  but it was thousands of dollars.

19  Q.  Have you seen any of those being sold?

20  A.  Absolutely not.

21  Q.  And you were shown a document by Mr. Marcus and asked about

22  HIPAA and I believe -- let me find that document.  It's Defense

23  Exhibit 58.  I'm going to zoom in a little, and I'll just read

24  it because it's short.  It's from Matt Smith to Monty Grow.

25        "Whose fax number is this?  We cannot show outside fax

1        numbers on these RX's.  There is a HIPAA concern around

2        unsecure pathways."

3            HIPAA is about patient privacy, correct?

4   A.   Correct.

5   Q.   And it also says "and patient brokering concerns"?

6   A.   Yes.

7   Q.   What does patient brokering concerns mean to you?

8            MR. MARCUS:  I'll object, Your Honor, calls for an

9   opinion.

10           THE COURT:  I'm going to sustain the objection.

11  BY MR. JUENGER:

12  Q.   You were also asked about an email we looked at earlier, an

13  exchange between yourself and Mr. Grow about changes to the

14  scripts.  Do you remember that email?

15  A.   Yes.

16  Q.   And I want to ask:  Did you ever see a change where a

17  script, the original script that came in, had no refill, and

18  then the change had refills?

19  A.   Yes.

20  Q.   And did you ever see where a script had 240 grams and was

21  changed to 360 grams?

22  A.   Yes.

23  Q.   Who should be making those changes?

24  A.   The doctor.

25  Q.   But who did the script come from?

1  A.  Mr. Grow.

2  Q.  And you were shown a document by defense, it was Defense

3  211, and I want to put it back up on the screen.

4        Defense 211 was an email from Mr. Grow to Mr. Louis.

5  Do you know who Mr. Louis was?

6  A.  Yes.

7  Q.  Who was he at PCA?

8  A.  That was a fellow co-worker out of the pharmacy, a

9  technician at Patient Care America.

10  Q.  Do you know what his title was?

11  A.  He was an adjudicator.

12  Q.  And what is an adjudicator?

13  A.  A person who billed prescriptions to insurance companies.

14  Q.  And I want to approach and have you look at 211.  Do you

15  have it there?

16  A.  Yes.

17  Q.  Do any of the therapeutic changes that are indicated on

18  there include the drug Resveratrol?

19  A.  No.

20  Q.  And I want to show you then what's been admitted as

21  Government's Exhibit 128.  Do you have a copy up there?

22  A.  No.

23  Q.  And if you would flip to the back of that, do you see

24  therapeutic change forms?

25  A.  Yes.

Lozada - Redirect

103

1  Q.  And what are those for?

2  A.  It's for -- a Therapeutic Alternative Form is basically when

3  a physician giving the okay to go ahead and either change an

4  active ingredient to another active ingredient that gives the

5  patient the same therapeutic alternative -- or the same

6  therapeutic -- how could I say it?

7         The Therapeutic Alternative Form is basically a form

8  that the physician signs off stating that we're able to go ahead

9  and change either a medication, you can change it to another

10  medication that's used in the same family or you can just omit

11  the medication from the formula itself.

12  Q.  Sure.  And if you look to the last page of that document,

13  there is a therapeutic change purposed, correct?

14  A.  No.  Yeah, there's none for Resveratrol.

15  Q.  There is none?

16  A.  Yes.

17  Q.  Oh.  So does Government's Exhibit 128 have a therapeutic

18  change?

19  A.  Yes.

20  Q.  And what is it for?  It's from one thing to another thing,

21  correct.

22  A.  Yes.

23  Q.  And what is it?

24  A.  It's changing the -- it's basically omitting the Resveratrol

25  from the formula.

Lozada - Redirect

104

1  Q.  Okay.  And now if you go to the front page of Government's

2  Exhibit 128, this is an email from Monty Grow to Chris O'Hara

3  and Wayne at 1st Care MD.  Do you know Chris O'Hara or Wayne at

4  1st Care MD?

5  A.  No.

6  Q.  And this email is dated 4-6, April 6, 2015.

7  A.  Yes.

8  Q.  Which is how many days after Tricare stopped billing for

9  Resveratrol, more or less?

10  A.  I'd say approximately like a week.

11  Q.  And I won't read the entire email but Mr. Grow tells Chris,

12     after giving him some instructions on how to fill out the

13     forms, "It's very important," all caps, many exclamations,

14     "they," the doctors, "date the form March 23, 2015,"

15     correct?

16  A.  Yes.

17  Q.  And this is a request being made on April 6th, correct?

18  A.  Yes.

19  Q.  They're being asked to backdate, correct?

20  A.  Yes.

21  Q.  And it has a list of doctors?

22  A.  Correct.

23  Q.  And do you recognize some of those doctors?

24  A.  Yes.

25  Q.  And Dr. Long Hoang, the first one, H-o-a-n-g --

1   A.   Yes.

2   Q.   -- what percentage of Mr. Grow's scripts had that doctor on

3   them?

4   A.   A pretty good amount.

5   Q.   Well, can you do better than that?

6   A.   I'd say probably -- I'd say 60/40.  60 being a big

7   percentage, the percentage that he wrote for.

8          MR. JUENGER:  Okay.  That is all I have, Your Honor.

9          THE COURT:  Thank sir, you're excused.

10          Ladies and gentlemen, how about if you take an hour for

11   lunch and come back at 1:30 to the original jury room.  So

12   Mrs. Christie is going to walk you over there so you won't get

13   lost back there.

14          THE COURT SECURITY OFFICER:  All rise.

15          THE COURT:  There are visiting judges, too.  Take your

16   notebooks.  Leave them in the jury room.  Don't talk about the

17   case, but you know that already.

18          Thank you, sir, you may leave.  Have a good day.

19          THE WITNESS:  Thank you.

20      (The witness was excused.)

21          THE COURT:  Who's your next witness, Government?

22          MR. LARSEN:  Your Honor, the Government will be calling

23   Mike Ewton.  He will be short witness.

24          THE COURT:  Mike who?

25          MR. LARSEN:  Ewton, E-w-t-o-n, I believe.

1          THE COURT:  And after him?

2          MR. LARSEN:  Ralph Louis.

3          THE COURT:  And after him?

4          MR. LARSEN:  We are hopeful that Jonelle Coronado will

5    be in town.  She is inbound from Germany as we speak, probably

6    somewhere over American airspace at this point.

7          THE COURT:  So you've got Coronado, Ewton and?

8          MR. LARSEN:  Ralph Louis, and that should be all for

9    the Government's case.

10          THE COURT:  How long do you think Louis will be?

11          MR. LARSEN:  We think Louis will probably be about the

12    same length as this witness, Mr. Lozada.

13          THE COURT:  Are you going to have defense witnesses

14    this afternoon?

15          MR. RASHBAUM:  We have a couple that are ready, Your

16    Honor, if need be, a couple in the building.  We have had some

17    travel issues, but we have two available in the building.

18          MR. LARSEN:  Can we know who they are?

19          THE COURT:  Yeah.  Who they are?

20          MR. RASHBAUM:  Sure.  Corcoran.

21          MR. MARCUS:  David Corcoran.

22          MR. RASHBAUM:  I'm not sure whether Davila is here or

23    Luis Green, one of the two.

24          THE COURT:  David Corcoran, the lawyer?

25          MR. MARCUS:  Yes.

1          THE COURT:  And who else?

2          MR. RASHBAUM:  Sal Davila and Luis Green.  I am just

3   not sure of the order for --

4          THE COURT:  And who is the third person?

5          MR. RASHBAUM:  Luis Green.  In some order those will be

6   our first three witnesses we expect.

7          THE COURT:  Where is that person in your list?

8          MR. RASHBAUM:  Luis Green?

9          THE COURT:  Help me out.

10          MR. RASHBAUM:  Under G.

11          THE COURT:  Okay.  Luis Green, there you go.  I had it

12   alphabetically.

13          Any exhibits with those individuals?  Then show it to

14   the Government and we can go through it.  Any exhibits that the

15   Government is going to introduce with your last three witnesses?

16          MR. JUENGER:  Your Honor, I think we went over them all

17   last night.

18          THE COURT:  That's why I want to know if there are any

19   other exhibits.  If they have been admitted, I don't need to

20   talk about them.  If they were not --

21          MR. JUENGER:  I don't anticipate any others than we

22   discussed last night.

23          THE COURT:  No other exhibits with any of the other

24   witnesses?

25          MR. JUENGER:  Including the defense witness?

1          THE COURT:  No.  Just worry about your own witnesses.

2          MR. JUENGER:  Yeah, that's enough.

3          THE COURT:  Any exhibits with the defense?

4          MR. RASHBAUM:  With the entire defense?

5          THE COURT:  No, the three witnesses.  I divide and

6    conquer.

7          MR. MARCUS:  Yes.  We will probably use Defendant's

8    Exhibit 208.

9          THE COURT:  What else?

10         MR. MARCUS:  212, 209, 210, 18.

11         THE COURT:  I'm sorry?

12         MR. MARCUS:  18, 36, 19, 47, 105.

13         THE COURT:  This is with your first three witnesses?

14         MR. MARCUS:  These would be with Mr. Corcoran, Your

15   Honor.

16         THE COURT:  All right.  What else?

17         MR. MARCUS:  164, 168, 171.

18         THE COURT:  That's it?

19         MR. MARCUS:  Yes.

20         THE COURT:  Show those exhibits, make sure the

21   Government sees them.  If the Government has any objection,

22   right after the judgment of acquittal argument, you will tell me

23   if you have any objections.  If not, I will assume that there

24   are none and they will be admitted.  If you have any objections,

25   after the judgment of acquittal argument, you will tell me, we

1    object to 105 or A, B and C, and we will decide then since the

2    jury will not be here during the Rule 29 argument.

3           By the same token, at that time I want you to submit to

4    me -- that's why I gave each side two copies of the jury

5    instructions.  I've already made some changes.  I added the

6    names of the accomplices and I changed that instruction to

7    include names.  If there are other names to include, we will

8    add.

9           If there any typographical errors, any corrections, you

10   put them on one of the two copies that I gave you and you just

11   give me your -- rip out the page with the changes that you think

12   are needed.  If you have any additional ones, then you can

13   prepare those, and they should be provided tomorrow morning.

14   Okay?

15          MR. RASHBAUM:  Judge, there's one more exhibit.  That

16   was just one witness.

17          THE COURT:  Okay.  What is the other one?

18          MR. RASHBAUM:  Defense Exhibit 120.

19          THE COURT:  Anything else?

20          MR. RASHBAUM:  Not for the first three witnesses, Your

21   Honor.

22          THE COURT:  Okay.  Let's just do it that way.  That way

23   we will move along.  All right.

24          MR. LARSEN:  Your Honor, I want to make sure I

25   understand your order on the jury instructions.  We give you any

1   changes tomorrow morning?

2          THE COURT:  No.  You're almost as bad as the jurors,

3   see that's why I like to keep it simple.

4          Okay.  I said, I gave you two copies.  Tell me what's

5   wrong with them and write out whatever you want to delete and

6   you're going to give me that right after the Rule 29 motion for

7   judgment of acquittal because you've had it earlier this morning

8   and you can read it.  Most of them are standard.

9          Anything additional, deletions by Rule 29, additions,

10  I'll give you until tomorrow morning.

11         MR. LARSEN:  Okay.

12         THE COURT:  You give it to me so I can read it and have

13  a charge conference.  That's why the charge conference doesn't

14  take that long.  It's preserved.

15         The purpose of the charge conference if you want to

16  commit error, I'll let you do that, but I'll preserve it.  If

17  you say we want instruction B, no, I'm not going to give it to

18  you, but I'll file it and I'll say why I won't give it, or if

19  you want to convince me to give an instruction.  It shouldn't

20  take that long, because it should only be three or four,

21  something like that, in my opinion, in my limited experience of

22  now 760 jury trials.

23         So maybe this will be different, but I think we could

24  do it that way, but I'll preserve the objections from either

25  side.  The Government's objections aren't as important because

1   if you win, you don't care; and if you lose, you can't appeal.

2   So you've got to persuade me to give an instruction.  That's why

3   I gave you till tomorrow, same thing with the defense.

4        That way you put jury instruction, defense proposed

5   one, two, three, four, it won't go past five probably, and then

6   I'll look at it and I'll think about it and I'll do some

7   research.  So by the time we have argument, it will be -- you

8   know, right next door in my courtroom, my assigned courtroom,

9   they are having probably the best civil lawyers in the nation

10  all trying to get multidistrict litigation from seven

11  magnificent judges on the Multidistrict Panel.

12       As I was coming up the elevator, there were some

13  lawyers I didn't know because they're from all over the country

14  and I told one of my law clerks -- you're here for the

15  multidistrict?  Yeah.  So I told my law clerk these are big

16  shots, and the lawyer responded, big shots who get -- fill in

17  the time -- to argue on multimillion dollar cases.  How much

18  time do you think each lawyer gets to argue?

19       MR. RASHBAUM:  Two minutes.

20       THE COURT:  You got it.  And I'm tempted to go in there

21  to see how people like Judge Vann and Judge Bryer, all

22  super-duper people -- they give two minutes and that's how I

23  want to do the charge conference.  So you help me out.  I'm not

24  limiting you to two minutes, but sometimes we spend two minutes.

25       All right.  You don't want to eat?  I didn't eat when I

1    was a lawyer in trial, but I eat as a judge.

2        MR. MARCUS:  No, we do want to eat.  On the jury

3    instructions, we submitted a lot of special instructions.

4        THE COURT:  You submitted a lot of stuff that I looked

5    at, some of it I included, some of them were standard.  What I

6    want you to do is what I've just said, look at what I've got,

7    tell me what's wrong with it by writing it, and if you really

8    want something else, then you'll submit it.  Instead of

9    submitting 45, you'll submit 4 or 5.

10       MR. MARCUS:  Okay.

11       THE COURT:  Maybe I'll grant some, maybe I'll deny.

12   Whatever I deny, you'll have it all set up and you can put in

13   your brief, in the event that your client is convicted, issue on

14   appeal.  I set it up for you.  I don't have any problem with

15   that.  Or you can argue to me why you want that as opposed to

16   going back and forth with two jury instructions.  It's just, you

17   know -- I don't know if you all -- does anybody bill by the hour

18   here?  No, those are the guys next door.  All right.  That's why

19   they're upset that it's two minutes.  You all don't bill by the

20   hour, so I'm helping you.  You just don't know it.

21       Okay.  Eat.  See you in 55 minutes.  Okay.

22       THE COURT SECURITY OFFICER:  All rise.

23       MR. JUENGER:  Judge, can I ask a question off the

24   record?  It has nothing to do with this case.

25       THE COURT:  Okay.

1        (There was a luncheon recess taken at 12:45 p.m.)

2                          AFTERNOON SESSION

3        (The following proceedings were held at 2:10 p.m. outside

4   the presence of the jury:)

5             THE COURT:  You can bring them.

6             THE COURT SECURITY OFFICER:  Yes, sir.

7             THE COURT:  I'm sorry.  I thought you were doing that.

8        (The jury returned to the courtroom at 2:10 p.m.)

9             THE COURT:  Thank you, folks.  Please be seated.

10            Call your next witness, please.

11            MR. LARSEN:  The United States calls Michael Ewton.

12            THE COURT:  Raise your right hand.

13            MICHAEL EWTON, GOVERNMENT'S WITNESS, SWORN.

14            THE COURT:  Have a seat and tell us your name and spell

15   your last name when you get a chance.

16            THE WITNESS:  My name is Mike Ewton, E-w-t-o-n.

17                          DIRECT EXAMINATION

18   BY MR. LARSEN:

19   Q.  Good afternoon, Mr. Ewton.  Where do you live, city and

20   state only, please?

21   A.  Jacksonville, Florida.

22   Q.  Do you know why you were called to testify here in court

23   today?

24   A.  Because I was kind of recruited to get involved in a

25   compound pharmacy, kind of set up some prescriptions and get a

Ewton - Direct

114

1  little bit of a kickback from it a couple of years ago, nearly

2  three years ago.

3  Q.  Are you a Tricare beneficiary?

4  A.  Yes.

5  Q.  And how is it that you're a beneficiary?

6  A.  My wife is active duty in the Navy.

7  Q.  What do you do for a living?

8  A.  I work for the power company in Jacksonville.

9  Q.  And where are you and your wife currently stationed?

10 A.  In Jacksonville, Florida.

11 Q.  Were you in Jacksonville, Florida in early 2015?

12 A.  Yes.

13 Q.  Now, did there come a time when you agreed -- you said just

14 a moment ago you ordered compounded medications through an

15 individual or related to an individual named Monty Grow?

16 A.  Yes.

17 Q.  Why did you agree to order these compounded medications?

18 A.  Through some friends of my wife, we were kind of recruited

19 one morning.  They told me that they had been involved with it

20 for some time.

21        THE COURT:  When you say "they" I don't know who you

22 mean.

23        THE WITNESS:  My wife's friends.  Should I use names?

24        THE COURT:  Yes, you should.

25        THE WITNESS:  Okay.  Natalie Pinkney, Rebecca Brown and

1  Leah Styles, we were all sitting around having coffee and they

2  started talking about money they were receiving for being

3  involved in this pharmacy.

4        THE COURT:  Should we receive that as evidence, you

5  think?

6        MR. LARSEN:  Are you asking me, Your Honor?

7        THE COURT:  You're the one who's proposing it.

8        MR. LARSEN:  Your Honor, I just asked why he agreed.

9  There was no objection.

10       THE COURT:  When you ask why, usually the "because"

11  includes hearsay, don't you think?

12       MR. LARSEN:  Your Honor, I can move on, sure.

13       THE COURT:  Okay.  You can't tell us what someone said

14  under most circumstances.

15       THE WITNESS:  Okay.

16       THE COURT:  There are exceptions, but you wouldn't know

17  that though.

18  BY MR. LARSEN:

19  Q.  Mr. Ewton, did you agree to order the medications?

20  A.  I did.

21  Q.  What products were these?

22  A.  A pain cream, a scar cream, and a multivitamin.

23  Q.  And did you agree also to be a sales rep for the defendant?

24  A.  Initially, I told them that I could potentially do that if

25  they could show me that it was on the up-and-up and not dirty.

1    It felt dirty to begin with.

2    Q.  Did you end up repping anybody?

3    A.  My wife signed up, I signed up, but I didn't go out

4    recruiting.

5    Q.  Okay.  What was the first step you took to get involved with

6    the defendant?

7    A.  There was some paperwork to fill out and then, once that was

8    done, you just waited for a phone call to come from somebody who

9    proposed that they were a doctor.

10   Q.  And what type of information did you put on the paperwork?

11   A.  You know, there may have been some tax forms, so that you

12   could receive the money for it.

13   Q.  Did you have to put information about yourself, anything

14   like that?

15   A.  I think so.

16   Q.  A minute ago you said that you felt like this was dirty.

17   Why did you feel that?

18   A.  Well, because there was more money than seemed reasonable

19   involved as what was presented as commission or kickback, and my

20   mom always said, if it doesn't feel right, then don't do it.

21   And I was presented with information about the people that were

22   selling the idea to me, that they had been recruited by somebody

23   and the entire situation had been vetted and it was legal.

24   Q.  Okay.

25   A.  And I let myself be sold on that idea because at that time

1    financially we were struggling and we needed some money and

2    everybody was getting some money and we wanted a piece.

3    Q.  Do you feel like what you were involved in was at any point

4    legal?

5    A.  I was convinced that at least it was legal, it may not have

6    been so ethical, but I felt like, based on what I was told, that

7    it was probably legal.

8    Q.  Was that something that the defendant told you?

9    A.  No, I never spoke -- to my knowledge, I don't think that I

10   ever spoke to him.

11   Q.  So who did you hear this from?

12   A.  Natalie Pinkney mostly.

13   Q.  Okay.  Now, did you receive these products at some point?

14   A.  Yes.

15   Q.  And what came in the mail?

16   A.  The pain cream, the scar cream, and the multivitamin for my

17   wife and for me.

18   Q.  Did you receive payment at some point?

19   A.  Yes.

20   Q.  And whose prescription were you paid for?

21   A.  I believe that I was paid for hers and mine, but it may have

22   been just mine.  I really -- I can't remember.  It's been a

23   while.

24   Q.  Okay.  As you stated earlier, you never recruited anyone

25   into this other than your wife?

Ewton - Direct

1  A.  Correct.

2  Q.  Do you and your wife share same bank account?

3  A.  Yes.

4  Q.  And the money that I came into that bank account do you use

5  for family or household expenses?

6  A.  Yes.

7  Q.  What did you use the money for, if anything?

8  A.  Just bills, it just was something to help with the bills.

9  Q.  And the money that you received, how do you know it came

10  from the defendant?

11  A.  That's the one interaction that I had with him personally.

12  We had some texting back and forth, or maybe an email or two,

13  regarding payment and regarding account information.  I think

14  that I received notification from him that money had been wired

15  to me.

16  Q.  Did you sign up for these products because you needed them?

17  A.  No.

18  Q.  At any point during this time frame you're testifying about,

19  did you learn that you had to become an employee of a pharmacy?

20  A.  I learned that in order to continue getting a payment or any

21  other payments that I would have to do that and so I filled out

22  the paperwork to do that?

23  Q.  Where did you learn that from or who did you learn that

24  from?

25  A.  Natalie.

1  Q.  Okay.  Not from the defendant?

2  A.  Not directly, no.

3  Q.  Why did you fill out the paperwork to become an employee of

4  a pharmacy?

5  A.  Because I'd like to see another payment.

6  Q.  Were you ever an employee, as you understand what an

7  employee is, of the pharmacy?

8  A.  No.  I already had a job and it was strictly about getting

9  another payment.

10  Q.  Okay.  Would you have paid any money out of pocket for any

11  of these medications?

12  A.  No.

13  Q.  I'm sorry?

14  A.  No.

15  Q.  Why not?

16  A.  I can get meds over the counter for -- I mean, if it was

17  cheap maybe.  I don't know if the stuff was any better than any

18  meds that I could get from Walgreen's so --

19  Q.  Okay.

20         MR. LARSEN:  If I could have one moment, Your Honor?

21         THE COURT:  Sure.

22         MR. LARSEN:  No further questions, Your Honor.

23         THE COURT:  Thank you.  Cross-examination.

24         MR. RASHBAUM:  Thank you, Your Honor.

25                    CROSS-EXAMINATION

1   BY MR. RASHBAUM:

2   Q.  Good afternoon.  My name is Dan Rashbaum.  I represent Monty

3   Grow.  You never met Monty Grow, right?

4   A.  No.

5   Q.  And have never spoken to him?

6   A.  To my knowledge, I don't think that I ever had a

7   conversation with him.

8   Q.  Now, you said that you thought it was dirty in the

9   beginning, but then you became a little bit more comfortable

10  with it, right?

11  A.  Really, on the day that we initially spoke, me and my wife's

12  friends spoke about it, I was more comfortable with it at the

13  end of that conversation.

14  Q.  And that's because your wife's friends had indicated to you

15  that it had been vetted by legal counsel, correct?

16  A.  Yes.

17  Q.  And that legal counsel thought it was on the up-and-up,

18  correct?

19          THE COURT:  Well, let me interrupt you for a second

20  because you all are so friendly with each other that you don't

21  object, which is probably why you didn't object to the original

22  hearsay about the friends.  So now we have the friends saying

23  that some lawyer said something, and so that's not just hearsay,

24  that's double hearsay.

25          MR. RASHBAUM:  The door was opened by the Government,

1    Your Honor.  The door was opened by the Government.

2              THE COURT:  I thought I closed it.

3              MR. RASHBAUM:  Not that time.

4              THE COURT:  I have to close it now.

5              MR. RASHBAUM:  That's okay.

6              THE COURT:  But that's the reason.  You all understand

7    what I told you before, generally, someone outside has to be

8    here.  There are exceptions.  I think I told you some of the

9    them already, and it's not whether that's true or not true,

10   that's how we do it.  So I'm going to sustain the objection to

11   what some lawyer said to some friends who said it to this

12   witness.

13             MR. RASHBAUM:  It goes to his state of mind, too, Your

14   Honor.

15             THE COURT:  Whose state of mind, the lawyer's, the

16   friends' or the witness'?

17             MR. RASHBAUM:  The witness, Your Honor.

18             THE COURT:  The state of mind of the witness is not at

19   issue.

20             MR. RASHBAUM:  Fair enough.  I'll move on.

21             THE COURT:  Is he a party to this case?  You haven't

22   been charged, right, with anything?

23             THE WITNESS:  Not to my knowledge.

24             THE COURT:  Okay.  So state of mind is not at issue.

25   BY MR. LARSEN:

1  Q.  After talking to your friends, you became more comfortable

2  with it, correct?

3  A.  I was never completely comfortable with the idea.  I was

4  broke.

5  Q.  You became comfortable enough that your wife received creams

6  on March 24, 2015, April 22, 2015, and May 7, 2015, right?

7  A.  How many payments did you mention?

8  Q.  No, I said she received creams.

9  A.  Oh, the medicine.

10  Q.  Yes.

11  A.  Yeah, okay, yes.

12  Q.  And you received in March, April and May as well?

13  A.  Sounds right.

14  Q.  And you received payment for one set of those prescriptions,

15  correct?

16  A.  I don't know.  I received two payments and I don't know what

17  I was paid for.

18  Q.  If I told you that the two payments were related to your

19  wife's prescriptions, the person that you brought into the

20  marketing, would that surprise you?

21  A.  I didn't know where the money was coming from, whether it

22  was from my prescription or hers.

23  Q.  If I told that you weren't paid for your prescriptions,

24  would that be inaccurate?

25          MR. LARSEN:  Foundation.

1            THE COURT:  Overruled.  If he doesn't know, he can say

2    I don't know.  I'll overrule the objection.  Go ahead.  You can

3    answer it.

4            THE WITNESS:  Again with the question, please.

5    BY MR. RASHBAUM:

6    Q.  Let me put it to you this way:  Do you know whether you were

7    paid for your prescriptions?

8    A.  I don't.

9            MR. RASHBAUM:  One moment, Your Honor.

10           THE COURT:  Sure.

11           MR. RASHBAUM:  No further questions, Your Honor.

12           THE COURT:  Redirect, if any.

13                         REDIRECT EXAMINATION

14   BY MR. LARSEN:

15   Q.  Mr. Ewton, you said you felt this whole thing was dirty.

16   Did you think it was legitimate or clean to be paid for either

17   your prescriptions or your wife's prescriptions for products

18   that you've testified you didn't even need?

19           MR. RASHBAUM:  Objection, Your Honor.

20           THE COURT:  Grounds.

21           MR. RASHBAUM:  State of mind.  He is the witness.

22           THE COURT:  Pardon?

23           MR. RASHBAUM:  You said state of mind.  He is the

24   witness.

25           THE COURT:  I'm going to sustain it because it's

1   leading.  See, if he said yes, the chances are it's a leading

2   question, and on redirect you still cannot lead.  You can ask

3   why, how, what, when.  All of those are not leading questions.

4   BY MR. LARSEN:

5   Q.  As you sit here today, do you feel what you engaged in was

6   legitimate?

7   A.  No.

8           MR. LARSEN:  Thank you.

9           THE COURT:  Thank you, sir.  Have a safe trip back.

10          THE WITNESS:  Thank you.

11      (The witness was excused.)

12          THE COURT:  Next witness.

13          MR. JUENGER:  Your Honor, that's going to be the

14   Government's final witness.

15          THE COURT:  So what does the Government usually say

16   when that happens?

17          MR. JUENGER:  Well, we would like to confirm that we

18   have the exhibits and rest.

19          THE COURT:  Okay.  How do you want to confirm that?

20          MR. JUENGER:  Well, we have a list that we've been

21   keeping all through trial, and we would like to confirm that

22   Your Honor has the same ones.

23          THE COURT:  Okay.  Go in order.

24          MR. JUENGER:  We have --

25          THE COURT:  Why don't you use the microphone to make

1    the court reporter happy.  If the court reporter is happy, the

2    judge is happy.

3            You're going to do it in order, right?

4            MR. JUENGER:  I am and perhaps it would be easier --

5            THE COURT:  If you do it in numerical order, that's

6    perfect, we can keep up with that.  So start with 1.  Is that

7    the lowest number?

8            MR. JUENGER:  It usually is.

9            THE COURT:  Then start with that.  If there's nothing

10   in between, we can say, for example, 1 through 9.

11           MR. JUENGER:  1 through 9.

12           THE COURT:  Okay.  Then what?

13           MR. JUENGER:  10 -- no, 11.

14           THE COURT:  And then what?  I've got 17-A, B, C, D.

15           MR. JUENGER:  Yes, Your Honor.

16           THE COURT:  Anything in between?  Then I have F and 18.

17           MR. JUENGER:  F and 18.

18           THE COURT:  Next group that I have is 31 through 36.

19           MR. JUENGER:  Correct, Your Honor, but I would ask --

20           THE COURT:  No, you tell me what's missing in between.

21           MR. JUENGER:  23, Your Honor, I would --

22           THE COURT:  23.  What say the Government to 23?  I

23   meant the defendant.  I made a mistake.  What say the defendant

24   to Exhibit Number 23 by the Government?

25           MR. MARCUS:  We are going to continue our objections,

1    Your Honor.  We've discussed this.

2              THE COURT:  Sustained.  Just tell me objection or not.

3    I am going to sustain the objection.

4              MR. JUENGER:  Then I have 31 through 36.

5              THE COURT:  That's what I said.  40 through 42.

6              MR. JUENGER:  40 to 42.

7              THE COURT:  44.

8              MR. JUENGER:  44.

9              THE COURT:  47.

10             MR. JUENGER:  47.

11             THE COURT:  The next one that I have is 49.

12             MR. JUENGER:  49.

13             THE COURT:  Anything else in that group so far?  In the

14   first 50, nothing else?

15             MR. JUENGER:  I think that's it, Your Honor.

16             THE COURT:  All right.  51, 52.

17             MR. JUENGER:  51, 52, 54, 55, 56, 58, 61, 62, 64, 67,

18   68, 69.

19             THE COURT:  I have 66 also.  Do you have 66 or not?

20             MR. JUENGER:  We don't have it marked, Your Honor, but

21   I trust your --

22             THE COURT:  They are your exhibits, do you want it in

23   or out?

24             MR. JUENGER:  Yes, Your Honor.

25             THE COURT:  You want it in.

1          MR. JUENGER:  In.

2          THE COURT:  Any objection from the defense?

3          MS. MEYERS:  Your Honor, no objection.

4          THE COURT:  Then it's --

5          MS. MEYERS:  For the record, Your Honor, we noted that

6  it had been put in on January 22nd.

7          THE COURT:  Okay.  It doesn't matter, it's in.  So I've

8  got 66 through 72.

9          MR. JUENGER:  Yes, Your Honor.

10          THE COURT:  And then I have 74.

11          MR. JUENGER:  Yes.

12          THE COURT:  The next category 76 through 82.

13          MR. JUENGER:  Yes.

14          THE COURT:  Then 85, 88, 92 and 93.  Anything in

15  between?

16          MR. JUENGER:  No, just those.

17          THE COURT:  And then I have 95 through 99.  Then I have

18  101 to 104.

19          MR. JUENGER:  I had all of those.  I had 100 marked.

20          THE COURT:  100.  What say the defendant to Exhibit

21  100?

22          MS. MEYERS:  No objection, Your Honor.

23          THE COURT:  Then it's in.

24     (Government's Exhibit Number 100 was received in evidence.)

25          THE COURT:  106 and 107.

1        MR. JUENGER:  Yes, Your Honor.

2        THE COURT:  Then I have 109 through 120.  Then I have

3   122.  Anything before that?

4        MR. JUENGER:  No, Your Honor.

5        THE COURT:  Then I have 127 through 131.  Then I have

6   133 to 139.  Then 141, and 143 through 154.

7        MR. JUENGER:  I have all of those, Your Honor, but I

8   also have 124 and 125, unless you mentioned those.

9        THE COURT:  124 and 125.  What say the defense to 124

10  and 125?

11       MS. MEYERS:  Your Honor, we have no objection to 124.

12       THE COURT:  Do you have an objection to 125?

13       MS. MEYERS:  I don't have it, Your Honor.

14       THE COURT:  It's an email on April 15, 2015, sometimes

15  described as 2019 and corrected.  It's an email between Mr. Grow

16  and others.

17       MS. MEYERS:  We have no objection, Your Honor.

18       THE COURT:  It will be admitted.

19     (Government's Exhibit Numbers 124 and 125 were received in

20  evidence.)

21       THE COURT:  So now we're up to 139, all of those, and

22  then 141 and 143 through 154, as I've just said.

23       MR. JUENGER:  Yes, Your Honor.

24       THE COURT:  The next one that I have is 157.

25       MR. JUENGER:  Yes, Your Honor.

 1          THE COURT:  Okay.  And then 159 all the way to 170-D.

 2   And then I have 172, 173 and 174.  Anything else?

 3          And, folks, you'll get all these exhibits, you're going

 4   to get an Exhibit List.  I am going to make them do an Exhibit

 5   List just with things that they decided they want to introduce,

 6   and I have admitted to make it easier for you.

 7          MR. JUENGER:  Your Honor, I have all of those that you

 8   had.

 9          THE COURT:  You don't have to tell me.  Tell me what

10   you don't have.

11          MR. JUENGER:  176.

12          THE COURT:  176.  What is the defendant's position?

13          MS. MEYERS:  Your Honor, we continue our objection to

14   that document.

15          THE COURT:  I'm sustaining the objection.

16          MR. JUENGER:  And then lastly, Your Honor, we have a

17   signed stipulation between the parties.  We would label it 177

18   and ask that that be admitted.

19          THE COURT:  Do you want to read it?

20          Ladies and gentlemen, a stipulation is an agreement

21   about something that is no longer in dispute.  You must accept

22   it.

23          Do you want to read it?

24          MR. JUENGER:  I can.  The stipulation reads:

25          "The parties stipulate and agree that at all times

1          pertinent to the Superseding Indictment, one, Tricare was a

2          health care benefit program and a Federal health care

3          program defined under Federal law; and, two, that

4          flurbiprofen drugs referenced in Counts 50 and 51 of the

5          Superseding Indictment were prescription drugs within the

6          meaning of the Food, Drug and Cosmetics Act."

7                It's signed by the parties.

8                THE COURT:  All right.  So you must accept that and

9    that eliminates the need to have additional witnesses because of

10   the cooperation of both sides voluntarily doing that to move the

11   case along about something that's not in dispute.

12               What say the Government?

13               MR. JUENGER:  The Government rests, Your Honor.

14               THE COURT:  Unfortunately, because the law requires me

15   to excuse you when the Government rests, let me give you a

16   seventh inning stretch, it may not be the seventh inning, and

17   then we'll make you come back.  Stay in this jury room because

18   we're going to bring you back relatively soon after I talk to

19   the lawyers about what else, if anything, they want to do.

20   Okay?

21               THE COURT SECURITY OFFICER:  All rise.

22               THE COURT:  Don't talk about the case.  You can leave

23   your notebooks here.  You can take your sodas.  Don't drink too

24   much or you may need more bathroom breaks this afternoon.

25               (The jury retired from the courtroom at 2:35 a.m. and the

1    following proceedings were held:)

2           THE COURT:  Did I hear the door yet?  There we go.

3           All right.  What say the defense?  And everyone else

4    can sit down.

5           MR. MARCUS:  Your Honor, we'll make a Rule 29 motion on

6    all counts.  I want to focus, though, on the health care fraud

7    counts, the conspiracy, and then Counts 2 through 8, the

8    substantive counts, just to start.

9           THE COURT:  You don't like to use the lectern.

10          MR. MARCUS:  I'll do that, Your Honor.

11          THE COURT:  I'm all ears.

12          MR. MARCUS:  Your Honor, the bulk of the evidence we've

13   heard has related to payments the Government argues are

14   kickbacks, payments to sales reps or patient recruiters, in

15   their words, or patients, and those relate to the kickback

16   charges, but they have charged a health care fraud under 1347

17   and they charged a conspiracy under 1349, a health care and a

18   wire fraud conspiracy, and the substantive counts relate to

19   claims.  These are reimbursement claims made to Tricare, and the

20   elements of those claims have to show that they were submitted

21   and that the claims themselves contained materially false

22   information.  It was done with a willfulness, a specific intent

23   to defraud Tricare.

24          Obviously, the evidence has been very clear in this

25   case.  Mr. Grow does not have a provider number with Tricare,

1    did not submit a claim to Tricare, did not bill Tricare.  All of

2    that was done by the pharmacy in this case, PCA.

3            THE COURT:  They can't be co-conspirators?

4            MR. MARCUS:  They could, sure, but look at the evidence

5    that's been submitted.  No one has come in that's testified

6    about how claims were submitted by PCA, that there was false

7    information put into those claims.  We've had no testimony about

8    anyone on the inside, you know, omitting material information as

9    part of reimbursement or doing anything on the PCA side.

10           We had Mr. Lozada today.  He's a technician.  They

11   chose not to call witnesses from the pharmacy, so that's their

12   problem, is that they haven't had someone come in and say that

13   anyone had a conversation --

14           THE COURT:  He's not from the pharmacy?

15           MR. MARCUS:  Mr. Lozada?

16           THE COURT:  Yeah.

17           MR. MARCUS:  Yeah, but he's a technician.

18           THE COURT:  Yeah, but he did more than that.  No?

19           MR. MARCUS:  He did not lay the requisite predicate for

20   a billing claim submission case or a conspiracy.  He never

21   talked with Mr. Grow about any of the claims that were submitted

22   to Tricare.  He didn't testify about that, and no one has

23   testified that they ever had a conversation with Mr. Grow about

24   how the claims would be submitted and that there was any intent

25   to defraud Tricare.

1          Everything in this case is focused on the way that

2    Mr. Grow ran and marketed his company and payments he made

3    either to his employees or, arguably, to patients or reps.

4    That's on the kickback side, but not on these first nine counts,

5    or eight counts, and I mean, they could have obviously put in

6    that evidence, but it hasn't been submitted.

7          So there's been no evidence from which you could

8    establish that there was a conspiracy between Mr. Grow and any

9    person because, remember, you can't conspire with a company,

10   right?  You have to have evidence specifically that there were

11   specific individuals --

12          THE COURT:  You cannot conspire with a company?  You

13   mean someone cannot -- companies speak through human beings,

14   companies are sometimes indicted.

15          MR. MARCUS:  That's right.

16          THE COURT:  Companies plead guilty, companies are

17   sentenced.  I mean, I've had two jury trials with companies.

18          MR. MARCUS:  You have to have a flesh and blood person

19   acting with authority.

20          THE COURT:  But you can do it with a company.

21   Companies speak through agents.

22          MR. MARCUS:  Right.

23          THE COURT:  In some places they even have the right to

24   contribute, they have the right to be indicted, they have the

25   right to defend themselves.  They just have to be represented by

1    lawyers.  So you can conspire with a company, but someone has to
2    speak for the company.
3             MR. MARCUS:  That's right.  My point is no one has done
4    that, no one has talked about the submission of claims to
5    Tricare from the company and connected them in any way to
6    Mr. Grow, let alone some sort of illegal or unlawful agreement
7    to do so.
8             THE COURT:  All right.  Let me hear from the Government
9    then.
10            MR. JUENGER:  Well, Your Honor --
11            THE COURT:  He's going to yield the microphone, just
12   like Senators do even now.
13            MR. JUENGER:  For starters, Your Honor --
14            THE COURT:  Okay.  What's the evidence regarding this,
15   first eight counts?
16            MR. JUENGER:  Well, it's a scheme, Your Honor, a scheme
17   to defraud.
18            THE COURT:  Between whom or among whom?
19            MR. JUENGER:  Well, Ginger Lay, for example, Robin
20   Halliburton, the witness today, Mr. Bjerke.  They all knew and
21   some of the witnesses who they recruited who did not need these
22   drugs, right, they were paid through Mr. Grow based on
23   submissions to PCA.
24            THE COURT:  You do not need --
25            MR. JUENGER:  I don't know that I need anyone inside

1    the pharmacy.  Clearly, the claims were submitted.  The charge

2    is submitted or caused to submit.  We have scads of faxes, of

3    emails of prescriptions from Mr. Grow to the pharmacy.  We had

4    the payments back from the pharmacy.  Any reasonable inference

5    is that they paid him for what they agreed to pay him for, which

6    was 50 percent of the reimbursements for all the scripts.

7              We also know there's plenty of evidence that

8    Mr. Grow --

9              THE COURT:  But don't the submissions have to be

10   fraudulent in the first place?

11             MR. JUENGER:  Of course.

12             THE COURT:  And who submitted the submissions?

13             MR. JUENGER:  PCA.

14             THE COURT:  Who on behalf of the pharmacy?

15             MR. JUENGER:  Whoever submits the claims.  I don't know

16   that we need to introduce any evidence as to who pushed the

17   button to submit the claims.

18             THE COURT:  Do we have the claims themselves?

19             MR. JUENGER:  We do have the claims.

20             THE COURT:  We have the summary of that, do we not?

21             MR. JUENGER:  We have the claims and the summary.

22             THE COURT:  Okay.  And the summary is based on the

23   claims.

24             MR. JUENGER:  It is.

25             THE COURT:  And there's really no dispute as to that.

1          MR. JUENGER:  I believe there's no dispute as to that.

2     I would also just analogize, Your Honor, in kind of the usual

3     Miami health care fraud case, they outsource the billing anyway.

4     The home health, the pharmacy, they don't do their own billing,

5     and that's never an obstacle because the issue is where the

6     money comes.  It comes from Medicare, or in this case Tricare,

7     based on claims that are clearly corrupted.

8          THE COURT:  And the actual fraud is what?

9          MR. JUENGER:  The fraud is several fold.  One, that the

10    patients didn't need it; two, that they were induced by

11    kickbacks on top of it.

12         THE COURT:  But let's put those aside because those are

13    separate counts, aren't they?

14         MR. JUENGER:  Third, the scripts were paid for, and

15    despite what anyone says, they were paid for.  And you also saw

16    evidence that -- and there are emails that we've introduced

17    which haven't come in through witnesses because they just

18    weren't for reasons, but those emails show that when the script

19    comes back to Mr. Grow and he doesn't like what it's in it, he

20    changes it to what he does like.  As Ms. Lay said, they changed

21    the scripts to p-01 because it was most expensive, sc-01 because

22    it was most expensive; and we know why they were most expensive

23    because, as we heard from Mr. Lozada, the defendant sold

24    ingredients that drive up the reimbursement for no other reason.

25         THE COURT:  So the lead witness regarding the health

1    care fraud would be Ms. Lay, right?

2         MR. JUENGER:  Yes.

3         THE COURT:  And that's enough in your view.

4         MR. JUENGER:  I think that in and of itself would be

5    enough, but all the surrounding evidence behind that.

6         THE COURT:  All right.  Anything else that the

7    defendant wishes to say?  Ginger Lay talked about it.  In her

8    soft voice, she said what happened.

9         MR. MARCUS:  Ginger Lay did not submit any bills to

10   Tricare.

11        THE COURT:  No, but she said others did.  You have to

12   have the person who submits it.  So if someone is in the back

13   doing everything from the top, that's not enough when claims are

14   submitted, claims are paid, there's no dispute that claims were

15   submitted, claims are paid.  And whether you accept her

16   testimony or not, Ms. Lay said this was a fraud, I made 6

17   million bucks on this fraud and Mr. Grow was part of it.  I

18   mean, she spoke for longer than that, but that's basically it.

19        MR. MARCUS:  But the fraud is the payment of kickbacks,

20   so this is the problem --

21        THE COURT:  No, there are two frauds, right?  Not just

22   the payment of kickbacks, but the fact that the medication was

23   not called for for one reason or another.

24        MR. MARCUS:  I thought when we started this trial, the

25   Government stipulated that medical necessity was not contested

1  in this case.  They weren't contesting that medication was

2  provided unnecessarily.  That's why we struck their experts and

3  we had that whole discussion.

4       So now they're trying to argue that there's somehow a

5  lack of medical necessity on claims.  They haven't shown a

6  single claim with any expert testimony or any physician to show

7  that there's a single claim that was submitted to Tricare that

8  was medically unnecessary.  Every claim that gets sent to

9  Tricare gets screened by Tricare through Express Scripts for

10 medical necessity.

11      Ms. Lay did not specify any claims.  There was no

12 testimony on that.  She does not have a provider number with

13 Tricare.  She did not cause a single claim to be submitted in

14 this case, nor Mr. Grow.  The claims were submitted voluntarily

15 by PCA, and that's the problem.  They don't have anyone who can

16 speak for the pharmacy, who came into court, or even through the

17 documents submitted, Your Honor, that said we are submitting

18 false, materially false claims to Tricare for reimbursement, and

19 that's the problem with a billing fraud case.  They just haven't

20 proven it.  They have a kickback case and that relates to the

21 other charges.

22      THE COURT:  Well, let's talk about a couple of things.

23      When I excluded -- you were talking about when I

24 excluded David Kazarian and Don Wenderling from the Government

25 and I did that pursuant to your motion, but I probably would

1   have done it even without the motion because Kazarian said that

2   he wanted to talk about the requirements under the law and

3   Wenderling was going to talk about health care fraud specialists

4   and the implementation about Tricare program and the rules.  I

5   said the rules are the rules, they are what they are.  An expert

6   would not assist the jury.  So I excluded those and I put aside

7   Dr. Simone, with an E at the end.  So those two were excluded

8   for that reason.  In fact, I said I would probably allow

9   Dr. Simone to testify, but the stipulation that has been entered

10  into probably takes care of that.

11          So which witness were you talking about that now you're

12  saying the Government has changed, has now changed what they

13  have agreed to?  I'm not understanding.  Help me out.

14          MR. MARCUS:  My point is they did not put on any

15  physician.  There's no testimony --

16          THE COURT:  But it has nothing to do with any witness I

17  excluded.

18          MR. MARCUS:  Well, no.  What I'm saying is, during that

19  discussion and even in the opening and our discussions in the

20  case, the Government has conceded that they are not contesting

21  medical necessity for claims in this case.  They haven't put on

22  any evidence, there's no physician, treating or otherwise, who

23  has identified a single claim --

24          THE COURT:  All right.  Let me ask the Government about

25  that.  Okay?  Yield the microphone.  My courtroom has two

 1    microphones so you all don't fight over that, but in Judge

 2    Graham's courtroom there's never any fighting.

 3              Now, what about that, is medical necessity an issue?

 4              MR. JUENGER:  Medical necessity is not an issue.

 5              THE COURT:  Then how do you win on these counts?

 6              MR. JUENGER:  Well, for example, witnesses testified

 7    that they never talked to a doctor, so how can a claim be

 8    legitimate when a doctor never talked to the patient, right?

 9              THE COURT:  I don't know.

10              MR. JUENGER:  It's beyond medical necessity.

11              THE COURT:  It may be a dumb thing to do and you can,

12    of course, always argue that people do it maybe for greed

13    because they thought they were getting something for nothing or

14    they were getting some money, the kickback.  But those are

15    different counts, right?

16              MR. JUENGER:  Sure, but the kickbacks are incorporated

17    into the health care fraud scheme as a way to induce the

18    patient.  It explains why patients --

19              THE COURT:  What is the difference between Count 1 and

20    Count 9?  See, that's why I gave you the jury instructions

21    before.  It kind of focuses me on what do we have here to help

22    the jurors.  So now help me.  You can't just put both of them

23    together.

24              MR. JUENGER:  No, no, and I don't mean to suggest that.

25    Count 9 and the substantive counts of the kickbacks, of course,

1   Your Honor knows this, it's illegal to pay money to induce the

2   referral.

3          THE COURT:  Pay and receive health care kickbacks.

4          MR. JUENGER:  Right.

5          THE COURT:  And what I'm going to do to help you out,

6   is I'm going to deny the Rule 29 motion on Counts 9, 10, 14, 17,

7   18, 20, 22 through 26, and 28 through 33, and 36 to 41, and 43

8   and 44.  I'm denying it on that basis.

9          The argument that your opponent is saying is in order

10  to defraud on that count, on that conspiracy, it's separate.  It

11  was charged, defraud the United States and pay and receive

12  health care kickbacks.  That's how it was charged.

13         The question is:  What's the difference between that

14  payment and receipt of health care kickbacks under 371 and Count

15  9 that also alleges the same conspiracy on the receiving health

16  care kickbacks?

17         It seems it's duplicative to me.  Doesn't it to you, on

18  that part?

19         MR. JUENGER:  You're asking for the difference between

20  Counts 1 and 9?

21         THE COURT:  Yeah.  Two conspiracies, same statute, pay

22  and receive health care kickbacks.  Tell me the difference.

23         MR. JUENGER:  Between Count 1, conspiracy to commit

24  health care fraud --

25         THE COURT:  And receive health care kickbacks.  You

1    told me that's included in Count 1, right?  Is it?

2            MR. JUENGER:  The conduct --

3            THE COURT:  Is it?

4            MR. JUENGER:  It is.

5            THE COURT:  Then what's the difference between that,

6    pay and receive health care kickbacks in the defrauding Count 1

7    conspiracy and the plain old conspiracy to pay and receive

8    health care kickbacks?  Can you gets kickbacks without fraud?

9            MR. JUENGER:  Yes.

10           THE COURT:  You can.  That's what Count 9 is.

11           MR. JUENGER:  Correct.

12           THE COURT:  You get kickbacks, which are not right,

13   it's illegal, but it's not fraudulent.

14           MR. JUENGER:  Sure, because it applies even if the

15   patient legitimately needs it, and we had patients say I only

16   ordered it for the money.

17           THE COURT:  But then, see, then we go back to the

18   legitimate need and that's the issue.  The issue is:  Part of

19   the fraud in Count 1 is medical necessity, but you say it's not

20   medical necessity.

21           MR. JUENGER:  Well, it depends on how you define

22   medical necessity.

23           THE COURT:  I know.  I know, but I don't want a Court

24   of Appeals to send it back if you win.

25           MR. JUENGER:  Let me see if I can explain the two as

1    you just articulated.

2          THE COURT:  Did I do it wrong?

3          MR. JUENGER:  No.  Count 9, I think we're all on the

4    same page.

5          THE COURT:  I got that.  I denied that one.  You've won

6    so far.  You still have to convince the jury.

7          MR. JUENGER:  So the difference of Count 1 is that it's

8    not only that they were kickbacks, the kickbacks explain why

9    people were induced to order things they didn't need.  When they

10   order things they don't need and when they don't talk to a

11   doctor or when the doctor is paid to write the script for a drug

12   that the defendant himself, I say fraudulently inflates the

13   price, because Tricare gets nothing from the use of Ethoxy Gold,

14   nothing -- That was Armando's testimony, Armando Lozada's

15   testimony, that it's exactly the same.

16          So the only purpose is to increase the price and give

17   nothing, and I think that combination of factors, perhaps any

18   one of them even, could render those claims fraudulent.  Tricare

19   should not pay those claims.  Tricare should not pay those

20   claims.

21          THE COURT:  Well, I think many people would agree with

22   that, which is why you filed a Motion in Limine saying no

23   argument about how negligent Tricare is.  Remember that motion

24   that you all filed, okay, or someone filed for the Government.

25   Okay.  So that means that you don't even want that considered,

1    but you've got to prove that there was fraud in the first place.

2    And what your opponent is saying, the person submitting the

3    claims -- which is what most health care fraud cases are, you

4    know, they're outright fraudulent claims, people who don't

5    exist, people who get picked up, people who don't need it.  This

6    is a little different.  Would you concede that?

7                MR. JUENGER:  I concede that, Your Honor.

8                THE COURT:  It's harder for the Government to prove.

9                MR. JUENGER:  It's harder for the Government.

10               THE COURT:  Okay.  The question is:  Have you proven

11   it?  What do you need?

12               MR. JUENGER:  Well, I think I need to argue it to the

13   jury, is what I need.

14               THE COURT:  Well, you need the evidence.  See, that's

15   what they're going to look at at the Eleventh Circuit, if you

16   win.

17               MR. JUENGER:  To make it easy, I think Ginger Lay's

18   testimony, in and of itself, is sufficient.  Of course, we're

19   not here to judge credibility in a Rule 29.

20               THE COURT:  No, we're not.

21               MR. JUENGER:  And I know your Honor knows that.

22               THE COURT:  See, the issue to me is:  If it's just

23   fraud, what is the fraud?  Put aside the kickbacks because the

24   kickbacks are part of Count 9.  You've got that.  I've denied it

25   on that.

1          MR. JUENGER:  Sure.

2          THE COURT:  The health care fraud is, you're saying, a

3   combination of the kickbacks that induced beneficiaries to

4   commit fraud basically.  So you would have to prove that the

5   beneficiaries have committed fraud and some have, some have not.

6   We may have to go count by count, wouldn't we?  Some say, well,

7   you know, I kind of needed it.  Others say, well, you know, it

8   was all right, but didn't feel good.  I felt a little guilty,

9   but it's all right.  I mean, everybody likes something for

10  nothing.  That may not be enough to prove fraud.

11         It certainly wasn't enough, in the exercise of the

12  Government's discretion, I suspect, to seek an Indictment, which

13  I am not criticizing it for a lot of reasons, but it may not be

14  enough, right?

15         If it's not enough for those individual beneficiaries

16  to have committed fraud, can it be enough for the person you say

17  is the lead defendant, if there are other defendants?

18         MR. JUENGER:  What is in evidence and that's in

19  addition to that, the beneficiaries didn't know that Mr. Grow

20  was paying the doctors and having them alter the scripts, right?

21  Why would he need to do that?  He needs to do that because he's

22  just trying to get more money, which shows that the whole

23  script, it has no -- it's untethered to what people really need

24  and I guess we can call that medical necessity.

25         THE COURT:  Who determines what people need?

1          MR. JUENGER:  Doctors.

2          THE COURT:  All right.  So if a beneficiary, a

3    prospective patient, wants something without seeing a doctor, is

4    that fraudulent just by itself?  You don't check with your

5    doctor.  You know what, there's no harm in this.  It's not

6    really harmful, right?  You're not suggesting that these things

7    are harmful.

8          MR. JUENGER:  But you also --

9          THE COURT:  Or you haven't proven that they're harmful.

10   Maybe useless, I don't know.

11         MR. JUENGER:  We are not suggesting that, but Tricare

12   would not pay a claim without a valid doctor's prescription.

13   That's a fundamental basis of the whole thing.

14         THE COURT:  Were there doctors' prescriptions in the

15   claims?

16         MR. JUENGER:  Yeah, I mean, of course.

17         THE COURT:  Were there fraudulent doctors'

18   prescriptions, doctor who say, you know what, give me some

19   money, let's put it in, I'm getting some money back.  Were there

20   some like that?

21         MR. JUENGER:  There would have to be.

22         THE COURT:  Well, I don't know.  Which ones were they?

23         MR. JUENGER:  There would have to be from the testimony

24   of the patients.  They never spoke to a doctor.  How can a

25   doctor write a script for someone they never spoke to?

1          THE COURT:  So they didn't write prescriptions.

2          MR. JUENGER:  No, there are prescriptions for people

3   who never spoke to a doctor.

4          THE COURT:  Written by whom?

5          MR. JUENGER:  The doctor, the applicable doctors.  You

6   can look at the data and see who they are.

7          THE COURT:  Okay.  So did they commit fraud?

8          MR. JUENGER:  If they wrote a script, and I think the

9   scripts say that it's going to be billed to Tricare, then I

10  think they arguably are part of the fraud as well.

11         THE COURT:  But then, doesn't that have to be proven?

12  If you had rested against the doctors would that have been

13  enough evidence in this trial to prosecute those doctors?  The

14  answer is easy, right?  It's not enough.

15         MR. JUENGER:  It would be a really tough argument on

16  the facts in this case.

17         THE COURT:  Don't I need that in order for this fraud

18  to survive?

19         MR. JUENGER:  No, Your Honor.

20         THE COURT:  I don't know.  But what I'm going to do is

21  tell you you've got -- there are some issues here.  I'm going to

22  deny it because we are still around and we'll see what happens,

23  but I'm going to deny it on Counts 1 through 8 more reluctantly.

24  Okay.  So that means you're going to have to do a little

25  research and find out what's going on.

 1          MR. MARCUS:  I'm sorry, Your Honor, I forgot --

 2          THE COURT:  You don't want me to deny it reluctantly,

 3   you want me to deny it happily.

 4          MR. MARCUS:  No, no.  Ms. Coronado, she never

 5   testified.  There is a kickback count, it's Count 17, that

 6   relates to her.  She didn't testify.

 7          THE COURT:  What say the Government?

 8          MR. JUENGER:  Your Honor, I would say there is evidence

 9   in the bank records that she was paid.  She is a beneficiary who

10   was paid.  Based on all the testimony that we've heard, a jury

11   can reasonably infer that she's being paid as part of the

12   kickbacks.

13          THE COURT:  Is she the one who is flying in from

14   Germany?

15          MR. JUENGER:  Yeah.

16          THE COURT:  Where is she?

17          MR. JUENGER:  She is probably landing soon.

18          THE COURT:  How much do you think it cost to fly her

19   here?  What would you say?

20          MR. JUENGER:  Probably $1800.

21          THE COURT:  Okay.  And her role in the particular count

22   was how much money?

23          MR. JUENGER:  It's going to be ironic probably,

24   ironically small how much the amount is.

25          THE COURT:  I know.  If not, I wouldn't be asking the

1    question.  See?

2              MR. JUENGER:  I know.

3              THE COURT:  I usually know the answers to my questions

4    when I ask them.  Okay.  Not all the time.

5              I don't know.  So the evidence about her can be

6    inferred from the documents that show her as a beneficiary.

7    Anyone else in that same category?

8              MR. JUENGER:  No, that's the only witness that did not

9    testify as to their particular kickbacks.

10             THE COURT:  All right.  Did anybody say anything about

11   the money laundering, obviously, as related to either health

12   care fraud, right, or the kickbacks, right?

13             MR. JUENGER:  Correct, Your Honor.

14             THE COURT:  So it doesn't matter which one, money

15   laundering would still stand in your view.

16             MR. JUENGER:  That's right, Your Honor.

17             THE COURT:  If the offense is dirty and then money is

18   used, it's laundered.

19             MR. JUENGER:  Correct.

20             THE COURT:  So that should be -- I'm going to deny the

21   motion for judgment of acquittal on 45 through 49.

22             On Count 50 and 51, how have you proved the causing the

23   misbranding of drugs while held for sale?

24             MR. JUENGER:  Well, misbranding, and we may we need --

25   We talked about we may need an instruction on the law in

 1   Florida.

 2           THE COURT:  But the evidence, the evident is what?

 3           MR. JUENGER:  Sure.  The theory is that those two

 4   prescriptions for those two drugs tied to Ms. Rambaran, I

 5   believe, the prescriptions are invalid because there was no

 6   valid doctor/patient relationship within the meaning of Florida

 7   law.

 8           Florida law requires there to be a valid

 9   physician/patient relationship.  We were going to call someone

10   to explain what that meant.

11           THE COURT:  So the testimony as from her, you combine

12   that with the law, those two misdemeanors are proven.

13           MR. JUENGER:  And we will argue that, yes.

14           THE COURT:  Okay.  And the defense is that's not enough

15   for those two misdemeanors, right?

16           MR. MARCUS:  Correct, because they had no doctor --

17   there's no testimony on the telemedicine.  In fact, the only

18   testimony in the case from their own witness, Dr. Bansal, was

19   that telemedicine is legal, he does it all the time.  And the

20   only evidence was related to Ms. Martini and the prescription

21   that he wrote where he said he never altered it.

22           So that's the problem.  They don't have any physician

23   who's coming in or even a witness who said this prescription

24   written, whether it's for Ms. Rambaran or any other patient in

25   this case, was altered, was false.  And telemedicine is legal

1    and therefore -- certainly, Mr. Grow had nothing to do with

2    causing the drugs to be misbranded.

3              THE COURT:  Because?

4              MR. MARCUS:  He's a marketer.

5              THE COURT:  Of what drug?

6              MR. MARCUS:  So flurbiprofen, they picked out, is an

7    ingredient that requires a prescription, but their whole theory

8    of this count would, first of all, have to show that the

9    prescription was invalid.

10             They haven't proven that with --

11             THE COURT:  He says the prescription is invalid if a

12   doctor doesn't prescribe it.

13             MR. MARCUS:  But there is no evidence that -- there is

14   a prescription, so we know that for each of these cases -- every

15   single claim in this case, Your Honor, there was a prescription,

16   it was signed by a doctor.

17             THE COURT:  The doctor was the good doctor.

18             MR. MARCUS:  There were a lot of different doctors who

19   were involved.  There are over 20 doctors in this case.

20             THE COURT:  Okay.  But the telemedicine doctor, what

21   did he have to do with that?

22             MR. MARCUS:  In this case all of the prescriptions, or

23   many of them, were written by doctors that consulted and worked

24   for telemedicine companies, yes, that's true, but there's no

25   evidence that any of those prescriptions are false.  There were

1    some -- you know, occasionally there was some confusion about

2    who called them, did a nurse call them on a day or a doctor, but

3    we have the actual documentation.

4         When you look in the file of every claim submitted to

5    Tricare, there's a prescription and they would have to actually

6    have witnesses come in and say this prescription written, it was

7    falsified, it was written by not that doctor, it was altered by

8    the pharmacy, whoever, whatever their theory is.  But you can't

9    just guess and come in and say, well, we don't think this is

10   really a valid prescription.

11        You have to prove it beyond a reasonable doubt.  They

12   haven't done that.

13        THE COURT:  Okay.  Government, on these counts, 50 and

14   51, the reason it's misbranding of drugs is because there's no

15   legitimate prescription.

16        MR. LARSEN:  Yes, Your Honor, and the reason there's no

17   legitimate prescription is that under Florida law, you need a

18   valid practitioner/patient relationship.

19        THE COURT:  Okay.  And who is the practitioner?

20        MR. LARSEN:  The practitioner in this case would be the

21   doctor that signed those two prescriptions.

22        THE COURT:  And who is that doctor?

23        MR. LARSEN:  I have to get the --

24        THE COURT:  He didn't testify.

25        MR. LARSEN:  No, no.

Jury Trial

153

1          THE COURT:  That's what I meant.  So don't you need

2    him?  So the beneficiary testified --

3          MR. LARSEN:  Yes.

4          THE COURT:  -- that he didn't have a doctor.

5          MR. LARSEN:  The beneficiary testified she never got a

6    physical examination by a doctor, never.

7          In the Indictment, it says in paragraph 8, "a valid

8       practitioner-patient relationship that included a documented

9       patient evaluation, including history and physical

10      examination adequate to establish a diagnosis for which the

11      drug --"

12         THE COURT:  So if a doctor doesn't conduct a physical

13   examination, but he prescribes it.  Here comes a patient and he

14   says, go ahead, I'm going to give you that because I think it

15   will be good for you.  I mean, it may be malpractice, it may not

16   be not ethical, but that's misbranding.

17         MR. LARSEN:  Yes, under Florida law.

18         THE COURT:  And you have a case on that.

19         MR. MARCUS:  No.

20         THE COURT:  I'm asking the Government.  Everybody gets

21   a chance, you know.  Just like in the Senate, they don't

22   interrupt each other, we shouldn't interrupt each other.  We

23   don't have a case on that.

24         See, I don't know.  I don't know.  It seems to me that

25   you need more than that.

Jury Trial

154

1          I mean, it may be a pyrrhic loss, like there's a

2     pyrrhic victory.  I don't know if there's a pyrrhic loss because

3     these are misdemeanors.

4          MR. LARSEN:  Your Honor --

5          THE COURT:  But I think you need more than that to

6     prove -- it seems like you need to prove something close to

7     fraud, someone who says, yeah, we give those prescriptions, you

8     don't even need a doctor, on you go.  Here you have a doctor who

9     didn't show up.

10         MR. LARSEN:  Actually, these two counts are strict

11    liability counts.  There's no fraud element.  There's not even a

12    scienter requirement.  There's just that the prescription was

13    misbranded per se.

14         THE COURT:  But who misbranded the prescription?

15         MR. LARSEN:  Well, the prescription became misbranded

16    when --

17         THE COURT:  By whom?  Someone has to be the bad actor.

18         MR. LARSEN:  The prescription is invalid when there is,

19    under Florida law, no valid doctor/patient relationship.  We

20    would have --

21         THE COURT:  That would be so wide open, see, I would be

22    concerned with that, too.

23         MR. LARSEN:  No physical exam and we did have the

24    witness --

25         THE COURT:  The law says doctors are required to

1    conduct a physical exam.

2         MR. LARSEN:  Yes, under Florida statute --

3         THE COURT:  It says that?  Read it to me where it says

4    physical exam.

5         MR. LARSEN:  It says, under Florida Statute Section

6    465.023(1)(h), "Drugs may only be prescribed pursuant to a

7    valid practitioner-patient relationship that included a

8    documented patient evaluation, including history and

9    physical examination adequate to establish a diagnosis for

10   which the drug was prescribed."

11        And Ms. Rambaran testified that she did not have a

12   physical examination by a doctor, and therefore, per se, those

13   counts -- and she talked about her husband's prescription as

14   well, which is the other count out of the two, that neither of

15   them saw a doctor.

16        THE COURT:  The other count is what?

17        MR. LARSEN:  51 and 50.

18        THE COURT:  Which one is hers, which one is her

19   husband's.  Hold on.

20        50 is hers, 51 is her husband's?

21        MR. MARCUS:  Judge, while we're waiting, can I just

22   make --

23        THE COURT:  No, no, because then he's not listening to

24   you.  See, he's looking for that.  That's the reason.  I want to

25   move fast, but we have to be fair.

1        I've got to get close to that mic or you don't hear me.

2        Did they clean out my courtroom already?  It's okay.

3  They're nice people.  I told them when I saw them -- they

4  thanked me for my hospitality giving them my courtroom and I

5  said as long as you don't send me another case, I'm fine.

6        Okay.  Which is which?

7        MR. LARSEN:  Your Honor, Ms. Rambaran is --

8        THE COURT:  50?

9        MR. LARSEN:  I'm looking for identifier.

10        THE COURT:  Which count?

11        MR. LARSEN:  It's the prescription number 107 --

12        THE COURT:  No, no, Count 50 or 51?  Numbers.

13        Remember I'm a numbers guy, even though I don't believe

14  in gambling.

15        MR. LARSEN:  She is Count 50.

16        THE COURT:  50 is Rosalinda Rambaran.  And 51 is?

17        MR. LARSEN:  Her husband, Rasheed Rambaran.

18        THE COURT:  Who did not testify.

19        MR. LARSEN:  No.  She --

20        THE COURT:  Right?

21        MR. LARSEN:  Correct.

22        THE COURT:  It was the son who testified.

23        MR. LARSEN:  Yes, Your Honor.

24        THE COURT:  So she testified for her husband.

25        MR. LARSEN:  She testified for herself and for her

1   husband as to the issue of whether a doctor saw --

2           THE COURT:  Because the husband could never see a

3   doctor without the wife knowing.

4           MR. LARSEN:  Your Honor, I concede that the husband did

5   not testify about that prescription.  She did testify about her

6   own prescription, she did say that she never saw a doctor.  Her

7   son also said he never saw a doctor and she did testify that her

8   husband --

9           THE COURT:  Well, her son has to do with which count?

10          MR. LARSEN:  You're right, he does not have anything to

11  do with --

12          THE COURT:  It was kind of superfluous.

13          MR. LARSEN:  Right.

14          THE COURT:  All right.  All right.  I'm going to grant

15  judgment of acquittal on Count 51.  I'm denying it, most

16  reluctantly, on Count 50 because I'll get another chance later

17  on.  Okay?

18          The money laundering, 45 through 49, is denied.  Okay.

19  So that's done.

20          What say the defense regarding what you're going to do?

21          MR. RASHBAUM:  Judge, look, I don't think anything has

22  changed.

23          THE COURT:  Then you are ready to call witnesses.

24          MR. RASHBAUM:  We are.

25          THE COURT:  Who is your first witness?

Jury Trial

1          MR. RASHBAUM:  But, Judge, I would like to -- look, the

2     trial just -- things happened today we didn't expect.  I would

3     like to have an opportunity to briefly talk to Mr. Grow before

4     doing that.

5          THE COURT:  Is he your first witness?

6          MR. RASHBAUM:  No, no, he's not, but I want to talk to

7     him before we put on a case.

8          THE COURT:  Oh, no.  It's 3:15.  Remember I told you it

9     was going to happen around then.  You just never believe me, and

10    that's starting late because I have to talk to these judges,

11    taking a longer recess because of the Chief Judge, doing all

12    that, which I apologize for.  If not, we would have even done it

13    quicker.  But you told me the witnesses you are going to call.

14    It's an important decision, but you've got to do it.

15         MR. RASHBAUM:  Judge, I need five minutes with my

16    client because the last witness just took the stand.

17         THE COURT:  Denied.  It's 3:15.  Let's go.

18         MR. RASHBAUM:  That's the record.  I need five minutes

19    to discuss with him whether he wants to put on a defense in a

20    criminal case that's going to put him in jail potentially for

21    life.

22         THE COURT:  First of all, if it was only for one day

23    the constitutional issue would be the same.  The fact that he

24    could be thrown in jail for life has nothing to do with the

25    constitution regarding the amount.  He has been out on bond with

1  you.  We started at 9:30 today.  You've been in the case since

2  what date?

3          MR. RASHBAUM:  I don't remember.  Months.

4          THE COURT:  And you even took the strategy, which I'm

5  not saying is good or bad, but it's unusual, after consulting

6  with your client, of even telling the jury that for sure he was

7  going to testify.  He doesn't even have to follow that because

8  what lawyers say is not evidence.  We've gone through defense

9  witnesses.

10         You've even listed not only the defense witnesses whom

11 you want to call, but the exhibits that you want to introduce.

12 So you are super-duper prepared.

13         MR. RASHBAUM:  We are ready.

14         THE COURT:  Then it's time to fish or cut bait.

15         MR. RASHBAUM:  That's not the issue, Your Honor, with

16 all due respect.  We are ready.  Our witnesses are out there.

17         THE COURT:  Then call them.

18         MR. RASHBAUM:  We want to have five minutes with our

19 client to make sure that his strategy hasn't changed given the

20 fact that the Government decided --

21         THE COURT:  You got it.  Start talking to him.  I'm

22 waiting right here.

23         MR. RASHBAUM:  Thank you.

24         THE COURT:  Look at the clock.

25         MR. MARCUS:  Judge, while --

1          THE COURT:  No, you can't talk.  Your client is not

2     hearing.  It's a critical stage in the proceedings.  He's

3     talking to co-counsel about strategy.

4       (There was a brief recess.)

5          THE COURT:  All right.  The court reporter is back,

6     defendant is back, defense counsel is back, Government counsel.

7          What say you?

8          MR. RASHBAUM:  We are ready to proceed, Your Honor.

9          THE COURT:  Okay.  Who is your first witness?

10          MR. MARCUS:  Your Honor, it's going to be David

11     Corcoran, and I just want to raise one issue with you.

12          THE COURT:  What exhibits do you wish to introduce

13     through him?

14          MR. MARCUS:  We will introduce Defense Exhibits 47,

15     18 --

16          THE COURT:  Hold on.  Hold on.  47.

17          MR. MARCUS:  18, 105, 164, 168, 36, 19, 171 and --

18     yeah.

19          THE COURT:  Those are most of the ones you mentioned

20     before.

21          Any objections from the Government?

22          MR. JUENGER:  47 appears to be admitted already.  Is

23     that correct?

24          THE COURT:  Well, if it is, then you wouldn't have any

25     objection to it anyway, so it's kind of unnecessary.  So I just

1   want to know what you don't like either for evidentiary purposes

2   or for any other purpose, and you tell me which ones, like I

3   said, I think around 12:30.  It's almost 3:30.  Look at them,

4   see if there's anything wrong with them, and if I don't hear

5   objection, they come in.

6          MR. JUENGER:  Your Honor, 18 appears to be hearsay to

7   me.

8          THE COURT:  Okay.  Just tell me objection to 18,

9   hearsay.

10          Other than 18, any other objection to any other one?

11          MR. JUENGER:  105 --

12          THE COURT:  No, no, whatever you say is on the record.

13  So think to yourself.  Mumble very softly to yourself.

14          MR. JUENGER:  No objection to 105.

15          THE COURT:  No, no, just tell me what you object to.

16  Make it easy for me, just tell me.  Anything you do not object

17  to that was announced three hours ago will come in unless you

18  tell me otherwise.  If you tell me otherwise, I'll entertain

19  argument.

20          MR. JUENGER:  Objection to 164.

21          THE COURT:  164.  Grounds.

22          MR. JUENGER:  Hearsay.

23          THE COURT:  All right.  What else?

24          MR. JUENGER:  168.  Hearsay.

25          THE COURT:  Grounds.  Hearsay.

1          MR. JUENGER:  Those are the only objections, Your

2    Honor.

3          THE COURT:  All right.  What is the defendant's

4    response to 18, the email between Phil Lockwood and Matthew

5    Smith?

6          MR. MARCUS:  It's a business record, Your Honor, of

7    PCA.  They submitted --

8          THE COURT:  Who is the records custodian?

9          MR. JUENGER:  They did a 902.11 certificate that the

10   Government provided to us for their emails.

11         THE COURT:  So if there is any email in any business

12   record, that would come in.  So if there was an email saying

13   Mr. Grow is a fraudulent individual and the Government wanted to

14   introduce that, that would come in in your view.  Would it come

15   in?

16         MR. MARCUS:  Emails can be business records, yes, Your

17   Honor.

18         THE COURT:  If an email in a business record said

19   Mr. Grow is a criminal, fraudulent individual.

20         MR. MARCUS:  We might have other reasons to object to

21   that, Your Honor.

22         THE COURT:  But it would be just that the probative

23   value is outweighed by the prejudicial impact, but it would be

24   admissible simply because it's within a business record, even if

25   it included hearsay, someone's opinion that he was a criminal.

1      MR. MARCUS:  No, there could be double or triple

2  hearsay in a document.

3      THE COURT:  And why isn't this hearsay?  Is Phil

4  Lockwood a witness?

5      MR. MARCUS:  Well --

6      THE COURT:  Is Matthew Smith a witness?

7      MR. MARCUS:  David Corcoran is on the email, he sent

8  it, he is testifying.

9      THE COURT:  So he is a recipient of a conversation

10  between Lockwood and Smith, right?

11      MR. MARCUS:  Well, yeah, he's one of the people listed,

12  yes.

13      THE COURT:  Okay.  So anytime someone gets an email

14  between those two individuals without the individuals

15  testifying, it comes in.  Under what rule?  The business records

16  exception is not enough.  You don't need the records custodian.

17  I told you at the beginning, we don't deal with that.  But the

18  problem is Matthew Smith, you've all told me -- well, the

19  Government thinks he's a co-conspirator, right?  Am I right,

20  that's what the Government says?

21      MR. LARSEN:  That's correct, Your Honor.

22      THE COURT:  But he hasn't been indicted yet, he has

23  counsel, et cetera.  And Phil Lockwood is?  I mean, I'm not

24  suggesting someone is or not, I just want to understand.  Is he

25  a co-conspirator?

1    MR. JUENGER:  He's not a co-conspirator, Your Honor.

2    THE COURT:  Okay.  So under what theory would this come

3    in?

4    MR. MARCUS:  That David Corcoran is the recipient of

5    the email.

6    THE COURT:  So anytime someone hears someone, a

7    conversation between two individuals who are not a party to this

8    case, it could come in.  I don't think so.  So I'm going to

9    sustain that objection.  So 18, the objection is sustained.

10   164 was the next one.  Defense 164.

11   MR. MARCUS:  So, Your Honor, this will come in when --

12   THE COURT:  Hold on.  164, an email between Matthew

13   Smith and David Corcoran and Monty Grow.

14   MR. MARCUS:  Yes.

15   THE COURT:  I'm going to sustain the objection for the

16   time being.  Obviously, his state of mind, Mr. Grow's state of

17   mind is at issue, but I don't know about Mr. Corcoran.  Is he a

18   defendant?

19   MR. MARCUS:  Is he a witness?  No.

20   THE COURT:  Is he a co-conspirator?

21   MR. MARCUS:  No.

22   THE COURT:  So his state of mind is not at issue, it

23   just isn't.

24   MR. MARCUS:  Okay.  But he works in Boston, so he has

25   flown down to testify, and if there becomes an issue through

1    cross-examination, I don't want to have to fly him back.

2         THE COURT:  I feel bad that people get flown in from

3    Boston and Germany.  I don't get involved in that.  I don't even

4    think some people should have been flown in from Jacksonville,

5    but I just get the case.  You all call whoever you want.  But

6    the exhibit doesn't come in, at least at this time just because

7    he got an email from Matthew Smith, the alleged co-conspirator.

8         168 is an email between Phil Lockwood and Ross

9    Christianson and RLH.  RLH is?  I bet you it's -- is it

10   Halliburton?

11        MR. MARCUS:  It's an equity company.

12        THE COURT:  Oh, it's a company.

13        MR. MARCUS:  It's a hedge fund, private equity company,

14   and Mr. Corcoran --

15        THE COURT:  Is the hedge company a co-conspirator?

16        MR. MARCUS:  No.

17        THE COURT:  Okay.  So then I'm going to sustain that

18   too, okay, with witness Corcoran.

19        So Exhibits 36, 19, 47, 105 and 171 will be admitted

20   without objection.

21      (Defendant's Exhibit Numbers 19, 36, 47, 105, 171 were

22   received in evidence.)

23        THE COURT:  How long do you -- I'm not limiting you;

24   I'm merely inquiring.  How long is Corcoran going to testify

25   for?  You have to look at the clock to see how long he's going

1   to testify?

2          MR. MARCUS:  No.  I would say I think his direct will

3   be less than an hour, Your Honor.

4          THE COURT:  Wow.  Bring him in.  Let's go.  Bring him

5   in.

6          MR. MARCUS:  There is one issue I just wanted you to be

7   advised of.

8          THE COURT:  Okay.

9          MR. MARCUS:  Mr. Corcoran is general counsel for PCA.

10  PCA has a limited waiver agreement with the Government.  He's

11  been interviewed by them on subjects.  They have a board

12  resolution, I can hand this to you.  I am just going to be

13  asking questions, Your Honor, within --

14         THE COURT:  Is he going to take any privilege?

15         MR. MARCUS:  If it comes up --

16         THE COURT:  I'm sorry, is the mic -- I'm getting as

17  close as I can to the mic.  Is he going to claim any privilege?

18  You don't know?  You're going to call a witness, and you don't

19  know what he's going to say?  Oh, my goodness.

20         MR. MARCUS:  Not as to the areas we're covering on

21  direct.  I can't speak for what they'll try to do on cross.

22         THE COURT:  Well, then they're going to move to strike

23  his testimony.  And you want me to strike his testimony in front

24  of the jury?  That would probably be a terrible strategy, but I

25  don't know, may be a good strategy, but it's your strategy after

1 consulting with your client, with your experience, I would

2 accept it.

3          MR. MARCUS:  That won't be an issue, the scope of the

4 direct.

5          THE COURT:  Well, what is the cross about?  You don't

6 know this fellow, right?

7          MR. JUENGER:  No, I do, Your Honor.

8          THE COURT:  The only person who doesn't know anybody is

9 me and the jurors, the ones who make decisions, but that's fine,

10 that's our system.

11          What is he going to say?

12          Bring him in.  Bring him in.  Let's find out outside of

13 the presence of the jury.  I mean, I hate to have a mess in

14 front of the jury.  We don't want to do that.

15          MR. JUENGER:  Your Honor --

16          THE COURT:  You want a mess in front of the jury.

17          MR. JUENGER:  No, I don't want a mess.  Your Honor, I

18 was just going to point out that counsel for PCA is here, if he

19 should be necessary, Mr. Greenberg, so --

20          THE COURT:  Mr. Gerry Greenberg.

21          MR. JUENGER:  Gerry Greenberg.

22          THE COURT:  So there's no confusion.

23          MR. JUENGER:  So there's no confusion.

24          THE COURT:  There he is.  I thought he was sitting

25 behind you, but look at that, he just moved strategically to the

 1   other side.  I don't know what that means.  I don't know what

 2   that means.

 3           So PCA's lawyer is present, right?  Do you want to

 4   announce your appearance for any reason or not?

 5           MR. GREENBERG:  If you want me to, I'm more than happy

 6   to, Your Honor.  Gerald Greenberg.

 7           THE COURT:  Okay.  You're the lawyer for whom?

 8           MR. GREENBERG:  For Patient Care America.

 9           THE COURT:  Okay.  Mr. Corcoran, please come forward,

10   if you don't mind, sir.  Let's find out what you're going to say

11   before we bring in the jury, if you don't mind.

12           Raise your right hand, please, sir.

13            DAVID CORCORAN, DEFENDANT'S WITNESS, SWORN.

14           THE COURT:  Okay.  Have a seat and tell us your name

15   and occupation.

16           THE WITNESS:  My name is David Corcoran.  I'm an

17   attorney.

18           THE COURT:  For whom regarding this case?

19           THE WITNESS:  I'm sorry.  For Patient Care America.

20           THE COURT:  Okay.  You can ask him the three most

21   important questions you're going to ask him in front of the

22   jury, and I give you permission to ask them in a leading

23   fashion.  Who's going to do it?

24           MR. MARCUS:  I'm going to do his direct.

25           THE COURT:  Then do that.  No, but I don't want you to

1   do the whole direct.  Tell me where you went to school, who you

2   are, what you did, let's skip all of that.  The last three

3   questions, and I'll let you lead him, if you want, so I know the

4   subject matter.

5           MR. MARCUS:  I'll give you the subject matter.

6           THE COURT:  No, but I want to hear it from him, so you

7   can ask him leading questions and he can say yes, and then we'll

8   do a mini-cross and find out if there are any issues.

9           MR. MARCUS:  Okay.

10          THE COURT:  Doesn't that seem fair?  It's certainly

11  efficient.  I think it's fair, but we could disagree.

12                     DIRECT EXAMINATION

13                (Outside the Jury's Presence)

14  BY MR. MARCUS:

15  Q.  Mr. Corcoran, did you have conversations with Mr. Grow about

16  his Employment Agreements with PCA?

17  A.  Yes.

18  Q.  And did you discuss with him his status as a 1099 employee

19  and the need to transition to being a W-2 employee?

20  A.  Not necessarily that subject as opposed to the -- he had

21  already accepted the idea that he was going to transition to

22  W-2.

23          THE COURT:  Okay.  Let me interrupt you for a second.

24  So you want him to testify about your client's exculpatory

25  statements.

1           MR. MARCUS:  No.

2           THE COURT:  What he just said, something about what he

3    told him.  You don't want to inculpate him obviously because

4    that may be admissible as an admission against party interests,

5    but he's testifying about what Grow told him.

6           MR. MARCUS:  He is going --

7           THE COURT:  How is that admissible?

8           MR. MARCUS:  No, he's going to testify about the

9    process that PCA went through when they moved Mr. Grow and the

10   other marketers from 1099 to W-2, and the steps he took, the

11   steps the company took.  The Government has made this an

12   allegation --

13          THE COURT:  Because PCA is a defendant in this case.

14          MR. MARCUS:  They were business partners with Mr. Grow.

15   They had Employee Agreements with him and the Employment

16   Agreement and his compensation is a direct issue in the case.

17          THE COURT:  But PCA is not a defendant.

18          MR. MARCUS:  We are the only defendant.

19          THE COURT:  So how is that admissible, what PCA did or

20   did not do?

21          The only way it could be admissible is if the

22   defendant's state of mind was at issue; and he could say this is

23   what they told me to do, I didn't do this, I did that.  I'm not

24   guilty, I don't have the intent, like co-counsel said in opening

25   statement.  That's really what the case is about.

1          The jury is not going to decide -- and I hate to use

2     acronyms, but you guys are forcing me to so it could be

3     consistent, but PCA is not on trial.  So what is he going to say

4     about it?

5          MR. MARCUS:  He is a fact witness who's going to

6     discuss the agreements that PCA drafted, that Mr. Grow signed,

7     the way that Mr. Grow was compensated, and the steps, how it

8     worked and their process where they consulted with counsel

9     and --

10         THE COURT:  Who consulted with counsel?

11         MR. MARCUS:  The company did.

12         THE COURT:  Why is that relevant here?  Because the

13    company has an advice of counsel defense.  Remember when we

14    talked about jury instructions?

15         MR. MARCUS:  Yes.

16         THE COURT:  The Government submitted two good faith

17    instructions and I was going to include them both and then I

18    asked you all, are you going to go on advice of counsel, and I

19    think it was your colleague, Mr. Rashbaum, said not advice of

20    counsel, just plain old good faith, and I accepted that.  It

21    makes sense.  It's the good faith of Mr. Grow, not the good

22    faith of PCA, as you describe them, so it doesn't really matter.

23         MR. MARCUS:  No, because Mr. Grow is relying on PCA as

24    an employee in terms of what they tell him.

25         THE COURT:  He can say that.  I would never prohibit

Corcoran - Direct

172

1   him from saying that because his state of mind is at issue.

2   PCA's state of mind is not at issue.

3          MR. MARCUS:  The Government has made it -- the

4   Government has put on witnesses in this case and argued to this

5   jury that the conversion of employees like Mr. Grow from 1099 to

6   W-2 was a sham.

7          THE COURT:  Okay.  Let me interrupt you.  Is the

8   Government going to say that's part of the fraud in this case

9   and that's how you prove your fraudulent claim against Mr. Grow;

10  yes or no?

11         MR. JUENGER:  Sort of.

12         THE COURT:  Okay.

13         MR. JUENGER:  Sorry, Your Honor.

14         THE COURT:  Yes or no?

15         MR. JUENGER:  It's not the fraud.

16         THE COURT:  No, no.  Yes or no, and then you can

17  explain.  You know, that's what lawyers always say.  I'm

18  annoying, isn't it?

19         MR. JUENGER:  I will say yes in the sense --

20         THE COURT:  So that's the fraud in this case.

21         MR. JUENGER:  No.

22         THE COURT:  If you had five potential frauds, we know

23  the fifth one would be some misbranding prescription one, and

24  the first one would be the kickbacks, right?  Where is this one?

25  It's not even in the top five.

Corcoran - Direct

1    MR. JUENGER:  It is and I wasn't arguing, but when I

2 opened I said the jury will hear evidence of efforts to coverup

3 and conceal the kickback scheme and the fraud scheme.  So to

4 that extent, I do believe that the effort to -- and you heard

5 many witnesses testify about how they never really became an

6 employee.

7    THE COURT:  So you have no objection to this testimony

8 I take it.  I'm the only one who's concerned.

9    MR. JUENGER:  No, I have plenty of objection to

10 hearsay.  I won't agree to that.

11    THE COURT:  But if it's an issue and you're going to

12 claim that, he has a right to defend himself with more than his

13 own testimony because, see, some jurors might believe, and you

14 would probably argue I suspect, that he's not entirely truthful

15 and he has an interest in the case.  Perhaps this witness

16 wouldn't and that's why they're calling him, so that's the

17 reason.

18    So if I preclude him and I'm making a mistake and you

19 argue that, then it's going to be one of those issues that are

20 going to be asked for by some smart appellate judge in Atlanta

21 and you are going to have to be there and you are going to have

22 to tell Judge Tjoflat why you insisted on this 1099 argument,

23 among others, and it's going to be sent bank.  And then we'll do

24 our two-and-a-half week case in one day because by then I'll

25 know everything about the case.  So you want to argue that

```
 1  still.
 2          MR. JUENGER:  I simply want to argue -- I don't want to
 3  preclude them from calling the witness but --
 4          THE COURT:  Then I will let them.
 5          MR. JUENGER:  -- if there's hearsay, I'll object to it.
 6          THE COURT:  All right.  I'm going to overrule the
 7  objection in view of that.  And then what else are you going to
 8  ask him?
 9          MR. MARCUS:  I'm just going to go through that and then
10  I'm going to ask him if he ever received a survey program from
11  Ginger Lay because there was testimony about how she sent in a
12  program --
13          THE COURT:  Go ahead.  Ask him that.  Go ahead.
14  BY MR. MARCUS:
15  Q.  Mr. Corcoran, did you ever receive a survey program sent to
16  you by a woman named Ginger Lay?
17  A.  No.
18          THE COURT:  Okay.
19          MR. MARCUS:  And then I am going to show him --
20          THE COURT:  What do you want to say about the 1099
21  conversion, anything about that?  Can you tell me why that was
22  done?
23          THE WITNESS:  I'm sorry, Judge?
24          THE COURT:  The 1099, what are you going to say about
25  that?
```

1          THE WITNESS:  When I spoke with the defendant he had

2   already agreed that it was, you know, appropriate to convert to

3   W-2, and so my conversation with him related to outlining an

4   employment contract, what he was looking for, et cetera.

5          THE COURT:  Did he tell you why he had agreed to that?

6          THE WITNESS:  No.

7          THE COURT:  All right.

8          MR. MARCUS:  Well, and just for --

9          THE COURT:  No, that's fine.  All right.  You're going

10  to hear the cross now and see whether there's any objection to

11  it.  All right?

12         Is there anything else you're going to ask this

13  attorney?

14         MR. MARCUS:  Well, I am going to talk about the safe

15  harbor for employee agreements, which is the reason they

16  transitioned from 1099 to W-2, and how that process unfolded.

17         THE COURT:  Because that's the defense in this case.

18         MR. MARCUS:  Yes, because they're charging that the

19  payments to Mr. Grow are illegal kickbacks.

20         MR. RASHBAUM:  I opened on it.

21         MR. MARCUS:  Right.  Our argument is that he was paid

22  lawful compensation for commissions as a marketer for PCA.  He

23  did it first under a 1099.  The company transitioned to W-2

24  based on advice they received.

25         THE COURT:  Advice from?

Corcoran - Direct

1          MR. MARCUS:  They got advice from -- so Mr. Corcoran --

2          THE COURT:  Advice from?

3          MR. MARCUS:  An outside law firm, Frier Levitt.

4          THE COURT:  So they're going to be coming in to

5     testify, too.

6          MR. MARCUS:  I'm going to ask Mr. Corcoran about what

7     he did.

8          THE COURT:  What he did based on the advice of some

9     other lawyers who gave it to his client, the company, right?  Do

10    I have that right?  I simplify things, but do I have that right?

11         MR. MARCUS:  Yes.  When he learned --

12         THE COURT:  I don't know if you can do that.  Now, what

13    about the safe harbor, what are you going to tell the jurors?

14    You notice -- I don't think I included that in the jury

15    instructions, but if you want it, you do it.  If I give that

16    instruction, I want you to pay close attention to the jurors as

17    I give that instruction.  That's what I want you to do.

18         So you are going to say that the safe harbor means

19    what?

20         MR. MARCUS:  It's a complete -- it's an absolute

21    defense to liability on the compensation charges.

22         THE COURT:  Okay.  And the compensation --

23         MR. MARCUS:  Even if you don't -- if you comply

24    technically with the safe harbor, you have no liability, even

25    civil liability, under the anti-kickback.

1          THE COURT:  We are not doing the civil case.  If that

2   comes --

3          MR. MARCUS:  I understand.

4          THE COURT:  -- we'll see what happens.  But the

5   criminal case is fraud, right?

6          MR. MARCUS:  They have to prove willfulness and our

7   point is, they were trying to comply with the safe harbor.

8          THE COURT:  Who is "they"?

9          MR. MARCUS:  The company --

10         THE COURT:  But he's the defendant.

11         MR. MARCUS:  -- along with Mr. Grow.

12         THE COURT:  Okay.

13         MR. MARCUS:  They were joint partners, Your Honor.

14   They have an Employment Agreement.

15         THE COURT:  All right.  Now, do you want to say what he

16   said?  I heard some of it, but I don't know if you want to say

17   it on the record.

18         MR. MARCUS:  Certainly, the Government's theory is that

19   the company is an unindicted co-conspirator of sorts.  They

20   haven't proven that.

21         THE COURT:  Is that your theory?  It gets tough coming

22   in here, right?  You have to figure out -- because now, if it

23   is, it's the defendant who wants to bring in a statement under

24   801(d)(2)(E) in furtherance of the conspiracy that he's charged

25   with, and I guess I'm the only one who gets cases like that.

 1    I'm not sure it's the ideal thing for a judge.  I don't know.

 2          But that's what you want to do?  That's how the

 3    company's statements come in through his lawyer, because it's a

 4    statement in furtherance -- I thought it was to show good faith.

 5          MR. MARCUS:  It does.

 6          THE COURT:  By the company.

 7          MR. MARCUS:  And Mr. Grow.  They're acting

 8    collectively.

 9          THE COURT:  All right.  All right.  What else are you

10    going to ask him?

11          MR. MARCUS:  That's really the scope of it, Your Honor.

12          THE COURT:  All right.

13          MR. MARCUS:  He'll also testify that the 1099 agreement

14    with Mr. Grow he drafts in September of 2014.  At the time he

15    does not know, nor the company, that Tricare is a Federal

16    program.  He learns that in December.

17          THE COURT:  Who?  Who is "he"?

18          MR. MARCUS:  Mr. Corcoran.

19          THE COURT:  What difference does that make what he

20    knows about Tricare?  He is not a co-conspirator.

21          MR. MARCUS:  It explains their actions.

22          THE COURT:  It explains whose actions?

23          MR. MARCUS:  The company and Mr. Grow's, because then

24    what happens is the company gets advice, they realize they

25    should move to the safe harbor of a W-2 agreement.  They put

1    into process a transition.  He can talk about the steps they

2    took.  I'm not going to elicit conversations.  And in March they

3    come to Mr. Grow --

4                THE COURT:  In March of?

5                MR. MARCUS:  2015, right in the heart of this, Your

6    Honor.  He learns this in December.  It takes them a few months

7    to figure out what they're doing and there are a variety of

8    steps they take and then they come forward and say we need to

9    transition you and the other marketers to W-2 and here's how we

10   do it.  And Mr. Grow goes along with it, relies on them, is

11   completely cooperative.

12               THE COURT:  I thought he said -- the attorney,

13   Mr. Corcoran, said he had decided to do that before.  That's not

14   true?

15               THE WITNESS:  I'm sorry?

16               THE COURT:  Did Mr. Grow decide to do that before or

17   you brought up the conversion?

18               THE WITNESS:  When I spoke to Mr. Grow in early March

19   of 2015, he had already, through conversations I think with one

20   of the executives of the company, agreed that it was a good idea

21   to transition to W-2.

22               THE COURT:  But he didn't tell you why?

23               THE WITNESS:  He did not say why because at that point

24   it was sort of a fait accompli.

25               THE COURT:  Okay.

1      MR. MARCUS:  I'm going to keep it to the facts, Your

2  Honor.

3      THE COURT:  All right.  Anything else?

4      MR. MARCUS:  That's it.

5      THE COURT:  All right.  Cross-examination.  See what

6  it's going to be, see what the issue is.

7      MR. JUENGER:  Mr. Corcoran --

8      THE COURT:  Well, you know, you've got to yield the

9  mic.  I wish I had two lecterns, but I don't want to mess Judge

10  Graham's courtroom.

11                      CROSS-EXAMINATION

12               (Outside the Jury's Presence)

13  BY MR. JUENGER:

14  Q.  Mr. Corcoran, when you began advising PCA in the fall of

15  2014 about the hiring of third-party marketers, you gave three

16  pieces of advice, correct?

17  A.  Right.

18  Q.  One was that they were not to be paying doctors or doctor

19  groups; two, that there were to be no payments by the

20  third-party marketers like Mr. Grow, they should not be paying

21  others to refer patients, correct?

22  A.  Correct.

23  Q.  And also that PCA should not be billing a Federal health

24  care program, correct?

25  A.  Correct.

Corcoran - Cross

181

1    Q.   That's the advice that you gave?

2    A.   Stay away from Federal health care programs.

3    Q.   And don't pay doctors, correct?

4    A.   Yeah, oh, yeah, right.

5    Q.   And that the independent marketers like Mr. Grow should not

6    be paying referral sources?

7    A.   Yeah, although I didn't know about his arrangements.  When

8    I'm talking about referral services, I'm talking about don't pay

9    doctors, don't pay their staff, you know, the people in the

10   medical profession.

11   Q.   Well, did you advise whether or not third-party marketers

12   like Mr. Grow should pay patients at all under any

13   circumstances?

14   A.   No.  That question never came up obviously.

15   Q.   And throughout your time, you never knew that he engaged in

16   those types of conduct, did you?

17   A.   I wouldn't have known of those kinds of things because those

18   were operational and had nothing really to do with legal

19   questions that got asked of me.

20   Q.   So you didn't know?

21   A.   Didn't know.

22   Q.   You didn't know.  Did others at PCA know that that's what he

23   was doing?

24   A.   I don't know.

25   Q.   And you said that it was in December of 2014 that you

1  realized that Tricare was a Federal health care program, right?

2  A.  It was in December of '14 that I first heard that they were

3  getting referrals from an entity called Tricare.  I wasn't

4  familiar with it.  So I looked them up and found that they were

5  potentially subject to the same kind of rules as Medicaid and

6  Medicare.

7  Q.  Which means that, under the Anti-Kickback Statute, the

8  payments PCA was making to Mr. Grow were illegal, correct?  You

9  know what the anti --

10        THE COURT:  Hold on, hold on, hold on.  How do you

11  answer?

12        THE WITNESS:  I didn't come to that conclusion.  What I

13  concluded was the company needed to -- this was obviously --

14        THE COURT:  The company needed to what?

15        THE WITNESS:  The company needed to retain specialized

16  health care counsel, which is when we retained Frier Levitt.

17        THE COURT:  All right.

18  BY MR. JUENGER:

19  Q.  And certainly by the time you retained Frier Levitt, you

20  knew that you could not pay Mr. Grow for referring Tricare

21  scripts because that violated the Anti-Kickback Statute.

22  A.  No.  The advice we got from Frier Levitt was you needed to

23  convert to W-2 because that's the only legitimate way to do

24  this.  You needed to get away from the 1099 format and switch to

25  W-2.

Corcoran - Cross

183

1   Q.  Which is another way of saying the way you were doing it was

2   illegal?

3   A.  I guess I didn't take it that way.  I just thought, you

4   know, tell us what we need to do to comply with the statute,

5   it's very complex, and he did and the company went on to do it.

6   Q.  It's very complex?  Don't pay people for Tricare scripts,

7   that's complex?

8   A.  I think the complexity is if you're not in it every day as,

9   you know, I guess you are, but I wasn't, so that's why we

10  brought in Frier Levitt.

11  Q.  People who spent ten years in the pharmacy business don't

12  know that?

13  A.  I'm not sure who you're referring to in terms of the ten

14  years.  I don't know who was in the business for ten years.

15  Q.  So you knew that in January of 2015 PCA had to convert

16  Mr. Grow to a W-2 employee to comply with the bona fide employee

17  safe harbor, correct?  That was the advice from your outside

18  counsel?

19  A.  That was the recommendation, convert to W-2.

20  Q.  And it wasn't until May of 2015 that you actually converted

21  Mr. Grow to a W-2 employee, bona fide or otherwise?

22  A.  I think it was April.

23  Q.  You don't know that the agreement says May?

24  A.  The agreement I drafted had an effective date of April 1st.

25  Q.  And so you spent four or five months telling Mr. Grow

1    to become an employee and then you fired him two months --

2              THE COURT:  Hold on.  Start again with the question.

3    BY MR. JUENGER:

4    Q.  And so it took five months, four to five months to bring

5    Mr. Grow onboard as a W-2 employee, correct?

6    A.  No, it took about three months.

7    Q.  Three months.

8    A.  Yeah.

9    Q.  And then within two months of bringing him on, you

10   terminated him, correct?

11   A.  I don't think we terminated him.  I think he decided to move

12   on because Tricare had simply stopped paying for the products.

13   Q.  So you didn't need him anymore, did you?

14   A.  I think it wasn't a question of whether we needed him.  We

15   probably -- I think the company would have liked to have kept

16   him.

17   Q.  Sure.  He brought in $40 million of business in eight

18   months, didn't he?

19   A.  It wasn't that so much, he just seemed like a capable guy.

20   Q.  And I think that you said earlier that PCA had other

21   marketers and you tried to come up with other ways to bring them

22   into compliance, correct?

23   A.  Yeah, the company tried to get everybody to convert I think.

24   Q.  And you were involved in that process, were you not?

25   A.  Only in the drafting phase, not in the talking to them

Corcoran - Cross

185

1    phase.

2    Q.  Well, how about the negotiating phase?

3    A.  Not in general, no.

4    Q.  Do you recall on May 1st negotiating with an individual

5    named Neil Caesar who was representing one of the marketers?

6    A.  Not negotiating so much.  I remember him.  He had a concept

7    that was different from the W-2 which he was trying to describe.

8          MR. JUENGER:  Should I continue, Your Honor?

9          THE COURT:  Well, how much longer do you think you

10   would have in front of the jury?

11         MR. JUENGER:  15 more minutes.

12         THE COURT:  All right.  Well, no issues were raised, so

13   I assume no issues will be raised in front of the jury.  Am I

14   right?

15         MR. RASHBAUM:  Of course.

16         THE COURT:  And then let's go.  Ready?  Bring in the

17   jury.

18         THE COURT SECURITY OFFICER:  All rise for the jury.

19      (Most jurors entered the courtroom at 3:51 p.m.)

20         THE COURT:  Go ahead and sit down once you get to your

21   place if you want to.  I know others are coming.  No problem.

22   You know what?  Let's make them more comfortable and everybody

23   sit down.  Okay.  It's easier that way.  Let's just wait a

24   little bit.

25         You know, one question I forgot to ask is how many

Corcoran - Cross

1    smokers do we have on the jury?  One, two.  Okay.  I had a case

2    that had one or two, I forgot, smokers.  By the end of the

3    trial, there were nine smokers.  It's a true story.  But this

4    one won't be like that.  Maybe two people will give up smoking,

5    you never know.  If I don't give you breaks to go outside, I'm

6    helping you.  You do what you want, I'm only kidding.

7          I haven't given you all, except today I think, a long

8    enough lunch break, but there was a case where I told the

9    jurors, because we had a lot of issues to discuss, that they

10   could go even to Bayside if they wanted to.  That's a pretty

11   place.  But I had to add later, after that case, when we came

12   back -- I told them come back at 2:30.  It was one of these

13   things, 12:30 to 2:30, and none of the jurors came back at 2:30,

14   so I asked the court reporter, did I tell them they were

15   excused?  And she said, no, no, you told them 2:30.  How could

16   all of them -- none of them are here.

17         They went to Bayside.  They decided to get on a boat,

18   on one of those cruises to see Gloria Estefan's house and all

19   the important people and they couldn't come back.  So I had to

20   start by saying to the jurors you can take a break, you can go

21   to Bayside, don't get a boat.  So if tomorrow or next week I

22   give you a long lunch break, that's part of the instruction, so

23   you can come back.  All right?  No big deal.

24        (The remaining jurors entered the courtroom at 3:53 p.m.)

25              THE COURT:  We killed some time.  All the jurors are

 1  here.  Thank you very much.

 2          Defendant is present, defense counsel, Government

 3  counsel.

 4          What say the defense, Mr. Marcus?  Who are you calling?

 5          MR. MARCUS:  David Corcoran.

 6          THE COURT:  Raise your right hand, sir.

 7          DAVID CORCORAN, DEFENDANT'S WITNESS, SWORN.

 8          THE COURT:  Tell us your name please, sir.

 9          THE WITNESS:  My name is David Corcoran.

10          THE COURT:  What is your profession?

11          THE WITNESS:  I'm an attorney.

12          THE COURT:  For whom?

13          THE WITNESS:  For Patient Care America.

14          THE COURT:  Thank you very much.  Go ahead.

15          MR. MARCUS:  At this time, Your Honor, we will

16  introduce into evidence Defense Exhibits 171, 47, 105, 36, and

17  19.

18          THE COURT:  They will be admitted without objection

19  from the Government.

20                       DIRECT EXAMINATION

21  BY MR. MARCUS:

22  Q.  Mr. Corcoran, when did you become counsel for Patient Care

23  America?

24  A.  April 2014.

25  Q.  And how did that happen?

Corcoran - Direct

188

A.   Patrick Smith, the CEO of the company, and he had just been
hired as CEO in March of 2014, called me and asked me if I could
help him out on some legal work that he had in connection with
the company.  At that point he was talking about employment
contracts and things of that nature.  He and I had worked
together for many years, over the course of 35 years, on other
projects, so I was happy to hear from him and happy to say yes.

Q.   Mr. Smith, Patrick Smith, was the CEO of the company?

A.   That's right.

Q.   And how long have you practiced law?

A.   Almost 45 years.

Q.   I want to direct your attention to September 2014, after you
became counsel for Patient Care America.  Did you get involved
in drafting any Employment Agreements for marketers?

A.   Not at that time, no.  At one point earlier in the year, I
had suggested an Employment Agreement in connection with another
marketing proposal, but in September of '14 the company
contacted me and asked me to prepare a Marketing Agreement for
MGTEN, I think the name was.  I don't know if it was Inc. or
LLC, but MGTEN.

Q.   MGTEN Marketing Group, does that ring a bell?

A.   Yes.

Q.   And what the purpose of the agreement?

A.   It was allocation of responsibilities where MGTEN would
attempt to promote the use of the company's compounds in

Corcoran - Direct

189

1    connection with -- you know, topical compounds for pain and

2    things of that nature.

3    Q.  And was PCA in the business of compounding medications in

4    the fall of 2014?

5    A.  Yes.

6    Q.  And MGTEN, do you know who is the principal or owner of that

7    company?

8    A.  Yes, Monty Grow.

9    Q.  And the agreement that was prepared, it was prepared between

10   Mr. Grow's company and Patient Care America?

11   A.  Yes.

12   Q.  And how was Mr. Grow going to be treated as an employee?

13   What status was he having under the agreement?

14   A.  At that point he was not an employee, he was a 1099 or, you

15   know -- in essence, the company would issue a so-called 1099,

16   which is a statement of earnings for income tax purposes, to his

17   business, to MGTEN.

18   Q.  And did Patient Care America have business relationships

19   with people, with companies on a 1099 basis other than Mr. Grow?

20   A.  Yes.

21   Q.  Was that a fairly standard business practice of the company

22   at that time?

23   A.  Well, it's fairly standard in all businesses, you know.  In

24   connection with any service business that provides I think more

25   than $500 worth of services a year, you have to give them a 1099

Corcoran - Direct

1    at the end of the year, so that the IRS has a way of tracking

2    who is getting paid.

3    Q.   And you mentioned there was a Marketing Agreement.  What was

4    MGTEN Marketing Group going to do on behalf of Patient Care

5    America?

6    A.   In general, promote the use of the company's compounds in

7    connection with pain management.

8    Q.   And PCA is a large specialty pharmacy?

9    A.   Yeah, I think that's a good way to put it.

10   Q.   Where do you work, sir, every day?

11   A.   Well, I'm not an employee -- speaking of 1099s, I'm not an

12   employee of the company, I am an outside counsel, and so my

13   office is up in the Boston area.

14   Q.   And where does the company operate?

15   A.   At the time, back in 2014, they were operating out of

16   Sunrise, Florida, and then more recently they've consolidated

17   operations in Pompano Beach.

18   Q.   And does PCA have contractual relationships with insurance

19   companies, insurance programs?

20   A.   Some, some they have contractual relationships with and

21   others they submit I guess what's called a -- I can't remember

22   the term, but where the company is allowed to get paid in spite

23   of the fact that it doesn't have a contract with the company.

24   Q.   And the compounding medication business of the pharmacy, are

25   these medications that are ultimately billed for reimbursement

1   to insurance programs?

2   A.   In general, yeah.

3   Q.   Both private insurance and other forms of insurance?

4   A.   Yes.

5   Q.   Would that include Federal programs?

6   A.   Generally not Medicare or Medicaid because I think they

7   never paid for these kinds of compounds, but Tricare did.

8   Q.   You mentioned Tricare.  Let me ask you:  In September of

9   2014, what did you know about Tricare?

10  A.   Nothing.  There was no discussion.  I'd never heard the name

11  before.

12  Q.   And there came a point in time when you heard the name?

13  A.   Yeah.

14  Q.   And upon hearing the name, what did you do?

15  A.   This was in late December of 2014, and it was the first time

16  I had heard that the company was, among other things, providing

17  prescriptions for Tricare beneficiaries and I had simply never

18  heard that term before, Tricare, and it surprised me because,

19  you know, I thought I was familiar with payors.

20         But in any event, I did some research and it turned out

21  that they were what I had once known as Champus, the military

22  benefit program, health benefit program, which had apparently

23  changed its name to Tricare at some point along the line.

24         So at any rate, I realized, okay, this is a Federal

25  program, so I did some further research about was that a

Corcoran - Direct

192

1   problem.

2   Q.   Okay.   And so learning that it was a Federal program, an

3   insurance program, what did you do next?

4   A.   Well, I talked to Patrick Smith at the company and suggested

5   that the company retain specialty health care counsel because

6   this is something that I felt required some in-depth expertise

7   in health care law, particularly in this area of compounding.

8   Q.   And did you retain an outside law firm for the company?

9   A.   Yeah, I contacted a company or a law firm, I should say,

10  called Frier Levitt, which is up in New Jersey and had a

11  national reputation in dealing with both health care issues, but

12  also specialty pharmacies and compounding pharmacies.

13  Q.   And was Frier Levitt engaged to do work on behalf of PCA on

14  this issue?

15  A.   Yeah.   You know, there's a process you go through where they

16  check to be sure that there's no conflicts with other clients

17  that they represent and have the client sign an Engagement

18  Letter, so that takes about 10 days, 2 weeks to get that lined

19  up.

20  Q.   Did Frier Levitt provide legal advice to you and the

21  company?

22  A.   Yes.

23  Q.   Did it provide legal advice to you and the company

24  concerning your compensation arrangements with outside marketers

25  like Mr. Grow?

1    A.   Yes.

2    Q.   Can you describe for the jury the steps you took next based

3    on that advice?

4              MR. JUENGER:   Objection, hearsay, Your Honor.

5              THE COURT:   Overruled.   Go ahead.

6              THE WITNESS:   So we spoke with one of the attorneys at

7    Frier Levitt and described to them the business model the

8    company had been operating on with these Marketing Agreements.

9              THE COURT:   When you said "we," you mean you?

10             THE WITNESS:   The company.

11             THE COURT:   But who did?   Who did the speaking?

12             THE WITNESS:   I'm sorry.   To clarify, I was on the

13   phone along with Patrick Smith, the CEO of the company.

14             THE COURT:   Okay.   Thank you.

15             THE WITNESS:   So we described to him the nature of the

16   contractual relationships we had in place with the companies

17   such as Mr. Grow's and asked him what he would recommend and

18   what he recommended was that the company change the format from

19   this so-called 1099 format where they're not employees to a W-2

20   format where Mr. Grow and, for example, his people would be

21   brought on as employees.   I mean, that's as concise as I can put

22   it in terms of -- he said, in essence, convert to W-2.

23   BY MR. MARCUS:

24   Q.   Did you discuss -- as part of this I mean, did you discuss a

25   concept called safe harbor?

Corcoran - Direct

1  A.  Yes, but only in the sense that he introduced it by saying,

2  you know, the safe harbor that you can comply with, that you

3  need to comply with is this W-2 exemption.

4  Q.  And that's a safe harbor from what?

5  A.  From the application of this statute, the so-called

6  Anti-Kickback Statute.

7  Q.  So was that the purpose of the transition from 1099 to W-2?

8  A.  Yeah, the company, and of course, the marketing people, too,

9  but the company wanted to get in compliance with this rule, the

10  outline.

11  Q.  And can you give a time frame for the jury about this

12  process where the company was discussing with Frier Levitt this

13  transition?

14  A.  Yes, we spoke to Frier Levitt on January 20, 2015, so that

15  was the beginning of process.  All right.  Now we know where to

16  go and so that was the beginning of the process of then

17  converting the marketing groups, including Mr. Grow and his

18  group, to W-2 employees, which the company did, in essence, over

19  the next three to four months, three months I guess.

20  Q.  And so what was the first step?  When did the company

21  decide or make a commitment to going through this process from

22  1099 to W-2?

23  A.  I spoke to Patrick Smith, the CEO of the company, the day

24  after that call, so that was January 21st, and he confirmed that

25  he wanted to move forward with this W-2 conversion.

1   Q.   And as part of this process, were you involved in drafting a

2   new Employment Agreement for Mr. Grow and his company?

3   A.   I was, yeah.

4   Q.   Let me show you Defense Exhibit 171.

5           MR. MARCUS:   Your Honor, is the ELMO on?

6           THE COURT:   I don't know.   Do you want it on?

7           MR. MARCUS:   I would like to, yes.

8           THE COURT:   Then you have to tell someone to turn it

9   on.

10          MR. MARCUS:   Thank you.

11          THE COURT:   Thank you, Gilda.

12  BY MR. MARCUS:

13  Q.   So if you could, Mr. Corcoran, could you explain what this

14  document is to the jury?

15  A.   What I'm looking at right in front of me?

16  Q.   Yes.

17  A.   Let me see.   It's not all that clear on my screen.   Yeah,

18  okay.   We had a telephone conference between Mr. Grow as well as

19  Patrick Smith, the CEO of the company, Matthew Smith, the COO of

20  the company, and myself discussing the outlines of the W-2

21  conversion of the Employment Agreement that we would put in

22  place for Mr. Grow.

23  Q.   Let's just take a step back.   What kind of a document is

24  this?   Did you prepare this document?

25  A.   It is a billing statement that I sent the company in March

1   of 2015 for work during that month.

2   Q.   Okay.  So you billed the company for your legal work?

3   A.   Yeah, at the end of every month I sent them a bill.

4   Q.   And this is a statement that describes the work you're

5   doing?

6   A.   Right, at any given point, correct.

7   Q.   And do you submit these bills monthly to the company?

8   A.   Um-hum.

9   Q.   How many hours a month do you think you work for PCA,

10  generally speaking?

11  A.   You know, it varies all over the lot, to be honest with you.

12  You know, at this point in time because we were, you know,

13  really fully involved in the process of converting the 1099's to

14  W-2, as well as a whole lot of other things, there was probably

15  150, 160 hours in this particular month.  Other months, it might

16  be as low as 20 or 30.

17  Q.   Right.  So on March 2nd you spent eight hours working on

18  this project?

19  A.   Yeah, I was physically down at the company at this point.

20  Q.   I think you said a moment ago this transition period, it

21  took a lot of hours, a lot of time?

22  A.   Oh, yeah.

23  Q.   Could you just tell the jury some of the steps that the

24  company was taking, that you and the company were taking as part

25  of this transition?

A.  Aside from drafting these employment contracts, things of
that nature, one of the most important things the company did
was bring in an HR executive.  You know, the company wasn't a
very big company at this time, so it didn't have a deep human
resources department.  So it brought in a very senior level
human resources professional, a guy who had been a vice
president of human resources at a number of companies that hired
thousands of people over the years, to head up the process of
bringing these people through the HR process, and that meant,
you know, employment offers, drug screens, background checks,
things of that nature.

So, you know, it's one thing to conceptualize we're
going to do this, it's another thing to then put the bricks and
mortar, you know what I mean, the block and the tackle
so-to-speak in place.

Q.  And who did the company hire to do the HR work?

A.  A person named Phillip Lockwood who had been a vice
president of human resources in a number of companies, including
several that Patrick Smith had been involved with.

Q.  Okay.  So your billing record on March 2nd reflects a
conference --

A.  Yeah.

Q.  -- with P. Smith, M. Smith and Monty.  Do you see that?

A.  Yeah.

Q.  Who is M. Smith?

Corcoran - Direct

1  A.   That would be Matthew Smith, who was at that time the vice

2  president of operations of the company.

3  Q.   And P. Smith, is that Patrick Smith, the CEO?

4  A.   Correct.

5  Q.   And who is Monty?

6  A.   And Monty was the head of MGTEN.  Monty Grow, the head of

7  MGTEN.

8  Q.   Right.  And in this conference what was discussed generally?

9  A.   The terms of his employment contract.

10 Q.   And what did you inform him of?

11 A.   Well, I didn't inform him of anything, you know what I mean?

12 I was sort of there as the scribe, if you know what I mean, to

13 put down in writing what the parties sort of worked out as far

14 as the pay and other aspects of the employment contract, the

15 term of the contract, things of that nature.

16 Q.   And which would lead to a new Employment Agreement with W-2

17 status?

18 A.   Correct.

19 Q.   Could you describe Mr. Grow's demeanor on the call?

20 A.   Yeah, he was very businesslike, you know, very

21 straightforward, you know, no ego.

22 Q.   Did Mr. Grow answer questions that were asked of him on the

23 call?

24 A.   Sure, things like what Monty -- I can remember

25 distinctly, you know, Patrick Smith, he's hired thousands of

1    people over the years, trying to draw Monty out a little bit,

2    okay, what are you looking for, what are you interested in doing

3    in terms of, you know, how long a contract, the pay, the

4    benefits, things of that nature.

5    Q.   Were there any questions asked of Mr. Grow that he didn't

6    want to answer?

7    A.   No, I can't think of any.  It was a very productive meeting.

8    I mean, as the guy who was going to write it all down and put in

9    some form of a contract, those are the kind of meetings you like

10   because, you know, you're getting things done.

11   Q.   So on March 5th you're working on drafting the Employment

12   Agreement?

13   A.   Yes.

14   Q.   And the next day, on the 6th, there are revisions to the

15   agreement.  Do you see that?

16   A.   Yes.

17   Q.   So in these two days, you worked about 15 hours on this

18   agreement?

19   A.   My guess is that -- I don't know what's redacted here.  I

20   probably did other things during those days.

21   Q.   Sure.

22   A.   But, you know, this was a significant focus because this

23   would set off the process of not only bringing Mr. Grow in, but

24   also the people in his group, in his group that he wanted to

25   bring over.

Corcoran - Direct

1  Q.  You were taking the advice from Frier Levitt seriously about

2  the need to comply with W-2 for employees?

3  A.  Yeah.  And actually, we had consulted at that point with an

4  additional law firm in Washington, D.C., and they gave us, in

5  essence, the same advice.

6  Q.  Was this a project that you were working on all throughout

7  the month of March 2015 --

8  A.  Yes.

9  Q.  -- and the company as well?

10  A.  Oh, yeah.  At that point Mr. Lockwood was physically down at

11  the company, you know, putting the infrastructure in place to

12  bring all these people aboard.

13  Q.  And you would interact with Mr. Lockwood?

14  A.  Oh, yeah.

15  Q.  Weekly?

16  A.  Sometimes daily.

17  Q.  Let me just show you Exhibit 47 quickly.  Can you explain

18  for the jury what the term "onboarding" means in this context?

19  A.  Sure, literally the process by which you would bring either

20  one or a number of new employees onboard, and that includes at

21  the first level making them, you know, sign off on an offer

22  sheet, so that everybody knows what the terms of the employment

23  is; background checks, drug screens, and then as they come

24  aboard, training on all kinds of different aspects, you know,

25  company policies and procedures and that kind of stuff.

1  Q.  Fair to say that Mr. Grow's company and your company were

2  business partners?  Do you agree with that?

3  A.  It was kind of like that, yeah.

4  Q.  And then in terms of the decision to go from 1099 to W-2,

5  which side of the business arrangement was making that decision?

6  A.  Well, it was initiated by the company, you know, Mr. Grow

7  agreed, but, you know, it was initiated by the company as a

8  result of the advice it had gotten.

9  Q.  When this idea was approached, the need to transition to W-2

10  to comply with the safe harbor, was there any resistance from

11  Mr. Grow to that?

12  A.  Not that I'm aware of.

13  Q.  Let me show you Exhibit 105.  This onboarding process, this

14  included both Mr. Grow and all of the employees for MGTEN

15  Marketing?

16  A.  I don't know that he brought everybody.  There were some

17  that, you know, didn't make the cut I guess but, you know, I

18  think it was more than a hundred as I understood it.

19  Q.  And so in April PCA -- you are still in the onboarding

20  process, are you not?

21  A.  Yeah, this is really down into the -- this is the execution

22  phase so-to-speak where it's getting done, being brought aboard,

23  you know, we're getting the offer letters back and all of that

24  stuff.

25  Q.  You said it was more than a hundred people that were

1   being --

2   A.   That was my understanding.  I think I saw somewhere that 110

3   plus offer letters went out.

4   Q.   How many hours do you think it took for your company to do

5   all of these steps involved in transitioning these employees to

6   W-2?

7   A.   Well, if you count not just my time or Phil Lockwood's time,

8   but the time of the other people in the human resources

9   department, the people in the finance department, the people in

10  the payroll department, the people in the operations department,

11  I mean, it's a staggering number of hours.  It had to be in the

12  thousands.  Phil Lockwood alone would have spent probably, I'll

13  bet, 400 hours between March and May on the project, him alone.

14  Q.   And Mr. Corcoran, were you trying to onboard as quickly as

15  you could?

16  A.   Of course.

17  Q.   Because you wanted to move the company into compliance?

18  A.   Yeah.

19  Q.   That was important to you?

20  A.   Oh, yeah, the company's feet were to the fire.

21  Q.   Did anyone ever tell you to slow things down on the

22  onboarding process?

23  A.   No, no.  It was the opposite.

24  Q.   This is Defense Exhibit 36.  So still in April, this is

25  April 28th, and you're finalizing the Employment Agreement and

1  the W-2 status?

2  A.   Yeah.

3  Q.   And you said Mr. Grow was cooperative and helpful throughout

4  this process?

5  A.   Yeah.

6  Q.   Did you ever see Mr. Grow do anything to delay this process

7  in any way?

8  A.   No.

9  Q.   Mr. Corcoran, did a woman named Ginger Lay ever send a

10 patient survey program to you to review for changes?

11 A.   No.

12 Q.   Let me show you what's in evidence as Government's Exhibit

13 134.

14        Was a document like this ever sent to you in February

15 of 2015?

16 A.   No.

17 Q.   And did you ever make changes to any survey consent form for

18 patients --

19 A.   No.

20 Q.   -- to be sent to any marketers?

21 A.   No.

22 Q.   Your company has produced a lot of documents to the

23 Government as part of this investigation.  Are you aware of

24 that?

25 A.   Yes.

1    Q.   They received a subpoena for documents?

2    A.   Yes.

3    Q.   And the Government asked them for documents related to a

4    whole host of people that had something to do with PCA?

5    A.   I am not sure that I recall.  That's kind of specific, but

6    I'll assume that in the scope of the request, they must have

7    wanted to talk to people.  Is that what you're suggesting?

8    Q.   Right.

9    A.   Okay.

10   Q.   And PCA produced hundreds of thousands of documents in this

11   case, did it not?

12   A.   I assume so, although, you know, just so it's clear, I

13   wasn't involved in that part of the effort.  That was a

14   different team of attorneys.

15   Q.   Okay.

16            MR. MARCUS:  Thank you, Mr. Corcoran.

17            THE COURT:  Cross-examination.

18                       CROSS-EXAMINATION

19   BY MR. JUENGER:

20   Q.   Mr. Corcoran, you never represented Monty Grow, did you?

21   A.   No.

22   Q.   And you never gave him any legal advice, did you?

23   A.   Not directly to Monty Grow, no.

24   Q.   What do you mean, not directly to Monty Grow?  Did you give

25   him advice or didn't you give him advice?

Corcoran - Cross

1  A.  I did not give him legal advice.

2  Q.  In fact, you would be ethically obligated to give him no

3  advice, correct?

4  A.  If he were on the opposite side or if he were a second party

5  to a transaction involving my client, yes, I'd have to tell him

6  to get his own counsel.

7  Q.  And you don't know that he was a second party on the other

8  side; is that what you're saying?

9  A.  It never came up.  He didn't ask me for specific legal

10 advice.

11 Q.  Did you give him legal advice?

12 A.  No.

13 Q.  You couldn't have given him legal advice, correct?

14 A.  I think that's right.

15 Q.  Now, when you started working with PCA, you did give PCA

16 some legal advice, correct?

17 A.  Correct.

18 Q.  And you told them, with respect to marketers like Mr. Grow,

19 that there could be no payment of doctors, correct?

20 A.  Correct.

21 Q.  Because that's an illegal kickback, right?

22 A.  I don't know if it's a legal payback, but just don't do it,

23 it's always a bad idea.

24 Q.  Have you heard of the Stark Law?

25 A.  Yes, I have.

Corcoran - Cross

1   Q.   How many years have you practiced in health care law?

2   A.   I'm more of a general corporate lawyer with some, you know,

3   issue spotting knowledge of health care law.

4   Q.   And one of the issues that you spotted very early on was

5   that PCA should not be using outside marketers if they are

6   receiving scripts from a Federal health care program, correct?

7   A.   Yes, don't involve Federal health care programs.

8   Q.   And as it turns out, your company paid kickbacks and

9   received over a hundred million dollars in claims.  You know

10  that now, right?

11  A.   I don't know that they paid kickbacks, but they received, I

12  think, 80 plus million.  I don't know.  I don't know what the

13  figure is.

14  Q.   A lot of money, let's just agree on that, correct?

15  A.   Yes.

16  Q.   And in fact, your company split 50 percent of the profits

17  with people like Mr. Grow, didn't it?

18  A.   I don't think it was 50 percent of the profits, but at any

19  rate, they paid Mr. Grow according to the Marketing Agreements.

20  Q.   Yeah.  And you negotiated the Marketing Agreements, correct?

21  A.   No, that was actually done by Matt Smith, but in any event.

22  Q.   Well, you're the corporate lawyer.

23  A.   I didn't negotiate the agreements, though, I just drafted

24  them.

25  Q.   Okay.  And the agreement with Mr. Grow from September or

Corcoran - Cross

1    October of 2014, you recall that?

2    A.   Yes.

3    Q.   And the nuts and bolts of it was that he received 50 percent

4    of all adjudicated scripts that he could bring in, correct?

5    A.   That isn't exactly how it worked.

6    Q.   Tell us how it worked.

7    A.   Well, you took the collected revenues, minus what was

8    referred to as cost of goods sold, including, I guess, costs

9    associated with the sales, and then there was a 50/50 split.

10   Q.   Yeah.  And the cost of goods sold was in many cases less

11   than three percent of the total reimbursement for the product.

12   You knew that, right?

13   A.   No, I don't know that but --

14   Q.   Did anybody there know that?

15   A.   I assume so, the financial people.

16   Q.   Who knew that?

17   A.   Presumably the financial people.

18   Q.   And presumably who are those people?

19   A.   Well, that would be the CFO.

20   Q.   Who was that?

21   A.   At the time it was a woman whose name was Patricia Gunn.

22   Q.   So Patricia Gunn was the only one who knew that the profits

23   on these drugs were 97 percent of the reimbursements?

24   A.   Oh, I don't know.  I don't know that she's the only one.  I

25   am just trying to suggest it wasn't anything that would have

Corcoran - Cross

1    come across my desk.

2    Q.  Who was in charge of the compounding business?

3    A.  Matt Smith was the company's vice president of operations

4    and you know, was the principal related guy who had the

5    relationship with the various marketing heads.

6    Q.  What was his relationship with Monty Grow?

7    A.  Well, he was the one who I think negotiated the contract

8    with Monty Grow, and then served as his liaison with the

9    company, I guess is how I would put it.

10   Q.  And isn't it true that in addition to being a marketer, he

11   also sold products to PCA?

12   A.  Who?

13   Q.  Monty Grow.

14   A.  I don't know about that.

15   Q.  He was one of your sources of supply.

16   A.  That isn't anything that I was aware of or was discussed

17   with me.

18   Q.  But you're the CEO -- I'm sorry, you're the general counsel?

19   A.  Again, you know, I work outside the company.  They have to

20   bring a matter to me before it, obviously, you know, becomes

21   something I can be aware of and work on.

22   Q.  You were involved in bringing him on as an employee,

23   correct?

24   A.  Yes.

25   Q.  You just told us that a staggering --

Corcoran - Cross

209

1  A.  It was staggering.

2  Q.  -- number of hours, a thousand hours was spent doing that,

3  but you never knew that he was a source of supply for some of

4  your most lucrative ingredients?

5  A.  No.  To give you an example, in March, April, and May there

6  was, you know, literally an interdisciplinary effort throughout

7  the company, whether it was finance, payroll, pharmacy

8  operations, human resources, et cetera, to bring these people

9  in.  That may have been thousands of hours, but in the spring

10  and fall -- spring, summer and fall of 2017, I was probably

11  spending 20 hours a month on matters referred to me by the

12  company.  So it isn't surprising that some things I wouldn't

13  know about.  I wasn't physically located there.  It just

14  wouldn't -- if it didn't involve a legal question that somebody

15  referred to me, I would have no way of knowing about it.

16  Q.  So that's just a long way of saying, no, you didn't know.

17  A.  I already said I didn't know.  I am just explaining why.

18  Q.  Okay.  But what you did know is that by December of 2014,

19  you knew that Tricare was a Federal health care program,

20  correct?

21  A.  Yeah.  I had first heard the name Tricare late in that month

22  and wasn't familiar with it, so I did some research and found

23  that it was the military health care program.

24  Q.  And now all of a sudden one of your cardinal rules, first

25  principles, don't bill Federal health care programs, has been

Corcoran - Cross

1   violated, right?

2   A.   Right.

3   Q.   And that means all of those commissions paid to Mr. Grow for

4   referring scripts to PCA, those are kickbacks?

5   A.   No, not necessarily.  But again, you know, my simple rule of

6   don't bill a Federal health care program, makes your life a lot

7   simpler.  You don't have to think about these kinds of issues.

8   If, as in this case, you do, then I suggested to the company,

9   you've got to get a specialty health care firm in here and get

10   some guidance.

11   Q.   So paying someone like Mr. Grow 50 percent of the profits

12   for referrals from Federal health care programs, that's just

13   something you know is wrong even if you don't have to refer to

14   the Anti-Kickback Statute?

15   A.   No, it's something that I don't want to think about.  If you

16   don't do Federal -- if you don't have any Federal programs that

17   you service, then obviously you don't have to worry about things

18   like the Federal Anti-Kickback Statute.

19   Q.   Which is a crime, right?  It's a criminal statute?

20   A.   Well --

21   Q.   Yes or no?

22   A.   It's a civil and criminal statute, but it obviously is very

23   fact specific.  You know, it doesn't just apply like that.

24   Q.   Of course.  And of course, in order to be a competent

25   lawyer, do you agree with me that to give competent legal

Corcoran - Cross

 1  advice, you have to know the facts?

 2  A.  Sure.

 3  Q.  I mean, can you offer legal advice without knowing all the

 4  facts?

 5  A.  It depends on what the question is.

 6  Q.  Well, let's talk about the Anti-Kickback Statute then.  You

 7  are familiar with it?

 8  A.  Sure.

 9  Q.  Okay.  And you know that it says, "whoever pays any

10      renumeration --" do you know what renumeration means?

11  A.  Sure.

12  Q.  What?

13  A.  Something of value.

14  Q.  "Anyone who pays renumeration to any person --" is Mr. Grow

15      a person?

16  A.  Yeah, I'll concede he's a person.

17  Q.  "-- to induce such person to refer an individual to a person

18      for the furnishing or arranging for the furnishing of any

19      item or service for which payment is made under Federal

20      health care program."

21          So PCA pays renumeration to Mr. Grow for referring

22  patients to order products that are paid for by a Federal health

23  care program.  Kickback, right?

24  A.  Yeah, that's why I told the company it needed to get some

25  advice from a specialty health care counsel firm.

Corcoran - Cross

1  Q.  And then knowing that you had an issue of a criminal nature,

2  you surely advised the company to stop doing what they were

3  doing until you sorted it out, right?

4  A.  No, I said to the company, we've got to retain -- I suggest

5  strongly that you retain outside counsel to get some guidance in

6  this area.

7  Q.  And as a competent lawyer, you must have asked your client

8  what are the facts about Mr. Grow, we need to find out the

9  facts, right, before you can provide any legal advice?

10  A.  I'm not sure what you mean by the facts.

11  Q.  Well, let me add some facts.  Did you know that he was

12  paying doctors to write the scripts he was referring to your

13  company to make millions of dollars?

14  A.  No.

15  Q.  Did you know that he was paying patients to induce them to

16  sign up for scripts that were being filled by PCA?

17  A.  I never heard anything like that.

18  Q.  Never heard anything like that.

19       So I think your testimony on direct was that in January

20  you got some advice from yet another firm, correct?

21  A.  No, the firm -- I suggested the company retain a specialty

22  health care firm.  I then did a search and came up with this

23  particular firm whose name was Frier Levitt in New Jersey --

24  Q.  Yes.

25  A.  -- as having particular --

1  Q.  Experts in health care law?

2  A.  Particularly in this area of compounding pharmacies.

3  Q.  And so at the time PCA got advice from Frier Levitt, the

4  advice was stop paying people like Mr. Grow commissions for

5  referring Tricare patients?

6  A.  Convert to W-2.

7  Q.  Because paying Mr. Grow commissions for referring Tricare

8  scripts violates the Anti-Kickback Statute, right?

9  A.  No, that isn't what they said.  They said convert to W-2

10  because that provides a safe harbor, so you can't get

11  second-guessed.

12  Q.  And so you knew and PCA knew in January that you needed to

13  fall under a safe harbor in order to protect yourself from what

14  had been going on for the last three or four months of

15  kickbacks?

16  A.  Again, I don't concede they're kickbacks, but the company

17  was told convert to this W-2 safe harbor in order to protect

18  your flank, so-to-speak, and that's what the company did.

19  Q.  And you didn't stop billing Tricare, did you?

20  A.  What do you mean me?  I didn't bill --

21  Q.  Your company, PCA, that you give advice to.

22  A.  The company continued while it was trying to convert.  It

23  didn't want to withdraw from the business I guess, so they

24  continued.

25  Q.  Because there was a lot of money at stake, correct?

Corcoran - Cross

214

1  A.  It wasn't so much that it was a lot of money, it was a

2  market that the company sensed was a good market.

3  Q.  And you, PCA, knew that the market was coming to an end,

4  didn't you?

5  A.  No.

6  Q.  No?  You weren't aware that Tricare was the only insurance

7  that remained paying at that time?

8  A.  No, there were private insurance companies that were paying.

9  Q.  Oh, there were, huh?  Hmm.  So you knew that you had to

10  convert Mr. Grow to what you say is a W-2 employee to be in the

11  safe harbor?

12  A.  Yeah.

13  Q.  And it took until May to get that accomplished, correct?

14  A.  I think it's April, but go ahead.

15  Q.  Well --

16  A.  It was not May, it was April.

17  Q.  April what?

18  A.  I'm going to say the last two weeks, last week of April.

19  Q.  And so it took you four months.  Do you know how much --

20  A.  Three months.

21  Q.  Three mounts.  Do you know how much money PCA obtained from

22  Tricare in that time period from people like Mr. Grow?

23  A.  I do not.

24  Q.  50 million you think?

25  A.  I really have no way of knowing.

Corcoran - Cross

1  Q.  Do you dispute that?

2  A.  I'm sorry?

3  Q.  Do you dispute that amount?

4  A.  I have no way to dispute it one way or the other.

5  Q.  And you took thousands, by your own testimony, thousands of

6  hours of work to get him onboard at the end of April, right?

7  A.  I didn't personally take thousands of hours but the

8  company --

9  Q.  The company.

10 A.  Yeah, I would estimate it had to be thousands of hours.

11 Q.  And yet, after going to all that work, you turned around and

12 terminated him within two months, correct?

13 A.  I don't know that the company terminated him.  I think he

14 decided to leave, but in any event, it was relatively simple.

15 Tricare had initially proposed new pricing for these various

16 compounds and then it simply stop paying so the market

17 obviously --

18 Q.  So you didn't need him anymore?

19 A.  Yeah, you couldn't support a sales staff when there were no

20 sales anymore.

21 Q.  That's fair.

22      And you also brought on board, I think you said 150 of

23 Mr. Grow's sales force?

24 A.  Yeah.  I don't know how many eventually were brought on, but

25 I think over 100 or 115 offers were made to his people.

Corcoran - Cross

216

1   Q.   And in the thousand or so hours that PCA expended bringing

2   those people on, did anyone at PCA ever ask who they were, what

3   their experience was, what their education was?

4   A.   No, it would be dependent on -- the company had a great deal

5   of confidence in Mr. Grow, and he, in turn, said these are the

6   people I want to bring with me.  Okay.

7   Q.   You had confidence in Mr. Grow, but you never bothered to

8   ask the facts about what he was doing?

9   A.   Again --

10  Q.   Correct?  Did anybody at PCA bother to find out those facts?

11  A.   I have no idea who had conversations with him at PCA or who

12  didn't have conversations with him at PCA.  I mean, I'm not a

13  mission.

14  Q.   I think we can all agree on that.  Were you aware, was

15  anybody at PCA aware -- well, let me back up.  Strike that.

16          PCA was selling prescription drugs, correct?

17  A.   Yes.

18  Q.   And those obviously require a prescription for a reason?

19  A.   Yes.

20  Q.   And those are compounded drugs which, to use a word, they're

21  sensitive, correct?  They can be harmful to people if they are

22  misused.  They require the supervision of a doctor.

23  A.   Oh, yeah, yeah.

24  Q.   So, of course, PCA, being the compliant and careful

25  corporate citizen that I'm sure it is, hires only the best

Corcoran - Cross

1   people on its staff to sell its products, correct?

2   A.  Do you mean pharmacists or in general?

3   Q.  Anybody.

4   A.  Oh, yeah, it tries.

5   Q.  So you would certainly expect that PCA would interview the

6   150 people that they were bringing in, correct?

7   A.  No, not in this case because it was almost -- this is more

8   akin to -- it's almost like an acquisition where, you know,

9   you're bringing in a group of people at one time except that it

10  was in connection with this conversion to W-2.

11  Q.  So then, what took so long?  I mean, you're just absorbing

12  Mr. Grow's people.

13  A.  Everything looks simple until you get down to the details of

14  trying to do it.  I can't tell you what every day -- you know,

15  how many progress we made every day, but it took that long and

16  everybody was working hard.  Everybody had their back to the

17  wheel.

18  Q.  And you had no idea that Tricare was eventually going to

19  stop paying for these.  Is that your testimony?

20  A.  No.  I'll tell you what I knew, which was on April 15th of

21  17th of 2015 Tricare issued a new contract with new pricing,

22  significantly lower than the old pricing that it had paid, and

23  the company was fine with it, signed it and sent it right back.

24  So there was no inkling that Tricare was simply going to stop

25  paying.  The obvious information from Tricare in the form of

Corcoran - Cross

1  this contract was that they were going to continue to pay, but

2  it would be a much lower rate which, as I said, the company was

3  fine with.

4  Q.  And isn't it true that the offer letters -- not the offer

5  letters, the offer packet that was sent out from PCA contained

6  an offer of employment along with an application, correct?

7  A.  I don't know what was in the -- I don't know what was in the

8  package completely.  Certainly there was an employment offer, I

9  know that.

10  Q.  And any of these employees, they weren't interviewed.  You

11  agree with that?

12  A.  I wouldn't know that.  That was an HR kind of thing.

13  Q.  You just testified about HR and all the steps they took and

14  the thousands of hours.  You don't know if they interviewed

15  people or not?

16  A.  No.

17  Q.  Did they review their applications before offering them a

18  job?

19  A.  What do you mean?

20  Q.  Applications, the people submitted applications.

21  A.  No, Monty provided, Mr. Grow provided the names and

22  information, you know, the demographic information, if you will.

23  The company then made offers subject to background checks and

24  drug screens.

25  Q.  So if you pass a criminal -- if you're not a criminal and

1    you haven't taken drugs in the last month, that's good enough

2    for PCA?  Is that your testimony?

3    A.  No.  If you haven't taken drugs, if you pass the background

4    check, and I can't tell what a background check might include,

5    and you were recommended by Mr. Grow, who we were bringing on to

6    head up this division.

7    Q.  And so certainly before you made these people your own

8    employees, right -- then you are responsible for them, correct?

9    That's the whole idea.

10   A.  I don't know what you mean by we're responsible for them, I

11   mean.

12   Q.  They are your employees.

13   A.  Yeah.

14   Q.  And if they do things wrong, PCA will be liable for that?

15   A.  Yeah, if they do it in the course of their employment,

16   perhaps, yeah.

17   Q.  Sure.  And you hired them to be sales reps, so if they screw

18   up in the sales rep world, PCA is on the hook.  Do you agree

19   with that?

20   A.  It depends on what they do.

21   Q.  It depends on what they do.

22   A.  Yeah.

23   Q.  So let's talk about what these people did.  Did you know

24   that PCA hired patients, it hired its patients as employees?

25   Did you know that?

Corcoran - Cross

1  A.  I don't know that.  I don't know who they are or what the

2  circumstances were.

3  Q.  PCA paid these people for their own prescriptions.  Do you

4  know that?

5  A.  Again, I wouldn't have any knowledge about that.

6  Q.  PCA hired a young plan who we heard from yesterday whose

7  last job before PCA hired him as a pharmaceutical sales rep was

8  to keep the buffet warm at a Pizza Hut.  Did you know that?

9        MR. JEAN:  Cici's.

10        MR. JUENGER:  Cici's, forgive me.  Thank you.

11        THE WITNESS:  I don't know that.

12  BY MR. JUENGER:

13  Q.  And PCA didn't care, did it?

14  A.  Again, I have no way of knowing who they -- what some of the

15  background of some of these people were because, again, that's

16  an HR kind of function.

17        THE COURT:  Let's wrap it up.

18  BY MR. JUENGER:

19  Q.  And it means --

20        THE COURT:  I'm sorry.  Let's wrap it up.

21        MR. JUENGER:  I will, Your Honor.

22        THE COURT:  So ask the best questions now, because you

23  may not get the chance to ask them.

24  BY MR. JUENGER:

25  Q.  So Mr. Grow wasn't the only marketer that worked for PCA,

Corcoran - Cross

1    correct?

2    A.   Correct.

3    Q.   So PCA had many different people from around the country who

4    were referring scripts in exchange for commissions, correct?

5    A.   I don't know how many they had, but there others other than

6    Mr. Grow.

7    Q.   There were others.  And PCA made efforts to incorporate many

8    of those different marketers into its business, right?

9    A.   Yeah.

10   Q.   And you, in fact, helped negotiate some of those deals,

11   didn't you?

12   A.   I wouldn't say I negotiated because I didn't get into the

13   economics of the deals, if you know what I mean, but if there

14   was a question of structure or legal implications of structure,

15   then I would have been called in.

16   Q.   Well, there was a marketing company by the name of -- I

17   don't know the name of it, but it was represented by an

18   individual by the name of Neil Caesar.  Do you remember

19   negotiating --

20   A.   I remember Neil Caesar.

21   Q.   And in your negotiations with Neil Caesar you explained that

22   whatever the structure you were going to come up with for that

23   entity to incorporate them, the whole ideas was to say that you

24   were compensating the company based on efforts, not on results,

25   meaning the number of scripts, correct, because that's what

Corcoran - Cross

 1   marketers do, bring scripts?

 2         MR. MARCUS:  Your Honor, I think we're moving outside

 3   the scope.

 4         THE COURT:  I don't know, but I'm used to lawyers

 5   saying objection.

 6         MR. MARCUS:  Objection.

 7         THE COURT:  And then the grounds.  That way I can

 8   react.  If we're all just chatting, it just takes longer.  So

 9   that's how we do things.

10         Wrap it up.

11   BY MR. JUENGER:

12   Q.  And the idea of the transaction, the general idea was that

13   the financial results for both parties would be the same.  In

14   other words, you were just trying to recreate what people were

15   doing before, which we have already I think agreed that it was a

16   kickback, or at least wrongful, in a different structure; isn't

17   that correct?

18   A.  No, I didn't agree that it was a kickback or wrongful, but

19   putting that aside, as it relates to my discussions with Neil

20   Caesar, it was an Alice in Wonderland kind of discussion where,

21   you know, you go down the rabbit hole.  He had outlined -- and

22   this was in a conversation some time between April 15th and say

23   May or May 5th, an elaborate concept he had as opposed to simply

24   W-2 conversion.  In other words, he was proposing on behalf of

25   his client, and I don't remember who they were either, something

Corcoran - Cross

1  other than W-2 conversion.

2        Well, all right, explain it to me.  And he tried to and

3  I tried to, you know, see if I could understand it, but then he

4  never produced any documents.  I asked him if he'd please

5  contact another attorney that we were working with at the time

6  to see if he could draw out the documents.  So nothing was ever

7  produced.

8        So I've got to tell you, I cannot at this point give

9  you much confirmation on what it was that he was asking because

10 he never produced a single document, oh, and nor did we go

11 forward with him or his client.

12 Q.  And at no point in your interactions with Mr. Grow did you

13 discuss anything other than this 1099 versus W-2 conversion; is

14 that correct?

15 A.  Yeah.  The interactions I had with him beginning in March of

16 2015 related to his employment contract, so at that point it was

17 very linear.  We were talking about his employment contract and

18 what the terms would be.

19 Q.  So you never had any discussions about the Food, Drug and

20 Cosmetic Act, did you?

21 A.  No.

22 Q.  You never had any discussions about the Federal health care

23 fraud statute, did you?

24 A.  With Mr. Grow?

25 Q.  Yes.

1   A.  No.

2   Q.  You never had any discussions about money laundering either?

3   A.  No.

4   Q.  And you never discussed conspiracy?

5   A.  No.

6   Q.  And let's be very clear that this safe harbor that you were

7   talking about, you call it W-2, but the safe harbor is called

8   bona fide employment, correct?

9   A.  Correct.

10  Q.  And bona fide employment means they have to be real

11  employees, correct?

12  A.  Yes.

13          MR. MARCUS:  Objection, Your Honor.

14          THE COURT:  Overruled.

15  BY MR. JUENGER:

16  Q.  You can't just convert how you are paying someone and call

17  it a bona fide employee.  Do you agree with that?

18  A.  Yeah, it depends on the facts.

19  Q.  It depends on the facts.  So you have to look at the facts

20  and see if somebody is really an employee or not?

21  A.  Correct.

22  Q.  Correct.

23          THE COURT:  Redirect.

24                  REDIRECT EXAMINATION

25  BY MR. MARCUS:

1  Q.  Mr. Juenger asked you a lot of questions about the

2  Anti-Kickback Statute.  It's fairly complicated, isn't it?

3  A.  Sure.

4  Q.  Very technical area?

5  A.  It's very fact specific.

6  Q.  Very fact specific?

7  A.  Sure.

8  Q.  That was the reason you wanted to get specialized outside

9  counsel when you realized Tricare was a Federal program?

10 A.  Yeah.  It's a little bit like if you're a, you know, general

11 practitioner or a family practice guy and you want to get the

12 neurologist involved or, you know, the specialty guys, same

13 thing happens in the legal business.

14 Q.  Right.  You wanted to get the best advice in this

15 complicated area for your company?

16 A.  Absolutely.

17 Q.  And Mr. Grow had a marketing company and was doing business

18 with your company for many months, correct?

19 A.  Yes.

20 Q.  And in December of 2014 he was actively marketing your

21 company's compounding medications, correct?

22        MR. JUENGER:  Objection as to leading, Your Honor.

23        THE COURT:  Isn't it?  Isn't it?  It was on direct,

24 too, but no one objected, so I'll sustain the objection now.

25        Who, what, when, where, how, why, all of those would

1    not be leading questions.

2    BY MR. MARCUS:

3    Q.   How would you characterize Mr. Grow's employee status for

4    PCA?

5    A.   He was not an employee up until roughly April -- some time

6    in April of 2015, and then he was an employee, and as I recall,

7    he was a vice president.

8    Q.   You were asked questions about remuneration, compensation.

9    Do you recall those questions?

10   A.   Yeah.

11   Q.   Is it illegal, under the kickback statute, to pay employees

12   commissions?

13   A.   No.

14   Q.   Is it illegal to have business relationships with other

15   companies?

16   A.   No.

17   Q.   Is it illegal to market compounding medications?

18   A.   No, of course not.

19   Q.   Is all employee compensation a kickback?

20   A.   I guess I would never characterize employ compensation --

21           MR. JUENGER:  Objection, Your Honor, this is

22   irrelevant.

23           THE COURT:  Overruled.

24           THE WITNESS:  I would never characterize compensation

25   paid to employees as a kickback.  By definition, they're an

1    employee, they're getting a salary, commissions, bonuses,

2    whatever, but it's not a kickback.

3    BY MR. MARCUS:

4    Q.  And why were you trying to comply with the safe harbor for

5    employee agreements?

6    A.  In other words, we wanted to be sure that the company's

7    commission people were paid not as 1099s, but were W-2 employees

8    in order to stay within the safe harbor.

9    Q.  And what was the reason for that?

10   A.  I mean the company -- that's exactly the advice the company

11   was given by the health care counsel it retained.

12   Q.  Did you follow all the advice that Frier Levitt gave to your

13   company in January of 2015?

14   A.  Yeah.

15   Q.  Did you disregard any of their advice?

16   A.  No, we went ahead and converted.

17   Q.  And that conversion took --

18           THE COURT:  Oh, it sounds like it's leading.

19   BY MR. MARCUS:

20   Q.  How long did that conversion take?

21           THE COURT:  There you go.

22           THE WITNESS:  It depends on -- I think there were some

23   groups that were brought in as early as late March because they

24   were smaller groups.  I think in Mr. Grow's case, it took

25   another month but he had the largest group.

Corcoran - Redirect

1  BY MR. MARCUS:

2  Q.  Did you see anyone intentionally delay that process in any

3  way?

4  A.  Never.

5  Q.  Do you have any reason to believe that Mr. Grow withheld any

6  information about his business practices from your company

7  throughout this time period?

8  A.  I don't have any information on that.  I mean, again, I

9  never heard of anything like that, that he had withheld any

10  information.

11  Q.  Were you concerned in January and February and March of 2015

12  that your company was engaged in a criminal conspiracy?

13  A.  No.  We were concerned that the company get, you know, into

14  this W-2 safe harbor as quickly as possible, that's all.

15  Q.  You were acting in good faith?

16  A.  Yeah, absolutely.  Again, this is -- you know, business is

17  full of challenges.  I mean, there are all kinds of challenges

18  that come up.  It doesn't have to be a legal challenge, it could

19  be a supplier issue or any number of things.  This is just

20  another one of those things that come up.  It's a challenge and

21  then it gets, you know, in this particular case, a high degree

22  of focus and eventually we got it done.

23            THE COURT:  Wrap it up.

24  BY MR. MARCUS:

25  Q.  This onboarding process, you said earlier it involved a lot

1   of time and expense to the company?

2           THE COURT:  Well, that's leading, sustained, unless

3   it's the last question.  Remember my rule.  I allow one leading

4   question at the end.  Is it your last question?

5           MR. MARCUS:  It's my last question, Your Honor.

6           THE COURT:  All right.  You can answer it.  Do you

7   remember it?

8           THE WITNESS:  I didn't think he finished it.

9           THE COURT:  Read back the question since you're there.

10      (The question referred to was read by the reporter.)

11          THE COURT:  The answer?

12          THE WITNESS:  Yes.

13          THE COURT:  Thank you, sir.  You are excused.  Have a

14  safe trip back to Boston.

15          THE WITNESS:  All right.  Thank you, sir.

16      (The witness was excused.)

17          THE COURT:  What say defense counsel?

18          MR. RASHBAUM:  Judge, at this time we call Luis Green.

19          THE COURT:  All right.  Right over here.  Right over

20  here, your right, my left.  Raise your right hand, please, sir.

21          LUIS GREEN, DEFENDANT'S WITNESS, SWORN.

22          THE COURT:  Have a seat and tell us your name.

23          THE WITNESS:  Good afternoon.  My name is Luis Steven

24  Green.

25                      DIRECT EXAMINATION

Green - Direct

230

BY MR. RASHBAUM:

Q.  Good afternoon.  Mr. Green, where are you from?

A.  Originally from San Diego and I live now in Jacksonville.

Q.  I want to bring you back to the end of 2014, 2015, early
2015.  Where were you living then?

A.  Jacksonville.

Q.  And what was your job at that time?

A.  I was working in the Navy.

Q.  Sorry, I didn't hear you.  You have to speak right into that
microphone.

A.  I was in the Navy.

Q.  Okay.  Did there come a time when you learned about
compounded medications?

A.  Yes, sir.

Q.  When was that?

A.  I guess it would be some time in like December of 2014 time
frame.

Q.  And what happened?  How did you learn about it?

A.  I had a friend, her name was Sara, who I played beach
volleyball with and she knew that I had some injury somewhere on
my arm and she actually had -- came to me telling me about the
products with the scar cream and the topical steroid.

Q.  And did you apply to become a patient for those products?

A.  I did, yes.

Q.  Why specifically did you want the medications?  What was

1  wrong?

2  A.  So I used to play semi-pro beach volleyball and so my right

3  arm had some pretty bad issues when I used to play, so I

4  actually had gone to the Navy doctors and they had told me that

5  I needed to take six months off from playing all together.  So

6  in that time frame, I stopped working out, stopped lifting, I

7  lost about 15 pounds or so.  And also on my ankle, I had

8  actually twisted it when I was on the aircraft carrier which led

9  me to some physical therapy and stuff like that.

10        So when she pursued me with that and she said, hey, I

11  have a product that I think could be beneficial for you, you

12  know, to get you back on playing, it sounded like something that

13  just made sense to me.  And as far as scars, I had some scars on

14  my glutes I was a little bit self-conscious about, so that's why

15  I took those products.

16  Q.  I know you're nervous.  Let's talk a little bit slower for

17  the court reporter.

18        THE COURT:  Oh, she can get it, she can get it.

19        MR. RASHBAUM:  She's the best.

20        THE COURT:  So just ask questions.

21  BY MR. RASHBAUM:

22  Q.  Did you fill out any paperwork before getting those

23  medications?

24  A.  I'm sorry.  Can you repeat the question?

25  Q.  Did you fill out any paperwork when you applied for those

Green - Direct

1   medications?

2   A.  Yes, I did.

3   Q.  What kind of paperwork did you fill out?

4   A.  It was a questionnaire.  It was asking some basic

5   information that Tricare would need, and then also the location

6   of the pain, the scars and the products I would be taking.

7   Q.  And did you speak with anyone before obtaining the

8   medications?

9   A.  Yes.

10  Q.  Who did you speak to?

11  A.  There's two different calls that I had.  I don't remember

12  what was the order of them, but one was from a doctor who called

13  and verified the information that was on the sheet, to verify

14  that everything was correct.  Another one was from a Tricare

15  representative, same questions, you know, making sure that

16  everything was correct.  They would even ask questions like, you

17  know, where is the pain at, where is the scars.  And then also

18  asked, they also inquired towards the end of that, has anybody,

19  you know, said that they're going to give you money or

20  compensation for taking these products.  That was the questions.

21  Q.  And had anyone given you any money to apply and get those

22  products?

23  A.  No.

24  Q.  Why did you want the products?

25  A.  I needed them.  I thought they were beneficial.

Green - Direct

233

1   Q.  No, did the products work for you?

2   A.  Yes, they did.

3   Q.  Okay.  After the products worked for you, did there come a

4   time when you decided you might want to become a representative

5   selling those products?

6   A.  Yes.

7   Q.  Okay.  But when you got the products initially and when you

8   used the products, you were not selling the products, right, you

9   weren't a marketer?

10  A.  Correct.

11  Q.  You were just a patient, right?

12  A.  Yes.

13          MR. LARSEN:  Objection, leading.

14          THE COURT:  It is leading, but I'm going to overrule it

15  at this stage, but it's not an invitation to continue to lead.

16          MR. RASHBAUM:  Yes, Your Honor.

17  BY MR. RASHBAUM:

18  Q.  What happened when you decided you wanted to become a

19  marketer of these products?

20  A.  I had gone back to Sara and I had asked her, you know, what

21  if I wanted to be a rep, kind of like what you're doing, and she

22  pretty much said, you know, just let me go ahead and talk to

23  Monty, and then at that point everything, I guess, panned out.

24  I spoke to Monty, he kind of did an interview over the phone,

25  asked me, you know, what was --

1         MR. LARSEN:  Objection, hearsay.

2         THE COURT:  Whose statements are we talking about,

3  Mr. Rashbaum?  Who do you want to introduce, whose statement?

4         MR. RASHBAUM:  I don't want to introduce any statement.

5         THE COURT:  Okay.  Then I'll sustain the objection.

6  Next question.

7         MR. RASHBAUM:  I am showing you what's in evidence --

8  well, Defense Exhibit 120, I'd like to offer it into evidence

9         THE COURT:  Any objection to 120?

10        MR. LARSEN:  No objection, Your Honor.

11        THE COURT:  It will be admitted.

12    (Defendant's Exhibit Number 120 was received in evidence.)

13  BY MR. RASHBAUM:

14  Q.  Okay.  I'm showing you Defendant's Exhibit 120 and, you know

15  what, why don't we do this first.  Why don't you take a quick

16  look at it and then I will put it on the ELMO.

17  A.  Thank you.

18  Q.  This is an email on March 10, 2015.  Tell the jury, if you

19  remember, what this email is about.

20  A.  So it's me writing to Monty and just expressing that I had

21  done some research on the multivitamin and I even listed where I

22  got the information from and just some of the benefits that

23  were -- that, I mean, I really believed that it would be

24  beneficial for a lot of different types of people, people

25  suffering from, just based off of the research, different types

1    of brain malfunctions, people suffering from migraines,

2    muscular --

3    Q.  You don't need to read the document, but this was research

4    you did before becoming a marketer, correct?

5         THE COURT:  I'm sorry.  I didn't hear your answer.

6    What are we doing?

7         THE WITNESS:  This was research I had done, I think

8    when the products were introduced.

9    BY MR. RASHBAUM:

10   Q.  Fair enough.  Okay.  And ultimately, were you able to sign

11   up any other individuals?

12   A.  Yes.  There was one other individual that I signed up.

13   Q.  When you became a marketer, did Mr. Grow give you any

14   materials regarding these products, if you recall?

15   A.  Honestly, I don't remember.  I mean, I do remember doing a

16   lot of research, but I can't remember if anything came from him

17   specific.

18   Q.  Did he give you any tax information, 1099 forms, or anything

19   of that type?

20   A.  Yeah, that was actually all done before any of the

21   marketing.  He gave me a 1099 sheet to fill out.

22   Q.  Did there come a time after you became marketing the product

23   that you switched your tax situation or your employee situation?

24   And if so, tell the jury what happened.

25   A.  Yes.  So it was towards the last month -- I mean, I only did

1  it for about four months.  Towards the last month, it switched

2  from a 1099 to a W-2, which at that point there was a transition

3  to become employees of Patient Care America.  So it was just

4  normal, I guess what you would kind of do for every single

5  company that you kind of get hired for, the W-2 forms and also a

6  drug test.  I don't know if that's relevant but --

7  Q.  Did you ever use a survey to market this material?

8  A.  Can you explain to me what you mean by survey?

9  Q.  Well, did you ever offer people that you were marketing the

10  material to enter into a survey program?

11  A.  No.

12  Q.  Did you ever meet or hear of a woman named Ginger Lay?

13  A.  No, never heard that name.

14        MR. RASHBAUM:  May I have one moment, Your Honor?

15        THE COURT:  Sure.

16  BY MR. RASHBAUM:

17  Q.  I just want to make sure I understand your testimony.  You

18  signed up one other marketer, correct?

19  A.  Yes, sir.

20  Q.  Did you sign up any other patients?

21  A.  Yes.

22  Q.  How many patients did you sign up?

23  A.  I think it must have been somewhere between 25 to 30 or so.

24  Q.  So you signed up some people who didn't become marketers,

25  right?

Green - Cross

237

1   A.   Yeah, I mean, only one of them out of them, so almost -- I

2   mean, yeah, not very many.

3   Q.   Do you remember how much money you made with regard to this

4   marketing program?

5   A.   It was somewhere in the realm of, I think, maybe 19 to

6   21,000.

7   Q.   I just have one last question:  Did Monty Grow ever ask you

8   to do anything that you thought was illegal?

9   A.   No.

10          MR. LARSEN:  Objection, hearsay.

11          THE COURT:  Overruled.

12          MR. RASHBAUM:  No further questions, Your Honor.

13          THE COURT:  Cross-examination.

14                        CROSS-EXAMINATION

15  BY MR. LARSEN:

16  Q.   Good afternoon, Mr. Green.

17  A.   Good afternoon, sir.

18  Q.   You stated on direct that you got involved in this.  You

19  were a volleyball player, you had volleyball injuries out in San

20  Diego; is that right?

21  A.   Well, I mean, I played volleyball since I was in San Diego,

22  but this was in Jacksonville.

23  Q.   Excuse me, in Jacksonville.

24  A.   Well, the injury was in Jacksonville.

25  Q.   So the time that you got involved, you were living in

Green - Cross

1   Jacksonville?

2   A.   Yes, sir.

3   Q.   There's a large naval or medical base or medical facility on

4   every base; isn't that right, Mr. Green?

5   A.   The one I went to would be Mayport, there is one there, yes.

6   Q.   There's a large naval station, large medical facility at

7   Mayport, Jacksonville, isn't there?

8   A.   Yes, sir.

9   Q.   And did you go to the doctors at Mayport medical about these

10   injuries you just testified about?

11   A.   Yes, sir.

12   Q.   Okay.  And did you ask them for these pain medications that

13   you eventually signed up for?

14   A.   No.  At the time when I had gone in they had actually --

15   their recommendation was to take six months off, they gave me

16   some regular pain pills, something like Tylenol or something

17   along those lines just to ease the pain, but nothing really to

18   remedy the issue.

19         As far as the ankle is concerned, I was going to

20   physical therapy when I was on the ship, but when I transitioned

21   over to Mayport, that all subsided just because the daily

22   routine was kind of hectic, so it was kind of hard to fit that

23   in my schedule.  I kind of just figured that, you know, it was

24   just going to be an ailment that I would have for, you know,

25   long term.

Green - Cross

239

1    Q.  Oh, wait.  You're saying you were too busy to go to the

2    doctor?

3    A.  No, I didn't say that.

4    Q.  I'm sorry.  I just missed something you said about your

5    schedule.  I just want to make sure I understand.

6    A.  Yeah, I said that the schedule was hectic, so at that point

7    I kind of came to the conclusion that this was just going to be

8    something that I would just kind of have to deal with.

9    Q.  Oh, okay.  So when you came back and you had this continuing

10   pain problem, did you see your doctor on the base?  It's free,

11   isn't it, to go to the doctor?

12   A.  Yeah.  Well, taxpayers pay for it, but it's free to me, yes.

13   Q.  Okay.  Did you go and see a doctor on the base for follow-up

14   with these injuries?

15   A.  Yes, sir.

16   Q.  Did they prescribe you anything other than Advil or Tylenol?

17   A.  I don't really remember what it was, but it was a

18   prescription like for some type of pain remedy and they said

19   that if need be, that they would probably suggest surgery after

20   that time frame.

21   Q.  Okay.  Let's fast-forward to when you met Sara, and Sara

22   recommended these pain products to you; is that correct?

23   A.  Well, I had already known her but, yes, she did recommend

24   those products to me.

25   Q.  On direct you talked about speaking to a doctor.  Was that a

Green - Cross

1   man or a woman, do you remember?

2   A.  It was a male.

3   Q.  It was a male?

4   A.  On the phone?

5   Q.  The doctor that called you.

6   A.  Oh, I don't remember.

7   Q.  You don't know if it was a man or a woman?

8   A.  No.  I thought you were referring to my provider on the Navy

9   base.

10  Q.  The telephone doctor that called you.

11  A.  I don't remember if it was male or female, no.

12  Q.  You never were physically examined by that doctor, were you?

13  A.  No, it was a phone call.

14  Q.  So you testified at some point you decided to become a sales

15  rep for these products?

16  A.  Yes, sir.

17  Q.  Was it a pain cream, a scar cream and a vitamin product?

18  A.  Well, at first it was just pain cream and then the scar

19  cream and then the multivitamin was introduced later.

20  Q.  Okay.  Now, at the time you became a sales rep for these

21  products, you weren't experienced in pharmaceutical products at

22  all, were you?

23  A.  No, sir.

24  Q.  You didn't have any experience in marketing these products,

25  did you?

1   A.   Not like official training on them, no.

2   Q.   The defendant never trained you on marketing any of these

3   products or how they worked, did he?

4   A.   I guess training, no.   There wasn't like a training course

5   for it, no, sir.

6   Q.   He didn't train you, did he?   It's a yes or no question.

7   A.   Oh, I mean, there was not a training process for it, no.

8   Q.   In fact, it looks like you trained Monty.   In this email

9   that counsel showed you from March 10, 2015, you're talking

10   about the research that you did on these products and how you

11   believe that knowing the product would give us all an ability to

12   better market our product.   So you're training the defendant;

13   isn't that right?   That's what this email looks like.

14   A.   I mean that sounds somewhat presumptuous.

15   Q.   Is it yes or no?

16   A.   I mean, I don't know what he did and didn't know as far as

17   that's concerned.   I mean, he may have known that stuff.   In a

18   lot of conversations that we had via conference call, he would

19   explain some of those benefits that are listed on there, but I

20   personally took the initiative to take myself into a better role

21   to understand the products myself.

22   Q.   Why did you email him about the benefits of the vitamin if

23   you weren't telling him how it worked and about your research?

24   A.   Have you taken a look at the link?

25   Q.   I see the link.

Green - Cross

242

1  A.  It's countless, countless amount of pages that obviously I

2  wasn't sure if he knew everything on all those pages, but I felt

3  that it was a lot of benefit for anybody to know and it was

4  really more I felt that it could be given to the other reps as

5  well.  I just thought it was so beneficial.

6  Q.  Okay.  So you testified that you at some point became an

7  employee of this pharmacy, Patient Care America?

8  A.  Um-hum.

9  Q.  You didn't get any training from Patient Care America, did

10 you, on these products?

11 A.  No.

12 Q.  I'm sorry?

13 A.  No.

14 Q.  Did you get any training or you didn't get any training

15 from --

16 A.  We did get training as far as like HIPAA compliance.

17 Q.  Do you know what HIPAA is?

18 A.  Excuse me?

19 Q.  What's HIPAA?

20 A.  HIPAA compliance?

21 Q.  What is HIPAA?

22 A.  Well, it really goes based off of what needs to be secure

23 and what doesn't need to be secure.  So as far as documentation,

24 it ensures that you're not revealing sensitive information and

25 that you're not leaving loose-leaf papers that contain people's

Green - Cross

1   Social Security number or things of that nature.

2   Q.   Okay.   Now, did you receive training on their products, the

3   pain cream, the scar cream, the vitamin products, from Patient

4   Care America after you became an employee?

5   A.   Not that I remember, no.

6   Q.   Did you ever go to the pharmacy?

7   A.   No.

8   Q.   Isn't it true that the money that you received in your

9   paychecks from Patient Care America were really just money paid

10  to you for what you were doing for the defendant before the

11  conversion?

12  A.   Can you restate that again?

13  Q.   The money you received as an employee of Patient Care

14  America was really payment for what you were doing for the

15  defendant before you got hired, correct?

16  A.   I mean, I wouldn't jump to that assumption, no.   I mean,

17  it's one company to another company, so I went to a different

18  company and then they started paying me for the things that were

19  given to that company.

20  Q.   Were you actually going out in the field and bringing in

21  patients for Patient Care America?

22  A.   Yes.

23  Q.   Okay.   How many?   Can you name some names?

24  A.   I mean --

25  Q.   You mentioned 20 to 25 people that you brought in.   Just

1    give us some names of these people.

2    A.   I mean, there's Chantingua (phonetic), which is a guy that

3    was actually one of the reps.

4    Q.   He was a rep, right?  So he is another rep.  So you brought

5    in a patient who then became a rep to make money for himself?

6    A.   Yeah.

7    Q.   Okay.  Give us another name.

8    A.   There was Sean, who is also a military member who I worked

9    with.

10   Q.   Was he also a rep?

11   A.   No.  Only one out of the almost 30 were reps, sir.

12   Q.   Okay.  Some other names.

13   A.   There was Johnson and then his wife also, she had scars.

14   Q.   You signed up a husband and his wife?

15   A.   Yeah.  He had scars on his inner armpit from lifting and

16   then his wife had scars on her stomach from pregnancy.

17   Q.   Did Mrs. get paid for Mr.'s prescription, do you know?

18   A.   No.  I mean, I signed them up.

19   Q.   So you got paid for both of them?

20   A.   Correct.  I signed them up.

21   Q.   What was your percentage, do you know?

22   A.   Honestly, I don't remember what it was.

23   Q.   You made over $20,000; isn't that true?

24   A.   Yes, sir, about 21 or so I think; 19, 21, 20.

25   Q.   You're not working for Patient Care America anymore, are

 1   you?

 2   A.  No, sir.

 3   Q.  Do you know why you were let go?

 4   A.  Well, I am guessing that it wasn't beneficial for the

 5   company.

 6   Q.  Is it true --

 7   A.  That's usually why you let people go.

 8   Q.  Isn't it true you were told that Tricare stop paying for

 9   these products, and therefore, everyone was let go?

10   A.  Yeah.

11           MR. LARSEN:  Nothing further, Your Honor.

12           THE COURT:  Any redirect?

13           MR. RASHBAUM:  Just one question, Your Honor.

14                     REDIRECT EXAMINATION

15   BY MR. RASHBAUM:

16   Q.  Those patients that you brought on, none of these patients

17   got paid any money, right?

18   A.  No.

19           MR. RASHBAUM:  No further questions, Your Honor.

20           THE COURT:  Thank you, sir, have a good day, and thank

21   you for serving in the Navy.

22           THE WITNESS:  Thank you, sir.

23           THE COURT:  What say defense counsel?

24           MR. RASHBAUM:  We would call Sal Davila.

25           THE COURT:  Right over here, please, sir, your right,

Davila - Direct

246

```
 1   my left.  Thank you.  Raise your right hand, please.
 2              SALVADOR DAVILA, DEFENDANT'S WITNESS, SWORN.
 3              THE COURT:  Okay.  Have a seat and tell us your name
 4   and how you spell your last name.
 5              THE WITNESS:  Salvador Davila, last name, D-a-v-i-l-a.
 6              THE COURT:  Is that with a capital V, too?
 7              THE WITNESS:  No, sir.
 8              THE COURT:  Capital V or without?
 9              THE WITNESS:  No, sir.
10                         DIRECT EXAMINATION
11   BY MR. RASHBAUM:
12   Q.  Mr. Davila, where do you live?
13   A.  Pensacola.
14   Q.  What do you do for a living?
15   A.  I am a personal trainer.
16   Q.  Have you ever heard of a company called MGTEN?
17   A.  Yes, sir.
18   Q.  What is MGTEN?
19   A.  To my understanding, it was a company owned by Monty, and he
20   helped supply compounding medications.
21   Q.  Have you ever met Monty Grow?
22   A.  No, sir.
23   Q.  Did there come a time when you became a marketer for MGTEN?
24   A.  Yes, sir.
25   Q.  When was that?
```

Davila - Direct

247

1   A.  Roughly, I believe 2014.  I don't remember the month.

2   Q.  And how did you become introduced to MGTEN?

3   A.  It was introduced by a gentleman named Ryan Long.

4   Q.  And after you became introduced to it, what happened next?

5   A.  I did my research on it and decided to be a part of it.

6   Q.  And in what way did you become a part of MGTEN?

7   A.  Basically, looking for people that were interested in

8   compound scar creams and pain creams and vitamins.

9   Q.  And when you became a marketer for MGTEN, did you receive

10  any paperwork from Mr. Grow?

11  A.  I was supposed to be a 1099.

12  Q.  And did you fill out that paperwork?

13  A.  Yes, sir.

14  Q.  And ultimately, did you bring people in to the MGTEN

15  company?  Let me rephrase.

16       Did you find people to market the MGTEN products?

17  A.  No, sir.

18  Q.  Did you find patients for the MGTEN products?

19  A.  Yes, sir.

20  Q.  How many patients, give or take, did you find that needed

21  the MGTEN products?

22  A.  Roughly, give or take, maybe 20, 30.

23  Q.  Out of those 20 or 30 patients that you brought in to MGTEN,

24  did a single one of people, did any of those people become

25  marketers?

1    A.  No, sir.

2    Q.  How did you find the patients?

3    A.  Just asking around.

4    Q.  And did you ask around anyplace in particular?

5    A.  For me, mainly it was the gym that I was working at.

6    Q.  Did you ever get any complaints from the patients that you

7    brought in regarding not being --

8          MR. LARSEN:  Hearsay.

9          THE COURT:  You have to wait for the question.

10         Regarding what?

11   BY MR. RASHBAUM:

12   Q.  Did you ever get any complaints from the patients that you

13   brought in?

14         THE COURT:  What's the objection?  Now you state the

15   objection.

16         MR. LARSEN:  The objection is hearsay, Your Honor.

17         THE COURT:  How is that not hearsay?

18         MR. RASHBAUM:  I will move on.

19         THE COURT:  Sustained.

20   BY MR. RASHBAUM:

21   Q.  When you brought in patients, what did you tell them?

22   A.  It was a matter of just asking them if they had any pain or

23   if they had any scars that they might have wanted to almost

24   diminish or lighten; and if so, I was instructed to fill out an

25   intake form, so they would fill it out and I would submit it.

1  Q.  And did you pay any of these patients to get the products?

2  A.  No, sir.

3  Q.  Did you receive compensation from this marketing program?

4  A.  Yes, sir.

5  Q.  Did there come a time when your 1099 status changed to a W-2

6  status?

7  A.  Yes, sir.

8  Q.  And what do you recall about that?

9  A.  I want to say it was roughly around maybe 2015, we were told

10 by Monty that we were switching over to a W-2.

11         THE COURT:  Who told you that, do you remember?

12         MR. RASHBAUM:  The judge asked who told you that.

13         THE COURT:  Who told you that, do you remember?

14         THE WITNESS:  It was through a conference call.

15         THE COURT:  With whom?

16         THE WITNESS:  With Monty, along with some other people

17 that I don't know.

18         THE COURT:  All right.

19 BY MR. RASHBAUM:

20 Q.  And how much in total do you recall did you get paid by

21 MGTEN?

22 A.  Roughly, give or take, maybe 15, 20,000.

23         MR. RASHBAUM:  No further questions, Your Honor.

24         THE COURT:  Cross-examination, Mr. Larsen.

25                     CROSS-EXAMINATION

Davila - Cross

250

1    BY MR. LARSEN:

2    Q.  Good afternoon, Mr. Davila.  Davila?

3    A.  Davila.

4         THE COURT:  See, it was spelled wrong, that's why.

5    They separated it in two in a piece of paper.  That's why we

6    were confused.  My apologies.  Davila, with the accent on the

7    first A.

8    BY MR. LARSEN:

9    Q.  Mr. Davila, you just testified that you made about $15,000

10   out of this scheme; is that right?

11   A.  From MGTEN?

12   Q.  Oh, okay.  Was there a difference in -- how much did you

13   make total?

14   A.  I don't remember if I got paid by a pharmaceutical company

15   that we switched over when we went to W-2s, but if I did, it

16   would have been probably about a total of 30, 35.

17   Q.  Let me show what's been admitted in evidence as Government's

18   Exhibit Number 161.  Do you see your name here?  Is this you,

19   Salvador Davila?

20   A.  Yes, sir.

21   Q.  I apologize.  Does that refresh your recollection?  41,360,

22   is that what you got paid?  Sound about right?

23   A.  I mean, I don't remember but if --

24   Q.  Do you have any reason to dispute that?

25   A.  No, sir.

1  Q.  Now, so you stated on direct that you met or were introduced

2  to this program through your friend Ryan?

3  A.  Through Ryan.

4  Q.  Ryan at the gym; is that right?

5  A.  Yes, sir.

6  Q.  And you got what, six percent commission on anything you

7  referred; is that right?

8  A.  I don't recall the percentage.

9  Q.  You stated that you researched these products and you

10  decided you wanted to become a part of it.  Isn't it true you

11  did this because you wanted to make money?  Isn't that true?

12  That's the reason you decided to become a part of this?

13  A.  That would be a part of it, yes, sir.

14  Q.  And the primary thing that you needed to know to be a part

15  of this was people with Tricare; isn't that true?

16  A.  Correct.

17  Q.  If you didn't know anybody in Tricare this was a dead-end

18  deal; isn't that right?

19  A.  I guess so, yes, sir.

20  Q.  And you never received any training on these products, did

21  you?

22  A.  No, sir.

23  Q.  You testified that you were looking for people that might

24  benefit from these products, but you didn't know anything about

25  these products, did you?

Davila - Cross

252

1  A.  I read up on them a little bit on a pamphlet that was given

2  to me.

3  Q.  Who gave you the pamphlet?

4  A.  I don't recall if it came from Ryan or from Monty.

5  Q.  You don't have any medical or marketing background, do you?

6  A.  No, sir.

7  Q.  And like you said, you weren't looking for people that

8  didn't have Tricare; isn't that right?

9  A.  That's correct.

10  Q.  Because nobody was going to pay $5,000 for a 30-day supply

11  of vitamins; is that right?

12  A.  If that's how much they were then, yeah, that would be

13  correct.

14  Q.  Would you pay $5,000 for a 30-day supply of vitamins?

15  A.  Probably not.

16  Q.  Would you pay $17,000 for a tube of scar cream?

17  A.  Probably not, but I don't have that kind of money.

18  Q.  Did you know how much these products cost?  You didn't know?

19  A.  No, sir.

20  Q.  Well, wasn't the main issue that you were paid on how much

21  these products cost?  You knew how much you were going to get

22  paid, right?

23  A.  I just knew that I was going to get paid on these products.

24  Q.  Okay.  So the more people with Tricare you find, the more

25  money you make, right?

1    A.  Correct.

2    Q.  Did you know that the defendant was selling products to the

3    pharmacy?

4          MR. RASHBAUM:  Objection, Your Honor, outside the scope

5    of direct.

6          THE COURT:  Overruled.  Go ahead.  You can answer the

7    question.

8          THE WITNESS:  I'm sorry.  Could you repeat that?

9    BY MR. LARSEN:

10   Q.  Did you know whether or not the defendant was selling

11   products to the pharmacy that was dispensing these creams?

12   A.  No, sir, I did not know that.

13   Q.  Did you know that the defendant was using telemedicine

14   doctors that he was paying to issue the prescriptions?

15   A.  No, sir, I did not know that.

16   Q.  Did you know that the patients were not seeing the doctors

17   that you were referring?

18   A.  Yes, sir.

19         MR. LARSEN:  That is all I have, Your Honor.  Thank

20   you.

21         THE COURT:  Redirect.

22         MR. RASHBAUM:  I have no further questions, Your Honor.

23         THE COURT:  Thank you, sir.  You are excused,

24   Mr. Davila.

25         (The witness was excused.)

Grow - Direct

1              THE COURT:  What say you?

2              MR. RASHBAUM:  Judge, may we have one moment?

3              THE COURT:  Sure.

4              MR. RASHBAUM:  Judge, we'd like to put in some

5    recordings of the defendant.

6              MR. JUENGER:  Objection, hearsay, Your Honor.

7              THE COURT:  Do you have any witnesses?

8              MR. RASHBAUM:  Judge, our next witness -- Monty Grow

9    will be our next witness, Your Honor.

10             THE COURT:  Okay.  Call him on the stand, if that's

11   what he wants to do.  He doesn't have to.

12             Raise your right hand, please, sir.

13             MONTY RAY GROW, DEFENDANT HEREIN, SWORN.

14             THE COURT:  Okay.  Have a seat and tell us your name,

15   please.

16             THE WITNESS:  Monty Grow.  M-o-n-t-y, G-r-o-w.

17             THE COURT:  Thank you, sir.

18                         DIRECT EXAMINATION

19   BY MR. RASHBAUM:

20   Q.  Good afternoon, Mr. Grow.

21   A.  Good afternoon.

22   Q.  How old are you?

23   A.  46.

24   Q.  Where are you from?

25   A.  I grew up in Inverness, Florida.

Grow - Direct

255

1  Q.  Tell me a little bit about your family.  Are you married?

2  A.  I am single.  I have a seven-year-old daughter.

3  Q.  How far did you go in school?

4  A.  I graduated from the University of Florida.

5  Q.  What years, if you recall, were you at the University of

6  Florida?

7  A.  I was there from 1989 to 1993.

8  Q.  What did you do after attending the University of Florida?

9  A.  I played professional football for the Kansas City Chiefs

10  and the Jacksonville Jaguars.

11  Q.  What position?

12  A.  I was a defensive back.

13  Q.  How long were you in the NFL for?

14  A.  Two years.

15  Q.  Why such a short career?

16  A.  I suffered a knee injury that ended my career.

17  Q.  After your football career, what did you do?

18  A.  At first, I did some real estate investing through my mother

19  who is a real estate broker, and at some point in time I took a

20  job with a company called Precision Orthopedics in Tampa,

21  Florida.

22  Q.  And what did Precision Orthopedics do?

23  A.  They sold orthopedic implants such as total knee

24  replacements, total hip replacements, arthroscopy equipment,

25  sports medicine things for things like ACL repairs, rotator cuff

Grow - Direct

1    repairs, things like that.

2    Q.   Who did they sell this equipment to, patients or to doctors?

3    A.   We called on physicians.  We would go into physician offices

4    and show them our different equipment, our implants, the

5    features and benefits of those; and if they chose to use those

6    on those particular patients, then they would.

7    Q.   How were you paid at Precision?

8    A.   I was paid on commissions.  So I was 100 percent commission.

9    Q.   After working at Precision Orthopedics -- I think you said

10   you were there until around 2005 -- what did you do next?

11   A.   Well, it was suggested by a physician that I stop working

12   for them because I was suffering from a lot of stress, extremely

13   high blood pressure and whatnot.  So he requested that I take

14   some time off.  So I actually wasn't doing much.  I was

15   investing.  So I did invest in a company called Community Oxygen

16   & Medical, which is a durable medical equipment company, with a

17   partner of mine named Laurene Holder.

18   Q.   And that was the woman who testified here yesterday, I

19   believe?

20   A.   Yes.  At that point in time her name was Laurene Holder.  I

21   believe she went back to her maiden name, Laurene Long.

22   Q.   What did Community Oxygen & Medical do?

23   A.   They sold durable medical equipment, things like

24   wheelchairs, walkers, things like that, as well as oxygen

25   supply.

1  Q.   And what was your role at this company?

2  A.   My goal was hopefully that it would be successful and I

3  could essentially earn a living off of the income that it was

4  able to bring in.  I was not really an active participant in it.

5  Our agreement was that we were 50/50 owners, and Ms. Holder

6  would help in running the business with a consultant that we had

7  hired to be our kind of CEO and run the day-to-day operations.

8  Q.   How much did you invest in Community Health?

9  A.   I believe overall it was approximately $180,000.

10 Q.   And did there come a time when you sold your interest in the

11 company?

12 A.   I did.  I believe that was in 2010.  I had received some of

13 my investment back and then I was -- my shares were purchased

14 from Ms. Holder and another investor I believe for about 210,

15 $220,000.

16 Q.   So you made a little bit of money in the company?

17 A.   I did.

18 Q.   Now, I'm showing you what's in evidence as Government's

19 Exhibit 2.  Do you recall seeing this document in court

20 yesterday?

21 A.   I believe so.

22 Q.   Let me just --

23           MR. RASHBAUM:  May I approach, Your Honor?

24           THE COURT:  Sure.  Permanent permission to approach all

25 witnesses.

1          MR. RASHBAUM:  Thank you, Your Honor.  I appreciate it.

2   BY MR. RASHBAUM:

3   Q.  Just take a quick look through to make sure that it's the

4   document that you saw.

5   A.  I believe it is, yes.

6   Q.  And is this a document that you signed while at Community

7   Health?

8   A.  I think the document was signed when we first started.  It

9   was a requirement.

10  Q.  And this would be your signature here?

11  A.  Yes, it is.

12  Q.  And the document is around 40 pages long, 39 pages long?

13  A.  It looks to be that, yes.

14  Q.  Now, when you signed this document -- do you have any

15  particular memories about it?  Was it a big moment in your life?

16  A.  I don't recall seeing it really or -- you know, not really.

17  Q.  Do you recall why you had to sign this document?

18  A.  I was told by our CEO who was running the business --

19          MR. JUENGER:  Objection, hearsay, Your Honor.

20          THE COURT:  Overruled.  State of mind exception.

21  A.  -- that it was required for anybody who owned more than 5

22  percent of the company, that they're required to sign those

23  forms.

24  Q.  When you signed this document -- and it talks about in here

25  Medicare laws, talks about the Federal Anti-Kickback Statute and

Grow - Direct

1   the Stark law -- were you provided with any additional

2   information about this stuff?

3   A.  No, I was not.

4   Q.  Were you given any training on this information?

5   A.  No, I was not.

6   Q.  Mr. Grow, what's your degree in?  Did you get a degree from

7   the University of Florida?

8   A.  I did.  I graduated with a degree in physiology.

9   Q.  Do you have a law degree?

10  A.  I do not.

11  Q.  So when you signed this, do you even recall reading all of

12  this stuff?

13  A.  I do not.

14  Q.  But nonetheless, you signed it on February 1, 2005, correct?

15  A.  Yes.

16  Q.  And when you signed this document, did you know whether you

17  were signing -- whether the document was referring to civil laws

18  or criminal laws?  Any idea about that?

19  A.  I had no idea.

20  Q.  After working at Community Health -- or I shouldn't say

21  working.  After investing in Community Health, what did you do

22  next?

23  A.  I actually started doing some consulting work for a company

24  called InforMD Solutions out of Louisiana, Baton Rouge.

25  Q.  And what was InforMD?

Grow - Direct

260

1               I'm going to call it InforMD for short, okay?

2               What was InforMD?

3  A.   InforMD was a company who basically was a marketing group,

4  and they had different products that they marketed to

5  physicians.

6  Q.   Did they market to patients as well or just physicians?

7  A.   Just physicians.

8  Q.   And how big was InforMD?

9  A.   At that point in time, I believe they probably had 30 to 40

10 marketers.

11 Q.   Now, I'm fast-forwarding a bit, but at a later point in time

12 when you worked for them again, did they get much larger?

13 A.   Yes, actually, when I was reapproached by them in 2014, at

14 that point in time they said that they had approximately 3,000

15 marketers across the country.

16 Q.   Okay.  Now, let me bring you back to your first time at

17 InforMD.  How long did you stay at InforMD that first time?

18 A.   I think I marketed for them approximately six or eight

19 months.

20 Q.   And were you successful in your marketing for them?

21 A.   I was.

22 Q.   Why did you decide to leave?

23 A.   I was marketing a product for them which is called Physician

24 Dispensing.  It's basically for physicians who see workers'

25 compensation patients within their practice; and with this, it

1    allowed the physician to be able to write prescriptions and fill

2    them from their office, that way they can ensure that the

3    workmen's compensation patients were actually receiving their

4    medications.

5    Q.   And did there come a time that you left InforMD?

6    A.   Yes, I did.

7    Q.   And why did you leave?

8    A.   What happened was there was several, I guess, law changes,

9    things like that, that occurred which really changed the whole

10   business structure for physicians to be able to dispense

11   medications out of their office.  It had a lot to do with

12   opioids and things like that.  They couldn't write certain

13   prescriptions out of their office anymore.  So really the

14   business was not viable anymore.

15   Q.   But you made good money at InforMD when you were there,

16   correct?

17   A.   I did.

18   Q.   Now, after leaving InforMD, what did you do next?  Did you

19   have another business venture?

20   A.   I did.  I started a business with my brother called

21   Grow-Chem.

22   Q.   And tell us a little bit about that venture.

23   A.   So that company was a company -- we sold agricultural

24   products, and we basically focused on products for citrus

25   growers and I started the company with my brother, although

Grow - Direct

262

1   really I was running everything, and I moved to Stuart, Florida

2   and opened up an office in Okeechobee.

3   Q.   And how did that company do?

4   A.   We started out very well.  I think I profited maybe $420,000

5   in the first month and a half, two months.

6   Q.   And what happened over time to that company?

7   A.   Unfortunately, the weather wasn't very good to us that year

8   and the citrus growers that we were calling on had a bad freeze

9   and so they lost most of their crops.  And our business

10  structure, the way that we marketed our products, really kind of

11  took the advantage away from us because the international ad

12  companies that we were competing against were able to make --

13  they were able to make financing agreements with the citrus

14  growers so they could finance the cost of their products over a

15  course of time because they had lost all their crops.  We were

16  not able to compete with giving those types of terms over a long

17  course of time.  So it really destroyed our business model.

18  Q.   But you were still able to make a decent amount of money in

19  that venture, correct?

20  A.   420,000 in a couple of months, yes.

21  Q.   Now, after this chemical, Grow chemical company, what

22  happened next?

23  A.   After we shut down the company, I moved from Stuart back to

24  Pinellas County, which is like St. Petersburg, Clearwater area.

25  Q.   And what did you do when you moved back to the Clearwater

1  area?

2  A.   Initially, I didn't do anything.   I was having some health

3  issues.   So I kind of took time off.   I had a newborn baby who

4  was, you know, approximately eight months old at the time, and

5  so really I was staying home with her and trying to get better.

6  Q.   And did you go back to school at that point in time and get

7  your degree?

8  A.   I did.   When I originally left the University of Florida to

9  go play for the Kansas City Chiefs, I had not graduated from

10  college yet, and so I used that time that I was not employed, I

11  used that time to finish my classes online and I was able to get

12  my degree at that point in time.

13          MR. RASHBAUM:   May I have one moment, Your Honor?

14          THE COURT:   Sure.

15  BY MR. RASHBAUM:

16  Q.   Now, I think throughout this trial you've seen the

17  Government has introduced Government's Exhibit 168.   What is

18  this?

19  A.   That's my current home.

20  Q.   Okay.

21          THE COURT:   Is there an exhibit number or part of the

22  Government's or what?

23          MR. RASHBAUM:   It's already in evidence, Your Honor.

24  It's Government's Exhibit 168.

25          THE COURT:   Okay.   Thank you.

Grow - Direct

1  BY MR. RASHBAUM:

2  Q.  Is that your current home?

3  A.  Yes.

4  Q.  Now, going back to this time before you even had MGTEN and

5  we've heard how you made considerable wealth at MGTEN -- I'd

6  like to put into evidence now Defendant's Exhibit 201.

7        MR. RASHBAUM:  I don't think there's an objection, Your

8  Honor.

9        MR. JUENGER:  No objection, Your Honor.

10        THE COURT:  Okay.  No objection to 201.

11        MR. RASHBAUM:  Yes, this is Defendant's Exhibit 201.

12        THE COURT:  Okay.

13    (Defendant's Exhibit Number 201 was received in evidence.)

14  BY MR. RASHBAUM:

15  Q.  Can you tell the jury what Defendant's Exhibit 201 is?

16  A.  That was a previous home of mine I believe in maybe the

17  years 2004 to 2009, something like that.

18  Q.  Is it fair to say that before even founding MGTEN, you had a

19  considerable amount of wealth in part from your football career

20  and from the prior companies that you had worked with?

21  A.  I would consider myself successful.

22  Q.  Now, taking you further through the chronology --

23        MR. RASHBAUM:  May I have one moment, Your Honor?  I'm

24  sorry.

25        THE COURT:  Sure.

1        MR. RASHBAUM:  I am losing my mind.

2   BY MR. RASHBAUM:

3   Q.  Did there come a time when you started to feel a little bit

4   better and decided it's time to go back to work?

5   A.  I wouldn't really call it as feeling better, but I did feel

6   like it was time to go back to work, yes.

7   Q.  And so in early 2014, what did you do?

8   A.  In early 2014, I was approached by a man named Rick

9   Massengale who owned the company InforMD Solutions that I

10  previously worked for.

11  Q.  And did Mr. Massengale hire you back to work again for

12  InforMD?

13  A.  He did.  He offered me a position to market the compounding

14  prescriptions for him and his company.

15  Q.  And when you say compounding prescriptions that you were

16  going to be marketing for InforMD, tell the jury specifically

17  what you're talking about.

18  A.  Basically, what we would do -- I had worked with InforMD

19  Solutions previously and Rick Massengale was the owner of the

20  company.  He knew that I had previous sales experience calling

21  on physicians.  So he asked me if I would like to, you know, get

22  involved and reach out to some of the physicians that I

23  previously had worked with and see if the compounding

24  prescriptions would be something that they would like to have in

25  their practice for their patients.

Grow - Direct

1   Q.   And so in InforMD, just to be clear, were you marketing to

2   patients?

3   A.   No, I was not.

4   Q.   Who were you only marketing to?

5   A.   To physicians.

6   Q.   And what did you find would happen when you were marketing

7   to -- what did you find would happen when you marketed to those

8   physicians?

9   A.   Well, when Mr. Massengale first approached me about

10  marketing the products, he told me a little bit about them and

11  explained to me that these were medications that, you know,

12  could benefit patients because they were non-narcotic, they were

13  non-toxic, and they were an alternative to opioids, so that

14  physicians, you know, were really liking the products because it

15  gave them another solution.

16       So I reached out to a couple of physicians that I had

17  worked with, you know, years past when I was in the orthopedic

18  business; and they confirmed that they were already writing

19  these prescriptions in their practice, they were using them, and

20  they had good success with them.

21       So I also -- what I did was I reached out to several

22  other friends of mine that were current sales representatives

23  for Precision Orthopedics, the old company that I used to work

24  for, and I asked them if they would reach out to some of their

25  physicians and ask them if they were currently using the

1    products and what type of experience they had with those.

2    Q.  Did you learn anything about a program called Tricare while

3    working at InforMD?

4    A.  I did.

5    Q.  What did you learn about Tricare?

6    A.  When Mr. Massengale first started talking to me about

7    compounding, what it was and things like that, he informed me

8    that some insurances at that point in time were paying for the

9    medications, some weren't.  But he singled out that Tricare was

10   the best payer because a lot of the other insurance companies,

11   depending on what type of plan you had -- there are so many

12   different plans, you know, with Blue Cross Blue Shield or Aetna,

13   different things like that -- sometimes they might get approved,

14   sometimes they wouldn't.  And he said that Tricare would always

15   get approved if a doctor, you know, wrote a prescription.

16   Q.  Now, in the beginning when you were working at InforMD, it

17   was more than Tricare paying for these compound pharmaceuticals,

18   correct?

19   A.  That's correct.

20   Q.  And some private insurances were paying for them as well; is

21   that fair to say?

22   A.  Yes, yes.

23   Q.  With regard to all of the payments made by any of these

24   insurance companies, did you have anything to do with how much

25   these insurance companies would reimburse for the particular

1  products?

2  A.   No, I had no control over that.

3  Q.   Did you have anything to do with setting the price for these

4  products?

5  A.   No.

6  Q.   Did you have anything to do with submitting claims for any

7  of these products?

8  A.   No.

9  Q.   Now, I think you said when you were back in InforMD, you

10  would market the products directly to doctors.  Did you find

11  that to be easy or difficult?

12  A.   It was difficult.  It wasn't because the doctors didn't want

13  to use it.  The problem was -- for me, it's that they were

14  already using it.  So pretty much every physician that I was

15  going to already had a current relationship with another

16  salesperson who had been coming to their office and providing

17  them with the compounding services.

18  Q.   And so --

19        THE COURT:  All right.  Let me interrupt you.  It's

20  close to 6:00.  I take it you're probably not finished, right?

21        MR. RASHBAUM:  No, Your Honor.

22        THE COURT:  How long do you think you'll be?  I'm not

23  limiting you.  I'm merely inquiring.

24        MR. RASHBAUM:  I'm really not sure, but it will be

25  awhile.

1      THE COURT:  All right.  So what I'm going to say is I'm

2  going to send you home.  It's still light out.  And remember,

3  tomorrow morning you can sleep in.  We'll start at 10:30.  So

4  Shirley Christie will take you to the jury room and then we've

5  got my old courtroom back.  This has been a fine courtroom, and

6  I'm happy that Judge Graham allowed me, but we'll be back.

7      So take your notebooks and all your belongings.  If you

8  left anything in this jury room, take it with you to the other

9  jury room, okay?

10      Don't talk about it.  Don't look at anything about it.

11  Don't google.  All right?  You know.  See you tomorrow, 10:30.

12      THE COURT SECURITY OFFICER:  All rise.

13  (The jury retired from the courtroom at 5:57 p.m.)

14      THE COURT:  All right.  Sir, you may sit down with your

15  lawyers, please.  Thank you.

16      MR. RASHBAUM:  May I sit down, Your Honor?

17      THE COURT:  Sure.

18      MR. RASHBAUM:  Thank you.

19      THE COURT:  Okay.  All the jurors have left.  Are you

20  going to call any other witnesses in this case?

21      MR. RASHBAUM:  It kind of depends, but probably not,

22  but, you know, I don't want to commit to that.

23      THE COURT:  Well, who would you call?  How about

24  telling your opponent?

25      MR. RASHBAUM:  No, I don't mind telling him.  I really

1    wouldn't know until after Mr. Grow is crossed.

2              THE COURT:  All right.

3              MR. RASHBAUM:  But again, Judge, in all candor, I hope

4    to not call anyone else.

5              THE COURT:  All right.  Did you all get a chance to do

6    anything with the jury instructions?  Do you remember those

7    sheets after Rule 29?

8              MR. LARSEN:  Judge, I looked at them over lunch.  I had

9    a couple of small changes.

10             THE COURT:  Okay.  Any big things?

11             MR. LARSEN:  No.  Just some typos and --

12             THE COURT:  Okay.  All right.  Cut out the sheets.

13             How about from the defense?

14             MR. MARCUS:  We'll be submitting some additional

15   instructions.

16             THE COURT:  No, that's not what I asked.  That's not

17   what I asked.  You've got that until tomorrow.  What about

18   problems with it?

19             Cut out the sheet that you don't like with your

20   changes.  You be the judge, see, for a little bit.

21             MR. MARCUS:  Sure.  Well --

22             THE COURT:  No, just cut it out and give it to me.  You

23   don't have to talk.  Just write; write, w-r-i-t-e.  Remember?  I

24   think I said that.

25             Okay.  So whatever changes you think should be made.

1          MR. MARCUS:  There are some substantive --

2          THE COURT:  Whatever changes, write them in with pen,

3   pencil, whatever it is.  Whatever you don't like.  You know,

4   cross it over, delete it, say it doesn't include this, whatever

5   it is and then rip out those pages and give it to me and we will

6   be ahead of the game.  Assuming the defendant continues to

7   testify -- I assume he will, and he'll be crossed.

8          If the Government is going to have any rebuttal, you

9   should have it tomorrow afternoon --

10         MR. JUENGER:  We'll be prepared, Your Honor.

11         THE COURT:  -- okay, which means we won't have the

12  closing arguments.  We'll have the charge conference tomorrow

13  and you can prepare over the weekend for your closing arguments

14  on Monday morning.  Okay?

15         How long does the Government want for closing argument?

16         I am sitting down, so you can say.

17         MR. JUENGER:  90 minutes, Your Honor.

18         THE COURT:  90 minutes.  How do you want to break up

19  your 90 minutes?  Emphasis added by the court reporter.

20         MR. JUENGER:  I'll talk slow.  60/30.

21         THE COURT:  Oh, my goodness.  How about the defense?

22         MR. RASHBAUM:  Judge, we won't go 90 minutes, but we'll

23  ask for 90 minutes as well.

24         THE COURT:  You know --

25         MR. RASHBAUM:  There's no chance we'll go 90 minutes.

1          THE COURT:  -- only one time did a lawyer, in all the

2   trials I've had, did a lawyer say, I don't need that much time,

3   as my opponent.  I can do this in 40 minutes, 30 minutes, and I

4   thought maybe you were going to be the second one, but you're

5   not.

6          MR. RASHBAUM:  I'm not that unique.

7          THE COURT:  No.

8          MR. RASHBAUM:  Judge --

9          THE COURT:  All right.  So that will be some time

10  Monday, and then the jury can decide.  No big deal.

11         MR. JUENGER:  Your Honor, can I just inquire?  Having

12  not tried a case before you, do you allow us to split the

13  closing so that one of us --

14         THE COURT:  You do split the closing.  You do.  Don't

15  you?  Oh, yeah.  Other judges don't allow you to do that?

16         MR. JUENGER:  Some don't.

17         THE COURT:  Really?  Which ones, just for my

18  information.  There's nothing wrong with that.  I'm just

19  curious.

20         MR. JUENGER:  Offhand, I can't recall.  And then

21  different judges have rules about the rebuttal close can't

22  exceed twice the -- whatever.

23         THE COURT:  Well, you know, the theory of it is -- it's

24  not really a time thing.

25         The theory is that two prosecutors have been fighting

1    internally about who gives the opening, who does what witness,

2    who does what cross, because they're usually type A

3    personalities, like the defense lawyers, too.  So I don't know

4    how they decide; seniority, flip of the coin, who worked harder,

5    who started the case, however those things are done.

6         So what ends up happening is sometimes the individual

7    who gives the opening statement actually gives a closing

8    argument.  I've seen that.  And then when we have the closings,

9    the rebuttal doesn't become a rebuttal.  It becomes the closing

10   argument that the person wanted, which has probably driven some

11   judges to have these rules.

12        I don't have one.  I'm going to trust you all, but the

13   rebuttal has to rebut.  So that's why generally we can't have

14   someone say, 10 minutes for opening, an hour and a half for

15   rebuttal.  Obviously, we can't have that because there's no way

16   you would need that much time to rebut.  So as long as their

17   rebuttal is to rebut -- sometimes it's the most exciting part of

18   a closing argument.  You just get down to it without the

19   beginning.  I don't have rules about that.

20        So, of course, you can split it.  There are two of you.

21        MR. JUENGER:  Thank you, Your Honor.

22        MR. RASHBAUM:  And Judge, can Mr. Marcus and I split

23   our closing argument?

24        THE COURT:  You know, I don't see that that often, but

25   what's sauce for the goose should be sauce for the gander.  I

 1  have no problem with that as long as it doesn't exceed the time,

 2  and you all agree among yourselves.  It doesn't bother me.  It

 3  doesn't bother me.

 4          MR. RASHBAUM:  Thank you, Your Honor.

 5          THE COURT:  Does it bother other judges?

 6          MR. RASHBAUM:  Not so far, but --

 7          THE COURT:  Okay.  No, I think that's only fair, if you

 8  want, you know, as long as it doesn't get too disjointed.  If we

 9  started having three or four, and then the defendant would have

10  to -- the client would have to decide eventually.  It can't be

11  like that.  But I don't have any problem.  I don't even care if

12  it's repetitious thinking that it inures to the detriment of the

13  person who's repeating.  So there's no point arbitrarily giving

14  you a time limit in closing that is less than what you've asked

15  for when we always have delays in a trial.  So I've never been a

16  believer of that.

17          I will tell you, look at the jurors.  90 minutes is --

18  you know, unless they are recent Cuban arrivals who were forced

19  to listen to Fidel Castro, it's just a long time.  But I'm sure

20  it will be more valuable than anything that Fidel Castro said in

21  his life.  Okay?

22          MR. RASHBAUM:  Judge -- sorry.

23          THE COURT:  What else?

24          MR. RASHBAUM:  I just wanted to --

25          THE COURT:  I think we've killed the five minutes.

1    That's my intention.

2          MR. RASHBAUM:  We all know this, but I'm going to put

3    in almost all of our exhibits through Mr. Grow.

4          THE COURT:  Okay.  Are you going to have any objections

5    to the exhibits, realizing the state of mind exception is really

6    applicable to a defendant?

7          MR. JUENGER:  It sure is, and I probably will not

8    object to anything.

9          THE COURT:  So what I'm going to let you do, you can

10   meet tonight.  You prefer meeting tomorrow morning?

11         MR. RASHBAUM:  I'll send him an email and I'll just

12   tell him all the exhibits.

13         THE COURT:  Do it however you want, but what I want you

14   to do is get here, get to my courtroom a little bit more 10:30.

15   I have a suspicion the juror is going to be late, since he's

16   been late twice, and he can blame the doctor, so we should have

17   time to do that.  But what I expect is to do it simply.

18         You tell me what the exhibits are, the numbers; and if

19   I don't hear anything from the Government on the defense

20   exhibits, they're in.  If there's an objection to something,

21   then yes, and then we can talk -- cross-examination is wide

22   open.

23         The only issue I had, and I probably should have

24   presented it before, because the defendant mentioned his family

25   which he is entitled to do, but I suspect the Government does

Jury Trial

276

1    not intend to cross-examine on an alleged incident regarding his

2    child, are you?

3              MR. JUENGER:  Never even crossed my mind.

4              THE COURT:  Okay.

5              MR. RASHBAUM:  We discussed that, yes.

6              THE COURT:  Okay.  I just didn't know about it.  I

7    didn't know whether you thought opening the door was a little --

8    you've got to be careful because some judges might think talking

9    about that, assuming it's the same child, I don't know if it's

10   the same child -- that that might open the door, if you've used

11   something for the benefit.  I don't think it's appropriate and,

12   under 403, I would probably exclude it; but then I don't want to

13   hear about it anymore, nor in closing, because it has nothing to

14   do with it, the family.  All right?

15             MR. RASHBAUM:  Judge, sorry, one last thing.  We would

16   like to play recordings through Mr. Grow.

17             THE COURT:  So the defense wants to play recordings of

18   Mr. Grow that were taken by whom?

19             MR. RASHBAUM:  By the Government.

20             THE COURT:  By the Government.  Wow.  You all really

21   have just switched this thing, and the Government is going to

22   agree or object to the Government's recordings of the defendant?

23             MR. JUENGER:  I don't disagree that the recordings --

24             THE COURT:  No, no, I just want to know if you're going

25   to object.

1      MR. JUENGER:  Well, it could come in as a --

2      THE COURT:  No, no, I just want to know if you're going

3  to object.  If you're not going to object --

4      MR. JUENGER:  Can I just reserve on whether I object

5  until tomorrow?  I just need to think about it.  I haven't

6  actually heard the recordings.  So I'd like to listen to them

7  first.

8      THE COURT:  Okay.  You should listen to the

9  Government's recordings of the defendant.

10     MR. JUENGER:  Someone has.  It just hasn't been me.

11     THE COURT:  Well, then he should tell you what they

12  say.  I suspect it's something exculpatory, because, if not, the

13  defense wouldn't bring it in.  Even though it's technically

14  hearsay because, you know, the state of mind exception is so

15  wide open, I probably wouldn't risk it.  But unless there's

16  something said or if he knew he was being recorded or, you know,

17  something, I don't know --

18     MR. RASHBAUM:  I will do it towards the end.

19     THE COURT:  How long are these recordings?

20     MR. RASHBAUM:  I've got to look, Your Honor.  They are

21  not short.

22     THE COURT:  More or less.

23     MR. RASHBAUM:  Like 30 minutes each.

24     THE COURT:  Oh, my goodness.  Oh, my goodness.

25     MR. RASHBAUM:  They're shorter.  They're shorter.

1    Don't listen to me.

2         THE COURT:  Maybe the thing to do is see how the

3    cross-examination is, and if there are prior consistent

4    statements, they come in as prior consistent statements.

5         MR. RASHBAUM:  I would just be afraid that they

6    wouldn't come in in redirect but we'll --

7         THE COURT:  Well, I have a feeling he's going to be

8    attacked on cross-examination --

9         MR. RASHBAUM:  He might be.

10        THE COURT:  -- by cross.  Yeah, so that's going to

11   happen, but I don't know.

12        MR. RASHBAUM:  That might be a good compromise, Your

13   Honor.

14        MR. JUENGER:  Your Honor, just going back --

15        THE COURT:  I want to go forward.

16        MR. JUENGER:  I know.  I hate to backtrack.  In a way

17   it's going forward.

18        As to the issue of Mr. Grow's incident with his child,

19   I --

20        THE COURT:  I thought you said it never even crossed

21   your mind.  I shouldn't have even brought it up.

22        MR. JUENGER:  No, no, it didn't cross my mind to

23   inquire into the matter, but I could see how something relevant

24   could come out of that, because this whole issue about having

25   access to lawyers and did you get advice, et cetera, I think it

1   would be --

2         THE COURT:  Oh, you think a criminal defense lawyer --

3         MR. JUENGER:  I think it would be fair --

4         THE COURT:  -- in a child abuse case gave him Tricare

5   advice?

6         MR. JUENGER:  No, absolutely not, but I think it would

7   be fair to simply establish a fact which he probably will not

8   deny, that he had access to lawyers.  He could have found a

9   lawyer for himself and, clearly, he could have.  I don't know

10  that he would deny that, but if he tried to deny that some way,

11  it would certainly be fair to say, you have had lawyers in that

12  time period.

13        THE COURT:  If you ask him, you had access to lawyers

14  if you wanted to --

15        MR. JUENGER:  Correct.

16        THE COURT:  -- didn't you?

17        MR. RASHBAUM:  His answer will be yes.  His answer will

18  be yes.

19        THE COURT:  There you go.  See, there you could ask

20  leading questions.  See how they are?

21        MR. JUENGER:  Yes, I do.  I like them.

22        THE COURT:  You've all practiced leading questions so

23  well on direct, you should be able to do it on cross.

24        All right.  Anything else I can help you with?

25        Sleep in tomorrow or prepare.  Do what you want.  See,

Jury Trial

280

1   I'm not rushing you that much.  You start at 10:30.  What's the

2   complaint?  Okay?

3           THE COURT SECURITY OFFICER:  All rise.

4           THE COURT:  All right.  Have a good afternoon.

5           MR. RASHBAUM:  Have a good night, Your Honor.

6           MR. JUENGER:  Good night, Your Honor.

7           THE COURT:  Good afternoon.  When does the sun set,

8   Shirley?

9           MR. RASHBAUM:  The sun has set, Your Honor.

10          MR. LARSEN:  The sun has set, Your Honor.

11          THE COURT:  No, no.  You've got to go to the west side

12  and you'll still see it.

13          MR. LARSEN:  The sun has set.

14          You want the instructions tonight?

15          THE COURT:  Yes, I do.  I do.  I do.  I do.  And from

16  the defense.

17          Okay.  Let's clean up.

18          I need just the ones you want to change.

19          MR. MARCUS:  I could red line --

20          THE COURT:  No, I don't need red line.

21          MR. MARCUS:  There are some that are red lined.

22          THE COURT:  I wanted you to do it all.  Do it all.  I

23  don't want you to red line.  I want you to take a pen and write

24  or delete.  That's what I want you to do.  One of the three of

25  you can do it.  That's what I want you to do.  Bring it in

1    tomorrow morning with that.  I don't want red lining.

2          I want you to cross out what you dislike, and I want

3    you to write in what you would like.  Then you can type

4    additional instructions.  Those you can type.  Those that you

5    don't like, just say you don't like them.  You don't even have

6    to say why.

7          (The trial adjourned at 6:15 p.m.)

8

9                    C E R T I F I C A T E

10         I hereby certify that the foregoing is an accurate

11   transcription of proceedings in the above-entitled matter.

12

13   ____09-10-18_____        _____
          DATE                 GILDA PASTOR-HERNANDEZ, RPR, FPR
14                             Official United States Court Reporter
                               Wilkie D. Ferguson Jr. U.S. Courthouse
15                             400 North Miami Avenue, Suite 13-3
                               Miami, Florida  33128     305.523.5118
16                             gphofficialreporter@gmail.com

17

18

19

20

21

22

23

24

25

**A**

**ability** 241:11
**able** 20:16 22:11 23:22 54:16
103:8 235:10 257:4 261:1,10
262:12,13,16,1 8 263:11
279:23
**aboard** 200:12,24 201:22
**about** 6:8,9 9:16,24 10:1,3 12:21
12:23 13:23 15:20 20:24 21:7
21:8,23,25 22:1,8 23:17,20
24:1,3,8,11,13 25:3,22,23
26:1 27:10 28:24 29:23 30:2
30:18,24 33:14 39:21 41:5,25
42:18,22,24 44:7 45:6,12,17
45:20,21,22 47:4,12 48:18
49:4,19 51:3 52:15 53:9,15,17
54:9,14 58:12,24 59:8,11,13
64:16 70:25 74:23 75:24
76:18,21,21 77:6,14,21 79:18
80:23 81:17,22 83:9 84:1,4,16
85:22 88:18,21 89:21 91:9,10
92:3,3 93:13,22 94:9,10,13,16
95:2 97:3,20 100:12,21 101:3
101:12,13 105:10,16 106:11
107:20 108:1 111:6 115:2
116:13,21 118:18 119:8
120:12,22 129:21 130:11,19
130:22 132:6,7,21,22,23
134:4 137:7 138:22,23 139:2
139:3,4,11,24 140:3 143:23
149:5,10,25 152:1 155:13
157:5,5 160:3 164:17 167:5
169:15,24 170:2,5,8,25 171:4
171:14 173:5,25 174:11,20,21
174:24 175:14 176:6,13
178:20 179:1 180:15 181:7,8
181:8 184:6 185:2 188:4
191:9,25 192:18 194:11
199:17 200:1 208:14 209:13
209:15 210:7,15,17 211:6
212:8 216:8 218:13 219:23
220:5 223:17,19,22 224:2,7
225:1 226:8 228:6 230:12,18
230:21 231:7,14 234:2,19
236:1 238:9,10 239:4,25
241:10,22,2 3 244:24 249:8
250:9,16,22 251:24 255:1
257:14 258:15,24,2 5 259:2,18
261:22 265:17 266:9,10 267:2
267:5,6 269:10,10,23 270:13
270:17 271:21 272:21 273:1
273:19 276:6,9,13 277:5
278:24
**above-entitled** 281:11
**absolute** 176:20
**absolutely** 48:16 64:21 66:17,19
100:20 225:16 228:16 279:6
**absorbed** 93:4
**absorbing** 217:11
**absorption** 93:8
**abuse** 279:4
**accent** 250:6
**accept** 129:21 130:8 137:15
167:2
**accepted** 169:21 171:20
**access** 278:25 279:8,13
**accompli** 179:24
**accomplices** 109:6
**accomplished** 214:13
**according** 42:4 206:19
**account** 33:23 75:5 89:4 118:2,4
118:13
**accurate** 281:10
**ACL** 255:25
**acquisition** 217:8
**acquittal** 108:22,25 110:7
149:21 157:15
**acronyms** 171:2
**across** 51:1 208:1 260:15

**Act** 130:6 223:20
**acting** 133:19 178:7 228:15
**actions** 41:14 43:7 178:21,22
**active** 29:7 30:11 52:25 54:15,16
103:4,4 114:6 257:4
**actively** 225:20
**actor** 154:17
**actual** 55:6 73:16 136:8 152:3
**actually** 22:10 23:3 36:3 55:13
64:19 65:12,24 71:18 73:16
82:15,16 85:21 88:3 91:14
152:5 154:10 183:20 200:3
206:21 230:21 231:4,8 235:20
238:14 243:20 244:3 256:14
259:23 260:13 261:3 273:7
277:6
**ad** 262:11
**add** 109:8 186:11 212:11
**added** 109:5 271:19
**addition** 56:9 145:19 208:10
**additional** 56:22 57:9 109:12
110:9 130:9 200:4 259:1
270:14 281:4
**additions** 110:9
**address** 27:16,17,19 82:21
**adequate** 153:10 155:9
**adjourned** 281:7
**adjudicated** 207:4
**adjudicator** 102:11,12
**admissible** 42:2,3,13,1 7 162:24
170:4,7,19,21
**admission** 170:4
**admitted** 18:24 27:8 32:21 42:1
51:18 57:23 60:19 70:15 81:8
84:24 88:15 102:20 107:19
108:24 128:18 129:6,18
160:22 165:19 187:18 234:11
250:17
**admitting** 32:17
**advance** 9:9
**advantage** 82:11
**advice** 171:13,18,19 175:24,25
176:1,2,8 178:24 180:16
181:1 182:22 183:17 192:20
192:23 193:3 200:1,5 201:8
204:22,25,2 5 205:1,3,10,11,13
205:16 211:1,3,25 210:9,24
213:3,4,21 225:14 227:10,12
227:15 278:25 279:5
**Advil** 239:16
**advise** 181:11
**advised** 166:7 212:2
**advising** 180:14
**Aetna** 267:12
**afraid** 261:5
**after** 6:12 13:10,11 23:17 28:18
30:12 40:13,20 43:7,10,17,24
44:4,7,9 52:20 98:10 104:8,12
106:1,3 108:22,25 110:6
122:1 130:18 159:5 166:25
186:11 188:12 194:24 215:11
233:3 235:22 239:19 243:4
247:4 255:8,17 256:9 259:20
259:21 261:18 262:21,23
270:1,7
**afternoon** 106:14 113:2,19
120:2 130:24 229:23 230:2
237:16,17 250:2 254:20,21
271:9 280:4,7
**afterwards** 43:8
**again** 22:1 35:24 46:1 67:25
69:4 71:16 72:21 73:2,8 75:10
78:10 82:9 89:21 123:4 184:2
208:19 210:5 213:16 216:9
220:5,14,1 5 228:8,16 243:12
260:12 265:11 270:3
**against** 147:12 170:4 172:9
262:12
**agent** 19:11 53:22 55:2,5 56:23

91:18
**agents** 93:7 133:21
**ago** 6:8,8 114:1,2,14 116:16
161:17 196:20
**agree** 11:21 76:16 79:3,13,15
82:13 88:9 91:23 92:13,19
93:5 96:19 98:19,22 99:3,12
99:18 114:17 115:19,23
129:25 143:21 173:10 201:2
206:14 210:25 216:14 218:11
219:18 222:18 224:17 274:2
276:22
**agreed** 11:24 94:17 114:13
115:8 135:5 139:13 175:2,5
179:20 201:7 222:15
**agreeing** 82:1
**agreement** 17:1,6,12 19:4,11
129:20 134:6 166:10 170:16
177:14 178:13,25 183:23,24
188:16,18,23 189:9,13 190:3
195:2,21 198:16 199:12,15,18
202:25 206:25 257:5
**agreements** 169:16 170:15 171:6
175:15 188:14 193:8 206:19
206:20,23 227:5 262:13
**agricultural** 261:23
**ahead** 7:17 10:24 56:2 62:3
74:19 77:9,23 103:3,8 123:2
153:14 174:13,13 185:20
187:14 193:5 214:14 227:16
233:22 253:6 271:6
**aiding** 93:8
**ailment** 238:24
**aircraft** 231:8
**airspace** 106:6
**akin** 217:8
**Alice** 222:20
**allegation** 170:12
**alleged** 165:7 276:1
**alleges** 141:15
**Alley** 11:12,13 27:23
**allocation** 188:24
**allow** 139:8 229:3 272:12,15
**allowed** 190:22 261:1 269:6
**almost** 20:7 110:2 161:3 188:11
217:7,8 237:1 244:11 248:23
275:3
**alone** 56:11 57:7 134:6 202:12
202:13
**along** 54:5 109:23 130:11 177:11
179:10 191:23 193:13 218:6
238:17 249:16
**alphabetically** 107:12
**already** 34:12,24 35:5 68:2
105:17 109:5 119:8 121:9
156:2 160:22 169:21 175:2
179:19 209:17 222:15 239:23
263:23 266:18 268:14,15
**alter** 145:20
**altered** 150:21,25 152:7
**alternates** 7:3,3
**alternative** 74:15,18,22,2 4 79:2
79:5,8 81:2,2,23 99:2,7 103:2,5
103:7 266:13
**alternatives** 75:24
**although** 181:7 204:12 261:25
**always** 38:15 58:2 78:23 116:20
140:12 172:17 205:23 267:14
274:15
**America** 1:4 49:1,6,7 56:5 68:9
69:13,25 102:9 168:8,19
187:13,23 188:13 189:10,18
190:5 236:3 242:7,9 243:4,9
243:14,21 244:25
**American** 106:6
**Americans** 99:16
**among** 134:18 173:23 191:16
274:2
**amount** 61:6 62:5 100:17 105:4

148:24 158:25 215:3 242:1
262:18 264:19
**analogize** 136:2
**ankle** 6:13 231:7 238:19
**announce** 168:4
**announced** 161:17
**annoying** 172:18
**another** 30:19 50:22 58:17 71:17
74:20 83:7 103:4,9,20 119:5,9
137:23 156:5 157:16 183:1
188:16 197:13 212:20 223:5
227:25 228:20 232:14 243:17
244:4,7 257:14 261:19 266:15
268:15
**answer** 26:11 51:9,9 54:14 56:14
57:1 59:19,21 62:3 66:25 77:9
89:13 123:3 147:14 182:11
198:22 199:6 229:6,11 235:5
253:6 279:17,17
**answered** 26:13 40:7 47:5 87:17
87:23
**answering** 54:13
**answers** 149:3
**anti** 182:9
**anticipate** 107:21
**anti-kickback** 176:25 182:7,21
194:6 210:14,18 211:6 213:8
225:2 258:25
**anybody** 9:3 112:17 116:2
149:10 167:8 207:14 216:10
216:15 217:3 232:18 242:3
251:17 258:21
**anymore** 73:17 79:10 184:13
215:18,20 244:25 261:13,14
276:13
**anyone** 51:14 69:17 75:1 117:24
132:8,13 134:25 136:15
138:15 149:7 202:21 211:14
216:2 228:2 232:7,21 270:4
**anyplace** 248:4
**anything** 13:23 14:11,14 24:8
27:1 31:8,10 36:6 42:10,22
44:3 47:12 50:24 53:9 66:3
77:21 109:19 110:9 116:13
118:7 121:22 125:16 126:13
127:14 128:3 129:2 130:19
132:9 137:6 149:10 157:10,21
161:4,16 174:21 175:12 180:3
198:11 203:6 207:25 208:16
212:17,18 223:13 228:9
235:16,18 237:8 239:16 251:6
251:24 263:2 267:2,24 268:3
268:6 269:8,10 270:6 274:20
275:8,19 279:24
**anytime** 163:13 164:6
**anyway** 136:3 160:25
**apologies** 250:6
**apologize** 8:25 50:10 158:12
250:21
**apparently** 191:22
**appeal** 111:1 112:14
**Appeals** 142:24
**appearance** 168:4
**APPEARANCES** 1:12
**appears** 160:22 161:6
**appellate** 173:20
**applicable** 75:4 147:5 275:6
**application** 194:5 218:6
**applications** 218:17,20,20
**applied** 92:24 231:25
**applies** 142:14
**apply** 210:23 230:23 232:21
**appointment** 9:14,15
**appreciate** 9:8 258:1
**approach** 102:14 257:23,24
**approached** 201:9 265:8 266:9
**appropriate** 79:13,16 175:2
276:11
**approved** 81:18 267:13,15

approximately 48:8 104:10 257:9 260:14,18 263:4
April 98:10 104:6,17 122:6,12 128:14 183:22,24 187:24 201:19 202:24,25 209:5 214:14,16,17,18 215:6 217:20 222:22 226:5,6
arbitrarily 274:13
area 190:13 192:7 212:6 213:2 225:4,15 262:24 263:1
areas 166:20
arguably 133:3 147:10
argue 12:20 111:17,18 112:15 138:4 140:12 144:12 150:13 173:14,19,2 5 174:2
argued 172:4
argues 131:13
arguing 173:1
argument 42:16 53:10 58:3 108:22,25 109:2 111:7 141:9 143:23 147:15 161:19 173:22 175:21 271:15 273:8,10,18,23
arguments 271:12,13
arm 230:21 231:3
Armando 3:10 47:20,22 48:4 70:19 143:14
Armando's 143:14
armpit 244:15
around 11:20 29:1 30:17 96:18 101:1 115:1 147:22 158:9 161:3 215:11 221:3 248:3,4 249:9 256:10 258:12
arrangement 16:10 21:9 22:3 23:15 24:4 28:24 201:5
arrangements 181:7 192:24
arrivals 274:18
arrive 69:15
arrived 65:7 69:11
arthroscopy 255:24
articulated 143:1
aside 23:9 25:25 136:12 139:6 144:23 197:1 222:19
asked 17:22 26:13 33:20 45:6,8 45:22 47:5 51:7 75:23 76:21 79:18 81:1 84:1,7 87:17,23 88:18 91:9 92:3 93:13 98:2 100:21 101:12 104:19 115:8 171:18 173:20 181:19 186:14 188:2,18 193:17 198:22 199:5 204:3 212:7 223:4 225:1 226:8 232:18 233:20,25 249:12 265:21 266:24 270:16 270:17 274:14
asking 6:5 41:4,5,18 42:18 52:6 54:13 68:1 115:6 141:19 148:25 153:20 166:13 223:9 232:4 248:3,22
aspects 198:14 200:24
assigned 111:8
assist 139:6
associated 16:9 207:9
assume 39:15 50:25 108:23 185:13 204:6,12 207:15 271:7
assuming 271:6 276:9
assumption 243:16
Atlanta 173:20
attached 19:3 27:22 83:12
attacked 278:8
attempt 188:25
attending 255:8
attention 46:8 51:22 57:11 176:16 188:12
attorney 168:17 175:13 179:12 187:11 223:5
attorneys 17:11 193:6 204:14
Attorney's 1:14,15
aunt 27:6,24
AUSA 1:13,14

Austin 48:6,7,8
authority 133:19
authorization 81:23 82:19 83:10
auto 25:10,12
availability 95:2 97:3,6
available 49:12 95:5 96:6,7,8,15 106:17
Avenue 2:6 281:15
aware 40:6,13,14,1 5 61:8,9 86:12 87:12,13,14 89:3 95:14 97:13,16 201:12 203:23 208:16,21 214:6 216:14,15
away 10:9 181:2 182:24 262:11
awhile 268:25
A-r-m-a-n-d-o 48:4
a.m 6:1 8:13,17 49:21 50:16 10:25

**B**

B 10:23 109:1 110:17 125:14
baby 263:3
back 14:4,20 24:19,20 43:18 49:18 69:4 82:17 83:25 90:25 93:2 102:3,23 105:11,13 112:16 118:12 124:9 130:17 130:18 135:4 136:19 137:12 142:17,24 146:19 160:5,6,6 165:1 186:12,12,13,19,23 190:15 195:23 201:23 216:15 217:16,23 229:9,14 230:4 231:12 233:20 239:9 255:12 256:21 257:13 260:16 262:23 262:25 263:6 264:4 265:4,6 265:11 268:9 269:5,6 278:14
backdate 104:19
background 19:25 197:10 200:23 218:23 219:3,4 220:15 252:5
backing 55:24
backtrack 278:16
backwards 75:23
baclofen 52:22
bad 110:2 154:17 159:5 165:2 205:23 231:3 262:8
bait 159:14
ball 34:15
ballpark 56:20
bank 33:23 118:2,4 148:9 173:23
Bansal 150:18
base 55:1,1 56:23 57:10 67:22 67:23 91:25 238:3,4 239:10 239:13 240:9
based 18:23 62:16 91:4 117:6 134:22 135:22 136:7 148:10 175:24 176:8 193:2 221:24 234:25 242:22
basic 38:10 232:4
basically 37:19 49:10 51:11,11 55:23 58:9 63:12 72:3 74:18 103:2,7,24 137:18 145:4 247:7 260:3,24 261:24 265:18
basis 33:8 63:19 65:4 87:15 141:8 146:13 189:19
batches 66:13
bathroom 50:1,2 130:24
Baton 259:24
Bayside 186:10,17,21
beach 190:17 230:19 231:2
became 6:12 8:21 30:12 95:14 120:9 122:1,5 154:15 173:5 188:13 235:13,22 240:20 242:6 243:4 244:5 246:23 247:4,9
become 18:13 29:25 55:11 87:15 96:11 118:19 119:3 184:1 187:22 230:23 233:4,18 236:3 236:24 240:14 247:2,6,24 251:10,12 273:9

becomes 164:25 208:20 273:9
becoming 235:4
before 10:9 4 16:21 29:13 33:16 36:4 48:9 49:24 51:7,18 52:6 53:24 61:16 63:3 64:6 67:9 70:10 72:12,18 75:12 85:12 98:9 121:7 128:3 140:21 158:3,7 160:20 168:11 179:13,16 191:11,18 212:9 218:17 219:7 220:7 222:15 231:22 232:7 235:4,20 243:10,15 264:4,18 272:12 275:24
began 180:14
begin 116:1
beginning 71:10 96:10,10 120:9 163:17 194:15,16 223:15 267:16 273:19
behalf 93:14 135:14 190:4 192:13 222:24
behind 137:5 167:25
being 7:5 23:22 47:12 60:4 69:20 70:10 80:24 84:7,10,12 86:17,18 89:6 96:8 100:19 104:17,19 105:6 115:2 148:11 164:16 169:19 201:22 202:1 208:10 212:16 216:24 248:7 277:16
beings 133:13
believe 16:2 18:7 33:12 100:22 105:25 117:21 136:1 150:5 156:13 158:9 173:4,13 228:5 241:11 247:1 256:19,21 257:9 257:12,14,21 258:5 260:9 264:16
believed 234:23
believer 274:16
bell 188:21
belongings 269:7
beneficial 231:11 232:25 234:24 242:5 245:4
beneficiaries 24:20 30:12 145:3 145:5,15,19 191:17
beneficiary 114:3,5 146:2 148:9 149:6 153:2,5
benefit 130:2 191:22,22 242:3 251:24 266:12 276:11
benefits 28:3 199:4 234:22 241:19,22 256:5
besides 67:18 68:8
best 71:2 111:9 216:25 220:22 225:14 231:19 267:10
bet 165:9 202:13
better 105:5 119:17 241:12,20 263:5 265:4,5
between 53:22 59:11 62:6,20 63:23 101:13 125:10,16,20 127:15 128:15 129:17 133:8 134:18 140:19 141:13,19,23 142:5 162:4 163:10,14 164:7 164:12 165:8 189:9 195:18 202:13 222:22 236:23
beyond 140:10 152:11
big 20:8 46:15 105:6 111:15,16 186:23 197:4 258:15 260:8 270:10 272:10
bill 70:13 71:18 73:15,17 74:8,9 76:13 112:17,19 132:1 196:3 209:25 210:6 213:20
billed 61:18,19 73:21 93:24 102:13 147:9 190:25 196:2
billing 61:21 62:1,1,2 74:3 77:25 104:8 132:20 136:3,4 138:19 180:23 195:25 197:20 213:19
bills 61:24 118:8,8 137:9 196:7
Biscayne 1:21 2:2
bit 35:24 52:7 53:24,25 73:1 96:22 114:1 120:9 185:24 199:1 225:10 231:14,16 252:1

255:1 257:16 260:11 261:22 265:3 266:10 270:20 275:14
bits 70:24
Bjerke 3:6 15:1,4,7,12,17 16:19 18:3,25 31:3,8,21,22 42:25 45:6 134:20
blacked 70:10
blame 275:16
blend 55:6 91:25,25
block 197:14
blood 133:18 256:13
bloodstream 92:19
Blue 267:12,12
board 55:13,15,19 166:11 215:22
Boards 55:24
boat 186:17,21
bolts 207:3
bona 183:16,21 224:8,10,17
bond 158:25
bonuses 227:1
Boston 164:24 165:3 190:13 229:14
both 7:4 15:6 51:3 130:10 140:22 171:17 191:3 192:11 201:14 222:13 244:19
bother 216:10 274:2,3,5
bothered 216:7
bottle 65:17
bottles 65:13,14,1 5 66:14
bottom 70:17
Boulevard 1:21 2:2
box 52:16 73:5 90:22
boy 10:23
brain 235:1
break 35:2 49:14,17,23 50:1,2,8 186:8,20,22 277:18
breaks 130:24 186:5
bricks 197:13
brief 16:4 50:6 112:13 160:4
briefly 13:14 158:3
bring 7:11,13 8:2,4,10,10 49:18 50:13 93:23 113:15 130:18 166:4,4 167:12,12 168:11 177:23 184:4,21 185:16 197:3 199:25 200:12,19 207:4 208:20 209:8 216:6 222:1 230:4 247:14 257:4 260:16 277:13 280:25
bringing 8:12 184:9 197:9 199:23 208:22 216:1 217:6,9 219:5 243:20
brings 37:20
broke 51:8 122:4
broker 255:19
brokering 86:1 101:5,7
Brooks 6:11,13,18 8:21,21
brother 261:20,25
brought 36:6 122:19 179:17 183:10 184:17 193:21 197:5 201:16,22 215:22,24 227:23 243:25 244:4 245:16 247:23 248:7,13,21 278:21
Broward 48:10
Brown 114:25
Brundige 3:3 7:21 10:18,20,22 11:2 12:23 14:19 27:3 28:3 39:21 40:3
Brundige's 39:22
Bryer 111:21
bucks 22:8,15 137:17
buddies 16:2
buffet 220:8
building 106:16,17
bulk 131:12
bunch 100:7
business 15:20 16:3,4,10 18:13 21:9 23:15 31:11,12 98:18 162:6,11,16,18,24 163:15

170:14 183:11,14 184:17
189:3,17,18,21,2 4 190:24
193:7 201:2,5 208:2 213:23
221:8 225:13,17 226:14 228:6
228:16 257:6 258:18 261:10
261:14,19,20 262:9,17 266:18
**businesses** 189:23
**businesslike** 198:20
**busy** 239:1
**button** 135:17
**buy** 96:25 100:4,6,9
**B-j-e-r-k-e** 15:8

---

C

**C** 109:1 125:14 281:9,9
**Cadillacs** 54:4
**Caesar** 185:5 221:18,20,21
222:20
**call** 6:11 12:19 23:24 24:18
38:16,18 43:24 44:5,6 46:9
77:22 82:24 83:9 113:10
116:8 132:11 145:24 150:9
152:2 157:23 158:13 159:11
159:17 165:5 166:18 194:24
198:19,23 224:7,16 229:18
240:13 241:18 245:24 249:14
254:10 260:1 265:5 269:20,23
270:4
**called** 14:25 15:16,19 23:22
29:25 32:4 45:10 49:1 113:22
137:23 152:2 182:3 188:2
190:21 192:10 193:25 221:15
224:7 232:12 240:5,10 246:16
255:20 256:3,15 259:24
260:23 261:20 267:2
**calling** 83:3 105:22 173:16 174:3
187:4 262:8 265:20
**calls** 50:20 53:3 59:18 62:24
66:1,24 67:25 74:1 101:8
113:11 232:11
**came** 7:22 13:10 14:21 24:6
30:18 34:1 57:13 65:11 79:19
80:22 101:17 117:15 118:4,9
138:16 181:14 186:11,13
191:12 205:9 212:22 230:21
235:16 239:7,9 252:4
**candor** 270:3
**capable** 184:19
**capital** 246:6,8
**caps** 104:13
**cardinal** 209:24
**care** 11:19 22:12 49:1,6,7 56:5
68:9 69:13,25 102:9 104:3,4
111:1 130:2,2 131:6,16,17
136:3 137:1 139:3,10 140:17
141:3,12,14,16,22,24,2 5 142:6
142:8 144:3 145:2 149:12
168:8,19 180:24 181:2 182:1
182:16 187:13,22 188:13
189:10,18 190:4 192:5,7,11
206:1,3,6,7 209:19,23,25
210:6,9,12 211:20,23,25
212:22 213:1 220:13 223:22
227:11 236:3 242:7,9 243:4,9
243:13,21 244:25 274:11
**career** 255:15,16,17 264:19
**careful** 216:24 276:8
**carrier** 231:8
**case** 1:3 8:23 12:13 27:19 44:7
44:10 49:20 51:2,3 90:18
97:21 105:17 106:9 112:24
121:21 130:11,22 131:25
132:2,20 133:1 136:3,6 138:1
138:14,19,20 139:20,21
147:16 150:18,25 151:15,19
151:22 152:20 153:18,23
156:5 158:7,20 159:1 164:8
165:5 168:18 170:13,16,25
172:4,8,20 173:15,24,25

175:17 177:1,5 186:1,8,11
204:11 210:8 217:7 227:24
228:21 269:20 272:12 273:5
279:4
**cases** 111:17 144:3 151:14
177:25 207:10
**cash** 78:17 100:15
**Castro** 274:19,20
**category** 127:12 149:7
**cause** 28:11 138:13
**caused** 135:2
**causing** 149:22 151:2
**cc'd** 88:3
**cent** 67:8
**cents** 59:11
**CEO** 188:1,2,8 193:13 194:23
195:19 198:3 208:18 257:7
258:18
**certain** 76:1,2 96:14 98:12
261:12
**certainly** 83:7,8 145:11 151:1
169:10 177:18 182:19 217:5
218:8 219:7 279:11
**certificate** 4:10 162:9
**certification** 55:13,16,19
**certified** 55:13,21
**certify** 281:10
**cetera** 163:23 175:4 209:8
278:25
**CFO** 207:19
**challenge** 228:18,20
**challenges** 228:17,17
**Champus** 191:21
**chance** 113:15 153:21 157:16
220:23 270:5 271:25
**chances** 124:1
**change** 23:18,19,20 24:3,11,11
72:14 74:20 78:19,21 81:17
82:1 83:10 86:6,12 87:4,9,14
101:16,18 102:24 103:3,9,9
103:13,18 193:18 280:18
**changed** 23:14,15 64:7 78:17
79:9 86:8,17,21 101:21 109:6
136:20 139:12,12 157:22
159:19 191:23 249:5 261:9
**changes** 37:22 101:13,23 102:17
109:5,1 1 110:1 136:20 203:10
203:17 261:8 270:9,20,25
271:2
**changing** 103:24
**Chantingua** 244:2
**characterize** 226:3,20,24
**characterized** 79:24
**charge** 16:14 83:2,22 85:19
110:13,13,1 5 111:23 135:1
208:2 271:12
**charged** 121:22 131:16,17
141:11,12 177:24
**charges** 16:9,25 131:16 138:21
176:21
**charging** 175:18
**chart** 36:4
**chatting** 222:8
**cheap** 100:5 119:17
**check** 25:9 71:5 90:13,21 146:4
192:16 219:4,4
**checked** 52:16 73:5
**checks** 197:10 200:23 218:23
**chemical** 58:20 91:14 262:21,21
**Chief** 50:9,22 158:11
**Chiefs** 255:9 263:9
**child** 276:2,9,10 278:18 279:4
**childhood** 16:2
**chose** 7:3 132:11 256:5
**Chris** 104:2,3,11
**Christianson** 165:9
**Christie** 105:12 269:4
**chronology** 264:22
**Cici's** 220:9,10

**Circuit** 144:15
**circumstances** 41:25 115:14
181:13 220:2
**citizen** 216:25
**citrus** 261:24 262:8,13
**city** 10:14 11:2 15:14 48:5
113:19 255:9 263:9
**civil** 111:9 176:25 177:1 210:22
259:17
**claim** 132:1,20 138:6,7,8,13
139:23 140:7 146:12 151:15
152:4 166:17 172:9 173:12
**claims** 131:19,19,20,2 1 132:6,7
132:21,24 134:4 135:1,15,17
135:18,19,21,2 3 136:7 137:13
137:14,14,1 5 138:5,11,14,18
139:21 143:18,19,20 144:3,4
146:15 206:9 268:6
**clarify** 193:12
**classes** 263:11
**clear** 44:19 67:13,14 88:8 131:24
195:17 204:12 224:6 266:1
**clearer** 90:2,18
**clearly** 135:1 136:7 279:9
**Clearwater** 262:24,25
**clerk** 111:15
**clerks** 111:14
**client** 112:13 158:16 159:6,19
160:1 167:1 176:9 192:17
205:5 212:7 222:25 223:11
274:10
**clients** 192:16
**client's** 169:24
**clock** 159:24 165:25
**close** 121:4 154:6 156:1 166:17
176:16 268:20 272:21
**closed** 121:2
**closing** 58:2 271:12,13,15
272:13,14 273:7,9,18,23
274:14 276:13
**closings** 273:8
**coffee** 49:24 115:1
**coin** 273:4
**colleague** 171:19
**collect** 26:5,7
**collected** 26:9 207:7
**collectively** 178:8
**college** 263:10
**combination** 143:17 145:3
**combine** 150:11
**come** 6:19 8:11 10:8 13:1 23:13
23:14 29:24 34:1 54:3 66:20
67:1 72:9,21 86:2 87:6,7,11
89:1 101:25 105:11 114:13
116:8 130:17 132:5,12 136:17
152:6,9 161:5,17 162:12,14
162:14 164:2,8,1 1 165:6
168:9 178:3 179:3,8 182:12
184:21 186:12,19,23 200:23
208:1 221:22 228:18,20
230:12 233:3 235:22 246:23
249:5 257:10 261:5 265:3
277:1 278:4,6,24
**comes** 8:11 52:20 63:6 136:6,6
136:19 153:13 163:15 166:15
177:2
**comfortable** 7:16,18 47:23
120:9,12 122:1,3,5 185:22
**coming** 7:16 8:6 43:3 72:15
83:12 86:19,22 87:10 111:12
122:21 150:23 176:4 177:21
185:21 214:3 268:16
**commercially** 49:12
**commission** 22:6,20 39:11
116:19 227:7 251:6 256:8
**commissions** 33:6,8,25 175:22
210:3 213:4,7 221:4 226:12
227:1 256:8

**commit** 110:16 141:23 145:4
147:7 269:22
**commitment** 194:21
**committed** 145:5,16
**Community** 256:15,22 257:8
258:6 259:20,21
**companies** 33:16 76:11,13 77:7
78:1 87:10 97:24 98:18
102:13 133:13,14,16,17,21
151:24 189:19 190:19 193:16
197:7,18 214:8 226:15 262:12
264:20 267:10,24,25
**company** 18:16,19 19:10 25:18
31:3,8,8 32:4,7,14 33:4 36:12
36:16,18 37:10,20,25 44:22
45:10 48:25 77:14 90:1,7
93:19 95:6,23 97:10,18 98:3
98:16,17 114:8 133:2,9,12,20
134:1,2,5 165:11,12,13,15
170:11 171:11,13 175:23
176:9 177:9,19 178:6,15,23
178:24 179:20 182:13,14,15
183:5 184:15,23 188:1,4,8,17
189:7,10,15,2 1 190:12,14,22
190:23 191:16 192:4,5,8,9,21
192:23 193:8,10,13,18 194:8
194:9,12,18,20,2 3 195:2,19,20
195:25 196:2,7,19,24,24
197:2,3,4,16 198:2 200:9,11
200:25 201:1,1,6,7 202:4,17
203:22 206:8,16 208:9,19
209:7,12 210:8 211:24 212:2
212:4,13,21 213:16,18,21,22
214:2 215:8,9,13 216:4
217:23 218:2,23 221:16,24
225:15,17,18 227:10,10,13
228:6,12,13 229:1 236:5
243:17,17,18,19 245:5 246:16
246:19 247:15 250:14 255:20
256:15,16 257:1,11,16 258:22
259:23 260:3 261:23,23,25
262:3,6,21,23 265:9,14,20
266:23
**company's** 178:3 188:25 190:6
202:20 208:3 225:21 227:6
**compare** 71:23
**compared** 67:8
**compensated** 171:7
**compensating** 221:24
**compensation** 170:16 175:22
176:21,22 192:24 226:8,19,20
226:24 232:20 249:3 260:25
261:3
**compete** 262:16
**competent** 210:24,25 212:7
**competing** 262:12
**complaint** 280:2
**complaints** 248:6,12
**complete** 176:20
**completed** 72:6,6
**completely** 78:8 122:3 179:11
218:8
**complex** 183:5,6,7
**complexity** 183:8
**compliance** 184:22 194:9 202:17
242:16,20
**compliant** 216:24
**complicated** 225:2,15
**comply** 176:23 177:7 183:4,16
194:2,3 200:2 201:10 227:4
**compound** 37:3 48:22 54:8 77:5
113:25 247:8 267:17
**compounded** 55:4 80:8 91:10
114:14,17 216:20 230:13
**compounding** 49:7,8 51:8,10,11
55:10 58:10 77:13 82:2 92:6
94:17 96:21 98:3 189:3
190:24 192:7,12 208:2 213:2
225:21 226:17 246:20 265:13

265:15,23 267:7 268:17
**compounds** 188:25 189:1 190:6
191:7 215:16
**compromise** 278:12
**conceal** 173:3
**concede** 144:6,7 157:4 211:16
213:16
**conceded** 139:20
**concept** 185:6 193:25 222:23
**conceptualize** 197:12
**concern** 71:25 72:2 85:25 101:1
**concerned** 154:22 173:8 228:11
228:13 238:19 241:17
**concerning** 192:24
**concerns** 86:1 101:5,7
**concise** 193:21
**concluded** 182:13
**conclusion** 182:12 239:7
**conduct** 17:3 142:2 153:12
155:1 181:16
**conference** 110:13,13,15 111:23
195:18 197:21 198:8 241:18
249:14 271:12
**confidence** 216:5,7
**confirm** 124:17,19,21
**confirmation** 223:9
**confirmed** 194:24 266:18
**conflicts** 192:16
**confused** 32:3 87:8 250:6
**confusing** 9:10
**confusion** 152:1 167:22,23
**connected** 134:5
**connection** 16:25 17:3 188:3,16
189:1,24 190:7 217:10
**conquer** 108:6
**consent** 74:19 79:12 81:17
203:17
**consider** 94:19,21 264:21
**considerable** 264:5,19
**considered** 143:25
**consistent** 71:7 171:3 278:3,4
**consolidated** 190:16
**conspiracies** 141:21
**conspiracy** 16:15,16 131:7,17,18
132:20 133:8 141:10,15,23
142:7,7 177:24 224:4 228:12
**conspire** 133:9,12 134:1
**constitution** 158:25
**constitutional** 158:23
**consultant** 257:6
**consulted** 151:23 171:8,10 200:3
**consulting** 159:5 167:1 259:23
**consuming** 71:23
**contact** 32:10 39:3,6 75:5 223:5
**contacted** 42:21 43:10,12 188:18
192:9
**contacts** 42:23
**contain** 242:25
**contained** 131:21 218:5
**container** 66:16
**containers** 65:11
**CONTENTS** 3:1
**contested** 137:25
**contesting** 138:1 139:20
**context** 200:18
**continue** 118:20 125:25 129:13
185:8 218:1 233:15
**continued** 213:22,24
**continues** 271:6
**continuing** 239:9
**contract** 18:20 175:4 190:23
198:9,14,15 199:3,9 208:7
217:21 218:1 223:16,17
**contracts** 188:5 197:1
**contractual** 76:10 190:18,20
193:16
**contribute** 133:24
**control** 268:2
**convenient** 65:20,22

**conversation** 120:7,13 132:13
132:23 163:9 164:7 175:3
222:22
**conversations** 97:3 169:15 179:2
179:19 216:11,12 241:18
**conversion** 172:5 174:21 179:17
194:25 195:21 217:10 222:24
223:1,13 227:17,20 243:11
**convert** 175:2 182:23 183:15,19
184:23 193:22 213:6,9,17,22
214:10 224:16
**converted** 183:20 227:16
**converting** 194:17 196:13
**convicted** 112:13
**convince** 42:3,13 110:19 143:6
**convinced** 117:5
**COO** 195:19
**cooperate** 17:8,9
**cooperating** 17:15
**cooperation** 130:10
**cooperative** 179:11 203:3
**copay** 25:25 26:5,9,16,19,24
**copays** 26:2
**copies** 37:19 109:4,10 110:4
**copy** 60:20 81:10 90:2,19 102:21
**Corcoran** 3:18,22 106:20,21,24
108:14 160:11 163:7 164:4,13
164:17 165:14,18,24 166:9
168:9,13,16 169:15 174:15
176:1,6 178:18 179:13 180:7
180:14 187:5,7,9,22 195:13
202:14 203:9 204:16,20
**corner** 57:19,20
**Coronado** 106:4,7 148:4
**corporate** 206:2,22 216:25
**correct** 14:14,15 22:13 24:24
27:21 32:8,10,15,24 33:21
34:5,9 35:14,17,22,2 5 36:1,8
36:10,13,16,17,21,2 2 37:8,9
37:12,15,17,2 4 38:4,10,13,14
38:22,23 39:1,4,8,12,14,16
40:2,4 44:16,21,23 54:18
56:25 57:1 61:5,25 67:2 68:16
68:17 70:6 71:12 72:5,20 73:7
74:14 76:6,9,11,1 3 77:2,15
78:1,2,5,9,20,2 5 79:3,6,11,14
79:17,23 80:5,25 82:10 83:3
83:15 84:11 85:9,23 88:23,24
89:25 90:3,5,8,14,2 5 91:7,19
91:22 92:7,10 93:12,19
100:13 101:3,4 103:13,21
104:15,17,19,2 2 118:1 120:15
120:18 122:2,15 125:19
142:11 149:13,19 150:16
156:21 160:23 163:21 180:16
180:21,22,24,2 5 181:3 182:8
183:17 184:5,10,22 196:6
198:4,18 205:3,13,16,17,19,20
206:6,14,20 207:4 208:23
209:20 212:20 213:25 214:13
215:12 216:10,16,2 1 217:1,6
218:6 219:8 221:1,2,4,25
222:17 223:14 224:8,9,11,21
224:22 225:18,21 232:14,16
233:10 235:4 236:18 239:22
243:15 244:20 251:16 252:9
252:13 253:1 259:14 261:16
262:19 267:18,19 279:15
**corrected** 128:15
**corrections** 109:9
**correctly** 71:3 72:3,13
**corrupted** 136:7
**Cosmetic** 223:20
**Cosmetics** 130:6
**cost** 25:23,24,2 5 78:12 99:16
148:18 207:8,10 252:18,21
262:14
**costs** 61:3 207:8
**counsel** 6:3,3 8:19,20 120:15,17

160:6,6 163:23 166:9 167:18
171:8,10,13,18,2 0 182:16
183:18 187:2,3,22 188:13
190:12 192:5 205:6 208:18
211:25 212:5 225:9 227:11
229:17 241:9 245:23
**count** 140:19,20,2 5 141:10,14
141:23 142:1,6,10,19 143:3,7
144:24 145:6,6 148:5,5,21
149:22 151:8 155:14,16
156:10,12,1 5 157:9,15,16
202:7
**counter** 119:16
**countless** 242:1,1
**country** 111:13 221:3 260:15
**counts** 130:4 131:6,7,7,8,18
133:4,5 134:15 136:13 140:5
140:15,25 141:6,20 147:23
152:13 154:10,11 155:19
**County** 48:10 262:24
**couple** 32:2 62:18 106:15,16
114:1 138:22 262:20 266:16
270:9
**course** 28:24 135:11 140:12,25
144:18 146:16 185:15 188:6
194:8 202:16 210:24,24
216:24 219:15 226:18 241:4
262:15,1 7 273:20
**court** 1:1 2:5 6:2,7,25 7:2,9,13
7:22,24 8:1,4,7,10,14,16,18
9:12,15,18,20,22,2 5 10:2,4,13
10:16,19,21,2 4 12:5,8,11,13
12:15,17,19,2 1 13:1,3,15
14:17,19,24 15:2,5,9,16 17:18
26:14 31:15,17 32:20 34:20
34:22 35:2,7,9 40:7,10,14,18
40:23,25 41:2,6,9,16,20,23
42:6,9,16,19,2 3 43:5,8,11,14
43:17 44:2,6,9,12,1 4 45:2,21
45:23 46:1,4,25 47:7,16,19,21
47:23 48:2 49:13,16,22 50:2,7
50:13,14,17 53:2,4,7,9,13,19
54:6 55:3,8,11,15,18,20,25
56:2,10 57:1,5,23,2 5 59:19,22
59:24 60:2,4,8,10 61:9,16,20
61:23 62:1,3,7,23,2 5 63:3,8
63:11,16 64:1,4,6,15,15
65:2,14 66:2,5,25 67:3,6,14
67:16 68:2,5 69:1 73:25 74:2
74:5 75:12,18 77:9,22 81:6,8
84:20,22,24 87:19,22 88:13
88:15 89:11,13,1 5 99:21
101:10 105:9,14,15,21,24
106:1,3,7,10,13,19,2 4 107:1,4
107:9,11,18,2 3 108:1,3,5,9
108:11,13,16,18,2 0 109:17,19
109:22 110:2,12 111:20 112:4
112:11,22,5 113:5,6,7,9,12
113:14,22 114:21,24 115:4,7
115:10,13,16 119:21,23
120:19 121:2,4,6,15,18,21,24
123:1,10,12,20,22,2 5 124:9,12
124:15,19,23,5 125:1,1,5,9
125:12,14,16,18,20,2 2 126:2,5
126:7,9,11,13,16,19,22,25
127:2,4,7,10,12,14,17,20,23
127:25 128:2,5,9,12,14,18,21
128:24 129:1,9,12,15,19
130:8,14,21,2 2 131:2,9,11
132:3,14,16,1 8 133:12,16,20
133:23 134:8,11,14,18,24
135:9,12,14,18,20,22,2 5 136:8
136:12,25 137:3,6,11,21
138:16,22 139:16,24 140:5,9
140:11,19 141:2,5,23,25
142:3,5,10,12,17,23,2 3 143:2
143:5,21 144:8,10,14,20,22
145:2,25 146:2,9,14,17,22
147:1,4,7,11,17,2 0 148:2,7,13

148:16,18,21,2 5 149:3,10,14
149:17,20 150:2,11,14 151:3
151:5,11,17,2 0 152:13,19,22
152:24 153:1,4,12,18,20
154:5,14,17,21,2 5 155:3,16,18
155:23 156:8,10,12,16,18,20
156:22,24 157:2,9,12,14,23,25
158:5,8,17,22 159:4,14,17,21
159:24 160:1,5,5,9,12,16,19
160:24 161:8,12,15,21,23,25
162:3,8,11,18,2 2 163:3,6,9,13
163:22 164:2,6,12,15,20,22
165:2,12,15,17,2 3 166:4,8,14
166:16,22 167:5,8,16,20,22,24
168:7,9,14,18,20,2 5 169:6,10
169:23 170:2,7,13,17,19
171:10,12,16,2 5 172:7,12,14
172:16,20,22 173:7,11 174:4
174:6,13,18,20,2 4 175:5,7,9
175:17,2 5 176:2,4,8,12,22
177:1,4,8,10,12,15,2 1 178:6,9
178:12,17,19,2 2 179:4,12,16
179:22,25 180:3,5,8 182:10
182:14,17 184:2 185:9,12,16
185:18,20 186:14,25 187:6,8
187:10,12,14,1 8 193:5,9,11,14
195:6,8,11 204:17 220:17,20
220:22 222:4,7 224:14,23
225:23 226:23 227:18,21
228:23 229:2,6,9,11,13,17,19
229:22 231:17,18,20 233:14
234:2,5,9,1 1 235:5 236:15
237:11,13 245:12,20,23,25
246:3,6,8 248:9,14,17,19
249:11,13,15,18,2 4 250:4
253:6,21,23 254:1,3,7,10,14
254:17 257:19,24 258:20
263:14,21,2 5 264:10,12,25
268:19,22 269:1,12,14,17,19
269:23 270:2,5,10,12,16,22
271:2,11,18,19,21,2 4 272:1,7
272:9,14,17,2 3 273:24 274:5
274:7,23,2 5 275:4,9,13 276:4
276:6,17,20,2 4 277:2,8,11,19
277:22,24 278:2,7,10,15,20
279:2,4,13,16,19,2 2 280:3,4,7
280:11,15,20,2 2 281:14
**courthouse** 2:6 50:5 281:14
**courtroom** 1:5 8:3,6,13,17 16:23
49:21 50:4,16 111:8,8 113:8
130:25 139:25 140:2 156:2,4
180:10 185:19 186:24 269:5,5
269:13 275:14
**cover** 70:1 76:25 77:17 78:3,11
99:2
**covered** 67:8,8,9 73:12,16 78:20
79:9 80:24 99:9,17
**covering** 79:22 98:11 166:20
**coverup** 173:2
**co-conspirator** 163:19,25 164:1
164:20 165:7,15 177:19
178:20
**co-conspirators** 132:3
**co-counsel** 160:3 170:24
**co-worker** 102:8
**cream** 11:17,25 13:6,7 14:5,5
25:5,6 28:5,8,1 1 39:23 40:4
55:1 56:7 62:12,1 7 66:9,11,12
92:1,2,4,12,24 93:8 100:16
115:22,22 117:16,16 230:22
240:17,17,18,1 9 243:3,3
252:16
**creams** 62:10 92:7 122:5,8 247:8
247:8 253:11
**create** 54:16
**credibility** 144:19
**credit** 39:11
**crime** 210:19
**Crimes** 1:15

**criminal** 158:20 162:19,25 177:5
  210:19,22 212:1 218:25,25
  228:12 259:18 279:2
**critical** 160:2
**criticizing** 145:13
**crops** 262:9,15
**cross** 45:7,20 46:3,17 65:3
  166:21 167:5 175:10 267:12
  271:4 273:2 278:10,22 279:23
  281:2
**crossed** 270:1 271:7 276:3
  278:20
**cross-examination** 3:5,8,12,16
  3:20,24 4:3,7 13:13,16 31:15
  31:18 65:3 75:18,19 119:23
  119:25 165:1 180:5,11 204:17
  204:18 237:13,14 249:24,25
  275:21 278:3,8
**cross-examine** 54:1 77:23 276:1
**cruises** 186:18
**Cuban** 274:18
**cuff** 255:25
**Cullen** 81:18
**curious** 272:19
**current** 263:19 264:2 266:22
  268:15
**currently** 114:9 266:25
**custodian** 162:8 163:16
**cut** 159:14 201:17 270:12,19,22
**cyclobenzaprine** 52:22

**D**

**D** 2:6 125:14 281:14
**daily** 200:16 238:21
**Dan** 13:18 32:1 120:2
**DANIEL** 1:19
**data** 63:5 147:6
**date** 43:15,17,24 44:7,9 81:13
  82:7 104:14 159:2 183:24
  281:13
**dated** 27:8 84:4 104:6
**dates** 95:19,21 96:3
**daughter** 255:2
**David** 3:18,22 106:21,24 138:24
  160:10 163:7 164:4,13 168:13
  168:16 187:5,7,9
**Davila** 4:5 106:22 107:2 245:24
  246:2,5,12 250:2,2,3,6,9,19
  253:24
**day** 9:10 47:17 71:24 83:18
  105:18 120:11 152:2 158:22
  173:24 183:8 190:10 194:23
  199:14 217:14,15 245:20
**days** 85:11 96:6 104:8 192:18
  199:17,20
**day-to-day** 63:19 257:7
**DEA** 83:2
**dead-end** 251:17
**deal** 34:7 163:17 186:23 216:4
  239:8 251:18 272:10
**dealing** 37:22,23 192:11
**dealings** 16:4,4
**deals** 221:10,13
**dealt** 97:2
**December** 49:4 178:16 179:6
  181:25 182:2 191:15 209:18
  225:20 230:16
**decent** 262:18
**decide** 97:24 109:1 171:1 179:16
  194:21 260:22 272:10 273:4
  274:10
**decided** 129:5 159:20 179:13
  184:11 186:17 215:14 233:4
  233:18 240:14 247:5 251:10
  251:12 265:4
**decides** 72:5
**decision** 17:25 18:2 42:11 76:25
  77:17 78:7,23 79:16 80:23
  99:1 158:14 201:4,5

**decisions** 76:18 77:7,14,20 79:1
  167:9
**deep** 197:4
**defend** 133:25 173:12
**defendant** 1:8,19 6:2 8:19 16:10
  18:11,12 19:20 21:9 22:4,17
  24:3,8,20 25:3,19,22 26:17
  28:18,21,23 29:14 30:18
  46:18 47:13 115:23 116:6
  117:8 118:10 119:1 125:23,23
  127:20 136:23 137:7 143:12
  145:17 160:6 164:18 170:13
  170:17,18 175:1 177:10,23
  187:2 241:2,12 243:10,15
  253:2,10,13 254:5,13 271:6
  274:9 275:6,24 276:22 277:9
**defendants** 145:17
**defendant's** 5:5,6,7,8,11,13,14
  32:18,22 81:9 84:25 88:16
  108:7 129:12 162:3 165:21
  168:13 170:22 187:7 229:21
  234:12,14 246:2 264:6,11,13
  264:15
**defense** 6:3,23 8:19 81:5 84:19
  85:12 88:12 89:17 100:22
  102:2,2,4 106:13 107:25
  108:3,4 109:18 111:3,4 127:2
  128:9 131:3 150:14 157:20
  158:19 159:8,10 160:6,14
  164:10 171:13 175:17 176:21
  187:2,4,16 195:4 202:24
  229:17 234:8 245:23 270:13
  271:21 273:3 275:19 276:17
  277:13 279:2 280:16
**defensive** 255:12
**define** 142:21
**defined** 130:3
**definition** 226:25
**defraud** 131:23 132:25 134:17
  141:10,11
**defrauding** 142:6
**degree** 228:21 259:6,6,8,9 263:7
  263:12
**delay** 203:6 228:2
**delaying** 50:24
**delays** 274:15
**delete** 110:5 271:4 280:24
**deletions** 110:9
**deliver** 91:23
**delivered** 13:4,5
**demand** 95:12 96:18
**demeanor** 198:19
**demographic** 218:22
**denied** 143:5 144:24 157:18
  158:17
**deny** 112:11,12 141:6 147:22,23
  148:2,3 149:20 279:8,10,10
**denying** 141:8 157:15
**department** 197:5 202:9,9,10,10
**dependent** 216:4
**depending** 66:12 267:11
**depends** 77:5 142:21 211:5
  219:20,21 224:18,19 227:22
  269:21
**deposit** 28:22 33:20
**DEPUTY** 8:3,6
**describe** 16:4 171:22 185:7
  193:2 198:19
**described** 91:17 128:15 193:7,15
**describes** 196:4
**describing** 70:20
**Description** 5:4
**design** 5:15,16
**desired** 46:21
**desk** 208:1
**despite** 136:15
**destroyed** 262:17
**detail** 48:19
**detailing** 14:4

**details** 217:13
**determines** 145:25
**detriment** 274:12
**diagnosis** 153:10 155:9
**Diego** 230:3 237:20,21
**difference** 46:15 62:20 63:1,23
  64:22 65:7 140:19 141:13,19
  141:22 142:5 143:7 178:19
  250:12
**different** 20:9 24:12 46:12,16
  48:23,23 58:11 63:9 64:9,16
  68:3,4,5 76:5 80:7 82:9 88:21
  94:10 95:1 110:23 140:15
  144:6 151:18 185:7 200:24
  204:14 221:3,8 222:16 232:11
  234:24,25 243:17 256:4 260:4
  267:12,13 272:21
**difficult** 34:10,12 95:15 268:11
  268:12
**diminish** 248:24
**direct** 3:4,7,11,15,19,23 3 4:2,6,9
  10:25 15:10 28:22 33:20
  45:17,21 46:3 47:25 57:11
  81:22 85:8,16 87:1 98:2
  113:17 166:2,21 167:4 168:24
  169:1,12 170:16 187:20
  188:12 212:19 225:23 229:25
  237:18 239:25 246:10 251:1
  253:5 254:18 259:23
**direction** 25:2
**directions** 25:7 97:18
**directly** 23:10 24:15 30:18 34:1
  34:1 36:21,23 37:1,23 39:3
  72:11,18 85:3 86:2,9,14,22
  87:6,7,11 92:21,24 97:2 119:2
  204:23,24 268:10
**dirty** 115:25 116:1,16 120:8
  121:15 149:17
**disagree** 169:11 276:23
**discretion** 145:12
**discuss** 158:19 169:18 171:6
  186:9 193:24,24 223:13
**discussed** 35:19 53:24 107:22
  126:1 198:8 208:16 224:4
  276:5
**discussing** 28:18 194:12 195:20
**discussion** 84:4 138:3 139:19
  191:10 222:20
**discussions** 139:19 222:19
  223:19,22 224:2
**disjointed** 274:8
**dislike** 281:2
**dispense** 48:22 261:10
**dispensing** 253:11 260:24
**dispute** 129:21 130:11 135:25
  136:1 137:14 215:1,3,4
  220:24
**disregard** 227:15
**distinctly** 198:25
**DISTRICT** 1:1,1,11
**divide** 59:4 108:5
**division** 1:2 219:6
**DMSO** 52:23
**doctor** 6:14,15,17 8:22 10:4,9,9
  10:10 12:23 19:17 22:11,12
  23:4,23,23,24 24:18 38:17,19
  38:22 46:9 49:11 51:13 57:16
  74:15,18 78:21,22 79:16 86:2
  101:24 105:2 116:9 140:7,8
  143:11,11 146:3,5,18,24,25
  147:3,5 150:16 151:12,16,17
  151:17,20 152:2,7,21,22
  153:4,6,12 154:8,8 155:12,15
  157:1,3,6,7 180:18 216:22
  232:12 239:2,10,11,13,25
  240:5,10,12 267:15 275:16
**doctors** 19:17 20:12 21:1,11,15
  21:17,18 22:5,25 23:21 24:6,9
  24:12 34:8,12,15,18,24 35:5

  35:13,15,19 36:19 37:23
  44:20 47:12 68:14 70:14
  74:23 75:4 81:1 104:14,21,23
  145:20 146:1,14,17 147:5,12
  147:13 151:18,19,23 154:25
  180:18 181:3,9 205:19 212:12
  231:4 238:9 253:14,16 256:2
  268:10,12
**doctor's** 9:14,15 21:3 72:7,17
  146:12
**doctor/patient** 150:6 154:19
**document** 19:3 45:6,7 51:23
  52:2 82:4 83:7 87:13 100:21
  100:22 102:2 103:12 129:14
  163:2 195:14,23,24 203:14
  223:10 235:3 257:19 258:4,6
  258:8,12,14,17,24 259:16,17
**documentation** 152:3 242:23
**documented** 153:8 155:8
**documents** 17:10 45:15 138:17
  149:6 203:22 204:1,3,10
  223:4,6
**doing** 19:14 29:20 46:10,12 98:3
  113:7 130:10 132:9 137:13
  158:4,11 177:1 179:7 181:23
  183:1 196:5 199:2 209:2
  212:2,3 216:8 222:15 225:17
  233:21 235:6,15 243:10,14
  256:14 259:23
**dollar** 100:17 111:17
**dollars** 58:24 62:18,19 100:18
  206:9 212:13
**Don** 138:24
**done** 62:2 69:22 72:12 80:22
  91:4 116:8 131:22 132:2
  134:3 139:1 152:12 157:19
  158:12 174:22 199:10 201:22
  206:21 228:22 234:21 235:7
  235:20 273:5
**door** 43:18,19 49:22 54:3 111:8
  112:18 120:25 121:1 131:2
  276:7,10
**double** 120:24 163:1
**doubt** 152:11
**down** 7:2,16 10:6 28:7 131:4
  164:25 185:20,23 196:19
  198:13 199:8 200:10 201:21
  202:21 217:13 222:21 262:23
  269:14,16 271:16 273:18
**downstream** 36:4 38:3,25 39:9
**Dr** 81:18 104:25 139:7,9 150:18
**drafted** 171:6 183:24 206:23
**drafting** 184:25 188:14 195:1
  197:1 199:11
**drafts** 178:14
**drank** 49:24
**drashbaum@mnrlawfirm.com**
  1:23
**draw** 199:1 223:6
**drawing** 29:8
**drink** 130:23
**drive** 7:24 136:24
**driven** 273:10
**drug** 51:15 54:17,20 56:16 99:17
  100:1 102:18 130:6 143:11
  151:5 153:11 155:10 197:10
  200:23 218:24 223:19 236:6
**drugs** 11:9,15,24 12:1,24 13:1,3
  13:4,5,10 25:23 64:19 99:14
  130:4,5 134:22 149:23 150:4
  151:2 152:14 155:6 207:23
  216:16,20 219:1,3
**due** 16:20
**dumb** 140:11
**duplicate** 71:19
**duplicates** 71:20,21,25
**duplicative** 141:17
**durable** 256:16,23
**during** 28:24 100:1 109:2

118:18 139:18 196:1 199:20
**duty** 114:6
**D-a-v-i-l-a** 246:5
**D.C** 200:4

**E**

**E** 1:20 139:7 281:9,9
**each** 16:1 49:11 109:4 111:18
120:20 151:14 153:22,22
277:23
**earlier** 18:10 27:11 59:14 68:16
81:22 101:12 110:7 117:24
184:20 188:15 228:25
**early** 36:9 45:11 114:11 179:18
206:4 227:23 230:4 265:7,8
**earn** 29:22 257:3
**earnings** 189:16
**ears** 131:11
**ease** 238:17
**easier** 125:4 129:6 185:23
**easy** 144:17 147:14 161:16
268:11
**eat** 111:25,25 112:1,2,21
**Economic** 1:15
**economics** 221:13
**education** 216:3
**efax** 85:22 86:13 87:2,5
**effective** 93:4 183:24
**efficient** 169:11
**effort** 173:4 204:13 209:6
**efforts** 74:14 173:2 221:7,24
**ego** 198:21
**eight** 133:5 134:15 184:17
196:17 260:18 263:4
**either** 6:16 14:14 52:1 64:8
74:20 78:17,18 103:3,9
110:24 123:16 133:3 149:11
161:1 200:19 222:25 224:2
**elaborate** 73:1 222:23
**Eleanor** 11:12,13 27:23
**element** 154:11
**elements** 131:20
**elevator** 111:12
**Eleventh** 144:15
**elicit** 179:2
**eliminates** 130:9
**ELMO** 51:22 195:5 234:16
**email** 19:4 24:17 27:8,15,16,16
27:19 60:24 61:1 70:18,20
71:8,10,22 72:16 81:13 83:12
84:10 85:11,13 101:12,14
102:4 104:2,6,1,1 118:12
128:14,15 162:4,11,12,18
163:7,13 164:5,12 165:7,8
234:18,19 241:8,13,22 275:11
**emailed** 28:15,18
**emailing** 89:18
**emails** 135:3 136:16,18 162:10
162:16
**Emphasis** 271:19
**employ** 65:24 226:20
**employed** 263:10
**employee** 29:25 118:19 119:3,6
119:7 169:18,19 170:15
171:24 173:6 175:15 183:16
183:16,21 184:1,5 189:12,14
190:11,12 208:22 214:10
224:17,20 226:3,5,6,19 227:1
227:5 235:23 242:7 243:4,13
**employees** 30:3 89:18 133:3
172:5 193:19,21 194:18 200:2
200:20 201:14 202:5 218:10
219:8,12,24 224:11 226:11,25
227:7 236:3
**employment** 169:16 170:15
175:4 177:14 188:4,14,16
195:2,21 197:1,10 198:9,14
198:16 199:11 200:22 202:25
218:6,8 219:15 223:16,17

224:8,10
**end** 49:4 68:23 72:10 116:2
120:13 139:7 186:2 190:1
196:3 214:3 215:6 229:4
230:4 232:18 277:18
**endeavoring** 54:5
**ended** 255:16
**ends** 273:6
**enforcement** 53:22
**engaged** 124:5 181:15 192:13
228:12
**Engagement** 192:17
**England** 66:6
**enough** 32:18 39:6 52:11 108:2
121:20 122:5 137:3,5,13
145:10,11,14,15,1 6 147:13,14
150:14 163:16 186:8 219:1
235:10
**ensure** 261:2
**ensures** 242:24
**enter** 16:25 236:10
**entered** 8:13,17 50:16 139:9
185:19 186:24
**entertain** 161:18
**entire** 14:1 37:19 104:11 108:4
116:23
**entirely** 173:14
**entitled** 275:25
**entity** 182:3 221:23
**equipment** 255:24 256:2,4,16,23
**equity** 165:11,13
**equivalence** 67:23
**equivalent** 67:24 68:1
**error** 110:16
**errors** 109:9
**ESQ** 1:19,20 2:1
**essence** 189:15 193:22 194:18
200:5
**essentially** 94:10 257:3
**establish** 133:8 153:10 155:9
279:7
**estate** 255:18,19
**Estefan's** 186:18
**estimate** 215:10
**et** 163:23 175:4 209:8 278:25
**ethical** 117:6 153:16
**ethically** 205:2
**ethoxy** 58:25 59:15,17,22,24
60:5,13,15 61:2,3,12 62:11,11
62:17,20,21 63:20,24,24
65:12 66:21 67:12,18,24 91:9
91:9,14 93:21,25 94:5 97:17
100:9 143:13
**ethoxydiglycol** 57:10 58:13,15
58:22 59:6 65:16 66:20 67:12
67:24 91:16,17 93:7,13 94:2,7
94:10,16,20,2 2 95:3,5,14
96:25 97:8,14 98:6 100:5
**evaluation** 153:9 155:8
**even** 73:22 77:6 123:18 133:23
134:12 138:16 139:1,19
142:14 143:18,25 150:23
154:8,11 156:13 158:12 159:4
159:6,7,10 162:24 165:3
172:25 176:23,24 186:10
210:13 232:16 234:21 259:11
264:4,18 274:11 276:3 277:13
278:20,21 281:5
**event** 6:16 112:13 191:20 206:21
215:14
**eventual** 54:7
**eventually** 215:24 217:18
228:22 238:13 274:10
**ever** 12:23 13:21,23 14:1,11
22:25 23:3,6,18 26:1 27:2
30:9,11,21 41:22 42:21 44:8
45:14 48:25 51:15 69:17
72:12,19,23 73:1,8 74:22 96:8
100:4,6,9 101:16,20 117:10

119:6 120:6 132:23 174:10,15
202:21 203:6,9,14,17 216:2
223:6 236:7,15,22 237:7 243:6
246:16,21 248:6,12
**every** 61:18 138:8 151:14 152:4
183:8 190:10 196:3 217:14,15
236:4 238:4 268:14
**everybody** 8:14 10:8 50:2 58:1
117:2 145:9 153:20 184:23
185:22 200:22 201:16 217:16
217:16
**everyone** 131:3 245:9
**everything** 67:14 72:3 133:1
137:13 173:25 217:13 232:14
232:16 233:23 242:23 268:17
**evidence** 5:3 12:21 18:24 32:22
38:2 43:1 81:5,9 84:19,25
88:12,16 115:4 127:24 128:20
131:12,24 132:4 134:9,13,17
134:14 135:7,16 136:16 137:5
139:22 144:14 145:18 147:13
148:8 149:5 150:2,20 151:13
151:25 159:8 165:22 173:2
187:16 203:12 234:7,8,12
250:17 257:18 263:23 264:6
264:13
**evident** 150:2
**evidentiary** 161:1
**Ewton** 3:14 105:23,25 106:7
113:11,13,16,1 9 115:19
123:15
**exact** 33:10 73:19 100:17
**exactly** 65:9 71:9 89:24 143:15
207:5 227:10
**exam** 154:23 155:1,4
**examination** 3:4,7,9,11,13,15,17
3:19,23,25 4:2,4,6,9 10:25
15:10 45:4 47:25 99:22
113:17 123:13 153:6,10,13
155:9,12 169:12 187:20
224:24 229:25 245:14 246:10
254:18
**examined** 240:12
**example** 38:1 72:7 90:7,16,17
92:2,15 93:2,7 94:23 125:10
134:19 140:6 193:20 209:5
**exceed** 272:22 274:1
**except** 186:7 217:9
**exception** 41:11 75:15 163:16
258:20 275:5 277:14
**exceptions** 41:11 115:16 121:8
**exchange** 101:13 221:4
**exciting** 273:17
**exclamations** 104:13
**exclude** 276:12
**excluded** 138:23,24 139:6,7,17
**exculpatory** 169:24 277:12
**excuse** 6:24 7:1 26:11 130:15
237:23 242:18
**excused** 6:12 8:23 14:19,22
47:16,18 105:9,20 124:11
186:15 229:13,16 253:23,25
**execution** 201:21
**executive** 85:16 197:3
**executives** 179:20
**exemption** 194:3
**exercise** 145:11
**exhibit** 5:5,6,7,8,9,10,11,13,14
18:25 27:7 32:18,22 38:1 46:7
51:18 57:23 60:20,21,23
70:16,17 73:2 81:5,9 84:3,19
84:25 85:12,12,2 2 88:12,16
88:19 89:17 100:23 102:21
103:17 104:2 108:18 109:15,18
125:24 127:20,24 128:19
129:4,4 165:6,21 195:4
200:17 201:13 202:24 203:12
234:8,12,14 250:18 257:19
263:17,21,2 4 264:6,11,13,15

**exhibits** 5:1,2 107:13,14,19,23
108:3,20 124:18 126:22 129:3
159:11 160:12,14 165:19
187:16 275:3,5,12,18,20
**exist** 144:5
**exorbitant** 99:18
**expect** 24:18 107:6 158:2 217:5
275:17
**expended** 216:1
**expense** 229:1
**expenses** 118:5
**expensive** 99:12,14 136:21,22,22
**experience** 20:1 110:21 167:1
216:3 240:24 265:20 267:1
**experienced** 240:21
**expert** 53:11,14 94:19,21,21
138:6 139:5
**expertise** 192:6
**experts** 53:21 138:2 213:1
**explain** 142:25 143:8 150:10
172:17 195:13 200:17 223:2
236:8 241:19
**explained** 221:21 266:11
**explaining** 209:17
**explains** 140:18 178:21,22
**explicit** 44:16,22
**Express** 138:9
**expressing** 234:20
**extent** 173:4
**extremely** 256:12
**E-w-t-o-n** 105:25 113:16

**F**

**F** 125:16,17 281:9
**face-to-face** 23:3
**facilitating** 88:25
**facility** 238:3,6
**fact** 9:8 16:18 80:2 100:7 137:22
139:8 150:17 158:23 159:20
171:5 190:23 205:2 206:16
210:23 221:10 225:5,6 241:8
279:7
**factors** 143:17
**facts** 147:16 180:1 211:1,4 212:8
212:9,10,1 1 216:8,10 224:18
224:19,19
**fair** 12:18 34:2,3,4 39:6 121:20
155:25 169:10,11 201:1
215:21 235:10 264:18 267:21
274:7 279:3,7,11
**fairly** 189:21,23 225:2
**fait** 179:24
**faith** 171:16,20,21,2 2 178:4
228:15
**fall** 45:11 180:14 189:4 209:10
209:10 213:13
**false** 131:21 132:6 138:18,18
150:25 151:25
**falsified** 152:7
**familiar** 43:1 52:4 53:17 59:14
182:4 191:19 209:22 211:7
**family** 74:21 103:10 118:5
225:11 255:1 275:24 276:14
**far** 10:9,9,10 23:5 126:13 143:6
198:13 231:13 238:19 241:16
242:16,23 255:3 274:6
**fashion** 168:23
**fast** 155:25
**fast-forward** 239:21
**fast-forwarding** 260:11
**fault** 9:8
**fax** 1:17,23 69:16,21 70:9 83:25
84:4,11,12,14,1 6 86:8,12,16
86:18,21,22 87:1,5,14,15 88:2
88:4,10 100:25,25
**faxed** 85:2
**faxes** 71:23 87:25 88:3 135:2
**features** 256:5
**February** 203:14 228:11 259:14

**Federal** 130:2,3 178:15 180:23
181:2 182:1 191:5,24 192:2
206:6,7 209:19,25 210:6,12
210:16,16,18 211:19,22
223:22 225:9 258:25
**FEDERICO** 1:10
**feel** 116:17,20 117:3 124:5 145:8
165:2 265:3,5
**feeling** 265:5 278:7
**feet** 202:20
**fellow** 102:8 167:6
**felt** 116:1,16 117:6 123:15 145:8
192:6 242:2,4
**female** 240:11
**Ferguson** 2:6 281:14
**fever** 6:6
**few** 6:7 29:6 62:18 88:2 179:6
**fide** 183:16,21 224:8,10,17
**Fidel** 274:19,20
**field** 243:20
**fifth** 172:23
**fight** 140:1
**fighting** 140:2 272:25
**figure** 10:5 59:4 177:22 179:7
206:13
**figured** 238:23
**file** 110:18 152:4
**filed** 143:22,24,24
**fill** 20:17 22:11 27:11,14,15,25
30:4 33:16,19 89:9 91:3
104:12 111:16 116:7 119:3
231:22,25 232:3 235:21
247:12 248:24,25 261:1
**filled** 24:16 27:15 30:12 33:15
39:10 71:2,5 81:1 118:21
212:16
**fills** 38:24
**final** 18:2 54:20 124:14
**finalizing** 202:25
**finance** 202:9 209:7 262:14
**financial** 207:15,17 222:13
**financially** 117:1
**financing** 262:13
**find** 25:19 38:6,9 46:18,20,21
47:4 70:2 71:18 100:22
147:25 167:12 168:10 169:8
212:8 216:10 247:16,18,20
248:2 252:24 266:6,7 268:10
**finding** 38:3 40:24
**fine** 156:5 167:9 175:9 217:23
218:3 269:5
**finish** 263:11
**finished** 229:8 268:20
**fire** 202:20
**fired** 184:1
**firm** 176:3 192:8,9 200:4 210:9
211:25 212:20,21,22,23
**first** 15:6,22 29:6 32:3,12 37:11
52:15 71:3 72:4,5 104:25
107:6 108:13 109:20 116:5
126:14 133:4 134:15 135:10
144:1 151:8 157:25 158:5,22
160:9 172:24 175:23 182:2
191:15 194:20 200:21 209:21
209:24 234:15 240:18 250:7
255:18 258:8 260:16,17 262:5
266:9 267:6 277:7
**fish** 159:14
**fit** 238:22
**five** 80:12 111:5 158:15,18
159:18 172:22,25 183:25
184:4,4 274:25
**flank** 213:18
**flesh** 133:18
**flip** 102:23 273:4
**Florida** 1:1,6,16,22 2:3,7 11:3
15:15 113:21 114:10,11 150:1
150:6,8 152:17 153:17 154:19
155:2,5 190:16 254:25 255:4

255:6,8,21 259:7 262:1 263:8
281:15
**flown** 164:25 165:2,4
**flurbiprofen** 52:22 130:4 151:6
**fly** 7:25 148:18 165:1
**flying** 148:13
**focus** 28:2 51:22 54:24 68:18
81:20 131:6 199:22 228:22
**focused** 46:8 133:1 261:24
**focuses** 140:21
**fold** 136:9
**folks** 50:17 113:9 129:3
**follow** 90:22 155:7 227:12
**following** 6:1 113:3 131:1
**follow-up** 90:17 239:13
**Food** 130:6 223:19
**football** 255:9,17 264:19
**force** 215:23
**forced** 274:18
**forcing** 281:10
**foregoing** 281:10
**forgive** 220:10
**forgot** 6:16 10:6 148:1 185:25
186:2
**forgotten** 56:14
**form** 14:4 27:9,10,22,2 5 28:17
38:15,24 39:10,16,19,22,25
40:20 43:21 74:15,24 79:5
82:9,18 88:2 103:2,7,7 104:14
199:9 203:17 217:25 248:25
**format** 182:24 193:18,19,20
**forms** 20:9 79:7 81:2,23 102:24
104:13 116:11 191:3 235:18
236:5 258:23
**formula** 56:5 76:23 79:2 81:17
82:2 93:11 103:11,25
**formulas** 51:15,16 61:13 76:2
80:19
**formulation** 52:16 54:12 55:6
73:9
**formulations** 51:25 52:8 54:23
76:5 91:12 92:3
**forth** 112:16 118:12
**forward** 168:9 179:8 194:25
223:11 278:15,17
**forwarded** 90:4
**found** 182:4 209:22 279:8
**foundation** 34:19 40:22 41:1,14
68:25 77:19 122:25
**founding** 264:18
**four** 42:7,8 59:1 70:21 71:11
80:12 110:20 111:5 183:25
184:4 194:19 213:14 214:19
236:1 274:9
**Fourth** 1:16
**four-liter** 58:25
**FPR** 2:5 281:13
**frame** 19:19 118:18 194:11
230:17 231:6 239:20
**fraud** 131:6,16,18 136:3,8,9
137:1,16,17,19 138:19 139:3
140:17 141:24 142:8,19 144:1
144:3,23,23 145:2,4,5,10,16
147:7,10,17 149:12 154:7,11
172:8,15,20 173:3 177:5
223:23
**frauds** 137:21 172:22
**fraudulent** 135:10 142:13
143:18 144:4 146:4,17 162:13
162:19 172:9
**fraudulently** 143:12
**free** 239:10,12
**freeze** 262:8
**friend** 11:10,11 15:23,25 27:6
230:19 251:2
**friendly** 120:20
**friends** 34:18,25 35:5 114:18,23
120:12,14,22,22 121:11,16
122:1 266:22

**Frier** 176:3 182:16,19,22 183:10
192:10,13,20 193:7 194:12,14
200:1 212:23 213:3 227:12
**from** 6:11,20,22 7:6,22 12:23
13:2 20:8 21:20 23:9,21 24:6
24:18 25:2,22,25 26:1,17 27:8
28:23 29:8 30:15,18,19,21
34:1,2 38:16,19 43:21,24 46:9
49:11,11,21 51:13,15 52:20
57:13,16 58:15,22 59:7 60:15
61:1,12 62:20,21 65:16 69:10
69:18 70:9,14,18,19 72:8,15
72:16,21,22,24 75:1 81:6,24
82:15 85:11,13 86:2,19 87:10
88:1 93:16 94:4,23 95:6,19,23
95:23,25 98:22 100:7,24
101:25 102:4 103:11,20,25
104:2 106:5 110:24 111:10,13
114:1 116:8 117:11 118:10,14
118:23,24 119:1,18 122:21,22
127:2 130:25 132:11,14 133:7
134:5,8 135:3,4 136:6,23
137:13 138:24 143:13 146:23
148:13 149:6 150:11,18
160:21 165:2,4,7 169:6
170:10 172:1,5 174:3,10
175:16,25 176:1,2 181:2
182:3,22,24 183:17 185:7
187:19 188:7 193:18 194:4,5
194:7,21 197:1 200:1 201:4
201:10 206:6,25 210:12
211:25 212:20 213:3,13,23
214:21,22 217:25 218:5 220:6
221:3 228:6 230:2,3 231:5
232:12,14 234:22,25 235:1,16
236:2 241:9 242:9,15 243:3,9
244:15,16 247:10 248:6,12
249:3 250:11 251:24 252:4,4
254:24 255:4,7 256:12 257:14
259:6 261:2 262:11,23 263:9
264:19,20 269:13 270:13
275:19 280:15
**front** 15:20 43:19 47:24 51:17
104:1 166:23 167:14,16
168:21 185:10,13 195:15
**frustration** 71:1
**full** 228:17
**fully** 196:13
**full-time** 29:16
**function** 220:16
**fund** 165:13
**fundamental** 146:13
**furnishing** 211:18,18
**further** 14:16 17:19 31:14 44:25
47:15 99:20 119:22 123:11
191:25 237:12 245:11,19
249:23 253:22 264:22
**furtherance** 177:24 178:4

**G**

**G** 107:10
**gambling** 156:14
**game** 37:2 271:6
**games** 34:16
**gander** 273:25
**gave** 6:7 11:23 14:4,8 33:19 47:3
109:4,10 110:4 111:3 140:20
176:9 180:15 181:1 200:4
204:22 227:12 235:21 238:15
252:3 266:15 279:4
**general** 96:6 99:14 166:9 185:3
190:6 191:2 206:2 208:18
217:2 222:12 225:10
**generally** 121:7 191:6 196:10
198:8 273:13
**gentleman** 247:3
**gentlemen** 105:10 129:20
**Gerald** 168:6
**Germany** 106:5 148:14 165:3

**Gerry** 167:20,21
**gets** 90:8 98:21 111:18 138:8,9
142:8 143:13 153:20 163:13
177:21,25 178:24 228:21
**getting** 26:25 88:22 90:25 117:2
118:20 119:8 140:13,14
146:19 166:16 182:3 190:2
199:10 201:22,23 227:1
231:22
**Gilda** 2:5 195:11 281:13
**Giles** 83:20
**Ginger** 70:9 134:19 137:7,9
144:17 174:11,16 203:9
236:12
**give** 14:6 42:16 53:4,20,21,25
54:14 56:18 62:16 100:17
109:11,25 110:6,10,12,17,18
110:19 111:2,22 130:15
143:16 146:18 153:14 154:7
168:22 169:5 176:15,17 186:4
186:5,22 189:25 194:11
204:24,25 205:1,2,11,15
209:5 210:25 213:21 223:8
232:19 235:13,18 241:11
244:1,7 247:20,22 249:22
270:22 271:5
**given** 14:11,14 27:13 159:19
186:7 196:6 205:13 227:11
232:21 242:4 243:19 252:1
259:4
**gives** 37:11,11,14 103:4 273:1,7
273:7
**giving** 74:19 82:21 103:3 104:12
156:4 262:16 274:13
**Gloria** 186:18
**Glover** 6:13
**glutes** 231:14
**go** 7:9,12,17 8:22 10:4,24 14:21
20:23 22:10 24:19 34:7 38:6,9
46:1,5 50:13,21,21 54:20 56:2
62:3 69:4 71:23 74:19 77:9,23
83:25 86:9,14 89:4 92:21
96:18 103:3,8 104:1 107:11
107:14 111:5,20 116:3 123:2
124:23 131:2 142:17 145:6
153:14 154:8 158:17 166:4
171:18 174:9,13,13 185:16,20
186:5,10,20 187:14 192:15
193:5 194:16 201:4 214:14
222:21 223:10 227:21 233:22
238:9 239:1,11,13 243:6
245:3,7,9 253:6 255:3 256:3
263:6,9 265:4,6 271:22,25
278:15 279:19 280:11
**goal** 257:2
**goes** 41:14 57:6 71:15,18 121:13
179:10 242:22
**going** 6:14,20 8:1 9:23 10:11
12:2 18:24 19:14 21:7 36:12
36:19,20,23 37:1 38:18 41:23
42:2,12,25 46:2 48:19 49:19
53:18,24 54:3 56:10,12 57:2,2
57:3 60:20 61:10 63:16 69:4
77:14,17,23 78:7,16 90:17,18
90:25 93:25 94:2,4 98:19
100:5,23 101:10 105:12
106:13 107:15 110:6,17
112:16 121:10 123:25 124:13
125:3,25 126:3 129:3,4
130:18 134:11 139:3 141:5,6
144:15 147:9,20,21,23,24,25
148:23 149:20 150:9 153:14
157:14,20 158:9,13,20 159:7
160:10 164:8,15 165:17,24,25
166:12,14,17,18,19,2 2 167:11
167:18 168:10,21,23,24
169:21 170:6,8 171:1,3,5,17
171:18 172:8 173:11,19,20,21
173:21,23 174:6,7,9,10,19,24

175:9,12,14 176:4,6,13,18
178:10 179:2 180:1,6 189:12
190:4 194:21 197:13 199:8
213:14 214:18 215:11 217:18
217:24 218:1 221:22 232:19
233:14 238:19,24 239:7
243:20 252:10,21,23 260:1
264:4 265:16 268:15 269:1,2
269:20 271:8 272:4 273:12
275:2,4,9,15 276:21,24 277:2
277:3 278:7,10,14,17
**Gold** 59:15,17,22,2,4 60:5,13,15
61:2,3,12 62:11,17,21 63:24
65:12 66:21 67:12,19,24 91:9
93:21,25 94:5 100:9 143:13
**gone** 55:12 159:8 231:4 233:20
238:14
**good** 6:2 8:14,15 13:18,20 15:12
15:13 31:22,23 40:16 47:17
75:21,22 105:4,18 113:19
120:2 145:8 151:17 153:15
159:5 166:25 171:16,20,21,21
178:4 179:20 190:9 214:2
219:1 228:15 229:23 230:2
237:16,17 245:20 250:2
254:20,21 261:15 262:7
266:20 278:12 280:4,5,6,7
**goodness** 166:19 271:21 277:24
277:24
**goods** 207:8,10
**google** 269:11
**goose** 273:25
**gotten** 201:8
**Government** 1:13 6:3,25 8:20
14:25 17:1,15,22 38:1 42:4
53:25 63:14 81:6 105:21,22
107:14,15 108:21,21 120:25
121:1 124:15 125:22,24
130:12,13,15 131:13 134:8
137:25 138:24 139:12,20,24
143:24 144:8,9 148:7 152:13
153:20 159:20 160:6,21
162:10,13 163:19,20 166:10
170:11 171:16 172:3,4,8
187:2,19 203:23 204:3 263:17
271:8,15 275:19,25 276:19,20
276:21
**Government's** 5:9,10 10:20 15:4
18:25 27:7 38:1 46:7 47:22
51:18 60:20,21,23 70:2,16,17
73:2 85:22 88:18 102:21
103:17 104:1 106:9 110:25
113:13 124:14 127:24 128:19
145:12 177:18 203:12 250:17
257:18 263:17,22,24 276:22
277:9
gphofficialreporter@gmail.com
2:7 281:16
**graduated** 255:4 259:8 263:9
**Graham** 269:6
**Graham's** 140:2 180:10
**gram** 62:12,17
**grams** 62:15 71:5 101:20,21
**grand** 29:1,2,3 30:17
**grant** 112:11 157:14
**great** 48:19 216:4
**greed** 140:12
**Green** 4:1 106:23 107:2,5,8,11
229:18,21,2,4 230:2 237:16
238:4
**Greenberg** 167:19,20,2 1 168:5,6
168:8
**grew** 254:25
**grounds** 53:2 62:23 73:25
123:20 161:21,25 222:7
**group** 19:9 58:9 86:23 90:1 92:9
125:18 126:13 188:21 190:4
194:18 199:24,24 217:9
227:25 260:3

**groups** 80:7,12,14 92:10 180:19
194:17 227:23,24
**Grow** 1:7 4:8 13:18,21,21,23
14:1,6,11,12 15:21,22 16:1,5
16:21,23 18:20 19:2,8,12,15
19:20 20:6 21:20 22:23 24:2
24:17 25:14 26:1 27:8,13
28:15 29:10 31:6 32:1,3,9
34:1 35:12,18,21,25 36:15,10
37:10 38:6 39:1,3 40:6,13,20
43:22 44:16,19 45:8 47:3
57:17 58:16 60:18 61:1 62:21
67:18 68:8 69:18 70:9,19,20
70:22 71:22 72:16,22,24 80:5
82:4 85:13,25 86:19 88:25
90:1,4 93:19 94:7 97:2,5,8,14
100:24 101:13 102:1,4 104:2
104:11 114:15 120:3,3 128:15
131:25 132:21,23 133:2,8
134:6,22 135:3,8 136:19
137:17 138:14 145:19 151:1
158:3 162:13,19 164:13
169:15 170:5,9,14 171:6,7,21
171:23 172:5,9 175:19 177:11
178:7,14 179:3,10,16,18
180:20 181:5,12 182:8,20
183:16,21,25 184:5 189:8,12
189:19 192:25 193:20 194:17
195:2,18,22 198:6,22 199:5
199:23 201:6,11,14 203:3,6
204:20,23,24 205:18 206:17
206:19,25 208:6,8,13 210:3
210:11 211:14,21 212:8 213:4
213:7 214:10,22 216:5,7
218:21 219:5 220:25 221:6
223:12,24 225:17 228:5
235:13 237:7 246:21 247:10
254:8,13,16,2 0 259:6 262:21
270:1 275:3 276:16,18
**growers** 261:25 262:8,14
**Grow's** 41:15,16,18 57:16,16
68:18,23,24 69:9,21 72:10
79:25 86:23 87:15 92:9 95:6
105:2 164:16 178:23 189:10
193:17 198:19 201:1 215:23
217:12 226:3 227:24 278:18
**Grow-Chem** 261:21
**guess** 6:15 19:16 23:22 26:8,21
28:11 145:24 152:9 177:25
183:3,9 190:21 194:19 199:19
201:17 207:8 208:9 213:23
226:20 230:16 233:23 236:4
241:4 251:19 261:8
**guessing** 86:11 245:4
**guidance** 210:10 212:5
**guilty** 16:9,11,12,14,18,1 8 17:4
133:16 145:8 170:24
**Gunn** 207:21,22
**guy** 42:24 156:13 184:19 197:6
199:8 208:4 225:11 244:2
**guys** 112:18 171:2 225:12
**gym** 248:5 251:4
**G-r-o-w** 254:16

**H**

**half** 10:2 262:5 273:14
**hall** 51:1
**Halliburton** 134:20 165:10
**hand** 10:19,21 15:3 47:21 60:20
71:17 81:10 113:12 166:12
168:12 187:6 229:20 246:1
254:12
**hands** 64:20
**happen** 18:7 42:25 158:9 187:25
266:6,7 278:11
**happened** 7:14 28:17 137:8
158:2 230:18 233:18 235:24
247:4 261:8 262:6,22
**happening** 60:25 88:4 273:6

**happens** 7:5 50:19 53:19 78:6
124:16 147:22 177:4 178:24
225:13
**happily** 148:3
**happy** 42:11 125:1,1,2 168:5
188:7,7 269:6
**harbor** 175:15 176:13,18,24
177:7 178:25 183:17 193:25
194:2,4 201:10 213:10,13,17
214:11 224:6,7 227:4,8
228:24
**hard** 7:17 96:14 217:16 238:22
**harder** 144:8,9 273:4
**harm** 146:5
**harmful** 146:6,7,9 216:21
**hate** 167:13 171:1 278:16
**having** 21:16 23:21 34:24 46:10
53:23 71:23 86:17 98:6 111:9
115:1 145:20 189:13 212:25
263:2 272:11 274:9 278:24
**head** 197:8 198:6,6 219:6
**heading** 85:21
**heads** 208:5
**health** 11:4,6,19 130:2,2 131:6
131:16,17 136:3,4,25 139:3
140:17 141:3,12,14,15,22,24
141:25 142:6,8 144:3 145:2
149:11 180:23 181:2 182:1,16
191:22 192:5,7,11 206:1,3,6,7
209:19,23,25 210:6,9,12
211:20,22,5 212:22 213:1
223:22 227:11 257:8 258:7
259:20,21 263:2
**hear** 12:23 42:11,24 47:7 49:22
82:15 117:11 131:2 134:8
156:1 161:4 169:6 173:2
175:10 188:7 230:9 235:5
236:12 275:19 276:13
**heard** 13:2 27:2 131:13 136:23
148:10 173:4 177:16 182:2
191:10,12,16,1 8 205:24
209:21 212:17,18 220:6 228:9
236:13 246:16 264:5 277:6
**hearing** 160:2 191:14
**hears** 164:6
**hearsay** 12:4 41:1,10 44:1,2
59:18 60:6 66:1,24 74:1 75:11
115:11 120:22,23,24 161:6,9
161:22,24,25 162:25 163:2,3
173:10 174:5 193:4 234:1
237:10 248:8,16,17 254:6
258:19 277:14
**heart** 179:5
**hectic** 238:22 239:6
**hedge** 165:13,15
**held** 6:1 39:18 113:3 131:1
149:23
**help** 91:23 107:9 111:23 118:8
139:13 140:21,22 141:5 188:3
257:6 279:24
**helped** 221:10 246:20
**helpful** 203:3
**helping** 112:20 186:6
**helps** 91:25
**her** 6:13,15,19,2 4 8:23 11:12,22
22:11,12 28:3 39:25 137:7,15
148:6,18,21 149:5,6 150:11
155:13,18,20 156:17,24,25
157:5,6,7,9 230:19 233:20
239:23 244:16 256:20,21
263:5
**herself** 156:25
**hey** 42:24 231:10
**he'll** 178:13 271:7
**high** 100:17 228:21 256:13
**him** 7:13 9:4 14:13,13,14 27:15
32:4 36:15 38:21 41:5 43:8,12
43:13,15 45:21,22 54:1 68:1
77:22,23,23 89:4 97:3 104:12

106:1,3 117:10 118:11,14
120:5,7 135:5,5 153:2 158:7
158:19,20 159:21 160:13
165:1 166:4,4 167:12,12
168:20,21 169:3,6,7,18,24
170:3,3,5,5 171:24 172:1
173:16,18 174:8,10,13,19
175:3 178:10 184:1,9,10,11
184:13,14,16 185:6 188:3,7
193:15,17 198:10,11,22
202:13 204:22,25,2 5 205:1,2
205:5,11,13 208:22 215:6,12
215:13,18 216:11,12 220:7
223:4,11,15 235:16 241:22,23
254:10 265:14 269:25 275:11
275:12 279:4,13
**himself** 143:12 173:12 244:5
279:9
**hip** 255:24
**HIPAA** 85:5,25 100:22 101:1,3
242:16,17,19,20,21
**hire** 197:16 265:11
**hired** 188:2 197:7 198:25 219:17
219:24,24 220:6,7 236:5
243:15 257:7
**hires** 216:25
**hiring** 180:15
**history** 49:9 153:9 155:8
**Hmm** 214:9
**Hoang** 104:25
**hold** 155:19 160:16,16 164:12
182:10,10,10 184:2
**Holder** 256:17,20 257:5,14
**hole** 222:21
**home** 136:4 263:5,19 264:2,16
269:2
**honest** 196:11
**Honestly** 235:15 244:22
**Honor** 6:24 7:1,12,21 8:9 12:4,7
12:18 13:12 14:16,18,23,25
26:12 31:14,16 40:17,22 41:1
41:13 42:5 44:13,25 45:1,19
45:25 46:23 47:15 49:25
50:12 51:5 53:1,14 54:10 58:4
59:18 62:22 64:10 67:5 68:4
73:23 75:10,17 77:8,19 81:4,7
81:11 84:18,23 87:18 88:14
99:20 101:8 105:8,22 106:16
107:16 108:15 109:21,24
115:6,8,12 119:20,22,24
121:1,14,17 123:9,11,19
124:13,22 125:15,19,21 126:1
126:15,20,24 127:3,5,9,22
128:1,4,7,11,13,17,23,25
129:7,13,16 130:13 131:5,10
131:12 134:10,13,16 136:2
138:17 141:1 144:7,21 147:19
148:1,8 149:13,16 151:15
152:16 154:4 156:7,23 157:4
159:15 160:8,10 161:6 162:2
162:6,17,21 163:21 164:1,11
166:3,13 167:7,15,17 168:6
172:13 177:13 178:11 179:6
180:2 185:8 187:15 193:4
195:5 220:21 222:2 224:13
225:22 226:21 229:5 233:16
234:10 236:14 237:12 245:11
245:13,19 248:16 249:23
253:4,19,22 254:6,9 257:23
258:1,19 263:13,23 264:8,9
264:23 268:21 269:16 271:10
271:17 272:11 273:21 274:4
277:20 278:13,14 280:5,6,9
280:10
**HONORABLE** 1:10
**hook** 219:18
**hope** 90:6 270:3
**hopeful** 106:4
**hopefully** 34:7 257:2

hoping 17:19
hospital 6:14,17,20
hospitality 156:4
host 204:4
hour 9:24 10:1,2,3 105:10
  112:17,20 166:3 273:14
hours 29:18 55:22,23 161:17
  196:9,15,17,2 1 199:17 202:4
  202:11,1 3 209:2,2,9,11 215:6
  215:7,10 216:1 218:14
house 10:12,13 43:19 186:18
household 118:5
HR 197:3,9,16 218:12,13 220:16
huh 9:20 214:9
human 60:4 133:13 197:4,6,7,18
  202:8 209:8
hundred 56:21 58:24 201:18,25
  206:9
hundreds 204:10
husband 156:17,24 157:1,2,4,8
  244:14
husband's 155:13,19,20
Hut 220:8
H-o-a-n-g 104:25

I

idea 24:7 62:16 79:12 86:16 90:6
  90:25 116:22,25 122:3 169:21
  179:20 201:9 205:23 216:11
  217:18 219:9 222:12,12
  259:18,19
ideal 178:1
ideas 221:23
Identification 5:3
identified 53:15 85:16 139:23
identifier 156:9
identifying 20:15 71:8
ignore 26:20
ill 8:21
illegal 44:17,20,23 134:6 141:1
  142:13 175:19 182:8 183:2
  205:21 226:11,14,17 237:8
image 89:22
immediately 33:1,4
impact 26:23 43:3,5 162:23
implants 255:23 256:4
implementation 139:4
implications 221:14
important 7:4 12:20 46:22 47:3
  47:10 93:8 104:13 110:25
  158:14 168:21 186:19 197:2
  202:19
inaccurate 122:24
inbound 106:5
Inc 19:9 188:19
incident 276:1 278:18
include 102:18 109:7,7 171:17
  191:5 219:4 271:4
included 73:19 97:23 112:5
  142:1 153:8 155:7 162:25
  176:14 201:14
includes 115:11 200:20
including 73:6 107:25 153:9
  155:8 194:17 197:18 207:8
income 29:8 189:16 257:3
incoming 88:3
incorporate 31:3 221:7,23
incorporated 140:16
incorrectly 89:1
increase 143:16
increased 96:21
increases 96:18
inculpate 170:3
independent 19:4,11 181:5
indicate 61:3
indicated 72:15 102:17 120:14
indicates 83:8
indicted 133:14,24 163:22
Indictment 130:1,5 145:12

153:7
individual 18:10 114:15,15
  145:15 162:13,19 185:4
  211:17 221:18 235:12 273:6
individuals 53:20 107:13 133:11
  163:14,14 164:7 235:11
induce 140:17 141:1 211:17
  212:15
induced 136:10 143:9 145:3
infer 148:11
inference 135:4
inferred 149:6
inflates 143:12
inform 198:10,11
information 19:18 24:17 33:5,20
  33:23 38:10,12,12,25 69:17
  72:9 82:18 83:9,12 88:8,10,23
  89:9,24 90:4,8,13 91:1 116:10
  116:13,21 118:13 131:22
  132:7,8 217:25 218:22,22
  228:6,8,10 232:5,13 234:22
  235:18 242:24 259:2,4 272:18
InforMD 18:17,18,20,2,2 20:3,6
  20:8,19,21,22 21:2,3,3,10
  21:21 22:1,4,5,7,17,18,19,22
  23:1,11,14,16,1 7 24:19,21
  32:4,7,9,10,12,1 3 33:1,4,8,15
  33:25 34:2,4,7 35:12,21 36:2
  36:10 37:19 44:20 45:10,11
  45:14 46:10,12 259:24,25
  260:1,2,3,8,17,1 7 261:5,15,18
  265:9,12,16,1 8 266:1 267:3
  267:16 268:9
informed 267:7
infrastructure 200:11
ingesting 92:16
ingredient 56:24 58:12 63:7
  64:22 68:4,5 74:20,20 76:22
  77:1,18 78:12,21 79:2,8,9
  80:20 82:13 93:10 94:17 99:5
  103:4,4 151:7
ingredients 52:25 54:15,16,19
  54:22,24 55:1 56:23 57:9
  58:11 67:18 68:8 72:25 73:5
  76:5,18 78:20 91:11,22 96:11
  96:14 98:12 100:1 136:24
  209:4
initially 115:24 120:11 215:15
  233:7 263:2
initials 55:18 57:19
initiated 201:6,7
initiative 241:20
injuries 237:19 238:10 239:14
injury 92:13 230:20 237:24
  255:16
inkling 217:24
inner 244:15
inning 130:16,16
input 70:13
inquire 272:11 278:23
inquired 232:18
inquiring 165:24 268:23
inside 132:8 134:25
insisted 173:22
instead 65:23 86:19 112:8
instructed 69:22 248:24
instructing 70:6,8,9
instruction 25:22 26:1 46:19,20
  46:22 47:3 109:6 110:17,19
  111:2,4 149:25 176:16,17
  186:22
instructions 6:8 24:13 26:16
  27:13 104:12 109:5,25 112:3
  112:3,16 140:20 171:14,17
  176:15 270:6,15 280:14 281:4
insurance 11:4,6 68:19,21 73:15
  76:11,13 77:7,13 78:1,11
  79:10 80:24 97:23,24 98:2
  99:1,17 100:12 102:13 190:18

190:19 191:1,3,3 192:3 214:6
  214:8 267:10,24,25
insurances 267:8,20
intake 20:9 23:24 27:9,10,22,25
  28:17 38:15,24 39:10 43:21
  248:25
intend 276:1
intent 131:22 132:24 170:24
intention 275:1
intentionally 42:9 228:2
interact 90:6 200:13
interaction 118:11
interactions 223:12,15
interdisciplinary 209:6
interest 173:15 257:10
interested 199:2 247:7
interests 170:4
internally 273:1
international 262:11
interrupt 40:15 49:13 61:10
  120:19 153:22,22 169:23
  172:7 268:19
interview 17:10 217:5 233:24
interviewed 166:11 218:10,14
introduce 63:16 107:15 129:5
  135:16 159:11 160:12,14
  162:14 187:16 234:3,4
introduced 18:11,11 35:25
  136:16 194:1 235:8 240:19
  247:2,3,4 251:1 263:17
inundated 34:25
inures 274:12
invalid 150:5 151:9,11 154:18
Inverness 254:25
invest 256:15 257:8
investigation 203:23
investing 255:18 256:15 259:21
investment 257:13
investor 257:14
invitation 54:3 233:15
invoices 93:24 94:4 95:22
involve 206:7 209:14
involved 26:21 29:9,14 54:22
  77:25 80:15,20 88:25 90:10
  113:24 114:19 115:3 116:5,19
  117:3 151:19 165:3 184:24
  188:13 195:1 196:13 197:19
  202:5 204:13 208:22 225:12
  228:25 237:18,25 265:22
involving 205:5
in-depth 192:6
ironic 12:10 148:23
ironically 148:24
irrelevant 44:3 226:22
IRS 190:1
issue 72:23 73:1 79:19 84:1
  85:22 112:13 121:19,24 136:5
  140:3,4 142:18,18 144:22
  157:1 158:23 159:15 160:11
  164:17,22,25 166:6 167:3
  170:16,22 172:1,2 173:11
  180:6 189:15 192:14 206:3
  212:1 228:19 238:18 252:20
  253:14 275:23 278:18,24
issued 217:21
issues 73:8 85:5 106:17 147:21
  169:8 173:19 185:12,13 186:9
  192:11 206:4 210:7 231:3
  263:3
item 211:19

J

J 1:13 49:15
Jacksonville 7:23 11:3 14:20
  15:15 20:5 113:21 114:8,10
  114:11 165:4 230:3,6 237:22
  237:23,24 238:1,7 255:10
Jaguars 255:10
jail 18:9 158:20,24

James 9:1
January 1:7 27:8 28:15 43:21
  45:12 84:4 86:4 87:4 88:5
  89:17 127:6 183:15 194:14,24
  212:19 213:12 227:13 228:11
jar 58:25
Jean 9:13,14,17,19,21,2 4 10:1,3
  10:12,15 220:9
JEFFREY 1:20
Jersey 192:10 212:23
jmarcus@mnrlawfirm.com
  1:24
Jo 83:20
job 19:23 29:16,22 48:20 58:6
  83:5,15 119:8 218:18 220:7
  230:7 255:20
Johnson 244:13
joint 177:13
JON 1:14
Jonelle 106:4
Jones 9:1,1,3 49:13,15
jon.juenger@usdoj.gov 1:18
Josie 3:3 7:21 10:18,20,22 27:2
  28:3
Jr 2:6 281:14
judge 1:11 6:5 7:8 18:2 32:17
  43:3 50:9,22,22 109:15
  111:21,21 112:1,23 125:2
  140:1 144:19 155:21 157:21
  158:1,11,15 159:25 173:20,22
  174:23 178:1 180:9 229:18
  249:12 254:2,4,8 269:6 270:3
  270:8,20 271:22 272:8 273:22
  274:22 276:15
judges 105:15 111:11 158:10
  272:15,21 273:11 274:5 276:8
judgment 108:22,25 110:7
  149:21 157:15
Juenger 1:14 3:4,11,13,21,24
  7:11,21,23 10:18 11:1 12:7,9
  12:12,14,16,18,2 2 13:12
  14:18 47:20 48:1 49:25 50:12
  51:5,6 52:10,13,14 53:14 54:5
  54:10,11 56:3,14,15 57:3,8,24
  58:4,5 60:12 61:11 62:4,9
  63:15,18 64:5,10,12,14,18
  65:5,18 66:10 67:10,15,17
  68:4,7 69:2,3 74:7 75:16 77:8
  77:19 79:24 81:7 84:7,21,23
  87:17,21 88:14 99:23 101:11
  105:8 107:16,21,25 108:2
  112:23 124:13,17,20,24 125:4
  125:8,11,13,15,17,19,2 1 126:4
  126:6,8,10,12,15,17,20,24
  127:1,9,11,13,16,1 9 128:1,4,7
  128:23,25 129:7,11,16,24
  130:13 134:10,13,16,19,25
  135:11,13,15,19,21,2 4 136:1,9
  136:14 137:2,4 140:4,6,10,16
  140:24 141:4,19,23 142:2,4,9
  142:11,14,21,2 5 143:3,7
  144:7,9,12,17,2 1 145:1,18
  146:1,8,11,16,21,2 3 147:2,5,8
  147:15,19 148:8,15,17,20,23
  149:2,8,13,16,19,2 4 150:3,13
  160:22 161:6,11,14,20,22,24
  162:1,9 164:1 167:7,15,17,21
  167:23 172:11,13,15,19,21
  173:1,9 174:2,5 180:7,13
  182:18 184:3 185:8,11 193:4
  204:19 220:10,12,18,21,24
  222:11 224:15 225:1,22
  226:21 254:6 258:19 264:9
  271:10,17,20 272:11,16,20
  273:21 275:7 276:3,23 277:1
  277:4,10 278:14,16,22 279:3
  279:6,15,21 280:6
July 21:8 49:5
jump 243:16

juror 6:12,12 7:1 8:17 275:15
jurors 8:13 42:11 50:13 52:10
  57:25 110:2 140:22 167:9
  173:13 176:13,16 185:19
  186:9,13,20,24,2 5 269:19
  274:17
jury 1:10 3:19,20 6:8 7:6,16 8:7
  8:15 15:20 20:3 21:8 23:20
  32:3 49:17,21 50:14,16 52:12
  105:11,16 109:2,4,25 110:22
  111:4 112:2,16 113:4,8
  130:17,25 133:17 139:6
  140:20 143:6 144:13 148:10
  159:6 166:24 167:13,14,16
  168:11,22 171:1,14 172:5
  173:2 176:14 185:10,13,17,18
  186:1 193:2 194:11 195:14
  196:23 200:18 234:18 235:24
  264:15 265:16 269:4,8,9,13
  270:6 272:10
Jury's 169:13 180:12
just 7:12 8:12,23 11:11,16,25,25
  12:2,19 17:8,14 18:13 20:8
  21:3,11 23:9 24:15,16,19,19
  25:5 26:21 27:15 28:18 29:4
  29:21 30:3,4 31:6,6,12 32:2
  32:16 35:4 38:2,6 39:15
  44:14,19 45:23,24 49:8 50:25
  53:15 54:24 59:8 67:13,21
  71:14,25 75:23 76:21 81:10
  81:20 82:17 83:7 87:13 89:10
  92:9 96:15 97:17 100:23
  103:10 107:2 108:1 109:10,16
  109:22 112:6,16,20 114:13
  115:8 116:8 117:22 118:8,8
  120:23 126:2 127:16 128:22
  129:5 131:8 133:25 134:11
  136:2,17 137:21 138:19
  140:22 143:1 144:22 145:22
  146:4 152:9 153:21 154:12
  155:21 158:2,9,16 160:11,25
  161:8,15,16 162:22 163:24
  164:23 165:5,6 166:6,12
  167:18,25 170:2 171:20 174:9
  175:8 183:3 184:19 185:23
  188:1 195:23 196:23 200:17
  202:7 204:12 205:22 206:14
  206:23 207:25 208:25 209:13
  209:16,17 210:12,23 217:11
  218:13 222:8,8,14 224:16
  228:19 231:13,20 233:11,22
  234:20,22,2 5 236:3,17 237:7
  238:10,17,21,23,2 4 239:4,5,7
  239:8 240:18 242:5 243:9,25
  245:13 248:3,22 250:9 252:23
  257:22 258:3 260:6,7 266:1
  270:11,22,23 272:11,17,18
  273:18 274:19,24 275:11
  276:6,21,24 277:2,4,5,10
  278:5,14 280:18 281:5
J-o-s-i-e 10:23

K

Kansas 255:9 263:9
kate@ kmeyerslaw.com 2:4
Kathryn 2:1,1
Kazarian 138:24 139:1
keep 110:3 125:6 180:1 220:8
keeping 124:21
kept 184:15
KEVIN 1:13
kevin.larsen@usdoj.gov 1:18
kickback 35:16 36:20 114:1
  116:19 131:15 133:4 138:20
  140:14 148:5 173:3 205:21
  211:23 222:16,18 226:11,19
  226:25 227:2
kickbacks 16:13,16,17 131:14
  136:11 137:19,22 140:16,25

141:3,12,14,16,22,2 5 142:6,8
  142:8,12 143:8,8 144:23,24
  145:3 148:12 149:9,12 172:24
  175:19 206:8,11 210:4 213:15
  213:16
kidding 186:6
killed 186:25 274:25
Kim 83:18
kind 11:17,22 20:10 29:20 49:6
  89:7 113:24,25 114:18 136:2
  140:21 145:7 157:12 160:25
  182:5 195:23 199:9 200:25
  201:3 204:5 218:12 220:16
  222:20 232:3 233:21,24 236:4
  236:5 238:22,22,23 239:7,8
  252:17 257:7 262:10 263:3
  267:23
kinds 181:17 191:7 200:24 210:7
  222:16
kit 20:7,8,8
knee 28:13 93:2 255:16,23
knew 35:15,18 134:20 181:15
  182:20 183:15 207:12,16,22
  209:3,19 213:12,12 214:3,9
  217:20 230:20 242:2 252:21
  252:23 265:20 277:16
know 8:5 9:5,7,8 15:16 16:1,1
  16:14 18:3,22 19:8 20:11
  21:17 22:23 24:1,6 28:17
  33:10 35:7,8,9,9 38:16,18
  39:13 40:7,15 41:6,9,11,12,25
  42:10,24 43:2,14 44:6 45:23
  46:8 47:12,13 49:19 50:7,19
  50:25 53:9,19,22 54:9 55:3,8
  55:8 57:1,12,18,25 59:1,6,19
  60:22 61:9,12,15,17,20 62:25
  63:3,4 66:25 67:11,17 73:21
  73:24 74:2 75:1,1,3 78:22
  81:15 86:11,13,21 87:4,9,19
  95:5,12 96:9 97:7,13,17
  100:15 102:5,10 104:3 105:17
  106:18 107:18 111:8,13
  112:17,17,20 113:22 114:21
  115:16 116:11 118:9 119:17
  122:16,16,21 123:1,2,6 132:8
  134:25 135:7,15 136:22 140:9
  142:23,23 144:4,21 145:7,7
  145:19 146:5,10,18,22 147:20
  148:25 149:2,3,5 151:14
  152:1 153:21,24,24 154:2
  161:1 164:17 166:18,19,25
  167:6,8 168:1,1 169:3 172:17
  172:22 173:25 175:2 176:12
  177:16 178:1,15 180:8 181:7
  181:9,20,21,22,22,2 4 182:9
  183:4,9,12,14,2 3 185:21,22,25
  186:5 188:19 189:1,6,15,23
  191:9,19 192:15 194:2,15
  195:6 196:11,12,12 197:3,10
  197:12,14 198:11,12,20,21,25
  199:3,10,19,2 2 200:11,21,24
  201:6,7,16,17,17,2 3 204:12
  205:7,22 206:2,9,11,12,12
  207:13,14,24,2 4 208:4,14,19
  208:20 209:6,13,16,17,18
  210:5,13,23 211:1,9,10
  212:11,15 214:19,21 215:13
  215:24 217:8,14 218:7,7,9,12
  218:14,22 219:10,23,25 220:1
  220:1,4,8,11 221:5,13,17
  222:4,21 223:3 225:10,12
  228:13,16,21 231:12,16
  232:15,17,19 233:20,22,25
  234:14 236:6 238:23,24 240:7
  241:16,16 242:3,17 244:17,21
  245:3 249:17 251:14,17,24
  252:18,18 253:2,10,12,13,15
  253:16 258:16 259:16 263:4
  265:21 266:11,14,17 267:12

267:15 269:11,22 270:1 271:3
  271:24 272:23 273:3,24 274:8
  274:18 275:2 276:6,7,9,24
  277:2,14,16,1 7 278:11,16
  279:7
knowing 157:3 209:15 211:3
  212:1 214:25 220:15 241:14
knowledge 51:14 75:5 117:9
  120:6 121:23 206:3 220:5
known 181:17 191:21 239:23
  241:17
knows 40:24 58:1 64:7 141:1
  144:21 178:20 200:22

L

L 1:19
lab 58:9
label 129:17
laboratory 58:10
lack 68:25 138:5
Ladies 105:10 129:20
landing 148:17
large 32:7 33:4 190:8 238:3,6,6
largely 98:21
larger 65:20,22 66:15 94:13
  260:12
largest 227:25
Larsen 1:13 3:7,9,15,17 4:3,6,7
  7:1,8,10 14:23,25 15:11 26:15
  31:14 32:19,23 34:19 40:22
  41:1 42:5,8 44:1 45:3,5,22,25
  46:2,6 47:2,9,15 105:22,25
  106:2,4,8,11,1 8 109:24
  110:11 113:11,18 115:6,8,12
  115:18 119:20,22 121:25
  122:25 123:14 124:4,8 152:16
  152:20,23,2 5 153:3,5,17
  154:4,10,15,18,2 3 155:2,5,17
  156:7,9,11,15,17,19,21,23,25
  157:4,10,13 163:21 233:13
  234:1,10 237:10,15 245:11
  248:8,16 249:24 250:1,8
  253:9,19 270:8,11 280:12,15
last 8:11 15:6 19:6 31:20 51:7,21
  51:23 73:3 85:12 103:12
  107:15,17,22 113:15 158:16
  169:2 213:14 214:18,18 219:11
  220:7 229:3,4,5 235:25 236:1
  237:7 246:4,5 276:15
lastly 129:16
late 19:22 36:9 158:10 191:15
  209:21 227:23 275:15,16
later 157:16 186:11 240:19
  260:11
laundered 149:18
laundering 149:11,15 157:18
  224:2
Laurene 256:17,20,21
law 2:1 53:22 95:12 111:14,15
  130:3,14 139:2 149:25 150:7
  150:8,12 152:17 153:17
  154:19,25 176:3 188:10 192:7
  192:8,9 200:4 205:24 206:1,3
  213:1 259:1,9 261:8
lawful 175:22
laws 85:6 258:25 259:17,18
lawyer 106:24 111:16,18 112:1
  120:23 121:11 168:3,7 178:3
  206:2,22 210:25 212:7 272:1
  272:2 279:2,9
lawyers 50:24 111:9,13 130:19
  134:1 159:8 172:17 176:9
  222:4 269:15 273:3 278:25
  279:8,11,13
lawyer's 121:15
lawyer-talk 12:19
lay 53:20 132:19 134:19 136:20
  137:1,7,9,16 138:11 174:11
  174:16 203:9 236:12

laying 41:14
layman's 49:8
Lay's 70:10 144:17
lead 46:2 58:7,8,9 124:2 136:25
  145:17 169:3 198:16 233:15
leading 26:12 46:23 56:12 57:3
  124:1,1,3 168:22 169:7
  225:22 226:1 227:18 229:2,3
  233:13,14 279:20,22
Leah 6:18 8:21 115:1
lean 26:25
learn 24:1 36:14 118:19,23,23
  230:18 267:2,5
learned 29:24 36:9 59:20 118:20
  176:11 230:12
learning 192:2
learns 178:16 179:6
least 6:22 17:18 117:5 165:6
  222:16
leave 49:17 56:11 57:7 105:16
  105:18 130:22 215:14 260:22
  261:7
leaves 35:21
leaving 36:10 242:25 261:18
lectern 131:9
lecterns 180:9
led 231:8
Lee 9:1
leeway 53:25
left 6:17 7:15,17 40:1 42:6 52:20
  229:20 246:1 261:5 263:8
  269:8,19
legal 42:16 116:23 117:4,5,7
  120:15,17 150:19,25 181:18
  188:3 192:20,23 196:2 204:22
  205:1,9,11,13,16,2 2 209:14
  210:25 211:3 212:9 221:14
  225:13 228:18
legitimate 123:16 124:6 140:8
  142:18 152:15,17 182:23
legitimately 142:15
length 106:12
less 49:3 65:20 96:17,18 104:9
  166:3 207:10 274:14 277:22
lesson 49:9
let 14:10 27:7 32:16 38:16,18
  42:12 46:7,8 49:13,22 52:6,6
  64:5 77:23 85:11 87:3 89:17
  93:22 97:7 98:15 100:22
  110:16 116:25 120:19 123:6
  130:15 134:6,8 139:24 142:25
  169:3,23 172:7 174:4 191:8
  195:4,17 200:17 201:13
  203:12 212:11 216:15 233:22
  245:3,7,9 247:15 250:17
  257:22 260:16 268:19 275:9
Letter 81:23 82:18 192:18
letters 20:16 201:23 202:3 218:4
  218:5
let's 12:19 28:2 45:11 75:23
  78:19 81:20,20 82:17 84:3,16
  91:9 92:2 109:22 136:12
  138:22 146:19 158:17 166:4
  167:12 168:10 169:2 185:16
  185:22,23 195:23 206:14
  211:6 219:23 220:17,20 224:6
  231:16 239:21 280:17
level 197:5 200:21
Levitt 176:3 182:16,19,22
  183:10 192:10,13,20 193:7
  194:12,14 200:1 212:23 213:3
  227:12
liability 154:11 176:21,24,25
liable 219:14
liaison 208:8
licensed 48:15,17,21
lie 39:25
lied 18:7
life 14:2 158:21,24 210:6 258:15

274:21
**lifting** 231:6 244:15
**light** 269:2
**lighten** 248:24
**like** 6:21 11:16,22 12:2 13:24
20:7 32:24 33:13 49:4 50:7
56:11,13,13 59:7 64:7 85:6
88:11 90:16,17 99:5 104:10
110:3,21 111:21 116:14,16
117:3,6 119:5 124:17,21
131:9 134:12 136:19,20
146:20 153:21 154:1,6 158:1
158:3 161:1,2 170:24 172:5
177:25 180:20 181:5,12
184:19 186:4 192:25 195:7
198:24 199:9 201:3 203:14
205:18 206:17 210:11,18,23
212:17,18 213:4 214:22 217:8
225:10 227:18 228:9 230:16
231:9,12 232:16 233:21 234:8
238:16 239:18 241:1,4,8,13
242:16 252:7 254:4 255:25
256:1,23,24 261:9,12 262:24
264:6,17 265:6,21,24 267:7
267:13 270:19 271:3 273:3
274:11 276:16 277:6,23
279:21 281:3,5,5
**liked** 184:15
**likes** 145:9
**liking** 266:14
**Limine** 143:22
**limit** 274:14
**limited** 53:25 110:21 166:10
**limiting** 111:24 165:23 268:23
**line** 5:4,4 39:11 87:1 191:23
280:19,20,23
**linear** 223:17
**lined** 192:18 280:21
**lines** 238:17
**lining** 281:1
**link** 241:24,25
**liquid** 91:20
**list** 52:20 104:21 107:7 124:20
129:4,5
**listed** 76:1 159:10 163:11 234:21
241:19
**listen** 42:24 87:20 274:19 277:6
277:8 278:1
**listener** 43:4,6
**listening** 155:23
**lists** 73:5
**literally** 56:7 200:19 209:6
**literature** 20:10 21:12 32:13,24
**liters** 59:1
**litigation** 111:10
**little** 29:5 35:24 50:23 52:7
53:24,25 73:1 87:7 100:23
114:1 120:9 144:6 145:8
147:24 185:24 199:1 225:10
231:14,16 252:1 255:1 257:16
261:22 265:3 266:10 270:20
275:14 276:7
**live** 11:2,3 15:14 48:5,6,9 113:19
230:3 246:12
**lived** 48:7,8
**living** 20:4,5 48:13 114:7 230:5
237:25 246:14 257:3
**LLC** 31:3,9 188:20
**LLP** 1:20
**local** 92:12
**localized** 92:21
**located** 18:22 209:13
**location** 28:4,13 39:22 232:5
**Lockwood** 162:4 163:4,10,23
165:8 197:17 200:10,13
202:12
**Lockwood's** 202:7
**long** 9:22 15:23,24 16:1 18:10
29:9 35:25 36:2,14,15 40:20

41:4,5,22 42:4,21 43:10,25
48:7,17 54:4 55:20 74:5
104:25 106:10 110:14,20
156:5 165:23,24,25 186:7,22
188:10 199:3 209:16 217:11
217:15 227:20 238:25 247:3
255:13 256:21 258:12,12
260:17 262:16 268:22 271:15
273:16 274:1,8,19 277:19
**longer** 36:18 50:9,23 67:8 73:12
80:24 91:14 98:11 129:21
137:18 158:11 185:9 222:8
**Long's** 41:3 42:1,3,12,17,18
**look** 6:9 52:1 57:22 69:4 81:20
93:24 99:6 102:14 103:12
111:6 112:6 132:4 144:15
147:6 152:4 157:21 158:1
159:24 161:3 165:25 167:25
224:19 234:16 241:24 258:3
269:10 274:17 277:20
**looked** 6:21 32:24 56:12 61:13
62:10 68:16 101:12 112:4
182:4 270:8
**looking** 52:10 61:20 64:8 69:10
155:24 156:9 175:4 195:15
199:2 247:7 251:23 252:7
**looks** 56:17 117:13 241:8,13
258:13
**loose-leaf** 242:25
**Loperamide** 52:22
**lose** 111:1
**losing** 265:1
**loss** 154:1,2
**lost** 105:13 231:7 262:9,15
**lot** 11:20 29:5 39:6 49:24 53:21
56:19 71:16 92:6 94:9 96:24
112:3,4 145:13 151:18 186:9
196:11,14,21,2 1 203:22
206:14 210:6 213:25 214:1
225:1 228:25 234:24 235:16
241:18 242:3 256:12 261:11
267:10
**loudly** 40:10 47:24
**Louis** 81:15 102:4,5 106:2,8,10
106:11
**Louisiana** 18:23 19:15,20,20
20:3,4,24 259:24
**low** 196:16
**lower** 10:21 217:22 218:2
**lowest** 125:7
**Lozada** 3:10 47:20,22 48:4 51:7
52:15 54:12 56:4 60:22 64:19
65:6 68:8 69:5 70:3,16,19
72:23 75:21 88:18 99:24
106:12 132:10,15 136:23
**Lozada's** 143:14
**lucky** 6:6
**lucrative** 209:4
**Luis** 4:1 106:23 107:2,5,8,11
229:18,21,23
**lunch** 21:15 105:11 186:8,22
270:8
**luncheon** 113:1
**Lying** 18:6
**L-o-z-a-d-a** 48:4

---

**M**

**M** 1:14 197:23,25
**made** 18:1 22:8,14,16,22 23:5
49:10 51:12 56:7,16 66:13,13
74:14 76:25 86:6 96:17
104:17 109:5 125:23 131:19
133:2 137:16 170:11 172:3
211:19 215:25 217:15 218:23
219:7 221:7 231:13 237:3
244:23 250:9 257:16 261:15
264:5 267:23 270:25
**magnificent** 111:11
**maiden** 256:21

**mail** 11:9 117:15
**main** 252:20
**mainly** 248:5
**make** 6:19 9:4,5 17:25 18:14
22:3,7,19,2 3 23:3 26:10 32:2
37:6 38:13 51:11 54:20 56:5
66:8 71:2 72:12 76:15,18 77:7
77:17 78:7 79:1 80:23 82:1
88:22 89:8,24 90:7,13 99:2
108:20 109:24 124:25 129:4,6
130:17 131:5 144:17 155:22
159:19 161:16 167:9 178:19
185:22 194:21 201:17 203:17
212:13 236:17 239:5 244:5
250:13 251:11 252:25 258:3
262:12,13,18
**makes** 77:14 78:23 79:16 99:1
171:21 210:6
**making** 10:8 72:3 79:15 98:18
99:10 101:23 173:18 182:8
200:21 201:5 232:15
**male** 240:2,3,11
**malfunctions** 235:1
**malpractice** 153:15
**man** 240:1,7 265:8
**management** 52:7 190:7
**manufacturer** 63:13
**manufacturers** 95:2
**many** 26:5,6 42:6 56:4,16,18
59:1 62:10 66:11 80:7 92:9
95:1,4 97:7 104:8,13 122:7
143:21 151:23 173:5 185:25
188:6 196:9 202:4 206:1
207:10 215:24 217:15 221:3,5
221:7 225:18 236:22 237:2
243:23 247:20 267:11
**March** 81:13 82:7 104:14 122:6
122:12 179:2,4,1 8 188:2
195:25 196:17 197:20 199:11
200:7 202:13 209:5 223:15
227:23 228:11 234:18 241:19
**Marcus** 1:20,20 3:12,19,23,25
53:1,3,6,8,1 1 59:18 60:6
62:22,24 63:25 64:25 66:1,24
67:5,25 68:24 73:23 74:1
75:10,20 77:10,24 81:4,10,12
84:18 85:1 87:24 88:11,17
89:12,16 99:20 100:12,21
101:8 106:21,25 108:7,10,12
108:14,17,19 112:2,10 125:25
131:5,10,12 132:4,15,17,19
133:15,18,22 134:3 137:9,19
137:24 139:14,18 148:1,4
150:16 151:4,6,13,18,22
153:19 155:21 159:25 160:10
160:14,17 162:6,16,20 163:1
163:5,7,11 164:4,11,14,19,21
164:24 165:11,13,16 166:2,6
166:9,15,20 167:3 168:24
169:5,9,14 170:1,6,8,14,18
171:5,11,15,23 172:3 174:9
174:14,19 175:8,14,18,21
176:1,3,6,11,20,2 3 177:3,6,9
177:11,13,18 178:5,7,11,13,18
178:21,23 179:5 180:1,4
187:4,5,15,21 193:23 195:5,7
195:10,12 204:16 222:6,20
224:13,25 226:2 227:3,19
228:1,24 229:5 270:14,21
271:1 273:22 280:19,21
**marked** 5:2 126:20 127:19
**market** 20:25 21:23 23:10 24:13
24:15 34:4 36:20,23,24 37:1,6
96:12 214:2,2,3 215:16
226:17 236:7 241:12 247:16
260:6 265:13 268:10
**marketed** 133:2 260:4,18 262:10
266:7
**marketer** 68:10 80:5 151:4

175:22 208:10 220:25 233:9
233:19 235:4,13 236:18
246:23 247:9
**marketers** 36:2 39:9 170:10
179:9 180:15,20 181:5,11
184:21 185:5 188:14 192:24
203:20 205:18 206:5 221:8
222:1 236:24 247:25 260:10
260:15
**marketing** 19:9,25 20:18 23:13
37:12 80:7,14 86:23 92:9
97:10,10,15 122:20 188:17,18
188:21 190:3,4 193:8 194:8
194:17 201:15 206:19,20
208:5 221:16 225:17,20
235:21,22 236:9 237:4 240:24
241:2 249:3 252:5 260:3,20
260:23 265:16 266:1,4,6,10
**married** 255:1
**marshals** 6:20
**Martini** 150:20
**Mary** 83:20
**Massengale** 265:9,11,19 266:9
267:6
**material** 57:6 63:5,23 132:8
236:7,10
**materially** 131:21 138:18
**materials** 37:12 45:8 235:14
**math** 59:1
**Matt** 60:7,9,10 69:23,24 85:14
85:16 100:24 206:21 208:3
**matter** 54:8 127:7 149:14 169:4
169:5 171:22 208:20 248:22
278:23 281:11
**matters** 9:11 53:23 209:10
**Matthew** 162:4 163:6,18 164:12
165:7 195:19 198:1
**may** 40:16 41:11 49:25 50:5
53:22 105:18 116:11 117:5,21
122:6,12 130:16,24 140:11
145:6,10,13 149:24,25 153:15
153:15 154:1 155:6 166:25
170:4 183:20,23 185:4 202:13
209:5,9 214:13,16 220:23
222:23,23 236:14 241:17
254:2 257:23 263:13 264:23
269:14,16
**maybe** 21:15 26:21 29:6,11
38:22 42:1,2 98:9 110:23
112:11,1 1 118:12 119:17
140:12 146:10 186:4 237:5
247:22 249:9,22 262:4 264:16
272:4 278:2
**Mayport** 238:5,7,9,21
**MD** 104:3,4
**mean** 13:2,4 17:9 20:14 25:11
30:10 41:11 57:7 65:9 67:11
67:12 68:11 74:17 77:7 95:22
101:7 114:22 119:16 133:5,13
133:17 137:18 140:24 145:9
146:16 153:15 154:1 163:23
167:13 193:9,21,2 4 197:14
198:11,12 199:8 202:11
204:24 211:3 212:10 213:20
216:12 217:2,11 218:19
219:10,11 221:13 227:10
228:8,17 234:23 235:15,25
236:8 237:1,2,21 241:7,14,16
241:17 243:16,16,24 244:2,18
250:23
**meaning** 71:9,10 86:7 90:15
97:6 130:6 150:6 221:25
**means** 40:15 42:1 143:25 147:24
168:1,2 176:18 182:7 200:18
210:3 211:10 220:19 224:10
271:11
**meant** 125:23 150:10 153:1
197:9
**Medicaid** 182:5 191:6

medical 85:5 137:25 138:5,10
  139:21 140:3,4,10 142:19,20
  142:22 145:24 181:10 238:3,3
  238:6,9 252:5 256:16,16,22
  256:23
medically 138:8
Medicare 37:6 136:6 182:6
  191:6 258:25
medication 11:17 38:22 49:10
  51:12,12 55:4 63:6 78:9,16,19
  91:10 103:9,10,11 137:22
  138:1 190:24
medications 38:4 48:22,22,23
  58:10,10 76:2 77:3,6,13 80:8
  96:21 98:3 99:12 100:16
  114:14,17 115:19 119:11
  189:3 190:25 225:21 226:17
  230:13,25 231:23 232:1,8
  238:12 246:20 261:4,11
  266:11 267:9
medicine 55:21 122:9 255:25
Medisca 58:18,19,20,2 59:6
  62:20 65:16 67:24 93:17
  95:10,20,25 100:7
meds 119:16,18
meet 13:21 15:22 41:11 236:12
  275:10
meeting 21:15 23:3 50:22 199:7
  275:10
meetings 199:9
meets 41:10
member 244:8
memories 258:15
memory 88:6
mention 11:25 122:7
mentioned 18:10 27:23 79:5
  85:2 93:16 95:10 128:8
  160:19 190:3 191:8 243:25
  275:24
mentioning 56:22
merely 165:24 268:23
mess 31:24 167:13,16,17 180:9
met 14:13 16:21,22 32:3 39:9,19
  120:3 239:21 246:21 251:1
metabolic 28:13 73:3
metabolized 92:18
Meyers 2:1,1 127:3,5,22 128:11
  128:13,17 129:13
MGTEN 19:8 37:10 188:19,20
  188:21,24 189:6,17 190:4
  198:6,7 201:14 246:16,18,23
  247:2,6,9,14,16,18,21,23
  249:21 250:11 264:4,5,18
Miami 1:2,6,16,22 2:3,6,7 10:15
  10:16 136:3 281:15,15
mic 156:1 166:16,17 180:9
Michael 3:14 113:11,13
Michelle 6:18 8:21
microphone 40:10 47:24 124:25
  134:11 139:25 230:10
microphones 140:1
mid 19:22,23
middle 51:9,23
might 7:13 9:10 26:25 162:20
  173:13 196:15 219:4 233:4
  248:23 251:23 267:13 276:8
  276:10 278:9,12
migraines 235:1
Mike 105:23,24 113:16
military 21:1,7 191:21 209:23
  244:8
milliliter 59:5,12,13 65:15,25
  66:16,18
milliliters 59:2 62:7,8,11 94:9
million 137:17 184:17 206:9,12
  214:24
millions 212:13
mind 10:19 41:15,17,19 121:13
  121:15,18,24 123:21,23

164:16,17,22 168:10,11
  170:22 172:1,2 258:20 265:1
  269:25 275:5 276:3 277:14
  278:21,22
mine 15:23 117:21,22 256:17
  264:16 266:22
mini-cross 169:8
minus 207:7
minute 7:19 116:16
minutes 6:7,8 111:19,22,24,24
  112:19,21 158:15,18 159:18
  185:11 271:17,18,19,22,23,25
  272:3,3 273:14 274:17,25
  277:23
misbranded 151:2 154:13,14,15
misbranding 149:23,24 152:14
  153:16 172:23
misdemeanors 150:12,15 154:3
misleading 65:1
miss 64:11,12,13,14
missed 239:4
missing 89:2 125:20
mission 216:13
mistake 125:23 173:18
misused 216:22
ML 59:9 61:7,14,15 62:5,6,7
  65:12,15,17,23 66:8
MLs 59:3,4 95:18
model 193:7 262:17
mom 6:6 22:10,12 45:17,20
  116:20
moment 21:7 40:17 41:13 44:25
  114:14 119:20 123:9 196:20
  236:14 254:2 258:15 263:13
  264:23
mom's 45:18
Monday 271:14 272:10
money 12:1,3 13:10 18:14 22:3,7
  22:14,19,22,2 3 25:12 28:23
  29:3,22 30:15 31:12 33:6
  115:2 116:12,18 117:1,2
  118:4,7,9,14 119:10 122:21
  136:6 140:14 141:1 142:16
  145:22 146:19,19 148:22
  149:11,14,1 7 157:18 206:14
  213:25 214:1,21 224:2 232:19
  232:21 237:3 243:8,9,13
  244:5 245:17 251:11 252:17
  252:25 257:16 261:15 262:18
month 13:11 196:1,3,9,15 200:7
  209:11,21 219:1 227:25
  235:25 236:1 247:1 262:5
monthly 28:22 196:7
months 29:9,11,11 48:8 159:3
  179:6 183:25 184:1,4,4,6,7,9
  184:18 194:19,19 196:15
  213:14 214:19,20 215:12
  225:18 231:5 236:1 238:15
  260:19 262:5,20 263:4
Monty 1:7 4:8 13:18,21,23 14:1
  14:6,11,12 15:20 16:8,22 19:8
  24:2 30:6 32:1,3 35:12,18
  43:21 57:16,16,17 58:16
  60:16,17,18 61:1 62:21 69:9
  70:19 85:13 86:19 100:24
  104:2 114:15 120:2,3 164:13
  189:8 197:23 198:5,6,6,24
  199:1 204:20,23,24 208:6,8
  208:13 218:21 233:23,24
  234:20 237:7 241:8 246:19,21
  249:10,16 252:4 254:8,13,16
montygrow@hotmail.com
  27:20
Monty's 15:25 19:10 75:5
more 25:12 29:7 30:11 49:3
  53:16,22 54:6 55:2 56:21 58:9
  65:20,22 66:15 87:3 104:9
  109:15 116:18 120:9,12 122:1
  130:24 132:18 145:22 147:23

153:25 154:5 168:5 173:12
  185:11,22 189:24 190:16
  201:18,25 206:2 217:7 242:4
  252:24,24 258:21 267:17
  274:20 275:14 277:22
MORENO 1:10
morning 6:2,6,11 8:14,15 9:11
  13:19,20 15:12,13 28:25
  31:22,23 75:21,22 109:13
  110:1,7,10 114:19 269:3
  271:14 275:10 281:1
mortar 197:14
most 46:22 47:3,10 71:3 99:16
  80:18 115:14 136:21,22,22
  144:3 157:15 160:19 168:20
  185:19 197:2 209:4 262:9
  273:17
mostly 117:12
mother 23:9 45:21 255:18
motion 110:6 131:5 138:25
  139:1 141:6 143:22,23 149:21
Motrin 92:15
mounts 214:21
move 7:4 36:15 42:14 44:12,13
  54:5 75:10 81:4 84:18 88:11
  109:23 115:12 121:20 130:10
  155:25 166:22 178:25 184:11
  194:25 202:17 248:18
moved 7:5 167:25 170:9 262:1
  262:23,25
moving 51:3 52:20 222:2
much 9:9 22:14 25:7 28:23
  29:22 30:15 58:22 59:6,9 61:3
  61:12,16 62:16 95:17 111:17
  130:24 148:18,22,24 184:19
  185:6,9 187:1,14 214:1,19,21
  218:2 223:9 233:22 237:3
  249:20 250:12 252:12,18,20
  252:21 256:14 257:8 260:12
  267:24 268:14 272:2 273:16
  280:1
multidistrict 111:10,11,15
multimillion 111:17
multiple 71:4
multivitamin 25:5 115:22
  117:16 234:21 240:19
Mumble 161:13
muscular 235:2
must 129:21 130:8 204:6 212:7
  236:23
myself 61:1 70:19 94:21 116:25
  195:20 241:20,21 264:21
M-e-d-i-s-c-a 58:20
M-o-n-t-y 254:16

N

name 10:21,22 11:11,12 13:18
  15:5,6,7 18:16 19:4 27:2 28:2
  31:20,24 32:1 45:18 48:2,4
  67:21 91:15 113:14,15,16
  120:2 168:14,16 187:8,9
  188:19 191:10,12,14,23
  207:21 209:21 212:23 221:16
  221:17,18 229:22,23 230:19
  236:13 243:23 244:7 246:3,4
  246:5 250:18 254:14 256:20
  256:21
named 15:23 27:2 31:3 114:15
  174:16 185:5 197:17 203:9
  236:12 247:3 256:17 265:8
names 109:6,7,7 114:23 218:21
  243:23 244:1,12
Natalie 114:25 117:12 118:25
nation 111:9
national 55:16 192:11
nationally 95:15
nature 50:20 188:5 189:2 193:15
  197:2,11 198:15 199:4 212:1
  243:1

naval 238:3,6
Navy 114:6 230:8,11 231:4
  240:8 245:21
NDC 61:19
nearly 114:1
necessarily 169:20 210:5
necessary 50:1 93:10 94:16
  167:19
necessity 100:10 137:25 138:5
  138:10 139:21 140:3,4,10
  142:19,20,22 145:24
need 6:9 28:11 38:6,9 46:8,20
  49:9,13 70:17 77:11 98:6
  106:16 107:19 123:18 130:9
  130:24 134:21,24,25 135:16
  136:10 142:18 143:9,10 144:5
  144:11,12,13,14 145:21,23,25
  147:17 149:24,25 152:17
  153:1,25 154:5,6,8 158:15,18
  163:16 169:19 179:8 183:4
  184:13 194:3 200:2 201:9
  212:8 215:18 232:5 235:3
  239:19 242:23 272:2 273:16
  277:5 280:18,20
needed 31:6 46:18,21 66:14
  82:25 83:23 109:12 117:1
  118:16 145:7 182:13,14,15,22
  182:24 184:14 211:24 213:12
  231:5 232:25 247:20 251:14
needs 38:4 72:7 142:15 145:21
  242:22
negligent 143:23
negotiate 206:23 221:10
negotiated 206:20 208:7 221:12
negotiating 185:2,4,6 221:19
negotiations 221:21
Neil 185:5 221:18,20,2 1 222:19
Neiman 1:20
neither 66:6 155:14
nervous 231:16
neurologist 225:12
never 12:25 13:2,3 14:13,13,14
  23:2,5 38:6,8 39:19 97:2
  117:9,24 120:3,5 122:3
  132:20 136:5 140:2,7,8
  146:24,25 147:3 148:4 150:21
  153:5,6 157:2,6,7 158:9
  171:25 173:5 181:14,15 186:5
  191:7,10,17 204:20,22 205:9
  209:3 212:17,18 216:7 223:4
  223:10,19,22 224:2,4 226:20
  226:24 228:4,9 236:13 240:12
  241:2 251:20 274:15 276:3
  278:20
new 24:23 27:22 36:15,18 37:10
  37:20,25 192:10 195:2 198:16
  200:20 212:23 215:15 217:21
  217:21
newborn 263:3
next 9:6,10 10:17 14:20 41:20
  44:12 47:19 58:2 89:15
  105:21 111:8 112:18 113:10
  124:12 125:18 126:11 127:12
  128:24 164:10 186:21 192:3
  193:2 194:19 199:14 234:6
  247:4 254:8,9 256:10 259:22
  261:18 262:22
NFL 255:13
nice 156:3
night 107:17,22 280:5,6
nine 48:18 133:4 186:3
nobody 252:10
noncompounded 77:6
noncompounding 77:13
none 13:2 28:3 103:14,15 108:24
  186:13,16 245:16
nonetheless 259:14
non-narcotic 266:12
non-toxic 266:13

normal 236:4
normally 33:16
North 2:6 281:15
Northeast 1:16
notebooks 49:18 105:16 130:23
  269:7
noted 127:5
nothing 31:2,14 47:15 51:2 64:7
  79:15 112:24 125:9 126:14
  139:16 140:13 143:13,14,17
  145:10 151:1 158:24 181:18
  191:10 223:6 238:17 245:11
  272:18 276:13
notice 71:3 176:14
notification 118:14
number 1:3 5:5,6,7,8,9,13,14
  6:17 28:3 32:22 69:21 73:5
  81:9 82:21 83:2,25 84:11,12
  84:14,17,25 86:12,16,18,21,22
  87:14,15 88:10,16 100:25
  125:7,24 127:24 131:25
  138:12 156:11 197:7,18
  200:20 202:11 209:2 221:25
  228:19 234:12 243:1 250:18
  263:21 264:13
numbers 5:10,11 20:16 33:10
  70:9 83:9 84:5 86:8 101:1
  128:19 156:12,13 165:21
  275:18
numerical 56:20 125:5
Numerous 56:6,17
nurse 152:2
nuts 207:3

O

object 40:22 64:25 101:8 109:1
  120:21,21 161:15,16 162:20
  174:5 275:8 276:22,25 277:3
  277:3,4
objected 75:12 225:24
objection 12:4,17 26:12 32:18
  32:19,20 34:19 41:23 44:1
  45:19 46:23 53:1 54:2 59:18
  60:10 62:22 63:17,25 66:1,24
  67:25 68:24 73:23 74:5 75:13
  77:8,19 81:6,7 84:20,22,23
  87:19,21 88:13,14 101:10
  108:21 115:9 121:10 123:2,19
  126:2,3 127:2,3,22 128:11,12
  128:17 129:13,15 160:25
  161:5,8,10,14,2 0 164:9,9,15
  165:20 173:7,9 174:7 175:10
  187:18 193:4 222:5,6 224:13
  225:22,24 226:21 233:13
  234:1,5,9,10 237:10 248:14
  248:15,16 253:4 254:6 258:19
  264:7,9,10 275:20
objections 108:23,24 110:24,25
  125:25 160:21 162:1 275:4
obligated 205:2
obstacle 136:5
obtain 95:15
obtained 214:21
obtaining 74:23 232:7
obvious 217:25
obviously 6:19 131:24 133:5
  149:11 164:16 170:3 181:14
  182:13 208:20 210:17,22
  215:17 216:18 242:1 273:15
occasionally 152:1
occupation 168:15
occurred 261:9
October 207:1
odd 28:7,10
off 25:9 54:12 71:5 74:16 90:21
  103:8 112:23 199:23 200:21
  231:5 234:25 235:15 242:22
  256:14 257:3 263:3
offense 149:17

offer 12:7,9 200:21 201:23 202:3
  211:3 218:4,4,5,6,8 234:8
  236:9
offered 11:8,15 12:1,9 265:13
offering 32:17 218:17
offers 197:10 215:25 218:23
Offhand 272:20
office 1:14,15 2:1 21:3,12 72:17
  86:20 190:13 261:2,11,13
  262:2 268:16
OFFICER 8:7 50:14 105:14
  112:22 113:6 130:21 185:18
  269:12 280:3
offices 34:8 256:3
official 2:5 241:1 281:14
often 273:24
oh 21:3 40:8 78:22 103:17 122:9
  158:8 165:12 166:19 181:4
  196:22 200:10,14 202:20
  207:24 214:9 216:23 217:4
  223:10 227:18 231:18 239:1,9
  240:6 241:7 250:12 271:21
  272:15 277:24,24 279:2
okay 7:2,5,15,24 9:12,20 10:5,6
  10:16 11:22 14:14 21:4 22:12
  22:25 24:6 26:9 27:16 29:24
  30:18 31:13 32:7 33:1,19 34:3
  36:4 40:23 47:23 49:16,23
  50:20 51:14,17 52:13 54:16
  56:22 58:12 59:13 66:7 67:15
  68:2 71:22 72:10,23 75:12
  80:19 81:20 82:17 84:16
  85:11 86:5,16 91:6 93:13,22
  95:1,5,12,25 96:9 100:9 103:3
  104:1 105:8 107:11 109:14,17
  109:22 110:4,11 112:10,21,21
  112:25 114:25 115:13,15
  116:5,24 117:13,24 119:1,10
  119:19 121:5,24 122:11
  124:19,23 125:12 127:7 129:1
  130:20 134:14 135:22 139:25
  143:24,25 144:10 147:7,24
  148:21 149:4 150:14 151:20
  152:13,19 156:2,6 157:17,18
  160:9 161:8 163:13 164:2,24
  165:17,18 166:8 168:7,9,14
  168:20 169:9,23 172:7,12
  174:18 176:22 177:12 179:25
  185:23 186:1 191:24 192:2
  193:14 195:18 196:2 197:20
  199:2 204:9,15 206:25 209:18
  211:9 216:6 230:12 233:3,7
  234:5,14 235:10 238:12 239:9
  239:13,21 240:20 242:6 243:2
  243:23 244:7,12 246:3 250:12
  252:24 254:10,14 260:1,16
  263:20,25 264:10,12 269:9,19
  270:10,12,25 271:11,14 274:7
  274:21 275:4 276:4,6 277:8
  280:2,17
Okeechobee 262:2
old 48:11,12 142:7 171:20
  217:22 254:22 263:4 266:23
  269:5
omit 103:10
omitting 103:24 132:8
onboard 184:5 200:20 202:14
  215:6
onboarding 200:18 201:13,19
  202:22 228:25
once 16:22 38:24 65:7 68:3
  71:16 77:22 116:7 185:20
  191:21
one 7:6 8:9,9,11 36:2 38:4 39:9
  40:17 41:10,13,2 5 44:25
  45:20 52:2 54:6 55:11 62:10
  64:22 65:15 66:11 68:16
  78:23 83:18 85:8 91:10
  100:15 103:20 104:25 106:23

109:10,15,16,1 7 111:5,14
  114:19 115:7 118:11 119:20
  122:14 123:9 126:11 128:24
  130:1 132:5,22 134:3,4 136:9
  137:23 143:5,18 148:13
  149:14 155:18,18 158:22
  160:11 161:10 163:11 164:10
  166:6 172:23,23,24,24 173:8
  173:19,24 177:25 179:19
  180:18 185:5,25 186:1,2,4,12
  186:18 188:15 193:6 197:2,12
  200:20 206:4 207:22,24 208:7
  208:15 209:24 215:4 217:9
  225:24 228:20 229:3 232:12
  232:14 235:12 236:14,18
  237:1,7 238:5,5 243:17 244:3
  244:11 245:13 247:24 254:2
  263:13 264:23 272:1,4,13
  273:12 276:15 280:20
ones 25:17 59:7 76:19 79:1
  109:12 124:22 146:22 160:19
  161:2 167:9 272:17 280:18
online 263:11
only 15:14 25:17,17 37:2,22
  53:5 66:5 84:10 110:20
  113:20 142:15 143:8,16 149:8
  150:17,20 155:6 158:22
  159:10 162:1 167:8 170:18,21
  173:8 177:25 182:23 184:25
  186:6 194:1 199:23 207:22,24
  214:6 216:25 220:25 235:25
  237:1 244:11 266:4 272:1
  274:7 275:23
open 13:6 36:12 54:3 66:8,11
  154:21 275:22 276:10 277:15
opened 44:22 66:14 120:25
  121:1 173:2 175:20 262:2
opening 66:18 139:19 170:24
  273:1,7,14 276:7
operate 190:14
operating 190:15 193:8
operational 181:18
operations 69:25 85:19 190:17
  198:2 202:10 208:3 209:8
  257:7
opine 68:1
opinion 53:3 62:24 67:25 101:9
  110:21 162:25
opinions 53:19,20
opioids 261:12 266:13
opponent 141:9 144:2 269:24
  272:3
opportunity 18:13,15 36:14
  158:3
opposed 112:15 169:20 222:23
opposite 202:23 205:4
order 11:9,21 12:21 31:7 55:6,21
  58:13,15 60:13,15 61:2 66:8
  93:16 94:22 107:3,5 109:25
  114:17 115:19 118:20 124:23
  125:3,5 141:9 143:9,10
  147:17 210:24 211:22 213:13
  213:17 227:8 232:12
ordered 12:1 58:17 65:8 114:14
  142:16
ordering 58:10,11,12 93:14
  orders 91:4
original 101:17 105:11 120:21
  originally 230:3 263:8
orthopedic 255:23 266:17
Orthopedics 255:20,22 256:9
  266:23
other 7:6 9:7,11 11:24 16:1
  19:23 25:19 26:16 33:15
  34:13,15 44:8 46:20 54:8,22
  54:24 55:1 57:5 64:23 65:6
  66:18 67:18 68:9 72:2 75:14
  80:12,19 89:18 91:22 92:9
  95:6 96:24,24 97:14 107:19

107:23,23 109:7,17 117:25
  118:21 120:20 136:24 138:21
  145:17 150:24 153:22,22
  155:14,16 161:2,10,10,10
  162:20 168:1 170:10 176:9
  179:9 184:20,21 186:8 189:19
  191:3,16 192:16 196:14,15
  198:14 199:20 202:8 205:7
  215:4 221:5 222:14,24 223:1
  223:13 226:14 227:6 235:11
  235:12 236:18,20 239:16
  242:4 244:12 249:16 266:22
  267:10 269:8,20 272:15 274:5
others 9:4 53:23 107:21 128:16
  137:11 145:7 173:23 180:21
  181:22 185:21 190:21 221:5,7
otherwise 139:22 161:18,18
  183:21
out 10:5 21:15 24:16 25:18,24
  27:1,11,14,15,15,2 5 30:4,12
  33:15,16,19 34:15 38:24
  39:10 40:21,24 41:5,22,24
  51:17 59:4 65:2 69:17,20
  70:10,10 71:2,5,18 74:23 75:4
  78:8 81:1 82:16 84:8,10,12,13
  86:17,18 87:16 88:9,10 89:24
  100:9,13,15 102:8 104:12
  107:9 109:11 110:5 111:23
  116:3,7 118:21 119:3,10
  126:23 139:13 141:5 147:25
  151:6 155:14 156:2 158:25
  159:16 167:12,18 168:10
  169:8 177:22 179:7 188:3
  190:15 191:20 198:13 199:1
  202:3 206:8 212:3,8 216:10
  218:5 223:6 231:6,22,25
  232:3 233:23 235:21 237:1,19
  243:20 244:11 247:12,23
  248:24,25 250:10 259:24
  261:11,13 262:4 265:22
  266:16,21,24 267:9 269:2
  270:12,19,22 271:5 278:24
  281:2
outline 194:10
outlined 222:21
outlines 195:20
outlining 175:3
outright 144:4
outside 3:19,20 45:19 50:4,5
  100:25 113:3 121:7 167:12
  169:13 176:3 180:12 183:17
  186:5 190:12 192:8,24 206:5
  208:19 212:5 222:2 225:8
  253:4
outsource 136:3
outweighed 162:23
over 7:15 16:24 30:3 71:17 72:3
  72:9 105:12 106:6 107:16
  111:13 119:16 140:1 151:19
  188:6 194:18 196:11 197:8
  199:1,25 206:9 215:25 229:19
  229:19 233:24 238:21 244:23
  245:25 249:10 250:15 262:6
  262:14,16 268:2 270:8 271:4
  271:13
overall 93:10 257:9
overrule 54:2 65:4 74:5 123:2
  174:6 233:14
Overruled 46:25 47:7 77:9,22
  87:22 123:1 193:5 224:14
  226:23 237:11 253:6 258:20
overseeing 91:7
own 27:1 36:12 44:22 64:20
  76:15 78:8 108:1 136:4
  150:18 157:6 173:13 205:6
  215:5 219:7 220:3
owned 246:19 258:21 265:9
owner 189:6 265:19
owners 257:5

oxygen 256:15,22,24
O'Hara 104:2,3

**P**

P 197:23 198:3
package 218:8
packet 218:5
pad 19:18 22:11
pads 20:12,14,15 22:5
page 3:2 5:4,4 19:6 51:21,24
  70:1 73:3 83:7 103:12 104:1
  109:11 143:4
pages 242:1,2 258:12,12 271:5
paid 16:6,7 20:16 28:20 31:7
  33:8 47:13 78:4 98:19,21
  117:20,21 119:10 122:17,23
  123:7,16 134:22 135:5 136:14
  136:15 137:14,15 143:11
  148:9,10,11 175:21 190:2,22
  191:7 206:8,11,19 210:3
  211:22 217:22 220:3 226:25
  227:7 243:9 244:17,19 245:17
  249:20 250:14,22 252:20,22
  252:23 256:7,8
pain 6:15 11:6,17,18,19,25
  13:6 14:4 25:6 28:13 52:7
  92:2,4,6,12,12,22,5 93:8
  100:16 115:22 117:16 189:1
  190:7 232:6,17 238:12,16,17
  239:10,18,22 240:17,18 243:3
  247:8 248:22
pains 6:21 8:23 13:23
pamphlet 252:1,3
Panel 111:11
panned 233:23
paper 11:23 64:8,15 250:5
papers 242:25
paperwork 30:4,7,12 33:15
  116:7,10 118:22 119:3 231:22
  231:25 232:3 247:10,12
paragraph 153:7
Pardon 9:25 12:8 123:22
part 10:10 17:18 36:18 46:4
  47:1 52:7 65:3 86:15 132:9
  137:17 141:18 142:18 144:24
  147:10 148:11 172:8 186:22
  193:24 195:1 196:24 203:23
  204:13 247:5,6 251:10,12,13
  251:14 263:21 264:19 273:17
participant 257:4
particular 8:25 43:17 53:23
  54:20 68:18 76:25 78:9 96:17
  148:21 149:9 196:15 212:23
  212:25 228:21 248:4 256:6
  258:15 267:25
particularly 192:7 213:2
particulars 88:4
parties 129:17,25 130:7 198:13
  222:13
partner 256:17
partners 170:14 177:13 201:2
party 121:21 164:7 170:4 205:4
  205:7
pass 55:21,24 218:25 219:3
passed 78:13
past 11:8 111:5 266:17
PASTOR-HERNANDEZ 2:5
  281:13
pathways 101:2
patient 22:22 23:6,10,25 24:15
  25:19,24 26:9,19,23 27:9,22
  27:25 38:3,16,24 39:4,7,10,13
  39:15 41:5 45:15 46:8 49:1,6
  49:7,11 51:13 56:4 68:9 69:13
  69:25 78:17,18 89:10,22
  100:13 101:3,5,7 102:9 103:5
  131:14 140:8,18 142:15 146:3
  150:24 153:9,13 155:8 168:8
  168:19 187:13,22 188:13

189:10,18 190:4 203:10
  230:23 233:11 236:3 242:7,9
  243:3,9,13,2,1 244:5,25
patiently 50:25
patients 16:6 20:13 25:3,15,23
  28:20 29:4 34:4 36:21,23,24
  37:2,23 38:17 44:17,23 45:8
  46:21 47:4 48:24 68:15 78:6
  131:15 133:3 136:10 140:18
  142:15 146:24 180:21 181:12
  203:18 211:22 212:15 213:5
  219:24,24 236:20,22 243:21
  245:16,16,24 247:18,20,23 248:2
  248:6,12,21 249:1 253:16
  256:2,6 260:6,25 261:3
  265:25 266:2,12
patient's 37:7
Patricia 207:21,22
Patrick 188:1,8 192:4 193:13
  194:23 195:19 197:19 198:3
  198:25
pay 22:25 23:6 26:6,19,24 27:1
  35:13,19 36:19 37:7 44:17,20
  44:23 58:23 78:7,16,17,18
  100:12,13 135:5 141:1,3,11
  141:21 142:6,7 143:19,19
  146:12 176:16 181:3,8,9,12
  182:20 183:6 198:14 199:3
  218:1 226:11 239:12 249:1
  252:10,14,16
payback 205:22
paychecks 243:9
payer 267:10
paying 25:17,18 35:15 37:3
  98:12 99:16 145:20 180:18,20
  181:6 184:12 210:11 212:12
  212:15 213:4,7 214:7,8
  215:16 217:19,25 224:16
  243:18 245:8 253:14 267:8,17
  267:20
payment 30:15 117:18 118:13
  118:20 119:5,9 122:14 137:19
  137:22 141:14 205:19 211:19
  243:14
payments 34:1 118:21 122:7,16
  122:18 131:13,14 133:2 135:4
  175:19 180:19 182:8 267:23
payors 191:19
payroll 202:10 209:7
pays 211:9,14,21
PCA 29:25 51:15 58:6,23 61:4
  65:7,24 66:20,23 67:18 68:23
  69:17 73:21 74:8 75:1,4 76:8
  80:7 81:15,15 85:17 89:18
  94:4 95:6,23 96:24 97:11
  98:15 100:2,9 102:7 132:2,6,9
  134:23 135:13 138:15 162:7
  166:9,10 167:18 169:16 170:9
  170:13,17,19 171:3,6,22,23
  175:22 180:14,23 181:22
  182:8 183:15 184:20 189:3
  190:8,18 192:13 196:9 201:19
  204:4,10 205:15,15 206:5
  208:11 210:4 211:21 212:16
  213:3,12,21 214:3,21 216:1,2
  216:10,11,12,15,16,2,4 217:5
  218:5 219:2,14,18,24 220:3,6
  220:7,13,25 221:3,7 226:4
PCA's 168:3 172:2
pen 271:2 280:23
pencil 271:3
Pensacola 246:13
people 34:25 38:6,9,25 41:24
  46:18,20 53:20,21 66:5,18
  75:14 87:19 88:2 111:21,22
  116:21 140:12 143:9,21 144:4
  144:5,5 145:23,25 147:22
  156:3 163:11 165:2,4 181:9
  183:6,11 186:4,19 189:19

193:20 194:8 197:8,9 199:1
  199:24 200:12 201:25 202:8,9
  202:9,10 204:4,7 206:17
  207:15,17,18 209:8 213:4
  214:22 215:25 216:2,6,21
  217:1,6,9,1,2 218:15,20 219:7
  219:23 220:3,15 221:3 222:14
  227:7 234:24,24 235:1 236:9
  236:24 243:25 244:1 245:7
  247:7,14,16,24,2,4 249:16
  251:15,23 252:7,24
people's 242:25
per 59:5,9 61:7,14,15 62:5,6
  154:13 155:12
percent 33:13,13,13 37:16,16,17
  41:24,25 62:13,14,15 99:17
  135:6 206:16,18 207:3,11,23
  210:11 251:6 256:8 258:22
percentage 22:20 36:6 105:2,7,7
  244:21 251:8
perfect 125:6
perhaps 26:22 125:4 143:17
  173:15 219:16
period 29:9 95:1,14 96:21
  196:20 214:22 228:7 279:12
perjury 18:3
Permanent 257:24
permission 168:22 257:24
person 27:2 60:2 102:13 107:4,7
  122:19 133:9,18 137:12 144:2
  145:16 167:8 197:17 211:14
  211:15,16,17,1 7 273:10
  274:13
personal 246:15
personalities 273:3
personally 16:21 67:3,6 118:11
  215:7 241:20
persuade 20:23 111:2
pertinent 130:1
Petersburg 262:24
pharmaceutical 18:13,15,19
  19:16,25 37:3 96:12 220:7
  240:21 250:14
pharmaceuticals 58:21 267:17
pharmacies 96:24 97:7,14
  192:12,12 213:2
pharmacist 74:19 75:4
pharmacists 48:21 51:16 75:2,3
  83:15,18 217:2
pharmacology 53:12
pharmacy 19:15,21 29:25 30:4,9
  30:10,13,16,19,2 1 38:17 46:9
  48:14,15,17,20,2 5 49:6,7 53:5
  53:9,16 55:14,17,19,23 58:7,8
  60:3 65:19 74:19 76:8,10
  77:18 78:3,19 82:5,15,24 83:8
  85:3,19 86:6,8,9,14,22 87:6,7
  87:11 89:8 90:12 91:4,6 92:6
  93:14,20 94:7 98:15,21 99:2
  102:8 113:25 115:3 118:19
  119:4,7 132:2,11,14 135:1,3,4
  135:14 136:4 138:16 152:8
  183:11 190:8,24 209:7 242:7
  243:6 253:3,11
phase 184:25 185:1,2 201:22
Phil 162:4 163:3,23 165:8 202:7
  202:12
Phillip 197:17
phone 24:18 38:18 43:24 44:5,6
  82:21 83:8 116:8 193:13
  233:24 240:4,13
phonetic 244:2
physical 153:6,12 154:23
  155:1,4,9,12 231:9 238:20
physically 20:4 196:19 200:10
  209:13 240:12
physician 72:8 79:8 80:2 81:24
  82:1,10,15,16,21,2 4 89:24
  91:4 103:3,8 138:6 139:15,22

150:22 256:3,11 260:23 261:1
  268:14
physicians 75:6 83:3,9,23 86:24
  88:1 90:13 256:3 260:5,6,7,24
  261:10 265:21,22 266:5,8,14
  266:16,25
physician's 86:19 90:8
physician/patient 150:9
physiology 259:8
Ph.D 53:23
picked 144:5 151:6
piece 11:23 117:2 250:5
pieces 64:8,15 180:16
pills 238:16
Pinellas 262:24
Pinkney 114:25 117:12
Pizza 220:8
PK 70:11,12
place 58:17 135:10 144:1 185:21
  186:11 193:16 195:22 197:15
  200:11
placed 51:17
places 95:6 133:23
plain 142:7 171:20
Plaintiff 1:5
plan 220:6 267:11
plans 99:2 267:12
play 231:2,3 263:9 276:16,17
played 230:19 237:21 255:9
player 237:19
playing 231:5,12
Plea 17:1,6,12
plead 16:9,11,12,14,1 8 133:16
please 8:8,18 11:11 15:3,14
  50:15,17 51:21 113:9,10,20
  123:4 168:9,12 187:8 223:4
  229:20 245:25 246:1 254:12
  254:15 269:15
pled 17:4
plenty 135:7 173:9
PLLC 2:1
plus 202:3 206:12
pocket 25:24 27:1 78:8 100:13
  100:15 119:10
point 10:8 17:23 23:19 25:10,11
  26:21 35:21 36:9 40:16 79:7
  106:6 117:3,13,18 118:18
  134:3 139:14 167:18 177:7
  179:23 188:4,15 189:14
  191:12,23 196:6,12,19 200:3
  200:10 223:8,12,16 233:23
  236:2 239:6 240:14 242:6
  255:19 256:20 260:9,11,14
  263:6,12 267:8 274:13
policies 200:25
policy 87:14
Pompano 190:17
Pope 66:6
position 129:12 255:11 265:13
possible 228:14
potential 172:22
potentially 115:24 158:20 182:5
pounds 231:7
powder 91:12
powders 55:7 91:25,25
power 114:8
practice 189:21 225:11 260:25
  265:25 266:19
practiced 188:10 206:1 279:22
practices 228:6
practitioner 152:19,20 225:11
practitioner-patient 153:8
  155:7
practitioner/patient 152:18
precise 87:3
Precision 255:20,22 256:7,9
  266:23
preclude 173:18 174:3
predicate 132:19

**prefer** 275:10
**pregnancy** 244:16
**prejudicial** 162:23
**prepare** 109:13 188:18 195:24
271:13 279:25
**prepared** 159:12 189:9,9 271:10
**prepares** 63:11
**prescribe** 21:12 38:22 151:12
239:16
**prescribed** 20:13 48:23 155:6,10
**prescribes** 153:13
**prescription** 20:9 23:7 45:12
49:11 51:13 52:3,21 53:16
57:12,13 61:13,18 69:5,8,10
70:21 71:14,19 72:6,6 73:16
73:17,19,22 74:10 76:2 77:3
78:3,11,15,23 79:3 86:1 88:8
88:10,23 89:9,21 90:16,21
99:14,16 117:20 122:22 130:5
146:12 150:20,23 151:7,9,11
151:14,15 152:5,6,10,15,17
154:12,14,15,1 8 155:13
156:11 157:5,6 172:23 216:16
216:18 239:18 244:17 267:15
**prescriptions** 20:17 35:13,15,19
44:17 59:7 68:14,16,18 69:18
70:10,14 71:2 72:9,24 73:14
73:14 74:9 79:24,25 80:2,14
84:7,12,16 85:2 86:9,23 87:2
87:10 88:22 89:1 91:3 98:21
102:13 113:25 122:14,19,23
123:7,17,17 135:3 146:14,18
147:1,2 150:4,5 151:22,25
152:21 154:7 191:17 220:3
253:14 261:1,13 265:14,15,24
266:19
**presence** 3:19,20 113:4 167:13
169:13 180:12
**present** 6:2 8:19 168:3 187:2
**presented** 116:19,21 275:24
**preserve** 110:16,24
**preserved** 110:14
**president** 19:8 69:25 197:7,18
198:2 208:3 226:7
**pressure** 256:13
**presumably** 207:17,18
**presumptuous** 241:14
**pretty** 100:17 105:4 186:10
231:3 233:22 268:14
**previous** 264:16 265:20
**previously** 265:10,19,23
**price** 65:6 78:18 97:24 100:15
143:13,16 268:3
**pricing** 215:15 217:21,22
**primary** 22:12 251:14
**principal** 189:6 208:4
**principles** 209:25
**prior** 17:15 71:24 264:20 278:3
278:4
**privacy** 85:5 101:3
**private** 97:23,24 165:13 191:3
214:8 267:20
**privilege** 166:14,17
**probably** 49:24 58:24,24 59:11
87:22 105:6 106:5,11 108:7
111:5,9 117:7 120:21 138:25
143:18 148:17,20,23 166:24
173:14 184:15 196:14 199:20
202:12 209:10 239:19 250:16
252:15,17 260:9 268:20
269:21 273:10 275:7,23
276:12 277:15 279:7
**probative** 162:22
**problem** 10:6 34:10 41:9 71:13
71:14 73:11,13 74 74:14 100:6
112:14 132:12 137:20 138:15
138:19 150:22 163:18 165:21
192:1 239:10 268:13 274:1,11
**problems** 35:3 71:8 270:18

**procedure** 87:5
**procedures** 88:5 200:25
**proceed** 160:8
**proceedings** 1:10 6:1 113:3
131:1 160:2 281:11
**process** 72:14 73:14 82:12,14
83:22 90:10 91:6 170:9 171:8
175:16 179:1 184:24 192:15
194:12,15,16,2 1 195:1 196:13
197:8,9 199:23 200:19 201:13
201:20 202:22 203:4,6 228:2
228:25 241:7
**processed** 71:15
**produced** 203:22 204:10 223:4,7
223:10
**product** 37:7 38:7 54:21 65:7
99:9 100:7 207:11 231:11
235:22 240:17 241:11,12
260:23
**productive** 50:10 199:7
**products** 20:10,19,25 21:13,20
21:23 22:1 23:6,14 24:14 25:3
25:16,18,20 26:25 30:22
32:14 37:4 46:19 63:19 65:19
97:23 98:18 115:21 117:13
118:16 123:17 184:12 208:11
211:22 217:1 230:22,23
231:15 232:6,20,22,24 233:1
233:3,5,7,8,8,1 9 235:8,14
239:22,24 240:15,21,21,24
241:3,10,21 242:10 243:2,3
245:9 247:16,18,21 249:1
251:9,20,24,5 251:22 252:13
253:2,11 260:4 261:24,24
262:10,11,4 266:10,14 267:1
268:1,4,7,10
**profession** 181:10 187:10
**professional** 197:6 255:9
**profit** 98:15
**profited** 262:4
**profits** 206:16,18 207:22 210:11
**program** 99:1 130:2,3 139:4
174:10,12,1 5 178:16 180:24
182:1 191:22,22,2 5 192:2,3
203:10 206:6 209:19,23 210:6
211:20,23 225:9 236:10 237:4
249:3 251:2 267:2
**programs** 181:2 190:19 191:1,5
206:7 209:25 210:12,16
**progress** 217:15
**prohibit** 171:25
**project** 196:18 200:6 202:13
**projects** 188:7
**promote** 188:25 190:6
**proper** 74:12
**proposal** 188:17
**proposed** 6:8 111:4 116:9
215:15
**proposing** 115:7 222:24
**prosecute** 147:13
**prosecutors** 272:25
**prospective** 146:3
**protect** 213:13,17
**prove** 44:3 144:1,8 145:4,10
152:11 154:6,6 172:9 177:6
**proved** 149:22
**proven** 138:20 144:10 146:9
147:11 150:12 151:10 177:20
**provide** 89:10 192:20,23 212:9
**provided** 93:19 109:13 138:2
162:10 218:21,21 259:1
**provider** 131:25 138:12 240:8
**provides** 189:24 213:10
**providing** 191:16 268:16
**PTC** 55:15
**PTCB** 55:13
**purchase** 61:4 95:17 96:15
**purchased** 58:22 65:10 95:6,19
95:25 97:17 257:13

**purchases** 95:23
**purchasing** 93:13 94:4,10,19
100:1
**purpose** 91:22 110:15 143:16
161:2 188:23 194:7
**purposed** 103:13
**purposes** 161:1 189:16
**pursuant** 138:25 155:6
**pursued** 231:10
**pushed** 135:16
**pushing** 25:10,11
**put** 38:2 39:19 64:19 81:11
82:17 102:3 109:10 111:4
112:12 116:10,13 123:6 127:6
132:7 133:5 136:12 139:6,14
139:21 140:22 144:23 146:19
158:7,19,20 172:4 178:25
190:9 193:21 195:21 197:13
198:13 199:8 208:9 234:16
254:4 264:6 275:2
**putting** 39:15 51:22 200:11
222:19
**pyrrhic** 154:1,2,2
**p-01** 52:18 54:25 56:5 57:9
62:10 136:21
**p.m** 113:1,3,8 185:19 186:24
269:13 281:7

---

| Q |
| --- |

**quantities** 65:10
**quantity** 65:20,21,22 66:12 72:7
89:2
**Queen** 66:6
**question** 26:11 34:20,22 41:20
44:12 45:20 46:2,17 51:7,9
54:6 56:12 57:4 58:2 64:25
67:5,16 68:3 69:1 74:8 77:11
78:10 89:11,15 99:20 112:23
123:4 124:2 141:13 144:10
149:1 181:14 184:2,14 185:25
209:14 211:5 221:14 229:3,4
229:4,5,9,10 231:24 234:6
237:7 241:6 245:13 248:9
253:7
**questionnaire** 232:4
**questions** 14:16 45:1 52:6 53:17
70:25 75:23 79:25 84:1 88:18
91:10 119:22 123:11 124:3
149:3 166:13 168:21 169:3,7
181:19 198:22 199:5 220:22
225:1 226:1,8,9 231:20
232:15,16,20 237:12 245:19
249:23 253:22 279:20,22
**quick** 234:15 258:3
**quicker** 158:13
**quickly** 7:4 200:17 202:14
228:14
**quite** 23:23 29:11 30:4 96:22

---

| R |
| --- |

**R** 281:9
**rabbit** 222:21
**raise** 15:3 47:21 113:12 160:11
168:12 187:6 229:20 246:1
254:12
**raised** 85:5 185:12,13
**raising** 10:19
**Ralph** 106:2,8
**Rambaran** 150:4,24 155:11
156:7,16,17
**ran** 133:2
**Rashbaum** 1:19,20 3:5,8,16 4:2
4:4,9 6:4,5,24 12:4 13:14,17
13:18 14:16 26:12 31:16,19
32:1,17 34:21,23 35:4,8,11
40:8,12,16,19,2 4 41:4,8,13,18
41:21 42:14,18,20 43:3,7,9,12
43:16,20,24 44:4,8,13,15,25 45:6
45:19 46:7,23 47:5 106:15,20

106:22 107:2,5,8,10 108:4
109:15,18,20 111:19 119:24
120:1,2,25 121:3,5,13,17,20
123:5,9,11,19,21,2 3 157:21,24
158:1,6,15,18 159:3,13,15,18
159:23 160:8 171:19 175:20
185:15 229:18 230:1 231:19
231:21 233:16,17 234:3,4,7
234:13 235:9 236:14,16
237:12 245:13,15,19,24
246:11 248:11,18,20 249:12
249:19,23 253:4,22 254:2,4,8
254:19 257:23 258:1,2 263:13
263:15,2,3 264:1,7,11,14,23
265:1,2 268:21,24 269:16,18
269:21,25 270:3 271:22,25
272:6,8 273:22 274:4,6,22,24
275:2,11 276:5,15,19 277:18
277:20,23,25 278:5,9,12
279:17 280:5,9
**Rashbaum's** 46:17
**Rasheed** 156:17
**rate** 191:24 206:19 218:2
**ratio** 67:8
**Ray** 1:7 4:8 254:13
**reach** 41:22,24 51:17 74:23 75:4
82:16 265:22 266:24
**react** 222:8
**read** 54:12 57:25 58:1 70:5,5,18
70:24 90:17 100:23 104:11
110:8,12 129:19,23 155:3
229:9,10 235:3 252:1
**reading** 259:11
**reads** 129:24
**ready** 7:9,12 50:11 106:15
157:23 159:13,16 160:8
185:16
**real** 38:12 40:10 47:24 224:10
255:18,19
**realize** 178:24
**realized** 182:1 191:24 225:9
**realizing** 275:5
**really** 12:15 29:12 31:10 86:16
95:16 112:7 117:22 120:11
135:25 145:23 146:6 147:15
152:10 170:25 171:22 173:5
178:11 181:18 196:13 201:21
214:25 224:20 234:23 238:17
239:17 242:4,22 243:9,14
257:4 258:16,1 6 261:9,13
262:1,10,17 263:5 265:5
266:14 268:24 269:25 272:17
272:24 275:5 276:20
**realm** 237:5
**reapproached** 260:13
**reason** 37:1 53:4 96:15 121:6
136:24 137:23 139:8 152:14
152:16 155:24 168:4 173:17
175:15 216:18 225:8 227:9
228:5 250:24 251:12
**reasonable** 116:18 135:4 152:11
**reasonably** 148:11
**reasons** 71:4 85:8 136:18 145:13
162:20
**Rebecca** 114:25
**rebut** 273:13,16,17
**rebuttal** 271:8 272:21 273:9,9
273:13,15,17
**recall** 75:24 76:2 79:19 80:21
81:2 84:1,8 85:3 86:2 91:12
95:19,21 96:8 97:11 98:4
185:4 204:5 207:1 226:6,9
235:14 249:8,20 251:8 252:4
255:5 257:19 258:16,17
259:11 272:20
**receipt** 141:14
**receive** 13:10 16:16,17 25:22
26:1 30:15 46:20 70:14 71:14

71:16 115:4 116:12 117:13,18
141:3,11,22,2,5 142:6,7
174:15 243:2 247:9 249:3
**received** 5:2 13:3,11 20:7 31:12
32:22 43:24 46:19 70:21
71:24 81:9 84:25 87:2 88:16
89:21 118:9,14 122:5,8,12,14
122:16 127:24 128:19 165:22
174:10 175:24 204:1 206:9,11
207:3 234:12 243:8,13 251:20
257:12 264:13
**receiving** 16:13 29:21 71:11
87:25 88:21 115:2 141:15
206:6 261:3
**recent** 274:18
**recently** 190:16
**recess** 50:6,19,20 113:1 158:11
160:4
**recipient** 163:9 164:4
**recognize** 104:23
**recollection** 250:21
**recommend** 193:17 239:23
**recommendation** 183:19 238:15
**recommended** 193:18 219:5
239:22
**record** 67:13,14 112:24 127:5
158:18 161:12 162:6,12,18,24
177:17 197:20
**recorded** 277:16
**recordings** 254:5 276:16,17,22
276:23 277:6,9,19
**records** 148:9 162:8,16 163:15
163:16
**recreate** 222:14
**recruit** 16:6
**recruited** 29:4 113:24 114:18
116:22 117:24 134:21
**recruiters** 131:14
**recruiting** 30:11 116:4
**red** 280:19,20,21,2,3 281:1
**redacted** 199:19
**redirect** 3:9,13,17,2,5 4:4 14:17
14:18 45:2,4 99:21,22 123:12
123:13 124:2 224:23,24
245:12,14 253:21 278:6
**reduce** 18:1
**reduction** 17:19,22
**refer** 180:21 210:13 211:17
**referenced** 130:4
**referral** 141:2 181:6,8
**referrals** 182:3 210:12
**referred** 28:20 207:8 209:11,15
229:10 251:7
**referring** 182:20 183:13 210:4
211:21 212:12 213:5,7 221:4
240:8 253:17 259:17
**refill** 101:17
**refills** 25:8,10,12 71:5 101:18
**reflects** 197:20
**refresh** 250:21
**regard** 61:1 72:24 74:22 237:3
267:23
**regarding** 44:9 118:13,13
134:14 136:25 157:20 158:25
168:18 235:14 248:7,10 276:1
**regular** 65:16 100:7 238:16
**reimburse** 62:17 76:19 77:14
78:15 267:25
**reimbursed** 59:7 61:12
**reimbursement** 61:22 65:6
76:15 77:7 78:1 80:15 97:20
97:25 98:24 131:19 132:9
136:24 138:18 190:25 207:11
**reimbursements** 61:23 135:6
207:23
**reimbursing** 78:12
**relate** 131:15,18
**related** 22:9 114:15 122:18
131:13 149:11 150:20 175:3

204:3 208:4 223:16
**relates** 138:20 148:6 222:19
**relationship** 19:17 20:11 21:5,11
21:16 22:16 68:9 150:6,9
152:18 153:8 154:19 155:7
208:5,6 268:15
**relationships** 21:17 23:21 24:8
34:13,25 35:5 76:10 189:18
190:18,20 193:16 226:14
**relatively** 130:18 215:14
**relax** 8:16
**relevance** 77:8
**relevant** 43:5 171:12 236:6
278:23
**relies** 179:10
**reluctantly** 147:23 148:2 157:16
**relying** 171:23
**remained** 37:17 214:7
**remaining** 8:17 186:24
**remedy** 238:18 239:18
**remember** 10:13 29:12 30:1,2
33:18 44:11 79:25 96:3
101:14 117:22 143:23 143:23
156:13 158:8 159:3 171:13
185:6 190:21 198:24 221:18
221:20 222:25 229:3,7 232:11
234:19 235:15,15,16 237:3
239:17 240:1,6,1,1 243:5
244:22 247:1 249:11,13
250:14,23 269:2 270:6,23
**remove** 74:20
**remuneration** 226:8
**render** 143:18
**renumeration** 211:10,10,14,21
**rep** 18:14,15,19 19:16 26:22,23
68:12,13 115:23 219:18 220:7
233:21 240:15,20 244:4,4,5
244:10
**repairs** 255:25 256:1
**repeat** 77:11 78:10 79:4 231:24
253:8
**repeating** 274:13
**repetitious** 274:12
**rephrase** 14:10 40:16 64:5 69:1
90:15 247:15
**replacements** 255:24,24
**REPORTED** 2:7
**reporter** 2:5 48:3 125:1,1 160:5
186:14 229:10 231:17 271:19
281:14
**Reporter's** 4:10
**repping** 116:2
**represent** 13:18 32:1 120:2
192:17
**representative** 232:15 233:4
**representatives** 266:22
**represented** 133:25 204:20
221:17
**representing** 185:5
**reps** 29:7 131:14 133:3 219:17
242:4 244:3,11
**reputation** 192:11
**request** 17:25 104:17 204:6
**requested** 256:13
**require** 216:18,22
**required** 62:11 154:25 192:6
258:21,22
**requirement** 90:22 154:12 258:9
**requirements** 139:2
**requires** 17:7,12 130:14 150:8
151:7
**requisite** 132:19
**research** 111:7 147:25 191:20
191:25 209:22 234:21,25
235:3,7,16 241:10,23 247:5
**researched** 251:9
**resend** 90:2
**reserve** 277:4
**resistance** 201:10

**resolution** 166:12
**resources** 197:5,6,7,18 202:8
209:8
**respect** 25:7 26:16 27:14 159:16
205:18
**respond** 70:22
**responded** 111:16
**response** 41:2 46:17 53:13 54:7
72:10 162:4
**responsibilities** 58:8 188:24
**responsibility** 90:12
**responsible** 39:18 87:25 219:8
219:10
**rest** 124:18
**restate** 243:12
**rested** 147:12
**restroom** 8:9
**rests** 130:13,15
**result** 201:8
**results** 221:24 222:13
**Resveratrol** 73:25 74:15,20,21,22
74:9,10 76:21 79:18 80:20,24
99:6 102:18 103:14,24 104:9
**retain** 182:15 192:5,8 212:4,5,21
**retained** 182:16,19 227:11
**retired** 49:21 130:25 269:13
**returned** 113:8
**revealing** 242:24
**revenues** 207:7
**review** 203:10 218:17
**revisions** 199:14
**reward** 9:6
**Rick** 265:8,19
**right** 6:7,17 7:5,9,15,15,16,17
8:1,22 9:6 10:4,7,12,19,24
13:11 15:2,3,6 18:25 32:5,13
32:20 33:1,6,8,11,14,17 34:6
34:10,16 35:1,6,16,20 37:4,7
37:14,20,23 38:7,8,12,19 39:7
39:13 41:2 42:19 44:17,20
46:5 47:21 50:17 51:4 52:21
54:9 56:2 57:12 62:3 64:9
65:3 75:13 76:8,22 77:6,6
78:4,8,18,19,22,2,4 79:7,12,18
79:22 80:22,23 81:24 83:9
84:14,14 85:5 86:1,17,21 87:3
87:13 88:4,19,23 89:5,9,18
90:18 91:20,20 92:2,3,16,16
93:19 94:13,23 96:11,17
97:17,18,21 98:12,13,15 99:6
108:16,22 109:23 110:6 111:8
111:25 112:18 113:12 116:20
120:3,10 121:22 122:6,13
125:3 126:16 130:8 131:3
133:10,15,22,23,24,2 5 134:3,8
134:22 137:1,6,2 1 139:24
140:8,15 141:4 142:1,12
145:8,9,14,20 146:2,6 147:14
149:10,12,12,1 6 150:15
156:20 157:10,13,14,14
159:22 160:5 161:23 162:3
163:10,19,19 167:6 168:3,12
172:24 173:12 174:6 175:7,9
175:11,21 176:9,10,10 177:5
177:15,22 178:9,9,12 179:5
180:3,5,17 181:4 182:1,17
185:12,14 186:23 187:6 188:9
194:15 195:15 196:6,17 198:8
204:8 205:14,21 206:10
207:12 210:1,2,19 211:23
212:3,9 213:8 215:6 217:23
219:8 221:8 223:2 225:14
229:6,15,19,19,19,20,2 0 230:9
231:2 233:8,11 236:25 237:20
238:4 241:13 244:4 245:17,25
245:25 246:1 249:18 250:10
250:22 251:4,7,8 252:8,11
252:22,25 254:12 268:19,20
269:1,11,14 270:2,5,12 272:9

276:14 279:24 280:4
**righty** 10:16
**right-hand** 57:19,20
**ring** 188:21
**rip** 109:11 271:5
**rise** 8:7 50:14 105:14 112:22
130:21 185:18 269:12 280:3
**risk** 277:15
**RLH** 165:9,9
**roadblock** 36:19
**Robin** 134:19
**role** 148:21 241:20 257:1
**room** 7:6 49:17 105:11,16
130:17 269:4,8,9
**Rosalinda** 156:16
**Ross** 165:8
**rotator** 255:25
**Rouge** 259:24
**roughly** 62:6 226:5 247:1,22
249:9,22
**routine** 238:22
**RPR** 2:5 281:13
**rule** 35:12,13 109:2 110:6,9
131:5 141:6 144:19 163:15
194:9 210:5 229:3 270:7
**rules** 12:21 43:1 76:15 139:4,5,5
182:5 209:24 272:21 273:11
273:19
**ruling** 68:5
**run** 36:19 257:7
**running** 257:6 258:18 262:1
**rushing** 280:1
**RX's** 101:1
**Ryan** 15:23,24 18:10 35:25 36:2
247:3 251:2,3,4 252:4
**r-u-n-d-i-g-e** 10:23

**S**

**s** 31:3,8 244:17
**safe** 14:20 124:9 175:14 176:13
176:18,24 177:7 178:25
183:17 193:25 194:2,4 201:10
213:10,13,17 214:11 224:6,7
227:4,8 228:14 229:14
**Safety** 63:5
**Sal** 107:2 245:24
**salary** 227:1
**sale** 149:23
**sales** 19:4,11 26:23 47:1 68:12
68:13 115:23 131:14 207:9
215:19,20,23 219:17,18 220:7
240:14,20 265:20 266:22
**salespeople** 34:13,15
**salesperson** 268:16
**Salvador** 4:5 246:2,5 250:19
**same** 14:21 37:11,17 43:19 63:1
63:8,25 64:4,9,16 67:23 68:6
70:21 74:21 80:10 82:9 85:21
103:5,5,10 106:12 109:3
111:3 118:2 124:22 141:15,21
143:4,15 149:7 158:23 182:5
200:5 222:13 225:12 232:15
276:9,10
**San** 230:3 237:19,21
**Sara** 230:19 233:20 239:21,21
**sauce** 273:25,25
**saw** 9:4 136:15 155:15 156:3
157:1,6,7 202:2 258:4
**saying** 40:13 120:22 139:12,18
141:9 143:22 144:2 145:2
159:5 162:12 172:1 183:1
186:20 194:1 205:8 209:16
222:5 239:1
**says** 6:22 19:4 27:9 28:4,4,13
38:15 39:22 40:3 52:7,18
72:11,18 73:3 101:5 136:15
151:11 153:7,14 154:7,25
155:3,3,5 163:20 183:23
211:9

scads 135:2
scanned 70:11
scar 13:7,9 14:5,5 25:5 28:4,5,8
28:11 39:22,23,25 40:4,4
115:22 117:16 230:22 240:17
240:18 243:3 247:8 252:16
scarce 96:11
scars 13:8 231:13,13 232:6,17
244:13,15,6 248:23
schedule 238:23 239:5,6
scheme 134:16,1 6 140:17 173:3
173:3 250:10
school 169:1 255:3 263:6
schooling 55:12
scienter 154:12
scope 45:19 46:3 167:3 178:11
204:6 222:3 253:4
scratch 51:15
screen 52:1 57:22 69:5 81:11
102:3 195:17
screened 138:9
screens 197:10 200:23 218:24
screw 219:17
scribe 198:12
script 19:18 20:12,14,1 5 22:5,10
22:12 101:17,17,20,2 5 136:18
143:11 145:23 146:25 147:8
scripts 68:23,25 71:11 72:15,21
101:14 105:2 135:6 136:14,21
138:9 145:20 147:9 182:21
183:6 206:6 207:4 210:4
212:12,16 213:8 221:4,25
222:1
sc-01 136:21
se 154:13 155:12
Sean 244:8
search 212:22
seat 7:18 8:16 15:5 47:23 113:14
168:14 229:22 246:3 254:14
seated 8:18 50:18 113:9
second 8:9 24:19 93:22 120:19
169:23 205:4,7 272:4
second-guessed 213:11
Section 1:15 155:5
secure 242:22,23
Security 8:7 50:14 105:14
112:22 113:6 130:21 185:18
243:1 269:12 280:3
see 7:2,3,17 16:23 19:8 28:2
38:15 39:23,24 43:2,22 51:19
52:8,11,16 57:1 61:21 66:18
69:5,17 72:12,19 73:3 79:8,12
81:13,20 82:7,17,18,22 83:13
84:5,21 85:13,21 88:2 89:18
89:22 93:25 94:2,4,5 101:16
101:20 102:23 110:3 111:21
112:21 119:5 124:1 140:20
142:17,25 144:14,22 147:6,22
149:1 153:24 154:21 155:24
157:2 161:4 165:25 173:13
175:10 177:4 180:5,6 186:18
195:17 197:23 199:15 203:6
223:3,6 224:20 228:2 239:10
239:13 241:25 250:4,18
260:24 265:23 269:11 270:20
273:24 278:2,23 279:19,20,25
280:12
seeing 146:3 253:16 257:19
258:16
seek 145:12
seeking 12:11,13 54:7
seem 28:7 52:4 169:10
seemed 116:18 184:19
seems 141:17 153:24 154:6
seen 61:23,24 100:19 263:16
273:8
sees 108:21
self-conscious 231:14
sell 30:24 67:18 217:1 256:2

selling 26:21 32:14 68:8 94:7
116:22 216:16 233:5,8 253:2
253:10
semi-pro 231:2
Senate 153:21
Senators 134:12
send 20:8 38:25 142:24 156:5
203:9 269:2 275:11
sending 40:20 82:4
senior 197:5
seniority 273:4
sense 37:6 171:21 172:19 194:1
231:13
sensed 214:2
sensitive 216:21 242:24
sent 32:13 33:1,4 40:6 43:21
68:14 71:4 72:3,11,18 79:7
138:8 163:7 173:23 174:11,15
195:25 196:3 203:14,20
217:23 218:5
sentence 17:20,22 18:1
sentenced 17:3 133:17
separate 136:13 141:10
separated 250:5
separately 61:19
September 178:14 188:12,17
191:8 206:25
serious 6:21
seriously 200:1
served 208:8
service 189:24 210:17 211:19
services 20:10 181:8 189:25
268:17
serving 245:21
SESSION 113:2
set 50:11 86:13 97:21 112:12,14
113:25 122:14 199:23 280:7,9
280:10,13
setting 268:3
seven 111:10
seventh 130:16,16
seven-year-old 255:2
several 136:9 197:19 261:8
266:21
sham 172:6
share 118:2
shares 257:13
sheet 23:24 24:16 25:9 63:5,6
70:1 76:1 200:22 232:13
235:21 270:19
sheets 20:9 24:2 270:7,12
she'll 8:22
Shield 267:12
ship 238:20
shipment 61:2
shipped 65:12,16
shipping 29:21
Shirley 269:4 280:8
Shores 10:15,16
short 100:24 105:23 255:15
260:1 277:21
shorter 277:25,25
shorthand 91:14
shots 111:16,16
shoulder 40:1
show 18:24 27:7 44:4 46:7 50:22
60:19 69:4 70:1,15 73:2 83:7
85:11 89:17 95:23 100:25
102:20 107:13 108:20 115:25
131:20 136:18 138:6 149:6
151:8 154:9 174:19 178:4
195:4 200:17 201:13 203:12
250:17 256:4
showed 38:2 241:9
showing 19:3 37:25 86:18 234:7
234:14 257:18
shown 11:10 76:1 84:3 87:13
100:21 102:2 138:5
shows 145:22

shut 262:23
side 109:4 110:25 132:9 133:4
168:1 201:5 205:4,8 280:11
sides 7:4 51:3 130:10
sign 18:20,25 73:3 74:16 118:16
192:17 200:21 212:16 235:10
236:20,22 258:17,22
signature 19:6 71:6 72:7 82:7
89:2 258:10
signed 32:9 37:10 82:9 116:3,3
129:17 130:7 151:16 152:21
171:6 217:23 235:12 236:18
236:24 238:13 244:14,18,20
258:6,8,14,24 259:11,14,16
significant 199:22
significantly 217:22
signing 259:17
signs 103:8
Simone 139:7,9
simple 110:3 210:5 215:14
217:13
simpler 210:7
simplest 51:10
simplify 176:10
simply 54:13 162:24 174:2
146:12 191:17 215:16 217:24
222:23 275:17 279:7
since 49:23 93:23 109:1 159:1
229:9 237:21 275:15
single 138:6,7,13 139:23 151:15
223:10 236:4 247:24 255:2
singled 267:9
sir 7:25 9:13 11:5,10 13:9,25
15:3,9,18 16:20,24 17:17 19:1
19:5,13 27:12 29:15 30:20
32:6,25 33:3 47:16 48:2 73:4
74:4 105:9,18 113:6 124:9
168:10,12 187:6,8 190:10
229:13,15,20 230:14 236:19
237:17 238:2,8,1 1 239:15
240:16,23 241:5 244:11,24
245:2,20,22,2 5 246:7,9,17,22
246:24 247:13,17,19 248:1
249:2,4,7 250:20,25 251:5,13
251:19,22 252:6,19 253:12,15
253:18,23 254:12,17 269:14
sit 7:16 124:5 131:4 185:20,23
269:14,16
site 91:23 92:12,21
sitting 16:24 96:5 97:13 115:1
167:24 271:16
situation 37:16 78:6 116:23
235:23,23
six 29:11 80:12 231:5 238:15
251:6 260:18
sizes 94:11,13,14
skin 93:4
skip 46:4 54:6 169:2
sleep 269:3 279:25
slow 202:21 271:20
slower 231:16
small 89:22 148:24 270:9
smaller 65:21 94:13 227:24
smart 173:20
Smith 60:7,9,11 69:23,24 70:6
100:20 224:20 162:5
163:6,10,18 164:13 165:7
188:1,8,8 192:4 193:13
194:23 195:19,19 197:19,23
197:23,25 198:1,3,3,25
206:21 208:3
smokers 186:1,2,3
smoking 186:4
Social 243:1
sodas 130:23
soft 137:8
softly 161:13
software 70:11,12,13
sold 93:20 97:8,14 100:19

116:25 136:23 207:8,10
208:11 255:23 256:23 257:10
261:23
solution 266:15
Solutions 18:17,18,20,2 2 45:10
45:11 259:24 265:9,19
solvent 91:20
some 9:2 11:9 12:3 13:10 17:19
23:19 32:13 33:15 35:21 36:9
54:8,24 63:15 67:21 70:25
72:8,9 75:14,23 80:17 84:1,4
88:18 91:10,1 1 104:12,23
106:16 107:5 109:5 111:6,12
112:5,5,1 1 113:25 114:18,20
116:7,11 117:1,2,13,18
118:12 120:23 121:8,11,11
133:23 134:6,21 140:14 145:5
145:5,6 146:18,19,20 147:21
152:1,1 165:4 172:23 173:13
173:20 176:8 177:16 186:25
188:3 190:20,20 191:20,23,25
192:6 196:23 199:9 201:16
205:16 206:2 209:3,12,22
210:10 211:24 212:5,11,20
220:14,15 221:10 222:22
226:5 227:22 230:16,20 231:3
231:9,13 232:4 234:21,22
236:24 238:16 239:18 240:14
241:19 242:6 243:23 244:1,12
249:16 254:4 255:18,19
256:14 257:12 259:23 263:2
265:22 266:24 267:8,9,20
270:11,14 271:1 272:9,16
273:10 276:8 279:10 280:21
somebody 116:8,22 209:14
224:20
somehow 9:5,7 138:4
someone 6:20 20:23 38:3 39:18
42:23 59:24 78:13 115:13
121:7 132:12 133:13 134:1
137:12 143:24 146:25 150:9
154:7,17 163:13,24 164:6,6
195:8 210:11 224:16 273:14
277:10
someone's 162:25
something 6:10 7:14 11:16
21:16 23:22 24:23 31:6 32:24
33:13 39:19 57:20 59:14,20
61:20 66:7 72:5 74:6 77:3
78:8,20 80:22 87:25 88:5 89:2
97:21 99:2 110:21 112:8
117:8 118:8 120:23 129:21
130:11 140:13 145:9 146:3
154:6 170:2 192:6 204:4
208:21 210:13,15 211:13
222:25 231:12 238:16,16
239:4,8 264:17 265:24 275:20
276:11 277:12,16,1 7 278:23
sometimes 27:17 76:18 89:1
93:16 99:6,9 111:24 128:14
133:14 200:16 267:13,14
273:6,17
somewhat 241:14
somewhere 29:1 30:17 106:6
202:2 230:20 236:23 237:5
son 6:4 156:22 157:7,9
soon 20:7 56:10,11 130:18
148:17
sorry 12:8 14:9 16:17 31:20,24
40:7,8,25 47:7 60:8 65:14
66:21 108:11 113:7 119:13
148:1 166:16 168:19 172:13
174:23 179:15 193:12 208:18
215:2 220:20 230:9 231:24
235:5 239:4 242:12 253:8
264:24 274:22 276:15
sort 134:6 172:11 179:24 198:12
198:13
sorted 212:3

sorts 177:19
Sound 250:22
sounded 56:13 231:12
sounds 33:14 122:13 227:18
   241:14
source 209:3
sources 181:6 208:15
South 1:21 2:2
SOUTHERN 1:1
so-called 189:15 193:19 194:5
so-to-speak 197:15 201:22
   213:18
speak 15:20 40:10 47:24 66:5
   106:5 133:13,21 134:2 138:16
   166:21 230:9 232:7,10
speaking 190:11 193:11 196:10
   239:25
special 112:3
specialists 139:3
specialized 51:12 182:15 225:8
specially 49:10
specialty 49:10 190:8 192:5,12
   210:9 211:25 212:21 225:12
specific 20:12,14 44:19 48:22
   131:22 133:11 204:5 205:9
   210:23 225:5,6 235:17
specifically 16:3 34:22 133:10
   230:25 265:16
specify 138:11
spell 15:5 48:2 58:19 113:14
   246:4
spelled 10:22 250:4
spend 111:24
spending 209:11
spent 183:11,25 196:17 202:12
   209:2
spite 190:22
split 206:16 207:9 272:12,14
   273:20,22
spoke 14:13 117:9,10 120:11,12
   137:18 146:24,25 147:3 175:1
   179:18 193:6 194:14,23
   233:24
spoken 14:11 120:5
sponsor 36:3
sports 255:25
spotted 206:4
spotting 206:3
spread 92:18
spring 79:20 82:5 209:9,10
St 262:24
staff 181:9 215:19 217:1
stage 160:2 233:15
staggering 202:11 208:25 209:1
stake 213:25
stand 18:6,8 55:18 149:15
   158:16 254:10
standard 110:8 112:5 189:21,23
Stark 205:24 259:1
start 8:12 9:9 10:7 33:16 52:6
   70:16 125:6,9 131:8 159:21
   184:2 186:20 269:3 280:1
started 19:19 20:3,6 32:4,12
   115:2 137:24 159:1 205:15
   243:18 258:8 259:23 261:20
   261:25 262:4 265:3 267:6
   273:5 274:9
starters 134:13
starting 158:10
starts 38:2
state 11:2 15:14 41:15,16,18
   48:5 55:24 113:20 121:13,15
   121:18,24 123:21,23 164:16
   164:16,22 170:22 172:1,2
   248:14 258:20 275:5 277:14
stated 117:24 237:18 251:1,9
statement 170:25 177:23 178:4
   189:16 195:25 196:4 234:3,4
   273:7

statements 41:3 169:25 178:3
   234:2 278:4,4
States 1:1,4,11,14,1 5 2:5 17:1
   55:14 113:11 141:11 281:14
stating 103:8
station 238:6
stationed 114:9
status 169:18 189:13 198:17
   203:1 226:3 249:5,6
statute 141:21 155:2,5 182:7,21
   183:4 194:5,6 210:14,18,19
   210:22 211:6 213:8 223:23
   225:2 226:11 258:25
stay 49:17 130:17 181:2 227:8
   260:17
staying 263:5
stellar 6:6
step 116:5 194:20 195:23
steps 65:24 66:2 170:10,11
   171:7 179:1,8 193:2 196:23
   202:5 218:13
Stera 67:22,23
steroid 230:22
Steven 229:23
sticker 78:18
still 28:4,7,11 39:22 57:25 124:2
   143:6 147:22 149:15 174:1
   201:19 202:24 262:18 269:2
   280:12
stipulate 129:25
stipulated 137:25
stipulation 129:17,20,2 4 139:9
stock 100:8
stomach 6:14,21 8:22 244:16
stop 66:23 67:6 99:10 212:2
   213:4,19 215:16 217:19,24
   245:8 256:11
stopped 66:20 67:1,7 79:22 98:3
   98:6,12 104:8 184:12 231:6,6
story 186:3
straighten 65:2
straightforward 198:21
strategically 167:25
strategy 159:4,19 160:3 166:24
   166:25,25
Street 1:16
stress 256:12
stretch 50:4 130:16
stricken 75:13
strict 154:10
strictly 119:8
strike 75:10 166:22,23 216:15
strongly 212:5
struck 138:2
structure 37:19 221:14,14,22
   222:16 261:10 262:10
struggling 117:1
Stuart 262:1,23
stuff 20:13 38:13 100:5 112:4
   119:17 200:25 201:24 231:9
   241:17 259:2,12
Styles 115:1
subject 53:23 169:4,5,20 182:5
   218:23
subjects 166:11
submission 132:20 134:4
submissions 134:23 135:9,12
submit 109:3 112:8,9 132:1
   135:2,17 137:9 190:21 196:7
   248:25
submits 135:15 137:12
submitted 17:10 112:3,4 131:20
   132:5,6,21,24 133:6 135:1,2
   135:12 137:14,15 138:7,13,14
   138:17 152:4 162:7 171:16
   218:20
submitting 77:25 112:9 138:17
   144:2 268:6 270:14
subpoena 204:1

subsided 238:21
substance 41:7,8,8,10
substantive 131:8,18 140:25
   271:1
substitute 79:13,16 82:13
substituted 79:2
substituting 99:5
success 266:20
successful 257:2 260:20 264:21
sudden 209:24
suffered 255:16
suffering 234:25 235:1 256:12
sufficient 144:18
suggest 140:24 207:25 212:4
   239:19
suggested 188:16 192:4 210:8
   212:21 256:11
suggesting 146:6,11 163:24
   204:7
Suite 1:21 2:2,6 281:15
sum 54:19
summary 135:20,21,22
summer 21:8 23:18 98:8,9
   209:10
sun 280:7,9,10,13
Sunrise 190:16
superfluous 157:12
Superseding 130:1,5
supervised 83:15
supervising 83:22
supervision 216:22
super-duper 111:22 159:12
supplement 73:3
supplier 228:19
supply 95:12 96:18 208:15
   209:3 246:20 252:10,14
   256:25
support 215:19
supposed 20:24 21:14,25 22:3
   22:19 24:13 75:2,3 82:12,14
   82:14,16 247:11
sure 8:22 17:21 23:23 24:5,15
   25:1 26:3,10 27:4,18 28:9
   29:19 30:4,8 32:2,11 33:14,24
   34:14,17 35:10 36:5 37:13
   38:5 39:5 40:18 43:2 44:18
   47:11 71:2 72:3,12 73:2 88:22
   89:8 90:7,13 103:12 106:20
   106:22 107:3 108:20 109:24
   115:12 119:21 123:10 132:4
   140:16 142:14 145:1 153:10
   159:6,19 178:1 183:13 184:17
   192:16 198:24 199:21 200:19
   204:5 211:2,8,1 1 212:10
   216:25 219:17 225:3,7 227:6
   232:15 236:15,17 239:5 242:2
   254:3 257:24 258:3 263:14
   264:25 268:24 269:17 270:21
   274:19 275:7
surely 212:2
surgeries 28:3
surgery 239:19
surprise 122:20
surprised 191:18
surprising 209:12
surrounding 137:5
survey 174:10,15 203:10,17
   236:7,8,10
survive 147:18
suspect 41:24 42:25 145:12
   173:14 275:25 277:12
suspicion 275:15
sustain 41:23 60:10 63:17 64:6
   101:10 121:10 123:25 126:3
   164:9,15 165:17 225:24 234:5
sustained 12:5 26:14 64:6 75:13
   126:2 164:9 229:24 248:19
sustaining 12:17 129:15
Sven 3:6 14:25 15:4,7 18:25

swallowing 92:16
swear 7:18
swelling 6:13
switch 182:24
switched 235:23 236:1 250:15
   276:21
switching 30:3 249:10
SWORN 10:20 15:4 47:22
   113:13 168:13 187:7 229:21
   246:2 254:13
system 33:10 167:10
S-v-e-n 15:7

─────────────────────────
                  T
─────────────────────────

T 281:9,9
TABLE 3:1
tablet 92:15
tackle 197:14
take 9:23 22:10 23:6 38:9,12,16
   46:9 49:16,23,25 50:2,20
   55:22 65:24 66:2,15 81:20
   91:22 92:2,15 105:10,15
   110:14,20 130:23 166:14
   173:8 179:8 183:3 186:20
   195:23 215:7 227:20 231:5
   234:15 238:15 241:20 247:20
   247:22 249:22 256:13 258:3
   268:20 269:4,7,8 280:23
taken 113:1 219:1,3 241:24
   276:18
takes 37:19 50:23 71:16 139:10
   179:6 192:18 222:8
taking 21:15 34:15 50:7 158:11
   196:24,24 200:1 232:6,20
   264:22
talk 6:9 12:19 13:23 39:21 49:19
   50:9 64:16 84:16 91:9 93:22
   95:2 105:16 107:20 130:18,22
   138:22 139:2,3 143:10 158:3
   158:6,10 160:1 175:14 179:1
   204:7 211:6 219:23 231:16
   233:22 269:10 270:23 271:20
   275:21
talked 14:1 45:17 92:3 94:9,13
   94:16 97:20 132:21 134:4
   137:7 140:7,8 149:25 155:13
   171:14 192:4 239:25
talking 20:24 21:8 22:1 23:17
   24:11 28:24 42:1 45:12 54:9
   59:8 81:17,22 83:23 85:22
   94:10 100:12 115:2 122:1
   138:23 139:11 159:21 160:3
   181:8,8 184:25 188:4 223:17
   224:7 234:2 241:9 265:17
   267:6 276:8
talks 258:24,25
Tampa 255:20
target 24:20 25:15
targeting 24:25
tax 116:11 189:16 235:18,23
taxes 33:2
taxpayers 239:12
team 8:12 47:1 204:14
Tech 55:19
technical 225:4
technically 176:24 277:13
technician 48:14,15,17,20,25
   53:6,7,16 55:10,14,23 58:7,8
   65:19 71:17 102:9 132:10,17
technicians 48:21 55:17 58:9
telemed 23:22 24:6,9,12
telemedicine 46:10 47:12 87:10
   90:7 150:17,19,2 5 151:20,24
   253:13
telephone 195:18 240:10
tell 6:16 8:6 9:9,11,16 10:21
   11:11 12:5 15:5 17:14 20:3
   21:7 23:20 24:8,17 25:19,23
   26:4,19 33:5 38:21 48:2,19

53:15 60:22 61:16 63:3 69:10
75:14 108:22,25 110:4 112:7
113:14 115:13 125:10 126:12
129:9,9 141:22 147:21 161:2
161:8,15,16,18,1 8 168:14
169:1 171:24 173:22 174:21
175:5 176:13 179:22 183:4
186:14 187:8 195:8 196:23
202:21 205:5 207:6 217:14,20
219:4 223:8 229:22 234:18
235:24 246:3 248:21 254:14
255:1 261:22 264:15 265:16
274:17 275:12,18 277:11
telling 20:10 42:21 85:25 159:6
183:25 230:21 241:23 269:24
269:25
tells 63:8 104:11
tempted 111:20
ten 183:11,13,14
term 59:14 68:24 95:12 190:22
191:18 198:15 200:18 238:25
terminated 184:10,11 215:12,13
terms 49:8 51:10 65:10 171:24
183:13 193:22 198:9 199:3
200:22 201:4 223:18 262:16
terrible 166:24
test 236:6
testified 23:9 96:1 97:10 123:18
132:5,23 140:6 148:5 153:2,5
155:11 156:22,24,25 218:13
238:10 240:14 242:6 250:9
251:23 256:18
testify 15:16,19 41:16 96:5
113:22 132:22 139:9 148:6
149:9 152:24 156:18 157:5,5
157:7 159:7 164:25 165:24
166:1 169:24 170:8 173:5
176:5 178:13 271:7
testifying 17:18 27:10 118:18
163:8,15 170:5
testimony 91:17 132:7 137:16
138:6,12 139:15 143:14,15
144:18 146:23 148:10 150:11
150:17,18 166:23,23 173:7,13
174:11 212:19 215:5 217:19
219:2 236:17
Texas 48:6,7,8
texting 118:12
thank 8:4 14:19 15:9 31:16
40:11 45:3 47:16 50:17 51:5
105:9,18,19 113:9 119:23,24
124:8,9,10 159:23 187:1,14
193:14 195:10,11 204:16
220:10 229:13,15 234:17
245:20,20,22 246:1 253:19,23
254:17 258:1 263:25 269:15
269:18 273:21 274:4
thanked 156:4
thanks 6:5
their 19:18 20:10 21:12 27:1
34:25 38:10 76:15 77:20 78:8
82:21 90:12 131:15 132:11
136:4 138:2 149:9 150:18
151:7 152:8 162:10 171:8
178:21 181:9 216:3,3 217:16
218:17 219:15 220:3 227:15
238:15 243:2 260:25 261:2,3
261:11,13 262:9,14,15 265:25
265:25 266:19,24 268:16
273:16
themselves 82:15 131:21 133:25
135:18
theory 150:3 151:7 152:8 164:2
177:18,21 272:23,25
therapeutic 74:15,18,22,23
75:24 79:5 81:2,23 102:17,24
103:2,5,6,7,13,17
therapy 231:9 238:20
thing 25:9 32:12 37:11,22 47:10

64:4 84:10 103:20,20 111:3
123:15 140:11 146:13 178:1
197:12,13 218:12 225:13
251:14 272:24 276:15,21
278:2
things 25:5 32:2 53:22 91:11
129:5 138:22 143:9,10 146:6
158:2 176:10 181:17 186:13
188:5 189:2 191:16 196:14
197:1,2,11 198:15,24 199:4
199:10,20 202:21 209:12
210:17 219:14 222:9 228:19
228:20 243:1,18 255:25,25
256:1,23,24 261:9,12 267:7
267:13 270:10 273:5
think 9:22 12:20 39:18 49:23
50:23 51:7,8 53:24 54:7 56:23
64:4 77:20 87:17 98:9 106:10
106:11 107:16 109:11 110:23
111:6,18 115:5,11 116:15
117:9 118:13 120:6 121:8
123:16 126:15 137:4 143:3,17
143:21 144:12,17 147:8,10
148:18 152:9 153:14 154:5
157:21 161:3,13 164:8 165:4
166:2 169:11 171:19 176:14
179:19 183:8,22 184:11,11,14
184:15,20,23 185:9 186:7
188:19 189:24 190:9 191:6
196:9,20 199:7 201:18 202:2
202:4 205:14 206:12,18 208:7
210:7,15 212:19 214:14,24
215:13,22,25 216:14 222:1,15
227:22,24 229:8 231:11 235:7
236:23 237:5 244:24 256:9
258:8 260:18 262:4 263:16
264:7 268:9,22 270:24,24
274:7,25 276:8,11 277:5
278:25 279:2,3,6
thinking 274:12
thinks 163:19
third 107:4 136:14
third-party 180:15,20 181:11
though 42:10 43:1 73:22 74:9
87:22 115:17 131:6 156:13
206:23 277:13
thought 9:3 50:10 113:7 120:8
120:17 121:2 137:24 140:13
167:24 178:4 179:12 183:3
191:19 232:25 237:8 240:8
242:5 272:4 276:7 278:20
thousand 62:18,18 209:2 216:1
thousands 66:14 95:18 100:18
197:8 198:25 202:12 204:10
209:9 215:5,5,7,10 218:14
three 25:5 42:6 70:21 71:11
80:12 107:6,15 108:5,13
109:20 110:20 111:5 114:2
161:17 168:20 169:2 180:15
184:6,7 194:19,19 207:11
213:14 214:20,21 274:9
280:24
through 11:9 15:23 22:7,16,22
24:2 35:25 36:14 43:18,19
46:1 55:12 68:3 71:23 73:15
89:4 94:24 107:14 114:14,18
124:21 125:10,11,18 126:4,5
127:8,12,17 128:2,5,6,22
131:7 133:13,21 134:22
136:17 138:9,16 141:7,7
147:23 149:21 157:18 159:8
160:13 164:25 170:9 174:9
178:3 179:19 192:15 194:21
197:9 249:14 251:2,3 255:18
258:3 264:22 275:3 276:5
throughout 92:18 181:15 200:6
203:3 209:6 228:7 263:16
thrown 158:24
tied 150:4

tier 29:6 33:12
tiered 37:16
tiering 33:10
till 49:4 111:3
time 9:20 11:8 18:9 19:19,23,24
23:13,14 29:24 35:21 64:17
66:15,20 67:1 71:3,3,16,22
72:4,5,13 73:8 80:10 81:4
84:18 88:11 95:1,14,18 96:6
96:21 98:2 100:1,4 109:3
111:7,17,18 114:13,20 116:25
118:18 121:13 149:4 150:19
159:14 164:16 165:6 178:14
181:15 182:19 186:25 187:15
188:15 189:22 190:15 191:12
191:15 194:11 196:12,21
197:4 198:1 202:7,7,8 207:21
213:3 214:7,22 217:9 222:22
223:5 226:5 228:7 229:1,18
230:7,12,16,1 6 231:6 233:4
235:22 237:25 238:14 239:20
240:20 246:23 249:5 255:19
256:14,20 257:10 260:9,11,14
260:16,17 261:5 262:6,15,17
263:3,4,6,10,11,1 2 264:4
265:3,4,6 267:8 272:1,2,9,24
273:16 274:1,14,19 275:17
279:12
times 39:6 56:4,6,16,17,2 1 70:21
71:4,11,21 95:25 96:14
129:25
title 58:6 102:10
Tjoflat 173:22
today 15:17 16:23 17:16,18 18:8
96:5 97:13 113:23 124:5
132:10 134:20 158:2 159:1
186:7
together 8:11 64:19 140:23
188:6 231:5
token 109:3
told 6:15 11:16,22 21:10 24:3,20
25:13,15 30:5 31:6 38:6 46:18
59:24 60:2,4 72:14 75:8,9
111:14,15 114:19 115:24
117:6,8 121:7,8 122:18,23
142:1 156:3 158:8,13 163:17
163:18 170:3,5,23 186:8,12
186:15 205:18 208:25 211:24
213:17 231:4 245:8 249:9,11
249:12,13 258:18 266:10
tomorrow 9:11,12 109:13 110:11
110:10 111:3 186:21 269:3,11
270:17 271:9,12 275:10 277:5
279:25 281:1
tonight 275:10 280:14
top 57:11,12,19,2 0 70:1 136:11
137:13 172:25
topical 92:6,12,2 4 189:1
230:22
total 54:19 207:11 249:20
250:13,16 255:23,24
tough 147:15 177:21
towards 26:25 49:4 232:18
235:25 236:1 277:18
town 10:10 37:3 106:5
tracking 190:1
train 21:20,23,2 5 241:6
trained 55:20 241:2,8
trainer 246:15
training 30:21 55:23 59:20
200:24 241:1,4,4,7,12 242:9
242:14,14,16 243:2 251:20
259:4
transaction 205:5 222:12
transcription 281:11
Transdermal 51:25 52:8,18
transition 169:19,21 179:1,9,21
194:7,13 196:20,25 201:9
236:2

transitioned 175:16,23 238:20
transitioning 202:5
transmission 85:9
travel 106:17
treated 189:12
treating 139:22
treatment 91:23
treats 92:12
trial 1:10 112:1 124:21 137:24
147:13 158:2 171:3 186:3
263:16 274:15 281:7
trials 7:4 110:22 133:17 272:2
Tricare 11:7 16:6 20:20 24:16
24:20,25 25:15 26:8 27:9 28:3
29:4 30:11 36:24 37:2,2 38:3
47:6,8 59:7 61:12 62:17 68:22
76:25 79:22 80:15 93:24
97:21 98:11,12 104:8 114:3
130:1 131:19,23,25 132:1,1
132:22,25 134:5 136:6 137:10
138:7,9,9,13,1 8 139:4 143:13
143:18,19,23 146:11 147:9
152:5 178:15,20 182:1,3,20
183:6 184:12 191:7,8,9,17,18
191:23 209:19,21 213:5,7,19
214:6,22 215:15 217:18,21,24
217:25 225:9 232:5,14 245:8
251:15,17 252:8,24 267:2,5,9
267:14,17 279:4
tried 11:20 184:21,23 223:2,3
272:12 279:10
tries 217:4
trip 14:20 124:9 229:14
triple 163:1
trouble 34:24
troubleshooting 89:7
true 40:20 71:20,21 80:3 87:22
121:9,9 151:24 179:14 186:3
208:10 218:4 243:8 244:23
245:6,8 251:10,11,15
trust 126:21 273:12
truth 12:10,11,13 17:14 39:16
40:3 88:25
truthful 173:14
try 11:16,22,24 20:23 23:6 42:14
71:1 89:8 166:21
trying 43:12 88:22 96:24 111:10
138:4 145:22 177:7 185:7
199:1 202:14 207:25 213:22
217:14 222:14 227:4 263:5
tube 252:16
turn 23:24 51:21 195:8 216:5
turned 191:20 215:11
turning 24:2
turns 206:8
twice 272:22 275:16
twisted 231:8
two 7:2 48:8 54:4 64:8,15 66:5
85:11 106:17,23 109:4,10
110:4 111:5,19,22,24,24
112:16,19 118:12 122:16,18
130:3 133:17 136:10 137:21
139:7,25 141:21 142:25 150:3
150:4,12,15 152:21 154:10
155:14 163:14 164:7 171:16
180:9,19 184:1,9 186:1,2,4
199:17 214:18 215:12 232:11
250:5 255:14 262:5 272:25
273:20
two-and-a-half 173:24
Tylenol 238:16 239:16
type 11:6 16:14 25:2,19 54:8
116:10 235:19 239:18 267:1
267:11 273:2 281:3,4
types 61:13 181:16 234:24,25
262:16
typographical 109:9
typos 270:11

**U**

ultimate 17:20
ultimately 18:1 89:8 90:12 91:3
  91:6 190:25 235:10 247:14
Um-hum 196:8 242:8
uncommon 77:4
under 48:21 53:3 107:10 115:14
  130:3 131:16,17 139:2 141:14
  152:17 153:17 154:19 155:2,5
  163:15 164:2 175:23 176:25
  177:23 181:12 182:7 189:13
  211:19 213:13 226:11 276:12
underneath 29:7
understand 17:6,9,12,25 19:14
  20:18 26:10 71:1 109:25
  119:6 121:6 163:24 177:3
  223:3 236:17 239:5 241:21
understanding 139:13 202:2
  246:19
understood 201:18
unfolded 175:16
Unfortunately 72:13 130:14
  262:7
unindicted 177:19
unique 272:6
United 1:1,4,11,14,1 5 2:5 17:1
  55:14 113:11 141:11 281:14
units 65:25
University 255:4,5,8 259:7
  263:8
unlawful 134:6
unless 41:10 42:12 75:14 128:8
  161:17 229:2 274:18 277:15
unnecessarily 138:2
unnecessary 138:8 160:25
unpack 32:2
unsecure 101:2
untethered 145:23
until 98:8 110:10 183:20 212:3
  214:13 217:13 226:5 256:10
  270:1,17 277:5
unusual 159:5
upset 112:19
up-and-up 115:25 120:17
use 19:17 20:12 23:22 24:12
  27:17 45:8 58:2 63:19 65:20
  65:22 100:5 108:7 114:23
  118:4,7 124:25 131:9 143:13
  171:1 188:25 190:6 216:20
  236:7 256:5 268:13
used 21:25 22:5 63:23 64:1,1,22
  70:13 72:11,18 81:15 103:10
  149:18 222:4 231:2,3 233:8
  263:10,11 266:23 276:10
useless 146:10
using 45:14,14 65:19,24 66:15
  66:20,23 67:1,7 206:5 253:13
  266:19,25 268:14
usual 136:2
usually 115:10 124:15 125:8
  149:3 245:7 273:2
U.S 17:10 281:14

**V**

V 246:6,8
valid 73:17 89:9 146:12 150:6,8
  152:10,18 153:7 154:19 155:7
valuable 274:20
value 162:23 211:13
Vann 111:21
varies 196:11
variety 179:7
various 208:5 215:15
venture 261:19,22 262:19
verified 232:13
verify 232:13
versus 64:23 94:13 223:13
very 13:14 29:6 32:7 50:10

89:22 93:7 95:4,15 99:17
  104:13 131:24 161:13 183:5,6
  187:1,14 197:4,5 198:20,20
  199:7 206:4 210:22 223:17
  224:6 225:4,5,6 237:2 262:4,7
vetted 116:23 120:15
via 69:16 241:18
viable 261:11
vial 65:22
vials 65:23 66:8,11,18
vice 69:25 197:6,17 198:1 208:3
  226:7
victory 154:2
view 53:10 137:3 149:15 162:14
  174:7
violated 182:21 210:1
violates 213:8
visiting 105:15
vitamin 13:6 28:13 76:22 240:17
  241:22 243:3
vitamins 72:25 80:19 247:8
  252:11,14
voice 137:8
volleyball 230:20 231:2 237:19
  237:19,21
voluntarily 130:10 138:14
vs 1:6

**W**

wait 8:12 185:23 239:1 248:9
waited 116:8
waiting 50:24,25 155:21 159:22
waiver 166:10
Walgreen's 119:18
walk 11:20 105:12
walkers 256:24
want 8:25 9:2,7 12:15 14:5
  24:19 26:5,10,10,19 28:2 32:2
  39:21 44:4 45:23 50:3,3,4,20
  50:23 51:22 52:15 57:11
  58:12 59:13 60:19 67:16 70:1
  70:15,24 71:7 81:10 82:12
  83:25 85:8 90:1 101:16 102:3
  102:14,20 107:18 109:3,24
  110:5,15,17,19 111:23,25
  112:2,6,8,15 124:19 126:22
  126:25 129:5,19,23 130:19
  131:6 142:23 143:25 148:2,3
  155:24 158:6 159:11,11,18
  160:11 161:1 163:24 165:1,5
  166:23 167:14,16,17 168:3,5
  168:25 169:3,6,24 170:3
  173:25 174:2,2,20 176:15,16
  176:17 177:15,16 178:2 180:9
  185:21 186:6 188:12 195:6
  199:6 210:15 213:23 216:6
  225:11 230:4,25 232:24 233:4
  234:3,4 236:17 239:5 249:9
  268:12 269:22 271:15,18
  274:8 275:13,13 276:12,24
  277:2 278:15 279:25 280:14
  280:18,23,23,24,2 5 281:1,2,2
wanted 14:5 25:12 28:12 50:9
  82:24 100:4 117:2 139:2
  162:13 166:6 186:10 199:24,25
  199:24 202:17 204:7 225:8,14
  227:6 233:18,21 248:23
  251:10,11 273:10 274:24
  279:14 280:22
wants 28:4,8 39:22 40:4 54:4
  146:3 158:19 177:23 254:11
  276:17
warehouse 19:24 29:13
warm 220:8
Washington 200:4
wasn't 29:6 51:1 83:5 86:15 98:8
  98:10 145:11 173:1 182:3
  183:9,20 184:14,19 197:3
  204:13 207:25 209:13,22

214:1 220:25 241:4 242:2
  245:4 252:20 256:14 262:7
  268:12
way 10:9 14:21 16:4 23:13 29:7
  35:24 37:25 41:24 42:14
  67:23 84:3 109:22,22 110:24
  111:4 123:6 129:1 133:1
  134:5 140:17 170:21 171:7
  182:23 183:1,1,3 185:23
  190:1,9 203:7 209:15,16
  214:25 215:4,4 220:14 222:7
  228:3 247:6 261:2 262:10
  273:15 278:16 279:10
Wayne 104:3,3
ways 184:21
wealth 264:5,19
weather 262:7
week 29:18 104:10 173:24
  186:21 214:18
weekend 271:13
Weekly 200:15
weeks 192:18 214:18
welcome 20:7 31:17
well 7:13 8:4 9:11 10:4 12:16
  19:16 20:7,15 22:5 23:21
  25:17 29:8 36:7 37:17 40:14
  41:6 45:11 46:2,4 52:1,11
  53:4 55:14 56:18 58:17 63:19
  72:8 76:3 78:15 82:17 86:8,13
  87:7 90:22 92:1 93:22 97:7
  100:8 105:5 116:18 120:19
  122:12 124:17,20 134:10,16
  134:19 138:22 139:18 140:6
  142:21 143:21 144:12,14
  145:6,7 146:22 147:10 149:24
  152:9 154:15 155:14 157:9
  160:24 163:5,11,18 166:22
  167:5 175:8,14 180:8 181:11
  185:2,9,12 189:23 190:11
  192:4 195:18 196:14 198:11
  200:9 201:6 202:7 206:22
  207:7,19 208:7 210:20 211:6
  212:11 214:15 216:15 221:16
  223:2 229:2 234:8 236:9
  237:21,24 239:12,23 240:18
  242:5,22 245:4 252:20 256:11
  256:24 260:6 262:4 266:9
  267:20 269:23 270:21 271:23
  272:23 277:1,11 278:7 279:23
wellness 76:22
Wenderling 138:24 139:3
went 23:21 68:2 107:16 169:1
  170:9 183:5 186:17 202:3
  227:16 238:5 243:17 250:15
  256:21
were 6:1 11:8,15,24 12:1 13:5
  15:16,19 16:3 18:11 19:14
  20:4,11,16,18,2 4 21:10,14,25
  22:3,11,19,25 23:10,13 24:13
  24:19 25:7,15,17,1 7 27:10,13
  28:17 29:7,9,13,20 30:3 32:9
  32:14 33:8 34:15,18,24,24
  42:21 45:10,12,14,14 46:10
  46:12 50:24,24,2 5 51:8 54:13
  56:4,22 57:9 58:8 59:7 68:1,5
  71:8,10,20,21 72:12,15 73:8
  74:14 75:23 76:1,21 79:18
  80:14,17 81:1,22 84:1,3,7,12
  86:23 87:10,13,2 5 88:3,18,21
  88:22 91:9 92:3 93:13 96:24
  98:2 99:12 100:1,21 101:12
  102:2 107:20 111:12 112:5
  113:3,7,22 114:11,18 115:1,2
  115:21 116:9,21 117:1,3,20
  119:6 122:18 123:6 128:19
  130:5 131:1,20 132:6,21
  133:10 134:22 135:1 136:10
  136:14,15,22 137:14 138:14
  138:23 139:7,11 140:13,14

143:8,9 146:14,17,19,22
  150:9 151:18,19,23,2 5 165:21
  170:14 177:7,13 180:18,19
  181:18 182:2,4,8 183:1
  184:24,24 185:12 186:3,14
  190:15 191:21 195:1 196:12
  196:24 198:22 199:5 200:1,6
  201:1,16,25 202:14,20 205:4
  205:4 207:23 208:22 212:2,16
  214:8,8,9 215:19,24,25 216:2
  216:14 217:6 218:1 219:5,5
  220:2,15 221:4,7,22,24
  222:14,14,2 5 223:5,17 224:6
  226:8 227:4,7,7,22,23,24
  228:11,13,1 5 230:5 232:25
  233:8,11 234:23 235:8,10
  236:9 237:19,25 239:1 240:8
  240:12,12,2 2 243:9,10,14,18
  243:20 244:11 245:3,8 247:7
  249:9,10 250:6 251:1,23
  252:12,20,2 1 253:16,17 255:5
  255:13 256:7,10 257:5,13
  259:1,4,17 260:20 261:3,15
  262:8,12,12,13,15,1 8 265:15
  266:1,4,6,11,12,12,13,14,18
  266:19,22,2 5 267:8,16,20
  268:9,13 272:4 274:18 276:18
weren't 80:17 83:2 122:23
  136:18 138:1 214:6 218:10
  233:9 240:21 241:23 252:7
  267:9
west 280:11
wetting 55:2,5 56:23 91:18
we'll 7:18 10:4,7 43:2 64:16
  78:22 93:22 130:17 131:5
  147:22 169:7 173:23 177:4
  269:3,6 270:14 271:10,12,22
  271:25 278:6
we're 21:8 44:19 94:2 103:8
  128:21 130:18 143:3 144:18
  144:20 155:21 166:20 197:12
  201:23 219:10 222:2,8
we've 124:20 126:1 131:12
  132:7 136:16 148:10 159:8
  212:4 264:5 269:4 274:25
whatnot 256:13
wheel 217:17
wheelchairs 256:24
while 22:25 23:10 117:23 149:23
  155:21 159:25 213:22 258:6
  267:2
whited 69:20 70:10 84:8,10,12
  84:13 86:17,18 87:15 88:9,10
white-out 83:25
whiting 69:17
whole 14:1 36:18 52:2 79:12
  123:15 138:3 145:22 146:13
  151:7 169:1 196:14 204:4
  219:9 221:23 261:9 278:24
wholesaler 58:20 63:12
wide 154:21 275:21 277:15
wife 6:6 114:6,9,18 116:3 117:17
  117:25 118:2 122:5 157:3
  244:13,14,16
wife's 114:23 120:11,14 122:19
  123:17
Wilkie 2:6 281:14
willfulness 131:22 177:6
win 111:1 140:5 142:24 144:16
window 96:6
wire 33:5 131:18
wired 118:14
wish 160:12 180:9
wishes 137:7
withdraw 213:23
withheld 228:5,9
witness 7:7,11,20,2 5 10:17,20
  10:22 12:20 14:20,22 15:4,7
  18:6,8 35:10 40:9 42:4,5

44:11 46:24 47:1,6,8,18,19,22
49:25 55:4,10,12,16,19,22
56:1 59:21,23 60:1,3,7,9,21
61:18,21,25 62:2,8 63:2,5,10
63:12,14 64:3 65:15 66:4,8
67:2,4,7 74:4 75:16 77:21,22
81:10 89:14 105:19,20,21,23
106:12 107:25 109:16 113:10
113:13,16 114:23,25 115:15
121:12,16,17,18,2 3 123:4,21
123:24 124:10,11,12,14
134:20 136:25 139:11,16
149:8 150:18,23 154:24
157:25 158:5,16 160:9 163:4
163:6 164:19 165:18 166:18
168:13,16,19 171:5 173:15
174:3,23 175:1,6 179:15,18
179:23 182:12,15 187:7,9,11
187:13 193:6,10,12,15 220:11
226:24 227:22 229:8,12,15,16
229:21,23 235:7 245:22
246:5,7,9 249:14,16 253:8,25
254:8,9,16 273:1
witnesses 42:6 106:13 107:6,15
107:24 108:1,5,13 109:20
130:9 132:11 134:21 136:17
140:6 152:6 157:23 158:13
159:9,10,16 172:4 173:5
254:7 257:25 269:20
woman 174:16 203:9 207:21
236:12 240:1,7 256:18
won 143:5
wonder 8:1
wondered 8:23
Wonderland 222:20
word 59:22 100:5 216:20
words 42:1,3,12,17,18 93:25
94:5 131:15 222:14,24 227:6
work 6:15 9:7 11:19 29:20 30:9
30:10 32:9 48:25 75:23 81:15
82:12,14 114:8 188:3 190:10
192:13 196:1,2,4,9 197:16
208:19,21 215:6,11 233:1
259:23 265:4,6,11 266:23
worked 19:24 31:1,1 68:14 76:8
94:23 151:23 171:8 188:5
198:13 199:17 207:5,6 220:25
233:3 241:3,23 244:8 260:12
264:20 265:10,18,23 266:17
273:4
workers 260:24
working 19:19 22:25 23:10
29:13 32:4 33:17 45:10 56:4
74:8 196:17 199:11 200:6
205:15 217:16 223:5 230:8
231:6 244:25 248:5 256:9,11
259:20,21 267:3,16
workmen's 261:3
works 37:25 164:24
world 9:6 219:18
worries 31:25
worry 51:3 108:1 210:17
worth 189:25
wouldn't 26:5,7 37:6,7 39:3 89:7
94:21 115:16 145:6 148:25
160:24 173:16 181:17 209:12
209:14 218:12 220:5 221:12
243:16 265:5 267:14 270:1
277:13,15 278:6
Wow 166:4 276:20
wrap 220:17,20 222:10 228:23
write 10:6 28:5 110:5 143:11
146:25 147:1 199:8 212:12
261:1,12 270:23,23 271:2
280:23 281:3
writes 71:1
writing 28:7 112:7 198:13
234:20 266:18
written 17:1 72:8 80:2 147:4

150:24 151:23 152:6,7
wrong 38:21 39:19 56:12 71:5
79:15 110:5 112:7 143:2
161:4 210:13 219:14 231:1
250:4 272:18
wrongful 222:16,18
wrote 40:3 71:22 105:7 147:8
150:21 267:15
w-r-i-t-e 270:23
W-2 169:19,22 170:10 172:6
175:3,16,23 178:25 179:9,21
182:23,25 183:16,19,21 184:5
185:7 193:19,22 194:3,7,18
194:22,25 195:20 196:14
198:16 200:2 201:4,9 202:6
203:1 213:6,9,17 214:10
217:10 222:24 223:1,13 224:7
227:7 228:14 236:2,5 249:5
249:10
W-2s 250:15

Y
yeah 9:17,19 11:19 13:4 20:22
23:19 26:25 38:20 43:16 88:2
95:8,19 103:14 106:19 108:2
111:15 122:11 132:16,17,18
141:21 146:14 148:15 154:7
160:18 163:11 181:4,4,7
184:8,23 190:9 191:2,13
192:9,15 194:8 195:3,17
196:3,19,22 197:22,24 198:20
200:3,10,14 201:3,21 202:18
202:20 203:2,5 206:20 207:10
209:21 211:16,24 214:12
215:10,19,24 216:23,23 217:4
219:13,15,16,22 221:9 223:15
224:18 225:10 226:14 227:14
228:16 235:20 237:1,2 239:6
239:12 244:6,15 245:10
252:12 272:15 278:10
year 29:11,22 96:10,17 188:15
189:25 190:1 262:7
years 48:12,18 114:1,2 183:11
183:14,14 188:6,6,11 197:8
199:1 206:1 255:5,14 264:17
266:17
yesterday 22:6 256:18 257:20
yield 134:11 139:25 180:8
young 220:6

Z
zero 9:3 28:4,7 39:22 97:15
zoom 52:7 100:23

$
$100 59:4
$12.50 61:7
$15,000 250:9
$17,000 252:16
$180,000 257:9
$1800 148:20
$20,000 244:23
$220,000 257:15
$30,000 30:19
$40 184:17
$400 22:9
$420,000 262:4
$5,000 252:10,14
$500 189:25
$60 62:6
$80,000 30:18

1
1 65:12,15,15,23,2 4 66:8,18
125:6,10,11 140:19 141:20,23
142:1,6,19 143:7 147:23
259:14
1st 104:3,4 183:24 185:4

1:30 105:11
10 6:8 59:11 125:13 141:6
192:18 234:18 241:9 273:14
10-minute 49:17
10:15 9:12,12 10:8
10:30 10:7 269:3,11 275:14
280:1
10:33 49:21
100 5:9 99:17 127:19,20,21,24
215:25 256:8
101 127:18
104 127:18
105 5:11 108:12 109:1 160:17
161:11,14 165:19,21 187:16
213:21
106 127:25
107 127:25 156:11
109 128:2
1099 33:1,19 37:14 169:18
170:10 172:5 173:22 174:20
174:24 175:16,23 178:13
182:24 189:14,15,19,25
193:19 194:7,22 201:4 222:13
235:18,21 236:2 247:11 249:5
1099s 190:11 227:7
1099's 196:13
11 3:3,4 125:13
11:14 50:16
110 202:2
113 3:14,15
114 215:25
12 5:13 67:8
12th 6:12
12:30 161:3 186:13
12:45 113:1
120 3:16 5:13 109:18 128:2
234:8,9,12,14
122 128:3
123 1:7
124 5:10 128:8,9,9,11,19
125 5:10 128:8,9,10,12,19
127 5:9 128:5
128 5:10 102:21 103:17 104:2
13 3:5 5:14
13th 6:12
13-3 1:5 2:6 281:15
131 128:5
131 128:6
134 203:13
1347 131:16
1349 131:17
137 18:25
139 128:6,21
14 141:6 182:2 188:17
141 128:6,22
143 51:18 57:24 70:2 73:2 84:3
128:6,22
15 3:6,7 59:11 128:14 185:11
199:17 231:7 249:22
15th 217:20 222:22
150 196:15 215:22 217:6
154 128:6,22
157 128:24
159 129:1
16 5:8
16-20893-CR-MORENO 1:3
160 196:15
161 250:18
164 108:17 160:17 161:20,21
164:10,10,12
165 5:12
168 108:17 160:17 161:24 165:8
263:17,24
169 3:18,19
17 5:5 32:18,22 141:6 148:5
17th 217:21
17-A 125:14
170-D 129:1
171 5:12 108:17 160:17 165:19

165:21 187:16 195:4
172 129:2
173 129:2
174 129:2
1750 1:21 2:2
176 129:11,12
177 129:17
18 108:10,12 125:16,17 141:7
160:15,17 161:6,8,10 162:4
164:9
180 3:21
187 3:22,23
19 5:10,11 108:12 160:17 165:19
165:21 187:17 237:5 244:24
1989 255:7
1993 255:7

2
2 1:21 2:2 131:7 192:18 257:19
2nd 196:17 197:20
2:10 113:3,8
2:30 186:12,13,13,15
2:35 130:25
20 62:13,14,15 141:7 151:19
194:14 196:16 209:11 243:25
244:24 247:22,23
20th 82:7
20,000 249:22
2004 264:17
2005 256:10 259:14
2009 264:17
201 5:14 264:6,10,11,13,15
2010 257:12
2014 19:22,23 21:8,9 23:18 36:9
49:4,4 94:23 178:14 180:15
181:25 187:24 188:2,12 189:4
190:15 191:9,15 207:1 209:18
225:20 230:4,16 247:1 260:13
265:7,8
2015 27:9 36:9 43:21 45:11,12
49:5 79:20 80:10 81:13 82:5
87:4 88:5 94:24 96:10 98:8,9
98:10 104:6,14 114:11 122:6
122:6,6 128:14 179:5,19
183:15,20 194:14 196:1 200:7
203:15 217:21 223:16 226:6
227:13 228:11 230:4,5 234:18
241:9 249:9
2017 209:10
2018 1:7
2019 128:15
204 3:24
208 108:8
209 108:10
21 5:12 244:24,24
21st 86:4 194:24
21,000 237:6
210 108:10 257:14
211 5:6 81:5,9 102:3,4,14
212 108:10
22 5:5 122:6 141:7
22nd 127:6
224 3:25
23 104:14 125:21,22,22,24
23rd 84:4
230 4:1,2
234 5:13
237 4:3
24 5:9 27:8 43:21 122:6
24th 28:15
240 101:20
245 4:4
246 4:5,6
25 1:7 5:7 236:23 243:25
250 4:7
254 4:8,9
26 141:7
264 5:14
27 81:13

**28** 48:12 141:7
**28th** 202:25
**281** 4:10
**29** 109:2 110:6,9 131:5 141:6
   144:19 270:7
**29th** 89:17

**3**

**3** 33:13 37:16
**3,000** 260:14
**3:15** 158:8,17
**3:30** 161:3
**3:51** 185:19
**3:53** 186:24
**30** 196:16 236:23 244:11 247:22
   247:23 250:16 260:9 272:3
   277:23
**30-day** 252:10,14
**305-400-4261** 1:22
**305-400-4266** 2:3
**305-530-6168** 1:17
**305-961-9356** 1:17
**305.523.5118** 2:7 281:15
**31** 3:8 125:18 126:4
**32** 5:5 30:17
**33** 141:7
**33128** 2:7 281:15
**33131** 1:22 2:3
**33132** 1:16
**35** 188:6 250:16
**36** 5:11 108:12 125:18 126:4
   141:7 160:17 165:19,21
   187:16 202:24
**360** 62:12,15,1 7 101:21
**371** 141:14
**39** 258:12

**4**

**4** 112:9
**4,000** 59:3,4 65:17 66:15
**4-6** 104:6
**40** 29:18 126:5,6 258:12 260:9
   272:3
**400** 2:6 22:8,15 202:13 281:15
**403** 276:12
**41** 141:7
**41,360** 250:21
**42** 29:23 126:5,6
**420,000** 262:20
**43** 85:22 141:7
**44** 126:7,8 141:8
**45** 3:9 112:9 149:21 157:18
   188:11
**46** 254:23
**465.023(1)(h)** 155:6
**47** 5:11 108:12 126:9,10 160:14
   160:16,22 165:19,21 187:16
   200:17
**48** 3:10,11
**49** 126:11,12 149:21 157:18

**5**

**5** 6:8 33:13 37:16 112:9 258:21
**5th** 199:11 222:23
**5:57** 269:13
**50** 126:14 130:4 135:6 149:22
   152:13 155:17,20 156:8,12,15
   156:16 157:16 206:16,18
   207:3 210:11 214:24
**50/50** 207:9 257:5
**500** 55:22,23
**51** 126:16,17 130:4 149:22
   152:14 155:17,20 156:12,16
   157:15
**52** 126:16,17
**53** 5:8 88:12,16 89:17
**54** 126:17
**55** 62:6 112:21 126:17

**56** 126:17
**58** 5:7 84:19,25 85:12 100:23
   126:17

**6**

**6** 104:6 137:16
**6th** 104:17 199:14
**6:00** 268:20
**6:15** 281:7
**60** 105:6
**60/30** 271:20
**60/40** 105:6
**61** 126:17
**62** 126:17
**64** 126:17
**66** 126:19,19 127:8
**67** 126:17
**68** 126:18
**69** 126:18

**7**

**7** 33:13 37:16 122:6
**701** 53:3
**72** 60:20,21,23 127:8
**74** 127:10
**75** 3:12
**76** 127:12
**760** 110:22
**77** 27:7 38:1 46:7

**8**

**8** 131:7 147:23 153:7
**8:00** 9:4 49:24
**8:30** 9:2,3
**80** 29:1,2 206:12
**801(d)(2)(E)** 177:24
**81** 5:6
**82** 127:12
**84** 5:7
**85** 70:16,17 88:19 127:14
**866-780-8355** 1:23
**88** 5:8 127:14

**9**

**9** 5:6 125:10,1 1 140:20,25 141:6
   141:15,20 142:10 143:3
   144:24
**9:00** 9:21,22
**9:30** 9:2 159:1
**9:32** 6:1
**9:38** 8:13
**9:39** 8:17
**90** 271:17,18,19,22,23,2 5 274:17
**902.11** 162:9
**92** 127:14
**93** 127:14
**95** 127:17
**97** 207:23
**99** 1:16 3:13 41:24 127:17