```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
 2                    MIAMI DIVISION

 3            CASE NUMBER 16-20893-CR-MORENO

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,              Courtroom 13-3

 6     vs.                          Miami, Florida

 7   MONTY RAY GROW,                January 26, 2018

 8           Defendant.
```

JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

```
APPEARANCES:

FOR THE GOVERNMENT:     KEVIN J. LARSEN, AUSA
                        JON M. JUENGER, AUSA
                        United States Attorney's Office
                        Economic Crimes Section
                        United States Attorney's Office
                        99 Northeast Fourth Street
                        Miami, Florida 33132
                                        305-961-9356
                                   Fax: 305-530-6168
                             kevin.larsen@usdoj.gov
                              jon.juenger@usdoj.gov

FOR THE DEFENDANT:      DANIEL L. RASHBAUM, ESQ.
                        JEFFREY E. MARCUS, ESQ.
                        Marcus Neiman & Rashbaum, LLP
                        2 South Biscayne Boulevard
                        Suite 1750
                        Miami, Florida 33131
                                        305-400-4261
                                   Fax: 866-780-8355
                             drashbaum@mnrlawfirm.com
                               jmarcus@mnrlawfirm.com
```

1                              **KATHRYN A. MEYERS, ESQ.**
                               Law Office of Kathryn A. Meyers, PLLC
2                              2 South Biscayne Boulevard
                               Suite 1750
3                              Miami, Florida 33131
                                               305-400-4266
4                                      kate@kmeyerslaw.com

5   **REPORTED BY:**            **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                               Official United States Court Reporter
6                              Wilkie D. Ferguson Jr. US Courthouse
                               400 North Miami Avenue - Suite 13-3
7                              Miami, Florida  33128    305.523.5118
                               gphofficialreporter@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          **TABLE OF CONTENTS**

2                                                              Page

3

4
Monty Ray Grow ............................................ 7

5
         Direct Examination by Mr. Rashbaum ..................... 7

6
Monty Ray Grow .......................................... 156

7
Direct Examination by Mr. Marcus (Outside the presence

8  of the jury) ............................................ 156

9  Cross-Examination by Mr. Larsen (Outside the presence
   of the jury) ............................................ 161

10
Reporter's Certificate .................................. 191

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            EXHIBITS

 2
    Exhibits                    Marked for          Received
 3                             Identification      in Evidence

 4  Description                    Page    Line    Page    Line

 5  Defendant's Exhibit Number 88 ....................... 9      4

 6  Defendant's Exhibit Number 32 ...................... 11      2

 7  Defendant's Exhibit Number 87 ...................... 12     18

 8  Defendant's Exhibit Number 89 ...................... 13     18

 9  Defendant's Exhibit Number 94 ...................... 15      4

10  Defendant's Exhibit Number 95 ...................... 16     16

11  Defendant's Exhibit Numbers 97, 98, 99 ............. 17     12

12  Defendant's Exhibit Number 38 ...................... 23     20

13  Defendant's Exhibit Number 181 ..................... 25      8

14  Defendant's Exhibit Number 84 ...................... 25     25

15  Defendant's Exhibit Number 70 ...................... 31      4

16  Defendant's Exhibit Number 83 ...................... 33     10

17  Defendant's Exhibit Numbers 42, 118, 130  ......... 34     24

18  Defendant's Exhibit Numbers 2, 78, 133 ............ 40     19

19  Defendant's Exhibit Numbers 8, 9, 10, 12, 22,
    41, 48,  ......................................... 46      4
20
    Defendant's Exhibit Numbers 81 and 129 ............ 71      4
21
    Defendant's Exhibit Numbers 67, 131, 190 .......... 75     10
22
    Defendant's Exhibit Numbers 11, 127 ............... 78     25
23
    Defendant's Exhibit Number 85 ..................... 81     13
24
    Defendant's Exhibit Numbers 39, 54, 62, 63,
25  139, 140  ........................................ 84     22
```

Defendant's Exhibit Number 54 withdrawn ........... 87    2

Defendant's Exhibit Numbers 35, 64, 65  ........... 89    4

Defendant's Exhibit Numbers 50, 55, 68, 123 ....... 92    4

Government's Exhibit Number 84 .................... 98    8

Defendant's Exhibit Number 72 .................... 108    13

Defendant's Exhibit Numbers 113, 212, 214,
215, 216, 217 ................................... 112    14

Defendant's Exhibit Numbers 4, 25, 27, 117,
126  ............................................ 122    2

Defendant's Exhibit Numbers 73, 77, 137 .......... 130    8

Defendant's Exhibit Numbers 46, 143, 146, 162 ..... 132    5

Defendant's Exhibit Numbers 6, 7, 13, 14, 17,
21, 24, 29, 34, 37, 40, 103, 125, 111, 112,
119, 167, 172, 173,  ............................ 142    18

Defendant's Exhibit Numbers 33, 66, 82, 129,
146, 204 ........................................ 190    10

Grow - Direct

6

1      (The following proceedings were held at 12:10 p.m.:)

2          THE COURT:  All right.  The last juror arrived half an

3  hour ago.

4          Okay.  Mr. Grow, thank you.

5          Bring them in.

6      (There was a brief discussion off the record.)

7          THE COURT SECURITY OFFICER:  All rise for the jury.

8      (The jury entered the courtroom at 12:10 p.m.)

9          THE COURT:  Welcome back home I guess I can say.  It's

10  a nicer courtroom, don't you think, or you don't care?

11          Everything okay, Mr. Jean, right?

12          JUROR JEAN:  Yes, sir.

13          THE COURT:  It took a little longer, but we had other

14  things that I filled up the time with.  Thank you anyway.

15  Please be seated.

16          We have all the jurors.  The defendant is present,

17  defense counsel.  We will continue with direct.

18          Before we do that, so I remember, I know one of you has

19  a doctor's appointment on Tuesday at 1:00, right?  Yes, I

20  remember.

21          Anybody else?  Anybody on Monday, first row?  Second

22  row?  Nobody?  Okay.  Thank you.  Go ahead.

23          MR. RASHBAUM:  Thank you, Your Honor.

24                      DIRECT EXAMINATION

25                        (Continuing)

BY MR. RASHBAUM:

Q.  Mr. Grow, when we stopped yesterday we were talking about your employment at InforMD.  Do you remember that?

A.  Yes, I do.

Q.  Can you just remind the jury what business InforMD was in?

A.  So InforMD Solutions was a marketing company that represented a pharmacy and they sold compounding medications, calling on physicians, going into their offices and showing them the products and then physicians would prescribe them to their patients.

    InforMD also had an agreement with a company called Pharmaceutica North America and they provided some of the ingredients that go into the compounds and they sold those to pharmacies as well.

Q.  Now, when you work at InforMD, what did you do?

A.  I had a few different responsibilities.  When I first started, I was marketing on physicians to use the products in their practice.  Then I also was approached by the owners of the company and they wanted me to start selling some of these chemicals to the pharmacies around the country, so I started doing that as well and I got a little sales team together and, you know, collectively we did that.

    Then the third thing they wanted me to do was to go out and actively recruit other sales organizations that were working for other pharmacies and see if we could convert them over to

1  InforMD and be a part of our team.

2  Q.  And when you were at InforMD, how were you compensated?

3  A.  I was, you know, commission only and I was a 1099 sales

4  representative.

5  Q.  Did you bring in other sales marketers at InforMD?

6  A.  Yes, I did, I brought in a few, like Shane Matthews and Ryan

7  Long, and they brought in others, like Sven Bjerke and a couple

8  of other people.

9  Q.  How did the structure work for commissions with the

10  salespeople that you brought in at InforMD?

11  A.  It was a tiered multilevel structure.  So each person, if

12  you were to get a sale, you would get a certain percentage, and

13  if you had a rep that was underneath you that got a sale, then

14  you would make a commission of whatever they sold as well.

15  Q.  Did InforMD have internal legal counsel?

16  A.  Yes, they did.  They had lawyers, you know, working for

17  them, doing quite a bit of work.

18       MR. RASHBAUM:  Judge, may I approach the ELMO please?

19       THE COURT:  Sure.

20       MR. RASHBAUM:  Thank you, Your Honor.

21  BY MR. RASHBAUM:

22  Q.  Mr. Grow, I'm going to give you some exhibits.  You can just

23  keep them near you to probably save some time.

24       If you could take a look at Defendant's Exhibit --

25       MR. RASHBAUM:  I'd like to move into evidence at this

Grow - Direct

9

1   time Defendant's Exhibit 88, Your Honor.  88.

2             MR. JUENGER:  No objection, Your Honor.

3             THE COURT:  It will be admitted.

4        (Defendant's Exhibit Number 88 was received in evidence.)

5   BY MR. RASHBAUM:

6   Q.  If you could take a look at Defendant's Exhibit 88.  Who is

7   Rick Massengale and Colleen Johnston?

8   A.  Rick Massengale was the owner of InforMD Solutions and

9   Colleen Johnston was his executive assistant.

10  Q.  And when you began working -- when you worked at InforMD in

11  March of 2014, did InforMD -- what is this document?

12  A.  That's the agreement that I signed with them to become a

13  rep.

14  Q.  And was that agreement drafted by lawyers at InforMD?

15  A.  I was told it was, yes.

16            MR. RASHBAUM:  I'd like to admit Defendant's Exhibit

17  76.

18            THE COURT:  Any objection?

19            MR. JUENGER:  We do object, Your Honor.

20            MR. RASHBAUM:  Your Honor, I'll move on.  I don't need

21  to admit 76.  I apologize.

22            THE COURT:  All right.

23            MR. RASHBAUM:  I'd like to admit Defendant's Exhibit

24  16.

25            THE COURT:  I admitted it already.

Grow - Direct

1           MR. JUENGER:  No objection.

2    BY MR. RASHBAUM:

3    Q.   What is this that we're looking at in Defendant's Exhibit

4    16?

5    A.   These are basically sales brochures that InforMD produced

6    that would explain the different medications that they offered

7    to physician offices.

8    Q.   And again, at InforMD, did the InforMD employees market to

9    patients?

10   A.   No, they just marketed to physicians.

11   Q.   Now, fast-forwarding a little bit to when you ventured off

12   on your own, did you use some of these same sales brochures?

13   A.   Yes, I actually used the same exact ones.  I knew they had

14   already been approved by their compliance department, so I

15   figured they were good to use.

16   Q.   How did you use them?

17   A.   I distributed them to my sales representatives so they could

18   learn a little bit about the product, and they would be able to

19   present it to patients as they came across them.

20          MR. RASHBAUM:  I'd like to admit into evidence

21   Defendant's Exhibit 32.

22          THE COURT:  Any objection?

23          MR. JUENGER:  No objection, Your Honor.

24          THE COURT:  Hold on.

25          MR. RASHBAUM:  I'm sorry, Your Honor.

1            THE COURT:  It will be admitted.

2        (Defendant's Exhibit Number 32 was received in evidence.)

3   BY MR. RASHBAUM:

4   Q.  This is a text message from your phone.  Let me just move in

5   if I can.  Do you know who R.F. is?

6   A.  Yes.  His name is Ryan Forsthoff.  He was the -- I guess the

7   vice president of sales for InforMD Solutions.

8   Q.  And you say, "Okay.  I have these guys getting upset with me

9        now for putting them off.  Have you heard anything back from

10       your attorney in regards to Pharmaco?  We need to let them

11       know something."

12           Do you know what you're talking about here?

13  A.  Yes.  This actually pertains to the sale of the chemicals

14  for Pharmaceutica North America.  One of my sales associates,

15  Rich Steinkohl, had made a sales call to this group call

16  Pharmaco and they were interested in purchasing some of our

17  products and I took this to Ryan Forsthoff.  I let him know that

18  they'd like, you know, a personal meeting with him and he told

19  me, basically, before he could take a meeting with them, he

20  would have to consult with his attorney.

21  Q.  So when you worked at InforMD, even before you could take

22  meetings, it's fair to say you had to run it through the

23  lawyers, right?

24  A.  Yes, that's correct.

25  Q.  And what type of chemicals were you selling at InforMD?

1    A.   It's a product called Stera Base.   It's the base product

2    that goes into all of these compounds that makes up the bulk of

3    the compound.

4         MR. RASHBAUM:   I'd like to admit into evidence

5    Defendant's Exhibit 87.

6         THE COURT:   Any objection?

7         MR. JUENGER:   Objection, Your Honor, hearsay.

8         THE COURT:   All right.   You've got to lay a proper

9    foundation.

10        MR. RASHBAUM:   May I approach the Government for one

11   second?

12        THE COURT:   I'm sorry?

13        MR. RASHBAUM:   May I approach the Government for one

14   second?

15        THE COURT:   Sure.

16        MR. JUENGER:   No objection, Your Honor.

17        THE COURT:   It will be admitted.

18     (Defendant's Exhibit Number 87 was received in evidence.)

19   BY MR. RASHBAUM:

20   Q.   Do you see in Defendant's Exhibit 87 it's from a woman named

21   Danae Brown to Ryan Forsthoff, cc'ing you?

22   A.   Yes, I do.

23   Q.   Can you tell the jury what this document is about?

24   A.   This is a document, when I first started with InforMD, that

25   they sent me to give me an efax number, so whenever physicians

1   that I called on or my sales reps called on and they prescribed

2   prescriptions, they would send these prescriptions to this

3   dedicated efax that was assigned to me.

4   Q.  And so at InforMD, when prescriptions were granted, they

5   first went to your efax line?

6   A.  Yes, they did.

7   Q.  So it would go from the doctor to your efax line and then

8   what would happen?

9   A.  It would go from the doctor to this dedicated efax line

10  which I had access to, as well as the sales associates at

11  InforMD had access to, and then they would forward it on to the

12  pharmacy.

13  Q.  I'm showing you Defendant's Exhibit 89.

14        MR. RASHBAUM:  I'd like it to be admitted, Your Honor.

15        THE COURT:  Any objection?

16        MR. JUENGER:  No objection, Your Honor.

17        THE COURT:  It will be admitted.

18     (Defendant's Exhibit Number 89 was received in evidence.)

19  BY MR. RASHBAUM:

20  Q.  So in Defendant's Exhibit 89, again, who is Colleen

21  Johnston, if you know?

22  A.  Colleen Johnston was the executive assistant that worked

23  directly with Ryan Forsthoff and Rick Massengale.

24  Q.  And if you look towards the bottom here, there are a bunch

25  of numbers; 5 percent, 8 percent, 12 percent.  Can you tell the

1  jury what these numbers represent while you were at InforMD?

2  A.  So basically that was the commission structure, we had like

3  a multilevel marketing structure.  So those are the different

4  percentages that each person would get paid if a physician was

5  to write a prescription.

6  Q.  Again, I don't want to fast-forward too much, but when you

7  opened your own company later on, did you have a structure

8  similar or different than this?

9  A.  It was very similar.  I basically took the same structure

10  and applied it to my own company.

11  Q.  And with the efax line that we saw before, when you opened,

12  not what changed after, did you have a similar structure that

13  you would get prescriptions from the doctor and then you would

14  send it on to the pharmacy?

15  A.  Yeah, I actually -- I set it up the same exact way because I

16  assumed that was the right way to do it.

17  Q.  Why did you assume that that was the right way to do it?

18  A.  Well, InforMD was very compliant, they had lots of attorneys

19  working on things for them and that's the way they did it, so I

20  assumed that that would be the proper way for me to do it as

21  well.

22       MR. RASHBAUM:  I'd like to put into evidence

23  Defendant's Exhibit 94, Your Honor?

24       THE COURT:  Any objection?

25       MR. JUENGER:  We do object, hearsay, Your Honor.

1          MR. RASHBAUM:  I will help you out.

2          MR. JUENGER:  No objection, Your Honor.

3          THE COURT:  It will be admitted.

4     (Defendant's Exhibit Number 94 was received in evidence.)

5  BY MR. RASHBAUM:

6  Q.  This is an email from Ryan Forsthoff to you on April 7, 2014

7  and an individual named Craig Hordlow.  Did you know Craig

8  Hordlow?

9  A.  Yes, he was one of the sales representatives in my team.

10 Q.  And it says, "Attached are PDFs of the script pad front,

11      Patient Information Sheet and back page physician

12      cheat-sheet."

13          Do you see that?

14 A.  Yes, I do.

15 Q.  Can you tell the jury a little bit about those documents?

16 A.  Yes.  The script pad on the front is the actual prescription

17 pad that was left with the physicians and those are the

18 different medications that this pharmacy offered, and if the

19 physicians wrote a prescription, decided to prescribe it to the

20 patient, they would check off whatever they wanted, fill out the

21 patient's information and send it in.

22          There's a second sheet here that's called -- they call

23 it a cheat-sheet.  Basically, it explains in layman's terms what

24 each of these medications were used for, for which conditions.

25 That would make it easier on the physician rather than have them

1  have to go through each medication that was within the formula.

2       And then the last sheet is a Patient Information Sheet.

3  Because these were in doctors' offices, so when the physician

4  saw the patient, they could give the patient this sheet to give

5  them a little bit of information about the compounds that they

6  would be receiving.

7  Q.  Was this similar to the situation that you set up later on

8  when you set up your own program?

9  A.  Yes, everything except for the Patient Information Sheet.  I

10  didn't have that.

11       MR. RASHBAUM:  I would like to move into evidence

12  Defendant's Exhibit 95, Your Honor.

13       THE COURT:  Any objection?

14       MR. JUENGER:  No objection, Your Honor.

15       THE COURT:  It will be admitted.

16     (Defendant's Exhibit Number 95 was received in evidence.)

17  BY MR. RASHBAUM:

18  Q.  Do you know who Ruth Bass is?

19  A.  Ruth Bass is one of the owners of InforMD Solutions and I

20  believe she was really responsible for a lot of the accounting

21  that was done.

22  Q.  And Defendant's Exhibit 95, what is this?

23  A.  This is -- when I first started with the company they sent

24  me a 1099 form for me to fill out, which I guess is a W-9 for

25  tax purposes so everything would be reported, and I also gave

1  them my banking information so they could make deposits into my

2  account whenever commissions were due.

3  Q.  And again moving forward, was this exactly what you did with

4  your marketers?

5  A.  Yeah, I basically just took the same program and when I

6  started my own company did the same exact thing.

7         MR. RASHBAUM:  I'd like to move in Defendant's Exhibit

8  98, 99 and 97, Your Honor.

9         THE COURT:  Any objection to these?

10        MR. JUENGER:  No objection, Your Honor.

11        THE COURT:  All three emails will be admitted.

12     (Defendant's Exhibit Numbers 97, 98, 99 were received in

13  evidence.)

14  BY MR. RASHBAUM:

15  Q.  Now, you mentioned that some reps came with you or that you

16  brought some marketers with you to InforMD and you say one of

17  them was Shane Matthews.

18        Take a look at Defendant's Exhibit 98.  What is this?

19  A.  This is a Sales Associate Agreement that was provided to

20  Mr. Matthews to sign up and become a representative.

21  Q.  For which company?

22  A.  For InforMD.

23  Q.  And showing you Defendant's Exhibit 99, what is this?

24  A.  This is a Sales Agreement for Ryan Long for InforMD

25  Solutions.

Grow - Direct

1  Q.  And showing you Defendant's Exhibit 97, what does this show?

2  A.  This is a breakdown of the commission structure for a

3  representative that Sven Bjerke brought on, a girl by the name

4  of Tiffany Osteen who became a representative, and this was

5  showing the commission breakdown for any sales that she

6  generated.

7  Q.  And so in this document Tiffany Osteen was brought on by

8  whom?

9  A.  Sven Bjerke.

10 Q.  And as a result of that, did Mr. Long and Mr. Grow, you,

11 receive compensation, receive commissions?

12 A.  Yes, we did.

13 Q.  And why was that?

14 A.  Because Tiffany Osteen was in our upline.

15 Q.  And is that similar to how you ran your own company later

16 on?

17 A.  That's exactly how I designed it, just basically taking the

18 same model that InforMD Solutions provided to me and I started

19 my company and did the same thing, other than we were marketing

20 to patients directly rather than going to doctors, and we also

21 utilized telemedicine companies to speak with the patients that

22 needed the medications.

23 Q.  Let's briefly talk about telemedicine, and we will talk

24 about it more later on, but let's get started on it now.

25       How did you learn about telemedicine?

1    A.   I learned about telemedicine a couple of different ways, but

2    the first way was, I made contact with a person by the name of

3    Ken Kimble, and he was involved in the compounding business with

4    sales and whatnot.  I actually made contact with him off of

5    LinkedIn and he and I had a conversation and I was telling him

6    about an idea that I had with durable medical equipment and he

7    told me that that would be a great idea to utilize with

8    telemedicine.  And I wasn't really familiar with it and he

9    explained what telemedicine was and he said that he had a

10   relationship with a company that I could talk to and meet with

11   and they would explain to me what it is and how it worked.

12        So he actually set up a call with the owners of that

13   telemedicine company.  They explained to me the process, the

14   legalities of it and how it worked.

15        At that point in time I ended up not doing telemedicine

16   with the durable medical equipment.  It just didn't materialize.

17   So that was how I learned about telemedicine.

18   Q.   Okay.  And as we go through the chronology, we'll get back

19   to telemedicine, but I want to take us back to InforMD, okay,

20   because again, InforMD did not use telemedicine, correct?

21   A.   No, they did not.

22   Q.   Now, while at InforMD, did there come a time when you became

23   acquainted with a pharmacy called PCA?

24   A.   Yes, I did.  My sales representative who sold the product

25   called Stera Base, he was making sales calls and he happened to

Grow - Direct

1  call upon Patient Care America and talked to a gentleman there

2  by the name of Matthew Smith and he presented the product to

3  Matt and they became interested in it.  They wanted to order it.

4  They sent in basically their application, a credit application

5  with patient -- with Pharmaceutica North America, that's who

6  manufactured the product, and they started to order it.

7  Q.  And did you receive -- well, let me ask you this first:  Was

8  PCA the only pharmacy while you were at InforMD that you sold

9  Stera Base to?

10  A.  No, we probably had 20 to 23 accounts, something like that.

11  Q.  And for the Stera Base that you sold, how were you

12  compensated?

13  A.  They paid me by the gram, so Stera Base comes in certain

14  gram packages anywhere from 5,000 on up, so they paid me a

15  commission for each gram that was sold.

16  Q.  When you say "they" who's the they?

17  A.  "They" was InforMD.

18  Q.  And so InforMD would give you a percentage of whatever their

19  commission was essentially?

20  A.  Exactly.

21  Q.  Now, did there come a time when you transitioned away from

22  your employment at InforMD?

23  A.  I did.  This was probably in September of 2014.  It was a

24  partial transition.  I continued selling products for them.  I

25  just didn't do the compounding with them anymore.  I had been

1    recruiting several large groups over to InforMD and trying to

2    get them to join the team and it was a little frustrating

3    because they were bringing these people over, paying them, you

4    know, 40 percent commissions, or offering to pay them 40 percent

5    commissions and, you know, I was getting paid much less and it

6    was a little frustrating, so I decided to branch out and take

7    other avenues.

8    Q.   What avenues did you take?

9    A.   During the process of selling Stera Base, I met a lot of

10   different people in the industry and there was a person by the

11   name of Eric Santos who I associated with because he wanted to

12   sell Stera Base as well and he wanted to become one of my

13   representatives.  He talked to me a little about his business

14   and that he was utilizing telemedicine for the compounding

15   pharmacy industry, and he asked me if I wanted to come over and

16   start marketing for him.

17   Q.   How long did you work with Mr. Santos for?

18   A.   It was a brief period of time, maybe not even a month.

19   Q.   Why so short of a time?

20   A.   I didn't feel like he was being honest with me about the

21   commissions.  Once my first commission check came in, it wasn't

22   anywhere near what it was supposed to be, what I thought it

23   would be, and I just didn't feel like he was being honest with

24   me, so I decided to get out of the situation.

25   Q.   And what situation did you then decide to get into?

1  A.  I talked to Patient Care America and I let them know what

2  had happened with Eric and they were actually working with Eric

3  and Matthew Smith from the pharmacy suggested that I just start

4  working with them direct and, you know, leave that situation.

5  Q.  And so was that the beginning of you setting up your company

6  that is the subject of this trial?

7  A.  Yes, that's correct.

8  Q.  Okay.  So tell the jurors, when you set up that company,

9  what structure did you set up for the company?  How was the

10 structure of the company?

11 A.  I basically just took the same structure that I had at

12 InforMD Solutions.  Nothing really changed.

13      The only thing that we switched was, instead of

14 marketing to physicians, we started marketing directly to

15 patients that could benefit from the products and everything

16 really remained the same.  We started utilizing the telemedicine

17 company to do the consults with the patients, so they could

18 receive the medication.

19 Q.  When you say pretty much everything except the telemedicine

20 and the marketing to the patients stayed the same, who were the

21 reps that you started with, the marketers that you started with

22 when you started this MGTEN company?

23 A.  I really started with three representatives.  There was

24 Shane Matthews, Ryan Long and Billy Burton.

25 Q.  So two of those reps came with you from InforMD; is that

Grow - Direct

1   fair to say?

2   A.  Yes, that's correct.

3   Q.  Okay.  And what commission structure did you set up?

4   A.  Basically, it was a tiered commission structure.  It was a

5   multilevel marketing really program that we took from InforMD.

6   It was the same thing we were doing there, and we just utilized

7   it in MGTEN company as well.

8           MR. RASHBAUM:  May I approach, Your Honor?

9           THE COURT:  Sure.  You have permanent permission to

10  approach.

11          MR. RASHBAUM:  Thank you, Your Honor.

12  BY MR. RASHBAUM:

13  Q.  Now, you said you started with three reps, correct?

14  A.  Yes.

15  Q.  Over time -- strike that.

16          MR. RASHBAUM:  I'd like to admit into evidence

17  Defendant's Exhibit 38.

18          MR. JUENGER:  No objection, Your Honor.

19          THE COURT:  It will be admitted.

20      (Defendant's Exhibit Number 38 was received in evidence.)

21  BY MR. RASHBAUM:

22  Q.  Just as an example, what does this email show you, if you

23  know?

24  A.  This was a patient who had started using the -- I don't know

25  which cream she used, but it says here a cream and a vitamin and

1   she really liked it and she was interested in learning more how

2   she could become a representative and work for my company.

3   Q.  So as your company grew, it grew with some people who were

4   patients that become reps, correct?

5   A.  Yes, that's correct.

6           THE COURT:  I'll sustain the objection.  What's the

7   basis of the --

8           MR. RASHBAUM:  I'm just trying to move it on, Judge.

9           THE COURT:  I know, but who, what, when, where, how,

10  why would be great.  If he says "correct," it's a leading

11  question.

12          MR. RASHBAUM:  I'd like to move into evidence

13  Defendant's Exhibit 181.

14          THE COURT:  Any objection?

15          MR. JUENGER:  No objection, Your Honor.

16          THE COURT:  Okay.  How many are there?  How many are

17  there?

18          MR. RASHBAUM:  It's a composite exhibit.

19          THE COURT:  I know, that's why I asked how many are

20  there.

21          MR. RASHBAUM:  Probably around a hundred.

22          THE COURT:  And these are 1099s?

23          MR. RASHBAUM:  I'm going to ask the witness.

24          THE COURT:  You're going to ask him about each one of

25  them?

Grow - Direct

1        MR. RASHBAUM:  No, I'm just going to ask him what they

2   are.  The jury will have it to look at.

3        THE COURT:  Tell me how many there are though.

4   Whenever it's a composite exhibit, whether it's a photograph or

5   a form, I've got to know how many you have.

6        MR. RASHBAUM:  It's 120, Your Honor.

7        THE COURT:  Okay.  It will be admitted.

8      (Defendant's Exhibit Number 181 was received in evidence.)

9   BY MR. RASHBAUM:

10  Q.  What are these 120 documents, two on a page?

11  A.  These are the 1099s that were provided to the

12  representatives that worked for me, so it was reported to the

13  IRS and they could pay their appropriate taxes.

14  Q.  And how did you get the idea to give 1099s to all of your

15  marketers?

16  A.  That's what was provided to me when I worked for InforMD and

17  my other sales reps.

18  Q.  Now, before we saw a patient who wanted to become a rep.

19        MR. RASHBAUM:  I'd like to move into evidence at this

20  point Defendant's Exhibit 84.

21        MR. JUENGER:  No objection, Your Honor.

22        THE COURT:  84 you said, right?

23        MR. RASHBAUM:  Yes.

24        THE COURT:  Thank you.  Admitted.

25      (Defendant's Exhibit Number 84 was received in evidence.)

1   BY MR. RASHBAUM:

2   Q.   What does this email show, Mr. Grow?

3   A.   This is an email from Louis Haigler, who was a

4   representative of mine, who was submitting a person that was

5   interested in receiving medications, but he was also letting me

6   know that this person was not interested in becoming a rep, they

7   just wanted the products.

8   Q.   Now, in total, approximately, throughout the course of this

9   company MGTEN how many reps or marketers ended up coming into

10  the company, approximately?

11  A.   130 maybe.

12  Q.   And in total, how many patients came into the company?

13  A.   Approximately 650.

14  Q.   Is it fair to say -- let me withdraw that.

15          How did this spread so quickly, if you know?

16  A.   Really it's -- I think it surprised all of us, but the

17  representatives did a great job going out talking to the

18  patients, promoting the products, and finding people that needed

19  them, and a lot of times when the patients started taking the

20  products and using them, they really liked them and they would

21  come back and ask how they could become a representative and,

22  you know, join in marketing them.

23  Q.   Were most of the -- let me not lead.

24          MR. RASHBAUM:   One moment, Your Honor.

25  BY MR. RASHBAUM:

Grow - Direct

1   Q.   You said there was around 150 reps, right?

2   A.   130 probably, yes.

3   Q.   Okay.  And how many patients were there?

4   A.   Approximately 650 over the course.

5   Q.   So fair to say that there were a lot more patients than

6   reps?

7   A.   Absolutely.

8   Q.   Now, as this business exploded, tell the jury about your

9   responsibilities, your role.

10  A.   I was a pretty busy person.  I was responsible for

11  recruiting new sales representatives.  I was responsible for

12  working with the current representatives with any questions that

13  they had and helping them give presentations to new

14  representatives they wanted to bring on board.

15       I was responsible for collecting the intakes from the

16  emails.  When a new representative would find a patient that was

17  interested in receiving the medication and talking to a

18  physician, they would email me the intake form, and from there,

19  I would actually take that intake form and upload it to the

20  telemedicine company so the physicians could then talk to the

21  patients.

22       Once those prescriptions were faxed over to me, I was

23  responsible for writing down the name of the person that the

24  script was sent for and forward that over to the pharmacy.  Once

25  the pharmacy would receive it, if they had any questions or

1    whatnot -- sometimes things weren't filled out properly, maybe a

2    missing signature or things like that, they would contact me and

3    see if I could reach out to the telemedicine network so the

4    physician could correct it.  They also would -- the pharmacy

5    would reach out to me if they were having issues getting ahold

6    of patients.  They would call each patient before they would

7    send the medicine, talk to the patient about how to use it and

8    to confirm that they wanted to receive it.

9          If they had problems reaching those patients, they

10   would call me and let me know that they were unable to reach the

11   patient and they were going to have to cancel them if the

12   patient wasn't going to call them.

13   Q.   Ever talk to patients about receiving medications or about

14   starting in the business, anything like that?

15   A.   I typically did not talk to patients.  That wasn't my

16   responsibility.  That was the sales representatives'

17   responsibility.

18   Q.   What about sales reps?

19   A.   Yes, for sales reps I did.  I tried to recruit sales reps on

20   my own, as well as I had sales representatives from time to time

21   that would contact me and they would have a representative that

22   was potentially wanting to start with the company and they would

23   ask me to reach out to them and talk to them myself.

24   Q.   Okay.  Now, we've heard in this trial from an individual

25   named Jill Cichowicz.  Do you recall that?

Grow - Direct

1  A.  I do, I remember.

2  Q.  And we heard that she got paid for her own medication.  Do

3  you remember that?

4  A.  I do.

5  Q.  Can you tell the jury what happened with Ms. Cichowicz?

6  A.  So I was contacted by a sales representative by the name of

7  Amy Fouche and she told me that she had a friend of hers that

8  she had talked to about becoming a representative for my company

9  and she asked if I would reach out to her and talk to her a

10 little bit about what the sales position was and what it

11 entailed.

12      So I called Ms. Cichowicz and I talked to her.  I told

13 her what the position was about.  She seemed very interested and

14 wanted to pursue it.  So I sent her over a W-9, as well as the

15 marketing material that she could review and share with

16 patients.

17 Q.  Do you know how it came to be that Ms. Cichowicz was paid

18 for her own medication?

19 A.  I really don't.  During the course of this investigation

20 when we were doing our research and whatnot, we were actually

21 able to find actually five different patients or they were sales

22 representatives that became patients and those five people were

23 paid on their own prescriptions.

24      During the course of working, while we were working

25 during 2015, there was one of those five that I was able to

Grow - Direct

1    catch.  There was a representative by the name of Josh Anderson

2    and he actually received payment on his own medication as well,

3    but I was able to catch that one and what I did was reverse the

4    commissions on his next paycheck and I took it back out.

5    Q.  So how many patients again did you have in total?

6    A.  Approximately 650.

7    Q.  And in going through your records you learned, for this

8    case, that there five, including Ms. Cichowicz, who were paid

9    for their own medicine, correct?

10   A.  Yes, that's correct.  They were representatives that were

11   also patients, and they received commissions on their own

12   medication.

13   Q.  Now, was it your program to pay patients for medicine?

14   A.  No, absolutely not.  That wasn't part of our program at all.

15   Nobody was offering or trying to bribe nobody to get

16   medications.  These were products that we presented to people,

17   they wanted them, they spoke to a physician and the physician,

18   you know, wrote them if they deemed it necessary.

19   Q.  I am going to show you Defendant's Exhibit 199 and

20   Defendant's Exhibit 70.

21          MR. RASHBAUM:  And I'd like to move these into

22   evidence, Your Honor, 199 and 70.

23          MR. JUENGER:  No objection to 199.

24          THE COURT:  199 has already been admitted.  What's the

25   other one, 170?

1          MR. RASHBAUM:  No, 70.

2          MR. JUENGER:  No objection to 70.

3          THE COURT:  70 will be admitted.

4      (Defendant's Exhibit Number 70 was received in evidence.)

5  BY MR. RASHBAUM:

6  Q.  So Ms. Cichowicz, you may recall, testified that she didn't

7  bring in anybody, that she didn't market the product, she just

8  got it herself.  Do you recall that?

9  A.  I do.

10 Q.  I'm showing you Defendant's Exhibit 199.  What is this?

11 A.  This was an email that I sent to Ms. Cichowicz after we

12 talked about the sales position and I sent this email over to

13 her, which included a W-9 form for her to fill out to become a

14 representative, and to provide her with the product information

15 that she could familiarize herself with and share with patients.

16 Q.  Did you send W-9 forms and information, marketing

17 information about the products to patients?

18 A.  No, just sales representatives I would send that to.  There

19 was no need to send it to a patient.

20 Q.  And Defendant's Exhibit 70, is that --

21         THE COURT:  What is that?  What is that?

22 BY MR. RASHBAUM:

23 Q.  What is this document?

24         MR. RASHBAUM:  Sorry, Your Honor.

25         THE WITNESS:  This is an email from Ms. Cichowicz

1  sending me her bank account information and her W-9 for tax

2  reporting purposes.

3  BY MR. RASHBAUM:

4  Q.  Now, you mentioned that there was an individual by the name

5  of Anderson?  Is that his name?

6  A.  Yes, Joshua Anderson.

7  Q.  And when you caught that he was paid for his medicine, what

8  did you do?

9  A.  I caught it, I believe, his third month as a representative,

10  and on that third month when I caught it, I deducted the amounts

11  that he was paid previously from his commission check.

12  Q.  Why didn't you do the same thing with Ms. Cichowicz?

13  A.  I never caught it.

14  Q.  Was Jonelle Coronado another woman -- you mentioned five,

15  Ms. Cichowicz as well as Mr. Anderson.  Was Jonelle Coronado

16  another woman who was mistakenly paid for her medicine?

17  A.  Yes, she was.

18  Q.  And why didn't you reverse her payment?

19  A.  I never knew about it.  I didn't realize it until we were

20  knee deep in this investigation, and we were able to track it

21  down and see.

22  Q.  Did any patient ever tell you that they were getting too

23  much product?

24  A.  No, I never had anyone tell me that.

25  Q.  Did anyone ever tell you that they were recruiting people

Grow - Direct

1    that didn't need the product?

2    A.   Absolutely not.

3    Q.   Now, I want to show you -- and by the way, if you run out of

4    exhibits up there, let me know and I'll give you mine.

5         I want to show you Defendant's Exhibit 83, which I will

6    move into evidence.

7         THE COURT:  Any objection?

8         MR. JUENGER:  No objection, Your Honor.

9         THE COURT:  It will be admitted.

10   (Defendant's Exhibit Number 83 was received in evidence.)

11   BY MR. RASHBAUM:

12   Q.   This is an email from you to Nichole Powell.  Do you see

13   that?

14   A.   I do.

15   Q.   And Nichole says, "It was great speaking with you today.

16        Here is the information and one script for my husband.  Just

17        to confirm, can we get the cream for our children as well?

18        I have five, but would only order for our two, 17 year old

19        and 16 year old if possible.  Thanks for your help."

20        And you respond back, "Nichole, thanks for the info.

21        Unfortunately the prescription can only be written for

22        people 18 and older.  I will process your husband's script

23        now."

24        Can you tell the jury what this is about?

25   A.   So, basically, she was asking me if she could get the

1    prescriptions for her children and I had my own personal rule

2    that nobody under 18 could get it.  This wasn't something from

3    the pharmacy.  I just felt like having children get these

4    medications, they could be possibly influenced by their parents

5    or something and I just didn't want that to happen.  So I said

6    no way, that we're not going to do it.

7    Q.  So if Ms. Powell's children had gotten this medication,

8    would you have received any compensation for it?

9    A.  Yes, I would.

10   Q.  And this email is from what year?

11   A.  This was November of 2014.

12            MR. RASHBAUM:  I would like to move into evidence

13   Defendant's Exhibits 130, 118 and 42, Your Honor.

14            THE COURT:  Any objection to 118?

15            MR. JUENGER:  No objection, Your Honor.

16            THE COURT:  It will be admitted.  130.

17            MR. JUENGER:  No objection.

18            THE COURT:  It will be admitted.  What was the other

19   one?

20            MR. RASHBAUM:  42.

21            THE COURT:  Any objection to 42?

22            MR. JUENGER:  No objection.

23            THE COURT:  It will be admitted.

24       (Defendant's Exhibit Numbers 42, 118, 130 were received in

25   evidence.)

Grow - Direct

1    BY MR. RASHBAUM:

2    Q.  Let's start with Defendant's Exhibit 130.  This is Natalie

3    Leon-Pinckney.  Who is Natalie Leon-Pinckney?

4    A.  She was a sales representative.

5    Q.  And she says, "Monty, attached is an intake form from

6        Orlando Stiles.  He is active duty overseas.  The address is

7        in Bahrain."

8            And you say in response in 2015, "Natalie, can't do it.

9        He must be here in the U.S."

10           Do you see that?

11   A.  I do.

12   Q.  What is this about?

13   A.  She's basically asking me if a prescription could be written

14   for someone who's located overseas and she's asking me, if it

15   can't be mailed there, that I could mail it to her or someone

16   else and they could send it to him.  And I said no, that you

17   can't do that, you can't market to someone who's located in

18   another country.

19   Q.  Why did you have that rule?

20   A.  I thought that it would be compliant and that it would stop

21   any type of shenanigans really.

22   Q.  Showing you Defendant's Exhibit 118, which is in evidence,

23   and this is from Luis Green:

24           "Monty, what can we do for clients that are on workups

25       or on deployment and will not be able to answer the phone

1    when the doctors call them to ensure that they are receiving

2    the correct medications?"  And your response in 2015:

3    "Luis, all patients must currently be living in the United

4    States in order to receive meds.  All patients must be

5    available to speak to the physician and pharmacy before a

6    prescription is given.  If they cannot do this, then they

7    are not eligible and should not be submitted."

8         Tell the jury what this is about.

9    A.  This is basically me explaining to Luis that all of the

10   patients would have to speak to a physician and the pharmacy as

11   well, and if they didn't have the capability to do that, then

12   they would not be allowed to receive the medications.  And I am

13   out of --

14   Q.  I want you to take a look at Defendant's Exhibit 15, which

15   is in evidence, and this is a text.

16        Let me ask you:  Who is Shane and Robin?

17   A.  Shane Matthews and Robin Halliburton, they were two sales

18   representatives for my company.

19   Q.  And what is going on in this text?  Tell the jury.

20   A.  So Ms. Halliburton was sending me a text and she's asking me

21   if I can pay a physician assistant commissions to write

22   prescriptions for patients out of his office, and she's telling

23   me that neither her or the physician could be an employee of the

24   company.  And I responded to her and I told her, no, you cannot

25   pay physician assistant, doctor, you know, to write

Grow - Direct

1    prescriptions and that's an illegal kickback.

2    Q.   Why did you think it was an illegal kickback?

3    A.   Because you can't pay doctors to write prescriptions.

4    Q.   Now, the Government has repeatedly said in this case that,

5    in fact, you did pay doctors to write prescriptions.  Did you

6    ever pay a doctor to write a prescription?

7    A.   Absolutely not.

8    Q.   And why not?

9    A.   Because it would be illegal.

10   Q.   Why would it be illegal?

11   A.   Because in my experience marketing to physicians, I always

12   knew you couldn't pay a physician to use your product.

13   Q.   I want to switch gears for one moment.

14        MR. RASHBAUM:  But, Judge, may I have just two seconds?

15        THE COURT:  Sure.

16   BY MR. RASHBAUM:

17   Q.   I want to move on to telemedicine.  What was your deal with

18   the telemedicine companies?  How did it work?

19   A.   So basically, the telemedicine companies, they had

20   physicians that I guess were contracted by them and I never

21   dealt with the physicians.  I just dealt with the owners of the

22   telemed company, and they charge my company what's called a

23   consult fee.  So whenever these physicians would reach out to my

24   patients or potential patients, they would do what's called a

25   consult.  They would talk to them on the phone, they would

Grow - Direct

1   verify their medical conditions and decide whether or not the

2   medications were appropriate for those particular patients.

3         The way that I compensated the telemedicine company was

4   just a flat fee irregardless of whether the patient receives the

5   medication or not.  Typically, there were four different types

6   of results; either the physician would write a prescription,

7   which would show up on my portal as script, or it would show up

8   as denied, meaning the physician talked to the patient and

9   refused to write a prescription for them because they didn't

10  feel it was necessary.

11        There was also a status called "refused" and that was,

12  after the physician did a consult with the patient and the

13  patient decided they didn't think the medicine was right for

14  themselves, they would refuse it.  And there was also

15  "cancelled" and that would mean that the telemedicine company

16  had tried to reach the patient, usually a few different times,

17  and they were unsuccessful, so they would cancel the patient out

18  of the system.

19  Q.   That's a lot, so let's kind of break it down a little bit.

20  What was the importance to you of doing prepaid consults?

21  A.   Well, the importance was that you're just paying for a

22  consult.  So it would never be misconstrued as, oh, I'm paying

23  for someone to write a prescription.  Whenever the physician

24  would see the patient, talk to them on the phone, they would

25  either come up with one of these four results; and if the

1   patient received a script, a credit was taken away from me.  If
2   the doctor denied the script, then it would also be taken a
3   credit away from me.  If the patient refused the script, it
4   would be taken away.  But if the patient canceled, then there
5   was no consult fee because they didn't actually speak to the
6   patient.
7   Q.  How many telemedicine companies did you work with?
8   A.  I worked with three different companies.  There was a
9   company called Complete Healthcare Concierge which actually
10  ended up splitting into another company called 1st Care MD.
11  There was another company called House Calls and a third company
12  just briefly, I think we used one time, was called MyOnCallDoc.
13  Q.  Now, now said telemedicine, I think you testified earlier,
14  was different than what InforMD did.  How did you gain
15  confidence in theses telemedicine companies?
16  A.  Well, when I was at InforMD I was recruiting quite a few
17  sales reps and representative groups, large groups that were
18  doing lots of business, some of them millions of dollars a
19  month, and some of these groups were using telemedicine
20  physicians.  And so I knew it was a successful way of operating
21  a business, and then just reaching out, I had originally talked
22  to the 1st Care MD company when Ken Kimble had introduced them
23  to me when I was really looking at doing the DME business but it
24  never panned out.  So when I started working with Eric Santos,
25  this is how he was also conducting his business, through

1   telemedicine.

2        So after speaking with several different telemedicine

3   companies, they explained the process, it was all done the same

4   way; and they basically, you know, proved to me that it was a

5   legal way to conduct business, so I decided to go and ahead and

6   pursue it.

7   Q.  And the telemedicine companies operated the same or

8   different than what Ms. Halliburton was suggesting?

9   A.  It was much different.

10  Q.  How so again?

11  A.  Well, I wasn't paying physicians to write prescriptions as

12  she was wanting me to.

13        MR. RASHBAUM:  I'd like to admit into evidence

14  Defendant's Exhibits 78, 2, and 133.

15        MR. JUENGER:  No objection to 78.  No objection to 2 or

16  133.

17        THE COURT:  133?  They will all be admitted.

18        MR. RASHBAUM:  Thank you, Your Honor.

19     (Defendant's Exhibit Numbers 2, 78, 133 were received in

20  evidence.)

21  BY MR. RASHBAUM:

22  Q.  Showing you Defendant's Exhibit 78.  Who is Chris O'Hara?

23  A.  He was one of the partners at Complete Healthcare Concierge.

24  Q.  What is Complete Healthcare Concierge?

25  A.  They're a telemedicine company that I originally talked to.

1  Q.  Now, in this document Mr. O'Hara, in November of 2014 -- by

2  the way, when did you start the company and the marketing that

3  is the subject of this case?

4  A.  I believe it was October of 2014, November, in that area.

5  Q.  So in November 2014, Mr. O'Hara says to you, "Monty, here

6       are the states we currently do not service."

7           And he lists around 10 to 12 states it looks like.

8  What did you think this meant?

9  A.  It meant, basically, that they could not prescribe

10 medications to patients in those states at that current time,

11 whether it was because they did not have physicians that were

12 available in those states or it wasn't legal in those states.

13 Q.  And what did that make you feel about Mr. O'Hara and his

14 telemedicine company?

15 A.  It made me feel that they were being compliant.

16 Q.  Tell the jury why you felt that way.

17 A.  Well, because they're giving me a list of states that they

18 couldn't do business in.  If they were doing something illegal

19 they would just say, you know, go do it anywhere you want, but

20 they were giving me rules and guidelines.

21 Q.  Showing you Defense Exhibit 2.  What is happening in this

22 email?

23 A.  So in this email I'm telling Chris that there were a couple

24 of patients that were uploaded into the system from Hawaii and

25 they were accidentally sent in, and so I was asking him if I

1  could get a credit for those, and he's telling that there's no

2  credit needed because the consult didn't take place.  And then

3  also he's telling me there that suspend the service in

4  Mississippi for any patients for the time being.

5  Q.  Do you know why he was telling you about suspending the

6  service in Mississippi?

7  A.  He didn't tell me specifically.  He just told me this, and I

8  followed his rule.

9  Q.  Showing you Defense Exhibit 133, and this comes from Craig

10  Long.  Who is Mr. Long?

11  A.  Craig Long was, I believe, the vice president of sales for a

12  company called MyOnCallDoc.

13  Q.  And is that another telemedicine company that you used?

14  A.  Yes, I used them briefly.

15  Q.  What is he telling you in this email?

16  A.  He's basically telling me the states that they could do

17  business in.

18  Q.  He says, "We will not be able to work on this project in the

19      following states due to unfriendly telemedicine laws."

20          Do you see that?

21  A.  Yes, I see it.  He's basically notifying me that those three

22  states were not telemedicine friendly.

23  Q.  He says, "I will update this list as often and as necessary

24      due to recruiting and legislative changes."

25          What did you think legislative changes meant?

Grow - Direct

1   A.   I believe there were some different laws that were trying to

2   be passed in different states and trying to get approval as

3   telemedicine was becoming more popular and he would notify me if

4   anything changed with those states.

5   Q.   How did this make you feel about the legality of Mr. Long's

6   company in telemedicine?

7   A.   It made me feel like they were totally legitimate and doing

8   things by the book.

9   Q.   Mr. Grow, did you ever write out a prescription for a

10  patient?

11  A.   No.

12  Q.   Why not?

13  A.   I'm not a doctor.

14  Q.   Did you ever make a change to a prescription for a patient?

15  A.   No, absolutely not.

16  Q.   Why not?

17  A.   Because that wouldn't be legal.

18  Q.   Now, the Government in this case has talked a little bit

19  about these 360 grams and 240 grams and checking boxes.  Can you

20  tell the jury a little bit about that and what you did?

21  A.   So, basically, we had Patient Intake Forms in which the

22  sales representatives would talk to potential patients, they

23  would find out from them what their ailments were.  So if a

24  patient had pain, for instance, they would fill out this form

25  that they had pain, and they would tell me the location of the

1   pain, such as maybe their knee or their back.

2          If the patient had a scar and had the desire for that

3   medication, they would let me know the location of the scar.

4   And then there was also -- at the bottom of the form, there was

5   a metabolic vitamin that we provided and there was a yes or no

6   answer that they could circle, basically notifying us whether or

7   not the patient was interested in talking to the physician about

8   that.

9   Q.   Now, before we move on to this topic a little bit, let's be

10  clear about one thing.  Why did you start this company?

11  A.   Well, I was in business, you know, I wanted to make money.

12  Q.   So if a patient got 360 grams on a product as opposed to 240

13  grams on a product, would you make more or less money?

14  A.   If they ordered --

15  Q.   Let me rephrase.

16  A.   Yeah.

17  Q.   If they got 360 grams instead of 240 grams, you would make

18  more money.  Is that fair to say?

19  A.   Yes, I would.  360 grams is a full month supply, 240 grams

20  would cover basically 20 days.

21  Q.   But did you ever make decisions as to what the doctors

22  prescribed?

23  A.   Absolutely not.  It was always the doctor's decision on what

24  they prescribed to the patient.

25  Q.   In the months of working in this company, how many times did

1  you speak with a doctor?

2  A.  Never.

3  Q.  Why not?

4  A.  I had no contact with the physicians.  Everything that I did

5  was through the management of the telemedicine companies that I

6  worked with.  So any questions that I had, I would always go

7  directly to them, and they would handle it from there.

8         MR. RASHBAUM:  I'd like to admit into evidence

9  Defendant's Exhibits 8 --

10        MR. JUENGER:  No objection to 8.

11        MR. RASHBAUM:  -- 12.

12        THE COURT:  It will be admitted.

13        MR. JUENGER:  No objection to 12.

14        THE COURT:  In.

15        MR. RASHBAUM:  22.

16        MR. JUENGER:  No objection.

17        THE COURT:  In.

18        MR. RASHBAUM:  41.

19        MR. JUENGER:  No objection.

20        THE COURT:  In.

21        MR. RASHBAUM:  48.

22        MR. JUENGER:  Can I see it, please?

23        MR. RASHBAUM:  Sure.

24        MR. JUENGER:  No objection, Your Honor.

25        THE COURT:  It will be in.

1          MR. RASHBAUM:  And Defense Exhibits 9 and 10.

2          MR. JUENGER:  No objections to 9 or 10.

3          THE COURT:  Both in.

4      (Defendant's Exhibit Numbers 8, 9, 10, 12, 22, 41, 48, were

5  received in evidence.)

6  BY MR. RASHBAUM:

7  Q.   Okay.  So let's start with Defendant's Exhibit 8.  In April

8  of 2015, Ms. Ashby sent you an email.  Do you see that?

9  A.   I do.

10 Q.   And she says, "What else is involved in the set-up process,

11      if you don't mind me asking?"

12          Do you see that?

13 A.   Yes.

14 Q.   And you respond, "You will receive a call from the doctor

15      and if prescribed a med, then the pharmacy will call you."

16          Can you tell the jury about this, what this shows?

17 A.   Yes.  So actually, this was a potential patient that sent me

18 their information directly, number one, and I wasn't sure who

19 the representative was so I asked them which representative

20 referred you so I'd know and assign that to the proper

21 representative.  But I also just wanted to let them know that

22 they had to take a call from a physician and that a doctor was

23 going to talk to them and, basically, if they provided a

24 medication for them, then the pharmacy would also be reaching

25 out to them.  So just explaining to them the process that they

Grow - Direct

1   would have to go through.

2   Q.   Defendant's Exhibit Number 12 is a text message on your

3   phone, correct?

4   A.   That's correct.

5   Q.   It says, "These patients were canceled by the doctors

6        because they couldn't get in touch with the patient.  Can

7        you see if the patient still want the meds and verify they

8        have to answer the phone?"

9           Can you tell the jury about this?

10  A.   Yes.  So these are patients from the telemedicine network

11  that were unable to be reached by the physician when they

12  reached out to them.  So when that happened, after they tried a

13  few different times, they would go ahead and cancel them.  So I

14  was just notifying the sales representative that their patient

15  had been cancel because they were unable to be contacted.

16  Q.   Did you ever hear of patients getting medications without

17  being contacted by doctors?

18  A.   No.

19  Q.   Defendant's Exhibit 22, what is this?

20  A.   This is a text conversation with one of my sales

21  representatives, Tiffany, for a patient of hers named William

22  and I'm letting her know that he's out of refills and that the

23  doctor would have to do a new consult with him to follow-up and,

24  you know, make sure that the product was still right for him and

25  that he needed it.  So I was reaching out to Tiffany to make

Grow - Direct

1   sure that William was still wanting the medications before he

2   would speak to a physician again.

3   Q.   Why do you care whether William still wants the medications?

4   Why not just call the telemedicine company and say auto refill

5   this product?

6   A.   Well, we wanted to make sure that he actually was using the

7   product and he needed it and wanted it.

8   Q.   And this text is in January of 2015, right?

9   A.   That's correct, January 8th.

10  Q.   Showing you Defendant's Exhibit 41, which is an email

11  exchange between you and David Vose.   Do you know who David Vose

12  is?

13  A.   Yes, he was a sales rep.

14  Q.   Okay.   And Mr. Vose, in the middle, says, "Hey boss.   So

15      Huggins claims he never got a call, but I gave him the

16      pharmacy's number."   And there's a phone number.   "He's

17      gonna call tomorrow."   And you say, "No, please tell him not

18      to call the pharmacy.   It's the doctor that's trying to call

19      him.   The pharmacy has nothing to do with it."

20          What's going on here?

21  A.   Basically, this is a patient that was submitted to the

22  doctor's network and they tried to get ahold of him on several

23  occasions, but they weren't able to reach him so they ended up

24  canceling him on two different occasions.   So I was just

25  reaching out to the rep and letting him know that, you know, the

Grow - Direct

1  pharmacy was trying to reach him and then they followed up.  He

2  was wondering if he should just call the pharmacy direct, and I

3  said to him no, he's got to talk to the physician first.  That's

4  the person he needs to talk to because the script has not been

5  written for him.

6  Q.  Why not just write him a script yourself?

7  A.  That would be illegal.

8  Q.  Showing you Defense Exhibit 48.  What's 1st Care MD again?

9  A.  They are a telemedicine network.

10  Q.  You see here there's -- what is this first page?

11  A.  This is the Patient Profile Form that is uploaded to the

12  telemedicine network so the doctor can review it and know what

13  to basically talk to the patient about.

14  Q.  And you see on the third page here there are some notes.

15  Tell the jury what this is about.

16  A.  These are follow-up notes from the physician which explain,

17  you know, exactly what he talked about, the communication that

18  he had with the patient, and basically diagnosis.

19  Q.  Did you receive these types of notes occasionally?

20  A.  Occasionally I did.  For the most part, they weren't sent to

21  me, but I did from time to time.

22  Q.  And how did that make you feel about the telemedicine

23  company and the doctors at the telemedicine company?

24  A.  Well, it showed me that they were doing a thorough job,

25  talking to the patients about their issues and making medical

Grow - Direct

1   decisions based on that.

2   Q.  I'm showing you Defendant's Exhibit 9, which is in evidence,

3   a text message.

4       Do you know who Torniqua Johnson is?

5   A.  Yes, she was a sales representative for our company.

6   Q.  And she says to you, "Hello, this is Torniqua Johnson.  I

7       emailed you because I'm having problems with my

8       prescription.  And also, my people have called and refilled

9       their prescription, but they haven't received anything yet."

10      And you respond, "Torniqua, Dr. Goldberg did not renew your

11      prescription, and it was sent to another physician who

12      denied it.  Please stop calling the pharmacy as they have no

13      control over any prescription that isn't written."

14      Do you see that?

15  A.  Yes, I do.

16  Q.  What are you talking to Torniqua Johnson about here?

17  A.  So basically, Ms. Johnson had a prescription that was

18  canceled for some reason by one of the physicians who originally

19  wrote it and she wanted to speak to another physician about

20  getting it refilled and having a new prescription written, but

21  after talking to the physician, he didn't write it, he didn't

22  deem it necessary.  So I'm letting her know that it's not a

23  situation of getting refills and not calling the pharmacy, but

24  it was actually that the physician denied the prescription for

25  her and that she wouldn't be receiving it.

Grow - Direct

1   Q.  Showing you Defendant's Exhibit 10, and I want to start at

2   the back of the exhibit.  It's an email from Ralph Louis to

3   Monty Grow, there's some copies, Esan Forde and Matthew Smith.

4   Subject:  Torniqua Johnson.  Did you know who Ralph Louis or

5   Matt Smith are?

6   A.  Yes, Ralph Louis basically was in charge of my account from

7   a certain period of time and he followed up on all of my

8   patients.  And Matt Smith was, I believe, the vice president of

9   operations for Patient Care America, he ran the day-to-day

10  business there.  He's who I dealt with.

11  Q.  And Ralph emails you, "Monty, with all the updates currently

12      going on with Tricare, I still want to keep you in the loop

13      with this patient.  She is currently a Dr. Goldberg patient

14      and she called us for a refill.  Knowing that we can't

15      refill his prescriptions, is there any way we can obtain a

16      new prescription for this patient or okay to have a

17      pharmacist contact the doctor to obtain a prescription?"

18          Do you see that?

19  A.  I do.

20  Q.  And Matt Smith responds, "Monty?"  Do you see that?

21  A.  I do.

22  Q.  And you answer, "I submitted her to another doctor and for

23      some reason he denied her a new prescription.  That's his

24      job and I don't have anything to do with what or who the

25      physician writes prescriptions for."

1             What are you telling the pharmacy here?

2   A.  I'm just basically telling them that I submitted her to a

3   doctor, he didn't write the prescription and that's his job.  I

4   don't have any control over it.

5   Q.  But we've heard a lot of testimony in this trial about you

6   paying doctors to write prescriptions.  Why not just pay this

7   doctor to write this prescription?

8   A.  Because that's not what we did.  We didn't pay doctors to

9   write prescriptions.

10          We had contracts with telemedicine companies who had

11  physicians talk to patients and if they deemed it medically

12  necessary, they would write the patient a prescription, or they

13  would deny it, or the patient would refuse it, and we paid

14  consult fees.

15          THE COURT:  How much longer do you think you have?  I'm

16  not limiting you.  I'm merely inquiring.

17          MR. RASHBAUM:  I'm moving rapidly, Your Honor.  That's

18  the good news.

19          THE COURT:  Oh, I didn't ask you that, and I think you

20  might be, but I still want to know how much longer you think you

21  have.

22          MR. RASHBAUM:  I think I have probably a couple of

23  hours, maybe one to two hours.

24          THE COURT:  Well, I've got to give the jurors a lunch

25  hour, don't I?  Right?  It's not mandated by the Constitution,

1   but it's the right thing to do.

2           I assume you're hungry and it's almost 1:30.  So we'll

3   see you at 2:25.

4           Don't talk about the case.  Leave your juror notebooks

5   in the jury room, not there, and we'll see you in an hour.

6           THE COURT SECURITY OFFICER:  All rise for the jury.

7           THE COURT:  All right.  You have to stay here five

8   minutes until the jurors are out and don't forget about my

9   instruction not to have any contact with them.  Okay?  See you

10  in an hour.

11          MR. RASHBAUM:  Can we leave our stuff up here?

12          THE COURT:  Pardon?

13          MR. RASHBAUM:  Can we leave our stuff up here?

14          THE COURT:  Sure.

15          MR. RASHBAUM:  Thank you, Your Honor.

16          THE COURT SECURITY OFFICER:  All rise.

17     (There was a luncheon recess taken at 1:29 p.m.)

18                         AFTERNOON SESSION

19     (The following proceedings were held at 2:45 p.m. outside

20  the presence of the jury:)

21          THE COURT:  All the jurors arrived, but we have another

22  issue with Mr. Jones, the younger one.  I forget his first name.

23          THE COURTROOM DEPUTY:  Gerald.

24          THE COURT:  Gerald Jones, the younger one.  He works on

25  Sundays at night, doesn't know if he can come in on Monday.  He

1    had told us that before and you picked him.

2        (Juror, Gerald Jones, entered the courtroom.)

3            THE COURT:  Take at seat anyplace you want, sir.

4            My courtroom deputy said or someone said that you want

5    to work Sunday night and you want to sleep during the trial.

6            JUROR G. JONES:  Well, unfortunately, with my job, we

7    work six days out of the week, so Sunday is a working day for

8    me.  So me trying to come in here on a Monday, trying to stay up

9    and listen is not going to work with me getting off at 6:00 in

10   the morning.

11           THE COURT:  You know what the solution is?

12           JUROR G. JONES:  That's why I asked.

13           THE COURT:  Don't work Sunday night.

14           JUROR G. JONES:  How can I not do that?  I'm scheduled

15   to work.

16           THE COURT:  You tell them you're on jury duty.

17           JUROR G. JONES:  Okay.

18           THE COURT:  If they want to talk to me, I'll talk to

19   them.  Tell them that the law prohibits them from penalizing you

20   in any way.

21           JUROR G. JONES:  You've got the power.  I've just got

22   to say whatever.  I'll let them know.

23           THE COURT:  Okay.

24           JUROR G. JONES:  All right.

25           THE COURT:  Can you do that?

1                  JUROR G. JONES:  Yeah.

2                  THE COURT:  Your normal hours are from what time to

3      what time?

4                  JUROR G. JONES:  My regular working shift is from 6:00

5      until the work is finished.

6                  THE COURT:  From 6:00 at night?

7                  JUROR G. JONES:  6:00 p.m. until the work is finished.

8                  THE COURT:  Have you been doing that every day?

9                  JUROR G. JONES:  No, I just -- my body is just not

10     adjusted to in the morning yet.  That's why I still be like kind

11     of --

12                 THE COURT:  Has not adjusted this whole week?

13                 JUROR G. JONES:  Nah, because I've been working nights

14     for five years now, so --

15                 THE COURT:  But this week have you been working nights?

16                 JUROR G. JONES:  No, I have not.

17                 THE COURT:  How did you get away from that?

18                 JUROR G. JONES:  You.

19                 THE COURT:  Then continue to do it on Sunday night.

20                 JUROR G. JONES:  All right.  I sure will.

21                 THE COURT:  But you've been paying attention and

22     everything?

23                 JUROR G. JONES:  Yeah, yeah, yeah, I have.

24                 THE COURT:  I know it's tough to adjust.  It's like

25     taking a long trip or something.

1          JUROR G. JONES:  It's all right.  Thank you.

2          THE COURT:  Thank you.

3      (Juror Gerald Jones retired from the courtroom.)

4          THE COURT:  It is tough to adjust.

5          MR. LARSEN:  Your Honor --

6          THE COURT:  Hold on.  We've got to hear the door.  What

7  do you all want to do?

8          MR. LARSEN:  We'd like to address the issue --

9          THE COURT:  No, how about do one thing at a time.

10  Jones.

11         MR. LARSEN:  Keep him.  We'd like to keep him.

12         MR. RASHBAUM:  Keep him.

13         THE COURT:  All right.  Done.

14         Now what do you want?

15         MR. LARSEN:  Your Honor, the parties are not in

16  agreement about the admissibility of the recorded statements of

17  the defendant.  The Government's position is they're hearsay and

18  they are not admissible under the prior statement.  These are

19  statements -- and I pulled the case last night, Your Honor, it's

20  United States versus Prieto and the cite is 232 F.3d 5 -- or

21  excuse me -- 816.

22         THE COURT:  Let me see it.

23         MR. LARSEN:  Your Honor, I did have some writing on it

24  but --

25         THE COURT:  That's okay.

 1          Judge Nesbitt, what an elegant lady she was.  I thought

 2     of her this morning.  It gave me courage to be courageous and

 3     say the right thing.

 4          Anyway, there's no question it's hearsay and this

 5     opinion says it's inadmissible.  The defendant tried to turn him

 6     in without testifying or testifying?

 7          See, I haven't read it yet, but I want to ask you first

 8     since you've read it.  Did he testify?

 9          MR. LARSEN:  Your Honor, I believe the Court in that

10     case allowed the defendant -- the proponent or the declarant to

11     testify.  The Court refused to adopt the bright line --

12          THE COURT:  No, no, no.  Whose statements were they in

13     Prieto?

14          MR. LARSEN:  They were I believe as co-conspirator's

15     statement or a cooperator's, excuse me.

16          THE COURT:  See, that's totally different.  We wouldn't

17     even be having this discussion.

18          MR. LARSEN:  Your Honor, if I may, the rule and the law

19     under Prieto is that statements of the declarant that are made

20     after an opportunity to fabricate are not admissible under Rule

21     801; and in this case, this situation, the defense would like to

22     enter statements that were made well after the motive to

23     fabricate.  Mr. Grow was aware in May of 2015 of a nationwide

24     news article specifically regarding the person on the telephone

25     call.

1          When the person on the telephone call contacted

2    Mr. Grow, she said, I've been called to go talk to the FBI.  So

3    this is precisely the type of --

4          THE COURT:  Let's hold on.  Okay.  Because your point

5    is -- let me look at the opinion, but I remember -- is it a

6    prior consistent statement?

7          MR. LARSEN:  Well --

8          THE COURT:  Yeah, because look at that, without even

9          reading it, look how the opinion on paragraph -- on the

10         second section it says, "A District Court is granted broad

11         discretion in determining the admissibility of a prior

12         consistent statement under Federal Rule 801(d)(2)(1)(B),"

13         and I bet you they're going to cite a Supreme Court

14         decision.

15         The reason I remember that is you're talking about the

16    opportunity to fabricate, and I think you're right about that.

17         Here it is, it's the Tome decision, Tome versus United

18    States:

19         Rule 801(d)(1)(B), "Prior consistent statements must

20         have been made before the alleged influence or motive to

21         fabricate arose."

22         MR. LARSEN:  And Your Honor --

23         THE COURT:  You may be right.  Hold on.  Hold on.  Give

24    me a chance and you'll see.

25         You may be right, and then it's something that I would

1    do and I would consider after.  It would have to be in redirect,

2    after cross-examination, right, because that's when a prior

3    consistent statement can come in.

4         First, you cross-examine him and he says, no, this is

5    not something I came up with, I've always been saying that.  So

6    then the defense lawyer says, I'm bringing in the prior

7    consistent statement, and then I worry about the timing of it.

8    So I think you're right, it's just premature, isn't it?

9         MR. LARSEN:  Sure, Your Honor, sure.

10        THE COURT:  Isn't it?  I mean, tell me if you disagree,

11   but isn't that what the law is?

12        When does a prior consistent statement come in?

13        MR. LARSEN:  Well, the prior consistent statement would

14   be -- you're right, Your Honor -- after the declarant makes a

15   statement to compare a consistent statement.  Our position is

16   the state of mind of the declarant -- the sole issue in this

17   case is the defendant's intent.

18        THE COURT:  That's true.

19        MR. LARSEN:  So the statement to be a prior --

20        THE COURT:  Well, it's not the sole issue, I think it's

21   the real issue, but obviously, maybe you've been convinced that

22   it's the sole issue, maybe you'll act like that, but you won't.

23   But it's not the sole issue, though I think it's the issue for

24   the jury for sure.

25        MR. LARSEN:  Fair enough, Your Honor.

1          THE COURT:  Okay.  Let me find out.  Are you going to
2    try to introduce these exhibits now during the direct or not?
3          MR. RASHBAUM:  Judge, I'm going --
4          THE COURT:  Why do my questions seem like they're hard?
5          MR. RASHBAUM:  No, the answer is no.
6          THE COURT:  No.  So you're going to do it on redirect.
7          MR. RASHBAUM:  Yes, Your Honor.
8          THE COURT:  Mr. Larsen, you're going to do the cross?
9          MR. LARSEN:  No, Mr. Juenger will be doing the cross.
10         THE COURT:  How long is it going to be, more or less?
11         MR. JUENGER:  Two hours or so.
12         THE COURT:  So we've got another hour of direct, an
13   hour and a half.  You said an hour, and hour and a half, two
14   hours.
15         MR. RASHBAUM:  I will go as fast as I can.
16         THE COURT:  No, I don't want you to do it fast.  I want
17   you to do it right, which is usually not long, but okay.
18         So you've got two hours of that, two hours of the
19   cross, and then comes the redirect.  So you all want me to
20   decide this at 7:00.
21         All right.  I'll wait till 7:00 to decide this.  That's
22   fair, isn't it?
23         Ready for the jury?  Okay.
24         No playing or using these statements yet.
25         MR. RASHBAUM:  I'm not going to.

1          THE COURT:  Bring in the jurors.

2          MR. RASHBAUM:  Judge, I assume the Government is not

3   going to use them in cross.

4          THE COURT:  Well, they can use anything in cross.

5   Number one, it's an admission against a party opponent, so it

6   doesn't matter when it was made.  If it was made yesterday --

7          MR. RASHBAUM:  I think --

8          THE COURT:  I interrupt a lot, but then you interrupt

9   me and someone has got to yield and I don't think I should yield

10  because then I'll talk afterwards.

11         They can use whatever they want.  You are the proponent

12  of the evidence.  What they would do it for is to impeach, to

13  attack the credibility.  It's not substantive evidence.

14  Remember we learned a lot on this issue a few days ago.  I'm

15  going to give you all a test.  So they can do it if they want

16  to.

17         MR. RASHBAUM:  Judge, they've already attacked his

18  credibility.

19         THE COURT:  Oh, and they're going to continue to do

20  that.

21         MR. RASHBAUM:  Judge, it's already an issue.  They

22  brought in his statements through co-conspirators where they've

23  said he's lied, so I should be able to bring them in then in my

24  direct.

25         THE COURT:  A consistent statement?

1          MR. RASHBAUM:  Yes.  They have already attacked his --
2     they've introduced statements of my client.

3          THE COURT:  So you want anticipatory rehabilitation.

4          MR. RASHBAUM:  It's not anticipatory.

5          THE COURT:  It is anticipatory.

6          MR. RASHBAUM:  No, they have done it through other
7     witnesses.

8          THE COURT:  It doesn't count.  Then the prior
9     consistent statement of other witnesses you could have brought
10    in.

11         MR. RASHBAUM:  I don't want to interrupt you.  They've
12    brought in Mr. Grow's statements through other witnesses, so I
13    want to rehabilitate those statements that they brought in
14    through other witness.

15         THE COURT:  You don't rehabilitate statements, you
16    rehabilitate witnesses.  So that is already done.  This is the
17    witness that you're not done with.  So I'm not going to let you
18    do it on direct.

19         MR. RASHBAUM:  Okay.

20         THE COURT:  I'm reserving ruling on redirect since I
21    expect there will be cross-examination.  So until then, I don't
22    have to decide and you don't have to argue.

23         MR. RASHBAUM:  So I'm prohibited from doing it on
24    direct.

25         THE COURT:  Because of the timing, of course.  You

1  can't bring in a prior statement of a witness, even the

2  defendant's, on direct when he hasn't been attacked yet.  Other

3  witnesses are different.  Their statements have come in under a

4  different rule of evidence.  It still would be hearsay.

5          If someone said, I'm not guilty, you can't bring in his

6  statement I'm not guilty.  Let's say he said, I'm not guilty.

7  You couldn't bring that in.  You couldn't unless it was in a

8  conversation with someone else, and I did get into trouble in

9  one case when I excluded an exculpatory statement that was

10  combined with another.

11          In the few cases I've been reserved, I can count them

12  on the fingers of one hand in criminal cases, was because under

13  the rule of completeness, and I cited it to them and I said, no,

14  it doesn't come in, and I was wrong because of the rule of

15  completeness.

16          So as long as we're not talking about the same

17  conversation where I kept an exculpatory statement out along

18  with an inculpatory, I dissected it, that was wrong.  That's not

19  what we're talking about.

20          Who recorded these conversations?

21          MR. RASHBAUM:  The Government did.

22          THE COURT:  The Government.  And he knew he was being

23  recorded?

24          MR. RASHBAUM:  Had no idea.

25          THE COURT:  Well, then that inures to his benefit --

1        MR. RASHBAUM:  It sure does.

2        THE COURT:  -- which is even more exculpatory, and

3   that's why it doesn't come in on direct.

4        MR. RASHBAUM:  Okay.

5        THE COURT:  So it all depends on the cross.  If you

6   don't attack his credibility, then it doesn't come in at all.

7   By the way, what do the statements -- how many statements are we

8   talking about?

9        MR. RASHBAUM:  It's --

10       THE COURT:  Another tough question, I know.  How many?

11       MR. RASHBAUM:  It's two calls.  There are two call,

12   Your Honor.

13       THE COURT:  How long are the calls?

14       MR. RASHBAUM:  They are around 20 to 30 minutes long.

15       THE COURT:  Each call?

16       MR. RASHBAUM:  Yeah.

17       THE COURT:  Between whom?

18       MR. RASHBAUM:  It's between him and an alleged

19   co-conspirator.

20       THE COURT:  Who?

21       MR. RASHBAUM:  Deanna Dutting.

22       THE COURT:  Who is not a witness, right?

23       MR. LARSEN:  No, Your Honor.

24       THE COURT:  Wasn't there something with that witness'

25   name that you wanted to introduce that I held off on?  I must be

1   somewhere in the right continent because you're thinking about

2   it.

3           MR. LARSEN:  There were two CBS news stories.  I think

4   one was Government's Exhibit 23, and that is where there's a

5   reference to that person, that person in the news story.  And

6   then the second is not --

7           THE COURT:  The reason I excluded it is I can't let

8   news stories, even if they're accurate.  You know, I'm telling

9   the jurors don't look at the paper and then I am going to allow

10  the Government to introduce a news story.  I can't do that.

11          But in any event, that person is not being called as a

12  witness.

13          MR. LARSEN:  No, Your Honor.

14          THE COURT:  And what does he say?

15          MR. RASHBAUM:  He says a lot of things.  He says, we

16  didn't do anything wrong.

17          THE COURT:  Can you be more precise?

18          MR. RASHBAUM:  We didn't do anything wrong.  There is

19  no kickbacks.  I didn't pay doctors.  I didn't pay for

20  prescriptions.  Telemedicine is legal.  You know, go get a

21  lawyer, don't talk to the Government because they'll try to

22  trick you.  That's the gist.  He basically says everything that

23  we are defending the case with.

24          THE COURT:  What is the date of that?

25          MR. RASHBAUM:  January 2016.

1        THE COURT:  What is the date of the Indictment?

2        MR. RASHBAUM:  After.

3        MR. LARSEN:  The date of the Indictment is after.  The

4   news stories all predated -- the incident that Your Honor

5   excluded was somewhere around April or May of 2015.  The

6   Government had issued subpoena I believe in the middle of 2015.

7        THE COURT:  So he obviously knew about the

8   investigation because, if not, he wouldn't have made the

9   comments.

10       MR. RASHBAUM:  The investigation was not his company.

11  Deanna Dutting was working for another company.  So he knew that

12  she was getting investigated.

13       MR. LARSEN:  Subpoenas had gone out well before.

14       MR. RASHBAUM:  He had no --

15       THE COURT:  Now you're interrupting each other, not

16  even just me.  It's just as bad.

17       MR. RASHBAUM:  He had no lawyer at the time.

18       THE COURT:  Pardon?

19       MR. RASHBAUM:  He had no lawyer at the time.

20       THE COURT:  Sometimes that has nothing to do with it.

21       MR. RASHBAUM:  He had not gotten a target letter at the

22  time.  He had not been indicted at the time.  He had never been

23  approached by law enforcement at the time.

24       THE COURT:  Do you agree with all of that?

25       MR. LARSEN:  On those issues, yes.  Subpoenas had been

1   issued to banks in his name, other accounts in his name months

2   before --

3           THE COURT:  And he knew about it.

4           MR. LARSEN:  I don't know that he knew about it, but he

5   certainly -- the issue was -- Ms. Dutting, the first words out

6   of her mouth in the recording is, the FBI wants to talk to me,

7   there's an investigation, and so he has a complete interest in

8   fabrication at every point thereafter.

9           In fact, the recordings do have don't talk to the

10  Government, you did all of this.  I didn't do this, you did all

11  of this.  You got greedy.  I didn't do this.  I'm a middleman.

12  So just listening to it, it's obvious.

13          MR. RASHBAUM:  Then they should love it.  They should

14  put it in their case.

15          I mean, what he says is, when you left my company you

16  went on your own, you went rogue, obviously, and you're being

17  investigated with your company.

18          THE COURT:  Okay.  I don't know yet, but when we look

19      at Rule 801(d)(1)(B), as indicated in the Prieto decision,

20      it provides in pertinent part "A prior consistent statement

21      by a witness is not hearsay if the declarant testifies at

22      the trial or hearing and is subject to cross-examination

23      concerning the statement, and the statement is consistent

24      with the declarant's testimony and is offered to rebut an

25      expressed or implied charge against the declarant of recent

1        fabrication or improper influence or motive."

2            That's the reason I have to wait.  It cannot be now.

3            First of all, we've got to wait till he finishes his

4   statement.  Then I have to decide whether it's consistent.  All

5   right.  And I assume if the defendant wishes to present it and

6   the Government wants to exclude it, that that's probably

7   consistent.  So then the problem is going to be whether -- the

8   timing of it.  I assume the Government is going to say that this

9   is recent fabrication, though I wonder what recent is.  See,

10  that's the problem.  It's all going to be timing.

11           When is recent?  Is the fabrication right now at the

12  time that you're testifying?  Obviously not because one prepares

13  in a trial, in a case.  This is a 2016 case, right?

14           MR. LARSEN:  Late 2016.

15           THE COURT:  Oh, my goodness, I feel so guilty in 2018.

16  So it's a 2016 case, so recent fabrication is not -- the

17  testimony in 2018 is whatever caused him to prepare his defense.

18  By the same token, the timing of it, it's a little bit close.

19  How much did he know?  It's not after Indictment.  It's not

20  after he, himself, has become a target, but it's after

21  supposedly he knows.

22           So I've got to hear on cross-examination, if you want

23  to pursue it, when he found out about this, if you're going to

24  attack that he's fabricating it.  Once I do that, I assume the

25  statement is consistent, then I've got to decide whether he made

1    it when he already had a motive.

2         I mean, what the Supreme Court -- I think it was

3    Justice Kennedy, but I don't remember, in Tome, I think it was.

4    What he wrote about was, he wanted to know is the person

5    fabricating it now.  See?  Is he just making it up?  You could,

6    if you wanted to, say, oh, I didn't know anything, I'm not

7    guilty, I'm not guilty, I'm not guilty, knowing that that's

8    going to come in.  Obviously, you can't bring that in.  This is

9    not quite that, but it's not quite the other thing.  Which means

10   that I don't like it because if I exclude it, it's one of the

11   issues on appeal, isn't it?

12        So you've got to figure out how important it is, right?

13        MR. LARSEN:  Yes, Your Honor.

14        THE COURT:  Okay.  All right.  By the way, this isn't

15   going to make that much difference, but I acquitted the

16   defendant yesterday of Count 50.  No, 51.

17        MR. LARSEN:  I think 51, Your Honor.

18        THE COURT:  I'm going to acquit him on both counts.  I

19   thought about it.  So the reason I'm telling you that is,

20   there's no need to deal with causing the misbranding of drugs

21   while held for sale.  So if the defense wants to talk about

22   that, you shouldn't because you've won, and there's no sense

23   preparing for cross-examination on whether those were dispensed,

24   flurbiprofen was dispensed in Jacksonville, and whether that

25   violates a State law or not.  Okay.  So that makes it easier for

1   you and that's what I've done.

2          It's a little bit different, the two counts, and I

3   understand the Government's position, but I'm still going to do

4   that.  Okay?

5          All righty.  Bring in the jurors.  Let's go.

6          THE COURT SECURITY OFFICER:  All rise.

7          THE COURT:  Since you're not bringing that in and the

8   conversations were 40 minutes, 20 and 20, it's 40 minutes less

9   than the two hours, so that's what I expect.

10         MR. RASHBAUM:  I think it will be longer.

11         THE COURT:  Ask your best questions first.

12         MR. RASHBAUM:  He has already testified, Your Honor.

13         THE COURT:  I know, I agree.  I think you probably have

14  asked your best questions already.

15         MR. RASHBAUM:  No, not even close.

16    (The jury entered the courtroom at 3:10 p.m.)

17         THE COURT:  Thank you, folks.  Please be seated.

18         This time we were discussing some issues related to

19  this case, but it was still important.  Okay.  It was not other

20  hearings.  All right.

21         All of the jurors are present, defendant, defense

22  counsel, Government counsel.

23         All right.  You may continue with your direct.

24         MR. RASHBAUM:  Thank you, Your Honor.

25         So at this time I'd like to move in Defense Exhibits 81

1  and 129.

2           MR. JUENGER:  No objection, Your Honor.

3           THE COURT:  They will be admitted.

4      (Defendant's Exhibit Numbers 81 and 129 was received in

5  evidence.)

6  BY MR. RASHBAUM:

7  Q.  So let's take a look at Defense Exhibit 81 first, and it's

8  an email between you and an individual named Alec Vancil.  Do

9  you see that?

10 A.  Yes, I do.

11 Q.  Who is Alec Vancil?

12 A.  He was a sales representative for MGTEN Marketing.

13 Q.  And Mr. Vancil says, "Hey, Monty, it's Alec again.  So I've

14     been getting a lot criticism lately based off the legal

15     aspect of this whole thing.  The whole thing is 100 percent

16     legal in every possible way, right, no fraud or nothing of

17     that sort?  I just want to clear it up, so I can get all my

18     prospects to relax."  And you respond, "Everything I do is

19     completely legal."

20           This is in January of 2015, correct?

21 A.  That's correct.

22 Q.  "I don't know what you are doing or how you are presenting

23     it.  These medications are for people who have pains, scars,

24     and desire to take a metabolic vitamin."

25           Do you see that?

1    A.   I do.

2    Q.   And then Mr. Vancil says, "I am presenting it as good as I

3         can.  It's just people are skeptical and stubborn.  It's

4         their loss then, I guess."  And you respond, "Well, you

5         can't force someone to have pain or scars.  They can either

6         benefit or not."

7             What do you mean when you're saying this?

8    A.   What I'm saying to him is really there is no pitch.  He's

9    talking about how he's presenting it to people and there is

10   really not much to present.  You either have a need for your

11   pain, you have a need for your scars, and a desire to take a

12   multilevel vitamin, and that's what it all boils down to.  There

13   is no sales pitch.  It's whether you need it or you don't need

14   it.

15   Q.   And showing you Defendant's Exhibit 129.  Do you have that

16   exhibit in front of you?

17   A.   Yes, I do.

18   Q.   Can you take a look at this document and tell the jury

19   what's happening here?

20   A.   Yes.  So basically this document -- normally, we have an

21   intake form that the representatives would fill out that I

22   provided to them, that would provide me with all the information

23   that needed to be uploaded to the doctor network, the

24   telemedicine network.  And on this one the representative,

25   instead of using that form, he actually emailed me the

1    information, and it was not clear exactly where the pain was

2    locate, where, you know, scar was and things like that.

3              So I needed to reach back out to him and, you know, ask

4    him exactly, you know, what -- you know, where the pain and scar

5    is for the patient, so I could submit it to the doctor.

6    Q.   Do you recall Ms. Lay testifying in this case, Ginger Lay?

7    A.   I do.

8    Q.   Why didn't you just do what she said you guys talked about,

9    which was just fill in where the pain was and scar, just make it

10   up?  Why didn't you do that?

11   A.   Because that's not what I did.  If that's what she did, then

12   maybe she did, but that's not what I did.

13   Q.   What would you do if a form didn't indicate where a scar was

14   or where the pain was?  What would be your approach?

15   A.   I would reach out to the sales representative or their

16   manager and ask them for clear direction of what they meant by

17   whatever was written down to clarify before I would present it

18   to the physician network.

19   Q.   And why would you do that?

20   A.   Because I wanted to make sure all the information was

21   accurate.

22   Q.   Now, you may recall yesterday, a woman named Josie Brundige

23   testified.

24   A.   Yes, I do.

25   Q.   And she had a form where she said that she wanted scar cream

1  even though she didn't have scars.  Do you recall that?

2  A.  I do.

3  Q.  Now, do you remember that and what happened when she

4  received that form?

5  A.  Yes, I remember receiving the form and reading it and it

6  clearly didn't make any sense to me.  So I reached out to a man

7  by the name of Ryan Long, who was the manager for Sven Bjerke,

8  and I told Ryan that I had received this form and that it would

9  not be submitted because it didn't make any sense.  He told me

10  that he would reach out to Mr. Bjerke and ask him exactly what

11  the situation was.  And after, I believe he consulted with

12  Mr. Bjerke, he recontacted me and told me that the patient had a

13  scar on her knee.

14  Q.  So in that situation, you did exactly what you did with

15  Mr. -- in this situation, Defendant's Exhibit 129, you followed

16  up with the individual?

17  A.  Yes, I did.

18        MR. RASHBAUM:  I'd like to admit into evidence

19  Defendant's Exhibit 67.

20        THE COURT:  Any objection?

21        MR. JUENGER:  No objection, Your Honor.

22        THE COURT:  It will be admitted.

23        MR. RASHBAUM:  131.

24        MR. JUENGER:  No objection.

25        THE COURT:  It will be admitted.

1          MR. RASHBAUM:  And 190.

2          MR. JUENGER:  And no objection.

3          THE COURT:  What is 190?  Composite exhibit, what is

4     that?

5          MR. RASHBAUM:  It's pages from the telemedicine portal.

6          THE COURT:  How many pages?

7          MR. RASHBAUM:  36 pages, Your Honor.

8          THE COURT:  All right.  It will be admitted under a

9     Composite Exhibit Number 190.

10         (Defendant's Exhibit Numbers 67, 131, 190 were received in

11    evidence.)

12    BY MR. RASHBAUM:

13    Q.  Starting with Defense Exhibit 5, which is in evidence,

14    what's happening in this text message between you and

15    Ms. Halliburton?

16    A.  Robin Halliburton is contacting me to tell me that one of

17    the patients that was submitted to the doctor network and got

18    denied a prescription, she wanted to know if he could get

19    resubmitted to the doctor network to see if another doctor would

20    consult with him.

21    Q.  When you say doctor network, what are you referring to?

22    A.  The telemedicine network.  And I told her that I didn't

23    think that he would get resubmitted.

24    Q.  Showing you Defendant's Exhibit 67, an email between you and

25    Mary Jo Giles on February 11, 2015.  Who is a Mary Jo Giles?

1   A.   She is a pharmacist at Patient Care America.

2   Q.   And what is Mary Jo Giles telling you in this email?

3   A.   She is telling me that there's a patient -- these two

4   patients that I guess didn't have any more refills, so they

5   reached out to the doctor directly to see if the doctor would

6   write a prescription and provide refills, and the doctor denied

7   that request and said that they would basically need to speak to

8   the patients again before doing so.

9   Q.   So in this case, did the doctors grant the refills or not

10  grant the refills?

11  A.   They did not.

12  Q.   Showing you Defendant's Exhibit 131.  Why was this patient

13  denied medication by the doctors?

14  A.   I believe this patient was pregnant so the doctors denied

15  it, and then I think there was an issue about whether she was

16  nursing.  I said, you know, if she had the baby already, if she

17  was nursing, then you couldn't do that.  And he said that she

18  was not nursing and that she was only doing formula.  So I said,

19  in that case, then I could resubmit her, but she would need to

20  talk to the doctor and let the doctor know that she was not

21  nursing at that time.

22  Q.   Showing you Defendant's Exhibit 190.  Can you tell the jury

23  what this is?

24  A.   This is actually a screenshot of the portal that the

25  telemedicine company, 1st Care MD, provided to me.  The intake

1    forms for the physicians would be uploaded into this portal and

2    this would actually show that the patient was, you know,

3    accepted into the portal properly and that they received it and

4    then on the status it would show me the status of whether a

5    prescription was written, if it said script, canceled, denied or

6    refused.

7    Q.   And if you could just look at this screen it will be easier.

8    I just pulled a page.  What did it mean if it was canceled?

9    A.   Canceled meant that the physician had tried multiple times

10   to reach the patient but was unable to.

11   Q.   What did it mean if it says script?

12   A.   It means that the physician provided a consult with the

13   patient and wrote a prescription and sent it to the pharmacy.

14   Q.   What did it mean if it was refused?

15   A.   Refused means that they talked to the patient and the

16   patient, after consulting with the physician, decided that they

17   did not want the product.

18   Q.   And what did it mean if it was denied?

19   A.   That would mean that the doctor spoke to the patient,

20   provided the consult, and decided that the patient was not a

21   candidate for the medication and denied it.

22   Q.   And if the prescription was denied, did you still have to

23   pay that consult fee?

24   A.   Yes, I did.

25   Q.   If it was refused, did you have to pay that consult fee?

1    A.   Absolutely.

2    Q.   What about if there was a script given, did you have to pay

3    a consult fee?

4    A.   I did pay it.

5    Q.   And what about if it was cancelled?

6    A.   There was no payment necessary.

7    Q.   And that's because why?

8    A.   Because a consult never took place.

9    Q.   Now, you would agree -- I'll take that back.

10        THE COURT:  Good.  Who, what, when, where, why, those

11   are the questions.

12   BY MR. RASHBAUM:

13   Q.   What was the most common determination by the telemedicine

14   companies?

15   A.   Scripts.

16   Q.   And why was that?

17   A.   Because the patients that were being submitted needed the

18   medication.

19        MR. RASHBAUM:  I would like to move into evidence

20   Defendant's Exhibit 11 and Defendant's Exhibit 127.

21        THE COURT:  I assume no objection to 11, so it will be

22   admitted.  127, any objection to that one?  It will also be

23   admitted.

24        MR. JUENGER:  No objection, Your Honor.

25        (Defendant's Exhibit Numbers 11, 127 were received in

1  evidence.)

2  BY MR. RASHBAUM:

3  Q.  Showing you Defendant's Exhibit 11.  What's going on in this

4  email?

5  A.  This is a patient, Michael Dimmick, who had contacted me,

6  reached out and said that he wanted to cancel his wound cream,

7  that he didn't need it anymore.  So I sent a request in the

8  previous month to the pharmacy advising them to cancel the

9  prescription but, unfortunately, the next month it arrived again

10 and he let me know again that the prescription arrived, and so I

11 was contacting the pharmacy to let them know they needed to

12 cancel it right away.

13 Q.  Now, if the prescription gets canceled, you make less money,

14 right?

15 A.  Yeah, I don't make any money.

16 Q.  So why would you be telling the pharmacy to cancel this

17 man's prescription?

18 A.  Because he didn't need it.

19 Q.  Defendant's Exhibit 122, what's going on here?

20 A.  These were patients that were submitted to the telemedicine

21 network and I believe they had been sitting there for a couple

22 of days and they notified me later on, I believe the

23 representative notified me that they did not want the

24 medications any longer, and so I reached out to the telemedicine

25 network to let them know to cancel the patients.

1   Q.   Why not just let the telemedicine network write the

2   prescription, send it to the pharmacy so everyone could make

3   their commissions?

4   A.   Because that's not what we did.   That wasn't what our

5   company did.

6   Q.   Showing you Defense Exhibit 127, what's going on here?

7   A.   This is Mary Jo Giles, the pharmacist from Patient Care

8   America, reaching out to me to let me know that a patient, Sara

9   Meyer, no longer wants refills and does not want the

10  prescription filled any longer, and I let her know, okay, thank

11  you.

12  Q.   Did you fight her on this or what happened after this?

13  A.   No, of course not.   Nothing happened.   They just didn't send

14  her any medications anymore.

15  Q.   Now, you have heard testimony in this case about you forcing

16  sales reps to get all three medications from their patients.   Do

17  you recall that?

18  A.   I do.

19  Q.   Tell the jury, did you ever do that?   And give them a little

20  insight into that.

21  A.   Absolutely not.   The representatives that spoke to patients

22  were to specifically ask them if they had any need for a pain

23  medication, a scar medication, or metabolic vitamins.   It was

24  never all three, it was for whatever the patient had a need for.

25  If they needed a pain cream, then they would let us know where

 1   their pain was located so the physician could talk to them.  If

 2   they didn't need it, it would be blank.  If they needed a scar

 3   cream, they would tell us where the location of the scar was and

 4   how they received the scar.

 5        If they wanted the metabolic vitamin, on the bottom of

 6   the form it was marked yes or no, and they distinctly had a

 7   choice of choosing whether they wanted it or they did not want

 8   it.

 9        MR. RASHBAUM:  I move in Defense Exhibit 85 if I

10   haven't done so already.

11        MR. JUENGER:  No objection, Your Honor.

12        THE COURT:  It will be admitted.

13   (Defendant's Exhibit Number 85 was received in evidence.)

14   BY MR. RASHBAUM:

15   Q.  So in this email between you and Mary Jo Giles, Mary Jo

16       Giles writes, "Jacob Sackman called today and asked for us

17       to only fill the scar cream, he did not want the pain cream,

18       and I reversed the claim."  You said, "Okay, thanks."

19        What happened here?

20   A.  So the patient, when they received the cream, decided that

21   they did not want the pain cream, only wanted the scar cream,

22   but I believe it had already been sent out.

23        So they went ahead and they reversed the claim, did a

24   charge-back and basically they said that they had already paid

25   me a commission on it, but they were going to reverse it and

1  basically let me know that they were going to take it out of my

2  next commission check.

3  Q.  Why not just send the creams to the person and get paid?

4  A.  It's not what we did.  That wasn't what our program was

5  about.

6  Q.  I want to talk to you a little bit about PCA.  I think the

7  Government suggested that you weren't telling PCA everything

8  about your program.  Is that true?

9  A.  That's not true.

10  Q.  What did PCA know about your program?

11  A.  PCA basically knew everything.  They knew that I was

12  marketing to Tricare patients, that I had sales reps that were

13  across the country.  PCA was located in 50 states.  I let them

14  know that some of the actual patients that came on board later

15  on wanted to become representatives and they were marketing the

16  products as well.  They knew that I was using telemedicine to

17  consult with these patients.  They knew my whole program.

18  Q.  Now, before getting involved with PCA and while working with

19  them, what did you think about the pharmacy?

20  A.  I thought they were great.  They really seemed to be on top

21  of things.  They always looked out for different things that

22  might be going wrong.

23       I remember there were a couple of occasions where, you

24  know, things weren't filled out properly maybe.  There was a

25  situation, I believe, where some of the physicians were using

1   kind of like a stamp for signatures rather than writing their

2   own signature by hand.  And for instance, Mary Jo Giles reached

3   out to me and said, you know, we can't have that, we need a

4   physician's signature.  So I would have to send the scripts back

5   out to the telemedicine network and request, you know, a proper

6   signature.

7           There was a situation we talked about with the efax

8   where they came to me and they said, listen, you know, we need

9   to provide you with an efax number that comes directly to the

10  pharmacy.

11          So there were different issues that came up, and they

12  were constantly correcting them if something like that happened.

13  Q.  Were they a big company or a small company, and where did

14  they operate?

15  A.  They were in South Florida and they were into many things.

16  They were a large company.  You know, they were in the

17  compounding business.  They were also into like renal and

18  diabetic supplies.

19          So they kind of had two different businesses and really

20  had grown fast.

21  Q.  Were they constantly on your back about compliance or

22  completely ignoring compliance issues?

23  A.  They were on me about it as things came up.  I mean, it

24  wasn't like there was a compliance thing every day, but if

25  something did happen, they were there to let me know and help me

1    find a resolution.

2              MR. RASHBAUM:  I'd like to move into evidence

3    Defendant's Exhibit 62.

4              MR. JUENGER:  No objection to 62, Your Honor.

5              THE COURT:  It will be admitted.

6              MR. RASHBAUM:  53, Defendant's Exhibit 53.

7              THE COURT:  It's already been admitted.

8              MR. RASHBAUM:  Okay.  Defendant's Exhibit 54.

9              THE COURT:  It will be admitted.

10             MR. JUENGER:  No objection.

11             MR. RASHBAUM:  Defendant's Exhibit 63.

12             THE COURT:  It will be admitted.

13             MR. RASHBAUM:  Defendant's Exhibit 139.

14             MR. JUENGER:  No objection.

15             THE COURT:  It will be admitted.

16             MR. RASHBAUM:  Defendant's Exhibit 140.

17             MR. JUENGER:  No objection.

18             THE COURT:  It will be admitted.

19             MR. RASHBAUM:  And Defendant's Exhibit 39.

20             MR. JUENGER:  No objection.

21             THE COURT:  39 will be admitted.

22        (Defendant's Exhibit Numbers 39, 54, 62, 63, 139, 140 were

23    received in evidence.)

24    BY MR. RASHBAUM:

25    Q.  Showing you Defendant's Exhibit 62, January of 2015, what is

1   this document?

2   A.  I don't know that I have that.  I don't remember that.  I

3   have a stack here but --

4          THE COURT:  I'm sorry, I can't hear what you all are

5   saying.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  I have to hear everything.  Everything I've

8   got to hear.

9          MR. RASHBAUM:  Let's just look on the screen.

10         THE COURT:  I'm sorry.  What did you say?  I didn't

11  hear it.

12         THE WITNESS:  I said I don't believe I have that

13  document.

14         THE COURT:  Okay.

15  BY MR. RASHBAUM:

16  Q.  Just look on the screen.  Who is Matt Smith?

17  A.  He was the vice-president of the pharmacy, ran the daily

18  operations there, the person that I dealt with on a daily basis.

19  Q.  And it says:  Attachment, Patient First HIPAA.pdf?

20  A.  Yes, that's correct.

21  Q.  And a document is attached.  Do you see that?

22  A.  Yes, I do.

23  Q.  Do you know what this document is about?

24  A.  It was basically me signing off on a HIPAA form.

25  Q.  Showing you Defendant's Exhibit 53 in evidence, do you have

1   that one?

2   A.   53?  Yes, I do.

3   Q.   What is this?  What is this about?  Let me ask you this:  Do

4   you know who Alisa Catoggio is?

5   A.   Yes, she worked at the pharmacy.

6   Q.   And do you know who Armando Lozada is?  He's the gentleman

7   that testified yesterday, I believe, right?

8   A.   Yes, I agree.

9   Q.   And what is Armando saying to Alisa here?

10  A.   He's basically saying that they received a prescription from

11  Monty, but really I guess it was from my group, for this

12  patient, Carley DiFranco, and the RX image was really small.

13  They couldn't make out who the physician is, the physician info,

14  and they wanted a new prescription so it was more clear and they

15  could see everything properly.

16  Q.   And Alisa is sending this to you why?

17  A.   So I could send it back to the telemedicine company, they

18  could talk to the doctor and have him comply with the proper

19  prescription.

20         MR. RASHBAUM:  Judge, I am going to withdraw

21  Defendant's Exhibit 54.

22         THE COURT:  You're going to withdraw?

23         MR. RASHBAUM:  Yeah, just to move things along.

24         THE COURT:  What say the Government?

25         MR. JUENGER:  He can withdraw it, Your Honor.

1          THE COURT:  Okay.

2      (Defendant's Exhibit Number 54 withdrawn.)

3   BY MR. RASHBAUM:

4   Q.  Showing you Defendant's Exhibit 63.  What's going on here?

5   A.  Ms. Catoggio is reaching out to me to let me know that this

6   patient's prescription was not signed and the date was not valid

7   and that it would need to be resubmitted properly.

8   Q.  We're going to talk a little bit more about fax lines in a

9   little bit, but what's happening here in this email between you

10  and Matt Smith on October 2014?

11  A.  He is telling me that I needed to remove my fax information

12  on the top of the page and that the only thing they could have

13  is the MD's fax information or nothing at all.

14  Q.  Is he talking about this right here?

15  A.  That's correct.

16  Q.  Did you end up removing your fax number on the top of the

17  page?

18  A.  I did.

19  Q.  And remind the jury again, when you started this program,

20  how did the prescriptions work?  How did it get from the doctor

21  to the pharmacy in the beginning?

22  A.  What would happen is the physician would write the

23  prescription, it would be efaxed over to my fax, and then I

24  would forward it to the pharmacy.

25  Q.  Showing you Defendant's Exhibit 140.  You say, "Matt, how do

1      you track my scripts that are faxed in and assign them to

2      me?"  And he says, "Place MG in the white box, top right."

3            Do you see that?

4  A.  I do.

5  Q.  What are you discussing and what is Matt telling you here?

6  A.  So basically, this is when I was first starting with the

7  company and I'm trying to figure out how they know it's a

8  prescription from one of my physicians or telemedicine networks

9  and how they would know that it would be credited to the proper

10 person and he told me to place my initials in the white box in

11 the upper right-hand corner.

12 Q.  And again, is this at the beginning of your program or

13 toward of the end of your program when this process was

14 occurring?

15 A.  This is at the beginning.

16 Q.  Now, I think you talked about it a little bit earlier, the

17 stamped scripts.  Do you recall that?

18 A.  Yes, I do.

19            MR. RASHBAUM:  At this time, Your Honor, I would move

20 in Defendant's Exhibit 64.

21            MR. JUENGER:  No objection.

22            THE COURT:  It will be admitted.

23            MR. RASHBAUM:  65.

24            MR. JUENGER:  No objection.

25            THE COURT:  It will be admitted.

1          MR. RASHBAUM:  And Defendant's Exhibit 35.

2          MR. JUENGER:  No objection.

3          THE COURT:  It will be admitted.

4     (Defendant's Exhibit Numbers 35, 64, 65 were received in

5   evidence.)

6   BY MR. RASHBAUM:

7   Q.  Showing you Defendant's Exhibit 64, which is an email on

8   February 2, 2015 from Matt Smith.  What does Matt Smith say to

9   you in this email?

10  A.  He's saying that he's concerned that he's seen apparent

11  stamping of a doctor's signature and he's telling me that it's

12  not allowed by Florida law.

13  Q.  When you say stamping, what does that mean?

14  A.  Basically, in this particular situation this physician was

15  using like a stamp with his name and he would just, I guess,

16  press it down.

17  Q.  And remind the jury who -- this is Defendant's Exhibit 65.

18  Remind the jury who Christopher O'Hara is again.

19  A.  He is one of the owners of the telemedicine network.

20  Q.  And he says, "You don't like this date or sig?"

21          What did you think sig -- what did you take "sig" to

22  mean?

23  A.  The signature.

24  Q.  And what is your response?

25  A.  I told him that the pharmacy says it's unacceptable.

1    Q.   And what's 1st Care MD again?

2    A.   They are a telemedicine network.

3    Q.   And Defendant's Exhibit 35, what are you telling Wayne here?

4    A.   I'm telling him that the pharmacy is letting me know that

5    certain prescriptions didn't have a valid signature, and I'm

6    asking him if he could get them properly signed and re-sent

7    over.  And he responds to me asking me, you know, what a valid

8    signature is.

9    Q.   After Matt Smith at PCA told you that they could no longer

10   have stamped signatures, in essence what did you do?

11   A.   I went to the telemedicine network and told them that we

12   couldn't have them and that they needed to change.

13   Q.   And what happened then?

14   A.   They changed.

15   Q.   Now, going back to the fax issue, when you started your

16   program, you testified that the faxes would go from the telemed

17   company to you and then you would send them to PCA.  Is that a

18   fair characterization of your testimony?

19   A.   Yes, that's correct.

20   Q.   Did there come a time when that changed?

21   A.   Yes.  The pharmacy approached me and they said that they

22   would -- for regulatory purposes that they needed the

23   prescriptions to come straight from the physician's office to

24   their office, so they said they wanted to provide me with an

25   efax number that was tied into the pharmacy.  That way, when

1  they receive it, I would get an email alert, but it was actually

2  going directly to the pharmacy.  I had no access to it.

3          MR. RASHBAUM:  Judge, may I have one moment?

4          THE COURT:  Sure.

5  BY MR. RASHBAUM:

6  Q.  And so when they told you of that concern, what happened?

7  A.  They provided with a new efax number and I applied that to

8  the prescriptions, so I was following their procedure.

9  Q.  We're going to break that down, but let's look at some

10 contemporaneous documents first.

11         MR. RASHBAUM:  Judge, I'd like to move in Defendant's

12 Exhibit 30.

13         THE COURT:  Already in.

14         MR. RASHBAUM:  Okay.  Defendant's Exhibit 50.

15         THE COURT:  Any objection?

16         MR. JUENGER:  No objection.

17         THE COURT:  In.

18         MR. RASHBAUM:  Defendant's Exhibit 55.

19         MR. JUENGER:  No objection.

20         THE COURT:  In.

21         MR. RASHBAUM:  Sorry, I didn't hear you.  I'm sorry,

22 Your Honor.

23         THE COURT:  In.

24         MR. RASHBAUM:  Defendant's Exhibit 68.

25         MR. JUENGER:  No objection.

 1              THE COURT:  In.

 2              MR. RASHBAUM:  And Defendant's Exhibit 123.

 3              THE COURT:  In.

 4        (Defendant's Exhibit Numbers 50, 55, 68, 123 were received

 5   in evidence.)

 6   BY MR. RASHBAUM:

 7   Q.   So starting with Defendant's Exhibit 30, who is Matt?

 8   A.   He's the vice president of the pharmacy.

 9   Q.   He says, "Your scripts cannot keep coming over with that 855

10        fax number attached on the template."

11              What is the 855 fax number?

12   A.   That's my efax number.

13   Q.   And what is your response to him?

14   A.   "When do you think you can get me the new script pad with

15        the fax number?  I have a bunch to send out."

16              So basically, I wanted to get a new script with the new

17   fax number that they wanted to be, you know, compliant with, and

18   get those before I could send any more uploads to the

19   telemedicine network.

20   Q.   Once you got that efax line, how did the process change from

21   before?  How did the prescriptions get from the telemed company

22   to the pharmacy?

23   A.   They just went directly from the telemed company to the

24   pharmacy through that efax line.

25   Q.   Did they go anywhere else when they hit the pharmacy?

1  A.  No.

2  Q.  Did you see the faxes as well?

3  A.  I did get an alert by email.

4  Q.  And what was the purpose of that alert?

5  A.  So I could track the patients that were being be sent over

6  and I would know that they had received them.

7  Q.  Now, showing you Defendant's Exhibit 50, Matt Smith says,

8      "This is your new efax number.  It points to you and the

9      people below also receive a copy.  Will G. Lay use the same

10     number?"  And you respond, "Okay, great.  Can you get a

11     separate one for Ginger?"

12          What are you saying here?

13 A.  I am telling him that I have my number and that I'm going to

14 start using it, but I wanted Ginger to have her own number

15 because our prescriptions were not tied together.

16 Q.  And did Ginger Lay ultimately get a different efax number?

17 A.  Yes, she did.

18          MR. RASHBAUM:  I would like to admit Defendant's

19 Exhibit 66.

20          MR. JUENGER:  No objection.

21          THE COURT:  In.

22          MR. RASHBAUM:  And 82.

23          MR. JUENGER:  No objection.

24          THE COURT:  In.  Well, 66 was already in.  And you said

25 82?

1        MR. RASHBAUM:  Yes, Your Honor.

2        THE COURT:  82 is already in.  Do you all keep track of

3  this like I do?  You should.

4        MR. RASHBAUM:  Apologies, Your Honor.

5        THE COURT:  No big deal.

6  BY MR. RASHBAUM:

7  Q.  So Defendant's 66, what would the pharmacy do when they got

8  prescriptions from the telemedicine company?

9  A.  They would make contact with all of the patients so they

10  could talk to the patients and explain to them how to use the

11  medications and verify that the patients wanted and needed the

12  medications before they sent it out to them.

13        THE COURT:  How do you know that?

14        THE WITNESS:  Because the pharmacy told me that was

15  their procedure.

16        THE COURT:  Who told you?  Does the pharmacy --

17        THE WITNESS:  Matthew Smith.

18        THE COURT:  Okay.

19  BY MR. RASHBAUM:

20  Q.  And what is this document showing you when the pharmacy

21  couldn't get in touch with the patient?

22  A.  It shows me -- they sent it to me and they said we're not

23  able to make contact with these patients and that they're going

24  to get reversed.  They sent me a list of Ginger Lay's patients

25  for me to provide to her, and then they had my patients as well.

1  Q.  So if the pharmacy couldn't get in touch with the patients

2  and the medicines were reversed, what happened to everyone's

3  commissions?

4  A.  You wouldn't receive anything.

5  Q.  For the last 10 minutes or so we've gone through PCA

6  changing, informing you you've got to fix the signatures of the

7  doctors.

8          THE COURT:  Oh, you're making closing argument?

9          MR. RASHBAUM:  No, I'm --

10         THE COURT:  Just ask a question.

11         MR. RASHBAUM:  Fine.

12 BY MR. RASHBAUM:

13 Q.  These compliance issues that PCA kept on bringing to your

14 attention, what did that make you feel about the pharmacy you

15 were working with?

16 A.  It made me feel that they were doing everything possible to

17 be compliant with the laws.

18 Q.  Mr. Grow, when you opened up this company and throughout the

19 process of getting this company, did you ever hire a lawyer for

20 advice?

21 A.  No, I did not.

22 Q.  Why not?

23 A.  Every company that I was working with all had lawyers.  From

24 the time I started with InforMD Solutions, they had lawyers.  We

25 couldn't even take meetings sometimes with outside people

1    without getting their lawyers' approval to even meet with that

2    company.

3         When I started with PCA, from the time I signed my

4    first agreement with them, they told me that the agreement was

5    written by their attorney, so I knew it was legal.  Every time I

6    turned around and there was anything questioned by the pharmacy

7    that came up, they would always, you know, reach out to me and,

8    you know, tell me that something might not be correct and we

9    needed to correct it.

10        So I was pretty sure that they were doing everything by

11   the law, and it wasn't necessary for me to hire an attorney.

12   Q.  Now, you've heard some testimony in this case about copays.

13   Do you recall that?

14   A.  I do.

15   Q.  And individuals have testified that you told your marketers

16   in some circumstances that they could pay copays for patients.

17   Do you recall that?

18   A.  I do.

19   Q.  Tell the jury what you can about this copay issue.

20   A.  So when I was with InforMD Solutions, the pharmacy that they

21   were tied in with didn't require the patients to pay copays, and

22   then when I started with Patient Care America and I met with

23   Matt Smith, he talked to me about copays and he said that they

24   actually would prefer that the copays get paid.  However, if the

25   patient couldn't pay it, that they were not going to send a

1    veteran to collections over a small copay and that they also had

2    a program that was approved by their attorneys in which the

3    representatives could pay copays on behalf of the beneficiaries

4    if they had chose to.

5    Q.   Now, did you have a program -- did you have a conversation

6    with marketers; and if so, how often, about this copay issue?

7    A.   No, there was no conversation.  From time to time it would

8    come up from the pharmacy.  They would alert me if a patient was

9    having issues with their copay or whatnot, and they would reach

10   out to me and ask me if either myself or the representative for

11   that patient wanted to take care of it.

12   Q.   And so in those circumstances, what would you tell the

13   marketer who was a 1099 employee of MGTEN?

14   A.   I would tell them the policy of the pharmacy, that they

15   would not be sent to collections, but they could pay it on

16   behalf of the patient if they chose to.

17   Q.   Did you ever pay anyone's copays?

18   A.   I did not.  I was asked to, I believe, on one or two

19   occasions, but I never actually did do it.

20   Q.   And who were you asked to pay -- who asked you to pay

21   copays?

22   A.   I believe it was Mary Joe Giles who is a pharmacist at the

23   pharmacy.

24   BY MR. RASHBAUM:

25   Q.   Showing you Defense Exhibit --

1        MR. RASHBAUM:  I'm sorry.  I'd like to admit

2  Government's Exhibit 84.

3        THE COURT:  Government's Exhibit?

4        MR. RASHBAUM:  Yes.

5        THE COURT:  I assume there's no objection.

6        MR. JUENGER:  No objection.

7        THE COURT:  Okay.  84.

8     (Government's Exhibit Number 84 was received in evidence.)

9  BY MR. RASHBAUM:

10 Q.  And turning your attention to the second page, Bates number

11 MG 120549, on February 10, 2015.

12        Mary Jo Giles says, "Monty, did you send in the copay

13     for Britney Watson of $51?"

14        Do you see that?

15 A.  I do.

16 Q.  Do you recall this; and if so, what is Mary Jo asking you

17 about here?

18 A.  She's asking me if I was going to pay the copay for Britney

19 Watson and telling me that it should paid in the form of a

20 cashier's check.  I believe she had ask me this the previous

21 month and I never paid it and so she was asking me again.

22 Q.  The fact that the pharmacy was asking you whether you wanted

23 to pay someone's copays, how did that affect your decision

24 whether that was okay or not?

25 A.  I felt it was fine.  It was their business practice, that's

1   what they chose to do.

2   Q.   But having said that, how many times did you actually pay

3   anyone's copays?

4   A.   I never paid a copay.

5   Q.   How many times did you tell your marketers go out there and

6   market and tell people you don't have to pay your copays?

7   A.   I never told them that.   The issue only came up on a few

8   occasions when the pharmacy notified me.   It really was a

9   nonissue.   I mean, a lot of these patients were active military

10  and their copay was zero dollars.   They didn't even have one, so

11  it really wasn't an issue.

12  Q.   Now, you've heard a lot of testimony in this case about how

13  expensive these medications are.   Let me ask you a question.   If

14  you had to come out of pocket for these medications, would you

15  buy them?

16  A.   It all depends how bad I needed them, but yes, they were

17  expensive, there's no doubt about it, but the way that I looked

18  at it was, really in 2014, Express Scripts, who's the pharmacy

19  benefit manager for Tricare, they came out and they basically

20  said that they were not going to cover compounded medications

21  any longer for the insurance companies that they represented,

22  but they gave those insurance companies the opportunity to say,

23  no, we still want to cover them.

24          And really pretty much everyone out there said, great.

25  You know, the insurance companies are like great, we don't have

1    to pay for these anymore, we're not going to do it because they

2    wanted to save money, but Tricare elected to keep, you know,

3    paying for them.  They thought they were necessary.  So I didn't

4    see anything wrong with that.

5    Q.  Is it true to say that you told your marketers to target

6    Tricare recipients?

7              MR. JUENGER:  Objection, leading, Your Honor.

8              THE COURT:  Sustained.

9    BY MR. RASHBAUM:

10   Q.  Okay.  The Government has alleged that you targeted Tricare

11   people.  What would you say regarding that allegation?

12   A.  I would say we absolutely did.  They were really the only

13   people that were covered by insurance that was still paying for

14   it.  It might have been very sparse for another insurance

15   company to cover any type of compound, in my experience, for any

16   other insurance company, so Tricare was really the only patients

17   out there that could benefit from these medications.

18   Q.  Now, going back to the cost of the medications, what was

19   your role in controlling or effecting the cost of these

20   medications?

21   A.  I had no control over the cost of the meds.  This was all

22   something that is negotiated between Tricare and the

23   manufacturers of, I guess, the ingredients.

24   Q.  And going back to an email that is in evidence, Defendant's

25   Exhibit 33, this is an email between you and Jill Cichowicz,

1  what did you say to Ms. Cichowicz on April 28, 2015 in realtime?

2  A.  She was asking me about vitamins.  There was a change of

3  formulary, and she was asking if they could be made so they

4  would be less expensive.  And I just told her no, that we don't

5  have any control over the cost, that the pharmacy has specific

6  formulas that benefit the patient and they get reimbursed

7  whatever the insurance carriers agree to pay.  So just

8  basically, that we have no control over cost.

9  Q.  Now, we've heard some testimony in this case regarding p-01

10  versus p-02, sc-01 versus sc-02 and sc-03, and the allegation

11  that you told your marketers they always had to do p-01 or sc-01

12  because that got the highest reimbursement.  Do you recall that

13  testimony?

14  A.  I do.

15  Q.  Can you explain for the jury this issue and what really

16  happened?

17  A.  Yeah, that was not the case at all.  The p-01 was a

18  prescription that helped for pain and that's what we were

19  marketing.

20         THE COURT:  The system is down.  There's a conspiracy

21  at 4:00 which is not accepted by the Court.

22         MR. RASHBAUM:  Government shutdown.

23         THE COURT:  It's the whole system.  We will get someone

24  up here.  Speak real loud.  I can hear you fine.

25         Mr. Grow, make sure you speak real loudly, and if any

1  of the jury cannot hear, raise your hand, and you too, Gilda.

2  So real loud.

3  BY MR. RASHBAUM:

4  Q.  So just tell the jury what really occurred regarding this

5  p-01, p-02, sc-01, sc-02, sc-03.

6  A.  So the p-01 was for pain.  If the patient had pain, then

7  they would market the p-01.  When it came to a scar, we used the

8  sc-01, and that was the cream, and I was told by the pharmacy

9  when we first started that the sc-02, sc-03 were gels and they

10  were no longer going to be utilized.  So, really, that was the

11  only option to use, was the p-01 and the sc-01.

12  Q.  So what was p-02 by the way?  Do you remember?

13  A.  Yes, I believe that was for neuropathy, and we didn't market

14  to patients with neuropathy.

15  Q.  So p-02 wasn't even part of your program, right?

16  A.  No, it was not.

17  Q.  Do you have any idea whether p-02 reimburses at a lower rate

18  than p-01?

19  A.  I have no idea.

20  Q.  And for sc-02 and sc-03 -- you were working exclusively for

21  PCA or were you working with other pharmacies for marketing?

22  A.  I was just with PCA.

23  Q.  Now, I think we also heard some testimony regarding a change

24  in the Wellness vitamin, a change to Wellness T?  Do you

25  remember that?

1  A.  I do.

2  Q.  And what can you tell the jury with regard to this change?

3  A.  So, basically, it was I believe in the spring, maybe March

4  of 2015, that I was notified by the pharmacy that the Wellness

5  capsules were going to be having a change in formulary.  There

6  was a product ingredient inside that was going to change.  I

7  believe that Resveratrol.  It was no longer going to be

8  compounded the same way and that they were issuing a new formula

9  and they were going to put that on a new prescription pad and

10  that all my patients that were currently getting that product in

11  the old formula would have to be issued new prescriptions.

12          MR. RASHBAUM:  I would like to move in Defendant's

13  Exhibit 113.

14          THE COURT:  It's not working.  Didn't you hear

15  everything is off?

16          MR. RASHBAUM:  I thought it was just the sound.

17          THE COURT:  But you can do it the old-fashion way.  You

18  know, we used to try cases before we had ELMOs.  You're probably

19  not old enough to remember that, but I tried hundreds of cases.

20          MR. JUENGER:  No objection.

21          THE COURT:  Show him the exhibit, tell me the number,

22  and then if you want the jury to see it, you go over there and

23  you give it to the court security officer.  We'll do it that

24  way.

25          Which number are we talking about now?

1          MR. RASHBAUM:  I tell you what, Your Honor.  What I'm

2    going to do, I'm going to shift around a little bit and try to

3    do some of the examination if I can.

4          THE COURT:  That don't include exhibits?

5          MR. RASHBAUM:  If I can, Your Honor.

6          THE COURT:  Excellent.  I think that's good.

7          MR. RASHBAUM:  If I can just have one moment to try to

8    regroup, if I can.  Let me see.

9          THE COURT:  Okay.  Is everybody okay?  Does anybody

10   need a bathroom break?  Mr. Jones, are you okay?  Need a break?

11         JUROR J. JONES:  No, okay.

12         THE COURT:  Okay.  See, they know what happens when I

13   give you a break.  I go back into the office and I don't come

14   back for an hour.  The phone rings.  They know.  They know.  I

15   stay here.  When you all take a break, I stay here so they will

16   leave me alone in there.

17         MR. RASHBAUM:  Let's try it this way.

18         THE COURT:  Well, you should probably use the lectern.

19   Well, it doesn't have a microphone.  Doesn't matter.

20         They're coming.

21         MR. RASHBAUM:  I just want to get organized here.

22         THE COURT:  Okay.  Is someone coming up, Mrs. Christie?

23         THE COURTROOM DEPUTY:  Yes, they'll be here in a

24   moment, hopefully.

25   BY MR. RASHBAUM:

Jury Trial

1  Q.  Do you remember hearing yesterday about something called

2  Ethoxy Gold?

3  A.  Yes, I did.

4  Q.  Have you ever used the term Ethoxy Gold?

5  A.  No, I have not.

6  Q.  Do you know what Ethoxy Gold is?

7  A.  Based on what they were talking about yesterday, I'm

8  assuming it's the product that I sold called ethoxydiglycol.

9  Q.  Now, can you tell the jury what you did with regard to --

10  I'm just going to call it ethoxy because I can't say the D word.

11  So ethoxy.

12  A.  So ethoxydiglycol was a product that was introduced to me

13  some time, I don't know, maybe in October of 2014, by an

14  individual who had a medical distribution company and I actually

15  had made contact with him because he managed some different

16  pharmacies and I was selling the product Stera Base and I

17  reached out to him to see if he may have a need for my product.

18       When I talked to him, he actually kind of did a reverse

19  on me and started telling me about a product that he had access

20  to that was, you know, an exclusive product that no one else

21  could really get at that time.  And he asked me if, you know, if

22  my pharmacies would be interested in maybe purchasing that

23  product.  I told him I didn't know anything about it and he

24  educated me a little bit, and afterwards I went and spoke to a

25  couple of people about the product and they told me that it was

1    really good and that if I had access to it, then absolutely they

2    thought they could have some pharmacies purchase it.

3    Q.   And this ethoxy, did you end up getting the product and

4    selling it to pharmacies?

5    A.   Yes, I did.

6    Q.   Did you only sell the product to PCA or other pharmacies as

7    well?

8    A.   I sold the product to three different pharmacies.  The first

9    pharmacy was a pharmacy down in South Florida.  I'm trying to

10   remember the name right now, but it was a pharmacy in South

11   Florida that I sold to first.  Then right about the same time

12   there was -- PCA purchased the product as well as a pharmacy in

13   St. Petersburg called Pharmetrics.

14   Q.   And there was talk about the size of the product.  Did you

15   have a choice -- let me just ask you:  How did you choose what

16   size of the product you would purchase?

17   A.   I chose the only size that was available for me.

18   Q.   And when you say the only size that was available for you,

19   are you saying that that was the only size available in the

20   world, or the only size that you could actually get your hands

21   on?

22   A.   It was the only size that I could get my hands on.

23   Q.   And what size was that?

24   A.   They came in one milliliter vials.

25   Q.   Now, you heard testimony yesterday that this ethoxy was easy

1    to get.  Do you recall that?

2    A.  I heard Mr. Lozada, I believe, say that.

3    Q.  And that there was no shortage of supply for it.  Do you

4    recall him testifying to that fact?

5    A.  I do.

6    Q.  What's your memory of how easy or hard it was for you to get

7    ethoxy?

8    A.  So when I was introduced to the product, I talked with two

9    people with a lot more experience than me in the compounding

10   business, one was Eric Santos, and I asked him specifically if

11   he had heard of ethoxydiglycol and he said absolutely, but you

12   can't get it anymore.  And I was like, well, that's not true

13   because I just talked to someone who said that they could get it

14   for me.  And he said, well, if you can really get it, I have,

15   you know, several pharmacies I'm sure that would be interested

16   in purchasing the product.

17           I then talked to Rick Massengale, who was the owner of

18   InforMD Solutions, and I asked him about the product and he, you

19   know, he told me the same thing, that it wasn't available and

20   that actually the company that represented it, Pharmaceutica

21   North America, was in the process of manufacturing their own

22   ethoxydiglycol, that they were getting ready to do that

23   themselves.

24   Q.  Did there come a time that Matt Smith and PCA was telling

25   you that they were having a hard time getting ethoxy and were

1  asking you whether you could get them more of it?

2  A.  Yes, absolutely.  I mean, I didn't know if they were

3  purchasing it from someone else, but they were purchasing it

4  from me, but I was selling it to other pharmacies as well and

5  there was limited supplies for me to get, and half the time,

6  whenever they wanted it, I had already sold supplies to

7  Pharmetrics and there was none available.

8           THE COURT:  Thank you very much.

9           MR. RASHBAUM:  I would like to admit, Your Honor,

10  Defendant's Exhibit 72.

11          MR. JUENGER:  No objection.

12          THE COURT:  It will be admitted.

13     (Defendant's Exhibit Number 72 was received in evidence.)

14  BY MR. RASHBAUM:

15  Q.  This is an email -- sorry.  This is an email December 26,

16  2014, from you to Matthew Smith, and the subject line -- can you

17  read the subject line for the jury?

18  A.  "Still no ethoxy?"

19  Q.  What's before the "still no ethoxy"?

20  A.  "Regarding."

21  Q.  And when you respond to an email, what does it usually come

22  up with when you actually respond?  Does that "re" come up, if

23  you know?

24  A.  I'm not sure.

25  Q.  The question is "still no ethoxy" on the subject line.  How

1  do you respond to Matthew Smith?

2  A.  I said, "No, sir.  They're telling me we may not get until

3       the second week of January."

4  Q.  What does this email in realtime show you?

5  A.  So, the pharmacy had been requesting the ethoxydiglycol and

6  asking me to provide it to them, but the person who was selling

7  it to me had none, it wasn't available.  So he was just

8  following up on it with me and asking me, you know, still no

9  ethoxy, where is it at?  Are we going to be able to get it?

10 Q.  Why would Mr. Lozada have testified yesterday that ethoxy

11 was in abundance and that you can get it anytime?  Mr. Lozada is

12 from PCA, right?

13 A.  Correct.  I have no idea why he would say that.

14 Q.  Mr. Grow, were your emails subpoenaed by the Government in

15 this case?

16 A.  Yes, they were.

17 Q.  Did the Government have access to all of your emails,

18 including this document --

19 A.  Yes, they did.

20 Q.  -- and all the other emails that we've looked at today?

21 A.  Yes.

22 Q.  Let's go back to Wellness T if you don't mind.  Tell the

23 jury again -- not really again.  Remind the jury briefly what

24 the situation was with Wellness T.

25 A.  The Wellness T was the new formulary for the metabolic

1    vitamins and it was because of one of the ingredients that was

2    no longer available, so they were having to come up with a new

3    formula, and they informed me that all of my patients who were

4    on the old formula would need to get new prescriptions if they

5    were going to receive them.

6         MR. RASHBAUM:  I'd like to admit at this time, Your

7    Honor -- I don't remember whether I already did it --

8    Defendant's Exhibit 113.

9         THE COURT:  Any objection?  Hearing none, I'll admit

10   it.

11        MR. RASHBAUM:  Defendant's Exhibit 214.

12        THE COURT:  My 214 doesn't have anything next to it.

13   Any objection?

14        MR. JUENGER:  If I could see it?  No objection.

15        THE COURT:  What is it?

16        MR. RASHBAUM:  It's an email between Matthew Smith to

17   Monty Grow, cc'ing Ralph Louis, regarding metabolic.

18        THE COURT:  On what date?

19        MR. RASHBAUM:  The date is March 10, 2015.

20        THE COURT:  All right.  That's 214?

21        MR. RASHBAUM:  That's Defendant's Exhibit 214.

22        THE COURT:  All right.  Admitted.

23        MR. RASHBAUM:  Defendant's Exhibit 212.

24        THE COURT:  Any objection?

25        MR. JUENGER:  No objection.

Jury Trial

111

```
1              THE COURT:  In.

2              MR. RASHBAUM:  Defendant's Exhibit 215.

3              MR. JUENGER:  No objection.

4              THE COURT:  What is it?

5              MR. RASHBAUM:  It's an email on March 26, 2015, between

6    Monty Grow and Matt Smith.

7              THE COURT:  Okay.  In.

8              MR. RASHBAUM:  Defendant's Exhibit 211.

9              THE COURT:  Already in.

10             MR. RASHBAUM:  Defendant's Exhibit 216.

11             THE COURT:  I don't even have that as a number, let

12   alone a description.  How many more exhibits do you have?

13             MR. RASHBAUM:  There's four in this series, Your Honor.

14             THE COURT:  216.  What else after that?

15             MR. RASHBAUM:  Government's Exhibit --

16             THE COURT:  No, no, of your exhibits.

17             MR. RASHBAUM:  Defendant's Exhibit 217.

18             THE COURT:  What else?

19             MR. RASHBAUM:  And that's it, Your Honor.

20             THE COURT:  That's your last exhibit.

21             MR. RASHBAUM:  Not for the witness, but for this topic,

22   yes.

23             THE COURT:  Are you going to have more exhibits after

24   217, is what I'm asking.

25             MR. RASHBAUM:  I don't think so, Your Honor.
```

1          THE COURT:  216, you're introducing it?

2          MR. RASHBAUM:  I would like to.

3          THE COURT:  Any objection?

4          MR. JUENGER:  No objection.

5          THE COURT:  What is it?

6          MR. RASHBAUM:  It's an email between Matt Smith and

7    Monty Grow on April 2, 2015.

8          THE COURT:  It's in.  What's 217?

9          MR. RASHBAUM:  217 is an email between Matt Smith and

10   Monty Grow on April 6, 2015.

11          THE COURT:  Any objection?

12          MR. JUENGER:  No objection.

13          THE COURT:  In.  All right.  Go ahead.

14      (Defendant's Exhibit Numbers 113, 212, 214, 215, 216, 217

15   were received in evidence.)

16          MR. RASHBAUM:  Judge, there are two Government's

17   exhibits as well.

18          THE COURT:  What numbers?

19          MR. RASHBAUM:  Government's Exhibit 128.  It's in.

20   Sorry.  Government's Exhibit 31.

21          MR. JUENGER:  No objection.

22          THE COURT:  Already in, so is 128.

23          Remember I told you all you're going to have the list

24   and all the exhibits.  They'll be in files and numbers and all

25   of that, so you don't have to memorize it.

1           Okay.  Let's wrap it up.

2   BY MR. RASHBAUM:

3   Q.  Okay.  So showing you Defendant's Exhibit 113, tell the jury

4   what this is about.

5   A.  They are telling me about the change of the formulary for

6   Tricare patients and that they have removed the Resveratrol from

7   the formula and that all new dispensing should have the T

8   formula.

9   Q.  Defendant's Exhibit 214, I'll give you a copy, what is this?

10  A.  That's me emailing Ralph Louis and asking him if we were

11  going to get the new prescription pads with the new formula

12  without the Resveratrol and how the upcoming refills would be

13  handled.

14  Q.  And the date on that?

15  A.  That is March the 10th, 2015.

16  Q.  Showing you Defendant's Exhibit 212, what's the date on this

17  document?

18  A.  March the 25th, 2015.

19  Q.  And what is this document?

20  A.  This document is actually a document that was provided to me

21  from 1st Care MD, which was the telemedicine network.  When I

22  reached out to them to tell them that I was going to have to get

23  a lot of prescriptions reconsulted to the patient so they could

24  get new scripts if the doctor chose to, that they were going to

25  have to all be resubmitted, and he informed me that they

1   actually had a form, which is this Letter of Authorization, that

2   a physician could sign and it would give the pharmacy and the

3   pharmacist permission to change the formulary as they saw fit

4   and dispense it to the patients.

5        So he actually signed this and I sent this off to the

6   pharmacy to ask them if this would be sufficient.

7   Q.  Showing you Defendant's Exhibit 215, what's the date on this

8   document?

9   A.  This is March 26, 2015.

10  Q.  And I'll give you a copy of it.  Is the pharmacy responding

11  to you from your previous email in this document; and if so,

12  what are they saying?

13  A.  They're telling me that they are processing the refills now

14  with the new formula, and I'm asking them if it was for

15  Dr. Hoang's patients or for all of the patients, all the doctors

16  that were, you know, prescribing medications to any of my

17  patients.

18  Q.  And did you go and get from most of those doctors the same

19  thing, Defendant's Exhibit 211?  Is that what you did after

20  this?

21  A.  I don't know if it was after or previous to that but, yes, I

22  had sent the list of physicians that had written prescriptions

23  for all of my patients and asked them, the telemedicine network

24  to talk to them and get approval to sign off on this Letter of

25  Authorization so the new formula could be processed.

1   Q.  And what is the date of this email, Defendant's Exhibit 211?

2   A.  March 27, 2015.

3   Q.  And that's one day after the previous email, Defendant's

4   Exhibit 215?

5   A.  Yes.

6   Q.  I'm showing you Defendant's Exhibit 216, and I ask you to

7   turn to MG 144761.  You can read it on the screen.  This is

8   dated April 2, 2015.  Do you see that?

9   A.  I do.

10  Q.  And if you go to the third page, there's an email from Esan

11  Forde to Matt Smith, and can you read this for the jury,

12  starting with "Kim is willing."

13  A.  "Kim is willing to call the doctor to explain the need for

14      this updated document to be signed and Kim will also explain

15      to the doctor that she will retroactively change the current

16      in-house capsule prescriptions and take the verbal

17      authorization to make those change to those capsule

18      prescriptions."

19  Q.  Who is Kim, do you know?

20  A.  Kim is a pharmacist.

21  Q.  And what did you understand that she was going to be doing

22  here?

23  A.  So basically, they had come up with a new form that they

24  wanted to add in addition to the authorization form that the

25  physicians had already signed, and what she wanted to do is call

1 those physicians and get their approval verbally to have the new

2 form go into effect.

3 Q. So the form that you had supplied from 1st Care MD,

4 Defendant's Exhibit 211, PCA didn't think that that was enough,

5 right?

6 A. That's correct.

7 Q. And so Kim was going to call the doctors and do a new form.

8 Is that fair to say?

9 A. Yes, it is.

10 Q. Now, you've heard testimony in this case that you didn't

11 allow PCA to ever call the doctors. Did you allow Kim to call

12 the doctors in this email? I mean, have you ever stopped anyone

13 from calling the doctors?

14 A. No, and they were always available to call physicians. I

15 had no control over that, nor did I need to.

16 Q. Now, I'm showing you Government's Exhibit 31. I'll give you

17 a copy of it as well.

18        Alisa Catoggio says, "We can't do that because of

19    commission cutoff and dates needing to match with the

20    document." Ralph Louis responds, "The claims were run

21    already. Why can they not be sent out?" Alisa says -- and

22    Ralph says, "Alisa, why can't we ask the doctor to date it

23    to the date of the original document?"

24        What do you understand PCA to be asking here?

25 A. They want to be able to date the additional document that

1   PCA came up with to match the original document that the doctor

2   signed and the telemedicine network sent to me that I forwarded

3   to the pharmacy.

4   Q.   And that email is on April 6th at 4:04 p.m., correct?

5   A.   That's correct.

6   Q.   Showing you Defendant's Exhibit 217, and I want you to look

7   at the bottom, April 6th, same day, at 4:13 p.m.  Do you see

8   that?

9   A.   Yes, I do.

10   Q.   If you turn the page, what is Matt Smith saying to his team

11   at PCA here?

12   A.   He is telling them to please call me and explain to me how

13   they want the form completed.

14   Q.   And what is being said on April 6th at 4:20 p.m.?

15   A.   They're saying the change went effective on the 23rd of

16   March.

17   Q.   And what did you understand that to mean?

18   A.   That that's the date that the new forms would need to be

19   signed because Kim was getting approval verbally.

20   Q.   I'm going to show you the one exhibit that the Government

21   put in in this case, which is Government's Exhibit 128.  I just

22   want you to note, what time is this, Defense Exhibit 217?

23   A.   4:28 p.m.

24   Q.   On what date?

25   A.   That's April 6, 2015.

1  Q.  I'll keep the time up there.  What do you send in --

2  Government's Exhibit 128, the one document the Government put

3  in, what did you do on April 6th, about an hour later, after you

4  got the communication in Defendant's Exhibit 217?  What do you

5  do?

6  A.  I forward the new forms to the telemedicine network and

7  inform them to have them date it on the 23rd like I was

8  instructed from the pharmacy.

9          MR. RASHBAUM:  May I have one moment, Your Honor?

10          THE COURT:  Sure.

11 BY MR. RASHBAUM:

12 Q.  Why did you instruct the telemedicine company to put the

13 date in Government's Exhibit 128 of March 23, 2015?

14 A.  Because that's what I was told to do.

15 Q.  Do you think there is anything wrong with that?

16 A.  No.

17 Q.  I want to talk to you a little bit about surveys.  You heard

18 Ginger Lay's testimony about the survey program in this case,

19 right?

20 A.  Yes, I did.

21 Q.  Was the survey program -- let's start with this:  Did there

22 come a time that you learned -- just tell the jury what you

23 learned about the survey program.  Go ahead.

24 A.  So really, I didn't know anything about a survey program.  I

25 believe it was one day some time in February, Matthew Smith sent

1   me a text message and he said, Monty, is Ginger offering

2   patients a thousand dollars to receive prescriptions?  And I

3   immediately said, I don't know, I'll find out.

4        I called Ginger Lay and I asked her and she got very

5   upset with me and said, no, that's not -- we're not doing

6   anything like that.  I need to know who that patient is and I'm

7   going to get ahold of the rep and find out what's going on.  And

8   I said okay.  I got the name of the patient from Matthew Smith.

9   I gave it to her.  And Matthew Smith told me I needed, you know,

10  immediate follow-up.

11       She calls me back later that evening and she tells me,

12  oh, no, Monty, nobody is offering money for prescriptions.

13  That's our survey assessment program that we're doing and that's

14  what they're referring to.  And I'm like, Ginger, I have no idea

15  what you're talking about, a survey program.  It was Chinese to

16  me.

17       She said, well, it's a program that we have that the

18  patients are able to be compensated if they participate in

19  answering questions about their experiences with the medications

20  or something like that.  And I told her, I was like, Ginger,

21  this was never approved by me.  It was never approved by the

22  pharmacy, you know, why would you do this?  And she said, well,

23  actually, you know, we called two attorneys, we talked to them,

24  they vetted it, and they said it was totally fine.  And I told

25  her that that was not acceptable and that it should have been

1  approved through myself and the pharmacy, more importantly, and

2  that, you know, I needed to take it up with the pharmacy.

3         So I called Matthew Smith and I told him that she was

4  doing some type of survey program and he told me that he needed

5  to get a copy of it immediately.  I contacted Ginger Lay, said I

6  need that survey program, so she emailed it to me.  I forwarded

7  it to Matt Smith.  I told her that I would be in contact with

8  her, and let her know as soon as I heard something.

9         It was maybe approximately nine days later Matt Smith

10 sent me a text message and he said that he needed to talk to me

11 about Ginger's program and then he followed that up and he said

12 she needs to cease that program immediately.  So I called Ginger

13 and I told her that she needed to cease the program immediately.

14 She informed me that it would be done and that no patients had

15 been paid and that she would cancel all of her patients and

16 ensure that they would not be paid.

17        She also told me that any patients that were in the

18 telemedicine network at that point in time, that I should call

19 the telemedicine network and tell them to cancel all those

20 patients, so that's what I did.  She followed up with emails and

21 whatnot telling me that, you know, the program was terminated

22 immediately and that was it.  It was done.

23 Q.  Let's look at the documents.  In realtime -- oh, I'm sorry.

24        MR. RASHBAUM:  I'd like to admit Defendant's Exhibit 4.

25        MR. JUENGER:  No objection.

 1              THE COURT:  Admitted.

 2              MR. RASHBAUM:  This may already be in as a Government's

 3   exhibit, but Defendant's Exhibit 126.

 4              THE COURT:  Any objection?

 5              MR. JUENGER:  No objection.

 6              THE COURT:  It's in.

 7              MR. RASHBAUM:  Defendant's Exhibit 25.

 8              THE COURT:  Any objection?

 9              MR. JUENGER:  No objection.

10              THE COURT:  It will be admitted.

11              MR. RASHBAUM:  Government's Exhibit 129.

12              THE COURT:  It will be admitted.  It's already been

13   admitted.

14              MR. RASHBAUM:  Defendant's Exhibit 117.

15              THE COURT:  Any objection?

16              MR. JUENGER:  I need to look at it, Your Honor.  I

17   believe it may be hearsay.

18              THE COURT:  All right.  Okay.

19         (There was a brief discussion off the record.)

20              MR. JUENGER:  No objection.

21              THE COURT:  It will be admitted.

22              MR. RASHBAUM:  Defendant's Exhibit 206.

23              THE COURT:  Already in.

24              MR. RASHBAUM:  Defendant's Exhibit 27.

25              MR. JUENGER:  No objection.

Jury Trial

1          THE COURT:  In.

2      (Defendant's Exhibit Numbers 4, 25, 27, 117, 126 were

3   received in evidence.)

4   BY MR. RASHBAUM:

5   Q.   Let's start with Defendant's Exhibit 4.  I can hand you a

6   copy.  Who is Matthew?

7   A.   Matthew Smith, the vice president of the pharmacy.

8   Q.   On February 19th, what does Matthew text you?

9   A.   He sends me a message saying a patient of Ginger's asked us

10  when he was receiving his $1,000 for filling his prescription.

11  Q.   And what do you answer in realtime?

12  A.   "What?"

13  Q.   What does Matthew say down here?

14  A.   "Is Ginger telling people she will pay them $1,000 for

15       filling scripts?"

16  Q.   And how do you respond?

17  A.   I had already called her by the time he had sent this back

18  and I said, not according to her.  I just called her and said

19  what the hell am I talking about and wants to know who the

20  patient is.

21  Q.   Who said -- I'm sorry, I turned the page too quickly.  And

22  who said --

23  A.   Ginger said to me, when I asked her if she was doing that,

24  she said, "What the hell are you talking about?"  And wants to

25  know who the patient is.

1   Q.   And Matthew says, "Needs to be careful."  Do you see that?

2   A.   Yes, I do.

3   Q.   And you say, "I told her that if she's doing that, it's

4        unacceptable and she says she's not and will get to the

5        bottom of it when she talks to the sales rep."

6             Do you see that?

7   A.   That's correct.

8   Q.   And the date of that is February 19, 2015.  Do you see that?

9   A.   I do.

10  Q.   And you said you also contacted her, correct?

11  A.   I did.

12  Q.   I'm showing you Defense Exhibit 126.  You can just look on

13  the screen.

14            On February 20, 2015, one day later, what does Ginger

15  send you?

16  A.   She sends me a copy of her consent form for this program

17  that she was doing with the surveys because I requested it from

18  her so I could send it to Matthew Smith.

19  Q.   Now, Ginger said you were part of this, so why wouldn't you

20  already have had this survey before?

21  A.   Because I was not a part of it, and I never heard anything

22  about a survey.

23  Q.   And Ginger says that PCA had already seen the survey and

24  that they had made markups to the survey.  Have you ever seen

25  any such document, any such markups?

1    A.  No, it didn't exist.

2    Q.  Let me ask you, your emails were subpoenaed in this case by

3    the Government, right?

4    A.  Yes, they were.

5    Q.  And you've reviewed all of those emails, correct?

6    A.  I did.

7    Q.  Have you ever seen any such document in your emails?

8    A.  It does not exist.

9    Q.  Let me ask you, PCA's documents were subpoenaed in this

10   case; is that correct?

11   A.  They were.

12   Q.  Have you ever seen any such document in that discovery in

13   this case?

14   A.  They do not exist.

15   Q.  But you do see this document, which is how many days after

16   the original text message from Matthew Smith?

17   A.  The next day.

18   Q.  Now I'm showing you another text message and this is from a

19   couple of days later.  It's an email from you to Matthew Smith

20   on March 3, 2015.  What are you telling Matt Smith?

21   A.  I believe they had another patient that called in and asked

22   the pharmacy where his money was for doing this survey, and he

23   sent me a message basically saying "Ginger Lay again."  I

24   immediately called her and she assured me that this program had

25   ended and this was maybe a residual person who the sales

1  representatives were not able to get ahold of, but that it was

2  absolutely terminated and no longer running.

3  Q.  Just going back to Defendant's Exhibit 126, this is Ginger

4  sending it to you on February 20, 2015, correct?

5  A.  Yes.

6  Q.  And that's a day after the text message?

7  A.  Yes.

8  Q.  And then, what do you do six minutes later, which is

9  Government's Exhibit 134?

10 A.  I forwarded it to Matthew Smith letting him know this is the

11 assessment agreement that they were using.

12 Q.  On March 4th, what does Ginger tell you in Government's

13 Exhibit 133?  This is one day after you've informed Ginger --

14 you have informed Matt that Ginger's program has been

15 terminated.  Do you see that?

16 A.  Yes, I do.

17 Q.  What does Ginger tell you one day later, on March 4th, in

18 realtime?

19 A.  It says, "Dear Monty.  I've informed my team that effective

20     immediately the program will be discontinued.  Those who are

21     at Teledoc will need to be converted to a non-paid product

22     evaluation.  I will be sending everyone their list of

23     patients from the portal.  Also, I informed them that those

24     who are already enrolled will need to be converted by April

25     30th, 2015.  The individual patients will receive an email

1    on April 1st letting them know the program will be

2    terminated.  Please advise the pharmacy of this.  Also let

3    the pharmacy know, if possible, if the patients call in

4    regards to the program, they need to contact their

5    representative and we will handle the rest."

6  Q.  What is she telling you in this email?

7  A.  She is basically telling me that the program is terminated,

8  those patients that were in the telemedicine portal needed to be

9  canceled and switched to a program that was not being

10 compensated.

11 Q.  And on that same day -- remind the jury who Mary Jo Giles is

12 again.

13 A.  She's a pharmacist at Patient Care America.

14 Q.  Do you know who Cynthia Louis is?

15 A.  I do not.

16 Q.  And so Mary Jo Giles writes to Matthew Smith and Cynthia

17    Louis, "Matt, Cynthia had a call from Ginger Lay regarding

18    payment for surveys.  The reps offering this will be

19    terminated by the end of the month and the program has

20    ended."

21        Do you see that?

22 A.  I do.

23 Q.  And that's Defendant's Exhibit 117?

24 A.  Yes.

25 Q.  And on that same day Ginger texts you, correct?

Jury Trial

1   A.   Yes, she does.

2   Q.   What does she say to you?

3   A.   She says again, "I am terminating the program effective

4        immediately."

5   Q.   And down on the text she says, "I'm not going to give the

6        group that's causing these problems an Employment Agreement

7        with the pharmacy."

8             Do you see she says that?

9   A.   I do.

10  Q.   What is she telling you here?

11  A.   When I spoke to her earlier, she was making excuses and she

12  was trying to place the blame on one of her sales groups that

13  was working for her, and so she's reiterating and telling me

14  that that group is not going to be getting an Employment

15  Agreement with the pharmacy, because at this point in time we

16  had just been meeting with Patient Care America and they

17  informed us that we were going to be needing to switch to a W-2

18  employee status with the pharmacy.

19  Q.   If you knew about this survey program with her and you knew

20  about it from the beginning, why is she telling you, it's not my

21  fault, this survey program, it's the fault of these other people

22  that are working under me?

23  A.   Because I never knew about the program.  This was the first

24  I ever heard of it.

25  Q.   And then in April she says, "I have a question.  I ended my

1       program on March 31st, but those who were due a first refill

2       in April would receive one assessment compensation.  Those

3       on the list I sent you are due a compensation, but it won't

4       be until when the new guidelines are in place.  Can I pay

5       them or not?  The pharmacy didn't process their refills."

6          Do you see that?

7 A.  I do.

8 Q.  And how do you respond?

9 A.  "I wouldn't be paying anyone."

10 Q.  Did you know that people were paid in April and May after

11 this text message?

12 A.  No, I did not.  As a matter of fact, she told me that nobody

13 had ever been paid.

14 Q.  I'm showing you Defendant's Exhibit 27, and in this text

15 Matt says -- and Matt is who again?

16 A.  Matthew Smith from the pharmacy.

17 Q.  "Ginger fell off a bit this period."  And your response is,

18       "Well, I think taking away her programs slowed her down

19       initially.  She actually just submitted quite a few to the

20       doctors.  They just haven't gotten the consult appointments

21       done, so you should see an increase."

22          What are you saying to Matt Smith here?

23 A.  He's telling me that she hasn't been submitting any

24 patients, and my assumption was it was probably because her

25 program that she was running got shut down.  And she informed me

1    that she was starting back up, not her program, but she was

2    selling to patients and there was no program involved, but she

3    was going to be submitting some new ones, you know, shortly.

4              MR. RASHBAUM:  May I have one moment, Your Honor?

5              THE COURT:  Sure.

6    BY MR. RASHBAUM:

7    Q.  Let me ask you a question.  After this survey issue, why did

8    you continue to work with Ginger Lay?

9    A.  Basically, she told me that she had canceled the program,

10   that nobody had ever been compensated and, quite frankly, she

11   was pretty convincing that the issues that were taking place,

12   she was blaming other people and she was -- ultimately, now I

13   realize, she was a pretty convincing liar.

14   Q.  When was the first time you learned that Ginger Lay paid

15   patients under the survey program that she said was canceled in

16   March, that she paid them in April, May, and I think June?

17   A.  In this trial.

18             MR. RASHBAUM:  Judge, I'd like to move into evidence

19   Defendant's Exhibit 73.

20             THE COURT:  Any objection?

21             MR. JUENGER:  No objection, Your Honor.

22             THE COURT:  In.

23             MR. RASHBAUM:  Defendant's Exhibit 77.

24             MR. JUENGER:  No objection.

25             THE COURT:  In.

1          MR. RASHBAUM:  Defendant's Exhibit 130 -- no, hold on a

2    second.  Defendant's Exhibit 137.

3          MR. JUENGER:  No objection.

4          THE COURT:  In.

5          MR. RASHBAUM:  And Government's Exhibit 102.

6          MR. JUENGER:  No objection.

7          THE COURT:  Admitted.  Already in.

8       (Defendant's Exhibit Numbers 73, 77, 137 were received in

9    evidence.)

10   BY MR. RASHBAUM:

11   Q.  Now, tell the jury, was Ginger Lay's situation with you as

12   far as the commissions issue --

13         THE COURT:  I'm sorry.  See, you're turning your back.

14         MR. RASHBAUM:  I'm sorry.

15         THE COURT:  So the court reporter with her headset

16   can't hear you.

17   BY MR. RASHBAUM:

18   Q.  Was Ginger Lay's situation with regard to commissions

19   different than your other marketers?

20   A.  Yes, it was, it was structured differently.  When she came

21   to me she said that she had her own sales force and she was

22   actually going to be providing her own telemedicine portal for

23   her to upload her patient forms directly to the telemedicine

24   company and she would also be paying for those telemedicine

25   consults herself and that she would be getting a 40 percent

1   commission on her sales.

2   Q.  Why was she different?

3   A.  I pretty much didn't have any oversight of her.  She had her

4   own sales force and her own program.  She wasn't associated with

5   MGTEN Marketing.

6   Q.  I want to shift gears a little bit and talk a little bit

7   about Stera Base.

8           MR. RASHBAUM:  Judge, I'd like to move into evidence

9   Defendant's Exhibit 46.

10          MR. JUENGER:  No objection.

11          THE COURT:  In.

12          MR. RASHBAUM:  143.

13          MR. LARSEN:  No objection.

14          THE COURT:  I'll admit it.

15          MR. RASHBAUM:  146.

16          MR. JUENGER:  I object to that, Your Honor, hearsay.

17          THE COURT:  It will be sustained.

18          MR. RASHBAUM:  He is on it.

19          THE COURT:  It doesn't matter.  It says email between

20  Colleen Johnston and Mary Firestone.  Sustained.

21          MR. RASHBAUM:  Copy, Monty Grow.

22          THE COURT:  You can ask him questions first about it.

23          MR. JUENGER:  No objection.

24          THE COURT:  You don't have an objection or you do?

25          MR. JUENGER:  I don't have any objection, Your Honor.

1              THE COURT:  It will be in.  Anything else?

2              MR. RASHBAUM:  Yes.  162.

3              MR. JUENGER:  No objection.

4              THE COURT:  In.

5        (Defendant's Exhibit Numbers 46, 143, 146, 162 were received

6   in evidence.)

7   BY MR. RASHBAUM:

8   Q.  Now, with regard to Stera Base --

9              THE COURT:  How much longer do you think you have?

10             MR. RASHBAUM:  One moment, Your Honor.

11             THE COURT:  I'm not limiting you.  I'm merely

12  inquiring.

13             MR. RASHBAUM:  I didn't hear, Your Honor, I'm sorry.

14             THE COURT:  I'm not limiting you.  I'm merely inquiring

15  again.

16             MR. RASHBAUM:  I think I have about 30 to 45 minutes.

17             THE COURT:  Those two hours keep on getting extended,

18  doesn't it?

19             All right.  Do you all need a bathroom break?  We will

20  work for another couple of hours.  Okay?  Is that all right with

21  you?

22             Go inside the jury room.  We will bring you back by

23  5:00.  We will work for another hour and a half.

24             THE COURT SECURITY OFFICER:  All rise for the jury.

25             THE COURT:  Don't talk about the case.

1        (The jury retired from the courtroom at 4:57 p.m.)

2             THE COURT:  Let me hear that door.

3        Okay.  Have a seat for a second.  After the direct

4   we're going to have, unless it comes out in the direct --

5   looking at this case regarding the prior consistent statements,

6   I've got to conduct an evidentiary hearing to find out about the

7   date of the motive.  It's the only way.  That's the way Judge

8   Nesbitt did it and she was praised, as she always was, by the

9   Eleventh Circuit, in that case by her former colleague, Judge

10  Marcus, who said, among other things, how careful she was, and

11  because the standard of review is abuse of discretion.

12            In order to exercise discretion, I have to do what

13  Judge Nesbitt did.

14            It says here, "The trial judge was cautious and

15       methodical in rendering the 801(d)(1)(B) ruling.  She heard

16       legal arguments from both sides and held a hearing in limine

17       during which several agents testified as to the events that

18       transpired from the time of" -- in that case the individual

19       was Palacios -- "Palacios' arrest, continuing through his

20       interrogation.  Her comments reflect thorough

21       consideration," and then it goes on to what she found

22       orally.

23            So the timing of it is important.  Whether a statement

24  is tinged with a motive to lie is a question of fact to be

25  determine by the trial court according to the particular

1   circumstances of each case.  And in fact, they cite approvingly

2   a Ninth Circuit case, United States versus Collicott,

3   C-o-l-l-i-c-o-t-t, 92 F.3d 973, Ninth Circuit, 1996, which

4   actually supports the inclusion that the question of when a

5   motive to fabricate attaches is a question of fact.  So they

6   disagree in that case.

7          The important thing about the Collicott case is that

8   the witness' motive to fabricate arose before any arrest was

9   made.  So there's no demarcation line.  Obviously, it's a lot

10  easier if it's after Indictment for example.  So it's a

11  case-by-case factual inquiry, and the only way to do it is to

12  have a hearing.

13          So what the Court of Appeals said is, "We, therefore,

14      hold that whether a witness had a motive to fabricate when a

15      prior consistent statement was made is a factual question

16      properly decided by the District Court and subject to

17      reversal only for a clear abuse of discretion.  Here, the

18      trial court's unambiguous finding that Palacios did not have

19      a motive to fabricate when he made his statements to

20      Detective Gross did not abuse that broad discretion."

21          I've got to have a hearing about that.  I've got to

22  exercise my discretion.  He's become a witness so he's treated,

23  the defendant, as any other witness when it comes to the

24  evidentiary rulings.  You know, there's usually a tendency on

25  the Courts, and I'll confess especially this Court, to lean over

1    backwards when a defendant takes the stand because he's going to

2    be cross-examined, and that's the reason why we have to wait

3    until the direct is over to see if he's challenged.

4         So we may not be able to do it today.  We may have to

5    do it after the cross-examination, and if the facts regarding

6    timing, for example -- there was an exhibit that we had

7    discussed before that I've excluded.  I excluded the copy of the

8    investigation of the reports, the media.  Obviously, I didn't

9    want the jury to know that, but that may become important to

10   decide the timing, because the Government is alleging that the

11   defendant had a motive to fabricate when he knew about the case.

12   So when he knew about the case is important.

13        One of the factors to consider whether he knew about

14   the case is whether he knew about the press releases, the

15   subpoenas, or whatever it is.

16        So all of that has to be done outside of the presence

17   of the jury, and if I do allow it in, then everything has to

18   come in for me to make a determination.  If I allow it on

19   redirect, the prior consistent statement, then the Government is

20   entitled to recross.  So I wanted to give you a heads-up of my

21   reading of the case law and Tome, the Supreme Court decision

22   from '96, or whenever it was.

23        So we're going to have to do that.  I don't want to do

24   that on the jury's time, so that's why we've got to work a

25   little bit more today and maybe come in really early on Monday

1    morning or that kind of thing, all right, so that we can finish

2    this case.

3           He is going to be your last witness?  I remember you

4    insisted that you wanted him to be last when I was pushing you

5    if you ran out of witnesses.  So I assume, since you were so

6    vigorous about that argument to me, you're consistent.

7           MR. RASHBAUM:  I am consistent and what I said was he

8    would be the last witness, although we need to see what the

9    cross is.

10          THE COURT:  The cross is going to say that Ginger Lay

11   is right and that the defendant is not telling the truth.

12          MR. RASHBAUM:  Well, we'll see.

13          THE COURT:  Am I right?

14          MR. JUENGER:  Yes.

15          THE COURT:  Except it took me 30 seconds to do that and

16   it's going to take you how long?

17          MR. JUENGER:  Two to three hours I imagine.

18          THE COURT:  Look at that.  Unbelievable.  Two or three

19   hours.

20          MR. JUENGER:  There's a lot of material to cover, Your

21   Honor.

22          THE COURT:  Oh, you're going to go through every email,

23   too.

24          MR. JUENGER:  No, I'm not going through every email.

25          THE COURT:  So what are you going to do for two or

1    three hours?  Oh, my goodness gracious.

2            You never saw Irving Younger's video?  Did you ever see

3    that?

4            MR. JUENGER:  Yes.

5            THE COURT:  Do you remember what he used to say, before

6    he died obviously, on cross-examination?  "Be brief, to the

7    point, and sit down."  That's probably the most violated piece

8    of advice among lawyers, but I won't prevent you.  I want you to

9    look at the jurors, though.  Sometimes lawyers think that the

10   questioning is to make themselves look good.  I'm doing all of

11   this, obviously, outside of the presence of the jury, but I'll

12   let you.

13           I do not restrict cross-examination unless it's

14   repetitious, very repetitious, just like I don't limit direct of

15   the defendant, even if it's repetitious, because it's your case.

16   I'm just assigned to it.  I just want to try it only once.

17   That's all.  Okay.

18           And you've already discussed with your client -- I am

19   not suggesting that the Government is going to prevail -- the

20   issue of forfeiture, just for planning in the event that the

21   jury is out early next week and it comes back with some -- no

22   matter what, if it comes back on any count, is there still

23   forfeiture on all of them, according to the Government?

24           MR. JUENGER:  Yes, Your Honor.

25           THE COURT:  So we've got to do that.  Have you

1   discussed that with him?

2          MR. RASHBAUM:  We will, Your Honor.

3          THE COURT:  I know it's kind of uncomfortable because

4   freedom is more important than money, but as I mentioned before,

5   I've got to know ahead of time to plan, to see what I book with

6   the jurors, that's all.  You don't have to decide right now and

7   you're going to have the whole weekend to talk about it, but

8   it's one of the nonimportant things that you're going to discuss

9   so when the case is over, you'll tell me.

10         I assume the Government won't bring in any witnesses

11  for the forfeiture part.

12         MR. JUENGER:  No additional evidence, Your Honor.

13         THE COURT:  Okay.  So if you do, you've got to be ready

14  to go, as sad as it may be, okay, or a stipulation, one of the

15  two, so that I can deal with the jury.

16         Then after the jurors are gone, we'll go through the

17  charge conference.  We've got to do all of this in order to

18  catch up for the time we're losing.  Okay?

19         MR. JUENGER:  Your Honor, just so that you know, we've

20  sent in a proposal forfeiture instruction I think last night --

21         THE COURT:  I got it.  I got it.

22         MR. JUENGER:  -- or early this morning.

23         THE COURT:  I got it already but, you know, as long as

24  I have it, I don't -- I haven't read them, I saw just saw them.

25         Okay.  Do you think you're going to have rebuttal?  You

 1   would say the percentage of the direct is what, of what you

 2   have?  Your client's direct is at what point?

 3          MR. RASHBAUM:  95 percent.

 4          THE COURT:  Okay.  So then you know.  Are you going to

 5   have any rebuttal?  95 percent that's pretty good.

 6          MR. JUENGER:  Pretty good.  There might be one, there

 7   might be one witness, maybe two, very short.

 8          THE COURT:  Yes, rebuttal is always very short, of

 9   course.

10          So you should be ready right after the cross, but I

11   don't want you to filibuster in order to wait for them like it's

12   been threatened by the other side when they wanted something.

13   There's no point doing that because it's too great a risk with

14   the jurors, so just be ready for that.  That's all.

15          Anything else I can help you with before we recess so

16   you can go to the bathroom and come back?

17          Hearing nothing, we will see you in five minutes.

18     (There was a brief recess at 5:05 p.m.)

19          THE COURT SECURITY OFFICER:  Bring them in?

20          THE COURT:  Yes, please.

21     (The jury returned to the courtroom at 5:45 p.m.)

22          THE COURT:  All right.  Go ahead.  Keep going.

23          MR. RASHBAUM:  Thank you, Your Honor.

24          THE COURT:  Are you going to go through any other

25   exhibits?

Jury Trial

1           MR. RASHBAUM:  I am, Your Honor.

2           THE COURT:  Why don't you just rattle off the numbers?

3    If I don't hear objection, they're in.  So if you can do it in

4    order, it's actually easier for me to find them, but if you

5    cannot --

6           MR. RASHBAUM:  I'm sorry, Judge.

7           THE COURT:  No problem, just tell me what they are.

8           MR. RASHBAUM:  Defendant's Exhibit 13.

9           THE COURT:  They are all defendant's.  13, in.

10          MR. RASHBAUM:  125.

11          THE COURT:  125, in.

12          MR. RASHBAUM:  14.

13          THE COURT:  Hold on.  Hold on.  125, in.

14          MR. RASHBAUM:  14.

15          THE COURT:  In.

16          MR. RASHBAUM:  119.

17          THE COURT:  In.

18          MR. RASHBAUM:  121.

19          THE COURT:  Already in.

20          MR. RASHBAUM:  112.

21          THE COURT:  In.

22          MR. RASHBAUM:  111.

23          THE COURT:  In.

24          MR. RASHBAUM:  47.

25          THE COURT:  Already in.

1        MR. RASHBAUM:  6.

2        THE COURT:  Any objection?

3        MR. JUENGER:  No objection.

4        THE COURT:  In.

5        MR. RASHBAUM:  24.

6        THE COURT:  In.

7        MR. RASHBAUM:  40.

8        THE COURT:  In.

9        MR. RASHBAUM:  103.

10       THE COURT:  I'm sorry, I missed it.

11       MR. RASHBAUM:  103.

12       THE COURT:  In.

13       MR. RASHBAUM:  21.

14       THE COURT:  In.

15       MR. RASHBAUM:  172.

16       THE COURT:  In.

17       MR. RASHBAUM:  7.

18       THE COURT:  In.

19       MR. RASHBAUM:  36.

20       THE COURT:  Already in.

21       MR. RASHBAUM:  167.

22       THE COURT:  In.

23       MR. RASHBAUM:  37.

24       THE COURT:  In.

25       MR. RASHBAUM:  34.

Grow - Direct

1          THE COURT:  In.

2          MR. RASHBAUM:  173.

3          THE COURT:  In.

4          MR. RASHBAUM:  29.

5          THE COURT:  Is there a particular reason why they're in

6    this order?

7          MR. RASHBAUM:  Yes, but we're almost done, and I'm not

8    going to go through them all.

9          THE COURT:  Okay.  I was just wondering.  It keeps me

10   sharp I guess.  29 in.

11         MR. RASHBAUM:  And 17.

12         THE COURT:  Any objection to 17?

13         MR. JUENGER:  No objection to 17.

14         THE COURT:  Okay.  In.  They are all in.  You can skip

15   all the predicate questions, and the Government doesn't have to

16   say I agree.  All right.

17         MR. RASHBAUM:  Thank you, Your Honor.

18      (Defendant's Exhibit Numbers 6, 7, 13, 14, 17, 21, 24, 29,

19   34, 37, 40, 103, 125, 111, 112, 119, 167, 172, 173, were

20   received in evidence.)

21   BY MR. RASHBAUM:

22   Q.  I want to switch gears.  You've heard in this trial about

23   the switch from 1099 for your marketers to W-2 with PCA.  Do you

24   recall that testimony?

25   A.  I do.

1  Q.  Can you tell the jury what this is about?

2  A.  Basically, Matthew Smith one day in, I believe it was late

3  February, contacts me and tells me he needs to talk to me and so

4  I give him a call and he told me that the pharmacy had hired an

5  outside law firm who specialized in health care law and they

6  were hired to come in and do an evaluation of the company's

7  practice because they had, you know, grown a significant

8  business and they wanted to do some compliance to make sure that

9  everything was being done properly.

10        He told me that while this evaluation was going on that

11  a red flag came up and it happened to be the way in which the

12  marketers for the company were being paid and compensated as

13  1099 independent contractors instead of W-2 employees, and he

14  informed me that they wanted to talk to me about this.

15        This made me very upset and nervous, anxious, and I

16  told him that I was going to quit this program and shut

17  everything down.  He informed me that, no, no, no, that wasn't

18  needed, it wasn't necessary, that they had attorneys and there

19  was a solution and they wanted to come up to Tampa, Florida

20  where I'm located and meet with me.  So I said okay, well, let's

21  hurry up and do this then.  And so we had some texts and calls

22  back and forth and he let me know that they were making

23  arrangements to come up to Tampa.  They ended up settling on

24  Thursday, I believe.  That was a Monday when he called me.  So

25  they were able to get into town Thursday with what he told me

1  was their legal department.

2        So they came up to Tampa and met with me.  We had

3  dinner with Matthew Smith, Patrick Smith, who's the CEO of the

4  pharmacy, and an attorney by the name of Gary Walker from the

5  law firm Akerman Senterfitt and we had a meeting there in Tampa

6  that night.

7  Q.  And after you had the meeting at Fleming's restaurant with

8  Mr. Walker and Pat Smith and Matt Smith, what were you told at

9  that meeting?

10 A.  I was told by Gary Walker, the attorney, that when you're

11 dealing with a Federal payer such as Tricare, that it was in a

12 gray area when it came to the way patients -- or not patients --

13 but marketers were being paid, that they would have to become a

14 W-2 employee, including myself and any other marketers that were

15 being compensated.  He said that it complied with something he

16 called a safe harbor which basically, I guess, gives an

17 exclusion.  If you're a W-2 employee of the pharmacy, then you

18 are, therefore, allowed to receive commissions from referrals

19 that are provided to the pharmacy; whereas if you're a 1099,

20 then it is not allowed and it could potentially violate the

21 anti-kickback act.

22 Q.  And after this meeting with Matt Smith, Pat Smith and Gary

23 Walker, what process began after the meeting?

24 A.  Well, they immediately said they were going to hire a human

25 resource firm to come in and handle what they called the

1    onboarding process because I wasn't the only marketing group for

2    the company, there were several other marketing groups as well

3    working for them, and that it was going to be a very, very big

4    project and there was going to be a lot of people potentially

5    that they would have to hire on with the company.  So that

6    process, they told me, was going to take several weeks.

7            I believe this is, you know, right at the beginning of

8    March, end of February.  And after about a week of talking back

9    and forth, they had said that they planned on having the

10   onboarding completed I believe by April 6th, and that was the

11   target date to be able to get everything completed for

12   compliance.

13   Q.  And the onboarding, did it take a longer period of time than

14   April 6th?

15   A.  It did.

16   Q.  And what was your reaction to that?

17   A.  I was not happy about it.  I was constantly talking to the

18   pharmacy, asking them what was going on.  They assured me that

19   they were working on it and doing everything possible to get

20   this transition done, you know, as smooth and fast as possible,

21   and they assured me that everything was fine so I kept waiting.

22           April 6th came and went and I stopped actually

23   providing a lot of the patients that were being submitted, I

24   stopped turning them into the telemedicine network because I

25   just started feeling uncomfortable.  And then finally I think

1   maybe around April 18th or something, April 19th, I sent out an

2   email and text message to all of my sales reps and let them know

3   that I was ending MGTEN Marketing Group and that we were no

4   longer going to be providing these services to patients, and

5   basically I appreciated all their hard work in helping take care

6   of these patients in need, but we were no longer going to be in

7   business; that their sales commissions from the previous month,

8   because they got paid a month behind, would be paid and that no

9   further payments would be made by MGTEN Marketing Group under

10  any circumstances, so please do not attempt to ask.

11  Q.   And what happened next?

12  A.   I let the pharmacy know that I had terminated the program

13  and that we were no longer going to be doing it and they assured

14  me that they were ready to do the onboarding process.  It was

15  approximately two days later that they said that they were ready

16  to onboard everyone and that we could proceed.

17  Q.   And what happened after that?

18  A.   So I reached back out to my sales team and I let them know

19  that I wanted to have a conference call with everyone so I could

20  inform them of the situation and what was currently going on.

21  So I scheduled a conference call that a lot of people attended

22  and I was able to tell them about the regulatory changes from

23  the pharmacy and the need to be converted to a W-2 employee if

24  they wanted to continue marketing this business.

25  Q.   Was that conference call recorded?

1  A.  It was not recorded by me, but during the course of this

2  investigation one of the participants on the call happened to

3  record it and it was turned over to the Government.

4  Q.  And when was the first time that you heard that conference

5  call?

6  A.  Several months ago, during the course of this investigation.

7  Q.  How did you get it?

8  A.  I got it from my attorneys.

9  Q.  And what did you say on that conference call, generally?

10  A.  Basically, the pharmacy had given me some outlines to

11  discuss, and basically, I let them know that there was

12  regulatory issues, that the pharmacy said we had to be W-2

13  employees; and I gave them pretty much a breakdown of what could

14  be expected if they wanted to continue, that they would have to

15  sign an employee agreement with the pharmacy, that they would

16  have to submit to a drug test, they would have to do some

17  training modules online, as well as HIPAA compliance.  And that

18  if they did choose to continue, they would have to provide me

19  with all of their information, so I could forward it to the

20  pharmacy, and the pharmacy would then send them out an employee

21  package which would involve all of this information such as the

22  drug testing forms and engagement letters and things like that.

23  Q.  Once you converted to a W-2 employee of the pharmacy, what

24  was your role going to be?

25  A.  My role was going to be the vice president of sales.

1  Q.   What was that going to entail?

2  A.   Basically, I would be overseeing the sales representatives

3  that were converted over to W-2, and I would be in charge of

4  helping with training them.  I would be also in charge of

5  product development for the pharmacy.  They were looking at

6  other avenues of business, and they wanted me to help with that

7  exploration.

8  Q.   Your sales reps, who would they be paid by after the

9  conversion?

10 A.   They would be paid directly from Patient Care America.

11 Q.   And were you converted to this W-2 employee status?

12 A.   I did, I was converted.

13 Q.   Now, did there come a time when the program terminated once

14 you were at PCA?

15 A.   Yes.  It was actually shortly thereafter, we were all

16 terminated, and basically it was because the changes with

17 Tricare when it came to compounding some time in early May,

18 essentially, they shut down the business and they were no longer

19 reimbursing for the compounded medications.

20 Q.   Mr. Grow, thankfully, I'm not going to show you all those

21 documents.  They're in evidence, but I'm going to show you just

22 a couple of them.

23       Showing you Defense Exhibit 13, and this is a text

24 message between you and who?

25 A.   This is Matthew Smith from the pharmacy at PCA.

Grow - Direct

1   Q.   And you say, "Email me over the stuff you have on

2        anti-kickback when you can."

3            When is this text message occurring?

4   A.   February 23, 2015.

5   Q.   And Matthew says, "Would like to come up Wednesday night to

6        think a bit more over options."  And you respond, "Okay.

7        I'm just throwing up."

8            Can you tell the jury what this is about and why you're

9   throwing up?

10  A.   He had called me earlier that day to inform me about the

11  attorneys coming into the practice and doing their evaluation

12  and letting me know that there was a potential gray area with

13  the issue of being compensated as a 1099 instead of W-2 and, you

14  know, I immediately started doing research and whatnot, and I

15  asked him to send me over the information on the Anti-Kickback

16  Statute, and by the time he called me back, I was already, you

17  know, knee deep in it and I was very concerned.

18  Q.   And what were you concerned about?

19  A.   I was concerned that our whole agreement was violating the

20  law.

21  Q.   And in what way did you think you were violating the law

22  possibly?

23  A.   Because it said that I was being paid as a 1099

24  representative and not a W-2.

25  Q.   And is that when you said to Mr. Smith, I'm going to shut

1   down the program?

2   A.  That is correct.  I told him that day that I was shutting

3   down the program, we weren't going to be operating anymore; and

4   he assured me that that wasn't necessary and that they had

5   already spoken with their attorneys, there were solutions and

6   that it could all be resolved and they wanted to come up and

7   meet with me.

8   Q.  And that text, again, is from February 23, 2015?

9   A.  That's correct.

10  Q.  Showing you Defense Exhibit 125, Matt Smith to Monty Grow on

11  February 26.

12  A.  Yes, that's him confirming that we were going to meet at

13  7:00 p.m. that night.

14  Q.  And where were you going to meet?

15  A.  At Fleming's Steakhouse in Tampa, Florida.

16  Q.  And this is three days after the text message?

17  A.  Yes, that's correct.

18  Q.  And again, who were you going to meet with at Fleming's

19  Steakhouse?

20  A.  I was meeting with Patrick Smith, who is the CEO of the

21  pharmacy, as well as Matt Smith, who was the vice president of

22  the pharmacy, as well as their legal counsel, Gary Walker.

23  Q.  And Gary Walker, did you later do some research on Gary

24  Walker and find out who he was?

25  A.  Yes, I did.  After that meeting I -- obviously, I felt a lot

1    better after I met with him and I was able to go and pull him up

2    online and confirm that he worked for a very large law firm, and

3    you know, had a lot of experience in health care law.

4    Q.   And then showing you Defendant's Exhibit 14, a day later,

5         Matt says, "Let me know what you thought about the

6         discussion last evening."  And you respond, "I appreciate

7         you guys coming up.  I think we have a lot of work to do.  I

8         guess we need to discuss the specifics of the Employment

9         Agreement and how the salary, the commission is going to be

10        structured."

11             Do you see that?

12   A.   I do.

13   Q.   And so by this point in time, is it fair to say that you had

14   decided to move forward with the program?

15   A.   Yes, absolutely.  Once they explained to me that we would be

16   in compliance and everything would be fine, then I said, great,

17   then we would be able to convert to a W-2, I was more than

18   willing to do that, and that we could proceed.

19   Q.   And I'm not going to show you every document, but was there

20   then a back and forth with PCA legal counsel and others

21   negotiating your employment contract?

22   A.   Yes, there was some, you know, talks back and forth between

23   attorneys, David Corcoran for the pharmacy, and there really

24   wasn't a whole lot of negotiations.  You know, we came to terms

25   pretty quickly.  And from there, it was just back and forth

1  talking about the onboarding process and how that was going to

2  proceed and take place.

3  Q.  And on March 12th, you receive an email from Matt Smith

4  talking about the progress of the boarding; is that fair to say?

5  A.  That is true.

6  Q.  And did you receive various updates like this?

7  A.  I did.  It was a regular basis, plus I was constantly

8  calling trying to figure out where the process was, what was

9  happening and, you know, how fast we were going to be able to

10  get it completed.

11  Q.  When it took longer than expected, on April 19th you sent a

12  text message out to some of your marketers letting them know

13  that the program is going to be terminated?

14  A.  That's correct.  I let them know that any of these

15  submissions that they had put in in April would not be processed

16  and that the program was terminated.

17  Q.  And do you send an email letting them know of the same

18  thing?

19  A.  That is correct.

20  Q.  That's Defendant's Exhibit 40 and others.

21        Did the pharmacy, before that conference call, give you

22  several talking points that you could use on the conference call

23  once they told you that you were going to be onboarded and that

24  the program could continue?

25  A.  Yes, they did.  They gave me an outline of topics, you know,

1    that I would discuss with the team.

2    Q.  And again, just moving backwards a little bit, Defendant's

3    Exhibit 34, this is an example of deadlines that they were

4    giving you for the onboarding?

5    A.  That is correct.

6    Q.  And Defendant's Exhibit 29, you inform Nichole Powell, no

7    payments will ever come from me in the future?

8    A.  Yes, I did.

9    Q.  Who would the payments come from?

10   A.  It would be from Patient Care America if she chose to come

11   on as a W-2 employee and was ultimately hired.

12   Q.  Once you met with that lawyer and had the Employment

13   Agreement from Mr. Corcoran and heard about all the compliance

14   work that was being done to move you and your employees from

15   1099 status to W-2 status, were you still nauseous?

16   A.  No, I felt at ease.  I felt like we had taken all the right

17   steps, listened to the attorneys and did what they told us that

18   should be done.

19            MR. RASHBAUM:  One moment, Your Honor.

20            THE COURT:  Sure.

21   BY MR. RASHBAUM:

22   Q.  I just want to show you one last document and ask you maybe

23   one or two final questions.  Did PCA, during the onboarding

24   process, ask you about how the tiered commission structure

25   worked?

1  A.  Yes, they did.  They wanted to know how my representatives

2  exactly were being paid.  They knew that it was a tier, but they

3  weren't sure exactly what the percentages were for each level.

4  Q.  And did you share that information with them?

5  A.  I did.

6  Q.  And did you share that with them through an email?

7  A.  I believe so, yes.

8          MR. RASHBAUM:  Apologies, one moment.  Give it one last

9  shot.  Hold on one second.  If it's not in this pile, we'll move

10  on.

11          MR. MARCUS:  It's 112.

12          MR. RASHBAUM:  112?  Do you have it?  Can you grab it?

13  I got it.

14  BY MR. RASHBAUM:

15  Q.  Showing you Defendant's Exhibit 112.  Apologies.

16          Is this where you're explaining to them the formula for

17  the commissions?

18  A.  Yes, it is, that's correct.

19  Q.  And there are other emails to that effect as well?

20  A.  Yes, there is.

21  Q.  Mr. Grow, in 2014 and 2015, when you were running MGTEN, did

22  you intend to violate any Federal crime?

23  A.  Absolutely not.

24  Q.  If you knew you were violating any Federal crime, would you

25  have run this program?

1  A.  No way.

2          MR. RASHBAUM:  I have no further questions, Your Honor.

3          THE COURT:  All right.  I suspect the cross-examination

4  is going to be extensive, right?

5          MR. JUENGER:  It will be, Your Honor.

6          THE COURT:  How long do you think it will be?

7          MR. JUENGER:  Two to three hours.

8          THE COURT:  Oh, my goodness.  So I'm going to send you

9  home for the weekend.  Okay?  Do not talk about the case.  Do

10 not read anything about the case.

11         Is Monday 9:00, a good time?

12         All right.  See you then.  Leave your notebooks in

13 there.  Have a good afternoon.  Have a good weekend.

14         THE COURT SECURITY OFFICER:  All rise for the jury.

15    (The jury retired from the courtroom at 6:13 p.m.)

16         THE COURT:  Okay.  Have a seat where you are.  Do you

17 still want to attempt to introduce those exhibits, Mr. Rashbaum?

18         MR. RASHBAUM:  That I read?

19         THE COURT:  No, the exhibits -- I think it has to do

20 with the prior consistent statements.  Was that 191 and 192?  Do

21 I have that or what is that?  No, that's not it.  Do we have

22 numbers?

23         MR. MARCUS:  There are three, Your Honor.  They are

24 175, 191, 192.  175, Your Honor --

25         MR. RASHBAUM:  We don't need that one.

1          THE COURT:  175.  What's the other one?

2          MR. MARCUS:  191, 192.

3          THE COURT:  Okay.

4          THE WITNESS:  MR. RASHBAUM:  On redirect.

5          MR. MARCUS:  Yes, it would be on redirect.

6          THE COURT:  Go ahead and ask him questions about it

7  outside of the presence of the jury now.

8          MR. RASHBAUM:  Okay.

9          THE COURT:  I mean, we might as well use this time,

10  right?

11          MR. MARCUS:  Well --

12          THE COURT:  If you don't intend to use it as a matter

13  of strategy, there's no point doing it.  What I don't want to do

14  is do this while the jurors are waiting.  That's the reason we

15  are doing it now.

16                       DIRECT EXAMINATION

17             (Outside the presence of the jury.)

18  BY MR. MARCUS:

19  Q.  Mr. Grow, in January of 2016, were you aware of any Federal

20  investigation into you, MGTEN or PCA?

21  A.  No.

22  Q.  Had you received any subpoena at that point?

23  A.  No.

24  Q.  Were you aware of anyone you had worked with being under

25  investigation?

1  A.  No.

2  Q.  Had anyone from law enforcement, Federal, State or local,

3  approached you to talk to you about your work at MGTEN?

4  A.  No.

5  Q.  Ms. Dutting, when did she work with you at MGTEN?

6  A.  I think she worked with me from like December of 2014

7  through maybe March, beginning of April, 2015.

8  Q.  And in March, April of 2015, what did she do?

9  A.  She was a marketer, she was a sales representative.

10  Q.  And after she stopped working with you, did she continue to

11  work, to your knowledge, in the industry?

12  A.  I believe, yes, she did.  She went and started her own

13  company and started working with some other pharmacy.

14  Q.  Did you have contact with her from, let's say, June of 2015

15  through the end of the year?

16  A.  I did not.

17  Q.  Were you aware that she was under any sort of Federal

18  investigation in January of 2016?

19  A.  No.

20  Q.  Were you aware that she had done an interview with CBS News?

21  A.  I saw that news program on the television, yes.

22  Q.  And when do you recall seeing that program?

23  A.  I believe it was some time in like May of 2015.

24  Q.  And it was a news interview, right?

25  A.  Yes.

1   Q.   Was she ever arrested, to your knowledge, after the news

2   interview?

3   A.   Not that I know of.

4   Q.   So let's fast-forward now six months or so to January of

5   2016.   Did she get in contact with you?

6   A.   Yes, she just reached out to me.   I don't even remember what

7   was said.   I think she reached out to me and said, hey, here's

8   my new phone number, or something like that.

9   Q.   Did you have a conversation with her?

10   A.   I think maybe like a week or so later I did.

11   Q.   Before we talk about the conversation, the news interview of

12   her on CBS, what was the subject of the interview?   Was it about

13   your business?

14   A.   No, I think it was just about compounding prescriptions for

15   Tricare, something like that.

16   Q.   And was Ms. Dutting's work -- did she have a different

17   company?

18   A.   Yes.

19   Q.   Do you recall the name of the company?

20   A.   I believe it was Healing 4 Heroes.

21   Q.   And was the interview focused on Ms. Dutting and her

22   company?

23   A.   Yes, it was.

24   Q.   And it talked generally about the industry?

25   A.   It did.

Grow - Direct

1  Q.  When Ms. Dutting called you on January 8th of 2016, did she

2  tell you that she was under investigation?

3  A.  I don't know if this is the exact date, but at some point

4  she called me and told me that someone, a Federal agent or

5  something like that had left a card or something in her -- on

6  her door or her mailbox.  I can't remember exactly.

7  Q.  Did she tell you that she was recording her conversation on

8  behalf of the FBI?

9  A.  No, she did not.

10  Q.  Now, when Ms. Dutting left and started her own company,

11  Healing 4 Heroes, did she run her new business the same way that

12  were you running your business?

13  A.  Honestly I don't know how she was doing it.  I had no idea

14  what she was doing.

15  Q.  Do you recall what the news article said about her company?

16  A.  That basically she was marketing compounded medications to

17  Tricare beneficiaries.

18  Q.  Now, today we heard through your testimony that you had been

19  told by PCA throughout your time working for them that your

20  compensation and your practices were legal, as far as you knew

21  at the time?

22  A.  Yes.

23  Q.  Fair to say?

24  A.  Absolutely.

25  Q.  The termination of the program after you became a W-2

 1    employee, that was a business decision, was it not, by PCA?

 2    A.  It was.

 3          THE COURT:  How is that going to help me make whatever

 4    decision I have to make about the prior consistent statements?

 5    What is it that you want me to do?  You want me to let them in

 6    based upon that case, Prieto, so how does this help me?

 7          MR. MARCUS:  Because, Your Honor, when he left and

 8    throughout, including when he was taped, he did not believe he

 9    had done anything wrong.  He didn't have any motive to

10    fabricate, he wasn't under investigation.  He was under the

11    belief that he had acted in compliance with the law.

12          THE COURT:  That's your conclusion.

13          MR. MARCUS:  Right.

14          THE COURT:  But I've got to get some facts, but how

15    does that help me?

16          MR. MARCUS:  Well, it helps to show his state of mind

17    with respect to the legality of his practice.  When he leaves

18    and the program is shut down, he's not told that there's a

19    criminal issue.

20          THE COURT:  When were you first told that there may be

21    some criminal problems?

22          THE WITNESS:  When the -- I mean, with me?

23          THE COURT:  Yeah, with you.

24          THE WITNESS:  When the Federal agents showed up at my

25    front door some time in June of 2016.

1          THE COURT:  Before then, you had no idea that you could

2     be investigated?

3          THE WITNESS:  I had no idea.

4          THE COURT:  All right.  Cross-examination.

5                         CROSS-EXAMINATION

6               (Outside the presence of the jury)

7                         CROSS-EXAMINATION

8     BY MR. LARSEN:

9     Q.   Mr. Grow, in the spring of 2015, you were aware that there

10    was nationwide scrutiny of compounding pharmacies and marketing

11    arrangements associated with those pharmacies, weren't you?

12    A.   Not the marketing arrangements.  I did know that there was

13    some scrutiny about compounding medications in general, yes.

14    Q.   And the way that the compounding -- the way that the

15    compounding pharmacies had been targeting the Tricare program

16    and billing the Tricare program, you knew there was nationwide

17    scrutiny specifically related to the Tricare program, didn't

18    you?

19    A.   I don't know that I knew that there was scrutiny.  I knew

20    that there was this CBS news program that was run that was

21    scrutinizing it.

22    Q.   And you actually saw that news story that prominently

23    portrayed Ms. Deanna Dutting, a woman that you paid over $21,000

24    to in exchange for referrals of Tricare patients?

25    A.   Yes, she was a part of that news program.

1  Q.  And in the spring of 2015, you were corresponding with

2  emails with PCA executives and members of the hedge fund

3  ownership interest in PCA, where they were asking you about

4  Deanna Dutting, correct?

5  A.  Yes.  They didn't know who she was.

6  Q.  Because they assumed or they presumed you were responsible

7  for Ms. Dutting, correct?

8  A.  They knew that I had a relationship with her, yes.

9  Q.  And there was a reference to calling Ms. Dutting an idiot.

10  Do you remember that characterization on an email?

11  A.  Yes, absolutely, I do remember that.

12  Q.  That was in the spring of 2015?

13  A.  I believe so.

14        THE COURT:  What is the spring of 2015?

15        MR. LARSEN:  March -- excuse me.  May of 2015, late

16  April, early May of 2015.

17  BY MR. LARSEN:

18  Q.  Now, in early 2016, several months later, Ms. Dutting

19  contacted you by telephone and told you she had been contacted

20  by the FBI and that the FBI wanted to talk to her about

21  specifically health care fraud and kickbacks, correct?

22  A.  Something of that nature, yes.

23  Q.  And you immediately or almost immediately told her, don't

24  talk to the Government, get a lawyer, right?

25  A.  I don't know if I told her not to talk to them.  I think I

Grow - Cross

1    said don't talk to them without a lawyer, yes.

2    Q.  Do you recall sending text messages shortly after that to

3    Ms. Dutting?

4    A.  Sure.

5    Q.  Do you remember sending Ms. Dutting links to articles about

6    why not to speak to the Government, don't talk to the FBI?

7    A.  Yes, I did.

8    Q.  So you were concerned about her speaking with authorities,

9    weren't you?

10   A.  I was concerned about her doing it without an attorney.

11   Q.  Those text messages where you were sending Ms. Dutting

12   advice about not talking to the Government, that was in between

13   the first call in January of 2015 and the second call that's at

14   issue, correct?

15   A.  I think it was pretty much the same time as the first call.

16   Q.  So at that same time, there were two recorded calls and

17   numerous text messages wherein you are telling Ms. Dutting not

18   to talk to the Government?

19   A.  Come to find out later, yes, I guess I did find out later,

20   much later, that there were two recorded calls.

21   Q.  I'm talking about the timing.  This is January of 2016, two

22   recorded calls where you're discussing health care fraud and

23   kickbacks, and at that same time sending numerous text messages

24   to Ms. Dutting advising her not to speak to the Government?

25   A.  I don't believe her and I were talking about health care

1   fraud and kickbacks.  She was telling me that an FBI agent

2   wanted to meet with her and I asked her, I believe -- I mean,

3   it's been so long since I've had that conversation or heard the

4   tapes, but I believe at that point in time she was saying that

5   she -- that they wanted to meet with her and she was

6   contemplating meeting with them, but didn't know if she should,

7   and I told her that she shouldn't do it without an attorney.  I

8   just, you know, pretty much felt like that was good advice.

9   Q.  You were just concerned for Ms. Dutting's well-being?

10  A.  Yes.

11          MR. LARSEN:  No further questions, Your Honor.  I would

12  just argue that the tapes themselves --

13          THE COURT:  Okay.  Now, do we have a transcript of the

14  taped conversations?

15          MR. MARCUS:  Yes.

16          THE COURT:  Let me see them.

17          MR. MARCUS:  Sure.

18          THE COURT:  The Government has it as well I suspect,

19  right?

20          MR. LARSEN:  Yes, Judge.

21          THE COURT:  Other than the Prieto case and the Ninth

22  Circuit case, Collicott is the Ninth Circuit case, any other

23  case that the Government has that you want me to read?

24          MR. LARSEN:  No, Your Honor.

25          THE COURT:  How about the defense?

1          MR. MARCUS:  No, Your Honor.

2          THE COURT:  Okay.  Well, you're free, if you want to,

3    as a proponent or the opponent of those exhibits, you are free

4    to file a pleading and a memo about it, if you want, and then I

5    will rule after I read that, after the cross-examination of the

6    defendant if the defendant still wishes to do that on redirect.

7    Okay?  So that will take care of that.

8          MR. MARCUS:  Can I just ask two questions of Mr. Grow,

9    Your Honor?

10         THE COURT:  No.  That's why we are finished with that.

11   You can do that.

12         Now, for the jury instructions, we have to make our

13   charge conference easier on Monday right before closing

14   argument -- by the way, over the weekend the other thing you all

15   should do is, you should have a clean Exhibit List of the

16   exhibits that have been admitted, one by the Government and one

17   by the defendants you can put the same indication as they are

18   here.  I mean, don't put anything that someone else would, like

19   this is the acquittal or the conviction exhibit, something like

20   that.  Skip all the numbers of exhibits that have not been

21   introduced or that have not been admitted.  I think it's

22   helpful, and I assume you're going to have all the exhibits --

23   both sides -- in a folder like I told the jurors.

24         Am I right, Government?

25         MR. LARSEN:  Yes, Judge.

 1          THE COURT:  Am I right, defense?

 2          MS. MEYERS:  Yes, Your Honor.

 3          THE COURT:  That's the way it should be.  I think you

 4   should also have a list of the witnesses whom you called without

 5   any reference, do it in the order that they were called, just

 6   because I think that's easier for them to go through everything,

 7   so you should have that.

 8          On the jury instructions, the defense says that I

 9   shouldn't give an expert witness instruction and the Government

10   agrees?

11          MR. LARSEN:  I don't think it's any longer necessary,

12   Your Honor.

13          THE COURT:  Okay.  I agree.  That's why -- I start with

14   the easy part, see.  So that's going to go out.

15          The defendant also says that on the instruction dealing

16   with the health care fraud, at the last line on Page 16 it says,

17   what must be proved beyond a reasonable doubt is that the

18   defendant knowingly attempted or carried out a scheme

19   substantially similar to the one alleged in the Indictment, and

20   the defendant says I should take out "attempted or carried out."

21   What say the Government?

22          MR. LARSEN:  I'm sorry, Your Honor.  Can you direct me

23   again to which jury instruction?

24          THE COURT:  The Jury Instruction 11 under health care

25   fraud, the second page, the last line.  You see where it says --

1  you can do this sitting down, the jury instructions.  Do you see

2  that last line, what must be proved?  You got it?  Do you have

3  it?

4          MR. MARCUS:  Page 15.

5          THE COURT:  Of my instructions.  It says Page 16, I

6  don't know if that's still true.  Do you have it?  It doesn't

7  look like you have it.  Jury Instruction 11, health care fraud,

8  do you have that?

9          MR. LARSEN:  I do.

10          THE COURT:  You don't have to stand up for that.  You

11  have it?

12          MR. LARSEN:  Yes.

13          THE COURT:  Look at the second page.  Look at the last

14  three lines, the last sentence.  Have you got that?  "What must

15  be proved," read it to yourself.  In the middle, defendant says

16  delete "attempted or" and just keep carried out a scheme, that

17  attempting to carry out a scheme is not enough.  What say the

18  Government?

19          MR. LARSEN:  Your Honor, this is the Pattern jury

20  instruction.  It's consistent with the way the case was charged.

21          THE COURT:  Sometimes that's not enough.  Not every

22  time, most of the time it's enough.  You know, there's a law

23  that says the Pattern Jury Instructions are not the law, but of

24  course, it's very important because they have great judges like

25  Judge Middlebrooks on that committee and all these very

1    intelligent, hard-working people.

2         Okay.  Look at it.  That's an issue.  So flag it as an

3    issue as to whether the health care fraud attempt is included in

4    the Indictment.  It is included in the Indictment, so it should

5    be there.  What say the defendant?  If it's included in the

6    Indictment, why shouldn't attempt be instructed?

7         MR. MARCUS:  Well, we moved on Rule 29 on these counts.

8         THE COURT:  I know that but it's been denied.  So that

9    takes care of that.

10        MR. MARCUS:  Right.  It's not an attempt --

11        THE COURT:  Does the Indictment say attempt?

12        MR. MARCUS:  They do have attempt to execute in the

13   Indictment, did knowingly and willfully --

14        THE COURT:  So in substantive counts, can you have

15   attempt?

16        Is the Government going to argue that he attempted or

17   that he did it?  Look at that.  See, I love to see dissent

18   within the ranks of both.

19        MR. JUENGER:  No, Your Honor, we're not going to argue

20   attempt.

21        THE COURT:  Delete it.

22        MR. JUENGER:  We'll delete it.

23        THE COURT:  Done.

24        MR. JUENGER:  And I would point out --

25        THE COURT:  Done.  Done.  You don't have to point out,

 1   both sides agree.  Done.

 2           MR. JUENGER:  But --

 3           THE COURT:  Done, if you both agree.  It's too late to

 4   chat.

 5           MR. JUENGER:  It needs to be deleted also in the

 6   elements, because the element, it still says attempt.  So I

 7   think it should be consistently deleted.

 8           THE COURT:  You put that in your notes?

 9           MR. JUENGER:  It's in the Pattern.  I did not --

10           THE COURT:  We're not talking about the Pattern.  We

11   are talking about my jury instructions that I gave you and that

12   I told all of you delete what you don't like and then we can add

13   later.  I obviously said it in Latin.

14           MR. MARCUS:  Your Honor --

15           THE COURT:  No.  You wanted it out.  It's out.

16           MR. MARCUS:  Looking at the Indictment, I was just

17   going to suggest adding two words because it's charged knowingly

18   and willfully, and I am just looking --

19           THE COURT:  That's different.  Did you put that in your

20   suggestions?

21           MR. MARCUS:  I did not.

22           THE COURT:  Then you're going to have to do it some

23   other time, not now.  This is why charging conferences are a

24   court reporter's nightmare, right, but that's why I'm going to

25   force you to do it the easy way.  It's not the final one, so it

1    doesn't really matter.  Okay?

2         I'm obviously going to take out the misbranded drugs,

3    so that will no longer be there.  So now they're there.

4         What are we going to do with objects of the conspiracy?

5    What is the Government's position on that?  And I included it

6    because I thought it was easier.

7         On Page 20, Instruction Number 14, it really should

8    have said, objects of the conspiracy charged in Count 9, so I'll

9    add that, obviously.  They put three objects.  You agree or

10   disagree?

11        MR. LARSEN:  Yes, I agree, Your Honor.

12        THE COURT:  You agree?  Then it will stay there;

13   charged in Count 9 will be one of the others.

14        All right.  The defense said they didn't want aiding

15   and abetting, but aiding and abetting is charged in the

16   substantive counts and I add the part that the Government never

17   includes in 27, 28 years.  I always tell them, it does not apply

18   to conspiracy.  I've suggested to every prosecutor in every

19   trial, send an email telling everybody, make sure that it's not

20   included.  So if a new judge comes in -- and we're going to have

21   five new ones.  If a new judge comes in, they might put it in

22   the conspiracy.  That may be a problem.

23        So I suggest again, as I've done, send an email saying,

24   hey, aiding and abetting, you can't aid and abet in a

25   conspiracy.  So make sure when you do the standard aiding and

1    abetting Section 2 instruction to add one line that says,

2    doesn't include the conspiracy charge to help you out, because

3    someone else may miss it and it may be an issue.  It's out.

4           All right.  Any proposed instruction by the Government?

5    You don't have any, right?

6           MR. LARSEN:  No, Your Honor.

7           THE COURT:  Okay.  On the defense, okay, let me do the

8    easy ones first.

9           Defense is requesting certain changes.  One is safe

10   harbor employee compensation agreement.  Did the Government get

11   a chance to see the Defendant's Proposed Jury instruction Number

12   9?

13          MR. LARSEN:  Yes, Your Honor, I looked at that this

14   morning.

15          THE COURT:  Do you like it?

16          MR. LARSEN:  No.

17          THE COURT:  Do you know what Title 42 United States

18   Code says in 1001.952(g)?  Is that the right law?  Look it up.

19   I do this in case you have some free time over the weekend,

20   that's what you should look at instead of doing it right before

21   closing.

22          So does the Government agree that I should give a safe

23   harbor instruction?

24          MR. LARSEN:  No, Your Honor, we don't.

25          THE COURT:  You don't.

1          MR. LARSEN:  No.

2          THE COURT:  Why not?

3          MR. LARSEN:  Because we don't believe the safe harbor

4    is applicable.  We don't believe the evidence has supported it.

5          THE COURT:  If I don't give it and there's some

6    evidence about this employment and their relationship and all of

7    this, then that's a big thing, isn't it?

8          MR. LARSEN:  Your Honor --

9          THE COURT:  I mean, I hate to speak like a juror.  I

10   don't know.  I want you guys to think like jurors.  It's a big

11   thing.

12         MR. JUENGER:  It is.

13         THE COURT:  So I'm very reluctant not give some type of

14   an instruction.  Do you think that this is what will make or

15   break the case?

16         MR. JUENGER:  No, Your Honor, but --

17         THE COURT:  I agree with you.  So if it's not going to

18   make or break the case, why not give it?

19         MR. JUENGER:  I agree with that, but I think we should

20   have a proper instruction --

21         THE COURT:  Then come up with one.

22         MR. JUENGER:  Okay.

23         THE COURT:  We have time and see what you can come up

24   with.  When in doubt, what I do is, I look at the laws passed by

25   Congress, however they were written.  If you all don't agree on

1    something easy and readable, then I'll read whatever the statute

2    says and that's what you should come up with because I'm covered

3    and that takes care of it.  I'm being very blunt.

4         Good faith attempts to satisfy safe harbor, I'm going

5    to deny that because I'll give a good faith instruction, and

6    then you can argue good faith for everything.

7         There's a Proposed Special Jury Instruction Number 10

8         that says, "A defendant cannot be found guilty of money

9         laundering if he thought that his business activities which

10        earned the money in question was legitimate and lawful."

11        That may be true, I think it is true, but the money

12   laundering statute covers it, so that's going to be denied.

13        The reaching agreement instruction, Defendant's

14   Proposed Special Jury Instruction Number 11, will be denied.

15        Okay.  So now what I'm going to do is, before closings

16   you'll have probably the end of whatever instruction I come up

17   with and then you can raise your objections to the others.

18        On Jury Instruction Number 12, the conspiracy to pay

19        and receive health care kickbacks on Count 9, the defendant

20        wants me to delete "An overt act is any transaction or

21        event, even one that may be entirely innocent when viewed

22        alone, that a conspirator commits to accomplish some object

23        of the conspiracy."

24        Isn't that what we give every time?  Mr. Marcus, were

25   you the one rising for that, or are you going to yield?  Why was

1  that deleted from your proposed?

2          Okay.  It will be given because it's the standard one.

3  On Jury Instruction Number 15 -- I assume it was the defendant

4  who was asking for that to be deleted.  Am I right, Government?

5          MR. LARSEN:  That's right, yes.

6          THE COURT:  All right.  On Jury Instruction Number 15,

7  the receipt of kickbacks, the defendant says, "remuneration is a

8  corrupt payment."

9          Well, so if you get remunerated -- nobody really talks

10 like that, but lawyers do.  So if you're a Harvard lawyer and

11 you ask your buddy also from Harvard, what did you get

12 remunerated this year, you think corrupt is part of it,

13 Mr. Marcus?

14         MR. MARCUS:  To be a kickback, yes.

15         THE COURT:  No, I didn't say to be kickback.  You say

16 remuneration is a corrupt payment.  That's not what remuneration

17 is.  Remuneration is a thesaurus word about getting paid.  So

18 that's going to be out.  I decline to add "corrupt."  Of course,

19 you have the whole instruction and you can argue whatever you

20 think is appropriate.

21         Then at the end, "to satisfy the second element of this

22     offense, the Government" -- the original instruction says --

23     "does not have to prove that the defendant's sole purpose in

24     soliciting or receiving the remuneration or kickback was to

25     induce the referral of an individual for the furnishing of

1   an item or service.  Rather, the Government must only prove

2   that inducing the referral was one of the defendant's

3   purposes in soliciting or receiving the remuneration or

4   kickback."

5       The defendant is suggesting to delete starting with

6   "does not have to prove that it's the sole purpose," go all

7   the way down and add that "the defendant's purpose has to be

8   the primary."

9       Well, the first thing I would suggest is why would I

10  delete "the sole purpose" and then add "primary."  That mean

11  there's more than one purpose if one is a primary.  So I think

12  the instruction is correct.  Tell me why it isn't.

13      MR. MARCUS:  Well, the instruction says that it just

14  has to be --

15      THE COURT:  No, tell me why it isn't correct.

16      MR. MARCUS:  Because I'm asking for a primary purpose

17  instruction, Your Honor.

18      THE COURT:  I know, but tell me why.

19      MR. MARCUS:  Because there's a circuit split on this

20  issue.

21      THE COURT:  What does the Eleventh Circuit say?

22      MR. MARCUS:  The Eleventh Circuit doesn't follow the

23  primary purpose test but --

24      THE COURT:  Then it will be denied.

25      MR. MARCUS:  Well, I just want to make a record.

1          THE COURT:  You know what?  Many years ago I got

2    nominated to the Eleventh Circuit because a bunch of people

3    failed.  You can google it.  It says, under failed nominations.

4    I'm with good people like John Roberts and my friend and others,

5    but I'm not an Eleventh Circuit judge.  I'm kind of happy, as I

6    told my colleagues, because this is more fun.

7          It's preserved in case the Supreme Court says the

8    Eleventh Circuit is wrong.  I'm not going to go against the

9    Eleventh Circuit even if I thought they were wrong.  Do you want

10   me to go against the Eleventh Circuit?

11         MR. MARCUS:  Well, the Eleventh Circuit doesn't deal

12   with a marketing situation.  Here's the problem with the way

13   this instruction is:  All these crimes are crimes of

14   willfulness, so this would incorporate -- I mean, what does it

15   mean to have a purpose?  So if I'm in a transaction, a business

16   dealing, and one of my rationales in my head is I may want to

17   make some money and do well --

18         THE COURT:  Every transaction has that as a purpose.

19         MR. MARCUS:  But this instruction almost criminalizes

20   every transaction.

21         THE COURT:  No.

22         MR. MARCUS:  No?

23         THE COURT:  No, it does not.  No, it does not because

24   you've got to take it in context with everything else.  You

25   can't just take one line of it.

1          It says, "does not have to prove that the defendant's

2     sole purpose in soliciting was to induce the referral."

3          It could be, you know what?  Let's make some legitimate

4  money and half of it is legit and half is not.  It does not.

5          MR. MARCUS:  I mean, we see this with a lot of the

6  corruption cases.  That's why the --

7          THE COURT:  I'm not trying a corruption case.  I'm

8  trying a kickback case.

9          MR. MARCUS:  It's a bribery issue, yes.  So it's a

10  similar context.

11          THE COURT:  Then it's preserved, but I'm not going to

12  give it.

13          The only question is whether I should -- the first

14  part, I'm not going to delete, "does not have to prove that the

15  defendant's sole purpose was to induce," unless there's a case

16  that says that I have to delete that.

17          Is there a case or would I be the first one in the

18  Eleventh Circuit to say that?

19          MR. MARCUS:  Yes, in the Eleventh Circuit?

20          THE COURT:  I'd be the first?  I'm not; never have

21  been, never will.  So that takes care of that.

22          So the only question is whether it has to be the

23  primary purpose.  It doesn't have to be the sole, but does it

24  have to be the primary?

25          MR. LARSEN:  No, Your Honor.

1          THE COURT:  Well, do you have like a case or something?

2          MR. LARSEN:  Your Honor, this exact instruction has

3    been given --

4          THE COURT:  Over and over again.

5          MR. LARSEN:  -- in this district as late as just this

6    last year in United States versus Serge Francois.  It was Case

7    Number 16-20399.

8          THE COURT:  I believe you.  You don't have to put the

9    case number, I believe you.

10         MR. LARSEN:  Okay.  And two of your colleagues followed

11   this exact instruction including --

12         THE COURT:  And I'm sure they're right.  Did the

13   Eleventh Circuit do anything with that?

14         MR. LARSEN:  I'm not aware of the Eleventh Circuit

15   doing anything with it.

16         THE COURT:  That's the important part.  All right.  So

17   I won't do it, but it's preserved.

18         So the Defendant's Jury Instruction Number 15, I'll put

19   it aside, I'll put denied and it will be filed so it's

20   preserved.

21         On the payments, it's kind of like the same thing.  The

22   defendant is saying to satisfy the second element of this

23   offense, the one about remuneration, I have written the

24   standard, "does not have to prove that the defendant's sole

25   purpose in offering or paying the remuneration was to induce,"

1   et cetera.  And the defendant wants me to say "referral" and put

2   "primary."  So in order to be consistent, I'll also deny that

3   and that will be part of the record; and if you get the Eleventh

4   Circuit to change its mind or the Supreme Court, that takes care

5   of it.

6           What kind of a good faith defense -- the defendant does

7   not like my good faith defense, wants to delete the last

8   paragraph.  You have that Jury Instruction 20, good faith,

9   defense?

10          This is really going to save time.  I know you'd rather

11  not do this now, but it helps the jurors.

12          Do you have that, the last paragraph, "but an honest

13     belief"?

14          The defense doesn't want that and wants it replaced

15     with "If the evidence leaves with you a reasonable doubt

16     that the defendant acted willfully, with the intent to

17     violate the law, you must find him not guilty."

18          Don't I give a willful instruction in any event some

19  other place, Mr. Marcus?

20          MR. MARCUS:  You do give willfully, yes.

21          THE COURT:  You want me to do it twice because it helps

22  you.

23          MR. MARCUS:  Well, every single count in this case has

24  a willfulness element, yes.

25          THE COURT:  Well, now it's not 49, it's 47.  You want

1  me read this 47 times.

2          MR. MARCUS:  No.

3          THE COURT:  Just twice?

4          MR. MARCUS:  I think with good faith --

5          THE COURT:  Three times.  What do I pick?

6          MR. MARCUS:  The more the better from our standpoint,

7  obviously, but at least twice.

8          THE COURT:  You know, it's not true because then people

9  tune out, so it's not true.  So I will not.

10         Now, is there anything wrong with the last paragraph?

11     "But an honest belief that a business venture will

12     ultimately succeed does not constitute good faith if the

13     defendant intended to deceive others by participating and

14     making representations the defendant knew to be false or

15     fraudulent."

16         That's not a correct statement of the law?

17         MR. MARCUS:  It doesn't make sense for the facts of

18  this case.  This is typically given where you have sort of a

19  business fraud situation from investors, for example, where

20  you're --

21         THE COURT:  And the Government doesn't say this was a

22  health care fraud case where patients were being deceived and

23  the Government was being deceived through the payments.  They

24  don't say that?

25         Does the Government say that?

1          MR. LARSEN:  We do, Your Honor.

2          THE COURT:  In your closing argument you're going to

3  say that in how much time?

4          MR. LARSEN:  I think you gave me an hour, Your Honor.

5          THE COURT:  No, you asked for 90 minutes.  I haven't

6  decided how much time yet, but I'll give you what you want.  So

7  it took me two seconds, it will take you, you say, 90 minutes.

8  I'll give it over the objections of the defense.

9          All right.  I think we've done enough.  Anything else?

10         MR. MARCUS:  Are the rest of our special instructions

11  denied as well, Your Honor?

12         THE COURT:  Which ones are those?

13         MR. MARCUS:  There was a definition of kickback.

14         THE COURT:  I do give the standard instruction.  It's

15  covered, denied as covered.  What else?

16         MR. MARCUS:  There was promotion is not inducement.

17         THE COURT:  Denied as covered.  You can always argue

18  whatever you want.  What else?

19         MR. MARCUS:  We offered -- we asked for a competing

20  inference instruction.

21         THE COURT:  I saw that.  Denied.  Well, you know, the

22  competing inference, where do you get that from?

23         MR. MARCUS:  It's a First Circuit Pattern instruction,

24  Your Honor.  I cited a First Circuit case where they used it.

25         THE COURT:  There's a case that's near and dear to my

1    heart.

2          MR. MARCUS:  They try a lot of marketing cases in the

3    First Circuit, so it's a good place for --

4          THE COURT:  I know, but I didn't quite understand what

5    that meant.

6          Does that mean that the Government has to exclude every

7    reasonable hypothesis of innocence, in your view, like they do

8    in the State courts in Florida?

9          MR. MARCUS:  No, but it talks about if you equally --

10          THE COURT:  I wanted to make sure that wasn't it

11    because United States versus Bell changed that.  I was the

12    original lawyer, that's how I remember it.  So I don't

13    understand what this instruction says then.  What does it say?

14          MR. MARCUS:  What it says is --

15          THE COURT:  No, tell me what it says.

16          MR. MARCUS:  If you have --

17          THE COURT:  Read it.  Read it.

18          MR. MARCUS:  Sure.  "Where evidence permits you to

19       draw --"

20          THE COURT:  And I want you to think about the jurors

21    you have selected, including Mr. Jones who is working nights,

22    everyone, all of them are listening, the juror who went to the

23    doctor, all of them are listening to this, something that's

24    going to make or break your case.  So read it.

25          MR. MARCUS:  "Where evidence permits you to draw either

1    of two equally valid inferences with respect to a defendant,

2    such as one of knowing and intentional participation in an

3    illegal plan and the other of lack of awareness or lack of

4    participation in an illegal plan, despite certain

5    associations with persons alleged to have been involved, you

6    are to draw the inference that favors the defendant."

7         THE COURT:  Okay.  In addition to being a run on

8    sentence, which would red pencil --

9         MR. MARCUS:  I followed the case, so I didn't wordsmith

10   it.

11        THE COURT:  And that's what the closing argument is

12   about?  I thought the closing argument is about the defendant is

13   not guilty, he didn't know he was violating the law, he had no

14   intent.  Is that what the defense is?

15        MR. MARCUS:  It will be, Your Honor.

16        THE COURT:  But you're going to tell them draw two

17   inferences, so you've got to pick one over the other one.  This

18   is the inference you should pick.  You're going to say that in

19   closing?

20        MR. MARCUS:  It depends how the Government argues their

21   first closing.

22        THE COURT:  Let's say the Government says he committed

23   a fraud, he did it for the money, he used other people, and you

24   have heard Ginger Lay, she laid it all out, and he made 20 out

25   of the 40 million dollars.  Let's say he says that, more

1    eloquently, with more detail, then what are you going to say?

2         MR. MARCUS:  Well, we're going to talk about her

3    perjuring herself and lying but I do believe the --

4         THE COURT:  Okay.  But that instruction doesn't help

5    you with that, it's a question of who you believe.  Okay.

6    Denied, but you can preserve it.  What else?

7         MR. MARCUS:  I also had Instruction Number 4 which

8    talked about the cost of prescription medications.

9         THE COURT:  You discussed that -- someone discussed

10   that in voir dire.  Remember?  Was it you?

11        MR. MARCUS:  It did come up, yes.

12        THE COURT:  And I think in opening.  So you can argue

13   whatever you want.  The cost of medicine doesn't necessarily

14   mean -- is the Government going to say the more it costs, the

15   guiltier you are?

16        MR. LARSEN:  No.

17        MR. MARCUS:  It's the same reason we have instructions

18   about sympathy to either side or bias.

19        THE COURT:  Oh, I'll give that one.

20        MR. MARCUS:  I understand.  But this is specific to

21   certain issues that I think the Government is going to spend a

22   lot of time on.  I mean, a lot of the thrust of their case is

23   the high cost of the medication.

24        THE COURT:  You can talk about that in closing.

25        MR. MARCUS:  It's nice to have an instruction that says

1   that that's not --

2          THE COURT:  It's not the law.  Is that from a case?  Is

3   there a case that talks about the high cost of medications?

4          MR. MARCUS:  It was modified based on the MacKenzie

5   case and the Ricole (phonetic) case from the First Circuit that

6   I filed.

7          THE COURT:  Was that a corruption case?

8          MR. MARCUS:  Those were health care marketing cases,

9   pharmaceutical marketing case.

10         THE COURT:  All right.  And the judge gave that

11  instruction?

12         MR. MARCUS:  They did.

13         THE COURT:  What happened to the case?

14         MR. MARCUS:  The defendant was acquitted.

15         THE COURT:  Okay.  Because of the facts, not because of

16  the instruction.  I'm going to deny it, but it's covered.  Did

17  you file that?

18         MR. MARCUS:  Yes, I filed it, I filed it last night.

19         THE COURT:  Then it's denied and preserved.  What else?

20  That's it from the defense?

21         MR. MARCUS:  Well, we filed our Number 2, which was

22  very similar to the reasonable doubt instruction.  We just added

23  a lack of evidence.

24         THE COURT:  You can argue that, but I'm going to stick

25  with the regular reasonable doubt instruction.

1            MR. MARCUS:  Okay.  And we added just a one-sentence

2    Indictment instruction; that the defendant starts with a clean

3    slate, that the Indictment doesn't prove anything.

4            THE COURT:  I told the jurors right before you selected

5    them about that and you can tell them that.  I'll tell them the

6    Indictment is going to go back with you, but it's not proof of

7    anything.  I'll tell them that.  All right?

8            So what will happen on Monday is, you'll get the jury

9    instructions, the final ones, and you get one more shot at

10   preserving anything or in case I missed something.

11           Does either side have proposed Verdict Forms?  Well,

12   while you do your Exhibit List, clean Exhibit List, clean

13   Witness List, you should have a proposed Verdict Form if you

14   want to have objects of the conspiracy, for example.  If you

15   don't have that, then, if you're the defendant, you've waived it

16   and you agree with a general Verdict Form, but if you want it,

17   prepare it and give it to me Monday morning.  All right?

18           Any other task that you want to undertake?

19           MR. JUENGER:  No tasks, one question.  Do you instruct

20   before we give closing or afterwards?

21           THE COURT:  It depends really on the timing of it.  I

22   think the smart thing to do is always to do it before.

23           MR. JUENGER:  I agree.

24           THE COURT:  The problem is, we're never done before

25   because you saw what it took.  It took an hour almost, 45

1    minutes to go through this and we are not even done and that's

2    what happens.  So then the jurors are waiting, will go home and

3    come back the next day.  So the changes are that I'll give it

4    afterwards, but you'll have the jury instructions in your hands

5    because you know what they are already.  So you can prepare your

6    closing arguments, and I let you argue the instruction if you

7    want.  Some judges don't let you.  I'll let you, but then you

8    should quote it.  Now you know what it is, so you can quote it,

9    and you'll have the jury instructions before you finish your

10   closings.

11           If you want to talk for 90 minutes, you know, I can

12   probably handwrite them.  You'll probably have it.  It's fair

13   for you to have it.  If I could do it before, maybe, but I don't

14   want to promise something I cannot keep.  I've got to work on

15   all of this now.  That's why we're doing this now to hopefully

16   get them to you before.  But you know how many times I've done

17   that out of 760 something?  Twice.  So it doesn't look good.

18   All right.  That's it?

19           MS. MEYERS:  One other question, Your Honor.

20           THE COURT:  Ms. Meyers, for which purpose does the

21   gentle lady rise?

22           MS. MEYERS:  Very briefly, Your Honor.  Is it Your

23   Honor's practice to go through the exhibits that have been

24   admitted in the defense case as Your Honor did in connection

25   with the Government's case?

1      THE COURT:  It's not my practice, but if you want to do

2  that, we can do that.

3      MS. MEYERS:  Well, I'm wondering about the timing.

4      THE COURT:  I wouldn't do that right now.

5      MS. MEYERS:  Not at all, Your Honor, but I'm just

6  wondering about the timing of the filing of the final Exhibit

7  List because I think it's important that everyone agrees as to

8  what exhibits were, in fact, admitted before we file a final

9  Exhibit List.

10     THE COURT:  Oh, my goodness.  Oh, my goodness.  Have

11  you got your list?

12     MS. MEYERS:  I do, Your Honor.

13     THE COURT:  My record indicates -- ready?

14     MS. MEYERS:  Yes, Your Honor.

15     THE COURT:  Defendant's 2, 4, 5, 6, 7, 8, 9, 10 through

16  17, 19, 21, 22, 24, 25, 27, 29, 30, 32, 34, 35, 36, 37, 38

17  through 43, 46, 47, 48, 50, 53, 55, 58, 62 through 65, 67 and

18  68, 70, 72 and 73, 77 and 78, 81, 83, I think 84, but I'm not

19  sure.

20     MS. MEYERS:  Yes, Your Honor.

21     THE COURT:  Okay.  Yes, 84?

22     MS. MEYERS:  Yes, Your Honor.

23     THE COURT:  You don't have to be standing up for this,

24  you can do it sitting down.

25     MS. MEYERS:  Thank you, Your Honor.

1          THE COURT:  85, 87, 88, 89, 94, 95, 97, 98, 99, 103,

2     105, 111, 112, 113, 117 through 121, 123, 125 through 127, 130,

3     131, 133, 137, 139, 140, 143, 162, 167, 171, 172, 173, 181, 190,

4     199, 201, 202-A, 202-I, J and K, 205, 206, 207, 211, 212 -- 13,

5     14, 15, and add-on 16 and 17.

6          MR. MEYERS:  We had a few additions, Your Honor.

7          THE COURT:  Tell me what they are.  And Government,

8     look to see whether you agree.

9          MS. MEYERS:  Defense Exhibit 33, Your Honor.

10         THE COURT:  What say the Government?

11         MR. LARSEN:  No objection.

12         THE COURT:  Okay.  You don't have to stand up for this

13    anymore.  Okay.  Admitted.

14         Next number.

15         MR. MEYERS:  Defendant's Exhibit 66.

16         THE COURT:  What say the Government?

17         MR. LARSEN:  No objection.

18         THE COURT:  In.  I could have made a mistake.  Next.

19         MS. MEYERS:  82.

20         THE COURT:  Government?

21         MR. LARSEN:  No objection.

22         THE COURT:  In.  Next.

23         MS. MEYERS:  129.

24         MR. LARSEN:  No objection.

25         THE COURT:  In.

1          MS. MEYERS:  146.

2          THE COURT:  Well, I sustained it and then they agreed,

3    so you're right.  I didn't see the agreement.  So it's in.

4    That's it?

5          MS. MEYERS:  204.

6          THE COURT:  Government?

7          MR. LARSEN:  No objection.  I'm hearing it's admitted

8    but --

9          THE COURT:  Okay.  I could have made a mistake.  In.

10        (Defendant's Exhibit Numbers 33, 66, 82, 129, 146, 204 were

11   received in evidence.)

12         MS. MEYERS:  Then what we brought --

13         THE COURT:  No, give me a number.

14         MS. MEYERS:  Government's Exhibit 84.

15         THE COURT:  84.

16         MS. MEYERS:  Of the Government's exhibits.

17         THE COURT:  Of the Government's.  Okay.  Well, I don't

18   know.  We went through the Government's list.  Remember?

19         MS. MEYERS:  But we admitted that today, Your Honor, in

20   the defense case.

21         THE COURT:  Okay, it's in.

22         MS. MEYERS:  That's it, Your Honor.  Thank you.

23         THE COURT:  All right.  Anything else?

24         Have a good evening and a good weekend.  We'll see you

25   Monday morning at 9:00.

1          MR. LARSEN:  Judge, have a good night.

2          THE COURT SECURITY OFFICER:  All rise.

3      (The trial adjourned at 7:05 p.m.)

4

5              C E R T I F I C A T E

6      I hereby certify that the foregoing is an accurate

7  transcription of proceedings in the above-entitled matter.

8

9  __09-10-18_____          _____
        DATE                 GILDA PASTOR-HERNANDEZ, RPR, FPR
10                           Official United States Court Reporter
                             Wilkie D. Ferguson Jr. U.S. Courthouse
11                           400 North Miami Avenue, Suite 13-3
                             Miami, Florida  33128     305.523.5118
12                           gphofficialreporter@gmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

**abet** 170:24
**abetting** 170:15,15,24 171:1
**able** 10:18 29:21,25 30:3 32:20
35:25 42:18 48:23 61:23
94:23 109:9 116:25 119:18
125:1 135:4 143:25 145:11
146:22 151:1,17 152:9
**about** 7:2 10:18 11:12 12:23
15:15 16:5 18:23,24,25 19:1,6
19:17 21:13,20 24:24 27:8
28:7,13,13,18 29:8,10,13
31:12,17 32:19 33:24 35:12
36:8 41:13 42:5 43:5,19,20
44:7,10 46:16 47:9 49:13,15
49:17,22,2,5 50:16,19 52:5
53:4,8 56:9,16 58:15,16 59:7
63:16,19 64:8 65:1 66:7 67:3
67:4 68:23 69:4,19,21 72:9
73:8 76:15 78:2,5 80:15 82:5
82:6,8,10,1,9 83:7,21,23 85:23
86:3 87:8,14 88:16 95:14
96:12,19,23 97:6 98:17 99:12
99:17 101:2 103:25 105:1,7
105:19,23,25 106:11,14
107:18 113:4,5 118:3,17,18
118:23,24 119:15,19 120:11
122:19,24 123:22 127:19,20
127:23 131:7,22 132:16,25
133:6 134:7,21 135:11,12,13
135:14 136:6 138:7 142:22
143:1,14 145:8,17 146:22
149:8,10,18 151:5 152:1,4
153:13,24 155:9,10 156:6
157:3 158:11,12,14,24 159:15
160:4 161:13 162:3,20 163:5
163:8,10,12,21,2 5 164:25
165:4 169:10,11 172:6 174:17
178:23 182:9,20 183:12,12
184:2,8,18,24 185:3 186:5
188:3,6
**above-entitled** 191:7
**absolutely** 27:7 30:14 33:2 37:7
43:15 44:23 78:1 80:21
100:12 106:1 107:11 108:2
125:2 151:15 154:23 159:24
162:11
**abundance** 109:11
**abuse** 133:11 134:17,20
**acceptable** 119:25
**accepted** 77:3 101:21
**access** 13:10,1 1 91:2 105:19
106:1 109:17
**accidentally** 41:25
**accomplish** 173:22
**according** 122:18 133:25 137:23
**account** 17:2 32:1 51:6
**accounting** 16:20
**accounts** 20:10 67:1
**accurate** 65:8 73:21 191:6
**acquainted** 19:23
**acquit** 69:18
**acquittal** 165:19
**acquitted** 69:15 185:14
**across** 10:19 82:13
**act** 59:22 144:21 173:20
**acted** 160:11 179:16
**active** 35:6 99:9
**actively** 7:24
**activities** 173:9
**actual** 15:16 82:14
**actually** 10:13 11:13 14:15 19:4
19:12 22:2 27:19 29:20,21
30:2 39:5,9 46:17 48:6 50:24
72:25 76:24 77:2 91:1 96:24
97:19 99:2 105:14,18 106:20
107:20 108:22 113:20 114:1,5
119:23 128:19 130:22 134:4
140:4 145:22 148:15 161:22

**add** 115:24 169:12 170:9,16
171:1 174:18 175:7,10
**added** 185:22 186:1
**adding** 169:17
**addition** 115:24 183:7
**additional** 116:25 138:12
**additions** 189:6
**address** 35:6 56:8
**add-on** 189:5
**adjourned** 191:3
**adjust** 55:24 56:4
**adjusted** 55:10,12
**admissibility** 56:16 58:11
**admissible** 56:18 57:20
**admission** 61:5
**admit** 9:16,21,23 10:20 12:4
23:16 40:13 45:8 74:18 93:18
98:1 108:9 110:6,9 120:24
131:14
**admitted** 9:3,25 11:1 12:17
13:14,17 15:3 16:15 17:11
23:19 25:7,24 30:24 31:3 33:9
34:16,18,23 40:17 45:12 71:3
74:22,2,5 75:8 78:22,23 81:12
84:5,7,9,12,15,18,2 1 88:22,25
89:3 108:12 110:22 121:1,10
121:12,13,2 1 130:7 165:16,21
187:24 188:8 189:13 190:7,19
**adopt** 57:11
**advice** 95:20 137:8 163:12 164:8
**advise** 56:21
**advising** 79:8 163:24
**affect** 98:23
**after** 14:12 31:11 38:12 40:2
47:12 50:21 57:20,22 59:1,2
59:14 66:2,3 68:19,20,20
74:11 77:16 80:12 90:9
111:14,23 114:19,21 115:3
118:3 124:15 125:6,13 128:10
129:7 133:3 134:10 135:5
138:16 139:10 144:7,22,23
145:8 146:17 148:8 150:16,25
151:1 157:10 158:1 159:25
163:2 165:5,5
**afternoon** 53:18 155:13
**afterwards** 61:10 105:24 186:20
187:4
**again** 10:8 13:20 14:6 17:3
19:20 30:5 40:10 48:2 49:8
71:13 76:8 79:9,10 87:19
88:12 89:18 90:1 98:21
109:23,23 124:23 126:12
127:3 128:15 132:15 150:8,18
153:2 166:23 170:23 178:4
**against** 61:5 67:25 176:8,10
**agent** 159:4 164:1
**agents** 137:17 160:24
**ago** 6:3 61:14 147:6 176:1
**agree** 66:24 70:13 78:9 86:8
101:7 142:16 166:13 169:1,3
170:9,11,12 171:22 172:17,19
172:25 186:16,23 189:8
**agreed** 190:2
**agreement** 7:11 9:12,14 17:19
17:24 56:16 96:4,4 125:11
127:6,15 147:15 149:19 151:9
153:13 171:10 173:13 190:3
**agrees** 166:10 188:7
**ahead** 6:22 40:5 47:13 81:23
112:13 118:23 138:5 139:22
156:6
**ahold** 28:5 48:22 119:7 125:1
**aid** 170:24
**aiding** 170:14,15,24,25
**ailments** 43:23
**Akerman** 144:5
**Alec** 71:8,11,13
**alert** 91:1 93:3,4 97:8
**Alisa** 86:4,9,16 116:18,21,22

**allegation** 100:11 101:10
**alleged** 58:20 64:18 100:10
166:19 183:5
**alleging** 135:10
**allow** 65:9 116:11,11 135:17,18
**allowed** 36:12 57:10 89:12
144:18,20
**almost** 53:2 142:7 162:23 176:19
186:25
**alone** 104:16 111:12 173:22
**along** 63:17 86:23
**already** 9:25 10:14 30:24 61:17
61:21 62:1,1,6 69:1 70:12,14
76:16 81:10,22,2,4 84:7 91:13
93:24 94:2 108:6 110:7 119:9
112:22 115:25 116:21 121:2
121:12,23 122:17 123:20,23
125:24 130:7 137:18 138:23
140:19,25 141:20 149:16
150:5 187:5
**although** 136:8
**always** 37:11 44:23 45:6 59:5
82:21 96:7 101:11 116:14
133:8 139:8 170:17 181:17
186:22
**America** 1:4 7:12 11:14 20:1,5
22:1 51:9 76:1 80:8 96:22
107:21 126:13 127:16 148:10
153:10
**among** 133:10 137:8
**amounts** 32:10
**Amy** 29:7
**Anderson** 30:1 32:5,6,15
**another** 32:14,16 35:18 39:10,11
42:13 50:11,19 51:22 53:21
60:12 63:10 64:10 66:11
75:19 100:14 124:18,21
132:20,23
**answer** 35:25 44:6 47:8 51:22
60:5 122:11
**answering** 119:19
**anticipatory** 62:3,4,5
**anti-kickback** 144:21 149:2,15
**anxious** 143:15
**anybody** 6:21,21 31:7 104:9
**anymore** 20:25 79:7 80:14 100:1
107:12 150:3 189:13
**anyone** 32:24,25 116:12 128:9
156:24 157:2
**anyone's** 97:17 99:3
**anyplace** 54:3
**anything** 11:9 28:14 43:4 50:9
51:24 61:4 65:16,18 69:6 95:4
96:6 100:4 105:23 110:12
118:15,24 119:6 123:21 132:1
139:15 155:10 160:9 165:18
178:13,15 180:10 181:9 186:3
186:7,10 190:23
**anytime** 109:11
**anyway** 6:14 57:4
**anywhere** 20:14 21:22 41:19
92:25
**Apologies** 94:4 154:8,15
**apologize** 9:21
**apparent** 89:10
**appeal** 69:11
**Appeals** 134:13
**APPEARANCES** 1:12
**applicable** 172:4
**application** 20:4,4
**applied** 14:10 91:7
**apply** 170:17
**appointment** 6:19
**appointments** 128:20
**appreciate** 151:6
**appreciated** 146:5
**approach** 8:18 12:10,13 23:8,10
73:14
**approached** 7:18 66:23 90:21

157:3
**appropriate** 25:13 38:2 174:20
**approval** 43:2 96:1 114:24 116:1
117:19
**approved** 10:14 97:2 119:21,21
120:1
**approvingly** 134:1
**approximately** 26:8,10,13 27:4
30:6 120:9 146:15
**April** 15:6 46:7 66:5 101:1 112:7
112:10 115:8 117:4,7,14,25
118:3 125:24 126:1 127:25
128:2,10 129:16 145:10,14,22
146:1,1 152:11,15 157:7,8
162:16
**area** 41:4 144:12 149:12
**argue** 62:22 164:12 168:16,19
173:6 174:19 181:17 184:12
185:24 187:6
**argues** 183:20
**argument** 95:8 136:6 165:14
181:2 183:11,12
**arguments** 133:16 187:6
**Armando** 86:6,9
**arose** 58:21 134:8
**around** 7:20 24:21 27:1 41:7
64:14 66:5 96:6 104:24 116:2
**arrangements** 143:23 161:11,12
**arrest** 133:19 134:8
**arrested** 158:1
**arrived** 6:2 53:21 79:9,10
**article** 57:24 159:15
**articles** 163:5
**Ashby** 46:8
**aside** 178:19
**asked** 21:15 24:19 29:9 46:19
54:12 70:14 81:16 97:18,20
97:20 105:21 107:10,18
114:23 119:4 122:9,23 124:21
149:15 164:2 181:5,19
**asking** 33:25 35:13,14 36:20
41:25 46:11 90:6,7 98:16,18
98:21,22 101:2,3 108:1 109:6
109:8 111:24 113:10 114:14
116:24 145:18 162:3 174:4
175:16
**aspect** 71:15
**assessment** 119:13 125:11 128:2
**assign** 46:20 88:1
**assigned** 13:3 137:16
**assistant** 9:9 13:22 36:21,25
**Associate** 17:19
**associated** 21:11 131:4 161:11
**associates** 11:14 13:10
**associations** 183:5
**assume** 14:17 53:2 61:2 68:5,8
68:24 78:21 98:5 136:5
138:10 165:22 174:3
**assumed** 14:16,20 162:6
**assuming** 105:8
**assumption** 128:24
**assured** 124:24 145:18,21
146:13 150:4
**attached** 15:10 35:5 85:21 92:10
**attaches** 134:5
**Attachment** 85:19
**attack** 61:13 64:6 68:24
**attacked** 61:17 62:1 63:2
**attempt** 146:10 155:17 168:3,6
168:10,11,12,15,2 0 169:6
168:16
**attempted** 166:18,20 167:16
168:16
**attempting** 167:17
**attempts** 173:4
**attended** 146:21
**attention** 55:21 95:14 98:10
**attorney** 11:10,20 96:5,11 144:4
144:10 163:10 164:7
**attorneys** 14:18 97:2 119:23

143:18 147:8 149:11 150:5
151:23 153:17
**Attorney's** 1:14,15
**AUSA** 1:13,13
**authorities** 163:8
**authorization** 114:1,25 115:17
115:24
**auto** 48:4
**available** 36:5 41:12 106:17,18
106:19 107:19 108:7 109:7
110:2 116:14
**Avenue** 2:6 191:11
**avenues** 21:7,8 148:6
**aware** 57:23 156:19,24 157:17
157:20 161:9 178:14
**awareness** 183:3
**away** 20:21 39:1,3,4 55:17 79:12
128:18

**B**

**baby** 76:16
**back** 6:9 11:9 15:11 19:18,19
26:21 30:4 33:20 44:1 51:2
73:3 78:9 83:4,21 86:17 90:15
100:18,24 104:13,14 109:22
119:11 122:17 125:3 129:1
130:13 132:22 137:21,22
139:16 143:22 145:8 146:18
149:16 151:20,22,25 186:6
187:3
**backwards** 135:1 153:2
**bad** 66:16 99:16
**Bahrain** 35:7
**bank** 32:1
**banking** 17:1
**banks** 67:1
**base** 12:1,1 19:25 20:9,11,13
21:9,12 105:16 131:7 132:8
**based** 50:1 71:14 105:7 160:6
185:4
**basically** 10:5 11:19 14:2,9
15:23 17:5 18:17 20:4 22:11
23:4 33:25 35:13 36:9 37:19
40:4 41:9 42:16,21 43:21 44:6
44:20 46:23 48:21 49:13,18
50:17 51:6 52:2 65:22 72:20
76:7 81:24 82:1,11 85:24
86:10 88:6 89:14 92:16 99:19
101:8 103:3 115:23 124:23
126:7 129:9 143:2 144:16
146:5 147:10,11 148:2,16
159:16
**basis** 24:7 85:18 152:7
**Bass** 16:18,19
**Bates** 98:10
**bathroom** 104:10 132:19 139:16
**became** 18:4 19:22 20:3 29:22
159:25
**become** 9:12 17:20 21:12 24:2,4
25:18 26:21 31:13 68:20
82:15 134:22 135:9 144:13
**becoming** 26:6 29:8 43:3
**before** 1:10 6:18 11:19,21 14:11
25:18 28:6 36:5 44:9 48:1
54:1 58:20 66:13 67:2 73:17
76:8 82:18 92:18,21 94:12
103:18 108:19 123:20 134:8
135:7 137:5 138:4 139:15
152:21 158:11 161:1 165:13
171:20 173:15 186:4,20,22,24
187:9,13,16 188:8
**began** 9:10 144:23
**beginning** 22:5 87:21 88:12,15
127:20 145:7 157:7
**behalf** 97:3,16 159:8
**behind** 146:8
**being** 21:20,23 41:15 42:4 47:17
63:22 65:11 67:16 78:17 93:5
117:14 126:9 143:9,12 144:13

144:15 145:23 149:13,23
153:14 154:2 156:24 173:3
180:22,23 183:7
**belief** 160:11 179:13 180:11
**believe** 16:20 32:9 41:4 42:11
43:1 51:8 57:9,14 66:6 74:11
76:14 79:21,22 81:22 82:25
85:12 86:7 97:18,22 98:20
102:13 103:3,7 107:2 118:25
121:17 124:21 143:2,24 145:7
145:10 154:7 157:12,23
158:20 160:8 162:13 163:25
164:2,4 172:3,4 178:8,9 184:3
184:5
**Bell** 182:11
**below** 93:9
**beneficiaries** 97:3 159:17
**benefit** 22:15 63:25 72:6 99:19
100:17 101:6
**best** 70:11,14
**bet** 58:13
**better** 151:1 180:6
**between** 48:11 64:17,18 71:8
75:14,24 81:15 87:9 100:22
100:25 110:16 111:5 112:6,9
131:19 148:24 151:22 163:12
**beyond** 166:17
**bias** 184:18
**big** 83:13 94:5 145:3 172:7,10
**billing** 161:16
**Billy** 22:24
**Biscayne** 1:20 2:2
**bit** 8:17 10:11,18 15:15 16:5
29:10 38:19 43:18,20 44:9
68:18 70:2 82:6 87:8,9 88:16
104:2 105:24 118:17 128:17
131:6,6 135:25 149:6 153:2
**Bjerke** 8:7 18:3,9 74:7,10,12
**blame** 127:12
**blaming** 129:12
**blank** 81:2
**blunt** 173:3
**board** 27:14 82:14
**boarding** 152:4
**body** 55:9
**boils** 72:12
**book** 43:8 138:5
**boss** 48:14
**both** 46:3 69:18 133:16 165:23
168:18 169:1,3
**bottom** 13:24 44:4 81:5 117:7
123:5
**Boulevard** 1:20 2:2
**box** 88:2,10
**boxes** 43:19
**branch** 21:6
**break** 38:19 91:9 104:10,10,13
104:15 132:19 172:15,18
182:24
**breakdown** 18:2,5 147:13
**bribe** 30:15
**bribery** 177:9
**brief** 6:6 21:18 121:19 137:6
139:18
**briefly** 18:23 39:12 42:14 109:23
187:22
**bright** 57:11
**bring** 6:5 8:5 27:14 31:7 61:1,23
63:1,5,7 69:8 70:5 132:22
138:10 139:19
**bringing** 21:3 59:6 70:7 95:13
**Britney** 98:13,18
**broad** 58:10 134:20
**brochures** 10:5,12
**brought** 8:6,7,10 17:16 18:3,7
61:22 62:9,12,13 190:12
**Brown** 12:21
**Brundige** 73:22
**buddy** 174:11

**bulk** 12:2
**bunch** 13:24 92:15 176:2
**Burton** 22:24
**business** 7:5 19:3 21:13 27:8
28:14 39:18,21,23,25 40:5
41:18 42:17 44:11 51:10
83:17 98:25 107:10 143:8
146:7,24 148:6,18 158:13
159:11,12 160:1 173:9 176:15
180:11,19
**businesses** 83:19
**busy** 27:10
**buy** 99:15

**C**

**C** 191:5,5
**call** 11:15,1,15 15:22 19:12 20:1
28:6,10,12 36:1 46:14,15,22
48:4,15,17,18,1 8 49:2 57:25
58:1 64:11,15 105:10 115:13
115:25 116:7,11,11,14 117:12
120:18 126:3,17 143:4 146:19
146:21,25 147:2,5,9 152:21
152:22 163:13,13,15
**called** 7:11 12:1 13:1,1 15:22
19:23,25 29:12 37:22,24
38:11 39:9,10,11,12 42:12
50:8 51:14 58:2 65:11 81:16
105:1,8 106:13 119:4,23
120:3,12 122:17,18 124:21,24
143:24 144:16,25 149:10,16
159:1,4 166:4,5
**calling** 7:8 50:12,23 116:13
152:8 162:9
**calls** 19:25 39:11 64:11,13
119:11 143:21 163:16,20,22
**came** 10:19 17:15 21:21 22:25
26:12 29:17 59:5 82:14 83:8
83:11,23 96:7 99:7,19 102:7
106:24 117:1 130:20 143:11
144:2,12 145:22 148:17
151:24
**cancel** 28:11 38:17 47:13,15
79:6,8,12,16,2 5 120:15,19
**canceled** 39:4 47:5 50:18 77:5,8
77:9 79:13 126:9 129:9,15
**canceling** 48:24
**cancelled** 38:15 78:5
**candidate** 77:21
**capability** 36:11
**capsule** 115:16,17
**capsules** 103:5
**card** 159:5
**care** 6:10 20:1 22:1 39:10,22
48:3 49:8 51:9 76:1,25 80:7
90:1 96:22 97:11 113:21
116:3 126:13 127:16 143:5
146:5 148:10 151:3 153:10
162:21 163:22,25 165:7
166:16,24 167:7 168:3,9
173:3,19 177:21 179:4 180:22
185:8
**careful** 123:1 133:10
**Carley** 86:12
**carried** 166:18,20 167:16
**carriers** 101:7
**carry** 57:11
**case** 1:3 30:8 37:4 41:3 43:18
53:4 56:19 77:5,25 80:7
63:9 65:23 67:14 68:13,13,16
70:19 73:6 76:9,19 80:15
96:12 99:12 101:9,17 109:15
116:10 117:21 118:18 124:2
124:10,13 132:25 133:5,9,18
134:1,2,6,7 135:11,12,14,21
136:2 137:15 138:9 155:9,10
160:6 164:21,22,22,23 167:20
171:19 172:15,18 176:7 177:7
177:8,15,17 178:1,6,9 179:23

180:18,22 181:24,25 182:24
183:9 184:22 185:2,3,5,5,7,9
185:13 186:10 187:24,25
190:20
**cases** 63:11,12 103:18,19 177:6
182:2 185:8
**case-by-case** 134:11
**cashier's** 98:20
**catch** 30:1,3 138:18
**Catoggio** 86:4 87:5 116:18
**caught** 32:7,9,10,13
**caused** 68:17
**causing** 69:20 127:6
**cautious** 133:14
**CBS** 65:3 157:20 158:12 161:20
**cc'ing** 12:21 110:17
**cease** 120:12,13
**CEO** 144:3 150:20
**certain** 8:12 20:13 51:7 90:5
171:9 183:4 184:21
**certainly** 67:5
**Certificate** 3:10
**certify** 191:6
**cetera** 179:1
**challenged** 135:3
**chance** 58:24 171:11
**change** 43:14 90:12 92:20 101:2
102:23,24 103:2,5,6 113:5
114:3 115:15,17 117:15 179:4
**changed** 14:12 22:12 43:4 90:14
90:20 182:11
**changes** 42:24,25 146:22 148:16
171:9 187:3
**changing** 95:6
**characterization** 90:18 162:10
**charge** 37:22 51:6 67:25 138:17
148:3,4 165:13 171:2
**charged** 167:20 169:17 170:8,13
170:15
**charge-back** 81:24
**charging** 169:23
**chat** 169:4
**cheat-sheet** 15:12,23
**check** 15:20 21:21 32:11 82:2
98:20
**checking** 43:19
**chemicals** 7:20 11:13,25
**children** 33:17 34:1,3,7
**Chinese** 119:15
**choice** 81:7 106:15
**choose** 106:15 147:18
**choosing** 81:7
**chose** 97:4,16 99:1 106:17
113:24 153:10
**Chris** 40:22 41:23
**Christie** 104:22
**Christopher** 89:18
**chronology** 19:18
**Cichowicz** 28:25 29:5,12,17
30:8 31:6,11,25 32:12,15
100:25 101:1
**circle** 44:6
**circuit** 133:9 134:2,3 164:22,22
175:19,21,22 176:2,5,8,9,10
176:11 177:18,19 178:13,14
179:4 181:23,24 182:3 185:5
**circumstances** 96:16 97:12
134:1 146:10
**cite** 56:20 58:13 134:1
**cited** 63:13 181:24
**claim** 81:18,23
**claims** 48:15 116:20
**clarify** 73:17
**clean** 165:15 186:2,12,12
**clear** 44:10 71:17 73:1,1,6 86:14
134:17
**clearly** 74:6
**client** 62:2 137:18
**clients** 35:24

client's 139:2
close 68:18 70:15
closing 95:8 165:13 171:21
    181:2 183:11,12,19,21 184:24
    186:20 187:6
closings 173:15 187:10
Code 171:18
colleague 133:9
colleagues 176:6 178:10
collecting 27:15
collections 97:1,15
collectively 7:22
Colleen 9:7,9 13:20,22 131:20
Collicott 134:2,7 164:22
combined 63:10
come 19:22 20:21 21:15 26:21
    38:25 53:25 54:8 59:3,12 63:3
    63:14 64:3,6 69:8 90:20,23
    97:8 99:14 104:13 107:24
    108:21,22 110:2 115:23
    118:22 135:18,25 139:16
    143:6,19,23 144:25 148:13
    149:5 150:6 153:7,9,10
    163:19 172:21,23 173:2,16
    184:11 187:3
comes 20:13 42:9 60:19 83:9
    133:4 134:23 137:21,22
    170:20,21
coming 26:9 92:9 104:20,22
    149:11 151:7
comments 66:9 133:20
commission 8:3,14 14:2 18:2,5
    20:15,19 21:21 23:3,4 32:11
    81:25 82:2 116:19 131:1
    151:9 153:24
commissions 8:9 17:2 18:11
    21:4,5,21 30:4,11 36:21 80:3
    95:3 130:12,18 144:18 146:7
    154:17
commits 173:22
committed 183:22
committee 167:25
common 78:13
communication 49:17 118:4
companies 18:21 37:18,19 39:7
    39:8,15 40:3,7 45:5 52:10
    78:14 99:21,22,25
company 7:6,11,19 14:7,10
    16:23 17:6,21 18:15,19 19:10
    19:13 22:5,8,9,10,17,22 23:7
    24:2,3 26:9,10,12 27:20 28:22
    29:8 36:18,24 37:22,22 38:3
    38:15 39:9,10,11,11,22 40:25
    41:2,14 42:12,13 43:6 44:10
    44:25 48:4 49:23,23 50:5
    66:10,11 67:15,17 76:25 80:5
    83:13,13,16 86:17 88:7 90:17
    92:21,23 94:8 95:18,19,23
    96:2 100:15,16 105:14 107:20
    118:12 130:24 143:12 145:2,5
    157:13 158:17,19,22 159:10
    159:15
company's 143:6
compare 59:15
compensated 8:2 20:12 38:3
    119:18 126:10 129:10 143:12
    144:15 149:13
compensation 18:11 34:8 128:2
    128:3 159:20 171:10
competing 181:19,22
complete 39:9 40:23,24 67:7
completed 117:13 145:10,11
    152:10
completely 71:19 83:22
completeness 63:13,15
compliance 10:14 83:21,22,24
    95:13 143:8 145:12 147:17
    151:16 153:13 160:11
compliant 14:18 35:20 41:15

92:17 95:17
complied 144:15
comply 86:18
composite 24:18 25:4 75:3,9
compound 12:3 100:15
compounded 99:20 103:8
    148:19 159:16
compounding 7:7 19:3 20:25
    21:14 83:17 107:8 147:18
    158:14 161:10,13,14,15
compounds 7:13 12:2 16:5
concern 91:6
concerned 89:10 149:17,18,19
    163:8,10 164:9
concerning 67:23
Concierge 39:9 40:23,24
conclusion 160:12
conditions 15:24 38:1
conduct 40:5 133:6
conducting 39:25
conference 138:17 146:19,21,25
    147:4,9 152:21,22 165:13
conferences 169:23
confess 134:25
confidence 39:15
confirm 28:8 33:17 151:2
confirming 150:12
Congress 172:25
connection 187:24
consent 123:16
consider 59:1 135:13
consideration 133:21
consistent 58:6,12,19 59:3,7,12
    59:13,15 61:25 62:9 67:20,23
    68:4,7,25 133:5 134:15
    135:19 136:6,7 155:20 160:4
    167:20 179:2
consistently 169:7
conspiracy 101:20 170:4,8,18,22
    170:25 171:2 173:18,23
    186:14
conspirator 173:22
constantly 83:12,21 145:17
    152:7
constitute 180:12
Constitution 52:25
consult 11:20 37:23,25 38:12,22
    39:5 42:2 47:23 52:14 75:20
    77:12,20,23,2 5 78:3,8 82:17
    128:20
consulted 74:11
consulting 77:16
consults 22:17 38:20 130:25
contact 19:2,4 28:2,21 45:4
    51:17 53:9 94:9,23 105:15
    120:7 126:4 157:14 158:5
contacted 29:6 47:15,17 58:1
    79:5 120:5 123:10 162:19,19
contacting 75:16 79:11
contacts 143:3
contemplating 164:6
contemporaneous 91:10
CONTENTS 3:1
context 176:24 177:10
continent 65:1
continue 6:17 55:19 61:19 70:23
    129:8 146:24 147:14,18
    152:24 157:10
continued 20:24
continuing 6:25 133:19
contract 151:21
contracted 37:20
contractors 143:13
contracts 52:10
control 50:13 52:4 100:21 101:5
    101:8 116:15
controlling 100:19
conversation 19:5 47:20 63:8,17
    97:5,7 158:9,11 159:7 164:3

conversations 63:20 70:8 164:14
conversion 148:9
convert 7:25 151:17
converted 125:21,24 146:23
    147:23 148:3,11,12
conviction 165:19
convinced 59:21
convincing 129:11,13
cooperator's 57:15
copay 96:19 97:1,6,9 98:12,18
    99:4,10
copays 96:12,16,21,23,2 4 97:3
    97:17,21 98:23 99:3,6
copies 51:3
copy 93:9 113:9 114:10 116:17
    120:5 122:6 123:16 131:21
    135:7
Corcoran 151:23 153:13
corner 88:11
Coronado 32:14,15
correct 11:24 19:20 22:7 23:2,13
    24:4,5,10 28:4 30:9,10 36:2
    47:3,4 48:9 71:20,21 85:20
    87:15 90:19 96:8,9 109:13
    116:6 117:4,5 123:7,10 124:5
    124:10 125:4 126:25 150:2,9
    150:17 152:14,19 153:5
    154:18 162:4,7,21 163:14
    175:12,15 180:16
correcting 83:12
corresponding 162:1
corrupt 174:8,12,16,18
corruption 177:6,7 185:7
cost 100:18,19,21 101:5,8 184:8
    184:13,23 185:3
costs 184:14
counsel 6:17 8:15 70:22,22
    150:22 151:20
count 62:8 63:11 69:16 137:22
    170:8,13 173:19 179:23
country 7:20 35:18 82:13
counts 69:18 70:2 168:7,14
    170:16
couple 8:7 19:1 41:23 52:22
    79:21 82:23 105:25 124:19
    132:20 148:22
courage 57:2
courageous 57:2
course 26:8 27:4 29:19,24 62:25
    80:13 139:9 147:1,6 167:24
    178:18
court 1:1 2:5 6:2,7,9,13 8:19 9:3
    9:18,22,25 10:22,24 11:1 12:6
    12:8,12,15,17 13:15,17 14:24
    15:3 16:13,15 17:9,11 23:9,19
    24:6,9,14,16,19,22,2 4 25:3,7
    25:22,24 30:24 31:3,21 33:7,9
    34:14,16,18,21,2 3 37:15
    40:17 45:12,14,17,20,2 5 46:3
    52:15,19,24 53:6,7,12,14,16
    53:21,24 54:3,11,13,16,18,23
    54:25 55:2,6,8,12,15,17,19,21
    55:24 56:2,4,6,9,13,22,25
    57:9,11,12,16 58:4,8,10,13,23
    59:10,18,20 60:1,4,6,8,10,12
    60:16 61:1,4,8,19,2 5 62:3,5,8
    62:15,20,25 63:22,25 64:2,5
    64:10,13,15,17,20,22,2 4 65:7
    65:14,17,24 66:1,7,15,18,20
    66:24 67:3,18 68:15 69:2,14
    69:18 70:6,7,11,13,17 71:3
    74:20,22,25 75:3,6,8 78:10,21
    81:12 84:5,7,9,12,15,18,21
    85:4,7,10,1 4 86:22,24 87:1
    88:22,25 89:3 91:4,13,15,17
    91:20,23 92:1,3 93:21,24 94:2
    94:5,13,16,18 95:8,10 98:3,5
    98:7 100:8 101:20,21,23
    103:14,17,21,2 3 104:4,6,9,12

104:18,22 108:8,12 110:9,12
    110:15,18,20,22,2 4 111:1,4,7
    111:9,11,14,16,18,20,2 3 112:1
    112:3,5,8,11,13,18,2 2 118:10
    121:1,4,6,8,10,12,15,18,21,23
    122:1 129:5,20,22,2 5 130:4,7
    130:13,15,15 131:11,14,17,19
    131:22,24 132:1,4,9,11,14,17
    132:24,25 133:2,25 134:13,16
    134:25 135:21 136:10,13,15
    136:18,22,25 137:5,25 138:3
    138:13,21,23 139:4,8,19,20,22
    139:24 140:2,7,9,11,13,15,17
    140:19,21,23,2 5 141:2,4,6,8
    141:10,12,14,16,18,20,22,24
    142:1,3,5,9,12,1 4 153:20
    155:3,6,8,14,16,1 9 156:1,3,6
    156:9,12 160:3,12,14,20,23
    161:1,4 162:14 164:13,16,18
    164:21,25 165:2,10 166:1,3
    166:13,24 167:5,10,13,21
    168:8,11,14,21,23,2 5 169:3,8
    169:10,15,19,22,2 4 170:12
    171:7,15,17,2 5 172:2,5,9,13
    172:17,21,23 174:6,15 175:15
    175:18,21,24 176:1,7,18,21,23
    177:7,11,20 178:1,4,8,12,16
    179:4,21,25 180:3,5,8,21
    181:2,5,12,14,17,21,2 5 182:4
    182:10,15,17,20 183:7,11,16
    183:22 184:4,9,12,19,24
    185:2,7,10,13,15,19,2 4 186:4
    186:21,24 187:20 188:1,4,10
    188:13,15,21,2 3 189:1,7,10,12
    189:16,18,20,22,2 5 190:2,6,9
    190:13,15,17,21,2 3 191:2,10
Courthouse 2:6 191:10
courtroom 1:5 6:8,10 53:23 54:2
    54:4 56:3 70:16 104:23 133:1
    139:21 155:15
courts 134:25 182:8
court's 134:18
cover 44:20 99:20,23 100:15
    136:20
covered 100:13 173:2 181:15,15
    181:17 185:16
covers 173:12
co-conspirator 64:19
co-conspirators 61:22
co-conspirator's 57:14
Craig 15:7,7 42:9,11
cream 23:25,25 33:17 73:25
    79:6 80:25 81:3,17,20,21
    81:21 102:8
creams 82:3
credibility 61:13,18 64:6
credit 20:4 39:1,3 42:1,2
credited 88:9
crime 154:22,24
crimes 1:14 176:13,13
criminal 63:12 160:19,21
criminalizes 176:19
criticism 71:14
cross 60:8,9,19 61:3,4 64:5
    136:9,10 139:10
cross-examination 3:9 59:2
    62:21 67:22 68:22 69:23
    135:5 137:6,13 155:3 161:4,5
    161:7 165:5
cross-examine 59:4
cross-examined 135:2
current 27:12 41:10 115:15
currently 36:3 41:6 51:11,13
    103:10 146:20
cutoff 116:19
Cynthia 126:14,16,17
C-o-l-l-i-c-o-t-t 134:3

D

**D** 2:6 105:10 191:10
**daily** 85:17,18
**Danae** 12:21
**DANIEL** 1:19
**date** 65:24 66:1,3 87:6 89:20
  110:18,19 113:14,16 114:7
  115:1 116:22,23,25 117:18,24
  118:7,13 123:8 133:7 145:11
  159:3 191:9
**dated** 115:8
**dates** 116:19
**David** 48:11,11 151:23
**day** 54:7 55:8 83:24 115:3 117:7
  118:25 123:14 124:17 125:6
  125:13,17 126:11,25 143:2
  149:10 150:2 151:4 187:3
**days** 44:20 54:7 61:14 79:22
  120:9 124:15,19 146:15
  150:16
**day-to-day** 51:9
**deadlines** 153:3
**deal** 37:17 69:20 94:5 138:15
  176:11
**dealing** 144:11 166:15 176:16
**dealt** 37:21,21 51:10 85:18
**Deanna** 64:21 66:1 161:23
  162:4
**dear** 125:19 181:25
**deceive** 180:13
**deceived** 180:22,23
**December** 108:15 157:6
**decide** 21:25 38:1 60:20,21
  62:22 68:4,25 135:10 138:6
**decided** 15:19 21:6,24 38:13
  40:5 77:16,20 81:20 134:16
  151:14 181:6
**decision** 44:23 58:14,17 67:19
  98:23 135:21 160:1,4
**decisions** 44:21 50:1
**declarant** 57:10,19 59:14,16
  67:21,25
**declarant's** 67:24
**decline** 174:18
**dedicated** 13:3,9
**deducted** 32:10
**deem** 50:22
**deemed** 30:18 52:11
**deep** 32:20 149:17
**defendant** 1:8,19 6:16 56:17
  57:5,10 68:5 69:16 70:21
  134:23 135:1,11 136:11
  137:15 165:6,6 166:15,18,20
  167:15 168:5 173:8,19 174:3
  174:7 175:5 178:22 179:1,6
  179:16 180:13,14 183:1,6,12
  185:14 186:2,15
**defendants** 167:1
**defendant's** 4:5,6,7,8,9,10,11,12
  4:13,14,15,16,17,18,19,20,21
  4:22,23,24 5:1,2,3,5,6,7,9,10
  5:11,13 8:24 9:1,4,6,16,23
  10:3,21 11:2 12:5,18,20 13:13
  13:18,20 14:23 15:4 16:12,16
  16:22 17:7,12,18,23 18:1
  23:17,20 24:13 25:8,20,25
  30:19,20 31:4,10,20 33:5,10
  34:13,24 35:2,22 36:14 40:14
  40:19,22 45:9 46:4,7 47:2,19
  48:10 50:2 51:1 59:17 63:2
  71:4 72:15 74:15,19 75:10,24
  76:12,22 78:20,20,25 79:3,19
  81:13 84:3,6,8,11,13,16,19,22
  84:25 85:25 86:21 87:2,4,25
  88:20 89:1,4,7,17 90:3 91:11
  91:14,18,24 92:22 94:7 93:7,18
  94:7 100:24 103:12 108:10,13
  110:8,11,21,23 111:2,8,10,17
  112:14 113:3,9,16 114:7,19
  115:1,3,6 116:4 117:6 118:4

120:24 121:3,7,14,22,24
  122:2,5 125:3 126:23 128:14
  129:19,23 130:1,2,8 131:9
  132:5 140:8,9 142:18 151:4
  152:20 153:2,6 154:15 171:11
  173:13 174:23 175:2,7 177:1
  177:15 178:18,24 188:15
  189:15 190:10
**defending** 65:23
**defense** 6:17 41:21 42:9 46:1
  49:8 57:21 59:6 68:17 69:21
  70:21,25 71:7 75:13 80:6 81:9
  97:25 117:22 123:12 148:23
  150:10 164:25 166:1,8 170:14
  171:7,9 179:6,7,9,14 181:8
  183:14 185:20 187:24 189:9
  190:20
**definition** 181:13
**delete** 167:16 168:21,22 169:12
  173:20 175:5,10 177:14,16
  179:7
**deleted** 169:5,7 174:1,4
**demarcation** 134:9
**denied** 38:8 39:2 50:12,24 51:23
  75:18 76:6,13,14 77:5,18,21
  77:22 168:8 173:12,14 175:24
  178:19 181:11,15,17,21 184:6
  185:19
**deny** 52:13 173:5 179:2 185:16
**department** 10:14 144:1
**depends** 64:5 99:16 183:20
  186:21
**deployment** 35:25
**deposits** 17:1
**deputy** 53:23 54:4 104:23
**description** 4:4 111:12
**designed** 18:17
**desire** 44:2 71:24 72:11
**despite** 183:4
**detail** 184:1
**Detective** 134:20
**determination** 78:13 135:18
**determine** 133:25
**determining** 58:11
**development** 148:5
**diabetic** 83:18
**diagnosis** 49:18
**died** 137:6
**difference** 69:15
**different** 7:16 10:6 14:3,8 15:18
  19:1 21:10,29 23:16 51:6 39:8
  39:14 40:2,8,9 43:1,2 47:13
  48:24 57:16 63:3,4 70:2 82:21
  83:11,19 93:16 105:15 106:8
  130:19 131:2 158:16 169:19
**differently** 130:20
**DiFranco** 86:12
**Dimmick** 79:5
**dinner** 144:3
**dire** 184:10
**direct** 3:5,7 6:17,24 22:4 49:2
  60:2,12 61:24 62:18,24 63:2
  64:3 70:23 133:3,4 135:3
  137:14 139:1,2 156:16 166:22
**direction** 73:16
**directly** 13:23 18:20 22:14 45:7
  46:18 76:5 83:9 91:2 92:23
  130:23 148:10
**disagree** 59:10 134:6 170:10
**discontinued** 125:20
**discovery** 124:12
**discretion** 58:11 133:11,12
  134:17,20,22
**discuss** 138:8 147:11 151:8
  153:1
**discussed** 135:7 137:18 138:1
  184:9,9
**discussing** 70:18 88:5 163:22
**discussion** 6:6 57:17 121:19

151:6
**dispense** 114:4
**dispensed** 69:23,24
**dispensing** 113:7
**dissected** 63:18
**dissent** 168:17
**distinctly** 81:6
**distributed** 10:17
**distribution** 105:14
**district** 1:1,1,10 58:10 134:16
  178:5
**DIVISION** 1:2
**DME** 39:23
**doctor** 13:7,9 14:13 36:25 37:6
  39:2 43:13 45:1 46:14,22
  47:23 48:18 49:12 51:17,22
  52:3,7 72:23 73:5 75:17,19,19
  75:21 76:5,5,6,20,20 77:19
  86:18 87:20 113:24 115:13,15
  116:22 117:1 182:23
**doctors** 16:3 18:20 36:1 37:3,5
  44:21 47:5,17 49:23 52:6,8
  65:19 76:9,13,14 95:7 114:15
  114:18 116:7,11,12,13 128:20
**doctor's** 6:19 44:23 48:22 89:21
**document** 9:11 12:23,24 18:7
  31:23 41:1 72:18,20 85:1,13
  85:21,23 94:20 109:18 113:17
  113:19,20,20 114:8,11 115:14
  116:20,23,25 117:1 118:2
  123:25 124:7,12,15 151:19
  153:22
**documents** 15:15 25:10 91:10
  120:23 124:9 148:21
**doing** 7:21 8:17 19:15 23:6
  29:20 38:20 39:18,23 41:18
  43:7 49:24 55:8 60:9 62:23
  71:22 76:8,18 95:16 96:10
  115:21 119:5,13 120:4 122:23
  123:3,17 124:22 137:10
  139:13 145:19 146:13 149:11
  149:14 156:13,15 159:13,14
  163:10 171:20 178:15 187:15
**dollars** 39:18 99:10 119:2
  183:25
**done** 16:21 40:3 56:13 62:6,16
  62:17 70:1 81:10 120:14,22
  128:21 135:16 142:7 143:9
  145:20 153:14,18 157:20
  160:9 168:23,25,25 169:1,3
  170:23 181:9 186:24 187:1,16
**doubt** 99:17 166:17 172:24
  179:15 185:22,25
**down** 27:23 32:21 38:19 72:12
  73:17 89:16 91:9 101:20
  106:9 122:13 127:5 128:18,25
  137:7 143:17 148:18 150:1,3
  160:18 167:1 175:7 188:24
**Dr** 50:10 51:13 114:15
**drafted** 9:14
**drashbaum@mnrlawfirm.com**
  1:23
**draw** 182:19,25 183:6,16
**drug** 147:16,22
**drugs** 69:20 170:2
**due** 17:2 42:19,24 128:1,3
**durable** 19:6,16
**during** 21:9 29:19,24,2,5 54:5
  60:2 133:17 147:1,6 153:23
**Dutting** 64:21 66:11 67:5 157:5
  158:21 159:1,10 161:23 162:4
  162:7,9,18 163:3,5,11,17,24
**Dutting's** 158:16 164:9
**duty** 35:6 54:16

**E**

**E** 1:19 191:5,5
**each** 8:11 14:4 15:24 16:1 20:15

24:24 28:6 64:15 66:15 134:1
  154:3
**earlier** 39:13 88:16 127:11
  149:10
**early** 135:25 137:21 138:22
  148:17 162:16,18
**earned** 173:10
**ease** 153:16
**easier** 15:25 69:25 77:7 134:10
  140:4 165:13 166:6 170:6
**easy** 106:25 107:6 166:14 169:25
  171:8 173:1
**Economic** 1:14
**educated** 105:24
**efax** 12:25 13:3,5,7,9 14:11 83:7
  83:9 90:25 91:7 92:12,20,24
  93:8,16
**efaxed** 87:23
**effect** 116:2 154:19
**effecting** 100:19
**effective** 117:15 125:19 127:3
**either** 38:6,25 72:5,10 97:10
  182:25 184:18 186:11
**elected** 100:2
**elegant** 57:1
**element** 169:6 174:21 178:22
  179:24
**elements** 169:6
**Eleventh** 133:9 175:21,22 176:2
  176:5,8,9,10,1 1 177:18,19
  178:13,14 179:3
**eligible** 36:7
**ELMO** 8:18
**ELMOs** 103:18
**eloquently** 184:1
**email** 15:6 23:22 26:2,3 27:18
  31:11,12,25 33:12 34:10
  41:22,23 42:15 46:8 48:10
  51:2 71:8 75:24 76:2 79:4
  81:15 87:9 89:7,9 91:1 93:3
  100:24,25 108:15,15,21 109:4
  110:16 111:5 112:6,9 114:11
  115:1,3,10 116:12 117:4
  124:19 125:25 126:6 131:19
  136:22,24 146:2 149:1 152:3
  152:17 154:6 162:10 170:19
  170:23
**emailed** 50:7 72:25 120:6
**emailing** 113:10
**emails** 17:11 27:16 51:11 109:14
  109:17,20 120:20 124:2,5,7
  154:19 162:2
**employee** 36:23 97:13 127:18
  144:14,17 146:23 147:15,20
  147:23 148:11 153:11 160:1
  171:10
**employees** 10:8 143:13 147:13
  153:14
**employment** 7:3 20:22 127:6,14
  151:8,21 153:12 172:6
**end** 87:16 88:13 106:3 126:19
  145:8 157:15 173:16 174:21
  124:25 126:20 127:25 143:23
**ending** 146:3
**enforcement** 66:23 157:2
**engagement** 147:22
**enough** 59:25 103:19 116:4
  167:17,21,22 181:9
**enrolled** 125:24
**ensure** 36:1 120:16
**entail** 148:1
**entailed** 29:11
**enter** 57:22
**entered** 6:8 54:2 70:16
**entirely** 173:21
**entitled** 135:20
**equally** 182:9 183:1
**equipment** 19:6,16

Eric 21:11 22:2,2 39:24 107:10
Esan 51:3 115:10
especially 134:25
ESQ 1:19,19 2:1
essence 90:10
essentially 20:19 148:18
et 179:1
ethoxy 105:2,4,6,10,1 106:3,25
107:7,25 108:18,19,25 109:9
109:10
ethoxydiglycol 105:8,12 107:11
107:22 109:5
evaluation 125:22 143:6,10
149:11
even 11:21 21:18 57:17 58:8
63:1 64:2 65:8 66:16 70:15
74:1 95:25 96:1 99:10 102:15
111:11 137:15 158:6 173:21
176:9 187:1
evening 119:11 151:6 190:24
event 65:11 137:20 173:21
179:18
events 133:17
ever 28:13 32:22,25 37:6 43:9,14
44:21 47:16 80:19 95:19
97:17 105:4 116:11,12 123:24
124:7,12 127:24 128:13
129:10 137:2 153:7 158:1
every 55:8 67:8 71:16 83:24
95:23 96:5 136:22,24 151:19
167:21 170:18,18 173:24
176:18,20 179:23 182:6
everybody 104:9 170:19
everyone 80:2 99:24 125:22
146:16,19 182:22 188:7
everyone's 95:2
everything 6:11 16:9,25 22:15
22:19 45:4 55:22 65:22 71:18
82:7,11 85:7,7 86:15 95:16
96:10 103:15 135:17 143:9,17
145:11,19,2 1 151:16 166:6
173:6 176:24
evidence 4:3 8:25 9:4 10:20 11:2
12:4,18 13:18 14:22 15:4
16:11,16 17:13 23:16,20
24:12 25:8,19,25 30:22 31:4
33:6,10 34:12,25 35:22 36:15
40:13,20 45:8 46:5 50:2 61:12
61:13 63:4 71:5 74:18 75:11
75:13 78:19 79:1 81:13 84:2
84:23 85:25 89:5 92:5 98:8
100:24 108:13 112:15 122:3
129:18 130:9 131:8 132:6
138:12 142:20 148:21 172:4,6
179:15 182:18,25 185:23
190:11
evidentiary 133:6 134:24
exact 10:13 14:15 17:6 159:3
178:2,11
exactly 17:3 18:17 20:20 49:17
73:1,4 74:10,14 154:2,3 159:6
examination 3:5,7 6:24 104:3
156:16
example 23:22 134:10 135:6
153:3 180:19 186:14
Excellent 104:6
except 16:9 22:19 136:15
exchange 48:11 161:24
exclude 68:6 69:10 182:6
excluded 63:9 65:7 66:5 135:7,7
exclusion 144:17
exclusive 105:20
exclusively 102:20
exculpatory 63:9,17 64:2
excuse 56:21 57:15 162:15
excuses 127:11
execute 168:12
executive 9:9 13:22
executives 162:2

exercise 133:12 134:22
exhibit 4:5,6,7,8,9,10,11,12,13
4:14,15,16,17,18,19,20,21,22
4:23,24 5:1,2,3,4,5,6,7,9,10
5:11,13 8:24 9:1,4,6,16,23
10:3,21 11:2 12:5,18,20 13:13
13:18,20 14:23 15:4 16:12,16
16:22 17:7,12,18,23 18:1
23:17,20 24:11,13 25:5,24,8,20
25:25 30:19,20 31:4,10,20
33:5,10 34:24 35:2,22 36:14
40:19,22 41:21 42:9 46:4,7
47:2,19 48:10 49:8 50:2 51:1
51:2 65:4 71:4,7 72:15,16
74:15,19 75:3,9,10,13,24
76:12,22 78:20,20,25 79:3,19
80:6 81:9,13 84:3,6,8,11,13
84:16,19,22,25 85:25 86:21
87:2,4,25 88:20 89:1,4,7,17
90:3 91:12,14,18,2 4 92:2,4,7
93:7,19 97:25 98:2,3,8 100:25
103:13,21 108:10,13 110:8,11
110:21,23 111:2,8,10,15,17,20
112:14,19,20 113:3,9,16
114:7,19 115:1,4,6 116:4,16
117:6,20,21,22 118:2,4,13
120:24 121:3,3,7,11,14,22,24
122:2,5 123:12 125:3,9,13
126:23 128:14 129:19,23
130:1,2,5,8 131:9 132:5 135:6
140:8 142:18 148:23 150:10
151:4 152:20 153:3,6 154:15
165:15,19 186:12,12 188:6,9
189:9,15 190:10,14
exhibits 4:1,2 8:22 33:4 34:13
40:14 45:9 46:1 60:2 70:25
104:4 111:12,16,23 112:17,24
139:25 155:17,19 165:3,16,20
165:22 187:23 188:8 190:16
exist 124:1,8,14
expect 62:21 70:9
expected 147:14 152:11
expensive 99:13,17 101:4
experience 37:11 100:15 107:9
151:3
experiences 119:19
expert 166:9
explain 6:10 19:11 49:16 94:10
101:15 115:13,14 117:12
explained 19:9,13 40:3 151:15
explaining 36:9 46:25 154:16
explains 15:23
exploded 27:8
exploration 148:7
Express 99:18
expressed 67:25
extended 132:17
extensive 155:4

                   F
F 191:5
fabricate 57:20,23 58:16,21
134:5,8,14,1 9 135:11 160:10
fabricating 68:24 69:5
fabrication 67:8 68:1,9,11,16
fact 37:5 67:9 98:22 107:4
128:12 133:24 134:1,5 188:8
factors 135:13
facts 135:5 160:14 180:17
185:15
factual 114:11,15
failed 176:3,3
fair 11:22 23:1 26:14 27:5 44:18
59:25 60:22 90:18 116:8
151:13 152:4 159:23 187:12
faith 173:4,5,6 179:6,7,8 180:4
180:12
false 180:14
familiar 19:8

familiarize 31:15
far 130:12 159:20
fast 60:15,16 83:20 145:20 152:9
fast-forward 14:6 158:4
fast-forwarding 10:11
fault 127:21,21
favors 183:6
fax 1:17,22 87:8,11,13,16,23
90:15 92:10,11,15,17
faxed 27:22 88:1
faxes 90:16 91:3
FBI 58:2 67:6 159:8 162:20,20
163:6 164:1
February 75:25 89:8 98:11
118:25 122:8 123:8,14 125:4
143:3 145:8 149:4 150:8,11
Federal 58:12 144:11 154:22,24
156:19 157:2,17 159:4 160:24
FEDERICO 1:10
fee 37:23 38:4 39:5 77:23,25
78:3
feel 21:20,23 38:10 41:13,15
43:5,7 49:22 68:15 95:14,16
feeling 145:25
fees 52:14
fell 128:17
felt 34:3 41:16 98:25 150:25
153:16,16 164:8
Ferguson 2:6 191:10
few 7:16 8:6 38:16 39:16 47:13
61:14 63:11 99:7 128:19
189:6
fight 80:12
figure 12 88:7 152:8
figured 10:15
file 165:4 185:17 188:8
filed 178:19 185:6,18,18,21
files 112:24
filibuster 139:11
filing 188:6
fill 15:20 16:24 31:13 43:24
72:21 73:9 81:17
filled 6:14 28:1 80:10 82:24
filling 122:10,15
final 153:23 169:25 186:9 188:6
188:8
finally 145:25
find 27:16 29:21 43:23 60:1 84:1
119:3,7 133:6 140:4 150:24
163:19,19 179:17
finding 26:18 134:18
fine 95:11 98:25 101:24 119:24
145:21 151:16
fingers 63:12
finish 136:1 187:9
finished 55:5,7 165:10
finishes 68:3
Firestone 131:20
firm 143:5 144:5,25 151:2
first 6:21 7:16 12:24 13:5 16:23
19:2 20:7 21:21 49:3,10 53:22
57:7 59:4 67:5 68:3 70:11
71:7 85:19 88:6 91:10 96:4
102:9 106:8,11 127:23 128:1
129:14 131:22 147:4 160:20
163:13,15 171:8 175:9 177:13
177:17,20 181:23,24 182:3
183:21 185:5
fit 114:3
five 29:21,22,25 30:8 32:14
33:18 53:7 55:14 139:17
170:21
fix 95:6
flag 143:11 168:2
flat 38:4
Fleming's 144:7 150:15,18
Florida 1:1,6,16,2,1 2:3,7 83:15
89:12 106:9,11 143:19 150:15
182:8 191:11

familiarize 31:15
flurbiprofen 69:24
focused 158:21
folder 165:23
folks 70:17
follow 175:22
followed 42:8 49:1 51:7 74:15
120:11,20 178:10 183:9
following 6:1 42:19 53:19 91:8
109:8
follow-up 47:23 49:16 119:10
force 72:5 130:21 131:4 169:25
forcing 80:15
Forde 51:3 115:11
foregoing 191:6
forfeiture 137:20,23 138:11,20
forget 53:8,22
form 16:24 25:5 27:18,19 31:13
35:5 43:24 44:4 49:11 72:21
72:25 73:13,25 74:4,5,8 81:6
85:24 98:19 114:1 115:23,24
116:2,3,7 117:13 123:16
186:13,16
former 133:9
forms 31:16 43:21 77:1 117:18
118:6 130:23 147:22 186:11
formula 16:1 76:18 103:8,11
110:3,4 113:7,8,11 114:14,25
154:16
formulary 101:3 103:5 109:25
113:5 114:3
formulas 101:6
Forsthoff 11:6,17 12:21 13:23
15:6
forth 143:22 145:9 151:20,22,25
forward 13:11 17:3 27:24 87:24
118:6 147:19 151:14
forwarded 117:2 120:6 125:10
Fouche 29:7
found 68:23 133:21 173:8
foundation 12:9
four 38:5,25 111:13
Fourth 1:15
FPR 2:5 191:9
Francois 178:6
frankly 129:10
fraud 71:16 162:21 163:22
164:1 166:16,25 167:7 168:3
180:19,22 183:23
fraudulent 180:15
free 165:2,3 171:19
freedom 138:4
friend 29:7 176:4
friendly 42:22
from 11:4,9 12:20 13:7,9 14:13
15:6 20:14,21 22:3,15,25 23:5
26:3 27:15,18 28:20,24 31:25
32:11 33:12 34:2,10 35:5,23
39:1,3 41:24 42:9 43:23 45:7
46:14,22 47:10 49:16,21 51:2
51:6 54:19 55:2,4,6,17 56:3
62:23 75:5 80:7,16 86:10,11
87:20 88:8 89:8 90:16,23
92:20,21,23 94:8 95:23 96:3
97:7,8 100:17 108:3,4,16
109:12 113:6,21 114:11,18
115:10 116:3,13 118:8 119:8
123:17 124:16,18,19 125:23
126:17 127:20 128:16 133:1
133:16,18 135:22 142:23
144:4,18 146:7,22 147:8
148:10,25 150:8 151:25 152:3
153:7,9,10,13,14 155:15
157:2,6,14 174:1,1,1 180:6,19
181:22 185:2,5,20
front 15:10,16 72:16 160:25
frustrating 21:2,6
full 44:19
fun 176:6
fund 162:2

furnishing 174:25
further 146:9 155:2 164:11
future 153:7
F.3d 56:20 134:3

**G**

G 54:6,12,14,17,21,24 55:1,4,7,9
55:13,16,18,20,2 3 56:1 93:9
gain 39:14
Gary 144:4,10,22 150:22,23,23
gave 16:25 48:15 57:2 99:22
119:9 147:13 152:25 169:11
181:4 185:10
gears 37:13 131:6 142:22
gels 102:9
general 161:13 186:16
generally 147:9 158:24
generated 18:6
gentle 187:21
gentleman 20:1 86:6
Gerald 53:23,24 54:2 56:3
gets 79:13
getting 11:8 21:5 28:5 32:22
47:16 50:20,23 54:9 66:12
71:14 82:18 95:19 96:1
103:10 106:3 107:22,25
117:19 127:14 130:25 132:17
174:17
Gilda 2:5 102:1 191:9
Giles 75:25,25 76:2 80:7 81:15
81:16 83:2 97:22 98:12
126:11,16
Ginger 73:6 93:11,14,16 94:24
118:18 119:1,4,14,20 120:5
120:12 122:14,23 123:14,19
123:23 124:23 125:3,12,13,17
126:17,25 128:17 129:8,14
130:11,18 136:10 183:24
Ginger's 120:11 122:9 125:14
girl 18:3
gist 65:22
give 8:22 12:25 16:4,4 20:18
25:14 27:13 33:4 52:24 58:23
61:15 80:19 103:23 104:13
113:9 114:2,10 116:16 127:5
135:20 143:4 152:21 154:8
166:9 171:22 172:5,13,18
173:5,24 177:12 179:18,20
181:6,8,14 184:19 186:17,20
187:3 190:13
given 36:6 78:2 147:10 174:2
178:3 180:18
gives 144:16
giving 41:17,20 153:4
go 6:22 7:13,23 13:7,9 16:1
19:18 40:5 41:19 45:6 47:1,13
58:2 60:15 65:20 70:5 90:16
92:25 99:5 103:22 104:13
109:22 112:13 114:18 115:10
116:2 118:23 132:22 136:22
138:14,16 139:16,22,24 142:8
151:1 156:6 166:6,14 175:6
176:8,10 186:6 187:1,2,23
goes 12:2 133:21
going 7:8 8:22 18:20 24:23,24
25:1 26:17 28:11,12 30:7,19
34:6 36:19 46:23 48:20 51:12
54:9 58:13 60:1,3,6,8,10,25
61:3,15,19 62:17 65:9 68:7,8
68:10,23 69:8,15,18 70:3 79:3
79:19 80:6 81:25 82:1,22
86:20,22 87:4,8 90:15 91:2,9
93:13 94:23 96:25 98:18
99:20 100:1,18,24 102:10
103:5,6,7,9 104:2,25 105:10
109:9 110:5 111:23 112:23
113:11,22,24 114:5 116:7
117:20 119:7,7 125:3 127:5
127:14,17 129:3 130:22 133:4

135:1,23 136:3,10,16,22,24,25
137:19 138:7,8,2 5 139:4,22
139:24 142:8 143:10,16
144:24 145:3,4,6,18 146:4,6
146:13,20 147:24,25 148:1,20
148:21 149:25 150:3,12,14,18
151:9,19 152:1,9,13,23 155:4
155:8 160:3 165:22 166:14
168:16,19 169:17,22,24 170:2
170:4,20 172:17 173:4,12,15
173:25 174:18 176:8 177:11
177:14 179:10 181:2 182:24
183:16,18 184:1,2,14,21
185:16,24 186:6
Gold 105:2,4,6
Goldberg 50:10 51:13
gone 66:13 95:5 138:16
gonna 48:17
good 10:15 52:18 72:2 78:10
104:6 106:1 137:10 139:5,6
155:11,13,13 164:8 173:4,5,6
176:4 179:6,7,8 180:4,12
182:3 187:17 190:24,24 191:1
goodness 68:15 137:1 155:8
188:10,10
google 176:3
gotten 34:7 66:21 128:20
Government 1:13 12:10,13 37:4
43:18 61:2 63:21,22 65:10,21
66:6 67:10 68:6,8 70:22 82:7
86:24 100:10 101:22 109:14
109:17 117:20 118:2 124:3
135:10,19 137:19,23 138:10
142:15 147:3 162:24 163:6,12
163:18,24 164:18,23 165:16
165:24 166:9,21 167:18
168:16 170:16 171:4,10,22
174:4,22 175:1 180:21,23,25
182:6 183:20,22 184:14,21
189:7,10,16,2 0 190:6
Government's 5:4 56:17 65:4
70:3 98:2,3,8 111:15 112:16
112:19,20 116:16 117:21
118:2,13 121:2,11 125:9,12
130:5 170:5 187:25 190:14,16
190:17,18
gphofficialreporter@gmail.com
2:7 191:12
grab 154:12
gracious 137:1
gram 20:13,14,15
grams 43:19,19 44:12,13,17,17
44:19,19
grant 76:9,10
granted 13:4 58:10
gray 144:12 149:12
great 19:7 24:10 26:17 33:15
82:20 93:10 99:24,25 139:13
151:16 167:24
greedy 67:11
Green 35:23
grew 24:3,3
Gross 134:20
group 11:15 86:11 127:6,14
145:1 146:3,9
groups 21:1 39:17,17,19 127:12
145:2
Grow 1:7 3:4,6 6:4 7:2 8:22
18:10 26:2 43:9 51:3 57:23
58:2 95:18 101:25 109:14
110:17 111:6 112:7,10 131:21
148:20 150:10 154:21 156:19
161:9 165:8
grown 83:20 143:7
Grow's 62:12
guess 6:9 11:6 16:24 37:20 72:4
76:4 86:11 89:15 100:23
142:10 144:16 151:8 163:19
guidelines 41:20 128:4

guiltier 184:15
guilty 63:5,6,6 68:15 69:7,7,7
73:8 179:17 183:13
guys 11:8 73:8 151:7 172:10

**H**

Haigler 26:3
half 6:2 60:13,13 108:5 132:23
177:4,4
Halliburton 36:17,20 40:8 75:15
75:16
hand 63:12 83:2 102:1 122:5
handle 45:7 126:5 144:25
handled 113:13
hands 106:20,22 187:4
handwrite 187:12
happen 13:8 34:5 83:25 87:22
186:8
happened 19:25 22:2 29:5 47:12
74:3 80:12,13 81:19 83:12
90:13 91:6 95:2 101:16
143:11 146:11,17 147:2
185:13
happening 41:21 72:19 75:14
87:9 152:9
happens 104:12 187:2
happy 145:17 176:5
harbor 144:16 171:10,23 172:3
173:4
hard 60:4 107:6,25 146:5
hard-working 168:1
Harvard 174:10,11
hate 172:9
having 28:5 34:3 50:7,20 57:17
97:9 99:2 103:5 107:25 110:2
145:9
Hawaii 41:24
head 176:16
headset 130:15
heads-up 135:20
Healing 158:20 159:11
health 143:5 151:3 162:21
163:22,25 166:16,24 167:7
168:3 173:19 180:22 185:8
Healthcare 39:9 40:23,24
hear 47:16 56:6 68:22 85:4,7,8
85:11 91:21 101:24 102:1
103:14 130:16 132:13 133:2
140:3
heard 11:9 28:24 29:2 52:5
80:15 96:12 99:12 101:9
102:23 106:25 107:2,11
116:10 118:17 120:8 123:21
127:24 133:15 142:22 147:4
153:13 159:18 164:3 169:22
hearing 67:22 105:1 110:9 133:6
133:16 134:12,21 139:17
190:7
hearings 70:20
hearsay 17:7 14:25 56:17 57:4
63:4 67:21 121:17 131:16
heart 182:1
hedge 162:2
held 6:1 53:19 64:25 69:21
133:16
hell 122:19,24
Hello 50:6
help 15:1 33:19 83:25 139:15
148:6 160:3,6,15 171:2 184:4
helped 101:18
helpful 165:22
helping 27:13 146:5 148:4
helps 160:16 179:11,21
her 29:2,9,9,12,13,14,1 8 31:13
31:13,14 32:1,11,16,18 34:1
35:15 36:23,24,24 47:22
50:22,25 51:22,25 57:2 66:7
67:6 74:13 75:22 76:19 80:10
80:12,14 93:14 94:25 101:4

119:4,9,20,25 120:7,8,8,13,15
122:17,18,18,23 123:3,10,16
123:18 124:24 127:11,12,13
127:19 128:18,18,24 129:1
130:15,21,22,23,23 131:1,3,3
131:4 133:9,20 157:12,14
158:9,12,21 159:5,6,6,7,10,11
159:15 162:8,20,23,25 163:8
163:10,24,25 164:2,2,5,7
184:2
Heroes 158:20 159:11
herself 31:8,15 130:25 184:3
hey 48:14 71:13 158:7 170:24
high 184:23 185:3
highest 101:12
him 11:17,18 19:4,5 21:16 24:24
25:1 35:16 41:25 47:23,24
48:15,17,19,22,23,24,2 5 49:1
49:3,5,6 54:1 56:11,11,12
57:5 59:4 64:18 68:17 69:18
72:8 73:3,4 74:10 75:20 86:18
89:25 90:4,6 92:13 93:13
103:21 105:15,17,18,23 107:4
107:10,18 113:10 120:3
125:10 131:22 136:4 138:1
143:4,16 149:15 150:2,12
151:1,1 156:6 179:17
himself 68:20
HIPAA 84:23 147:17
HIPAA.pdf 85:19
hire 95:19 96:11 144:24 145:5
hired 143:4,6 153:11
hit 92:25
Hoang's 114:15
hold 10:24 56:6 58:4,23,23
130:1 134:14 140:13,13 154:9
home 6:9 155:9 187:2
honest 21:20,23 179:12 180:11
Honestly 159:13
Honor 6:23 8:20 9:1,2,19,20
10:23,25 12:7,16 13:14,16
14:23,25 15:2 16:12,14 17:8
17:10 23:8,11,18 24:15 25:6
25:21 26:24 30:22 31:24 33:8
34:13,15 40:18 45:24 52:17
53:15 56:5,15,19,2 3 57:9,18
58:22 59:9,14,25 60:7 64:12
64:23 65:13 66:4 69:13,17
70:12,24 71:2 74:21 75:7
78:24 81:11 84:4 86:25 88:19
91:22 94:1,4 100:7 104:1,5
108:9 110:7 111:13,19,25
118:9 121:16 129:4,21 131:16
131:25 132:10,13 136:21
137:24 138:2,12,19 139:23
140:1 142:17 153:19 155:2,5
155:23,24 160:7 164:11,24
165:1,9 166:2,12,22 167:19
168:19 169:14 170:11 171:6
171:13,24 172:8,16 175:17
177:25 178:2 181:1,4,11,24
183:15 187:19,22,24 188:5,12
188:14,20,22,2 5 189:6,9
190:19,22
HONORABLE 1:10
Honor's 187:23
hopefully 104:24 187:15
Hordlow 15:7,8
hour 6:3 52:25 53:5,10 60:12,13
60:13,13 104:14 118:3 132:23
181:4 186:25
hours 52:23,23 55:2 60:11,14,18
60:18 70:9 132:17,20 136:17
136:19 137:1 155:7
House 39:11
Huggins 48:15
human 144:24
hundred 24:21
hundreds 103:19

Case 1:16-cr-20893-FAM   Document 233   Entered on FLSD Docket 09/10/2018   Page 198 of 207

198

hungry 53:2
hurry 143:21
husband 33:16
husband's 33:22
hypothesis 182:7

**I**

idea 19:6,7 25:14 63:24 102:17
102:19 109:13 119:14 159:13
161:1,3
**Identification** 4:3
idiot 162:9
ignoring 83:22
illegal 37:1,2,9,10 41:18 49:7
183:3,4
image 86:12
imagine 136:17
immediate 119:10
immediately 119:3 120:5,12,13
120:22 124:24 125:20 127:4
144:24 149:14 162:23,23
impeach 61:12
implied 67:25
importance 38:20,21
important 69:12 70:19 133:23
134:7 135:9,12 138:4 167:24
178:16 188:7
importantly 120:1
improper 68:1
inadmissible 57:5
incident 66:4
include 104:4 171:2
included 31:13 168:3,4,5 170:5
170:20
includes 170:17
including 30:8 109:18 144:14
160:8 178:11 182:21
inclusion 134:4
incorporate 176:14
increase 128:21
inculpatory 63:18
independent 143:13
indicate 73:13
indicated 67:19
indicates 188:13
indication 165:17
indicted 66:22
**Indictment** 66:1,3 68:19 134:10
166:19 168:4,4,6,11,13
169:16 186:2,3,6
individual 15:7 28:24 32:4 71:8
74:16 105:14 125:25 133:18
174:25
individuals 96:15
induce 174:25 177:2,15 178:25
inducement 181:16
inducing 175:2
industry 21:10,15 157:11
158:24
inference 181:20,22 183:6,18
inferences 183:1,17
influence 58:20 68:1
influenced 34:4
info 33:20 86:13
inform 118:7 146:20 149:10
153:6
information 15:11,21 16:2,5,9
17:1 31:14,16,17 32:1 33:16
46:18 72:22 73:1,20 87:11,13
147:19,21 149:15 154:4
**InforMD** 7:3,5,6,11,1 5 8:1,2,5
8:10,15 9:8,10,11,14 10:5,8,8
11:7,21,25 12:24 13:4,11 14:1
14:18 16:19 17:16,22,24
18:18 19:19,20,22 20:8 21:18
20:22 21:1 22:12,25 23:5
25:16 39:14,16 95:24 96:20
107:18
informed 110:3 113:25 120:14

125:13,14,19,2 3 127:17
128:25 143:14,17
informing 95:6
ingredient 103:6
ingredients 7:13 100:23 110:1
initially 128:19
initials 88:10
innocence 182:7
innocent 173:21
inquiring 52:16 132:12,14
inquiry 134:11
inside 103:6 132:22
insight 80:20
insisted 136:4
instance 43:24 83:2
instead 22:13 44:17 72:25
143:13 149:13 171:20
instruct 118:12 186:19
instructed 118:8 168:6
instruction 53:9 138:20 166:9
166:15,23,24 167:7,20 170:7
171:1,4,11,23 172:14,20
173:5,7,13,14,16,1 8 174:3,6
174:19,22 175:12,13,17
176:13,19 178:2,11,18 179:8
179:18 181:14,20,23 182:13
184:4,7,25 185:1,16,22,25
186:2 187:6
instructions 165:12 166:8 167:1
167:5,23 169:11 181:10
184:17 186:9 187:4,9
insurance 99:21,22,25 100:13
100:14,16 101:7
intake 27:18,19 35:5 43:21
72:21 76:25
intakes 27:15
intelligent 168:1
intend 154:22 156:12
intended 180:13
intent 59:17 179:16 183:14
intentional 183:2
interest 67:7 162:3
interested 11:16 20:3 24:1 26:5
26:6 27:17 29:13 44:7 105:22
107:15
internal 8:15
interrogation 133:20
interrupt 61:8,8 62:11
interrupting 66:15
interview 157:20,24 158:2,11,12
158:21
introduce 60:2 64:25 65:10
155:17
introduced 39:22 62:2 105:12
107:8 165:21
introducing 112:1
inures 63:25
investigated 66:12 67:17 161:2
investigation 29:19 32:20 66:8
66:10 67:7 135:8 147:2,6
156:20,25 157:18 159:2
160:10
investors 180:19
involve 147:21
involved 19:3 46:10 82:18 129:2
183:5
in-house 115:16
irregardless 38:4
**IRS** 25:13
Irving 137:2
issue 53:22 56:8 59:16,20,21,22
59:23,23 61:14,21 67:5 76:15
90:15 96:19 97:6 99:7,11
101:15 129:7 130:12 137:20
149:13 160:19 163:14 168:2,3
171:3 175:20 177:9
issued 66:6 67:1 103:11
issues 28:5 49:25 66:25 69:11
70:18 83:11,22 95:13 97:9

129:11 147:12 184:21
issuing 103:8
item 175:1

**J**

J 1:13 104:11 189:4
Jacksonville 69:24
Jacob 81:16
January 1:7 48:8,9 65:25 71:20
84:25 109:3 156:19 157:18
158:4 159:1 163:13,21
Jean 6:11,12
**JEFFREY** 1:19
Jill 28:25 100:25
jmarcus@mnrlawfirm.com
1:23
Jo 75:25,25 76:2 80:7 81:15,15
83:2 98:12,16 126:11,16
job 26:17 49:24 51:24 52:3 54:6
Joe 97:22
John 176:4
Johnson 50:4,6,16,17 51:4
Johnston 9:7,9 13:21,22 131:20
join 21:2 26:22
**JON** 1:13
Jonelle 32:14,15
Jones 53:22,24 54:2,6,12,14,17
54:21,24 55:1,4,7,9,13,16,18
55:20,23 56:1,3,10 104:10,11
182:21
jon.juenger@usdoj.gov 1:18
Josh 30:1
Joshua 32:6
Josie 73:22
Jr 2:6 191:10
judge 1:10 8:18 24:8 37:14 57:1
60:3 61:2,17,21 86:20 91:3,11
112:16 129:18 131:8 133:7,9
133:13,14 140:6 164:20
165:25 167:25 170:20,21
176:5 185:10 191:1
judges 167:24 187:7
Juenger 1:13 9:2,19 10:1,23
12:7,16 13:16 14:25 15:2
16:14 17:10 23:18 24:15
25:21 30:23 31:2 33:8 34:15
34:17,22 40:15 45:10,13,16
45:19,22,24 46:2 60:9,11 71:2
74:21,24 75:2 78:24 81:1
84:4,10,14,17,2 0 86:25 88:21
88:24 89:2 91:16,19,25 93:20
93:23 98:6 100:7 103:20
108:11 110:14,25 111:3 112:4
112:12,21 120:25 121:5,9,16
121:20,25 129:21,24 130:3,6
131:10,16,23,2 5 132:3 136:14
136:17,20,24 137:4,24 138:12
138:19,22 139:6 141:3 142:13
155:5,7 168:19,22,24 169:2,5
169:9 172:12,16,19,22 186:19
186:23
June 129:16 157:14 160:25
juror 6:2,12 53:4 54:2,6,12,14
54:17,21,24 55:1,4,7,9,13,16
55:18,20,23 56:1,3 104:11
172:9 182:22
jurors 6:16 22:8 52:24 53:8,21
6:1 65:9 70:5,21 137:9 138:6
138:16 139:14 156:14 165:23
172:10 179:11 182:20 186:4
jury 1:9 3:8,9 6:7,8 7:5 12:23
14:1 15:15 25:2 27:8 29:5
33:24 36:8,19 41:16 43:20
46:16 47:9 49:15 53:5,6,20
54:16 59:24 60:23 70:16
72:18 76:22 80:19 87:9
89:17,18 96:19 101:15 102:1
102:4 103:2,22 105:9 108:17

109:23,23 113:3 115:11
118:22 126:11 130:11 132:22
132:24 133:1 135:9,17 137:11
137:21 138:15 139:21 143:1
149:8 155:14,15 156:7,17
161:6 165:12 166:8,23,24
167:1,7,19,23 169:11 171:11
173:7,14,18 174:3,6 178:18
179:8 186:8 187:4,9
jury's 135:24
just 7:5 8:22 10:10 11:4 17:5
18:17 19:16 20:25 21:23 22:3
22:11 23:6,22 24:8 25:6,7
31:7,18 33:16 34:3,5 37:14,21
38:4,21 39:12,21 41:19 42:7
46:21,25 47:14 48:4,24 49:2,6
52:2,6 54:21 55:9,9 58:8
66:16,16 67:12 69:5 71:17
72:3 73:8,9,9 77:7,8 80:1,13
82:3 85:9,16 86:23 89:15
92:23 95:10 101:4,7 102:4,22
103:16 104:7,21 105:10
106:15 107:13 109:7 117:21
118:22 122:18 123:12 125:3
127:16 128:19 133:4,14,16
137:16,20 138:19,24 139:14
140:2,7 142:9 145:25 148:21
149:7 151:25 153:2,22 158:6
158:14 164:8,9,12 165:8
166:5 167:16 169:16,18
175:13,25 176:25 178:5 180:3
185:22 186:1 188:5
Justice 69:3

**K**

K 189:4
kate@ kmeyerslaw.com 2:4
Kathryn 2:1,1
keep 8:23 51:12 56:11,11,12
92:9 94:2 100:2 118:1 132:17
139:22 167:16 187:14
keeps 142:9
Ken 19:3 39:22
Kennedy 69:3
kept 63:17 95:13 145:21
**KEVIN** 1:13
kevin.larsen@usdoj.gov 1:17
kickback 37:1,2 174:14,15,24
175:4 177:8 181:13
kickbacks 65:19 162:21 163:23
164:1 173:19 174:7
Kim 115:12,13,14,19,2 0 116:7
116:11 117:19
Kimble 19:3 39:22
kind 38:19 55:10 83:1,19 105:18
136:1 138:3 176:5 178:21
179:6
knee 32:20 44:1 74:13 149:17
knew 10:13 32:19 37:12 39:20
63:22 66:7,11 67:3,4 82:11,11
82:16,17 96:5 127:19,19,23
135:11,12,13,14 154:2,24
159:20 161:16,19,19 162:8
180:14
know 6:18 7:22 8:3,16 11:5,11
11:12,17,18 13:21 15:7 16:18
21:4,5 22:1,4 23:23,24 24:9
24:19 25:5 26:6,15,22 28:10
29:17 30:18 33:4 36:25 40:4
41:19 42:5 44:3,11 46:20,21
47:22,24 48:11,25,25 49:12
49:17 50:4,22 51:4 52:20
53:25 54:11,22 55:24 64:10
65:8,20 67:4,18 68:19 69:4,6
70:13 71:22 73:2,3,4,4 75:18
76:16,20 77:2 79:10,11,25
80:8,10,25 82:1,10,14,24 83:3
83:5,8,16,25 85:2,23 86:4,6
87:5 88:7,9 90:4,7 92:17 93:6

94:13 96:7,8 99:25 100:2
103:18 104:12,14,14 105:6,13
105:20,21,23 107:15,19 108:2
108:23 109:8 114:16,21
115:19 118:24 119:3,6,9,22
119:23 120:2,8,21 122:19,25
125:10 126:1,3,14 128:10
129:3 134:24 135:9 138:3,5
138:19,23 139:4 143:7,22
145:7,20 146:2,12,18 147:11
149:12,14,17 151:3,5,22,24
152:9,12,14,17,2 5 154:1
158:3 159:3,13 161:12,19
162:5,25 164:6,8 167:6,22
168:8 171:17 172:10 175:18
176:1 177:3 179:10 180:8
181:21 182:4 183:13 187:5,8
187:11,16 190:18
**knowing** 51:14 69:7 183:2
**knowingly** 166:18 168:13
169:17
**knowledge** 157:11 158:1
**knows** 68:21

---

**L**

**L** 1:19
**lack** 183:3,3 185:23
**lady** 57:1 187:21
**laid** 183:24
**large** 21:1 39:17 83:16 151:2
**Larsen** 1:13 3:9 56:5,8,11,15,23
57:9,14,18 58:7,22 59:9,13,19
59:25 60:8,9 64:23 65:3,13
66:3,13,25 67:4 68:14 69:13
69:17 131:13 161:8 162:15,17
164:11,20,24 165:25 166:11
166:22 167:9,12,19 170:11
171:6,13,16,24 172:1,3,8
174:5 177:25 178:2,5,10,14
181:1,4 184:16 189:11,17,21
189:24 190:7 191:1
**last** 6:2 16:2 56:19 99:5 111:20
136:3,4,8 138:20 151:6
153:22 154:8 166:16,25 167:2
167:13,14 178:6 179:7,12
180:10 185:18
**late** 64:14 143:2 162:15 169:3
178:5
**lately** 71:14
**later** 14:7 16:7 18:15,24 79:22
82:14 118:3 119:11 120:9
123:14 124:19 125:8,17
146:15 150:23 151:4 158:10
162:18 163:19,19,20 169:13
**Latin** 169:13
**laundering** 173:9,12
**law** 2:1 54:19 57:18 59:11 66:23
69:25 89:12 96:11 135:21
143:5,5 144:5 149:20,21
151:2,3 157:2 160:11 167:22
167:23 171:18 179:17 180:16
183:13 185:2
**lawful** 173:10
**laws** 42:19 43:1 95:17 172:24
**lawyer** 59:6 65:21 66:17,19
95:19 153:12 162:24 163:1
174:10 182:12
**lawyers** 8:16 9:14 11:23 95:23
95:24 96:1 137:8,9 174:10
**lay** 12:8 73:6,6 93:9,16 119:4
120:5 124:23 126:17 129:8,14
136:10 183:24
**layman's** 15:23
**Lay's** 94:24 118:18 130:11,18
**lead** 26:23
**leading** 24:10 100:7
**lean** 134:25
**learn** 10:18 18:25
**learned** 19:1,17 30:7 61:14

---

118:22,23 129:14
**learning** 24:1
**least** 180:7
**leave** 22:4 53:4,11,13 104:16
155:12
**leaves** 160:17 179:15
**lectern** 104:18
**left** 15:17 67:15 159:5,10 160:7
**legal** 8:15 40:5 41:12 43:17
65:20 71:14,16,19 96:5
133:16 144:1 150:22 151:20
159:20
**legalities** 19:14
**legality** 43:5 160:17
**legislative** 42:24,25
**legit** 177:4
**legitimate** 43:7 173:10 177:3
**Leon-Pinckney** 35:3,3
**less** 21:5 44:13 60:10 70:8 79:13
101:4
**let** 11:4,10,17 20:7 22:1 26:14,23
28:10 33:4 36:16 44:3,15
46:21 54:22 56:22 58:5 60:1
62:17 65:7 76:20 79:10,11,25
80:1,8,10,25 82:1,13 83:25
86:3 87:5 99:13 104:8 106:15
111:11 120:8 124:2,9 126:2
129:7 133:2 137:12 143:22
146:2,12,18 147:11 151:5
152:14 160:5 164:16 171:7
187:6,7,7
**letter** 66:21 114:1,24
**letters** 147:22
**letting** 26:5 47:22 48:25 50:22
90:4 125:10 126:1 149:12
152:12,17
**let's** 18:23,24 35:2 38:19 44:9
46:7 58:4 63:6 70:5 71:7 85:9
91:9 104:17 109:22 113:1
118:21 120:23 122:5 143:20
157:14 158:4 177:3 183:22,25
**level** 154:3
**liar** 129:13
**lie** 133:24
**lied** 61:23
**like** 8:6,7,25 9:16,23 10:20 11:18
12:4 13:14 14:2,22 16:11 17:7
20:10 21:20,23 23:16 24:12
25:19 28:2,14 30:21 34:3,12
40:13 41:7 43:7 45:8 55:10,24
56:8,11 57:21 59:22 60:4
69:10 70:25 73:2 74:18 78:19
83:1,12,17,24 84:2 89:15,20
91:11 93:18 94:3 98:1 99:25
103:12 107:12 108:9 110:6
112:2 118:7 119:6,14,20,20
120:24 129:18 131:8 137:14
139:11 147:22 149:5 152:6
153:16 157:6,23 158:8,10,15
159:5 164:8 165:18,19,23
167:7,24 169:12,17 171:15 172:9
172:10 174:10 176:4 178:1,21
179:7 182:7
**liked** 24:1 26:20
**limine** 133:14
**limit** 137:14
**limited** 108:5
**limiting** 52:16 132:11,14
**line** 4:4,4 13:5,7,9 14:11 57:11
92:20,24 108:16,17,25 134:9
166:16,25 167:2 171:1 176:25
**lines** 87:8 167:14
**LinkedIn** 19:5
**links** 163:5
**list** 41:17 42:23 94:24 112:23
114:22 125:22 128:3 165:15
166:4 186:12,12,13 188:7,9
188:11 190:18
**listen** 54:9 83:8

---

**listened** 153:17
**listening** 67:12 182:22,23
**lists** 41:7
**little** 6:13 7:21 10:11,18 15:15
16:5 21:2,6,13 29:10 38:19
43:18,20 44:9 68:18 70:2
80:19 82:6 87:8,9 88:16 104:2
105:24 118:17 131:6,6 135:25
153:2
**living** 36:3
**LLP** 1:20
**local** 157:2
**locate** 57:2
**located** 35:14,17 81:1 82:13
143:20
**location** 43:25 44:3 81:3
**long** 8:7 17:24 18:10 21:17
22:24 42:10,10,1 1 55:25
60:10,17 63:16 64:13,14 74:7
136:16 138:23 155:6 164:3
**longer** 6:13 52:15,20 70:10
79:24 80:9,10 90:9 99:21
102:10 103:7 110:2 125:2
132:9 145:13 146:4,6,13
148:18 152:11 166:11 170:3
**Long's** 43:5
**look** 8:24 9:6 13:24 17:18 25:2
36:14 58:5,8,9 65:9 67:18
71:7 72:18 77:7 85:9,16 91:9
117:6 120:23 121:16 123:12
136:18 137:9,10 167:7,13,13
168:2,17 171:18,20 172:24
187:17 189:8
**looked** 82:21 99:17 109:20
113:19
**looking** 10:3 39:23 133:5 148:5
169:16,18
**looks** 41:7
**loop** 51:12
**losing** 138:18
**loss** 72:4
**lot** 16:20 21:9 26:19 27:5 38:19
52:5 61:8,14 65:15 71:14 99:9
99:12 107:9 113:23 134:9
136:20 145:4,23 146:21
150:25 151:3,7,24 177:5
182:2 184:22,22
**lots** 14:18 39:18
**loud** 101:24 102:2
**loudly** 101:25
**Louis** 26:3 51:2,4,6 110:17
113:10 116:20 126:14,17
**love** 67:13 168:17
**lower** 102:17
**Lozada** 86:6 107:2 109:10,11
**Luis** 35:23 36:3,9
**lunch** 52:24
**luncheon** 53:17
**lying** 184:3

---

**M**

**M** 1:13
**MacKenzie** 185:4
**made** 11:15 19:2,4 41:15 43:7
57:19,22 58:20 61:6,6 66:8
68:25 95:16 101:3 105:15
123:24 134:9,15,19 143:15
146:9 183:24 189:18 190:9
**mail** 35:15
**mailbox** 159:6
**mailed** 35:15
**make** 8:14 15:25 17:1 41:13 43:5
43:14 44:11,13,17,21 47:24
47:25 48:6 49:22 69:15 73:9
73:20 74:6,9 79:13,15 80:2
86:13 94:9,23 95:14 101:25
115:17 135:18 137:10 143:8
160:3,4 165:12 170:19,25
172:14,18 175:25 176:17

---

177:3 180:17 182:10,24
**makes** 12:2 59:14 69:25
**making** 19:25 49:25 69:5 95:8
127:11 143:22 180:14
**man** 74:6
**managed** 105:15
**management** 45:5
**manager** 73:16 74:7 99:19
**mandated** 52:25
**manufactured** 20:6
**manufacturers** 100:23
**manufacturing** 107:21
**many** 24:16,16,19 25:3,5 26:9
26:12 27:3 30:5 39:7 44:25
64:7,10 75:6 83:15 99:2,5
111:12 124:15 176:1 187:16
**man's** 79:17
**March** 9:11 103:3 110:19 111:5
113:15,18 114:9 115:2 117:16
118:13 124:20 125:12,17
128:1 129:16 145:8 152:3
157:7,8 162:15
**Marcus** 1:19,20 3:7 133:10
154:11 155:23 156:2,5,11,18
160:7,13,16 164:15,17 165:1
165:8 167:4 168:7,10,12
169:14,16,2 1 173:24 174:3
174:14 175:13,16,19,22,25
176:11,19,22 177:5,9,19
179:19,20,23 180:2,4,6,17
181:10,13,16,19,2 3 182:2,9,14
182:16,18,2 5 183:9,15,20
184:2,7,11,17,20,2 5 185:4,8
185:12,14,18,2 1 186:1
**marked** 4:2 81:6
**market** 10:8 31:7 35:17 99:6
102:7,13
**marketed** 10:10
**marketer** 97:13 157:9
**marketers** 8:5 17:4,16 22:21
25:15 26:9 96:15 97:6 99:5
100:5 101:11 130:19 142:23
143:12 144:13,14 152:12
**marketing** 7:6,17 14:3 18:19
21:16 22:14,14,20 23:5 26:22
29:15 31:16 37:11 41:2 71:12
82:12,15 101:19 102:21 131:5
145:1,2 146:3,9,24 159:16
161:10,12 176:12 182:2 185:8
185:9
**markups** 123:24,25
**Mary** 75:25,25 76:2 80:7 81:15
81:15 83:2 97:22 98:12,16
126:11,16 131:20
**Massengale** 9:7,8 13:23 107:17
**match** 116:19 117:1
**material** 29:15 136:20
**materialize** 19:16
**Matt** 20:3 51:5,8,20 85:16 87:10
87:25 88:5 89:8,8 90:9 92:7
93:7 96:23 107:24 111:6
112:6,9 115:11 117:10 120:7
120:9 124:20 125:14 126:17
128:15,15,22 144:8,22 150:10
150:21 151:5 152:3
**matter** 61:6 104:19 128:12
131:19 137:22 156:12 170:1
191:7
**Matthew** 20:2 22:3 51:3 94:17
108:16 109:1 110:16 118:25
119:8,9 120:3 122:6,7,8,13
123:1,18 124:16,19 125:10
126:16 128:16 143:2 144:3
148:25 149:5
**Matthews** 8:6 17:17,20 22:24
36:17
**may** 8:18 12:10,13 23:8 31:6
37:14 57:18,23 58:23,25 66:5
70:23 73:22 91:3 105:17

109:2 118:9 121:2,17 128:10
129:4,16 135:4,4,9 138:14
148:17 157:23 160:20 162:15
162:16 170:22 171:3,3 173:11
173:21 176:16
**maybe** 21:18 26:11 28:1 44:1
52:23 59:21,22 73:12 82:24
103:3 105:13,22 120:9 124:25
135:25 139:7 146:1 153:22
157:7 158:10 187:13
**MD** 39:10,22 49:8 76:25 90:1
113:21 116:3
**MD's** 87:13
**mean** 38:15 59:10 67:15 69:2
72:7 77:8,11,14,18,19 83:23
89:13,22 99:9 108:2 116:12
117:1 156:9 160:22 164:2
165:18 172:9 175:10 176:14
176:15 177:5 182:6 184:14,22
**meaning** 38:8
**means** 69:9 77:12,15
**meant** 41:8,9 42:25 73:16 77:9
182:5
**med** 46:15
**media** 135:8
**medical** 19:6,16 38:1 49:25
105:14
**medically** 52:11
**medication** 16:1 22:18 27:17
29:2,18 30:2,12 34:7 38:5
44:3 46:24 76:13 77:21 78:18
80:23,23 184:23
**medications** 7:7 10:6 15:18,24
18:22 26:5 28:13 30:16 34:4
36:2,12 38:2 41:10 47:16 48:1
48:3 71:23 79:24 80:14,16
94:11,12 99:13,14,20 100:17
100:18,20 114:16 119:19
148:19 159:16 161:13 184:8
185:3
**medicine** 28:7 30:9,13 32:7,16
38:13 184:13
**medicines** 95:2
**meds** 36:4 47:7 100:21
**meet** 19:10 96:1 143:20 150:7,12
150:14,18 164:2,5
**meeting** 11:18,19 127:16 144:5,7
144:9,22,23 150:20,25 164:6
**meetings** 11:22 95:25
**members** 162:2
**memo** 165:4
**memorize** 112:25
**memory** 107:6
**mentioned** 17:15 32:4,14 138:4
**merely** 52:16 132:11,14
**message** 11:4 47:2 50:3 75:14
119:1 120:10 122:9 124:16,18
124:23 125:6 128:11 146:2
148:24 149:3 150:16 152:12
**messages** 163:2,11,17,23
**met** 21:9 96:22 144:2 151:1
153:12
**metabolic** 44:5 71:24 80:23 81:5
109:25 110:17
**methodical** 133:15
**Meyer** 80:9
**Meyers** 2:1,1 166:2 187:19,20
187:22 188:3,5,12,14,20,22,25
189:6,9,15,19,23 190:1,5,12
190:14,16,19,22
**MG** 88:2 98:11 115:7
**MGTEN** 22:22 23:7 26:9 71:12
97:13 131:5 146:3,9 154:21
156:20 157:3,5
**Miami** 1:2,6,16,2,1 2:3,6,7
191:11,11
**Michael** 79:5
**microphone** 104:19
**middle** 48:14 66:6 167:15

**Middlebrooks** 167:25
**middleman** 67:11
**might** 52:20 82:22 96:8 100:14
139:6,7 156:9 170:21
**military** 99:9
**milliliter** 106:24
**million** 183:25
**millions** 39:18
**mind** 46:15 79:16 109:22 160:16
179:4
**mine** 26:4 33:4
**minutes** 53:8 64:14 70:8,8 95:5
125:8 132:16 139:17 181:5,7
187:1,11
**misbranded** 170:2
**misbranding** 69:20
**misconstrued** 38:22
**miss** 171:3
**missed** 141:10 186:10
**missing** 42:4,6
**Mississippi** 82:4,6
**mistake** 189:18 190:9
**mistakenly** 32:16
**model** 18:18
**modified** 185:4
**modules** 147:17
**moment** 26:24 37:13 91:3 104:7
104:24 118:9 129:4 132:10
153:19 154:8
**Monday** 6:21 53:25 54:8 135:25
143:24 155:11 165:13 186:8
186:17 190:25
**money** 44:11,13,18 79:13,15
100:2 119:12 124:22 138:4
173:8,10,11 176:17 177:4
183:23
**month** 21:18 32:9,10 39:19
44:19 79:8,9 98:21 126:19
146:7,8
**months** 44:25 67:1 147:6 158:4
162:18
**Monty** 1:7 3:4,6 35:5,24 41:5
51:3,11,20 71:13 86:11 98:12
110:17 111:6 112:7,10 119:1
119:12 125:19 131:23 156:3
**more** 18:24 24:1 27:5 43:3 44:13
44:18 60:10 64:2 65:17 76:4
86:14 87:8 92:18 107:9 108:1
111:12,23 120:1 135:25 138:4
149:6 151:17 175:11 176:6
180:6 183:25 184:1,14 186:9
**MORENO** 1:10
**morning** 54:10 55:10 57:2 136:1
132:18 171:14 186:17 190:25
**most** 26:23 49:20 78:13 114:18
137:7 167:22
**motive** 57:22 58:20 68:1 69:1
133:7,24 134:5,8,14,19
135:11 160:9
**mouth** 67:6
**move** 8:25 9:20 11:4 16:11 17:7
24:8,12 25:19 30:21 33:6
34:12 37:17 44:9 70:25 78:19
81:9 84:2 86:23 88:19 91:11
103:12 129:18 131:8 151:14
153:14 154:9
**moved** 168:7
**moving** 17:3 52:17 153:2
**much** 14:6 21:5 22:19 32:23
40:9 52:15,20 68:19 69:15
72:10 99:24 108:13 131:3
132:9 147:13 163:15,20 164:8
181:3,6
**multilevel** 8:11 14:3 23:5 72:12
**multiple** 77:9
**must** 35:9 36:3,4 58:19 64:25
166:17 167:2,14 175:1 179:17
**MyOnCallDoc** 39:12 42:12
**myself** 28:23 97:10 120:1 144:14

**N**

**Nah** 55:13
**name** 11:6 18:3 19:2 20:2 21:11
27:23 29:6 30:1 32:4,5 53:22
64:25 67:1,1 74:7 89:15
106:10 119:8 144:4 158:19
**named** 12:20 15:7 28:25 47:21
71:8 73:22
**Natalie** 35:2,3,8
**nationwide** 57:23 161:10,16
**nature** 162:22
**nauseous** 153:15
**near** 8:23 21:22 181:25
**necessarily** 184:13
**necessary** 30:18 38:10 42:23
50:22 52:12 78:6 96:11 100:3
143:18 150:4 166:11
**need** 9:20 11:10 31:19 33:1
69:20 72:10,11,13,1 3 76:7,19
79:7,18 80:22,24 81:2 83:3,8
87:7 104:10,10 105:17 110:4
115:13 116:15 117:18 119:6
120:6 121:16 125:24 126:4
132:19 136:8 146:6,23 151:8
155:25
**needed** 18:22 26:18 42:2 47:25
48:7 72:23 73:3 78:17 79:11
80:25 81:2 87:11 90:12,22
94:11 96:9 99:16 119:9 120:2
120:4,10,13 126:8 143:18
**needing** 116:19 127:17
**needs** 49:4 120:12 123:1 143:3
169:5
**negotiated** 100:22
**negotiating** 151:21
**negotiations** 151:24
**Neiman** 1:20
**neither** 36:23
**nervous** 143:15
**Nesbitt** 57:1 133:8,13
**network** 28:3 47:10 48:22 49:9
49:12 72:23,24 73:18 75:17
75:19,21,22 79:21,25 80:1
83:5 89:19 90:2,11 92:19
113:21 114:23 117:2 118:6
120:18,19 145:24
**networks** 88:8
**neuropathy** 102:13,14
**never** 32:13,19,24 37:20 38:22
39:24 45:2 48:15 66:22 78:8
80:24 97:19 98:21 99:4,7
119:21,21 123:21 127:23
137:2 170:16 177:20,21
186:24
**new** 27:11,13,16 47:23 50:20
51:16,23 86:14 91:7 92:14,16
92:16 93:8 103:8,9,11 109:25
110:2,4 113:7,11,11,24
114:14,25 115:23 116:1,7
117:18 118:6 128:4 129:3
158:8 159:11 170:20,21,21
**news** 52:18 57:24 65:3,5,8,10
66:4 157:20,21,24 158:1,11
159:15 161:20,22,25
**next** 30:4 79:9 82:2 110:12
124:17 137:21 146:11 187:3
189:14,18,22
**nice** 184:25
**nicer** 6:10
**Nichole** 33:12,15,20 153:6
**night** 53:25 54:5,13 55:6,19
56:19 138:20 144:6 149:5
150:13 185:18 191:1
**nightmare** 169:24
**nights** 55:13,15 182:21
**nine** 120:9
**Ninth** 134:2,3 164:22,22
**nobody** 6:22 30:15,15 34:2
119:12 128:12 129:10 174:9

**nominated** 176:2
**nominations** 176:3
**none** 108:7 109:7 110:9
**nonimportant** 138:8
**nonissue** 99:9
**non-paid** 125:21
**normal** 55:2
**normally** 72:20
**North** 2:6 7:12 11:14 20:5
107:21 191:11
**Northeast** 1:15
**note** 117:22
**notebooks** 53:4 155:12
**notes** 49:14,16,19 169:8
**nothing** 22:12 48:19 66:20 71:16
80:13 87:13 139:17
**notified** 79:22,23 99:8 103:4
**notify** 43:3
**notifying** 42:21 44:6 47:14
**November** 34:11 41:1,4,5
**number** 1:3 4:5,6,7,8,9,10,12,13
4:14,15,16,23 5:1,4,5 9:4 11:2
12:18,25 13:18 15:4 16:16
23:20 25:8,25 31:4 33:10
46:18 47:2 48:16,16 61:5 75:9
81:13 83:9 87:2,16 90:25 91:7
92:10,11,12,15,1 7 93:8,10,13
93:14,16 98:8,10 103:21,25
108:13 111:11 158:8 170:7
171:11 173:7,14,18 174:3,6
178:7,9,18 184:7 185:21
189:14 190:13
**numbers** 4:11,17,18,19,20,21,22
4:24 5:2,3,6,7,9,10,11,13
13:25 14:1 17:12 34:24 40:19
46:4 71:4 75:10 78:25 84:22
89:4 92:4 112:14,18,24 122:2
130:8 132:5 140:2 142:18
155:22 165:20 190:10
**numerous** 163:17,23
**nursing** 76:16,17,18,21

**O**

**object** 9:19 14:25 131:16 173:22
**objection** 9:2,18 10:1,22,23 12:6
12:7,16 13:15,16 14:24 15:2
16:13,14 17:9,10,23 18:8 24:6
24:14,15 25:21 30:23 31:2
33:7,8 34:14,15,17,21,22
40:15,15 45:10,13,16,19,24
71:2 74:20,21,24 75:2 78:21
78:22,24 81:11 84:4,10,14,17
84:20 88:21,24 89:2 91:15,16
91:19,25 93:20,23 98:5,6
100:7 103:20 108:11 110:9,13
110:14,24,25 111:3 112:3,4
112:11,12,21 120:25 121:4,5
121:8,9,15,20,25 129:20,21,24
130:3,6 131:10,13,23,24,25
132:3 140:3 141:2,3 142:12
142:13 189:11,17,21,24 190:7
**objections** 46:2 173:17 181:8
**objects** 170:4,8,9 186:14
**obtain** 51:15,17
**obvious** 67:12
**obviously** 59:21 66:7 67:16
68:12 69:8 134:9 135:8 137:6
137:11 150:25 169:13 170:2,9
180:7
**occasionally** 49:19,20
**occasions** 48:23,24 82:23 97:19
99:8
**occurred** 102:4
**occurring** 88:14 149:3
**October** 41:4 87:10 105:13
**off** 6:6 10:11 11:9 15:20 19:4
54:9 64:25 71:14 85:24
103:15 114:5,24 121:19
128:17 140:2

offense 174:22 178:23
offered 10:6 15:18 67:24 181:19
offering 21:4 30:15 119:1,12
  126:18 178:25
office 1:14,15 2:1 36:22 90:23,24
  104:13
officer 6:7 53:6,16 70:6 103:23
  122:24 139:19 155:14 191:2
offices 7:8 10:7 16:3
Official 2:5 191:10
often 42:23 97:6
oh 38:22 52:19 61:19 68:15 69:6
  95:8 119:12 120:23 136:22
  137:1 155:8 184:19 188:10,10
okay 6:4,11,22 11:8 19:18,19
  22:8 23:3 24:16 25:7 27:3
  28:24 46:7 48:14 51:16 53:9
  54:17,23 56:25 58:4 60:1,17
  60:23 62:19 64:4 67:18 69:14
  69:25 70:4,19 80:10 81:18
  84:8 85:14 87:1 91:14 93:10
  94:18 98:7,24 100:10 104:9,9
  104:10,11,12,22 111:7 113:1
  113:3 119:8 121:18 132:20
  133:3 137:17 138:13,14,18,25
  139:4 142:9,14 143:20 149:6
  155:9,16 156:3,8 164:13
  165:2,7 166:13 168:2 170:1
  171:7,7 172:22 173:15 174:2
  178:10 183:7 184:4,5 185:15
  186:1 188:21 189:12,13 190:9
  190:17,21
old 33:18,19 103:11,19 110:4
older 33:22
old-fashion 103:17
onboard 146:16
onboarded 152:23
onboarding 145:1,10,13 146:14
  152:1 153:4,23
once 21:21 27:22,24 68:24 92:20
  117:16 147:23 148:13 151:15
  152:23 153:12
one 6:18 11:14 12:10,13 15:9
  16:19 17:16 21:12 24:24
  26:24 29:25 30:3,25 33:16
  34:19 37:13 38:25 39:12
  40:23 44:10 46:18 47:20
  50:18 52:23 53:22,24 56:9
  61:5 63:9,12 65:4 68:12 69:10
  72:24 75:16 78:22 86:1 88:8
  89:19 91:3 93:11 97:18 99:10
  104:7 105:20 106:24 107:10
  110:1 115:3 117:20 118:2,9
  118:25 123:14 125:13,17
  127:12 128:2 129:4 132:10
  135:13 138:8,14 139:6,7
  143:2 147:2 153:19,22,23
  154:8,8,9 155:25 156:1
  165:16,16 166:19 169:25
  170:13 171:1,9 172:21 173:21
  173:25 174:2 175:2,11,11
  176:16,25 177:17 178:23
  183:2,17,17 184:19 186:9,19
  187:19
ones 10:13 129:3 170:21 171:8
  181:12 186:9
one-sentence 186:1
online 147:17 151:2
only 8:3 20:8 22:13 33:18,21
  76:18 81:17,21 87:12 99:7
  100:12,16 102:11 106:6,17,18
  106:19,20,22 133:7 134:11,17
  137:16 145:1 175:1 177:13,22
opened 14:7,11 95:18
opening 184:12
operate 83:14
operated 40:7
operating 39:20 150:3
operations 51:9 85:18

opinion 57:5 58:5,9
opponent 61:5 165:3
opportunity 72:20 58:16 99:22
opposed 44:12
option 102:11
options 149:6
orally 133:22
order 20:3,6 33:18 36:4 133:12
  138:17 139:11 140:4 142:6
  166:5 179:2
ordered 44:14
organizations 7:24
organized 104:21
original 116:23 117:1 124:16
  174:22 182:12
originally 39:21 40:25 50:18
Orlando 35:6
Osteen 18:4,7,14
other 6:13 7:24,25 8:5,8 18:19
  21:7 25:17 30:25 34:18 62:6,9
  62:12,14 63:2 66:5 67:1 69:9
  70:19 100:16 102:21 106:6
  108:4 109:20 127:21 129:12
  130:19 133:10 134:23 139:12
  139:24 144:14 145:2 148:6
  154:19 156:1 157:13 164:21
  164:22 165:14 169:23 179:19
  183:3,17,23 186:18 187:19
others 8:7 151:20 152:20 170:13
  177:13 176:4 180:13
out 7:23 15:1,20 16:24 21:6,24
  26:17 28:1,3,5,23 29:9 30:4
  31:13 33:3 36:13,22 37:23
  38:17 39:21,24 43:9,23,24
  46:25 47:12,22,25 48:25 53:8
  54:7 60:1 63:17 66:13 67:5
  68:23 69:12 72:21 73:3,15
  74:6,10 76:5 79:6,24 80:8
  81:22 82:1,21,24 83:3,5 86:13
  87:5 88:7 92:15 94:12 96:7
  97:10 99:5,14,19,24 100:17
  105:17 113:22 116:21 119:3,7
  133:4,6 136:5 137:21 146:1
  146:18 147:20 150:24 152:8
  152:12 158:6,7 163:19,19
  166:14,18,20,20 167:16,17
  168:24,25 169:15,15 170:2
  171:2,3 174:18 180:9 183:24
  183:24 187:17
outline 152:25
outlines 147:10
outside 3:7,9 53:19 95:25 135:16
  137:11 143:5 156:7,17 161:16
over 7:25 21:1,3,15 23:15 27:4
  27:22,24 29:14 31:12 50:13
  52:4 87:23 90:7 92:9 93:5
  97:1 100:21 101:5,8 103:22
  116:15 134:25 135:3 138:9
  147:3 148:3 149:1,6,15
  161:23 165:14 171:19 178:4,4
  181:8 183:17
overseas 35:6,14
overseeing 148:2
oversight 131:3
overt 173:20
own 10:12 14:7,10 16:8 17:6
  18:15 28:20 29:2,18,23 30:2,9
  30:11 34:1 67:16 83:2 93:14
  107:21 130:21,22 131:4,4
  157:12 159:10
owner 9:8 107:17
owners 7:18 16:19 19:12 37:21
  89:19
ownership 162:3
O'Hara 40:22 41:1,5,13 89:18

P

package 147:21
packages 20:14

pad 15:10,16,17 92:14 103:9
pads 113:11
page 3:2 4:4,4 15:11 25:10 49:10
  49:14 77:8 87:12,17 98:10
  115:10 117:10 122:21 166:16
  166:25 167:4,5,13 170:7
pages 75:5,6,7
paid 14:4 20:13,14 21:5 29:2,17
  29:23 30:8 32:7,11,16 52:13
  81:24 82:3 96:24 98:19,21
  99:4 120:15,16 128:10,13
  129:14,16 143:12 144:13
  146:8,8 148:8,10 149:23
  154:2 161:23 174:17
pain 43:24,25 44:1 72:5,11 73:1
  73:4,9,14 80:22,25 81:1,17,21
  101:18 102:6,6
pains 71:23
Palacios 133:19,19 134:18
panned 39:24
paper 65:9
paragraph 58:9 179:8,12 180:10
Pardon 53:12 66:18
parents 34:4
part 8:1 30:14 49:20 67:20
  102:15 123:19,21 138:11
  161:25 166:14 170:16 174:12
  177:14 178:16 179:3
partial 20:24
participants 147:2
participate 119:18
participating 180:13
participation 183:2,4
particular 38:2 89:14 133:25
  142:5
parties 56:15
partners 40:23
party 61:5
passed 43:2 172:24
PASTOR-HERNANDEZ 2:5
  191:9
Pat 144:8,22
patient 15:11,20 16:2,4,4,9 20:1
  20:5 22:1 23:24 25:18 27:16
  28:6,7,11,12 31:19 32:22 38:4
  38:8,12,13,16,17,2 4 39:1,3,4
  39:6 43:10,14,21,24 44:2,7,12
  44:24 46:17 47:6,7,14,21
  48:21 49:11,13,18 51:9,13,13
  51:16 52:12,13 73:5 74:12
  76:1,3,12,14 77:2,10,13,15,16
  77:19,20 79:5 80:7,8,24 81:20
  85:19 86:12 94:21 96:22,25
  97:8,11,16 101:6 102:6
  113:23 119:6,8 122:9,20,25
  124:21 126:13 127:16 130:23
  148:10 153:10
patients 7:10 10:9,19 18:20,21
  22:15,17,20 24:4 26:12,18,19
  27:3,5,21 28:6,9,13,15 29:16
  29:21,22 30:5,11,13 31:15,17
  36:3,4,10,22 37:24,24 38:2
  41:10,24 42:4 43:22 47:5,10
  47:16 49:25 51:8 52:11 75:17
  76:4,8 78:17 79:20,25 80:16
  80:21 82:12,14,17 93:5 94:9
  94:10,11,23,24,2 5 95:1 96:16
  96:21 99:9 100:16 102:14
  103:10 110:3 113:6 114:4,15
  114:15,17,23 119:2,18 120:14
  120:15,17,20 125:23,25 126:3
  126:8 128:24 129:2,15 144:12
  144:12 145:23 146:4,6 161:24
  180:22
patient's 15:21 87:6
Patrick 144:3 150:20
Pattern 167:19,23 169:9,10
  181:23
pay 21:4 25:13 30:13 36:21,25

37:3,5,6,12 52:6,8 65:19,19
  77:23,25 78:2,4 96:16,21,25
  97:3,15,17,20,20 98:18,23
  99:2,6 100:1 101:7 122:14
  128:4 173:18
paycheck 30:4
payer 144:11
paying 21:3 38:21,22 40:11 52:6
  55:21 100:3,13 128:9 130:24
  178:25
payment 30:2 32:18 78:6 126:18
  174:8,16
payments 146:9 153:7,9 178:21
  180:23
PCA 19:23 20:8 82:6,7,10,11,13
  82:18 90:9,17 95:5,13 96:3
  102:21,22 106:6,12 107:24
  109:12 116:4,11,24 117:1,11
  123:23 142:23 148:14,25
  151:20 153:23 156:20 159:19
  160:1 162:2,3
PCA's 124:9
PDFs 15:10
penalizing 54:19
pencil 183:8
people 8:8 21:3,10 24:3 26:18
  29:22 30:16 32:25 33:22 50:8
  71:23 72:3,9 93:9 95:25 99:6
  100:11,13 105:25 107:9
  122:14 127:21 128:10 129:12
  145:4 146:21 168:1 176:2,4
  180:8 183:23
percent 13:25,25,25 21:4,4
  71:15 130:25 139:3,5
percentage 8:12 20:18 139:1
percentages 14:4 154:3
period 21:18 51:7 128:17 145:13
perjuring 184:3
permanent 23:9
permission 23:9 114:3
permits 182:18,25
person 8:11 14:4 19:2 21:10
  26:4,6 27:10,23 49:4 57:24
  58:1 65:5,5,11 69:4 82:3
  85:18 88:10 109:6 124:25
personal 11:18 34:1
persons 183:5
pertains 11:13
pertinent 67:20
Petersburg 106:13
Pharmaceutica 7:12 11:14 20:5
  107:20
pharmaceutical 185:9
pharmacies 7:14,20,25 102:21
  105:16,22 106:2,4,6,8 107:15
  108:4 161:10,11,15
pharmacist 51:17 76:1 80:7
  97:22 114:3 115:20 126:13
Pharmaco 11:10,16
pharmacy 7:7 13:12 14:14 15:18
  19:23 20:8 21:15 22:3 27:24
  27:25 28:4 34:3 36:5,10 46:15
  46:24 48:18,19 49:1,2 50:12
  50:23 52:1 77:13 79:8,11,16
  80:2 82:19 83:10 85:17 86:5
  87:21,24 89:25 90:4,21,25
  91:2 92:8,22,24,2 5 94:7,14,16
  94:20 95:1,14 96:6,20 97:8,14
  97:23 98:22 99:8,18 101:5
  102:8 103:4 106:9,9,10,12
  109:5 114:2,6,10 117:3 118:8
  119:22 120:1,2 122:7 124:22
  126:2,3 127:7,15,18 128:5,16
  143:4 144:4,17,19 145:18
  146:12,23 147:10,11,15,20,20
  147:23 148:5,25 150:21,22
  151:23 152:21 157:13
pharmacy's 48:16
Pharmetrics 106:13 108:7

**phone** 11:4 35:25 37:25 38:24
  47:3,8 48:16 104:14 158:8
**phonetic** 185:5
**photograph** 25:4
**physician** 10:7 14:4 15:11,25
  16:3 27:18 28:4 30:17,17 36:5
  36:10,21,23,2 5 37:12 38:6,8
  38:12,23 44:7 46:22 47:11
  48:2 49:3,16 50:11,19,21,24
  51:25 73:18 77:9,12,16 81:1
  86:13,13 87:22 89:14 116:14
**physicians** 7:8,9,17 10:10 12:25
  15:17,19 22:14 27:20 37:11
  37:20,21,23 39:20 40:11
  41:11 45:4 50:18 52:11 77:1
  82:25 88:8 114:22 115:25
  116:1,14
**physician's** 83:4 90:23
**pick** 180:5 183:17,18
**picked** 54:1
**piece** 137:7
**pile** 154:9
**pitch** 72:8,13
**place** 42:2 78:8 88:2,10 127:12
  128:4 129:11 152:2 179:19
  182:3
**Plaintiff** 1:5
**plan** 138:5 183:3,4
**planned** 145:9
**planning** 137:20
**playing** 60:24
**pleading** 165:4
**please** 6:15 8:18 45:22 48:17
  50:12 70:17 117:12 126:2
  139:20 146:10
**PLLC** 2:1
**plus** 152:7
**pocket** 99:14
**point** 19:15 25:20 58:4 67:8
  120:18 127:15 137:7 139:2,13
  151:13 156:13,22 159:3 164:4
  168:24,25
**points** 93:8 152:22
**policy** 97:14
**popular** 43:3
**portal** 38:7 75:5 76:24 77:1,3
  125:23 126:8 130:22
**portrayed** 161:23
**position** 29:10,13 31:12 56:17
  59:15 70:3 170:5
**possible** 33:19 71:16 95:16
  126:3 145:19,20
**possibly** 34:4 149:22
**potential** 37:24 43:22 46:17
  149:12
**potentially** 28:22 144:20 145:4
**Powell** 33:12 153:6
**Powell's** 34:7
**power** 54:21
**practice** 7:18 98:25 143:7
  149:11 160:17 187:23 188:1
**practices** 159:20
**praised** 133:8
**precise** 65:17
**precisely** 58:3
**predated** 66:4
**predicate** 142:15
**prefer** 96:24
**pregnant** 76:14
**premature** 59:8
**prepaid** 38:20
**prepare** 68:17 186:17 187:5
**prepares** 68:12
**preparing** 69:23
**prescribe** 7:9 15:19 41:9
**prescribed** 13:1 44:22,24 46:15
**prescribing** 114:16
**prescription** 14:5 15:16,19
  33:21 35:13 36:6 37:6 38:6,9

38:23 43:9,14 50:8,9,11,13,17
  50:20,24 51:16,17,23 52:3,7
  52:12 75:18 76:6 77:5,13,22
  79:9,10,13,17 80:2,10 86:10
  86:14,19 87:6,22 88:8 101:18
  103:9 113:11 122:10 184:8
**prescriptions** 13:2,2,4 14:13
  27:22 29:23 34:1 36:22 37:1,3
  37:5 40:11 51:15,22 56:9,12
  65:20 87:20 90:5,23 91:8
  92:21 93:15 94:8 103:11
  110:4 113:23 114:22 115:16
  115:18 119:2,12 158:14
**presence** 3:7,9 53:20 135:16
  137:11 156:7,17 161:6
**present** 6:16 10:19 68:5 70:21
  72:10 73:17
**presentations** 27:13
**presented** 20:2 30:16
**presenting** 71:22 72:2,9
**preserve** 184:6
**preserved** 176:7 177:11 178:17
  178:20 185:19
**preserving** 186:10
**president** 11:7 42:11 51:8 92:8
  122:7 147:25 150:21
**press** 89:16 135:14
**presumed** 162:6
**pretty** 22:19 27:10 96:10 99:24
  129:11,13 131:3 139:5,6
  147:13 151:25 163:15 164:8
**prevail** 137:19
**prevent** 137:8
**previous** 79:8 98:20 114:11,21
  115:3 146:7
**previously** 32:11
**Prieto** 56:20 57:13,19 67:19
  160:6 164:21
**primary** 175:8,10,11,16,23
  177:23,24 179:2
**prior** 56:18 58:6,11,19 59:2,6,12
  59:13,19 62:8 63:1 67:20
  133:5 134:15 135:19 155:20
  160:4
**probably** 8:23 20:10,23 24:21
  27:2 52:22 68:6 70:13 103:18
  104:18 128:24 137:7 173:16
  187:12,12
**problem** 68:7,10 140:7 170:22
  176:12 186:24
**problems** 28:9 50:7 127:6
  160:21
**procedure** 91:8 94:15
**proceed** 146:16 151:18 152:2
**proceedings** 1:9 6:1 53:19 191:7
**process** 19:13 21:9 33:22 40:3
  46:10,25 88:13 92:20 95:19
  107:21 128:5 144:23 145:1,6
  146:14 152:1,8 153:24
**processed** 114:25 152:15
**processing** 114:13
**produced** 10:5
**product** 10:18 12:1,1 19:24 20:2
  20:6 31:7,14 32:23 33:1 37:12
  44:12,13 47:24 48:5,7 77:17
  103:6,10 105:8,12,16,17,19,20
  105:23,25 106:3,6,8,12,14,16
  107:8,16,18 125:21 148:5
**products** 7:9,17 11:17 20:24
  22:15 26:7,18,20 30:16 31:17
  82:16
**Profile** 49:11
**program** 16:8 17:5 23:5 30:13
  30:14 82:4,8,10,17 87:19
  88:12,13 90:16 97:2,5 102:15
  118:18,21,23,24 119:13,15,17
  120:4,6,11,12,13,2 1 123:16
  124:24 125:14,20 126:1,4,7,9
  126:19 127:3,19,21,23 128:1

128:25 129:1,2,9,15 131:4
  143:16 146:12 148:13 150:1,3
  151:14 152:13,16,24 154:25
  157:21,22 159:25 160:18
  161:15,16,17,20,25
**programs** 128:18
**progress** 152:4
**prohibited** 62:23
**prohibits** 94:19
**project** 42:18 145:4
**prominently** 161:22
**promise** 187:14
**promoting** 26:18
**promotion** 181:16
**proof** 186:9
**proper** 12:8 14:20 46:20 83:5
  86:18 88:9 172:20
**properly** 28:1 77:3 82:24 86:15
  87:7 90:6 134:16 143:9
**proponent** 57:10 61:11 165:3
**proposal** 138:20
**proposed** 171:4,11 173:7,14
  174:1 186:11,13
**prosecutor** 170:18
**prospects** 71:18
**prove** 63:23 175:1,6 177:1,14
  178:24 186:3
**proved** 40:4 166:17 167:2,15
**provide** 9:1 72:6 76:6 83:9
  90:24 94:25 109:6 147:18
**provided** 7:12 17:19 18:18 25:11
  25:16 44:5 46:23 72:22 76:25
  77:12,20 91:7 113:20 144:19
**provides** 67:20
**providing** 130:22 145:23 146:4
**pull** 151:1
**pulled** 56:19 77:8
**purchase** 106:2,16
**purchased** 106:12
**purchasing** 11:16 105:22 107:16
  108:3,3
**purpose** 93:4 174:23 175:6,7,10
  175:11,16,23 176:15,18 177:2
  177:15,23 178:25 187:20
**purposes** 16:25 32:2 90:22 175:3
**pursue** 29:14 40:6 68:23
**pushing** 136:4
**put** 14:22 67:14 103:9 117:21
  118:2,12 152:15 165:17,18
  169:8,19 170:9,21 178:17,18
  178:19 179:1
**putting** 11:9
**p-01** 101:9,11,17 102:5,6,7,11
  102:18
**p-02** 101:10 102:5,12,15,17
**p.m** 6:1,8 53:17,19 55:7 70:16
  117:4,7,14,23 133:1 139:18
  139:21 150:13 155:15 191:3

**Q**

**question** 24:11 57:4 64:10 95:10
  99:13 108:25 127:25 129:7
  133:24 134:4,5,15 173:10
  177:13,22 184:5 186:19
  187:19
**questioned** 96:6
**questioning** 137:10
**questions** 27:12,25 45:6 60:4
  70:11,14 78:11 119:12 122:1
  142:15 153:23 155:2 156:6
  164:11 165:8
**quickly** 26:15 122:21 151:25
**quit** 143:16
**quite** 8:17 39:16 69:9,9 128:19
  129:10 182:4
**quote** 187:8,8

**R**

**R** 191:5

**raise** 102:1 173:17
**Ralph** 51:2,4,6,1 1 110:17
  113:10 116:20,22
**ran** 18:15 51:9 85:17 136:5
**ranks** 168:18
**rapidly** 52:17
**Rashbaum** 1:19,20 3:5 6:23 7:1
  8:18,20,21,25 9:5,16,20,23
  10:2,20,25 11:3 12:4,10,13,19
  13:14,19 14:22 15:1,5 16:11
  16:17 17:7,14 23:8,11,12,16
  23:21 24:8,12,18,21,23 25:1,6
  25:9,19,23 26:1,24,25 30:21
  31:1,5,22,24 32:3 33:11 34:12
  34:20 35:1 37:14,16 40:13,18
  40:21 45:8,11,15,18,21,23
  46:1,6 52:17,22 53:11,13,15
  56:12 60:3,5,7,15,25 61:2,7
  61:17,21 62:1,4,6,11,19,23
  63:21,24 64:1,4,9,11,14,16,18
  64:21 65:15,18,25 66:2,10,14
  66:17,19,21 67:13 70:10,12
  70:15,24 71:6 74:18,23 75:1,5
  75:7,12 78:12,19 79:2 81:9,14
  84:2,6,8,11,13,16,19,2 4 85:9
  85:15 86:20,23 87:3 88:19,23
  89:1,6 91:3,5,11,14,18,21,24
  92:2,6 93:18,22 94:1,4,6,19
  95:9,11,12 97:24 98:1,4,9
  100:9 101:22 102:3 103:12,16
  104:1,5,7,17,21,2 5 108:9,14
  110:6,11,16,19,21,2 3 111:2,5
  111:8,10,13,15,17,19,21,25
  112:2,6,9,16,1 9 113:2 118:9
  118:11 120:24 121:2,7,11,14
  121:22,24 122:4 129:4,6,18
  129:23 130:1,5,10,14,17
  131:8,12,15,18,2 1 132:2,7,10
  132:13,16 136:7,12 138:2
  139:3,23 140:1,6,8,10,12,14
  140:16,18,20,22,2 4 141:1,5,7
  141:9,11,13,15,17,19,21,23,25
  142:2,4,7,11,17,2 1 153:19,21
  154:8,12,14 155:2,17,18,25
  156:4,8
**rate** 102:17
**rather** 15:25 18:20 83:1 175:1
  179:10
**rationales** 176:16
**rattle** 140:2
**Ray** 1:7 3:4,6
**re** 108:22
**reach** 28:3,5,10,23 29:9 37:23
  38:16 48:23 49:1 73:3,15
  74:10 77:10 96:7 97:9
**reached** 47:11,12 74:6 76:5 79:6
  79:24 83:2 105:17 113:22
  146:18 158:6,7
**reaching** 28:9 39:21 46:24 47:25
  48:25 80:8 87:5 173:13
**reaction** 145:16
**read** 57:7,8 108:17 115:7,11
  138:24 155:10,18 164:23
  165:5 167:15 173:1 180:1
  182:17,17,24
**readable** 173:1
**reading** 58:9 74:5 135:21
  139:10,14 146:14,15 188:13
**ready** 60:23 107:22 138:13
  139:10,14 146:14,15 188:13
**real** 59:21 101:24,25 102:2
**realize** 32:19 129:13
**really** 16:20 19:8 22:12,16,23
  23:5 24:1 26:16,20 29:19
  35:21 39:23 72:8,10 82:20
  83:19 86:11,12 99:8,11,18,24
  100:12,16 101:15 102:4,10
  105:21 106:1 107:14 109:23
  118:24 135:25 151:23 170:1,7
  174:9 179:10 186:21

**realtime** 101:1 109:4 120:23
  122:11 125:18
**reason** 50:18 51:23 58:15 65:7
  68:2 69:19 135:2 142:5
  156:14 184:17
**reasonable** 166:17 179:15 182:7
  185:22,25
**rebut** 67:24
**rebuttal** 138:25 139:5,8
**recall** 28:25 31:6,8 73:6,22 74:1
  80:17 88:17 96:13,17 98:16
  101:12 107:1,4 142:24 157:22
  158:19 159:15 163:2
**receipt** 174:7
**receive** 18:11,1 20:7 22:18
  27:25 28:8 36:4,12 46:14
  49:19 91:1 93:9 95:4 110:5
  119:2 125:25 128:2 144:18
  152:3,6 173:19
**received** 4:2 9:4 11:2 12:18
  13:18 15:4 16:16 17:12 23:20
  25:8,25 30:2,11 31:4 33:10
  34:8,24 39:1 40:19 46:5 50:9
  71:4 74:4,8 75:10 77:3 78:25
  81:4,13,20 84:23 86:10 89:4
  92:4 93:6 98:8 108:13 112:15
  122:3 130:8 132:5 142:20
  156:22 190:11
**receives** 38:4
**receiving** 16:6 26:5 27:17 28:13
  36:1 50:25 74:5 122:10
  174:24 175:3
**recent** 67:25 68:9,9,11,16
**recess** 53:17 139:15,18
**recipients** 100:6
**reconsulted** 113:23
**recontacted** 74:12
**record** 6:6 121:19 147:3 175:25
  179:3 188:13
**recorded** 56:16 63:20,23 146:25
  147:1 163:16,20,22
**recording** 67:6 159:7
**recordings** 67:9
**records** 30:7
**recross** 135:20
**recruit** 7:24 28:19
**recruiting** 21:1 27:11 32:25
  39:16 42:24
**red** 143:11 183:8
**redirect** 59:1 60:6,19 62:20
  135:19 156:4,5 165:6
**reference** 65:5 162:9 166:5
**referral** 174:25 175:2 177:2
  179:1
**referrals** 144:18 161:24
**referred** 46:20
**referring** 75:21 119:14
**refill** 48:4 51:14,15 128:1
**refilled** 50:8,20
**refills** 47:22 50:23 76:4,6,9,10
  80:9 113:12 114:13 128:5
**reflect** 133:20
**refuse** 38:14 52:13
**refused** 38:9,11 39:3 57:11 77:6
  77:14,15,25
**regard** 103:2 105:9 130:18
  132:8
**regarding** 57:24 100:11 101:9
  102:4,23 108:20 110:17
  126:17 133:5 135:5
**regards** 11:10 126:4
**regroup** 104:8
**regular** 53:4 152:7 185:25
**regulatory** 90:22 146:22 147:12
**rehabilitate** 62:13,15,16
**rehabilitation** 62:3
**reimbursed** 101:6
**reimbursement** 101:12
**reimburses** 102:17

**reimbursing** 148:19
**reiterating** 127:13
**related** 70:18 161:17
**relationship** 19:10 162:8 172:6
**relax** 71:13
**releases** 135:14
**reluctant** 172:13
**remained** 22:16
**remember** 6:18,20 7:3 29:1,3
  58:5,15 61:14 69:3 74:3,5
  82:23 85:2 102:12,25 103:19
  105:1 106:10 110:7 112:23
  136:3 137:5 158:6 159:6
  162:10,11 163:5 182:12
  184:10 190:18
**remind** 7:5 87:19 89:17,18
  109:23 126:11
**remove** 87:11
**removed** 113:6
**removing** 87:16
**remunerated** 174:9,12
**remuneration** 174:7,16,16,17,24
  175:3 178:23,25
**renal** 83:17
**rendering** 133:15
**renew** 50:10
**rep** 8:13 9:13 25:18 26:6 48:13
  48:25 119:7 123:5
**repeatedly** 37:4
**repetitious** 137:14,14,15
**rephrase** 44:15
**replaced** 179:14
**reported** 2:5 16:25 25:12
**reporter** 2:5 130:15 191:10
**reporter's** 3:10 169:24
**reporting** 32:2
**reports** 135:8
**represent** 14:1
**representations** 180:14
**representative** 8:4 17:20 18:3,4
  19:24 24:2 26:4,21 27:16
  28:21 29:6,8 30:1 31:14 32:9
  35:4 39:17 46:19,19,21 47:14
  50:5 71:12 72:24 73:15 79:23
  97:10 126:5 149:24 157:9
**representatives** 10:17 15:9
  21:13 22:23 25:12 26:17
  27:11,12,14 28:16,20 29:22
  30:10 31:18 36:18 43:22
  47:21 72:21 80:21 82:15 97:3
  125:1 148:2 154:1
**represented** 7:7 99:21 107:20
**reps** 13:7 17:15 22:21,25 23:13
  24:4 25:17 26:9 27:1,6 28:18
  28:19,19 39:17 80:16 82:12
  126:18 146:2 148:8
**request** 76:7 79:7 83:5
**requested** 123:17
**requesting** 109:5 171:9
**require** 96:21
**research** 29:20 149:14 150:23
**reserved** 63:11
**reserving** 62:20
**residual** 124:25
**resolution** 84:1
**resolved** 150:6
**resource** 144:25
**respect** 160:17 183:1
**respond** 33:20 46:14 50:10
  71:18 72:4 93:10 108:21,22
  109:1 122:16 128:8 149:6
  151:6
**responded** 36:24
**responding** 114:10
**responds** 51:20 90:7 116:20
**response** 35:8 36:2 89:24 92:13
  128:17
**responsibilities** 7:16 27:9
**responsibility** 28:16,17

**responsible** 16:20 27:10,11,15
  27:23 162:6
**rest** 126:5 181:10
**restaurant** 144:7
**restrict** 137:13
**resubmit** 76:19
**resubmitted** 75:19,23 87:7
  113:25
**result** 18:10
**results** 38:6,25
**Resveratrol** 103:7 113:6,12
**retired** 56:3 133:1 155:15
**retroactively** 115:15
**returned** 139:21
**reversal** 134:17
**reverse** 30:3 32:18 81:25 105:18
**reversed** 81:18,23 94:24 95:2
**review** 29:15 49:12 133:11
**reviewed** 124:5
**Rich** 11:15
**Rick** 9:7,8 13:23 107:17
**Ricole** 185:5
**right** 6:2,11,19 9:22 11:23 12:8
  14:16,17 25:22 27:1 38:13
  47:24 48:8 52:25 53:1,7 54:24
  55:20 56:1,13 57:3 58:16,23
  58:25 59:2,8,14 60:17,21
  64:22 65:1 68:5,11,13 69:12
  69:14 70:20,23 71:16 75:8
  79:12,14 86:7 87:14 88:2
  102:15 106:10,11 109:12
  110:20,22 112:13 116:5
  118:19 121:18 124:3 132:19
  132:20 136:1,11,13 138:6
  139:10,22 142:16 145:7
  153:16 155:3,4,12 156:10
  157:24 160:13 161:4 162:24
  164:19 165:13,24 166:1
  168:10 169:24 170:14 171:4,5
  171:18,20 174:4,5,6 178:12
  178:16 181:9 185:10 186:4,7
  186:17 187:18 188:4 190:3,23
**righty** 70:5
**right-hand** 88:11
**rings** 10:14
**rise** 6:7 53:6,16 70:6 132:24
  155:14 187:21 191:2
**rising** 173:25
**risk** 139:13
**Roberts** 176:4
**Robin** 36:16,17 75:16
**rogue** 67:16
**role** 27:9 100:19 147:24,25
**room** 53:5 132:22
**row** 6:21,22
**RPR** 2:5 191:9
**rule** 34:1 35:19 42:8 57:18,20
  58:12,19 63:4,13,14 67:19
  165:5 168:7
**rules** 41:20
**ruling** 62:20 133:15
**rulings** 134:24
**run** 11:22 33:3 116:20 154:25
  159:11 161:20 183:7
**running** 125:2 128:25 154:21
  159:12
**Ruth** 16:18,19
**RX** 86:12
**Ryan** 8:6 11:6,17 12:21 13:23
  15:6 17:24 22:24 74:7,8
**R.F** 11:5

**S**

**Sackman** 81:16
**sad** 138:14
**safe** 144:16 171:9,22 172:3
  173:4
**salary** 151:9

**sale** 8:12,13 11:13 69:21
**sales** 7:21,24 8:3,5 10:5,12,17
  11:7,14,15 13:1,10 15:9 17:19
  17:24 18:5 19:4,24,25 25:17
  27:11 28:16,18,19,19,20 29:6
  29:10,21 31:12,18 35:4 36:17
  39:17 42:11 43:22 47:14,20
  48:13 50:5 71:12 72:13 73:15
  80:16 82:12 123:5 124:25
  127:12 130:21 131:1,4 146:2
  146:7,18 147:25 148:2,8
  157:9
**salespeople** 8:10
**same** 10:12,13 14:9,15 17:5,6
  18:18,19 22:11,16,20 23:6
  32:12 40:3,7 63:16 68:18 93:9
  103:8 106:11 107:19 114:18
  117:7 126:11,25 152:17
  159:11 163:15,16,23 165:17
  178:21 184:17
**Santos** 21:11,17 39:24 107:10
**Sara** 80:8
**satisfy** 173:4 174:21 178:22
**save** 8:23 100:2 179:10
**saw** 14:11 16:4 25:18 114:3
  137:2 138:24,24 157:21
  161:22 181:21 186:25
**saying** 59:5 72:7,8 85:5 86:9,10
  89:10 93:12 106:19 114:12
  117:10,15 122:9 124:23
  128:22 164:4 170:23 178:22
**says** 15:10 23:25 24:10 33:15
  35:5 41:5 42:18,23 46:10 47:5
  48:14 50:6 57:5 58:10 59:4,6
  65:15,15,22 67:15 71:13 72:2
  77:11 85:19 88:2 89:20,25
  92:9 93:7 98:12 116:18,21,22
  123:1,4,23 125:19 127:3,5,8
  127:25 128:15 131:19 133:14
  149:5 151:5 166:8,15,16,20
  166:25 167:5,15,23 169:6
  171:1,18 173:2,8 174:7,22
  175:13 176:3,7 177:1,16
  182:13,14,15 183:22,25
  184:25
**scar** 44:2,3 73:2,4,9,13,2,5 74:13
  80:23 81:2,3,4,17,2,1 102:7
**scars** 71:23 72:5,11 74:1
**scheduled** 54:14 146:21
**scheme** 166:18 167:16,17
**screen** 77:7 85:9,16 115:7
  123:13
**screenshot** 76:24
**script** 15:10,16 27:24 33:16,22
  38:7 39:1,2,3 49:4,6 77:5,11
  78:2 92:14,16
**scripts** 78:15 83:4 88:1,17 92:9
  99:18 113:24 122:15
**scrutinizing** 161:21
**scrutiny** 161:10,13,17,19
**sc-01** 101:10,11 102:5,8,11
**sc-02** 101:10 102:5,9,20
**sc-03** 101:10 102:5,9,20
**seat** 54:3 133:3 155:16
**seated** 6:15 70:17
**second** 6:21 12:11,14 15:22
  58:10 65:6 98:10 109:3 130:2
  133:3 154:9 163:13 166:25
  167:13 174:21 178:22
**seconds** 37:14 136:15 181:7
**section** 1:14 58:10 171:1
**security** 6:7 53:6,16 70:6 103:23
  132:24 139:19 155:14 191:2
**see** 7:25 12:20 15:13 28:3 32:21
  33:12 35:10 38:24 42:20,21
  45:22 46:8,12 47:7 49:10,14
  50:14 51:18,20 53:3,5,9 56:22
  57:7,16 58:24 68:9 69:5 71:9
  71:25 75:19 76:5 85:21 86:15

88:3 93:2 98:14 100:4 103:22
104:8,12 105:17 110:14 115:8
117:7 123:1,6,8 124:15
125:15 126:21 127:8 128:6,21
130:13 135:3 136:8,12 137:2
138:5 139:17 151:11 155:12
164:16 166:14,25 167:1
168:17,17 171:11 172:23
177:5 189:8 190:3,24
**seeing** 157:22
**seem** 60:4
**seemed** 29:13 82:20
**seen** 89:10 123:23,24 124:7,12
**selected** 182:21 186:4
**sell** 21:12 106:6
**selling** 7:19 11:25 20:24 21:9
105:16 106:4 108:4 109:6
129:2
**send** 13:2 14:14 15:21 28:7
31:16,18,19 35:16 80:2,13
82:3 83:4 86:17 90:17 92:15
92:18 96:25 98:12 118:1
123:15,18 147:20 149:15
152:17 155:8 170:19,23
**sending** 32:1 36:20 86:16 125:4
125:22 163:2,5,11,23
**sends** 122:9 123:16
**sense** 69:22 74:6,9 180:17
**sent** 12:25 16:23 20:4 27:24
29:14 31:11,12 41:25 46:8,17
49:20 50:11 77:13 79:7 81:22
93:5 94:12,22,24 97:15 114:5
114:22 116:21 117:2 118:25
120:10 122:17 124:23 128:3
138:20 146:1 152:11
**sentence** 167:14 183:8
**Senterfitt** 144:5
**separate** 93:11
**September** 20:23
**Serge** 178:6
**series** 111:13
**service** 41:6 42:3,6 175:1
**services** 146:4
**SESSION** 53:18
**set** 14:15 16:7,8 19:12 22:8,9
23:3
**setting** 22:5
**settling** 143:23
**set-up** 46:10
**several** 21:1 40:2 48:22 107:15
133:17 145:2,6 147:6 152:22
162:18
**Shane** 8:6 17:17 22:24 36:16,17
**share** 29:15 31:15 154:4,6
**sharp** 142:10
**sheet** 15:11,22 16:2,2,4,9
**shenanigans** 35:21
**shift** 55:4 104:2 131:6
**short** 21:19 139:7,8
**shortage** 107:3
**shortly** 129:3 148:15 163:2
**shot** 154:9 186:9
**show** 18:1 23:22,22 26:2 30:19 33:3
35:3 38:7,7 77:2,4 103:21
109:4 117:20 148:20,21
151:19 153:22 160:16
**showed** 49:24 160:24
**showing** 7:8 13:13 17:23 18:1,5
31:10 35:22 40:22 41:21 42:9
48:10 49:8 50:2 51:1 72:15
75:24 76:12,22 79:3 80:6
84:25 85:25 87:4,25 89:7 93:7
94:20 97:25 113:3,16 114:7
115:6 116:16 117:6 123:12
124:18 128:14 148:23 150:10
151:4 154:15
**shows** 46:16 94:22
**shut** 128:25 143:16 148:18
149:25 160:18

**shutdown** 101:22
**shutting** 150:2
**side** 139:12 184:18 186:11
**sides** 133:16 165:23 169:1
**sig** 89:20,21,21
**sign** 17:20 114:2,24 147:15
**signature** 28:2 83:2,4,6 89:11,23
90:5,8
**signatures** 83:1 90:10 95:6
**signed** 9:12 87:6 90:6 96:3 114:5
115:14,25 117:2,19
**significant** 143:7
**signing** 85:24
**similar** 14:8,9,12 16:7 18:15
166:19 177:10 185:22
**since** 57:8 62:20 70:7 136:5
164:3
**single** 179:23
**sir** 6:12 54:3 109:2
**sit** 137:7
**sitting** 79:21 167:1 188:24
**situation** 16:7 21:24,25 22:4
50:23 57:21 74:11,14,15
82:25 83:7 89:14 109:24
130:11,18 146:20 176:12
180:19
**six** 54:7 125:8 158:4
**size** 106:14,16,17,18,19,20,22,23
**skeptical** 72:3
**skip** 142:14 165:20
**slate** 186:3
**sleep** 54:5
**slowed** 128:18
**small** 83:13 86:12 97:1
**smart** 186:22
Smith 20:2 22:3 51:3,5,8,20
85:16 87:10 89:8,8 90:9 93:7
94:17 96:23 107:24 108:16
109:1 110:16 111:6 112:6,9
115:11 117:10 118:25 119:8,9
120:3,7,9 122:7 123:18
124:16,19,20 125:10 126:16
128:16,22 143:2 144:3,3,8,8
144:22,22 148:25 149:25
150:10,20,21 152:3
**smooth** 145:20
**sold** 7:7,13 8:14 19:24 20:8,11
20:15 105:8 106:8,11 108:6
**sole** 59:16,20,22,23 174:23 175:6
175:10 177:2,15,23 178:24
**soliciting** 174:24 175:3 177:2
**solution** 54:11 143:19
**solutions** 7:6 9:8 11:7 16:19
17:25 18:18 22:12 95:24
96:20 107:18 150:5
**some** 7:12,19 8:22,23 10:12
11:16 17:15,16 24:3 39:18,19
43:1 49:14 50:18 51:3,23
56:23 70:18 82:14,25 91:9
96:12,16 101:9 102:23 104:3
105:13,15 106:2 118:25 120:4
129:3 137:21 143:8,21 147:10
147:16 148:17 150:23 151:22
152:12 157:13,23 159:3
160:14,21,25 161:13 169:22
171:19 172:5,13 173:22
176:17 177:3 179:18 187:7
**someone** 35:14,15,17 38:23 54:4
61:9 63:5,8 72:5 101:23
104:22 107:13 108:3 159:4
165:18 171:3 184:9
**someone's** 98:23
**something** 11:11 20:10 34:2,5
41:18 55:25 58:25 59:5 64:24
83:12,25 96:8 100:22 105:1
119:20 120:8 139:12 144:15
146:1 158:8,15 159:5,5
162:22 165:19 173:1 178:1
182:23 186:10 187:14,17

**sometimes** 28:1 66:20 95:25
137:9 167:21
**somewhere** 65:1 66:5
**soon** 120:8
**sorry** 10:25 12:12 31:24 85:4,6
85:10 91:21,21 98:1 108:15
112:20 120:23 122:21 130:13
130:14 132:13 140:6 141:10
166:22
**sort** 71:17 157:17 180:18
**sound** 103:16
**South** 1:20 2:2 83:15 106:9,10
**SOUTHERN** 1:1
**sparse** 100:14
**speak** 18:21 36:5,10 39:5 45:1
48:2 50:19 76:7 101:24,25
163:6,24 172:9
**speaking** 33:15 40:2 163:8
**special** 173:7,14 181:10
**specialized** 143:5
**specific** 101:5 184:20
**specifically** 42:7 57:24 80:22
107:10 161:17 162:21
**specifics** 151:8
**spend** 184:21
**split** 175:19
**splitting** 39:10
**spoke** 36:17 77:19 80:21 105:24
127:11
**spoken** 150:5
**spread** 26:15
**spring** 103:3 161:9 162:1,12,14
**St** 106:13
**stack** 85:3
**stamp** 83:1 89:15
**stamped** 88:17 90:10
**stamping** 89:11,13
**stand** 135:1 167:10 189:12
**standard** 133:11 170:25 174:2
178:24 181:14
**standing** 188:23
**standpoint** 180:6
**start** 7:19 21:16 22:3 28:22 35:2
41:2 44:10 46:7 51:1 93:14
118:21 122:5 166:13
**started** 7:17,20 12:24 16:23 17:6
18:18,24 20:6 22:14,16,21,21
22:22,23 23:13,24 26:19
39:24 87:19 90:15 95:24 96:3
96:22 102:9 105:19 145:25
134:19 155:20 160:4
**starting** 28:14 75:13 88:6 92:7
115:12 129:1 175:5
**starts** 186:2
**state** 59:16 69:25 157:2 160:16
182:8
**statement** 56:18 57:15 58:6,12
59:3,7,12,13,15,15,19 61:25
62:9 63:1,6,9,17 67:20,23,23
68:4,25 133:23 134:15 135:19
180:16
**statements** 56:16,19 57:12,19,22
58:19 60:24 61:22 62:2,12,13
62:15 63:3 64:7,7 133:5
134:19 155:20 160:4
**states** 1:1,4,10,14,1 5 2:5 36:4
41:6,7,10,12,12,1 7 42:16,19
42:22 43:2,4 56:20 58:18
82:13 134:2 171:17 178:6
182:11 191:10
**status** 38:11 77:4,4 127:18
148:11 153:15,15
**statute** 149:16 173:1,12
**stay** 53:7 54:8 104:15,15 170:12
**stayed** 22:20
**Steakhouse** 150:15,19
**Steinkohl** 11:15
**steps** 153:17
**Stera** 12:1 19:25 20:9,11,13 21:9

21:12 105:16 131:7 132:8
**stick** 185:24
**Stiles** 35:6
**still** 47:7,24 48:1,3 51:12 52:20
55:10 63:4 70:3,7 72:22
99:23 100:13 108:18,19,25
109:8 137:22 153:15 155:17
165:6 167:6 169:6
**stipulation** 138:14
**stop** 35:20 50:12
**stopped** 7:2 116:12 145:22,24
157:10
**stories** 65:3,8 66:4
**story** 65:5,10 161:22
**straight** 90:23
**strategy** 156:13
**Street** 1:15
**strike** 23:15
**structure** 8:9,11 14:2,3,7,9,12
18:2 22:9,10,11 23:3,4 153:24
**structured** 130:20 151:10
**stubborn** 72:3
**stuff** 53:11,13 149:1
**subject** 22:6 41:3 51:4 67:22
108:16,17,25 134:16 158:12
**submissions** 152:15
**submit** 73:5 147:16
**submitted** 36:7 48:21 51:22 52:2
74:9 75:17 78:17 79:20
128:19 145:23
**submitting** 26:4 128:23 129:3
**subpoena** 66:6 156:22
**subpoenaed** 109:14 124:2,9
**subpoenas** 66:13,25 135:15
**substantially** 166:19
**substantive** 61:13 168:14 170:16
**succeed** 180:12
**successful** 39:20
**sufficient** 114:6
**suggest** 169:17 170:23 175:9
**suggested** 22:3 82:7 170:18
**suggesting** 40:8 137:19 175:5
**suggestions** 169:20
**Suite** 1:21 2:2,6 191:11
**Sunday** 54:5,7,13 55:19
**Sundays** 53:25
**supplied** 116:3
**supplies** 83:18 108:5,6
**supply** 44:19 107:3
**supported** 172:4
**supports** 134:4
**supposed** 21:22
**supposedly** 68:21
**Supreme** 58:13 69:2 135:21
176:7 179:4
**sure** 8:19 12:15 23:9 37:15
45:23 46:18 47:24 48:1,6
53:14 55:20 59:9,9,24 64:1
73:20 91:4 96:10 101:25
107:15 108:24 118:10 129:5
143:8 153:20 154:3 163:4
164:17 170:19,25 178:12
182:10,18 188:19
**surprised** 26:16
**survey** 118:18,21,23,24 119:13
119:15 120:4,6 123:20,22,23
123:24 124:22 127:19,21
129:7,15
**surveys** 118:17 123:17 126:18
**suspect** 155:3 164:18
**suspend** 42:3
**suspending** 42:5
**sustain** 24:6
**sustained** 100:8 131:17,20 190:2
**Sven** 8:7 18:3,9 74:7
**switch** 37:13 127:17 142:22,23
**switched** 22:13 126:9
**sympathy** 184:18
**system** 38:18 41:24 101:20,23

**T**

T 102:24 109:22,24,5 113:7
191:5,5
**TABLE** 3:1
take 8:24 9:6 11:19,21 17:18
19:19 21:6,8 27:19 36:14 42:2
46:22 54:3 71:7,24 72:11,18
78:9 82:1 89:21 95:25 97:11
104:15 115:16 120:2 136:16
145:6,13 146:5 152:2 165:7
166:20 170:2 176:24,25 181:7
taken 39:1,2,4 53:17 153:16
takes 135:1 168:9 173:3 177:21
179:4
taking 18:17 26:19 55:25 128:18
129:11
talk 18:23,23 19:10 27:20 28:7
28:13,15,23 29:9 37:25 38:24
43:22 46:23 49:3,4,13 52:11
53:4 54:18,18 58:2 61:10
65:21 67:6,9 69:21 76:20 81:1
82:6 86:18 87:8 94:10 106:14
114:24 118:17 120:10 131:6
132:25 138:7 143:3,14 155:9
157:3 158:11 162:20,24,25
163:1,6,18 184:2,24 187:11
talked 20:1 21:13 22:1 29:8,12
31:12 38:8 39:21 40:25 43:18
49:17 73:8 77:15 83:7 88:16
96:23 105:18 107:8,13,17
119:23 158:24 184:8
talking 7:2 11:12 26:17 27:17
44:7 49:25 50:16,21 58:15
63:16,19 64:8 72:9 87:14
103:25 105:7 119:15 122:19
122:24 145:8,17 152:1,4,22
163:12,21,25 169:10,11
talks 123:5 151:22 174:9 182:9
185:3
Tampa 143:19,23 144:2,5
150:15
taped 160:8 164:14
tapes 164:4,12
target 66:21 68:20 100:5 145:11
targeted 100:10
targeting 161:15
task 186:18
tasks 186:19
tax 16:25 32:1
taxes 25:13
team 7:21 8:1 15:9 21:2 117:10
125:19 146:18 153:1
Teledoc 125:21
telemed 37:22 90:16 92:21,23
telemedicine 18:21,23,25 19:1,8
19:9,13,15,17,19,20 21:14
22:16,19 27:20 28:3 37:17,18
37:19 38:3,15 39:7,13,15,19
40:1,2,7,25 41:14 42:13,19,22
43:3,6 45:5 47:10 48:4 49:9
49:12,22,23 52:10 65:20
72:24 75:5,22 76:25 78:13
79:20,24 80:1 82:16 83:5
86:17 88:8 89:19 90:2,11
92:19 94:8 113:21 114:23
117:2 118:6,12 120:18,19
124:23 130:22,23,24 145:24
telephone 57:24 58:1 162:19
television 157:21
tell 12:23 13:25 15:15 22:8 25:3
27:8 29:5 32:22,24,25 33:24
36:8,19 41:16 42:7 43:20,25
46:16 47:9 48:17 49:15 54:16
54:19 59:10 72:18 75:16
76:22 80:19 81:3 96:8,19
97:12,14 99:5,6 102:4 103:2
103:21 104:1 105:9 109:22
113:3,22 118:22 120:19
125:12,17 130:11 138:9 140:7

143:1 146:22 149:8 159:2,7
170:17 175:12,15,18 182:15
183:16 186:5,5,7 189:7
telling 19:5 36:22 41:23 42:1,3,5
42:15,16 52:1,2 65:8 69:19
76:2,3 79:16 82:7 87:11 88:5
89:11 90:3,4 93:13 98:19
105:19 107:24 109:2 113:5
114:13 117:12 120:21 122:14
124:20 126:6,7 127:10,13,20
128:23 136:11 163:17 164:1
170:19
tells 119:11 143:3
template 92:10
tendency 134:24
term 105:4
terminated 120:21 125:2,15
126:2,7,19 146:12 148:13,16
152:13,16
terminating 127:3
termination 159:25
terms 15:23 151:24
test 61:15 147:16 175:23
testified 31:6 39:13 70:12 73:23
86:7 90:16 96:15 109:10
133:17
testifies 67:21
testify 57:8,11
testifying 57:6,6 68:12 73:6
107:4
testimony 52:5 67:24 68:17
80:15 90:18 96:12 99:12
101:9,13 102:23 106:25
116:10 118:18 142:24 159:18
testing 147:22
text 11:4 36:15,19,20 47:2,20
48:8 50:3 75:14 119:1 120:10
122:8 124:16,18 125:6 127:5
128:11,14 146:2 148:23 149:3
150:8,16 152:12 163:2,11,17
163:23
texts 126:25 143:21
thank 6:4,14,22,2,3 8:20 23:11
25:24 40:18 53:15 56:1,2
70:17,24 80:10 108:8 139:23
142:17 188:25 190:22
thankfully 148:20
thanks 33:19,20 81:18
their 7:8,9,18 10:14 20:4,18
25:13 29:23 30:9,11 34:4 38:1
43:23 44:1,1 46:18 47:14
49:25 50:9 63:3 67:14 72:4
73:15 80:3,16 81:1 83:1 90:24
91:8 94:15 96:1,5 97:2,9
98:25 99:10 107:21 116:1
119:19 125:22 126:4 128:5
144:1 146:5,7 147:19 149:11
150:5,22 172:6 183:20 184:22
themselves 38:14 107:23 137:10
164:12
thesaurus 174:17
theses 39:15
they'd 11:18
thing 7:23 17:6 18:19 22:13 23:6
32:12 44:10 53:1 56:9 57:3
69:9 71:15,15 83:24 87:12
107:19 114:19 134:7 136:1
152:18 165:14 172:7,11 175:9
178:21 186:22
things 6:14 14:19 28:1,2 43:8
65:15 73:2 82:21,21,24 83:15
83:23 86:23 133:10 138:8
147:22
think 6:10 26:16 37:2 38:13
39:12,13 41:8 42:25 52:15,19
52:20,22 58:16 59:8,20,23
61:7,9 65:3 69:2,3,17 70:10
70:13 75:23 76:15 82:6,19
88:16 89:21 92:14 102:23

104:6 111:25 116:4 118:15
128:18 129:16 132:9,16 137:9
138:20,25 145:25 149:6,21
151:7 155:6,19 157:6 158:7
158:10,14 162:25 165:21
165:21 166:3,6,1,1 169:7
172:10,14,19 173:11 174:12
174:20 175:11 180:4 181:4,9
182:20 184:12,21 186:22
188:7,18
thinking 65:11
third 7:23 32:9,10 39:11 49:14
115:10
thorough 49:24 133:20
though 25:3 59:23 68:9 74:1
137:9
thought 21:22 35:20 57:1 69:19
82:20 100:3 103:16 106:2
151:5 170:6 173:9 176:9
183:12
thousand 191:2
threatened 139:12
three 17:11 22:23 23:13 39:8
42:21 80:16,24 106:8 136:17
136:18 137:1 150:16 155:7,23
167:14 170:9 180:5
through 112:20 116:1 119:3 30:7
39:25 45:5 47:1 61:22 62:6,12
62:14 92:24 95:5 120:1
133:19 136:22,24 138:16
139:24 142:8 154:6 157:7,15
159:18 166:6 180:23 187:1,23
188:15,17,1 7 189:2,2 190:18
throughout 26:8 95:18 159:19
160:8
throwing 149:7,9
thrust 184:22
Thursday 143:24,25
tier 154:2
tiered 8:11 23:4 153:24
Tiffany 18:4,7,14 47:21,25
till 60:21 68:3
time 6:14 8:23 9:1 19:15,22
20:21 21:18,19 23:15 28:20
28:20 39:12 41:10 42:4 49:21
49:21 51:7 55:2,3 56:9 66:17
66:19,22,22,2 3 68:12 70:18
70:25 76:21 88:19 90:20
95:24 96:3,5 97:7,7 105:13,21
106:11 107:24,25 108:5 110:6
117:22 118:1,22,2 5 120:18
122:17 127:15 129:14 133:18
135:24 138:5,18 145:13 147:4
148:13,17 149:16 151:13
155:11 156:9 157:23 159:19
159:21 160:25 163:15,16,23
164:4 167:22,22 169:23
171:19 172:23 173:24 179:10
181:3,6 184:22
times 26:19 38:16 44:25 47:13
77:9 99:2,5 180:1,5 187:16
timing 59:7 62:25 68:8,10,18
133:23 135:6,10 163:21
186:21 188:3,6
tinged 133:24
Title 171:17
today 33:15 81:16 109:20 135:4
135:25 159:18 190:19
together 7:21 93:15
token 68:18
told 9:15 11:18 19:7 29:7,12
36:24 42:7 54:1 74:8,9,12
75:22 88:10 89:25 90:9,11
91:6 94:14,16 96:4,15 99:7
100:5 101:4,11 102:8 105:23
105:25 107:19 112:23 118:14
119:9,20,24 120:3,4,7,13,17
123:3 128:12 129:9 143:4,10

143:16,25 144:8,10 145:6
150:2 152:23 153:17 159:4,19
160:18,20 162:19,23,25 164:7
165:23 169:12 176:6 186:4
Tome 58:17,17 69:3 135:21
tomorrow 48:17
top 82:20 87:12,16 88:2
topic 44:9 111:21
topics 152:25
Torniqua 50:4,6,10,16 51:4
total 26:8,12 30:5
totally 43:7 57:16 119:24
touch 47:6 94:21 95:1
tough 55:24 56:4 64:10
toward 88:13
towards 13:24
town 143:25
track 32:20 88:1 93:5 94:2
training 147:17 148:4
transaction 173:20 176:15,18,20
transcript 164:13
transcription 191:7
transition 20:24 145:20
transitioned 20:21
transpired 133:18
treated 134:22
trial 1:9 22:6 28:24 52:5 54:5
67:22 68:13 129:17 133:14,25
134:18 142:22 170:19 191:3
Tricare 51:12 82:12 99:19 100:2
100:6,10,16,2,2 113:6 144:11
148:17 158:15 159:17 161:15
161:16,17,24
trick 65:22
tried 28:19 38:16 47:12 48:22
57:5 77:9 103:19
trip 55:25
trouble 63:8
true 59:18 82:8,9 100:5 107:12
152:5 167:6 173:11,11 180:8
180:9
truth 136:11
try 60:2 65:21 103:18 104:2,7,17
137:16 182:2
trying 21:1 24:8 30:15 43:1,2
48:18 49:1 54:8,8 88:7 106:9
127:12 152:8 177:7,8
Tuesday 6:19
tune 180:9
turn 57:5 115:7 117:10
turned 96:6 122:21 147:3
turning 98:10 130:13 145:24
twice 179:21 180:3,7 187:17
two 22:25 25:10 33:18 36:17
37:14 48:24 52:23 60:11,1,3
60:18,18 64:11,11 65:3 70:2,9
76:3 83:19 97:18 107:8
112:16 119:23 132:17 136:17
136:18,25 138:15 139:7
146:15 153:23 155:7 163:16
163:20,1 165:8 169:17
178:10 181:7 183:1,16
type 11:25 35:21 58:3 100:15
120:4 172:13
types 38:5 49:19
typically 28:15 38:5 180:18

**U**

ultimately 93:16 129:12 153:11
180:12
unable 28:10 47:11,15 77:10
unacceptable 89:25 123:4
unambiguous 134:18
Unbelievable 136:18
uncomfortable 138:3 145:25
under 34:2 56:18 57:19,20 58:12
63:3,12 75:8 127:22 129:15
146:9 156:24 157:17 159:2
160:10,10 166:24 176:3

**underneath** 8:13
**understand** 70:3 115:21 116:24
  117:17 182:4,13 184:20
**undertake** 186:18
**unfortunately** 33:21 54:6 79:9
**unfriendly** 42:19
**United** 1:1,4,10,14,1 5 2:5 36:3
  56:20 58:17 134:2 171:17
  178:6 182:11 191:10
**unless** 63:7 133:4 137:13 177:15
**unsuccessful** 38:17
**until** 32:19 53:8 55:5,7 62:21
  109:2 128:4 135:3
**upcoming** 113:12
**update** 42:23
**updated** 115:14
**updates** 51:11 152:6
**upline** 18:14
**upload** 27:19 130:23
**uploaded** 41:24 49:11 72:23
  77:1
**uploads** 92:18
**upper** 88:11
**upset** 11:8 119:5 143:15
**use** 7:17 10:12,15,16 19:20 28:7
  37:12 61:3,4,11 93:9 94:10
  102:11 104:18 152:22 156:9
  156:12
**used** 10:13 15:24 23:25 39:12
  42:13,14 102:7 103:18 105:4
  137:5 181:24 183:23
**using** 23:24 26:20 39:19 48:6
  60:24 72:25 82:16,25 89:15
  93:14 125:11
**usually** 38:16 60:17 108:21
  134:24
**utilize** 19:7
**utilized** 18:21 23:6 102:10
**utilizing** 21:14 22:16
**U.S** 35:9 191:10

**V**

**valid** 87:6 90:5,7 183:1
**Vancil** 71:8,11,13 72:2
**various** 152:6
**venture** 180:11
**ventured** 10:11
**verbal** 115:16
**verbally** 116:1 117:19
**Verdict** 186:11,13,16
**verify** 38:1 47:7 94:11
**versus** 56:20 58:17 101:10,10
  134:2 178:6 182:11
**very** 14:9,18 29:13 100:14 108:8
  119:4 137:14 139:7,8 143:15
  145:3,3 149:17 151:2 167:24
  167:25 172:13 173:3 185:22
  187:22
**veteran** 97:1
**vetted** 119:24
**vials** 106:24
**vice** 11:7 42:11 51:8 92:8 122:7
  147:25 150:21
**vice-president** 85:17
**video** 137:2
**view** 182:7
**viewed** 173:21
**vigorous** 136:6
**violate** 144:20 154:22 179:17
**violated** 137:7
**violates** 69:25
**violating** 149:19,21 154:24
  183:13
**vitamin** 23:25 44:5 71:24 72:12
  81:5 102:24
**vitamins** 80:23 101:2 110:1
**voir** 184:10
**Vose** 48:11,11,14
**vs** 1:6

**W**

**wait** 60:21 68:2,3 135:2 139:11
**waiting** 145:21 156:14 187:2
**waived** 186:15
**Walker** 144:4,8,10,2 3 150:22,23
  150:24
**want** 14:6 19:19 33:3,5 34:5
  36:14 37:13,17 41:19 47:7
  51:1,12 52:20 54:3,4,5,18
  56:7,14 57:7 60:16,16,19
  61:11,15 62:3,11,13 68:22
  71:17 77:17 79:23 80:9 81:7
  81:17,21 82:6 99:23 103:22
  104:21 116:25 117:6,13,22
  118:17 131:16 135:19,23 137:8
  137:16 139:11 142:22 153:22
  155:17 156:13 160:5,5 164:23
  165:2,4 170:14 172:10 175:25
  176:9,16 179:14,21,25 181:6
  181:18 182:20 184:13 186:14
  186:16,18 187:7,11,14 188:1
**wanted** 7:19,23 15:20 20:3
  21:11,12,15 25:18 26:7 27:14
  28:8 29:14 30:17 44:11 46:21
  48:6,7 50:19 64:25 69:4,6
  73:20,25 75:18 79:6 81:5,7,21
  82:15 86:14 90:24 92:16,17
  93:14 94:11 97:11 98:22
  100:2 108:6 115:24,25 135:20
  136:4 139:12 143:8,14,19
  146:19,24 147:14 148:6 150:6
  154:1 162:20 164:2,5 169:15
  182:10
**wanting** 28:22 40:12 48:1
**wants** 48:3 67:6 68:6 69:21 80:9
  122:19,24 173:20 179:1,7,14
**wasn't** 19:8 21:21 28:12,15
  30:14 34:2 40:11 41:12 46:18
  64:24 80:4 82:4 83:24 96:11
  99:11 102:15 107:19 109:7
  131:4 143:17,18 145:1 150:4
  151:24 160:10 182:10
**Watson** 98:13,19
**way** 14:15,16,17,19,2 0 19:2 33:3
  34:6 38:3 39:20 40:4,5 41:2
  41:16 51:15 54:20 64:7 69:14
  71:16 90:25 99:17 102:12
  103:8,17,24 104:17 133:7,7
  134:11 143:11 144:12 149:21
  155:1 159:11 161:14,14
  165:14 166:3 167:20 169:25
  175:7 176:12
**Wayne** 90:3
**ways** 19:1
**Wednesday** 149:5
**week** 54:7 55:12,15 109:3
  137:21 145:8 158:10
**weekend** 138:7 155:9,13 165:14
  171:19 190:24
**weeks** 145:6
**Welcome** 6:9
**well** 7:14,21 8:14 13:10 14:18,21
  20:7 21:12,23 7 28:20 29:14
  30:2 32:15 33:17 36:11 38:21
  39:16 40:11 41:17 44:11 48:6
  49:24 52:24 54:6 57:22 58:7
  59:13,20 61:4 63:25 66:13
  72:4 82:16 93:2,24 94:25
  104:18,19 106:7,12 107:12,14
  108:4 112:17 116:17 119:17
  119:22 128:18 136:12 143:20
  144:24 145:2 147:17 150:21
  150:22 154:19 156:9,11
  160:16 164:18 165:2 168:7
  174:9 175:9,13,2 5 176:11,17
  178:1 179:23,25 181:11,21
  184:2 185:21 186:11 188:3
  190:2,17
**Wellness** 102:24,24 103:4

**W**

109:22,24,25
**well-being** 164:9
**went** 13:5 67:16,16 81:23 90:11
  92:23 105:24 117:15 145:22
  157:12 182:22 190:18
**were** 6:1 7:2,24 8:2,2,12 10:15
  11:16,25 13:4 14:1 15:24 16:3
  17:2,12 18:19 20:8,11 21:3
  22:2,20 23:6 24:3 25:11 26:23
  27:3,5,22 28:5,10,11 29:20,20
  29:21,22,24 30:8,10,10,16
  32:19,20,22,2,5 34:24 36:17
  37:20 38:2,5,17 39:17,19
  40:19 41:11,15,18,20,23,24,25
  42:22 43:1,1,7,23 46:4 47:5
  47:11,15 49:24 53:19 57:12
  57:14,22 65:3 69:23 70:8,18
  75:10 78:17,25 79:20,20
  80:22 81:25 82:1,12,15,20,23
  82:25 83:11,12,13,15,15,16,16
  83:17,21,23,5 84:22 89:4
  92:4 93:5,15 95:2,15,16 96:10
  96:21,25 97:20 99:9,16,20
  100:3,12,13 101:18 102:9,10
  102:20,21 103:5,8,9,10 105:7
  107:22,25,25 108:2,3 109:14
  109:16 110:2,3,5 112:15
  113:10,24 114:16 116:14,20
  120:17 122:2 123:19 124:2,4
  124:9,11 125:1,11 126:8
  127:17 128:1,1,10 129:11 130:8
  132:5 136:5 142:19 143:6,12
  143:22,25 144:8,13,14,24
  145:2,19,23 146:3,6,13,14,15
  148:3,5,11,14,15,1 8 149:18,21
  150:5,12,14,18 152:9,23
  153:3,15 154:2,3,21,24
  156:19,24 157:17,20 159:12
  159:20 160:20 161:9 162:1,3
  162:6 163:8,11,16,20,25
  164:9 166:5 172:25 173:24
  176:9 180:22 185:8 188:8
  190:10
**weren't** 28:1 48:23 49:20 82:7
  82:24 150:3 154:3 161:11
  163:9
**we'll** 19:18 53:2,5 103:23 136:12
  138:16 154:9 168:22 190:24
**we're** 10:3 34:6 63:16,19 87:8
  91:9 94:22 100:1 119:5,13
  133:4 135:23 138:18 142:7
  168:19 169:10 170:20 184:2
  186:24 187:15
**we've** 28:24 52:5 56:6 60:12
  68:3 95:5 101:9 109:20
  135:24 137:25 138:17,19
  181:9
**whatnot** 19:4 28:1 29:20 97:9
  120:21 149:14
**while** 14:1 19:22 20:8 29:24
  69:21 82:18 143:10 156:14
  186:12
**white** 88:2,10
**whole** 55:12 71:15,15 82:17
  101:23 138:7 149:19 151:24
  174:19
**Wilkie** 2:6 191:10
**willful** 179:18
**willfully** 168:13 169:18 179:16
  179:20
**willfulness** 176:14 179:24
**William** 47:21 48:1,3
**willing** 115:12,13 151:18
**wishes** 68:5 165:6
**withdraw** 26:14 86:20,22,25
**withdrawn** 5:1 87:2
**witness** 24:23 31:25 62:14,17
  63:1 64:22,24 65:12 67:21
  85:6,12 94:14,17 111:21

134:8,14,22,2 3 136:3,8 139:7
  156:4 160:22,24 161:3 166:9
  186:13
**witnesses** 62:7,9,12,1 6 63:3
  136:5 138:10 166:14
**woman** 12:20 32:14,16 73:22
  161:23
**won** 69:22
**wonder** 68:9
**wondering** 49:2 142:9 188:3,6
**word** 105:10 174:17
**words** 67:5 169:17
**wordsmith** 183:9
**work** 7:15 8:9,17 21:17 24:2
  37:18 39:7 42:18 54:5,7,9,13
  54:15 55:5,7 87:20 129:8
  132:20,23 135:24 146:5 151:7
  153:14 157:3,5,1 1 158:16
  187:14
**worked** 9:10 11:21 13:22 19:11
  19:14 25:12,16 39:8 45:6 86:5
  151:2 153:25 156:24 157:6
**working** 7:24 8:16 9:10 14:19
  22:2,4 27:12 29:24,24 39:24
  44:25 54:7 55:4,13,15 66:11
  82:18 95:15,23 102:20,21
  103:14 127:13,22 145:3,19
  157:10,13 159:19 182:21
**works** 53:24
**workups** 35:24
**world** 106:20
**worry** 59:7
**wouldn't** 43:17 50:25 57:16 66:8
  95:4 123:19 128:9 188:4
**wound** 79:6
**wrap** 113:1
**write** 14:5 36:21,25 37:3,5,6
  38:6,9,23 40:11 43:9 49:6
  50:21 52:3,6,7,9,12 76:6 80:1
  87:22
**writes** 51:25 81:16 126:16
**writing** 27:23 56:23 83:1
**written** 33:21 35:13 49:5 50:13
  50:20 73:17 77:5 96:5 114:22
  172:25 178:23
**wrong** 63:14,18 65:16,18 82:22
  100:4 118:15 160:9 176:8,9
  180:10
**wrote** 15:19 30:18 50:19 69:4
  77:13
**W-2** 127:17 142:23 143:13
  144:14,17 146:23 147:12,23
  148:3,11 149:13,24 151:17
  153:11,15 159:25
**W-9** 16:24 29:14 31:13,16 32:1

**Y**

**yeah** 14:15 17:5 44:16 55:1,23
  55:23,23 58:8 64:16 79:15
  86:23 101:17 160:23
**year** 33:18,19 34:10 157:15
  174:12 178:6
**years** 55:14 170:17 176:1
**yesterday** 7:2 61:6 69:16 73:22
  86:7 105:1,7 106:25 109:10
**yield** 61:9,9 173:25
**younger** 53:22,24
**Younger's** 137:2

**Z**

**zero** 99:10

**$**

**$1,000** 122:10,14
**$21,000** 161:23
**$51** 98:13

**I**

**1st** 39:10,22 49:8 76:25 90:1
  113:21 116:3 126:1
**1:00** 6:19
**1:29** 53:17
**1:30** 53:2
**10** 4:16,19,21 5:13 41:7 46:1,2,4
  51:1 95:5 98:11 110:19 173:7
  188:15
**10th** 113:15
**100** 71:15
**1001.952(g)** 171:18
**102** 130:5
**103** 5:11 141:9,11 142:19 189:1
**105** 189:2
**108** 5:5
**1099** 8:3 16:24 97:13 142:23
  143:13 144:19 149:13,23
  153:15
**1099s** 24:22 25:11,14
**11** 4:6,22 75:25 78:20,21,25 79:3
  166:24 167:7 173:14
**111** 5:11 140:22 142:19 189:2
**112** 5:6,11 140:20 142:19 154:11
  154:12,15 189:2
**113** 5:6 103:13 110:8 112:14
  113:3 189:2
**117** 5:7 121:14 122:2 126:23
  189:2
**118** 4:17 34:13,14,24 35:22
**119** 5:12 140:16 142:19
**12** 4:7,11,19 13:25 41:7 45:11,13
  46:4 47:2 173:18
**12th** 152:3
**12:10** 6:1,8
**120** 25:6,10
**120549** 98:11
**121** 140:18 189:2
**122** 5:8 79:19
**123** 5:3 92:2,4 189:2
**125** 5:11 140:10,11,13 142:19
  150:10 189:2
**126** 5:8 121:3 122:2 123:12
  125:3
**127** 4:22 78:20,22,25 80:6 189:2
**128** 112:19,22 117:21 118:2,5
**129** 4:20 5:13 71:1,4 72:15 74:15
  121:11 189:23 190:10
**13** 4:8,23 5:5,11 140:8,9 142:18
  148:23 189:4
**13-3** 1:5 2:6 191:11
**130** 4:17 5:9 26:11 27:2 34:13,16
  34:24 35:2 130:1 189:2
**131** 4:21 74:23 75:10 76:12
  189:3
**132** 5:10
**133** 4:18 40:14,16,17,19 42:9
  125:13 189:3
**134** 125:9
**137** 5:9 130:2,8 189:3
**139** 4:25 84:13,22 189:3
**14** 5:6,11 140:12,14 142:18
  151:4 170:7 189:5
**140** 4:25 84:16,22 87:25 189:3
**142** 5:12
**143** 5:10 131:12 132:5 189:3
**144761** 115:7
**146** 5:10,13 131:15 132:5 190:1
  190:10
**15** 4:9 36:14 167:4 174:3,6
  178:18 189:5
**150** 27:1
**156** 3:6,8
**16** 4:10,10 9:24 10:4 33:19
  166:16 167:5 189:5
**16-20399** 178:7
**16-20893-CR-MORENO** 1:3
**161** 3:9
**162** 5:10 132:2,5 189:3
**167** 5:12 141:21 142:19 189:3

**17** 4:11 5:11 33:18 142:11,12,13
  142:18 188:16 189:5
**170** 30:25
**171** 189:3
**172** 5:12 141:15 142:19 189:3
**173** 5:12 142:2,19 189:3
**175** 155:24,24 156:1
**1750** 1:21 2:2
**18** 4:7,8 5:12 33:22 34:2
**18th** 146:1
**181** 4:13 24:13 25:8 189:3
**19** 4:18 123:8 188:16
**19th** 122:8 146:1 152:11
**190** 4:21 5:13 75:1,3,9,10 76:22
  189:3
**191** 3:10 155:20,24 156:2
**192** 155:20,24 156:2
**199** 30:19,22,23,24 31:10 189:4
**1996** 134:3

**2**

**2** 1:20 2:2 4:6,18 5:1,8 40:14,15
  40:19 41:21 89:8 112:7 115:8
  171:1 185:21 188:15
**2:25** 53:3
**2:45** 53:19
**20** 4:12 20:10 44:20 64:14 70:8,8
  123:14 125:4 170:7 179:8
  183:24
**201** 189:4
**2014** 9:11 15:6 20:23 34:11 41:1
  41:4,5 87:10 99:18 105:13
  108:16 154:21 157:6
**2015** 29:25 35:8 36:2 46:8 48:8
  57:23 66:5,6 71:20 75:25
  84:25 89:8 98:11 101:1 103:4
  110:19 111:5 112:7,10 113:15
  113:18 114:9 115:2,8 117:25
  118:13 123:8,14 124:20 125:4
  125:25 149:4 150:8 154:21
  157:7,8,14,23 161:9 162:1,12
  162:14,15,16 163:13
**2016** 65:25 68:13,14,16 156:19
  157:18 158:5 159:1 160:25
  162:18 163:21
**2018** 1:7 68:15,17
**202-A** 189:4
**202-I** 189:4
**204** 5:13 190:5,10
**205** 189:4
**206** 121:22 189:4
**207** 189:4
**21** 5:11 141:13 142:18 188:16
**211** 111:8 114:19 115:1 116:4
  189:4
**212** 5:6 10:23 112:14 113:16
  189:4
**214** 5:6 10:11,12,20,2 112:14
  113:9
**215** 5:6 111:2 112:14 114:7
  115:4
**216** 5:6 111:10,14 112:1,14
  115:6
**217** 5:6 111:17,24 112:8,9,14
  117:6,22 118:4
**22** 4:19,25 45:15 46:4 47:19
  188:16
**23** 4:12 20:10 65:4 118:13 149:4
  150:8
**23rd** 117:15 118:7
**232** 56:20
**24** 4:17 5:11 141:5 142:18
  188:16
**240** 43:19 44:12,17,19
**25** 4:13,14,14,22 5:7 121:7 122:2
  188:16
**25th** 113:18
**26** 1:7 108:15 111:5 114:9
  150:11

**27** 5:7 115:2 121:24 122:2
  128:14 170:17 188:16
**28** 101:1 170:17
**29** 5:11 142:4,10,18 153:6 168:7
  188:16

**3**

**3** 124:20
**3:10** 70:16
**30** 64:14 91:12 92:7 132:16
  136:15 188:16
**30th** 125:25
**305-400-4261** 1:22
**305-400-4266** 2:3
**305-530-6168** 1:17
**305-961-9356** 1:16
**305.523.5118** 2:7 191:11
**31** 4:15 112:20 116:16
**31st** 128:1
**32** 4:6 10:21 11:2 188:16
**33** 4:16 5:13 100:25 189:9
  190:10
**33128** 2:7 191:11
**33131** 1:21 2:3
**33132** 1:16
**34** 4:17 5:11 141:25 142:19
  153:3 188:16
**35** 5:2 89:1,4 90:3 188:16
**36** 75:7 141:19 188:16
**360** 43:19 44:12,17,19
**37** 5:11 141:23 142:19 188:16
**38** 4:12 23:17,20 188:16
**39** 4:24 84:19,21,22

**4**

**4** 4:5,9,15,19,20 5:2,3,7 120:24
  122:2,5 158:20 159:11 184:7
  188:15
**4th** 125:12,17
**4:00** 101:21
**4:04** 117:4
**4:13** 117:7
**4:20** 117:14
**4:28** 117:23
**4:57** 133:1
**40** 4:18 5:11 21:4,4 70:8,8
  130:25 141:7 142:19 152:20
  183:25
**400** 2:6 191:11
**41** 4:19 45:18 46:4 48:10
**42** 4:17 34:13,20,21,24 171:17
**43** 188:17
**45** 132:16 186:25
**46** 4:19 5:10 131:9 132:5 188:17
**47** 140:24 179:25 180:1 188:17
**48** 4:19 45:21 46:4 49:8 188:17
**49** 179:25

**5**

**5** 5:10 13:25 56:20 75:13 188:15
**5,000** 20:14
**5:00** 132:23
**5:05** 139:18
**5:45** 139:21
**50** 5:3 69:16 82:13 91:14 92:4
  93:7 188:17
**51** 69:16,17
**53** 84:6,6 85:25 86:2 188:17
**54** 4:24 5:1 84:8,22 86:21 87:2
**55** 5:3 91:18 92:4 188:17
**58** 188:17

**6**

**6** 5:11 112:10 117:25 141:1
  142:18 188:15
**6th** 117:4,7,14 118:3 145:10,14
  145:22
**6:00** 54:9 55:4,6,7

**6:13** 155:15
**62** 4:24 84:3,4,22,25 188:17
**63** 4:24 84:11,22 87:4
**64** 5:2 88:20 89:4,7
**65** 5:2 88:23 89:4,17 188:17
**650** 26:13 27:4 30:6
**66** 5:13 93:19,24 94:7 189:15
  190:10
**67** 4:21 74:19 75:10,24 188:17
**68** 5:3 91:24 92:4 188:18

**7**

**7** 3:4,5 5:11 15:6 141:17 142:18
  188:15
**7:00** 60:20,21 150:13
**7:05** 191:3
**70** 4:15 30:20,22 31:1,2,3,4,20
  188:18
**71** 4:20
**72** 5:5 108:10,13 188:18
**73** 5:9 129:19 130:8 188:18
**75** 4:21
**76** 9:17,21
**760** 187:17
**77** 5:9 129:23 130:8 188:18
**78** 4:18,22 40:14,15,19,22
  188:18

**8**

**8** 4:13,19 5:4,9 13:25 45:9,10
  46:4,7 188:15
**8th** 48:9 159:1
**801** 57:21
**801(d)(1)(B)** 58:19 67:19 133:15
**801(d)(2)(1)(B)** 58:12
**81** 4:20,23 70:25 71:4,7 188:18
**816** 56:21
**82** 5:13 93:22,25 94:2 189:19
  190:10
**83** 4:16 33:5,10 188:18
**84** 4:14,25 5:4 25:20,22,25 98:2
  98:7,8 188:18,21 190:14,15
**85** 4:23 81:9,13 189:1
**855** 92:9,11
**866-780-8355** 1:22
**87** 4:7 5:1 12:5,18,20 189:1
**88** 4:5 9:1,1,4,6 189:1
**89** 4:8 5:2 13:13,18,20 189:1

**9**

**9** 4:5,19 46:1,2,4 50:2 170:8,13
  171:12 173:19 188:15
**9:00** 155:11 190:25
**90** 181:5,7 187:11
**92** 5:3 134:3
**94** 4:9 14:23 15:4 189:1
**95** 4:10 16:12,16,22 139:3,5
  189:1
**96** 135:22
**97** 4:11 17:8,12 18:1 189:1
**973** 134:3
**98** 4:11 5:4 17:8,12,18 189:1
**99** 1:15 4:11 17:8,12,23 189:1