**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NUMBER 16-20893-CR-MORENO**

UNITED STATES OF AMERICA,

        Plaintiff,               **Courtroom 13-3**

  vs.                        **Miami, Florida**

MONTY RAY GROW,            **January 29, 2018**

        Defendant.

**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE FEDERICO A. MORENO**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

| | |
|---|---|
| **FOR THE GOVERNMENT:** | **KEVIN J. LARSEN, AUSA** |
| | **JON M. JUENGER, AUSA** |
| | United States Attorney's Office |
| | Economic Crimes Section |
| | United States Attorney's Office |
| | 99 Northeast Fourth Street |
| | Miami, Florida 33132 |

                                   305-961-9356
                            Fax: 305-530-6168
                          kevin.larsen@usdoj.gov
                          jon.juenger@usdoj.gov

| | |
|---|---|
| **FOR THE DEFENDANT:** | **DANIEL L. RASHBAUM, ESQ.** |
| | **JEFFREY E. MARCUS, ESQ.** |
| | Marcus Neiman & Rashbaum, LLP |
| | 2 South Biscayne Boulevard |
| | Suite 1750 |
| | Miami, Florida 33131 |

                                   305-400-4261
                            Fax: 866-780-8355
                       drashbaum@mnrlawfirm.com
                         jmarcus@mnrlawfirm.com

1                                    **KATHRYN A. MEYERS, ESQ.**
                                     Law Office of Kathryn A. Meyers PLLC
2                                    2 South Biscayne Boulevard
                                     Suite 1750
3                                    Miami, Florida 33131
                                                        305-400-4266
4                                                    kate@kmeyerslaw.com

5     **REPORTED BY:**                **GILDA PASTOR-HERNANDEZ, RPR, FPR**
                                     Official United States Court Reporter
6                                    Wilkie D. Ferguson Jr. US Courthouse
                                     400 North Miami Avenue - Suite 13-3
7                                    Miami, Florida  33128    305.523.5118
                                     gphofficialreporter@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Page

Monty Ray Grow .............................................. 36

    Cross-Examination by Mr. Juenger ....................... 36

    Redirect Examination by Mr. Rashbaum .................. 207

    Recross-Examination by Mr. Juenger ................... 234

Jonelle Coronado (Rebuttal) ............................... 240

Direct Examination by Mr. Larsen .......................... 240

    Cross-Examination by Mr. Marcus ....................... 249

    Redirect Examination by Mr. Larsen ................... 272

Keith Tighe (Rebuttal) .................................... 275

    Direct Examination by Mr. Larsen ...................... 275

Gary Walker (Rebuttal) .................................... 279

    Direct Examination by Mr. Juenger ..................... 279

Reporter's Certificate .................................... 311

**EXHIBITS**

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Government's Exhibit Number 178 .................... | 23 | | | 5 |
| Government's Exhibit Number 206 .................... | 35 | | | 16 |
| Government's Exhibit Number 201 .................... | 70 | | | 25 |
| Government's Exhibit Number 202 .................... | 74 | | | 2 |
| Government's Exhibit Number 204 .................... | 76 | | | 2 |
| Government's Exhibit Number 199 .................... | 81 | | | 16 |
| Government's Exhibit Number 195 .................... | 89 | | | 17 |
| Government's Exhibit Number 205 .................... | 99 | | | 6 |
| Government's Exhibit Number 176 .................... | 207 | | | 8 |
| Government's Exhibit Number 22 .................... | 212 | | | 9 |
| Defendant's Exhibit Numbers 191 and 192 .......... | 232 | | | 11 |
| Defendant's Exhibit Numbers 191-A and 192-A ....... | 234 | | | 4 |
| Government's Exhibit Number 23 .................... | 236 | | | 11 |
| Defendant's Exhibit Number 200 .................... | 261 | | | 13 |
| Defendant's Exhibit Number 25 .................... | 281 | | | 4 |

1        (The following proceedings were held at 9:02 a.m.:)

2        THE COURT:  Okay.  Please be seated.  The defendant is

3  present, defense counsel, Government counsel.

4        Are you going to introduce any exhibits on

5  cross-examination?

6        MR. JUENGER:  Yes, Your Honor.

7        THE COURT:  Well, you've got to tell me what they are.

8        MR. JUENGER:  Yes, Your Honor.  We have added to our

9  Exhibit List.  I believe the last exhibit we had was 177, which

10  was the stipulation.

11        THE COURT:  Is there someone out there waiting for

12  them?  Hold on.  Is there someone outside in the hallway?

13        Why don't you go in the hallway and wait for the

14  jurors?

15        THE COURTROOM DEPUTY:  He is.

16        THE COURT:  What else is happening?  You don't want to

17  let me know.

18        I feel like a parent, the children never want the

19  parent to know anything.  Okay.  We are probably better off.

20        Anyway, what exhibits is it, what number?  Give me a

21  number.

22        MR. JUENGER:  178.

23        THE COURT:  178.  You've shown it to your opponent?

24        MR. JUENGER:  Yes, Your Honor.

25        THE COURT:  Any objection?

1           MS. MEYERS:  Your Honor, yes.

2           THE COURT:  Okay.  You have to use the microphone.

3  Both of you get on each of the two microphones and you tell me

4  178 -- no.

5           See that lectern over there.  That's for one of the

6  lawyers and that little lectern is for one of the other lawyers.

7  It's Monday, we have been here a week.  We kind of know that.

8  You've seen other hearings, too, unfortunately.

9           178 is what?  What is it?

10          MR. JUENGER:  A statement of the defendant.

11          THE COURT:  And the objection is?

12          MS. MEYERS:  We didn't get this until last night, Your

13  Honor.  Last night, at 6:00, we were told that 43 additional

14  exhibits would be --

15          THE COURT:  No.  I just want to know one at a time.

16          MS. MEYERS:  Okay.

17          THE COURT:  I don't want to know about 43.  Let's say

18  he only wants to introduce two out of the 43.  Do you want me to

19  talk about 41 exhibits or only about the two?

20          MS. MEYERS:  No, Your Honor.

21          THE COURT:  Okay.  So we're doing one at a time.  It's

22  the only way to do it I think.  178, statement of the defendant

23  taken when, by whom?

24          MR. JUENGER:  It's an email from March 24, 2015.

25          THE COURT:  To whom?

1          MR. JUENGER:  To Chris O'Hara.

2          THE COURT:  About what?

3          MR. JUENGER:  About the payment of a thousand dollars

4     to a patient.

5          THE COURT:  Okay.  And why didn't you give that before?

6          MR. JUENGER:  Well, we did turn over everything in

7     discovery, Your Honor.

8          THE COURT:  So why does the defense say you didn't know

9     about it?

10         MS. MEYERS:  Because they didn't identify this

11    document, Your Honor.

12         THE COURT:  What would you do if the document had been

13    identified?

14         MS. MEYERS:  We would have dealt with it, Your Honor,

15    but as Your Honor --

16         THE COURT:  Can you tell me how you would have dealt

17    with it?

18         MS. MEYERS:  In terms of whether we would have

19    objected?

20         THE COURT:  No, in terms of how are you prejudiced by

21    it.

22         MS. MEYERS:  Your Honor, we're prejudiced because the

23    night before cross-examination we got 43.  I do have

24    objections --

25         THE COURT:  I just want to do one at a time, not 43,

one at a time.  178.  You are not surprised because you knew

about this.  So the issue is, they didn't list it in the

exhibit, which is annoying, but the defendant vigorously --

defense counsel vigorously and continuously have said we never

have to show anything for impeachment, we never have to show

anything for impeachment.  I will not tell you.  Mr. Rashbaum

would constantly say, we don't have to show what's for

impeachment.

So now I'm wondering if what's sauce for the goose is

sauce for the gander.

MR. MEYERS:  But Your Honor did require us to turn over

all impeachment documents, and we did the night before every

witness was to be impeached.

THE COURT:  So you want to recess till tomorrow.

MS. MEYERS:  Sure.

THE COURT:  We will wait till this afternoon, we'll

start this afternoon then if that's what you want.  We'll have

the cross and that means closing argument is limited to an hour

each side.  We've got to make up time somehow.  Okay?  There's

no point talking 90 minutes.  Let's go.

Now, you didn't know about this exhibit.  You're

totally shocked because this case is about what?

MS. MEYERS:  It is about healthcare fraud, Your Honor,

but the Government turned over 1.1 million pages --

THE COURT:  I don't care about 1.1 million.  I care

1    about Exhibit 178.

2          What would you do now that you know about 178?

3          MS. MEYERS:  If we have additional --

4          THE COURT:  What is 178?  Tell me what it says and how

5    surprising and shocking it is.

6          MR. JUENGER:  It is an email.

7          THE COURT:  I'm sorry.  Quote it.

8          MR. JUENGER:  Yes, Your Honor.

9          THE COURT:  Read it.

10         MR. JUENGER:  Chris O'Hara reports to Mr. Grow, "doctor

11    reported" --

12         THE COURT:  Who is talking now?

13         MR. JUENGER:  Chris O'Hara.

14         THE COURT:  I want to know what Monty Grow says.

15         MR. JUENGER:  He receives the information and says, "I

16    will pass this on to Ginger and see what this is about."

17         THE COURT:  Okay.  Now tell me what O'Hara says.

18         MR. JUENGER:  O'Hara says, "Doctor reported she spoke

19    with the below mentioned patient and he," the patient,

20    "claims he was promised $1,000 to try the cream.  He is from

21    Med RX," which we have heard is Ginger Lay's company.  "What

22    do I do with patient --"

23         THE COURT:  I didn't want you to add anything.  I want

24    you just to tell me what they say, so it's clear.

25         MR. JUENGER:  "What do I do with patient Eric Schwant

 1      the patient who says he was promised $1,000?"

 2          THE COURT:  Okay.  So what's wrong with that?

 3          MS. MEYERS:  We have no objection other than

 4   timeliness, Your Honor.

 5          THE COURT:  You have no objection other than

 6   timeliness.

 7          MS. MEYERS:  Correct.

 8          THE COURT:  So the timing -- Mr. Rashbaum, the next

 9   time you make faces when your colleagues are talking, I'm going

10   to ask you to leave the courtroom.  You've been doing it for

11   five days.  Five days is enough.  All right.  So no

12   ups-and-downs, no sign by the face or by the fingers.  Am I

13   clear?

14          MR. RASHBAUM:  Yes, Your Honor.

15          THE COURT:  All right?  And if it happens in front of

16   the jury, I'm going to say, please step outside, and you'll know

17   why.  It will be because you're making faces.  You're too good

18   of a lawyer and you've been around too long to do that.  So if

19   you cannot restrain yourself, you either do the talking or you

20   leave, but no faces.  All right?

21          MR. RASHBAUM:  Fair enough.

22          THE COURT:  Now, so you don't need a day on Exhibit

23   178.

24          MS. MEYERS:  We'd like an opportunity to review it,

25   Your Honor, but --

1          THE COURT:  Go ahead, give it to her.  That's it?

2          MS. MEYERS:  The Government --

3          THE COURT:  Review it.  Oh, you got it, you got it last

4    night.

5          MS. MEYERS:  At 9:00, Your Honor.

6          THE COURT:  Okay.  And it wasn't enough time to review

7    this one.

8          MS. MEYERS:  Your Honor, there were 43.

9          THE COURT:  I'm not talking about 43.  I'm talking

10   about 178.

11         See, the truth is, it's no surprise, you knew about

12   this and you expected this.  Isn't it?

13         MS. MEYERS:  Given Your Honor's -- excuse me, Your

14   Honor.  Given Your Honor's prior rulings that we had to turn

15   over all documents related to impeachment, we were not expecting

16   43.  I have --

17         THE COURT:  I'm not asking you about 43.  I'm asking

18   you about 178.

19         You're shocked.  This is totally unbelievable, a

20   statement by your client.  You didn't go over this statement.

21   As an officer of the court, you're telling me you never went

22   over this statement?

23         MS. MEYERS:  Your Honor --

24         THE COURT:  That's my question.  Is that what you're

25   telling me?

```
 1            MS. MEYERS:  I can't recall, Your Honor, there are a
 2  million pages --
 3            THE COURT:  I don't want you to tell me about a
 4  million.  I want you to tell me about this one.
 5            MS. MEYERS:  I can't recall as I sit here, Your Honor.
 6            THE COURT:  Mr. Rashbaum, this is a total surprise to
 7  you, this particular statement?  You never went over with your
 8  client about this particular --
 9            MR. RASHBAUM:  I actually like this document, Your
10  Honor.
11            THE COURT:  Okay.  So listen to what we've done, right?
12  We've spent 8 minutes about a statement that one of the defense
13  lawyers thinks is good for him.  This is why people don't like
14  lawyers and jurors are people.  Look what we're doing here.
15            This is why I do one statement at a time, one exhibit
16  at a time.
17            It shows you what a total and absolute waste of 8
18  minutes we've had over this exhibit that the defense knows about
19  it, likes it, but wants to object because they have gotten a
20  million throughout the discovery and they've gotten 43 last
21  night.  I don't understand.
22            Next exhibit.  You can use 178.
23            Next number.
24            MR. JUENGER:  179, Your Honor.
25            THE COURT:  What is 179?
```

1      MR. JUENGER:  Email from Monty Grow to Ginger Lay.

2      THE COURT:  And that was not provided to the defense?

3      MR. JUENGER:  It was provided.

4      THE COURT:  You didn't want to introduce it before

5   because of what?

6      MR. JUENGER:  Well --

7      THE COURT:  I'm sorry, I don't know if the mic is on or

8   off.  I hate starting the week like an obnoxious jerk, which is,

9   I'm sure, what you all think, but it's unbelievable to me when

10  you have a whole weekend to work on a case that both sides think

11  is important that you can't even answer the question.

12      This is a statement by the defendant whom you knew on

13  Monday he was going to testify.  You didn't want to introduce it

14  in your case in chief because you didn't think it would help

15  you.

16      MR. JUENGER:  I thought it would have been redundant at

17  that point.

18      THE COURT:  And it's not redundant now?

19      MR. JUENGER:  Perhaps slightly.

20      THE COURT:  Okay.  What is that statement?

21      MR. JUENGER:  It's a forward from an email from the

22  pharmacy.

23      THE COURT:  A forward from whom?

24      MR. JUENGER:  From Ralph Louis to Monty Grow.

25      THE COURT:  Who never testified.

1    MR. JUENGER:  He did not testify.

2    THE COURT:  I know, that's why I say it.

3    MR. JUENGER:  He writes, "Monty, the listed patients

4    are still being informed that they would not have a copay if

5    they are part of some "survey."  They are currently removed

6    from autofill."

7    This was in April of 2015.

8    THE COURT:  Okay.  April what?

9    MR. JUENGER:  April 13, 2015.

10   THE COURT:  And there's no other evidence regarding

11   this?

12   MR. JUENGER:  There is other evidence, but based on the

13   defendant's direct testimony he said that he didn't know about

14   it until February, and then he knew in March it had been

15   terminated.  So these are emails that show he knows after that

16   fact that it's continuing.  So that's the purpose of introducing

17   it.

18   THE COURT:  And you didn't think it was a good thing to

19   introduce in your case.

20   MR. JUENGER:  I didn't know that he was going to take

21   the position that he didn't know about it and --

22   THE COURT:  Oh, you knew he was going to take the

23   position he had nothing to do with this, and he doesn't know

24   because you heard the opening statement.

25   MR. JUENGER:  But then he does say he knew it was

1    terminated after March 3rd, and this is evidence that he was

2    continually put on notice that the program was continuing.

3    That's relevant because he neither fired Ginger Lay --

4            THE COURT:  I didn't say it wasn't relevant.  It's

5    absolutely relevant.

6            See, now you're boxing me in as to how strict I should

7    be with the rules regarding requiring the Government to list all

8    exhibits that you're going to use, aren't you?  So we've got to

9    go one by one to see what it is.  Then you are kind of losing

10   the impact of what you're going to do in cross-examination

11   because we're doing it in the presence of the defendant because

12   he's entitled to be here at all stages.  So think about what's

13   happening right now.  Right?

14           We're going to go exhibit by exhibit then for

15   impeachment, where you all think impeachment is secreted things

16   where we're going to bring out something that nobody knows, and

17   in order for me to be fair, it's going to come out beforehand

18   anyway clearly.

19           I don't understand why that's advantageous to the

20   proponent of the exhibit.

21           MR. JUENGER:  Your Honor, I hope that he will be

22   truthful about all these emails.

23           THE COURT:  You hope -- you really in your heart,

24   without the Court making any determination, you hope that the

25   defendant will be truthful, which is why your cross-examination,

1    you plan on being there for three hours.

2              MR. JUENGER:  I think it will be --

3              THE COURT:  Are you really serious about that?

4              MR. JUENGER:  I am, Your Honor.

5              THE COURT:  You are.  You are.  Just like defense

6    counsel is serious about the one exhibit that is so prejudicial

7    that co-counsel thinks it's good.  I don't understand what's

8    going on.  I mean, I don't care because it's not my case, it's

9    your case, but it doesn't make -- so you're hopeful that a Perry

10   Mason moment is going to occur and he's going to say you're

11   right, I'm wrong, you're right, I'm wrong, you're right, I'm

12   wrong 43 times.

13             You really think so, huh?  You really think so or just

14   with 179?

15             MR. JUENGER:  No, with most of these.

16             THE COURT:  With most of these, right?  Okay.  So why

17   do you think the defense is fighting about it?

18             MR. JUENGER:  I don't know.  They're Mr. Grow's

19   statements.

20             THE COURT:  Well, it's not to create appellate error

21   because there's no rule that would require it.  Okay.  It's just

22   the sense of fairness, for me to have a fair trial where

23   everybody knows what's going on ahead of time.

24             Did I allow the defense during cross-examination of any

25   witness to use any exhibit that you didn't know about ahead of

1   time?

2            MR. JUENGER:  We received all of their exhibits the

3   night before.

4            THE COURT:  Okay.  So this is technically the night

5   before.

6            MR. JUENGER:  It is the night before, yes.

7            THE COURT:  Okay.  Sunday night.

8            MR. JUENGER:  Yes.

9            THE COURT:  All right.  Couldn't have been Saturday

10  night.  At least they could have said it's the Saturday night

11  massacre.  Well, okay.

12           And what's the objection to this?

13           MS. MEYERS:  Other than timeliness there is none, Your

14  Honor.

15           THE COURT:  So you like it?  What would you have done?

16           Whenever you say timeliness, a judge would always say

17  what would you have done if you knew about this not Sunday

18  night, but Saturday night or Friday?  So I will do what other

19  judges do.  What would you have done if Sunday [sic], instead of

20  leaving around 7:00, we would have left at 8:00 or 9:00?  What

21  would you have done with Exhibit 179?

22           MS. MEYERS:  We would have addressed it, Your Honor.

23           THE COURT:  Pardon?

24           MS. MEYERS:  We would have known about it and addressed

25  it.

1          THE COURT:  Which means what?  You've got to tell me

2    how you would have addressed it if you want me to exclude it

3    because the defendant already rested.

4          MS. MEYERS:  Your Honor, we would have had time to look

5    through the remainder of the documents to see --

6          THE COURT:  I just want to do one at a time.  With 179,

7    what would you have done?

8          MS. MEYERS:  We would have looked through the database

9    to see if there were any documents before or after that would

10   have shed context, provided context to this document.

11         THE COURT:  Okay.  And what is the database?

12         MS. MEYERS:  The Government produced --

13         THE COURT:  No, no, don't tell me what the Government

14   produced.  You told me you would look at the database.  So this

15   ignorant judge is saying, what is the database?

16         MS. MEYERS:  It is simply a place where we -- I'm not

17   computer literate, but it is a place where we put all the

18   documents --

19         THE COURT:  So you wouldn't be looking at it.

20         MS. MEYERS:  I would because I can now understand the

21   computer database because someone much younger than me explained

22   how to use it.

23         THE COURT:  So then the fact that you're computer

24   illiterate is of no moment because now you know what you're

25   doing.

1        MS. MEYERS:  I can't explain the terms to the Court.

2        THE COURT:  But you can do it.

3        MS. MEYERS:  I can do it, Your Honor.

4        THE COURT:  Tell what you would do in English.

5        MS. MEYERS:  I would plug in the Bates number of this

6  document and then I would look at the documents in date order to

7  see what came before or after to see if there were other

8  responses to this document.

9        THE COURT:  All right.  And how long does that take?

10        MS. MEYERS:  Per document?

11        THE COURT:  Yeah, for this document for example.

12        MS. MEYERS:  I can't give Your Honor an idea, I don't

13  know.  It depends on the volume.

14        THE COURT:  How many are there before and how many are

15  there after?

16        MS. MEYERS:  Again, Your Honor, I don't want to say a

17  million one because Your Honor is going to get upset, but that

18  is what is on the database.

19        THE COURT:  I know what's on the database, but it's

20  not -- you only look at a few before and a few after, or you

21  look at five years' worth?

22        MS. MEYERS:  Not five years, Your Honor, this entire

23  scheme was less than a year.

24        THE COURT:  Well, see, now you've fallen for the bait.

25        MS. MEYERS:  Not really.

1           THE COURT:  The scheme by whom?  By others.

2           MS. MEYERS:  Well, the alleged scheme, the alleged

3  scheme.

4           THE COURT:  By Ginger Lay.  Okay.  So we forget what

5  the case is about, right?

6           So you would look at the emails before and the emails

7  afterwards.  So you get on whatever you use and you look up

8  right before and you look right after.

9           Now, why wouldn't you have done that at 7:00 in the

10 morning, I mean, if it's that crucial?  When did you all decide,

11 oh, my God?

12          What time did you do this?  Mr. Juenger, you gave this

13 at what time Sunday night, more or less?

14          MR. JUENGER:  I believe we sent the exhibit list around

15 6:00 and about an hour later Ms. Lam forwarded PDFs of all of

16 these exhibits.

17          THE COURT:  Okay.  And why did you wait so long?

18 Sunday night.  I mean it seems like that's what civil lawyers

19 do, see they do things right at the end, or they give you a lot

20 of stuff so you don't find it, or they give it to you at the

21 last moment.  Some civil lawyers I should say.  So why Sunday

22 night?

23          Maybe they weren't even working.  They said, you know

24 what, my religion prohibits me from working Sunday, or my

25 husband prohibits me from working Sunday or my kids want to be

1   with me Sunday because I've been coming home at 10:00 every

2   night.

3           Doesn't it look bad to do it on the Sunday night,

4   especially when you had -- Friday night I wouldn't expect you to

5   work, it was tiring, but Saturday night.

6           MR. JUENGER:  Saturday I worked on narrowing my

7   cross-exam and taking away documents.  That's how we ended with

8   43.

9           THE COURT:  Because you didn't have enough documents on

10  your case in chief.  You're not going to ask any questions with

11  the documents in your case?

12          MR. JUENGER:  The documents we offered in the

13  case-in-chief?

14          THE COURT:  Yeah, the evidence.

15          MR. JUENGER:  Some of them, sure.

16          THE COURT:  Okay.  And how long is your cross on that?

17          MR. JUENGER:  I think the entire cross is probably --

18          THE COURT:  No, that you would use the exhibits that

19  have already been admitted into evidence, more or less.

20          MR. JUENGER:  More or less, 90 minutes.

21          THE COURT:  90 minutes of the three hours.  So you're

22  going to spend 90 minutes on the exhibits that were not

23  identified until last night; am I right?  If I'm wrong, correct

24  me.

25          MR. JUENGER:  Yeah, I think it's down to 30 minutes on

1    the new documents.

2          THE COURT:  Okay.  All right.  So then what you're

3    going to do is you're going to put aside all the new documents

4    and do the other cross-examination.  Does that make sense?

5          MR. JUENGER:  If I can have a moment to find in my

6    outline which are the new documents --

7          THE COURT:  It probably is not sequential, but then it

8    should have been given earlier, don't you think?

9          MR. JUENGER:  Your Honor --

10         THE COURT:  Or you don't believe that I should require

11   the turning over of exhibits that are used for impeachment?

12         MR. JUENGER:  I think that's a fine rule and that's why

13   we sent them last night.  I didn't have them earlier, so I

14   couldn't have turned them over any earlier than we did.

15         THE COURT:  I know.  How many do we have, Shirley?

16         THE COURTROOM DEPUTY:  We're missing one.  Oh, we have

17   them all.

18         THE COURT:  Let's do it that way.  Okay.  You're lucky.

19   We just kind of killed 21 minutes because we had to because

20   there were no jurors.

21         Who was the latest juror, the typical one?

22         THE COURTROOM DEPUTY:  Yes.

23         THE COURT:  We are going to get rid of him sooner or

24   later because he comes in late every single day.  It wasn't bad

25   today, it was 21 minutes, but 45 minutes, an hour other days.

1          So that means you're going to have to regroup.  I'll

2     allow 178.  You can use 178.  If you have three or four that you

3     think are the most important exhibits we can go over them.  You

4     can pick those out of the 43, and let's see what they are.

5          (Government's Exhibit Number 178 was received in evidence.)

6          MR. JUENGER:  195, Your Honor.

7          THE COURT:  195, what is that?

8          MR. JUENGER:  An email from Mr. Grow to Matt Smith.

9          THE COURT:  Okay.  What date?  There were a lot of

10    emails.  In fact, there were a lot introduced by both sides.

11         MR. JUENGER:  The date is October 10, 2014.

12         THE COURT:  Okay.  What does it say?

13         MR. JUENGER:  It's lengthy.  Do you want me to read the

14    entire thing or summarize it?

15         THE COURT:  You know what, time doesn't seem to be of

16    the essence in this case.  If it's a lengthy email, might as

17    well hear it now.  I'm going to hear it later.  You want me to

18    hear it later.

19         MR. JUENGER:  The email reads:  "Matt, the other

20         product we discussed is the wetting agent ethoxydiglycol.

21         I'm sure your pharmacist will be familiar with it.  It's an

22         alternative to what you are currently using.  Not only is it

23         a very good product, the reimbursement on the AWP is

24         advantageous."

25         It lists the product, it lists the price per

1        milliliter, and it lists the price for the AWP.

2            "You can use up to 20 percent of the total volume of

3        the RX.  48 milliliter for a 240 gram med.  This is a total

4        of $2,832 for a 240 gram and $4,248 for a 360 gram med.

5            "We just need to keep it very quiet and not let anyone

6        know that you are using it.  The manufacturer does not sell

7        it to outside pharmacies.  It's just like the situation with

8        the patch and that manufacturer.  If they find out you are

9        using it, they will shut down my inventory source."

10           THE COURT:  And the reason you didn't want to introduce

11  this in the case-in-chief is?  It got lost in the email?

12           MR. JUENGER:  I don't know why we didn't add this to

13  our list but we --

14           THE COURT:  Because you could have, right?

15           MR. JUENGER:  Well, I think we originally did.  We

16  originally had 300 and something emails and we didn't want to

17  introduce 300 in our case-in-chief, so we limited it down to

18  170.  We cut our exhibit list in half.

19           THE COURT:  No, that's a good thing, but then what you

20  should have done is said, okay, these are the exhibits we may

21  use on rebuttal so we wouldn't have this issue.

22           MR. JUENGER:  I think that would have been wise.

23           THE COURT:  Especially if you had them already.  See,

24  it's not like something you just found.

25           MR. JUENGER:  It's not, you're right.

1          THE COURT:  Which usually what happens, right?  Oh, we

2    just got this from the agency in San Diego which we have no

3    control, and then we got through all of our analysis.  That

4    happens.

5          It's something you had.  You decided, which is a good

6    thing, to cut down the list of exhibits.  The bad thing is

7    giving it to them Sunday night before Monday morning.

8          What would you have done if he had given you this

9    particular exhibit Friday night?

10         MS. MEYERS:  Same answer, Your Honor.

11         THE COURT:  I don't know what that is.

12         MS. MEYERS:  I would have gone on the database, I would

13   have looked to see what documents came before and after, what

14   additional documents were sent regarding the subject matter.  It

15   wouldn't have necessarily been a function of reading the first

16   few above and the next few that followed, it would have been

17   doing some database searches.

18         THE COURT:  But you would do that anyway because this

19   is not a subject that's totally out of the blue.  In fact, it's

20   something that has been mentioned repeatedly by witnesses and by

21   the direct.  It's nothing new, is it?

22         MS. MEYERS:  The subject matter is not, you're correct.

23         THE COURT:  There's nothing new.  So you would have --

24   three lawyers would have gone through the database in order to

25   prepare the defendant.  In fact, I'm sure they did because the

1  direct was lengthy and went through everything.  So I cannot

2  believe that you didn't do that.  There's really no prejudice

3  whatsoever.

4       The only prejudice is my rule that says give it up

5  before, so we don't spend half an hour.  That's the reason for

6  that rule, so there are no surprises, so people don't try a case

7  for purposes of appeal, which there wouldn't be because you're

8  not even entitled to it under the law, unless they adopt

9  Moreno's rule.  The thing is, if I force the defendants to do

10 it, I should force for sure the Government because I have less

11 authority to force the defendants to do it.  Right?

12      MR. JUENGER:  Correct.

13      THE COURT:  It's just not fair, is it?  But it is what

14 the case is about, isn't it?  And everybody knew about it.  It's

15 just beyond me.  Now we have the jurors saying, see, they're

16 making us wait anyway.  Tomorrow we'll come in -- some jurors

17 came in before 8:15, the typical juror who always gets here, and

18 they're going to say, oh, they're always talking.  Okay.

19      What is the other exhibit that's of the same degree of

20 importance according to the Government?  Of course, there's zero

21 prejudice because the defendant is sitting here knowing exactly

22 what it is.  So it's even better than if they had given to you

23 200 exhibits on Friday night.  I mean, that's the truth.  You

24 can be even better prepared.  That's it?

25      MR. JUENGER:  201, Your Honor.

Jury Trial

1              THE COURT:  What is 201?

2              MR. JUENGER:  201 is an email from Mr. Grow to someone

3    named Jessica.

4              THE COURT:  Who is Jessica?  Jessica you said?

5              MR. JUENGER:  Correct.

6              THE COURT:  Who is Jessica?

7              MR. JUENGER:  Jessica was an individual that Mr. Grow

8    was soliciting to refer Tricare beneficiaries to him while he

9    was working for the company InforMD Solutions, which he

10   testified is how he learned about compounding, how he then

11   tailored his own business, or tailored their model to roll over

12   into his own business.

13             What he testified to was that InforMD Solutions only

14   solicited to doctors.  He said that many times and I made sure

15   to make notes of that.  In fact, though, what he was doing, I'd

16   like to ask him, presumably behind InforMD Solutions back was

17   soliciting directly to patients.  I think that's why they fired

18   him, but I'd like to ask him about that.

19             And so this document, that's the purpose for

20   introducing this because I think InforMD Solutions told him we

21   will not allow you to do that because that's an illegal

22   kickback.  I don't know.  I want to ask him about it.  I hope

23   he's truthful about it, but depending on what his answer is,

24   will elicit more questions from me.  And I don't care that he

25   knows that's what I'm going to ask him.

1          THE COURT:  Okay.

2          MS. MEYERS:  Our only objection to this document, Your

3   Honor, is that it pre-dates the relevant period in the

4   Indictment.

5          THE COURT:  Well, doesn't InforMD Solutions predate the

6   Indictment?

7          MS. MEYERS:  It does to a certain extent, Your Honor.

8          THE COURT:  What do you mean, "to a certain extent"?

9          MS. MEYERS:  Well, much of the conduct that we've been

10  talking about --

11         THE COURT:  I'm sorry, you're speaking a little fast.

12         MS. MEYERS:  Sorry, Your Honor.  It's the New Yorker

13  part of me.

14         THE COURT:  Okay.  Think southern.

15         MS. MEYERS:  Okay, I'll think southern.  Much of the

16  conduct that we've been talking about is really in the summer of

17  2014.

18         THE COURT:  Okay.  Did the Government talk about

19  InforMD Solutions in its case-in-chief?

20         MR. JUENGER:  No, but --

21         THE COURT:  I'm talking to her.  I know what you're

22  going to say.

23         MR. JUENGER:  Forgive me, Your Honor.  I didn't have my

24  glasses.

25         THE COURT:  I'm sorry, Ms. Meyers, did the Government?

1        MS. MEYERS:  They did not, Your Honor, but we did.

2        THE COURT:  Who brought it up?

3        MS. MEYERS:  We did, Your Honor.

4        THE COURT:  That's the problem with bringing it up.  I

5   wouldn't prevent you from bringing it up, but you brought it up,

6   so it does become relevant.

7        MS. MEYERS:  Your Honor, I am just preserving the

8   record and we can move on.

9        THE COURT:  You're preserving the record to tell the

10  Court of Appeals we brought up InforMD Solutions, and the

11  Government did not bring up InforMD Solutions.  So now we want

12  to keep them from bringing up something that we would have

13  objected to because it predated the Indictment.

14       MS. MEYERS:  Understood, Your Honor.

15       THE COURT:  And you think that's going to convince two

16  out of three appellate judges in this case.

17       MS. MEYERS:  Not likely, Your Honor.

18       THE COURT:  It's not because it's not fair.  See, this

19  is something new, but you brought it up in the first place.  So

20  I'm going to let him ask that.  What else?

21       MR. JUENGER:  204 is the exact same email -- I'm sorry,

22  202 is the exact same email, but sent to another person.

23       THE COURT:  Who's that?

24       MR. JUENGER:  That is someone by the name of Lori,

25  L-o-r-i.

1    THE COURT:  And it has to do with InforMD Solutions?

2    MR. JUENGER:  It's the exact same email as 201.

3    THE COURT:  All right.  I'll allow you to cross on

4 that.  Now, what else?

5    MR. JUENGER:  204.

6    THE COURT:  What is that?

7    MR. JUENGER:  204 is an email from Monty Grow to Ryan

8 Long on January 14th of 2015.

9    THE COURT:  And?  What does it say?

10    MR. JUENGER:  It says, "Ryan" -- it's a response to an

11 email from Ryan.  The Court heard Ryan Long was one of his sales

12 reps at InforMD Solutions.

13    THE COURT:  You have Ryan Long's email, too?

14    MR. JUENGER:  Correct.

15    THE COURT:  Is that part of it?

16    MR. JUENGER:  It is part of it.

17    THE COURT:  Then read to me Ryan Long types A, B, C,

18 and then I want to hear what he says.

19    MR. JUENGER:  Ryan Long types:  "Hey, bud.  As far as

20  Sven, he's a really good old friend and I threw him a big

21  bone hoping he would be a good influence on Bowman and in

22  his ear.  (No regret.)  I did get reduced from my own 10, 7,

23  5, 3, 2 verbal and word agreement that was said would never

24  be changed no matter what from the beginning, and as you

25  say, that can be pretty significant, but those are only

1    words.  I'm once again not structured, not legitimate, and
2    it's not even my point.  I don't think we will ever see eye
3    to eye here and didn't expect to.  The nice thing is we
4    don't have to.  We can just talk politely and disagree.  If
5    you decided to pay me nothing tomorrow, I would still send
6    you referrals.  Doesn't mean I have to like it.  Once again,
7    always thanks for listening.  You're too busy for all this
8    hogwash so go back to work and get some intakes submitted
9    for us and have a great day.  Your friend always, RL."

10        In response Mr. Grow writes:  "Ryan, unfortunately
11   things had to change a little for everyone when the system
12   was modified to make it actually work.  Otherwise we would
13   still be making ZERO."  All caps.  "Nobody was ever
14   guaranteed that things would never change, they were
15   constantly changing.  There was no room for a 10, 7, 5, 2
16   system, plus me having to pay 150 for every doctor consult
17   up-front out of my own pocket before making a dime.  That's
18   called risk and I took it.  We could still be selling at
19   InforMD and not be getting paid one red cent.  When they
20   made the change that they weren't going to pay me on my
21   three Tricares, that was $7500.  I didn't quit.  I got
22   better by figuring out a system that actually works and
23   people are benefiting tremendously.  MG."

24        THE COURT:  All right.  What's the objection,
25   Ms. Meyers?

1    MS. MEYERS:  Your Honor, I don't even know what the

2  circumstances of this email are and so we would have had an

3  opportunity again to --

4    THE COURT:  Well, you did know about this email.

5    MS. MEYERS:  I didn't, Your Honor.

6    THE COURT:  It wasn't provided by the Government way

7  back?

8    MS. MEYERS:  It was, Your Honor.

9    THE COURT:  And then you did know about it.

10    MS. MEYERS:  Well --

11    THE COURT:  All of you knew about it.

12    MS. MEYERS:  Your Honor, it was part of the same mass

13  production.

14    THE COURT:  And you moved for a continuance because you

15  didn't have time to go through all of the emails.  How many

16  emails by the defendant were produced by the Government?

17    MR. JUENGER:  Innumerable, Your Honor.

18    THE COURT:  I don't know what that means.  Emails by

19  him.

20    MR. JUENGER:  Mr. Larsen said it was in the thousands.

21    THE COURT:  Okay.  And you didn't go through the

22  emails.

23    MS. MEYERS:  Your Honor, there were more than that.

24    THE COURT:  More than the thousands?  A million emails?

25    MS. MEYERS:  Probably less than that, Your Honor.

1          THE COURT:  Okay.  That's why he says a thousand and

2    you didn't go through the emails.

3          MS. MEYERS:  We did to the best of our ability, Your

4    Honor.

5          THE COURT:  You did, of course, because no one moved

6    for a continuance of the trial saying, Judge, we have not gone

7    through every email that our client sent, so we're not ready.

8    No one said that, right?

9          MS. MEYERS:  No, Your Honor.

10         THE COURT:  Then, I don't know what I would have done.

11   I probably would have forced the Government to say give us your

12   list, and they did.  So now the only issue is the additional

13   list.  Okay.  And that's it, those are the most important ones

14   of the 43?

15         MR. JUENGER:  No, Your Honor.  There are a few more.

16         THE COURT:  Basically they are emails -- all of them

17   are emails by the defendant?

18         MR. JUENGER:  By and to the defendant, yes.  There are

19   two emails, 205, 206, which are emails from Larry Speir, who was

20   one of the telemedicine owners.

21         THE COURT:  I know who he is by now.

22         MR. JUENGER:  He sends --

23         THE COURT:  Now, I will tell you, if you all think -- I

24   wish in a case of this nature, I could send interrogatories to

25   the jurors.  I wish I could do that, but the case is too

1   important.  One of these days, with the permission of the

2   parties, I would do that.  Because you are all into the case so

3   much that you forget what the case is really about, both of you.

4   You really forget.  What do you think the jurors are thinking

5   about this case?

6           MR. JUENGER:  When it will be over.

7           THE COURT:  Well, that's true.  How about when will it

8   start today?  But other than that, it's, is the defendant guilty

9   of fraud and receiving kickbacks or paying kickbacks, right?

10  That's what the case is about.

11          So the other emails have to do -- do they pre-date the

12  Indictment or they post date it?  What are the topics of the

13  other emails?

14          MR. JUENGER:  Well, the two I mentioned, 205 and 206,

15  as well as 210 -- well, we already have 125 in -- but all three

16  of those deal with the issue of how Mr. Grow paid the

17  telemedicine company House Calls 24/7.

18          THE COURT:  They are emails to whom?

19          MR. JUENGER:  They are from and to Larry Speir.

20          MS. MEYERS:  210?  Your Honor, I believe 210 is --

21  well, yes, it also involves Ken Kimble, you're right.

22          THE COURT:  So I have to go one by one while we make

23  the jurors wait?  And then I tell them what we call a white lie

24  by telling them, oh, it's me, I'm late because I was doing other

25  hearings, but it isn't the truth, is it?  205.  What is 205?

1        MR. JUENGER:  205 is Larry Speir emailing Monty Grow an

2   invoice for these consults.

3        THE COURT:  What is 206?

4        MR. JUENGER:  206 is the same thing.

5        THE COURT:  The same date?

6        MR. JUENGER:  Different date.

7        THE COURT:  And 210 is what?

8        MR. JUENGER:  210 I'll just withdraw, Your Honor.

9        THE COURT:  All right.  And 205, 206 what's the

10  prejudice about that?  That came out before.

11       MS. MEYERS:  We're fine with it, Your Honor.

12       THE COURT:  So you can talk about all the exhibits that

13  have already been admitted.  You can talked about 178, 179, 195,

14  201, 202, 204, 205 and 206.  Any other exhibit, I assume we'll

15  probably have some sort of a break.

16    (Government's Exhibit Number 206 was received in evidence.)

17       THE COURT:  All right.  Bring in the jurors.  We have

18  to start.  It's 9:40.

19    (The jury returned to the courtroom at 9:45 a.m.)

20       THE COURT:  Good morning.  I hope you all had a good

21  weekend.  Thank you very much.

22       All the jurors are present, defendant, defense counsel,

23  Government counsel.

24       Cross-examination, Mr. Juenger, consistent with our

25  discussions that we had from 9:00 to 9:40.

CROSS-EXAMINATION

BY MR. JUENGER:

Q.   Good morning, Mr. Grow.

A.   Good morning.

Q.   Mr. Grow, if we go back to the time period October 2014 to June 2015, you knew that it was illegal to pay Tricare patients, correct?

A.   I did.

Q.   And similarly, during that same time period you knew it was illegal to pay a doctor to write a script for a Tricare patient, correct?

A.   Yes, to write a prescription and paying them for writing that prescription would be illegal.

Q.   Correct.  That's quid pro quo; isn't that right?

A.   I'm not familiar with that term, but --

Q.   Well, let's break it down then.  As I understand your testimony, you said that you paid for these doctor consults in advance precisely because you wanted to avoid this quid pro quo, that is, the appearance that you were paying for the script and not the consult; isn't that right?

A.   The reasons the consults were paid up-front with 1st Care MD is because that's what they required, because it was more of a credit issue.  They didn't want to provide consults and then come back to you asking you for money, and you not have the money available, so they required a prepayment.

Grow - Cross

1   Q.   And so, then, is it your testimony that you never got

2   consults that you hadn't paid for?  Is that your testimony?

3   A.   Never got consults that I hadn't paid for?  No.  Sometimes

4   they were paid for in advance.  Sometimes I ran out of credits

5   and they provided consults and then they would have me pay a

6   bill which would then add more consults to it.  There was

7   another company that I used which did not require me to pay the

8   consults up-front, but would send me an invoice weekly on any

9   consults that were done and then they were paid that same day.

10  Q.   But the bottom line is you knew that you couldn't pay a

11  doctor for a script, correct?

12  A.   For a script you could not pay them.  You had to pay them

13  for a consult.

14  Q.   All right.  I want to show you some of the exhibits that

15  were introduced.  If you could look at your screen, I'm putting

16  up here what is -- what was introduced as Government's 161, and

17  I want to ask you, 161 is a list of the various individuals that

18  were sales reps for your company, MGTEN, correct?

19  A.   That's correct.

20  Q.   And have you had an opportunity to review this before to

21  confirm that these are all reps?

22  A.   I didn't look at it thoroughly, but I have seen the

23  document, yes.

24  Q.   And I'm indicating towards the lower third of the page where

25  it says Med RX Sales.  Do you see that?

1   A.   I do.

2   Q.   And it's 6.3 million and change.   That was Ginger Lay's

3   company, right?

4   A.   That is correct.

5   Q.   And she was by far your largest sales rep?

6   A.   I believe so, yes.   She was paid a much higher percentage

7   than anyone else but, yeah, I would imagine that she brought in

8   more referrals than anyone, her group did.

9   Q.   And she was paid many times more than all the other reps put

10  together, correct?

11  A.   That's correct.

12  Q.   She was your big hitter, right?

13  A.   She produced a lot of business, yes.

14  Q.   All right.   Now I want to show you what's been admitted as

15  Government's Exhibit 162.   Can you see that?

16  A.   I do.

17  Q.   And this summary represents the various sales reps that you

18  had at MGTEN that were also Tricare patients billed through the

19  pharmacy, correct?

20  A.   Yes.

21  Q.   Now, we can look through the list here and see some names we

22  recognize.   For example, turning to Page 2, where I'm indicating

23  toward the lower third of the page, there's Nichole Powell.   We

24  heard from her, correct?

25  A.   Yes, we did.

Grow - Cross

1   Q.   And we heard from -- we heard about some of these people.

2   We heard about Joy Bing, correct?

3   A.   Yes.

4   Q.   And I want to show you what has been previously admitted as

5   Government's Exhibit 164.  Do you see that document?

6   A.   I do.

7   Q.   And this document represents payments that MGTEN made to

8   those beneficiary sales reps, correct?

9   A.   Yes.

10  Q.   And as we just noted, here is Joy Bing.  She was one of your

11  beneficiary sales reps, correct?

12  A.   Correct.  She was a patient who became a sales rep.

13  Q.   And you don't dispute that any of these transactions took

14  place, do you?

15  A.   I do not.

16  Q.   And we'll note where it says Count 36, where it says Count

17  38, where it says Count 43, those are all payments made to

18  Jonelle Coronado, correct?

19  A.   That's correct.

20  Q.   And Jonelle Coronado never referred any patients to MGTEN to

21  be submitted to PCA, did she?

22  A.   She did not.  She was one of the four marketers that did not

23  provide any patients.  She was one of the four people that ended

24  up getting paid on her own without my knowledge that during the

25  course of this case we realized and have spoken about during

1    prior testimony, yes.

2    Q.   It was an accident?

3    A.   That's correct.

4    Q.   And also listed on here there are three lines, Count 37,

5    Count 42, and Count 44.   Those were all payments to a woman by

6    the name of Jill Cichowicz, and we heard from her at trial,

7    correct?

8    A.   I did.

9    Q.   And similarly to Jonelle Coronado, Jill Cichowicz, did not

10   refer any business to MGTEN or Patient Care America, did she?

11   A.   She did not.   She was one of the four.

12   Q.   Another accident, correct?

13   A.   That's correct.

14   Q.   And the other two -- Count 39 was a payment to Joy Bing in

15   February, correct?

16   A.   Yes.

17   Q.   And Count 40 was a payment to Rosalinda Rambaran in March?

18   A.   That's correct.

19   Q.   And at the time of those payments in February and March

20   neither Joy Bing nor Rosalinda Rambaran, were employees of PCA,

21   were they?

22   A.   They were not PCA employees at that point in time.   They

23   were independent representatives for MGTEN Marketing Group.

24   Q.   And they weren't employees of MGTEN, were they?

25   A.   They were not employees.   They were provided with 1099s.

1  Q.   Independent contractors.

2  A.   That's correct.

3  Q.   And it stands to reason, does it not, that if they were not

4  employees of either PCA or MGTEN, they couldn't be bona fide

5  employees of either MGTEN or PCA, correct?

6  A.   At that point in time, they were not employees.  They were

7  independent representatives.

8  Q.   And my question is --

9  A.   Just like myself with PCA, I was -- at that point in time I

10  was an independent representative as well.

11  Q.   And my question is simply if you're not an employee, you

12  can't be a bona fide employee, correct?  It's logical?

13  A.   It seems logical.

14  Q.   Now I want to show you what has been previously admitted as

15  Government's Exhibit 163.  Do you see that document?

16  A.   Yes.

17  Q.   And this document, the financial analyst, Lisa Klitz,

18  testified that she pulled all of these transactions out of your

19  bank account, correct?  Do you remember her testimony?

20  A.   I do.

21  Q.   And she testified that in total she counted up almost 19 --

22  roughly $19 million in payments from PCA to you and to your

23  MGTEN account, correct?

24  A.   Yes.

25  Q.   And here we've listed some, but not all of those payments.

1   And do you have any reason to dispute that you received these

2   payments?

3   A.  I do not.

4   Q.  And these payments were all commissions for your referral of

5   Tricare patients or actually their scripts to PCA and then you

6   got a reimbursement of 50 percent, correct?

7   A.  I did.

8   Q.  And at the time that these payments were made, starting from

9   the top because they're in chronological order, Counts 10 all

10  the way down into Count 26, that is from November 7th to April

11  27th, millions of dollars in payments, you were not an employee

12  of PCA at the time?

13  A.  I was not.

14  Q.  And I think we've done this, but because you were not an

15  employee, you ipso facto could not have been a bona fide

16  employee?

17  A.  Sounds logical, yes.

18  Q.  Now I want to turn to show you Government's Exhibit 63.  Can

19  you see Government's 63?

20  A.  I see 67, yes.

21  Q.  Thank you.  67.  Thank you for the correction.

22          Government's 67, do you see this?

23  A.  Yes.

24  Q.  And this is an email that you sent, from you to Mary

25  Delgado, correct?

1    A.   Yes.

2    Q.   And fun fact, Mary Delgado's claim to fame was that she was

3    on -- was she on the Bachelor or Bachelorette?

4    A.   I believe she was on the Bachelor.

5    Q.   That means that she's a contestant then, right?

6    A.   Correct.

7    Q.   Yeah, I've seen the show.  And here you're sending to Mary

8         Delgado -- you say, "I have attached the patient list with

9         the reps," right?

10   A.   Right.

11   Q.   And that is a document in which you keep tabs on who's a

12   patient and who their reps are out to several levels, correct?

13   A.   Correct.

14   Q.   And you talked about this on direct, it was 7 percent, 5

15   percent, 3 percent, and then some outliers where people got

16   more, correct?

17   A.   Yeah, there were two different actually, I would say

18   downlines.  One of the downlines was a 7, 5, 3 commission and

19   another one was a 6, 4, 2, but the lead managers for all of

20   those would get commissions on everyone.  So Shane Matthews was

21   one of the original representatives and his downline was the 7,

22   5, 3, and he would get an additional 5 because his total

23   percentage was 20 percent.  So it would always add to 20

24   percent.

25   Q.   So I flipped open the patient list.  Do you recognize this

1  to be the patient list?

2  A.  Yes.

3  Q.  And for the written record, it shows that the Bates number

4  is MG 107055 for future reference, and it lists here Glenn

5  Powell.  Glenn Powell, as this list -- as I understand it, Glenn

6  Powell is the patient.

7  A.  That's correct.

8  Q.  And we heard about Glenn Powell, did we not?

9  A.  I believe so.

10  Q.  Okay.  Glenn Powell was the husband of Nichole Powell,

11  correct, and we did hear from her?

12  A.  Yes, that's correct.

13  Q.  And this represents, then, that Nichole Powell received 7

14  percent of whatever Tricare reimbursed for her husband, Glenn

15  Powell, correct?

16  A.  Yes.

17  Q.  And it's also correct that Nichole Powell mentioned that her

18  friend, Stacey Hanaman, brought her into this, correct?

19  A.  That's correct.

20  Q.  And that this reflects Stacey Hanaman got 5 percent, right?

21  A.  Right.

22  Q.  And then Shane, that's Shane Matthews?

23  A.  Yes.

24  Q.  And his claim to fame is ex-football player like yourself,

25  right?

1   A.   I believe.

2   Q.   You don't know?

3   A.   I don't know if that's his claim to fame, but yeah, he did

4   play football.

5   Q.   Fair enough.   He played for the Bears, didn't he?

6   A.   I think he played for many, many teams over the course of 12

7   years.

8   Q.   And Shane got 8 percent --

9   A.   Yes.

10   Q.   -- of Mr. Powell's reimbursement from Tricare?

11   A.   Yes.

12   Q.   And you got the rest?

13   A.   I did.

14   Q.   And let's flip the page then and let's turn to what is more

15   specifically identified as MG 107073, for the record, and here

16   we see Nichole Powell's name, right?

17   A.   Right.

18   Q.   And so this reflects that Nichole Powell, because she's in

19   the first line, she's a patient?

20   A.   Correct.

21   Q.   And as we would expect, Stacey Hanaman gets 7 percent now.

22   A.   Yes.

23   Q.   Because she's the one who immediately brought Nichole Powell

24   into this?

25   A.   Correct.

Q.  And then Shane Matthews receives 13 percent because he is
the one who brought Stacey in and she's the one who brought
Nichole in, correct?

A.  That's right.

Q.  All right.  A couple more of these I want you to see.  You
used this document, then, to determine who the patient was and
then who to pay after that?

A.  Yes.  This is actually a document that I kept on my phone
that would track them as they come in because sometimes I
would -- you know, they would come in through emails or people
would text message me.  So I wouldn't forget later on, I would
put them in there, yes.

Q.  Sure.  And didn't you tell your sales reps that you would
lock yourself in a room for four days to calculate all these
commissions down to the penny, right?

A.  Sometimes, yes, it took a long time.  As the business grew,
it became longer and longer to handle the commissions and do all
of that.

Q.  Right.  So you had to have a document like this to keep
everything in track, you couldn't keep this in your memory,
could you?

A.  Definitely not.

Q.  And so let's look at another page of this same document.
It's, for the record, MG 107060.  And here we see the name of
Jill Cichowicz.  Do you see that?

Grow - Cross

1    A.   Yes, I do.

2    Q.   And Jill Cichowicz was someone who testified in this trial,

3    correct?

4    A.   That's correct.

5    Q.   And Jill Cichowicz testified that she got paid for her

6    prescription, didn't she?

7    A.   She did.

8    Q.   And here it shows, according to the way you keep this, that

9    Jill Cichowicz brought Jill Cichowicz into this, correct?

10   A.   That's correct.  That's where the mistake was made.

11   Q.   So when you saw this and you paid Jill Cichowicz, you knew

12   you were paying Jill Cichowicz for bringing in Jill Cichowicz,

13   right?

14   A.   If I would have seen it and realized it, yes, but that's

15   where the mistake was made, as I said.

16   Q.   Well, what was the mistake?

17   A.   The mistake was she was entered as the representative for

18   the patient, which she should not have been.  Amy Fouche should

19   have been in that position at number 7.

20   Q.   Right.  But when you lock yourself in a room for four days

21   to calculate the commissions, this document that you created

22   showed for your own eyes to see that you were writing a check

23   for Jill Cichowicz for bringing Jill Cichowicz into this?

24   A.   Had I seen it, I would have realized it.

25   Q.   Let's go on to what's been marked as -- so let me back up

1   for a second.

2          The Jill Cichowicz payment you said earlier was just an

3   accident, right?  It was a one-off, it shouldn't have happened,

4   but it did.

5   A.  I didn't say it was a one-off.  I said it happened with four

6   different representatives, the same situation happened over the

7   course of -- well, actually it was five, but one of the people I

8   did catch and I corrected.  But, yes, these are the four that

9   went unnoticed and Ms. Cichowicz was one of them.

10  Q.  So it went unnoticed, and now we're looking at MG 107062.

11  It lists Jonelle Coronado as the patient, correct?

12  A.  That's correct.

13  Q.  And it lists Jonelle Coronado as the rep, right?

14  A.  Yes.

15  Q.  And, in fact, Jonelle Coronado was paid for bringing Jonelle

16  Coronado into all of this, correct?

17  A.  That is correct.

18  Q.  Now, attached to Government's Exhibit 67 was also a

19  commission report and I'm showing you the first commission

20  report that's listed in this packet.  Can you see this?

21  A.  I can.

22  Q.  And what I want to do is walk through what information is in

23  here, and I just want to focus on the first patient whose name

24  is Eleanor Alley.  Do you see that?

25  A.  Yes.

1   Q.   And Eleanor Alley was Sven Bjerke's, or Bjerke's, or

2   Bjerke's aunt, correct?

3   A.   I believe so.

4   Q.   And this shows the patient's name, shows the date of

5   dispensing, it shows a list of what the drug is, right?

6   A.   Yes.

7   Q.   And you received these from the pharmacy, right?

8   A.   I do.

9   Q.   And if we go over, it shows who the doctor was, right?

10  A.   Right.

11  Q.   It shows how much the reimbursement was for Tricare?

12  A.   Right.

13  Q.   So, for example, this first one, this is the wellness

14  capsule, right?

15  A.   Yes, it is.

16  Q.   And it reimbursed $6,164.31, right?

17  A.   Right.

18  Q.   And then next to that it lists the cost to the pharmacy of

19  making this wellness vitamin, right?

20  A.   Yes.

21  Q.   And that cost is $76.90, right?

22  A.   Correct.

23  Q.   Then it lists the amount of profit to the pharmacy, right?

24  A.   Yes.

25  Q.   And that means for this product the pharmacy made -- my eyes

1    are bad -- but it's $6,087.41, correct, profit?

2    A.   Correct.  Cost after goods, right.

3    Q.   And the cost is 75 bucks, right?

4    A.   Yes.

5    Q.   So it's mostly profit?

6    A.   It's a high profit margin, yes.

7    Q.   Well, 99 percent profit.  We can do the math, right?

8    A.   Yes.

9    Q.   And that means, this last line represents your commission,

10   which is $3,043.70, right?

11   A.   That's right.

12   Q.   And so this comes every month for every patient, right?

13   A.   It does.

14   Q.   And you can see that for the second one, that's the pain

15   cream, $6,000 in reimbursement?

16   A.   Yes.

17   Q.   5200 in profit, more or less?

18   A.   Yes.

19   Q.   This next one is the scar cream, $16,000 and change in

20   reimbursement?

21   A.   Yes.

22   Q.   $700 in cost, more or less?

23   A.   That's correct.

24   Q.   $15,729 in profit?

25   A.   Yes.

1   Q.   And so you took home $7800 from that, correct?

2   A.   My portion before paying out commissions, correct.

3   Q.   Of course.

4          And if we add that up, we get roughly $13,500.  Do you

5   have any reason to dispute that?

6   A.   No.

7   Q.   You knew that each patient that would signed up for pain

8   scar and vitamin would ultimately result in, give or take,

9   $13,500 in profits to you?

10  A.   Yes, depending on which medications they got.  If they got a

11  scar, a vitamin, and a pain, then that's what it added up to

12  according to this document.

13  Q.   Right.  I'm not saying that every single patient got a pain,

14  scar and vitamin, but most of them did, did they not?

15  A.   A high percentage did, yes.

16  Q.   Okay.  Let me put these back together.

17         Now, in opening statement Mr. Rashbaum showed the jury

18  a photograph of a beachfront property.  Do you remember that?

19  A.   Yes.

20  Q.   And that beachfront property, as far as I understood, was

21  purchased by you back in 2000; is that right?

22  A.   I think I purchased the property, the land, and then I built

23  the home afterwards.

24  Q.   And that was towards the tail end of your NFL career, right?

25  A.   No, that was well after my NFL career.  My NFL career I

1  finished in 1994 or '95.

2  Q.  Oh.  But in any event, the house was a property located at

3  1679 North Seabreeze Drive, Tarpon Springs, Florida, right?

4  A.  Yes.

5  Q.  And you had a mortgage on that property with SunTrust?

6  A.  I did.

7  Q.  And you defaulted on that mortgage in 2009, didn't you?

8  A.  It was a default situation, yes.

9  Q.  And ultimately, in 2012, the bank foreclosed on your

10  property?

11  A.  Yes, they did.

12  Q.  And that was just a year or so before you started getting

13  involved in these compounding medications, right?

14  A.  Yeah, a couple of years.

15  Q.  And so your financial health in 2012 was not quite as rosy

16  as Mr. Rashbaum portrayed it in his opening statement, right?

17  A.  Actually, that wasn't the situation at all.  The house was

18  sold.  I signed over the deed to my ex-wife and her current

19  husband in which they were going to refinance the property.

20  After I signed the deed over, trusting them, they did not resign

21  a new mortgage and proceeded to never pay one payment and it put

22  me in a bad situation because now I had no ownership of the

23  house because I signed over the deed and they weren't making the

24  payments and they weren't willing to sell the home as the market

25  was falling.

```
 1              So I had no control over the situation and they put me
 2    in a bad position, but financially, no, I was still fine.
 3    Q.  So --
 4    A.  I wasn't going to pay their mortgage for a home that I no
 5    longer owned.
 6    Q.  Are you finished?
 7    A.  Yes, sir.
 8    Q.  But you were sued in the foreclosure action, correct?
 9    A.  I was.
10    Q.  And your testimony is just that it was all someone else's
11    fault?
12    A.  Not someone else's fault.  It was my fault for signing over
13    the deed and trusting that they would get a new mortgage on the
14    home and take me off the current mortgage, so it was actually
15    kind of stupidity on my part for doing that.
16    Q.  And in 2013, the year after the foreclosure action was
17    resolved, you reported about $95,000 in income; isn't that true,
18    on your tax return?
19    A.  If that's what it says, yes.
20    Q.  Do you have any reason to dispute that that's roughly the
21    amount on your taxes?
22    A.  No.
23    Q.  And that's a good income, isn't it?
24    A.  Yeah, that's a great income.
25    Q.  And roughly was it 2005 that you opened the company called
```

 1   Community Oxygen and Medical, right?

 2   A.   Yes, I believe that was 2005 it was created.

 3   Q.   And that was along with Ms. Long who we had brief testimony

 4   from here in court, right?

 5   A.   Yes.

 6   Q.   And Ms. Long's brother is Ryan Long who's a friend of yours,

 7   yes?

 8   A.   Right.  Yes.

 9   Q.   And Ryan Long was a sales rep under you at both InforMD

10   Solutions and then later at Patient Care America, correct?

11   A.   That's correct.

12   Q.   And Community Oxygen was a Federal healthcare provider,

13   wasn't it?

14   A.   They were.

15   Q.   And that means you get to bill Federal healthcare programs,

16   right?

17   A.   Yes.  We, I believe, billed Medicare.

18   Q.   And we introduced into evidence through Ms. Long what is

19   admitted as Government's Exhibit 2.  Can you see that on the

20   screen?

21   A.   I do.

22   Q.   And this is called an Enrollment Application.  This is how

23   you enroll to become a Medicare provider so that you can bill

24   Medicare for patients, right?

25   A.   Yes.

Grow - Cross

1   Q.   And you signed that application as the authorized official?

2   A.   Yes.  One of my -- I was required to sign it.  I believe

3   anybody who was over a 5 percent owner in the company was

4   required to sign this.

5   Q.   You were co-owners with Ms. Long, right?

6   A.   I was.

7   Q.   So she could have signed it?

8   A.   She signed it as well.  I believe everyone had to sign it.

9   Q.   Both of you signed it.  There's no dispute, right?

10  A.   If you show me our initials, I believe so, yeah.  I think

11  she said the other day that we both signed it.

12  Q.   Flipping to -- well, the very last page shows Ms. Holder's

13  signature as a delegated official, correct?

14  A.   Yes.

15  Q.   And it shows your name, your signature as the president and

16  as the authorized official?

17  A.   Yes.

18  Q.   And what that means is you were the authorized official and

19  then you delegated shared responsibility to her.  Is that your

20  understanding?

21  A.   I believe when we signed this, it was kind of you sign this

22  one, I'll sign that one.  It wasn't a big meeting or anything

23  like that.

24  Q.   Sure.  That's fair.

25       But the fact of the matter is you signed this one and

Grow - Cross

1  she signed that one, right?

2  A.   Yes.

3  Q.   And let's look at this, what you signed, and I'd ask you to

4  just read along.  I want to read it so that it's in the record,

5  so listen carefully.

6      Starting from the top, it says:  "This section is used

7      to officially notify the supplier of additional requirements

8      that must be met and maintained in order for the supplier to

9      be enrolled in the Medicare program."

10     And that's something you wanted to be enrolled in,

11 right?

12 A.   Yes.

13 Q.   It continues:  "This section also requires the signature and

14     date thereof of an authorized official who can legally and

15     financially bind the supplier to the laws, regulations, and

16     program instructions of the Medicare program."

17     So far, so good?

18 A.   Yes.

19 Q.   It also then -- I won't read this part, but it authorizes

20 you to add a delegated official, which is what you do, right,

21 Ms. Long?

22 A.   Yes.

23 Q.   Reading down further, it says:  "By his or her signature,

24     the authorized official named below and the delegated

25     official named in Section 16, agree to adhere to the

 1          following requirements stated in this Certification

 2          Statement."

 3               Right?  That's what it says.

 4    A.  I see it, yes.

 5    Q.  And what that means is this is a contract that you're

 6    entering into with Medicare, right?

 7    A.  Yes, it's an agreement.

 8    Q.  And an agreement, a contract, call it what you will,

 9    involves reciprocal obligations.  Do you understand that?

10    A.  Yes.

11    Q.  And in the case of a Medicare enrollment, Medicare is

12    agreeing to let you into the program.  That's what they give

13    you, right?

14    A.  Right.

15    Q.  And with that comes the opportunity to bill Medicare, right?

16    A.  Right.

17    Q.  And Medicare is a deep pot of money, is it not?

18    A.  I don't know if it's a deep pot of money, but it is a

19    provider that many patients have, Medicare, so yes.

20    Q.  Well, I'm too colloquial perhaps, but Medicare is the

21    largest payer of medical claims in the United States, are they

22    not?

23    A.  If you say so.  I don't know that but --

24    Q.  Okay.  And so Medicare allows you to take part in the

25    program and bill them for services, right?

1  A.  Yes.

2  Q.  And your obligation is not a heavy one, but it's to abide by

3  Medicare's laws, rules and regulations.  That's what you have to

4  promise to get into the program, right?

5  A.  According to this document, yes.

6  Q.  Well, did you agree to do that?

7  A.  I signed the document, so yes, I agreed to do that.

8  Q.  Do you sign contracts that you don't intend to abide by,

9  Mr. Grow?

10  A.  No, I do not.

11  Q.  So again, you agreed to abide by the laws, rules, and

12  regulations of Medicare.  That's your obligation, correct?

13  A.  That's correct.

14  Q.  And would you agree with me that in order to abide by those

15  laws, rules, and regulations you have to know what they are?

16  A.  Yes.

17  Q.  And I'm not reading all of this, but if we go down to the

18  third -- under A-3, it lists some of the laws, rules, and

19  regulations that you agreed to abide by and I'll read that for

20  you and you correct me if I say it wrong.

21          "I agree to abide by the Medicare laws, regulations,

22      and program instructions applicable to DME POS suppliers."

23          DME is just durable medical equipment, right?

24  A.  Yes.

25  Q.  "And the Medicare laws, regulations, and program

1        instructions are available through the Medicare contractor.

2        I understand that payment of a claim by Medicare is

3        conditioned upon the claim and the underlying transaction

4        complying with such laws, regulations, and program

5        instructions, including but not limited to, the Federal

6        Anti-Kickback Statute and the Stark Law and on the

7        supplier's compliance with all applicable conditions of

8        participation in Medicare."

9            A lawyer clearly wrote that, but doesn't that mean that

10   you agree to abide by all rules, including the Federal

11   Anti-Kickback Statute, yes or no?

12   A.   Yes.

13   Q.   And it says that "Payment of the claim is conditioned upon

14        the claim itself --" that's the request for money, right?

15   A.   Right.

16   Q.   "-- and the underlying transaction."

17            That's the dealing with the patient and the doctor,

18   that's the transaction that underlies the claim, correct?

19   A.   Yes.

20   Q.   All of it has to abide by the laws, rules, and regulations,

21   correct?

22   A.   I would assume so, yes.

23   Q.   And if we go down to Number 6, A-6, it says:  "I will not

24        knowingly present or cause to be presented a false or

25        fraudulent claim for payment by Medicare and will not submit

1        claims with deliberate ignorance or reckless disregard of

2        their truth or falsity."

3            That's what it says, right?

4   A.   It does say that.

5   Q.   And so it says you won't submit claims that you know are

6   false, right?

7   A.   Right.

8   Q.   And it says you won't even submit claims that you suspect

9   are false?

10  A.   Yes.

11  Q.   And after that, under B, where it says "authorized official

12       signature," it says, "I have read the contents of this

13       application," full stop, right?

14  A.   It says, "I have read the contents of this application,"

15  yes.

16  Q.   And you signed this because you had read those instructions,

17  right?

18  A.   Yes, I read the instructions.  I don't remember exactly what

19  was happening at that point in time but, yeah, I mean, obviously

20  I signed this form.

21  Q.   Well, it was a long time ago, right?

22  A.   Yeah, February of 2005, so 12 years ago.

23  Q.   Well, let me ask you, do you have a habit of signing

24  contracts that you don't read before you sign them?

25  A.   Unfortunately, I think there's a lot of things that I've

1  signed that contain a lot of documents, even like my health

2  insurance, maybe 20 pages worth of documents, I don't read the

3  whole thing.  I just, you know, go to the page where I need to

4  sign it and I sign it.  So, yeah, I think there are certain

5  situations that -- when I buy a car, a vehicle, there's pages

6  and pages of documents.  I don't think I go through it and read

7  line by line and examine every portion of it.  I sign the papers

8  and fill out what's necessary and move on.

9  Q.  You fill out what's necessary to get what you want; is that

10  right?

11  A.  To get what I want?  I think it's more -- if you want health

12  insurance, you have to sign all these papers and, yeah, you have

13  to sign it.  So, yeah, I wanted health insurance, I signed it

14  without necessarily reading the 20 pages of documents that came

15  along with it.

16  Q.  Well, you didn't sign this document to get health insurance,

17  did you?

18  A.  No, I did not.

19  Q.  You signed this document to be able to get money from

20  Medicare, right?

21  A.  Yes, to get Medicare billing privileges.

22  Q.  And at the time you signed it, it said "I have read the

23      contents of this application."

24          That's what it says, right?

25  A.  Yes, it does.

1  Q.  So anybody who looks at this either at the time or in the

2  future would have every right to believe that you actually read

3  this form, wouldn't they?

4  A.  Yes.

5  Q.  Whether you actually read it or not, that's what they could

6  rely on?

7  A.  That's correct.

8  Q.  Okay.  Now, prior to working at your own company, Community

9  Oxygen and Medical, you worked for a medical device company

10 called Precision Orthopedics; is that right?

11 A.  Yes, I did.

12 Q.  And how many years did you work there, more or less?

13 A.  I'd say around five.

14 Q.  And you held the position of medical device sales

15 representative, right?

16 A.  That is correct.

17 Q.  And that job was to market Precision's devices to doctors,

18 right?

19 A.  Yes.

20 Q.  And that, I understand, can be a very stressful position to

21 hold.  Do you agree?

22 A.  I do agree.

23 Q.  And, in fact, you actually shadow doctors and kind of have

24 to live the life of a doctor, don't you?

25 A.  I mean, you don't live the life of a doctor, but you do work

1    with them and you provide them with necessary equipment that

2    they use during the surgery.  And when they go into those

3    surgeries, a lot of times you will go as well, not into the

4    sterile field, but you'll stand outside the sterile field and

5    answer any questions that they might have about the products if

6    a situation arises.

7    Q.  Yeah.  I meant that in that job, you live the life of a

8    doctor in that you have to be there at 4:00 in the morning.  If

9    there's a surgery, you have to be there with the doctor, don't

10   you?

11   A.  It's not necessary, but it all depends what the doctor's

12   needs are.  If the doctor requests you to be there, then by all

13   means you would try to be there if you didn't have anything else

14   scheduled, but it wasn't a requirement.

15   Q.  Well, in fact, you did, you actually suited up and went into

16   surgeries sometimes, on occasions, did you not?

17   A.  Yes, you were required to wear scrubs into the surgical

18   suite.  I was never allowed inside the sterile area.  You had to

19   stand back away from that.

20   Q.  And as a condition of your continued employment at Precision

21   Orthopedics, you were required to take annual healthcare

22   compliance training, weren't you?

23   A.  No, I was not.

24   Q.  You were not?  You never took compliance training there?

25   A.  I did not.

1  Q.  You did work as a medical device sales representative,

2  correct?

3  A.  I did.

4  Q.  Do you remember a man who worked at Precision as a medical

5  device sales representative by the name of Keith Tighe,

6  T-i-g-h-e?

7  A.  No.  Keith Tighe, I'm not familiar with.  I've never heard

8  that name.

9  Q.  So you don't know if he was a medical device sales rep just

10 like you, you don't know that?

11 A.  I don't know that.  If he was there, he was not there while

12 I was there.

13 Q.  Well, what years were you there?

14 A.  From 1999 to 2005.

15 Q.  But would you agree that if you were both medical device

16 sales reps at the same company at the same time, you would agree

17 you got the same training, right?

18 A.  Not necessarily.

19 Q.  Okay.

20 A.  I got my training in 1999 when I started.

21 Q.  And as far as you are telling us, there was no annual

22 compliance training at Precision Orthopedics?

23 A.  There was not.

24 Q.  All right.  But at the time that you worked at Precision

25 Orthopedics, you knew that you couldn't pay those doctors in

Grow - Cross

1  order to order Precision Orthopedics products.  You knew that

2  much, didn't you?

3  A.  Yes, I did.

4  Q.  And similarly, you knew that you could not pay a patient any

5  kind of compensation in order to order products from Precision

6  Orthopedics.  You knew that much as well?

7  A.  I never had any interaction with patients, so it wasn't

8  something that came up but --

9  Q.  It doesn't really even seem to make sense, does it?

10  A.  I had no interaction with patients.

11  Q.  Right.  You wouldn't even be soliciting your products to

12  patients, you go to doctors.

13  A.  That was my -- my job was to call on physicians, yes.

14  Q.  And that's the same way that later InforMD Solutions

15  marketed compounds, right, to doctors?

16  A.  That's correct.

17  Q.  Not to patients?

18  A.  We did not solicit patients for telemedicine while I was at

19  InforMD Solutions, but there were times where patients were

20  given forms in which they could go to their own physician and

21  talk to them, and if it was deemed necessary, then that

22  physician could write them a prescription and send it in to the

23  pharmacy.

24  Q.  Well, let's stick with Precision Orthopedics first before we

25  move on.  I want to ask you -- you testified that you knew you

1  couldn't pay a doctor, right?

2  A.  That's correct.

3  Q.  Could you pay the doctor's secretary instead?

4  A.  No, I wouldn't assume.

5  Q.  And you told us that you couldn't pay a patient and you

6  never did pay a patient, but you knew you couldn't pay a

7  patient, right?

8  A.  Right.

9  Q.  Could you pay the patient's spouse?

10 A.  The thought would have never crossed my mind when I was

11 working at Precision Orthopedics to ever talk a patient or even

12 talk to their spouse.  So it's nothing that even entered my

13 mind.

14 Q.  And you understood at the time you were at Precision

15 Orthopedics that you can't pay the doctor because that would

16 corrupt the whole process, wouldn't it?

17 A.  Yes.  You could not go to some doctor and say, hey, I'm

18 going to give you money to use my equipment.

19 Q.  Right.  Because then the doctor has an incentive to order

20 your product whether or not the patient wants it, whether or not

21 the patient needs it, whether or not it's a good product.

22        The money corrupts the whole system of medicine,

23 doesn't it?

24 A.  That could be a potential problem, yes.

25 Q.  And the same thing is true in the context of a patient.  And

1  I know your testimony was that it never really crossed your

2  mind, but I'm asking you now, if you offered to pay the patient

3  to buy Precision Orthopedics products, the patient might order

4  it whether they need it, whether they want it, whether it's the

5  best orthopedic product; isn't that right?

6  A.  That's not right because the doctor is the person who is

7  responsible for ordering it.  A patient might be able to request

8  it, but ultimately, the physician is the one that has to order

9  it and it's their final decision.  So the patient has no say in

10 what implant or whatnot they would have received.

11 Q.  Unless you're paying the doctor also, right?

12 A.  Whether you're paying the doctor or not, he's ultimately the

13 person that is going to make the decision of whether that

14 particular product is qualified for the patient to have.

15 Q.  But you just agreed with me a few minutes ago that if you

16 pay the doctor, the whole thing is corrupted because the doctor

17 is incentivized to order a product that the patient may not

18 need, may not want, that may not even be a good product.  Didn't

19 you say that?

20 A.  I said it could potentially corrupt that situation, yes.

21 Q.  Okay.  You started working at InforMD Solutions in 2014,

22 correct?

23 A.  Yes.

24 Q.  And that was March, because I think you said -- your

25 testimony was that you signed a contract with InforMD Solutions

1   in March of 2014, right?

2   A.   Yes.

3   Q.   And I noticed as part of your testimony that you indicated

4   that you thought InforMD Solutions was a really compliant

5   company because they had lots of lawyers.  Is that what you

6   said, something like that?

7   A.   I don't know if it's lots of lawyers, but I do know that

8   they talked about lawyers a lot.

9   Q.   And you said that at InforMD Solutions, InforMD had a model

10  in which they were marketing compound creams and selling

11  ingredients.  Am I right about that?

12  A.   Yes.

13  Q.   So let's talk about both of those because you participated

14  in both of those activities, right?

15  A.   I did.

16  Q.   And let's start with marketing.

17        And you told us -- I wrote it down.  You told us that

18  at InforMD, when you were marketing, you were, "calling on

19  physicians."  You said that you were, "presenting products to

20  doctors."  You said you were, "marketing to physicians" and that

21  when you brought in your friends, Shane, Ryan and Sven, they too

22  were, "marketing to doctors."  Is that right?

23  A.   That is right.

24  Q.   And later in your testimony, you contrasted the way that

25  InforMD Solutions did business and the way you later devised

1  your marketing with PCA, right?  You contrasted the two.

2  A.   Yes.  There were similarities and there were also some

3  differences that we made changes when we switched over doing it

4  with my own company, yes.

5  Q.   Yes.  And one of those was that you used telemedicine, but

6  InforMD didn't use telemedicine.  That was one of the

7  differences, right?

8  A.   Right.

9  Q.   And the other difference you indicated was that you would

10  market directly to patients, but InforMD Solutions only marketed

11  to doctors, right?

12  A.   Yes, that we would market to patients who would then see

13  telemedicine physicians.  That was the difference.

14  Q.   That's PCA's model.  That's the model you did with PCA for

15  your company?

16  A.   Yes.

17  Q.   But at InforMD Solutions they marketed to doctors.

18  Basically, it was similar to what you did at Precision where you

19  would go to the doctor's office, explain how wonderful these

20  products were, leave them a script and then let them decide if

21  they wanted to use the product?

22  A.   That was the bulk of it, yes.

23  Q.   Okay.  But that's not exactly what happened in practice at

24  InforMD Solutions, is it, because you also started not only to

25  market to doctors, but also to patients?

1   A.   There were some patients that took the information in to

2   their own physicians and spoke with them and received

3   prescriptions, yes.

4   Q.   And I want to show you Government's Exhibit 201.

5        MR. JUENGER:  Is this in evidence?  I move it into

6   evidence, Your Honor, if it's not.

7        THE COURT:  Well, why don't you ask him first.

8   BY MR. JUENGER:

9   Q.   Well, let me show you this document.  Have a look at that

10  and see if you recognize the email, the email address, the

11  contents.

12  A.   Yes.

13  Q.   And what is it?

14  A.   This is a document where I was talking to a potential person

15  that I thought might be a good person to be a sales

16  representative, and she could talk to people and recruit them as

17  potential patients that could go see their own physicians and

18  have the physicians do examinations on them and potentially

19  write them prescriptions for these medications.

20       MR. JUENGER:  Your Honor, based on that, I move 201

21  into evidence.

22       THE COURT:  Any objection?

23       MR. RASHBAUM:  No objections, Your Honor.

24       THE COURT:  It will be admitted.

25       (Government's Exhibit Number 201 was received in evidence.)

1   BY MR. JUENGER:

2   Q.  And so the jury can see it now, this is an email from Monty

3   Grow to bluejeansforever16@hotmail.com, correct?

4   A.  Yes.

5   Q.  And it's in the record now so I wouldn't bother spelling

6   bluejeansforever, but the subject is a day in the life, correct?

7   A.  Correct.

8   Q.  And I won't read all of this, but you send this email to

9       Jessica and you say:  "Hello, my name is Monty Grow, and my

10      company is InforMD Solutions."

11          And this is when you were working at InforMD Solutions,

12  correct?

13  A.  That is correct.

14  Q.  InforMD Solutions that solicits to doctors, not patients,

15  right?

16  A.  The bulk of the time was to doctors, yes.

17  Q.  And it goes on to say:  "I was reading your blog a day in

18      the life of a military wife and I thought of a great idea."

19          And you go on to explain your idea of selling these

20  creams, correct?

21  A.  That is correct.

22  Q.  And it continues where I've highlighted in the second

23      paragraph:  "I wanted to see if you would like to become a

24      representative of mine and help share this product with your

25      readers.  The income potential is very great, and while also

1    helping so many others, just to give you an idea, you would

2    earn approximately $900 every time a prescription is filled

3    and refilled.  If you were to share this product with ten

4    military friends, you would each earn approximately" -- not

5    "each," strike that -- "you would earn approximately $9,000

6    per month."

7         And so is it fair to say in this email, you are

8    soliciting Jessica to be a sales rep for you?

9    A.  I am.

10   Q.  But not a sales rep like Sven and Ryan and the others who

11   worked at InforMD Solutions, right?

12   A.  No, she would be the same.

13   Q.  She would be the same?

14   A.  Yes.  She would be coming to InforMD Solutions.  I say at

15   the very top my company is InforMD Solutions.

16   Q.  But Sven and Ryan and the others, they solicited to doctors?

17   A.  They solicited to some doctors, but there was also a couple

18   of patients that came in through them specifically that went to

19   their own physician and got medication.

20   Q.  But that's not what you said on Friday, is it?

21   A.  I said at InforMD Solutions we mainly marketed physicians,

22   yes, that was the bulk of it, but there were on occasions

23   opportunities where people needed medications and they went to

24   their own physicians and talked to their physicians to see if it

25   was right for them.  I believe Ryan Long was actually one of

Grow - Cross

1   those people that did that himself.

2   Q.  But you never mentioned that on Friday?  That's my question.

3   A.  I don't think it was asked.

4   Q.  And Sven Bjerke never mentioned that in his direct or on his

5   cross, did he?

6   A.  Sven Bjerke actually had his mother -- at one point when he

7   was at InforMD Solutions, he had her go to her physician as

8   well, and at that point in time I don't believe her insurance

9   was covered.  So, yeah, he actually sent his mother to her

10  physician to talk about it as well.

11  Q.  And Jessica here, you never told her that she would be

12  soliciting to doctors, did you?

13  A.  I did not.

14  Q.  So you weren't trying to have her be a sales rep to solicit

15  to doctors, it was just to find patients if I understand this?

16  A.  In her particular situation, I was reaching out to her to

17  talk to patients, that's correct.

18  Q.  And now I want to show you what has been marked as

19  Government's Exhibit 202.  Do you recognize that one?

20  A.  Yes.  It looks like the same document.

21  Q.  Correct.

22          MR. JUENGER:  Your Honor, I would move Government's 202

23  into evidence.

24          THE COURT:  Any objection?

25          MR. RASHBAUM:  No objection, Your Honor.

1          THE COURT:  It will be in.

2      (Government's Exhibit Number 202 was received in evidence.)

3   BY MR. JUENGER:

4   Q.  And so we're now looking on the screen at Government's 202,

5   email from Monty Grow to Mrs.Sergeant@live.com, April 27, 2014.

6   Do you recognize this?

7   A.  I do.

8   Q.  And the subject is Air Force Wife Life, correct?

9   A.  That's correct.

10  Q.  And this is really just -- it's not 100 percent the same,

11  but this is similar to the last email we just looked at?

12  A.  It is.

13  Q.  And when I read this, I noticed that both of these women

14  were blogging about their military lives, were they not?

15  A.  Yes, they were.

16  Q.  That's how you found them?

17  A.  Yes.  Actually, I believe Ryan Long was the one that found

18  them and he talked to me about this particular situation and he

19  thought it might be a good potential opportunity to talk to

20  these two different people about being involved with our

21  company.

22  Q.  And you knew that these women had Tricare?

23  A.  I mean, I didn't know, but I assumed if they were in the

24  military or they were a military wife that they would be covered

25  by Tricare, yes.

1  Q.  And you knew that Tricare was paying out a good bit of money

2  for these particular compound creams, correct?

3  A.  Yes.

4  Q.  And you didn't tell InforMD Solutions' management that you

5  were doing this off-line, did you?

6  A.  Yes, they knew.

7  Q.  And in fact, InforMD Solutions refused to pay you and Sven

8  and Ryan for your Tricare scripts, didn't they?

9  A.  There came a certain point in time where they did not pay.

10  For, I don't know, several months they did pay, and then all of

11  a sudden, without explanation, they did not pay us.

12  Q.  Well, isn't the explanation that their team of lawyers that

13  impressed you so much with their compliance realized that if

14  you're paying people and you're paying scripts from Tricare,

15  that constitutes an illegal kickback and, they refused to do it?

16  Isn't that what happened?

17  A.  No, that is not what happened at all.

18  Q.  All right.  I want to show you what is marked as

19  Government's 204.  Do you recognize the email?  That's the

20  question, do you recognize the email?

21  A.  Yes, I do.

22        MR. JUENGER:  Your Honor, I would move into evidence

23  Government's 204 at this time and ask to publish.

24        THE COURT:  What say the defense?

25        MR. RASHBAUM:  No objection, Your Honor.

1          THE COURT:  It will be admitted.

2       (Government's Exhibit Number 204 was received in evidence.)

3   BY MR. JUENGER:

4   Q.  And this that we can now see on the screen, Government's

5   204, is an email that begins -- it's from

6   ryanlong1234@yahoo.com.  That is Ryan Long, correct?

7   A.  That is correct.

8   Q.  And it's to you at montygrow@hotmail.com.  That's your

9   email, right?

10  A.  Yes.

11  Q.  And I'm not going to read Sven's, the jury can read it for

12  themselves, but the nuts and bolts are that Sven is complaining

13  to you because under the old system you had, it was a 10, 7, 5,

14  3, 2 arrangement, correct?

15  A.  Yes.  Ryan Long is complaining to me, not Sven, but yes.

16  Q.  You correct me to my embarrassment to the end of the day.

17  But the deal changed, right, when you went to PCA and now the

18  deal was different.

19  A.  Yes.  It was still a tier program, but the percentages had

20  changed, yes.

21  Q.  And it went from this one which totals 27, it went to a 7,

22  5, 3, which is what?  15 percent, a much smaller percentage.

23  A.  Yes.

24  Q.  So it's worth complaining about, isn't it?

25  A.  He felt the need to complain, yes.

Grow - Cross

1  Q.  Okay.  And the top part is your answer to Ryan Long and I'll

2  read it.  Please read along with me.

3       You say:  "Unfortunately, things had to change a little

4    for everyone when the system was modified to make it

5    actually work."

6       And the system modification is you leaving InforMD

7  Solutions, where the model is to solicit to doctors, and you

8  create your new program where you solicit to patients.  That's

9  maybe not the only difference, but that's a difference that

10 you're talking about here?

11 A.  That is one of the differences, yes.

12 Q.  And by making it actually work means not that better

13 information is provided, or anything like that, it's that you're

14 able to actually get scripts and make money, right?

15 A.  Yes.  As we said, the marketing to physicians was quite

16 difficult because all of them currently had relationships with

17 other companies that they were doing business with, so that made

18 the process difficult.

19      The only really business that we were able to get --

20 there were a couple of physicians that started writing that

21 wasn't previously engaged with other pharmacies, but the other

22 portion of it was, we had a few patients that did go in and see

23 their physicians directly and see if it was right for them, yes.

24 Q.  It was difficult because the doctors weren't ordering,

25 correct?

 1   A.   They were ordering from other pharmacies.

 2   Q.   But don't they say in business just build a better

 3   mousetrap?   I mean, if you had the better product, wouldn't they

 4   choose your product?

 5   A.   Sometimes they would, but sometimes relationships are more

 6   important.

 7   Q.   Relationships are more important.   Sounds like a euphemism

 8   to me.   Well, it's not a question.

 9              THE COURT:  No, it isn't.

10              MR. JUENGER:  I'll ask to strike that.  Disregard that.

11              THE COURT:  All that does is the court reporter writes

12   more and then I'm invited to say something and I'd rather not

13   say anything.

14              Question and answer.  Let's go.

15   BY MR. JUENGER:

16   Q.   You continue:  "Otherwise, we would all still be making

17       ZERO," in all caps.

18              And you didn't make zero at InforMD Solutions, but you

19   just didn't make a lot, did you?

20   A.   That's correct.

21   Q.   What you made zero on were Tricare scripts?

22   A.   No, Tricare scripts was basically all I was making money on

23   when it came to referring these patients.  Pretty much all of

24   the other insurances had stopped paying.  There was a little bit

25   that got approved, but very little, and Tricare was all that was

Grow - Cross

1   paying at that point in time.

2   Q.   And then you made zero on Tricare scripts when InforMD

3   Solutions stopped paying you for those scripts, correct?

4   A.   Yes.  At one point in time there was a pharmacy that my

5   Tricare scripts were with, and they informed me that that

6   pharmacy was not going to reimburse on Tricare.  They did not

7   give me a reason why.  They just said that those scripts, if

8   they were going to be covered, would have to be redone and sent

9   in to one of the other pharmacies.

10          InforMD Solutions worked with six different pharmacies

11  that they had relationships with across the country and provided

12  prescriptions from physicians to each of those.  For whatever

13  reason this particular pharmacy -- I don't know if they lost

14  their contract with Tricare or what, but they were not going to

15  reimburse.  So I was informed by Rick Massengale, the owner of

16  the company, that in order for me to get reimbursed on those

17  particular prescriptions that I would have to get new scripts

18  issued, and they would be resent in to one of their other

19  participating pharmacies.

20  Q.   And if we continue reading, you tell Ryan:  "Nobody was ever

21       guaranteed that things would never change.  They were

22       constantly changing.  There was no room for a 10, 7, 5, 2

23       system, plus me having to pay 150 for every doctor consult

24       upfront out of my pocket before making a dime.  That's

25       called risk and I took it.  We could still be selling at

1     InforMD and not be getting paid one red cent.  When they

2     made the change that they weren't going to pay me on my

3     three Tricares, which was 7500, I didn't quit.  I got better

4     by figuring out a system that actually works and people were

5     benefiting tremendously."

6          Did I read that correctly?

7   A.   I believe you did.

8   Q.   And what that says is that InforMD Solutions stopped paying

9   for Tricare, correct?

10  A.   That particular pharmacy stopped paying for Tricare, yes.

11  Q.   And so you went out on your own and you set up your own

12  program, which is a risky endeavor, right?

13  A.   Right.

14  Q.   And you created a model that actually worked, meaning it

15  actually paid?

16  A.   That's correct.

17  Q.   Okay.  Now, when you were at InforMD Solutions, you signed a

18  contract.  I think it came in -- well, it's listed as

19  Government's 199.

20          Can I show this?

21          MR. RASHBAUM:  What number, I'm sorry, Jon?  What

22  number?

23          THE COURT:  I'm sorry?

24          MR. RASHBAUM:  What number?

25          MR. JUENGER:  I have it listed as Government's 199.

```
 1            MR. RASHBAUM:  Okay.

 2            THE COURT:  Did we go as far as 199 in my list,

 3   Government?

 4            MR. JUENGER:  We did not.

 5            THE COURT:  Okay.  So this is something new.

 6            MR. RASHBAUM:  It's okay, Your Honor.

 7            THE COURT:  Pardon?

 8            MR. RASHBAUM:  No objection.

 9            THE COURT:  Okay.  What is it?

10            MR. JUENGER:  It's 199.

11            THE COURT:  I know that, but what is it?

12            MR. JUENGER:  It's an email from Mr. Grow to Colleen

13   Johnston.  I'll show it to the witness.

14            THE COURT:  Okay.  No problem.  It will be admitted

15   without objection from the defense.

16       (Government's Exhibit Number 199 was received in evidence.)

17   BY MR. JUENGER:

18   Q.  So you had testified that you signed a contract with InforMD

19   Solutions, correct?

20   A.  Correct.

21   Q.  And I just want to show you -- well, you look at it and tell

22   me if it's the contract you signed.

23   A.  Yes, I see my signature.

24   Q.  And in the contract that you signed, where I have

25   highlighted on Page 7 of the contract -- for the record, it's MG
```

1   125399 -- do you see where it says in this section, I think it's

2   Section IX, Roman numeral -- I skipped that day in school --

3   Compliance with Applicable Laws.

4   A.   Yes, I see it.

5   Q.   And it says there sales consultant.  That's you, right?

6   A.   Yes.

7   Q.   "Sales consultant represents and warrants to InforMD that it

8        is and shall remain throughout the term of this agreement in

9        compliance with all applicable Federal and State laws and

10       regulations related to this agreement and the services to be

11       provided under this agreement, including without limitation

12       statutes and regulations related to fraud, abuse, false

13       claims and statements, referrals, prohibitions of kickbacks,

14       et cetera."

15            Did I read that correctly?

16   A.   Yes, you did.

17   Q.   And so in this agreement, which we've already discussed is a

18   reciprocal obligation between the parties, you agreed here that

19   you would abide by all rules and regulations, including the

20   prohibition on kickbacks and fraud, correct?

21   A.   Correct.

22   Q.   And if you didn't abide by this, InforMD Solutions was

23   allowed to fire you, weren't they?

24   A.   I believe that's what it says, yes.

25   Q.   Now, the other part of the job that you had at InforMD

1    Solutions was selling compound ingredients like Sterabase,

2    correct?

3    A.   Yes.

4    Q.   And that's how you ended up meeting Matt Smith, who was the

5    director of compounding at PCA, right?

6    A.   Yes.  One of my sales associates called on PCA and presented

7    them with the product Sterabase and Matt Smith and his staff

8    showed an interest in it and that's how ultimately I ended up

9    meeting him, was through that.

10   Q.   I'm curious, did you know Matt Smith from someplace else

11   before that?

12   A.   No, I did not.

13   Q.   Did you ever do any work for a place called Home Care

14   Solutions or QMed?

15   A.   I did not work for them, no.

16   Q.   Okay.  I want to show you what's been admitted as

17   Government's 155, and this is an email between yourself and Mary

18   Jo Giles.  Do you remember who Mary Jo Giles was?

19   A.   Yes, she was a pharmacist at PCA.

20   Q.   And I want to start at the back of this so that we're in

21   chronological order.

22        Ms. Giles emails you in August of 2014, and says:

23        "Monty, please send me the pricing for Sterabase --" it says

24        f-r-o, but I'm sure she means for -- "5 kilogram and 20

25        kilogram.  Thanks."

Grow - Cross

1           Is that correct?

2   A.   That is correct.

3   Q.   And then your response to her is telling her that Sterabase

4   is offered at $2.50 per gram, right?

5   A.   That's correct.

6   Q.   So you do the math for her.  5,000 grams, or 5 kilos, would

7   cost them $12,500.

8   A.   Yes.  That was the minimum order.

9   Q.   And that 20 kilos, or 20,000 grams, would cost them $50,000,

10  right?

11  A.   Yes.

12  Q.   And you include with that the AWP, that's average wholesale

13  price, right?

14  A.   That is correct.

15  Q.   And $12.93 per gram, right?

16  A.   Yes.

17  Q.   And AWP is the number that insurance companies use when they

18  determine the reimbursement, right?

19  A.   I believe so.

20  Q.   One of the most important factors that a pharmacy has, they

21  want to know what the AWP is so they know how much they're going

22  to get reimbursed, right?

23  A.   Yes.  They want to know their cost of the product and the

24  AWP.

25  Q.   And Mary Jo Giles responds to you:  "That is the price?  It

1    seems very high."  Correct?

2  A.  That is correct.

3  Q.  Were you surprised to see her say that your product cost a

4  lot of money?

5  A.  I don't know if surprise is the word, but I guess it was

6  high to her.  I don't know what the other products, you know,

7  competitive products were all selling for so --

8  Q.  You had no idea what those products might be?

9  A.  What they might be?

10  Q.  Yeah.

11  A.  I knew there were other products out there, but I don't know

12  what those products were -- their price was on them.

13  Q.  Well, let's see what your response was to Mary Jo Giles.

14        You say:  "Mary Jo, if you would like we can discuss on

15      the phone.  I know the price per gram is higher compared to

16      Lipoderm."

17        Lipoderm is another base ingredient, right?  It's a

18  commonly used base ingredient, right?

19  A.  Yes, Lipoderm is a -- was a competitive product to

20  Sterabase.

21  Q.  She didn't tell you they were using Lipoderm, did she?

22  A.  When I talked to Matt Smith on the phone originally about

23  Sterabase, he told me that they were currently using Lipoderm.

24  Q.  So you go on to say:  "I know the price per gram is higher

25      compared to Lipoderm, but you have to take into account the

1          AWP difference as well.  See below a sample cost analysis

2          and ROI comparison on the use -- on the differences between

3          Sterabase and Lipoderm."

4              So you're going to lay it out for her?

5   A.  Yes, we did have a cost analysis information sheet that was

6   provided to us by Patient Care -- not Patient Care America, but

7   Pharmaceutica North America.  They were the manufacturer of

8   Sterabase.

9   Q.  And ROI means return on investment, correct?

10  A.  Yes.

11  Q.  So that means you're basically comparing how much money you

12  can make out of each dollar of investment, right?

13  A.  Something like that, yes.

14  Q.  If you have a better explanation, I'm happy to accept it.

15  A.  No, yours is fine.

16  Q.  Okay.  And what you do, then, is you lay out for Lipoderm,

17  it costs 50 cents per gram and the AWP, or what the insurance

18  companies will use, is $2.53.  So correct me if I'm wrong, for

19  each 50 cents that the pharmacy spends in costs using Lipoderm,

20  they're going to get $2.53 back from the insurance company,

21  right?

22  A.  Right.

23  Q.  And so you do the numbers for her, you do the math for her,

24  and you let them know that if they buy 20,000 grams of Lipoderm

25  they can expect to make $39,000, $39,400, right?

Grow - Cross

1    A.   Based on those numbers, yes, that's correct.

2    Q.   And then you run the numbers for her and do a similar

3    calculation for Sterabase.  It starts at the bottom of the page.

4    It continues on to the top of the next page.

5            Now, compared to Lipoderm, which was 50 cents per gram,

6    Sterabase costs five times as much for the pharmacy, $2.50 per

7    gram, correct?

8    A.   Yes.

9    Q.   But the payout is $12.93, way higher as well, right?

10   A.   Yes, it is.

11   Q.   So you do the math, and you did the math for her.  So for

12   every 20,000 grams of Sterabase that you use, making the same

13   products, but you use it and you get $208,600, right?  It's

14   math?

15   A.   Yes, it's math.

16   Q.   And you subtract what you would receive from Sterabase from

17   what you would receive for Lipoderm, and the difference is you

18   make about $170,000 more if you use the product that you're

19   selling, right?

20   A.   Yes.

21   Q.   Okay.  And they ordered Sterabase from you, didn't they?

22   A.   They did.

23   Q.   Lots of people ordered these drugs from you, right?

24   A.   Lots of pharmacies.  I think they had about 20 pharmacies

25   that ordered Sterabase from my sales group, yes.

1  Q.  And you said a number of times in emails and you've said it

2  here in court, that you have no control over the cost of the

3  drugs, and I think what you mean is you really have no

4  control or you're saying you have no control over the

5  reimbursements from the companies, from the insurance companies.

6  Is that what you mean?

7  A.  I had no control over any prices of any of it.  The prices

8  that were charged from the sales of Sterabase -- For instance

9  the cost of the product, I believe it said it was $2.50, I had

10  no control over that.  That was something that Pharmaceutica

11  North America, the company that produced the product, they set

12  those prices.  I had no control over the AWP.  That is something

13  that Pharmaceutica North America, I believe, would be in charge

14  of negotiating with the insurance companies.

15        So, yeah, I had no control over it.  It was simply a

16  product.  They tell me this is the price of our product that you

17  can offer it to pharmacies, and this is the average wholesale

18  price that you will show them so they can look at it and be able

19  to enter it into their system because for each claim they have

20  to put in the AWP, it was my understanding.

21  Q.  And that explanation I accept as true, but I want to ask,

22  when you say that you have no control over the reimbursements

23  from the insurance companies, it's not exactly true, is it,

24  because you're just explaining in that email you use one product

25  over another and you make $170,000, right?

1   A.   That's right.

2   Q.   So there's control over which products you choose and the

3   product you choose is the one that generates a whole lot of

4   money.  So there is control in that sense, correct?

5   A.   No, there's no control in that, because ultimately the

6   pharmacy chooses whether they want to use that product or not.

7   I don't control that and I don't control the price.

8           My job was to sell the product to as many pharmacies

9   that were willing to purchase it, and that's what marketers do.

10  So, yes, I was out selling a product to pharmacies, and this

11  pharmacy happened to be one of them.

12          MR. JUENGER:  And I would move to admit Government's

13  Exhibit 195.

14          THE COURT:  Any objection?

15          MR. RASHBAUM:  No objection, Your Honor.

16          THE COURT:  It will be admitted.

17     (Government's Exhibit Number 195 was received in evidence.)

18  BY MR. JUENGER:

19  Q.   And 195 is another email.  It starts at the bottom, from

20  you, Monty Grow, Friday, October 10th, to Matt Smith at PCA.

21  And who is Matt Smith again?

22  A.   He was the vice president and in charge of daily operations

23  at PCA.

24  Q.   And in this email -- well, I'll just read it for the record.

25          It says:  Matt, the other product we discussed is the

1        wetting agent ethoxydiglycol.  I'm sure your pharmacist will

2        be familiar with it.  It's an alternative to what you're

3        currently using.  Not only is it a good product, the

4        reimbursement on the AWP is advantageous."

5            And then it sets forth the ingredients, the codes, and

6   shows that the cost is $10 per milliliter and the reimbursement

7   through the AWP is almost $60, correct?

8   A.  Yes, that's correct.

9   Q.  And you explain to Mr. Smith that you can use up to 20

10  percent of the total volume of the RX.  That means if you made a

11  tube of cream, 20 percent of it could be this ethoxydiglycol,

12  correct?

13  A.  Yes.

14  Q.  And so, as you continue:  "48 milliliters for a 240 gram

15        med."

16            Again, you have just done the math, you said that for a

17  240 gram cream, you can include 48 milliliters of this

18  ethoxydiglycol, right?

19  A.  Yes, 20 percent.

20  Q.  And you further explain that this is a total of $2,832 for a

21  240 gram cream, right?

22  A.  That's correct.

23  Q.  That's a lot of money; do you agree?

24  A.  I do agree.

25  Q.  And it's $4,248 for a 360 gram med.  So you use

1  ethoxydiglycol that you're selling here with this AWP so high,

2  it generates a lot of money in reimbursements, correct?

3  A.  Yes, it does.

4  Q.  And we heard testimony from the lead pharmacy technician at

5  PCA and he said that, in fact, the pharmacy used this product

6  that you sold to Matt Smith at PCA, correct?

7  A.  Yes, I sold it to PCA.

8  Q.  And it was used in the creams for the scripts that you

9  referred to PCA, correct?

10 A.  I assume they were used in the scripts that anyone referred

11 to PCA.

12 Q.  You don't know that, though, do you?

13 A.  I don't know either way.  I don't know if they were or if

14 they weren't.

15 Q.  You know they were used in your scripts, though.

16 A.  I knew from time to time they were used in my prescriptions.

17 Q.  And the product that you sold here, it was known within PCA

18 as Ethoxy Gold, wasn't it?

19 A.  Not to my knowledge.  The only time I ever saw anything

20 referred to by that was one time when Armando Lozada ordered it

21 from me and said we're ordering Gold Ethoxy or something like

22 that, but they never said that to me.  Maybe that was an inside

23 thing with the pharmacy, but that was nothing that was ever

24 referred to me other than one email when he ordered the product.

25 Q.  Well, you heard the testimony of Mr. Lozada and he said that

Grow - Cross

1  in contrast to this Ethoxy that you sold, ethoxydiglycol -- this

2  came in one milliliter units, didn't it?

3  A.  Yes, it did.

4  Q.  In contrast to this that the pharmacy knew as Ethoxy Gold,

5  there was another Ethoxy Gold which was just regular old Ethoxy

6  Gold that he ordered from Medisca, correct?  That's what he

7  said, right?

8  A.  That's what he says, yes.

9  Q.  And he told the jury that he could buy it for pennies,

10 pennies, right?

11 A.  That's what he said, yes.

12 Q.  And he said that it reimbursed dollars, correct?

13 A.  I don't recall what he said it reimbursed, but I do recall

14 him saying that he could order it from Medisca.

15 Q.  He said dollars.  He did not say 2800 to $4,200, did he?

16 A.  I don't recall what he said to be honest with you.

17 Q.  And he said that he never, ever, in the time that he was

18 working at PCA, had a problem where he couldn't get the cheap

19 regular old Ethoxy that cost pennies and reimbursed dollars.

20 That was his testimony, was it not?

21 A.  I believe it was.

22 Q.  And in fact, yours, the Ethoxy Gold that you were selling,

23 that was the Ethoxy that was difficult to come by, was it not?

24 A.  I did not sell a product called Ethoxy Gold.  I sold a

25 product called ethoxydiglycol.

Grow - Cross

1  Q.   Right.   The one that we're looking at here on Government's

2  195 that cost $10 per milliliter instead of pennies and that

3  reimburses $60 instead of a single dollar, that's the product

4  that you sold, correct?

5  A.   That was the product that I sold.

6  Q.   And that's the product that you had a hard time coming by

7  when the pharmacy wanted more of it from you, correct?

8  A.   Yes.   It was only available in limited supplies.

9  Q.   Indeed, and if we continue reading the final paragraph, you

10      say to Matt Smith:  "We just need to keep it very quiet and

11      not let anyone know you're using it.   The manufacturer does

12      not sell it to outside pharmacies.   It's just like the

13      situation with the patch and that manufacturer.   If they

14      find out you're using it, they will shut down my inventory."

15          How many manufacturers can you name that make a

16  product, don't want anyone to know that they're using it,

17  they'll shut you down if you use their product?   How does that

18  happen, Mr. Grow?

19  A.   So when I found this product, I was talking to a man by the

20  name of Antoine Murani, and I was actually calling him in regard

21  to Sterabase.   He managed some pharmacies, I met him through

22  LinkedIn.   I called Mr. Murani to talk to him about Sterabase,

23  and in that process he told me about a product called

24  ethoxydiglycol, that he thought would be great if I could

25  represent it for him because he had some supply through his

1   medical company.  I believe it was called Mediport Medical

2   Supply.

3           He explained to me that it was a very exclusive product

4   and that the manufacturer of this product also owned pharmacies

5   and they felt like they had a superior product because they were

6   able to provide this in their medications.  He told me that he

7   could get some and obviously it was a superior product and that

8   we could use it, but he did not want anybody out there telling

9   everybody that they were using it because the manufacturer, who

10  also owned their own pharmacies, did not want competing

11  pharmacies to do the same thing.

12          I explained this in this email, it's the same thing

13  with the patch.  The company Pharmaceutica North America which

14  owns Sterabase also owned a therapeutic pain patch in which --

15  it was an exclusive product.  They did not want other

16  pharmacies -- even though they produced it, and they had their

17  own pharmacies, they did not want other pharmacies buying it

18  because they felt like it provided them an advantage out in the

19  market when they were calling on physicians and things like

20  that, that they would be able to provide them with a better

21  product and differentiate themselves from other sales

22  organizations.  So that was the meaning of that.

23  Q.  Is it fair to say that the creams, the scar cream and the

24  pain cream at PCA, that Ethoxy Gold was -- not Ethoxy Gold, I'll

25  use your term -- that the ethoxydiglycol that you sold was the

1   secret sauce in those ingredients?  Is that fair to say?

2   A.  I wouldn't say it was a secret sauce.  This was a product

3   that they could use, that was said that it was a superior

4   product and they chose to use it.  This is just one of the

5   pharmacies that I sold the product to that used it.

6   Q.  So explain to me how ethoxydiglycol is superior to the

7   ethoxydiglycol.

8   A.  It's not a matter of being superior.  It's a matter of

9   inventory.

10          When I talked to Antoine Murani, he told me that there

11   was no inventory available.  After speaking with this gentleman

12   about the product, because this is the first I ever heard of it,

13   I went back and I talked to two people.  One was Rick

14   Massengale, the owner of InforMD Solutions, and I asked him if

15   he had heard of this particular product and he told me that he

16   had and he was very familiar with it, although he said that it

17   was no longer available, that you could not get it.

18          As a matter of fact, Pharmaceutica North America, which

19   is the company that InforMD Solutions represented and they made

20   the Sterabase, he said that they were in the process of trying

21   to get their own private label on ethoxydiglycol and get their

22   own number, whatever that number is, to be able to produce it.

23          I also spoke with a man by the name of Eric Santos who

24   was interested in doing some marketing on the Sterabase and I

25   asked him about the product, if he had ever heard of it, and he

Grow - Cross

1    said absolutely, but the same thing, that you can't get it.  And

2    I told him absolutely that I could get it, that I spoke to a

3    gentleman on the phone and he said he could supply it, and he

4    said, well, if you can supply it, then I definitely have people

5    who are interested in purchasing it.

6    Q.   Before we leave InforMD Solutions and move on to your work

7    with Patient Care America, I want to ask a follow-up question.

8    When we first started this discussion about InforMD Solutions, I

9    reminded you that on your direct you said something like you

10   believed InforMD was very compliant with the laws because it had

11   a lot of lawyers.  You said something like that, right?

12   A.   That they talked about lawyers.

13   Q.   They talked about lawyers.  They were compliant because they

14   talked about lawyers?

15   A.   Yes.  There were situations that arose over the course of my

16   employment with them in which they said they needed to get

17   lawyer's permission, lawyer's approval, things of that nature.

18   Q.   So is it fair to say in your mind that lawyers equal

19   compliance --

20   A.   Well --

21   Q.   -- in your mind?

22   A.   In my mind, lawyers can help assist you in maintaining

23   compliance, yes.

24   Q.   And how many lawyers did your company, MGTEN, have?

25   A.   None.

Q.   Now, I want to talk about telemedicine a little bit.

You told us that that was one of the big differences between how InforMD Solutions worked and how your company, MGTEN, worked when you were with PCA, because they didn't use telemedicine and you did use telemedicine, correct?

A.   That's correct.  That was one of the changes.

Q.   And one of the companies that you used for telemedicine was called House Calls 24/7, correct?

A.   I did.

Q.   And I think you mentioned earlier today and you mentioned Friday during your direct testimony that it was a point for you to make sure to pay the consults upfront because you didn't even want the appearance that these were quid pro quo payments for scripts.  Is that fair or did I mess that up?

A.   Well, I don't think the words quid pro quo, or whatever, have ever come out my mouth, so I don't remember saying that, but I did talk about payments that were made to these telemed companies were generally paid upfront, but it had nothing to do with legality of anything.  When I was -- the first telemedicine company that I used was a company by the name of 1st Care MD, and it was their requirement that any vendor, such as myself, pay for consults upfront because they were not willing to issue you any type of financing I guess.  They wanted their money upfront.  They did not want a physician to go do consults and send over prescriptions to your pharmacy and then come back and

1   have a collection issue where you couldn't pay them for those

2   consults.  So they liked to collect their money upfront.

3        With the company House Call MD, they did not require

4   that.  They provided their consults, and on a weekly basis they

5   would then send an invoice every Monday, I believe, and ask for

6   you to pay for those consults.

7   Q.  And they asked you to pay for a consult, focusing only on

8   House Calls 24/7, they asked you to pay for a consult only after

9   it generated a script, right?

10  A.  No.  You paid for a consult whether a script was generated

11  or not.  So if a script was written, then that was considered a

12  consult.  If the doctor talked to the patient, and the patient

13  refused the medication, that was a consult.  If the doctor

14  talked to the patient and the patient was denied a prescription

15  because the doctor didn't deem it necessary, that was a consult.

16  If the doctor tried to get ahold of the patient, but was unable

17  to reach them and speak with them, then that patient was

18  canceled.  That was not considered a consult because there was

19  no patient/doctor interaction.

20  Q.  And you said that House Calls 24/7 would send you an invoice

21  on a weekly basis, correct?

22  A.  That is correct.

23  Q.  And you would then pay for consults whether there was a

24  script generated or not?

25  A.  That is correct.

 1  Q.  I'm going to show you --

 2          MR. JUENGER:  I'm going to offer Government's 205.

 3          THE COURT:  Any objection?

 4          MR. RASHBAUM:  No objection, Your Honor.

 5          THE COURT:  It will be admitted.

 6      (Government's Exhibit Number 205 was received in evidence.)

 7  BY MR. JUENGER:

 8  Q.  And this is an email from Larry Speir.  He is the fellow who

 9  ran House Calls 24/7, correct?

10  A.  Yes.

11  Q.  And it's to you, Monty Grow, and it says:  "Here's your

12      invoice for last week.  Let me know when you initiate

13      payment."

14          So it's clear you didn't pay in advance for these

15  consults, correct?

16  A.  Not with this company, no.

17  Q.  And you turn the page and it lists 15 consults and it lists

18  the names of 15 patients, correct?

19  A.  That's correct.

20  Q.  And all those patients got scripts, didn't they?

21  A.  I couldn't tell you off of the top of my head whether they

22  got scripts or not.  It says they got consults.

23  Q.  But at the time you would have known that you got scripts

24  for all of those, correct?

25  A.  No, I would not because some of these patients are mine and

1   some of them were Ginger Lay's and I did not have total access

2   to Ginger Lay's patients.  I would have to go research them one

3   by one, so --

4   Q.  You sent all the scripts to the telemedicine companies for

5   Ginger Lay, correct?

6   A.  No, I did not.

7   Q.  And you sent all of the scripts that were generated to PCA,

8   did you not?

9   A.  Only for patients that were submitted by me.  So I had

10  separate portals.  When it came to telemedicine, Ginger Lay

11  provided her own stuff to 1st Care MD and she had her own fax

12  number in which the prescriptions would be faxed over so they

13  could keep track of.  They did not come to me and then me to the

14  pharmacy.  They went directly to her.

15          And I believe it was the same way with House Calls.  I

16  am not positive on that.  House Calls did not have an online

17  portal like 1st Care MD did.  1st Care MD had an Internet

18  website in which you would upload the patient's information by

19  scanning the documents, and it would upload into it.  So it was

20  a little bit more high tech, I guess, whereas House Calls did

21  not have that situation.

22          I do see on here that on the page before that, it was

23  talking about a Ms. Dimmick.

24  Q.  And?

25  A.  Can I see the other page?  There was something.  Oh,

Grow - Cross

101

1    Ms. Bland, I'm sorry.  So, yeah, where it says that the

2    patient, they couldn't get ahold of, and so I don't think she's

3    on there.  If you flip back to the other page.

4    Q.  Yeah, she's not on there.  She didn't get a script.  They

5    couldn't get in touch with her.

6    A.  Yeah, that's not a consult.  They weren't able to get ahold

7    of her, so that is not a consult.  So she was not charged for

8    it.  That's one of the examples that I went through I believe.

9    Q.  So you don't know -- your testimony is that you don't know

10   if there were scripts generated for all these 15 people that 15

11   consults were paid for.  You don't know that; is that your

12   testimony?

13   A.  My testimony is, when I received this document, he's billing

14   me for 15 consults.  It does not give the result of that consult

15   right there.  With the other company, 1st Care MD, I would have

16   access to that.

17   Q.  I don't mean to cut you off, but let's just talk about this

18   company.  I don't want to conflate the two.

19   A.  Okay.

20   Q.  And so you're saying that he sends you a bill for 15

21   consults and you're saying that you don't know at the time

22   whether a script is generated or not?

23   A.  On my particular patients that are on this list of 15, I

24   would have that access.  With Ginger's patients, I would not.

25   Q.  But you ultimately received compensation for Ginger's

1    patients, right?

2    A.  Yes.  Every two weeks there was a commission that was paid,

3    but at this particular time you will see these consults were all

4    done in one week, let's say Monday through Friday, and then on

5    Monday, they were sent to me to be paid for the consults.  I

6    would not receive a commission statement for another week and a

7    half to know if those people actually received prescriptions.

8    Q.  But it is true that House Calls 24/7, they emailed the

9    script back to you and you sent it to the pharmacy?

10   A.  I don't recall.  They may have to me.  I don't know if they

11   sent them all to me or if they sent just mine or Ginger's.  I

12   can't remember exactly who was sent what.

13   Q.  Okay.  Well, we'll get to that in just a moment.

14           I want to show you what has been previously admitted as

15   Government's Exhibits 104, which is a composite, 106, which is a

16   composite, 107, which is a composite, 108 and 109, which are all

17   composites, and I have them here.  Let's just look at the first

18   one, and that is Government's 104.

19           This is from you to Larry Speir, correct?

20   A.  Yes.

21   Q.  And in the subject line it's MGTEN prescriptions, and then

22   it has attachments which are PDFs of scripts for Joy Bing,

23   Oliver Thomas, and Vidal Bing.  Do you see that?

24   A.  I can't see it, but if you dropped it down a little bit, I

25   could.

1    Q.   Oops, my bad.

2    A.   Yeah, I see it.

3    Q.   Okay.  And this is what you would send to Mr. Speir as a

4    consult, correct?

5    A.   Yes, that's correct.

6    Q.   So the idea is that Mr. Speir will farm this out to one of

7    his telemedicine doctors and they will do what they have to do

8    and they'll do a consult and they'll generate a script or they

9    won't generate a script, but you're going to pay for it anyway?

10   A.   That is correct.

11   Q.   And so just turning to look at the Patient Profile for the

12   first one of these that's sent in, tell us what the patient's

13   name is.

14   A.   I do not know right now.

15   Q.   How come you don't know?

16   A.   Because it's not written there.

17   Q.   There's nothing on this Patient Profile, is there?

18   A.   There is not.

19   Q.   And then we turn the page and it lists several sort of -- I

20   guess this is like a guide.  It says guide, Non-Narcotic

21   Compounding Guide, and it lists p-01, 02, 03, 04, sc-01.  It

22   lists the different types of compounded drugs that are on your

23   prescriptions, right?

24   A.   Yes, this was a sheet showing them basically what was

25   available.

1  Q.   And then we turn the page, and for the record it's MG

2  122471, this is the actual prescription filled out for Joy Bing,

3  correct?

4  A.   That is correct.

5  Q.   And I'm not going to read it into the record, but it

6  contains her address, her contact info, her Social Security or

7  her Tricare number, and all of her personal information,

8  correct?

9  A.   Yes.

10  Q.   And it also has a check box.  The box is checked for p-01,

11  transdermal cream, correct?

12  A.   That is correct.

13  Q.   The box is checked for sc-01, transdermal scar cream,

14  correct?

15  A.   Yes.

16  Q.   The box is checked for general wellness, whatever that says.

17  That's the metabolic wellness vitamin, correct?

18  A.   That is correct.

19  Q.   The box is checked for 360 grams, correct?

20  A.   Yes.

21  Q.   And the box is filled out 3 for the number of refills,

22  correct?

23  A.   That is correct.

24  Q.   And all that's missing for this prescription to be

25  effective, to be valid, to be used for Tricare to pay out tens

Grow - Cross

105

1  of thousands of dollars, of which you received $13,500, is a

2  signature, correct?

3  A.  It looks like there's some other information that's there

4  that needs to be filled out but --

5  Q.  What is that information?

6  A.  It's all the doctor's information.  So a physician would

7  have to call this patient, talk to them, do a consult, and

8  decide whether or not to write a prescription.

9  Q.  No, sir.  All the doctor has to do is sign this script for

10 it to be effective, correct?  Correct?

11 A.  I imagine if the doctor chose to sign this, then I guess it

12 would be valid.

13 Q.  And how much did you pay for the consult that underlies this

14 profile and prescription that you sent in to House Calls 24/7?

15 How much did you pay?

16 A.  Consults were $75 with that company.

17 Q.  So basically $75 for a signature for this to be effective?

18 A.  No.  It was $75 for the physician to call and talk to the

19 doctor -- or to talk to the patient.  As a matter of fact, with

20 this company, the reason that you see that it's blank up above

21 is because when we originally started, we did this the same way

22 with the other company.  We filled out the information that was

23 asked of us.

24         If you flip back to the other page, I could show it to

25 the jury and talk to them on what I'm referring to.  So we would

1  fill out the information --

2  Q.  Can I stop you just for a second just so I can make the

3  record clear that what I'm showing you is MG 122469.  Just so

4  the record is clear about what you're describing.  Go ahead.

5  A.  So this is the Patient Profile Form and, like I said, we

6  used two different companies.  And even when we first started

7  with House Calls, this was the second company that I used, we

8  did it the same way.

9         We would fill out a request for consult time if the

10  patient had one, which made it convenient for them, whether or

11  not they were working or how late they stayed up, things like

12  that.  We would give their name and their phone number and any

13  allergies, any surgeries they might have had, and what ailments

14  in the comments area of -- if they were having pain or if they

15  were having scars or a desire for any type of medication, and

16  then also we would circle the area of the pain, the scar

17  location.  The fungus area, we did not market any fungus.  And

18  then we would provide this to the telemedicine company.  With

19  1st Care MD, we would load it up into the portal through

20  scanning it, and with this company, House Calls, we actually

21  faxed it to them.

22         When we started with House Calls, that's how the

23  process was done.  At some point in time, I received an email

24  from the owner of House Calls, Larry Speir, and he suggested

25  that I do it a different way.  And what he wanted me to do was

1    basically collect almost like -- I felt like a physical

2    examination of the patient.  He said in his email, I believe the

3    reason he wanted this done was because sometimes this company,

4    what they would have is like a nurse practitioner call the

5    patient, but with the limited amount of information that I was

6    using, he said that the doctor would probably have to call the

7    patient every time as well, and so he wanted me to collect more

8    information so possibly the doctor didn't need to call the

9    patient himself after the nurse practitioner talked to them.

10          So I told Mr. Speir that I wanted the doctor to call

11   the patient every time and not just a nurse.  So what I chose to

12   do was do exactly opposite of what he told me, which he wanted

13   me to provide additional information, so the doctor may not feel

14   complied to call the patient.  So I did exactly the opposite.  I

15   gave him less information.  That way the doctor would have to

16   call the patient every time because I didn't just want a nurse

17   talking to them, but I wanted the physician talking to them as

18   well.  So that's why I made the change here and did not fill out

19   this Patient Profile Form.

20   Q.  Okay.  And we went over the first prescription in that group

21   and the prescriptions themselves, they all were marked p-01,

22   s-01 [sic], wellness vitamin, 360 grams, and three refills,

23   correct?

24   A.  That's correct.  That's what that particular patient was

25   requesting.  They said that they had pain, they had a scar, and

Grow - Cross

1  they had a desire to possibly take a metabolic vitamin.

2  Q.  I'm going to hand you, Mr. Grow, the rest of the documents

3  that I listed out earlier.  It was 104, 106, 107, 108, 120, 109,

4  and I just want you to take a look at those and tell me which of

5  those don't follow the same pattern of having those three drugs

6  marked, having 360 grams, and having three refills.

7  A.  Yeah, it looks like the vast majority have all of those

8  checked, that they were requesting the pain, the scar, and the

9  vitamin.  Vast majority, yes.

10 Q.  You said vast majority.  Were there some in there you saw

11 that weren't that way?

12 A.  Yes, I believe I saw a patient, Iliana Harris, that was not

13 requesting a specific medication.

14 Q.  I know you looked at it then.  Isn't it true that you

15 received information that doctors were not always calling the

16 patients?  Correct?

17 A.  This particular person, the owner of House Calls, told me

18 that sometimes it was just a nurse practitioner that was calling

19 the patients and then they would report to a doctor, and that

20 doctor, based on what that nurse practitioner told them, would

21 sometimes decide that they had enough information that they

22 could write a prescription.  Other ones, you know, did it

23 themselves.  I believe the nurse practitioners could even write

24 scripts.  I don't know exactly, but the situation with them was

25 that sometimes a nurse practitioner would call the patients and

1    then report to a doctor, yes.

2    Q.  And so it's your understanding then, that if a patient

3    reported that they hadn't spoken to a doctor, that it's your

4    understanding that that means they spoke to a PA, but not a

5    doctor, but they spoke to somebody?  Is that your testimony?

6    A.  Yeah, that would be my testimony.  I never recall anybody

7    saying to me personally I didn't speak to a doctor.

8    Q.  But I'm going to show what's been previously admitted as

9    Government's 125.  And do you see this -- it's a little fuzzy,

10   but it will clear up -- where it says -- this is someone from

11   the pharmacy contacting you, correct, Ralph Louis?  I think you

12   said he was assigned to sort of help shepherd your patients; is

13   that right?

14   A.  Yes, that's correct.

15   Q.  And he's saying in the part where I've highlighted that a

16   patient, Windy Bailey, is refusing the product until she speaks

17   with a doctor, correct?

18   A.  Yes.

19   Q.  And did you follow-up with patient Windy Bailey?

20   A.  I don't recall.

21   Q.  You don't recall?

22   A.  I mean, I would think that I would, but I don't recall this

23   particular situation, no.

24   Q.  So is it your testimony that in a circumstance in which --

25   clearly the pharmacy has a prescription for Windy Bailey,

 1  correct?

 2  A.  Yes.

 3  Q.  And she's saying she doesn't want to get the product until

 4  after she speaks to a doctor, correct?

 5  A.  Until she speaks with a doctor, yes.

 6  Q.  And you would agree with me that there should be no

 7  prescription unless a doctor actually spoke to the patient?

 8  A.  Well, when I read this, it doesn't necessarily say that she

 9  hasn't spoken to a doctor.  She says she wants to speak to the

10  doctor.  I could read this and say she wants to speak to him

11  again.  Maybe she has already spoken to him and she wants to

12  reconfirm something.  I wouldn't know just by reading this.

13  Q.  That's a fair point, but that's not my question.  My

14  question is:  You agree that there should not be a prescription

15  for a patient unless the patient spoke to a doctor.

16  A.  I agree that the doctor is responsible for signing every

17  prescription, and he should follow the proper protocols that

18  doctors are required to do if he signed this prescription.

19  Q.  And so if the doctor didn't speak to the patient, the doctor

20  should not be writing a prescription for the patient.

21  A.  I'm not a doctor, and I don't know their particular laws on

22  what is required and what is not required, but I would assume

23  that he is a physician and he knows the proper laws that he must

24  take, and so he should be following those and if he signed a

25  prescription, then he should be following those particular laws.

Grow - Cross

111

1  Q.  You do recall that we heard from witnesses in this very

2  trial last week who said they received prescriptions and they

3  never spoke to a doctor; is that correct?

4  A.  I think I recall some saying they were never examined by a

5  doctor.  I don't recall saying they never spoke to one.  It may

6  have happened.  I don't remember every bit of everyone's

7  testimony, but I do remember people saying they were never --

8  you asked them if they were examined by a doctor.  So, yeah,

9  they did not have a face-to-face exam with a doctor.

10  Q.  Well, I never used the word "examination," but the jury will

11  use its best recollection.

12         MR. RASHBAUM:  Objection, Your Honor, no question.

13         THE COURT:  All right.  Sustained.  Let's just ask

14  questions.

15         How much longer do you think you have?

16         MR. JUENGER:  Not too long, Your Honor, I would think

17  half an hour.

18         THE COURT:  All right.  You okay?  Everybody all right?

19  I'm looking at the jurors.  They all nod up and down.  All

20  right.

21  BY MR. JUENGER:

22  Q.  Now, in addition to House Calls 24/7, you also used a

23  company called 1st Care MD for telemedicine services, right?

24  A.  I did.

25  Q.  And I believe it was Mr. Rashbaum introduced Government's

Grow - Cross

1   Exhibit 190.  Do you recognize this?  Is this what we looked at

2   Friday?

3   A.   This is the portal that I was referring to earlier in which

4   we could upload Patient Intakes so then they could go to the

5   telemedicine network, who would then distribute them to their

6   physicians to do consults for patients.

7   Q.   And this has some summary data on the top screen, correct,

8   that I'm indicating with my pen here?  Do you see that?

9   A.   Yes.

10  Q.   And it shows that there were 673 uploads, correct?  That

11  means you or someone on your behalf uploaded these profiles and

12  prescriptions on to the system, right?

13  A.   That's right.

14  Q.   And it shows over here that there were actually 673

15  consultations done, which makes sense.  Everything you sent in

16  got some sort of consult, correct?

17  A.   Not everything but, yeah, it looks like there were 748

18  uploaded and there were 673 consults.

19  Q.   And more importantly, down here it shows what happened to

20  those prescriptions that were uploaded, right?

21  A.   That's correct.

22  Q.   And so of the total, 624 of them were scripted, the doctor

23  signed the script, correct?

24  A.   Right.

25  Q.   And 20 of them were denied, right?

1    A.   Right.

2    Q.   I mean, that's what it says.  And 29 were refused, and

3    refused just means that no consult was done because the patient

4    didn't want it or what have you?

5    A.   No.  Refused means that the physician spoke with the

6    patient, and after consulting them, that the patient decided

7    that the prescription medication was not right for them and so

8    they refused it.

9    Q.   Okay.  And I understand that, right.  The point here that 20

10   were denied is important in a way because it proves that you

11   weren't doing quid pro quo, right?  If all you did was pay for

12   scripts, right, then doctors would never deny it, they'd just

13   sign every script, right?

14   A.   Possibly, yes.

15   Q.   But let's look at what actually happened here.  And I don't

16   have a calculator, so I'm not going to be able to do this for

17   the jury.  You can all do the math on your own.

18        But if you take the total number of scripts that were

19   sent in and divide by the -- or if you take the number that were

20   scripted, 624, and divide by the number of net uploads, it

21   results in a 93 percent success rate for you; isn't that right?

22   I mean, again, you don't have a calculator in front of you, but

23   do you dispute that it would be 93 percent?  It's a high rate.

24   A.   Yeah, there's a high rate of prescriptions being written.  I

25   would assume that to be because the patients that were being

1    submitted needed the medications.  We were talking to patients

2    who had pain, who had scars, and had a need for a vitamin.

3    These medications were non-narcotic, non-addictive, and they

4    consulted with a physician who deemed it necessary for them get

5    them.

6    Q.  And just as another way to calculate, right, these were

7    refused, so you can't blame that on the doctor, right?  I mean,

8    that's the patient's decision.

9    A.  I wouldn't blame anything on anyone here.

10   Q.  Well, I just want to know what numbers to use for my math.

11   So if we take out the 29 refusals, then our math is 624 divided

12   by 644 and the success rate goes up even higher, to 97 percent

13   success rate.  Not quite 100 percent, but pretty close, right?

14   A.  It's a high rate.

15   Q.  Have you ever been to Vegas?

16   A.  I have.

17   Q.  What's your game?

18   A.  Blackjack.

19   Q.  I'm a craps guy, but I want to ask you this:  If you went to

20   Vegas and they had a slot machine where you put a dollar coin

21   in, you pulled the handle and you won 97 percent of the time,

22   would you keep playing blackjack?

23   A.  Yes.  I can't stand sitting in front of a slot machine all

24   day.

25   Q.  Good answer.  You're a businessman, right?

Grow - Cross

1  A.   Yes, I am.

2  Q.   And you did all of this, you told us on your direct you did

3  this to make money and that's the American way, right?

4  A.   Absolutely.  I had a business and I was trying to earn a

5  living, yes.

6  Q.   And as part of any business, you have some expenses and one

7  of those was telemedicine, right?

8  A.   Yes, in this business telemedicine was an expense.

9  Q.   If you had a 100 percent rejection rate on these scripts

10 this would have been a bad business, right?

11 A.   Yes.

12 Q.   And so as a business man, understanding how all of this

13 works, what your costs are, what your profits are, what the

14 expenses are, how many scripts out of a hundred did you need to

15 be approved in order to cover your expenses?  In business they

16 call that the breakeven point, right?

17 A.   That's correct.  I never broke down the math but, yeah, I

18 think every business has expenses and breakeven points and this

19 was one of them.

20 Q.   And the answer to my question of how many scripts out of a

21 hundred that you would need to prove in order to at least break

22 even is two scripts, right?  Because two scripts puts over

23 $27,000 in your pocket, right?  We agreed earlier that it was

24 around 13,500 for one script.  Two scripts is 27,000.  And that

25 easily covers 100 consults, right?

1  A.  It depends what was written on each one of those scripts.

2  But, yes, if all three were written as you're suggesting, then

3  it would be two, yeah, that would cover the cost.

4  Q.  And as we just determined, in this case you received upwards

5  of 93 or 97 percent, which is 93 to 97 scripts out of a hundred.

6  A.  Yes.

7  Q.  And you didn't really have any other expenses to speak of,

8  did you?

9  A.  Not a whole lot.

10  Q.  You didn't create any marketing materials, did you?

11  A.  I did not.

12  Q.  You used the ones that you took from InforMD Solutions,

13  right?

14  A.  Yes, I did.

15  Q.  And you paid directly -- from what you were paid, you paid

16  directly percentages to your sales reps and to the patients'

17  sales reps, correct?

18  A.  I did.

19  Q.  And other than that, you didn't really have any expenses,

20  did you?

21  A.  No.

22  Q.  Now --

23  A.  I thought that was great.

24  Q.  I'm sure you did, I'm sure you did, but I want to switch

25  gears a little bit and ask you about a witness who testified by

1    the name of Josie Brundige.  Do you remember her?

2    A.  I do.

3    Q.  And she testified that she ordered a pain cream.  Do you

4    recall that?

5    A.  I do.

6    Q.  And she testified that she ordered a pain cream because she

7    had some back pain.

8    A.  Yes, I heard that testimony.

9    Q.  And she said that she was offered some money to be able to

10   order these and participate.  Do you remember that?

11   A.  I don't believe she was offered anything for her to order a

12   script, no.

13   Q.  But nonetheless, she said that there was some offer of

14   money, she may not have gone into any detail, correct?

15   A.  No, I don't recall her saying she was offered anything to

16   get a prescription.

17   Q.  And we showed that Josie Brundige -- her script did get

18   authorized and it paid out for pain cream, scar cream, and a

19   vitamin, and I think she testified that she got all three of

20   those, right?

21   A.  That is correct.

22   Q.  And that would mean that you received approximately $13,500

23   each month for those drugs, correct?

24   A.  Give or take, yes.

25   Q.  And the thing is, she testified that she has no scars.  So

1    she should not have received a scar cream and you should not

2    have been paid for that scar cream.  Do you agree with that?

3    A.  If that's what she says, then a scar cream should not have

4    been written for her.  I believe she also testified that the

5    pain that she was having was in her back, but on the form that

6    she filled out she said the pain was in her knee, so --

7    Q.  So what?

8    A.  It's a little bit conflicting as well.

9    Q.  So I want to ask you -- we'll get to the actual documents.

10   But she testified under oath that she told Eleanor Alley, who's

11   Sven Bjerke's aunt, that she didn't have any scars.  That's what

12   her testimony was.  Do you remember that?

13   A.  Yes.

14   Q.  And Sven Bjerke testified that he wrote down the information

15   that he was given, and it was that when it came to scars, she

16   had zero.  Do you remember his testimony?

17   A.  I do remember his testimony.

18   Q.  And I want to know if you'll agree with me that a lady who

19   admits she has no scars does not need scar cream.

20   A.  That would be correct.

21   Q.  And I want to show you -- this is Government's 77, which is

22   the Intake Form, intake information that Sven Bjerke sent to you

23   for this woman, Josie Brundige.  Do you see it?

24   A.  I do.

25   Q.  And if we look at what Sven Bjerke sent you, it says

1  location of scar, zero.  It says she still wants a scar cream,

2  but I think we just agreed that a woman who does not have scars

3  does not need a scar cream.

4  A.   That's correct.

5  Q.   And yet, if we look at the prescription for Josie Brundige,

6  she's got the trifecta; pain, scar, and wellness vitamin,

7  correct?

8  A.   Yes, all three are checked.

9  Q.   And how did that happen?

10 A.   When I received this Intake Form, I read the same thing you

11 just read, zero, still wants scar cream, and I had questions

12 about it.  So I called Sven Bjerke's manager, who is Ryan Long,

13 and I told him that I had received this and that it did not make

14 sense and that I was not going to submit this patient to the

15 physician network.

16      He said that he would get to the bottom of it.  He

17 contacted Mr. Bjerke, he informed him that this patient would

18 not be submitted.  Mr. Bjerke then told him that he would find

19 out what the situation was.  He then returned my call, Mr. Long

20 did, and told me that he had spoken with Mr. Bjerke and

21 Mr. Bjerke said that, in fact, the patient had pain in her knee

22 as well as a scar on her knee and that she needed a scar

23 medication and was requesting it.

24      So I then uploaded this form to the doctor network for

25 the doctor to talk to her about the pain and the scar, as well

Grow - Cross

1  as the vitamin.

2  Q.  But in truth, no one called Josie Brundige?

3  A.  I have no idea who called Josie Brundige or if they called

4  her or not.  I didn't speak with the patients.

5  Q.  Why didn't you call Josie Brundige?

6  A.  Because she's not my patient.  I have no relationship with

7  her.  The people that were responsible for handling the patients

8  were the actual sales representatives.  So in this case, I

9  called the sales representative that is responsible for Sven

10  Bjerke, who is Ryan Long.  That's his direct managers, so I

11  called him to have him handle the situation.

12  Q.  So you only spoke to Ryan?

13  A.  That is correct.

14  Q.  And you are saying that Ryan told you he called Sven?

15  A.  Yes, he did.

16  Q.  Sven never testified to that, did he?

17  A.  I don't know if he was asked.

18  Q.  No one asked?

19  A.  I don't know.  I don't recall.

20  Q.  And whatever happened, they didn't speak to Josie Brundige,

21  did they?  You can tell from looking at this, can't you?

22  A.  How can I tell from looking at that?

23  Q.  Well, you saw Josie Brundige on the stand, didn't you?

24  A.  I did.

25  Q.  Josie Brundige is not a man by any stretch of the

1    imagination?

2    A.   No, she is not.

3    Q.   And so this was put on here fraudulently?

4    A.   I think there's just an S missing.  Kind of like you said

5    before earlier, there was a question you had and you said, oh, I

6    bet it was not "fro," but it's "for."  I mean, people make

7    mistakes, you know, don't put "she" and accidentally put "he."

8    Q.   And what about the scarring on the knees, was there an S

9    missing out this, because she testified that she had no scars on

10   her body?

11   A.   Like I said, I was informed that she did.

12   Q.   And the fact that this is mistaken inures to your financial

13   benefit, does it not?

14   A.   Could you repeat that?  It what, my financial benefit,

15   "errs"?

16   Q.   It goes to your financial benefit.  You make money from this

17   order of scar cream that this woman does not need, correct?

18   A.   Had I known she did not need it, it would not be submitted.

19   However, if she did get a prescription after speaking with a

20   physician, who orders it for her after discussing with her her

21   ailments, if there was a prescription written, then, yes, I

22   would receive compensation for it.

23   Q.   Mr. Grow, you have forged documents in the past, have you

24   not?

25   A.   What do you mean, forged?

1   Q.  I mean signing someone's name without their authorization or

2   consent.

3            MR. RASHBAUM:  Objection, Your Honor.

4            THE COURT:  I don't know.  How much longer do you think

5   you have?  I'm not limiting you.  I'm merely inquiring.

6            MR. JUENGER:  15, 20 minutes.

7            THE COURT:  You know what?  Why don't you -- I always

8   say a time and it never ends up being the right time anyway, so

9   let me give you extra time.  1:15, all right?  Don't talk about

10  the case.  Take your notebooks into the jury room, and we'll see

11  you at 1:15 hopefully.  Okay?

12           THE COURT SECURITY OFFICER:  All rise for the jury.

13     (The jury retired from the courtroom at 11:58 a.m.)

14           THE COURT:  Let me hear that door.  There we go.

15           Thank you.  Okay.  Please be seated.  Where are we

16  going?  What is the fraudulent thing?

17           MR. JUENGER:  Well, Your Honor --

18           THE COURT:  Why don't you use the lectern to make the

19  court reporter happy.  If she's happy, I'm happy.  I'm not happy

20  with that.

21           What?  Where are we going?  What are you going to ask

22  him?  What is the fraudulent document?

23           MR. JUENGER:  In 2014, I believe August of 2014,

24  Mr. Grow signed a legal document, a Marital Settlement Agreement

25  with his wife, in which he admitted that he had forged her name

1    on their income tax returns.  She didn't know about it.  It

2    ultimately caused $150,000, more or less, in liability, tax

3    liability.  And they set forth in the agreement -- he explained

4    what he had done, that she was not responsible, and therefore,

5    she would not have any of this liability as they ended their

6    marital relations.

7              So this document clearly has been messed with.  The

8    story is --

9              THE COURT:  Which document are we talking about?

10             MR. JUENGER:  The document we were just talking about.

11             THE COURT:  Okay.  But you have to be clear.

12             MR. JUENGER:  Josie --

13             THE COURT:  Hold on, hold on.  The document that we're

14   talking about is one related to this case?

15             MR. JUENGER:  Correct.

16             THE COURT:  Does it have an exhibit number?

17             MR. JUENGER:  It does.

18             THE COURT:  What is it?

19             MR. RASHBAUM:  77 I think.

20             MR. JUENGER:  I'm told it's 77, Your Honor.

21             THE COURT:  All right.  Hold on a second.  I don't

22   think there's any objection to 77.  The issue is whether you can

23   bring in -- and he admitted that he fraudulently did it where?

24   How do you know it was fraudulent?

25             MR. JUENGER:  It's an admission that he made in a

1    Marital Settlement Agreement that was filed in State court in

2    his divorce action.  I do not --

3              THE COURT:  But how was the admission made?

4              MR. JUENGER:  Well, it's in the Marital Settlement

5    Agreement.  It sets forth what he did.  He signs that document.

6              THE COURT:  The Marital Settlement Agreement says, I

7    forged my wife's signature because she was not responsible.  It

8    says that?

9              MR. JUENGER:  In so many words it does, Your Honor.

10             THE COURT:  Well --

11             MR. JUENGER:  I'm happy to send a copy up to you if you

12   want to see it.

13             THE COURT:  All right.  Tell me what it says.  That way

14   we know what we're talking about.

15             MR. RASHBAUM:  Tell me what it says, too.  What number

16   is it?

17             MR. JUENGER:  It's 196, but we are not trying to

18   introduce it.

19             MR. RASHBAUM:  I've never seen it so --

20             THE COURT:  They're talking to each other.  When they

21   talk to each other, you don't have to take it down.

22             What is the part that says I committed a fraud?

23             MR. JUENGER:  It's paragraph 11, Page 6 --

24             THE COURT:  Okay.  Quote, give me the quote.

25             MR. JUENGER:  -- of the Marital Settlement Agreement.

1          It says:  "The parties are jointly obligated for a debt

2     owed to the IRS in excess of $140,000 for a joint Federal

3     Income Tax Return that was filed for the 2010 tax year.  The

4     husband freely and voluntarily admits that he met with an

5     accountant of his choice and completed the tax return,

6     signing the return himself and signing the name of the wife

7     without her knowledge or consent.  The wife had

8     independently earned very minimal income during that year.

9     The husband had earned all of the income from his businesses

10    and other investments, and the wife had no knowledge

11    whatsoever of the sum of money earned and reported by the

12    husband.  He handled all the finances and investments, and

13    the wife had no knowledge of any taxes due as the husband

14    did not show her any income or business records or speak

15    with her about his business income."

16         THE COURT:  What are you going to tell the jury that

17 that means?

18         MR. JUENGER:  Well, I'm asking --

19         THE COURT:  No, no.

20         MR. JUENGER:  I'm not going to tell the jury --

21         THE COURT:  My mic, again, it goes off when I ask

22 questions.  I don't know why.

23         What are you going to tell the jury that this means,

24 that he signed for his wife the income tax return and thus that

25 he's mostly responsible for paying the taxes since he signed it?

1          MR. JUENGER:  I don't need to go into anything about

2    the taxes.

3          THE COURT:  So you want to ask him a question and

4    you're not going to talk to the jury about it?

5          MR. JUENGER:  Not necessarily.

6          THE COURT:  Then there's no point in admitting it, is

7    there?

8          MR. JUENGER:  I assume he's going to be honest and

9    admit that in the past he has done that.  He can explain it to

10   the jury.

11         THE COURT:  He probably will.

12         MR. JUENGER:  And then we'll move on.

13         THE COURT:  And he probably will just like he did about

14   the home because he has already told the jury that his wife,

15   according to him, was irresponsible.  So that means what in this

16   case?

17         MR. JUENGER:  I just think that this is --

18         THE COURT:  Doesn't really mean that much, does it?

19         MR. JUENGER:  Well, there is strong suggestion that the

20   pertinent documents for this case have been tampered with as we

21   just discussed, Your Honor.

22         THE COURT:  Well, you can argue that to your heart's

23   content and you can ask him that.  The issue is when a

24   defendant, or any witness, is on the stand, can he be impeached

25   by signing an income tax form for his wife, especially since you

 1   never asked any of the jurors whether they have done that.  I

 2   don't know.

 3          MR. JUENGER:  That's a good question.

 4          THE COURT:  It is a good question.  So before you

 5   really want something, you have to discuss within your

 6   colleagues and your mind, is this really the big thing or it

 7   doesn't really mean anything.  It seems even before hearing from

 8   defense, that you're saying it's not that big of a deal because

 9   I'm not even going to argue to the jury that this means he

10   committed a fraud in this case, because in reality, it doesn't

11   really mean that, does it?

12          MR. JUENGER:  It's simply impeachment in the sense that

13   the jury is -- I believe when they hear him admit, as he

14   certainly must, that he signed his wife's signature --

15          THE COURT:  It shows that he committed healthcare fraud

16   and gave kickbacks and received kickbacks?

17          MR. JUENGER:  It --

18          THE COURT:  This is in a divorce.

19          MR. JUENGER:  However slightly, I believe it does

20   undermine his credibility on that point.

21          THE COURT:  All right.  Who's this young lady back

22   there?  Who are you?

23          A SPECTATOR:  A spectator.

24          THE COURT:  Are you in shorts?

25          A SPECTATOR:  Yes.

Jury Trial

128

1          THE COURT:  Then you have to leave the courtroom.

2          All right.  I'm starting to get a little tougher on

3    that.  When I had to do it to a prosecutor, I should do it to

4    someone who is not a prosecutor, shouldn't I?  It's only fair.

5          All right.  I am sorry.

6          MR. JUENGER:  Your Honor, I only felt that -- and I

7    believe, under 608(b), I can inquire.  I don't intend to

8    introduce, I am stuck with his answer, and then I'll move on.

9          THE COURT:  Let's find out.  What's the objection?

10          MR. RASHBAUM:  First of all --

11          THE COURT:  This is the biggest deal in the world.

12          MR. RASHBAUM:  First of all, there's been no 404(b)

13    notice, so I didn't even know what he was doing.

14          THE COURT:  There's no what?

15          MR. RASHBAUM:  There was no 404(b) notice in this case,

16    Your Honor.  This was never noticed up.  All I heard is that

17    there's a forgery --

18          THE COURT:  Well, he didn't try to introduce it in his

19    case in chief, number one.  Number two, he doesn't even want to

20    introduce it, he just wants to ask under 608(b), just like you

21    could ask Government witnesses.

22          MR. RASHBAUM:  It's highly prejudicial and it still

23    needs a 404(b) notice.

24          THE COURT:  It needs a what?

25          MR. RASHBAUM:  A 404(b) notice.

 1             THE COURT:  I don't think so on cross-examination, but

 2   it doesn't matter.  What would you do if you knew about it?

 3             MR. RASHBAUM:  Well, I might have called his wife to

 4   testify.

 5             THE COURT:  Oh, I'm sure she would have been a great

 6   witness for him, right?

 7             MR. RASHBAUM:  We spoke to her.  Yes, she would have

 8   been a good witness for him.

 9             THE COURT:  Okay.  Then I'll let you bring her in.

10   Done.

11             MR. RASHBAUM:  Number one, I would have -- I also would

12   have moved to exclude it and I also would have looked into --

13             THE COURT:  I'll let you bring in the wife.  Where does

14   she live, Tampa?

15             MR. RASHBAUM:  She lives in the Tampa area.

16             THE COURT:  Okay.

17             MR. RASHBAUM:  I also would have looked into it.  I

18   would have investigated what this agreement is instead of

19   getting a 13-page agreement.  I have none of the other records

20   of this case.  I would have looked into it.  Judge, it's highly

21   prejudicial.  The question itself was prejudicial, and I'm going

22   to ask that you strike the question.  And there was no 404(b)

23   notice.  I understand you take the position they don't need to

24   notice up other bad acts, but it's not inextricably intertwined

25   to this case.

 1          THE COURT:  Wait a second.  I think in this district if

 2   you were to ask prosecutors, I'm probably the toughest on them

 3   with 404(b) evidence.  I don't know that for a fact, but that's

 4   my reputation I think, though you never know.  I think Judge

 5   Huck was also pretty tough on that.  I don't know if he

 6   continues to be.

 7          So I exclude a lot of 404(b) evidence to the point the

 8   prosecutors have even complained to the former chief judge about

 9   it many years ago.  So I know that.  So I do require notice.

10   The issue is not that.

11          The issue, especially when he's not trying to introduce

12   it, the issue is whether he can ask him a question about this in

13   a case of fraud.  I think the prejudicial impact is minimal, but

14   I think the probative value is even less significant.  So, under

15   403, I would exclude it in any event because it doesn't even

16   warrant any question.

17          Think about what we're doing.  If I allowed you to do

18   that, I would have to allow him not just to explain how well he

19   got along with his wife, but I would allow the defendant to call

20   the wife and then I wonder whether you would cross-examine and

21   then we would be relitigating a divorce that really has nothing

22   to do with this case, which is why I would exclude it.

23          I suspect, though I do not know, that if you were to

24   ask either spouse, they would say it's not the first fraud or

25   lie that they've committed; and I would have the tendency to

1   exclude most, even if they occurred, sins that have occurred

2   between husband and wife, particularly if they're divorced and I

3   would definitely not allow it.

4            So I'm excluding it without deciding whether notice had

5   to be provided.  It's really not significant for either side and

6   it has nothing to do with it.

7            Now, you want me to strike it in front of the jury.  I

8   will do so.  What that generally does -- I do grant that if the

9   lawyers want -- is the jurors then say, wow, that must have been

10   important if the judge is telling us to disregard what we took a

11   break for, for lunch.  If you want me to do that, I'll do that.

12           MR. RASHBAUM:  Judge, if I may have a moment to confer

13   with my smarter colleagues on that.

14           THE COURT:  Well, I don't know if they're smarter.

15           MR. RASHBAUM:  They are.

16           THE COURT:  They certainly are sitting there overseeing

17   everything while you're being very pugilistic when it comes to

18   this.

19           MR. RASHBAUM:  One moment, Your Honor.

20           THE COURT:  Sure.

21           MR. RASHBAUM:  We'll leave it alone, Your Honor.

22           THE COURT:  Whatever you want.  Okay.  What other area

23   are you going to go into or other exhibits since we have this

24   little time?

25           MR. JUENGER:  I have two areas I want to go into.

 1          THE COURT:  Okay.

 2          MR. JUENGER:  I'd have to refer to my notes to see what

 3  exhibits --

 4          THE COURT:  Go ahead.  Refer to your notes.  No

 5  problem.  That's fair.  I'm just doing this now so we don't have

 6  a break for coffee within 15 minutes after lunch.  That's all.

 7          MR. JUENGER:  It would be one topic area with one

 8  exhibit that's already admitted.

 9          THE COURT:  Can you tell me what the topic is?

10          MR. JUENGER:  Yeah, it's the issue of whiting out of

11  the prescriptions.

12          THE COURT:  Okay.  Next.

13          MR. JUENGER:  The next topic area has to do with the

14  bona fide employee safe harbor that was brought up and --

15          THE COURT:  All right.  You can do that.  Anything

16  else?

17          MR. JUENGER:  And I'm not even sure I'm going to --

18  well, it does raise the issue of two exhibits --

19          THE COURT:  What are those?

20          MR. JUENGER:  -- that we previously discussed.

21          THE COURT:  Look what happened, we spent 40 minutes

22  discussing the exhibit and the defense then said no objection.

23  I just always like to do such meaningful work, but that's all

24  right.  What exhibit numbers are they?

25          MR. JUENGER:  I believe it's Exhibit 176.

1           THE COURT:  That was admitted.

2           MR. JUENGER:  I thought it was -- it's the CBS -- we

3    talked about this before, the email with the defendant's

4    statement that has the CBS news story attached to it.

5           THE COURT:  So you're going ask him, did you know about

6    the CBS story?

7           MR. JUENGER:  Correct.

8           THE COURT:  Okay.  Since knowledge is an issue, you can

9    ask him, did you hear about the news?  Why can't he?

10          MR. RASHBAUM:  It's not relevant to this case, but

11   that's why I would object.

12          THE COURT:  What was the CBS article about?

13          MR. JUENGER:  It was about compounding, about using

14   marketing companies to solicit patients.

15          THE COURT:  Hold on.  And we don't have compounding and

16   marketing in this case?

17          MR. RASHBAUM:  It's not about his company, and also,

18   look at when the story came out.

19          THE COURT:  When did the story come out?

20          MR. JUENGER:  It came out at the end of February which

21   is right in the middle --

22          THE COURT:  Of what year?

23          MR. JUENGER:  What?

24          THE COURT:  Of what year?

25          MR. JUENGER:  Of 2015.

1          THE COURT:  Okay.  And the Indictment alleges fraud

2    when?

3          MR. JUENGER:  From mid 2014 to mid 2015, so this was

4    literally almost right in the middle of the --

5          THE COURT:  All right.  So the issue is, in a case

6    where the defense is I didn't know anything, I just do what I'm

7    supposed to do, I don't control anything, but more elaborate

8    than that, whether the prosecutor can cross-examine a defendant

9    about what he knew regarding media, insurance fraud, Medicare

10   fraud, compounding, or anything like that.  And I think his

11   knowledge is relevant, don't you?

12         MR. RASHBAUM:  Yes, I just don't think that the article

13   should come in with the hearsay.

14         THE COURT:  Well, we're not even there yet.  Can he ask

15   him questions?

16         MR. RASHBAUM:  Sure.

17         THE COURT:  Then you can.  You want to introduce an

18   article, extrinsic evidence, as good as some articles are -- I

19   keep articles just because they give me a summary of what the

20   case is about, but that's not the case.

21         MR. JUENGER:  Here's what I will say, Your Honor.  I

22   tried to think this through beforehand.  I would ask him

23   questions about it and if he says --

24         THE COURT:  Well, what questions would be about the

25   article?

1      MR. JUENGER:  I would ask, because I get to do leading

2  for once in my life, I would ask, it's about compounding,

3  correct?

4      THE COURT:  It's not for once in your life, but with my

5  permission or overlooking, but go ahead.

6      MR. JUENGER:  I knew you'd say that.

7      THE COURT:  Go ahead.

8      MR. JUENGER:  So I would say, the article is about

9  compounding, correct?

10      THE COURT:  Okay.

11      MR. JUENGER:  And the article is about how patients

12  were solicited and it's about how doctors wrote the scripts and

13  it's about what the drugs were.  And then I want to ask him

14  about his statement that's in that exhibit.

15      THE COURT:  You can do that.

16      MR. JUENGER:  And if he answers those questions

17  truthfully and consistent with what's actually in the story,

18  then I don't need the story.

19      THE COURT:  Say, in your view, he does not, then what

20  do you want to do?

21      MR. JUENGER:  Then I think I should be entitled to play

22  the story.

23      THE COURT:  To play the story.

24      MR. JUENGER:  So it will put his statement about the

25  story in context.

1        THE COURT:  Why don't we wait to see what happens,

2   okay?  Do you want to ask him now?

3        MR. JUENGER:  I can ask him now.

4        THE COURT:  Why don't we do it now so we don't

5   interrupt.

6        Go ahead.

7   BY MR. JUENGER:

8   Q.  So, Mr. Grow, you've been listening.  Do you remember the

9   CBS news story from February of 2015 that we've been talking

10  about?

11  A.  It was not in February of 2015, it was actually, I believe,

12  in May of 2015, but, yeah, I'm familiar with it.

13  Q.  Well, there were two CBS stories, there was one in February

14  and one in May.  Do you want me to show you the email?

15  A.  Sure.  If you want to refresh my memory, that would be

16  great.

17        THE COURT:  Go ahead.  Wonderful.

18  BY MR. JUENGER:

19  Q.  The first is Government's Exhibit 176.

20  A.  Yes, I see it.

21  Q.  And do you remember that?

22  A.  I don't remember exactly what the article said, but I do

23  remember, yes, receiving this email from Mauricio.  I mean, I

24  was familiar with it.

25        THE COURT:  Okay.  What are the other questions?

```
 1              THE WITNESS:  I just can't remember what it said now.

 2              THE COURT:  What are the other questions you're going

 3    to ask him about compounds?

 4              MR. JUENGER:  Well, about the story?

 5              THE COURT:  Yeah.

 6    BY MR. JUENGER:

 7    Q.   In the email Mauricio asks or he's referring this article to

 8         you and he says:  "Check out this article, pretty scary."

 9         And you say, "Yes, saw that article."

10              So, in fact, did you see the article?

11    A.   Yes, I'm saying I remember seeing the article.

12    Q.   Okay.  And in that article it was about compounding,

13    correct?

14    A.   It had something to do with compounding, yes.

15    Q.   And they were talking about compounded pain and scar creams,

16    correct?

17    A.   I can't tell you for sure.  I don't remember right now as we

18    speak but, yes, it had something to do with compounding, but I

19    don't remember the specifics.

20              THE COURT:  Thank you.

21              So what do you want to do?

22              MR. JUENGER:  I mean I think --

23              THE COURT:  No.  What do you want to do?

24              MR. JUENGER:  I want to play the article.

25              THE COURT:  All right.  Why shouldn't he?
```

 1          MR. RASHBAUM:  It's extrinsic evidence.  He's stuck

 2   with the answer.

 3          THE COURT:  It is extrinsic evidence.  Can the

 4   prosecutor in cross-examination introduce extrinsic evidence to

 5   show a prior inconsistent statement, particularly when it's

 6   attached to an email that he has received?  Why shouldn't he?

 7          MR. RASHBAUM:  Judge, it's an article about a company

 8   in Utah doing completely different things than this case.

 9          THE COURT:  Okay.

10          MR. RASHBAUM:  I mean, if he wants to ask him like --

11          THE COURT:  How about deleting the portions -- the

12   thing is the thing that makes it relevant are some of the topics

13   discussed.  Obviously, that's not the case that we're trying

14   here.

15          The issue is, if someone says, oh, I'm totally ignorant

16   of that, I just don't know what's going on in the industry --

17   I'm not suggesting your client is doing that -- but if someone

18   does that to that extent, can you cross-examine him?  Obviously,

19   the article wouldn't come in if it wasn't an email.  There's an

20   email saying, hey, watch out for these type of things.  Even if

21   it's a different case, it's this case.

22          MR. RASHBAUM:  It's still got to be inconsistent with

23   something he's saying.  In order to impeach someone, there's got

24   to be something in the article itself that is inconsistent with

25   what he's saying today.

1          THE COURT:  Okay.

2          MR. RASHBAUM:  There's nothing in the article that's

3    inconsistent with what he's saying today.

4          THE COURT:  What's the inconsistency?

5          MR. JUENGER:  Your Honor, it says, I saw that article,

6    the next word is fraudulent.  That's the --

7          THE COURT:  Whose word is "fraudulent"?

8          MR. JUENGER:  That's Mr. Grow's word.  His response

9       when he gets the email is, "Yes, saw that article,

10      fraudulent."

11         MR. RASHBAUM:  I don't have a problem with him asking

12   about that.  In other words, I don't have a problem with him

13   reading the email and him saying, your response was, "Yes, I saw

14   that article, fraudulent."  What did you mean by that?  I don't

15   have any problem with that.  He'll get the answer yes, but I

16   don't have any problem with that.

17         I have a problem with putting in an article that has

18   nothing to do with this case and it's not impeachment.

19         THE COURT:  That's why I excluded it in the first

20   place.  Let me think about it.

21         MR. JUENGER:  But the witness won't say anything about

22   the article that he referred to as fraudulent.  That's the

23   important point.  To put his statement about what he thought was

24   fraudulent into context, the jury has to know what it is.  I

25   assume the witness would say --

1          THE COURT:  Give me the article and the email and let

2   me think about it.  I think better on a full stomach, something

3   that I haven't been able to do, to my delight, throughout this

4   past week, but that's all right.

5          You don't want to give it to me?

6          MR. JUENGER:  I do want to give it to you but I want to

7   let you know it's --

8          THE COURT:  Do you have it with you?

9          MR. JUENGER:  Yeah.

10         THE COURT:  Then give --

11         MR. JUENGER:  We have the video and the attached

12   article.

13         THE COURT:  Oh, you want the video, too?

14         MR. JUENGER:  Why not?

15         THE COURT:  Because what I would probably do if I see

16   an article is I would probably redact things out so that it

17   really becomes relevant.  And once you know that -- is the

18   article consistent with what's in the video or it's separate?

19         MR. JUENGER:  I think it's almost identical.  I

20   think --

21         THE COURT:  Then I should be able to help you and you

22   direct your IT people to delete the portions, assuming I were to

23   let it in.  So give me the article and I'll figure out what goes

24   in or not, all right, and the email.  Okay.  We'll do that.  And

25   then, after that, you're done with cross or not?

1          MR. JUENGER:  Yes, Your Honor.  I might want to just

2   show him a few other exhibits that were already in evidence, but

3   that would be it.

4          THE COURT:  Okay.  Who's doing the redirect?

5          MR. RASHBAUM:  I am, Your Honor.

6          THE COURT:  You are because you did the direct, right?

7   It makes sense.  How long is it?

8          MR. RASHBAUM:  It will be pretty short.

9          THE COURT:  Now, you all filed a pleading last night,

10  right?  What time was it?

11         MR. RASHBAUM:  You have to ask Mr. Marcus.

12         THE COURT:  Okay.  What time was it?

13         MR. MARCUS:  It was very late, Your Honor.

14         THE COURT:  Everybody works on Sunday night, giving

15  exhibits, filing pleadings.  Are you attempting to introduce his

16  conversations --

17         MR. RASHBAUM:  Yes, Your Honor.

18         THE COURT:  -- in redirect?

19         Okay.  What say the Government in its response?  I want

20  to see if the prosecutors are going to say, oh, it was done so

21  untimely on Sunday night.  That's what I was looking for.

22  Mr. Larsen.

23         MR. LARSEN:  Yes, Your Honor.  As I argued last week,

24  inconsistent with the case and consistent with the case that I

25  provided to the Court --

1          THE COURT:  Prior good acts.

2          MR. LARSEN:  -- we believe these are self-exculpatory

3    statements that were made after the motive to lie had arisen.

4    We don't believe that these are prior consistent statements

5    within the meaning of the rule and that this is textbook hearsay

6    that is not admissible under the case law, the Supreme Court

7    case law and the Eleventh Circuit case that I provided the Court

8    with.  That's the Government's position.  It hasn't changed.

9          THE COURT:  Did you get a chance to read the

10   Government's motion?

11         MR. LARSEN:  The defense motion?

12         THE COURT:  The defense motion.  I'm sorry.

13         MR. LARSEN:  Your Honor, I was able to see it very

14   early on my phone this morning.  I saw the accusation of

15   revisionist history, I saw the accusation that when the call was

16   made that there was a belief in the truth.  I did not get a

17   chance to read the whole thing.

18         THE COURT:  So you want time to respond, I take it, at

19   least.

20         MR. LARSEN:  Your Honor, I haven't read the whole

21   thing.  I do apologize, but I just saw it this morning.

22         THE COURT:  It's very reasonable not to have time to do

23   something when you get it Sunday night, right?  Sounds familiar

24   from three hours ago.

25         Okay.  Why did you wait till Sunday night to do it?

1   Was this before or after you got the list of exhibits?

2        MR. MARCUS:  Well, I was drafting the pleading --

3        THE COURT:  While you got the list of exhibits?

4        MR. MARCUS:  Well, we talked about this Friday night.

5   You said file something if you want by Monday morning.  That was

6   our discussion Friday night.  So that's why I filed it last

7   night and I was getting exhibits from them late into the night

8   and --

9        THE COURT:  Since some of you like Latin, I would say

10   in pari delicto.  Since we like quid pro quo, ipso facto, I will

11   say in pari delicto.  That brings me back to my earlier altar

12   boy days when we used to use Latin, which is no longer used,

13   which I think is a good thing since it's a dead language.

14        But I'll give the Government an opportunity to read it.

15   Do you think that's fair?

16        MR. MARCUS:  Sure.

17        THE COURT:  Okay.  So that means no mention -- after

18   the cross, if it's the reasonable cross time, you'll start your

19   redirect, but you'll wait until the end and --

20        MR. RASHBAUM:  Your Honor --

21        THE COURT:  -- I'm sure -- you interrupted again.

22   You've got to relax.  We're here.  We're doing a two-and-a-half

23   week case in a week and a half, so you have time.

24        All right.  So that's what we'll do time-wise.  All

25   right.

1          Now that you're not going to call the wife -- by the

2   way, the young lady there in the back is a paralegal for you

3   all?

4          MR. RASHBAUM:  No.

5          MS. BERLIOZ (a spectator):  No, I'm just observing,

6   Your Honor.

7          THE COURT:  And you've got a computer and the iPhone.

8   So you don't work for the defense or anything?

9          MS. BERLIOZ:  No, Your Honor.

10          THE COURT:  And what are you working on?

11          MS. BERLIOZ:  I am just taking notes.

12          THE COURT:  Of the trial?

13          MS. BERLIOZ:  Yes, Your Honor.

14          THE COURT:  For yourself?  Are you a reporter?

15          MS. BERLIOZ:  No, I'm an attorney.

16          THE COURT:  Pardon?

17          MS. BERLIOZ:  I'm an attorney.

18          THE COURT:  Okay.  And how did you get your computer

19   in?

20          MS. BERLIOZ:  I was not aware.

21          THE COURT:  You're not supposed to bring in a computer.

22   I just assumed that -- everybody needs permission to do that.

23          MS. BERLIOZ:  I apologize.

24          THE COURT:  And I assumed, though I did not know, that

25   you were an assistant for the defense and I had allowed

1    computers I think.

2         THE COURT SECURITY OFFICER:  We can take her outside,

3    Your Honor.

4         THE COURT:  There's nothing wrong with observing, but I

5    saw you were -- have you recorded anything?

6         MS. BERLIOZ:  No, Your Honor.

7         THE COURT:  Because you know that's a big no-no, right,

8    in Federal court, to record things?

9         MS. BERLIOZ:  Yes, Your Honor.

10        THE COURT:  And you are doing this for a -- what is

11   your name?

12        MS. BERLIOZ:  Alejandra Berlioz.

13        THE COURT:  You're a lawyer working for who?

14        MS. BERLIOZ:  White & Case.

15        THE COURT:  Okay.  Great firm, great people.  And

16   you're working now for White & Case, and you've been here all

17   morning?

18        MS. BERLIOZ:  Yes.

19        THE COURT:  Is this billable time for a particular

20   client, right?

21        MS. BERLIOZ:  Yes, Your Honor.

22        THE COURT:  All right.  I won't ask who because you're

23   entitled to that.  But you can't use computers unless you get

24   the Court's permission, unless the Chief Judge has changed

25   things.  I don't know.  The lawyers can bring in phones because

1    I changed that, and sometimes it's distracting.

2           Okay.  You're welcome to stay here, but without the

3    computer.  You can bring in your phone as a lawyer, but you

4    can't be -- I think it seems like it, though I don't know, but

5    since no one has a party in here, let me think about it.  But I

6    always assumed you were working with the defense as an

7    assistant.

8           MS. BERLIOZ:  No, Your Honor.

9           THE COURT:  We let reporters do certain things if they

10   sign up.  I think Chief Judge Moore still does that.  In case

11   they do something wrong, we can do something.  We let lawyers

12   because we have some power over lawyers, but that's why.

13          All right.  Don't worry about it, but I think you can

14   come in.

15          Let's find out how that happened.  Okay?

16          THE COURT SECURITY OFFICER:  Yes, sir.

17          THE COURT:  Thank you.  Don't worry about it, you're

18   welcome to come back here.  It's no big deal.  I think.  I don't

19   know.

20          All right.  Why are you all standing here?  You don't

21   want to eat?

22          MR. JUENGER:  I have one more point to raise, Your

23   Honor, because nothing is easy with lawyers.  If Your Honor were

24   to decide to allow in the prior consistent statement, then the

25   Government would ask --

1          THE COURT:  The prior consistent statement, you mean

2     the --

3          MR. JUENGER:  The tapes that the defense wants to play.

4     I would ask -- and if I know that in advance, I would do it in

5     my conclusion of my cross, I think the Government should be

6     allowed to play or at least reference the other video that the

7     defendant mentioned from May of 2015, which --

8          THE COURT:  The CBS.

9          MR. JUENGER:  The second CBS story which includes the

10    recording of the woman who worked for him who later, because now

11    she's cooperating with the Government, does the calls, because I

12    think the jury needs to be able to know the predicate for why

13    those calls were created.

14         THE COURT:  Why not just call the woman, so she can be

15    cross-examined, which is the purpose of the hearsay rule in the

16    first place?  You're not going to call the CBS person, right --

17         MR. JUENGER:  No.

18         THE COURT:  -- or the newspaper writer.  If you have

19    that, why don't you call her?

20         MR. JUENGER:  Well, she's busy right now.

21         THE COURT:  She's not the only person busy, but that's

22    generally why we don't like hearsay because who's going to be

23    cross-examined on an article, the news reporter?

24         MR. JUENGER:  But the only issue for us is that at the

25    time when these tapes are going to be played, and at the time

1    they were recorded, the defendant knew, so that's the issue.   He

2    knew that she had been exposed as someone who was involved in

3    this.

4            THE COURT:  Which is why he has reason to fabricate.

5            MR. JUENGER:  Correct.  So even if the tapes are

6    played, the Government ought to be able to sort of make the

7    argument to the jury that, hey, yes, this is what he said on the

8    tapes, but let's consider the context in which he's making these

9    statements.

10           THE COURT:  So what ends up happening is, I probably

11   have to conduct a full hearing like Judge Nesbitt did on the

12   timing of the fabrication because that's what Judge Marcus wrote

13   in that case from the Eleventh Circuit that the Government

14   cited, right?  That's what I would have to do.  Before she

15   allowed a statement like that, she made a determination that

16   there was time to fabricate.

17           Do I have that wrong?  Isn't that what Judge Nesbitt

18   did in her wisdom?  And she was praised.  That's what I have to

19   do.  So that means we would have to do that outside of the

20   presence of the jury, wouldn't we?  When would we do that?

21           MR. RASHBAUM:  Judge, may I have one moment?

22           THE COURT:  Timing is so important in life, isn't it?

23           MR. RASHBAUM:  Judge, may I have one moment? I may have

24   a solution to all this.

25           THE COURT:  Okay.  Go ahead.

1          I've got to give my court reporter a midmorning break

2     which is merging with a lunch break.

3          I'll make it up to you at the end of the week.

4          MR. RASHBAUM:  Judge, there may be a happy medium.

5          THE COURT:  Hold on.

6          MR. RASHBAUM:  I'm sorry.

7          THE COURT:  All right.  What's the solution?

8          MR. RASHBAUM:  My solution is the following:  Instead

9     of playing the tapes, I want to be able to ask the witness

10    whether he learned --

11         THE COURT:  The witness, the defendant.

12         MR. RASHBAUM:  Yeah.

13         THE COURT:  Okay.

14         MR. RASHBAUM:  Whether he learned in the course of this

15    investigation that he was recorded by the Government and whether

16    on that recording -- what he said on that recording, which is

17    that he had done nothing wrong.

18         THE COURT:  He's going to say he did not know he was

19    being recorded I suspect.

20         MR. RASHBAUM:  Correct.  But he learned later through

21    the discovery of this case that he was recorded, and then I

22    would just, you know, leave it pretty much at that.

23         THE COURT:  I know.  But I suspect the Government would

24    say even though he has repeatedly said that he thinks every

25    defendant would satisfy him with a truthful response, that he

1  will not believe that.  Am I right?

2  MR. JUENGER:  I think that's probably right, Your

3  Honor.

4  THE COURT:  Oh, I'm shocked, which is why we have to go

5  through it.  You know, I think this is an important thing.  You

6  know when I tell you I think some things are not as important as

7  you all think it is, I think this is important because it goes

8  to perhaps the heart of the case, right?  The defendant's intent

9  and knowledge, that's really what this case is about.

10  MR. JUENGER:  It is, Your Honor.

11  THE COURT:  If someone says before he knows about the

12  case being recorded, oh, we shouldn't be doing this, this is

13  wrong, or if the defendant were to say, don't do that, this is

14  wrong, those things would be very important.  Now, if someone

15  says that when he knows he's being recorded, or after being

16  arrested, then we know that there's an opportunity to fabricate,

17  an opportunity to do so.

18  This is in between, right?  He's not a target, he

19  hasn't been arrested.  But there's a case from that Ninth

20  Circuit that was mentioned in the Eleventh Circuit case that

21  says you don't have to be arrested.  So this is an important

22  thing.

23  Does it open up a can of worms?  Of course it does, but

24  sometimes we've got to do that.

25  That means if I let the defense bring this in, I should

1    let the Government bring in the CBS thing because it's the same

2    type of thing.  It's not coming in for the truth, it's coming in

3    to show the defendant's knowledge.  So I think it's true.

4           So if I let it in, I should let in the CBS thing,

5    right, Mr. Marcus, because it's kind of like the same thing?

6           MR. MARCUS:  It really isn't, Your Honor.

7           THE COURT:  Why not?

8           MR. MARCUS:  The CBS tape is a news interview of

9    Ms. Dutting who was noticed as a Government witness.  The

10   Government has decided not to call her.  That tape was done in

11   May of 2015.  In January of 2016, Ms. Dutting become a

12   cooperating witness and at the direction of the Government made

13   two lengthy undercover recordings of the defendant where she,

14   through a series of questions, tried to entrap him into saying

15   something incriminating.  In response, he made exculpatory

16   statements.  That was 11 months before he was charged in this

17   case.  He was not represented by an attorney.  He had never been

18   approached by law enforcement.

19          THE COURT:  And the Ninth Circuit case is the same.

20          MR. MARCUS:  Very different, Your Honor.

21          THE COURT:  Why?

22          MR. MARCUS:  The Ninth Circuit case involves a traffic

23   stop where there were drugs in a car and a woman -- a passenger

24   in the car is questioned at the scene and makes statements

25   knowing she's been stopped, there are drugs in her car.  She

1  then is arrested minutes later, and what the Ninth Circuit said

2  is, yes, it was technically before she was arrested, but the

3  motive had attached at that moment because she had been stopped,

4  she was confronted by law enforcement and she knew she had

5  incriminating --

6        THE COURT:  But see, the CBS articles predate the

7  conversations that were recorded by the Government.  True?

8        MR. MARCUS:  Yes.

9        THE COURT:  See, obviously it's not a drug case and I

10  know the difference between the two.  But in a sophisticated

11  case with a long investigation, the crimes, according to the

12  Government, date back to 2014, it takes a long time to

13  investigate these cases.  Probably too long, but since I've

14  never investigated, I shouldn't complain.  And that's the

15  problem.  We don't know what the mind is.

16        The issue is, I have to make a determination outside of

17  the presence of the jury, which means I also have to make,

18  oddly, a decision on the credibility of a witness when it comes

19  to the timing of it.

20        MR. MARCUS:  I have no problem, Your Honor, with you

21  listening to the recording before so you can have the full

22  context.

23        THE COURT:  But the recording doesn't really --

24        MR. MARCUS:  No, I am talking about the news article,

25  the video of the news article.

1              THE COURT:  The issue is going to be the same.  It's

2    going to be what did the defendant know and when did he know it.

3              MR. MARCUS:  But he's not mentioned in the news

4    article, his company is not.

5              THE COURT:  Of course, he's not mentioned in the news

6    article.

7              MR. MARCUS:  Nor is PCA.  So the idea that there's an

8    article --

9              THE COURT:  It would be as if a news article said, hey,

10   listen, do you see that they're investigating similar frauds?

11   That's what it is, right?

12             MR. MARCUS:  No.

13             THE COURT:  Or dissimilar frauds.  Hey, watch out, this

14   is a big thing.  It makes sense to bring it up.

15             MR. MARCUS:  That's way too attenuated to create a

16   motive to fabricate.  If that were true, Your Honor, any news

17   article about any industry -- I mean, why is it that the

18   Government decided to record him seven months after that news

19   report aired with secret recordings?

20             THE COURT:  I suspect because they didn't think they

21   had enough evidence of healthcare fraud.

22             MR. MARCUS:  They thought they would get his true state

23   of mind.  They thought it would be incriminating to him.

24             THE COURT:  Of course.

25             MR. MARCUS:  They were wrong.  Right, so they made a

1    determination seven months after this news video was released,

2    and they knew he was aware of the video, like many other people,

3    and they decided that they wanted to record him to capture his

4    true state of mind.  Because they don't like the answers he gave

5    in January of 2016, they now want to preclude him --

6              THE COURT:  What are the answers in January of 2016?

7              MR. MARCUS:  Those are the recordings, Your Honor.  We

8    want to put in just a few minutes of that, you know, a couple of

9    excerpts from the call with their cooperator.  They don't like

10   what he said on the tape.  They want to attack his truthfulness

11   now in court that he's lying about these same issue.  He should

12   be allowed -- the jury should be allowed to hear his statements

13   before he ever was aware of their investigation.

14             THE COURT:  You may be right and that's why I'm taking

15   the time.  But then, they should also be aware of the fact that

16   he knew about problems in the industry because that goes to his

17   state of mind, too.

18             Obviously, I excluded it very quickly at the beginning,

19   in the Government's case in chief.  I'm not going to let

20   newspaper articles come in and videos.  But once he takes the

21   stand and says, well, I didn't know anything about it, and he

22   says it on a recording, then the jury can decide whether to

23   believe him or not.  Isn't that the issue in this case?

24             If the jurors believe the defendant, what should the

25   verdict be?

1          MR. MARCUS:  Not guilty.

2          THE COURT:  And if the jurors disbelieve the defendant,

3     you will not say, so I'll ask the Government, what should the

4     verdict be?

5          MR. JUENGER:  Guilty, Your Honor.

6          THE COURT:  That's it.  It really is.  I hate to

7     simplify a case for you all.

8          MR. MARCUS:  These two forms of evidence are not

9     similar.  One is a recorded consistent --

10         THE COURT:  But they go to his state of mind,

11    knowledge.  Of course, they're not similar, but they go to

12    whether he is telling the truth when he talks in the statement

13    about, oh, I don't know anything about it, right?

14         MR. MARCUS:  There should then be inconsistent

15    statements from his testimony that they would then show, well,

16    this article or this video you watched said X and now you said

17    Y.  I mean, you have to have inconsistencies.  They just want to

18    put it in because it has collateral material about how bad this

19    industry is.  They want to poison the well on compounding.  They

20    want to bring in collateral issues that are not before this

21    Court.

22         THE COURT:  That's why I was going to look at this

23    during my -- I was going to say lunch hour, but it isn't a lunch

24    hour anymore.  I was going to look at it to see what could be

25    redacted out.  That's what I was going to do.

1          MR. MARCUS:  Right, I understand, that's the written

2    article, but the video --

3          THE COURT:  Once they know what I redacted out, there

4    must be a way that you can redact out the video too, I would

5    assume.  I don't know.  Right?  I don't know because I haven't

6    seen the video.  Have you?

7          MR. MARCUS:  I haven't seen the clips that they intend

8    to offer from the video.

9          THE COURT:  You've never seen the video?

10         MR. MARCUS:  I've seen the CBS story.  I don't know

11   what they --

12         THE COURT:  How long of a story is it?

13         MR. MARCUS:  It's about four or five minutes.

14         MR. JUENGER:  Three minutes.

15         THE COURT:  So I'll tell you what.  You have it?  Go

16   ahead and watch it for four or five minutes and see how it

17   compares to the article.  Do you have a copy of it?  I would do

18   that.  You can do that right here.  All right?  I don't need to

19   be here while you do that, right?

20         Anything else?  Are you going to have any rebuttal?

21         MR. JUENGER:  I think we plan on -- right now we have

22   one brief witness coming from Germany.  She's already here, so

23   we want to put her on for five minutes.

24         MR LARSEN:  Two.

25         THE COURT:  Two witnesses he says, or two minutes?

1          MR. LARSEN:  Let me just confer.

2          THE COURT:  I think he meant two witnesses.  Do you all

3   talk to each other?  Who's the other witness?

4          MR. JUENGER:  No, that's the only witness right now,

5   but the last subject area I have --

6          THE COURT:  There's dissent in the ranks again.  Okay.

7   No problem.

8          You've got to tell him ahead of time, even though it's

9   rebuttal, right, so we don't have issues each time.

10         MR. RASHBAUM:  We don't anticipate any more witnesses,

11   Your Honor.

12         THE COURT:  Okay.  Did you work on your closings --

13         MR. LARSEN:  Yes, we did.

14         THE COURT:  -- to reduce them?  You're going to

15   make the closing?  Both of you are making the closing.

16         MR. JUENGER:  We're splitting it.

17         THE COURT:  Who's first?

18         MR. LARSEN:  Your Honor, I am.

19         THE COURT:  Mr. Larsen, how long are you going to be?

20         MR. LARSEN:  About an hour.

21         THE COURT:  So you didn't reduce it.  How long are you

22   going to be?

23         MR. JUENGER:  I timed him yesterday and I think it's

24   going to be closer to 45 or 50, but he wants the hour.

25         THE COURT:  How long is yours?

1    MR. JUENGER:  I haven't even started yet, Your Honor

2    THE COURT:  Oh, you should have done it over the

3  weekend.

4    MR. JUENGER:  I've been thinking about this case for a

5  year.

6    THE COURT:  Okay, good.  I don't want to try it for a

7  year.

8    And you guys are going to split your closing?

9    MR. RASHBAUM:  I'm going to do the closing.

10    THE COURT:  Okay.  How long?  So it's going to be

11  shorter.

12    MR. RASHBAUM:  It will be much shorter than theirs

13  combined.

14    THE COURT:  Can you give me an estimate?

15    MR. RASHBAUM:  I don't really know what I'm going to

16  say, but I would think it would be around -- it will be a little

17  bit longer than my opening.

18    THE COURT:  I don't remember how long that was.

19    MR. RASHBAUM:  I have no idea how long the opening was.

20    THE COURT:  I'll look it up.

21    MR. RASHBAUM:  I think probably 30 to 45 minutes, Your

22  Honor.

23    THE COURT:  All right.  Maybe we can do it today.  I

24  don't think so, but we'll try.  All right.  Come back at 1:20.

25    MR. RASHBAUM:  Thank you, Your Honor.

 1         (There was a luncheon recess taken at 12:45 p.m.)

 2                         AFTERNOON SESSION

 3         (The following proceedings were held at 1:19 p.m. outside

 4    the presence of the jury:)

 5                   THE COURT:  Ms. Berlioz, you're here, right?

 6                   MS. BERLIOZ (a spectator):  Yes, Your Honor.

 7                   THE COURT:   Where is your computer?  You can use it.

 8    All right.  It was a misunderstanding on my part, which is

 9    probably fueled by the fact that in every single case, the

10    lawyers seek permission to bring in computers, and there is an

11    administrative order that allows lawyers in the Southern

12    District of Florida to bring in their computers.  Apparently,

13    they don't know that and they keep asking, or all the lawyers I

14    have are from outside the Southern District of Florida, which

15    lately has been the case.

16              Did they take away your computer?  Where did you put

17    it?

18                   MS. BERLIOZ:  No, I have it.

19                   THE COURT:  So you can use it because you have not been

20    disruptive at all, but if you can take notes by hand, certainly

21    you should be able to.  You know, not with the clicking, but I

22    haven't heard anything or done anything.  It's just in all the

23    years I've been here, I've never seen it, but it doesn't mean

24    it's wrong.  So I don't want you to think anything of it.  All

25    right?

1          MS. BERLIOZ:  Thank you, Your Honor.

2          THE COURT:  So that takes care of that.

3          I'm going to allow the cross-examination on the issue

4  of the media, and I'll give a limiting instruction.  The jurors

5  will understand that it comes in only for knowledge and intent.

6  And I'm also going to allow the prior statements by the

7  defendant and the jury will decide that issue.

8          I was thinking about having an evidentiary hearing on

9  whether it comes in or not, and the United States Supreme Court

10 has always stated how important cross-examination is no matter

11 who it is.  It usually is of Government witnesses, but it's the

12 same thing with the defendants, but by the same token, a

13 defendant has a right to defend himself and then he can be

14 cross-examined on it and then the jury decides.  So rather than

15 spending the time on an issue when the witness is here -- if the

16 witness were not here -- since that's really what the case is

17 about.  I understand the arguments and all of that, but the

18 jurors can find out both things, what did he know, when did he

19 know it, and what did he do, and they should be able to answer

20 it unanimously based upon that.  I will keep out -- I will

21 continue to keep out the family thing, the divorce, because it

22 just opens up a can of worms on things, as most divorces, where

23 when there's usually fault on both sides.  It doesn't mean as

24 much as something related.

25         So based upon that ruling, any objections from the

1    Government to that ruling?

2           MR. JUENGER:  No objection, Your Honor.

3           THE COURT:  From the defense?

4           MR. RASHBAUM:  Just our prior objection.

5           THE COURT:  Which is what?  See, I make you preserve it

6    so you know.  To what, to your prior statements?

7           MR. RASHBAUM:  Yeah.

8           THE COURT:  Your client's prior statements you don't

9    want in.

10          MR. RASHBAUM:  That the article shouldn't come in.

11          THE COURT:  Well, the article is only coming in

12   depending on what the defendant says.  If he says, yeah, I

13   remember it -- but he seemed to indicate that he didn't remember

14   the details.  If he said, yeah, I remember it, it has nothing to

15   do with this case, then I would let it in, but once I heard

16   that, that was enough for me to let it in with a limiting

17   instruction that it only comes in for knowledge and intent.

18          Ready?

19          MR. JUENGER:  Your Honor, just so that I'm abundantly

20   clear that Government's Exhibit 23 and 176 are in with the

21   attached article?

22          THE COURT:  They are not in yet.

23          MR. JUENGER:  Okay.

24          THE COURT:  It all depends on what he says, right?

25          MR. JUENGER:  Well, I think the emails should come in

1    because those contain his statements.  The question is

2    whether --

3            THE COURT:  I sustained it the last time we spoke,

4    remember, way back last week?

5            MR. JUENGER:  Correct.

6            THE COURT:  On 23 at least.  What was the other one?

7            MR. JUENGER:  176.

8            THE COURT:  I probably did the same thing on that one.

9            MR. JUENGER:  I think you reserved on both as of last

10   week.

11           THE COURT:  No.  On 176 I put sustain.  On 23 I put

12   sustain.  I don't reserve on most things except restaurants,

13   which I haven't been able to do at least for lunch.  So what we

14   will do is -- I sustained it, but you can always bring it up

15   later once the defendant took the stand, but in your case in

16   chief I sustained it.  Your case in chief is over, isn't it?

17           MR. JUENGER:  It is.

18           THE COURT:  So you ask him the question and it all

19   depends.  If an individual admits to something, you don't bring

20   it in the first place, right?

21           MR. JUENGER:  That's fair, but his own statement about

22   it I believe should come in.

23           THE COURT:  But you never separate it.  What is -- his

24   own statement without that is meaningless, right?  What is his

25   own statement?

1          MR. JUENGER:  His own statement is that --

2          THE COURT:  Of 23 or 176?

3          MR. JUENGER:  176.

4          THE COURT:  What is his own statement?

5          MR. JUENGER:  His own statement is, "yes, saw that

6      article, fraudulent."

7          THE COURT:  What does that mean?

8          MR. JUENGER:  Well, without asking him about the

9  article, it's meaningless.

10         THE COURT:  Which is why I don't let it in unless you

11 ask him about the article and he denies knowing anything about

12 the article.  You're right, it is meaningless, which is why it

13 doesn't come in.

14         MR. JUENGER:  So I anticipate I will ask him about the

15 article, he'll say what he remembers.  If he remembers it, we

16 will discuss it.  If he doesn't remember it, I would ask to

17 introduce it.  Then we can discuss --

18         THE COURT:  No, you just ask him about the article.

19 Before you introduce it, you say, what did mean by fraudulent?

20 And then he'll tell you, and you'll say, isn't it a fact that

21 what you meant by fraudulent is you were doing business just

22 like someone else was doing a different type of business, so you

23 knew this was wrong, didn't you?  And he says, no, I didn't.

24 And you say, yes, you did.  Then you move on to something else.

25         MR. JUENGER:  Correct.

 1          THE COURT:  Isn't that how it's done?  That's how it's

 2   done quickly, but it won't be done like that.  Remember,

 3   cross-examination is not to convince the witness, right?

 4          MR. JUENGER:  Correct.

 5          THE COURT:  Especially the defendant, it just isn't

 6   going to happen.  He is not going to say, yes, I'm guilty,

 7   because he could have done that before.  All right?

 8          MR. JUENGER:  Yes, sir.

 9          THE COURT:  Ready, set, go.  Bring in the jurors,

10   please.

11      (The jury entered the courtroom at 1:50 p.m.)

12          THE COURT:  We have got everybody, don't we?  Almost.

13   Two more.  All right.  Have a seat, everybody, relax.  We'll

14   wait for them.

15          And I haven't forgotten, Mr. Merida, 1:00 tomorrow?

16          JUROR MERIDA:  Yes, sir.

17          THE COURT:  What time do you want to leave tomorrow for

18   your doctor's appointment?

19          JUROR MERIDA:  Around noon.

20          THE COURT:  All right.  When do you think you could

21   come back from that, from past experiences?  Are they worse --

22   are doctors worse than judges?

23          JUROR MERIDA:  Yes, they are.  I don't know.

24          THE COURT:  So 3:00 you think, or you don't think

25   that's even reasonable?

1          JUROR MERIDA:  Maybe 3:00, 2:30.  I can't tell you.  I

2    don't know when I'm going to get out.

3          THE COURT:  But from your past experiences.

4          JUROR MERIDA:  This is my first time there.

5          THE COURT:  Oh, it's the first time.  Okay.  But you'll

6    go.  The only question is when will you come back and we will

7    figure it out.  All right?

8          Do we have everybody?

9          THE COURT SECURITY OFFICER:  We have two missing.  They

10   went to the 7th floor.

11         THE COURT:  Two, who are missing totally.

12         THE COURT SECURITY OFFICER:  They went to get coffee.

13         THE COURT:  They are coming back though, right?

14         THE COURT SECURITY OFFICER:  I hope so.

15         THE COURT:  Okay.  Okay.  Have a seat.  Did they run

16   out of coffee there?

17         JUROR PADRON:  They wanted cafe con leche.

18         THE COURT:  It takes so long to have the cafe con leche

19   at 10 till 2.  You can get it at 8:00.  That's when I got it

20   this morning.  Well, we've got to wait.

21         They are here?  Don't let them out next time.

22     (The remaining jurors entered the courtroom.)

23         THE COURT:  Okay.  We've got everybody.  All of the

24   jurors are present, defendant, defense counsel, Government

25   counsel.

Grow - Cross

1        All right.  The end of the cross-examination.

2  BY MR. JUENGER:

3  Q.  Good afternoon, Mr. Grow.

4  A.  Good afternoon.

5  Q.  We heard a lot throughout this trial about this issue of the

6  whiting out of the fax numbers of prescriptions.  Do you recall

7  all of that?

8  A.  I do.

9  Q.  And I believe last Friday on your direct examination, you

10 were saying that the whiting out was done because of concerns

11 over HIPAA compliance; is that correct?

12 A.  Yes.

13 Q.  What do you mean by that?  Can you explain for the jury how

14 whiting out your fax number off the prescriptions complies with

15 HIPAA?

16 A.  There was a concern, obviously, when it comes to HIPAA,

17 which is the patient private information, and it was my

18 understanding that if the faxes were being seen by people

19 outside of the doctor, that it could potentially be a HIPAA

20 concern, although I have a signed agreement with the pharmacy

21 that basically states that I am HIPAA compliant with them.  So I

22 really don't know the entire issue.

23        All I know is that they came to me and they said that

24 we cannot have the faxes going to you and then to us.  So to fix

25 the situation we are going to give you an efax number that's

1   dedicated to you that will come straight to the pharmacy, but

2   will alert you and you will be able to view it.

3   Q.  Well, perhaps you didn't understand my question, which is to

4   explain how faxing -- or I'm sorry, whiting out your fax off of

5   the prescription complies with HIPAA.  HIPAA is about patient

6   privacy, correct?

7   A.  Correct.

8   Q.  And so concealing the fact that you faxed the prescription,

9   how does that in any way protect the patient's privacy?

10  A.  It wasn't necessary because I had already signed HIPAA

11  compliant forms with PCA stating that I could view it.

12  Q.  But if it wasn't necessary, why did the pharmacy insist on

13  it over and over and over?

14  A.  They didn't really explain it to me.  They didn't have to.

15  They told me it needed to be done, so I made the switch.  I

16  didn't complain.  I didn't ask questions.  I said, okay, you

17  want me to do it?  Then this is how we'll do it.  I just

18  followed their rules.

19  Q.  So let's look at Government's Exhibit 80 that's been

20  admitted into evidence, and I've highlighted the entire top

21  part.  Matt Smith instructs you -- Matt Smith, he's the one

22  who's in charge of compounding at PCA, correct?

23  A.  Correct.

24  Q.  And he says, "Whose fax number is this?  We cannot show

25      outside fax numbers on these RX's."

1          That's prescriptions, right?

2   A.   Yes.

3   Q.   And he says, "There is a HIPAA concern around unsecure

4        pathways."

5          If I understand your testimony, it was that you don't

6   really know what that means, you just agreed to comply.  Fair

7   enough?

8   A.   Fair enough.

9   Q.   And it also says "and patient brokering concerns."  What is

10  patient brokering, Mr. Grow?

11  A.   I don't know.

12  Q.   You don't know?

13  A.   I don't know what patient brokering is, no.

14  Q.   Do you know what a patient is?

15  A.   I do.

16  Q.   Do you know what a broker is?

17  A.   Someone who does transactions.

18  Q.   What kinds of transactions?

19  A.   I don't know.  Any kind I guess.  I am not exactly sure what

20  your question is.

21  Q.   Isn't it true that brokering means buying and selling

22  usually for another person?  A stockbroker might buy stocks or

23  sell stocks for his clients.  Isn't that what broker means?

24  A.   Yes, that's what stockbrokers, from what I understand, do.

25  Q.   So a patient broker buys and sells patients for a pharmacy,

1   correct?

2   A.  I don't know.

3   Q.  Well, in fact, you were essentially buying and selling

4   patients for the pharmacy, were you not?

5   A.  No, I was not.

6   Q.  But nonetheless, they asked you to conceal your fax number

7   based on HIPAA and patient brokering.  That's what this email

8   says, correct?

9   A.  I would actually have to see the email again or the form

10  again to see which email they're talking about.  There was, I

11  know, an occasion where the fax was being sent by the

12  telemedicine network, and at the top of it, there was a number.

13  So I don't even know if this is my number that they're referring

14  to.

15  Q.  Well, Mr. Smith, the head of compounding, sent it to you,

16  correct?

17  A.  Yes, and he's asking whose fax number is this.  I think he

18  knew my fax number, so I don't know what fax number you're

19  referring to.

20  Q.  Okay.  Let's move on.

21          You told us, I believe, in your direct testimony that

22  you had learned about some red flags from PCA in January or

23  February of 2015.  That was from Mr. Smith as well, correct?

24  A.  That is correct.

25  Q.  And you said that after you heard about these concerns you

1   were upset, nervous and anxious.  Those were your words,

2   correct?

3   A.  I felt all of those, yes.

4   Q.  And you even went so far as to tell PCA that you were

5   prepared to quit this job based on those red flags, isn't that

6   true?

7   A.  Yes.

8   Q.  And this was the most lucrative job you had ever had in your

9   career; isn't that right?

10  A.  That is correct.

11  Q.  At the time you were prepared to quit, you were making 2

12  million dollars every two weeks, right?

13  A.  I would have to look, but I don't think -- no, I don't think

14  at that point I was making that.  I believe it was -- in the

15  beginning the income was good, but it wasn't -- it didn't grow

16  to that amount until much later.

17  Q.  Well, the summaries are in evidence and they will speak for

18  themselves so I'm going to move on.

19  A.  Okay.

20  Q.  You then told us on direct that despite the fact that you

21  were upset, nervous, and anxious, and ready to quit one of the

22  most lucrative jobs in your career, perhaps in anyone's career,

23  you said that the pharmacy called and told you they had a fix

24  and that that gave you some comfort, is that correct, the

25  substance of it?

A.   Sure.  They didn't use the word "fix" I don't believe, but

they said that they had talked to their attorneys and there was

a solution and they wanted to discuss it with me.

Q.   Right.  And so you had a dinner meeting in Tampa at a

steakhouse.  Which steakhouse, because I can only remember

Bern's.

A.   Fleming's.

Q.   Fleming's Steakhouse, and it's there that you met the

attorney Gary Walker, correct?

A.   That is correct.

Q.   And I understand that you looked Gary Walker up on the

Internet and you saw that he was at a big firm, correct?

A.   Yes.

Q.   And did that give you confidence that this was a man who

knew what he was talking about?

A.   It did.

Q.   And as I understand your testimony on direct, you said that

Mr. Walker advised you that whatever the concerns were, if PCA

simply went from paying you as a 1099 contractor and now decided

and implemented payment to you as a W-2 employee where you

deduct earnings, right, then all of a sudden, abracadabra, what

was once red flags and concerns is now all cleaned up and legal.

Is that what Mr. Walker told you?

A.   He told me that there was some safe harbors that included an

employee W-2 status, and that if you were a W-2 employee for the

1  pharmacy, that you would then be qualified under these safe

2  harbors and would not be in any violation of any type of statute

3  or whatnot.

4          He didn't really say, you know, hocus pocus or

5  abracadabra.  He wasn't implying that.  He was just stating that

6  in order to be compliant, then a W-2 status should be

7  implemented.

8  Q.  But I want to follow-up on what you just said.  You said

9  that if you became a W-2, you would not be in violation of any

10 type of statute or whatever.  Wasn't it that you would not be in

11 violation of the Anti-Kickback Statute specifically?

12 A.  Yes, it was the Anti-Kickback Statute is what he was

13 referring to.

14 Q.  And does that make any sense to you, Mr. Grow, that simply

15 by becoming an employee and being paid by the pharmacy, that all

16 of a sudden, all of what was done under the Anti-Kickback

17 Statute as a violation would be washed away?  Does make sense to

18 you?

19 A.  Yes, it does make sense to me.

20 Q.  Why?

21 A.  Because if you have no idea that you are in violation of

22 something, and when you find out, you rectify the situation and

23 you do the right thing by becoming compliant, then it shows that

24 you are doing and taking the necessary steps to make sure that

25 you are compliant.  So, yes, it makes sense to me that if you

1    don't know about something and then you find out and you do the

2    right thing, then it makes sense.

3    Q.   Well, I asked a bad question.  Let me try it again.

4         We all agreed earlier that paying patients for ordering

5    scripts was illegal under the Anti-Kickback Statute, correct?

6    A.   Correct.

7    Q.   But now you're telling me that Gary Walker told you that as

8    long as you become a W-2 employee of PCA, now there's no more

9    anti-kickback violation?  Is that what you understood him to

10   say?

11   A.   No, that's not what we discussed.

12   Q.   Well, I'm trying to get at what it was that was discussed,

13   because your testimony was that he told you to become a W-2

14   employee and now you're in a safe harbor under which you're

15   protected from any violations of the Anti-Kickback Statute.

16   A.   That is correct.

17   Q.   And so what I'm asking is, does that make any sense?  The

18   manner in which you're paid dictates whether something is

19   illegal or legal, does that make sense to you?

20   A.   I didn't write the law.  All I can do is go by someone who

21   is an expert in the law and is providing me with that

22   information.  So there are a lot of laws I think that don't make

23   sense if you try to read them, at least in my experience.  When

24   I try to read some of the laws and technical jargon it doesn't

25   make any sense, but that's why, you know, you have attorneys

1    giving advice, and he was giving me this advice in this specific

2    instance when I met with him at dinner.  They specifically came

3    up and met with me for this specific issue.

4    Q.  And so you just told us that you tried to read the law on

5    occasions, correct?

6    A.  I have read laws in the past, yes.

7    Q.  And here is a law that is central to the business you're

8    running that makes millions and millions of dollars.  Did you

9    read it?

10   A.  I had never read it until it was brought to my attention

11   from PCA and the attorney.

12   Q.  And did you read it?

13   A.  Yes, I did.

14   Q.  Did you read the part about bona fide employee safe harbor?

15   A.  I did.

16   Q.  You did.  And then you know that the safe harbor is not for

17   being merely an employee, it's for being a bona fide employee.

18   You understand that, right?

19   A.  I understand that's what it says.

20   Q.  And what does "bona fide" mean?

21   A.  "Bona fide" for me, it would be a guess.  I don't think

22   there's a specific definition of bona fide employee; but in my

23   specific instance, they offered me a salary, they offered me

24   insurance benefits, they offered me stock options.  They talked

25   to me about my specific responsibilities with the company, where

1    we were going, what they would like for me to do in the future,

2    and they gave me a salary as well as commissions.  So, yeah, I

3    felt like I was an employee at that point in time.

4    Q.  The question is:  What does "bona fide" mean?  Not whether

5    you were an employee, but what does "bona fide" employee mean?

6    A.  I don't know what the legal definition of bona fide employee

7    is.

8    Q.  Doesn't it mean real, genuine, legitimate?  Isn't that the

9    way we all use the word bona fide?

10   A.  Bona fide, yeah, you would think that bona fide means real,

11   and, yeah, I thought of myself as a real employee.  I don't

12   think they give fake employees $150,000 salaries and a list of

13   responsibilities and benefits, things of that nature.

14   Q.  You never asked for anything in writing from Mr. Walker, did

15   you?

16   A.  No, I did not.

17   Q.  Well, let me ask this:  Did you rely on the opinion of

18   Mr. Walker?

19   A.  I did, among others.

20   Q.  And did you follow that advice?

21   A.  I did.

22   Q.  Who else did you rely upon?  You just said there were

23   others.  What other lawyers did you rely upon?

24   A.  Patrick Smith, Matt Smith, and David Corcoran.

25   Q.  And David Corcoran was the lawyer we heard from last week,

Grow - Cross

1    correct?

2    A.   Yes.

3    Q.   And Dave Corcoran was the one who said of all of the

4    employees that were hired, you were the one who told them who to

5    hire, right?

6    A.   I assisted in that process, yes.

7    Q.   And you were the one who dictated what the payments were

8    going to be to those particular individuals, correct?

9    A.   The commission structure with them was determined by their

10   managers actually.  So each time someone was brought on, I was

11   told what percentage they would be paid.

12   Q.   Well, in fact, didn't you tell all of those sales

13   representatives in that big conference call that you had with

14   them that nothing was going to change with their employment.  I

15   shouldn't use the word employment.  Nothing was going to change

16   in their arrangement with you except now they were going to be

17   paid by PCA; isn't that right?

18   A.   I told them that in order to continue being involved in this

19   business, that each and every person would have to become an

20   employee of the pharmacy in order to be compliant.

21   Q.   But you just conceded a few moments ago that when you read

22   the law, you knew that it was to become a bona fide employee,

23   not just an employee, correct?

24   A.   Yes, you have to become an employee.  The "bona fide" I

25   didn't really stress as much as you did, but now that we

1    discussed it, yes, if it says bona fide employee, they you had

2    to become a bona fide employee.

3          I wasn't in charge of the hiring process or determining

4    what each of their responsibilities were.  They had an HR

5    department that they hired outside specific for onboarding any

6    and all representatives that came in and they were the ones who

7    determined what each person's responsibilities were and that

8    process.  I was not an HR expert by any means and just followed

9    the rules that they gave me.

10   Q.  And we heard from some of those PCA employees last week,

11   didn't we?

12   A.  Yes.

13   Q.  Nichole Powell, correct?

14   A.  Yes, she was here.

15   Q.  Rashaan Rambaran, the Cici's Pizza employee, we heard from

16   him?

17   A.  Yes.

18   Q.  And their testimony was that they did nothing different and

19   didn't consider themselves real employees of PCA.  That was the

20   substance of their testimony, correct?

21   A.  I believe so.

22   Q.  And in fact, on that conference call, you told everyone on

23   the call that nothing was changing except they were going to get

24   their checks through an employment account that deducted taxes.

25   That was the only thing that was changing, correct?

Grow - Cross

A.   To start, that was going to be the start.  There were going
to be many changes that were coming along, but you've got to
understand the situation here, the whole timing of the dynamics
of the switch-over from 1099 to W-2.  As we were making this W-2
switch-over, I know I had several conversation with Matt Smith
and Pat Smith in regard to the future of the company and what we
would be doing and the interaction that we would have with these
sales representatives in training them, bringing them in for a
national meeting, and things of that nature.

     Unfortunately, soon after these agreements were sent
out and signed, it was a matter of a couple of weeks before the
whole program was terminated.  So we were never able to
implement the sales programs and things of that nature that were
discussed to lead the program into the future.

Q.   And so there was no training at PCA of all of these new
employees of yours, was there?

A.   No, there was some training.  There was no sales training at
that point in time.

     In order to become an employee, they were required to
do several different modules online consisting of different
things that revolved around HIPAA, and revolved around, I
believe, compliance and things of that nature.  So I believe
there was about six or seven different training modules online
that everyone had to complete before they were able to become an
employee.

1  Q.  And it was a matter of six to eight weeks before PCA

2  terminated every one of these employees, including yourself

3  eventually, right?

4  A.  That is correct.

5  Q.  And that's because of the simple fact that Tricare stopped

6  paying for the prescriptions, right?

7  A.  Yes.  When Tricare decided that they were not going to

8  reimburse anymore essentially there was no business.  The

9  business ceased to exist, so there was no need to have employees

10  without a product to sell.

11  Q.  And 56 of those employees were PCA patients who were

12  generating scripts, their own scripts for the pharmacy, correct?

13  A.  No, they were not generating their own scripts for the

14  pharmacy.  The scripts that were generated on their own scripts

15  were generated by another sales representative.

16  Q.  But, for example, Nichole Powell, she became hired as an

17  employee of PCA at the same time that PCA was billing for her

18  script, correct?

19  A.  I would have to look at the dates but, yes, more than

20  likely, yes.

21  Q.  And once Tricare wasn't paying for the scripts, PCA had no

22  need for Nichole Powell anymore, correct?

23  A.  Or anyone else for that matter.

24  Q.  Exactly.

25         Now, let's go back to Mr. Walker.  You said you never

1    got anything in writing from him.

2    A.    I did not.

3    Q.    And you never asked for an opinion letter from PCA, did you?

4    A.    I did not.  I took their word that they were being compliant

5    and doing everything possible.  They told me that they had hired

6    an outside attorney group that specialized in healthcare.  They

7    had come in to do an evaluation of their business and that is

8    what they had found and they were advising them on the solution

9    to rectifying the situation at hand.  So, yeah, I did not ask

10   for an opinion letter.  Meeting with him face-to-face was, you

11   know, good enough for me.

12   Q.    You know what an opinion letter is, don't you?

13   A.    Where someone is giving you an opinion on something.

14   Q.    Sure.  A law firm is giving you a written opinion, correct?

15   A.    Yes.

16   Q.    And it sets forth all the facts that they know about what

17   the business is, it sets forth what the law is, it analyzes it

18   and it gives you a legal conclusion that you can rely on,

19   correct?

20   A.    I would think so.

21   Q.    You've seen opinion letters before.

22   A.    Yeah, I believe I've seen an opinion letter before.

23   Q.    Do you remember you mentioned Mr. Ken Kimble, correct?

24   A.    Yeah, I know Ken Kimble.  I know the name.

25   Q.    Ken Kimble introduced you to Ginger Lay, didn't he?

1  A.  Yes, he did.

2  Q.  And Ken Kimble sent you an opinion letter that had to do

3  with how to legally do a pain survey, didn't he?

4  A.  Ken Kimble sent me many, many emails about a lot of stuff,

5  most of which I never even read.

6  Q.  And though you knew about opinion letters, you never asked

7  for one with regard to your business with PCA?

8  A.  No, I did not.

9  Q.  And you never got your own lawyer?

10  A.  No, I did not.

11  Q.  And you certainly could have afforded a lawyer, couldn't

12  you?

13  A.  Yes, I could have afforded a lawyer at that time.

14  Q.  And you didn't ask -- is it your brother that's J.J. Grow?

15  A.  Yes, that's my brother.

16  Q.  And you didn't ask him for any free legal advice?

17  A.  Free legal advice in regard to what?

18  Q.  In regard to any of these issues.

19  A.  In regard to PCA?

20  Q.  Correct.

21  A.  No, I don't think I ever asked him for legal advice on PCA.

22  Q.  You could have, though, correct?

23  A.  Well, he's not an attorney so he can't -- no, my brother

24  can't give me advice.

25  Q.  But when you were at InforMD Solutions, you had a legal

1  issue arise at InforMD Solutions, didn't you?

2  A.  Yes, I did.

3  Q.  And you forwarded that legal issue to your brother and he

4  got you legal advice for free?

5  A.  Yes, he did.

6  Q.  But you didn't bother to do that when it came to PCA?

7  A.  No, I did not.

8  Q.  Now, this dinner meeting with Mr. Walker, he never gave you

9  any advice about the Federal Healthcare Fraud Statute, did he?

10 A.  I don't believe we discussed that.

11 Q.  And did you ever tell Mr. Walker when you're having this

12 dinner and discussing this W-2 bona fide safe harbor issue, did

13 you tell him that you were sending patients that you marketed to

14 telemedicine doctors that you paid for?  Did you tell him that?

15 A.  Yes, I did.

16 Q.  And did you tell Mr. Walker that most of your sales reps

17 were Tricare beneficiaries and patients of PCA at the same time

18 they were rep'ing their family members?  Did you tell him that?

19 A.  He did know that many of the sales representatives that were

20 at MGTEN at that point in time were patients and that some of

21 those patients then became sales and marketers.  And, yes, he

22 did know that the patients were being sent to telemedicine

23 doctors in which they were consulted and I was paying consults.

24 We specifically addressed that.  He asked me how the

25 telemedicine network was being paid.

1   Q.   But did you tell Mr. Walker that most of your sales reps

2   were Tricare beneficiaries and that they were rep'ing their

3   family members?  Did you tell him that?

4   A.   Yes, I told him that many of them were patients and

5   beneficiaries that had become sales representatives, but the

6   issue of rep'ing family members was not discussed.

7   Q.   And you told him that at this dinner meeting?

8   A.   I told him what?

9   Q.   What I just mentioned.

10  A.   Yes, he asked me specifically can you tell me about your

11  business and how the business operates and how you've been able

12  to grow the way you have.

13  Q.   Tell us what you told him.

14  A.   That's what I told him.  I told him that -- he already knew

15  that we were marketing to Tricare recipients because that's what

16  the whole business was based about.  He asked me --

17  Q.   Wait.  Let me stop you there for a second and I'm sorry to

18  interrupt, but you said he already knew.  Did you tell him that?

19  How did he already know that you were doing Tricare business?

20  A.   Matthew Smith and Patrick Smith had discussed this with him.

21  Q.   And so, as we have heard many times today, is that hearsay?

22  A.   Not hearsay to me since they were talking about it right in

23  front of me, the three of them.

24  Q.   So at this dinner meeting they told him your business is

25  Tricare business?

1  A.   I don't know that they said this is Tricare business, but

2  he's the one that mentioned to me that it was Tricare as he was

3  talking about the Anti-Kickback Act.   That's the whole point of

4  the meeting, was that we were doing business with Tricare and

5  they said that it was a gray area with the Anti-Kickback Act and

6  that's why we were meeting.   So, yes, he knew that it was

7  Tricare that we were referring to.

8  Q.   Did you tell Mr. Walker that you were selling ingredients to

9  PCA that increased the reimbursements by thousands of dollars?

10  Did you tell him that fact?

11  A.   I don't think we discussed the ingredients at all in that

12  meeting.

13  Q.   Did you tell Mr. Walker that you and your sales reps were

14  telling patients that they didn't have to pay their copays?

15  A.   We did not discuss copays during that meeting.

16  Q.   Did you tell Mr. Walker that you had discovered that Ginger

17  Lay, one of your reps, was using a bogus study to pay up to a

18  thousand dollars to patients to induce them to sign up for your

19  drugs?

20  A.   I don't think that Ginger Lay or any of that came up in this

21  meeting in conversation.   I don't even think at this point in

22  time -- I don't even know if we knew.   All of this happened

23  right about the same time.   The whole Ginger Lay survey program

24  and the start of the transition where they bring it to light

25  that we should become W-2 employees, it was all happening right

1  at the same time.  So I don't know if it had already come out by

2  the time of this meeting or if it came out right after.  So it

3  was all happening right together.

4  Q.  You're right, it was all happening around the same time, but

5  we saw emails concerning Ginger Lay's study and those were on

6  February 20th of 2015.  The dinner was on Thursday, February 28,

7  2015, correct?

8  A.  Yes, I guess so.

9  Q.  And so just a week before this meeting with a lawyer who out

10  of your own mouth you said was a very experienced and competent

11  attorney, you have an issue with Ginger Lay a week before and

12  you never bring it up to him?

13  A.  I did not.  That's not what we were there to discuss.  We

14  were specifically there to discuss the W-2 situation.

15  Q.  And Ginger Lay was part of the W-2 situation, wasn't she?

16  She was one of your reps.

17  A.  She was potentially someone that would become a W-2, yes.

18  Q.  And the pharmacy discovering that Ginger Lay was paying

19  patients was a huge issue, was it not?

20  A.  I don't know what they were doing with it at that point in

21  time.  I do know that the pharmacy contacted me and they asked

22  me if Ginger Lay was paying patients.  I believe that was on

23  February the 19th.  And I told them I had no idea, but I would

24  find out, after which I called her and she got very upset and

25  said, no, that they weren't.  I think "hell no" was the exact

1   words, but she told me that they were not, and then later on

2   that night, she called me and told me about this survey program.

3   I immediately called Matthew Smith from the pharmacy and

4   reported this to him.  He then requested immediately that I get

5   him a copy of this survey.

6           I contacted Ginger, told her I needed to get a copy of

7   it.  She emailed it to me and I emailed it to them, and they

8   said that they would get back to me and that's all that

9   happened.  And I think -- I don't know what the date was, but I

10  think it was somewhere around March 2nd, somewhere around there,

11  where he sends me a message and he says Ginger needs to cease

12  the program immediately and so I told Ginger you need to cease

13  the program immediately.

14          Matthew Smith never discussed with me why.  I never

15  asked why.  He never told me we talked to our attorneys and they

16  say this or that.  It was never even brought up.  He simply said

17  Ginger needs to cease her program immediately and so I followed

18  his directions and I told her, you need to cease the program

19  immediately.

20  Q.  Did you ever ask Mr. Walker his views about the CBS news

21  story that you had seen two or three days before this meeting in

22  Tampa?

23  A.  No, I did not.

24  Q.  But you did see the story, right?

25  A.  Apparently, yes.

1  Q.  And based on what you saw, you thought the conduct was

2  fraudulent, did you not?

3  A.  I believe so.

4  Q.  And in the news story that you saw, it was about compounding

5  pharmacies, wasn't it?

6  A.  It was.

7  Q.  And it was about the excessive amount of money that was

8  being paid by insurance companies for these compound drugs,

9  wasn't it?

10  A.  No, that was not the basis of the story.

11  Q.  And in fact, the drugs that were referenced in the story

12  were pain creams and scar creams that cost less than your pain

13  creams and the scar cream; isn't that right?

14  A.  I think they might have discussed the cost of the creams,

15  but once again, that was not the basis for the story.

16  Q.  And the story discussed how marketing companies would try

17  and recruit patients to order the creams, correct?

18  A.  No, that's not what they were doing.

19  Q.  Well, what's your recollection of what they were doing?

20  A.  The recollection of what they were doing was they were

21  contacting physicians as if they were in agreement with a

22  patient, that the patient wanted a medication, and they were

23  convincing a physician that a patient wanted a medication.  And

24  without ever getting the patient's consent, a script was being

25  written, and then without a pharmacy ever talking to a patient

Grow - Cross

1    and confirming with them that they wanted and actually needed

2    the medication, they were sending the medications to this

3    person's front doorstep.  The person said that they got this

4    medication and thought it was an accident.  They had no idea why

5    they had received it.

6            So that is something very different than what our

7    program did and, yes, it seems fraudulent.  If you are going to

8    send a medication to a patient who doesn't want it, doesn't have

9    a need for it, has no idea what it's about, and the pharmacy

10   never contacted them either, then that sounds kind of shady,

11   yeah.

12   Q.  In fact, in the news story they interviewed a patient,

13   correct?

14   A.  I don't remember, but I think I saw some quotes from him or

15   something.

16   Q.  And the patient said that someone called him and asked him

17   if he had pain, right?

18   A.  I don't remember the details of the interview.  I mean, it

19   was years ago so --

20   Q.  And the patient said that, yes, he did have pain and he was

21   actually interested in what their product was, correct?

22   A.  I don't recall.

23   Q.  And then the telemarketer found out who the patient's real

24   doctor was and went to that doctor, correct?

25   A.  I believe they -- I don't know if they went to him, but

1  somehow, yes, they did contact that doctor.

2  Q.  Correct.  And they contact the doctor and say, your patient

3  wants this product, here is a script, please sign for it, and

4  the doctor signed it, correct?

5  A.  I believe so.

6  Q.  And the issue in the story was that it kind of was shady

7  because the patient said I was interested, but the letter to the

8  doctor said your patient wants this and doctors want to give

9  their patients what they want so the doctor signed, right?

10  A.  I think the issue at hand, when I looked at the article,

11  from what I recall is that the patient said that they never told

12  anybody that they wanted it.  There was no want.

13      In our program, we talked to patients face-to-face.  We

14  were not a telemarketing company.  We were not randomly dialing

15  patients that we had no relationship with.  Our representatives

16  were meeting with them face-to-face and asking them specifically

17  if they had a need and a desire for these medications.  And if

18  they did, then they were supplied their information to a

19  physician and a physician would call them.  I think that's a

20  very big difference between what we were doing and what this

21  company was doing.

22      Our company also -- it was mandatory that they speak

23  with the pharmacy to confirm with the pharmacy before any

24  medication would be sent out that they had a need for it and

25  they also understood how the medication would be applied.  I

1    think we've looked at many, many documents over the course of my

2    testimony that showed if a pharmacy was not able to get in

3    contact with a patient, then that patient was canceled.

4    Q.   One of the big differences between your operation and the

5    one in the news story is that the one in the news story didn't

6    offer to sign the patient up to make more money from selling

7    more of the drugs, did they?

8    A.   I don't understand your question.

9    Q.   A big difference between the situation in the news story and

10   what you were doing, right, a big difference between the two is

11   that in the news story there was no offer to the patient to make

12   any compensation out of compounding, no direct payment, no

13   payment to their spouse, no offer that they could be a sales rep

14   and start making their own money off of these products.   There

15   were no financial incentives involved.   That's a difference

16   between your program and the one on the video?

17   A.   No, I think the one on the video there was financial as

18   well.   I believe that the telemarketers were definitely being

19   compensated for those prescriptions.

20   Q.   Not the telemarketers, the patients.   No incentive to the

21   patients in the news story.

22   A.   I don't recall but, yeah, I don't think that there was an

23   incentive to that patient.   I didn't offer incentives to our

24   patients either.

25   Q.   Well, they could sign up to be a rep, right?

A.   If their representative felt like they would be a good

candidate and they showed an interest and they felt like the

product would be good for them to market, then, yes, they could

potentially become a marketer.

Q.   Then they could sign up their spouse, their family, and then

make money off of it, right?

A.   They could talk to people that they felt were good

candidates, and if those people said that they had a need and

they wanted to talk to a physician and go over their conditions

and a physician felt that it was a good product for that patient

and that physician wrote a prescription, then, yes, they could

do that.

Q.   Another glaring difference between the CBS news story and

what you were you doing is that in the CBS news story the

telemarketer person actually went to this patient's real doctor,

correct, not a telemedicine doctor.

A.   Yeah, I believe the telemarketing company, from what I

understand, was contacting this physician without the patient's

consent and they were getting the physician to sign a

prescription without the patient knowing anything about it.

Q.   But it was the patient's real doctor who knew their real

history, who knew they had pain, for example?

A.   I have no idea what the doctor knew.  I just know what I

read in the article was that they were contacting physicians on

behalf of patients who did not give them the authority to do so

1    nor did they even talk to the patient about their condition and

2    the patient never told them that they wanted the medication.  So

3    you're talking about a patient that is totally unaware of what's

4    going on behind closed doors and they hear the doorbell ring one

5    day and they walk to the door and there's medication sitting on

6    the doorstep and they think, wow, someone must have sent this to

7    the wrong place.  So they were totally unaware of anything that

8    was going on.

9    Q.  And there's nothing in the news story that suggests the

10   doctor was being compensated by the telemarketer, correct?

11   A.  I don't recall seeing anything.

12   Q.  And in your situation, you, the owner of the marketing

13   company, was paying for the script or the consult, either way,

14   correct?

15           MR. RASHBAUM:  Objection, Your Honor, compound.  Can he

16   just break it up?

17           THE COURT:  Overruled.  But he can answer it how he

18   wishes.  He doesn't have to answer it yes or no the way it's

19   phrased.  Go ahead.

20           THE WITNESS:  Please repeat the question, please.

21           THE COURT:  How many people thought that was going to

22   happen no matter what.  Then repeat the question.

23   BY MR. JUENGER:

24   Q.  In the news story there was no indication that the doctor

25   was paid anything for writing a script for that doctor's real

1  patient, correct?

2  A.  I don't recall anything about that in the report, but like I

3  said, it's been three years since I read that article.

4  Q.  And in your case, the doctors were paid to do the consult

5  for your patients that you recruited, correct?

6  A.  That is correct.  The doctors talk to the patients and, as

7  we explained earlier, no matter what the result was, they were

8  paid a consult fee.

9  Q.  Well, we already established the result was 97 percent of

10  the time you got a prescription, right?

11  A.  Based on the numbers you showed today, that's what it looks

12  to be, yes.

13  Q.  And that turned into 19 million dollars in the matter of

14  eight months, correct?

15  A.  Yes, sir.

16  Q.  And in the news story, the drugs that they mentioned, they

17  actually had the formulas in there.  Did you notice that?

18  A.  I did not.

19  Q.  And in those formulas each of the creams used a product

20  called ethoxydiglycol.  Did you notice that?

21  A.  I did not.

22  Q.  And it showed the reimbursement from the insurance company

23  and it was something like $7.  Do you remember that?

24  A.  No, I did not.

25  Q.  If you look at the total price paid for these drugs, they

1    were almost -- yours were almost twice as much as the ones in

2    the CBS story.

3    A.   I think there's a lot of different variables with any of

4    these medications.  I'm no billing specialist, I've never done

5    billing for the pharmacy.  I never submitted any claims.  I've

6    never, you know, entered them into a system.  That wasn't

7    anything having to do with my particular responsibilities with

8    this company.  I was simply a marketer.

9         But I do know from Mr. Lozada's testimony the other day

10   that ethoxydiglycol is an inactive ingredient and it's not

11   listed on the actual prescriptions.  So I don't remember this

12   article in detail and seeing what was listed out in that article

13   as being an ingredient, but I guess I'd be surprised if

14   ethoxydiglycol, which is an inactive ingredient, was listed on

15   there but --

16   Q.   There may be many variables that affect the ultimate

17   reimbursement for a drug, but in this case, clearly

18   ethoxydiglycol was one of them.

19             THE COURT:  Is that a question?

20             MR. JUENGER:  It's not a question, Your Honor.

21             THE COURT:  Then it will be stricken.

22             MR. JUENGER:  Strike it.

23   BY MR. JUENGER:

24   Q.   But you never mentioned this story to Gary Walker, right?

25   A.   I don't recall mentioning it to him, no.

Grow - Cross

195

1   Q.   In your direct testimony you told us about Ginger Lay and

2   her study, right?

3   A.   Yes.

4   Q.   And as I understood listening to your direct, you had no

5   idea about the study in the beginning, right?

6   A.   That's correct.

7   Q.   And then you found out about it and the pharmacy found out

8   about it, right?

9   A.   Right.

10  Q.   There was an effort made to see if it was legal?

11  A.   I have no idea.

12  Q.   But ultimately, on March 3rd, the decision was made to

13  terminate the program, right?

14  A.   That is correct.

15  Q.   And to be clear, that survey involved paying patients a

16  thousand dollars.  That's a lot of money, isn't it?

17  A.   Absolutely.

18  Q.   And if you're paying a patient a thousand dollars, there's a

19  corrupt motive, a corrupt influence on that patient's ordering,

20  would you agree?

21  A.   I do agree with that.

22  Q.   And so you need to shut that down, right?

23  A.   Right.

24  Q.   And so you must have fired Ginger Lay at that point, right?

25  What a terrible thing to do.

A.   Ginger Lay, when she -- when I confronted her about this issue of offering patients money, we had no idea about the survey.  That evening she told me that the survey was what we were referring to.  When the patient that first time called, I guess, they didn't say it was for a survey, they just said that they had been offered a thousand dollars.  So I went to her -- or Matt Smith came to me and said is Ginger Lay offering patients, you know, a thousand dollars to get a prescription?

     Obviously, she let us know later that evening that, no, no, no, that wasn't what it is, this is a survey that we're doing.  And she explained that she had talked to two attorneys who had given opinion letters, or something of that nature -- I don't even know if she said opinion letter, she said that they vetted it -- and asked me if I wanted to get on the phone with those attorneys, and I said no, that it had nothing to do with me, that she should have gotten this approved through the pharmacy before implementing anything.  And so I told her that I would have to go back to the pharmacy and see how they wanted to handle it.

     So it wasn't me making any of those decisions.  I did what I thought was proper and that was take the issue to the pharmacy and let them handle it as they see fit.

Q.   But you had an opinion letter from Ken Kimble, right?

A.   I never saw his opinion letter.  I never looked at it.

Q.   Do you agree that he sent it to you?

1  A.  Over the course of this investigation, yes, I have seen an

2  opinion letter now, but I did not see an opinion letter then.

3  Q.  Okay.  So you didn't fire Ginger Lay.  You at least stopped

4  doing any more business with her, right?  You cut her off and

5  stopped paying her, right?

6  A.  The pharmacy did not require her to be terminated.  They

7  talked to her and they discussed it.  Ginger Lay said that no

8  patients had ever been paid.  She said that patients that were

9  offered the program would be eliminated and they would not be

10  paid.  She had me personally call the telemedicine company and I

11  canceled every patient that was currently uploaded in the system

12  and they were deleted so they would not be called and consulted

13  on the program as well.

14       So, ultimately, I did not make any decisions in regard

15  to Ginger Lay.  All I was told by the pharmacy was, after

16  hearing those facts -- and whatever they did with it, I don't

17  know.  I didn't ask questions.  They came to me and said, she

18  needs to terminate it, so that's what I enforced.

19  Q.  Well, she worked for you though, correct?

20  A.  No, she did not work for me.  She had her own independent

21  marketing group.  Basically, I was just a liaison between her

22  and the pharmacy.

23       When Ginger Lay contacted me, she asked me if I had a

24  good pharmacy that I was working with, someone who was reliable

25  and compliant, and I said yes, and so I made an introduction to

Grow - Cross

198

the pharmacy.  That's why she had her own telemedicine agreement

and portal, and I was just kind of an intermediary between her

and the pharmacy.

Q.  But we saw in the bank accounts earlier today that you paid

her over $6 million out of your account, correct?

A.  That's correct.

Q.  And the deal with her was that you got 10 percent, so you

made approximately 1.25 million dollars off of Ginger Lay's

patients, right?

A.  I did.

Q.  And so you have to agree you had a financial incentive to

keep working with her, right?

A.  There was a financial incentive, however, that financial

incentive was never based on her committing fraud.  She insisted

that her program had ended, that it had stopped, that no one had

ever been paid, and that those patients would be deleted and

eliminated and that's what she told me happened and that's what

I believed.  She was pretty convincing.  So the pharmacy was the

one that ultimately made the decision to make her stop the

program, but allowed her to continue based on the facts that she

presented to us.

Q.  But the pharmacy kept getting emails saying patients are

calling, they're telling us that they're expected to get paid a

thousand dollars from Med RX, and the pharmacy forwarded these

emails to you, correct, all the way to June?

A.   Yes, that's correct.   There were -- on several different

occasions there were times where the pharmacy said that someone

contacted them and said that the medications would be free, they

wouldn't have to pay copays, or something like that if they

participated in a survey.   There were a couple of occasions

where that happened with the pharmacy, they forwarded it to me.

I talked to Ginger and Ginger said that nobody has been

paid, that the program was switched, just as she testified, to a

non-paid program and that's what they were conducting.   And I

specifically asked her -- I remember one of these emails where

it talked someone mentioned a survey, and she said that the

patient was obviously confused, that this was a person that was

part of the original survey program in which they were offered

something and then were canceled, resubmitted for the non-paid

program.

Q.   And ultimately, the pharmacy hired her; isn't that right?

A.   Yes, they did.

Q.   Despite the fact that they too knew that she was paying

patients to be part of a survey.   They knew it, they didn't fire

her, they hired her, correct?

A.   Well, like I said, they didn't know that she was paying

anybody.   Ms. Lay was very convincing in letting us know that no

one had ever been paid.   As a matter of fact, the first time

that I ever found out that a patient had been paid was about a

week and a half ago when Ms. Lay's documents during this

1    investigation were turned over to my attorneys.  At that point

2    in time we figured out that, against everything that she said

3    was being done and everything that we insisted, she was paying

4    patients in fact.

5    Q.  Now, what is Diagnostic Innovations?

6    A.  Diagnostic Innovations was a company that I briefly started

7    I think maybe in February, March of 2015.  I was going to be

8    working with a company, I believe it was called Vantari, that

9    had a genetic testing program for potential cancer patients.

10   Q.  And isn't it true that you signed up Ginger Lay to be a

11   sales rep for you at Diagnostic Innovations?

12   A.  That is correct.  Ginger Lay was very interested in working

13   in that arena.

14   Q.  Despite the fact that she was lying to you about a patient

15   study that didn't exist and that was paying patients a thousand

16   dollars, you signed her up for your new company to be a sales

17   rep, correct?

18   A.  Had I known she was lying at the time, she would not have

19   been offered anything.  As a matter of fact, she would have been

20   terminated from everything.  The fact of the matter is she was

21   lying.  I did not know the truth.  I didn't find out the truth

22   until a week and a half ago.

23   Q.  And when was the contract with her signed?

24   A.  I don't remember the exact date, but maybe some time in

25   March.

Grow - Cross

1  Q.  April 27, 2015, does that sound right?

2  A.  Possibly so.

3          MR. JUENGER:  Ms. Lam, do you have the contract over

4  there?  Forgive me, Your Honor, but I think it's on the table.

5          THE COURT:  All right.  Go get it.  You don't need

6  forgiveness for that.  Go get it.

7  BY MR. JUENGER:

8  Q.  I was right after all, April 27, 2015.  Does that sound

9  right to you?

10  A.  Sure, that's about the time frame.

11  Q.  So at the time you signed up Ginger Lay to be a rep for you,

12  you had already had your meeting with Gary Walker, right?

13  A.  I had.

14  Q.  And the meeting with Gary Walker said the way to avoid

15  anti-kickback problems is to become a bona fide employee,

16  correct?

17  A.  That is correct, when you're dealing with a Government

18  payer.

19  Q.  And despite the fact that she had lied to you, you signed

20  her up to be a sales rep?

21  A.  Unfortunately, at that point in time I didn't know that she

22  had lied to me.

23  Q.  Now, something else you said on your direct was that you

24  decided you would never market to soldiers deployed overseas,

25  right?

A.   Yes.   That was one of the rules that people had asked me on

several occasions if they could market or provide something to a

patient that was in Bahrain or, you know, on deployment, and I

said no.

Q.   And what struck me by your answer was that you said you did

that because you didn't want any shenanigans, a word which I

appreciate, but I wondered if you could tell us what you meant

by shenanigans?

A.   On one specific occasion there was a representative who

asked me if someone who is stationed overseas could get the

medication shipped to her and then her ship it to them, and I

just didn't think that that was kosher enough.

Q.   Why?   What would be wrong with that?

A.   Because I don't think it would be possible really for the

pharmacy to handle their end of it and be able to talk to the

patient, confirm with them that they wanted it, that they needed

it, and explain to them how to use the product.   So, to me, it

looked like there was a lot of loose ends so it was better to,

you know, not allow it.

Q.   Okay.   And one last set of questions I want to ask is that:

Do you remember Lisa Klitz, the financial analyst who presented

testimony?

A.   Yes, I do.

Q.   She presented, I think it was five summary exhibits that

purported to outline five different transactions that you were

1  involved in.  Do you remember that, just generally speaking?

2  A.  I do.

3  Q.  And it showed the purchases of -- there was the house, there

4  were the two cars, there were the jet skis and the TD Ameritrade

5  account.  Do you remember that?

6  A.  Yes.

7  Q.  And then my question is just, having had a chance to review

8  those, do you agree that you were involved in those

9  transactions?

10  A.  I was involved in those transactions.  I purchased a home, I

11  purchased vehicles.  I did transfer money into a TD Ameritrade

12  account so money could be invested in different stocks and

13  things of that nature.  I did end up at some point in time

14  purchasing those jet skis.

15  Q.  And each of those transactions involved more than $10,000,

16  correct?

17  A.  I believe so.

18  Q.  And each of those transactions was funded by monies that you

19  received from PCA, correct?

20  A.  Yes.  I believe that money did -- some of it did originate

21  from PCA, among other people, but yes, that was part of it.

22          MR. JUENGER:  Your Honor, that's all I have.

23          THE COURT:  All right.  And the exhibits to be admitted

24  are none; is that right?

25          MR. JUENGER:  No, Your Honor, none.  Thank you.

1          THE COURT:  All right.  Redirect.

2          MR. RASHBAUM:  Thank you, Your Honor.

3          THE COURT:  You know, while you're setting up, and I've

4    given you this instruction before, ladies and gentlemen of the

5    jury, so some of it will sound repetitious, which is probably a

6    good thing sometimes to be reminded, and you may remember that I

7    have instructed you in the past about hearsay.

8          A statement out of court is generally not admissible

9    without the person who made the statement, the declarant we call

10   them, coming to court so he can be cross-examined because we

11   think by cross-examination you as jurors can determine the truth

12   of what the person is saying.  But sometimes we allow, as I have

13   throughout this trial, statements to come in without the person

14   testifying.  For example, emails of the defendant came in.

15   Whenever there's a statement by a party, it comes in.  The

16   defendant decided to take the stand in any event.  So other

17   statements made to him are also admissible whether they are

18   introduced by the prosecutors or introduced by the defense

19   lawyers.  Even though what the lawyers say -- the legal term is

20   they're not coming in for the truth, which sounds like a weird

21   thing, but what they mean by that is they're just coming in to

22   see what the witness, in this case the defendant, but the same

23   thing would apply to any other witness, what the witness,

24   including the defendant, knew when and that type of thing.  We

25   call that state of mind and, of course, the state of mind of the

1  defendant is at issue from very beginning.  In opening statement

2  the defense lawyer told you his intent and knowledge were at

3  issue.

4          So I've allowed of things in that normally would not

5  come in without the person.  So if someone tells someone, hey,

6  you knew about this, you knew about that, you're not here to

7  determine if whatever those individuals out of court told the

8  defendant, or another witness, is true, but what the state of

9  mind of the witness, in this case the defendant, was.  That's

10  what you determine.

11          I don't know if that helped or confused you a little

12  bit, but it's probably worth a whole year of an evidence class,

13  and based upon your looks, I think you passed.  All right?

14          All right.  Redirect.

15          MR. JUENGER:  Your Honor, I am afraid I misspoke.  I

16  misunderstood.  I do intend to introduce 176.

17          THE COURT:  Well, that's kind of why I asked you.

18          MR. JUENGER:  I see now.

19          THE COURT:  Most judges wouldn't, but I just don't want

20  to have outside of the presence --

21          MR. JUENGER:  I understand.

22          MR. RASHBAUM:  Let me see what it is, Your Honor.

23          THE COURT:  Well, 176 is what we have spoken about ad

24  nauseam.  I say ad nauseam, they don't.  That's one of the

25  reports, right, one of the news articles?

1           MR. JUENGER:  Correct.

2           THE COURT:  176 is the February 23rd news report,

3    right, article?

4           MR. JUENGER:  Correct, Your Honor, yes.

5           THE COURT:  Now, the same thing applies.  You say how

6    in the world can a judge have a news article.  You have an

7    objection I take it.

8           MR. RASHBAUM:  Yeah.

9           THE COURT:  Okay.  You have an objection and the reason

10   I've overruled the objection is to tell you that it comes in

11   not -- when you look at February 23, 2015 article, it has to do

12   with prescription creams and gels, with something unrelated to

13   this case in the sense that it involves American Ford from Utah,

14   Action Medical, Western Medical, and obviously, those are not

15   the individuals or the entities discussed in this case.

16          The only reason is to provide context to any of the

17   emails that the defendant may have issued to say, hey, did you

18   hear about this article?  Yes, I heard about the article.  If

19   you don't know about the article, it could be about the Super

20   Bowl or something like that, right, which wouldn't have anything

21   to do with it.  But it's not to prove that a fraud occurred even

22   in that unrelated case, or even that a fraud occurred in this

23   case, but just what did the defendant know and when did he know

24   it and did he act with the specific intent to commit a crime,

25   which was the issue, as raised by defense counsel right after

Grow - Redirect

1    the prosecutor's opening statement.  So there's no secret of

2    what you all have to decide.  Okay?

3            In my view, it's not complicated, but it's difficult,

4    and that's what you should do.  All right?

5            Any objection to that instruction?

6            MR. RASHBAUM:  No, Your Honor.

7            THE COURT:  All right.  Then the exhibit is admitted.

8        (Government's Exhibit Number 176 was received in evidence.)

9            MR. RASHBAUM:  May I proceed, Your Honor?

10           THE COURT:  You may.

11                        REDIRECT EXAMINATION

12   BY MR. RASHBAUM:

13   Q.  So Mr. Juenger just talked to you about the purchasing of

14   some stuff, a couple of cars, a house, jet skis and an

15   Ameritrade account.  Do you recall that?

16   A.  I do.

17   Q.  When you purchased those items, which were over $10,000, did

18   you purchase them out in the open or did you run them through

19   someone to hide your purchases?

20   A.  No, I just went there and purchased them.

21   Q.  Well, why wouldn't you hide those purchased considering,

22   according to the Government, they are the proceeds of illegal

23   activity?

24   A.  Because I didn't think anything I had ever done was illegal.

25   Q.  Now, Mr. Juenger spent a lot of time talking about this CBS

Grow - Redirect

1  article in February of 2015. Do you recall that?

2  A. I do.

3  Q. And on the top of the email -- can I see the exhibit?

4          Let me ask you first: What did you think -- there's an

5  email and you say this is fraudulent, or something to that

6  effect. The jury can look at it. What did you think was

7  fraudulent about the conduct in the CBS article as opposed to

8  what your company was doing?

9  A. In that article the patients were not being told by the

10  marketing company -- they weren't being talked to by the

11  marketing company about products. The marketing company was

12  simply somehow getting their information, finding out who their

13  doctor was, calling their doctor and pretending that they had

14  spoken to the patient and the patient wanted medications, and

15  somehow was able to convince the doctor to write a prescription

16  for that patient.

17          Then the pharmacy, without ever contacting the patient,

18  talking to them to discuss the patient's need and desire for the

19  medications, would then bill for the medications and send them

20  to them, and this particular couple that was interviewed said

21  they had no idea what these medications were for and why they

22  received them.

23          So that was a big difference between what they were

24  doing and what we were doing, in which we directly marketed to

25  patients, we confirmed that they wanted and needed them. They

1  filled out information that would then be sent to the physicians

2  so the physicians could call the patients, consult with them,

3  and see if the medications were right for them.  And if they

4  were written a prescription, it was provided to the pharmacy,

5  who would then call the patient, talk to the patient about how

6  to use the medications, talk to the patient to confirm that they

7  wanted the medication and still needed it before it was sent

8  out.

9  Q.  Let's get a little more specific about the CBS article

10  because you were asked some questions without it.

11        Do you see in the article it says, "All I saw was

12     egregious billing for something John didn't want.  We had no

13     idea how to use, we didn't know what was in it, Meryl said."

14        Is that what your company was doing?

15  A.  No, it was not.

16  Q.  What was your company doing?

17  A.  We were providing medications to people that needed it and

18  wanted it and confirmed that, and then our pharmacy was

19  following up with those patients before they sent it to

20  reconfirm.

21  Q.  Now, do you recall Mr. Juenger talking to you about his love

22  of, I think it was craps or blackjack?

23  A.  Yes.

24  Q.  And do you recall him bringing up Defense Exhibit 190, which

25  is already in evidence?  Do you recall that?

1    A.   Yes, I do.

2              MR. RASHBAUM:   May I have one moment, Your Honor?

3              THE COURT:   Sure.

4    BY MR. RASHBAUM:

5    Q.   Do you remember Mr. Juenger asking you a lot of questions

6    about how, for instance, in this one document it was 97 percent,

7    I think he said, 97 percent of the people actually got

8    prescriptions?

9    A.   Yes.

10   Q.   And he compared it to a slot machine.   Do you recall that?

11   A.   Yes, I do.

12   Q.   Can you tell the jury why that comparison is absolutely

13   absurd?

14   A.   Well, a slot machine is very random so you just pull the

15   lever and hopefully something comes up.   If you were going to

16   equate that to this business, it had no similarities whatsoever.

17   That would be like me just walking out on the street and asking

18   somebody their name and sending them in to, you know, talk to a

19   doctor.   We actually were talking to specific patients who had

20   pain, who stated they had scars, and had the desire for

21   metabolic vitamins.   So they were very specific patients in

22   which we were confirming prior to sending to the telemedicine

23   network that they had these needs.   So they were very specific.

24   It was not random at all.

25   Q.   These are denied and refused.   Do you see that?

Grow - Redirect

1  A.  I do.

2  Q.  Did you pay the telemedicine company for these denied

3  prescriptions and refused prescriptions?

4  A.  I paid them for the consults on those, yes.

5  Q.  So in those cases, granted it's only 4 percent of the time

6  or 3 percent of the time, was the telemedicine company still

7  paid?

8  A.  Yes.

9  Q.  And why was that important to you?

10  A.  Because I was paying for consults.

11  Q.  And why was it important that you were paying for consults?

12  A.  Because you can't pay someone to write a prescription, the

13  quid pro quo I believe that they -- their terminology that they

14  used.

15  Q.  Well, let me ask you in your own words, not in Mr. Juenger's

16  words, why did you think it was not okay to pay doctors to write

17  prescriptions?

18  A.  Because that would influence their prescribing.  I never

19  spoke with a doctor.  I never talked to a single doctor that

20  wrote any of these prescriptions.  I had no contact with them

21  whatsoever.  I simply had an agreement with a telemedicine

22  company that they had physicians on staff that would talk to

23  patients and in return for doing a consult with a patient,

24  irregardless of the outcome, that I would pay a fee for that

25  consult.

1          MR. RASHBAUM:  Judge, may I have one moment?

2          THE COURT:  Sure.

3          MR. RASHBAUM:  Judge, I will be offering Government's

4    Exhibit 22 in a moment.

5          THE COURT:  22?

6          MR. RASHBAUM:  Yes.

7          MR. JUENGER:  No objection.

8          THE COURT:  Okay.  Admitted.

9       (Government's Exhibit Number 22 was received in evidence.)

10   BY MR. RASHBAUM:

11   Q.  Before we get to Government's Exhibit 22, you recall

12   Mr. Juenger asking you questions about Ms. Cichowicz and

13   Ms. Coronado, correct?

14   A.  Yes, I do.

15   Q.  And I think your testimony was that you thought both were

16   marketers and that they got paid for the marketing that they

17   were doing, correct?

18   A.  That is correct.

19   Q.  But that it turned out there was a mistake and that they

20   actually were two of four exceptions where they got paid for

21   their own prescriptions.  Is that accurate?

22   A.  Yes, that is.

23   Q.  I am showing you a document, Government's Exhibit 22, which

24   is now in evidence.  It's between you and MCC Leah Stiles, on

25   April 27, 2015.

Grow - Redirect

1    There's an email down below which says, "Good morning,

2    Monty.  Please note that you just received an email from

3    Tyrah Jenkins and Cassandra Kiever both signing up under

4    me."  And you respond, "We won't be offering employee

5    agreements to new people until they have a referral."

6    Do you see that?

7  A.  Yes.

8  Q.  Can you explain for the jury what you were telling

9  Ms. Stiles in this email?

10 A.  Well, basically, that you only become a sales representative

11 when you have referrals of other potential patients, then you

12 would become an employee.

13 Q.  Let's focus the jury in a little bit.

14    Is this during the period of time that you were

15 transferring your marketers from 1099 to W-2 employees of the

16 pharmacy?

17 A.  Yes, it is.

18 Q.  So what are you telling Ms. Stiles about who you're going to

19 actually allow to be transferred as W-2 employees of the

20 pharmacy?

21 A.  Only people that have already provided referrals.

22 Q.  Now, this is the key point:  Ms. Cichowicz and Ms. Coronado,

23 did they come over as W-2 employees for the pharmacy?

24 A.  I believe so.  I believe Ms. Cichowicz did.  I am not

25 positive about Ms. Coronado, but I know that they were both

Grow - Redirect

214

offered opportunities to come over, yes.

Q. Why would you offer Ms. Cichowicz an opportunity to come to the pharmacy as a W-2 employee when it turns out she didn't have any referrals?

A. Because it was a mistake. I thought that she did have referrals. We found out later that that wasn't the case, but the reason she was offered was because I thought she had referrals.

Q. Now, the Government showed you Government's Exhibit 67. Do you recall the downline that they showed you when they showed you this exhibit?

A. Yes, I do.

Q. And they showed you Ms. Cichowicz and Ms. Coronado and we'll just take Ms. Coronado for example. They showed Jonelle Coronado and Jonelle getting 7 percent on Jonelle Coronado. Do you see that?

A. Yes, I do.

Q. And remind the jury of what your testimony was regarding why this occurred.

A. It was a mistake.

Q. Okay. If we move down on the same exhibit to Joshua Anderson, do you see that?

A. I do.

Q. What does it say next to Joshua Anderson?

A. Joshua Anderson, 7 percent.

1 Q.  What later happens with Joshua Anderson's 7 percent on his

2 own prescriptions?

3 A.  Later on I caught the mistake, and during the course of the

4 program, when I caught it, I then deducted the previous amount

5 that he had been paid from his next payment.  So I just

6 corrected the situation.

7 Q.  Why didn't you do the same with Ms. Coronado and

8 Ms. Cichowicz?

9 A.  Because I never realized it until much later when we were

10 doing this investigation for this case.

11 Q.  Now, this document, Government's Exhibit 67, goes from MG

12 107040 to MG 107084.  It looks like it's around 50 pages.  I

13 will just flip through it and it's just names, downlines,

14 correct?

15 A.  Yes.

16 Q.  How many times in the more than or close to 700 of these

17 downlines, how many times are there an example like Cichowicz or

18 Coronado?

19 A.  I believe four, five.

20 Q.  And with regard to the fifth, which is Mr. Anderson, what

21 did you do?

22 A.  I corrected it when I caught it.

23 Q.  By the way, tell the jury how you actually kept your

24 records.  I know you testified it took like four hours to figure

25 out the commissions.  What was your actual process?  Did you use

Grow - Redirect

1 an Excel file or did you use something else?

2 A.  Typically, I just had it written down on paper.  I would sit

3 down and go through the sales reports that were provided to me

4 from the pharmacy and I would write them out on paper and

5 sometimes my girlfriend at the time would assist me in -- you

6 know, I would call out numbers to her and she would write them

7 down next to some of the sales representatives as we were doing

8 it.  She would help me assist sometimes.

9         But it was just all by hand for a while, and then at a

10 certain point in time, I think maybe in March, I met with

11 someone and she saw how I was doing it and she said, I could

12 simplify your life, you know, very fast by creating an Excel

13 spreadsheet.  That way, whenever you got commissions, she could

14 simply put those commissions into the Excel file and it would

15 then, you know, spit them out instantaneously and I wouldn't

16 have to spend all that time, you know, going through it by hand

17 and, you know, shuffling through all my papers.

18 Q.  So is your testimony to this jury that for these 600 or 700

19 patients you actually kept the records --

20         MR. JUENGER:  Objection as to leading, Your Honor.

21         THE COURT:  Yeah, I'm going to sustain the objection.

22         MR. RASHBAUM:  I'll move on, Your Honor.  I'll move on.

23 BY MR. RASHBAUM:

24 Q.  Now, you remember there was some testimony where the

25 Government asked you about foreclosure of your prior home.  Do

1  you recall that?

2  A.  I do.

3  Q.  Let me ask you, at the time that your prior home was

4  foreclosed -- first of all who was living in it?

5  A.  My ex-wife and her new husband.

6  Q.  And second of all, what was your net worth, approximately,

7  at the time that that home was foreclosed?

8  A.  Probably just over a million dollars.

9  Q.  Now, the Government showed you Government Exhibit 2.  You

10  may recall this, it's the Community Oxygen documents.  Do you

11  recall that?

12  A.  I do.

13  Q.  And they asked you to read part of this.  I want to ask you

14  to read something they didn't ask you to read, which is Number

15  6.  And let me help you because it's a little bit blurry.

16        It says, "I will not knowingly present or cause to be

17      presented a false or fraudulent claim for payment by

18      Medicare and will not submit claims with deliberate

19      ignorance or reckless disregard of their truth or falsity."

20        Did you always follow this, Mr. Grow?

21  A.  I did.

22  Q.  Let me ask you:  In this entire document is the word Tricare

23  anywhere in this document?

24  A.  I do not see it.

25  Q.  But putting aside that the word Tricare isn't in here, do

Grow - Redirect

1   you think that you ever violated anything in this document?

2   A.   No.

3   Q.   There was a brief question about one of the places that you

4   used to work at, a place called Precision Orthopedics.  Do you

5   recall that?

6   A.   I do.

7   Q.   When did you work at Precision Orthopedics?

8   A.   I believe I started some time around September of 1999 and I

9   ended around March of 2005.

10  Q.   Now, the Government showed you Government's Exhibits 201 and

11  202.  These are similar letters.  Do you recall that?

12  A.   Yes.

13  Q.   And this occurred at your time at InforMD, correct?

14  A.   Correct.

15  Q.   Let me ask you, do you recall, did InforMD pay you for some

16  of these Tricare patients?

17  A.   Yes, they did.

18  Q.   And Mr. Juenger talked about an email where they said -- and

19  I'll show it to you, it's Government's Exhibit 204, where it

20  seems that they stopped paying you for these types of marketing

21  to patients.  Do you know why that was?

22  A.   It had nothing to do with marketing to patients.  It's just

23  simply the pharmacy that they were talking about where these

24  prescriptions were located I guess no longer had a relationship,

25  I guess, with Tricare to bill Tricare.

Grow - Redirect

1  Q.  Now, in Government's Exhibit 204, when you respond to

2  Mr. Long, January of 2015, you say that you're taking the risk.

3  What did you mean by that?

4  A.  Well, I meant whenever you do a consult with a physician and

5  I'm paying for that consult, you know, I was assuming the risk

6  because there's no guarantee that anything is going to come from

7  that consult.  You know, the patient could get a script, they

8  could get denied, they could get refused, and so irregardless of

9  what happens, I was assuming the risk for the payment of that

10  consult.

11  Q.  Why don't you say doctor prescription?  Why do you say

12  doctor consult?

13  A.  Because it wasn't a prescription.  We were paying for

14  consults.

15  Q.  I'm showing you what Mr. Juenger showed you as Defense --

16  I'm sorry -- Government's Exhibit 199, and what he showed you

17  was this Sales Consultant Agreement between you and InforMD.  Do

18  you recall that?

19  A.  I do.

20  Q.  And he brought up that conformed in this agreement, you were

21  agreeing to comply with the applicable laws, including the

22  Anti-Kickback Statute.

23  A.  Yes.

24  Q.  Do you see that?

25  A.  I do.

1  Q.  Tell the jury whether this agreement gave you -- how did

2  this agreement make you feel about InforMD?

3  A.  Well, they're giving me an agreement telling me that I

4  needed to comply with all the laws and they were the ones that

5  were telling me how their program worked and I was following

6  their direction.  So I assumed that everything that I was doing

7  was legal and complying with all of these laws.

8  Q.  Comparing InforMD to MGTEN, were the compounds that InforMD

9  were selling similar or different than MGTEN?

10  A.  They were similar.

11  Q.  At InforMD were you a 1099 employee or a W-2 employee?

12  A.  I was a 1099.

13  Q.  What about at MGTEN?

14  A.  I was a 1099 that then became a W-2 later.

15  Q.  At InforMD were you a paid in salary or commissions?

16  A.  Commissions.

17  Q.  At MGTEN were your reps paid in salary or commissions?

18  A.  Commissions.

19  Q.  With the exception of telemed, which we've just talked about

20  and talked about the consults, was there any difference between

21  your program and InforMD's program?

22  A.  None.

23  Q.  The marketing materials that you used at MGTEN, were they

24  the same as InforMD's marketing materials or different than

25  InforMD's marketing materials?

Grow - Redirect

1  A.  They were the same ones.

2  Q.  Were you essentially a copy cat of InforMD or an innovator?

3  A.  I just took their program and turned it into my own.

4  Q.  And their program, at least on the face of this document

5  which Mr. Juenger showed you, Government's Exhibit 199, did this

6  make you think that InforMD was looking to follow the law or go

7  against the law?

8  A.  Follow the law.

9  Q.  Now, Mr. Juenger asked you some questions about AWP.  Do you

10 recall that?

11 A.  I do.

12 Q.  And he showed you Government's Exhibit 155.  And I think in

13 this Government exhibit you're comparing Lipoderm to Sterabase.

14 Do you recall that?

15 A.  Yes.

16 Q.  Now, let's talk about AWP a little bit.  AWP stands for --

17 do you know what it stands for?

18 A.  I believe it's average wholesale price.

19 Q.  Do you know who sets the average wholesale price?

20 A.  I believe the person -- or the people that set it are the

21 insurance companies.  So in this case, Tricare sets the AWP with

22 the manufacturers of the products.

23 Q.  Let me ask you a more straightforward question, which is:

24 Do you have anything to do with setting the AWP for any product?

25 A.  No, I have no control of that.

1  Q.  Do you know why Tricare, in their own judgment, decided to

2  pay a greater AWP for Sterabase versus Lipoderm?

3          MR. JUENGER:  Objection, foundation, Your Honor.

4          THE COURT:  Overruled.  If you don't know, say I don't

5  know.

6          THE WITNESS:  I have no idea.

7  BY MR. RASHBAUM:

8  Q.  The fact that Tricare decided to pay a greater AWP for

9  Sterabase versus Lipoderm, using you common sense, does that

10 tell you anything about the two products?

11 A.  It would tell me that it's probably a better product.

12 Q.  Again, do you have anything to do with deciding that

13 Sterabase should get paid a higher AWP than Lipoderm?

14 A.  No, I do not.

15 Q.  Now, when you lay out these numbers here and you're

16 comparing the two products, which product are you selling?

17 A.  I'm selling the Sterabase.

18 Q.  And what are you trying to convince the pharmacy to do here?

19 A.  Well, she was concerned about the cost of the Sterabase so I

20 was explaining to her the reimbursements for both of them so she

21 could then make an educated decision.

22 Q.  By laying out these numbers, did you think that you were

23 doing anything sinister or were you trying to show her what the

24 profitability is of the product and what the differences are in

25 the profitability of the two products?

Grow - Redirect

223

A.   Yeah, I'm just laying out the numbers for her so she could see them in realtime and see the difference.  I mean, they're always concerned about make sure there's profitability in any of the products that they use.

Q.   And again, you just testified you had nothing to do with the AWP.  Did you have anything to do with what Tricare actually reimburses for these products?

A.   No.

Q.   Who determines that?

A.   Tricare.

Q.   Briefly, Mr. Juenger showed you Government Exhibit 195, do you recall that, referring to ethoxydiglycol?

A.   Yes.

Q.   How many different types of Ethoxy could you get?

A.   Just one.

Q.   How many types of Ethoxy did you sell?

A.   Just one.

Q.   How many pharmacies did you sell it to?

A.   Three.

Q.   Did you force anyone to buy this Ethoxy?

A.   No.

Q.   Who sets the price for the reimbursement of this Ethoxy?

A.   Tricare.

Q.   Did you have anything to do with it?

A.   No.

Grow - Redirect

224

1  Q.  At a point in time, did you have trouble getting Ethoxy?

2  A.  Yes, more than half the time it was not available.  There

3  was nothing available to me.  So it was on back order for the

4  three different pharmacies that I sold it to.

5  Q.  Now, going back to telemed just briefly, Mr. Juenger showed

6  you Government Exhibit 205, which was one invoice.  Do you

7  recall that?

8  A.  Yes.

9  Q.  And on Government Exhibit 205, these people, were they

10  paid -- was the telemed company paid for their prescriptions or

11  paid for the consults?

12  A.  They were paid for the consults.

13  Q.  Is the word "prescription" anywhere on this document?

14  A.  No.  I think line one says telemedicine consults.

15  Q.  By the way, do you know at some point in time Mr. Dimmick,

16  does his prescription get canceled?

17  A.  I believe so, but I -- I'm not positive, but I think I

18  remember that.

19  Q.  Do you recall yesterday seeing an email where Mr. Dimmick's

20  prescription gets canceled?

21  A.  Yes.

22  Q.  Do you recall the Government showing you Government Exhibit

23  80 --

24  A.  Yes.

25  Q.  -- and them asking you questions about patient brokering and

Grow - Redirect

1  HIPAA.  Do you recall that?

2  A.  I do.

3  Q.  Let me ask you:  Why were numbers, in your mind, why were

4  they whited out?

5  A.  I don't really know exactly why they were whited out.  I

6  didn't ask questions.  When the pharmacy told me to do something

7  in order to be compliant, I just did it.  I didn't stop to ask

8  questions and didn't question them.  I trusted that they knew

9  the laws, they knew any concerns that might potentially, you

10  know, raise red flags or whatnot.  So whenever they came to me

11  with something to make a change to, that's what I did.

12  Q.  Mr. Juenger asked you a lot of questions about your reps

13  being patients.  Do you recall that?

14  A.  Yes.

15  Q.  Were most of your reps patients or were most of your reps

16  just reps?  Do you know?

17  A.  I'm not positive.

18  Q.  Let me ask you:  Was there a good number of your reps that

19  also were not patients?

20  A.  Yes.

21  Q.  Was it in any way a requirement for a rep to also be a

22  patient?

23  A.  No, not at all.  Most of the most successful representatives

24  were not patients.

25  Q.  Now, Mr. Juenger asked you several questions regarding

1    getting a lawyer.  Do you recall that?

2    A.   I do.

3    Q.   Why didn't you get a lawyer in this case?

4    A.   I wish I had looking back on it.  But when I was dealing

5    with companies like InforMD, who I knew had plenty of lawyers,

6    they were always preaching compliance, wouldn't even take a

7    meeting with certain companies without consulting with their

8    attorneys, from dealing with the telemedicine company who had

9    assured me that their attorneys had drawn up all the contracts

10   and the legalities of their business practice, to the first time

11   that I met with PCA and they drew up an agreement with me and

12   sent it over, they told me their attorney had drawn up the

13   agreement.

14        I only made one change to the agreement, and when I

15   sent it over to be signed, I let them know that I made a change,

16   and he said that, I believe through text message, that he would

17   have to get his attorney's approval to sign off on it.

18        Whenever there were issues with the pharmacy,

19   everything from prescriptions needing to be signed, you know, by

20   hand rather than with some type of font print, whether it was,

21   you know, patients going to be canceled because they weren't

22   able to be contacted, this fax issue with the fax coming

23   straight to me, then to the pharmacy, just them bringing these

24   different changes showed me that they were doing everything they

25   could to be compliant.  So I didn't feel that it was necessary

Grow - Redirect

227

1    to get an attorney, that I could rely on their attorneys.

2    Q.   Now, Mr. Grow, you were indicted in this case in November,

3    late November, almost December of 2016; is that correct?

4    A.   Yes.

5    Q.   Now, are you aware of an individual named Deanna Dutting?

6    A.   I am.

7    Q.   Tell the jury -- and we haven't heard from Deanna Dutting in

8    this trial, correct?

9    A.   No, we have not.

10   Q.   Tell the jury who Deanna Dutting is.

11   A.   Deanna Dutting was a former sales representative for MGTEN.

12   Q.   And how long was Ms. Dutting with you for at MGTEN?

13   A.   I believe about three months.

14   Q.   And then what happened to Ms. Dutting?

15   A.   Ms. Dutting and another representative decided that they

16   were going to go out and start their own company, so basically

17   become their own MGTEN and do the business themselves.

18   Q.   Now, at some point in time, did Ms. Dutting -- let me

19   rephrase.

20          THE COURT:  Who, what, where, when, how, those are the

21   best ways.

22          MR. RASHBAUM:  Yes.

23          THE COURT:  Sometimes they're the only way to ask

24   questions.

25   BY MR. RASHBAUM:

Grow - Redirect

228

1   Q.   Do you know whether at some point in time you were recorded

2   or not by the Government in this case?

3   A.   Yes.   During the course of this investigation, I found out

4   that there were some undercover surveillance calls that were

5   placed to me, between me and Ms. Dutting.

6   Q.   And at the time that you were recorded, were you aware that

7   you were being recorded?

8   A.   No, I was not.

9   Q.   Were you recorded before or after you were indicted in this

10  case?

11  A.   Before.

12  Q.   Do you know how long before you were recorded -- how long

13  before you were indicted you were recorded?

14  A.   Almost a year.

15  Q.   At the time that you were recorded, did you even have legal

16  counsel at the time?

17  A.   No, I did not.

18  Q.   Were you aware at the time that you were recorded that you

19  were even being investigated?

20  A.   No, I did not.

21  Q.   And by the way, you sat through this trial.   Have we seen or

22  heard any recordings in this case?

23  A.   We have not.

24  Q.   And when Ms. Dutting recorded you, have you now become aware

25  of who else was listening on to that conversation?

1   A.   Yes.

2   Q.   Who was it?

3   A.   The FBI.

4        MR. RASHBAUM:   Judge, at this point in time, I'd like

5   to put into evidence Defense Exhibit 192, which is a recording.

6        THE COURT:   All right.

7        MR. RASHBAUM:   And I'd like to play an excerpt from

8   that recording.   Of course, the jury will have the whole

9   recording if they want to listen to it.

10        THE COURT:   All right.   There is an objection by the

11   Government?

12        MR. JUENGER:   Your Honor, we would just ask that the

13   entire recordings be played.

14        THE COURT:   How long are they?

15        MR. RASHBAUM:   Collectively, I think they're over an

16   hour, Your Honor.

17        THE COURT:   Okay.   Then play it all.   If you don't want

18   to play it all on your redirect, I'll allow it on recross,

19   whatever you want.

20        MR. RASHBAUM:   One moment, Your Honor.   I am just

21   putting in Defendant's Exhibit 192.

22        THE COURT:   192 is admitted.   You can play whatever

23   portions you want.

24        MR. RASHBAUM:   We can play the whole recording if you

25   want, Your Honor.

1          THE COURT:  It's not what I want.  I am just assigned

2     at random the case.

3          MR. RASHBAUM:  Judge, we will play our excerpt, and if

4     they jury wants to hear more, they can.

5          THE COURT:  That's what I said.  That's what I just

6     said about five minutes ago.  You play whatever portion you want

7     and the Government plays whatever portion it wants, and then the

8     jury can play, or replay whatever portions they want.  There are

9     few things that everybody can do whatever they want.  You don't

10    really want to know what I want because I would probably

11    disagree with all of you on that.

12         MR. RASHBAUM:  Judge --

13         THE COURT:  Go ahead, play it.

14         MR. RASHBAUM:  We have it currently set for the

15    excerpts.  I'll play the whole recording but --

16         THE COURT:  Do whatever you want, but do it.

17         MR. RASHBAUM:  Can we have three minutes to set up the

18    full recording?  We have only the excerpts set up.

19         THE COURT:  Did you all drink your coffee?  You're not

20    coffee drinkers?  Drink water or whatever.  We'll bring you

21    right back, because this is going to take more than three

22    minutes.

23         THE COURT SECURITY OFFICER:  All rise for the jury.

24         THE COURT:  But don't talk about the case.

25    (The jury retired from the courtroom at 3:42 p.m.)

1          MR. RASHBAUM:  We only have the excerpts set up.

2          THE COURT:  All right.  Set it up however you all want.

3     (There was a brief recess.)

4          THE COURT:  Everything is working, we have no problems,

5     right?

6          MR. MARCUS:  Good enough, Your Honor.  It could be

7     heard, yes.

8          THE COURT:  With the mic is what I was told.

9          MR. MARCUS:  Yes.

10         THE COURT:  All right.  Bring in the jurors.  It's a

11    sunny day outside.

12         THE COURT SECURITY OFFICER:  Please remain standing for

13    the jury.

14         THE COURT:  Are you going to play the whole thing?

15         MR. RASHBAUM:  No.

16         THE COURT:  Is the Government going to play the whole

17    thing?

18         MR. JUENGER:  Your Honor, I prefer to just move them

19    into evidence.  The jury will have them and --

20         THE COURT:  You do what you want.

21         MR. RASHBAUM:  I'm going to move them both into

22    evidence.

23         MR. JUENGER:  See how easy it works.

24         THE COURT:  I may go back there.

25     (The jury returned to the courtroom at 4:33 p.m.)

1           THE COURT:  We should board you by sections since

2    you're in first class, business class.

3           I think we've got everybody, right?

4           Okay.  You were going to play a particular exhibit.

5    What's the number of the exhibit?

6           MR. RASHBAUM:  Judge, at this point in time I'd like to

7    move in Government -- sorry -- Defense Exhibits 191 and 192.

8           THE COURT:  Any objection?

9           MR. JUENGER:  No objection, Your Honor.

10          THE COURT:  They will both be admitted.

11      (Defendant's Exhibit Numbers 191 and 192 were received in

12   evidence.)

13          THE COURT:  And these are recorded conversations of the

14   defendant by Ms. Dutting, right?

15          MR. RASHBAUM:  And by the Government, Your Honor.

16          THE COURT:  Okay.

17          MR. RASHBAUM:  Judge, at this time we would like to

18   play excerpts from Government's Exhibit 192.  Of course, the

19   entire tapes will be in evidence.

20          THE COURT:  All right.  I'll admit them both.  Of

21   course, the court reporter will not take down what is being

22   said.

23      (The recording marked as Government's Exhibit 192 was

24   played.)

25   BY MR. RASHBAUM:

1   Q.  Mr. Grow, when these recordings were made, did you know you

2   were being listened to by the U.S. Attorney's Office and the

3   FBI?

4   A.  No, I did not.

5   Q.  What is your position on these recordings?  What did you

6   believe?  Did you believe that you had committed a crime?

7   A.  No.  I felt like everything that I did was in an attempt to

8   be compliant.  I had no intention of violating anything.

9   Q.  As you sit here today, Mr. Grow, did you ever intend to

10  violate any law?

11  A.  Absolutely not.

12          MR. RASHBAUM:  I have no further questions, Your Honor.

13          THE COURT:  Any recross on the admitted Exhibits 191

14  and 192?

15          MR. JUENGER:  Yes, Your Honor.

16          THE COURT:  By the way, do we have transcripts of those

17  conversations?

18          MR. RASHBAUM:  We do.

19          THE COURT:  And they are admitting them at 191-A and

20  192-A.

21          MR. RASHBAUM:  We can do that, Your Honor.

22          THE COURT:  So that way you'll have it in writing as

23  well as the recordings.  The Government agrees, right?

24          MR. JUENGER:  Excuse me, Your Honor.

25          THE COURT:  Do you agree that the transcripts should go

Grow - Recross

1    in, too?

2              MR. JUENGER:  Yeah, we have no problem with that.

3              THE COURT:  Okay.

4         (Defendant's Exhibit Numbers 191-A and 192-A were received

5    in evidence.)

6              THE COURT:  Okay.  Go ahead.

7                        RECROSS-EXAMINATION

8    BY MR. JUENGER:

9    Q.  Mr. Grow, the audio that was just played was simply a

10   snippet of two full recordings, correct?

11   A.  That is correct.

12   Q.  And the full recordings, one is approximately 23 minutes and

13   the other is approximately 27 minutes, correct?

14   A.  I assume so.  If you say so.

15   Q.  And in the full recordings, from the beginning Ms. Dutting

16   tells you that she's been contacted by the FBI, correct?

17   A.  I think in the first one -- I have not listened to these in

18   months, but I think in the first one she said that, yes, that

19   she had been contacted by the FBI and was instructed to call

20   them.

21   Q.  Correct.  And she tells you further that she's actually been

22   asked to come in to the FBI and to give them a statement about

23   compounding, about illegal commissions, and about healthcare

24   fraud; isn't that right?

25   A.  Something to that extent, yes.

1    Q.   And you knew that when Ms. Dutting was working for you, you

2    had paid her and her company approximately $170,000, correct?

3    A.   I know that I had paid her.  I don't know what the amount

4    was, but yes, she used to work for me.

5    Q.   She had a company calling Healing 4 Heroes which ran an

6    Internet site to solicit patients, correct?

7    A.   Yes.  I don't know if she was soliciting patients through

8    the site, but the patients that she did talk to were directed

9    that they could go to that site for more information.

10   Q.   And Healing 4 Heroes and Ms. Deanna Dutting was the subject

11   of a second CBS exposé in May of 2015, correct?

12   A.   Yes, I believe so.

13        MR. JUENGER:  And at this time, Your Honor, I would

14   move to admit Government's Exhibit 23 with the attachment.

15        THE COURT:  Any objection?

16        MR. RASHBAUM:  Just the previous objection, Your Honor.

17        THE COURT:  Okay.  I am going to overrule the objection

18   with the same cautionary instruction.  I admitted one report and

19   I already told you it's being admitted just to show knowledge,

20   for the state of mind of the defendant, and it had to do with an

21   unrelated case.

22        This one is a little bit more perhaps problematic for

23   me because it does discuss Ms. Dutting, Tricare, and Patient

24   Care America so it's this case.  But I'm admitting it -- since

25   Ms. Dutting is not testifying, I'm admitting it to show what the

1    defendant knew.

2         So what the lawyers say is it's not coming in for the

3    truth of the matter asserted in the article, but the article is

4    about this case, but it comes in only with the limited

5    instruction that you are to consider it for the state of mind,

6    whether the defendant knew at the time of the crime and also

7    whether he knew of the alleged crime at the time that he's

8    making the recorded conversations.  Okay.  I don't know if that

9    helped you, but that's the best I can do.  All right?

10        Go ahead.

11   (Government's Exhibit Number 23 was received in evidence.)

12   BY MR. JUENGER:

13   Q.  And you did see the CBS video that's under discussion?

14   A.  I did.

15   Q.  And when you saw that story about Ms. Dutting, your comment

16   was that she was an idiot, correct?

17   A.  No, I believe that was Matthew Smith's comment.

18   Q.  And you agreed with Matthew Smith that she was an idiot?

19   A.  Yes.

20   Q.  And it's in evidence, I don't need to play it, but the

21   subject of that video was that Tricare beneficiaries were being

22   targeted and prescribed expensive pain and scar medications,

23   correct?

24   A.  The basis that we were referring to when he was talking

25   about or making the idiot comment was the fact that Ms. Dutting

1  and Paul Robinson left my company, went out and started their

2  own venture.  This interview that took place was based on

3  something she did not while she was with MGTEN, but she was with

4  her own company.  And this interview that took place talked

5  about someone who went on to her website and put in some

6  information, and without ever talking to a doctor and without

7  ever talking to a pharmacy, they had prescription medications

8  show up on their front doorstep.

9  Q.  From Patient Care America?

10 A.  No, it was not Patient Care America.

11 Q.  All right.  But in any event, the subject of the story was

12 pain and scar medications, correct?

13 A.  Yes, it was about compounding pharmacy.

14 Q.  And the subject was especially referencing Tricare

15 beneficiaries, correct?

16 A.  Yes, it was in regard to Tricare as well.

17 Q.  And so you knew at the time those recordings were done that

18 Deanna Dutting was a subject of an FBI investigation.  She told

19 you so, correct?

20 A.  At the time of when, the recordings?

21 Q.  The recordings we just listened to.

22 A.  Oh, the undercover recording.  I don't know that she told me

23 that she was target.  She told me that an FBI agent left a card,

24 I believe, in her mailbox or something of that nature and wanted

25 a meeting with her.

Grow - Recross

1  Q.  To discuss compounding, illegal commissions, and healthcare

2  fraud, that's what she told you, correct?

3  A.  I believe so.

4  Q.  And so you knew that if the FBI got to Deanna Dutting, you

5  were next, didn't you?

6  A.  I mean, I had no idea.  I didn't think of it that way.  She

7  told me she was contacted, and if they wanted to talk to her,

8  they wanted to talk to her.

9  Q.  And when you were working with Deanna Dutting as far as

10  Patient Care America, you and Deanna had agreed that the

11  beneficiaries that she recruited, their copays would be covered,

12  didn't you?

13  A.  No, that's not true.  Ms. Dutting went out on her own and

14  decided that she would pay copays for her beneficiaries without

15  my knowledge.  When she was ready to leave my company and she

16  wanted her last commission check she sent me an email and she

17  said, this is the amount that I think I'm owed, please make sure

18  that all of my beneficiaries or patients have their copays taken

19  care of and please take it out of my commission.

20        I then contacted Ms. Dutting and said, what are you

21  talking about with these copays?  And she said, well, I've been

22  paying these copays.  And I said, why would you do that?  I

23  never gave you authorization to do that.  And she said, well, I

24  thought it was okay.  And I said, well, I'm not going to be

25  deducting those copays from anything.  I'm going to be giving

1   you your check and that's final and our business relationship is

2   severed.

3   Q.   Did you let the pharmacy know that Deanna Dutting had paid

4   the copays for 40 or 50 patients?

5   A.   Yes, they were aware of it.

6   Q.   And did they and you return the money to Tricare for those

7   claims in which the copays were not paid by the patients?

8   A.   The pharmacy had a policy that the copays could be paid by

9   marketers, although it was never discussed with Ms. Dutting.

10  She agreed to do that on her own because that's just kind of the

11  way she did business.   Ms. Dutting made decisions on her own and

12  without ever consulting anyone and that's what she decided to

13  do.

14  Q.   And you said PCA had a policy of paying copays, correct?

15  A.   PCA had a policy that it was allowed to pay copays, yes.

16  Q.   And did their counsel approve of that?

17  A.   According to Matthew Smith, yes.

18          MR. JUENGER:   That is all I have, Your Honor.

19          THE COURT:   Thank you, sir.   You may step down next to

20  your lawyers.

21          What say the defense?

22          MR. RASHBAUM:   Judge, the defense rests.

23          THE COURT:   What say the Government?

24          MR. LARSEN:   Your Honor, the Government has three

25  witnesses to call in rebuttal.   The first witness' name is

 1  Jonelle Coronado.

 2          THE COURT:  Okay.  Right over here, please, on your

 3  right, my left.

 4          Raise your right hand, please.

 5          JONELLE CORONADO, GOVERNMENT'S WITNESS, SWORN.

 6          THE COURT:  Okay.  Have a seat and speak real loudly

 7  into that microphone and tell us your name.

 8          THE WITNESS:  My name is Jonelle Coronado.

 9          THE COURT:  J-o-n-e-l-l-e?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Then Coronado?

12          THE WITNESS:  Yes.

13          THE COURT:  All right.  Go ahead.

14                    DIRECT EXAMINATION

15                       (Rebuttal)

16  BY MR. LARSEN:

17  Q.  Good afternoon, Ms. Coronado.  Where do you live, city and

18  state only, please?

19  A.  I live in Kottweiler, Germany.

20  Q.  So no state.

21  A.  Yeah.

22  Q.  Do you know why you are called to testify here in court

23  today?

24  A.  Yes.

25  Q.  Why is that?

Coronado - Direct

1  A.  To testify on my account of what had occurred when I had met

2  and dealt with Monty Grow.

3  Q.  Are you a Tricare beneficiary?

4  A.  Yes, I am.

5  Q.  And how are you a Tricare beneficiary?

6  A.  My husband is in the military.

7  Q.  Where were you stationed in early 2015?

8  A.  We were stationed at Fort Campbell, Kentucky, living in

9  Tennessee; Clarksville, Tennessee.

10  Q.  And did you become acquainted with the defendant in early of

11  2015?

12  A.  I believe that's the correct time frame.

13  Q.  How did you become acquainted with the defendant?

14  A.  Referred by a friend.  He had phoned me from that referral.

15  Q.  The defendant called you?

16  A.  Yes, I spoke to Monty.

17  Q.  What did the defendant tell you on that phone call?

18  A.  He told me who he represented and his company and that they

19  had good news of these prescriptions of compounds that Tricare

20  had just began to accept and approve, basically, what they

21  offered and what was covered, and asked me if any of those, you

22  know, had applied to me or had been told that they had and that

23  was the conversation.  That's how it started.

24  Q.  What, if any, words would you use to describe your

25  impression, the impression you got from the first conversation

Coronado - Direct

242

1  you had with Mr. Grow?

2  A.  I would say that Monty was very -- he was charismatic, you

3  know, very charismatic and confident in what he was selling.  I

4  mean, he was a salesperson.  It was his region from where I was

5  living, that's what I was under the impression of.  Me, being

6  that I lived in his region, you know, there was -- I guess it

7  was friendly banter plus giving me an opportunity to try

8  something that hadn't been offered before.

9  Q.  What did he give you an opportunity to try?

10 A.  That was going to be some vitamins, pain cream, and also a

11 scar cream.

12 Q.  Was there any specific ingredient or, excuse me, any

13 specific product of those three that piqued your interest?

14 A.  Well, to tell you the truth, at the time all of them had

15 piqued my interest.  One, I needed vitamins because I have a

16 strong deficiency in iron; two, I have notated through Tricare

17 with knee and shoulder issues; and then also I had just had

18 surgery a couple of years prior where I did have a scar.  So all

19 of those were, you know, something that I was very interested

20 in.

21 Q.  What did he tell you, if anything, about the pain and the

22 scar products?

23 A.  Well, he told me that basically being compounds, that they

24 were something that would work -- it would be something that I

25 wouldn't get offered typically, so something that would work.

Coronado - Direct

1  So the compound drugs would be -- it would be like -- I guess

2  like the vitamins, he had information on them, you know, to

3  share basically.  He was going to send me that information and

4  then you could look, but I mean the list of everything that was

5  in them which made them compound was extremely long, so you kind

6  of get lost in that list, but they were to be better than any

7  vitamin that you would ever try or any scar cream or any pain

8  cream.

9  Q.  At the time you had this first conversation with the

10 defendant, were you under the care of any physician for chronic

11 pain?

12 A.  I had previously been, but not at that time.  I was working

13 several hours and, I mean, it takes a long time to get in to a

14 doctor like if you just call for something, so it's hard to

15 schedule.

16 Q.  Were you taking anything for pain?

17 A.  No.  I mean, nothing prescribed.

18 Q.  What were you taking?

19 A.  I would just like take Tylenol or something.

20 Q.  Was that working for you?

21 A.  It was working okay.

22 Q.  What, if anything, did the defendant say about whether you

23 need to see a doctor in connection with getting these products?

24 A.  Okay.  So that was the question asked by me, if I had to

25 make an appointment in order to get these now that they're being

1  prescribed, and he said that it was actually very convenient,

2  that a doctor would call me and I would speak to him in order to

3  get this prescribed.

4  Q.  Did the subject of the opportunity to make money, was that

5  discussed with Mr. Grow?

6  A.  Yes, it was actually discussed in the same conversation and

7  being that it was his region and there was an opportunity to

8  actually work I guess -- I'm trying to think of how to explain

9  it, but being that it was his region and I had the opportunity,

10  that I would make money.  I mean, I would try it, make money

11  based on even the products I was using.

12  Q.  What did Mr. Grow tell you about how you could make money

13  with the products that you used yourself?

14  A.  He said that I -- or by using the products, you know, if you

15  signed up under him that you would receive the products and then

16  you would also get a commission from even your own products.

17  And then basically, if you liked them, you know, it's something

18  that I could share with my other Tricare friends.

19  Q.  So did you agree to order these products the defendant was

20  pushing?

21  A.  Yeah, I had agreed that I wanted -- I definitely wanted to

22  try them.

23  Q.  What did you order?

24  A.  Well, when I spoke to him, I was interested in all of them.

25  Q.  So did you sign up for the pain, the scar, and the vitamin?

Coronado - Direct

245

A.   Yes.

Q.   Did the defendant seem satisfied with just signing up you?

A.   Well, he actually in that conversation asked me like if my husband needed any of those prescriptions as well.

Q.   Was your husband living in the home at the time?

A.   My husband was actually in Afghanistan at that time.

Q.   Did you tell Mr. Grow that your husband was in Afghanistan on this phone call?

A.   Yes.

Q.   Did Mr. Grow persist in trying to sell you his products for your husband?

A.   He did tell me that they were readily available, you know, that I mean if I -- because I was going to send my information, like email it to him, that I could email my husband's as well and that he could set that up to where my husband could receive the products as well.

Q.   What did you tell him about your husband's need for the product?

A.   Well, I told him that my husband -- one, my husband doesn't take anything, he doesn't even take over-the-counter stuff, and that he wouldn't be interested in like a scar cream.  There was no need for it.

Q.   Did he say anything about the vitamin?

A.   Yeah, he said that that's the one thing that, you know, anybody could take, was the vitamins, but I knew my husband and

Coronado - Direct

246

1   that would just be a waste to set that up.

2   Q.  Did you ever see a doctor, physically see a doctor?

3   A.  No.  Shortly after I had sent Monty my information, I

4   received a phone call from a doctor just like he said I would.

5   Q.  And after the phone call and your prescription was approved,

6   did the product eventually come in the mail?

7   A.  Yes, it did.

8   Q.  Describe what came in the mail.

9   A.  I got vitamins, but it was more than one bottle, and then I

10  got several of the scar creams and several of the pain creams.

11  Q.  Did you take a look at the labels of these products?

12  A.  Yes, I did.

13  Q.  Do you recall anything that jumped out at you?

14  A.  Actually not at first, but later on, I had received another

15  one and I did recall something that didn't look right, and it

16  was from the pharmacy, it had like in the doctor's label, it had

17  Monty's name in the middle of it and, to me, that didn't look

18  right.

19  Q.  So like a first name, Monty?

20  A.  Yeah.  I can't tell you exactly the name, I just know that

21  "Monty" stood out.

22  Q.  So this payment that the defendant promised you for ordering

23  your own products, did you ever get it?

24  A.  Yes, I did.

25  Q.  How did you get it?

1  A.  Well, whenever I had first sent the information to Monty, it

2  was my Social and my banking and routing number and it came to

3  my bank.

4  Q.  Into your bank account?

5  A.  Yes, sir.

6  Q.  When did you first realize that the payment had come to your

7  bank account?

8  A.  I'm not sure like how quickly, but my husband had actually

9  gotten in touch with me from Afghanistan wondering where the

10  money had come from because it was a large amount.

11  Q.  What did you tell him?

12  A.  Well --

13       MR. MARCUS:  Objection, Your Honor, this calls for

14  hearsay.

15       THE COURT:  What did you tell who?

16       MR. LARSEN:  Her husband.

17       THE COURT:  I'm going to sustain the objection.

18  BY MR. LARSEN:

19  Q.  After you spoke with your husband, did you make any

20  decisions about what to do about this program?

21  A.  Yes.  Because of the amount of money that I had received and

22  speaking to my husband, I decided that I wasn't going to

23  continue with the company from Monty because there was a -- I

24  guess I hadn't anticipated an exact amount of what was going to

25  come.  So, you know, basically I felt like I had gotten a large

Coronado - Direct

1  amount of money and I hadn't even shared the products, so for

2  doing nothing.

3  Q.  How much did you get paid?

4  A.  Well, that first amount I want to say was $1800.

5  Q.  You said that you decided to stop.  What steps did you take

6  to try and stop?

7  A.  Well, when you get the prescription you had to pay a

8  copayment and so I think -- I want to say in the timeline, I was

9  happy with them and I had gotten a phone call and -- before, you

10  know, the conversation that I had had that I'm speaking of, but

11  I had wanted to continue with like the vitamins, but then after

12  that, I had stopped.

13  Q.  Did the shipments keep coming?

14  A.  Yes.  I actually had called the pharmacy and the kid that I

15  talked to on the line -- because before when I had to pay my

16  copayment, I had to return a call and I paid it with like my

17  card over the phone.  So I called the same number and, you know,

18  told them, I didn't want to pay the copayment, that I didn't

19  want this, and then I still received a shipment and it was

20  still -- it wasn't with the vitamins anymore though.

21  Q.  Did you get paid after that second shipment?

22  A.  I still did, yes.

23  Q.  When was the last time you remember being contacted by the

24  defendant?

25  A.  I spoke to the defendant, I am not exactly -- it was

1    probably like maybe the second month or so and he had let me

2    know that they were switching over.  I think there was a change

3    in the company or the company's name, and so I was going to have

4    to reapply to work with him.  And so he was going to email me

5    the application and I would send all the information back to

6    him.  That was the last time I spoke to him.

7    Q.  Did you ever follow through with the application?

8    A.  No, sir.  I figured whenever I had gotten that, and based on

9    the decisions I had made previously, that would just kind of be

10   my way out of, you know, no longer participating in Monty's

11   business because I didn't apply.

12             MR. LARSEN:  Nothing further, Your Honor.

13             THE COURT:  Cross-examination, Mr. Marcus.

14             MR. MARCUS:  Thank Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. MARCUS:

17   Q.  Good afternoon, ma'am.

18   A.  Good afternoon, sir.

19   Q.  Did I hear right, that you currently live in Germany?

20   A.  Yes, sir.

21   Q.  So you flew all the way here from Germany?

22   A.  Yes, sir.

23   Q.  Long flight?

24   A.  Yes, sir.

25   Q.  Who paid for your --

1                THE COURT:  Almost as long as the trial.

2    BY MR. MARCUS:

3    Q.  Who paid for your flight?

4    A.  I'm sorry, sir.  It would be the U.S. Government.

5    Q.  Okay.  They flew you over here?

6                I have a few questions.  Let's start.

7                So we're now, you agree we're toward the end of January

8    of 2018.  You agree with that?

9    A.  Yes, sir.

10   Q.  And you said that you had a phone call with Mr. Grow you

11   think in early 2015.  That was the first call?

12   A.  I mean I spoke to him then, but I want to say it was

13   probably at the end of 2014.

14   Q.  Okay.  Just on direct a few minutes ago you testified it was

15   it was early 2015, though.  Do you recall that?

16   A.  I know.  When I'm sitting here thinking of it now that

17   you're talking about it, because it was January -- I am trying

18   to think.  It may have been -- it was probably 2015, early,

19   yeah.

20   Q.  Right.  But you're not sure sitting here?

21   A.  I just know it was between December and January, because

22   right shortly after then is when I had gotten the medications.

23   I can't remember the exact date, but it was that time frame,

24   sir.

25   Q.  Right.  And then you said that you think you had a second

1  call with Mr. Grow?

2  A.  Oh, no, I know I had a second call.  I've only spoken to

3  Monty -- I mean, maybe over email once, but I know on the phone

4  conversations I spoke to him twice.

5  Q.  Twice.  And the second call you think was when?

6  A.  The second call was probably a couple of months after the

7  first, otherwise I hadn't spoken to him.

8  Q.  And that's the call, the second call is the call where you

9  were told about transitioning to be an employee of the pharmacy?

10 A.  Yes, that's when he was switching his business name or

11 switching businesses.

12 Q.  Okay.  Let's step back.  Let me ask you a couple of

13 questions about the first call.

14 A.  Okay, sir.

15 Q.  You have a business background in sales, do you not?

16 A.  Yes, sir.

17 Q.  And at the time of the first call, you were actually a sales

18 representative, weren't you?

19 A.  Yes, I was, sir.

20 Q.  And you were doing -- were you selling phones?

21 A.  Yeah, I was assistant manager for a Sprint company.

22 Q.  Okay.  Had you been paid in that job on a commission basis?

23 A.  Both.

24 Q.  Both, salary and commission?

25 A.  (Witness nodding).

Coronado - Cross

252

1  Q.  And when you were talking to Mr. Grow on that first call, he

2  was trying to get you to become a sales rep for his company?

3  A.  Yes, sir.

4  Q.  And you were going to promote these three products that the

5  pharmacy was compounding.  Do you recall that?

6  A.  Yeah.  I mean I was going to -- I mean, I made it pretty

7  clear that I was going to try them before I would share them

8  with anybody.

9  Q.  Okay.  You had an interest, you testified on direct you had

10  an interest --

11  A.  Yes, definitely.

12  Q.  -- in trying these medications just for your own --

13  A.  Yes, sir.

14  Q.  -- personal use.

15       THE COURT:  You have to wait for the question because

16  we have a hard-working court reporter who has to write

17  everything down, so just wait.

18  BY MR. MARCUS:

19  Q.  You had a personal interest in trying these three

20  medications.  You testified to that on direct, that's correct?

21  A.  Yes, sir.

22  Q.  There was a pain cream, right, and a scar cream, and then

23  wellness vitamins?  Those are the three products you were

24  interested in?

25  A.  Yes.

1   Q.  And you understood from the conversation with Mr. Grow that

2   you would be promoting those three items in the region where you

3   were living, right?

4   A.  Yeah, and that's the region that he was over from my

5   understanding, so yes.

6   Q.  Where were you living at this time?

7   A.  In Clarksville, Tennessee.

8   Q.  And Mr. Grow made you aware that he did not have other sales

9   reps in that area; isn't that right?

10  A.  No.

11  Q.  Are you sure?

12  A.  Not to my recollection.

13  Q.  Were you aware of any other sales reps for his company in

14  your area?

15  A.  No, but honestly, even though I was in the military

16  involvement at that time, I was working in the civilian or more

17  of the economy with Sprint and probably the only time I lived

18  there had only one military related friend.  So I really didn't

19  speak to military to know if I had anybody in Clarksville.  Is

20  that what you meant?

21  Q.  Well, my question was, yes or no, were you aware of any

22  other sales reps for Mr. Grow's company in the area you were

23  living in in Tennessee?

24  A.  Not in Tennessee.

25  Q.  Okay.  And you said that you had pain in your knees, right,

Coronado - Cross

254

1  you had some knee pain?

2  A.  I had right knee pain and right shoulder.

3  Q.  Okay.  And you had some scarring from past surgeries; is

4  that correct?

5  A.  Yes, sir.

6  Q.  Okay.  And you were also interested in the vitamin?

7  A.  Definitely the vitamins, yes.

8  Q.  Okay.  And you agree that for Mr. Grow's perspective on this

9  call, he was very much interested in you becoming a rep for

10  these products?

11  A.  It seemed like a good opportunity.

12  Q.  Okay.  And he was trying to essentially recruit you to be a

13  rep?

14  A.  That's what the conversation seemed to be.

15  Q.  Okay.  You have testified once before under oath about these

16  matters, haven't you?

17  A.  Yes, sir.

18  Q.  Now, the first time that you ever talked with law

19  enforcement wasn't until the end of September of 2016; is that

20  right?

21  A.  Oh, yeah.  I mean, I had no -- I hadn't been in touch with

22  law enforcement on my own account.

23  Q.  Right.  You agree there was about 18 months between when you

24  had these initials call with Mr. Grow and when you first

25  answered questions to law enforcement?

1  A.  Yes, sir.

2  Q.  Okay.  And then, at some point you testified under oath.  Do

3  you recall that?  That was in the fall of 2016, in October?

4  A.  The fall of 2016?

5  Q.  October.  Let me ask you this:  Do you recall when you

6  testified that there was a court reporter just like here taking

7  down --

8  A.  I am just trying to stay on the time frame.

9          THE COURT:  You're interrupting him, which means I

10  interrupt you.

11          The court reporter cannot take two people talking at

12  once, so you each have to wait for each other.  I'm sorry.  Go

13  ahead.

14          THE WITNESS:  I don't remember the date, but I

15  remember, of course, testifying.

16  BY MR. MARCUS:

17  Q.  And do you recall that there was a court reporter there

18  taking down your statement?

19  A.  Yes, sir.

20  Q.  Okay.  Have you ever seen a transcript of your past

21  testimony?

22  A.  No.

23  Q.  Okay.

24          MR. MARCUS:  Your Honor, may I approach?

25          THE COURT:  With what?  With what?

Coronado - Cross

256

```
 1          MR. MARCUS:  I will mark it, Your Honor, for --

 2          THE COURT:  With what?  Did I say that three times?

 3          MR. MARCUS:  Yes.  It's a transcript.

 4          THE COURT:  Okay.  You want me to use different words.

 5          MR. MARCUS:  It's a transcript, Your Honor.  I'm trying

 6   to refresh --

 7          THE COURT:  Does it have an exhibit number?  Remember I

 8   am a numbers guy.  Give me a number and I can look it up.

 9          MR. MARCUS:  218.

10          THE COURT:  Defense 218.

11          MR. MARCUS:  Defense 218.

12          THE COURT:  If I go to the list, I'll see it there.

13          MR. MARCUS:  We just added it, Your Honor.

14          THE COURT:  You added one.

15          MR. MARCUS:  That's right.

16          THE COURT:  Okay.  And this is under the rule that you

17   can add things, it doesn't matter when.

18          MR. MARCUS:  I am just going to use it --

19          THE COURT:  That seems to be the new rule, right?  But

20   you agree with that rule I take it.

21          MR. MARCUS:  I didn't know what the witness was going

22   to say, Your Honor, before she took the stand.

23          THE COURT:  It sounds familiar I think.  So you and

24   your opponent are in the same boat.  So 218.  And you've shown

25   it to -- let me get the list.  You've shown it to your opponent,
```

1    right?

2              MR. MARCUS:  Yes.

3              THE COURT:  And you don't want to introduce it, you

4    just want to show it.

5              MR. MARCUS:  I'm just using it to refresh recollection.

6              THE COURT:  Okay.  Then you can use anything you want

7    to refresh her recollection.  Go ahead.

8              Does that help you remember?  That's what they mean

9    when they say refresh your recollection.  Does it, looking at

10   that piece of paper, does it remind you of something?

11             THE WITNESS:  Oh, I mean, I know I testified.  I just

12   don't know the exact date.

13             THE COURT:  Okay.  What's the question?

14   BY MR. MARCUS:

15   Q.  Well, I asked you if your past testimony was in October of

16   2016.  Do you have a better memory now having seen the document?

17   A.  When you said October, I know I testified, I just didn't

18   know the exact date.  I didn't want to make up or fill in the

19   gap.  Sorry.

20   Q.  No, no, I understand.  It was a long time ago.  We are now

21   in January, late January of 2018.  This is, you know --

22   A.  Over a year ago.

23   Q.  Well over a year ago.

24             And when you testified and you were asked what Mr. Grow

25   said to you on that first call about these commissions and being

1   paid for yourself, you said you couldn't recall exactly what he

2   said.

3        THE COURT:  Well, don't you have to say, do you

4   remember this question being asked and this answer instead of

5   paraphrasing?  Would you agree that that might be preferable?

6   That way you say what page -- I don't know how long this

7   transcript is because I wasn't there.  If not, it would probably

8   be shorter than what it was I would suspect, but I don't know.

9   But what are we talking about?  Do you know the page?

10       MR. MARCUS:  Yes.

11       THE COURT:  Okay.  Give your opponent the page.  He has

12  it.  He doesn't have a copy of it.  You don't have a copy of it,

13  Mr. Larsen?

14       MR. LARSEN:  Your Honor, I have a copy not in my

15  physical possession, but I'm aware --

16       THE COURT:  Where is it, in Germany?

17       MR. LARSEN:  No, no, Your Honor.

18       THE COURT:  Okay.  You should bring everything just in

19  case.  Okay.  We've got the page, we've got the question.  Okay.

20  You got the question and the answer.  Go ahead.

21       MR. MARCUS:  Thank you, Your Honor.

22       THE COURT:  In quotes.

23  BY MR. MARCUS:

24  Q.  "Question:  Just to the best of your recollection."  This is

25       on Page 12 at Line 4.

Coronado - Cross

259

1          "Answer:  I can't exactly remember how he explained it,

2      but basically it was that it was legal and that I could get

3      paid because even if I represented, that he would still be

4      able to receive money from it".

5          Do you recall that testimony?

6   A.  Yes, sir.

7   Q.  Do you recall on that same page being asked:

8          "Question:  Do you know the name of the company?

9          "Answer:  I know his company is MG, I can't remember

10     the last part of it.  It's been a couple of years.  It's

11     hard for me to remember."

12         Do you recall that?

13  A.  Yes, sir.

14  Q.  "Question" -- same Page, 12, Line 25 -- "What about the

15     pharmacy?

16         "Answer:  The pharmacy, yes, it was from here in

17     Florida.

18         "Question:"  -- Page 13, Line 3 -- "Do you remember the

19     name?

20         "Answer:  I'm just blanking right now.  I know the name

21     and I know it was from here in Florida.  It might come to

22     me."

23  A.  Right, and now with time gone by, I really don't remember

24     the name, but I didn't go back and look at my bottles to recall.

25  Q.  Right.  Your memory probably -- well, let me ask you:  Do

1  you agree that your memory of these events would have been

2  better in October 2016 than sitting here today in January of

3  2018?

4  A.  I wish I could say I agree with that.  I mean, it's kind of

5  like when you have a conversation and then afterwards you

6  remember, but it's not on record, on court record.  So like

7  let's say after I leave here today and I remember the pharmacy

8  name, you know, it's one of those things where, you know, maybe

9  the stress of people and kind of shaky here to like be a little

10 nervous and I don't want to make up a fact.

11         So, I mean, I could say that I could recall the

12 conversations, you know, yeah, at a later date when I wasn't

13 under the stress because I remember the main facts of our

14 conversation, and I remember where I was sitting because I was

15 outside Publix on Tiny Town and I remember the street name, sir,

16 but I can't tell you the name of the pharmacy or the guy that I

17 spoke to when I called to tell him I didn't want any more

18 prescriptions.

19 Q.  Right.  And the truth is you couldn't recall the exact

20 wording or what he was saying to you on that first call.  You

21 agree with that, you couldn't remember the specifics?

22 A.  I agree, but I remember certain specifics like finding out

23 that it was -- you know, trusting that it was legal.

24 Q.  Okay.  He told you he thought -- right, that his company,

25 their business practices were legal.  You remember that from the

1  call?

2  A.  Yes, sir.

3  Q.  And you believed him I assume?

4  A.  Well, yes, sir.

5          MR. MARCUS:  Okay.  Your Honor, at this time I'm going

6  to introduce Defense Exhibit 200.  It's on our list.

7          THE COURT:  What is that?

8          MR. MARCUS:  It's an email from Mr. Grow to

9  Ms. Coronado.

10         THE COURT:  Any objection?

11         MR. LARSEN:  No objection, Your Honor.

12         THE COURT:  It will be admitted.

13    (Defendant's Exhibit Number 200 was received in evidence.)

14  BY MR. MARCUS:

15  Q.  So, Ms. Coronado, do you see the date of the email, December

16  1st of 2014?

17  A.  Yeah.  I knew it was in that December-January time frame.

18  Q.  Okay.  And Mr. Grow is telling you -- he is recapping your

19  conversation of that day.  "Great talking to you today."  Do you

20  see that?

21  A.  Yes, sir.

22  Q.  This is the first phone call that you had with him, correct?

23  A.  Yes, sir.

24  Q.  Okay.  You agree now it's not in January of 2015, it was on

25  December 1st of 2014?

Coronado - Cross

262

1   A.  Well, I knew it was -- like I said, it was in the

2   December-January time frame.

3   Q.  Right.  Now, he's attached some documents.  Do you recall

4   receiving attachments --

5   A.  Yes.

6   Q.  -- promotional materials about the three products he was

7   discussing with you?

8   A.  Yes, sir.  That is what I was talking to Mr. Larsen about.

9   He had sent me the information with the -- about the compounds.

10  Q.  Okay.  You told the Government about this, that you received

11  this promotional information?

12  A.  I believe so.

13  Q.  Did you tell the Government that you were working in sales

14  at the time of this call?

15  A.  Yes, sir.

16  Q.  Okay.  And Mr. Grow also sent you a W-9 in that email.  Do

17  you see that?

18  A.  Yes, sir.

19  Q.  And that was a document for tax purposes for an employee?

20  Are you aware of that?

21  A.  Yeah, I'm aware of it.  I don't remember what I did with

22  that though.

23  Q.  Okay.  I'll show it to you.  It's actually attached.

24  A.  Okay.

25  Q.  We can go through --

1   A.   Okay.   I am sure you have it.

2   Q.   -- the whole document.

3         THE COURT:   No, no.   Remember, Ms. Coronado, you have

4   to relax, wait for a question and then answer it.   I cannot have

5   two individuals speaking at once.

6   BY MR. MARCUS:

7   Q.   Mr. Grow, in this email, was asking you to complete a W-9

8   tax employee form.   Do you see that?

9   A.   Yes, sir.

10   Q.   Consistent with the conversation about you becoming a sales

11   rep for his company, do you agree with that?

12   A.   Yes, sir.

13   Q.   Okay.   Now, he also sent you a Tricare Patient Intake Form,

14   right, and you see this?   "If you chose to get the information

15   yourself," do you see that?   You had mentioned on the call that

16   you had --

17         THE COURT:   I'm sorry.   I didn't hear the answer.

18         THE WITNESS:   I see it.

19         THE COURT:   Okay.   Thank you.

20   BY MR. MARCUS:

21   Q.   You agree that there's nothing in this document where

22   Mr. Grow is saying to you, I'm going to pay you money to get

23   prescriptions?

24   A.   I agree, sir.   Sorry, that was loud all of a sudden.

25   Q.   Because he's saying the choice is yours.   If you're

1  interested in these products, right, here is some information

2  that might be available to you.  Do you agree with that?

3  A.  Yes, sir.

4  Q.  And ultimately, you testified that a physician called you on

5  the phone and did a telemedicine consult?

6  A.  Yes, sir.

7  Q.  Asked you about your patient history?

8  A.  Yes, sir.

9  Q.  And you filled out a Patient Intake Form about your knee

10  pain and your surgical scars, et cetera.  Do you recall that?

11  A.  I don't recall.

12  Q.  Okay.  But you were asked questions by the doctor about your

13  medical history and whether you qualified for these products?

14  A.  Yes, sir.

15  Q.  And you wanted to get these products because you were

16  interested to see if they would help you.  Do you agree with

17  that?

18  A.  Yes, sir.

19  Q.  Okay.  And ultimately, the physician wrote you a

20  prescription for the three products?

21  A.  Yes.

22  Q.  And you took the vitamins and they were really good.  You

23  had a good experience with them, didn't you?

24  A.  I did.

25  Q.  And you told the Government about that?

Coronado - Cross

265

1   A.   Yes.

2   Q.   Okay.   And the pain cream that you used, that worked as

3   well, that helped you?

4   A.   Yes, sir.

5   Q.   And you said earlier that it's hard sometimes, it's hard to

6   go to the doctor, to get an appointment.   This telemedicine

7   consult was very convenient for you, wasn't it?

8   A.   Yeah, and something that I didn't know was covered by my

9   insurance.

10  Q.   Okay.   But the fact that you had it, it helped you because

11  you were able to get products that you might not have gotten

12  without going to another physician and getting an office visit

13  and getting a prescription.   You agree with that?

14  A.   I agree.

15  Q.   You never told Mr. Grow that you didn't personally need any

16  of these three products, did you?

17  A.   No, I didn't tell him that I personally didn't need them.

18  Q.   Okay.   And just showing you the second page of Defendant's

19  Exhibit 200, did you read these materials, these promotional

20  materials?

21  A.   I read over some of it.   I didn't read it in its entirety.

22  Q.   But these were materials that would have been useful to you

23  to market these products to people you knew or people you didn't

24  know.   Do you agree with that?

25  A.   Yeah, had I liked them, I agree that they would have been

Coronado - Cross

266

1 marketable.

2 Q.  Right.  On that call you never told Mr. Grow you were not

3 interested in being a sales rep, did you?

4 A.  Oh, no, quite the opposite.

5 Q.  And you filled out a W-9 and sent it?

6 A.  I believe I did.

7 Q.  Okay.  And just to show you what was sent to you, this is a

8 document that would be used for tax purposes, right, for an

9 employee?

10 A.  Yeah, it's a tax form.

11 Q.  You never wrote back to Mr. Grow and said, why are you

12 sending me a W-9, I have no interest in being an employee or a

13 sales rep, did you?

14 A.  No, not in that instance I didn't.

15 Q.  Okay.  Did you ever send him a written email where you told

16 him --

17 A.  No, sir.

18 Q.  Now, let me ask you this, too:  In terms of the company

19 itself, you had no qualms or issues with the idea of selling

20 these products and earning a commission, did you?

21 A.  Well --

22 Q.  At the time.

23 A.  At the time?  Well, I was trying them, so I hadn't tried

24 selling them yet.

25 Q.  Right.  But when you met with the Government they asked you

1  about this and you told them, you thought it was just like Avon,

2  it was sales.  Didn't you tell them that?

3  A.  I think I told him something to that effect to where, yeah,

4  like other direct sales where people have made money on their

5  own products as well.

6  Q.  Let's talk about that.  You agree there's nothing wrong with

7  marketing these products to other people on a commission basis

8  as a sales rep?

9  A.  Like these products as in the ones that are related to

10  Mr. Grow or any products?

11  Q.  Well, let's start with any products first.

12  A.  Well, yeah.  I mean, I know a lot of people -- being in the

13  military environment, online, I mean we see so many

14  advertisements for Rodan and Fields, Plexus, other stuff like

15  that in direct sales, and many military spouses, that's part of

16  their livelihood.

17  Q.  Right.  You, yourself, worked in the sales business

18  yourself?

19  A.  Yeah, but I worked for the corporate business where I had to

20  foot it every day.  It wasn't online and it wasn't the direct

21  sales, network marketing, should I say, is what it's called.

22  Q.  Okay.  But you sent in the W-9 after you received it in

23  December of 2014?

24  A.  I sent in the information that Mr. Grow asked me to.  I was

25  compliant because I was interested.

1   Q.   Right.   And I think we established you never told him you

2   were not interested in becoming a sales rep.   You agree with

3   that?

4   A.   Yes.

5   Q.   And you have a distinct memory talking to Mr. Grow, now on

6   December 1st of 2014, that he explained to you that the business

7   was legal, you agree with that, receiving commissions?

8   A.   Yes, without hesitation he said it was.

9   Q.   Right.   You can't remember a lot of the other details, you

10  agree with that, certain details?

11  A.   I remember a lot of details, I just don't remember the

12  pharmacy name.   I remember details of our conversation.   It was

13  a pleasant one.

14  Q.   When you sent in the W-9, that was because you were going to

15  be an employee.   You were going to do sales?

16  A.   Yes.

17  Q.   Okay.   And the second call, that happened you think, what, a

18  month or two later, sometime in 2015?

19  A.   Yeah, it wasn't too long after that, within a couple of

20  months.

21  Q.   But you're not sure of when it happened.   You agree with

22  that?

23  A.   No.

24  Q.   But the discussion was about an opportunity to become an

25  employee of the pharmacy, a W-2 employee?

Coronado - Cross

269

A.  Well, the discussion was that they were making changes in
their business and so in order for me to continue that I would
have to, you know, reapply.  So basically what he was doing --
or where I was -- where our connection was there, it would end,
and I'd have to reapply in order to work for him.

Q.  To work as an employee, you were going to be a W-2 employee?

A.  Yes, sir.

Q.  The assumption of the person on the other end of that phone
call in 2015 was that you were acting as a sales rep?

        MR. LARSEN:  Objection, Your Honor, foundation.  He's
talking about the impression of the other person on the phone
call.

        MR. MARCUS:  I can rephrase.

        THE COURT:  Okay.  Is that what you're asking?

        MR. MARCUS:  I will rephrase, Your Honor.

        THE COURT:  Okay.  Or give up asking it altogether.

BY MR. MARCUS:

Q.  The second call --

        THE COURT:  Call between whom?

        MR. MARCUS:  Well, that's what I'm going to ask, Your
Honor.

        THE COURT:  Well, go ahead, you can.  You can lead.

BY MR. MARCUS:

Q.  You testified on direct you thought the second call was with
Mr. Grow himself directly?

Coronado - Cross

1  A.  Yes.

2  Q.  And that call was about continuing, reapplying to now be an

3  employee of the pharmacy?

4  A.  Well, with a different company.  I wasn't going to say that

5  it was the pharmacy.  He just said that they were making some

6  changes and I have to reapply.  In order to continue, I'd have

7  to reapply.

8  Q.  Reapply?

9  A.  Yes, sir.

10 Q.  You knew that Mr. Grow had a marketing company called MG

11 something, right?

12 A.  Yes.

13 Q.  And this transition would now make you an employee of a

14 different company, a second company?

15 A.  Yes.

16 Q.  Okay.  Are you sure you talked Mr. Grow on that second call?

17 A.  Well, from my phone, it would come up if it was him.

18 Q.  Well --

19 A.  My recollection is yes, it was Mr. Grow, because I only

20 spoke to him, like I said, twice.

21 Q.  This would be the second time, right, this second call?

22 A.  Yes, because months later I had received a different call

23 and it was not Monty.

24 Q.  So now there's a third call?

25 A.  But it wasn't Monty.

1   Q.   Okay.  With someone else --

2   A.   (Witness nodding).

3   Q.   -- talking about the transition to being a W-2 employee?

4   A.   No, sir.

5   Q.   No.  Okay.  Let's stick with this.

6   A.   Okay.

7   Q.   Okay.  I don't want to confuse the issue.

8        Were you made aware on that phone call by Mr. Grow that

9   in order to transition to be W-2 for this new company you had to

10  be making -- you had to be acting as a sales rep be promoting

11  and bringing in people interested in the products?

12  A.   I don't recall, sir.

13  Q.   You don't recall.  Would you be surprised to learn that no

14  one was transitioned --

15       THE COURT:  Well, let me ask you this:  I know lawyers

16  always ask those questions.  Maybe if it weren't 5:30 I wouldn't

17  interrupt.  A surprise, how is that admissible, what she would

18  be surprised to learn?  You mean if she's not surprised, it

19  makes a difference, and if she is surprised, it makes a

20  difference?  It doesn't matter whether you're surprised or not.

21       It's what she did and sometimes what she heard.  Do you

22  agree?

23       MR. MARCUS:  You're right.  I'm trying to probe her

24  recollection.  I'll rephrase, Your Honor.

25  BY MR. MARCUS:

Coronado - Redirect

1  Q.  Is it possible --

2        THE COURT:  Oh, that's the same problem because

3  everything is possible.  So that's not appropriate either.

4        MR. MARCUS:  One moment, Your Honor.

5        THE COURT:  Sure.  You can have all the time you want.

6        MR. MARCUS:  No further questions.

7        THE COURT:  Okay.  We have redirect?

8        MR. LARSEN:  Briefly.

9        THE COURT:  Why do lawyers always say that?  I'm going

10  to ask Gilda, with her free time, to count in her computer how

11  many times all of you say briefly.

12        MR. LARSEN:  And "slowly for the court reporter."

13                        REDIRECT EXAMINATION

14  BY MR. LARSEN:

15  Q.  Ms. Coronado, did you ever do any work for the defendant,

16  Monty Grow?

17  A.  No, sir.

18  Q.  Have you ever been an employee of Monty Grow, given your

19  understanding of what an employee means?

20  A.  Well, to the point where I had given him all my information

21  and received a phone call from a doctor, that was the only

22  action that I did.  Oh, and received, I'm sorry, the

23  prescriptions.

24  Q.  And did you ever refer any patients to the defendant?

25  A.  No, sir.

Coronado - Redirect

1   Q.  What did the defendant pay you for?

2   A.  For my own prescriptions, for just paying that first

3   copayment.

4   Q.  And your memory has been called into question by Mr. Marcus

5   quite a bit on cross.

6       Do you have any doubt that the defendant told you that

7   he would pay you for your own prescription, any doubt?

8   A.  No doubt at all.

9       MR. LARSEN:  May I approach, Your Honor, the ELMO?

10      THE COURT:  With what?

11      MR. LARSEN:  Defendant's Exhibit 200.

12      THE COURT:  That has been already admitted.

13      MR. LARSEN:  Yes.

14      THE COURT:  Okay.  Then you can.

15  BY MR. LARSEN:

16  Q.  Let me show you what's been admitted as Defense Exhibit

17  100 [sic] and do you remember Mr. Marcus asked you if this would

18  be useful for you to market these medications?  Correct?

19  A.  If I was to.

20  Q.  Are you a doctor, Ms. Coronado?

21  A.  No.

22  Q.  Do you see here where it says "enhance patient experience,

23  offer compound topicals in your practice"?

24  A.  Yes.

25  Q.  Do you have a practice?

1   A.   No, sir.

2   Q.   It says here in this first bullet:  "Patient friendly

3        alternative to oral medications for elderly and child

4        patients who struggle to take pills."

5             Are you elderly or a child?

6   A.   No, sir.

7   Q.   And down here:  "Train your physicians and staff on the

8        topical compounds available on the most common formulations

9        and usages."

10            Do you train physicians at all in your life,

11  Ms. Coronado?

12  A.   No, sir.

13  Q.   Now, you said on direct, on cross that you did like the

14  products?

15  A.   Yes, sir.

16  Q.   Would you pay $5,000 a month for the vitamins?

17  A.   No, sir.

18  Q.   Would you pay $17,000 a month out of pocket for a single

19  tube of scar cream?

20  A.   No, sir.  I wasn't aware at the time of how much those were.

21  Q.   Would you pay for it now that you know?

22  A.   No, sir.

23            MR. LARSEN:  Nothing further.

24            THE COURT:  All right.  Thank you, ma'am.  Have a good

25  day and safe trip back.

Tighe - Direct

1          THE WITNESS:  Thank you.

2      (The witness was excused.)

3          THE COURT:  What say the Government since the sun has

4  not set yet?

5          MR. LARSEN:  Your Honor, the Government calls Keith

6  Tighe.

7          THE COURT:  Raise your right hand, please, sir.

8           KEITH TIGHE, GOVERNMENT'S WITNESS, SWORN.

9          THE COURT:  Okay.  Have a seat and tell us your name

10  and spell your last name for us.

11          THE WITNESS:  It's Keith Tighe, T-i-g-h-e.

12          THE COURT:  Thank you, sir.

13                   DIRECT EXAMINATION

14                      (Rebuttal)

15  BY MR. LARSEN:

16  Q.  Mr. Tighe, where do you live, city and state only, please?

17  A.  Jacksonville, Florida.

18  Q.  And where do you currently work?

19  A.  I work for Smith and Nephew.

20          THE COURT:  Can you speak a little louder?

21          THE WITNESS:  Yes.  I work for Smith and Nephew.

22  BY MR. LARSEN:

23  Q.  What kind of business is that?

24  A.  Medical device.

25  Q.  What do you do for that business?

Tighe - Direct

276

1   A.   Basically sell to orthopedic surgeons, hospitals; total hip,

2   total knee replacements.

3   Q.   Orthopedic device products?

4   A.   Yes, sir.

5   Q.   How long have you been employed in the medical device area?

6   A.   Since 2003.

7   Q.   Do you remember -- or did you ever work at a medical device

8   company named Precision Orthopedics?

9   A.   Yes.

10  Q.   When did you work at Precision?

11  A.   2004 to 2013.

12  Q.   What was your job title there?

13  A.   Medical device sales.

14  Q.   And do you recall the defendant, Monty Grow, being an

15  employee at the time you worked at Precision?

16  A.   I knew of him, yes, sir.

17  Q.   And do you know what he did at Precision?

18  A.   I mean, there was 30 something sales reps that worked for

19  the same company, so assuming he did the same thing as I did.

20  Q.   Okay.  Do you know Mr. Grow personally outside of what you

21  just testified?

22  A.   No, sir, I do not.

23  Q.   Now, what, if any, training did you receive as a medical

24  device sales rep at Precision when you first started in 2004?

25          THE COURT:  Why are we going into this?

Tighe - Direct

1              MR. LARSEN:  Your Honor, I'm asking about training.

2              THE COURT:  I know what you asked.  I am asking why.

3    So tell me because.

4              MR. LARSEN:  Because of testimony of the defendant on

5    cross about what training he may or may not have received at the

6    same time period.  They worked at the same place at the same

7    time and Mr. Grow testified that he did not receive --

8              THE COURT:  I got it but --

9              MR. LARSEN:  May I ask the question, Your Honor?

10             THE COURT:  All right.  If there's no objection to it,

11   I won't object.

12   BY MR. LARSEN:

13   Q.  What, if any, training did you receive on healthcare

14   compliance?  I'll narrow it, just the scope of the question.

15             MR. RASHBAUM:  Timing, Your Honor.

16             THE COURT:  Pardon?

17             MR. RASHBAUM:  Timing.

18             THE COURT:  I don't know.  It's 5:35 if that's what

19   you're asking me.  If you have an objection you know what to

20   say.

21             MR. RASHBAUM:  Objection, Your Honor.

22             THE COURT:  Ground.

23             MR. RASHBAUM:  Timing.

24             THE COURT:  Okay.

25             MR. RASHBAUM:  Foundation.

Tighe - Direct

278

1          MR. LARSEN:  In 2004.

2          THE COURT:  You don't have an objection to his

3    testimony?

4          MR. RASHBAUM:  I do, Your Honor, but --

5          THE COURT:  Okay.  I'm going to sustain the objection

6    because there are 30 employees.  I assume the testimony will be

7    that he did get trained in A, B, and C, right?

8          MR. LARSEN:  That what I expect him to say.

9          THE COURT:  I know, but he doesn't even know Mr. Grow,

10   so I'm going to sustain the objection.

11         I think that's probably about it, don't you think?

12         MR. LARSEN:  Your Honor, give me one minute.

13         THE COURT:  Sure.

14         MR. LARSEN:  I said it would be brief, Your Honor, and

15   it is brief.

16         THE COURT:  Well, you got a little help from me, but

17   you understand why.  There are other employees, he doesn't know,

18   so just because one employee is trained, doesn't mean the other

19   29 are, unless you're going to call 29 out of the 30, and they

20   participated in a particular program with him.  If he doesn't

21   know him, that takes care of it.  That's the reason why I ruled.

22   You don't have to agree with it, but I just thought you were

23   owed an explanation.

24         Thank you very much.

25         MR. LARSEN:  Thank you.

 1          THE COURT:  Have a safe trip back to Jacksonville.  At

 2   least it's a little warmer here.

 3          THE WITNESS:  Yes, sir.  Fins up.

 4       (The witness was excused.)

 5          THE COURT:  Okay.  Anything else?

 6          MR. JUENGER:  Yes, Your Honor, the Government's last

 7   rebuttal witness, Gary Walker.

 8          THE COURT:  Okay.  What is he going to say?

 9          MR. JUENGER:  He was the lawyer who attended the

10   meeting with Mr. Grow in Tampa at the steak house.

11          THE COURT:  Okay.  Come forward, please, sir.  Thank

12   you very much.  That's okay.  You don't have to rush.  Raise

13   your right hand.

14          GARY WALKER, GOVERNMENT'S WITNESS, SWORN.

15          THE COURT:  Have a seat and tell us your name, please.

16          THE WITNESS:  My name is Gary Walker.

17          THE COURT:  What do you do for a living?

18          THE WITNESS:  I'm a healthcare attorney.

19          THE COURT:  All right.  Go ahead.

20                      DIRECT EXAMINATION

21                          (Rebuttal)

22   BY MR. JUENGER:

23   Q.  Mr. Walker, where do you live?

24   A.  In Tampa.

25   Q.  And I think you just told us what you do.  How many years

Walker - Direct

1  have you been a healthcare attorney?

2  A.  40 years this year.

3  Q.  Congratulations.  Are you familiar with a company called

4  Patient Care America?

5  A.  Yes.

6  Q.  And did you represent Patient Care America?

7  A.  I opened a file and we had a dinner, but I don't know that I

8  ever really did any work for them, but yes, I'm familiar with

9  them.

10  Q.  And when was that?

11  A.  This is '18.  It was either 2015 or 2016.  It was a few

12  years ago.

13      THE COURT:  I'm sorry, I couldn't hear what you said.

14      THE WITNESS:  2015 or 2016, a few years ago.

15      THE COURT:  Okay.  Thank you.

16  BY MR. JUENGER:

17  Q.  Is there any documentation that would help refresh your

18  recollection as to the actual dates?

19  A.  Oh, the emails that we exchanged about the dinner.

20      MR. JUENGER:  May I approach, Your Honor?

21      THE COURT:  Sure.  Do you have an exhibit?

22      MR. JUENGER:  It's actually listed as Defendant's

23  Exhibit 25.

24      THE COURT:  I assume there's no objection to

25  Defendant's Exhibit 25 by the defendant.

Walker - Direct

1          MR. MARCUS:  No, Your Honor.

2          THE COURT:  Okay.  It will be admitted.  You got it.

3  Go ahead.

4      (Defendant's Exhibit Number 25 was received in evidence.)

5  BY MR. JUENGER:

6  Q.  Looking at Defendant's Exhibit 125, does that refresh your

7  recollection about the dinner that you were referring to?

8  A.  Okay.  2015, February of 2015, the end of February.

9  Q.  Can you give us the exact date?

10 A.  Let's see.  The dinner was February 26th of 2015.

11 Q.  And --

12         THE COURT:  Did you say it was Defendant's 25?

13         MR. MARCUS:  It's 125.

14         THE WITNESS:  125, Your Honor.

15         MR. JUENGER:  Both.

16         THE COURT:  Okay.  Oh, they said both.  Okay.  I looked

17 at the first one.  So 125 was already admitted, but what I have

18 for -- this is an email between whom?  What is the number first

19 of all?  Let's go.  Look at that exhibit.  What is the number?

20         MR. JUENGER:  The number is Defendant's 125.

21         THE COURT:  125, my notes say email between Mr. Grow

22 and Mr. Smith.  Is that the right one?

23         MR. JUENGER:  That's right.

24         THE COURT:  Okay.  I've admitted it already.

25 BY MR. JUENGER:

1  Q.  And who was at this dinner meeting that you were discussing?

2  A.  Two people from the compounding pharmacy and Monty Grow.

3  Q.  Did you represent Monty Grow?

4  A.  No.

5  Q.  And do you recall -- if you don't recall their names, do you

6  recall who the individuals were from the pharmacy?

7  A.  Patrick Smith, and I apologize, but I don't remember the

8  other guy's name.

9  Q.  That's fine.  And what was the purpose of this dinner

10  meeting in Tampa?  What was the subject?

11  A.  We were talking about healthcare compliance and the need to

12  have the marketing staff -- the marketing people become bona

13  fide employees of the pharmacy for compliance purposes.

14  Q.  And we'll talk about that in a moment in a little more

15  detail, but have you represented entities in the past on that

16  subject matter about bona fide employees?

17  A.  Yes, sir, that's most of my practice.

18  Q.  And when you meet with clients and when you make legal

19  opinions about that subject matter, what do you need to be able

20  to make those opinions?

21  A.  Well, I've got to have a complete understanding of all the

22  facts because all the compliance is what are you doing, what is

23  it that you're specifically doing, and then I need to take those

24  facts and compare them to the regulations that the Government

25  publishes to help us know you can do this and you can't do that.

1   Q.  And in this case, do you feel that you ever got all the

2   facts that you needed to make a competent opinion on that

3   subject matter?

4   A.  No, sir.  I didn't render any opinions.  You know, we talked

5   about things that night, but talking about it is one thing and

6   doing an opinion is an entirely different matter.

7   Q.  And can you explain in layman's terms what that means, that

8   bona fide employee safe harbor?  What's the point of all that?

9   A.  The Government doesn't like the idea of --

10          MR. MARCUS:  Your Honor, I'm going to object at this

11  point.  It's calling for an expert opinion.

12          THE COURT:  Okay.

13          MR. JUENGER:  Let me rephrase.

14          THE COURT:  You know what?  Let me send the jurors home

15  because I think it's going to take a little while.

16          MR. JUENGER:  I hope it doesn't.

17          THE COURT:  And the sun is setting.  Don't talk about

18  it.  Don't read anything about it.  Don't discuss anything.

19  Don't Google anything.  You know that.  Please.

20          I'll keep all the articles that I can get ahold of, if

21  you want them afterwards, but it's not fair to read about them

22  without the lawyers and the defendant being present.  Okay?

23          Have a good afternoon.  9:00, for some of you 8:30.

24  You know what I mean by that.  Not you, Mr. Jones, you're here

25  always early.  9:00 for everybody else except a couple of you.

Jury Trial

284

 1    See you then.  Leave your notebooks in the jury room.

 2              COURT SECURITY OFFICER:  Please rise for the jury.

 3        (The jury retired from the courtroom at 5:48 p.m.)

 4              THE COURT:  Okay.  Be seated, please.  Let me hear that

 5    door.  Thank you.

 6              Okay.  He's going to say what?

 7              MR. JUENGER:  The rephrased question would be:  What

 8    did he say to them?  That's what's relevant and I'm going to ask

 9    him to explain what he said to them.  I'm going to ask him a few

10    questions --

11              THE COURT:  What who said to whom?

12              MR. JUENGER:  What the witness said --

13              THE COURT:  What the lawyer said to Mr. Grow.

14              MR. JUENGER:  Correct.

15              THE COURT:  All right.  So what's wrong with that?  To

16    that, there's nothing.

17              MR. MARCUS:  Right, he's a fact witness, but he was

18    asking him to give an opinion --

19              MR. JUENGER:  Well --

20              THE COURT:  You are all interrupting each other.

21              I don't know what to do, Gilda.

22              Let me just wave the white flag.  If you all want to

23    dispense with the court reporter and give up the right to

24    appeal, we can do that.

25              MR. JUENGER:  No.

 1          THE COURT:  Then we can't interrupt each other.  I've

 2  got to help her because she is working really hard every day.

 3          Okay.  And that would have taken two minutes.

 4          MR. JUENGER:  Maybe a few minutes more, but yes.

 5          THE COURT:  That's why I have to bring you back

 6  tomorrow.  I'm sorry.  So that's it, right?

 7          MR. JUENGER:  That's it, promise.

 8          THE COURT:  And then you rest your rebuttal.

 9          MR. JUENGER:  Yes, Your Honor.

10          THE COURT:  All right.  You have to come back.  Is 9:00

11  all right?

12          THE WITNESS:  Fine.

13          THE COURT:  All right.  See you then.  Thank you, sir.

14  Watch your step.  If the box wasn't there, he wouldn't have to

15  watch his step.

16      (The witness was excused.)

17          THE COURT:  So you'll rest and that's it.  Are you

18  going to renew your motion for judgment of acquittal?

19          MR. MARCUS:  Yes.  I could do that now, Your Honor, if

20  you want.

21          THE COURT:  Well, I mean, you are making the same

22  arguments?

23          MR. MARCUS:  I actually have a couple of cases.

24          THE COURT:  Okay, that say what?

25          MR. MARCUS:  It's a little different.  I mean,

1    expanding on the argument, the discussion we had the last time.

2              THE COURT:  Okay.  Why don't you?

3              MR. MARCUS:  Thank you.

4              THE COURT:  On which counts, 1 through 9?

5              MR. MARCUS:  1 through 8, which are the healthcare

6    fraud, wire fraud counts, and then I'm going to talk about the

7    money laundering counts just in relation, not the kickback

8    counts.

9              THE COURT:  No, the kickbacks, I'm going to deny it.

10   You can renew it later and I will deny it.

11             By the way, I saw the good faith -- because we've kind

12   of talked about the jury instructions to save time, and about

13   the so-called safe harbor, and I couldn't figure out -- the

14   defendant proposed what you referred to as 42 U.S.C. Section

15   1001.952(g).  I think you meant CFR, right?

16             MR. MARCUS:  Yes, that sounds right, Your Honor.

17             THE COURT:  CFR, (i) though, because I kept on reading

18   (g) over and over again --

19             MR. MARCUS:  I apologize.

20             THE COURT:  -- and it had nothing to do with anything.

21   But having the time to read all 50 pages of the CFR, I think you

22   wanted to talk about the employees and renumeration.  Am I

23   right?

24             MR. MARCUS:  Yes, Your Honor.

25             THE COURT:  Just so you know, since I told you what all

1   the jury instructions are going to be ahead of time, you know

2   that so you can continue to prepare your closings, recognizing

3   that 42 Code of Federal Regulations Section 1001.952 -- see, you

4   can tell how exciting it is when we are losing our crowd.  See?

5   That should tell you something.  Those are the lawyers leaving.

6   Imagine the jurors, right?  Think about that.

7         But anyway, it says -- this is the instruction that I

8      think you want me to give, says "employees" as used in

9      Section 1128(b) of the Act.  "A remuneration does not

10     include any amount paid by an employer to an employee who

11     has a bona fide employment relationship with the employer

12     for employment in the furnishing of any item or service for

13     which payment may be made in whole or in part under

14     Medicare, Medicaid or other Federal healthcare program.  For

15     purposes of paragraph (i) of this section the term

16     "employee" has the same meaning as it does for purposes of

17     Title 26, United States Code, Section 3121(d)(2)."

18         Is that the section that you want me to look at?

19         MR. MARCUS:  Yes, Your Honor.

20         THE COURT:  All right.  What I'm going to do is, I will

21  give an instruction, but what I'm going to do, instead of

22  putting it aside, I'm going to give that instruction right after

23  I define remuneration.

24         So in remuneration, when I talk about what kickbacks

25     mean, the receipt of kickbacks, which is the first time I

1      repeat remuneration where I say, "Remuneration is a payment

2      such as a kickback, bribe, or rebate made directly or

3      indirectly, overtly or covertly, in cash or in kind, then

4      I'm going to add:  "Remuneration does not include any amount

5      paid by an employer to an employee who has a good faith

6      employment --" and then I'll put in parentheses bona fide,

7      which in Latin means good faith, that way they know since

8      they heard the words bona fide -- "a good faith employment

9      relationship with the employer for employment in the

10     furnishing of any item or service for which payment may be

11     made in whole or in part under a Federal healthcare

12     program."

13          Is that satisfactory to the defense?

14          MR. MARCUS:  Yes, Your Honor.

15          THE COURT:  What is wrong from the Government's

16  perspective?

17          MR. JUENGER:  I don't think there's anything wrong with

18  that, but I would let the Court know that in the Eleventh

19  Circuit case of United States versus Vernon, the Court goes even

20  further and sets forth what factors a Court or a jury should

21  consider in deciding whether an employee is a bona fide

22  employee.

23          THE COURT:  I missed that in your proposed

24  instructions.  Do you know where it is?

25          MR. JUENGER:  No.

1          THE COURT:  Did you file it or give it to me and I

2  missed it?

3          MR. JUENGER:  It has not been filed yet.

4          THE COURT:  Then how can I decide that?  But I'm so

5  glad I'm bringing it up.  Do you have the case with you or the

6  proposed instruction?  Am I going to get it tomorrow morning?

7          MR. LARSEN:  Your Honor, we do have them.

8          THE COURT:  In your office.

9          MR. LARSEN:  No, they actually we have the case and we

10  wrote the proposed instructions.  I did ask for them to be filed

11  today.  I don't know if they --

12          THE COURT:  Well, I don't know.  Maybe they did.

13          MR. LARSEN:  I did ask for it to be filed.

14          THE COURT:  I haven't checked my filings.

15          MR. LARSEN:  But I do have a copy of them.  Ms. Lam

16  went to grab them from --

17          THE COURT:  And you've given them to the defense, too.

18  Okay.  We need to see that, right?  So am I going to get it at

19  one particular time?

20          MR. LARSEN:  I'm hoping to have it any minute now, Your

21  Honor.

22          THE COURT:  Any minute.  Someone is bringing it on a

23  burro from the other side or what?

24          MR. LARSEN:  I am hoping that --

25          THE COURT:  Here we are.  No.  Okay.

1          Anyway, I'll read that, I'll hear from your opponents

2    regarding that, and I think that's about the only thing left

3    with the jury instructions based upon what we've discussed

4    today.

5          I have filed the denial of the instructions, the ones

6    that the defense proposed and I just put denied as covered and

7    there's a Notice of Filing.  So when you get home, or whenever

8    you see that, or even here, you can check.  It should be

9    uploaded by then so you're protected.  Anything I denied, you've

10   got there.  If I missed anything, then you can tell me tomorrow,

11   and it will be the defense.  Because the Government, if you

12   lose, it doesn't matter unless it's important for some issue in

13   case you win and you want to raise it for other kickback cases.

14         Okay.  What else regarding jury instructions?

15         MR. JUENGER:  Your Honor, based on the defendant's

16   testimony today, I think it may be appropriate to include an

17   advice of counsel instruction.

18         THE COURT:  Okay.  The defense didn't want one.

19         MR. RASHBAUM:  No, Your Honor, I mean --

20         THE COURT:  Okay.  So once again I get the great

21   opportunity that no other judge has.  The prosecutor insists on

22   the advice of counsel instruction, or you don't insist, you just

23   suggest.  Do I have that right?  Because I remember --

24         MR. JUENGER:  You do, Your Honor.

25         THE COURT:  -- I had it, I deleted it, and now the

1    Government wants advice of counsel.

2         MR. JUENGER:  Well, I think we were the ones that

3    originally proposed it.

4         THE COURT:  Well, to protect the defendant I assume.

5         MR. JUENGER:  No, to make sure that the jury is

6    instructed about what advice of counsel is.

7         THE COURT:  Okay.  We've had a couple of lawyers

8    testify, some to a greater degree than others, and we've had the

9    defendant, in response to a question asked by defense counsel, I

10   wish I would have had a lawyer, I felt comfortable if I have

11   lawyers, so it seems to be that there's almost a quasi advice of

12   counsel defense.

13        MR. RASHBAUM:  There's a good faith defense.  I mean,

14   none of these -- I'll move up there, so she can hear me.

15        THE COURT:  See that box you told the witnesses.

16        MR. RASHBAUM:  Judge, so there has been zero testimony

17   in this case that -- here are the lawyers that have testified.

18        THE COURT:  No, no, no, I know that.  I don't need

19   that.

20        MR. RASHBAUM:  So out of the three lawyers that have

21   testified, actually two lawyers have testified --

22        THE COURT:  What are you going to tell the jurors about

23   the lawyers?

24        MR. RASHBAUM:  I am just going to say that -- exactly

25   what we've said all along, that he knew InforMD had lawyers, he

1   knew PCA had lawyers.  He went to a meeting with a lawyer where

2   he was told certain things.  They weren't his lawyers.  He

3   depended on -- he relied on the fact that these companies had

4   lawyers and that was a good faith defense.

5           THE COURT:  All right.  Now, you've confused me when

6   both of you are here.  I am looking at Mr. Marcus, and even

7   though you have disagreed from time to time with your

8   co-counsel, I prefer having -- make it easier for me.  All

9   right?

10          So what does the Government say?  If he doesn't want

11  it, as long as he recognizes that, why should we give an advice

12  of counsel?

13          MR. JUENGER:  Because I think if defense counsel is

14  going to argue that Mr. Grow effectively relied on counsel and

15  maybe you'll notice --

16          THE COURT:  He's going to rely on the companies that

17  had lawyers.  Listen, he's going to say it better, but longer.

18  They had lawyers, I trusted the companies because they had

19  lawyers.  Because that's kind of what he has said, right, the

20  defendant?  He said that.  That's what he said.

21          MR. JUENGER:  True.  He also said on cross-examination

22  that he relied on Mr. Walker.  I asked him that question because

23  I've been curious for a year about how this is going to play out

24  and what I don't want is a simple good faith instruction and

25  then argument about advice of counsel.  It reminds me of the

1    entrapment situation where you have defense -- defendants don't

2    want an entrapment instruction because it's difficult to meet,

3    but they want --

4         THE COURT:  Well, I've never seen that.  They always

5    want an entrapment instruction and the Government objects.

6         MR. JUENGER:  And then they argue entrapment in front

7    of the jury, he was entrapped, he was entrapped, but they don't

8    want the instruction because it's not easy for them to meet.

9    It's an analogy, but it's the closest analogy I could come up

10   with.

11        THE COURT:  So you want me to give an advice of counsel

12   instruction, but then tell them this is not an advice of counsel

13   case.

14        MR. JUENGER:  No, what I propose is that --

15        THE COURT:  That would help you though.

16        MR. JUENGER:  But I propose giving a good faith

17   instruction as it currently is in the Patterns, but then just

18   add a section below it that says something like, to the extent

19   that a defendant raises advice of counsel in support of his good

20   faith, he's required -- or I suppose it's the defendant's burden

21   to show, I'm not sure, but there are three elements set forth in

22   the Pattern that make up the advice of counsel defense.  So it

23   would incorporate that.

24        So it doesn't preclude them from arguing good faith,

25   which, of course, they're entitled to in a fraud case, but it

1  lets the jury know that to the extent good faith means advice of

2  counsel, here is the way you analyze that.  I think that is a

3  fair middle ground.

4          THE COURT:  All right.

5          MR. RASHBAUM:  Advice of counsel is not our defense and

6  I'm going to make it --

7          THE COURT:  But it kind of is.  It's advice of counsel

8  to co-conspirators is my defense, is what you would want to say.

9          MR. RASHBAUM:  Judge, Mr. Juenger point blank asked

10  Mr. Grow numerous times did you have a lawyer in this case, and

11  he said no.

12          THE COURT:  He said no.

13          MR. RASHBAUM:  Mr. Juenger asked Mr. Grow:  Did

14  Mr. Walker represent you?  He said no.  What we are asking for

15  is a good faith defense.  It's a good faith defense.  It's not

16  an advice of counsel defense.  I'm not asking for an advice of

17  counsel defense.

18          THE COURT:  What are you going to say in closing

19  argument again about the lawyers?

20          MR. RASHBAUM:  I'm going to say that he worked at a

21  company that had lawyers.  He worked with a pharmacy that had

22  lawyers.  The onboarding process involved lawyers.  He went to a

23  meeting with someone he thought was a lawyer of the company.

24  And as a result of all of that -- and then I'm going bring them

25  to the good faith defense.  I'm not going to mention -- I am not

1   going to say word about -- in fact, I am going to acknowledge

2   probably that he did not have a lawyer.  All right.  So it's

3   prejudicial to us to give an advice of counsel defense when

4   we're not asking for it because I'm afraid that the jury is

5   going to think he had to have a lawyer then.

6           THE COURT:  No, but see, the other side of the coin,

7   which I think makes sense, is to say I acted in good faith

8   because I relied on others who perhaps were wrongdoers and their

9   lawyers.  So it's kind of an indirect advice of counsel to

10  allege accomplices.  That's what it seems like.

11          MR. RASHBAUM:  It's not though.  First of all, none of

12  these lawyers have even been given target letters.

13          THE COURT:  I don't mean the lawyers, but the lawyers'

14  advice -- who do the lawyers advise?

15          MR. RASHBAUM:  They advise the companies.

16          THE COURT:  Which company?

17          MR. RASHBAUM:  PCA and InforMD.  InforMD isn't a

18  co-conspirator.

19          THE COURT:  And PCA goes by which name?

20          MR. RASHBAUM:  Patient Care America.

21          THE COURT:  And Patient Care America has not been

22  investigated in this case.

23          MR. RASHBAUM:  They have been I think.

24          THE COURT:  Of course -- no, you know.  You don't just

25  think.

1          MR. RASHBAUM:  It's a civil suit.

2          THE COURT:  And he relied on Patient Care and Patient

3    Care relied on the lawyers.

4          MR. RASHBAUM:  Judge, there's case law actually

5    directly on this point.  We just had it in another case where

6    one of the clients --

7          THE COURT:  So what you do is the following:  You

8    submit the instruction so I can read it.  You submit case law in

9    support of that, when a lawyer -- and it may be the first time

10   an instruction is given when the defendant doesn't want to.  I

11   don't like it, but I don't know.  It seems logical, but I don't

12   know.  And then the defense can submit a case that says, you

13   can't do that, Judge, because if you do that, you're going to

14   have to try the case again if the defendant is convicted.

15         So I don't know what I'm going to do unless you tell me

16   what support there is, and I don't think you're going to find a

17   case that's exactly on all fours, where a defendant objects to

18   the advice of counsel instruction because the counsel did not

19   advise him, but advised others.  If you find that case, I would

20   love it.  I don't think you're going to find that, but if you

21   do, show it to me.

22         MR. RASHBAUM:  Judge, I think in our last trial there

23   was --

24         THE COURT:  Just show it to me.

25         MR. RASHBAUM:  Okay.  But I want to make sure I'm being

 1  up-front with the Court.  It wasn't exactly on the --

 2          THE COURT:  I know, it wouldn't be.

 3          MR. RASHBAUM:  Okay.  Okay.

 4          THE COURT:  It's an analogy.  Okay.  I will look at the

 5  analogy and see what I do.

 6          MR. JUENGER:  The only thing I would supplement to what

 7  Mr. Rashbaum said is, I clearly asked Mr. Grow whether he relied

 8  on Mr. Walker, and he said yes.  I put that question in there

 9  precisely because I wanted to know for sure was he saying he

10  relied on Mr. Walker, and he answered in the affirmative.

11          THE COURT:  Well, but Mr. Walker is not his lawyer.

12          MR. JUENGER:  That's true.  That's what makes this all

13  bizarre to me.

14          THE COURT:  I'm going to let Mr. Walker testify.  He

15  can testify as to what happened at this dinner meeting in Tampa

16  with at least one other individual, Mr. Grow, about whom the

17  jury has heard.  Because what he's doing is he is testifying --

18  whether he's a lawyer, a doctor, or just the waiter, he can

19  testify as to what happened and he can be cross-examined.

20          MR. JUENGER:  Correct.

21          THE COURT:  Now, the issue is, what can the defense

22  lawyers say regarding the lawyers as lawyers?

23          MR. RASHBAUM:  I am not sure what that means.  I'm

24  sorry.

25          THE COURT:  What that means is, if you go beyond what

1    you should go in your closing argument, I'm going to have an

2    instruction prepared.  I probably will not give the instruction

3    requested by the Government because it's the safest thing to do.

4    Okay?  Because he doesn't really have a lawyer.  It's got to be

5    a lawyer who advises someone, but he's going to rely on the fact

6    that lawyers were present and did things for the companies.

7           So I'm going to have some sort of an instruction ready

8    to use and you'll know what the instruction says.  In closing

9    argument, if it goes beyond what it should be, and the

10   Government objects, I'm going to sustain the objection and give

11   that instruction.  So I don't think I've ever done that

12   before --

13          MR. RASHBAUM:  I understand.

14          THE COURT:  -- where I give you, you know, notice, like

15   404(b) notice, right?  Okay.  Future bad acts in closing

16   argument.  You'll know if do you that, I'm not just going to

17   shoot from the hip or take a sidebar, I'm going to read the

18   instruction, which means it's probably not a good thing for the

19   defense, which means you'll be not restrained in presenting

20   argument, but restrained in not going beyond since you're not

21   asking for advice of counsel.

22          MR. RASHBAUM:  Right.

23          THE COURT:  It would be like if you said entrapment and

24   it's not an entrapment case.

25          MR. RASHBAUM:  Let me just make sure I --

Jury Trial

1          THE COURT:  We'll look at the instruction and we'll see

2    how it should be done.

3          MR. RASHBAUM:  But just so I understand, I plan on --

4    I'm not going to talk about this a lot in closing, and what

5    little I do talk about, is going to be exactly what I have done

6    at trial, which is the company had a lawyer, PCA had a lawyer,

7    Mr. Grow is a copycat.  That's it.

8          THE COURT:  Okay.  And you're going to object to that?

9          MR. JUENGER:  If that's it, I don't believe I'll object

10   to that.

11         THE COURT:  All right.  Now you know.  Have an

12   instruction, I'll look at it and I'll decide.  It's just like

13   carrying an umbrella on a sunny day, it's wonderful not to get

14   wet and everybody is happy.

15         Anything else at 6:05?

16         MR. MARCUS:  Yes, just on this point, Your Honor --

17         THE COURT:  I thought this point has been settled.

18         MR. MARCUS:  It may be, but I just want to raise just

19   one concern in case something different happens in closing and

20   you're going to give an instruction --

21         THE COURT:  Well, nothing different is going to happen

22   in closing because you heard -- who is giving the closing?

23         MR. MARCUS:  Mr. Rashbaum.

24         THE COURT:  Then he knows.

25         MR. MARCUS:  I just want to front one concern.  The

1   advice of counsel defense is not an affirmative defense and my

2   only concern --

3           THE COURT:  Oh, I'm not going to talk about burdens or

4   anything.

5           MR. MARCUS:  Well, it does sort of, that's the

6   danger --

7           THE COURT:  I'm not going to talk about --

8           MR. MARCUS:  -- when you give it in the negative, where

9   you say --

10          THE COURT:  Wait till he gives me what I'm going to

11  give.  Now you're arguing about the jury instruction I may give

12  if your co-counsel pushes the envelope because it may shift the

13  burden.  Look at what we're doing.  There's no point in doing

14  that.

15          First, let's see what the instruction is.  I will not

16  say whose burden it is.

17          Whenever you do things like that, most jurors don't

18  understand it anyway.  We give it to satisfy the lawyers and the

19  Court of Appeals.  Right?

20          But I will not talk about affirmative defenses and all

21  of that.  It's got to be simple.  But if it's not simple as

22  proposed, I will simplify it.  And if there's an objection, we

23  can talk about that.  All right?  But let's see it in writing.

24          You've got it already?

25          MR. JUENGER:  I do, Your Honor.

 1              THE COURT:  Okay.  Have you got copies?

 2              MR. JUENGER:  I'll give them a copy and I'll pass you a

 3  copy.

 4              THE COURT:  Okay.  Give me a copy now the old-fashioned

 5  way, give your opponent a copy, and that way we'll have it, and

 6  then you tell me what's wrong with it tomorrow.  Okay?

 7              MR. MARCUS:  Can I address the Rule 29, Your Honor?

 8              THE COURT:  Well --

 9              MR. MARCUS:  Well, my concern is --

10              THE COURT:  Let me tell you, I have problems, as I

11  mentioned before, I still have problems with Counts 1 through 9.

12  I'm going deny it in any event, okay, I'm telling you right now.

13  I've thought about this a lot over the weekend.  I also think

14  about the case.  I'm going to deny it.  I'm concerned.  I

15  generally just rule on it and let it go.

16              The reason I'm not going to grant it is -- I've done it

17  a bunch of times, granted judgment of acquittals -- is the

18  Government cannot appeal.  And it's the same issue that I had

19  before, I think it's duplicative when you are talking about the

20  kickbacks when they're in Count 9, too, right?  It's wire fraud

21  and healthcare fraud, but you've worked in the kickbacks in

22  there.  All right.  I don't think it should be done that way.

23              But there is an element of the healthcare fraud, it's

24  not a strong element.  It's a good argument by the defense, but

25  I'm going to do something I have not done in 31 years.  If the

Jury Trial

302

1  jury finds the defendant guilty of Counts 1 and 9, I'll give you

2  an opportunity -- well, you always have an opportunity to file a

3  Motion for Judgment of Acquittal, but that would be a good one

4  for me to look at, with the Government having an opportunity to

5  respond in writing, and to think about it instead of just

6  shooting from the hip.

7           If he's found guilty of the other counts, does it make

8  any practical difference?  It affects the Sentencing Guidelines

9  I suspect, though I don't know.  Does it?

10          MR. MARCUS:  It will.  Also presenting it to the jury,

11 I mean --

12          THE COURT:  Pardon?

13          MR. MARCUS:  I just want to cite United States versus

14 Medina.  I think it's a case well worth looking at where the

15 Court --

16          THE COURT:  From the Eleventh Circuit?

17          MR. MARCUS:  From the Eleventh Circuit.

18          THE COURT:  Do you have a copy for me?

19          MR. MARCUS:  I do actually.

20          THE COURT:  Then just give it to me.  I'm better at

21 reading than being read to.

22          MR. MARCUS:  Okay.

23          THE COURT:  The only time, I make you read is when

24 you're reading a piece of evidence, so the court reporter takes

25 it down.

1          Okay.  And this is a case where you had kickbacks and

2   healthcare fraud and two conspiracies?

3          MR. MARCUS:  Yes.

4          THE COURT:  Two conspiracies.  This case had two

5   conspiracies?

6          MR. MARCUS:  Yes, it had money laundering -- very

7   similar, yes, kickbacks, healthcare fraud was charged.

8          THE COURT:  Was there a kickback conspiracy

9   instruction?

10         MR. MARCUS:  Yes.

11         THE COURT:  Separate and apart from a healthcare

12  conspiracy instruction?

13         MR. MARCUS:  Yes.

14         THE COURT:  Then I'll look at it.

15         MR. MARCUS:  Okay.

16         THE COURT:  I'll read it.  I'll read it.

17         Affirmed in part, reversed in part, sentences vacated.

18  That's the first thing I read.  We don't want that, do we?  We

19  don't want that.  We don't want that.  But I'll read it and we

20  will figure it out.

21         Now, on the kickbacks, there's enough evidence.  You

22  want to preserve the record.  I'll let you preserve the record.

23         MR. MARCUS:  Yes, we'll renew our motion on kickbacks.

24         THE COURT:  And money laundering, if he's guilty of

25  kickbacks and there's money running around, isn't that enough

1  for money laundering?

2      MR. MARCUS:  Not if you kick 1 through 8 because here's

3  the issue with that:

4      THE COURT:  Okay.

5      MR. MARCUS:  It's a little more complicated.

6      THE COURT:  You cannot have money laundering of

7  kickbacks.

8      MR. MARCUS:  In this case on the facts, the money

9  received through Mr. Grow's business comes from the pharmacy as

10  compensation.  So he is not getting paid, for example -- he is

11  not receiving kickbacks from patients or physicians.  So he is

12  not receiving kickbacks.  The theory is that he's receiving

13  kickbacks from the pharmacy because it's this unlawful

14  compensation.  That's the argument.  So they're going to have to

15  show, first of all, that he knew that the compensation he's

16  receiving from the pharmacy, doesn't meet the safe harbor, did

17  violate the law, was illegal.

18      THE COURT:  I agree with that, without using the words

19  safe harbor --

20      MR. MARCUS:  Right.

21      THE COURT:  -- which I don't use.

22      MR. MARCUS:  Right.

23      THE COURT:  Because not one juror knows what safe

24  harbor is.

25      MR. MARCUS:  Right.  That's the one, really the only

1   viable theory, and obviously, you know, you've seen the evidence

2   in the case.  When you --

3           THE COURT:  Well, if he is found not guilty of the

4   kickbacks and the fraud, there's no money laundering obviously.

5           MR. MARCUS:  But there's --

6           THE COURT:  Right?

7           MR. MARCUS:  Yes, but what's confusing about it, Your

8   Honor, is that they have -- so they have a theory that he's

9   receiving illegal compensation, that's one of the objects of the

10  kickback conspiracy.  There are other objects of the conspiracy

11  which involve the way he pays or his company pays the

12  telemedicine --

13          THE COURT:  So unlike what you suggested in your

14  verdict form, I'm going to have three objects of the conspiracy.

15  I'm going to have the jurors decide unanimously which object,

16  and that will take care of it, won't it?  See, you didn't

17  suggest that, but I'm going to do that.  What's wrong with that?

18          MR. MARCUS:  I think that solves that first --

19          THE COURT:  It's hard coming here, right?  Because you

20  all make me work, but that's what I'll do.  It's harder for the

21  jurors because they for Count 9 have to find out what the --

22          MR. MARCUS:  Maybe on the form, will you direct them,

23  Your Honor, that if they find on the first object, the

24  compensation object, if they find not guilty, then will you

25  direct them that they need to find on the money laundering

1 counts, not guilty?

2          THE COURT:  No, I'm going to -- they're going to have

3 to say yes or no on each object of the conspiracy for Count 9.

4 You want that, right?

5          MR. MARCUS:  Yes.  And so what happens if they come

6 back on, let's say, the second or third object and they come

7 back on money laundering?

8          THE COURT:  You know what happens?  When that happens,

9 then it's when I worry about it, because I don't know what

10 they're going to do, right?  And then I don't worry about it.

11 You preserve it, but I don't worry about it, because your

12 argument will be what?  That if they don't find him guilty of

13 one or two of the three conspiracies, they can't find him guilty

14 of money laundering?

15          MR. MARCUS:  That's right.

16          THE COURT:  All right.  Let's find out what they do,

17 because I'm going to let it go to the jury in that sense, and

18 then you're going to have to do some post-trial work depending

19 on what the verdict is, but it will be all covered one way or

20 another.  The jury is going to determine which of the three

21 objects of Count 9, and I'm going to give you the verdict form.

22          Here, this is what it will say:  I've got it already.

23 Okay?  What I do in the Verdict Form I am not giving you -- do

24 you all want copies?  Shirley, you know what?  Can you make six

25 copies of this?  Instead of me reading, I'm going to give you

 1    copies of the Verdict Form.

 2             MR. RASHBAUM:  Thank you, Your Honor.

 3             THE COURT:  I mean, I would give it to you tomorrow

 4    anyway, but I'm going to give it to you tonight, and it will say

 5    how I wrote it.  I haven't looked at it yet, since I prepared

 6    it, so I have to see exactly, but I'm confident it has what I

 7    asked for it to have, and then you look at it, but it doesn't

 8    become an issue unless they find your client guilty.  Then you

 9    can tell me which one money laundering it doesn't apply to, or

10    is it your contention it doesn't apply under any object of the

11    conspiracy or the substantive offenses?

12             MR. MARCUS:  It only applies to the one object.

13             THE COURT:  Which is what?

14             MR. MARCUS:  It's the receive and solicit remuneration

15    from the pharmacy.  I think that's the first object.

16             THE COURT:  I think I put that one as the third, but I

17    don't remember.  I'm going to look at it, and I don't know what

18    the Government's position is on that.  You can be ready for it

19    afterwards.

20             MR. JUENGER:  Sure.

21             THE COURT:  Okay.  That's it?

22             MR. MARCUS:  Well, yeah.  Medina talks about both --

23             THE COURT:  I can't discuss Medina with you without

24    reading it.

25             MR. MARCUS:  That's all I have, Your Honor.

1       THE COURT:  It's like some of these news reporters,

2  remember?  I'll never forget with Bush versus Gore, everybody

3  was pronouncing things as they're reading it with -- some

4  reporters are good at that, others are more thorough.  But I've

5  got to read it before I tell you whether it applies or not, and

6  you've read it, too?

7       MR. JUENGER:  I'm loosely familiar with it.  I'll look

8  at it again.

9       THE COURT:  Then become fully familiar with it,

10  whichever one, and then we'll be able to discuss it.

11       How long is this lawyer going to talk for?

12       MR. JUENGER:  10 more minutes.

13       THE COURT:  Okay.  How long is your cross?

14       MR. MARCUS:  About the same I would think.

15       THE COURT:  All right.  So then, after that you renew

16  your motions for judgment of acquittal, you preserve it.  I'll

17  have the jury instructions hopefully for you before you finish

18  your closing arguments.  Now you know what it is.  You'll have

19  the Verdict Form and then we'll start.  We will have to break

20  for lunch and for midmorning and mid afternoon, though we

21  haven't done that.  This is a tough jury.  Every time I want

22  them to have a break, they don't want one, so they've been

23  holding it.

24       MR. RASHBAUM:  Judge, we do have the situation,

25  remember, about the juror --

1          THE COURT:  We do and you chose him and, of course,

2     we're going to break at noon, and then we are going to come back

3     again at 3:00, unless you want to excuse him.

4          What say the defense?  Here, give each one --

5          MR. RASHBAUM:  No, Your Honor, we will wait.

6          THE COURT:  You want him?

7          MR. RASHBAUM:  We'll wait, yeah.

8          THE COURT:  Okay.  What say the Government?

9          MR. JUENGER:  Can't argue with that.

10          THE COURT:  All right.  You want him, too, and we

11     promised him, so we will break from 12:00 to 3:00.

12          So if we start at 9:00, the other juror you've selected

13     will come in at 9:30, then we'll do everything by 10:00.  You'll

14     start your closing argument at 10:00.  The perfect thing would

15     be an hour each.

16          MR. MARCUS:  We agree.

17          MR. RASHBAUM:  I am pretty sure I'll be less than an

18     hour.

19          THE COURT:  Let the record reflect I'm looking at the

20     two prosecutors.  All right.  It's kind of a big gap of three

21     hours.

22          What are the rest of the jurors going to do?  I would

23     have said to them to come at 8:00, but they're not going to get

24     here at 8:00 anyway, so there's no point in doing that.  You

25     don't want to do it in an hour?

1        MR. JUENGER:  I will try and do it as expeditiously as

2   possible.

3        THE COURT:  No, I don't want you to do it fast.

4        MR. JUENGER:  Mr. Larsen is doing the open/close.  I'll

5   work on what I'm going to say in rebuttal and try and

6   anticipate.

7        THE COURT:  Well, rebuttal is very brief.

8        MR. JUENGER:  Generally, yes.

9        THE COURT:  Mr. Larsen.

10       MR. LARSEN:  Yes.

11       THE COURT:  You're how long?

12       MR. LARSEN:  I think I can do this in, if I'm fast,

13   45 --

14       THE COURT:  No, I don't want you to talk fast.

15       MR. LARSEN:  I've timed it a couple of times and I'm

16   under an hour, Your Honor, but I'm closer to an hour than I am

17   30 minutes.

18       THE COURT:  I don't arbitrarily cut you off because,

19   you know, I make you wait when I'm doing other hearings or when

20   I'm talking to another judge.  So I always think it's arbitrary

21   to just cut you off 15, 20 minutes when you've sat here through

22   civil hearings and calendar calls.  So it's unfair, but we have

23   the juror, so that means that's what we're going to do.  Coming

24   back from a doctor, he may not come back at 3:00.  But that's

25   what we'll do.  All right?

1          Have a good evening.  Right?

2          MR. JUENGER:  Yes, Your Honor.

3          THE COURT:  Good evening.

4          MR. JUENGER:  Thank you.

5      (The trial adjourned at 6:25 p.m.)

6

7                  C E R T I F I C A T E

8          I hereby certify that the foregoing is an accurate

9   transcription of proceedings in the above-entitled matter.

10

11   __09-10-18_____     _____
         DATE                GILDA PASTOR-HERNANDEZ, RPR, FPR
12                           Official United States Court Reporter
                             Wilkie D. Ferguson Jr. U.S. Courthouse
13                           400 North Miami Avenue, Suite 13-3
                             Miami, Florida  33128    305.523.5118
14                           gphofficialreporter@gmail.com

15

16

17

18

19

20

21

22

23

24

25

**A**

abide 58:2,8,11,14,19,2 1 59:10
59:20 82:19,22
ability 33:3
able 61:19 67:7 77:14,19 88:18
94:6,20 95:22 101:6 113:16
117:9 140:3,21 142:13 147:12
148:6 149:9 159:21 160:19
162:13 167:2 178:12,24
183:11 190:2 202:15 208:15
226:22 259:4 265:11 282:19
308:10
about 6:17,19,19 7 7:2,3,9 8:2,21
8:22,23,25 9:1,2,16 11:9,10
11:11,17,18 12:3,4,8,12,18
14:13,21 15:12,22 16:3,6,17
16:25 17:17,24 20:5,15 26:14
26:14 27:10,18,22,23 28:10
28:16,18 32:4,9,11 34:3,5,7
34:10 35:10,12,13 39:1,2,25
43:14 44:8 53:17 63:5 68:8,11
68:13 73:10 74:14,18,20
76:24 77:10 85:22 87:18,24
93:22,23 95:12,25 96:8,12,13
96:14 97:1,17 100:23 101:17
106:4 116:25 119:12,25 121:8
122:9 123:1,9,10,14 124:14
125:15 126:1,4,13 129:2
130:8,12,17 133:3,5,9,12,13
133:13,17 134:9,20,23,24
135:2,8,11,12,13,14,2 4 136:10
137:3,4,12,1 5 138:7,11
139:12,20,21,2 3 140:2 143:4
146:5,13,17 150:9,11 152:24
153:17 154:11,16,2 1 155:13
155:13,18 156:13 157:20
158:4 160:8,17 162:21 163:8
163:11,11,14,18 166:5 167:5
169:10,22,2 5 171:15 173:1
174:14,25 178:23 180:16
181:4,6 182:9 183:10,16,22
184:3,23 186:2,20 187:4,7
188:9 191:20 192:1,3 193:2
195:1,5,7,8 196:1,2 199:24
200:14 201:10 204:7 205:6,6
205:23 206:18,18,19,19
207:13,25 208:7,11 209:5,9
209:21 210:6 212:12 213:18
213:25 216:25 218:3,18,23
220:2,13,19,2 0 221:9,16
222:10,19 223:3 224:25
225:12 227:13 230:6,24
234:22,23,2 3 236:4,15,25
237:5,13 238:21 242:21
243:22 244:12 245:17,23
247:20,20 250:17 251:9,13
254:15,23 257:25 258:9
259:14 262:6,8,9,10 263:10
264:7,9,12,2 5 267:1,6 268:24
269:11 270:2 271:3 277:1,5
278:11 280:19 281:7 282:11
282:14,16,19 283:5,5,17,18,21
286:6,12,12,22 287:6,24
290:2 291:6,22 292:23,25
294:19 295:1 297:16 299:4,5
300:3,7,11,20,2 3 301:13,14,19
302:5 305:7 306:9,10,11
307:22 308:14,25
above 25:16 105:20
above-entitled 311:9
abracadabra 171:21 172:5
absolute 12:17
absolutely 15:5 96:1,2 115:4
195:17 210:12 233:11
absurd 210:13
abundantly 161:19
abuse 82:12
accept 86:14 88:21 241:20
access 100:1 101:16,24

accident 40:2,12 48:3 188:4
accidentally 121:7
accomplices 295:10
according 26:20 47:8 51:12 58:5
126:15 152:11 207:22 239:17
account 41:19,23 85:25 177:24
198:5 203:5,1,2 207:15 241:1
247:4,7 254:22
accountant 125:5
accounts 198:4
accurate 212:21 311:8
accusation 142:14,15
acknowledge 295:1
acquainted 241:10,13
acquittal 285:18 302:3 308:16
acquittals 301:17
across 79:11
act 184:3,5 206:24 287:9
acted 295:7
acting 269:9 271:10
action 53:8,16 124:2 206:14
272:22
activities 68:14
activity 207:23
acts 129:24 142:1 298:15
actual 104:2 118:9 120:8 194:11
215:25 280:18
actually 12:9 31:12,22 42:5
43:17 46:8 48:7 52:7 53:14
62:2,5,23 63:15 72:25 73:6,9
74:17 77:5,12,14 80:4,14,15
93:20 102:7 106:20 110:7
112:14 113:15 135:17 136:11
169:9 176:10 188:1,21 191:15
193:17 210:7,19 212:20
213:19 215:23 216:19 223:6
234:21 244:1,6,8 245:3,6
246:14 247:8 248:14 251:17
262:23 280:22 285:23 289:9
291:21 296:4 302:19
ad 205:23,24
add 9:23 24:12 37:6 43:23 51:4
56:20 256:17 288:4 293:18
added 5:8 51:11 256:13,14
addition 111:22
additional 6:13 9:3 25:14 33:12
43:22 56:7 107:13
address 70:10 104:6 301:7
addressed 17:22,24 18:2 182:24
adhere 56:25
adjourned 311:5
administrative 159:11
admissible 142:6 204:8,17
271:17
admission 123:25 124:3
admit 89:12 126:9 127:13
232:20 235:14
admits 118:19 125:4 162:19
admitted 21:19 35:13 38:14 39:4
41:14 54:19 70:24 76:1 81:14
83:16 89:16 99:5 102:14
109:8 122:25 123:23 132:8
133:1 167:20 203:23 207:7
212:8 229:22 232:10 233:13
235:18,19 261:12 273:12,16
281:2,17,24
admitting 126:6 233:19 235:24
235:25
adopt 26:8
advance 36:18 37:4 99:14 147:4
advantage 94:18
advantageous 15:19 23:24 90:4
advertisements 267:14
advice 174:1,1 175:20 181:16,17
181:21,24 182:4,9 290:17,22
291:1,6,11 292:11,25 293:11
293:12,19,22 294:1,5,7,16,16
295:3,9,14 296:18 298:21
300:1

advise 295:14,15 296:19
advised 171:18 296:19
advises 298:5
advising 180:8
affect 194:16
affects 302:8
affirmative 297:10 300:1,20
afforded 181:11,13
Afghanistan 245:6,7 247:9
afraid 205:15 295:4
after 14:15 15:1 18:9 19:7,15,20
20:8 25:13 46:7 50:2 51:25
52:20 53:16 60:11 95:11 98:8
107:9 110:4 113:6 121:19,20
132:6 140:25 142:3 143:1,17
150:15 153:18 154:1 169:25
178:10 185:2,24 197:15 201:8
206:25 228:9 246:3,5 247:19
248:11,21 250:22 251:6 260:7
267:22 268:19 287:22 308:15
afternoon 8:16,17 159:2 166:3,4
240:17 249:17,18 283:23
308:20
afterwards 20:7 51:23 260:5
283:21 307:19
again 19:16 31:1,6 32:3 58:11
89:21 90:16 110:11 113:22
125:21 143:21 157:6 169:9,10
173:3 187:15 222:12 223:5
286:18 290:20 294:19 296:14
308:8 309:3
against 200:2 221:7
agency 25:2
agent 23:20 90:1 237:23
ago 60:21,22 67:15 130:9 142:24
176:21 188:19 199:25 200:22
230:6 250:14 257:20,22,23
287:12 311:6
agree 56:25 58:6,14,21 59:10
62:21,22 64:15,16 90:23,24
110:6,14,16 118:2,18 195:20
195:21 196:25 198:11 203:8
233:25 244:19 250:7,8 254:8
254:23 256:20 258:5 260:1,4
260:21,22 261:24 263:11,21
263:24 264:2,16 265:13,14,24
265:25 267:6 268:2,7,10,21
271:22 278:22 304:18 309:16
agreed 58:7,11,19 67:15 82:18
115:23 119:2 168:6 173:4
236:18 238:10 239:10 244:21
agreeing 57:12 219:21
agreement 30:23 57:7,8 82:8,10
82:11,17 122:24 123:3 124:1
124:5,6,25 129:18,19 166:20
187:21 198:1 211:21 219:17
219:20 220:1,2,3 226:11,13
226:14
agreements 178:10 213:5
agrees 233:23
ahead 11:16 23,25 106:4 132:4
135:5,7 136:6,17 148:25
156:16 157:8 192:19 230:13
234:6 236:10 240:13 255:13
257:7 258:20 269:22 279:19
281:3 287:1
ahold 98:16 101:2,6 283:20
ailments 106:13 121:21
Air 74:8
aired 93:19
Alejandra 145:12
alert 167:2
allege 295:10
alleged 20:2,2 236:7
alleges 134:1
allergies 106:13
Alley 48:24 49:1 118:10
allow 16:24 23:2 27:21 30:3

130:18,19 131:3 146:24 160:3
160:6 202:19 204:12 213:19
229:18
allowed 63:18 82:23 130:17
144:25 147:6 148:15 154:12
154:12 198:20 205:4 239:15
allows 57:24 159:11
almost 41:21 90:7 107:1 134:4
140:19 164:12 194:1,1 227:3
228:14 250:1 291:11
alone 131:21
along 54:3 56:4 61:15 77:2
130:19 178:2 291:25
already 18:3 21:19 24:23 34:15
35:13 82:17 110:11 126:14
132:8 141:2 156:22 167:10
183:14,18,19 185:1 193:9
201:12 209:25 213:21 235:19
273:12 281:17,24 300:24
306:22
altar 143:11
alternative 23:22 90:2 274:3
although 95:16 166:20 239:9
altogether 269:16
always 17:16 26:17,18 31:7,9
43:23 108:15 122:7 132:23
146:6 160:10 162:14 217:20
223:3 226:6 271:16 272:9
283:25 293:4 302:2 310:20
America 1:4 40:10 54:10 86:6,7
88:11,13 94:13 95:18 96:7
235:24 237:9,10 238:10 280:4
280:6 295:20,21
American 115:3 206:13
Ameritrade 203:4,1 1 207:15
among 175:19 203:21
amount 49:23 53:21 107:5
170:16 187:7 215:4 235:3
238:17 247:10,21,2 4 248:1,4
287:10 288:4
Amy 47:18
analogy 293:9,9 297:4,5
analysis 25:3 86:1,5
analyst 41:17 202:21
analyze 294:2
analyzes 180:17
Anderson 214:22,24,2 5 215:20
Anderson's 215:1
annoying 8:3
annual 63:21 64:21
another 29:22 37:7 40:12 43:19
46:23 85:17 88:25 89:19 92:5
102:6 114:6 168:22 179:15
191:13 205:8 227:15 246:14
265:12 296:5 306:20 310:20
answer 13:11 25:10 27:23 63:5
77:1 78:14 114:25 115:20
128:8 138:2 139:15 160:19
192:17,18 202:5 258:4,20
259:1,9,16,20 263:4,17
answered 254:25 297:10
answers 135:16 154:4,6
anticipate 157:10 163:14 310:6
anticipated 247:24
anti-kickback 59:6,11 172:11,12
172:16 173:5,9,1 5 184:3,5
201:15 219:22
Antoine 93:20 95:10
anxious 170:1,21
anybody 55:3 62:1 94:8 109:6
189:12 199:22 245:25 252:8
253:19
anymore 155:24 179:8,22
248:20
anyone 24:5 38:7,8 91:10 93:11
93:16 114:9 179:23 223:20
239:12
anyone's 170:22
anything 5:19 8:5,6 9:23 55:22

63:13 77:13 78:13 91:19
97:19 114:9 117:11,15 126:1
127:7 132:15 134:6,7,10
139:21 144:8 145:5 154:21
155:13 156:20 159:22,22,24
163:11 175:14 180:1 191:20
192:7,11,2,5 193:2 194:7
196:17 200:19 206:20 207:24
218:1 219:6 221:24 222:10,12
222:23 223:6,24 233:8 238:25
242:21 243:16,22 245:20,23
246:13 257:6 279:5 283:18,18
283:19 286:20 288:17 290:9
290:10 299:15 300:4
**anyway** 5:20 15:18 25:18 26:16
103:9 122:8 287:7 290:1
300:18 307:4 309:24
**anywhere** 217:23 224:13
**apart** 303:11
**apologize** 142:21 144:23 282:7
286:19
**Apparently** 159:12 186:25
**appeal** 26:7 284:24 301:18
**Appeals** 29:10 300:19
**appearance** 36:19 97:13
**APPEARANCES** 1:12
**appellate** 16:20 29:16
**applicable** 58:22 59:7 82:3,9
219:21
**application** 54:22 55:1 60:13,14
61:23 249:5,7
**applied** 189:25 241:22
**applies** 206:5 307:12 308:5
**apply** 204:23 249:11 307:9,10
**appointment** 164:18 243:25
265:6
**appreciate** 202:7
**approach** 255:24 273:9 280:20
**approached** 151:18
**appropriate** 272:3 290:16
**approval** 96:17 226:17
**approve** 239:16 241:20
**approved** 78:25 115:15 196:16
246:5
**approximately** 72:2,4,5 117:22
198:8 217:6 234:12,13 235:2
**April** 14:7,8,9 42:10 74:5 201:1
201:8 212:25
**arbitrarily** 310:18
**arbitrary** 310:20
**area** 63:18 106:14,16,17 129:15
131:22 132:7,13 157:5 184:5
253:9,14,22 276:5
**areas** 131:25
**arena** 200:13
**argue** 126:22 127:9 292:14
293:6 309:9
**argued** 141:23
**arguing** 293:24 300:11
**argument** 8:18 148:7 286:1
292:25 294:19 298:1,9,16,20
301:24 304:14 306:12 309:14
**arguments** 160:17 285:22
308:18
**arise** 182:1
**arisen** 142:3
**arises** 63:6
**Armando** 91:20
**arose** 96:15
**around** 10:18 17:20 20:14 62:13
115:24 158:16 164:19 168:3
178:21,21 185:4 186:10,10
215:12 218:8,9 303:25
**arrangement** 76:14 176:16
**arrested** 150:16,19,21 152:1,2
**article** 133:12 134:12,18,25
135:8,11 136:22 137:7,8,9,10
137:11,12,24 138:7,19,24
139:2,5,9,14,17,2 140:1,12

140:16,18,23 147:23 152:24
152:25 153:4,6,8,9,17 155:16
156:2,17 161:10,11,21 163:6
163:9,11,12,15,1 8 189:10
191:24 193:3 194:12,12 206:3
206:6,11,18,18,1 9 208:1,7,9
209:9,11 236:3,3
**articles** 134:18,19 152:6 154:20
205:25 283:20
**aside** 22:3 217:25 287:22
**asked** 73:3 95:14,25 98:7,8
105:23 111:8 120:17,18 127:1
169:6 173:3 175:14 180:3
181:6,21 182:24 183:10,16
185:21 186:15 188:16 196:14
197:23 199:10 202:1,10
205:17 209:10 216:25 217:13
221:9 225:12,25 234:22
241:21 243:24 245:3 257:15
257:24 258:4 259:7 264:7,12
266:25 267:24 273:17 277:2
291:9 292:22 294:9,13 297:7
307:7
**asking** 11:17,17 36:24 67:2
125:18 139:11 159:13 163:8
169:17 173:17 189:16 210:5
210:17 212:12 224:25 263:7
269:14,16 277:1,2,19 284:18
294:14,16 295:4 298:21
**asks** 137:7
**asserted** 236:3
**assigned** 109:12 230:1
**assist** 96:22 216:5,8
**assistant** 144:25 146:7 251:21
**assisted** 176:6
**associates** 83:6
**assume** 35:14 59:22 66:4 91:10
110:22 113:25 126:8 139:25
156:5 234:14 261:3 278:6
280:24 291:4
**assumed** 74:23 144:22,24 146:6
220:6
**assuming** 140:22 219:5,9 276:19
**assumption** 269:8
**assured** 226:9
**attached** 43:8 48:18 133:4 138:6
140:11 152:3 161:21 262:3,23
**attachment** 235:14
**attachments** 102:22 262:4
**attack** 154:10
**attempt** 233:7
**attempting** 141:15
**attended** 279:9
**attention** 174:10
**attenuated** 153:15
**attorney** 144:15,17 151:17 171:9
174:11 180:6 181:23 185:11
226:12 227:1 279:18 280:1
**attorneys** 171:2 173:25 186:15
196:11,15 200:1 226:8,9
227:1
**attorney's** 1:14,15 226:17 233:2
**audio** 234:9
**August** 83:22 122:23
**aunt** 49:2 118:11
**AUSA** 1:13,14
**authority** 26:11 191:25
**authorization** 122:1 238:23
**authorized** 55:1,16,18 56:14,24
60:11 117:18
**authorizes** 56:19
**autofill** 14:6
**available** 36:25 59:1 93:8 95:11
95:17 103:25 224:2,3 245:12
264:2 274:8
**Avenue** 2:6 311:13
**average** 84:12 88:17 221:18,19
**avoid** 36:18 201:14
**Avon** 267:1

**aware** 144:20 154:2,13,15 227:5
228:6,18,24 239:5 253:8,13
253:21 258:15 262:20,21
271:8 274:20
**away** 21:7 63:19 159:16 172:17
**AWP** 23:23 24:1 84:12,17,21,24
86:1,17 88:12,20 90:4,7 91:1
221:9,16,16,21,2 4 222:2,8,13
223:6
**A-3** 58:18
**A-6** 59:23
**a.m** 5:1 35:19 122:13

**B**

**B** 30:17 60:11 278:7
**Bachelor** 43:3,4
**Bachelorette** 43:3
**back** 27:16 31:8 32:7 36:5,24
47:25 51:16,21 63:19 83:20
86:20 95:13 97:25 101:3
102:9 105:24 117:7 118:5
127:21 143:11 144:2 146:18
152:12 158:24 162:4 164:21
165:6,13 179:25 186:8 196:18
224:3,5 226:4 230:21 231:24
249:5 251:12 259:24 266:11
274:25 279:1 285:5,10 306:6
306:7 309:2 310:24,24
**background** 251:15
**bad** 21:3 22:24 25:6 50:1 52:22
53:2 103:1 115:10 129:24
155:18 173:3 298:15
**Bahrain** 202:3
**Bailey** 109:16,19,25
**bait** 19:24
**bank** 41:19 52:9 198:4 247:3,4,7
**banking** 247:2
**banter** 242:7
**base** 85:17,18
**based** 14:12 70:20 87:1 108:20
160:20,25 169:7 170:5 183:16
187:1 193:11 198:14,20
205:13 237:2 244:11 249:8
290:3,15
**basically** 33:16 69:18 78:22
86:11 103:24 105:17 107:1
166:21 197:21 213:10 227:16
241:20 242:23 243:3 244:17
257:20 259:2 269:3 276:1
**basis** 98:4,21 187:10,15 236:24
251:22 267:7
**Bates** 19:5 44:3
**beachfront** 51:18,20
**Bears** 45:5
**became** 39:12 46:17 172:9
179:16 182:21 220:14
**become** 29:6 54:23 71:23 151:11
173:8,13 176:19,22,24 177:2
178:19,24 183:5 184:25
185:17 191:4 201:15 213:10
213:12 227:17 228:24 241:10
241:13 252:2 268:24 282:12
**becomes** 140:17
**becoming** 172:15,23 254:9
263:10 268:2
**before** 1:10 7:5,23 8:12 13:4
17:3,5,6 18:9 19:7,14,20 20:6
20:8 25:7,13 26:5,17 31:17
35:10 37:20 51:2 52:12 60:24
65:24 79:24 83:11 96:6
100:22 121:5 127:4,7 133:3
143:1 148:14 150:11 151:16
152:2,21 154:13 155:20
163:19 164:7 178:11,24 179:1
180:21,22 185:9,11 186:21
189:23 196:17 204:4 209:7,9
212:11 228:9,11,12,13 242:8
248:9,15 252:7 254:15 256:22

298:12 301:11,19 308:5,17
**beforehand** 15:17 134:22
**began** 241:20
**beginning** 30:24 154:18 170:15
195:5 205:1 234:15
**begins** 76:5
**behalf** 112:11 191:25
**behind** 27:16 192:4
**being** 14:4 16:1 74:20 95:8
113:24,25 122:8 131:17
149:19 150:12,15,15 166:18
169:11 172:15 174:17,17
176:18 180:4 182:22,25 187:8
187:24 190:18 192:10 194:13
200:3 208:9,10 225:13 228:7
228:19 232:21 233:2 235:19
236:21 242:5,23 243:25 244:7
244:9 248:23 257:25 258:4
259:7 266:3,12 267:12 271:3
276:14 283:22 296:25 302:21
**belief** 142:16
**believe** 5:9 20:14 22:10 26:2
34:20 38:6 43:4 44:9 45:1
49:3 54:2,17 55:2,8,10,21
62:2 72:25 73:8 74:17 80:7
82:24 84:19 88:9,13 92:21
94:1 98:5 100:15 101:8 107:2
108:12,23 111:25 117:11
118:4 122:23 127:13,19 128:7
132:25 136:11 142:2,4 150:1
154:23,24 162:22 166:9
169:21 170:14 171:1 177:21
178:22,22 180:22 182:10
185:22 187:3 188:25 189:5
190:18 191:17 200:8 203:17
203:20 211:13 213:24,24
215:19 218:8 221:18,20
224:17 226:16 227:13 233:6,6
235:12 236:17 237:24 238:3
241:12 262:12 266:6 299:9
**believed** 96:10 198:18 261:3
**below** 9:19 56:24 86:1 213:1
293:18
**beneficiaries** 27:8 182:17 183:2
183:5 236:21 237:15 238:11
238:14,18
**beneficiary** 39:8,11 241:3,5
**benefit** 121:13,14,16
**benefiting** 31:23 80:5
**benefits** 174:24 175:13
**Berlioz** 144:5,9,11,13,15,17,20
144:23 145:6,9,12,12,14,18,21
146:8 159:5,6,18 160:1
**Bern's** 171:6
**best** 33:3 67:5 111:11 227:21
236:9 258:24
**bet** 121:6
**better** 5:19 26:22,24 31:22 77:12
78:2,3 80:3 86:14 94:20 140:2
202:18 222:11 243:6 257:16
260:2 292:17 302:20
**between** 82:18 83:17 86:2 97:3
131:2 150:18 152:10 189:20
190:4,9,10,16 191:13 197:21
198:2 208:23 212:24 219:17
220:20 228:5 250:21 254:23
269:19 281:18,21
**beyond** 26:15 297:25 298:9,20
**big** 30:20 38:12 55:22 97:2
127:6,8 145:7 146:18 153:14
171:12 176:13 189:20 190:4,9
190:10 208:23 309:20
**biggest** 128:11
**bill** 37:6 54:15,23 57:15,25
101:20 208:19 218:25
**billable** 145:19
**billed** 38:18 54:17
**billing** 61:21 101:13 179:17
194:4,5 209:12

**bind** 56:15
**Bing** 39:2,10 40:14,20 102:22,23
104:2
**Biscayne** 1:21 2:2
**bit** 75:1 78:24 97:1 100:20
102:24 111:6 116:25 118:8
158:17 205:12 213:13 217:15
221:16 235:22 273:5
**bizarre** 297:13
**Bjerke** 73:4,6 118:14,22,25
119:17,18,20,2 1 120:10
**Bjerke's** 49:1,1,2 118:11 119:12
**blackjack** 114:18,22 209:22
**blame** 114:7,9
**Bland** 101:1
**blank** 105:20 294:9
**blanking** 259:20
**blog** 71:17
**blogging** 74:14
**blue** 25:19
**bluejeansforever** 71:6
**bluejeansforever16@hotmail....**
71:3
**blurry** 217:15
**board** 232:1
**boat** 256:24
**body** 121:10
**bogus** 184:17
**bolts** 76:12
**bona** 41:4,12 42:15 132:14
174:14,17,20,21,2 2 175:4,5,6
175:9,10,1 0 176:22,24 177:1
177:2 182:12 201:15 282:12
282:16 283:8 287:11 288:6,8
288:21
**bone** 30:21
**both** 6:3 13:10 23:10 34:3 54:9
55:9,11 64:15 68:13,14 74:13
157:15 160:18,23 162:9
212:15 213:3,25 222:20
231:21 232:10,20 251:23,24
281:15,16 292:6 307:22
**bother** 71:5 182:6
**bottle** 246:9
**bottles** 259:24
**bottom** 37:10 87:3 89:19 119:16
**Boulevard** 1:21 2:2
**Bowl** 206:20
**Bowman** 30:21
**box** 104:10,10,13,16,19,21
285:14 291:15
**boxing** 15:6
**boy** 143:12
**break** 35:15 36:16 115:21
131:11 132:6 149:1,2 192:16
308:19,22 309:2,11
**breakeven** 115:16,18
**bribe** 288:2
**brief** 54:3 156:22 218:3 231:3
278:14,15 310:7
**briefly** 200:6 223:11 224:5 272:8
272:11
**bring** 15:16 29:11 35:17 123:23
15:9,13 144:21 145:25 146:3
150:25 151:1 153:14 155:20
159:10,12 162:14,19 164:9
184:24 185:12 230:20 231:10
258:18 285:5 294:24
**bringing** 29:4,5,12 47:12,23
48:15 178:8 209:24 226:23
271:11 289:5,22
**brings** 143:11
**broke** 115:17
**broker** 168:16,23,25
**brokering** 168:9,10,13,2 1 169:7
224:25
**brother** 54:6 181:14,15,23 182:3
**brought** 29:2,5,10,1 9 38:7 44:18
45:23 46:2,2 47:9 68:21

132:14 174:10 176:10 186:16
219:20

**C**

**C** 30:17 278:7 311:7,7
**cafe** 165:17,18
**calculate** 46:14 47:21 114:6
**calculation** 87:3
**calculator** 113:16,22
**calendar** 310:22
**call** 34:23 57:8 65:13 98:3 105:7
105:18 107:4,6,8,10,14,16
108:25 115:16 119:19 120:5
130:19 142:15 144:1 147:14
147:16,19 151:10 154:9
176:13 177:22,23 189:19
197:10 204:9,25 209:2,5
216:6 234:19 239:25 241:17
243:14 244:2 245:8 246:4,5
248:9,16 250:10,11 251:1,2,5
251:6,8,8,8,13,1 7 252:1 254:9
254:24 257:25 260:20 261:1
261:22 262:14 263:15 266:2
268:17 269:9,12,18,19,24
270:2,16,21,22,2 4 271:8
272:21 278:19
**called** 31:18 53:25 54:22 62:10
79:25 83:6,13 92:24,25 93:22
93:23 94:1 97:8 111:23
119:12 120:2,3,3,9,11,14
129:3 170:23 185:24 186:2,3
188:16 193:20 196:4 197:12
200:8 218:4 240:22 241:15
248:14,17 260:17 264:4
267:21 270:10 273:4 280:3
**calling** 68:18 93:20 94:19 108:15
108:18 198:23 208:13 235:5
283:11
**calls** 34:17 97:8 98:8,20 99:9
100:15,16,2 0 102:8 105:14
106:7,20,22,2 4 108:17 111:22
147:11,13 228:4 247:13 275:5
310:22
**came** 19:7 25:13 26:17 35:10
61:14 65:8 72:18 75:9 78:23
80:18 92:2 100:10 118:15
133:18,20 166:23 174:2 177:6
182:6 184:20 185:2 196:7
197:17 204:14 225:10 246:8

247:2
**Campbell** 241:8
**canceled** 98:18 190:3 197:11
199:14 224:16,20 226:21
**cancer** 200:9
**candidate** 191:2
**candidates** 191:8
**caps** 31:13 78:17
**capsule** 49:14
**capture** 154:3
**car** 61:5 151:23,24,25
**card** 237:23 248:17
**care** 8:25,25 16:8 27:24 36:21
40:10 54:10 83:13 86:6,6 96:7
97:20 100:11,17,1 7 101:15
106:19 111:23 160:2 235:24
237:9,10 238:10,19 243:10
278:21 280:4,6 295:20,21
296:2,3 305:16
**career** 51:24,25,2 5 170:9,22,22
**carefully** 56:5
**carrying** 299:13
**cars** 203:4 207:14
**case** 1:3 8:22 13:10,14 14:19
16:8,9 20:5 21:10,11 23:16
26:6,14 29:16 33:24,25 34:2,3
34:5,10 39:25 57:11 116:4
120:8 122:10 123:14 126:16
126:20 127:10 128:15,19
129:20,25 130:13,22 133:10
133:16 134:5,20,20 138:8,13
138:21,21 139:18 141:24,24
142:6,7,7 143:23 145:14,16
146:10 148:13 149:21 150:8,9
150:12,19,20 151:17,19,22
152:9,11 154:19,23 155:7
158:4 159:9,15 160:16 161:15
162:15,16 193:4 194:17
204:22 205:9 206:13,15,22,23
214:6 215:10 221:21 226:3
227:2 228:2,10,2 2 230:2,24
235:21,24 236:4 258:19 283:1
288:19 289:5,9 290:13 291:17
293:13,25 294:10 295:22
296:4,5,8,12,14,17,1 9 298:24
299:19 301:14 302:14 303:1,4
304:8 305:2
**cases** 152:13 211:5 285:23
290:13
**case-in-chief** 21:13 24:11,17
28:19
**cash** 288:3
**Cassandra** 213:3
**cat** 221:2
**catch** 48:8
**caught** 215:3,4,22
**cause** 59:24 217:16
**caused** 123:2
**cautionary** 235:18
**CBS** 133:2,4,6,12 136:9,13
147:8,9,16 151:1,4,8 152:6
156:10 186:20 191:13,14
194:2 207:25 208:7 209:9
235:11 236:13
**cease** 186:11,12,17,18
**ceased** 179:9
**cent** 31:19 80:1
**central** 174:7
**cents** 86:11,19 87:5
**certain** 28:7,8 61:4 75:9 146:9
216:10 226:7 260:22 268:10
292:2
**certainly** 127:14 131:16 159:20
181:11
**Certificate** 3:16
**Certification** 57:1
**certify** 311:8
**cetera** 82:14 264:10
**CFR** 286:15,17,21

**chance** 142:9,17 203:7
**change** 31:11,14,20 38:2 50:19
77:3 79:21 80:2 107:18
176:14,15 225:11 226:14,15
249:2
**changed** 30:24 76:17,20 142:8
145:24 146:1
**changes** 69:3 97:6 178:2 226:24
269:1 270:6
**changing** 31:15 79:22 177:23,25
**charge** 88:13 89:22 167:22
177:3
**charged** 88:8 101:7 151:16
303:7
**charismatic** 242:2,3
**cheap** 92:18
**check** 47:22 104:10 137:8
238:16 239:1 290:8
**checked** 104:10,13,16,1 9 108:8
119:8 289:14
**checks** 177:24
**chief** 13:14 21:10 128:19 130:8
145:24 146:10 154:19 162:16
162:16
**child** 274:3,5
**children** 5:18
**choice** 125:5 263:25
**choose** 78:4 89:2,3
**chooses** 89:6
**chose** 95:4 105:11 107:11 263:14
309:1
**Chris** 7:1 9:10,13
**chronic** 243:10
**chronological** 42:9 83:21
**Cichowicz** 40:6,9 46:25 47:2,5,9
47:9,11,12,12,23,2 3 48:2,9
212:12 213:22,24 214:2,13
215:8,17
**Cici's** 177:15
**circle** 106:16
**Circuit** 142:7 148:13 150:20,20
151:19,22 152:1 288:19
302:16,17
**circumstance** 109:24
**circumstances** 32:2
**cite** 302:13
**cited** 148:14
**city** 240:17 275:16
**civil** 20:18,21 296:1 310:22
**civilian** 253:16
**claim** 43:2 44:24 45:3 59:2,3,13
59:14,18,25 88:19 217:17
**claims** 9:20 57:21 60:1,5,8 82:13
194:5 217:18 239:7
**Clarksville** 241:9 253:7,19
**class** 205:12 232:2,2
**cleaned** 171:22
**clear** 9:24 10:13 99:14 106:3,4
109:10 123:11 161:20 195:15
252:7
**clearly** 15:18 59:9 109:25 123:7
194:17 297:7
**clicking** 159:21
**client** 11:20 12:8 33:7 138:17
145:20 307:8
**clients** 168:23 282:18 296:6
**client's** 161:8
**clips** 156:7
**close** 114:13 215:16
**closed** 192:4
**closer** 157:24 310:16
**closest** 293:9
**closing** 8:18 157:15,15 158:8,9
294:18 298:1,8,1 5 299:4,19
299:22,22 308:18 309:14
**closings** 157:12 287:2
**Code** 287:3,17
**codes** 90:5
**coffee** 132:6 165:12,16 230:19

230:20

coin 114:20 295:6
collateral 155:18,20
colleagues 10:9 127:6 131:13
collect 98:2 107:1,7
collection 98:1
Collectively 229:15
Colleen 81:12
colloquial 57:20
combined 158:13
come 15:17 26:16 36:24 46:9,10
  92:23 97:16,25 100:13 103:15
  133:19 134:13 138:19 146:14
  146:18 154:20 158:24 161:10
  161:25 162:22 163:13 164:21
  165:6 167:1 180:7 185:1
  204:13 205:5 213:23 214:1,2
  219:6 234:22 246:6 247:6,10
  247:25 259:21 270:17 279:11
  285:10 293:9 306:5,6 309:2
  309:13,23 310:24
comes 22:24 50:12 57:15 131:17
  152:18 160:5,9 161:17 166:16
  204:15 206:10 210:15 236:4
  304:9
comfort 170:24
comfortable 291:10
coming 21:1 72:14 93:6 151:2,2
  156:22 161:11 165:13 178:2
  204:10,20,2 1 226:22 236:2
  248:13 305:19 310:23
comment 236:15,17,25
comments 106:14
commission 43:18 48:19,19 50:9
  102:2,6 176:9 238:16,19
  244:16 251:22,24 266:20
  267:7
commissions 42:4 43:20 46:15
  46:17 47:21 51:2 175:2
  215:25 216:13,14 220:15,16
  220:17,18 234:23 238:1
  257:25 268:7
commit 206:24
committed 124:22 127:10,15
  130:25 233:6
committing 198:14
common 222:9 274:8
commonly 85:18
Community 54:1,12 62:8 217:10
companies 77:17 84:17 86:18
  88:5,5,14,23 97:7,18 100:4
  106:6 133:14 187:8,16 221:21
  226:5,7 292:3,16,18 295:15
  298:6
company 9:21 27:9 34:17 37:7
  37:18 38:3 53:25 55:3 62:8,9
  64:16 68:5 69:4,15 71:10
  72:15 74:21 79:16 86:20
  88:11 94:1,13 95:19 96:24
  97:3,20,20 98:3 99:16 101:15
  101:18 105:16,20,22 106:7,18
  106:20 107:3 111:23 133:17
  138:7 153:4 174:25 178:6
  189:14,21,22 191:17 192:13
  193:22 194:8 197:10 200:6,8
  200:16 208:8,10,11,1 1 209:14
  209:16 211:2,6,22 224:10
  226:8 227:16 235:2,5 237:1,4
  238:15 241:18 247:23 249:3
  251:21 252:2 253:13,22 259:8
  259:9 260:24 263:11 266:18
  270:4,10,14,1 4 271:9 276:8
  276:19 280:3 294:21,23
  295:16 299:6 305:11
company's 249:3
compare 282:24
compared 85:15,25 87:5 210:10
compares 156:17
comparing 86:11 220:8 221:13

222:16

comparison 86:2 210:12
compensated 190:19 192:10
compensation 65:5 101:25
  121:22 190:12 304:10,14,15
  305:9,24
competent 185:10 283:2
competing 94:10
competitive 85:7,19
complain 76:25 152:14 167:16
complained 130:8
complaining 76:12,15,24
complete 178:24 263:7 282:21
completed 125:5
completely 138:8
compliance 59:7 63:22,24 64:22
  75:13 82:3,9 96:9 152:3 166:11
  178:22 226:6 277:14 282:11
  282:13,22
compliant 68:4 96:10,13 166:21
  167:11 172:6,23,25 176:20
  180:4 197:25 225:7 226:25
  233:8 267:25
complicated 207:3 304:5
complied 107:14
complies 166:14 167:5
comply 168:6 219:21 220:4
complying 59:4 220:7
composite 102:15,16,16
composites 102:17
compound 68:10 75:2 83:1
  187:8 192:15 243:1,5 273:23
compounded 103:22 137:15
compounding 27:10 52:13 83:5
  103:21 133:13,15 134:10
  135:2,9 137:12,14,18 155:19
  167:22 169:15 187:4 190:12
  234:23 237:13 238:1 252:5
  282:2
compounds 65:15 137:3 220:8
  241:19 242:23 262:9 274:8
computer 18:17,21,23 144:7,18
  144:21 146:3 159:7,16 272:10
computers 145:1,23 159:10,12
con 165:17,18
conceal 169:6
concealing 167:8
conceded 176:21
concern 166:16,20 168:3 299:19
  299:25 300:2 301:9
concerned 222:19 223:3 301:14
concerning 185:5
concerns 166:10 168:9 169:25
  171:18,22 225:9
conclusion 147:5 180:18
condition 63:20 192:1
conditioned 59:3,13
conditions 59:7 191:9
conduct 39:9,16 148:11 187:1
  208:7
conducting 199:9
confer 131:12 157:1
conference 176:13 177:22
confidence 171:14
confident 242:3 307:6
confirm 37:21 189:23 202:16
  209:6
confirmed 208:25 209:18
confirming 188:1 210:22
conflate 101:18
conflicting 118:8
conformed 219:20
confronted 152:4 196:1
confuse 271:7
confused 199:12 205:11 292:5
confusing 305:7
Congratulations 280:3
connection 243:23 269:4
consent 122:2 125:7 187:24

191:19

consider 148:8 177:19 236:5
  288:21
considered 98:11,18
considering 207:21
consistent 35:24 135:17 140:18
  141:24 142:4 146:24 147:1
  155:9 263:10
consisting 178:20
conspiracies 303:2,4,5 306:13
conspiracy 303:8,12 305:10,10
  305:14 306:3 307:11
constantly 8:7 31:15 79:22
constitutes 75:15
consult 31:16 36:20 37:13 79:23
  98:7,8,10,12,13,15,1 8 101:6,7
  101:14 103:4,8 105:7,13
  106:9 112:16 113:3 192:13
  193:4,8 209:2 211:23,25
  219:4,5,7,10,12 264:5 265:7
consultant 82:5,7 219:17
consultations 112:15
consulted 114:4 182:23 197:12
consulting 113:6 226:7 239:12
consults 36:3 36:17,21,23 37:2,3
  37:5,6,8,9 97:12,22,24 98:2,4
  98:6,23 99:15,17,22 101:11
  101:14,21 102:3,5 105:16
  112:6,18 115:25 182:23 211:4
  211:10,11 219:14 220:20
  224:11,12,14
contact 104:6 189:1,2 190:3
  211:20
contacted 119:17 185:21 186:6
  188:10 197:23 199:3 226:22
  234:16,19 238:7,20 248:23
contacting 109:11 187:21
  191:18,24 208:17
contain 61:1 162:1
contains 104:6
content 126:23
contention 307:10
contents 3:1 60:12,14 61:23
  70:11
contestant 43:5
context 18:10,10 66:25 135:25
  139:24 148:8 152:22 206:16
continually 15:2
continuance 32:14 33:6
continue 78:16 79:20 90:14 93:9
  160:21 176:18 198:20 247:23
  248:11 269:2 270:6 287:2
continued 63:20
continues 56:13 71:22 87:4
  130:6
continuing 14:16 15:2 270:2
continuously 8:4
contract 57:5,8 67:25 79:14
  80:18 81:18,22,24,2 5 200:23
  201:3
contractor 59:1 171:19
contractors 41:1
contracts 58:8 60:24 226:9
contrast 92:1,4
contrasted 68:24 69:1
control 25:3 53:1 88:2,4,4,7,10
  88:12,15,22 89:2,4,5,7,7
  134:7 221:25
convenient 106:10 244:1 265:7
conversation 178:5 184:21
  228:25 241:23,25 243:9 244:6
  245:3 248:10 253:1 254:14
  260:5,14 261:19 263:10
  268:12
conversations 141:16 152:7
  232:13 233:17 236:8 251:4
  260:12
convicted 296:14
convince 29:15 164:3 208:15

222:18

convincing 187:23 198:18
  199:22
cooperating 147:11 151:12
cooperator 154:9
copay 14:4
copayment 248:8,16,18 273:3
copays 184:14,15 199:4 238:11
  238:14,18,21,22,2 5 239:4,7,8
  239:14,15
copies 301:1 306:24,25 307:1
copy 124:11 156:17 186:5,6
  221:2 258:12,12,14 289:15
  301:2,3,4,5 302:18
copycat 299:7
Corcoran 175:24,25 176:3
Coronado 3:8 39:18,20 40:9
  48:11,13,15,1 6 212:13 213:22
  213:25 214:13,14,15,1 5 215:7
  215:18 240:1,5,8,11,17 261:9
  261:15 263:3 272:15 273:20
  274:11
corporate 267:19
correct 10:7 21:23 25:22 26:12
  27:5 30:14 36:7,11,14 37:11
  37:18,19 38:4,10,11,19,24
  39:2,8,11,12,18,1 9 40:3,7,12
  40:13,15,18 41:2,5,12,19,23
  42:6,25 43:6,12,13,16 44:7,11
  44:12,15,17,18,1 9 45:20,25
  46:3 47:3,4,9,10 48:11,12,16
  48:17 49:2,22 50:1,2,23 51:1
  51:2 53:8 54:10,11 55:13
  58:12,13,20 59:18,21 62:7,16
  64:2 65:16 66:2 67:22 71:3,6
  71:7,12,13,20,2 1 73:17,21
  74:8,9 75:2 76:6,7,14,16
  77:25 78:20 79:3 80:9,16
  81:19,20 82:20,21 83:2 84:1,2
  84:5,14 85:1,2 86:9,18 87:1,7
  89:4 90:7,8,12,22 91:2,6,9
  92:6,12 93:4,7 97:5,6,8 98:21
  98:22,25 99:9,15,18,19,24
  100:5 102:19 103:4,5,10
  104:3,4,8,11,12,14,17,18,19
  104:22,23 105:2,10,10 107:23
  107:24 108:16 109:11,14,17
  110:1,4 111:3 112:7,10,16,21
  112:23 115:17 116:17 117:14
  117:21,23 118:20 119:4,7
  120:13 121:17 123:15 133:7
  135:3,9 137:13,16 148:5
  149:20 162:5 163:25 164:4
  166:11 167:6,7,22,23 169:1,8
  169:16,23,24 170:2,10,24
  171:9,10,12 173:5,6,16 174:5
  176:1,8,23 177:13,20,25
  179:4,12,18,22 180:14,19,23
  181:20,22 185:7 187:17
  188:13,21,24 189:2,4 191:16
  192:10,14 193:1,5,6,14 195:6
  195:14 197:19 198:5,6,25
  199:1,20 200:12,17 201:16,17
  203:16,19 206:1,4,2 1 212:13,17
  212:18 215:14 218:13,14
  227:3,8 234:10,11,13,16,21
  235:2,6,11 236:16,23 237:12
  237:15,19 238:2 239:14
  241:12 252:20 254:4 261:22
  273:18 284:14 297:20
corrected 48:8 215:6,22
correction 42:21
correctly 80:6 82:15
corrupt 66:16 67:20 195:19,19
corrupted 67:16
corrupts 66:22
cost 49:18,21 50:2,3,22 84:7,9
  84:23 85:3 86:1,5 88:2,9 90:6
  92:19 93:2 116:3 187:12,14

222:19

**costs** 86:17,19 87:6 115:13
**counsel** 5:3,3 8:4 16:6 35:22,23
165:24,25 206:25 228:16
239:16 290:17,22 291:1,6,9
291:12 292:12,13,14,25
293:11,12,19,22 294:2,5,7,16
294:17 295:3,9 296:18,18
298:21 300:1
**count** 39:16,16,17 40:4,5,5,14
40:17 42:10 272:10 301:20
305:21 306:3,21
**counted** 41:21
**country** 79:11
**counts** 42:9 286:4,6,7,8 301:11
302:1,7 306:1
**couple** 46:5 52:14 72:17 77:20
154:8 178:11 199:5 207:14
208:20 242:18 251:6,12
259:10 268:19 283:25 285:23
291:7 310:15
**course** 26:20 33:5 39:25 45:6
48:7 51:3 96:15 149:14
150:23 153:5,24 155:11 190:1
197:1 204:25 215:3 228:3
229:8 232:18,21 255:15
293:25 294:24 309:1
**court** 1:1 2:5 5:2,7,11,16,23,25
6:2,11,15,17,21,2 5 7:2,5,8,12
7:16,20,25 8:14,16,25 9:4,7,9
9:12,14,17,23 10:2,5,8,15,22
11:1,3,6,9,17,21,2 4 12:3,6,11
12:25 13:2,4,7,18,20,23,25
14:2,8,10,18,22 15:4,23,24
16:3,5,16,20 17:4,7,9,15,23
18:1,6,11,13,19,2 3 19:1,2,4,9
19:11,14,19,24 20:1,4,17 21:9
21:14,16,18,21 22:2,7,10,15
22:18,23 23:7,9,12,15 24:10
24:14,19,23 25:1,11,18,23
26:13 27:1,4,6 28:1,5,8,11,14
28:18,21,25 29:2,4,9,10,15,18
29:23 30:1,3,6,9,11,13,15,17
31:24 32:4,6,9,11,14,18,21,24
33:1,5,10,16,21,2 3 34:7,18,22
35:3,5,7,9,12,17,2 0 54:4 70:7
70:22,24 73:24 74:1 75:24
76:1 78:9,11,11 80:23 81:2,5
81:7,9,11,14 88:2 89:14,16
99:3,5 111:13,18 122:4,7,12
122:14,18,19 123:11,16,13,16
123:18,21 124:1,3,6,10,13,20
124:24 125:16,19,21 126:3,6
126:11,13,18,22 127:4,15,18
127:21,24 128:1,9,11,14,18,24
129:1,5,9,13,1 6 130:1 131:14
131:16,20,22 132:1,4,9,12,15
132:19,21 133:1,5,8,12,15,19
133:22,24 134:1,5,14,17,24
135:4,7,10,15,19,2 3 136:1,4
136:17,25 137:2,5,20,23,25
138:3,9,11 139:1,4,7,19 140:1
140:8,10,13,15,2 1 141:4,6,9
141:12,14,18,25 142:1,6,7,9
142:12,18,22 143:3,9,17,21
144:7,10,12,14,16,18,21,24
145:2,4,7,8,10,13,15,19,22
146:9,16,17 147:1,8,14,18,21
148:4,10,22,2 5 149:1,5,7,11
149:13,18,23 150:4,11 151:7
151:19,21 152:6,9,23 153:1,5
153:9,13,20,2 4 154:6,11,14
155:2,6,10,21,2 2 156:3,9,12
156:15,25 157:2,6,12,14,17,19
157:21,25 158:2,6,10,14,18,20
158:23 159:5,7,19 160:2,9
161:3,5,8,11,22,2 4 162:3,6,8
162:11,18,23 163:2,4,7,10,18
164:1,5,9,12,17,20,2 4 165:3,5

165:9,11,12,13,14,15,18,23
192:17,21 194:19,21 201:5
203:23 204:1,3,8,10 205:7,17
205:19,23 206:2,5,9 207:7,10
210:3 212:2,5,8 216:21 222:4
227:20,23 229:6,10,14,17,22
230:1,5,13,16,19,23,2 4 231:2
231:4,8,10,12,14,16,20,24
232:1,8,10,13,16,20,2 1 233:13
233:16,19,22,2 5 234:3,6
235:15,17 239:19,23 240:2,6
240:9,11,13,2 2 247:15,17
249:13 250:1 252:15,16 255:6
255:9,11,17,2 5 256:2,4,7,10
256:12,14,16,19,2 3 257:3,6,13
258:3,11,16,18,2 2 260:6
261:7,10,12 263:3,17,19
269:14,16,19,22 271:15 272:2
272:5,7,9,12 273:10,12,14
274:24 275:3,7,9,12,20
276:25 277:2,8,10,16,18,22,24
278:2,5,9,13,1 6 279:1,5,8,11
279:15,17,19 280:13,15,21,24
281:2,12,16,21,2 4 283:12,14
283:17 284:2,4,11,13,15,20,23
285:1,5,8,10,13,17,21,24
286:2,4,9,17,20,2 5 287:20
288:15,18,19,20,2 3 289:1,4,8
289:12,14,17,22,2 5 290:18,20
290:25 291:4,7,15,18,22
292:5,16 293:4,11,15 294:4,7
294:12,18 295:6,13,16,19,21
295:24 296:2,7,24 297:1,2,4
297:11,14,21,2 5 298:14,23
299:1,8,11,17,21,2 4 300:3,7
300:10,19 301:1,4,8,10
302:12,15,16,18,20,23,24
303:4,8,11,14,16,2 4 304:4,6
304:18,21,23 305:3,6,13,19
306:2,8,16 307:3,13,16,21,23
308:1,9,13,15 309:1,6,8,10,19
310:3,7,9,11,14,1 8 311:3,12
**Courthouse** 2:6 311:12
**courtroom** 1:5 5:15 10:10 22:16
22:22 35:19 122:13 128:1
164:11 165:22 230:25 231:25
284:3
**Court's** 145:24
**cover** 115:15 116:3
**covered** 73:9 74:24 79:8 238:11
241:21 265:8 290:6 306:19
**covers** 115:25
**covertly** 288:3
**co-conspirator** 295:18
**co-conspirators** 294:8
**co-counsel** 16:7 292:8 300:12
**co-owners** 55:5
**craps** 114:19 209:22
**cream** 9:20 50:15,19 90:11,17
90:21 94:23,24 104:11,13
117:3,6,18,1 8 118:1,2,3,19
119:1,3,11 121:17 187:13
242:10,11,1 1 243:7,8 245:21
252:22,22 265:2 274:19
**creams** 68:10 71:20 75:2 91:8
94:23 137:15 187:12,12,13,14
187:17 193:19 206:12 246:10
246:10
**create** 16:20 77:8 116:10 153:15
**created** 47:21 54:2 80:14 147:13
**creating** 216:12
**credibility** 127:20 152:18
**credit** 36:23
**credits** 37:4
**crime** 26:24 233:6 236:6,7
**crimes** 1:15 152:11
**cross** 8:18 21:16,17 30:3 73:5
140:25 143:18,18 147:5 273:5
274:13 277:5 308:13

crossed 66:10 67:1
**cross-exam** 21:7
**cross-examination** 3:5,10 5:5
7:23 15:10,25 16:24 22:4
35:24 36:1 129:1 138:4 160:3
160:10 164:3 166:1 204:11
249:13,15 292:21
**cross-examine** 130:20 134:8
138:18
**cross-examined** 147:15,23
160:14 204:10 297:19
**crowd** 287:4
**crucial** 20:10
**curious** 83:10 292:23
**current** 52:18 53:14
**currently** 14:5 23:22 77:16
85:23 90:3 197:11 230:14
249:19 275:18 293:17
**cut** 24:18 25:6 101:17 197:4
310:18,21

---

### D

**D** 2:6 311:12
**daily** 89:22
**danger** 300:6
**DANIEL** 1:19
**data** 117:2
**database** 18:8,11,14,15,2 1 19:18
19:19 25:12,17,24
**date** 19:6 23:9,11 34:12 35:5,6
49:4 56:14 152:12 186:9
200:24 250:23 255:14 257:12
257:18 260:12 261:15 281:9
311:11
**dates** 179:19 280:18
**Dave** 176:3
**David** 175:24,25
**day** 10:22 22:24 31:9 37:9 55:11
71:6,17 76:16 82:2 114:24
192:5 194:9 231:11 261:19
267:20 274:25 285:2 299:13
**days** 10:11,11 22:25 34:1 46:14
47:20 143:12 186:21
**dead** 14:13
**deal** 34:16 76:17,18 127:8
128:11 146:18 198:7
**dealing** 59:17 201:17 226:4,8
**dealt** 7:14,16 241:2
**Deanna** 227:5,7,10,1 1 235:10
237:18 238:4,9,10 239:3
**debt** 125:1
**December** 227:3 250:21 261:15
261:25 267:23 268:6
**December-January** 261:17
262:2
**decide** 20:10 69:20 105:8 108:21
146:24 154:22 160:7 207:2
289:4 299:12 305:15
**decided** 25:5 31:5 113:6 151:10
153:18 154:3 171:19 179:7
201:24 204:16 222:1,8 227:15
238:14 239:12 247:22 248:5
**decides** 160:14
**deciding** 131:4 222:12 288:21
**decision** 67:9,13 114:8 152:18
195:12 198:19 222:21
**decisions** 196:20 197:14 239:11
247:20 249:9
**declarant** 204:9
**dedicated** 167:1
**deduct** 171:21
**deducted** 177:24 215:4
**deducting** 238:25
**deed** 52:18,20,23 53:13
**deem** 98:15
**deemed** 65:21 114:4
**deep** 57:17,18
**default** 52:8
**defaulted** 52:7

defend 160:13
**defendant** 1:8,19 5:2 6:10,22 8:3
13:12 15:11,25 18:3 25:25
26:21 32:16 33:17,18 34:8
35:22 126:24 130:19 134:8
147:7 148:1 149:11,25 150:13
151:13 153:2 154:24 155:2
160:7,13 161:12 162:15 164:5
165:24 204:14,16,22,24 205:1
205:8,9 206:17,23 232:14
235:20 236:1,6 241:10,13,15
241:17 243:10,22 244:19
245:2 246:22 248:24,25
272:15,24 273:1,6 276:14
277:4 280:25 283:22 286:14
291:4,9 292:20 293:19 296:10
296:14,17 302:1
**defendants** 26:9,11 160:12
293:1
**defendant's** 4:14,15,17,1 8 14:13
133:3 150:8 151:3 229:21
232:11 234:4 261:13 265:18
273:11 280:22,25 281:4,6,12
281:20 290:15 293:20
**defense** 5:3 7:8 8:4 12:12,18
13:2 16:5,17,24 35:22 75:24
81:15 127:8 132:22 134:6
142:11,12 144:8,25 146:6
147:3 150:25 161:3 165:24
204:18 205:2 206:25 209:24
219:15 229:5 232:7 239:21,22
256:10,11 261:6 273:16
288:13 289:17 290:6,11,18
291:9,12,13 292:4,13 293:1
293:22 294:5,8,15,15,16,17,25
295:3 296:12 297:21 298:19
300:1,1 301:24 309:4
**defenses** 300:20
**deficiency** 242:16
**define** 287:23
**definitely** 46:22 96:4 131:3
190:18 244:21 252:11 254:7
**definition** 174:22 175:6
**degree** 26:19 291:8
**delegated** 55:13,19 56:20,24
**delete** 140:22
**deleted** 197:12 198:16 290:25
**deleting** 138:11
**Delgado** 42:25 43:8
**Delgado's** 43:2
**deliberate** 60:1 217:18
**delicto** 143:10,11
**delight** 140:3
**denial** 290:5
**denied** 98:14 112:25 113:10
210:25 211:2 219:8 290:6,9
**denies** 163:11
**deny** 113:12 286:9,10 301:12,14
**department** 177:5
**depended** 292:3
**depending** 27:23 51:10 161:12
306:18
**depends** 19:13 63:11 116:1
161:24 162:19
**deployed** 201:24
**deployment** 202:3
**DEPUTY** 5:15 22:16,22
**describe** 241:24 246:8
**describing** 106:4
**Description** 4:3
**desire** 106:15 108:1 189:17
208:18 210:20
**despite** 170:20 199:18 200:14
201:19
**detail** 117:14 194:12 282:15
**details** 161:14 188:18 268:9,10
268:11,12
**determination** 15:24 148:15
152:16 154:1

**determine** 46:6 84:18 204:11
  205:7,10 306:20
**determined** 116:4 176:9 177:7
**determines** 223:9
**determining** 177:3
**device** 62:9,14 64:1,5,9,15
  275:24 276:3,5,7,13,24
**devices** 62:17
**devised** 68:25
**Diagnostic** 200:5,6,11
**dialing** 189:14
**dictated** 176:7
**dictates** 173:18
**Diego** 25:2
**difference** 69:9,13 77:9,9 86:1
  87:17 152:10 189:20 190:9,10
  190:15 191:13 208:23 220:20
  223:2 271:19,20 302:8
**differences** 69:3,7 77:11 86:2
  97:2 190:4 222:24
**different** 35:6 43:17 48:6 74:20
  76:18 79:10 103:22 106:6,25
  138:8,21 151:20 163:22
  177:18 178:20,20,23 188:6
  194:3 199:1 202:25 203:12
  220:9,24 223:14 224:4 226:24
  256:4 270:4,14,22 283:6
  285:25 299:19,21
**differentiate** 94:21
**difficult** 77:16,18,24 92:23
  207:3 293:2
**dime** 31:17 79:24
**Dimmick** 100:23 224:15
**Dimmick's** 224:19
**dinner** 171:4 174:2 182:8,12
  183:7,24 185:6 280:7,19
  281:7,10 282:1,9 297:15
**direct** 3:9,13,15 14:13 25:21
  26:1 43:14 73:4 96:9 97:11
  115:2 120:10 140:22 141:6
  166:9 169:21 170:20 171:17
  190:12 195:1,4 201:23 240:14
  250:14 252:9,20 267:4,15,20
  269:24 274:13 275:13 279:20
  305:22,25
**directed** 235:8
**direction** 151:12 220:6
**directions** 186:18
**directly** 27:17 69:10 77:23
  100:14 116:15,16 208:24
  269:25 288:2 296:5
**director** 83:5
**disagree** 31:4 230:11
**disagreed** 292:7
**disbelieve** 155:2
**discovered** 184:16
**discovering** 185:18
**discovery** 7:7 12:20 149:21
**discuss** 85:14 127:5 163:16,17
  171:3 184:15 185:13,14
  208:18 235:23 238:1 283:18
  307:23 308:10
**discussed** 23:20 82:17 89:25
  126:21 132:20 138:13 173:11
  173:12 177:1 178:14 182:10
  183:6,20 184:11 186:14
  187:14,16 197:7 206:15 239:9
  244:5,6 290:3
**discussing** 121:20 132:22 182:12
  262:7 282:1
**discussion** 96:8 143:6 236:13
  268:24 269:1 286:1
**discussions** 35:25
**dispense** 284:23
**dispensing** 49:5
**dispute** 39:13 42:1 51:5 53:20
  55:9 113:23
**disregard** 60:1 78:10 131:10
  217:19

**disruptive** 159:20
**dissent** 157:6
**dissimilar** 153:13
**distinct** 268:5
**distracting** 146:1
**distribute** 112:5
**district** 1:1,1,11 130:1 159:12,14
**divide** 113:19,20
**divided** 114:11
**DIVISION** 1:2
**divorce** 124:2 127:18 130:21
  160:21
**divorced** 131:2
**divorces** 160:22
**DME** 58:22,23
**doctor** 9:10,18 31:16 36:10,17
  37:11 49:9 59:17 62:24,25
  63:8,9,12 66:1,15,17,19 67:6
  67:11,12,16,1 6 79:23 98:12
  98:13,15,16 105:9,11,19
  107:6,8,10,13,1 9 108:9,10,20
  109:1,3,5,7,17 110:4,5,7,9,10
  110:15,16,19,19,2 1 111:3,5,8
  111:9 112:22 114:7 119:24,25
  166:19 188:24,24 189:1,2,4,8
  189:9 191:15,16,21,23 192:10
  192:24 208:13,13,15 210:19
  211:19,19 219:11,12 237:6
  243:14,23 244:2 246:2,2,4
  264:12 265:6 272:21 273:20
  297:18 310:24
**doctors** 27:14 62:17,23 64:25
  65:12,15 68:20,22 69:11,17
  69:25 71:14,16 72:16,17
  73:12,15 77:7,24 103:7
  108:15 110:18 113:12 135:12
  164:22 182:14,23 189:8 193:4
  193:6 211:16
**doctor's** 63:11 66:3 69:19 105:6
  164:18 192:25 246:16
**document** 7:11,12 12:9 18:10
  19:6,8,10,1 1 27:19 28:2 37:23
  39:5,7 41:15,17 43:11 46:6,8
  46:19,23 47:21 51:12 58:5,7
  61:16,19 70:9,14 73:20
  101:13 122:22,24 123:7,9,10
  123:13 124:5 210:6 212:23
  215:11 217:22,23 218:1 221:4
  224:13 257:16 262:19 263:2
  263:21 266:8
**documentation** 280:17
**documents** 8:12 11:15 18:5,9,18
  19:6 21:7,9,11,12 22:13,6
  25:13,14 61:1,2,6,14 100:19
  108:2 118:9 121:23 126:20
  190:1 199:25 217:10 262:3
**doing** 6:21 10:10 12:14 15:11
  18:25 25:17 27:15 34:24
  53:15 69:3 75:5 77:17 95:24
  113:11 128:13 130:17 132:5
  138:8,17 141:4 143:22 145:10
  150:12 163:21,22 172:24
  178:7 180:5 183:19 184:4
  185:20 187:18,19,20 189:20
  189:21 190:10 191:14 196:11
  197:4 208:8,24,24 209:14,16
  211:23 212:17 215:10 216:7
  216:11 220:6 222:23 226:24
  248:2 251:20 269:3 282:22,23
  283:6 297:17 300:13,13
  309:24 310:4,19
**dollar** 86:12 93:3 114:20
**dollars** 7:3 42:11 92:12,15,19
  105:1 170:12 174:8 184:9,18
  193:13 195:16,18 196:6,8
  198:8,24 200:16 217:8
**done** 12:11 17:15,17,19,2 1 18:7
  20:9 24:20 25:8 33:10 37:9
  42:14 90:16 102:4 106:23

107:3 112:15 113:3 123:4
  126:9 127:1 129:10 140:25
  141:20 149:17 151:10 158:2
  159:22 164:1,2,2,7 166:10
  167:15 172:16 194:4 200:3
  207:24 237:17 298:11 299:2,5
  301:16,22,5 308:21
**door** 122:14 192:5 284:5
**doorbell** 192:4
**doors** 192:4
**doorstep** 188:3 192:6 237:8
**doubt** 273:6,7,8
**down** 21:25 24:9,17 25:6 36:16
  59:23 68:17 93:14,17 102:24
  111:19 112:19 115:17 118:14
  124:21 195:22 213:1 214:21
  216:2,3,7 232:21 239:19
  252:17 255:7,18 274:7 302:25
**downline** 43:21 214:10
**downlines** 43:18,18 215:13,17
**drafting** 143:2
**drashbaum@mnrlawfirm.com**
  1:23
**drawn** 26:9,12
**drew** 226:11
**drink** 230:19,20
**drinkers** 230:20
**Drive** 52:3
**dropped** 102:24
**drug** 49:5 152:9 194:17
**drugs** 87:23 88:3 103:22 108:5
  117:23 135:13 151:23,25
  184:19 187:8,11 190:7 193:16
  193:25 243:1
**due** 125:13
**duplicative** 301:19
**durable** 58:23
**during** 16:24 36:9 39:24,25 63:2
  97:11 125:8 155:23 184:15
  199:25 213:14 215:3 228:3
**Dutting** 151:9,11 227:5,7,10,11
  227:12,14,15,1 8 228:5,24
  232:14 234:15 235:1,10,23,25
  236:15,25 237:18 238:4,9,13
  238:20 239:3,9,11
**dynamics** 178:3

**E**

**E** 1:20 311:7,7
**each** 6:3 8:19 51:7 72:4,5 79:12
  86:12,19 88:19 116:1 117:23
  124:20,21 157:3,9 176:10,19
  177:4,7 193:19 203:15,18
  255:12,12 284:20 285:1 306:3
  309:4,15
**ear** 30:22
**earlier** 22:8,13,14 48:2 97:10
  108:3 112:3 115:23 121:5
  143:11 173:4 193:7 198:4
  265:5
**early** 142:14 241:7,10 250:11,15
  250:18 283:25
**earn** 72:2,4,5 115:4
**earned** 125:8,9,11
**earning** 266:20
**earnings** 171:21
**easier** 292:8
**easily** 115:25
**easy** 146:23 231:23 293:8
**eat** 146:21
**Economic** 1:15
**economy** 253:17
**educated** 222:21
**efax** 166:25
**effect** 208:6 267:3
**effective** 104:25 105:10,17
**effectively** 292:14
**effort** 195:10

**egregious** 209:12
**eight** 179:1 193:14
**either** 10:19 41:4,5 62:1 91:13
  130:24 131:5 188:10 190:24
  192:13 272:3 280:11
**elaborate** 134:7
**elderly** 274:3,5
**Eleanor** 48:24 49:1 118:10
**element** 301:23,24
**elements** 293:21
**Eleventh** 142:7 148:13 150:20
  288:18 302:16,17
**elicit** 27:24
**eliminated** 197:9 198:17
**ELMO** 273:9
**else's** 53:10,12
**email** 6:24 9:6 13:1,21 23:8,16
  23:19 24:11 27:2 29:21,22
  30:2,7,11,1 3 32:2,4 33:7
  42:24 70:10,10 71:2,8 72:7
  74:5,11 75:19,20 76:5,9 81:12
  83:17 88:24 89:19,24 91:24
  94:12 99:8 106:23 107:2
  133:3 136:14,23 137:7 138:6
  138:19,20 139:9,13 140:1,24
  169:7,9,10 208:3,5 213:1,2,9
  218:18 224:19 238:16 245:14
  245:14 249:4 251:3 261:8,15
  262:16 263:7 266:15 281:18
  281:21
**emailed** 102:8 186:7,7
**emailing** 35:1
**emails** 14:15 15:22 20:6,6 23:10
  24:16 32:15,16,18,22,24 33:2
  33:16,17,19,1 9 34:11,13,18
  46:10 83:22 88:1 161:25
  181:4 185:5 198:22,25 199:10
  204:14 206:17 280:19
**embarrassment** 76:16
**employed** 276:5
**employee** 41:11,12 42:11,15,16
  132:14 171:20,25,25 172:15
  173:8,14 174:14,17,17,22
  175:3,5,5,6,1 1 176:20,22,23
  176:24 177:1,2,1 5 178:19,25
  179:17 201:15 213:4,12 214:3
  220:11,11 251:9 262:19 263:8
  266:9,12 268:15,25,25 269:6
  269:6 270:3,13 271:3 272:18
  272:19 276:15 278:18 283:8
  287:10,16 288:5,21,22
**employees** 40:20,22,24,2 5 41:4,5
  41:6 175:12 176:4 177:10,19
  178:16 179:2,9,1 1 184:25
  213:15,19,23 278:6,17 282:13
  282:16 286:22 287:8
**employer** 287:10,11 288:5,9
**employment** 63:20 96:16 176:14
  176:15 177:24 287:11,12
  288:6,8,9
**end** 20:19 51:24 76:16 133:20
  143:19 149:3 166:1 202:15
  203:13 250:7,13 254:19 269:4
  269:8 281:8
**endeavor** 80:12
**ended** 21:7 39:23 83:4,8 123:5
  198:15 218:9
**ends** 122:8 148:10 202:18
**enforced** 197:18
**enforcement** 151:18 152:4
  254:19,22,25
**engaged** 77:21
**English** 19:4
**enhance** 273:22
**enough** 10:11,21 11:6 21:9 45:5
  108:21 153:21 161:16 168:7,8
  180:11 202:12 231:6 303:21
  303:25
**enroll** 54:23

enrolled 56:9,10
enrollment 54:22 57:11
enter 88:19
entered 47:17 66:12 164:11
  165:22 194:6
entering 57:6
entire 19:22 21:17 23:14 166:22
  167:20 217:22 229:13 232:19
entirely 283:6
entirety 265:21
entities 206:15 282:15
entitled 15:12 26:8 135:21
  145:23 293:25
entrap 151:14
entrapment 293:1,2,5,6 298:23
  298:24
entrapped 293:7,7
envelope 300:12
environment 267:13
equal 96:18
equate 210:16
equipment 58:23 63:1 66:18
Eric 9:25 95:23
error 16:20
errs 121:15
especially 21:4 24:23 126:25
  130:11 164:5 237:14
ESQ 1:19,20 2:1
essence 23:16
essentially 169:3 179:8 221:2
  254:12
established 193:9 268:1
estimate 158:14
et 82:14 264:10
Ethoxy 91:18,21 92:1,4,5,5,19
  92:22,23,24 94:24,24 223:14
  223:16,20,22 224:1
ethoxydiglycol 23:20 90:1,11,18
  91:1 92:1,25 93:24 94:25 95:6
  95:7,21 193:20 194:10,14,18
  223:12
euphemism 78:7
evaluation 180:7
even 13:11 20:23 26:8,22,24
  31:2 32:1 60:8 61:1 65:9,11
  66:11,12 67:18 94:16 97:12
  106:6 108:23 114:12 115:22
  127:7,9 128:13,19 130:8,14
  130:15 131:1 132:17 134:14
  138:20 148:5 149:24 157:8
  158:1 164:25 169:13 170:4
  181:5 184:21,22 186:16 192:1
  196:13 204:19 206:21,22
  226:6 228:15,19 244:11,16
  245:20 248:1 253:15 259:3
  278:9 288:19 290:8 292:6
  295:12
evening 196:3,9 311:1,3
event 52:2 130:15 204:16 237:11
  301:12
events 260:1
eventually 179:3 246:6
ever 31:2,13 66:11 79:20 83:13
  91:19,23 92:17 95:12,25
  97:16 114:15 154:13 170:8
  181:21 182:11 186:20 187:24
  187:25 197:8 198:16 199:23
  199:24 207:24 208:17 218:1
  233:9 237:6,7 239:12 243:7
  246:2,23 249:7 254:18 255:20
  266:15 272:15,18,24 276:7
  280:8 283:1 298:11
every 8:12 21:1 22:24 31:16
  33:7 50:12,12 51:13 61:7 62:2
  72:2 79:23 87:12 98:5 102:2
  107:7,11,16 110:16 111:6
  113:13 115:18 149:24 159:9
  170:12 176:19 179:2 197:11
  267:20 285:2 308:21

everybody 16:23 26:14 94:9
  111:18 141:14 144:22 164:12
  164:13 165:8,23 230:9 232:3
  283:25 299:14 308:2
everyone 31:11 43:20 55:8 77:4
  177:22 178:24
everyone's 111:6
everything 7:6 26:1 46:20
  112:15,1,7 131:17 180:5 200:2
  200:3,20 220:6 226:19,24
  231:4 233:7 243:4 252:17
  258:18 272:3 309:13
evidence 4:2 14:10,12 15:1
  21:14,19 23:5 35:16 54:18
  70:5,6,21,25 73:23 74:2 75:22
  76:2 81:16 89:17 99:6 130:3,7
  134:18 138:1,3,4 141:2
  153:21 155:8 167:20 170:17
  205:12 207:8 209:25 212:9,24
  229:5 231:19,22 232:12,19
  234:5 236:11,20 261:13 281:4
  302:24 303:21 305:1
evidentiary 160:8
exact 29:21,22 30:2 185:25
  200:24 247:24 250:23 257:12
  257:18 260:19 281:9
exactly 26:21 60:18 69:23 88:23
  102:12 107:12,14 108:24
  136:22 168:19 179:24 225:5
  246:20 248:25 258:1 259:1
  291:24 296:17 297:1 299:5
  307:6
exam 111:9
examination 3:6,9,11,13,15
  107:2 111:10 166:9 207:11
  240:14 272:13 275:13 279:20
examinations 70:18
examine 61:7
examined 111:4,8
example 19:11 38:22 49:13
  179:16 191:22 204:14 214:14
  215:17 304:10
examples 101:8
Excel 216:1,12,14
except 162:12 176:16 177:23
  283:25
exception 220:19
exceptions 212:20
excerpt 229:7 230:3
excerpts 154:9 230:15,18 231:1
  232:18
excess 125:2
excessive 187:7
exchanged 280:19
exciting 287:4
exclude 18:2 129:12 130:7,15,22
  131:1
excluded 139:19 154:18
excluding 131:4
exclusive 94:3,15
exculpatory 151:15
excuse 11:13 233:24 242:12
  309:3
excused 275:2 279:4 285:16
exhibit 4:4,5,6,7,8,9,10,11,12,13
  4:14,15,16,17,18 5:9,9 8:3,21
  9:1 10:22 12:5,18,22 15:14
  15:14,20 16:6,25 17:21 20:14
  23:5 24:18 25:9 26:19 35:14
  35:16 38:15 39:5 41:15 42:18
  48:18 54:19 70:4,25 73:19
  74:2 76:2 81:16 89:13,17 99:6
  112:1 123:16 132:8,22,24,25
  135:14 136:19 161:20 167:19
  207:7,8 208:3 209:24 212:4,9
  212:11,23 214:9,11,21 215:11
  217:9 218:19 219:11,16 221:5
  221:12,13 223:11 224:6,9,22
  229:5,21 232:4,5,11,18,23

234:4 235:14 236:11 256:7
  261:6,13 265:19 273:11,16
  280:21,23,25 281:4,6,19
exhibits 4:1,2 5:4,20 6:14,19
  15:8 17:22 20:16 21:18,22
  22:11 23:3 24:20 25:6 26:23
  35:12 37:14 102:15 131:23
  132:3,18 141:2,15 143:1,3,7
  202:24 203:23 218:10 232:7
  233:13
exist 179:9 200:15
expanding 286:1
expect 21:4 31:3 45:21 86:25
  278:8
expected 11:12 198:23
expecting 11:15
expeditiously 310:1
expense 115:8
expenses 115:6,14,15,18 116:7
  116:19
expensive 236:22
experience 173:23 264:23
  273:22
experienced 185:10
experiences 164:21 165:3
expert 173:21 177:8 283:11
explain 18:21 94:3,12 123:3
  193:7 196:11 259:1 268:6
explained 18:21 94:3,12 123:3
  193:7 196:11 259:1 268:6
explaining 88:24 222:20
explanation 75:11,12 86:14
  88:21 278:23
exposed 148:2
exposé 235:11
extent 28:7,8 138:18 234:25
  293:18 294:1
extra 122:9
extremely 243:5
extrinsic 134:18 138:1,3,4
ex-football 44:24
ex-wife 52:18 217:5
eye 31:2,3
eyes 47:22 49:25

F

F 311:7
fabricate 148:4,16 150:16
  153:16
fabrication 148:12
face 10:12 221:4
faces 10:9,17,20
face-to-face 111:9 180:10
  189:13,16
fact 14:16 18:23 23:10 25:19,25
  27:15 43:2 48:15 55:25 62:23
  63:15 75:7 91:5 92:22 95:18
  105:19 119:21 121:12 130:3
  137:10 154:15 159:9 163:20
  167:8 169:3 170:20 176:12
  177:22 179:5 184:10 187:11
  188:12 199:18,23 200:4,14,19
  200:20 201:19 222:8 236:25
  260:10 265:10 284:17 292:3
  295:1 298:5
facto 42:15 143:10
factors 84:20 288:20
facts 180:16 197:16 198:20
  260:13 282:22,24 283:2 304:8
fair 10:21 15:17 16:22 26:13
  29:18 45:5 55:24 72:7 94:23
  95:1 96:18 97:14 110:13
  128:4 132:5 143:15 162:21
  168:6,8 283:21 294:3
fairness 16:22
faith 286:11 288:5,7,8 291:13
  292:4,24 293:16,20,24 294:1

294:15,15,2 5 295:7
fake 175:12
fall 255:3,4
fallen 19:24
falling 52:25
false 59:24 60:6,9 82:12 217:17
falsity 60:2 217:19
fame 43:2 44:24 45:3
familiar 23:21 36:15 64:7 90:2
  95:16 136:12,24 142:23
  256:23 280:3,8 308:7,9
family 160:21 182:18 183:3,6
  191:5
far 30:19 38:5 51:20 56:17 64:21
  81:2 170:4 238:9
farm 103:6
fast 28:11 216:12 310:3,12,14
fault 53:11,12,12 160:23
fax 1:17,23 100:11 166:6,14
  167:4,24,25 169:6,11,17,18,18
  226:22,22
faxed 100:12 106:21 167:8
faxes 166:18,24
faxing 167:4
FBI 229:3 233:3 234:16,19,22
  237:18,23 238:4
February 14:14 40:15,19 60:22
  133:20 136:9,11,13 169:23
  185:6,6,23 200:7 206:2,11
  208:1 281:8,8,10
Federal 54:12,15 59:5,10 82:9
  125:2 145:8 182:9 287:3,14
  288:11
FEDERICO 1:10
fee 193:8 211:24
feel 5:18 107:13 220:2 226:25
  283:1
fellow 99:8
felt 76:25 94:5,18 107:1 128:6
  170:3 175:3 191:1,2,7,10
  233:7 247:25 291:10
Ferguson 2:6 311:12
few 19:20,20 25:16,16 33:15
  67:15 77:22 141:2 154:8
  176:21 230:9 250:6,14 280:11
  280:14 284:9 285:4
fide 41:4,12 42:15 132:14
  174:14,17,20,21,2 2 175:4,5,6
  175:9,10,10 176:22,24 177:1
  177:2 182:12 201:15 282:13
  282:16 283:8 287:11 288:6,8
  288:21
field 63:4,4
Fields 267:14
fifth 215:20
fighting 16:17
figure 140:23 165:7 215:24
  286:13 303:20
figured 200:2 249:8
figuring 31:22 80:4
file 143:5 216:1,14 280:7 289:1
  302:2
filed 124:1 125:3 141:9 143:6
  289:3,10,13 290:5
filing 141:15 290:7
filings 289:14
fill 61:8,9 106:1,9 107:18 257:18
filled 72:2 104:2,21 105:4,22
  118:6 209:1 264:9 266:5
final 67:9 93:9 239:1
finances 125:12
financial 41:17 52:15 121:12,14
  121:16 190:15,17 198:11,13
  198:13 202:21
financially 53:2 56:15
financing 97:23
find 20:20 22:5 24:8 73:15 93:14
  119:18 128:9 146:15 160:18
  172:22 173:1 185:24 200:21

296:16,19,2 0 305:21,23,24,25
306:12,13,1 6 307:8
finding 208:12 260:22
finds 302:1
fine 22:12 35:11 53:2 86:15
282:9 285:12
fingers 10:12
finish 308:17
finished 52:1 53:6
Fins 279:3
fire 82:23 197:3 199:19
fired 15:3 27:17 195:24
firm 145:15 171:12 180:14
first 25:15 29:19 45:19 48:19,23
49:13 65:24 70:7 95:12 96:8
97:19 102:17 103:12 106:6
107:20 128:10,12 130:24
136:19 139:19 147:16 157:17
162:20 165:4,5 196:4 199:23
208:4 217:4 226:10 232:2
234:17,18 239:25 241:25
243:9 246:14,19 247:1,6
248:4 250:11 251:7,13,17
252:1 254:18,24 257:25
260:20 261:22 267:11 273:2
274:2 276:24 281:17,18
287:25 295:11 296:9 300:15
303:18 304:15 305:18,23
307:15
fit 196:22
five 10:11,11 19:21,22 48:7
62:13 87:6 156:13,16,23
202:24,25 215:19 230:6
fix 166:24 170:23 171:1
flag 284:22
flags 169:22 170:5 171:22
225:10
Fleming's 171:7,8
flew 249:21 250:5
flight 249:23 250:3
flip 45:14 101:3 105:24 215:13
flipped 43:25
Flipping 55:12
floor 165:10
Florida 1:1,6,16,22 2:3,7 52:3
159:12,14 259:17,21 275:17
311:13
focus 48:23 213:13
focusing 98:7
follow 108:5 110:17 175:20
217:20 221:6,8 249:7
followed 25:16 167:18 177:8
186:17
following 5:1 57:1 110:24,25
149:8 159:3 209:19 220:5
296:7
follow-up 96:7 109:19 172:8
font 226:20
foot 267:20
football 45:4
force 26:9,10,11 74:8 223:20
forced 33:11
Ford 206:13
foreclosed 52:9 217:4,7
foreclosure 53:8,16 216:25
foregoing 311:8
forged 121:23,25 122:25 124:7
forgery 128:17
forget 20:4 34:3,4 46:11 308:2
Forgive 28:23 201:4
forgiveness 201:6
forgotten 164:15
form 60:20 62:3 106:5 107:19
118:5,22 119:10,24 126:25
169:9 263:8,13 264:9 266:10
305:14,22 306:21,23 307:1
308:19
former 130:8 227:11
forms 65:20 155:8 167:11

formulas 193:17,19
formulations 274:8
Fort 241:8
forth 90:5 123:3 124:5 180:16
180:17 288:20 293:21
forward 13:21,23 279:11
forwarded 20:15 182:3 198:24
199:6
Fouche 47:18
found 24:24 74:16,17 93:19
180:8 188:23 195:7,23 196:24
214:6 228:3 302:7 305:3
foundation 222:3 269:10 277:25
four 23:2 39:22,23 40:11 46:14
47:20 48:5,8 156:13,16
212:20 215:19,24
fours 296:17
Fourth 1:16
FPR 2:5 311:11
frame 201:10 241:12 250:23
255:8 261:17 262:2
fraud 8:23 34:9 82:12,20 124:22
127:10,15 130:13,24 134:1,9
134:10 153:21 182:9 198:14
206:21,22 234:24 238:2 286:6
286:6 293:25 301:20,21,23
303:2,7 305:4
frauds 153:10,13
fraudulent 59:25 122:16,22
123:24 139:6,7,10,14,22,24
163:6,19,21 187:2 188:7
208:5,7 217:17
fraudulently 121:3 123:23
free 181:16,17 182:4 199:3
272:10
freely 125:4
Friday 17:18 21:4 25:9 26:23
72:20 73:2 89:20 97:11 102:4
112:2 143:4,6 166:9
friend 30:20 31:9 44:18 54:6
241:14 253:18
friendly 242:7 274:2
friends 62:11 72:4 244:18
fro 121:6
from 6:24 9:20 13:1,21,21,23,24
14:6 20:24,25 23:8 25:2 27:2
27:24 29:5,12 30:7,11,22,24
33:19 34:19 35:25 38:24 39:1
40:6 41:22 42:8,10,24 44:11
45:10 49:7 51:1 54:4 56:6
61:19 63:19 64:14 65:5 71:2
74:5 75:14 76:5,21 78:1 79:12
81:12,15 83:10 86:20 87:16
87:16,21,23,5 88:5,5,8,23
89:19 91:4,16,21 92:6,14 93:7
94:21 99:8 102:19 106:24
109:10 111:1 116:12,15
120:21,22 121:16 122:13
125:9 127:7 134:3 136:9,23
142:24 143:7 147:7 148:13
150:19 154:9 155:15 156:8,22
159:14 160:25 161:3 164:21
164:21 165:3 168:24 169:22
169:23 171:19 173:15 174:11
175:14,25 177:10,15 178:4
180:1,3 186:3 188:14 189:11
190:6 191:17 193:22 194:9
196:23 198:24 200:20 203:19
203:21 205:1 206:13 213:2,15
215:5,1,1 216:4 219:6 226:8
226:19 227:7 229:7 230:25
232:18 234:15 237:9 238:25
241:14,25 242:4 244:16 246:4
246:16 247:9,10,23 249:21
253:1,4 254:3 259:6,16,21
260:25 261:8 270:17 272:21
278:16 282:2,6 284:3 288:15
289:16,23 290:1 292:7 293:24
298:17 302:6,16,17 303:11

304:9,11,13,1 6 307:15 309:11
310:24
front 10:15 113:22 114:23 131:7
183:23 188:3 237:8 293:6
299:25
fueled 159:9
full 60:13 140:2 148:11 152:21
230:18 234:10,12,15
fully 308:9
fun 43:2
function 25:15
funded 203:18
fungus 106:17,17
furnishing 287:12 288:10
further 56:23 90:20 233:12
234:21 249:12 272:6 274:23
288:20
future 44:4 62:2 175:1 178:6,14
298:15
fuzzy 109:9
f-r-o 83:24

**G**

g 286:18
game 114:17
gander 8:10
gap 257:19 309:20
Gary 3:14 171:9,11 173:7
194:24 201:12,14 279:7,14,16
gave 20:12 107:15 127:16 154:4
170:24 175:2 177:9 182:8
220:1 238:23
gears 116:25
gels 206:12
general 104:16
generally 97:18 131:8 147:22
203:1 204:8 301:15 310:8
generate 103:8,9
generated 98:9,10,24 100:7
101:10,22 179:14,15
generates 89:3 91:2
generating 179:12,13
genetic 200:9
gentleman 95:11 96:3
gentlemen 204:4
genuine 175:8
Germany 156:22 240:19 249:19
249:21 258:16
gets 26:17 45:21 139:9 224:20
getting 31:19 39:24 52:12 80:1
129:19 143:7 187:24 191:19
198:22 208:12 214:15 224:1
226:1 243:23 265:12,13
304:10
Gilda 2:5 272:10 284:21 311:11
Giles 83:18,18,22 84:25 85:13
Ginger 9:16,21 13:1 15:3 20:4
38:2 100:1,2,5,10 180:25
184:16,20,23 185:5,11,15,18
185:22 186:6,11,12,17 195:1
195:24 196:1,7 197:3,7,15,23
198:8 199:7,7 200:10,12
301:21
Ginger's 101:24,25 102:11
girlfriend 216:5
give 5:20 7:5 11:1 19:12 20:19
20:20 26:4 33:11 51:8 57:12
66:18 72:1 79:7 101:14
106:12 117:24 122:9 124:24
134:19 140:1,5,6,10,23
143:14 149:1 158:14 160:4
166:25 171:14 175:12 181:24
189:8 191:25 204:22 242:9
256:8 258:11 269:16 278:12
281:9 284:18,23 287:8,21,22
289:1 292:11 293:11 295:3
298:2,10,14 299:20 300:1,8,11
300:11,18 301:2,4,5 302:1,20
306:21,25 307:3,4,4 309:4

given 11:13,14 22:8 25:8 26:22
65:20 118:15 196:12 204:4
272:18,20 289:17 295:12
296:10
gives 180:18 300:10
giving 25:7 141:14 174:1,1
180:13,14 220:3 238:25 242:7
293:16 299:22 306:23
glad 289:5
glaring 191:13
glasses 28:24
Glenn 44:4,5,5,8,10,14
go 5:13 8:20 11:1,20 15:9,14
23:3 31:8 32:15,21 33:2 34:22
36:5 47:25 49:9 58:17 59:23
61:3,6 63:2,3 65:12,20 66:17
69:19 70:17 71:19 73:7 77:22
78:14 81:2 85:24 97:24 100:2
106:4 112:4 122:14 126:1
131:23,25 132:4 135:5,7
136:6,17 148:25 150:4 155:10
155:11 156:15 164:9 165:6
173:20 179:25 191:9 192:19
196:18 201:5,6 216:3 221:6
227:16 230:13 231:24 233:25
234:6 235:9 236:10 240:13
255:12 256:12 257:7 258:20
259:24 262:25 265:6 269:22
279:19 281:3,19 297:25 298:1
301:15 306:17
God 20:11
goes 71:17 114:12 121:16 125:21
140:23 150:7 154:16 215:11
288:19 295:19 298:9
going 5:4 10:9,16 13:13 14:20,22
15:8,10,14,16,1 7 16:8,10,10
16:23 19:17 21:10,22 22:3,3
22:23 23:1,17 26:18 27:25
28:22 29:15,20 31:20 52:19
53:4 66:18 67:13 76:11 79:6,8
79:14 80:2 84:21 86:4,20 99:1
99:2 103:9 104:5 108:2 109:8
113:16 119:14 122:16,21,21
125:16,20,23 126:4,8 127:9
129:21 131:23 132:17 133:5
137:2 138:16 141:20 144:1
147:16,22,25 149:18 153:1,2
154:19 155:22,23,24,25
156:20 157:14,19,22,24 158:8
158:9,10,15 160:3,6 164:6,6
165:2 166:24,25 170:18 175:1
176:8,14,15,1 6 177:23 178:1
178:1 179:7 188:7 192:4,8,21
200:7 210:15 213:18 216:16
216:21 219:6 224:5 226:21
227:16 230:21 231:14,16,21
232:4 235:17 238:24,25
242:10 243:3 245:13 247:17
247:22,24 249:3,4 252:4,6,7
256:18,21 261:5 263:22
265:12 268:14,15 269:6,20
270:4 272:9 276:25 278:5,10
278:19 279:8 283:10,15 284:6
284:8,9 285:18 286:6,9 287:1
287:20,21,22 288:4 289:6,18
291:22,24 292:14,16,17,23
294:6,18,20,24,2 5 295:1,1,5
296:13,15,16,2 0 297:14 298:1
298:5,7,10,16,17,2 0 299:4,5,8
299:20,21 300:3,7,10 301:12
301:14,16,2 5 304:14 305:14
305:15,17 306:2,2,10,17,18,20
306:21,25 307:4,17 308:11
309:2,2,22,23 310:5,23
Gold 91:18,21 92:4,5,6,22,24
94:24,24
gone 25:12,24 33:6 117:14
259:23
good 10:17 12:13 14:18 16:7

23:23 24:19 25:5 30:20,21
35:20,20 36:3,4 53:23 56:17
66:21 67:18 70:15 74:19 75:1
90:3 114:25 127:3,4 129:8
134:18 142:1 143:13 158:6
166:3,4 170:15 180:11 191:1
191:3,7,10 197:24 204:6
213:1 225:18 231:6 240:17
241:19 249:17,18 254:11
264:22,23 274:24 283:23
286:11 288:5,7,8 291:13
292:4,24 293:16,19,24 294:1
294:15,15,25 295:7 298:18
301:24 302:3 308:4 311:1,3
**goods** 50:2
**Google** 283:19
**goose** 8:9
**Gore** 308:2
**gotten** 12:19,20 196:16 247:9,25
248:9 249:8 250:22 265:11
**Government** 1:13 5:3 8:24 11:2
15:7 18:12,13 26:10,20 28:18
28:25 29:11 32:6,16 33:11
35:23 81:3 128:21 141:19
143:14 146:25 147:5,11 148:6
148:13 149:15,23 151:1,9,10
151:12 152:7,12 153:18 155:3
160:11 161:1 165:24 201:17
207:22 214:9 216:25 217:9,9
218:10 221:13 223:11 224:6,9
224:22,22 228:2 229:11 230:7
231:16 232:7,15 233:23
239:23,24 250:4 262:10,13
264:25 266:25 275:3,5 282:24
283:9 290:11 291:1 292:10
293:5 298:3,10 301:18 302:4
309:8
**Government's** 4:4,5,6,7,8,9,10
4:11,12,13,1 6 23:5 35:16
37:16 38:15 39:5 41:15 42:18
42:19,22 48:18 54:19 70:4,25
73:19,22 74:2,4 75:19,23 76:2
76:4 80:19,25 81:16 83:17
89:12,17 93:1 99:2,6 102:15
102:18 109:9 111:25 118:21
136:19 142:8,10 154:19
161:20 167:19 207:8 212:3,9
212:11,23 214:9 215:11
218:10,19 219:11,14 221:5,12
232:18,23 235:14 236:11
240:5 275:8 279:6,14 288:15
307:18
**gphofficialreporter@gmail.com**
2:7 311:14
**grab** 289:16
**gram** 24:3,4,4 84:4,15 85:15,24
86:17 87:5,7 90:14,17,21,25
**grams** 84:6,9 86:24 87:12
104:19 107:22 108:6
**grant** 131:8 301:16
**granted** 211:5 301:17
**gray** 184:5
**great** 31:9 53:24 71:18,25 93:24
116:23 129:5 136:16 145:15
145:15 261:19 290:20
**greater** 222:2,8 291:8
**grew** 46:16
**ground** 277:22 294:3
**group** 38:8 40:23 87:25 107:20
180:6 197:21
**grow** 1:7 3:4 9:10,14 13:1,24
23:8 27:2,7 30:7 31:10 34:16
35:1 36:3,5 58:9 71:3,9 74:5
81:12 89:20 93:18 99:11
108:2 121:23 122:24 136:8
166:3 168:10 170:15 172:14
181:14 183:12 217:20 227:7
233:1,9 234:9 241:2 242:1
244:5,12 245:7,10 250:10

251:1 252:1 253:1,8 254:24
257:24 261:8,18 262:16 263:7
263:22 265:15 266:2,11
267:10,24 268:5 269:25
270:10,16,19 277:8 272:16,18
276:14,20 277:7 278:9 279:10
281:21 282:2,3 284:13 292:14
294:10,13 297:7,16 299:7
**Grow's** 16:18 139:8 253:22
254:8 304:9
**guarantee** 219:6
**guaranteed** 31:14 79:21
**guess** 85:5 97:23 100:20 103:20
105:11 168:19 174:21 185:8
194:13 196:5 218:24,25 242:6
243:1 244:8 247:24
**guide** 103:20,20,21
**Guidelines** 302:8
**guilty** 34:8 155:1,5 164:6 302:1
302:7 303:24 305:3,24 306:1
306:12,13 307:8
**guy** 114:19 256:8 260:16
**guys** 158:8
**guy's** 282:8

## H

**habit** 60:23
**half** 24:18 26:5 102:7 111:17
143:23 199:25 200:22 224:2
**hallway** 5:12,13
**Hanaman** 44:18,20 45:21
**hand** 108:2 159:20 180:9 189:10
216:9,16 226:20 240:4 275:7
279:13
**handle** 46:17 114:21 120:11
196:19,22 202:15
**handled** 125:12
**handling** 120:7
**happen** 93:18 119:9 164:6
192:22 299:21
**happened** 48:3,5,6 69:23 75:16
75:17 89:11 111:6 112:19
113:15 120:20 132:21 146:15
184:22 186:9 198:17 199:6
227:14 268:17,21 297:15,19
**happening** 5:16 15:13 60:19
148:10 184:25 185:3,4
**happens** 10:15 25:1,4 136:1
215:1 219:9 299:19 306:5,8,8
**happy** 86:14 122:19,19,19,19
124:11 149:4 248:9 299:14
**harbor** 132:14 173:14 174:14,16
182:12 283:8 286:13 304:16
304:19,24
**harbors** 171:24 172:2
**hard** 93:6 243:14 259:11 265:5,5
285:2 305:19
**harder** 305:20
**hard-working** 252:16
**Harris** 108:12
**hate** 13:8 155:6
**having** 31:16 79:23 106:14,15
108:5,6,6 118:5 160:8 182:11
194:7 203:7 257:16 286:21
292:8 302:4
**head** 99:21 169:15
**Healing** 255:5,10
**health** 52:15 61:1,11,13,16
**healthcare** 8:23 54:12,15 63:21
127:15 153:21 180:6 182:9
234:23 238:1 277:13 279:18
280:1 282:11 286:5 287:14
288:11 301:21,23 303:2,7,11
**hear** 23:17,17,18 30:18 44:11
122:14 127:13 133:9 154:12
192:4 206:18 230:4 249:19
263:17 280:13 284:4 290:1
291:14
**heard** 9:21 14:24 30:11 38:24

39:1,1,2 40:6 44:8 64:7 91:4
91:25 95:12,15,2 5 111:1
117:8 128:16 159:22 161:15
166:5 169:25 175:25 177:10
177:15 183:21 206:18 227:7
228:22 231:7 271:21 288:8
297:17 299:22
**hearing** 127:7 148:11 160:8
197:16
**hearings** 6:8 34:25 310:19,22
**hearsay** 134:13 142:5 147:15,22
183:21,22 204:7 247:14
**heart** 15:23 150:8
**heart's** 126:22
**heavy** 58:2
**held** 5:1 62:14 159:3
**hell** 185:25
**Hello** 71:9
**help** 13:14 71:24 96:22 109:12
140:21 216:8 217:15 257:8
264:16 278:16 280:17 282:25
285:2 293:15
**helped** 205:11 236:9 265:3,10
**helping** 72:1
**her** 11:1 28:21 38:8,24 39:24
40:6 41:19 44:11,14,17,18
47:5 52:18 55:19 56:23 73:7,7
73:8,9,11,14,16,1 6 84:3,3,6
85:3,6 86:4,23,23 87:2,11
100:11,11,1 4 101:5,7 104:6,6
104:6,7,7 117:1,11,15,17
118:4,5,6,1 2 119:21,22,25
120:4,7 121:10,20,20,20
122:25 125:7,14,15 129:7,9
145:2 147:19 148:18 151:10
151:25 156:23 179:17 185:24
186:6,17,18 195:2 196:1,6,17
197:4,4,5,6,7,20, 2 1 198:1,2,5
198:7,12,14,15,19, 2 0 199:10
199:16,20,20 200:16,23
201:20 202:11,1 2 16:9 217:5
222:20,23 223:1 235:2,2,3
237:4,5,24,25 238:7,8,13,14
238:16 239:10,11 247:16
257:7 271:23 272:10,10 285:2
**Heroes** 235:5,10
**hesitation** 268:8
**hey** 30:19 66:17 138:20 148:7
153:9,13 205:5 206:17
**he'll** 139:15 163:15,20
**hide** 207:19,21
**high** 50:6 51:15 85:1,6 91:1
100:20 113:23,24 114:14
**higher** 38:6 85:15,24 87:9
114:12 222:13
**highlighted** 71:22 81:25 109:15
167:20
**highly** 128:22 129:20
**him** 12:13 22:23 27:8,16,18,18
27:20,22,25 29:20 30:20
32:19 70:7 83:9 92:14 93:20
93:21,22,25 95:14,25 96:2
107:15 110:10,11 119:13,17
119:18 120:11,11 122:22
126:3,15,23 127:13 129:6,8
130:12,18 133:5,9 134:15,22
135:13 136:2,3 137:3 138:10
138:18 139:11,12,13 141:2
147:10 149:25 151:14 153:18
153:23 154:3,5,23 157:8,23
162:18 163:8,11,14,18 173:9
174:2 177:16 180:1,10 181:16
181:21 182:13,14,1 8 183:3,4
183:7,8,13,14,14,18, 2 0,24
184:10 185:12 186:6,18 187:4
188:16,16,2 5 194:25 204:17
209:24 244:2,15,2 4 245:14,17
245:19 247:11 249:4,6,6
250:12 251:4,7 255:9 260:17

261:3,22 265:17 266:15,16
267:3 268:1 269:5 270:17,20
272:20 276:16 278:8,20,21
284:9,9,18 292:22 296:19
306:12,13 309:1,3,6,10,11
**himself** 73:1 107:9 125:6 160:13
269:25
**hip** 276:1 298:17 302:6
**HIPAA** 166:11,15,16,19,21
167:5,5,10 168:3 169:7
178:21 225:1
**hire** 176:5
**hired** 176:4 177:5 179:16 180:5
199:16,20
**hiring** 177:3
**history** 142:15 191:22 264:7,13
**hitter** 38:12
**hocus** 172:4
**hogwash** 31:8
**hold** 5:12 62:21 123:13,13,21
133:15 149:5
**Holder's** 55:12
**holding** 308:23
**home** 21:1 51:1,23 52:24 53:4,14
83:13 126:14 203:10 216:25
217:3,7 245:5 283:14 290:7
**honest** 92:16 126:8
**honestly** 253:15
**Honor** 5:6,8,24 6:1,13,20 7:7,11
7:14,15,22 8:11,23 9:8 10:4
10:14,25 11:5,8,14,23 12:1,5
12:10,24 15:21 16:4 17:14,22
18:4 19:3,12,16,17,22 22:9
23:6 25:10 26:25 28:3,7,12,23
29:1,3,7,14,17 32:1,5,8,12,17
32:23,25 33:4,9,15 34:20 35:8
35:11 70:6,20,23 73:22,25
75:22,25 81:6 89:15 99:4
111:12,16 122:3,17 123:20
124:9 126:21 128:6,16 131:19
131:21 134:21 139:5 141:1,5
141:13,17,23 142:13,20
143:20 144:6,9,13 145:3,6,9
145:21 146:8,23,23 150:3,10
151:6,20 152:10 153:16 154:7
155:5 157:11,18 158:1,22,25
159:6 160:1 161:2,19 192:15
194:20 201:4 203:22,25 204:2
205:15,22 206:4 207:6,9
210:2 216:20,22 222:3 229:12
229:16,20,2 5 231:6,18 232:9
232:15 233:12,15,21,24
235:13,16 239:18,24 247:13
249:12,14 255:24 256:1,5,13
256:22 258:14,17,21 261:5,11
269:10,15,2 1 271:24 272:4
273:9 275:5 277:1,9,15,21
278:4,12,14 279:6 280:20
281:1,14 283:10 285:9,19
286:16,24 287:19 288:14
289:7,21 290:15,19,24 299:16
300:25 301:7 305:8,23 307:2
307:25 309:5 310:16 311:2
**HONORABLE** 1:10
**Honor's** 11:13,14
**hope** 15:21,23,24 27:22 35:20
165:14 283:16
**hopeful** 16:9
**hopefully** 122:11 210:15 308:17
**hoping** 30:21 289:20,24
**hospitals** 276:1
**hour** 8:18 20:15 22:25 26:5
111:17 155:23,24 157:20,24
229:16 309:15,18,25 310:16
310:16
**hours** 16:1 21:21 142:24 215:24
243:13 309:21
**house** 34:17 52:2,17,23 97:8
98:3,8,20 99:9 100:15,16,20

102:8 105:14 106:7,20,22,24
108:17 111:22 203:3 207:14
279:10
**HR** 177:4,8
**Huck** 130:5
**huge** 185:19
**huh** 16:13
**hundred** 115:14,21 116:5
**husband** 20:25 44:10,14 52:19
125:4,9,12,13 131:2 217:5
241:6 245:4,5,6,7,11,15,19,19
245:25 247:8,16,19,22
**husband's** 245:14,17

**I**

**idea** 19:12 71:18,19 72:1 85:8
103:6 120:3 153:7 158:19
172:21 185:23 188:4,9 191:23
195:5,11 196:2 208:21 209:13
222:6 238:6 266:19 283:9
**identical** 140:19
**Identification** 4:2
**identified** 7:13 21:23 45:15
**identify** 7:10
**idiot** 236:16,18,25
**ignorance** 60:1 217:19
**ignorant** 18:15 138:15
**Iliana** 108:12
**illegal** 27:21 36:6,10,13 75:15
173:5,19 207:22,24 234:23
238:1 304:17 305:9
**illiterate** 18:24
**imagination** 121:1
**imagine** 38:7 105:11 287:6
**immediately** 45:23 186:3,4,12
186:13,17,19
**impact** 15:10 130:13
**impeach** 138:23
**impeached** 8:13 126:24
**impeachment** 8:5,6,8,12 11:15
15:15,15 22:11 127:12 139:18
**implant** 67:10
**implement** 178:13
**implemented** 171:20 172:7
**implementing** 196:17
**implying** 172:5
**importance** 26:20
**important** 13:11 23:3 33:13 34:1
78:6,7 84:20 113:10 131:10
139:23 148:22 150:5,6,7,14
150:21 160:10 211:9,11
290:12
**importantly** 112:19
**impressed** 75:13
**impression** 241:25,25 242:5
269:11
**inactive** 194:10,14
**incentive** 66:19 190:20,23
198:11,13,14
**incentives** 190:15,23
**incentivized** 67:17
**include** 84:12 90:17 287:10
288:4 290:16
**included** 171:24
**includes** 147:9
**including** 59:5,10 82:11,19
179:2 204:24 219:21
**income** 53:17,23,24 71:25 123:1
125:3,8,9,14,15,2 4 126:25
170:15
**inconsistencies** 155:17
**inconsistency** 139:4
**inconsistent** 138:5,22,24 139:3
141:24 155:14
**incorporate** 293:23
**increased** 184:9
**incriminating** 151:15 152:5
153:23
**Indeed** 93:9

**independent** 40:23 41:1,7,10
197:20
**independently** 125:8
**indicate** 161:13
**indicated** 68:3 69:9
**indicating** 37:24 38:22 112:8
**indication** 192:24
**indicted** 227:2 228:9,13
**Indictment** 28:4,6 29:13 34:12
134:1
**indirect** 295:9
**indirectly** 288:3
**individual** 27:7 162:19 227:5
297:16
**individuals** 37:17 176:8 205:7
206:15 263:5 282:6
**induce** 184:18
**industry** 138:16 153:17 154:16
155:19
**inextricably** 129:24
**influence** 30:21 195:19 211:18
**info** 104:6
**information** 9:15 48:22 70:1
77:13 86:5 100:18 104:7
105:3,5,6,22 106:1 107:5,8,13
107:15 108:15,21 118:14,22
166:17 173:22 189:18 208:12
209:1 235:9 237:6 243:2,3
245:13 246:3 247:1 249:5
262:9,11 263:14 264:1 267:24
272:20
**InforMD** 27:9,13,16,20 28:5,19
29:10,11 30:1,12 31:19 54:9
65:14,19 67:21,25 68:4,9,9,18
68:25 69:6,10,17,24 71:10,11
71:14 72:11,14,15,21 73:7
75:4,7 77:6 78:18 79:2,10
80:1,8,17 81:18 82:7,22,25
95:14,19 96:6,8,10 97:3
116:12 181:25 182:1 218:13
218:15 219:17 220:2,8,8,11
220:15 221:2,6 226:5 291:25
295:17,17
**InforMD's** 220:21,24,25
**informed** 14:4 79:5,15 119:17
121:11
**ingredient** 85:17,18 194:10,13
194:14 242:12
**ingredients** 68:11 83:1 90:5 95:1
184:8,11
**initials** 55:10 254:24
**initiate** 99:12
**Innovations** 200:5,6,11
**innovator** 221:2
**Innumerable** 32:17
**inquire** 128:7
**inquiring** 122:5
**inside** 63:18 91:22
**insist** 167:12 290:22
**insisted** 198:14 200:3
**insists** 290:11
**instance** 88:8 174:2,23 210:6
266:14
**instantaneously** 216:15
**instead** 17:19 66:3 93:2,3 129:18
149:8 258:4 287:21 302:5
306:25
**instructed** 204:7 234:19 291:6
**instruction** 160:4 161:17 204:4
207:5 235:18 236:5 287:7,21
287:22 289:6 292:17,22
292:24 293:2,5,8,12,17 296:8
296:10,18 298:2,2,7,8,11,18
299:1,12,20 300:11,15 303:9
303:12
**instructions** 56:16 58:22 59:1,5
60:16,18 286:12 287:1 288:24
289:10 290:3,5,14 308:17
**instructs** 167:21

**insurance** 61:2,12,13,16 73:8
84:17 86:17,20 88:5,14,23
134:9 174:24 187:8 193:22
221:21 265:9
**insurances** 78:24
**intake** 118:22,22 119:10 263:13
264:9
**intakes** 31:8 112:4
**intend** 58:8 128:7 156:7 205:16
233:9
**intent** 150:8 160:5 161:17 205:2
206:24
**intention** 233:8
**interaction** 65:7,10 98:19 178:7
**interest** 83:8 191:2 242:13,15
252:9,10,19 266:12
**interested** 95:24 96:5 188:21
189:7 200:12 242:19 244:24
245:21 252:24 254:6,9 264:1
264:16 266:3 267:25 268:2
271:11
**intermediary** 198:2
**Internet** 100:17 171:12 235:6
**interrogatories** 33:24
**interrupt** 136:5 183:18 255:10
271:17 285:1
**interrupted** 143:21
**interrupting** 255:9 284:20
**intertwined** 274:20
**interview** 151:8 188:18 237:2,4
**interviewed** 188:12 208:20
**introduce** 5:4 6:18 13:4,13
14:19 24:10,17 124:18 128:8
128:18,20 130:11 134:17
138:4 141:15 163:17,19
205:16 257:3 261:6
**introduced** 23:10 37:15,16
54:18 111:25 180:25 204:18
204:18
**introducing** 14:16 27:20
**introduction** 197:25
**inures** 121:12
**inventory** 24:9 93:14 95:9,11
**invested** 203:12
**investigate** 152:13
**investigated** 129:18 152:14
228:19 295:22
**investigating** 153:10
**investigation** 149:15 152:11
154:13 197:1 200:1 215:10
228:3 237:18
**investment** 86:9,12
**investments** 125:10,12
**invited** 78:12
**invoice** 35:2 37:8 98:5,20 99:12
224:6
**involve** 305:11
**involved** 52:13 74:20 148:2
176:18 190:15 195:15 203:1,8
203:10,15 294:22
**involvement** 253:16
**involves** 34:21 57:9 151:22
266:13
**iPhone** 144:7
**ips** 42:15 143:10
**iron** 242:16
**irregardless** 211:24 219:8
**irresponsible** 126:15
**IRS** 125:2
**issue** 8:2 24:21 33:12 34:16
36:23 97:22 98:1 123:22
126:23 130:10,11,12 132:10
132:18 133:8 134:5 138:15
147:24 148:1 152:16 153:1
154:11,23 160:3,7,15 166:5
166:22 174:3 182:1,3,12
183:6 185:11,19 189:6,10
196:2,21 205:1,3 206:25
226:22 271:7 290:12 297:21

**issued** 79:18 206:17
**issues** 155:20 157:9 181:18
226:18 242:17 266:19
**item** 287:12 288:10
**items** 207:17 253:2
**IX** 82:2

**J**

**J** 1:13
**Jacksonville** 275:17 279:1
**January** 1:7 30:8 151:11 154:5,6
169:22 219:2 250:7,17,21
257:21,21 260:2 261:24
**jargon** 173:24
**JEFFREY** 1:20
**Jenkins** 213:3
**jerk** 13:8
**Jessica** 27:3,4,4,6,7 71:9 72:8
73:11
**jet** 203:4,14 207:14
**Jill** 40:6,9 46:25 47:2,5,9,9,11,12
47:12,23,23 48:2
**jmarcus@mnrlawfirm.com**
1:24
**Jo** 83:18,18 84:25 85:13,14
**job** 62:17 63:7 65:13 82:25 89:8
170:5,8 251:22 276:12
**jobs** 170:22
**John** 209:12
**Johnston** 81:13
**joint** 125:2
**jointly** 125:1
**Jon** 1:14 80:21
**Jonelle** 3:8 39:18,20 40:9 48:11
48:13,15,15 214:14,15,15
240:1,5,8
**Jones** 283:24
**jon.juenger@usdoj.gov** 1:18
**Joshua** 214:21,24,5 215:1
**Josie** 117:1,17 118:23 119:5
120:2,3,5,20,23,2 5 123:12
**Joy** 39:2,10 40:14,20 102:22
104:2
**Jr** 2:6 311:12
**judge** 1:11 17:16 18:15 33:6
129:20 130:4,8 131:10,12
138:7 145:24 146:10 148:11
148:12,17,21,2 3 149:4 206:6
212:1,3 229:4 230:3,12 232:6
232:17 239:22 290:21 291:16
294:9 296:4,13,2 2 308:24
310:20
**judges** 17:19 29:16 164:22
205:19
**judgment** 222:1 285:18 301:17
302:3 308:16
**Juenger** 1:14 3:5,7,15 5:6,8,22
5:24 6:10,24 7:1,3,6 9:6,8,10
9:13,15,18,25 12:24 13:1,3,6
13:16,19,21,24 14:1,3,9,12,20
14:25 15:21 16:2,4,15,18 17:2
17:6,8 20:12,14 21:6,12,15,17
21:20,25 22:5,9,12 23:6,8,11
23:13,19 24:12,15,22,25
26:12,25 27:2,5,7 28:20,23
29:21,24 30:2,5,7,10,14,16,19
32:17,20 33:15,18,2 2 34:6,14
34:19 35:1,4,6,8,2 4 36:2 70:5
70:8,20 71:1 73:22 74:3 75:22
76:3 78:10,15 80:25 81:4,10
81:12,17 89:12,18 99:2,7
111:16,21 122:6,17,23 123:10
123:12,15,17,20,2 5 124:4,9,11
124:17,23,2 5 125:18,20 126:1
126:5,8,12,17,1 9 127:3,12,17
127:19 128:6 131:25 132:2,7
132:10,13,17,20,2 5 133:2,7,13
133:20,23,2 5 134:3,21 135:1

135:6,8,11,16,21,2 4 136:3,7
136:18 137:4,6,22,24 139:5,8
139:21 140:6,9,11,14,19
141:1 146:22 147:3,9,17,20
147:24 148:5 150:2,10 155:5
156:14,21 157:4,16,23 158:1
158:4 161:2,19,23,2 5 162:5,7
162:9,17,21 163:1,3,5,8,14,25
164:4,8 166:2 192:23 194:20
194:22,23 201:3,7 203:22,25
205:15,18,2 1 206:1,4 207:13
207:25 209:21 210:5 212:7,12
216:20 218:18 219:15 221:5,9
222:3 223:11 224:5 225:12,25
229:12 231:18,23 232:9
233:15,24 234:2,8 235:13
236:12 239:18 279:6,9,22
280:16,20,2 2 281:5,15,20,23
281:25 283:13,16 284:7,12,14
284:19,25 285:4,7,9 288:17
288:25 289:3 290:15,24 291:2
291:5 292:13,21 293:6,14,16
294:9,13 297:6,12,20 299:9
300:25 301:2 307:20 308:7,12
309:9 310:1,4,8 311:2,4
**Juenger's** 211:15
**jumped** 246:13
**June** 36:6 198:25
**juror** 22:21 26:17 164:16,19,23
165:1,4,17 304:23 308:25
309:12 310:23
**jurors** 5:14 12:14 22:20 26:15
26:16 33:25 34:4,23 35:17,22
111:19 127:1 131:9 154:24
155:2 160:4,18 164:9 165:22
165:24 204:11 231:10 283:14
287:6 291:22 300:17 305:15
305:21 309:22
**jury** 1:10 10:16 35:19 51:17
71:2 76:11 92:9 105:25
111:10 113:17 122:10,12,13
125:16,20,23 126:4,10,14
127:9,13 131:7 139:24 147:12
148:7,20 152:17 154:12,22
159:4 160:7,14 164:11 166:13
204:5 208:6 210:12 213:8,13
214:18 215:23 216:18 220:1
227:7,10 229:8 230:4,8,23,25
231:13,19,2 5 284:1,2,3
286:12 287:1 288:20 290:3,14
291:5 293:7 294:1 295:4
297:17 300:11 302:1,10
306:17,20 308:17,21
**just** 6:15 7:25 9:24 16:5,13,21
18:6 22:19 24:5,7,24 25:2
26:13,15 29:7 31:4 35:8 39:10
41:9 48:2,23 52:12 53:10 56:4
58:23 61:3 64:9 67:15 72:1
73:15 74:10,11 78:2,19 79:7
81:21 88:24 89:24 90:16 92:5
93:10,12 95:4 101:17 102:11
102:13,17 103:11 106:2,2,3
107:11,16 108:4,18 110:12
111:13 113:3,12 114:6,10
116:4 119:2,11 121:4 123:10
126:13,17,2 1 128:20,20
130:18 132:5,23 134:6,12,19
137:1 138:16 141:1 142:21
144:5,11,22 147:14 149:22
154:8 155:17 157:1 159:22
160:22 161:4,19 163:18,21
164:5 167:17 168:6 172:5,8
174:4 175:22 176:21,23 177:8
183:9 185:9 191:23 192:16
196:5 197:21 198:2 199:8
202:12 203:1,7 204:21 205:19
206:23 207:13,20 210:14,17
213:2 214:14 215:5,13,13
216:2,9 217:8 218:22 220:19

221:3 223:1,5,15,17 224:5
225:7,16 226:23 229:12,20
230:1,5 231:18 234:9 235:16
235:19 237:21 239:10 241:20
242:17 243:14,19 245:2 246:1
246:4,20 249:9 250:14,21
252:12,17 255:6,8 256:13,18
257:4,5,11,1 7 258:18,24
259:20 265:18 266:7 267:1
268:11 270:5 273:2 276:21
277:14 278:18,22 279:25
284:22 286:7,25 290:6,22
291:24 293:17 295:24 296:5
296:24 297:18 298:16,25
299:3,12,16,18,18,2 5 301:15
302:5,13,20 310:21
**J-o-n-e-l-l-e** 240:9
**J.J** 181:14

---

## K

*kate@ kmeyerslaw.com* 2:4
**Kathryn** 2:1,1
**keep** 24:5 29:12 43:11 46:19,20
47:8 93:10 100:13 114:22
134:19 159:13 160:20,21
198:12 248:13 283:20
**Keith** 3:12 64:5,7 275:5,8,11
**Ken** 34:21 180:23,24,25 181:2,4
196:23
**Kentucky** 241:8
**kept** 46:8 198:22 215:23 216:19
286:17
**KEVIN** 1:13
*kevin.larsen@usdoj.gov* 1:18
**key** 213:22
**kick** 304:2
**kickback** 27:22 75:15 286:7
288:2 290:13 303:8 305:10
**kickbacks** 34:9,9 82:13,20
127:16,16 286:9 287:24,25
301:20,21 303:1,7,21,23,25
304:7,11,12,1 3 305:4
**kid** 248:14
**kids** 20:25
**Kiever** 213:3
**killed** 22:19
**kilogram** 83:24,25
**kilos** 84:6,9
**Kimble** 34:21 180:23,24,25
181:2,4 196:23
**kind** 6:7 15:9 22:19 53:15 55:21
62:23 65:5 121:4 151:5
168:19 188:10 189:6 198:2
205:17 239:10 243:5 249:9
260:4,9 275:23 286:11 288:3
292:19 294:7 295:9 309:20
**kinds** 168:18
**Klitz** 41:17 202:21
**knee** 118:6 119:21,22 242:17
254:1,2 264:9 276:2
**knees** 121:8 253:25
**knew** 8:1 11:11 13:12 14:14,22
14:25 17:17 26:14 32:11 36:6
36:9 37:10 47:11 51:7 64:25
65:1,4,6,25 66:6 74:22 75:1,6
85:11 91:16 92:4 129:2 134:9
135:6 148:1,2 152:4 154:2,16
163:23 169:18 171:15 176:22
181:6 183:14,18 184:6,22
191:21,22,23 199:18,19
204:24 205:6,6 225:8,9 226:5
235:1 236:1,6,7 237:17 238:4
245:25 261:17 262:1 265:23
270:10 276:16 291:25 292:1
304:15
**know** 5:17,19 6:7,15,17 7:8 8:21
9:2,14 10:16 13:7 14:2,13,20
14:21,23 16:18,25 18:24
19:13,19 20:23 22:15 23:15

24:6,12 25:11 27:22 28:21
32:1,4,9,18 33:10,21 45:2,3
46:10 57:18,23 58:15 60:5
61:3 64:9,10,11 67:1 68:7,7
74:23 75:10 79:13 81:11
83:10 84:21,21,23 85:5,6,6,11
85:15,24 86:24 91:12,13,13
91:15 93:11,16 99:12 101:9,9
101:11,21 102:7,10 103:14,15
108:14,22,24 110:12,21
114:10 118:18 120:17,19
121:7 122:4,7 123:1,24
124:14 125:22 127:2 128:13
130:3,4,5,9,23 131:14 133:5
134:6 138:16 139:24 140:7,17
144:24 145:7,25 146:4,19
147:4,12 149:18,22,23 150:5
150:6,16 152:10,15 153:2,2
154:8,21 155:13 156:3,5,5,10
158:15 159:13,21 160:18,19
161:6 164:23 165:2 166:22,23
168:6,11,12,13,14,16,1 9 169:2
169:11,13,18 172:4 173:1,25
174:16 175:6 178:5 180:11,12
180:16,24,24 182:22,22
183:19 184:1,22 185:1,20,21
186:9 188:25 191:23 194:6,9
196:8,9,13 197:17 199:21,22
200:21 201:21 202:3,19 204:3
205:11 206:19,23,23 209:13
210:18 213:25 215:6 216:6,16
216:12,15,16,1 7 218:21 219:5
219:7 221:17,19 222:1,4,5
224:15 225:5,10,16 226:15,19
226:21 228:1,12 230:10 233:1
235:3,3,7 236:8 237:22 239:3
240:22 241:22 242:3,6,19
243:2 244:14,17 245:12,24
246:20 247:25 248:10,17
249:2,10 250:16,21 251:2,3
253:19 256:21 257:11,12,17
257:18,21 258:6,8,9 259:8,9
259:20,21 260:8,8,12,23
265:8,24 267:12 269:3 271:15
274:21 276:17,20 277:2,18,19
278:9,9,17,21 280:7 282:25
283:4,14,19,2 4 284:20 286:25
287:1 288:7,18,24 289:11,12
291:18 294:1 295:24 296:11
296:12,15 297:2,9 298:8,14
298:16 299:11 302:9 305:1
306:8,9,24 307:17 308:18
310:19
**knowing** 26:21 151:25 163:11
191:20
**knowingly** 59:24 217:16
**knowledge** 39:24 91:19 125:7,10
125:13 133:18 134:11 150:9
151:3 155:11 160:5 161:17
205:2 235:19 238:15
**known** 17:24 91:17 99:23
121:18 200:18
**knows** 12:18 14:15 15:16 16:23
27:25 110:23 150:11,15
299:24 304:23
**kosher** 202:12
**Kottweiler** 240:19

---

## L

**L** 1:19
**label** 95:21 246:16
**labels** 246:11
**ladies** 204:4
**lady** 118:18 127:21 144:2
**Lam** 20:15 201:3 289:15
**land** 51:22
**language** 143:13
**large** 247:10,25
**largest** 38:5 57:21

**Larry** 33:19 34:19 35:1 99:8
102:19 106:24
**Larsen** 1:13 3:9,11,13 32:20
141:22,23 142:2,11,13,20
156:24 157:1,13,18,19,20
239:24 240:16 247:16,18
249:12 258:13,14,17 261:11
262:8 269:10 272:8,12,14
273:9,11,13,1 5 274:23 275:5
275:15,22 277:1,4,9,12 278:1
278:8,12,14,2 5 289:7,9,13,15
289:20,24 310:4,9,10,12,15
**last** 5:9 6:12,13 11:3 12:20 20:21
21:23 22:13 50:9 55:12 74:11
99:12 111:2 141:9,23 143:6
157:5 162:3,4,9 166:9 175:25
177:10 202:20 238:16 248:23
249:6 259:10 275:10 279:6
286:1 296:22
**late** 22:24 34:24 106:11 141:13
143:7 227:3 257:21
**lately** 159:15
**later** 20:15 22:24 23:17,18 46:11
54:10 65:14 68:24,25 147:10
149:20 152:1 162:15 170:16
186:1 196:9 214:6 215:1,3,9
220:14 246:14 260:12 268:18
270:22 286:10
**latest** 22:21
**Latin** 143:9,12 288:7
**laundering** 286:7 303:6,24
304:1,6 305:4,25 306:7,14
307:9
**law** 2:1 26:8 59:6 142:6,7 151:18
152:4 173:20,21 174:4,7
176:22 180:14,17 221:6,7,8
233:10 254:18,22,25 296:4,8
304:17
**laws** 56:15 58:3,11,15,18,21,25
59:4,20 82:3,9 96:10 110:21
110:23,25 173:22,24 174:6
219:21 220:4,7 225:9
**lawyer** 10:18 59:9 145:13 146:3
175:25 181:9,11,13 185:9
205:2 226:1,3 279:9 284:13
291:10 292:1 294:10,23 295:2
295:5 296:9 297:11,18 298:4
298:5 299:6,6 308:11
**lawyers** 6:6,6 12:13,14 20:18,21
25:24 68:5,7,8 75:12 96:11,12
96:13,14,18,22,2 4 131:9
145:25 146:11,12,23 159:10
159:11,13 175:23 204:19,19
226:5 236:2 239:20 271:15
272:9 283:22 287:5 291:7,11
291:17,20,21,23,2 5 292:1,2,4
292:17,18,19 294:19,21,22,22
295:9,12,13,13,1 4 296:3
297:22,22,22 298:6 300:18
**lawyer's** 96:17,17
**lay** 13:1 15:3 20:4 86:4,16 100:5
100:10 180:25 184:17,20,23
185:11,15,18,2 2 195:1,24
196:1,7 197:3,7,15,23 199:22
200:10,12 201:11 222:15
**laying** 222:22 223:1
**layman's** 283:7
**Lay's** 9:21 38:2 100:1,2 185:5
198:8 199:25
**lead** 43:19 91:4 178:14 269:22
**leading** 135:1 216:20
**Leah** 212:24
**learn** 271:13,18
**learned** 27:10 149:10,14,20
169:22
**least** 17:10 115:21 142:19 147:6
162:6,13 173:23 197:3 221:4
279:7 297:16
**leave** 10:10,20 69:20 96:6 128:1

131:21 149:22 164:17 238:15
260:7 284:1
**leaving** 17:20 77:6 287:5
**leche** 165:17,18
**lectern** 6:5,6 122:18
**left** 17:20 237:1,23 240:3 290:2
**legal** 122:24 171:22 173:19
175:6 180:18 181:16,17,21,25
182:3,4 195:10 204:19 220:7
228:15 259:2 260:23,25 268:7
282:18
**legalities** 226:10
**legality** 97:19
**legally** 56:14 181:3
**legitimate** 31:1 175:8
**lengthy** 23:13,16 26:1 151:13
**less** 19:23 20:13 21:19,20 26:10
32:25 50:17,22 62:12 107:15
123:2 130:14 187:12 309:17
**let** 5:17 24:5 29:20 47:25 51:16
57:12 60:23 69:20 70:9 86:24
93:11 99:12 122:9,14 129:9
129:13 139:20 140:1,7,23
146:5,9,11 150:25 151:1,4,4
154:19 157:1 161:15,16
163:10 165:21 173:3 175:17
183:17 196:9,22 205:22 208:4
211:15 217:3,15,22 218:15
221:23 225:3,18 226:15
227:18 239:3 249:1 251:12
255:5 256:25 259:25 266:18
271:15 273:16 283:13,14
284:4,22 288:18 297:14
298:25 301:10,15 303:22
306:17 309:19
**lets** 294:1
**letter** 180:3,10,12,2,2 181:2
189:7 196:13,23,24 197:2,2
**letters** 180:21 181:6 196:12
218:11 295:12
**letting** 199:22
**let's** 6:17 8:20 22:18 23:4 36:16
45:14,14 46:23 47:25 56:3
65:24 68:13,16 78:14 85:13
101:17 102:4,17 111:13
113:15 128:9 146:15 148:8
167:19 169:20 179:25 209:9
213:13 221:16 250:6 251:12
260:7 267:6,11 271:5 281:10
281:19 300:15,23 306:6,16
**levels** 43:12
**lever** 210:15
**liability** 123:2,3,5
**liaison** 197:21
**lie** 34:23 130:25 142:3
**lied** 201:19,22
**life** 62:24,25 63:7 71:6,18 74:8
135:2,4 148:22 216:12 274:10
**light** 184:24
**like** 5:18 10:24 12:9,13 13:8 16:5
17:15 20:18 24:7,24 27:16,18
31:6 41:9 44:24 46:19 55:23
61:1 64:10 68:6 71:23 72:10
73:20 77:13 78:7 83:1 85:14
86:13 91:21 93:12 94:5,18,19
96:9,11 100:17 103:20 105:3
106:5,11 107:1,1,4 108:7
112:17 121:4,11 126:13
128:20 132:23 134:10 138:10
143:9,10 146:4 147:22 148:11
148:15 151:5 154:2,4,9
163:22 164:2 175:1,3 191:1,2
193:2,23 199:4,21 202:18
204:20 206:20 210:17 215:12
215:17,24 226:5 229:4,7
232:6,17 233:7 243:1,2,14,19
245:3,14,21 246:4,16,19
247:8,25 248:11,16 249:1
254:11 255:6 260:5,6,9,22

262:1 267:1,4,9,14 270:20
274:13 283:9 293:18 295:10
296:11 298:14,23 299:12
300:17 308:1
**liked** 98:2 244:17 265:25
**likely** 29:17 179:20
**likes** 12:19
**limitation** 82:11
**limited** 8:18 24:17 59:5 93:8
107:5 236:4
**limiting** 122:5 160:4 161:16
**line** 4:3,3 37:10 45:19 50:9 61:7
61:7 102:21 224:14 248:15
258:25 259:14,18
**lines** 40:4
**LinkedIn** 93:22
**Lipoderm** 85:16,17,19,21,23,25
86:3,16,19,24 87:5,17 221:13
222:2,9,13
**Lisa** 41:17 202:21
**list** 5:9 8:2 15:17 20:14 24:13,18
25:6 33:12,13 37:17 38:21
43:8,25 44:1,5 49:5 81:2
101:23 143:1,3 175:12 243:4
243:6 256:12,25 261:6
**listed** 14:3 40:4 41:25 48:20
80:18,25 108:3 194:11,12,14
280:22
**listen** 12:11 56:5 153:10 229:9
292:17
**listened** 233:2 234:17 237:21
**listening** 31:7 136:8 152:21
195:4 228:25
**lists** 23:25,25 24:1 44:4 48:11,13
49:18,23 58:18 99:17,17
103:19,21,22
**literally** 134:4
**literate** 18:17
**little** 6:6 28:11 31:11 77:3 78:24
78:25 97:1 100:20 102:24
109:9 116:25 118:8 128:2
131:24 158:16 205:11 209:9
213:13 217:15 221:16 235:22
260:9 275:20 278:16 279:2
282:14 283:15 285:25 299:5
304:5
**live** 62:24,25 63:7 129:14 240:17
240:19 249:19 275:16 279:23
**lived** 246:2 253:17
**livelihood** 267:16
**lives** 74:14 129:15
**living** 115:5 217:4 241:8 242:5
245:5 253:3,6,23 279:17
**LLP** 1:20
**load** 106:19
**located** 52:2 218:24
**location** 106:17 119:1
**lock** 46:14 47:20
**logical** 41:12,13,42:17 296:11
**long** 10:18 19:9 20:17 21:16
30:8,11,17,19 46:16 54:3,6,9
54:18 55:5 56:21 60:21 72:25
74:17 76:6,15 77:11 113:16
119:12,19 120:10 141:7
152:11,12,13 156:12 157:19
157:21,25 158:10,18,19
165:18 173:8 219:2 227:12
228:12,12 229:14 243:5,13
249:23 250:1 257:20 258:6
268:19 276:5 292:11 308:11
308:13 310:11
**longer** 46:17,17 53:5 95:17
111:15 122:4 143:12 158:17
218:24 249:10 292:17
**Long's** 30:13 54:6
**look** 12:14 18:4,14 19:6,20,21
20:6,7,8 21:3 37:15,22 38:21
46:23 56:3 70:9 81:21 88:18
102:17 103:11 108:4 113:15

118:25 119:5 132:21 133:18
155:22,24 158:20 167:19
170:13 179:19 193:25 206:11
208:6 243:4 246:11,15,17
256:8 259:24 281:19 287:18
297:4 299:1,12 300:13 302:4
303:14 307:7,17 308:7
**looked** 8:18 25:13 74:11 108:14
112:1 129:12,17,20 177:11
189:10 190:1 196:24 202:18
281:16 307:5
**looking** 18:19 48:10 74:4 93:1
111:19 120:21,22 141:21
221:6 226:4 257:9 281:6
292:6 302:14 309:19
**looks** 62:1 73:20 105:3 108:7
112:17 193:11 205:13 215:12
**loose** 202:18
**loosely** 308:7
**Lori** 29:24
**lose** 290:12
**losing** 15:9 287:4
**lost** 24:11 79:13 243:6
**lot** 20:19 23:9,10 38:13 60:25
61:1 63:3 68:8 78:19 85:4
89:3 90:23 91:2 96:11 116:9
130:7 166:5 173:22 181:4
194:3 195:16 202:18 207:25
210:5 225:12 267:12 268:9,11
299:4 301:13
**lots** 68:5,7 87:23,24
**loud** 263:24
**louder** 275:20
**loudly** 240:6
**Louis** 13:24 109:11
**love** 209:21 296:20
**lower** 37:24 38:23
**Lozada** 91:20,25
**Lozada's** 194:9
**lucky** 22:18
**lucrative** 170:8,22
**lunch** 131:11 132:6 149:2
155:23,23 162:13 308:20
**luncheon** 159:1
**lying** 154:11 200:14,18,21
**L-o-r-i** 29:25

---

**M**

**M** 1:14
**machine** 114:20,23 210:10,14
**made** 27:14 31:20 39:7,17 42:8
47:10,15 49:25 69:3 77:17
78:21 79:2 80:2 90:10 95:19
97:17 106:10 107:18 123:25
124:3 142:3,16 148:15 151:12
151:15 153:25 167:15 195:10
195:12 197:25 198:8,19 204:9
204:17 226:14,15 233:1
239:11 243:5 249:9 252:6
253:8 267:4 271:8 287:13
288:20
**mail** 246:6,8
**mailbox** 237:24
**main** 260:13
**mainly** 72:21
**maintained** 56:8
**maintaining** 96:22
**majority** 108:7,9,10
**make** 8:19 10:9 16:9 22:4 27:15
31:12 34:22 65:9 67:13 77:4
77:14 78:18,19 86:12,25
87:18 88:25 93:15 97:12
106:2 115:3 119:13 121:6,16
122:18 148:6 149:3 152:16,17
157:15 161:5 172:4 174:17,19,24
173:17,19,22,2,5 190:6,11
191:6 197:14 198:19 220:2
221:6 222:21 223:3 225:11
238:17 243:25 244:4,10,10,12

247:19 257:18 260:10 270:13
282:18,20 283:2 291:5 292:8
293:22 294:6 296:25 298:25
302:7,23 305:20 306:24
310:19
**makes** 112:15 138:12 141:7
151:24 153:14 172:25 173:2
174:8 271:19,19 295:7 297:12
**making** 10:17 15:24 26:16 31:13
31:17 49:19 52:23 77:12
78:16,22 79:24 87:12 148:8
157:15 170:11,14 178:4
190:14 196:20 236:8,25 269:1
270:5 271:10 285:21
**man** 64:4 93:19 95:23 115:12
120:25 171:14
**managed** 93:21
**management** 75:4
**manager** 119:12 251:21
**managers** 43:19 120:10 176:10
**mandatory** 189:22
**manner** 173:18
**manufacturer** 24:6,8 86:7 93:11
93:13 94:4,9
**manufacturers** 93:15 221:22
**many** 19:14,14 22:15 27:14
32:15 38:9 45:6,6 57:19 62:12
72:1 89:8 93:15 96:24 115:14
115:20 124:9 130:9 154:2
178:2 181:4,4 182:19 183:4
183:21 190:1,1 192:21 194:16
215:16,17 223:14,16,18
267:13,15 272:11 279:20
**March** 6:24 14:14 15:1 40:17,19
67:24 68:1 186:10 195:12
200:7,25 216:10 218:9
**Marcus** 1:20,20 3:10 141:11,13
143:2,4,16 148:12 151:5,6,8
151:20,22 152:8,20,24 153:3
153:7,12,15,22,2,5 154:7
155:1,8,14 156:1,7,10,13
231:6,9 247:13 249:13,14,16
250:2 252:18 255:16,24 256:1
256:3,5,9,11,13,15,18,21
257:2,5,14 258:10,21,23
261:5,8,14 263:6,20 269:13
269:15,17,20,2,3 271:23,25
272:4,6 273:4,17 281:1,13
283:10 284:17 285:19,23,25
286:3,5,16,19,2,4 287:19
288:14 292:6 299:16,18,23,25
300:5,8 301:7,9 302:10,13,17
302:19,22 303:3,6,10,13,15,23
304:2,5,8,20,22,2,5 305:5,7,18
305:22 306:5,15 307:12,14,22
307:25 308:14 309:16
**margin** 50:6
**marital** 122:24 123:6 124:1,4,6
124:25
**mark** 256:1
**marked** 4:2 47:25 73:18 75:18
107:21 108:6 232:23
**market** 52:24 62:17 69:10,12,25
94:19 106:17 191:3 201:24
202:2 265:23 273:18
**marketable** 266:1
**marketed** 65:15 69:10,17 72:21
182:13 208:24
**marketer** 191:4 194:8
**marketers** 39:22 89:9 182:21
212:16 213:15 239:9
**marketing** 40:23 68:10,16,18,20
68:22 69:1 77:15 95:24
116:10 133:14,16 183:15
187:16 192:12 197:21 208:10
208:11,11 212:16 218:20,22
220:23,24,25 267:7,21 270:10
282:12,12
**Mary** 42:24 43:2,7 83:17,18

84:25 85:13,14
**Mason** 16:10
**mass** 32:12
**massacre** 17:11
**Massengale** 79:15 95:14
**material** 155:18
**materials** 116:10 220:23,24,25
262:6 265:19,20,22
**math** 50:7 84:6 86:23 87:11,11
87:14,15 90:16 113:17 114:10
114:11 115:17
**Matt** 23:8,19 83:4,7,10 85:22
89:20,21,25 91:6 93:10
167:21,21 175:24 178:5 196:7
**matter** 25:14,22 30:24 55:25
95:8,8,18 105:19 129:2
160:10 178:11 179:1,23
192:22 193:7,13 199:23
200:19,20 236:3 256:17
271:20 282:16,19 283:3,6
290:12 311:9
**matters** 254:16
**Matthew** 183:20 186:3,14
236:17,18 239:17
**Matthews** 43:20 44:22 46:1
**Mauricio** 136:23 137:7
**may** 24:20 67:17,18,18 102:10
107:13 111:5 117:14 131:12
136:12,14 147:7 148:21,23,23
149:4 151:11 154:14 194:16
204:6 206:17 207:9,10 210:2
212:1 217:10 231:24 235:11
239:19 250:18 255:24 273:9
277:5,5,9 280:20 287:13
288:10 290:16 296:9 299:18
300:11,12 310:24
**maybe** 20:23 61:2 77:9 91:22
110:11 158:23 165:1 200:7,24
216:10 249:1 251:3 260:8
271:16 285:4 289:12 292:15
305:22
**ma'am** 249:17 274:24
**MCC** 212:24
**MD** 36:21 97:20 98:3 100:11,17
100:17 101:15 106:19 111:23
**mean** 16:8 20:10,18 26:23 28:8
31:6 59:9 60:19 62:25 74:23
78:3 88:3,6 101:17 109:22
113:2,2,14 114:7 117:22 121:6
121:25 122:1 126:18 127:7,11
136:23 137:22 138:10 139:14
147:1 153:17 155:17 159:23
160:23 163:7,19 166:13
174:20 175:4,5,8 188:18
204:21 219:3 223:2 238:6
242:4 243:4,13,17 244:10
245:13 250:12 251:3 252:6,6
254:21 257:8,11 260:4,11
267:12,13 271:18 276:18
278:18 283:24 285:21,25
287:25 290:19 291:13 295:13
302:11 307:3
**meaning** 80:14 94:22 142:5
287:16
**meaningful** 132:23
**meaningless** 162:24 163:9,12
**means** 8:18 18:1 23:1 32:18 43:5
42:25 50:9 54:15 55:18 57:5
63:13 77:12 83:24 86:9,11
90:10 109:4 112:11 113:3,5
125:17,23 126:15 127:9
143:17 148:19 150:25 152:17
168:6,21,23 175:10 177:8
255:9 272:19 283:7 288:7
294:1 297:23,25 298:18,19
310:23
**meant** 63:7 157:2 163:21 202:7
219:4 253:20 286:15
**med** 9:21 24:3,4 37:25 90:15,25

198:24
**media** 134:9 160:4
**Medicaid** 287:14
**medical** 54:1 57:21 58:23 62:9,9
62:14 64:1,4,9,15 94:1,1
206:14,14 264:13 275:24
276:5,7,13,23
**Medicare** 54:17,23,24 56:9,16
57:6,11,11,15,17,19,20,24
58:12,21,25 59:1,2,8,25 61:20
61:21 134:9 217:18 287:14
**Medicare's** 58:3
**medication** 72:19 98:13 106:15
108:13 113:7 119:23 187:22
187:23 188:2,4,8 189:24,25
192:2,5 202:11 209:7
**medications** 51:10 52:13 70:19
72:23 94:6 114:1,3 188:2
189:17 194:4 199:3 208:14,19
208:19,21 209:3,6,17 236:22
237:7,12 250:22 252:12,20
273:18 274:3
**medicine** 66:22
**Medina** 302:14 307:22,23
**Mediport** 94:1
**Medisca** 92:6,14
**medium** 149:4
**meet** 282:18 293:2,8 304:16
**meeting** 55:22 83:4,9 171:4
178:9 180:10 182:8 183:7,24
184:4,6,12,15,2 1 185:2,9
186:21 189:16 201:12,14
226:7 237:25 279:10 282:1,10
292:1 294:23 297:15
**members** 182:18 183:3,6
**memory** 46:20 136:15 257:16
259:25 260:1 268:5 273:4
**mention** 143:17 294:25
**mentioned** 9:15 22:5 30:24 34:14
44:17 73:2,4 97:10,10 147:7
150:20 153:3,5 180:23 183:9
184:2 193:16 194:24 199:11
263:15 301:11
**mentioning** 194:25
**merely** 122:5 174:17
**merging** 149:2
**Merida** 164:15,16,19,2 3 165:1,4
**Meryl** 209:13
**mess** 97:14
**message** 46:11 186:11 226:16
**messed** 123:7
**met** 56:8 93:21 125:4 171:8
174:2,3 216:10 226:11 241:1
266:25
**metabolic** 104:17 108:1 210:21
**Meyers** 2:1,1 6:1,12,16,20 7:10
7:14,18,22 8:11,15,23 9:3
10:3,7,24 11:2,5,8,13,23 12:1
12:5 17:13,22,24 18:4,8,12,16
18:20 19:1,3,5,10,12,16,22,25
20:2 25:10,12,22 28:2,7,9,12
28:15,25 29:1,3,7,14,17 31:25
32:1,5,8,10,12,23,5,24 33:9
34:20 35:11
**MG** 31:23 44:4 45:15 46:24
48:10 81:25 104:1 106:3
215:11,12 259:9 287:16
**MGTEN** 37:18 38:18 39:7,20
40:10,23,24 41:4,5,23 96:24
97:4 102:21 182:20 220:8,9
220:13,17,23 227:11,12,17
237:3
**Miami** 1:2,6,16,22 2:3,6,7
311:13,13
**mic** 13:7 125:21 231:8
**microphone** 6:2 240:7
**microphones** 6:3
**mid** 134:3,3 308:20
**middle** 133:21 134:3 246:17

294:3
**midmorning** 149:1 308:20
**might** 23:16 63:5 67:3,7 70:15
74:19 85:8,9 106:13 129:3
141:1 168:22 187:14 225:9
258:5 259:21 264:2 265:11
**military** 71:18 72:4 74:14,24,24
241:6 253:15,18,19 267:13,15
**milliliter** 24:1,3 90:6 92:2 93:2
**milliliters** 90:14,17
**million** 8:24,25 12:2,4,20 19:17
32:24 38:2 41:22 170:12
193:13 198:5,8 217:8
**millions** 42:11 174:8,8
**mind** 66:10,13 67:2 96:18,21,22
127:6 152:15 153:23 154:4,17
155:10 204:25,25 205:9 225:3
235:20 236:5
**mine** 71:24 99:25 102:11
**minimal** 125:8 130:13
**minimum** 84:8
**minute** 278:12 289:20,22
**minutes** 8:20 12:12,18 21:20,21
21:22,25 22:19,25,25 67:15
122:6 132:6,21 152:1 154:8
156:13,14,16,23,2 5 158:21
230:6,17,22 234:12,13 250:14
285:3,4 308:12 310:17,21
**missed** 288:23 289:2 290:10
**missing** 22:16 104:24 121:4,9
165:9,11
**misspoke** 205:15
**mistake** 47:10,15,16,1 7 212:19
214:5,20 215:3
**mistaken** 121:12
**mistakes** 121:7
**misunderstanding** 159:8
**misunderstood** 205:16
**model** 27:11 68:9 69:14,14 77:7
80:14
**modification** 77:6
**modified** 31:12 77:4
**modules** 178:20,23
**moment** 16:10 18:24 20:21 22:5
102:13 131:12,19 148:21,23
152:3 210:2 212:1,4 229:20
272:4 282:14
**moments** 176:21
**Monday** 6:7 13:13 25:7 98:5
102:4,5 143:5
**money** 36:24,25 57:17,18 59:14
61:19 66:18,22 75:1 77:14
78:22 85:4 86:11 89:4 90:23
91:2 97:23 98:2 115:3 117:9
117:14 121:16 125:11 187:7
190:6,14 191:6 195:16 196:2
203:11,12,20 239:6 244:4,10
244:10,12 247:10,21 248:1
259:4 263:22 267:4 286:7
303:6,24,25 304:1,6,8 305:4
305:25 306:7,14 307:9
**monies** 203:18
**month** 50:12 72:6 117:23 249:1
268:18 274:16,18
**months** 75:10 151:16 153:18
154:1 193:14 227:13 234:18
251:6 254:23 268:20 270:22
**Monty** 1:7 3:4 9:14 13:1,24 14:3
30:7 35:1 71:2,9 74:5 83:23
89:20 99:11 213:2 241:2,16
242:2 246:3,19,21 247:1,23
251:3 270:23,25 272:16,18
**montygrow@hotmail.com** 76:8
**Monty's** 246:17 249:10
**Moore** 146:10
**more** 20:13 21:19,20 27:24
32:23,24 33:15 36:22 37:6
38:8,9 43:16 45:14 46:5 50:17

50:22 61:11 62:12 78:5,7,12
87:18 93:7 100:20 107:7
112:19 123:2 134:7 146:22
157:10 164:13 173:8 179:19
190:6,7 197:4 203:15 209:9
215:16 221:23 224:2 230:4,21
235:9,22 246:9 253:16 260:17
282:14 285:4 304:5 308:4,12
**MORENO** 1:10
**Moreno's** 26:9
**morning** 20:10 25:7 35:20 36:3
36:4 63:8 142:14,21 143:5
145:17 165:20 213:1 289:6
**mortgage** 52:5,7,21 53:4,13,14
**most** 16:15,16 23:3 33:13 51:14
84:20 131:1 160:22 162:12
170:8,22 181:5 182:16 183:1
205:19 225:15,15,23,23 274:8
282:17 300:17
**mostly** 50:5 125:25
**mother** 73:6,9
**motion** 142:10,11,12 285:18
302:3 303:23
**motions** 308:16
**motive** 142:3 152:3 153:16
195:19
**mousetrap** 78:3
**mouth** 97:16 185:10
**move** 29:8 61:8 65:25 70:5,20
73:22 75:22 89:12 96:6
126:12 128:8 163:24 169:20
170:18 214:21 216:22,22
231:18,21 232:7 235:14
291:14
**moved** 32:14 33:5 129:12
**Mrs.Sergeant@live.com** 74:5
**much** 18:21 28:9,15 34:3 35:21
38:6 49:11 65:2,6 75:13 76:22
78:23 84:21 86:11 87:6
105:13,15 111:15 122:4
126:18 149:22 158:12 160:24
170:16 176:25 194:1 215:9
248:3 254:9 274:20 278:24
279:12
**Murani** 93:20,22 95:10
**must** 56:8 110:23 127:14 131:9
156:4 192:6 195:24
**myself** 41:9 97:21 175:11

**N**

**name** 29:24 40:6 45:16 46:24
48:23 49:4 55:15 64:5,8 71:9
93:15,20 95:23 97:20 103:13
106:12 117:1 122:1,25 125:6
145:11 180:24 210:18 239:25
240:7,8 246:17,19,20 249:3
251:10 259:8,19,20,24 260:8
260:15,16 268:12 275:9,10
279:15,16 282:8 295:19
**named** 27:3 56:24,25 227:5
276:8
**names** 38:21 99:18 215:13 282:5
**narrow** 277:14
**narrowing** 21:6
**national** 178:9
**nature** 33:24 96:17 175:13 178:9
178:13,22 196:12 203:13
237:24
**nauseam** 205:24,24
**necessarily** 25:15 61:14 64:18
110:8 126:5
**necessary** 61:8,9 63:1,11 65:21
98:15 114:4 167:10,12 172:24
226:25
**need** 10:22 24:5 61:3 67:4,18
76:25 93:10 107:8 114:2
115:14,21 118:19 119:3
121:17,18 126:1 129:23
135:18 156:18 179:9,22

186:12,18 188:9 189:17,24
191:8 195:22 201:5 208:18
236:20 243:23 245:17,22
265:15,17 282:11,19,23
289:18 291:18 305:25
**needed** 72:23 96:16 114:1
119:22 167:15 186:6 188:1
202:16 208:25 209:7,17 220:4
242:15 245:4 283:2
**needing** 226:19
**needs** 63:12 66:21 105:4 128:23
128:24 144:22 147:12 186:11
186:17 197:18 210:23
**negative** 300:8
**negotiating** 88:14
**Neiman** 1:20
**neither** 15:3 40:20
**Nephew** 275:19,21
**nervous** 170:1,21 260:10
**Nesbitt** 148:11,17
**net** 113:20 217:6
**network** 112:5 119:15,24 169:12
182:25 210:23 267:21
**never** 5:18 8:4,5 11:21 12:7
13:25 30:23 31:14 37:1,3
39:20 52:21 63:18,24 64:7
65:7 66:6,10 67:1 73:2,4,11
79:21 91:22 92:17 109:6
111:3,4,5,7,10 113:12 115:17
120:16 122:8 124:19 127:1
128:16 130:4 151:17 152:14
156:9 159:23 162:23 174:10
175:14 178:12 179:25 180:3
181:5,6,9 182:8 185:12
186:14,14,15,1 6 188:10
189:11 192:2 194:4,5,6,24
196:24,24 198:14 201:24
211:18,19 215:9 238:23 239:9
265:15 266:2,11 268:1 293:4
308:2
**new** 22:1,3,6 25:21,23 28:12
29:19 52:21 53:13 77:8 79:17
81:5 178:15 200:16 213:5
217:5 256:19 271:9
**news** 133:4,9 136:9 147:23
151:8 152:24,25 153:3,5,9,16
153:18 154:1 186:20 187:4
188:12 190:5,5,9,11,21
191:13,14 192:9,24 193:16
205:25 206:2,6 241:19 308:1
**newspaper** 147:18 154:20
**next** 10:8 12:22,23 25:16 49:18
50:19 87:4 132:12,13 139:6
165:21 214:24 215:5 216:7
238:5 239:19
**NFL** 51:24,25,25
**nice** 31:3
**Nichole** 38:23 44:10,13,17 45:16
45:18,23 46:3 177:13 179:16
179:22
**night** 6:12,13 7:23 8:12 11:4
12:21 17:3,4,6,7,10,10,18,18
20:13,18,22 21:2,3,4,5,23
22:13 25:7,9 26:23 141:9,14
141:21 142:23,25 143:4,6,7
186:2 283:5
**Ninth** 19:19 151:19,22 152:1
**nobody** 15:16 31:13 79:20 199:7
**nod** 111:19
**nodding** 251:25 271:2
**none** 17:13 96:25 129:19 203:24
203:25 220:22 291:14 295:11
**nonetheless** 117:13 169:6
**non-addictive** 114:3
**non-narcotic** 103:20 114:3
**non-paid** 199:9,14
**noon** 164:19 309:2
**normally** 205:4
**North** 2:6 52:3 86:7 88:11,13

94:13 95:18 311:13
**Northeast** 1:16
**notated** 242:16
**note** 39:16 213:2
**notebooks** 122:10 284:1
**noted** 39:10
**notes** 27:15 132:2,4 144:11
159:20 281:21
**nothing** 14:23 25:21,23 31:5
66:12 91:23 97:18 103:17
130:21 131:6 139:2,18 145:4
146:23 149:17 161:14 176:14
176:15 177:18,23 192:9
196:15 218:22 223:5 224:3
243:17 248:2 249:12 263:21
267:6 274:23 284:16 286:20
299:21
**notice** 15:2 128:13,15,23,25
129:23,24 130:9 131:4 193:17
193:20 290:7 292:15 298:14
298:15
**noticed** 68:3 74:13 128:16 151:9
**notify** 56:7
**November** 42:10 227:2,3
**no-no** 145:7
**number** 1:3 4:4,5,6,7,8,9,10,11
4:12,13,16,17,1 8 5:20,21
12:23 19:5 23:5 35:16 44:3
47:19 59:23 70:25 74:2 76:2
80:21,22,24 81:16 84:17 88:1
89:17 95:22,22 99:6 100:12
104:7,21 106:12 113:18,19,20
123:16 124:15 128:19 129:18
129:11 166:14,25 167:24
169:6,12,13,17,18,1 8 207:8
212:9 217:14 225:18 232:5
236:11 247:2 248:17 256:7,8
261:13 281:4,18,19,20
**numbers** 4:14,15 86:23 87:1,2
114:10 132:24 166:6 167:25
193:11 216:6 222:15,22 223:1
225:3 232:11 234:4 256:8
**numeral** 82:2
**numerous** 294:10
**nurse** 107:4,9,11,1 6 108:18,20
108:23,25
**nuts** 76:12

---

**O**

**oath** 118:10 254:15 255:2
**object** 12:19 133:11 277:11
283:10 299:8,9 305:15,23,24
306:3,6 307:10,12,15
**objected** 7:19 29:13
**objection** 5:25 6:11 10:3,5 17:12
28:2 31:24 70:22 73:24,25
75:25 81:8,15 89:14,15 99:3,4
111:12 122:3 123:22 128:9
132:22 161:2,4 192:15 206:7
206:9,10 207:5 212:7 216:20
216:21 222:3 229:10 232:8,9
235:15,16,17 247:13,17
261:10,11 269:10 277:10,19
277:21 278:2,5,10 280:24
298:10 300:22
**objections** 7:24 70:23 160:25
**objects** 299:5 296:17 298:10
305:9,10,14 306:21
**obligated** 125:1
**obligation** 58:2,12 82:18
**obligations** 57:9
**obnoxious** 13:8
**observing** 144:5 145:4
**obviously** 60:19 94:7 138:13,18
152:9 154:18 166:16 196:9
199:12 206:14 305:1,4
**occasion** 169:11 202:9
**occasions** 63:16 72:22 174:5
199:2,5 202:2

**occur** 16:10
**occurred** 131:1,1 206:21,22
214:19 218:13 241:1
**October** 23:11 36:5 89:20 255:3
255:5 257:15,17 260:2
**oddly** 152:18
**off** 5:19 13:8 53:14 99:21 101:17
125:21 166:14 167:4 190:14
191:6 197:4 198:8 226:17
310:18,21
**offenses** 307:11
**offer** 88:17 192:7 117:13 156:8
190:6,11,13,23 214:2 273:23
**offered** 21:12 67:2 84:4 117:9,11
117:15 174:23,23,24 196:6
197:9 199:13 200:19 214:1,7
241:21 242:8,25
**offering** 196:2,7 212:3 213:4
**office** 11:4,15 2:1 69:19 233:2
265:12 289:8
**officer** 11:21 122:12 145:2
146:16 165:9,12,14 230:23
231:12 284:2
**official** 2:5 55:1,13,16,18 56:14
56:20,24,25 60:11 311:12
**officially** 56:7
**off-line** 75:5
**oh** 11:3 14:22 20:11 22:16 25:1
26:18 34:24 52:2 100:25
121:5 129:5 138:15 140:13
141:20 150:4,12 155:13 158:2
165:5 237:22 251:2 254:21
257:11 266:4 272:2,22 280:19
281:16 300:3
**okay** 5:2,19 6:2,16,21 7:5 8:19
9:17 10:2 11:6 12:11 13:20
14:8 16:16,21 17:4,7,11 18:11
20:4,17 21:16 22:2,18 23:9,12
24:20 26:18 28:1,14,15,18
32:21 33:1,13 44:10 51:16
57:24 62:8 64:19 67:21 69:23
77:1 80:17 81:1,5,6,9,14
83:16 86:16 87:21 101:19
102:13 103:3 107:20 111:18
113:9 122:11,15 123:11
124:24 129:9,16 131:22 132:1
132:12 133:8 134:1 135:10
136:2,25 137:12 138:9 139:1
140:24 141:4,12,19 142:25
143:17 144:18 145:15 146:2
146:15 148:25 149:11 153:16
157:12 158:6,10 161:23 165:5
165:15,15,23 167:16 169:20
170:19 197:3 202:20 206:9
207:2 211:16 212:8 214:21
229:17 232:4,16 234:3,6
235:17 236:8 238:24 240:2,6
243:21,24 250:5,14 251:12,14
251:22 252:9 253:25 254:3,6
254:8,12,15 255:2,20,23
256:4,16 257:6,13 258:11,18
258:19,19 260:24 261:5,18,24
262:10,16,23,24 263:1,13,19
264:12,19 265:2,10,18 266:7
266:15 267:22 268:17 269:14
269:16 270:16 271:1,5,6,7
272:7 273:14 275:9 276:20
277:24 278:5 279:5,8,11,12
280:15 281:2,8,16,16,24
283:2,22 284:4,6 285:3,24
286:2 289:18,25 290:14,18,20
291:7 296:25 297:3,3,4 298:4
298:15 299:8 301:1,4,6,12
302:22 303:1,1,5 304:4 306:23
304:23 305:9 306:13,19
307:9,12,16 308:10,22 309:4
**ones** 33:13 108:22 116:12 177:6
194:1 220:4 221:1 267:9
290:5 291:2
**one-off** 48:3,5
**online** 100:16 178:20,23 267:13
267:20
**only** 6:18,19,22 19:20 23:22
26:4 27:13 28:2 30:25 33:12
69:10,24 77:9,19 90:3 91:19
93:8 98:7,8 100:9 120:12
128:4,6 147:21,24 157:4
160:5 161:11,17 165:6 171:5
177:25 206:16 211:5 213:10
213:21 226:14 227:23 230:18
231:1 236:4 240:18 251:2
253:17,18 270:19 272:21
275:16 290:2 297:6 300:2
302:23 304:25 307:12
**Oops** 103:1
**open** 43:25 150:23 207:18
**opened** 53:25 280:7
**opening** 14:24 51:17 52:16
158:17,19 205:1 207:1
**opens** 160:22
**open/close** 310:4
**operates** 183:11
**operation** 190:4
**operations** 89:22
**opinion** 175:17 180:3,10,12,13
180:14,21,22 181:2,6 196:12
196:13,23,24 197:2,2 283:2,6
283:11 284:18
**opinions** 282:19,20 283:4
**opponent** 5:23 256:24,25 258:11
301:5
**opponents** 290:1
**opportunities** 72:23 214:1
**opportunity** 10:24 32:3 37:20
57:15 74:19 143:14 150:16,17
214:2 242:7,9 244:4,7,9
254:11 268:24 290:21 302:2,2
302:4

opposed 208:7
opposite 107:12,14 266:4
options 174:24
oral 274:3
order 15:17 19:6 25:24 42:9
  56:8 58:14 65:1,1,5,5 66:19
  67:3,8,17 79:16 83:21 84:8
  92:14 115:15,21 117:10,11
  121:17 138:23 159:11 172:6
  176:18,20 178:19 187:17
  224:3 225:7 243:25 244:2,19
  244:23 269:2,5 270:6 271:9
ordered 87:21,23,25 91:20,24
  92:6 117:3,6
ordering 67:7 77:24 78:1 91:21
  173:4 195:19 246:22
orders 121:20
organizations 94:22
original 43:21 199:13
originally 24:15,16 85:22 105:21
  291:3
originate 203:20
orthopedic 67:5 276:1,3
Orthopedics 62:10 63:21 64:22
  64:25 65:1,6,24 66:11,15 67:3
  218:4,7 276:8
other 6:6,8 10:3,5 14:10,12
  17:13,18 19:7 22:4,25 23:19
  26:19 34:8,11,13,24 35:14
  38:9 40:14 55:11 69:9 77:17
  77:21,21 78:1,24 79:9,18
  82:25 85:6,11 89:25 91:24
  94:15,17,21 100:25 101:3,15
  105:3,22,24 108:22 116:7,19
  124:20,21 125:10 129:19,24
  131:22,23 136:25 137:2
  139:12 141:2 147:6 154:2
  157:3,3 162:6 175:23 194:9
  203:21 204:16,23 213:11
  234:13 244:18 253:8,13,22
  255:12 267:4,7,14 268:9
  269:8,11 278:17,18 282:8
  284:20 285:1 287:14 289:23
  290:13,21 295:6 297:16 302:7
  305:10 309:12 310:19
others 20:1 72:1,10,16 175:19
  175:23 291:8 295:8 296:19
  308:4
otherwise 31:12 78:16 251:7
ought 148:6
out 5:11 6:18 15:16,17 23:4 24:8
  25:19 29:16 31:17,22 35:10
  37:4 41:18 43:12 51:2 61:8,9
  73:16 75:1 79:24 80:4,11
  85:11 86:4,12,16 89:10 93:14
  94:8,18 97:16 103:6 104:2,21
  104:25 105:4,22 106:1,9
  107:18 108:3 114:11 115:14
  115:20 116:5 117:18 118:6
  119:19 121:9 128:9 132:10
  133:18,19,20 137:8 138:20
  140:16,23 146:15 153:13
  155:25 156:3,4 160:18,20,21
  165:2,7,16,21 166:6,10,14
  167:4 172:22 173:1 178:11
  185:1,2,9,24 188:23 189:24
  190:12 194:12 195:7,7 198:5
  199:24 200:2,21 204:8 205:7
  207:18 208:12 209:1,8 210:17
  212:19 214:3,6 215:25 216:4
  216:6,15 222:15,22 223:1
  225:4,5 227:16 228:3 237:1
  238:13,19 246:13,21 249:10
  260:22 264:9 266:5 274:18
  278:19 286:13 291:20 292:23
  303:20 305:21 306:16
outcome 211:24
outliers 43:15
outline 22:6 202:25

outside 5:12 10:16 24:7 63:4
  93:12 145:2 148:19 152:16
  159:3,14 166:19 167:25 177:5
  180:6 205:20 231:11 260:15
  276:20
over 6:5 7:6 8:11,24 11:15,20,22
  12:7,18 22:11,14 23:3 27:11
  34:6 45:6 48:6 49:9 52:18,20
  52:23 53:1,12 55:3 69:3 88:2
  88:4,7,10,12,15,22,25 89:2
  96:15 97:25 100:12 107:20
  112:14 115:22 146:12 158:2
  162:16 166:11 167:13,13,13
  190:1 191:9 197:1 198:5
  200:1 201:3 207:17 213:23
  214:1 217:8 226:12,15 229:15
  240:2 248:17 249:2 250:5
  251:3 253:4 257:22,23 265:21
  286:18,18 301:13
overlooking 135:5
overrule 235:17
overruled 192:17 206:10 222:4
overseas 201:24 202:10
overseeing 131:16
overtly 288:3
over-the-counter 245:20
owed 125:2 238:17 278:23
own 27:11,12 30:22 31:17 39:24
  47:22 62:8 65:20 69:4 70:2,17
  72:19,24 80:11,11 94:10,17
  95:21,22 100:11,11 113:17
  162:21,24,25 163:1,4,5
  179:12,13,14 181:9 185:10
  190:14 197:20 198:1 211:15
  212:21 215:2 221:3 222:1
  227:16,17 237:2,4 238:13
  239:10,11 244:16 246:23
  252:12 254:22 267:5 273:2,7
owned 53:5 94:4,10,14
owner 55:3 79:15 95:14 106:24
  108:17 192:12
owners 33:20
ownership 52:22
owns 94:14
Oxygen 54:1,12 62:9 217:10
O'Hara 7:1 9:10,13,17,18

**P**

PA 109:4
packet 48:20
PADRON 165:17
page 3:2 4:3,3 37:24 38:22,23
  45:14 46:23 55:12 61:3 81:25
  87:3,4 99:17 100:22,25 101:3
  103:19 104:1 105:24 124:23
  258:6,9,11,19,2 5 259:7,14,18
  265:18
pages 8:24 12:2 61:2,5,6,14
  215:12 286:21
paid 31:19 34:16 36:17,21 37:2
  37:3,4,9 38:6,9 39:24 47:5,11
  48:15 80:1,15 97:18 98:10
  101:11 102:2,5 116:15,15,15
  117:18 118:2 172:15 173:18
  176:11,17 182:14,25 187:8
  192:25 193:4,8,2 5 197:8,10
  198:4,16,23 199:8,23,24
  211:4,7 212:16,20 215:5
  220:15,17 222:13 224:10,10
  224:11,12 235:2,3 239:3,7,8
  248:3,16,21 249:25 250:3
  251:22 258:1 259:3 287:10
  288:5 304:10
pain 50:14 51:7,11,13 94:14,24
  106:14,16 107:25 108:8 114:2
  117:3,6,7,18 118:5,6 119:6,21
  119:25 137:15 181:3 187:12
  187:12 188:17,20 191:22
  210:20 236:22 237:12 242:10

242:21 243:7,11,16 244:25
  246:10 252:22 253:25 254:1,2
  264:10 265:2
paper 216:2,4 257:10
papers 61:7,12 216:17
paragraph 71:23 93:9 124:23
  287:15
paralegal 144:2
paraphrasing 258:5
Pardon 17:23 81:7 144:16
  277:16 302:12
parent 5:18,19
parentheses 288:6
pari 143:10,11
part 14:5 28:13 30:15,16 32:12
  53:15 56:19 57:24 68:3 77:1
  82:25 109:15 115:6 124:22
  159:8 167:21 174:14 185:15
  199:13,19 203:21 217:13
  259:10 267:15 287:13 288:11
  303:17,17
participate 117:10
participated 68:13 199:5 278:20
participating 79:19 249:10
participation 59:8
particular 12:7,8 25:9 67:14
  73:16 74:18 75:2 79:13,17
  80:10 95:15 101:23 102:3
  107:24 108:17 109:23 110:21
  110:25 145:19 176:8 194:7
  208:20 232:4 278:20 289:19
particularly 131:2 138:5
parties 34:2 82:18 125:1
party 146:5 204:15
pass 9:16 301:2
passed 205:13
passenger 151:23
past 121:23 126:9 140:4 164:21
  165:3 174:6 204:7 254:3
  255:20 257:15 282:15
**PASTOR-HERNANDEZ** 2:5
  311:11
Pat 178:6
patch 24:8 93:13 94:13,14
pathways 168:4
patient 7:4 9:19,19,22,25 10:1
  36:10 39:12 40:10 43:8,12,25
  44:1,6 45:19 46:6 47:18 48:11
  48:23 50:12 51:7,13 54:10
  59:17 65:4 66:5,6,7,11,20,21
  66:25 67:2,3,7,9,14,17 86:6,6
  96:7 98:12,12,14,14,16,17
  101:2 103:11,17 105:7,19
  106:5,10 107:2,5,7,9,11,14,16
  107:19,24 108:12 109:2,16,19
  110:7,15,15,19,20 112:4
  113:3,6,6 119:14,17,21 120:6
  166:17 167:5 168:9,10,13,14
  168:25 169:7 187:22,22,23,25
  188:8,12,16,20 189:2,7,8,11
  190:3,3,6,11,23 191:10,20
  192:1,2,3 193:1 195:18 196:4
  197:11 199:12,24 200:14
  202:3,16 208:14,14,16,17
  209:5,5,6 211:23 219:7
  224:25 225:22 235:23 237:9
  237:10 238:10 263:13 264:7,9
  273:22 274:2 280:4,6 295:20
  295:21 296:2,2
patients 14:3 27:17 36:6 38:18
  39:20,23 42:5 54:24 57:19
  65:7,10,12,17,18,1 9 69:10,12
  69:25 70:1,17 71:14 72:18
  73:15,17 77:8,22 78:23 99:18
  99:20,25 100:2,9 101:23,24
  102:1 108:16,19,25 109:12
  112:6 113:25 114:1 116:16
  120:4,7 133:14 135:11 168:25
  169:4 173:4 179:11 182:13,17

182:20,21,22 183:4 184:14,18
  185:19,22 187:17 189:9,13,15
  190:20,21,24 191:25 193:5,6
  195:15 196:2,8 197:8,8 198:9
  198:16,22 199:19 200:4,9,15
  208:9,25 209:2,19 210:19,21
  211:23 213:11 216:19 218:16
  218:21,22 225:13,15,19,24
  226:21 235:6,7,8 238:18
  239:4,7 272:24 274:4 304:11
patient's 49:4 66:9 100:18
  103:12 114:8 167:9 187:24
  188:23 191:15,18,21 195:19
  208:18
patient/doctor 98:19
Patrick 175:24 183:20 282:7
pattern 108:5 293:22
Patterns 293:17
Paul 237:1
pay 31:5,16,20 36:6,10 37:5,7,10
  37:12,12 46:7 52:21 53:4
  64:25 65:4 66:1,3,5,6,6,9,15
  67:2,16 75:7,9,10,11 79:23
  80:2 97:12,22 98:1,6,7,8,23
  99:14 103:9 104:25 105:13,15
  113:11 184:14,17 199:4 211:2
  211:12,16,2 4 218:15 222:2,8
  238:14 239:15 248:7,15,18
  263:22 273:1,7 274:16,18,21
payer 57:21 201:18
paying 34:9 36:12,19 47:12 51:2
  67:11,12 75:1,14,14 78:24
  79:1,3 80:8,10 125:25 171:19
  173:4 179:6,21 182:23 185:18
  185:22 192:13 195:15,18
  197:5 199:18,21 200:3,15
  211:10,11 218:20 219:5,13
  238:22 239:14 273:2
payment 7:3 40:14,17 48:2
  52:21 59:2,13,25 99:13
  171:20 190:12,13 215:5
  217:17 219:9 246:22 247:6
  287:13 288:1,10
payments 39:7,17 40:5,19 41:22
  41:25 42:2,4,8,11 52:24 97:13
  97:17 176:7
payout 87:9
pays 305:11,11
PCA 39:21 40:20,22 41:4,5,9,22
  42:5,12 69:1,14 76:17 83:5,6
  83:19 89:20,23 91:5,6,7,9,11
  91:17 92:18 94:24 97:4 100:7
  153:7 167:11,22 169:22 170:4
  171:18 173:8 174:11 176:17
  177:10,19 178:15 179:1,11,17
  179:17,21 180:3 181:7,19,21
  182:6,17 184:9 203:19,21
  226:11 239:14,15 292:1
  295:17,19 299:6
PCA's 69:14
PDFs 20:15 102:22
pen 112:8
pennies 92:9,10,19 93:2
penny 46:15
people 12:13,14 26:6 31:23 39:1
  39:23 43:15 46:10 48:7 70:16
  72:23 73:1 74:20 75:14 80:4
  87:23 95:13 96:4 101:10
  102:7 111:7 120:7 121:6
  140:22 145:15 154:2 166:18
  191:7,8 192:21 202:1 203:21
  209:17 210:7 213:5,21 221:20
  224:9 255:11 260:9 265:23,23
  267:4,7,12 271:11 282:2,12
per 19:10 23:25 72:6 84:4,15
  85:15,24 86:17 87:5,6 90:6
  93:2
percent 24:2 42:6 43:14,15,15
  43:23,24 44:14,20 45:8,21

46:1 50:7 55:3 74:10 76:22
90:10,11,19 113:21,23 114:12
114:13,21 115:9 116:5 193:9
198:7 210:6,7 211:5,6 214:15
214:25 215:1
**percentage** 38:6 43:23 51:15
76:22 176:11
**percentages** 76:19 116:16
**perfect** 309:14
**perhaps** 13:19 57:20 150:8
167:3 170:22 235:22 295:8
**period** 28:3 36:5,9 213:14 277:6
**permission** 34:1 96:17 135:5
144:22 145:24 159:10
**Perry** 16:9
**persist** 245:10
**person** 29:22 67:6,13 70:14,15
108:17 147:16,21 168:22
176:19 188:3 191:15 199:12
204:9,12,13 205:5 221:20
269:8,11
**personal** 104:7 252:14,19
**personally** 109:7 197:10 265:15
265:17 276:20
**person's** 177:7 188:3
**perspective** 254:8 288:16
**pertinent** 126:20
**Pharmaceutica** 86:7 88:10,13
94:13 95:18
**pharmacies** 24:7 77:21 78:1
79:9,10,19 87:24,24 88:17
89:8,10 93:12,21 94:4,10,11
94:16,17,17 95:5 187:5
223:18 224:4
**pharmacist** 23:21 83:19 90:1
**pharmacy** 13:22 38:19 49:7,18
49:23,25 65:23 79:4,6,13
80:10 84:20 86:19 87:6 89:6
89:11 91:4,5,23 92:4 93:7
97:25 100:14 102:9 109:11,25
166:20 167:1,12 168:25 169:4
170:23 172:1,15 176:20
179:12,14 185:18,21 186:3
187:25 188:9 189:23,23 190:2
194:5 195:7 196:17,18,22
197:6,15,22,24 198:1,3,18,22
198:24 199:2,6,16 202:15
208:17 209:4,18 213:16,20,23
214:3 216:4 218:23 222:18
225:6 226:18,23 237:7,13
239:3,8 246:16 248:14 251:9
252:5 259:15,16 260:7,16
268:12,25 270:3,5 282:2,6,13
294:21 304:9,13,16 307:15
**phone** 46:8 85:15,22 96:3
106:12 142:14 146:3 196:14
241:17 245:8 246:4,5 248:9
248:17 250:10 251:3 261:22
264:5 269:8,11 270:17 271:8
272:21
**phoned** 241:14
**phones** 145:25 251:20
**photograph** 51:18
**phrased** 192:19
**physical** 107:1 258:15
**physically** 246:2
**physician** 65:20,22 67:8 72:19
73:7,10 97:24 105:6,18
107:17 110:23 113:5 114:4
119:15 121:20 187:23 189:19
189:19 191:9,10,11,18,19
219:4 243:10 264:4,19 265:12
**physicians** 65:13 68:19,20 69:13
70:2,17,18 72:21,24,24 77:15
77:20,23 79:12 94:19 112:6
187:21 191:24 209:1,2 211:22
274:7,10 304:11
**pick** 23:4
**piece** 257:10 302:24

**pills** 274:4
**piqued** 242:13,15
**Pizza** 177:15
**place** 18:16,17 29:19 39:14
83:13 139:20 147:16 162:20
192:7 218:4 237:2,4 277:6
**placed** 28:5
**places** 218:3
**Plaintiff** 1:5
**plan** 16:1 156:21 299:3
**play** 45:4 135:21,23 137:24
147:3,6 229:7,17,18,22,24
230:3,6,8,13,15 231:14,16
232:4,18 236:20 292:23
**played** 45:5,6 147:25 148:6
229:13 232:24 234:9
**player** 44:24
**playing** 114:22 149:9
**plays** 230:7
**pleading** 141:9 143:2
**pleadings** 141:15
**pleasant** 268:13
**please** 5:2 10:16 77:2 83:23
122:15 164:10 189:3 192:20
192:20 213:2 231:12 238:17
238:19 240:2,4,18 275:7,16
279:11,15 283:19 284:2,4
**plenty** 226:5
**Plexus** 267:14
**PLLC** 2:1
**plug** 19:5
**plus** 31:16 79:23 242:7
**pocket** 31:17 79:24 115:23
274:18
**pocus** 17:21
**point** 8:20 13:17 31:2 40:22 41:6
41:9 60:19 73:6,8 75:9 79:1,4
97:11 106:23 110:13 113:9
115:16 126:6 127:20 130:7
139:23 146:22 170:14 175:3
178:18 182:20 184:3,21
185:20 195:24 200:1 201:21
203:13 213:22 216:10 224:1
224:15 227:18 228:1 229:4
232:6 255:2 272:20 283:8,11
294:9 296:5 299:16,17 300:13
309:24
**points** 115:18
**poison** 155:19
**policy** 239:8,14,15
**politely** 31:4
**portal** 100:17 106:19 112:3
198:2
**portals** 100:10
**portion** 51:2 61:7 77:22 230:6,7
**portions** 138:11 140:22 229:23
230:8
**portrayed** 52:16
**POS** 58:22
**position** 14:21,23 47:19 53:2
62:14,20 129:23 142:8 233:5
307:18
**positive** 100:16 213:25 224:17
225:17
**possession** 258:15
**possible** 180:5 202:14 272:1,3
310:2
**possibly** 107:8 108:1 113:14
201:2
**post** 34:12
**post-trial** 306:18
**pot** 57:17,18
**potential** 66:24 70:14,17 71:25
74:19 200:9 213:11
**potentially** 67:20 70:18 166:19
185:17 191:4 225:9
**Powell** 38:23 44:5,5,6,8,10,10,13
44:15,17 45:18,23 177:13
179:16,22

**Powell's** 45:10,16
**power** 146:12
**practical** 302:8
**practice** 69:23 226:10 273:23,25
282:17
**practices** 260:25
**practitioner** 107:4,9 108:18,20
108:25
**practitioners** 108:23
**praised** 148:18
**preaching** 226:16
**precisely** 36:18 297:9
**Precision** 62:10 63:20 64:4,22
64:24 65:1,5,24 66:11,14 67:3
69:18 218:4,7 276:8,10,15,17
276:24
**Precision's** 62:17
**preclude** 154:5 293:24
**predate** 28:5 152:6
**predated** 29:13
**predicate** 147:12
**prefer** 231:18 292:8
**preferable** 258:5
**prejudice** 26:2,4,21 35:10
**prejudiced** 7:20,22
**prejudicial** 16:6 128:22 129:21
129:21 130:13 295:3
**prepare** 25:25 287:2
**prepared** 26:24 170:5,11 298:2
307:5
**prepayment** 36:25
**prescribed** 236:22 243:17 244:1
244:3
**prescribing** 211:18
**prescription** 36:12,13 47:6
65:22 72:2 98:14 104:2,24
105:8,14 107:20 108:22
109:25 110:7,14,17,18,20,25
113:7 117:16 119:5 121:19,21
167:5,8 191:11,20 193:10
196:8 206:12 208:15 209:4
211:12 219:11,13 224:13,16
224:20 237:7 246:5 248:7
264:20 265:13 273:7
**prescriptions** 70:3,19 79:12,17
91:16 97:25 100:12 102:7,21
103:23 107:21 111:2 112:12
112:20 113:24 132:11 166:6
166:14 168:1 179:6 190:19
194:11 210:8 211:3,3,17,20
212:21 215:2 218:24 224:10
226:19 241:19 245:4 260:18
263:23 272:23 273:2
**presence** 15:11 148:20 152:17
159:4 205:20
**present** 5:3 35:22 59:24 165:24
217:16 283:22 298:6
**presented** 59:24 83:6 198:21
202:21,24 217:17
**presenting** 68:19 298:19 302:10
**preserve** 161:5 303:22,22
306:11 308:16
**preserving** 29:7,9
**president** 55:15 89:22
**presumably** 27:16
**pretending** 208:13
**pretty** 30:25 78:23 114:13 130:5
137:8 141:8 149:22 198:18
252:6 309:17
**prevent** 29:5
**previous** 215:4 235:16
**previously** 39:4 41:14 77:21
102:14 109:8 132:20 243:12
249:9
**pre-date** 34:11
**pre-dates** 28:3
**price** 23:25 24:1 84:13,25 85:12
85:15,24 88:16,18 89:7
193:25 221:18,19 223:22

**prices** 88:7,7,12
**pricing** 83:23
**print** 226:20
**prior** 11:14 40:1 62:8 138:5
142:1,4 146:24 147:1 160:6
161:4,6,8 210:22 216:25
217:3 242:18
**privacy** 167:6,9
**private** 95:21 166:17
**privileges** 61:21
**pro** 36:14,18 97:13,15 113:11
143:10 211:13
**probably** 5:19 21:17 22:7 32:25
33:11 35:15 107:6 126:11,13
130:2 140:15,16 148:10 150:2
152:13 158:21 159:9 162:8
204:5 205:12 217:8 222:11
230:10 249:1 250:13,18 251:6
253:17 258:7 259:25 278:11
295:2 298:2,18
**probative** 130:14
**probe** 271:23
**problem** 29:4 66:24 81:14 92:18
132:5 139:11,12,15,16,17
152:15,20 157:7 234:2 272:2
**problematic** 235:22
**problems** 154:16 201:15 231:4
301:10,11
**proceed** 207:9
**proceeded** 52:21
**proceedings** 1:10 5:1 159:3
311:9
**proceeds** 207:22
**process** 66:16 77:18 93:23 95:20
106:23 176:6 177:3,8 215:25
294:22
**produce** 95:22
**produced** 18:12,14 32:16 38:13
88:11 94:16
**product** 23:20,23,25 49:25
66:20,21 67:5,14,17,18 69:21
71:24 72:3 78:3,4 83:7 84:23
85:3,19 87:18 88:9,11,16,16
88:24 89:3,6,8,10,25 90:3
91:5,17,24 92:24,25 93:3,5,6
93:16,17,19,23 94:3,4,5,7,15
94:21 95:2,4,5,12,15,25
109:16 110:3 179:10 188:21
189:3 191:3,10 193:19 202:17
221:24 222:11,16,24 242:13
245:18 246:6
**production** 32:13
**products** 63:5 65:1,5,11 67:3
68:19 69:20 85:6,7,8,11,12
87:13 89:2 190:14 208:11
221:22 222:10,16,25 223:4,7
242:22 243:23 244:11,13,14
244:15,16,19 245:10,16
246:11,23 248:1 252:4,23
254:10 262:6 264:1,13,15,20
265:11,16,23 266:20 267:5,7
267:9,10,1 271:11 274:14
276:3
**profile** 103:11,17 105:14 106:5
107:19
**profiles** 112:11
**profit** 49:23 50:1,5,6,7,17,24
**profitability** 222:24,25 223:3
**profits** 51:9 115:13
**program** 15:2 56:9,16,16 57:12
57:25 58:4,22,25 59:4 76:19
77:8 80:12 178:12,14 184:23
186:2,12,13,17,18 188:7
189:13 190:16 195:13 197:9
197:13 198:15,20 199:8,9,13
199:15 200:9 215:4 220:5,21
220:21 221:3,4 247:20 278:20
287:14 288:12
**programs** 54:15 178:13

prohibition 82:20
prohibitions 82:13
prohibits 20:24,25
promise 58:4 285:7
promised 9:20 10:1 246:22
  309:11
promote 252:4
promoting 253:2 271:10
promotional 262:6,11 265:19
pronouncing 308:3
proper 110:17,23 196:21
property 51:18,20,22 52:2,5,10
  52:19
proponent 15:20
propose 293:14,16
proposed 286:14 288:23 289:6
  289:10 290:6 291:3 300:22
prosecutor 128:3,4 134:8 138:4
  290:21
prosecutors 130:2,8 141:20
  204:18 309:20
prosecutor's 207:1
protect 167:9 291:4
protected 173:15 290:9
protocols 110:17
prove 115:21 206:21
proves 113:10
provide 36:23 39:23 63:1 94:6
  94:20 106:18 107:13 202:2
  206:16
provided 13:2,3 18:10 32:6 37:5
  40:25 77:13 79:11 82:11 86:6
  94:18 98:4 100:11 131:5
  141:25 142:7 209:4 213:21
  216:3
provider 54:12,23 57:19
providing 173:21 209:17
publish 75:23
publishes 282:25
Publix 260:15
pugilistic 131:17
pull 210:14
pulled 41:18 114:21
purchase 89:9 207:18
purchased 51:21,22 203:10,11
  207:17,20,21
purchases 203:3 207:19
purchasing 96:5 203:14 207:13
purported 202:25
purpose 14:16 27:19 147:15
  282:9
purposes 26:7 262:19 266:8
  282:13 287:15,16
pushes 300:12
pushing 244:20
put 15:2 18:17 22:3 38:9 46:12
  51:16 52:1 53:1 88:20
  114:20 121:3,7,7 135:24
  139:23 154:8 155:18 156:23
  159:16 162:11,1 216:14
  229:5 237:5 288:6 290:6
  297:8 307:16
puts 115:22
putting 37:15 139:17 217:25
  229:21 287:22
p-01 103:21 104:10 107:21
p.m 159:1,3 164:11 230:25
  231:25 284:3 311:5

Q
QMed 83:14
qualified 67:14 172:1 264:13
qualms 266:19
quasi 291:11
question 11:24 13:11 41:8,11
  73:2 75:20 78:8,14 96:7
  110:13,14 111:12 115:20
  121:5 126:3 127:3,4 129:21
  129:22 130:12,16 162:1,18
  165:6 167:3 168:20 173:3
  175:4 190:8 192:20,22 194:19
  194:20 203:7 218:3 221:23
  225:8 243:24 252:15 253:21
  257:13 258:4,19,20,24 259:8
  259:14,18 263:4 273:4 277:9
  277:14 284:7 291:9 292:22
  297:8
questioned 151:24
questions 21:10 27:24 63:5
  111:14 119:11 125:22 134:15
  134:23,24 135:16 136:25
  137:2 151:14 167:16 197:17
  202:20 209:10 210:5 212:12
  221:9 224:25 225:6,8,12,25
  227:24 233:12 250:6 251:13
  254:25 264:12 271:16 272:6
  284:10
quickly 154:18 164:2 247:8
quid 36:14,18 97:13,15 113:11
  143:10 211:13
quiet 24:5 93:10
quit 31:21 80:3 170:5,11,21
quite 52:15 77:15 114:13 266:4
  273:5
quo 36:14,18 97:13,15 113:11
  143:10 211:13
quote 9:7 124:24,24
quotes 188:14 258:22

R
R 311:7
raise 132:18 146:22 225:10
  240:4 275:7 279:12 290:13
  299:18
raised 206:25
raises 293:19
Ralph 13:24 109:11
Rambaran 40:17,20 177:15
ran 37:4 99:9 235:5
random 210:14,24 230:2
randomly 189:14
ranks 157:6
Rashaan 177:15
Rashbaum 1:19,20 3:6 8:6 10:8
  10:14,21 12:6,9 51:17 52:16
  70:23 73:25 75:25 80:21,24
  81:1,6,8 89:15 99:4 111:12,25
  122:3 123:19 124:15,19
  128:10,12,15,22,2 5 129:3,7,11
  129:15,1 7 131:12,15,19,21
  133:10,17 134:12,16 138:1,7
  138:10,22 139:2,11 141:5,8
  141:11,17 143:20 144:4
  148:21,23 149:4,6,8,12,14,20
  157:10 158:9,12,15,19,21,25
  161:4,7,10 192:15 204:2
  205:22 206:8 207:6,9,12
  210:2,4 212:1,3,6,10 216:22
  216:23 222:7 227:22,25 229:4
  229:7,15,20,2 4 230:3,12,14,17
  231:1,15,2 1 232:6,15,17,25
  233:12,18,21 235:16 239:22
  277:15,17,21,23,2 5 278:4
  290:19 291:13,16,20,2 4 294:5
  294:9,13,20 295:11,15,17,20
  295:23 296:1,4,22,2 5 297:3,7
  297:23 298:13,22,2 5 299:3,23
  307:2 308:24 309:5,7,17
rate 113:21,23,24 114:12,13,14
  115:9
rather 78:12 160:14 226:20
Ray 1:7 3:4
reach 98:17
reaching 73:16
read 9:9 23:13 30:17 56:4,4,19
  58:19 60:12,14,16,18,24 61:2
  61:6,22 62:2,5 71:8 74:13
  76:11,11 77:2,2 80:6 82:15

89:24 104:5 110:8,10 119:10
  119:11 142:9,17,20 143:14
  173:23,24 174:4,6,9,10,12,14
  176:21 181:5 191:24 193:3
  217:13,14,14 265:19,21,21
  283:18,21 286:21 290:1 296:8
  298:17 302:21,23 303:16,16
  303:18,19 308:5,6
readers 71:25
readily 245:12
reading 25:15 56:23 58:17 61:14
  71:17 79:20 93:9 110:12
  139:13 286:17 302:21,24
  306:25 307:24 308:3
reads 23:19
ready 33:7 161:18 164:9 170:21
  238:15 298:7 307:18
real 175:8,10,1 1 177:19 188:23
  191:15,21,21 192:25 240:6
reality 127:10
realize 247:6
realized 39:25 47:14,24 75:13
  215:9
really 15:23 16:3,13,13 19:25
  26:2 28:16 30:20 34:3,4 65:9
  67:1 68:4 74:10 77:19 88:3
  116:7,19 126:18 127:5,6,7,11
  130:21 131:5 140:17 150:9
  151:6 152:23 155:6 158:15
  160:16 166:22 167:14 168:6
  172:4 176:25 202:14 225:5
  230:10 253:18 259:23 264:22
  280:8 285:2 298:4 304:25
realtime 223:2
reapply 249:4 269:3,5 270:6,7,8
reapplying 270:2
reason 24:10 26:5 41:3 42:1
  51:5 53:20 79:7,13 105:20
  107:3 148:4 206:9,16 214:7
  278:21 301:16
reasonable 142:22 143:18
  164:25
reasons 36:21
rebate 288:2
rebuttal 3:8,12,14 24:21 156:20
  157:9 239:25 240:15 275:14
  279:7,21 285:8 310:5,7
recall 12:1,5 92:13,13,1 6 102:10
  109:6,20,21,2 2 111:1,4,5
  117:4,15 120:19 166:6 188:22
  189:11 190:22 192:11 193:2
  194:25 207:15 208:1 209:21
  209:24,25 210:10 212:11
  214:10 217:1,10,1 1 218:5,11
  218:15 219:18 221:10,14
  223:12 224:7,19,22 225:1,13
  226:1 246:13,15 250:15 252:5
  255:3,5,17 258:1 259:5,7,12
  259:24 260:11,19 262:3
  264:10,11 271:12,13 276:14
  282:5,5,6
recapping 261:18
receipt 287:25
receive 87:16,17 102:6 121:22
  244:15 245:15 259:4 276:23
  277:7,13 307:14
received 4:2 17:2 23:5 35:16
  42:1 44:13 49:7 67:10 70:2,25
  74:2 76:2 81:16 89:17 99:6
  101:13,25 102:7 105:1 106:23
  108:15 111:2 116:4 117:12
  118:1 119:10,13 127:16 138:6
  188:5 203:19 207:8 208:22
  212:9 213:2 232:11 234:4
  236:11 246:4,14 247:21
  248:19 261:13 262:10 267:22
  270:22 272:21,22 277:5 281:4
  304:9
receives 9:15 46:1

receiving 34:9 136:23 262:4
  268:7 304:11,12,12,1 6 305:9
recess 8:14 159:1 231:3
recipients 183:15
reciprocal 57:9 82:18
reckless 60:1 217:19
recognize 38:22 43:25 70:10
  73:19 74:6 75:19,20 112:1
recognizes 292:11
recognizing 287:2
recollection 111:11 187:19,20
  253:12 257:5,7,9 258:24
  270:19 271:24 280:18 281:7
reconfirm 110:12 209:20
record 29:8,9 44:3 45:15 46:24
  56:4 71:5 81:25 89:24 104:1,5
  106:3,4 145:8 153:18 154:3
  260:6,6 303:22,22 309:19
recorded 145:5 148:1 149:15,19
  149:21 150:12,15 152:7 155:9
  228:1,6,7,9,12,13,15,18,24
  232:13 236:8
recording 147:10 149:16,16
  152:21,23 154:22 229:5,8,9
  229:24 230:15,18 232:23
  237:22
recordings 151:13 153:19 154:7
  228:22 229:13 233:1,5,23
  234:10,12,15 237:17,20,21
records 125:14 129:19 215:24
  216:19
recross 229:18 233:13
Recross-Examination 3:7 234:7
recruit 70:16 187:17 254:12
recruited 193:5 238:11
rectify 172:22
rectifying 180:9
red 31:19 80:1 169:22 170:5
  171:22 225:10
redact 140:16 156:4
redacted 155:25 156:3
redirect 3:6,11 141:4,18 143:19
  204:1 205:14 207:11 229:18
  272:7,13
redone 79:8
reduce 157:14,21
reduced 30:22
redundant 13:16,18
refer 27:8 40:10 132:2,4 272:24
reference 44:4 147:6
referenced 187:11
referencing 237:14
referral 42:4 213:5 241:14
referrals 31:6 38:8 82:13 213:11
  213:21 214:4,6,8
referred 39:20 91:9,10,20,24
  139:22 241:14 286:14
referring 78:23 105:25 112:3
  137:7 169:13,19 172:13 184:7
  196:4 223:12 236:24 281:7
refilled 72:3
refills 104:21 107:22 108:6
refinance 52:19
reflect 309:19
reflects 44:20 45:18
refresh 136:15 256:6 257:5,7,9
  280:17 281:6
refusals 114:11
refused 75:7,15 98:13 113:2,3,5
  113:8 114:7 210:25 211:3
  219:8
refusing 109:16
regard 93:20 178:6 181:7,17,18
  181:19 197:14 215:20 237:16
regarding 14:10 15:7 25:14
  134:9 214:18 225:25 290:2,14
  297:22
region 242:4,6 244:7,9 253:2,4
regret 30:22

**regroup** 23:1
**regular** 92:5,19
**regulations** 56:15 58:3,12,15,19
58:21,25 59:4,20 82:10,12,19
282:24 287:3
**reimburse** 79:6,15 179:8
**reimbursed** 44:14 49:16 79:16
84:22 92:12,13,19
**reimbursement** 23:23 42:6
45:10 49:11 50:15,20 84:18
90:4,6 193:22 194:17 223:22
**reimbursements** 88:5,22 91:2
184:9 222:20
**reimburses** 93:3 223:7
**rejection** 115:9
**related** 11:15 82:10,12 123:14
160:24 253:18 267:9
**relation** 286:7
**relations** 123:6
**relationship** 120:6 189:15
218:24 239:1 287:11 288:9
**relationships** 77:16 78:5,7 79:11
**relax** 143:22 164:13 263:4
**released** 154:1
**relevant** 15:3,4,5 28:3 29:6
133:10 134:11 138:12 140:17
284:8
**reliable** 197:24
**relied** 292:3,14,2,2 295:8 296:2,3
297:7,10
**religion** 20:24
**relitigating** 130:21
**rely** 62:6 175:17,22,2,3 180:18
227:1 292:16 298:5
**remain** 82:8 231:12
**remainder** 18:5
**remaining** 165:22
**remember** 41:19 51:18 60:18
64:4 83:18 97:16 102:12
111:6,7 117:1,10 118:12,16
118:17 136:8,21,22,23 137:1
137:11,17,19 158:18 161:13
161:13,14 162:4 163:16 164:2
171:5 180:23 188:14,18
193:23 194:11 199:10 200:24
202:21 203:1,5 204:6 210:5
216:24 224:18 248:23 250:23
255:14,15 256:7 257:8 258:4
259:1,9,11,18,2,3 260:6,7,13
260:14,15,21,22,2,5 262:21
263:3 268:9,11,11,1,2 273:17
276:7 282:7 290:23 307:17
308:2,25
**remembers** 163:15,15
**remind** 214:18 257:10
**reminded** 96:9 204:6
**reminds** 292:25
**removed** 14:5
**remuneration** 287:9,23,24 288:1
288:1,4 307:14
**render** 283:4
**renew** 285:18 286:10 303:23
308:15
**renumeration** 286:22
**rep** 38:5 39:12 48:13 54:9 64:9
72:8,10 73:14 190:13,25
200:11,17 201:11,20 225:21
252:2 254:9,13 263:11 266:3
266:13 267:8 268:2 269:9
271:10 276:24
**repeat** 121:14 192:20,22 288:1
**repeatedly** 25:20 149:24
**repetitious** 204:5
**rephrase** 227:19 269:13,15
271:24 283:13
**rephrased** 284:7
**replacements** 276:2
**replay** 230:8
**report** 48:19,20 108:19 109:1

153:19 193:2 206:2 235:18
**reported** 2:5 9:11,18 53:17
109:3 125:11 186:4
**reporter** 2:5 78:11 122:19
144:14 147:23 149:1 232:21
252:16 255:6,11,17 272:12
284:23 302:24 311:12
**reporters** 146:9 308:1,4
**Reporter's** 3:16
**reports** 9:10 205:25 216:3
**represent** 93:25 280:6 282:3
294:14
**representative** 41:10 47:17
62:15 64:1,5 70:16 71:24
120:9 179:15 191:1 202:9
213:10 227:11,15 251:18
**representatives** 40:23 41:7
43:21 48:6 120:8 176:13
177:6 178:8 182:19 183:5
189:15 216:7 225:23
**represented** 95:19 151:17
241:18 259:3 282:15
**represents** 38:17 39:7 44:13
50:9 82:7
**reps** 30:12 37:18,21 38:9,17 39:8
39:11 43:9,12 46:13 64:16
116:16,17 182:16 183:1
184:13,17 185:16 220:17
225:12,15,15,16,1 8 253:9,13
253:22 276:18
**reputation** 130:4
**rep'ing** 182:18 183:2,6
**request** 59:14 67:7 106:9
**requested** 186:4 298:3
**requesting** 107:25 108:8,13
119:23
**requests** 63:12
**require** 8:11 16:21 22:10 37:7
98:3 130:9 197:4
**required** 36:22,25 55:2,4 63:17
63:21 110:18,22,22 178:19
293:20
**requirement** 63:14 97:21 225:21
**requirements** 56:7 57:1
**requires** 56:13
**requiring** 15:7
**research** 100:2
**resent** 79:18
**reserve** 162:12
**reserved** 162:9
**resign** 52:20
**resolved** 53:17
**respond** 142:18 213:4 219:1
302:5
**responds** 84:25
**response** 30:10 31:10 84:3 85:13
139:8,13 141:19 149:25
151:15 291:9
**responses** 19:8
**responsibilities** 174:25 175:13
177:4,7 194:7
**responsibility** 55:19
**responsible** 67:7 110:16 120:7,9
123:4 124:7 125:25
**rest** 45:12 108:2 285:8,17
309:22
**restaurants** 162:12
**rested** 18:3
**restrain** 10:19
**restrained** 298:19,20
**rests** 239:22
**resubmitted** 199:14
**result** 51:8 101:14 193:7,9
294:24
**results** 113:21
**retired** 122:13 230:25 284:3
**return** 53:18 86:9 125:3,5,6,24
211:23 239:6 248:16
**returned** 35:19 119:19 231:25

**returns** 123:1
**reversed** 303:17
**review** 10:24 11:3,6 37:20 203:7
**revisionist** 142:15
**revolved** 178:21,21
**Rick** 79:15 95:13
**rid** 22:23
**right** 10:11,15,20 12:11 15:13,13
16:11,11,11,1 6 17:9 19:9 20:5
20:8,8,19 21:23 22:2 24:14,25
25:1 26:11 30:3 34:23 33:8
34:9,21 35:9,17 36:14,20
37:14 38:3,12,14 43:5,9,10
44:20,21,25 45:16,17 46:4,5
46:15,19 47:13,20 48:3,13
49:5,7,9,10,12,14,16,17,19,21
49:23 50:2,3,7,10,11,12 51:13
51:21,24 52:3,13,13,6 54:1,4,8
54:16,24 55:5,9 56:1,11,20
57:3,6,13,14,15,16,2 5 58:4,23
59:14,15 60:3,6,7,13,17,21
61:10,20,24 62:2,10,15,18
64:17,24 65:11,15 66:1,7,8,19
67:5,6,11 68:1,11,14,22,23
69:1,7,8,11 71:15 72:11,25
75:18 76:9,17 77:14,23 80:12
80:13 82:5 83:5 84:4,10,13,15
84:18,22 85:17,1 8 86:12,21
86:22,25 87:9,13,19,23 88:25
89:1 90:18,21 92:7,10 93:1
96:11 98:9 101:15 102:1
103:14,23 109:13 111:13,18
111:18,20,23 112:12,13,20,24
112:25 113:1,7,9,11,12,13,21
114:6,7,13,25 116:5 116:13,16
115:22,23,25 116:13 117:20
122:8,9 123:21 124:13 127:21
128:2,5 129:6 132:15,24
133:21 134:4,5 137:17,25
140:4,24 141:6,10 142:23
143:24,25 145:7,20,22 146:13
146:20 147:16,20 148:14
149:7 150:1,2,8,18 151:5
153:11,25 154:14 155:13
156:1,5,18,18,19,2 1 157:4,9
158:23,24 159:5,8,25 160:13
161:24 162:20,24 163:12
164:3,7,13,20 165:7,13 166:1
168:1 170:9,12 171:4,21
172:23 173:2 174:18 176:5,17
179:3,6 183:22 184:23,25
185:2,3,4 186:24 187:13
188:17 189:9 190:10,25 191:6
193:10 194:24 195:2,5,8,9,13
195:22,23,24 196:23 197:4,5
198:9,12 199:16 201:1,5,8,9
201:12,2,5 203:23,24 204:1
205:13,14,2,5 206:3,20,25
207:4,7 209:3 229:6,10
230:21 231:2,5,10 232:3,14
232:20 233:23 234:24 236:9
237:11 240:2,3,4,13 246:15
252:22 253:3,9,2,5 254:2,2,20
254:23 256:15,19 257:1
259:20,23,2,5 260:19,24 262:3
263:14 264:1 266:2,8,25
267:17 268:1,9 270:11,21
271:23 274:24 275:7 277:10
278:7 279:13,19 281:22,23
284:15,17,23 285:6,10,11,13
286:15,16,23 287:6,20,22
289:18 290:23 292:5,9,19
294:4 295:2 298:15,22 299:11
300:19,23 301:12,20,22
304:20,22,2,5 305:6,19 306:4
306:10,15,1 6 308:15 309:10
309:20 310:25 311:1
**ring** 192:4

**rise** 122:12 230:23 284:2
**risk** 31:18 79:25 219:2,5,9
**risky** 80:12
**RL** 31:9
**Robinson** 237:1
**Rodan** 267:14
**ROI** 86:2,9
**roll** 27:11
**Roman** 82:2
**room** 31:15 46:14 47:20 79:22
122:10 284:1
**Rosalinda** 40:17,20
**rosy** 52:15
**roughly** 41:22 51:4 53:20,25
**routing** 247:2
**RPR** 2:5 311:11
**rule** 16:21 22:12 26:4,6,9 142:5
147:15 256:16,19,2,0 301:7,15
**ruled** 278:21
**rules** 15:7 58:3,11,15,1 8 59:10
59:20 82:19 167:18 177:9
202:1
**ruling** 160:25 161:1
**rulings** 11:14
**run** 87:2 165:15 207:18
**running** 174:8 303:25
**rush** 279:12
**RX** 9:21 24:3 37:25 90:10
198:24
**RX's** 167:25
**Ryan** 30:7,10,11,11,13,17,19
31:10 54:6,9 68:21 72:10,16
72:25 74:17 75:8 76:6,15 77:1
79:20 119:12 120:10,12,14
ryanlong1234@yahoo.com 76:6

**S**

**S** 121:4,8
**safe** 132:14 171:24 172:1 173:14
174:14,16 182:12 274:25
279:1 283:8 286:13 304:16,19
304:23
**safest** 298:3
**salaries** 175:12
**salary** 174:23 175:2 220:15,17
251:24
**sales** 30:11 37:18,25 38:5,17
39:8,11,12 46:13 54:9 62:14
64:1,5,9,16 70:15 72:8,10
73:14 82:5,7 83:6 87:25 88:8
94:21 116:16,17 120:8,9
176:12 178:8,13,17 179:15
182:16,19,21 183:1,5 184:13
190:13 200:11,16 201:20
213:10 216:3,7 219:17 227:11
251:15,17 252:2 253:8,13,22
262:13 263:10 266:3,13 267:2
267:4,8,15,17,2 1 268:2,15
269:9 271:10 276:13,18,24
**salesperson** 242:4
**same** 25:10 26:19 29:21,22 30:2
32:12 35:4,5 36:9 37:9 46:23
48:6 64:16,16,17 65:14 66:25
72:12,13 73:20 74:10 87:12
94:11,12 96:1 100:15 105:21
106:8 108:5 119:10 151:1,5
151:19 153:1 154:11 160:12
160:12 162:8 179:17 182:17
184:23 185:1,4 204:22 206:5
214:21 215:7 220:24 221:1
235:18 244:6 248:17 256:24
259:7,14 272:2 276:19,19
277:6,6,6 285:21 287:16
301:18 308:14
**sample** 86:1
**San** 25:2
**Santos** 95:23
**sat** 228:21 310:21
**satisfactory** 288:13

satisfied 245:2
satisfy 149:25 300:18
Saturday 17:9,10,18 21:5,6
sauce 8:9,10 95:1,2
save 286:12
saw 47:11 91:19 108:10,12
  120:23 137:9 139:5,9,13
  142:14,15,2 1 145:5 163:5
  171:12 185:5 187:1,4 188:14
  196:24 198:4 209:11 216:11
  236:15 286:11
saying 18:15 26:15 33:6 51:13
  88:4 92:14 97:16 101:20,21
  109:7,15 110:3 111:4,5,7
  117:15 120:14 127:8 137:11
  138:20,23,2 5 139:3,13 151:14
  166:10 198:22 204:12 260:20
  263:22,25 297:9
says 9:4,14,15,17,1 8 10:1 26:4
  30:10,18 33:1 37:25 39:16,16
  39:17 53:19 56:6,23 57:3
  59:13,23 60:3,5,8,11,12,14
  61:24 80:8 82:1,5,24 83:22,23
  89:25 92:8 99:11,22 101:1
  103:20 104:16 109:10 110:9
  113:2 118:3,25 119:1 124:6,8
  124:13,15,22 125:1 134:23
  137:8 138:15 139:5 150:11,15
  150:21 154:21,22 156:25
  161:12,12,24 163:23 167:24
  168:3,9 169:8 174:19 177:1
  186:11 209:11 213:1 217:16
  224:14 273:22 274:2 287:7,8
  293:18 296:12 298:8
scanning 100:19 106:20
scar 50:19 51:8,11,14 94:23
  104:13 106:16 107:25 108:8
  117:18 118:1,2,3,19 119:1,1,3
  119:6,11,22,22,2 5 121:17
  137:15 187:12,13 236:22
  237:12 242:11,18,22 243:7
  244:25 245:21 246:10 252:22
  274:19
scarring 121:8 254:3
scars 106:15 114:2 117:25
  118:11,15,19 119:2 121:9
  210:20 264:10
scary 137:8
scene 151:24
schedule 243:15
scheduled 63:14
scheme 19:23 20:1,2,3
school 82:2
Schwant 9:25
scope 277:14
screen 37:15 54:20 74:4 76:4
  112:7
script 36:10,19 37:11,12 69:20
  98:9,10,11,2 4 101:4,22 102:9
  103:8,9 105:9 112:23 113:13
  115:24 117:12,17 179:18
  187:24 189:3 192:13,25 219:7
scripted 112:22 113:20
scripts 42:5 75:8,14 77:14 78:21
  78:22 79:2,3,5,7,1 7 91:8,10
  91:15 97:14 99:20,22,23
  100:4,7 101:10 102:22 108:24
  113:12,18 115:9,14,20,22,22
  115:24 116:1,5 135:12 173:5
  179:12,12,13,14,14,21
scrubs 63:17
sc-01 103:21 104:13
Seabreeze 52:3
searches 25:17
seat 164:13 165:15 240:6 275:9
  279:15
seated 5:2 122:15 284:4
second 48:1 50:14 71:22 106:2,7
  123:21 130:1 147:9 183:17

217:6 235:11 248:21 249:1
  250:25 251:2,5,6,8 265:18
  268:17 269:18,24 270:14,16
  270:21,21 306:6
secret 95:1,2 153:19 207:1
secretary 66:3
secreted 15:15
section 1:15 56:6,13,25 82:1,2
  286:14 287:3,9,15,17,18
  293:18
sections 232:1
Security 104:6 122:12 145:2
  146:16 165:9,12,14 230:23
  231:12 284:2
see 6:5 9:16 11:11 15:6,9 18:5,9
  19:7,7,24 20:19 23:4 24:23
  25:13 26:15 29:18 31:2 37:25
  38:15,21 39:5 41:15 42:19,20
  42:22 45:16 46:3,25,25 47:22
  48:20,24 50:14 54:19 57:4
  69:12 70:10,17 71:2,23 72:24
  76:4 77:22,23 81:23 82:1,4
  85:3,13 86:1 100:22,25 102:3
  102:23,24 103:2 105:20 109:9
  112:8 118:23 122:10 124:12
  132:2 136:1,20 137:10 140:15
  141:20 142:13 152:6,9 153:10
  155:24 156:16 161:5 169:9,10
  186:24 195:10 196:18,22
  197:2 204:22 205:18,22 208:3
  209:3,11 210:25 213:6 214:16
  214:22 217:24 219:24 223:2,2
  231:23 236:13 243:23 246:2,2
  256:12 261:15,20 262:17
  263:8,14,15,1 8 264:16 267:13
  273:22 281:10 284:1 285:13
  287:3,4 289:18 290:8 291:15
  295:6 297:5 299:1 300:15,23
  305:16 307:6
seeing 137:11 192:11 194:12
  224:19
seek 159:10
seem 23:15 65:9 245:2
seemed 161:13 254:11,14
seems 20:18 41:13 85:1 127:7
  146:4 188:7 218:20 256:19
  291:11 295:10 296:11
seen 6:8 37:22 43:7 47:14,24
  124:19 156:6,7,9,10 159:23
  166:18 180:21,22 186:21
  197:1 228:21 255:20 257:16
  293:4 305:1
selected 309:12
self-exculpatory 142:2
sell 24:6 52:24 89:8 92:24 93:12
  168:23 179:10 223:16,18
  245:10 276:1
selling 31:18 68:10 71:19 79:25
  83:1 85:7 87:19 89:10 91:1
  92:22 168:21 169:3 184:8
  190:6 220:9 222:16,17 242:3
  251:20 266:19,24
sells 168:25
send 31:5 33:24 37:8 65:22 71:8
  83:23 97:25 98:5,20 103:3
  124:11 188:8 208:19 243:3
  245:13 249:5 266:15 283:14
sending 43:7 182:13 188:2
  210:18,22 266:12
sends 33:22 101:20 186:11
sense 16:22 22:4 65:9 89:4
  112:15 119:14 127:12 141:7
  153:14 172:14,17,19,2 5 173:2
  173:17,19,23,2 5 206:13 222:9
  295:7 306:17
sent 20:14 22:13 25:14 29:22
  33:7 42:24 73:9 79:8 100:4,7
  102:5,9,11,11,1 2 103:12
  105:14 112:15 113:19 118:22

118:25 169:11,15 178:10
  181:2,4 182:22 189:24 192:6
  196:25 209:1,7,19 226:12,15
  238:16 246:3 247:1 262:9,16
  263:13 266:5,7 267:22,24
  268:14
sentences 303:17
Sentencing 302:8
separate 100:10 140:18 162:23
  303:11
September 218:8 254:19
sequential 22:7
series 151:14
serious 16:3,6
service 287:12 288:10
services 57:25 82:10 111:23
SESSION 159:2
set 80:11 88:11 122:3 164:9
  202:20 221:20 230:14,17,18
  231:1,2 245:15 246:1 275:4
  293:21
sets 90:5 124:5 180:16,17 221:19
  221:21 223:22 288:20
setting 204:3 221:24 283:17
settled 299:17
Settlement 122:24 124:1,4,6,25
seven 153:18 154:1 178:23
several 43:12 75:10 103:19
  178:5,20 199:1 202:2 225:25
  243:13 246:10,10
severed 239:2
shadow 62:23
shady 188:10 189:6
shaky 260:9
Shane 43:20 44:22,22 45:8 46:1
  68:21
share 71:24 72:3 243:3 244:18
  252:7
shared 55:19 248:1
shed 18:10
sheet 86:5 103:24
shenanigans 202:6,8
shepherd 109:12
shift 300:12
ship 202:11
shipment 248:19,21
shipments 248:13
shipped 202:11
Shirley 22:15 306:24
shocked 8:22 11:19 150:4
shocking 9:5
shoot 298:17
shooting 302:6
short 141:8
shorter 158:11,12 258:8
shortly 246:3 250:22
shorts 127:24
shoulder 242:17 254:2
show 8:5,5,7 14:15 37:14 38:14
  39:4 41:14 42:18 43:7 55:10
  70:4,9 73:18 75:18 80:20
  81:13,21 83:16 88:18 99:1
  102:14 105:24 109:8 118:21
  125:14 136:14 138:5 141:2
  151:3 155:15 167:24 218:19
  222:23 235:19,25 237:8 257:4
  262:23 266:7 273:16 293:21
  296:21,24 304:15
showed 47:22 51:17 83:8 117:17
  190:2 191:2 193:11,22 203:3
  214:9,10,10,13,1 4 217:9
  218:10 219:15,16 221:5,12
  223:11 224:5 226:24
showing 48:19 103:24 106:3
  212:23 219:15 224:22 265:18
shown 5:23 256:24,25
shows 12:17 44:3 47:8 49:4,4,5
  49:9,11 55:12,15 90:6 112:10
  112:14,19 127:15 172:23

shuffling 216:17
shut 24:9 93:14,17 195:22
sic 17:19 107:22 273:17
side 8:19 131:5 289:23 295:6
sidebar 298:17
sides 13:10 23:10 160:23
sign 10:12 55:2,4,8,21,2 2 58:8
  60:24 61:4,4,7,12,13,16 105:9
  105:11 113:13 146:10 184:18
  189:3 190:6,25 191:5,19
  226:17 244:25
signature 55:13,15 56:13,23
  60:12 81:23 105:2,17 124:7
  127:14
signed 51:7 52:18,20,23 55:1,7,8
  55:9,11,21,25 56:1,3 58:7
  60:16,20 61:1,13,19,22 67:25
  80:17 81:18,22,24 110:18,24
  112:23 122:24 125:24,25
  127:14 166:20 167:10 178:11
  189:4,9 200:10,16,23 201:11
  201:19 226:15,19 244:15
significant 30:25 130:14 131:5
signing 53:12 60:23 110:16
  122:1 125:6,6 126:25 213:3
  245:2
signs 124:5
similar 69:18 74:11 87:2 153:10
  155:9,11 218:11 220:9,10
  303:7
similarities 69:2 210:16
similarly 36:9 40:9 65:4
simple 179:5 292:24 300:21,21
simplify 155:7 216:12 300:22
simply 18:16 41:11 88:15 127:12
  171:19 172:14 186:16 194:8
  208:12 211:21 216:14 218:23
  234:9
since 125:25 126:25 131:23
  133:8 143:9,10,13 146:5
  152:13 160:16 183:22 193:3
  232:1 235:24 275:3 276:6
  286:25 288:7 298:20 307:5
single 22:24 51:13 93:3 159:9
  211:19 274:18
sinister 222:23
sins 131:1
sir 53:7 105:9 146:16 164:8,16
  193:15 239:19 240:10 247:5
  249:8,18,20,22,2 4 250:4,9,24
  251:14,16,19 252:3,13,21
  254:5,17 255:1,19 259:6,13
  260:15 261:2,4,21,23 262:8
  262:15,18 263:9,12,24 264:3
  264:6,8,14,18 265:4 266:17
  269:7 270:9 271:4,12 272:17
  272:25 274:1,6,12,15,17,20,22
  275:7,12 276:4,16,22 279:3
  279:11 282:17 283:4 285:13
sit 12:5 216:2 233:9
site 235:6,8,9
sitting 26:21 114:23 131:16
  192:5 250:16,20 260:2,14
situation 24:7 48:6 52:8,17,22
  53:1 63:6 67:20 73:16 74:18
  93:13 100:21 108:24 109:23
  119:19 120:11 166:25 172:22
  178:3 180:9 185:14,15 190:9
  192:12 215:6 293:1 308:24
situations 61:5 96:15
six 79:10 178:23 179:1 306:24
skipped 82:2
skis 203:4,14 207:14
slightly 13:19 127:19
slot 114:20,23 210:10,14
slowly 272:12
smaller 76:22
smarter 131:13,14
Smith 23:8 83:4,7,10 85:22

89:20,21 90:9 91:6 93:10
167:21,21 169:15,23 175:24
175:24 178:5,6 183:20,20
186:3,14 196:7 236:18 239:17
275:19,21 281:22 282:7
**Smith's** 236:17
**snippet** 234:10
**Social** 104:6 247:2
**sold** 52:18 91:6,7,17 92:1,24
93:4,5 94:25 95:5 224:4
**soldiers** 201:24
**solicit** 65:18 73:14 77:7,8 133:14
235:6 307:14
**solicited** 27:14 72:16,17 135:12
**soliciting** 27:8,17 65:11 72:8
73:12 235:7
**solicits** 71:14
**solution** 148:24 149:7,8 171:3
180:8
**Solutions** 27:9,13,16,2,0 28:5,19
29:10,11 30:1,12 54:10 65:14
65:19 67:21,25 68:4,9,25
69:10,17,24 71:10,11,14
72:11,14,15,2,1 73:7 75:4,7
77:7 78:18 79:3,10 80:8,17
81:19 82:22 83:1,14 95:14,19
96:6,8 97:3 116:12 181:25
182:1
**solves** 305:18
**some** 14:5 20:21 21:15 25:17
26:16 31:8 35:15 37:14 38:21
39:1 41:25 43:15 58:18 66:17
69:2 70:1 72:17 93:21,25 94:7
95:24 99:25 100:1 105:3
106:23 108:10 111:4 112:7,16
115:6 117:7,9,13 134:18
138:12 143:9 146:12 150:6
169:22 170:24 171:24 173:24
177:10 178:17 182:20 188:14
200:24 203:13,20 204:5
207:14 209:10 216:7,24 218:8
218:15 221:9 224:15 226:20
227:18 228:1,4 237:5 242:10
254:1,3 255:2 262:3 264:1
265:21 270:5 283:23 290:12
291:8 298:7 306:18 308:1,3
**somebody** 109:5 210:18
**somehow** 8:19 189:1 208:12,15
**someone** 5:11,12 18:21 27:2
29:24 47:2 53:10,12 109:10
112:11 128:4 138:15,17,23
148:2 150:11,14 163:22
168:17 173:20 176:10 180:13
185:17 188:16 192:6 197:24
199:2,11 202:10 205:5,5
207:19 211:12 216:11 237:5
271:1 289:22 294:23 298:5
**someone's** 122:1
**someplace** 83:10
**something** 15:16 24:16,24 25:5
25:20 29:12,1,9 56:10 65:8
68:6 78:12 81:5 86:13 88:10
88:12 91:21 96:9,11 100:25
110:12 127:5 137:14,18
138:23,24 140:2 142:23 143:5
146:11,11 151:15 160:24
162:19 163:24 172:22 173:1
173:18 180:13 188:6,15
193:23 196:12 199:4,14
201:23 202:2 206:12,20 208:5
209:12 210:15 216:1 217:14
225:6,11 234:25 237:3,24
242:8,19,24,24,2,5 243:14,19
244:17 246:15 257:10 265:8
267:3 270:11 276:18 287:5
293:18 299:19 301:25
**sometime** 268:18
**sometimes** 37:3,4 46:9,16 63:16
78:5,5 107:3 108:18,21,25

146:1 150:24 204:6,12 216:5
216:8 227:23 265:5 271:21
**somewhere** 186:10,10
**soon** 178:10
**sooner** 22:23
**sophisticated** 152:10
**sorry** 9:7 13:7 28:11,12,2,5 29:21
80:21,23 101:1 128:5 142:12
149:6 167:4 183:17 219:16
232:7 250:4 255:12 257:19
263:17,24 272:22 280:13
285:6 297:24
**sort** 35:15 103:19 109:12 112:16
148:6 298:7 300:5
**sound** 201:1,8 204:5
**sounds** 42:17 78:7 142:23
188:10 204:20 256:23 286:16
**source** 24:9
**South** 1:21 2:2
**southern** 1:1 28:14,15 159:11,14
**so-called** 286:13
**speak** 98:17 109:7 110:9,10,19
116:7 120:4,20 125:14 137:18
170:17 189:22 240:6 244:2
253:19 275:20
**speaking** 28:11 95:11 121:19
203:1 247:22 248:10 263:5
**speaks** 109:16 110:4,5
**specialist** 194:4
**specialized** 180:6
**specific** 108:13 174:1,3,22,23,25
177:5 202:9 206:24 209:9
210:19,21,2,3 242:12,13
**specifically** 45:15 72:18 172:11
174:2 182:24 183:10 185:14
189:16 199:10 282:23
**specifics** 137:19 260:21,22
**spectator** 127:23,23,2,5 144:5
159:6
**Speir** 33:19 34:19 35:1 99:8
102:19 103:3,6 106:24 107:10
**spell** 275:10
**spelling** 71:5
**spend** 21:22 26:5 216:16
**spending** 160:15
**spends** 86:19
**spent** 12:12 132:21 207:25
**spit** 216:15
**split** 158:8
**splitting** 157:16
**spoke** 9:18 70:2 95:23 96:2
109:4,5 110:7,15 111:3,5
113:5 120:12 129:7 162:3
211:19 241:16 244:24 247:19
248:25 249:6 250:12 251:4
260:17 270:20
**spoken** 39:25 109:3 110:9,11
119:20 205:23 208:14 251:2,7
**spouse** 66:9,12 130:24 190:13
191:5
**spouses** 267:15
**spreadsheet** 216:13
**Springs** 52:3
**Sprint** 251:21 253:17
**Stacey** 44:18,20 45:21 46:2
**staff** 83:7 211:22 274:7 282:12
**stages** 15:12
**stand** 63:4,19 114:23 120:23
126:24 154:21 162:15 204:16
256:22
**standing** 146:20 231:12
**stands** 41:3 221:16,17
**Stark** 59:6
**start** 8:17 34:8 35:18 68:16
83:20 143:18 178:1,1 184:24
190:14 227:16 250:6 267:11
308:19 309:12,14
**started** 52:12 64:20 67:21 69:24
77:20 96:8 105:21 106:6,22

158:1 200:6 218:8 237:1
241:23 276:24
**starting** 13:8 42:8 56:6 128:2
**starts** 87:3 89:19
**state** 82:9 124:1 153:22 154:4,17
155:10 204:25,2,5 205:8
235:20 236:5 240:18,20
275:16
**stated** 57:1 160:10 210:20
**statement** 6:10,22 11:20,20,22
12:7,12,15 13:12,20 14:24
51:17 52:16 57:2 102:6 133:4
135:14,24 138:5 139:23
146:24 147:1 148:15 155:12
162:21,24,2,5 163:1,4,5 204:8
204:9,1,5 205:1 207:1 234:22
255:18
**statements** 16:19 82:13 142:3,4
148:9 151:16,24 154:12
155:15 160:6 161:6,8 162:1
204:13,17
**states** 1:1,4,11,14,1,5 2:5 57:21
160:9 166:21 287:17 288:19
302:13 311:12
**stating** 167:11 172:5
**stationed** 202:10 241:7,8
**status** 171:25 172:6
**statute** 59:6,11 172:2,10,11,12
172:17 173:5,15 182:9 219:22
**statutes** 82:12
**stay** 146:2 255:8
**stayed** 106:11
**steak** 279:10
**steakhouse** 171:5,5,8
**step** 10:16 239:19 251:12 285:14
285:15
**steps** 172:24 248:5
**Sterabase** 83:1,7,2,3 84:3 85:20
85:23 86:3,8 87:3,6,12,16,21
87:25 88:8 93:21,22 94:14
95:20,24 221:13 222:2,9,13
222:17,19
**sterile** 63:4,4,18
**stick** 65:24 271:5
**Stiles** 212:24 213:9,18
**still** 14:4 31:5,13,18 53:2 76:19
78:16 79:25 119:1,11 128:22
138:22 146:10 209:7 211:6
248:19,20,22 259:3 301:11
**stipulation** 5:10
**stock** 174:24
**stockbroker** 168:22
**stockbrokers** 168:24
**stocks** 168:22,23 203:12
**stomach** 140:2
**stood** 246:21
**stop** 60:13 106:2 151:23 183:17
198:19 225:7 248:5,6
**stopped** 78:24 79:3 80:8,10
151:25 152:3 179:5 197:3,5
198:15 218:20 248:12
**stories** 136:13
**story** 123:8 133:4,6,18,19
135:17,18,22,23,2,5 136:9
137:4 147:9 156:10,12 186:21
186:24 187:4,10,11,15,16
188:12 189:6 190:5,5,9,11,21
191:13,14 192:9,24 193:16
194:2,24 236:15 237:11
**straight** 167:1 226:23
**straightforward** 221:23
**street** 1:16 210:17 260:15
**stress** 176:25 260:9,13
**stressful** 62:20
**stretch** 120:25
**stricken** 194:21
**strict** 15:6
**strike** 72:5 78:10 129:22 131:7
194:22

**strong** 126:19 242:16 301:24
**struck** 202:5
**structure** 176:9
**structured** 31:1
**struggle** 274:4
**stuck** 128:8 138:1
**study** 184:17 185:5 195:2,5
200:15
**stuff** 20:20 100:11 181:4 207:14
245:20 267:14
**stupidity** 53:15
**subject** 25:14,19,22 71:6 74:8
102:21 157:5 235:10 236:21
237:11,14,18 244:4 282:10,16
282:19 283:3
**submit** 59:25 60:5,8 119:14
217:18 296:8,8,12
**submitted** 31:8 39:21 100:9
114:1 119:18 121:18 194:5
**substance** 170:25 177:20
**substantive** 307:11
**subtract** 87:16
**success** 113:21 114:12,13
**successful** 225:23
**sudden** 75:11 171:21 172:16
263:24
**sued** 53:8
**suggest** 290:23 305:17
**suggested** 106:24 305:13
**suggesting** 116:2 138:17
**suggestion** 126:19
**suggests** 192:9
**suit** 296:1
**suite** 1:21 2:2,6 63:18 311:13
**suited** 63:15
**sum** 125:11
**summaries** 170:17
**summarize** 23:14
**summary** 38:17 112:7 134:19
202:24
**summer** 28:16
**sun** 275:3 283:17
**Sunday** 17:7,17,19 20:13,18,21
20:24,25 21:1,3 25:7 141:14
141:21 142:23,25
**sunny** 231:11 299:13
**SunTrust** 52:5
**Super** 206:19
**superior** 94:5,7 95:3,6,8
**supplement** 297:6
**supplied** 189:18
**supplier** 56:7,8,15
**suppliers** 58:22
**supplier's** 59:7
**supplies** 93:8
**supply** 93:25 94:2 96:3,4
**support** 293:19 296:9,16
**suppose** 293:20
**supposed** 134:7 144:21
**Supreme** 142:6 160:9
**sure** 8:15 13:9 21:15 23:21
25:25 26:10 27:14 46:13
55:24 83:24 90:1 97:12
116:24,24 129:5 131:20
132:17 134:16 136:15 137:17
143:16,21 168:19 171:1
172:24 180:14 201:10 210:3
212:2 223:3 238:17 247:8
250:20 253:11 263:1 268:21
270:16 272:5 278:13 280:21
291:5 293:21 296:25 297:9,23
298:25 307:20 309:17
**surgeons** 276:1
**surgeries** 63:3,16 106:13 254:3
**surgery** 63:2,9 242:18
**surgical** 63:17 264:10
**surprise** 11:11 12:6 85:5 271:17
**surprised** 8:1 85:3 194:13
271:13,18,18,19,20

surprises 26:6
surprising 9:5
surveillance 228:4
survey 14:5 181:3 184:23 186:2
    186:5 195:15 196:3,3,5,10
    199:5,11,13,19
suspect 60:8 130:23 149:19,23
    153:20 258:8 302:9
sustain 162:11,12 216:21 247:17
    278:5,10 298:10
sustained 111:13 162:3,14,16
Sven 30:20 49:1 68:21 72:10,16
    73:4,6 75:7 76:12,15 118:11
    118:14,22,25 119:12 120:9,14
    120:16
Sven's 76:11
switch 116:24 167:15
switched 69:3 199:8
switching 249:2 251:10,11
switch-over 178:4,5
SWORN 240:5 275:8 279:14
system 31:11,16,22 66:22 76:13
    77:4,6 79:23 80:4 88:19
    112:12 194:6 197:11
s-01 107:22

**T**

T 311:7,7
table 3:1 201:4
tabs 43:11
tail 51:24
tailored 27:11,11
take 14:20,22 19:9 51:8 53:14
    57:24 63:21 85:25 108:1,4
    110:24 113:18,19 114:11
    117:24 122:10 124:21 129:23
    142:18 145:2 159:16,20
    196:21 204:16 206:7 214:14
    226:6 230:21 232:21 238:19
    243:19 245:20,20,25 246:11
    248:5 255:11 256:20 274:4
    282:23 283:15 298:17 305:16
taken 6:23 159:1 238:18 285:3
takes 152:12 154:20 160:2
    165:18 243:13 278:21 302:24
taking 21:7 144:11 154:14
    172:24 219:2 243:16,18 255:6
    255:18
talk 6:19 28:18 31:4 35:12 65:21
    66:11,12,13 68:13 70:16 73:10
    73:17 74:19 93:22 97:1,17
    101:17 105:7,18,19,25 119:25
    122:9 124:21 126:4 157:3
    191:7,9 192:1 193:6 202:15
    209:5,6 210:18 211:22 221:16
    230:24 235:8 238:7,8 267:6
    282:14 283:17 286:6,22
    287:24 299:4,5 300:3,7,20,23
    308:11 310:14
talked 35:13 43:14 68:8 72:24
    74:18 85:22 95:10,13 96:12
    96:13,14 98:12,14 107:9
    133:3 143:4 171:2 174:24
    186:15 189:13 196:11 197:7
    199:7,11 207:13 208:10
    211:19 218:18 220:19,20
    237:4 248:15 254:18 270:16
    283:4 286:12
talking 8:20 9:12 10:9,19 11:9,9
    26:18 28:10,16,2,1 70:14
    77:10 93:19 100:23 107:17,17
    114:1 123:9,10,14 124:14,20
    136:9 137:15 152:24 169:10
    171:15 183:22 184:3 187:25
    192:3 207:25 208:18 209:21
    210:19 218:23 236:24 237:6,7
    238:21 250:17 252:1 255:11
    258:9 261:19 262:8 268:5
    269:11 271:3 282:11 283:5

301:19 310:20
talks 155:12 307:22
Tampa 129:14,15 171:4 186:22
    279:10,2,4 282:10 297:15
tampered 126:20
tape 151:8,10 154:10
tapes 147:3,25 148:5,8 149:9
    232:19
target 150:18 237:23 295:12
targeted 236:22
Tarpon 52:3
tax 53:18 123:1,2 125:3,3,5,24
    126:25 262:19 263:8 266:8,10
taxes 53:21 125:13,25 126:2
    177:24
TD 203:4,11
team 75:12
teams 45:6
tech 100:20
technical 173:24
technically 17:4 152:2
technician 91:4
telemarketer 188:23 191:15
    192:10
telemarketers 190:18,20
telemarketing 189:14 191:17
telemed 97:17 220:19 224:5,10
telemedicine 33:20 34:17 65:18
    69:5,6,13 97:1,5,5,7,19 100:4
    100:10 103:7 106:18 111:23
    112:5 115:7,8 169:12 182:14
    182:22,25 191:16 197:10
    198:1 210:22 211:2,6,21
    224:14 226:8 264:5 265:6
    305:12
tell 5:7 6:3 7:16 8:6 9:4,17,24
    12:3,4 18:1,13 19:4 29:9
    33:23 34:23 46:13 75:4 79:20
    81:21 85:21 88:16 99:21
    103:12 108:4 120:21,22
    124:13,15 125:16,20,23 132:9
    137:17 150:6 156:15 157:8
    163:20 165:1 170:4 176:12
    182:11,13,14,16,1 8 183:1,3,10
    183:13,18 184:8,10,13,16
    202:7 206:10 210:12 215:23
    220:1 222:10,11 227:7,10
    240:7 241:17 242:14,21
    244:12 245:7,12,17 246:20
    247:11,1,5 260:16,17 262:13
    265:17 267:2 275:9 277:3
    279:15 287:4,5 290:10 291:22
    293:12 296:15 301:6,10 307:9
    308:5
telling 11:21,25 34:24 64:21
    84:3 94:8 131:10 155:12
    173:7 184:14 198:23 213:8,18
    220:3,5 261:18 301:12
tells 205:5 234:16,21
ten 72:3
tendency 130:25
Tennessee 241:9,9 253:7,23,24
tens 104:25
term 36:15 82:8 94:25 204:19
    287:15
terminate 195:13 197:18
terminated 14:15 15:1 178:12
    179:2 197:6 200:20
terminology 211:13
terms 7:18,20 19:1 266:18 283:7
terrible 195:25
testified 13:25 27:10,13 41:18
    41:21 47:2,5 65:25 81:18
    116:25 117:3,6,19,25 118:4
    118:10,14 120:16 121:9 199:8
    215:24 223:5 250:14 252:9,20
    254:15 255:2,6 257:11,17,24
    264:4 269:24 276:21 277:7
    291:17,21,21

testify 13:13 14:1 129:4 240:22
    241:1 291:8 297:14,15,19
testifying 204:14 235:25 255:15
    297:17
testimony 14:13 36:17 37:1,2
    40:1 41:19 53:10 54:3 67:1,25
    68:3,24 91:4,25 92:0 97:91
    101:9,12,13 109:5,6,24 111:7
    117:8 118:12,16,17 155:15
    168:5 169:21 171:17 173:13
    177:18,20 190:2 194:9 195:1
    202:22 212:15 214:18 216:18
    216:24 255:21 257:15 259:5
    277:4 278:3,6 290:16 291:16
testing 200:9
text 46:11 226:16
textbook 142:5
Thank 35:21 42:21,21 122:15
    137:20 146:17 158:25 160:1
    203:25 204:2 239:19 249:14
    258:21 263:19 274:24 275:1
    275:12 278:24,25 279:11
    280:15 284:5 285:13 286:3
    307:2 311:4
thanks 31:7 83:25
their 17:2 27:11 42:5 43:12 53:4
    60:2 65:20 66:12 67:9 70:2,17
    72:19,24,24 74:14 75:12,13
    77:23 79:14,18 84:23 85:12
    88:19 93:17 94:6,10,16 95:21
    95:21 97:21,23 98:2,4 106:12
    106:12 110:21 112:5 122:1
    123:1,5 154:9,13 159:12
    167:18 171:2 176:9,14,16
    177:4,18,20,24 179:12,13,14
    180:4,7 182:18 183:2 184:14
    188:21 189:9,18 190:13,14
    191:1,5,5,9,2 1 192:1 202:15
    208:12,12,13 210:18 211:13
    211:18 212:21 217:19 220:5,6
    221:3,4 222:1 224:10 226:7,9
    226:10,12 227:1,16,17 237:1
    237:8 238:11,18 239:16
    260:25 267:4,16 269:2 282:5
    295:8
theirs 158:12
themselves 76:12 94:21 107:21
    108:23 170:18 177:19 227:17
theory 304:12 305:1,8
therapeutic 94:14
thereof 56:14
they'd 113:12
thing 14:18 23:14 24:19 25:6,6
    26:9 31:3 35:4 61:3 66:25
    67:16 91:23 94:11,12 96:1
    117:25 119:10 122:16 127:6
    138:12,12 142:17,21 143:13
    150:5,22 151:1,2,4,5 153:14
    160:12,21 162:8 172:23 173:2
    177:25 195:25 204:6,21,23,24
    206:5 231:14,17 245:24
    276:19 283:5 290:2 297:6
    298:3,18 303:18 309:14
things 15:15 20:19 31:11,14
    60:25 77:3 79:21 94:19 96:17
    106:11 138:8,20 140:16 145:8
    145:25 146:9 150:6,14 160:18
    160:22 162:12 175:13 178:9
    178:13,21,22 203:13 205:4
    230:9 256:17 260:8 283:5
    292:2 298:6 300:17 308:3
think 6:22 13:9,10,14 14:18
    15:12,15 16:2,13,13,17 21:17
    21:25 22:8,12 23:3 24:15,22
    27:17,20 28:14,15 29:15 31:2
    33:23 34:4 42:14 45:6 51:22
    55:10 60:25 61:4,6,11 67:24
    73:3 80:18 82:1 87:24 88:3
    97:10,15 101:2 109:11,22

111:4,15,16 115:18 117:19
    119:2 121:4 122:4 123:19,22
    126:17 129:1 130:1,4,4,13,14
    130:17 134:10,12,22 135:21
    137:22 139:20 140:2,2,19,20
    143:13,15 145:1 146:4,5,10
    146:13,18 147:5,12 150:2,5,6
    150:7,7 151:3 153:20 156:21
    157:2,23 158:16,21,24 159:24
    161:25 162:9 164:20,24,24
    169:17 170:13,13 173:22
    174:21 175:10,12 180:20
    181:21 184:11,20,21 185:25
    186:9,10 187:14 188:14
    189:10,19 190:1,17,22 192:6
    194:3 200:7 201:4 202:12,14
    202:24 204:11 205:13 207:24
    208:4,6 209:22 210:7 211:16
    212:15 216:10 218:1 221:6,12
    222:22 224:14,17 229:15
    232:3 234:17,18 238:6,17
    244:8 248:8 249:2 250:11,18
    250:25 251:5 256:23 267:3
    268:1,17 278:11,11 279:25
    283:15 286:15,21 287:6,8
    288:17 290:2,16 291:2 292:13
    294:2 295:5,7,23,25 296:16
    296:20,22 298:11 301:13,19
    301:22 302:5,14 305:18
    307:15,16 308:14 310:12,20
thinking 34:4 158:4 160:8
    250:16
thinks 12:13 16:7 149:24
third 37:24 38:23 58:18 270:24
    306:6 307:16
Thomas 102:23
thorough 308:4
thoroughly 37:22
though 27:15 91:12,15 94:16
    130:4,23 144:24 146:4 149:24
    157:8 165:13 181:6,22 197:19
    204:19 248:20 250:15 253:15
    262:22 286:17 292:7 293:15
    295:11 302:9 308:20
thought 13:16 66:10 68:4 70:15
    71:18 74:19 93:24 116:23
    133:2 139:23 153:22,23
    175:11 187:1 188:4 192:21
    196:21 212:15 214:5,7 238:24
    260:24 267:1 269:24 278:22
    294:23 299:17 301:13
thousand 7:3 33:1 184:18
    195:16,18 196:6,8 198:24
    200:15
thousands 32:20,24 105:1 184:9
three 16:1 21:21 23:2 25:24
    29:16 31:21 34:15 40:4 80:3
    107:22 108:5,6 116:2 117:19
    119:8 142:24 156:14 183:23
    186:21 193:3 223:19 224:4
    227:13 230:17,21 239:24
    242:13 252:4,19,23 253:2
    256:2 262:6 264:20 265:16
    291:20 293:21 305:14 306:13
    306:20 309:20
threw 30:20
through 18:5,8 25:3,24 26:1
    32:15,21 33:2,7 38:18,21
    46:10 48:22 54:18 59:1 61:6
    72:18 83:9 90:7 93:21,25
    101:8 102:4 106:19 134:22
    149:20 150:5 151:14 177:24
    196:16 207:18 215:13 216:3
    216:16,17 226:16 228:21
    235:7 242:16 249:7 262:25
    286:4,5 301:11 304:2,9
    310:21
throughout 12:20 82:8 140:3
    166:5 204:13

**Thursday** 185:6
**tier** 76:19
**Tighe** 3:12 64:5,7 275:6,8,11,16
**till** 8:14,16 142:25 165:19
  300:10
**time** 6:15,21 7:25 8:1,19 10:9
  11:6 12:15,16 16:23 17:1 18:4
  18:6 20:12,13 23:15 32:15
  36:5,9 40:19,22 41:6,9 42:8
  42:12 46:16 60:19,21 61:22
  62:1 64:16,24 66:14 71:16
  72:2 73:8 75:9,23 79:1,4
  91:16,16,19,2 0 92:17 93:6
  99:23 101:21 102:3 106:9,23
  107:7,11,16 114:21 122:8,8,9
  131:24 141:10,12 142:18,22
  143:18,23 145:19 147:25,25
  148:16 152:12 154:15 157:8,9
  160:15 162:3 164:17 165:4,5
  165:21 170:11 175:3 176:10
  178:18 179:17 181:13 182:17
  182:20 184:22,23 185:1,2,4
  185:21 193:10 196:4 199:23
  200:2,18,24 201:10,11,21
  203:13 207:25 211:5,6 213:14
  216:5,10,16 217:3,7 218:8,13
  224:1,2,1,5 226:10 227:18
  228:1,6,15,16,1 8 229:4 232:6
  232:17 235:13 236:6,7 237:17
  237:20 241:12 242:14 243:9
  243:12,13 245:5,6 248:23
  249:6 250:23 251:17 253:6,16
  253:17 254:18 255:8 257:20
  259:23 261:5,17 262:2,14
  266:22,23 270:21 272:5,10
  274:20 276:15 277:6,7 286:1
  286:12,21 287:1,25 289:19
  292:7,7 296:9 302:23 308:21
**timed** 157:23 310:15
**timeline** 248:8
**timeliness** 10:4,6 17:13,16
**times** 16:12 27:14 38:9 63:3
  65:19 87:6 88:1 183:21 199:2
  215:16,17 256:2 272:11
  294:10 301:17 310:15
**time-wise** 143:24
**timing** 10:8 148:12,22 152:19
  178:3 277:15,17,23
**Tiny** 260:15
**tiring** 21:5
**title** 276:12 287:17
**today** 22:25 34:8 97:10 138:25
  139:3 158:23 183:21 193:11
  198:4 233:9 240:23 260:2,7
  261:19 289:11 290:4,16
**together** 38:10 51:16 185:3
**token** 160:12
**told** 6:13 18:14 27:20 66:5 68:17
  68:17 73:11 85:23 92:9 93:23
  94:6 95:10,15 96:2 97:2
  107:10,12 108:17,20 115:2
  118:10 119:13,18,20 120:14
  123:20 126:14 167:15 169:21
  170:20,23 171:23,24 173:7,13
  174:4 176:4,11,18 177:22
  180:5 183:4,7,8,13,14,14,24
  185:23 186:1,2,6,12,15,18
  189:11 192:2 195:1 196:3,17
  197:15 198:17 205:2,7 208:9
  225:6 226:12 231:8 235:19
  237:18,22,23 238:2,7 241:18
  241:22 242:23 245:19 248:18
  251:9 260:24 262:10 264:25
  265:15 266:2,15 267:1,3
  268:1 273:6 279:25 286:25
  291:15 292:2
**tomorrow** 8:14 26:16 31:5
  164:15,17 285:6 289:6 290:10
  301:6 307:3

**tonight** 307:4
**top** 42:9 56:6 72:15 77:1 87:4
  99:21 112:7 167:20 169:12
  208:3
**topic** 132:7,9,13
**topical** 274:8
**topicals** 273:23
**topics** 34:12 138:12
**total** 12:6,17 24:2,3 41:21 43:22
  90:10,20 100:1 112:22 113:18
  193:25 276:1,2
**totally** 8:22 11:19 25:19 138:15
  165:11 192:3,7
**totals** 76:21
**touch** 101:5 247:9 254:21
**tough** 130:5 308:21
**tougher** 128:2
**toughest** 130:2
**toward** 38:23 250:7
**towards** 37:24 51:24
**Town** 260:15
**track** 46:9,20 100:13
**traffic** 151:22
**train** 274:7,10
**trained** 278:7,18
**training** 63:22,24 64:17,20,22
  178:8,15,17,17,2 3 276:23
  277:1,5,13
**transaction** 59:3,16,18
**transactions** 39:13 41:18 168:17
  168:18 202:25 203:9,10,15,18
**transcript** 255:20 256:3,5 258:7
**transcription** 311:9
**transcripts** 233:16,25
**transdermal** 104:11,13
**transfer** 203:11
**transferred** 213:19
**transferring** 213:15
**transition** 184:24 270:13 271:3
  271:9
**transitioned** 271:14
**transitioning** 251:9
**tremendously** 31:23 80:5
**trial** 1:10 16:22 33:6 40:6 47:2
  111:2 144:12 166:5 204:13
  227:8 228:21 250:1 296:22
  299:6 311:5
**Tricare** 27:8 36:6,10 38:18 42:5
  44:14 45:10 49:11 74:22,25
  75:1,8,14 78:21,22,25 79:2,5
  79:6,14 80:9,10 104:7,25
  179:5,7,21 182:17 183:2,15
  183:19,25 184:1,2,4,7 217:22
  217:25 218:16,25,25 221:21
  222:1,8 223:6,10,23 235:23
  236:21 237:14,16 239:6 241:3
  241:5,19 242:16 244:18
  263:13
**Tricares** 31:21 80:3
**tried** 98:16 134:22 151:14 174:4
  266:23
**trifecta** 119:6
**trip** 274:25 279:1
**trouble** 224:1
**true** 34:7 53:17 66:25 88:21,23
  102:8 108:14 151:3 152:7
  153:16,22 154:4 168:21 170:6
  200:10 205:8 238:13 292:21
  297:12
**trusted** 225:8 292:18
**trusting** 52:20 53:13 260:23
**truth** 11:11 26:23 34:25 60:2
  120:2 142:16 151:2 155:12
  200:21,21 204:11,20 217:19
  236:3 242:14 260:19
**truthful** 15:22,25 27:23 149:25
**truthfully** 135:17
**truthfulness** 154:10
**try** 9:20 26:6 63:13 128:18 158:6

158:24 173:3,23,24 187:16
  242:7,9 243:7 244:10,22
  248:6 252:7 296:14 310:1,5
**trying** 73:14 95:20 115:4 124:17
  130:11 138:13 173:12 222:18
  222:23 244:8 245:10 250:17
  252:2,12,19 254:12 255:8
  256:5 266:23 271:23
**tube** 90:11 274:19
**turn** 7:6 8:11 11:14 42:18 45:14
  99:17 103:19 104:1
**turned** 8:24 22:14 193:13 200:1
  212:19 221:3
**turning** 22:11 38:22 103:11
**turns** 214:3
**twice** 194:1 251:4,5 270:20
**two** 6:3,18,19 29:15 33:19 34:14
  40:14 43:17 69:1 74:20 95:13
  101:18 102:2 106:6 115:22,22
  115:24 116:3 128:19 131:25
  132:18 136:13 151:13 152:10
  155:8 156:24,25,25 157:2
  164:13 165:9,11 170:12
  186:21 190:10 196:11 203:4
  212:20 222:10,16,25 234:10
  242:16 255:1 263:5 268:18
  282:2 285:3 291:21 303:2,4,4
  306:13 309:20
**two-and-a-half** 143:22
**Tylenol** 243:19
**type** 97:23 106:15 138:20 151:2
  163:22 172:2,10 204:24
  226:20
**types** 30:17,19 103:22 218:20
  223:14,16
**typical** 22:21 26:17
**typically** 216:2 242:25
**Tyrah** 213:3
**T-i-g-h-e** 64:6 275:11

---

**U**

**ultimate** 194:16
**ultimately** 51:8 52:9 67:8,12
  83:8 89:5 101:25 123:2
  195:12 197:14 198:19 199:16
  264:4,19
**umbrella** 299:13
**unable** 98:16
**unanimously** 160:20 305:15
**unaware** 192:3,7
**unbelievable** 11:19 13:9
**under** 26:8 54:9 58:18 60:11
  76:13 82:11 118:10 128:7,20
  130:14 142:6 172:1,16 173:5
  173:14 213:3 236:13 242:5
  243:10 244:15 254:15 255:2
  256:16 260:13 287:13 288:11
  307:10 310:16
**undercover** 151:13 228:4 237:22
**underlies** 59:18 105:13
**underlying** 59:3,16
**undermine** 127:20
**understand** 12:21 15:19 16:7
  18:20 36:16 44:5 57:9 59:2
  62:20 73:15 113:9 129:23
  156:1 160:5,17 167:3 168:5
  168:24 171:11,17 174:18,19
  178:3 190:8 191:18 205:21
  257:20 278:17 298:13 299:3
  300:18
**understanding** 55:20 88:20
  109:2,4 115:12 166:18 253:5
  272:19 282:21
**understood** 29:14 51:20 66:14
  173:9 189:25 195:4 253:1
**unfair** 310:22
**unfortunately** 6:8 31:10 60:25
  77:3 178:10 201:21
**United** 1:1,4,11,14,1 5 2:5 57:21

160:9 287:17 288:19 302:13
  311:12
**units** 92:2
**unlawful** 304:13
**unless** 26:8 67:11 110:7,15
  145:23,24 163:10 278:19
  290:12 296:15 307:8 309:3
**unlike** 305:13
**unnoticed** 48:9,10
**unrelated** 206:12,22 235:21
**unsecure** 168:3
**until** 6:12 14:14 21:23 109:16
  110:3,5 143:19 170:16 174:10
  200:22 213:5 215:9 254:19
**untimely** 141:21
**upfront** 79:24 97:12,18,22,24
  98:2
**upload** 100:18,19 112:4
**uploaded** 112:11,18,20 119:24
  197:11 290:9
**uploads** 112:10 113:20
**upset** 19:17 170:1,21 185:24
**ups-and-downs** 10:12
**upwards** 116:4
**up-front** 31:17 36:21 37:8 297:1
**usages** 274:9
**use** 6:2 12:22 15:8 16:25 18:22
  20:7 21:18 23:2 24:2,21 63:2
  66:18 69:6,21 84:17 86:2,18
  87:12,13,18 88:24 89:6 90:9
  90:25 93:17 94:8,25 95:3,4
  97:4,5 111:11 114:10 122:18
  143:12 145:23 159:7,19 171:1
  175:9 176:15 202:17 209:6,13
  215:25 216:1 223:4 241:24
  252:14 256:4,18 257:6 298:8
  304:21
**used** 22:11 37:7 46:6 56:6 69:5
  85:18 91:5,8,10,15,1 6 95:5
  97:7,20 104:25 106:6,7
  111:10,22 116:12 143:12,12
  193:19 211:14 218:4 220:23
  235:4 244:13 265:2 266:8
  287:8
**useful** 265:22 273:18
**using** 23:22 24:6,9 85:21,23
  86:19 90:3 93:11,14,16 94:9
  107:6 133:13 184:17 222:9
  244:11,14 257:5 304:18
**usually** 25:1 160:11,23 168:22
**Utah** 138:8 206:13
**U.S** 233:2 250:4 311:12
**U.S.C** 286:14

---

**V**

**vacated** 303:17
**valid** 104:25 105:12
**value** 130:14
**Vantari** 200:8
**variables** 194:3,16
**various** 37:17 38:17
**vast** 108:7,9,10
**Vegas** 114:15,20
**vehicle** 61:5
**vehicles** 203:11
**vendor** 97:21
**venture** 237:2
**verbal** 30:23
**verdict** 154:25 155:4 305:14
  306:19,21,23 307:1 308:19
**Vernon** 288:19
**versus** 222:2,9 288:19 302:13
  308:2
**very** 23:23 24:5 35:21 55:12
  62:20 71:25 72:15 78:25 85:1
  93:10 94:3 95:16 96:10 111:1
  125:8 131:17 141:13 142:13
  142:22 150:14 151:20 154:18
  185:10,24 188:6 189:20

199:22 200:12 205:1 210:14
210:21,23 216:12 242:2,3,19
244:1 254:9 265:7 278:24
279:12 303:6 310:7
**vetted** 196:14
**viable** 305:1
**vice** 89:22
**Vidal** 102:23
**video** 140:11,13,18 147:6 152:25
154:1,2 155:16 156:2,4,6,8,9
190:16,17 236:13,21
**videos** 154:20
**view** 135:19 167:2,11 207:3
**views** 186:20
**vigorously** 8:3,4
**violate** 233:10 304:17
**violated** 218:1
**violating** 233:8
**violation** 172:2,9,11,17,2 1 173:9
**violations** 173:15
**visit** 265:12
**vitamin** 49:19 51:8,11,14 104:17
107:22 108:1,9 114:2 117:19
119:6 120:1 243:7 244:25
245:23 254:6
**vitamins** 210:21 242:10,15
243:2 245:25 246:9 248:11,20
252:23 254:7 264:22 274:16
**volume** 19:13 24:2 90:10
**voluntarily** 125:4
**vs** 1:6

---

**W**

---

**wait** 5:13 8:16 20:17 26:16
34:23 130:1 136:1 142:25
143:19 164:14 165:20 183:17
252:15,17 255:12 263:4
300:10 309:5,7 310:19
**waiter** 297:18
**waiting** 5:11
**walk** 48:22 192:5
**Walker** 3:14 171:9,11,18,23
173:7 175:14,18 179:25 182:8
182:11,16 183:1 184:8,13,16
186:20 194:24 201:12,14
279:7,14,16,2,3 292:22 294:14
297:8,10,11,14
**walking** 210:17
**want** 5:16,18 6:15,17,18 7:25
8:14,17 9:14,23,23 12:3,4
13:4,13 18:2,6 19:16 20:25
23:13,17 24:10,16 27:22
29:11 30:18 36:23 37:14,17
38:14 39:4 41:14 42:18 46:5
48:22,23 56:4 61:9,11,11
65:25 67:4,18 70:4 73:18
75:18 81:21 83:16,20 84:21
84:23 88:21 89:6 93:16 94:8
94:10,15,17 96:7 97:1,13,24
101:18 102:14 107:16 108:4
110:3 113:4 114:10,19 116:24
118:9,18,21 124:12 126:3
127:5 128:19 131:7,9,11,22
131:25 134:17 135:13,20
136:2,14,15 137:21,23,24
140:5,6,6,13 141:1,19 142:18
143:5 146:21 149:9 154:5,8
154:10 155:17,19,20 156:23
158:6 159:24 161:9 164:17
167:17 172:8 188:8 189:8,9
189:12 202:6,20 205:19
209:12 217:13 229:9,17,19,23
229:25 230:1,6,8,9,10,10,16
231:2,20 248:4,8,18,19
250:12 256:4 257:3,4,6,18
260:10,17 271:7 272:5 283:21
284:22 285:20 287:8,18
290:13,18 292:10,24 293:2,3
293:5,8,11 294:8 296:10,25

---

299:18,25 302:13 303:18,19
303:19,22 306:4,24 308:21,22
309:3,6,10,25 310:3,14
**wanted** 36:18 56:10 61:13 69:21
71:23 93:7 97:23 106:25
107:3,7,10,12,1 7 154:3
165:17 171:3 187:22,23 188:1
189:12 191:9 192:2 196:14,18
202:16 208:14,25 209:7,18
237:24 238:7,8,16 244:21,21
248:11 264:15 286:22 297:9
**wants** 6:18 12:19 66:20 110:9,10
110:11 119:1,11 128:20
138:10 147:3 157:24 189:3,8
230:4,7 291:11
**warmer** 279:2
**warrant** 130:16
**warrants** 82:7
**washed** 272:1
**wasn't** 11:6 15:4 22:24 32:6
52:17 53:4 54:13 55:22 63:14
65:7 77:21 91:18 138:19
167:10,12 170:15 172:5,10
177:3 179:21 185:15 187:5,9
194:6 196:10,20 214:6 219:13
247:22 248:20 254:19 258:7
260:12 265:7 267:20,20
268:19 270:4,25 274:20
285:14 297:1
**waste** 12:17 246:1
**watch** 138:20 153:13 156:16
285:14,15
**watched** 155:16
**water** 230:20
**wave** 284:22
**way** 6:22 22:18 32:6 42:10 47:8
65:14 68:24,25 87:9 91:13
100:15 105:21 106:8,25
107:15 108:11 113:10 114:6
115:3 124:13 144:2 153:15
156:4 162:4 167:9 175:9
183:12 192:13,18 198:25
201:14 215:23 216:13 224:15
225:21 227:23 228:21 233:16
233:22 238:6 239:11 249:10
249:21 258:6 286:11 288:7
294:2 301:5,5,22 305:11
306:19
**ways** 227:21
**wear** 63:17
**website** 100:18 237:5
**week** 6:7 13:8 99:12 102:4,6
111:2 140:4 141:23 143:23,23
149:3 162:4,10 175:25 177:10
185:9,11 199:25 200:22
**weekend** 13:10 35:21 158:3
301:13
**weekly** 37:8 98:4,21
**weeks** 102:2 170:12 178:11
179:1
**weird** 204:20
**welcome** 146:2,18
**well** 5:7 7:6 13:6 16:20 17:11
19:24 20:2 23:17 24:15 28:5,9
32:4,10 34:7,14,15,15,21
36:16 41:10 47:16 48:7 50:7
51:25 55:8,12 57:20 58:6
60:21,23 61:16 63:3,15 64:13
65:6,24 70:7,9 73:8,10 75:12
78:8 80:18 81:21 85:13 86:1
87:9 89:24 91:25 96:4,20
97:15 102:13 107:7,18 110:8
111:10 114:10 118:8 119:22
119:25 120:23 122:17 124:4
124:10 125:18 126:19,22
128:18 129:3 130:18 131:14
132:18 134:14,24 136:13
137:4 143:2,4 147:20 154:21
155:15,19 161:11,25 163:8

---

165:20 167:3 169:3,15,23
170:17 173:3,12 175:2,17
176:12 181:23 187:19 190:18
190:25 193:9 197:13,19
199:21 205:17,23 207:21
210:14 211:15 213:10 219:4
220:3 222:19 233:23 237:16
238:21,23,24 242:14,23
244:24 245:3,4,14,16,19
247:1,12 248:4,7 253:21
257:15,23 258:3 259:25 261:4
262:1 265:3 266:21,23 267:5
267:11,12 269:1,20,22 270:4
270:17,18 271:15 272:20
278:16 282:1 284:19 285:21
289:12 291:2,4 293:4 297:11
299:21 300:5 301:8,9 302:2
302:14 305:3 307:22 310:7
**wellness** 49:13,19 104:16,17
107:22 119:6 252:23
**went** 11:21 12:7 26:1 48:9,10
63:15 72:18,23 76:17,21,21
80:11 95:13 100:14 101:8
107:20 114:19 165:10,12
170:4 171:19 188:24,25
191:15 196:6 207:20 237:1,5
238:13 289:16 292:1 294:22
**were** 5:1 6:13 11:8,15 18:9 19:7
21:22 22:20 23:9,10 25:14
31:14 32:16,23 36:19,21 37:4
37:9,9,15,1 8 38:18 40:5,20,21
40:22,23,24,25 41:3,6,6
42:4,8,11,1 4 43:17 47:12,22
52:19 53:8 54:14 55:5,18
63:17,21,24 64:13,15 65:19
65:19 66:14 68:10,18,18,19
68:20,22 69:2,2,20 70:1 71:11
72:3,22 74:14,14,15,23,24
75:5 77:17,19,20 78:1,21 79:5
79:8,14,21 80:4,17 85:3,7,11
85:12,21,23 86:7 88:8 89:9
91:10,13,15,1 6 92:22 94:5,9
94:19 95:20 96:13,15 97:4,13
97:17,18,22 100:1,7,9 101:10
101:11 102:3,5 105:16 106:11
106:14,15 107:21 108:8,10,15
111:4,7,8 112:10,16 113:2,10
112:22,25 113:2,10,18,19,25
114:1,3,6 116:2,15 120:7,8
123:10 130:2,23 135:12,13
136:13 137:15 140:22 141:2
142:3 144:25 145:5 146:6,23
147:13 148:1 150:13 151:23
152:7 153:16,25 159:3 160:16
163:21 166:10,18 169:3,4
170:1,1,4,11,11,2 1 171:18,25
175:1,5,22 176:4,4,7,7,16
177:4,6,7,23 178:1,2,4,10,12
178:13,19,24 179:7,11,11,13
179:14,15 180:4,8 181:25
182:13,17,18,19,20,22,23
183:2,2,4,15,19,2 2 184:4,6,7
184:8,13 185:5,13,14,20
186:1 187:11,12,18,19,20,20
187:21,22 188:2 189:14,14,16
189:18,20 190:10,15,18 191:7
191:14,19,24 192:7 193:4,7
194:1,1 196:4 197:8,12 199:1
199:2,5,9,13,4 200:1 202:25
203:4,4,8 205:2 207:17 208:9
208:21,23,24 209:3,4,10,17
210:15,19,21,22,3 211:11
212:15,17,20 213:8,14,25
215:9 216:3,7 218:23,24
219:13,20 220:4,5,8,9,10,15
220:15,17,23 221:1,2 222:22
222:23 224:9,12 225:3,3,5,15
225:15,19,24 226:6,18,24
227:2,16 228:1,4,4,6,6,7,9,9

---

228:12,13,13,15,18,18,19
232:4,11 233:1,2 234:4 235:8
236:21,24 237:17 238:5,9
239:5,7 241:7,8 242:19,24
243:6,10,16,1 8 245:12 249:2
251:9,17,20,2 0 252:1,4,23
253:3,6,13,21,22 254:6
257:24 260:25 262:13 264:12
264:15,22 265:11,22 266:2
268:2,14,15 269:1,6,9 270:5
271:8 274:20 278:22 281:7
282:1,6,1 1 291:2 295:8 298:6
**weren't** 20:23 31:20 40:24 52:23
52:24 63:22 73:14 77:24 80:2
82:23 91:14 101:6 108:11
113:11 185:25 208:10 226:21
251:18 271:16 292:2
**Western** 206:14
**wet** 299:14
**wetting** 23:20 90:1
**we'll** 8:16,17 26:16 35:14 39:16
102:13 118:9 122:10 126:12
131:21 140:24 143:24 158:24
164:13 167:17 214:13 230:20
282:14 299:1,1 301:5 303:23
308:10,19 309:7,13 310:25
**we're** 6:21 7:22 12:14 15:11,14
15:16 22:16 33:7 35:11 48:10
74:4 83:20 91:21 93:1 123:13
124:14 130:17 134:14 138:13
143:22,22 157:16 196:10
250:7,7 295:4 300:13 309:2
310:23
**we've** 8:19 12:11,12,1 8 15:8
28:9,16 41:25 42:14 82:17
136:9 150:24 165:20,23 190:1
220:19 232:3 258:19,19
286:11 290:3 291:7,8,25
**whatnot** 67:10 172:3 225:10
**whatsoever** 26:3 125:11 210:16
211:21
**whichever** 308:10
**while** 27:8 34:22 64:11 65:18
71:25 131:17 143:3 156:19
204:3 216:9 237:3 283:15
**white** 34:23 145:14,16 284:22
**whited** 225:4,5
**whiting** 132:10 166:6,10,14
167:4
**whole** 13:10 61:3 66:16,22 67:16
89:3 116:9 142:17,20 178:3
178:12 183:16 184:3,23
205:12 229:8,24 230:15
231:14,16 263:2 287:13
288:11
**wholesale** 84:12 88:17 221:18,19
**wife** 71:18 74:8,24 122:25 125:6
125:7,10,13,24 126:14,25
129:3,13 130:19,20 131:2
144:1
**wife's** 124:7 127:14
**Wilkie** 2:6 311:12
**willing** 52:24 89:9 97:22
**win** 290:13
**Windy** 109:16,19,25
**wire** 286:6 301:20
**wisdom** 148:18
**wise** 24:22
**wish** 33:24,25 226:4 260:4
291:10
**wishes** 192:18
**withdraw** 35:8
**witness** 8:13 16:25 81:13 116:25
126:24 129:6,8 137:1 139:21
139:25 149:9,11 151:9,12
152:18 156:22 157:3,4 160:15
160:16 164:3 192:20 204:22
204:23,23 205:8,9 222:6
239:25 240:5,8,10,12 251:25

255:14 256:21 257:11 263:18
271:2 275:1,2,8,11,2 1 279:3,4
279:7,14,16,1 8 280:14 281:14
284:12,17 285:12,16
**witnesses** 25:20 111:1 128:21
156:25 157:2,10 160:11
239:25 291:15
**woman** 40:5 118:23 119:2
121:17 147:10,14 151:23
**women** 74:13,22
**won** 114:21
**wonder** 130:20
**wondered** 202:7
**wonderful** 69:19 136:17 299:13
**wondering** 8:9 247:9
**word** 30:23 85:5 111:10 139:6,7
139:8 171:1 175:9 176:15
180:4 202:6 217:22,25 224:13
295:1
**wording** 260:20
**words** 31:1 97:15 124:9 139:12
170:1 186:1 211:15,16 241:24
256:4 288:8 304:18
**work** 13:10 21:5 31:8,12 62:12
62:25 64:1 77:5,12 83:13,15
96:6 132:23 144:8 157:12
197:20 218:4,7 235:4 242:24
242:25 244:8 249:4 269:5,6
272:15 275:18,19,2 1 276:7,10
280:8 305:20 306:18 310:5
**worked** 21:6 62:9 64:4,24 72:11
79:10 80:14 97:3,4 147:10
197:19 220:5 265:2 267:17,19
276:15,18 277:6 294:20,21
301:21
**working** 20:23,24,2 5 27:9 62:8
66:11 67:21 71:11 92:18
106:11 144:10 145:13,16
146:6 197:24 198:12 200:8,12
231:4 235:1 238:9 243:12,20
243:21 253:16 262:13 285:2
**works** 31:22 80:4 115:13 141:14
231:23
**world** 128:11 206:6
**worms** 150:23 160:22
**worry** 146:13,17 306:9,10,11
**worse** 164:21,22
**worth** 19:21 61:2 76:24 205:12
217:6 302:14
**wouldn't** 18:19 20:9 21:4 24:21
25:15 26:7 29:5 46:11 62:3
65:11 66:4,16 71:5 78:3 95:2
110:12 114:9 138:19 148:20
199:4 205:19 206:20 207:21
216:15 226:6 242:25 245:21
271:16 285:14 297:2
**wow** 131:9 192:6
**write** 36:10,12 65:22 70:19
105:8 108:22,23 173:20
208:15 211:12,16 216:4,6
252:16
**writer** 147:18
**writes** 14:3 31:10 78:11
**writing** 36:12 47:22 77:20
110:20 175:14 180:1 192:25
233:22 300:23 302:5
**written** 44:3 98:11 103:16
113:24 116:1,2 118:4 121:21
156:1 180:14 187:25 209:4
216:2 266:15
**wrong** 10:2 16:11,11,1 2 21:23
58:20 86:18 145:4 146:11
148:17 149:17 150:13,14
153:25 159:24 163:23 192:7
202:13 267:6 284:15 288:15
288:17 301:6 305:17
**wrongdoers** 295:8
**wrote** 59:9 68:17 118:14 135:12
148:12 191:11 211:20 264:19

266:11 289:10 307:5
**W-2** 171:20,25,2 5 172:6,9 173:8
173:13 178:4,4 182:12 184:25
185:14,15,1 7 213:15,19,23
214:3 220:11,14 268:25 269:6
271:3,9
**W-9** 262:16 263:7 266:5,12
267:22 268:14

---
**X**
---

**X** 155:16

---
**Y**
---

**Y** 155:17
**yeah** 19:11 21:14,25 38:7 43:7
43:17 45:3 52:14 53:24 55:10
60:19,22 61:4,12,1 3 63:7 73:9
85:10 88:15 101:1,4,6 103:2
108:7 109:6 111:8 112:17
113:24 115:17 116:3 132:10
136:12 137:5 140:9 149:12
161:7,12,14 175:2,10,11
180:9,22,24 188:11 190:22
191:17 206:8 216:21 223:1
234:2 240:21 244:21 245:24
246:20 250:19 251:21 252:6
253:4 254:21 260:1 261:17
262:21 265:8,25 266:10 267:3
267:12,19 268:19 307:22
309:7
**year** 19:23 52:12 53:16 125:3,8
133:22,24 158:5,7 205:12
228:14 257:22,23 280:2
292:23
**years** 19:21,22 45:7 52:14 60:22
62:12 64:13 130:9 159:23
188:19 193:3 242:18 259:10
279:25 280:2,12,1 4 301:25
**yesterday** 157:23 224:19
**Yorker** 28:12
**young** 127:21 144:2
**younger** 18:21

---
**Z**
---

**zero** 26:20 31:13 78:17,18,21
79:2 118:16 119:1,11 291:16

---
**$**
---

**$1,000** 9:20 10:1
**$10** 90:6 93:2
**$10,000** 203:15 207:17
**$12,500** 84:7
**$12.93** 84:15 87:9
**$13,500** 51:4,9 105:1 117:22
**$140,000** 125:2
**$15,729** 50:24
**$150,000** 123:2 175:12
**$16,000** 50:19
**$17,000** 274:18
**$170,000** 87:18 88:25 235:2
**$1800** 248:4
**$19** 41:22
**$2,832** 24:4 90:20
**$2.50** 84:4 87:6 88:9
**$2.53** 86:18,20
**$208,600** 87:13
**$27,000** 115:23
**$3,043.70** 50:10
**$39,000** 86:25
**$39,400** 86:25
**$4,200** 92:15
**$4,248** 24:4 90:25
**$5,000** 274:16
**$50,000** 84:9
**$6** 198:5
**$6,000** 50:15
**$6,087.41** 50:1
**$6,164.31** 49:16

**$60** 90:7 93:3
**$7** 193:23
**$700** 50:22
**$75** 105:16,17,18
**$7500** 31:21
**$76.90** 49:21
**$7800** 51:1
**$9,000** 72:5
**$900** 72:2
**$95,000** 53:17

---
**0**
---

**02** 103:21
**03** 103:21
**04** 103:21

---
**1**
---

**I** 286:4,5 301:11 302:1 304:2
**1st** 36:21 97:20 100:11,17,17
101:15 106:19 111:23 261:16
265:25 268:6
**1.1** 8:24,25
**1.25** 198:8
**1:00** 164:15
**1:15** 122:9,11
**1:19** 159:3
**1:20** 158:24
**1:50** 164:11
**10** 23:11 30:22 31:15 42:9 76:13
79:22 165:19 198:7 308:12
**10th** 89:20
**10:00** 21:1 309:13,14
**100** 74:10 114:13 115:9,25
273:17
**1001.952** 287:3
**1001.952(g)** 286:15
**104** 102:15,18 108:3
**106** 102:15 108:3
**107** 102:16 108:3
**107040** 215:12
**107055** 44:4
**107060** 46:24
**107062** 48:10
**107073** 45:15
**107084** 215:12
**108** 102:16 108:3
**109** 102:16 108:3
**1099** 171:19 178:4 213:15
220:11,12,14
**1099s** 40:25
**11** 4:14,16 124:23 151:16
**11:58** 122:13
**1128(b)** 287:9
**12** 45:6 60:22 258:25 259:14
**12:00** 309:11
**12:45** 159:1
**120** 118:3
**122469** 106:3
**122471** 104:2
**125** 34:15 109:9 281:6,13,14,17
281:20,21
**125399** 82:1
**13** 4:17 14:9 46:1 259:18
**13,500** 115:24
**13-page** 129:19
**13-3** 1:5 2:6 311:13
**14th** 30:8
**15** 76:22 99:17,18 101:10,10,14
101:20,23 122:6 132:6 310:21
**150** 31:16 79:23
**155** 83:17 221:12
**16** 4:5,9 56:25
**16-20893-CR-MORENO** 1:3
**161** 37:16,17
**162** 38:15
**163** 41:15
**164** 39:5
**1679** 52:3
**17** 4:10

**170** 24:18
**1750** 1:21 2:2
**176** 4:12 132:25 136:19 161:20
162:7,11 163:2,3 205:16,23
206:2 207:8
**177** 5:9
**178** 4:4 5:22,23 6:4,9,22 8:1 9:1
9:2,4 10:23 11:10,18 12:22
23:2,2,5 35:13
**179** 12:24,25 16:14 17:21 18:6
35:13
**18** 254:23 280:11
**19** 41:21 193:13
**19th** 185:23
**190** 112:1 209:24
**191** 4:14 232:7,11 233:13
**191-A** 4:15 233:19 234:4
**192** 4:14 229:5,21,22 232:7,11
232:18,23 233:14
**192-A** 4:15 233:20 234:4
**195** 4:10 23:6,7 35:13 89:13,17
89:19 93:2 223:11
**196** 124:17
**199** 4:9 80:19,25 81:2,10,16
219:16 221:5
**1994** 52:1
**1999** 64:14,20 218:8

---
**2**
---

**2** 1:21 2:2 4:7,8 30:23 31:15
38:22 43:19 54:19 76:14
79:22 165:19 170:11 217:9
**2nd** 186:10
**2:30** 165:1
**20** 24:2 43:23,23 61:2,14 83:24
84:9 87:24 90:9,11,19 112:25
113:9 122:6 310:21
**20th** 185:6
**20,000** 84:9 86:24 87:12
**200** 4:17 26:23 261:6,13 265:19
273:11
**2000** 51:21
**2003** 276:6
**2004** 276:11,24 278:1
**2005** 53:25 54:2 60:22 64:14
218:9
**2009** 52:7
**201** 4:6 26:25 27:1,2 30:2 35:14
70:4,20,25 218:10
**2010** 125:3
**2012** 52:9,15
**2013** 53:16 276:11
**2014** 23:11 28:17 36:5 67:21
68:1 74:5 83:22 122:23,23
134:3 152:12 250:13 261:16
261:25 267:23 268:6
**2015** 6:24 14:7,9 30:8 36:6
133:25 134:3 136:9,11,12
147:7 151:11 169:23 185:6,7
200:7 201:1,8 206:11 208:1
212:25 219:2 235:11 241:7,11
250:11,15,18 261:24 268:18
269:9 280:11,14 281:8,8,10
**2016** 151:11 154:5,6 227:3
254:19 255:3,4 257:16 260:2
280:11,14
**2018** 1:7 250:8 257:21 260:3
**202** 4:7 29:22 35:14 73:19,22
74:2,4 218:11
**204** 4:8 29:21 30:5,7 35:14 75:19
75:23 76:2,5 218:19 219:1
**205** 4:11 33:19 34:14,25,25 35:1
35:9,14 99:2,6 224:6,9
**206** 4:5 33:19 34:14 35:3,4,9,14
35:16
**207** 3:6 4:12
**21** 22:19,25
**210** 34:15,20,20 35:7,8
**212** 4:13

**218** 256:9,10,11,24
**22** 4:13 212:4,5,9,11,23
**23** 4:4,16 161:20 162:6,11 163:2
   206:11 234:12 235:14 236:11
**23rd** 206:2
**232** 4:14
**234** 3:7 4:15
**236** 4:16
**24** 6:24
**24/7** 34:17 97:8 98:8,20 99:9
   102:8 105:14 111:22
**240** 3:8,9 24:3,4 90:14,17,21
**249** 3:10
**25** 4:6,18 259:14 280:23,25
   281:4,12
**26** 42:10 287:17
**26th** 281:10
**261** 4:17
**27** 74:5 76:21 201:1,8 212:25
   234:13
**27th** 42:11
**27,000** 115:24
**272** 3:11
**275** 3:12,13
**279** 3:14,15
**28** 185:6
**2800** 92:15
**281** 4:18
**29** 1:7 113:2 114:11 278:19,19
   301:7

---

**3**

**3** 30:23 43:15,18,22 76:14,22
   104:21 211:6 259:18
**3rd** 15:1 195:12
**3:00** 164:24 165:1 309:3,11
   310:24
**3:42** 230:25
**30** 21:25 158:21 276:18 278:6,19
   310:17
**300** 24:16,17
**305-400-4261** 1:22
**305-400-4266** 2:3
**305-530-6168** 1:17
**305-961-9356** 1:17
**305.523.5118** 2:7 311:13
**31** 301:25
**311** 3:16
**3121(d)(2)** 287:17
**33128** 2:7 311:13
**33131** 1:22 2:3
**33132** 1:16
**35** 4:5
**36** 3:4,5 39:16
**360** 24:4 90:25 104:19 107:22
   108:6
**37** 40:4
**38** 39:17
**39** 40:14

---

**4**

**4** 4:15,18 43:19 211:5 235:5,10
   258:25
**4:00** 63:8
**4:33** 231:25
**40** 40:17 132:21 239:4 280:2
**400** 2:6 311:13
**403** 130:15
**404(b)** 128:12,15,23,2 5 129:22
   130:3,7 298:15
**41** 6:19
**42** 40:5 286:14 287:3
**43** 6:13,17,18 7:23,25 11:8,9,16
   11:17 12:20 16:12 21:8 23:4
   33:14 39:17
**44** 40:5
**45** 22:25 157:24 158:21 310:13
**48** 24:3 90:14,17

---

**5**

**5** 4:4 30:23 31:15 43:14,18,22,22
   44:20 55:3 76:13,22 79:22
   83:24 84:6
**5,000** 84:6
**5:30** 271:16
**5:35** 277:18
**5:48** 284:3
**50** 42:6 86:17,19 87:5 157:24
   215:12 239:4 286:21
**5200** 50:17
**56** 179:11

---

**6**

**6** 4:11 43:19 59:23 124:23
   217:15
**6.3** 38:2
**6:00** 6:13 20:15
**6:05** 299:15
**6:25** 311:5
**600** 216:18
**608(b)** 128:7,20
**624** 112:22 113:20 114:11
**63** 42:18,19
**644** 114:12
**67** 42:20,21,22 48:18 214:9
   215:11
**673** 112:10,14,18

---

**7**

**7** 30:22 31:15 43:14,18,21 44:13
   45:21 47:19 76:13,21 79:22
   81:25 214:15,25 215:1
**7th** 42:10 165:10
**7:00** 17:20 20:9
**70** 4:6
**700** 215:16 216:18
**74** 4:7
**748** 112:17
**75** 50:3
**7500** 80:3
**76** 4:8
**77** 118:21 123:19,20,22

---

**8**

**8** 4:12 12:12,17 45:8 286:5 304:2
**8:00** 17:20 165:19 309:23,24
**8:15** 26:17
**8:30** 283:23
**80** 167:19 224:23
**81** 4:9
**866-780-8355** 1:23
**89** 4:10

---

**9**

**9** 4:13 286:4 301:11,20 302:1
   305:21 306:3,21
**9:00** 11:5 17:20 35:25 283:23,25
   285:10 309:12
**9:02** 5:1
**9:30** 309:13
**9:40** 35:18,25
**9:45** 35:19
**90** 8:20 21:20,21,22
**93** 113:21,23 116:5,5
**95** 52:1
**97** 114:12,21 116:5,5 193:9
   210:6,7
**99** 1:16 4:11 50:7