```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION

 3                 CASE NUMBER 16-20893-CR-MORENO

 4   UNITED STATES OF AMERICA,

 5            Plaintiff,                    Courtroom 13-3

 6     vs.                                  Miami, Florida

 7   MONTY RAY GROW,                        January 30, 2018

 8            Defendant.
```

```
 9  ================================================

                    JURY TRIAL PROCEEDINGS
10        BEFORE THE HONORABLE FEDERICO A. MORENO
                UNITED STATES DISTRICT JUDGE
11  ================================================

12  APPEARANCES:

13  FOR THE GOVERNMENT:     KEVIN J. LARSEN, AUSA
                            JON M. JUENGER, AUSA
14                          DAREN GROVE, AUSA
                            United States Attorney's Office
15                          Economic Crimes Section
                            United States Attorney's Office
16                          99 Northeast Fourth Street
                            Miami, Florida 33132
17                                              305-961-9356
                                           Fax: 305-530-6168
18                                       kevin.larsen@usdoj.gov
                                          jon.juenger@usdoj.gov
19                                        daren.grove@usdoj.gov

20  FOR THE DEFENDANT:      DANIEL L. RASHBAUM, ESQ.
                            JEFFREY D. MARCUS, ESQ.
21                          Marcus Neiman & Rashbaum, LLP
                            2 South Biscayne Boulevard
22                          Suite 1750
                            Miami, Florida 33131
23                                              305-400-4261
                                           Fax: 866-780-8355
24                                     drashbaum@mnrlawfirm.com
                                        jmarcus@mnrlawfirm.com

25
```

```
 1                              KATHRYN A. MEYERS, ESQ.
                                Law Office of Kathryn A. Meyers PLLC
 2                              2 South Biscayne Boulevard
                                Suite 1750
 3                              Miami, Florida 33131
                                                    305-400-4266
 4                                          kate@kmeyerslaw.com

 5   REPORTED BY:               GILDA PASTOR-HERNANDEZ, RPR, FPR
                                Official United States Court Reporter
 6                              Wilkie D. Ferguson Jr. US Courthouse
                                400 North Miami Avenue - Suite 13-3
 7                              Miami, Florida  33128   305.523.5118
                                gphofficialreporter@gmail.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      TABLE OF CONTENTS
 2                                                    Page
 3
 4
    Gary Walker ................................................ 8
 5
    Direct Examination By Mr. Juenger .......................... 8
 6
          Cross-Examination by Mr. Marcus ..................... 12
 7
    Closing Argument by Mr. Larsen ............................ 42
 8
    Closing Argument by Mr. Rashbaum .......................... 79
 9
    Closing Argument by Mr. Rashbaum (Continuation) ........... 106
10
    Closing Argument by Mr. Juenger ........................... 123
11
    Reporter's Certificate .................................... 182
12
13
14
15
16                          EXHIBITS
17  Exhibits                  Marked for          Received
                            Identification      in Evidence
18
    Description               Page      Line     Page    Line
19
    Defendant's Exhibit Number 219 .................... 13        1
20
21
22
23
24
25
```

```
 1          (The following proceedings were held at 9:13 a.m.:)
 2              THE COURT:  Good morning.
 3              MR. JUENGER:  Good morning, Your Honor.
 4              THE COURT:  We were missing four, but now we are almost
 5    there.  We are missing one.  We were missing four at 9:00.  We
 6    had four at a quarter till 9, but now we have 13 jurors.  And 14
 7    jurors is probably too much under our laws.
 8              What do you all want to do?
 9              The defendant is present, defense counsel, Government
10    counsel.
11              What do you all want to do?
12              MR. RASHBAUM:  About what?
13              THE COURT:  I will not infer guilt from silence.
14              MR. RASHBAUM:  I'm sorry.  What's the question?
15              THE COURT:  We have 13 jurors.  The law says we should
16    have 12.  There's a juror missing.
17              MR. LARSEN:  We would like to wait, at least --
18              THE COURT:  So surprising.  What say the defense?
19              MR. RASHBAUM:  I guess we have no objection to waiting.
20              MR. MARCUS:  Which juror is missing, Your Honor?
21              THE COURT:  Well, at least that's an intelligent
22    question, though it doesn't have any legal basis, but at least
23    it has a strategic one.  It is not the same juror who's been
24    late every day.  If not, I would be pushing you all to excuse
25    him, but it's a different juror.  The other juror got here on
```

1   time.  I wouldn't say early, but on time.  So we'll wait.

2          MR. JUENGER:  Your Honor, while we wait --

3          THE COURT:  Oh, I knew you were going to have something

4   anyway, which is why I didn't want to come out at 8:30.

5          The copier jammed because of the length of the jury

6   instructions, probably.  So I've given you what I'll refer to as

7   the semi-final jury instructions, but I think they're probably

8   pretty final, but you can look at it.  Do you all have copies?

9   How many copies do you have, two, three?

10          MR. JUENGER:  Yes, Your Honor, two.

11          THE COURT:  Two?

12          MR. JUENGER:  Yes.

13          THE COURT:  Okay.  That's enough.  34 pages.  So you

14   can look at it.

15          Okay.  What do you wish to say at the lectern so that

16   the court reporter can hear you perfectly?

17          Is there someone there who's going to tell me?

18          THE COURT SECURITY OFFICER:  I could check, Your Honor.

19          THE COURT:  No, why don't you wait out there?  I'm okay

20   with these guys.

21          THE COURT SECURITY OFFICER:  I'll wait out there.

22          THE COURT:  I'm okay with these guys.  I'm packing.

23   They won't do anything.  I'm okay.  They are always protecting

24   us.  I'm fine.  Okay.

25          MR. JUENGER:  So, Your Honor --

1        THE COURT:  So it's not like a filibuster.  It's

2  actually a practical thing we're doing here.

3        MR. JUENGER:  Yes.  Mr. Marcus proposed some redactions

4  to the first CBS story of February 2015.  I've had a chance to

5  review his proposals.  I agree with a few of them and I disagree

6  with a few of them.

7        THE COURT:  I'm going to let the whole thing in.

8  That's why we spent all that time --

9        MR. JUENGER:  Fair enough.

10       THE COURT:  -- doing it.  We spent all that time.  I

11 struggled with it.  I suggested a redaction.  But once

12 everything comes in, I gave them a super limiting instruction,

13 which they understood, and they understood the difference

14 between the first CBS story and the second.  The first one has

15 nothing to do with the case.  It's just for the defendant's

16 state of mind.  The second one does have that, and they could

17 probably -- they probably know more about hearsay than you all

18 do, by my explanation.  They really do.  They understand the

19 person is not here, but sometimes it does, and this is kind of

20 like the perfect case for that.  Other cases are not as good.

21 So you don't need to redact it.  They know that it's only a

22 story and they understand with that limiting instruction.  So

23 there's no point redacting it.

24       Now, did you introduce the actual video?  You didn't,

25 did you?

1          MR. JUENGER:  I don't -- no.

2          THE COURT:  You didn't.  So that's it.

3          MR. JUENGER:  Okay.

4          THE COURT:  I don't know why you didn't, but that's

5     fine.

6          THE COURT:  Okay.  Unless it makes it an issue but I

7     don't think it's an issue now.

8          MR. MARCUS:  That's fine.  We preserved our objections

9     to that exhibit.

10          THE COURT SECURITY OFFICER:  They're all here, Your

11    Honor.

12          THE COURT:  They're all here.  Bring them in.  Let's

13    go.  Put on Mr. Walker.  Let's go.

14          THE COURT SECURITY OFFICER:  All rise for the jury.

15     (The jury entered the courtroom at 9:18 a.m.)

16          THE COURT:  Good morning, Mr. Walker.  Right over

17    there, please.  You know where it is.  Sorry you had to wait.

18          Good morning, everybody.  Thank you for being here.  I

19    think we've got everybody, right?

20          Okay.  Have a seat.  Now we'd got everybody.  Okay.

21          Has anybody read anything about the case, googled

22    anything about the case, talked about the case?  Did anybody

23    contact you about the case?  Nobody answers.  Nothing is going

24    to happen to you if you tell me.  If you don't tell me and we

25    find out, then that's different.  But go ahead and tell me.

1    Nobody.

2              Okay.  You may conclude with your direct.

3              MR. JUENGER:  Thank you, Your Honor.

4                      DIRECT EXAMINATION

5    BY MR. JUENGER:

6    Q.  Good morning, Mr. Walker.  When we left off yesterday, you

7    were about to tell us what you said to Mr. Grow and the others

8    at this dinner meeting about the bona fide employee exception to

9    the Anti-Kickback Statute.  Do you recall that?

10   A.  Yes, sir.

11   Q.  And I want you to do that for us now just to tell us to the

12   best of your recollection what you said at the dinner, but I

13   want to make sure that you understand that we do not need to

14   know all the expertise that might be in your brain.  All we care

15   about is what you said or didn't say at the --

16             THE COURT:  Oh, just ask the question.

17             What did he say?  What did Mr. Grow say?

18   BY MR. JUENGER:

19   Q.  What did you say?

20   A.  We talked about the difference between a marketing person

21   being paid as a bona fide employee versus an independent

22   contractor; and it's kind of a high-level discussion of the fact

23   that if the provider, in this case the pharmacy, exercises

24   enough control over the marketing people, then the Government is

25   okay with paying a percentage commission.  And so that's kind of

1   at the 10,000-foot level.  If the Government doesn't like

2   percentage-based commissions paid to 1099 people who are not --

3   1099 is shorthand for independent contractor.  So we talked

4   about just basically the difference between what it takes to be

5   a bona fide employee who is eligible to receive a percentage

6   commission and an independent contractor who should not be

7   receiving one.

8   Q.  And did you get into any deeper level of detail than that?

9   A.  I don't specifically recall.  I mean, I'd be surprised if we

10  didn't talk -- I'm almost certain that we would have talked

11  about the level of control because it's so bedrock in what the

12  distinction is.

13  Q.  And what is it about control that you would have discussed?

14  A.  The Government believes that if the marketing person --

15          MR. MARCUS:  Your Honor, I'm just going to object to

16  "would have" and just focus on what he remembers actually was

17  said.

18          THE COURT:  Yeah.  What did you say and what did he

19  say.  Those two things only.

20          THE WITNESS:  Okay.  I don't specifically recall the

21  details of what we would have talked about other than that

22  concept.  That was the purpose of the meeting.

23  BY MR. JUENGER:

24  Q.  Okay.  And during the conversation, did you ever say that

25  the bona fide employee safe harbor just means become a W-2 and

Walker - Direct

1    get paid as a W-2?  Is that sufficient?  Would you have said

2    that?

3    A.  I would not have said that.

4    Q.  And did you ever tell anyone at the dinner that once a

5    person becomes a bona fide employee, then the gloves are off and

6    they can just do whatever they want?

7              MR. MARCUS:  Objection, Your Honor.  Leading.

8              THE COURT:  It is leading, but in view of the way all

9    the questions have been asked, I'm going to exercise my

10   discretion and overrule that objection.

11             MR. MARCUS:  He's also asking -- he's trying to elicit

12   an opinion as to what he might have said.  Again, he doesn't

13   seem to remember the specifics.

14             THE COURT:  Then that goes to the weight and not its

15   admissibility and you'll cross-examine him on it, but I'm going

16   to overrule the objection.

17             THE WITNESS:  I'm sorry.  So the question again was?

18   BY MR. JUENGER:

19   Q.  Yes, the question was:  Did you tell anyone at the dinner

20   that once a person becomes a bona fide employee, then, in

21   effect, the gloves are off and they can do whatever they want?

22   A.  I would not have said something like that.

23   Q.  And specifically, did Mr. Grow or anyone at the dinner tell

24   you anything about what his sales reps were doing or how he was

25   operating his marketing business?

Walker - Direct

1  A.  I don't recall any of those details.

2  Q.  And do you know what an opinion letter is?

3  A.  Yes, sir.

4  Q.  What is an opinion letter?

5          MR. MARCUS:  Objection, Your Honor.

6          THE COURT:  Sustained.

7  BY MR. JUENGER:

8  Q.  Did you provide --

9          THE COURT:  Sustained.

10  BY MR. JUENGER:

11  Q.  Did you have other conversations at the dinner besides the

12  issue of health care compliance; just personal banter, for

13  example?

14  A.  Yes, sir.

15  Q.  And after the dinner, did you ever have any contact with

16  Mr. Grow or PCA again?

17  A.  I sent one follow-up email.  I had seen an article on this

18  1099 versus W-2 topic, and I sent that as a follow-up to

19  Mr. Smith.  But otherwise, no, sir.

20  Q.  And Mr. Smith is at what company?

21  A.  Oh, I'm sorry.  The pharmacy.

22  Q.  You never sent anything to Mr. Grow?

23  A.  No, sir.

24          MR. JUENGER:  Okay.  That's all I have, Your Honor.

25          THE COURT:  Cross-examination.

Walker - Cross

1                        CROSS-EXAMINATION

2    BY MR. MARCUS:

3    Q.  Good morning, Mr. Walker.

4         You said yesterday on direct that you had opened a file

5    to represent, I believe, PCA; is that true?

6    A.  Yes, sir.

7    Q.  And by opening a file, you checked conflicts to make sure

8    you could provide legal services --

9    A.  Yes, sir.

10   Q.  -- to the pharmacy?

11   A.  Yes, sir.

12   Q.  And you had a conversation with Mr. Patrick Smith about the

13   representation?

14   A.  Yes, sir.

15   Q.  And you actually drafted an engagement agreement that you

16   signed to represent them?

17   A.  Yes, sir.

18   Q.  Okay.  You recall doing that the day before?

19   A.  I don't recall the specific day, but yes, we did the

20   engagement letter, yes, sir.

21        MR. MARCUS:  Your Honor, at this time I'd offer into

22   evidence Defense Exhibit 219.

23        MR. JUENGER:  No objection.

24        THE COURT:  All right.  It will be admitted.

25        MR. MARCUS:  Thank you.

1          (Defendant's Exhibit Number 219 was received in evidence.)

2    BY MR. MARCUS:

3    Q.   Mr. Walker, engagement agreements are a common thing for

4    lawyers to do when they represent a client, correct?

5    A.   Yes, sir.

6    Q.   And you said one of the reasons -- you check conflicts to

7    make sure you can take on the representation?

8    A.   Yes, sir.

9    Q.   And then the agreement sort of defines in general terms what

10   the scope of that work will be, does it not?

11   A.   Yes, sir.

12   Q.   Okay.  And you said before you drafted this agreement, you

13   had some conversations with Patrick Smith?

14   A.   Yes, sir.

15   Q.   And he was the CEO of PCA?

16   A.   Yes, sir.

17   Q.   And you don't really recall the specifics of that discussion

18   today?

19   A.   I know from the emails that it was about the 1099, W-2, but

20   I don't specifically recall the details of the phone

21   conversation.

22   Q.   Okay.  So this is the day before the Flemings dinner.  You

23   see you're emailing the engagement letter to Mr. Smith?

24   A.   It's actually Mr. Smith emailing --

25   Q.   Oh, you're right.  You're right about that.  Let me just

1   show you the attached agreement.

2          And again, this is on the letterhead of your law firm

3   at the time?

4   A.  Yes, sir.

5   Q.  This paragraph 1, scope of work, that's defining in general

6   terms what this engagement will be about.  You see that?

7   A.  Yes, sir.

8   Q.  And you drafted this, correct?

9   A.  Yes, sir.

10  Q.  So when you say that you would like to confirm that we will

11  provide legal assistance with respect to certain health care

12  compliance issues related to your compounding pharmacy and its

13  relationships with distributors and marketing representatives,

14  that is what you were being brought in to do, correct, to give

15  advice in that area?

16  A.  Yes, sir.

17  Q.  Okay.  And you had a dinner meeting the next day with

18  Patrick Smith, the CEO, Mr. Matthew Smith, the chief operating

19  officer of the pharmacy, and Monty Grow; is that correct?

20  A.  Yes, sir.

21  Q.  And you never talked to Mr. Grow before that dinner,

22  correct?

23  A.  No, sir.

24  Q.  But the dinner was being set up by your -- by PCA, right?

25  A.  Yes, sir.

1   Q.   Okay.   And they made you aware that Mr. Grow was an outside

2   marketer, didn't they?

3            MR. JUENGER:   Objection as to hearsay, Your Honor.

4            THE COURT:   Overruled.

5            THE WITNESS:   Ask it again.   I'm sorry.

6   BY MR. MARCUS:

7   Q.   You were told by Mr. Smith that Mr. Grow was an outside

8   marketer for their compounding pharmacy?

9   A.   Yes, sir, I think so.

10  Q.   Right.   And you talked about that the general discussion was

11  about bringing their relationships with outside marketers into

12  legal compliance?

13  A.   Yes, sir.

14  Q.   Okay.   Now, you said that 1099 is a shorthand for being an

15  independent contractor?

16  A.   Yes, sir.

17  Q.   And you agree that W-2 is like a shorthand for being an

18  employee?

19  A.   Yes, sir.

20  Q.   And you talked about the ability to be paid commissions as

21  an employee; that that's perfectly legal?

22  A.   As a bona fide employee, yes, sir.

23  Q.   Right.   And you're referencing -- when you say that, right,

24  you're talking about the fact that, right, that if you set it up

25  correctly with compliance, that's a legal relationship?

Walker - Cross

1    A.  Yes, sir.

2    Q.  And what you were going to be doing is be giving advice on

3    the company to how to do that properly, correct?

4    A.  Yes, sir.

5    Q.  You were also there to give reassurance to Mr. Grow that

6    this issue was going to be handled appropriately.  Do you recall

7    that?

8    A.  I don't recall that specifically, but it's not unusual for a

9    lawyer to be there to kind of validate an idea.

10   Q.  Right, but let me ask you this:  You were at the dinner.  At

11   the time of the dinner, you were made aware by Mr. Smith that

12   they had every intention of formalizing an employee W-2

13   relationship with Mr. Grow?

14   A.  Yes, sir.

15   Q.  Right.  And, in fact, you told that to law enforcement,

16   right, when they came and asked you about it months later,

17   correct?

18   A.  A month later.

19   Q.  No, no.  Law enforcement came to you, I believe, in August

20   of last year to ask you some questions.

21   A.  Oh, I'm sorry.  Yes, sir.  I'm sorry.

22   Q.  Okay.  And they asked you about this, right?

23   A.  Right.  Yes.

24   Q.  And you told them that Mr. Grow -- that you were told by

25   Mr. Smith that Mr. Grow was going to be brought over to be an

Walker - Cross

1   employee of the pharmacy?

2   A.  Yes, sir.

3   Q.  And you also told them that you were there -- the purpose of

4   the dinner was to give comfort, reassurance to Mr. Grow that

5   this process would be handled in a --

6   A.  I don't know about comfort.  I mean, I'm there to explain

7   what the law is.

8           THE COURT:  Okay.  Can I have you at the lectern?  That

9   way the witness looks at you, and he can look at the jury

10  instead of you having a dialogue there.  It makes it easier for

11  me and maybe for the jurors.  Thank you.

12  BY MR. MARCUS:

13  Q.  Were you finished answering, Mr. Walker?

14  A.  I'm sorry.  Again?

15  Q.  You knew that Mr. Grow was an outside marketer that was

16  doing work for the pharmacy --

17  A.  Yes, sir.

18  Q.  -- on a 1099 basis?

19  A.  Yes, sir.

20  Q.  And you were told that they wanted to bring him over as an

21  employee, right, as a W-2 --

22  A.  Yes, sir.

23  Q.  -- to be compliant, correct?

24  A.  Yes, sir.

25  Q.  And that was the reason Mr. Grow was at the dinner that

Walker - Cross

1   night, right?

2   A.  I don't know what other reasons he had, but, I mean, that

3   certainly was what I was aware of.

4   Q.  Mr. Smith wanted Mr. Grow to be comfortable with the way the

5   pharmacy was going to handle this serious issue; isn't that

6   right?

7   A.  I mean, I suppose so.  The word "comfortable," I don't know.

8   I suppose so.  I don't want to parse words, but I guess so.

9   Q.  Right.  Well, you were being brought in, right, to provide

10  expertise in this area.  That was the purpose of the engagement?

11  A.  Yes, sir.

12  Q.  Okay.  Now, you yourself, did you ever talk with

13  Mr. Corcoran, the general counsel of the company?

14  A.  I don't think so.  Not back then, and I don't recall it in

15  the past few months.

16  Q.  Right.

17  A.  I may.  I don't know.  Recently I may have, but I know I had

18  not spoken with anybody other than Mr. Smith back at that time.

19  Q.  Okay.  And you don't know what other outside law firms were

20  doing or not doing?

21  A.  No, sir.

22  Q.  Do you know the law firm firearm Frier Levitt, for example?

23  A.  I know them, yes, sir.

24  Q.  And they are a specialist in the same area you are, in

25  health care?

1    A.  Yes, sir.  Yes, sir.

2    Q.  Okay.  You don't know the work they were doing?

3    A.  No, sir.

4    Q.  And you don't know the work that was done after that dinner

5    on February 26 of 2015, do you?

6    A.  No, sir.

7    Q.  Okay.

8         MR. MARCUS:  Nothing further, Your Honor.

9         THE COURT:  Redirect.

10        MR. JUENGER:  No redirect, Your Honor.  The Government

11   rests its rebuttal case.

12        THE COURT:  Thank you, Mr. Walker.

13        I'm sorry?

14        MR. JUENGER:  The Government rests its rebuttal case,

15   Your Honor.

16        THE COURT:  Thank you, Mr. Walker.

17        THE WITNESS:  Thank you, Judge.

18     (The witness was excused.)

19        THE COURT:  Ladies and gentlemen, you've heard all the

20   evidence that you are to consider in the case.  Two parts of the

21   trial remain.  One is the arguments from the lawyers, and the

22   other is the jury instructions from the Court.  So I have to go

23   over the jury instructions with the lawyers now.  They know more

24   or less what I'm going to tell you about the law, but I have to

25   confirm that, and then we have to chat about how much time they

1   really want to spend with you in closing arguments.  Sometimes

2   I'm tempted to ask the jurors what they think would be a good

3   amount of time for closing argument, but I haven't had the

4   courage to do that yet.  One of these days I'll do that.

5        All right.  So that means I've got to send you back

6   into that room, and we'll bring you back.  Okay?  Now, don't

7   leave.  Don't go wandering to the cafeteria or out.  You can go

8   in the hallway if you are too crowded in there, but don't leave

9   the hallway.  Okay?  Thank you.

10        THE COURT SECURITY OFFICER:  All rise for the jury.

11     (The jury retired from the courtroom at 9:35 a.m.)

12        THE COURT:  Okay.  I heard that door.  All right.

13   Good.

14        Okay.  You're moving for judgment of acquittal on all

15   counts, right, Mr. Marcus?

16        MR. MARCUS:  Yes, Your Honor.

17        THE COURT:  I need the Government to come up.  Tell me

18   about the United States versus Medina case, 485 F.3d 1291, and

19   what am I going to do with that case when it comes to the health

20   care fraud?  How is this case different from that case where the

21   Court of Appeals, Judge Fay, and along with Judge Tjoflat and a

22   visiting judge, reversed convictions for health care fraud.

23   What do I do with that?

24        Who from the Government is going to approach the

25   lectern?  You were going to now and all of a sudden you

Jury Trial

1    retreated.

2          You're familiar with that case?

3          MR. LARSEN:  Your Honor, I have read that case, but I

4    have not read it recently.  I was planning to read the case --

5    my impression, Your Honor, was that there would be some argument

6    that would be post trial.

7          THE COURT:  Yeah.  Okay.  I'm concerned about it.

8          MR. LARSEN:  I certainly remember arguing that case for

9    Your Honor in a kickback case that was done a few years ago

10   dealing with the conspiracy to commit or to defraud the United

11   States and to pay health care kickbacks.  And Your Honor --

12         THE COURT:  And it only had kickbacks.

13         MR. LARSEN:  No.  Well, in that case --

14         THE COURT:  Isn't that the issue?

15         MR. LARSEN:  Yes.  It was a multi-object conspiracy

16   case involving a home health care agency, and we argued the

17   Medina case.  I believe Your Honor was reluctant on the

18   multi-object conspiracy -- the conspiracy to defraud.

19         THE COURT:  What did I do?

20         MR. LARSEN:  You kept the conspiracy to defraud in.

21   You kept the multi-object conspiracy in.

22         THE COURT:  And what did the jury do?

23         MR. LARSEN:  The jury did convict on all counts.

24         THE COURT:  And more importantly, what did the Court of

25   Appeals do?

1          MR. LARSEN:  The Court of Appeals upheld the

2    convictions.

3          THE COURT:  Okay.  Well, here in the Verdict Form that

4    I've proposed for you all, we have the objects of the

5    conspiracy.  So I'm not concerned with that because the jury can

6    unanimously find; but by reading this case, it's obviously not

7    helpful to you, is it?

8          MR. LARSEN:  Your Honor, again, if I had time to

9    refresh my understanding of the Medina case last night, and

10   that's on me, but my understanding was that the Court in that

11   case --

12         THE COURT:  How about this:  I'll read a couple of

13   lines to you.

14         MR. LARSEN:  Okay.

15         THE COURT:  "We hold that based on the facts of this

16       case, representatives of Ocean and United paying kickbacks

17       alone is not sufficient to establish health care fraud.

18       While we acknowledge that paying kickbacks like those at

19       issue in this case is a violation" -- and then they cite the

20       statute -- "we cannot hold that this conduct alone is

21       sufficient to establish health care fraud without someone

22       making a knowing false or fraudulent representation to

23       Medicare."

24         And then they distinguish -- the individual named

25   Guerra loses on all counts because, apparently, there was

1  enough.  But, you know, I mentioned before, last week, that

2  there's an issue with this, and I don't think this case helps

3  you.

4           MR. LARSEN:  Your Honor, I think that there is plenty

5  of evidence that the jury can find that there was fraud in this

6  case, that there was health care fraud.  And the evidence --

7           THE COURT:  What's the fraud?

8           MR. LARSEN:  The fraud is the hiding of the copays.

9  There is evidence in this case that prescriptions, that

10 documents, the underlying transaction documents were altered.

11 Josie Brundige testified about that.

12          THE COURT:  But by whom?  See, isn't that the issue?

13          MR. LARSEN:  Well --

14          THE COURT:  I mean, there was fraud in the Medina case,

15 certainly by Guerra, because there was Isabel Guerra, Isabel

16 Canepa and Pura Medina.  The issue was who did what in that

17 case?  And here, what are you going to tell the jury that Grow

18 did to commit fraud?  The kickbacks I understand.  I'm denying

19 the motion for judgment of acquittal on the receipt and sending

20 of kickbacks.  I think there's sufficient evidence.

21          MR. LARSEN:  Well, Your Honor, I think we can start

22 with the conspiracy with the pharmacy to artificially engineer

23 the products.  Those were the claims that were submitted to

24 engineer the products for the sole purpose of jacking up the

25 reimbursement which led --

1          THE COURT:  Okay.  And who submitted those claims?

2          MR. LARSEN:  The pharmacy, but there's a --

3          THE COURT:  The pharmacy is not a defendant in this

4     case.

5          MR. LARSEN:  He caused the claims, Your Honor.  He

6     caused the claims to be submitted.

7          THE COURT:  How did he cause the claims to be

8     submitted?

9          MR. LARSEN:  He referred each prescription.  The

10    pharmacy couldn't have submitted the claim if Mr. Grow didn't

11    submit the prescription, and that's what this case is about.

12    It's about him going out, beating the bushes, finding Tricare

13    beneficiaries, signing them up for stuff that they did not need.

14    It's a difference between efficacy and need.  They did not need

15    it.  They have all testified that they did not need the

16    products, and then the evidence is replete in this case with the

17    fact that there was discussions between members of the pharmacy,

18    Matt Smith -- We heard a witness testify today --

19         THE COURT:  Did we hear from Matt Smith?

20         MR. LARSEN:  We did not hear Matt Smith, but there is

21    evidence in the case --

22         THE COURT:  Okay.  Because I must have missed it.

23         MR. LARSEN:  No, Your Honor.  But there is evidence in

24    this case about Matt Smith's statements, and they are throughout

25    the documents that have been offered and admitted by both

1    parties in this case.

2            THE COURT:  I know, but the purpose -- yeah, they have

3    been.  But the reason is, if there's a statement in furtherance

4    of the conspiracy, it's admissible for that, and if it's to

5    provide context.  And I suspect, though I haven't heard from the

6    defendant, that they may say that Smith is guilty of something.

7    They may say that all kinds of individuals are guilty of

8    something.  Tricare is guilty of incompetence and Smith is

9    guilty of a crime and Lay is guilty of something, and

10   Halliburton, too, and Bjerke and all of that.  But the issue is

11   Grow.  What did Grow do specifically?

12           Were doctors involved, too?

13           MR. LARSEN:  Yes, doctors were involved.  Grow was --

14   well, I'd like to stay with the first topic.

15           THE COURT:  Which doctor was involved and what did the

16   doctor do?  And did he commit a crime?

17           MR. LARSEN:  Your Honor, the doctors -- for example,

18   one of the doctors in the case is a doctor named either Hoang

19   Long or Long Hoang.

20           THE COURT:  Did he testify?

21           MR. LARSEN:  He did not, but his name is on each of the

22   prescriptions, and those are admitted in evidence.  But --

23           THE COURT:  So they are false prescriptions.  So the

24   doctor committed a crime or the doctor did not commit a crime?

25           MR. LARSEN:  Your Honor, the case, it's an ongoing --

1   it's an evolving investigation.  The doctors may have committed

2   a crime.

3           THE COURT:  I know and I'm not suggesting you should

4   tell me.  The problem, of course, is can you have health care

5   fraud without -- if you falsify a doctor's prescription, fine,

6   but how do we know it's not a legitimate prescription?  See,

7   these are the questions the jurors are going to have anyway.

8           MR. LARSEN:  Your Honor, I believe that there's enough

9   evidence in this case to send this issue to the jury.

10          THE COURT:  I know.  I got that conclusion.  Obviously,

11  you do.

12          MR. LARSEN:  Your Honor, there are emails in evidence

13  where the defendant is telling through the telemedicine

14  companies to have the doctors change the prescriptions.  In

15  fact, there's an email I'm going to reference in my closing

16  statement today where he says, hey, I need these changed, these

17  prescriptions changed to 360 grams.

18          THE COURT:  All right.  Hold on a second.  What about

19  that?

20          MR. MARCUS:  Well, it's a mischaracterization.  So you

21  could pull up the exhibit.  What you're going to see --

22          THE COURT:  If it's a mischaracterization where lawyers

23  always say, objection, mischaracterization of the evidence, I

24  always say overruled.  They decide which side's characterization

25  is correct or not.

1        Look at all this, everybody is a team player here, huh?

2        MR. MARCUS:  Your Honor, the evidence in Medina was

3   stronger for the Government than it is in this case, and the

4   Eleventh Circuit was quite clear:  You have to prove every

5   essential element beyond a reasonable doubt with specific and

6   reliable evidence.  You first have to show that the claims

7   submitted to Tricare are false.

8        THE COURT:  Well, I don't know about the reliable.  It

9   has to be evidence.  The jurors can disagree.  Because the

10  Government suggested in Medina that they couldn't call witnesses

11  who were involved in crime because they wouldn't be good

12  witnesses, and Judge Fay very appropriately said, that's the

13  problem with the Government's burden of proof.  And, my

14  goodness, I suspect 60, 70 percent of our trials have people

15  with problems as witnesses.  So that's not an issue.

16       MR. MARCUS:  The only doctor that testified in this

17  case was Dr. Bansal on his one prescription who came in and

18  said, I didn't alter the prescription.  I made a medical

19  judgment.  I was asked, I changed from one formula to the other

20  when it wasn't available.  I didn't alter my choice.  That's the

21  only evidence of --

22       THE COURT:  And what about the evidence saying, he's

23  not a good doctor in that sense because he gives us grief.  We

24  can't have our scheme?

25       MR. MARCUS:  That may be an opinion, but that's

1    irrelevant to whether his medical judgment is changed or altered

2    or corrupted.  That's the point.  There's a lot of guesswork

3    here.  There's no evidence that's been presented that doctors

4    were corrupted, that they altered or forged prescriptions, that

5    the telemedicine company did it.

6          There are a couple of emails where Mr. Grow may

7    complain and say, hey, you know, the doctor didn't check this

8    off.  Can you follow up with him?  That doesn't show control or

9    conspiracy.  That shows Mr. Grow following up, and the problem

10   is, they never complete the story.  They never bring in the

11   owners or managers from the telemed companies to say, hey, this

12   is what we did.  There's no evidence that they did anything

13   improper that's been proven in this trial, either from

14   physicians, nurses, the telemed companies.

15         All they had were a couple of patients who talked

16   about, you know, a conversation and what was or was not asked.

17   So they have no ability to check --

18         THE COURT:  Why isn't that enough?

19         MR. MARCUS:  Because there's no evidence that the

20   prescriptions given were not medically proper, and by the way,

21   there's been no evidence in this trial that there was a lack of

22   medical necessity.

23         So, for example, he raised the issue of the

24   formulations.  These formulations are all true.  They correctly

25   identify the ingredients that go into each formulation of the

1    medication.  The claim then gets submitted to Tricare, and

2    Tricare has its own price schedule.  They set the prices.  So

3    there's nothing false in that claim submission.

4          And what Medina said is, just because you have a

5    kickback pattern, that doesn't taint the claims themselves.  It

6    doesn't prove they're false.  It doesn't prove that they weren't

7    medically necessary and that they weren't appropriately

8    prescribed.  And that's the problem with this case, is they

9    focused on kickbacks.  It's their right.  It's their burden.

10   But they haven't proven lack of medical necessity.  They haven't

11   proven that these prescriptions or the claims that were

12   submitted were false.

13         And by the way, even if they could even cross that

14   hurdle, which they haven't come close on, they then have to

15   prove that Mr. Grow, like the employee in Medina, had knowledge

16   that the claims sent to Tricare had false information in them.

17   They haven't even come close to that.

18         So that's the point, is that this case is weaker for

19   the Government than Medina.  The Medina court was quite clear.

20   They said it should have been granted, a Rule 29, on those

21   counts, and there's no reason to send this to the jury and

22   confuse them, Your Honor, as to these issues.

23         MR. LARSEN:  Your Honor, conspiracies are proved with

24   inferences, and the case law says that over and over again.  The

25   conspirators or conspiracies are not proved through direct

1    evidence alone.  There are inferences, and this case is full of

2    inferences that Mr. Grow set a chain of course.  He was the

3    member of a scheme, Your Honor.  He was a part of a scheme.

4         Part of the charge and part of the jury instructions in

5    this case involve aiding and abetting, and there's evidence that

6    Mr. Grow aided and abetted with all of the sales reps to get

7    prescriptions for people that didn't need it.  There is evidence

8    that he aided and abetted with uncharged co-conspirators, like

9    those at the pharmacy, to jack up the prices for medically

10   equivalent products just for purposes of submitting false claims

11   to Tricare.  These claims -- Tricare would not have paid these

12   claims had they known that the formulations were being

13   manipulated because of mere packaging.  The only difference --

14   the witness testified the only difference between ethoxy,

15   between the defendant's ethoxy was how it was packaged.  They

16   opened up the tub of it and put it into little one millimeter

17   jars, and they could bill $2,000 for that.

18        So I think there's plenty of evidence.  I think this is

19   an intelligent jury.  They can draw the inferences.  I think the

20   Government should be given that benefit.  If the jurors feel

21   that we have not proven it, then the jurors are the sole finders

22   of fact.  I think that the Government has laid a sufficient

23   legal foundation for these fraud charges.

24        From what I recall in the previous case when we

25   discussed this case three, four years ago, and it was a

1   conspiracy to defraud and to pay and receive health care

2   kickbacks, and the issue did turn on -- you know, Medicare in

3   that case doesn't pay for claims where there are lies or, like

4   in this case, formulations that are being manipulated.

5            THE COURT:  Now, look what Medina says:

6            "The Government argues that Medina was the technician

7        at United who prepared the compounded medications discussed

8        previously.  The argument is that since there was evidence

9        that compounded medication was given to patients when

10       Medicare was billed for manufactured medication, she is

11       guilty of conspiracy to commit health care fraud.  Even if

12       we put aside the fact that the evidence in the record is not

13       sufficient to sustain a conviction as to anyone for health

14       care fraud on this ground, Medina's actions in preparing the

15       compounded medication would still not be sufficient to

16       establish her part in a conspiracy.  There is no evidence in

17       the record that shows Medina was preparing the compounded

18       medication with knowledge that manufactured medication was

19       actually being prescribed.  Thus, there is insufficient

20       evidence to show Medina's knowing participation in a

21       conspiracy to defraud the United States or commit health

22       care fraud.  Based on this record, the Government offers no

23       other relevant evidence as to any of Medina's actions that

24       would show her participation in a conspiracy for any of the

25       three objectives charged.  Therefore, we vacate Medina's

1        conviction as to the multi-objective conspiracy count."

2            Okay.  Tell me how that's different from this case.

3            MR. LARSEN:  Well, Your Honor, in this case there is

4    not a pharmacy technician who's been charged.

5            THE COURT:  True.

6            MR. LARSEN:  This involves a chain of events that

7    originate with the defendant.  And again, there is ample

8    evidence in the evidentiary record that the chain that has begun

9    with Mr. Grow, the manipulating of the ingredients, but also

10   dictating which products these doctors should apply, dictating

11   that everyone gets a pain cream, everyone gets a scar cream,

12   everyone gets the vitamin product, and when those products are

13   not selected, going back to those doctors and asking for the

14   changes.

15           The defense characterization just isn't -- it's not

16   intellectually honest.  This isn't just about a missing

17   signature or a missing -- this is about missing refills, okay,

18   missing refills because of the money, missing 360 versus 240

19   grams because of the money, and Tricare wouldn't pay for claims

20   that are not necessary.  And you heard Dr. Bansal say that in

21   his mind in that prescription, which was consistent with all the

22   other prescriptions in the case, that 360 is too much for a new

23   patient, and three refills is too much for a single patient.

24           So there's ample evidence here, Your Honor, beyond just

25   how the compounds were manipulated.  There are the constant

1    pressure on the telemedicine companies to pump out the same

2    high-paying prescriptions.  There is the evidence -- there's

3    direct evidence of the defendant's own statements about waiving

4    -- not waiving; telling people not to pay their copayments.

5    Why?  Because he would lose all of the money.  That's a

6    fraudulent claim.  And he knows that Phil Snodgrass' claim is

7    fraudulent because he doesn't want to pay the copay.  He said it

8    on the stand, he wouldn't have paid the copay.

9            And Ginger Lay.  Monte Grow and Ginger Lay conspired

10   with one another to have that patient call into the pharmacy and

11   lie that he was okay with all of this.

12           THE COURT:  Why isn't Ginger Lay's testimony enough?

13   You didn't have that in Medina.

14           MR. MARCUS:  She's far removed, Your Honor.  So she has

15   no influence over the claims being submitted.

16           THE COURT:  So your argument is that she's not guilty,

17   either.

18           MR. MARCUS:  She talked about -- again, Medina was

19   quite clear:  Paying kickbacks on a claim doesn't make the claim

20   submitted false.  So they can talk about copays.

21           THE COURT:  Well, they don't quite say that like that.

22           MR. MARCUS:  Well, they say that, "While we acknowledge

23       that paying kickbacks like those at issue in this case is a

24       violation of the Anti-Kickback Statute, we cannot hold that

25       this conduct alone is sufficient to establish health care

1          fraud without someone making a knowing false or fraudulent
2          representation to Medicare."
3               Ms. Lay does not deal with Tricare.  None of the people
4     that they brought in to testify dealt with Tricare.
5               THE COURT:  How about Halliburton?
6               MR. MARCUS:  Halliburton?  Again, she's an outside
7     marketer.  She's a sales rep.  She didn't deal with Tricare.
8     That's the problem with their case.  They have kickbacks and
9     they have evidence of kickbacks, right, allegedly, but they
10    don't have any evidence that the actual medical claims
11    themselves are false or were knowingly submitted with false
12    information known by Mr. Grow.
13              The formulas are a good example, Your Honor.  They want
14    to argue about the cost of ethoxydiglycol and that it changes
15    based on size.  That's fine.  But when you look at every single
16    claim, it clearly lists ethoxydiglycol, one millimeter.  And
17    guess what, that then generates a reimbursement price that
18    Tricare sets.  So every ingredient listed -- it would be one
19    thing if they had evidence, Your Honor, that the formulas or the
20    claims listed, for example, ingredients that were not put into
21    the drug, right, that they were false.  That's not true.
22    There's no evidence of that.  We have to assume that all these
23    formulations are truly indicated on the claim.  So they don't
24    have that.  They don't have any evidence that these
25    prescriptions were given without medical necessity.

1        As we know in health care cases, you typically prove

2    that either through testimony of witnesses or typically

3    physicians, sometimes with experts.  They don't have any of

4    that.  They're trying to now argue, well, we know there's a

5    scheme.

6        I mean, with respect -- this is a multi-year case, Your

7    Honor, and we're standing here right before closing and the

8    Government is struggling to even identify cogent theories, let

9    alone specific direct or even testimony or documents that prove

10   what they have to prove under Medina.  That's the problem with

11   their case.  They don't have doctors --

12        THE COURT:  Well, I do think there's a problem, but as

13   I mentioned yesterday and maybe even Friday, I'm going to deny

14   the motion for judgment of acquittal.  But it's an important

15   thing to do.  I have to think more about it and look at the

16   record.  If the jury finds the defendant guilty, it may be the

17   first time certainly in Federal court and I'm thinking even in

18   State court, over 30 years, 32 years, that I may grant a

19   judgment of acquittal after the verdict, and that way the

20   Government can appeal.  And if I do that, if they find him

21   guilty, I'll give the defendant, obviously, an opportunity to

22   put it in writing and the Government to put it in writing,

23   mention that other case, and look at the evidence as to those

24   counts.  On the other ones, I'm satisfied.

25        Now, does the Government argue that -- if I were to

1    grant acquittal after the verdict of the health care fraud, what

2    happens to the money laundering statutes?

3           Can you have money laundering linked -- can these

4    specified unlawful activities be kickback money?

5           MR. LARSEN:  Yes, it can, Your Honor.

6           THE COURT:  All right.  I agree.  And that's why I will

7    deny that one, too, even if I grant health care fraud.  So let's

8    find out what the jury is going to do.  It is not my practice to

9    do that, like I've said before.  I've never done it before, but

10   I don't have the level of comfort.  I have issues with this.  I

11   wouldn't want to wait until the Court of Appeals decides, like

12   my good friend and colleague did, because it creates all kinds

13   of issues.  But we will cross that bridge when we come to it.

14   And obviously, it makes a big difference I suspect regarding the

15   guidelines, right?

16          MR. MARCUS:  Tremendous.

17          THE COURT:  Okay.  So then if it happens, then I'll

18   make whatever adjustments are appropriate then, but I'm going to

19   wait.  Okay?  So I'm denying it, but with concerns.  So that

20   means after the verdict -- now, they're at closing.  What's

21   going to happen, if the defendant is found guilty of any count,

22   does the forfeiture still stand or does it have to be linked

23   with any particular count?

24          MR. LARSEN:  Your Honor, I believe the forfeiture still

25   stands.  I do have my asset forfeiture colleague here prepared

1  on that.

2        THE COURT:  Wonderful.

3        MR. LARSEN:  So he's probably better to address that

4  than I am.

5        THE COURT:  Okay.

6        MR. GROVE:  Should I address that now, Your Honor?

7        THE COURT:  Yeah.  I've got to find out what the

8  defense is going to do.  I told them that a week ago.  Let's

9  find out so that we're prepared with the jury.

10        State your name for the record.

11        MR. GROVE:  Sure.  I'm Assistant United States Attorney

12  Daren Grove for the Government.  Good morning, Your Honor.

13        THE COURT:  Good morning.

14        MR. GROVE:  The forfeiture will stand.  In fact, I

15  believe we filed forfeiture jury instructions, Your Honor.

16        THE COURT:  I saw them.

17        MR. GROVE:  And so we have assets that are linked to

18  either the 1957 charge and/or --

19        THE COURT:  Okay.

20        MR. GROVE:  -- the health care fraud.

21        THE COURT:  What's the defendant going to do?  You are

22  all switching on me here.  What's the defendant going to do if

23  he's found guilty regarding forfeiture?  What do I tell the

24  jurors?

25        MR. MARCUS:  I don't think we need the jurors, Your

1    Honor, because we don't -- there's no factual issue.  We're

2    going to --

3              THE COURT:  No, you do need the jurors.  If there's no

4    admission, they have to make a decision.  So that's what I want

5    to know.

6              MR. MARCUS:  Well, there are two issues.  There is the

7    factual finding that the jury would make, that these assets were

8    proven to have come from the money.  There's not going to be --

9    there's not a dispute on that.  We haven't argued that.

10             THE COURT:  So what's the dispute?

11             MR. MARCUS:  Well, we're going to have legal issues

12   after because we don't think the money laundering will be proven

13   for legal issues, and that's something that the jury wouldn't

14   decide.  We would deal with that post-trial, Your Honor.  It

15   goes to the arguments we made with Rule 29 with respect to money

16   laundering.

17             THE COURT:  Okay.  But I'm confident that I would deny

18   that, only if it's linked to health care fraud.

19             So the issue is, are we going to have a forfeiture jury

20   trial afterwards?  That's the issue that I'm concerned with.

21             MR. GROVE:  Your Honor, if I may, basically, either

22   party can elect to retain the jury or not.  If they elect not to

23   retain, they can still ask for a hearing before the Court.  So

24   is that what you're referring to, that you don't want to retain

25   the jury for that purpose, but nonetheless want to have a

1    hearing?  Is that it?

2            MR. MARCUS:  That's right.  We don't need factual

3    findings from the jury as to whether the property charged in the

4    four counts came from -- I think we can work something out with

5    them, Your Honor.

6            THE COURT:  Well, that's what I wanted you to do before

7    today.  That's why I mentioned it a week ago, and I said it's

8    premature, but think about it.  Why did I say that?  Because

9    once the jury renders a verdict, they think they're going home.

10           MR. MARCUS:  And they can go home.

11           THE COURT:  Well, I don't know, not with what I've

12   heard.  It's not enough for them to go home.  In the cases that

13   I've had, defendant says, we're not fighting that.  Freedom is

14   more important than money, but you don't have to do that.  And

15   then the jury -- be prepared.

16           Is the Government going to present any evidence after

17   the trial in the event -- and I'm not suggesting there will be a

18   conviction.  If it's a total acquittal, good-bye.

19           MR. JUENGER:  There will be no additional evidence,

20   Your Honor.

21           THE COURT:  Okay.  How about from the defense?

22           MR. MARCUS:  No, Your Honor.  That's --

23           THE COURT:  Okay.  So then what will happen right after

24   the verdict, I say, ladies and gentlemen, you have one more

25   thing to decide.  And who is going to make the closing argument

1  for the forfeiture?

2          MR. JUENGER:  I will for the Government, Your Honor.

3          THE COURT:  Okay.  How long would that be?

4          MR. JUENGER:  Three minutes.

5          THE COURT:  Okay.  I'll take that.  You can make it a

6  little longer than that, but that's certainly reasonable.  For

7  the defense?

8          MR. MARCUS:  The same or less, Your Honor.

9          THE COURT:  Okay.  And then you'll do that.  I'll

10 instruct the jurors and they will have a verdict and they will

11 come back immediately and that takes care of it.  I just wanted

12 to know what do I do with the jury.

13         Thank you very much.  Ready for closings?  If anybody

14 needs to go to the bathroom, do it now because we're going

15 straight through, that includes Gilda.  We're off.  Go ahead.

16 Go to the bathroom.  Do whatever you want, but come back in a

17 minute.

18    (Daren Grove, AUSA, retired from the courtroom and a brief

19 recess was taken.)

20         THE COURT:  All right.  Defendant is present, defense

21 counsel, Government counsel.  Bring in the jurors.  Let's go.

22 Thank you.

23         THE COURT SECURITY OFFICER:  All rise for the jury.

24    (The jury entered the courtroom at 10:08 a.m.)

25         THE COURT:  Thank you, folks.  Please be seated.

1        Remember what I told you at the beginning.  What the
2   lawyers say is not evidence, but it's very important.  It's what
3   they believe the evidence has shown at this stage and how they
4   think you should come up with a decision in this case based upon
5   the law that I told them.  I will tell you everything you need
6   to know about the law.  It will be in writing and I'll give you
7   a copy and I'll read it to you, both.  So you'll be fine when it
8   comes to that.  All right?

9        Government always bears the burden of proof, so the
10  prosecutor goes first and then the defense, one of the defense
11  lawyers, and then another prosecutor goes next because they bear
12  the burden of proof, and then I'll give you the instructions.
13  We won't be able to do that before 12.  So what we're going to
14  do is at 12:00 we'll recess and we'll come back at 2:30, I think
15  as a goal.

16       Is that all right?  You think so?  Is it optimistic?
17  2:45?

18       MR. MERIDA:  They told me it could take between an hour
19  and two hours.  The appointment is at 1:00.

20       THE COURT:  Okay.  We will shoot then for 3:00.  All
21  right?  And then you all can go shopping at Bayside or something
22  and not talk about the case.  All right?  It's the only way to
23  do it.

24       All right.  Who's going to speak for the prosecution,
25  the Government?

1      MR. LARSEN:  I will, Your Honor.

2      THE COURT:  Mr. Larsen, you've got the floor.

3      MR. LARSEN:  Thank you.

4                    CLOSING ARGUMENTS

5      MR. LARSEN:  May it please the Court, counsel, and

6  ladies and gentlemen of the jury:  It's been exactly one week or

7  a week and a day at this point since this trial began and you've

8  all sat patiently and listened intently to what all the

9  witnesses said and you followed along as myself and the other

10 lawyers showed you a lot of the paper exhibits, the documents in

11 this case.  As Judge Moreno just mentioned, he will instruct you

12 later about the law as it applies in this case, and he's the

13 sole judge of the law in this case.

14      It's clear that you all have taken your jobs as jurors

15 very seriously, and this is a very serious matter that we've all

16 spent the last week sharing here together.

17      The defendant, Monty Ray Grow, is charged with

18 committing very serious crimes, and soon you all will be asked

19 to consider all of the evidence and to decide as the sole judges

20 of the facts in this case, you all, whether he, in fact,

21 committed those crimes.  And I said it a week ago when I had my

22 first opportunity to address you and some of the other jurors

23 that were not so lucky to be selected in this case, and I want

24 to say it again today:  Thank you for your service.

25      A week ago my colleague, Mr. Juenger, had his first

Closing Arguments

1     chance to address you in his opening statement, if you remember

2     that, and he told you that this case, the United States of

3     America versus Monty Ray Grow, is about fraud.  He said, this

4     case is about a man who lied and cheated to get a bunch of money

5     that he didn't deserve, and that's what fraud is in a nutshell.

6     That's what he said.  He told you about the Government's theory

7     of the case and how he would prove that that man, the defendant,

8     defrauded the Tricare military health insurance program out of

9     millions so that he could line his own pockets.

10          Now it's my turn to come before you all and talk about

11    the evidence that we proved over the past week and a day and to

12    show you why there is no reasonable doubt as to the defendant's

13    guilt in this case.

14          I want to talk first for a few minutes about --

15          Your Honor, may I review the jury instructions?  I know

16    you haven't given the jury instructions yet.  May I review them?

17          THE COURT:  Yeah, you can talk about it.  That's why I

18    gave them to you.

19          MR. LARSEN:  Thank you.

20          Now, I want to talk for a few minutes about some of the

21    jury instructions that you will be instructed on over the course

22    of the rest of the day by Judge Moreno, and I'm going to show

23    you the jury instruction for health care fraud.

24          Now, there are five elements you see here in the jury

25    instruction that the Government must prove in this case.  First,

Closing Arguments

1    we must prove that the defendant knowingly executed or attempted

2    to execute a scheme or artifice to defraud a health care benefit

3    program by means of false or fraudulent pretenses,

4    representations or promises.

5         What is a scheme or artifice?  It's a plan.  It's a

6    plan that's intended to cheat someone, and in this case that

7    someone is Tricare, out of money.

8         What are false or fraudulent promises, pretenses,

9    representations?  They're lies and false pretenses.

10         Now, one of the elements that we must prove is that

11   Tricare was a health care benefit program.  The parties have

12   stipulated that Tricare is a health care benefit program.  We

13   also must prove that that program affected interstate commerce,

14   and affecting interstate commerce means it had any impact on the

15   movement of money or goods from one state to another.  And some

16   of the evidence that you all heard were about the goods, the

17   compounded medications, and there's evidence that those

18   medications moved from the pharmacy here in Florida, PCA, to

19   states all over the country.

20         You heard about money, money that was paid from Tricare

21   to the pharmacy, and from the pharmacy to the defendant, and

22   then from the defendant to all of his co-conspirators all around

23   the country.  So thus, we've proven that part of the element,

24   element number 2.

25         Element number 3 requires that the Government prove

that the false or fraudulent pretenses, representations or promises are related to a material fact.  What's a material fact?  It's something that's important, and that's defined in the jury instructions.

Element number 4 requires that the Government prove that the defendant acted willfully and intended to defraud. That means he meant to do it and he intended to defraud Tricare.

Finally, we must prove that the defendant did so in connection with the delivery of or payment for health care benefits, items or services.

So we must prove that the defendant's plan and lies and representations and false pretenses dealt with the delivery of items, the medications, that Tricare paid for.

So let's talk about what the evidence has shown about the defendant's scheme and plan to defraud Tricare.  Here the defendant's scheme was to cheat and deceive the benefit program. And how did he do that?  There are three parts to this plan.

First, the evidence has shown that he paid patients in order to refer others for these expensive compounded medications that they all said they didn't need.  Second, he paid the doctors to approve those prescriptions for those expensive compounded medications that they all said they didn't need.  And third, he concocted artificially-engineered formulations that were designed for no other reason than to jack up the price of reimbursement from Tricare so that the defendant and the

1  pharmacy working together could reap the money, reap the profits

2  and make as much as they could.

3       Let's talk about the lies that the defendant told in

4  connection with his plan to defraud Tricare.  Lie Number 1 --

5  and I should say lie and false pretense Number 1 -- was that

6  these patients really needed the medications and these expensive

7  vitamins.  Remember the testimony over and over again that one

8  30-day supply of the vitamins was $5,000.  Remember all the

9  patients, what they said about whether they need it.  Some of

10  them may have liked it, but to a T they all said they didn't

11  need these medications.

12       Lie Number 2 is that the doctors really wrote hundreds

13  of prescriptions for the drugs based on a legitimate need of the

14  patients.

15       Lie Number 3 is that the money that the defendant

16  caused PCA to bill to Tricare represented the real value of

17  these drugs.  All of these things are false.

18       All of the witnesses said they didn't need the drugs.

19  All of the prescriptions were engineered -- excuse me -- were

20  generated by prescriptions that the defendant paid for, and the

21  defendant played a central role in making sure that each patient

22  got the same three products; pain cream p-01, scar cream sc-01,

23  and a vitamin product.

24       He made sure that these drugs were as expensive as

25  Tricare would allow him to get.  Remember the insider at the

1    pharmacy, Armando Lozada -- he was here last week -- told you

2    that the defendant and the pharmacy that he worked at used

3    ingredients that were designed only to maximize reimbursement.

4         Element number 4 requires proof of willful intent.

5    "Willfully" means that the act was committed voluntarily and

6    purposely with the intent to do something the law forbids.  That

7    is with a bad purpose to disobey the law or disregard it.

8         And Judge Moreno will explain to you later that the

9    defendant doesn't actually need to know about the existence of

10   the Anti-Kickback Statute.  Although I think the evidence -- I

11   think you all will agree that the evidence shows that the

12   defendant did know about the Anti-Kickback Statute.  He knew all

13   about it.

14        The defendant or the Government, excuse me, only need

15   to show that the defendant was acting wrongfully, that he acted

16   with the specific intent to cheat someone, Tricare, an insurance

17   program that's there for the military's men, women and their

18   families, that expects that it's going to pay for products that

19   these folks need and that they really need it and that these

20   products were actually prescribed by a doctor that actually set

21   his or her eyes on the patient.

22        Let's talk about some examples of willfulness that the

23   defendant committed.  I've already talked a little bit about the

24   engineering of the ingredients to maximize the payouts from

25   Tricare.  What's another one?  The defendant telling his

1   co-conspirators to take care of copays for these patients, so
2   they won't cancel their orders.  Remember, I think it was on
3   maybe the first day of trial, you had Philip Snodgrass, a former
4   military beneficiary, military serviceman.  He said that he
5   wouldn't have ordered these.  He wouldn't have paid the copay
6   for the creams, and you saw the defendant's own words in the
7   text message where he's texting with Ginger Lay.  Remember
8   Ginger Lay?  She also testified on day one.  And the defendant
9   told Ginger Lay to make sure that Mr. Snodgrass didn't cancel
10  his prescriptions, didn't cancel over a copay.  And Ginger Lay
11  said they were going to call the pharmacy the next day and take
12  care of that and they did.  They had Mr. Snodgrass call in and
13  agree not to cancel.
14        You also heard from Amanda Donnelly.  She said that
15  Robin Halliburton -- she testified on day two or three of the
16  trial.  She said that Robin Halliburton told her she didn't have
17  to pay the copays and that Robin Halliburton, in fact, paid the
18  copays for her.  She signed up for these products to help her
19  friend out, Amanda Donnelly did, and she didn't need them.
20        These are two examples of patients that were unwilling
21  to pay a copay even as small as $17.  Why?  Because patients
22  won't pay copays for medications they don't need.  It's as
23  simple as that.  And the defendant knows this.  There were many
24  emails and documents in this case about patients complaining and
25  threatening to cancel their orders.

1          Now, let's talk about materiality.  I talked about it a

2   minute ago.  A material fact is something that's important.

3   It's an important fact, not white lies.  These are big lies.

4   They are important lies.  They are lies that Tricare would rely

5   on in deciding whether to pay a claim.

6          It's an important fact in this case, folks, that the

7   defendant's scheme caused claims on Tricare for medications that

8   they all said they didn't need, and that's the point of covering

9   these medications, isn't it?  These patients weren't seeking

10  care for problems -- they were not seeking care from a doctor

11  for these problems.  Remember what they said.  How did they get

12  involved in this?  They were approached by a friend or a family

13  member or, in some cases, even Monty Grow himself.

14         Remember you heard yesterday Monty Grow called Jonelle

15  Coronado on the phone?  And Jill Cichowicz, she also told us she

16  got a personal call from Monty Grow on the phone marketing these

17  drugs to them, and these folks signed up for these medications

18  because the defendant paid them to do it, not because they

19  needed it.

20         Let's talk about how the defendant paid the patients in

21  this scheme.  I just talked about a couple of examples where he

22  paid them for their own orders:  Jonelle Coronado yesterday.

23  Jill Cichowicz last week.  Yesterday you saw Mr. Juenger put

24  Government's Exhibit 67 in front of you.  It was the defendant's

25  own document.  And we reviewed it and you saw the document.

1   Jonelle Coronado was getting paid for recruiting Jonelle

2   Coronado.

3          Both of these women said -- well, let's talk about what

4   Jonelle Coronado said.  She said she had two conversations with

5   the defendant.  Not a defendant's rep or a friend.  The

6   defendant called her, tried to market these products for her and

7   her husband, mind you, who she said was deployed in Afghanistan

8   at the time.  Think about that.  It's important.

9          The defendant's response to that and the only thing he

10  can say; it was an accident.  Did he accidentally call Jonelle?

11  Did he accidentally offer to pay her for her own prescriptions?

12  Did he accidentally write that on that document, that patient

13  list, Jonelle Coronado is being paid by Jonelle?  Did he

14  accidentally write that in?  No.  It's just not -- it doesn't

15  hold up.  It doesn't pass the eye test, the smell test.  And in

16  turn for doing nothing more than providing the defendant their

17  Tricare information, Jonelle Coronado and Jill Cichowicz were

18  paid about $10,000.

19         Now, the defendant paid patients other ways, sneakier

20  ways.  He paid other beneficiaries to refer him their spouses,

21  their children and their closest of friends, and these people

22  weren't out pounding the pavement, selling PCA's drugs for the

23  defendant.  No.  You saw this document throughout the course of

24  this trial.  The colorful, glossy sales aid that the defendant

25  wants you to believe he sent to all of his patients so they

1    could educate other Tricare patients about how to use these

2    products.

3            Remember yesterday?  If you take a little bit closer

4    look at the document, anyone that looked at it would quickly

5    find out that this was designed for doctors, and that's what he

6    was doing at the pharmacy in Louisiana, remember?  And that

7    pharmacy's name was InforMD Solutions.  And if anybody had a

8    question about these products, these drugs, there's a phone

9    number on the bottom.  Oh, but it's for InforMD Solutions in

10   Louisiana.  What kind of information do you think any of these

11   patients would get if they were marketed on this bogus sales aid

12   for the defendant's products.  It just underscores the fact that

13   he didn't care about training.  He wasn't training these folks.

14   All he cared about was getting that Tricare number.  That was

15   his meal ticket.  He got 13 and a half thousand dollars for

16   every patient that signed up for those products.  This was

17   window dressing.

18           Remember -- I think he said he was 20 years old on the

19   stand, but a couple of years ago he was a teenager -- Rashaan

20   Rambaran, the guy that worked at Cici's pizza?  He said he never

21   got a minute of training from the defendant.  He didn't even

22   know the first thing about HIPAA.

23           All the witnesses said they received no training

24   because they weren't marketing anything.  The defendant wants to

25   use the name of his company, MGTEN Marketing.  It's window

1    dressing, too, folks.  It's not real.  This was a pyramid

2    scheme.  He depended on the military families telling their

3    friends, telling their brothers, telling their wives, their

4    husbands, hey, this is a way to make a little extra money and

5    they did it.  They said they needed the money.  They paid their

6    bills with it.  He depended on that.  He took advantage of those

7    folks and he made millions.

8         You don't need training to sign up your husband.  You

9    don't need training to sign up your buddy, and you don't need a

10   brochure when the scheme is being pushed by, like I just said,

11   the defendant's cash.

12        The bottom line is people signed up because they were

13   paid.  This is a perversion of medicine.  People seek medical

14   care when they are sick.  We go to the doctor when we need to.

15   We don't go to the doctor because someone on the other side of

16   the transaction is making money to get us to go there or paying

17   us money, even worse.  That's not how medicine works.  That's

18   why it's fraud.

19        Let's talk about the defendant's plan related to the

20   doctors.  We talked about the patients now.  The defendant had

21   the patients.  Now he just needed someone to sign those

22   prescriptions, someone to approve those prescriptions.  He

23   needed that signature.  The signature.  How does he do it?  He

24   pays the doctors to sign them.  Does that make sense?

25        Patients told you on the stand that they could have

gotten the medical care for free on the bases they were living on or near, with military doctors that Tricare pays for and provides that benefit to them.  That didn't make sense for the defendant.  Of course not.  So he comes up with a way to cut these real doctors that are there to care for the patients out of the equation and it's called telemed.  You've heard about that quite a bit over the last week and a day.

You remember the defendant said that at InforMD, that Louisiana pharmacy, that he called on doctors in the office. That was the business plan that he apparently copied when he took this plan elsewhere.

He also said, though, that they weren't making any money.  You saw that email yesterday.  He wasn't making a red cent.  And actually going to a doctor and talking to a doctor about why the doctor should prescribe these medications for their patients, it wasn't working.  He was making no money.  So what does he do?  He leaves InforMD and devises this plan to find his own doctors, teledocs.

Now, of course, he says that these were just consultations they paid for in advance regardless of the outcome and the docs had the final say.  But this isn't true.  And how do we know that?  Let's talk about that first telemedicine company, House Calls 24/7.  You heard quite a bit about that telemedicine company during the course of the past week or so.

You all have seen a number of prescriptions in this

1    case.  They've been on and off the screens.  I'm showing you

2    Government's Exhibit 115, and it's an email from Monty Grow to

3    House Calls 24/7.  That's the telemedicine company that we're

4    talking about.  Subject:  MGTEN scripts.  And two attachments,

5    Andrew Yoakum, Ashton Yoakum in the state of Washington.  And

6    you see on each of these prescriptions there's no doctor

7    signature, so this is the defendant sending a prescription to a

8    doctor for what?  For the signature.  And what is filled in on

9    each of these scripts?  P-01, sc-01, the combination vitamin,

10   360 grams, three refills.  All of these were prechecked by the

11   defendant, and look at the box in the top right corner, MG.

12   That's Monty Grow.  That's not someone else doing this.  That's

13   him.  This is his prescription, an email coming from him to the

14   telemedicine company.

15         This isn't just an isolated incident.  I'm not going to

16   go through exhibit or prescription after prescription with you

17   all.  These documents are going to go back with you when you

18   deliberate today.  But Government's Exhibit 104 was the Bing

19   family in Florida; prechecked, no signature.  Government's

20   Exhibit 108 was the King family, a husband and wife also in

21   Florida, prechecked with no signature.  Government's Exhibit 117

22   is patient Eleanor Alley.  Do you remember her?  She was Sven

23   Bjerke's aunt.  Same thing; three prechecked prescriptions,

24   refills, 360 grams, no signature.  All these selections were

25   made before the doctor even saw the prescription.

Closing Arguments

1        Now, were there some when the sc-01 wasn't checked?

2   Sure, but you heard it out of the defendant's own mouth

3   yesterday.  It was a rare occasion.

4        You remember on day one when Ginger Lay testified about

5   the instructions she received from Monty Grow, and there was

6   Government's Exhibit Number 1 or 100, excuse me.  It was an

7   email from Monty Grow to Ginger Lay at the beginning of their

8   engaging in the scheme, and you'll see it right here:  Always

9   use p-01 for pain and sc-01 for scar, and the evidence in the

10  case is that she followed those instructions time and time and

11  time again.  The defendant depended on people like Ginger Lay to

12  execute the instructions that he gave so that he could make the

13  most money.  If he made money, she made money, and so on and so

14  forth down the line.  That's how the scheme worked.  And he came

15  up with it.

16       The doctors in this case either signed these

17  prescriptions -- again, all they need is the signature -- or

18  they rejected it, and how often do you think that a doctor

19  rejected the prescriptions?  We'll talk about that in a minute.

20  Again, the defendant only wants the signature.  Nothing else.

21  So much for independent medical judgment.

22       Now, the defendant testified that he paid up-front for

23  these doctor consults because he wanted to avoid the appearance,

24  but this isn't true.  You remember Government's Exhibit 205 and

25  206?  There were a couple of invoices from 24/7, House Calls

1  24/7 to Monty Grow, and there's no dispute that those invoices
2  were issued to the defendant a week after the patients were
3  seen.  He's paying for patients that have already been seen by a
4  doctor, and some of the names are familiar.  I invite you all to
5  look through those invoices.  You'll see some of the folks that
6  testified in this case, one of which was Philip Snodgrass, the
7  Bing family, James Featherston.
8       And the reality is, ladies and gentlemen, that the
9  defendant paid House Calls for the signature.  That's what their
10  role in the scheme was.  That's what he needed.  That's what the
11  defendant needed to perfect his plan.  Without the signature,
12  without the prescription, there can be no bill, there can be no
13  claim.
14       Now, let's talk about what the doctor's arrangement was
15  with 1st Care MD, the other telemedicine company.  It's a little
16  bit different.  In that case you heard evidence that instead of
17  prechecking the prescriptions, just the same products were
18  suggested at the bottom of the intake form, but the products
19  were the same.  The recommendations were the same.  The refills
20  were the same.  The grams were the same.  It's the same thing.
21  So really no change.
22       And if you look at Government's Exhibit 145, it was the
23  prescription for Josie Brundige who testified I believe last
24  week -- She's the lady who said she had no scars and she got
25  issued a scar cream.  She was recruited by Sven Bjerke, if you

1    remember him.  On that prescription, those are the suggestions

2    that are attached on her Patient Intake Form.

3           And Ginger Lay told you back on day one that the

4    defendant instructed her how to fill out the prescriptions for

5    1st Care MD and that she indeed followed those directions.

6           Yesterday you looked at Defense Exhibit 190, and that

7    was the screenshot for 1st Care MD.  And if you remember, there

8    was quite a bit of discussion about the 600 or so patients that

9    the defendant had gotten -- had paid for consults for in that

10   case and you remember the discussion about the approval rate of

11   how many prescriptions actually got issued and there was slight

12   disagreement.  It was either 93 or 97 percent approval rate.  93

13   to 97 percent of the prescriptions that that man sent to 1st

14   Care MD were approved.  Consider that in light of the fact of

15   what all the witnesses said about whether they needed the

16   products.

17          You heard evidence that each of those prescriptions

18   approved by 1st Care paid the defendant 13.5 thousand dollars.

19   You also heard him say that maybe it would take two

20   prescriptions out of every 100 to recoup his costs, the cost for

21   the consults.  You carry that out over the 600, it was about

22   $110,000 that he paid for those patients to be seen.  That's a

23   heck of a return of investment.

24          The only risk to the defendant in this case was if he

25   ran into someone the likes of Dr. Bansal, if you remember him,

1  who testified last week.  Remember the defendant's own words:

2  Dr. Bansal is terrible.  Why is he terrible?  He was terrible

3  because, in the defendant's own words, he doesn't write half the

4  time and gives zero refills.  Not because he is slow.  Just

5  because he doesn't do what the defendant wants him to do.

6         Remember Dr. Bansal said 360 grams on every script or

7  on the script that he was referring to, 360 grams is too much

8  for a new patient to get, and all of these were new patients.

9  He said he wouldn't approve months and months of refills for the

10 same reason.  He'd want to know if the product actually worked.

11 He'd want to follow up with the patient.  He'd want to talk to

12 them, see how it was working or not working before authorizing

13 months and months of expensive products.

14        What did he say about the vitamin?  He said he never

15 wrote vitamins.  That didn't make the defendant happy at all.

16 He refused to write, and he said he wouldn't write for the

17 vitamins because they are no different than what you can buy at

18 the supermarket over the counter.

19        Can you please put on Government's Exhibit 110?

20        Government's Exhibit 110 is the defendant's own words

21 writing to Christopher O'Hara in the end of December 2014:

22        "I received three scripts back today from two different

23     doctors, and neither one of them wrote for 360 grams.  This

24     is a tremendous difference in reimbursement.  Is there a way

25     we can fix this?"

1        Nothing in there about, hey, this isn't enough for the

2   patient.  They're going to run out a week before their next

3   refill.  No.  He doesn't care about any of that.  He cares about

4   how much he's going to get paid, and it's in his own words,

5   black and white, right in front of you, ladies and gentlemen.

6        Remember, the defendant got between 93 and 97 percent

7   of his prescriptions approved, and when he ran into someone like

8   Dr. Bansal, he wrote emails calling him terrible; calling his

9   boss, complaining.  I guess 97 or 93 percent wasn't good enough

10  for the defendant.

11       Now, we've talked about two of the three pieces of the

12  puzzle that the defendant assembled in order to execute his

13  scheme to defraud Tricare.  He had the patients.  He had the

14  doctors.  And now he just needed a place that was willing to

15  take these prescriptions and bill Tricare for the highest

16  possible reimbursement, and that place was Patient Care America.

17       You heard Armando Lozada, the pharmacy insider, testify

18  that PCA used the defendant's Gold Ethoxy and Stera Base

19  products for no other reason than to drive up the amount of

20  money that Tricare would pay.  The more Tricare paid, the more

21  PCA had to pay the defendant in commissions, kickbacks.

22  Mr. Lozada said that the defendant's products increased

23  reimbursement by about $2,000 versus equivalent ethoxy.  He said

24  ethoxy is ethoxy.  The only difference was how the defendant

25  packaged his product and how much money he would get paid for

Closing Arguments

1    it.

2           You heard the testimony about folks at the pharmacy

3    taking and repackaging into one-millimeter bottles of ethoxy,

4    and you saw yesterday some conversations between the defendant

5    and a pharmacist about why he should buy his ethoxy.  Her

6    reaction is, that seems expensive.  It seems like a lot.  His

7    answer is, yeah, it's a little bit more you have to pay on the

8    front end, but think about how much money you're going to make

9    on the back end and it was not even close.  And the defendant

10   gets half of it.  He's splitting the profits with the pharmacy

11   and the evidence has shown that that was a gamble the pharmacy

12   and Mr. Grow were willing to take and it paid off handsomely.

13   20,000 grams came back to something like $170,000 in extra

14   reimbursement that Tricare didn't know about.

15          The defendant is not just a drug sales representative.

16   He profits on the front end with the patients and on the back

17   end with the claims, profits on the front end with selling the

18   products and on the back end with the commissions.

19          You've seen the evidence.  There were a lot of claims

20   in this case.  Special Agent Klein talked about claims submitted

21   being about 4500 in number, and about two-thirds of those

22   involved claims for pain and scar products that the defendant

23   was pushing and engineering; the ethoxy, the Stera Base.  If you

24   do the math, defendant's Ethoxy Gold led to Tricare overpaying

25   PCA by at least $6 million.  It's a lot of money.

1          Now, the defendant's scheme to defraud Tricare

2    involved, as I've said, the patients and the doctors and PCA's

3    willingness to fill the prescriptions with the defendant's

4    cost-engineered products.  That's the scheme in a nutshell.

5    That's the scheme to defraud.

6          So as you can see, ladies and gentlemen, we have proved

7    the defendant's knowing and intentional participation in this

8    scheme.  We have proved that.  Now let's talk about specific

9    incidents where he actually carried that scheme through to

10   completion.  That means Tricare was billed and paid a claim, and

11   that's Counts 2 through 8 of the Indictment.

12         Count 2, you'll see when you review the Indictment, is

13   Mr. Snodgrass, PS.  He said he didn't need the products.  He

14   said he only signed up because he was paid to do the survey.  He

15   said he wouldn't have paid a copay.

16         Remember Ms. Rambaran, she said she didn't need the

17   products.  She didn't use it and you all saw the products as I

18   laid them out in front of the witness box.  It was maybe 10, 12

19   feet long, maybe a foot high.  And she only ordered this

20   medication because she got paid, and what did she do?  She

21   signed up her husband.  She got paid on her husband's

22   prescriptions.  She signed up her teenage child.  She got paid

23   on his prescriptions.  And then he testified that he signed up

24   his big brother, so he could get paid on his prescriptions.

25   Again, that is exactly how the defendant wanted the scheme to

Closing Arguments

1   work and it worked.

2          You heard from Josie Brundige.  That's Count 4.  She

3   told you she ordered the products because she was paid, and

4   remember that Mr. Bjerke, when he testified, he told you that he

5   filled out Ms. Brundige's Patient Intake Form and it said she

6   had no scars, but she wanted the product anyway.  And she

7   testified that she had no scars.

8          Mr. Bjerke told you that he sent that intake form to

9   the defendant and you saw that Ms. Brundige's intake form got

10  changed and faxed by the defendant to the pharmacy with a scar

11  cream.  Again, Ms. Brundige doesn't dispute, she has no scars.

12  And remember that tube of scar cream cost about $17,000 for a

13  single month supply.

14         Count 5 is Blair Von Letkemann.  He was that young

15  marine who testified on day one or two, and he said that he

16  didn't need the products.  When I asked if they worked, you

17  recall his testimony was, not really.  They worked about as good

18  as a bottle of Vaseline lotion, and he only ordered the products

19  because he was paid to do the survey.  He was hard up for money.

20  A junior marine approached him.

21         All of these ideas were placed in motion ultimately by

22  the defendant.

23         Count 6 is Amanda Donnelly.  She testified at this

24  trial that she signed up for the products to help out her

25  friend, she said Sara Farmer; that she didn't need these

products and that she was told she could ignore the copayment
bills that were coming from the pharmacy.  She stated that Robin
Halliburton, who also testified at this trial, told her that she
didn't have to pay them and that Robin Halliburton, in fact,
paid those copays for her and that it was the defendant who told
her it was okay to do that.  That's what Ms. Halliburton said on
the stand.

Count 7 is James Featherston.  He said he also didn't
need the product.  He only signed up because he was paid to do
the survey, and he wouldn't have paid out of pocket for it.

And finally, Mike Ewton.  He's married to the Navy wife
and testified that he signed up along with his wife because the
defendant paid him for his wife's prescription.  He said it felt
dirty and he got paid for doing nothing.

Remember each of these witnesses.  Were they wealthy
people?  Most of them were serving in the military for our
country and they told us they used the money to pay their bills.
Some of them talked about being desperate, without a job.
Ms. Rambaran had no job at the time, and this is the kind of
person that the defendant took advantage of, people like these
to perpetuate his scheme and to line his pockets.

Now, these are just some of the examples of acts that
were executed in the furtherance of the scheme.  There could
have been others.  You heard other witnesses in this case.  You
heard from the Rambarans.  Those could have been Rashaan

1    Rambaran.  That could have been a count.  You heard from Nichole
2    Powell who said that she was paid for her husband's
3    prescription.  That could have been another act.  They are not,
4    but there is more evidence in this case than, like I'm saying,
5    those Counts 2 through 8, and those are just two examples of
6    additional acts in execution of the scheme.
7              Now, let's talk about how we've shown that the
8    defendant committed these acts willfully and intentionally.
9    This means on purpose, that he intended to do it.  The defendant
10   has already testified that he knew what he could and could not
11   do.  He knew he couldn't pay patients.  He knew he couldn't pay
12   doctors.  He knows that tweaking the formulas -- that he was, in
13   fact, tweaking the formulas to increase the price to Tricare,
14   and he knows Tricare was footing the bill.
15             What are some other things that he was doing, though,
16   to show his intent?  He was concealing things.  Let's talk about
17   that for a minute.
18             Remember the evidence about whiting out of the
19   prescriptions, whiting out the fax headers on the top of the
20   prescriptions?  And remember yesterday when Mr. Juenger
21   questioned Mr. Grow about the term patient brokering and he
22   struggled to define what patient brokering is?  Does that make
23   sense?  He said he didn't -- he understood what broker was, but
24   you put the two words together and he just couldn't define it.
25   Do you believe him when he says that?

1          Patient brokering means selling patients, and he was

2    whiting out the fax headers done for the simple purpose of

3    hiding the fact that he and Ginger Lay were selling patients to

4    PCA.   And Ginger Lay said on the first day of trial, she said

5    that the reason they were whiting out the prescriptions was so

6    that it wouldn't look like the prescription was coming from the

7    marketer, but rather from the doctor.

8          The defendant testified that he didn't know why he was

9    asked to white-out the prescriptions.   He was asked that.   He

10   said, I don't know.   I just followed the instructions.   I didn't

11   really -- I didn't think about it.   I just -- I don't know why

12   they asked me to do that, but I did it.   Ms. Lay knew why, but

13   he didn't?   Does that make sense?   No, it doesn't.

14         What do you think would have happened if down the road

15   an investigation like has happened came about and prescriptions

16   showed up with Monty Grow's name at the top of the prescription?

17   It would be a problem.   He knew that.   The pharmacy knew that,

18   and they took care of it.

19         Additional evidence of concealment involves the issue

20   of the copays.   Remember that text Monty Grow sent to Ginger Lay

21   about Mr. Snodgrass' copay?   He told her to call the pharmacy

22   and tell them it was okay; he didn't want to cancel the

23   prescription.   The defendant did not want patients to call PCA

24   complaining about copays because, in all likelihood, they would

25   have canceled those prescriptions and the people at the pharmacy

Closing Arguments

1   would have canceled those prescriptions and that meant a lot of

2   lost money to the defendant.

3        Now, the defendant tells his co-conspirators like

4   Ginger Lay and Robin Halliburton and Sven Bjerke to tell

5   patients to ignore the bills, and they all testified independent

6   of one another that they did this and that they received

7   directions from the defendant.  Why would you conceal that?

8   Patients complain about copays for medications they don't need.

9        Let's talk about the surveys Ginger Lay testified about

10  on day one and two.  This is just one part of the scheme, but

11  was yet another way to conceal the kickback payments.  It's

12  concealment by making something that, as Ginger Lay told you,

13  was a sham look real, look legitimate.  She said that Monty Grow

14  never asked for any data in these surveys.  She never provided

15  the data to anybody.  She admits that she came up with the idea.

16  She also says the defendant knew about it, and the defendant did

17  know about it.

18       Now, let's talk about what was happening in February

19  and March of 2015 with regard to those surveys.  Patients having

20  signed up for the sham survey started calling the pharmacy about

21  things like, where's my payment?  And we saw email after email

22  where that was occurring.  And remember the reaction in the

23  emails in realtime by the pharmacy employees to news that

24  patients were getting paid like this?  The employees clearly

25  knew something was going on that was wrong and they alerted the

1   defendant and the program ultimately gets terminated.

2          Remember that Ginger Lay testified that the defendant

3   told her to terminate the program, and she said she did, but to

4   keep paying the patients.  She asked him, what do I do with the

5   rest of the patients?  He said, keep paying them because we

6   don't want any problems.  What problems?  Problems?  Well,

7   complaining patients, that's a problem.  Canceled orders, that's

8   a problem.  Lost commissions, that's a problem.  Maybe even

9   report the fact that this is happening to Tricare, that's a big

10  problem.

11         So this money was hush money.  Keep them happy until

12  this thing plays itself out and we'll move on to something else

13  and there is evidence that they did move on to something else.

14  They're talking about doing business months after this.  And ask

15  yourselves, if the defendant knew one of his big, heavy hitter

16  reps like Ginger Lay had created a fake survey that was being

17  used to pay patients that he knows -- he testified to it -- is a

18  crime, then why did he stay in business with her?  Why did he

19  pay her millions of dollars in commissions?  Why did he talk

20  about future business with her?  He said that he continued

21  working with her because she was a convincing liar.  Remember

22  that?  But the truth is, she was his heaviest hitter.  She meant

23  millions of dollars in revenue.  He paid her $6.3 million over a

24  matter of months, and he, himself made over a million off of

25  Ginger's efforts.

1          Government's Exhibit 142 we showed last week was an
2     email in May of 2015 where the defendant is telling the pharmacy
3     how much to pay to Ginger and him.  Look at that, $2.1 million
4     for a pay period, and you heard evidence that the pay period was
5     typically about two weeks.  Ginger and Monty were making $2.1
6     million.  Of course, he's not going to get rid of her, and the
7     evidence is he never did.  Focus on the date, May 22, 2015.
8          Now, the last area that I want to talk to you about is
9     how the defendant concealed his crimes.  It deals with this
10    conversion to be a sales force, a W-2 sales force for the
11    pharmacy.  The defendant told you on direct exam that despite
12    his prior history at Precision Orthopedics and InforMD in
13    Louisiana and as an investor for a Medicare, or excuse me, for a
14    DME company that billed the Medicare program, that his first
15    real clue that something didn't smell right to him was sometime
16    in February of 2015, when in the thick of the crimes, he learned
17    about some gray area from Matt Smith at PCA.  He says Matt Smith
18    told -- he told Matt Smith when he heard about this gray area,
19    gray area, that he's packing up his business and walking away.
20    That was his testimony, and then after some dinner meeting
21    shortly thereafter, he had somehow been convinced that
22    everything was going to be okay and he decided he's back in
23    business.  He's going to stay with PCA.  Well, he's going to
24    stay with PCA because there's millions of dollars to be made.
25    Is it reasonable to believe that the defendant thought that by

1    merely changing how his folks were getting paid, that this

2    illegal activity suddenly become okay?  He knew it wasn't.

3    Don't you think a sophisticated businessman, an investor, a

4    marketer, a business owner like the defendant would want to find

5    out for himself, talk to a lawyer of his own?  That's what a

6    common sense reasonable person would do, wouldn't it?

7         You've heard some testimony about how the defendant's

8    employees and how he became an employee of the pharmacy, and he

9    wants you to exonerate him based on that fact.  These folks

10   worked for him.  They were his employees.  They all became

11   employees of the pharmacy.  He wants to agree that that somehow

12   shields him from his crimes.

13        Do you think that any of the defendant's sales reps who

14   testified over the last week or so were employees in the most

15   basic common sense meaning of the word?  Rashaan Rambaran?  Of

16   course not.  They even said it.  They all said that nothing

17   changed from when they worked for the defendant.

18        Remember Ms. Halliburton?  She said the only reason she

19   filled out the paperwork was so that she could get her last two

20   commission checks.  They were over $10,000.  She said she never

21   did anything with the money because she felt like it was going

22   to be taken away from her.  She knew from day one that she was

23   violating the law.

24        Do you remember PCA's lawyer who testified last week,

25   David Corcoran?  Did he seem to know what was going on?  Did he

seem to know anything that was going on with respect to the defendant's sales force?  He said they just trusted the defendant to tell him who to hire and how much to pay them, and you just saw a document a minute ago where the defendant is telling the pharmacy how much to pay.  That's not how -- I wish I could tell -- well, I think you wish you all could probably tell your employers how much to pay you.  Is that how an employee works?  No.

Do you think that an employee gets an offer letter in the same packet with an application for an employment like Rashaan Rambaran?  You saw his employment application where he talked about his job, keeping the buffet warm.  In that same packet an offer letter?  It was just window dressing like everything else, ladies and gentlemen, to cover up the illegal conduct.

And let's talk about when these folks were actually converted to W-2 employees.  That happened weeks before it all came crashing down, late in the game, May 2015.  These folks are actually W-2 in name only employees of the pharmacy, and why did it come crashing down?  Because Tricare finally caught on and turned off the spigot.  So there's no need for them to stay in this scheme anymore.  In reality, the only reason that the defendant and PCA hired these people was to cover everything up.

Now, we have proven beyond a reasonable doubt that the defendant committed health care fraud.  He's also charged with

1    conspiracy and that's a separate crime and the judge will

2    instruct you later about that.  He'll tell you that a conspiracy

3    is simply an agreement by two or more people to break the law,

4    and I told you about all of the people that the defendant agreed

5    to break the law with.  Some them include Ginger Lay, Robin

6    Halliburton, Sven Bjerke.  The evidence is beyond a reasonable

7    doubt that not only did the defendant commit health care fraud,

8    but he conspired with these people, he made agreements with

9    these people to commit the health care fraud that I've been

10   spending the last several minutes talking about.  So you must

11   find him guilty not only as to Counts 2 through 8 of the

12   Indictment, but also Count 1.

13          Now, Count 9 of the Indictment charges the defendant

14   with another conspiracy and that's a conspiracy to pay and

15   receive health care kickbacks and the Indictment alleges there

16   are three ways that the defendant accomplished this conspiracy.

17   The first way that the defendant accomplished this conspiracy,

18   the first way he committed that crime was he agreed to receive

19   kickbacks from the pharmacy in exchange for referring those

20   beneficiaries like Jonelle Coronado and Jill Cichowicz to PCA.

21   So receipt, receipt of kickbacks.

22          Number 2, he conspired with others to pay kickbacks

23   directly to beneficiaries like I just mentioned, again, Jonelle

24   Coronado, Jill Cichowicz, Philip Snodgrass, Blair Von Letkemann,

25   James Featherston.  The conspiracy is to pay those folks in

Closing Arguments

1    connection with their agreement to let them bill their Tricare

2    number.

3          The third way was that he paid folks like Robin

4    Halliburton, Ginger Lay and Sven Bjerke, the marketers that you

5    heard testimony the defendant worked with.  And what did they

6    do?  He paid them kickbacks in exchange to refer other people to

7    him, like Nichole Powell, so that he could take and, in turn,

8    refer Nichole Powell's prescription to PCA and get paid on that

9    prescription as well.

10         What's the common thing here, though?  Everything

11   funnels up, and at the neck of the funnel is Monty Grow.

12         The law requires that the Government prove beyond a

13   reasonable doubt that the defendant's conspiracy to pay and

14   receive health care kickbacks was done willfully, and you heard

15   the defendant testify that he has experience in the health care

16   industry.  He worked at Precision Orthopedics.  That's a medical

17   device company.  He said he got some training there.  He knows

18   you can't pay anyone anything for a referral that would be paid

19   for by a taxpayer-funded program like Medicare and Tricare.

20   That's in emails.  He says it to one of the beneficiaries.  He

21   knows Tricare is a Federal health care program.  He admitted

22   that he knew he couldn't pay patients.  He said it on the stand.

23   He said it in emails.  He said it in text messages.

24         But he came up with, as I mentioned earlier, a sneakier

25   way to pay kickbacks in a majority of instances.  He wouldn't

Closing Arguments

1    pay the patient directly, although he did.  But he would pay the

2    patient indirectly by paying their wife, their husband, their

3    kid, and he wants you to believe he thought that this

4    arrangement was legal.  Is that reasonable, though?  A man with

5    the training and experience of the defendant thinking it's okay

6    to pay a wife for a husband's prescription?  I can't pay you,

7    sir, but I can pay your wife.

8         You heard all these beneficiaries testify, the husbands

9    and wives, they share bank accounts.  They share the money.

10   That's a reasonable thing for a reasonable person to believe;

11   and to adopt Mr. Grow's understanding, or what he wants you to

12   believe is his understanding of the law, would render the

13   Anti-Kickback Statute toothless.  This is why Congress

14   criminalized both direct payments and indirect payments.  Direct

15   payments; Jonelle Coronado, Jill Cichowicz.  Indirect payments,

16   spouses, husbands, wives, friends.  Congress criminalized overt

17   payments, out in the open, Jonelle Coronado, Jill Cichowicz --

18   it's in writing for everyone to see -- and covert, secretly,

19   secretive payments, more convoluted, more difficult to detect

20   payments where there's a line or two or three where there are

21   spouses being paid, children being paid, whole families on the

22   same drugs that they say they didn't need.

23        All of this behavior is illegal and the defendant knows

24   it.  He signed a Medicare provider agreement for the company

25   that he said he was merely an investor for.  How can you agree

1    to something and sign something that you don't understand?  Do
2    you believe that?
3              THE COURT:  You have five minutes.
4              MR. LARSEN:  Did the defendant impress you as someone
5    who was naive, unsophisticated?  Think about it and use your
6    common sense.  He talked about his time at InforMD, the big
7    Louisiana pharmacy.  Remember, InforMD marketed the doctors.
8    They didn't pay the doctors, and they didn't pay the patients
9    the way the defendant did.  Remember, it's the defendant that
10   leaves InforMD with a new way of doing business, one that's
11   designed to eliminate the need to visit the doctors' offices,
12   and he primed this new scheme to entice patients into the
13   scheme.
14             Now, there are other conspiracies.  There's a wire
15   fraud conspiracy charge in this count, and that's a simple one,
16   folks.
17             If you find he committed the health care fraud
18   conspiracy and he used the wires to do so, he is also guilty of
19   committing wire fraud.  And there's evidence in this case;
20   there's the bank records and the defendant yesterday admitted
21   that every single one of those -- excuse me.  The defendant
22   admitted that he paid these folks with wires, the bank records.
23             So, again, who are the folks that Mr. Grow is
24   conspiring with?  Ginger Lay, Robin Halliburton, Sven Bjerke,
25   and even arguably Matt Smith.

1          Now, although Matt Smith is not on trial and he did not

2     testify, you heard plenty of evidence during the trial about

3     Matt Smith.  You know that the defendant signed a contract with

4     him through PCA, that the defendant agreed with him to sell

5     Stera Base or to market his Stera Base and Ethoxy Gold to jack

6     up the reimbursements.  Matt Smith is the one who tells the

7     defendant to white-out the fax headers on the prescription.

8     Matt Smith is an uncharged co-conspirator in this case.  The

9     evidence shows that.

10         With respect to the money laundering counts in the

11    Indictment, money laundering is just cleaning dirty money.  If

12    the money is not dirty, then it doesn't need to be cleaned.  So

13    if you found the defendant committed health care fraud and

14    violated the kickback charges, then any money that flowed from

15    those crimes is dirty, and the defendant admitted yesterday

16    about several transactions that were over $10,000 that he made.

17         Now, I've talked about all the crimes.  These are all

18    the crimes in the case.  Now I want to talk a little bit about

19    credibility of witnesses.  And Judge Moreno will instruct you

20    about credibility a little later on, but here's where your

21    common sense is so important.

22         Each of you know how to judge the credibility of the

23    people that you've observed over the past, how you do this in

24    your everyday lives.  You judge the credibility of people, not

25    just witnesses in a trial, but day-to-day.  And some of the

 1    things you will be asked to consider are:  Does the witness

 2    impress you as one who was telling the truth?  Did the witness

 3    have any particular reason not to tell the truth?  Did the

 4    witness have a personal interest in the outcome of the case?

 5    Those are some of the things, among others, you're going to be

 6    asked to consider.

 7         Who has a motive to lie in this case?  The defendant

 8    wants you to believe that witness after witness that told you

 9    they committed the crimes with the defendant were lying when

10    each of them pointed at him as the one who instructed them how

11    the scheme that he came up with worked.  He insists that they

12    all came up with these stories independently.  Does that make

13    any sense?  Each of the witnesses that pled guilty and accepted

14    responsibility for their actions told you that they knew what

15    perjury is and what the consequences could be if they lied under

16    oath.

17         Just because a defendant pled guilty or a witness pled

18    guilty to a crime, it doesn't mean they're lying.  Ask

19    yourselves whether the things they said were backed up by other

20    documents.  A document doesn't have a motive to lie.  And who

21    has the most incentive to lie?  Monty Grow.  You saw him

22    testify.  Did you believe his act?  He's a great salesman.  He

23    marketed himself on the stand for two days, but the evidence in

24    this case is too strong even for the best salesman to overcome.

25         Finally, I want to circle back in conclusion and talk

Closing Arguments

1    about what this case isn't about.  Mr. Juenger talked about it

2    on day one.  This case isn't about others like Matt Smith, the

3    other co-conspirators you heard from.  It's about whether the

4    defendant participated in the scheme to defraud Tricare.  It's

5    about whether he conspired with others to pay and receive health

6    care kickbacks and to take millions from Tricare.

7          There is a jury instruction about aiding and abetting

8    in this case.  And I'll let you -- well, of course, the judge

9    will instruct you on that, but in a nutshell, you don't have to

10   prove -- the defendant can be proved guilty even without

11   evidence that he personally performed every act that's charged

12   in the Indictment.  He can be guilty for directing another

13   person or an agent of his.  He can intentionally join and commit

14   a crime with a person like a Matt Smith, and there's evidence of

15   that kind of conduct in this case.

16         He said at length he didn't know what his employees

17   were doing or his agents were doing, but you all heard testimony

18   of Ginger Lay and Robin Halliburton and Sven Bjerke.  They all

19   told you about the directions that they got from him, and the

20   documents confirm that they, in fact, followed those

21   instructions.  He hired these folks to do his bidding.  This is

22   aiding and abetting.

23         The defendant willfully sold the Stera Base and the

24   ethoxy.  He whited out the prescriptions.  He's not merely a

25   spectator here.  He willingly jacked up the prices with

1   engineered ingredients.  He preselected the medications on

2   prescriptions and changed things when he didn't get what he

3   wanted.  He willingly whited out the faxes.  The defendant is

4   the mastermind in this scheme, and he got paid by PCA for

5   selling the product.  He got paid by PCA for recruiting and

6   selling the patients to do it.  He paid the doctors for the

7   prescriptions.  He paid the patients and reps for the referrals.

8   His hands are in everything.  Everything.  But don't take my

9   word for it.  Let's look at his.

10        In final, grand jury -- or excuse me, Government's

11   Exhibit Number 62, an email to Robin Halliburton.  She's trying

12   to find out what's going on, and he says, I see everything in

13   realtime.  He sure did.

14        Ladies and gentlemen, it's time for me to sit down, and

15   I certainly did not highlight all of the evidence that you heard

16   over the course of a week in an hour's time.  It's impossible.

17   I did my best.  But as you have heard, this is a summary of the

18   key points of evidence that, along with your own recollection of

19   the other evidence, firmly points you to the conclusion that

20   that man defrauded a health care insurance program that exists

21   to benefit the men and women of our uniformed services.  The

22   defendant did this for no other reason than immense greed, and

23   the only just verdict that you can reach, given the evidence

24   that you've been presented with, is that Monty Grow is guilty of

25   all charges.

1        Thank you.

2        THE COURT:  Thank you, Mr. Larsen.

3        For the defense.

4        MR. RASHBAUM:  Thank you, Your Honor.  If I can just

5   have two seconds to set up.

6        THE COURT:  You can have as much time as you want.  The

7   clock is ticking, though.

8        MR. RASHBAUM:  Can we get the computer?  Is this

9   working?

10       Good afternoon or morning.  I had a whole presentation

11  planned, but Mr. Larsen said something that I have to start

12  with.  In some ways, it's the most important thing in this case.

13  He said, "A document doesn't have a motive to lie."  Throughout

14  my entire closing argument, I want you to remember those words

15  from Mr. Larsen, "A document in realtime" -- I added the word

16  realtime -- "has no motive to lie."

17       Now I'll go on to what I planned.

18       A week ago I told you there was going to be one issue

19  in this case, and that issue was Mr. Grow's intent.  What did

20  Mr. Grow intend?

21       We can move to the next slide.

22       And by intent, you're going to learn about the word

23  "willfulness."  In essence, did Mr. Grow knowingly and willfully

24  intend to commit a crime?

25       Now -- next slide, please -- you must decide -- the

1  judge is going to tell you this -- whether the Government has

2  proved the specific facts necessary to find the defendant guilty

3  beyond a reasonable doubt.  We have no burden in this case,

4  ladies and gentlemen.  The burden of proof lies with the

5  Government, and it's a high burden.  They have to show you that

6  Mr. Grow intended to commit a crime, willfully and knowingly

7  intended to commit a crime beyond any reasonable doubt.  They

8  can't do that; can't even come close.

9       The Judge is going to tell you that proof beyond a

10  reasonable doubt is proof so convincing that you would be

11  willing to rely and act on it without hesitation in the most

12  important of your own affairs.  It's a high standard.

13       I want to talk to you about some of the witnesses that

14  we heard from in this case, and I want to give you a broad

15  overview.  Don't worry, we will get into more specifics as my

16  discussion moves on.

17       The Government's very first witness was Ginger Lay.

18  We're going to talk about Ms. Lay, but let me say this at the

19  outset:  The first witness is a symbolic witness.  The

20  Government, they took Ms. Lay's word for a lot of things.  A

21  document doesn't have motive to lie.  Well, luckily, we were

22  able to show through documents that that's just what Ms. Lay

23  did.  She lied.  We'll take you through it.

24       That's their first witness.  Their second, third and

25  fourth witnesses were Philip Snodgrass, Blair Von Letkemann and

1    James Featherston.

2          Now, by the way, you could tell by their demeanor, they

3    were very different witnesses than Ms. Lay.  They were honest.

4    They also told you that they never met Monty Grow, they never

5    talked to Monty Grow, they never had any communications with

6    Monty Grow.  With regard to the surveys that they participated

7    in, they didn't have a clue whether Monty Grow knew about those

8    surveys or not.

9          The next witness of the Government was Nichole Powell.

10   You may remember her.  She is the witness who testified, I

11   didn't think I was doing anything wrong.  I would never

12   intentionally commit a crime.  I thought this was something like

13   Amway or Avon.  That's Nichole Powell.

14         The next witness was Robin Halliburton, another

15   Government cooperator.  She said a lot of things, and we're

16   going to talk a little bit more about her later.  But the big

17   takeaway from Ms. Halliburton is she said, the Government wasn't

18   too happy with me.  So I started to use words like patient

19   brokering, which was their words.  I need them to file a Rule

20   35, so I'm not on home confinement anymore.

21         The next witness was Dr. Ankush Bansal.  We'll talk

22   about him as well.  The takeaway from him was, he does

23   telemedicine.  The prescriptions he wrote in this case he

24   thought were necessary.  Mr. Grow never told him to write a

25   prescription that he didn't need to write.

1         The next witness was Armando Lozada.  Armando Lozada

2    testified that he had little contact with Monty Grow, but the

3    one thing he knew was that Mr. Grow's ethoxy, what he called

4    Ethoxy Gold, not Mr. Grow, sold at a higher reimbursement.  And

5    he testified, we had a lot of ethoxy.  He was wrong about that.

6    Again, documents don't have a motive to lie.  I'll show you the

7    document proving he was wrong about that.

8         The next witness was Laurene Long.  I'm not exactly

9    sure why the Government called her other than to say that

10   Mr. Grow worked in a company and filled out a form that he would

11   comply with the health care laws, something which even today, as

12   he told you on the stand the last two days, he's always intended

13   to comply with the health care laws.

14        The next agent was Agent Jennifer Klein.  Ms. Klein

15   talked about the claims data, the claims data that went to

16   Tricare that Mr. Grow had nothing to do with.  Mr. Grow didn't

17   submit claims to Tricare for reimbursement.  Mr. Grow didn't

18   determine what Tricare would reimburse for.  Mr. Grow didn't

19   determine what the prices of those reimbursements would be.

20        The next witnesses were Amanda Donnelly and Jill

21   Cichowicz.  We're going to talk a little bit about Ms. Cichowicz

22   later.  But Ms. Donnelly and Ms. Cichowicz, one thing was very

23   consistent about both of them; they both needed and liked the

24   products.  In fact, you'll look in the Government's own exhibit,

25   Ms. Cichowicz says, I love the vitamins.  They're working so

1    well.  How can I get more of them?

2           The next witness of the Government's -- I wish I had

3    called him -- was Sven Bjerke, and what did Mr. Bjerke tell you?

4    It surprised me.  I was fishing.  He said, Mr. Grow had two

5    rules:  Rule number one, you don't pay doctors.  Rule number

6    two, you don't pay patients.  This is the Government's witness,

7    not my witness.  I had never talked to the man before.

8           The next witness was Josie Brundige and Ms. Brundige

9    said, I don't have any scars and I got scar cream and the

10   Government brought that up in their closing.  They left out part

11   of the story.  See, what happens is -- and you heard testimony

12   to this effect -- when Mr. Grow got that form which said no

13   scars, but want scar cream, he followed up.  He reached out to

14   Ryan Long.  He said, what's going on here?  And he was told that

15   she had a scar, and he always had faith that she would talk to

16   the doctor and tell the doctor the truth.

17          Then you have the Rambarans and Michael Ewton, all

18   people who had little to no contact with Mr. Grow.  But Ewton,

19   for instance, said, I thought it was a little shady, but then I

20   heard from legal.  Now, I don't know who he was talking about,

21   but he said, I heard that it was okay.  I asked some questions

22   and I was told that it was run by legal.  I was told that by the

23   marketers, by my friends who brought me in.

24          Then you heard from Jonelle Coronado on rebuttal.  She

25   said she needed the creams.  She said she didn't remember a lot

 1   of this.  You saw that she, like Cichowicz, got a W-2 form.

 2   She, like Cichowicz, were invited to come and become W-2

 3   employees, and you saw that email which the Government didn't

 4   show you -- I had to show you -- where it shows that the only

 5   people that were invited to become employees of the pharmacy

 6   were people who had referrals, were people who were marketers.

 7        Now, the Government wants to make a big deal about Jill

 8   Cichowicz and Jonelle Coronado getting paid on their own

 9   medicines.  It is a big deal.  It's four examples out of almost

10   700.  It's a mistake.  And you know it's a mistake because on

11   one of those examples it was fixed; Josh Anderson.  And you know

12   it's a mistake because if Mr. Grow thought that they were just

13   getting paid on their own medicine, he would have never moved

14   them over to the W-2 program.  He thought they were marketers.

15        Then you get Mr. Walker who testified today.

16   Mr. Walker basically just confirmed everything Mr. Grow said.

17   He said, I had a dinner with Mr. Grow and two execs from the

18   pharmacy, and the point of the dinner was to talk to Mr. Grow

19   about moving over from a 1099 to a W-2 relationship, exactly

20   what Mr. Grow testified to on the stand.

21        Then, of course, they called the financial analyst,

22   Lisa Klitz, to tell you about all the money Mr. Grow made.  I

23   told you a week ago, ladies and gentlemen, he made a lot of

24   money.  It's not a crime.

25        Now, we also called some witnesses.  We called

1   Mr. Davila -- he was a short witness -- and Mr. Green.  But

2   they're important, because Mr. Larsen repeatedly today said, the

3   patients got the products because they were getting paid for the

4   products.  That's not true.  Mr. Davila testified that he signed

5   up nearly 25 patients.  None of them got paid for the products

6   and not one of them became even a marketer.  Zero dollars.

7        We called Mr. Corcoran, the lawyer.  Mr. Corcoran

8   testified, I went to Northwestern Law School.  I've been a

9   lawyer in the health care field for 40 years.  I didn't know

10  that Tricare was a Government program, but when we figured this

11  out, we did everything we could to get it corrected.  And when

12  we brought Monty Grow's people on board, it was like an

13  acquisition.  It wasn't like an Employment Agreement from

14  scratch.  It was like we were acquiring a company.  Remember

15  that testimony?

16       And then, of course, you heard from Monty Grow.  The

17  defendant doesn't have to testify, but he had nothing to hide.

18       If we can go two more slides.

19       The judge is going to tell you that the word

20  "knowingly" means that an act was done voluntarily and

21  intentionally and not because of a mistake or an accident.  It's

22  important.  The Judge is also going to say that the word

23  "willfully" means that the act was committed voluntarily and

24  purposefully with the intent to do something the law forbids,

25  that is, with a bad purpose to disobey or disregard the law.

1          The judge is going to tell you about something called a

2     good faith defense.  "Good faith," he is going to tell you, is a

3     complete defense to a charge that requires intent to defraud.

4     If you have good faith, you can't be convicted of any of the

5     counts in this case.  Good faith is an honestly-held belief or

6     an honestly-formed belief.  It cannot be fraudulent intent even

7     if the opinion or belief is mistaken.  So even if, for instance,

8     the solution wasn't to go from 1099 to W-2, even if

9     Mr. Corcoran, the pharmacy, Mr. Walker, they were all wrong, a

10    good faith belief in that shows Mr. Grow is not guilty.

11          And lastly, with regard to good faith, similarly,

12    evidence of a mistake in judgment, an error in management or

13    carelessness cannot establish fraudulent intent.  You can't be

14    guilty of a fraud by a mere mistake or carelessness.

15          Ladies and gentlemen, we are in the pursuit of truth.

16    At one point in this trial the Government said, we don't care

17    about the truth.  Think about that.  Think about the things that

18    we the defense had to bring out in this case.  For a week the

19    Government put on its case, but they didn't tell you about

20    recordings.  They didn't tell you that Monty Grow was recorded

21    by the Government undercover without him knowing it.  They

22    didn't want you to know that.  Ask yourself why.

23          For weeks -- I'm sorry, week.  It felt like weeks.  For

24    a week the Government called 20-some-odd witnesses, and what did

25    you see in almost every witness?

1        They would put in a document or two.  They would give

2    you what they wanted as the punch line, and what would we have

3    to do?  We'd have to show you all the documents because, again,

4    according to Mr. Larsen -- and I agree -- a document doesn't

5    have a motive to lie.

6        Text messages:  The Government doesn't put in the text

7    messages.  We do.  Why?  Because we are in the pursuit of truth.

8    You know, this case, the documents, they're like DNA.  They're

9    like fingerprints.  They are like forensic evidence.  You see a

10   bank robbery.  What do you want to look at?  The video.

11       You see someone's stolen something.  What do you want

12   to look for?  The fingerprints.

13       In a fraud case, you want to know what someone is

14   thinking.  What do you want to look at?  You want to look at the

15   documents.  You want to look at the text messages.  You want to

16   look at the recordings in realtime.  The Government didn't want

17   to show you that.  We had to show you that.

18       What else did we show you?  We showed you Monty Grow.

19   I'm loud.  Maybe because I'm small, I try to take over a

20   courtroom.  When Monty Grow testified, I tried to stay quiet.  I

21   asked him questions like, tell us about surveys, and let him

22   talk to you all.  But unlike with Ginger Lay, unlike with Robin

23   Halliburton, what did we do after he talked to you all?  We

24   supported everything with a document.  Why?  Because Mr. Larsen

25   is right, documents don't have a motive to lie.

Closing Arguments

1           So let's talk about some of the documents.

2           Now, what you heard is you heard how this program

3    began, and what you heard was you heard that Mr. Grow started by

4    working for a company called InforMD.  You heard InforMD was

5    different.  Now, Mr. Larsen wants you to believe that he made no

6    money at InforMD.  Let's talk about what's in evidence in the

7    case.  Mr. Grow made over $200,000 a year at InforMD.  Mr. Grow,

8    before he ever created MGTEN, was a millionaire.  He made a lot

9    more money in this case.  We are not running away from that.

10   But let's put everything into perspective.  He was a millionaire

11   before this company even began.

12           What you learned about InforMD is they used the same

13   commission structure.  What you learned about InforMD is they

14   used the same compounds.  What you learned in InforMD is there

15   was an overlap in the pharmacies.  They used some of the same

16   reps, and you learned that, look, Mr. Grow, he's kind of lazy,

17   he used the same literature.  He knew it had been approved by

18   lawyers at InforMD.  He sent it to his marketers to describe the

19   products, so that they would know what they were marketing.

20           The only difference between InforMD, a company that you

21   saw was heavily lawyered up, and Mr. Grow's company, was

22   Mr. Grow used telemedicine.  And you heard from the testimony of

23   Dr. Bansal, not our witness, the Government's witness, and he

24   testified that telemedicine is legal.  He testified that he had

25   consultations with patients and that he was paid per consult

1    regardless of whether he wrote a script or not.

2           Now, the Government comes in here throughout the entire

3    trial and through their closing and repeatedly they say the

4    following:  Mr. Grow paid doctors.  Absolutely no evidence of

5    that.  In fact, evidence of the exact opposite.  We didn't hear

6    from one doctor in this case who said he was paid to write a

7    prescription, not one.  In fact, the only doctor that was called

8    in this case said the opposite.  We didn't see one document in

9    this case where it said anyone was getting paid for

10   prescriptions.  In fact, we saw the opposite.  It always said

11   they were getting paid per consults.

12          Now, the Government wants to use math and wants to

13   suggest that because 95, 97 -- I don't care if it's 99 percent

14   -- of this group ended up getting prescriptions, this

15   self-selected group, that it must be fraud.  That's insane.

16   It's not evidence and it doesn't make any sense.  It's not a

17   slot machine as Mr. Juenger would try to have you believe.  The

18   marketers were going out to people and finding out if they

19   needed the medication.  And by the way, the doctors were calling

20   the people, giving consults to see if they need the medication.

21   And by the way, the pharmacy was calling to confirm whether the

22   people needed the medication, whether they wanted the

23   medication.

24          No matter how many times the Government comes up here

25   and says that Mr. Grow paid for prescriptions or paid doctors,

1   you know that not to be the case because there was not one iota,

2   not one little piece of evidence showing that to be the case.

3          You also learned from the telemed company that they

4   would send emails to Mr. Grow saying, we only operate in these

5   states.  That's Government's Exhibit 78.  It gave Mr. Grow faith

6   that he was working with a company that was on the up-and-up.

7   If they're part of the conspiracy, why won't they write

8   prescriptions in all the states?

9          Now, we talked about it a little bit.  The Government

10  comes up here and says, every single patient got paid.  Now, Sal

11  Davila's patients, for instance, just one example of the 700,

12  none of his patients became marketers.  None of them got paid.

13  But you also see throughout all the testimony in this case,

14  there was no quid pro quo.  I've never used that word either.

15  No bribery.

16         And you see if you look at Defendant's Exhibit 5, there

17  were plenty of patients who rejected it.  Josh wants to know if

18  Sanchez can get resubmitted.  He was the one who got rejected.

19  Got rejected by who?  The doctor.  What does Mr. Grow say?  I

20  don't think so.

21         Text message February 28, 2015, right in the middle of

22     the Government's so-called conspiracy, Mr. Grow is saying,

23     "The doctor didn't give the guy a prescription.  Can't be

24     resubmitted."

25         A document doesn't have a motive to lie.

Closing Arguments

1    Defendant's Exhibit 10 regarding Torniqua Johnson.  You

2 heard testimony about Ms. Johnson.  Ms. Johnson was rejected of

3 getting medications by the doctor, and she kept calling the

4 pharmacy to find out why can't she get these medications.  And

5 they got in touch with Mr. Grow, and Mr. Grow responds to

6 Matthew Smith, now a supposed co-conspirator according to

7 Mr. Larsen in his closing, he responds:

8    "I submitted her to another doctor, and for some reason

9    he denied her a new prescription.  That's his job and I

10    don't have anything to do with what or who the physician

11    writes prescriptions for."

12    This is May 12, 2015, right in the middle of the

13 Government's conspiracy.  Documents don't have a motive to lie.

14    Well, if you listen to Mr. Larsen, why didn't Mr. Grow

15 just call up that telemed company and say, hey, we have got to

16 write a prescription for Torniqua Johnson.  I can make $13,500

17 on that.  Because the doctors had independence, see?  Mr. Grow

18 didn't pay doctors for prescriptions, and you see that in

19 realtime.  The Government had this document.  Did they show it

20 to you on the direct examination of any of their witnesses?  No.

21 Ask yourself why.

22    Defense Exhibit 67.  This is about refills.  "The

23    following patients, we need refills.  We reached out to

24    Dr. Garcia, but the refill requests were sent back and

25    denied."

1        Well, I'm confused.  I thought the telemed company is a

2   co-conspirator which all that needs to happen is Mr. Grow calls

3   them up or pays them something and they automatically write a

4   refill.  Government doesn't show you this document.  Ask

5   yourself why.

6        Now, the Government talked a lot about kickbacks, and

7   what you saw in this case, like I told you in opening you would

8   see, is that commissions are not kickbacks.  You pay a marketer

9   like you would at Amway or Avon or Herbalife to market

10  something, nothing wrong with that.  You see it was done at

11  InforMD, brought over to Mr. Grow's program.

12       Let's talk some more about the documents.

13       The Government puts Ms. Halliburton on the stand.

14  Remember that?  She's a nice lady.  She was scared.  I felt bad

15  for her.  I didn't like crossing her, to be honest with you.

16  The Government puts her on for about 45 minutes.  She testifies

17  about all these conversations she had with Mr. Grow, how he was

18  the mastermind.  She used words like patient brokering which she

19  later said she doesn't even know what it means; the Government

20  told her to say it.  And I get up on cross and I show her

21  Defense Exhibit 15.

22       Ladies and gentlemen, this is the videotape at the

23  7-Eleven when there's a robbery that shows that the defendant

24  didn't do it, Defendant's Exhibit 15.  The Government didn't

25  want you to see it.  So they don't ask her one question about it

1   on direct, but on cross I show her Defendant's Exhibit 15,

2   probably the most important exhibit in this case, again, because

3   a document doesn't have a motive to lie.

4           In May of 2015, in the heart of their supposed

5       conspiracy, Robin Halliburton says, "I have a friend who is

6       a PA" -- and we learned a PA is a doctor -- "and could

7       prescribe or refer patients that can benefit from the pain

8       cream.  Neither I nor he can have our name associated with

9       being an employee of the pharmacy while currently holding

10      our jobs.  Do you think this is something we could do?  Do

11      you have any script pads that can be used to be faxed to the

12      pharmacy?"  And you know what Mr. Grow says?  "Doctors

13      cannot be paid to write prescriptions.  That is an illegal

14      kickback."

15          This is a fingerprint, ladies and gentlemen.  This is

16  DNA evidence.  This case is about -- they said it, they spent 30

17  minutes saying it -- about Mr. Grow paying doctors.  The problem

18  is, he didn't pay any doctors, and the problem is the very

19  document that they didn't want you to see shows it in realtime.

20          "Doctors cannot be paid to write prescriptions.  That

21      is an illegal kickback."

22          They can refer Tricare patients that they see in their

23  clinic, but they can't receive any type of pay or inducement.

24          You want to know what Mr. Grow's intent is in 2015?

25  You don't have to go any further than this document.  Ask

1    yourself why the Government didn't show that to Ms. Halliburton

2    in her hour of direct.

3            Defendant's Exhibit 129.  They want you to believe,

4    like with Brundige, that Mr. Grow was just making stuff up, and

5    they don't even have a witness to say that.  They want you to

6    infer it.  They want you to assume it.  But again, they don't

7    show you Defendant's Exhibit 129, we do.  And in 129, there's a

8    question -- there's an intake form, basically, where this

9    individual needs medicines; and Mr. Grow says to the marketer, I

10   need to know what is his pain and what is the scar for each

11   patient.  Well, I'm confused.  If he's just making stuff up, why

12   does he need to know that?  Why doesn't he just write down

13   whatever he wants to write down?  Why?  Because that's not what

14   he's doing.  That's not what his program is about.

15           We talked about InforMD a little bit.  I want to talk

16   briefly about PCA.

17           So Mr. Grow had some confidence in his program because

18   it was virtually the same program that he took from InforMD.

19   We've already discussed that.  He also had confidence in his

20   program because PCA was constantly hounding him about compliance

21   issues, and normally when someone in a pharmacy is hounding you

22   about compliance issues, you don't really think they're engaging

23   in a fraud.  And what do you see through that?  You see every

24   time they brought up any compliance issue whatsoever, Mr. Grow

25   complied.

1          So showing you Defendant's Exhibit 64, Matt Smith, this

2     supposed co-conspirator, says, I have a concern because I'm

3     seeing the stamping of a doctor's signature.  So what does Monty

4     Grow do?  He changes it.  He goes back.  You saw the documents.

5     You saw the defense exhibits.  He goes back to the telemedicine

6     company, and he says, we can't stamp signatures.  We need actual

7     signatures.  That's what the pharmacy is telling me.  The

8     telemedicine company says, why?  He says, I don't know why.

9     That's what they're telling me.  To be compliant, we need to do

10    it this way.  It's changed.

11         Defendant's Exhibit 53.  The pharmacist, Alisa Catoggio

12        says, "We are having trouble making out the doctor's name.

13        We can't really read his handwriting.  Can you go back and

14        get it fixed?"

15         Wow, that's really consistent with a pharmacy that is

16    trying to submit anything to Tricare.  Not really consistent.

17    So what does Mr. Grow do?  He goes back.  He gets it fixed.

18         Defendant's Exhibit 30.  I still don't understand the

19    Government's argument on this.  Matt Smith comes to him, and I

20    showed you the series of documents through Mr. Grow's direct.

21    Matt Smith comes to him and says, we have an issue, because

22    what's happening is the telemedicine company initially was

23    sending prescriptions to Mr. Grow who was then sending the

24    prescriptions to the pharmacy.  Matt Smith says, we have an

25    issue with that.  It's got to come straight from the

Closing Arguments

1    telemedicine company to the pharmacy.

2           So what does Mr. Grow do?  Does he jump up and down and

3    say, no, I need to get the prescriptions first because I control

4    the doctors and I need to make sure that, you know, these

5    products are checked?  No, he doesn't say that.  He said, okay.

6           So what's done?  They set up an efax line.  An efax

7    line is set up so that the prescriptions will go straight to the

8    pharmacy, and there's some whiting out done.  Yeah, there is.

9    They have to white-out the phone number which is Mr. Grow's

10   phone number.  Compliance makes Mr. Grow feel good about the

11   pharmacy he's working with.  Nothing sinister about it.  Just

12   the opposite.

13          But ladies and gentlemen, it doesn't stop there.

14   Mr. Grow has his own rules.  Now, you heard from Mr. Bjerke his

15   two main rules:  Don't pay doctors, don't pay patients.  But he

16   has his own rules.  So we will see Defendant's Exhibit 61 where

17   he's telling people -- and you see there's about five or six of

18   the same exhibits.  I just showed you one.  There's about five

19   or six of the same exhibits where he's telling people, you can't

20   give me patients out of the country.

21          Now, Ms. Coronado, you saw her memory, it wasn't very

22   good.  She testified that Mr. Grow was saying the opposite to

23   her about her husband in Afghanistan.  That doesn't make any

24   sense.  Again, documents don't have a motive to lie.  This

25   document is in January 2015.  You'll see a similar document with

Closing Arguments

1    another marketer in February of 2015 and you'll see another

2    document with a similar marketer and a different marketer in

3    April 2015 and you'll see another document saying the same thing

4    with another marketer in May 2015.

5         Maybe Ms. Coronado's memory is not that good.  Maybe

6    she's been pushed a little bit like Ms. Halliburton by the

7    Government.  Documents don't lie.  And talk about reasonable

8    doubt.

9         Everything is out in the open in Mr. Grow's program.

10   You saw and you saw from every one of their witnesses, the first

11   thing that Mr. Grow sends to every single marketer in the case

12   is a 1099.  He sends them a tax form.  He's not telling them to

13   hide what they make.  He's telling them the opposite.  Whatever

14   you make, you better report on your income taxes so that the IRS

15   can audit you.  By the way, he reports what he makes on his own

16   income taxes so that the IRS can audit him.  Sounds like someone

17   is trying to hide something.

18        Another one of Mr. Grow's internal rules, Defendant's

19   Exhibit 83.  Mr. Grow says, we are not going to sell these

20   products to individuals under the age of 18.  Not really -- I

21   mean, he could have made more money, $13,500 I think the

22   Government said, if he sells them to people under 18.  No rule

23   against it.  He says, we're not going to do it.  Defendant's

24   Exhibit 83.

25        Defendant's Exhibit 11.  Ralph -- Ralph is from the

1    pharmacy -- "The patient keeps getting the wound cream, but
2    needs it canceled.  We have tried canceling previously, but
3    it still keeps coming."
4         This is important, this document.  Again, realtime, May
5    14, 2015.  If Mr. Grow is committing this huge fraud, wanting
6    money no matter what, why is he canceling someone's creams when
7    the guy says he doesn't need it?  Why not just let them keep
8    coming?  Because he learns from the patient that they don't want
9    the creams.  By the way, this is Michael Dimmick.  You'll see on
10   one of those consult charts, he's on there.  That's Defendant's
11   Exhibit 11.
12        Now, I want to talk a little bit about the surveys and
13   Ginger Lay.  But before I do so, the judge is going to instruct
14   you that in this case the Government has made a Plea Agreement
15   with Ginger Lay and Robin Halliburton.  Part of that Plea
16   Agreement is in exchange for their trial testimony.  The Court
17   will instruct you that a witness who hopes to gain more
18   favorable treatment may have a reason to make a false statement
19   in order to strike a good bargain with the Government.
20        Ginger Lay faces years in prison.  She told you that.
21   She pled guilty and she got more than half a decade -- she faces
22   more than half a decade in prison.  She also told you that if
23   she didn't plead guilty, she would be sitting right next to
24   Mr. Grow facing more than two decades in prison.  She said she
25   didn't want to go to prison for that long, and so as a result of

Closing Arguments

1    that, she's cooperating with the Government and testifying.

2          Now, the Government trusted Ginger Lay.  And guess

3    what?  She fooled them just like she fooled Mr. Grow.  You heard

4    me right.  She fooled the Government.  Let me tell you how.  She

5    lied.  You don't have to take my word that she lied.  You don't

6    have to take Mr. Grow's word that she lied.  You can listen to

7    Mr. Larsen.  A document doesn't have a motive to lie, and the

8    documents themselves show that she blatantly lied.

9          Let's start with the small lie first.  She said

10   repeatedly that her survey program started in late January or

11   early February.  Remember that?  Well, if you look at

12   Government's Exhibit 171, Philip Snodgrass, one of the people

13   who participated in her survey without Mr. Grow knowing, his

14   prescription he got in late December 2014.  That's Government's

15   Exhibit 171.  That means he took part in the survey even

16   earlier.  And James Featherston got his prescription on January

17   9, 2015, Government's Exhibit 1.  She fooled the Government.

18         See, in this case the Government subpoenaed all of

19   Mr. Grow's emails.  They got them all.  Now, they didn't show

20   you any of them.  You can ask yourself why.  We had to do that.

21   But they also asked her for all of her documents and they asked

22   her for all of her text messages and they also got all the

23   documents from the pharmacy.  They subpoenaed the pharmacy for

24   all of their documents.  Do you know what mysteriously happened?

25   Ms. Grow [sic] only gave them her text messages through the end

Closing Arguments

1   of January.

2           THE COURT:  You said Ms. Grow.  You didn't mean --

3           MR. RASHBAUM:  I'm sorry.  Thank you, Judge.

4           Ms. Lay only gave text messages through the end of

5   January.  Wow, isn't that ironic?  Because the survey program --

6   see, what the Government didn't subpoena is they didn't subpoena

7   Mr. Grow's text messages.  Luckily, we had them.  And it's

8   ironic because Mr. Grow's text messages about the survey

9   program, which are all in February and later, show that he knew

10  nothing about it.  Ask yourself, why does Ms. Lay give over a

11  stack of text messages that stop in January?  Makes you ask why.

12          So let's look at Mr. Grow's text messages.  Again,

13  fingerprint evidence.

14          February 2015 Matthew Smith says, "A patient of

15      Ginger's asked us when he was receiving 1,000 K for filling

16      his prescription."

17          Mr. Grow's response?  By the way, Mr. Grow's response

18  to what Mr. Larsen says is a co-conspirator in this case:

19          "What?  What are you talking about?"

20          If he's a co-conspirator in the case, why does he say,

21  hey, that's the survey program that we have been dealing with?

22  No, his first response in realtime -- documents don't have a

23  motive to lie -- is "What?"

24          Then he says, "I told her that if she's doing that" --

25  what happens is, as you heard him testify, he goes back,

Closing Arguments

1    Mr. Grow, and he talks to Ms. Lay, and he says, what the heck is

2    this survey program about?  Are you paying patients?  And at

3    first she says, I'll get to the bottom of it, and then she comes

4    back and she says, I'm doing this survey program.  And Mr. Grow

5    says, get me the survey program right away so I can send it to

6    the pharmacy.  The pharmacy wants to see it.  And sure enough,

7    you see those documents.  Those documents don't lie.  You see in

8    realtime that Mr. Grow gets from Ms. Lay the program, and

9    Defendant's Exhibit 124, he sends it on to the pharmacy.  And

10   what does the pharmacy say?  It says, you've got to terminate

11   this program.  And what does Mr. Grow do?  Mr. Grow goes back

12   and tells Ginger Lay she has got to terminate the program.

13        So, see, Ginger Lay wasn't prepped by the Government

14   for this text on February.  So what does she do because she's

15   worried about her plea deal?  She lies.  She says, actually, the

16   pharmacy knew about this earlier and they made a markup to this

17   survey program.  They actually edited it.

18        Ladies and gentlemen, the Government subpoenaed all the

19   pharmacy's documents.  I challenge you to look in all of the

20   exhibits in this case.  There's no such edited document because

21   it doesn't exist.  It's a lie.  And if you think they had it, do

22   you think that would have been maybe Government's Exhibit 1 or

23   2?

24        But it doesn't end there.  What happens next --

25        THE COURT:  You've used 50 minutes.

1          MR. RASHBAUM:  I'm sorry, Your Honor?

2          THE COURT:  You have used 50 minutes.  How much longer

3    do you think you have?

4          MR. RASHBAUM:  I think I have maybe a half an hour,

5    Your Honor.

6          THE COURT:  All right.  Ladies and gentlemen, we are

7    going to recess.  Don't talk about the case.  We'll bring you

8    back at 3:00.  Do not discuss the contents of the testimony.  Do

9    not say anything to anyone.  Do not let anyone say anything to

10   you.  Go have lunch.  Remember, if you see any of the

11   individuals involved in the case, don't say hello to them and

12   don't hold it against them if they don't say hello.  All right?

13   We'll see you at 3:00.

14         THE COURT SECURITY OFFICER:  All rise.

15      (The jury retired from the courtroom at 12:07 p.m.)

16         THE COURT:  Have a seat.

17         MR. RASHBAUM:  Thank you, Your Honor.

18         THE COURT:  Both sides were insistent upon keeping a

19   juror who had the doctor's appointment that you've known about

20   since Monday.  So I have to -- have a seat.  Just leave that

21   there.  You're coming back.

22         MR. RASHBAUM:  Okay.

23         THE COURT:  And that's what you want, that's what you

24   get.  It's not the ideal, but that's what you want.

25             All right.  The final jury instructions you have,

1   anything that either -- and you've used some of them anyway in

2   closing.  Any objections to the instructions as they have been

3   discussed since last week and as they were finally provided this

4   morning to you at 9:00, the 33 pages, from the Government?

5            MR. LARSEN:  No, Your Honor.

6            THE COURT:  From the defense?

7            MR. MARCUS:  No, Your Honor.

8            THE COURT:  Okay.  How about the Verdict Form that I

9   gave you all yesterday?  Any problems with it?

10           MR. MARCUS:  Not from us, Your Honor.

11           THE COURT:  From the Government?

12           MR. LARSEN:  No.

13           THE COURT:  Okay.  I know you've all filed -- the list

14  of witnesses you have filed.  Do you have an extra copy?  That's

15  what I would like to give to the jurors.  If not, I can get it.

16  Defense filed your list of witnesses and the Government filed

17  your list of witnesses.  I think I remember seeing it.  Those

18  will go to the jury.  The Indictment without the last two

19  counts, since I granted judgment of acquittal on the two

20  misdemeanor counts, that will go back.  I just photocopy --

21  photo out, basically, deleted the last two counts, but added the

22  last page with the foreman's signature and the U.S. Attorney's

23  signature.  That will go out.  The Verdict Form will go to the

24  jury.  The Indictment will go to the jury, the list of

25  witnesses.

1          Do you have your list of exhibits, the final list of

2    exhibits?

3          MS. MEYERS:  We do, Your Honor.

4          THE COURT:  Okay.  Then I'd like to see that because

5    that will go to the jury.

6          The other thing you have to do is you will today, now,

7    go through all the exhibits so you can agree, so we don't have

8    the delay.  So the jury will start deliberating today after the

9    final closings.  And they have been working pretty hard till

10   around 6:30.  They probably won't reach a verdict by then, but

11   we'll do that.

12         Anything from the Government?  Anything from the

13   defense?

14         MR. LARSEN:  Not from the Government, Your Honor.

15         MR. MARCUS:  Your Honor, just the only instruction -- I

16   think you were working on a safe harbor instruction.  We talked

17   about the language last night.  I didn't see it in this --

18         THE COURT:  Remember what I said yesterday?  I read to

19   you -- since you all gave me the wrong G of the Code of Federal

20   Regulations, I read all of the regulations which, of course, I

21   do not believe -- the 50 pages of regulations involving this,

22   which is very interesting, and I told you I would put it in

23   remuneration.  So if you look at remuneration, it should be

24   there, because that's what it is.

25         I didn't see in what I read the words "safe harbor,"

1    did you?  Certainly not in G which was the proposed.  The words

2    "safe harbor."  What I read in the regulation was the definition

3    of what's exempted.

4            MR. MARCUS:  Okay.

5            THE COURT:  And I think it should be there, but we'll

6    check again.  I could have made a mistake.

7            MR. MARCUS:  It's there, Your Honor.  My apologies.

8            THE COURT:  That's what it is.  It's in plain English.

9    You probably missed it because it didn't have the Latin that the

10   Government likes and it didn't have the convoluted words like

11   "safe harbor" that the defense likes.  It's in plain English.

12   Maybe it's because it's my third language and I like to speak

13   juror English, and I wish you all did, too, throughout.  You've

14   done a great job so far.  I will note that.

15           Anything else?

16           Don't hang around the jurors.

17           Now, if he doesn't come back at 3:00, what do you want

18   to do?

19           You both at least agree you love the word "wait,"

20   because both of you always agree on waiting and waiting.

21           MR. RASHBAUM:  Wait.

22           THE COURT:  Wait until?

23           MR. RASHBAUM:  He comes back.

24           THE COURT:   Whatever time it is.

25           MR. RASHBAUM:  Hold on.  Hold on.

1          THE COURT:  Well, very Biblical.  We always go for the

2    lost sheep and we forget about the other 11.  They don't quite

3    do that, but it's your jury.  We'll see you at 2:55.

4          THE COURT SECURITY OFFICER:  All rise.

5       (There was a luncheon recess taken at 12:12 p.m.)

6                        AFTERNOON SESSION

7       (The following proceedings were held at 4:00 p.m. outside

8    the presence of the jury:)

9          THE COURT SECURITY OFFICER:  Rise for the jury.

10      (The jury entered the courtroom at 4:00 p.m.)

11         THE COURT:  Okay.  Thank you, folks.  Be seated.

12         Mr. Rashbaum, you may conclude your closing argument.

13         MR. RASHBAUM:  Thank you, Your Honor.

14         Good afternoon.  When we stopped, we were talking about

15   Ginger Lay's survey program.  I want to just go back to that a

16   little bit.  So Ms. Lay turned over her documents to the

17   Government.  She turned over her text messages to the

18   Government, and she fooled them just like years ago she fooled

19   Monty Grow.  As I said to you before, when you look at her text

20   messages -- they're in evidence -- you'll notice that

21   miraculously they stop in January.

22         Well, thank God Mr. Grow kept his text messages because

23   what they show is that Mr. Grow had no idea about Ms. Lay's

24   program; that when he found out about it, he and the pharmacy

25   immediately put a stop to it, and that after that she told him

1  she wasn't making any payments to anyone.  And it's only in this

2  trial when Mr. Grow finally sees her bank records that he would

3  have no access to, that he sees that she was paying people all

4  along.  She fooled him just like she fooled them.  But again,

5  let's look at the documents.

6        So when you look at Defense Exhibit 4, you see in

7  realtime when Mr. Grow first learns about Ginger Lay's program

8  and you see in realtime that he confronts her; and when she

9  tells him about it and when the pharmacy says she can't do it

10 any longer, he tells her, it's unacceptable.  You can't be doing

11 something like that.  You see it in realtime.  You don't have to

12 take Ginger Lay's word for it.  By the way, you don't even have

13 to take Monty Grow's word for it.  He testified.  You saw him

14 testify here.  And he told you how it all went down.  But you've

15 got the documents.  You've got the videotape.  You've got the

16 fingerprints.

17       Then what you see when you look at Defendant's Exhibit

18 124, you see her caught in another lie.  See, when she got on

19 the stand, she didn't know because the Government didn't know

20 that there were other text messages.  So when she got caught in

21 that lie, what did she do? She made something up.  She said,

22 there's an email with the pharmacy where the pharmacy does a

23 markup.  There's no such email.  The only emails on the survey

24 program are the emails after, when Mr. Grow finds out about it

25 and he sends the survey program to the pharmacy and the pharmacy

Closing Arguments

1   tells him to shut it down.  That's Defense Exhibit 124.  And by

2   the way, that's at the end of February 2015.

3          Then, again, we see text messages between Ginger Lay

4   and Monty Grow on March 3, 2015.  This is Defense Exhibit 206.

5   Again, never turned over by Ms. Lay to the Government.  Again,

6   in her hours of direct testimony, never brought up by the

7   Government before all of you.  Ask yourself why.

8          Defense Exhibit 206 is critical, ladies and gentlemen.

9   When you look at it, you'll see.

10          Ginger Lay says to Mr. Grow, "I'm terminating the

11       program effective immediately."  This part is even maybe

12       more critical.  She says, "I'm not going to give the group

13       that's causing these problems an Employment Agreement with

14       the pharmacy."

15          She's blaming others for the survey program.

16          Now, if she's in a conspiracy with Mr. Grow, why is she

17   blaming others?  Why?  Because Mr. Grow was upset.  But as of

18   March 3rd, Mr. Grow thinks the program is shut down.  And sure,

19   you're going to see there are a bunch of emails that the

20   Government put in evidence that show that there were

21   occasionally patients after this point calling about their

22   $1,000 survey.  And Mr. Grow's assumption is, the pharmacy's

23   assumption is, nobody is getting paid on it because in March she

24   says, I shut down the program.  It's done.

25          But what does Ms. Lay do when she comes in here?  She

1  says, me and Mr. Grow had a conversation and he told me I got to

2  keep paying those people because I don't want them to be making

3  problems with the pharmacy.  One problem with that.  Again, the

4  Government didn't have it.  Ms. Lay didn't give it to them.

5       And there's a text message, fingerprints, in April of

6       2015 where Ms. Lay says, "I have a question.  I ended my

7       program" -- not our program.  "I ended my program on March

8       31st," consistent with this text message right here.  "I

9       ended my program on March 31st.  But those who were due a

10      first refill in April would receive one assessment

11      compensation.  Those on the list I sent you are due

12      compensation, but it won't be until when the new guidelines

13      are in place.  Can I pay them or not?  The pharmacy didn't

14      process their refills."

15      What she's saying here is, the pharmacy, they didn't

16  give them refills because the survey program was terminated, but

17  can I still pay these people?

18      Now, if she had had a conversation with Mr. Grow where

19  Mr. Grow told her, you've got to keep paying those people;

20  you've got to keep them quiet, why would she be asking them in

21  April 29, 2015 in realtime, can I still be paying those people?

22  And you know what Mr. Grow's response is?  "I wouldn't be paying

23  anyone."

24      She's a liar, ladies and gentlemen, caught in a lie.

25  Fingerprints.  Caught with documents, documents that don't have

Closing Arguments

1  a motive to lie.  And why was she caught?  Because she didn't

2  give her text messages over to the Government, and the

3  Government didn't have our text messages.  I'll admit it.  So

4  when she testified that whole first day for Mr. Juenger, she

5  didn't know that the text messages were going to show that she

6  spent a day lying to all of you.  And why did she lie?  She lied

7  because she wants to get less time, and she believes the only

8  way she'll get less time is by putting Mr. Grow away.  What a

9  nightmare, a nightmare that an individual can come in this

10  courtroom and be framed like that.  Thank God we had the

11  fingerprints to show you she's a liar.

12          This message was April 29, 2015.  After April 29, 2015,

13  we find out in this trial -- we didn't know it before -- that

14  she paid 56 patients $43,100.  In June she paid nine patients

15  almost $10,000.  That's Government's Exhibit 202-K -- Defense

16  Exhibit 202-K.  Sorry.  You can look at it.

17          "I would not be paying anyone," those are Mr. Grow's

18  words.  That's a videotape of innocence.

19          In opening the Government promised you you'd hear about

20  backdating.  Mr. Grow took the stand, was on cross-examination

21  for four hours.  Not one question on backdating.  You know why?

22  Because, see, when the Government brought in the backdating

23  documents, so-called backdating documents through another

24  witness, they show you one document where Mr. Grow is telling

25  the telemedicine company, it's important to put a certain date

1    on the new formularies.

2           I've got to tell you, I was a little nervous when I saw

3    it.  Then I went back and I looked at all the emails.  And what

4    do we see?  Defense Exhibit 2016 [sic].  Kim from the pharmacy

5    is going to call the doctor to explain the need for this updated

6    document to be signed, and Kim will also explain to the doctor

7    that she will retroactively change the current in-house capsule

8    prescriptions and take the verbal authorizations to make those

9    changes to those capsule prescriptions.  It's in the document.

10   You can look at it.  Defendant's Exhibit 216.

11          And you see PCA says, why can't we ask the doctor to

12   date it to the date of the original document?  And it's

13   determined by the pharmacy, there's no issue with it.  They had

14   dated it that date originally.  If you talk to the doctor, the

15   doctor can go back and make it that date now and you see the

16   pharmacy gives Mr. Grow instructions on it and eight minutes

17   later, I think, Mr. Grow says, make sure you put that date down.

18   It's not backdating.  But, see, if you only see that last

19   document, if you only see the document that the Government chose

20   to show you, it looks bad for Mr. Grow.  But when you see the

21   whole picture, when you see just more than the trailer in the

22   movie, you see what really happened here.  When you see the

23   documents, when you see the videotapes, when you see all the

24   things that the Government wanted to hide from you, you see

25   Mr. Grow's state of mind.

1            A big issue in this case -- they asked it to almost

2     every witness.  Two issues:  After the witnesses got up there

3     and said, the products worked, I liked them, I needed them, they

4     didn't like that answer.  So they said, well, would you spend

5     $5,000 for the products out of your pocket?  And they all said,

6     no, I wouldn't.  I took some antibiotics last week.  I wouldn't

7     spend the money out of my pocket for that antibiotic, but that's

8     why we have insurance.  That's the whole point of insurance.  It

9     doesn't make anyone guilty, and it doesn't mean that anyone

10    doesn't need the antibiotic.  I needed it.

11           The second thing they always did with the witness is

12    they want you to somehow think that because these people, these

13    marketers, Mr. Grow were going after Tricare patients, there's

14    something wrong with that.  We admit it.  The program was

15    seeking Tricare patients, and the reason why they were seeking

16    Tricare patients was because Tricare was reimbursing for the

17    creams.  They weren't seeking patients who couldn't get

18    reimbursement from their insurance companies because, sure

19    enough, they didn't want to take money out of their pockets and

20    pay for creams, just like I don't want to pay for antibiotics.

21    If my insurance company isn't going to cover my antibiotic, I'm

22    going to go some place else.

23           They were marketers.  They were marketing to people who

24    were covered by the program.  Nothing wrong with that.  Their

25    own witness, she fought me on it a lot, Ms. Halliburton, but

Closing Arguments

1    ultimately even she agreed.

2          The other thing they do, the Government, is they'd have

3    you believe that somehow Mr. Grow controls the cost and the

4    reimbursement from Tricare.  In fact, today we heard something

5    new.  Today we heard Mr. Grow is even packaging the products.

6    There's no evidence of that in the trial.  Mr. Grow had

7    absolutely nothing to do with the AWP and reimbursement from

8    Tricare.  Mr. Grow had nothing to do with the submitting of the

9    forms to Tricare, and Mr. Grow certainly had nothing to do with

10   whether Tricare would actually reimburse or not.

11         If you look at Defendant's Exhibit 33, Mr. Grow writes

12         in realtime on April 28, 2015, "No, we have no control over

13         cost.  The pharmacy has formulas that benefit the patients

14         and get reimbursed whatever the insurance carriers" -- i.e.

15         Tricare -- "agree to pay."

16         Ethoxy:  Mr. Lozada comes in here, says he had very

17   little communications with Mr. Grow, and he says, we had a

18   boatload of ethoxy.  I don't even know why we were buying ethoxy

19   from Mr. Grow and the Government would have you believe that

20   Mr. Grow's packaging it and he's making sure that it's in these

21   small vials because the small vials get better reimbursement,

22   according to the Government.  Now, first of all, there's

23   absolutely no evidence in this trial that the small vials get

24   greater reimbursement.  But let's assume it does.  I don't know,

25   to be honest with you, but let's assume it does.

Closing Arguments

1          What there is evidence in this trial of is that

2   Mr. Grow got the ethoxy he could get.  It was on limited supply

3   at least for him.  It was very profitable; and if he could get

4   more of it, he would have, because he would have made more

5   money.  And the evidence in this trial is he sold the ethoxy not

6   only to PCA, but to other pharmacies, pharmacies that he wasn't

7   marketing for.

8          And you see, again, in Defendant's Exhibit 72, not

9   shown to Mr. Lozada, not shown by the Government to any of their

10  witnesses -- ask yourself why -- a re line from Matt Smith, I'm

11  sorry, from Monty Grow to Matt Smith, responding to an email.

12  Now, my email, the way it works is when there is a re line, it's

13  a response.  So the original message is still, no ethoxy?

14         The pharmacy is saying, "We still can't get ethoxy?"

15     And Mr. Grow says, "No, sir, they're telling me we may not

16     get it till the second week of January."

17         He doesn't have any.  You don't have to take Mr. Grow's

18  word for it.  The document supports it.

19         Let's talk about the W-2 issue a little bit.  The W-2

20  issue is a critical issue, but not for what the Government is

21  talking about.  The W-2 issue is critical because it shows in

22  realtime Mr. Grow's intent.  Mr. Grow finds out on February 23rd

23  in a text message that the Government doesn't show you, he finds

24  out that for the prior two months of his program, they should

25  have been doing it as a W-2 employee and not as a 1099 employee.

1   The characterization of their employment, according to PCA, they

2   have been mistaken and it needs to be changed.

3       Now, the Government wants to talk about how nothing

4   ever changed, nothing ever changed.  We'll get to that.  But

5   let's talk about why this is important, which is it shows his

6   intent.  And do you know what Mr. Grow says?  He says, "Okay,

7   I'm just throwing up.  I'm nauseous."  Okay.  If he's in this

8   huge conspiracy with this pharmacy where he is paying doctors

9   and paying kickbacks, the issue he's nauseous about is the

10  characterization of the employment?  No, he's nauseous because

11  he's dependent on this pharmacy.  The pharmacy has been on him

12  about compliance and he has agreed with all the compliance

13  changes and now he finds out in realtime on February 23rd that

14  they have been doing it wrong.  And his initial reaction -- you

15  heard it -- is, I'm ending the program.

16      Then what happens?  The pharmacy says, you don't have

17  to end the program.  It's a gray area.  It can be fixed.  And

18  within four days, a lawyer, you saw him here today, Gary Walker,

19  the pharmacy executives and Gary Walker fly up to Tampa where

20  Mr. Grow lives and they meet with him.  You heard

21  what Mr. Walker said; the purpose of the meeting was to assure

22  Mr. Grow that it could be switched from a 1099 to a W-2.

23      Mr. Grow feels better after that meeting; thinks it's

24  not such a big issue.  So what does he do?  He says, okay, let's

25  start this onboarding process.  What do you need?  And when he

Closing Arguments

1    does the onboarding process, he's not just talking to Matt Smith

2    and Pat Smith.  You see in Defense Exhibit 105, he's talking to

3    lawyers from PCA.  David Corcoran says, I'll talk to you at 2

4    p.m.  We'll talk about the onboarding.

5          You heard from Mr. Corcoran, Northwestern Law School,

6    40 years in the health care field.  By the way, he didn't know

7    Tricare was a Government program.  He is involved in the

8    onboarding.  And what you see is the onboarding -- you'll see it

9    in the exhibits -- it takes time.  Mr. Grow gets antsy.  He

10   doesn't like how much time it's taking.  So on April 19th -- you

11   see it in emails and text messages -- he sends an email and text

12   message to all of his reps and he says, we're done.  We're

13   shutting down the program, and then guess what happens?  The

14   onboarding actually happens within three or four days and the

15   program is brought back on.  This isn't the behavior of someone

16   who wants, who intends to commit a fraud.

17         Now, the Government comes up here and they say, every

18   patient got the same products.  Not true.  You can look at it in

19   the records.  Not every patient got the same products.  We

20   showed you several examples of when patients didn't get all

21   three products.  They come up here and they say, Mr. Grow even

22   testified that most of the patients got the same products.  Not

23   true.  Mr. Juenger showed him eight patients; said, how many of

24   these eight patients got the same products?  He said, most of

25   them.  There were two, I think, that didn't.  That's only of

Closing Arguments

117

1      those eight.

2              The Government gets up here with Ginger Lay who says,

3      we had to put p-01 and we had to always put sc-01 because the

4      reimbursements are higher.  The Government has the burden of

5      proof.  They don't bring anyone in this courtroom to prove to

6      you that the reimbursements are higher.  They don't bring anyone

7      in this courtroom to disagree with Mr. Grow who testified,

8      that's not it.  The pharmacy was only making p-01.  We were only

9      marketing p-01.  We weren't doing p-02 which is a neuropathy

10     medicine.  The pharmacy was only doing sc-01.  They weren't

11     doing sc-02.  So every time the doctor would check off sc-02,

12     I'd have to go back because the pharmacy couldn't fill that

13     prescription.  The Government has the burden of proof.  They

14     don't bring in one witness to disagree with that.

15             Mr. Larsen wants to talk about copays.  And this was

16     very confusing.  Let me state at the outset, Mr. Grow took the

17     stand.  He told you that he never paid a copay.  He also told

18     you that on occasions his reps would ask him, can I pay the

19     copay?  And he said, yeah, you can pay the copay.  I'm not going

20     to reimburse it, but you can pay it if you want, and also, the

21     pharmacy is not going to go after these veterans.  He told you

22     that.

23             And we also showed you Government's Exhibit 94 where

24     the pharmacy was asking him, do you want to pay the copays for

25     these people?  Again, reinforcing the idea that that was okay.

Closing Arguments

1    See, here's where the Government confuses me, because

2    in one breath today they said, the reason why Mr. Grow and his

3    people were paying the copays and not telling the pharmacy is

4    because the pharmacy wouldn't allow it.  They would shut it

5    down.  Okay.  Disregard the fact that there are emails in this

6    case where the pharmacy is asking whether they want to pay the

7    copays, and then about five minutes later the Government says,

8    the pharmacy is a co-conspirator.  They are all part of this

9    thing.

10    So let me ask you, if they're a co-conspirator, why did

11    they agree to this?  It doesn't make sense.

12    This case, ladies and gentlemen, is about intent.

13    Every single count in this case has a specific intent argument.

14    There are a lot of counts.  We're going to go through them real

15    quickly, but there are a lot of them, and you should not

16    compromise on these counts.  They all have the same intent

17    element.  If at the end of the day you believe as I do and as

18    the fingerprints, the documents show that Mr. Grow didn't have

19    the intent to commit a crime, he's not guilty of every single

20    count and I'm going to show you why.

21    Count 1 is a conspiracy to commit health care fraud and

22    wire fraud, and you're going to see that in order to be

23    convicted of that count, you must knowingly and willfully

24    conspire and you must know the unlawful purpose of the plan and

25    willfully join in it.  You must have the intent to commit this

1  crime.

2          This involves false statements to Tricare, Count 1.  We

3  have not heard evidence of one false statement to Tricare.  We

4  have not heard evidence of one doctor who didn't write an

5  accurate prescription.  We haven't heard one evidence of

6  Mr. Grow communicating with Tricare in any way, but you don't

7  even have to get there because the fingerprints, the video

8  recordings, the documents show he didn't intend to commit this

9  crime.  That's Count 1.

10          Count 2 through 8 is health care fraud.  It's the same

11  thing as Count 1, but it's the substantive counts.  And again,

12  for each of those counts, 2 through 8, in order to be found

13  guilty, you must knowingly and willfully -- intent.  You must

14  knowingly and willfully execute an attempt to execute a scheme

15  or artifice to defraud a health care benefit program and you

16  must act willfully and intentionally to defraud.  Intent.  It's

17  Counts 2 through 8.

18          Count 9, another conspiracy.  This is a conspiracy to

19  pay and receive kickbacks.  You're going to see there's some

20  objects to this conspiracy, but it's all the same.  Again,

21  there's an intent element.  You must know the unlawful purpose

22  of the plan and willfully join in it.

23          Counts 10 through 14, 17 through 18, 20, 22, 26, 28 and

24  33, receipt of kickbacks.

25          You must knowingly and willfully solicit or receive

1   remuneration -- don't ask me what that means -- such as a

2   kickback or bribe.  You didn't hear evidence of any bribes in

3   this case, and again, you have to intend to commit the crime.

4            Counts 36, 40 through 41, 43 and 44, same thing, but

5   with paying kickbacks.  Still has the knowingly and willfully

6   language.  In order to find him guilty, you have to throw all of

7   this out, all of the documents, all hundred exhibits or so

8   showing his actual intent.

9            Counts 45 through 49, money laundering.  This case,

10  there is no money hidden in a backyard.  You know, when you

11  think money laundering, you think, as Mr. Larsen said in his

12  closing, about cleaning money.  You know the biggest way -- and

13  you can look at the Government's exhibit on this.  You know the

14  biggest way that Mr. Grow cleaned his money?  He paid the IRS.

15  His biggest payment in this case was paying the IRS who could

16  audit him.  He wasn't hiding it or laundering it.  He didn't

17  think he was doing anything wrong.  He was declaring it.  Hey,

18  Government, here is the $5.8 million for you that I made with

19  MGTEN.  Come take a look at my books.  Come take a look at my

20  business.  That's not laundering.

21            Now, listen, Mr. Grow wanted to make money.  I told you

22  that a week ago, and he made a lot of money.  And by the way,

23  the Government took it all.  You heard that from Ms. Lay.  They

24  seized all of his assets.  But he made a lot of money, and that

25  was his goal.  So there are emails -- and the Government is

1  going to come up here -- look, I don't get another shot at this.

2  But the Government gets the last word because they have the

3  burden of proof and they are going to come up here and I imagine

4  they're going to say documents don't have a motive to lie.

5  Mr. Rashbaum and Mr. Larsen are right about that and they are

6  going to come up here and they're going to show you a bunch of

7  Government exhibits.  I want you to look at their Government

8  exhibits really, really carefully, because what their Government

9  exhibits show is that Mr. Grow wanted to make money.  When he

10 marketed, he marketed in a way to make money.  That was his

11 goal, but not one of their documents shows his intent, and they

12 didn't want you to see any of those documents, what this case is

13 really about.

14         THE COURT:  You've used 35 minutes.

15         MR. RASHBAUM:  Thank you, Your Honor.

16         Making money, ladies and gentlemen -- I told you this a

17 week ago -- is not guilt.  You will see no instruction in the

18 jury instructions where it says, if you make money, you are

19 guilty.

20         Ladies and gentlemen, Mr. Grow is innocent.  We don't

21 have to prove that.  The Government has the burden beyond a

22 reasonable doubt to show that he's guilty.  There is massive

23 doubt here.  Each and every one of these documents is doubt.

24 But I will tell you this:  It's clear from the documents that

25 Monty Grow is in a nightmare right now because he's innocent.

1   Forget about their burden.  He's innocent.  You may not like the

2   program.  You may not like how much money he made, but one thing

3   in this trial is clear:  He never intended to commit a crime,

4   and for each and every one of these counts, the Government has

5   the burden beyond a reasonable doubt, before this man loses his

6   life, to prove that he intended to commit a crime, and they

7   can't come close.

8          You're going to get a Verdict Form in this case.  It's

9   many pages long, and on that Verdict Form -- I won't read it

10  all -- it will say, as to Count 1 on the charge of knowingly and

11  willfully conspiring to commit health care fraud.  Knowingly and

12  willfully.  You're going to see it in each and every one of the

13  counts, and it's going to say, guilty or not guilty.  The only

14  just verdict is not guilty.  Count 2, not guilty.  And I'll

15  premark the other ones for you.  Not guilty, not guilty, not

16  guilty, not guilty, not guilty.  That's the only just verdict in

17  this case, ladies and gentlemen.  You cannot compromise.

18         I want to thank you for your time in this case.  It's

19  an emotional case.  There's only one just verdict.  Give

20  Mr. Grow his life back, please.

21         Thank you.

22         THE COURT:  Mr. Juenger, your turn.

23         MR. JUENGER:  Thank you, Your Honor.  May it please the

24  Court.  And may I request a five-minute warning, Your Honor?

25         THE COURT:  All right.  You have 23 minutes left.

1          MR. JUENGER:  Ladies and gentlemen, you'll be happy to

2   hear that I'm the last lawyer you're going to hear from in this

3   case, besides the judge.  He is a lawyer, of course, as well.

4          I'm not going to waste my time rehashing what

5   Mr. Larsen did in his opening, opening/close.  He quite nicely

6   organized all the evidence that you've heard over the last week

7   or so and demonstrated how the Government has proved its case

8   beyond any reasonable doubt that Mr. Grow committed the offenses

9   which he's charged with in this case.  I couldn't have said it

10  any better if I had written that myself.

11         Now, rather than give you a rehash, I'm only going to

12  try and address some of the points that Mr. Rashbaum raised over

13  the last 90 minutes.  I only get 23 minutes, so I'm not going to

14  be able to hit them all for sure.

15         But I want to start with something that Mr. Larsen

16  initially said, that Mr. Rashbaum picked up on and ran with as

17  his theme throughout this entire closing of his, and the theme

18  was that documents don't have a motive to lie.  Do you remember

19  that?  You heard it a dozen times.  Documents don't have a

20  motive to lie.  It's a nice theme.  It's a nice slogan that

21  Mr. Larsen may want to rethink using in the future, but in

22  philosophy we call that sort of argument sophistry, which is

23  just a fancy way of saying a phony argument, a fancy way of

24  making a phony argument.

25         What do I mean by that?  Think about it.  Documents

Closing Arguments

1   don't have a motive to lie.  It's a nice slogan, but it's a

2   ridiculous statement because documents don't have motives.

3   People have motives.  Documents cannot lie.  Only people can

4   lie.  The only thing that documents can do is prove what was

5   said.  Whether it's true or whether it's false, a document can't

6   tell you that.

7          So when Mr. Rashbaum says that documents are the DNA

8   and the fingerprints in this case, all that can really mean in

9   plain English is that the document says what's on the document,

10  and that's what documents are.  That's why we have documents, to

11  memorialize what was said, not to ensure that what was said is

12  true.

13         Now, I could write on a document, the Marlins beat the

14  Yankees and that memorializes it and it fixes it in black and

15  white forever on a piece of paper or on an email.  It will be

16  there in a year or a thousand years.  That may be true.  Knowing

17  what we know about the Marlins, it's probably not true, but

18  that's all a document can do.  Documents are important.  We've

19  got hundreds of them for you to look at, but they're only

20  important because they record what people say.  They are hardly

21  DNA or fingerprints the way we ordinarily understand those words

22  to mean in a criminal trial.

23         So that's the first thing that I want to say.  Let's

24  not be seduced by fancy, phony arguments also known as

25  sophistry.  Let's aim for clear thinking.  Let's aim to get to

1    the truth.  That's why we're here.

2            One of the main arguments that Mr. Rashbaum made during

3    the first half of the day was that he said, the Government says

4    Mr. Grow paid doctors.  They say it.  They say it all the time.

5    Well, that may have been said, but what anyone on our side meant

6    to say was that Grow did not pay doctors in a quid pro quo.

7    Again, there I am with the Latin.  But Mr. Rashbaum's argument

8    is called a straw man argument.  It's an argument that you build

9    up so that you can knock something down, make a lot of noise and

10   violence about it.  But ladies and gentlemen, if you'll recall,

11   I knocked that argument down yesterday when Mr. Grow was being

12   cross-examined.

13           Do you remember Defendant's Exhibit 190?  It's that big

14   compilation, the computer screen that shows all of the different

15   scripts that were uploaded, and I'm the one who pointed out 20

16   of those had been rejected by the doctors.  Look, that proves

17   that there was no quid pro quo.  I can't get away from the

18   Latin, but it's this for that.  If Grow had actually paid the

19   doctors for the scripts quid pro quo -- you give me a scrip,

20   I'll give you money -- if he had done that, we would have seen

21   that the doctors never denied a script.  But that's not what

22   happened.  But why is that important?

23           I'm going to ask when you get the Superseding

24   Indictment.  Take a look in here.  Do we ever charge Mr. Grow

25   with paying kickbacks to doctors?  Look through it.  It's not in

1   here.  We did not charge that because what's important about it

2   is not that he paid them kickbacks.  We didn't charge him with

3   that.  What is important is really the question, why did

4   Mr. Grow use telemedicine at all?  That's what this is all

5   about.  Why did he use telemedicine?

6          You heard from some of the patients, the Tricare

7   patients that Mr. Grow recruited.  They all had Tricare, and

8   that means they all had access to free doctors.  And some of the

9   patients told you, they not only had access to doctors; they had

10  primary care physicians helping them with their day-to-day

11  needs.

12         Now, they could have gone to their own doctors and

13  asked for a prescription.  So if they had done that, if Mr. Grow

14  had let them do that, he wouldn't have had to pay $150 for a

15  consult.  He wouldn't have had to white-out his name and fax

16  number off the prescriptions.  He wouldn't have had to do

17  anything.  But instead, he chose to use telemedicine.  And why

18  did he decide to choose that?  The simple answer is it's part of

19  the scheme, because he wanted to take the decision about writing

20  a script away from the patients' real doctors.  Think about

21  that.  Real doctors are more likely to reject the offer that

22  he's making, and he knows that.  That was his experience at

23  InforMD Solutions, the compounding company that he worked at

24  before he struck out on his own.  You go to doctors.  You try

25  and get them to order drugs and it didn't work.  They didn't

1    make any money.

2           Real doctors know their patients.  Real doctors have

3    their patients' best interest in mind.  They have a real

4    relationship with patients.  The teledocs, if they call the

5    patients at all -- and remember, we heard from at least two

6    witnesses, Nichole Powell and Josie Brundige, that didn't speak

7    to a doctor, but they got drugs.  How can that happen?

8           But even if the teledocs call, it's a five-minute

9    conversation.  They don't even leave a phone number for a

10   callback.  Is that real medicine?  The answer is simple:  It is

11   not.

12          Furthermore, a real doctor is more likely to push back

13   and deny a prescription or alter it, ask that it be changed, ask

14   some questions at all.  In that case, Mr. Grow can't call the

15   doctor and insist on changes.  You saw emails where he's asking

16   for changes.  He can't do that with a real doctor.  He would

17   most certainly be met with the question, who the heck are you?

18   Why are you calling my patients?  What's the answer; oh, I'm a

19   marketer?  I mean, that is nonsense.  Monty Grow cannot have

20   that happen.  And so telemedicine is the way for him to wrest

21   control from doctors who care about their patients and place

22   them in the hands of doctors who are just cashing a check at the

23   end of the day.

24          Dr. Bansal was the exception, which is why we brought

25   him here.  Mr. Larsen discussed how unusual he was, and I'm not

Closing Arguments

1    going to go over it all again.  You heard him explain why he did

2    what he did and why he didn't do what the defendant wanted all

3    the teledocs to do.

4         Another issue:  Mr. Rashbaum lashed out at the

5    Government, telling you that we have not shown you certain

6    documents.  I think he went so far as to say we didn't want you

7    to see them.  Well, as you can imagine, there may well be

8    millions of documents in this case.  We cannot possibly show you

9    every document.  You would hate us if we did, and we would be

10   here for months.  If we didn't filter the records and the

11   witnesses, this case would be very long and very boring, which

12   might suit Mr. Rashbaum's purposes, but not ours.  We're trying

13   to get to the truth.  Mr. Rashbaum says that we didn't want you

14   to hear those tapes that he only played a little snippet of.

15   The tapes are in evidence.  How did he get the tapes?  He got

16   the tapes because we made the tapes and gave them to him.  We

17   did not hide that from you.

18        If you choose to listen to those tapes, take note of

19   one thing:  And there was some discussion of this.  Those tapes

20   do not express Mr. Grow's intent at the time of the crimes.

21   Those recordings express his intent six months after, when

22   Deanna Dutting, a name you've heard, she was the subject of a

23   nationwide CBS exposé in which her company called Healing 4

24   Heroes had patients, Tricare patients sign up.  You can look at

25   it.  It's Government's Exhibit 23, if anyone is writing them

1    down.  You can see the story.  Jim Axelrod, the Jim Axelrod from

2    CBS News types in his name and, lo and behold, he's got creams.

3            Look at the story and you'll see that Mr. Grow knows

4    Deanna Dutting is a liability.  She is cooperating six months

5    later, and she calls him to talk about it.  And she says, the

6    FBI, they want me to come in.  And what does he say?  What do

7    you think he would say?  Does he say, I'm guilty?  No.  He says

8    like what he says here.  He's got a story for everything, but

9    listen to the tone of his voice.  He's a nervous man.  If he's

10   got nothing to hide, why is he so nervous?  Why is he telling

11   Deanna Dutting not to talk to the FBI?  So I think all of that

12   is a red herring, but I have to address Mr. Rashbaum's

13   arguments.

14           I would like to talk about all of the Ginger Lay emails

15   and texts, but the most important one is that April 29th one

16   where she asks Mr. Grow, after all of this drama over the

17   preceding months about this program, which everybody can see is

18   a bogus patient study, she emails him or she texts him and says,

19   hey, should I continue to pay these patients?  And he says, no.

20   But let me ask:  Why would she be asking him that at all if he

21   didn't know about it, if he didn't know what was going on?  And

22   I can explain to you my -- well, let me explain what the

23   evidence shows about that email.

24           You heard that on May 1st or May 5th, everybody was

25   being converted over to the pharmacy.  The pharmacy was the one

1    who had the concerns about the patients calling in, about the

2    thousand dollar survey, and so it makes sense to stop paying

3    before they move into the pharmacy.  That, ladies and gentlemen,

4    is the explanation for why he told her to stop paying.  There's

5    no doubt they were involved together.  If they were not, why on

6    earth would he keep paying her money and accepting money from

7    Tricare?  He got $1.25 million based on what Ginger was doing.

8    Why didn't he call the FBI on her?  If he's compliant and

9    running a compliant business and she's out making up things and

10   lying to him, he's not going to play along.  He is not going to

11   hire her into a new business venture.  It's nonsense, ladies and

12   gentlemen.

13          I want to talk about the Brundige script.  And I don't

14   know why Mr. Rashbaum brought it up, but how can that happen?

15   Do you remember that, where Josie Brundige testified that she

16   has no scars and she said she has no scars and she told Sven

17   Bjerke that she had no scars.  And on the intake form you saw

18   from Sven Bjerke to Mr. Grow, it says she has no scars, but then

19   you see the script.  She's getting scar medication, and the

20   script comes from Mr. Grow to the pharmacy.  And I showed it to

21   him and I said, look, this is a problem, and what did he do?  He

22   blamed it on Ryan Long, like he blames everything on somebody

23   else.

24          Poor Ms. Brundige.  She didn't even speak to a doctor.

25   So how did that script get generated at all and why is it

1    changed -- obviously, you know Josie Brundige is a woman, but in

2    Mr. Grow's hands, it says he has pain and scars.  Well, she is

3    not a he.  And when I asked, he said, oh, well, that's a typo.

4    Really?  That's a typo?  Well, why does it say that she has

5    scars and why is she getting a scar cream?  The only obvious

6    answer is because he was getting $13,500 for that script.

7           Nichole Powell was brought up and Mr. Rashbaum invoked

8    her name because she said on the stand, I didn't know this was

9    illegal, and he wants you to infer from that if she didn't know,

10   how could Mr. Grow know?

11          Well, consider what she didn't know and what Mr. Grow

12   did know.  She did not know that Grow was paying the teledocs.

13   She didn't know he was selling ingredients like ethoxy to the

14   pharmacy to ratchet up the price.  She didn't know about the

15   pain study.  She didn't know about whiting out a prescription.

16   She didn't know he was making a 50 percent profit.  She didn't

17   know that those drugs were 95 or more percent profit.  She

18   didn't know what Grow knew, but still in her heart she said she

19   knew this was wrong.  Faith in humanity.

20          Next, in a feat that tortures common sense,

21   Mr. Rashbaum argues that the whiting out of prescriptions shows

22   that Mr. Grow is compliant with the law.  That is backwards.  I

23   asked any witness I could to explain -- including Mr. Grow, and

24   that's the only one that matters -- how does whiting out your

25   fax number and your name off a prescription comply with HIPAA?

Closing Arguments

1   HIPAA exists to protect patient information.  Whiting out his

2   name does not protect people's information.  He shouldn't have

3   the information.  The solution to the problem is for him to stop

4   having patient information.  He's not a doctor.  He's not a

5   nurse.  He's not a pharmacist.  He shouldn't have that

6   information.  The answer is to keep him from having that

7   information; and instead, they all decide to conceal it.

8        The other half of the email -- and that's in

9   Government's Exhibit 80.  The other half of the email that

10  Mr. Rashbaum didn't want to bring up with Mr. Grow was that it

11  says, it's also a concern about patient brokering.  Patient

12  brokering, Mr. Grow.  What is patient brokering?  I don't know.

13  He speaks English.  We all know what a patient is.  We all know

14  what a broker is, and we would especially think that a man who

15  has a $3 million brokerage account with TD Ameritrade would know

16  what a broker is.  But he doesn't want to answer the question

17  because he doesn't want to admit what he can't admit:  Patient

18  brokering violates the Anti-Kickback Statute.

19       Mr. Rashbaum says, there's no evidence that the

20  patients got all three.  Well, it's not the Government's

21  position that every patient got all three.  But if you look at

22  Government's Exhibit 170, it's a summary of all of

23  Mr. Grow's patients' claims, and you can look at them by date.

24  There's too many to count, but look at the dates.  On the same

25  date, most of these people get three drugs.  Look at his

1   scripts.  There's only three things you can get:  A pain, a scar

2   and a vitamin.  So it doesn't take rocket science to realize

3   what's going on here:  Jam out as many scripts with all three as

4   you can.  It's not our position that that happened in every

5   case, but it happened and it surely happened in most.

6            Just a few more points that I want to make.

7            THE COURT:  You have five minutes to make those points.

8            MR. JUENGER:  Thank you, Your Honor.

9            I don't know, Mr. Rashbaum showed Defense Exhibit 11,

10  an email in which Mr. Grow mentions that a patient was canceling

11  their creams, and Mr. Rashbaum asked, why would Monty Grow allow

12  cancellations if he's committing fraud?  The simple answer is,

13  Mr. Grow cannot make someone order drugs that they don't want to

14  receive anymore.  He can create financial incentives for them to

15  want the drugs, but when they don't want them, he can't make

16  them take the drugs.  And, in fact, if he let the scripts keep

17  coming to patients, what are they going to do?  They are going

18  to start complaining.  They may even call Tricare, and then he's

19  liable to be exposed.

20           Mr. Rashbaum brought up an issue about the lawyers, and

21  this is where he says that Mr. Grow again is trying to be

22  compliant, but you heard Attorney Walker this morning.  So I

23  probably don't even need to summarize this, but let's be clear:

24  Walker told you this morning Grow and PCA never told him the

25  facts, so he could not render a legal opinion, and he did not

1    render a legal opinion.  He said he did not know what Grow and

2    his sales reps were doing when they marketed.  He said he never

3    told Grow that just changing the way he was paid would make him

4    or his sales reps a bona fide employee.  He said that he never

5    told Grow that simply by becoming a bona fide employee, he had

6    free reign to do whatever he wanted.  Mr. Walker said he did not

7    render a legal opinion, so how can any of that be the basis of a

8    good faith by the defendant?  It just cannot.

9         The other lawyer that defense called worked for PCA,

10   Mr. Corcoran.  He said he barely talked to the defendant.  He

11   said, in fact, if you listened to what he said, Corcoran and PCA

12   relied on Mr. Grow.  Mr. Grow told them who to hire.  He told

13   them how much to pay, and though Corcoran said they spent a

14   thousand hours, he said a staggering amount of time, could they

15   have?  They hired the pizza boy, after all, to sell prescription

16   drugs, and you know how much of a farce that was.  Because as

17   soon as Tricare stopped paying, they didn't need the pizza boy.

18   They didn't need anybody anymore, because it was all about

19   targeting Tricare patients, because Tricare paid a lot of money,

20   because Tricare was a big Government bureaucracy that didn't

21   figure out to stop this as soon as the commercial insurance did.

22        One other thing that Mr. Grow did not tell to Attorney

23   Walker, he did not tell Attorney Walker that he had seen a CBS

24   News story two days before the meeting, and I'm going to cull

25   out Government's Exhibit 176 and beg you to look at it, because

1    it shows that Mr. Grow knew a lot.

2         He didn't tell Attorney Walker about that news story,

3    that CBS news story, because he knew what that meant.  And if

4    you look at that news story -- and I asked Mr. Grow about it.

5    We disagreed about what was in the story.  So don't take my word

6    for it.  Don't take his word for it.  You look at it for

7    yourself.

8         One thing to pay attention to is at the end of it where

9    it talks about the amount and the formula of the pain cream

10   which cost half of what his cost -- and didn't use Ethoxy Gold.

11   You know his Ethoxy Gold pays a lot.  Compare it to the one in

12   that article.  But the important thing about that email is what

13   it says, how he himself -- we finally get him choosing words,

14   right?  Not quid pro quo.  He doesn't know that.  He doesn't

15   know what a broker is, but there is one word that he does know.

16   Can we pull it up?  Technology.  Ladies and gentlemen, I will

17   tell you what it says.  He sees that.  His friend sends that to

18   him and he sees it.  He says, yes, I've seen the story.  The one

19   word he uses to describe that:  Fraudulent.  Fraudulent.  Of all

20   the words in the dictionary, he uses fraudulent.

21        There it is, finally.

22        Ladies and gentlemen, that email alone puts to rest any

23   doubts about his intent of what he was doing.

24        And with that, I thank you.  The case is yours.

25        Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Juenger and Mr. Larsen and

2  Ms. Meyers and Mr. Marcus and Mr. Rashbaum.

3          Now I've got to give you the jury instructions which

4  will probably take about 20, 25 minutes.  So what I'm going to

5  do is give you a bathroom break and the court reporter a break,

6  because as you would suspect, we had other hearings and she

7  worked during those hearings.  So I've got to give her a little

8  break.  When she comes out, I will give you the instructions on

9  the law.

10          So you cannot talk about the case yet.  You can take

11  your notebooks in there because you won't need it for the jury

12  instructions because I'm just going to read it to you and give

13  it to you in writing.  So don't talk about the case yet.  We'll

14  bring you back in about 10 minutes.  Is that all right?  Okay.

15  See you then.

16          THE COURT SECURITY OFFICER:  All rise.

17      (The jury retired from the courtroom at 5:03 p.m.)

18          THE COURT:  Here, I think these are the defendant's.

19  You may want these back.  I don't know.

20          MR. RASHBAUM:  Thank you.

21          THE COURTROOM DEPUTY:  You're welcome.

22          THE COURT:  All right.  What I propose to do is

23  instruct the jurors now, with the exception of the last page of

24  the instructions and maybe the Verdict Form and all of that, and

25  that way bring them back tomorrow morning and start again

1   because it's already 5:00.  By the time I read it back, it's

2   5:30.  I don't think either side would expect a verdict before

3   sundown, but the reason I don't want to read all of the

4   instructions is we do have the two alternates, and I never know

5   what's going to happen the next day.  So I'd rather be cautious.

6   Confucius wrote that the cautious seldom err, and I err, but let

7   me try to be more cautious so I'll err less.

8          So that's what I was proposing, which means they will

9   go home around 5:30, 5:40 and they come back tomorrow because I

10  suspect they would come back anyway, even though I tell them

11  there's no minimum time and no maximum time.  I don't think you

12  all could get all your exhibits organized before I could even

13  say, go home, but I don't know.  Since I told you yesterday,

14  maybe you are already all set.  So I could be wrong.

15         Any problems with that from the Government?

16         MR. LARSEN:  No, Your Honor.

17         THE COURT:  From the defense?

18         MR. RASHBAUM:  No, Your Honor.

19         THE COURT:  All right.  So that's what I'm going to do.

20  So I'll stop towards the end and I'll tell them, come back.  You

21  can't deliberate overnight, of course.  I'll give them the

22  cautionary instructions:  Don't read Mr. Weaver's articles in

23  the Miami Herald.  Don't read other articles.  Don't see the

24  news.  And, you know, if you tell the jurors the reason why

25  you're telling them things, I really do think jurors see it.  If

1   we just do it cavalierly and then, of course, they succumb to

2   that temptation and especially in a trial that only lasted a

3   week and a couple of days.

4        So you saw the Verdict Form, the jury instructions.  So

5   at the end tomorrow morning, I'll say, are there any objections?

6   But if there are some, now would be the final and last time to

7   say anything.  I mean, you are entitled to do it tomorrow

8   morning, but it probably wouldn't be the ideal way to end.

9        So I assume there are none from the Government and none

10  from the defense, right?

11       MR. LARSEN:  None from the Government.

12       THE COURT:  Now, the only issue I had, in order to file

13  something that you had proposed that I think were covered were

14  the good faith defense that combined Number 17 and 18.  Who

15  proposed that, the defendant or the Government?

16       MR. JUENGER:  The Government did, Your Honor.  And

17  based on the closing, I don't believe that it's necessary.

18       THE COURT:  Yeah, I'm going to deny it.  It's covered.

19  And the bona fide also is denied as covered.  You need me to

20  file that --

21       MR. JUENGER:  No, sir.

22       THE COURT:  -- for purposes of appeal?  So I'll just

23  throw it out.  There is no need to file anything.

24       Do we have the Government's Witness List?  You have a

25  clean copy of it?

Case 1:16-cr-20893-FAM   Document 235   Entered on FLSD Docket 09/10/2018   Page 139 of
201
Charge to the Jury
139

1          MR. JUENGER:  Yes, we do, Your Honor.

2          THE COURT:  Okay.  You've got to do that.

3          How about your exhibits?  So those are the things that

4    you should do once I instruct the jurors 95 percent, so we'll

5    have that clean, and tomorrow morning I'll give them a clean

6    copy of the Indictment without what I said.  And then I don't

7    need -- only the defendant and one lawyer for each side do I

8    need, but you're all welcome to come whenever you want.  But you

9    have a clean copy.

10          So go ahead, use the facilities or do what you want and

11   come back in about five minutes and we'll do the instructions.

12   Okay?

13      (There was a brief recess at 5:08 p.m.)

14          THE COURT SECURITY OFFICER:  All rise, please.

15          THE COURT:  Okay.  Bring in the jurors, please.

16          Good afternoon.

17      (The jury entered the courtroom at 5:33 p.m.)

18          THE COURT:  Thank you, folks.  You may be seated.  I

19   just wanted you to see how early it still is, but I'm going to

20   shut this down so that I can read these instructions.

21          Defendant is present, defense counsel, Government

22   counsel and all of the jurors.

23          Members of the jury, it is my duty to instruct you on

24   the rules of law that you must use in deciding this case.  After

25   I have completed these instructions, I will give -- okay.  I

Charge to the Jury

1    will hold off on one instruction because you will not begin your

2    deliberations right away.  You are going to begin your

3    deliberations tomorrow.  That's what I'm going to do, instead of

4    today.

5         So I'm going to give you all the instructions except

6    the final, final ones, because that way all 14 of you have to

7    come back tomorrow.  You cannot deliberate at home, obviously,

8    since there are no jurors except you, but you can't even do it

9    among yourselves tomorrow morning.  You come in, you wait again.

10   You don't talk about the case.  You don't read anything about

11   the case.  You come back in and I give you very brief

12   instructions.  We gather all the evidence.  We're going to give

13   you a copy of the Indictment, the Verdict Form, and then is when

14   you begin your deliberations tomorrow morning.  All right?

15        You must decide then, tomorrow morning, whether the

16   Government has proved the specific facts necessary to find the

17   defendant guilty beyond a reasonable doubt.  Your decision must

18   be based only on the evidence presented here.  You must not be

19   influenced in any way by either sympathy for or prejudice

20   against the defendant or the Government.

21        You must follow the law as I explain it, even if you do

22   not agree with the law, and you must follow all of my

23   instructions as a whole.  You may not single out or disregard

24   any of the Court's instructions on the law.

25        The Indictment against the defendant is not evidence of

Charge to the Jury

1   guilt, though I'm going to send it to you so you can compare it

2   with the Verdict Form and you will know which count is which in

3   order to give you guidance.  Okay?  The law presumes every

4   defendant is innocent.  The defendant does not have to prove his

5   innocence or produce any evidence at all.  The Government must

6   prove guilt beyond a reasonable doubt; and if it fails to do so,

7   you must find the defendant not guilty.

8         The Government's burden of proof is a heavy burden, but

9   it does not have to prove a defendant's guilt beyond all

10  possible doubt.  The Government's proof only has to exclude any

11  reasonable doubt concerning a defendant's guilt.

12        A "reasonable doubt" is a real doubt based on your

13  reason and common sense after you have carefully and impartially

14  considered all of the evidence in the case.

15        "Proof beyond a reasonable doubt" is proof so

16  convincing that you would be willing to rely and act upon it

17  without hesitation in the most important of your own affairs.

18  If you are convinced that a defendant has been proved guilty

19  beyond a reasonable doubt, say so.  If you are not convinced,

20  say so.

21        As I said before, you must consider only the evidence

22  that I have admitted in the case.  Evidence includes the

23  testimony of witnesses and the exhibits admitted, but anything

24  the lawyers say is not evidence and is not binding on you.

25        You should not assume from anything I have said that I

1  have any opinion about any factual issue in this case.  Except

2  for my instructions to you on the law, now and throughout the

3  trial, including when I told you the limited instruction about

4  how to consider certain pieces of evidence, you should disregard

5  anything I may have said during the trial in arriving at your

6  own decision about the facts.  Your own recollection and

7  interpretation of the evidence is what matters.

8       In considering the evidence, you may use reasoning and

9  common sense to make deductions and reach conclusions.  You

10  should not be concerned about whether the evidence is direct or

11  circumstantial.

12       "Direct evidence" is the testimony of a person who

13  asserts that he or she has actual knowledge of a fact, such as

14  an eyewitness.

15       "Circumstantial evidence" is proof of a chain of facts

16  and circumstances that tend to prove or disprove a fact.  There

17  is no legal difference in the weight you may give to either

18  direct or circumstantial evidence.  They're equal.

19       When I say that you must consider all of the evidence,

20  I do not mean that you must accept all of the evidence as true

21  or accurate.  You should decide whether you believe what each

22  witness had to say and how important that testimony was.  In

23  making that decision, you may believe or disbelieve any witness

24  in whole or in part.  The number of witnesses testifying

25  concerning a particular point does not necessarily matter.

Charge to the Jury

1    To decide whether you believe any witness, I suggest

2  that you ask yourself a few questions:

3    Did the witness impress you as one who was telling the

4  truth?

5    Did the witness have any particular reason not to tell

6  the truth?

7    Did the witness have a personal interest in the outcome

8  of the case?

9    Did the witness seem to have a good memory?  Did the

10 witness have the opportunity and ability to accurately observe

11 the things he or she testified about?

12    Did the witness appear to understand the questions

13 clearly and answer them directly?

14    Did the witness' testimony differ from other testimony

15 or other evidence?

16    You should also ask yourself whether there was evidence

17 that a witness testified falsely about an important fact and ask

18 whether there was evidence that at some other time a witness

19 said or did something or did not say or do something that was

20 different from the testimony the witness gave during this trial.

21    To decide whether you believe a witness, you may

22 consider the fact that a witness has been convicted of a felony

23 or a crime involving dishonesty or a false statement.  But keep

24 in mind that a simple mistake does not mean that a witness was

25 not telling the truth as he or she remembers it.  People

1  naturally tend to forget some things or remember them

2  inaccurately.  So if a witness misstated something, you must

3  decide whether it was because of an innocent lapse in memory or

4  an intentional deception.  The significance of your decision may

5  depend on whether the misstatement is about an important fact or

6  about an unimportant detail.

7        A defendant has a right not to testify.  But since the

8  defendant did testify, you should decide whether you believe the

9  defendant's testimony in the same way as that of any other

10  witness taking into consideration all of these instructions.

11        You must consider some witnesses' testimony with more

12  caution than others.

13        In this case, the Government has made a Plea Agreement

14  with Ginger Lay, Robin Halliburton and Sven Bjerke -- Bjerke,

15  I'm sorry, the J is mispronounced with an I -- in exchange for

16  their testimony.  Such plea bargaining, as it is called,

17  provides for the possibility of a lesser sentence than the

18  witness would normally face.

19        Plea bargaining is lawful and proper and the rules

20  expressly provide for it.  But a witness who hopes to gain more

21  favorable treatment may have a reason to make a false statement

22  in order to strike a good bargain with the Government.

23        So while a witness of that kind may be entirely

24  truthful when testifying, you should consider that testimony

25  with more caution than the testimony of other witnesses.  And,

Charge to the Jury

1   of course, the fact that a witness has pled guilty to an offense

2   is not evidence of the guilt of any other person.

3          You have been permitted to take notes during the trial

4   and some of you have taken advantage of that opportunity.  You

5   must use your notes only as a personal memory aid during

6   deliberations.  You must not give your notes priority over your

7   independent recollection of the evidence and you must not allow

8   yourselves to be unduly influenced by the notes of other jurors.

9   I emphasize that notes are not entitled to any greater weight

10  than your memories or impressions about the testimony.

11         Now I'm going to give you some instructions on the

12  charges.

13         The Indictment charges a bunch of separate crimes.  We

14  call them counts.  Each count has a number.  You will be given a

15  copy of the Indictment to refer to during your deliberations.

16  So you're going to have the Indictment and then you're going to

17  have the Verdict Form with the questions and your answers about

18  whether guilty or not guilty.

19         Count 1 charges that the defendant knowingly and

20  willfully conspired with others to commit health care fraud and

21  wire fraud, and that's a shortened version.  You'll see the

22  whole indictment with the numbers of the law and other things,

23  but this is to make a summary of it so you'll remember what it

24  is.

25         Counts 2 through 8 charge that the defendant knowingly

Charge to the Jury

1    and willfully committed health care fraud, and you'll see each

2    count how it's charged with the dates, et cetera.

3           Count 9 charges that the defendant knowingly and

4    willfully conspired with others to pay and receive health care

5    kickbacks.  This is a separate conspiracy from Count 1 which

6    charges conspiracy with others to commit health care fraud and

7    wire fraud.

8           Then Counts 10 through 14, 17 through 18, 20, 22

9    through 26 and 28 through 33 charge that the defendant knowingly

10   and willfully solicited or received kickbacks in connection with

11   a Federal health care program, Tricare.

12          Counts 36 through 41 and 43 through 44 charge that the

13   defendant knowingly and willfully offered or paid kickbacks in

14   connection with a Federal health care benefit program.

15          Counts 45 through 49 charge what is also called money

16   laundering, and the actual technical term of that in the charge

17   is that the defendant knowingly engaged or attempted to engage

18   in a monetary transaction affecting interstate commerce by or

19   through a financial institution in criminally derived property

20   greater than $10,000, and that such property was derived from a

21   specified unlawful activity.  So that's kind of a one-line

22   summary of each count, a group of counts.  Now I'm going to give

23   you the actual instructions on each count.

24          Count 1 charges the defendant with conspiracy to commit

25   health care fraud and wire fraud.  It is a Federal crime to

1  knowingly and willfully conspire or agree with someone else to

2  do something that, if actually carried out, would result in the

3  crime of health care fraud or wire fraud.

4       A "conspiracy" is an agreement by two or more persons

5  to commit an unlawful act.  In other words, it is a kind of

6  partnership for criminal purposes.  Every member of the

7  conspiracy becomes the agent or partner of every other member.

8       The Government does not have to prove that all of the

9  people named in the Indictment were members of the plan or that

10  those who were members made any kind of formal agreement.  The

11  heart of a conspiracy is the making of the unlawful plan itself.

12  So the Government does not have to prove that the conspirators

13  succeeded in carrying out the plan.

14       The defendant can be found guilty of this conspiracy

15  offense only if all of the following facts are proved beyond a

16  reasonable doubt:

17       First, two or more persons in some way or manner agree

18  to try to accomplish a common and unlawful plan.  That is a plan

19  to commit health care fraud or wire fraud as charged in the

20  Indictment.  And two, the defendant knew the unlawful purpose of

21  the plan and willfully joined in it.

22       A person may be a conspirator even without knowing all

23  the details of the unlawful plan or the names and identities of

24  all the other conspirators.

25       If a defendant played only a minor part in the plan,

1    but had a general understanding of the unlawful purpose of the

2    plan and willfully joined in the plan on at least one occasion,

3    that is sufficient for you to find the defendant guilty.  But

4    simply being present at the scene of an event or merely

5    associating with certain people and discussing common goals and

6    interests does not establish proof of a conspiracy.  Also, a

7    person who does not know about a conspiracy, but happens to act

8    in a way that advances some purpose of one does not

9    automatically become a conspirator.  So that's the law of

10   conspiracy to commit health care fraud.

11        So now I'm going to tell you about health care fraud

12   which is the object of the conspiracy.  And also, Counts 2

13   through 8 charge the defendant with what they call substantive

14   counts, and that is actual health care fraud.

15        It is a Federal crime to knowingly and willfully

16   execute or attempt to execute a scheme or artifice to defraud a

17   health care benefit program or to get any of the money or

18   property owned by or under the custody or control of a health

19   care benefit program by means of false or fraudulent pretenses,

20   representations or promises.  The defendant can be found guilty

21   of this offense only if all of the following facts are proved

22   beyond a reasonable doubt:

23        First, the defendant knowingly executed or attempted to

24   execute a scheme or artifice to defraud a health care benefit

25   program by means of false or fraudulent pretenses,

1    representations or promises;

2         Two, the health care benefit program affected

3    interstate commerce;

4         Three, the false or fraudulent pretenses,

5    representations or promises related to a material fact;

6         Four, the defendant acted willfully and intended to

7    defraud;

8         And fifth, the defendant did so in connection with the

9    delivery of or payment for health care benefits, items or

10   services.

11        Health care benefit program means any public or private

12   plan or contract affecting commerce under which any medical

13   benefit, item or service is provided to any individual and

14   includes any individual or entity who is providing a medical

15   benefit, item or service for which payment may be made under the

16   plan or contract.

17        A health care program affects interstate commerce if

18   the health care program had any impact on the movement of any

19   money, goods, services or persons from one state to another.

20        The Government need only prove that the health care

21   program itself either engaged in interstate commerce or that its

22   activity affected interstate commerce to any degree.  The

23   Government need not prove that the defendant engaged in

24   interstate commerce or that the acts of the defendant affected

25   interstate commerce.

Charge to the Jury

150

1          A "scheme to defraud" includes any plan or course of

2    action intended to deceive or cheat someone out of money or

3    property by using false or fraudulent pretenses, representations

4    or promises relating to a material fact.  A statement or

5    representation is false or fraudulent if it is about a material

6    fact that the speaker knows is untrue or makes with reckless

7    indifference as to the truth and makes with intent to defraud.

8          A statement or representation may be false or

9    fraudulent when it is a half-truth or effectively conceals a

10   material fact and is made with the intent to defraud.

11         A "material fact" is an important fact that a

12   reasonable person would use to decide whether to do or not to do

13   something.  A fact is material if it has the capacity or natural

14   tendency to influence a person's decision.  It does not matter

15   whether the decision-maker actually relied on the statement or

16   knew or should have known that the statement was false.

17         To act with "intent to defraud" means to do something

18   with the specific intent to deceive or cheat someone, usually

19   for personal financial gain or to cause financial loss to

20   someone else.  The Government does not have to prove all the

21   details alleged in the Indictment about the precise nature and

22   purpose of the scheme.  It also does not have to prove that the

23   alleged scheme actually succeeded in defrauding anyone.  What

24   must be proved beyond a reasonable doubt is that the defendant

25   knowingly carried out a scheme substantially similar to the one

1    alleged in the Indictment.

2        Now, I'm going to instruct you on Count 9 which is

3    another charged conspiracy.  This one is one to pay and receive

4    health care kickbacks.

5        It is a separate Federal crime for anyone to conspire

6    or agree with someone else to do something that would be another

7    Federal crime if it was actually carried out.  The Government

8    does not have to prove that the members planned together all the

9    details of the plan or the overt acts that the Indictment

10   charges would be carried out in an effort to commit the intended

11   crime.

12       The heart of the conspiracy is the making of the

13   unlawful plan itself followed by the commission of any overt

14   act.  The Government does not have to prove that the

15   conspirators succeeded in carrying out the plan.

16       The defendant can be found guilty of this crime only if

17   all of the following facts are proved beyond a reasonable doubt:

18       First, two or more persons in some way agree to try to

19   accomplish a shared and unlawful plan, that is a plan to solicit

20   and receive health care kickbacks and to offer and pay health

21   care kickbacks;

22       Two, the defendant knew the unlawful purpose of the

23   plan and willfully joined in it;

24       Three, during the conspiracy, one of the conspirators

25   knowingly engaged in at least one overt act as described in the

1    Indictment;

2          And four, the overt act was committed at or about the

3    time alleged and with the purpose of carrying out or

4    accomplishing some object of the conspiracy.

5          An "overt act" is any transaction or event, even one

6    that may be entirely innocent when viewed alone, that a

7    conspirator commits to accomplish some object of the conspiracy.

8          Once again, the Government does not have to prove that

9    all the people named in the Indictment were members of the plan

10   or that those who were members made any kind of formal

11   agreement.  The heart of a conspiracy is the making of the

12   unlawful plan itself.  So the Government does not have to prove

13   that the conspirators succeeded in carrying out the plan.

14         A person may be a conspirator even without knowing all

15   the details of the unlawful plan or the names and identities of

16   all of the other alleged conspirators.

17         If a defendant played only a minor part in the plan,

18   but had a general understanding of the unlawful purpose of the

19   plan and willfully joined in the plan on at least one occasion,

20   that is sufficient for you to find that defendant guilty.  But

21   simply being present at the scene of an event or merely

22   associating with certain people and discussing common goals and

23   interests does not establish proof of a conspiracy.  Also, a

24   person who does not know about a conspiracy, but happens to act

25   in a way that advances some purpose of one does not

1    automatically become a conspirator.

2         For Count 9, this conspiracy -- well, let me do that

3    for both conspiracies.

4         In this case regarding the alleged conspiracies, the

5    Indictment charges in Count 1 that the defendant conspired to

6    commit health care fraud and to commit wire fraud.  In Count 9,

7    the Indictment charges that the defendant conspired to pay and

8    receive health care kickbacks.  So we're talking about two

9    separate conspiracies that are being charged.

10        The Government does not have to prove that a defendant

11   willfully conspired to commit all the crimes charged in each

12   conspiracy.  It is sufficient if the Government proves beyond a

13   reasonable doubt that a defendant willfully conspired to commit

14   one of the objects previously discussed in crimes alleged in

15   each conspiracy.

16        But to return a verdict of guilty, you must all agree

17   on which of the crimes or objects of the conspiracy the

18   defendant agreed to commit.

19        For Count 1, we're talking about health care fraud and

20   wire fraud.  For Count 9, I'm going to define for you the

21   objects of that conspiracy.  And this will become clearer when I

22   give you the Verdict Form and I'll read it to you tomorrow

23   morning.  Okay?  You will see, oh, that's what the judge was

24   talking about, because it will be easier.

25        What I've done in the Verdict Form, instead of just

1    putting what each count is, guilty or not guilty -- and you have

2    to match it with the Indictment, which is how it's done

3    traditionally, but in this case what I've done and what I do in

4    most cases, depending on how many counts we have, is I put a

5    little phrase for each count.  And you'll see for Count 9,

6    you'll also have to fill in something to find unanimously which

7    of the objects of the conspiracy, if any, the Government has

8    proven if you find the defendant guilty of Count 9.  All right?

9    But it will become clear with the Verdict Form.

10         But the first object of Count 9 is a violation of a

11   Federal law that makes it a crime to knowingly and willfully

12   solicit and receive unlawful remuneration, such a kickbacks and

13   bribes, in exchange for referring an individual to a person for

14   the furnishing and arranging the furnishing of prescription

15   medications for which payment is made in whole or in part under

16   a Federal health care program, in this case Tricare.

17         The second object of this conspiracy in Count 9 is a

18   violation of a Federal law that makes it a crime to knowingly

19   and willfully offer and pay unlawful remuneration, such as

20   kickbacks and bribes, money, to induce a person to purchase,

21   order, arrange or recommend the purchase, order or arrangement

22   of prescription medications for which payment is made in whole

23   or in part under a Federal health care program, in this case

24   Tricare.

25         The third object alleged in the conspiracy is a

1    violation of a Federal law that this section makes it a crime to

2    knowingly and willfully offer and pay unlawful remuneration,

3    such as kickbacks and bribes, to induce a person to refer an

4    individual to a person for the furnishing and arranging the

5    furnishing of any item and service for which payment is made in

6    whole or part under a Federal health care program, in this case

7    Tricare.

8           All right.  So those are the objects of the conspiracy.

9           Now, I'm going to tell you about Counts 10 through 14

10   and Counts 17 through 18 and 20, 22 through 26, 28 through 33,

11   which charge the defendant with violating a Federal law that

12   makes it a Federal crime for anyone to solicit or receive any

13   remuneration, including a kickback or bribe, including by wire

14   transfer, in return for referring an individual for the

15   furnishing or arranging for the furnishing of any item and

16   service that would be paid for in whole or in part by a Federal

17   health care program.  A defendant can be found guilty of that

18   offense only if all of the following facts were proved beyond a

19   reasonable doubt:

20          One, that the defendant knowingly and willfully

21   solicited or received remunerations such as a kickback or bribe

22   as charged in the Indictment;

23          Two, that the defendant solicited or received a

24   remuneration or kickback in order to induce the referral of an

25   individual to a person or entity for the furnishing or arranging

Charge to the Jury

1    for the furnishing of any item or service;

2         And three, that the payment for such items or service

3    may be made in whole or in part under a Federal health care

4    program.

5         "Remuneration" is a payment, such as a kickback, bribe

6    or rebate, made directly or indirectly, overtly or covertly, in

7    cash or in kind.  Remuneration does not include any amount paid

8    by an employer to an employee who has a good faith -- you've

9    heard the Latin bona fide, that's where it comes from, it means

10   good faith in Latin -- employment relationship with the employer

11   for employment in the furnishing of any item or service for

12   which payment may be made in whole or in part under a Federal

13   health care program.

14        A "Federal health care program" is any plan or program

15   that provides health benefits, whether directly through

16   insurance or otherwise, which is funded directly in whole or in

17   part by the United States Government.  Tricare is a Federal

18   health care program.

19        To satisfy the second element of this offense, the

20   Government does not have to prove that the defendant's sole

21   purpose in soliciting or receiving the remuneration or kickback

22   was to induce the referral of an individual for the furnishing

23   of an item or service.  Rather, the Government must only prove

24   that inducing the referral was one of the defendant's purposes

25   in soliciting or receiving the remuneration or kickback.

1        Now, I'm going to talk about money laundering.  And

2   see, what I'm going to do, I'm going to explain it and I'll

3   explain it tomorrow again, but I think it makes sense to talk

4   about the Verdict Form a little bit now that you'll get.  You'll

5   get one Verdict Form that you have to fill out.

6        So Count 1 of the Indictment.  You know, it says the

7   case number, United States of America versus Monty Ray Grow,

8   Verdict Form.  We, the jury, unanimously -- all of you must

9   agree -- find the defendant, Monty Ray Grow -- and every count

10  is going to have guilty or not guilty -- as to Count 1 of the

11  Indictment, and I have put conspiracy to defraud the United

12  States, it's longer than that, but you've heard what it is --

13  guilty or not guilty.

14       As to Count 2 of the Indictment, health care fraud, and

15  then I put the name of the alleged beneficiary which is in the

16  Indictment, but this makes it easier for you to see and compare

17  the exhibits, PS, initials, and then it has the claim, the

18  approximate date of the claim is December 29, 2014, guilty or

19  not guilty.

20       As to Count 3 of the Indictment, health care fraud for

21  beneficiary, with the initials, claim, with the date, and I do

22  that just as the Indictment charges so you'll see, either not

23  guilty or guilty.

24       The same thing for Count 4, Count 5, Count 6, Count 7

25  and Count 8, it's health care fraud, different beneficiaries

1    with initials, and the claims with the dates.  That way you look

2    at the Indictment.  That's what's charged.  Then you look at the

3    evidence to see if it was proven beyond a reasonable doubt.  So

4    those are the first eight.

5          Count 9 is the conspiracy that I read a few minutes

6    ago, and that's the other conspiracy, alleged, to pay and

7    receive health care kickbacks, and then it has guilty or not

8    guilty.

9          Here in the first conspiracy, you have to decide

10   unanimously the health care fraud or the wire fraud.  Here if

11   you find that the Government has proven the defendant guilty of

12   Count 9, the conspiracy to pay and receive health care

13   kickbacks, then you would have to answer three other questions

14   on the objects of the conspiracy.

15         In order to find the defendant guilty of Count 9, you

16   would have to find him unanimously guilty of one of the objects.

17   You don't have to find him guilty of all three objects of the

18   conspiracy, but one, but what you have to do is all of you must

19   agree to the same object.  So I have explained the objects, and

20   here you have sort of a little one-line summary of it.

21         (A) is solicit and receive kickbacks in exchange for

22   referring individuals to a person to arrange for furnishing

23   prescription medications; (B) Offer and pay kickbacks to induce

24   a person to arrange or recommend the purchase of prescription

25   medication; and (C) Offer and pay kickbacks to induce a person

1   to refer an individual to a person for the furnishing of any

2   item and service paid by a Federal health care program.

3          What I mean by that is, you have to be unanimous not

4   just on Count 9, guilty, but you have to be unanimous on which

5   object of the conspiracy.  You can't say, well, you know, six of

6   us think it's A.  The other six think it's B.  So we have 12.

7   There it is, Judge.  No, you have to agree.  You don't have to

8   agree on all three, find the defendant guilty, that the

9   Government has proven it beyond a reasonable doubt on all three.

10  You have to at least find him guilty of one in order to find him

11  guilty.  Of course, if the Government hasn't proven it, it's not

12  guilty and you don't need to answer any of those questions

13  because you say, not guilty of the conspiracy.  But if you find

14  that the Government has proven him guilty of Count 9, you have

15  to tell us which of the three objects you unanimously find.  All

16  right?

17         So I thought I would say this now to make it easier as

18  you're digesting the instructions, and all of this is going back

19  to you in writing, too, so there's no test tomorrow about it.

20         Then we have all the different counts on kickbacks.  As

21  to Count 10 of the Indictment, receipt of kickbacks in

22  connection with a Federal health care program on November 7,

23  2014 for $85,946; guilty or not guilty.  As to Count 11 of the

24  Indictment, receipt of kickbacks in connection with a Federal

25  health care program on November 21st, 2014 for $74,663.

Charge to the Jury

1    And I do that for each count with a number, the amount

2  of money, and the date for receipt of kickbacks, and that goes

3  on through Count 18 on Page 3 of the Verdict Form.  I didn't

4  mean Count 18.  I meant Number 18, because there are some counts

5  that are not part of this Indictment.  So it has a number on the

6  left that goes in order, but it doesn't necessarily match the

7  count.  So 18 is really as to Count 22.  You'll see that.  And

8  then as to Count 23, it goes all the way down to Count 31.

9  Again, it has receipt of kickbacks in connection with the

10  Federal health care program on whatever date for the amount of

11  money.

12    Then it keeps going with Count 32, 33, 36.  See, it

13  skips the counts because some of other counts have nothing to do

14  with Mr. Gray -- with Mr. Grow.  I'm sorry.

15    Then when we go to Count 36, it's different than

16  receipt of kickbacks.  It's payment of kickbacks.  So it will

17  say as to Count 36 of the Indictment, payment of kickbacks in

18  connection with a Federal health care program on January 20,

19  2015 for $1,800.

20    As to Count 37, payment of kickbacks in connection with

21  a Federal health care program on February 18, 2015 for $1,680.

22  Then it keeps going with Count 38, 39, 40, 41 on that page, with

23  a payment as opposed to receipt and with a date and the amount

24  of money.

25    Same thing as to Count 43, payment of kickbacks.  As to

Count 44, payment of kickbacks with a date.

Then the last questions have to do with what I'm going to talk to you about now, money laundering.  Counts 45, 46, 47, 48 and 49 have to do with money laundering, and I'm going to tell you about that, but first I'm going to define for you money laundering, which is using proceeds of specified unlawful activity.

It is a Federal crime to knowingly engage in certain kinds of financial transactions commonly known as money laundering.  Mr. Grow can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt: First, he knowingly conducted or tried to conduct financial transactions.

Second, he knew that the money or property involved in the transaction were the proceeds of a specified unlawful activity, specifically health care fraud and soliciting and receiving kickbacks in violation of the Federal Anti-Kickback Statute.

Third, money or property did come from an unlawful activity, specifically health care fraud or soliciting and receiving kickbacks in violation of the Federal Anti-Kickback Statute.

Fourth, the property had a value of more than $10,000.

And fifth, the transaction took place in the United States.

Charge to the Jury

162

The term "proceeds" means any property derived from or obtained or retained directly or indirectly through some form of unlawful activity, including the gross receipts of the activity. To know "that the money or property involved in the transaction came from some kind of unlawful activity" is to know that the money or property came from an activity that is a felony under State, Federal or foreign law.

The phrase "specified unlawful activity" means health care fraud or soliciting and receiving kickbacks in violation of the Federal Anti-Kickback Statute.

A defendant cannot be found guilty of money laundering if he thought the business that produced the money in question was legitimate.  It does not matter whether the defendant knew the precise nature of the crime, but the Government must prove that the defendant knew that the property involved in the monetary transaction was obtained or derived from committing some crime.

So the money laundering verdict will say Count 45 of the Indictment, money laundering with a date, the amount of money; Count 46, money laundering and the date for an amount of money, et cetera, and all of that.

You know, this probably should have been in another place, but I'm going to keep it in the same order because now I'm going back to payment of kickbacks.  I probably should have read that, I think, before money laundering because it's payment

1    of kickbacks.  So I'm going to change -- because it makes more

2    sense when you get it.  It's going to be retyped.  And I'm going

3    to change the order because I just read to you all the money

4    laundering which comes back after payment.  I have receipt of

5    payment, but I'm going to read this to you anyway.

6           Counts 36 through 41, 43 and 44 charge the defendant

7    with violating a provision of the Federal law which makes it a

8    crime for anyone to offer or pay any remuneration, including a

9    kickback or bribe, including by wire transfer, to a person, to

10   induce such person to purchase, order and arrange for and

11   recommend purchasing and ordering any good, service or item that

12   would be paid for in whole or in part by a Federal health care

13   program.  A defendant can be found guilty of that offense only

14   if all of the following facts were proved beyond a reasonable

15   doubt:

16          First, that the defendant knowingly and willfully

17   offered or paid remunerations such as a kickback or bribe as

18   charged in the Indictment;

19          Second, that the defendant offered or paid the

20   remuneration or kickback in order to induce the purchase, order

21   or to arrange for or recommend the purchasing or ordering of any

22   good, service or item;

23          And three, that the payment for such items or service

24   may be made in whole or in part under a Federal health care

25   program.

Charge to the Jury

1          "Remuneration" has already been defined for you and a

2    "Federal health care program" has already been explained.

3          To satisfy the second element of this offense that the

4    defendant offered or paid the remuneration or kickback in order

5    to induce the purchase, order or to arrange for or recommend the

6    purchasing or ordering of any good, service or item, the

7    Government does not have to prove that the defendant's sole

8    purpose in offering or paying the remuneration or kickback was

9    to induce the purchase, order or to arrange for or recommend the

10   purchase or order of any good, service or item.  Rather, the

11   Government must only prove that inducing the referral was one of

12   the defendant's purposes in offering of paying the remuneration

13   or kickback.

14         So this will go right before money laundering.  Okay?

15   That was my mistake.  So I'm fixing it now.

16         Now, I'm going to define for you -- we're almost at the

17   end.  There are 34 pages and we're on Page 26.  So we're almost

18   there.  Okay?

19         You will see that the Indictment charges that a crime

20   was committed in or around or on or about a certain date.  The

21   Government does not have to prove that the crime occurred on an

22   exact date.  The Government only has to prove beyond a

23   reasonable doubt that the crime was committed on a date

24   reasonably close to the date alleged.

25         The word "knowingly" means that an act was done

1    voluntarily and intentionally and not because of mistake or by

2    accident.

3         The word "willfully" means that the act was committed

4    voluntarily and purposely with the intent to do something the

5    law forbids; that is, with the bad purpose to disobey or

6    disregard the law.  While a person must have acted with the

7    intent to do something the law forbids, before you can find that

8    the person acted willfully, the person need not be aware of the

9    specific law or rule that his conduct may be violating.

10        "Good faith" is a complete defense to a charge that

11   requires intent to defraud.  A defendant is not required to

12   prove good faith.  The Government must prove intent to defraud

13   beyond a reasonable doubt.  An honestly held opinion or an

14   honestly formed belief cannot be fraudulent intent even if the

15   opinion or belief is mistaken.  Similarly, evidence of a mistake

16   in judgment, an error in management or carelessness cannot

17   establish fraudulent intent, but an honest belief that a

18   business venture would ultimately succeed does not constitute

19   good faith if the defendant intended to deceive others by

20   participating in making representations the defendant knew to be

21   false or fraudulent.

22        Now, I'm going to give you an instruction on aiding and

23   abetting that applies to all the counts except the conspiracy,

24   because they are separate type of counts, 1 and 9.

25        It is possible to prove the defendant guilty of a crime

Case 1:16-cr-20893-FAM Document 235 Entered on FLSD Docket 09/10/2018 Page 166 of 201

Charge to the Jury

166

1  even without evidence that the defendant personally performed

2  every act charged.  Ordinarily, any act a person can do may be

3  done by directing another person or agent or may be done by

4  acting with or under the direction of others.

5       A defendant "aids and abets" a person if the defendant

6  intentionally joins with the person to commit a crime.  A

7  defendant is criminally responsible for the acts of another

8  person if the defendant aids and abets the other person.  A

9  defendant is also responsible if the defendant willfully directs

10 or authorizes the acts of an agent, employee or other associate.

11 But finding that a defendant is criminally responsible for the

12 acts of another person requires proof that the defendant

13 intentionally associated with or participated in the crime, not

14 just proof that the defendant was simply present at the scene of

15 a crime or knew about it.

16      In other words, you must find beyond a reasonable doubt

17 that the defendant was a willful participant and not merely a

18 knowing spectator.

19      We have three other instructions that have to do --

20 well, I'll read one, and then the last two I'm going to leave

21 for tomorrow.

22      Each count in the Indictment charges a separate crime.

23 You must consider each crime and the evidence related to it

24 separately.  If you find the defendant guilty or not guilty of

25 one crime, that must not affect your verdict for any other

Charge to the Jury

1    crime.

2         I caution you that the defendant is on trial only for

3    the specific crimes charged in the Indictment.  You are here to

4    determine from the evidence in this case whether the defendant

5    is guilty or not guilty of those specific crimes.

6         You must never consider punishment in any way to decide

7    whether a defendant is guilty.  If you find a defendant guilty,

8    the punishment is for the judge alone to decide later.

9         So tomorrow I'll tell you about the duty to deliberate

10   and I'll tell you about the verdict and the things I'm going to

11   send back to you.  So now you go home.  You can think about it

12   all you want.  You can sleep on it.  The only thing you cannot

13   do is talk about it.  You cannot talk about it with anyone.  You

14   cannot read about anything in the newspaper.

15        I suspect that there may be something in the Miami

16   Herald, and those of you who read the Miami Herald, remember, I

17   made the promise I'll cut out the articles if you want and give

18   it to you if you desire, after you have reached a verdict.

19   Because I saw a news reporter here, that's how I know that.  And

20   there may be other articles.  So, you know, sometimes it's good

21   to stay away from the news anyway, or you know, see sports,

22   though sometimes sports are news, too.  So whatever.  Do what

23   you want except read about this case outside or talk about it or

24   listen to it.

25        So I'm going to send you home.  It just got dark a

1    little bit.  So if the gentlemen can accompany the ladies to

2    their parking lot or the Metrorail, I would appreciate it.  And

3    tomorrow morning -- 9:00 good enough for you?  Is that good?

4         Don't talk about the case tomorrow morning, even when

5    you get together.  You've got to come back in here.  I'll give

6    you the last two instructions, and then you can take as long as

7    you want or as little as you want to deliberate, as long as you

8    consider all the evidence.  All right?

9         Have a good afternoon.  We will see you tomorrow

10   morning.

11        THE COURT SECURITY OFFICER:  All rise.

12     (The jury retired from the courtroom at 6:23 p.m.)

13        THE COURT:  I have to hear the door.

14        THE COURT SECURITY OFFICER:  I'm sorry, sir.

15        THE COURT:  That's all right.

16        Okay.  Any objections, corrections, additions,

17   deletions or omissions to the jury instructions except for the

18   last two pages that I have not given, from the Government?

19        MR. JUENGER:  Your Honor, there were a few nits here

20   and there.  I think you caught them.  I could sort of tell the

21   way you paused where there should have been an "and" or an "or"

22   or something like that.

23        THE COURT:  Yeah, I did that.

24        To the way I read them, any objections?

25        MR. JUENGER:  No objection.

Case 1:16-cr-20893-FAM   Document 235   Entered on FLSD Docket 09/10/2018   Page 169 of
201
Charge to the Jury
169

1          THE COURT:  From the defense?

2          MR. RASHBAUM:  No, Your Honor.

3          THE COURT:  Okay.  Yeah, I changed them.  You saw what

4    I changed.  So we'll retype whatever needs to be retyped.  I'll

5    give them the other two.

6          Okay.  The exhibits, you got them all together?  It

7    will be nice to do it today so tomorrow morning it's all set up.

8    You have to wait anyway till they all go home.

9          So we've got them, defense and Government?

10         MR. LARSEN:  We do.

11         THE COURT:  It looks like you don't want to do it

12   today.

13         MR. LARSEN:  No, that's not it at all, actually.  And I

14   hate to inconvenience the Court in any way, but there was some

15   confusion I think on both sides about what actually had come in

16   when we compared our lists, and we wondered if it would be

17   possible to compare our lists with that of the Court's.  I know

18   we went through this the other night.

19         THE COURT:  We did go through it.  So the only

20   additional ones were the additional exhibits that you all held

21   off for a little bit.

22         MR. LARSEN:  We did and, unfortunately, notes, maybe

23   some might have been missed, and we just don't want to send

24   anything back.

25         THE COURT:  No problem.  I make the same mistake.  But

Case 1:16-cr-20893-FAM  Document 235  Entered on FLSD Docket 09/10/2018  Page 170 of
201
Charge to the Jury
170

1    rather than going through all of them, tell me what you disagree

2    with.

3             MR. LARSEN:  Okay.

4             THE COURT:  See, that's always better, and then I'll

5    tell you.

6             Which ones does the Government say that are in that the

7    defendant says did not come in?  Give me a number.

8             If you could do it in order, it's easier for me.

9             Hopefully, we don't have two juries next week.

10            Are there still 43 counts or how many counts are there

11   in total?  The two acquitted ones -- I'll just take the number

12   out.  No problem.

13            Do we have it or not?

14            MR. LARSEN:  Yes.  We had it.  It was sitting right

15   back here.

16            THE COURT:  Okay.  Okay.

17            MR. LARSEN:  There were some questions --

18            THE COURT:  Just tell me the number.

19            MR. LARSEN:  Your Honor, 17-C and 17-D.

20            THE COURT:  They were both admitted.

21            MR. LARSEN:  Okay.

22            THE COURT:  Next number.

23            MR. LARSEN:  32.

24            THE COURT:  Admitted.

25            MR. LARSEN:  59.

1           THE COURT:  Not admitted.

2           MR. LARSEN:  Okay.  66.

3           THE COURT:  Admitted.

4           MR. LARSEN:  70.

5           THE COURT:  By admitted, I mean "ed" at the end, not

6   "it."  My accent sometimes -- What was the one after 66?

7           MR. LARSEN:  70, Your Honor.

8           THE COURT:  70?

9           MR. LARSEN:  Yes.

10          THE COURT:  It was admitted.

11          MR. LARSEN:  81 and 82.

12          THE COURT:  They were admitted.

13          MR. LARSEN:  91.  I have it as out.

14          THE COURT:  Hold on.  91 was not.

15          MR. LARSEN:  Okay.  96.

16          THE COURT:  Yes.

17          MR. LARSEN:  And then I have 105 as out.

18          THE COURT:  No, yeah.

19          MR. LARSEN:  111 was in.

20          THE COURT:  Yes.

21          MR. LARSEN:  And 121 was out.

22          THE COURT:  Well, why don't you tell me what you --

23  yeah, it was out.

24          MR. LARSEN:  I have that it was out.

25          THE COURT:  Yes, you're right.

```
 1              MS. MEYERS:  So do we, Your Honor.

 2              MR. LARSEN:  Okay.  130.

 3              THE COURT:  In.

 4              MR. LARSEN:  132.

 5              THE COURT:  No.

 6              MR. LARSEN:  Okay.  153.

 7              THE COURT:  In.

 8              MR. LARSEN:  154 and 155.

 9              THE COURT:  154 was in.  155, I forgot.  I think it was

10   in and then it was out.  So I don't remember.

11              MR. LARSEN:  I have that it was in.

12              THE COURT:  What say the defendant?

13              MS. MEYERS:  I have that, Your Honor, that the Court

14   sustained defense objection.

15              THE COURT:  I did.  But then I have a little mark that

16   it went in.  So when in doubt, it's out.  I don't remember.

17         Okay.  So 155, we will say no.  Next.

18              MR. LARSEN:  Your Honor, those were the only ones that

19   I had on my list.

20              THE COURT:  Okay.  And the defendant.  Is there an

21   issue with the defendant's exhibits or not?

22         Give me the numbers on which there's disagreement.

23   Defense, Ms. Meyers?

24              MS. MEYERS:  Your Honor, I need to hear from the

25   Government.
```

Charge to the Jury

 1              THE COURT:  No, no.  Well, didn't you --

 2              MS. MEYERS:  We did confer, Your Honor, but Mr. Larsen

 3    --

 4              THE COURT:  You did confer?

 5              MS. MEYERS:  We did, yes.

 6              THE COURT:  Did they disagree with any of yours?

 7              MS. MEYERS:  I believe they might have disagreed on a

 8    few, but Mr. Larsen --

 9              THE COURT:  Hold on.  You have got to use the

10    microphone.

11              MS. MEYERS:  I apologize, Your Honor.

12              THE COURT:  Use the lectern.  You've got to use the

13    microphone, not for me, but for the court reporter.

14              MS. MEYERS:  I apologize, Your Honor.

15              THE COURT:  Just tell me which ones you disagree with.

16              MR. LARSEN:  Your Honor, just to --

17              THE COURT:  No, no.  Tell me which ones --

18              MR. LARSEN:  155.

19              THE COURT:  Pardon?

20              MR. LARSEN:  155 was in, Your Honor.

21        (There was a brief discussion off the record.)

22              MR. LARSEN:  So the parties agree that 155,

23    Government's Exhibit 155 was in, Your Honor.

24              THE COURT:  Defense agrees that it's in?

25              MR. RASHBAUM:  Agree, Your Honor.

Charge to the Jury

174

 1              THE COURT:  Okay.  I thought I had sustained it at

 2    first and then admitted it, but I didn't scratch sustain.  So

 3    155 is in.

 4              Now, talk first about the defendant's exhibits.  Just

 5    tell me what you disagree with.

 6              MS. MEYERS:  18.

 7              THE COURT:  No, no.  First talk.  You've talked?

 8              MS. MEYERS:  We spoke outside, Your Honor, yes.

 9              THE COURT:  Wherever.  I don't care where it is.

10              Give me a number.

11              MS. MEYERS:  18.

12              THE COURT:  It's out.

13              MS. MEYERS:  Correct.

14              THE COURT:  No, you don't need correct.  Just --

15              MS. MEYERS:  No, I'm just speaking to Mr. Larsen.  I

16    apologize.

17              THE COURT:  You don't need to say anything.

18              Give me a number.  Next number.

19              MS. MEYERS:  32.

20              THE COURT:  In.  Next number.

21              MR. LARSEN:  38.

22              MS. MEYERS:  38, Your Honor.

23              THE COURT:  In.

24              MS. MEYERS:  17 -- oh, 70.  70.

25              THE COURT:  Pardon?

Case 1:16-cr-20893-FAM  Document 235  Entered on FLSD Docket 09/10/2018  Page 175 of 201
Charge to the Jury
175

```
 1              MS. MEYERS:  70.

 2              THE COURT:  70.  In.

 3              MS. MEYERS:  83 and 84.

 4              THE COURT:  Both in.

 5              MS. MEYERS:  87 through 89.

 6              THE COURT:  In.

 7              MS. MEYERS:  94 and 95.

 8              THE COURT:  They were in.  Someone must have been

 9  sleeping during those, but apparently, according to a trial that

10  I'm going to have in April, you can sleep on the job and still

11  get paid.

12              MS. MEYERS:  Only on unsanitary planes, Your Honor.

13              97 through 99.

14              THE COURT:  In.

15              MS. MEYERS:  102.

16              THE COURT:  No.  It is not in.  It's out.

17              MS. MEYERS:  105.

18              THE COURT:  In.

19              MS. MEYERS:  118.

20              THE COURT:  In.

21              MS. MEYERS:  120.

22              THE COURT:  In.

23              MS. MEYERS:  141.

24              THE COURT:  No.  It's out.

25              MS. MEYERS:  142.
```

Case 1:16-cr-20893-FAM   Document 235   Entered on FLSD Docket 09/10/2018   Page 176 of 201
Charge to the Jury
176

```
 1            THE COURT:  No.  It's out.
 2            MS. MEYERS:  171.
 3            THE COURT:  In.
 4            MS. MEYERS:  175.
 5            THE COURT:  No.  It's out.
 6            MS. MEYERS:  200.
 7            THE COURT:  In.
 8            MS. MEYERS:  201.
 9            THE COURT:  In.
10            MS. MEYERS:  202-F.
11            THE COURT:  No.  It's out.
12            MS. MEYERS:  210.
13            THE COURT:  Out.
14            That's it?
15            MS. MEYERS:  That's it.
16            MR. LARSEN:  Yes, Your Honor.
17            THE COURT:  Okay.  What I want you to do is put them
18 all together on that table in front of the jury, all of it, and
19 tomorrow morning when they come in, I'll give them the
20 instructions and we'll have my law clerks and the court security
21 officer carry it in the jury room.  So do that now.
22            You ready?
23            MR. JUENGER:  Yes, Your Honor, but I wanted to comment
24 on -- you had the payment of kickback charges behind the money
25 laundering.
```

1            THE COURT:  And I said I made a mistake and I'm going

2     to put it in front.

3            MR. JUENGER:  I'm not sure you made a mistake because I

4     think Mr. Marcus' suggestion was that those could not be the

5     predicate for the money laundering, if I understood him.  So I

6     thought maybe that's the reason why you had put it behind.

7            THE COURT:  I don't remember.

8            MR. JUENGER:  It doesn't matter either way, but --

9            MR. MARCUS:  I don't know if he agreed with me.  So --

10           THE COURT:  I read it.  I read it.  It doesn't matter

11    the order.

12           MR. JUENGER:  It doesn't.

13           THE COURT:  And I'm changing it because it makes sense

14    because of the Verdict Form.  I'd rather do it in order because

15    it's easier for people to follow.  I don't know how they're

16    going to do it, whether they'll do it in order.  They can do it

17    whichever way they want.  They can start with money laundering

18    if they want.

19           Obviously, if they find him not guilty of everything

20    and find him guilty of money laundering, we've got an issue, but

21    I can resolve that.  But there's no point telling them all of

22    that.  It's just confusing.  Because you can't be guilty of

23    money laundering if you're not guilty of anything else, in this

24    case.  You could in others.  But we'll cross that bridge when we

25    come to it.

1          But I think it's easier.  I think the instructions have
2    been full.

3          All right.  You don't want to move the exhibits?  Move
4    the exhibits first.

5          MR. RASHBAUM:  We should look through them to make sure
6    that --

7          THE COURT:  By move them, not move them in.  Move them
8    physically on that table.  Yes, that way they're there.  No
9    one's going to touch them.

10          Okay.  Obviously, you need a new list of exhibits.  So
11    you can do that tonight and give it to me tomorrow morning.
12    Show it to your opponent.  Same thing for the defense.

13          So it's a clean list.  You don't have all the numbers.
14    You only have the numbers of what has been admitted.  So you
15    don't have what has been sustained.  So you're going to skip a
16    lot of numbers, and that way it's easier for them.  Otherwise --
17    it's easier for them to follow with that.

18          The list of witnesses I think also helps even though it
19    wasn't a long trial.  It probably would have been in front of
20    some other judges.  I don't know.

21          So what do you want to say?

22          MR. RASHBAUM:  Judge, do you have any rules for the
23    lawyers for deliberation, where we should be?

24          THE COURT:  Where they should be?  No, I don't, but
25    I'll tell you tomorrow.  What I do -- you can go wherever you

Case 1:16-cr-20893-FAM   Document 235   Entered on FLSD Docket 09/10/2018   Page 179 of 201
Charge to the Jury
179

1    want.  I picked a time arbitrarily and I suspect in about 95

2    percent of the cases I've been right on the money on the timing.

3    On the verdict, I've been 99 percent on the money.  I'm pretty

4    impressed with myself with 760, but I think that's a good

5    record.  But with timing, a little bit less.  Not necessarily on

6    the verdict but when they'll have a question or something.

7         So what I'm going to do is I'll pick a time probably

8    right before or right around the lunchtime and they can stretch

9    their legs.  So all I need is the defendant, one lawyer for each

10   side.  So the rest of you can do what you want, but you don't

11   have to hang around the courthouse.  I personally think that's a

12   waste of time, but you're welcome to do that if you want to.

13        So I will probably pick say 12:00, a little bit before

14   12; and then if they don't have a question or a verdict in those

15   three hours, I send them to lunch and you should go to lunch and

16   then I pick a time in the middle or late afternoon.  We'll take

17   your phone numbers, too, and we can call you if something

18   happens.  But I'm usually right on the money when something

19   happens, whether it's a question or a note.  That way you're not

20   just hanging around the courthouse doing nothing else.

21        So is that satisfactory?

22        MR. RASHBAUM:  Thank you, Your Honor.

23        THE COURT:  All right.  That's what we're going to do.

24   Okay?  So you know.

25        These are it?  Where are the defense exhibits?  They're

Case 1:16-cr-20893-FAM   Document 235   Entered on FLSD Docket 09/10/2018   Page 180 of 201
Charge to the Jury
180

1    in a box, too?

2          MS. MEYERS:  Yes, Your Honor.

3          MR. RASHBAUM:  Yes.

4          THE COURT:  Okay.

5          MR. LARSEN:  Your Honor, we're going to make sure that

6    the exhibits that were not admitted are taken out of there.

7          THE COURT:  No, no.  You're going to do that now.

8          MR. LARSEN:  Now.  Exactly.  Right now, yes.

9          THE COURT:  Yes.  Do it now.  Yes.  I want you to do

10   that now.  Don't leave for tomorrow what you can do today.

11   Okay.

12         Do we need a computer or a recording for the jurors?

13   That may be one of the first questions.  I don't think so, but

14   what do you say?

15         MR. LARSEN:  Yes, Judge.

16         MR. RASHBAUM:  If they ask for it, it's fine with us.

17         THE COURT:  Well, what if they ask for it in an hour?

18         MS. MEYERS:  Your Honor, the recordings are among our

19   exhibits.  They're on a flash drive for each exhibit.

20         THE COURT:  Well, that doesn't do anybody good in an

21   envelope, does it?

22         MS. MEYERS:  And transcripts.  So if they would like to

23   hear them, I think they probably do need a computer.

24         MR. RASHBAUM:  I would wait until they ask.

25         THE COURT:  What say the prosecution?

Charge to the Jury

1          MR. JUENGER:  Your Honor, we have a clean laptop for

2     that very purpose, and I think it should just go back with them.

3     If they don't use it --

4          THE COURT:  Assuming they know how to use it, which

5     nobody asked in voir dire.  Hey, anybody know how to use the

6     laptop?  Nobody asked that question, assuming that everybody

7     does.  You never know.

8          So you want to wait until they ask for it.  Is that the

9     Government's position, too?

10         MR. JUENGER:  No, our position would just be to send it

11    back.  If they have questions about how to use it, they could

12    ask then and someone from the court could show them.

13         THE COURT:  Oh, no.  Whenever there's a question from

14    the jury, I bring you back.

15         MR. JUENGER:  Okay.

16         THE COURT:  We do everything there.  If I see any of

17    the jurors, I say good morning and that's it.  I don't talk to

18    them about the case.

19         MR. RASHBAUM:  My concern about sending a computer back

20    is they're going to have no idea why the computer is being sent

21    back.  It's not an exhibit.  So I think the more prudent thing

22    to do is to wait to see if they ask.  There's a transcript in

23    there and there's a CD in there.

24         THE COURT:  All right.  That's what we'll do.

25         The instructions were actually 28 pages.  They were

1    misnumbered, but what I'll do is we'll retype them and tomorrow

2    morning, we'll give you copies of those.  So you should know

3    that those are in.  Okay?

4              MR. RASHBAUM:  Thank you.

5              THE COURT:  And you will show me the exhibits.

6              Ready?  Set?  Go home, Gilda.  It's almost 7.  I don't

7    want to be sued under the Fair Labor Standards Act.

8         (The trial adjourned at 6:45 p.m.)

9

10                   C E R T I F I C A T E

11        I hereby certify that the foregoing is an accurate

12   transcription of proceedings in the above-entitled matter.

13

14   _____            _____
          DATE                 GILDA PASTOR-HERNANDEZ, RPR, FPR
15                             Official United States Court Reporter
                               Wilkie D. Ferguson Jr. U.S. Courthouse
16                             400 North Miami Avenue, Suite 13-3
                               Miami, Florida  33128    305.523.5118
17                             gphofficialreporter@gmail.com

18

19

20

21

22

23

24

25

**A**

abets 166:5,8
abetted 30:6,8
abetting 30:5 77:7,22 165:23
ability 15:20 28:17 143:10
able 41:13 80:22 123:14
about 4:12 6:17 7:21,22,22,23
  8:7,8,15,20 9:4,11,13,21
  10:24 12:12 13:19,25 14:6
  15:10,11,20,2 4 16:16,22 17:6
  19:24,25 20:18 21:7 22:12
  23:11 24:11,12,2 4 26:18 27:8
  27:22 28:16 32:16,17 33:3,18
  33:20 34:5,14 35:15 39:8,21
  41:6,22 42:12 43:3,4,6,10,14
  43:17,20 44:16,20 45:14,14
  46:3,9 47:9,12,13,22,23 48:24
  49:1,1,20,21 50:3,8,18 51:1,8
  51:13,14,22 52:19,20 53:6,15
  53:22,23 54:4 55:4,19 56:14
  57:8,10,15,21 58:14 59:1,3,3
  59:11,23 60:2,5,8,14,20,21,21
  61:8 62:12,17 63:18 64:7,16
  64:18,21 65:11,15,21,24 66:8
  66:9,9,16,17,18,2 0 67:14,20
  68:5,8,17,18 69:7 70:12,16
  71:2,4,10 74:5,6 75:2,16,17
  75:18,20 77:1,1,1,2,3,5,7,19
  79:22 80:13,18 81:7,16,22
  82:5,7,15,21,2 3 83:20 84:7,19
  84:22 86:1,17,17,17,19 87:21
  88:1,6,12,13 90:9 91:2,22
  92:6,12,16,17,2 5 93:16,17
  94:14,15,16,20,2 2 96:10,11,17
  96:18,23 97:7 98:12 100:8,10
  100:19 101:2,15,16 102:7,19
  103:8 104:17 106:2,14,23,24
  107:7,9,24 108:21 110:19
  114:19,21 115:3,5,9,12 116:4
  117:15 118:7,12 120:12 121:5
  121:13 122:1 123:25 124:17
  125:10 126:1,5,19,20 127:21
  129:5,14,17,21,2 3 130:1,1,13
  131:14,15 132:11 133:20
  134:18 135:2,4,5,9,12,23
  136:4,10,13,1 4 139:3,11
  140:10,10 142:1,3,6,10
  143:11,17 144:5,6 145:10,17
  148:7,11 150:5,21 152:2,24
  153:8,19,24 155:9 157:1,4
  159:19 161:3,5 164:20 166:15
  167:9,10,11,13,13,14,23,23
  168:4 169:15 174:4 179:1
  181:11,18,19
above-entitled 182:12
absolutely 89:4 113:7,23
accent 171:6
accept 142:20
accepted 76:13
accepting 130:6
access 107:3 126:8,9
accident 50:10 85:21 165:2
accidentally 50:10,11,12,14
accompany 168:1
accomplish 147:18 151:19 152:7
accomplished 71:16,17
accomplishing 152:4
according 87:4 91:6 113:22
  115:1 175:9
account 132:15
accounts 73:9
accurate 119:5 142:21 182:11
accurately 143:10
acknowledge 22:18 33:22
acquiring 85:14
acquisition 85:13
acquittal 24:13 19:35:14,19
  36:1 39:18 103:19
acquitted 170:11

act 47:5 64:3 76:22 77:11 80:11
  85:20,23 119:16 141:16 147:5
  148:7 150:17 151:14,25 152:2
  152:5,24 164:25 165:3 166:2
  166:2 182:7
acted 45:6 47:15 149:6 165:6,8
acting 47:15 166:4
action 150:2
actions 31:14,23 76:14
activities 36:4
activity 69:2 146:21 149:22
  161:7,16,20 162:3,3,5,6,8
acts 63:22 64:6,8 149:24 151:9
  166:7,10,12
actual 6:24 34:10 95:6 120:8
  142:13 146:16,23 148:14
actually 6:2 9:16 12:15 13:24
  31:19 47:9,20,20 53:14 57:11
  58:10 61:9 70:16,19 101:15
  101:17 113:10 116:14 125:18
  147:2 150:15,23 151:7 169:13
  169:15 181:25
added 79:15 103:21
additional 39:19 64:6 65:19
  169:20,20
additions 168:16
address 37:3,6 42:22 43:1
  123:12 129:12
adjourned 182:8
adjustments 36:18
admissibility 10:15
admissible 25:4
admission 38:4
admit 110:3 112:14 132:17,17
admits 66:15
admitted 12:24 24:25 25:22
  72:21 74:20,22 75:15 141:22
  141:23 170:20,24 171:1,3,5
  171:10,12 174:2 178:14 180:6
adopt 73:11
advance 53:20
advances 148:8 152:25
advantage 52:6 63:20 145:4
advice 14:15 16:2
affairs 80:12 141:17
affect 166:25
affected 44:13 149:2,22,24
affecting 44:14 146:18 149:12
affects 149:17
Afghanistan 50:7 96:23
after 11:15 19:4 35:19 36:1,20
  38:12 39:16,23 54:16 56:2
  66:21 67:14 68:20 76:8 87:23
  104:8 106:25 107:24 108:21
  110:12 112:2,13 115:23
  117:21 128:21 129:16 134:15
  139:24 141:13 163:4 167:18
  171:6
afternoon 79:10 106:6,14
  139:16 168:9 179:16
afterwards 38:20
again 10:12,17 11:16 14:2 15:5
  17:14 22:8 29:24 32:7 33:18
  34:6 42:24 46:7 55:11,17,20
  61:25 62:11 71:23 74:23 82:6
  87:3 93:2 94:6 96:24 98:4
  100:12 105:6 107:4 108:3,5,5
  109:3 114:8 117:25 119:11,20
  120:3 125:7 128:1 133:21
  136:25 140:9 152:8 157:3
  160:9
against 97:23 102:12 140:20,25
age 97:20
agency 21:16
agent 60:20 77:13 82:14,14
  147:7 166:3,10
agents 77:17
ago 21:9 30:25 37:8 39:7 42:21
  42:25 49:2 51:19 70:4 79:18

84:23 106:18 120:22 121:17
  158:6
agree 6:15 17 36:6 47:11 48:13
  69:11 73:25 87:4 104:7
  105:19,20 113:15 118:11
  140:22 147:1,17 151:6,18
  153:16 157:9 158:19 159:7,8
  173:22,25
agreed 71:4,18 75:4 113:1
  115:12 153:18 177:9
agreement 12:15 13:9,12 14:1
  71:3 72:1 73:24 85:13 98:14
  98:16 108:13 144:13 147:4,10
  152:11
agreements 13:3 71:8
agrees 173:24
ahead 7:25 40:15 139:10
aid 50:24 51:11 145:5
aided 30:6,8
aiding 30:5 77:7,22 165:22
aids 166:5,8
aim 124:25,25
alerted 66:25
Alisa 95:11
alleged 150:21,23 151:1 152:3
  152:16 153:4,14 154:25
  157:15 158:6 164:24
allegedly 34:9
alleges 71:15
Alley 54:22
allow 46:25 118:4 133:11 145:7
almost 4:4 9:10 84:9 86:25
  110:15 112:1 164:16,17 182:6
alone 22:17,20 30:1 33:25 35:9
  135:22 152:6 167:8
along 20:21 42:9 63:12 78:18
  107:4 130:10
already 47:23 56:3 64:10 94:19
  137:1,14 164:1,2
alter 27:18,20 127:13
altered 23:10 28:1,4
alternates 137:4
although 47:10 73:1 75:1
always 5:23 26:23,24 41:9 55:8
  82:12 83:15 89:10 105:20
  106:1 112:11 117:3 170:4
Amanda 48:14,19 62:23 82:22
America 1:4 43:3 59:16 157:7
Ameritrade 132:15
among 76:5 140:9 180:18
amount 20:3 59:19 134:14 135:9
  156:7 160:1,10,2 3 162:7,9
ample 32:7,24
Amway 81:13 92:9
analyst 84:21
Anderson 84:11
Andrew 54:5
and/or 37:18
Ankush 81:21
another 33:10 41:11 44:15 47:25
  64:3 66:6,11 71:14 77:12
  81:14 91:8 97:1,1,3,4,18
  107:18 110:23 119:18 121:1
  128:4 149:19 151:3,6 162:22
  166:3,7,12
answer 60:7 112:4 126:18
  127:10,18 131:6 132:6,16
  133:12 143:13 158:13 159:12
answering 17:13
answers 7:23 145:17
antibiotic 112:7,10,21
antibiotics 112:6,20
Anti-Kickback 8:9 33:24 47:10
  47:12 73:13 128:18 161:17,21
  162:10
antsy 116:9
anybody 7:21,22 18:18 40:13
  51:7 66:15 134:18 180:20
  181:5

anymore 70:22 81:20 133:14
  134:18
anyone 10:4,19,23 31:13 51:4
  72:18 89:9 102:9,9 107:1
  109:23 110:17 112:9,9 117:5
  117:6 125:5 128:25 150:23
  151:5 155:12 163:8 167:13
anything 5:23 7:21,22 10:24
  11:22 28:12 51:24 69:21 70:1
  72:18 81:11 91:10 95:16
  102:9,9 103:1 104:12,12
  105:15 120:17 126:17 138:7
  138:23 140:10 141:23,25
  142:5 167:14 169:24 174:17
  177:23
anyway 5:4 26:7 62:6 103:1
  137:10 163:5 167:21 169:8
apologies 105:7
apologize 173:11,14 174:16
apparently 22:25 53:10 175:9
appeal 35:20 138:22
Appeals 20:21 21:25 22:1 36:11
appear 143:12
appearance 55:23
APPEARANCES 1:12
application 70:10,11
applies 42:12 165:23
apply 32:10
appointment 41:19 102:19
appreciate 168:2
approach 20:24
approached 49:12 62:20
appropriate 36:18
appropriately 16:6 27:12 29:7
approval 57:10,12
approve 45:21 52:22 58:9
approved 57:14,18 59:7 88:17
approximate 157:18
April 97:3 109:5,10,21 110:12
  110:12 113:12 116:10 129:15
  175:10
arbitrarily 179:1
area 14:15 18:10,24 68:8,17,18
  68:19 115:17
arguably 74:25
argue 34:14 35:4,25
argued 21:16 38:9
argues 31:6 131:21
arguing 21:8
argument 3:7,8,9,10 20:3 21:5
  31:8 33:16 39:25 79:14 95:19
  106:12 118:13 123:22,23,24
  125:7,8,8,11
arguments 19:21 20:1 38:15
  42:4 124:24 125:2 129:13
Armando 47:1 59:17 82:1,1
around 44:22 104:10 105:16
  137:9 164:20 179:8,11,20
arrange 154:21 158:22,24
  163:10,21 164:5,9
arrangement 56:14 73:4 154:21
arranging 154:14 155:4,15,25
arriving 142:5
article 11:17 135:12
articles 137:22,23 167:17,20
artifice 44:2,5 119:15 148:16,24
artificially 23:22
artificially-engineered 45:23
Ashton 54:5
aside 31:12
asked 10:9 16:16,22 27:19 28:16
  42:18 62:16 65:9,9,12 66:14
  67:4 76:1,6 83:21 87:21 99:21
  99:21 100:15 112:1 126:13
  131:3,23 133:11 135:4 181:5
  181:6
asking 10:11 32:13 109:20
  117:24 118:6 127:15 129:20
asks 129:16

assembled 59:12
asserts 142:13
assessment 109:10
asset 36:25
assets 37:17 38:7 120:24
assistance 14:11
Assistant 37:11
associate 166:10
associated 93:8 166:13
associating 148:5 152:22
assume 34:22 94:6 113:24,25
138:9 141:25
assuming 181:4,6
assumption 108:22,23
assure 115:21
attached 14:1 57:2
attachments 54:4
attempt 119:14 148:16
attempted 44:1 146:17 148:23
attention 135:8
Attorney 37:11 133:22 134:22
134:23 135:2
Attorney's 1:14,15 103:22
audit 97:15,16 120:16
August 16:19
aunt 54:23
AUSA 1:13,13,14 40:18
authorizations 111:8
authorizes 166:10
authorizing 58:12
automatically 92:3 148:9 153:1
available 27:20
Avenue 2:6 182:16
avoid 55:23
Avon 81:13 92:9
aware 15:1 16:11 18:3 165:8
away 68:19 69:22 88:9 101:5
110:8 125:17 126:20 140:2
167:21
AWP 113:7
Axelrod 129:1,1
a.m 4:1 7:15 20:11 40:24

B

B 158:23 159:6
back 18:14,18 20:5,6 32:13
40:11,16 41:14 54:17 57:3
58:22 60:9,13,16,18 68:22
76:25 91:24 95:4,5,13,17
100:25 101:4,11 102:8,21
103:20 105:17,23 106:15
111:3,15 116:15 117:12
122:20 127:12 136:9,15,25
137:1,9,10,20 139:11 140:7
140:11 159:18 162:24 163:4
167:11 168:5 169:24 170:15
181:2,11,14,19,21
backdating 110:20,21,22,23
111:18
backed 76:19
backwards 131:22
backyard 120:10
bad 47:7 85:25 92:14 111:20
165:5
bank 73:9 74:20,22 87:10 107:2
Bansal 27:17 32:20 57:25 58:2,6
59:8 81:21 88:23 127:24
banter 11:12
barely 134:10
bargain 98:19 144:22
bargaining 144:16,19
Base 59:18 60:23 75:5,5 77:23
based 22:15 31:22 34:15 41:4
46:13 69:9 130:7 138:17
140:18 141:12
bases 53:1
basic 69:15
basically 9:4 38:21 84:16 94:8
103:21

basis 4:22 17:18 134:7
bathroom 40:14,16 136:5
Bayside 41:21
bear 41:11
bears 41:9
beat 124:13
beating 24:12
became 69:8,10 85:6 90:12
become 9:25 69:2 84:2,5 148:9
153:1,21 154:9
becomes 10:5,20 147:7
becoming 134:5
bedrock 9:11
before 1:10 12:18 13:12,22
14:21 23:1 35:7 36:9,9 38:23
39:6 41:13 43:10 54:25 58:12
59:2 70:17 83:7 88:8,11 98:13
106:19 108:7 110:13 122:5
126:24 130:3 134:24 137:2,12
141:21 162:25 164:14 165:7
179:8,13
beg 134:25
began 42:7 88:3,11
begin 140:1,2,14
beginning 41:1 55:7
begun 32:8
behavior 73:23 116:15
behind 176:24 177:6
behold 129:2
being 7:18 8:21 14:14,24 15:14
15:17 18:9 30:12 31:4,19
33:15 50:13 52:10 60:21
63:18 67:16 73:21,21 93:9
125:11 129:25 148:4 152:21
153:9 181:20
belief 86:5,6,7,10 165:14,15,17
believe 12:5 16:19 21:17 26:8
36:24 37:15 41:3 50:25 56:23
64:25 68:25 73:3,10,12 74:2
76:8,22 88:5 89:17 94:3
104:21 113:3,19 118:17
138:17 142:21,23 143:1,21
144:8 173:7
believes 9:14 110:7
beneficiaries 24:13 50:20 71:20
71:23 72:20 73:8 157:25
beneficiary 48:4 157:15,21
benefit 30:20 44:2,11,12 45:16
53:3 78:21 93:7 113:13
119:15 146:14 148:17,19,24
149:2,11,13,15
benefits 45:10 149:9 156:15
besides 11:11 123:3
best 8:12 76:24 78:17 127:3
better 37:3 97:14 113:21 115:23
123:10 170:4
between 6:14 8:20 9:4 24:14,17
30:14,15 41:18 59:6 60:4
88:20 108:3
beyond 27:5 32:24 70:24 71:6
72:12 80:3,7,9 121:21 122:5
123:8 140:17 141:6,9,15,19
147:15 148:22 150:24 151:17
153:12 155:18 158:3 159:9
161:11 163:14 164:22 165:13
166:16
Biblical 106:1
bidding 77:21
big 36:14 49:3 61:24 67:9,15
74:6 81:16 84:7,9 112:1
115:24 125:13 134:20
biggest 120:12,14,15
bill 30:17 46:16 56:12 59:15
64:14 72:1
billed 31:10 61:10 68:14
bills 52:6 63:2,17 66:5
binding 141:24
Bing 54:18 56:7
Biscayne 1:21 2:2

bit 47:23 51:3 53:7,23 56:16
57:8 60:7 75:18 81:16 82:21
90:9 94:15 97:6 98:12 106:16
114:19 157:4 168:1 169:21
179:5,13
Bjerke 25:10 56:25 62:4,8 66:4
71:6 72:4 74:7 77:18 83:3,3
96:14 130:17,18 144:14,14
Bjerke's 54:23
black 59:5 124:14
Blair 62:14 71:24 80:25
blamed 130:22
blames 130:22
blaming 108:15,17
blatantly 99:8
board 85:12
boatload 113:18
bogus 51:11 129:18
bona 81:9 9:5,25 10:5,20
15:22 134:4,5 138:19 156:9
books 120:19
boring 128:11
boss 59:9
both 24:25 41:7 50:3 73:14
82:23,23 102:18 105:19,20
153:3 169:15 170:20 175:4
bottle 62:18
bottles 60:3
bottom 51:9 52:12 56:18 101:3
Boulevard 1:21 2:2
box 54:11 61:18 180:1
boy 134:15,17
brain 8:14
break 71:3,5 136:5,5,8
breath 11:22
bribe 120:2 155:13,21 156:5
163:9,17
bribery 90:15
bribes 120:2 154:13,20 155:3
bridge 36:13 177:24
brief 40:18 139:13 140:11
173:21
briefly 94:16
bring 7:12 17:20 20:6 28:10
40:21 86:18 102:7 117:5,6,14
132:10 136:14,25 139:15
181:14
bringing 15:11
broad 80:14
brochure 52:10
broker 64:23 132:14,16 135:15
brokerage 132:15
brokering 64:21,22 65:1 81:19
92:18 132:11,12,12,18
brother 61:24
brothers 52:3
brought 14:14 16:25 18:9 34:4
83:10,23 85:12 92:11 94:24
108:6 110:22 116:15 127:24
130:14 131:7 133:20
Brundige 23:11 56:23 62:2,11
83:8,8 94:4 127:6 130:13,15
130:24 131:1
Brundige's 62:5,9
buddy 52:9
buffet 70:12
build 125:8
bunch 43:4 108:19 121:6 145:13
burden 27:13 29:9 41:9,12 80:3
80:4,5 117:4,13 121:3,21
122:1,5 141:8,8
bureaucracy 134:20
bushes 24:12
business 10:25 53:10 67:14,18
67:20 68:19,23 69:4 74:10
120:20 130:9,11 162:12
165:18
businessman 69:3
buy 58:17 60:5

buying 113:18

C

C 158:25 182:10,10
cafeteria 20:7
call 27:10 33:10 48:11,12 49:16
50:10 65:21,23 91:15 111:5
123:22 127:4,8,14 130:8
133:18 145:14 148:13 179:17
callback 127:10
called 49:14 50:6 53:6,9 82:3,9
83:3 84:21,25,25 85:7 86:1,24
88:4 89:7 125:8 128:23 134:9
144:16 146:15
calling 59:8,8 66:20 89:19,21
91:3 108:21 127:18 130:1
calls 53:23 54:3 55:25 56:9 92:2
129:5
came 16:16,19 27:17 39:4 55:14
60:13 65:15 66:15 70:18
72:24 76:11,12 162:5,6
cancel 48:2,9,10,13,25 65:22
canceled 65:25 66:1 67:7 98:2
canceling 98:2,6 133:10
cancellations 133:12
Canepa 23:16
capacity 150:13
capsule 111:7,9
care 8:14 11:12 14:11 18:25
20:20,22 21:11,16 22:17,21
23:6 24:4 31:1,11,14,22 33:25
35:1 36:1,7 37:20 38:18 40:11
43:23 44:2,11,12 45:9 48:1,12
49:10,10 51:13 52:14 53:1,5
56:15 57:5,7,14,18 59:3,16
65:18 70:25 71:7,9,15 72:14
72:15,21 74:17 75:13 77:6
78:20 82:11,13 85:9 86:16
89:13 116:6 118:21 119:10,15
122:11 126:10 127:21 145:20
146:1,4,6,11,14,2,5 147:3,19
148:10,11,14,17,19,2,4 149:2,9
149:11,17,18,2,0 151:4,20,21
153:6,8,19 154:16,23 155:6
155:17 156:3,13,14,18 157:14
157:20,25 158:7,10,12 159:2
159:22,25 160:10,18,21
161:16,20 162:9 163:12,24
164:2 174:9
cared 51:14
carefully 121:8 141:13
carelessness 86:13,14 165:16
cares 59:3
carried 61:9 147:2 150:25 151:7
151:10
carriers 113:14
carry 57:21 176:21
carrying 147:13 151:15 152:3
152:13
case 1:3 6:15,20 7:21,22,22,23
8:23 19:11,14,20 20:18,19,20
20:20 21:2,3,4,8,9,13,16,17
22:6,9,11,16,1 9 23:2,6,9,14
23:17 24:4,11,16,21,24 25:1
25:18,25 26:9 27:3,17 29:8,18
29:24 30:1,5,24,2 5 31:3,4
32:2,3,22 33:23 34:8 35:6,11
35:23 41:4,22 42:11,12,13,20
42:23 43:2,4,7,13,25 44:6
48:24 49:6 54:1 55:10,16 56:6
56:16 57:10,24 60:20 62:4,24
64:4 74:19 75:8,18 76:4,7,24
77:1,2,8,15 79:12,19 80:3,14
81:23 86:5,18,19 87:8,13 88:7
88:9 89:6,8,9 90:1,2,13 92:7
93:2,16 97:11 98:14 99:18
100:18,20 101:20 102:17,21
112:1 118:6,12,13 120:3,9,15
121:12 122:8,17,18,19 123:3

123:7,9 124:8 127:14 128:8
128:11 133:5 135:24 136:10
136:13 139:24 140:10,11
141:14,22 142:1 143:8 144:13
153:4 154:3,16,23 155:6
157:7 167:4,23 168:4 177:24
181:18
cases 6:20 35:1 39:12 49:13
154:4 179:2
cash 52:11 156:7
cashing 127:22
Catoggio 95:11
caught 70:20 107:18,20 109:24
109:25 110:1 168:20
cause 24:7 150:19
caused 24:5,6 46:16 49:7
causing 108:13
caution 144:12,25 167:2
cautionary 137:22
cautious 137:5,6,7
cavalierly 138:1
CBS 6:4,14 128:23 129:2 134:23
135:3
CD 181:23
cent 53:14
central 46:21
CEO 13:15 14:18
certain 9:10 14:11 110:25 128:5
142:4 148:5 152:22 161:8
164:20
certainly 18:3 21:8 23:15 35:17
40:6 78:15 105:1 113:9
127:17
Certificate 3:11
certify 182:11
cetera 146:2 162:21
chain 30:2 32:6,8 142:15
challenge 101:19
chance 6:4 43:1
change 26:14 56:21 111:7 163:1
163:3
changed 26:16,17 27:19 28:1
62:10 69:17 78:2 95:10 115:2
115:4,4 127:13 131:1 169:3,4
changes 32:14 34:14 95:4 111:9
115:13 127:15,16
changing 69:1 134:3 177:13
characterization 26:24 32:15
115:1,10
charge 30:4 37:18 74:15 86:3
122:10 125:24 126:1,2 145:25
146:9,12,15,16 148:13 155:11
163:6 165:10
charged 31:25 32:4 39:3 42:17
70:25 77:11 123:9 146:2
147:19 151:3 153:9,11 155:22
158:2 163:18 166:2 167:3
charges 30:23 71:13 75:14 78:25
145:12,13,19 146:3,6,24
151:10 153:5,7 157:22 164:19
166:22 176:24
charts 98:10
chat 19:25
cheat 44:6 45:16 47:16 150:2,18
cheated 43:4
check 5:18 13:6 28:7,17 105:6
117:11 127:22
checked 12:7 55:1 96:5
checks 69:20
chief 14:18
child 61:22
children 50:21 73:21
choice 27:20
choose 126:18 128:18
choosing 135:13
chose 111:19 126:17
Christopher 58:21
Cichowicz 49:15,23 50:17 71:20
71:24 73:15,17 82:21,21,22

82:25 84:1,2,8
Cici's 51:20
circle 76:25
Circuit 27:4
circumstances 142:16
circumstantial 142:11,15,18
cite 22:19
claim 24:10 29:1,3 33:6,6,19,19
34:16,23 49:5 56:13 61:10
157:17,18,21
claims 23:23 24:1,5,6,7 27:6
29:5,11,16 30:10,11,12 31:3
32:19 33:15 34:10,20 49:7
60:17,19,20,22 82:15,15,17
132:23 158:1
clean 138:25 139:5,5,9 178:13
181:1
cleaned 75:12 120:14
cleaning 75:11 120:12
clear 27:4 29:19 33:19 42:14
121:24 122:3 124:25 133:23
154:9
clearer 153:21
clearly 34:16 66:24 143:13
clerks 176:20
client 13:4
clinic 93:23
clock 79:7
close 29:14,17 60:9 80:8 122:7
164:24
closer 51:3
closest 50:21
closing 3:7,8,9,10 20:1,3 26:15
35:7 36:20 39:25 42:4 79:14
83:10 89:3 91:7 103:2 106:12
120:12 123:17 138:17
closings 40:13 104:9
clue 68:15 81:7
Code 101:19
cogent 35:8
colleague 36:12,25 42:25
colorful 50:24
combination 54:9
combined 138:14
come 5:4 20:17 29:14,17 36:13
38:8 40:11,16 41:4,14 43:10
70:20 80:8 84:2 95:25 105:17
110:9 116:21 120:19,19 121:1
121:3,6 122:7 129:6 137:9,10
137:20 139:8,11 140:7,9,11
161:19 168:5 169:15 170:7
176:19 177:25
comes 6:12 20:19 41:8 53:4 89:2
89:24 90:10 95:19,21 101:3
105:23 108:25 113:16 116:17
130:20 136:8 156:9 163:4
comfort 17:4,6 36:10
comfortable 18:4,7
coming 54:13 63:2 65:6 98:3,8
102:21 133:17
comment 176:23
commerce 44:13,14 146:18
149:3,12,17,21,22,24,25
commercial 134:21
commission 8:25 9:6 69:20
88:13 151:13
commissions 9:12 15:20 59:21
60:18 67:8,19 92:8
commit 21:10 23:18 25:16,24
31:11,21 71:7,9 77:13 79:24
80:6,7 81:12 116:16 118:19
118:21,25 119:8 120:3 122:3
122:6,11 145:20 146:6,24
147:5,19 148:10 151:10 153:6
153:6,11,13,16 163:1
commits 152:7
committed 25:24 26:1 42:21
47:5,23 64:8 70:25 71:18
74:17 75:13 76:9 85:23 123:8

146:1 152:2 164:20,23 165:3
committing 42:18 74:19 98:5
133:12 162:16
common 13:3 69:6,15 72:10
74:6 75:21 131:20 141:13
142:9 147:18 148:5 152:22
commonly 161:9
communicating 119:6
communications 81:5 113:17
companies 26:14 28:11,14 33:1
112:18
company 11:20 16:3 18:13 28:5
51:25 53:23,24 54:3,14 56:15
68:14 72:17 73:24 82:10
85:14 88:4,11,20,21 90:3,6
91:15 92:1 95:6,8,22 96:1
110:25 112:21 126:23 128:23
compare 135:11 141:1 157:16
169:17
compared 169:16
compensation 109:11,12
compilation 125:14
complain 28:7 66:8
complaining 48:24 59:9 65:24
67:7 133:18
complete 28:10 86:3 165:10
completed 139:25
completion 61:10
compliance 11:12 14:12 15:12
15:25 94:20,22,24 96:10
115:12,12
compliant 17:23 95:9 130:8,9
131:22 133:22
complied 94:25
comply 82:11,13 131:25
compounded 31:7,9,15,17 44:17
45:19,22
compounding 14:12 15:8 126:23
compounds 32:25 88:14
compromise 118:16 122:17
computer 76:7 125:14 180:12,23
181:19,20
conceal 66:7,11 132:7
concealed 68:9
concealing 64:16
concealment 65:19 66:12
conceals 150:9
concept 9:22
concern 95:2 132:11 181:19
concerned 21:7 22:5 38:20
142:10
concerning 141:11 142:25
concerns 36:19 130:1
conclude 8:2 106:12
conclusion 26:10 76:25 78:19
conclusions 142:9
concocted 45:23
conduct 22:20 33:25 70:15
77:15 161:12 165:9
conducted 161:12
confer 173:2,4
confidence 94:17,19
confident 38:17
confinement 81:20
confirm 14:10 19:25 77:20
89:21
confirmed 84:16
conflicts 12:7 13:6
confronts 107:8
Confucius 137:6
confuse 29:22
confused 92:1 94:11
confuses 118:1
confusing 117:16 177:22
confusion 169:15
Congress 73:13,16
connection 45:9 46:4 72:1
146:10,14 149:8 159:22,24
160:9,18,20

consequences 76:15
consider 19:20 42:19 57:14 76:1
76:6 131:11 141:21 142:4,19
143:22 144:11,24 166:23
167:6 168:8
consideration 144:10
considered 141:14
considering 142:8
consistent 32:21 82:23 95:15,16
109:8
conspiracies 29:23,25 74:14
153:3,4,9
conspiracy 21:10,15,18,18,20,21
22:5 23:22 25:4 28:9 31:1,11
31:16,21,24 32:1 71:1,2,14,14
71:16,17,25 72:13 74:15,18
90:7,22 91:13 93:5 108:16
115:8 118:21 119:18,18,20
146:5,6,24 147:4,7,11,14
148:6,7,10,12 151:3,12,24
152:4,7,11,23,24 153:2,12,15
153:17,21 154:7,17,25 155:8
157:11 158:5,6,9,12,14,18
159:5,13 165:23
conspirator 147:22 148:9 152:7
152:14 153:1
conspirators 29:25 147:12,24
151:15,24 152:13,16
conspire 118:24 147:1 151:5
conspired 33:9 71:8,22 77:5
145:20 146:4 153:5,7,11,13
conspiring 74:24 122:11
constant 32:25
constantly 94:20
constitute 165:18
consult 88:25 98:10 126:15
consultations 53:20 88:25
consults 55:23 57:9,21 89:11,20
contact 7:23 11:15 82:2 83:18
contents 3:1 102:8
context 25:5
Continuation 3:9
continue 129:19
continued 67:20
contract 75:3 149:12,16
contractor 8:22 9:3,6 15:15
control 8:24 9:11,13 28:8 96:3
113:12 127:21 148:18
controls 113:3
conversation 9:24 12:12 13:21
28:16 109:1,18 128:7
conversations 11:11 13:13 50:4
60:4 92:17
conversion 68:10
converted 70:17 129:25
convict 21:23
convicted 86:4 118:23 143:22
conviction 31:13 32:1 39:18
convictions 20:22 22:2
convinced 68:21 141:18,19
convincing 67:21 80:10 141:16
convoluted 73:19 105:10
cooperating 99:1 129:4
cooperator 81:15
copay 33:7,8 48:5,10,21 61:15
65:21 117:17,19,19
copayment 63:1
copayments 33:4
copays 23:8 33:20 48:1,17,18,22
63:5 65:20,24 66:8 117:15,24
118:3,7
copied 53:10
copier 5:5
copies 5:8,9 182:2
copy 41:7 103:14 138:25 139:6,9
140:13 145:15
Corcoran 18:13 69:25 85:7,7
86:9 116:3,5 134:10,11,13
corner 54:11

**Coronado** 49:15,22 50:1,2,4,13
50:17 71:20,24 73:15,17
83:24 84:8 96:4
**Coronado's** 97:5
**correct** 13:4 14:8,14,19,22 16:3
16:17 17:23 26:25 174:13,14
**corrected** 85:11
**corrections** 168:16
**correctly** 15:25 28:24
**corrupted** 28:2,4
**cost** 34:14 57:20 62:12 113:3,13
135:10,10
**costs** 57:20
**cost-engineered** 61:4
**counsel** 4:9,10 18:13 40:21,21
42:5 139:21,22
**count** 32:1 36:21,23 61:12 62:2
62:14,23 63:8 64:1 71:12,13
74:15 118:13,20,21,23 119:2
119:9,10,11,18 122:10,14
132:24 141:2 145:14,19 146:2
146:3,5,22,23,24 151:2 153:2
153:5,6,19,20 154:1,5,5,8,10
154:17 157:6,9,10,14,20,24,24
157:24,24,25 158:5,12,15
159:4,14,21,2,3 160:1,3,4,7,7
160:8,8,12,15,17,20,22,25
161:1 162:18,20 166:22
**counter** 58:18
**country** 44:19,23 63:17 96:20
**counts** 20:15 21:23 22:25 29:21
35:24 39:4 61:11 64:5 71:11
75:10 86:5 103:19,20,21
118:14,16 119:11,12,17,23
120:4,9 122:4,13 145:14,25
146:8,12,15,2,2 148:12,14
154:4 155:9,10 159:20 160:4
160:13,13 161:3 163:6 165:23
165:24 170:10,10
**couple** 22:12 28:6,15 49:21
51:19 55:25 138:3
**courage** 20:4
**course** 26:4 30:2 43:21 50:23
53:4,19,24 68:6 69:16 77:8
78:16 84:21 85:16 104:20
123:3 137:21 138:1 145:1
150:1 159:11
**court** 1:1 2:5 4:2,4,13,15,18,21
5:3,11,13,16,18,19,21,2,2,6:1
6:7,10 7:2,4,6,10,12,14,16
8:16 9:18 10:8,14 11:6,9,25
12:24 15:4 17:8 19:9,12,16,19
19:22 20:10,12,17,2,1 21:7,12
21:14,19,22,24,2,4 22:1,3,10
22:12,15 23:7,12,14 24:1,3,7
24:19,22 25:2,15,20,23 26:3
26:10,18,22 27:8,22,28 18
29:19 31:5 32:5 33:12,16,21
34:5 35:12,17,18 36:6,11,17
37:2,5,7,13,16,19,2 1 38:3,10
38:17,23 39:6,11,21,23 40:3,5
40:9,20,23,25 41:20 42:2,5
43:17 74:3 79:2,6 98:16 100:2
101:25 102:2,6,14,16,18,23
103:6,8,11,13 104:4,18 105:5
105:8,22,24 106:1,4,9,11
121:14 122:22,24,25 133:7
136:1,5,16,18,2,2 137:17,19
138:12,18,22 139:2,14,15,18
168:11,13,14,15,2,3 169:1,3,11
169:14,19,25 170:4,16,18,20
170:22,24 171:1,3,5,8,10,12
171:14,16,18,20,22,2,5 172:3,5
172:7,9,12,13,15,2,0 173:1,4,6
173:9,12,13,15,17,19,2,4 174:1
174:7,9,12,14,17,20,23,25
175:2,4,6,8,14,16,18,20,22,24
176:1,3,5,7,9,11,13,17,20
177:1,7,10,1 3 178:7,24

**D**
**D** 1:20 2:6 182:15
**DANIEL** 1:20
**Daren** 1:14 37:12 40:18
daren.grove@usdoj.gov 1:19
**dark** 167:25
**data** 66:14,15 82:15,15
**date** 68:7 110:25 111:12,12,14
111:15,17 132:23,25 157:18
157:21 160:2,10,23 161:1
162:19,20 164:20,22,23,24
182:14
**dated** 111:14
**dates** 132:24 146:2 158:1
**David** 69:25 116:3
**Davila** 85:1,4
**Davila's** 90:11
**day** 4:24 12:18,19 13:22 14:17
42:7 43:11,22 48:3,8,11,15
53:7 55:4 57:3 62:15 65:4

179:23 180:4,7,9,17,20,25
181:4,12,13,16,2,4 182:5,15
**courthouse** 2:6 179:11,20
182:15
**courtroom** 5:7 15:20 11 40:18
40:24 87:20 102:15 106:10
110:10 117:5,7 136:17,21
139:17 168:12
**Court's** 140:24 169:17
**cover** 70:14,23 112:21
**covered** 112:24 138:13,18,19
**covering** 49:8
**covert** 73:18
**covertly** 156:6
**co-conspirator** 75:8 91:6 92:2
95:2 100:18,20 118:8,10
**co-conspirators** 30:8 44:22 48:1
66:3 77:3
**crashing** 70:18,20
**cream** 32:11,11 46:22,22 56:25
62:11,12 83:9,13 93:8 98:1
131:5 135:9
**creams** 48:6 83:25 98:6,9 112:17
112:20 129:2 133:11
**create** 133:14
**created** 67:16 88:8
**creates** 36:12
**credibility** 75:19,20,22,24
**crime** 25:9,16,24,2,4 26:2 27:11
67:18 71:1,18 76:18 77:14
79:24 80:6,7 81:12 84:24
118:19 119:1,9 120:3 122:3,6
143:23 146:25 147:3 148:15
151:5,7,11,1 6 154:11,18
155:1,12 161:8,10 162:14,17
163:8 164:19,21,23 165:25
166:6,13,15,22,23,2,5 167:1
**crimes** 1:15 42:18,21 68:9,16
69:12 75:15,17,1 8 76:9
128:20 145:13 153:11,14,17
167:3,5
**criminal** 124:22 147:6
**criminalized** 73:14,16
**criminally** 146:19 166:7,11
**critical** 108:8,12 114:20,21
**cross** 29:13 36:13 92:20 93:1
177:24
**crossing** 92:15
**cross-examination** 3:6 11:25
12:1 110:20
**cross-examine** 10:15
**cross-examined** 125:12
**crowded** 20:8
**cull** 134:24
**current** 111:7
**currently** 93:9
**custody** 148:18
**cut** 53:4 167:17

66:10 69:22 77:2 110:4,6
118:17 125:3 127:23 137:5
**days** 20:4 76:23 82:12 115:18
116:14 134:24 138:3
**day-to-day** 75:25 126:10
**deal** 34:3,7 38:14 84:7,9 101:15
**dealing** 21:10 100:21
**deals** 68:9
**dealt** 34:4 45:12
**Deanna** 128:22 129:4,11
**decade** 98:21,22
**decades** 98:24
**deceive** 45:16 150:2,18 165:19
**December** 58:21 99:14 157:18
**deception** 144:8
**decide** 26:24 38:14 39:25 42:19
79:25 126:18 132:7 140:15
142:21 143:1,21 144:3,8
150:12 158:9 167:6,8
**decided** 68:22
**decides** 36:11
**deciding** 49:5 139:24
**decision** 38:4 41:4 126:19
140:17 142:6,23 144:4 150:14
**decision-maker** 150:15
**declaring** 120:17
**deductions** 142:9
**deeper** 9:8
**defendant** 1:8,20 4:9 24:3 25:6
26:13 32:7 35:16,21 36:21
37:21,22 39:13 40:20 42:17
43:7 44:1,21,22 45:6,8,25
46:3,15,20,2,1 47:2,9,12,14,15
47:23,25 48:8,23 49:18,20
50:5,6,16,19,23,2,4 51:21,24
52:20 53:4,8 54:7,1 1 55:11,20
55:22 56:2,9,11 57:4,9,18,24
58:5,15 59:6,10,12,21,24 60:4
60:9,15,22 61:25 62:9,10,22
63:5,13,20 64:8,9 65:8,23
66:2,3,7,16,1 6 67:1,2,15 68:2
68:9,11,25 69:4,17 70:3,4,23
70:25 71:4,7,13,16,1 7 72:5,15
73:5,23 74:4,9,9,20,2 1 75:3,4
75:7,13,15 76:7,9,17 77:4,10
77:23 78:3,22 80:2 85:17
92:23 128:2 134:8,13 138:15
139:7,21 140:17,20,25 141:4
141:4,7,18 144:7,8 145:19,25
146:3,9,13,17,2,4 147:14,20,25
148:3,13,20,2,3 149:6,8,23,24
150:24 151:16,22 152:17,20
153:5,7,10,13,1 8 154:8
155:11,17,20,2,3 157:9 158:11
158:15 159:8 162:11,13,15
163:6,13,16,1 9 164:4 165:11
165:19,20,25 166:1,5,5,7,8,9
166:9,11,12,14,17,2,4 167:2,4
167:7,7 170:7 172:12,20
179:9
**defendant's** 3:19 6:15 13:1
30:15 33:3 43:12 45:11,15,16
48:6 49:7,24 50:5,9 51:12
52:11,19 55:2 58:1,3,20 59:18
59:22 60:24 61:1,3,7 69:7,13
70:2 72:13 90:16 91:1 92:24
93:1 94:3,7 95:1,1,11,18 96:16
97:18,23,25 98:10 101:9
107:17 111:10 113:11 114:8
125:13 136:18 141:9,11 144:9
156:20,24 164:7,12 172:21
174:4
**defense** 4:9,18 12:22 32:15 37:8
39:21 40:7,20 41:10,10 57:6
79:3 86:2,3,18 92:21,22,25
95:5 103:6,16 104:13 105:11
107:6 108:1,4,8 110:15 111:4
116:2 133:9 134:9 137:17
138:10,14 139:21 165:10

169:1,9 172:14,23 173:24
178:12 179:25
**define** 64:22,24 153:20 161:5
164:16
**defined** 45:3 164:1
**defines** 13:9
**defining** 14:5
**definition** 105:2
**defraud** 21:10,18,20 31:1,21
44:2 45:6,7,15 46:4 59:13
61:1,5 77:4 86:3 119:15,16
148:16,24 149:7 150:1,7,10
150:17 157:11 165:11,12
**defrauded** 43:8 78:20
**defrauding** 150:23
**degree** 149:22
**delay** 104:8
**deleted** 103:21
**deletions** 168:17
**deliberate** 54:18 137:21 140:7
167:9 168:7
**deliberating** 104:8
**deliberation** 178:23
**deliberations** 140:2,3,14 145:6
145:15
**delivery** 45:9,12 149:9
**demeanor** 81:2
**demonstrated** 123:7
**denied** 91:9,25 125:21 138:19
**deny** 35:13 36:7 38:17 127:13
138:18
**denying** 23:18 36:19
**depend** 144:5
**depended** 52:2,6 55:11
**dependent** 115:11
**depending** 154:4
**deployed** 50:7
**DEPUTY** 136:21
**derived** 146:19,20 162:1,16
**describe** 88:18 135:19
**described** 151:25
**Description** 3:18
**deserve** 43:5
**designed** 45:24 47:3 51:5 74:11
**desire** 167:18
**desperate** 63:18
**despite** 68:11
**detail** 9:8 144:6
**details** 9:21 11:1 13:20 147:23
150:21 151:9 152:15
**detect** 73:19
**determine** 82:18,19 167:4
**determined** 111:13
**device** 72:17
**devises** 53:17
**dialogue** 17:10
**dictating** 32:10,10
**dictionary** 135:20
**differ** 143:14
**difference** 6:13 8:20 9:4 24:14
30:13,14 36:14 58:24 59:24
88:20 142:17
**different** 4:25 7:25 20:20 32:2
56:16 58:17,22 81:3 88:5 97:2
125:14 143:20 157:25 159:20
160:15
**difficult** 73:19
**digesting** 159:18
**Dimmick** 98:9
**dinner** 8:8,12 10:4,19,23 11:11
11:15 13:22 14:17,21,24
16:10,11 17:4,25 19:4 68:20
84:17,18
**dire** 181:5
**direct** 3:5 8:2,4 12:4 29:25 33:3
35:9 68:11 73 14,14 91:20
93:1 94:2 95:20 108:6 142:10
142:12,18
**directing** 77:12 166:3

direction 166:4
directions 57:5 66:7 77:19
directly 71:23 73:1 143:13 156:6
156:15,16 162:2
directs 166:9
dirty 63:14 75:11,12,15
disagree 6:5 27:9 117:7,14 170:1
173:6,15 174:5
disagreed 135:5 173:7
disagreement 57:12 172:22
disbelieve 142:23
discretion 10:10
discuss 102:8
discussed 9:13 30:25 31:7 94:19
103:3 127:25 153:14
discussing 148:5 152:22
discussion 8:22 13:17 15:10 57:8
57:10 80:16 128:19 173:21
discussions 24:17
dishonesty 143:23
disobey 47:7 85:25 165:5
disprove 142:16
dispute 38:9,10 56:1 62:11
disregard 47:7 85:25 118:5
140:23 142:4 165:6
distinction 9:12
distinguish 22:24
distributors 14:13
DISTRICT 1:1,1,10
DIVISION 1:2
DME 68:14
DNA 87:8 93:16 124:7,21
docs 53:21
doctor 25:15,16,18,24,2 4 27:16
27:23 28:7 47:20 49:10 52:14
52:15 53:14,14,15 54:6,8,25
55:18,23 56:4 65:7 83:16,16
89:6,7 90:19,23 91:3,8 93:6
111:5,6,11,14,1 5 117:11
119:4 127:7,12,15,16 130:24
132:4
doctors 25:12,13,17,1 8 26:1,14
28:3 32:10,13 35:11 45:21
46:12 51:5 52:20,24 53:2,5,9
53:18 55:16 58:23 59:14 61:2
64:12 74:7,8,11 78:6 83:5
89:4,19,25 91:17,18 93:12,17
93:18,20 96:4,15 115:8 125:4
125:6,16,19,21,2 5 126:8,9,12
126:20,21,24 127:2,2,21,22
doctor's 26:5 56:14 95:3,12
102:19
document 49:25,25 50:12,23
51:4 70:4 76:20 79:13,15
80:21 82:7 87:1,4,24 89:8
90:25 91:19 92:4 93:3,19,25
96:25,25 97:2,3 98:4 99:7
101:20 110:24 111:6,9,12,19
111:19 114:18 124:5,9,9,13
124:18 128:9
documents 23:10,10 24:25 35:9
42:10 48:24 54:17 76:20
77:20 80:22 82:6 87:3,8,15,25
88:1 91:13 92:12 95:4,20
96:24 97:7 99:8,21,23,24
100:22 101:7,7,19 106:16
107:5,15 109:25,25 110:23,23
111:23 118:18 119:8 120:7
121:4,11,12,23,2 4 123:18,19
123:25 124:2,3,4,7,10,10,18
128:6,8
doing 6:2,10 10:24 12:18 16:2
17:16 18:20,20 19:2 50:16
51:6 54:12 63:14 64:15 67:14
74:10 77:17,17 81:11 94:14
100:24 101:4 107:10 114:25
115:4 117:9,10,11 120:17
130:7 134:2 135:23 179:20
dollar 130:2

dollars 51:15 57:18 67:19,23
68:24 85:6
done 19:4 21:9 36:9 65:2 72:14
85:20 92:10 96:6,8 105:14
108:24 116:12 125:20 126:13
153:25 154:2,3 164:25 166:3
166:3
Donnelly 48:14,19 62:23 82:20
82:22
door 20:12 168:13
doubt 27:5 43:12 70:24 71:7
72:13 80:3,7,10 97:8 121:22
121:23,23 122:5 123:8 130:5
140:17 141:6,10,11,12,12,15
141:19 147:14 148:22 150:24
151:17 153:13 155:19 158:3
159:9 161:11 163:15 164:23
165:13 166:16 172:16
doubts 135:23
down 55:14 65:14 70:18,20
78:14 94:12,13 96:7 107:14
108:1,18,24 111:17 116:13
118:5 125:9,11 129:1 139:20
160:8
dozen 123:19
Dr 27:17 32:20 57:25 58:2,6
59:8 81:21 88:23 91:24
127:24
drafted 12:15 13:12 14:8
drama 129:16
drashbaum@mnrlawfirm.com
1:24
draw 30:19
dressing 51:17 52:1 70:13
drive 59:19 180:19
drug 34:21 60:15
drugs 46:13,17,18,2 4 49:17
50:22 51:8 73:22 126:25
127:7 131:17 132:25 133:13
133:15,16 134:16
due 109:9,11
during 9:24 53:24 75:2 125:2
136:7 142:5 143:20 145:3,5
145:15 151:24 175:9
Dutting 128:22 129:4,11
duty 139:23 167:9

E
E 182:10,10
each 24:9 25:21 28:25 46:21
54:6,9 57:17 63:15 75:22
76:10,13 94:10 119:12 121:23
122:4,12 139:7 142:21 145:14
146:1,22,23 153:11,15 154:1
154:5 160:1 166:22,23 179:9
180:19
earlier 72:24 99:16 101:16
early 5:1 99:11 139:19
earth 130:6
easier 17:10 153:24 157:16
159:17 170:8 177:15 178:1,16
178:17
Economic 1:15
ed 171:5
edited 101:17,20
educate 51:1
efax 96:6,6
effect 10:21 83:12
effective 108:11
effectively 150:9
efficacy 24:14
effort 151:10
efforts 67:25
eight 111:16 116:23,24 117:1
158:4
either 25:18 28:13 33:17 35:2
37:18 38:21 55:16 57:12
90:14 103:1 137:2 140:19
142:17 149:21 157:22 177:8

Eleanor 54:22
elect 38:22,22
element 27:5 44:23,24,2 5 45:5
47:4 118:17 119:21 156:19
164:3
elements 43:24 44:10
Eleventh 27:4
elicit 10:11
eligible 9:5
eliminate 74:11
elsewhere 51:1
email 11:17 26:15 53:13 54:2,13
55:7 66:21,21 68:2 78:11 84:3
107:22,23 114:11,12 116:11
124:15 129:23 132:8,9 133:10
135:12,22
emailing 13:23,24
emails 13:19 26:12 28:6 48:24
59:8 66:23 72:20,23 90:4
99:19 107:23,24 108:19 111:3
116:11 118:5 120:25 127:15
129:14,18
emotional 122:19
emphasize 145:9
employee 8:8,21 9:5,25 10:5,20
15:18,21,22 16:12 17:1,21
29:15 69:8 70:8,9 93:9 114:25
114:25 134:4,5 156:8 166:10
employees 66:23,24 69:8,10,11
69:14 70:17,19 77:16 84:3,5
employer 156:8,10
employers 70:7
employment 70:10,11 85:13
108:13 115:1,10 156:10,11
end 58:21 60:8,9,16,17,17,18
99:25 100:4 101:24 108:2
115:17 118:17 127:23 135:8
137:20 138:5,8 164:17 171:5
ended 89:14 109:6,7,9
ending 115:15
enforcement 16:15,19
engage 146:17 161:8
engaged 146:17 149:21,23
151:25
engagement 12:15,20 13:3,23
14:6 18:10
engaging 55:8 94:22
engineer 23:22,24
engineered 46:19 78:1
engineering 47:24 60:23
English 105:8,11,13 124:9
132:13
enough 5:13 6:9 8:24 23:1 26:8
28:18 33:12 39:12 59:1,9
101:6 112:19 168:3
ensure 124:11
entered 7:15 40:24 106:10
139:17
entice 74:12
entire 79:14 89:2 123:17
entirely 144:23 152:6
entitled 138:7 145:9
entity 149:14 155:25
envelope 180:21
equal 142:18
equation 53:6
equivalent 30:10 59:23
err 137:6,6,7
error 86:12 165:16
especially 132:14 138:2
ESQ 1:20,20 2:1
essence 79:23
essential 27:5
establish 22:17,21 31:16 33:25
86:13 148:6 152:23 165:17
et 146:2 162:21
ethoxy 30:14,15 59:18,23,24,24
60:3,5,23,24 75:5 77:24 82:3
82:4,5 113:16,18,18 114:2,5

114:13,14 131:13 135:10,11
ethoxydiglycol 34:14,16
even 29:13,13,17 31:11 35:8,9
35:13,17 36:7 48:21 49:13
51:21 52:17 54:25 60:9 67:8
69:16 74:25 76:24 77:10 80:8
82:11 85:6 86:2,5,8 88:11
92:19 94:5 99:15 107:12
108:11 113:1,5,18 116:21
119:7 127:8,9 130:24 133:18
133:23 137:10,12 140:8,21
147:22 152:5,14 165:14 166:1
168:4 178:18
event 39:17 148:4 152:5,21
events 32:6
ever 9:24 10:4 11:15 18:12 88:8
115:4,4 125:24
every 4:24 16:12 27:4 34:15,18
51:16 57:20 58:6 74:21 77:11
86:25 90:10 94:23 97:10,11
112:2 116:17,19 117:11
118:13,19 121:23 122:4,12
128:9 132:21 133:4 141:3
147:6,7 157:9 166:2
everybody 7:18,19,20 27:1
129:17,24 181:6
everyday 75:24
everyone 32:11,11,12 73:18
everything 6:12 41:5 68:22
70:14,23 72:10 78:8,8,12
84:16 85:11 87:24 88:10 97:9
129:8 130:22 177:19 181:16
evidence 3:17 12:22 13:1 19:20
23:5,6,9,20 24:16,21,23 25:22
26:9,12,23 27:2,6,9,21,22
28:3,12,19,21 30:1,5,7,18
31:8,12,16,20,23 32:8,24 33:2
33:3 34:9,10,19,22,2 4 35:23
39:16,19 41:2,3 42:19 43:11
44:16,17 45:14,18 47:10,11
55:9 56:16 57:17 61:18,19
64:4,18 65:19 67:13 68:4,7
71:6 74:19 75:2,9 76:23 77:11
77:14 78:15,18,19,23 86:12
87:9 88:6 89:4,5,16 90:2
93:16 100:13 106:20 108:20
113:6,23 114:1,5 119:3,4,5
120:2 123:6 128:15 129:23
132:19 140:12,18,2 5 141:5,14
141:21,22,24 142:4,7,8,10,12
142:15,18,19,2 0 143:15,16,18
145:2,7 158:3 165:15 166:1
166:23 167:4 168:8
evidentiary 32:8
evolving 26:1
Ewton 63:11 83:17,18
exact 89:5 164:22
exactly 42:6 61:25 82:8 84:19
180:8
exam 68:11
examination 3:5 8:4 91:20
28:23 34:13,20 90:11
example 11:13 18:22 25:17
28:23 34:13,20 90:11
examples 47:22 48:20 49:21
63:22 64:5 84:9,11 116:20
except 140:5,8 142:1 165:23
167:23 168:17
exception 8:8 127:24 136:23
exchange 71:19 72:6 98:16
144:15 154:13 158:21
exclude 141:10
excuse 4:24 46:19 47:14 55:6
68:13 74:21 78:10
excused 19:18
execs 84:17
execute 44:2 55:12 59:12 119:14
119:14 148:16,16,24
executed 44:1 63:23 148:23
execution 64:6

executives 115:19
exempted 105:3
exercise 10:9
exercises 8:23
exhibit 3:19 7:9 12:22 13:1
  26:21 49:24 54:2,16,18,20,21
  55:6,24 56:22 57:6 58:19,20
  68:1 78:11 82:24 90:5,16 91:1
  91:22 92:21,24 93:1,2 94:7
  95:1,11,18 96:16 97:19,24,25
  98:11 99:12,15,17 101:9,22
  107:6,17 108:1,4,8 110:15,16
  111:4,10 113:11 114:8 116:2
  117:23 120:13 125:13 128:25
  132:9,22 133:9 134:25 173:23
  180:19 181:21
exhibits 3:16,17 42:10 95:5
  96:18,19 101:20 104:1,2,7
  116:9 120:7 121:7,8,9 137:12
  139:3 141:23 157:17 169:6,20
  172:21 174:4 178:3,4,10
  179:25 180:6,19 182:5
exist 101:21
existence 47:9
exists 78:20 132:1
exonerate 69:9
expect 137:2
expects 47:18
expensive 45:19,21 46:6,24
  58:13 60:6
experience 72:15 73:5 126:22
expertise 8:14 18:10
experts 35:3
explain 17:6 47:8 111:5,6 128:1
  129:22,22 131:23 140:21
  157:2,3
explained 158:19 164:2
explanation 6:18 130:4
exposed 133:19
exposé 128:23
express 128:20,21
expressly 144:20
extra 52:4 60:13 103:14
eye 50:15
eyes 47:21
eyewitness 142:14

**F**

F 182:10
face 144:18
faces 98:20,21
facilities 139:10
facing 98:24
fact 8:22 15:24 16:15 24:17
  26:15 30:22 31:12 37:14
  42:20 45:2,3 48:17 49:2,3,6
  51:12 57:14 63:4 64:13 65:3
  67:9 69:9 77:20 82:24 89:5,7
  89:10 113:4 118:5 133:16
  134:11 142:13,16 143:17,22
  144:5 145:1 149:5 150:4,6,10
  150:11,11,13
facts 22:15 42:20 80:2 133:25
  140:16 142:6,15 147:15
  148:21 151:17 155:18 161:11
  163:14
factual 38:1,7 39:2 142:1
fails 141:6
Fair 6:9 182:7
faith 83:15 86:2,2,4,5,10,1 1 90:5
  131:19 134:8 138:14 156:8,10
  165:10,12,19
fake 67:16
false 22:22 25:23 27:7 29:3,6,12
  29:16 30:10 33:20 34:1,11,11
  34:21 44:3,8,9 45:1,12 46:5
  46:17 98:18 129:23 134:2,5
  143:23 144:21 148:19,25
  149:4 150:3,5,8,16 165:21

falsely 143:17
falsify 26:5
familiar 21:2 56:4
families 47:18 52:2 73:21
family 49:12 54:19,20 56:7
fancy 123:23,23 124:24
far 33:14 105:14 128:6
farce 134:16
Farmer 62:25
favorable 98:18 144:21
fax 1:17,23 64:19 65:2 75:7
  126:15 131:25
faxed 62:10 93:11
faxes 78:3
Fay 20:21 27:12
FBI 129:6,11 130:8
feat 131:20
Featherston 56:7 63:8 71:25
  81:1 99:16
February 6:4 19:5 66:18 68:16
  90:21 97:1 99:11 100:9,14
  101:14 108:2 114:22 115:13
  160:21
Federal 35:17 72:21 104:19
  146:11,14,2 5 148:15 151:5,7
  154:11,16,18,2 3 155:1,6,11,12
  155:16 156:3,12,14,17 159:7
  159:22,24 160:10,18,21 161:8
  161:17,21 162:7,10 163:7,12
  163:24 164:2
FEDERICO 1:10
feel 30:20 96:10
feels 115:21
feet 61:19
felony 143:22 162:6
felt 63:13 69:21 86:23 92:14
Ferguson 21:8 82:15
few 6:5,6 18:15 21:9 43:14,20
  133:6 143:2 158:5 168:19
  173:8
fide 8:8,21 9:5,25 10:5,20 15:22
  134:4,5 138:19 156:9
field 85:9 116:6
fifth 149:8 161:24
fighting 39:13
figure 134:21
figured 85:10
file 12:4,7 81:19 138:12,20,23
filed 37:15 103:13,14,16,16
filibuster 6:1
fill 57:4 61:3 117:12 154:6 157:5
filled 54:8 62:5 69:19 82:10
filling 100:15
filter 128:10
final 5:8 53:21 78:10 102:25
  104:1,9 138:6 140:6,6
finally 45:8 63:11 70:20 76:25
  103:3 107:2 135:13,21
financial 84:21 133:14 146:19
  150:19,19 161:9,12
find 7:25 22:6 23:5 35:20 36:8
  37:7,9 51:5 53:18 69:4 71:11
  74:17 78:12 80:2 91:4 110:13
  120:6 140:16 141:7 148:3
  152:20 154:6,8 157:9 158:11
  158:15,16,1 7 159:8,10,10,13
  159:15 165:7 166:16,24 167:7
  177:19,20
finders 30:21
finding 24:12 38:7 89:18 166:11
findings 39:3
finds 35:16 107:24 114:22,23
  115:13
fine 5:24 7:5,8 26:5 34:15 41:7
  180:16
fingerprint 93:15 100:13
fingerprints 87:9,12 107:16
  109:5,25 110:11 118:18 119:7
  124:8,21

finished 17:13
firearm 18:22
firm 14:2 18:22
firmly 78:19
firms 18:19
first 6:4,14,14 25:14 27:6 35:17
  41:10 42:22,25 43:14,25
  45:18 48:3 51:22 53:22 65:4
  68:14 71:17,18 80:17,19,24
  96:3 97:10 99:9 100:22 101:3
  107:7 109:10 110:4 113:20
  124:23 125:3 147:17 148:23
  151:18 154:10 158:4,9 161:5
  161:12 163:16 174:2,4,7
  178:4 180:13
fishing 83:4
five 43:24 74:3 96:17,18 118:7
  133:7 139:11
five-minute 122:24 127:8
fix 58:25
fixed 84:11 95:14,17 115:17
fixes 124:14
fixing 164:15
flash 180:19
Flemings 13:22
floor 42:2
Florida 1:1,6,16,22 2:3,7 44:18
  54:19,21 182:16
flowed 75:14
fly 115:19
focus 9:16 68:7
focused 29:9
folks 40:25 47:19 49:6,17 51:13
  51:7,7 56:5 60:2 69:1,9 70:16
  70:18 71:25 72:3 74:16,22,23
  77:21 106:11 139:18
follow 28:8 58:11 140:21,22
  177:15 178:17
followed 42:9 55:10 57:5 65:10
  77:20 83:13 151:13
following 4:1 28:9 89:4 91:23
  106:7 147:15 148:21 151:17
  155:18 161:11 163:14
follow-up 11:17,18
fooled 99:3,3,4,17 106:18,18
  107:4,4
foot 61:19
footing 64:14
forbids 47:6 85:24 165:5,7
force 68:10,10 70:2
foregoing 182:11
foreign 162:7
foreman's 103:22
forensic 87:9
forever 124:15
forfeiture 36:22,24,2 5 37:14,15
  37:23 38:19 40:1
forged 28:4
forget 106:2 122:1 144:1
forgot 172:9
form 22:3 56:18 57:2 62:5,8,9
  62:10 83:12 84:1 94:8 97:12
  103:8,23 122:8,9 130:17
  136:24 138:4 140:13 141:2
  145:17 153:22,25 154:9 157:4
  157:5,8 160:3 162:2 177:14
formal 147:10 152:10
formalizing 16:12
formed 165:14
former 48:3
forms 113:9
formula 27:19 135:9
formularies 111:1
formulas 34:13,19 64:12,13
  113:13
formulation 28:25
formulations 28:24,24 30:12
  31:4 34:23 45:23
forth 55:14

fought 112:25
found 36:21 37:23 75:13 106:24
  119:12 147:14 148:20 151:16
  155:17 161:10 162:11 163:13
foundation 30:23
four 4:4,5,6 30:25 39:4 84:9
  110:21 115:18 116:14 149:6
  152:2
fourth 1:16 80:25 161:23
FPR 2:5 182:14
framed 110:10
fraud 20:20,22 22:17,21 23:5,6
  23:7,8,14,1 8 26:5 30:23 31:11
  31:14,22 34:1 36:1,7 37:20
  38:18 43:3,5,23 52:18 70:25
  71:7,9 74:15,17,19 75:13
  86:14 87:13 89:15 94:23 98:5
  116:16 118:21,22 119:10
  122:11 133:12 145:20,21
  146:1,6,7,25,2 5 147:3,3,19,19
  148:10,11,14 153:6,6,19,20
  157:14,20,2 5 158:10,10
  161:16,20 162:9
fraudulent 22:22 33:6,7 34:1
  44:3,8 45:1 86:6,13 135:19,19
  135:20 148:19,25 149:4 150:3
  150:5,9 165:14,17,21
free 53:1 126:8 134:6
Freedom 39:13
Friday 35:13
friend 36:12 48:19 49:12 50:5
  62:25 93:5 135:17
friends 50:21 52:3 73:16 83:23
Frier 18:22
from 4:13 13:19 19:21,22 20:11
  20:20,24 24:19 25:5 27:19
  28:11,13 30:24 32:2 38:8 39:3
  39:4,21 40:18 44:15,18,20,21
  44:22 45:25 47:24 48:14
  49:10,16 51:21 54:2,13 55:5,7
  55:25 58:22 62:2 63:2,25 64:1
  65:6,7 66:7 68:17 69:12,17,22
  69:22 71:19 75:14 77:3,6,19
  79:15 80:14 81:17,22 83:20
  83:24 84:17,19 85:13,16 86:9
  88:9,22 89:6 90:3 93:7 94:18
  95:25 96:14 97:10,25 98:8
  99:23 101:8 102:15 103:4,6
  103:10,11 104:12,12,14 111:4
  111:24 112:18 113:4,7,19
  114:10,11 115:22 116:3,5
  120:23 121:24 123:2 125:17
  126:6,20 127:5,21 128:17
  129:1 130:6,18,20 131:9
  132:6 136:17 137:15,17 138:9
  138:10,11 141:25 143:14,20
  146:5,20 149:19 156:9 161:19
  162:1,5,6,16 167:4,21 168:12
  168:18 169:1 172:24 181:12
  181:13
front 49:24 59:5 60:8,16,17
  61:18 176:18 177:2 178:19
full 30:1 178:2
funded 156:16
funnel 72:11
funnels 72:11
furnishing 154:14,14 155:4,5,15
  155:15,2 5 156:1,11,22 158:22
  159:1
further 19:8 93:25
furtherance 25:3 63:23
Furthermore 127:12
future 67:20 123:21
F.3d 20:18

**G**

G 104:19 105:1
gain 98:17 144:20 150:19
gamble 60:11

game 70:18
Garcia 91:24
Gary 3:4 115:18,19
gather 140:12
gave 6:12 43:18 55:12 90:5
    99:25 100:4 103:9 104:19
    128:16 143:20
general 13:9 14:5 15:10 18:13
    148:1 152:18
generated 46:20 130:25
generates 34:17
gentlemen 19:19 39:24 42:6
    56:8 59:5 61:6 70:14 78:14
    80:4 84:23 86:15 92:22 93:15
    96:13 101:18 102:6 108:8
    109:24 118:12 121:16,20
    122:17 123:1 125:10 130:3,12
    135:16,22 168:1
gets 29:1 32:11,11,12 60:10 67:1
    70:9 95:17 101:8 116:9 117:2
    121:2
getting 50:1 51:14 66:24 69:1
    84:8,13 85:3 89:9,11,14 91:3
    98:1 108:23 130:19 131:5,6
Gilda 2:5 40:15 182:6,14
Ginger 33:9,9,12 48:7,8,9,10
    55:4,7,11 57:3 65:3,4,20 66:4
    66:9,12 67:2,16 68:3,5 71:5
    72:4 74:24 77:18 80:17 87:22
    98:13,15,20 99:2 101:12,13
    106:15 107:7,12 108:3,10
    117:2 129:14 130:7 144:14
Ginger's 67:25 100:15
give 14:14 16:5 17:4 35:21 41:6
    41:12 80:14 87:1 90:23 96:20
    100:10 103:15 108:12 109:4
    109:16 110:2 122:19 123:11
    125:19,20 136:3,5,7,8,12
    137:21 139:5,25 140:5,11,12
    141:3 142:17 145:6,11 146:22
    153:22 165:22 167:17 168:5
    169:5 170:7 172:22 174:10,18
    176:19 178:11 182:2
given 5:6 28:20 30:20 31:9 34:25
    43:16 78:23 145:14 168:18
gives 27:23 58:4 111:16
giving 16:2 89:20
glossy 50:24
gloves 10:5,21
go 7:13,13,25 19:22 20:7,7 28:25
    39:10,12 40:14,15,16,21
    41:21 52:14,15,16 54:16,17
    79:17 85:18 86:8 93:25 95:13
    96:7 98:25 102:10 103:18,20
    103:23,23,24 104:5,7 106:1
    106:15 111:15 112:22 117:12
    117:21 118:14 126:24 128:1
    137:9,13 139:10 160:15
    164:14 167:11 169:8,19
    178:25 179:15 181:2 182:6
goal 41:15 120:25 121:11
goals 148:5 152:22
God 106:22 110:10
goes 10:14 38:15 41:10,11 95:4,5
    95:17 100:25 101:11 160:2,6
    160:8
going 5:3,17 6:7 7:23 9:15 10:9
    10:15 16:2,6,25 18:5 19:24
    20:19,24,25 23:17 24:12 26:7
    26:15,21 32:13 35:13 36:8,18
    36:21 37:8,21,22 38:2,8,11,19
    39:9,16,25 40:14 41:13,24
    43:22 47:18 48:11 53:14
    54:15,17 59:2,4 60:8 66:25
    68:6,22,23,23 69:21,25 70:1
    76:5 78:12 79:18,22 80:1,9,18
    81:16 82:21 83:14 85:19,22
    86:1,2 89:18 97:19,23 98:13
    102:7 108:12,19 110:5 111:5

112:13,21,22 117:19,21
    118:14,20,22 119:19 121:1,3
    121:4,6,6 122:8,12,13 123:2,4
    123:11,13 125:23 128:1
    129:21 130:10,10 133:3,17,17
    134:24 136:4,12 137:5,19
    138:18 139:19 140:2,3,5,12
    141:1 145:11,16,16 146:22
    148:11 151:2 153:20 155:9
    157:1,2,2,10 159:18 160:12
    160:22 161:2,4,5 162:23,24
    163:1,2,2,5 164:16 165:22
    166:20 167:10,25 170:1
    175:10 177:1,16 178:9,15
    179:7,23 180:5,7 181:20
Gold 59:18 60:24 75:5 82:4
    135:10,11
gone 126:12
good 4:2,3 6:20 7:16,18 8:6 12:3
    20:2,13 27:11,23 34:13 36:12
    37:12,13 59:9 62:17 79:10
    86:2,2,4,5,10,1 1 96:10,22
    97:5 98:19 106:14 134:8
    138:14 139:16 143:9 144:22
    156:8,10 163:11,22 164:6,10
    165:10,12,1 9 167:20 168:3,3
    168:9 179:4 180:20 181:17
goodness 27:14
goods 44:15,16 149:19
good-bye 39:18
googled 7:21
gotten 53:1 57:9
Government 1:13 4:9 8:24 9:1
    9:14 19:10,14 20:17,24 27:3
    27:10 29:19 30:20,22 31:6,22
    35:8,20,22,25 37:12 39:16
    40:2,21 41:9,25 43:25 44:25
    45:5 47:14 72:12 80:1,5,20
    81:9,15,17 82:9 83:10 84:3,7
    85:10 86:16,19,21,24 87:6,16
    89:2,12,24 90:9 91:19 92:4,6
    92:13,16,19,24 94:1 97:7,22
    98:14,19 99:1,2,4,17,18 100:6
    101:13,18 103:4,11,16 104:12
    104:14 105:10 106:17,18
    107:19 108:5,7,20 109:4
    110:2,3,19,22 111:19,24
    113:2,19,22 114:9,20,23
    115:3 116:7,17 117:2,4,13
    118:1,7 120:18,23,2,5 121:2,7
    121:7,8,21 122:4 123:7 125:3
    128:5 134:20 137:15 138:9,11
    138:15,16 139:21 140:16,20
    141:5 144:13,22 147:8,12
    149:20,23 150:20 151:7,14
    152:8,12 153:10,12 154:7
    156:17,20,23 158:11 159:9,11
    159:14 162:14 164:7,11,21,22
    165:12 168:18 169:9 170:6
    172:25
Government's 27:13 43:6 49:24
    54:2,18,19,2 1 55:6,24 56:22
    58:19,20 68:1 78:10 80:17
    82:24 83:2,6 88:23 90:5,22
    91:13 95:19 99:12,14,17
    101:22 110:15 117:23 120:13
    123:12 132:9,20,22 134:25
    138:24 141:8,10 173:23 181:9
gphofficialreporter@gmail.com
    2:7 182:17
grams 26:17 32:19 54:10,24
    56:20 58:6,7,23 60:13
grand 78:10
grant 35:18 36:1,7
granted 29:20 103:19
gray 68:17,18,19 115:17 160:14
great 76:22 105:14
greater 113:24 145:9 146:20
greed 78:22

Green 85:1
grief 27:23
gross 162:3
ground 31:14
group 89:14,15 108:12 146:22
Grove 1:14 37:6,11,12,14,17,20
    38:21 40:18
Grow 1:7 8:7,17 10:23 11:16,22
    14:19,21 15:1,7 16:5,13,24,25
    17:4,15,25 18:4 23:17 24:10
    25:11,11,13 28:6,9 29:15 30:2
    30:6 32:9 33:9 34:12 42:17
    43:3 49:13,14,16 54:2,12 55:5
    55:7 56:1 60:12 64:21 65:20
    66:13 72:11 74:23 76:21
    78:24 79:20,23 80:6 81:4,5,6
    81:7,24 82:2,4,10,16,16,17,18
    83:4,12,18 84:12,16,17,18,20
    84:22 85:16 86:10,20 87:18
    87:20 88:3,7,7,16,22 89:4,25
    90:4,5,19,22 91:5,5,14,17
    92:2,17 93:12,17 94:4,9,17,24
    95:4,17,23 96:2,10,14 97:11
    97:11,19 98:5,24 99:3,13,25
    100:2 101:1,4,8,11,11 106:19
    106:22,23 107:2,7,24 108:4
    108:10,16,17,8 109:1,18,19
    110:8,20,24 111:16,17,20
    112:13 113:3,5,6,8,9,11,17,19
    114:2,11,15,22 115:6,20,22,23
    116:9,21 117:7,16 118:2,18
    119:6 120:14,21 121:9,20,25
    122:20 123:8 125:4,6,11,18
    125:24 126:4,7,13 127:14,19
    129:3,16 130:18,20 131:10,11
    131:12,18,22,2 3 132:10,12
    133:10,11,13,21,2 4 134:1,3,5
    134:12,12,22 135:1,4 157:7,9
    160:14 161:10
Grow's 65:16 73:11 79:19 82:3
    85:12 88:21 92:11 93:24
    95:20 96:9 97:9,18 99:6,19
    100:7,8,12,17,1 7 107:13
    108:22 109:22 110:17 111:25
    113:20 114:17,22 128:20
    131:2 132:23
Guerra 22:25 23:15,15
guess 4:19 18:8 34:17 59:9 99:2
    116:13
guesswork 28:2
guidance 141:3
guidelines 36:15 109:12
guilt 4:13 43:13 121:17 141:1,6
    141:9,11 145:2
guilty 25:6,7,8,9,9 31:11 33:16
    35:16,21 36:21 37:23 71:11
    74:18 76:13,17,18 77:10,12
    78:24 80:2 86:10,14 98:21,23
    112:9 118:19 119:13 120:6
    121:19,22 122:13,13,14,14,15
    122:15,16,16,1 6 129:7 140:17
    141:7,18 145:1,18,18 147:14
    148:3,20 151:16 152:20
    153:16 154:1,1,8 155:17
    157:10,10,13,13,18,19,23,23
    158:7,8,11,15,16,1 7 159:4,8
    159:10,11,12,13,14,23,23
    161:10 162:11 163:13 165:25
    166:24,24 167:5,5,7,7 177:19
    177:20,22,23
guy 51:20 90:23 98:7
guys 5:20,22

                    H
half 51:15 58:3 60:10 98:21,22
    102:4 125:3 132:8,9 135:10
half-truth 150:9
Halliburton 1:10 34:5,6 48:15
    48:16,17 63:3,4,6 66:4 69:18

71:6 72:4 74:24 77:18 78:11
    81:14,17 87:23 92:13 93:5
    94:1 97:6 98:15 112:25
    144:14
hallway 20:8,9
handle 18:5
handled 16:6 17:5
hands 78:8 127:22 131:2
handsomely 60:12
handwriting 95:13
hang 105:16 179:11
hanging 179:20
happen 7:24 36:21 39:23 92:2
    127:7,20 130:14 137:5
happened 65:14,15 70:17 99:24
    111:22 125:22 133:4,5,5
happening 66:18 67:9 95:22
happens 36:2,17 83:11 100:25
    101:24 115:16 116:13,14
    148:7 152:24 179:18,19
happy 58:15 67:11 81:18 123:1
harbor 9:25 104:16,25 105:2,11
hard 62:19 104:9
hardly 124:20
hate 128:9 169:14
having 17:10 66:19 95:12 132:4
    132:6
headers 64:19 65:2 75:7
Healing 128:23
health 11:12 14:11 18:25 20:19
    20:22 21:11,16 22:17,21 23:6
    26:4 31:1,11,13,2 1 33:25 35:1
    36:1,7 37:20 38:18 43:8,23
    44:2,11,12 45:9 70:25 71:7,9
    71:15 72:14,15,2 1 74:17
    75:13 77:5 78:20 82:11,13
    85:9 116:6 118:21 119:10,15
    122:11 145:20 146:1,4,6,11
    146:14,25 147:3,19 148:10,11
    148:14,17,18,2 4 149:2,9,11,17
    149:18,20 151:4,20,20 153:6
    153:8,19 154:16,23 155:6,17
    156:3,13,14,15,1 8 157:14,20
    157:25 158:7,10,12 159:2,22
    159:25 160:10,18,21 161:16
    161:20 162:8 163:12,24 164:2
hear 5:16 24:19,20 89:5 110:19
    120:2 123:2,2 128:14 168:13
    172:24 180:23
heard 19:19 20:12 24:18 25:5
    32:20 39:12 44:16,20 48:14
    49:14 53:6,23 55:2 56:16
    57:17,19 59:17 60:2 62:2
    63:24,25 64:1 68:4,18 69:7
    72:5,14 73:8 75:2 77:3,17
    78:15,17 80:14 83:11,20,21
    83:24 85:16 88:2,2,3,3,4,22
    91:2 96:14 99:3 100:25 113:4
    113:5 115:15,20 116:5 119:3
    119:4,5 120:23 123:6,19
    126:6 127:5 128:1,22 129:24
    133:22 156:9 157:12
hearing 38:23 39:1
hearings 136:6,7
hearsay 6:17 15:3
heart 93:4 131:18 147:11 151:12
    152:11
heaviest 67:22
heavily 88:21
heavy 67:15 141:8
heck 57:23 101:1 127:17
held 4:1 106:7 165:13 169:20
hello 102:11,12
help 48:18 62:24
helpful 22:7
helping 126:10
helps 23:2 178:18
her 31:16,24 47:21 48:16,18,18
    50:6,6,7,11,1 1 54:22 57:2,4

60:5 61:21,21,22 62:24 63:3,5
63:6 64:2 65:21 67:3,18,19,20
67:21,23 68:6 69:19,22 81:10
81:16 82:9 91:8,9 92:15,15,16
92:20,20,2 5 93:1 94:2 96:21
96:23,23 99:10,13,21,21,22,22
99:25 100:24 101:15 106:16
106:17,19 107:2,8,10,18
108:6 109:19 110:2 128:23
130:4,6,8,1 1 131:8,18 136:7
**Herald** 137:23 167:16,16
**Herbalife** 92:9
**Heroes** 128:24
**herring** 129:12
**hesitation** 80:11 141:17
**hey** 26:16 28:7,11 52:4 59:1
91:15 100:21 120:17 129:19
181:5
**He'll** 71:2
**hidden** 120:10
**hide** 85:17 97:13,17 111:24
128:17 129:10
**hiding** 23:8 65:3 120:16
**high** 61:19 80:5,12
**higher** 82:4 117:4,6
**highest** 59:15
**highlight** 78:15
**high-level** 8:22
**high-paying** 33:2
**him** 4:25 10:15 17:20 24:12 28:8
35:20 46:25 50:20 54:13,13
57:1,19,25 58:5 59:8 62:20
63:13 64:25 67:4 68:3,15 69:9
69:10,12 70:3 71:11 72:7 75:4
75:4 76:10,21 77:19 81:22,22
81:24 83:3 86:21 87:21,21
94:20 95:19,21 97:16 100:25
106:25 107:4,9,13 108:1
114:3 115:11,18,20 116:23
117:18,24 120:6,16 126:2
127:20,25 128:1,16 129:5,18
129:18,20 130:10,21 132:3,6
133:24 134:3 135:13,18
158:16,17 159:10,10,14 177:5
177:19,20
**himself** 49:13 67:24 69:5 76:23
135:13
**HIPAA** 51:22 131:25 132:1
**hire** 70:3 130:11 134:12
**hired** 70:23 77:21 134:15
**history** 68:12
**hit** 123:14
**hitter** 67:15,22
**Hoang** 25:18,19
**hold** 22:15,20 26:18 33:24 50:15
102:12 105:25,25 140:1
171:14 173:9
**holding** 93:9
**home** 21:16 39:9,10,12 81:20
137:9,13 140:7 167:11,25
169:8 182:6
**honest** 32:16 81:3 92:15 113:25
165:17
**honestly** 165:13,14
**honestly-formed** 86:6
**honestly-held** 86:5
**Honor** 4:3,20 5:2,10,18,2 5 7:11
8:3 9:15 10:7 11:5,24 12:21
15:3 19:8,10,15 20:16 21:3,5
21:9,11,17 22:8 23:4,21 24:5
24:23 25:17,25 26:8,12 27:2
29:22,23 30:3 32:3,24 33:14
34:13,19 35:7 36:5,24 37:6,12
37:15 38:1,14,21 39:5,20,22
40:2,8 42:1 43:15 79:4 102:1
102:5,17 103:5,7,10 104:3,14
104:15 105:7 106:13 121:15
122:23,24 133:8 135:25
137:16,18 138:16 139:1

168:19 169:2 170:19 171:7
172:1,13,18,24 173:2,11,14,16
173:20,23,2 5 174:8,22 175:12
176:16,23 179:22 180:2,5,18
181:1
**HONORABLE** 1:10
**Hopefully** 170:9
**hopes** 98:17 144:20
**hounding** 94:20,21
**hour** 41:18 94:2 102:4 180:17
**hours** 41:19 108:6 110:21
134:14 179:15
**hour's** 78:16
**House** 53:23 54:3 55:25 56:9
**huge** 98:5 115:8
**huh** 27:1
**humanity** 131:19
**hundred** 120:7
**hundreds** 46:12 124:19
**hurdle** 29:14
**husband** 50:7 52:8 54:20 61:21
73:2 96:23
**husbands** 52:4 73:8,16
**husband's** 61:21 64:2 73:6
**hush** 67:11

**I**

**idea** 16:9 66:15 106:23 117:25
181:20
**ideal** 102:24 138:8
**ideas** 62:21
**Identification** 3:17
**identify** 28:25 35:8
**identities** 147:23 152:15
**ignore** 63:1 66:5
**illegal** 69:2 70:14 73:23 93:13,21
131:9
**imagine** 121:3 128:7
**immediately** 40:11 106:25
108:11
**immense** 78:22
**impact** 44:14 149:18
**impartially** 141:13
**important** 35:14 39:14 41:2 45:3
49:2,3,4,6 50:8 75:21 79:12
80:12 85:2,22 93:2 98:4
110:25 115:5 124:18,20
125:22 126:1,3 129:15 135:12
141:17 142:22 143:17 144:5
150:11
**importantly** 21:24
**impossible** 78:16
**impress** 74:4 76:2 143:3
**impressed** 179:4
**impression** 21:5
**impressions** 145:10
**improper** 28:13
**inaccurately** 144:2
**incentive** 76:21
**incentives** 133:14
**incident** 54:15
**incidents** 61:9
**include** 71:5 156:7
**includes** 40:15 141:22 149:14
150:1
**including** 131:23 142:3 155:13
155:13 162:3 163:8,9
**income** 97:14,16
**incompetence** 25:8
**inconvenience** 169:14
**increase** 64:13
**increased** 59:22
**indeed** 57:5
**independence** 91:17
**independent** 8:21 9:3,6 15:15
55:21 66:5 145:7
**independently** 76:12
**indicated** 34:23
**indictment** 61:11,12 71:12,13,15

75:11 77:12 103:18,24 125:24
139:6 140:13,25 145:13,15,16
145:22 147:9,20 150:21 151:1
151:9 152:1,9 153:5,7 154:2
155:22 157:6,11,14,16,20,22
158:2 159:21,24 160:5,17
162:19 163:18 164:19 166:22
167:3
**indifference** 150:7
**indirect** 73:14,15
**indirectly** 73:23 156:6 162:2
**individual** 22:24 94:9 110:9
149:13,14 154:13 155:4,14,25
156:22 159:1
**individuals** 25:7 97:20 102:11
158:22
**induce** 154:20 155:3,24 156:22
158:23,25 163:10,20 164:5,9
**inducement** 93:23
**inducing** 156:24 164:11
**industry** 72:16
**infer** 4:13 94:6 131:9
**inferences** 29:24 30:1,2,19
**influence** 33:15 150:14
**influenced** 140:19 145:8
**information** 29:16 34:12 50:17
51:10 132:1,2,3,4,6,7
**InforMD** 51:7,9 53:8,17 68:12
74:6,7,10 88:4,4,6,7,12,13,14
88:18,20 92:11 94:15,18
126:23
**ingredient** 34:18
**ingredients** 28:25 32:9 34:20
47:3,24 78:1 131:13
**initial** 115:14
**initially** 95:22 123:16
**initials** 157:17,21 158:1
**innocence** 110:18 141:5
**innocent** 121:20,25 122:1 141:4
144:3 152:6
**insane** 89:15
**insider** 46:25 59:17
**insist** 127:15
**insistent** 102:18
**insists** 76:11
**instance** 83:19 86:7 90:11
**instances** 72:25
**instead** 17:10 56:16 126:17
132:7 140:3 153:25
**institution** 146:19
**instruct** 40:10 42:11 71:2 75:19
77:9 98:13,17 136:23 139:4
139:23 151:2
**instructed** 43:21 57:4 76:10
**instruction** 5,6,7 19:22,23 30:4
37:15 41:12 43:15,16,21 45:4
55:5,10,12 65:10 77:21
102:25 103:2 111:16 121:18
136:3,8,12,24 137:4,22 138:4
139:11,20,25 140:5,12,23,24
142:2 144:10 145:11 146:23
159:18 166:19 168:6,17
176:20 178:1 181:25
**insufficient** 31:19
**insurance** 43:8 47:16 78:20
112:8,8,18,2 1 113:14 134:21
156:16
**intake** 56:18 57:2 62:5,8,9 94:8
130:17
**intellectually** 32:16
**intelligent** 4:21 30:19
**intend** 79:20,24 119:8 120:3
**intended** 44:6 45:6,7 64:9 80:6,7
82:12 122:3,6 149:6 150:2
151:10 165:19
**intends** 116:16

**intent** 47:4,6,16 64:16 79:19,22
85:24 86:3,6,13 93:24 114:22
115:6 118:12,13,16,19,25
119:13,16,2 1 120:8 121:11
128:20,2 1 135:23 150:7,10,17
150:18 165:4,7,11,12,14,17
**intention** 16:12
**intentional** 61:7 144:4
**intentionally** 64:8 77:13 81:12
85:21 119:16 165:1 166:6,13
**intently** 42:8
**interest** 76:4 127:3 143:7
**interesting** 104:22
**interests** 148:6 152:23
**internal** 97:18
**interpretation** 142:7
**interstate** 44:13,14 146:18 149:3
149:17,21,22,24,25
**introduce** 6:24
**investigation** 26:1 65:15
**investment** 57:23
**investor** 68:13 69:3 73:25
**invite** 56:4
**invited** 84:2,5
**invoices** 55:25 56:1,5
**invoked** 131:7
**involve** 30:5
**involved** 25:12,13,15 27:11
49:12 60:22 61:2 102:11
116:7 130:5 161:14 162:4,15
**involves** 32:6 65:19 119:2
**involving** 21:16 104:21 143:23
**in-house** 111:7
**iota** 90:1
**ironic** 100:5,8
**irrelevant** 28:1
**IRS** 97:14,16 120:14,15
**Isabel** 23:15,15
**isolated** 54:15
**issue** 7:6,7 11:12 16:6 18:5 21:14
22:19 23:2,12,16 25:10 26:9
27:15 28:23 31:2 33:23 38:1
38:19,20 65:19 79:18,19
94:24 95:21,25 111:13 112:1
114:19,20,20,2 1 115:9,24
128:4 133:20 138:12 142:1
172:21 177:20
**issued** 56:2,25 57:11
**issues** 14:12 29:22 36:10,13 38:6
38:11,13 94:21,22 112:2
**item** 149:13,15 155:5,15 156:1
156:11,23 159:2 163:11,22
164:6,10
**items** 45:10,13 149:9 156:2
163:23
**i.e** 113:14

**J**

**J** 1:13 144:15
**jack** 30:9 45:24 75:5
**jacked** 77:25
**jacking** 23:24
**Jam** 133:3
**James** 56:7 63:8 71:25 81:1
99:16
**jammed** 5:5
**January** 1:7 96:25 99:10,16
100:1,5,11 106:21 114:16
160:18
**jars** 30:17
**JEFFREY** 1:20
**Jennifer** 82:14
**Jill** 49:15,23 50:17 71:20,24
73:15,17 82:20 84:7
**Jim** 129:1,1
**jmarcus@mnrlawfirm.com**
1:24
**job** 63:18,19 70:12 91:9 105:14
175:10

jobs 42:14 93:10
Johnson 91:1,2,2,16
join 77:13 118:25 119:22
joined 147:21 148:2 151:23
   152:19
joins 166:6
JON 1:13
Jonelle 49:14,22 50:1,1,4,10,13
   50:13,17 71:20,23 73:15,17
   83:24 84:8
jon.juenger@usdoj.gov 1:18
Josh 84:11 90:17
Josie 23:11 56:23 62:2 83:8
   127:6 130:15 131:1
Jr 2:6 182:15
judge 1:10 19:17 20:21,21,22
   27:12 42:11,13 43:22 47:8
   71:1 75:19,22,2,4 77:8 80:1,9
   85:19,22 86:1 98:13 100:3
   123:3 153:23 159:7 167:8
   178:22 180:15
judges 42:19 178:20
judgment 20:14 23:19 27:19
   28:1 35:14,19 55:21 86:12
   103:19 165:16
Juenger 1:13 3:5,10 4:3 5:2,10
   5:12,25 6:3,9 7:1,3 8:3,5,18
   9:23 10:18 11:7,10,24 12:23
   15:3 19:10,14 39:19 40:2,4
   42:25 49:23 64:20 77:1 89:17
   110:4 116:23 122:22,23 123:1
   133:8 136:1 138:16,21 139:1
   168:19,25 176:23 177:3,8,12
   181:1,10,15
jump 96:2
June 110:14
junior 62:20
juries 170:9
juror 4:16,20,23,25,25 5 102:19
   105:13
jurors 4:6,7,15 17:11 20:2 26:7
   27:9 30:20,21 31 37:24,25 38:3
   40:10,21 42:14,22 103:15
   105:16 136:23 137:24,25
   139:4,15,22 140:8 145:8
   180:12 181:17
jury 1:9 5:5,7 7:14,15 17:9
   19:22,23 20:10,11 21:22,23
   22:5 23:5,17 26:9 29:21 30:4
   30:19 35:16 36:8 37:9,15 38:7
   38:13,19,22,2,5 39:3,9,15
   40:12,23,24 42:6 43:15,16,21
   43:23,24 45:4 77:7 78:10
   102:15,25 103:18,24,24 104:5
   104:8 106:3,8,9,10 121:18
   136:3,11,17 138:4 139:17,23
   157:8 168:12,17 176:18,21
   181:14
just 6:15 8:11,16 9:4,15,16,25
   10:6 11:12 13:25 29:4 30:10
   32:15,16,24 40:11 42:11
   49:21 50:14 51:12 52:10,21
   53:19 54:15 56:17 58:4 59:14
   60:15 63:22 64:5,24 65:10,11
   66:10 70:2,4,13 71:23 75:11
   75:25 76:17 78:23 79:4 80:22
   84:12,16 90:11 91:15 94:4,11
   94:12 96:11,18 98:7 99:3
   102:20 103:20 104:15 106:15
   106:18 107:4 111:21 112:20
   115:7 116:1 122:14,16,19
   123:23 127:22 133:6 134:3,8
   136:12 138:1,22 139:19
   153:25 157:22 159:4 163:3
   166:14 167:25 169:23 170:11
   170:18 173:15,16 174:4,14,15
   177:22 179:20 181:2,10

K

K 100:15
kate@ kmeyerslaw.com 2:4
Kathryn 2:1,1
keep 67:4,5,11 98:7 109:2,19,20
   130:6 132:6 133:16 143:23
   162:23
keeping 70:12 102:18
keeps 98:1,3 160:12,22
kept 21:20,21 91:3 106:22
KEVIN 1:13
kevin.larsen@usdoj.gov 1:18
key 78:18
kickback 21:9 29:5 36:4 66:11
   75:14 93:14,21 120:2 155:13
   155:21,24 156:5,21,25 163:9
   163:17,20 164:4,8,13 176:24
kickbacks 21:11,12 22:16,18
   23:18,20 29:9 31:2 33:19,23
   34:8,9 59:21 71:15,19,22,22
   72:6,14,25 77:6 92:6,8 115:9
   119:19,24 120:5 125:25 126:2
   146:5,10,13 151:4,20,21
   153:8 154:12,20 155:3 158:7
   158:13,21,23,2,5 159:20,21,24
   160:2,9,16,16,17,20,2,5 161:1
   161:17,21 162:9,24 163:1
kid 73:1
Kim 111:4,6
kind 6:19 8:22,25 16:9 51:10
   63:19 77:15 88:16 144:23
   146:21 147:5,10 152:10 156:7
   162:5
kinds 25:7 36:12 161:9
King 54:20
Klein 60:20 82:14,14
Klitz 84:22
knew 5:3 17:15 47:12 64:10,11
   64:11 65:12,17,1 7 66:16,25
   67:15 69:2,22 72:22 76:14
   81:7 82:3 88:17 100:9 101:16
   131:18,19 135:1,3 147:20
   150:16 151:22 161:14 162:13
   162:15 165:20 166:15
knock 125:9
knocked 125:11
know 6:17,21 7:4,17 8:14 11:2
   13:19 17:6 18:2,7,17,17,19,22
   18:23 19:2,4,23 23:1 25:2
   26:3,6,10 27:8 28:7,16 31:2
   35:1,4 38:5 39:11 40:12 41:6
   43:15 47:9,12 51:22 53:22
   58:10 60:14 65:8,10,11 66:17
   69:25 70:1 75:3,22 77:16
   83:20 84:10,11 85:9 86:22
   87:8,13 88:19 90:1,17 92:19
   93:12,24 94:10,12 95:8 96:4
   99:24 103:13 107:19,19
   109:22 110:5,13,21 113:18,24
   115:6 116:6 118:24 119:21
   120:10,12,1 3 124:17 127:2
   129:21,21 130:14 131:1,8,9
   131:10,11,12,12,13,14,15,16
   131:17,18 132:12,13,15,15
   133:9 134:1,16 135:11,14,15
   135:15 136:19 137:4,13,24
   141:2 148:7 152:24 157:6
   159:5 162:4,5,22 167:19,20
   167:21 169:17 177:9,15
   178:20 179:24 181:4,5,7
   182:2
knowing 22:22 31:20 34:1 61:7
   86:21 99:13 124:16 147:22
   152:14 166:18
knowingly 34:11 44:1 79:23
   80:6 85:20 118:23 119:13,14
   119:25 120:5 122:10,11
   145:19,25 146:3,9,13,17
   147:1 148:15,23 150:25
   151:25 154:11,18 155:2,20

knowledge 29:15 31:18 142:13
known 30:12 34:12 102:19
   124:24 150:16 161:9
knows 33:6 48:23 64:12,14
   67:17 72:17,21 73:23 126:22
   129:3 150:6

L

L 1:20
Labor 182:7
lack 28:21 29:10
ladies 19:19 39:24 42:6 56:8
   59:5 61:6 70:14 78:14 80:4
   84:23 86:15 92:22 93:15
   96:13 101:18 102:6 108:8
   109:24 118:12 121:16,20
   122:17 123:1 125:10 130:3,11
   135:16,22 168:1
lady 56:24 92:14
laid 30:22 61:18
language 104:17 105:12 120:6
lapse 144:3
laptop 181:1,6
Larsen 1:13 3:7 4:17 21:3,8,13
   21:15,20,23 22:1,8,14 23:4,8
   23:13,21 24:2,5,9,20,23 25:13
   25:17,21,25 26:8,12 29:23
   32:3,6 36:5,24 37:3 42:1,2,3,5
   43:19 74:4 79:2,11,15 85:2
   87:4,24 88:5 91:7,14 99:7
   100:18 103:5,12 104:14
   117:15 120:11 121:5 123:15
   123:21 127:25 136:1 137:16
   138:11 169:10,13,22 170:3,14
   170:17,19,21,23,2 5 171:2,4,7
   171:9,11,13,15,17,19,21,24
   172:2,4,6,8,11,1 8 173:2,8,16
   173:18,20,22 174:15,21
   176:16 180:5,8,15
lashed 128:4
last 16:20 22:9 23:1 42:16 47:1
   49:23 53:7 56:23 58:1 68:1,8
   69:14,19,24 71:10 82:12
   103:3,18,21,22 104:17 111:18
   112:6 121:2 123:2,6,13
   136:23 138:6 161:2 166:20
   168:6,18
lasted 138:2
lastly 86:11
late 4:24 70:18 99:10,14 179:16
later 16:16,18 42:12 47:8 71:2
   75:20 81:16 82:22 92:19
   100:9 111:17 118:7 129:5
   167:8
Latin 105:9 125:7,18 156:9,10
laundering 36:2,3 38:12,16
   75:10,11 120:9,11,16,20
   146:16 157:1 161:3,4,6,10
   162:11,18,19,20,2 5 163:4
   164:14 176:25 177:5,17,20,23
Laurene 82:8
law 2:1 4:15 14:2 16:15,19 17:7
   18:19,22 19:24 29:24 41:5,6
   42:12,13 47:6,7 69:23 71:5
   72:12 73:12 85:8,24,25 116:5
   131:22 136:9 139:24 140:21
   140:22,24 141:3 142:2 145:22
   148:9 154:11,18 155:1,11
   162:7 163:7 165:5,6,7,9
   167:8
lawful 144:19
laws 4:7 82:11,13
lawyer 16:9 69:5,24 85:7,9
   115:18 123:2,3 134:9 139:7
   179:9
lawyered 88:21
lawyers 13:4 19:21,23 26:22
   41:2,11 42:10 88:18 116:3

161:8,12 163:16 164:25
knowledge 29:15 31:18 142:13
known 30:12 34:12 102:19
   124:24 150:16 161:9
knows 33:6 48:23 64:12,14
   67:17 72:17,21 73:23 126:22
   129:3 150:6

L

L 1:20
Labor 182:7
lack 28:21 29:10
ladies 19:19 39:24 42:6 56:8
   59:5 61:6 70:14 78:14 80:4
   84:23 86:15 92:22 93:15
   96:13 101:18 102:6 108:8
   109:24 118:12 121:16,20
   122:17 123:1 125:10 130:3,11
   135:16,22 168:1
lady 56:24 92:14
laid 30:22 61:18
language 104:17 105:12 120:6
lapse 144:3
laptop 181:1,6
Larsen 1:13 3:7 4:17 21:3,8,13
   21:15,20,23 22:1,8,14 23:4,8
   23:13,21 24:2,5,9,20,23 25:13
   25:17,21,25 26:8,12 29:23
   32:3,6 36:5,24 37:3 42:1,2,3,5
   43:19 74:4 79:2,11,15 85:2
   87:4,24 88:5 91:7,14 99:7
   100:18 103:5,12 104:14
   117:15 120:11 121:5 123:15
   123:21 127:25 136:1 137:16
   138:11 169:10,13,22 170:3,14
   170:17,19,21,23,2 5 171:2,4,7
   171:9,11,13,15,17,19,21,24
   172:2,4,6,8,11,1 8 173:2,8,16
   173:18,20,22 174:15,21
   176:16 180:5,8,15
lashed 128:4
last 16:20 22:9 23:1 42:16 47:1
   49:23 53:7 56:23 58:1 68:1,8
   69:14,19,24 71:10 82:12
   103:3,18,21,22 104:17 111:18
   112:6 121:2 123:2,6,13
   136:23 138:6 161:2 166:20
   168:6,18
lasted 138:2
lastly 86:11
late 4:24 70:18 99:10,14 179:16
later 16:16,18 42:12 47:8 71:2
   75:20 81:16 82:22 92:19
   100:9 111:17 118:7 129:5
   167:8
Latin 105:9 125:7,18 156:9,10
laundering 36:2,3 38:12,16
   75:10,11 120:9,11,16,20
   146:16 157:1 161:3,4,6,10
   162:11,18,19,20,2 5 163:4
   164:14 176:25 177:5,17,20,23
Laurene 82:8
law 2:1 4:15 14:2 16:15,19 17:7
   18:19,22 19:24 29:24 41:5,6
   42:12,13 47:6,7 69:23 71:5
   72:12 73:12 85:8,24,25 116:5
   131:22 136:9 139:24 140:21
   140:22,24 141:3 142:2 145:22
   148:9 154:11,18 155:1,11
   162:7 163:7 165:5,6,7,9
   167:8
lawful 144:19
laws 4:7 82:11,13
lawyer 16:9 69:5,24 85:7,9
   115:18 123:2,3 134:9 139:7
   179:9
lawyered 88:21
lawyers 13:4 19:21,23 26:22
   41:2,11 42:10 88:18 116:3

133:20 141:24 178:23
Lay 25:9 33:9,9 34:3 48:7,8,9,10
   55:4,7,11 57:3 65:3,4,12,20
   66:4,9,12 67:2,16 71:5 72:4
   74:24 77:18 80:17,18,22 81:3
   87:22 98:13,15,20 99:2 100:4
   100:10 101:1,8,12,13 106:16
   108:3,5,10,25 109:4,6 117:2
   120:23 129:14 144:14
Lay's 33:12 80:20 106:15,23
   107:7,12
lazy 88:16
leading 10:7,8
learn 79:22
learned 68:16 88:12,13,14,16
   90:3 93:6
learns 98:8 107:7
least 4:17,21,22 60:25 105:19
   114:3 127:5 148:2 151:25
   152:19 159:10
leave 20:7,8 102:20 127:9
   166:20 180:10
leaves 53:17 74:10
lectern 5:15 17:8 20:25 173:12
led 23:25 60:24
left 8:6 83:10 122:25 160:6
legal 4:22 12:8 14:11 15:12,21
   15:25 30:23 38:11,13 73:4
   83:20,22 88:24 133:25 134:1
   134:7 142:17
legitimate 26:6 46:13 66:13
   162:13
legs 179:9
length 5:5 77:16
less 19:24 40:8 110:7,8 137:7
   179:5
lesser 144:17
let 6:7 13:25 16:10 35:8 72:1
   77:8 80:18 87:21 98:7 99:4
   102:9 117:16 118:10 126:14
   129:20,22 133:16 137:6 153:2
Letkemann 62:14 71:24 80:25
letter 11:2,4 12:20 13:23 70:9,13
letterhead 14:2
let's 7:12,13 36:7 37:8 40:21
   45:14 46:3 47:22 49:1,20 50:3
   52:19 53:22 56:14 61:8 64:7
   64:16 66:9,18 70:16 78:9 88:1
   88:6,10 92:12 99:9 100:12
   107:5 113:24,25 114:19 115:5
   115:24 124:23,25,25 133:23
level 9:1,8,11 36:10
Levitt 18:22
liability 129:4
liable 133:19
liar 67:21 109:24 110:11
lie 33:11 46:4,5,12,15 76:7,20,21
   79:13,16 80:21 82:6 87:5,25
   90:25 91:13 93:3 96:24 97:7
   99:7,9 100:23 101:7,21
   107:18,21 109:24 110:1,6
   121:4 123:18,20 124:1,3,4
lied 43:4 76:15 80:23 99:5,5,6,8
   110:6
lies 31:3 44:9 45:11 46:3 49:3,3
   49:4,4 80:4 101:15
life 122:6,20
light 57:14
like 4:17 6:1,20 9:1 10:22 14:10
   15:17 22:18 25:14 29:15 30:8
   31:3 33:21,23 36:9,11 52:10
   55:11 59:7 60:6,13 63:20 64:4
   65:6,15 66:3,21,24 67:16 69:4
   69:21 70:10,13 71:20,23 72:3
   72:7,19 77:2,14 81:12,18 84:1
   84:2 85:12,13,14 86:23 87:8,9
   87:9,21 92:7,9,15,18 94:4
   97:6,16 99:3 103:15 104:4
   105:10,12 106:18 107:4,11

110:10 112:4,20 116:10 122:1
122:2 129:8,14 130:22 131:13
168:22 169:11 180:22
liked 46:10 82:23 112:3
likelihood 65:24
likely 126:21 127:12
likes 57:25 105:10,11
limited 114:2 142:3
limiting 6:12,22
line 3:18,18 43:9 52:12 55:14
63:21 73:20 87:2 96:6,7
114:10,12
lines 22:13
linked 36:3,22 37:17 38:18
Lisa 84:22
list 50:13 103:13,16,17,2,4 104:1
104:1 109:11 138:24 172:19
178:10,13,18
listed 34:18,20
listen 91:14 99:6 120:21 128:18
129:9 167:24
listened 42:8 134:11
lists 34:16 169:16,17
literature 88:17
little 30:16 40:6 47:23 51:3 52:4
56:15 60:7 75:18,20 81:16
82:2,21 83:18,19 90:2,9 94:15
97:6 98:12 106:16 111:2
113:17 114:19 128:14 136:7
154:5 157:4 158:20 168:1,7
169:21 172:15 179:5,13
lives 75:24 115:20
living 53:1
LLP 1:21
lo 129:2
long 25:19,19 40:3 61:19 82:8
83:14 98:25 122:9 128:11
130:22 168:6,7 178:19
longer 40:6 102:2 107:10 157:12
look 5:8,14 17:9 27:1 31:5 34:15
35:15,23 51:4 54:11 56:5,22
65:6 66:13,13 68:3 78:9 82:24
87:10,12,14,14,15,1 6 88:16
90:16 99:11 100:12 101:19
104:23 106:19 107:5,6,17
108:9 110:16 111:10 113:11
116:18 120:13,19,19 121:1,7
124:19 125:16,24,25 128:24
129:3 130:21 132:21,23,24,25
134:25 135:4,6 158:1,2 178:5
looked 51:4 57:6 111:3
looks 17:9 111:20 169:11
lose 33:5
loses 22:25 122:5
loss 150:19
lost 66:2 67:8 106:2
lot 28:2 42:10 60:6,19,25 66:1
80:20 81:15 82:5 83:25 84:23
88:8 92:6 112:25 118:14,15
120:22,24 125:9 134:19 135:1
135:11 168:2 178:16
lotion 62:18
loud 87:19
Louisiana 51:6,10 53:9 68:13
74:7
love 82:25 105:19
Lozada 47:1 59:17,22 82:1,1
113:16 114:9
luckily 80:21 100:7
lucky 42:23
lunch 102:10 179:15,15
luncheon 106:5
lunchtime 179:8
lying 76:9,18 110:6 130:10

M

M 1:13
machine 89:17
made 15:1 16:11 27:18 38:15

46:24 52:7 54:25 55:13,13
67:24 68:24 71:8 75:16 84:22
84:23 88:5,7,8 97:21 98:14
101:16 105:6 107:21 114:4
120:18,22,4 122:2 125:2
128:16 144:13 147:10 149:15
150:10 152:10 154:15,22
155:5 156:3,6,12 163:24
167:17 177:1,3
main 96:15 125:2
majority 72:25
make 8:13 12:7 13:7 33:19 36:18
38:4,7 39:25 40:5 46:2 48:9
52:4,24 53:3 55:12 58:15 60:8
64:22 65:13 76:12 84:7 89:16
91:16 96:4,23 97:13,14 98:18
111:8,15,17 112:9 118:11
120:21 121:9,10,18 125:9
127:1 133:6,7,13,15 134:3
142:9 144:21 145:23 159:17
169:25 178:5 180:5
makes 7:6 17:10 36:14 96:10
97:15 100:11 130:2 156:6,7
154:11,18 155:1,12 157:3,16
163:1,7 177:13
making 22:22 34:1 46:21 52:16
53:12,13,16 66:12 68:5 94:4
94:11 95:12 107:1 109:2
113:20 117:8 121:16 123:24
126:22 130:9 131:16 142:23
147:11 151:12 152:11 165:20
man 43:4,7 57:13 73:4 78:20
83:7 122:5 125:8 129:9
132:14
management 86:12 165:16
managers 28:11
manipulated 30:13 31:4 32:25
manipulating 32:9
manner 147:17
manufactured 31:10,18
many 5:9 48:23 57:11 89:24
116:23 122:9 132:24 133:3
154:4 170:10
March 66:19 108:4,18,23 109:7
109:9
Marcus 1:20,21 3:6 4:20 6:3 7:8
9:15 10:7,11 11:5 12:2,21,25
13:2 15:6 17:12 19:20 20:15,16
26:20 27:2,16,25 28:19 33:14
33:18,22 34:6 36:16 37:25
38:6,11 39:2,10,22 40:8 103:7
103:10 104:15 105:4,7 136:2
177:4,9
marine 62:15,20
mark 172:15
Marked 3:17
market 50:6 75:5 92:9
marketed 51:11 74:7 76:23
121:10,10 134:2
marketer 15:2,8 17:15 34:7 65:7
69:4 85:6 92:8 94:9 97:1,2,2,4
97:11 127:19
marketers 15:11 72:4 83:23 84:6
84:14 88:18 89:18 90:12
112:13,23
marketing 8:20,24 9:14 10:25
14:13 49:16 51:24,25 88:19
112:23 114:7 117:9
markup 101:16 107:23
Marlins 124:13,17
married 53:11
massive 121:22
mastermind 78:4 92:18
match 154:2 160:6
material 45:2,2 49:2 149:5 150:4
150:5,10,11,13
materiality 49:1
math 60:24 89:12
Matt 24:18,19,20,2 4 68:17,17,18

74:25 75:1,3,6,8 77:2,14 95:1
95:19,21,24 114:10,11 116:1
matter 42:15 67:24 89:24 98:6
142:25 150:14 162:13 177:8
177:10 182:12
matters 131:24 142:7
Matthew 14:18 91:6 100:14
maximize 47:3,24
maximum 137:11
may 8:2 18:17,17 25:6,7 26:1
27:25 28:6 35:16,18 38:21
42:5 43:15,16 46:10 68:2,7
70:18 81:10 91:12 93:4 97:4
98:4,18 106:12 114:15 122:1
122:2,23,24 123:21 124:16
125:5 128:7 129:24,24 133:18
136:19 139:18 140:23 142:5,8
142:17,23 143:21 144:4,21,23
147:22 149:15 150:8 152:6,14
156:3,12 163:24 165:9 166:2
166:3 167:15,20 180:13
maybe 17:11 35:13 48:3 57:19
61:18,19 67:8 87:19 97:5,5
101:22 102:4 105:12 108:11
136:24 137:14 169:22 177:6
MD 56:15 57:5,7,14
meal 56:15
mean 9:9 17:6 18:2,7 23:14 35:6
76:18 97:21 100:2 112:9
123:25 124:8,22 127:19 138:7
142:20 143:24 159:3 160:4
171:5
meaning 69:15
means 9:25 20:5 36:20 44:3,14
45:7 47:5 61:10 64:9 65:1
85:20,23 92:19 99:15 120:1
126:8 137:8 148:19,25 149:11
150:17 156:9 162:1,8 164:25
165:3
meant 45:7 66:1 67:22 125:5
135:3 160:4
medical 27:18 28:1,22 29:10
34:10,25 52:13 53:1 55:21
72:16 149:12,14
medically 28:20 29:7 30:9
Medicare 22:23 31:2,10 34:2
68:13,14 72:19 73:24
medication 29:1 31:9,10,15,18
31:18 61:20 89:19,20,22,23
130:19 158:25
medications 31:7 44:17,18 45:13
45:19,22 46:6,11 48:22 49:7,9
49:17 53:15 66:8 78:1 91:3,4
154:15,22 158:23
medicine 52:13,17 84:13 117:10
127:10
medicines 84:9 94:9
Medina 20:18 21:17 22:9 23:14
23:16 27:2,10 29:4,15,19,19
31:5,6,17 33:13,18 35:10
Medina's 31:14,20,23,25
meet 115:20
meeting 8:8 9:22 14:17 68:20
115:21,23 134:24
member 30:3 49:13 147:6,7
members 24:17 139:23 147:9,10
151:8 152:9,10
memorialize 124:11
memorializes 124:14
memories 145:10
memory 96:21 97:5 143:9 144:3
145:5
men 47:17 78:22
mention 35:23
mentioned 23:1 35:13 39:7
42:11 71:23 72:24
mentions 133:10
mere 30:13 86:14
merely 69:1 73:25 77:24 148:4

152:21 166:17
MERIDA 41:18
message 48:7 90:21 109:5,8
110:12 114:13,23 116:12
messages 72:23 87:6,7,15 99:22
99:25 100:4,7,8,11,12 106:17
106:20,22 107:20 108:3 110:2
110:3,5 116:11
met 47:4 127:17
Metrorail 168:2
Meyers 2:1,1 104:3 136:2 172:1
172:13,23,24 173:2,5,7,11,14
174:6,8,11,13,15,19,22,24
175:1,3,5,7,12,15,17,19,21,23
175:25 176:2,4,6,8,10,12,15
180:2,18,22
MG 54:11
MGTEN 51:25 54:4 88:8 120:19
Miami 1:2,6,16,22 2:3,6,7
137:23 167:15,16 182:16,16
Michael 83:17 98:9
microphone 173:10,13
middle 90:21 91:12 179:16
might 8:14 10:12 128:12 169:23
173:7
Mike 63:11
military 43:8 48:4,4 52:2 53:2
63:16
military's 47:17
millimeter 30:16 34:16
million 60:25 67:23,24 68:3,6
120:18 130:7 132:15
millionaire 88:8,10
millions 43:9 52:7 67:19,23
68:24 77:6 128:8
mind 6:16 32:21 50:7 111:25
127:3 143:24
minimum 137:11
minor 147:25 152:17
minute 40:17 49:2 51:21 55:19
64:17 70:4
minutes 40:4 43:14,20 71:10
74:3 92:16 93:17 101:25
102:2 111:16 118:7 121:14
122:25 123:13,13 133:7 136:4
136:14 139:11 158:5
miraculously 106:21
mischaracterization 26:20,22
26:23
misdemeanor 103:20
misnumbered 182:1
mispronounced 144:15
missed 24:22 105:9 169:23
missing 4:4,5,5,16,2 0 32:16,17
32:17,18,18
misstated 144:2
misstatement 144:5
mistake 84:10,10,12 85:21 86:12
86:14 105:6 143:24 164:15
165:1,15 169:25 177:1,3
mistaken 86:7 115:2 165:15
Monday 102:20
monetary 146:18 162:16
money 32:18,19 33:5 36:2,3,4
38:8,12,15 39:14 43:4 44:7,15
44:20,20 46:1,15 52:4,5,16,17
53:13,16 55:13,13,13 59:20
59:25 60:8,25 62:19 63:17
66:2 67:11,11 69:21 73:9
75:10,11,11,12,1 4 84:22,24
88:6,9 97:21 98:6 112:7,19
114:5 120:9,10,11,12,14,21,22
120:24 121:9,10,16,18 122:2
125:20 127:1 130:6,6 134:19
146:15 148:17 149:19 150:2
154:20 157:1 160:2,11,24
161:3,4,5,9,14,1 9 162:4,6,11
162:12,18,19,20,20,21,25
163:3 164:14 176:24 177:5,17

177:20,23 179:2,3,18
**Monte** 33:9
**month** 16:18 62:13
**months** 16:16 18:15 58:9,9,13
58:13 67:14,24 114:24 128:10
128:21 129:4,17
**Monty** 1:7 14:19 42:17 43:3
49:13,14,16 54:2,12 55:5,7
56:1 65:16,20 66:13 68:5
72:11 76:21 78:24 81:4,5,6,7
82:2 85:12,16 86:20 87:18,20
95:3 106:19 107:13 108:4
114:11 121:25 127:19 133:11
157:7,9
**more** 6:17 19:23 21:24 35:15
39:14,24 50:16 59:20,20 60:7
64:4 71:3 73:19,19 80:15
81:16 83:1 85:18 88:9 92:12
97:21 98:17,21,22,24 108:12
111:21 114:4,4 126:21 127:12
131:17 133:6 137:7 144:11,20
144:25 147:4,17 151:18
161:23 163:1 181:21
**Moreno** 1:10 42:11 43:22 47:8
75:19
**morning** 4:2,3 7:16,18 8:6 12:3
37:12,13 79:10 103:4 133:22
133:24 136:25 138:5,8 139:5
140:9,14,15 153:23 168:3,4
168:10 169:7 176:19 178:11
181:17 182:2
**most** 55:13 63:16 69:14 76:21
79:12 80:11 93:2 116:22,24
127:17 129:15 132:25 133:5
141:17 154:4
**motion** 23:19 35:14 62:21
**motive** 76:7,20 79:13,16 80:21
82:6 87:5,25 90:25 91:13 93:3
96:24 99:7 100:23 110:1
121:4 123:18,20 124:1
**motives** 124:2,3
**mouth** 55:2
**move** 67:12,13 79:21 130:3
178:3,3,7,7,7
**moved** 44:18 84:13
**movement** 44:15 149:18
**moves** 80:16
**movie** 111:22
**moving** 20:14 84:19
**much** 4:7 19:25 32:22,23 40:13
46:2 55:21 58:7 59:4,25 60:8
68:3 70:3,5,7 79:6 102:2
116:10 122:2 134:13,16
**multi-object** 21:15,18,21
**multi-objective** 32:1
**multi-year** 35:6
**must** 24:22 43:25 44:1,10,13
45:8,11 71:10 79:25 89:15
118:23,24,25 119:13,13,16,21
119:25 139:24 140:15,17,18
140:21,22 141:5,7,21 142:19
142:20 144:2,11 145:5,6,7
150:24 153:16 156:23 157:8
158:18 162:14 164:11 165:6
165:12 166:16,23,25 167:6
175:8
**myself** 42:9 123:10 179:4
**mysteriously** 99:24

**N**

**naive** 74:5
**name** 25:21 37:10 51:7,25 65:16
70:19 93:8 95:12 126:15
128:22 129:2 131:8,25 132:2
157:15
**named** 22:24 25:18 147:9 152:9
**names** 56:4 147:23 152:15
**nationwide** 128:23
**natural** 150:13

**naturally** 144:1
**nature** 150:21 162:14
**nauseous** 115:7,9,10
**Navy** 63:11
**near** 53:2
**nearly** 85:5
**necessarily** 142:25 160:6 179:5
**necessary** 29:7 32:20 80:2 81:24
138:17 140:16
**necessity** 28:22 29:10 34:25
**neck** 72:11
**need** 6:21 8:13 20:17 24:13,14
24:14,15 26:16 30:7 37:25
38:3 39:2 41:5 45:20,22 46:9
46:11,13,18 47:9,14,19,19
48:19,22 49:8 52:8,9,9,14
55:17 61:13,16 62:16,25 63:9
66:8 70:21 73:22 74:11 75:12
81:19,25 89:20 91:23 94:10
94:12 95:6,9 96:3,4 98:7
111:5 112:10 115:25 133:23
134:17,18 136:11 138:19,23
139:7,8 149:20,23 159:12
165:8 172:24 174:14,17
178:10 179:9 180:12,23
**needed** 46:6 49:19 52:5,21,23
56:10,11 57:15 59:14 82:23
83:25 89:19,22 112:3,10
**needs** 40:14 92:2 94:9 98:2
115:2 126:11 169:4
**Neiman** 1:21
**neither** 58:23 93:8
**nervous** 11:12 129:9,10
**neuropathy** 117:9
**never** 11:22 14:21 28:10,10 36:9
51:20 58:14 66:14,14 68:7
69:20 81:4,4,5,11,24 83:7
84:13 90:14 108:5,6 117:17
122:3 125:21 133:24 134:2,4
137:4 167:6 181:7
**new** 32:22 58:8,8 74:10,12 91:9
109:12 111:1 113:5 130:11
178:10
**news** 66:23 129:2 134:24 135:2
135:3,4 137:24 167:19,21,22
**newspaper** 167:14
**next** 14:17 41:11 48:11 59:2
79:21,25 81:9,14,21 82:1,8,14
82:20 83:2,8 98:23 101:24
131:20 137:5 170:9,22 172:17
174:18,20
**nice** 92:14 123:20,20 124:1
169:7
**nicely** 123:5
**Nichole** 64:1 72:7,8 81:9,13
127:6 131:7
**night** 18:1 22:9 104:17 169:18
**nightmare** 110:9,9 121:25
**nine** 110:14
**nits** 168:19
**nobody** 7:23 8:1 108:23 181:5,6
**noise** 125:9
**none** 34:3 85:5 90:12,12 138:9,9
138:11
**nonetheless** 38:25
**nonsense** 127:19 130:11
**normally** 94:21 144:18
**North** 2:6 182:16
**Northeast** 1:16
**Northwestern** 85:8 116:5
**note** 105:14 128:18 179:19
**notebooks** 136:11
**notes** 145:3,5,6,8,9 169:22
**nothing** 6:15 7:23 19:8 29:3
50:16 55:20 59:1 63:14 69:16
82:16 85:17 92:10 96:11
100:10 112:24 113:7,8,9
115:3,4 129:10 160:13 179:20
**notice** 106:20

**November** 159:22,25
**number** 1:3 3:19 13:1 44:24,25
45:5 46:4,5,12,15 47:4 51:9
51:14 53:25 55:6 60:21 71:22
72:2 78:11 83:5,5 96:9,10
126:16 127:9 131:25 138:14
142:24 145:14 157:7 160:1,4
160:5 170:7,11,18,22 174:10
174:18,18,20
**numbers** 145:22 172:22 178:13
116:11,14,16 179:17
**nurse** 132:5
**nurses** 28:14
**nutshell** 43:5 61:4 77:9

**O**

**oath** 76:16
**object** 9:15 148:12 152:4,7
154:10,17,25 158:19 159:5
**objection** 4:19 10:7,10,16 11:5
12:23 15:3 26:23 168:25
172:14
**objections** 7:8 103:2 138:5
168:16,24
**objectives** 31:25
**objects** 22:4 119:20 153:14,17
153:21 154:7 155:8 158:14,16
158:17,19 159:15
**observe** 143:10
**observed** 75:23
**obtained** 162:3,16
**obvious** 131:5
**obviously** 22:6 26:10 35:21
36:14 131:1 140:7 177:19
178:10
**occasion** 55:3 148:2 152:19
**occasionally** 108:21
**occasions** 117:18
**occurred** 164:21
**occurring** 66:22
**Ocean** 22:16
**off** 8:6 10:5,21 28:8 40:15 54:1
60:12 67:24 70:21 117:11
126:16 131:25 140:1 169:21
173:21
**offense** 145:1 147:15 148:21
155:18 156:19 163:13 164:3
**offenses** 123:8
**offer** 12:21 50:11 70:9,13 126:21
151:20 154:19 155:2 158:23
158:25 163:8
**offered** 24:25 146:13 163:17,19
164:4
**offering** 164:8,12
**offers** 31:22
**office** 1:14,15 2:1 53:9
**officer** 5:18,40:23 102:14 104:19
136:16 139:14 168:11,14
176:21
**offices** 74:11
**Official** 2:5 182:15
**often** 55:18
**oh** 5:3 8:16 11:21 13:25 16:21
51:9 127:18 131:3 153:23
174:24 181:13
**okay** 5:13,15,19,22,23,2 4 7:3,6
7:20,20 8:2,25 9:20,24 11:24
12:18 13:12,22 14:17 15:1,14
16:22 17:8 18:12,19 19:2,7
20:6,9,12,14 21:7 22:3,14
24:1,22 32:2,17 33:11 36:17
36:19 37:5,19 38:17 39:21,23
40:3,5,9 41:20 63:6 65:22
68:22 69:7 73:3 83:14 96:5
102:22 103:8,13 104:4 105:4
106:11 115:6,7,24 117:25
118:5 136:14 139:7,12,15,25
141:3 153:23 164:14,18

**168:16** 169:3,6 170:3,16,16
170:21 171:2,15 172:2,6,17
172:20 174:1 176:17 178:10
179:24 180:4,11 181:15 182:3
**old** 51:18
**omissions** 168:17
**onboarding** 115:25 116:1,4,8,8
116:14
**once** 6:11 10:4,20 39:9 139:4
152:8
**one** 4:5,23 6:14,16 9:7 11:17
13:6 19:21 20:4 25:18 27:17
27:19 30:16 33:10 34:6,18
36:7 39:24 41:10 42:6 44:10
44:15 46:7 47:25 48:8 55:4
56:6 57:3 58:23 62:15 66:6,10
66:10 67:15 69:22 72:20
74:10,15,21 75:6 76:2,10 77:2
79:18 82:3,22 83:5 84:11 85:6
86:16 89:6,7,8 90:1,2,11,18
92:25 96:18 97:10,18 98:10
99:12 109:3,10 110:21,24
117:14 118:2 119:3,4,5
121:11,23 122:2,4,12,19
125:2,15 128:19 129:15,15,25
131:24 134:22 135:8,11,15,18
139:7 140:1 143:3 148:2,8
149:19 150:25 151:3,3,24,25
152:5,19,25 153:14 155:20
156:24 157:5 158:16,18
159:10 164:11 166:20,25
171:6 179:9 180:13
**one's** 178:9
**ones** 35:24 122:15 140:6 169:20
170:6,11 172:18 173:15,17
**one-line** 146:21 158:20
**one-millimeter** 60:3
**ongoing** 25:25
**only** 6:21 9:19 21:12 27:16,21
30:13,14 38:18 41:22 47:3,14
50:9 55:20 57:24 59:24 61:14
61:19 62:18 63:9 69:18 70:19
70:22 71:7,11 78:23 84:4
88:20 89:7 90:4 99:25 100:4
104:15 107:1,23 110:7 111:18
111:19 114:6 116:25 117:8,8
117:10 122:13,16,19 123:11
123:13 124:3,4,19 126:9
128:14 131:5,24 133:1 138:2
138:12 139:7 140:18 141:10
141:21 145:5 147:15,25
148:21 149:20 151:16 152:17
155:18 156:23 161:10 163:13
164:11,22 167:2,12 169:19
172:18 175:12 178:14
**open** 73:17 97:9
**opened** 12:4 30:16
**opening** 12:7 43:1 92:7 110:19
123:5
**opening/close** 123:5
**operate** 90:4
**operating** 10:25 14:18
**opinion** 10:12 11:2,4 27:25 86:7
133:25 134:1,7 142:1 165:13
165:15
**opponent** 178:12
**opportunity** 35:21 42:22 143:10
145:4
**opposed** 160:23
**opposite** 89:5,8,10 96:12,22
97:13
**optimistic** 41:16
**order** 45:19 59:12 98:19 118:22
119:12 120:6 126:25 133:13
138:12 141:3 144:22 154:21
154:21 155:24 158:15 159:10
160:6 162:23 163:3,10,20,20
164:4,5,9,10 170:8 177:11,14
177:16

**ordered** 48:5 61:19 62:3,18
**ordering** 163:11,21 164:6
**orders** 48:2,25 49:22 67:7
**ordinarily** 124:21 166:2
**organized** 123:6 137:12
**original** 111:12 114:13
**originally** 111:14
**originate** 32:7
**Orthopedics** 68:12 72:16
**other** 4:25 6:20 9:21 11:11 18:2
  18:18,19 19:22 27:19 31:23
  32:22 35:23,24 42:9,22 45:24
  50:19,20 51:1 52:15 56:15
  59:19 63:24 64:15 72:6 74:14
  76:19 77:3 78:19,22 82:9
  104:6 106:2 107:20 113:2
  114:6 122:15 132:8,9 134:9
  134:22 136:6 137:23 143:14
  143:15,18 144:9,25 145:2,8
  145:22 147:5,7,24 152:16
  158:6,13 159:6 160:13 166:8
  166:10,16,19,25 167:20 169:5
  169:18 178:20
**others** 8:7 45:19 63:24 71:22
  76:5 77:2,5 108:15,17 144:12
  145:20 146:4,6 165:19 166:4
  177:24
**otherwise** 11:19 156:16 178:16
**out** 5:4,19,21 7:25 20:7 24:12
  33:1 36:8 37:7,9 39:4 43:8
  44:7 48:19 50:22 51:5 53:5
  55:2 57:4,20,21 59:2 61:18
  62:5,24 63:10 64:18,19 65:2,5
  67:12 69:5,19 73:17 77:24
  78:3,12 82:10 83:10,13 84:9
  85:11 86:18 89:18,18 91:4,23
  95:12 96:8,20 97:9 103:21,23
  106:24 107:24 110:13 112:5,7
  112:19 114:22,24 115:13
  120:7 125:15 126:24 128:4
  130:9 131:15,21,24 132:1
  133:3 134:21,25 136:8 138:23
  140:23 147:2,13 150:2,25
  151:7,10,15 152:3,13 157:5
  167:17 170:12 171:13,17,21
  171:23,24 172:10,16 174:12
  175:16,24 176:1,5,11,13
  180:6
**outcome** 53:20 76:4 143:7
**outset** 80:19 117:16
**outside** 15:1,7,11 17:15 18:19
  34:6 106:7 167:23 174:8
**over** 7:16 8:24 16:25 17:20
  19:23 29:24,24 33:15 35:18
  43:11,21 44:19 46:7,7 48:10
  53:7 57:21 58:18 67:23,24
  69:14,20 75:16,23 78:16
  84:14,19 87:19 88:7 92:11
  100:10 106:16,17 108:5 110:22
  113:12 123:6,12 128:1 129:16
  129:25 145:6
**overcome** 76:24
**overlap** 88:15
**overnight** 137:21
**overpaying** 60:24
**overrule** 10:10,16
**overruled** 15:4 26:24
**overt** 73:16 151:9,13,2 5 152:2,5
**overtly** 156:6
**overview** 80:15
**own** 29:2 33:3 43:9 48:6 49:22
  49:25 50:11 53:18 55:2 58:1,3
  58:20 59:4 69:5 78:18 80:12
  82:24 84:8,13 96:14,16 97:15
  112:25 126:12,24 141:17
  142:6,6
**owned** 148:18
**owner** 69:4
**owners** 28:11

**O'Hara** 58:21

**P**

**PA** 93:6,6
**packaged** 30:15 59:25
**packaging** 30:13 113:5,20
**packet** 70:10,13
**packing** 5:22 68:19
**pads** 91:13
**page** 3:2,18,18 103:22 136:23
  160:3,22 164:17
**pages** 5:13 103:4 104:21 122:9
  164:17 168:18 181:25
**paid** 8:21 9:2 10:1 15:20 30:11
  33:8 44:20 45:13,18,20 46:20
  48:5,17 49:18,20,22 50:1,13
  50:18,19,20 52:5,13 53:20
  55:22 56:9 57:9,18,22 59:4,20
  59:25 60:12 61:10,14,15,20
  61:21,22,24 62:3,19 63:5,9,10
  63:13,14 64:2 66:24 67:23
  69:1 72:3,6,8,18 73:21,21
  74:22 78:4,5,6,7 84:8,13 85:3
  85:5 88:25 89:4,6,9,11,25,25
  90:10,12 93:13,20 108:23
  110:14,14 117:17 120:14
  125:4,18 126:2 134:3,19
  146:13 155:16 156:7 159:2
  163:12,17,19 164:4 175:11
**pain** 32:11 46:22 55:9 60:22
  93:7 94:10 131:2,15 133:1
  135:9
**paper** 42:10 124:15
**paperwork** 69:19
**paragraph** 14:5
**Pardon** 173:19 174:25
**parking** 168:2
**parse** 18:8
**part** 30:3,4,4 31:16 44:23 66:10
  83:10 90:7 98:15 99:15
  108:11 118:8 126:18 142:24
  147:25 152:17 154:15,23
  155:6,16 156:3,12,17 160:5
  163:12,24
**participant** 16:7
**participated** 77:4 81:6 99:13
  166:13
**participating** 165:20
**participation** 31:20,24 61:7
**particular** 36:23 76:3 142:25
  143:5
**parties** 25:1 44:11 173:22
**partner** 147:7
**partnership** 147:6
**parts** 19:20 45:17
**party** 38:22
**pass** 50:15
**past** 18:15 43:11 53:24 75:23
**PASTOR-HERNANDEZ** 2:5
  182:14
**Pat** 116:2
**patient** 32:23,23 33:10 46:21
  47:21 50:12 51:16 54:22 57:2
  58:8,11 59:2,16 62:5 64:21,22
  65:1 73:1,2 81:18 90:10 92:18
  94:11 98:1,8 100:14 116:18
  116:19 129:18 132:1,4,11,11
  132:12,13,17,21 133:10
**patiently** 42:7
**patients** 28:15 31:9 45:18 46:6,9
  46:14 48:1,20,21,24 49:9,20
  50:19,25 51:1,11 52:20,21,25
  53:5,16 56:2,3 57:8,22 58:8
  59:13 60:16 61:2 64:11 65:1,3
  65:23 66:5,8,19,24 67:4,5,7
  67:17 72:22 74:8,12 78:6,7
  83:6 85:3,5 88:25 90:11,12,17
  91:23 93:7,22 96:15,20 101:2
  108:21 110:14,14 112:13,15

112:16,17 113:13 116:20,22
  116:23,24 126:6,7,9,20 127:2
  127:3,4,5,18,2 1 128:24,24
  129:19 130:1 132:20,23
  133:17 134:19
**Patrick** 12:12 13:13 14:18
**pattern** 29:5
**paused** 168:21
**pavement** 50:22
**pay** 21:11 31:1,3 32:19 33:4,7
  47:18 48:17,21,22 49:5 50:11
  59:20,21 60:7 63:4,17 64:11
  64:11 67:17,19 68:3,4,4 70:3
  70:5,7 71:14,22,25 72:13,18
  72:22,25 73:1,1,6,6,7 74:8,8
  77:5 83:5,6 91:18 92:8 93:18
  93:23 96:15,15 109:13,17
  112:20,20 113:15 117:18,19
  117:20,24 118:6 119:19 125:6
  126:14 129:19 134:13 135:8
  146:4 151:3,20 153:7 154:19
  155:2 158:6,12,23,25 163:8
**paying** 8:25 22:16,18 33:19,23
  52:16 56:3 67:4,5 73:2 93:17
  101:2 107:3 109:2,19,21,22
  110:17 115:8,9 118:3 120:5
  120:15 125:25 130:2,4,6
  131:12 134:17 164:8,12
**payment** 45:9 66:21 120:15
  149:9,15 154:15,22 155:5
  156:2,5,12 160:16,17,20,23,25
  161:1 162:24,25 163:4,5,23
  176:24
**payments** 66:11 73:14,14,15
  73:17,19,20 107:1
**payouts** 47:24
**pays** 52:24 53:2 92:3 135:11
**PCA** 11:16 12:5 13:15 14:24
  44:18 46:16 59:18,21 60:25
  65:4,23 68:17,23,24 70:23
  71:20 72:8 75:4 78:4,5 94:16
  94:20 111:11 114:6 115:1
  116:3 133:24 134:9,11
**PCA's** 50:22 61:2 69:24
**people** 8:24 9:2 27:14 30:7 33:4
  34:3 50:21 52:12,13 55:11
  63:16,20 65:25 70:23 71:3,4,8
  71:9 72:6 75:23,24 83:18 84:5
  84:6,6 85:12 89:18,20,22
  96:17,19 97:22 99:12 107:3
  109:2,17,19,2 1 112:12,23
  117:25 118:3 124:3,3,20
  132:25 143:25 147:9 148:5
  152:9,22 177:15
**people's** 132:2
**per** 88:25 89:11
**percent** 27:14 57:12,13 59:6,9
  89:13 131:16,17 139:4 179:2
  179:3
**percentage** 8:25 9:5
**percentage-based** 9:2
**perfect** 6:20 56:11
**perfectly** 5:16 15:21
**performed** 77:11 166:1
**period** 68:4,4
**perjury** 76:15
**permitted** 145:3
**perpetuate** 65:1
**person** 6:19 8:20 9:14 10:5,20
  63:20 69:6 73:10 77:13,14
  142:12 145:2 147:22 148:7
  150:12 152:14,24 154:13,20
  155:3,4,25 158:22,24,25
  159:1 163:9,10 165:6,8,8
  166:2,3,5,6,8,8,12
**personal** 11:12 49:16 76:4 143:7
  145:5 150:19
**personally** 77:11 166:1 179:11
**persons** 147:4,17 149:19 151:18

**person's** 150:14
**perspective** 88:10
**perversion** 52:13
**pharmacies** 88:15 114:6,6
**pharmacist** 60:5 95:11 132:5
**pharmacy** 8:23 11:21 12:10
  14:12,19 15:8 17:1,16 18:5
  23:22 24:2,3,10,1 7 30:9 32:4
  33:10 44:18,21,21 46:1 47:1,2
  48:11 51:6 53:9 59:17 60:2,10
  60:11 62:10 63:2 65:17,21,25
  66:20,23 68:2,1 1 69:8,11 70:5
  70:19 71:19 74:7 84:5,18 86:9
  89:21 91:4 93:9,12 94:21 95:7
  95:15,24 96:1,8,11 98:1 99:23
  99:23 101:6,6,9,10,1 6 106:24
  107:9,22,22,25,2 5 108:14
  109:3,13,15 111:4,13,16
  113:13 114:14 115:8,11,11,16
  115:19 117:8,10,12,21,24
  118:3,4,6,8 129:25,25 130:3
  130:20 131:14
**pharmacy's** 51:7 101:19 108:22
**Phil** 33:6
**Philip** 48:3 56:6 71:24 80:25
  99:12
**philosophy** 123:22
**phone** 13:20 49:15,16 51:8 96:9
  96:10 127:9 179:17
**phony** 123:23,24 124:24
**photo** 103:21
**photocopy** 103:20
**phrase** 154:5 162:8
**physically** 178:8
**physician** 91:10
**physicians** 28:14 35:3 126:10
**pick** 179:7,13,16
**picked** 123:16 179:1
**picture** 111:21
**piece** 90:2 124:15
**pieces** 59:11 142:4
**pizza** 51:20 134:15,17
**place** 59:14,16 109:13 112:22
  127:21 161:24 162:23
**placed** 62:21
**plain** 105:8,11 124:9
**Plaintiff** 1:5
**plan** 44:5,6 45:11,15,17 46:4
  52:19 53:10,11,17 56:11
  118:24 119:22 147:9,11,13,18
  147:18,21,23,2 5 148:2,2
  149:12,16 150:1 151:9,13,15
  151:19,19,23 152:9,12,13,15
  152:17,19,19 156:14
**planes** 175:12
**planned** 79:11,17 151:8
**planning** 21:4
**play** 130:10
**played** 46:21 128:14 147:25
  152:17
**player** 27:1
**plays** 67:12
**plea** 98:14,15 101:15 144:13,16
  144:19
**plead** 98:23
**please** 7:17 40:25 42:5 58:19
  79:25 122:20,23 139:14,15
**pled** 76:13,17,17 98:21 145:1
**plenty** 23:4 30:18 75:2 90:17
**PLLC** 2:1
**pocket** 63:10 112:5,7
**pockets** 43:9 63:21 112:19
**point** 6:23 28:2 29:18 42:7 49:8
  84:18 86:16 108:21 112:8
  142:25 177:21
**pointed** 76:10 125:15
**points** 78:18,19 123:12 133:6,7
**Poor** 130:24
**position** 132:21 133:4 181:9,10

possibility 144:17
possible 59:16 141:10 165:25
  169:17
possibly 128:8
post 21:6
post-trial 38:14
pounding 50:22
Powell 64:2 72:7 81:9,13 127:6
  131:7
Powell's 72:8
practical 6:2
practice 36:8
preceding 129:17
prechecked 54:10,19,21,23
prechecking 56:17
precise 150:21 162:14
Precision 68:12 72:16
predicate 177:5
prejudice 140:19
premark 122:15
premature 39:8
prepared 31:7 36:25 37:9 39:15
preparing 31:14,17
prepped 101:13
prescribe 53:15 93:7
prescribed 29:8 31:19 47:20
prescription 24:9,11 26:5,6
  27:17,18 32:21 54:7,13,16,16
  54:25 56:12,23 57:1 63:13
  64:3 65:6,16,23 72:8,9 73:6
  75:7 81:25 89:7 90:23 91:9,16
  99:14,16 100:16 117:13 119:5
  126:13 127:13 131:15,25
  134:15 154:14,22 158:23,24
prescriptions 23:9 25:22,23
  26:14,17 28:4,20 29:11 30:7
  32:22 33:2 34:25 45:21 46:13
  46:19,20 48:10 50:11 52:22
  52:22 53:25 54:6,23 55:17,19
  56:17 57:4,11,13,17,20 59:7
  59:15 61:3,22,23,24 64:19,20
  65:9,15,25 66:1 77:24 78:2
  78:7 81:23 89:10,14,25 90:8
  91:11,18 93:13,20 95:23,24
  96:3,7 111:8,9 126:16 131:21
preselected 78:1
presence 166:20
present 4:9 39:16 40:20 139:21
  148:4 152:21 166:14
presentation 79:10
presented 28:3 78:24 140:18
preserved 7:8
pressure 33:1
presumes 141:3
pretense 46:5
pretenses 44:3,8,9 45:1,12
  148:19,25 149:4 150:3
pretty 5:8 104:9 179:3
previous 30:24
previously 31:8 98:2 153:14
price 29:2 34:17 45:24 64:13
  131:14
prices 29:2 30:9 77:25 82:19
primary 126:10
primed 74:12
prior 68:12 114:24
priority 145:6
prison 98:20,22,24,25
private 149:11
pro 90:14 125:6,17,19 135:14
probably 4:7 5:6,7 6:17,17 37:3
  70:6 93:2 104:10 105:9
  124:17 133:23 136:4 138:8
  162:22,24 178:19 179:7,13
  180:23
problem 26:4 27:13 28:9 29:8
  34:8 35:10,12 65:17 67:7,8,8
  67:10 93:17,18 109:3 130:21
  132:3 169:25 170:12

problems 27:15 49:10,11 67:6,6
  67:6 103:9 108:13 109:3
  137:15
proceedings 1:9 4:1 106:7
  182:12
proceeds 161:6,15 162:1
process 17:5 109:14 115:25
  116:1
produce 141:5
produced 162:12
product 32:12 46:23 58:10
  59:25 62:6 63:9 78:5
products 23:23,24 24:16 30:10
  32:10,12 46:22 47:18,20
  48:18 50:6 51:2,8,12,16 56:17
  56:18 57:16 58:13 59:19,22
  60:18,22 61:4,13,17,17 62:3
  62:16,18,24 63:1 82:24 85:3,4
  85:5 88:19 96:5 97:20 112:3,5
  113:5 116:18,19,21,22,24
profit 131:16,17
profitable 114:3
profits 46:1 60:10,16,17
program 43:8 44:3,11,12,13
  45:16 47:17 67:1,3 68:14
  72:19,21 78:20 84:14 85:10
  88:2 92:11 94:14,17,18,20
  97:9 99:10 100:5,9,21 101:2,4
  101:5,8,11,12,17 106:15,24
  107:7,24,25 108:11,15,18,24
  109:7,7,9,9,16 112:14,24
  114:24 115:15,17 116:7,13,15
  119:15 122:2 129:17 146:11
  146:14 148:17,19,25 149:2,11
  149:17,18,21 154:16,23 155:6
  155:17 156:4,13,14,14,18
  159:2,22,25 160:10,18,21
  163:13,25 164:2
promise 167:17
promised 110:19
promises 44:4,8 45:2 148:20
  149:1,5 150:4
proof 27:13 41:9,12 47:4 80:4,9
  80:10 117:5,13 121:3 141:8
  141:10,15,1 5 142:15 148:6
  152:23 166:12,14
proper 28:20 144:19
properly 16:3
property 39:3 146:19,20 148:18
  150:3 161:14,19,23 162:1,4,6
  162:15
proposals 6:5
propose 136:22
proposed 6:3 22:4 105:1 138:13
  138:15
proposing 137:8
prosecution 41:24 180:25
prosecutor 41:10,11
protect 132:1,2
protecting 5:23
prove 27:4 29:6,6,15 35:1,9,10
  43:7,25 44:1,10,13,25 45:8,8
  45:11 72:12 77:10 117:5
  121:21 122:6 124:4 141:4,6,9
  142:16 147:8,12 149:20,23
  150:20,22 151:8,14 152:8,12
  153:10 156:20,23 162:14
  164:7,11,21,22 165:12,12,25
proved 29:23,25 43:11 61:6,6,8
  77:10 80:2 123:7 140:16
  141:18 147:15 148:21 150:24
  151:17 155:18 161:11 163:14
proven 28:13 29:10,11 30:21
  38:8,12 44:23 70:24 154:8
  158:3,11 159:9,11,14
proves 125:16 153:12
provide 11:8 12:8 14:11 18:9
  25:5 144:20
provided 66:14 103:3 149:13

provider 8:23 73:24
provides 53:3 144:17 156:15
providing 50:16 149:14
proving 82:7
provision 163:7
prudent 181:21
PS 61:13 157:17
public 149:11
pull 26:21 135:16
pump 33:1
punch 87:2
punishment 167:6,8
Pura 23:16
purchase 154:20,21 158:24
  163:10,20 164:5,9,10
purchasing 163:11,21 164:6
purpose 9:22 17:3 18:10 23:24
  25:2 38:25 47:7 64:9 65:2
  85:25 115:21 118:24 119:21
  147:20 148:1,8 150:22 151:22
  152:3,18,25 156:21 164:8
  165:5 181:2
purposefully 85:24
purposely 47:6 165:4
purposes 30:10 128:12 138:22
  147:6 156:24 164:12
pursuit 86:15 87:7
push 127:12
pushed 52:10 97:6
pushing 4:24 60:23
put 7:13 30:16 31:12 34:20
  35:22,22 49:23 58:19 64:24
  86:19 87:1,6 88:10 104:22
  106:25 108:20 110:25 111:17
  117:3,3 154:4 157:11,15
  176:17 177:2,6
puts 92:13,16 135:22
putting 110:8 154:1
puzzle 59:12
pyramid 52:1
p-01 46:22 54:9 55:9 117:3,8,9
p-02 117:9
p.m 102:15 106:5,7,10 116:4
  136:17 139:13,17 168:12
  182:8

Q

quarter 4:6
question 4:14,22 8:16 10:17,19
  51:8 92:25 94:8 109:6 110:21
  126:3 127:17 132:16 162:12
  179:6,14,19 181:6,13
questioned 64:21
questions 10:9 16:20 26:7 83:21
  87:21 127:14 143:2,12 145:17
  158:13 159:12 161:2 170:17
  180:13 181:11
quickly 51:4 118:15
quid 90:14 125:6,17,19 135:14
quiet 87:20 109:20
quite 27:4 29:19 33:19,21 53:7
  53:23 57:8 106:2 123:5
quo 90:14 125:6,17,19 135:14

R

R 182:10
raised 28:23 123:12
Ralph 97:25,25
Rambaran 51:20 61:16 63:19
  64:1 69:15 70:11
Rambarans 63:25 83:17
ran 57:25 59:7 123:16
rare 55:3
Rashaan 51:19 63:25 69:15
  70:11
Rashbaum 1:20,21 3:8,9 4:12
  4:14,19 79:4,8 100:3 102:1,4
  102:17,22 105:21,23,25
  106:12,13 121:5,15 123:12,16

124:7 125:2 128:4,13 130:14
  131:7,21 132:10,19 133:9,11
  133:20 136:2,20 137:18 169:2
  173:25 178:5,22 179:22 180:3
  180:16,24 181:19 182:4
Rashbaum's 125:7 128:12
  129:12
ratchet 131:14
rate 57:10,12
rather 65:7 123:11 137:5 156:23
  164:10 170:1 177:14
Ray 1:7 42:17 43:3 157:7,9
re 114:10,12
reach 78:23 104:10 142:9
reached 83:13 91:23 167:18
reaction 60:6 66:22 115:14
read 7:21 21:3,4,4 22:12 41:7
  95:13 104:18,20,25 105:2
  122:9 136:12 137:1,3,22,23
  139:20 140:10 153:22 158:5
  162:25 163:3,5 166:20 167:14
  167:16,23 168:24 177:10,10
reading 22:6
ready 40:13 176:22 182:6
real 46:16 52:1 53:5 66:13 68:15
  118:14 126:20,21 127:2,2,3
  127:10,12,16 141:12
reality 56:8 70:22
realize 133:2
really 6:18 13:17 20:1 46:6,12
  47:19 56:21 62:17 65:11
  94:22 95:13,15,16 97:20
  111:22 121:8,8,13 124:8
  126:3 131:4 137:25 160:7
realtime 66:23 78:13 79:15,16
  87:16 91:19 93:19 98:4
  100:22 101:8 107:7,8,11
  109:21 113:12 114:22 115:13
reap 46:1,1
reason 17:25 25:3 29:21 45:24
  58:10 59:19 65:5 69:18 70:22
  76:3 78:22 91:8 98:18 112:15
  118:2 137:3,24 141:13 143:5
  144:21 177:6
reasonable 27:5 40:6 43:12
  68:25 69:6 70:24 71:6 72:13
  73:4,10,10 80:3,7,10 97:7
  121:22 122:5 123:8 140:17
  141:6,11,12,15,1 9 147:16
  148:22 150:12,24 151:17
  153:13 155:19 158:3 159:9
  161:11 163:14 164:23 165:13
  166:16
reasonably 164:24
reasoning 142:8
reasons 13:6 18:2
reassurance 16:5 17:4
rebate 156:6
rebuttal 19:11,14 83:24
recall 8:9 9:9,20 11:1 12:18,19
  13:17,20 16:6,8 18:14 30:24
  62:17 125:10
receipt 23:19 71:21,21 119:24
  159:21,24 160:2,9,16,23
  163:4
receipts 162:3
receive 9:5 31:1 71:15,18 72:14
  77:5 93:23 109:10 119:19,25
  133:14 146:4 151:3,20 153:8
  154:12 155:12 158:7,12,21
received 3:17 13:1 51:23 55:5
  58:22 66:6 146:10 155:21,23
receiving 9:7 100:15 156:21,25
  161:17,21 162:9
recently 18:17 21:4
recess 40:19 41:14 102:7 106:5
  139:13
reckless 150:6
recollection 8:12 78:18 142:6

145:7
**recommend** 154:21 158:24
163:11,21 164:5,9
**recommendations** 56:19
**record** 31:12,17,22 32:8 35:16
37:10 124:20 173:21 179:5
**recorded** 86:20
**recording** 180:12
**recordings** 86:20 87:16 119:8
128:21 180:18
**records** 74:20,22 107:2 116:19
128:10
**recoup** 57:20
**recruited** 56:25 126:7
**recruiting** 50:1 78:5
**red** 53:13 129:12
**redact** 6:21
**redacting** 6:23
**redaction** 6:11
**redactions** 6:3
**redirect** 19:9,10
**refer** 5:6 45:19 50:20 72:6,8
93:7,22 145:15 155:3 159:1
**reference** 26:15
**referencing** 15:23
**referral** 72:18 155:24 156:22,24
164:11
**referrals** 78:7 84:6
**referred** 24:9
**referring** 38:24 58:7 71:19
154:13 155:14 158:22
**refill** 59:3 91:24 92:4 109:10
**refills** 32:17,18,2,3 54:10,24
56:19 58:4,9 91:22,23 109:14
109:16
**refresh** 22:9
**refused** 58:16
**regard** 66:19 81:6 86:11
**regarding** 36:14 37:23 91:1
153:4
**regardless** 53:20 89:1
**regulation** 105:2
**regulations** 104:20,20,21
**rehash** 123:11
**rehashing** 123:4
**reign** 134:6
**reimburse** 82:18 113:10 117:20
**reimbursed** 113:14
**reimbursement** 23:25 34:17
45:25 47:3 58:24 59:16,23
60:14 82:4,17 112:18 113:4,7
113:21,24
**reimbursements** 75:6 82:19
117:4,6
**reimbursing** 112:16
**reinforcing** 117:25
**reject** 126:21
**rejected** 55:18,19 90:17,18,19
91:2 125:16
**related** 14:12 45:2 52:19 149:5
166:23
**relating** 150:4
**relationship** 15:25 16:13 84:19
127:4 156:10
**relationships** 14:13 15:11
**relevant** 31:23
**reliable** 27:6,8
**relied** 134:12 150:15
**reluctant** 21:17
**rely** 49:4 80:11 141:16
**remain** 19:21
**remember** 10:13 21:8 41:1 43:1
46:7,8,25 48:2,7 49:11,14
51:3,6,18 53:8 54:22 55:4,24
57:1,7,10,25 58:1,6 59:6
61:16 62:4,12 63:15 64:18,20
65:20 66:22 67:2,21 69:18,24
74:7,9 79:14 81:10 83:25
85:14 92:14 99:11 102:10

103:17 104:18 123:18 125:13
127:5 130:15 144:1 145:23
167:16 172:10,16 177:5
**remembers** 9:16 143:25
**removed** 33:14
**remuneration** 104:23,23 120:1
154:12,19 155:2,13,24 156:5
156:7,21,25 163:8,20 164:1,4
164:8,12
**remunerations** 155:21 163:17
**render** 73:12 133:25 134:1,7
**renders** 39:9
**rep** 34:7 50:5
**repackaging** 60:3
**repeatedly** 85:2 89:3 99:10
**replete** 24:16
**report** 67:9 97:14
**REPORTED** 2:5
**reporter** 2:5 5:16 136:5 167:19
173:13 182:15
**Reporter's** 3:11
**reports** 97:15
**represent** 12:5,16 13:4
**representation** 12:13 13:7 22:22
34:2 150:5,8
**representations** 44:4,9 45:1,12
148:20 149:1,5 150:3 165:20
**representative** 60:15
**representatives** 14:13 22:16
**represented** 46:16
**reps** 10:24 30:6 67:16 69:13
78:7 88:16 116:12 117:18
134:2,4
**request** 122:24
**requests** 91:24
**required** 165:11
**requires** 44:25 45:5 47:4 72:12
86:3 165:11 166:12
**resolve** 177:21
**respect** 14:11 35:6 38:15 70:1
75:10
**responding** 114:11
**responds** 91:5
**response** 50:9 100:17,17,22
109:22 114:13
**responsibility** 76:14
**responsible** 166:7,9,11
**rest** 43:22 67:5 135:22 179:10
**rests** 19:11,14
**resubmitted** 90:18,24
**result** 98:25 147:2
**retain** 38:22,23,24
**retained** 162:2
**rethink** 123:21
**retired** 20:11 40:18 102:15
136:17 168:12
**retreated** 21:1
**retroactively** 111:7
**return** 57:23 153:16 155:14
**retype** 169:4 182:1
**retyped** 163:2 169:4
**revenue** 67:23
**reversed** 20:22
**review** 6:5 43:15,16 61:12
**reviewed** 49:25
**rid** 68:6
**ridiculous** 124:2
**right** 7:16,19 12:24 13:25,25
14:24 15:10,23,23,24 16:10
16:15,16,22,2,3 17:21 18:1,6,9
18:9,16 20:5,12,1,5 26:18 29:9
34:9,21 35:7 36:6,15 39:2,23
40:20 41:8,16,21,22,24 54:11
55:8 59:5 68:15 87:25 90:21
91:12 98:23 99:4 101:5 102:6
102:12,25 109:8 121:5,25
122:25 135:14 136:14,22
137:19 138:10 140:2,14 144:7
154:8 155:8 159:16 164:14

168:8,15 170:14 171:25 178:3
179:2,8,8,18,2,3 180:8 181:24
**rise** 7:14 20:10 40:23 102:14
106:4,9 136:16 139:14 168:11
**risk** 57:24
**road** 65:14
**robbery** 87:10 92:23
**Robin** 48:15,16,17 63:2,4 66:4
71:5 72:3 74:24 77:18 78:11
81:14 87:22 93:5 98:15
144:14
**rocket** 133:2
**role** 46:21 56:10
**room** 20:6 176:21
**RPR** 2:5 182:14
**rule** 29:20 38:15 81:19 83:5,5
97:22 165:9
**rules** 83:5 96:14,15,16 97:18
139:24 144:19 178:22
**run** 59:2 83:22
**running** 88:9 130:9
**Ryan** 83:14 130:22

S

**safe** 9:25 104:16,25 105:2,11
**Sal** 90:10
**sales** 10:24 30:6 34:7 50:24
51:11 60:15 68:10,10 69:13
70:2 134:2,4
**salesman** 76:22,24
**same** 4:23 18:24 33:1 40:8 46:22
54:23 56:17,19,19,20,20,20
58:10 70:10,12 73:22 88:12
88:14,15,17 94:18 96:18,19
97:3 116:18,19,22,24 118:16
119:10,20 120:4 132:24 144:9
157:24 158:19 160:25 162:23
169:25 178:12
**Sanchez** 90:18
**Sara** 62:25
**sat** 42:8
**satisfactory** 179:21
**satisfied** 35:24
**satisfy** 156:19 164:3
**saw** 37:16 48:6 49:23,25 50:23
53:13 54:25 60:4 61:17 62:9
66:21 70:4,11 76:21 84:1,3
88:21 89:10 92:7 95:4,5 96:21
97:10,10 107:13 111:2 115:18
127:15 130:17 138:4 167:19
169:3
**saying** 27:22 64:4 90:4,22 93:17
96:22 97:3 109:15 114:14
123:23
**says** 4:15 26:16 29:24 31:5 39:13
53:19 64:25 66:16 68:17
72:20 78:12 82:25 89:25
90:10 93:5,12 94:9 95:2,6,8,8
95:12,21,24 97:19,23 98:7
100:14,18,24 101:1,3,4,5,10
101:15 107:9 108:24 109:1,24
109:1,6 111:11,17 113:16,17
114:15 115:6,6,16,24 116:3
116:12 117:2 118:7 121:18
124:7,9 125:3 128:13 129:5,7
129:8,18,19 130:18 131:2
132:11,19 133:21 135:13,17
135:18 157:6 170:7
**scar** 32:11 46:22 55:9 56:25
60:22 62:10,12 83:9,13,15
94:10 130:19 131:5 133:1
**scared** 92:14
**scars** 56:22 62:6,7,11 83:9,13
130:16,16,17,1,8 131:2,5
**scene** 148:4 152:21 166:14
**schedule** 29:2
**scheme** 27:24 30:3,3 35:5 44:2,5
45:15,16 49:7,21 52:2,10 55:8
55:14 56:10 59:13 61:1,4,5,8

61:9,25 63:21,23 64:6 66:10
70:22 74:12,13 76:11 77:4
78:4 119:14 126:19 148:16,24
150:1,22,23,25
**School** 85:8 116:5
**science** 133:2
**scope** 13:10 14:5
**scratch** 85:14 174:2
**screen** 125:14
**screens** 54:1
**screenshot** 57:7
**scrip** 125:19
**script** 58:6,7 89:1 93:11 125:21
126:20 130:13,19,20,25 131:6
**scripts** 54:4,9 58:22 125:15,19
133:1,3,16
**sc-01** 46:22 54:9 55:1,9 117:3,10
**sc-02** 117:11,11
**seat** 7:20 102:16,20
**seated** 40:25 106:11 139:18
**second** 6:14,16 26:18 45:20
80:24 112:11 114:16 154:17
156:19 161:14 163:19 164:3
**seconds** 79:5
**secretive** 73:19
**secretly** 73:18
**section** 1:15 155:1
**security** 5:18,21 7:10,14 20:10
40:23 102:14 106:4,9 136:16
139:14 168:11,14 176:20
**seduced** 124:24
**see** 13:23 14:6 23:12 26:6,21
43:24 54:6 55:8 56:5 58:12
61:6,12 73:18 78:12 83:11
86:25 87:9,11 89:8,20 90:13
90:16 91:17,18 92:8,10,25
93:19,22 94:23,23 96:16,17
96:25 97:1,3 98:9 99:18 100:6
101:6,7,7,13 102:10,13 104:4
104:17,2,5 106:3 107:6,8,11
107:17,18,18 108:3,9,19
110:22 111:4,11,15,18,18,19
111:20,21,22,22,23,23,24
114:8 116:2,8,8,1,1 118:1,22
119:19 121:12,17 122:12
128:7 129:1,3,17 130:19
136:15 137:23,25 139:19
145:21 146:1 153:23 154:5
157:2,16,22 158:3 160:7,12
164:19 167:21 168:9 170:4
181:16,22
**seeing** 95:3 103:17
**seek** 52:13
**seeking** 49:9,10 112:15,15,17
**seem** 10:13 69:25 70:1 143:9
**seems** 60:6,6
**seen** 11:17 53:25 56:3,3 57:22
60:19 125:20 134:23 135:18
**sees** 107:2,3 135:17,18
**seized** 120:24
**seldom** 137:6
**selected** 32:13 42:23
**selections** 54:24
**self-selected** 89:15
**sell** 75:4 97:19 134:15
**selling** 50:22 60:17 65:1,3 78:5,6
131:13
**sells** 97:22
**semi-final** 5:7
**send** 20:5 26:9 29:21 90:4 101:5
141:1 167:11,25 169:23
179:15 181:10
**sending** 23:19 54:7 95:23,23
181:19
**sends** 97:11,12 101:9 107:25
116:11 135:17
**sense** 27:23 52:24 53:3 64:23
65:13 69:6,15 74:6 75:21
76:13 89:16 96:24 118:11

130:2 131:20 141:13 142:9
157:3 163:2 177:13
**sent** 11:17,18,22 29:16 50:25
57:13 62:8 65:20 88:18 91:24
109:11 181:20
**sentence** 144:17
**separate** 71:1 145:13 146:5
151:5 153:9 165:24 166:22
**separately** 166:24
**series** 95:20
**serious** 18:5 42:15,18
**seriously** 42:15
**service** 42:24 149:13,15 155:5
155:16 156:1,2,11,23 159:2
163:11,22,23 164:6,10
**serviceman** 88:4
**services** 12:8 45:10 78:21 149:10
149:19
**serving** 63:16
**SESSION** 106:6
**set** 14:24 15:24 29:2 30:2 47:20
79:5 96:6,7 137:14 169:7
182:6
**sets** 34:18
**several** 71:10 75:16 116:20
**shady** 83:19
**sham** 66:13,20
**share** 73:9,9
**shared** 151:19
**sharing** 42:16
**sheep** 106:2
**she'll** 110:8
**shields** 69:12
**shoot** 41:20
**shopping** 41:21
**short** 85:1
**shortened** 145:21
**shorthand** 9:3 15:14,17
**shortly** 58:21
**shot** 121:1
**show** 14:1 27:6 28:8 31:20,24
43:12,22 47:15 64:16 80:5,22
82:6 84:4,4 87:3,17,17,18
91:19 92:4,20 93:1 94:1,7
99:8,19 100:9 106:23 108:20
110:5,11,24 111:20 114:23
118:18,20 119:8 121:6,9,22
128:8 178:12 181:12 182:5
**showed** 42:10 65:16 68:1 87:18
95:20 96:18 116:20,23 117:23
130:20 133:9
**showing** 54:1 90:2 95:1 120:8
**shown** 41:3 45:14,18 60:11 64:7
114:9,9 128:5
**shows** 28:9 31:17 47:11 75:9
84:4 86:10 92:23 93:19
114:21 115:5 121:11 125:14
129:23 131:21 135:1
**shut** 108:1,18,24 118:4 139:20
**shutting** 116:13
**sic** 99:25 111:4
**sick** 52:14
**side** 52:15 125:5 137:2 139:7
179:10
**sides** 102:18 169:15
**side's** 26:24
**sign** 52:8,9,21,24 74:1 128:24
**signature** 32:17 52:23,23 54:7,8
54:19,21,24 55:17,20 56:9,11
95:3 103:22,23
**signatures** 95:6,7
**signed** 12:16 48:18 49:17 51:16
52:12 55:16 61:14,21,22,23
62:24 63:9,12 66:20 73:24
75:3 85:4 111:6
**significance** 144:4
**signing** 24:13
**silence** 4:13
**similar** 96:25 97:2 150:25

**similarly** 86:11 165:15
**simple** 48:23 65:2 74:15 126:18
127:10 133:12 143:24
**simply** 71:3 134:5 148:4 152:21
166:14
**since** 31:8 42:7 102:20 103:3,19
104:19 137:13 140:8 144:7
**single** 32:23 34:15 62:13 74:21
90:10 97:11 118:13,19 140:23
**sinister** 96:11
**sir** 8:10 11:3,14,19,2,3 12:6,9,11
12:14,17,20 13:5,8,11,14,16
14:4,7,9,16,20,23,2,5 15:9,13
15:16,19,22 16:1,4,14,21 17:2
17:17,19,22,24 18:6,11,21,23
19:1,1,3,6 73:7 114:15 138:21
168:14
**sit** 78:14
**sitting** 98:23 170:14
**six** 96:17,19 128:21 129:4 159:5
159:6
**size** 34:15
**skip** 178:15
**skips** 160:13
**sleep** 167:12 175:10
**sleeping** 175:9
**slide** 79:21,25
**slides** 85:18
**slight** 57:11
**slogan** 123:20 124:1
**slot** 89:17
**slow** 58:4
**small** 48:21 87:19 99:9 113:21
113:21,23
**smell** 50:15 68:15
**Smith** 11:19,20 12:12 13:13,23
13:24 14:18,18 15:7 16:11,25
18:4,18 24:18,19,2,0 25:6,8
68:17,17,18 74:25 75:1,3,6,8
77:2,14 91:6 95:1,19,21,24
100:14 114:10,11 116:1,2
**Smith's** 24:24
**sneakier** 50:19 72:24
**snippet** 128:14
**Snodgrass** 33:6 48:3,9,12 56:6
61:13 65:21 71:24 80:25
99:12
**sold** 77:23 82:4 114:5
**sole** 23:24 30:21 42:13,19
156:20 164:7
**solicit** 119:25 151:19 154:12
155:12 158:21
**solicited** 146:10 155:21,23
**soliciting** 156:21,25 161:16,20
162:9
**solution** 86:8 132:3
**Solutions** 51:7,9 126:23
**some** 6:3 13:13 16:20 21:5 42:22
43:20 44:15 46:9 47:22 49:13
55:1 56:4,5 60:4 63:18,22
64:15 68:17,20 69:7 71:5
72:17 75:25 76:5 79:12 80:13
83:21 84:25 88:1,15 91:8
92:12 94:17 96:8 103:1 112:6
112:22 119:19 122:13 126:6,8
127:14 128:19 138:6 143:18
144:1,11 145:4,11 147:17
148:8 151:18 152:4,7,25
160:4,13 162:2,5,17 169:14
169:23 170:17 178:20
**somebody** 130:22
**somehow** 68:21 69:11 112:12
113:3
**someone** 5:17 22:21 34:1 44:6,7
47:16 52:15,21,22 54:12
57:25 59:7 74:4 87:13 94:21
97:16 116:15 133:13 147:1
150:2,18,20 151:6 175:8
181:12

**someone's** 87:11 98:6
**something** 5:3 10:22 25:6,8,9
38:13 39:4 41:21 45:3 47:6
49:2 60:13 66:12,25 67:12,13
68:15 74:1,1 79:11 81:12
82:11 85:24 86:1 87:11 92:3
92:10 93:10 97:17 107:11,21
112:14 113:4 123:15 125:9
138:13 143:19,19 144:2 147:2
150:13,17 151:6 154:6 165:4
165:7 167:15 168:22 179:6,17
179:18
**sometime** 68:15
**sometimes** 6:19 20:1 35:3
167:20,22 171:6
**soon** 42:18 134:17,21
**sophisticated** 69:3
**sophistry** 123:22 124:25
**sorry** 4:14 7:17 10:17 11:21 15:5
16:21,21 17:14 19:13 86:23
100:3 102:1 110:16 114:11
144:15 160:14 168:14
**sort** 13:9 123:22 158:20 168:20
**Sounds** 97:16
**South** 1:21 2:2
**SOUTHERN** 1:1
**so-called** 90:22 110:23
**speak** 41:24 105:12 127:6
130:24
**speaker** 150:6
**speaking** 174:15
**speaks** 132:13
**Special** 60:20
**specialist** 18:24
**specific** 12:19 27:5 35:9 47:16
61:8 80:2 118:13 140:16
150:18 165:9 167:3,5
**specifically** 9:9,20 10:23 13:20
16:8 25:11 161:16,20
**specifics** 10:13 13:17 80:15
**specified** 36:4 146:21 161:6,15
162:8
**spectator** 77:25 166:18
**spend** 20:1 112:4,7
**spending** 71:10
**spent** 6:8,10 42:16 93:16 110:6
134:13
**spigot** 70:21
**splitting** 60:10
**spoke** 174:8
**spoken** 18:18
**sports** 167:21,22
**spouses** 50:20 73:16,21
**stack** 100:11
**stage** 41:3
**staggering** 134:14
**stamp** 95:5
**stamping** 95:3
**stand** 33:8 36:22 37:14 51:19
52:25 63:7 72:22 76:23 82:12
84:20 92:13 107:19 110:20
117:17 131:8
**standard** 80:12
**Standards** 182:7
**standing** 35:7
**stands** 36:25
**start** 23:21 79:11 99:9 104:8
115:25 123:15 133:18 136:25
177:17
**started** 66:20 81:18 88:3 99:10
**state** 6:16 35:18 37:10 44:15
54:5 111:25 117:16 149:19
162:7
**stated** 63:2
**statement** 25:3 26:16 43:1 98:18
119:3 124:2 143:23 144:21
150:4,8,15,16
**statements** 24:24 33:3 119:2
**states** 1:1,4,10,14,1 5 2:5 20:18

21:11 31:21 37:11 43:2 44:19
90:5,8 156:17 157:7,12
161:25 182:15
**statute** 8:9 22:20 33:24 47:10,12
73:13 132:18 161:18,22
162:10
**statutes** 36:2
**stay** 25:14 67:18 68:23,24 70:21
87:20 167:21
**Stera** 59:18 60:23 75:5,5 77:23
**still** 31:15 36:22,24 38:23 95:18
98:3 109:17,21 114:13,14
120:5 131:18 139:19 170:10
175:10
**stipulated** 44:12
**stolen** 87:11
**stop** 96:13 100:11 106:21,25
130:2,4 132:3 134:21 137:20
**stopped** 106:14 134:17
**stories** 76:12
**story** 6:4,14,22 28:10 83:11
129:1,3,8 134:24 135:2,3,4,5
135:18
**straight** 40:15 95:25 96:7
**strategic** 4:23
**straw** 125:8
**Street** 1:16
**stretch** 179:8
**strike** 98:19 144:22
**strong** 76:24
**stronger** 27:3
**struck** 126:24
**structure** 88:13
**struggled** 6:11 64:22
**struggling** 35:8
**study** 129:18 131:15
**stuff** 24:13 94:4,11
**subject** 54:4 128:22
**submission** 29:3
**submit** 24:11 82:17 95:16
**submitted** 23:23 24:1,6,8,10
27:7 29:1,12 33:15,20 34:11
60:20 91:8
**submitting** 30:10 113:8
**subpoena** 100:6,6
**subpoenaed** 99:18,23 101:18
**substantially** 150:25
**substantive** 119:11 148:13
**succeed** 165:18
**succeeded** 147:13 150:23 151:15
152:13
**succumb** 138:1
**sudden** 20:25
**suddenly** 69:2
**sued** 182:7
**sufficient** 10:1 22:17,21 23:20
30:22 31:13,15 33:25 148:3
152:20 153:12
**suggest** 89:13 143:1
**suggested** 6:11 27:10 56:18
**suggesting** 26:3 39:17
**suggestion** 177:4
**suggestions** 57:1
**suit** 128:12
**Suite** 1:22 2:2,6 182:16
**summarize** 133:23
**summary** 78:17 132:22 145:23
146:22 158:20
**sundown** 137:3
**super** 6:12
**supermarket** 58:18
**Superseding** 125:23
**supply** 46:8 62:13 114:2
**supported** 87:24
**supports** 114:18
**suppose** 18:7,8
**supposed** 91:6 93:4 95:2
**sure** 8:13 12:7 13:7 37:11 46:21
46:24 48:9 55:2 78:13 82:9

96:4 101:6 108:18 111:17
112:14 113:20 123:14 177:3
178:5 180:5
**surely** 133:5
**surprised** 9:9 83:4
**surprising** 4:18
**survey** 61:14 62:19 63:10 66:20
67:16 99:10,13,15 100:5,8,21
101:2,4,5,17 106:15 107:23
107:25 108:15,22 109:16
130:2
**surveys** 66:9,14,19 81:6,8 87:21
98:12
**suspect** 25:5 27:14 36:14 136:6
137:10 167:15 179:1
**sustain** 31:13 174:2
**sustained** 11:6,9 172:14 174:1
178:15
**Sven** 54:22 56:25 66:4 71:6 72:4
74:24 77:18 83:3 130:16,18
144:14
**switched** 115:22
**switching** 37:22
**symbolic** 80:19
**sympathy** 140:19

**T**

**T** 46:10 182:10,10
**table** 3:11 176:18 178:8
**taint** 29:5
**take** 13:7 40:5 41:18 48:1,11
51:3 57:19 59:15 60:12 72:7
77:6 78:8 80:23 87:19 99:5,6
107:12,13 111:8 112:19
114:17 120:19,19 125:24
126:19 128:18 133:2,16 135:5
135:6 136:4,10 145:3 168:6
170:11 179:16
**takeaway** 81:17,22
**taken** 40:19 42:14 69:22 106:5
145:4 180:6
**takes** 9:4 40:11 116:9
**taking** 60:3 116:10 144:10
**talk** 9:10 18:12 33:20 41:22
43:10,14,17,20 45:14 46:3
47:22 49:1,20 50:3 52:19
53:22 55:19 56:14 58:11 61:8
64:7,16 66:9,18 67:19 68:8
69:5 70:16 75:18 76:25 80:13
80:18 81:16,21 82:21 83:15
84:18 87:22 88:1,6 92:12
94:15 97:7 98:12 102:7
111:14 114:19 115:3,5 116:3
116:4 117:15 129:5,11,14
130:13 136:10,13 140:10
157:1,3 161:3 167:13,13,23
168:4 174:4,7 181:17
**talked** 7:22 8:20 9:3,10,21 14:21
15:10,20 28:15 33:18 47:23
49:1,21 52:20 59:11 60:20
63:18 70:12 74:6 75:17 77:1
81:5 82:15 83:7 87:23 90:9
92:6 94:15 104:16 134:10
174:7
**talking** 15:24 53:14 54:4 67:14
71:10 83:20 100:19 106:14
114:21 116:1,2 153:8,19,24
**talks** 101:1 135:9
**Tampa** 115:19
**tapes** 128:14,15,15,16,16,18,19
**targeting** 134:19
**tax** 97:12
**taxes** 97:14,16
**taxpayer-funded** 72:19
**TD** 132:15
**team** 27:1
**technical** 146:16
**technician** 31:6 32:4
**Technology** 135:16

**teenage** 61:22
**teenager** 51:19
**teledocs** 53:18 127:4,8 128:3
131:12
**telemed** 28:11,14 53:6 90:3
91:15 92:1
**telemedicine** 26:13 28:5 33:1
53:22,24 54:3,14 56:15 81:23
88:22,24 95:5,8,22 96:1
110:25 126:4,5,17 127:20
**tell** 5:17 7:24,24,25 8:7,11 10:4
10:19,23 19:24 20:17 23:17
26:4 32:2 37:23 41:5 65:22
66:4 70:3,6,7 71:2 76:3 80:1,9
81:2 83:3,16 84:22 85:19 86:1
86:2,19,20 87:21 99:4 111:2
121:24 124:6 134:22,23 135:2
135:17 137:10,20,24 143:5
148:11 155:9 159:15 161:5
167:9,10 168:20 170:1,5,18
171:22 173:15,17 174:5
178:25
**telling** 26:13 33:4 47:25 52:2,3,3
68:2 70:5 76:2 95:7,9 96:17
96:19 97:12,13 110:24 114:15
118:3 128:5 129:10 137:25
143:3,25 177:21
**tells** 66:3 75:6 101:12 107:9,10
108:1
**temptation** 138:2
**tempted** 20:2
**tend** 142:16 144:1
**tendency** 150:14
**term** 64:21 146:16 162:1
**terminate** 67:3 101:10,12
**terminated** 67:1 109:16
**terminating** 108:10
**terms** 13:9 14:6
**terrible** 58:2,2,2 59:8
**test** 50:15,15 159:19
**testified** 23:11 24:15 27:16
30:14 48:8,15 55:4,22 56:6,23
58:1 61:23 62:4,7,15,23 63:3
63:12 64:10 65:8 66:5,9 67:2
67:17 69:14,24 81:10 82:2,5
84:15,20 85:4,8 87:20 88:24
88:24 96:22 107:13 110:4
116:22 117:7 130:15 143:11
143:17
**testifies** 92:16
**testify** 24:18 25:20 34:4 59:17
72:15 73:8 75:2 76:22 85:17
100:25 107:14 144:7,8
**testifying** 99:1 142:24 144:24
**testimony** 33:12 35:2,9 46:7
60:2 62:17 68:20 69:7 72:5
77:17 83:11 85:15 88:22
90:13 91:2 98:16 102:8 108:6
141:23 142:12,22 143:14,14
143:20 144:9,11,16,24,25
145:10
**text** 48:7 65:20 72:23 87:6,6,15
90:21 99:22,25 100:4,7,8,11
100:12 101:14 106:17,19,22
107:20 108:3 109:5,8 110:2,3
110:5 114:23 116:11,11
**texting** 48:7
**texts** 129:15,18
**thank** 7:18 8:3 12:25 17:11
19:12,16,17 20:9 40:13,22,25
42:3,24 43:19 79:1,2,4 100:3
102:17 106:11,13,22 110:10
121:15 122:18,21,23 133:8
135:24,25 136:1,20 139:18
179:22 182:4
**their** 15:8,11 29:9,9 33:4 34:8
35:11 47:17 48:2,25 49:22
50:16,20,21,1 52:2,3,3,3,5
53:16 55:7 56:9 59:2 63:17

72:1,1 73:2,2,2 76:14 80:24
80:24 81:2,19 83:10 84:8,13
89:3 91:20 93:4,22 97:10
98:16 99:24 108:21 109:14
112:18,19,24 114:9 115:1
121:7,8,11 122:1 126:10,12
127:2,3,21 133:11 144:16
168:2 179:9
**theme** 23:17,17,20
**themselves** 29:5 34:11 99:8
**theories** 35:8
**theory** 43:6
**they'd** 113:2
**thick** 68:16
**thing** 6:2,7 13:3 34:19 35:15
39:25 50:9 51:22 54:23 56:20
67:12 72:10 73:10 79:12 82:3
82:22 97:3,11 104:6 112:11
113:2 118:9 119:11 120:4
122:2 124:4,23 128:19 134:22
135:8,12 157:24 160:25
167:12 178:12 181:21
**things** 9:19 46:17 64:15,16
66:21 76:1,5,19 78:2 80:20
81:15 86:17 111:24 130:9
133:1 137:25 139:3 143:11
144:1 145:22 167:10
**think** 5:7 7:7,19 15:9 18:14 20:2
23:2,4,20,2 1 30:18,18,19,22
35:12,15 37:25 38:12 39:4,8,9
41:4,14,16 47:10,1 1 48:2 50:8
51:10,18 55:18 60:8 65:11,14
69:3,13 70:6,9 74:5 81:11
86:17,17 90:20 93:10 94:22
97:21 101:21,22 102:3,4
103:17 104:16 105:5 111:17
112:12 116:25 120:11,11,17
123:25 126:20 128:6 129:7,11
132:14 136:18 137:2,11,25
138:13 157:3 159:6,6 162:25
167:11 168:20 169:15 172:9
177:4 178:1,1,18 179:4,11
180:13,23 181:22,21
**thinking** 35:17 73:5 87:14
124:25
**thinks** 108:18 115:23
**third** 45:23 72:3 80:24 105:12
154:25 161:19
**though** 4:22 25:5 53:12 64:15
72:10 73:4 79:7 134:13
137:10 141:1 167:22 178:18
**thought** 68:25 73:3 81:12,24
83:19 84:12,14 92:1 159:17
162:12 174:1 177:6
**thousand** 51:15 57:18 124:16
130:2 134:14
**threatening** 48:25
**three** 5:9 30:25 31:25 32:23 40:4
45:17 46:22 48:15 54:10,23
58:22 59:11 71:16 73:20
116:14,21 132:20,21,25 133:1
133:3 149:4 151:24 156:2
158:13,17 159:8,9,15 163:23
166:19 179:15
**through** 26:13 29:25 35:2 40:15
54:16 56:5 61:9,11 64:5 71:11
75:4 80:22,23 89:3 94:23
95:20 99:25 100:4 104:7
110:23 118:14 119:10,12,17
119:23,23 120:4,9 125:25
145:25 146:8,8,9,9,12,12,15
146:19 148:13 155:9,10,10,10
156:15 160:3 162:2 163:6
169:18,19 170:1 175:5,13
178:5
**throughout** 24:24 50:23 79:13
89:2 90:13 105:13 123:17
142:2
**throw** 120:6 138:23

**throwing** 115:7
**ticket** 51:15
**ticking** 79:7
**till** 4:6 104:9 114:16 169:8
**time** 5:1,1 6:8,10 12:21 14:3
16:11 18:18 19:25 20:3 22:8
35:17 50:8 55:10,10,11 58:4
63:19 74:6 78:14,16 79:6
94:24 105:24 110:7,8 116:9
116:10 117:11 122:18 123:4
125:4 128:20 134:14 137:1,11
137:11 138:6 143:18 152:3
179:1,7,12,16
**times** 89:24 123:19
**timing** 179:2,5
**Tjoflat** 20:21
**today** 13:18 24:18 26:16 39:7
42:24 54:18 58:22 82:11
84:15 85:2 104:6,8 113:4,5
115:18 118:2 140:4 169:7,12
180:10
**together** 42:16 46:1 64:24 130:5
151:8 168:5 169:6 176:18
**told** 15:7 16:15,24,24 17:3,20
37:8 41:1,5,18 43:2,6 46:3
47:1 48:9,16 49:15 52:25 57:3
62:3,4,8 63:1,3,5,17 65:21
66:12 67:3 68:11,18,18 71:4
76:8,14 77:19 79:18 81:4,24
82:12 83:14,22,22 84:23 92:7
92:20 98:20,22 100:24 104:22
106:25 107:14 109:1,19
117:17,17,21 120:21 121:16
126:9 130:4,16 133:24,24
134:3,5,12,12 137:13 142:3
**tomorrow** 136:25 137:9 138:5,7
139:5 140:3,7,9,14,1 5 153:22
157:3 159:19 166:21 167:9
168:3,4,9 169:7 176:19
178:11,25 180:10 182:1
**tone** 129:9
**tonight** 178:11
**toothless** 73:13
**top** 54:11 64:19 65:16
**topic** 11:18 25:14
**Torniqua** 91:1,16
**tortures** 131:20
**total** 39:18 170:11
**touch** 91:5 178:9
**towards** 137:20
**traditionally** 154:3
**trailer** 111:21
**training** 51:13,13,21,2 3 52:8,9
72:17 73:5
**transaction** 23:10 52:16 146:18
152:5 161:15,24 162:4,16
**transactions** 75:16 161:9,13
**transcript** 181:22
**transcription** 182:12
**transcripts** 180:22
**transfer** 155:14 163:9
**treatment** 98:18 144:21
**tremendous** 36:16 58:24
**trial** 1:9 19:21 21:6 28:13,21
38:20 39:17 42:7 48:3,16
50:24 62:24 63:3 65:4 75:1,2
75:25 86:16 89:3 98:16 107:2
110:13 113:6,23 114:1,5
122:3 124:22 138:2 142:3,5
143:20 145:3 167:2 175:9
178:19 182:8
**trials** 27:14
**Tricare** 24:12 25:8 27:7 29:1,2
29:16 30:11,11 32:19 34:3,4,7
34:18 43:8 44:7,11,12,20 45:7
45:13,15,25 46:4,16,25 47:16
47:25 49:4,7 50:17 51:1,14
53:2 59:13,15,20,2 0 60:14,24
61:1,10 64:13,14 67:9 70:20

72:1,19,21 77:4,6 82:16,17,18
85:10 93:22 95:16 112:13,15
112:16,16 113:4,8,9,10,15
116:7 119:2,3,6 126:6,7
128:24 130:7 133:18 134:17
134:19,19,20 146:11 154:16
154:24 155:7 156:17
tried 50:6 87:20 98:2 161:12
trouble 95:12
true 12:5 28:24 32:5 34:21 53:21
55:24 85:4 116:18,23 124:5
124:12,16,1 7 142:20
truly 34:23
trusted 70:2 99:2
truth 67:22 76:2,3 83:16 86:15
86:17 87:7 125:1 128:13
143:4,6,25 150:7
truthful 144:24
try 87:19 89:17 123:12 126:24
137:7 147:18 151:18
trying 10:11 35:4 78:11 95:16
97:17 128:12 133:21
tub 30:16
tube 62:12
turn 31:2 43:10 50:16 72:7
122:22
turned 70:21 106:16,17 108:5
tweaking 64:12,13
two 5:9,10,11 9:19 19:20 38:6
41:19 48:15,20 50:4 54:4
57:19 58:22 59:11 62:15 64:5
64:24 66:10 68:5 69:19 71:3
73:20 76:23 79:5 82:12 83:4,6
84:17 85:18 87:1 96:15 98:24
103:18,19,21 112:2 114:24
116:25 127:5 134:24 137:4
147:4,17,20 149:2 151:18,22
153:8 155:23 166:20 168:6,18
169:5 170:9,11
two-thirds 60:21
type 93:23 165:24
types 129:2
typically 35:1,2 68:5
typo 131:3,4

U

ultimately 62:21 67:1 113:1
165:18
unacceptable 107:10
unanimous 159:3,4
unanimously 22:6 154:6 157:8
158:10,16 159:15
uncharged 30:8 75:8
under 4:7 35:10 76:15 97:20,22
148:18 149:12,15 154:15,23
155:6 156:3,12 162:6 163:24
166:4 182:7
undercover 86:21
underlying 23:10
underscores 51:12
understand 6:18,22 8:13 23:18
74:1 95:18 124:21 143:12
understanding 22:9,10 73:11,12
148:1 152:18
understood 6:13,13 64:23 177:5
unduly 145:8
unfortunately 169:22
uniformed 78:21
unimportant 144:6
United 1:1,4,10,14,1 5 2:5 20:18
21:10 22:16 31:7,21 37:11
43:2 156:17 157:7,11 161:24
182:15
unlawful 36:4 118:24 119:21
146:21 147:5,11,18,20,23
148:1 151:13,19,22 152:12,15
152:18 154:12,19 155:2 161:6
161:15,19 162:3,5,8
Unless 7:6

unlike 87:22,22
unsanitary 175:12
unsophisticated 74:5
until 36:11 67:11 105:22 109:12
180:24 181:8
untrue 150:6
unusual 16:8 127:25
unwilling 48:20
updated 111:5
upheld 22:1
uploaded 125:5
upset 108:17
up-and-up 90:6
up-front 55:22
use 51:1,25 55:9 61:17 74:5
61:18 89:12 126:4,5,17
135:10 139:10,24 142:8 145:5
150:12 173:9,12,12 181:3,4,5
181:11
used 47:2 59:18 63:17 67:17
74:18 88:12,14,15,17,22
90:14 92:18 93:11 101:25
102:2 103:1 121:14
uses 135:19,20
using 123:21 150:3 161:6
usually 150:18 179:18
U.S 103:22 182:15

V

vacate 31:25
validate 16:9
value 46:16 161:23
Vaseline 62:18
venture 130:11 165:18
verbal 111:8
verdict 22:3 35:19 36:1,20 39:9
39:24 40:10 78:23 103:8,23
104:10 122:8,9,14,16,19
136:24 137:2 138:4 140:13
141:2 145:17 153:16,22,25
154:9 157:4,5,8 160:3 162:18
166:25 167:10,18 177:14
179:3,6,14
version 145:21
versus 8:21 11:18 20:18 32:18
43:3 59:23 157:7
very 27:12 40:13 41:2 42:15,15
42:18 80:17 81:3 82:22 93:18
96:21 104:22 106:1 113:16
114:3 117:16 128:11,11
140:11 181:2
veterans 117:21
vials 113:21,21,23
video 6:24 87:10 119:7
videotape 92:22 107:15 110:18
videotapes 111:23
view 10:8
viewed 152:6
violated 75:14
violates 132:18
violating 69:23 155:11 163:7
165:9
violation 22:19 33:24 154:10,18
155:1 161:17,21 162:9
violence 125:10
virtually 94:18
visit 74:11
visiting 20:22
vitamin 32:12 46:23 54:9 58:14
133:2
vitamins 46:7,8 58:15,17 82:25
voice 129:9
voir 181:5
voluntarily 47:5 85:20,23 165:1
165:4
Von 62:14 71:24 80:25
vs 1:6

W

wait 4:17 5:1,2,19,21 7:17 36:11
36:19 105:19,21,22 140:9
169:8 180:24 181:8,22
waiting 4:19 105:20,20
waiving 33:3,4
Walker 3:4 7:13,16 8:6 12:3
13:3 17:13 19:12,16 84:15,16
86:9 115:18,19,21 133:22,24
134:6,23,23 135:2
walking 68:19
wandering 20:7
want 4:8,11 5:4 8:11,13 10:6,21
18:8 20:1 33:7 34:13 36:11
38:4,24,25 40:16 42:23 43:14
43:20 58:10,11,11 65:22,23
67:6 68:8 69:4 75:18 76:25
79:6,14 80:13,14 83:18 82:22
87:10,11,13,14,14,15,15,16
92:25 93:19,24 94:3,5,6,15
98:8,12,25 102:23,24 105:17
106:15 109:2 112:12,19,20
117:20,24 118:6 121:7,12
122:18 123:15,21 124:23
128:6,13 129:6 130:13 132:10
132:16,17 133:6,13,15,15
136:19 137:3 139:8,10 167:12
167:17,23 168:7,7 169:11,23
176:17 177:17,18 178:3,21
179:1,10,12 180:9 181:8
182:7
wanted 17:20 18:4 39:6 40:11
55:23 61:25 62:6 78:3 87:2
89:22 111:24 120:21 121:9
126:19 128:2 134:6 139:19
176:23
wanting 98:5
wants 50:25 51:24 55:20 58:5
69:9,11 73:3,11 76:8 84:7
88:5 89:12,12 90:17 94:13
101:6 110:7 115:3 116:16
117:15 131:9
warm 70:12
warning 122:24
Washington 54:5
wasn't 27:20 51:13 53:13,16
55:1 59:9 69:2 81:17 85:13
86:8 96:21 101:13 107:1
114:6 120:16 178:19
waste 123:4 179:12
way 10:8 17:9 18:4 28:20 29:13
35:19 41:22 52:4 53:4 58:24
66:11 71:17,18 72:3,25 74:9
74:10 81:2 89:19,21 95:10
97:15 98:9 100:17 107:12
108:2 110:8 114:12 116:6
119:6 120:12,14,22 121:10
123:23,23 124:21 127:20
134:3 136:25 138:8 140:6,19
144:9 147:17 148:8 151:18
152:25 158:1 160:8 167:6
168:21,24 169:14 177:8,17
178:8,16 179:19
ways 50:19,20 71:16 79:12
weaker 29:18
wealthy 63:15
Weaver's 137:22
week 23:1 37:8 39:7 42:6,7,16
42:21,25 43:11 47:1 49:23
53:7,24 56:2,24 58:1 59:22
68:1 69:14,24 78:16 79:18
84:23 86:18,23,24 103:3
112:6 114:16 120:22 121:17
123:9 159:16 160:23
weeks 68:5 70:17 86:23,23
weight 10:14 142:17 145:9
welcome 136:21 139:8 179:12
well 4:21 18:9 21:13 22:3 23:13
23:21 25:14 26:20 27:8 32:3
33:21,22 35:4,12 38:6,11 39:6

39:11 50:3 67:6 68:23 70:6
72:9 77:8 80:21 81:22 83:1
91:14 92:1 94:11 99:11 106:1
106:22 112:4 123:3 125:5
128:7,7 129:22 131:2,3,4,11
132:20 153:2 159:5 166:20
171:22 173:1 180:17,20
went 82:15 85:8 107:14 111:3
128:6 169:18 172:16
were 4:1,4,5 5:3 8:7 10:24 14:14
15:7 16:2,5,10,11,2 4 17:3,13
17:20 18:9,19 19:2 20:25
23:10,23,23 25:12,13 27:11
28:4,15,20 29:11,12 30:12
32:25 34:11,20,21,25 35:25
38:7 42:23 44:16 45:24 46:19
46:19,24 47:3,20 48:11,20,23
49:10,12 50:17 51:11 52:12
53:1,19 54:10,24 55:1,25 56:2
56:2,17,19,19,20,2 0 57:14
58:8 60:12,19 62:21 63:2,15
63:16,23 65:3,5 66:24 68:5
69:1,10,14,20 70:16 75:16
76:9,19 77:17,17 80:21,25
81:3,3,24 82:20 84:2,5,6,6,6
84:12,14 85:3,14 86:9 88:19
89:11,18,19 90:17 91:24
102:18 103:3 104:16 106:7,14
107:20 108:20 109:9 110:5
112:13,15,23,23,24 4 113:18
116:25 117:8 118:3 125:15
130:5,5 131:17 134:2 138:13
138:13 147:9,10 152:9,10
155:18 161:15 163:14 168:19
169:20 170:17,20 171:12
172:18 175:8 180:6 181:25,25
weren't 29:6,7 49:9 50:22 51:24
53:12 112:17 117:9,10
we'll 5:1 20:6 41:14,14 55:19
67:12 80:23 81:21 102:7,13
104:11 105:5 106:3 115:4
116:4 136:13 139:4,11 169:4
176:20 177:24 179:16 181:24
182:1,2
we're 6:2 35:7 37:9 38:1,11
39:13 40:14,15 41:13 54:3
80:18 81:15 82:21 97:23
116:12,12 118:14 125:1
128:12 140:12 153:8,19
164:16,17,17 179:23 180:5
we've 7:19 42:15 44:23 59:11
64:7 94:19 124:18 169:9
177:20
whatsoever 94:24
whichever 177:17
while 5:2 22:18 33:22 93:9
144:23 165:6
white 49:3 59:5 124:15
whited 77:24 78:3
white-out 65:9 75:7 96:9 126:15
131:15,21,24 132:1
whiting 64:18,19 65:2,5 96:8
131:15,21,24 132:1
whole 6:7 73:21 79:10 110:4
111:21 112:8 140:23 142:24
145:22 154:15,22 155:6,16
156:3,12,16 163:12,24
wife 54:20 63:11,12 73:2,6,7
wife's 63:13
Wilkie 2:6 182:15
willful 47:4 166:17
willfully 45:6 47:5 64:8 72:14
77:23 79:23 80:6 85:23
118:23,25 119:13,14,16,22,25
120:5 122:11,12 145:20 146:1
146:4,10,13 147:1,21 148:2
148:15 149:6 151:23 152:19
153:11,13 154:11,19 155:2,20
163:16 165:3,8 166:9
willfulness 47:22 79:23

**willing** 59:14 60:12 80:11
141:16
**willingly** 77:25 78:3
**willingness** 61:3
**window** 51:17,25 70:13
**wire** 74:14,19 118:22 145:21
146:7,25 147:3,19 153:6,20
155:13 158:10 163:9
**wires** 74:18,22
**wish** 5:15 70:5,6 83:2 105:13
**witness** 9:20 10:17 15:5 17:9
19:17,18 24:18 30:14 61:18
76:1,2,4,8,8,1 7 80:17,19,19
80:24 81:9,10,14,2 1 82:1,8
83:2,6,7,8 85:1 86:25 88:23
88:23 94:5 98:17 110:24
112:2,11,25 117:14 131:23
138:24 142:22,23 143:1,3,5,7
143:9,10,12,14,17,18,20,21,22
143:24 144:2,10,18,20,23
145:1
**witnesses** 27:10,12,1 5 35:2 42:9
46:18 51:23 57:15 63:15,24
75:19,25 76:13 80:13,25 81:3
82:20 84:25 86:24 91:20
97:10 103:14,16,17,25 112:2
114:10 127:6 128:11 141:23
142:24 144:11,25 178:18
**wives** 52:3 73:9,16
**woman** 131:1
**women** 47:11 50:3 78:21
**wondered** 169:16
**Wonderful** 37:2
**word** 18:7 69:15 78:9 79:15,22
80:20 85:19,22 90:14 99:5,6
105:19 107:12,13 114:18
121:2 135:5,6,15,19 164:25
165:3
**words** 18:8 48:6 58:1,3,20 59:4
64:24 79:14 81:18,19 92:18
104:25 105:1,10 110:18
124:21 135:13,20 147:5
166:16
**work** 13:10 14:5 17:16 19:2,4
39:4 62:1 126:25
**worked** 47:2 51:20 55:14 58:10
62:1,16,17 69:10,17 72:5,16
76:11 82:10 112:3 126:23
134:9 136:7
**working** 46:1 53:16 58:12,12
67:21 79:9 82:25 88:4 90:6
96:11 104:9,16
**works** 52:17 70:8 114:12
**worried** 101:15
**worry** 80:15
**worse** 52:17
**wouldn't** 5:1 27:11 32:19 33:8
36:11 38:13 48:5,5 58:9,16
61:15 63:10 65:6 69:6 72:25
109:22 112:6,6 118:4 126:14
126:15,16 138:8
**wound** 98:1
**Wow** 95:15 100:5
**wrest** 127:20
**write** 50:12,14 58:3,16,16 81:24
82:25 89:6 90:7 91:16 92:3
93:13,20 94:12,13 119:4
124:13
**writes** 91:11 113:11
**writing** 35:22,22 41:6 58:21
73:18 126:19 128:25 136:13
159:19
**written** 123:10
**wrong** 66:25 81:11 82:5,7 86:9
92:10 104:19 112:14,24
115:14 120:17 131:19 137:14
**wrongfully** 47:15
**wrote** 46:12 58:15,23 59:8 81:23
89:1 137:6

**W-2** 9:25 10:1 11:18 13:19
15:17 16:12 17:21 68:10
70:17,19 84:1,2,14,19 86:8
114:19,19,21,2 5 115:22

**Y**

**Yankees** 124:14
**yeah** 9:18 21:7 25:2 37:7 43:17
60:7 96:8 117:19 138:18
168:23 169:3 171:18,23
**year** 16:20 88:7 124:16
**years** 21:9 30:25 35:18,18 51:18
51:19 85:9 98:20 106:18
116:6 124:16
**yesterday** 8:6 12:4 35:13 49:14
49:22,23 51:3 53:13 55:3 57:6
60:4 64:20 74:20 75:15 103:9
104:18 125:11 137:13
**Yoakum** 54:5,5
**young** 62:14

**Z**

**zero** 58:4 85:6

**$**

**$1,000** 108:22
**$1,680** 160:21
**$1,800** 160:19
**$1.25** 130:7
**$10,000** 50:18 69:20 75:16
110:15 146:20 161:23
**$110,000** 57:22
**$13,500** 91:16 97:21 131:6
**$150** 126:14
**$17** 48:21
**$17,000** 62:12
**$170,000** 60:13
**$2,000** 30:17 59:23
**$2.1** 68:3,5
**$200,000** 88:7
**$3** 132:15
**$43,100** 110:14
**$5,000** 46:18 112:5
**$5.8** 120:18
**$6** 60:25
**$6.3** 67:23
**$74,663** 159:25
**$85,946** 159:23

**1**

**1** 3:19 14:5 46:4,5 55:6 71:12
99:17 101:22 118:21 119:2,9
119:11 122:10 145:19 146:5
146:24 153:5,19 157:6,10
165:24
**1st** 56:15 57:5,7,13,18 129:24
**1,000** 100:15
**1:00** 41:19
**10** 61:18 91:1 119:23 136:14
146:8 155:9 159:21
**10,000-foot** 9:1
**10:08** 40:24
**100** 55:6 57:20
**102** 175:15
**104** 54:18
**105** 116:2 171:17 175:17
**106** 3:9
**108** 54:20
**1099** 9:2,3 11:18 13:19 15:14
17:18 84:19 86:8 97:12
114:25 115:22
**11** 97:25 98:11 106:2 133:9
159:23
**110** 58:19,20
**111** 171:19
**115** 54:2
**117** 54:21
**118** 175:19

**12** 3:6 4:16 41:13 61:18 91:12
159:6 179:14
**12:00** 41:14 179:13
**12:07** 102:15
**12:12** 106:5
**120** 175:21
**121** 171:21
**123** 3:10
**124** 101:9 107:18 108:1
**129** 94:3,7,7
**1291** 20:18
**13** 3:19 4:6,15 51:15
**13-3** 1:5 2:6 182:16
**13.5** 57:18
**130** 172:2
**132** 172:4
**14** 4:6 98:5 119:23 140:6 146:8
155:9
**141** 175:23
**142** 68:1 175:25
**145** 56:22
**15** 92:21,24 93:1
**153** 172:6
**154** 172:8,9
**155** 172:8,9,17 173:18,20,22,23
174:3
**16-20893-CR-MORENO** 1:3
**17** 119:23 138:14 146:8 155:10
174:24
**17-C** 170:19
**17-D** 70:19
**170** 132:22
**171** 99:12,15 176:2
**175** 176:4
**1750** 1:22 2:2
**176** 134:25
**18** 97:20,22 119:23 138:14 146:8
155:10 160:3,4,4,7,21 174:6
174:11
**182** 3:11
**19th** 116:10
**190** 57:6 125:13
**1957** 37:18

**2**

**2** 1:21 2:2 44:24 46:12 61:11,12
64:5 71:11,22 113:6 116:3
119:10,12,1 7 122:14 145:25
148:12 157:14
**2:30** 41:14
**2:45** 41:17
**2:55** 106:3
**20** 51:18 119:23 125:15 136:4
146:8 155:10 160:18
**20,000** 60:13
**20-some-odd** 86:24
**200** 176:6
**201** 176:8
**2014** 58:21 99:14 157:18 159:23
159:25
**2015** 6:4 19:5 66:19 68:2,7,16
70:18 90:21 91:12 93:4,24
96:25 97:1,3,4 98:5 99:17
100:14 108:2,4 109:6,21
110:12,12 113:12 160:19,21
**2016** 111:4
**2018** 1:7
**202-F** 176:10
**202-K** 110:15,16
**205** 55:24
**206** 55:25 108:4,8
**21st** 159:25
**210** 176:12
**216** 111:10
**219** 3:19 12:22 13:1
**22** 68:7 119:23 146:8 155:10
160:7
**23** 122:25 123:13 128:25 160:8
**23rd** 114:22 115:13

**24/7** 53:23 54:3 55:25 56:1
**240** 32:18
**25** 85:5 136:4
**26** 19:5 119:23 146:9 155:10
164:17
**28** 90:21 113:12 119:23 146:9
155:10 181:25
**29** 29:20 38:15 109:21 110:12,12
157:18
**29th** 129:15

**3**

**3** 44:25 46:15 108:4 157:20
160:3
**3rd** 108:18
**3:00** 41:20 102:8,13 105:17
**30** 1:7 35:18 93:16 95:18
**30-day** 46:8
**305-400-4261** 1:23
**305-400-4266** 2:3
**305-530-6168** 1:17
**305-961-9356** 1:17
**305.523.5118** 2:7 182:16
**31** 160:8
**31st** 109:8,9
**32** 35:18 160:12 170:23 174:19
**33** 103:4 113:11 119:24 146:9
155:10 160:12
**33128** 2:7 182:16
**33131** 1:22 2:3
**33132** 1:16
**34** 5:13 164:17
**35** 81:20 121:14
**36** 120:4 146:12 160:12,15,17
163:6
**360** 26:17 32:18,22 54:10,24
58:6,7,23
**37** 160:20
**38** 160:22 174:21,22
**39** 160:22

**4**

**4** 45:5 47:4 62:2 107:6 128:23
157:24
**4:00** 106:7,10
**40** 85:9 116:6 120:4 160:22
**400** 2:6 182:16
**41** 120:4 146:12 160:22 163:6
**42** 3:7
**43** 120:4 146:12 160:25 163:6
170:10
**44** 120:4 146:12 161:1 163:6
**45** 92:16 120:9 146:15 161:3
162:18
**4500** 60:21
**46** 161:3 162:20
**47** 161:3
**48** 161:4
**485** 20:18
**49** 120:9 146:15 161:4

**5**

**5** 62:14 90:16 157:24
**5th** 129:24
**5:00** 137:1
**5:03** 136:17
**5:08** 139:13
**5:30** 137:2,9
**5:33** 139:17
**5:40** 137:9
**50** 101:25 102:2 104:21 131:16
**53** 95:11
**56** 110:14
**59** 170:25

**6**

**6** 62:23 157:24
**6:23** 168:12

**6:30** 104:10
**6:45** 182:8
**60** 27:14
**600** 57:8,21
**61** 96:16
**62** 78:11
**64** 95:1
**66** 171:2,6
**67** 49:24 91:22

---

**7**

**7** 63:8 157:24 159:22 182:6
**7-Eleven** 92:23
**70** 27:14 171:4,7,8 174:24,24
   175:1,2
**700** 84:10 90:11
**72** 114:8
**760** 179:4
**78** 90:5
**79** 3:8

---

**8**

**8** 3:4,5 61:11 64:5 71:11 119:10
   119:12,17 145:25 148:13
   157:25
**8:30** 5:4
**80** 132:9
**81** 171:11
**82** 171:11
**83** 97:19,24 175:3
**84** 175:3
**866-780-8355** 1:23
**87** 175:5
**89** 175:5

---

**9**

**9** 4:6 71:13 99:17 119:18 146:3
   151:2 153:2,6,20 154:5,8,10
   154:17 158:5,12,15 159:4,14
   165:24
**9:00** 4:5 103:4 168:3
**9:13** 4:1
**9:18** 7:15
**9:35** 20:11
**90** 123:13
**91** 171:13,14
**93** 57:12,12 59:6,9
**94** 117:23 175:5
**95** 89:13 131:17 139:4 175:7
   179:1
**96** 171:15
**97** 57:12,13 59:6,9 89:13 175:13
**99** 1:16 89:13 175:13 179:3