UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 16-20893-Moreno

UNITED STATES OF AMERICA,
           Plaintiff,
vs.

MONTY RAY GROW,
           Defendant.
_____/

**DEFENDANT MONTY GROW'S SENTENCING MEMORANDUM**

COMES the Defendant, by and through Reizenstein and Sola, PA, Philip L. Reizenstein, Esq., and hereby files this sentencing memorandum on behalf of Monty Grow:

    I.    THE SENTENCING PACKAGE DOCTRINE DOES NOT APPLY

The United States wants this Court to re-impose a 260-month sentence, or a sentence as near to 260 months as can be achieved. The Government's request ignores the intent of Congress as to the maximum prison sentence a defendant can receive for health care fraud. Tthe wording of the remand of the Court of Appeals, as well as the law, common sense, and the concept of sentencing proportionality all mitigate against a sentence in excess of 120 months on Count One.

The government cites to the sentencing package doctrine in *United States v. Fowler*, 749 F.3d 1010 (11th Cir. 2014). The Eleventh Circuit opinion in *United States v. Grow*, 977 F.3d 1310, 1331 (11th Cir. 2020), explicitly particularizes that "we vacate Grow's twenty-year sentence for count one and remand for proceedings consistent with this opinion" – with no resentencing ordered on the remaining count. The sentencing package doctrine and *United States v. Fowler* do not apply to limited remands such as the one issued in the present case.

The Eleventh Circuit "has been explicit when it is vacating an *entire* original sentencing package as opposed to remand for resentencing on a single issue." *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996) ("Accordingly, we vacate [appellant's] sentence *in its*

1

*entirety* and remand this case to the district court with instructions *to fashion a new sentence* which is not inconsistent with this opinion…" (emphasis added)). *See also United States v. Joseph*, 569 Fed. Appx. 861, 864 (11th Cir. 2014)(Where on first appeal the Court "vacated only Joseph's Count 3 conviction and sentence…[the Court] did not vacate the entire sentencing package on direct appeal, but instead issued only a limited remand"); *Simmons v. United States*, 8:12-CR-219-T-27AEP, 2020 WL 3000705, at *4 (M.D. Fla. June 4, 2020)(where the district court found that it lacked jurisdiction to consider other counts based on the "limited remand" in which the Eleventh Circuit "vacate[d] the sentence on Count 24 and remand[ed] for proceedings consistent with [the] opinion."). As the above cases illustrate, for the sentencing package doctrine to apply, the appellate court would have had to vacate the entire sentence. That did not occur here.

The opinion in *Fowler* identifies the separate situation where entire sentences are vacated: "On direct appeal, we have routinely, without hesitation and as a matter of course, vacated entire sentences and remanded for resentencing on all surviving counts after vacating a conviction or sentence on some, but not all, of the counts." *Fowler*, 749 F.3d at 1016 (11th Cir. 2014).

The Eleventh Circuit in *Fowler* explained that courts expressly identify situations where the sentencing package doctrine requires that the entire sentence be vacated so that the entire sentence can be treated in consideration of all counts. In the Eleventh Circuit's opinion in the present case, there is no such "*Fowler*" specification that the entire sentence must be vacated after vacating the sentence for Count One. [1]

---

[1] There is some conflicting *dicta* in decisions in this circuit. See *United States v. Walker*, 768 Fed. Appx. 877, 880 (11th Cir. 2019):

> As a rule, we treat sentences on multiple counts as a single package. When a multi-count sentence incorporates an illegal sentence, the entire case should be remanded for resentencing If the district court viewed a defendant's sentence as a "package," with each component of the sentence dependent on the other, the district court "may" revisit the entire sentence in a multi-count case on remand,

The law traditionally recognizes that the same *actus reus* can result in varying treatment of the accused. A person can discharge a weapon killing someone. Florida law recognizes everything from the act being lawful – either an accident or self-defense – to third degree murder, manslaughter, second degree murder or premeditated first degree murder. The various punishments range from none if the act is lawful, to the death penalty for first degree murder. It is therefore entirely consistent for this Court to resentence Mr. Grow to a significantly lesser sentence because of the opinion resulting in the severity of Count One being reduced. It is inconsistent with the rule of lenity and due process of law to sentence Mr. Grow to the same sentence for what is now clearly a conviction on a lesser charge.

