### IN THE DISTRICT COURT OF THE UNITED STATES
### FOR THE DISTRICT OF SOUTHERN FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | **Case No: 1:16-CR-20893-FAM-1** |
| Plaintiff, ) | |
| ) | MOTION TO MODIFY IMPOSED TERM |
| vs. ) | OF IMPRISONMENT AND GRANT |
| ) | COMPASSIONATE RELEASE |
| MONTY GROW, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

THE DEFENDANT, Monty Grow, by and through his undersigned counsel and pursuant to 18 U.S.C. §3582(c)(1)(A), respectfully moves this Court to modify the imposed term of imprisonment on the above referenced case entered by the Court on April 16, 2018 and amended on June 22, 2021. This request is based on an extraordinary and compelling reason related to Mr. Grow's medical circumstance. His condition requires long-term, specialized medical care not being provided by the Bureau of Prisons ("BOP"), and the failure to receive this care places him at risk of serious continued deterioration in health or death. This Motion is based upon the following:

1. Mr. Grow was convicted of violating 18 U.S.C. §1349, 18 U.S.C. §1347, 18 U.S.C. §371, 18 U.S.C. §1957, and 42 U.S.C. §1320-7b(b)(1)(a). He was initially sentenced to 262 months, however that sentence was corrected upon remand to 156 months imprisonment followed by three years of supervised release, a special assessment fee of One Thousand Seven Hundred ($1,700.00) Dollars, and restitution in the amount of Eighteen Million Eight Hundred Fifty-Six Thousand Seven Hundred Forty-Four ($18,856,744.00) Dollars.

1

2.  Mr. Grow has been incarcerated since his conviction on February 5, 2018 and is scheduled to be released from the BOP on April 13, 2028. He is a non-violent offender housed in FCI Coleman's minimum-security camp facility. He does not pose a danger to the safety of any other person or the community. To date, he has paid the full assessment ordered by the Court and approximately $2,147,000.00 in restitution. He has also forfeited an additional $2,.011,000.00 to the government.

3.  Mr. Grow suffers from Chronic Traumatic Encephalopathy ("CTE"). His symptoms began more than thirteen years ago, after a long high school, college, and professional football career where he sustained repeated blows to the head. He awakened from sleep one day feeling extremely dizzy with a bout of vomiting. Over the next few weeks, the dizziness and nausea continued, and he noticed he was unusually sensitive to light and loud sounds (photophobia and phonophobia). Sleeping became difficult. As time continued, Mr. Grow's symptoms varied and included memory problems, tinnitus (ringing in his ears), migraines, and irritability. He soon began experiencing "brain fog," balance issues, and visual disturbance.[1] After seeking medical attention and receiving numerous consultations, clinicians concurred in finding it was CTE which was causing his myriad symptoms.

4.  Due to the severity and degenerative nature of his disease, Mr. Grow has experienced a worsening of symptoms over time including extreme sensitivity to bright light, sensitivity to loud noises, sleeplessness, blurred vision (not corrected

---

[1] Dr. Mark Mills noted in a recent evaluation that while over time Mr. Grow's symptoms have tended to wax and wane, the overall picture has been one of increasing symptoms, or more broadly, one of clinical decline. Dr. Mills report is submitted as an attachment to this motion as Exhibit 1.

by corrective lenses), loss of balance, extreme fatigue, "brain fog," impaired memory, difficulty concentrating, dizziness, headaches, difficulty problem solving, poor impulse control, tinnitus, anxiety, panic, and depression. He has been diagnosed by the BOP with disorder of the brain, hypertension, sleep apnea, sleep disorder, anxiety disorder, and major depressive disorder. His overall condition has not been properly addressed at the BOP. Mr. Grow has received no specialized therapy to address his symptoms or stop disease progression, and the symptoms are made worse by prison conditions.

5. Treatment to slow the progression of CTE is very limited and requires long-term specialized care. Mr. Grow is approved to receive this specialized treatment free of charge through the NFL Trust at Cleveland Clinic in Weston, Florida.[2] He cannot participate in this program while incarcerated, and the BOP has repeatedly refused to provide a recommended assessment by a neurologist. Without this treatment, Mr. Grow is at increased risk of worsening symptoms, serious deterioration in cognitive abilities, and decline in his overall ability to function.

