UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 16-20893-CR-MORENO(s)

**UNITED STATES OF AMERICA,**

vs.

**MONTY RAY GROW,**

    **Defendant.**
_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files its Response in Opposition to Defendant's Motion to Modify Imposed Term of Imprisonment and Grant Compassionate Release [DE-436]. In his motion, Defendant requests that his sentence of 156 months imprisonment be reduced to "time served" based on his claim that he suffers from Chronic Traumatic Encephalopathy ("CTE"). He argues that his condition requires long-term, specialized medical care that BOP is not providing, and that without it he is at risk of serious deterioration in health or death. The government opposes the motion for two main reasons. First, Defendant's medical condition does not meet the standard for extraordinary and compelling reasons needed to justify compassionate release. And second, the 3553(a) factors weigh heavily against reducing his sentence to time served.

As explained in more detail below, it is uncertain whether Defendant actually has CTE. Rather, Defendant suffers from a constellation of symptoms including headaches, dizziness, depression, anxiety, and sensitivity to light and sound. Importantly, he does not suffer from any of the dementia-like symptoms related to advanced CTE like uncontrollable muscle movements,

1

trouble speaking, dysphagia (trouble swallowing), delusions, or serious self-harming thoughts or violent behaviors. He manages his daily affairs without any assistance. And the symptoms he does have are being treated by BOP medical staff using appropriate therapies. Defendant vaguely speculates about generalized treatments to mitigate some of his symptoms. But he has failed to identify any specific "long-term or specialized medical care" that BOP is failing to provide him that "without which [he] is at risk of serious deterioration in health or death." Without more than speculation, the Court should not grant the extraordinary remedy of compassionate release.

Additionally, the seriousness of Defendant's offense, the need to promote deterrence and respect for the law, and the need to avoid unwarranted sentence disparities undermines Defendant's demand for compassionate release at this time.

## I.   Pertinent Factual and Procedural Background

In February of 2018 a jury found Defendant guilty on multiple counts of health care fraud, conspiracy to commit health care fraud, receipt of health care kickbacks, conspiracy to receive health care kickbacks, and money laundering. *See* DE-215. The Court sentenced Defendant to 156-months imprisonment. *See* DE-368. To date, Defendant has served approximately 74 months of that imposed sentence. According to BOP, Defendant's projected release date is April 13, 2028. *See* https://www.bop.gov/mobile/find_inmate/byname.jsp# inmate_ results (last visited April 14, 2024).

Defendant is currently designated to FCI Coleman Low, where he lives at the adjacent minimum security satellite camp. As befits the camp setting, inmates are not locked in individual cells but live in a dormitory style housing with an open floor plan. Since June of 2023, Defendant has worked in the Coleman recreation department. Defendant requested and was recently granted

enrollment in BOP's Residential Drug Abuse Program ("RDAP"). RDAP is BOP's most intensive drug treatment program. Inmates participate in half-day programming and half-day work, school, or vocational activities. Successful complete of the RADP will further reduce Defendant's prison sentence. Because the Coleman satellite camp does not have an RDAP, however, Defendant is pending reassignment to a new BOP facility that does.

Upon his intake with BOP in February of 2018, Defendant received a comprehensive medical evaluation. *See* Govt. Ex. 1 (composite exhibit of Defendant's BOP medical records), pp. 1-17.[1] As relevant here, Defendant reported a history of chronic dizziness, and that he had been seen by multiple specialists, including a neurologist, but without any successful treatment for this condition. *Id.,* p.3. The Defendant also reported that he had a history of concussions and that he was prescribed Ambien for insomnia and depression. *Id.*, p.7-8. During his intake, BOP requested copies of Defendant's previous medical records but never received any. *Id*., pp. 18-20, 31. Throughout his first year in custody, Defendant's main complaints were for abdominal cramps and an infected finger, which required medical intervention. *See id*., pp. 21-24.

The medical records for 2019-2020 show that Defendant received a cholecystectomy at Jackson Hospital due to acute cholecystitis.[2] *See* Gov. Ex. 1, pp. 25-27. Defendant also

---

[1] The government obtained a complete set of Defendant's BOP medical records and provided a copy to defense counsel. Rather than submit all six years of records, the government will file under seal one composite exhibit with the pertinent records referred to in this memorandum.