## II) THE 260 MONTH SENTENCE IS NOT PROPORTIONAL

18 U.S.C. §3553(a)(6) requires that a sentencing court consider the sentences of other defendants convicted of similar conduct. The sentence should be proportional to other sentences with similar conduct and there should not be a disparity between sentences for similar crimes with similar conduct.

At the outset, the sentence for Co-Defendant Ginger Lay was twenty-one months and three years of supervised release. [DE: 182]. There is no dispute that Ms. Lay was rewarded for her

---

even if only a single component of the sentence is defective. *United States v. Fowler*, 749 F.3d 1010, 1016-17 (11th Cir. 2014). However, it is in the interest of judicial economy for the district court "not to redo that which has been done correctly at the first" sentencing hearing. *United States v. Rogers*, 848 F.2d 166, 169 (11th Cir. 1988). Accordingly, we may commit decisions as to whether a resentencing hearing is necessary and the scope of such a hearing to the discretion of the district court.

3

cooperation.² But Monty Grow's sentence was more than ten times Ms. Lay's sentence for similar conduct. Ms. Lay's actions were an indispensable part of the conduct the jury and the Court considered. Shane Matthews, another codefendant received a three-month sentence. Mr. Grow's sentence was disproportionate to the sentences of his co-defendants, even accounting for role and assistance, under any type of analysis.

At the initial sentencing hearing, there was some discussion of other sentences other judges have issued for similar conduct in this district; however, the discussion appears to have been limited to the experiences of the individual lawyers and not an analysis of the actual sentences given throughout the United States and in the Southern District of Florida. Regardless, even under an anecdotal analysis, Mr. Grow's 260-month sentence exceeded the 240-month sentence of Philip Esformes, whose 1.3-billion-dollar healthcare fraud is often cited as the most extensive health care fraud case prosecuted in this district. [*United States v. Esformes*, Case No. 16-cr-20549 S.D.F.L (Scola, J.); DE:1459]. ³ Judge Scola was quoted as saying that Esformes' 1.3-billion-dollar fraud was "unmatched in our community, if not our country." ⁴

---

² *See United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (explaining that defendants who cooperate with the government and enter plea agreements are not similarly situated to defendants who do not assist the government and proceed to trial).

³ At the first sentencing hearing this Court noted that under a proportionality analysis "If you want me to consider other cases, I have to see how similar or dissimilar they are, and one of them would be how much money did you make...the amount of money makes a big difference that someone made." [DE: 240, pp. 65-66].

⁴ Jay Weaver, *Miami healthcare exec Esformes sentenced to 20 years in biggest Medicare fraud case*, Miami Herald (September 12, 2019), https://www.miamiherald.com/article234993252.html. The United States Department of Justice said this about Esformes:

> "For nearly two decades, Philip Esformes bankrolled his lavish lifestyle with taxpayer dollars, paying bribes with impunity and robbing Medicare and Medicaid by billing for services that people did not need or get," said Assistant Attorney General Brian A. Benczkowski. "It is a credit to the tenacity of our prosecutors and law enforcement partners that the man behind one of the biggest health care frauds in history will be spending 20 years in prison" said Deputy Special Agent in Charge

In another notorious case in this district, Judge Marra sentenced Dr. Salomon Melgen to 204 months in prison and $52,997,442.00 dollars in restitution, for a fraud loss amount of approximately 73 million dollars. Case No. 15-cr-80049 S.D.F.L (Marra, J); [DE:539]. This represented a variance from the guideline level of 38 that Judge Marra had determined. *Id*., [DE:486].

The United States Sentencing Commission's website[5] has an interactive data analyzer that allows the user to filter sentencing results by year, circuit, district, and crime. The following searches were run with the indicated filters:

| CRIME | YEAR | IMPRISONMENT DISTRIBUTION [6] |
|---|---|---|
| Fraud, Theft Embezzlement | 2019 | **SDFL:** Average Prison Sentence: 38 months; Median Prison Sentence: 30 months; 0-24 Months:42.6% 24-59 Months: 39.8% |