6. Mr. Grow has a verified re-entry plan and would reside with his mother in Florida. His mother and brother have been instrumental in identifying treatment options through the NFL Trust at the Cleveland Clinic and would assist him as needed. Mr. Grow would be able to work remotely for his brother's property management business from home where he can control the environmental stressors and triggers

---

2 Email correspondence from the Cleveland Clinic outlining the proposed Brain and Body Assessment, available treatment, and evaluation process is submitted as an attachment to this motion as Exhibit 2.

that exacerbate his symptoms. This would enable him to continue paying the remaining restitution he owes.

7. Based upon the foregoing and considering his condition, Mr. Grow submitted a Reduction in Sentence Application to the Warden at FCI Coleman on December 2, 2023. He requested a transfer to home confinement or, in the alternative, a Reduction in Sentence to the time he has served pursuant to 18 U.S.C. § 3582(c)(1)(A) and changes in the United States Sentencing Guidelines ("U.S.S.G.") which took effect on November 1, 2023. *See* U.S.S.G. §1B1.13(b)(1)(C). Mr. Grow's request was denied by the Warden on January 8, 2024.[3] He now seeks relief from this Court.

## BACKGROUND

Monty Grow is a 52-year-old former defensive back for the NFL Jacksonville Jaguars and Kansas City Chiefs. He is also a devoted father to his teenaged daughter. He suffers from CTE, a progressive degenerative disease of the brain, caused from repeated head trauma sustained while playing football.

Mr. Grow led a law-abiding life until he got a job in the healthcare industry and became engaged in a healthcare fraud scheme. He was ultimately sentenced to prison for thirteen years for violating 18 U.S.C. §§371, 1347, 1349 and 1957 and 42 U.S.C. §1320a-7b(b)(1)(A). Mr. Grow fully acknowledges he needed to atone for his misconduct. However, his prison sentence for a first-time offender who engaged in a non-violent crime was substantial. He has currently served

---

[3] Mr. Grow's request to the Warden and subsequent denial are submitted as an attachment to this motion as Exhibit 3.

over half of his time as calculated by the BOP.

While incarcerated, Mr. Grow has experienced a significant increase in medical symptoms associated with his CTE and a decline in his mental and physical health. The BOP does not offer and has not provided available therapies and medication which could delay the progression of his disease. The treatment needed to address his condition is not available in a prison setting, but it is available to him free of charge through the NFL Trust at a partner clinic in Florida if he were released. Mr. Grow respectfully requests a reduction in his prison sentence to time served so he may receive this specialized treatment needed to slow the progression of the CTE and treat his worsening symptoms.

**ARGUMENT**

The Court has both the jurisdiction and discretion to grant compassionate release and modify Mr. Grow's sentence to time served followed by a period of supervised release. Upon motion of the Director of the BOP or the defendant, the Court may reduce an inmate's term of imprisonment if it finds (1) extraordinary and compelling reasons warrant such a reduction; (2) the reduction is consistent with applicable policy statements issued by the United States Sentencing Commission ("U.S.S.C."); and (3) the applicable sentencing factors set forth in 18 U.S.C. §3553(a) warrant a reduction. *See* 18 U.S.C. §3582(c)(1)(a).

1. **Medical Circumstances of Defendant Is Extraordinary and Compelling Reason Warranting Compassionate Release**

On April 27, 2023, the U.S.S.C. published Amendments to the Sentencing Guidelines which included new guidance related to what constitutes an "extraordinary and compelling reason"

for compassionate relief. *See* U.S.S.G. §1B1.13.[4] The new guidance was intended to, among other things, extend the applicability of the policy statement to defendant-filed motions and expand the list of specified extraordinary and compelling reasons that can warrant sentence reductions.[5]

Specifically, the U.S.S.C. added two new subcategories to the "Medical Circumstances of the Defendant" ground for relief, one of which applies when the "petitioner is suffering from a medical condition that requires long-term specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. §1B1.13(b)(1)(C).