[2] Cholecystitis is an inflammation of the gallbladder typically cause by an obstruction due to gallstones. A cholecystectomy is a surgical procedure to remove the gallbladder. The surgery is common and minimally invasive. *See* Cleveland Clinic website, available at https://my.clevelandclinic.org/health/procedures/21614-gallbladder-removal (last visited April 14, 2024).

experienced recurring knee pain and other minor ailments. In November of 2020, Defendant reported dizziness as part of a medical visit for his knee pain. *Id*., pp. 28-30.

In 2021, Defendant reported that he had "post concussion syndrome" and he complained of headaches and dizziness due to the bright lights of his cell. *See* Govt. Ex. 1, p.31. However, testing at that time revealed no evidence of photophobia. *Id.* Defendant reported that he had been prescribed unspecified medications prior to incarceration with limited success. *Id.* BOP staff prescribed Mirtazapine and Amitriptyline for Defendant's depression, anxiety, and headaches.[3] *Id*., p.32. In October of 2022, Defendant sustained a leg injury while playing tennis. *Id.,* p.34. The medical records also reveal that in December 2022 Defendant requested that his anxiety medication be changed to Buspirone due to the side effects of Mirtazapine, and BOP complied with Defendant's request.[4] *See id*., pp. 37-38.

In February 2023, Defendant again complained of anxiety, headaches, and dizziness when around loud noise and bright lights. *See* Govt. Ex. 1, p.39. Based on his history of sleep apnea Defendant was issued a CPAP machine.[5] *Id*.; *see also* p.43. Doctors also prescribed Propranolol

---

[3] Mirtazapine is an atypical antidepressant used primarily for the treatment of major depressive disorder. It also has off-label use for generalized anxiety disorder, social anxiety disorder, headaches, and migraines. *See* https://www.ncbi.nlm.nih.gov/books/NBK519059/#:~:text=Mirtazapine (last visited April 23, 2024). Amitriptyline is a tricyclic antidepressant that is FDA-approved to treat depression in adults. The drug is also used off-label to treat chronic pain syndrome, anxiety, and insomnia. *See* NIH, National Library of Medicine, available at https://www.ncbi.nlm.nih.gov/books/NBK537225/#:~:text=Amitriptyline (last visited April 14, 2024)

[4] "Buspirone treats anxiety. It works by balancing the levels of dopamine and serotonin in your brain, hormones that help regulate mood." *See* https://my.clevelandclinic.org/health/drugs/20084-buspirone-tablets (last visited April 20, 2024).

[5] A CPAP (continuous positive airway pressure) machine uses mild air pressure to keep breathing airways open during sleep. *See* https://www.nhlbi.nih.gov/health/cpap. (last visited April 20, 2014). The link between sleep apnea and cognitive and neurophysiological deficits is

to alleviate Defendant's headaches (*id*., p. 41), and over time increased the dosage from 20 mg to 80 mg daily.[6] *Id.*, p.60. In July 2023, Defendant was recommended for ophthalmology and neurology consultations to assess his symptoms. *Id.*, p. 46. The neurology consult was denied at that time pending the results of the ophthalmology exam. *Id.*, p.50. In August of 2023, BOP prescribed Lisinopril and Captopril for Defendant's emergent high blood pressure.[7] *See id*., p.49. In October 2023, following the ophthalmology consultation, Defendant was given a new prescription for eyeglasses with tinted lenses to help address his photophobia. *Id.*, p.51. In December of 2023, Defendant was again recommended for a neurological consultation (*id*., p.54), however, BOP's regional medical office deferred approval until a decision was made whether or not to conduct an MRI or CT scan prior to the neurology exam. Doctors also changed Defendant's Buspirone prescription to Duloxetine to accommodate Defendant's complaint about the side effects of Buspirone.[8] *Id.,* pp. 52-53.

---

well-established. "Patients with obstructive sleep apnea experience neuropsychological symptoms such as anxiety, attention deficits, cognitive impairment, depressive symptoms and other psychological disturbances" …. and they "demonstrate a decline in a wide spectrum of cognitive abilities, including memory, attention, psychomotor speed, executive, verbal and visual-spatial skills." *See* R. Bilyukov, et al., Cognitive Impairment and Affective Disorders in Patients with Obstructive Sleep Apnea, Frontiers of Psychiatry (2018).