---

Denise M. Stemen of the FBI's Miami Field Office. "The illicit road Esformes took to satisfy his greediness led to millions in fraudulent health care claims, the largest amount ever charged by the Department of Justice."
Office of Public Affairs, *South Florida Health Care Facility Owner Sentenced to 20 Years in Prison for Role in Largest Health Care Fraud Scheme Ever Charged by The Department of Justice | OPA | Department of Justice*, The United States Department of Justice (September 12, 2019), https://www.justice.gov/opa/pr/south-florida-health-care-facility-owner-sentenced-20-years-prison-role-largest-health-care.
It is notable that the government sought restitution from Esformes in the amount of $207,474,897. [*Esformes,* Case No. 16-cr-20549; DE 1446].
[5] The United States Sentencing Commission is an independent agency within the judicial branch of the federal government…The Commission's other responsibilities include: (1) establishing a data collection, analysis, and research program to serve as a clearinghouse and information center for information on federal sentencing practices; (2) publishing data concerning the sentencing process; (3) collecting and disseminating information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in 18 U.S.C. § 3553(a); Interactive Data Analyzer - IDA Dashboards (ussc.gov).
[6] All data was obtained with the criminal history category I.

| | | |
|---|---|---|
| | | 60-119 Months: 14.5%<br>120+ Months: 3.1%<br><br>**Nationwide:**<br>Average Prison Sentence: 25 months;<br>Median Prison Sentence: 16 months;<br><br>0-24 Months: 63.7%<br>24-59 Months: 25.8%<br>60-119 Months: 8.4%<br>120+ Months: 2.1% |
| Fraud, Theft Embezzlement | 2018 | **SDFL:**<br>Average Prison sentence: 39 Months;<br>Median Prison Sentence: 30 Months;<br><br>0-24 Months:41.4%<br>24-59 Months: 41.7%<br>60-119 Months: 12.7%<br>120+ Months: 4.3%<br><br>**Nationwide:**<br>Average Prison Sentence: 27 months<br>Median Prison Sentence: 18 months<br><br>0-24 Months: 63.6%<br>24-59 Months: 24.6%<br>60-119 Months: 9.1%<br>120+ Months: 2.7% |
| Fraud, Theft Embezzlement | 2017 | **SDFL:**<br>Average Prison sentence: 35 Months;<br>Median Prison Sentence: 27 Months;<br><br>0-24 Months:44.6%<br>24-59 Months: 42.87% |

| | | | |
|---|---|---|---|
| | | | 60-119 Months: 8.6%<br>120+ Months:3.9 %<br><br>**Nationwide:**<br>Average Prison Sentence: 28 months<br>Median Prison Sentence: 18 months<br><br>0-24 Months: 61.3%<br>24-59 Months: 27.6%<br>60-119 Months: 8.1%<br>120+ Months: 3.1% |
| Money Laundering | 2019 | | **SDFL:**<br>Average Prison sentence: 44 Months;<br>Median Prison Sentence: 30 Months;<br><br>0-24 Months:40.0%<br>24-59 Months: 38.2%<br>60-119 Months: 14.5%<br>120+ Months:7.3 %<br><br>**Nationwide:**<br>Average Prison Sentence: 54 Months<br>Median Prison Sentence: 30 Months<br><br>0-24 Months: 44.4%<br>24-59 Months: 24.4%<br>60-119 Months: 18.9%<br>120+ Months: 12.4% |
| Money Laundering | 2018 | | **SDFL:**<br>Average Prison sentence: 45 Months;<br>Median Prison Sentence: 37 Months;<br><br>0-24 Months: 37.7%<br>24-59 Months: 31.1%<br>60-119 Months: 26.2%<br>120+ Months: 4.9 % |

7

| | | | |
|---|---|---|---|
| | | | **Nationwide:**<br>Average Prison Sentence: 54 Months<br>Median Prison Sentence: 36 Months<br><br>0-24 Months: 40.3%<br>24-59 Months: 28.0%<br>60-119 Months: 19.0%<br>120+ Months: 12.7% |
| Money Laundering | 2017 | | **SDFL :**<br>Average Prison sentence: 50 Months;<br>Median Prison Sentence: 37 Months;<br><br>0-24 Months:43.9%<br>24-59 Months: 24.4%<br>60-119 Months: 19.5%<br>120+ Months:12.2 %<br><br>**Nationwide:**<br>Average Prison Sentence: 55 Months<br>Median Prison Sentence: 36 Months<br><br>0-24 Months: 40.9%<br>24-59 Months: 28.1%<br>60-119 Months: 19.0%<br>120+ Months: 11.9% |

In *USA v. Maria Martins*, 13-CR-20546-Williams, a case with $20,700,000.00 in restitution ordered, the defendant, who pled guilty, was sentenced to 120 months. [DE: 38].[7] In *USA v. Julio Brunet*, 14-CR-20211-Ungaro, the defendant, upon a plea, was sentenced to 120 months and restitution of $18, 686,742. [DE:55].[8] Both SDFL cases were cited by the government

---

[7] This case was cited by the prosecution at the first sentencing hearing. [DE:240, p. 61].
[8] *Id.*

at sentencing and appear relevant in addressing the concerns of this Court about the amount of money a defendant received, when conducting a proportionality analysis. [DE: 240, pp. 65-66]; Fn4, *supra*.