2. **Mr. Grow Suffers from a Medical Condition Requiring Long-Term Specialized Care Not Being Provided by the BOP and Without Which He Is at Risk of Serious Deterioration In Health or Death**

Mr. Grow meets the criteria for a reduction in sentence as established pursuant to statute and the recent U.S.S.G. amendments. He is precisely the kind of inmate the revised sentencing guidance was intended to protect. Mr. Grow's CTE can only be managed through highly specialized treatment and therapies. He is at an increased risk of mental and physical deterioration if his CTE symptoms are left untreated. Despite Mr. Grow's best efforts, it is simply not possible for an inmate with CTE to receive adequate treatment within the BOP or avoid the environmental triggers within the prison that exacerbate CTE symptoms and hasten physical and mental decline.

CTE is a neurodegenerative medical condition associated with significant mortality and

---

[4] The effective date of these amendments was November 1, 2023. *See* www.ussc.gov.
[5] *See* Amendments to Sentencing Guidelines, April 27, 2023, U.S.S.C., https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023.

morbidity.[6] Those suffering from the disease have a significantly higher risk of experiencing severe cognitive decline, changes in behavior, and increased motor problems. The disease slowly progresses to involve widespread regions of the brain and brainstem, with stages three and four of the disease marked by significant decrease in brain weight and increasing severity of cognitive abnormalities.[7] These cognitive abnormalities ultimately lead to an inability to feed, swallow, bathe, or clothe oneself. Patients with advanced CTE often require long-term skilled nursing care.

Highly specialized care is required to manage Mr. Grow's disease. Currently, recommended treatments include cognitive behavioral therapy, motor therapy, mood and behavior therapy, vestibular rehabilitative therapy, occupational-ocular therapy, memory impairment medications, dopamine agonists, stimulants, and specific antidepressants/antianxiety medications. Additionally, there are preclinical studies focused on the use of anti-inflammatory, immunotherapy, and targeted drug therapies to treat CTE.[8]

Mr. Grow can be treated outside of prison with these known and experimental therapies to slow the rapid progression of his degenerative brain disease. However, none of it is available through the BOP. Indeed, the BOP has failed to provide basic recommended medical evaluations during Mr. Grow's incarceration, let alone treatment or accommodation. In Mr. Grow's medical record, BOP physician Dr. Ivan Negron noted that Mr. Grow suffers from CTE symptoms due to repetitive head traumas and that his symptoms had actually increased while taking a certain medication prescribed by BOP and contraindicated for CTE patients.[9] Dr. Negron referred Mr.

---

6 *See Recent Preclinical Insights Into the Treatment of Chronic Traumatic Encephalopathy*, Frontiers, 2020, https://www.frontiersin.org/journals/neuroscience/articles/10.3389/fnins.2020.00616/full.
7 *See Chronic Traumatic Encephalopathy: Update on Current Clinical Diagnosis and Management*, Biomedicines 2021, 9, 415. https://doi.org/10.3390/biomedicines9040415.
8 Id.
9 A copy of Mr. Grow's relevant BOP medical record is available and can be submitted under seal as Exhibit 4.

Grow to a neurologist; however, the Regional BOP failed to approve the neurologist examination on two separate occasions when it was ordered. Although Mr. Grow has repeatedly requested treatment by a specialist and medication to address his condition, he has not received the necessary treatment while at the BOP.

Mr. Grow qualifies for specialized evaluation and treatment of CTE symptoms through the NFL Trust near his home at the Cleveland Clinic in Weston, Florida.[10] The NFL Trust provides physical and neurological assessments for ex-NFL athletes who are then given customized potential treatments to manage symptoms, get rid of cognitive effects, and help delay neurodegeneration for those who are suffering symptoms stemming from head trauma they experienced during their careers. This highly regarded program was designed to address the very specific population of CTE patients such as Mr. Grow. The only opportunity for Mr. Grow to benefit from this program is outside of prison walls. While he remains in prison, Mr. Grow will continue to decline without specialized evaluation, treatment, and therapy.