    6    Propranolol is a beta-blocker used to prevent migraines and alleviate the symptoms of anxiety, among other things. *See* https://www.nhs.uk/medicines/propranolol/ (last visited April 20, 2024).

    7    Lisinopril and Captopril are approved by the FDA to manage hypertension in adults. *See* https://www.ncbi.nlm.nih.gov/books/NBK482230 (last reviewed April 20, 2024); https://www.ncbi.nlm.nih.gov/books/NBK535386 (last reviewed April 20, 2024).

    8    Duloxetine is a type of antidepressant medicine known as a serotonin-noradrenaline reuptake inhibitor (SNRI). SNRIs work by increasing the amount of mood-enhancing chemicals, serotonin and noradrenaline, in the brain. It is used to treat depression and anxiety. *See* NIH, National Library of Medicine, available at https://www.ncbi.nlm.nih.gov/books/NBK549806/ (last viewed April 14, 2024).

In February 2024, BOP doctors received approval to prescribe Defendant with a non-formulary medication, Keppra, which is an anti-seizure medication thought to be of value to those with traumatic brain injury. *See* Gov. Ex. 1, p.62. More recently, BOP's regional medical office approved a neurology consultation for Defendant.

Throughout all of Defendant's BOP medical history, there has never been a report that Defendant is suffering from tremors, trouble speaking or swallowing, delusions, confusion, suicidal ideation, or other serious dementia-like symptoms. He is consistently described as alert and oriented; his affect is generally pleasant and cooperative; and his thinking is appropriate and goal oriented. *See e.g.,* Govt. Ex. 1, pp. 40-41, 45, 49, 57, 59. Moreover, until May of 2023 Defendant worked driving a forklift. *Id*., p.44. While he stopped due to his dizziness, he more recently began working in the Colman recreation department. *See id*., p.63. And despite his medical issues, Defendant requested and was recently accepted into BOP's RDAP program. Defendant has never been unable to care for himself; nor has he required any assistance in his daily activities of living.

## II.   Legal Standards for Compassionate Release

"A district court has no inherent authority to modify a defendant's sentence and may do so only when authorized by a statute or rule." *United States v. Giron*, 15 F.4th 1343, 1345 (11th Cir. 2021). "A statutory exception exists for compassionate release," under 18 U.S.C. 3582(c)(1)(A). *Id*. Under this provision, a district court has discretion to grant a motion for compassionate release if three conditions are met: (1) "extraordinary and compelling reasons warrant such a reduction," (2) "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission," and (3) the "§ 3553(a) sentencing factors weigh in favor of a reduction." *Id.* (quoting

6

18 U.S.C. 3583(c)(1)(A)). It is an inmate's burden to show that he meets all the requirements for a reduction under § 3582(c). *See United States v. Mantack*, 833 F. App'x 819, 819– 20 (11th Cir. 2021) (citing *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)); *see also United States v. Alonge*, No. 21-13566, 2022 WL 1135533, at *1 (11th Cir. Apr. 18, 2022).[9]

As pertains to Defendant's motion, the Sentencing Commission recently amended the definition of "extraordinary and compelling reasons" to include circumstances where: "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." USSG §1B1.13(b)(1)(C) (Nov. 2023).

### A. Defendant Has Not Established Extraordinary and Compelling Reasons.

In his motion, Defendant states that "[he] suffers from Chronic Traumatic Encephalopathy." DE-436 ("Def. Mot.") at 2. He says that he began experiencing symptoms of CTE over 13 years ago and, after numerous medical consultations, multiple "clinicians concurred in finding it was CTE which was causing his myriad symptoms." *Id.* This diagnosis is dubious to say the least. It is unsupported by the medical literature and contradicted by the medical reports of many of his own doctors. The medical literature—including the paper Defendant himself cites in his motion—uniformly concludes that "CTE can only be diagnosed by postmortem neuropathologic examination of the brain tissue." *See Chronic Traumatic Encephalopathy: Update on Current Clinical Diagnosis and Management*, Biomedicines (Apr. 2021), available at

---

[9] Under the statute, a defendant is required to exhaust his administrative remedies prior to filing a compassionate release motion in the district court. As noted in his motion, Defendant made a request for compassionate release with BOP in December of 2023, and that request was denied in January of 2024.