Under the metrics of the fraud sentences and money laundering sentences, for the years 2017-2019, Monty Grow's sentence was in the top percentile of sentences issued. It is reasonable to assume that if there was a filter for sentences over 160 months (15 years) and 240 months (20 years) the percentiles would shrink even further.

### III) LOSS AMOUNT

At the first sentencing, the defense argued to this Court that the loss amount should be calculated based on the health care fraud and the guilty verdict in count five for seven thousand dollars. [DE:240, p. 23]. This is the only substantive count of health care fraud for which Mr. Grow was convicted. The defendant's loss argument is more persuasive now that Count One has been remanded for sentencing and the government has chosen to proceed on conspiracy to commit health care fraud alone.[9] There has been a change of circumstances with the decision of the Eleventh Circuit that now undermines this Court's original reasoning.

The Government argues that no other guideline calculations need to be done at this sentencing by virtue of the law of the case doctrine. *United States v. Escobar-Urrego*, 110 F.3d 1556 (11th Cir. 1997). The Government misapplies the law of the case doctrine. Because Count One was returned for sentencing on what the Government elected to be a reduced charge, any calculations by this Court as to Count One are subject to review. "On remand, the district court

---

[9] The Court responded to the argument by noting "Count 1 is conspiracy to commit health care fraud and wire fraud on everything." [DE:240, p. 26]. It is submitted that the Court's response is no longer operative based on the decision of the Court of Appeals on Count 1.

9

must permit the government to either consent to resentencing based on a maximum sentence of ten years on count one or elect to retry Grow on count one with a special verdict."
*United States v. Grow*, 977 F.3d at 1331.

The Eleventh circuit has clearly indicated that this court must decide a new sentence on only Count One, with the ***maximum*** sentence of ten years. The remand contemplates the sentence may well be less. Because the fundamental nature of Count One has changed, the remand for resentencing on Count One must have contemplated a *de novo* review, otherwise the Appellate Court would have simply instructed this Court to impose a ten-year sentence which did not occur. Therefore the facts underlying a lawful sentence on Count One must be determined. This is the common-sense approach taken by the Second Circuit in *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002): "But when a case is remanded for *de novo* resentencing, the defendant may raise in the district court and, if properly preserved there, on appeal to the court of appeals, issues that he or she had previously waived by failing to raise them."

At the first sentencing, the Court found that the loss in the case was "the gain to the defendant." [DE:240, p. 31]. The defendant objects to the Court applying the same calculation at the resentencing. *See* U.S.S.G. §2B1.1 ("(B) Gain**.--**The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). *See also United States v. Bracciale*, 374 F.3d 998, 1003–04 (11th Cir. 2004) ("While the 'loss to losing victim' approach is not required in every case, the district court should not abandon a loss calculation in favor of a gain amount where a reasonable estimate of the victims' loss based on existing information is feasible.").

The "gain" versus actual or intended loss issue is more egregious because of the pre-trial agreement that medical necessity was not an issue in the trial. There was testimony by a doctor

10

that the prescriptions he issued were legitimate. [DE:240, p, 25]. Therefore, there is a patent unfairness in using gain for determining the guidelines loss amount when all of the conduct was not illegal. If this Court adjusts the loss amount, there should be a corresponding adjustment on the enhancement of three points in paragraph 59 of the PSR pursuant to USSG § 2B1.1(b)(7)(A),(B)(ii) for a loss over seven million dollars to a government health care program.