### 3. Applicable Sentencing Factors Warrant a Reduction

The sentencing factors to be considered by the Court when evaluating whether to grant compassionate release are outlined in 18 U.S.C. §3553(a) and include, but are not limited to:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

---

[10] For a detailed description of the NFL Trust and Cleveland Clinic partnership and treatment protocols see https://consultqd.clevelandclinic.org/trust-taking-multidisciplinary-approach-brain-health-former-nfl-players/ and https://www.cbsnews.com/news/cleveland-clinic-nflpa-the-trust-program-ex-nfl-players-brain-health/.

2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

5) Any pertinent policy statement;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Mr. Grow was a zero-point, first-time offender with no history of violence at the time of his sentencing. He was convicted of a financial crime and ultimately received a thirteen-year sentence which was harsher than any of his co-defendants.[11] Reducing Mr. Grow's sentence to time served would not create any sentencing disparities amongst his co-defendants.

---

11 The co-defendant who received the next highest sentence got twenty-one months, while the remaining co-defendants received minimal or probationary sentences.

Additionally, United States Sentencing Commission statistics show the average sentence for health care fraud offenders in FY 2020 was thirty months in prison.[12] A total of 79.1% of offenders received prison time. Of the 52.1% of health care fraud offenders sentenced under the U.S.S.G. manual, 47.9% received a variance (of which 98.7% were downward variances). Another 43.6% received a substantial assistance downward departure, and 10.5% received some other downward departure. Only 1.3% received an upward variance, which is intended to punish the most heinous of financial crimes. The crime of which Mr. Grow was convicted was wrong. However, it wasn't extraordinary enough to place him in the most egregious category of offenders. A reduction in sentence to time served would not create an unwarranted sentencing disparity based on available statistics.

Mr. Grow has now served half of his time with no major conduct issues and was ultimately moved to a minimum-security camp as a result. His service of six years in prison reflects the seriousness of the underlying offense and far exceeds the average prison sentence for health care fraud cases. Because of his medical condition and symptoms, life in prison has been akin to torture for Mr. Grow on most days. He has been adequately punished for his crime, especially given the difficult separation from his young daughter for a significant portion of her life.

Since his conviction, Mr. Grow has paid the entire ordered assessment and made significant payment toward his restitution and forfeiture obligations. If he were released, he would have a job working for his brother from his residence and could pay the remaining restitution quicker than he could if he remains incarcerated. This would also be the most effective way for Mr. Grow to

---

12 A copy of the U.S.S.C. Health Care Fraud Offenses FY20 summary is submitted as an attachment to this motion as Exhibit 5. More detailed information is also available at www.ussc.gov.

receive available treatment for his deteriorating condition. Mr. Grow is at minimum risk of reoffending if released.

## CONCLUSION

Based on the forgoing, Mr. Grows asks the Court to grant his motion to modify the imposed term of imprisonment to time served in the interest of justice and release Mr. Grow from his confinement at FCI Coleman. The release of a medically at-risk inmate with deteriorating health whom the BOP is not equipped to treat, is at minimum risk of reoffending, and does not pose a danger to the community is in the best interests of both the government and Mr. Grow. Mr. Grow requests the opportunity to be heard by the Court on this matter so that he may provide additional details related to his condition, prognosis, and possible treatment.

Respectfully submitted this the 21st day of March 2024.

/s/ Curran K. Porto
Curran K. Porto, Esq.
Florida Bar No. 039470
Curran K. Porto, P.A.
410 South Ware Boulevard, Suite 800
Tampa, Florida 33619
(813) 626-0088 - telephone
(813) 626-5252 – facsimile
Primary service email: curran@southernelderlaw.com
Secondary email: info@southernelderlaw.com
Co-counsel for Monty Grow

Cindy Crick (Admitted *Pro Hac Vice*)
SC Bar No.70233, Fed. ID No. 13076
cindy@cindycricklaw.com
Cindy Crick Law, LLC
416 E. North Street, Second Floor
Greenville, SC 29601
(864) 775-5788
Co-counsel for Monty Grow