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8069746/ (last visited April 21, 2024). Indeed, even the Cleveland Clinic—which Defendant also relies heavily upon—reports that "there's no way to diagnose this condition while a person is alive." *See* Cleveland Clinic's webpage on CTE ("Cleveland Clinic Web Page"), https://my.clevelandclinic.org/health/diseases/17686-chronic-traumatic-encephalopathy-cte (last visited April 21, 2024). Moreover, none of Defendant's treating doctors dating back to 2010, including those at BOP who have treated him for the last six years, have ever diagnosed Defendant with CTE.

The only support Defendant offers for his CTE diagnosis is the report of Dr. Mills (*see* DE 436, Ex. 1) who visited Defendant at Coleman in November of 2023. Dr. Mills admits he never reviewed any of Defendant's BOP medical records for the last six years. *See* DE-436, Ex. 1, p.3 n.4. And the report identifies no independent medical examination conducted by Dr. Mills. In fact, it appears that Dr. Mills primarily relied on his conversation with Defendant to reach his conclusions. Perhaps because of this, Dr. Mills erroneously writes that "multiple clinicians have concurred in finding that it is this diagnosis [CTE] which is causing his myriad symptoms." Critically, none of Defendant's medical records dating back to 2010 contain a diagnosis of CTE. *See* DE-338, Exs 1-4, and Ex 7 (Defendant's 2010-2013 medical reports). In fact, none of the records the government was provided by defense counsel even mention CTE, let alone diagnoses it, which begs the question of what Dr. Mills relied upon in order to "concur" with these other unnamed clinicians' alleged diagnosis of CTE.

Not only do Defendant's prior doctors <u>not</u> diagnose him with CTE, but their reports actually offer other alternatives to explain Defendant's symptoms. In addition, those reports demonstrate that many of Defendant's symptoms have existed since 2010. As one example,

8

according to a medical evaluation from 2010, Defendant's condition at that time included: (1) daily headaches, (2) occasional ringing in the ears, (3) difficulty in concentration, (4) neck, shoulder, wrist, finger, knee, and back pain, (5) difficulty sleeping, and (6) depression and anxiety. *See* DE 338-1, pp. 3-4 (Medical report of Dr. M. Einbund, 2/24/2010). As to possible causes for some of the symptoms, among other things, Dr. Einbund reported degeneration of the cervical spine at C5-6 and a compression fracture at T-12. *See id*. p.9-10.

As another example, in July of 2011 Defendant was seen by Dr. Hain regarding his dizziness and imbalance. *See* DE 338-4 (Medical report of Dr. T. Hain, 7/27/2011). This report noted his herniated disc at C5-C6 as a possible cause. *See id*., p.1. The report also noted that Defendant had a family history of migraines. *See id*., p.2. As such, Doctor Hain wrote a prescription for Effexor "on the thought that this may be a migraine variant." *Id*., p.1.[10] These records show that Defendant experienced many of his current symptoms for eight years before his incarceration. None of his doctors diagnosed him with CTE. And more importantly, none of them were able to provide treatments that eliminated or even reduced his symptoms.

Setting aside the dubious diagnosis, a more fundamental problem with Defendant's motion is that it is equally well-settled that at present "[t]here's no cure for CTE." Cleveland Clinic Web Page, *supra*. Even Dr. Mills writes that despite advances in treatment options "the overall clinical course [of CTE] has not yet been meaningfully ameliorated." DE-436, Ex, 1, p.4. Like Alzheimer's dementia, Dr. Mills admits, "some treatments address symptoms, but the course of the illness is

---

[10] Migraine symptoms are remarkably similar to those of Defendant: severe headache, mood changes, difficulty concentrating, trouble sleeping, fatigue, nausea, vision changes, sensitivity to light and sound, and dizziness, among others. *See* https://my.clevelandclinic.org/health/diseases/5005-migraine-headaches.

largely unchanged." *Id.* In more familiar terms: "CTE is a degenerative brain disease. That means it's progressive, and the symptoms will get worse over time. This can take years or even decades. Experts currently don't have a way to predict how long it may take to see the decline in brain function." Cleveland Clinic Web Page, *supra*. In other words, no treatments will stop the brain from degenerating. Nonetheless, despite the lack of any treatment to cure or stop the progression of CTE, or any way to predict the course of the disease, "[t]reatments for some of the symptoms are possible, and these vary depending on [the patient's] symptoms, medical history and more." *Id.* That is precisely what BOP is doing. BOP is trying to make an independent assessment and diagnosis of Defendant's condition while also taking steps to minimize the impact of his symptoms.