IV) <u>MEDICAL ISSUES</u>

Monty Grow has a debilitative brain injury as a result of repeated blows to his head while playing football in high school, college, and the NFL.[10] This will shorten his life span and lessen the days he has left to be a loving father and productive person. Monty Grow has additional significant physical/medical issues beyond his brain injury. He will become more physically and mentally disabled as he ages. This means that, unlike many defendants who are released in their 60's or 70's, his quality of life will be severely diminished if he survives his prison sentence. The days he spends incarcerated on this case are the best days he will have physically and mentally. His ability to rebuild his life upon release will be non-existent because of how his disabilities will worsen with age. This is relevant to sentencing. *Rita v. United States*, 551 U.S. 338, 364–65 (2007) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines.").
*See also* U.S.S.G. 5H1.4:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart

---

[10] As discussed *infra*, there is a 99% chance Monty Grow suffers from chronic traumatic encephalopathy (CTE).

downward…

**Physical Disability:**

In March 2010, Monty Grow was evaluated by Dr. Michael Einbund, MD, a board-certified Orthopedic Surgeon. His reports are attached. [Exhibits 1 and 1A].

Dr. Einbund made the following diagnoses ten years ago:

| | | |
|---|---|---|
| Cephalgia | Headaches | This diagnosis corresponds with the diagnosis of Doctors Sinoff and Hain that Monty Grow saw for his condition. |
| Cervical Spine sprain with radicular pain | A pinched nerve in the neck causing pain and weakness radiating down arms, shoulders and fingers. | |
| Impingement syndrome Bilateral Shoulders | Dr. Einbund recommended acromioplasty for both shoulders. | Acromioplasty is a surgical procedure that involves shaving away part of the shoulder bone to relieve the impingement of the rotator cuff tendon that supports the shoulder joint. |
| Chronic sprain right wrist | | |
| Compression Fracture T-12 | A compression fracture is defined as a vertebral bone in the spine that has decreased at least 15 to 20% in height due to fracture. | The T12 vertebra is the twelfth thoracic vertebra in the spine of the human body. It is part of the spinal column, which supports the top of the human body. |
| Lumbosacral strain with radial pain | This is a condition secondary to the compression fracture. | The condition describes pain and weakness that radiates down the shoulders, arms, and hands. |
| Reconstructed Right Knee | Like many former athletes who played a violent sport, Monty Grow needs a knee replacement. | |
| Insomnia | This is a symptom of CTE. | |
| Depression | This is a symptom of CTE. | |

| Tinnitus | This is a condition of ringing in the ears. | This condition is addressed more fully by the doctors' reports. |

Dr. Einbund found Mr. Grow had a "whole person impairment rating of 38%." [Exhibit 1, p. 1].[11] Monty Grow had several significant medical issues in 2010 that have only gotten worse, including his need for a total knee replacement, the need for surgery to his hands and wrists, and the need for a surgical procedure for his shoulders

In 2011 Monty Grow sought help for an onset of nausea, dizziness, headaches, and sensitivities to light and noise. The reports of Drs. Stuart Sinoff, MD, and Timothy Hain, MD, are attached. [Exhibits 2 and 3]. The symptoms are very debilitating, were not resolved, and continue to this day. Two points should be of note: first, Monty Grow's desperation with the dizziness and nausea were such that in December 2011, as indicated in an e-mail to Dr. Sinoff regarding a discussion with Mr. Grow's then wife, Monty Grow was considering harming himself or suicide. [Exhibit 4]. Second, the triggers for the episodes of dizziness and nausea are bright, florescent lights and loud noises – two circumstances present in all prisons. As a result, Monty Grow spends his days on his bunk in a dark room if possible. In Mr. Grow's letter to the Court [Exhibit 5] he references those times when he was first struck with nausea and dizziness: "*I fell into a deep depression and was unemployed for over three years. I spent my days laying in a dark room trying to cope with the pain and battling the demons in my head that wanted me to end my life every day.*"

In *United States v. Charles*, 531 F.3d 637, 641 (8th Cir. 2008) the court stated:

---

[11] American Medical Association Guides to the Evaluation of Permanent Impairment, 5th Edition, on Page 603, defines "Whole Person Impairment" as the "percentages that estimate the impact of the impairment on the individual's overall ability to perform activities of daily living, excluding work." The AMA defines Impairment as "[A] significant deviation, loss, or loss of use of any body structure or body function in an individual with a health condition, disorder or disease."