So far, as described above, BOP authorized and obtained an ophthalmology consultation for Defendant, which resulted in a new prescription for eyeglasses that are tinted to ease his sensitivity to light. BOP authorized and provided Defendant with a CPAP machine to address his sleep apnea. As noted above (*see* FN 5), sleep apnea can cause or contribute to many neurophysiological and cognitive issues similar to those Defendant is experiencing. Defendant also receives an array of medications to treat his headaches, high blood pressure, depression, and anxiety. BOP has periodically modified the dosages or changed the medications altogether as they search for the best options to treat Defendant's symptoms.[11] BOP also recently approved a non-

---

11  Dr. Mills quibbles with some of BOP's drug choices and/or the dosages, but without even reviewing the BOP medical records. For example, he claims that Defendant's Propranolol prescription should be increased from 40 mg daily, when in fact BOP doctors have prescribed 80 mg daily. Similarly, he questions the use of Buspirone due to its side effects, but BOP changed Defendant's Buspirone prescription to Duloxetine to accommodate the side effects Defendant was experiencing. Significantly, however, Dr. Mills offers no meaningful alternatives to what BOP is prescribing.

formulary drug thought to provide relief for those experiencing symptoms from traumatic brain injury. Additionally, BOP has authorized a neurology consultation for Defendant in an attempt to determine the cause or causes of Defendant's complaints and determine the best course of treatment going forward.

As the foregoing demonstrates, Defendant is wrong to state that he "has received no specialized therapy to address his symptoms." Def. Mot. at 3. Defendant notes that as a former NFL player he is "approved to receive specialized treatment free of charge through the NFL Trust at Cleveland Clinic in Weston, Florida." *Id.* In fact, however, Defendant is approved to receive a free *two-day assessment* from Cleveland Clinic. *See id*, Ex. 2 (email describing "the Brain Body Assessment at Cleveland Clinic," which "is a comprehensive 2-day visit"); *see also* NFL Trust website, available at https://playerstrust.com/services/brain-and-body ("Through an integrated and individually tailored assessment offered by premiere medical institutions, you obtain a thorough, in-depth evaluation of your overall health."). That evaluation assesses a wide range of health concerns for former football players including, among other things, cardiology, nutrition, orthopedics, and neurology. *See id.* As such, the Brain Body Assessment is not the sort of long term or specialized treatment that Defendant suggests. It is certainly no silver bullet for treating CTE. And beyond that, it is entirely speculative what treatments Cleveland Clinic might recommend that would differ from what BOP is currently doing or what BOP may recommend going forward after Defendant's neurology examination.

Defendant identifies a laundry list of *possible* therapies to treat some CTE symptoms. *See* Def. Mot. at 7. BOP is already employing some of these therapies (*e.g.,* dopamine agonists and antidepressants/antianxiety medications) and some do not appear particularly relevant at this time

based on Defendant's symptoms (*e.g.*, motor therapy or behavior therapy). Defendant also cites a medical journal discussing experimental treatments for CTE, *see id*. n.8, but the studies cited are preclinical and involve animal, not human, subjects. Therefore, Defendant is not being denied any experimental treatments. The bottom line is that Defendant has identified no specific long-term or specialized medical care that BOP is not providing him, and without which he risks serious deterioration in health or death. As such, he has not established extraordinary and compelling reasons for compassionate release.

> **B.     The 3553 Factors Weigh Against a Reduction at this Time.**

Reducing Defendant's sentence to time served based on his current medical condition would undermine the 3553(a) factors which justified his sentence in the first place. As the Court will recall, this was a very serious offense. Defendant defrauded Tricare—the U.S. military's health care benefit program—out of approximately $40 million. To execute the scheme, Defendant recruited hundreds of soldiers, veterans, and their family members to order expensive compounded drugs that they didn't need. Defendant paid many of these recruits a small kickback for soliciting others to participate, creating a pyramid of kickback payments with himself towering at the top. Defendant also paid bribes to doctors to induce them to write prescriptions for his recruits. And he sold the pharmacy inactive filler ingredients used to fraudulently inflate the reimbursement from Tricare. Defendant reaped 50% of the profits—roughly $20 million—from the scheme. This was not a routine health care fraud case, and Defendant was no bit player. His 156-month sentence accurately reflects the seriousness of the offense. Cutting that sentence to 74 months would trivialize the nature of his crime.