> To determine if an extraordinary physical impairment exists, we ask three questions. First, is the particular defendant's physical condition such that he or she would find imprisonment more than the normal hardship? Second, would imprisonment subject him or her to more than the normal inconvenience or danger? Specifically, would imprisonment worsen his or her condition or does he or she require special care not provided by the [Bureau of Prisons]? Third, does the physical condition have any substantial present effect on the defendant's ability to function?

Other judges in this district have granted significant variances based on a defendant's medical condition. *United States v. Seecharan*, 523 Fed. Appx. 679, 680–81 (11th Cir. 2013) ("The [Southern District Court of Florida in 2:10–cr–14096–JEM–3] then found that Seecharan's medical condition did not justify a sentence of home confinement, but that a downward variance to 60 months [from a guideline of 108-135 months] imprisonment was appropriate." ).

The issue is not just whether Mr. Grow can receive "appropriate care" by the Bureau of Prisons, although he cannot, considering the condition has lasted for over ten years and has gone unresolved by numerous specialists in the field.[12] The issue is Mr. Grow's inability to resume any normal life once released from prison. Mr. Grow is only going to get worse as he ages and his health deteriorates. Mr. Grow will never have even the limited physical and mental functions he now has. His incarceration takes away from him the best days he has left.

---

[12] In 2014 Mr. Grow was diagnosed with "severe sleep apnea." [Exhibit 6]. This condition has gone untreated by the Bureau of Prisons, who has not provided Mr. Grow with a sleep apnea machine. The consequences of untreated sleep apnea include depression, hypertension, heart disease and a lessened life expectancy. See Sleep Apnea: Types, Common Causes, Risk Factors, Effects on Health (webmd.com).

**Chronic Traumatic Encephalopathy:**

It is most likely that the dizziness, nausea, and headaches Monty Grow suffers from is caused from Chronic Traumatic Encephalopathy (CTE) which was caused from being repeatedly being hit in the head during high school, college, and in the NFL.

CTE is a progressive degenerative disease of the brain found in people with a history of repetitive brain trauma (often athletes), including symptomatic concussions as well as asymptomatic sub-concussive hits to the head that do not cause symptoms.

The Boston University CTE Research Center is widely considered the leading center for research on CTE. After reaching out to the Center for help in understanding his disability, Mr. Grow agreed to donate his brain upon his death so the study of the brain damage caused by football could continue and others could be helped. As stated on the Center's website,

> [t]he repeated brain trauma triggers progressive degeneration of the brain tissue, including the build-up of an abnormal protein called tau. These changes in the brain can begin months, years, or even decades after the last brain trauma or end of active athletic involvement. The brain degeneration is associated with common symptoms of CTE including memory loss, confusion, impaired judgment, impulse control problems, aggression, depression, suicidality, parkinsonism, and eventually progressive dementia.

Boston University Research: CTE Center, Frequently Asked Questions about CTE | CTE Center (bu.edu).

CTE is "progressive" and "fatal". Alzheimer's Association, *Chronic Traumatic Encephalopathy (CTE)*, https://www.alz.org/alzheimers-dementia/what-is-dementia/related_conditions/chronic-traumatic-encephalopathy-(cte). CTE has four stages: The first stage is associated with headaches and difficulty in concentrating; In stage two individuals experience mood swings, depression, short term memory loss, and difficulty with their emotions;

In stage three the deficits that are seen worsen and in the fourth stage there are classic signs of dementia.[13]

Statistically, there is a 99% chance Monty Grow suffers from CTE. 110 out of 111 brains of former NFL players were found to have CTE.[14]

CTE may well explain the poor decision making associated with the facts of this case. This is not an excuse, but an explanation. More significantly, as argued in the previous section, the time Mr. Grow has left is precious. In *United States v. Gigante*, 989 F. Supp. 436, 439 (E.D.N.Y. 1998), the Honorable Judge Jack Weinstein sentenced Vincent Gigante, a notorious head of a mafia family,[15] and noted malingerer, to 120 months in prison, a departure from the guideline range of 262 to 327 months. The departure was based on the Court's recognition of Gigante's medical condition and reduced life expectancy pursuant to the U.S.S.G §§ 5H1.1 and 5H1.4. *Gigante*, 989 F. Supp. at 443.