A reduction in sentence to time served would also undermine the twin goals of promoting

12

deterrence and respect for the law. Defendant has failed to accept any responsibility or show any remorse for his criminal conduct. Defendant perjured himself at trial. He later sought a commutation where he took no responsibility but instead distorted the true nature of his conduct, ignored or misrepresented much of the evidence of his guilt, blamed others for supposedly misleading him into criminal conduct, accused his co-conspirators of falsely condemning him, and he misquoted and mischaracterized the Court while accusing it of unfairness at trial and sentencing. *See* DE-342, Ex. 1 (Petition for Commutation of Sentence). Early release to time served under these circumstances would fail to promote respect for the law. Equally problematic, early release will undermine the vital deterrent effect needed in white collar cases generally and in health care fraud cases specifically. *See United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) ("[W]hen the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment.").

In support of his motion, Defendant argues that his 156-month sentence is disproportionally high compared to the sentences of similarly situated defendants. Defendant is wrong. Most of the charged co-conspirators in this case are not similarly situated to him for many reasons, including that: (1) they were only responsible for a small fraction of the loss amount attributable to Defendant, (2) they played no aggravating role like he did, (3) they pleaded guilty and accepted responsibility unlike him, and (4) most agreed to cooperate while Defendant took the witness stand and perjured himself. The Eleventh Circuit has consistently held that defendants who plead guilty and cooperate are not similarly situated to defendants who go to trial for purposes of such proportionality arguments. *See United States v. Docampo,* 573 F.3d 1091, 1101 (11th Cir. 2009)

("[D]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial.").

In any event, those most similarly situated to Defendant did receive sentences similar to his, and therefore granting Defendant a sentence of time served would be grossly unfair to them. Erik Santos, for example, received a 135-month sentence for his role recruiting Tricare patients for PCA pharmacy. *See United States v. Erik Santos, et al.*, Case No. 20-cr-60089-RKA, DE-36 (J&C). Santos caused fewer losses to Tricare and made less money than Defendant, but unlike Defendant he pled guilty and accepted responsibility. *See id.*, DE-15 (Factual Proffer). Steve Miller, another patient recruiter, also caused fewer losses to Tricare and made less money than Defendant. He pled guilty, accepted responsibility, and received a 97-month sentence. *See United States v. Jonah Steven Miller*, Case No. 19-cr-20230-CMA, DE-35 (J&C). Reducing Defendant's sentence to time served (or approximately 74 months) would result in a sentence substantially less than those who are most similarly situated to him but who pled guilty. That result would be manifestly unfair.

Defendant's citation to general statistical data on average health care fraud sentences is equally unavailing because the statistics merely reflect the *average* case. This case is not an average health care fraud case for several obvious reasons. The sentence in an average health care fraud case: (1) does not involve over $20 million dollars in actual fraud loss,[12] (2) does not involve a trial, (2) does not involve perjury by the defendant, and (4) does not involve sophisticated means,

---

[12] In the statistics cited by Defendant, the average fraud loss was $1.2 million. In this case, the actual loss attributed to Defendant was over 15 times higher than that.

14

recruitment of co-conspirators, or a Federal health care program enhancement. That Defendant's sentence is greater than the average sentence merely reflects the fact that his fraud scheme was far from average.

### III. Conclusion

For the foregoing reasons, the Court should deny Defendant's Motion for Compassionate Release (DE-436).

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   *s/Jon M. Juenger*
Jon M. Juenger
Assistant U.S. Attorney
Fla. Bar No. 56108
99 N.E. 4th Street, Fourth Floor
Miami, Florida 33132-2111
Tel: (305) 961-9450
Jon.Juenger@usdoj.gov

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 25, 2024, I electronically filed the Government's Response in Opposition to Defendant's Motion for Compassionate Release via CM/ECF.