The sentence Monty Grow serves in this case will disproportionately affect him more than the average 49-year-old defendant sentenced to prison. He has less time to live, and a poor quality of life to look forward to during his time in prison and after he is released. For example,

---

[13] Dan Robitzski, *Aaron Hernandez's CTE: 5 Facts About This Brain Disease,* Live Science (September 25, 2017), https://www.livescience.com/60515-aaron-hernandez-facts-about-cte.html. It is significant to note that since 2010 Monty Grow has suffered from depression, headaches, mood swings, poor decision making involving himself and his family, and has some evidence of suicidal ideations associated with despair over his conditions.

[14] Jesse Mez, MD, MS, et. al, *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, Journal of the American Medical Association (July 25, 2017), available at https://health.hawaii.gov/nt/files/2018/07/jama_Mez_2017_oi_170072.pdf .

[15] After noting Gigante's rise to power in the mafia, the court found at sentencing that "[f]or example, by a preponderance of the evidence the government has demonstrated that defendant was partly responsible for the 1980's murders of Philadelphia mafiosi—Anthony Caponigro, Fred Salerno, Johnny "Keys" Simone, Frank Sindone, Frank "Chickie" Narducci, and Rocco "Rocky" Marinucci. A criminal history category of II appropriately characterizes defendant's criminal past." *Gigante*, 989 F. Supp. at 441.

in 2010, Dr. Einbund found that Monty Grow had "quite bit of difficulty putting on his shoes and socks…getting in and out of a car, walking two blocks…rolling over in bed…dressing himself…using tools and appliances, tying his shoes…" [Exhibit 1, p. 13]. Mr. Grow's diminished mental and physical abilities are all factors that sentencing courts must consider. See *Pepper v. United States*, 562 U.S. 476, 487–88 (2011):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue… Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.

### V)   REMORSE AND REHABILITATION

The issue of remorse was raised at the first sentencing and discussed by this Court. The Court found that at the time of sentencing, which was approximately forty days removed from the trial, Monty Grow had "no remorse" and "no acceptance of responsibility" and "that's what makes him different from other defendants who are perhaps sentenced too leniently, including Ms. Lay." [DE: 240, p. 84].

It is understandable that as his life was shattered by the jury verdict, and the results of the close and hard-fought trial were still fresh, Monty Grow had not had the time to reflect on the actions that brought him before the Court. This is not an uncommon reaction to a guilty verdict in which it objectively appears was a difficult case for the jury to decide. Over three years in prison for Monty Grow has given him time to understand his conduct. While suffering physically, mostly incapacitated on his bunk, Monty Grow has had time to reflect. This is clear in his letter to the court: "*I would like to take this opportunity to apologize to the court and the government for the poor decisions I have made. I am here today to accept full responsibility for my actions*." [Exhibit 5] . Monty Grow contracted COVID-19 while in prison which made his "*brain fog*" even worse:

*"I've spent the last three years thinking about the poor decisions I made, the pain I have caused to the people who love me. I take full responsibility for my actions. I have learned from that and want to be a productive person."* [Exhibit 5].

In *Pepper v. United States,* 562 U.S. 476 (2011) the Supreme Court stated that evidence of rehabilitation and good post-arrest conduct is "clearly relevant to the selection of an appropriate sentence" and "provides the most up-to-date picture" of the defendant's history and characteristics. *Id.* at 491. This Court can and should consider the person Monty Grow has become while being incarcerated and his reflections on his conduct.

This Court undoubtedly saw the worst of Monty Grow. At the sentencing hearing the Court mentioned the twenty million dollars made over a few months. [DE:240, p. 78]. This fact is fairly unique in fraud cases, where schemes percolate for years. The facts of this case fit within the parameters of an individual who is ill and suffers from a brain disease that among other things makes his actions rash and impulsive. In other words, the small timeframe should be contrasted against all of Monty Grow's life. The bad balanced with the good; the need for deterrence balanced against the need for a sentence to be no longer than necessary to accomplish the goals set out by Congress.[16]

Respectfully Submitted,
S/*Philip L. Reizenstein*
Philip L. Reizenstein, Esq.
Florida Bar# 634026
2828 Coral Way Suite 540
Miami, FL, 33145
(305) 444-0755
Philreizenstein@protonmail.com

---

[16] As counsel has explained in motions to continue, he has not had the ability to confer with Monty Grow and have him review this memorandum. The memorandum is filed to comply with the Court deadlines, but counsel may move this Court for permission to file an amended memorandum or supplement the memorandum with additional evidence which at the moment cannot be obtained because Monty Grow is still in quarantine at FDC.